IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>Winstar Communications, Inc., *et al.*,<br>Debtor. | Chapter 7<br><br>Bankr. Case No. 01-01430 (KJC) |
| Christine C. Shubert,<br>Chapter 7 Trustee,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>Lucent Technologies Inc.,<br><br>Defendant-Appellant. | Civil Action No. 06-147 (JJF)<br><br>Adv. Proc. No. 01-01063  (KJC) |

## LUCENT TECHNOLOGIES, INC.'S OPENING BRIEF

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (DE Bar No. 2732)
Paul N. Heath (DE Bar No. 3704)
Jason M. Madron (DE Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

CRAVATH, SWAINE & MOORE LLP
Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

WILMER CUTLER PICKERING HALE
  AND DORR LLP
Seth P. Waxman
Craig Goldblatt
Danielle Spinelli
Michelle Glassman Bock
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

- and -

Philip D. Anker
James H. Millar
399 Park Avenue
New York, NY  10022
(212) 230-8800

Dated:  May 1, 2006
            Wilmington, Delaware

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................... 2

STATEMENT OF THE BASIS FOR THIS COURT'S JURISDICTION ......................... 6

STATEMENT OF ISSUES PRESENTED ON APPEAL ................................................. 6

STANDARD OF REVIEW ................................................................................................. 7

NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 7

STATEMENT OF FACTS ................................................................................................. 8

    A.    The Parties Begin A Strategic Relationship Intended For Mutual
        Benefit .................................................................................................... 9

    B.    The Parties Execute The "Subcontract" And Thereafter Engage In
        "Pass-Through" Transactions To Finance The Build-Out Of
        Winstar's Network ................................................................................ 10

    C.    Winstar Assists Lucent In Meeting Revenue Targets; Lucent
        Provides Winstar Reciprocal Benefits ................................................. 13

    D.    At The Height Of The Telecom Boom, Winstar Obtains More
        Favorable Financing Terms .................................................................. 14

    E.    The Lucent And Winstar Relationship Further Deteriorates ............... 16

    F.    Winstar Enters Into A Strategic Relationship With Siemens; Siemens
        Funds Are Earmarked To Pay Lucent ................................................. 18

    G.    After December 7, 2000, Lucent Provides Winstar Additional Loans
        And Other New Value ........................................................................... 20

    H.    Lucent Refuses To Honor Winstar's March 2001 Request To Borrow ... 21

    I.    Winstar Files For Bankruptcy And Sues Lucent ................................. 21

ARGUMENT ..................................................................................................................... 22

    I.    THE PREFERENCE JUDGMENT MUST BE REVERSED ............................ 22

        A.    Lucent Was Not An Insider Of Winstar ............................................... 23

            1.    The bankruptcy court applied the wrong standard in
                concluding that Lucent was a "person in control" of
                Winstar, relying on allegedly improper transactions
                rather than requiring actual managerial control on
                December 7, 2000 .................................................................. 25

            2.    The bankruptcy court improperly relied on Lucent's
                contractual leverage and bargaining power to
                support its conclusion that Lucent "bullied" Winstar
                and exercised control ............................................................ 30

3.    The bankruptcy court's adverse inference drawn from former Lucent employees' invocation of their Fifth Amendment rights does not support its conclusion ................................................................................. 31

B.    The Payment To Lucent Was Not A Transfer Of Property Of Winstar Because It Came From Earmarked Funds .............................. 33

1.    Lucent did not waive the earmarking doctrine ..................... 34

2.    The parties agreed that the proceeds of the Siemens loan would be, and they in fact were, earmarked for Lucent ................................................................................. 36

C.    Lucent Is Entitled To A New Value Defense ................................. 40

1.    Lucent provided $28.6 million in new value in the form of equipment and related services ............................... 41

2.    Lucent provided Winstar with $62.3 million of new value drawn down under the Second Credit Agreement to pay for services ............................................ 42

II.    LUCENT DID NOT BREACH ANY OBLIGATION TO WIRELESS UNDER THE SUBCONTRACT ............................................................... 44

A.    The Bankruptcy Court Improperly Treated Lucent's Past Waivers Of The Subcontract's Task Order Requirement As An Agreement By The Parties To Modify The Subcontract Permanently ........................... 46

B.    Even Had The Parties' Conduct Otherwise Amounted To A Modification, That Modification Was Ineffective Under The "No Oral Modifications" Clause ..................................................................... 49

C.    Even If Lucent And Wireless Had Effectively Modified The Subcontract, There Is No Evidence Supporting The Conclusion That Such Modified Terms Were Breached ............................................... 53

III.    THE BANKRUPTCY COURT ERRED IN EQUITABLY SUBORDINATING LUCENT'S CLAIMS ................................................ 55

A.    The Equitable Subordination Claim Depends On The Erroneous Conclusion That Lucent Was An Insider Of Winstar ........................ 56

B.    The Bankruptcy Court's Equitable Subordination Remedy Was Not Tied To Any Injury That Lucent Allegedly Caused To Other Winstar Creditors ................................................................................................. 57

C.    The Bankruptcy Court Improperly Disregarded The Text Of The Bankruptcy Code In Subordinating Lucent's Claim On A Debt To The Interests Of Equity Holders ............................................................ 60

CONCLUSION ................................................................................................. 60

## TABLE OF AUTHORITIES

*ABC Elec. Servs., Inc. v. Rondout Elec., Inc. (In re ABC Elec. Servs., Inc.),*
   190 B.R. 672 (Bankr. M.D. Fla. 1995) ............................................. 28

*Adams v. Anderson (In re Superior Stamp & Coin Co.),*
   223 F.3d 1004 (9th Cir. 2000) ..................................................... 33

*Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs. Inc.),*
   29 B.R. 139 (Bankr. E.D.N.Y. 1983) ......................................... 56, 57

*Andrews v. United States,*
   441 F.3d 220 (4th Cir. 2006) ....................................................... 25

*Anostario v. Vicinanzo,*
   450 N.E.2d 215 (N.Y. 1983) ..................................................... 50, 51

*Badger Freightways, Inc. v. Continental Illinois Nat'l Bank
 and Trust Co. of Chicago (In re Badger Freightways, Inc.),*
   106 B.R. 971 (Bankr. N.D. Ill. 1989) ................................... 24, 27, 60

*Balaber-Strauss v. GTE Supply (In re Coin Phones, Inc.),*
   153 B.R. 135 (Bankr. S.D.N.Y. 1993) ......................................... 32-33

*Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC
 (In re Epic Capital Corp.),*
   290 B.R. 514 (Bankr. D. Del. 2003) .............................................. 56

*Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.),*
   393 F.2d 60 (2d Cir. 1968) .......................................................... 43

*Baxter v. Palmigiano,*
   425 U.S. 308 (1976) .................................................................... 31

*Beacon Terminal Corp. v. Chemprene, Inc.,*
   429 N.Y.S.2d 715 (App. Div. 1980) .............................................. 47

*Beard v. Braunstein,*
   914 F.2d 434 (3d Cir. 1990) ........................................................ 55

*Becker v. Faber,*
   19 N.E.2d 997 (N.Y. 1939) .......................................................... 47

*Benjamin v. Diamond (In re Mobile Steel Co.),*
   563 F.2d 692 (5th Cir. 1977) ....................................................... 56

*Browning Interests v. Allison (In re Holloway),*
   955 F.2d 1008 (5th Cir. 1992) ..................................................... 26

*Butler v. David Shaw, Inc.,*
   72 F.3d 437 (4th Cir. 1996) .................................................... 24, 25

RLF1-3009112-1

*Centennial & Allegheny Univ. Hosps.-East Tenet Healthsys. Phila., Inc. v. Nat'l Union of Hosp. & Health Care Employees (In re Allegheny Health, Educ. & Research Found.)*,
383 F.3d 169 (3d Cir. 2004) ........................................................................................ 7

*Century Glove v. Iselin (In re Century Glove, Inc.)*,
151 B.R. 327 (Bankr. D. Del. 1993) .......................................................................... 59

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
160 F.3d 982 (3d Cir. 1998) ...................................................................................... 58

*Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*,
432 F.3d 448 (3d Cir. 2006) ................................................................................. 57-58

*Estes v. N&D Props., Inc. (In re N&D Props., Inc.)*,
799 F.2d 726 (11th Cir. 1986) .................................................................................. 58

*Doe By & Through Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000) ................................................................................. 32

*Gillman v. Continental Airlines (In re Continental Airlines)*,
203 F.3d 203 (3d Cir. 2000) ....................................................................................... 7

*Granfinanceria, S.A. v. Nordberg*,
492 U.S. 33 (1989) .................................................................................................... 55

*Grossman v. Charmoy (In re Craig Systems Corp.)*,
244 B.R. 529 (Bankr. D. Mass. 2000) ...................................................................... 26

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ..................................................................................................... 25

*Herbert Const. Co. v. Greater N.Y. Savs. Bank (In re 455 CPW Assocs.)*,
No. 99-5068, 2000 WL 1340569 (2d. Cir. Sept. 14, 2000) ...................................... 26

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*,
286 B.R. 256 (Bankr. S.D.N.Y. 2002) .......................................................... 24, 25, 28

*Hunter v. Babcock (In re Babcock Dairy Co. of Ohio, Inc.)*,
70 B.R. 662 (Bankr. N.D. Ohio 1986) ............................................................... 25, 30

*Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp.
(In re Ice Cream Liquidation, Inc.)*,
320 B.R. 242 (Bankr. D. Conn. 2005) ...................................................................... 43

*In re After Six, Inc.*,
177 B.R. 219 (Bankr. E.D. Pa. 1995) ....................................................................... 56

*In re Earley*,
305 B.R. 837 (Bankr. N.D. Ill. 2004) ....................................................................... 44

*In re Elcona Homes Corp.*,
863 F.2d 483 (7th Cir. 1988) .................................................................................... 48

iv

*In re Vinard*,
    133 B.R. 217 (Bankr. S.D. Ind. 1991) .................................................................. 32

*Int'l Ventures v. Block Props. VII (In re Int'l Ventures, Inc.)*,
    214 B.R. 590 (Bankr. E.D. Ark. 1997) .......................................................... 34, 38

*Int'l Ventures v. Block Props. VII (In re Int'l Ventures, Inc.)*,
    207 B.R. 618 ((Bankr. E.D. Ark. 1997) ......................................................... 35

*Isaacs Business Ventures, Inc. v. Thompson*,
    636 N.Y.S.2d 906 (App. Div. 1996) .......................................................... 50-51

*John Street Leasehold LLC v. FDIC*,
    196 F.3d 379 (2d Cir. 1999) ........................................................................ 51, 52

*Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*,
    124 B.R. 522 (Bankr. N.D. Ill. 1991) .......................................................... 30

*Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)*,
    137 F.3d 1087 (8th Cir. 1998) ...................................................................... 39

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*,
    908 F.2d 1351 (7th Cir. 1990) .......................................................... 31, 56, 58

*Klein v. Klein*,
    589 N.E.2d 382 (N.Y. 1992) ........................................................................ 50

*Kroh Bros. Dev. v. Continental Constr. Eng'rs, Inc.*
*(In re Kroh Bros. Dev Co.)*,
    930 F.2d 648 (8th Cir. 1991) ...................................................................... 41

*Laker v. Vallette (In re Toyota of Jefferson, Inc.)*,
    14 F.3d 1088 (5th Cir. 1994) ...................................................................... 41

*Lundy v. Adamar of New Jersey, Inc.*,
    34 F.3d 1173 (3d Cir. 1994) ........................................................................ 36

*Lynn v. Continental Bank (In re Murchison)*,
    154 B.R. 909 (Bankr. N.D. Tex. 1993) ....................................................... 25

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*,
    811 N.Y.S.2d 47 (App. Div. 2006) .......................................................... 48, 49

*Mandross v. Peoples Banking Co. (In re Hartley)*,
    825 F.2d 1067 (6th Cir. 1987) .......................................................... 33, 40

*Marshall v. Marshall*,
    No. 04-1544, slip op. (U.S. May 1, 2006) .................................................. 54

*MB Ltd P'ship v. Nutri/System, Inc. (In re Nutri/System, Inc.)*,
    169 B.R. 854 (Bankr. E.D. Pa. 1994) ............................................................... 56

*McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*,
    859 F.2d 561 (8th Cir. 1988) ............................................................... 33, 36

*Meeks v. Bank of Rison (In re Armstrong)*,
    231 B.R. 746 (Bankr. E.D. Ark. 1999) ............................................................... 26, 30

*Merrill Lynch Interfunding, Inc. v. Argenti*,
    155 F.3d 113 (2d Cir. 1998) ............................................................... 51

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
    436 N.E.2d 1265 (N.Y. 1982) ............................................................... 47, 48, 49

*N. Pipeline Constr. Co. v. Marathon Pipeline Co.*,
    458 U.S. 50 (1982) ............................................................... 55

*Oliver v. Kolody (In re Oliver)*,
    142 B.R. 486 (Bankr. M.D. Fla. 1992) ............................................................... 33

*Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*,
    824 F.2d 249 (3d Cir. 1987) ............................................................... 36

*RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*,
    808 F.2d 271 (3d Cir. 1986) ............................................................... 31

*Rose v. Spa Realty Assocs.*,
    42 N.Y.2d 338, 397 N.Y.S.3d 922 (1977) ............................................................... 49, 50, 51, 52, 53

*Rush v. Riddle (In re Standard Stores, Inc.)*,
    124 B.R. 318 (Bankr. C.D. Cal. 1991) ............................................................... 28

*S. Tech. Coll. v. Graham Props. P'ship (In re S. Tech. Coll., Inc.)*,
    199 B.R. 46 (Bankr. E.D. Ark. 1995) ............................................................... 43

*Schy v. Fed. Deposit Ins. Corp.*,
    465 F. Supp. 766 (E.D.N.Y. 1977) ............................................................... 38

*Smith v. Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*,
    893 F.2d 693 (5th Cir. 1990) ............................................................... 58

*Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*,
    247 B.R. 463 (B.A.P. 8th Cir. 2000) ............................................................... 34

*Stoumbos v. Kilimnik*,
    988 F.2d 949 (9th Cir. 1993) ............................................................... 58

*Three Flint Hill Ltd. P'shp v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'shp.)*
    213 B.R. 292 (D. Md. 1997) ............................................................... 28

*Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., Inc.),*
    162 B.R. 359 (Bankr. S.D. Fla. 1993) ........................................................ 34, 35, 38

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.,*
    894 F.2d 516 (2d Cir. 1990) ................................................................................. 52

*United States v. Pelullo,*
    964 F.2d 193 (3d Cir. 1992) ................................................................................. 31

*USX Corp. v. Penn Cent. Corp.,*
    130 F.3d 562 (3d Cir. 1997) ................................................................................. 36

*Washington Hosp. v. White,*
    889 F.2d 1294 (3d Cir. 1989) ............................................................................... 36

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),*
    161 B.R. 107 (E.D. Pa. 1993) .................................................................... 56, 57, 58

*Yoppolo v Lindecamp (In re Fox),*
    277 B.R. 740 (Bankr. N.D. Ohio 2002) ................................................................ 26

## STATUTES

### Federal

11 U.S.C. § 101(5) ........................................................................................................ 60

11 U.S.C. § 101(31) ................................................................................................. 24, 25

11 U.S.C. § 157(b) ........................................................................................................ 54

11 U.S.C. § 501(a) ........................................................................................................ 60

11 U.S.C. § 510(c) ................................................................................................... 56, 60

11 U.S.C. § 547(b) ................................................................................................. passim

11 U.S.C. § 547(c) ............................................................................. 7, 23, 40, 43, 44

11 U.S.C. § 726 ............................................................................................................. 55

18 U.S.C. § 3282 .......................................................................................................... 31

28 U.S.C. § 157 .............................................................................................................. 7

28 U.S.C. § 158 .............................................................................................................. 6

### State

N.Y. Gen. Oblig. Law § 5-703 ..................................................................................... 50

N.Y. Gen. Oblig. Law § 15-301 .............................................................................. 49, 50

## BOOKS AND ARTICLES

E. Allan Farnsworth, *Farnsworth on Contracts* § 8.5 (2d ed. 2001) ............................................... 48

James Wm. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 1.13 (2d ed. 1994) ........................ 36

Jonathan E. Nuechterlein & Philip J. Weiser, *Digital Crossroads:*
*American Telecommunications Policy in the Internet Age* (2005) ...................................................... 1

Om Malik, *Broadbandits: Inside The $750 Billion Telecom Heist* (2003) ......................................... 4

Paul Starr, *The Great Telecom Implosion*, The American Prospect (Sept. 9, 2002) .......................... 1

## LEGISLATIVE MATERIALS

*Financial Turmoil in the Telecommunications Marketplace: Maintaining the*
*Operations of Essential Communications: Hearing Before the Senate Committee on*
*Commerce, Science and Transportation*, 107th Cong. (July 30, 2002)
(Statement of Michael Powell, Chairman of the Federal Communication Commission) ..................... 1

The decision of the bankruptcy court, and the many errors it made, can only be understood against the backdrop of the rapid rise and fall of the telecommunications sector—the bursting of the 1990s telecom bubble. Winstar Communications, Inc. ("Winstar") was one of many telecommunications companies, founded in that decade, that sought to build a global broadband network to provide high-speed telecommunications services to business customers. Following the passage of the Telecommunications Act of 1996, which deregulated the industry, capital flooded into this sector of the economy. At that time, "many companies racked up huge debts laying redundant fiber-optic cables over the same city-to-city routes on the mistaken—and, in retrospect, wildly unrealistic—assumption that demand would keep pace."[1] Because "much of this investment was vendor financed," manufacturers "such as Lucent, Nortel, Motorola, Alcatel and Cisco" lent billions of dollars to the telecom companies that purchased their equipment.[2]

But when the demand for telecom services did not match expectations, "[h]yper competition ensued in various markets across the industry [and] vicious price wars ensued, driving down overall industry and individual company revenues."[3] The results, as FCC Chairman Michael Powell noted, "were devastating." *Id.* at 9. "As some telecom companies began to fail and enter bankruptcy, others resorted to fraud and deception to mask these core fundamental problems facing their companies. Some went so far in their deception to not only mask failure, but to inflate, artificially, revenue growth—to make it look like the dream was real." *Id.*

This case arises from that environment. During the heady days of the telecommunications boom, the debtor, Winstar, and the defendant, Lucent Technologies, Inc. ("Lucent"), entered into agreements intended to create a mutually beneficial strategic relationship. In the course of that relationship, Lucent concededly engaged in some of the

---

[1] Jonathan E. Nuechterlein and Philip J. Weiser, *Digital Crossroads: American Telecommunications Policy in the Internet Age* 36 (2005).

[2] Paul Starr, "The Great Telecom Implosion," *The American Prospect* (Sept. 9, 2002).

[3] Michael Powell, Chairman of the Federal Communication Commission, Statement Before Senate Committee on Commerce, Science and Transportation at 8 (July 30, 2002).

misconduct Chairman Powell described. And so too did Winstar. As the telecom sector was collapsing, the parties' relationship deteriorated. When Winstar ultimately filed for bankruptcy, it sued Lucent, claiming (among other things) that Lucent had breached various of the parties' contractual arrangements. Subsequently, the bankruptcy case was converted to chapter 7 and the trustee, Christine Shubert (the "Trustee"), took over the action, adding a new claim, that Lucent had received an improper preferential payment from Winstar prior to the bankruptcy.

The Trustee's case at trial focused heavily on the allegations of corporate misconduct that she leveled against Lucent. Neither the preference statute nor state contract law, however, is intended to provide a remedy for claims of improper accounting or other financial irregularities. Losing sight of that fact, the bankruptcy court made the fundamental error of allowing its distaste for Lucent's conduct to override its obligation to follow governing law. In so doing, the court upset previously settled principles that are critical to commercial lending. Its errors will thus have serious adverse consequences, not only for Lucent, but for any party doing business with companies that may seek bankruptcy protection in Delaware. Faithful application of the correct legal standards requires reversal of the bankruptcy court's judgment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The relationship between Lucent and Winstar began with high expectations all around. In October 1998, the parties entered into a series of agreements under which Winstar would receive financing and Lucent equipment to build its wireless network, and Lucent would grow its customer base by facilitating the success of a large potential customer. Over a period of a little more than two years, Lucent lent Winstar more than a billion dollars, which financed Winstar's purchase both of Lucent equipment, and of equipment and services provided by other vendors.

