# ROA
# TAB
# 903

winstar

# Memorandum

| | |
|---|---|
| **To** | Dave Ackerman |
| | Frank Jules |
| | Nate Kantor |
| | Jerry Maloney |
| | Fred Rubin |
| | Bill Zlotnick |
| **From** | Rick Uhl |
| **Date** | September 29, 2000 |
| **Re** | Winstar & Lucent |

This is to advise that commencing October 1 2000 Lucent will not accept service charges from Winstar until such time Winstar and Lucent agree as to the exact services to be provided and Lucent issues Winstar a purchase order in accordance with the attached letter

attachment

**DEFENDANT'S EXHIBIT**
**424**

CONFIDENTIAL    ZWC    0126821

09/29/00  17:  9 56 FAX 973 381 4106        NINA AVERSANO                        @002


**Lucent Technologies**
Bell Labs Innovations



Nina A. ersano                  5 Wood Hollow Road
Pr nd  t No th Amer ca          Room 1K 01
Service Provider Networks       Parsippany, NJ 07054 USA

Phone 973 381 4100
Fax 973 381 4106

September 27, 2000

Mr Richard J Uhl
Group Executive & Chief Financial Officer
Winstar Communications
685 Third Avenue
New York New York 10017

Dear Nate

This is to inform you that Lucent will accept your purchase order WVFI 0000002958 conditioned upon Winstar agreeing to the following understandings and conditions  If you agree  kindly sign in the space provided below and return to me immediately  Nate, this is a great opportunity for us to move our relationship forward toward what we originally envisioned – a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar s business plan  I hope you agree with me that we should seize the moment.

It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent to Winstar under our Supply Contract dated October 21  1998  Pursuant to Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at the time Winstar was providing to itself  This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent  Since the signing of that contract there have been a number of attempts to formalize this broad services relationship  The last such attempt was undertaken this past June when the parties entered into two addenda – the Hub and B Site Addendum and the Optical Network Addendum  These addenda did not include the full range of service contemplated in the Supply Contract

I m sure you would agree that fault for the failure to execute on our original concept lies with both Winstar and Lucent  Happily  it appears we both favor the same result – a broad services relationship  We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent  We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible  our two teams meet at your offices to finalize a broad services agreement  This would be a lock up session to finalize a full services agreement no later than two weeks thereafter  Consistent with the principles already established in our two addenda referenced above Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement   Lucent may either perform the work itself by

CONFIDENTIAL    ZWC   0126822

09/29/00  FRI 13 36 FAX 973 581 4108     NINA AVERSANO                                   ☎003

acquiring expertise and personnel from Winstar or subcontract some or all of it to third parties (including Winstar)  Consistent with this model  commencing October 1  2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative)  Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any performed services by Winstar presumably on Lucent s behalf  In addition, Lucent would not be able to accept purchase orders or invoices for Winstar performed services that are outside the scope of work defined in the agreement

Further  until this new services agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda referenced above or that fall within the scope of the new  as yet unexecuted  services agreement.  Prior to Winstar performing any work that may rightfully fall within either of the two existing addenda referenced above, I lucent would need to issue mutually acceptable written purchase orders  Should this process not be followed  Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent s behalf

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision  If you have any questions  please call me on 973-581 4100

*Nina Aversano*

Nina Aversano
President  North America

I agree

*[signature]*

Richard J  Uhl
For Winstar Communications  Inc

CONFIDENTIAL   ZWC   0126823

# ROA
# TAB
# 920

# Confidential

# REDACTED

Original Message
From         Chawla  Kukie
Sent         Wednesday, October 11  2000 10 36 AM
To           nkantor@winstar com
Subject      Winstar/Siemens

Nate

As we move towards a formal agreement to cement our business and financial relationship  I wanted to take a moment to reflect on new joint opportunities that lie ahead for us

Clearly  Siemens has high expectations on the growth of Winstar both here in the US and in Europe  We want to be part of that growth and success  Siemens has a strong presence on a global level and we believe that this agreement will pave the way for participating in that continued growth  Also  we would like to be introduced to your strategic partners  like Williams and Multimedia Fiber Networks  to explore what opportunities exist for our portfolio of products and services  We do understand that ultimately it is our value proposition will enable these companies to purchase from Siemens

I am sure Winstar has plans of presenting its full portfolio of services to Siemens (on a global level) with the expectations of Siemens selecting specific services that meet its requirements and budget  While there is no commitment to purchase any Winstar services at this time  other than what has already been contracted for we will help facilitate the introduction of key Siemens decision makers to Winstar to review your offerings  I have requested Tony Maher's help in this area for the European sector

We have been satisfied  thus far  with the services provided by Winstar at our local Florida campus facilities and this application could be a template moving forward in other campus areas  Also  if there are any opportunities to use Winstar services as part of a bundled or turnkey application  we will actively explore how we may engage your sales team as these opportunities arise

I am looking forward to a mutually beneficial and growing business relationship between Winstar and Siemens

*Kukie Chawla*
*Senior Vice President  Sales*
*Siemens Carrier Networks  Inc*
*900 Broken Sound Parkway*
*Boca Raton, FL  33487*
*Tel  (561) 923-6846*
*Fax  (561) 923-8771*



DEFENDANT'S
EXHIBIT

1

Siemens ICN 00034

# ROA
# TAB
# 931

**From**      Dennis Huber  <dhuber@winstar com>
**To**        Lisa Hicks  <lhicks@winstar com>
**Cc**        Bill Zlotnick  <bzlotnick@winstar com>
**Sent**      Monday  October 23  2000 5 57 PM
**Subject**   Re  Fwd  Re  Winstar Services Meeting on Tuesday

<x flowed>Lisa

Exactly correct  Anything else will result in a mass exodus of this place
when this deal is announced

What I want is the following
o  Winstar identifies the deliverable products (in terms of functional
requirments)
o  Lucent PMs the deliverable products
o  Lucent subcontracts the work to Winstar
o  Winstar hires to staff the projects
o  Winstar delivers the products
o  Lucent pays Winstar staff
o  Winstar pays Lucent for the deliverables that Winstar accepts

Lucent will need PMs in a couple of  cross functional  directions
o  City Managers (eg  BOS  NYC) responsible for everything that Winstar
needs in a city
o  Deliverable Product Managers (eg  Hubs  Bs)
o  WLA Project Managers (eg, Savvis, WAM'Net  On  Site)

Close alignment of the project managers will make Lucent s job easy  The
opposite is also true

Dennis

At 12 25 PM 10/23/00  0400  you wrote
>Dennis
>
>Lucent seems determined to  hire  each individual person  I have no
>intention of giving them all the detail they have requested below
>especially anything that has to do with employee salary information  My
>perspective on this process is very simple  we develop a scope of work
>and associated deliverables, Lucent sub contracts back to Winstar to
>provide the work covered in the scope  The process should be that Lucent
>hires Winstar to provide X deliverable defined in the scope  which would
>be one PO with a set price  and Winstar just does the work  Am I seeing
>this differently than you are?
>
>Lisa
>
>>X Sender  dhuber@mail w instar com
>>X Mailer  QUALCOMM Windows Eudora Pro Version 4 2 0 58
>>Date  Mon, 23 Oct 2000 08 41 10  0400
>>To  "Rigotti David Roy (David)  <drigotti@lucent com >  \petrini@lucent com
>>From  Dennis Huber <dhuber@winstar com>
>>Subject  Re  Winstar Services Meeting on Tuesday
>>Cc  Zlotnick  Bill  <bzlotnick@w instar com>

DEFENDANT'S
EXHIBIT
452

5/4/01

CONFIDENTIAL  WC  0108595

```
>>      Hicks  Lisa  <lhicks@winstar com>
>>      'Harris, Deborah  <dharrisbrown@lucent com>
>>      Garrett  Gregory  <ggarrett@lucent com>
>>      Fawcett  Lee  <lfawcett@lucent com>
>>      "Gilbert  Raymond"  <raygilbert@lucent com>
>>      Salow  Roger  <roger_salow@ins com>
>>      Watson, Peter D (Peter)  <pdwatson@lucent com>
>>      "Epstein  Marc'  <epstein@lucent com>
>>      Hsu  Diane  <dlawhsu@lucent com> 'Dowdy  Mary
>> <mmdowdy@lucent com>
>>      'Follmer  Marie  <follmer@lucent com>
>>
>>Dave  Vanessa
>>
>>I d like to get started at noon on Tuesday as we had planned   We will be
>>able to speak to your points  I will bring Dave s perspective of this
>>activity  I d like to understand Lucent s perspective as well  and frame
>>our mutual expectations based upon this understanding   We should take
>>some time at the outset of our meetings to make sure we understand our
>>objectives  so that we can drive toward them from the outset
>>
>>Dave I was unable to read your second attachment
>>
>>Dennis
>>
>>At 10 18 PM 10/22/00  0400  Rigotti  David Roy (David) wrote
>>>Dennis
>>>
>>>I believe our upcoming Services meeting is now scheduled to start on Tuesday
>>>at 3 00 PM at an  off premises  conference center  I believe those details
>>>are coming out on Monday
>>>
>>>In the meantime we are requesting that you and your team bring as much data
>>>and materials as possible to make our sessions as productive as possible
>>>The following information would be of benefit
>>>
>>>*   All Winstar Employees
>>>      *      Scopes of work by department
>>>      *      Job Descriptions for Winstar employees
>>>*   Winstar contractors
>>>      *      Contractor Scopes of work
>>>      *      Contracts for Contractors
>>>*   Salaries and loaded costs for each employee
>>>*   SLA s between functional groups
>>>*   Deliverables based needs
>>>
>>>Also I believe that Vanessa was going to contact you about Dave Ackerman s
>>>participation in this extremely critical strategic discussion   We feel that
>>>his participation is very important and would hope he could join us as early
>>>into the discussion as possible  so that the appropriate tone can be set
>>>If he is not available  we would ask that you be able to articulate his 3 4
>>>most critical aspects of the proposed arrangement (as to the true value to
>>>Winstar)
>>>
>>>Also  though covered briefly above  we have engaged our agency within Lucent
>>>that supports the provision of contracted labor  They have designed a very
>>>specific list of needed information in order to bring current Winstar
```

5/4/01

CONFIDENTIAL  WC  0108596

>>>contracted labor under the umbrella control of Lucent  That  checklist  (my
>>>terminology) is attached as well
>>>
>>>
>>>
>>>Thanks and we look forward to seeing you on Tuesday
>>>
>>>David R  Rigotti  )
>>> > Lucent Technologies
>>>Services Sales Director  WinStar
>>>*(703) 326 6348 (Work)
>>>   (703) 980 7450 (Mobile)
>>>*dingotti@lucent com
>>>
>>>
>

