IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>Wınstar Communıcatıons, Inc , *et al* ,<br>　　　　　　Debtor | Chapter 7<br><br>Bankr Case No 01-01430 (KJC) |
| Chrıstıne C Shubert,<br>Chapter 7 Trustee,<br><br>　　　　Plaıntıff-Appellee,<br><br>　　v<br><br>Lucent Technologıes Inc ,<br><br>　　　　Defendant-Appellant | Cıvıl Actıon No 06-147 (JJF)<br><br>Adv Proc No 01-01063 (KJC) |

## LUCENT TECHNOLOGIES INC 'S APPENDIX—VOLUME II

RICHARDS, LAYTON & FINGER, P A
Danıel J DeFranceschı (DE Bar No 2732)
Paul N Heath (DE Bar No 3704)
One Rodney Square
920 North Kıng Street
Wılmıngton, DE 19801
(302) 651-7700

CRAVATH, SWAINE & MOORE LLP
Paul C Saunders
Danıel Slıfkın
Mıchael A Paskın
Worldwıde Plaza
825 Eıghth Avenue
New York, NY 10019
(212) 474-1000

WILMER CUTLER PICKERING HALE
  AND DORR LLP
Seth P Waxman
Craıg Goldblatt
Danıelle Spınellı
Mıchelle Glassman Bock
1875 Pennsylvanıa Avenue, NW
Washıngton, D C 20006
(202) 663-6000

　　- and -

Phılıp D Anker
James H Mıllar
399 Park Avenue
New York, NY 10022
(212) 230-8800

Dated   May 1, 2006
Wılmıngton, Delaware

# ROA
# TAB
# 507

CONFORMED COPY

CREDIT AGREEMENT

Dated as of May 4, 2000

among

WVF-I LLC, as Initial Borrower,

Any Additional Borrowers Party Hereto

WINSTAR COMMUNICATIONS, INC

The Lenders Party Hereto,

THE BANK OF NEW YORK,
as Collateral Agent

and

LUCENT TECHNOLOGIES INC
as Administrative Agent



[Reference No    7725-064]

DEFENDANT'S
EXHIBIT
29

[NYCORP JOSTTCO I 44592 06/14/00 5 50p]

TABLE OF CONTENTS

Page

ARTICLE IDefinitions

SECTION 1 01    Defined Terms                                              1
SECTION 1 02    Classification of Loans and Borrowings                    41
SECTION 1 03    Terms Generally                                           41
SECTION 1 04    Accounting Terms                                          42


ARTICLE IIThe Loans

SECTION 2 01    Commitments                                               42
SECTION 2 02    Loans and Borrowings                                      42
SECTION 2 03    Requests for Borrowings                                   43
SECTION 2 04    Funding of Borrowings                                     45
SECTION 2 05    Interest Elections                                        46
SECTION 2 06    Termination and Reduction of Commitments                  48
SECTION 2 07    Repayment of Loans, Evidence of Debt                      49
SECTION 2 08    Amortization of Loans                                     50
SECTION 2 09    Prepayment of Loans                                       50
SECTION 2 10    Fees                                                      51
SECTION 2 11    Interest                                                  52
SECTION 2 12    Alternate Rate of Interest                                53
SECTION 2 13    Increased Costs                                           53
SECTION 2 14    Break Funding Payments                                    54
SECTION 2 15    Taxes                                                     55
SECTION 2 16    Payments Generally  Pro Rata Treatment
                   Sharing of Set-offs                                    58
SECTION 2 17    Mitigation Obligations, Replacement of
         Lenders 60
SECTION 2 18    Refinancing Requirement                                   61
SECTION 2 19    Conversion Notes                                          63
SECTION 2 20    Replacement Borrowers                                     64
SECTION 2 21    Borrower Payment Allocations                              66
SECTION 2 22    Mandatory Assignment of Loans                             67


ARTICLE IIIRepresentations and Warranties

SECTION 3 01    Corporate Organization and Power                          69
SECTION 3 02    Subsidiaries                                              69
SECTION 3 03    Corporate Authority                                       69
SECTION 3 04    Binding Obligation                                        70
SECTION 3 05    Litigation  Labor Controversies                           70
SECTION 3 06    Governmental Approvals  No Conflicts                      70
SECTION 3 07    Financial Condition                                       71
SECTION 3 08    Taxes                                                     71
SECTION 3 09    Margin Regulations, Margin Stock                          72
SECTION 3 10    Compliance with ERISA                                     72
SECTION 3 11    Investment Company and Holding Company
                   Status                                                 73
SECTION 3 12    Properties and Licenses                                   73

SECTION 3 13    Telecommunications Business and
                Telecommunications Licenses 73
SECTION 3 14    Investments                                    74
SECTION 3 15    Compliance with Laws and Charter
                Documents                                      74
SECTION 3 16    Environmental Protection                       75
SECTION 3 17    Insurance                                      76
SECTION 3 18    Compliance with Agreements                     76
SECTION 3 19    Full Disclosure                                76
SECTION 3 20    Supply Agreement                               76
SECTION 3 21    Security Documents                             77


                ARTICLE IVConditions

SECTION 4 01    Effective Date                                 77
SECTION 4 02    First Borrowing                                79
SECTION 4 03    Each Borrowing                                 81
SECTION 4 04    Replacement Borrower                           81
SECTION 4 05    Released Borrower                              84


                ARTICLE VAffirmative Covenants

SECTION 5 01    Financial Statements   Compliance
                Certificates                                   84
SECTION 5 02    Corporate Existence                            86
SECTION 5 03    Conduct of Business                            86
SECTION 5 04    Taxes                                          86
SECTION 5 05    Insurance                                      87
SECTION 5 06    Inspection                                     87
SECTION 5 07    Maintenance of Records                         87
SECTION 5 08    Maintenance of Property                        88
SECTION 5 09    ERISA                                          88
SECTION 5 10    Notice of Adverse Developments                 89
SECTION 5 11    Environmental Matters                          90
SECTION 5 12    Interest Rate Protection                       90
SECTION 5 13    Measurement Date                               90
SECTION 5 14    Information Regarding Collateral               91
SECTION 5 15    Casualty and Condemnation                      92
SECTION 5 16    Temporary Restricted Subsidiaries             93
SECTION 5 17    Leasing of Collateral                          93


                ARTICLE VINegative Covenants

SECTION 6 01    Limitation on Indebtedness                     93
SECTION 6 02    Limitations on Mergers, Consolidations and
                Sales of Assets                                98
SECTION 6 03    Limitations on Liens    .                      99
SECTION 6 04    Investments, Acquisitions  Loans  Advances
                and Guaranties                                102
SECTION 6 05    Dividends, Purchase of Stock                  108
SECTION 6 06    Use of Proceeds                               110
SECTION 6 07    Phase 1 Financial Covenants                   110
SECTION 6 08    Phase 2 Financial Covenants                   113

SECTION 6 09   Consolidated Senior Debt to Consolidated
               Annualized EBITDA                              115
SECTION 6 10   EBITDA to Consolidated Debt Service            116
SECTION 6 11   Certain Prepayments of Indebtedness            116
SECTION 6 12   Amount of Bank Facilities                      116
SECTION 6 13   Use of Collateral                              117
SECTION 6 14   Activities of Borrower                         120


               ARTICLE VIIEvents of Default


               ARTICLE VIIIThe Agents


               ARTICLE IXMiscellaneous

SECTION 9 01   Notices                                        126
SECTION 9 02   Waivers  Amendments                            127
SECTION 9 03   Expenses, Indemnity, Damage Waiver             128
SECTION 9 04   Successors and Assigns                         130
SECTION 9 05   Survival                                       133
SECTION 9 06   Counterparts  Integration, Effectiveness       134
SECTION 9 07   Severability                                   134
SECTION 9 08   Right of Setoff                                134
SECTION 9 09   Governing Law, Jurisdiction, Consent to
               Service of Process                             135
SECTION 9 10   WAIVER OF JURY TRIAL                           136
SECTION 9 11   Headings                                       136
SECTION 9 12   Confidentiality                                136
SECTION 9 13   Interest Rate Limitation                       137


               ARTICLE XSubsidiaries

SECTION 10 01  Restricted Subsidiaries                        137
SECTION 10 02  Principal Subsidiaries                         140
SECTION 10 03  Designated Foreign Subsidiaries                141
SECTION 10 04  Temporary Restricted Subsidiaries              142
SECTION 10 05  Administrative Agent Duties                    142
SECTION 10 06  Additional Subsidiaries                        142
SECTION 10 07  Designation of Subsidiaries Under Bank
               Credit Agreement                               142
SECTION 10 08  Conversions Upon Prepayment                    142



Contents, p  4

4



[MTCORP 1083768 1 44590 48/14/00 5 50p]

Contents, p  5

5



Contents, p  6

6

EXHIBITS

Exhibit A -- Form of Assignment and Acceptance
Exhibit B -- Form of Conversion Agreement
Exhibit C -- Form of Conversion Indenture
Exhibit D -- Form of Equipment Owner Agreement
Exhibit E -- Form of Equipment User Agreement
Exhibit F -- Form of Guarantee Agreement
Exhibit G -- Form of Perfection Certificate
Exhibit H -- Form of Pledge Agreement
Exhibit I -- Form of U S  Security Agreement
Exhibit J -- Form of Compliance Certificate

SCHEDULES

Schedule 2 01  -     Commitments
Schedule 3 02  -     Subsidiaries
Schedule 3 05A -     Litigation
Schedule 3 05B -     Labor Controversies
Schedule 3 07  -     Material Adverse Changes
Schedule 3 13A -     Telecommunications Licenses
Schedule 3 13B -     Adverse Events Affecting Licenses
Schedule 3 14  -     Investments
Schedule 4 01  -     Post-Restructuring Parent Subsidiaries
Schedule 6 01        Existing Indebtedness
Schedule 6 03  -     Existing Liens
Schedule 6 13        Customer Premises Collateral



CREDIT AGREEMENT dated as of May 4,
2000, among WVP-I LLC  a Delaware limited
liability company, as Initial Borrower, any
additional Borrowers party hereto  WINSTAR
COMMUNICATIONS, INC , a Delaware corporation,
the LENDERS party hereto, THE BANK OF
NEW YORK, as Collateral Agent, and LUCENT
TECHNOLOGIES INC , as Administrative Agent

The parties hereto agree as follows

ARTICLE I

Definitions

SECTION 1 01    Defined Terms,  As used in this
Agreement, the following terms have the meanings specified
below

"ABR", when used in reference to any Loan or
Borrowing, refers to whether such Loan, or the Loans
comprising such Borrowing, are bearing interest at a rate
determined by reference to the Alternate Base Rate

"Acquired Indebtedness" means Indebtedness of any
Person outstanding on the date on which such Person is
acquired, by merger or otherwise (other than Indebtedness
Incurred in connection with  or to provide all or any
portion of the funds or credit support utilized to
consummate  the transaction or series of transactions
pursuant to which such Person was acquired)

"Adjusted Gross PP&E" means gross property, plant
and equipment of the Consolidated Group on a consolidated
basis less (i) the Loans then outstanding, (ii) Non-Fiber
Capital Lease Obligations for the Consolidated Group on a
consolidated basis and (iii) the gross property, plant and
equipment of the Principal Subsidiaries and Designated
Foreign Subsidiaries on a consolidated basis to the extent
that such gross property  plant and equipment exceeds 10% of
the gross property, plant and equipment of the Consolidated
Group on a consolidated basis

"Adjusted LIBO Rate" means, with respect to any
LIBOR Borrowing for any Interest Period  an interest rate
per annum (rounded upwards  if necessary  to the next 1/16
of 1%) equal to (a) the LIBO Rate for such Interest Period
multiplied by (b) the Statutory Reserve Rate

"Administrative Agent" means Lucent, in its
capacity as administrative agent for the Lenders hereunder

"Administrative Questionnaire" means an
Administrative Questionnaire in a form supplied by the
Administrative Agent

"Affiliate" of any specified Person means

(1)   any other Person  directly or indirectly,
controlling or controlled by  or

(ii) under direct or indirect common control with

such specified Person  For the purposes of this definition,
"control" when used with respect to any Person means the
power to direct the management and policies of such Person
directly or indirectly  whether through the ownership of
Voting Stock  by contract or otherwise  and the terms
"controlling" and "controlled" have the meaning correlative
to the foregoing

"Affiliated Equipment User" means any Equipment
User that is an Affiliate of the Parent (including any
Restricted Subsidiary) or with which the Parent or a
Restricted Subsidiary has entered into an agreement to
provide management or operating services

"Agents" means the Administrative Agent and the
Collateral Agent

"Alternate Base Rate" means  for any day, a rate
per annum equal to the greater of (a) the Prime Rate in
effect on such day and (b) the Federal Funds Effective Rate
in effect on such day plus ½ of 1%  Any change in the
Alternate Base Rate due to a change in the Prime Rate or the
Federal Funds Effective Rate shall be effective from and
including the effective date of such change in the Prime
Rate or the Federal Funds Effective Rate  respectively

"Applicable Margin  means  for any day, (a) with
respect to any ABR Loan, a rate per annum equal to 3 75%
prior to October 1, 2000, or 2 75% on and after October 1
2000  or (b) with respect to any LIBOR Loan  a rate per
annum equal to 4 75% prior to October 1  2000  or 3 75% on
and after October 1  2000, provided that the "Applicable
Margin" will be increased during any Refinancing Period in
accordance with Section 2 18

"Assignment and Acceptance" means an assignment
and acceptance entered into by a Lender and an assignee
(with the consent of the Borrowers and Administrative Agent
if required by Section 9 04)  and accepted by the
Administrative Agent  in the form of Exhibit A or any other
form approved by the Administrative Agent

"Availability Period" means the period from and
including the Effective Date to but excluding the earlier of

3

the Availability Termination Date and the date of termination of the Commitments

"Availability Termination Date" means December 31, 2004

"Available Commitment" means, with respect to each Lender its Commitment provided that the aggregate "Available Commitments" of the Lucent Lenders shall not at any time exceed the excess, if any, of $1,000 000,000 over the aggregate principal amount of outstanding Lucent Loans and Lucent Conversion Notes at such time At any time when there is more than one Lucent Lender with a Commitment and the "Available Commitments" of the Lucent Lenders are limited as a result of the foregoing proviso, the aggregate "Available Commitments" of the Lucent Lenders may be allocated between the Lucent Lenders as agreed between such Lucent Lenders For purposes of this definition, if a Lender that is not a Lucent Lender has a Commitment that, when funded would result in a Lucent Loan then such Lender shall be deemed to be a Lucent Lender solely for purposes of determining the extent to which such Commitment is an Available Commitment

"Average Life" means, as of the date of determination, with respect to any Indebtedness the quotient obtained by dividing

(i) the sum of the products of numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment by

(ii) the sum of all such payments

"Bank Agent" means The Bank of New York in its capacity as administrative agent under the Bank Credit Agreement

"Bank Borrower" means WCI Capital Corp a Delaware corporation

"Bank Collateral" means any and all "Collateral", as defined in the Bank Credit Agreement

"Bank Credit Agreement" means the Revolving Credit and Term Loan Agreement dated as of May 4 2000 among the Parent, the Bank Borrower, the Bank Lenders, the Bank Agent and Bank L/C Issuer, the guarantors party thereto, Citicorp North America Inc as syndication agent, and CIBC World

4

Markets Corp and Credit Suisse First Boston, as documentation agents thereunder

"Bank Credit Documents" means the Bank Credit Agreement and the other "Credit Documents", as defined in the Bank Credit Agreement

"Bank L/C Issuer" means any bank that is an issuer of letters of credit under the Bank Credit Agreement

"Bank Lenders" means, collectively, the "Lenders", as defined in the Bank Credit Agreement

"Bank Loan Parties" means the Parent, the Bank Borrower and the Restricted Subsidiaries

"Bank Loans" means any loans made pursuant to the Bank Credit Agreement

"Board" means the Board of Governors of the Federal Reserve System of the United States of America

"Board of Directors" of any Person means the Board of Directors of such Person or any committee thereof duly authorized to act on behalf of such Board of Directors

"Bond Notes" means notes issued pursuant to the Bond Notes Offering

"Bond Notes Offering" means the issuance of notes on April 10 2000, by the Parent

"Borrowers" means the Initial Borrower and any Replacement Borrowers, but excluding any Released Borrowers

"Borrowing" means a Loan or group of Loans of the same Type, made, converted or continued on the same date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect

"Borrowing Request" means a request by the Designated Borrower for a Borrowing in accordance with Section 2 03

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed provided that when used in connection with a LIBOR Loan the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market



[NYCORP 1037700 1 44590 06/16/00 5 50p]

5

"Capital Lease Obligation" means an obligation
that is required to be classified and accounted for as a
capital lease for financial reporting purposes in accordance
with GAAP and the amount of Indebtedness represented by
such obligation shall be the capitalized amount of such
obligation determined in accordance with GAAP, and the
Stated Maturity thereof shall be the date of the last
payment of rent or any other amount due under such lease
prior to the first date upon which such lease may be
terminated by the lessee without payment of a penalty

"Capital Stock" of any Person means any and all
shares, interests rights to purchase, warrants, options
participations or other equivalents of or interests in
(however designated) equity of such Person, including any
Preferred Stock but excluding any debt securities
convertible into such equity

"Cash Capital Expenditures" means capital
expenditures of the Consolidated Group on a consolidated
basis including, without duplication, the acquisition of
licenses for radio spectrum for cash (less additions to
Capital Lease Obligations from Fiber Capital Lease
Obligations) plus cash payments made with respect to Fiber
Capital Lease Obligations, excluding (i) expenditures of Net
Available Cash reinvested in Telecommunications Assets as
provided in Section 2 06(c)(iii) of the Bank Credit
Agreement, (ii) expenditures of net proceeds from casualty
and condemnation reinvested in Telecommunications Assets as
provided in Section 2 06(c)(ii) of the Bank Credit
Agreement and (iii) capital expenditures resulting from the
swap or exchange of existing Telecommunications Assets for
other Telecommunications Assets

"Change in Law" means (a) the adoption of any law,
rule or regulation after the date of this Agreement, (b) any
change in any law rule or regulation or in the
interpretation or application thereof by any Governmental
Authority after the date of this Agreement or (c) compliance
by any Lender (or for purposes of Section 2 13(b), by any
lending office of such Lender or by such Lender's holding
company if any) with any request, guideline or directive
(whether or not having the force of law) of any Governmental
Authority made or issued after the date of this Agreement

6

"Change of Control" means the occurrence of any of the following events

(i)  any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (i) any such person shall be deemed to have "beneficial ownership" of all shares that any person has the right to acquire  whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the total voting power of the Voting Stock of the Parent, provided, however, that the Permitted Holders beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) directly or indirectly  in the aggregate a lesser percentage of the total voting power of the Voting Stock of the Parent than such other person and do not have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the Board of Directors of the Parent (for the purposes of this clause (i)  such other person shall be deemed beneficially to own any Voting Stock of a Person (the "specified person") held by any other Person (the "parent entity"), if such other person is the beneficial owner (as defined above in this clause (i)), directly or indirectly, of more than 35% of the voting power of the Voting Stock of such parent entity and the Permitted Holders beneficially own (as defined in this proviso)  directly or indirectly  in the aggregate a lesser percentage of the voting power of the Voting Stock of such parent entity and do not have the right or ability by voting power contract or otherwise to elect or designate for election a majority of the Board of Directors of such parent entity),

(ii)  individuals who on the Effective Date constituted the Board of Directors of the Parent (together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Parent was approved by a vote of 66-2/3% of the directors of the Parent then still in office who were either directors on the Effective Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Parent then in office



[CITICORP 1037788 1 44530 06/16/00-5 50p]

7

(iii)     the adoption of a plan relating to the liquidation or dissolution of the Parent, or

(iv) the merger or consolidation of the Parent with or into another Person or the merger of another Person with or into the Parent, or the sale of all or substantially all the assets of the Parent (determined on a consolidated basis) to another Person (other than, in all such cases, a Person that is controlled by the Permitted Holders), other than a transaction following which in the case of a merger or consolidation transaction, securities that represented 100% of the Voting Stock of the Parent immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) constitute at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction

"Code" means the Internal Revenue Code of 1986 as amended from time to time

"Collateral" means any and all "Collateral", as defined in the Security Agreements

"Collateral Agent" means The Bank of New York in its capacity as collateral agent for the Secured Parties (as defined in the Security Documents) under the Security Documents

"Collateral Cost" means with respect to any property or asset the Purchase Price attributable to such property or asset, determined by reference to Lucent's invoice therefor disregarding amounts attributable to installation and related services other intangibles and sales taxes

"Collateral Prepayment Amount" means with respect to any Collateral Trigger Event an amount equal to the product of (a) the sum of the aggregate principal amount of the Loans outstanding at the time, multiplied by (b) a fraction the numerator of which shall be the total Collateral Cost of the properties or assets that are the subject of the applicable Collateral Trigger Event, and the denominator of which shall be the total Collateral Cost of all properties and assets constituting Collateral immediately prior to such Collateral Trigger Event provided that if a Collateral Trigger Event described in clause (b) of the definition of "Collateral Trigger Event" occurs and if the applicable Borrower has replaced the affected

8

property or asset as contemplated by the proviso to the
definition of "Collateral Trigger Event" but the
replacement property or assets do not have a value
equivalent to or greater than the property or asset that was
the subject of such Collateral Trigger Event (determined
immediately prior to giving effect to the applicable event),
then the "Collateral Prepayment Amount" in respect of such
Collateral Trigger Event shall be reduced by an amount equal
to the Collateral Cost of the replacement property or
assets

"Collateral Trigger Event" means

(a)   any direct or indirect sale or transfer
(including pursuant to a sale and leaseback
transaction) of any property or asset constituting
Collateral, except any such sale or transfer to a
Foreign Subsidiary permitted pursuant to Section 6 13
(but any such sale or transfer by a Foreign Subsidiary
Equipment Owner of Collateral acquired by it shall
constitute a Collateral Trigger Event)   or

(b)   any casualty or other damage to  or any
taking under power of eminent domain or by condemnation
or similar proceeding of, any property or asset
constituting Collateral

and the aggregate Collateral Cost of all properties and
assets affected by any such events described in clause (a)
or (b) above (other than those events as to which a
prepayment has been made pursuant to Section 2 09(c) or  in
the case of events described in clause (b) above, as to
which the affected properties or assets have been repaired,
restored or replaced in accordance with the requirements set
forth below) exceeds the Collateral Trigger Threshold at the
time, provided that an event referred to in clause (b) above
shall not constitute a "Collateral Trigger Event" if (i) the
applicable Borrower elects  by notice to the Administrative
Agent, to repair, restore or replace the affected property
or asset  as promptly as practicable  but in any event
within 180 days (or, if it is not reasonably practicable to
do so within 180 days, then 360 days), after the Collateral
Trigger Threshold is reached in accordance with the
requirements of this proviso, (ii) all Net Proceeds from
such event are deposited with the Collateral Agent to be
held as cash collateral pursuant to the applicable Security
Agreement, subject to release to pay the costs of such
repair, restoration, replacement or purchase as and when
due  (iii) the applicable Borrower promptly commences and
diligently pursues such repair  restoration or replacement
and (iv) in the case of a replacement, each property or

9

asset acquired pursuant to such replacement (A) is acquired
by the applicable Borrower pursuant to the Supply Agreement
(if the Supply Agreement is in effect at the time and the
property or asset that was the subject of the applicable
event was Lucent Product), (B) has a value equivalent to or
greater than the property or asset that was the subject of
the applicable event (determined immediately prior to giving
effect to the applicable event), (C) becomes Collateral
effective upon such replacement  free and clear of all Liens
(other than the Lien of the applicable Security Agreement)
and (D) is not financed with any Borrowings hereunder
(unless the applicable Borrower is the Designated Borrower,
and then only to the extent the purchase price thereof
exceeds the greater of (i) the Collateral Cost of the
property or asset subject to such event and (ii) the Net
Proceeds of such event) _provided further_ that, if at the
expiration of the 180-day (or if applicable 360-day)
period commencing on any date that the Collateral Trigger
Threshold is reached the applicable Borrower has not
substantially completed the repair  restoration or
replacement of the affected property or asset in accordance
with all the requirements of the foregoing proviso  then a
"Collateral Trigger Event" shall be deemed to have occurred
at the expiration of such 180-day (or, if applicable
360-day) period  If an event referred to in
clause (b) above occurs with respect to any Collateral owned
by a Foreign Subsidiary Equipment Owner, then the applicable
Borrower may satisfy the requirements of the foregoing
proviso by causing the applicable Foreign Subsidiary
Equipment Owner to repair  restore or replace the affected
property or asset as provided above  but any such
replacement shall not be financed with any Borrowings
hereunder

          "Collateral Trigger Threshold" means  at any time,
an amount equal to the greater of $10 000 000 or 5 0% of the
total Collateral Cost of all properties and assets
constituting Collateral at the time

          "Commitment" means  with respect to each Lender,
the commitment, if any, of such Lender to make Loans
hereunder during the Availability Period  expressed as an
amount representing the maximum principal amount of the
Loans to be made by such Lender hereunder, as such
commitment may be (a) reduced from time to time pursuant to
Section 2 06 and (b) reduced or increased from time to time
pursuant to assignments by or to such Lender pursuant to
Section 9 04   The initial amount of each Lender's
Commitment is set forth on Schedule 2 01, or in the
Assignment and Acceptance pursuant to which such Lender
shall have assumed its Commitment, as applicable   The

[NYCORP 1087708 1 44593 06/11/00 5 50p]

10

initial aggregate amount of the Lenders' Commitments is $2 000 000 000

"Communications Act" means the Communications Act of 1934, as amended

"Consolidated Annualized EBITDA" means with respect to any determination date the product of EBITDA for the most recent full fiscal quarter ending on or prior to such date multiplied by four (4), provided that, for purposes of determining compliance with conditions to any Consolidated Group Member's ability to Incur Indebtedness on any day Consolidated Annualized EBITDA shall be calculated for any period based on the product of EBITDA for the period ending on the most recent fiscal quarter end prior to such day for which financial statements have been delivered pursuant to Section 5 01 multiplied by four (4)

"Consolidated Debt Service" means for any period Consolidated Interest Expense for such period plus regularly scheduled principal payments on Indebtedness (excluding any such payments on Fiber Capital Lease Obligations) of the Consolidated Group on a consolidated basis for such period

"Consolidated Group" means the Bank Loan Parties Principal Subsidiaries, the Borrowers and their Subsidiaries, Vendor Financing Obligors and Designated Foreign Subsidiaries

"Consolidated Group Member" means any Person included in the Consolidated Group

"Consolidated Interest Expense" means for any period the interest expense of the Consolidated Group on a consolidated basis for such period whether paid or accrued with respect to all outstanding Indebtedness other than Fiber Capital Lease Obligations including all discounts and other fees and charges owed with respect to letter of credit and bankers' acceptance financing and net costs and amounts payable to or payable by a Consolidated Group Member under Hedging Obligations less any interest expense for such period not required to be paid in cash

11

"Consolidated Net Income" means the net income (or loss) of the Consolidated Group on a consolidated basis for the relevant period for which financial statements have most recently been delivered, provided however, that there shall not be included in such Consolidated Net Income

(i)  any gain (or loss) realized upon the sale or other disposition of any assets of a Consolidated Group Member or any other Person (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business and any gain (or loss) realized upon the sale or other disposition of any Capital Stock of any Person  or

(ii) extraordinary gains or losses

For the purposes of this definition  Consolidated Net Income (i) includes the net income (or loss) of any Person acquired by a Consolidated Group Member beginning as of the first day of the fiscal quarter during which such Person is acquired and (ii) excludes the net income (or loss) of any Person divested by a Consolidated Group Member beginning as of the first day of the fiscal quarter during which such Person is divested

"Consolidated Revenue" means  for any period  the revenue of the Consolidated Group on a consolidated basis for such period  provided  however  that there shall not be included in such Consolidated Revenue the revenue of the Principal Subsidiaries and Designated Foreign Subsidiaries on a consolidated basis (after eliminating intercompany transactions among the Consolidated Group Members) to the extent that such revenue exceeds 10% of the revenue of the Consolidated Group on a consolidated basis

"Consolidated Senior Debt" means, as of any date of determination, Indebtedness (excluding Hedging Obligations and Fiber Capital Lease Obligations) of the Consolidated Subsidiary Group on a consolidated basis less aggregate cash balances (to the extent that such cash balances are pledged to the Bank Lenders and Bank L/C Issuer under the Bank Credit Documents) held by the Consolidated Group in excess of $50,000,000, in each case as of such date  On any Measurement Date, Consolidated Senior Debt shall be calculated including the amount stated in the Borrowing Request, if applicable

"Consolidated Senior Secured Debt" means, as of any date of determination  Indebtedness (excluding Hedging Obligations) under the Bank Credit Agreement of the

12

Consolidated Group less aggregate cash balances (to the extent that such cash balances are pledged to the Bank Lenders and Bank L/C Issuer under the Bank Credit Documents) held by the Consolidated Group in excess of $50,000,000, in each case as of such date

"Consolidated Subsidiary Group" means the Bank Borrower, Restricted Subsidiaries, Principal Subsidiaries, the Vendor Financing Obligors, the Borrowers and their Subsidiaries and Designated Foreign Subsidiaries

"Consolidated Subsidiary Group Member" means any Person included in the Consolidated Subsidiary Group

"Consolidated Total Capitalization" means, as of any date of determination, the sum of (i) Consolidated Total Debt and (ii) total equity (including Preferred Stock which includes, without duplication, the Series D Preferred Stock, but excluding Disqualified Stock) and excluding cumulative losses and negative retained earnings of the Consolidated Group on a consolidated basis

"Consolidated Total Debt" means, as of any date of determination, Indebtedness (excluding Hedging Obligations and Fiber Capital Lease Obligations) of the Consolidated Group on a consolidated basis less aggregate cash balances (to the extent that such cash balances are pledged to the Bank Lenders and Bank L/C Issuer under the Bank Credit Documents) held by the Consolidated Group in excess of $50,000,000 in each case as of such date  On any Measurement Date, Consolidated Total Debt shall be calculated including the amount stated in the Borrowing Request  if applicable

"Contractual Obligation" means  as to any Person any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its Property is bound

"Conversion Agreement" means the Conversion Agreement between the Parent and Lucent substantially in the form of Exhibit B

"Conversion Certificate" has the meaning assigned to such term in the Conversion Indenture

"Conversion Indenture" means an indenture between the Parent  as issuer, and the Conversion Trustee substantially in the form of Exhibit C



13

"Conversion Notes" means senior notes issued or to be issued by the Parent pursuant to the Conversion Indenture upon the conversion of any Lucent Loans in accordance with Section 2 19 and the Conversion Indenture

"Conversion Trustee" means United States Trust Company of New York  as trustee under the Conversion Indenture

"Converting Restricted Subsidiary" has the meaning assigned to such term in Section 10 01

"Currency Agreement" means in respect of a Person any foreign exchange contract  currency swap agreement or other similar agreement designed to protect such Person against fluctuations in currency values

"Data Center Equipment Financing" means Purchase Money Indebtedness provided by an Equipment Vendor Lender and Incurred for the purpose of financing not more than 100% of the Vendor Equipment Price of telecommunications, data transmission or computer equipment, provided that, such equipment is (1) manufactured by such Equipment Vendor Lender or another single Equipment Vendor  (2) used to provide data transmission, data storage or hosting services, or services directly related to any such services and (3) installed in a central office or data center facility owned or operated by a Consolidated Subsidiary Group Member

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would  unless cured or waived, become an Event of Default

"Designated Borrower" means  at any time, the Borrower hereunder at such time that is entitled to borrow Loans under Section 2 01  At any time, there shall be only one Designated Borrower hereunder  Initially  the Designated Borrower shall be the Initial Borrower  Upon any Replacement Borrower becoming a Borrower hereunder  such Replacement Borrower shall become the Designated Borrower hereunder  and shall replace the previous Designated Borrower in such capacity  as provided in Section 2 20

"Designated Foreign Subsidiaries" means the Subsidiaries of the Bank Borrower listed as Designated Foreign Subsidiaries on Schedule 3 02 as of the Effective Date plus Subsidiaries of the Bank Borrower designated as Designated Foreign Subsidiaries pursuant to Section 10 03(b) but excluding Subsidiaries removed as Designated Foreign Subsidiaries pursuant to Sections 10 03(c) and (d)

14

"Disqualified Stock" means, with respect to any Person, any Capital Stock other than Series D Preferred Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event

(i) matures or is mandatorily redeemable (other than for Capital Stock that is not Disqualified Stock) pursuant to a sinking fund obligation or otherwise,

(ii) is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock or

(iii)     is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise  in whole or in part

in each case on or prior to the first anniversary after the latest Stated Maturity of the Loans and the Bank Loans, provided  however, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary after the latest Stated Maturity of the Loans and the Bank Loans shall not constitute Disqualified Stock if

(A)  the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than one of the following   (1) the "asset sale" terms applicable to the Bank Loans and described in Section 2 06(c)(iii) of the Bank Credit Agreement, (2) the "change of control" terms applicable to the Loans and described herein or (3) the then prevailing market terms for comparable Capital Stock generally and reasonably acceptable to the Administrative Agent, such acceptance not to be unreasonably withheld or delayed, and

(B)  any such provision only becomes operative after prepayment of all outstanding Loans and termination of the Commitments

"dollars" or "$" refers to lawful money of the United States of America

15

"EBITDA" for any period means for the Consolidated Group on a consolidated basis (x) Consolidated Net Income, minus (y) interest income and gains from discontinued operations to the extent included in calculating such Consolidated Net Income plus (z) the following to the extent deducted in calculating such Consolidated Net Income

(i) all income tax expense

(ii) interest expense of the Consolidated Group on a consolidated basis whether paid or accrued, with respect to all outstanding Indebtedness, including all discounts and other fees and charges owed with respect to letter of credit and bankers' acceptance financing and net costs and amounts payable to or payable by a Consolidated Group Member under Hedging Obligations,

(iii) depreciation and amortization expense (excluding amortization expense attributable to a prepaid operating activity item that was paid in cash in a prior period)

(iv) all other non-cash charges (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period)

(v) Preferred Stock dividends, and

(vi) losses from discontinued operations,

provided however, that there shall not be included in EBITDA the EBITDA attributable to the Principal Subsidiaries and Designated Foreign Subsidiaries on a consolidated basis (after eliminating intercompany transactions among Consolidated Group Members) to the extent that such EBITDA exceeds 10% of the EBITDA of the Consolidated Group on a consolidated basis

"Effective Date" means the date on which the conditions specified in Section 4 01 are satisfied (or waived in accordance with Section 9 02)

"Eligible Assignee" means (a) any commercial bank or other financial institution (including any credit corporation, finance company or insurance company) that either (i) has total assets in excess of $1,000,000,000, (ii) has combined capital and surplus and undivided profits in excess of $250 000 000, (iii) has long-term indebtedness rated A- or better by S&P or A3 or better by Moody's or commercial paper having one of the two highest credit

16

ratings obtainable from S&P or Moody's, or (iv) has an Affiliate that satisfies any of the criteria described in the foregoing clause (i), (ii) and (iii) or (b) any fund (whether formed as a corporation, partnership, trust or other entity) that is regularly engaged in making, purchasing or investing in loans or securities (other than a fund that primarily purchases and invests in loans or securities of distressed borrowers and issuers, unless the fund manager thereof satisfies any of the criteria described in clause (a) above) and that has total assets (together with any other funds managed by the same fund manager) in excess of $1 000 000 000, <u>provided</u> that if the determination of whether a Person is an "Eligible Assignee" is being made in the context of an assignment of a Commitment, then, for purposes of clause (a)(iv) above, a Person shall be deemed not to be an "Affiliate" of another Person unless they are part of the same consolidated group

"<u>Eligible Equipment and Services</u>" means equipment other products and services purchased pursuant to the <u>Supply Agreement</u>

"<u>Environmental Claim</u>" means any claim, demand notice of violation suit, administrative or judicial proceeding regulatory action investigation information request or order, in each case in writing involving any Hazardous Substance, Environmental Law, noise or odor pollution or any environmental injury or threat of environmental injury to human health property or the environment

"<u>Environmental Law</u>" means any federal state local or foreign statute or common law, regulation, order, decree common law or agency requirement as now in effect or hereinafter adopted relating to (i) the handling, use, presence, disposal or release of any Hazardous Substance or (ii) the protection, preservation or restoration of the environment, natural resources or human health or safety as it relates to a Hazardous Substance

"<u>Equipment Owner Agreement</u>" means an agreement among a Borrower the Administrative Agent, the Collateral Agent and one or more Foreign Subsidiary Equipment Owners substantially in the form of Exhibit D

"<u>Equipment User</u>" has the meaning assigned to such term in Section 6 13

"<u>Equipment User Agreement</u>" means an agreement among a Borrower the Administrative Agent the Collateral

17

Agent and one or more Equipment Users, substantially in the form of Exhibit B

"Equipment Vendor" means a Person that manufactures equipment that is a Telecommunications Asset and any Affiliate of such Person

"Equipment Vendor Lender" means an Equipment Vendor, provided that if an Equipment Vendor does not in the ordinary course of its business provide vendor financing to purchasers of its products and services, "Equipment Vendor Lender" shall mean a Person, not an Affiliate of such Equipment Vendor that in the ordinary course of its business provides financing for equipment (including related items utilized in connection therewith) manufactured utilized, sold or distributed by Equipment Vendors

"Equity Clawback Prepayment" has the meaning assigned to such term in Section 6 05

"ERISA" means the Employee Retirement Income Security Act of 1974 as amended from time to time

"ERISA Group" means the Parent and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Parent are treated as a single employer under Section 414 of the Code or are considered to be one employer under Section 4001 of ERISA

"Event of Default" has the meaning assigned to such term in Article VII

"Exchange Act" means the Securities Exchange Act of 1934 as amended

"Excluded Taxes" means, with respect to either Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder, (a) all taxes (including, without limitation, branch profits taxes) imposed on or measured by the net income or any franchise taxes  taxes on doing business or taxes measured by capital or net worth, in each case imposed as a result of a present, former or future connection between an Agent, a Lender or any other recipient, as the case may be  and the jurisdiction of the relevant authority imposing the tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent  such Lender or such other recipient having executed, delivered or performed its obligations or received a payment under  or enforced, this

18

Agreement or any Loan Document) and (b) in the case of a
Foreign Lender (other than an assignee pursuant to a request
by any Borrower under Section 2 17(b)) any withholding tax
that is imposed on amounts payable to such Foreign Lender at
the time such Foreign Lender becomes a party to this
Agreement (or designates a new lending office) or is
attributable to such Foreign Lender's failure to comply with
Sections 2 15(e) or (f), except to the extent that such
Foreign Lender (or its assignor, if any) was entitled, at
the time of designation of a new lending office (or
assignment), to receive additional amounts from any Borrower
with respect to such withholding tax pursuant to
Section 2 15(a)

"Exempt Assignment" means an assignment to an
Eligible Assignee that pursuant to the terms of such
assignment restricts the rights of such assignee with
respect to the approval of any amendment modification or
waiver of any provisions of the Loan Documents to rights
that may be granted to a Participant in accordance with
Section 9 04(e)

"Existing Credit Agreement" means the Credit
Agreement dated as of October 21, 1988, as amended, among
Winstar Network Expansion, LLC, the Parent the lenders
party thereto, State Street Bank and Trust Company, as
collateral agent and The Bank of New York (as successor to
Lucent) as administrative agent thereunder

"Fair Market Value" means (i) with respect to
cash, the actual amount thereof (ii) with respect to
Marketable Securities, the closing price of such Marketable
Securities as of the end of the trading day immediately
preceding the date of determination on the exchange on which
such Marketable Securities are principally traded and
(iii) with respect to any Property other than cash or
Marketable Securities the price that could reasonably be
expected to be negotiated in an arm's-length free market
transaction for cash between a willing seller and a willing
buyer neither of whom is under pressure or compulsion to
complete the transaction Unless otherwise specified with
respect to any Property (other than cash or Marketable
Securities) (x) in the case of items with a Fair Market
Value in excess of $1 0 million but less than or equal to
$100 0 million, Fair Market Value shall be determined by the
chief financial officer or treasurer of the Parent acting in
good faith and, if such Fair Market Value is in excess of
$5 0 million shall be evidenced by an Officer's
Certificate and (y) in the case of items with a Fair Market
Value in excess of $100 0 million, Fair Market Value shall
be determined by the Board of Directors of the Parent acting

[NYCORP 1017768 1 44578 06/18/00 5 50p]

19

in good faith and shall be evidenced by a resolution of the Board of Directors of the Parent

"FCC" means the Federal Communications Commission (or any successor Governmental Authority)

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any day that is a Business Day the average (rounded upwards, if necessary to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it

"Fiber Capital Lease Obligations" means Capital Lease Obligations related to the indefeasible rights of use or similar arrangements for use of fiber optic cable or fiber optic cable transmission capacity

"Financed Foreign Subsidiary Assets" means any assets acquired by a Foreign Subsidiary Equipment Owner as contemplated by Section 6 13(d) to the extent that such assets would constitute "Collateral" (as defined in the U S Security Agreement) if acquired directly by any Borrower

"Financial Officer" means with respect to any Person the chief financial officer, principal accounting officer, treasurer or controller of such Person

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America any State thereof or the District of Columbia

"Foreign Subsidiary" means any Subsidiary of the Bank Borrower formed under the laws of any jurisdiction outside of the United States of America

"Foreign Subsidiary Equipment Owner" means any Foreign Subsidiary that has purchased any Financed Foreign Subsidiary Assets or to which any Collateral has been sold or transferred in each case in accordance with Section 6 13

"Foreign Subsidiary Security Agreement" means any security agreement, mortgage or other document between a Foreign Subsidiary Equipment Owner and the Collateral Agent (or any sub-agent of the Collateral Agent appointed by the Collateral Agent, with the approval of the Administrative Agent, to act on its behalf thereunder) pursuant to which such Foreign Subsidiary Equipment Owner shall grant a Lien on any Financed Foreign Subsidiary Assets acquired by it to secure the Obligations  Each Foreign Subsidiary Security Agreement shall include provisions substantially the same as those included in the U S  Security Agreement (modified in a manner reasonably satisfactory to the Administrative Agent to reflect any requirements of applicable law in the jurisdiction where such Financed Foreign Subsidiary Assets are to be located or recommendations of any local counsel in such jurisdiction engaged by the Administrative Agent) and otherwise shall be reasonably satisfactory in form and substance to the Administrative Agent

"Fronting Commitment" means a Commitment that is assigned by a Lucent Lender pursuant to an Assignment and Acceptance designating the assigned Commitment as a "Fronting Commitment"

"GAAP" means generally accepted accounting principles in the United States of America as in effect as of the Effective Date  including those set forth in

(i)  the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants,

(ii) statements and pronouncements of the Financial Accounting Standards Board,

(iii)    such other statements by such other entity as  approved by a significant segment of the accounting profession  and

(iv) the rules and regulations of the SEC governing the inclusion of financial statements (including pro forma financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC

"Governmental Authority" means the government of the United States of America  any other nation or any political subdivision thereof, whether state or local, and any agency  authority, instrumentality, regulatory body

21

court, central bank or other entity exercising executive,
legislative, judicial, taxing regulatory or administrative
powers or functions of or pertaining to government

"Guarantee" means any obligation, contingent or
otherwise of any Person directly or indirectly guaranteeing
any Indebtedness of any other Person and any obligation,
direct or indirect, contingent or otherwise, of such first
Person to purchase or pay (or advance or supply funds for
the purchase or payment of) such Indebtedness of such other
Person (whether arising by virtue of partnership
arrangements, or by agreements to keep-well to purchase
assets, goods, securities or services entered into for the
purpose of assuring in any other manner the obligee of such
Indebtedness of the payment thereof or to protect such
obligee against loss in respect thereof (in whole or in
part)), provided, however, that the term "Guarantee" shall
not include endorsements for collection or deposit in the
ordinary course of business  The term "Guarantee" used as a
verb has a corresponding meaning

"Guarantee Agreement" means the Guarantee
Agreement among the Guarantors and the Administrative Agent,
substantially in the form of Exhibit F

"Guarantors" means the Parent and the Bank
Borrower

"Hazardous Substance" means any substance, in any
concentration or mixture, that is (i) listed classified or
regulated pursuant to any Environmental Law (11) petroleum
product or by-product asbestos containing material,
polychlorinated biphenyls radioactive material or radon or
(111) any waste or other substance regulated in connection
with any Environmental Law

"Hedging Obligations" of any Person means the
obligations of such Person pursuant to any Interest Rate
Agreement or Currency Agreement

"Incur" means issue, assume Guarantee, incur or
otherwise become liable for provided, however, that any
Indebtedness or Capital Stock of a Person existing at the
time such Person becomes a Restricted Subsidiary, Principal
Subsidiary or Designated Foreign Subsidiary (whether by
merger, consolidation acquisition or otherwise) shall be
deemed to be Incurred by such Person at the time it becomes
a Restricted Subsidiary Principal Subsidiary or Designated
Foreign Subsidiary (except in the case a Principal
Subsidiary becomes a Restricted Subsidiary or a Designated
Foreign Subsidiary or a Restricted Subsidiary becomes a

[STCORP 1057700 1 44590 06/14/36 5 59p]

22

Principal Subsidiary or a Designated Foreign Subsidiary or a Designated Foreign Subsidiary becomes a Restricted Subsidiary or a Principal Subsidiary)   The term "Incurrence" when used as a noun shall have a correlative meaning  The accretion of principal of a non-interest bearing or other discount security shall not be deemed the Incurrence of Indebtedness

            "Indebtedness" means, with respect to any Person, (i) all obligations of such Person for borrowed money or for the deferred purchase price of property or services (including all obligations, contingent or otherwise, of such Person in connection with letters of credit, bankers' acceptances  Hedging Obligations or other similar instruments) other than indebtedness to trade creditors and service providers Incurred in the ordinary course of business and payable on usual and customary terms  (ii) all obligations of such Person evidenced by bonds, notes debentures or other similar instruments  (iii) all payment obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the remedies available to the seller or lender under such agreement are limited to repossession or sale of such property), (iv) all Capital Lease Obligations of such Person, (v) all obligations of the types described in clauses (i)  (ii)  (iii) or (iv) above secured by (or for which the obligee has an existing right contingent or otherwise, to be secured by) any Lien upon or in any property (including accounts  contract rights and other intangibles) owned by such Person  even though such Person has not assumed or become liable for the payment of such Indebtedness  (vi) all Disqualified Stock  (vii) all Indebtedness of others Guaranteed by such Person and (viii) all Indebtedness of any partnership of which such Person is a general partner

            The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability  upon the occurrence of the contingency giving rise to the obligation of any contingent obligations at such date

            "Indemnified Taxes" means Taxes other than Excluded Taxes and Other Taxes

            "Initial Borrower" means WVP-I  LLC, a Delaware limited liability company

23

"Interest Election Request" means a request by a Borrower to convert or continue a Borrowing in accordance with Section 2 05

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any LIBOR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a LIBOR Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period

"Interest Period" means  with respect to any LIBOR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or  with the consent of the Lenders participating in such Borrowing, nine or twelve months) thereafter, as the applicable Borrower may elect  provided  that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month  in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing

"Interest Rate Agreement" means in respect of a Person any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement designed to protect such Person against fluctuations in interest rates

"Investments" means any investments (whether through purchase of Capital Stock or Indebtedness) or subordination of any claim or demand a Person may have to the claim or demand of any other Person in any other Person or without duplication, Guarantee the Indebtedness of such Person or acquisitions of all or substantially all of the assets or business of any other Person or a division or operating business unit thereof (excluding any such

24

acquisition classified as a capital expenditure under GAAP),
or capital contribution to (by means of any transfer of cash
or property to others or any payment for property or
services for the account of others)  or purchase or
acquisition of Capital Stock  Indebtedness or similar
instruments issued by such Person (other than Indebtedness
permitted under Section 6 01)

       "Lenders" means the Persons listed on
Schedule 2 01 and any other Person that shall have become a
party hereto pursuant to an Assignment and Acceptance  other
than any such Person that ceases to be a party hereto
pursuant to an Assignment and Acceptance

       "LIBOR" when used in reference to any Loan or
Borrowing, refers to whether such Loan, or the Loans
comprising such Borrowing  are bearing interest at a rate
determined by reference to the Adjusted LIBO Rate

       "LIBO Rate" means, with respect to any LIBOR
Borrowing for any Interest Period  the rate appearing on the
Bloomberg LIBOR page of the Bloomberg Service (or on any
successor or substitute page of such Service, or any
successor to or substitute for such Service, providing rate
quotations comparable to those currently provided on such
page of such Service  as determined by the Administrative
Agent from time to time for purposes of providing quotations
of interest rates applicable to dollar deposits in the
London interbank market) at approximately 11 00 a m    London
time  two Business Days prior to the commencement of such
Interest Period, as the rate for dollar deposits with a
maturity comparable to such Interest Period   In the event
that such rate is not available at such time for any reason
then the "LIBO Rate" with respect to such LIBOR Borrowing
for such Interest Period shall be the rate at which dollar
deposits of $5,000,000 and for a maturity comparable to such
Interest Period are offered by the principal London office
of the Administrative Agent (or  if the Administrative Agent
at the time is not a commercial bank  any commercial bank
based in New York City selected by the Administrative Agent
for the purpose of quoting such rate, provided that such
commercial bank has a combined capital and surplus and
undivided profits of not less than $500 000,000) in
immediately available funds in the London interbank market
at approximately 11 00 a m , London time, two Business Days
prior to the commencement of such Interest Period

       "Lien" means any mortgage, pledge  security
interest, encumbrance  lien or charge of any kind (including
any conditional sale or other title retention agreement or
lease in the nature thereof)

[NYCORP 1097708 1 44598 06/14/00-5 ssp]

25

"Loan Documents" means this Agreement, the Guarantee Agreement, the Security Documents, the Conversion Agreement and any Equipment Owner Agreements

"Loan Parties" means the Borrowers the Guarantors, the Pledgor and any Foreign Subsidiary Equipment Owners

"Loans" means the loans made or deemed made to the Borrowers pursuant to this Agreement

"Lucent" means Lucent Technologies Inc

"Lucent Conversion Note means any Conversion Note that is held or Guaranteed by Lucent or any of its Affiliates or for which Lucent or any Affiliate thereof is otherwise directly or indirectly liable, pursuant to a make-whole arrangement or otherwise

"Lucent Lender" means any Lender that is Lucent or an Affiliate of Lucent

"Lucent Loan" means any Loan that is held by any Lucent Lender or that is Guaranteed by Lucent or any Affiliate thereof or for which Lucent or any Affiliate thereof is otherwise directly or indirectly liable, pursuant to a make-whole arrangement or otherwise    Solely for purposes of determining Available Commitments (a) if a Lucent Loan is held by a Lender that is not a Lucent Lender and if the amount that Lucent and its Affiliates may be required to pay in respect of such Loan is limited by the terms of the Guarantee or other agreement under which they are directly or indirectly liable therefor to an amount less than the outstanding principal amount of such Loan then the amount of such Loan that is deemed to be a "Lucent Loan" shall be limited to the maximum aggregate amount that Lucent and its Affiliates may be required to pay pursuant to the terms of such Guarantee or other agreement and (b) a Loan shall be deemed not to be "held by" a Lucent Lender to the extent that such Lucent Lender has sold a participation in such Loan to a Person other than Lucent or an Affiliate of Lucent on terms that would result in such participation not constituting a "Lucent Loan" if such participation had been consummated as an assignment pursuant to Section 9 04(b)

"Lucent Products" means equipment that is manufactured by or on behalf of Lucent, licenses to use software developed by Lucent  and installation and engineering services related to the foregoing products

26

"<u>Margin Regulation</u>" means, collectively, Regulations T, U and X of the Board

"<u>Marketable Securities</u>" means, with respect to any asset disposition any readily marketable equity securities of a corporation that are (i) traded on the New York Stock Exchange the American Stock Exchange or the Nasdaq National Market (including small capitalization markets) and (ii) issued by a corporation having a total equity market capitalization of not less than $250 0 million, <u>provided</u>, <u>however</u> that, other than for purposes of determination of Fair Market Value, the excess of (A) the aggregate amount of securities of any one such corporation held by the Bank Loan Parties on a consolidated basis over (B) 20 times the average daily trading volume of such securities during the 20 immediately preceding trading days shall be deemed not to be Marketable Securities as determined on the date of the contract relating to such asset disposition

"<u>Material Adverse Effect</u>" means any material and adverse effect on (i) the consolidated business, properties, condition (financial or otherwise) or operations of the Consolidated Group on a consolidated basis, (ii) the ability of any Borrower or any other Loan Party timely to perform any of its material obligations or of the Lenders to exercise any remedy, under any Loan Document or (iii) the legality validity binding nature or enforceability of any material provisions of any Loan Document

"<u>Maturity Date</u>" means December 31  2006

"<u>Measurement Date</u>" has the meaning assigned to such term in Section 5 13

"<u>MFN Fiber IRU Capital Lease Obligation</u>" means the obligations of Winstar Wireless, Inc  under the Fiber Optic Network Agreements, dated as of July 22, 1999, September 30, 1999 and February 10, 2000, each between Winstar Wireless Inc  and Metromedia Fiber Network Services, Inc  (as amended or restated from time to time)

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any member of the ERISA Group is making or accruing an obligation to make contributions or has within the preceding five plan years made or accrued contributions

[NICORP 1097300 1 44598 06/14/00 5 50p]

27

"Net Available Cash" from an asset disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other noncash form), in each case net of

(i)    all reasonable legal  title and recording tax expenses, commissions and other fees and expenses Incurred  and all federal  state  provincial  foreign and local taxes required to be accrued as a liability under GAAP  as a consequence of such asset disposition

(ii) all payments made on any Indebtedness which is secured by any assets subject to such asset disposition  in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets  or which must by its terms  or in order to obtain a necessary consent to such asset disposition  or by applicable law  be repaid out of the proceeds from such asset disposition,

(iii)    all distributions and other payments out of such cash required to be made to minority interest holders in any Subsidiary of the Parent  and

(iv) the deduction of appropriate amounts provided by the seller as a reserve  in accordance with GAAP against any liabilities associated with the property or other assets disposed in such asset disposition and retained by a Bank Loan Party as a result of such asset disposition

"Net Cash Proceeds" with respect to any issuance or sale of Capital Stock or Indebtedness that is not Refinancing Indebtedness means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually Incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof

"Net Proceeds" means  with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds  but only as and when received  (ii) in the case of

28

a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid by the Parent and the Restricted Subsidiaries to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by the Parent and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent and the Restricted Subsidiaries and the amount of any reserves established by the Parent and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable in each case that are directly attributable to such event (as determined reasonably and in good faith by the chief financial officer of the Parent)

"Network Equipment Financing" means Purchase Money Indebtedness provided by an Equipment Vendor Lender and Incurred for the purpose of financing the Vendor Equipment Price of telecommunications data transmission or computer equipment provided that the primary equipment (the purchase price for which equipment is included in such Vendor Equipment Price) is (1) manufactured by such Equipment Vendor Lender or another single Equipment Vendor, (2) used to provide Telecommunication Business services and (3) installed as part of a network owned or operated by a Consolidated Subsidiary Group Member

"Non-Fiber Capital Lease Obligations" means Capital Lease Obligations less Fiber Capital Lease Obligations

"Obligations" means (a) the obligations of the Borrowers to duly and punctually pay (i) the principal of and interest on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrowers under this Agreement and (b) the obligations of the Borrowers to duly and punctually perform their other obligations under this Agreement and the other Loan Documents

"office com" means office com Inc , its Subsidiaries and its successors

[NYCORP 1897708 1 44598 04/14/00-5 50p]

29

"On-Network Buildings" means all buildings in which a Consolidated Group Member is capable of providing Telecommunications Business services which are linked directly or indirectly by assets owned or operated by a Consolidated Group Member to communications transmission equipment owned or operated by a Consolidated Group Member

"On-Network Hubs" means all buildings used to aggregate Telecommunications Business transmissions from On-Network Buildings utilizing assets owned or operated by a Consolidated Group Member and linked directly or indirectly by assets owned or operated by a Consolidated Group Member to communications transmission equipment owned or operated by a Consolidated Group Member

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes  charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to  any Loan Document

"Outstanding Old Bond Debt" means any Indebtedness outstanding as of the date hereof of (i) Winstar Equipment Corp  in respect of its 12½% Guaranteed Senior Secured Notes due 2007 and (ii) the Parent in respect of its (A) 14% Senior Discount Notes due 2005  (B) 10% Senior Subordinated Notes due 2008 and (C) 11% Senior Subordinated Deferred Interest Notes due 2008

"Parent" means Winstar Communications  Inc  a Delaware corporation

"PBGC" means the Pension Benefit Guarantee Corporation (or any successor Governmental Authority)

"Pension Plan" means a Plan that (i) is an employee pension benefit plan  as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) and (ii) is subject to the provisions of Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code

"Perfection Certificate" means a certificate in the form of Exhibit G or any other form approved by the Agents

"Permitted Holders" means William J  Rouhana  Jr (or  in the event of his incompetence or death  his estate, heirs  executor, administrator  committee or other personal representative (collectively, 'heirs")) or any Person

controlled, directly or indirectly, by William J Rouhana, Jr or his heirs

"Permitted Investments" has the meaning assigned to such term in Section 6 04

"Permitted Liens" has the meaning assigned to such term in Section 6 03

"Person" means any individual, corporation partnership, limited liability company, joint venture, association joint-stock company trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity

"Plan" means an employee benefit plan as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is maintained or contributed to by the Bank Borrower or any member of the ERISA Group

"Pledge Agreement" means the Pledge Agreement between the Pledgor and the Collateral Agent substantially in the form of Exhibit H

"Pledgor" means Winstar Wireless Inc    a Delaware corporation

"Preferred Stock", as applied to the Capital Stock of any Person means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person

"Prepayment Event" means the issuance by the Parent after the Effective Date of any shares of its capital stock or other equity securities for cash consideration other than Disqualified Stock and other stock options or warrants issued to officers or employees or stock issued upon the exercise of any such stock options or warrants

"Prime Rate" means (a) at any time that The Bank of New York is the Bank Agent  the rate of interest from time to time publicly announced by The Bank of New York in The City of New York as its prime commercial lending rate or (b) at any other time, the rate of interest per annum published from time to time in the "Money Rates" column (or any successor column) of The Wall Street Journal as the prime rate or  if such rate shall cease to be so published or is not available for any reason  the rate of interest publicly announced from time to time by any commercial bank

31

based in New York City selected by the Administrative Agent
for the purpose of quoting such rate, provided such
commercial bank has a combined capital and surplus and
undivided profits of not less than $500,000,000  Each
change in the Prime Rate shall be effective from and
including the opening of business on the date such change is
announced or published, as the case may be

"Principal Payment Date" means each March 31
June 30  September 30 and December 31, commencing on and
including March 31  2005, and ending on and including the
Maturity Date

"Principal Subsidiaries" means the Subsidiaries of
the Parent listed as Principal Subsidiaries on Schedule 3 02
as of the Effective Date plus Subsidiaries of the Parent
designated as Principal Subsidiaries pursuant to
Sections 10 01(d) or (e) or Sections 10 02(b) or (c) but not
including Subsidiaries removed as Principal Subsidiaries
pursuant to Section 10 02(d) or (e)

"Property" means  with respect to any Person  any
interest of such Person in any kind of property or asset
whether real  personal or mixed, or tangible or intangible,
including Capital Stock in  and other securities of  any
other Person

"Purchase Money Indebtedness" means Indebtedness
(including Capital Lease Obligations, Acquired Indebtedness
mortgage financings and purchase money obligations) Incurred
for the purpose of financing not more than 100% of the cost
and directly related expenses including costs of design
construction, acquisition, lease, installation (including
the cost of other equipment incidental to such
installation), insurance, shipping, handling  storage
transportation  testing  development or improvement or any
service agreement  maintenance agreement or warranty
agreement with respect to the applicable Telecommunications
Assets of a Consolidated Group Member

"Purchase Price" means amounts paid or payable for
Eligible Equipment and Services pursuant to invoices
delivered pursuant to the Supply Agreement

"Receivables" means receivables, chattel paper,
instruments, documents or intangibles evidencing or relating
to the right to payment of money and proceeds and products
thereof in each case generated in the ordinary course of
business

32

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay redeem, defease or retire, or to issue other Indebtedness in exchange, conversion or replacement for, such Indebtedness "Refinances " "Refinanced" and "Refinancing" shall have correlative meanings

"Refinancing Indebtedness" means Indebtedness of a Consolidated Group Member that Refinances any Indebtedness of a Consolidated Group Member existing on the Effective Date or Incurred in compliance with this Agreement, including Indebtedness that Refinances Refinancing Indebtedness provided, however, that

(i) such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced,

(ii) such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being Refinanced

(iii) such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses including any premium and defeasance costs) under the Indebtedness being Refinanced,

(iv) such Refinancing Indebtedness is not secured by Liens beyond the Liens in place at the time of the Incurrence of the Indebtedness being Refinanced, except as otherwise permitted under this Agreement, and

(v) such Refinancing Indebtedness is issued on terms no more restrictive in any material respect than those contained in the Indebtedness being Refinanced or is on commercially reasonable terms approved by the Administrative Agent, such approval not to be unreasonably withheld or delayed, provided, however that (a) any Refinancing of Indebtedness referred to in Section 6 01(a)(v)(A) shall not be subject to this clause (v) so long as such Refinancing is on commercially reasonable terms at the time of such Refinancing and (b) any Refinancing Indebtedness shall not be subject to this clause (v) if (x) the Incurrence of such Indebtedness would not require any approval by the Administrative Agent if such Indebtedness were not Refinancing Indebtedness and (y) the terms of such


[NYCORP 1087708 1 44590 05/24/00 5 50p]

33

Refinancing Indebtedness are commercially reasonable at the time of such Refinancing, provided further that Refinancing Indebtedness Incurred by the Parent to refinance Loans shall not be subject to this clause (v)

"Refinancing Notice" has the meaning assigned to such term in Section 2 18

"Refinancing Period" means any period commencing on the date of occurrence of a Refinancing Period Trigger Event and ending on the next day on which the Borrowers shall have prepaid an aggregate principal amount of Loans equal to the aggregate principal amount of Loans required to have been refinanced pursuant to the Refinancing Notice that resulted in the occurrence of such Refinancing Period Trigger Event and any Refinancing Notices subsequently delivered with respect to which the Refinancing Trigger Date occurred during such period  It is understood that  if a Refinancing Notice requires that all outstanding Loans be refinanced, the Borrowers shall be deemed not to have satisfied such requirement until there are no Loans outstanding

"Refinancing Trigger Date" means, with respect to any Refinancing Notice  the date that is 90 days (or, if necessary in order to complete a year-end audit, 105 days) after the date such Refinancing Notice is delivered to the Borrowers

"Refinancing Trigger Event" means the failure of the Borrowers to prepay Loans in the amount required by a Refinancing Notice prior to the Refinancing Trigger Date with respect to such Refinancing Notice, provided that, if a Refinancing Trigger Date occurs during a Refinancing Period that commenced on a previous date and is continuing, no Refinancing Period Trigger Event shall be deemed to occur on such Refinancing Trigger Date  References herein to the date of occurrence of a Refinancing Period Trigger Event shall be deemed to refer to the Refinancing Trigger Date prior to which the Borrowers failed to prepay Loans resulting in the occurrence of such Refinancing Period Trigger Event

"Register" has the meaning set forth in Section 9 04

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors  officers, employees, agents and advisors of such Person and such Person's Affiliates



"<u>Released Borrower</u>" means any Initial Borrower or Replacement Borrower that has ceased to be a Borrower in accordance with Section 2 20 or 2 22

"<u>Replacement Borrower</u>" means any corporation or limited liability company that becomes a "Borrower" hereunder in accordance with Sections 2 20 and 4 04

"<u>Replacement Trigger Event</u>" means, with respect to any Borrower that (a) at least $250,000,000 of Loans shall have been made to such Borrower (on a cumulative basis) and (b) at least $50 000,000 aggregate principal amount of Loans to such Borrower shall have been repaid or prepaid (on a cumulative basis) subsequent to the first date on which the condition described in clause (a) above was satisfied

"<u>Required Lenders</u>" means at any time Lenders having outstanding Loans and Commitments representing more than 50% of the sum of the total outstanding Loans and Commitments at such time  <u>provided</u> that (i) at any time (on or after the first date on which Lenders (other than Lucent Lenders) hold Commitments and Loans aggregating $100,000,000 or more) that Lucent Lenders have outstanding Loans and Commitments representing more than 50% of the sum of all outstanding Loans and Commitments at such time, "Required Lenders" means each of (A) the Lucent Lenders at such time and (B) other Lenders holding more than 50% of the outstanding Loans and Commitments (excluding those held by Lucent Lenders) at such time and (ii) if at such time any Lender shall have become a Lender pursuant to an Exempt Assignment  the Loans and Commitments assigned to such Lender pursuant to such Exempt Assignment, and any Loans made pursuant to any Commitments assigned to such Lender pursuant to such Exempt Assignment  shall be disregarded for all purposes of this definition as though such Loans and Commitments did not exist  <u>provided</u> <u>further</u> that, if any Loans or Commitments referred to in clause (ii) above are subsequently assigned to a Lucent Lender  such Loans or Commitments shall cease to be disregarded as provided in such clause

"<u>Responsible Officer</u>" means the chief executive officer, president  chief financial officer  principal accounting officer, secretary or assistant secretary or treasurer or assistant treasurer of the Parent

"<u>Restricted Subsidiaries</u>" means the Subsidiaries of the Parent listed as Restricted Subsidiaries on Schedule 3 02 as of the Effective Date plus Subsidiaries of the Parent which are designated as or become Restricted

35

Subsidiaries pursuant to Sections 10 01(b) and (c) but not
including Subsidiaries removed as Restricted Subsidiaries
pursuant to Sections 10 01(d) through (f)

"Sale/Leaseback Transaction" means the transfer by
a Consolidated Group Member of property owned by it to a
Person (other than a Consolidated Group Member) and the
leasing by any Consolidated Group Member of such property
from such Person

"SEC" means the Securities and Exchange Commission
(or any successor Governmental Authority)

"Second Borrower" has the meaning assigned to such
term in Section 2 20

"Securities Act" means the Securities Act of 1933

"Security Agreements" means the U S  Security
Agreements and any Foreign Subsidiary Security Agreements

"Security Documents" means the Pledge Agreement
and the Security Agreements

"Series A Preferred Stock" means the Series A 6%
Cumulative Convertible Preferred Stock of the Parent

"Series C Preferred Stock" means the Series C
14¼% Senior Cumulative Exchangeable Preferred Stock due
2007 of the Parent  issued and outstanding on the Effective
Date

"Series C Stock Transaction" means (i) the
exchange of the Series C Preferred Stock for exchange
debentures ("Exchange Debentures") pursuant to the terms of
the Series C Preferred Stock, (ii) the exchange by the
Parent of Exchange Debentures for the Parent's 14¾% Senior
Discount Notes due 2010 and the Parent's 12¾% Senior Notes
due 2010, and (iii) the repurchase by the Parent for cash of
shares of Series C Preferred Stock and/or Exchange
Debentures which are not exchanged in connection with the
foregoing transactions

"Series D Preferred Stock" means the Series D 7%
Cumulative Convertible Preferred Stock due 2010 of the
Parent

"Series G Preferred Stock" means the Series G
Senior Cumulative Participating Convertible Preferred Stock
of the Parent

"Shelf Registration" means the registration under the Securities Act of the offering and sale of securities of the Parent which will include the offering and sale of Conversion Notes that is required to be maintained in effect in accordance with Section 2 19 and the Conversion Agreement

"Stated Maturity" means with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred) "Stated Maturity" has, with respect to a Capital Lease Obligation, the meaning set forth herein in the definition of Capital Lease Obligation "Stated Maturity" means, with respect to Indebtedness and Refinancing Indebtedness the date specified in the instrument evidencing such Indebtedness or Refinancing Indebtedness as the fixed date on which the final payment of principal of such Indebtedness or Refinancing Indebtedness is due and payable

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal special emergency or supplemental reserves) expressed as a decimal established by the Board to which any commercial banks subject to regulation by the Board are subject with respect to the Adjusted LIBO Rate for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) Such reserve percentages shall include those imposed pursuant to such Regulation D LIBOR Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage

"Subsidiary" means, with respect to any Person, a corporation, association, partnership or other business entity of which (a) more than 50% of the total voting power of shares of Voting Stock is at the time owned or controlled, directly or indirectly by

(i)    such Person,

37

(ii) such Person and one or more Subsidiaries of such Person  or

(iii)      one or more Subsidiaries of such Person

or (b) 50% of the total voting power of shares of Voting Stock is at the time owned or controlled, directly or indirectly  by such Person pursuant to (i), (ii) or (iii) of clause (a) above and such Person has, directly or indirectly  the requisite control over such entity to prevent it from Incurring Indebtedness, or taking any other action at any time, in contravention of the provisions of this Agreement or any other credit agreement or indenture applicable to it

"Supply Agreement" means the Supply Agreement dated as of October 21, 1998  between Lucent and the Parent

"Taxes" means any and all present or future taxes, levies, imposts, duties  deductions  charges or withholdings imposed by any Governmental Authority

"Telecommunications Assets" means (i) any Property (other than cash  Temporary Cash Investments and Marketable Securities) used in the Telecommunications Business or (ii) the Capital Stock of any Person engaged primarily in the Telecommunications Business

"Telecommunications Business" means the business of (i) transmitting, or providing services relating to the transmission of  voice, video or data through transmission facilities, (ii) constructing  creating, developing or producing communications networks, related network transmission equipment, software, devices and content for use in a communications or content distribution business, (iii) data center management, computer and application outsourcing, computer systems integration, reengineering of computer software  information services and web hosting and any services related thereto or (iv) evaluating, participating or pursuing any other activity or opportunity that is primarily related to those identified in (i), (ii) or (iii) above or in furtherance thereof, including without limitation  any business conducted by any Consolidated Group Member on the Effective Date, _provided, however_, that the determination of what constitutes a Telecommunications Business shall be made in good faith by the Board of Directors of the Parent

"Telecommunications Licenses" has the meaning assigned to such term in Section 3 13

38

"Temporary Cash Investments" means any of the following

(i)  any investment in direct obligations of the United States of America or any agency thereof or obligations guaranteed by the United States of America or any agency thereof,

(ii) investments in time deposit accounts, certificates of deposit, money market deposits, bankers' acceptances and repurchase obligations maturing within 365 days of the date of acquisition thereof issued by a bank or trust company which is organized under the laws of the United States of America  any state thereof or any foreign country recognized by the United States, and which bank or trust company has capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign currency equivalent thereof) and has outstanding debt which is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) or any money-market fund sponsored by a registered broker-dealer or mutual fund distributor

(iii)      repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (i) above entered into with a bank meeting the qualifications described in clause (ii) above

(iv) investments in commercial paper, maturing not more than 270 days after the date of acquisition, issued by a corporation (other than an Affiliate of the Parent) organized and in existence under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's Investors Service, Inc  or "A-1" (or higher) according to Standard and Poor's Ratings Group,

(v)  investments in securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America  or by any political subdivision or taxing authority thereof, and

39

rated at least "A" by Standard & Poor's Ratings Group
or "A" by Moody's Investors Service, Inc ,
        (vi) auction rate preferred stocks of any
corporation maturing within 90 days after the date of
acquisition rated at least "A" by Standard and Poor's
Ratings Group  and

        (vii)    any investment in a registered
investment company investing exclusively in investments
of the types described in clauses (i) through (vi)

        "Temporary Restricted Subsidiaries" means those
Restricted Subsidiaries listed as Temporary Restricted
Subsidiaries on Schedule 3 02 but not including any
Subsidiaries so listed that are removed as Restricted
Subsidiaries pursuant to Sections 10 01(d) through (f)

        "Third Party Products" means Eligible Equipment
and Services other than Lucent Products

        "Transactions" means the execution delivery and
performance by each Loan Party of the Loan Documents (and
in the case of the Parent, the Conversion Indenture) to
which it is to be a party, the borrowing of Loans, the use
of the proceeds thereof and, in the case of the Parent, the
issuance of Conversion Notes

        "Type', when used in reference to any Loan or
Borrowing  refers to whether the rate of interest on such
Loan, or on the Loans comprising such Borrowing, is
determined by reference to the Adjusted LIBO Rate or the
Alternate Base Rate

        'Unrestricted Proceeds" means, on any date of
determination, (a) the sum of the following amounts received
by the Bank Borrower and Restricted Subsidiaries for the
period from and after the Effective Date to such date of
determination

        (i)  the aggregate Net Cash Proceeds from the
issuance or sale of Capital Stock (other than
Disqualified Stock) of the Parent (other than an
issuance or sale to the Bank Borrower or a Restricted
Subsidiary and other than an issuance or sale to an
employee stock ownership plan or to a trust established
by a Bank Loan Party or Principal Subsidiary for the
benefit of their employees),

        (ii) Net Available Cash received from the sale of
Investments made pursuant to clauses (ix)  (xi)  (xii),
(xiv) and (xxi) of Section 6 04(b) and any cash

40

dividends, interest and other distributions received
from such Investments
    (iii)    cash dividends, interest and other
distributions received from Unrestricted Subsidiaries
or from Investments in Unrestricted Subsidiaries

    (iv) Net Cash Proceeds or Net Available Cash from
sales of Capital Stock of Unrestricted Subsidiaries
and

    (v)  upon the conversion of an Unrestricted
Subsidiary to a Restricted Subsidiary  the aggregate
cost of all Investments made by the Borrower or a
Restricted Subsidiary in the Subsidiary being
converted

less (b) the sum of amounts deemed utilized as Unrestricted
Proceeds under (1) clauses (i), (ix), (xix) and (xx) of
Section 6 04(b)  (2) Section 6 05, (3) Section 6 07(c) and
(4) Section 6 08(c)

    "Unrestricted Subsidiaries" means all Subsidiaries
of the Parent that are not Principal Subsidiaries,
Restricted Subsidiaries or Designated Foreign Subsidiaries

    "U S  Security Agreement" means a Security
Agreement between a Borrower and the Collateral Agent
substantially in the form of Exhibit I

    "Vendor Equipment Price" means the purchase price
of equipment manufactured by an Equipment Vendor and the
costs associated therewith, including costs of shipping
handling, storage  transportation, testing, development or
improvement, insurance  design  construction and
installation, including the cost of other equipment or items
incidental to such installation  and the cost of service or
warranty agreements or maintenance agreements therefor

    "Vendor Financing" means (a) any financing or
other credit or deferred payment arrangement except in the
ordinary course of business on terms not to exceed 120 days
provided by a supplier, manufacturer or lessor of
Telecommunications Assets or any Affiliate thereof and
(b) the financing represented by the Loans under this
Agreement

    "Vendor Financing Obligor" means a Subsidiary of
the Bank Borrower that is formed to Incur Purchase Money
Indebtedness  provided  that (a) substantially all the
Property of such Subsidiary consists of Property the
purchase price of which was financed with the proceeds of

41

such Purchase Money Indebtedness, (b) such Subsidiary's Purchase Money Indebtedness is not secured by Liens on any Property other than such Subsidiary's Capital Stock, Property owned by such Subsidiary and Property owned by other Subsidiaries that constitute "Vendor Financing Obligors" within the meaning of this definition and (c) such Subsidiary's Purchase Money Indebtedness is not Guaranteed by or otherwise recourse to any other Person other than a Guarantor

"Voting Stock" of a Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors managers or trustees thereof

"Welfare Plan" means a "welfare plan", as defined in Section 3(1) of ERISA

"Wholly Owned" means with respect to a Subsidiary, all the Capital Stock of such Subsidiary (other than directors' qualifying shares or a similar immaterial number of shares owned by third parties to comply with local shareholder residency requirements outside the United States) is owned by the Parent or one or more Wholly Owned Subsidiaries

"Williams Fiber IRU Capital Lease Obligation" means the IRU Agreement, effective as of December 17, 1998, between Winstar Wireless Inc and Williams Communications Inc (as amended modified, clarified supplemented, or restated from time to time)

SECTION 1 02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e g , a "LIBOR Loan") Borrowings also may be classified and referred to by Type (e g  a "LIBOR Borrowing")

SECTION 1 03    Terms Generally  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"  The word "will" shall be construed to have the same meaning and effect as the word "shall"  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to

42

such agreement  instrument or other document as from time to
time amended  supplemented or otherwise modified (subject to
any restrictions on such amendments, supplements or
modifications set forth herein), (b) any reference herein to
any Person shall be construed to include such Person's
successors and assigns  (c) the words "herein", "hereof" and
"hereunder", and words of similar import, shall be construed
to refer to this Agreement in its entirety and not to any
particular provision hereof  (d) all references herein to
Articles  Sections  Exhibits and Schedules shall be
construed to refer to Articles and Sections of  and Exhibits
and Schedules to, this Agreement and (e) the words "asset"
and "property" shall be construed to have the same meaning
and effect and to refer to any and all tangible and
intangible assets and properties, including cash
securities, accounts  contract rights, licenses and
intellectual property

        SECTION 1 04   Accounting Terms    Except as
otherwise expressly provided herein, the term "consolidated"
and all other terms of an accounting nature shall be
interpreted and construed in accordance with GAAP, as in
effect on the date hereof  provided, however  that, for
purposes of determining compliance with the provisions of
this Agreement  the term "consolidated" as applied to the
Parent  the Bank Borrower, Restricted Subsidiaries,
Principal Subsidiaries  the Borrowers  Vendor Financing
Obligors  Designated Foreign Subsidiaries  Consolidated
Group, Consolidated Subsidiary Group and/or Loan Parties  as
the case may be  shall mean only the consolidation of the
Persons indicated, as applicable, and not other Persons that
otherwise under GAAP would be included on a consolidated
basis   If there shall occur a change in GAAP which would
affect the computation used to determine compliance with any
covenant set forth in Article V or VI, the Parent  the
Borrowers and the Lenders agree to negotiate in good faith
in an effort to agree upon an amendment to this Agreement
that will permit compliance with such covenant to be
determined by reference to GAAP as so changed while
affording the Lenders and the Consolidated Group the rights
and obligations intended to be afforded by such covenant
prior to such change (it being understood, however, that
such covenant shall remain in full force and effect in
accordance with its existing terms unless and until such
amendment shall become effective)

43

ARTICLE II

The Loans

SECTION 2 01    Commitments    Subject to the terms
and conditions set forth herein, each Lender with an
Available Commitment agrees to make Loans to the Designated
Borrower at any time and from time to time during the
Availability Period in an aggregate principal amount not
exceeding its remaining Available Commitment at the time
Amounts repaid in respect of Loans may not be reborrowed

SECTION 2 02    Loans and Borrowings    (a)  Each
Loan shall be made as part of a Borrowing consisting of
Loans of the same Type made by the Lenders ratably in
accordance with their respective Available Commitments,
provided that if a Fronting Commitment is assigned by a
Lucent Lender then until such Fronting Commitment is fully
drawn  (i) such Lucent Lender shall not be required to make
any additional Loans and (ii) the amount of the Loan to be
made by the assignee of such Fronting Commitment pursuant to
each Borrowing shall equal the amount of the Loan that would
have been made by such assignee pursuant to such Borrowing
without giving effect to such assignment plus either (A) the
amount of the Loan that would have been made by such Lucent
Lender pursuant to such Borrowing without giving effect to
such assignment or, if less, (B) the remaining amount of
such Fronting Commitment   The foregoing proviso shall not
be construed to require any Lender to make a Loan pursuant
to a Commitment that is not an Available Commitment   The
failure of any Lender to make any Loan required to be made
by it shall not relieve any other Lender of its obligations
hereunder, provided that the Commitments of the Lenders are
several and no Lender shall be responsible for any other
Lender's failure to make Loans as required, provided further
that Lucent agrees that it shall be liable hereunder for the
obligation of any of its Affiliates that is a Lender to make
Loans hereunder as required

(b)  Subject to Section 2 12, each Borrowing shall
be comprised entirely of LIBOR Loans or ABR Loans as the
Designated Borrower may request in accordance herewith
Each Lender at its option may make any LIBOR Loan by causing
any domestic or foreign branch or Affiliate of such Lender
to make such Loan, provided that any exercise of such option
shall not affect the obligation of the applicable Borrower
to repay such Loan in accordance with the terms of this
Agreement

(c)  At the commencement of each Interest Period
for any LIBOR Borrowing  such Borrowing shall be in an

44

aggregate amount that is an integral multiple of $100,000 and not less than $5,000 000   Borrowings of more than one Type may be outstanding at the same time, _provided_ that there shall not be more than 20 LIBOR Borrowings outstanding at the same time

(d)  Notwithstanding any other provision of this Agreement  the Borrowers shall not be entitled to request, or to elect to convert or continue, any Borrowing as a LIBOR Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date

SECTION 2 03   Requests for Borrowings.  To request a Borrowing  the Designated Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a LIBOR Borrowing, not later than 11 00 a m , New York City time  three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11 00 a m , New York City time, one Business Day before the date of the proposed Borrowing, _provided_ that (i) only one request for a Borrowing may be made in any single calendar month (it being understood that all Borrowings made by the Designated Borrower on the same date shall be treated as a single request for a Borrowing for purposes of this limitation) and (ii) if any Lucent Lender has an Available Commitment at the time of such Borrowing and any portion of the proceeds of such Borrowing to be funded by such Lucent Lender would be required to be funded by such Lucent Lender other than as a credit against amounts owing to Lucent or an Affiliate of Lucent as provided in Section 2 04, then the applicable Borrowing Request shall be made not later than five Business Days before the date of the proposed Borrowing (in the case of a LIBOR Borrowing) or three Business Days before the date of the proposed Borrowing (in the case of an ABR Borrowing) Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Designated Borrower  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2 02

(i)  the aggregate amount of such Borrowing and a reasonably detailed description of the use of the proceeds therefrom (and each written Borrowing Request shall attach copies of all invoices to be paid with such proceeds) and indicating the portion, if any, of such Borrowing that is financing the Purchase Price of any Third Party Products,



[NYCORP 1027708 1 4459D 06/11/00-5 50p]

45

(ii) the date of such Borrowing, which shall be a
Business Day,

(iii)    whether such Borrowing is to be a LIBOR
Borrowing or an ABR Borrowing,

(iv) in the case of a LIBOR Borrowing, the initial
Interest Period to be applicable thereto, which shall
be a period contemplated by the definition of the term
"Interest Period" and

(v)  the location and number of the account or
accounts to which funds (if any) are to be disbursed,
which shall comply with the requirements of
Section 2 04

If no election as to the Type of Borrowing is specified,
then the requested Borrowing shall be an ABR Borrowing    If
no Interest Period is specified with respect to any
requested LIBOR Borrowing, then the Designated Borrower
shall be deemed to have selected an Interest Period of one
month's duration    Promptly following receipt of a Borrowing
Request in accordance with this Section  the Administrative
Agent shall advise each Lender with an Available Commitment
of the details thereof and of the amount of such Lender's
Loan to be made as part of the requested Borrowing

SECTION 2 04   Funding of Borrowings.  (a)  Each
Lender with an Available Commitment shall make each Loan to
be made by it hereunder on the proposed date thereof by wire
transfer of immediately available funds by 12 00 noon,
New York City time, to the account of the Administrative
Agent most recently designated by it for such purpose by
notice to the Lenders   The Administrative Agent will make
such Loans available to the Designated Borrower by promptly
crediting the amounts so received, in like funds, to an
account of the Designated Borrower maintained with the
Administrative Agent in New York City and designated by the
Designated Borrower in the applicable Borrowing Request
Notwithstanding the foregoing  if the proceeds of any
Borrowing are to be used to make any payment to or for the
account of Lucent or any Affiliate thereof (i) if any Lucent
Lender has an Available Commitment, then such Lucent Lender
may make its Loan by crediting the amount thereof against
the payment obligations to Lucent or any such Affiliate and
shall be deemed to have made a Loan in the amount of such
credit and (ii) the Administrative Agent will make the Loans
of the other Lenders available to the Designated Borrower by
promptly crediting the amounts so received from such other
Lenders, in immediately available funds, to an account of
Lucent maintained with the Administrative Agent for such

46

purpose, to the extent of the proceeds of such Loans designated to be used to make payments to Lucent or any of its Affiliates (after giving effect to any credits pursuant to clause (i) above) and the balance, if any, of such proceeds shall be made available to the Designated Borrower as provided in the preceding sentence

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Designated Borrower a corresponding amount    In such event if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent    then the applicable Lender and the Designated Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Designated Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Designated Borrower the interest rate applicable to ABR Loans of the same Class If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing

SECTION 2 05    Interest Elections    (a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and  in the case of a LIBOR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request    Thereafter, the applicable Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a LIBOR Borrowing, may elect Interest Periods therefor, all as provided in this Section    The applicable Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing

(b)    To make an election pursuant to this Section the applicable Borrower shall notify the Administrative

[NYCORP 1897108 1 44598 06/14/00 5 50p]

47

Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2 03 if the applicable Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election   Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the applicable Borrower

(c)   Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2 02 and paragraph (f) of this Section

(i)   the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing),

(ii)   the effective date of the election made pursuant to such Interest Election Request  which shall be a Business Day

(iii)    whether the resulting Borrowing is to be a LIBOR Borrowing or an ABR Borrowing  and

(iv)  if the resulting Borrowing is a LIBOR Borrowing  the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period"

If any such Interest Election Request requests a LIBOR Borrowing but does not specify an Interest Period  then the applicable Borrower shall be deemed to have selected an Interest Period of one month's duration

(d)   Promptly following receipt of an Interest Election Request  the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing

(e)   If a Borrower fails to deliver a timely Interest Election Request with respect to a LIBOR Borrowing of such Borrower prior to the end of the Interest Period applicable thereto  then, unless such Borrowing is repaid as

48

provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto

(f)    A Borrowing may not be converted to or continued as a LIBOR Borrowing if after giving effect thereto (i) the Interest Period therefor would commence before and end after a date on which any principal of the Loans is scheduled to be repaid and (ii) the sum of the aggregate principal amount of outstanding LIBOR Borrowings with Interest Periods ending on or prior to such scheduled repayment date plus the aggregate principal amount of outstanding ABR Borrowings would be less than the aggregate principal amount of Loans required to be repaid on such scheduled repayment date

SECTION 2 06    Termination and Reduction of Commitments    (a)  Unless previously terminated  the Commitments shall terminate on the Availability Termination Date

(b)    On the date of each Loan made by any Lender such Lender's Commitment shall be reduced by an amount equal to such Loan

(c)    In the event that a prepayment would be required pursuant to paragraph (b) or (c) of Section 2 09, all Commitments then in effect shall be reduced ratably by an aggregate amount equal to the excess, if any, of the amount of the required prepayment over the aggregate principal amount of Loans outstanding immediately prior to giving effect to such prepayment

(d)    The Designated Borrower may at any time terminate, or from time to time reduce  the Commitments, provided that each reduction of the Commitments pursuant to this paragraph (d) shall be in an amount that is an integral multiple of $1 000 000 and not less than $5,000,000

(e)    The Designated Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments  under paragraph (d) of this Section at least one Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof    Promptly following receipt of any



49

such notice, the Administrative Agent shall advise the Lenders of the contents thereof   Each notice delivered by the Designated Borrower pursuant to this Section shall be irrevocable   Any termination or reduction of the Commitments shall be permanent   Each reduction of the Commitments pursuant to paragraph (d) of this Section shall be made ratably among the Lenders in accordance with their respective Commitments, provided that the Designated Borrower may, in its discretion, reduce the Commitments of Lucent Lenders in excess of their Available Commitments pursuant to such paragraph (d) without reducing the Commitments of other Lenders

SECTION 2 07   Repayment of Loans, Evidence of Debt   (a)   Each Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan made to such Borrower and held by such Lender as provided in Section 2 08

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of each Borrower to such Lender resulting from each Loan made by such Lender   including the amounts of principal and interest payable and paid to such Lender from time to time hereunder

(c)   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder   the Borrower thereof   the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the applicable Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof

(d)   The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein   provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of any Borrower to repay its Loans in accordance with the terms of this Agreement

(e)   Any Lender may request that Loans made by it to any Borrower be evidenced by a promissory note of such Borrower   In such event, the applicable Borrower shall prepare, execute and deliver to such Lender such a promissory note payable to the order of such Lender (or, if

50

requested by such Lender, to such Lender and its registered
assigns) and in a form approved by the Administrative Agent
Thereafter, the Loans evidenced by such promissory note and
interest thereon shall at all times (including after
assignment pursuant to Section 9 04) be represented by one
or more promissory notes in such form payable to the order
of the payee named therein (or if such promissory note is a
registered note to such payee and its registered assigns)

SECTION 2 08   Amortization of Loans
(a)  Subject to adjustment pursuant to paragraph (c) of this
Section the Borrowers shall repay Borrowings on each
Principal Payment Date in an aggregate amount equal to
$250,000,000

(b)  To the extent not previously paid, all Loans
shall be due and payable on the Maturity Date

(c)  Any prepayment of a Borrowing shall be
applied to reduce ratably the subsequent scheduled
repayments of the Borrowings to be made pursuant to this
Section

(d)  Prior to any repayment of any Borrowings
hereunder, the Borrowers shall select the Borrowing or
Borrowings to be repaid and shall notify the Administrative
Agent by telephone (confirmed by telecopy) of such selection
not later than 11 00 a m   New York City time, three
Business Days before the scheduled date of such repayment
provided that the Borrowers shall select Borrowings to be
repaid in accordance with Section 2 21 and otherwise such
that each Lender shall receive its pro rata share of such
repayment as provided in Section 2 16   Each repayment of a
Borrowing shall be applied ratably to the Loans included in
the repaid Borrowing   Repayments of Borrowings shall be
accompanied by the payment of accrued interest on the amount
thereof

SECTION 2 09   Prepayment of Loans   (a)  The
Borrowers shall have the right at any time and from time to
time to prepay any Borrowing in whole or in part subject to
the requirements of Section 2 21 and this Section

(b)  In the event and on each occasion that any
Net Proceeds are received by or on behalf of the Parent or
any Restricted Subsidiary in respect of any single
Prepayment Event, the Borrowers shall, within three Business
Days after such Net Proceeds are received, prepay Borrowings
in an aggregate amount equal to 50% of the excess   if any
of such Net Proceeds over $350 000,000



51

(c)  In the event and on each occasion that any Collateral Trigger Event occurs, the applicable Borrower shall, within five Business Days after the date that such Collateral Trigger Event occurs, prepay Borrowings in an aggregate amount equal to the Collateral Prepayment Amount with respect to such Collateral Trigger Event

(d)  Prior to any optional or mandatory prepayment of Borrowings hereunder, the applicable Borrower or Borrowers shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (e) of this Section, provided that the Borrowers shall select Borrowings to be prepaid in accordance with Section 2 21 and otherwise such that each Lender shall receive its pro rata share of such prepayment as provided in Section 2 16

(e)  The Borrowers shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a LIBOR Borrowing, not later than 1 00 p m , New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11 00 a m   New York City time, one Business Day before the date of prepayment   Each such notice shall be irrevocable and shall specify the prepayment date  the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment   Promptly following receipt of any such notice  the Administrative Agent shall advise the Lenders of the contents thereof Each partial prepayment of any Borrowing shall be in an amount that is an integral multiple of $100,000 and not less than $5 000 000  except as necessary to apply fully the required amount of a mandatory prepayment   Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing   Prepayments of Borrowings shall be accompanied by the payment of accrued interest on the amount prepaid

SECTION 2 10   Fees   (a)  The Designated Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the rate of 1 50% per annum on the average daily amount of the Available Commitment of such Lender during the period from and including the Effective Date to but excluding the date on which the Commitments terminate   Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Commitments terminate  commencing on the first such date to occur after the Effective Date   All commitment fees

[NYCORP 1887788 1 44598 06/31/00 8 10p]



52

shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day)

(b)   The Borrowers agree to pay to Lucent, for its own account, fees in the amounts and at the times separately agreed

(c)   The Borrowers agree to pay to the Administrative Agent (if other than Lucent) and the Collateral Agent, for its own account, fees in the amounts and at the times separately agreed

(d)   All fees payable hereunder shall be paid on the dates due, in immediately available funds, (i) to the applicable Agent  (ii) to Lucent, in the case of fees payable to it, or (iii) to the Administrative Agent, in the case of commitment fees  for distribution to the Lenders entitled thereto   Fees paid shall not be refundable under any circumstances

SECTION 2 11   _Interest_   (a)  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin



(b)   The Loans comprising each LIBOR Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin

(c)   Notwithstanding the foregoing if any principal of or interest on any Loan or any fee or other amount payable by any Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section

(d)   All accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, _provided_ that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount of such Loan repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Loan prior to the end of the current Interest Period therefor  accrued interest on such Loan shall be payable on the effective date of such conversion

[NYCORP 1067708 1 44558 06/14/00 5 58p]

53

(e)  All interest hereunder shall be computed on the basis of a year of 360 days  except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day)   The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined in accordance with this Agreement by the Administrative Agent, and such determination shall be conclusive absent manifest error

SECTION 2 12    Alternate Rate of Interest    If prior to the commencement of any Interest Period for a LIBOR Borrowing

(a)  the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period, or

(b) the Administrative Agent is advised by a majority in interest of the Lenders participating in such Borrowing that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period,

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders by telephone or telecopy as promptly as practicable thereafter and  until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (1) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBOR Borrowing shall be ineffective and (11) if any Borrowing Request requests a LIBOR Borrowing such Borrowing shall be made as an ABR Borrowing

SECTION 2 13    Increased Costs    (a)  If any Change in Law shall

(i)  impose, modify or deem applicable any reserve  special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate), or

54

(ii) impose on any Lender or the London interbank market any other condition affecting this Agreement or LIBOR Loans made by such Lender

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) (excluding for purposes of this Section 2.13(a) any such increased costs resulting from (x) Taxes (as to which Section 2.15(a) shall exclusively govern) and (y) changes in the basis taxation of Excluded Taxes), then the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered

(b)  If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered

(c)  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and the basis therefor shall be delivered to the Borrowers by the applicable Lender (with a copy to the Administrative Agent) and shall be prima facie evidence thereof  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 90 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor provided further that, if the Change



in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof

SECTION 2 14    Break Funding Payments    In the event of (a) the payment of any principal of any LIBOR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any LIBOR Loan other than on the last day of the Interest Period applicable thereto  (c) the failure to borrow  convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any LIBOR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by a Borrower pursuant to Section 2 17, then, in any such event, the applicable Borrower shall compensate each Lender for the loss  cost and expense attributable to such event    In the case of a LIBOR Loan such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess  if any  of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred  at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or  in the case of a failure to borrow  convert or continue  for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid  at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market    A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this paragraph shall be delivered to the Borrowers and shall be prima facie evidence thereof    The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof

SECTION 2 15    Taxes    (a)  Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes, provided that if any Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender



56

receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable Borrower shall make such deductions and (iii) the applicable Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law

(b)  In addition, each Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law

(c)  Each Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender on or with respect to any payment by or on account of any obligation of such Borrower hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties interest and reasonable expenses arising therefrom or with respect thereto  whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority  A certificate as to the amount of such payment and supported by calculations thereof in reasonable detail delivered to a Borrower by a Lender  or by the Administrative Agent on its own behalf or on behalf of a Lender  shall be conclusive absent manifest error

(d)  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority  such Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent

(e)  Each Foreign Lender shall deliver to each Borrower (with a copy to the Administrative Agent) two copies of (i) in the case of Foreign Lender claiming exemption under an applicable income tax treaty or under Section 1442(b) of the Code and applicable Treasury regulations thereunder  either United States Internal Revenue Service Form W-8BEN or Form W-8ECI (or any subsequent versions thereof or successors thereto), or, (ii) in the case of a Foreign Lender claiming exemption from U S  Federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", Form W-8BEN  (or any subsequent versions thereof or successors thereto) and a certificate representing that

57

such Foreign Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder of such Borrower (within the meaning of Section 871(h)(3)(B) of the Code) and is not a controlled foreign corporation related to such Borrower (within the meaning of Section 864(d)(4) of the Code), in either case, properly completed and duly executed by such Foreign Lender claiming complete exemption from, or reduced rate of, U S Federal withholding tax on payments by such Borrower under this Agreement or any other Loan Document   Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement or designates a new lending office   In addition each Foreign Lender shall deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender  or otherwise upon the reasonable request of such Borrower   Notwithstanding any other provision of this Section 2 15  a Foreign Lender shall not be required to deliver any form pursuant to this Section 2 15 that such Foreign Lender is not legally able to deliver

(f)  With respect to any Indemnified Tax or Other Tax for which any Borrower may be required to indemnify or to make additional payments for the account of the Administrative Agent or any Lender under this Section 2 15, the Administrative Agent and/or such Lender shall use reasonable efforts (at such Borrower's sole cost and expense) to fulfill any certification, documentation, reporting  registration or similar requirements prescribed by the relevant governmental or other taxing authority as a condition to a reduction or elimination of such Tax, provided that the Administrative Agent or Lender, as applicable, has been informed of such requirement in writing by such Borrower

(g)  If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by any Borrower pursuant to this Section 2 15  it shall pay over such refund to such Borrower (but only to the extent of indemnity payments made by such Borrower under this Section 2 15 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund)  provided however, that such Borrower, upon the written request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant

58

Governmental Authority) to the Administrative Agent or such
Lender in the event the Administrative Agent or such Lender
is required to repay such refund to such Governmental
Authority  Nothing contained in this Section 2 15 shall
require the Administrative Agent or any Lender to make
available its tax returns (or any other information relating
to its Taxes which it deems confidential) to any Borrower or
any other Person

SECTION 2 16  Payments Generally, Pro Rata
Treatment, Sharing of Set-offs  (a)  Each Borrower shall
make each payment required to be made by it hereunder or
under any other Loan Document (whether of principal
interest or fees, or of amounts payable under Section 2 13,
2 14 or 2 15  or otherwise) prior to 12 00 noon, New York
City time  on the date when due, in immediately available
funds, without set-off or counterclaim  Any amounts
received after such time on any date may, in the discretion
of the Administrative Agent  be deemed to have been received
on the next succeeding Business Day for purposes of
calculating interest thereon  All such payments shall be
made to the Administrative Agent at The Chase Manhattan
Bank  New York  New York  ABA no  021000021, account
no  9101449099, phone no  (212) 552-2222 (or such other
account as the Administrative Agent shall from time to time
specify by notice), except that payments pursuant to
Sections 2 10(b), 2 10(c), 2 13, 2 14, 2 15 and 9 03 shall
be made directly to the Persons entitled thereto and
payments pursuant to other Loan Documents shall be made to
the Persons specified therein  The Administrative Agent
shall distribute any such payments received by it for the
account of any other Person to the appropriate recipient
promptly following receipt thereof  If any payment under
any Loan Document shall be due on a day that is not a
Business Day, the date for payment shall be extended to the
next succeeding Business Day, and, in the case of any
payment accruing interest  interest thereon shall be payable
for the period of such extension  All payments under each
Loan Document shall be made in dollars

(b)  Each repayment or prepayment of principal of
the Loans of any Borrower hereunder, or selection of
Borrowings of any Borrower for repayment or prepayment
shall be made such that the benefit of such repayment or
prepayment is shared by the Lenders ratably in accordance
with the aggregate principal amount of their respective
Loans to such Borrower then outstanding

(c)  If at any time insufficient funds are
received by and available to the Administrative Agent to pay
fully all amounts of principal, interest and fees then due



59

hereunder  such funds shall be applied (i) first, towards payment of interest and fees then due hereunder  ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties  and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties

(d)   If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender  then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest  and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to a Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply)  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation

(e)   Unless the Administrative Agent shall have received notice from a Borrower prior to the date on which any payment is due from such Borrower to the Administrative Agent for the account of the Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption  distribute to the Lenders the amount due In such event, if such Borrower has not in fact made such

60

payment, then each of the Lenders severally agrees to repay
to the Administrative Agent forthwith on demand the amount
so distributed to such Lender with interest thereon, for
each day from and including the date such amount is
distributed to it to but excluding the date of payment to
the Administrative Agent, at the greater of the Federal
Funds Effective Rate and a rate determined by the
Administrative Agent in accordance with banking industry
rules on interbank compensation

      (f)  Without limiting the generality of
paragraph (a) above, each Borrower's obligations to make
each payment required to be made by it hereunder or under
any other Loan Document (whether of principal, interest,
fees or otherwise) shall be absolute and unconditional and
shall not be subject to any delay reduction, set-off,
counterclaim, defense or recoupment for any reason,
including any failure of any equipment or other assets
acquired pursuant to the Supply Agreement or any part
thereof, or any dispute with breach of representation or
warranty by or claim against any supplier manufacturer
installer, vendor or distributer, including Lucent   The
provisions of this paragraph shall not be construed as a
waiver by the Parent or any Borrower of any rights they may
have under the Supply Agreement

      SECTION 2 17   Mitigation Obligations, Replacement
of Lenders   (a)  If any Lender requests compensation under
Section 2 13, or if any Borrower is required to pay any
additional amount to any Lender or any Governmental
Authority for the account of any Lender pursuant to
Section 2 15, then, if requested by any Borrower  such
Lender shall use reasonable efforts to designate a different
lending office for funding or booking its Loans hereunder or
to assign its rights and obligations hereunder to another of
its offices, branches or affiliates, if, in the reasonable
judgment of such Lender, such designation or assignment
(i) would eliminate or reduce amounts payable pursuant to
Section 2 13 or 2 15  as the case may be, in the future and
(ii) would not subject such Lender to any unreimbursed cost
or expense and would not otherwise be disadvantageous to
such Lender   The Borrowers hereby agree to pay all
reasonable costs and expenses incurred by any Lender in
connection with any such designation or assignment made at
any Borrower's request

      (b)  If any Lender requests compensation under
Section 2 13  or if any Borrower is required to pay any
additional amount to any Lender or any Governmental
Authority for the account of any Lender pursuant to
Section 2 15, then the Borrowers may, at their sole expense

61

and effort, upon notice to such Lender and the Administrative Agent require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9 04), all its interests rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that (i) the Borrowers shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) such assignment will result in a reduction in such compensation or payments A Lender shall not be required to make any such assignment and delegation if, prior thereto as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply

SECTION 2 18  <u>Refinancing Requirement</u>   (a)  At any time that the aggregate principal amount of outstanding Lucent Loans equals or exceeds $500,000 000, Lucent may in its sole discretion require by notice to the Borrowers and the Parent (a "<u>Refinancing Notice</u>") that the Borrowers and the Parent refinance all (or, in Lucent's sole discretion a specified portion) of the outstanding Loans  If a Refinancing Notice is given and the Borrowers fail to prepay the required amount of Loans by the Refinancing Trigger Date with respect to such Refinancing Notice, then such failure shall not constitute an Event of Default, but shall result in the commencement of a Refinancing Period (unless a Refinancing Period previously commenced and is then continuing in which case the requirements of such Refinancing Notice shall be taken into consideration in determining the end of such Refinancing Period)  Lucent may deliver Refinancing Notices from time to time hereunder whenever it is entitled to do so, and delivery of a Refinancing Notice requiring the refinancing of less than all outstanding Loans shall not prevent Lucent from subsequently delivering a Refinancing Notice requiring the refinancing of additional Loans provided only that the aggregate outstanding principal amount of Lucent Loans equals or exceeds $500 000,000 at the time any Refinancing Notice is given  Any failure or delay by Lucent in giving a Refinancing Notice when it is entitled to do so shall not be construed as a waiver of Lucent's rights to give Refinancing Notices  It is understood that, if a Refinancing Notice



62

requires that all outstanding Loans be refinanced the Borrowers shall be deemed not to have satisfied such requirement until there are no Loans outstanding

(b)  Subject to paragraph (c) below, during any Refinancing Period the Applicable Margin with respect to all outstanding Loans will be increased by 2 0% per annum   In addition, during any Refinancing Period Borrowings will be permitted only for the purpose of making payments of the Purchase Price of Lucent Products  except that Third Party Products purchased by the Designated Borrower pursuant to the Supply Agreement may be financed during a Refinancing Period to the extent that, for any applicable Borrowing, the Purchase Price of such Third Party Products does not exceed the greater of (i) the maximum non-Lucent content percentage allowed under the Supply Agreement in relation to the Purchase Price of the Lucent Products financed by the same Borrowing or (ii) an amount less than or equal to the Eligible Equipment and Services comprised of Lucent Products purchased under the Supply Agreement after April 15,  2000 and not financed by any Loans hereunder   The foregoing shall not be construed to limit Lucent's other rights and remedies during any Refinancing Period

(c)  If a Refinancing Period has commenced and is continuing but (i) all lending commitments under the Bank Credit Agreement are fully funded  (ii) a refinancing of outstanding Loans has occurred subsequent to the date of the Refinancing Notice that resulted in the commencement of such Refinancing Period but such refinancing was insufficient to prepay the required amount of Loans and  due solely to adverse market conditions (as determined by Lucent)   a refinancing could not be consummated in an amount sufficient to prepay a greater principal amount of outstanding Loans and (iii) the aggregate principal amount of outstanding Loans does not exceed $250,000,000 after giving effect to such refinancing, then the 2 0% per annum increase in the Applicable Margin during such Refinancing Period (as provided in paragraph (b) above) will not apply to any Loans advanced during the remainder of such Refinancing Period (but shall continue to apply during such Refinancing Period to Loans outstanding prior to satisfaction of the conditions referred to in clauses (i), (ii) and (iii) of this paragraph), _provided_ that (A) the other rights and remedies applicable during a Refinancing Period will continue to apply so long as such Refinancing Period continues and (B) if at any time thereafter during such Refinancing Period the aggregate outstanding principal amount of Lucent Loans equals or exceeds $500,000 000 and Lucent gives another Refinancing Notice to the Borrowers and the Parent  then on and after the Refinancing Trigger Date with respect to such

63

Refinancing Notice, if a Refinancing Period is continuing, the 2 0% per annum increase in the Applicable Margin specified in paragraph (b) above will apply to all outstanding Loans for the remainder of such Refinancing Period, notwithstanding any subsequent prepayment of Loans that is insufficient to terminate such Refinancing Period and notwithstanding satisfaction of the conditions referred to in clauses (i) (ii) and (iii) of this paragraph

SECTION 2 19    Conversion Notes    (a)  During any Refinancing Period, Lucent may elect to convert at any time in whole or from time to time in part, the outstanding Lucent Loans to Conversion Notes in accordance with this Section and the Conversion Indenture   In order to effect any such conversion  Lucent shall execute and deliver a Conversion Certificate to the Conversion Trustee in accordance with Section 2 02 of the Conversion Indenture Lucent shall deliver to each of the Borrowers  the Parent and the Agents  a copy of each Conversion Certificate so delivered to the Conversion Trustee, at the time such Conversion Certificate is so delivered to the Conversion Trustee   Effective upon authentication and delivery by the Conversion Trustee of any Conversion Notes in accordance with Section 2 02 of the Conversion Indenture, Lucent Loans in an aggregate principal amount equal to the principal amount of such Conversion Notes shall be deemed to have been converted to such Conversion Notes for all purposes of the Loan Documents

(b)  On each date on which Lucent Loans are converted to Conversion Notes as provided herein, each Borrower shall pay to the Administrative Agent  for distribution to Lucent, all accrued and unpaid interest on its Lucent Loans so converted

(c)  On each occasion that Lucent delivers a Conversion Certificate as contemplated hereby, Lucent shall notify the Administrative Agent and the Borrowers of the specific Lucent Loan or Lucent Loans that are to be converted   If there is more than one Borrower at the time, such notice shall comply with Section 2 21

(d)  Upon any conversion of Lucent Loans to Conversion Notes, the indebtedness of the applicable Borrower or Borrowers represented by the Lucent Loans so converted shall become indebtedness of the Parent as a result of such conversion and shall cease to constitute "Loans" for all purposes of the Loan Documents, and the applicable Borrower or Borrowers shall be released from their liability in respect thereof

64

(e)  Promptly after the date hereof the Parent
shall prepare and file, and prior to the earlier of (i) the
date on which the aggregate principal amount (on a
cumulative basis) of Loans borrowed hereunder equals or
exceeds $250,000 000 and (ii) September 30, 2000, the Parent
shall cause to become effective a registration statement
under the Securities Act and thereafter the Parent shall at
all times maintain in effect one or more registration
statements under the Securities Act with respect to the
offering and sale by the Lenders who hold the Lucent Loans
(and any underwriters on their behalf) of Conversion Notes
in an aggregate principal amount not less then the aggregate
principal amount of outstanding Loans Any such
registration statement or registration statements may be
shelf registration statements registering the offering and
sale of debt and/or equity securities of the Parent so long
as any offer and sale of Conversion Notes are covered
thereby Any and all such registration statements shall
comply with the requirements of the Conversion Agreement

SECTION 2 20   Replacement Borrowers and Released
Borrowers.  (a)  Subject to the requirements of this Section
and Section 4 04 any corporation or limited liability
company that is a Wholly Owned Subsidiary of the Pledgor may
become a Borrower hereunder  The Parent shall notify the
Agents and the Lenders thereof not less than 10 Business
Days prior to the proposed effective date of any such
Subsidiary becoming a Borrower  Any such notice shall
specify the identity of the proposed Replacement Borrower
and the proposed effective date of such proposed Replacement
Borrower becoming a Borrower

(b)  Any Replacement Borrower must be a
corporation or limited liability company that (i) is Wholly
Owned directly by the Pledgor and Wholly Owned indirectly by
the Bank Borrower  (ii) is organized under the laws of one
of the states of the United States of America and
(iii) prior to the date of becoming a Borrower hereunder,
has not conducted any business or acquired any assets or
incurred any Indebtedness or other liabilities (other than
liabilities incidental to its organization and existence)

(c)  Any proposed addition of a proposed
Replacement Borrower as a Borrower hereunder shall be
subject to satisfaction of the conditions set forth in
Section 4 04 and unless and until such conditions are
satisfied no such proposed Replacement Borrower shall
become a Borrower hereunder  On the effective date of any
such proposed Replacement Borrower becoming a Borrower, such
Replacement Borrower shall become a "Borrower" and the
"Designated Borrower" for all purposes of the Loan Documents

65

(entitled to the full rights and benefits of, and subject to all obligations of, a Borrower hereunder), and the Borrower that was the Designated Borrower prior to such effective date shall cease to be the Designated Borrower for all purposes of the Loan Documents  Without limiting the generality of the foregoing, upon a Replacement Borrower becoming a Borrower hereunder, the previous Designated Borrower shall be deemed to have assigned the Commitments (and all obligations to pay commitment fees hereunder, including fees previously accrued and not yet paid) to such Replacement Borrower, and such Replacement Borrower shall be deemed to have assumed the Commitments (and such obligation to pay commitment fees), with the effect that such Replacement Borrower shall be the only Borrower hereunder that is permitted to borrow additional Loans under Section 2 01 unless and until another Replacement Borrower becomes a Borrower hereunder in accordance with this Section and Section 4 04  When a Borrower ceases to be the Designated Borrower upon a Replacement Borrower becoming a Borrower as provided herein, such Borrower that is no longer the Designated Borrower shall continue to constitute a Borrower hereunder for all purposes of the Loan Documents and to remain liable as such for all outstanding Loans made to it while it was the Designated Borrower and accrued interest thereon  as well as all other obligations of a Borrower hereunder (except as expressly provided above with respect to commitment fees) unless and until such Borrower becomes a Released Borrower as provided herein  It is expressly understood that there shall not be more than two Borrowers hereunder at any time and  at any time that there is more than one Borrower hereunder  the Borrower that is not the Designated Borrower is referred to herein as the "Second Borrower"

      (d)  Subject to the requirements of this Section and Section 4 05, a Borrower may become a Released Borrower  The Parent shall notify the Lenders thereof not less than five Business Days prior to the proposed effective date of any Borrower becoming a Released Borrower  Any such notice shall specify the identity of the proposed Released Borrower and the proposed effective date of such Borrower becoming a Released Borrower  A Borrower shall not become a Released Borrower unless and until all conditions set forth in Section 4 05 are satisfied with respect to such Borrower

      (e)  Upon the effectiveness of a Borrower hereunder becoming a Released Borrower (i) such Released Borrower shall cease to be a "Borrower" for all purposes of the Loan Documents and shall be released from all liability in respect of the Obligations, (ii) the U S  Security Agreement entered into by the Released Borrower, and any



66



Foreign Subsidiary Security Agreements entered into by any Foreign Subsidiary Equipment Owner in order to grant security interests in any Collateral financed with Loans made to such Released Borrower shall cease to constitute "Security Agreements" for all purposes of the Loan Documents and, subject to the following provisions of this paragraph, any Liens granted under such Security Agreements shall be released, and (ii) the Capital Stock of such Released Borrower pledged under the Pledge Agreement shall cease to secure the Obligations and, subject to the following provisions of this paragraph, the Collateral Agent shall release such Capital Stock from the lien of the Pledge Agreement, and return to or as directed by the Pledgor the stock certificates representing such Capital Stock, <u>provided</u> that, if required by the Bank Credit Agreement, (A) the Liens granted under the Security Agreements referred to in clause (ii) above shall not terminate but shall be assigned by the Collateral Agent to the Bank Agent to secure the Bank Loans and (B) the Capital Stock of such Released Borrower shall be pledged to secure the Bank Loans (or, if already pledged, shall continue to be pledged to secure the Bank Loans) and the stock certificates representing such pledged Capital Stock shall be delivered to the Bank Agent   It is expressly understood that  notwithstanding any contrary provision of any Loan Document  any Obligations (contingent or otherwise) of a Borrower  other than Loans made to it and accrued interest thereon  shall not terminate by reason of such Borrower becoming a Released Borrower, but shall continue to constitute Obligations for all purposes of the Loan Documents and shall be deemed to have been assumed by the Borrower that *is* the Designated Borrower at the time

67

SECTION 2 21    Borrower Payment Allocations    At
any time that there are two Borrowers hereunder

(a)  all payments of principal in respect of
outstanding Loans (whether in respect of scheduled
installments or mandatory or optional prepayments)
shall be made solely in respect of, and allocated to
repay, outstanding Loans of the Second Borrower until
all Loans of the Second Borrower have been fully
repaid, then in respect of outstanding Loans of the
Designated Borrower  provided that (i) the foregoing
shall not apply to prepayments pursuant to
Section 2 09(c) in respect of a Collateral Trigger
Event, which shall be made in respect of and allocated
to repay outstanding Loans of the applicable Borrower
to whom Loans were made to finance the Collateral
affected by such Collateral Trigger Event, and (ii) the
foregoing shall not be construed to limit or affect any
remedies that may be exercised upon an Event of
Default, or to apply to the allocation and distribution
of any amounts that may be recovered upon any exercise
of remedies  including any distributions pursuant to
the Security Documents, which shall be distributed as
provided therein, and

(b)  any conversion of Lucent Loans to Conversion
Notes as contemplated by Section 2 19 shall be made
solely in respect of outstanding Lucent Loans of the
Second Borrower unless and until there are no
outstanding Lucent Loans of the Second Borrower  then
in respect of outstanding Lucent Loans of the
Designated Borrower

SECTION 2 22    Mandatory Assignment of Loans
(a)  At any time that there are two Borrowers hereunder and
any Bank Loans are outstanding, any one or more of the Bank
Lenders may purchase all (but not less than all) outstanding
Loans of the Second Borrower in accordance with and subject
to the requirements of this Section  In order to exercise
the rights granted under this Section, the Bank Lender or
Bank Lenders exercising such rights shall notify the
Administrative Agent and the Borrowers not less than five
Business Days prior to the proposed effective date of such
purchase  which notice shall specify the proposed effective
date of such purchase  Upon receipt of any such notice  the
Administrative Agent shall notify the Lenders thereof

(b)  The obligations of the Lenders to sell and
assign Loans pursuant to any exercise by any Bank Lender or
Bank Lenders of their rights under this Section shall be
subject to the condition that (i) the Administrative Agent



68

shall have received payment of the purchase price of the outstanding Loans of the Second Borrower in an amount equal to the sum of the principal amount of all outstanding Loans of the Second Borrower as of the date of purchase plus accrued and unpaid interest thereon to the date of purchase plus any amounts that would be required to be paid pursuant to Section 2 14 (determined as if the purchased Loans were being prepaid on the date of purchase) and (ii) subject to paragraph (d) below, the applicable Bank Lender or Bank Lenders shall have entered into arrangements with the Second Borrower and the Parent (and the Parent and the Second Borrower agree to cooperate in concluding such arrangements), reasonably satisfactory to the Administrative Agent, providing for the Loans of the Second Borrower to be evidenced by one or more separate agreements and instruments after giving effect to such purchase    Promptly after receipt thereof  the Administrative Agent shall distribute to the applicable Lenders their respective shares of such purchase price

(c)   Subject to paragraph (d) below, upon consummation of the purchase by any Bank Lender or Bank Lenders of the Loans of a Second Borrower in accordance with this Section, such Second Borrower shall become a Released Borrower with the consequences set forth in Section 2 20, except that (i) such Released Borrower shall remain liable for its Loans  (ii) the U S  Security Agreement entered into by such Released Borrower  and any Foreign Subsidiary Security Agreements entered into by any Foreign Subsidiary Equipment Owner in order to grant security interests in any Collateral financed with Loans made to such Released Borrower  shall continue to secure the Loans of such Released Borrower (but not any Obligations of any other Borrower)  and the Collateral Agent shall assign such Security Agreements to or as directed by such Bank Lender or Bank Lenders, (iii) the Capital Stock of such Released Borrower shall continue to secure the Loans of such Released Borrower (but not any Obligations of any other Borrower) and shall be delivered by the Collateral Agent to or as directed by such Bank Lender or Bank Lenders and (iv) the Loans so purchased and accrued interest thereon shall cease to be secured by the remaining Security Documents

(d)   In the event that it is not possible for the applicable Bank Lender or Bank Lenders to conclude the arrangements contemplated by clause (ii) of paragraph (b) above, then the Agents and the Lenders agree to enter into an intercreditor agreement with the Bank Lender or Bank Lenders that desire to purchase the Second Borrower's Loans, which agreement shall provide to such Bank Lender or Bank Lenders (on the one hand) and to the Agents and the Lenders (on the other hand) the same rights and economic benefits

69

that they would have had if such arrangements had been concluded   Any such intercreditor agreement must be in form and substance reasonably satisfactory to all parties thereto and shall be entered into on the date of consummation of the purchase and sale of Loans of the applicable Second Borrower   If any such intercreditor agreement is entered into, then the Second Borrower shall not become a Released Borrower upon consummation of such purchase and sale of its Loans and paragraph (c) above shall not apply

(e)   This Section 2 22 is intended to be for the benefit of the Bank Lenders and may be enforced by the Bank Agent on their behalf   This Section 2 22 may not be amended without the prior written consent of the Bank Agent   The Parent and the Borrowers acknowledge and agree that (i) any transaction contemplated by this Section 2 22 shall not require their consent or approval and (ii) they do not have any rights under this Section

## ARTICLE III

### Representations and Warranties

Each of the Parent and the Borrowers represents and warrants to the Lenders that

SECTION 3 01   Corporate Organization and Power   Each Consolidated Group Member is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization   has all necessary corporate power to own its property and to carry on its business as now being conducted   and is duly licensed or qualified to do business and, if applicable, is in good standing in each jurisdiction in which the character of the properties owned or leased by it therein or in which the nature of the business transacted by it or the nature of the property owned or leased by it makes such licensing or qualification necessary   except where the failure to be so qualified   or to be in good standing, could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect   All of the issued and outstanding shares of Capital Stock of each Consolidated Group Member have been duly authorized and validly issued and are fully paid and nonassessable   All such shares owned by any Consolidated Group Member are owned beneficially, and of record   free of any Lien   except Liens created under the Pledge Agreement or the Bank Credit Documents

SECTION 3 02   Subsidiaries   Schedule 3 02 identifies each direct or indirect Subsidiary of the Parent as of the date hereof and sets forth for each Subsidiary

(i) the jurisdiction of its organization, (ii) the percentage as the case may be (or other ownership interest) of issued and outstanding shares of each class of its Capital Stock owned by each Bank Loan Party and if such percentage is not 100% (excluding directors' qualifying shares as required by law or a similar immaterial number of shares owned by third parties to comply with local shareholder residency requirements outside the United States), (iii) a description of each class of its authorized Capital Stock and the number of shares of each class issued and outstanding and (iv) its status as a Restricted Subsidiary  Temporary Restricted Subsidiary  Principal Subsidiary, Designated Foreign Subsidiary, Borrower or Unrestricted Subsidiary  as the case may be

SECTION 3 03   Corporate Authority   Each Loan Party has all necessary corporate power and authority to execute and deliver, and to incur and perform its obligations under, each of the Loan Documents to which it is a party (and  in the case of the Parent  the Conversion Indenture)  all of which have been duly authorized by all proper and necessary corporate action   No consent or approval of stockholders is required as condition to the validity or performance of  or the exercise by either Agent, or the Lenders of any of their rights or remedies under, any Loan Document

SECTION 3 04   Binding Obligation   Each of the Loan Documents constitutes the valid and legally binding obligation of each Loan Party that is a party thereto, enforceable in accordance with its terms, subject as to enforcement to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles

SECTION 3 05   Litigation, Labor Controversies. Except as described in Schedule 3 05A hereto  there are no proceedings or investigations now pending or  to the knowledge of any Responsible Officer  threatened against any Consolidated Group Member before any court or arbitrator or before or by any Governmental Authority which, individually or in the aggregate, if determined adversely to the interests of such Consolidated Group Member could reasonably be expected to have a Material Adverse Effect   Except as set forth on Schedule 3 05B  there are no labor controversies pending or  to the best knowledge of any Responsible Officer, threatened against any Consolidated Group Member that could reasonably be expected  individually or in the aggregate, to have a Material Adverse Effect

71

SECTION 3 06   Governmental Approvals, No
Conflicts   (a)  All authorizations, consents, approvals,
registrations, notices, exemptions and licenses with or from
any Governmental Authority or other Person necessary for the
execution, delivery and performance by each Loan Party of,
and the Incurrence and performance of each of its
obligations under, each of the Loan Documents to which such
Loan Party is a party (and, in the case of the Parent, the
Conversion Indenture) and the exercise by the Agents and the
Lenders of their remedies under each of the Loan Documents
have been effected or obtained and are in full force and
effect except (i) filings necessary to perfect Liens created
under the Security Documents, (ii) consents from any
Governmental Authority with respect to transfers of control
of Telecommunications Licenses and (iii) consents from any
Governmental Authority or Person the absence of which,
individually or in the aggregate, could not reasonably be
expected to have a Material Adverse Effect

          (b)  There is no statute  regulation, rule, order
or judgment, and no provision of any agreement or instrument
binding upon any Consolidated Group Member  or affecting its
Properties  and no provision of the certificate of
incorporation or by-laws (or similar constitutive
instruments) of any Consolidated Group Member, that would
prohibit, conflict with or in any way impair the execution
or delivery of  or the Incurrence or performance of any
obligations of any Consolidated Group Member under, any Loan
Document (other than dollar limitations on Incurrence of
Indebtedness) or result in or require the creation or
imposition of any Lien on Property of any Consolidated Group
Member as a consequence of the execution  delivery and
performance of any Loan Document other than as otherwise
provided therein

          SECTION 3 07   Financial Condition   (a)  The
consolidated balance sheets of the Parent as of December 31,
1998 and 1999, together with consolidated statements of
income, retained earnings  paid-in capital and surplus and
cash flows for the fiscal year then ended, reported upon by
Grant Thornton LLP  heretofore delivered to the
Administrative Agent and the Lenders, fairly present the
Parent's consolidated financial condition and consolidated
results of operations and transactions in capital accounts
as of the dates and for the periods referred to and have
been prepared in accordance with GAAP consistently applied
throughout the period involved   There are no material
liabilities (whether known or unknown, direct or indirect,
fixed or contingent, and of any nature whatsoever) of the
Consolidated Group on a consolidated basis as of the date of



72

such balance sheet that are not reflected therein or in the notes thereto

(b) Except as provided in Schedule 3 07, there has been no event or circumstance that has had a Material Adverse Effect since December 31 1999

SECTION 3 08    Taxes.    Each Consolidated Group Member has filed or caused to be filed all material tax returns that are required to be filed and paid and discharged material taxes that are shown to be due and payable on said returns or on any assessment made against it or any of its property and all other taxes, assessments or other governmental charges, imposed on it or any of its property by any Governmental Authority, except to the extent that (a)(1) such taxes, assessments and governmental charges which are being contested in good faith and by appropriate proceedings and (11) adequate reserves are being maintained (in accordance with GAAP) or (b) any failure to file such tax returns or to pay and discharge such taxes, assessments or governmental charges could not reasonably be expected to result in a Material Adverse Effect    No notices of tax liens have been filed and no claims are being asserted concerning any such taxes  which liens or claims could reasonably be expected, individually or in the aggregate  to have a Material Adverse Effect    The charges, accruals and reserves on the books of the Parent and its Subsidiaries on a consolidated basis for any taxes or other governmental charges are adequate

SECTION 3 09    Margin Regulations, Margin Stock    None of the Consolidated Group Members is engaged principally  or as one of its primary activities, in the business of extending credit for the purpose of purchasing or carrying margin stock

SECTION 3 10    Compliance with ERISA    Each member of the ERISA Group is in compliance with the applicable provisions of ERISA and the Code with respect to each Plan except for any failure so to comply that, individually or in the aggregate  could not reasonably be expected to have a Material Adverse Effect    No member of the ERISA Group has (i) an accumulated funding deficiency under Section 412 of the Code in respect of any Pension Plan  whether or not waived, (ii) failed to make any contribution or payment to any Pension Plan, or made any amendment to any Pension Plan, which has resulted or could result in the imposition of a Lien or the posting of a bond or other security under Section 302(f) of ERISA or Section 401(a)(29) of the Code, (iii) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007



of ERISA, all of which have been paid or (iv) engaged in a transaction with respect to a Plan, which (assuming the taxable period of such transaction, within the meaning of Section 4975(f)(2) of the Code, to have expired as of the date hereof) has resulted or could reasonably be expected to result in such member being subject to a material tax or penalty imposed by Section 4975 of the Code or Section 502 of ERISA  As of the last day of the most recent plan year ended prior to the date hereof, the actuarially determined present value of all benefit liabilities (as determined on the basis of the actuarial assumptions contained in the most recent actuarial valuation) did not exceed the then fair market value of the assets of any Pension Plan by more than $25 0 million, and there has been no material change in the financial condition of any Pension Plan since the last day of the most recent plan year   No member of the ERISA Group has incurred any withdrawal liability under Part I of Subtitle E of Title IV of ERISA with respect to a Multiemployer Plan in an amount in excess of $25 0 million, nor has any member of the ERISA Group received any notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA  and no Multiemployer Plan is reasonably expected to be in reorganization or to be terminated where such reorganization or termination has had or could reasonably be expected to have, through increases in the contributions required to be made or otherwise, a Material Adverse Effect

     SECTION 3 11   Investment Company and Holding Company Status   None of the Consolidated Group Members is (i) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (ii) subject to regulation under the Public Utility Holding Company Act of 1935  the Federal Power Act, each as amended  or any foreign, federal, state or local statute or regulation limiting its ability to Incur indebtedness for money borrowed as contemplated hereby

     SECTION 3 12   Properties and Licenses.  (a)  On the date hereof, excluding the licenses described in Section 3 13 (and other spectrum or broadcasting licenses that are not Telecommunications Licenses), each Consolidated Group Member has good and marketable title to, or valid leasehold interests in all of its properties and assets that are reflected on the consolidated balance sheet of the Parent as of December 31  1999, referred to in Section 3 07(a), except for such immaterial properties and assets as have been disposed of in the ordinary course of business and except for minor defects in title that do not

74

interfere with the ability of such Consolidated Group Member
to conduct its business as now conducted   All such assets
and properties are so owned or held free and clear of all
Liens, except Permitted Liens

(b)   Each Consolidated Group Member owns, or is
licensed to use, all trademarks  trade names, copyrights,
patents and other intellectual property material to its
business, and the use thereof by such Consolidated Group
Member does not infringe upon the rights of any other
Person, except for any such infringements that, individually
or in the aggregate, could not reasonably be expected to
result in a Material Adverse Effect

(c)   Each Consolidated Group Member has all
licenses and permits that are material to the business of
such Consolidated Group Member   Each license or permit that
is material to the business of such Consolidated Group
Member is valid and in full force and effect  and such
Consolidated Group Member is in compliance in all material
respects with the terms and conditions thereof

SECTION 3 13   Telecommunications Business and
Telecommunications Licenses   (a)  The Parent and its
Subsidiaries are in compliance in all material respects with
the Communications Act and with all applicable rules,
regulations and policies of the FCC

(b)   Each Consolidated Group Member has disclosed
on Schedule 3 13A a complete and accurate list of (i) all 38
and 28 GHZ spectrum licenses and (ii) all other licenses,
the loss of which could reasonably be expected to result in
a Material Adverse Effect on a consolidated basis  issued by
the FCC and held as of the date hereof by such Consolidated
Group Member (the "Telecommunications Licenses")   All of
the Telecommunications Licenses are currently valid and in
full force and effect   No Responsible Officer has knowledge
or could have reasonably been expected to have knowledge of
any investigation, notice of apparent liability violation,
forfeiture or other order or complaint issued by or before
any court or regulatory body, including the FCC  or of any
other proceedings (other than FCC rulemaking proceedings and
other proceedings relating to the wireless communications
industry generally) which could in any manner materially
threaten or adversely affect the validity or continued
effectiveness of any of the Telecommunications Licenses,
except as disclosed on Schedule 3 13B

(c)   Except as disclosed on Schedule 3 13B, no
event has occurred which (i) results in  or after notice or
lapse of time or both would result in, revocation,



75

suspension, modification, non-renewal, impairment, restriction or termination of or order of forfeiture with respect to, any Telecommunications License the loss of which could reasonably be expected to have a Material Adverse Effect or (ii) materially and adversely affects or could reasonably be expected in the future to materially adversely affect any of the rights of any Consolidated Group Member thereunder

(d)  Each Consolidated Group Member has duly filed in a timely manner all material filings, reports, applications documents instruments and information required to be filed by them under the Communications Act and all such filings are true and complete in all material respects

(e)  Each Consolidated Group Member has no reason to believe that any of the Telecommunications Licenses will not be renewed in the ordinary course

SECTION 3 14  Investments   Schedule 3 14 discloses a complete and accurate list of all Investments of each Consolidated Group Member existing on the date hereof

SECTION 3 15  Compliance with Laws and Charter Documents   (a)  None of the Consolidated Group Members is or as a result of performing any of its obligations under the Loan Documents will be  in violation in any material respect of (i) any law statute, rule, regulation or order of any Governmental Authority (including Environmental Laws) applicable to it or its material properties or assets or (ii) its certificate of incorporation  by-laws or any similar constitutive document

(b)  Each Consolidated Group Member has all necessary authorizations, consents  approvals, registrations  franchises, licenses and permits  with or from Governmental Authorities and other Persons for it to own its properties and conduct its business as currently conducted and contemplated, except to the extent failure to have the same could not  individually or in the aggregate reasonably be expected to have a Material Adverse Effect

SECTION 3 16  Environmental Protection.  To any Responsible Officer's knowledge or based on any knowledge such Responsible Officer could reasonably be expected to have  all real property owned or leased by such Consolidated Group Member is free of contamination from any Hazardous Substance  or a constituent thereof  that could result in the incurrence of liabilities that would reasonably be expected to have a Material Adverse Effect  To any

Responsible Officer's knowledge or based on any knowledge such Responsible Officer could reasonably be expected to have, no such Consolidated Group Member has caused or suffered to occur any release of any Hazardous Substance into the environment or any other conditions that individually or in the aggregate, could reasonably be expected to result in the incurrence of material liabilities or any material violations of any Environmental Laws that would reasonably be expected to have a Material Adverse Effect   To any Responsible Officer's knowledge or based on any knowledge such Responsible Officer could reasonably be expected to have, no such Consolidated Group Member has caused or suffered to occur any condition on any of its property that could give rise to the imposition of any lien under the Environmental Laws that would reasonably be expected to have a Material Adverse Effect   To any Responsible Officer's knowledge or based on any knowledge such Responsible Officer could reasonably be expected to have, no Consolidated Group Member is engaged in any manufacturing or any other operations  other than the use and storage in the ordinary course of their business of petroleum products and amounts of Hazardous Substances customarily used in the maintenance of office buildings and used for provision of Telecommunications Business that require the use, handling, transportation, storage or disposal of any Hazardous Substance, where such operations require permits or are otherwise regulated pursuant to the Environmental Laws

SECTION 3 17   Insurance   All of the properties and operations of each Consolidated Group Member of a character usually insured by companies of established reputation engaged in the same or a similar business similarly situated are adequately insured  by financially sound and reputable insurers  against loss or damage of the kinds and in amounts customarily insured against by such Persons, and each Consolidated Group Member carries, with such insurers in customary amounts as is usually carried by companies of established reputation engaged in the same or a similar business similarly situated  except for self insurance (including deductibles) maintained in accordance with customary norms

SECTION 3 18   Compliance with Agreements   None of the Consolidated Group Members is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Contractual Obligation to which it is a party, which default could reasonably be expected, individually or in the aggregate  to have a Material Adverse Effect

[NYCORP 1587708 1 44590 05/16/00-5 50p]

77

SECTION 3 19    Full Disclosure    All information
(other than projections  budgets, and analysts' reports)
relating to any Consolidated Group Member delivered in
writing to either Agent or any Lender in connection with the
negotiation, execution and delivery of this Agreement and
the other Loan Documents does not include any untrue
statement of a material fact or omit to state any material
fact necessary in order to make the statements therein, in
the light of the circumstances under which they were made,
not misleading as of the date such information was
delivered _ The most recent projections and budgets for the
Consolidated Group delivered to either Agent or any Lender
prior to the date hereof have been prepared in good faith on
assumptions believed to be reasonable with respect to such
Consolidated Group Member on March 31, 2000

SECTION 3 20    Supply Agreement.    The Supply
Agreement is in full force and effect    The Parent and the
Borrowers (a) are in compliance in all material respects
with the terms and conditions of the Supply Agreement and
(b) have not terminated  nor taken any action which could
result in the termination of, the Supply Agreement (except
during the Disengagement Period, as defined in the Supply
Agreement)

SECTION 3 21    Security Documents    The
representations and warranties in the Security Documents are
true and correct

ARTICLE IV

Conditions

SECTION 4 01    Effective Date    The Commitments of
the Lenders hereunder shall not become effective until the
date on which each of the following conditions is satisfied
(or waived in accordance with Section 9 02)

(a)    The Administrative Agent (or its counsel)
shall have received from each party hereto either (i) a
counterpart of this Agreement signed on behalf of such
party or (ii) written evidence reasonably satisfactory
to the Administrative Agent (which may include telecopy
transmission of a signed signature page of this
Agreement) that such party has signed a counterpart of
this Agreement

(b)    The Administrative Agent shall have received
a favorable written opinion (addressed to the Agents
and the Lenders, dated the Effective Date and
addressing such matters relating to the Loan Parties,



78

the Loan Documents and the Transactions as the
Administrative Agent shall reasonably request  in each
case in form and substance reasonably satisfactory to
the Administrative Agent) of each of (i) Graubard
Mollen & Miller  counsel for the Parent and the Initial
Borrower, (ii) Shearman & Sterling  counsel for the
Parent and the Initial Borrower, and (iii) Willkie Farr
& Gallagher  special FCC counsel for Parent and the
Initial Borrower  The Parent and the Initial Borrower
hereby request their counsel referred to in this
paragraph to deliver such opinions

(c)   The Administrative-Agent shall have-received
such documents and certificates as the Administrative
Agent or its counsel may reasonably request relating to
the organization  existence and good standing of the
Loan Parties  the authorization of the Transactions and
any other legal matters relating to the Loan Parties,
the Loan Documents or the Transactions, all in form and
substance reasonably satisfactory to the Administrative
Agent and its counsel  The organizational documents of
the Initial Borrower shall require that all its Capital
Stock be evidenced by certificates



(d)   The Agents and Lucent shall be satisfied that
all fees and other amounts due and payable to them
hereunder on or prior to the Effective Date, including,
to the extent invoiced  reimbursement or payment of all
expenses required to be reimbursed or paid by the
Initial Borrower hereunder or under any other Loan
Document  have been paid

(e)   The Administrative Agent shall have received
counterparts of the Guarantee Agreement signed on
behalf of each Guarantor

(f)   The Collateral Agent shall have received
counterparts of the U S  Security Agreement signed on
behalf of the Initial Borrower

(g)   The Collateral Agent shall have received
(i) counterparts of the Pledge Agreement signed on
behalf of the Pledgor and (ii) certificates evidencing
all the outstanding shares of Capital Stock of the
Initial Borrower  together with stock powers or other
instruments of transfer with respect thereto endorsed
in blank

(h)   A restructuring of the corporate holdings of
the Parent resulting in (i) the Bank Borrower being
directly wholly owned by the Parent  (ii) except as set

79

forth on Schedule 4 01, (A) the Bank Borrower replacing the Parent as the direct or indirect parent of all the Parent's Subsidiaries and (B) the Parent's ownership of all such Subsidiaries being indirect and solely through the Parent's ownership of the Bank Borrower, and (iii) the Initial Borrower being directly wholly owned by the Pledgor shall have taken place on terms reasonably satisfactory to the Administrative Agent and the Lenders

(i) The Bank Credit Documents shall have been executed and delivered by the parties thereto and copies thereof shall have been delivered to the Administrative Agent, together with a certificate dated the Effective Date and signed by a Vice President or a Financial Officer of the Parent, to the effect that true and complete copies of all the Bank Credit Documents have been so delivered The terms and conditions of the Bank Credit Documents shall be reasonably satisfactory to Lucent All conditions to the availability of loans under the Bank Credit Agreement shall have been satisfied and the initial borrowing of loans thereunder shall have been made

(j) All loans outstanding under the Existing Credit Agreement together with accrued and unpaid interest thereon and all accrued and unpaid fees and any other payment obligations owing under the Existing Credit Agreement shall have been paid in full and all "Commitments" (as defined in the Existing Credit Agreement) shall have been terminated

(k) The Lenders shall have received the certificate of the Chief Financial Officer of the Parent required under the indentures governing the Bond Notes

The Administrative Agent shall notify the Initial Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding

SECTION 4 02 First Borrowing. The obligations of the Lenders to make the initial Loans hereunder on the occasion of the first Borrowing are subject to the satisfaction of the following conditions, in addition to those set forth in Section 4 03

(a) The Effective Date shall have occurred

(b) Lucent shall have received counterparts of the Conversion Indenture and the Conversion Agreement,

80

signed on behalf of each party thereto   All
arrangements for the issuance of Conversion Notes
(including delivery to the Conversion Trustee of the
Securities Authentication Order (as defined in the
Conversion Indenture) and Conversion Notes duly
executed on behalf of the Parent in an aggregate
principal amount of $2,000,000,000) shall have been
completed in a manner reasonably satisfactory to
Lucent

(c)  The Administrative Agent shall have received
a certificate, dated the date of the first Borrowing
and signed by the President, a Vice President or a
Financial Officer of each of the Parent and the Initial
Borrower  confirming compliance with the conditions set
forth in Section 4 03

(d)  The Agents and Lucent shall be satisfied that
all fees and other amounts due and payable to them
hereunder on or prior to the date of the first
Borrowing  including  to the extent invoiced,
reimbursement or payment of all expenses required to be
reimbursed or paid by the Initial Borrower hereunder or
under any other Loan Document, have been paid

(e)  The Collateral Agent shall have received
counterparts of an Equipment User Agreement or other
document contemplated by Section 6 13, in either case
signed on behalf of the initial Equipment User or
Users

(f)  The Agents shall have received evidence
reasonably satisfactory to them that all documents and
instruments  including Uniform Commercial Code
financing statements, required by law or reasonably
requested by either Agent to be filed, registered or
recorded to create or perfect the Liens intended to be
created under the U S  Security Agreement entered into
by the Initial Borrower  and to protect the Initial
Borrower's ownership interest in (and the Lien of such
U S  Security Agreement on) all Collateral that will be
leased to or otherwise possessed by any initial
Affiliated Equipment User, have been so filed
registered or recorded

(g)  The Agents shall have received a completed
Perfection Certificate dated the date of the first
Borrowing and signed by a Financial Officer of the
Initial Borrower  together with all attachments
contemplated thereby  including (i) the results of a
search of the Uniform Commercial Code (or equivalent)

81

filings made with respect to the Initial Borrower in the jurisdictions contemplated by the Perfection Certificate and (ii) copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Agents that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6 03 or have been released

(h)  The Administrative Agent shall have received evidence reasonably satisfactory to it that the insurance required by Section 5 05 and the U S Security Agreement is in effect and that the Collateral Agent has been named as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of any Borrower or any Foreign Subsidiary Equipment Owner constituting Collateral

(i)  As of the date of the first Borrowing, all funding commitments in respect of all other credit facilities of the Parent and its Subsidiaries including all commitments under the Bank Credit Agreement  shall be fully drawn  and the Administrative Agent shall have received a certificate to such effect dated the date of such Borrowing and signed by a Financial Officer of the Parent

SECTION 4 03    Each Borrowing    The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions

(a)  At the time of and immediately after giving effect to such Borrowing  the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (or, in the case of any representation or warranty that is not qualified as to materiality, true and correct in all material respects) on and as of the date of such Borrowing (or in the case of any representation and warranty that expressly relates to an earlier date  on and as of such earlier date)

(b)  At the time of and immediately after giving effect to such Borrowing no Default shall have occurred and be continuing

(c)  At the time of and immediately after giving effect to such Borrowing, the Supply Agreement shall be in full force and effect and the Parent and the

82

Borrowers shall be in compliance therewith in all
material respects

(d)  At the time of and immediately after giving
effect to such Borrowing the Parent shall be in
compliance with its obligations under Section 2 19, if
applicable, with respect to the Shelf Registration

(e)  If any portion of such Borrowing is to be
used to finance all or any part of the Purchase Price
of any assets that have been or are being acquired by
or transferred to a Foreign Subsidiary Equipment Owner
as contemplated by Section 6 13, then all arrangements
with respect thereto contemplated by Section 6 13 shall
have been completed

Each Borrowing shall be deemed to constitute a
representation and warranty by the Designated Borrower on
the date thereof as to the matters specified in paragraphs
(a)  (b)  (c), (d) and, if applicable, (e) of this Section

SECTION 4 04    Replacement Borrower    The
effectiveness of any addition of a proposed Replacement
Borrower as a Borrower hereunder as contemplated by
Section 2 20 is subject to the satisfaction of the following
conditions

(a)  The Administrative Agent shall have received
from such Replacement Borrower an instrument signed on
behalf of such Replacement Borrower and reasonably
satisfactory in form and substance to the
Administrative Agent and its counsel  pursuant to which
such Replacement Borrower shall agree to become a
Borrower and the Designated Borrower hereunder and to
assume all obligations of a Borrower and the Designated
Borrower hereunder

(b)  The Administrative Agent shall have received
favorable written opinions (addressed to the Agents and
the Lenders  dated the effective date of such
Replacement Borrower becoming a Borrower and addressing
such matters relating to the Loan Parties  the Loan
Documents and the Transactions as the Administrative
Agent shall reasonably request, in each case in form
and substance reasonably satisfactory to the
Administrative Agent) of counsel to the Parent and such
Replacement Borrower (which counsel shall be reasonably
satisfactory to the Administrative Agent)

(c)  Such Replacement Borrower shall be a recently
organized  limited purpose corporation or limited



[NYCORP 1097708 1 44599 06/14/00-5 52p]

83

liability company that, prior to the effective date of becoming a Borrower hereunder shall not have engaged in any business or activity, acquired any assets (other than cash) or incurred any liabilities (other than liabilities incidental to its organization and existence)

(d) The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization existence and good standing of such Replacement Borrower, the authorization of the Transactions and any other legal matters relating to such Replacement Borrower, the Loan Documents or the Transactions all in form and substance reasonably satisfactory to the Administrative Agent and its counsel If such Replacement Borrower is a limited liability company, its organizational documents shall require that all its Capital Stock be evidenced by certificates

(e) The Administrative Agent shall have received written confirmation from the Guarantors that their Guarantees under the Guarantee Agreement shall continue to apply to the Obligations of such Replacement Borrower

(f) The Collateral Agent shall have received counterparts of a U S Security Agreement signed on behalf of such Replacement Borrower

(g) The Collateral Agent shall have received certificates evidencing all the outstanding shares of Capital Stock of such Replacement Borrower, together with stock powers or other instruments of transfer with respect thereto endorsed in blank, in accordance with the Pledge Agreement

(h) The Administrative Agent shall have received a certificate dated the effective date of such Replacement Borrower becoming a Borrower and signed by the President a Vice President or a Financial Officer of each of the Parent and such Replacement Borrower, to the effect that, after giving effect to such replacement, the representations and warranties of the Loan Parties set forth in the Loan Documents are true and correct (or in the case of any representation or warranty that is not qualified as to materiality true and correct in all material respects) on and as of such effective date (or, in the case of any representation and warranty that expressly relates to an earlier date

84

on and as of such earlier date) and no Default has occurred and is continuing

(i)  The conditions set forth in paragraphs (e) (f), (g) and (h) of Section 4 02 shall have been satisfied as of the effective date of such Replacement Borrower becoming a Borrower, determined for this purpose as though such Replacement Borrower were the Initial Borrower and as though such effective date were the date of the first Borrowing hereunder

(j)  On the effective date of such Replacement Borrower becoming a Borrower and after giving effect thereto, and after giving effect to any repayments of Loans made on such date and any existing Borrower becoming a Released Borrower on such date (i) there shall not be more than two Borrowers and (ii) if there is a Second Borrower, then a Replacement Trigger Event shall have occurred with respect to such Borrower on or prior to such date

SECTION 4 05   Released Borrower   The effectiveness of any Borrower becoming a Released Borrower as contemplated by Section 2 20 is subject to the satisfaction of the following conditions

(a)  As of the effective date of such Borrower becoming a Released Borrower, such Borrower shall not have any outstanding Loans and shall have paid all accrued interest owed with respect to its Loans

(b)  On the effective date of such Borrower becoming a Released Borrower and after giving effect thereto, and after giving effect to any Replacement Borrower becoming a Borrower on such date, there shall be a Designated Borrower hereunder

(c)  No Event of Default shall have occurred and be continuing

(d)  The Bank Credit Agreement shall be in effect and it is necessary for such Borrower to become a Released Borrower in order for the Bank Loan Parties to comply with their obligations thereunder

The conditions set forth in this Section shall not apply to a Second Borrower becoming a Released Borrower in accordance with Section 2 22



85

ARTICLE V

Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full each of the Parent and the Borrowers covenants and agrees with the Lenders that

SECTION 5 01  Financial Statements, Compliance Certificates  The Parent and the Borrowers will furnish to the Administrative Agent

(a)  in no event more than 55 days following the end of each of the first three quarters of each fiscal year  copies of the Parent's Quarterly Report on Form 10 Q being filed with the SEC

(b)  in no event more than 55 days following the end of each of the first three quarters of each fiscal year, copies of the consolidated quarterly income statements and consolidated balance sheets for the Consolidated Group Members

(c)  in no event more than 105 days following the end of each fiscal year  a copy of the Parent's Annual Report on Form 10-K being filed with the SEC, together with a report thereon by Grant Thornton LLP (or another nationally recognized firm of independent certified public accountants)  for such year as well as a letter from Grant Thornton LLP (or another nationally recognized firm of independent certified public accountants) to the effect that during the course of their audit they reviewed this Agreement and nothing came to their attention indicating a Default hereunder,

(d)  in no event more than 105 days following the end of each fiscal year, copies of the consolidated annual income statements and consolidated balance sheets for the Consolidated Group Members,

(e)  together with each report delivered pursuant to Sections 5 01(a) and (b), a certificate of the Bank Borrower, signed by an authorized officer of the Bank Borrower, in substantially the form of Exhibit J stating whether  as of the last date of the financial statements included in such report, any event occurred or circumstance existed which, individually or in the aggregate, constituted a Default (and, if so, detailing the facts with respect thereto) and whether each of the



86

Consolidated Group Members was in compliance with the
covenants set forth herein, together with calculations
to establish the Consolidated Group Members' compliance
with the covenants contained in Sections 6 07, 6 08,
6 09 and 6 10

(f)  promptly upon the filing by the Parent with
the SEC or any national securities exchange of any
registration statement (other than a registration
statement on Form S-8 or an equivalent form) or regular
periodic report (other than the reports referred to in
Sections 5 01(a) and (b))  notification of such filing
and  at the request of any Lender  the Loan Parties
shall deliver to such Lender a copy of such filing
(excluding exhibits),

(g)  promptly upon the mailing thereof to the
shareholders of the Parent generally copies of all
financial statements, reports and proxy statements so
mailed,

(h)  within five Business Days of any Responsible
Officer obtaining knowledge of any Default, if such
Default is then continuing, a certificate of a
Responsible Officer stating that such certificate is a
"Notice of Default" and setting forth the details
thereof and the action which the Consolidated Group
Member is taking or proposes to take with respect
thereto  and

(i)  such additional information, reports or
statements, regarding the business  financial condition
or results of operations of the Parent and its
Subsidiaries  as the Administrative Agent on behalf of
itself or the Lenders from time to time may reasonably
request  provided so long as there is no Default that
such information shall be reasonably available to the
Consolidated Group

SECTION 5 02  Corporate Existence.  Except as
permitted by Section 6 02, each Consolidated Group Member
shall maintain its corporate existence in good standing (if
applicable) and qualify and remain qualified to do business
in each jurisdiction in which the character of the
properties owned or leased by it therein or in which the
transaction of its business is such that the failure to
qualify  individually or in the aggregate, could reasonably
be expected to have a Material Adverse Effect

SECTION 5 03  Conduct of Business  Each
Consolidated Group Member shall (a) cause the Consolidated

87

Group Members as a whole to receive not less than 95% of
their operating revenue on a consolidated basis for the
Consolidated Group during any fiscal year from the conduct
of Telecommunications Business, (b) preserve, renew and keep
in full force and effect, all of its franchises and licenses
necessary or desirable in the normal conduct of its business
the loss of which, individually or in the aggregate could
reasonably be expected to have a Material Adverse Effect,
and (c) comply with all applicable laws, orders, rules and
regulations of all Governmental Authorities the failure with
which so to comply individually or in the aggregate, could
reasonably be expected to have a Material Adverse Effect

SECTION 5 04    Taxes    Each Consolidated Group
Member shall file all material tax returns that are required
to be filed and pay and discharge all material taxes,
assessments and governmental charges upon it, its income and
its properties prior to the date on which penalties are
attached thereto, except to the extent that (a)(i) such
taxes, assessments and governmental charges shall be
contested in good faith and by appropriate proceedings by a
Consolidated Group Member  and (ii) adequate reserves are
maintained (in accordance with GAAP) by the Consolidated
Group with respect thereto  or (b) any failure to file such
tax returns or to pay and discharge such taxes, assessments
and governmental charges could not reasonably be expected
individually or in the aggregate  to have a Material Adverse
Effect

SECTION 5 05    Insurance    Each Consolidated Group
Member shall (a) maintain adequate insurance on all of the
properties and operations of a character usually insured by
companies of established reputation engaged in the same or a
similar business similarly situated  by financially sound
and reputable insurers, against loss or damage of the kinds
and in amounts customarily insured against by such Persons,
and carry  with such insurers in customary amounts as is
usually carried by companies of established reputation
engaged in the same or a similar business similarly situated
except for self insurance (including deductibles) maintained
in accordance with customary norms  and (b) provide evidence
that to the extent required by either Agent that the
Collateral Agent  for its benefit and the benefit of the
Secured Parties (as defined in the Security Agreements)  has
been named as loss payee by endorsement to the policies for
casualty insurance with respect to the Collateral

SECTION 5 06    Inspection    Each Consolidated
Group Member shall permit the Agents and the Lenders to have
one or more of their officers and employees, or any other
Person designated by either Agent or any Lender, to visit

88

and inspect any of the properties of the Consolidated Group
and to examine the minute books, books of account and other
records of the Consolidated Group, and discuss its affairs
finances and accounts with its officers and with the
Consolidated Group's independent accountants, upon
reasonable advance notice during normal business hours and,
so long as no Default has occurred and is continuing not
more than twice in any calendar year, and at the Lenders'
expense, for the purpose of monitoring each of the
Consolidated Group Member's compliance with the Loan
Documents

SECTION 5 07   Maintenance of Records   Each
Consolidated Group Member shall (a) keep proper books of
record and account in which full, true and correct entries
will be made of all dealings or transactions of or in
relation to its business and affairs  (b) set up on its
books reserves with respect to all taxes  assessments,
charges  reviews and claims  and (c) on a current basis, set
up on its books, from its earnings, appropriate reserves
against doubtful accounts receivable, advances and
investments and all other proper reserves (including by
reason of enumeration  reserves for premiums  if any, due on
required prepayments and reserves for depreciation,
obsolescence, or amortization of properties), which should
be set aside from such earnings in connection with its
business   (All bookkeeping requirement determinations
pursuant to this Section 5 07 shall be made in accordance
with, or as required by GAAP (including principles as to
materiality) consistently applied in the opinion of the
independent auditors regularly engaged by the Consolidated
Group )

SECTION 5 08   Maintenance of Property.   Each
Consolidated Group Member shall maintain, keep and preserve
all of its properties in good repair  working order and
condition and from time to time make all necessary and
proper repairs, renewals, replacements, and improvements
thereto, except to the extent that any failure so to
maintain  keep and preserve such properties  individually or
in the aggregate, could not reasonably be expected to have a
Material Adverse Effect



89

SECTION 5 09   BRISA   The Parent and the
Borrowers shall furnish to the Administrative Agent

(a)  within ten days after a Responsible Officer
learns that any "reportable event" (as defined in
Section 4043(c) of BRISA)  other than a reportable
event for which the 30-day notice requirement has been
waived by the PBGC, has occurred with respect to a
Pension Plan, a statement setting forth details as to
such reportable event and the action proposed to be
taken with respect thereto,

(b)  within ten days after receipt thereof, a copy
of any notice that any member of the BRISA Group may
receive from the PBGC relating to the intention of the
PBGC to terminate any Pension Plan or to appoint a
trustee to administer any Plan

(c)  within ten days after filing with any
affected party (as such term is defined in Section 4001
of BRISA) of a notice of intent to terminate a Pension
Plan, a copy of such notice and a statement setting
forth the details of such termination, including the
amount of liability if any  of any member of the BRISA
Group under Title IV of BRISA,

(d)  within ten days after the adoption of an
amendment to a Pension Plan if  after giving effect to
such amendment  the Pension Plan is a plan described in
Section 4021(b) of ERISA  a statement setting forth the
details thereof

(e)  within 30 days after withdrawal from a
Pension Plan during a plan year for which any member of
the BRISA Group could be subject to liability under
Section 4063 or 4064 of BRISA  a statement setting
forth the details thereof  including the amount of such
liability,

(f)  within 30 days after cessation of operations
by any member of the BRISA Group at a facility under
the circumstances described in Section 4062(e) of
BRISA, a statement setting forth the details thereof
including the amount of liability of the Bank Borrower
or a member of the ERISA Group under Title IV of BRISA,

(g)  within ten days after adoption of an
amendment to a Pension Plan which would require
security to be given to the Pension Plan pursuant to
Section 401(a)(29) of the Code or Section 307 of BRISA,

90

)

a statement setting forth the details thereof,
including the amount of such security

(h)  within ten days after failure by any member
of the ERISA Group to make payment to a Pension Plan
which would give rise to a lien in favor of the Plan
under Section 302(f) of ERISA, a statement setting
forth the details thereof, including the amount of such
lien,

(i)  within ten days after the due date for filing
with the PBGC, pursuant to Section 412(n) of the Code,
of a notice of failure to make a required installment
or other payment with respect to a Pension Plan, a
statement setting forth details as to such failure and
the action proposed to be taken with respect thereto,
and

(j)  within 30 days after receipt thereof by any
member of the ERISA Group from the sponsor of a
Multiemployer Plan  a copy of each notice concerning
the imposition of withdrawal liability or the
termination or reorganization of a Multiemployer Plan

SECTION 5 10  Notice of Adverse Developments
The Parent and the Borrowers shall promptly notify the
Administrative Agent upon the discovery by any Responsible
Officer of the occurrence of (a) any material litigation or
proceedings that are instituted or threatened (to the
knowledge of the Responsible Officer) against any
Consolidated Group Member or any of their respective assets
including the filing or commencement of any action, suit or
proceeding by or before any arbitrator or Governmental
Authority against or affecting the Consolidated Group Member
that, if adversely determined  could reasonably be expected
to result in a Material Adverse Effect  (b) any other
development in the business or affairs of any Consolidated
Group Member if the effect thereof would reasonably be
expected, individually or in the aggregate  to have a
Material Adverse Effect (other than events generally
applicable to all Persons engaged in similar businesses)
(c) any Collateral Trigger Event, and (d) any Prepayment
Event  (Upon receipt, the Administrative Agent shall
promptly advise each Lender of the contents of any such
notice )

SECTION 5 11  Environmental Matters  Each
Consolidated Group Member shall (a) comply in all material
respects with all applicable Environmental Laws, (b) notify
the Administrative Agent promptly after becoming aware of
any Environmental Claim, or any fact or circumstance that is



91

reasonably likely to result in an Environmental Claim or a
violation of any Environmental Law that would reasonably be
expected to have a Material Adverse Effect, with respect to
the Consolidated Group's properties or facilities, and
(c) promptly forward to the Administrative Agent a copy of
any order, notice permit, application, or any other
communication or report received in connection with any such
matters as they may affect such premises that would
reasonably be expected to have a Material Adverse Effect

SECTION 5 12    Interest Rate Protection  Within
90 days after the Effective Date, the Consolidated Group
Members shall maintain at all times (if necessary) one or
more Interest Rate Agreements  in form and substance
reasonably satisfactory to the Administrative Agent
(provided that no approval by the Administrative Agent shall
be required if the Bank Agent's approval thereof shall have
been obtained)  to ensure that the interest rate on not less
than 50% of the aggregate principal amount of outstanding
Indebtedness (other than Hedging Obligations) of the
Consolidated Group on a consolidated basis be fixed or
capped (whether under the terms thereof or after giving
effect to such Hedging Obligations) for an Average Life of
not less than three (3) years

SECTION 5 13    Measurement Date    The Parent shall
provide to the Administrative Agent on or after January 1
2003 a certificate signed by an authorized officer of the
Bank Borrower specifying the ratio of Consolidated Total
Debt to Consolidated Annualized EBITDA within one Business
Day after (a) the date a Borrowing Request is submitted by
the Designated Borrower and (b) the date the fiscal
quarterly and annual reports of the Parent are required to
be delivered or are delivered to the Administrative Agent
pursuant to Section 5 01 (each such date a "Measurement
Date")

SECTION 5 14    Information Regarding Collateral
(a)  The Borrowers will furnish to each Agent prompt written
notice of any change (i) in any Borrower's, any Affiliated
Equipment User's or any Foreign Subsidiary Equipment Owner's
corporate name or in any trade name used to identify it in
the conduct of its business or in the ownership of its
properties, (ii) in the location of any Borrower's, any
Affiliated Equipment User's or any Foreign Subsidiary
Equipment Owner's chief executive office  its principal
place of business or any material asset constituting
Collateral (other than the installation of any asset
constituting Collateral in a jurisdiction in the United
States of America in which all Uniform Commercial Code
financing statements (including  subject to the

92

qualifications described in paragraph (c) below, fixture filings if applicable) and other appropriate filings, recordings or registrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in such jurisdiction to the extent necessary to perfect the security interests under each U S Security Agreement (including if applicable, each Borrower's ownership interest in any Collateral leased to or otherwise possessed by any Affiliated Equipment User) (iii) in any Borrower's, any Affiliated Equipment User's or any Foreign Subsidiary Equipment Owner's identity or corporate structure or (iv) in any Borrower's or any Affiliated Equipment User's Federal Taxpayer Identification Number   The Parent and the Borrowers agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid  legal and perfected security interest in all the Collateral

(b)   Each year, at the time of delivery of annual financial statements for the Parent with respect to the preceding fiscal year pursuant to Section 5 01, each Borrower shall deliver to each Agent a certificate of a Financial Officer of the Parent or each Borrower (i) setting forth the information required pursuant to Sections 1 and 2 of the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the date of the first Borrowing or the date of the most recent certificate delivered pursuant to this Section  (ii) certifying that all Uniform Commercial Code financing statements (including, subject to the qualifications described in paragraph (c) below, fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental  municipal or other appropriate office in each jurisdiction identified pursuant to clause (i) above to the extent necessary to protect and perfect the security interests under the Security Agreements (including each Borrower's ownership interest in any Collateral leased to or otherwise possessed by any Affiliated Equipment User) for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period) and (iii) setting forth  based on advice of counsel in each jurisdiction where any Financed Foreign Subsidiary Assets are located  all filings, recordings and registrations, including refilings  rerecordings and reregistrations  that

93

will be necessary in each such jurisdiction during the period of 18 months after the date of such certificate in order to maintain the effectiveness and perfection of all Liens granted under all Foreign Subsidiary Security Agreements

(c)  Notwithstanding the foregoing  no fixture filing shall be required with respect to Collateral constituting fixtures at a single customer location unless all the Collateral constituting fixtures at such location has an aggregate Collateral Cost in excess of $100 000

SECTION 5 15   Casualty and Condemnation
(a)  The Parent and the Borrowers shall furnish to the Agents and the Lenders prompt written notice of any casualty or other damage to any material portion of any Collateral or the commencement of any action or proceeding for the taking of any Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding

(b)  If any event described in paragraph (a) of this Section results in Net Proceeds (whether in the form of insurance proceeds  condemnation award or otherwise) and either the aggregate amount of all such Net Proceeds exceeds $5,000 000 or a Default has occurred and is continuing  the Collateral Agent is authorized to collect such Net Proceeds and  if received by any Borrower, any Foreign Subsidiary Equipment Owner or any other Consolidated Group Member, such Net Proceeds shall be paid over to the Collateral Agent All such Net Proceeds retained by or paid over to the Collateral Agent shall be held by the Collateral Agent and released from time to time to pay the costs of repairing restoring or replacing the affected property in accordance with the terms of this Agreement and the applicable provisions of the applicable Security Agreement, subject to the provisions of the applicable Security Agreement regarding application of such Net Proceeds during a Default

(c)  If any Net Proceeds retained by or paid over to the Collateral Agent as provided above continue to be held by the Collateral Agent on the date that any prepayment is due pursuant to Section 2 09(c) in respect of the event resulting in such Net Proceeds, then such Net Proceeds shall be applied to prepay Borrowings as provided in Section 2 09(c)

SECTION 5 16   Temporary Restricted Subsidiaries
On or before the first anniversary date of the date hereof the Parent shall cause each Temporary Restricted Subsidiary to (a) become a direct or indirect Subsidiary of the Bank

94

Borrower, (b) Guarantee the Bank Loans and (c) pledge a substantial majority of its assets to secure the Bank Loans to the extent legally permissible

SECTION 5 17   Leasing of Collateral   Each Borrower will enter into, as lessor, operating leases with respect to all Collateral owned by it providing revenues sufficient to satisfy its Obligations as and when due   Any such leases shall comply with Section 6 13

## ARTICLE VI

### Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full  each of the Parent and the Borrowers covenants and agrees with the Lenders that

SECTION 6 01   Limitation on Indebtedness   (a)  None of the Consolidated Group Members shall Incur any Indebtedness, except, without duplication

(i)  Subject to Section 6 12, Indebtedness of the Bank Loan Parties to the Bank Agent  the Bank Lenders and Bank L/C Issuer under the Bank Credit Documents,

(ii)  Indebtedness of the Bank Borrower or a Restricted Subsidiary owed to and held by the Bank Borrower and Restricted Subsidiaries, provided, however  that (A) such Indebtedness may not be sold pledged, assigned or in any way transferred to a Person other than the Bank Borrower and Restricted Subsidiaries and the instruments evidencing the Indebtedness must so provide  (B) the occurrence of any event that results in a Restricted Subsidiary that is owed or holds Indebtedness ceasing to be a Restricted Subsidiary shall constitute a transfer of the Indebtedness, (C) the Bank Borrower may only Incur Indebtedness under this clause (ii) if the Indebtedness is unsecured and expressly subordinated to the prior payment in full in cash of all Loans and obligations Incurred in any way under the Loan Documents and (D) for avoidance of doubt, the Parent, Principal Subsidiaries  Vendor Financing Obligors and Designated Foreign Subsidiaries may not Incur Indebtedness under this clause (ii)



(iii)  Indebtedness of the Parent Incurred under the Bond Notes Offering and Indebtedness of the Parent Incurred in respect of the Series C Stock Transaction, and any Refinancing of Indebtedness permitted under this clause (iii)

(iv)  Indebtedness existing on the date hereof as set forth on Schedule 6 01

(v)  Purchase Money Indebtedness,

(A)  Incurred by the Loan Parties under the Loan Documents,

(B)  Incurred by the Bank Borrower, Restricted Subsidiaries  Principal Subsidiaries Vendor Financing Obligors and Designated Foreign Subsidiaries under Fiber Capital Lease Obligations not to exceed $250 0 million  excluding the MFN Fiber IRU Capital Lease Obligations and the Williams Fiber IRU Capital Lease Obligations, provided that Indebtedness Incurred under this clause (v) (B), shall be on commercially reasonable terms and conditions

(C)  Incurred by the Bank Borrower, Restricted Subsidiaries, Principal Subsidiaries, Vendor Financing Obligors and Designated Foreign Subsidiaries in respect of Data Center Equipment Financings (or Incurred by the Parent or the Bank Borrower  in the form of a Guarantee) not to exceed $150 0 million, provided that any Guarantee of Indebtedness Incurred under this clause by the Bank Borrower shall be (1) substantially in the form of Exhibit F attached hereto or  otherwise (2) on terms and conditions reasonably acceptable to the Administrative Agent  such acceptance not to be unreasonably delayed,

(D)  Incurred by the Bank Borrower, Restricted Subsidiaries, Principal Subsidiaries Vendor Financing Obligors and Designated Foreign Subsidiaries in respect of Network Equipment Financings (or Incurred by the Parent or the Bank Borrower, in the form of a Guarantee) not to exceed $250 0 million  provided that any Guarantee of Indebtedness Incurred under this clause by the Bank Borrower shall be (1) substantially in the form of Exhibit F attached hereto or, otherwise (2) on terms and conditions reasonably acceptable



to the Administrative Agent, such acceptance not
to be unreasonably delayed, or

(E)  Incurred by the Bank Borrower,
Restricted Subsidiaries, Principal Subsidiaries,
Vendor Financing Obligors and Designated Foreign
Subsidiaries (or Incurred by the Parent or the
Bank Borrower in the form of a Guarantee) not to
exceed $100 0 million at any time outstanding,
provided that any Guarantee of Indebtedness
Incurred under this clause by the Bank Borrower
shall be (1) substantially in the form of Exhibit
F attached hereto or, otherwise (2) on terms and
conditions reasonably acceptable to the
Administrative Agent, such acceptance not to be
unreasonably delayed

provided however that Indebtedness under this clause (v)
other than clauses (A) and (B) above  shall be on
commercially reasonable terms and conditions and, to the
extent that any such Incurrence shall be in a principal
amount exceeding $25 0 million and not be Incurred by a
Vendor Financing Obligor, on terms and conditions reasonably
acceptable to the Administrative Agent, such acceptance not
to be unreasonably withheld or delayed

(vi) Hedging Obligations consisting of
(A) Interest Rate Agreements or Currency Agreements
directly related to Indebtedness permitted to be
Incurred by the Bank Loan Parties or Principal
Subsidiaries  provided  however, that the notional
amount of any such Hedging Obligation does not exceed
the amount of Indebtedness to which such Hedging
Obligation relates or (B) Currency Agreements used to
hedge non-U S  dollar currency exposures of the Bank
Loan Parties or Principal Subsidiaries, entered into in
accordance with customary industry practices for
companies in the Telecommunications Business with
international operations and not for purposes of
speculation,

(vii)      Indebtedness of a Consolidated Group
Member solely in respect of letters of credit  bank
guarantees, banker's acceptances, cash deposits, surety
bonds  bid bonds and performance bonds Incurred in the
ordinary course of business, provided, however, that
such instruments or deposits do not support any
Indebtedness other than Indebtedness which, if Incurred
by such Person, would be permitted to be Incurred
pursuant to another provision of this covenant



97

(viii)  Indebtedness of the Bank Loan Parties and Principal Subsidiaries in an aggregate principal amount not to exceed $50 0 million at any time outstanding

(ix)  Indebtedness of the Parent in an aggregate principal amount not to exceed the sum of (x) $1 65 billion (y) an additional amount equal to the sum of (A) the aggregate Net Cash Proceeds received by the Parent after the Effective Date from the issuance or sale of Capital Stock (other than Disqualified Stock) of the Parent (other than an issuance or sale to the Bank Borrower or any Restricted Subsidiary and other than an issuance or sale to an employee stock ownership plan or to a trust established by the Parent the Bank Borrower  a Restricted Subsidiary or a Principal Subsidiary for the benefit of its employees) provided that such Net Cash Proceeds in this clause (y) are invested by the Parent in the Bank Borrower and such Investment is not in the form of Indebtedness and (B) the Fair Market Value of any Capital Stock (other than Disqualified Stock) of the Parent issued to any Person (other than a Subsidiary) in exchange for Telecommunications Assets which will be held by the Bank Borrower or a Restricted Subsidiary or in exchange for the Capital Stock of another Person a substantial majority of the assets of which consist of Telecommunications Assets in a transaction pursuant to which such other Person becomes a Restricted Subsidiary, in each case received or issued, as the case may be  subsequent to the Effective Date and (z) Conversion Notes and amounts raised and utilized by the Parent to invest in the Bank Borrower for the purpose of Refinancing Loans and that are applied to prepay Loans in accordance with this Agreement provided, however, that Indebtedness Incurred under this clause (ix) is issued on terms (other than as to interest rates  redemption prices and issue price) no more restrictive than the Bond Notes Offering or  if more restrictive  such restrictions would not be more adverse than the terms of the Bond Notes Offering to the interests of the Lenders in any material respect, provided further that such Indebtedness has a Stated Maturity at least one year beyond the later of the maturity of the Loans and the maturity of the Bank Loans and further provided that no principal payments thereunder shall fall due during the life of the Loans or the Bank Loans and such Indebtedness shall be issued at commercially reasonable rates (it being understood that the rates applicable to Conversion Notes are deemed to be commercially reasonable),

98

(x)  Acquired Indebtedness Incurred by the Bank Borrower, Restricted Subsidiaries, Principal Subsidiaries and Designated Foreign Subsidiaries in respect of the acquisition of a Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary,

(xi)  Refinancing Indebtedness in respect of Indebtedness Incurred with respect to the Outstanding Old Bond Debt or pursuant to clauses (iii) (iv) (v) (ix) and (x) of this Section 6 01(a), provided, that Indebtedness of the Parent cannot be Refinanced by Indebtedness Incurred by the Bank Borrower, any Restricted Subsidiary, Principal Subsidiary, or Designated Foreign Subsidiary provided further, however, that Refinancing Indebtedness shall not include Indebtedness of a Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary that Refinances Indebtedness of the Bank Borrower,

(xii)  Guarantees by a Consolidated Group Member of Indebtedness Incurred by an Unrestricted Subsidiary secured by a pledge of the Capital Stock of such Unrestricted Subsidiary so long as the pledge provides for no recourse against the Consolidated Group Member for such Indebtedness other than recourse against such Capital Stock

(xiii)  Indebtedness Incurred pursuant to the MFN Fiber IRU Capital Lease Obligations and the Williams Fiber IRU Capital Lease Obligations and other Capital Lease Obligations arising under an agreement in effect on the date hereof  and

(xiv)  Guarantees by the Parent or the Bank Borrower of Indebtedness of another such Consolidated Subsidiary Group Member, to the extent the Parent or the Bank Borrower would be allowed to Incur such Indebtedness directly hereunder

(b)  The Borrowers shall not incur any Indebtedness other than the Loans notwithstanding whether any such Indebtedness would be permitted under Section 6 01(a)

(c)  All Indebtedness that the Bank Borrower and the Restricted Subsidiaries are permitted to Incur pursuant to Section 6 01(a) must be Incurred by the Bank Borrower (and shall not be Incurred by any Restricted Subsidiary), except (i) Indebtedness under the Bank Credit Documents (ii) Indebtedness permitted by clause (ii) of

[CITCORP 1017780 1 44598 06/14/00-5 50p]

99

Section 6 01(a), (iii) existing Indebtedness of Restricted
Subsidiaries referred to in clause (iv) of Section 6 01(a),
(iv) Indebtedness permitted to be Incurred by a Restricted
Subsidiary under clause (vii) (viii), (x), (xi) or
(xiii) of Section 6 01(a) and (v) Purchase Money
Indebtedness permitted by clause (v) of Section 6 01(a),
_provided_ that, in the case of any such Purchase Money
Indebtedness other than the Loans and other than the Fiber
Capital Lease Obligations, either (A) each individual
financing constituting Purchase Money Indebtedness is in an
aggregate principal amount not exceeding $75,000,000 and is
secured only by the Property the purchase price of which was
financed by the proceeds of such individual financing (and
not cross-collateralized with any other Purchase Money
Indebtedness) or (B) in the case of any other such Purchase
Money Indebtedness, such Purchase Money Indebtedness is
Incurred by a Vendor Financing Obligor

SECTION 6 02    Limitations on Mergers,
Consolidations and Sales of Assets    (a)  None of the
Consolidated Group Members shall be a party to any merger
consolidation or share exchange, or sell  transfer  lease or
otherwise dispose of all or substantially all of its assets
or property  including the Capital Stock of Subsidiaries, in
one transaction or a series of related transactions,
including any disposition of assets or property as part of a
Sale/Leaseback Transaction or permit any Restricted
Subsidiary or Principal Subsidiary so to do  _provided_
_however_, that this Section shall not apply to nor operate to
prevent (i) the Bank Borrower  a Restricted Subsidiary
Principal Subsidiary or Designated Foreign Subsidiary being
a party to any merger where the Bank Borrower  a Restricted
Subsidiary  Principal Subsidiary or Designated Foreign
Subsidiary is the surviving Person if  after giving effect
to such merger, no Default would then exist  _provided_
_further_ that if a Restricted Subsidiary merges with a
Designated Foreign Subsidiary or Principal Subsidiary and
the Designated Foreign Subsidiary or Principal Subsidiary is
the surviving Person  as the case may be, then such merger
shall be deemed to be a conversion of the Restricted
Subsidiary into a Designated Foreign Subsidiary or a
Principal Subsidiary  as the case may be  and such
conversion shall be subject to the restrictions herein,
(ii) any Restricted Subsidiary or the Bank Borrower merging
into another Restricted Subsidiary or the Bank Borrower if,
after giving effect to such merger  no Default would then
exist, or (iii) the Bank Borrower or any Restricted
Subsidiary or Principal Subsidiary from selling its
inventory in the ordinary course of its business or selling
Capital Stock of Unrestricted Subsidiaries  Notwithstanding
the foregoing exceptions, neither any Borrower nor any of

its Subsidiaries shall be a party to any merger, consolidation or share exchange, or sell, transfer or otherwise dispose of all or substantially all of its assets or property, including the Capital Stock of Subsidiaries in one transaction or a series of related transactions

(b)  None of the Consolidated Group Members shall sell or issue any Capital Stock (i) of the Bank Borrower to any Person other than the Parent or (ii) of any Borrower to any Person other than the Pledgor (which shall pledge any additional Capital Stock of any Borrower it acquires to secure the Obligations)  The Pledgor shall continue to be a Wholly Owned Subsidiary of the Bank Borrower

SECTION 6 03   <u>Limitations on Liens.</u>  (a)  None of the Consolidated Group Members shall create  incur  assume or suffer to exist any Lien upon or in any of its property or assets  whether now owned or hereafter acquired, except the following Liens (collectively  "<u>Permitted Liens</u>")

(i)  Liens arising by operation of law in connection with worker's compensation  unemployment insurance, social security obligations, taxes, assessments, statutory obligations or other similar charges, good faith deposits  pledges or Liens in connection with bids  tenders, contracts or leases to which such Consolidated Group Member is a party (other than contracts for borrowed money), or other deposits required to be made or surety bonds or other obligations of like nature (which for the purposes of this Agreement shall include letters of credit in the nature of a surety bond) required to be obtained in the ordinary course of business in connection with any of the foregoing  <u>provided</u> that in each case the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings and for which reserves in conformity with GAAP have been provided on the books of such Consolidated Group Member,

(ii)  mechanics', workmen's  materialmen's, landlords'  carriers' or other similar Liens arising in the ordinary course of business (or deposits to obtain the release of such Liens) securing obligations not due or  if due  being contested in good faith by appropriate proceedings and for which reserves in conformity with GAAP have been provided on the books of such Consolidated Group Member,

(iii)  Liens for taxes or assessments or other government charges or levies on such Consolidated Group



101

Member, not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by appropriate proceedings and for which reserves in conformity with GAAP have been provided on the books of such Consolidated Group Member

(iv)  Liens arising out of judgments or awards against such Consolidated Group Member or in connection with surety or appeal bonds in connection with bonding such judgments or awards, the time for appeal from which or petition for rehearing of which shall not have expired or with respect to which such Consolidated Group Member shall be prosecuting an appeal or proceeding for review and with respect to which it shall have obtained a stay of execution pending such appeal or proceeding for review <u>provided</u> that the aggregate amount of liabilities (including interest and penalties, if any) of the Consolidated Group on a consolidated basis secured by such Liens shall not exceed $25 0 million at any one time outstanding

(v)  Liens upon any Property acquired by such Consolidated Group Member to secure any Indebtedness of the Consolidated Group on a consolidated basis incurred at the time of the acquisition of such Property to finance the purchase price of such Property, or Liens upon property resulting from the sale by such Consolidated Group Member of Property and the leasing of the same or similar property from the purchaser thereof (or a subsequent purchaser or lessee) <u>provided</u> that any such Lien shall apply only to the Property that was so acquired or sold and leased back and the aggregate principal amount of Indebtedness secured by such Liens shall not exceed $15 0 million at any time outstanding on a consolidated basis,

(vi)  Survey exceptions or encumbrances easements or reservations, or rights of others for rights-of-way utilities and other similar purposes, or zoning or other restrictions as to the use of real properties which are necessary for the conduct of the activities of such Consolidated Group Member or which customarily exist on properties of corporations engaged in similar activities and similarly situated and which do not in any event materially impair their use in the operation of the business of such Consolidated Group Member

(vii)  Liens listed on Schedule 6 03

[NYCORP 1087780 1 46590 01/14/02 5 53p]



102



(viii)  Liens securing permitted Indebtedness of a Subsidiary of a Bank Loan Party incurred in connection with the acquisition or construction of Property of such Subsidiary, provided that such Lien is limited to the Property being financed by such Indebtedness and any revenues of such Subsidiary directly attributable to such Property,

(ix)  Liens securing Indebtedness under the Bank Credit Documents,

(x)  Any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any Lien referred to in the foregoing paragraphs (i) through (ix)  inclusive, in connection with the permitted extension, renewal or replacement of the Indebtedness secured thereby, provided however  that the principal amount of Indebtedness secured thereby shall not exceed the principal amount of the Indebtedness so secured at the time of any extension  renewal or refinancing, and that such extension  renewal or refinancing shall be limited to the Property which was subject to the Lien so extended, renewed or refinanced,

(xi)  Liens securing obligations under the Loan Documents, including Liens provided for in the Security Documents

(xii)  Liens securing Indebtedness existing or incurred in connection with permitted Capital Lease Obligations  provided such Liens are limited to Liens on the capital assets that have been acquired or construction of which has been financed by the proceeds of such Capital Lease Obligations, including Liens incurred pursuant to the Fiber Capital Lease Obligations and Capital Lease Obligations Incurred in respect of the Data Center Equipment Financing,

(xiii)  Liens encumbering the Capital Stock of Unrestricted Subsidiaries provided that there is no recourse to the Consolidated Group for the obligations secured other than against such stock,

(xiv)  Liens under the Bank Credit Documents securing obligations under Hedging Obligations,

(xv)  Liens securing repurchase obligations arising out of permitted Temporary Cash Investments

(xvi)  Liens securing obligations of a Consolidated Group Member (other than in respect of Indebtedness for borrowed money) in an aggregate amount not to exceed $10 0 million,

(xvii)     Liens on Temporary Cash Investments to secure   Indebtedness Incurred under Section 6 01(a)(vii), and

(xviii)  Liens securing Purchase Money Indebtedness now existing or to be Incurred under Section 6 01(a)(v)(C), (D) or (E) or any replacement financing thereof

(b)  Notwithstanding the foregoing, no Consolidated Group Member will create, incur, assume or suffer to exist any Lien on any Collateral or any Capital Stock of a Borrower or any Subsidiary thereof except (i) Liens created under the Security Documents  (ii) Liens described in clause (ii) or (iii) of paragraph (a) of this Section, (iii) in the case of Collateral  rights of Equipment Users under leases or similar arrangements, subject to Equipment User Agreements and (iv) in the case of Capital Stock of a Second Borrower, Liens securing the Bank Loans that are junior to the Liens created under the Pledge Agreement, on the terms contemplated by the Pledge Agreement  provided that  in the case of Liens described in clause (ii) or (iii) of paragraph (a) of this Section that are permitted because the obligations secured thereby are being contested, such Liens shall be permitted on the Collateral or Capital Stock of a Borrower or any Subsidiary thereof only if such contest effectively suspends the collection of the contested obligation and the failure to make payment pending the resolution of such contest could not reasonably be expected to result in a Material Adverse Effect

SECTION 6 04   Investments, Acquisitions, Loans, Advances and Guaranties   None of the Consolidated Group Members shall directly or indirectly, make, retain or have outstanding any Investments except the following Investments (collectively "Permitted Investments")

(a) in the case of the Parent,

(i)  Investments in the Bank Borrower (other than Indebtedness)

(ii)  Investments in Capital Stock of Temporary Restricted Subsidiaries owned as of the

104

Effective Date, subject to the provisions of
Section 5 16

(iii)  Investments in Subsidiaries not to
exceed more than $1 0 million in the aggregate

(iv)  Temporary Cash Investments in an
aggregate amount no greater than $10 0 million at
any one time, provided that such Temporary Cash
Investments balance shall not exceed $5 0 million
for more than three (3) consecutive Business Days,

(v)  Investments in Outstanding Old Bond
Debt

(vi)  Investments in a captive insurance
company not to exceed $1 0 million  and

(vii)  Investments with respect to the
Series C Stock Transaction

(b) in the case of the Parent  clauses (vi)
(viii), (x) (xii) and (xxvii)  and in the case of the Bank
Borrower and Restricted Subsidiaries, any of the following

(i)  Investments in (A) a Person that will, upon
the making of such Investment  become a Restricted
Subsidiary, provided  however, that the primary
business of such Restricted Subsidiary is the
Telecommunications Business  or (B) all or
substantially all of the assets of a Person, or a
corporate division thereof by the Bank Borrower or a
Restricted Subsidiary in an aggregate amount for all
Investments pursuant to this clause (i) not to exceed
the sum of (x) $200 0 million plus (y) Unrestricted
Proceeds, provided that to the extent that the Bank
Borrower deems an Investment made under the preceding
clause (A) or clause (B) to be a capital expenditure
permitted under Section 6 07(c) or 6 08(c), such
Investment shall be deemed to be a Cash Capital
Expenditure for the purposes of this Agreement and
shall not be deemed to be an Investment for the purpose
of calculating amounts available to be invested under
this clause (i)

(ii)  Investments in Temporary Cash Investments,

(iii)  ownership of stock, obligations or
securities received in settlement of debts (created in
the ordinary course of business) owing to the Bank
Borrower or any Subsidiary,

105

(iv)  endorsements of negotiable instruments for collection in the ordinary course of business,

(v)  loans and advances to employees in the ordinary course of business for payroll, travel, relocation, and similar purposes,

(vi)  loans or advances to employees made in the ordinary course of business consistent with past practices of the Consolidated Group or as part of a compensation plan approved by the Board of Directors of the Parent in an amount not to exceed $5 0 million at any time outstanding

(vii)  Investments consisting of performance bonds and letters of credit and other similar surety devices obtained to support  or in lieu of  performance bonds in each case entered into in the ordinary course of business,

(viii)  the repurchase or other acquisition of shares of Capital Stock of a Bank Loan Party from employees, former employees  directors or former directors of the Bank Loan Party (or permitted transferees of such employees  former employees directors or former directors), pursuant to the terms of the agreements (including employment agreements) or plans (or amendments thereto) approved by the Board of Directors of the Parent under which such individuals purchase or sell or are granted the option to purchase or sell, shares of such Capital Stock  provided, however  that the aggregate amount of such repurchases and other acquisitions (other than repurchases and acquisitions made pursuant to agreements in effect on the Effective Date) shall not exceed $5 0 million in any calendar year (with unused amounts being carried forward indefinitely)

(ix)  Investments in any Person a substantial majority of the assets of which consist of Telecommunications Assets, provided, however, that the Investments made pursuant to this clause (ix) are pledged as Bank Collateral for the Bank Loans and provided further that the cost of acquisition of all such Investments made pursuant to this clause (ix) (measured on the date each such Investment was made) and then outstanding, does not exceed the sum of $100 0 million, plus Unrestricted Proceeds on the date of any such Investment, provided that with respect to this clause (ix) Unrestricted Proceeds are deemed to be

106

utilized only after the $100 0 million has been utilized in full,

(x)  cash payments in lieu of the issuance of fractional shares in connection with stock splits or upon conversion into Capital Stock of the Consolidated Group Member (other than Disqualified Stock) of any security of the Consolidated Group Member or any convertible Indebtedness of the Consolidated Group Member,

(xi)  Investments in office com, the cost of which (measured by the Fair Market Value of the consideration paid on the date each such Investment is made) does not exceed $25 0 million during each of the three 12-month periods following the Effective Date (with unused annual amounts being carried over to future periods even if such periods occur after the third anniversary of the Effective Date),

(xii)  Investments, the aggregate cost of which (measured by the Fair Market Value of the consideration paid on the date each such Investment was made) which when taker together with the cost of all other Investments made pursuant to this clause (xii), does not exceed $80 0 million at any time outstanding

(xiii)  any Guarantee of any Indebtedness of any Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary to the extent the Person Incurring such Guarantee would be permitted to directly Incur such Indebtedness under Section 6 01

(xiv)  Existing Investments as set forth on Schedule 3 14

(xv)  Investments in Capital Stock of customers of any Consolidated Subsidiary Group Member received and held by the Person providing such products or services, or by the Bank Borrower or any Restricted Subsidiary in exchange for products and services provided in the ordinary course of business, provided, however, that the value of such products and services (calculated as the consideration received by such Person for such products and services in a comparable arm's-length transaction) shall not exceed $50 0 million during each successive 12-month period following the Effective Date

(xvi)  Hedging Obligations on Indebtedness permitted pursuant to Section 6 01

107

(xvii)  Investments in Restricted Subsidiaries,

(xviii)  advances to customers in the ordinary course of business that are recorded as Receivables on the balance sheet of the vendor

(xix)  Investments in Principal Subsidiaries and Designated Foreign Subsidiaries in an aggregate amount not to exceed the sum of (A) $150 0 million, (B) Unrestricted Proceeds on the date of any such Investment and (C) the original cost of any Investment in a Principal Subsidiary or Designated Foreign Subsidiary plus the cost of any subsequent Investments in such Subsidiaries to the extent that such Subsidiaries are converted to Restricted Subsidiaries pursuant to Article X, provided that with respect to this clause (xix) Unrestricted Proceeds are deemed to be utilized only after the $150 0 million has been utilized in full  provided further that the conversion of a Restricted Subsidiary or Unrestricted Subsidiary to a Principal Subsidiary or a Designated Foreign Subsidiary shall constitute an Investment under this clause and such Investment shall be valued, in the case of a Restricted Subsidiary  at the cost of the Investment in the Restricted Subsidiary at the time it became a Restricted Subsidiary plus the cost of any subsequent Investments in the Restricted Subsidiary through the date the Restricted Subsidiary becomes a Principal Subsidiary or a Designated Foreign Subsidiary and, in the case of an Unrestricted Subsidiary  at the cost of the Investment in the Unrestricted Subsidiary at the time it became an Unrestricted Subsidiary plus the cost of any subsequent Investments in the Unrestricted Subsidiary through the date the Unrestricted Subsidiary becomes a Principal Subsidiary or a Designated Foreign Subsidiary

(xx)  Investments in Unrestricted Subsidiaries in an aggregate amount not to exceed the sum of (A) $50 0 million  (B) Unrestricted Proceeds on the date of any such Investment and (C) the original cost of any Investment in an Unrestricted Subsidiary plus the cost of any subsequent Investments in such Subsidiaries to the extent that such Subsidiaries are converted to Restricted Subsidiaries, Principal Subsidiaries or Designated Foreign Subsidiaries pursuant to Article X  provided that with respect to this clause (xx) Unrestricted Proceeds are deemed to be utilized only after the $50 0 million has been utilized in full  provided further, that the conversion of a

108

Restricted Subsidiary, Principal Subsidiary or a
Designated Foreign Subsidiary into an Unrestricted
Subsidiary shall constitute an Investment in
Unrestricted Subsidiaries under this clause and such
Investment shall be valued at the cost of the
Investment in the Restricted Subsidiary, Principal
Subsidiary or Designated Foreign Subsidiary at the time
it became such a Person plus the cost of any subsequent
Investments on such Person through the date the
Restricted Subsidiary, Principal Subsidiary or
Designated Foreign Subsidiary becomes an Unrestricted
Subsidiary,

(xxi)  Investments paid for with Capital Stock of
the Parent (based on the cost of such Investments
measured by the Fair Market Value of the Parent's
Capital Stock on the date of such Investment)

(A)  in any Person engaged in the
Telecommunications Business that is not a
Subsidiary  a substantial majority of the assets
of which person consist of Telecommunications
Assets, and

(B)  in any other Person that is not a
Subsidiary of the Parent up to a maximum aggregate
amount of $50 0 million at any time outstanding

(xxii)    Investments in Outstanding Old Bond
Debt,

(xxiii)   Investments in Capital Stock of (A) any
Borrower  (B) any Vendor Financing Obligor and (C) a
captive insurance compan, in an aggregate amount  for
clauses (A), (B) and (C)  not to exceed $5 0 million

(xxiv)  Investments in the Capital Stock of the
Parent by the Bank Borrower but only in the event the
Bank Borrower is prohibited by law, contract or
otherwise from making a dividend to the Parent pursuant
to Section 6 05(a) and to the extent and in an amount
that a dividend from the Bank Borrower to the Parent
would be permitted pursuant to Section 6 05(a),
provided  however, the proceeds from an Investment
under this clause (xxiv) shall be used solely for the
purposes permitted under Section 6 05(a) with respect
to the payment of dividends

(xxv)  Investments in any Vendor Financing Obligor
to meet regularly scheduled principal and interest
payments and fees and indemnity and expense



109

reimbursement obligations owed under Purchase Money Indebtedness of such Vendor Financing Obligor to the extent not paid out of proceeds from operating leases on Property owned by such Vendor Financing Obligor

(xxvi)  Investments in any Borrower that are applied to pay Obligations, and

(xxvii)  Guarantees by the Parent or the Bank Borrower (i) of the Obligations pursuant to the Guarantee Agreement or (ii) of the Indebtedness to be incurred by the Bank Borrower under Section 6 01(a)(v)(C)  (D) or (E)

provided that no new Investment shall be permitted to be made pursuant to clause (i), (viii), (ix)  (xi) (xii)  (xix), (xx)  (xxi) or (xxv) above while an Event of Default shall have occurred and be continuing except for Investments that such Consolidated Group Member shall have committed to make prior to the date of the related Default  and

(c)  in the case of any Borrower, Investments in Temporary Cash Investments

In determining the amount of Investments outstanding  (A) Investments in Capital Stock and Investments taking the form of equity contributions shall always be valued at the original cost thereof (regardless of any subsequent appreciation or depreciation therein) less cash (or in the case of Investments made for other than cash, the Fair Market Value of Telecommunications Assets or Marketable Securities) received from such Investments by the Person making such Investments, provided that in no event may the amount of an Investment outstanding be valued at less than zero and (B) Investments in Indebtedness shall be valued at the original principal amount thereof less any cash payments received on such Indebtedness  It is understood that the assumption and payment by a Borrower of a Foreign Subsidiary Equipment Owner's obligation to pay the Purchase Price of any Eligible Equipment and Services in accordance with Section 6 13 shall not be construed to be an Investment by such Borrower in violation of this Section

SECTION 6 05  Dividends, Purchase of Stock and Prepayments.  (a) None of the Consolidated Group Members shall declare any dividends (other than dividends payable in Capital Stock of the Parent or the Bank Borrower) on any shares of any class of its Capital Stock  or apply any of its Property or assets to the purchase, redemption or other retirement of  or set apart any sum for the payment of any

110

dividends on, or for the purchase, redemption or other
retirement of, or make any other distribution by reduction
of capital or otherwise in respect of, any shares of any
class of Capital Stock of a Loan Party, or permit any
Principal Subsidiary so to do, or permit any Unrestricted
Subsidiary to purchase or acquire any shares of any class of
Capital Stock of the Bank Borrower, except for any Permitted
Investment, provided that dividends (other than dividends by
a Borrower, which shall not be permitted by any of the
following clauses) are permitted (i) by the Bank Borrower to
the Parent to the extent necessary for the Parent to (A) so
long as no Event of Default has occurred and is continuing,
meet its regularly scheduled obligations in regard to
principal and interest in connection with Indebtedness
Incurred pursuant to clauses (iii)  (iv) and (v) of
Section 6 01(a) and Refinancing thereof to the extent
permitted in Section 6 01(a)(xi)  (B) pay the ordinary
operating expenses of the Parent and other liabilities
incurred by the Parent in the ordinary course of business,
(C) so long as no Event of Default has occurred and is
continuing, repay the Outstanding Old Bond Debt  including
regularly scheduled interest payments thereon  and (D)
pay cash payments in lieu of the issuance of fractional
shares in connection with stock splits or upon conversion
into Capital Stock of the Parent (other than Disqualified
Stock) of any security of the Parent or any convertible
Indebtedness of the Parent  (ii) to the Bank Borrower
Restricted Subsidiaries, Principal Subsidiaries, Designated
Foreign Subsidiaries and minority shareholders, provided
that dividends may only be paid to minority shareholders
ratably to the extent of their percentage interests in
Capital Stock of the applicable Subsidiary, and (iii) so
long as no Event of Default has occurred and is continuing
to the Parent or by the Parent in an amount no greater than
the Net Available Cash of the substantially concurrent sale
of (or specified with particularity at the time of the sale
of, and subsequently made with such Net Available Cash of)
or made by exchange for  Capital Stock (other than
Disqualified Stock) of the Parent (other than Capital Stock
issued or sold to a Subsidiary of the Parent or an employee
stock ownership plan or to a trust established by the Parent
or any of its Subsidiaries for the benefit of their
employees), provided that such dividends and purchases of
Capital Stock shall be deemed to be a utilization of
Unrestricted Proceeds and shall not exceed the regularly
scheduled dividend amounts under Series A Preferred Stock
and Series G Preferred Stock  It is understood that the
assumption and payment by a Borrower of a Foreign Subsidiary
Equipment Owner's obligation to pay the Purchase Price of
any Eligible Equipment and Services in accordance with

111

Section 6 13 shall not be construed to be a dividend by such Borrower in violation of this Section

(b)   None of the Consolidated Group Members shall permit any Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary to enter into any agreement or instrument which by its terms restricts the ability of such Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary to (i) declare or pay dividends or make similar distributions  (ii) repay principal of  or pay any interest on, any Indebtedness owed to any Consolidated Group Member described in Section 6 01(a), (iii) make payments of royalties  licensing fees and similar amounts to any Consolidated Group Member, (iv) make loans or advances to any Consolidated Group Member or (v) permit any Consolidated Group Member to engage in consolidated cash management inconsistent with prudent business practice

(c)   None of the Consolidated Group Members shall permit (i) a Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary to issue a stock dividend other than on a pro rata basis to its shareholders  and (ii) the Bank Borrower to issue stock dividends to any Person other than the Parent  and  in each case of clauses (i) and (ii), the stock issued to a Restricted Subsidiary  Principal Subsidiary  or Designated Subsidiary in connection with such stock dividend is pledged to secure the Bank Loans

(d)   None of the Consolidated Group Members shall, subject to the Refinancing provisions of Section 6 01(a)(xi)  prepay Indebtedness under clauses (iii) and (ix) of Section 6 01(a) except that Indebtedness under clause (iii) may be prepaid to the extent allowed pursuant to provisions in the applicable Bond Notes indentures that allow prepayments of up to 35% of the aggregate amount of the Bond Notes and notes issued in the Series C Transaction with the net cash proceeds from one or more public equity offerings (an "Equity Clawback Prepayment"), provided that any such prepayment shall be deemed to be utilization of Unrestricted Proceeds in the amount of such prepayment

SECTION 6 06    Use of Proceeds   The proceeds of Loans will be used solely to pay the Purchase Price of Eligible Equipment and Services acquired by the Designated Borrower (or by a Foreign Subsidiary Equipment Owner as contemplated by Section 6 13) pursuant to the Supply Agreement

112

)



SECTION 6 07   Phase 1 Financial Covenants   Until December 31, 2002, the Consolidated Group Members shall

(a)  Maximum EBITDA Losses/Minimum EBITDA.  Not permit EBITDA for any fiscal quarter referred to below to be less than the amount set forth opposite such fiscal quarter

| Quarter Ended | Amount |
|---|---|
| March 31, 2000 | $(48,000,000) |
| June 30, 2000 | $(42,000,000) |
| September 30  2000 | $(38,000,000) |
| December 31, 2000 | $(28,000,000) |
| March 31, 2001 | $(17,000,000) |
| June 30, 2001 | $(9,000,000) |
| September 30  2001 | $(5,000,000) |
| December 31, 2001 | $1 000,000 |
| March 31, 2002 | $28 000 000 |
| June 30, 2002 | $44 000 000 |
| September 30  2002 | $60,000,000 |
| December 31  2002 | $76,000,000 |

(b)  Minimum Revenues.  Not permit Consolidated Revenue for any fiscal quarter referred to below (calculated as of the last day of any fiscal quarter end and based on the results of the quarter then ended) to be less than the amount set forth opposite such fiscal quarter

| Quarter Ended | Amount |
|---|---|
| March 31, 2000 | $118,000,000 |
| June 30  2000 | $129,000 000 |
| September 30  2000 | $139,000,000 |
| December 31  2000 | $163 000 000 |
| March 31, 2001 | $173,000,000 |
| June 30, 2001 | $188,000,000 |
| September 30, 2001 | $199,000,000 |
| December 31  2001 | $217,000,000 |
| March 31, 2002 | $240 000 000 |
| June 30, 2002 | $268,000,000 |
| September 30  2002 | $294,000,000 |
| December 31  2002 | $328 000 000 |



[CITICORP 1007300 1 44SSB 06/34/00 5 50p]

113

(c)  <u>Maximum Cash Capital Expenditures</u>    Not
permit total Cash Capital Expenditures during any fiscal
year referred to below to exceed the amount set forth
opposite such fiscal year  <u>provided</u> that unused amounts
permitted to be expended in any fiscal year may be carried
forward one year with all capital expenditures deemed first
applied to any carry-forward amounts  <u>provided further</u> that
on any date that any Bank Loan Party receives Net Cash
Proceeds from permitted Indebtedness (other than Refinancing
Indebtedness) or equity in excess of $1 5 <u>billion, on a</u>
cumulative basis from the Effective Date, the Bank Borrower
may increase at its discretion, the maximum Cash Capital
Expenditures in any year or years by an aggregate amount
equal to such Net Cash Proceeds that exceed $1 5 billion,
<u>provided further</u> that any such amount of increase shall be
deemed a utilization of Unrestricted Proceeds  and <u>provided</u>
<u>further</u> that under no circumstances shall the maximum annual
Cash Capital Expenditures exceed (excluding carry over
amounts) $1 3 billion for any year prior to and including
2001 and $1 0 billion in any year thereafter while this
covenant is applicable

| Fiscal Year | Amount |
|-------------|--------|
| 2000 | $1 300 000,000 |
| 2001 | $1 150 000 000 |
| 2002 | $  550 000 000 |

(d)  <u>Maximum Consolidated Senior Secured Debt to</u>
<u>Consolidated Total Capitalization</u>  Not permit the ratio of
Consolidated Senior Secured Debt to Consolidated Total
Capitalization to exceed 25% at any time   For the purpose
of calculating Consolidated Total Capitalization, paid-in
capital shall be given effect as of the date paid in

(e)  <u>Maximum Consolidated Total Debt to</u>
<u>Consolidated Total Capitalization</u>  Not permit the ratio of
Consolidated Total Debt to Consolidated Total Capitalization
to exceed 75% at any time   For the purpose of calculating
Consolidated Total Capitalization  paid-in capital shall be
given effect as of the date paid in

(f)  <u>Maximum Consolidated Senior Secured Debt to</u>
<u>Adjusted Gross PP&E</u>  Not permit the ratio of Consolidated
Senior Secured Debt to Adjusted Gross PP&E to exceed 50% at
any time

114

(g)  <u>On-Network Hubs</u>   Not permit the number of On-Network Hubs as of the last day of any fiscal quarter referred to below to be less than the amount set forth opposite such fiscal quarter

| Quarter Ended | On-Network Hubs |
|---|---|
| March 31  2000 | 125 |
| June 30, 2000 | 142 |
| September 30, 2000 | 159 |
| December 31, 2000 | 175 |
| March 31  2001 | 190 |
| June 30, 2001 | 204 |
| September 30  2001 | 219 |
| December 31  2001 | 234 |
| March 31, 2002 | 249 |
| June 30, 2002 | 263 |
| September 30  2002 | 267 |
| December 31  2002 | 268 |

(h)  <u>On-Network Buildings</u>   Not permit the number of On-Network Buildings as of the last day of any fiscal quarter referred to below to be le s than the amount set forth opposite such fiscal quarter

| Quarter Ended | On-Network Buildings |
|---|---|
| March 31  2000 | 1,649 |
| June 30  2000 | 2,322 |
| September 30, 2000 | 3,320 |
| December 31, 2000 | 4,477 |
| March 31, 2001 | 5,981 |
| June 30, 2001 | 7,366 |
| September 30  2001 | 8,755 |
| December 31  2001 | 10 147 |
| March 31  2002 | 10 256 |
| June 30  2002 | 10 366 |
| September 30  2002 | 10 475 |
| December 31, 2002 | 10,585 |



[NYCORP 1887788 1 44530 06/14/00 5 56p]

115

SECTION 6 08   Phase 2 Financial Covenants   On and after January 1, 2003, the Consolidated Group Members shall

(a)  Consolidated Total Debt to Consolidated Annualized EBITDA.  Not permit the ratio of Consolidated Total Debt as of any date during any period referred to below to Consolidated Annualized EBITDA as of such date to be greater than the ratio set forth opposite the period during which such date occurs

| Period | Ratio |
|---|---|
| March 31  2003 - June 29, 2003 | 15 00x |
| June 30  2003 - September 29  2003 | 11 00x |
| September 30  2003 - December 30, 2003 | 10 00x |
| December 31  2003 - March 30  2004 | 9 00x |
| March 31, 2004 - June 29, 2004 | 8 00x |
| June 30  2004 - September 29  2004 | 7 50x |
| September 30  2004 - December 30, 2004 | 7 00x |
| December 31  2004 - March 30  2005 | 6 00x |
| March 31  2005 and thereafter | 5 00x |

(b)  EBITDA to Consolidated Interest Expense   Not permit the ratio of EBITDA to Consolidated Interest Expense in each case for the period of four consecutive fiscal quarters ending on any date referred to below to be less than the ratio set forth opposite such date

| Quarter End Date | Ratio |
|---|---|
| March 31  2003 | 0 50x |
| June 30, 2003 | 0 50x |
| September 30, 2003 | 0 75x |
| December 31, 2003 | 0 75x |
| March 31  2004 | 1 00x |
| June 30, 2004 | 1 00x |
| September 30  2004 | 1 25x |
| December 31  2004 | 1 25x |
| March 31  2005 | 1 50x |
| June 30  2005 | 1 50x |
| September 30  2005 | 1 75x |
| December 31, 2005 | 1 75x |
| March 31  2006 | 2 00x |
| June 30  2006 | 2 00x |



116

| Quarter End Date | Ratio |
|---|---|
| September 30  2006 | 2 25x |
| December 31, 2006 | 2 25x |
| March 31, 2007 and the last day of each quarter ended thereafter | 2 50x |

(c) <u>Maximum Cash Capital Expenditures</u>  Not permit total Cash Capital Expenditures during any fiscal year, commencing with the fiscal year ending December 31, 2003, to exceed $400 0 million (<u>provided</u> that unused amounts permitted to be expended in any fiscal year may be carried forward one year with all Cash Capital Expenditures deemed first applied to any carry-forward amounts), <u>provided further</u> <u>however</u> that on any date that any Bank Loan Party receives Net Cash Proceeds from permitted issuance of Indebtedness (other than Refinancing Indebtedness) or equity in excess of $1 5 billion, on a cumulative basis from the Effective Date  the Bank Borrower may increase, at its discretion, the maximum Cash Capital Expenditures in any year or years by an aggregate amount equal to such Net Cash Proceeds that exceed $1 5 billion  <u>provided further</u> that any such amount of increase shall be deemed a utilization of Unrestricted Proceeds  and <u>provided further</u> that under no circumstances shall the maximum annual Cash Capital Expenditures (excluding carry over amounts) exceed $1 0 billion in any year while this covenant is applicable

SECTION 6 09   <u>Consolidated Senior Debt to</u> <u>Consolidated Annualized EBITDA</u>  On and after March 31, 2002, the Consolidated Group Members shall not permit the ratio of Consolidated Senior Debt to Consolidated Annualized EBITDA as of any day during any period referred to below to be more than the ratio set forth opposite such period

| Period | Ratio |
|---|---|
| March 31, 2002 - June 29, 2002 | 12 50x |
| June 30, 2002 - September 29, 2002 | 10 00x |
| September 30, 2002 - December 30  2002 | 9 00x |
| December 31  2002 - March 30, 2003 | 7 50x |
| March 31, 2003 - June 29, 2003 | 5 00x |
| June 30  2003 - September 29  2003 | 4 50x |
| September 30, 2003 - December 30, 2003 | 4 00x |
| December 31  2003 - March 30  2004 | 4 00x |
| March 31  2004 and thereafter | 3 50x |

117

SECTION 6 10    EBITDA to Consolidated Debt
Service.    The Consolidated Group Members shall not permit
the ratio of EBITDA to Consolidated Debt Service for the
four consecutive fiscal quarters ending on the last day of
any fiscal quarter ending on or after December 31, 2003, to
be less than 1 0x

SECTION 6 11    Certain Prepayments of
Indebtedness.    No Consolidated Group Member shall
voluntarily prepay, redeem or defease any Indebtedness at
any time that any Loans are outstanding, other than
(a) prepayments of Loans, (b) prepayment of revolving credit
loans outstanding under the Bank Credit Agreement that do
not involve any termination or reduction of (or agreement to
terminate or reduce) the commitments to make such loans,
(c) prepayments or redemptions of Indebtedness (other than
(1) prepayments of Indebtedness under the Bank Credit
Agreement that are not described in clause (b) above, (11)
prepayments or redemptions of Indebtedness issued by the
Parent, other than (x) Outstanding Old Bond Debt and (y)
prepayments described in clause (iii) of the definition of
Series C Stock Transaction, and (111) prepayments or
redemptions of other Purchase Money Indebtedness) not
exceeding $150,000 000 in the aggregate for all such
prepayments and redemptions made pursuant to this
clause (c)  and (d) Equity Clawback Prepayments in respect
of the Bond Notes  provided that at the time of and after
giving effect to any such Equity Clawback Prepayment and any
concurrent prepayment of Loans  no Refinancing Period is in
effect and the aggregate principal amount of outstanding
Loans does not exceed $250 000,000

SECTION 6 12    Amount of Bank Facilities    The
aggregate principal amount of Indebtedness outstanding under
the Bank Credit Documents shall not at any time exceed the
sum of (a) the aggregate amount of revolving credit
commitments under the Bank Credit Agreement on the Effective
Date  minus the aggregate amount of such commitments that
have expired or have been terminated or reduced prior to
such time  (b) the aggregate amount of Bank Loans made as
term loans under the Bank Credit Agreement on the Effective
Date, minus the aggregate amount of such Bank Loans repaid
or prepaid prior to such time  (c) the aggregate amount of
commitments to make Bank Loans to be made as term loans
under the Bank Credit Agreement that are in effect on the
Effective Date but are not drawn on the Effective Date,
minus the aggregate amount of such commitments that have
expired or have been terminated or reduced (without having
been drawn upon) prior to such time and the aggregate amount
of Bank Loans made pursuant to such commitments that have
been repaid or prepaid prior to such time, plus (d) the

118

aggregate amount of additional Bank Loans made under the Bank Credit Agreement prior to such time the proceeds of which were applied to prepay Loans promptly after the borrowing of such Bank Loans  minus the aggregate amount of such Bank Loans that have been repaid or prepaid prior to such time

SECTION 6 13   Use of Collateral   (a)  The Parent and the Borrowers will not permit any asset constituting Collateral to be outside any Borrower's possession or located on any property not owned by a Borrower  except in accordance with this Section

(b)  A Borrower may lease any assets constituting Collateral to, or otherwise allow any such assets to be in the possession of, any other Restricted Subsidiary or any Affiliate of the Parent (or other Person with which the Parent or a Restricted Subsidiary has entered into an agreement to provide management and operating services) that is in the business of operating assets of the type leased to or possessed by it or any customer of any such Restricted Subsidiary or Affiliate (any such Restricted Subsidiary, Affiliate (or other Person) or customer obtaining a lease with respect to or possession of  or other right to use or possess, such assets  an "Equipment User") if (i) in the case of any such Affiliated Equipment User (A) such Affiliated Equipment User has entered into an Equipment User Agreement and (B) all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by either Agent to be filed registered or recorded to perfect (or maintain the perfection of) the Liens created under the applicable Security Agreement with respect to such assets, and to protect the applicable Borrower's ownership interests therein, shall be so filed  registered or recorded or (ii) in the case of any such customer to which has been leased (or which possesses or otherwise uses) Collateral having a Collateral Cost in excess of $50,000 (A) such customer has entered into a written lease agreement for (or other written agreement granting such customer the right to possess or use) such assets and such lease (or other agreement) shall have a term not exceeding three years (subject to renewal rights requiring the consent of the lessor) and otherwise be on terms and conditions no less favorable to the applicable Borrower than those customary for leases of similar assets between unaffiliated parties, (B) the assets leased to (or otherwise possessed or used by) such customer shall be of the type described on Schedule 6 13 and (C) such customer shall have entered into an Equipment User Agreement or the lease agreement (or other agreement) with such customer shall include provisions



119

substantially the same as those that would be included in an
Equipment User Agreement provided that any lease or
transfer of possession of any Collateral contemplated hereby
shall not relieve any Loan Party of any of its respective
obligations under any Loan Document  The foregoing shall
not be construed to prohibit (1) the return of any asset
constituting Collateral to the vendor thereof or another
service provider for repairs  services  modifications or
other similar purposes or (2) the storage of any asset
constituting Collateral in any warehouse or similar
facility

        (c)  It is understood that the Parent and the
Borrowers intend that a portion of the Collateral will be
located and used outside the United States of America,
provided that neither the Parent nor any Borrower will
permit any asset constituting Collateral to be located
outside the United States of America (or to be transferred
between jurisdictions outside the United States of America)
unless (i) the Parent or the applicable Borrower shall have
notified the Lenders thereof reasonably in advance of any
such assets being transferred outside the United States of
America (or between such jurisdictions) and (ii) the
Administrative Agent shall be reasonably satisfied that
(A) the laws of the jurisdiction in which such assets are to
be located adequately protect the interests of the Lenders
in such Collateral  (B) the security interests in such
Collateral granted under the applicable Security Agreement
will continue to be adequately protected and perfected,
(C) there are not any material risks relating to the
political or economic stability of the jurisdiction in which
such Collateral is to be located or the Person that will
possess such Collateral in such jurisdiction, (D) the
portion of the Collateral located in such jurisdiction  and
in all jurisdictions outside the United States of America,
is within acceptable limits and (E) the location of such
Collateral in such jurisdiction is not otherwise materially
disadvantageous to the Lenders  The applicable Borrower
shall deliver to the Lenders, with a copy to the Agents
such legal opinions and other documentation as the
Administrative Agent shall reasonably request in connection
with its consideration or approval of any proposed transfer
of Collateral outside the United States of America or
between jurisdictions outside the United States of America

        (d)  In order to facilitate the use of Collateral
outside the United States of America as contemplated by
paragraph (c) above  a Borrower may sell or otherwise
transfer title to any asset constituting Collateral to any
Foreign Subsidiary that is a Consolidated Group Member
provided that no such asset shall be so sold or transferred

120

unless (i) all the requirements of paragraph (c) above are
satisfied prior to such sale or transfer, (ii) such sale or
transfer is made subject to the security interests granted
under the applicable Security Agreement and (iii) the
applicable Foreign Subsidiary Equipment Owner has entered
into an Equipment Owner Agreement with respect to such asset
and such other documents and agreements as the
Administrative Agent shall reasonably request in order to
confirm, protect and perfect the security interests in such
asset granted under the applicable Security Agreement
After giving effect to any such sale or transfer, the
provisions of this Section shall continue to apply to any
subsequent use (or relinquishment of possession or control)
of the applicable Collateral by the applicable Foreign
Subsidiary Equipment Owner (as though such Foreign
Subsidiary Equipment Owner were named as a Borrower herein)

          (e)   In order to facilitate the use of Collateral
outside the United States of America as contemplated by
paragraph (c) above, as an alternative to the procedure set
forth in paragraph (d) above a Borrower may permit any
Foreign Subsidiary that is a Consolidated Group Member to
acquire directly from Lucent (or any Affiliate of Lucent)
pursuant to the Supply Agreement  any asset that is to
constitute a Financed Foreign Subsidiary Asset, <u>provided</u>
that no such asset shall be so acquired by a Foreign
Subsidiary unless (i) all the requirements of paragraph (c)
above are satisfied prior to such acquisition, (ii) the
applicable Foreign Subsidiary Equipment Owner has entered
into a Foreign Subsidiary Security Agreement and an
Equipment Owner Agreement with respect to such asset and
such other documents and agreements as the Administrative
Agent shall reasonably request in order to confirm  protect
and perfect the security interests in such asset granted
under such Foreign Subsidiary Security Agreement and
(iii) the Designated Borrower shall assume the obligation of
the applicable Foreign Subsidiary Equipment Owner to pay the
Purchase Price of such asset   After giving effect to any
such acquisition, such asset shall constitute "Collateral"
for all purposes hereof and the provisions of this Section
shall continue to apply to any subsequent use (or
relinquishment of possession or control) of the applicable
Collateral by the applicable Foreign Subsidiary Equipment
Owner (as though such Foreign Subsidiary Equipment Owner
were named as a Borrower herein)   If there is more than one
Borrower hereunder, any Foreign Subsidiary Equipment Owner
must enter into separate Foreign Subsidiary Security
Agreements with respect to the Collateral financed by the
respective Borrowers



121

SECTION 6 14    Activities of Borrowers    No
Borrower will engage in any business or activity other than
the acquisition of assets comprising Collateral, the
financing thereof pursuant to this Agreement  the leasing
and disposition thereof to Equipment Users as contemplated
hereby and activities incidental to the foregoing    No
Borrower will incur any liabilities other than its
obligations under the Loan Documents to which it is a party
and liabilities incidental to its existence and permitted
business activities

ARTICLE VII

Events of Default

If any of the following events ("Events of
Default") shall occur

(a)  Any Borrower shall fail duly to pay any
principal of any Loan when due  whether at maturity  by
notice of intention to prepay or otherwise,

(b)  Any Borrower shall fail duly to pay any
interest  fee or any other amount payable under the
Loan Documents within three Business Days after the
same shall be due

(c)  The Loan Parties shall fail duly to observe
or perform any term  covenant  or agreement contained
in Article VI

(d)  The Loan Parties shall fail duly to observe
or perform any other term  covenant or agreement
contained in any Loan Document, and such failure shall
have continued unremedied for a period of 30 days after
written notice is given by the Administrative Agent to
the Borrowers and the Parent,

(e)  Any representation or warranty made or deemed
made by a Loan Party in a Loan Document, or any
statement or representation made in any certificate
report or opinion delivered by or on behalf of a Loan
Party in connection with a Loan Document, shall prove
to have been false or misleading in any material
respect when so made or deemed made,

(f)  A Loan Party or Bank Loan Party shall fail to
pay any Indebtedness (other than obligations hereunder)
in an amount of $25 0 million or more when due and such
failure shall continue after the applicable grace
period, if any  specified in the agreement or

122

instrument evidencing such Indebtedness unless such failure shall have been cured or waived, or a default shall have occurred and be continuing with respect to any such Indebtedness having an aggregate principal amount outstanding of $25 0 million or more and as a result of such default the holder of such Indebtedness shall have accelerated, or shall have the right to accelerate the maturity of such Indebtedness prior to its express maturity,

(g)  An involuntary case or other proceeding shall be commenced against any Loan Party or Bank Loan Party (except as provided below) seeking liquidation, reorganization or other relief with respect to it or its debts under any applicable bankruptcy insolvency reorganization or similar law or seeking the appointment of a custodian receiver, liquidator, assignee trustee sequestrator or similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of more than 60 days, or an order or decree approving or ordering any of the foregoing shall be entered and continued unstayed and in effect

(h)  Any Loan Party or Bank Loan Party (except as provided below) shall commence a voluntary case or proceeding under any applicable bankruptcy insolvency reorganization or similar law or any other case or proceeding to be adjudicated a bankrupt or insolvent or any of them shall consent to the entry of a decree or order for relief in respect of any Loan Party or Bank Loan Party in an involuntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against any of them, or any of them shall file a petition or answer or consent seeking reorganization or relief under any applicable law  or any of them shall consent to the filing of such petition or to the appointment of or taking possession by a custodian  receiver, liquidator, assignee, trustee  sequestrator or simila, official of any Loan Party or Bank Loan Party or any substantial part of their respective property, or any of them shall make an assignment for the benefit of creditors, or any of them shall admit in writing its inability to pay its debts generally as they become due  or any Loan Party or Bank Loan Party shall take corporate action in furtherance of any such action

[DTCORP 1087708 1 44548 06/16/00 5 50p]

123

(1)  One or more judgments against a Loan Party or Bank Loan Party or attachments against its property, which in the aggregate exceed $25 0 million, or the operation or result of which could reasonably be expected to have a Material Adverse Effect, shall be rendered against such Loan Party or Bank Loan Party and there shall be any period of 30 consecutive days during which a stay of such judgment or attachment, by reason of a pending appeal or otherwise  shall not be in effect

(j)  Notice of intent to terminate or amend a Pension Plan shall have been filed with any affected party (as defined in Section 4001 of ERISA), if  after giving effect thereto  the Pension Plan is a plan described in Section 4021(b) of ERISA or notice of an application by the PBGC to institute proceedings to terminate a Pension Plan pursuant to Section 4042 of ERISA shall have been received by any member of the ERISA Group, in each case only if the amount of unfunded benefit liabilities (as defined in Section 4001(a)(18) of ERISA) as of the date such notice is filed or received exceeds $15 0 million  any member of the ERISA Group incurs liability under Sections 4062(e)  4063 or 4064 of ERISA in respect of a Pension Plan in an amount in excess of $15 0 million, an amendment is adopted to a Pension Plan which would require security to be given to such Pension Plan pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA in an amount in excess of $15 0 million  any member of the ERISA Group fails to make a payment to a Pension Plan which would give rise to a Lien in favor of such Plan under Section 302(f) of ERISA in an amount in excess of $15 0 million, or

(k)  any Change of Control shall occur,

then, and in every such event (other than an event with respect to a Borrower or Guarantor described in clause (g) or (h) of this Article)  and at any time thereafter during the continuance of such event  the Administrative Agent may and at the request of the Required Lenders shall  by notice to the Borrowers, take either or both of the following actions, at the same or different times    (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable  together with accrued interest thereon and all fees



124

)

and other obligations of the Borrowers accrued hereunder,
shall become due and payable immediately, without
presentment, demand, protest or other notice of any kind,
all of which are hereby waived by each Borrower  and in case
of any event with respect to any Borrower or Guarantor
described in clause (g) or (h) of this Article, the
Commitments shall automatically terminate and the principal
of the Loans then outstanding  together with accrued
interest thereon and all fees and other obligations of the
Borrowers accrued hereunder, shall automatically become due
and payable, without presentment, demand  protest or other
notice of any kind, all of which are hereby waived by each
Borrower

        The provisions of clauses (g) and (h) of this
Article VII shall not apply to any Bank Loan Party (other
than a Loan Party) that would be permitted to become an
Unrestricted Subsidiary pursuant to Article X without the
occurrence of a Default hereunder after giving effect to
such action  Any such Bank Loan Party shall be deemed
converted to an Unrestricted Subsidiary provided that such
conversion shall be deemed to be an Investment in
Unrestricted Subsidiaries under Section 6 04(b)(xx) as of
the date of such conversion

                    ARTICLE VIII

                    The Agents

        Each of the Lenders hereby irrevocably appoints
each Agent as its agent and authorizes each Agent to take
such actions on its behalf and to exercise such powers as
are delegated to such Agent by the terms of the Loan
Documents, together with such actions and powers as are
reasonably incidental thereto

        Any Person serving as an Agent hereunder shall
have the same rights and powers in its capacity as a Lender
as any other Lender and may exercise the same as though it
were not an Agent, and such Person and its Affiliates may
accept deposits from  lend money to and generally engage in
any kind of business with the Parent or any Subsidiary or
other Affiliate thereof as if it were not an Agent
hereunder

        Neither Agent shall have any duties or obligations
except those expressly set forth in the Loan Documents
Without limiting the generality of the foregoing
(a) neither Agent shall be subject to any fiduciary or other
implied duties  regardless of whether a Default has occurred

125

and is continuing  (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers  except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9 02)  and (c) except as expressly set forth in the Loan Documents  neither Agent shall have any duty to disclose, and shall not be liable for the failure to disclose  any information relating to the Parent or any of its Subsidiaries that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity  Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9 02) or in the absence of its own gross negligence or wilful misconduct  Each Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to such Agent by a Loan Party or a Lender  and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement  warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate  report or other document delivered thereunder or in connection therewith  (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity  enforceability  effectiveness or genuineness of any Loan Document or any other agreement  instrument or document  or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice  request, certificate, consent  statement, instrument  document or other writing believed by it to be genuine and to have been signed or sent by the proper Person  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person  and shall not incur any liability for relying thereon  Each Agent may consult with legal counsel (who may be counsel for the Parent or the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts

126

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent

Subject to the appointment and acceptance of a successor Agent as provided in this paragraph, an Agent may resign at any time by notifying the Lenders and the Borrowers  In addition  the Required Lenders shall have the right to remove the Collateral Agent at any time  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor with the approval of the Borrowers (which approval shall not be unreasonably withheld or delayed and  if an Event of Default has occurred and is continuing, shall not be required, and, in the case of removal of the Collateral Agent, no approval shall be required if the successor is the same Person serving as Administrative Agent or an Affiliate of such Person)   If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation or after the Required Lenders give notice of removal of the Collateral Agent (as applicable), then the retiring Agent may (or  in the case of removal of the Collateral Agent  the Administrative Agent may)  on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York  or an Affiliate of any such bank (or, in the case of a successor Collateral Agent, may be the same Person that is serving as Administrative Agent or an affiliate of such Person)   Upon the acceptance of its appointment as Agent hereunder by a successor  such successor shall succeed to and become vested with all the rights  powers, privileges and duties of the retiring Agent  and the retiring Agent shall be discharged from its duties and obligations hereunder  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor  After an Agent's resignation or removal hereunder, the provisions of this Article and Section 9 03 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent



[NYCORP 1001758 3 44509 06/16/00-1 50p]

127

Each Lender acknowledges that it has, independently and without reliance upon either Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement  Each Lender also acknowledges that it will, independently and without reliance upon either Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate  continue to make its own decisions in taking or not taking action under or based upon this Agreement  any other Loan Document or related agreement or any document furnished hereunder or thereunder

ARTICLE IX

Miscellaneous

SECTION 9 01   Notices   Except in the case of notices and other communications expressly permitted to be given by telephone  all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy  as follows

(a) if to any Borrower or the Parent  to it at The Winstar Building, 685 Third Avenue  9th Floor New York  New York 10017  Attention of Treasurer and General Counsel (Telecopy No  (212) 584-4001)

(b) if to the Collateral Agent  to it at One Wall Street  18th Floor  New York, New York 10286, Attention of Genoveso Caviness, Agency Function Administration (Telecopy No  (212) 635-6365),

(c) if to the Administrative Agent, to it at 600 Mountain Avenue, Murray Hill, New Jersey 07974, Attention of Assistant Treasurer-Project Finance (Telecopy No  (908) 582-3101),

(d) if to Lucent, to it at 600 Mountain Avenue, Murray Hill  New Jersey 07974  Attention of Assistant Treasurer-Project Finance (Telecopy No  (908) 582-3101)  and

(e) if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire

128

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt

    SECTION 9 02  Waivers, Amendments  (a) No failure or delay by either Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power  The rights and remedies of the Agents and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given  Without limiting the generality of the foregoing  the making of a Loan shall not be construed as a waiver of any Default, regardless of whether an Agent or any Lender may have had notice or knowledge of such Default at the time

    (b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except  in the case of this Agreement pursuant to an agreement or agreements in writing entered into by the Parent  the Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the applicable Agent and the Loan Party or Loan Parties that are parties thereto with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest on such Loan, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan or any interest thereon, or any fees payable hereunder, or reduce the amount of  waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2 16(b), (c) or (d) in a manner that would alter the pro rata sharing of payments required

129

thereby, without the written consent of each Lender,
(v) change any of the provisions of this Section or the
definition of "Required Lenders" or any other provision of
any Loan Document specifying the number or percentage of
Lenders required to waive, amend or modify any rights
thereunder or make any determination or grant any consent
thereunder without the written consent of each Lender,
(vi) release all or any substantial part of the Collateral
or any Capital Stock pledged under the Pledge Agreement from
the Liens of the Security Documents (except as expressly
provided in the Security Documents), without the written
consent of each Lender (vii) release any Guarantor from its
Guarantee under the Guarantee Agreement (except as expressly
provided in the Guarantee Agreement) or limit or condition
its obligations thereunder, without the written consent of
each Lender or (viii) amend modify or otherwise affect any
of Lucent's rights under Section 2 18 or 2 19 or the
Conversion Agreement without the written consent of Lucent
provided further that no such agreement shall amend, modify
or otherwise affect the rights or duties of either Agent
without the prior written consent of such Agent

SECTION 9 03   Expenses, Indemnity, Damage Waiver
(a)  The Borrowers shall pay (1) all costs and expenses
reasonably incurred by Lucent and each Agent, including the
fees, charges and disbursements of one firm of counsel in
each jurisdiction for each of Lucent or the Agents, in
connection with the negotiation preparation execution and
delivery of the Loan Documents  (ii) all costs and expenses
reasonably incurred by Lucent  including the fees, charges
and disbursements of counsel for Lucent, in connection with
the issuance, offering or sale of any Conversion Notes and
(iii) all reasonable costs and expenses incurred by either
Agent or any Lender  including the fees, charges and
disbursements of counsel for either Agent or any Lender, in
connection with (A) the enforcement or protection of its
rights in connection with the Loan Documents  including its
rights under this Section, or in connection with the Loans
made hereunder  including all such costs and expenses
incurred during any workout, restructuring or negotiations
in respect of such Loans, and (B) in the case of Lucent and
the Agents  the administration of, and any amendments,
modifications  waivers or supplements or to the
provisions of, any of the Loan Documents, provided that the
obligations of the Borrowers hereunder with respect to
payment of fees  charges and disbursements of counsel will
be limited to (A) Cravath, Swaine & Moore, special counsel
to Lucent and the Administrative Agent (or such other single
firm acting in such capacity from time to time)  (B)
Sullivan & Cromwell  special counsel to the Collateral Agent
(or such other single firm acting in such capacity from time

130

to time), (C) one other firm of counsel to the Agents and the Lenders in each jurisdiction and (D) if necessary, special counsel to the Agents and the Lenders in such areas as telecommunications regulations

(b)    The Borrowers shall indemnify each Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee incurred by or asserted against any Indemnitee arising out of in connection with or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby (ii) any Loan or the use of the proceeds therefrom (iii) any actual or alleged presence or release of any Hazardous Substance on or from any property owned or operated by the Parent or any of its Subsidiaries or at which any Collateral is located, or any Environmental Claim related in any way to the Parent or any of its Subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing whether based on contract tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not as to any Indemnitee be available to the extent that such losses claims damages liabilities or related expenses have resulted from the gross negligence or wilful misconduct of such Indemnitee

(c)    To the extent that any Borrower fails to pay any amount required to be paid by it to either Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to such Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount provided that the unreimbursed expense or indemnified loss claim damage, liability or related expense as the case may be, was incurred by or asserted against such Agent in its capacity as such For purposes hereof a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and Commitments at the time

(d)    To the extent permitted by applicable law neither the Parent nor any Borrower shall assert and each of them hereby waives any claim against any Indemnitee, on

[CYCORP 1067788 1 44590 05/14/00 5 50p]

131

any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof

(e)  All amounts due under this Section shall be payable not later than 30 days after written demand therefor

SECTION 9 04   Successors and Assigns    (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder (other than as expressly contemplated by Section 2 20) without the prior written consent of each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void)   Nothing in this Agreement, expressed or implied shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and  to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right   remedy or claim under or by reason of this Agreement, provided that Section 2 22 is for the benefit of the Bank Lenders as provided therein

(b)  Any Lender may  without the consent of the Parent or any Borrower (except as expressly provided below) assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), provided that (1) except in the case of an assignment to Lucent or a Lender or to an Affiliate of Lucent or a Lender  the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed and, while an Event of Default has occurred and is continuing, shall not be required), (11) except in the case of an assignment to Lucent or an Affiliate of Lucent or an assignment during a Refinancing Period or while an Event of Default has occurred and is continuing or an Exempt Assignment or an assignment to a Bank Lender or Bank Lenders contemplated by Section 2 22 (but subject to clause (2) below), the Borrowers must give their prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (111) except in the case of an assignment to Lucent  a Lender or an Affiliate of Lucent or a Lender or an assignment of the entire remaining amount of the assigning



132

Lender's Commitment or its entire remaining Loans or an
assignment to a Bank Lender or Bank Lenders contemplated by
Section 2 22, the amount of the Commitment and Loans of the
assigning Lender subject to each such assignment (determined
as of the date the Assignment and Acceptance with respect to
such assignment is delivered to the Administrative Agent)
shall not be less than $10 000 000 unless the Borrowers
otherwise consent, (iv) each partial assignment shall be
made as an assignment of a proportionate part of all the
assigning Lender's rights and obligations under this
Agreement, except that this clause (iv) shall not be
construed to prohibit the assignment of a proportionate part
of all of the assigning Lender's rights and obligations in
respect of (A) Loans separately from (or without assigning)
Commitments (B) Commitments separately from (or without
assigning) Loans or (C) Loans to one Borrower separately
from (or without assigning) Loans to another Borrower,
(v) the parties to each assignment shall execute and deliver
to the Administrative Agent an Assignment and Acceptance
together with a processing fee of $3 500 and (vi) the
assignee, if it shall not be a Lender shall deliver to the
Administrative Agent an Administrative Questionnaire,
<u>provided further</u> that (1) a Fronting Commitment may be
assigned without regard to compliance with clause (iii)
above and without payment of the fee referred to in
clause (v) above and (2) notwithstanding the exceptions to
clause (ii) above if an assignment would result in the
total number of Lenders exceeding 14 (with all affiliated
Lenders being treated as a single Lender for this purpose)
such assignment shall require the prior written consent of
the Borrowers unless such assignment is made during a
Refinancing Period or while an Event of Default has occurred
and is continuing except that this clause (2) shall not
apply to any assignment pursuant to Section 2 22, and any
Person that becomes a Lender pursuant to an assignment
pursuant to Section 2 22 (and any assignee of any such
Person) shall be deemed not to be a Lender for purposes of
the limitation set forth in this clause (2)   Subject to
acceptance and recording thereof pursuant to paragraph (d)
of this Section  from and after the effective date specified
in each Assignment and Acceptance the assignee thereunder
shall be a party hereto and, to the extent of the interest
assigned by such Assignment and Acceptance, have the rights
and obligations of a Lender under this Agreement, and the
assigning Lender thereunder shall, to the extent of the
interest assigned by such Assignment and Acceptance be
released from its obligations under this Agreement (and in
the case of an Assignment and Acceptance covering all of the
assigning Lender's rights and obligations under this
Agreement, such Lender shall cease to be a party hereto but
shall continue to be entitled to the benefits of

133

Sections 2 13, 2 14, 2 15 and 9 03)   Any assignment or
transfer by a Lender of rights or obligations under this
Agreement that does not comply with this paragraph shall be
treated for purposes of this Agreement as a sale by such
Lender of a participation in such rights and obligations in
accordance with paragraph (e) of this Section

          (c)   The Administrative Agent  acting for this
purpose as an agent of the Borrowers, shall maintain at one
of its offices a copy of each Assignment and Acceptance
delivered to it and a register for the recordation of the
names and addresses of the Lenders  and the Commitments of
and principal amount of the Loans owing to  each Lender
pursuant to the terms hereof from time to time (the
"Register")   The entries in the Register shall be
conclusive  and the Borrowers, the Agents and the Lenders
may treat each Person whose name is recorded in the Register
pursuant to the terms hereof as a Lender hereunder for all
purposes of this Agreement  notwithstanding notice to the
contrary   The Register shall be available for inspection by
the Borrowers and any Lender  at any reasonable time and
from time to time upon reasonable prior notice

          (d)   Upon its receipt of a duly completed
Assignment and Acceptance executed by an assigning Lender
and an assignee, the assignee's completed Administrative
Questionnaire (unless the assignee shall already be a Lender
hereunder) and the processing fee referred to in clause (v)
of paragraph (b) of this Section  subject to the
Administrative Agent s right to consent to such assignment
to the extent provided in paragraph (b) of this Section  the
Administrative Agent shall accept such Assignment and
Acceptance and record the information contained therein in
the Register   No assignment shall be effective for purposes
of this Agreement unless it has been recorded in the
Register as provided in this paragraph

          (e)   Any Lender may, without the consent of the
Parent, any Borrower or the Administrative Agent  sell
participations to one or more banks or other entities (a
"Participant") in all or a portion of such Lender's rights
and obligations under this Agreement (including all or a
portion of its Commitments and the Loans owing to it)
provided that (i) such Lender's obligations under this
Agreement shall remain unchanged, (ii) such Lender shall
remain solely responsible to the other parties hereto for
the performance of such obligations and (iii) the Borrowers
the Agents and the other Lenders shall continue to deal
solely and directly with such Lender in connection with such
Lender's rights and obligations under this Agreement   Any
agreement or instrument pursuant to which a Lender sells



134

such a participation shall provide that such Lender shall
retain the sole right to enforce the Loan Documents and to
approve any amendment, modification or waiver of any
provision of the Loan Documents, _provided_ that such
agreement or instrument may provide that such Lender will
not, without the consent of the Participant agree to any
amendment, modification or waiver described in the first
proviso to Section 9 02(b) that affects such Participant
Subject to paragraph (f) of this Section, each Borrower
agrees that each Participant shall be entitled to the
benefits of Sections 2 13  2 14 and 2 15 to the same extent
as if it were a Lender and had acquired its interest by
assignment pursuant to paragraph (b) of this Section  To
the extent permitted by law, each Participant also shall be
entitled to the benefits of Section 9 08 as though it were a
Lender  provided such Participant agrees to be subject to
Section 2 16(d) as though it were a Lender

        (f)  A Participant shall not be entitled to the
benefits of Section 2 15 unless the Borrowers are notified
of the participation sold to such Participant and such
Participant agrees  for the benefit of the Borrowers, to
comply with Sections 2 15(e) and (f) as though it were a
Lender

        (g)  Any Lender may at any time pledge or assign a
security interest in all or any portion of its rights under
this Agreement to secure obligations of such Lender,
including any pledge or assignment to secure obligations to
a Federal Reserve Bank  and this Section shall not apply to
any such pledge or assignment of a security interest,
_provided_ that no such pledge or assignment of a security
interest shall release a Lender from any of its obligations
hereunder or substitute any such pledgee or assignee for
such Lender as a party hereto

        SECTION 9 05  _Survival_  All covenants,
agreements  representations and warranties made by the Loan
Parties in the Loan Documents and in the certificates or
other instruments delivered in connection with or pursuant
to this Agreement or any other Loan Document shall be
considered to have been relied upon by the other parties
hereto and shall survive the execution and delivery of the
Loan Documents and the making of any Loans  regardless of
any investigation made by any such other party or on its
behalf and notwithstanding that either Agent or any Lender
may have had notice or knowledge of any Default or incorrect
representation or warranty at the time any credit is
extended hereunder, and shall continue in full force and
effect as long as the principal of or any accrued interest
on any Loan or any fee or any other amount payable under

135

this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated    The provisions of Sections 2 13, 2 14, 2 15 and 9 03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans  the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof

SECTION 9 06    Counterparts, Integration, Effectiveness    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract    This Agreement, the other Loan Documents and any separate letter agreements with respect to the agreement of the Parent and the Borrowers to cooperate with Lucent with respect to marketing, selling or syndicating Loans and Commitments or with respect to fees payable to Lucent or either Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof    Except as provided in Section 4 01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which  when taken together  bear the signatures of each of the other parties hereto  and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns    Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement

SECTION 9 07    Severability    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall  as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof  and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction

136

1

SECTION 9 08    <u>Right of Setoff</u>    If an Event of
Default shall have occurred and be continuing, each Lender
and each of its Affiliates is hereby authorized at any time
and from time to time, to the fullest extent permitted by
law, to set off and apply any and all deposits (general or
special, time or demand provisional or final) at any time
held and other obligations at any time owing by such Lender
or Affiliate to or for the credit or the account of any
Borrower against any of and all the obligations of any
Borrower now or hereafter existing under this Agreement held
by such Lender, irrespective of whether or not such Lender
shall have made any demand under this Agreement and although
such obligations may be unmatured   The rights of each
Lender under this Section are in addition to other rights
and remedies (including other rights of setoff) which such
Lender may have

SECTION 9 09    <u>Governing Law, Jurisdiction,</u>
<u>Consent to Service of Process</u>   (a)  This Agreement shall be
construed in accordance with and governed by the law of the
State of New York

(b)  Each of the Parent and the Borrowers hereby
irrevocably and unconditionally submits  for itself and its
property, to the nonexclusive jurisdiction of the Supreme
Court of the State of New York sitting in New York County
and of the United States District Court of the Southern
District of New York, and any appellate court from any
thereof, in any action or proceeding arising out of or
relating to any Loan Document  or for recognition or
enforcement of any judgment  and each of the parties hereto
hereby irrevocably and unconditionally agrees that all
claims in respect of any such action or proceeding may be
heard and determined in such New York State or, to the
extent permitted by law, in such Federal court   Each of the
parties hereto agrees that a final judgment in any such
action or proceeding shall be conclusive and may be enforced
in other jurisdictions by suit on the judgment or in any
other manner provided by law   Nothing in this Agreement or
any other Loan Document shall affect any right that either
Agent or any Lender may otherwise have to bring any action
or proceeding relating to this Agreement or any other Loan
Document against the Parent  any Borrower or their
properties in the courts of any jurisdiction

(c)  Each of the Parent and the Borrowers hereby
irrevocably and unconditionally waives  to the fullest
extent it may legally and effectively do so  any objection
which it may now or hereafter have to the laying of venue of
any suit, action or proceeding arising out of or relating to
this Agreement or any other Loan Document in any court



[NYCORP 1089788 1 44563 06/14/00-5 50p]

137

referred to in paragraph (b) of this Section   Each of the
parties hereto hereby irrevocably waives, to the fullest
extent permitted by law  the defense of an inconvenient
forum to the maintenance of such action or proceeding in any
such court

      (d)   Each party to this Agreement irrevocably
consents to service of process in the manner provided for
notices in Section 9 01   Nothing in this Agreement or any
other Loan Document will affect the right of any party to
this Agreement to serve process in any other manner
permitted by law

      SECTION 9 10   <u>WAIVER OF JURY TRIAL</u>   EACH PARTY
HERETO HEREBY WAIVES  TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW  ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN
ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF
OR RELATING TO THIS AGREEMENT  ANY OTHER LOAN DOCUMENT OR
THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON
CONTRACT, TORT OR ANY OTHER THEORY)   EACH PARTY HERETO
(A) CERTIFIES THAT NO REPRESENTATIVE  AGENT OR ATTORNEY OF
ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE,
THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION
SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES
THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO
ENTER INTO THIS AGREEMENT BY  AMONG OTHER THINGS  THE MUTUAL
WAIVERS AND CERTIFICATIONS IN THIS SECTION

      SECTION 9 11   <u>Headings</u>   Article and Section
headings and the Table of Contents used herein are for
convenience of reference only  are not part of this
Agreement and shall not affect the construction of  or be
taken into consideration in interpreting  this Agreement

      SECTION 9 12   <u>Confidentiality</u>   Each of the
Agents and the Lenders agrees to maintain the
confidentiality of the Information (as defined below),
except that Information may be disclosed (a) to its and its
Affiliates' directors, officers, employees and agents
including accountants, legal counsel and other advisors (it
being understood that the Persons to whom such disclosure is
made will be informed of the confidential nature of such
Information and instructed to keep such Information
confidential), (b) to the extent requested by any regulatory
authority  (c) to the extent required by applicable laws or
regulations or by any subpoena or similar legal process,
(d)  to any other party to this Agreement, (e) in connection
with the exercise of any remedies hereunder or any suit,
action or proceeding relating to this Agreement or any other
Loan Document or the enforcement of rights hereunder or
thereunder  (f) subject to an agreement containing

138

provisions substantially the same as those of this Section,
to any assignee of or Participant in, or any prospective
assignee of or Participant in, any of its rights or
obligations under this Agreement, (g) with the consent of
the Parent or any Borrower or (h) to the extent such
Information (i) becomes publicly available other than as a
result of a breach of this Section or (ii) becomes available
to either Agent or any Lender on a nonconfidential basis
from a source other than the Parent or any Borrower    For
the purposes of this Section   "Information" means all
information received from the Parent or any Borrower
relating to the Parent   any Borrower or their businesses,
other than any such information that is publicly available
or available to either Agent or any Lender on a
nonconfidential basis prior to disclosure by the Parent or
any Borrower  provided that such information is identified
at the time of delivery as confidential    Any Person
required to maintain the confidentiality of Information as
provided in this Section shall be considered to have
complied with its obligation to do so if such Person has
exercised the same degree of care to maintain the
confidentiality of such Information as such Person would
accord to its own confidential information

    SECTION 9 13    Interest Rate Limitation
Notwithstanding anything herein to the contrary  if at any
time the interest rate applicable to any Loan  together with
all fees  charges and other amounts which are treated as
interest on such Loan under applicable law (collectively the
"Charges"), shall exceed the maximum lawful rate (the
"Maximum Rate") which may be contracted for  charged  taken,
received or reserved by the Lender holding such Loan in
accordance with applicable law  the rate of interest payable
in respect of such Loan hereunder, together with all  Charges
payable in respect thereof, shall be limited to the Maximum
Rate and, to the extent lawful, the interest and Charges
that would have been payable in respect of such Loan but
were not payable as a result of the operation of this
Section shall be cumulated and the interest and Charges
payable to such Lender in respect of other Loans or periods
shall be increased (but not above the Maximum Rate therefor)
until such cumulated amount  together with interest thereon
at the Federal Funds Effective Rate to the date of
repayment, shall have been received by such Lender



[NYCORP 1087700 3 44530 06/14/00-4 50p]

139

# ARTICLE X

## Subsidiaries

SECTION 10 01    Restricted Subsidiaries    (a)    On the Effective Date, Restricted Subsidiaries shall consist of the Subsidiaries listed as Restricted Subsidiaries on Schedule 3 02

(b)    Upon the occurrence of the last of all of the following events with respect to a Subsidiary such Subsidiary shall become a Restricted Subsidiary    (i) the Subsidiary is or becomes a Subsidiary of the Bank Borrower and 80% or more of the Capital Stock and Voting Stock of the Subsidiary is owned through Restricted Subsidiaries, by the Bank Borrower    (ii) the Subsidiary Guarantees the Bank Loans, (iii) the Subsidiary pledges a substantial majority of its assets to secure the Bank Loans, (iv) all of the Capital Stock of the Subsidiary owned by the Bank Borrower and Restricted Subsidiaries is pledged to secure the Bank Loans and (v) notice of the foregoing shall have been received by the Administrative Agent

(c)    Upon the occurrence of the last of all of the following events with respect to a Subsidiary organized under laws of a jurisdiction outside the United States    such Subsidiary shall become a Restricted Subsidiary    (i) the Subsidiary is or becomes a Wholly Owned Subsidiary of the Bank Borrower, (ii) the Subsidiary Guarantees the Bank Loans    to the extent legally permissible    or except as reasonably determined by the Bank Agent to be impractical (iii) the Subsidiary pledges substantially all of its assets to secure the Bank Loans to the extent legally permissible, except as reasonably determined by the Bank Agent to be impractical, (iv) all of the Capital Stock and Voting Stock of the Subsidiary is pledged to secure the Bank Loans to the extent legally permissible, except as reasonably determined by the Bank Agent to be impractical    and (v) notice of the foregoing shall have been received by the Administrative Agent    provided that if any of the actions set forth in (ii), (iii) or (iv) above are not legally permissible or are reasonably determined by the Bank Agent to be impractical but become legally permissible or are reasonably determined by the Bank Agent not to be impractical at any time after the date hereof    such Subsidiary shall take such actions if requested by the Bank Agent within 30 days of such request

(d) (i)    Upon the occurrence of any of the following events, a Restricted Subsidiary (the "Converting Restricted Subsidiary") shall automatically and without further action by any Person cease to be a Restricted Subsidiary    (A) at least 80% of the Capital Stock and

Voting Stock of the Converting Restricted Subsidiary ceases to be owned directly or indirectly through Restricted Subsidiaries, by the Bank Borrower   (B) the Guarantee, if any of the Converting Restricted Subsidiary of the Bank Loans is released involuntarily in whole or part or otherwise becomes unenforceable in any material respect or (C) the assets of the Converting Restricted Subsidiary pledged to secure the Bank Loans, if any, are released involuntarily in whole or part, or the Lien if any, in favor of the Bank Lenders on any material portion of the Bank Collateral contemplated under the Bank Credit Documents is unenforceable or ineffective, except as otherwise permitted thereunder, (D) for a Converting Restricted Subsidiary organized under the laws of the United States less than all of the Capital Stock of the Converting Restricted Subsidiary owned by the Bank Borrower and Restricted Subsidiaries remains pledged to secure the Bank Loans, (E) for a Converting Restricted Subsidiary organized under the laws of a jurisdiction outside the United States, Capital Stock and Voting Stock constituting less than (1) the lesser of the Capital Stock and Voting Stock owned by the Bank Borrower and Restricted Subsidiaries or (2) 66% of the Capital Stock and Voting Stock of the Converting Restricted Subsidiary remains pledged to secure the Bank Loans or (F) the Converting Restricted Subsidiary ceases to be a Wholly Owned Subsidiary of the Bank Borrower and (1) is not a guarantor under the Bank Credit Documents or (2) has not pledged a substantial majority of its assets to secure the Bank Loans  provided further  that Temporary Restricted Subsidiaries are not subject to this paragraph (d) provided, moreover  that a conversion under this paragraph is deemed to be an Investment in Principal Subsidiaries under Section 6 04(b)(xix) as of the date of such conversion whether or not such an Investment is permitted pursuant to that Section

(ii)  Upon the occurrence of any of the events specified in Section 10 01(d)(1)  a Converting Restricted Subsidiary shall automatically and without further action by any Person become   (A) a Principal Subsidiary if it meets the requirements set forth in Sections 10 02(b) or (c), (B) a Designated Foreign Subsidiary if it meets the requirements set forth in Section 10 03(b) or (c)  or (C) an Unrestricted Subsidiary if it does not meet any of the requirements set forth in the preceding clauses (A) and (B)

(e)  Subject to the provisions of Section 6 04(b)(xix), upon the occurrence of the last of all of the following events, a Restricted Subsidiary shall become a Principal Subsidiary voluntarily   (1) the Restricted

141

Subsidiary is designated a Principal Subsidiary by the Board of Directors of the Parent and (ii) notice of the foregoing shall have been received by the Administrative Agent    Upon conversion to a Principal Subsidiary pursuant to this paragraph (e)  provided that no default under the Bank Loan Agreement exists, the Bank Agent shall promptly release the assets of the Subsidiary and any Capital Stock of the Subsidiary not owned by the Bank Borrower or any Restricted Subsidiary from the Lien of the Bank Credit Documents and release such Principal Subsidiary from its Guarantee of the Bank Loans

(f)  Subject to the provisions of Article VI, upon the occurrence of the last of the following events, a Restricted Subsidiary shall become an Unrestricted Subsidiary voluntarily   (i) the Restricted Subsidiary is designated as an Unrestricted Subsidiary by the Board of Directors of the Parent  and (ii) notice of the foregoing shall have been received by the Administrative Agent    Upon conversion to an Unrestricted Subsidiary  provided that no default under the Bank Credit Agreement exists, the Bank Agent shall promptly release the assets of the Unrestricted Subsidiary and the Capital Stock of the Unrestricted Subsidiary from the Lien of the Bank Credit Documents and release such Unrestricted Subsidiary from its Guarantee of the Bank Loans

SECTION 10 02  Principal Subsidiaries   (a)  On the Effective Date  Principal Subsidiaries shall consist of the Subsidiaries listed as Principal Subsidiaries on Schedule 3 02

(b)  Subject to the provisions of Section 6 04(b)(xix)  upon the occurrence of the last of each of the following events with respect to a Subsidiary organized under the laws of any jurisdiction within the United States or any state thereof, such Subsidiary shall become a Principal Subsidiary   (i) all of the Voting Stock of the Subsidiary owned by the Bank Borrower or Restricted Subsidiaries is pledged to secure the Bank Loans and (ii) notice thereof shall have been received by the Administrative Agent

(c)  Subject to the provisions of Section 6 04(b)(xix)  upon the occurrence of the last of each of the following events with respect to a Subsidiary organized under the laws of a jurisdiction outside the United States, such Subsidiary shall become a Principal Subsidiary (i) the lesser of the Voting Stock owned by the Bank Borrower or Restricted Subsidiaries or 66% of the Voting Stock of the Subsidiary is pledged to secure the Bank Loans

142

to the extent legally permissible except as determined by
the Bank Agent to be impractical and (ii) notice of the
foregoing shall have been received by the Administrative
Agent

(d)  Subject to the provisions of Section
6 04(b)(xx), upon the occurrence of the later of each of the
following events a Principal Subsidiary shall become an
Unrestricted Subsidiary voluntarily  (i) the Principal
Subsidiary is designated as an Unrestricted Subsidiary by
the Board of Directors of the Parent and (ii) notice of the
foregoing shall have been received by the Administrative
Agent   Upon conversion to a Unrestricted Subsidiary in the
case of clause (i), provided that no default under the Bank
Credit Agreement exists, the Bank Agent shall release the
Capital Stock of such Unrestricted Subsidiary from the Lien
of the Bank Credit Documents

(e)  Upon the occurrence of any of the following
events a Principal Subsidiary shall automatically and
without further action by any Person become an Unrestricted
Subsidiary   (i) all of the Voting Stock of the Principal
Subsidiary owned by the Bank Borrower or Restricted
Subsidiaries is not pledged to secure the Bank Loans to the
extent legally permissible, except as determined by the Bank
Agent to be impractical  (ii) the pledge of the Capital
Stock of the Principal Subsidiary is not enforceable or
(iii) a conversion of the Principal Subsidiary to an
Unrestricted Subsidiary pursuant to Article VIII  provided
that a conversion under this paragraph is deemed to be an
Investment in Unrestricted Subsidiaries under Section
6 04(b)(xx) as of the date of such conversion whether or not
such an Investment is permitted pursuant to that Section

SECTION 10 03   Designated Foreign Subsidiaries
(a)  On the Effective Date  Designated Foreign Subsidiaries
shall consist of the Subsidiaries listed as Designated
Foreign Subsidiaries on Schedule 3 02

(b)  Upon the occurrence of the last of each of
the following events with respect to a Subsidiary organized
under the laws of a jurisdiction outside the United States,
such Subsidiary shall become a Designated Foreign
Subsidiary   (i) the Subsidiary becomes a Wholly Owned
Subsidiary of the Bank Borrower, (ii) the Subsidiary is
designated as Designated Foreign Subsidiary by the Board of
Directors of the Parent, (iii) none of the Capital Stock of
the Subsidiary is pledged as collateral to any Person other
than a Consolidated Group Member, and (iv) notice of the
foregoing shall have been received by the Administrative
Agent



143

(c)  Upon the occurrence of any of the following events, a Designated Foreign Subsidiary shall automatically and without further action by any Person become an Unrestricted Subsidiary  (i) the Designated Foreign Subsidiary shall cease to be a Wholly Owned Subsidiary of the Bank Borrower  (ii) any of the Capital Stock of the Subsidiary is pledged as collateral to any Person other than a Consolidated Group Member or the Bank Lenders or Bank L/C Issuer or (iii) a conversion of the Designated Foreign Subsidiary to an Unrestricted Subsidiary pursuant to Article VIII  provided that a conversion under this paragraph is deemed to be an Investment in Unrestricted Subsidiaries under Section 6 04(b)(xx) as of the date of such conversion whether or not such Investment is permitted pursuant to that Section

(d)  Subject to the provisions of Section 6 04(b)(xx), upon the occurrence of the last to occur of the following events, a Designated Foreign Subsidiary shall become an Unrestricted Subsidiary voluntarily  (i) the Designated Foreign Subsidiary is designated as an Unrestricted Subsidiary by the Board of Directors of the Parent and (ii) notice of the foregoing shall have been received by the Administrative Agent

SECTION 10 04   Temporary Restricted Subsidiaries  On the Effective Date  Temporary Restricted Subsidiaries shall consist of Subsidiaries which are listed as Temporary Restricted Subsidiaries on Schedule 3 02 all of whose Voting Stock is pledged to secure the Bank Loans under the Bank Credit Documents but which Subsidiaries have not otherwise Guaranteed the Bank Loans or pledged all of their assets to secure the Bank Loans under the Bank Credit Documents

SECTION 10 05   Administrative Agent Duties    The Administrative Agent shall keep a register of Restricted Subsidiaries  Temporary Restricted Subsidiaries, Principal Subsidiaries and Designated Foreign Subsidiaries under this Agreement

SECTION 10 06   Additional Subsidiaries.  If any additional Subsidiary of the Bank Borrower is formed or acquired after the Effective Date, the Parent will notify the Administrative Agent and the Lenders thereof and such Subsidiary shall be deemed an Unrestricted Subsidiary until such time as the Subsidiary becomes a Restricted Subsidiary, Principal Subsidiary or Designated Foreign Subsidiary pursuant to this Article X

144

SECTION 10 07   Designation of Subsidiaries Under
Bank Credit Agreement   The Parent shall take such action as
necessary in order that each Subsidiary of the Bank Borrower
has the same classification hereunder and under the
analogous provisions of the Bank Credit Agreement

SECTION 10 08   Conversions Upon Prepayment   In
accordance with other provisions of this Article X, at the
time of, or substantially simultaneously with, a Borrower
becoming a Released Borrower, such Released Borrower shall
become a Restricted Subsidiary and each Subsidiary, if any
of the Released Borrower shall be designated by the Bank
Borrower as a Restricted Subsidiary, Principal Subsidiary or
Designated Foreign Subsidiary (or, failing any such
designation, shall be deemed designated an Unrestricted
Subsidiary), provided that (a) no more than 10% of the
assets financed by any Loans to such Released Borrower shall
be owned by Subsidiaries  if any  of such Released Borrower
that remain Unrestricted Subsidiaries and (b) no more than
20% of the assets financed by any Loans to such Released
Borrower shall be owned by Subsidiaries, if any, of the
Released Borrower that are or become Principal Subsidiaries
or Designated Foreign Subsidiaries except  in the case of
either clause (a) or (b) above, as may be otherwise
permitted under this Agreement   Any designation of a
Subsidiary of a Released Borrower under this Section 10 08
shall not be deemed an Investment under Section 6 04   The
calculations under this Section 10 08 for the determination
of the percentage of assets owned by a Person shall be based
on the purchase price of the assets and other costs directly
attributable or allocable to the acquisition of such assets

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written

WVF-I LLC,

by
/s/ Frederic E Rubin
Name  Frederic E  Rubin
Title Vice-President,
        Treasurer

WINSTAR COMMUNICATIONS, INC ,

by
/s/  Frederic E  Rubin
Name  Frederic E  Rubin
Title Senior Vice President
        Treasurer

THE BANK OF NEW YORK  as
Collateral Agent,

by
/s/  Brendan T  Nedzi
Name  Brendan T  Nedzi
Title Senior Vice President

LUCENT TECHNOLOGIES INC ,
individually and as
Administrative Agent,

by
/s/  Peter M  Sperling
Name  Peter M  Sperling
Title Director, Credit

Schedule 2 01

Commitments

Lender

Lucent Technologies Inc

Commitment
Amount

$2,000,000,000

Schedule 3 02 – Subsidiaries

| Restricted Subs | Jurisdiction of Organization | Authorized Capital | Issued Capital |
|---|---|---|---|
| WCI Capital Corp | Delaware | 200 common | 100 shares held by Winstar Communications Inc |
| Winstar Wireless, Inc | Delaware | 200 common | 90 shares held by Winstar Communications Inc |
| Winstar AVR SPE, LLC | Delaware | n/a | Winstar Wireless Inc. is sole member |
| Winstar AVR Account Party LLC | Delaware | n/a | Winstar AVR SPE, LLC is sole member |
| Winstar Broadband Acquisition 1999 LLC | Delaware | n/a | Winstar Wireless, Inc. is sole member |
| Winstar Government Solutions LLC | Delaware | n/a | Winstar Wireless Inc is sole member |
| Winstar Mudcom Acquisition Corp | Delaware | 200 common | 100 shares held by Winstar Wireless Inc |
| Winstar Network Expansion, LLC | Delaware | n/a | Winstar Wireless, Inc. is sole member |
| WWI License Holding, Inc | Delaware | 200 common | 100 held by Winstar Wireless Inc |
| Winstar Equipment Corp | Delaware | 200 common, | 100 shares held by WCI Capital Corp |
| Winstar Equipment II Corp | Delaware | 200 common | 100 shares held by WCI Capital Corp |
| Winstar Wireless Fiber Corp | Delaware | 200 common | 100 shares held by WCI Capital Corp |
| Winstar LMDS, LLC | Delaware | n/a | Winstar Wireless Fiber Corp. is sole member |
| Winstar Credit Corp | Delaware | 200 common | 100 shares held by WCI Capital Corp |
| Winstar Switch Acquisition Corp | Delaware | 200 common | 100 shares held by WCI Capital Corp |
| Winstar New Media Company Inc | Delaware | 25 0 million common / 1 million preferred | 17,484 371 common shares held by WCI Capital Corp   1 0 million common shares held by non affiliates |
| Winstar Interactive Media Sales Inc. | Delaware | 3,000 common | 100 shares held by Winstar New Media Company, Inc |
| Winstar EasyNet Inc | Delaware | 1 000 common | 500 shares held by Winstar New Media Company, Inc |
| Winstar Interactive Ventures I Inc | Delaware | 200 common | 100 shares held by Winstar New Media Company Inc |
| Winstar Global Media, Inc | New York | 200 common | 100 shares held by Winstar New Media Company, Inc |
| Winstar Radio Networks Inc | Delaware | 200 common | 100 shares held by Winstar New Media Company Inc |
| Walt Baby Love Productions, Inc | California | 100,000 common | 100 shares held by Winstar Radio Networks, Inc |
| Non Fiction Films Inc | Delaware | 200 common | 90 shares held by Winstar New Media Company, Inc |
| FoxLauder Associates, Inc | New York | 5 0 million common | 100 shares held by Non Fiction Films Inc |
| Wellspring Media, Inc | Delaware | 40 000 common / 15 000 class A common / 12,000 preferred | 100 shares held by Winstar New Media Company, Inc |
| Winstar Broadcasting Corp | Delaware | 200 common | 100 shares held by Winstar New Media Company Inc |
| Sportsin Radio Network Inc | Delaware | 1 000 common | 500 shares held by Winstar New Media Company, Inc |

2

| Temporary Rest. Subs | Jurisdiction of Organization | Authorized Capital | Issued Capital |
|---|---|---|---|
| Winstar Wireless of Delaware LLC | Delaware | n/a | Winstar Wireless Inc is sole member |
| Winstar Wireless of Georgia LLC | Delaware | n/a | Winstar Wireless Inc is sole member |
| Winstar Wireless of Indiana LLC | Delaware | n/a | Winstar Wireless Inc is sole member |
| Winstar Wireless of New Jersey LLC | Delaware | n/a | Winstar Wireless Inc is sole member |
| Winstar Wireless of New York LLC | Delaware | n/a | Winstar Wireless, Inc is sole member |
| Winstar Wireless of Pennsylvania, LLC | Delaware | n/a | Winstar Wireless, Inc is sole member |
| Winstar Wireless of Virginia, LLC | Virginia | n/a | Winstar Wireless, Inc is sole member |
| Winstar Wireless of West Virginia, LLC | Delaware | n/a | Winstar Wireless, Inc is sole member |

| Unrestricted Subs | Jurisdiction of Organization | Authorized Capital | Issued Capital |
|---|---|---|---|
| Winstar for Business, Inc | Delaware | | |
| Office com, Inc | Delaware | 9,000 common<br>1,000 preferred | 130 common shares and 222 Series A Convertible Preferred shares held by Winstar for Business, Inc<br>50 common shares and 111 Series A Convertible Preferred shares held by CBS, Inc |
| Individual com, Inc | Delaware | 25 million common | 4 0 million shares held by Office com, Inc |
| At Your Office, Inc | Delaware | | 1 0 million shares held by NewsEdge Corporation |
| Winstar International Inc | Delaware | 200 common | 100 shares held by Winstar New Media Company Inc |
| Winstar Europe SA | Belgium | 200 common | 100 shares held by WCI Capital Corp |
| Winstar Japan | Japan | | |
| Winstar Australia PTY Ltd | Australia | | |
| Winstar del Peru, SRL | Peru | | |
| Winstar International Hongkong Holding (BVI) Ltd | British Virgin Islands | | 1 |
| Winstar Hongkong (BVI) Limited | British Virgin Islands | | 1 |
| Winstar Communications Hongkong Limited | Hong Kong | | 1 |
| Winstar Argentina SA | Argentina | | |
| Connect SA | Argentina | | |
| Winstar Venezuela CA | Venezuela | | |
| Winstar Holdings do Brasil, Lida. | Brazil | | 1 |
| Winstar do Brasil, Ltda. | Brazil | | |
| Winstar Columbia, Ltda. | Columbia | | |
| Winstar Holdings BV | The Netherlands | | |
| Winstar Communications GMBH | Germany | | |



| Entity | Country | | |
|---|---|---|---|
| Winstar Communications BV | The Netherlands | | |
| Winstar Communications SA (France) | France | | |
| Winstar Communications Ltd (UK) | UK | | |
| Winstar Communications SA (Spain) | Spain | | |
| Winstar Communications SA (Switz) | Switzerland | | |
| Winstar Communications SA (Belgium) | Belgium | | |
| Winstar Communications of Canada Inc | Canada | | |
| Winstar Puerto Rico, Inc | Puerto Rico | | |
| WWPTLLC | Delaware | n/s | Winstar Wireless, Inc is sole member |

Schedule 3.05A – Litigation

None

5

Schedule 3.05B – Labor Controversies

Name

6

Schedule 3.07 – Material Adverse Changes

None

7

Schedule 3.13A – Telecommunications Licenses

1  Summary of Winstar 38 GHz License Holdings

| ID | Licensee | Call Sign | Service Area | Service Type | # of Channels |
|----|----------|-----------|--------------|--------------|---------------|
| 1 | Winstar Wireless Fiber Corp | WJPC619 | Poughkeepsie NY | 38GHz | 1 |
| 2 | Winstar Wireless Fiber Corp | WMG833 | Baltimore MD | 38GHz | 1 |
| 3 | Winstar Wireless Fiber Corp | WMG834 | Long Island NY | 38GHz | 1 |
| 4 | Winstar Wireless Fiber Corp | WMG835 | Northeast NJ | 38GHz | 1 |
| 5 | Winstar Wireless Fiber Corp | WMK415 | New York NY | 38GHz | 1 |
| 6 | Winstar Wireless Fiber Corp | WMNJ18 | Seattle, WA | 38GHz | 7 |
| 7 | Winstar Wireless Fiber Corp | WMNJ19 | Atlanta GA | 38GHz | 4 |
| 8 | Winstar Wireless Fiber Corp | WMNJ20 | Baltimore MD | 38GHz | 6 |
| 9 | Winstar Wireless Fiber Corp | WMNJ21 | Boston MA | 38GHz | 6 |
| 10 | Winstar Wireless Fiber Corp | WMNJ22 | Buffalo, NY | 38GHz | 7 |
| 11 | Winstar Wireless Fiber Corp | WMNJ23 | Chicago IL | 38GHz | 6 |
| 12 | Winstar Wireless Fiber Corp | WMNJ24 | Cincinnati, OH | 38GHz | 7 (one is 2x 50 MHz) |
| 13 | Winstar Wireless Fiber Corp | WMNJ25 | Cleveland OH | 38GHz | 6 |
| 14 | Winstar Wireless Fiber Corp | WMNJ26 | Dallas TX | 38GHz | 4 |
| 15 | Winstar Wireless Fiber Corp | WMNJ27 | Denver CO | 38GHz | 6 |
| 16 | Winstar Wireless Fiber Corp | WMNJ28 | Detroit MI | 38GHz | 7 |
| 17 | Winstar Wireless Fiber Corp | WMNJ29 | Houston TX | 38GHz | 6 |
| 18 | Winstar Wireless Fiber Corp | WMNJ30 | Kansas City KS | 38GHz | 7 |
| 19 | Winstar Wireless Fiber Corp | WMNJ31 | Los Angeles CA | 38GHz | 4 |
| 20 | Winstar Wireless Fiber Corp | WMNJ32 | Miami, FL | 38GHz | 7 |
| 21 | Winstar Wireless Fiber Corp | WMNJ33 | Milwaukee WI | 38GHz | 6 |
| 22 | Winstar Wireless Fiber Corp | WMNJ34 | Minneapolis, MN | 38GHz | 6 |
| 23 | Winstar Wireless Fiber Corp | WMNJ35 | New York (LI), NY | 38GHz | 6 |
| 24 | Winstar Wireless Fiber Corp | WMNJ36 | New York (West), NY | 38GHz | 6 |
| 25 | Winstar Wireless Fiber Corp | WMNJ37 | New York (Man) NY | 38GHz | 7 |
| 26 | Winstar Wireless Fiber Corp | WMNJ38 | Philadelphia, PA | 38GHz | 5 |
| 27 | Winstar Wireless Fiber Corp | WMNJ39 | Phoenix, AZ | 38GHz | 6 |
| 28 | Winstar Wireless Fiber Corp | WMNJ40 | Pittsburgh, PA | 38GHz | 5 |

8



| | | | | | |
|---|---|---|---|---|---|
| 29 | Winstar Wireless Fiber Corp | WMN341 | San Diego, CA | 18GHz | 5 |
| 30 | Winstar Wireless Fiber Corp | WMN342 | San Francisco, CA | 18GHz | 4 |
| 31 | Winstar Wireless Fiber Corp | WMN343 | Spokane, WA | 18GHz | 7 |
| 32 | Winstar Wireless Fiber Corp | WMN344 | St Louis MO | 38GHz | 6 |
| 33 | Winstar Wireless Fiber Corp | WMN345 | Tacoma, WA | 18GHz | 6 |
| 34 | Winstar Wireless Fiber Corp | WMN346 | Tampa FL | 39GHz | 7 |
| 35 | Winstar Wireless Fiber Corp | WMN347 | Washington D C | 18GHz | 6 |
| 36 | Winstar Wireless Fiber Corp | WMT531 | Austin, TX | 38GHz | 1 |
| 37 | Winstar Wireless Fiber Corp | WMT602 | Houston, TX | 18GHz | 1 |
| 38 | Winstar Wireless Fiber Corp | WMT603 | Buffalo NY | 38GHz | 1 |
| 39 | Winstar Wireless Fiber Corp | WMT604 | Phoenix, AZ | 38GHz | 1 |
| 40 | Winstar Wireless Fiber Corp | WMT605 | Pittsburgh, PA | 38GHz | 1 |
| 41 | Winstar Wireless Fiber Corp | WMT606 | Seattle, WA | 39GHz | 1 |
| 42 | Winstar Wireless Fiber Corp | WMT607 | Denver CO | 38GHz | 1 |
| 43 | Winstar Wireless Fiber Corp | WMT608 | Charlotte NC | 38GHz | 1 |
| 44 | Winstar Wireless Fiber Corp | WMT609 | Chicago IL | 18GHz | 1 |
| 45 | Winstar Wireless Fiber Corp | WMT610 | Dallas TX | 38GHz | 1 |
| 46 | Winstar Wireless Fiber Corp | WMT611 | Cincinnati OH | 38GHz | 1 |
| 47 | Winstar Wireless Fiber Corp | WMT612 | Cleveland OH | 38GHz | 1 |
| 48 | Winstar Wireless Fiber Corp | WMT613 | Columbus OH | 38GHz | 1 |
| 49 | Winstar Wireless Fiber Corp | WMT614 | Orlando, FL | 38GHz | 1 |
| 50 | Winstar Wireless Fiber Corp | WMT615 | Washington, D C | 18GHz | 1 |
| 51 | Winstar Wireless Fiber Corp | WMT616 | St Louis MO | 38GHz | 1 |
| 52 | Winstar Wireless Fiber Corp | WMT670 | Honolulu HI | 38GHz | 1 |
| 53 | Winstar Wireless Fiber Corp | WMT671 | Minneapolis, MN | 38GHz | 1 |
| 54 | Winstar Wireless Fiber Corp | WMT672 | Memphis, TN | 38GHz | 1 |
| 55 | Winstar Wireless Fiber Corp | WMT673 | New York Man NY | 38GHz | 1 |
| 56 | Winstar Wireless Fiber Corp | WMT674 | Atlanta, GA | 38GHz | 1 |
| 57 | Winstar Wireless Fiber Corp | WMT675 | Boston MA | 38GHz | 1 |
| 58 | Winstar Wireless Fiber Corp | WMT676 | Los Angeles, CA | 38GHz | 1 |
| 59 | Winstar Wireless Fiber Corp | WMT677 | Milwaukee, WI | 38GHz | 1 |
| 60 | Winstar Wireless Fiber Corp | WMT678 | Detroit, MI | 38GHz | 1 |
| 61 | Winstar Wireless Fiber Corp | WMT679 | Kansas City KS | 38GHz | 1 |
| 62 | Winstar Wireless Fiber Corp | WMT686 | Boston MA | 38GHz | 1 |
| 63 | Winstar Wireless Fiber Corp | WMT763 | Rochester, NY | 38GHz | 1 |



| | | | | | |
|---|---|---|---|---|---|
| 64 | Winstar Wireless Fiber Corp | WMT817 | Richmond, VA | 38GHz | 1 |
| 65 | Winstar Wireless Fiber Corp | WMT818 | Nashville, TN | 38GHz | 1 |
| 66 | Winstar Wireless Fiber Corp | WMT819 | Austin, TX | 38GHz | 1 |
| 67 | Winstar Wireless Fiber Corp | WMT820 | San Juan, PR | 38GHz | 1 |
| 68 | Winstar Wireless Fiber Corp | WMT821 | Portland, OR | 38GHz | 1 |
| 69 | Winstar Wireless Fiber Corp | WMT822 | Norfolk, VA | 38GHz | 1 |
| 70 | Winstar Wireless Fiber Corp | WMT823 | San Antonio, TX | 38GHz | 1 |
| 71 | Winstar Wireless Fiber Corp | WMT824 | Jacksonville, FL | 38GHz | 1 |
| 72 | Winstar Wireless Fiber Corp | WMW286 | Providence, RI | 38GHz | 1 |
| 73 | Winstar Wireless Fiber Corp | WMW287 | Dayton, OH | 38GHz | 1 |
| 74 | Winstar Wireless Fiber Corp | WMW288 | Tampa FL | 38GHz | 1 |
| 75 | Winstar Wireless Fiber Corp | WMW289 | Miami FL | 38GHz | 1 |
| 76 | Winstar Wireless Fiber Corp | WMW290 | Raleigh NC | 38GHz | 1 |
| 77 | Winstar Wireless Fiber Corp | WMW291 | West Palm Beach FL | 38GHz | 1 |
| 78 | Winstar Wireless Fiber Corp | WMW292 | Indianapolis IN | 38GHz | 1 |
| 79 | Winstar Wireless Fiber Corp | WMW493 | New York, NY | 38GHz | 1 |
| 80 | WWI License Holding, Inc | WMW517 | Austin TX | 38GHz | 1 |
| 81 | WWI License Holding, Inc | WMW518 | Indianapolis IN | 38GHz | 1 |
| 82 | WWI License Holding, Inc | WMW519 | Jacksonville, FL | 38GHz | 1 |
| 83 | WWI License Holding Inc | WMW520 | Memphis TN | 38GHz | 1 |
| 84 | WWI License Holding Inc | WMW521 | Omaha NE | 38GHz | 1 |
| 85 | WWI License Holding Inc | WMW522 | San Antonio, TX | 38GHz | 1 |
| 86 | Winstar Wireless Fiber Corp | WMW858 | Sacramento, CA | 38GHz | 1 |
| 87 | WWI License Holding, Inc | WMW860 | Charlotte NC | 38GHz | 1 |
| 88 | WWI License Holding, Inc | WMW861 | New Orleans LA | 38GHz | 1 |
| 89 | WWI License Holding, Inc | WMW862 | Norfolk VA | 38GHz | 1 |
| 90 | WWI License Holding, Inc | WMW863 | Oklahoma City OK | 38GHz | 1 |
| 91 | WWI License Holding, Inc | WMW864 | Portland, OR | 38GHz | 1 |
| 92 | Winstar Wireless Fiber Corp | WMW867 | San Francisco, CA | 38GHz | 1 |
| 93 | Winstar Wireless Fiber Corp | WMW942 | Hartford CT | 38GHz | 1 |
| 94 | Winstar Wireless Fiber Corp | WMW943 | Philadelphia PA | 38GHz | 1 |
| 95 | Winstar Wireless Fiber Corp | WPJA780 | Las Vegas, NV | 38GHz | 1 |
| 96 | Winstar Wireless Fiber Corp | WPJA781 | Spokane WA | 38GHz | 1 |
| 97 | Winstar Wireless Fiber Corp | WPJA782 | Portland OR | 38GHz | 1 |
| 98 | Winstar Wireless Fiber Corp. | WPJA784 | Philadelphia, PA | 38GHz | 1 |

10

| 99 | Winstar Wireless Fiber Corp | WPJA785 | Dallas, TX | 38GHz | 1 |
| 100 | Winstar Wireless Fiber Corp | WPJA786 | Baltimore, MD | 38GHz | 1 |
| 101 | Winstar Wireless Fiber Corp | WPJA793 | Mobile, AL | 38GHz | 1 |
| 102 | Winstar Wireless Fiber Corp | WPJA794 | Harrisburg, PA | 38GHz | 1 |
| 103 | Winstar Wireless Fiber Corp | WPJA795 | Chattanooga, TN | 38GHz | 1 |
| 104 | Winstar Wireless Fiber Corp | WPJA796 | Spokane, WA | 38GHz | 1 |
| 105 | Winstar Wireless Fiber Corp | WPJA797 | Tulsa, OK | 38GHz | 1 |
| 106 | Winstar Wireless Fiber Corp | WPJA798 | El Paso, TX | 38GHz | 1 |
| 107 | Winstar Wireless Fiber Corp | WPJA790 | Syracuse, NY | 38GHz | 1 |
| 108 | Winstar Wireless Fiber Corp | WPJC255 | Birmingham, AL | 38GHz | 1 |
| 109 | WWI License Holding, Inc. | WPJC552 | Stamford, CT | 38GHz | 1 |
| 110 | WWI License Holding, Inc | WPJC591 | Boise City, ID | 38GHz | 1 |
| 111 | Winstar Wireless Fiber Corp | WPJC569 | Norfolk, VA | 38GHz | 1 |
| 112 | Winstar Wireless Fiber Corp | WPJC570 | Monterey, CA | 38GHz | 1 |
| 113 | Winstar Wireless Fiber Corp | WPJC571 | Memphis, TN | 38GHz | 1 |
| 114 | Winstar Wireless Fiber Corp | WPJC572 | Las Vegas, NV | 38GHz | 1 |
| 115 | Winstar Wireless Fiber Corp | WPJC573 | Indianapolis, IN | 38GHz | 1 |
| 116 | Winstar Wireless Fiber Corp | WPJC574 | Greensboro, NC | 38GHz | 1 |
| 117 | Winstar Wireless Fiber Corp | WPJC575 | Dayton, OH | 38GHz | 1 |
| 118 | Winstar Wireless Fiber Corp | WPJC576 | Columbus, OH | 38GHz | 1 |
| 119 | Winstar Wireless Fiber Corp | WPJC577 | Salt Lake City, UT | 38GHz | 1 |
| 120 | Winstar Wireless Fiber Corp | WPJC578 | Tampa, FL | 38GHz | 1 |
| 121 | Winstar Wireless Fiber Corp | WPJC579 | Tulsa, OK | 38GHz | 1 |
| 122 | Winstar Wireless Fiber Corp | WPJC609 | Jackson, MS | 38GHz | 1 |
| 123 | Winstar Wireless Fiber Corp | WPJC610 | Omaha, NE | 38GHz | 1 |
| 124 | Winstar Wireless Fiber Corp | WPJC611 | Little Rock, AR | 38GHz | 1 |
| 125 | Winstar Wireless Fiber Corp | WPJC612 | Birmingham, AL | 38GHz | 1 |
| 126 | Winstar Wireless Fiber Corp | WPJC613 | Battle Creek, MI | 38GHz | 1 |
| 127 | Winstar Wireless Fiber Corp | WPJC614 | Albany, NY | 38GHz | 1 |
| 128 | Winstar Wireless Fiber Corp | WPJC615 | Toledo, OH | 38GHz | 1 |
| 129 | Winstar Wireless Fiber Corp | WPJC616 | Albuquerque, NM | 38GHz | 1 |
| 130 | Winstar Wireless Fiber Corp | WPJC617 | Columbia, SC | 38GHz | 1 |
| 131 | Winstar Wireless Fiber Corp | WPJC618 | Ogden, UT | 38GHz | 1 |
| 132 | Winstar Wireless Fiber Corp | WPJC620 | Louisville, KY | 38GHz | 1 |
| 133 | Winstar Wireless Fiber Corp | WPJC622 | Grand Rapids, MI | 38GHz | 1 |



| | | | | | |
|---|---|---|---|---|---|
| 134 | Winstar Wireless Fiber Corp | WPJC710 | Madison, WI | 38GHz | |
| 135 | Winstar Wireless Fiber Corp | WPJC711 | Green Bay, MI | 38GHz | |
| 136 | Winstar Wireless Fiber Corp | WPJC928 | Greenville, SC | 38GHz | |
| 137 | Winstar Wireless Fiber Corp | WPJC929 | Wichita, KS | 38GHz | |
| 138 | Winstar Wireless Fiber Corp | WPJC984 | Allentown, PA | 38GHz | |
| 139 | Winstar Wireless Fiber Corp | WPJC985 | Youngstown, OH | 38GHz | |
| 140 | Winstar Wireless Fiber Corp | WPJC986 | Ft Worth, TX | 38GHz | |
| 141 | Winstar Wireless Fiber Corp | WPJC987 | Danbury, CT | 38GHz | |
| 142 | Winstar Wireless Fiber Corp | WPJC988 | Cape Cod, MA | 38GHz | |
| 143 | Winstar Wireless Fiber Corp | WPJC989 | New Brunswick, NJ | 38GHz | |
| 144 | Winstar Wireless Fiber Corp | WPJC990 | Melbourne, FL | 38GHz | |
| 145 | Winstar Wireless Fiber Corp | WPJC991 | South Bend, IN | 38GHz | |
| 146 | Winstar Wireless Fiber Corp | WPJD393 | Baton Rouge, LA | 38GHz | |
| 147 | Winstar Wireless Fiber Corp | WPJD394 | Greensboro, NC | 38GHz | |
| 148 | Winstar Wireless Fiber Corp | WPJD395 | New Orleans, LA | 38GHz | |
| 149 | Winstar Wireless Fiber Corp | WPJD856 | Southampton, NY | 38GHz | |
| 150 | Winstar Wireless Fiber Corp | WPJD860 | Toledo, OH | 38GHz | |
| 151 | Winstar Wireless Fiber Corp | WPJD861 | W Palm Beach, FL | 38GHz | |
| 152 | Winstar Wireless Fiber Corp | WPJD862 | Poughkeepsie, NY | 38GHz | |
| 153 | Winstar Wireless Fiber Corp | WPJD863 | Ft Worth, TX | 38GHz | |
| 154 | Winstar Wireless Fiber Corp | WPJD864 | Baton Rouge, LA | 38GHz | |
| 155 | Winstar Wireless Fiber Corp | WPJD865 | Rockford, IL | 38GHz | |
| 156 | Winstar Wireless Fiber Corp | WPJD866 | Shreveport, LA | 38GHz | |
| 157 | Winstar Wireless Fiber Corp | WPJD867 | Canton, OH | 38GHz | |
| 158 | Winstar Wireless Fiber Corp | WPJD868 | Louisville, KY | 38GHz | |
| 159 | Winstar Wireless Fiber Corp | WPJD869 | Flint, MI | 38GHz | |
| 160 | Winstar Wireless Fiber Corp | WPJD870 | Syracuse, NY | 38GHz | |
| 161 | Winstar Wireless Fiber Corp | WPJD871 | Corpus Christi, TX | 38GHz | |
| 162 | Winstar Wireless Fiber Corp | WPJD872 | Montgomery, AL | 38GHz | |
| 163 | Winstar Wireless Fiber Corp | WPJD873 | Scranton, PA | 38GHz | |
| 164 | Winstar Wireless Fiber Corp | WPJD874 | Savannah, GA | 38GHz | |
| 165 | Winstar Wireless Fiber Corp | WPJD875 | Reno, NV | 38GHz | |
| 166 | Winstar Wireless Fiber Corp | WPJD876 | Springfield, MA | 38GHz | |
| 167 | Winstar Wireless Fiber Corp | WPJD877 | Ft Worth, TX | 38GHz | |
| 168 | Winstar Wireless Fiber Corp | WPJD878 | Peoria, IL | 38GHz | |

12

| | | | | | |
|---|---|---|---|---|---|
| 169 | Winstar Wireless Fiber Corp | WPJD879 | Toledo, OH | 38GHz | 1 |
| 170 | Winstar Wireless Fiber Corp | WPJE262 | Ft Worth, TX | 38GHz | 1 |
| 171 | Winstar Wireless Fiber Corp | WPJE263 | Saginaw, MI | 38GHz | 1 |
| 172 | Winstar Wireless Fiber Corp | WPJE530 | Saginaw, MI | 38GHz | 1 |
| 173 | Winstar Wireless Fiber Corp | WPJE531 | Poughkeepsie, NY | 38GHz | 1 |
| 174 | Winstar Wireless Fiber Corp | WPJE532 | Boise, ID | 38GHz | 1 |
| 175 | Winstar Wireless Fiber Corp | WPJE533 | Mobile, AL | 38GHz | 1 |
| 176 | Winstar Wireless Fiber Corp | WPJE534 | Springfield, MA | 38GHz | 1 |
| 177 | Winstar Wireless Fiber Corp | WPJE535 | Wichita, KS | 38GHz | 1 |
| 178 | Winstar Wireless Fiber Corp | WPJE536 | Ft Worth, TX | 38GHz | 1 |
| 179 | Winstar Wireless Fiber Corp | WPJE537 | Rockford, IL | 38GHz | 1 |
| 180 | Winstar Wireless Fiber Corp | WPJE538 | Honolulu, HI | 38GHz | 1 |
| 181 | Winstar Wireless Fiber Corp | WPJE539 | Wichita, KS | 38GHz | 1 |
| 182 | Winstar Wireless Fiber Corp | WPJE792 | Lansing, MI | 38GHz | 1 |
| 183 | Winstar Wireless Fiber Corp | WPJE793 | Saginaw, MI | 38GHz | 1 |
| 184 | Winstar Wireless Fiber Corp | WPJE794 | Stockton, CA | 38GHz | 1 |
| 185 | Winstar Wireless Fiber Corp | WPJE795 | Atlantic City, NJ | 38GHz | 1 |
| 186 | Winstar Wireless Fiber Corp | WPNA368 | Fresno, CA | 38GHz | 1 total (2 x 50 MHz) |
| 187 | Winstar Wireless Fiber Corp | WPNA369 | Bakersfield, CA | 38GHz | 1 total (2 x 50 MHz) |
| 188 | Winstar Wireless Fiber Corp | WPNA372 | Eureka, CA | 38GHz | 1 total (2 x 50 MHz) |
| 189 | No Wire, LLC | WPNA388 | Topeka, KS | 38GHz | 1 |
| 190 | No Wire, LLC | WPNA436 | Nashville, TN | 38GHz | 1 |
| 191 | No Wire, LLC | WPNA520 | Shreveport, LA | 38GHz | 1 |
| 192 | Winstar Wireless Fiber Corp | WPNA526 | San Luis Obispo, CA | 38GHz | 1 total (2 x 50 MHz) |
| 193 | Winstar Wireless Fiber Corp | WPNA663 | Miami, FL | 38GHz | 1 |
| 194 | No Wire, LLC | WPNA672 | Charleston, SC | 38GHz | 1 |
| 195 | No Wire, LLC | WPNA673 | Roanoke, VA | 38GHz | 1 |
| 196 | Winstar Wireless Fiber Corp | WPNA676 | Savannah, GA | 38GHz | 1 |
| 197 | Winstar Wireless Fiber Corp | WPNA681 | Oxnard, CA | 38GHz | 1 total (2 x 50 MHz) |
| 198 | Winstar Wireless Fiber Corp | WPNC464 | Los Angeles, CA | 38GHz | 1 |
| 199 | Winstar Wireless Fiber Corp | WPNC471 | Cincinnati, OH | 38GHz | 1 |

| | | | | |
|---|---|---|---|---|
| 200 | Winstar Wireless Fiber Corp | WPND496 | Knoxville, TN | 38GHz |
| 201 | WWI License Holding, Inc | WPND497 | Shreveport, LA | 38GHz |
| 202 | Winstar Wireless Fiber Corp | WPND514 | Milwaukee, WI | 38GHz |
| 203 | Winstar Wireless Fiber Corp | WPND515 | Pittsburgh, PA | 38GHz |
| 204 | Winstar Wireless Fiber Corp | WPND516 | Atlanta, GA | 38GHz |
| 205 | Winstar Wireless Fiber Corp | WPND517 | Chicago, IL | 38GHz |
| 206 | Winstar Wireless Fiber Corp | WPND518 | Denver, CO | 38GHz |
| 207 | Winstar Wireless Fiber Corp | WPND614 | Colorado Springs, CO | 38GHz |
| 208 | Winstar Wireless Fiber Corp | WPND619 | Tucson, AZ | 38GHz |
| 209 | Winstar Wireless Fiber Corp | WPND620 | Phoenix, AZ | 38GHz |
| 210 | Winstar Wireless Fiber Corp | WPND621 | Detroit, MI | 38GHz |
| 211 | Winstar Wireless Fiber Corp | WPND622 | Jacksonville, FL | 38GHz |
| 212 | Winstar Wireless Fiber Corp | WPND623 | Louisville, KY | 38GHz |
| 213 | Winstar Wireless Fiber Corp | WPND624 | Minneapolis MN | 38GHz |
| 214 | Winstar Wireless Fiber Corp | WPND671 | Canton OH | 38GHz |
| 215 | Winstar Wireless Fiber Corp | WPND761 | San Jose, CA | 38GHz |
| 216 | Winstar Wireless Fiber Corp | WPND762 | El Paso TX | 38GHz |
| 217 | Winstar Wireless Fiber Corp | WPND763 | W Palm Beach FL | 38GHz |
| 218 | Winstar Wireless Fiber Corp | WPND764 | Grand Rapids MI | 38GHz |
| 219 | No Wire, LLC | WPND768 | Green Bay WI | 38GHz |
| 220 | No Wire, LLC | WPND769 | Burlington VT | 38GHz |
| 221 | Winstar Wireless Fiber Corp | WPND825 | Syracuse NY | 38GHz |
| 222 | Winstar Wireless Fiber Corp | WPND830 | Miami FL | 38GHz |
| 223 | Winstar Wireless Fiber Corp | WPND837 | Houston, TX | 38GHz |
| 224 | No Wire, LLC | WPNE214 | Wichita KS | 38GHz |
| 225 | Winstar Wireless Fiber Corp | WPNE226 | Ft Wayne IN | 38GHz |
| 226 | WWI License Holding, Inc | WPNE229 | Beaumont, TX | 38GHz |
| 227 | Winstar Wireless Fiber Corp | WPNE234 | Rochester, NY | 38GHz |
| 228 | Winstar Wireless Fiber Corp | WPNE250 | Bellingham WA | 38GHz |
| 229 | No Wire, LLC | WPNE259 | Waco, TX | 38GHz |
| 230 | Winstar Wireless Fiber Corp | WPNE363 | Peoria IL | 38GHz |
| 231 | WWI License Holding, Inc | WPNE398 | Mobile, AL | 38GHz |
| 232 | WWI License Holding, Inc | WPNE399 | Las Vegas, NV | 38GHz |
| 233 | WWI License Holding, Inc | WPNE400 | Honolulu, HI | 38GHz |
| 234 | WWI License Holding, Inc | WPNE401 | Ft Collins/Loveland CO | 38GHz |

14

| | | | | | |
|---|---|---|---|---|---|
| 235 | Winstar Wireless Fiber Corp | WPNE686 | Charleston SC | 38GHz | - |
| 236 | No Wire LLC | WPNE687 | Springfield MO | 38GHz | - |
| 237 | No Wire LLC | WPNE688 | Birmingham, AL | 38GHz | - |
| 238 | Winstar Wireless Fiber Corp | WPNE715 | Richmond, VA | 38GHz | 50 MHz |
| 239 | Winstar Wireless Fiber Corp | WPNE742 | Knoxville, TN | 38GHz | 50MHz |
| 240 | Winstar Wireless Fiber Corp | WPNE756 | San Juan PR | 38GHz | - |
| 241 | Winstar Wireless Fiber Corp | WPNE759 | St Louis MO | 38GHz | - |
| 242 | Winstar Wireless Fiber Corp | WPNE961 | Chicago, IL | 38GHz | - |
| 243 | Winstar Wireless Fiber Corp | WPNE963 | Charlotte NC | 38GHz | - |
| 244 | Winstar Wireless Fiber Corp | WPNE964 | Memphis, TN | 38GHz | - |
| 245 | Winstar Wireless Fiber Corp | WPNE989 | Tucson AZ | 38GHz | 50 MHz |
| 246 | Winstar Wireless Fiber Corp | WPNE993 | St Louis MO | 38GHz | - |
| 247 | Winstar Wireless Fiber Corp | WPNE994 | Memphis TN | 38GHz | - |
| 248 | Winstar Wireless Fiber Corp | WPNF243 | Tucson AZ | 38GHz | 50 MHz |
| 249 | Winstar Wireless Fiber Corp | WPNF246 | Manchester NH | 38GHz | - |
| 250 | Winstar Wireless Fiber Corp | WPNF258 | San Antonio TX | 38GHz | Total |
| 251 | Winstar Wireless Fiber Corp | WPNG286 | Las Vegas NV | 38GHz | (2 x 50 MHz) |
| 252 | Winstar Wireless Fiber Corp | WPNG289 | San Antonio, TX | 38GHz | 50 MHz |
| 253 | Winstar Wireless Fiber Corp | WPNG291 | Tampa, FL | 38GHz | - |
| 254 | Winstar Wireless Fiber Corp | WPNG293 | San Antonio, TX | 38GHz | - |
| 255 | Winstar Wireless Fiber Corp | WPNG309 | Nashville, TN | 38GHz | - |
| 256 | Winstar Wireless Fiber Corp | WPNG360 | Nashville, TN | 38GHz | - |
| 257 | Winstar Wireless Fiber Corp | WPNG361 | Orlando FL | 38GHz | - |
| 258 | Winstar Wireless Fiber Corp | WPNG362 | Orlando FL | 38GHz | - |
| 259 | Winstar Wireless Fiber Corp | WPNG363 | Kansas City, MO | 38GHz | - |
| 260 | Winstar Wireless Fiber Corp | WPNG364 | Indianapolis IN | 38GHz | - |
| 261 | Winstar Wireless Fiber Corp | WNPG365 | Minneapolis MN | 38GHz | - |
| 262 | Winstar Wireless Fiber Corp | WPNG368 | Denver CO | 38GHz | - |
| 263 | Winstar Wireless Fiber Corp | WPNG369 | Phoenix, AZ | 38GHz | - |
| 264 | Winstar Wireless Fiber Corp | WNPG374 | Knoxville TN | 38GHz | - |
| 265 | Winstar Wireless Fiber Corp | WPNG375 | Memphis TN | 38GHz | - |
| 266 | Winstar Wireless Fiber Corp | WPNG376 | Little Rock AR | 38GHz | - |
| 267 | Winstar Wireless Fiber Corp | WPNG377 | Indianapolis, IN | 38GHz | - |
| 268 | Winstar Wireless Fiber Corp | WPNG378 | San Juan, PR | 38GHz | - |

15

| 269 | Winstar Wireless Fiber Corp | WPNG379 | Oklahoma City, OK | 38GHz | 1 |
| 270 | Winstar Wireless Fiber Corp | WPNG382 | San Juan, PR | 38GHz | 1 total (2 x 50 MHz) |
| 271 | Winstar Wireless Fiber Corp | WPNG384 | Las Vegas, NV | 38GHz | 1 total (2 x 50 MHz) |
| 272 | Winstar Wireless Fiber Corp | WPNG390 | San Juan, PR | 38GHz | 1 total (2 x 50 MHz) |
| 273 | Winstar Wireless Fiber Corp | WPNG400 | Knoxville, TN | 38GHz | 50MHz |
| 274 | Winstar Wireless Fiber Corp | WPNG951 | Richmond, VA | 38GHz | 50 MHz |
| 275 | Winstar Wireless Fiber Corp | WPNH422 | Honolulu, HI | 38GHz | 1 |
| 276 | Winstar Wireless Fiber Corp | WPNH554 | Beaumont, TX | 38GHz | 1 |
| 277 | Winstar Wireless Fiber Corp | WPNH842 | San Juan PR | 38GHz | 1 |
| 278 | Winstar Wireless Fiber Corp | WPNI212 | New Bedford MA | 38GHz | 1 |
| 279 | Winstar Wireless Fiber Corp | WPNI214 | Louisville KY | 38GHz | 1 |
| 280 | Winstar Wireless Fiber Corp | WPNI216 | New Orleans LA | 38GHz | 1 |
| 281 | WWI License Holding Inc | WPNI218 | Colorado Springs CO | 38GHz | 1 |
| 282 | WWI License Holding, Inc. | WPNI252 | El Paso, TX | 38GHz | 1 |
| 283 | Winstar Wireless Fiber Corp | WPNI256 | Tacoma, WA | 38GHz | 1 |
| 284 | Winstar Wireless Fiber Corp | WPNI258 | Akron, OH | 38GHz | 1 |
| 285 | WWI License Holding, Inc | WPNI271 | Fort Lauderdale FL | 38GHz | 1 |
| 286 | Winstar Wireless Fiber Corp | WPNI835 | Jackson MS | 38GHz | 1 |
| 287 | Winstar Wireless Fiber Corp | WPNI838 | Raleigh Durham NC | 38GHz | 1 |
| 288 | Winstar Wireless Fiber Corp | WPNL601 | Pensacola FL | 38GHz | 1 |
| 289 | Winstar Wireless Fiber Corp | WPNL602 | Shreveport, LA | 38GHz | 1 |
| 290 | Winstar Wireless Fiber Corp | WPNL613 | Louisville KY | 38GHz | 1 |
| 291 | Winstar Wireless Fiber Corp | WPNL623 | Harrisburg PA | 38GHz | 1 |
| 292 | No Wire, LLC | WPNN812 | Austin TX | 38GHz | 1 |
| 293 | Winstar Wireless Fiber Corp | WPOM875 | Santa Rosa, CA | 38GHz | 1 |
| 294 | Winstar Wireless Fiber Corp | WPOP580 | Dallas, TX | 38GHz | 2 |
| 295 | Winstar Wireless Fiber Corp | WPOP581 | Atlanta, GA | 38GHz | 3 |
| 296 | Winstar Wireless Fiber Corp | WPOP585 | Kansas City, MO | 38GHz | 1 |
| 297 | Winstar Wireless Fiber Corp | WPOP586 | Grand Island, NE | 38GHz | 1 |
| 298 | Winstar Wireless Fiber Corp | WPOP587 | Marshall, MO | 38GHz | 1 |
| 299 | Winstar Wireless Fiber Corp | WPOP588 | Lincoln, NE | 38GHz | 1 |
| 300 | Winstar Wireless Fiber Corp | WPOP589 | Norfolk, VA | 38GHz | 1 |
| 301 | Winstar Wireless Fiber Corp | WPOP590 | Norfolk, VA | 38GHz | 1 |

16

| 302 | Winstar Wireless Fiber Corp | WPOP591 | Oceanside, CA | 38GHz | 1 |
| 303 | Winstar Wireless Fiber Corp | WPOP592 | Lacrosse, LA | 38GHz | 1 |
| 304 | Winstar Wireless Fiber Corp | WPOP593 | Kansas City MO | 38GHz | 1 |
| 305 | Winstar Wireless Fiber Corp | WPOP594 | Armonk NY | 38GHz | 1 |
| 306 | Winstar Wireless Fiber Corp | WPOP595 | Biloxi MS | 38GHz | 1 |
| 307 | Winstar Wireless Fiber Corp | WPOP596 | Brownsville TX | 38GHz | 1 |
| 308 | Winstar Wireless Fiber Corp | WPOP597 | Chattanooga TN | 38GHz | 1 |
| 309 | Winstar Wireless Fiber Corp | WPOP598 | Huntsville AL | 38GHz | 1 |
| 310 | Winstar Wireless Fiber Corp | WPOP599 | Salinas, CA | 38GHz | 50 MHz |
| 311 | Winstar Wireless Fiber Corp | WPOP600 | Raleigh NC | 38GHz | 1 |
| 312 | Winstar Wireless Fiber Corp | WPOP601 | Tallahassee FL | 38GHz | 1 |
| 313 | Winstar Wireless Fiber Corp | WPOP602 | White Plains NY | 38GHz | 1 |
| 314 | Winstar Wireless Fiber Corp | WPOU595 | Ft. Wayne, IN | 38GHz | 1 |
| 315 | Winstar Wireless Fiber Corp | WPOV372 | Victorville, CA | 38GHz | 50 MHz |

2  Summary of 28 GHz License Holdings

| License | Call Sign | Service Area | Block |
|---|---|---|---|
| WinStar LMDS, LLC | WPOH 657 | American Samoa | B |
| WinStar LMDS, LLC | WPOH 628 | Chico Oroville, CA | B |
| WinStar LMDS, LLC | WPOH 635 | Fairbanks AK | B |
| WinStar LMDS, LLC | WPOH 626 | Fresno CA | A |
| WinStar LMDS, LLC | WPOH 629 | Greensboro, NC | A |
| WinStar LMDS, LLC | WPOH 623 | Ithaca NY | B |
| WinStar LMDS, LLC | WPOH 636 | Juneau, AK | A |
| WinStar LMDS, LLC | WI OH 627 | Madista CA | A |
| WinStar LMDS, LLC | WPOH 631 | New Orleans LA | A |
| WinStar Wireless Fiber Corp | WPOI 485[1] | New York City PMSA, NY | 27.5-28 35 GHz |
| WinStar LMDS, LLC | WPOH 632 | Norfolk, VA | A |

[1] This license covers the New York City Primary Metropolitan Statistical Area  WinStar acquired 850 MHz of spectrum from the original licensee, Cellularvision, in the fall of 1998  The original license was partitioned

| WinStar LMDS, L L C | WPOH 630 | Orlando FL | A |
|---|---|---|---|
| WinStar LMDS, L L C | WPOH 634 | Provo Orem, UT | A |
| WinStar LMDS, L L C | WPOH 625 | Sacramento CA | B |
| WinStar LMDS, L L C | WPOH 633 | Salt Lake City UT | A |
| WinStar LMDS, L L C | WPOH 624 | San Francisco Oakland San Jose CA | A |

Notes

Block A Spectrum is 27 5 28 35 GHz, paired with 29 1 29 25 GHz. This block also includes 31 075 31 225 GHz
Block B Spectrum is 31 0-31 075 GHz paired with 31 225 31 3 GHz

3    Winstar also operates a number of point to point microwave facilities (i e  links) in bands other than the 38 GHz and 28 GHz bands, including in the 10 GHz and 18 GHz bands  No individual such facility is material to Consolidated Group

4    Section 101 17 of the FCC s rules provides that 38 GHz licensees must demonstrate substantial service at the time of license renewal Although the FCC did not adopt specific buildout criteria for 38 GHz licensees  it has stated that buildout of four wireless point to point links per million population would constitute substantial service for a traditional point to point licensee  However  Winstar s business plan is not that of a traditional point to point licensee  Winstar has made and is continuing to make substantial investment in developing a national telecommunications business and infrastructure  We believe a national investment and our ongoing operations are sufficient to demonstrate substantial service for all our 38 GHz licenses  As a result, we expect that our 38 GHz licenses will be renewed by the FCC, but we cannot be certain of that conclusion

•    On February 10 1998  the FCC granted additional channels for the following Winstar 38 GHz licenses  Atlanta (Call Sign WPOP581) Buffalo (WMN322), Cincinnati (WMN324)  Dallas (WPOP580)  Houston (WMN329)  Miami (WMN332)  New York (WMN337)  St  Louis (WMN344), Seattle (WMN318)  Spokane (WMN343)  and Tampa (WMN346)  On March 12, 1998, several parties filed petitions for reconsideration of each of these grants  with the exception of the Seattle grant  On October 22  1999, the FCC denied some of the petitions for reconsideration and affirmed the grants²  Parties have filed an application for review requesting that the FCC reconsider the grants  Winstar filed an opposition to this application.  In addition  on March 9, 1998  several parties filed petitions for reconsideration of the 38 GHz Order alleging, among other things, that the February 10 1998, license grant to Winstar were in violation of the Commission s processing rules  Winstar filed a consolidated opposition to these petitions  The FCC denied these petitions on August 23 1999  However  several parties have filed petitions for review in the US  Court of Appeals for the D C  Circuit

18

²    One petition for reconsideration remains pending



- On December 29 1999 the FCC granted in part five Winstar applications requesting additional channels in the following areas Baltimore (WMN220), New York (WMN335 & WMN336) Philadelphia (WMN338) and Washington, D C (WMN347) On January 24, 2000 several parties filed petitions for reconsideration of each of these grants Winstar filed an opposition to these petitions which remains pending

- In addition, on March 15 2000 the FCC granted in whole or in part twelve Winstar applications for additional channel pairs in San Diego (WMN341), Milwaukee (WMN333) Kansas City (WMN330) Cleveland (WMN330) Detroit (WMN325) Tacoma (WMN345) Phoenix (WMN339) Boston (WMN321) Minneapolis (WMN334) Denver (WMN327) Pittsburgh (WMN340) and Chicago (WMN323) These channel grants were conditioned by the Commission on the final outcome of the pending proceedings described in the above two paragraphs On March 15, 2000 the FCC also granted Winstar a channel pair in Santa Rosa California (WPON875) Grant of this application was conditioned on the outcome of a pending petition for reconsideration

- On October 23 1997 DCT Communications Inc filed a petition for reconsideration seeking revocation of Winstars license in Ft Lauderdale Florida (WPNI271) On January 21, 1999 the Commission released an order denying DCT's petition for reconsideration In response DCT filed an application for review which Winstar opposed The Commission denied the application for review on February 22 2000 however DCT has requested that the FCC reconsider its decision

## Schedule 3.13B – Adverse Events Affecting Licenses

- Section 101.17 of the FCC's rules provides that 38 GHz licensees must demonstrate substantial service at the time of license renewal. Although the FCC did not adopt specific buildout criteria for 38 GHz licenses at its stated that buildout of four wireless point to point links per million population would constitute substantial service for a traditional point to point licensee. However, Winstar's business plan is not that of a traditional point to point licensee. Winstar has made and is continuing to make substantial investment in developing a national telecommunications business and infrastructure. We believe a national investment and our ongoing operations are sufficient to demonstrate substantial service for all our 38 GHz licenses. As a result, we expect that our 38 GHz licenses will be renewed by the FCC, but we cannot be certain of that conclusion.

- On February 10, 1998, the FCC granted additional channels for the following Winstar 38 GHz licenses Atlanta (Call Sign WPOF581), Buffalo (WMN322), Cincinnati (WMN324), Dallas (WPOF580), Houston (WMN329), Miami (WMN332), New York (WMN337), St. Louis (WMN344), Seattle (WMN318), Spokane (WMN343) and Tampa (WMN346). On March 12, 1998, several parties filed petitions for reconsideration of each of these grants with the exception of the Seattle grant. On October 22, 1999 the FCC denied some of the petitions for reconsideration and affirmed the grants. Parties have filed an application for review requesting that the FCC reconsider the grants. Winstar filed an opposition to this application. In addition on March 9, 1998 several parties filed petitions for reconsideration of the 38 GHz Order alleging among other things that the February 10, 1998 license grant to Winstar were in violation of the Commission's processing rules. Winstar filed a consolidated opposition to these petitions. The FCC denied these petitions on August 23, 1999. However, several parties have filed petitions for review in the U.S. Court of Appeals for the D.C. Circuit.

On December 29, 1999, the FCC granted in part five Winstar applications requesting additional channels in the following areas: Baltimore (WMN320), New York (WMN335 & WMN336), Philadelphia (WMN318) and Washington, D.C. (WMN347). On January 24, 2000, several parties filed petitions for reconsideration of each of these grants. Winstar filed an opposition to these petitions which remains pending.

- In addition, on March 15, 2000, the FCC granted in whole or in part twelve Winstar applications for additional channel pairs in San Diego (WMN341), Milwaukee (WMN313), Kansas City (WMN330), Cleveland (WMN325), Detroit (WMN328), Tacoma (WMN345), Phoenix (WMN339), Boston (WMN321), Minneapolis (WMN314), Denver (WMN327), Pittsburgh (WMN340) and Chicago (WMN322). These channel grants were conditioned by the Commission on the final outcome of the pending proceedings described in the above two paragraphs. On March 15, 2000, the FCC also granted Winstar a channel pair in Santa Rosa, California (WPOM875). Grant of this application was conditioned on the outcome of a pending petition for reconsideration.

- On October 23, 1997, DCT Communications Inc. filed a petition for reconsideration seeking revocation of Winstar's license in Ft. Lauderdale, Florida (WPNI271). On January 21, 1999, the Commission released an order denying DCT's petition for reconsideration. In response, DCT filed an application for review which Winstar opposed. The Commission denied the application for review on February 22, 2000 however DCT has requested that the FCC reconsider its decision.

- Winstar operates a number of point to point microwave facilities (i.e. links) in the 17.7–19.7 GHz (18 GHz) band. In an ongoing proceeding, the FCC has proposed the relocation of a number of these facilities to accommodate satellite services. However, the FCC has proposed that relocated microwave operators should receive compensation for such relocation. A final FCC Order in this proceeding is expected later this year.



---

[3] One petition for reconsideration remains pending.

20

Schedule 3 14 – Investments

1  Investment by Consolidated Group Members in their respective Subsidiaries including, Unrestricted Subsidiaries
2  See the following

| Name of Entity | Security Held | No Shares/CSEs | Amount of Investment ($) | Percent of Common Owned (fully diluted) | Owned by |
|---|---|---|---|---|---|
| Arend | Convertible Preferred | 7467 290 | $1 000,000 | 1 10 | WIVI |
| Commerce  Inc | Convertible Preferred | 72 400 000 | $3 000 000 | 6 35 | WIVI |
| Digital Works | Convertible Preferred | 7119 617 | $1 000,000 | 0 43 | WIVI |
| Equity Broadcast Corp | Convertible Preferred | 7343,665 | $3 470 000 | 3 77 | WBC |
| Frontline Capital Group | Common | 63 492 | $3 000,000 | 0 23 | WCII |
| ICNT, Inc  (Internet Connect) | Convertible Preferred | 380 760/586 769 | $5 000 000 | 1 10 | WCII |
| Jobs.com | Convertible Preferred | 7300 000 | $1 000 000 | 0 77 | WIVI |
| KPD Winstar | Common | 70 | $1 000 000 | 35 00 | WII |
| Media on Demand | Convertible Preferred | 193 050 | $1 000 000 | 1 60 | WCII |
| Next Century Media | Note | n/r | $  500 000 | n/a | WCII |
| LTS Software Ltd | Warrants | 50 000 | | | WCII(1) |
| Sandbox, Inc | Convertible Preferred | 7396 825 | $2,000 000 | 2 11 | WIVI |
| Total Sports | Convertible Preferred | 7375 373 | $5 000,000 | 3 43 | WIVI |
| Unapix | Convertible Preferred | 7200,000 | $  450 000 | 1 96 | WIVI |
| WamNet  Inc | Convertible Preferred | 85 000/16 472 808 | $85 000 000 | 16 30 | WCII |

| Legend | Notes |
|---|---|
| WCII – Winstar Communications, Inc | (1) Originally issued to Winstar Multichannel  LLC, which merged into WCII on 12/21/99 |
| WWI – Winstar Wireless  Inc | |
| WIVI – Winstar Interactive Ventures I, Inc | |
| WII – Winstar International  Inc | |
| WBC – Winstar Broadcasting Corp | |

21

Schedule 4.01 – Post-Restructuring Parent Subsidiaries

The shares of common stock of Winstar Wireless, Inc. currently held by the Parent will not be contributed to the Borrower as of the Effective Date. Such shares will be contributed to the Borrower by the Parent at such time as such transfer is approved by the state public utility commissions in each state where such approval is required.

The shares of capital stock of each of the following Subsidiaries of the Parent - all of which are Unrestricted Subsidiaries and all of which are organized outside of the United States - will be contributed to the Borrower promptly following the Effective Date.

| Name of Subsidiary | Jurisdiction of Organization |
|---|---|
| Winstar Columbia Ltda | Columbia |
| Winstar Holdings BV | The Netherlands |
| Winstar Communications of Canada, Inc | Canada |

22

Schedule 6.01 – Existing Indebtedness

| Lender/Lessor | Borrower/Lessee | Amount ($) | Nature of Assets Financed |
|---|---|---|---|
| ACC | WWI | 333 K | Motor vehicles |
| AT&T | WWI | 10.2 mil | Seattle and Tampa switches |
| BankBoston | WWI | 4.3 mil | San Francisco switch |
| BankBoston | WWI | 3.0 mil | Motor vehicles |
| The Bank of New York | WWI | 7.3 mil | Denver and Minneapolis switches |
| Centigram | WWI | 1.0 mil | Telephone and other misc. equipment |
| Finova | WWI | 2.0 mil | NYC switch |
| GECC | WWI | 799K | Computer equipment |
| GMAC | WWI | 867 K | Motor vehicles |
| GTE Lease | WWI | 53 K | Miscellaneous equipment |
| Line Leasing | W V | 157 K | Computer and ACO system |
| Mellon US Leasing | WWI | 1.0 mil | LA switch |
| ML Investors | WWI | 750 K | Wireless radios |
| Newcourt Comm'l Finance | WWI | 13.9 mil | Fractional interest in corporate jet |
| Prime Leasing | WWI | 1.9 mil | Chicago switch (1) |
| Transamerica | WWI | 4.7 mil | Wireless radios |
| Transamerica | WWI | 4.3 mil | Kansas City Switch, 38 GHz radios |
| WASCO | WWI | 4.2 mil | Columbus switch |
| WASCO | WWI | 3.5 mil | Furniture and office equipment at 685 3rd Ave., NYC |
| Imperial Business Credit | WWI | 8 K | Lease of Servers (3) |
| Sunrise Leasing Corporation | WWI | n/a | Operating Lease of Internet network equipment (3) |
| Cisco Systems | WWI | n/a | Operating Lease of Routers (3) |
| Williams Communications | WWI | 247.6 mil (2) | Fiber IRU |
| Metromedia Fiber Networks | WWI | 108.0 mil (2) | Fiber IRU |
| AT&T | WWI | 9.0 mil (2) | Fiber IRU |
| Electric Lightwave | WWI | 1.9 mil (2) | Fiber IRU |

| Legend | Notes |
|---|---|
| WWI – Winstar Wireless, Inc. (or itself or its successor by merger to Winstar Telecommunications, Inc. on 3/31/98) | (1) Refers to Winstar's Chicago switch, not the Chicago switch acquired by WSAC from US One<br>(2) Includes future relations to current Capu'nl Lense Obligations pursuant to current binding agreements. Excludes maintenance expenses and imputed interest/financing costs<br>(3) Indebtedness of ISP Networks, Inc., an Internet Service Provider, which was acquired by WWI in December 1999 |

23

Schedule 6 03 -- Existing Liens

1  Purchases money liens and liens securing Capital Lease Obligations described on Schedule 6 01
2  Information UCC filings by Cisco Systems and Sunrise Capital in connection with leases of computer equipment to ISP Networks Inc which was acquired
   in December 1999
3  Liens in favor of United States Trust Company of New York Inc as collateral agent securing Old Bond Debt of Winstar Equipment Corp ('WEC') in the
   amount of $323,000  This indebtedness is being deferred by WEC and the liens on WEC's assets securing the debt will, pursuant to the terms of the
   indenture under which such debt was issued, be released 123 days following deposit of funds with U S Trust
4  UCC-1 on file in favor of Diana Commercial Credit covering de minimis amount of computer equipment  There is no current debt associated with this filing
5  UCC-1 on file in favor of IBM Leasing filed against Winstar Equipment Corp covering de minimis amount of computer equipment
6  The following liens

| Jurisdiction | Amount ($) | Nature of Lien |
|---|---|---|
| State of Utah | 3 589 | sales taxes |
| Fairfax County  VA | 8,600 | judgement |
| NY State | 14,946 | taxes |
| State of Texas | less than $10 000* | Taxes |

* The exact amount of this lien could not be read from the lien search results as a result of the poor copy quality  however it could be determined that the amount
was less than $10,000

24

Schedule 6.13 – Customer Premises Coll iter;l

All items covered by Schedule C 1 to the Supply Agreement



EXHIBIT A

[Form of]

ASSIGNMENT AND ACCEPTANCE

Reference is made to the Credit Agreement dated as of May 4  2000 (as amended and in effect on the date hereof, the "Credit Agreement"), among WVF-I LLC, any additional Borrowers party thereto  Winstar Communications, Inc , the lenders party thereto, The Bank of New York, as collateral agent and Lucent Technologies Inc  as administrative agent for the Lenders (in such capacity, the "Administrative Agent")   Terms defined in the Credit Agreement are used herein with the same meanings

1    The Assignor hereby sells and assigns, without recourse  to the Assignee, and the Assignee hereby purchases and assumes  without recourse  from the Assignor  effective as of the Assignment Date set forth below  the interests set forth below (the "Assigned Interest") in the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents, including  without limitation, the amounts set forth below of (i) the Commitments of the Assignor on the Assignment Date and (ii) the Loans owing to the Assignor which are outstanding on the Assignment Date  If a Commitment is assigned hereby, such assigned Commitment [is/is not] a Fronting Commitment   The Assignee hereby acknowledges receipt of a copy of the Credit Agreement  From and after the Assignment Date (i) the Assignee shall be a party to and be bound by the provisions of the Credit Agreement and, to the extent of the interests assigned by this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and under the Loan Documents and (ii) the Assignor shall, to the extent of the interests assigned by this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement[1]

2    This Assignment and Acceptance is being delivered to the Administrative Agent together with (i) if the Assignee is a Foreign Lender, any forms of the type described in Section 2 15(e) of the Credit Agreement, duly completed and executed by such Assignee, (ii) if the Assignee is not already a Lender under the Credit Agreement, an Administrative Questionnaire and (iii) a processing and recordation fee of $3,500

---

[1] If the assignment is an Exempt Assignment, add limitations regarding voting rights

2

3   This Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of New York

Date of Assignment

Legal Name of Assignor

Legal Name of Assignee

Assignee's Address for Notices

Effective Date of Assignment ("Assignment Date")

|   | Principal Amount of outstanding Loans Assigned | Amount of Commitment Assigned |
|---|---|---|
|   | $ | $ |



3

The terms set forth above are          Accepted */
hereby agreed to

_____ as Assignor          LUCENT TECHNOLOGIES INC ,
                                 as Administrative Agent

by _____              by _____
   Name                             Name
   Title                            Title

_____ as Assignee          [BORROWERS]

by _____              by _____
   Name                             Name
   Title                            Title

_____

   */   To be completed to the extent consents are
required under Section 9 04(b) of the Credit Agreement



Exhibit B

EXHIBIT B

WINSTAR COMMUNICATIONS  INC

$2 000 000,000 Aggregate Principal Amount of

Senior Notes Due 2010

CONVERSION AGREEMENT

[          ], 2000

Lucent Technologies Inc
600 Mountain Avenue
Murray Hill, New Jersey 07974

Ladies and Gentlemen

Reference is made to the Credit Agreement  dated
as of May 4, 2000 (as amended  supplemented or otherwise
modified from time to time, the "Credit Agreement") by and
among WVF-I LLC, a Delaware limited liability company  any
Replacement Borrower (as defined in the Credit Agreement)
from time to time party thereto, Winstar Communications
Inc , a Delaware corporation (the "Company")  the lenders
party thereto, The Bank of New York, as collateral agent,
and Lucent Technologies Inc  ("Lucent"), as administrative
agent thereunder  Capitalized terms used herein and not
otherwise defined herein have the meanings specified in the
Credit Agreement or  if not defined therein, in the
Conversion Indenture referred to in the Credit Agreement

The Credit Agreement provides that, during any
Refinancing Period, Lucent may elect in its sole discretion
to convert outstanding Lucent Loans, at any time in whole or
from time to time in part, into Conversion Notes issued by
the Company under the Conversion Indenture  The Credit
Agreement also requires that, on and after the earlier of
(A) the date on which the aggregate principal amount (on a
cumulative basis) of Loans borrowed under the Credit
Agreement equals or exceeds $250,000,000 and
(B) September 30, 2000, the Company will maintain in effect
one or more registration statements under the Securities Act
registering the offer and sale of Conversion Notes, such
that at all times the aggregate principal amount of
Conversion Notes covered by such effective registration
statement or registration statements equals or exceeds the
aggregate principal amount of outstanding Lucent Loans  The
Company and Lucent are entering into this Agreement in order
to set forth certain agreements of the Company with respect

[NYCORP 1655025 ? 43058 05/05/2000  12 27p]

to the registration of Conversion Notes under the Securities
Act and the issuance  offering and sale thereof

1    Registration of the Conversion Notes

(1)  The Company covenants and agrees with
Lucent that, on and after the earlier of (A) the date
on which the aggregate principal amount (on a
cumulative basis) of Loans borrowed under the Credit
Agreement equals or exceeds $250,000,000 and
(B) September 30, 2000, the Company will maintain in
effect one or more registration statements under the
Securities Act registering the offer and sale of all of
the Conversion Notes that may be issued pursuant to the
Conversion Indenture, such that at all times the
aggregate principal amount of Conversion Notes covered
by such effective registration statement or
registration statements equals or exceeds the aggregate
principal amount of outstanding Lucent Loans

(ii)  The Company covenants and agrees with
Lucent that the Company will promptly (A) advise Lucent
of the status of the filing of the registration
statements referred to in subparagraph (i) of this
Section 1  with the Securities and Exchange Commission
("Commission"), and respond to requests by Lucent for
information regarding the status of such filing, (B)
provide Lucent with drafts of such registration
statements in such number as Lucent may reasonably
request and provide Lucent a reasonable opportunity to
comment on such drafts, (C) notify Lucent when such
registration statements have been filed with the
Commission and provide Lucent with copies of such
registration statements as filed with the Commission in
such number as Lucent may reasonably request,
(D) provide Lucent with copies of all correspondence
with the Commission with respect to such registration
statements  (E) notify Lucent when the Commission has
declared such registration statements effective and
(F) deliver to Lucent copies of such effective
registration statements in such number as Lucent may
reasonably request

2    Representations and Warranties of the
Company

The Company represents and warrants to, and agrees
with, Lucent as of the date hereof and as of each Conversion
Date as follows (provided that the representations and
warranties set forth in subparagraphs (i), (iii), (vi)
(vii), (x)(A)   (xi), (xii), (xiii), (xiv), (xv), (xvi),

(xviii), (xix) (xx), (xxi) (xxii) and (xxiii) of this Section 2 shall be given only as of each Conversion Date and not as of the date hereof)

(i) A registration statement, including a prospectus, relating to the Conversion Notes has been filed with the Commission and has become effective Such registration statement, and each other registration statement relating to the Conversion Notes that is filed with the Commission, is hereinafter referred to as a "Registration Statement", and the prospectus included in any such Registration Statement, as first filed with the Commission pursuant to and in accordance with Rule 424(b) ("Rule 424(b)") under the Securities Act including all material incorporated by reference therein, is hereinafter referred to as a "Prospectus" No document has been or will be prepared or distributed in reliance on Rule 434 under the Securities Act

(ii) On the effective date of each Registration Statement such Registration Statement and the Prospectus forming part thereof, including all amendments and supplements thereto complied in all respects with the requirements of the Securities Act and the rules and regulations of the Commission (the "Rules and Regulations") and did not include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made not misleading, and on each Delivery Date (as defined in Section 3(b)) each Registration Statement and Prospectus (and any amendment or supplement thereto) relating to the Conversion Notes then being delivered (each such Registration Statement, a "Relevant Registration Statement" and each such Prospectus, a "Relevant Prospectus") will, in the case of each such Relevant Registration Statement, be effective and, in the case of each such Relevant Registration Statement and Relevant Prospectus, will comply in all respects with the requirements of the Securities Act and the Rules and Regulations, and none of such documents will include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading provided that this representation and warranty does not apply to statements or omissions made in reliance upon and in conformity with information concerning Lucent or any other Person that has acquired

4

Conversion Notes for distribution (an "Other Person")
furnished in writing by or on behalf of Lucent or any
Other Person to the Company expressly for use in each
Relevant Registration Statement and each Relevant
Prospectus (or any amendment or supplement thereto)

(iii)  The Company is not now, nor immediately after
the issuance of any Conversion Notes will be, an
"investment company" or a company "controlled by" an
"investment company" within the meaning of the
Investment Company Act of 1940, as amended

(iv)  Each subsidiary of the Company has been duly
incorporated and is validly existing as a corporation
in good standing under the laws of the jurisdiction of
its incorporation  has corporate power and authority to
own  lease and operate its properties and to conduct
its business as described in each Relevant Prospectus
and is duly qualified as a foreign corporation to
transact business and is in good standing in each
jurisdiction in which such qualification is required
whether by reason of the ownership or leasing of
property or the conduct of business, except where the
failure to be in good standing or to so qualify would
not have  singly or in the aggregate, a Material
Adverse Effect (as hereinafter defined)

(v)  All of the issued and outstanding capital
stock of the Company has been duly authorized and
validly issued and is fully paid and nonassessable  and
conforms in all material respects to the description
therein in each Relevant Prospectus

(vi)  Except as disclosed in each Relevant
Prospectus  (A) since the date of the latest audited
financial statements included in each Relevant
Prospectus, there has been no material adverse change
in the condition, financial or otherwise, or in the
results of operations or business of the Company, and
its subsidiaries considered as one enterprise, whether
or not arising in the ordinary course of business (a
"Material Adverse Change"), (B) there have been no
transactions entered into by the Company or any of its
subsidiaries, other than those in the ordinary course
of business, which are material with respect to the
condition, financial or otherwise  or to the results of
operations or business of the Company and its
subsidiaries considered as one enterprise, and
(C) there has been no dividend or distribution of any
kind declared  paid or made by the Company on any class



5

of its capital stock, except for regular quarterly dividends

(vii)  The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the state of its incorporation with corporate power and authority to own  lease and operate its properties and to conduct its business as described in each Relevant Prospectus and to enter into and perform its obligations under this Agreement and the Conversion Indenture, and the Company is duly qualified as a foreign corporation to transact business and is in good standing in each jurisdiction in which such qualification is required  whether by reason of the ownership or leasing of property or the conduct of business  except where the failure to be in good standing or to so qualify would not have a material adverse effect on the condition, financial or otherwise, or on the results of operations or business of the Company and its subsidiaries considered as one enterprise (a "Material Adverse Effect")

(viii)  The Company has the corporate power and authority to enter into and perform its obligations under this Agreement  the Conversion Indenture and the Conversion Notes and to issue the Conversion Notes This Agreement has been duly authorized, executed and delivered by the Company

(ix)  The Conversion Notes and the Conversion Indenture have been duly authorized by the Company The Conversion Indenture (assuming due execution by the Trustee) constitutes a legal  valid and binding obligation of the Company  and the Conversion Notes will, when authenticated  issued and delivered in the manner provided for in the Conversion Indenture constitute legal  valid and binding obligations of the Company entitled to the benefits of the Conversion Indenture and enforceable  in each case, against the Company in accordance with their terms  subject to applicable bankruptcy, insolvency, fraudulent conveyance  reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general  principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding in equity or at law), and except that rights to indemnity and contribution may be limited by federal and state securities laws and by public policy considerations The Conversion Notes and the Conversion Indenture



6

conform in all material respects to the description
thereof contained in each Relevant Prospectus

(x) (A)   Except as described in each Relevant
Prospectus neither the Company nor any of its
subsidiaries is in violation of its charter or by-laws
or in default in the performance or observance of any
obligation  agreement  covenant or condition contained
in any contract, indenture, mortgage, loan agreement,
note, lease or other agreement or instrument to which
the Company or any of its subsidiaries is a party or by
which it or any of them may be bound, or to which any
of the property or assets of the Company or any of its
subsidiaries is subject, the effect of which violation
or default in performance or observance, singly or in
the aggregate, would have a Material Adverse Effect,

(B)   The execution  delivery and performance of
this Agreement, the Conversion Indenture and the
Conversion Notes, the issuance of the Conversion Notes
and the consummation of the transactions contemplated
herein and therein have been duly authorized by all
necessary corporate action on the part of the Company
and its subsidiaries and will not conflict with or
constitute a breach of, or default under, or result in
the creation or imposition of any lien  charge or
encumbrance upon any property or assets of the Company
or any of its subsidiaries pursuant to, any contract,
indenture, mortgage  loan agreement, note, lease or
other agreement or instrument to which the Company or
any of its subsidiaries is a party or by which it or
any of them may be bound, or to which any of the
property or assets of the Company or any of its
subsidiaries is subject  or violate any applicable law,
administrative regulation or administrative or court
decree, in each case  the effect of which conflict,
breach, default  lien, charge, encumbrance or
violation, singly or in the aggregate, would have a
Material Adverse Effect  nor will such action result in
any violation of the provisions of the charter or by-
laws of the Company or any of its subsidiaries

(xi)   Except as described in each Relevant
Prospectus, there are no pending actions, suits or
proceedings against or affecting the Company, any of
its subsidiaries or any of their respective properties
that, individually or in the aggregate, could reason-
ably be expected to have a Material Adverse Effect, or
to materially and adversely affect the ability of the
Company to perform its obligations under the Conversion
Indenture or this Agreement, or which are otherwise



[NYCORP/1055885 9 43058 05/05/2000  12:27p]

7

material in the context of the sale of the Conversion Notes and, to the Company's knowledge, no such actions, suits or proceedings are threatened or contemplated

(xii) Except as described in each Relevant Prospectus, the Company and its subsidiaries possess adequate certificates, authorities or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by them and have not received any notice of proceedings relating to the revocation or modification of any such certificate, authority or permit that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect

(xiii) No authorization, approval or consent of or filing with, any court or governmental authority or agency is necessary or required in connection with the issuance by the Company of the Conversion Notes, except (A) those already obtained or made under the Securities Act and the Trust Indenture Act of 1939 ("Trust Indenture Act"), and (B) such as may be required under state securities or Blue Sky laws and the securities laws of foreign jurisdictions

(xiv) Except as described in each Relevant Prospectus the Company and its subsidiaries own possess or can acquire on reasonable terms, adequate trademarks trade names and other rights to inventions, know-how, patents, copyrights, confidential information and other intellectual property (collectively, "intellectual property rights") necessary to conduct the business as now operated by them or used in the conduct of the business as now operated by them, except to the extent that the failure to own or possess or the inability to acquire such intellectual property rights would not individually or in the aggregate have a Material Adverse Effect, and the Company has not received any notice of infringement of or conflict with asserted rights of others with respect to any intellectual property rights that, if determined adversely to the Company or any of its subsidiaries would individually or in the aggregate have a Material Adverse Effect

(xv) The accountants who certified the financial statements and supporting schedules included in each Relevant Registration Statement and each Relevant Prospectus are independent public accountants as

8

required by the Securities Act and the Rules and
Regulations

(xvi)  The financial statements, including the notes
thereto, included in each Relevant Registration
Statement and each Relevant Prospectus present fairly
in all material respects the consolidated financial
position of the Company and its subsidiaries and of the
Company's predecessors as of the dates indicated and
the results of their operations and cash flows for the
periods specified, except as otherwise specifically
stated in each Relevant Prospectus, said financial
statements have been prepared in conformity with
generally accepted accounting principles in the United
States applied on a consistent basis, any schedules
included in any Relevant Registration Statement present
fairly the information required to be stated therein
and if pro forma financial statements are included in
any Relevant Registration Statement or any Relevant
Prospectus  the assumptions used in preparing the pro
forma financial statements included in such Relevant
Registration Statement or Relevant Prospectus provide a
reasonable basis for presenting the significant effects
directly attributable to the transactions or events
described therein  the related pro forma adjustments
give appropriate effect to those assumptions, and the
pro forma columns therein reflect the proper
application of those adjustments to the corresponding
historical financial statement amounts

(xvii)  The Conversion Indenture conforms in all
material respects with the requirements of the Trust
Indenture Act applicable to indentures to be qualified
thereunder

(xviii)  Except as described in each Relevant
Prospectus, neither the Company nor any of its
subsidiaries is in violation of any statute, rule,
regulation  decision or order of any governmental
agency or body or any court, domestic or foreign,
relating to the use, disposal or release of hazardous
or toxic substances or relating to the protection or
restoration of the environment or human exposure to
hazardous or toxic substances (collectively,
"environmental laws"), owns or operates any real
property contaminated with any substance that is
subject to any environmental laws, is liable for any
off-site disposal or contamination pursuant to any
environmental laws, or is subject to any claim relating
to any environmental laws, which violation,
contamination, liability or claim would individually or

9

in the aggregate have a Material Adverse Effect  and
the Company is not aware of any pending investigation
which might lead to such a claim

(xix)  Except as described in each Relevant
Prospectus  the Company and its subsidiaries are in
compliance in all material respects with the
Communications Act of 1934 (as amended by the Tele-
communications Act of 1996  the "Communications Act")
and with all applicable rules, regulations and policies
of the Federal Communications Commission (the "FCC")

(xx)  All FCC licenses held (as of the most recent
date for which any financial information is included or
incorporated by reference in any Relevant Prospectus)
by the Company and its subsidiaries (other than
experimental licenses in the 38 GHz portions of the
radio spectrum and licenses granted to the Company or
its subsidiaries or acquired from Local Area
Telecommunications Inc  that are not in the 38 GHz
portion of the radio spectrum and proceedings affecting
the service rules and licensing of Spectrum in the 38
GHz band) (the "Licenses") are currently valid and in
full force and effect  Neither the Company nor any of
its subsidiaries has any knowledge of any
investigation, notice of apparent liability  violation
forfeiture or other order or complaint issued by or
before any court or regulatory body  including the FCC,
or of any other proceedings (other than proceedings
relating to the wireless communications industries
generally and proceedings affecting the service rules
and licensing of spectrum in the 38 GHz band) which
could in any manner materially threaten or adversely
affect the validity or continued effectiveness of any
of the Licenses  except as disclosed in each Relevant
Prospectus

(xxi)  Except as described in each Relevant
Prospectus, no event has occurred which (A) results in,
or after notice or lapse of time or both would result
in  revocation, suspension  modification, non-renewal,
impairment, restriction or termination of, or order of
forfeiture with respect to, any License the loss of
which could reasonably be expected to have a Material
Adverse Effect or (B) materially and adversely affects
or could reasonably be expected in the future to
materially adversely affect any of the rights of the
Company or any of its subsidiaries thereunder

(xxii)  The Company and its subsidiaries have duly
filed in a timely manner all material filings, reports

applications, documents, instruments and information required to be filed by them under the Communications Act, and all such filings are true correct and complete in all material respects

(xxiii) Neither the Company nor any of its subsidiaries has any reason to believe that any of the Licenses will not be renewed in the ordinary course

3    Issuance of the Conversion Notes, Delivery

(a) The Company agrees subject to the terms and conditions of the Credit Agreement, to issue the Conversion Notes

(b) Delivery of each issuance of the Conversion Notes shall be made at the offices and on such dates and times as Lucent shall specify in the Conversion Certificates (each such date and time of delivery of the Conversion Notes, a "Delivery Date")    Certificates for the Conversion Notes shall be registered in such names and in such denominations as Lucent shall specify in the Conversion Certificates    Lucent shall specify in the relevant Conversion Certificate whether the issuance of the Conversion Notes will be in the form of (i) definitive, fully registered certificates or (ii) one or more Global Securities (as defined and described in the Conversion Indenture)

4    Covenants of the Company    With respect to each issuance of Conversion Notes, the Company covenants and agrees with Lucent as follows

(i) The Company will advise Lucent and each Other Person (provided that the Company has been notified of such Other Person), when any Registration Statement and any amendment thereto has been filed with the Commission and when any Registration Statement or any post-effective amendment thereto has become effective

(ii) The Company will file each Relevant Prospectus with the Commission pursuant to and in accordance with Rule 424(b)(2), not later than the first business day following the delivery of the relevant Conversion Certificate

(iii) The Company will furnish to Lucent and each Other Person such number of copies of each Relevant Registration Statement and Relevant Prospectus, including all exhibits and any amendments or

11

supplements thereto as Lucent and each Other Person may reasonably request

(iv)  The Company will not at any time make any amendment or supplement to any Relevant Registration Statement or any Relevant Prospectus of which Lucent and each Other Person (provided that the Company has been notified of such Other Person) shall not have previously been advised and furnished a copy and have had reasonable opportunity to comment on such proposed amendment or supplement, or to which Lucent or any Other Person or their respective counsel shall reasonably object, except as required by applicable law

(v)  The Company will advise Lucent and each Other Person (provided that the Company has been notified of such Other Person), of the institution by the Commission of any stop order proceedings in respect of any Relevant Registration Statement or of any part thereof and will use every reasonable effort to prevent the issuance of any such stop order and to obtain as soon as possible its lifting, if issued

(vi)  The Company will advise Lucent and each Other Person (provided that the Company has been notified of such Other Person)  of any request by the Commission for amendments or supplements to any Relevant Registration Statement or any Relevant Prospectus or for additional information  Upon receipt of such notice from the Company use of each Relevant Prospectus shall be suspended until the Company has amended or supplemented each Relevant Prospectus to correct such misstatement or omission or to effect such compliance The Company will forthwith prepare such amendment or supplement as may be necessary so that each Relevant Prospectus  as so amended or supplemented, does not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading and furnish to Lucent or such Other Person  as applicable, such number of copies as Lucent or such Other Person  as applicable, may reasonably request

(vii)  If at any time prior to completion of the distribution of the Conversion Notes by Lucent or such Other Person to purchasers who are not its affiliates (as determined by Lucent, or such Other Person, as applicable) any event shall occur or condition shall exist as a result of which it is necessary, in the view of the Company or in the reasonable view of Lucent or

12

such Other Person, as applicable, to amend or supplement each Relevant Prospectus in order that each Relevant Prospectus will not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading, or if such amendment or supplement is necessary to comply with applicable law, the Company will (in a form and in substance that shall be reasonably satisfactory to Lucent, or such Other Person as applicable), forthwith prepare such amendment or supplement as may be necessary so that each Relevant Prospectus, as so amended or supplemented, does not include such untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading and furnish to Lucent or such Other Person as applicable, such number of copies as Lucent or such Other Person, as applicable, may reasonably request The Company agrees to notify Lucent and each Other Person (provided that the Company has been notified of such Other Person) to suspend use of each Relevant Prospectus as promptly as practicable after the occurrence of an event specified in the first sentence of this paragraph (without giving effect to the reasonable view of Lucent or such Other Person, as applicable), and upon receipt of such notice from the Company use of each Relevant Prospectus shall be suspended until the Company has amended or supplemented each Relevant Prospectus to correct such misstatement or omission or to effect such compliance

(viii)  The Company will furnish to Lucent and each Other Person (provided that the Company has been notified of such Other Person) copies of any annual reports, quarterly reports and current reports filed by the Company with the Commission on Forms 10-K, 10-Q and 8-K or such other similar forms as may be designated by the Commission, and such other documents, reports and information as shall be furnished by the Company to the Trustee or to the holders of the Conversion Notes pursuant to the Conversion Indenture but only so long as the Company is obligated to furnish the foregoing documents pursuant to the Conversion Indenture

(ix)  The Company will use its commercially reasonable efforts in cooperation with Lucent and each Other Person to (A) permit the Conversion Notes to be eligible for clearance and settlement through the Depository, (B) provide a CUSIP number for the Conversion Notes not later than the effective date of each Relevant Registration Statement, and (C) provide

the Trustee with printed certificates for the Conversion Notes in a form eligible for deposit with the Depository

(x)  The Company will endeavor, in cooperation with Lucent, each Other Person and their respective counsel  to qualify the Conversion Notes for offering and sale under the applicable securities laws of such states and other jurisdictions of the United States as Lucent may reasonably designate, provided, that the Company shall not be obligated to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or to take any action that would subject the Company to general service of process in any jurisdiction where it would not be so subject at the date of this Agreement   In each jurisdiction in which the Conversion Notes have been so qualified  the Company will file such statements and reports as may be required by the laws of such jurisdiction to continue such qualification in effect for a period of not less than one year from the date of each Relevant Prospectus   The Company shall promptly advise Lucent and each Other Person (provided that the Company has been notified of such Other Person) of the receipt by the Company of any notification with respect to (x) the suspension of the qualification or exemption from qualification of the Conversion Notes for offering or sale in any jurisdiction or (y) the institution threatening or contemplation of any proceeding for such purpose

(xi)  Prior to the termination of the Commitments and the repayment of all outstanding Lucent Loans  the Company will not  without the prior written consent of Lucent, (A) amend or modify the Conversion Indenture or (B) amend or modify  or redeem or defease, the Issue Date Senior Notes, or amend or modify the indenture under which the Issue Date Senior Notes were issued

(xii)  On the date hereof and on each Conversion Date, Lucent and each Other Person will receive an opinion  dated as of the date hereof or the relevant Conversion Date, as the case may be, of counsel for the Company  in customary form and substance and otherwise reasonably satisfactory to Lucent and each Other Person

(xiii)  On each Conversion Date, Lucent and each Other Person shall receive a certificate, dated such Conversion Date, of the Chief Executive Officer or any Vice President and a principal financial or accounting

14

officer of the Company in which such officers, to the best of their knowledge after reasonable investigation, shall state that the representations and warranties of the Company in this Agreement are true and correct, that the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Conversion Date, and that, subsequent to the dates of the most recent financial statements in the Relevant Prospectus there has been no material adverse change, nor any development or event involving a prospective material adverse change, in the condition (financial or other), business, properties or results of operations of the Company and its subsidiaries taken as a whole except as set forth in or contemplated by the Relevant Prospectus or as described in such certificate

(xiv)  On each Conversion Date, the Company if requested with reasonable advanced notice by Lucent or any Other Person  will cause its independent public accountants to provide to Lucent and any Other Person a comfort letter in customary form and covering matters of the type customarily covered in comfort letters in connection with primary underwritten offerings, subject to receipt of appropriate documentation as contemplated, and only if permitted, by Statement of Auditing Standards No  72

(xv)  On each Conversion Date  counsel for Lucent and each Other Person will be furnished with such documents and opinions as they may reasonably require for the purpose of enabling them to pass upon the issuance of the Conversion Notes as contemplated herein and related proceedings, or in order to evidence the accuracy of any of the representations or warranties or the fulfillment of any of the conditions, herein contained, and all proceedings taken by the Company in connection with the issuance of the Conversion Notes and as herein contemplated shall be reasonably satisfactory in form and substance to Lucent, each Other Person and their respective counsel

(xvi)  The Company will comply with all rules and regulations of the Commission to the extent and so long as they are applicable to the resale of the Conversion Notes or the Relevant Registration Statement and will make generally available to its security holders (or otherwise provide in accordance with Section 11(a) of the Securities Act) an earnings statement satisfying the provisions of Section 11(a) of the Securities Act, no later than 45 days after the end of a 12-month



[NYCORP:1053085 9 43053 05/01/2000  12:37p]

15

period (or 90 days if such period is a fiscal year) beginning with the first month of the Company's first fiscal quarter commencing after the effective date of the Relevant Registration Statement, which statement shall cover such 12-month period

(xvii) The Company will enter into such customary agreements (including, if requested, an underwriting agreement in customary form) and take all such other action, if any, as Lucent and any Other Person shall reasonably request in order to facilitate any disposition of the Conversion Notes pursuant to any Relevant Registration Statement

(xviii) The Company will (A) make reasonably available for inspection by a representative of, and special counsel acting for, Lucent or any Other Person, all relevant financial and other records, pertinent corporate documents and properties of the Company and its subsidiaries and (B) cause the Company's officers, directors, employees, accountants and counsel to supply all relevant information reasonably requested by such representative and special counsel in connection with the Relevant Registration Statement

5    Payment of Expenses    The Company will pay all expenses incident to the performance of its obligations under this Agreement, including (i) the filing fees with the Commission and printing of each Relevant Registration Statement and each Relevant Prospectus and of each amendment or supplement thereto and the delivery to Lucent each Other Person and their respective designees of printed copies thereof (ii) the copying of this Agreement and the Conversion Indenture, (iii) the preparation, issuance and delivery of the Conversion Notes, including capital duties, stamp duties and transfer taxes, if any payable upon issuance of any of the Conversion Notes and the fees and expenses of the Trustee, (iv) the fees and disbursements of the Company's counsel and accountants (v) the qualification of the Conversion Notes under state securities laws in accordance with the provisions of Section 4(xi), including filing fees and the reasonable fees and disbursements of counsel for Lucent and each Other Person in connection therewith, (vi) the fee of any filing for review of any offering with the National Association of Securities Dealers, Inc , (vii) all expenses and application fees incurred in connection with the application for the inclusion of the Conversion Notes for book-entry transfer by the Depository and (viii) any out-of-pocket expenses incurred by the Company on any "road show" or similar presentation to prospective purchasers of Conversion Notes

(NYCORP\1015085 P 43050 05/05/2000 (1 37p)

16

6     Indemnification and Contribution

(1)    The Company will indemnify and hold harmless
Lucent and each Other Person, their respective
affiliates, directors and officers and each person, if
any, who controls such person within the meaning of
Section 15 of the Securities Act, against any losses,
claims, damages or liabilities, joint or several, to
which such person may become subject, under the
Securities Act or the Securities Exchange Act of 1934
(the "Exchange Act'), or otherwise, insofar as such
losses, claims, damages or liabilities (or actions in
respect thereof) arise out of or are based upon any
breach of any of the representations and warranties of
the Company contained herein or any untrue statement or
alleged untrue statement of any material fact contained
in any Registration Statement, or any Prospectus, or
any amendment or supplement thereto  or arise out of or
are based upon the omission or alleged omission to
state therein a material fact necessary in order to
make the statements therein, in the light of the
circumstances under which they were made, not
misleading, and will reimburse Lucent and each Other
Person for any legal or other expenses reasonably
incurred by Lucent and each Other Person in connection
with investigating or defending any such loss, claim
damage  liability or action as such expenses are
incurred, provided however, that the Company will not
be liable in any such case to the extent that any such
loss, claim, damage or liability arises out of or is
based upon an untrue statement or alleged untrue
statement in or omission or alleged omission from any
of such documents in reliance upon and in conformity
with written information furnished to the Company by
Lucent or any Other Person specifically for use
therein, it being understood and agreed that the only
such information consists of the information described
as such in subsection (11) below, provided further,
however, that with respect to any untrue statement or
alleged untrue statement in or omission or alleged
omission from any Relevant Registration Statement or
any Relevant Prospectus, the indemnity agreement
contained in this subsection (1) shall not inure to the
benefit of Lucent or any Other Person that sold the
Conversion Notes concerned to the person asserting any
such losses, claims, damages or liabilities, to the
extent that such sale was an initial resale by Lucent
or such Other Person and any such loss, claim, damage
or liability of Lucent or such Other Person results
from the fact that there was not sent or given to such

[NYCORP/1015085 # 43050 05/05/2000  12 17p]



17

person, at or prior to the written confirmation of the
sale of such Conversion Notes to such person, a copy of
the Relevant Prospectus if the Company had previously
furnished copies thereof to Lucent or such Other Person
and such Relevant Prospectus corrected such untrue
statement or omission or alleged untrue statement or
omission

(ii)  Lucent and each Other Person will severally
and not jointly indemnify and hold harmless the
Company, its affiliates, directors and officers and
each person, if any who controls the Company within
the meaning of Section 15 of the Securities Act,
against any losses, claims, damages or liabilities to
which the Company may become subject, under the
Securities Act or the Exchange Act or otherwise,
insofar as such losses, claims, damages or liabilities
(or actions in respect thereof) arise out of or are
based upon any untrue statement or alleged untrue
statement of any material fact contained in the
Relevant Prospectus, or any amendment or supplement
thereto, or arise out of or are based upon the omission
or the alleged omission to state therein a material
fact necessary in order to make the statements therein,
~      ~ of the circumstances    ~~~ ~'ch they w~re
ma~~ not misleading, in each case to the extent, but
only to the extent, that such untrue statement or
alleged untrue statement or omission or alleged
omission was made in reliance upon and in conformity
with written information furnished to the Company by
Lucent or such Other Person (as the case may be)
specifically for use therein, and will reimburse any
legal or other expenses reasonably incurred by the
Company in connection with investigating or defending
any such loss, claim, damage, liability or action as
such expenses are incurred, it being understood and
agreed that the only such information furnished by
Lucent and each Other Person consists of information in
the Relevant Prospectus under the caption "Plan of
Distribution"

(iii)  Promptly after receipt by an indemnified
party under this Section of notice of the commencement
of any action, such indemnified party will, if a claim
in respect thereof is to be made against the
indemnifying party under subsection (i) or (ii) above,
notify the indemnifying party of the commencement
thereof, but the omission so to notify the indemnifying
party will not relieve it from any liability which it
may have to any indemnified party otherwise than under
subsection (i) or (ii) above  In case any such action

18

is brought against any indemnified party and it
notifies the indemnifying party of the commencement
thereof, the indemnifying party will be entitled to
participate therein and, to the extent that it may
wish, jointly with any other indemnifying party
similarly notified  to assume the defense thereof, with
counsel reasonably satisfactory to such indemnified
party (who shall not  except with the consent of the
indemnified party (which consent shall not be
unreasonably withheld), be counsel to the indemnifying
party), and after notice from the indemnifying party to
such indemnified party of its election so to assume the
defense thereof, the indemnifying party will not be
liable to such indemnified party under this Section for
any legal or other expenses subsequently incurred by
such indemnified party in connection with the defense
thereof other than reasonable costs of investigation
No indemnifying party shall, without the prior written
consent of the indemnified party (which consent shall
not be unreasonably withheld), effect any settlement of
any pending or threatened action in respect of which
any indemnified party is or could have been a party and
indemnity could have been sought hereunder by such
indemnified party unless such settlement includes an
u-  n-t.onal .elease of such indemnified party from
all liability on any claims that are the subject matter
of such action and does not include a statement as to
or an admission of fault, culpability or failure to act
by or on behalf of any indemnified party

    (iv)  If the indemnification provided for in this
Section is unavailable or insufficient to hold harmless
an indemnified party under subsection (i) or (ii)
above, then each indemnifying party shall contribute to
the amount paid or payable by such indemnified party as
a result of the losses, claims, damages or liabilities
referred to in subsection (i) or (ii) above (A) in such
proportion as is appropriate to reflect the relative
benefits received by the Company on the one hand and
Lucent and each Other Person on the other from the
offering of the Conversion Notes or (B) if the
allocation provided by clause (A) above is not
permitted by applicable law, in such proportion as is
appropriate to reflect not only the relative benefits
referred to in clause (A) above but also the relative
fault of the Company on the one hand and Lucent and
each Other Person on the other in connection with the
statements or omissions which resulted in such losses,
claims, damages or liabilities as well as any other
relevant equitable considerations  The relative
benefits received by the Company on the one hand and

19

Lucent and each Other Person on the other shall be
deemed to be in the same proportion as the aggregate
principal amount of the Conversion Notes issued by the
Company bear to the aggregate principal amount of the
Conversion Notes issued to Lucent and each Other Person
by the Company under this Agreement   The relative
fault shall be determined by reference to, among other
things, whether the untrue or alleged untrue statement
of a material fact or the omission or alleged omission
to state a material fact relates to information
supplied by the Company or Lucent or each Other Person
and the parties' relative intent, knowledge, access to
information and opportunity to correct or prevent such
untrue statement or omission  The amount paid by an
indemnified party as a result of the losses, claims
damages or liabilities referred to in the first
sentence of this subsection (iv) shall be deemed to
include any legal or other expenses reasonably incurred
by such indemnified party in connection with
investigating or defending any action or claim which is
the subject of this subsection (iv)  Notwithstanding
the provisions of this subsection (iv), neither Lucent
nor any Other Person shall be required to contribute
any amount in excess of the amount by which the
aggregate principal amount of the Conversion Notes
issued to it exceeds the amount of any damages which
Lucent or such Other Person has otherwise been required
to pay by reason of such untrue or alleged untrue
statement or omission or alleged omission   Lucent's
and each Other Person's obligations in this subsection
(iv) to contribute are several in proportion to their
respective purchase obligations and not joint

(v)   The obligations of the Company under this
Section shall be in addition to any liability which the
Company may otherwise have and shall extend, upon the
same terms and conditions, to each person, if any, who
controls Lucent or any Other Person within the meaning
of the Securities Act or the Exchange Act, and the
obligations of Lucent and each Other Person under this
Section shall be in addition to any liability which
such persons may otherwise have and shall extend   upon
the same terms and conditions, to each person, if any
who controls the Company within the meaning of the
Securities Act or the Exchange Act

7   Representations, Warranties and Agreements to
Survive Delivery  All representations, warranties, and
agreements contained in this Agreement or in certificates of
officers of the Company submitted pursuant hereto, shall
remain operative and in full force and effect, regardless of

[NYCORP]1055085 9 43058 05/05/2000  12:17p]



20

any investigation made by or on behalf of Lucent, any Other Person or any controlling person, or by or on behalf of the Company, and shall survive delivery of and payment for the Conversion Notes

8    Notices   All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication   Notices to Lucent shall be directed to it at Lucent Technologies Inc , 600 Mountain Avenue, Murray Hill, New Jersey 07974, Attention Assistant Treasurer-Project Finance, fax  (908) 582-3101, with a copy to Cravath, Swaine & Moore, 825 Eighth Avenue New York, New York, 10019, Attention  James C  Vardell, III fax  (212) 474-3700, notices to the Company shall be directed to the Company at 685 Third Avenue, New York, New York 10017  Attention   Timothy R  Graham, fax  (212) 584-4001, with a copy to Graubard Mollen & Miller  600 Third Avenue, New York, New York 10016, Attention   David Alan Miller, fax  (212) 818-8881

9    Parties   This Agreement shall inure to the benefit of and be binding upon Lucent and the Company and their respective successors  heirs and legal representatives   Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person  firm or corporation  other than Lucent   the Company and their respective successors, heirs and legal representatives, and the affiliates  controlling persons, officers and directors referred to in Section 6 and their heirs and legal representatives, any legal or equitable rights  remedy or claim under or in respect of this Agreement or any provision herein   This Agreement and all conditions and provisions hereof are intended for the sole and exclusive benefit of Lucent  the Company and their respective successors  heirs and legal representatives, and said affiliates  controlling persons, officers and directors and their heirs and legal representatives  and for the benefit of no other person, firm or corporation Notwithstanding the foregoing, each Other Person and its successors  heirs and legal representatives, and the affiliates, controlling persons, officers and directors referred to in Section 6 and their heirs and legal representatives, shall be entitled to enforce the agreements for their benefit contained in Sections 4, 5, 6 and 7 hereof against the Company as if such Other Person was a party hereto   No purchaser of Conversion Notes from Lucent or any Other Person shall be deemed to be a successor by reason merely of such purchase, unless such Person has acquired Conversion Notes for distribution



21

10  <u>Governing Law and Time</u>   This Agreement shall
be governed by and construed in accordance with the laws of
the State of New York applicable to agreements made and to
be performed in said State   Each party hereto irrevocably
submits to the jurisdiction of any State or Federal court in
the State of New York and irrevocably waives any objection
it may now or hereafter have to the laying of venue of any
action in any such court   Each party hereto expressly
waives its rights to trial by jury   Specified times of day
refer to New York City time