22

CONVERSION AGREEMENT

    If the foregoing is in accordance with your
understanding of our agreement, please sign and return to
the Company a counterpart hereof, whereupon this instrument,
along with all counterparts, will become a binding agreement
between Lucent and the Company in accordance with its terms

               Very truly yours,

               WINSTAR COMMUNICATIONS  INC

               By  _____
                    Name
                    Title

Confirmed and accepted as of
the date first above written

LUCENT TECHNOLOGIES INC

    By  _____
        Name
        Title



Exhibit C

EXHIBIT C

WINSTAR COMMUNICATIONS  INC
Issuer

$2 000 000 000 Aggregate Principal Amount of
Senior Notes Due 2010

INDENTURE

Dated as of [        ]  2000

UNITED STATES TRUST COMPANY
OF NEW YORK
Trustee

[c/m 7725-064]

NYCorp 1051029 5 4306a 05/04/2000  2 34p]

CROSS REFERENCE TABLE

| TIA Section | Indenture Section | |
|---|---|---|
| 310 (a) (1) | 7 10 | |
| (a) (2) | 7 10 | |
| (a) (3) | N A | |
| (a) (4) | N A | |
| (b) | 7 08 | 7 10 |
| (c) | N A | |
| 311 (a) | 7 11 | |
| (b) | 7 11 | |
| (c) | N A | |
| 312 (a) | 2 05 | |
| (b) | 10 03 | |
| (c) | 10 03 | |
| 313 (a) | 7 06 | |
| (b) (1) | N A | |
| (b) (2) | 7 06 | |
| (c) | 10 02 | |
| (d) | 7 06 | |
| 314 (a) | 4 02 | 4 12 |
| | | 10 02 |
| (b) | N A | |
| (c) (1) | 10 04 | |
| (c) (2) | 10 04 | |
| (c) (3) | N A | |
| (d) | N A | |
| (e) | 10 05 | |
| (f) | 4 12 | |
| 315 (a) | 7 01 | |
| (b) | 7 05 | 10 02 |
| (c) | 7 01 | |
| (d) | 7 01 | |
| (e) | 6 11 | |
| 316 (a) (last sentence) | 2 08 | |
| (a) (1) (A) | 6 05 | |
| (a) (1) (B) | 6 04 | |
| (a) (2) | N A | |
| (b) | 6 07 | |
| 317 (a) (1) | 6 08 | |
| (a) (2) | 6 09 | |
| (b) | 2 04 | |
| 318 (a) | 10 01 | |

N A  means Not Applicable

Note   This Cross-Reference Table shall not  for any purpose  be deemed to
be part of the Indenture



TABLE OF CONTENTS

ARTICLE 1

Definitions and Incorporation by Reference

| | | |
|---|---|---|
| SECTION 1 01 | Definitions | 1 |
| SECTION 1 02 | Other Definitions | 35 |
| SECTION 1 03 | Incorporation by Reference of Trust Indenture Act | 35 |
| SECTION 1 04 | Rules of Construction | 36 |

ARTICLE 2

The Securities

| | | |
|---|---|---|
| SECTION 2 01 | Form and Dating | 36 |
| SECTION 2 02 | Execution Authentication and Issuance of Securities | 37 |
| SECTION 2 03 | Registrar and Paying Agent | 38 |
| SECTION 2 04 | Paying Agent To Hold Money in Trust | 39 |
| SECTION 2 05 | Securityholder Lists | 39 |
| SECTION 2 06 | Transfer and Exchange | 40 |
| SECTION 2 07 | Replacement Securities | 41 |
| SECTION 2 08 | Outstanding Securities, When Securities Disregarded | 42 |
| SECTION 2 09 | Temporary Securities | 42 |
| SECTION 2 10 | Cancellation | 43 |
| SECTION 2 11 | Defaulted Interest | 43 |
| SECTION 2 12 | CUSIP, ISIN and Common Code Numbers | 44 |
| SECTION 2 13 | Rights of Agent Members | 44 |
| SECTION 2 14 | No Obligation of the Trustee | 44 |

ARTICLE 3

Redemption

| | | |
|---|---|---|
| SECTION 3 01 | Notices to Trustee | 45 |
| SECTION 3 02 | Selection of Securities To Be Redeemed | 45 |
| SECTION 3 03 | Notice of Redemption | 46 |
| SECTION 3 04 | Effect of Notice of Redemption | 47 |
| SECTION 3 05 | Deposit of Redemption Price | 47 |
| SECTION 3 06 | Securities Redeemed in Part | 47 |



2

## ARTICLE 4

### Covenants

| | | |
|---|---|---|
| SECTION 4 01 | Payment of Securities | 47 |
| SECTION 4 02 | SEC Reports | 48 |
| SECTION 4 03 | Limitation on Indebtedness | 48 |
| SECTION 4 04 | Limitation on Restricted Payments | 52 |
| SECTION 4 05 | Limitation on Restrictions on Distributions from Restricted Group Members | 58 |
| SECTION 4 06 | Limitation on Sales of Assets and Subsidiary Stock | 60 |
| SECTION 4 07 | Limitation on Affiliate Transactions | 65 |
| SECTION 4 08 | Limitation on the Sale or Issuance of Capital Stock of Restricted Group Members | 67 |
| SECTION 4 09 | Change of Control | 68 |
| SECTION 4 10 | Limitation on Liens | 70 |
| SECTION 4 11 | Limitation on Sale/Leaseback Transactions | 70 |
| SECTION 4 12 | Compliance Certificate | 70 |
| SECTION 4 13 | Further Instruments and Acts | 71 |

## ARTICLE 5

### Successor Company

| | | |
|---|---|---|
| SECTION 5 01 | When Company May Merge or Transfer Assets | 71 |

## ARTICLE 6

### Defaults and Remedies

| | | |
|---|---|---|
| SECTION 6 01 | Events of Default | 72 |
| SECTION 6 02 | Acceleration | 74 |
| SECTION 6 03 | Other Remedies | 75 |
| SECTION 6 04 | Waiver of Past Defaults | 75 |
| SECTION 6 05 | Control by Majority | 76 |
| SECTION 6 06 | Limitation on Suits | 76 |
| SECTION 6 07 | Rights of Holders to Receive Payment | 76 |
| SECTION 6 08 | Collection Suit by Trustee | 77 |
| SECTION 6 09 | Trustee May File Proofs of Claim | 77 |
| SECTION 6 10 | Priorities | 77 |
| SECTION 6 11 | Undertaking for Costs | 78 |



3

SECTION 6 12    Waiver of Stay or Extension Laws        78

ARTICLE 7

Trustee

SECTION 7 01    Duties of Trustee                         78
SECTION 7 02    Rights of Trustee                         80
SECTION 7 03    Individual Rights of Trustee              80
SECTION 7 04    Trustee s Disclaimer                      80
SECTION 7 05    Notice of Defaults                        81
SECTION 7 06    Reports by Trustee to Holders             81
SECTION 7 07    Compensation and Indemnity                81
SECTION 7 08    Replacement of Trustee                    82
SECTION 7 09    Successor Trustee by Merger               83
SECTION 7 10    Eligibility Disqualification              83
SECTION 7 11    Preferential Collection of Claims
                Against Company                           84


ARTICLE 8

Discharge of Indenture, Defeasance

SECTION 8 01    Discharge of Liability on Securities,
                Defeasance                                84
SECTION 8 02    Conditions to Defeasance                  85
SECTION 8 03    Application of Trust Money                87
SECTION 8 04    Repayment to Company                      87
SECTION 8 05    Indemnity for Government
                Obligations                               87
SECTION 8 06    Reinstatement                             87


ARTICLE 9

Amendments

SECTION 9 01    Without Consent of Holders                88
SECTION 9 02    With Consent of Holders                   88
SECTION 9 03    Compliance with Trust Indenture Act       89
SECTION 9 04    Revocation and Effect of Consents
                and Waivers                               89
SECTION 9 05    Notation on or Exchange of
                Securities                                90
SECTION 9 06    Trustee To Sign Amendments                90
SECTION 9 07    Payment for Consent                       90

[NYC0-p 1055029 5 4306= 05/04/_000  3  4p]



4

ARTICLE 10

Miscellaneous

| SECTION 10 01 | Trust Indenture Act Controls | 91 |
| SECTION 10 02 | Notices | 91 |
| SECTION 10 03 | Communication by Holders with Other Holders | 92 |
| SECTION 10 04 | Certificate and Opinion as to Conditions Precedent | 92 |
| SECTION 10 05 | Statements Required in Certificate or Opinion | 92 |
| SECTION 10 06 | Rules by Trustee, Paving Agent and Registrar | 93 |
| SECTION 10 07 | Legal Holidays | 93 |
| SECTION 10 08 | Governing Law | 93 |
| SECTION 10 09 | No Recourse Against Others | 93 |
| SECTION 10 10 | Successors | 93 |
| SECTION 10 11 | Multiple Originals | 93 |
| SECTION 10 12 | Table of Contents  Headings | 94 |

Exhibit 1 - Form of Security
Exhibit 2 - Form of Conversion Certificate



INDENTURE dated as of [            ],
2000, between WINSTAR COMMUNICATIONS, INC , a
Delaware corporation (the 'Company") and
UNITED STATES TRUST COMPANY OF NEW YORK  a
New York corporation (the  Trustee )

    The Company is a party to the Credit Agreement
(such term and other capitalized terms used herein having
the meanings specified below)  under which any Borrower,
which is a Wholly Owned Subsidiary, may incur indebtedness
guaranteed by the Company  The Credit Agreement provides
that, during any Refinancing Period, Lucent may at any time
and from time to time convert any such indebtedness
constituting Lucent Loans into the Company's unsecured
Senior Notes pursuant to Section 2 02 hereof (the
"Securities")   Each party agrees as follows for the benefit
of the other party and for the equal and ratable benefit of
the Holders of the Securities

ARTICLE 1

Definitions and Incorporation by Reference

    SECTION 1 01   Definitions

        "Acquired Indebtedness" means Indebtedness of an
entity outstanding on the date on which an interest in such
entity is acquired, by merger or otherwise (other than
Indebtedness Incurred in connection with  or to provide all
or any portion of the funds or credit support utilized to
consummate  the transaction or series of transactions
pursuant to which such entity was acquired)

        "Affiliate  of any specified Person means any
other Person  directly or indirectly, controlling or
controlled by or under direct or indirect common control
with such specified Person  For the purposes of this
definition  "control" when used with respect to any Person
means the power to direct the management and policies of
such Person, directly or indirectly  whether through the
ownership of voting securities  by contract or otherwise
and the terms "controlling" and "controlled" have meanings
correlative to the foregoing  For purposes of
Sections 4 04  4 06 and 4 07 only, "Affiliate" shall also
mean any beneficial owner (other than Credit Suisse First
Boston Private Equity Division and any Affiliate of Credit
Suisse First Boston Private Equity Division) of Capital
Stock representing 10% or more of the total voting power of
the Voting Stock (on a fully diluted basis) of the Company



[NYCorp 1955029 5 4306t- 05/04/2000  2 14p]



2

or of rights or warrants to purchase such Capital Stock (whether or not currently exercisable) and any Person who would be an Affiliate of any such beneficial owner pursuant to the first sentence hereof

"Asset Disposition" means any sale, lease, transfer or other disposition (or series of related sales leases transfers or dispositions) by the Company or any Restricted Group Member including any disposition by means of a merger consolidation or similar transaction (each referred to for the purposes of this definition as a "disposition") of

(1) any shares of Capital Stock of a Restricted Group Member (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company or a Restricted Group Member)

(2) all or substantially all the assets of any division or line of business of the Company or any Restricted Group Member or

(3) any other assets of the Company or any Restricted Group Member outside of the ordinary course of business of the Company or such Restricted Group Member

(other than in the case of clauses (1), (2) and (3)

(A) a disposition by a Restricted Group Member to the Company or by the Company or a Restricted Group Member to a Restricted Group Member

(B) for purposes of Section 4 06 only, a disposition that constitutes a Restricted Payment permitted by Section 4 04 or a Permitted Investment

(C) for purposes of Section 4 06 only a sale of shares of Capital Stock of an Unrestricted Subsidiary for Fair Market Value,

(D) for purposes of Section 4 06 only, a disposition of Receivables in a Qualified Receivables Transaction, and

3

(E) a disposition of assets with a fair market value of less than $250,000 in a single transaction or series of related transactions)

"Attributable Debt" in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate borne by the Securities compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended)

"Average Life" means as of the date of determination, with respect to any Indebtedness, the quotient obtained by dividing

(1) the sum of the products of numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment by

(2) the sum of all such payments

"Board of Directors" means the Board of Directors of the Company or any committee thereof duly authorized to act on behalf of such Board

"Borrower" means WVF-I LLC a Delaware limited liability company, and any Replacement Borrower (as defined in the Credit Agreement) but excluding any Released Borrower (as defined in the Credit Agreement)

"Business Day" means each day which is not a Legal Holiday

'Capital Lease Obligation" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with GAAP and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty

"Capital Stock of any Person means any and all shares, interests rights to purchase, warrants, options

[NYCorp 1055029 5 4306W 05/04/2000 2 16p]

4

participations or other equivalents of or interests in
(however designated) equity of such Person including any
Preferred Stock but excluding any debt securities
convertible into such equity

"Change of Control" means the occurrence of any of
the following events

(1) any "Person" (as such term is used in
Sections 13(d) and 14(d) of the Exchange Act) other
than one or more Permitted Holders, is or becomes the
"beneficial owner" (as defined in Rules 13d-3 and 13d-5
under the Exchange Act except that for purposes of
this clause (1) such person shall be deemed to have
"beneficial ownership" of all shares that any such
person has the right to acquire, whether such right is
exercisable immediately or only after the passage of
time) directly or indirectly of more than 35% of the
total voting power of the Voting Stock of the Company
provided however that the Permitted Holders bene-
ficially own (as defined in Rules 13d-3 and 13d-5 under
the Exchange Act) directly or indirectly, in the
aggregate a lesser percentage of the total voting power
of the Voting Stock of the Company than such other
person and do not have the right or ability by voting
power contract or otherwise to elect or designate for
election a majority of the Board of Directors (for the
purposes of this clause (1), such other person shall be
deemed to beneficially own any Voting Stock of a Person
(the "specified person") held by any other Person (the
"parent entity") if such other person is the
beneficial owner (as defined above in this clause (1)),
directly or indirectly of more than 35% of the voting
power of the Voting Stock of such parent entity and the
Permitted Holders beneficially own (as defined in this
proviso) directly or indirectly in the aggregate a
lesser percentage of the voting power of the Voting
Stock of such parent entity and do not have the right
or ability by voting power contract or otherwise to
elect or designate for election a majority of the board
of directors of such parent entity),

(2) individuals who on the Issue Date constituted
the Board of Directors (together with any new directors
whose election by such Board of Directors or whose
nomination for election by the shareholders of the
Company was approved by a vote of 66-2/3% of the
directors of the Company then still in office who were
either directors on the Issue Date or whose election or
nomination for election was previously so approved)

cease for any reason to constitute a majority of the Board of Directors then in office

(3) the adoption of a plan relating to the liquidation or dissolution of the Company  or

(4) the merger or consolidation of the Company with or into another Person or the merger of another Person with or into the Company, or the sale of all or substantially all the assets of the Company (determined on a consolidated basis) to another Person (other than, in all such cases, a Person that is controlled by the Permitted Holders), other than a transaction following which in the case of a merger or consolidation transaction, securities that represented 100% of the Voting Stock of the Company immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) constitute at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction

"Closing Date" means [        ], 2000

"Code  means the Internal Revenue Code of 1986, as amended

"Company" means the party named as such in this Indenture until a successor replaces it and  thereafter, means the successor and  for purposes of any provision contained herein and required by the TIA  each other obligor on the indenture securities

"Consolidated Interest Expense" means  for any period  the total interest expense of the Company and its Restricted Group Members (including the total interest expense of unconsolidated Permitted International Joint Ventures), plus, to the extent not included in such total interest expense, and to the extent incurred by the Company or its Restricted Group Members, without duplication

(1) interest expense attributable to capital leases and the interest expense attributable to leases constituting part of a Sale/Leaseback Transaction

(2) amortization of debt discount and debt issuance cost,

(3) capitalized interest,



6

(4) non-cash interest expenses,

(5) commissions discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing,

(6) net payments pursuant to Hedging Obligations

(7) Preferred Stock dividends in respect of all Preferred Stock of Restricted Group Members held by Persons other than the Company or a Restricted Group Member (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the issuer of such Preferred Stock),

(8) interest incurred in connection with Investments in discontinued operations

(9) interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is Guaranteed by (or secured by the assets of) the Company or any Restricted Group Member and

(10) the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Company) in connection with Indebtedness Incurred by such plan or trust

excluding however a portion of any such interest expense or other item listed in clauses (1) through (10) above to the extent included therein solely as an expense or other item of an unconsolidated Permitted International Joint Venture and equal to the Third Party Ownership Interest in such Permitted International Joint Venture

"Consolidated Leverage Ratio" as of any date of determination means the ratio of (x) the aggregate amount of Indebtedness of the Company and its Restricted Group Members as of such date of determination to (y) EBITDA for the most recent four consecutive fiscal quarters ending at least 45 days prior to such date of determination (the "Reference Period"), provided however that

(1) if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is an Incurrence of Indebtedness the amount of such Indebtedness shall be calculated after giving effect on a pro forma

7

basis to such Indebtedness as if such Indebtedness had
been Incurred on the first day of the Reference Period,

(2) if the Company or any Restricted Group Member
has repaid, repurchased, defeased or otherwise dis-
charged any Indebtedness that was outstanding as of the
end of such fiscal quarter or if any Indebtedness is to
be repaid  repurchased  defeased or otherwise dis-
charged on the date of the transaction giving rise to
the need to calculate the Consolidated Leverage Ratio
(other than, in each case  Indebtedness Incurred under
any revolving credit agreement), the aggregate amount
of Indebtedness shall be calculated on a pro forma
basis and EBITDA shall be calculated as if the Company
or such Restricted Group Member had not earned the
interest income, if any  actually earned during the
Reference Period in respect of cash or Temporary Cash
Investments used to repay, repurchase, defease or
otherwise discharge such Indebtedness,

(3) if since the beginning of the Reference Period
the Company or any Restricted Group Member shall have
made any Asset Disposition, the EBITDA for the Refer-
ence Period shall be reduced by an amount equal to the
EBITDA (if positive) directly attributable to the
assets which are the subject of such Asset Disposition
for the Reference Period or increased by an amount
equal to the EBITDA (if negative) directly attributable
thereto for the Reference Period,

(4) if since the beginning of the Reference Period
the Company or any Restricted Group Member (by merger
or otherwise) shall have made an Investment in any
Restricted Group Member (or any Person which becomes a
Restricted Group Member) or an acquisition of assets
which constitutes all or substantially all of a
business or one or more operating units of a business,
EBITDA for the Reference Period shall be calculated
after giving pro forma effect thereto (including the
Incurrence of any Indebtedness) as if such Investment
or acquisition occurred on the first day of the
Reference Period, and

(5) if since the beginning of the Reference Period
any Person that subsequently became a Restricted Group
Member or was merged with or into the Company or any
Restricted Group Member since the beginning of such
Reference Period shall have made any Asset Disposition,
any Investment or acquisition of assets that would have
required an adjustment pursuant to clause (3) or



8

(4) above if made by the Company or a Restricted Group
Member during the Reference Period, EBITDA for the
Reference Period shall be calculated after giving
pro forma effect thereto as if such Asset Disposition
Investment or acquisition occurred on the first day of
the Reference Period

"Consolidated Net Income" means, for any period,
the net income (or loss) of the Company and its consolidated
Restricted Group Members and (without duplication) the
Company's equity in the net income (or loss) of any
unconsolidated Permitted International Joint Ventures
provided however that there shall not be included in such
Consolidated Net Income

(1) any net income (or loss) of any Person (other
than the Company) if such Person is not a Restricted
Group Member  except that

(A) subject to the exclusions contained in
clauses (4) and (7) below, the Company's equity in
the net income of any such Person for such period
shall be included in such Consolidated Net Income
up to the aggregate amount of cash actually
distributed by such Person during such period to
the Company or a Restricted Group Member as a
dividend or other distribution (subject, in the
case of a dividend or other distribution paid to a
Restricted Group Member, to the limitations
contained in clause (3) below)  and

(B) the Company's equity in a net loss of any
such Person for such period shall be included in
determining such Consolidated Net Income

(2) any net income (or loss) of any Person
acquired by the Company  a Subsidiary or a Permitted
International Joint Venture in a pooling of interests
transaction for any period prior to the date of such
acquisition

(3) any net income (or loss) of any Restricted
Group Member if such Restricted Group Member is subject
to restrictions, directly or indirectly, on the payment
of dividends or the making of distributions by such
Restricted Group Member  directly or indirectly, to the
Company  except that

(A) subject to the exclusions contained in
clauses (4) and (7) below  the Company's equity in

NYDc-p,105S039 S 4305k 05/04/ 000   14p

9

the net income of any such Restricted Group Member
for such period shall be included in such Consoli-
dated Net Income up to the aggregate amount of
cash distributed or capable of being distributed
by such Restricted Group Member during such period
to the Company or another Restricted Group Member
as a dividend or other distribution (subject in
the case of a dividend or other distribution paid
to another Restricted Group Member to the
limitation contained in this clause), and

    (B) the Company's equity in a net loss of any
such Restricted Group Member for such period shall
be included in determining such Consolidated Net
Income

    (4) any gain (or loss) realized upon the sale or
other disposition of any assets of the Company its
consolidated Subsidiaries or any other Person (inclu-
ding pursuant to any sale-and-leaseback arrangement)
which is not sold or otherwise disposed of in the
ordinary course of business and any gain (or loss)
realized upon the sale or other disposition of any
Capital Stock of any Person

    (5) extraordinary gains or losses

    (6) the cumulative effect of a change in
accounting principles after the Issue Date and

    (7) to the extent not otherwise excluded in
accordance with GAAP the net income (or loss) of any
unconsolidated Permitted International Joint Venture in
an amount that corresponds to the Third Party Ownership
Interest in the income of such Permitted International
Joint Venture on the last day of such period

Notwithstanding the foregoing, for the purposes of
Section 4 04 only, there shall be excluded from Consolidated
Net Income any repurchases repayments or redemptions of
Investments proceeds realized on the sale of the Invest-
ments or return of capital to the Company or a Restricted
Group Member to the extent such repurchases, repayments,
redemptions, proceeds or returns increase the amount of
Restricted Payments permitted under such covenant pursuant
to Section 4 04(a)(3)(D)

    "Conversion Certificate" has the meaning specified
in Section 2 02



[8°C>°> 1055123 5 4305W 05/01/2000  3 3(p)]

10

"Conversion Date" means with respect to any Security the date on which such Security is deemed to be issued pursuant to Section 2 02   Any Security issued upon any transfer or any exchange of a Security pursuant to Section 2 06 or replacement of a Security pursuant to Section 2 07 shall be deemed to have the same Conversion Date as its predecessor Security

'Credit Agreement" means the credit agreement dated as of May 4  2000 among the Borrower, the Company, the lenders from time to time party thereto, The Bank of New York  as collateral agent  and Lucent, as administrative agent (as may be amended  supplemented or modified from time to time)

"Currency Agreement" means, in respect of a Person  any foreign exchange contract  currency swap agreement or other similar agreement designed to protect such Person against fluctuations in currency values

"Default" means any event which is  or after notice or passage of time or both would be  an Event of Default

"Depository" means The Depository Trust Company its nominees and their respective successors

"Discount Notes" means the Company s 14-3/4% Senior Discount Notes due 2010

Disqualified Stock  means with respect to any Person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event

(1) matures or is mandatorily redeemable (other than for Capital Stock that is not Disqualified Stock) pursuant to a sinking fund obligation or otherwise,

(2) is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock or

(3) is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise  in whole or in part,

in each case on or prior to the ninety-first day after the Stated Maturity of the Securities  provided, however  that



11

any Capital Stock that would not constitute Disqualified
Stock but for provisions thereof giving holders thereof the
right to require such Person to purchase or redeem such
Capital Stock upon the occurrence of an "<u>asset sale</u>" or
"<u>change of control</u>" occurring prior to the ninety-first day
after the Stated Maturity of the Securities shall not
constitute Disqualified Stock if

    (1) the "<u>asset sale</u>" or "<u>change of control</u>"
provisions applicable to such Capital Stock are not
more favorable to the holders of such Capital Stock
than the terms applicable to the Securities in
Section 4 06 and Section 4 09, and

    (2) any such requirement only becomes operative
after compliance with such terms applicable to the
Securities  including the purchase of any Securities
tendered pursuant thereto

    "<u>EBITDA</u>" for any period means the sum of
Consolidated Net Income  plus the following to the extent
deducted in calculating such Consolidated Net Income

    (1) all income tax expense of the Company and its
consolidated Restricted Group Members, <u>provided  how-
ever</u>, that a portion of the income tax expense of an
unconsolidated Permitted International Joint Venture
equal to the percentage of the net income (net loss) of
such Permitted International Joint Venture allocated to
the Company and its Restricted Subsidiaries in accor-
dance with GAAP shall be included in EBITDA regardless
of whether deducted in calculating Consolidated Net
Income,

    (2) Consolidated Interest Expense  <u>provided,
however</u>  that the portion of Consolidated Interest
Expense attributable to an unconsolidated Permitted
International Joint Venture shall be included in EBITDA
regardless of whether deducted in calculating
Consolidated Net Income,

    (3) depreciation and amortization expense of the
Company and its consolidated Restricted Group Members
(excluding amortization expense attributable to a
prepaid operating activity item that was paid in cash
in a prior period)  <u>provided, however</u>, that a portion
of the depreciation and amortization expense of an
unconsolidated Permitted International Joint Venture
equal to the percentage of the net income (net loss) of
such Permitted International Joint Venture allocated to

12

the Company and its Restricted Subsidiaries in accor-
dance with GAAP shall be included in EBITDA regardless
of whether deducted in calculating Consolidated Net
Income, and

(4)  all other noncash charges of the Company and
its consolidated Restricted Group Members (excluding
any such noncash charge to the extent that it repre-
sents an accrual of or reserve for cash expenditures in
any future period) _provided_, _however_, that a portion
of all other noncash charges of an unconsolidated
Permitted International Joint Venture equal to the
percentage of the net income (net loss) of such
Permitted International Joint Venture allocated to the
Company and its Restricted Subsidiaries in accordance
with GAAP shall be included in EBITDA regardless of
whether deducted in calculating Consolidated Net
Income

in each case for such period   Notwithstanding the fore-
going  the provision for taxes based on the income or
profits of  and the depreciation and amortization and
non-cash charges of  a Restricted Group Member shall be
added to Consolidated Net Income to compute EBITDA only to
the extent (and in the same proportion) that the net income
of such Restricted Group Members was included in calculating
Consolidated Net Income and only if a corresponding amount
would be permitted at the date of determination to be
dividended to the Company by such Restricted Group Members
without prior approval (that has not been obtained)
pursuant to the terms of its charter and all agreements
instruments, judgments, decrees, orders, statutes, rules and
governmental regulations applicable to such Restricted Group
Members or its stockholders

'Eligible Receivables" means  at any time,
Receivables of the Company and its Restricted Subsidiaries
as evidenced on the most recent monthly consolidated balance
sheet of the Company, arising in the ordinary course of
business of the Company or any Restricted Subsidiary

"Euro Equivalent" means with respect to any
monetary amount in a currency other than euros, at any time
for determination thereof  the amount of euros obtained by
converting such foreign currency involved in such computa-
tion into euros at the spot rate for the purchase of euros
with the applicable foreign currency as published in The
Wall Street Journal in the  Exchange Rates" column under the
heading "Currency Trading" on the date two Business Days
prior to such determination

[NYCorp 30550 9 & 4305M 05/04/ 000  2 14p]



13

"Euro Notes" means the Company's 12-3/4% Senior Notes due 2010 denominated in Euro

"Exchange Act" means the Securities Exchange Act of 1934, as amended

"Existing Subordinated Notes" means the 10% Senior Subordinated Notes due 2008 of the Company the 15% Senior Subordinated Deferred Interest Notes due 2007 of the Company and the 11% Senior Subordinated Deferred Interest Notes due 2008 of the Company

"Fair Market Value" means, with respect to any Property (other than cash), the price that could be negotiated in an arm's-length free market transaction for cash between a willing seller and a willing buyer, neither of whom is under pressure or compulsion to complete the transaction   Unless otherwise specified, (1) in the case of items with a Fair Market Value in excess of $1 000 000 but less than or equal to $12 5 million  Fair Market Value shall be determined by the chief financial officer or treasurer of the Company acting in good faith and, if such Fair Market Value is in excess of $2 0 million, shall be evidenced by an Officers  Certificate and (2) in the case of items with a Fair Market Value in excess of $12 5 million, Fair Market Value shall be determined by the Board of Directors acting in good faith and shall be evidenced by a resolution of the Board of Directors

"GAAP" means generally accepted accounting principles in the United States of America as in effect as of the Issue Date  including those set forth in



(1) the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants

(2) statements and pronouncements of the Financial Accounting Standards Board

(3) such other statements by such other entity as approved by a significant segment of the accounting profession and

(4) the rules and regulations of the SEC governing the inclusion of financial statements (including pro forma financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act  including opinions and pronouncements in staff accounting bulletins and similar written state-

[NYCorp 1015023 5 4306% 05/04/2000  1 16p]

14

ments from the accounting staff of the SEC    All ratios and computations based on GAAP contained in this Indenture shall be computed in conformity with GAAP

"Global Security" has the meaning specified in Section 2 01

"Guarantee" means any obligation, contingent or otherwise  of any Person directly or indirectly guaranteeing any Indebtedness of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person

(1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such Person (whether arising by virtue of partnership arrangements  or by agreements to keep-well  to purchase assets  goods, securities or services  to take-or-pay or to maintain financial statement conditions or otherwise), or

(2) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part),

provided  however  that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business   The term "Guarantee" used as a verb has a corresponding meaning   The term "Guarantor" shall mean any Person Guaranteeing any obligation

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement or Currency Agreement

"Holder  or 'Securityholder" means the Person in whose name a Security is registered on the Registrar's books

"Incur" means issue, assume, Guarantee, incur or otherwise become liable for  provided  however  that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Group Member (whether by merger, consolidation  acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Group Member   The term "Incurrence" when used as a noun shall have a correlative meaning   The accretion of principal of a non-interest bearing or other discount security shall not be deemed the Incurrence of Indebtedness



"Indebtedness" means, with respect to any Person on any date of determination (without duplication)

(1) the principal in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable,

(2) all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale/Leaseback Transactions entered into by such Person,

(3) all obligations of such Person issued or assumed as the deferred purchase price of property all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business)

(4) all obligations of such Person for the reimbursement of any obligor on any letter of credit, bank guarantee, banker's acceptance, surety bond or performance bond

(5) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary or Restricted Group Member of such Person, the principal amount of such Preferred Stock to be determined in accordance with the Indenture (but excluding in each case, any accrued dividends),

(6) all obligations of the type referred to in clauses (1) through (5) of other Persons and all dividends of other Persons for the payment of which in either case such Person is responsible or liable directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee

(7) all obligations of the type referred to in clauses (1) through (6) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets and the amount of the obligation so secured and



[NYCo-p 1055229 5 43064 0 /06/2000  2 14p]

16

(8) to the extent not otherwise included in this definition  Hedging Obligations of such Person

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability upon the occurrence of the contingency giving rise to the obligation  of any contingent obligations at such date, provided  however  that the amount of Indebtedness of any unconsolidated Permitted International Joint Venture shall be reduced by an amount that corresponds to the Third Party Ownership Interest in such Permitted International Joint Venture

Indenture" means this Indenture as amended or supplemented from time to time

Interest Rate Agreement' means, in respect of a Person  any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement designed to protect such Person against fluctuations in interest rates

"Investee" means any Person (other than the Company or any Restricted Group Member) in which the Company or any Restricted Group Member has an Investment

'Investment" in any Person means any direct or indirect advance, loan (other than advances to customers in the ordinary course of business that are recorded as Receivables on the balance sheet of the lender) or other extensions of credit (including by way of Guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others)  or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person

For purposes of the definitions of "Unrestricted Subsidiary"  "Restricted Payment" and "Permitted International Joint Venture", and for purposes of Section 4 04 and Section 4 06

(1) "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary or other entity) of the Fair Market Value of the net assets of any (A) Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary or (B) Permitted International

Joint Venture at the time that such entity is designated an Investee provided however, that if any Permitted International Joint Venture shall cease to satisfy the definition of "Permitted International Joint Venture" and is not designated promptly as a Restricted Subsidiary or an Unrestricted Subsidiary it shall be deemed to have been designated as an Investee, provided further however that upon a redesignation of such Subsidiary as a Restricted Subsidiary or such Investee as a Permitted International Joint Venture the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary or Investee, as applicable, equal to an amount (if positive) equal to (A) the Company's "Investment" in such entity at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest in such entity) of the Fair Market Value of the net assets of such entity at the time of such redesignation and

(2) any property transferred to or from an Unrestricted Subsidiary or Investee shall be valued at its Fair Market Value at the time of such transfer

"Issue Date" means April 10 2000

'Issue Date 2008 Senior Notes" means the Company's 12-1/2% Senior Notes due 2008

'Issue Date Discount Notes" means Discount Notes issued on the Issue Date

Issue Date Euro Notes" means Euro Notes issued on the Issue Date

"Issue Date Initial Senior Notes" means "Initial Securities" as such term is defined in the indenture governing the Issue Date Senior Notes dated as of the Issue Date, between the Company and United States Trust Company of New York as trustee

"Issue Date Senior Notes" means the Company's 12-3/4% Senior Notes due 2010

"Lien" means any mortgage pledge security interest, encumbrance lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof)

"Lucent" means Lucent Technologies Inc

[NYCorp 1055029 5 4305A 05/04/2000 2 16p]

18

"Lucent Loans" has the meaning specified in the Credit Agreement

"Marketable Securities" means, with respect to any Asset Disposition, any readily marketable equity securities of a corporation whose primary business is the Telecommunications Business that are (i) traded on the New York Stock Exchange, the American Stock Exchange or the Nasdaq National Market and (ii) issued by a corporation having a total equity market capitalization of not less than $250 0 million provided however that the excess of (A) the aggregate amount of securities of any one such corporation held by the Company and any Restricted Group Member over (B) 20 times the average daily trading volume of such securities during the 20 immediately preceding trading days shall be deemed not to be Marketable Securities  as determined on the date of the contract relating to such Asset Disposition

Net Available Cash" from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration  but only as and when received  but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other noncash form)  in each case net of

(1) all legal, title and recording tax expenses, commissions and other fees and expenses incurred, and all Federal, state, provincial, foreign and local taxes required to be accrued as a liability under GAAP  as a consequence of such Asset Disposition