Two particular events lie at the heart of this case. The first is a financing transaction that took place in December 2000. At that time, just on the eve of the collapse of the telecom sector, and at a time when the once robust relationship between Lucent and Winstar was fraying, Winstar entered into a new strategic relationship with Siemens, a Lucent rival. As part of that

2

relationship, Winstar obtained a new loan of approximately $200 million from Siemens. The net proceeds of the Siemens loan, as the relevant agreements among the various parties all required, immediately went to pay down Winstar's debt to Lucent. This repayment forms the basis of the Trustee's claim that Lucent received an avoidable preference.

The second event took place several months later, in March 2001, just weeks before Winstar filed for bankruptcy. Throughout the parties' strategic relationship, Lucent provided equipment for the building of the Winstar network, and Lucent financed Winstar's purchase of equipment and services necessary to build that network. At the outset, the parties had envisioned that Lucent would itself ultimately play an important role in the actual building of the network But Winstar never quite permitted Lucent to play the active role Lucent had expected. Instead, at Winstar's request, the parties engaged in a circuitous series of transactions, described by the parties as the "pass-through," under which Lucent was ostensibly building the network, but was subcontracting the actual work to a Winstar subsidiary, Winstar Wireless Inc. ("Wireless"). Through these roundabout arrangements, in essence, Lucent was merely funding Winstar's build-out of its own network, through its Wireless subsidiary. Over time, Lucent grew increasingly disillusioned with the way this "pass-through" practice operated, which was disadvantageous to Lucent, inconsistent with the parties' original understanding, and contrary to the express terms of their agreement. In September 2000, Lucent announced that it was no longer willing to continue to engage in the practice. And in March 2001, Lucent exercised its contractual right to refuse to honor a request made by Winstar seeking to borrow additional funds to pay for services that Winstar said Wireless had performed in building out its network. The Trustee has cast that refusal to make a loan to Winstar as a breach of the "Subcontract" between Lucent and Wireless.

Following a bench trial, the bankruptcy court ruled in favor of the Trustee on each of the counts tried. *First*, the court awarded the Trustee $188.2 million on her preference claim related to the payment of the net Siemens proceeds to Lucent. *Second*, the court found that Lucent breached the "Subcontract" with Wireless, and awarded Wireless $62 million in damages (less an

3

agreed $6.3 million setoff). *Finally*, the court concluded that all of Lucent's claims against the Winstar estate should be equitably subordinated, and that $21 million in liens that Lucent held on Winstar assets should be set aside and transferred to the Trustee for the benefit of the estate.

*Preference.* In awarding $188.2 million to the Trustee on her preference claim, the bankruptcy court made three separate and independent errors:

*First*, because Lucent received the Siemens proceeds more than 90 days before Winstar filed for bankruptcy, it could not be held liable for a "preference" unless it was found to be an "insider" of Winstar's. The bankruptcy court's decision, deeming Lucent an insider on the ground that it was a "person in control" over Winstar, represents a dramatic break with prior law. It is settled that a commercial creditor "controls" the debtor for purposes of the preference statute only in the highly unusual circumstance in which the creditor, in accordance with the plain meaning of the statute, actually "controls" the management and business affairs of the debtor.

No evidence in the record permitted the determination that such a circumstance existed here. Indeed, the bankruptcy court made no such determination. Instead, its conclusion that Lucent was an insider rested on its view that some of the transactions between Lucent and Winstar were suspect. That is concededly true. In fact, Lucent, on its own initiative, conducted an internal investigation of certain of the transactions in question, and reported the matter to the SEC. But the record demonstrates at worst that Lucent and Winstar worked together to help each other meet financial targets. As one leading chronicle of the rise and fall of the "fiber barons" put it: "Winstar [followed] a time-tested strategy: You scratch my back and I'll scratch yours."[4] The bankruptcy court simply applied the wrong legal standard. Its conclusion that this type of conduct—absent actual managerial control of the debtor—can render a party an insider amounts to nothing less than a revolution in the world of commercial lending. Indeed, we are unaware of any published opinion in which one public company has been deemed to be an insider of another.

---

[4]    Om Malik, *Broadbandits: Inside The $750 Billion Telecom Heist* 131 (2003).

This case, without any finding, or even any evidence, of actual managerial control, is a particularly poor candidate to become the first.

*Second,* the court erred in finding that a transaction in which Lucent simply traded places with Siemens amounted to a transfer of Winstar's property, which is a necessary predicate for a voidable preference. That transaction had no effect on the bankruptcy estate at all. It is a paradigmatic case of "earmarking," in which all parties agreed that Siemens' funds would go to Lucent. It was these funds, not funds belonging to Winstar, that Lucent received in the transfer.

*Third,* after the alleged preferential transfer, Lucent provided approximately $90 million in unsecured loans and other new value to Winstar. Under the Bankruptcy Code, any preference judgment must be reduced by the amount of that new value. But the bankruptcy court literally failed to address Lucent's arguments relating to more than $60 million of such new value. And the court rejected the only new value argument it did address on bases that are unsupportable: it found the loan to be secured when in fact it was not, and it held that Lucent failed to prove that it provided the new value *after* it had received the alleged preference, when the timing of that new value was neither disputed nor disputable.

*Subcontract.* The bankruptcy court also held for the Trustee on the so-called "Subcontract" claim, awarding $62 million in damages—notwithstanding that the express terms of the contract were utterly inconsistent with the Trustee's claim. The court reasoned that the Subcontract, which would not obligate Lucent to pay Wireless for services unless Lucent issued a "Task Order" specifically ordering the services for which Wireless sought payment, had been modified by the conduct of the parties. That reasoning incorrectly treats Lucent's temporary, quarter-by-quarter *waiver* of compliance with the "Task Order" procedure as an implicit, unwritten agreement to *modify* the Subcontract to abolish that requirement permanently, despite the Subcontract's express provision that it could be modified *only* in writing and controlling New York law that enforces such a contractual prohibition on non-written modifications. In any event, even if the Subcontract had been modified, Lucent could not have breached it. The record is

5

clear that no exchange of purchase orders and invoices—the conduct that allegedly replaced the requirement of a formal Task Order—occurred in March 2001. The evidence on which the bankruptcy court relied was simply a request by *Winstar* (which was not a party to the Subcontract) that Lucent *lend* it money under their credit agreement. This draw request cannot constitute a demand by *Wireless* that Lucent *pay* it for services under even the allegedly modified terms of the Subcontract, and hence cannot support a claim of breach of contract.

***Equitable subordination.*** Finally, the bankruptcy court erroneously subordinated Lucent's claims against Winstar's bankruptcy estate, ignoring the well-established principle that equitable subordination is a remedial rather than a punitive doctrine, and without making any effort to tailor the subordination to any identifiable harm to creditors caused by the alleged improper conduct, as the law requires. Further, the bankruptcy court went so far as to subordinate Lucent's debt claims to the interests of certain equity holders, in plain contravention of the unambiguous text of the Bankruptcy Code.

The law allows for none of this. The bankruptcy court's decision is replete with legal error, and its judgment must be reversed.

### STATEMENT OF THE BASIS FOR THIS COURT'S JURISDICTION

The bankruptcy court entered judgment on December 28, 2005. Lucent timely appealed on January 11, 2006. This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

### STATEMENT OF ISSUES PRESENTED ON APPEAL

This appeal presents the following issues:

I. **PREFERENCE CLAIM**

    A.    Was Lucent an insider of Winstar on December 7, 2000?

    B.    Does the earmarking doctrine apply to the alleged preference because Winstar did not transfer an interest in property to Lucent?

    C.    Was Lucent entitled to the "new value" affirmative defense pursuant to 11 U.S.C. § 547(c)(4)?

## II.    SUBCONTRACT CLAIM

Did Lucent breach a contract with Wireless?[5]

## III.    EQUITABLE SUBORDINATION CLAIM

Did the bankruptcy court err by subordinating Lucent's claims to the claims of all other creditors, and to the interests of preferred shareholders, and by transferring Lucent's security interests to the Trustee for the benefit of the estate?

### STANDARD OF REVIEW

The bankruptcy court's conclusions of law are reviewed *de novo. Centennial & Allegheny Univ. Hosps -East Tenet Healthsys. Phila., Inc. v. Nat'l Union of Hosp. & Health Care Employees (In re Allegheny Health, Educ. & Research Found.)*, 383 F.3d 169, 175 (3d Cir. 2004). With respect to core matters, the bankruptcy court's findings of fact are reviewed for clear error. *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 208 (3d Cir. 2000). Lucent contends, however, that the Trustee's Subcontract claim is non-core. If Lucent prevails on that point, the findings of fact related to that claim would be subject to *de novo* review. *In re Allegheny Health*, 383 F.3d at 175. *See infra* at 54-55 n.56.

### NATURE AND STAGE OF THE PROCEEDINGS

Winstar and Wireless filed chapter 11 bankruptcy petitions on April 18, 2001. That same day, they brought this adversary proceeding. The bankruptcy court held a bench trial in the spring of 2005, the parties submitted proposed findings and conclusions, and the court heard oral argument in June 2005. The bankruptcy court issued its Memorandum of Decision on December 21, 2005, and on December 28, 2005, entered final judgment in favor of the Trustee. This is an appeal from that final judgment.[6]

---

[5]    Lucent contends that the Subcontract claim is a non-core matter pursuant to 28 U.S.C. § 157 and that it has not consented to the entry of judgment by the bankruptcy court. *See infra* at 54-55 n.56.

[6]    With respect to non-core claims, the bankruptcy court lacked the authority to enter judgment, but rather had the authority only to enter proposed findings and conclusions that would be subject to *de novo* review by the district court. *See* 28 U.S.C. § 157(c)(1); *infra* at 54-55 n.56. Because the bankruptcy court's order is styled as a "judgment," however, Lucent filed a notice of appeal and is herein pursuing this appeal from that purported judgment. In addition, out of an abundance of caution, Lucent also filed, on January 3, 2006, an objection to proposed findings

7

## STATEMENT OF FACTS

Winstar was a telecommunications carrier seeking to create a global broadband network to provide services to business customers. DX 211 at Part 1, ROA 689.[7] It developed an innovative wireless platform that allowed it to offer broadband services without the cost of laying fiber at each customer site.[8] Instead, Winstar installed a dish at a business site (a "B site") and transmitted data via a wireless platform to a "hub," from which fiber cable transmitted the data to a network. *See id.*

Wireless was a wholly-owned subsidiary of Winstar, serving as the engineering arm of the company. Wireless's primary business was the design, construction, and build-out of the network. Jt. Stip. at ¶¶ 1, 2, ROA 327.

Lucent, a 1990s spin-off of the AT&T systems and technology unit, is a global leader in the business of designing and delivering telecommunications products, systems, and services to telecommunications carriers.

---

and conclusions per Fed. R. Bankr. P. 9033(b). Appellant's Designation of Items to be Included in the Record on Appeal, Tab 353 ("ROA 353").

[7]    At trial, exhibits were designated as "PX" (plaintiff's exhibits), "DX" (defendant's exhibits), or "JX" (joint exhibits). Trial exhibits are thus cited herein by exhibit number, and document number in the record on appeal ("ROA"). Each deposition transcript that was admitted into evidence bears a "JX" designation. They are cited by reference to the JX number, the location in the ROA, followed by the witness name and page number (*e.g.*, "Kantor Dir. at __"). Trial transcripts are cited by the transcript volume number, followed by the page number. For example, testimony found at pages 29-30 of the transcript of day 16 of the trial is cited as "16-29-30 (Wilson Tr.)."

    The Memorandum of Decision Including Findings of Fact and Conclusions of Law with Respects to Count VII and X, and XI of the Second Amended Complaint and Counts 5 and 6 of the Second Amended Answer and Counterclaims (Dec. 21, 2005) is cited as "Op." The Renumbered Joint Stipulation as to Uncontested Facts is cited as "Jt. Stip."

    For the Court's convenience, Lucent's Appendix contains the parties' designations for the ROA, and the principal documents cited herein (or excerpts thereof), numbered to correspond with the ROA.

[8]    Prior to the telecom boom, telecommunications transmission relied primarily on copper wires. With the boom, companies began laying fiberoptic cable for high volume broadband uses that copper could not accommodate, such as video-streaming, teleconferencing, and other internet-based services.

**A.      The Parties Begin A Strategic Relationship Intended For Mutual Benefit.**

On October 21, 1998, Lucent and Winstar entered into a strategic relationship whereby Lucent agreed to collaborate with Winstar in the financing and build-out of its network. PX 331, ROA 1573. At that time, each party believed that its own success would be furthered by the success of the other. Lucent hoped to facilitate the development of Winstar's business, thereby fostering the growth of a large potential customer and creating a new market for its products. Winstar benefited from Lucent's established industry presence and its agreement to finance Winstar's network build-out. *See id.*; *see also* DX 699 at 14, ROA 1178 (Ackerman SEC Tr.).

The parties initially structured their relationship around two key agreements: the Supply Agreement and the First Credit Agreement.

*The Supply Agreement.* The Supply Agreement, entered into in October 1998, described the parties' respective obligations for the build-out of Winstar's network and provided that Lucent would supply Winstar with products and certain services for the network build-out. Jt. Stip. at ¶6, ROA 327. As regards products, Lucent was obligated to provide "best of breed" equipment. DX 28 at § 2.3(a), ROA 506 (Supply Agreement). In instances where Lucent itself could not provide best of breed equipment, it agreed to finance Winstar's purchases of such equipment from other vendors. *Id.* at § 11.3(c). Winstar in turn agreed to buy from Lucent a set proportion of the equipment and services it purchased using funds it borrowed under the Lucent credit agreement: 65% Lucent content during the first year, and 70% thereafter. *Id.* at § 11.3(b)(i).

In addition, the Supply Agreement also addressed how the network build-out would be managed. Because Lucent did not yet have all of the necessary experience or capabilities required to build out a global communications systems network,[9] the Supply Agreement gave Lucent up to five years to collaborate with Winstar and develop certain capabilities. *Id.* at § 3.1

---

[9]      ROA 371 at 16-22-23 (Wilson Tr.); JX 1, ROA 460 (Kantor Cr. at 52-53).

and at Schedule A § 3.3(b). The parties specifically agreed that Lucent "would work together with Winstar on how to transition those services and those capabilities to Lucent as Lucent acquired those core competencies and both parties were comfortable that [Lucent] was able to assume them."[10] The Supply Agreement thus contained an agreement between the parties to agree on a "Transition Plan," defining Lucent's role in managing the network build-out. The Supply Agreement obligated Lucent to perform only those services specifically ordered by Winstar, "subject to the Transition Plan." *Id.* at §§ 1.1(kk) & 6.1(a); *see also* DX 390, ROA 869.

*The First Credit Agreement.* To set the parameters of Lucent's obligation to finance the build-out of the Winstar network, the parties executed, contemporaneous with the Supply Agreement, a credit agreement (the "First Credit Agreement"). Under the First Credit Agreement, Lucent became the primary secured lender to Winstar and provided a $2 billion line of credit (with a $500 million limit on outstanding borrowings at any one time). To secure the financing, Winstar gave Lucent a lien on virtually all of its assets. Op. at ¶ 27, ROA 347.

**B.    The Parties Execute The "Subcontract" And Thereafter Engage In "Pass-Through" Transactions To Finance The Build-Out Of Winstar's Network.**

In the months following the execution of the Supply Agreement and the First Credit Agreement, Lucent and Winstar failed to agree on a Transition Plan. Even before the execution of the principal agreements, there was reason to believe that reaching an agreement on a Transition Plan would be an on-going source of dispute. After Lucent provided Winstar a draft "Winstar/Lucent Partnership Concept," Nate Kantor, President and COO of Winstar, sent an internal email to Winstar's Chairman and CEO to say that he doubted that Lucent had "all the skills in place to actually make this happen." DX 695, ROA 1174. Instead, he suggested the creation of a separate Winstar subsidiary (which ultimately became Wireless) "that does Engineering, Program Management, Construction, etc. . . . I want Lucent to actually buy services from us as part of the deal and wrap it all under this agreement." *Id.*

---

[10]    ROA 371 at 16-23 (Wilson Tr.); *see also* JX 1 at 52-53, ROA 460 (Kantor Cr.).

At Winstar's request, the parties settled on an arrangement that was similar to what Kantor had earlier suggested in his internal email. In March 1999, Lucent and Wireless entered into an "Agreement For Network Build-Out Services," which they referred to as the "Subcontract," made effective as of January 4, 1999. DX 117, ROA 595. Under the Subcontract, the parties agreed that insofar as Lucent sought to request services from Wireless, it would send Wireless a "Task Order." Wireless would then perform the ordered services. *See id.* at § 1.1; *see also* DX 141, ROA 619. Lucent would in turn pay Wireless in accordance with the agreed-upon Task Order. *Id.* at § 4.1. The Task Order requirement thus served to permit Lucent, insofar as it took on responsibility to build out the Winstar network, to determine which services it would provide, and which services to subcontract to Wireless or to another third party.

In fact, however, the only Task Order that Lucent issued Wireless was for the first quarter of 1999. Thereafter, between March 1999 and September 2000, the parties engaged in the following roundabout exchange of paperwork: (1) Winstar sent a purchase order to Lucent for services performed by Wireless in building out Winstar's network; (2) Lucent, in turn, sent a purchase order to Wireless for those services; (3) Wireless invoiced Lucent for the services performed, as described in the purchase order it had received; (4) Lucent invoiced Winstar in the same amount for the same services; (5) Winstar drew on the Credit Agreement and used the funds it borrowed to pay Lucent's invoice; and, finally (6) Lucent used the funds it had just received from Winstar to pay Wireless's invoice.[11] The purchase orders, invoices and funds were all exchanged on the same day, to avoid any accounts receivable issue. DX 274, ROA 753; DX 239, ROA 718. The net effect was that Winstar built out its own network, through its subsidiary Wireless, and borrowed the money to pay for the build-out by drawing on its credit line from Lucent.

---

[11]     *See* DX 274, ROA 753; DX 714, ROA 1193; *see also* ROA 371 at 16-44-45 (Wilson Tr.).

The pass-through transactions were structured to allow Winstar to obtain favorable accounting treatment. DX 141, ROA 619; DX 125, ROA 603. Specifically, the inspiration for structuring the pass-through this way stemmed from Winstar's desire to capitalize otherwise non-capitalizable costs associated with the build-out, and thus improve its stated financial position.[12] Lucent agreed to the pass-through arrangement for the first quarter of 1999. DX 117, ROA 595. But Lucent soon discovered that the transactions yielded it no benefit, and indeed imposed administrative costs to process, track, and manage. DX 163, ROA 641; *see also* ROA 371 at 16-30 (Wilson Tr.). In addition, because financing the cost of services performed by Wireless did not increase Lucent's collateral, this arrangement diluted Lucent's collateral base, thereby weakening Lucent's protection in the event of bankruptcy and interfering with its ability to market the Winstar loans. *See* DX 155, ROA 633. The arrangement also deprived Lucent of the revenues it anticipated receiving in connection with its building of the Winstar network. Lucent thus announced its objection to the practice in early June 1999, *see* DX 155, ROA 633; DX 163, ROA 641, but nevertheless agreed to pass through Wireless-performed services in the second quarter of 1999, on the understanding that the parties would thereafter work to discontinue the practice by developing a Transition Plan. ROA 371 at 16-54 (Wilson Tr.).

In July 1999, Lucent and Winstar began negotiating toward a relationship that would have Lucent managing as much of the build-out as possible. DX 164, ROA 642; DX 168, ROA 646. In August 1999, Lucent provided Winstar with a document outlining a proposed "turnkey" approach, under which Lucent would provide overall management of the build-out. DX 168, ROA 646. Winstar, however, was unwilling at that point to allow Lucent to play such an active role in the building of its network. DX 169, ROA 647. Rather than say so, Winstar dragged out the negotiations over the turnkey proposal through the end of 1999. *See* DX 195, ROA 673. Lucent—believing that the parties were still negotiating towards a turnkey relationship—

---

[12]    ROA 371 at 16-29-30 (Wilson Tr.); *see* DX 125, ROA 603.

continued to perform the pass-through transactions that Winstar had first proposed. *See* ROA 371 at 16-61-62 (Wilson Tr.); *see also* DX 214, ROA 692.