</x-flowed>

5/4/01

CONFIDENTIAL WC 0108597

# ROA
# TAB
# 953

# Confidential

Supplemental Agreement / Execution Copy

## SUPPLEMENTAL AGREEMENT

among

### WINSTAR COMMUNICATIONS, INC ,

### SIEMENS CARRIER NETWORKS LLC

and

### SIEMENS AKTIENGESELLSCHAFT

This Supplemental Agreement ('Supplement') executed on November 6 2000 ('Supplement Execution Date') by and among WINSTAR COMMUNICATIONS, INC a Delaware corporation with offices located at 7799 Leesburg Pike, Suite 401, Tysons Corner, Virginia 22043 ( WCI and together with its Affiliates "Winstar") and SIEMENS CARRIER NETWORKS LLC ( Siemens ), successor in interest to certain business of SIEMENS INFORMATION AND COMMUNICATION NETWORKS, INC , a Delaware corporation with offices located at 900 Broken Sound Parkway N W Boca Raton Florida 33487 and SIEMENS AKTIENGESELLSCHAFT a German corporation with offices located at Hofmannstrasse 51, 81359 Munich, Germany ( Siemens AG )

### WITNESSETH

WHEREAS Siemens and Winstar have entered into a certain Point to Multipoint Supply and Services Agreement executed September 13 1999 as amended by Amendment 1 thereto executed November 3 2000 (such agreement as amended being referred to as the 'Agreement ) to deploy certain telecommunications systems and services to various areas specified by Winstar and

WHEREAS, Winstar and Siemens have amended the referenced Agreement with the purpose among others to incorporate a new product line SDSL System to be furnished by Siemens to Winstar and in accordance with the terms and conditions of the Agreement and

WHEREAS Winstar has requested Siemens AG and Siemens to provide certain financing to support Winstar s telecommunication business operations and Siemens Financial Services, Inc ( SFSI ) a subsidiary of Siemens AG is prepared to provide financing for such purpose and

1

Siemens ICN 01832

DEFENDANT'S EXHIBIT 474

# Confidential

WHEREAS WCI and certain of its subsidiaries are parties to a Revolving Credit and Term Loan Agreement dated May 4 2000 among WCI Capital Corp a wholly owned subsidiary of WCI (the ' Borrower ') The Bank of New York as Administrative Agent, Collateral Agent and Lender and the other agents and lenders party thereto (as previously amended and as such agreement may hereafter be amended including by the Financing Agreement (defined below), the Winstar Credit Agreement ) and

WHEREAS SFSI and Winstar intend to enter into an amendment to the Winstar Credit Agreement (such amendment hereinafter referred to as the Financing Agreement ) pursuant to which SFSI will become a party thereto and make a single loan to the Borrower in the amount of two hundred million (US$200,000 000 00) US Dollars (the Siemens Loan )

NOW THEREFORE in consideration of the premises and the covenants hereinafter contained the parties hereto agree as follows

1  The parties agree the Agreement, as amended is in existence and valid  The parties agree that the effectiveness of this Supplement is conditioned on the full signature execution of the Financing Agreement and the funding of the Siemens Loan thereunder  The date on which the Siemens Loan is funded to Winstar is hereinafter referred to as the ' Funding Date '  The parties agree that of the full signature execution of the Financing Agreement and Siemens funding of the Siemens Loan are conditioned on the prior execution and continued existence and validity of this Supplement and the issuance of the Letter of Credit (the Letter of Credit as defined hereunder)  In the event (a) the Agreement is terminated for cause by Siemens pursuant to Subsection 21 1(b) of the Agreement or (b) Winstar commits any breach under this Supplement that has not been cured within thirty (30) days of receipt of written notice from Siemens  such events shall be considered a default by Winstar hereunder ( Event of Default )

2  Winstar will issue purchase orders take delivery and pay Siemens in accordance with the time periods described in Section 5 below, for systems and services specified in the Schedules attached to the Agreement (including such systems and services that are added to such Schedules from time to time) in accordance with the terms and conditions of the Agreement, for deployment in the United States in an aggregate amount of not less than one hundred fifty million (US$150 000 000 00) US Dollars of which at least twenty three million (US$23 000 000 00) US Dollars will be for the purchase of services specified in the Schedules attached to the Agreement  Winstar shall not have the right to terminate the Agreement, any amendments to the Agreement or this Supplement so long as Winstar s obligation under this Supplement remain unfulfilled in their entirety  The parties agree that any failure to deliver by Siemens or other breach of this Supplement or of the Agreement or amendments to the Agreement by Siemens shall not relieve Winstar of its obligations under this Section 2 provided, however in the event of any such failure to deliver or other breach by Siemens the parties agree to negotiate in good faith towards appropriate modifications to this Supplement  Any purchase order cancellation or purchase order termination by Winstar under this Agreement shall not affect in any way Winstar s obligations under this Section 2

2

Siemens ICN 01833

# Confidential

3   Siemens AG and Winstar agree to negotiate in good faith to enter into a purchase agreement
    (the 'Frame Agreement ) for Winstar to procure systems and services to be deployed outside
    of the United States  The Frame Agreement will have  as appropriate, the general terms and
    conditions of the Agreement which will be modified to the extent necessary, to incorporate
    certain provisions consistent with local legal and regulatory requirements  commercial and
    business practices and product or performance specifications  Both parties agree to dedicate
    sufficient resources to immediately commence negotiations and conclude the Frame
    Agreement  within one hundred twenty (120) days of the Funding Date  Such Frame
    Agreement will contain provisions for liquidated damages and a letter of credit
    corresponding to those provisions contained herein  The letter of credit for the Frame
    Agreement obligations may be in the form of an amendment to the Letter of Credit called for
    in this Supplement  Upon execution of this Supplement  Siemens AG and Winstar will
    commence and proceed working together to formulate a business development and rollout
    plan for targeted international markets as part of developing the Frame Agreement

4   The Frame Agreement shall provide that WinStar shall purchase from Siemens AG, or its
    affiliates other than Siemens  systems and services for deployment in Europe in accordance
    with the terms and conditions set forth in the Frame Agreement in a minimum amount of
    forty two million (US$42 000 000 00) U S Dollars within the earlier of (i) two (2) years
    from the execution of the Frame Agreement or (ii) twenty eight (28) months from the
    Funding Date  Contemporaneous with the execution of the Frame Agreement  the obligation
    of  Section 2 shall be reduced by forty two million (US$42,000,000 00) US Dollars   All
    services purchased under the Frame Agreement shall apply towards the twenty three million
    (US$23 000 000 00) minimum purchase of services specified in Section 2   Furthermore
    after twelve (12) months of the Funding Date  the parties will jointly review the Winstar s
    European rollout and deployment plans to analyze if the Winstar s forty two million
    (US$42 000 000 00) US Dollars purchase level set forth in this Section can be achieved
    based on the prevailing business and regulatory conditions  In the event such purchase level
    cannot be met  the parties will use their best efforts to negotiate an adjustment of such
    purchase level and if applicable  make the corresponding adjustment to the purchases for the
    US deployment  provided however  nothing herein shall modify Winstar s obligation to
    purchase the total combined amount of one hundred fifty million (US$150 000 000 00) US
    Dollars of systems and services as set forth in Section 2 of this Supplement under the
    Agreement and the Frame Agreement (i e  any reduction in the Frame Agreement purchase
    commitment will increase the purchase commitment under the Agreement so the total
    purchase commitment is US$150 000 000 00)

5   Winstar shall issue purchase orders  take delivery and pay under the terms of the Agreement
    and the Frame Agreement  when applicable  systems and services under the commitment set
    forth in Section 2 as adjusted by Section 4 by the following dates

    5 1     Twenty five million (US$25 000,000 00) US Dollars (for any combination of the
    systems and services specified in Section 2) shall be covered by a purchase order to be issued
    to Siemens on or before the Funding Date  for systems and/or services to be delivered in the

3

# Confidential

first quarter of 2001 provided however that the effectiveness of such purchase order shall be conditioned on and shall be revocable by Winstar in the event Winstar and Siemens do not execute this Supplement and the Financing Agreement or the Siemens Loan is not funded to Winstar and

    5 2    Approximately sixty five million (US$65,000,000) US Dollars shall be covered by purchase orders issued (for any combination of the systems and services as specified in Section 2, as modified under Section 4 above) during the first year following the Funding Date, and

    5 3    Approximately sixty million (US$60,000 000) US Dollars shall be covered by purchase orders issued (for any combination of the systems and services as specified in Section 2 as modified under Section 4 above) during the second year following the Funding Date provided however no less than forty five million (US$45 000 000) of the purchase orders issued as part of such sixty million (US$60 000 000) shall be for delivery and payment prior to the expiration of the second year following the Funding Date provided further however, no more than fifteen million (US$15,000,000) of the purchase orders issued as part of such sixty million (US$60 000,000) shall be made during the period beginning on the twenty second month following the Funding Date through the expiration of the second year following the Funding Date for delivery and payment prior to or after expiration of the second year following the Funding Date

6    In the event that (i) Winstar s obligations under Section 2 of this Supplement as adjusted by Section 4 if the Frame Agreement is executed by the parties are not fulfilled by the end of the time period established by this Supplement, or (ii) there is an Event of Default as defined in Section 1 of this Supplement before the obligations under Section 2 (as adjusted by Section 4 if the Frame Agreement is executed by the parties) have been fulfilled by Winstar (the event within the scope of clauses (i) and (ii) of this sentence are referred to as damage events or a damage event ) Winstar agrees that Siemens will suffer losses and damages and the amount of such losses and damages that would be suffered by Siemens in respect of lost purchases under this Supplement would be extremely difficult to determine The amount of the losses and damages that would be suffered by Siemens upon a damage event would be extremely difficult to determine because among other things Siemens and Winstar have not agreed on a specific combination of systems or services to be purchased under this Supplement (although Winstar has agreed to purchase a quantity of systems and services, the aggregate prices of which would equal the amounts to be purchased under this Supplement) and each of the systems and services would have its own lost profit Due to the extreme difficulty of determining the amount of losses and damages that would be suffered by Siemens upon a damage event Siemens and Winstar agree for purposes of this Supplement that instead of requiring proof of actual damages the amount of such losses and damages is fairly and reasonably established as the liquidated amount of twenty five percent (25%) of the amount by which the amount of Winstar s issuance of purchase orders for and taking delivery of systems and services under Section 2 (collectively purchase or purchases for the purpose of this clause) is less than the total amounts of systems and services Winstar is required to purchase and pay for as adjusted by Section 4 if the Frame Agreement is executed by the parties in the time frame referred to under Section 2 Siemens and Winstar agree that upon the occurrence of a damage event Winstar shall pay to Siemens as liquidated