(2) all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets  or which must by its terms  or in order to obtain a necessary consent to such Asset Disposition or by applicable law, be repaid out of the proceeds from such Asset Disposition,

(3) all distributions and other payments required to be made to minority interest holders in Restricted Group Members as a result of such Asset Disposition  and

19

(4) the deduction of appropriate amounts provided
by the seller as a reserve  in accordance with GAAP,
against any liabilities associated with the property or
other assets disposed in such Asset Disposition and
retained by the Company or any Restricted Group Member
after such Asset Disposition

"Net Cash Proceeds", with respect to any issuance
or sale of Capital Stock, means the cash proceeds of such
issuance or sale net of attorneys' fees, accountants' fees,
underwriters' or placement agents' fees, discounts or
commissions and brokerage, consultant and other fees
actually incurred in connection with such issuance or sale
and net of taxes paid or payable as a result thereof

"Office com" means Office com Inc  and its
successors

"Officer" means the Chairman of the Board  the
President, any Vice President  the Treasurer or the Secre-
tary of the Company

"Officers' Certificate" means a certificate signed
by two Officers

"Opinion of Counsel" means a written opinion from
legal counsel who is acceptable to the Trustee  The counsel
may be an employee of or counsel to the Company or the
Trustee

"Permitted Credit Facility" means one or more
credit agreements, loan agreements, lease agreements,
commercial paper facilities  Receivables facilities or
similar facilities, secured or unsecured, providing for
revolving credit loans, term loans, sales of receivables or
letters of credit, entered into from time to time by the
Company or its Restricted Group Members, and including any
related notes  Guarantees  collateral documents  instruments
and agreements executed in connection therewith, as the same
may be amended, supplemented, modified, restated or replaced
from time to time  A Vendor Financing that otherwise
satisfies the foregoing definition will also constitute a
Permitted Credit Facility

"Permitted Holders" means William J  Rouhana  Jr
(or in the event of his incompetence or death, his estate
heirs, executor  administrator, committee or other personal
representative (collectively, "heirs")) or any Person
controlled  directly or indirectly, by William J  Rouhana
Jr  or his heirs

NYCorp 1055039 5 41064V 05/04/ 00D   16p

20

"Permitted International Joint Venture" means any entity (other than a Subsidiary of the Company) all or substantially all of whose business is outside the U S and that (i) based on a determination of the Board of Directors, the Company has directly or indirectly the requisite control over such entity to prevent it from Incurring Indebtedness, or taking any other action at any time, in contravention of any of the provisions of this Indenture that apply to a Permitted International Joint Venture, (ii) the Company or a Restricted Subsidiary owns at least 33⅓% of the Voting Stock of such entity and the Third Party Ownership Interest of such entity does not exceed 66⅔%, (iii) such entity is engaged primarily in aspects of the Telecommunications Business directly related to the Company s business and (iv) the Company has designated such entity as a Permitted International Joint Venture pursuant to a resolution of the Board of Directors

Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions  The Board of Directors may designate any Permitted International Joint Venture to no longer be a Permitted International Joint Venture and to be treated as an Investee provided however, that such designation would be permitted under Section 4 04  Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions

"Permitted Investment" means an Investment by the Company or any Restricted Group Member in

(1) the Company, a Restricted Group Member or a Person that will  upon the making of such Investment, become a Restricted Group Member provided, however that the primary business of such Restricted Group Member is the Telecommunications Business,

(2) another Person if as a result of such Invest- ment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to  the Company or a Restricted Group Member, provided, however, that such Person's primary business is the Telecommunications Business,

NYTCO-7 10550 9 S 4306- 05/04/ 000  2 14p3



(3) cash and Temporary Cash Investments

(4) Receivables owing to the Company or any Restricted Group Member,

(5) Capital Stock of customers of the Company or any Restricted Group Member received in exchange for products and services provided in the ordinary course of business provided however, that the value of such products and services (calculated as the consideration received by the Company or such Restricted Group Member for such products and services in a comparable arm's-length transaction) shall not exceed $50 0 million during each successive 12-month period following the Issue Date,

(6) payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business,

(7) loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Group Member or as part of a compensation scheme approved by the Board of Directors in an amount not to exceed $5 0 million at any one time outstanding

(8) stock obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Group Member or in satisfaction of judgments or settlement of claims or disputes,

(9) shares of Capital Stock of an unrestricted Subsidiary provided, however, that such shares are being acquired from the Company or a Restricted Group Member and

(10) any Person to the extent such Investment represents the noncash portion (other than Marketable Securities) of the consideration received for an Asset Disposition as permitted pursuant to Section 4 06



[NYCo-p 2055029 5 (3056 05/04/2000 2 16p)]

22

"Permitted Liens" means, with respect to any Person

(1) pledges or deposits by such Person under worker s compensation laws unemployment insurance laws or similar legislation or good faith deposits in connection with bids tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or United States government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent or similar operational requirements, in each case Incurred in the ordinary course of business,

(2) Liens imposed by law such as carriers' warehousemen's and mechanics' Liens in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review and Liens arising solely by virtue of any statutory or common law provision relating to banker's Liens rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution, provided, however, that (A) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Company in excess of those set forth by regulations promulgated by the Federal Reserve Board and (B) such deposit account is not intended by the Company or any Restricted Group Member to provide collateral to the depository institution,

(3) Liens for taxes not yet subject to penalties for nonpayment or which are being contested in good faith and by appropriate proceedings promptly instituted and diligently concluded, provided however, that such Person has created a reserve or other appropriate provision therefor as may be required by GAAP

(4) Liens in favor of issuers of letters of credit bank guarantees bankers' acceptances, surety bonds, bid bonds and performance bonds issued pursuant to the request of and for the account of such Person in the ordinary course of its business, provided, however



23

that the Indebtedness in respect thereto is permitted to be Incurred by Section 4 03,

(5) minor survey exceptions, minor encumbrances easements or reservations of, or rights of others for, licenses rights-of-way, sewers, electric lines telegraph and telephone lines and other similar purposes or zoning or other restrictions as to the use of real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person,

(6) Liens to secure Indebtedness permitted under the provisions described in Section 4 03(b)(1) Section 4 03(b)(5) Section 4 03(b)(8) (but with respect to Section 4 03(b)(8) only to the extent such Indebtedness constitutes Refinancing Indebtedness of Purchase Money Indebtedness) and Section 4 03(b)(10), provided however that any such Liens securing Indebtedness (other than Indebtedness pursuant to a Permitted Credit Facility) described in Section 4 03(b)(5) (or Refinancing Indebtedness thereof) may not extend to any property owned by the Company or any of the Restricted Group Members other than the property acquired with the proceeds from Indebtedness Incurred under such Section 4 03(b)(5) and the proceeds therefrom

(7) Liens existing on the Issue Date

(8) Liens on property or shares of Capital Stock of another Person at the time such other Person becomes a Subsidiary of such Person or a Permitted Inter-national Joint Venture, provided however, that the Liens may not extend to any other property owned by such Person or any of its Restricted Group Members (other than assets and property affixed or appurtenant thereto)

(9) Liens on property at the time such Person or any of its Subsidiaries or Permitted International Joint Ventures acquires the property, including any acquisition by means of a merger or consolidation with or into such Person or a Subsidiary of such Person, provided, however, that the Liens may not extend to any other property owned by such Person or any of its





24

Restricted Group Members (other than assets and property affixed or appurtenant thereto)

(10) Liens in favor of the Company or any Restricted Group Member on any property other than property of the Company

(11) Liens securing Hedging Obligations consisting of (A) Interest Rate Agreements or Currency Agreements directly related to Indebtedness that is, and is permitted to be incurred under this Indenture or (B) Currency Agreements used to hedge non-U S dollar currency exposures of the Company and its Restricted Group Members, entered into in accordance with customary industry practices for companies in the Telecommunications Business with international operations and not for purposes of speculation, in each case secured by a Lien on the same property securing such Hedging Obligations

(12) Liens incurred in the ordinary course of business of the Company or any of its Restricted Group Members with respect to obligations that do not exceed $10 0 million at any one time outstanding, provided, however that

(A) such obligations are not Incurred in connection with the borrowing of money, and

(B) such Liens do not in the aggregate materially detract from the value of the property or materially impair the use thereof in the operation of business by the Company or such Restricted Group Member

(13) Liens on the Capital Stock of an Unrestricted Subsidiary and

(14) Liens to secure any Refinancing (or successive Refinancings) as a whole or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (7) (8) or (9) provided however that

(A) such new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such

25

property or proceeds or distributions thereof)
and

     (B) the Indebtedness secured by such Lien at
such time is not increased to any amount greater
than the sum of (x) the outstanding principal
amount or if greater, committed amount of the
Indebtedness described under clauses (7), (8) or
(9) at the time the original Lien became a
Permitted Lien and (y) an amount necessary to pay
any fees and expenses, including premiums and
defeasance costs, related to such refinancing,
refunding extension renewal or replacement

For purposes of this definition the term "Indebtedness"
shall be deemed to include interest, fees and other amounts
due on such Indebtedness

    'Person means any individual, corporation
partnership limited liability company, joint venture,
association, joint-stock company trust unincorporated
organization government or any agency or political
subdivision thereof or any other entity

    "Preferred Stock", as applied to the Capital Stock
of any Person, means Capital Stock of any class or classes
(however designated) which is preferred as to the payment of
dividends or distributions or as to the distribution of
assets upon any voluntary or involuntary liquidation or
dissolution of such Person over shares of Capital Stock of
any other class of such Person

    Preferred Stock Exchange Offer" means an offer by
the Company to exchange any and all of its Series C
Preferred Stock (or the exchange debentures issuable in
respect of such Series C Preferred Stock in accordance with
its terms) for Discount Notes and Issue Date Senior Notes

    "principal" of a Security means the principal of
the Security plus the premium if any payable on the
Security which is due or overdue or is to become due at the
relevant time

    "Property" means with respect to any Person any
interest of such Person in any kind of property or asset
whether real, personal or mixed or tangible or intangible,
including Capital Stock in, and other securities of, any
other Person For purposes of any calculation required
pursuant to this Indenture the value of any Property shall
be its Fair Market Value



[NYCorp 1055029 5 63064 05/04/2000 7 16p]



26

"Public Equity Offering" means an underwritten primary public offering of common stock of the Company pursuant to an effective registration statement under the Securities Act

"Purchase Money Indebtedness" means Indebtedness (including Capital Lease Obligations, Acquired Indebtedness, mortgage financings and purchase money obligations) Incurred for the purpose of financing all or any part of the cost of construction, installation, acquisition, lease, development or improvement by the Company or any Restricted Group Member of any Telecommunications Assets of the Company or any Restricted Group Member including any related note, Guarantees collateral documents instruments and agreements executed in connection therewith, as the same may be amended supplemented modified or restated from time to time

"Qualified Receivables Transaction" means an Incurrence of Indebtedness of the Company or any Restricted Group Member pursuant to either (1) credit facilities secured by Receivables or (2) Receivables purchase facilities

"Receivables" means receivables, chattel paper instruments, documents or intangibles evidencing or relating to the right to payment of money and proceeds and products thereof in each case generated in the ordinary course of business

"Refinance" means, in respect of any Indebtedness to refinance extend renew refund repay prepay, redeem defease or retire, or to issue other Indebtedness in exchange or replacement for such indebtedness "Refinanced" and "Refinancing" shall have correlative meanings

"Refinancing Indebtedness" means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Group Member existing on the Issue Date or Incurred in compliance with this Indenture, including Indebtedness that Refinances Refinancing Indebtedness, provided, however, that

(1) such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced

(2) such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is

Incurred that is equal to or greater than the Average
Life of the Indebtedness being Refinanced, and

(3) such Refinancing Indebtedness has an aggregate
principal amount (or if Incurred with original issue
discount an aggregate issue price) that is equal to or
less than the aggregate principal amount (or if
Incurred with original issue discount the aggregate
accreted value) then outstanding (plus fees and
expenses including any premium and defeasance costs)
under the Indebtedness being Refinanced,



provided further, however, that Refinancing Indebtedness
shall not include (A) Indebtedness of a Subsidiary or a
Permitted International Joint Venture that Refinances
Indebtedness of the Company or (B) Indebtedness of the
Company or a Restricted Group Member that Refinances
Indebtedness of an Unrestricted Subsidiary

"Refinancing Period" has the meaning specified in
the Credit Agreement

"Restricted Group Member" means collectively each
Restricted Subsidiary and each Permitted International Joint
Venture

"Restricted Payment" with respect to any Person
means

(1) the declaration or payment of any dividends or
any other distributions of any sort in respect of its
Capital Stock (including any payment in connection with
any merger or consolidation involving such Person) or
similar payment to the direct or indirect holders of
its Capital Stock (other than dividends or distribu-
tions payable solely in its Capital Stock (other than
Disqualified Stock) rights to purchase additional
Capital Stock (other than Disqualified Stock) for cash
and dividends or distributions payable solely to the
Company or a Restricted Group Member, and other than
pro rata dividends or other distributions made by a
Restricted Group Member that is not a Wholly Owned
Subsidiary to minority stockholders or holders of Third
Party Ownership Interests (or owners of an equivalent
interest in the case of a Restricted Group Member that
is an entity other than a corporation) or holders of
Third Party Ownership Interests),

(2) the purchase, redemption or other acquisition
or retirement for value of any Capital Stock of the

[NYCorp 1055029 5 4336U 05/04/2000 3 14p]



28

Company or any direct or indirect parent of the Company held by any Person or of any Capital Stock of a Restricted Group Member held by any Affiliate of the Company (other than a Restricted Group Member) including the exercise of any option to exchange any Capital Stock (other than into Capital Stock of the Company that is not Disqualified Stock),

(3) the purchase repurchase redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of such Person (other than the purchase repurchase or other acquisition of Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity in each case due within one year of the date of such purchase, repurchase or other acquisition) or

(4) the making of any Investment (other than a Permitted Investment) in any Person

"Restricted Subsidiary" means any Subsidiary of the Company that is not an Unrestricted Subsidiary

'Sale/Leaseback Transaction" means an arrangement relating to property owned by the Company or a Restricted Group Member on the Issue Date or thereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Group Member transfers such property to a Person (other than the Company or a Restricted Group Member) and the Company or a Restricted Group Member leases it from such Person

"SEC' means the Securities and Exchange Commission

"Secured Indebtedness" means any Indebtedness of the Company secured by a Lien on property of the Company or any Restricted Group Member

"Securities Custodian" means the custodian with respect to a Global Security (as appointed by the Depository) or any successor Person thereto and shall initially be the Trustee

"Senior Indebtedness" means

(1) Indebtedness of the Company whether outstanding on the Issue Date or thereafter Incurred and



29

  (2) accrued and unpaid interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company to the extent postfiling interest is allowed in such proceeding) in respect of (A) indebtedness of the Company for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which the Company is responsible or liable

unless, in the case of clauses (1) and (2), in the instrument creating or evidencing the same or pursuant to which the same is outstanding it is provided that such obligations are subordinate in right of payment to the Securities, provided however, that Senior Indebtedness shall not include

  (1) any obligation of the Company to any Subsidiary or Permitted International Joint Venture,

  (2) any liability for Federal, state, local or other taxes owed or owing by the Company,

  (3) any accounts payable or other liability to trade creditors arising in the ordinary course of business (including guarantees thereof or instruments evidencing such liabilities)

  (4) any Indebtedness of the Company (and any accrued and unpaid interest in respect thereof) which is subordinate or junior in any respect to any other Indebtedness or other obligation of the Company, or

  (5) that portion of any Indebtedness which at the time of Incurrence is Incurred in violation of this Indenture

  "Securities" means the Securities issued under this Indenture

  "Series C Preferred Stock" means the Series C 14-1/4% Senior Cumulative Exchangeable Preferred Stock due 2007 of the Company issued and outstanding on the Issue Date

  "Significant Restricted Group Member" means any Restricted Group Member that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC, assuming for the purpose of this definition that a Permitted



30

International Joint Venture that is not a Subsidiary of the Company is a Subsidiary of the Company

"Stated Maturity" means, with respect to any security the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred)

"Subordinated Obligation" means any Indebtedness of the Company (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Securities pursuant to a written agreement to that effect

"Subsidiary" means with respect to any Person any corporation association partnership or other business entity of which more than 50% of the total voting power of shares of Voting Stock is at the time owned or controlled directly or indirectly by

    (1) such Person

    (2) such Person and one or more Subsidiaries of such Person or

    (3) one or more Subsidiaries of such Person

"Telecommunications Assets" means (a) any Property(other than cash, cash equivalents and securities) used in the Telecommunications Business, (b) for purposes of Section 4 03 Section 4 04 and Section 4 10 only, Capital Stock of any Person, or (c) for all other purposes of this Indenture, Capital Stock of a Restricted Group Member or a Person that becomes a Restricted Group Member as a result of the acquisition of such Capital Stock by the Company or another Restricted Group Member, in each case acquired from any Person (other than a Subsidiary of the Company or a Permitted International Joint Venture) in a bona fide transaction, provided, however, that, in the case of clause (b) or (c) such Person is primarily engaged in the Telecommunications Business

"Telecommunications Business" means the business of (i) transmitting or providing services relating to the transmission of, voice, video or data through transmission

31

facilities  (ii) constructing  creating, developing or
producing communications networks, related network transmis-
sion equipment, software, devices and content for use in a
communications or content distribution business  (iii) data
center management  computer and application outsourcing,
computer systems integration, reengineering of computer
software, information services and web hosting and any
services related thereto or (iv) evaluating  participating
or pursuing any other activity or opportunity that is
primarily related to those identified in (i)  (ii) or
(iii) above or in furtherance thereof, including, without
limitation, any business conducted by the Company or any
Restricted Group Member on the Issue Date, provided,
however, that the determination of what constitutes a
Telecommunications Business shall be made in good faith by
the Board of Directors

        "Temporary Cash Investments" means any of the
following

        (1) any investment in direct obligations of the
United States of America or any agency thereof or
obligations guaranteed by the United States of America
or any agency thereof

        (2) investments in time deposit accounts,
certificates of deposit, money market deposits
bankers' acceptances and repurchase obligations
maturing within 365 days of the date of acquisition
thereof issued by a bank or trust company which is
organized under the laws of the United States of
America  any state thereof or any foreign country
recognized by the United States, and which bank or
trust company has capital, surplus and undivided
profits aggregating in excess of $500,000 000 (or the
foreign currency equivalent thereof) and has outstan-
ding debt which is rated "A" (or such similar equiva-
lent rating) or higher by at least one nationally
recognized statistical rating organization (as defined
in Rule 436 under the Securities Act) or any money-
market fund sponsored by a registered broker dealer or
mutual fund distributor

        (3) repurchase obligations with a term of not more
than 30 days for underlying securities of the types
described in clause (1) above entered into with a bank
meeting the qualifications described in clause (2)
above,



32

(4) investments in commercial paper, maturing not more than 270 days after the date of acquisition issued by a corporation (other than an Affiliate of the Company) organized and in existence under the laws of the United States of America any state thereof or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's Investors Service Inc or "A-1" (or higher) according to Standard and Poor's Ratings Group

(5) investments in securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or terri-tory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by Standard & Poor's Ratings Group or "A" by Moody s Investors Service Inc

(6) auction rate preferred stocks of any corporation maturing within 90 days after the date of acquisition rated at least "A" by Standard and Poor's Ratings Group and

(7) any investment in a registered investment company investing exclusively in investments of the types described in clauses (1) through (6) above

"Third Party Ownership Interest" in a Permitted International Joint Venture means a percentage equal to the difference between 100% and the percentage of the net income (net loss) of such Permitted International Joint Venture allocated to the Company and its Restricted Subsidiaries in accordance with GAAP

"TIA" means the Trust Indenture Act of 1939 (15 U S C §§ 77aaa-77bbbb) as in effect on the date of this Indenture

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor

"Trust Officer" means the Chairman of the Board the President or any other officer or assistant officer of the Trustee assigned by the Trustee to administer its corporate trust matters

33

"Uniform Commercial Code" means the New York
Uniform Commercial Code as in effect from time to time

"Unrestricted Subsidiary" means

(1) Office com

(2) Winstar Credit Corp ,

(3) any Subsidiary of the Company that at the time
of determination shall be designated an Unrestricted
Subsidiary by the Board of Directors in the manner
provided below, and

(4) any Subsidiary of an Unrestricted Subsidiary

The Board of Directors may designate any Subsidiary of the
Company (including any newly acquired or newly formed
Subsidiary) to be an Unrestricted Subsidiary unless such
Subsidiary or any of its Subsidiaries owns any Capital Stock
or Indebtedness of, or holds any Lien on any property of
the Company (other than Capital Stock (other than
Disqualified Stock) of the Company contributed to such
Unrestricted Subsidiary and promptly transferred by such
Unrestricted Subsidiary in exchange for Telecommunications
Assets) or any other Subsidiary of the Company that is not a
Subsidiary of the Subsidiary to be so designated or is the
obligor on any Indebtedness a default on which would result
in a default on any Indebtedness of the Company or a
Restricted Subsidiary provided, however, that immediately
(A) the Subsidiary to be so designated has total assets of
$10,000 or less or (B) if such Subsidiary has assets greater
than $10 000 such designation would be permitted under
Section 4 04

The Board of Directors may designate any
Unrestricted Subsidiary to be a Restricted Subsidiary,
provided, however, that immediately after giving effect to
such designation (A) the Consolidated Leverage Ratio would
be no worse than the Consolidated Leverage Ratio determined
immediately prior to such designation, (B) all Liens and
Indebtedness of such Unrestricted Subsidiary outstanding
immediately following such designation would  if Incurred at
such time, have been permitted to be Incurred at such time
for all purposes of this Indenture and (C) no Default shall
have occurred and be continuing  Any such designation by
the Board of Directors shall be evidenced to the Trustee by
promptly filing with the Trustee a copy of the resolution of
the Board of Directors giving effect to such designation and

34

an Officers' Certificate certifying that such designation complied with the foregoing provisions

"U S Dollar Equivalent" means with respect to any monetary amount in a currency other than U S dollars, at any time for determination thereof, the amount of U S dollars obtained by converting such foreign currency involved in such computation into U S dollars at the spot rate for the purchase of U S dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination

Except as described in Section 4 03, whenever it is necessary to determine whether the Company has complied with any covenant in this Indenture or a Default has occurred and an amount is expressed in a currency other than U S dollars such amount will be treated as the U S Dollar Equivalent determined as of the date such amount is initially determined in such currency

"U S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option

"Vendor Financing" means any financing or other credit or deferred payment arrangement provided by a supplier manufacturer or lessor of Telecommunications Assets or any Affiliate thereof

"Voting Stock" of a Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof

"Wholly Owned Subsidiary" means a Restricted Subsidiary all the Capital Stock of which (other than directors' qualifying shares) is owned by the Company or one or more Wholly Owned Subsidiaries

35

SECTION 1 02    Other Definitions

|  | Defined in |
| Term | Section |
| --- | --- |
| "Affiliate Transaction" | 4 07 |
| "Agent Members" | 2 13 |
| "Appendix" | 2 01 |
| "Bankruptcy Law" | 6 01 |
| "Change of Control Offer" | 4 09(b) |
| "covenant defeasance option" | 8 01(b) |
| "Custodian" | 6 01 |
| "Event of Default" | 6 01 |
| "Initial Lien" | 4 10 |
| "legal defeasance option" | 8 01(b) |
| "Legal Holiday" | 10 07 |
| "Offer" | 4 06(b) |
| "Offer Amount" | 4 06(c)(2) |
| "Offer Period" | 4 06(c)(2) |
| "Paying Agent" | 2 03 |
| "Purchase Date" | 4 06(c)(1) |
| "Registrar" | 2 03 |
| "Securities Authentication Order" | 2 02 |
| "Successor Company" | 5 01 |

SECTION 1 03    Incorporation by Reference of Trust
Indenture Act    This Indenture is subject to the mandatory
provisions of the TIA which are incorporated by reference in
and made a part of this Indenture    The following TIA terms
have the following meanings

"Commission" means the SEC,

"indenture securities" means the Securities,

"indenture security holder" means a
Securityholder,

"indenture to be qualified" means this Indenture,

"indenture trustee" or "institutional trustee"
means the Trustee    and

"obligor" on the indenture securities means the
Company and any other obligor on the indenture securities

All other TIA terms used in this Indenture that
are defined by the TIA, defined by TIA reference to another
statute or defined by SEC rule have the meanings assigned to
them by such definitions

(NYCorp;1055829 5 4396W 05/04/2000  2 34p)



36

SECTION 1 04    _Rules of Construction_    Unless the context otherwise requires

(1) a term has the meaning assigned to it,

(2) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP,

(3) "_or_" is not exclusive

(4) "_including_" means including without limitation,

(5) words in the singular include the plural and words in the plural include the singular,

(6) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness

(7) the principal amount of any noninterest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP

(8) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock  whichever is greater  and

(9) all references to the date the Securities were originally issued shall refer to the Issue Date

## ARTICLE 2

### The Securities

SECTION 2 01    _Form and Dating_    The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 attached hereto, which is hereby incorporated in and expressly made a part of this Indenture    The Securities may have notations  legends or endorsements required by law, stock exchange rule, agreements to which the Company is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Company)    Each Security shall be dated the date of its authentication

Holders of Securities may request Securities to be issued in the form of definitive, fully registered certificates or as one or more definitive, fully registered permanent global Securities without interest coupons with the global securities legend and restricted securities legend set forth in Exhibit 1 hereto (each, a "Global Security")  Global Securities shall be deposited on behalf of the purchasers of the Securities represented thereby with the Trustee, at its principal corporate trust office  as custodian for the Depository (or with such other custodian as the Depository may direct), and registered in the name of the Depository or a nominee of the Depository, duly executed by the Company and authenticated by the Trustee as provided in Section 2 02, and shall be delivered by the Trustee to such Depository or pursuant to such Depository's instruc- tions or held by the Trustee as custodian for the Depository  The aggregate principal amount of the Global Securities may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depository or its nominee as hereinafter provided

SECTION 2 02  Execution, Authentication and Issuance of Securities.  The provisions of this Section 2 02 shall apply to the execution, authentication and issuance of the Securities

Two Officers shall sign the Securities for the Company by manual or facsimile signature on the Closing Date and deliver such signed Securities to the Trustee on such date

If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless

A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture

On the Closing Date, the Company shall deliver to the Trustee an irrevocable written instruction (the "Securities Authentication Order") signed by two Officers of the Company (or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company) which directs the Trustee to authenticate and deliver to, or as directed by  Lucent up to $2,000,000,000 aggregate principal amount of Securities  at such times and in such principal

[*TCorp 10330 9 5 43066 05/04/ 000  3 34?]

38

amounts as shall be specified by Lucent in one or more
Conversion Certificates (as defined below) delivered to the
Trustee on any Business Day after the Closing Date

As used herein, "Conversion Certificate" means a
writing signed by an officer of Lucent substantially in the
form of Exhibit 2 attached hereto and specifying the
information contemplated thereby  Lucent may in its sole
discretion elect to convert into Securities, from time to
time, all or any portion of the Lucent Loans outstanding
under the Credit Agreement, by delivering a Conversion
Certificate to the Trustee  provided, that the aggregate
principal amount of all Securities authenticated and
delivered by the Trustee under this Indenture shall not
exceed $2,000,000,000, except as provided in Section 2 07

The Trustee shall rely solely on the receipt of a
Conversion Certificate as conclusive evidence of its
authorization to issue to  or as directed by, Lucent the
principal amount of Securities specified in the Conversion
Certificate  and no further act or evidence, written or
oral, shall be required by the Trustee, the Company or any
other Person for the issuance of Securities by the Trustee
under this Indenture  A Conversion Certificate may be
delivered to the Trustee by facsimile, courier or in the
manner specified in Section 10 02  Each Security shall be
authenticated and delivered by the Trustee to  or directed
by  Lucent within one (1) Business Day after receipt by the
Trustee of a Conversion Certificate, and the Conversion Date
of each Security so authenticated and delivered shall be
deemed to be the date of receipt by the Trustee of the
relevant Conversion Certificate  Each Security
authenticated, issued and delivered by the Trustee in
accordance with this Section 2 02 shall constitute a valid,
legal and binding obligation of the Company

The Trustee may appoint an authenticating agent
reasonably acceptable to the Company to authenticate the
Securities  Unless limited by the terms of such
appointment, an authenticating agent may authenticate
Securities whenever the Trustee may do so  Each reference
in this Indenture to authentication by the Trustee includes
authentication by such agent  An authenticating agent has
the same rights as any Registrar, Paying Agent or agent for
service of notices and demands

SECTION 2 03  Registrar and Paying Agent  The
Company shall maintain an office or agency where Securities
may be presented for registration of transfer or for
exchange (the "Registrar") and an office or agency where

39

Securities may be presented for payment (the 'Paying Agent")    The Registrar shall keep a register of the Securities and of their transfer and exchange    The Company may have one or more co-registrars and one or more additional paying agents    The term "Paying Agent" includes any additional paying agent

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture    which shall incorporate the terms of the TIA    The agreement shall implement the provisions of this Indenture that relate to such agent    The Company shall notify the Trustee of the name and address of any such agent    If the Company fails to maintain a Registrar or Paying Agent    the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7 07    The Company or any Wholly Owned Subsidiary incorporated or organized within The United States of America may act as Paying Agent    Registrar co-registrar or transfer agent

The Company initially appoints the Trustee as Registrar and Paying Agent in connection with the Securities

SECTION 2 04    Paying Agent To Hold Money in Trust    Prior to each due date of the principal and interest on any Security    the Company shall deposit with the Paying Agent a sum sufficient to pay such principal and interest when so becoming due    The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money held by the Paying Agent for the payment of principal of or interest on the Securities and shall notify the Trustee of any default by the Company in making any such payment    If the Company or a Subsidiary acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund    The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by the Paying Agent    Upon complying with this Section    the Paying Agent shall have no further liability for the money delivered to the Trustee

SECTION 2 05    Securityholder Lists    The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders    If the Trustee is not the Registrar    the Company shall furnish to the Trustee, in writing at least five Business Days before each interest


[NYCorp 10550 9 5 4106V 05/04/2000  3 14p]

40

payment date and at such other times as the Trustee may
request in writing a list in such form and as of such date
as the Trustee may reasonably require of the names and
addresses of Securityholders

     SECTION 2 06   <u>Transfer and Exchange</u>  (a)  All
Securities issued upon any transfer or exchange pursuant to
the terms of the Indenture shall evidence the same debt and
shall be entitled to the same benefits under the Indenture
as the Securities surrendered upon such transfer or
exchange

     (b)  Prior to the due presentation for registra-
tion of transfer of any Security the Company, the Trustee
the Paying Agent, the Registrar or any co-registrar may deem
and treat the person in whose name a Security is registered
as the absolute owner of such Security for the purpose of
receiving payment of principal of and interest on such
Security and for all other purposes whatsoever, whether or
not such Security is overdue, and none of the Company, the
Trustee the Paying Agent the Registrar or any co-registrar
shall be affected by notice to the contrary

     (c)  The Registrar or co-registrar shall not be
required to register the transfer or exchange of any
Security for a period beginning 15 Business Days before the
mailing of a notice of an offer to repurchase or redeem
Securities or 15 Business Days before an interest payment
date

     (d)  The Securities shall be issued in registered
form and shall be transferable only upon the surrender of a
Security for registration of transfer  When a Security is
presented to the Registrar or a co-registrar with a request
to register a transfer, the Registrar shall register the
transfer as requested if the requirements of this Indenture
and Section 8-401(1) of the Uniform Commercial Code are met
When Securities are presented to the Registrar or a co-
registrar with a request to exchange them for an equal
principal amount of Securities of other denominations, the
Registrar shall make the exchange as requested if the same
requirements are met  To permit registrations of transfers
and exchanges the Company shall execute and the Trustee
shall authenticate certificated Securities and Global
Securities at the Registrar's or co-registrar's request  No
service charge shall be made for any registration of
transfer or exchange, but the Company may require payment of
a sum sufficient to cover any transfer tax, assessments or
similar governmental charge payable in connection therewith
(other than any such transfer taxes, assessments or similar

[NYCorp 1051029 5 4386H 03/04/ 000 2 14p]



41

governmental charge payable upon exchange or transfer
pursuant to Sections 3 06, 4 06, 4 09 and 9 05)

(e)    The transfer and exchange of Global
Securities or beneficial interests therein shall be effected
through the Depository  in accordance with this Indenture
and the procedures of the Depository therefor    A transferor
of a beneficial interest in a Global Security shall deliver
to the Registrar a written order given in accordance with
the Depository's procedures containing information regarding
the participant account of the Depository to be credited
with a beneficial interest in the Global Security    The
Registrar shall, in accordance with such instructions
instruct the Depository to credit to the account of the
Person specified in such instructions a beneficial interest
in the Global Security and to debit the account of the
Person making the transfer the beneficial interest in the
Global Security being transferred

(f)    Each Global Security shall be transferred to
the beneficial owners thereof in the form of certificated
Securities in an aggregate principal amount equal to the
principal amount of such Global Security, in exchange for
such Global Security, if (1) the Depository notifies the
Company that it is unwilling or unable to continue as
Depository for such Global Security or if at any time such
Depository ceases to be a "clearing agency" registered under
the Exchange Act and a successor depositary is not appointed
by the Company within 90 days of such notice  (11) an Event
of Default has occurred and is continuing or (111) the
Company  in its sole discretion, notifies the Trustee in
writing that it elects to cause the issuance of certificated
Securities under the Indenture

In the event of the occurrence of the events
specified in this Section 2 06(f), the Company shall
promptly make available to the Trustee a reasonable supply
of certificated Securities in definitive, fully registered
form without interest coupons

SECTION 2 07    Replacement Securities.    If a
mutilated Security is surrendered to the Registrar or if the
Holder of a Security claims that the Security has been lost,
destroyed or wrongfully taken, the Company shall issue and
the Trustee shall authenticate a replacement Security if the
requirements of Section 8-405 of the Uniform Commercial Code
are met and the Holder satisfies any other reasonable
requirements of the Trustee    If required by the Trustee or
the Company, such Holder shall furnish an indemnity bond
sufficient in the judgment of the Company and the Trustee to

42

protect the Company  the Trustee  the Paying Agent  the
Registrar and any co-registrar from any loss which any of
them may suffer if a Security is replaced   The Company and
the Trustee may charge the Holder for their expenses in
replacing a Security

Every replacement Security is an additional
obligation of the Company

SECTION 2 08   Outstanding Securities. When
Securities Disregarded   Securities outstanding at any time
are all Securities authenticated by the Trustee except for
those canceled by it, those delivered to it for cancellation
and those described in this Section as not outstanding   A
Security does not cease to be outstanding because the
Company or an Affiliate of the Company holds the Security