### C.     Winstar Assists Lucent In Meeting Revenue Targets; Lucent Provides Winstar Reciprocal Benefits.

Nevertheless, Lucent obtained advantages from the parties' business relationship. Because of its ambitious network build-out plans, Winstar was a substantial customer for Lucent equipment. *See* DX 28 at § 2.3, ROA 506 (conferring preferred supplier status). And Winstar did purchase equipment on a timetable that helped Lucent achieve revenue targets. But the record is replete with evidence that these benefits ran in both directions.

Winstar took full advantage of Lucent's desire to meet market expectations, and used that as leverage to bargain for favorable terms. At times, Winstar would use this leverage to demand favorable pricing, as in December 1999, when Winstar negotiated a 30 percent price reduction on Lucent's prices on long-haul optical products and services. ROA 371 at 16-69-70 (Wilson Tr.). On other occasions, Winstar would ask for reciprocal help from Lucent, as the end of a fiscal quarter approached, in meeting its revenue targets. For example, in December 1999, Winstar prevailed on Lucent to purchase $10 million in radios links from Wireless. DX 201, ROA 679; ROA 371 at 16-73 (Wilson Tr.). And in March 2000, Winstar persuaded Lucent to buy $35 million in equipment and services from Wireless. *Id.* at 16-93-94. Winstar also took an aggressive position with respect to the "best of breed" equipment requirement, rejecting products that it believed did not meet that standard—and instead buying equipment from Lucent's competitors. *See* DX 699 at 15-16, ROA 1178 (Ackerman SEC Tr.).[13]

---

[13]     For example, Winstar rejected Lucent's digital cross-connects and routers in favor of equipment from TellLabs and Cisco. Winstar similarly rejected Lucent's AnyMediaFast solution in favor of equipment from a company called AFC. *See* JX 6 at 427-429, ROA 465 (Ackerman Cr., 3/5/04 Dep).

### D.    At The Height Of The Telecom Boom, Winstar Obtains More Favorable Financing Terms.

By the middle of 2000, the relationship between the companies had become rockier. This was the height of the telecom boom, and Winstar found itself in the enviable position of attracting vast amounts of new capital. In May 2000, Winstar obtained $1.15 billion in new financing to pursue its aggressive build-out plans from a consortium of bank lenders. Op. at ¶ 31, ROA 347. Winstar then drew down on this bank facility to pay off its debt to Lucent under the First Credit Agreement. Jt. Stip ¶ 8, ROA 327. Lucent in turn released its lien on Winstar's assets, Op. at ¶ 32, ROA 347, which were pledged instead to secure the new loans under the bank facility. In May 2000, Winstar also raised almost $1 billion in the form of an equity infusion and $1.6 billion in the form of a public debt offering. PX 186, ROA 1428.

Winstar used this opportunity to extract extremely favorable credit terms under the new Lucent-Winstar credit agreement, the "Second Credit Agreement." DX 29, ROA 507 (Second Credit Agreement). Under this new agreement, Winstar was entitled to have up to $1 billion outstanding at any one time. Jt. Stip. at ¶ 9. Because Winstar had pledged its own assets to secure the loans under the bank facility, the Second Credit Agreement required Winstar to establish special entities, WVF-1 and WVF-LU2, to be the actual borrowers under the agreement. ROA 374 at 19-62-63 (Keefe Tr.). Although Winstar guaranteed the loan, Lucent obtained a lien only on the equity of and assets held by those borrowers, and not on any assets of Winstar or its other subsidiaries. Id. at 63-64. Moreover, Lucent agreed that Winstar could draw on the line of credit to purchase not only equipment but also certain services, DX 29 at § 6.06, ROA 507, even though the collateral securing the loan consisted only of equipment (and the proceeds of that equipment).[14] Lucent also agreed to restrictions on its ability to sell the Winstar loans, a highly

---

[14]    DX 32 at § 1.02, ROA 510; DX 33 at § 1.02, ROA 511 (Security Agreements for borrowers WVF-1 and WVF-LU2 respectively, defining "Collateral" securing the loans under the Second Credit Agreement).

unusual concession. ROA 374 at 19-74-75 (Keefe Tr.). In sum, Winstar effectively doubled its line of credit from Lucent while providing Lucent with a substantially weaker pool of assets to secure the loan, and obtaining other favorable credit terms.

The Second Credit Agreement did expressly provide, however, that if Winstar received any additional funds under the bank facility, *those funds* were to be paid to Lucent to reduce Winstar's outstanding borrowings. *Id.* at 19-74. Specifically, the agreement provided that Winstar could incur additional indebtedness under the bank facility only if "the proceeds . . . were applied to prepay [amounts owed to Lucent]." DX 29 at § 6.12 & § 1.01, ROA 507.

The agreement also included a refinancing provision that allowed Lucent, in its discretion, to issue a "refinancing notice" when Winstar's outstanding borrowings reached $500 million. ROA 374 at 19-75 (Keefe Tr.); *see also* DX 29 at § 2.18, ROA 507. Upon issuance of such a refinancing notice by Lucent, Winstar had 90 to 105 days to prepay or refinance the loans. After that time period, Lucent (1) could increase the interest rate on the loans by two percentage points; (2) could require prepayment or convert its Winstar loans to marketable notes; (3) was no longer required to finance network build-out services (thus increasing the value of the collateral securing the loan); and finally, (4) could enforce the content provisions of the Supply Agreement on a draw-by-draw basis rather than annually. DX 29 at § 2.18, ROA 507; *see also* PX 201, ROA 1443. In short, the refinancing provision gave Lucent the right to take various steps to reduce its exposure, while still allowing Winstar to draw up to the full $1 billion credit limit during the "refinancing period."

Throughout the course of the negotiations on the Second Credit Agreement, Winstar represented to Lucent that it did not intend to draw on the new loan until the fall of 2000. ROA 375 at 20-17 (Perricone Tr.). Just before the loan closed, however, Winstar informed Lucent that it would likely draw on this line in July or August of 2000. *Id.* Then, on May 23, 2000—just 19 days after the closing of the loan—Winstar submitted a draw request for $160 million, DX 686, ROA 1165, even though at the time Winstar had almost $600 million cash on hand, due in part to

15

the recent capital infusion. DX 687, ROA 1166; ROA 375 at 20-20 (Perricone Tr.). Relations

between the companies had clearly deteriorated. As one Lucent executive wrote in an internal

email: "This is not in the spirit of the new deal. This is reprehensible. The company [Winstar]

lied to us about the usage." DX 295, ROA 774.

Lucent set out to assign its Winstar loan to two investment banks, Bear Stearns and

Donaldson, Lufkin & Jenrette. ROA 375 at 20-23-25 (Perricone Tr.). The terms that Lucent was

able to negotiate were quite favorable, given that the loans were under-collateralized: a sale of the

full $248 million for approximately 93 cents on the dollar. *Id.* at 20-25. Despite its earlier

contrary indications, however, Winstar refused to agree to the assignment of the loans. *Id.* at 20-

25. Thereafter, Winstar continued to borrow heavily under the Second Credit Agreement, and

despite the terms of the Supply Agreement, more than half of Winstar's borrowing financed the

purchase of non-Lucent equipment. *See* DX 285, ROA 764.

### E.    The Lucent And Winstar Relationship Further Deteriorates.

*Lucent seeks to end the pass-through practice.* By September 2000, Lucent was deeply

displeased with the state of its relationship with Winstar. The parties had been unable to agree on

a Transition Plan relating to the network build-out; Lucent's undercollateralized exposure to

Winstar was increasing at a greater rate than Lucent had been led to believe because of Winstar's

aggressive use of the Second Credit Agreement, often to purchase non-Lucent products and

services; Lucent had absorbed administrative costs for the pass-through of Wireless expenses for

six quarters in hopes of obtaining the Transition Plan; and, finally, Winstar had effectively

blocked Lucent's attempts to reduce its exposure by assigning Winstar's borrowing to other

entities.

Frustrated by the delay in agreeing to a Transition Plan, Lucent determined to end the

pass-through practice. *See* ROA 366 at 11-38 (Harris Tr.). On September 22, 2000, Lucent

wrote to Winstar stating that it was rejecting Winstar's September 8, 2000 purchase order for

services rendered in the third quarter of 2000. DX 390, ROA 869. Winstar ultimately persuaded

16

Lucent to pass through, once again, the expenses for third quarter 2000 services, as reflected in Lucent's September 27, 2000 letter. DX 424, ROA 903. Lucent stated that thereafter, "Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative)." *Id.*

*The parties enter into the software pool agreement.* At the end of the third quarter of 2000, Winstar agreed to a $212 million purchase of goods from Lucent. Op. at ¶¶ 51, 52, ROA 347. That purchase included a software pool agreement, which was an arrangement through which Winstar would be able to obtain access to various Lucent software programs. DX 421, ROA 900. The software pool agreement, which was accompanied by various post-dated ancillary agreements, provided Lucent substantial revenue. Lucent's accounting treatment of this series of agreements was admittedly improper. *See* DX 739 at ¶¶ 52-61, ROA 1219 (SEC Civil Complaint). Lucent itself recognized that issue, conducted an internal investigation, and identified a number of responsible individuals. Lucent thereafter revised its earlier announcement of projected revenue for fiscal year 2000 and immediately reported the matter to the SEC, ultimately paying a substantial fine. ROA 376 at 21-16 (Schacht Tr.).

But Winstar also obtained substantial benefits from entering into the software pool agreement; Winstar extracted, as a concession from Lucent, certain additional services, credits, and price discounts. DX 739 at ¶ 54, ROA 1219; *see also* DX 699 at 104-105, ROA 1178. As the SEC concluded: "[Winstar] understood Lucent's critical need to recognize revenue in its fiscal year ending September 30, 2000, and used that leverage to gain very favorable additional terms for Winstar." *Id.*

*Organizational change occurs at Lucent.* In this same period, in response to the volatile conditions in the telecom industry, Lucent underwent a substantial internal organizational change. Former CEO Henry Schacht was rehired as CEO in October 2000 to replace Rich McGinn, ROA 376 at 21-8 (Schacht Tr.); Bill Plunkett, liaison to the Winstar account, was terminated, *id.* 21-35; and Nina Aversano, who had been the head of North American sales, left the company, *id.* at 21-

17

35. Lucent conducted a thorough reexamination of many of its policies, and determined to adopt a more cautious business strategy. To that end, Lucent reigned in its aggressive approach to vendor financing. *Id.* at 21-11-12. Consistent with its overall retrenchment, Lucent examined its accounts and considered issuing a refinancing notice to Winstar. *See id.* at 21-13-15.

     *Winstar persuades Lucent not to issue a refinancing notice.* By October 23, 2000, less than a month after the execution of the software pool agreement, Winstar had borrowed more than $500 million under the Second Credit Agreement, despite being flush with capital in May 2000. DX 285, ROA 764 (total borrowings about $690 million). Because Winstar had exceeded the $500 million refinancing trigger, Lucent considered exercising its right to issue a refinancing notice under the Second Credit Agreement. But Winstar's CEO asked Lucent not to do so, ROA 376 at 21-13-14 (Schacht Tr.), and Lucent acquiesced.

### F.    Winstar Enters Into A Strategic Relationship With Siemens; Siemens Funds Are Earmarked To Pay Lucent.

     By November 2000, Winstar was actively negotiating with Siemens, a direct competitor of Lucent's, to create a new strategic relationship. DX 441, ROA 920. Winstar sought to buy the type of equipment and services from Siemens that Lucent had hoped to sell to Winstar. Likewise, Siemens sought to enter into an agreement that would obligate Winstar to purchase its equipment. *See* DX 474, ROA 953 (Winstar-Siemens Agreement). Moreover, Siemens offered to provide Winstar with financing in the form of an additional $200 million tranche of the existing $1.15 billion bank facility that Winstar had obtained in May of that year. *Id.* By December 2000, that deal was ready to close. DX 518, 997.

     All of the relevant parties—Lucent, Winstar, Siemens, and the other participants in the bank facility—understood and agreed that the net proceeds of the Siemens loan would go to pay off debt owed to Lucent under the Second Credit Agreement. As noted, under the Second Credit Agreement, Winstar was required to use the net proceeds of any increase to the bank facility to repay its outstanding Lucent balance. *See, e.g.,* DX 29 at § 6.12(d), ROA 507. At the time of the

Siemens loan, Winstar's indebtedness to Lucent exceeded $750 million. DX 285, ROA 764 & DX 7, ROA 485. Therefore, upon receiving the proceeds of the Siemens loan as an increase to the bank facility, Winstar was required to transfer the proceeds to Lucent to pay down its borrowings. Jt. Stip. at ¶ 23, ROA 327. Had Winstar failed to do so immediately, it would have defaulted under the Second Credit Agreement. That, in turn, would have been a default under the terms of the bank facility, which specified that Winstar's failure to pay any indebtedness over $25 million when due was an Event of Default. DX 284 at § 9.01(f), ROA 763.

Accordingly, in November 2000, one month before the Siemens loan closed, the administrative agent for the bank facility, Bank of New York, informed all of the other lenders in the facility, including Siemens, that the existing bank facility needed to be amended to allow Winstar to use the Siemens proceeds to "repay outstandings under the credit agreement with Lucent." *See* DX 721 at Siemens ICN 02210, ROA 1200. Each of the members of the bank facility, including Siemens, executed that amendment, dated December 6, 2000. *See* DX 516 at 79, Siemens ICN 01539, ROA 995.

Although it would receive the proceeds of the Siemens loan, Lucent was nonetheless displeased with Winstar's decision to obtain the Siemens financing. For one thing, Lucent was aware that as soon as Winstar turned over the Siemens proceeds to Lucent, Winstar would be able to continue drawing on the line of credit provided by Lucent under the Second Credit Agreement. In other words, the pay-down would increase the availability under that loan agreement, leaving Lucent no better off. DX 491, ROA 970. Moreover, Siemens—which became a participant in the bank facility—would share in that facility's stronger collateral base, even though its loan was made later in time. Furthermore, Lucent was effectively being required to finance Siemens products and services, ROA 375 at 20-32-33 (Perricone Tr.); *see* DX 477, ROA 956, and Winstar would now have a new strategic relationship with a major business rival of Lucent's.

During its negotiations of the Siemens loan, Winstar sought to persuade Lucent to waive its contractual right under the Second Credit Agreement to receive the proceeds from that loan.

*See e g.* DX 486, ROA 965. Lucent declined to do so. DX 498, ROA 977. On December 7, 2000, Winstar closed on the Siemens loan for $200 million. Jt. Stip. at ¶ 10, ROA 327. That same day, Winstar drew down the full amount of the loan. As it was required to, Winstar immediately transferred the proceeds to Lucent to reduce the outstanding balance under the Second Credit Agreement.[15] *Id.* at ¶¶ 17, 23. Even after Lucent was paid the proceeds of the Siemens loan, Winstar's outstanding borrowings from Lucent still placed it above the $500 million refinancing trigger. Accordingly, on December 19, 2000, Lucent issued a refinancing notice. DX 544, ROA 1023.

### G.    After December 7, 2000, Lucent Provides Winstar Additional Loans And Other New Value.

On December 29, 2000, Winstar submitted a $62.3 million draw request to Lucent, under the Second Credit Agreement, to finance network build-out services performed by Wireless during the fourth quarter of 2000. DX 9, ROA 487; JX 9 at 38-40, ROA 468 (Montemarano Cr.). Lucent had not agreed in advance to the performance of these services, as Winstar continued to manage the build-out of the network.[16] Consistent with the September 27, 2000 letter, however, Winstar and Lucent no longer engaged in the "pass-through" transactions under the Subcontract. Neither Lucent nor Wireless generated or exchanged any purchase order or invoice for network build-out services performed between September 27, 2000 and December 29, 2000. Lucent initially refused the draw request, but ultimately allowed Winstar to borrow the $62.3 million. In doing so, however, Lucent told Winstar that this funding was a one-time accommodation and

---

[15]    Although Winstar borrowed $200 million from Siemens, it received only $194 million after payment of certain loan fees to Siemens. Winstar paid Lucent only $188.2 million because its partial repayment of its Lucent loan balance entitled it to a refund of loan fees it had previously paid Lucent in May 2000. Jt. Stip. at ¶ 17, ROA 327.

[16]    As one Winstar employee put it in an email to a colleague: "Lucent seems determined to hire each individual [employee of Wireless]. I have no intention of giving them all the detail that they have requested . . . . My perspective on this process is very simple—we develop a scope of work and associated deliverables, Lucent sub-contracts back to Winstar to provide the work covered in the scope. The process should be that Lucent hires Winstar to provide X deliverable defined in the scope, which would be one PO with a set price, and Winstar just does the work." DX 452, ROA 931.

would not be repeated in 2001. *See* JX 9 at 40-42, ROA 468 (Montemarano Cr.); DX 599, ROA 1078.

Lucent also provided equipment and services for Winstar's network after December 7, 2000, shipping Winstar $28.6 million worth of equipment. ROA 376 at 21-51-52 (Terrell Tr.); PX 480 at ¶ 6, ROA 1722; *see also* DX 644, ROA 1123 (invoices). Winstar never paid Lucent for any of this equipment. *Id.* In addition, Lucent lent Winstar a further $115 million for equipment under the Second Credit Agreement, from late December 2000 through February 2001. Winstar used more than half of those proceeds, $90 million, to purchase non-Lucent equipment. DX 8, 10-11, ROA 486, 488-89.

**H.     Lucent Refuses To Honor Winstar's March 2001 Request To Borrow.**

Notwithstanding Lucent's prior statements that it was ending the pass-through practice, on March 27, 2001, Winstar submitted to Lucent a $62 million request for borrowing under the Second Credit Agreement, DX 668, ROA 1147, stating that the funds would be used to finance network build-out services performed by Wireless during the first quarter of 2001, services for which Lucent did not give its advance direction or consent, and that were not reflected in any exchange of invoices or purchase orders. *See* JX 9 at 50-51, ROA 468 (Montemarano Cr.). Lucent was not required to pay for any such services. In light of Winstar's various covenant defaults under the Second Credit Agreement, Lucent refused to honor the draw request. DX 663, ROA 1142; *see also* PX 409, ROA 1651.

**I.     Winstar Files For Bankruptcy And Sues Lucent.**

On April 18, 2001, Winstar and its affiliates filed voluntary Chapter 11 petitions (Case No. 01-01430), and immediately sued Lucent, initiating this adversary proceeding. The efforts to reorganize the debtors' businesses were unsuccessful, and on December 19, 2001, substantially all of Winstar's assets were sold for approximately $42.5 million. ROA 367 at 12-34 (Scherf Tr.); PX 460 at 10, ROA 1702. On January 24, 2002, the Bankruptcy Court converted the cases to chapter 7.

As of the time of the bankruptcy, Winstar owed Lucent approximately $735 million for unpaid loans, for which Lucent filed proofs of claim. *See* DX 46 at tab A.1 & A.4, ROA 524. With respect to the equipment securing these loans, the parties entered into a series of stipulations during the bankruptcy case in which they agreed that the value of that collateral (which was ultimately sold with the other assets) was only approximately $21 million. Those funds today are held in escrow.

## ARGUMENT

### I.     THE PREFERENCE JUDGMENT MUST BE REVERSED.

The preference statute, section 547(b) of the Bankruptcy Code, provides that a trustee may avoid any transfer of (1) an interest of the debtor in property that is (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before that transfer was made; (4) made while the debtor was insolvent; (5) made between 90 days and one year before the date of the filing of the bankruptcy petition, if the creditor at the time of the transfer was an insider; and (6) that enables the creditor to receive more than the creditor would receive in a distribution in a chapter 7 bankruptcy had the transfer not occurred. 11 U.S.C. § 547(b).