4

Siemens ICN 01835

Supplemental Ag ement / Execution Copy

# Confidential

damages within ten (10) business days following Siemens demand for payment of liquidated damages the amount equal to twenty five percent (25%) of the amount by which Winstar s purchases of systems and services under Section 2 are less than the total amount of the purchases and payment required to be made by Winstar under Section 2 as adjusted by Section 4 if the Frame Agreement is executed by the parties  The liquidated damages provision of this Section is a material part of the consideration for this Supplement and the Financing Agreement, and the parties acknowledge and agree that they would not entered into this Supplement and Financing Agreement without the liquidated damages provision set forth in this Section  Siemens and Winstar agree that the amount of liquidated damages is reasonable in light of the anticipated or actual harm to Siemens that would be caused by a damage event and the inconvenience or nonfeasibility of Siemens otherwise obtaining an adequate remedy  Siemens and Winstar agree that this liquidated damages provision is intended to be a means to calculate damages and is not intended to be a penalty or forfeiture  Liquidated damages herein are intended to constitute the exclusive compensation due to Siemens and the sole and exclusive remedy of Siemens for all of Siemens actual losses and damages sustained as a result of Winstar s failure to purchase the requisite amount of systems and services as provided in Section 2  as adjusted by Section 4 if the Frame Agreement is executed by the parties  provided however that the imposition of liquidated damages shall not and is not intended to limit in any event (a) the rights and remedies of Siemens under the Agreement  except to the extent that the exercise of any right or remedy would seek compensation for actual loss or damages sustained as a result of Winstar s failure to purchase the required amount of products and services as provided in this Supplement  or (b) the rights or remedies of Siemens in respect of systems and services that are ordered and delivered to Winstar, but not paid for by Winstar

7   Siemens will invoice Winstar and Winstar shall pay Siemens in readily available funds for all systems and services being provided by Siemens under the Agreement in accordance with the terms of the Agreement

8   Prior to the Funding Date  Winstar shall cause Bank of New York or another bank acceptable to Siemens (Bank of New York or such other bank being referred to herein as the  Issuing Bank ) to issue an irrevocable standby Letter of Credit for the benefit of Siemens (a) in the form of the irrevocable standby Letter of Credit attached hereto as Form A (or in such other form as may be satisfactory to Siemens) - (b) in the amount of twenty five million (US$25 000,000 00) US Dollars  and (c) with an initial term (the  Letter of Credit Term ) of two (2) years and one hundred twenty (120) days (which irrevocable standby Letter of Credit is referred to herein as the  Letter of Credit  as it may be extended supplemented, or amended  and which term shall also refer to any irrevocable standby Letter of Credit issued in replacement therefor)

    8 1    If the Letter of Credit is presented for full or partial payment in accordance with subsection 8 3 below during the Letter of Credit Term  Winstar shall  within seven (7) business days (defined as Monday through Friday  holidays excepted) after such presentment is made on the Letter of Credit  cause the Issuing Bank to amend the Letter of Credit to increase the amount of the Letter of Credit by the amount of the documentary draft or

5

# Confidential

demand for payment made with such presentment so that the amount available under the Letter of Credit shall at all times be at least twenty-five million (US$25,000,000 00) US Dollars At the end of each calendar quarter during the Letter of Credit Term the parties will review the amount of the Letter of Credit and total amounts owing by Winstar under purchase orders issued under the Agreement If as of the date which is the last day of each calendar quarter during the Letter of Credit Term (the "Measurement Date") the unpaid balance of amounts owed by Winstar under the purchase orders issued under the Agreement exceeds the amount available for drawing under the Letter of Credit (such excess being called the "Letter of Credit Shortfall"), then by the date which is ten (10) business days after the Measurement Date Winstar shall, at its option either (i) increase the amount of the Letter of Credit by the amount of the Letter of Credit Shortfall or (ii) pay Siemens in readily available funds, an amount equal to the Letter of Credit Shortfall Upon request of Winstar Siemens shall immediately request that Issuer reduce the amount of the Letter of Credit to twenty five million (US$25 000 000 00) US Dollars after Winstar has reduced the Letter of Credit Shortfall to zero

8 2    The Issuing Bank shall have and maintain an office in New York City New York at which letters of credit issued by the Issuing Bank (and any documentary drafts or demands for payment thereunder) may be presented for payment and at which office such letters of credit (and documentary drafts or demands for payment thereunder) shall be paid If at any time during the term of this Supplement the Issuing Bank shall fail to have and maintain an office in New York City at which letters of credit issued by Issuing Bank (and any documentary drafts or demands for payment thereunder) may be presented for payment, and at which office such letters of credit (and documentary drafts or demands for payment thereunder) shall be paid, then promptly upon Siemens request Winstar shall cause the Letter of Credit to be replaced with a new Letter of Credit issued by a bank acceptable to Siemens that has and maintains such an office in New York City

8 3    Siemens shall be entitled to present the Letter of Credit and any documentary drafts or demands for payment thereunder for payment of all or any part of the credit in accordance with the terms of the Letter of Credit and Siemens shall be entitled to certify to the Issuing Bank that the amount is due, immediately upon the occurrence of any of the following events

> (a) a failure of Winstar to pay an amount when due in accordance with Section 7 of this Supplement or
> (b) Winstar is obligated to pay liquidated damages as provided in Section 6 above or
> (c) a failure of Winstar to cause the Issuing Bank to amend the Letter of Credit or a failure of Winstar to pay Siemens in accordance with Section 8 1 of this Supplement but Siemens may only in this event draw down an amount equal to the Letter of Credit Shortfall

No delay or omission by Siemens in exercising any right to draw on the Letter of Credit shall impair any such right or be construed as a waiver of any such right nor shall any course of

6

# Confidential

Supplemental Agreement / Execution Copy

dealing between Siemens and Winstar be construed as a waiver of any such right  No failure on the part of Siemens to exercise any right to draw on the Letter of Credit in any circumstance shall constitute a waiver of any future right to draw on-the Letter of Credit Siemens rights and remedies hereunder are cumulative  No draw by Siemens under the Letter of Credit shall cure or be deemed to cure any default or limit in any respect Siemens' rights or remedies under the Agreement the Financing Agreement or this Supplement, except to the extent such draw shall be deemed to cure Winstar's payment failure up to the amount of the draw

8 4     If Siemens presents the Letter of Credit, or any documentary drafts or demands for payment thereunder, for payment  and the Issuing Bank of the Letter of Credit honors such drafts or demands for payment and makes such payment to Siemens Siemens shall apply such payment to the Purchase Amount (herein defined)  If the amount of such payment received by Siemens from the Issuing Bank of the Letter of Credit is less than the outstanding unpaid balance of the Purchase Amount  then Winstar shall remain obligated to Siemens for payment of the deficiency  If the amount of such payment received by Siemens from the Issuing Bank of the Letter of Credit is greater than the outstanding balance of the Purchase Amount  such surplus shall be remitted to Winstar, provided however, Siemens' shall not seek amounts from the  Issuing Bank in excess of the amount Siemens believes in good faith to be  as of the date it delivers the Letter of Credit for payment  outstanding balance of the Purchase Amount    Purchase Amount" means the amount equal to (i) the unpaid purchase price for the goods delivered and/or services provided by Siemens to Winstar pursuant to the purchase orders issued by Winstar under the Agreement, plus (ii) any amounts (other than the unpaid purchase price for the goods delivered and/or services provided by Siemens to Winstar under the Agreement) owed by Winstar to Siemens under this Supplement on account of liquidated damages pursuant to Section 6 above

8 5     If the Letter of Credit remains outstanding on the date that Winstar makes the final payment in available funds on purchases in fulfilling its obligations under Section 2 under this Supplement  then upon Winstar's written request made at least one hundred twenty (120) days after the date of such final payment Siemens shall deliver the Letter of Credit to Winstar or to the Issuing Bank

9   The provisions of this Supplement take precedence over the provisions of the Agreement and any amendments to the Agreement in the event of a conflict or inconsistency  between the provisions of this Supplement and   the provisions of the Agreement and any amendments to the Agreement  the provisions of this Supplement shall take precedence

10  Any disputes arising or relating to this Supplement shall be governed by the laws of the State of New York  The parties agree that Siemens AG is not subject to jurisdiction of any state or federal courts in the U S  and its execution of this Supplement shall not be deemed to be a waiver of any such position on the part of Siemens AG

IN WITNESS WHEREOF  this Supplement has been executed and delivered by the undersigned duly authorized representatives  as of the date last written below

7

Siemens ICN 01838

# Confidential

Supplemental Agreement / Execution Copy

WINSTAR COMMUNICATIONS  INC          SIEMENS CARRIER NETWORKS LLC

By _____            By _____

Printed _____            Printed        Dieter Diehn
                                       _____

Title _____            Title        Executive Vice President & CFO
                                       _____

Date _____             Date        December 6  2000
                                       _____


                                       SIEMENS AKTIENGESELLSCHAFT

                                       By _____

                                       Printed _____

                                       Title _____

                                       Date _____

8

Siemens ICN 01839

01-DEZ-2000  16 47                                              5 02/02

# Confidential

Supplemental Agreement / Execution Copy

WINSTAR COMMUNICATIONS INC          SIEMENS CARRIER NETWORKS LLC

By _____            By _____

Printed _____           Printed _____

Title _____           Title _____

Date _____           Date _____


SIEMENS AKTIENGESELLSCHAFT

By  i.V. _____  F.Schll

Printed R Lehrmann  F SchehL

Title Senior Vice President Finance and Business

Date ⁵1 Dez 00

8

DEC 04 2000  9 5. AM FR SIEMENS CONTRACTS 5619256 1    5 5 E 250440 5    64 E

## Confidential

Supplemental Agreement / Execution Copy

WINSTAR COMMUNICATIONS INC

By _____

Printed _____

Fredenc E. Rubin
Senior Vice President Treasurer
Title _____

Date _____

SIEMENS CARRIER NETWORKS LLC

By _____

Printed    Dieter Diehn

Title    Executive Vice President & CFO

Date    December 6  2000


SIEMENS AKTIENGESELLSCHAFT

By _____

Printed _____

Title _____

Date _____

8

Siemens ICN 01841

# ROA
# TAB
# 965

11/14/00  12 26 FAX 908 559 1700     LUCENT TREASURY     ☒003
NOV-13-2000  16 48     WINSTAR     2125844073     P 02

winstar

Frederic E. Rub n
Senior Vice President
Treasurer
Winstar Communications

The Winstar Bu ld ng
685 Third Avenue
9th Floor
New York  NY 10017
T (212) 792 9039
F (212) 584 4073

November 13, 2000

Martina Hund-Mejean
Senior Vice President & Treasurer
Lucent Technologies Inc
600 Mountain Avenue
Murray Hill  NJ  07974

Re     Winstar/Lucent Financings

Dear Martina

Thanks for your November 7th letter  Congratulations on your new position with Lucent and I look forward to meeting you as we continue to develop the strategic partnership between our companies  We value our partnership with Lucent. I believe that this partnership continues as a valuable asset to both companies and it has been the basis upon which we have consistently provided significant value to each other over the past two years

I would like to take this opportunity to reflect the approach discussed during the Winstar/Lucent meeting on Monday November 7, 2000  As you know, Winstar has obtained a commitment for an additional $200 million of loans under our Senior Secured Credit facility  We intend to close that transaction in the next couple of weeks  Winstar also agreed to pay to Lucent the net proceeds from the $200 million financing per the terms of our existing Agreement. As we stated in our meeting on November 7 we would, however prefer Lucent to consider accepting $100 million of those proceeds and permit Winstar to retain the balance. The enhanced working capital would help to continue to build our business even more quickly which, we believe, ultimately benefits Lucent as our principal supplier  We look forward to your positive response to this request

In addition, and in the spirit of our partnership  we also offered Lucent the right to convert its Winstar loans at all times  instead of waiting for the $500 million trigger point currently required in our Agreement  The financial terms associated with reaching $500 million of loans on Lucent's balance sheet, however  would remain, as per our current Agreement  In addition, we would, of course, provide you with marketing support in connection with these and other types of sales of Lucent's Winstar paper



CONFIDENTIAL  WC  0069328

11/14/00  12 28 FAX 908 559 1709        LUCENT TREASURY                                    ☒004
NLU-13-2008  16 48        WINSTAR                                    2125844873    P 03

## winstar

Martina Hund Mejean
November 13, 2000
Page 2

Finally regarding your request to conduct due diligence, we would be most happy to work with you on an update of Winstar s plan. As you know your people on the supply side have been working very closely with us in the deployment of our network  We would welcome this opportunity to update your group as it is our belief that a thorough understanding of our current operations would give you even more confidence in our future success as well as the opportunities that we both have when we work closely together.