If a Security is replaced pursuant to Sec-
tion 2 07, it ceases to be outstanding unless the Trustee
and the Company receive proof satisfactory to them that the
replaced Security is held by a bona fide purchaser

If the Paying Agent segregates and holds in trust
in accordance with this Indenture, on a redemption date or
maturity date money sufficient to pay all principal and
interest payable on that date with respect to the Securities
(or portions thereof) to be redeemed or maturing, as the
case may be  then on and after that date such Securities (or
portions thereof) cease to be outstanding and interest on
them ceases to accrue

Notwithstanding any other provisions of this
Indenture to the contrary, in determining whether the
Holders of the required principal amount of Securities have
concurred in any direction, waiver or consent   Securities
owned by the Company or by any Person directly or indirectly
controlling or controlled by or under direct or indirect
common control with the Company shall be disregarded and
deemed not to be outstanding, except that, for the purpose
of determining whether the Trustee shall be protected in
relying on any such direction  waiver or consent, only
Securities which the Trustee knows are so owned shall be so
disregarded   Also  subject to the foregoing  only
Securities outstanding at the time shall be considered in
any such determination

SECTION 2 09   Temporary Securities.  Until
definitive Securities are ready for delivery, the Company
may prepare and the Trustee shall authenticate temporary
Securities   Temporary Securities shall be substantially in

43

the form of definitive Securities but may have variations
that the Company considers appropriate for temporary
Securities   Without unreasonable delay, the Company shall
prepare and the Trustee shall authenticate definitive
Securities and deliver them in exchange for temporary
Securities

        SECTION 2 10    Cancellation.  The Company at any
time may deliver Securities to the Trustee for cancellation
The Registrar and the Paying Agent shall forward to the
Trustee any Securities surrendered to them for registration
of transfer  exchange or payment   The Trustee and no one
else shall cancel and destroy (subject to the record reten-
tion requirements of the Exchange Act) all Securities
surrendered for registration of transfer  exchange  payment
or cancellation and deliver a certificate of such destruc-
tion to the Company unless the Company directs the Trustee
to deliver canceled Securities to the Company   The Company
may not issue new Securities to replace Securities it has
redeemed  paid or delivered to the Trustee for cancellation

        At such time as all beneficial interests in a
Global Security have either been exchanged for certificated
Securities  redeemed, purchased or canceled, such Global
Security shall be returned to the Depository for cancella-
tion or retained and canceled by the Trustee   At any time
prior to such cancellation, if any beneficial interest in a
Global Security is exchanged for certificated Securities,
redeemed, purchased or canceled  the principal amount of
Securities represented by such Global Security shall be
reduced and an adjustment shall be made on the books and
records of the Trustee (if it is then the Securities
Custodian for such Global Security) with respect to such
Global Security  by the Trustee or the Securities Custodian
to reflect such reduction

        SECTION 2 11    Defaulted Interest   If the Company
defaults in a payment of interest on the Securities, the 
Company shall pay defaulted interest (plus interest on such
defaulted interest to the extent lawful) in any lawful
manner   The Company may pay the defaulted interest to the
persons who are Securityholders on a subsequent special
record date   The Company shall fix or cause to be fixed any
such special record date and payment date to the reasonable
satisfaction of the Trustee and shall promptly mail to each
Securityholder a notice that states the special record date,
the payment date and the amount of defaulted interest to be
paid

[NYCorp 1015SU 9 5 v304M 05/06/2000  7 14)]

SECTION 2 12    CUSIP, ISIN and Common Code
Numbers   The Company in issuing the Securities may use
"CUSIP"  "ISIN" or "Common Code" numbers (if then generally
in use) and  if so, the Trustee shall use "CUSIP" numbers,
"ISIN" or "Common Code" in notices of redemption as a
convenience to Holders, provided, however, that any such
notice may state that no representation is made as to the
correctness of such numbers either as printed on the
Securities or as contained in any notice of a redemption and
that reliance may be placed only on the other identification
numbers printed on the Securities, and any such redemption
shall not be affected by any defect in or omission of such
numbers

       SECTION 2 13    Rights of Agent Members,  Members
of, or participants in  the Depository ("Agent Members")
shall have no rights under this Indenture with respect to
any Global Security held on their behalf by the Depository
or by the Trustee as the custodian of the Depository or
under such Global Security  and the Company, the Trustee and
any agent of the Company or the Trustee shall be entitled to
treat the Depository as the absolute owner of such Global
Security for all purposes whatsoever

       Notwithstanding the foregoing, (i) nothing herein
shall prevent the Company, the Trustee or any agent of the
Company or the Trustee from giving effect to any written
certification  proxy or other authorization furnished by the
Depository or impair, as between the Depository and its
Agent Members  the operation of customary practices of such
Depository governing the exercise of the rights of a holder
of a beneficial interest in any Global Security  and
(ii) the registered Holder of a Global Security shall be
entitled to grant proxies and otherwise authorize any
Person, including Agent Members and Persons that may hold
interests through Agent Members, to take any action which a
Holder is entitled to take under the Indenture or the
Securities

       SECTION 2 14    No Obligation of the
Trustee,  (a)  The Trustee shall have no responsibility or
obligation to any beneficial owner of a Global Security, a
member of, or a participant in the Depository or other
Person with respect to the accuracy of the records of the
Depository or its nominee or of any participant or member
thereof, with respect to any ownership interest in the
Securities or with respect to the delivery to any
participant, member, beneficial owner or other Person (other
than the Depository) of any notice (including any notice of
redemption) or the payment of any amount, under or with

45

respect to such Securities   All notices and communications
to be given to the Holders and all payments to be made to
Holders under the Securities shall be given or made only to
or upon the order of the registered Holders (which shall be
the Depository or its nominee in the case of a Global
Security)   The rights of beneficial owners in any Global
Security shall be exercised only through the Depository
subject to the applicable rules and procedures of the
Depository   The Trustee may rely and shall be fully
protected in relying upon information furnished by the
Depository with respect to its members, participants and any
beneficial owners

(b)   The Trustee shall have no obligation or duty
to monitor, determine or inquire as to compliance with any
restrictions on transfer imposed under this Indenture or
under applicable law with respect to any transfer of any
interest in any Security (including any transfers between or
among Depository participants, members or beneficial owners
in any Global Security) other than to require delivery of
such certificates and other documentation or evidence as are
expressly required by, and to do so if and when expressly
required by  the terms of the Indenture  and to examine the
same to determine substantial compliance as to form with the
express requirements hereof

### ARTICLE 3

#### Redemption

SECTION 3 01   Notices to Trustee   If the Company
elects to redeem Securities pursuant to paragraph 5 of the
Securities  it shall notify the Trustee in writing of the
redemption date  the principal amount of Securities to be
redeemed and the paragraph of the Securities pursuant to
which the redemption will occur



The Company shall give each notice to the Trustee
provided for in this Section at least 30 days before the
redemption date unless the Trustee consents to a shorter
period   Such notice shall be accompanied by an Officers'
Certificate and an Opinion of Counsel from the Company to
the effect that such redemption will comply with the condi-
tions herein

SECTION 3 02   Selection of Securities To Be
Redeemed.  If fewer than all the Securities are to be
redeemed  the Trustee shall select the Securities to be
redeemed pro rata or by lot or by a method that complies

46

with applicable legal and securities exchange requirements,
if any, and that the Trustee in its sole discretion shall
deem to be fair and appropriate and in accordance with
methods generally used at the time of selection by fidu-
ciaries in similar circumstances   The Trustee shall make
the selection from outstanding Securities not previously
called for redemption   The Trustee may select for redemp-
tion portions of the principal amount of Securities that
have denominations larger than $1 000   Securities and
portions of them the Trustee selects shall be in principal
amounts of $1 000 or a whole multiple of $1,000   Provisions
of this Indenture that apply to Securities called for
redemption also apply to portions of Securities called for
redemption   The Trustee shall notify the Company promptly
of the Securities or portions of Securities to be redeemed

        SECTION 3 03   Notice of Redemption   At least
30 days but not more than 60 days before a date for redemp-
tion of Securities  the Company shall mail a notice of
redemption by first-class mail to each Holder of Securities
to be redeemed at such Holder s registered address

        The notice shall identify the Securities to be
redeemed and shall state

        (1) the redemption date

        (2) the redemption price,

        (3) the name and address of the Paying Agent,

        (4) that Securities called for redemption must be
surrendered to the Paying Agent to collect the redemp-
tion price

        (5) if fewer than all the outstanding Securities
are to be redeemed  the identification and principal
amounts of the particular Securities to be redeemed,

        (6) that  unless the Company defaults in making
such redemption payment, interest on Securities (or
portion thereof) called for redemption ceases to accrue
on and after the redemption date  and

        (7) that no representation is made as to the
correctness or accuracy of the CUSIP number, ISIN or
Common Code number  if any, listed in such notice or
printed on the Securities

[NYCorp 1655329 5 4306W 05/04/2000  7 14p]

47

At the Company's request (which request may be
revoked by the Company at any time prior to the time at
which the Trustee shall have given such notice to the
Holders), the Trustee shall give the notice of redemption in
the Company's name and at the Company's expense   In such
event, the Company shall provide the Trustee with the
information required by this Section

SECTION 3 04   Effect of Notice of Redemption
Once notice of redemption is mailed, Securities called for
redemption become due and payable on the redemption date and
at the redemption price stated in the notice.  Upon surren-
der to the Paying Agent, such Securities shall be paid at
the redemption price stated in the notice, plus accrued
interest to the redemption date (subject to the right of
Holders of record on the relevant record date to receive
interest due on the related interest payment date)   Failure
to give notice or any defect in the notice to any Holder
shall not affect the validity of the notice to any other
Holder

SECTION 3 05   Deposit of Redemption Price   On or
prior to the redemption date  the Company shall deposit with
the Paying Agent (or  if the Company or a Subsidiary is the
Paying Agent  shall segregate and hold in trust) money
sufficient to pay the redemption price of and accrued inter-
est on all Securities to be redeemed on that date other than
Securities or portions of Securities called for redemption
which have been delivered by the Company to the Trustee for
cancellation

SECTION 3 06   Securities Redeemed in Part.  Upon
surrender of a Security that is redeemed in part, the
Company shall execute and the Trustee shall authenticate for
the Holder (at the Company's expense) a new Security equal
in principal amount to the unredeemed portion of the Secur-
ity surrendered



ARTICLE 4

Covenants

SECTION 4 01   Payment of Securities.  The Company
shall promptly pay the principal of and interest on the
Securities on the dates and in the manner provided in the
Securities and in this Indenture   Principal and interest
shall be considered paid on the date due if on such date the
Trustee or the Paying Agent holds in accordance with this

[NYCorp 1055029 5 4304W 05/0 /2000  2 16p]

48

Indenture money sufficient to pay all principal and interest
then due

The Company shall pay interest on overdue princi-
pal at the rate specified therefor in the Securities  and it
shall pay interest on overdue installments of interest at
the same rate to the extent lawful

SECTION 4 02  SEC Reports   Notwithstanding that
the Company may not be subject to the reporting requirements
of Section 13 or 15(d) of the Exchange Act, the Company will
file with the SEC and provide the Trustee and Security-
holders with such annual reports and such information,
documents and other reports as are specified in Sections 13
and 15(d) of the Exchange Act and applicable to a U S
corporation subject to such Sections  such information
documents and other reports to be so filed and provided at
the times specified for the filing of such information
documents and reports under such Sections   The Company also
shall comply with the other provisions of TIA § 314(a)

SECTION 4 03   Limitation on Indebtedness.
(a)  The Company will not  and will not permit any
Restricted Group Member to, Incur, directly or indirectly,
any Indebtedness, provided, however, that the Company will
be entitled to Incur Indebtedness if  on the date of such
Incurrence and after giving effect thereto on a pro forma
basis, the Consolidated Leverage Ratio would be less than
6 0 to 1

(b)  Notwithstanding Section 4 03(a), so long as
no Default has occurred and is continuing, the Company and
the Restricted Group Members will be entitled to Incur any
or all of the following Indebtedness

(1) Indebtedness Incurred pursuant to one or more
Permitted Credit Facilities  provided  however, that,
after giving effect to any such Incurrence  the aggre-
gate principal amount of such Indebtedness then
outstanding does not exceed (A) the greater of
(x) $1 0 billion (which amount shall be increased to
$1 15 billion upon the effectiveness of an amendment to
the indenture governing the Issue Date Senior Notes
that increases the amount in Section 4 03 (b)(1)(A)
therein from "$1 0 billion" to "$1.15 billion"), and
(y) 85% of Eligible Receivables less (B) the sum of
(i) all principal payments with respect to such
Indebtedness (other than Indebtedness Incurred pursuant
to the revolving loan portion of a Permitted Credit
Facility) pursuant to Section 4 06(a)(3)(A) and

49

(11) the principal amount of such Indebtedness assumed by a transferee in any Asset Disposition,

(2) Indebtedness owed to and held by the Company or a Restricted Group Member, provided however that (A) any subsequent issuance or transfer of any Capital Stock or the occurrence of any other event which results in any such Restricted Group Member ceasing to be a Restricted Group Member or any subsequent transfer of such Indebtedness (other than to the Company or another Restricted Group Member) shall be deemed, in each case to constitute the Incurrence of such Indebtedness by the obligor thereon and (B) if the Company is the obligor on such Indebtedness, such Indebtedness is not secured and is expressly subordinated to the prior payment in full in cash of all obligations with respect to the Securities,

(3) the Securities, the Issue Date 2008 Senior Notes the Issue Date Senior Notes, the Issue Date Discount Notes and the Issue Date Euro Notes

(4) Indebtedness outstanding on the Issue Date (other than Indebtedness described in clause (1) (2) or (3) of this Section 4 03(b)) and any exchange debentures issued in exchange for the Series C Preferred Stock in accordance with its terms or Discount Notes or the Issue Date Initial Senior Notes issued in exchange for such exchange debentures or Series C Preferred Stock

(5) Purchase Money Indebtedness, provided, however, that, to the extent such Purchase Money Indebtedness is Incurred by a Restricted Group Member, such Purchase Money Indebtedness shall be Incurred pursuant to a Permitted Credit Facility or a Vendor Financing, provided further, however that the amount of such Purchase Money Indebtedness does not exceed 100% of the cost and directly related expenses of the construction installation acquisition, lease, insurance, shipping, development or improvement of, or any service agreement, maintenance agreement, warranty agreement or similar agreement in respect of, the applicable Telecommunications Assets,

(6) Indebtedness of the Company in an amount which when taken together with the amount of all other Indebtedness of the Company Incurred pursuant to this clause (6) and then outstanding does not exceed two times the sum of (x) the aggregate Net Cash Proceeds

[NYCorp 1055029 5 4306W 05/0C/2000 7 16p]

50

received by the Company from the issuance or sale of
Capital Stock (other than Disqualified Stock) of the
Company (other than an issuance or sale to a Subsidiary
of the Company or a Permitted International Joint
Venture and other than an issuance or sale to an
employee stock ownership plan or to a trust established
by the Company, any of its Subsidiaries or any
Permitted International Joint Venture for the benefit
of their employees) and (y) the fair market value of
any Capital Stock (other than Disqualified Stock) of
the Company issued to any Person (other than a
Subsidiary of the Company or a Permitted International
Joint Venture) (i) in exchange for Telecommunications
Assets or (ii) in exchange for Capital Stock of another
Person a substantial majority of the assets of which
consist of Telecommunications Assets in a transaction
pursuant to which such other Person becomes a
Restricted Group Member  in each case received or
issued, as the case may be  on or subsequent to
February 1, 2000, provided, however, that such Net Cash
Proceeds or fair market value have not served as a
basis for making a Restricted Payment pursuant to
Section 4 04(a)(3)(B), Section 4 04(b)(1) or
Section 4 04(b)(5),

(7) Indebtedness of a Restricted Group Member
Incurred and outstanding on or prior to the date on
which such Subsidiary (in the case of a Restricted
Subsidiary) or an interest in such entity (in the case
of a Permitted International Joint Venture) was
acquired by the Company (other than Indebtedness
Incurred in connection with  or to provide all or any
portion of the funds or credit support utilized to
consummate  the transaction or series of related
transactions pursuant to which such Subsidiary (in the
case of a Restricted Subsidiary) or an interest in such
entity (in the case of a Permitted International Joint
Venture) was acquired by the Company), provided
however, that on the date of such acquisition and after
giving pro forma effect thereto, the Company would have
been able to Incur at least $1 00 of additional
Indebtedness pursuant to Section 4 03(a),

(8) Refinancing Indebtedness in respect of
Indebtedness Incurred pursuant to Section 4 03(a) or
pursuant to clause (3), (4), (5) or (7) of this
Section 4 03(b) or this clause (8), provided  however
that any Refinancing Indebtedness Incurred by a
Restricted Group Member in respect of Indebtedness
Incurred pursuant to clause (5) of this Section 4 03(b)



51

is Incurred pursuant to a Permitted Credit Facility or a Vendor Financing,

(9) Hedging Obligations consisting of (A) Interest Rate Agreements or Currency Agreements directly related to Indebtedness permitted to be Incurred by the Company pursuant to thi Indenture, _provided_, _however_, that the notional amount of any such Hedging Obligation does not exceed the amount of Indebtedness to which such Hedging Obligation relates or (B) Currency Agreements used to hedge non-U S dollar currency exposures of the Company and its Restricted Group Members, entered into in accordance with customary industry practices for companies in the Telecommunications Business with international operations and not for purposes of speculation,

(10) Indebtedness solely in respect of letters of credit bank guarantees, banker's acceptances cash deposits, surety bonds bid bonds and performance bonds Incurred in the ordinary course of business _provided_, _however_ that such instruments or deposits do not support any Indebtedness other than Indebtedness which if Incurred by the Company would be permitted to be Incurred pursuant to another provision of this Section 4 03,

(11) Indebtedness of the Company or a Restricted Group Member consisting of a Guaranty of Indebtedness of a Restricted Group Member permitted to be Incurred under this Indenture, _provided however_, that the entity providing the Guaranty would have been able to Incur such Indebtedness under this Indenture and

(12) Indebtedness of the Company or a Restricted Group Member in an aggregate principal amount which, when taken together with all other Indebtedness of the Company and the Restricted Group Members outstanding on the date of such Incurrence (other than Indebtedness permitted by clauses (1) through (11) of this Section 4 03(b) or Section 4 03(a)) does not exceed $50 0 million

(c) Notwithstanding the foregoing the Company will not Incur any Indebtedness pursuant to Section 4 03(b) (other than the Incurrence of (1) any exchange debentures issued in exchange for the Series C Preferred Stock in accordance with its terms or Discount Notes or Issue Date Initial Senior Notes issued in exchange for such exchange debentures or Series C Preferred Stock and (2) any



(TYCO-p 1055029 5 43064 05/04/2006  2 16p)

52

Indebtedness issued in exchange for the Existing Subor-
dinated Notes) if the proceeds thereof are used directly or
indirectly, to Refinance any Subordinated Obligations unless
such Indebtedness shall be subordinated to the Securities to
at least the same extent as such Subordinated Obligations

(d)  For purposes of determining compliance with
this Section 4 03  (1) in the event that an item of
Indebtedness meets the criteria of more than one of the
types of Indebtedness described above, the Company  in its
sole discretion  will classify such item of Indebtedness at
the time of Incurrence and only be required to include the
amount and type of such Indebtedness in one of the above
clauses and (2) the Company will be entitled to divide and
classify an item of Indebtedness in more than one of the
types of Indebtedness described above

(e)  For purposes of determining compliance with
any U S  dollar or euro denominated restriction on the
Incurrence of Indebtedness where the Indebtedness Incurred
is denominated in a different currency, the amount of such
Indebtedness will be the U S  Dollar Equivalent or Euro
Equivalent  as the case may be  determined on the date of
the Incurrence of such Indebtedness, provided, however  that
if any such Indebtedness denominated in a different currency
is subject to a Currency Agreement with respect to U S
dollars or euros  as the case may be, covering all
principal, premium  if any  and interest payable on such
Indebtedness the amount of such Indebtedness expressed in
U S  dollars or euros will be as provided in such Currency
Agreement   The principal amount of any Refinancing
Indebtedness Incurred in the same currency as the
Indebtedness, being Refinanced will be the Euro Equivalent
or U S  Dollar Equivalent  as appropriate, of the
Indebtedness Refinanced, except to the extent that (1) such
U S  Dollar Equivalent or Euro Equivalent was determined
based on a Currency Agreement, in which case the Refinancing
Indebtedness will be determined in accordance with the
preceding sentence, and (2) the principal amount of the
Refinancing Indebtedness exceeds the principal amount of the
Indebtedness being Refinanced, in which case the U S  Dollar
Equivalent or Euro Equivalent of such excess, as
appropriate, will be determined on the date such Refinancing
Indebtedness is Incurred

SECTION 4 04   Limitation on Restricted Payments
(a)  The Company will not, and will not permit any

53

Restricted Group Member, directly or indirectly, to make a
Restricted Payment if at the time the Company or such
Restricted Group Member makes such Restricted Payment

(1) a Default shall have occurred and be
continuing (or would result therefrom),

(2) after giving effect thereto on a pro forma
basis the Company is not entitled to Incur an
additional $1 00 of Indebtedness pursuant to
Section 4 03(a)  or

(3) the aggregate amount of such Restricted
Payment and all other Restricted Payments since the
Issue Date would exceed the sum of (without
duplication)

(A) the amount of (x) cumulative EBITDA
during the period (taken as a single accounting
period) beginning on the first day of the fiscal
quarter of the Company beginning after the Issue
Date and ending on the last day of the most recent
fiscal quarter ending at least 45 days prior to
the date of such Restricted Payment minus (y) the
product of 1 5 times cumulative Consolidated
Interest Expense during such period  plus

(B) subject to Section 4 04(c), 100% of the
aggregate Net Cash Proceeds received by the
Company from the issuance or sale of its Capital
Stock (other than Disqualified Stock) subsequent
to the Issue Date (other than an issuance or sale
to a Subsidiary of the Company or a Permitted
International Joint Venture and other than an
issuance or sale to an employee stock ownership
plan or to a trust established by the Company  any
of its Subsidiaries or any Permitted International
Joint Venture for the benefit of their employees),
provided, however, that such Net Cash Proceeds
have not served as a basis to make a Restricted
Payment pursuant to Section 4 04(b)(1) or
Section 4 04(b)(5)  plus

(C) the amount by which Indebtedness of the
Company or a Restricted Group Member is reduced on
the Company's consolidated balance sheet upon the
conversion or exchange (other than by a Subsidiary
of the Company or a Permitted International Joint
Venture) subsequent to the Issue Date of any
Indebtedness of the Company or a Restricted Group

54

Member for or into Capital Stock (other than
Disqualified Stock) of the Company (less the
amount of any cash or the fair value of any other
property (other than Capital Stock of the Company
that is not Disqualified Stock) distributed by
the Company or a Restricted Group Member upon such
conversion or exchange) plus

(D) an amount equal to the sum of (x) the net
reduction in the Investments (other than Permitted
Investments) made by the Company or any Restricted
Group Member in any Person resulting from repur-
chases, repayments or redemptions of such Invest-
ments by such Person proceeds realized on the
sale of such Investment proceeds representing the
return of capital (excluding dividends and distri-
butions), in each case received by the Company or
any Restricted Group Member, and (y) if an
Unrestricted Subsidiary is designated as a
Restricted Group Member or an Investee is desig-
nated as a Restricted Group Member or becomes a
Restricted Subsidiary, the portion (proportionate
to the Company's equity interest in such Subsi-
diary or Investee) of the fair market value of the
net assets of such Unrestricted Subsidiary or
Investee at the time such Unrestricted Subsidiary
is designated a Restricted Group Member or such
Investee is designated as a Restricted Group
Member or becomes a Restricted Subsidiary,
provided, however, that the foregoing sum shall
not exceed, in the case of any such Person,
Unrestricted Subsidiary or Investee, the amount of
Investments (excluding Permitted Investments)
previously made (and treated as a Restricted
Payment and included in the calculation of the
amount of Restricted Payments) by the Company or
any Restricted Group Member in such Person,
Unrestricted Subsidiary or Investee

(b) The provisions of Section 4 04(a) shall not
prohibit

(1) subject to Section 4 04(c), any Restricted
Payment made out of the Net Cash Proceeds of the
substantially concurrent sale of (or specified with
particularity at the time of the sale of, and
subsequently made with such Net Cash Proceeds of), or
made by exchange for Capital Stock (other than
Disqualified Stock) of the Company (other than Capital
Stock issued or sold to a Subsidiary of the Company or

55

a Permitted International Joint Venture or an employee
stock ownership plan or to a trust established by the
Company, any of its Subsidiaries or any Permitted
International Joint Venture for the benefit of their
employees), provided, however, that such Net Cash
Proceeds have not served as a basis for making any
other Restricted Payment provided further however
that (A) such Restricted Payment shall be excluded in
the calculation of the amount of Restricted Payments
and (B) the Net Cash Proceeds from any such sale (to
the extent so used for such Restricted Payment) shall
be excluded from the calculation of amounts under
Section 4 04(a)(3)(B),

(2) any purchase repurchase redemption,
defeasance or other acquisition or retirement for value
of Subordinated Obligations made by exchange for, or
out of the proceeds of the substantially concurrent
sale of (or specified with particularity at the time of
the sale of, and subsequently made with such proceeds
of), Indebtedness which is permitted to be Incurred
pursuant to Section 4 03, provided however, that such
purchase repurchase redemption, defeasance or other
acquisition or retirement for value shall be excluded
in the calculation of the amount of Restricted
Payments

(3) dividends paid within 60 days after the date
of declaration thereof if at such date of declaration
such dividend would have complied with this
Section 4 04, provided, however that at the time of
payment of such dividend no other Default shall have
occurred and be continuing (or result therefrom),
provided further, however, that such dividend shall be
included in the calculation of the amount of Restricted
Payments,

(4) so long as no Default has occurred and is
continuing the repurchase or other acquisition of
shares of Capital Stock of the Company from employees,
former employees, directors or former directors of the
Company, any of its Subsidiaries or any Permitted
International Joint Venture (or permitted transferees
of such employees former employees directors or
former directors), pursuant to the terms of agreements
(including employment agreements) or plans (or amend-
ments thereto) approved by the Board of Directors under
which such individuals purchase or sell or are granted
the option to purchase or sell shares of such Capital
Stock provided however, that the aggregate amount of



INTCorp 1055025 X 43064 05/04/2000  1 1(p)

such repurchases and other acquisitions (other than
repurchases and acquisitions made pursuant to agree-
ments in effect on the Issue Date) shall not exceed
$5 0 million in any calendar year (with unused amounts
being carried forward indefinitely) *provided further,
however*, that such repurchases and other acquisitions
shall be included in the calculation of the amount of
Restricted Payments,

(5) subject to Section 4 04(c), Investments in any
Person a substantial majority of the assets of which
consist of Telecommunications Assets *provided, how-
ever* that the Fair Market Value of all such Invest-
ments made pursuant to this clause (5) (measured on the
date each such Investment was made) and then outstan-
ding, does not exceed the sum of $100 0 million, plus
the sum of (x) the aggregate Net Cash Proceeds received
by the Company from the issuance or sale of Capital
Stock (other than Disqualified Stock) of the Company
(other than an issuance or sale to a Subsidiary of the
Company or a Permitted International Joint Venture and
other than an issuance or sale to an employee stock
ownership plan or to a trust established by the
Company, any of its Subsidiaries or any Permitted
International Joint Venture for the benefit of their
employees) and (y) the fair market value of any Capital
Stock (other than Disqualified Stock) of the Company
issued to any Person (other than a Subsidiary of the
Company or a Permitted International Joint Venture)
(i) in exchange for Telecommunications Assets or
(ii) in exchange for Capital Stock of another Person a
substantial majority of the assets of which consist of
Telecommunications Assets in a transaction pursuant to
which such other Person becomes a Restricted Group
Member, in each case received or issued  as the case
may be, subsequent to February 1, 2000, *provided,
however*, that such Net Cash Proceeds or fair market
value have not served as a basis for making any other
Restricted Payment, *provided further, however*, that
(A) such Investments shall be excluded in the
calculation of the amount of Restricted Payments and
(B) the Net Cash Proceeds from any such issuance or
sale of Capital Stock (to the extent so used for such
Restricted Payment) shall be excluded from the
calculation of amounts under Section 4 04(a)(3)(B),

(6) Investments in any Person whose primary
business it is to directly (or indirectly through
subsidiaries) own or hold licenses granted by the
Federal Communications Commission or any other

governmental entity with authority to grant tele-
communications or radio frequency licenses or
authorizations, provided however that the Company or
a Restricted Group Member shall  at the time of making
such Investment  have an active role in the management
or operation of such Person and in the provision of
telecommunications services by such Person, provided
further however that such Investment shall be
included in the calculation of the amount of Restricted
Payments

(7) the exchange or purchase and retirement of
(A) the Series C Preferred Stock for (i) exchange
debentures in accordance with the terms of the Series C
Preferred Stock or (ii) cash or Indebtedness of the
Company or (B) the Existing Subordinated Notes for cash
or Indebtedness of the Company provided, however, that
such exchange or purchase and retirement shall be
excluded in the calculation of the amount of Restricted
Payments

(8) cash payments in lieu of the issuance of
fractional shares in connection with stock splits or
upon the conversion into Capital Stock of the Company
(other than Disqualified Stock) of any security of the
Company or any convertible Indebtedness of the Company
provided, however, that such exchange and retirement
shall be excluded in the calculation of the amount of
Restricted Payments

(9) Investments in Office com  the fair market
value of which (measured on the date each such Invest-
ment is made) does not exceed (x) in the case of an
Investment to be made on or immediately after the Issue
Date  $50 0 million, and (y) during each of the three
12-month periods following the Issue Date
$25 0 million per year (with unused annual amounts
being carried over to future periods even if such
periods occur after the third anniversary of the Issue
Date), provided however, that such Investments shall
be excluded in the calculation of the amount of
Restricted Payments, and

(10) Investments, the aggregate Fair Market Value
(measured on the date each such Investment was made) of
which  when taken together with the Fair Market Value
of all other Investments made pursuant to this
clause (10) then outstanding, does not exceed
$10 0 million, provided however that such Investment

58

shall be included in the calculation of the amount of Restricted Payments

(c)  The amounts determined pursuant to Section 4 04(a)(3)(B), Section 4 04(b)(1) and Section 4 04(b)(5) based on Net Cash Proceeds received from the issuance or sale of Capital Stock (or the Fair Market Value of Capital Stock issued) shall be reduced to the extent such Net Cash Proceeds or Fair Market Value have served as the basis for Incurring any Indebtedness pursuant to Section 4 03(b)(6) and such Indebtedness (including any Refinancings thereof) remains outstanding

SECTION 4 05   Limitation on Restrictions on Distributions from Restricted Group Members_  The Company will not  and will not permit any Restricted Group Member to  create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Group Member to (a) pay dividends or make any other distributions on its Capital Stock to the Company or a Restricted Group Member or pay any Indebtedness owed to the Company  (b) make any loans or advances to the Company or a Restricted Group Member or (c) transfer any of its property or assets to the Company or a Restricted Group Member, except

(1) any encumbrance or restriction pursuant to an agreement in effect at or entered into on the Issue Date

(2) any encumbrance or restriction with respect to a Restricted Group Member pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Group Member on or prior to the date on which such Subsidiary (in the case of a Restricted Subsidiary) or an interest in such entity (in the case of a Permitted International Joint Venture) was acquired by the Company (other than Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate  the transaction or series of related transactions pursuant to which such Subsidiary (in the case of a Restricted Subsidiary) or entity (in the case of a Permitted International Joint Venture) became a Restricted Group Member or was acquired by the Company) and outstanding on such date,

(3) any encumbrance or restriction pursuant to an agreement effecting a Refinancing of Indebtedness Incurred pursuant to an agreement referred to in



59

Section 4 05(1) or Section 4 05(2) or this clause (3) or contained in any amendment to an agreement referred to in Section 4 05(1) or Section 4 05(2) or this clause (3), provided however, that the encumbrances and restrictions with respect to such Restricted Group Member contained in any such refinancing agreement or amendment are no less favorable to the Securityholders than encumbrances and restrictions with respect to such Restricted Group Member contained in such predecessor agreements

(4) any encumbrance or restriction pursuant to a Permitted Credit Facility, provided, however, that (a) the outstanding Indebtedness under such Permitted Credit Facility does not exceed the amounts permitted under Section 4 03(b)(1), Section 4 03(b)(5) and Section 4 03(b)(8) (but with respect to Section 4 03(b)(8) only to the extent such Indebtedness constitutes Refinancing Indebtedness of Purchase Money Indebtedness), (b) such restrictions (other than following an event of default under such Permitted Credit Facility) permit dividends and distributions necessary to permit the Company to satisfy its obligations on the Securities, and (c) the chief financial officer of the Company determines in good faith that (1) any such restrictions contained in any such Permitted Credit Facility are no more restrictive taken as a whole, than those contained in a credit facility with terms that are commercially reasonable for a borrower engaged in a business comparable to the Company that has substantially comparable Indebtedness and (2) any such restrictions will not materially affect the Company's ability to make principal, premium or interest payments on the Securities

(5) any encumbrance or restriction arising under any applicable law or action or at the request of a governmental regulatory authority,

(6) in the case of clause (c) above, any such encumbrance or restriction consisting of customary non assignment provisions in leases, including leases in respect of data centers and indefeasible rights of use, governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder

(7) in the case of clause (c) above restrictions contained in security agreements or mortgages securing Indebtedness of the Company or a Restricted Group



60

Member to the extent such restrictions restrict the
transfer of the property subject to such security
agreements or mortgages,

(8) in the case of clause (c) above, restrictions
imposed in connection with the grant or acquisition of
radio frequency spectrum (to the extent such restric-
tions restrict the transfer of such radio frequency
spectrum) or common carrier licenses or their equiv-
alent (to the extent such restrictions restrict the
transfer of such licenses),

(9) in the case of clause (c) above, restrictions
relating to the property or assets of an unconsolidated
Permitted International Joint Venture, not relating to
any Indebtedness and that do not individually or in
the aggregate, detract from the value of the property
or assets of the Permitted International Joint Venture
in any material respect,

(10) in the case of clause (c) above customary
provisions arising or agreed to in the ordinary course
of business, not relating to any Indebtedness and that
do not individually or in the aggregate, detract from
the value of the property or assets of the Company or
any Restricted Group Member in any material respect,
and

(11) any restriction with respect to a Restricted
Group Member imposed pursuant to an agreement entered
into for the sale or disposition of all or substan-
tially all the Capital Stock or assets of such
Restricted Group Member pending the closing of such
sale or disposition

SECTION 4 06    Limitation on Sales of Assets and
Subsidiary Stock    (a)  The Company will not, and will not
permit any Restricted Group Member to, directly or indi-
rectly  consummate any Asset Disposition unless