The preference statute serves the fundamental bankruptcy objective of achieving equality of treatment among unsecured creditors. In the immediate period before filing for bankruptcy, a debtor presumably may pay some creditors and not others. These preferential payments to certain creditors run contrary to the goal of equal treatment of creditors. Consequently, a trustee is permitted to unwind certain preferential payments made before the bankruptcy.

The $188.2 million judgment on the Trustee's preference claim entered here, however, must be reversed for three separate and independent reasons. *First*, because Lucent received the Siemens repayment more than 90 days before Winstar filed for bankruptcy, the Trustee had to show that Lucent was an insider of Winstar. She did not and could not. She relied exclusively on evidence of various corporate misdeeds. Until the bankruptcy court's decision in this case, no court had ever found that type of evidence sufficient to establish insider status. The law requires

22

far more: a showing that the insider exercised managerial control over the debtor and its business affairs. There was no evidence in this case of such control.

*Second*, Winstar never made a transfer of its interest in property to Lucent. Instead, the funds transferred to Lucent were *Siemens* funds that were "earmarked" for Lucent. The transaction at issue did not diminish the estate's property at all: it merely substituted Siemens for Lucent as a creditor. Under established law—and for good and common-sense reasons—such a swapping out of one creditor for another is not a "preference."

*Third,* even if the payment of the Siemens loan proceeds did give rise to preference liability, the amount of the preference should have been substantially reduced in light of Lucent's affirmative defense that it had provided subsequent "new value" to Winstar under section 547(c)(4) of the Bankruptcy Code. The bankruptcy court's new value analysis ignored entire lines of argument and made no reference at all to the evidence cited in support of this defense.

### A.        Lucent Was Not An Insider Of Winstar.

Lucent received the $188.2 million at issue more than 90 days but less than one year before Winstar's bankruptcy filing. Thus, for the Trustee to recover the transfer as preferential, she had to prove that Lucent was an insider of Winstar's at the time of the transfer. *See* 11 U.S.C. § 547(b)(4)(B). In holding that Lucent was an insider, the bankruptcy court applied a legal standard wholly unsupported by the governing law. It is settled that an insider must exercise significant managerial control over the debtor's business affairs. The bankruptcy court did not so find, and the record is entirely devoid of any evidence that could support such a finding.

The purpose of the extended preference look-back period for insiders under section 547 is to identify those creditors who so control the operations of the debtor that, if they receive a pre-filing transfer from the debtor, they are likely to have received it not for legitimate business reasons, but because the creditor was manipulating the debtor to the detriment of other creditors. "The basic goals of § 547(b) are (1) to prevent a rush by creditors to dismantle the debtor, and (2) to promote the policy of equality of distribution between similarly situated creditors by

23

preventing debtors from selecting certain creditors to favor by transfers of property on the eve of bankruptcy." *Badger Freightways, Inc. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago (In re Badger Freightways, Inc.)*, 106 B.R. 971, 981 (Bankr. N.D. Ill. 1989). The preference statute allows recovery against insiders and non-insiders alike of transfers made in the 90 days before bankruptcy. But a debtor can plan around the 90-day period. So, for those creditors such as the company's officers and directors, who can direct the debtor's operations and thus control the date on which the debtor files for bankruptcy, the Bankruptcy Code provides an extended preference period. *Id.*

As a matter of law, Lucent was not such an insider. Where, as here, the debtor is a corporation, the Bankruptcy Code provides a list of persons or entities that qualify as insiders. *See* 11 U.S.C. § 101(31).[17] Lucent obviously does not fit—and the Trustee did not contend that Lucent fits—most of the categories specified by the statute. Lucent was clearly not itself a director or officer of Winstar. Indeed, it did not even have a representative on Winstar's board, and no employee of Lucent was an officer of Winstar. Lucent was not a general partner of Winstar; Lucent was not a general partnership in which Winstar was a general partner; and Lucent was not a relative of a general partner, director, or officer of Winstar. Nor was Lucent an affiliate or managing agent of Winstar. *Id.* at § 101(31)(E) and (F). Thus, Lucent could have been a statutory insider of Winstar only if it was a "person in control" of Winstar.[18]

---

[17]    Section 101(31) of the Bankruptcy Code provides that "'insider' includes - . . . (B) if the debtor is a corporation - (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor."

[18]    Because the statutory definition of insider states only what the term "includes," it provides a non-exhaustive list of insiders. Accordingly, an ostensibly separate category, the so-called "non-statutory insiders," exists. *See Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). But, in the commercial and corporate context, courts commonly apply the same standard to determine if an entity is a statutory "person in control" or a "non-statutory insider." *See Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996) (holding that, to satisfy the non-statutory insider standard, the alleged insider "must exercise sufficient authority over the debtor so as to unqualifiedly dictate corporate policy and the

1.    The bankruptcy court applied the wrong standard in concluding that Lucent was a "person in control" of Winstar, relying on allegedly improper transactions rather than requiring actual managerial control on December 7, 2000.

The words of the Bankruptcy Code, like those of any other statute, must be read to mean what they say.[19]  The essential requirement of the "person in control" standard is actual managerial control of the debtor.  *Lynn v. Continental Bank, N.A. (In re Murchison)*, 154 B.R. 909, 913 (Bankr. N.D. Tex. 1993).  To determine whether a creditor exercised actual managerial control, courts look to whether the creditor made personnel decisions, handled payroll or accounts receivable, and otherwise managed the debtor's business.  *See, e.g., Butler*, 72 F.3d at 443.  The requisite control is "sufficient authority over the corporate debtor so as to [unqualifiedly] dictate corporate policy and the disposition of corporate assets."[20]  Thus, a quite substantial body of law makes clear that a "person in control," in the business, commercial, or lender contexts, requires a showing that the creditor exercised managerial or operating control.

-------

disposition of corporate assets") (quoting *Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986)).  Here, the bankruptcy court purported to consider only whether Lucent satisfied the statutory definition of an insider as a "person in control of the debtor."  However, the result does not turn on which doctrinal category is employed: because the legal standard is the same, Lucent is neither a "person in control" nor a "non-statutory insider."

[19]    *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms").  In addition, the canon of *ejusdem generis* also supports the conclusion that a "person in control" must exercise control of the same nature, and to the same extent, as the more specific enumerated "insiders."  *See Andrews v. United States*, 441 F.3d 220, 223-24 (4th Cir. 2006) ("According to the *ejusdem generis* canon, '[a] general word or phrase [that] follows a list of specifics . . . will be interpreted to include only items of the same type as those listed.'" (citation omitted); *In re A. Tarricone*, 286 B.R. at 263 (employing *ejusdem generis* canon in interpreting meaning of non-statutory insider, in light of section 101(31)(B)(i)-(vi)).

[20]    *In re Murchison*, 154 B.R. at 913 (citation omitted).

Here, although the bankruptcy court at one point recited the proper legal standard,[21] it declined to apply it. The court did *not* find specific evidence of managerial or operating control. It did *not* analyze whether Lucent unqualifiedly dictated Winstar's corporate policy and the disposition of Winstar's corporate assets. And it did *not* consider whether Lucent controlled such things as Winstar's personnel, payroll or accounts receivable. Rather, the bankruptcy court took the view that the "[t]rue test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length." Op. at ¶ 135, ROA 347.[22] In so holding, the bankruptcy court erred as a matter of law.

Certainly, some courts have begun the insider discussion by reference to dealings at "arm's length." For example, the Second Circuit has stated that an insider is one who has "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."[23] But even these courts have made clear that such general observations cannot replace the requirement that an insider have actual managerial control. "Flexibility notwithstanding, courts have required *evidence of extensive control* before

---

[21]    The bankruptcy court quoted from a case that explained that, in determining whether a creditor is a "person in control," "courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses." Op. at 73-74, ¶ 136, ROA 347, quoting *Meeks v. Bank of Rison (In re Armstrong)*, 231 B.R. 746, 749-50 (Bankr. E.D. Ark. 1999).

[22]    For this proposition, the bankruptcy court purported to quote *Grossman v. Charmoy (In re Craig Systems Corp.)*, 244 B.R. 529, 539 (Bankr. D. Mass. 2000), but that case lends no support to the bankruptcy court's analysis, and does not even contain the language that the bankruptcy court used. To the contrary, *In re Craig Systems* simply noted that whether "the alleged insider dealt at arm's length with the debtor" was one factor a court might consider, but it made clear that, in the final analysis, "[f]or a person to be considered an insider it must appear that they have at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualif[iedly] dictate corporate policy and the disposition of corporate assets." *Id.* (citations and internal quotations omitted).

[23]    *Herbert Const. Co. v. Greater N.Y. Savs. Bank (In re 455 CPW Assocs.)*, No. 99-5068, 2000 WL 1340569, at *5 (2d. Cir. Sept. 14, 2000) (Attachment A). *See also Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992) (courts should consider the closeness of the parties' relationship and whether the transactions were conducted at arm's length).

26

finding insider status [as a person in control]." *In re 455 CPW Assocs.*, 2000 WL 1340569 at *5 (emphasis added). "[W]hether a transaction was conducted at arm's length is not, for 'insider' purposes, completely dispositive of the issue." *Yoppolo v. Lindecamp (In re Fox)*, 277 B.R. 740, 745 (Bankr. N.D. Ohio 2002).

The leading case of *Badger Freightways* exemplifies the correct analysis of "person in control," and throws into stark relief the errors made by the bankruptcy court here. In that case, the defendant bank, like Lucent here, contended that the debtor "must allege facts demonstrating that [the alleged insider] had management control over [the debtor]." 106 B.R. at 981. In contrast, the debtor, like the Trustee here, claimed that "[a]ll it must allege are facts demonstrating that [the debtor] and the [defendant bank] representative were sufficiently close that the restructuring was not negotiated on an arms-length basis." *Id.* In resolving that question, the *Badger* court focused on the "basic goals" of § 547(b): (1) to prevent a rush by creditors to dismantle the debtor, and (2) to promote the policy of equality of distribution between similarly situated creditors. The *Badger* court therefore concluded that a lender is an insider only if it, like a corporate officer or director, can manipulate the timing of the debtor's bankruptcy filing and otherwise "control" its basic managerial decisions. *Id.* In so holding, the court considered, and expressly rejected, the very rule the bankruptcy court announced here—that a lender is an insider if its dealings with the debtor were not at arm's length. *Id.* That inchoate standard has no basis in the statute's text, its purpose, or in the applicable caselaw.

Because the bankruptcy court was looking for evidence of the wrong thing—whether transactions were "at arm's length," rather than whether Lucent exercised managerial control over Winstar—its approach to the evidence was fundamentally wrongheaded. A number of the bankruptcy court's own findings demonstrate that Lucent *did not* exercise managerial control over Winstar. For example, the bankruptcy court found that (1) in the spirit of cooperation and because of pressure from Winstar, Lucent passed through Wireless-performed services although it was not contractually required to do so and although it objected to the arrangement, Op. at ¶¶ 43,

45, ROA 347; (2) Winstar extracted concessions from Lucent, *id.* at ¶ 71; (3) Winstar entered into agreements to buy equipment from Siemens, Lucent's competitor, *id.* at ¶ 68; and (4) Lucent funded substantially more non-Lucent purchases than anticipated under the Supply Agreement, *id.* at 22, n.23.

Indeed, the substantial body of uncontested evidence in this record simply does not permit the conclusion that Lucent had managerial control over Winstar. Most importantly, Winstar extracted extremely favorable financing terms from Lucent in May 2000, obtaining a loan with a very high borrowing limit secured by a rather limited collateral base. In addition, Winstar aggressively interpreted the Supply Agreement's best of breed provision, which many times resulted in its rejection of Lucent content. Finally—completely against Lucent's wishes— Winstar entered into another strategic relationship with Lucent's rival Siemens under which it agreed to purchase substantial quantities of equipment from Siemens, rather than from Lucent.

Significantly, there is no evidence at all that Winstar's paying the Siemens proceeds over to Lucent was anything other than a commercially reasonable arm's-length transaction, as that payment was expressly required by the terms of the Second Credit Agreement. In fact, a number of courts have made clear that unless the alleged preferential payment itself resulted from the improper exercise of "control," a payment made more than 90 days before the bankruptcy is not subject to preference challenge.[24]

The bankruptcy court not only applied the wrong legal standard, confusing non-arm's-length transactions with managerial control, but also lost sight of the requirement, set forth in the statutory language, that the defendant be "in control" of the debtor "at the time" of the alleged preference. 11 U.S.C. § 547(b)(4)(B). The transactions on which the court relied took place

---

[24]    *See, e.g., In re Tarricone,* 286 B.R. at 262-263; *see also ABC Elec. Servs. v. Rondout Elec. (In re ABC Elec. Servs.),* 190 B.R. 672, 676 (Bankr. M.D. Fla. 1995); *Three Flint Hill Ltd. P'shp v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'shp.),* 213 B.R. 292, 298 (D. Md. 1997); *Rush v. Riddle (In re Standard Stores, Inc.),* 124 B.R. 318, 324 (Bankr. C.D. Cal. 1991).

months in advance of the December 7, 2000 transfer, the last occurring in September 2000. And the record contains significant evidence showing that the Lucent-Winstar relationship changed dramatically in the months immediately leading up to the transfer. In October 2000, Lucent changed its senior management and, as part of its adoption of a more conservative business strategy in accord with the more challenging business environment, reduced its focus on vendor financing.[25] Most critically, in December 2000—"at the time" of the alleged preferential payment to Lucent—Winstar entered into a new relationship with one of Lucent's principal competitors, Siemens, something that Lucent would never have let Winstar do if it truly had been "in control" of Winstar. *See* DX 474, ROA 953.

In addition, while the record contains no evidence or finding that Lucent exercised managerial control over Winstar at any time, no one contends that Lucent was a "person in control" of Winstar by the date of the bankruptcy. Lucent thus could not direct or control the timing of the Winstar bankruptcy filing, one of the key reasons that insider transactions are subject to a longer look-back period. In fact, if Lucent was in control of Winstar, it surely exercised that control in an extraordinarily peculiar manner—permitting Winstar to file for bankruptcy when it owed Lucent some three quarters of a billion dollars, having recently run up hundreds of millions of dollars in new debt, and allowing Winstar to accompany its bankruptcy petition with a lawsuit seeking damages in excess of $10 billion. Insofar as an "inference" of control may be drawn from events separated by months from the date of the transfer, the bankruptcy court never even sought to explain why it elected to rely on improper transactions (which by no means equate with control) that took place months before December 7, 2000; rather than the obvious lack of control demonstrated only a few months later.

---

[25]     *See* ROA 376 at 21-8 & 21-10-12 (Schacht Tr.) ("it was very clear to me that we had to change the way we were doing business top to bottom . . . . And this meant very much pulling back on how we did vendor financing . . . [e]verything changed—the way we did business, who was in charge, the way we organized, the policies of the company . . . we had new people, new organization, new way of doing business, a completely different philosophy.")

2.    The bankruptcy court improperly relied on Lucent's contractual leverage
and bargaining power to support its conclusion that Lucent "bullied"
Winstar and exercised control.

The bankruptcy court also erred in relying, for its insider conclusion, on what it perceived

to be Lucent's "improper" exercise of superior bargaining power.[26] That holding disregards the

clear distinction—repeatedly recognized in the caselaw—between exercising legitimate leverage

obtained through a bargained-for contractual relationship and the type of control that gives rise to

insider status. "The fact that a debtor has a weak bargaining position and few choices does not

indicate that the other party is an insider as long as the [creditor] cannot unilaterally implement

the transfer in issue." *Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522,

530 (Bankr. N.D. Ill. 1991) (quotations and citations omitted). Numerous other cases are in

accord.[27] Indeed, even where a lender has the power to shut down a debtor's operations because

of the debtor's defaults under the loan agreement, the lender is not an insider, because its control

is merely financial, not operational or managerial. *Id.* at 530.

Lucent's conduct was completely consistent with the terms of its agreements with

Winstar. While the bankruptcy court may have viewed Lucent as a "bully" for ultimately

enforcing its contractual rights and using its contractual and business leverage, it cannot use the

preference statute to penalize Lucent for conduct that was wholly permissible under the parties'

freely entered contractual agreements. As the Seventh Circuit put it: "[W]e are not willing to

embrace a rule that requires participants in commercial transactions not only to keep their

contracts but also do 'more'—just how much more resting in the discretion of a bankruptcy judge

---

[26]    For example, the court noted that Lucent was "the much larger company [that] bullied
and threatened the smaller [Winstar] into taking actions that were designed to benefit the larger at
the expense of the smaller," Op. at ¶ 18, ROA 347; that Lucent "manipulated the timing of a
refinancing notice that would have put the world on notice that Winstar was in dire financial
straits until Lucent could take some more," *id.*; and that "when Winstar did not behave as Lucent
wanted, Lucent simply shut down any discussion of a transition agreement," *id.* at ¶ 71.

[27]    *In re Babcock Dairy Co.*, 70 B.R. at 666; *see also, e.g., In re Armstrong*, 231 B.R. at 749-
50 (stating that financial oversight—even intrusive financial oversight—does not amount to
control giving rise to insider status).

assessing the situation years later." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*,

908 F.2d 1351, 1356 (7th Cir. 1990) (Easterbrook, J.).

> 3.  The bankruptcy court's adverse inference drawn from former Lucent
>     employees' invocation of their Fifth Amendment rights does not support
>     its conclusion.

In reaching its conclusion that Lucent was in control of Winstar, the bankruptcy court

relied very heavily on an adverse inference drawn from two former Lucent employees' invocation

of the Fifth Amendment. Those ex-employees, Deborah Harris and William Plunkett, invoked

the privilege when questioned about the end-of-quarter transactions, the software pool agreement,

and other transactions in which it was alleged that Lucent billed Winstar for equipment that it

never delivered (the so-called "bill and hold" transactions). Op. at ¶¶ 142-145. This, too, was

legal error. The invocation of the Fifth Amendment by these former Lucent employees could

support an inference only that various transactions in which those employees participated may

have involved misconduct,[28] including accounting improprieties for which they might have faced

personal criminal liability. It cannot support an inference that Lucent had managerial control

over Winstar's business decisions.

Of course, there is no absolute bar in a civil case to drawing an adverse inference from

the invocation of the privilege against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308,

318 (1976). But "the key to the *Baxter* holding is that such adverse inference can only be drawn

---

[28]     Both Deborah Harris and William Plunkett made clear that they intended to invoke their
Fifth Amendment privilege against self-incrimination on every question except for those as to
their name, address and telephone number. *See* ROA 278, Ex. A, Plunkett Dep. at 5; *see also id.*
Ex. B, Harris Dep. at 3-4. The Third Circuit has expressly cautioned that in such circumstances,
it is improper to rely, as the bankruptcy court here did, on "fact-specific questions by which the
examining attorney effectively testifies for the invoking witness." *RAD Servs., Inc. v. Aetna Cas.
& Sur. Co.*, 808 F.2d 271, 278 (3d Cir. 1986). In fact, in view of the "sharp practices" of trustee's
counsel, *id.*, the drawing of any adverse inference was improper.

     While both Harris and Plunkett might have faced criminal liability at the time of their
depositions, as of this date neither has in fact been charged with criminal wrongdoing in
connection with these transactions that took place in September 2000. *See generally* 18 U.S.C.
3282; (five-year statute of limitations for federal securities fraud); *United States v. Pelullo*, 964
F.2d 193, 214 (3d Cir. 1992) (noting five-year statute of limitations for mail and wire fraud where
the victim was not a financial institution).

when independent evidence exists of the fact to which the party refuses to answer." *Doe By &*
*Through Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). The bankruptcy court
disregarded this condition, making no finding of independent evidence that Lucent controlled
Winstar. And none exists: at most, the record contains "independent evidence" that certain
transactions, such as the software pool agreement, were part of an improper effort to meet
revenue targets. In equating that inference—that the parties engaged in "sham transactions"
intended to "inflate . . . revenues," Op. at ¶ 143, ROA 347—with the entirely separate question
whether Lucent controlled Winstar, *id.* at ¶ 145, the bankruptcy court merely replicated the
fundamental legal error that otherwise infected its analysis of the insider issue. As a matter of
law, wrongful conduct does not equate with insider status. *See In re Vinard*, 133 B.R. 217, 220
(Bankr. S.D. Ind. 1991) ("[f]raud or bad faith is not the basis for preference recovery").[29]

*    *    *

The bankruptcy court's insider ruling is a dramatic expansion of existing law. Research
has not revealed any prior decision in which one public company was held to be an insider in
control of another. The determination that Lucent was an insider of Winstar, on the record here,
has broad and far-reaching implications for lenders and others who transact business with
companies that may seek bankruptcy protection in Delaware. As one court noted in rejecting a
similar effort to extend insider liability to a creditor with whom the debtor had a business
relationship, such an extension would mean that "every entity that negotiated a contract with the
debtor within one year of the filing would be subjected to a preference attack by the trustee
because the contract allegedly created a special relationship for control purposes." *Balaber-*

---

[29]    In *Vinard*, the debtors sued their bank, alleging that they never intended to collateralize a
certain loan with their home. *Id.* at 219-220. They argued, in essence, that because the bank had
improperly acquired the home mortgage to secure that loan, the bank's lien could be avoided as a
preferential transfer to an insider. *Id.* at 220. The court disagreed: "The Debtors' allegations, if
true, may establish fraud or bad faith dealing, but not fraud or bad faith dealing *by an insider.*"
*Id.* (emphasis in original).