    I look forward to working out a mutually beneficial plan for the continued growth of this very important partnership

                            Very truly yours

                            Frederic E Rubin
                            Senior Vice President & Treasurer

                                                            TOTAL P 03

CONFIDENTIAL WC 0069329

# ROA
# TAB
# 970

**Printer Printer**

| | |
|---|---|
| **From** | Rogers Leslie L (Leslie) |
| **Sent** | Thursday November 16 2000 5 09 PM |
| **To** | Harris Deborah K (Deborah Kristine) Derrick Peter (Peter) Mark Robert M (Rob) Montemarano Michael A (Michael) Nelson William K (William); Plunkett William Montgomery II (Bill); Spurrier Carole J (Carole) Keefe Michael C (Michael) Quinn William N (William) Keller William C (Bill) Pernone Elizabeth (Beth) |
| **Cc** | Kerner Margaret (Margaret) |
| **Subject** | RE Fred Rubin Letter |

My first reaction is the following

Winstar did not "agree to the disbursement of $200MM to Lucent This is a contractual situation under which Winstar is forced to comply or be in default They are doing us no favors by paying us the cash for the above reason Further they have nothing to stop them from simultaneously borrowing an additional $200MM from the Lucent facility rendering our position no better than before

Secondly we do not discuss Lucent s financial position" with outsiders particularly customers It is inappropriate to use LU s enormous pressures as an excuse to demand that we be paid in accordance with the contractual agreement they have with us

I would venture to say that your third paragraph is probably nebulous enough so not to imply any interest on our part to amend our rights but we must chose our words with caution because as we all are painfully aware Winstar is particularly adept at finding ways to spin our words to their advantage (eg "all funds from other sources must be used was literally interpreted by Winstar to mean all funds were drawn and put into a bank account rather than using the funds for purchases and operations)

Since I have not seen the original letter I cannot comment on what requests were not addressed

Leslie

> ----Original Message----
> **From** Harris Deborah K (Deborah Kristine)
> **Sent** Thursday November 16 2000 4 42 PM
> **To** Derrick Peter Mark Robert Montemarano Michael Nelson William Plunkett William Rogers Leslie Spurrier Carole Keefe Michael C (Michael)
> **Cc** Kerner Margaret
> **Subject** FW Fred Rubin Letter
> **Importance** High
>
> Okay everyone
>
> I have drafted a conversational yet hopefully accurate response to Winstar s letter on the Financing agreement Please review and provide any comments by the morning and I will send to Winstar on Friday which will help set up Carole and my visit with Nate Kantor on Monday
>
> If you need to reach me the best bet is on my cell phone 908 759 5342 If you need to fax anything to me please call Margaret Kerner and she will know the best way to reach me
>
> Thanks
> Debbie
>
> ---- --
> **From** Dollins Audrey M (Audrey)
> **Sent:** Thursday November 16 2000 4 30 PM
> **To** Harris Deborah K (Deborah Kristine)
> **Subject.** Fred Rubin Letter
>
> Debbie
>
> Here it is I haven t received Margaret s e-mail yet so I m waiting for a return call to make sure I have your title listed correctly But at least you can look it over right now
>
> << File Fred Rubin Letter 11 16 00 doc >>



DEFENDANT'S
EXHIBIT
491

1

CONFIDENTIAL          LWI     00037184

# ROA
# TAB
# 997

# Confidential

| | |
|---|---|
| **From** | Chawla  Kukie |
| **Sent** | Wednesday  December 06  2000 6 03 PM |
| **To** | frubin@winstar com  kmonaco@winstar com  kzinghini@winstar com |
| **Cc** | Deutsch  Theodore  Holwell  Kevin  Kasera  Siddharth  Liston  Tim |
| **Subject** | FW  Congratulations |

Fred  Kevin and Ken
Thanks for working with us as true partners and getting this transaction done!!
Best regards
KUKIE

— Original Message—

| | |
|---|---|
| **From** | Chawla  Kukie |
| **Sent** | Wednesday  December 06  2000 5 59 PM |
| **To** | nkantor@winstar com  dackerman@winstar com  ruhl@winstar com |
| **Subject** | Congratulations |

Nate  Dave and Rick

Congratulations on the financial closure for the $200M senior secured facility from Siemens
With the conclusion of this deal  Siemens and Winstar enter into a new phase of our strategic relationship  I want to thank you for your personal effort and patience in bringing this tremendous program to closure  Dave  you had the vision  Rick you created the financial model  And Nate  you convinced Siemens executive management that Winstar is the right partner

In addition  we could not have achieved this milestone without the drive of key members of your team and in particular I want to mention Fred Rubin  Kevin Monaco and Ken Zinghini for their positive contributions in making this a reality Their dedication and attention to this project was instrumental in achieving success

I am looking forward to continuing to have our teams work together to ensure a smooth and successful implementation of our products and services in the Winstar network

Again my sincere thanks for your assistance and for the first $25M purchase order

Best regards
*Kukie Chawla*
*Senior Vice President  Sales*
*Siemens Carrier Networks  Inc*
*900 Broken Sound Parkway*
*Boca Raton  FL  33487*
*Tel  (561) 923-6846*
*Fax (561) 923-8771*

DEFENDANT'S
EXHIBIT
518

1

Siemens ICN 01071

# ROA
# TAB
# 1023



**Lucent Technologies**
Bell Labs Innovations

Elizabeth T Perricone
Director North America
Customer Finance

600 Mountain Avenue
Murray Hill, NJ 07974
Phone  908-582-0366
Fax  908-582-2237
Email  eperricone@lucent.com

December 19  2000

VIA FACSIMILE (212 584 4001)

Winstar Communications, Inc
WVF I LLC
The Winstar Building
685 Third Avenue  9th Floor
New York, NY 10017
Att   Treasurer and General Counsel

Re   <u>Lucent Credit Facility</u>

Ladies and Gentlemen

Reference is made to the Credit Agreement (the ' Agreement"), dated as of May 4, 2000
among you, Lucent Technologies Inc , as administrative agent and lender, and The Bank of
New York, as collateral agent   Capitalized terms not defined in this letter shall have the
meanings ascribed to them in the Agreement   As of the date hereof, the principal amount of
outstanding Lucent Loans exceeds $500 000 000

Pursuant to Section 2 18(a)  Lucent hereby requires that the Borrower and the Parent refinance
all outstanding Loans under the Agreement   This letter is a Refinancing Notice pursuant to
Section 2 18(a) of the Agreement

                                        Lucent Technologies Inc


                                        By

DEFENDANT'S
EXHIBIT
544

CONFIDENTIAL
3WC 0008694

# ROA
# TAB
# 1039

**Derrick, Peter (Peter)**

| | |
|---|---|
| **From** | Derrick Peter (Peter) |
| **Sent** | Friday December 29 2000 11 08 AM |
| **To** | Montemarano Michael A (Michael) |
| **Cc** | Hopkins Deborah C (Debby/CFO) Verwaayen Bernardus J (Ben) Hund-Mejean Martina (Martina) Harris Deborah K (Deborah Kristine) Carroll Christopher F (Christopher) Perricone Elizabeth (Beth) DaSilva Kevin G (Kevin) Gibbens Mark G (Mark) |
| **Subject** | FW winstar |

Michael

As discussed today and based on the agreements reached with Winstar we have initiated the following payments to Winstar

- $32M – as per their drawdown request ($30M in cash $2 0M Lucent content)
- $62M – for services $58M will be disbursed and $4 0M will be retained by Lucent as per your agreement with Winstar (we have an internal memo Chris Carroll is currently obtaining the required formal disbursement documentation from Winstar)
- $10 025M accounts payable will be released to Winstar today

Regards

Peter

-- --Original Message -- -

| | |
|---|---|
| **From** | **Carroll, Christopher F (Christopher)** |
| **Sent** | Friday December 29 2000 10 23 AM |
| **To** | Derrick Peter (Peter) |
| **Subject** | FW winstar |

**Christopher Carroll**
Financial Vice President
North America Region

-----Original Message-----

| | |
|---|---|
| **From** | Montemarano Michael A (Michael) |
| **Sent** | Wednesday December 27 2000 6 43 PM |
| **To** | Hund-Mejean Martina Harris Deborah K (Deborah Kristine) |
| **Cc** | Carroll Christopher Hopkins Deborah Rosen Stephen Verwaayen Bernardus Spurner Carole J (Carole) Derrick Peter (Peter) |
| **Subject** | winstar |

Based on a call today with the winstar chairman president and CFO we took the following position as articulated by Ben

DEFENDANT'S
EXHIBIT
560

We would allow winstar to use the credit facility to fund their services for this quarter. We would not engage in any billing/PO s between the companies but they could and intend to draw down the facility for about 65M. This would be cash out the door for us

We agreed that the 35m credit granted in 4qtr can be used as a reduction to their outstanding credit facility. It would not be dispersed in cash to them but we go against the credit facility as a repayment

They also indicated they had presented a draw down last week of 32M. Ben asked them to reconsider this given the extremely low lucent content

I will work this tomorrow with their CFO and plan to ensure they adequately document the cash draws. In addition Ben asked the CT to set up a meeting with Winstar to get the relationship to a new level where both compan es benefit

Other issues to be discussed
Retroactive pricing of Hubs and Buildings b s and hubs
Closure on services/outsourcing arrangement