(1) the Company or such Restricted Group Member
receives consideration at the time of such Asset
Disposition at least equal to the Fair Market Value
(including as to the value of all noncash consider-
ation), of the shares and assets subject to such Asset
Disposition,

(2) at least 75% of the consideration thereof
received by the Company or such Restricted Group Member



61

is in the form of cash or cash equivalents, Marketable Securities or Telecommunications Assets, and

(3) an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Group Member as the case may be)

(A) _first_ to the extent the Company or such Restricted Group Member elects (or is required by the terms of any Indebtedness) to prepay, repay, redeem or purchase (x) Senior Indebtedness of the Company that is either secured Indebtedness or has a Stated Maturity prior to the Stated Maturity of the Securities or (y) Indebtedness (other than any Disqualified Stock) of a Restricted Group Member (in each case other than Indebtedness owed to the Company or an Affiliate of the Company) within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash,

(B) _second_ to the extent of the balance of such Net Available Cash after application in accordance with clause (A) to the extent the Company elects to acquire Telecommunications Assets within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash, and

(C) _third_ to the extent of the balance of such Net Available Cash after application in accordance with clauses (A) and (B) to make an offer to the holders of the Securities (and to holders of other Senior Indebtedness that have a right to be included in such offer) to purchase Securities (and such other Senior Indebtedness) pursuant to and subject to the conditions contained in Section 4 06(b),

_provided_ _however_ that in connection with any prepayment repayment or purchase of Indebtedness pursuant to clause (A) or (C) above, the Company or such Restricted Group Member shall permanently retire such Indebtedness (other than Indebtedness Incurred pursuant to the revolving loan portion of a Permitted Credit Facility) and shall cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased



[NYCorp;10550 9 5 4301W 05/04/2000  2 14p]

62

Notwithstanding the foregoing provisions of this Section 4 06, the Company and the Restricted Group Members will not be required to apply any Net Available Cash in accordance with this Section 4 06 except to the extent that the aggregate Net Available Cash from all Asset Dispositions which are not applied in accordance with this Section 4 06 exceeds $5 0 million   Pending application of Net Available Cash pursuant to this Section 4 06, such Net Available Cash shall be invested in Permitted Investments

For the purposes of this Section 4 06, the following are deemed to be cash or cash equivalents

(1) the assumption of Indebtedness of the Company or any Restricted Group Member and the release of the Company or such Restricted Group Member from all liability on such Indebtedness in connection with such Asset Disposition  and

(2) securities received by the Company or any Restricted Group Member from the transferee that are promptly converted by the Company or such Restricted Group Member into cash or cash equivalents

(b)   In the event of an Asset Disposition that requires the purchase of Securities (and other Senior Indebtedness) pursuant to Section 4 06(a)(3)(C)  the Company shall purchase Securities tendered pursuant to an offer by the Company for the Securities (and such other Senior Indebtedness) (the "Offer") at a purchase price of 100% of their principal amount (or  if other than the Securities 100% of their principal amount or, in the event such other Senior Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), without premium, plus accrued but unpaid interest (or, in respect of such other Senior Indebtedness, such lesser price, if any, as may be provided for by the terms of such Senior Indebtedness) in accordance with the procedures (including prorationing in the event of oversubscription) set forth in Section 4 06(c)   If the aggregate purchase price of Securities (and any other Senior Indebtedness) tendered pursuant to the Offer exceeds the Net Available Cash allotted to their purchase, the Company shall select the Securities and other Senior Indebtedness to be purchased on a pro rata basis but in round denominations, which in the case of the Securities will be denominations of $1,000 principal amount or multiples thereof   The Company shall not be required to make an Offer to purchase Securities (and other Senior Indebtedness) pursuant to this Section 4 06 if the Net Available Cash available therefor is less than

[NYCorp 1055029 5 4306W 05/04/2000  3 34p]

63

$10 0 million (which lesser amount shall be carried forward
for purposes of determining whether such an Offer is
required with respect to the Net Available Cash from any
subsequent Asset Disposition)   Upon completion of an Offer,
the amount of Net Available Cash that served as the basis
for such Offer will be reset at zero for purposes of
Section 4 06(a)

　　　　　(c)  (1)  Promptly  and in any event within
10 days after the Company becomes obligated to make an
Offer  the Company shall deliver to the Trustee and send, by
first-class mail to each Holder, a written notice stating
that the Holder may elect to have his Securities purchased
by the Company either in whole or in part (subject to
prorating as described in Section 4 06(b) in the event the
Offer is oversubscribed) in integral multiples of $1 000 of
principal amount  at the applicable purchase price   The
notice shall specify a purchase date not less than 30 days
nor more than 60 days after the date of such notice (the
"Purchase Date") and shall contain such information
concerning the business of the Company which the Company in
good faith believes will enable such Holders to make an
informed decision (which at a minimum will include (A) the
most recently filed Annual Report on Form 10-K (including
audited consolidated financial statements) of the Company,
the most recent subsequently filed Quarterly Report on Form
10-Q and any Current Report on Form 8-K of the Company filed
subsequent to such Quarterly Report, other than Current
Reports describing Asset Dispositions otherwise described in
the offering materials (or corresponding successor reports),
(B) a description of material developments in the Company s
business  if any  subsequent to the date of the latest of
such Reports  and (C) if material  appropriate pro forma
financial information) and all instructions and materials
necessary to tender Securities pursuant to the Offer
together with the information contained in clause (3)

　　　　　(2)  Not later than the date upon which written
notice of an Offer is delivered to the Trustee as provided
below, the Company shall deliver to the Trustee an Officers'
Certificate as to (A) the amount of the Offer (the "Offer
Amount"), including information as to any other Senior
Indebtedness included in the Offer, (B) the allocation of
the Net Available Cash from the Asset Dispositions pursuant
to which such Offer is being made and (C) the compliance of
such allocation with the provisions of Section 4 06(a) and
(b)   On such date, the Company shall also irrevocably
deposit with the Trustee or with a Paying Agent (or  if the
Company is acting as its own Paying Agent, segregate and
hold in trust) in Temporary Cash Investments, maturing on

[NYCorp 1615021 5 4366  05/04/2000  1 34p]

64

the last day prior to the Purchase Date or on the Purchase Date if funds are immediately available by open of business, an amount equal to the Offer Amount to be held for payment in accordance with the provisions of this Section   If the Offer includes other Senior Indebtedness, the deposit described in the preceding sentence may be made with any other paying agent pursuant to arrangements satisfactory to the Trustee   Upon the expiration of the period for which the Offer remains open (the "Offer Period")  the Company shall deliver to the Trustee for cancellation the Securities or portions thereof which have been properly tendered to and are to be accepted by the Company   The Trustee shall, on the Purchase Date, mail or deliver payment (or cause the delivery of payment) to each tendering Holder in the amount of the purchase price   In the event that the aggregate purchase price of the Securities delivered by the Company to the Trustee is less than the Offer Amount applicable to the Securities  the Trustee shall deliver the excess to the Company immediately after the expiration of the Offer Period for application in accordance with this Section 4 06

        (3)   Holders electing to have a Security purchased shall be required to surrender the Security, with an appropriate form duly completed  to the Company at the address specified in the notice at least three Business Days prior to the Purchase Date   Holders shall be entitled to withdraw their election if the Trustee or the Company receives not later than two Business Days prior to the Purchase Date  a telex  facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Security purchased   Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered

        (4)  At the time the Company delivers Securities to the Trustee which are to be accepted for purchase, the Company shall also deliver an Officers' Certificate stating that such Securities are to be accepted by the Company pursuant to and in accordance with the terms of this Section   A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent  mails or delivers payment therefor to the surrendering Holder

        (d)   The Company shall comply, to the extent applicable  with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations

[NYCorp 1055029 5 43064 05/01/2000  2 14p]

65

ın connection with the repurchase of Securities pursuant to this Section  To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue of its compliance with such securities laws or regulations

SECTION 4 07  Limitation on Affiliate Trans-actions.  (a)  The Company will not, and will not permit any Restricted Group Member to  enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with  or for the benefit of  any Affiliate of the Company (an "Affiliate Transaction") unless

(1) the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Group Member than those that could be obtained at the time of the Affiliate Transaction in arm's-length dealings with a Person who is not an Affiliate,

(2) if such Affiliate Transaction or series of related Affiliate Transactions involves an amount in excess of $12 5 million  the terms of the Affiliate Transaction are set forth in writing and either (A) a committee of the Board of Directors a majority of whose members are disinterested with respect to such transaction or (B) a majority of the non-employee directors of the Company disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and that the relevant Affiliate Transaction is in the best interest of the Company or such Restricted Group Member and have approved the relevant Affiliate Transaction as evidenced by a Board Resolution, and

(3) if such Affiliate Transaction or series of related Affiliate Transactions involves an amount in excess of $25 0 million, the Board of Directors shall also have received a written opinion from an investment banking firm  accounting firm or appraisal firm of national prominence that is not an Affiliate of the Company to the effect that such Affiliate Transaction is fair, from a financial standpoint  to the Company and its Restricted Group Members



66

(b)  The provisions of Section 4 07(a) will not prohibit

(1) any Investment (other than a Permitted Investment) or other Restricted Payment, in each case permitted to be made pursuant to Section 4 04,

(2) the entering into  maintaining or performance of any employment contract, collective bargaining agreement, benefit plan, program or arrangement, related trust agreement or any other similar arrangement for or with any employee, officer or director heretofore or hereafter entered into in the ordinary course of business  including vacation, health insurance, deferred compensation, retirement, savings or other similar plans,

(3) the payment of compensation, performance of indemnification or contribution obligations, or an issuance, grant or award of stock, options, or other equity-related interests or other securities, to employees  officers or directors in the ordinary course of business,

(4) the payment of reasonable fees to directors of the Company and its Restricted Group Members who are not employees of the Company or its Restricted Group Members

(5) any transaction with a Restricted Group Member or joint venture or similar entity that would constitute an Affiliate Transaction solely because the Company or a Restricted Group Member owns an equity interest in or otherwise controls such Restricted Group Member, joint venture or similar entity,

(6) the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Company, and

(7) transactions with respect to the provision of Telecommunications Business services, including wireline or wireless transmission capacity, the lease or sharing or other use of cable or fiber optic lines equipment, rights-of-way or other access rights between the Company or any Restricted Group Member and any other Person provided, however, that, in the case of this clause (7), such transaction complies with Section 4 07(a)(1) and is in the best interest of the Company or such Restricted Group Member

67

SECTION 4 08   Limitation on the Sale or Issuance
of Capital Stock of Restricted Group Members.   The Company

(1) will not and will not permit any Restricted
Group Member to issue  transfer  convey, sell or otherwise
dispose of any Capital Stock of any Restricted Group Member
other than to the Company or a Restricted Group Member and

(11) will not permit any Person other than the
Company or a Restricted Group Member to own any Capital
Stock of any Restricted Group Member  other than directors'
qualifying shares or shares required by applicable law to be
held by a Person other than the Company or a Restricted
Group Member

except, in each case, for

(a) a sale  transfer  conveyance or other
disposition by the Company or a Restricted Group Member
of 100% of the Capital Stock of a Restricted Group
Member sold in a transaction not prohibited by
Section 4 06

(b) an issuance  sale, transfer  conveyance or
other disposition of the Capital Stock of a Restricted
Group Member sold in a transaction not prohibited by
Section 4 06 if, after giving effect thereto, such
Restricted Group Member remains a Restricted Group
Member and the Net Cash Proceeds of such issuance
(other than an issuance by a Permitted International
Joint Venture), sale  transfer, conveyance or other
disposition are applied in accordance with
Section 4 06

(c) an issuance  sale, transfer, conveyance or
other disposition of Capital Stock of a Restricted
Group Member such that,

(1) immediately after giving effect thereto,
such Restricted Group Member would no longer
constitute a Restricted Group Member,

(2) any remaining Investment in such
Restricted Group Member by the Company or any
other Restricted Subsidiary would have been
permitted to be made at such time under
Section 4 04 (and for purposes of Section 4 04,
such Investment will be deemed to have been made
at such time) and

[NYCorp 1051028 3 38RW 05/04/2000 ~ 16)]

68

(3) the Net Cash Proceeds of such issuance (other than an issuance by a Permitted International Joint Venture), sale transfer conveyance or other disposition are applied in accordance with Section 4 06,

(d) Capital Stock of a Restricted Group Member issued and outstanding on the Issue Date or the date of formation of such Restricted Group Member and, in each case held by Persons other than the Company or any Restricted Group Member and any additional Capital Stock (other than Disqualified Stock) issued as dividends or distributions on such Capital Stock or pursuant to preemptive or similar rights,

(e) Capital Stock of a Restricted Group Member issued and outstanding prior to the time that such Person becomes a Restricted Group Member, and

(f) any non-convertible Preferred Stock constituting Indebtedness and permitted to be Incurred under Section 4 03

SECTION 4 09   Change of Control.   (a) Upon the occurrence of a Change of Control, each Holder shall have the right to require that the Company purchase such Holder s Securities at a purchase price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of holders of record on the relevant record date to receive interest on the relevant interest payment date), in accordance with the terms contemplated in Section 4 09(b)

(b)   Within 30 days following any Change of Control  the Company shall mail a notice to each Holder with a copy to the Trustee (the "Change of Control Offer") stating

(1) that a Change of Control has occurred and that such Holder has the right to require the Company to purchase such Holder's Securities at a purchase price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date),

(2) the circumstances and relevant facts regarding such Change of Control (including information with respect to pro forma historical income, cash flow and



69

capitalization  each after giving effect to such Change
of Control),

(3) the purchase date (which shall be no earlier
than 30 days nor later than 60 days from the date such
notice is mailed), and

(4) the instructions determined by the Company,
consistent with this Section  that a Holder must follow
in order to have its Securities purchased

(c)  Holders electing to have a Security purchased
will be required to surrender the Security, with an appro-
priate form duly completed  to the Company at the address
specified in the notice at least three Business Days prior
to the purchase date  Holders will be entitled to withdraw
their election if the Trustee or the Company receives not
later than two Business Days prior to the purchase date, a
telegram, telex  facsimile transmission or letter setting
forth the name of the Holder, the principal amount of the
Security which was delivered for purchase by the Holder and
a statement that such Holder is withdrawing his election to
have such Security purchased

(d)  On the purchase date, all Securities pur-
chased by the Company under this Section shall be delivered
by the Company to the Trustee for cancellation  and the
Company shall pay the purchase price plus accrued and unpaid
interest, if any  to the Holders entitled thereto

(e)  Notwithstanding the foregoing provisions of
this Section  the Company shall not be required to make a
Change of Control Offer upon a Change of Control if a third
party makes the Change of Control Offer in the manner  at
the times and otherwise in compliance with the requirements
set forth in this Section applicable to a Change of Control
Offer made by the Company and purchases all Securities
validly tendered and not withdrawn under such Change of
Control Offer

(f)  The Company shall comply, to the extent
applicable, with the requirements of Section 14(e) of the
Exchange Act and any other securities laws or regulations
in connection with the repurchase of Securities pursuant to
this Section  To the extent that the provisions of any
securities laws or regulations conflict with provisions of
this Section  the Company shall comply with the applicable
securities laws and regulations and shall not be deemed to
have breached its obligations under this Section by virtue
of its compliance with such securities laws or regulations

[NYCorp 1015O.9 5 (3D6W 05/04/2000 ) 14p]

SECTION 4 10    Limitation on Liens    The Company
will not, and will not permit any Restricted Group Member
to, directly or indirectly  Incur or suffer to exist or
become effective any Lien (the "Initial Lien") of any nature
whatsoever on any of its property (including Capital Stock)
whether owned at the Issue Date or thereafter acquired, or
upon any income or profits therefrom (other than Permitted
Liens) to secure any Indebtedness, without effectively
providing that the Securities shall be secured (1) equally
and ratably with (or prior to) the Indebtedness so secured
for so long as such Indebtedness is so secured or (2) in the
event such Indebtedness constitutes Subordinated Obliga-
tions, prior to such Indebtedness for so long as such
Indebtedness is so secured

        Any Lien created for the benefit of the Holders of
the Securities pursuant to this Section shall provide by its
terms that such Lien shall be automatically and uncondi-
tionally released and discharged upon the release and
discharge of the Initial Lien

SECTION 4 11    Limitation on Sale/Leaseback
Transactions.   The Company will not, and will not permit any
Restricted Group Member to, directly or indirectly, enter
into  assume, guarantee or otherwise become liable with
respect to any Sale/Leaseback Transaction with respect to
any property unless

        (1) the Company or such Restricted Group Member
        would be entitled to (A) Incur Indebtedness in an
        amount equal to the Attributable Debt with respect to
        such Sale/Leaseback Transaction pursuant to
        Section 4 03 and (B) create a Lien on such property
        securing such Attributable Debt without equally and
        ratably securing the Securities pursuant to
        Section 4 10

        (2) the net proceeds received by the Company or
        any Restricted Group Member in connection with such
        Sale/Leaseback Transaction are at least equal to the
        Fair Market Value of such property, and

        (3) the Company applies the proceeds of such
        transaction in compliance with Section 4 06

SECTION 4 12    Compliance Certificate    The
Company shall deliver to the Trustee within 120 days after
the end of each fiscal year of the Company an Officers'
Certificate stating that in the course of the performance by
the signers of their duties as Officers of the Company they

71

would normally have knowledge of any Default and whether or not the signers know of any Default that occurred during such period   If they do, the certificate shall describe the Default  its status and what action the Company is taking or proposes to take with respect thereto   The Company also shall comply with TIA § 314(a)(4)

SECTION 4 13   Further Instruments and Acts   Upon request of the Trustee  the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

ARTICLE 5

Successor Company

SECTION 5 01   When Company May Merge or Transfer Assets   (a)  The Company shall not consolidate with or merge with or into  or convey  transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person  unless

(1) the resulting, surviving or transferee Person (the "Successor Company") shall be a Person organized and existing under the laws of the United States of America  any State thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume  by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, all the obligations of the Company under the Securities  this Indenture and the Registration Rights Agreement,

(2) immediately after giving pro forma effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Subsidiary as a result of such transaction as having been Incurred by the Successor Company or such Subsidiary at the time of such transaction), no Default shall have occurred and be continuing,

(3) immediately after giving pro forma effect to such transaction, the Consolidated Leverage Ratio of the Successor Company shall be no worse than the Consolidated Leverage Ratio of the Company determined immediately prior to such transaction,



(4) if, as a result of any such transaction property or assets of the Successor Company would become subject to a Lien subject to Section 4 10, the Successor Company shall have secured the Securities as required by said Section  and

(5) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with this Indenture,

provided  however, that clauses (3) and (4) will not be applicable to (A) a Restricted Subsidiary consolidating with  merging into or transferring all or part of its properties and assets to the Company or (B) the Company merging with an Affiliate of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction

The Successor Company shall be the successor to the Company and shall succeed to  and be substituted for and may exercise every right and power of, the Company under this Indenture  but the predecessor Company in the case of a conveyance  transfer or lease shall not be released from the obligation to pay the principal of and interest on the Securities

## ARTICLE 6

### Defaults and Remedies

SECTION 6 01   Events of Default.  An "Event of Default" occurs if

(1) the Company defaults in any payment of inter- est on any Security when the same becomes due and payable, and such default continues for a period of 30 days

(2) the Company (i) defaults in the payment of the principal of any Security when the same becomes due and payable at its Stated Maturity, upon optional redemp- tion, upon declaration or otherwise, or (ii) fails to redeem or purchase Securities when required pursuant to this Indenture or the Securities,

(3) the Company fails to comply with Section 5 01,



73

(4) the Company fails to comply with Section 4 02 4 03, 4 04, 4 05, 4 06  4 07  4 08, 4 09  4 10 or 4 11 (other than a failure to purchase Securities when required under Section 4 06 or 4 09) and such failure continues for 30 days after the notice specified below,

(5) the Company fails to comply with any of its agreements in the Securities or this Indenture (other than those referred to in clause (1), (2)  (3) or (4) above) and such failure continues for 60 days after the notice specified below,

(6) Indebtedness of the Company or any Restricted Group Member is not paid within any applicable grace period after final maturity or is accelerated by the holders thereof because of a default and the total amount of such Indebtedness unpaid or accelerated exceeds $25 0 million  or its foreign currency equivalent at the time,

(7) the Company or any Significant Restricted Group Member pursuant to or within the meaning of any Bankruptcy Law

(A) commences a voluntary case,

(B) consents to the entry of an order for relief against it in an involuntary case,

(C) consents to the appointment of a Custo-dian of it or for any substantial part of its property, or

(D) makes a general assignment for the bene-fit of its creditors,

or takes any comparable action under any foreign laws relating to insolvency,

(8) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that

(A) is for relief against the Company or any Significant Restricted Group Member in an involuntary case

(B) appoints a Custodian of the Company or any Significant Restricted Group Member or for any substantial part of its property, or

[NYCorp 1035029 5 4306U 05/04/ 006  2 34p]



74

(C) orders the winding up or liquidation of the Company or any Significant Restricted Group Member

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days, or

(9) any judgment or decree for the payment of money in excess of $25 0 million or its foreign currency equivalent at the time is entered against the Company or any Restricted Group Member, remains outstanding for a period of 60 consecutive days following the entry of such judgment or decree and is not discharged, waived or the execution thereof stayed within 10 days after the notice specified below

The foregoing will constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment  decree or order of any court or any order, rule or regulation of any administrative or governmental body

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors  The term 'Custodian" means any receiver, trustee, assignee  liquidator  custodian or similar official under any Bankruptcy Law

A Default under clauses (4), (5) or (9) is not an Event of Default until the Trustee or the holders of at least 25% in principal amount of the outstanding Securities notify the Company of the Default and the Company does not cure such Default within the time specified after receipt of such notice   Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default"

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof  written notice in the form of an Officers' Certificate of any Event of Default under clause (6) and any event which with the giving of notice or the lapse of time would become an Event of Default under clause (4)  (5) or (9)  its status and what action the Company is taking or proposes to take with respect thereto

SECTION 6 02   Acceleration   If an Event of Default (other than an Event of Default specified in Section 6 01(7) or (8) with respect to the Company) occurs

75

and is continuing the Trustee by notice to the Company, or the Holders of at least 25% in principal amount of the Securities by notice to the Company and the Trustee may declare the principal of and accrued but unpaid interest on all the Securities to be due and payable  Upon such a declaration, such principal and interest shall be due and payable immediately.  If an Event of Default specified in Section 6 01(7) or (8) with respect to the Company occurs the principal of and interest on all the Securities shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders  The Holders of a majority in principal amount of the Securities by notice to the Trustee may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration  No such rescission shall affect any subsequent Default or impair any right consequent thereto

SECTION 6 03    Other Remedies.    If an Event of Default occurs and is continuing  the Trustee may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding  A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquies-cence in the Event of Default  No remedy is exclusive of any other remedy  All available remedies are cumulative

SECTION 6 04    Waiver of Past Defaults  The Holders of a majority in principal amount of the Securities by notice to the Trustee may waive an existing Default and its consequences except (i) a Default in the payment of the principal of or interest on a Security (ii) a Default arising from the failure to redeem or purchase any Security when required pursuant to this Indenture or (iii) a Default in respect of a provision that under Section 9 02 cannot be amended without the consent of each Securityholder affected  When a Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or impair any consequent right



SECTION 6 05   Control by Majority.   The Holders of a majority in principal amount of the Securities may direct the time  method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee   However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or  subject to Section 7 01, that the Trustee determines is unduly prejudicial to the rights of other Securityholders or would involve the Trustee in personal liability provided  however, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction   Prior to taking any action hereunder, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action

SECTION 6 06   Limitation on Suits   Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Securityholder may pursue any remedy with respect to this Indenture or the Securities unless

(1) the Holder gives to the Trustee written notice stating that an Event of Default is continuing,

(2) the Holders of at least 25% in principal amount of the Securities make a written request to the Trustee to pursue the remedy

(3) such Holder or Holders offer to the Trustee reasonable security or indemnity against any loss liability or expense,

(4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of security or indemnity, and

(5) the Holders of a majority in principal amount of the Securities do not give the Trustee a direction inconsistent with the request during such 60-day period

A Securityholder may not use this Indenture to prejudice the rights of another Securityholder or to obtain a preference or priority over another Securityholder

SECTION 6 07   Rights of Holders to Receive Payment   Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of

principal of and interest on the Securities held by such
Holder, on or after the respective due dates expressed in
the Securities, or to bring suit for the enforcement of any
such payment on or after such respective dates, shall not be
impaired or affected without the consent of such Holder

SECTION 6 08    Collection Suit by Trustee    If an
Event of Default specified in Section 6 01(1) or (2) occurs
and is continuing  the Trustee may recover judgment in its
own name and as trustee of an express trust against the
Company for the whole amount then due and owing (together
with interest on any unpaid interest to the extent lawful)
and the amounts provided for in Section 7 07

SECTION 6 09    Trustee May File Proofs of Claim
The Trustee may file such proofs of claim and other papers
or documents as may be necessary or advisable in order to
have the claims of the Trustee and the Securityholders
allowed in any judicial proceedings relative to the Company,
its creditors or its property and  unless prohibited by law
or applicable regulations  may vote on behalf of the Holders
in any election of a trustee in bankruptcy or other Person
performing similar functions, and any Custodian in any such
judicial proceeding is hereby authorized by each Holder to
make payments to the Trustee and  in the event that the
Trustee shall consent to the making of such payments
directly to the Holders, to pay to the Trustee any amount
due it for the reasonable compensation  expenses, disburse-
ments and advances of the Trustee, its agents and its
counsel  and any other amounts due the Trustee under
Section 7 07

SECTION 6 10    Priorities    If the Trustee col-
lects any money or property pursuant to this Article 6, it
shall pay out the money or property in the following order

FIRST    to the Trustee for amounts due under Sec-
tion 7 07

SECOND    to Securityholders for amounts due and
unpaid on the Securities for principal and interest
ratably, without preference or priority of any kind,
according to the amounts due and payable on the Securi-
ties for principal and interest, respectively, and

THIRD    to the Company

The Trustee may fix a record date and payment date
for any payment to Securityholders pursuant to this Section
At least 15 days before such record date, the Company shall

mail to each Securityholder and the Trustee a notice that
states the record date, the payment date and amount to be
paid

SECTION 6 11   Undertaking for Costs   In any suit
for the enforcement of any right or remedy under this Inden-
ture or in any suit against the Trustee for any action taken
or omitted by it as Trustee  a court in its discretion may
require the filing by any party litigant in the suit of an
undertaking to pay the costs of the suit, and the court in
its discretion may assess reasonable costs, including rea-
sonable attorneys' fees, against any party litigant in the
suit  having due regard to the merits and good faith of the
claims or defenses made by the party litigant   This Section
does not apply to a suit by the Trustee, a suit by a Holder
pursuant to Section 6 07 or a suit by Holders of more than
10% in principal amount of the Securities

SECTION 6 12   Waiver of Stay or Extension Laws.
The Company (to the extent it may lawfully do so) shall not
at any time insist upon  or plead, or in any manner whatso-
ever claim or take the benefit or advantage of, any stay or
extension law wherever enacted  now or at any time hereafter
in force, which may affect the covenants or the performance
of this Indenture, and the Company (to the extent that it
may lawfully do so) hereby expressly waives all benefit or
advantage of any such law  and shall not hinder  delay or
impede the execution of any power herein granted to the
Trustee  but shall suffer and permit the execution of every
such power as though no such law had been enacted

## ARTICLE 7

### Trustee

SECTION 7 01.  Duties of Trustee.  (a)  If an
Event of Default has occurred and is continuing  the Trustee
shall exercise the rights and powers vested in it by this
Indenture and use the same degree of care and skill in their
exercise as a prudent Person would exercise or use under the
circumstances in the conduct of such Person's own affairs

(b)   Except during the continuance of an Event of
Default

(1) the Trustee undertakes to perform such duties
and only such duties as are specifically set forth in
this Indenture and no implied covenants or obligations

shall be read into this Indenture against the Trustee, and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein  upon certificates or opinions furnished to the Trustee and conforming to the require-ments of this Indenture   However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture

(c)  The Trustee may not be relieved from liabil-ity for its own negligent action, its own negligent failure to act or its own wilful misconduct  except that

(1) this paragraph does not limit the effect of paragraph (b) of this Section

(2) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts, and

(3) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6 05

(d)  Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section

(e)  The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company

(f)  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law

(g)  No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers  if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it

80

(h)  Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA

SECTION 7 02    Rights of Trustee.  (a)  The Trustee may rely on any document believed by it to be genuine and to have been signed or presented by the proper person    The Trustee need not investigate any fact or matter stated in the document

(b)  Before the Trustee acts or refrains from acting  it may require an Officers' Certificate or an Opinion of Counsel    The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel

(c)  The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care

(d)  The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers, provided  however  that the Trustee's conduct does not constitute wilful misconduct or negligence.

(e)  The Trustee may consult with counsel  and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect to any action taken  omitted or suffered by it here-under in good faith and in accordance with the advice or opinion of such counsel

SECTION 7 03    Individual Rights of Trustee.    The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee    Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights    However  the Trustee must comply with Sections 7 10 and 7 11

SECTION 7 04    Trustee's Disclaimer    The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Company's use of the proceeds from the Securities, and it shall not be responsible for any statement of the Company in the Inden-



81

ture or in any document issued in connection with the sale
of the Securities or in the Securities other than the
Trustee's certificate of authentication

SECTION 7 05  Notice of Defaults  If a Default
occurs and is continuing and if it is known to the Trustee,
the Trustee shall mail to each Securityholder notice of the
Default within 90 days after it occurs  Except in the case
of a Default in payment of principal of or interest on any
Security (including payments pursuant to the mandatory
redemption provisions of such Security  if any), the Trustee
may withhold the notice if and so long as a committee of its
Trust Officers in good faith determines that withholding the
notice is in the interests of Securityholders

SECTION 7 06  Reports by Trustee to Holders.  As
promptly as practicable after each May 15 beginning with
the May 15 following the date of this Indenture  and in any
event prior to July 15 in each year, the Trustee shall mail
to each Securityholder a brief report dated as of May 15
that complies with TIA § 313(a)  The Trustee also shall
comply with TIA § 313(b)

A copy of each report at the time of its mailing
to Securityholders shall be filed with the SEC and each
stock exchange (if any) on which the Securities are listed
The Company agrees to notify promptly the Trustee whenever
the Securities become listed on any stock exchange and of
any delisting thereof

SECTION 7 07  Compensation and Indemnity  The
Company shall pay to the Trustee from time to time
reasonable compensation for its services  The Trustee's
compensation shall not be limited by any law on compensation
of a trustee of an express trust  The Company shall reim-
burse the Trustee upon request for all reasonable out-of-
pocket expenses incurred or made by it, including costs of
collection  in addition to the compensation for its
services  Such expenses shall include the reasonable
compensation and expenses, disbursements and advances of the
Trustee's agents, counsel, accountants and experts  The
Company shall indemnify the Trustee against any and all
loss, liability or expense (including attorneys' fees)
incurred by it in connection with the administration of this
trust and the performance of its duties hereunder  The
Trustee shall notify the Company promptly of any claim for
which it may seek indemnity  Failure by the Trustee to so
notify the Company shall not relieve the Company of its
obligations hereunder  The Company shall defend the claim
and the Trustee may have separate counsel and the Company



82

shall pay the fees and expenses of such counsel    The
Company need not reimburse any expense or indemnify against
any loss, liability or expense incurred by the Trustee
through the Trustee's own wilful misconduct, negligence or
bad faith

        To secure the Company's payment obligations in
this Section  the Trustee shall have a lien prior to the
Securities on all money or property held or collected by the
Trustee other than money or property held in trust to pay
principal of and interest on particular Securities

        The Company's payment obligations pursuant to this
Section shall survive the discharge of this Indenture   When
the Trustee incurs expenses after the occurrence of a
Default specified in Section 6 01(7) or (8) with respect to
the Company  the expenses are intended to constitute
expenses of administration under the Bankruptcy Law

        SECTION 7 08   Replacement of Trustee.  The
Trustee may resign at any time by so notifying the Company
The Holders of a majority in principal amount of the Secur-
ities may remove the Trustee by so notifying the Trustee and
may appoint a successor Trustee    The Company shall remove
the Trustee if

        (1) the Trustee fails to comply with Section 7 10,

        (2) the Trustee is adjudged bankrupt or insolvent

        (3) a receiver or other public officer takes
    charge of the Trustee or its property, or

        (4) the Trustee otherwise becomes incapable of
    acting

        If the Trustee resigns  is removed by the Company
or by the Holders of a majority in principal amount of the
Securities and such Holders do not reasonably promptly
appoint a successor Trustee  or if a vacancy exists in the
office of Trustee for any reason (the Trustee in such event
being referred to herein as the retiring Trustee)  the
Company shall promptly appoint a successor Trustee

        A successor Trustee shall deliver a written
acceptance of its appointment to the retiring Trustee and to
the Company   Thereupon the resignation or removal of the
retiring Trustee shall become effective, and the successor
Trustee shall have all the rights, powers and duties of the
Trustee under this Indenture   The successor Trustee shall

83

mail a notice of its succession to Securityholders   The
retiring Trustee shall promptly transfer all property held
by it as Trustee to the successor Trustee, subject to the
lien provided for in Section 7 07

      If a successor Trustee does not take office within
60 days after the retiring Trustee resigns or is removed
the retiring Trustee or the Holders of 10% in principal
amount of the Securities may petition any court of competent
jurisdiction for the appointment of a successor Trustee

      If the Trustee fails to comply with Section 7 10,
any Securityholder may petition any court of competent jur-
isdiction for the removal of the Trustee and the appointment
of a successor Trustee

      Notwithstanding the replacement of the Trustee
pursuant to this Section  the Company's obligations under
Section 7 07 shall continue for the benefit of the retiring
Trustee

      SECTION 7 09   Successor Trustee by Merger.  If
the Trustee consolidates with  merges or converts into  or
transfers all or substantially all its corporate trust
business or assets to  another corporation or banking
association, the resulting  surviving or transferee
corporation without any further act shall be the successor
Trustee

      In case at the time such successor or successors
by merger  conversion or consolidation to the Trustee shall
succeed to the trusts created by this Indenture any of the
Securities shall have been authenticated but not delivered
any such successor to the Trustee may adopt the certificate
of authentication of any predecessor trustee  and deliver
such Securities so authenticated, and in case at that time
any of the Securities shall not have been authenticated, any
successor to the Trustee may authenticate such Securities
either in the name of any predecessor hereunder or in the
name of the successor to the Trustee  and in all such cases
such certificates shall have the full force which it is
anywhere in the Securities or in this Indenture provided
that the certificate of the Trustee shall have

      SECTION 7 10   Eligibility, Disqualification.  The
Trustee shall at all times satisfy the requirements of TIA
§ 310(a)   The Trustee shall have a combined capital and
surplus of at least $50 000 000 as set forth in its most
recent published annual report of condition   The Trustee
shall comply with TIA § 310(b), provided however, that