*Strauss v. GTE Supply (In re Coin Phones, Inc.)*, 153 B.R. 135, 141 (Bankr. S.D.N.Y. 1993). The bankruptcy court's "interpretation of 'insider' would subject such a large pool of individuals to preference actions that the term insider would be given an 'absurd and illogical' meaning." *Id.* (quoting *Oliver v. Kolody (In re Oliver)*, 142 B.R. 486, 490 (Bankr. M.D. Fla. 1992)). Because the bankruptcy court's unprecedented expansion of insider liability cannot be squared with the controlling legal standard, the preference judgment must be reversed.

### B.    The Payment To Lucent Was Not A Transfer Of Property Of Winstar Because It Came From Earmarked Funds.

The Trustee's preference claim fails for another fundamental reason: there was no "transfer of an interest of the debtor in property." 11 U.S.C. § 547(b). Rather, Siemens provided $194 million in new financing, and it was this money—coming from Siemens, not Winstar—that funded the $188.2 million payment to Lucent.

Under the well-established "earmarking" doctrine, when a new creditor agrees simply to switch positions with a prior creditor by providing the financing to pay the amount the debtor owes to the prior creditor and thereafter standing in that creditor's shoes, the prior creditor is deemed by law not to have received any transfer from the debtor. Rather, the new creditor's funds are considered to have been "earmarked" for the prior creditor. The requirements of the earmarking doctrine are met where "(1) [there is] . . . an agreement between the new lender and the debtor that the new funds advanced will be used to pay a specified antecedent debt, (2) . . . that agreement [is performed] according to its terms, and (3) the transaction viewed as a whole . . . does not result in any diminution of the [debtor's] estate." *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 566 (8th Cir. 1988).[30]

---

[30]    *See also id.* at 565 ("When new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be 'earmarked' and the payment is held not to be a voidable preference."); *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1070 (6th Cir. 1987) (same); *see also Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004 (9th Cir. 2000) (reversing

That is precisely what happened here. Siemens provided nearly $194 million knowing full well—indeed, the operative documents required—that the funds it provided would be used to pay Lucent; the funds were so used, with the payment to Lucent occurring on the very same day that Siemens provided its new loan; and Winstar's bankruptcy estate was not diminished at all, since the new $194 million provided by Siemens more than offset the $188.2 million payment to Lucent.

The bankruptcy court nevertheless refused to apply the earmarking doctrine, holding, procedurally, that Lucent had waived the issue and, substantively, that the doctrine did not apply in any event. The bankruptcy court was wrong on both counts.

        1.    <u>Lucent did not waive the earmarking doctrine.</u>

The bankruptcy court's waiver holding had two elements. First, the bankruptcy court faulted Lucent for failing to plead earmarking as an affirmative defense. Op. at ¶ 100, ROA 347. Second, the bankruptcy court stated that Lucent had stipulated that the requirement for a preference claim set forth in section 547(b)(1) had been satisfied. *Id.* at ¶ 96. Neither point has merit.

As for the former, the bankruptcy court was flatly wrong in asserting that earmarking is an affirmative defense. To the contrary, it is an element of the plaintiff's case-in-chief in a preference action to prove that the transfer at issue was of "an interest of the debtor"—*i.e.*, that the payment did not come from funds of a new lender earmarked to pay the old lender. 11 U.S.C. § 547(b).[31] Accordingly, it is the plaintiff, not the defendant, that bears the burden of proving and pleading that there was a transfer of property of the debtor. *In re Libby*, 247 B.R. at 467; *In re Safe-T-Brake*, 162 B.R. at 362. As with any other element of the plaintiff's case-in-chief in any

---

preference judgment because the earmarking doctrine applied and hence the payment to the old lender was not a transfer of property of the debtor).

[31]    *See Stingley v. AlliedSignal, Inc. (In re Libby Int'l., Inc.)*, 247 B.R. 463, 467 (B.A.P. 8th Cir. 2000); *Int'l Ventures v. Block Props VII (In re Int'l Ventures, Inc.)*, 214 B.R. 590, 594 (Bankr. E.D. Ark. 1997); *Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., Inc.)*, 162 B.R. 359, 362-63 (Bankr. S.D. Fla. 1993).

civil action, the defendant is not obligated to plead as an affirmative defense that the plaintiff cannot prove its case. *See In re Int'l Ventures, Inc.*, 207 B.R. 618, 620 (Bankr. E.D. Ark. 1997) ("the earmarking doctrine is not required to be pleaded as an affirmative defense since it is an element of the plaintiff's proof rather than an affirmative defense").

The bankruptcy court similarly erred in its other rationale for concluding that Lucent had waived the earmarking doctrine. The bankruptcy court pointed to a pre-trial stipulation in which Lucent acknowledged that "*[s]ection 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.*" Op. at ¶ 96, ROA 347 (citing an earlier version of the Jt. Stip. at ¶ 18, ROA 327) (emphasis added). But by its express terms, section 547(b)(1) speaks only to whether the transfer at issue was "to or for the benefit of a creditor," 11 U.S.C. § 547(b)(1), not to whether the transfer was of "an interest of the debtor in property." The latter is a separate element of a preference claim that is set forth in the introductory language to section 547(b), before the beginning of clause (1). Section 547 specifies:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>     (1) to or for the benefit of a creditor;

11 U.S.C. § 547. As one court explained after quoting subsection (b), including the five clauses, (1) through (5):

> There is, however, a sixth element that the trustee must prove to establish that a transfer is a voidable preference. While this sixth element is not specifically identified and enumerated, as are the other elements of a voidable preference in section 547(b), it nevertheless appears clearly in the introductory language in section 547(b). The Bankruptcy Code requires the trustee to establish by a fair preponderance of the evidence that there was a transfer of ". . . an interest of the debtor in property."

*In re Safe-T-Brake*, 162 B.R. at 362-63.

Lucent's stipulation that the payment at issue was "to or for the benefit of a creditor" merely acknowledged that Lucent was a creditor of Winstar and that it received the payment. It says nothing about whether the payment was made with funds belonging to Winstar, rather than

with funds belonging to Siemens that were earmarked to pay Lucent. The bankruptcy court's

contrary reading of the stipulation ignores its plain language—Lucent stipulated that the Trustee

had satisfied the requirements of section "547(b)(1)," not that the Trustee had satisfied the

separate element set forth in the introductory language to section 547(b). And the bankruptcy

court's ruling on this point is a conclusion of law entitled to no deference.[32] Moreover, even if

the stipulation here were not expressly limited to section 547(b)(1), the strong judicial preference

for reaching the merits of disputes would require that any ambiguity in the stipulation be

construed against finding a waiver by Lucent of the earmarking doctrine.[33]

> 2.  The parties agreed that the proceeds of the Siemens loan would be, and
>     they in fact were, earmarked for Lucent.

Despite its ostensible finding of waiver, the bankruptcy court went on to address the

merits, and concluded that the earmarking doctrine did not apply. That conclusion was similarly

erroneous.

As noted, the earmarking doctrine applies, and a transfer is accordingly not avoidable,

where three conditions are met: "(1) the existence of an agreement between the new lender and

the debtor that the new funds advanced will be used to pay a specified antecedent debt, (2)

performance of that agreement according to its terms, and (3) the transaction viewed as a whole

. . . does not result in any diminution of the [debtor's] estate." *In re Bohlen*, 859 F.2d at 566.

Satisfaction of the second element is not disputed. If there was an agreement between

Siemens and Winstar that the Siemens loan proceeds be used to pay down the debt to Lucent, it

plainly was performed. Indeed, the Trustee so stipulated. *See* Jt. Stip. at ¶ 17, ROA 327

---

[32]    *See USX Corp. v. Penn Cent. Corp.*, 130 F.3d 562, 566 (3d Cir. 1997) ("A consensual
stipulation of the parties is 'to be interpreted according to the general principles of contract
construction.'") (quoting *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 824 F.2d 249,
254 (3d Cir. 1987)); *Washington Hosp. v. White*, 889 F.2d 1294, 199 (3d Cir. 1989) (the proper
interpretation of a contract is a question of law, not fact, subject to plenary review on appeal).

[33]    *Cf. Lundy v. Adamar of New Jersey, Inc.*, 34 F.3d 1173, 1186 & n.5 (3d Cir. 1994) ("'the
outcome of cases should turn on their merits rather than on technical issues of pleading and
procedure'") (quoting 2 James Wm. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 1.13[1],
at 1-59).

RLF1-3009112-1

("Winstar wire transferred $188,180,000.00 to Lucent, which represented a payment of the $194,000,000.00 net proceeds of the Siemens loan minus $5,820,000.00 [a refund of an upfront fee paid to Lucent at the time of the borrowing under the Second Credit Agreement]").

The bankruptcy court erroneously concluded that the other two elements for earmarking were not satisfied. *First*, the bankruptcy court stated that "there is nothing in the record evidencing an agreement between Siemens and the Debtors that the proceeds of the Siemens transaction be used to pay Lucent." Op. at ¶ 99, ROA 347. That observation was simply incorrect.

When Siemens made its loan, the bank facility that Siemens joined mandated that the proceeds of that loan be used to pay down Winstar's debt to Lucent. The loan agreement for that facility made it an event of default for Winstar to "fail to pay any Indebtedness (other than obligations hereunder) in an amount of $25.0 million or more when due." DX 284 at § 9.01(f), ROA 763. Lucent's Second Credit Agreement, in turn, provided that if Winstar incurred additional debt under the bank facility, the proceeds had to be used to pay down Lucent's debt. Jt. Stip. at ¶ 23, ROA 327.[34] Accordingly, had Winstar not used the Siemens funds to pay Lucent, it would have "failed to pay an[] Indebtedness" of over $188 million—and thus Winstar would have been in immediate default of its loan agreement with Siemens. In short, the bank agreement pursuant to which Siemens made its loan required Winstar to use the Siemens loan proceeds to pay Lucent.

---

[34]    The Lucent Second Credit Agreement included negative covenants limiting the indebtedness of not only the borrower WVF-1, but also the "Parent" (Winstar Communications), the "Bank Borrower" (WCI Capital) and "Restricted Subsidiaries" (certain operating subsidiaries of Winstar). DX 29 at § 6.01 (Negative Covenants); *see also id.* at § 1.01 (Defined Terms), ROA 507. Subject to such covenants, those entities could incur additional indebtedness under the Bank Facility provided that "the proceeds [are] applied to prepay [the Lucent] Loans . . . ." *Id.* at § 6.12; *see also id.* at § 1.01 (Defining "Loans") & § 6.01 (limiting any of these entities from incurring additional indebtedness, except subject to § 6.12). The Second Credit Agreement further stated that failure to perform the covenant of section 6.12 constituted an "Event of Default" which would terminate any obligation of Lucent to provide future financing and also make all outstanding loans immediately payable and due. *Id.* at Article VII(c).

This was no accident. Winstar, Siemens, and Lucent were all sophisticated commercial actors, and all were well aware of the consequences of the agreements they made. The parties' joint understanding that the proceeds of the Siemens loan were to go to Lucent is amply evidenced in the record. Before borrowing the additional $194 million from Siemens, Winstar requested that Lucent waive the requirement that the proceeds be paid to Lucent, which Lucent refused to do. DX 486, ROA 965. Winstar thus knew that the funds it obtained from Siemens would have to be used to pay Lucent. So, too, did Siemens and the other sophisticated commercial lenders under the bank facility. In a memorandum dated only three weeks before the closing of the Siemens loan, the agent bank for the facility advised the lenders that Winstar "intends on utilizing up to $200 million of proceeds from the [Siemens loan and other new capital] to repay outstandings under the credit agreement with Lucent . . ." DX 721 at Siemens ICN 02210, ROA 1200.

As a matter of law, because (1) the Lucent credit agreement required Winstar to use the proceeds of any extension of the bank facility exclusively to pay down Lucent's debt, and (2) the bank facility provided that Winstar would be in default if it failed to comply with this term in the Lucent credit agreement (thus "incorporating" the terms of the Lucent agreement into the bank facility itself[35]), Winstar and Siemens agreed that the Siemens proceeds would be used to pay down Lucent's debt.[36] The bankruptcy court's contrary conclusion is simply unsupportable and contrary to controlling law.

---

[35]     *See Schy v. Fed. Deposit Ins. Corp.*, 465 F. Supp. 766, 768 (E.D.N.Y. 1977) (cross-default provision "incorporated the negative covenants of pre-existing agreements").

[36]     Even if it were the case—which it clearly is not—that the record was ambiguous or incomplete on the question whether Siemens and Winstar had agreed that the loan proceeds were to be paid over to Lucent, the bankruptcy court erred in placing the burden of proof on this issue on Lucent. "The [T]rustee had the burden to prove the earmarking doctrine does not apply." *Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)*, 137 F.3d 1087, 1089 (8th Cir. 1998) (citations omitted); *In re Int'l Ventures*, 214 B.R. at 594; *In re Safe-T-Brake,* 162 B.R. at 364-65.

*Second*, the bankruptcy court concluded that the transaction did not fall within the earmarking exception because it diminished Winstar's bankruptcy estate. Again, the bankruptcy court erred. Winstar suffered no loss as a result of the Siemens loan. It obtained a new $194 million from Siemens and paid $188.2 million of that amount to Lucent. As a matter of law, there was no diminution of Winstar's estate. "'[R]eplacing one creditor with another of equal priority does not diminish the estate and thus no voidable [transfer] results.'" *In re Safe-T-Brake*, 162 B.R. at 364.

The bankruptcy court reached a contrary conclusion, asserting that "[b]ut for the payment over to Lucent, [Winstar] would have had the use of those funds." Op. at ¶ 98, ROA 347. But that statement ignores the terms of the Siemens-Winstar loan agreement, which obligated Winstar to use the proceeds to pay Lucent. The whole point of the earmarking doctrine is that such contractual arrangements operate to earmark the new lender's proceeds for the benefit of the old lender. Those proceeds thus never become the debtor's property as a matter of law.

The bankruptcy court's only other explanation for concluding that Winstar's estate had been diminished was that Siemens' loan was secured by a different "collateral pool" from Lucent's. *Id.* at ¶ 99. But that difference was legally immaterial. The creditors' respective collateral pools would matter only if Winstar had been required to surrender value in order to obtain the new Siemens loan. For example, had Winstar been required to impair or encumber previously unencumbered assets in order to obtain the loan, or if the new indebtedness otherwise had consumed Winstar's equity in existing collateral supporting the bank facility, [37] the making of the new loan might have diminished the estate.

---

[37]    Take, for example, a consumer debtor who owns a house valued at $100,000 that is subject to a $75,000 first mortgage. If that debtor grants a second mortgage to a new lender in order to refinance $20,000 of unsecured credit card debt, the new loan has consumed $20,000 of equity in the house and therefore diminished the estate by $20,000.

Neither happened here. Winstar gave no additional collateral to secure Siemens' $194 million loan, beyond the collateral Winstar had already given to secure the bank facility. *See* DX 474, ROA 953 (containing no provision requiring additional collateral). And, the bank facility was not oversecured, so there was no possibility that Siemens's loan could eat into any Winstar "equity" by encumbering assets of Winstar's that were previously unencumbered. To the contrary, there was already over $1 billion outstanding on the bank facility,[38] which was secured by assets worth a small fraction of that.[39]

"Even where the debtor transfers a security interest in return for the loan, the payment is only a voidable preference to the extent the transaction depleted the debtor's estate." *In re Hartley*, 825 F.2d at 1071. Here, the transaction did not deplete that estate at all. Accordingly, the Trustee's preference claim fails as a matter of law. The judgment must be reversed.

### C.    Lucent Is Entitled To A New Value Defense.

Even if Winstar's payment to Lucent of the Siemens loan proceeds were avoidable as a preference, Lucent would still have a substantial new value defense with respect to much of the preference claim.

Section 547(c)(4) of the Bankruptcy Code provides that the trustee may not avoid a transfer "to or for the benefit of a creditor, *to the extent that*, after such transfer, such creditor gave new value to or for the benefit of the debtor—(A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4) (emphasis added). This "new value" defense recognizes that, when a creditor receives an otherwise preferential transfer, but then provides unsecured new value to the estate, the estate is

---

[38]    The parties stipulated that Winstar had drawn down on the bank facility to pay off the balance of the First Credit Agreement in May of 2000. Jt. Stip. at ¶ 8, ROA 327. That balance totaled approximately $1.207 billion. *See* DX 300, ROA 779.

[39]    Substantially all of Winstar's assets—including those "securing" the Siemens loan and the rest of the bank facility—were sold in Winstar's bankruptcy for less than $60 million. *See* ROA 367 at 12-34 (Scherf Tr.) (discussing sale of Winstar assets and equity in bankruptcy).

replenished. Accordingly, the preferential transfer is recoverable only to the extent that it exceeds

the subsequent new value, provided that the new value is not secured by an unavoidable security

interest. *See Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1092 (5th Cir.

1994) (citing *Kroh Bros. Dev. v. Continental Constr Eng'rs, Inc. (In re Kroh Bros. Dev.)*, 930

F.2d 648, 652 (8th Cir. 1991)).

Lucent provided the following new value on an unsecured basis to Winstar after

December 7, 2000: (1) $28.6 million of goods and services for which Winstar never paid; and (2)

$62.3 million that Winstar borrowed from Lucent under the Second Credit Agreement to pay for

other parties' services. With respect to the $28.6 million, the bankruptcy court held that Lucent's

new value defense failed because, to the extent that Lucent provided any equipment or software

to Winstar after December 7, 2000, it did so on a secured basis, "subject to two separate security

agreements dated May 9, 2000, and December 22, 2000." Op. at ¶ 150, ROA 347. In support of

that proposition, the bankruptcy court relied on the fact that Lucent filed secured proofs of claim

in the bankruptcy case. *Id.* The bankruptcy court further found that even if the additional value

was provided on an unsecured basis, Lucent failed to show that it provided such additional value

*after* the Siemens repayment. *Id.* The bankruptcy court was wrong in both respects, and it failed

altogether to address the additional $62.3 million in loans Lucent made to Winstar after

December 7, 2000.

     1.    <u>Lucent provided $28.6 million in new value in the form of equipment and related services.</u>

After December 7, 2000, Lucent provided to Winstar $28.6 million in equipment and

related services. The bankruptcy court erred in finding that Lucent provided that equipment and

services on a secured basis pursuant to the Security Agreements (dated May 9, 2000 and

December 22, 2000), DX 32, ROA 510; DX 33, ROA 511, and in concluding that Lucent had not

proved that it delivered the new value after December 7, 2000.

The equipment and services at issue had absolutely nothing to do with Lucent's secured lending to Winstar or the collateral pledged to support Lucent's secured loans. It is undisputed that the Security Agreements secured only those obligations incurred by WVF-I and WVF-LU2, the entities named as borrowers under the Second Credit Agreement. DX 32, ROA 510; DX 33, ROA 511. But the equipment and services at issue were not financed by those borrowers under the Second Credit Agreement.[40] Thus, the debt owed to Lucent by Winstar arising from Lucent's sale of the equipment and services was not secured at all by the WVF-I and WVF-LU2 Security Agreements.