Michael

Confidential

# ROA
# TAB
# 1078



**Lucent Technologies**
Bell Labs Innovations

Michael A. Montemarano          283 King George Rd
Vice President Finance          Room: C4C01A
North America Region            Warren NJ 07059

                                Phone  908 559 4880
                                Fax     908 559 2399

February 6, 2001

VIA FACSIMILE (212 584 4001)

Mr  Richard Uhl, Group Executive and CFO
Winstar Communications, Inc
The Winstar Building
685 Third Avenue, 31st Floor
New York, NY 10017

Rick,

Thank you for delivering the Capital Expense forecast for Winstar which details the amounts expected to be drawn down under the Credit Agreement for the quarter ended March 31, 2001  As you know, the $60M placeholder for "Services" has been discussed many times and the Lucent position stands firm  Absent resolution of any outsourcing work (and then only on a going forward basis), Lucent's position has been clear that non-Lucent performed Services activity cannot be funded from the credit facility

cc    C Spurner
      D Harris
      B Verwaayen

DEFENDANT'S
EXHIBIT
599

onfidential

# ROA
# TAB
# 1142



**Lucent Technologies**
Bell Labs Innovations

Michael C. Keefe          Lucent Technologies Inc.
Corporate Counsel         Room 3C 507
                          600 Mountain Avenue
                          Murray Hill, NJ 07974
                          Telephone (908) 582 6754
                          Facsimile (908) 582 2020
                          Email mckeefe@lucent.com

March 30, 2001

VIA FACSIMILE (212 584 4001)

Winstar Communications  Inc
WVF I LLC
WVF LU2  LLC
The Winstar Building
685 Third Avenue  9th Floor
New York, NY 10017
Att   Treasurer and General Counsel

Re   Lucent Credit Facility

Ladies and Gentlemen

Reference is made to the Credit Agreement (the  Agreement ) dated as of May 4  2000  among
you, Lucent Technologies Inc   as administrative agent and lender, and The Bank of New York  as
collateral agent.  Capitalized terms not defined in this letter shall have the meanings ascribed to them
in the Agreement.

Lucent has not funded your latest borrowing request because of the failure to fulfill the borrowing
conditions in Section 4 03 of the Agreement

Lucent is willing to provide a one time accommodation waiver to permit you to borrow under the
Agreement only to pay unpaid invoices for Lucent products and services  which would result in no
cash being remitted to you   Lucent is willing to provide this waiver on the condition that you agree
to the following, such agreement to be evidenced by your execution of a copy of this letter

1        The borrowing request is submitted no later than 11 00 a.m., Tuesday, April 3, 2001,

\\NJ9620SVR01\CorpSecurta\keeferae\North America\Winstar\Borrowing Waiver Letter on  LETTERHEAD (3 30-01).doc

CONFIDENTIAL

LWI  00004709



DEFENDANT'S
EXHIBIT
663

2

2      You acknowledge that this waiver is an accommodation as you have not satisfied the borrowing conditions in Section 4 03 of the Agreement  and

3      You acknowledge that Lucent is not in breach or violation of the Agreement and that you do not have any claims against Lucent on account of or in connection with the Agreement  and any claims you may have against Lucent on account of the Agreement as of the date hereof are hereby released by you, on behalf of yourselves and your affiliates  officers  directors  successors and assigns

If the foregoing is acceptable and you agree to the terms set forth above  please countersign a copy of this letter and return it to me

Lucent Technologies Inc

Agreed and Acknowledged
Winstar Communications, Inc


By _____
    Name
    Title


WVF-I LLC


By _____
    Name
    Title


WVF-LU2, LLC


By _____
    Name
    Title


**CONFIDENTIAL**                    LWI 00004710

# ROA
# TAB
# 1147



## NOTICE OF REQUEST FOR BORROWING

To     Lucent Technologies Inc  as Administrative Agent

Reference is made to the Credit Agreement dated as of May 4  2000 among WVF LU2  LLC
("the Borrower")  Winstar Communications Inc  (Winstar)  the lenders which are a party
thereto  The Bank of New York as Collateral Agent  and Lucent Technologies Inc
as Administrative Agent (as amended from time to time  the  Credit Agreement')
Unless otherwise defined herein  capitalized terms defined in the Credit Agreement
and used herein shall have the same meaning ascribed to such terms in the Credit
Agreement

Pursuant to Section 2 03 the Credit Agreement  the Borrower hereby gives the Administrative
Agent written notice of request for a Borrowing according to the following instructions

1  Total Amount of Borrowing                                          $      62 050 743 00

   a)  Amount of Borrowing to be paid directly to
      Lucent for Lucent Invoices                                   $

   b)  Amount of Borrowing to be paid directly to
      Lucent for Lucent Subsidiary Invoices                        $            -

   c)  Amount of Borrowing to be paid directly to
      Lucent for Lucent International Invoices                      $

   d)  Amount of Borrowing to be paid directly to
      Lucent for Lucent Arrangement Fees                           $

   e)  Amount of Borrowing to be paid directly to
      the Borrower Non-Lucent Equipment                            $      62,050 743 00

| | |
|---|---|
| BANK NAME | STATE STREET BANK & TRUST |
| | BOSTON  MA |
| ABA NUMBER | 011 000 028 |
| ACCOUNT NAME | MERRILL GROUP |
| | CREDIT  MERRILL PREMIER FUND |
| FOR FURTHER CREDIT TO | WVF-LU2, LLC |
| ACCOUNT NUMBER | 3 3 2 4 7 7 2 |
| AMOUNT | $  62 050 743 00 |

**DEFENDANT'S
EXHIBIT
668**
tabbies

| | |
|---|---|
| BANK NAME | STATE STREET BANK & TRUST |
| | BOSTON MA |
| ABA NUMBER | 011 000 028 |
| ACCOUNT NAME | MERRILL GROUP |
| | CREDIT MERRILL PREMIER FUND |
| FOR FURTHER CREDIT TO | WVF-LU2, LLC |
| ACCOUNT NUMBER | 3324773 |
| AMOUNT | $ |

2 Effective Date of Borrowing        March 30 2001

3 Type of Borrowing        _____ LIBOR     X   ABR

4 Interest Period    Months        _____ 1 _____ 2 _____ 3
                                    _____ 6 _____ 9 _____ 12

5 The Lucent invoices to be paid with the Borrowing are listed on Schedule A attached

The Borrower hereby certifies that all conditions for borrowing set forth in Section 4 03 the Credit Agreement have been satisfied or will be satisfied as of the date hereof and the date the borrowing is made

Dated this 27 day of March 2001

WVF-LU2 LLC

By _____

Name   Richard J Uhl
Group Executive and CFO

CONFIDENTIAL
3WC 0008250

winstar

# Fax Cover Sheet

Date        March 27, 2001

To          Genoveso Caviness

Fax #       908-582-3101

From        Doreene Nidowicz

Phone #     212-792-9069

RI Fax      212-584-4073

# of pages (including cover)

Message

Attached, please find the draw request for 3/30/01

Please call me if you have any questions

Thanks
Doreene

CONFIDENTIAL
3WC 0008251

```
*************** -COMM  JOURNAL- **************** DATE APR-02-2001 ****** TIME 09 37 ********

   MODE = MEMORY TRANSMISSION          START-APR-02 09 36    END-APR-02 09 37

      FILE NO -394

STN NO   COMM   ABBR NO    STATION NAME/TEL NO    PAGES   DURATION

001      OK     *          819085823101           003/003 00 00 35


*********************************** -      - ***** -           - *********
```

winstar

# Fax Cover Sheet


Date-        March 27, 2001

To.          Genoveso Caviness

Fax #-       908-582 3101

From.        Doreene Nidowicz

Phone #      212 792-9069

RI Fax       212-584-4073

# of pages (including cover)

Message:

Attached  please find the draw request for 3/30/01

Please call me if you have any questions.

Thanks
Doreene

CONFIDENTIAL
3WC 0008252

winstar

# Fax Cover Sheet

| | |
|---|---|
| Date | April 2, 2001 |
| To | Genoveso Caviness |
| Fax # | 908-582-3101 |
| From | Doreene Nidowicz |
| Phone # | 212-792-9069 |
| RI Fax | 212-584-4073 |

# of pages (including cover)

Message

Please add this to the draw request as an attachment. Although this is not usually provided, this is the detail behind the services number

Please call me if you have any questions

Thanks
Doreene

CONFIDENTIAL
3WC 0008253

(CAPITAL LABOR SCHEDULES)Lucent Billing Estimate to 1Q (2001)00(06)01.xls 23  b

Winstar Telecommunications Inc
Lucent Billing for Capital Labor
Q1 2001 Estimate

|  | Department |  | January | | | February | | | March (Estimate) | | | Quarter 1 (Estimate) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | Total Internal Labor | Total External Labor | Total Lucent Billable | Total Internal Labor | Total External Labor | Total Lucent Billable | Total Internal Labor | Total External Labor | Total Lucent Billable | Total Internal Labor | Total External Labor | Total Lucent Billable |

**WINSTAR SYSTEMS GROUP**

**WINSTAR NETWORK SERVICES**

**WINSTAR FOR BUILDINGS**

GRAND TOTAL

4/2/01 10:50 AM

CONFIDENTIAL
3WC 0008254

```
*************** -COMM  JOURNAL- ******************* DATE APR-02-2001 **** TIME 11 10 ********

     MODE = MEMORY TRANSMISSION              START=APR-02 11 09    END=APR-02 11 10
       FILE NO =996

  STN NO   COMM   ABBR NO    STATION NAME/TEL NO    PAGES  DURATION
    001     OK      *         819085823101           002/002 00 00 20
```

                                                   -WINSTAR            -
```
******************************************* -        - **** -      2125844873- ********
```

winstar

## Fax Cover Sheet

Date:            April 2, 2001

To:              Genoveso Caviness

Fax #            908-582-3101

From:            Doreene Nidowicz

Phone #          212-792-9069

RI Fax           212-584-4073

# of pages (including cover)
                    —

Message:

Please add this to the draw request as an attachment.  Although this is not
usually provided, this is the detail behind the services number

Please call me if you have any questions

Thanks
Doreene

CONFIDENTIAL
3WC 0008255

# ROA
# TAB
# 1165



winstar

## NOTICE OF REQUEST FOR BORROWING

To    Lucent Technologies Inc  as Admin istrative Agent

Reference is made to the Credit Agreement dated as of May 4 2000 among WVF I LLC ( the Borrower ) Winstar Communications Inc (Winstar) the lenders which are a party thereto  The Bank of New York as Collateral Agent  and Lucnet Technologies Inc as Administrative Agent (as amended from time to time  the  Credit Agreement ) Unless otherwise defined herein  capitalized terms defined in the Credit Agreement and used herein shall have the same meaning ascribed to such terms in the Credit Agreement

Pursuant to Section 2 03 the Credit Agreement  the Borrower hereby gives the Administrative Agent written notice of request for a Borrowing according to the following instructions