[NYCorp 10558 9 5 43064 05/04/2000  2 14p]

84

there shall be excluded from the operation of
TIA § 310(b)(1) any indenture or indentures under which
other securities or certificates of interest or participa-
tion in other securities of the Company are outstanding if
the requirements for such exclusion set forth in
TIA § 310(b)(1) are met

SECTION 7 11    Preferential Collection of Claims
Against Company   The Trustee shall comply with TIA
§ 311(a)   excluding any creditor relationship listed in TIA
§ 311(b)   A Trustee who has resigned or been removed shall
be subject to TIA § 311(a) to the extent indicated

ARTICLE 8

Discharge of Indenture, Defeasance

SECTION 8 01    Discharge of Liability on Securi-
ties, Defeasance   (a)  When (1) the Company delivers to the
Trustee all outstanding Securities (other than Securities
replaced pursuant to Section 2 07) for cancellation or
(2) all outstanding Securities have become due and payable,
whether at maturity or on a redemption date as a result of
the mailing of a notice of redemption pursuant to Article 3
hereof and the Company irrevocably deposits with the Trustee
funds sufficient to pay at maturity or upon redemption all
outstanding Securities  including interest thereon to
maturity or such redemption date (other than Securities
replaced pursuant to Section 2 07), and if in either case
the Company pays all other sums payable hereunder by the
Company  then this Indenture shall  subject to
Sections 8 01(c) and 8 01(d), cease to be of further effect
The Trustee shall acknowledge satisfaction and discharge of
this Indenture on demand of the Company accompanied by an
Officers' Certificate and an Opinion of Counsel-and at the
cost and expense of the Company

(b)    Subject to Sections 8 01(c), 8 01(d) and
8 02, the Company at any time may terminate (1) all its
obligations under the Securities and this Indenture ("legal
defeasance option") or (2) its obligations under
Sections 4 02  4 03  4 04, 4 05, 4 06, 4 07, 4 08, 4 09,
4 10 and 4 11 and the operation of Sections 6 01(4),
6 01(6)  6 01(7)  6 01(8) and 6 01(9) (but  in the case of
Sections 6 01(7) and (8), with respect only to Significant
Restricted Group Members) and the limitations contained in
Sections 5 01(a)(3) and (4) ("covenant defeasance option")
The Company may exercise its legal defeasance option not-

85

withstanding its prior exercise of its covenant defeasance option

If the Company exercises its legal defeasance option payment of the Securities may not be accelerated because of an Event of Default with respect thereto  If the Company exercises its covenant defeasance option  payment of the Securities may not be accelerated because of an Event of Default specified in Sections 6 01(4), 6 01(6), 6 01(7) 6 01(8) and 6 01(9) (but, in the case of Sections 6 01(7) and (8)  with respect only to Significant Restricted Group Members) or because of the failure of the Company to comply with Section 5 01(a)(3) or (4)

Upon satisfaction of the conditions set forth herein and upon request of the Company, the Trustee shall acknowledge in writing the discharge of those obligations that the Company terminates

(c)  Notwithstanding Sections 8 01(a) and 8 01(b) above, the Company's obligations in Sections 2 03, 2 04  2 05  2 06  2 07  2 08  7 07 and 7 08 and in this Article 8 shall survive until the Securities have been paid in full  Thereafter  the Company's obligations in Sections 7 07, 8 04 and 8 05 shall survive

(d)  Notwithstanding Sections 8 01(a) and 8 01(b) above  this Indenture shall remain in effect regardless of satisfaction of the conditions set forth in Section 8 01(a), and the Company may not exercise its legal defeasance option or covenant defeasance option  so long as any loans are outstanding under the Credit Agreement or any commitments to make loans thereunder remain in effect

SECTION 8 02   Conditions to Defeasance.  The Company may exercise its legal defeasance option or its covenant defeasance option only if


(1) the Company irrevocably deposits in trust with the Trustee money or U S  Government Obligations for the payment of principal of and interest on the Securities to maturity or redemption, as the case may be

(2) the Company delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U S  Government Obligations plus any deposited money without investment will provide cash at such times and in such amounts as

will be sufficient to pay principal and interest when due on all the Securities to maturity or redemption, as the case may be,

(3) 123 days pass after the deposit is made and during the 123-day period no Default specified in Sections 6 01(7) or (8) with respect to the Company occurs which is continuing at the end of the period,

(4) the deposit does not constitute a default under any other agreement binding on the Company,

(5) the Company delivers to the Trustee an Opinion of Counsel to the effect that the trust resulting from the deposit does not constitute or is qualified as a regulated investment company under the Investment Company Act of 1940

(6) in the case of the legal defeasance option, the Company shall have delivered to the Trustee an Opinion of Counsel stating that (A) the Company has received from, or there has been published by, the Internal Revenue Service a ruling, or (B) since the date of this Indenture there has been a change in the applicable Federal income tax law in either case to the effect that and based thereon such Opinion of Counsel shall confirm that, the Securityholders will not recognize income gain or loss for Federal income tax purposes as a result of such defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such defeasance had not occurred

(7) in the case of the covenant defeasance option, the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that the Security-holders will not recognize income, gain or loss for Federal income tax purposes as a result of such covenant defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred and

(8) the Company delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Securities as contemplated by this Article 8 have been complied with

[NYCD--p 1055029 5 4306W 05/04/ 800 2 14p]

87

Before or after a deposit  the Company may make
arrangements satisfactory to the Trustee for the redemption
of Securities at a future date in accordance with Article 3

SECTION 8 03   Application of Trust Money.  The
Trustee shall hold in trust money or U S  Government Obliga-
tions deposited with it pursuant to this Article 8   It
shall apply the deposited money and the money from U S
Government Obligations through the Paying Agent and in
accordance with this Indenture to the payment of principal
of and interest on the Securities

SECTION 8 04   Repayment to Company   The Trustee
and the Paying Agent shall promptly turn over to the Company
upon request any excess money or securities held by them at
any time

Subject to any applicable abandoned property law
the Trustee and the Paying Agent shall pay to the Company
upon request any money held by them for the payment of
principal or interest that remains unclaimed for two years,
and, thereafter, Securityholders entitled to the money must
look to the Company for payment as general creditors

SECTION 8.05   Indemnity for Government Obliga-
tions.  The Company shall pay and shall indemnify the
Trustee against any tax  fee or other charge imposed on or
assessed against deposited U S  Government Obligations or
the principal and interest received on such U S  Government
Obligations

SECTION 8 06   Reinstatement.   If the Trustee or
Paying Agent is unable to apply any money or U S  Government
Obligations in accordance with this Article 8 by reason of
any legal proceeding or by reason of any order or judgment
of any court or governmental authority enjoining, restrain-
ing or otherwise prohibiting such application, the Company's
obligations under this Indenture and the Securities shall be
revived and reinstated as though no deposit had occurred
pursuant to this Article 8 until such time as the Trustee or
Paying Agent is permitted to apply all such money or U S
Government Obligations in accordance with this Article 8,
provided, however, that, if the Company has made any payment
of interest on or principal of any Securities because of the
reinstatement of its obligations, the Company shall be
subrogated to the rights of the Holders of such Securities
to receive such payment from the money or U S  Government
Obligations held by the Trustee or Paying Agent


[NYCORP 1033029 5 430EM 05/04/ 000  2 14p]

88

## ARTICLE 9

### Amendments

SECTION 9 01    Without Consent of Holders    The Company and the Trustee may amend this Indenture or the Securities without notice to or consent of any Security-holder

(1) to cure any ambiguity, omission, defect or inconsistency,

(2) to comply with Article 5,

(3) to provide for uncertificated Securities in addition to or in place of certificated Securities provided, however that the uncertificated Securities are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Securities are described in Section 163(f)(2)(B) of the Code

(4) to add guarantees with respect to the Securities or to secure the Securities,

(5) to add to the covenants of the Company for the benefit of the Holders or to surrender any right or power herein conferred upon the Company

(6) to comply with any requirements of the SEC in connection with qualifying, or maintaining the qualification of, this Indenture under the TIA or

(7) to make any change that does not adversely affect the rights of any Securityholder

After an amendment under this Section becomes effective the Company shall mail to Securityholders a notice briefly describing such amendment    The failure to give such notice to all Securityholders, or any defect therein shall not impair or affect the validity of an amendment under this Section

SECTION 9 02    With Consent of Holders    The Company and the Trustee may amend this Indenture or the Securities without notice to any Securityholder but with the written consent of the Holders of at least a majority in principal amount of the Securities then outstanding (including consents obtained in connection with a tender

offer or exchange for the Securities)    However, without the
consent of each Securityholder affected thereby, an
amendment may not

    (1) reduce the amount of Securities whose Holders
must consent to an amendment,

    (2) reduce the rate of or extend the time for
payment of interest on any Security

    (3) reduce the principal amount of or extend the
Stated Maturity of any Security

    (4) reduce the amount payable upon the redemption
of any Security or change the time at which any Secur-
ity may be redeemed in accordance with Article 3,

    (5) make any Security payable in money other than
that stated in the Security,

    (6) make any changes in the ranking or priority of
any Security that would adversely affect the
Securityholders, or

    (7) make any change in Section 6 04 or 6 07 or the
second sentence of this Section

    It shall not be necessary for the consent of the
Holders under this Section to approve the particular form of
any proposed amendment, but it shall be sufficient if such
consent approves the substance thereof

    After an amendment under this Section becomes
effective  the Company shall mail to Securityholders a
notice briefly describing such amendment  The failure to
give such notice to all Securityholders, or any defect
therein, shall not impair or affect the validity of an
amendment under this Section

    SECTION 9 03  <u>Compliance with Trust Indenture
Act</u>  Every amendment to this Indenture or the Securities
shall comply with the TIA as then in effect

    SECTION 9 04  <u>Revocation and Effect of Consents
and Waivers</u>  A consent to an amendment or a waiver by a
Holder of a Security shall bind the Holder and every subse-
quent Holder of that Security or portion of the Security
that evidences the same debt as the consenting Holder's
Security, even if notation of the consent or waiver is not
made on the Security  However, any such Holder or subse-



90

quent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective  After an amendment or waiver becomes effective  it shall bind every Security-holder  An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee

The Company may  but shall not be obligated to fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture  If a record date is fixed  then notwithstanding the immediately preceding paragraph  those Persons who were Securityholders at such record date (or their duly designated proxies)  and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action  whether or not such Persons continue to be Holders after such record date  No such consent shall be valid or effective for more than 120 days after such record date

SECTION 9 05  Notation on or Exchange of Securi-ties  If an amendment changes the terms of a Security, the Trustee may require the Holder of the Security to deliver it to the Trustee  The Trustee may place an appropriate notation on the Security regarding the changed terms and return it to the Holder  Alternati ely, if the Company or the Trustee so determines, the Company in exchange for the Security shall issue and the Trustee shall authenticate a new Security that reflects the changed terms  Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment

SECTION 9 06  Trustee To Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee  If it does  the Trustee may but need not sign it  In signing such amendment the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 7 01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment is authorized or permitted by this Indenture

SECTION 9 07  Payment for Consent  Neither the Company nor any Affiliate of the Company shall, directly or indirectly  pay or cause to be paid any consideration whether by way of interest, fee or otherwise, to any Holder

[NYCorp 1055028 5 43084 03/04/2000  2 16p]

91

for or as an inducement to any consent  waiver or amendment
of any of the terms or provisions of this Indenture or the
Securities unless such consideration is offered to be paid
to all Holders that so consent, waive or agree to amend in
the time frame set forth in solicitation documents relating
to such consent  waiver or agreement

ARTICLE 10

Miscellaneous

SECTION 10 01    Trust Indenture Act Controls    If
any provision of this Indenture limits  qualifies or
conflicts with another provision which is required to be
included in this Indenture by the TIA, the required
provision shall control

SECTION 10 02    Notices.    Any notice or communica-
tion shall be in writing and delivered in person  mailed by
first-class mail or transmitted by facsimile (with written
confirmation of receipt) addressed as follows

if to the Company

Winstar Communications  Inc
685 Third Avenue
Thirty-first Floor
New York, New York 10017
Facsimile  212-584-4001

Attention of General Counsel

if to the Trustee

United States Trust Company of New York
114 West 47th Street
New York  New York 10036-1532
Facsimile  212-852-1627

Attention of Corporate Trust Division

The Company or the Trustee by notice to the other
may designate additional or different addresses for subse-
quent notices or communications

Any notice or communication mailed to a Security-
holder shall be mailed to the Securityholder at the
Securityholder's address as it appears on the registration

[NYCorp:1055029 5 4306W 05/04/2000  2 14p]

92

books of the Registrar and shall be sufficiently given if so mailed within the time prescribed

Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders    If a notice or communication is mailed in the manner provided above, it is duly given  whether or not the addressee receives it

SECTION 10 03    _Communication by Holders with Other Holders_    Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities    The Company, the Trustee  the Registrar and anyone else shall have the protection of TIA § 312(c)

SECTION 10 04    _Certificate and Opinion as to Conditions Precedent._    Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture  the Company shall furnish to the Trustee

(1) an Officers' Certificate in form and substance reasonably satisfactory to the Trustee stating that  in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with  and

(2) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with

SECTION 10 05    _Statements Required in Certificate or Opinion_    Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include

(1) a statement that the individual making such certificate or opinion has read such covenant or condition,

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based,

(3) a statement that, in the opinion of such individual, he has made such examination or

93

investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with, and

(4) a statement as to whether or not in the opinion of such individual such covenant or condition has been complied with

SECTION 10 06   <u>Rules by Trustee, Paying Agent and Registrar</u>   The Trustee may make reasonable rules for action by or a meeting of Securityholders   The Registrar and the Paying Agent may make reasonable rules for their functions

SECTION 10 07   <u>Legal Holidays.</u>   A "<u>Legal Holiday</u>" is a Saturday  a Sunday or a day on which banking institutions are not required to be open in the State of New York   If a payment date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday  and no interest shall accrue for the intervening period   If a regular record date is a Legal Holiday, the record date shall not be affected

SECTION 10 08   <u>Governing Law.</u>   This Indenture and the Securities shall be governed by, and construed in accordance with  the laws of the State of New York but without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby

SECTION 10 09   <u>No Recourse Against Others</u>   A director  officer  employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation   By accepting a Security, each Securityholder shall waive and release all such liability   The waiver and release shall be part of the consideration for the issue of the Securities

SECTION 10 10   <u>Successors</u>   All agreements of the Company in this Indenture and the Securities shall bind its successors   All agreements of the Trustee in this Indenture shall bind its successors

SECTION 10 11   <u>Multiple Originals</u>   The parties may sign any number of copies of this Indenture   Each signed copy shall be an original  but all of them together represent the same agreement   One signed copy is enough to prove this Indenture

NYCorp 1055021 5 <30f> 05/04/2000  2 18p]

94

SECTION 10 12   Table of Contents, Headings   The
table of contents, cross-reference sheet and headings of the
Articles and Sections of this Indenture have been inserted
for convenience of reference only, are not intended to be
considered a part hereof and shall not modify or restrict
any of the terms or provisions hereof



95

IN WITNESS WHEREOF  the parties have caused this
Indenture to be duly executed as of the date first written
above

WINSTAR COMMUNICATIONS, INC ,

by _____
Name
Title

UNITED STATES TRUST COMPANY
OF NEW YORK

by _____
Name
Title



[NYCorp 1655029 5 4306W 05/04/2000  2 14p]



EXHIBIT 1

[FORM OF SECURITY]

[Global Securities Legend]*

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN
AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A
NEW YORK CORPORATION ("DTC")  NEW YORK  NEW YORK, TO THE
COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE
OR PAYMENT  AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN
THE NAME OF CEDE & CO  OR SUCH OTHER NAME AS IS REQUESTED BY
AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE
TO CEDE & CO  OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC) ANY TRANSFER, PLEDGE OR
OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON
IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE &
CO   HAS AN INTEREST HEREIN

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED
TO TRANSFERS IN WHOLE, BUT NOT IN PART  TO NOMINEES OF DTC
OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND
TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE
LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE
RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE
REVERSE HEREOF



---

*/ [If the Security is to be issued in global form add the
Global Securities Legend and the attachment to Exhibit 1
captioned "[TO BE ATTACHED TO GLOBAL SECURITIES] - SCHEDULE
OF INCREASES OR DECREASES IN GLOBAL SECURITY" ]

[NYCorp 1055029 5 4306H 05/04/.000  ) 14p)

No _____                     $ _____
CUSIP No _____
ISIN No _____
Common Code No _____

Senior Notes Due 2010

Winstar Communications  Inc   a Delaware
corporation, promises to pay to _____,
or its registered assigns  the principal sum of
_____ Dollars on April 15, 2010

Interest Payment Dates  April 15 and October 15

Record Dates  April 1 and October 1

Additional provisions of this Security are set
forth on the other side of this Security

Dated  _____

                                    WINSTAR COMMUNICATIONS, INC ,

                          by  _____
                              Name
                              Title

                          by  _____
                              Name
                              Title

TRUSTEE'S CERTIFICATE OF
   AUTHENTICATION

UNITED STATES TRUST COMPANY
   OF NEW YORK
   as Trustee, certifies
      that this is one of
      the Securities referred
      to in the Indenture

  by
     _____
         Authorized Signatory

[NYCorp:1053029 3 4305W 05/04/2000  2 16p]

[FORM OF REVERSE SIDE OF SECURITY]

Senior Notes Due 2010

1    Interest

Winstar Communications  Inc   a Delaware
corporation (such corporation, and its successors and
assigns under the Indenture hereinafter referred to, being
herein called the "Company"), promises to pay interest on
the principal amount of this Security at a rate per annum
(the "Specified Interest Rate") equal to (1) the "Yield to
Worst Call" on the Company's 12-½% Senior Notes due 2010
(issued under an indenture dated as of the Issue Date
between the Company and the Trustee), as published by
Bloomberg L P  under the heading "Yields to Call" at 4 p m
on the Conversion Date of this Security (or such other time
on such date as shall be agreed by the Company and the
Holders of this Security), as calculated using a bid price
quoted as of 4 p m  on such date by the Holders of this
Security (or as of such other time on such date as shall be
agreed by the Company and the Holders of this Security) plus
(11) 2 00%

The Company will pay interest semiannually on
April 15 and October 15 of each year  commencing on the
first such date after the Conversion Date of this Security
Interest on this Security will accrue from the most recent
date to which interest has been paid or  if no interest has
been paid  from the Conversion Date of this Security
Interest will be computed on the basis of a 360-day year of
twelve 30-day months  The Company will pay interest on
overdue principal at 1% per annum in excess of the Specified
Interest Rate for this Security and will pay interest on
overdue installments of interest at such higher rate to the
extent lawful

2    Method of Payment

The Company will pay interest on the Securities
(except defaulted interest) to the Persons who are regis-
tered holders of Securities at the close of business on
the April 1 or October 1 next preceding the interest payment
date even if Securities are canceled after the record date
and on or before the interest payment date   Holders must
surrender Securities to a Paying Agent to collect principal
payments   The Company will pay principal and interest in
money of the United States that at the time of payment is

[NYCorp 1015078 5 (106W 05/04/2000  2  4p]

2

legal tender for payment of public and private debts   Pay-
ments in respect of the Securities represented by a Global
Security (including principal, premium and interest) will be
made by wire transfer of immediately available funds to the
accounts specified by The Depository Trust Company   The
Company will make all payments in respect of a certificated
Security (including principal  premium and interest) by
mailing a check to the registered address of each Holder
thereof  provided  however  that payments on a certificated
Security will be made by wire transfer to a U S  dollar
account maintained by the payee with a bank in the
United States if such Holder elects payment by wire transfer
by giving written notice to the Trustee or the Paying Agent
to such effect designating such account no later than
30 days immediately preceding the relevant due date for
payment (or such other date as the Trustee may accept in its
discretion)


3   Paying Agent and Registrar

        Initially  United States Trust Company of
New York, a New York corporation (the  Trustee"), will act
as Paying Agent and Registrar   The Company may appoint and
change any Paying Agent  Registrar or co-registrar without
notice   The Company or any of its domestically incorporated
Wholly Owned Subsidiaries may act as Paying Agent, Registrar
or co-registrar


4   Indenture

        The Company issued the Securities under an
Indenture dated as of [                 ], 2000 (the
"Indenture")  between the Company and the Trustee   The
terms of the Securities include those stated in the
Indenture and those made part of the Indenture by reference
to the Trust Indenture Act of 1939 (15 U S C. §§ 77aaa-
77bbbb) as in effect on the date of the Indenture (the
"Act")   Terms defined in the Indenture and not defined
herein have the meanings ascribed thereto in the Indenture
The Securities are subject to all such terms  and
Securityholders are referred to the Indenture and the Act
for a statement of those terms

        The Securities are general unsecured obligations
of the Company   The Securities issued on any Conversion
Date, and all Securities issued upon the transfer, exchange
or replacement thereof will be treated as a single class
for all purposes under the Indenture   The Indenture

ITTCorp 1055029 5 4306W 05/04/2000  7 19p]



3

contains covenants that limit the ability of the Company and
its Restricted Group Members to incur additional
indebtedness, pay dividends or distributions on, or redeem
or repurchase capital stock  make investments  issue or sell
capital stock of Restricted Group Members, engage in
transactions with affiliates, create liens on assets,
transfer or sell assets, guarantee indebtedness, restrict
dividends or other payments of Restricted Group Members,
consolidate, merge or transfer all or substantially all of
its assets and the assets of its subsidiaries, and engage in
sale/leaseback transactions   These covenants are subject to
important exceptions and qualifications

          The Indenture limits the original aggregate
principal amount of the Securities to $2,000,000,000
(subject to Section 2 07 of the Indenture)


5    Optional Redemption

          Except as set forth below, the Company shall not
be entitled to redeem the Securities at its option prior to
April 15  2005

          On and after April 15, 2005, the Company shall be
entitled at its option to redeem all or a portion of the
Securities upon not less than 30 nor more than 60 days'
notice   The redemption price with respect to any such
redemption of all or a portion of this Security shall be the
sum of the principal amount of this Security so redeemed,
plus accrued interest thereon to the redemption date
(subject to the right of Holders of record on the relevant
record date to receive interest due on the relevant interest
payment date), plus a redemption premium equal to the
principal amount of this Security so redeemed multiplied by
the Premium Percentage as of the redemption date   The
"Premium Percentage" as of any redemption date shall be a
percentage determined by multiplying the Specified Interest
Rate for this Security by the percentage set forth below



4

opposite the period during which such redemption date occurs

| 12-Month Period Commencing on April 15 of the Year Indicated | Redemption Price |
|---|---|
| 2005 | 50% |
| 2006 | 33-1/3% |
| 2007 | 16-2/3% |
| 2008 and thereafter | 0 00% |

In addition  prior to April 15, 2003  the Company shall be entitled at its option on one or more occasions to redeem Securities in an aggregate principal amount not to exceed 35% of the aggregate principal amount of the Securities originally issued with the net cash proceeds from one or more Public Equity Offerings, provided  however, that (1) at least 65% of such aggregate principal amount of Securities remains outstanding immediately after the occurrence of each such redemption (other than Securities held, directly or indirectly, by the Company or its Affiliates); and (2) each such redemption occurs within 90 days after the closing date of the related Public Equity Offering  The redemption price with respect to any such redemption of all or any portion of this Security shall be the sum of the principal amount of this Security so redeemed, plus accrued and unpaid interest thereon to the redemption date  plus a redemption premium equal to the principal amount of this Security so redeemed multiplied by a percentage equal to the Specified Interest Rate for this Security

6   Notice of Redemption

Notice of redemption will be mailed at least 30 days but not more than 60 days before the redemption date to each Holder of Securities to be redeemed at his registered address  Securities in denominations larger than $1,000 principal amount may be redeemed in part but only in whole multiples of $1,000  If money sufficient to pay the redemption price of and accrued interest on all Securities (or portions thereof) to be redeemed on the redemption date is deposited with the Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Securities (or such portions thereof) called for redemption

(NYCo-p 1055029 5 4306W 05/04/2000  2 11p)

5

7  Put Provisions

Upon a Change of Control, any Holder of Securities will have the right to cause the Company to repurchase all or any part of the Securities of such Holder at a repurchase price equal to 101% of the principal amount of the Securities to be repurchased plus accrued interest to the date of repurchase (subject to the right of holders of record on the relevant record date to receive interest due on the related interest payment date) as provided in  and subject to the terms of  the Indenture

8  Denominations, Transfer, Exchange

The Securities are in registered form without coupons in denominations of $1,000 principal amount and whole multiples of $1 000   A Holder may transfer or exchange Securities in accordance with the Indenture   The Registrar may require a Holder  among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture   The Registrar need not register the transfer of or exchange any Securities selected for redemption (except, in the case of a Security to be redeemed in part, the portion of the Security not to be redeemed) or any Securities for a period of 15 days before a selection of Securities to be redeemed or 15 days before an interest payment date

9  Persons Deemed Owners

The registered Holder of this Security may be treated as the owner of it for all purposes

10  Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee or Paying Agent shall pay the money back to the Company at its request unless an abandoned property law designates another Person After any such payment  Holders entitled to the money must look only to the Company and not to the Trustee for payment.

[NYCORp 1055029 5 43064 05/04/2000  2 16p]

11   Discharge and Defeasance

Subject to certain conditions  the Company at any
time shall be entitled to terminate some or all of its
obligations under the Securities and the Indenture if the
Company deposits with the Trustee money or U S  Government
Obligations for the payment of principal and interest on the
Securities to redemption or maturity  as the case may be

12   Amendment, Waiver

Subject to certain exceptions set forth in the
Indenture  (i) the Indenture and the Securities may be
amended with the written consent of the Holders of at least
a majority in principal amount outstanding of the Securities
and (ii) any default or noncompliance with any provision may
be waived with the written consent of the Holders of a
majority in principal amount outstanding of the Securities
Subject to certain exceptions set forth in the Indenture
without the consent of any Securityholder, the Company and
the Trustee shall be entitled to amend the Indenture or the
Securities to cure any ambiguity, omission  defect or
inconsistency, or to comply with Article 5 of the Indenture,
or to provide for uncertificated Securities in addition to
or in place of certificated Securities  or to add guarantees
with respect to the Securities or to secure the Securities,
or to add additional covenants or surrender rights and
powers conferred on the Company, or to comply with any
request of the SEC in connection with qualifying the
Indenture under the Act  or to make any change that does not
adversely affect the rights of any Securityholder

13   Defaults and Remedies

Under the Indenture, Events of Default include
(i) default for 30 days in payment of interest on the
Securities, (ii) default in payment of principal on the
Securities at maturity, upon redemption pursuant to
paragraph 5 of the Securities  upon acceleration or other-
wise  or failure by the Company to purchase Securities when
required  (iii) failure by the Company to comply with other
agreements in the Indenture or the Securities, in certain
cases subject to notice and lapse of time, (iv) certain
accelerations (including failure to pay within any grace
period after final maturity) of other Indebtedness of the
Company if the amount accelerated (or so unpaid) exceeds
$25 0 million, (v) certain events of bankruptcy or insol-
vency with respect to the Company and the Significant

7

Restricted Group Members  and (vi) certain judgments or
decrees for the payment of money in excess of $25 0 million
If an Event of Default occurs and is continuing, the Trustee
or the Holders of at least 25% in principal amount of the
Securities may declare all the Securities to be due and
payable immediately   Certain events of bankruptcy or
insolvency are Events of Default which will result in the
Securities being due and payable immediately upon the
occurrence of such Events of Default

        Securityholders may not enforce the Indenture or
the Securities except as provided in the Indenture   The
Trustee may refuse to enforce the Indenture or the Securi-
ties unless it receives indemnity or security satisfactory
to it   Subject to certain limitations, Holders of a major-
ity in principal amount of the Securities may direct the
Trustee in its exercise of any trust or power   The Trustee
may withhold from Securityholders notice of any continuing
Default (except a Default in payment of principal or
interest) if it determines that withholding notice is in the
interest of the Holders


14   Trustee Dealings with the Company

        Subject to certain limitations imposed by the Act,
the Trustee under the Indenture, in its individual or any
other capacity, may become the owner or pledgee of Securi-
ties and may otherwise deal with and collect obligations
owed to it by the Company or its Affiliates and may other-
wise deal with the Company or its Affiliates with the same
rights it would have if it were not Trustee


15   No Recourse Against Others

        A director, officer, employee or stockholder, as
such, of the Company or the Trustee shall not have any
liability for any obligations of the Company under the
Securities or the Indenture or for any claim based on  in
respect of or by reason of such obligations or their crea-
tion   By accepting a Security, each Securityholder waives
and releases all such liability   The waiver and release are
part of the consideration for the issue of the Securities

[NYCorp 1015037 5 4305W 05/04/2000  2 16p]



B

### 16    Authentication

This Security shall not be valid until an author-
ized signatory of the Trustee (or an authenticating agent)
manually signs the certificate of authentication on the
other side of this Security

### 17    Abbreviations

Customary abbreviations may be used in the name of
a Securityholder or an assignee   such as TEN COM (=tenants
in common), TEN ENT (=tenants by the entireties)   JT TEN
(=joint tenants with rights of survivorship and not as
tenants in common)  CUST (=custodian)  and U/G/M/A (=Uniform
Gift to Minors Act)

### 18    CUSIP, ISIN and Common Code Numbers

Pursuant to a recommendation promulgated by the
Committee on Uniform Security Identification Procedures the
Company has caused CUSIP numbers to be printed on the
Securities and has directed the Trustee to use CUSIP numbers
in notices of redemption as a convenience to Security-
holders   To the extent such numbers have been issued, the
Company has caused ISIN and Common Code numbers to be
similarly printed on the Securities and has similarly
instructed the Trustee   No representation is made as to the
accuracy of such numbers either as printed on the Securities
or as contained in any notice of redemption and reliance may
be placed only on the other identification numbers placed
thereon

### 19    Governing Law.

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED
IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT
WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS
OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF
ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY

9

The Company will furnish to any Securityholder upon written request and without charge to the Security holder a copy of the Indenture which has in it the text of this Security in larger type   Requests may be made to

Winstar Communications, Inc
685 Third Avenue
Thirty-first Floor
New York  NY 10019

Attention   General Counsel

[NYCorp 1051029 5 4306% 05/04/ 000    14p]





---

### ASSIGNMENT FORM

To assign this Security  fill in the form below

I or we assign and transfer this Security to

    (Print or type assignee s name  address and zip code)

    (Insert assignee s soc  sec  or tax I D  No )

and irrevocably appoint _____ agent to
transfer this Security on the books of the Company  The
agent may substitute another to act for him

---

Date  _____ Your Signature  _____

---



Sign exactly as your name appears on the other side of this
Security

I⁵ᵀᶜ□¬ 1055025 5 ‹306» 05/84/ 000    1‹0)



[TO BE ATTACHED TO GLOBAL SECURITIES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this
Global Security have been made

| Date of Exchange | Amount of decrease in Principal amount of the Global Security | Amount of increase in Principal amount of this Global Security | Principal amount of this Global Security (following such decrease or increase) | Signature of authorized officer of Trustee or Securities Custodian |
|---|---|---|---|---|





## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Security purchased by the Company pursuant to Section 4 06 or 4 09 of the Indenture, check the box

☐

If you want to elect to have only part of this Security purchased by the Company pursuant to Section 4 06 or 4 09 of the Indenture  state the amount in principal amount    $_____

Date _____        Your Signature  _____
                                           (Sign exactly as your name
                                           appears on the other side of
                                           this Security )

Signature Guarantee  _____
                         (Signature must be guaranteed)


Signatures must be guaranteed by an  eligible guarantor institution' meeting the requirements of the Registrar  which requirements include membership or participation in the Security Transfer Agent Medallion Program ( STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934  as amended



[NYCorp 1015039 5 43064 C6/04/2000  3 14p]

EXHIBIT 2

FORM OF CONVERSION CERTIFICATE

<u>Conversion Certificate</u>

Pursuant to Section 2 02 of the Indenture  dated as of [          ], 2000 (the "<u>Indenture</u>")  by and among Winstar Communications  Inc  (the "<u>Company</u>"), and United States Trust Company of New York  as trustee (the "<u>Trustee</u>"), the undersigned officer of Lucent Technologies Inc  ("<u>Lucent</u>") hereby certifies (capitalized terms used but not defined herein have the meanings given to them in the Indenture)

1    A Refinancing Period has commenced and is continuing and all of the conditions preredent under the Credit Agreement to the conversion into Securities of Lucent Loans outstanding under the Credit Agreement have been satisfied

2    The aggregate principal amount of Securities that the Trustee is hereby instructed to authenticate and deliver as set forth below (together with the aggregate principal amount of Securities that the Trustee has been instructed to authenticate and deliver  but that the Trustee has not yet authenticated and delivered  pursuant to any other Conversion Certificates that have been or are being delivered by Lucent to the Trustee) does not exceed the aggregate principal amount of Lucent Loans outstanding under the Credit Agreement

The Trustee is hereby instructed to authenticate and deliver the aggregate principal amount of the Securities set forth below pursuant to the Securities Authentication Order, dated as of the Closing Date, and in accordance with the following additional instructions

(a)   aggregate principal amount  $_____

(b)   registered in the name of   _____

(c)   deliver to the offices of   _____

(d)   time of delivery   _____

[NYCORP 10554 1 ] (] 5D 05/03/2000  ] )(p)]



2

(e)    check form in which the Securities are to be issued

☐ definitive, fully registered certificates

☐ Global Security

This is a Conversion Certificate as such term is defined in the Indenture  and the date of receipt hereof by the Trustee (which if not a Business Day shall be the immediately succeeding Business Day) shall be deemed to be the Conversion Date of the Securities authenticated and delivered pursuant to the instructions set forth herein

IN WITNESS WHEREOF, Lucent has caused this certificate to be executed in its corporate name by a duly authorized officer of Lucent

Dated    _____

LUCENT TECHNOLOGIES INC

by    _____

Name _____
Title

[NYCORP 1055421 3 4 058 05/23/2000 ) 16)]

Exhibit D



EXHIBIT D

EQUIPMENT OWNER AGREEMENT dated as of ● among [NAME OF BORROWER], a ● company (the "Company") ● (the "Equipment Owner"), LUCENT TECHNOLOGIES INC , as administrative agent (the "Administrative Agent") for the Lenders (as defined below), and THE BANK OF NEW YORK as collateral agent (the "Collateral Agent") for the Lenders

Reference is made to (a) the Credit Agreement dated as of May 4, 2000 (as amended or modified from time to time the "Credit Agreement") among Winstar Communications, Inc , the Company, as a borrower thereunder, any additional borrowers from time to time party thereto, the lenders from time to time party thereto (the "Lenders") the Collateral Agent and the Administrative Agent and (b) the Security Agreement dated as of ● (as amended or modified from time to time, the "Company Security Agreement") between the Company and the Collateral Agent  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Credit Agreement  Each of the parties hereto acknowledges receipt of a true and correct copy of the Credit Agreement

The Company has either (i) sold or otherwise transferred, and may from time to time in the future sell or otherwise transfer, to the Equipment Owner certain equipment and other assets acquired by the Company pursuant to the Supply Agreement (any such equipment and other assets, the "Intercompany Purchased Equipment") or (ii) has assumed or will assume the liability of the Equipment Owner to pay the purchase price of certain equipment and other assets acquired or to be acquired by the Equipment Owner pursuant to the Supply Agreement (any such equipment and assets, the "Direct Purchased Equipment" and, together with the Intercompany Purchased Equipment, the "Equipment")  The purchase price of any Intercompany Purchased Equipment has been financed by the Company pursuant to the Credit Agreement and is subject to a security interest (the "Company Security Interest") in favor of the Collateral Agent under the Company Security Agreement  All or a portion of the purchase price of any Direct Purchased Equipment is being financed by the Company pursuant to the Credit Agreement and, as a condition to the assumption by the Company of the liability of the Equipment Owner to pay the purchase price of such Direct Purchased Equipment, the Equipment Owner has entered into or will be required to enter into a Foreign Subsidiary Security Agreement granting a security interest in the Direct Purchased Equipment in favor of the Collateral Agent  It is a further condition of the sale or transfer of the Intercompany Purchased Equipment

[NYCorp 1051206 3 4641A 05/04/2000  11 31a]

2

to the Equipment Owner, or the assumption by the Company of
the liability to pay the purchase price of the Direct
Purchased Equipment, as the case may be, that the Equipment
Owner enter into an agreement in the form hereof to confirm
certain rights and remedies in respect of the Equipment as
set forth herein.