Simply put, Lucent had a security interest only in the assets of WVF-I and WVF-LU2. It did not hold a security interest in any of the assets of Winstar. The bankruptcy court recognized this fact in an earlier part of its opinion, Op. at ¶ 34, ROA 347, but then disregarded it in examining the new value issue. The equipment and services at issue were provided to and purchased by Winstar entities other than WVF-I or WVF-LU2. DX 644, ROA 1123. Lucent therefore did not hold a security interest in these assets.

As for the bankruptcy court's other rationale, the record plainly demonstrates that Lucent provided this unsecured new value after it received the $188.2 million payment on December 7, 2000. The unchallenged and uncontradicted testimony of Lucent employee Vernon Terrell and the relevant invoices so specified. ROA 376 at 21-51-52 (Terrell Tr.); DX 644, ROA 1123. And the same testimony established that Winstar never paid for this new value. ROA 376 at 21-52 (Terrell Tr.).

    2.    <u>Lucent provided Winstar with $62.3 million of new value drawn down under the Second Credit Agreement to pay for services.</u>

The bankruptcy court entirely failed to address the additional $62.3 million of new value that Lucent indisputably loaned to Winstar after Winstar submitted a request for borrowing under

---

[40]    *See* ROA 376 at 21-51-52 (Terrell Tr.) (testifying that Winstar never paid for these pieces of equipment and services); PX 480, ROA 1722 (Terrell declaration).

the Second Credit Agreement on December 29, 2000. *See* DX 9, ROA 487. As discussed above, the financing provided by Lucent under the Second Credit Agreement was secured by the assets of WVF-I and WVF-LU2, the borrowers. DX 32, ROA 510; DX 33, ROA 511; Op. at ¶ 34, ROA 347. But the $62.3 million at issue went to finance Wireless services, not to buy assets. JX 9, at 38-39, ROA 468 (Montemarano Cr.). Thus, Lucent, whose loans were at the time already grossly undersecured,[41] received no corresponding increase in the value of its collateral.

As a matter of law, new value includes advances of money, goods, or services "*to the extent that*, after such transfer, such creditor gave new value to or for the benefit of the debtor— (A) not secured by an otherwise unavoidable security interest." 11 U.S.C. § 547(c)(4)(A) (emphasis added). Thus, when an undersecured creditor—like Lucent here—provides something of value, and does not receive a corresponding increase in its collateral base, it has, by definition, provided new value on an unsecured basis and is entitled to an offset for any preference liability to the extent that the new value provided was unsecured.[42] For that reason, the fact that Lucent filed a proof of claim, asserting that its claim was at least in part secured, is of no moment for the purposes of this analysis.[43]

---

[41] As of December 19, 2000, Winstar owed Lucent over $500 million in pre-existing debt. DX 544, ROA 1023. Because of the weak collateral pool securing those loans, *see supra* at 16, they were necessarily undercollateralized. And whatever collateral did secure these loans would, as a matter of law, be applied to the oldest outstanding indebtedness. *Ice Cream Liquidation, Inc v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242, 253-54 (Bankr. D. Conn. 2005) (citation omitted) ("As a general rule, payment is applied to debts in the order in which they accrue."). It thus necessarily follows that the $62.3 million advanced to Winstar under the Second Agreement on December 29, 2000 was lent on an entirely unsecured basis.

[42] *See Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.)*, 393 F.2d 60, 65 (2d Cir. 1968), *cert. denied*, 393 U.S. 837 (1968) (construing section 60c under the Bankruptcy Act, predecessor to Section 547(c)(4) of the Bankruptcy Code); *Ice Cream Liquidation, Inc.*, 320 B.R. at 253-54 (new value defense is available to a creditor to the extent that a subsequent advance is not secured); *S. Tech. Coll. v. Graham Props. P'ship (In re S. Tech. Coll., Inc.)*, 199 B.R. 46, 50 (Bankr. E.D. Ark. 1995), *aff'd* 89 F.3d 1381 (8th Cir. 1996) (landlord may claim new value in provision of leased space in excess of security held).

[43] Lucent filed a proof of claim for more than $700 million owed for borrowings under the Second Credit Agreement, indicating that the claim was secured. That claim included the $62.3

Lucent provided $62.3 million of unsecured new value to Winstar after December 7, 2000. Winstar did not repay or give consideration to Lucent in any way on account of the new value. Lucent is thus entitled to this $62.3 million of new value as an offset against any preference liability.[44]

## II.   LUCENT DID NOT BREACH ANY OBLIGATION TO WIRELESS UNDER THE SUBCONTRACT.

The bankruptcy court erred—both as a matter of law and fact—in holding that in March 2001, Lucent breached the Subcontract that it had entered into with Wireless. The Subcontract is not a lengthy document. It stretches to just over four pages. The core of the parties' obligations to one another is contained in a single subsection, which states, in its entirety:

1.   SERVICES AND SCOPE OF WORK

> 1.1      Services. Contractor [Wireless] agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually, a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties may agree from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable

---

million that Lucent lent in December 2000. *See* DX 46, ROA 524, front page and at tab A.4. Lucent's assertion, however, that its claim was secured does not by itself mean that *any part*, let alone that *all of the claim* was in fact secured. *See In re Earley*, 305 B.R. 837, 840 (Bankr. N.D. Ill. 2004). And even if some portion of the claim was, in fact, supported by collateral, that would by no means establish that the December 2000 loan of $62.3 million—which came on top of more than $500 million of pre-existing debt—was a secured loan. *Supra* at 43 n.41 (explaining that the value of collateral is applied to the oldest outstanding debt). In truth, as discussed above, the new value extended in connection with the December 29, 2000 draw was wholly unsecured.

The bankruptcy court also held that Lucent was secured because it had stipulated that the value of its collateral was approximately $21 million, and that amount was being held in escrow. PX 506-508, ROA 1748-1750. But the stipulations on which the bankruptcy court relied expressly provide that "[n]othing in this Stipulation and Order shall affect or impair . . . the parties' respective rights, arguments, defenses and remedies in the Adversary Proceeding." PX 506 at 5, ¶ 4, ROA 1748.

[44]      In addition, the bankruptcy court's decision cannot be reconciled with its decision on the equitable subordination claim. *See infra* at 55-60. Specifically, the bankruptcy court determined that it was appropriate to transfer Lucent's lien, partly securing its claims, to the estate, rendering Lucent wholly unsecured on its entire claim. But if Lucent's security interest were thus "avoidable," then under the express language of Section 547(c)(4), Lucent should have received the benefit of the new value defense.

> Task Order and shall be on either a firm, fixed price or time and materials basis
> as specified in the applicable Task Order executed by both parties.

DX 117 at § 1.1, ROA 595.

The Subcontract established the "Task Order" as the mechanism by which Lucent could order network build-out services.[45] The Task Order requirement was a critical piece of the Subcontract, because it would enable Lucent to determine which particular services required for the network build-out Lucent would purchase from Wireless, acting as Lucent's subcontractor. If Lucent and Wireless did not agree to a Task Order, nothing in the Subcontract imposed on Lucent any obligation to pay Wireless.

Lucent issued no Task Order for the March 2001 quarter. The Trustee does not dispute the absence of a Task Order, nor did the bankruptcy court find otherwise. The Trustee could therefore prevail on her breach of contract claim only by proving that the parties had modified the terms of the Subcontract before March 2001 to eliminate the requirement of Task Orders.

The bankruptcy court held that such a modification had occurred and that the agreement as modified had been breached. Both conclusions were erroneous as a matter of law. The court completely missed the distinction in New York law between a temporary waiver, which is the most that may have occurred here, and a permanent modification, which plainly did not. And it misapplied the narrow exceptions to the New York rule that "no oral modifications" clauses, like the one that appeared in the Subcontract, are generally to be given effect. Finally, even had the Subcontract been modified, the bankruptcy court was wrong to conclude that Lucent breached the modified terms by failing to pay Wireless: the March 2001 "Request for Borrowing" upon

---

[45]    The Task Order requirement parallels the purchase order requirement of the Supply Agreement. Under Section 4.1 of that agreement, "[a]ll purchases of Deliverables or Services shall be made by means of orders (each, a 'Purchase Order') issued by WinStar to Lucent from time to time pursuant to this Section." DX 28 at § 4.1, ROA 506.

which the Trustee relied was, by its terms, a request for a *loan* made by *Winstar*—not a demand for *payment* made by *Wireless*.[46]

### A.    The Bankruptcy Court Improperly Treated Lucent's Past Waivers Of The Subcontract's Task Order Requirement As An Agreement By The Parties To Modify The Subcontract Permanently.

Between March 1999 and September 2000, Lucent did not insist on strict compliance with the requirement that the parties agree to a Task Order before Wireless performed work. Instead, the parties operated under a less formal procedure, involving the exchange of purchase orders and invoices. As the bankruptcy court found, the procedure followed was that Winstar sent a purchase order to Lucent for certain build-out services. Lucent then sent a corresponding purchase order to Wireless. Wireless then invoiced Lucent for those services and Lucent invoiced Winstar in the same amount. *See* Op. at ¶ 42, ROA 347; *see also* DX 714, ROA 1193 (collecting Winstar and Lucent purchase orders and invoices from the first quarter of 1999 to the third quarter 2000).

The bankruptcy court concluded that Lucent and Wireless had agreed to modify the Subcontract based solely on this evolution in practice, supplemented by just one other piece of evidence: the testimony of a Lucent employee that, as of September 30, 2000, Lucent and Winstar "were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." Op. at ¶ 80, ROA 347. From this, the court concluded that "[t]he requirement that there be 'task orders' as contemplated by the Subcontract was modified by the course of conduct between the parties." *Id.* at ¶ 82. But this conclusion does not follow from the premises. The bankruptcy court erred as a matter of law in failing to analyze whether Lucent's declining to insist on compliance with the

---

[46]    Of course, the fact that the two companies are separate entities is crucial to the Trustee's ability to recover. If Winstar and Wireless were actually the same entity, Lucent would be entitled to offset any damages it allegedly caused Wireless under the Subcontract against the approximately $735 million that Winstar owed Lucent for loans that Winstar has not repaid.

Task Order requirement constituted a temporary waiver, rather than a permanent modification, of obligations under the Subcontract.

Modification of a contract changes the terms of the agreement itself. Proving a modification therefore requires proving "each element requisite to the formulation of a contract, including mutual assent to its terms." *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (App. Div. 1980); *Becker v. Faber*, 19 N.E.2d 997, 998 (N.Y. 1939) ("A contractual obligation may not be altered without the consent of the person who has assumed the obligation."). The bankruptcy court did not even discuss the requirement that it find "mutual assent to [the] . . . terms" of the modification it concluded had been made. Nor did it identify any evidence demonstrating Lucent's assent, as the record contains none. Indeed, over the course of the lengthy trial, no witness pointed to any statement or communication that purported to represent such a modification.

The mere fact that the parties performed in several quarters without complying with the Task Order procedure is insufficient, as a matter of law, to demonstrate the parties' agreement to modify the contract permanently. Similarly, the Lucent employee's quoted comment indicates nothing more than that in a given quarter, the parties entered into a commercially binding relationship by exchanging purchase orders and invoices. And, as a matter of law, the fact that Lucent decided to perform in a given quarter without insisting on Task Orders by no means demonstrates that it agreed to the removal of that condition with respect to *future* quarters. This is the crucial legal distinction between a waiver and a modification, which the bankruptcy court missed entirely.

The New York Court of Appeals has emphasized the importance of this distinction.[47] In *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982), that court found that a lower court had "erred in failing to distinguish between an oral agreement that

---

[47]     The Subcontract is governed by New York law. DX 117 at § 8.5, ROA 595.

purports to *modify* the terms of a prior written agreement and an oral *waiver* by one party to a written agreement of a right to require of the other party certain performance in compliance with that agreement." 436 N.E.2d at 1269 (emphasis added). *See also In re Elcona Homes Corp.*, 863 F.2d 483, 487 (7th Cir. 1988) (Posner, J.) ("Suppose the practice of a landlord is to accept late payment from his tenant. That practice does not entitle the tenant to pay late; it does not modify the contract."); E. Allan Farnsworth, *Farnsworth on Contracts* § 8.5 (2d ed. 2001) ("[I]f a court asks whether the conduct of the parties amounted to a 'modification,' it will determine whether there was assent by applying the usual rules for the formation of contracts. . . . Conduct such as continuing performance with knowledge that the condition has not occurred might be questionable as the manifestation needed for a modification but sufficient for waiver.").

Thus, Lucent's waiving compliance with the Task Order requirement in any given quarter did not commit it to waiving that requirement in future quarters. Here, the Subcontract expressly provides that a party's waiver of a provision in one circumstance does not preclude the party from enforcing the agreement later. *See* DX 117 at § 8.8, ROA 595 (the "waiver of any default or breach [shall not] constitute a waiver of the rights granted in this Agreement with respect to any subsequent other default or breach"). And the law is in any event clear that a waiver can "be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform." *Nassau Trust Co.*, 436 N.E.2d at 1270; *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 811 N.Y.S.2d 47, 51 (App. Div. 2006) (same, because "[w]aiver is unilateral"). Lucent did exactly that in a letter to Winstar dated September 27, 2000. That letter provided that, going forward, until the transition agreement was in place, "Winstar would perform . . . work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Otherwise, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services

presumably on Lucent's behalf." DX 424, ROA 903.[48]  In the same letter, Lucent agreed to

accept the September 2000 purchase order.  *Id.*  Thus, Wireless had a "reasonable time after

notice within which to perform," *Nassau Trust Co.*, 436 N.E.2d at 1270—it was on notice from

the end of September 2000 that no future waivers would be given.  The original, written terms of

the Subcontract were thus in full force for the March 2001 quarter.

> **B.**    **Even Had The Parties' Conduct Otherwise Amounted To A Modification, That Modification Was Ineffective Under The "No Oral Modifications" Clause.**

The Subcontract's plain terms rendered ineffective any putative modification that was not

made in writing and signed by both parties.  Section 8.6 of the Subcontract states:

> No modification, amendment, supplement to or waiver of this Agreement or any Task Order hereunder, or any of their provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties.

DX 117 at § 8.6, ROA 595.  No one contends that any such writing exists.

Clauses requiring any modification to be made in writing—usually referred to as "no oral

modifications" clauses—are generally enforceable and enforced in New York:

> A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y. Gen. Oblig. Law § 15-301(1); see also *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343-44,

397 N.Y.S.3d 922, 926 (1977).  Because the Subcontract contained just such a clause, the claimed

modification by conduct was ineffective.  The original terms of the Subcontract, including its

Task Order requirement, thus controlled, and Lucent did not breach the Subcontract.

---

[48]    The bankruptcy court disregarded this letter because, it thought, Winstar did not freely assent to the terms it contained.  Op. at ¶ 80, ROA 347.  But Winstar's assent was not needed. Lucent had not agreed to any modification of the Task Order requirement, so its declining to insist on compliance with that requirement in the preceding quarters could operate as nothing more than a temporary waiver—which "is unilateral," and thus may be withdrawn by the party that made the waiver at any time in its sole discretion.  *See Madison Ave  Leasehold LLC*, 811 N.Y.S.2d at 51.

The bankruptcy court nevertheless concluded that the "no oral modifications" clause was ineffective, because an exception applied. In *Rose*, the court identified two circumstances in which the general rule should yield, and the modification be allowed. First, the requirement of a writing should be disregarded "[w]here there is partial performance of the oral modification . . . [b]ut only if the partial performance . . . [is] unequivocally referable to the oral modification." *Id.* at 343. Second, an oral modification may be enforced where equitable estoppel applies, *i.e.*, where the party opposing the oral modification "has induced another's significant and substantial reliance" on the modification. *Id.* at 344. But the same condition attaches: "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Id.* In other words, conduct purportedly undertaken in reliance on an oral modification must be inexplicable absent reference to the alleged oral modification.

None of the bankruptcy court's observations,[49] nor any fact in the record, is sufficient to satisfy either of the *Rose* exceptions. As regards the first exception, demonstrating that performance is "unequivocally referable" to an oral modification—as the New York Court of Appeals has explained—is extremely difficult. The standard is satisfied only if the parties' performance is "'unintelligible or at least extraordinary,' explainable only with reference to the oral agreement." *Anostario v. Vicinanzo*, 450 N.E.2d 215, 216 (N.Y. 1983) (Mem.) (citation omitted).[50] In other words, the performance must make no sense at all unless the parties in fact agreed to modify the contract.

---

[49] The bankruptcy court's application of the *Rose* analysis appears in Paragraph 85. It is not clear, however, based on those observations, which of the two exceptions the bankruptcy court found to be applicable.

[50] As the Court of Appeals explained in *Anostario*, "[i]t is not sufficient . . . that the oral agreement gives significance to plaintiff's actions." *Id.* Although that opinion was discussing the partial performance exception to the general New York Statute of Frauds, N.Y. Gen. Oblig. Law § 5-703[1], other decisions of the New York courts and the Second Circuit make clear that its interpretation of "unequivocally referable" applies equally to the *Rose* rule. *E.g.*, *Klein v. Klein*, 589 N.E.2d 382, 382-83 (N.Y. 1992) (Mem.) (applying *Anostario* otherwise-inexplicable test to oral-modification question under N.Y. Gen. Oblig. Law § 15-301[1]); *Isaacs Bus. Ventures, Inc.*

Conversely, "where the performance is 'reasonably explained' by the possibility of other reasons for the conduct," the *Rose* exception is not satisfied. *Merrill Lynch Interfunding,* 155 F.3d at 122. That is the case here: as Winstar's engineering subsidiary, Wireless's primary function was to construct its parent's network. Indeed, Winstar created Wireless in 1998 for the specific purpose of enabling Winstar to manage its network build-out, and then sought to use the entity to obtain the favorable pass-through treatment. *See* DX 695, ROA 1174. Wireless's performance in building out Winstar's network between September 2000 and March 2001 therefore is "reasonably explained" by the fact that Winstar wanted its network built, *whether or not Lucent was going to perform the pass-through.* Even if in some circumstances a party's provision of services is "inexplicable" absent another party's implicit agreement to pay for them, in this regard it is important to bear in mind that in substance, Winstar was building out its own network. Lucent was merely lending money to finance that effort. Thus, Wireless's ostensible performance in building out the Winstar network was by no means "unequivocally referable" to the putative non-written modification. The first *Rose* exception accordingly does not apply as a matter of law.[51]

The second *Rose* exception, equitable estoppel, is quite similar to the first, and for substantially the same reasons also is inapplicable here. "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." 42 N.Y.2d at 344. However, "conduct relied upon to establish estoppel must not otherwise be compatible with

---

*v. Thompson,* 636 N.Y.S.2d 906, 908 (N.Y. App. Div. 1996); *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 122 (2d Cir. 1998) ("For partial performance to overcome § 15-301, that partial performance must be 'unequivocally referable' to the contract. *Rose,* 42 N.Y.2d at 343-44. As interpreted by the New York Court of Appeals, this standard means that the action taken must be 'unintelligible or at least extraordinary, explainable only with reference to the oral agreement.'" (citing *Anostario,* 450 N.E.2d at 216)).

[51]     *See also John Street Leasehold LLC v. FDIC,* 196 F.3d 379, 382 (2d Cir. 1999) (per curiam) (complaining party's actions in making capital improvements not unequivocally referable to oral modification where party would have taken actions anyway).

the agreement as written." *Id.* That is, it must be inexplicable absent the alleged oral modification.[52] The Trustee was unable to satisfy this test, for two reasons.

*First*, as discussed above, the Trustee did not and could not demonstrate that Wireless's conduct in building out Winstar's network could not be explained absent the purported oral modification. Rather, Wireless's conduct was "reasonably explained" by Winstar's desire to have Wireless build Winstar's network, regardless of whether Lucent performed the pass-through.