1  Total Amount of Borrowing                                       | $        160 052 143 45 |

   a)  Amount of Borrowing to be paid directly to
     Lucent for Lucent Invoices                           | $         73 168 493 95 |

   b)  Amount of Borrowing to be paid directly to
     Lucent for Lucent BCS & other subsidiary Invoices    | $          7 227 646 00 |

   c)  Amount of Borrowing to be paid directly to
     Lucent for Lucent International Invoices              | $          2 656 003 50 |

   d)  Amount of Borrowing to be paid directly to
     Lucent for Lucent Arangement Fees                    | $                       |

   e)  Amount of Borrowing to be paid directly to
     the Borrower Non Lucent Equipment                    | $         77 000 000 00 |

    * Wire Disbursement instructions for Non Lucent Invoices

BANK NAME             STATE STREET BANK & TRUST
                      BOSTON MA

ABA NUMBER            011 000 028

DEFENDANT'S
EXHIBIT
686

ACCOUNT NAME                MERRILL GROUP
                           CREDIT MERRILL PREMIER FUND

FOR FURTHER CREDIT TO      WVF I LLC
ACCOUNT NUMBER             3273932

2  Effective Date of Borrowing       May 30  2000

3  Type of Borrowing              ✗  LIBOR          _____ ABR

4  Interest Period      Months        _____ 1    _____ 2    _____ 3
                                       ✗  6    _____ 9    _____ 12

5  The Lucent invoices to be paid with the Borrowing are listed on Schedule A attached

The Borrower hereby certifies that all conditions for borrowing set forth in Section 4 03 the
Credit Agreement have been satisfied or will be satisfied as of the date hereof and the date the
borrowing is made

Dated this 23 day of May 2000

                              WVF I LLC

                              By _____

                              Name  Frederic E  Rubin

                              Title  Vice President  Treasurer

5/23/00  10 45 AM

## Lucent Invoices - Draw 18
## March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|

### DOMESTIC

| | Invoice # | Invoice Amt |
|---|---|---|
| PARENT | CR908670 | (1 670 00) |
| PARENT | SU006591 | S4 252 374 00 |
| PARENT | CR002973 | S1 664 601 49 |
| PARENT | ER003483 | S1 531 613 05 |
| PARENT | CR002468 | S1 531 026 13 |
| PARENT | SL005121 | S1 185 641 41 |
| PARENT | WR002012 | S1 056 838 52 |
| PARENT | SU006756 | S876 146 45 |
| PARENT | SU006612 | S588 267 00 |
| PARENT | 0206403542 | S525 414 66 |
| PARENT | 20102866 | S352 297 90 |
| PARENT | ER003188 | S325 000 00 |
| PARENT | SU007139 | S240 000 00 |
| PARENT | WR003289 | S231 966 72 |
| PARENT | 20102227 | 230 000 00 |
| PARENT | ER002975 | 219 287 57 |
| PARENT | CR003290 | S219 287 16 |
| PARENT | SU005339 | S219 287 16 |
| PARENT | PR001459 | S219 283 14 |
| PARENT | SR002335 | S219 283 14 |
| PARENT | PR001391 | S219 282 14 |
| PARENT | PR001207 | S190 785 47 |
| PARENT | ER002460 | S190 773 11 |
| PARENT | SR002315 | S184 548 26 |
| PARENT | WR003242 | S183 890 33 |
| PARENT | SU007090 | S183 058 84 |
| PARENT | CR003135 | S181 395 85 |
| PARENT | WR003246 | S173 184 18 |
| PARENT | SU007103 | S173 085 89 |
| PARENT | CR003133 | S173 080 90 |
| PARENT | CR003137 | S173 080 90 |
| PARENT | CR003138 | S173 080 90 |
| PARENT | CR003140 | S173 080 90 |
| PARENT | CR003142 | S173 080 90 |
| PARENT | NR003785 | S173 080 90 |
| PARENT | NR003786 | S173 080 90 |
| PARENT | NR003788 | S173 080 90 |
| PARENT | PR001407 | S173 080 90 |
| PARENT | PR001409 | S173 080 90 |
| PARENT | PR001410 | S173 080 90 |
| PARENT | PR001412 | S173 080 90 |
| PARENT | PR001413 | 173 080 90 |
| PARENT | PR001414 | 173 080 90 |

CONFIDENTIAL  WC  0041429

5/23/00  10 45 AM

## Lucent Invoices – Draw 18
### March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|
| PARENT | PR001415 | $173 080 90 |
| PARENT | PR001447 | $173 080 90 |
| PARENT | SR002310 | $173 080 90 |
| PARENT | SR002312 | $173 080 90 |
| PARENT | SR002318 | $173 080 90 |
| PARENT | SR002320 | $173 080 90 |
| PARENT | SR002321 | $173 080 90 |
| PARENT | SU007070 | $173 080 90 |
| PARENT | SU007074 | $173 080 90 |
| PARENT | SU007093 | $173 080 90 |
| PARENT | SU007096 | $173 080 90 |
| PARENT | WR003221 | $173 080 90 |
| PARENT | WR003233 | $173 080 90 |
| PARENT | WR003248 | $173 080 90 |
| PARENT | WR003264 | $173 080 90 |
| PARENT | WR003290 | $173 080 90 |
| PARENT | 20101894 | $129 918 47 |
| PARENT | CR003144 | $124 039 15 |
| PARENT | ER003604 | $110 441 50 |
| PARENT | ER003608 | $110 441 50 |
| PARENT | SU006598 | $99 400 00 |
| PARENT | CR003150 | $91 300 00 |
| PARENT | PR001463 | $85 560 00 |
| PARENT | ER003508 | $81 047 00 |
| PARENT | NR003194 | $79 701 61 |
| PARENT | 400012333 | $70 886 21 |
| PARENT | ER913028 | $69 624 76 |
| PARENT | 400012858 | $54 000 00 |
| PARENT | 228109 | $33 456 93 |
| PARENT | NR003853 | $29 631 00 |
| PARENT | SU007172 | $25 708 00 |
| PARENT | SR002416 | $24 926 07 |
| PARENT | SU006607 | $18 480 00 |
| PARENT | 20102547 | $18 000 00 |
| PARENT | 228110 | $17 507 55 |
| PARENT | SU006604 | $17 472 00 |
| PARENT | SU007758 | $15 960 00 |
| PARENT | SU007784 | $15 960 00 |
| PARENT | CR00335B | $15 712 00 |
| PARENT | NR004204 | $14 407 00 |
| PARENT | PR001206 | $11 175 99 |
| PARENT | ER002058 | $11 041 00 |
| PARENT | 400004949 | $10 825 00 |
| PARENT | NR002270 | $9 984 77 |
| PARENT | CR002409 | $9 956 17 |
| PARENT | SU005230 | $9 882 47 |

Page 2 of 7

CONFIDENTIAL WC 0041430

5/23/00  10 45 AM

## Lucent Invoices - Draw 18
## March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|
| PARENT | SR002071 | $9 853 11 |
| PARENT | CR003301 | $9 583 40 |
| PARENT | WR003487 | $9 578 04 |
| PARENT | WR002520 | $8 885 92 |
| PARENT | CR003040 | $8 744 00 |
| PARENT | WR002471 | $8 135 00 |
| PARENT | 40309053 | $7 518 40 |
| PARENT | ER003612 | $7 200 00 |
| PARENT | ER002982 | $6 000 00 |
| PARENT | SU005426 | $5 927 28 |
| PARENT | NR004203 | $5 578 00 |
| PARENT | NR003342 | $4 915 76 |
| PARENT | SR001680 | $4 572 00 |
| PARENT | WR002830 | $3 782 00 |
| PARENT | CR003072 | $3 778 72 |
| PARENT | SU007315 | $3 775 68 |
| PARENT | SU006761 | $3 712 45 |
| PARENT | CR002876 | $3 657 01 |
| PARENT | SR002204 | $3 611 32 |
| PARENT | 10101849 | $3 375 00 |
| PARENT | WR003479 | $3 297 01 |
| PARENT | CR002875 | $3 251 85 |
| PARENT | NR004205 | $2 933 00 |
| PARENT | ER003327 | $2 021 00 |
| PARENT | 40308287 | $1 573 14 |
| PARENT | CR003292 | $1 318 00 |
| PARENT | ER002980 | $1 318 00 |
| PARENT | SR001720 | $1 318 00 |
| PARENT | SR002210 | $1 318 00 |
| PARENT | SU007168 | $1 318 00 |
| PARENT | WR002024 | $1 318 00 |
| PARENT | 40304611 | $420 96 |
| PARENT | SO005451 | $285 53 |
| PARENT | 49315659 | $241 93 |
| PARENT | PR001210 | $212 14 |
| PARENT | WR002231 | $114 87 |
| PARENT | 40307191 | $106 98 |
| PARENT | 40304532 | $97 51 |
| PARENT | 10101575 | $70 00 |
| PARENT | ER003485 | $5 755 012 50 |
| PARENT | ER003480 | $522 619 66 |
| PARENT | 20102031 | $4 067 800 00 |
| PARENT | SU007958 | $3 701 62 |
| PARENT | SU007985 | $1 318 00 |
| PARENT | SU007169 | $10 107 00 |
| PARENT | SU007170 | $40 141 00 |

CONFIDENTIAL WC 0041431

5/23/00  10 45 AM

## Lucent Invoices - Draw 18
### March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|
| PARENT | SU007171 | $63 043 00 |
| PARENT | SU000980 | $1 554 00 |
| PARENT | SR002693 | $880 171 87 |
| PARENT | CR003570 | $1 188 00 |
| PARENT | CR003568 | $1 318 00 |
| PARENT | 10101937 | $140 00 |
| PARENT | 10100980 | $38 593 26 |
| PARENT | 10100899 | $4 624 75 |
| PARENT | 10101823 | $465 00 |
| PARENT | 10101623 | $1 585 00 |
| PARENT | 10101382 | $705 00 |
| PARENT | 20103134 | $335 00 |
| PARENT | PR001623 | $1 200 00 |
| PARENT | PR001622 | $26 977 85 |
| PARENT | PR001621 | $7 066 28 |
| PARENT | PR001594 | $3 611 32 |
| PARENT | PR001566 | $7 952 15 |
| PARENT | SU007789 | $18 480 00 |
| PARENT | SU007786 | $17 472 00 |
| PARENT | SU007872 | $788 281 16 |
| PARENT | SU007766 | $1 546 373 00 |
| PARENT | SU007762 | $18 480 00 |
| PARENT | SU007760 | $17 472 00 |
| PARENT | SU007759 | $17 976 00 |
| PARENT | SU007757 | $1 456 833 00 |
| PARENT | ER003825 | $2 000 00 |
| PARENT | ER003823 | $230 000 00 |
| PARENT | ER003854 | $150 000 00 |
| PARENT | WR003920 | $1 200 00 |
| PARENT | NR004275 | $36 245 00 |
| PARENT | NR004202 | $9 338 00 |
| PARENT | 10101987 | $5 735 10 |
| PARENT | 70103133 | $105 00 |
| PARENT | 50104270 | $550 00 |
| PARENT | 10102048 | $30 271 10 |
| PARENT | 40104543 | $485 00 |
| PARENT | 10101892 | $875 00 |
| PARENT | SU006809 | $28 306 261 76 |
| PARENT | SU007788 | $14 784 00 |
| PARENT | SU007761 | $14 784 00 |
| PARENT | CR003602 | $22 320 00 |
| PARENT | 20103242 | $90 900 36 |
| PARENT | 20102030 | $919 751 24 |
| PARENT | 20102207 | $3 769 800 00 |
| PARENT | 20103543 | $302 990 90 |