Accordingly, the parties hereto agree as follows

ARTICLE I

Rights in Equipment

SECTION 1 01    Acknowledgment of Interest.    The
Equipment Owner acknowledges and agrees that (a) any
Intercompany Purchased Equipment is sold or transferred to
the Equipment Owner subject to, and shall remain subject to,
the Company Security Interest granted under the Company
Security Agreement and (b) any Direct Purchased Equipment
will be required to become subject to, and shall remain
subject to a security interest granted by the Equipment
Owner under a Foreign Subsidiary Security Agreement to
secure the Obligations

SECTION 1 02    Subject and Subordinate.    The
Equipment Owner acknowledges and agrees that its rights and
interests in and to the Equipment are subject and
subordinate in all respects to the Security Interest and the
rights and interests of the Collateral Agent under the
applicable Security Agreement

SECTION 1 03    Use and Disposition of Equipment
The Equipment Owner shall not make or permit to be made an
assignment  pledge or hypothecation of the Equipment or
grant any other lien or encumbrance in respect of the
Equipment   The Equipment Owner shall not make or permit to
be made any transfer of the Equipment and shall remain at
all times in possession of the Equipment, except (a) to sell
or otherwise transfer title to the Equipment back to the
Company and (b) the Equipment Owner may lease the Equipment
(or sell the Equipment to another Foreign Subsidiary that is
a Restricted Subsidiary) to the same extent that the Company
is permitted to lease (or sell) the Equipment in accordance
with Section 6 13 of the Credit Agreement

SECTION 1 04    No Right of Set-off, Counterclaim,
Etc  The Equipment Owner acknowledges and agrees that it
does not have and in no event will assert, as against the
Administrative Agent, the Collateral Agent or any Lender,
any lien, right of distraint or levy, right of set-off,
claim deduction, counterclaim, security or other interest



[NYCorp 1061206 2 4641A 05/04/2000  11 11a]

3

in any of the Equipment or in the proceeds thereof, including any of the foregoing which might arise or exist in the Equipment Owner's favor pursuant to any agreement, common law, statute or otherwise

SECTION 1 05    Filings    The Equipment Owner agrees to execute and deliver such filings, recordings or registrations  including all refilings, rerecordings and reregistrations, containing a description of the Equipment as the Collateral Agent or the Administrative Agent may request from time to time in order to protect the perfection of the Security Interest

SECTION 1 06    Information Regarding Equipment
(a)  The Equipment Owner agrees to maintain records of the location of each item of Equipment and to provide copies of such records to the Collateral Agent or the Administrative Agent promptly following any request therefor

(b)  The Equipment Owner will furnish to the Collateral Agent prompt written notice of (i) any change (A) in the Equipment Owner's corporate name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties, (B) in the location of the Equipment Owner's chief executive office or its principal place of business, (C) in the jurisdiction in which any Equipment is located to any other jurisdiction (other than a jurisdiction in which filings have been made as contemplated by Section 1 05 above) or (D) in the Equipment Owner's identity or corporate structure or (ii) any action that is necessary, and that has not been taken  in order that the Security Interest in the Equipment will be recognized  protected and perfected under the law of the jurisdiction where the Equipment is located    The Equipment Owner agrees not to effect or permit any change referred to in clause (i) of the preceding sentence until notice thereof has been given and all filings requested pursuant to Section 1 05 above have been made    The Equipment Owner also agrees promptly to notify the Collateral Agent if any material portion of the Equipment is damaged or destroyed

SECTION 1 07    Inspection and Verification    Each of the Collateral Agent and the Administrative Agent and such persons as the Collateral Agent or the Administrative Agent may reasonably designate shall have the right to inspect the Equipment, all records related thereto (and to make extracts and copies from such records) and the premises upon which any of the Equipment is located    Each of the Collateral Agent and the Administrative Agent shall have the absolute right to share any information it gains from any

4

such inspection or verification with any Lender and their
agents and representatives

SECTION 1 08   Maintenance of Equipment.   The
Equipment Owner will keep and maintain all Equipment in good
working order and condition, ordinary wear and tear
excepted

SECTION 1 09   Remedies   The Equipment Owner
acknowledges and agrees that the Collateral Agent may
exercise its rights and remedies under the Security
Agreement with respect to the Equipment upon the occurrence
and during the continuance of an Event of Default (as
defined in the Credit Agreement)   Upon the occurrence and
during the continuance of an Event of Default, the Equipment
Owner agrees to deliver each item of the Equipment to the
Collateral Agent on demand, and it is agreed that the
Collateral Agent shall have the right with or without legal
process and with or without previous notice, to take
possession of the Equipment or any part thereof (at the same
or different times) and without liability for trespass to
enter any premises where the Equipment or any part thereof
may be located for the purpose of taking possession of or
removing the Equipment and  generally, to exercise any and
all rights afforded to a secured party under the Uniform
Commercial Code or other applicable law   Without limiting
the generality of the foregoing, the Equipment Owner agrees
that the Collateral Agent shall have the right to sell or
otherwise dispose of all or any part of the Equipment, at
public or private sale for cash, upon credit or for future
delivery as the Collateral Agent shall deem appropriate
Upon consummation of any such sale the Collateral Agent
shall have the right to assign, transfer and deliver to the
purchaser or purchasers thereof the Equipment so sold   Each
such purchaser at any such sale shall hold the property sold
absolutely, free from any claim or right on the part of the
Equipment Owner, and the Equipment Owner hereby waives all
rights with respect to the Equipment which the Equipment
Owner now has or may at any time in the future have under
any rule of law or statute now existing or hereafter
enacted

SECTION 1 10   Company Security Agreement   If the
Equipment Owner is acquiring or has acquired any
Intercompany Purchased Equipment, the Equipment Owner
acknowledges receipt of a copy of the Company Security
Agreement and agrees to be bound by and to comply with the
requirements of Sections 4 02, 4 03, 4 04, 4 05, 4 06, 4 07
4 08 and 5 01 of the Company Security Agreement as though it
were the Company   This Section shall not be construed to



[NYCorp/1051306 2 4641A 05/04/2000   11 11a]

5

relieve the Company of any of its obligations under the
Security Agreement

## ARTICLE II

### Miscellaneous

SECTION 2 01    Notices    All notices and other
communications provided for herein shall be in writing and
shall be delivered by hand or overnight courier service,
mailed by certified or registered mail or sent by telecopy,
as follows

(a)    if to the Company  to it at [The W_nstar
Building, 685 Third Avenue, 9th Floor, New York,
New York 10017  Attention of Treasurer and General
Counsel (Telecopy No  (212) 584-4001)],

(b)   if to the Collateral Agent, to it at
One Wall Street, 18th Floor  New York, New York 10286,
Attention of Genoveso Caviness, Agency Function
Administration (Telecopy No  (212) 635-6365),

(c)   if to the Administrative Agent, to it at
600 Mountain Avenue  Murray Hill, New Jersey 07974
Attention of Assistant Treasurer-Project Finance
(Telecopy No  (908) 582-3101), and

(d)   if to the Equipment Owner, to it in care of
the Company at [The Winstar Building, 685 Third Avenue
9th Floor, New York, New York 10017, Attention of
Treasurer and General Counsel (Telecopy No
(212)  584-4001)]

Any party hereto may change its address or telecopy number
for notices and other communications hereunder by notice to
the other parties hereto   All notices and other
communications given to any party hereto in accordance with
the provisions of this Agreement shall be deemed to have
been given on the date of receipt

SECTION 2 02    Assignments.   The Equipment Owner
shall not have the right to assign or transfer its rights or
obligations hereunder or any interest herein or in the
Equipment (and any such assignment or transfer shall be
void)

SECTION 2 03    Successors and Assigns   Whenever
in this Agreement any of the parties hereto is referred to,

6

such reference shall be deemed to include the successors and assigns of such party and all covenants, promises and agreements by or on behalf of the parties hereto that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns

SECTION 2 04   <u>GOVERNING LAW.</u>  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK

SECTION 2 05   <u>Waivers. Amendment</u>   (a)  No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power  or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power   The rights and remedies of the Collateral Agent hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have   No waiver of any provisions of this Agreement or consent to any departure by the Equipment Owner therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given   No notice to or demand on the Equipment Owner in any case shall entitle the Equipment Owner to any other or further notice or demand in similar or other circumstances

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into among the parties hereto

SECTION 2 06   <u>WAIVER OF JURY TRIAL</u>   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION   SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2 06

SECTION 2 07   <u>Severability</u>   In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining

[NYCorp;1031 06 2 4641A 05/04/2000   11 11a]



7

provisions contained herein shall not in any way be affected
or impaired thereby  The parties shall endeavor in
good-faith negotiations to replace the invalid, illegal or
unenforceable provisions with valid provisions the economic
effect of which comes as close as possible to that of the
invalid, illegal or unenforceable provisions

SECTION 2 08    Counterparts.  This Agreement may
be executed in counterparts  each of which shall constitute
an original but all of which when taken together shall
constitute but one contract

SECTION 2 09    Headings   Article and Section
headings used herein are for convenience of reference only,
are not part of this Agreement and are not to affect the
construction of, or to be taken into consideration in
interpreting, this Agreement

SECTION 2 10    Jurisdiction. Consent to Service of
Process.  (a)  Each of the Company and the Equipment Owner
hereby irrevocably and unconditionally submits, for itself
and its property  to the nonexclusive jurisdiction of any
New York State court or Federal court of the United States
of America sitting in New York City, and any appellate court
from any thereof, in any action or proceeding arising out of
or relating to this Agreement, or for recognition or
enforcement of any judgment, and each of the parties hereto
hereby irrevocably and unconditionally agrees that all
claims in respect of any such action or proceeding may be
heard and determined in such New York State or, to the
extent permitted by law, in such Federal court  Each of the
parties hereto agrees that a final judgment in any such
action or proceeding shall be conclusive and may be enforced
in other jurisdictions by suit on the judgment or in any
other manner provided by law

(b)   Each of the Company and the Equipment Owner
hereby irrevocably and unconditionally waives, to the
fullest extent it may legally and effectively do so, any
objection which it may now or hereafter have to the laying
of venue of any suit, action or proceeding arising out of or
relating to this Agreement in any New York State court or
Federal court sitting in New York City  Each of the parties
hereto hereby irrevocably waives, to the fullest extent
permitted by law, the defense of an inconvenient forum to
the maintenance of such action or proceeding in any such
court

(c)   Each party to this Agreement irrevocably
consents to service of process in the manner provided for
notices in Section 2 01  Nothing in this Agreement will

[NYCorp 30F120E 2 6661A 05/06/2000  11 11A]



8

affect the right of any party to this Agreement to serve process in any other manner permitted by law

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written

[NAME OF COMPANY],

by

                                Name
                                Title


[EQUIPMENT OWNER]

by

                                Name
                                Title


THE BANK OF NEW YORK, as Collateral Agent,

by

                                Name
                                Title


LUCENT TECHNOLOGIES INC    as Administrative Agent,

by

                                Name
                                Title



(NYCorp 1081205 2 4641A 05/04/2000  11 31a)

Exhibit E



EXHIBIT E

EQUIPMENT USER AGREEMENT dated as of ●,
●, among [NAME OF EQUIPMENT OWNER], a ● (the
"Equipment Owner") [NAME OF EQUIPMENT USER],
a ● (the "Equipment User"), LUCENT
TECHNOLOGIES INC , as administrative agent
(the "Administrative Agent") for the Lenders
(as defined below), and THE BANK OF NEW YORK,
as collateral agent (the "Collateral Agent")
for the Lenders

Reference is made to (a) the Credit Agreement
dated as of May 4, 2000 (as amended or modified from time to
time, the "Credit Agreement") among Winstar Communications,
Inc , the Equipment Owner, any additional Borrowers from
time to time party thereto, the lenders from time to time
party thereto (the "Lenders"), the Collateral Agent and the
Administrative Agent and (b) the Security Agreement dated as
of ● (as amended or modified from time to time, the
"Security Agreement") between the Equipment Owner and the
Collateral Agent

The Equipment User has entered into, and may from
time to time in the future enter into, one or more leases,
sub-leases or other arrangements (collectively, the
"Leases") with the Equipment Owner granting to the Equipment
User the right to possess or use certain equipment and other
assets   All or a portion of such equipment and other assets
(the "Equipment") is owned by the Equipment Owner and has
been financed pursuant to the Credit Agreement and is
subject to a security interest (the "Security Interest") in
favor of the Collateral Agent under the Security Agreement
It is a condition of the availability of the Equipment to
the Equipment User that the Equipment User enter into an
agreement in the form hereof to acknowledge the ownership of
the Equipment by the Equipment Owner, and the Security
Interest therein pursuant to the Security Agreement, and to
confirm certain rights and remedies in respect of the
Equipment as set forth herein

Accordingly, the parties hereto agree as follows

ARTICLE I

Rights in Equipment

SECTION 1 01   Acknowledgment of Interest.   The
Equipment User acknowledges and agrees that (a) the
Equipment Owner is the owner of the Equipment, (b) the
Equipment is subject to the Security Interest granted under
the Security Agreement and (c) the Leases do not grant to
the Equipment User any ownership rights in the Equipment

NYCorp 1066839 2 4641A 05/04/2000  11 29a]

2

SECTION 1 02    Subject and Subordinate.   The Equipment User acknowledges and agrees that its rights and interests in and to the Equipment are subject and subordinate in all respects to the Security Interest and the rights and interests of the Collateral Agent under the Security Agreement

SECTION 1 03    Use and Disposition of Equipment The Equipment User shall not make or permit to be made an assignment, pledge or hypothecation of the Equipment or grant any other lien or encumbrance in respect of the Equipment - The Equipment User shall not make or permit to be made any transfer of the Equipment and shall remain at all times in possession of the Equipment, except (a) to return the Equipment to the Equipment Owner and (b) the Equipment User may sub-lease the Equipment to the extent permitted by and in accordance with Section 6.13 of the Credit Agreement (and the Equipment User acknowledges receipt of a copy of the Credit Agreement)

SECTION 1 04    No Right of Set-off, Counterclaim, Etc.  The Equipment User acknowledges and agrees that it does not have and in no event will assert, as against the Administrative Agent, the Collateral Agent or any Lender, any lien, right of distraint or levy, right of set-off claim, deduction, counterclaim, security or other interest in any of the Equipment or in the proceeds thereof, including any of the foregoing which might arise or exist in the Equipment User's favor pursuant to any agreement, common law statute or otherwise

SECTION 1 05    Uniform Commercial Code Filings The Equipment User agrees to execute and deliver such Uniform Commercial Code financing statements or other appropriate filings  recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Equipment as the Collateral Agent or the Administrative Agent may request from time to time in order to protect the ownership interest of the Equipment Owner in the Equipment or the perfection of the Security Interest

SECTION 1.06    Information Regarding Equipment (a)  The Equipment User agrees to maintain records of the location of each item of Equipment and to provide copies of such records to the Collateral Agent or the Administrative Agent promptly following any request therefor

(b)  The Equipment User will furnish to the Collateral Agent prompt written notice of any change (1) in the Equipment User's corporate name or in any trade name

3

used to identify it in the conduct of its business or in the
ownership of its properties, (ii) in the location of the
Equipment User's chief executive office or its principal
place of business, (iii) the jurisdiction in which any
Equipment is located to any other jurisdiction (other than a
jurisdiction in which filings have been made as contemplated
by Section 1 05 above), (iv) in the Equipment User's
identity or corporate structure or (v) in the Equipment
User's Federal Taxpayer Identification Number    The
Equipment User agrees not to effect or permit any change
referred to in the preceding sentence until notice thereof
has been given and all filings requested pursuant to
Section 1 05 above have been made    The Equipment User also
agrees promptly to notify the Collateral Agent if any
material portion of the Equipment is damaged or destroyed

SECTION 1 07    Inspection and Verification.    Each
of the Collateral Agent and the Administrative Agent and
such persons as the Collateral Agent or the Administrative
Agent may reasonably designate shall have the right to
inspect the Equipment, all records related thereto (and to
make extracts and copies from such records) and the premises
upon which any of the Equipment is located.    Each of the
Collateral Agent and the Administrative Agent shall have the
absolute right to share any information it gains from any
such inspection or verification with any Lender and their
agents and representatives

SECTION 1 08    Maintenance of Equipment    The
Equipment User will keep and maintain all Equipment in good
working order and condition    ordinary wear and tear
excepted

SECTION 1 09    Remedies.    The Equipment User
acknowledges and agrees that the Collateral Agent may
terminate the Equipment User's rights and interests in and
to the Equipment upon the occurrence and during the
continuance of an Event of Default (as defined in the Credit
Agreement)    Upon the occurrence and during the continuance
of an Event of Default, the Equipment User agrees to deliver
each item of the Equipment to the Collateral Agent on
demand  and it is agreed that the Collateral Agent shall
have the right with or without legal process and with or
without previous notice, to take possession of the Equipment
or any part thereof (at the same or different times) and
without liability for trespass to enter any premises where
the Equipment or any part thereof may be located for the
purpose of taking possession of or removing the Equipment
and, generally, to exercise any and all rights afforded to a
secured party under the Uniform Commercial Code or other
applicable law    Without limiting the generality of the

[NYCorp 1060033    4661A 05/06/ 000  11 .68]

4

foregoing, the Equipment User agrees that the Collateral
Agent shall have the right to sell or otherwise dispose of
all or any part of the Equipment, at public or private sale
for cash, upon credit or for future delivery as the
Collateral Agent shall deem appropriate    Upon consummation
of any such sale the Collateral Agent shall have the right
to assign, transfer and deliver to the purchaser or
purchasers thereof the Equipment so sold    Each such
purchaser at any such sale shall hold the property sold
absolutely, free from any claim or right on the part of the
Equipment User, and the Equipment User hereby waives all
rights with respect to the Equipment which the Equipment
User now has or may at any time in the future have under any
rule of law or statute now existing or hereafter enacted

ARTICLE II

Miscellaneous

SECTION 2 01    Notices    All notices and other
communications provided for herein shall be in writing and
shall be delivered by hand or overnight courier service,
mailed by certified or registered mail or sent by telecopy,
as follows

(a) if to the Equipment Owner, to it at
The Winstar Building, 685 Third Avenue, 9th Floor,
New York, New York 10017  attention of Treasurer and
General Counsel (Telecopy No  (212) 584-4001),

(b) if to the Collateral Agent, to it at
One Wall Street, 18th Floor, New York, New York 10286
Attention of Genoveso Caviness, Agency Function
Administration (Telecopy No  (212) 635-6365),

(c) if to the Administrative Agent  to it at
600 Mountain Avenue, Murray Hill, New Jersey 07974,
Attention of Assistant Treasurer-Project Finance
(Telecopy No  (908) 582-3101)  and

(d) if to the Equipment User, to it at ●,
Attention of ● (Telecopy No  ●)

Any party hereto may change its address or telecopy number
for notices and other communications hereunder by notice to
the other parties hereto   All notices and other
communications given to any party hereto in accordance with
the provisions of this Agreement shall be deemed to have
been given on the date of receipt

[NYCorp 1060839 3 4641A 05/04/2000  11 38a]

5

SECTION 2 02   _Assignments_   The Equipment User shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Equipment (and any such assignment or transfer shall be void)

SECTION 2 03   _Successors and Assigns._   Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the parties hereto that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns

SECTION 2 04   GOVERNING LAW   THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK

SECTION 2 05   _Waivers. Amendment_   (a)  No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power   The rights and remedies of the Collateral Agent hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have   No waiver of any provisions of this Agreement or consent to any departure by the Equipment User therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given No notice to or demand on the Equipment User in any case shall entitle the Equipment User to any other or further notice or demand in similar or other circumstances

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into among the parties hereto

SECTION 2 06   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN

[NYCorp 1040039 3 6661A 05/04/2000  11 28a]

6

INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2 06

SECTION 2 07    Severability    In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby    The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions

SECTION 2 08    Counterparts.    This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract

SECTION 2 09    Headings    Article and Section headings used herein are for convenience of reference only are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement

SECTION 2 10    Jurisdiction. Consent to Service of Process.    (a)    Each of the Equipment Owner and the Equipment User hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court    Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

(b)    Each of the Equipment Owner and the Equipment User hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State court or Federal court sitting in New York City    Each of the parties hereto hereby irrevocably waives, to the fullest extent

7

permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court

(c)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 2 01   Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law

8

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written

[EQUIPMENT OWNER]

by

———————————————
Name
Title

[EQUIPMENT USER]

by

———————————————
Name
Title

THE BANK OF NEW YORK, as Collateral Agent,

by

———————————————
Name
Title

LUCENT TECHNOLOGIES INC , as Administrative Agent,

by

———————————————
Name
Title

[NYCorp 1060039 2 4661A 05/04/2000  11:28a]







Exhibit F





EXHIBIT F

GUARANTEE AGREEMENT dated as of
May [ ] 2000, among WINSTAR COMMUNICATIONS,
INC , a Delaware corporation (the "Parent )
WCI CAPITAL CORP , a Delaware corporation
(the "Bank Borrower" the Parent and the Bank
Borrower being referred to individually as a
"Guarantor" and collectively as the
"Guarantors") and LUCENT TECHNOLOGIES INC
("Lucent") as administrative agent (the
"Administrative Agent") for the Lenders (as
defined below)

Reference is made to the Credit Agreement dated as
of May 4 2000 (as amended or modified from time to time,
the "Credit Agreement"), among the Parent, WVF I LLC, as
initial borrower thereunder and, any additional borrowers
from time to time party thereto the lenders from time to
time party thereto (the "Lenders") The Bank of New York, as
collateral agent (the "Collateral Agent") and the
Administrative Agent Capitalized terms used herein and not
defined herein shall have the meanings assigned to such
terms in the Credit Agreement

The Lenders have agreed to make Loans to the
Borrowers pursuant to and upon the terms and subject to the
conditions specified in, the Credit Agreement Each of the
Borrowers is an indirect Wholly Owned Subsidiary of the
Guarantors Each of the Guarantors acknowledges that it
will derive substantial benefit from the making of the Loans
by the Lenders The obligations of the Lenders to make
Loans are conditioned on among other things, the execution
and delivery by the Guarantors of a Guarantee Agreement in
the form hereof As consideration therefor and in order to
induce the Lenders to make Loans the Guarantors are willing
to execute this Agreement

Accordingly the parties hereto agree as follows

ARTICLE I

Guarantee

SECTION 1 01   Guarantee   Each Guarantor
unconditionally guarantees jointly with the other Guarantor
and severally, as a primary obligor and not merely as a
surety, (a) the due and punctual payment of (i) the
principal of and premium, if any, and interest (including
interest accruing during the pendency of any bankruptcy,
insolvency receivership or other similar proceeding

[WTCorp 1059941 2 16LDW 05/15/2000  E 17p]

2

regardless of whether allowed or allowable in such proceeding) on the Loans  when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (11) all other monetary obligations  including fees, costs, expenses and indemnities  whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of each Borrower under the Credit Agreement and the other Loan Documents and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of each Borrower under or pursuant to the Credit Agreement and the other Loan Documents (all the monetary and other obligations referred to in the preceding clauses (a) and (b) being collectively called the "Obligations")   Each Guarantor further agrees that the Obligations may be extended or renewed  in whole or in part  without notice to or further assent from it  and that it will remain bound upon its guarantee notwithstanding any extension or renewal of any Obligation

SECTION 1 02    Obligations Not Waived.  To the fullest extent permitted by applicable law, each Guarantor waives presentment _ , dema~_ of payment from and protest to any Borrower or other Loan Party of any of the Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment   To the fullest extent permitted by applicable law  the obligations of each Guarantor hereunder shall not be affected by (a) the failure of the Administrative Agent  the Collateral Agent or any Lender to assert any claim or demand or to enforce or exercise any right or remedy against any Borrower or the other Guarantor under the provisions of the Credit Agreement, any other Loan Document or otherwise  (b) any rescission, waiver  amendment or modification of, or any release from any of the terms or provisions of this Agreement, any other Loan Document, any Guarantee or any other agreement  including with respect to the other Guarantor under this Agreement or (c) the failure to perfect any security interest in, or the release of  any of the security held by or on behalf of the Collateral Agent or any Lender

SECTION 1 03    Security   Each of the Guarantors authorizes the Collateral Agent and each of the Lenders to (a) take and hold security given for the payment of this Guarantee and the Obligations and exchange, enforce, waive and release any such security, (b) apply such security and direct the order or manner of sale thereof as they in their

[NYCorp  ?59963 ? 464 A 05/06/2000    32a]

3

sole discretion may determine and (c) release or substitute
any one or more endorsees or other obligors

SECTION 1 04    Guarantee of Payment    Each
Guarantor further agrees that its guarantee constitutes a
guarantee of payment when due and not of collection, and
waives any right to require that any resort be had by the
Administrative Agent or any Lender to any of the security
held for payment of the Obligations or to any balance of any
deposit account or credit on the books of the Administrative
Agent or any Lender in favor of any Borrower, any other Loan
Party or any other Person

SECTION 1 05    No Discharge or Diminishment of
Guarantee    The obligations of each Guarantor hereunder
shall not be subject to any reduction  limitation,
impairment or termination for any reason (other than the
indefeasible payment in full in cash of the Obligations),
including any claim of waiver, release, surrender,
alteration or compromise of any of the Obligations, and
shall not be subject to any defense or setoff  counterclaim
recoupment or termination whatsoever by reason of the
invalidity, illegality or unenforceability of the
Obligations or otherwise  Without limiting the generality
of the foregoing, the obligations of each Guarantor
hereunder shall not be discharged or impaired or otherwise
affected by the failure of the Administrative Agent, the
Collateral Agent or any Lender to assert any claim or demand
or to enforce any remedy under the Credit Agreement, any
other Loan Document or any other agreement, by any waiver or
modification of any provision of any thereof, by any
default  failure or delay  wilful or otherwise, in the
performance of the Obligations, or by any other act or
omission that may or might in any manner or to any extent
vary the risk of either Guarantor or that would otherwise
operate as a discharge of each Guarantor as a matter of law
or equity (other than the indefeasible payment in full in
cash of all the Obligations)

SECTION 1 06    Defenses of Borrower Waived    To
the fullest extent permitted by applicable law, each of the
Guarantors waives any defense based on or arising out of the
defense of any Borrower or other Loan Party or the
unenforceability of the Obligations or any part thereof from
any cause, or the cessation from any cause of the liability
of any Borrower or any other Loan Party, other than the
final and indefeasible payment in full in cash of the
Obligations    The Collateral Agent and the Lenders may, at
their election, foreclose on any security held by one or
more of them by one or more judicial or nonjudicial sales,
accept an assignment of any such security in lieu of

4

foreclosure, compromise or adjust any part of the
Obligations, make any other accommodation with any Borrower
or other Loan Party or guarantor or exercise any other right
or remedy available to them against any Borrower or other
Loan Party or guarantor, without affecting or impairing in
any way the liability of either Guarantor hereunder except
to the extent the Obligations have been fully  finally and
indefeasibly paid in cash   To the fullest extent permitted
by applicable law, each of the Guarantors waives any defense
arising out of any such election even though such election
operates, pursuant to applicable law  to impair or to
extinguish any right of reimbursement or subrogation or
other right or remedy of such Guarantor against any
Borrower, the other Guarantor or any other guarantor, as the
case may be  or any security

ARTICLE II

Miscellaneous

SECTION 2 01   Representations and Warranties
Each of the Guarantors represents and warrants as to itself
that all representations and warranties relating to it
contained in the Credit Agreement are true and correct

SECTION 2 02   Information   Each of the
Guarantors assumes all responsibility for being and keeping
itself informed of each Borrower's and each other Loan
Party's financial condition and assets, and of all other
circumstances bearing upon the risk of nonpayment of the
Obligations and the nature, scope and extent of the risks
that such Guarantor assumes and incurs hereunder, and agrees
that none of the Administrative Agent or the Lenders will
have any duty to advise either of the Guarantors of
information known to it or any of them regarding such
circumstances or risks

SECTION 2 03   Termination of this Agreement and
the Guarantees.   This Agreement and the Guarantees made
hereunder shall terminate when all the Obligations have been
indefeasibly paid in full and the Lenders have no further
commitment to lend under the Credit Agreement and shall
continue to be effective or be reinstated  as the case may
be, if at any time payment, or any part thereof, of any
Obligation is rescinded or must otherwise be restored by the
Administrative Agent or any Lender upon the bankruptcy or
reorganization of any Borrower, either Guarantor or
otherwise

[NYCorp 1039943 3 4641  05/01/2000  11 32a]

5

SECTION 2 04  <u>Binding Effect, Several Agreement,</u>
<u>Assignments</u>   Whenever in this Agreement any of the parties
hereto is referred to, such reference shall be deemed to
include the successors and assigns of such party, and all
covenants  promises and agreements by or on behalf of each
party hereto that are contained in this Agreement shall bind
and inure to the benefit of each party hereto and their
respective successors and assigns   This Agreement shall
become effective as to each Guarantor when a counterpart
hereof executed on behalf of such Guarantor shall have been
delivered to the Administrative Agent, and a counterpart
hereof shall have been executed on behalf of the
Administrative Agent and thereafter shall be binding upon
such Guarantor and the Administrative Agent and their
respective successors and assigns, and shall inure to the
benefit of such Guarantor, the Administrative Agent and the
Lenders  and their respective successors and assigns, except
that neither Guarantor shall have the right to assign its
rights or obligations hereunder or any interest herein (and
any such attempted assignment shall be void)   This
Agreement shall be construed as a separate agreement with
respect to each Guarantor and may be amended, modified,
supplemented, waived or released with respect to either
Guarantor without the approval of the other Guarantor and
without affecting the obligations of the other Guarantor
hereunder

SECTION 2 05  <u>Waivers, Amendment</u>   (a)  No
failure or delay of the Administrative Agent in exercising
any power or right hereunder shall operate as a waiver
thereof  nor shall any single or partial exercise of any
such right or power, or any abandonment or discontinuance
of steps to enforce such a right or power, preclude any
other or further exercise thereof or the exercise of any
other right or power  The rights and remedies of the
Administrative Agent hereunder and of the Collateral Agent
and the Lenders under the other Loan Documents are
cumulative and are not exclusive of any rights or remedies
that they would otherwise have  No waiver of any provision
of this Agreement or consent to any departure by either
Guarantor therefrom shall in any event be effective unless
the same shall be permitted by paragraph (b) below  and then
such waiver or consent shall be effective only in the
specific instance and for the purpose for which given  No
notice or demand on any Borrower or either Guarantor in any
case shall entitle such Borrower or Guarantor to any other
or further notice or demand in similar or other
circumstances

(b)  Neither this Agreement nor any provision
hereof may be waived, amended or modified except pursuant to

[NYCorp;1011815 3 46412 15/04/2000  11 33a]

6

a written agreement entered into between the party hereto
with respect to which such waiver amendment or modification
relates and the Administrative Agent with the prior written
consent of the Required Lenders as required under the Credit
Agreement

SECTION 2 06    Governing Law    THIS AGREEMENT
SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE
LAWS OF THE STATE OF NEW YORK

SECTION 2 07    Notices.    All communications and
notices hereunder shall be in writing and given as provided
in Section 9 01 of the Credit Agreement    All communications
and notices hereunder to the Bank Borrower shall be given to
it in care of the Parent

SECTION 2 08    Survival of Agreement, Sever-
ability    (a)    All covenants, agreements, representations
and warranties made by the Guarantors herein and in the
certificates or other instruments prepared or delivered in
connection with or pursuant to this Agreement or any other
Loan Document shall be considered to have been relied upon
by the Administrative Agent and the Lenders and shall
survive the making by the Lenders of the Loans regardless of
any investigation made by any Lender or on any Lender's
behalf, and shall continue in full force and effect as long
as the principal of or any accrued interest on any Loan or
any other fee or amount payable under this Agreement or any
other Loan Document is outstanding and unpaid and as long as
the Commitments have not been terminated

(b)    In the event any one or more of the
provisions contained in this Agreement or in any other Loan
Document should be held invalid illegal or unenforceable in
any respect the validity legality and enforceability of
the remaining provisions contained herein and therein shall
not in any way be affected or impaired thereby (it being
understood that the invalidity of a particular provision in
a particular jurisdiction shall not in and of itself affect
the validity of such provision in any other jurisdiction)
The parties shall endeavor in good-faith negotiations to
replace the invalid, illegal or unenforceable provisions
with valid provisions the economic effect of which comes as
close as possible to that of the invalid, illegal or
unenforceable provisions

SECTION 2 09    Counterparts    This Agreement may
be executed in counterparts, each of which shall constitute
an original but all of which when taken together shall
constitute a single contract, and shall become effective as
provided in Section 2 04    Delivery of an executed signature

[NYCorp 105994) 2 46418 05/04/2003  11 12a]

7

page to this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Agreement

SECTION 2 10   Rules of Interpretation.   The rules of interpretation specified in Section 1 03 of the Credit Agreement shall be applicable to this Agreement

SECTION 2 11   Jurisdiction. Consent to Service of Process   (a)  Each Guarantor hereby irrevocably and unconditionally submit, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment  and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law   Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower, either Guarantor or its properties in the courts of any jurisdiction