*Second*, even if Wireless did rely on Lucent to perform the pass-through despite the absence of a Task Order, and its actions were not "otherwise . . . compatible with the agreement as written," 42 N.Y.2d at 344, any such reliance was not reasonable. The September 27, 2000 letter unequivocally notified Winstar and Wireless that Lucent would no longer make pass-through payments to Wireless. DX 424, ROA 903. Winstar well understood this. Richard Uhl, Winstar's CFO, signed the letter and forwarded it to his colleagues with the following explanation: "This is to advise that, commencing October 1, 2000 Lucent will not accept service charges from Winstar until such time Winstar and Lucent agree to the exact services to be provided and Lucent issues Winstar a purchase order in accordance with the attached letter." DX 424, ROA 903; *see also* JX 13 at 143-144, ROA 472 (Uhl Cr.).

If Wireless indeed continued to build out the Winstar network after Lucent sent that letter, expecting to be paid for that work by Lucent, it acted at its own peril. In fact, after sending its September 27, 2000 letter, Lucent accepted no further service charges and issued no purchase orders. The bankruptcy court's claim that "Lucent ignored the reset terms the very next quarter

---

[52]    Although the articulation is different, decisional law makes clear that this condition is the same "unequivocally referable" requirement that applies to the partial-performance exception. *E.g.*, *John Street Leasehold*, 196 F.3d at 382 ("New York will enforce oral modifications in two circumstances—where there has been (1) partial performance or (2) reliance—but only where the subsequent performance or reliance is 'unequivocally referable to the modification.'" (citation omitted)). *See also Towers Charter & Marine Corp. v. Cadillac Ins. Co*, 894 F.2d 516, 522 (2d Cir. 1990) ("[Under the] equitabl[e] estopp[el] exception . . . too, the conduct claimed to have been performed in reliance on the oral modification must be unequivocally referable to the modification.").

[i.e., December 2000]," Op. at ¶ 85, ROA 347, is clearly wrong. In December 2000, all that happened was that *Winstar*, not Wireless, requested financing under the Second Credit Agreement.[53] No pass-through transactions took place. *See* DX 560, ROA 1039 (forwarded email confirming that no invoices or purchases orders would be exchanged; Lucent merely would allow Winstar to use the credit facility to fund services); DX 599, ROA 1078.[54]

In sum, neither of the two narrow exceptions recognized in *Rose* applies. Accordingly, the Subcontract's clause prohibiting modifications not made in a signed writing was fully effective. Thus, the plain, written terms of the Subcontract were in force, and—as nobody disputes—Lucent breached none of those terms.

### C.    Even If Lucent And Wireless Had Effectively Modified The Subcontract, There Is No Evidence Supporting The Conclusion That Such Modified Terms Were Breached.

The bankruptcy court concluded that "[t]he requirement that there be 'task orders' as contemplated by the Subcontract was modified by the course of conduct between the parties." Op. at ¶ 82, ROA 347. By the bankruptcy court's and the Trustee's own accounts, the conduct that replaced the Task Order requirement was one in which "Winstar sent a purchase order to Lucent which, in turn, sent a purchase order to Wireless. Wireless performed the services and then sent Lucent an invoice . . . . Lucent then invoiced Winstar in the same amount as Lucent was billed by Wireless. Then . . . Winstar would draw down under the applicable Credit Agreement, [and] use the draw to pay Lucent which would then pay its obligation to Wireless." *Id.* at ¶ 42; *see also* DX 714, ROA 1193 (collecting purchase orders and invoices for quarters up to and including September 2000).

---

[53]    Op. at ¶ 72, ROA 347 ("By letter dated December 28, 2000 . . . Winstar sent Lucent a request to borrow $62,324,930.00."); DX 9, ROA 487 (Dec. 2000 Request to Borrow).

[54]    Furthermore, Lucent repeatedly told Winstar that Lucent's funding under a pass-through arrangement would not be repeated in 2001. *See* JX 9 at 40-42, ROA 468 (Montemarano Cr.); *see also* DX 599, ROA 1078 (February 2001 letter from Lucent confirming that non-Lucent services will not be funded under the Lucent credit facility in 2001).

Even if the Subcontract had been modified so that an exchange of invoices and purchase orders triggered Lucent's obligation to pay, Lucent still would not have breached the Subcontract. In March 2001, Winstar did not issue a purchase order to Lucent. Nor did Wireless submit an invoice to Lucent. Rather, all that happened was that Winstar made a request to borrow from Lucent under the Second Credit Agreement.[55] Because there was no exchange of purchase orders and invoices among the parties in March 2001, no obligation for Lucent to pay Wireless ever arose, and Lucent could not have breached even the allegedly modified terms of the Subcontract.

At most, Lucent's refusal of Winstar's request to draw down on its line of credit could support a claim that Lucent had breached its obligations to *Winstar* under the Second Credit Agreement. Indeed, the Trustee brought such a claim, but later abandoned it, ROA 207 at ¶ 1— perhaps because any recovery on that claim (for which the Trustee could not establish damages, in any event) would be entirely offset by Winstar's conceded $735 million debt to Lucent. *See* n. 46, *supra.* But a request by *Winstar* to *borrow* funds under the Second Credit Agreement, of course, is not a request by *Wireless* for *payment* under the Subcontract. In fact, the record does not contain any evidence of a communication to Lucent by *Wireless* after September 2000. Accordingly, by denying Winstar's request, Lucent could not have breached the Subcontract's purportedly modified terms.[56]

---

[55]   Op. at ¶ 78, ROA 347 ("On March 27, 2001 Winstar faxed to Lucent a notice of Winstar's request to borrow $62,050,743.00 . . . . The draw request is on Winstar letterhead and is captioned "Notice of Request for Borrowing.").

[56]   The bankruptcy court entered final judgment against Lucent not only on the Trustee's preference claim, but also on this state-law claim alleging breach of contract, having concluded that it was a core bankruptcy matter under 11 U.S.C. § 157(b). Lucent disagrees that this was a core matter on which the bankruptcy court had the authority to enter judgment. *See Marshall v. Marshall*, No. 04-1544, slip op. at 5-6 (U.S. May 1, 2006) ("In non-core matters, a bankruptcy court may not enter final judgment; it has authority to issue only proposed findings of fact and conclusions of law, which are reviewed *de novo* by the district court."). Indeed, Lucent contends that it was entitled to a trial by jury on this claim. Lucent recognizes that in connection with its prior motion to withdraw the reference (as well as its motion to certify an interlocutory appeal from the denial of that motion), this Court rejected that latter position. "The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of

### III.    THE BANKRUPTCY COURT ERRED IN EQUITABLY SUBORDINATING LUCENT'S CLAIMS.

Lucent lost hundreds of millions of dollars in the Winstar bankruptcy, and filed proofs of claim for the amounts it was owed. Ultimately, Lucent and the Trustee stipulated that Lucent's claims were secured by collateral valued at approximately $21 million. PX 506-508, ROA 1748-1750. The bankruptcy court, however, subordinated Lucent's claims and set aside Lucent's lien.

The bankruptcy court's equitable subordination holding is wrong for three reasons. *First*, the bankruptcy court premised its conclusion that Lucent's claim should be equitably subordinated on its improper determination that Lucent was an insider of Winstar. *Second*, even if there were a basis equitably to subordinate some part of Lucent's claim, the bankruptcy court made no effort to tailor the relief to any identifiable harm that Lucent caused Winstar. *Third*, the

---

the rest of the estate and, thus, is now part of the claims allowance process, triable only in equity." ROA 268, D. Ct. Mem. Op. at 10. The bankruptcy court relied on that statement in finding the Subcontract Claim to be a core matter. Op. at 8 n.13, ROA 347.

Lucent respectfully disagrees with those conclusions. In fact, the Subcontract claim has no effect whatsoever on the "ordering of creditors." It affects only the amount that the Trustee will be able to distribute to creditors—not the ordering or priority of those creditors' claims, which in a chapter 7 bankruptcy case, like Winstar's, is determined simply by the Bankruptcy Code's priority scheme. *See* 11 U.S.C. § 726. Indeed, the Trustee's Subcontract claim here is no more "part of the claims allowance process" than was the breach of contract and warranty action in *N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982). In *Marathon*, the Supreme Court concluded that a debtor's claim to recover pre-petition contract damages in order to augment the assets of its estate cannot be subject to final determination by a bankruptcy court without violating Article III of the Constitution. Given that the Trustee's subcontract claim is on all fours with the claim at issue in *Marathon*, it is non-core. *See Granfinancieria, S.A. v Nordberg*, 492 U.S. 33, 93 (1989) (Blackmun, J., dissenting) (Congress "could not designate as 'core bankruptcy proceedings' state-law contract actions brought by debtors against third parties. Otherwise, *Northern Pipeline* would be rendered a nullity."); *see also Beard v. Braunstein*, 914 F.2d 434, 443 (3d Cir. 1990) (same).

Recognizing that this issue has been briefed previously to this Court, which has rejected Lucent's arguments, and in reliance on the Trustee's representation that all of these issues will be deemed preserved for further appeal without their full assertion herein, Lucent will not repeat these arguments here in their entirety. But in order to avoid any ambiguity as to whether these issues have been presented to this Court, Lucent does urge this Court to hold that the Subcontract claim is a non-core matter on which Lucent is entitled to *de novo* factual review in an Article III court. Indeed, with respect to the state-law contract claim, Lucent urges this Court to hold that the determination of the issue by the bankruptcy court violated Lucent's Seventh Amendment jury trial rights.

bankruptcy court's subordination of Lucent's debt claim to the interests of equity holders is precluded by the plain language of the Bankruptcy Code.

> **A.    The Equitable Subordination Claim Depends On The Erroneous Conclusion That Lucent Was An Insider Of Winstar.**

Bankruptcy courts possess the power to "prevent the consummation of a course of conduct by a claimant which . . . would be fraudulent or otherwise inequitable by subordinating his claims to the ethically superior claims asserted by other creditors." *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir. 1977). But equitable subordination, codified in section 510(c) of the Bankruptcy Code,[57] must be imposed sparingly, as it is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors."[58]

Insiders are subject to much closer scrutiny in analyzing equitable subordination claims. "The overwhelming majority of subordination cases involve the claims of fiduciaries." *In re Teletronics Servs., Inc.*, 29 B.R. at 169. Equitable subordination usually is a response to efforts by corporate insiders to convert their equity interests into secured debt in anticipation of bankruptcy. *Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d at 1356. In such circumstances, courts often require the insiders to return to their position at the end of the line. *Id.* Courts have also subordinated the debt claims of shareholders, officers, and directors who were found to have

---

[57]    Section 510(c) of the Bankruptcy Code provides in relevant part –

The court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

[58]    *Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1994); *see also Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 525 (Bankr. D. Del. 2003) (equitable subordination is an extraordinary measure not lightly invoked); *MB Ltd. P'ship. v. Nutri/System, Inc. (In re Nutri/System, Inc.)*, 169 B.R. 854, 865 (Bankr. E.D. Pa. 1994) (same); *In re After Six, Inc.*, 177 B.R. 219, 231 (Bankr. E.D. Pa. 1995) (same); *Anaconda-Ericsson, Inc. v. Hessen (In re Teletronics Servs., Inc.)*, 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983) (same).

engaged in fraud, mismanagement, self-dealing, or other breaches of trust. *In re Teletronics Servs.,* 29 B.R. at 169.

The bankruptcy court stated that its equitable subordination finding did not depend on its conclusion that Lucent was an insider. The court acknowledged, however, in a statement revealing the bankruptcy court's confusion of bad acts with actual managerial control, that "the same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues." Op. at ¶ 158, ROA 347.

But, as demonstrated above, Lucent is not an insider. And "[w]here the claimant is a non-insider, . . . [it] is insufficient . . . merely to establish sharp dealings; rather, [the objector] must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." *In re M. Paolella & Sons,* 161 B.R. at 119. The degree of misconduct required for equitable subordination has been described as "very substantial," and as involving "moral turpitude." *Id.* And the objector must prove such gross misconduct "with particularity." *Id.* at 118-119.

The Trustee made no such showing here. As discussed above, at most she showed that both Lucent and Winstar engaged in mutually beneficial, albeit improper, transactions and that with respect to certain transactions, Lucent strictly enforced its contractual rights. The law does not permit equitable subordination on such a showing.

### B.    The Bankruptcy Court's Equitable Subordination Remedy Was Not Tied To Any Injury That Lucent Allegedly Caused To Other Winstar Creditors.

The doctrine of equitable subordination "is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.),* 432

F.3d 448, 462 (3d Cir. 2006) (citations omitted).[59]  The bankruptcy court here made no serious

effort to quantify the harm allegedly caused to other creditors, or to limit the equitable

subordination to that harm.

The bankruptcy court concluded that Lucent's misconduct had injured other creditors

through: (1) the payment of the Siemens loan proceeds to Lucent, (2) the interest, storage, and

insurance paid by Winstar to Lucent on purportedly unnecessary equipment and services

purchased by Winstar to generate revenue for Lucent, and (3) the small recovery on the sale of

the supposedly $244 million in Lucent inventory during the bankruptcy proceedings.  Op. at

¶ 160, ROA 347.  The bankruptcy court further found that the timing of Lucent's issuing of the

refinancing notice caused Winstar to receive an additional $270 million in equity financing on

December 7, 2000, through the issuance of Series H Preferred Stock.  Id. at ¶¶ 161-162.

None of these purported "damages" constitutes the kind of harm to the estate or to other

creditors that could justify equitable subordination.  Winstar was contractually obliged to pay

Lucent the Siemens loan proceeds, and Lucent was not contractually obliged to issue a

refinancing notice on any particular date, so neither circumstance could possibly justify equitable

subordination.  Lucent acted within its contractual rights in both of these respects.[60]

In any event, even if Lucent's demand that Winstar honor the Second Credit Agreement

and pay it the net proceeds of the Siemens loan caused harm to the estate, any such harm would

---

[59]     *See also Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998) ("A bankruptcy court should … attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination."); *Stoumbos v. Kilimnik*, 988 F.2d 949, 960 (9th Cir. 1993) ("A claim will be subordinated only to the claims of creditors whom the inequitable conduct has disadvantaged."); *Estes v. N&D Props., Inc. (In re N&D Props., Inc.)*, 799 F.2d 726, 733 (11th Cir. 1986) (stating that "equitable subordination operates only to redress the amount of actual harm done").

[60]     *In re Paolella & Sons, Inc.*, 161 B.R. at 120 (citing *Kham & Nate's Shoes No. 2*, 908 F.2d at 1357; *Smith v. Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 700 (5th Cir. 1990)) (so long as the lender and debtor reached the terms of the contract at arms length, a creditor does not act inequitably in exercising its contractual rights).

be fully remedied by the court's preference judgment. Relying on Lucent's receipt of the same proceeds as a basis for equitable subordination is double-counting, and inconsistent with the established principle that equitable subordination is non-punitive. *See, e.g., Century Glove v. Iselin (In re Century Glove, Inc ),* 151 B.R. 327, 332 (Bankr. D. Del. 1993) (citation omitted) (a debtor may not obtain both equitable subordination and an award of money damages which would compensate it for the damages resulting from the same conduct).

The bankruptcy court also inappropriately included as a harm suffered by creditors the "pennies on the dollar in realized value received from the sale of the $244 million in Lucent inventory" during the bankruptcy proceedings. Op. at ¶ 160, ROA 347. The small amount received months later by the estate for its inventory is hardly evidence that such inventory was overpriced or unnecessary when sold. Rather, the value of all of Winstar's assets depreciated precipitously with the crash of the telecom sector—from an estimated $3.2 billion at the time of the filing to approximately $42.5 million when sold during the bankruptcy case.

The only remaining injury to creditors found by the bankruptcy court was the "interest, . . . storage costs and insurance costs . . . paid by Winstar to Lucent on unnecessary equipment and services." Op. at ¶ 160, ROA 347. But the bankruptcy court made no finding at all about the extent of that supposed injury; nor did it otherwise explain how its equitable subordination determination was tailored to redress it. If Lucent's alleged wrongful conduct involved selling Winstar equipment that Winstar did not need, the only effect on the Winstar estate would be the corresponding increase in Winstar's liability to Lucent under the Second Credit Agreement, which financed those purchases. Winstar never paid that liability in any event. Disallowing Lucent's *unsecured* claim would provide a complete remedy for that injury. But Lucent's *secured* claim, represented by its $21 million lien that the bankruptcy court directed be transferred to the estate, by definition reflects value that the bankruptcy estate in fact obtained from the equipment sold to Winstar by Lucent, whether or not the equipment was needed.

59

Depriving Lucent of that value can only be described as punitive, and thus forbidden by the principles of equitable subordination.[61]

### C.    The Bankruptcy Court Improperly Disregarded The Text Of The Bankruptcy Code In Subordinating Lucent's Claim On A Debt To The Interests Of Equity Holders.

Adding insult to injury, the bankruptcy court held that Lucent's debt claims should be subordinated to the equity interests of preferred shareholders. The Bankruptcy Code, however, says the opposite: "the court may . . . under principles of equitable subordination, subordinate . . . all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c). A "claim" is defined as a right to payment on a *debt*. 11 U.S.C. § 101(5). An "interest" is a right to recover on account of an *equity* investment. *See id.* § 501(a) ("[a] creditor or an indenture trustee may file a proof of claim. An equity security holder may file a proof of interest."). Therefore, section 510(c) permits the bankruptcy court to subordinate a creditor's claim on a debt *only* to another creditor's claim on a debt, *not* to an equity holder's interest. *See In re Badger Freightways,* 106 B.R. at 980 ("The language of § 510(c) distinguishes between 'claims' and 'interests.' Section 510(c) authorizes the subordination of one claim to another in appropriate circumstances, but not the subordination of a claim to an interest."). The bankruptcy court's subordination of Lucent's *claim* on a debt to preferred shareholder's equity *interests* is the exercise of a power that Congress has not granted it, and must obviously be reversed.

### CONCLUSION

The judgment of the Bankruptcy Court should be reversed.

---

[61]    Even if it could be established that Lucent's conduct required Winstar to incur some incremental debt to third parties, for items such as insurance or storage, rather than simply increasing Lucent's own unsecured claim, the extent of that unsecured debt would need to exceed the hundreds of millions of dollars in services and non-Lucent equipment that Lucent financed before there would be any basis to award an equitable subordination remedy that exceeded Lucent's loss on its unsecured claim. There is no evidentiary basis at all—and none is suggested—for that conclusion.

Dated: May 1, 2006
      Wilmington, Delaware

CRAVATH, SWAINE & MOORE LLP
Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (DE Bar No. 2732)
Paul N. Heath (DE Bar No. 3704)
Jason M. Madron (DE Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

WILMER CUTLER PICKERING HALE
   AND DORR LLP
Seth P. Waxman
Craig Goldblatt
Danielle Spinelli
Michelle Glassman Bock
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000

- and -

Philip D. Anker
James H. Millar
399 Park Avenue
New York, NY 10022
(212) 230-8800

*Attorneys for Appellant*

61

# Attachment
# A

Westlaw.

225 F.3d 645
225 F.3d 645, 2000 WL 1340569 (C.A.2 (N.Y.))
**(Cite as: 225 F.3d 645)**

Page 1

# H

Briefs and Other Related Documents
NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Second Circuit.
In re 455 CPW ASSOCIATES, Debtor; 455 CPW Associates,
HERBERT CONSTRUCTION COMPANY,
Plaintiff-Appellant,
v.
The GREATER NEW YORK SAVINGS BANK,
Defendant-Appellee.
**No. 99-5068.**

Sept. 14, 2000.

Appeal from the United States District Court for the Southern District of New York, Deborah A. Batts, Judge.

Gerard Romski, Ross & Cohen, LLP, New York, NY, for appellant.
Thomas R. Califano, Morrison Cohen Singer & Weinstein, LLP; Raymond N. Hannigan, on the brief, Herrick, Feinstin LLP, New York, NY, for appellee.

Present CALABRESI and SOTOMAYOR, Circuit Judges, TRAGER, District Judge.

*SUMMARY ORDER*

**\*1** UPON DUE CONSIDERATION, it is ORDERED, ADJUDGED, AND DECREED that the judgment of the district court be and hereby is AFFIRMED.

Plaintiff-appellant Herbert Construction Company ("Herbert") appeals the district court's affirmance of the bankruptcy court's orders in favor of defendant-appellee The Greater New York Savings Bank ("the Bank"). We affirm.