CONFIDENTIAL WC 0041432

5/23/00  10 45 AM

## Lucent Invoices – Draw 18
## March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|
| PARENT TOTAL | | 573 168,493 95 |
| Anixter P O Box 98908 Chicago IL | 0315849 | S1 595 706 00 |
| Anixter P O Box 98908 Chicago IL | 0315850 | S5 631 940 00 |
| CHICAGO TOTAL | | S7 227,646 00 |
| TOTAL DOMESTIC | | S80,396,139 95 |

CONFIDENTIAL WC 0041433

5/23/00  10 45 AM

## Lucent Invoices - Draw 18
### March 31, 2000

| | Invoice # | Invoice Amt |
|---|---|---|

### INTERNATIONAL

| | | |
|---|---|---|
| FRANCE | MKT12015 | 704 00 |
| FRANCE | 975487 | 18 660 00 |
| FRANCE | 976249 | 91 783 00 |
| | FRANCE TOTAL | 111 147 00 |
| | | |
| BELGIUM | 973490 | 8 327 00 |
| BELGIUM | 973488 | 8 327 00 |
| BELGIUM | 975484 | 18 660 00 |
| BELGIUM | 976195 | 71 502 55 |
| BELGIUM | 976246 | 41 931 00 |
| | BELGIUM TOTAL | 148 747 55 |
| | | |
| NETHERLANDS | 973472 | 970 00 |
| NETHERLANDS | 973454 | 58 289 00 |
| NETHERLANDS | 973464 | 65 102 00 |
| NETHERLANDS | 975464 | 3 614 00 |
| NETHERLANDS | 975471 | 158 287 00 |
| NETHERLANDS | 975476 | 2 143 00 |
| NETHERLANDS | 975478 | 158 287 00 |
| NETHERLANDS | 975483 | 18 660 00 |
| NETHERLANDS | 976333 | 7 746 00 |
| NETHERLANDS | 976332 | 6 707 00 |
| NETHERLANDS | 976331 | 6 202 00 |
| NETHERLANDS | 976319 | 323 00 |
| NETHERLANDS | 976285 | 22 164 00 |
| NETHERLANDS | 976252 | 3 721 00 |
| NETHERLANDS | 973473 | 38 929 00 |
| NETHERLANDS | 974343 | 185 061 00 |
| NETHERLANDS | 975481 | 35 884 00 |
| NETHERLANDS | 976175 | 140 210 10 |
| NETHERLANDS | 976176 | 214 507 65 |
| NETHERLANDS | 976243 | 99 415 00 |
| NETHERLANDS | 976641 | 3 277 00 |
| NETHERLANDS | 976643 | 20 139 00 |
| NETHERLANDS | 976644 | 15 239 00 |
| | NETHERLANDS TOTAL | 1 288 956 75 |
| | | |
| UNITED KINGDOM | 975486 | 18 660 00 |
| UNITED KINGDOM | 975475 | 2 143 00 |

CONFIDENTIAL WC 0041434

5/23/00  10 45 AM

## Lucent Invoices - Draw 18
### March 31, 2000

|  | Invoice # | Invoice Amt |  |
|---|---|---|---|
| UNITED KINGDOM | 975474 | 2 143 00 | |
| UNITED KINGDOM | 975473 | 37 393 00 | |
| UNITED KINGDOM | 975460 | 10 950 00 | |
| UNITED KINGDOM | 976247 | 14 294 00 | |
| | UNITED KINGDOM TOTAL | 85 583 00 | |
| | | | |
| GERMANY | 976188 | 76 888 00 | |
| GERMANY | 976177 | 26 712 00 | |
| GERMANY | 976289 | 17 916 00 | |
| GERMANY | 975485 | 18 660 00 | |
| GERMANY | 973478 | 6 051 00 | |
| GERMANY | 972852 | 29 270 00 | |
| GERMANY | 972794 | 17 500 00 | |
| GERMANY | 972793 | 14 500 00 | |
| GERMANY | 976248 | 34 030 00 | |
| | GERMANY TOTAL | 241 527 00 | |
| | | | |
| ARGENTINA | 1 7631 | 13 859 00 | |
| ARGENTINA | 1 7703 | 7 929 00 | |
| ARGENTINA | 1 7889 | 151 685 38 | |
| ARGENTINA | 1 7903 | 69 528 00 | |
| ARGENTINA | 1 7904 | 30 606 98 | |
| ARGENTINA | 1 7927 | 22 202 95 | |
| ARGENTINA | 1 8163 | 61 526 55 | |
| ARGENTINA | 1 8568 | 3 983 06 | |
| ARGENTINA | 1 8569 | 33 727 50 | |
| ARGENTINA | 2s510019 | 154 858 78 | fr Lucent USA |
| ARGENTINA | 2S510019 | 230 135 00 | fr Lucent USA |
| | ARGENINA TOTAL | 780 042 20 | |

| INTERNATIONAL TOTA | $2 656 003 50 |
|---|---|

CONFIDENTIAL WC 0041435

# ROA
# TAB
# 1166



**Unknown**

| | |
|---|---|
| **From** | Hopkins Deborah C (Deborah) |
| **Sent** | Wednesday May 31 2000 9 15 PM |
| **To** | Viqueira William (William) |
| **Subject** | RE Winstar |

I went ahead and left him an email saying the week of June 19th would be good but we should talk

| | |
|---|---|
| **From** | Viqueira William (William) |
| **Sent** | Thursday June 01 2000 12 41 AM |
| **To** | Hopkins Deborah C (Deborah) |
| **Subject** | Winstar |
| **Importance** | High |

Deb
I asked Leslie to send you some background on the LU/Winstar relationship but I m not sure if you got it   Anyway  in short, we agreed to a very poorly structured deal with them for $2billion with availability capped at $1 billion at any one time   At the time we did this  they assured us verbally that they would not draw on this line until late this year   As it turns out  they have decided to sit on $600 million in cash they raised from banks and do not want to use that cash to pay approx  $100mm in AR they owe us   They have suggested they will draw $250mm on our line to pay our AR if we insist on the AR being paid this quarter   This is the last thing I want
Rick Uhl  their CFO has an ego the size of the galaxy   He is upset you have not called him to introduce yourself and discuss the above   There is lots more color on this but I ll stop here   Give me a call to discuss when you can
Bill

DEFENDANT'S
EXHIBIT
687

# ROA
# TAB
# 1174

**Printer Printer**

| | |
|---|---|
| From | Nate Kantor [nkantor@winstar com] |
| Sent | Tuesday May 08 2001 5 22 PM |
| To | Bill Rouhana |
| Subject | FW Winstar Partnership Concept |

Bill,

I actually like this MOU and scope of work  however  will zing them with regard to the
hesitancy regarding financing, I want to get this as close to a  committment" as possible
before we go through the negotiation I obviously recognize alot of financial due diligince
needs to be done  but they need to understand that this is a deal breaker right from day
one   I like the $1 5 billion-I think that would be good to shoot for

I doubt whether they have all the skills in place to  actually" make this happen   My idea
is to create a WinStar subsidiary that does Engineering, Program Management, Construction
etc -kind of a combo Ackerman/Simons org that will actually work with Lucent providing the
'outsource management' of the contract or some professional services   I want Lucent to
actually buy services from us as part of the deal and wrap it all under this agreement
We should be able to finance and capitalize all this and possibly even get revenue ( not
sure if I am stretching this a bit-want you to think about it)   Typically I would
outsource this stuff and have our folks become Lucent employees, but I am concerned about
stock options etc   I think we have built a machine that would be too difficult for
Lucent to duplicate  the perfect solution is to put them together as a team so be get best
of both worlds   Please think about how we can do this and I will start pointing them in
this 'combined" direction   I'll send you my response to them

Take care and hope you are enjoying your weekend

   Nate

>Cc  Nina Aversano <aversano@lucent com>
>      Mark Wilson
>      <wilsonmark@lucent com>
>From  "Plunkett, William Montgomery, II (Bill)" <wmplunkett@lucent com>
>To  nkantor@winstar com
>Original-Cc  Nina Aversano <aversano@lucent com>  Mark Wilson
>      <wilsonmark@lucent com>
>Subject  FW  Winstar Partnership Concept
>Date  Fri  -2 Oct 1998 18 39 37  0400
>X-Mailer  Internet Mail Service (5 5 1960 3)
>
>Nate
>Please find attached a copy of the WinStar/Lucent Partnership Concept   We
>are look forward to discussing this with you and your team next week   We
>think it is a good starting paper but we have lots of details to work out
>
>
>                            Nina Aversano
>
> -  -  -----
>From   Plunkett  William Montgomery, II (Bill)
>Sent   Friday  October 02, 1998 2 11 PM
>To   Aversano  Nina (Nina)
>Subject   FW  Winstar Partnership Concept
>
>
>
> <<Memorandum of Understanding 2 doc>>
>
>
>

1

CONFIDENTIAL 2WC 0065534

# ROA
# TAB
# 1178

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of                    )
                                    )
LUCENT TECHNOLOGIES, INC            )   File No  HO_9128

WITNESS   David W  Ackerman

PAGES     1 through 219

PLACE     Securities and Exchange Commission Headquarters
          450 Fifth Street, NW
          Washington, DC

DATE      Thursday, October 11, 2001


      The above_entitled matter came on for hearing at
10 00 a m , pursuant to notice


APPEARANCES

On behalf of the Securities and Exchange Commission

      KEN R  CUNNINGHAM, ESQ
      RICHARD W  GRIME, ESQ
      CHARLES E  CAIN, ESQ
      RICHARD MOORE, ACCOUNTANT
      Securities and Exchange Commission
      450 Fifth Street, NW
      Washington, DC  20549
      (202) 942_7160

On behalf of the Witness

      MERRILL G  GODFREY, ESQ
      ROLAND G  SCHROEDER, ESQ
      Shearman & Sterling
      801 Pennsylvania Avenue, NW, Suite 900
      Washington, DC  20004_2604
      (202) 508_8000