(b)  Each Guarantor hereby irrevocably and unconditionally waive  to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 2 07   Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law

SECTION 2 12   Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN

(NYCorp 1059943 2 6661A 05/04/2000  11 33a)

8

RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT
OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER
LOAN DOCUMENTS  EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED  EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY
WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE
FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS
AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY,
AMONG OTHER THINGS  THE MUTUAL WAIVERS AND CERTIFICATIONS IN
THIS SECTION 2 12

SECTION 2 13    Right of Setoff   If an Event of
Default shall have occurred and be continuing, each Lender
is hereby authorized at any time and from time to time, to
the fullest extent permitted by law  to set off and apply
any and all deposits (general or special, time or demand,
provisional or final) at any time held and other
Indebtedness at any time owing by such Lender to or for the
credit or the account of either Guarantor against any or all
the obligations of such Guarantor now or hereafter existing
under this Agreement and the other Loan Documents held by
such Lender, irrespective of whether or not such Lender
shall have made any demand under this Agreement or any other
Loan Document and although such obligations may be
unmatured   The rights of each Lender under this
Section 2 13 are in addition to other rights and remedies
(including other rights of setoff) which such Lender may
have

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written

WINSTAR COMMUNICATIONS, INC

by

_____
Name
Title

WCI CAPITAL CORP ,

by

_____
Name
Title

LUCENT TECHNOLOGIES INC , as Administrative Agent

by

_____
Name
Title



Exhibit G

EXHIBIT G

## PERFECTION CERTIFICATE

Reference is made to (a) the Credit Agreement dated as of May 4, 2000 (as amended or modified from time to time, the "Credit Agreement"), among the undersigned as a borrower thereunder (the "Current Borrower"), any additional borrowers from time to time party thereto, Winstar Communications, Inc , a Delaware corporation (the "Parent"), the lenders party thereto (the "Lenders")  The Bank of New York, as collateral agent (in such capacity, the "Collateral Agent")  and Lucent Technologies Inc , as administrative agent (in such capacity  the "Administrative Agent"), and (b) the Security Agreement dated as of ● (as amended or modified from time to time, the "Security Agreement") between the Current Borrower and the Collateral Agent  Capitalized terms used herein without definition have the meanings assigned to them in the Credit Agreement and the Security Agreement

The undersigned, a Financial Officer of the Current Borrower, hereby certifies to the Administrative Agent, the Collateral Agent and each Lender as follows

1    Names.  (a)  The exact company name of the Current Borrower  as such name appears in its certificate of formation, is ●

(b)  The Current Borrower has not had any change in its name since its formation

(c)  Except as set forth in Schedule 1 hereto  the Current Borrower has not changed its identity or company structure in any way since its formation until the present  Changes in identity or company structure would include mergers, consolidations and acquisitions, as well as any change in the form, nature or jurisdiction of company organization

(d)  Neither the Current Borrower nor any of its divisions or other business units has used any other names (including trade names or similar appellations) in connection with the conduct of its business since its formation until the present

(e)  The Federal Employer Identification Number of the Current Borrower is ●

2    Current Locations   (a)  The chief executive office of the Current Borrower is located as the following address

[NYCorp]1061714 2 4443A 05/04/2000  11 29a]

2

<u>Mailing Address</u>          <u>County</u>          <u>State</u>

     (b)  The following are all the places of business of the Current Borrower not identified above

     (c)  The following are the names and addresses of all Persons other than the Current Borrower which have possession of any of the Collateral

     (d)  The following are all the locations where the Current Borrower maintains any Collateral not identified above

     3   <u>File Search Reports</u>  Attached hereto as Schedule 3(A) are true copies of file search reports from the Uniform Commercial Code filing offices where filings described in Schedule 5 are to be made  Attached hereto as Schedule 3(B) is a true copy of each financing statement or other filing identified in such file search reports

     4   <u>UCC Filings.</u>  Duly signed financing statements on Form UCC-1 in substantially the form of Schedule 4 hereto have been duly filed or delivered to the Collateral Agent for filing in the Uniform Commercial Code filing offices in each jurisdiction where the Current Borrower has Collateral as identified in Section 2 hereof

     5   <u>Schedule of Filings</u>  Attached hereto as Schedule 5 is a schedule setting forth, with respect to the filings described in Section 4 above, each filing and the filing office in which such filing has been or is to be made

     6   <u>Filings Fees</u>  All filing fees and taxes payable in connection with the filings described in Section 4 above have been paid or provided for

     IN WITNESS WHEREOF, the undersigned has duly executed this certificate this ___ day of •  •

                [NAME OF CURRENT BORROWER]

               _____
               Name
               Title

[NYCorp 1061714 2 6661A 05/04/2000  11 29A]

Exhibit H

PLEDGE AGREEMENT dated as of May [    ],
2000, among, WINSTAR WIRELESS, INC (the
"Pledgor"), and BANK OF NEW YORK, as
collateral agent (in such capacity, the
"Collateral Agent") for the Secured Parties,
as defined herein

Reference is made to the Credit Agreement dated as
of May 4, 2000 (as amended or modified from time to time,
the "Credit Agreement") among WVF-I LLC, a Delaware limited
liability company, as initial borrower thereunder, any other
borrowers thereunder from time to time party thereto,
Winstar Communications, Inc , the lenders party thereto  the
Collateral Agent and Lucent Technologies Inc , as
administrative agent  The Lenders have agreed to extend
credit to the Borrowers pursuant to, and subject to the
terms and conditions specified in, the Credit Agreement
Each Borrower is or will be a Wholly Owned Subsidiary of the
Pledgor  The obligations of the Lenders to extend credit
under the Credit Agreement are conditioned upon, among other
things, the execution and delivery by the Pledgor of a
pledge agreement in the form hereof to secure (a) the due
and punctual payment by each Borrower of (i) the principal
of and interest on the Loans  when and as due, whether at
maturity, by acceleration, upon one or more dates set for
prepayment or otherwise  and (ii) all other monetary
obligations of each Borrower to the Secured Parties under
the Credit Agreement and the other Loan Documents, and
(b) the due and punctual performance of all other
obligations of each Borrower to the Secured Parties under
the Credit Agreement and the other Loan Documents (all the
foregoing obligations being collectively called the
"Obligations")

Accordingly, the Pledgor and the Collateral Agent
hereby agree as follows

## ARTICLE I

### Definitions

SECTION 1 01  Terms Defined in the Credit
Agreement.  Terms used herein and not otherwise defined
herein shall have the meanings set forth in the Credit
Agreement

(NYCORP,1010539 6163058 05/05/2000  12 13p]

2

SECTION 1 02    Definition of Certain Terms Used Herein.  As used herein, the following terms shall have the following meanings

"Collateral" shall have the meaning assigned to such term in Section 2 01

"Credit Agreement" shall have the meaning assigned to such term in the preliminary statement of this Agreement

"Federal Securities Laws" shall have the meaning assigned to such term in Section 4 03

"Obligations" shall have the meaning assigned to such term in the preliminary statement of this Agreement

"Pledged Securities" shall mean the Pledged Stock all other shares of Capital Stock and other securities (including warrants, options and similar rights to acquire securities) now or hereafter included in the Collateral and all stock certificates and other instruments evidencing any such securities

"Pledged Stock" shall have the meaning assigned to such term in Section 2 01

"Secured Parties" shall mean (a) the Lenders, (b) the Administrative Agent and the Collateral Agent, in their capacities as such under each Loan Document and (c) the successors and assigns of the foregoing

SECTION 1 03    Rules of Interpretation.  The rules of interpretation specified in Section 1 03 of the Credit Agreement shall be applicable to this Agreement

## ARTICLE II

### Pledge

SECTION 2 01    Pledge.  As security for the payment or performance as the case may be  in full of the Obligations, the Pledgor hereby bargains, sells, conveys assigns, sets over, mortgages, pledges, hypothecates and transfers to the Collateral Agent, its successors and its assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in  all of the Pledgor's right, title and interest in, to and under (a) the Capital Stock issued by the Initial Borrower to the Pledgor listed on Schedule I and the Capital

[NYCORP;1040519  6  3053 05/05/ 000  12 33p]

3

Stock hereafter issued by the Initial Borrower or any
Replacement Borrower to the Pledgor (collectively, the
"Pledged Stock") and the certificates representing the
Pledged Stock, (b) all other property which may be delivered
to and held by the Collateral Agent pursuant to the terms
hereof, (c) subject to Section 2 04, all dividends, cash,
instruments and other property from time to time received,
receivable or otherwise distributed, in respect of, in
exchange for or upon the conversion of the securities
referred to in clauses (a) and (b) above  (d) subject to
Section 2 04, all rights and privileges of the Pledgor with
respect to the securities and other property referred to in
clauses (a), (b) and (c) above, and (e) all proceeds of any
of the foregoing (the items referred to in clauses (a)
through (e) being collectively called the "Collateral")

     TO HAVE AND TO HOLD the Collateral  together with
all right  title  interest, powers  privileges and
preferences pertaining or incidental thereto, unto the
Collateral Agent  its successors and its assigns, for the
benefit of the Secured Parties, forever, subject, however,
to the terms  covenants and conditions hereinafter set
forth

     SECTION 2 02   Delivery of the Collateral,
Intercompany Obligations,   (a)  Upon delivery to the
Collateral Agent, (i) the Pledged Securities shall be
accompanied by stock powers or similar powers duly executed
in blank or other instruments of transfer satisfactory to
the Collateral Agent and by such other instruments and
documents as the Collateral Agent may reasonably request and
(ii) all other property comprising part of the Collateral
shall be accompanied by proper instruments of assignment
duly executed by the Pledgor and such other instruments or
documents as the Collateral Agent may reasonably request
Each delivery of Pledged Securities shall be accompanied by
a schedule describing the securities theretofore and then
being pledged hereunder, which schedule shall be attached
hereto as Schedule I and made a part hereof   Each schedule
so delivered shall supplement any prior schedules so
delivered

     (b)  The Pledgor agrees to promptly deliver or
cause to be delivered to the Collateral Agent any and all
Pledged Securities  and any and all certificates or other
instruments or documents representing the Collateral

     (c)  The Pledgor agrees that, if any Borrower is a
limited liability company, it will cause such Borrower to
provide in its limited liability company operating agreement
or other relevant constitutive documents that its limited

[NYCORP;1010119 6 4305a 05/05/2000  12 37p]

4

liability company interests shall at all times be represented by certificates, which shall constitute "securities" within the meaning of Section 8-102 and Section 8-103 of Article 8 of the Uniform Commercial Code and shall be governed by Article 8 of the Uniform Commercial Code

SECTION 2 03    Registration in Nominee Name, Denominations,   The Collateral Agent shall have the right (in its sole and absolute discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee or the name of the applicable Pledgor, endorsed or assigned in blank or in favor of the Collateral Agent   The Pledgor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of the Pledgor   The Collateral Agent shall at all times have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement

SECTION 2 04    Voting Rights, Dividends and Interest, etc.  (a)   Unless and until an Event of Default shall have occurred and be continuing and the Collateral Agent shall have notified the Pledgor that its rights under this Section 2 04 are being suspended

(i)   The Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers accruing to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents, provided, however, that such action would not materially and adversely affect the rights inuring to a holder of the Pledged Securities or the rights and remedies of the Collateral Agent or any of the Secured Parties under this Agreement or the Credit Agreement or any other Loan Document or the ability of the Collateral Agent or any of the Secured Parties to exercise the same

(ii)   The Collateral Agent shall execute and deliver to the Pledgor, or cause to be executed and delivered to the Pledgor, all such proxies, powers of attorney and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers which it is entitled to exercise pursuant to subparagraph (i) above

[NYCORP;1040519 6 4305D 05/05/2000  13 32p)

5

(iii)  The Pledgor shall be entitled to receive
and retain any and all dividends paid in cash on the
Pledged Securities pledged by it to the extent and only
to the extent that such cash dividends are permitted
by  and otherwise paid in accordance with, the terms
and conditions of the Credit Agreement, the other Loan
Documents and applicable laws   Other than pursuant to
the first sentence of this paragraph (a)(iii) all
noncash dividends and all dividends paid or payable in
cash or otherwise in connection with a partial or total
liquidation or dissolution  return of capital, capital
surplus or paid-in surplus  and all other distributions
made on or in respect of Pledged Securities, whether
paid or payable in cash or otherwise, whether resulting
from a subdivision  combination or reclassification of
the outstanding Capital Stock of the issuer of any
Pledged Securities or received in exchange for Pledged
Securities or any part thereof, or in redemption
thereof, or as a result of any merger, consolidation,
acquisition or other exchange of assets to which such
issuer may be a party or otherwise, shall be and become
part of the Collateral, and, if received by the
Pledgor, shall not be commingled by the Pledgor with
any of its other funds or property but shall be held
separate and apart therefrom, shall be held in trust
for the benefit of the Collateral Agent and shall be
forthwith delivered to the Collateral Agent in the same
form as so received (with any necessary endorsement)

(b)  Upon the occurrence and during the
continuance of an Event of Default, after the Collateral
Agent shall have notified the Pledgor of the suspension of
its rights under paragraph (a)(iii) above, then all rights
of the Pledgor to dividends which the Pledgor is authorized
to receive pursuant to paragraph (a)(iii) above shall cease
and all such rights shall thereupon become vested in the
Collateral Agent, which shall have the sole and exclusive
right and authority to receive and retain such dividends
All dividends which are received by the Pledgor contrary to
the provisions of this Section 2 04 shall be received in
trust for the benefit of the Collateral Agent, shall be
segregated from other property or funds of the Pledgor and
shall be forthwith delivered to the Collateral Agent in the
same form as so received (with any necessary endorsement)
Any and all money and other property paid over to or
received by the Collateral Agent pursuant to the provisions
of this paragraph (b) shall be retained by the Collateral
Agent in an account to be established by the Collateral
Agent upon receipt of such money or other property and shall
be applied in accordance with the provisions of
Section 4 02

[NYC03P;1010519 E 4305B:05/05/2000  12 11p]

6

(c)  Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Pledgor of the suspension of its rights under paragraph (a)(i) above, then all rights of the Pledgor to exercise the voting and consensual rights and powers which it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2 04, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2 04  shall cease  and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers

(d)  Any notice given by the Collateral Agent to the Pledgor suspending its rights under paragraph (a) above (i) may be given by telephone if promptly confirmed in writing  and (ii) may suspend the rights of the Pledgor under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Collateral Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing

ARTICLE III

Representations, Warranties And Covenants

The Pledgor represents, warrants and covenants to and with the Collateral Agent and the Lenders that

(a) the Pledged Stock represents all the outstanding Capital Stock of each Borrower,

(b) the Pledged Securities have been duly and validly authorized and issued by the Borrowers and are fully paid and nonassessable

(c) except for the security interest granted hereunder, the Pledgor (i) is and will at all times continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule I  (ii) holds the same free and clear of all Liens, except as expressly permitted by Section 4 04, (iii) will make no assignment, pledge, hypothecation or transfer of, or create any security interest in, the Collateral  other than pursuant hereto, except as expressly permitted by Section 4 04, and (iv) subject to Section 2 04  will cause any and all Collateral,

[NYCORP/1040539 6 43059 05/05/ 00D  12 32p]

7

whether for value paid by the Pledgor or otherwise, to be forthwith deposited with the Collateral Agent and pledged or assigned hereunder

(d) except for restrictions and limitations imposed by securities laws generally, the Collateral pledged hereunder is and will be freely transferable and assignable  and no portion of such Collateral is or will be subject to any option  right of first refusal, shareholders agreement, charter or by-law provision or contractual restriction of any nature which might prohibit  impair, delay or otherwise affect the pledge of such Collateral hereunder, the sale or disposition of the Collateral pursuant hereto after the occurrence of an Event of Default or the exercise by the Collateral Agent of its rights and remedies hereunder,

(e) the Pledgor (i) has the power and authority to pledge the Collateral pledged by it hereunder in the manner hereby done or contemplated and (ii) will defend its title or interest thereto or therein against any and all Liens (other than the Lien of this Agreement and Liens expressly contemplated by Section 4 04) however arising, of all Persons whomsoever,

(f) no consent or approval of any Governmental Authority or any securities exchange was or is necessary to the validity of the pledge effected hereby

(g) by virtue of the execution and delivery by the Pledgor of this Agreement, when the Pledged Securities, certificates, instruments or other documents representing or evidencing the Collateral are delivered to the Collateral Agent in accordance with this Agreement, the Collateral Agent will obtain a legal valid and perfected first priority security interest in the Pledged Securities as security for the payment and performance of the Obligations, and

(h) the pledge effected hereby is effective to vest in the Collateral Agent, on behalf of the Secured Parties  the rights of the Collateral Agent in the Collateral as set forth herein

[NYCORP;10(0513 6((305D 05/05/-090  11 ))p)

8

## ARTICLE IV

### Remedies

SECTION 4 01  Remedies upon Default.    If an Event of Default shall have occurred and be continuing  the Collateral Agent may exercise  to the extent permitted by law, all the rights of a secured party under the Uniform Commercial Code of the State of New York (whether or not the Code is in effect in the jurisdiction where such rights are exercised). and, in addition, the Collateral Agent may, without being required to give any notice, except as herein provided or as may be required by mandatory provisions of law, sell the Collateral, or any part thereof, at public or private sale or at any broker s board or on any securities exchange  for cash  upon credit or for future delivery as the Collateral Agent shall deem appropriate  The Collateral Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold  Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal which the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted

The Collateral Agent shall give the Pledgor at least 10 days' prior written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9-504(3) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral  Such notice, in the case of a public sale  shall state the time and place for such sale and  in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange and, in the case of a private sale  shall state the time after which any such sale is to be made  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale  At any such sale, the Collateral, or

9

portion thereof  to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given  The Collateral Agent may, without notice or publication  adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale  and such sale may  without further notice, be made at the time and place to which the same was so adjourned   In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid in full by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and  in case of any such failure, such Collateral may be sold again upon like notice   At any public sale made pursuant to this Section any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption  stay, valuation or appraisal on the part of the Pledgor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to it from the Pledgor as a credit against the purchase price, and the Collateral Agent may, upon compliance with the terms of sale  hold, retain and dispose of such property without further accountability to the Pledgor therefor   For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof, the Collateral Agent shall be free to carry out such sale pursuant to such agreement, and the Pledgor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full   As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver

SECTION 4 02   Application of Proceeds of Sale.
The proceeds of any sale of Collateral pursuant to
Section 4 01, as well as any Collateral consisting of cash,
shall be applied by the Collateral Agent as follows

FIRST, to the payment of all costs and expenses
incurred by the Administrative Agent or the Collateral
Agent (in its capacity as such hereunder or under any
other Loan Document) in connection with such sale or
otherwise in connection with this Agreement or any of
the Obligations, including all court costs and the fees
and expenses of its agents and legal counsel, the
repayment of all advances made by the Collateral Agent
hereunder or under any other Loan Document on behalf of
the Pledgor and any other costs or expenses incurred in
connection with the exercise of any right or remedy
hereunder or under any other Loan Document·

SECOND  to the payment in full of the Obligations
(the amounts so applied to be distributed among the
Secured Parties pro rata in accordance with the amounts
of the Obligations owed to them on the date of any such
distribution)  and

THIRD, to the Pledgor  its successors or assigns,
or as a court of competent jurisdiction may otherwise
direct

Subject to the instructions of the Required Lenders, the
Collateral Agent shall have absolute discretion as to the
time of application of any such proceeds, moneys or balances
in accordance with this Agreement   Upon any sale of the
Collateral by the Collateral Agent (including pursuant to a
power of sale granted by statute or under a judicial
proceeding), the receipt of the Collateral Agent or of the
officer making the sale shall be a sufficient discharge to
the purchaser or purchasers of the Collateral so sold and
such purchaser or purchasers shall not be obligated to see
to the application of any part of the purchase money paid
over to the Collateral Agent or such officer or be
answerable in any way for the misapplication thereof

SECTION 4 03   Securities Act, etc.  In view of
the position of the Pledgor in relation to the Pledged
Securities, or because of other present or future
circumstances  a question may arise under the Securities Act
of 1933, as now or hereafter in effect, or any similar
statute hereafter enacted analogous in purpose or effect
(such Act and any such similar statute as from time to time
in effect being called the "Federal Securities Laws") with
respect to any disposition of the Pledged Securities

11

permitted hereunder  The Pledgor understands that
compliance with the Federal Securities Laws might very
strictly limit the course of conduct of the Collateral Agent
if the Collateral Agent were to attempt to dispose of all or
any part of the Pledged Securities, and might also limit the
extent to which or the manner in which any subsequent
transferee of any Pledged Securities could dispose of the
same  Similarly  there may be other legal restrictions or
limitations affecting the Collateral Agent in any attempt to
dispose of all or part of the Pledged Securities under
applicable Blue Sky or other state securities laws or
similar laws analogous in purpose or effect  The Pledgor
recognizes that in light of the foregoing restrictions and
limitations the Collateral Agent may, with respect to any
sale of Pledged Securities  limit the purchasers to those
who will agree, among other things, to acquire Pledged
Securities for their own account, for investment, and not
with a view to the distribution or resale thereof  The
Pledgor acknowledges and agrees that in light of the
foregoing restrictions and limitations  the Collateral
Agent  in its sole and absolute discretion, (a) may proceed
to make such a sale whether or not a registration statement
for the purpose of registering the Pledged Securities or
part thereof shall have been filed under the Federal
Securities Laws, and (b) may approach and negotiate with a
single possible purchaser to effect such sale.  The Pledgor
acknowledges and agrees that any such sale might result in
prices and other terms less favorable to the seller than if
such sale were a public sale without such restrictions  In
the event of any such sale  the Collateral Agent shall incur
no responsibility or liability for selling all or any part
of the Pledged Securities at a price which the Collateral
Agent, in its sole and absolute discretion, may in good
faith deem reasonable under the circumstances,
notwithstanding the possibility that a substantially higher
price might have been realized if the sale were deferred
until after registration as aforesaid or if more than a
single purchaser were approached  The provisions of this
Section will apply notwithstanding the existence of a public
or private market upon which the quotations or sales prices
may exceed substantially the price at which the Collateral
Agent sells

        SECTION 4 04  Permitted Junior Liens  If at any
time any Borrower is deemed to be a Second Borrower, the
Pledgor shall be permitted to grant to the Bank Agent for
the ratable benefit of the Bank Loan Parties a
second-priority security interest in and a second-priority
lien on all the Capital Stock issued by the Second Borrower
to the Pledgor, to secure the payment and performance of the
Bank Loan Parties' monetary and other obligations under the

[NYCORP,1040511 6 43058 05/03/2000  12 32p]

12

Bank Credit Documents, provided that each of the Collateral Agent and the Administrative Agent shall have received written acknowledgment, in form and substance satisfactory to them, from the Bank Agent acknowledging that (a) any such security interest or lien will be expressly junior and subordinate in priority, operation and effect to any and all security interests and liens now existing or hereafter created or arising in favor of the Collateral Agent for the benefit of the Secured Parties hereunder and (b) under no circumstances shall any Secured Party have, or be deemed to have, any fiduciary duty or any other duty to the Bank Agent or any Bank Loan Party with respect to actions such Secured Party takes or is permitted to take hereunder

## ARTICLE V

### Miscellaneous

SECTION 5 01    Notices.   All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given to (a) the Collateral Agent as provided in Section 9 01 of the Credit Agreement and (b) the Pledgor to it in care of Winstar Communications, Inc , as provided in Section 9 01 of the Credit Agreement.

SECTION 5 02    Security Interest Absolute    All rights of the Collateral Agent hereunder, the security interests granted hereunder and all obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement or any other Loan Document  any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of  all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations, or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Obligations or this Agreement

SECTION 5 03    Survival of Agreement.   All covenants, agreements, representations and warranties made by the Pledgor herein and in the certificates or other

(NYCORP;1050539 6 4305B 05/05/2000  12 31p)

13

instruments prepared or delivered in connection with or
pursuant to this Agreement or any other Loan Document shall
be considered to have been relied upon by the Secured
Parties and shall survive the making by the Lenders of the
Loans, and the execution and delivery to the Lenders of any
instruments evidencing such Loans, regardless of any
investigation made by the Secured Parties or on their
behalf, and shall continue in full force and effect until
this Agreement shall terminate

      SECTION 5 04    Binding Effect, Several Agreement
This Agreement shall become effective as to the Pledgor when
a counterpart hereof executed on behalf of the Pledgor shall
have been delivered to the Collateral Agent and a
counterpart hereof shall have been executed on behalf of the
Collateral Agent, and thereafter shall be binding upon the
Pledgor and the Collateral Agent and their respective
successors and assigns  and shall inure to the benefit of
the Pledgor  the Collateral Agent and the other Secured
Parties and their respective successors and assigns  except
that the Pledgor shall not have the right to assign its
rights hereunder or any interest herein or in the Collateral
except as expressly contemplated by this Agreement or the
Credit Agreement

      SECTION 5.05    Successors and Assigns.  Whenever
in this Agreement any of the parties hereto is referred to,
such reference shall be deemed to include the successors and
assigns of such party, and all covenants  promises and
agreements by or on behalf of the Pledgor or the Collateral
Agent that are contained in this Agreement shall bind and
inure to the benefit of their respective successors and
assigns

      SECTION 5 06    Collateral Agent Appointed
Attorney-in-Fact.  The Pledgor hereby appoints the
Collateral Agent the attorney-in-fact of the Pledgor for the
purpose of carrying out the provisions of this Agreement and
taking any action and executing any instrument which the
Collateral Agent may deem necessary or advisable to
accomplish the purposes hereof, which appointment is
irrevocable and coupled with an interest  Without limiting
the generality of the foregoing, the Collateral Agent shall
have the right, upon the occurrence and during the
continuance of an Event of Default, with full power of
substitution either in the Collateral Agent's name or in the
name of the Pledgor, to ask for, demand, sue for, collect,
receive and give acquittance for any and all moneys due or
to become due under and by virtue of any Collateral, to
endorse checks, drafts, orders and other instruments for the
payment of money payable to the Pledgor representing any

[NYCORP/1076719 6|43050 05/05/2000  11 13p]

14

dividend or other distribution payable in respect of the
Collateral or any part thereof or on account thereof and to
give full discharge for the same, to settle, compromise,
prosecute or defend any action, claim or proceeding with
respect thereto, and to sell, assign, endorse, pledge,
transfer and make any agreement respecting, or otherwise
deal with, the same, provided, however, that nothing herein
contained shall be construed as requiring or obligating the
Collateral Agent or any Secured Party to make any commitment
or to make any inquiry as to the nature or sufficiency of
any payment received by the Collateral Agent or any Secured
Party, or to present or file any claim or notice  or to take
any action with respect to the Collateral or any part
thereof or the moneys due or to become due in respect
thereof or any property covered thereby, and no action taken
by the Collateral Agent or any Secured Party or omitted to
be taken with respect to the Collateral or any part thereof
shall give rise to any defense, counterclaim or offset in
favor of the Pledgor or to any claim or action against the
Collateral Agent or any other Secured Party

SECTION 5 07   Collateral Agent's Fees and
Expenses, Indemnification.  (a)  The Pledgor agrees to pay
upon demand to the Collateral Agent the amount of any and
all reasonable expenses, including the reasonable fees and
expenses of its counsel and of any experts or agents, which
the Collateral Agent may incur in connection with (i) the
administration of this Agreement  (ii) the custody or
preservation of, or the sale of, collection from or other
realization upon any of the Collateral, (iii) the exercise,
enforcement or protection of any of the rights of the
Collateral Agent hereunder or (iv) the failure of the
Pledgor to perform or observe any of the provisions hereof

(b)  Without limitation of its indemnification
obligations under the other Loan Documents  the Pledgor
agrees to indemnify the Collateral Agent and the other
Indemnitees against, and hold each of them harmless from,
any and all losses, claims, damages, liabilities and related
expenses  including reasonable counsel fees and expenses,
incurred by or asserted against any of them arising out of,
in any way connected with, or as a result of, the execution
delivery or performance of this Agreement or any claim,
litigation  investigation or proceeding relating hereto or
to the Collateral  whether or not any Indemnitee is a party
thereto, provided that such indemnity shall not, as to any
Indemnitee, be available to the extent that such losses,
claims, damages  liabilities or related expenses are
determined by a court of competent jurisdiction by final and
nonappealable judgment to have resulted from the gross
negligence or wilful misconduct of such Indemnitee

[NYCORP/1040519 6 4305B 05/05/2000  12 12p]

15

(c)   Any such amounts payable as provided hereunder shall be additional Obligations secured hereby and by the other Security Documents   The provisions of this Section shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document  or any investigation made by or on behalf of the Collateral Agent or any Secured Party   All amounts due under this Section shall be payable on written demand therefor

(d)   Notwithstanding the foregoing, the obligations of the Grantor hereunder with respect to payment of fees  charges and disbursements of counsel will be limited to (i) Cravath  Swaine & Moore  special counsel to Lucent and the Administrative Agent (or such other single firm acting in such capacity from time to time), (ii) Sullivan & Cromwell, special counsel to the Collateral Agent (or such other single firm acting in such capacity from time to time), (iii) one other firm of counsel to the Collateral Agent  the Administrative Agent and the Lenders in each jurisdiction and (iv) if necessary  special counsel to the Collateral Agent  the Administrative Agent and the Lenders in such areas as telecommunications regulations

SECTION 5 08   GOVERNING LAW.   THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK

SECTION 5 09   Waivers.  Amendment    (a)   No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power   The rights and remedies of the Collateral Agent hereunder and of the Collateral Agent, the Administrative Agent and the Secured Parties under the other Loan Documents are cumulative and are not exclusive of any rights or remedies which they would otherwise have   No waiver of any provisions of this Agreement or any other Loan Document or consent to any departure by the Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given   No notice or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances

16

(b)  Neither this Agreement nor any provision
hereof may be waived, amended or modified except pursuant to
an agreement or agreements in writing entered into by the
Collateral Agent and the Pledgor with respect to which such
waiver, amendment or modification is to apply, subject to
any consent required in accordance with Section 9 02 of the
Credit Agreement

SECTION 5 10  WAIVER OF JURY TRIAL.  EACH PARTY
HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN
RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT
OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE
OTHER LOAN DOCUMENTS   EACH PARTY HERETO (A) CERTIFIES THAT
NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY
WOULD NOT  IN THE EVENT OF LITIGATION  SEEK TO ENFORCE THE
FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS
AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE  BY
AMONG OTHER THINGS  THE MUTUAL WAIVERS AND CERTIFICATIONS IN
THIS SECTION

SECTION 5 11  Severability.  In the event any one
or more of the provisions contained in this Agreement or in
any other Loan Document should be held invalid, illegal or
unenforceable in any respect, the validity, legality and
enforceability of the remaining provisions contained herein
and therein shall not in any way be affected or impaired
thereby   The parties shall endeavor in good-faith
negotiations to replace the invalid  illegal or
unenforceable provisions with valid provisions the economic
effect of which comes as close as possible to that of the
invalid  illegal or unenforceable provisions

SECTION 5 12  Counterparts.  This Agreement may be
executed in two or more counterparts, each of which shall
constitute an original but all of which when taken together
shall constitute but one contract, and shall become
effective as provided in Section 5 04

SECTION 5 13  Headings   Article and Section
headings used herein are for convenience of reference only
are not part of this Agreement and are not to affect the
construction of  or to be taken into consideration in
interpreting, this Agreement

SECTION 5.14  Jurisdiction; Consent to Service of
Process.  (a)  The Pledgor hereby irrevocably and
unconditionally submits, for itself and its property, to the
nonexclusive jurisdiction of any New York State court or

Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law  Nothing in this Agreement shall affect any right that the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Pledgor or its properties in the courts of any jurisdiction

(b)  The Pledgor hereby irrevocably and unconditionally waives  to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court  Each of the parties hereto hereby irrevocably waives  to the fullest extent permitted by law  the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5 01  Nothing in this Agreement will affected the right of any party to this Agreement to serve process in any other manner permitted by law

SECTION 5 15   Termination.  This Agreement and the security interests granted hereby shall terminate when all the Obligations have been indefeasibly paid in full and the Lenders have no further commitment to lend under the Credit Agreement  at which time the Collateral Agent shall reassign and deliver to the Pledgor  at the Pledgor's expense and against receipt  such of the Collateral as shall not have been sold or otherwise applied hereunder and shall remain held by the Collateral Agent hereunder, together with such documents as the Pledgor shall reasonably request to evidence such termination and reassignment  Any such reassignment and any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Collateral Agent  The Pledged Securities of a Released Borrower shall be subject to release or

[NYCORP:2040519 6 43058 05/05/2000  12 33p]

18

assignment as expressly provided in Sections 2 20 and 2 22
of the Credit Agreement

[NYCORP 3060839 6 43058 05/05/2000  12 31p]

19

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written

WINSTAR WIRELESS, INC ,

by _____
   Name
   Title


BANK OF NEW YORK, as
Collateral Agent

by _____
   Name
   Title

[NYCORP 1060613 6:4235B 05/05/2000  22 33p]

REC CLSD

Exhibit 1

SCHEDULE I
to Pledge Agreement

Pledged Securities

Issuer                          Pledged Securities

WVP-I LLC                       1 unit of Membership
                                Interest

EXHIBIT I

SECURITY AGREEMENT dated as of [          ],
between [          ] a [          ]
(the "Grantor"), and BANK OF NEW YORK, as
collateral agent (in such capacity  the
"Collateral Agent") for the Secured Parties,
as defined herein

Reference is made to the Credit Agreement dated as
of May 4  2000 (as amended or modified from time to time
the "Credit Agreement")  among  the Grantor  as borrower
thereunder, any other borrowers thereunder from time to time
party thereto, Winstar Communications, Inc   the lenders
party thereto, the Collateral Agent and Lucent Technologies
Inc , as administrative agent   The Grantor is a Borrower
under the Credit Agreement   The Lenders have agreed to
extend credit to the Grantor and any other Borrowers
pursuant to  and subject to the terms and conditions
specified in  the Credit Agreement   The obligations of the
Lenders to extend credit under the Credit Agreement are
conditioned upon  among other things  the execution and
delivery by the Grantor of a security agreement in the form
hereof to secure (a) the due and punctual payment by each
Borrower of (i) the principal of and interest on the Loans,
when and as due, whether at maturity, by acceleration, upon
one or more dates set for prepayment or otherwise  and
(ii) all other monetary obligations of each Borrower to the
Secured Parties under the Credit Agreement  and (b) the due
and punctual performance of all other obligations of each
Borrower to the Secured Parties under the Credit Agreement
and the other Loan Documents (all the foregoing obligations
being collectively called the "Obligations")

Accordingly, the Grantor and the Collateral Agent
hereby agree as follows

## ARTICLE I

### Definitions

SECTION 1 01   Terms Defined in the Credit
Agreement   Terms used herein and not otherwise defined
herein shall have the meanings set forth in the Credit
Agreement

SECTION 1 02   Definition of Certain Terms Used
Herein   As used herein  the following terms shall have the
following meanings

[NYCORP;1060194 @ 43056 05/05/2000  13 29p]

2

"Collateral" shall mean all (a) Equipment, (b) General Intangibles (but excluding General Intangibles to the extent that an assignment thereof would violate a restriction on assignment contained therein), and (c) Proceeds

"Credit Agreement" shall have the meaning assigned to such term in the preliminary statement of this Agreement

"Equipment" shall mean all equipment furniture and furnishings, and all tangible personal property similar to any of the foregoing including tools parts and supplies of every kind and description, and all improvements accessions or appurtenances thereto, in each case that are now owned or hereafter acquired by the Grantor  The term Equipment shall also include Fixtures

"Fixtures" shall mean all items of Equipment, whether now owned or hereafter acquired  of the Grantor that become so related to particular real estate that an interest in them arises under any real estate law applicable thereto

"General Intangibles" shall mean all choses in action and causes of action and all other assignable intangible personal property of the Grantor of every kind and nature now owned or hereafter acquired by the Grantor, including the Grantor's rights under the Supply Agreement and all intellectual property acquired by or granted to the Grantor pursuant to the Supply Agreement

Obligations" shall have the meaning assigned to such term in the preliminary statement of this Agreement

"Proceeds" shall mean any consideration received from the sale, exchange, license  lease or other disposition of any asset which constitutes Collateral, including any payment received from any insurer or other Person as a result of the destruction, loss  theft  damage or other involuntary conversion of whatever nature of any asset which constitutes Collateral, and shall include any and all other amounts from time to time paid or payable under or in connection with any of the Collateral

"Secured Parties" shall mean (a) the Lenders, (b) the Administrative Agent and the Collateral Agent  in their capacities as such under each Loan Document and (c) the successors and assigns of the foregoing

"Security Interest" shall have the meaning assigned to such term in Section 2 01

INTCORP;1050194 8 43058 05/05/2000  12 39p)

3

SECTION 1 03    Rules of Interpretation    The rules
of interpretation specified in Section 1 03 of the Credit
Agreement shall be applicable to this Agreement.