## I. BACKGROUND

The current appeal arises out of a single-asset real estate bankruptcy proceeding under Chapter 11. Debtor, 455 CPW Associates ("the Debtor"), was a general partnership comprised of four limited partnerships, which were in turn comprised of corporate general partners and individual limited partners. The Debtor's only asset was a landmark but uninhabitable building on Central Park West between 105th and 106th Streets (the "Property"). At the time of the bankruptcy proceedings the Property was appraised at $8 million.

The Greater New York Savings Bank made two loans to the Debtor. First, on December 1, 1988, as part of the Debtor's acquisition of the Property, the bank lent it $19,350,000 secured by a first mortgage on the Property. Of that amount, the individual limited partners (the "Guarantors") guaranteed $3.4 million. Second, on August 3, 1989, the Bank lent the Debtor an additional $4 million, and consolidated the loans into a single mortgage on the Property with a total principal indebtedness of $23,350,000. Of this total loan, the Guarantors guaranteed $7,450,000.

Shortly after the 1989 loan and consolidation, Herbert performed construction work on the Property. When Herbert was not paid, it filed a mechanic's lien against the Property on November 13, 1990. Herbert sued the Debtor and, on October 8, 1991, received a judgment for approximately $540,000.

The Debtor stopped making payments to the Bank around June 1990, and by November, the Bank accelerated payments. In October 1994, the Bank sued the Guarantors in New York state court (the "Guaranty Litigation"), and on December 12, 1994, the Bank initiated an involuntary Chapter 7 bankruptcy proceeding against the Debtor. The Bank and the Guarantors settled the Guaranty Litigation on February 22, 1995. As part of the settlement, the Guarantors paid the Bank a total of $1.6 million, and the Bank released the Guarantors from their personal guarantees of the remaining almost $5 million. In addition, the Chapter 7 proceeding was converted into a Chapter 11 proceeding.

The Bank then proposed a Plan of Reorganization (the "Plan"), to which the Debtor consented. The Bank is by far the Debtor's largest creditor, owed nearly $50 million as of the date it filed the initial Chapter 7 proceeding. The Bank's Plan values the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Property at $8 million, and calls for the appointment of a liquidating trustee to market the Property for one year following confirmation, during which time the Debtor would retain nominal title. The Plan establishes the priority of the Bank's mortgage over Herbert's subsequently-filed mechanic's lien, and, because the Bank's claim is far greater than the value of the Property, the Bank is the Debtor's only secured creditor under the Plan. The Plan allows the Bank to credit bid its claim up to $8 million and retain an unsecured deficiency claim of $39.4 million.    As a result, the Bank is the sole member of the secured class, Class 3, and it is also the largest member of the unsecured class, Class 4. Both of these classes, the only impaired classes, voted in favor of the Plan. Class 4 voted three to two in favor.

> FN1. The Plan calls for any amount over $8 million to be paid *pro rata* to the unsecured creditors. It also requires the Bank to establish an unsecured creditors' fund of $10,000.

**\*2** Herbert is the Debtor's largest unsecured creditor, after the Bank. Herbert objected to the Plan, and the bankruptcy court (Lifland, *Bankr.J.*) held a confirmation hearing on November 27, 1995. At that hearing, Herbert made the following objections:    (1) the Bank's deficiency claim was improperly classified with unsecured creditors who were not "substantially similar" in Class 4, and this classification was a gerrymandering of the vote in order to ensure Class 4's consent; and (2) the vote of Michael Overington, an alleged "insider" of the Debtor, was improperly counted in Class 4, and the inclusion of Overington (whose claim was for $441) was also to ensure Class 4's consent. In addition, Herbert filed an adversary proceeding against the Bank to determine the priority of its mechanic's lien in reference to the Bank's mortgage (the "Adversary Proceeding"). In that proceeding, Herbert alleged that the Bank's mortgage was a building loan contract under New York Lien Law § 22. Because the Bank's mortgage did not comply with the requirements for building loan contracts under § 22, Herbert contends that its mechanic's lien is entitled to priority over the Bank's mortgage.

> FN2. Herbert made additional objections at the hearing that it has not raised on appeal, and so we do not address them here.

In lieu of an answer, the Bank moved to dismiss the

Adversary Proceeding under Rule 7012 of the Federal Rules of Bankruptcy Procedure. The Bank argued that its mortgage was filed prior to Herbert's mechanic's lien and that Herbert had failed to plead the existence of a building loan contract. The bankruptcy court dismissed the Adversary Proceeding. It also overruled Herbert's objections to the Bank's Reorganization Plan. The Plan was confirmed, the trustee appointed, the Property sold, and disbursements made accordingly. Pending the resolution of Herbert's appeals, $500,000 was placed in escrow.

Herbert appealed both the dismissal of his adversary proceeding and the confirmation of the Plan to the United States District Court for the Southern District of New York (Batts, *J.*). Herbert renewed its objections to the Plan and also contended for the first time that the Bank's deficiency claim was improperly allowed. The district court found that argument waived, and it affirmed both the confirmation of the Plan and the dismissal of Herbert's Adversary Proceeding.

Herbert now appeals both rulings of the district court.

## II. DISCUSSION

### A. Standard of Review

Our review of orders of district courts acting as appellate courts in bankruptcy cases is "plenary." *In re Best Products Co., Inc.,* 68 F.3d 26, 29 (2d Cir.1995). Thus, we "independently review the factual findings and legal conclusions of the bankruptcy court." *Id.* We review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo. Id.*

### B. Mootness

The Bank argues that Herbert's appeal from the confirmation of the Plan is moot because the Plan has already been executed. Constitutional mootness doctrine aims to "ensure[ ] that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit, including the pendency of the appeal." *Muhammad v. City of New York Dep't of Corrections,* 126 F.3d 119, 123 (2d Cir.1997) (quotation marks and citation omitted). A case becomes moot, then, only when it is "impossible for the court to grant any effectual relief whatever to a prevailing party."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

*Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quotation marks and citation omitted). In this case, the court can still order effective relief for Herbert, namely the payment of the funds currently in escrow. Therefore the issue is not constitutionally moot.

**\*3** In the bankruptcy context, even where an issue is found not to be constitutionally moot, it may be found moot as an equitable matter. *In re Chateaugay Corp.*, 10 F.3d 944, 949-50 (2d Cir.1993) (*Chateaugay II*). Where a reorganization plan has been "substantially consummated" there is a presumption that appeals should be dismissed as moot. However, when certain conditions are met, that presumption can be overcome. *Chateaugay II*, 10 F.3d at 952-53. Here, the Bank argues that Herbert's appeal fails to meet all of the requirements for overcoming the presumption of mootness. We believe the question is a close one, but ultimately do not need to decide the issue because even assuming, *arguendo*, that the appeal is not moot, we find that Herbert's objections to the Plan lack merit.

> FN3.
> [S]ubstantial consummation will not moot an appeal if all of the following circumstances exist: (a) the court can still order some effective relief ...; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity ...; (c) such relief will not unravel intricate transactions ... and create an unmanageable, uncontrollable situation for the Bankruptcy Court ...; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings ...; and (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.
> *Chateaugay II*, 10 F.3d at 952-53 (quotation marks and citations omitted).

> FN4. Since the issue is not one of constitutional mootness but only bankruptcy mootness, such an assumption is not improper. *Cf Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998) (prohibiting courts from assuming their own jurisdiction in order to reach the merits of a case in the context of a question of constitutional standing).

### C. The Adversary Proceeding

Herbert initiated its Adversary Proceeding to determine whether the Bank's mortgage should be subordinated to Herbert's mechanic's lien because the Bank failed to file a compliant building loan contract as required by New York Lien Law § 22. Although a prior recorded mortgage generally has priority over a mechanic's lien, failure to comply with § 22 results in the subordination of the interests of the parties to the building loan contract to claims under a mechanic's lien.

The question before us is whether the Bank's Loan to the Debtor actually constituted a building loan contract as that term is defined by Lien Law § 2(13) as "a contract whereby a ... 'lender,' in consideration of the *express promise* of an owner to make an improvement upon real property, agrees to make advances to ... such owner to be secured by a mortgage on such real property" (emphasis added). The plain language of the statute requires not only that a building loan contract be for the purpose of improvements, or indicate that it will be used for improvements, but that the mortgagor expressly promise to make such improvements in return for the loan.

New York courts have been quite strict about the "express promise" required to transform a given loan agreement into a building loan contract. In *Weaver Hardware Co. v. Solomovitz*, 235 N.Y. 321 (1923), the Court of Appeals held that a loan intended for improvements was not a building loan contract because there was "no agreement upon the part of the borrower and mortgagor to erect any building and no expression of any details such as would be appropriate to an agreement whereby one party agreed to erect and the other party agreed to loan money for the purpose of such erection." *Id.* at 334; *Finest Investments v. Security Trust Co.*, 468 N.Y.S.2d 256, 257 (App.Div. 4th Dep't 1983) (finding that even after a mortgage was filed concurrently with a document called "Building Loan Agreement," where that document was not an agreement and the mortgage did not require any building or improvements, the mortgage was not on a building loan).

> FN5. Herbert argues that cases (*Weaver*, in particular) prior to the 1929 legislation that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

defined the term "building loan contract" in § 2(13) are not controlling and are at odds with the definition provided in the statute. The argument has no merit. New York courts have continued to cite *Weaver* as stating the standard for determining whether an express contract existed. *See, e.g., Pawling Sav. Bank, Inc. v. Jeff Hunt Prop., Inc.,* 639 N.Y.S.2d 462, 463 (App.Div.2d Dep't 1996), *Finest Investments v. Security Trust Co.,* 468 N.Y.S.2d 256, 257 (App.Div. 4th Dep't 1983). And, as the Bank argues, the statutory definition comports with *Weaver's*

Here, Herbert does not allege that the governing loan documents contain an express promise, nor-to the extent such documents may be incorporated into the pleadings-does it point to anything in those documents that constitutes an express promise or that is inconsistent with the Bank's characterization of the loan agreement. Herbert also tries to avoid dismissal by arguing that the question of whether the loan agreement is a building loan contract is not amenable to determination on a Fed.R.Civ.P. 12(b)(6) motion. Rather, it contends that additional loan documents and the loan application (which are not part of the record) might be probative as to whether the agreement was a building loan contract. Such documents, however, can only be "supplement[al]" to the agreement itself and hence would "not change the nature of the transaction." *Syracuse Capital Corp. v. Pattison Constr. Corp.,* 234 N.Y.S. 68, 72 (Sup.Ct. Onondaga 1929). We agree with both the bankruptcy court and the district court that Herbert has failed to make an improvement. Accordingly, we affirm the dismissal of Herbert's Adversary Proceeding.

> FN6. The bankruptcy court considered the complaint and the loan documents referred to in the complaint, namely the first mortgage note, the first mortgage itself, "Schedule A" (describing the parcel of land), Schedule B, the personal guaranty of payment signed by the individual limited partners of the limited partnerships that formed CPW Associates, and the project loan agreement.

### D. Confirmation of the Plan

**\*4** Herbert objects to four aspects of the confirmed Plan: (1) the allowance of the Bank's deficiency claim; the classification of both (2) that deficiency

claim and (3) Herbert's own claim; and (4) the counting of the vote of an alleged insider in determining consent of the unsecured creditors in Class 4. Each of these objections is intended to undermine the vote of Class 4 in favor of the Plan and thus subject the Plan to the "cram down" provisions of 11 U.S.C. § 1129(b). We address each objection in turn.

1. The Allowance of the Deficiency Claim. Herbert objected to the allowance of the Bank's unsecured deficiency claim for the first time in the district court. That court found the issue waived and did not consider it. "[A] federal appellate court does not consider an issue not passed upon below." *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308-09 (2d Cir.1999) (quotation marks and citation omitted). Herbert had ample notice of the claim, as the Bank identified it as among the Class 4 unsecured claims on October 11, 1999, and over a month before the confirmation hearing was held. Because Herbert failed to object to the claim at any point during the bankruptcy proceedings, it has waived any objection to the allowance of the Bank's unsecured deficiency claim. We therefore do not address the merits of that objection.

> FN7. Herbert is correct that the rule of not addressing issues raised for first time on appeal is prudential rather than jurisdictional, *see Lo Duca v. United States,* 93 F.3d 1100, 1104 (2d Cir.1996), but we nonetheless decline to hear a claim that Herbert had ample opportunity to raise before the proper court.

2. The Classification of the Deficiency Claim. Herbert separately attacks the Plan on the grounds that the *classification* of the Bank's deficiency claim together with the other unsecured claims was improper. Under § 1122(a), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Herbert argues that because the deficiency claim and the other unsecured claims had different origins, they are not "substantially similar" and should therefore be classed separately. However, "[t]he different origins of [an] unsecured deficiency claim and general unsecured trade claims, claims which enjoy similar rights and privileges within the Bankruptcy Code, do not alone justify separate segregation." *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir.1994). Moreover, the Bank's deficiency claim and

225 F.3d 645                                                                                                      Page 5
225 F.3d 645, 2000 WL 1340569 (C.A.2 (N.Y.))
**(Cite as: 225 F.3d 645)**

Herbert's mechanic's lien-the second largest claim in Class 4-are in fact extraordinarily similar: Both were secured claims that became unsecured because of the comparatively small security available to offset the total debts claimed. They were therefore properly classed together as unsecured claims. Accordingly, the district court was correct in affirming the classification of the Bank's deficiency claim together with the other unsecured claims.

> FN8. The district court reviewed the bankruptcy court's finding that the Bank's deficiency claim was substantially similar to those of the other unsecured creditors under 11 U.S.C. § 1122(a) for clear error. The Ninth Circuit has determined that claim classification is a question of fact, *In re Johnston,* 21 F.3d 323, 327 (9th Cir.1994), but the Fifth Circuit has held that while subsidiary fact findings are reviewed for clear error, the classification of a claim is a legal determination reviewed *de novo. See Greystone III Joint Venture,* 995 F.2d 1274, 1279 n. 5 (5th Cir.1992). The Second Circuit generally reviews *de novo* a bankruptcy court's interpretations of the text of a plan, confirmation order, and final decree as conclusions of law. *See In re Duplan Corp.,* 212 F.3d 144, 151 (2d Cir.2000). Which standard of review is appropriate for claim classification is a question this circuit has not yet answered. We do not address the question here, however, because under either standard, the district court was correct in its conclusion that the claims had been properly classed together.

3. The Classification of the Mechanic's Lien. Herbert, for the first time in its brief to this court, contends that its own mechanic's lien was misclassified as unsecured rather than secured. Although the Bank argues the merits of the claim, we find it waived. *See Monarch,* 192 F.3d at 308-09. We note, however, that just as Herbert's argument that the Bank's loan was a building loan contract is without merit, so too is its contention that its mechanic's lien should have been classified as secured. As we discussed above, the value of the Property is much less than the Bank's claim, which is prior to Herbert's claim. As a result, Herbert's claim was properly classified as unsecured.

**\*5** 4. The Alleged Insider. In determining that an impaired class of claims has accepted a reorganization plan, the vote of a class cannot count

"any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). In pertinent part, the definition of an " 'insider' includes-... (C) if the debtor is a partnership-... (v)[a] person in control of the debtor." 11 U.S.C. § 101(31)(C)(v). The definition of an insider has been applied flexibly. "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *In re 9281 Shore Road Owners Corp.,* 187 B.R. 837, 853 (E.D.N.Y.1995) (internal quotation marks and citation omitted); *see also Matter of Krehl,* 86 F.3d 737, 741 (7th Cir.1996) (stating that "the ... definition [of insider] is intended to be illustrative rather than exhaustive") (citation omitted); *In re ABC Elec. Svcs., Inc.,* 190 B.R. 672, 675 (Bankr.M.D.Fla.1995) (considering "whether or not the facts indicate an opportunity to self-deal or exert more control over the Debtor's affairs than is available to other creditors").

Flexibility notwithstanding, courts have required evidence of extensive control before finding insider status under § 101(31)(C)(v). *See ABC Elec.,* 190 B.R. at 675 (stating that actual management over debtor's affairs, including debtor's personnel or contract decisions, production schedules or accounts payable, can qualify a party as an insider; *In re NMI Systems, Inc.,* 179 B.R. 357, 369-70 (Bankr.D.D.C.1995) (holding that a vice president/sales manager was not an "officer" of a corporate employer because he did not set overall corporate policy or "perform[ ] other important executive duties of such a character that it is likely he would be accorded less than arms-length treatment in the payment of his antecedent claim against the debtor").

Herbert claims that Michael Overington was an insider of the Debtor because he was the vice-president of a limited partnership that was a limited partner of the Debtor and because he signed documents in connection with the Bank's mortgage on behalf of the Debtor. Excerpts of a deposition transcript from the Guaranty Litigation presented during the confirmation hearing indicated that Overington was an employee of the limited partnership with responsibility for "the day-to-day functions of 455 CPW Associates." The transcript also indicated that responsibility was "delegated" to him by someone else. As a result, the bankruptcy judge concluded, "He comes out as a person not in control but one who exercised and functioned pursuant to someone else who is in control. Whether he actually is an insider or control person, as is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

alleged, is something that has not been established by this transcript."

Shortly after the bankruptcy court confirmed the reorganization plan, Herbert's counsel wrote the bankruptcy court informing it that the Bank had, at Herbert's earlier request, finally turned over documents that provided additional support for Overington's insider status. The documents showed that Overington was a vice-president of the limited partnership, that he signed various documents in connection with the Bank's loans on behalf of the debtor, and that he signed the affidavit that the debtor submitted in opposition to the Bank's Guaranty Litigation. The district court considered this evidence as well as the deposition transcript, and it still found that Overington was not an insider. Although it is a close question, we are confident that the evidence does not demonstrate that Overington executed "actual management of the Debtor's affairs" that afforded him "an opportunity to self-deal." *ABC Elec.,* 190 B.R. at 675. Moreover, all of the evidence presented goes to Overington's status in 1989. It in no way suggests that he was an insider when he voted on the plan in 1995. *See In re Mcorp Fin., Inc.,* 137 B.R. 219, 232 (Bankr.S.D.Tex.1992) ("[T]he determination of insider status is made at the time the vote is taken, not at the time the claim arises."); *In re Featherworks Corp.,* 25 B.R. 634 at 640 (Bankr.E.D.N.Y.1982), *aff'd,* 36 B.R. 460, 464 (E.D.N.Y.1984) (same). We thus conclude that Overington's vote was properly included in determining the consent of Class 4.

### III. CONCLUSION

*6 We need not consider whether the Bank's Plan violates the "cram down" provisions of 11 U.S.C. 1129(b) because none of Herbert's attempts to upset the unanimous consent of the impaired classes to the Plan are availing. We have considered all of Herbert's claims properly before us, and we find them to be without merit. The judgment of the district court is therefore AFFIRMED.

C.A.2 (N.Y.),2000.
In re 455 CPW Associates
225 F.3d 645, 2000 WL 1340569 (C.A.2 (N.Y.))

Briefs and Other Related Documents (Back to top)

• 2000 WL 34003295 (Appellate Brief) Reply Brief for Appellant (Apr. 24, 2000) Original Image of this Document (PDF)

• 2000 WL 34003294 (Appellate Brief) Brief for Appellee (Mar. 17, 2000) Original Image of this Document (PDF)
• 99-5068 (Docket) (Sep. 03, 1999)
• 1999 WL 33630759 (Appellate Brief) Brief for Appellant (Jan. 01, 1999) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jason M. Madron hereby certify that on May 1, 2006 I caused copies of the

foregoing **Lucent Technologies Inc.'s Opening Brief** to be served upon the following parties in

the manner indicated:


**Via Hand Delivery:**

Sheldon K. Rennie
Michael G. Menkowitz
Fox, Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, DE   19801-3046

**Via First Class Mail:**

Stephen M. Rathkopf
David R. King
Herrick Feinstein LLP
2 Park Avenue
New York, NY  10016-9301

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 8th Avenue
New York, NY  10019

Philip D. Anker
James H. Millar
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York  10022

Craig T. Goldblatt
Danielle Spinelli
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M. Street N.W.
Washington, D.C. 20037


Jason M. Madron (DE Bar No. 4431)