13

1      Q    You described it as general oversight  Could you
2  go into a little bit more detail?  For instance, did you
3  have the opportunity to make suggestions as to what
4  equipment was purchased?  Did you actually negotiate deals
5  with vendors?  Did you have the opportunity to veto?
6      A    Okay  Let's take them one at a time
7      Q    Sure
8      A    Did I make suggestions?  Yes, with regard to the
9  type and application, the architecture, and who we'd look at
10  for various functions  Then you said did I __
11     Q    Did you negotiate with vendors?
12     A    If it was a large deal, a large transaction __ and
13  that was a subjective definition of large, we didn't have a
14  specific number __ then I would be involved in the
15  negotiation of the overall contract, for example, with
16  Lucent
17        If it were a very __ a relatively smaller contract
18  or one that was specialized, for example, with a contractor
19  who was going to construct certain elements of the network,
20  one of the senior VPs would do that, and perhaps run some of
21  it by me or not, depending upon __ I was more in an advice
22  role there  If he thought he needed my advice, he'd ask it,
23  otherwise, they could do their own thing
24     Q    Was Bill Zlotnick more involved with the
25  purchasing of equipment from vendors than you were?
26     A    It's hard to __ when you say "more," at the
27  detailed level he had more of a day_to_day interaction with
28  regard to the individual purchase requests  But again, as
29  I said, Bill didn't write the purchase orders  They came
30  out of procurement
31        But Bill would sort of see these individual
32  documents because he had budget control  So he would __
33  when you say "more," it was at a different level  He would
34  see the specific elements and then report to me sort of
35  generically, we're within budget  We're exceeding budget
36  This looks like we may go over budget
37        And then I'd take a look at perhaps some of the
38  individual things to see why we were exceeding or why we
39  weren't __ so, you know, it was that kind of __ did that
40  make sense?
41     Q    Yes, it did  Thanks
42       Looking specifically at Lucent, when did Winstar's

14

1   relationship with Lucent begin?
2       A    It began very early in Winstar's history   We
3   started __ when we built the retail business __ well,
4   I can't remember dates   Probably around '96_ish, we
5   initiated discussions with Lucent, as well as a number of
6   other vendors, to provide us with basic switching equipment
7   to get into the local voice switch business
8            So I think it was back __ it might have even been
9   earlier than that, but I think '96 feels about right
10      Q    Okay   And did the parties then, Lucent and
11  Winstar, that is, sign a service agreement in October of
12  1998?
13      A    Yes    That was when we took the relationship to a
14  different stage
15      Q    Okay   And what __
16      A    A different level
17      Q    In a very general sense, what did the service
18  agreement obligate the parties to do?
19      A    It obligated Lucent to provide us with substantial
20  financing, and us, it obligated us to utilize Lucent to the
21  best of our ability to be our network, systems __ network
22  equipment, systems, and services vendor, provided they were
23  best of breed in each of the areas that we needed either the
24  services or equipment or systems   That's at a very high
25  level
26      Q    Did Lucent and Winstar enter into an
27  end_of_quarter deal in the end of December 1999 that you're
28  aware of?
29      A    Off the top of my head, no, I don't remember, but
30  I imagine that we did because typically we did
31      Q    Okay   Could you describe in general terms the
32  typical manner in which Winstar would purchase equipment or
33  services from Lucent after October of 1998?
34      A    It was a multi_faceted undertaking   We would __
35  the basic service construct was the development of the
36  Winstar architecture   So that was a service that was
37  purchased sort of as __ how can you define it? __ a service
38  to be performed by Lucent that would then drive the purchase
39  of other equipment as the architectural elements were
40  identified going forward
41           However, in the meantime, we had a business to
42  run, and we were still building networks   So we would also

15

1   at the same time, based on an existing architecture of what
2   equipment we were using, purchase individual elements of
3   equipment from Lucent and individual services associated
4   with deploying those elements from Lucent, as well as then
5   the systems that we previously talked about that would
6   support them
7         So the first step in the process is we were buying
8   individual things, sort of, or in groups of ten or twenty or
9   fifty
10   Q    Such as switches?
11   A    Switches, support systems, data switches,
12   engineering services
13   Q    And typically how did this occur? Did Winstar
14   approach Lucent or did Lucent approach Winstar?
15   A    It was both, but initially you would say that
16   Winstar defined it by approaching Lucent  Once that
17   contract was signed, we were really trying to create the
18   strategy relationship where Lucent would proactively make
19   recommendations to us based on their understanding of the
20   technology and how it was evolving, and we would proactively
21   make requests of Lucent based on what we knew our business
22   plan to be  We were doing something unique that no one else
23   in the world was even trying to do, so it was an iterative
24   process
25   Q    Is it fair to __ I'm sorry  Is it fair to say
26   that both parties knew what Winstar's goals were to build
27   out this network, so both parties were working to achieve
28   that same goal and would approach each other with ideas?
29   A    Yes  We should change seats  You're doing much
30   better than I am
31   Q    Again, in very general terms, could you describe
32   for me the mechanics of a purchase if Lucent were to
33   approach Winstar?
34   A    Again, it depends at which level we're talking
35   An individual, for example a contractor, Lucent would say,
36   hey, we have this individual who can help you in this area
37   performing this service  And they weren't ready yet to take
38   on the whole service  That would be done at a relatively
39   low level in the organization so long as it fit the umbrella
40   of the contract and the capital authorized to be expended
41         Then there were ongoing things that we knew we
42   were buying, like a new 5E switch  It wasn't up for

16

1  discussion as to whether or not that was the appropriate
2  switching vehicle, we're just going to buy one   So a
3  purchase request __ far more sophisticated for a 5E switch,
4  but it was an engineering order, really, with the
5  configuration all laid out __ was jointly done with Lucent,
6  and then that order would be placed on Lucent
7      But a new network element, there would be
8  architectural engineering discussions among all __ between
9  and among the various organizations with Winstar and Lucent
10 Then we might take vendor A, B, C, and D's equipment and put
11 it in our lab and, side by side with Lucent's E, run them
12 through their paces, and then jointly come out with an
13 analysis that says, oh, this is best of breed or this isn't
14 best of breed
15     And, in fact, Lucent was not best of breed in some
16 instances, accepted that, and we bought other vendors'
17 equipment   And in some areas they had no desire to be best
18 of breed   For example, they don't make radios   So they'd
19 help us determine which vendor's radios to deploy   And in
20 other areas, there were disagreements between the parties
21 Q     I'm sorry   In what type of deal between Lucent
22 and Winstar or purchased by Winstar from Lucent would you
23 personally become involved?
24 A     I was just getting there
25 Q     Okay   Great
26 A     So where there were disagreements, for example, as
27 to best of breed, there were __ there would be then a
28 head_to_head comparison against the requirements   And the
29 senior person, the vice president or senior VP at Lucent __
30 I don't know his title __ and I would then sit there and,
31 since it was supposed to be a partnership, evaluate jointly
32 whether or not it was best of breed
33     Because, you know, you get two engineers in a
34 room, you'll get two different opinions as to which
35 engineering solution is best, so I always said we should
36 have only one engineer   We'll always know the right answer
37     But then that kind of decision, then, was
38 typically jointly made by my counterpart at Lucent and I,
39 and we rarely __ in fact, we never had an issue where it
40 never had to be bumped up to our bosses as to what we
41 purchase or not
42 Q     In 1999 and 2000, who was your counterpart at

104

1   other
2       Q    And what about when you dealt with Plunkett?  Did
3   you think then that what he was asking you to do was do this
4   because this helped Lucent recognize revenue?
5       A    I didn't think that doing this was a revenue
6   recognition issue   I had in the back of my mind that it was
7   something else that he needed to shift to the next quarter
8   for his personal __ maybe his __ how he was getting
9   commissioned or something   I didn't know
10      Q    Well, didn't it cross your mind that in some
11  fashion, in some way, what he was asking you to do was to
12  help him deceive somebody?
13      A    I don't know because the document is there with
14  the date on it   So how can it be deceptive?  I don't think
15  we were trying to deceive anybody
16      Q    Well, let me say the document might have been
17  regarding as being deceptive because the deal was reached at
18  the end of September and the initial document was initialed
19  by him right around the end of September
20           Other documents that were reached at the end of
21  September were dated the end of September   And then this
22  other document gets put on one side, and then a few days or
23  weeks later it then gets dated but in fact is dated a date
24  unrelated to when it was actually reached
25      A    See, I don't see that it's __ I'm going through a
26  transaction now   I'm refinancing my house   I got a
27  commitment letter dated September and I got other things
28  dated September and we're actually going to settle in
29  October   And so I don't see anything __ I mean, some things
30  happen in this month, and we're negotiating it all at the
31  same time
32      Q    Yes   But you're not reaching the deal when you
33  refinance your house in October and then signing it next
34  January   You're signing it __
35      A    Well, I reached the deal in September   I got the
36  commitment in September, and we're actually settling in
37  October   So I __
38      Q    Right   But you're not dating the settlement __
39      A    Maybe I'm thinking __ I'm just telling you how
40  I think   So that's why I didn't see anything particularly
41  wrong
42      Q    You saw nothing at all?  I mean, it just strikes

105

1   me as just __ I'm trying to ask you, at that time you saw
2   nothing untoward about what he was asking you to do   Is
3   that right?
4        A    Well, I don't think so because I know __ I've
5   dealt with sales people all my life   I've never been in
6   sales because I don't think I could sell and I don't think
7   I could get turned down
8        And so sales guys do things for the craziest of
9   reasons because they're gaming their commissions and stuff
10  And as long as it wasn't harming me, I'm okay with it
11       Q    So did you at least suspect at the time that
12  that's what he was perhaps doing?
13       A    I don't know what I was thinking   All I was
14  thinking was the deal is done I got what I wanted   I got
15  the hubs and B's and I got an integration lab   And hey, and
16  I got this gravy, too   I've gotten our credit which we __
17  you know, which I felt was appropriate and due and coming to
18  us anyway
19       So that's what I was thinking, that I got
20  something that I'd been trying to get, in terms of the hubs
21  and B's pricing and an integration lab, for literally a
22  year_and_a_half   So I'm not thinking about much else
23       Q    Had Plunkett ever asked you to do a deal like this
24  in the past?
25       A    A deal like this?
26       Q    Meaning had Plunkett ever asked you to date
27  documents different from when the deal was actually
28  concluded?
29       A    I don't think so
30       Q    Had anyone at Lucent ever asked you to do that?
31       A    It's sort of a contextual issue   -I know we've
32  reached conclusions on deals and then people have said,
33  "Well, we're not going to sign it until next month "  But
34  you're saying there's some difference here that I'm not
35  getting
36       Q    I'm asking you __ well, here Plunkett has asked
37  you, we've reached the deal, but you know what?  Can we date
38  part of it a different date next month?  Has anyone asked
39  you __ at least with just that limited context, has anyone
40  asked you to do that?
41       A    I can't unequivocally say no to that ever because
42  there may be times when we reached agreements and did things