## ARTICLE II

### Security Interest

SECTION 2 01    Security Interest    As security for
the payment or performance, as the case may be, in full of
the Obligations, the Grantor hereby bargains, sells,
conveys, assigns, sets over, mortgages, pledges,
hypothecates and transfers to the Collateral Agent, its
successors and assigns, for the benefit of the Secured
Parties, and hereby grants to the Collateral Agent, its
successors and assigns, for the benefit of the Secured
Parties, a security interest in, all of the Grantor's right,
title and interest in, to and under the Collateral (the
"Security Interest")    Without limiting the foregoing, the
Collateral Agent is hereby authorized to file one or more
financing statements (including fixture filings, but only to
the extent such fixture filings are required pursuant to
Section 5 14(c) of the Credit Agreement (the "Fixture
Filings")), continuation statements or other documents for
the purpose of perfecting, confirming, continuing, enforcing
or protecting the Security Interest granted by the Grantor
without the signature of the Grantor, and naming the Grantor
as debtor and the Collateral Agent as secured party

SECTION 2.02    No Assumption of Liability    The
Security Interest is granted as security only and shall not
subject the Collateral Agent or any other Secured Party to,
or in any way alter or modify  any obligation or liability
of the Grantor with respect to or arising out of any of the
Collateral

## ARTICLE III

### Representations and Warranties

The Grantor represents and warrants to the
Collateral Agent and the Secured Parties that·

SECTION 3 01    Title and Authority    The Grantor
has good and valid rights in and title to the Collateral and
has full power and authority to grant to the Collateral
Agent the Security Interest in the Collateral pursuant
hereto and to execute, deliver and perform its obligations
in accordance with the terms of this Agreement, without the

[NYCORP1106C194 # 43058 05/05/2000- 12:27P]

4

consent or approval of any other Person other than any
consent or approval which has been obtained

SECTION 3 02   Filings   On or prior to the first
Borrowing by the Grantor under the Credit Agreement, a
Perfection Certificate with respect to the Grantor shall
have been duly prepared, completed and executed and the
information set forth therein shall be correct and complete
On or prior to the first Borrowing by the Grantor under the
Credit Agreement, fully executed Uniform Commercial Code
financing statements (including Fixture Filings, as
applicable) or other appropriate filings  recordings or
registrations containing a description of the Collateral
shall have been filed of record in each governmental,
municipal or other office specified in Schedule 5 to the
Perfection Certificate, which are all the filings,
recordings and registrations that are necessary to publish
notice of and protect the validity of and to establish a
legal  valid and perfected security interest in favor of the
Collateral Agent (for the benefit of the Secured Parties) in
respect of all Collateral in which the Security Interest may
be perfected by filing, recording or registration in the
United States (or any political subdivision thereof) and its
territories and possessions  and no further or subsequent
filing, refiling  recording, rerecording, registration or
reregistration is necessary in any such jurisdiction, except
as provided under applicable law with respect to the filing
of continuation statements, provided that fixture filings
will only be filed if required by Section 5 14(c) of the
Credit Agreement

SECTION 3 03   Validity of Security Interest   The
Security Interest constitutes (a) a legal and valid security
interest in all the Collateral securing the payment and
performance of the Obligations and (b) a perfected security
interest in all Collateral in which a security interest may
be perfected by filing, recording or registering a financing
statement or analogous document in the United States (or any
political subdivision thereof) and its territories and
possessions pursuant to the Uniform Commercial Code or other
applicable law in such jurisdictions, provided that fixture
filings will only be filed if required by Section 5 14(c) of
the Credit Agreement.  The Security Interest is and shall be
prior to any other Lien on any of the Collateral  except for
Liens expressly permitted by the Credit Agreement that are
prior to the Security Interest as a matter of law

SECTION 3 04   Absence of Other Liens   The
Collateral is owned by the Grantor free and clear of any
Lien, except for Liens permitted under Section 6 03(b) of
the Credit Agreement   The Grantor has not filed or

[NYCORP;1060194 8 4305E 05/06/3000  12 19p]

5

consented to the filing of any financing statement or
analogous document under the Uniform Commercial Code or any
other applicable laws covering any Collateral, except in
respect of the Security Interest

## ARTICLE IV

### Covenants

SECTION 4 01   Collateral Schedules   (a) Promptly
following the delivery of each Borrowing Request by the
Grantor under the Credit Agreement, the Grantor will deliver
to the Collateral Agent (i) copies of all invoices paid or
financed, in whole or in part, with the Loans resulting from
such Borrowing Request  together with such other information
as shall be necessary to identify each item of Collateral
financed thereby and (ii) a schedule indicating the
Equipment User or Users that will lease  use or otherwise
possess such Collateral and the location or locations of
such Collateral

(b) From time to time (but not less frequently
than quarterly)  the Grantor will deliver to the Collateral
Agent (i) supplements to and corrections of the schedules
and other information theretofore delivered to the
Collateral Agent sufficient to enable the Collateral Agent
to identify each item of Collateral, the jurisdiction in
which it is located and the Equipment User that is leasing
such Collateral and (ii) copies of all Equipment User
Agreements and leases and subleases under which any
Collateral is leased (to the extent not previously delivered
to the Collateral Agent)

SECTION 4 02   Protection of Security   The
Grantor shall  at its own cost and expense, take any and all
actions necessary to defend title to the Collateral against
all Persons and to defend the Security Interest of the
Collateral Agent in the Collateral and the priority thereof
against any Lien (except for Liens permitted under
Section 6 03(b) of the Credit Agreement)

SECTION 4 03   Further Assurances   The Grantor
agrees, at its own expense, to execute, acknowledge, deliver
and cause to be duly filed all such further instruments and
documents and take all such actions as the Collateral Agent
the Administrative Agent, or any Lucent Lender may from time
to time reasonably request to better assure, preserve,
protect and perfect the Security Interest and the rights and
remedies created hereby, including the payment of any fees
and taxes required in connection with the execution and

6

delivery of this Agreement, the granting of the Security
Interest and the filing of any financing statements
(including Fixture Filings) or other documents in connection
herewith or therewith

SECTION 4 04    Inspection and Verification    The
Collateral Agent and such Persons as the Collateral Agent
may reasonably designate shall have the right  on reasonable
advance notice during normal business hours at the Grantor's
own cost and expense, to inspect the Collateral  all records
related thereto (and to make extracts and copies from such
records) and the premises upon which any of the Collateral
is located  to discuss the Grantor s affairs with the
officers of the Grantor and its independent accountants and
to verify under reasonable procedures the validity, amount,
quality quantity value, condition and status of  or any
other matter relating to, the Collateral, including  in the
case of Collateral in the possession of any third Person, by
contacting the third Person possessing such Collateral for
the purpose of making such a verification    Subject to the
provisions of Section 9 12 of the Credit Agreement   the
Collateral Agent shall have the absolute right to share any
information it gains from such inspection or verification
with any Secured Party and their agents and representatives

SECTION 4 05    Taxes. Encumbrances    At its
option, the Collateral Agent may discharge past due taxes,
assessments, charges, fees, liens, security interests or
other encumbrances at any time levied or placed on the
Collateral and not permitted under the Loan Documents and
may pay for the maintenance and preservation of the
Collateral to the extent the Grantor fails to do so as
required by the Credit Agreement or this Agreement, and the
Grantor agrees to reimburse the Collateral Agent on demand
for any payment made or any expense incurred by the
Collateral Agent pursuant to the foregoing authorization,
provided, however, that nothing in this Section 4 05 shall
be interpreted as excusing the Grantor from the performance
of, or imposing any obligation on the Collateral Agent or
any Secured Party to cure or perform, any covenants or other
promises of the Grantor with respect to taxes, assessments,
charges, fees  liens, security interests or other
encumbrances and maintenance as set forth herein or in the
Credit Agreement

SECTION 4 06    Continuing Obligations of the
Grantor   The Grantor shall remain liable to observe and
perform all the conditions and obligations to be observed
and performed by it under each contract, agreement or
instrument relating to the Collateral, all in accordance
with the terms and conditions thereof, and the Grantor

[NYCORP 1060191 @ 43050 05/25/2000  12 21p]

7

agrees to indemnify and hold harmless the Collateral Agent
and the Secured Parties from and against any and all
liability for such performance

SECTION 4 07   Use and Disposition of Collateral
The Grantor shall not make or permit to be made an
assignment, pledge or hypothecation of the Collateral or
grant any other Lien (except for Liens permitted under
Section 6 03(b) of the Credit Agreement) in respect of the
Collateral   The Grantor shall not make or permit to be made
any transfer of the Collateral and the Grantor shall remain
at all times in possession of the Collateral   except that
unless and until the Collateral Agent shall notify (which
notice may be given by telephone if promptly confirmed in
writing) the Grantor that an Event of Default shall have
occurred and be continuing and that during the continuance
thereof the Grantor shall not sell, convey, lease, assign,
transfer or otherwise dispose of any Collateral, the Grantor
may use and dispose of the Collateral in any lawful manner
not inconsistent with the provisions of this Agreement or
the Credit Agreement

SECTION 4 08   Insurance and Related Matters
(a) The Grantor, at its own expense, shall maintain or cause
to be maintained insurance covering physical loss or damage
to the Collateral in accordance with the provisions of the
Credit Agreement and this Agreement

(b)   The Grantor will, maintain, with financially
sound and reputable insurance companies with AM Best's
rating of A minus (A-) or better, All-Risk property
insurance for the full replacement value of all Collateral
All policies of All-Risk property insurance maintained by or
for the benefit of the Grantor with respect to the
Collateral shall be (i) maintained in an amount not less
than the full replacement value of all property thereof,
with deductibles or self insured retention not exceeding
$100 000, and (ii) endorsed or otherwise amended to include
a "standard" or "New York" lender's loss payable
endorsement, in favor of and satisfactory to the Collateral
Agent, which endorsement shall provide that the insurance
carrier shall pay all proceeds otherwise payable to any Loan
Party under such policies directly to the Collateral Agent
All such policies also shall provide that none of the
Grantor   the Administrative Agent   the Collateral Agent nor
any other party shall be a coinsurer thereunder and shall
contain a "Replacement Cost Endorsement", without any
deduction for depreciation, "mortgagee's interest"/"breach
of warranty coverage" and such other provisions as the
Administrative Agent or the Collateral Agent may reasonably
require from time to time to protect the interests of the

8

Lenders   Each such policy also shall provide that it shall not be canceled (i) by reason of nonpayment of premium except upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent   The Grantor shall deliver to the Administrative Agent and the Collateral Agent   upon not less than 30 days' prior written notice to the cancelation   modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent and the Collateral Agent) together with evidence satisfactory to the Administrative Agent and the Collateral Agent of payment of the premium therefor   The Grantor shall notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section is taken out by any Loan Party, and shall promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies

(c) The Grantor irrevocably makes  constitutes and appoints the Collateral Agent (and all officers  employees or agents designated by the Collateral Agent) as the Grantor's true and lawful agent (and attorney-in-fact) for the purpose  during the continuance of an Event of Default, of making  settling and adjusting claims in respect of Collateral under policies of insurance, endorsing the name of the Grantor on any check, draft  instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto   In the event that the Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or part relating thereto, the Collateral Agent may - without waiving or releasing any obligation or liability of the Grantor hereunder or any Event of Default, in its sole discretion  obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Collateral Agent deems advisable   All sums disbursed by the Collateral Agent in connection with this Section 4 08, including reasonable attorneys' fees  court costs  expenses and other charges relating thereto, shall be payable  upon demand, by the Grantor to the Collateral Agent

(NYCORP)_661194 8 4365B 05/05/2000  12 27p]

9

(d)  In the event of any casualty or other damage to, or any taking under power of eminent domain or by condemnation or similar proceedings of  any property or asset constituting Collateral, then any and all Net Proceeds from such event shall be deposited with the Collateral Agent to the extent required by Section 5 15 of the Credit Agreement   Subject to the provisions of the Credit Agreement requiring that such Net Proceeds be applied to prepay Loans in the event of a Collateral Trigger Event  the Collateral Agent will hold such Net Proceeds and, provided that the Grantor elects to repair, restore or replace the affected property or asset in accordance with the definition of the term "Collateral Trigger Event" set forth in the Credit Agreement, the Collateral Agent will release such Net Proceeds from time to time to pay the costs of such repair, restoration or  replacement, provided that (1) such repair restoration or replacement shall comply with the requirements set forth in such definition of "Collateral Trigger Event" and (11) as a condition of any release of funds  the Collateral Agent may require delivery of evidence reasonably satisfactory to it of compliance with such requirements   The Collateral Agent shall invest any portion of the funds held by it from time to time pursuant to this paragraph as directed in writing from time to time by the Grantor   Any such investment shall be made only in Temporary Cash Investments  shall be at the Grantor's risk and the earnings thereon shall be credited to the funds then held by the Collateral Agent hereunder for the Grantor's account   The Collateral Agent shall not be liable for any interest on uninvested funds   If any Event of Default occurs and is continuing  the Collateral Agent may, in its discretion, apply any funds then held by it hereunder as provided in Section 6 02

ARTICLE V

Power of Attorney

SECTION 5 01   Power of Attorney   The Collateral Agent shall have the right, as the true and lawful agent and attorney-in-fact of the Grantor, with power of substitution for the Grantor and in the Grantor's name or otherwise  for the use and benefit of the Collateral Agent and the Secured Parties  upon the occurrence and during the continuance of an Event of Default (a) to receive  endorse, assign and/or deliver any and all notes, acceptances, checks, drafts money orders or other evidences of payment relating to the Collateral or any part thereof, (b) to demand, collect, receive payment of  give receipt for and give discharges and releases of all or any of the Collateral, (c) to commence

and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral, (d) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, and (e) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes, provided, however, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent or any Secured Party to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent or any Secured Party, or to present or file any claim or notice or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby  and no action taken or omitted to be taken by the Collateral Agent or any Secured Party with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of the Grantor or to any claim or action against the Collateral Agent or any Secured Party  It is understood and agreed that the appointment of the Collateral Agent as the agent and attorney-in-fact of the Grantor for the purposes set forth above is coupled with an interest and is irrevocable  The provisions of this Section shall in no event relieve the Grantor of any of its obligations hereunder or under the Credit Agreement with respect to the Collateral or any part thereof or impose any obligation on the Collateral Agent or any Secured Party to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by the Collateral Agent or any Secured Party of any other or further right which it may have on the date of this Agreement or hereafter, whether hereunder, under any other Loan Document  by law or otherwise

ARTICLE VI

Remedies

SECTION 6 01    Remedies upon Default    Upon the occurrence and during the continuance of an Event of Default, the Grantor agrees to deliver each item of Collateral to the Collateral Agent on demand, and it is agreed that the Collateral Agent shall have the right with or without legal process and with or without previous notice

11

or demand for performance, to take possession of the Collateral or any part thereof (at the same or different times) and without liability for trespass to enter any premises where the Collateral or any part thereof may be located for the purpose of taking possession of or removing the Collateral and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law  Without limiting the generality of the foregoing, the Grantor agrees that the Collateral Agent shall have the right  subject to the mandatory requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral  at public or private sale for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate  Upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold  Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of the Grantor, and the Grantor hereby waives (to the extent permitted by law) all rights of redemption  stay and appraisal which the Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted

The Collateral Agent shall give the Grantor 10 days  written notice (which the Grantor agrees is reasonable notice within the meaning of Section 9-504(3) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral  Such notice, in the case of a public sale, shall state the time and place for such sale  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such public sale  At any such sale, the Collateral  or portion thereof  to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given  The Collateral Agent may  without notice or publication  adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent

[NYCORP]1069134 8 4305B 06/05/2000  12 39p]

12

until the sale price is paid by the purchaser or purchasers
thereof, but the Collateral Agent shall not incur any
liability in case any such purchaser or purchasers shall
fail to take up and pay for the Collateral so sold and in
case of any such failure, such Collateral may be sold again
upon like notice   At any public (or, to the extent
permitted by law, private) sale made pursuant to this
Section, any Secured Party may bid for or purchase, free (to
the extent permitted by law) from any right of redemption,
stay  valuation or appraisal on the part of the Grantor
(all said rights being also hereby waived and released to
the extent permitted by law)  the Collateral or any part
thereof offered for sale and may make payment on account
thereof by using any Obligation then due and payable to such
Secured Party from the Grantor as a credit against the
purchase price and such Secured Party may  upon compliance
with the terms of sale, hold, retain and dispose of such
property without further accountability to the Grantor
therefor   For purposes hereof, a written agreement to
purchase the Collateral or any portion thereof shall be
treated as a sale thereof   the Collateral Agent shall be
free to carry out such sale pursuant to such agreement and
the Grantor shall not be entitled to the return of the
Collateral or any portion thereof subject thereto,
notwithstanding the fact that after the Collateral Agent
shall have entered into such an agreement all Events of
Default shall have been remedied and the Obligations paid in
full   As an alternative to exercising the power of sale
herein conferred upon it  the Collateral Agent may proceed
by a suit or suits at law or in equity to foreclose this
Agreement and to sell the Collateral or any portion thereof
pursuant to a judgment or decree of a court or courts having
competent jurisdiction or pursuant to a proceeding by a
court-appointed receiver

        SECTION 6 02   Application of Proceeds   The
Collateral Agent shall apply the proceeds of any collection
or sale of the Collateral, as well as any Collateral
consisting of cash, as follows

        FIRST, to the payment of all costs and expenses
incurred by the Administrative Agent or the Collateral
Agent (in its capacity as such hereunder or under any
other Loan Document) in connection with such collection
or sale or otherwise in connection with this Agreement
or any of the Obligations, including all court costs
and the fees and expenses of its agents and legal
counsel, the repayment of all advances made by the
Collateral Agent or the Administrative Agent hereunder
or under any other Loan Document on behalf of the
Grantor and any other costs or expenses incurred in

13

connection with the exercise of any right or remedy hereunder or under any other Loan Document,

SECOND, to the payment in full of the Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution) and

THIRD to the Grantor, its successors or assigns, or as a court of competent jurisdiction may otherwise direct

Subject to the instructions of the Required Lenders the Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement Upon any sale of the Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof

## ARTICLE VII

### Miscellaneous

SECTION 7 01    Notices    All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9 01 of the Credit Agreement

SECTION 7.02    Security Interest Absolute    All rights of the Collateral Agent hereunder, the Security Interest and all obligations of the Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement any other Loan Document any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument, (c) any exchange release or non-perfection of any Lien on other collateral, or any release or amendment

14

or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations, or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of the Grantor in respect of the Obligations or this Agreement

SECTION 7 03    Survival of Agreement    All covenants agreements representations and warranties made by the Grantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Secured Parties and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Secured Parties or on their behalf and shall continue in full force and effect until this Agreement shall terminate

SECTION 7 04    Binding Effect    This Agreement shall become effective when a counterpart hereof executed on behalf of the Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the Grantor and the Collateral Agent and their respective successors and assigns, and shall inure to the benefit of the Grantor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that the Grantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Credit Agreement

SECTION 7 05    Successors and Assigns    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns

SECTION 7 06    Collateral Agent Appointed Attorney-in-Fact    The Grantor hereby appoints the Collateral Agent the attorney-in-fa t of the Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof which appointment is irrevocable and coupled with an interest

15

SECTION 7 07   Collateral Agent's Fees and
Expenses. Indemnification   (a)   The Grantor agrees to pay
upon demand to the Collateral Agent the amount of any and
all reasonable expenses, including the reasonable fees and
expenses of its counsel and of any experts or agents, which
the Collateral Agent may incur in connection with (i) the
administration of this Agreement  (ii) the custody or
preservation of  or the sale of  collection from or other
realization upon any of the Collateral, (iii) the exercise
enforcement or protection of any of the rights of the
Collateral Agent hereunder or (iv) the failure of the
Grantor to perform or observe any of the provisions hereof

          (b)  Without limitation of its indemnification
obligations under the other Loan Documents, the Grantor
agrees to indemnify the Collateral Agent and the other
Indemnitees against  and hold each of them harmless from
any and all losses, claims, damages, liabilities and related
expenses, including reasonable counsel fees and expenses
incurred by or asserted against any of them arising out of
in any way connected with  or as a result of, the execution
delivery or performance of this Agreement or any claim,
litigation, investigation or proceeding relating hereto or
to the Collateral, whether or not any Indemnitee is a party
thereto; provided that such indemnity shall not, as to any
Indemnitee, be available to the extent that such losses,
claims, damages  liabilities or related expenses are
determined by a court of competent jurisdiction by final and
nonappealable judgment to have resulted from the gross
negligence or willful misconduct of such Indemnitee

          (c)  The provisions of this Section 7 07 shall
remain operative and in full force and effect regardless of
the termination of this Agreement or any other Loan
Document, the consummation of the transactions contemplated
hereby, the repayment of any of the Loans, the invalidity or
unenforceability of any term or provision of this Agreement
or any other Loan Document, or any investigation made by or
on behalf of the Collateral Agent or any Secured Party   All
amounts due under this Section 7 07 shall be payable on
written demand therefor

          (d)  Notwithstanding the foregoing  the
obligations of the Grantor hereunder with respect to payment
of fees, charges and disbursements of counsel will be
limited to (i) Cravath, Swaine & Moore, special counsel to
Lucent and the Administrative Agent (or such other single
firm acting in such capacity from time to time),
(ii) Sullivan & Cromwell, special counsel to the Collateral
Agent (or such other single firm acting in such capacity
from time to time), (iii) one other firm of counsel to the

16

Collateral Agent, the Administrative Agent and the Lenders
in each jurisdiction and (iv) if necessary, special counsel
to the Collateral Agent the Administrative Agent and the
Lenders in such areas as telecommunications regulations

SECTION 7 08    GOVERNING LAW    THIS AGREEMENT
SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE
LAWS OF THE STATE OF NEW YORK

SECTION 7 09    Waivers, Amendment    (a)    No
failure or delay of the Collateral Agent in exercising any
power or right hereunder shall operate as a waiver thereof
nor shall any single or partial exercise of any such right
or power, or any abandonment or discontinuance of steps to
enforce such a right or power  preclude any other or further
exercise thereof or the exercise of any other right or
power  The rights and remedies of the Collateral Agent
hereunder and of the Collateral Agent  the Administrative
Agent and the Secured Parties under the other Loan Documents
are cumulative and are not exclusive of any rights or
remedies that they would otherwise have  No waiver of any
provisions of this Agreement or any other Loan Document or
consent to any departure by the Grantor therefrom shall in
any event be effective unless the same shall be permitted by
paragraph (b) below  and then such waiver or consent shall
be effective only in the specific instance and for the
purpose for which given  No notice to or demand on the
Grantor in any case shall entitle the Grantor to any other
or further notice or demand in similar or other
circumstances

(b)    Neither this Agreement nor any provision
hereof may be waived, amended or modified except in
accordance with Section 9 02 of the Credit Agreement

SECTION 7 10    WAIVER OF JURY TRIAL    EACH PARTY
HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW  ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN
RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT
OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE
OTHER LOAN DOCUMENTS   EACH PARTY HERETO (A) CERTIFIES THAT
NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY
WOULD NOT  IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE
FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS
AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY,
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN
THIS SECTION 7 10

[NYCORP 1688194 8;4385D 05/05/2000  12 23p]

17

SECTION 7 11    Severability   In the event any one
or more of the provisions contained in this Agreement should
be held invalid  illegal or unenforceable in any respect,
the validity, legality and enforceability of the remaining
provisions contained herein shall not in any way be affected
or impaired thereby   The parties shall endeavor in
good-faith negotiations to replace the invalid  illegal or
unenforceable provisions with valid provisions the economic
effect of which comes as close as possible to that of the
invalid  illegal or unenforceable provisions

SECTION 7 12   Counterparts   This Agreement may be
executed in two or more counterparts, each of which shall
constitute an original but all of which when taken together
shall constitute but one contract  and shall become
effective as provided in Section 7 04

SECTION 7 13   Headings   Article and Section
headings used herein are for convenience of reference only
are not part of this Agreement and are not to affect the
construction of  or to be taken into consideration in
interpreting, this Agreement

SECTION 7 14   Jurisdiction, Consent to Service of
Process   (a)   The Grantor hereby irrevocably and
unconditionally submits, for itself and its property, to the
nonexclusive jurisdiction of any New York State court or
Federal court of the United States of America sitting in New
York City, and any appellate court from any thereof, in any
action or proceeding arising out of or relating to this
Agreement or the other Loan Documents, or for recognition or
enforcement of any judgment, and each of the parties hereto
hereby irrevocably and unconditionally agrees that all
claims in respect of any such action or proceeding may be
heard and determined in such New York State or, to the
extent permitted by law  in such Federal court   Each of the
parties hereto agrees that a final judgment in any such
action or proceeding shall be conclusive and may be enforced
in other jurisdictions by suit on the judgment or in any
other manner provided by law   Nothing in this Agreement
shall affect any right that the Collateral Agent or any
Secured Party may otherwise have to bring any action or
proceeding relating to this Agreement or the other Loan
Documents against the Grantor or its properties in the
courts of any jurisdiction

(b)   The Grantor hereby irrevocably and
unconditionally waives, to the fullest extent it may legally
and effectively do so, any objection which it may now or
hereafter have to the laying of venue of any suit, action or
proceeding arising out of or relating to this Agreement or

18

the other Loan Documents in any New York State court or
Federal court sitting in New York City   Each of the parties
hereto hereby irrevocably waives, to the fullest extent
permitted by law  the defense of an inconvenient forum to
the maintenance of such action or proceeding in any such
court

        (c)   Each party to this Agreement irrevocably
consents to service of process in the manner provided for
notices in Section 7 01   Nothing in this Agreement will
affect the right of any party to this Agreement to serve
process in any other manner permitted by law

        SECTION 7 15   <u>Termination</u>   This Agreement and
the Security Interest shall terminate when all the
Obligations have been indefeasibly paid in full and the
Lenders have no further commitment to lend under the Credit
Agreement  at which time the Collateral Agent shall execute
and deliver to the Grantor  at the Grantor s expense  all
Uniform Commercial Code termination statements and similar
documents which the Grantor shall reasonably request to
evidence such termination and release of the Security
Interest   Any execution and delivery of termination
statements or documents pursuant to this Section 7 15 shall
be without recourse to or warranty by the Collateral Agent
If pursuant to Section 2 20 of the Credit Agreement, the
Grantor ceases to be a "<u>Borrower</u>" under the Credit
Agreement, the Grantor shall automatically be released from
its obligations hereunder and the Security Interest in the
Collateral of the Grantor shall be automatically released,
<u>provided</u> that, if required by the Bank Credit Agreement  the
Liens granted under this Agreement that secured the
Obligations prior to the effectiveness of such release shall
not terminate, but shall be assigned by the Collateral
Agent   This Agreement and the Security Interest shall also
be subject to termination or assignment as expressly
provided in Sections 2 20 and 2 22 of the Credit Agreement

19

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written

[NAME OF GRANTOR]

by    _____
      Name
      Title


BANK OF NEW YORK, as
Collateral Agent

by    _____
      Name
      Title

[NYCORP 1060394 B 4305D 05/05/2000  12 29p]

Exhibit J

EXHIBIT J

Form of Officer s Compliance Certificate

Compliance Certificate

[For the Fiscal Quarter ending _____ ]

[For the Fiscal Year ending _____ ]

     Reference is made to the Credit Agreement  dated as of May 4  2000 (as amended, amended and restated, supplemented or otherwise modified from time to time  the "Credit Agreement"), among Winstar Communications, Inc , a Delaware corporation (the "Parent") WVP-I LLC  Delaware limited liability company, any additional borrowers from time to time parties thereto  each of the Lenders from time to time parties thereto  Lucent Technologies Inc   as administrative agent for the Lenders and The Bank of New York  as collateral agent for the Lenders   All capitalized terms not otherwise defined herein shall have the respective meanings given to them in the Credit Agreement   Pursuant to Section 5 01(e) of the Credit Agreement  the undersigned authorized officer of the Bank Borrower hereby certifies on behalf of the Bank Borrower that

     (a)  As of the date of the financial statements included in each report on Form [10-K] [10-Q] attached hereto and delivered concurrently to the Administrative Agent pursuant to Section 5 01 of the Credit Agreement, no event occurred or circumstance existed which constituted a Default or Event of Default except as follows  [detail any facts with respect thereto]

     The financial statements referred to in Section 5 01 of the Credit Agreement which are delivered concurrently with the delivery of this Compliance Certificate fairly present the financial position, results of operations, cash flows and changes in stockholders' equity of the Parent and its consolidated subsidiaries, subject to normal year-end audit adjustments which are not expected to be material in amount [1]

     (b)  The covenant calculations set forth below for the Consolidated Group Members are based on the Parent s [audited] consolidated balance sheet and statements of

_____

   [1]  Insert only in Compliance Certificates accompanying annual financial statements delivered pursuant to Section 5 01 of the Credit Agreement

[WTCorp 16f7024 1 4441A 05/12/2000  11 09p]

2

earnings, cash flows and stockholders' equity for the fiscal
[quarter] [year] ended _____, 20__ (the "Period-
End Date") contained in the report on Form [10-K] [10-Q]
attached hereto

[PHASE 1 FINANCIAL COVENANTS]

1    Maximum EBITDA Losses/Minimum EBITDA
     (Section 6 07(a))

     [during fiscal quarter]                              _____

2    Minimum Revenues (Section 6 07(b))

     [fiscal quarter [calculated as of the
     last day of any fiscal quarter end and
     based on the results of the quarter then
     ended)]                                              _____

[3   Maximum Cash Capital Expenditures
     (Section 6 07(c))[1]

     [during fiscal year]                                 _____]

4    Maximum Consolidated Senior Secured Debt
     to Consolidated Total Capitalization
     (Section 6 07(d))

     [at any time  for the purpose of
     calculating Consolidated Total
     Capitalization  paid-in capital shall be
     given effect as of the date paid in]                 _____

5    Maximum Consolidated Total Debt to
     Consolidated Total Capitalization
     (Section 6 07(e))

     [at any time, for the purpose of
     calculating Consolidated Total
     Capitalization, paid-in capital shall be
     given effect as of the date paid in]                 _____

6    Maximum Consolidated Senior Secured Debt
     to Adjusted Gross PP&E (Section
     6 07(f))

_____

   [1] Insert only in Compliance Certificates accompanying
annual financial statements delivered pursuant to
Section 5 01 of the Credit Agreement

[NYCorp 1047824 2 4641A 05/12/2000  12 08p]

3

[at any time]                                                _____

7    On-Network Hubs (Section 6 07(g))

     [number for any fiscal quarter (as
     calculated on the last day of any fiscal
     quarter)]                                               _____

8    On-Network Buildings (Section 6 07(h))

     [number for any fiscal quarter
     (calculated as of the last day of any
     fiscal quarter end)]                                    _____

[PHASE 2 FINANCIAL COVENANTS]

1    Consolidated Total Debt to
     Consolidated Annualized EBITDA
     (Section 6 08(a))

     [for any fiscal quarter for the
     fiscal quarter ending on such date]                     _____

2    EBITDA to Consolidated Interest
     Expense (Section 6 08(b))

     [for the last four consecutive fiscal
     quarters immediately preceding any
     date of determination]                                  _____

3    Maximum Cash Capital Expenditures
     (Section 6 08(c))

     [annual amount]                                         _____

[ADDITIONAL FINANCIAL COVENANTS]

1    Consolidated Senior Debt to
     Consolidated Annualized EBITDA
     (Section 6 09)

     [for any day during the fiscal
     quarter ending on such date]                            _____

2    EBITDA to Consolidated Debt Service
     (Section 6 10)

     [for the four consecutive fiscal
     quarters ending on such date]                           _____

4

IN WITNESS WHEREOF  on behalf of the Bank
Borrower  the undersigned has hereto set his or her hand

Dated  _____, ____

WCI CAPITAL CORP

by  _____
Name  [an authorized
      officer]
Title

INYCorp 1067034 1 4643A 05/12/3000- 13 00p}

## CERTIFICATE OF SERVICE

I, Jason M. Madron hereby certify that on May 1, 2006 I caused copies of the foregoing **Lucent Technologies Inc.'s Appendix - Volume II** to be served upon the following parties in the manner indicated:

**Via Hand Delivery:**

Sheldon K. Rennie
Michael G. Menkowitz
Fox, Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, DE   19801-3046

**Via First Class Mail:**

Stephen M. Rathkopf
David R. King
Herrick Feinstein LLP
2 Park Avenue
New York, NY  10016-9301

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 8th Avenue
New York, NY  10019

Philip D. Anker
James H. Millar
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York  10022

Craig T. Goldblatt
Danielle Spinelli
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M. Street N.W.
Washington, D.C. 20037

Jason M. Madron (DE Bar No. 4431)