UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Civil Action No. 06-147(JJF) |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7 |
| Debtors. | Bankr. Case No. 01-1430 (KJC) |
| LUCENT TECHNOLOGIES INC., | Adv. Pro. No. 01-1063 (KJC) |
| Defendant-Appellant, | |
| v. | |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE, | |
| Plaintiff-Appellee. | |

**TRUSTEE CHRISTINE C. SHUBERT'S BRIEF IN OPPOSITION TO
THE APPEAL OF LUCENT TECHNOLOGIES INC.**

On the Brief:

    Stephen M. Rathkopf, Esq.
    David R. King, Esq.
    Andrew C. Gold, Esq.

Of Counsel:

    Sheldon K. Rennie, Esq.
    (DE Bar No. 3772)

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016-9301
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street
Suite 1300
Wilmington, Delaware 19899-2323
Telephone:    (302) 654-7444

*Attorneys for Appellee Christine C.
Shubert, Chapter 7 Trustee*

**TABLE OF CONTENTS**

Page No.

TABLE OF AUTHORITIES ......................................................................................... iii

TABLE OF ABBREVIATIONS .................................................................................... vii

SUMMARY OF ARGUMENT ........................................................................................ 1

    COUNT TEN - RECOVERY OF THE PREFERENTIAL PAYMENT ................ 1

    COUNT ELEVEN - EQUITABLE SUBORDINATION ........................................ 4

    COUNT SEVEN - BREACH OF THE WIRELESS SUBCONTRACT ................. 5

STATEMENT OF FACTS RELATING TO PREFERENCE AND EQUITABLE
SUBORDINATION COUNTS ........................................................................................ 5

    I.     BACKGROUND ............................................................................................ 6

    II.    LUCENT'S NON-ARMS LENGTH DEALINGS AND CONTROL ............. 7

         1.    The End Of Quarter Deals ............................................................. 7

         2.    Lucent's Subcontract Threats ...................................................... 17

         3.    Lucent's Insistence on the Preferential Payment ..................... 18

         4.    The December 2000 Subcontract Payment ................................ 20

         5.    The Refinancing Notice ................................................................ 22

         6.    Nothing Changed By December 7, 2000 .................................... 23

ARGUMENT ................................................................................................................ 26

    I.     APPLICABLE STANDARDS OF REVIEW ............................................. 26

    II.    THE TRIAL COURT'S FINDING OF A $188,180,000
PREFERENTIAL PAYMENT SHOULD BE AFFIRMED IN ALL
RESPECTS ................................................................................................ 28

         A.    Lucent Was An Insider Of Winstar On December 7, 2000 ............... 28

            1.    The Trial Court Properly Found That Lucent Was A
"Person In Control" of Winstar ............................................. 29

            2.    The Trial Court Properly Found That Winstar And
Lucent Did Not Deal At Arm's Length ................................. 33

         B.    The December 7, 2000 Transfer Was Not Earmarked For
Lucent ...................................................................................................... 35

            1.    The Trial Court Correctly Found That Siemens Did
Not Require Winstar To Repay Lucent ................................. 35

            2.    The Trial Court's Finding That The Transaction
Diminished The Winstar Estate Was Not Clearly
Erroneous ................................................................................. 37

            3.    Lucent Stipulated That The Proceeds Of The
Siemens' Loan Was A Transfer Of An Interest Of
Property Of The Debtor .......................................................... 38

HF 3308684v.1 #06723/0002 06/14/2006

4.    Lucent Waived The Earmarking Defense By Failing To Raise It In Its Answer Or In The Joint Pre-Trial Memorandum..........................................................................38

III.    THE TRIAL COURT PROPERLY REJECTED LUCENT'S SECTION 547(C)(4) NEW VALUE DEFENSE ..............................................39

A.    Lucent Failed To Prove It Provided $28.4 Million In New Value For Goods And Related Services ...............................................40

B.    Lucent Failed To Prove That it Provided $62.3 Million Of Unsecured New Value For The Subcontract Payment .......................43

C.    Lucent Failed To Meet its Burden To Show That It Was Undercollateralized.   ..............................................................................46

IV.    THE TRIAL COURT'S DECISION TO EQUITABLY SUBORDINATE LUCENT'S CLAIMS SHOULD BE AFFIRMED ...........47

A.    The Trial Court Applied The Correct Standard .................................48

B.    The Trial Court Adequately "Quantified" The Harm ........................49

C.    Subordination Of Lucent's Claim To Equity Is Allowed ..................50

V.    THE TRIAL COURT CORRECTLY FOUND THAT LUCENT BREACHED THE SUBCONTRACT  ...........................................................50

A.    Background Facts ...............................................................................50

B.    The Trial Court Correctly Found That The Subcontract Was Modified ............................................................................................52

C.    Lucent's New "Waiver" Argument Is Not Supported By The Evidence ............................................................................................55

1.    Lucent is Barred from Asserting Waiver................................57

D.    Lucent's Failure To Pay For The Services In March 2001 Was A Breach Of The Subcontract ....................................................57

E.    The Trial Court Properly Entered Judgment On The Subcontract Claim, As Opposed To Submitting Proposed Findings Of Fact And Conclusions Of Law .......................................58

CONCLUSION....................................................................................................................59

ii

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

ABC Elec. Serv., Inc. v. Rondout Elec. Inc. (In re ABC Electric Serv., Inc.),
190 B.R. 672 (Bankr. M.D. Fla. 1995) ........................................................ 30, 33

AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distribution, Inc.),
315 B.R. 24 (Bankr. D. Del. 2005) ........................................................ 35, 36, 39

American Bag & Metal Co. v. Alcan Aluminum Corp., 497 N.Y.S.2d 787
(N.Y. App. Div. 1985) ...................................................................................... 54

Ansel Prop. v. Nutri/System of Florida Assoc. (In re Nutri/System of Florida Assoc.,
Inc.), 178 B.R. 645 (E.D. Pa. 1995) .................................................................. 26

ATACS Corp. v. Trans World Comm., Inc., 155 F.3d 659 (3d Cir. 1998), aff'd,
275 F.3d 33 (3d Cir. 2001) ................................................................................. 28

Badger Freightways, Inc. v. Cont. Nat'l Bank and Trust Co. of Chicago (In re
Badger Freightways), 106 B.R. 971 (Bankr. N.D. Ill. 1989) ........................ 30, 32

Bank of New York v. Epic Resorts (In re Epic Capital Corp.), 307 B.R. 767
(D. Del. 2004) ............................................................................................... 27, 47

Brown v. Philip Morris Inc., 250 F.3d 789 (3d Cir. 2001) ................................... 41

Butler v. Shaw, 72 F.3d 437 (4th Cir. 1996) ......................................................... 33

Capital Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus
Avenue Realty Trust), 968 F.2d 1332 (1st Cir. 1992) ............................ 47, 48, 49

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
323 F.3d 228 (3d Cir. 2003) .............................................................................. 27

Committee of Unsecured Creditors v. Motorola (In re: Iridium Operation LLC),
285 B.R. 822 (S.D.N.Y. 2002), aff'd, 165 Fed. Appx. 878 (2d Cir. 2005) ........ 59

Connecticut Nat. Bank v. Germain, 503 U.S. 249, 112 S. Ct. 1146, 117 L.
Ed.2d 391 (1992) .............................................................................................. 44

CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131
(Bankr. S.D.N.Y. 1992) ................................................................................. 28, 34

Creditors Comm. v. Spada (In re Spada), 903 F.2d at 975 .............................. 27, 43

Dardovitch v. Haltzman, 190 F.3d 125 (3d Cir. 1999) ......................................... 26

De Rosa v. Buildex, Inc. (In re F&S Cent. Mfg. Corp.), 53 B.R. 842
(Bankr. E.D.N.Y. 1985) ..................................................................................... 30

EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp.2d 412 (S.D.N.Y. 2004) ...... 54

Evergreen Marine Corp. v. Welgrow Int'l, 942 F. Supp. 201 (S.D.N.Y. 1996) .......... 54

Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458
(5th Cir. 1991) ................................................................................................... 26

Fabricators, Inc. v. Technical Fabricators, Inc., 126 B.R. 239 (S.D. Miss. 1989),
aff'd, 926 F.2d 1458 (5th Cir. 1991) ................................................................. 47

iii

Grossman v. Charmoy (In re Craig Systems Corp.), 244 B.R. 529 (Bankr. D. Mass. 2000)....................................................................................................34

Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 7, 120 S. Ct. 1942, 147 L. Ed.2d 1 (2000) ...........................................................................44

Hohmann and Barnard, Inc. v. Sciaky Bros., Inc., 333 F.2d 5 (2d Cir. 1964)...........................53

Hormel v. Helvering, 312 U.S. 552, 85 L.Ed. 1037, 61 S. Ct. 719 (1941) ...............................42

Hutchins v. Commonwealth Mortgage Corp., 165 B.R. 401 (E.D. Pa. 1994) ............................42

Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.), 320 B.R. 242 (Bankr. D. Conn. 2005) ...........................................45

In re Allegheny Int'l, Inc., 118 B.R. 282 (W.D. Pa. 1990) .............................................33, 35

In re Aluminum Mills Corp., 132 B.R. 869 (Bankr. N.D. Ill. 1991)...........................................29

In re General Datacomm Indus., Inc., 407 F.3d 616, n.13 (3d Cir. 2005) .................................41

In re Holloway, 955 F.2d 1008 (5th Cir. 1992) .......................................................................28

In re Hygrade Envelope Corp., 393 F.2d 60 (2d Cir. 1968) ................................................45, 46

In re Locke Mill Partners, 178 B.R. 697 (Bankr. M.D. N.C. 1995)...........................................33

In re Marrama, 331 B.R. 10 (D. Mass. 2005), aff'd, 445 F.3d 518 (1st Cir 2006) .....................27

In re Micro Innovations Corp., 185 F.3d 329 (5th Cir. 1999)....................................................46

In re Mid-America Waste Syst., Inc., 284 B.R. 53 (Bank. D. Del. 2002)....................................50

In re Mobile Steel Co., 563 F.2d 692 (5th Cir. 1977) ..............................................................47

In re N&D Prop., Inc., 799 F.2d 726 (11th Cir. 1986)...............................................................47

In re New York City Shoes, 880 F.2d 679 (3d Cir. 1989) ........................................................42

In re Northwestern Corp., 319 B.R. 68 (D. Del. 2005) ............................................................27

In re Papio Keno Club, Inc., 262 F.3d 725 (8th Cir. 2001).......................................................26

In re Superior Stamp and Coin Co., Inc., 223 F.3d 1004 (9th Cir. 2000) ...................................36

In re Three Flint Hill Ltd. P'ship, 213 B.R. 292 (D. Md. 1997) ......................................27, 33, 34

Intercontinental Polymers, Inc. v. Equitable Chem., LP (In re Intercontinental Polymers), 2005 Bankr. Lexis 997 (Bankr. M.D. Tenn 2005)...............................................46

Jacoury v. Anderson (In re Ozark Rest. Equip. Co.), 850 F.2d 342 (8th Cir. 1988)....................42

Koch v. Rogers (In re Broumas), 135 F.3d 769, 1998 U.S. App. LEXIS 3070 (4th Cir. 1998).......................................................................................................33, 34

Koch v. Rogers (In re Broumas), 203 B.R. 385 (D. Md. 1996), aff'd in relevant part, 135 F.3d 769 (4th Cir. 1998) ..............................................................................32, 33, 35

Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir. 1993) ........................................................................1

Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery Ltd. P'ship), 178 B.R. 426 (Bankr. W.D. Tex. 1995), rev'd on other grounds, 171 F.3d 249 (5th Cir. 1999)...........................................................................................................45, 46

Lynn v. Cont. Bank, N.A. (In re Murchison), 154 B.R. 909 (Bankr. N.D. Tex. 1993) ...........30, 32

iv

Marine Transp. Lines, Inc. v. Int. Org. of Masters, Mates & Pilots, 878 F.2d 41
(2d Cir. 1989).................................................................................................53

Matter of Lifschultz Fast Freight, 132 F.3d 339 (7th Cir. 1997) .................................50

McCuskey v. Nat'l. Bank of Waterloo, (In re Bohlen Enters. Ltd), 859 F.2d 561
(8th Cir. 1988)...............................................................................................35

Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.), 321 B.R. 388
(Bankr. D. Del. 2005) .....................................................................................42

New Line Cinema Corp. v. Atlantic Releasing Corp., 1985 WL 1622
(S.D.N.Y. June 12, 1985)...............................................................................53

New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101
(2d Cir. 2006)................................................................................................28

New York City Shoes, Inc. v. Best Shoe Corp., 106 B.R. 58 (E.D. Pa. 1989),
aff'd, 106 B.R. 58 (E.D. Pa. 1989) .............................................................27, 36

Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)................59

Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide
Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003) ........................................29, 32

Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina S.P.A.
(In re R.M.L., Inc.), 195 B.R. 602 (Bankr. M.D. Pa. 1996), aff'd, 127 F3d
1096 (3d Cir. 1997).......................................................................................43

OHC Liquidation Trust v. Credit Suisse First Boston LLC (In re Oakwood Homes
Corp.), 340 B.R. 510 (Bankr. D. Del. 2006)................................................33, 35

Olympia & York Battery Park Co. v. Ins. Co. of No. America Philadelphia, 1989
WL 63052 (S.D.N.Y. June 2, 1989) .................................................................54

Pau v. Bellavia, 536 N.Y.S.2d 472 (N.Y. App. Div. 1988) .........................................54

Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf
Trailer Corp. Plan No. 003 (In re Fruehauf Trailer Corp.), 444 F.3d 203
(3d Cir. 2006)................................................................................................26

PG 1044 Madison Ave. Assoc., LLC v. Sirene One, LLC, 369 F. Supp.2d 512
(S.D.N.Y. 2005).............................................................................................54

Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466 (3rd Cir. 1988) ...............39

Puma Indus. Consulting, Inc., v. Daal Assoc., Inc., 1986 WL 10281
(S.D.N.Y. Sept. 9, 1986), aff'd, 808 F2d 982 (2d Cir. 1987) .............................53

Reigle v. S.S. Mahajan (In re Kumar Bavishi & Assoc.), 906 F.2d 942
(3d Cir. 1990)............................................................................................27, 35

Rhythm & Hues, Inc. v. The Terminal Mktg. Co., Inc., 2004 WL 941908
(S.D.N.Y. May 4, 2004)..................................................................................53

Rose v. Spa Realty Assoc., 366 N.E.2d 1279 (N.Y. 1977).................................53, 54

Rosen Trust v. Rosen, 386 N.Y.S.2d 491 (N.Y. App. Div. 1976), aff'd, 371
N.E.2d 828 (N.Y. 1977)..................................................................................53

Rushton v. E&S Enters. Inc. (In re Eleva), 235 B.R. 486 (B.A.P. 10th Cir. 1999) ...................42

Sarcona v. DeGiaimo, 641 N.Y.S.2d 479 (N.Y. App. Div. 1996).................................54

v

Sender v. The Bronze Group, Ltd. (In re Hedged-Inv. Assoc., Inc.), 380 F.3d 1292
   (10th Cir. 2004)............................................................................................50

Singleton v. Wulff, 428 U.S. 106, 49 L.Ed.2d 826, 96 S. Ct. 2868 (1976) ................................42

Southern Tech. College v. Graham Props. P'ship, 199 B.R. 46 (Bankr. E.D.
   Ark. 1995), aff'd 89 F.3d 1381 (8th Cir. 1996) ..............................................45

Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.), 335 B.R.
   539 (D. Del. 2005)....................................................................................27, 28

Tennessee Wheel and Rubber Co. v. Street (In re Tennessee Wheel and Rubber
   Co.), 62 B.R. 1002, 1005 (Bankr. M.D. Tenn. 1986) ......................................34

The Republic of the Philippines v. Westinghouse Electric Corp., 43 F.3d 65,
   71 fn. 5 (3d Cir. 1995) .................................................................................1

Total Technical Servs., Inc. v. Whitworth (In re Total Technical Servs., Inc.),
   150 B.R. 893 (Bankr. D. Del. 1993) ..............................................................32

Travis v. Fallani and Cohn, 739 N.Y.S.2d 675 (N.Y. App. Div. 2002)........................................28

Trustees of the National Elevator Indus. Pension, Health Benefit and Educ.
   Funds v. Lutyk, 332 F.3d 188 (3d Cir. 2003) ..................................................26

United States v. Ron Pair Enters., Inc., 489 U.S. 235, 109 S. Ct. 1026, 103
   L. Ed.2d 290 (1989)....................................................................................44

Walsh v. Dutil (In re Demko), 264 B.R. 404 (Bankr. W.D. Pa. 2001) ........................27, 28, 33

Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.), 161 B.R.
   107 (E.D. Pa. 1993), aff'd, 37 F.3d 1487 (3d Cir. 1994)..................................27

Wasserman v. Village Assocs. (In re Freestate Mgmt. Serv., Inc.), 153 B.R. 972
   (Bankr. D. Md. 1993)...................................................................................39

## Statutes

11 U.S.C. § 101(31) ..............................................................................................28

11 U.S.C. §510(c) .................................................................................................50

11 U.S.C. §547(b) ....................................................................................31, 32, 38, 39

11 U.S.C. §547(c) ....................................................................................4, 27, 43, 44, 46

11 U.S.C. §547(g) .................................................................................................46

28 U.S.C. § 157(b) ...............................................................................................59

## Rules

Del. Bankr. Rule 7016-2(d) ....................................................................................39

## Other

19 JAMES WM. MOORE, ET AL., MOORE'S FED. PRAC. §205.05[2] (3d ed. 2001)........................42

HF 3308684v.1 #06723/0002 06/14/2006

# EXPLANATION OF RECORD CITATION
## AND TABLE OF ABBREVIATIONS

All citations to the trial record list the appropriate page in the Trustee's Appendix filed with this brief. Citations to testimony, whether live, read from transcripts, or from video played at trial, identify the witness and the Appendix page numbers.[1] Citations to trial exhibits identify the exhibit and Appendix page number, including pin citing where appropriate. Citations to adversary proceeding filings identify the appropriate document and Appendix cite. Citations to the trial court's Opinion identify the paragraph number of the Opinion only. The Opinion is included in the Trustee's Appendix at *B5 - B92*.

Certain abbreviations and defined terms are used throughout the text of this brief. Those abbreviations and defined terms include:

Lucent Br. ..............................................Lucent's Trial Brief on Appeal filed May 1, 2006

LFOF......................................................Lucent's Proposed Findings of Fact
Filed June 6, 2005

LCOL .....................................................Lucent Proposed Conclusions of Law filed June 6, 2005

Op. or Opinion .......................................Memorandum of Decision of Judge Rosenthal dated
December 21, 2005

RJSF.......................................................Renumbered Joint Stipulation of Uncontested Facts
Filed April 26, 2005

TFOF......................................................Trustee's Proposed Findings of Fact Filed June 6, 2005

---

[1] Live testimony and deposition reads are included in the trial transcripts. The court reporter refused to transcribe deposition testimony replayed from video recordings. At the trial court's request, the parties stipulated to and submitted transcripts of those depositions, which were filed as joint trial exhibits in the adversary proceeding.

vii

HF 3308684v.1 #06723/0002 06/14/2006

Appellee Christine C. Shubert (the "Trustee"), chapter 7 trustee for Winstar Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Wireless"), respectfully submits this brief in opposition to the appeal by Lucent Technologies Inc. ("Lucent") from the December 28, 2005 judgment (the "Judgment") entered by the Bankruptcy Court below.

## SUMMARY OF ARGUMENT

After a 21 day bench trial in which the trial court reviewed over 1,400 exhibits and considered the credibility of 39 witnesses (Op. at 2-3), the court entered the Judgment, awarding the Trustee (1) $188,180,000, plus pre-judgment interest, for recovery of a preferential payment; (2) $55,750,742, plus pre-judgment interest, for breach of a subcontract between Lucent and Wireless; and (3) equitable subordination of all of Lucent's claims against the Winstar estate. (B-1). The trial court also rejected Lucent's new value and earmarking defenses, and dismissed Lucent's counterclaims. The Judgment and the trial court's findings of fact and conclusions of law, as set forth in the 88-page Opinion, should be sustained in all respects.

## COUNT TEN - RECOVERY OF THE PREFERENTIAL PAYMENT

Although Lucent disputes the trial court's finding of fact that Lucent was an "insider" of Winstar on December 7, 2000, the date of the challenged payment (See Op. ¶146),[2] it changes its strategy from trial and now concedes that it engaged in "misconduct" and "suspect" transactions. (Lucent Br. at 1, 4, 17). But Lucent cavils with this Court by never specifying the facts underlying the "misconduct" and "suspect" transactions. These facts are at the heart[3] of the trial court's insider determination — a series of last minute, massive end of quarter sales and related conduct in which Lucent repeatedly caused Winstar to do Lucent's bidding, including participation in numerous schemes and outright fraud to create hundreds of millions of dollars of fake revenue so that Lucent could appear to be more profitable than it was. (Op. ¶71). If this pattern of conduct spanning more than a year does not demonstrate Lucent's "control" over

---

[2]    Despite vigorously litigating the issue at trial and listing it in its Notice of Issues on Appeal, Lucent no longer disputes the trial court's finding that Winstar was insolvent on December 7, 2000, nor does it contest the dismissal of its counterclaims. Having not raised these issues in its appellate brief, these issues are no longer disputed. See e.g., The Republic of the Philippines v. Westinghouse Electric Corp., 43 F.3d 65, 71 n. 5 (3d Cir. 1995); Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993).
[3]    The "heart" of this case is not the "two particular events" referenced by Lucent in its revisionist summary of the relationship between Lucent and Winstar at pages 2 and 3 of Lucent's brief.

Winstar and its lack of "arms length" dealings for purposes of insider determination, then we submit that nothing short of a common board of directors and common officers would. As the trial court properly found: "What became apparent as the evidence unfolded was that what began as a 'strategic partnership' to benefit both parties quickly degenerated into a relationship in which the much larger company [Lucent] bullied and threatened the smaller [Winstar] into taking actions that were designed to benefit the larger at the expense of the smaller." (Op. ¶18).

What Lucent concedes (and what underpins the trial court's insider finding) includes, among many other things discussed _infra_: (i) a fraudulent September 2000 end of quarter software deal that Lucent required Winstar to participate in, which generated 26% of Lucent's profits for the quarter, and which led to SEC penalties for Lucent and suits against Lucent and Winstar executives. (Op. ¶¶57-62). As one Winstar executive testified, Winstar inflated the software pool to whatever revenue number Lucent needed: "[m]y recollection of how this was priced was it was priced at whatever number Lucent needed for its revenue" (Zlotnick _B1034_; Op. ¶60); (ii) a December 1999 end of quarter deal in which Winstar purchased, among other unneeded Lucent equipment, $36 million dollars of unneeded optronics equipment to create revenue for Lucent that quarter. The optronics equipment remained in _Lucent's_ warehouses undelivered 15 months later, when Winstar filed in bankruptcy in April 2001 (Op. ¶71, n. 41); and (iii) false end of quarter bill and hold deals where Winstar employees knowingly signed fraudulent documents to create revenue for Lucent, because "Lucent required it". (Hicks _B924-926_).

In short, what Lucent now so cavalierly concedes are the very facts that demonstrate Lucent's continued and growing influence and control over Winstar — to the point where Lucent could, and did, quickly quash the little resistance Winstar could muster to Lucent's improper demands with a single call from one of its senior executives to Winstar's President.[4] This influence and control was so pervasive that end of quarter after end of quarter Winstar purchased

---

[4]     In September 2000, Lucent employee Deborah Harris advised Nina Aversano, Lucent's President of North American Sales, that Winstar employees Ackerman and Uhl were "vehement" that Winstar was out of money and could not afford to help Lucent by buying anything it did not need. Harris requested that Aversano call Winstar President Nate Kantor to "provide direction" that the deal would take place. (Op. ¶¶49, 51; PX-86 _B1142-52_). After Aversano's call, the resistance ended. (Op. ¶52; PX-127 _B1345-46_).

Lucent equipment and services that Winstar did not need to give Lucent the revenue it demanded.

(Op ¶¶71, 138). As summarized by Winstar President Kantor in a memorandum concerning

unneeded Lucent equipment that Lucent insisted Winstar buy in a June 2000 end of quarter deal:

> 2Q00 [June 2000] EOQ DEAL SUMMARY — "Stuff we need now . . . 19.69
> [million dollars]; Stuff we need later this year . . . 13.3 [million dollars]; Stuff we
> need next year (or years after) . . . 60.7 [million dollars]; Stuff we really need this
> year that we could be buying [from others] instead of the next year [Lucent]
> stuff:

| | |
|---|---|
| Ascend 500 switches | 10 [million dollars] |
| Cisco Routers | 40 [million dollars] |
| Dell/Compaq equipment | 12 [million dollars] |
| | 62 [million dollars]; |

(PX-345 *B1614*) (Emphasis in original).

Lucent's brief mischaracterizes its conduct as "improper accounting" or "financial irregularities".[5]  In doing so, Lucent makes no specific mention of any of the above-described or myriad other facts the Trustee proved, including Lucent's conduct in repeatedly refusing to honor its agreements with Winstar until Winstar complied with Lucent's wishes.  Instead, Lucent suggests that the Judgment was tainted by the trial court's "distaste" for Lucent's conduct, resulting in what Lucent describes as a "dramatic expansion of existing law."  To the contrary, this case represents nothing more than a proper application of existing law to dramatic and compelling facts.  The trial court found Lucent to be an insider of Winstar by reason of Lucent's evidenced control over and non-arms length relationship with Winstar, not by reason of any "distaste" (as warranted as that might be) on the part of the court.

Lucent argues that this is the first time one public company has been held to be an insider of another.  As this case and the more publicized criminal trials in Enron, Worldcom, Tyco, etc. have shown, being a public company does not provide immunity from the law.  Lucent also contends that if upheld, this case will have "broad and far-reaching" implications.  Hyperbole aside, on the facts in this record, Lucent is a minority of one in believing (if it truly does) that it

---

[5]    The last time Lucent's counsel mischaracterized Lucent's conduct, the SEC compelled Lucent to issue a press release admitting it had committed fraud and that its counsel's statements were improper.  See infra, at 14 (PX-179 *B1410*; PX-167 *B1398-99*).

was not an insider of Winstar on December 7, 2000 by any court's standard.

Lucent also appeals the trial court's finding of fact that the December 7, 2000 payment was not earmarked for Lucent. (Op. ¶¶96-100). Here, the trial court relied upon multiple grounds to support its determination. First, the trial court was correct that the evidence showed that Siemens and Winstar did not agree to "earmark" or reserve the Siemens loan proceeds for Lucent. (Op. ¶99). The trial court also correctly found that Lucent stipulated that a transfer of an interest of the debtor had occurred, and that Lucent had waived the earmarking defense by failing to assert it as an affirmative defense in any pleading, failing to ever mention the element among the disputed issues it wished to try in the pretrial order, or even to raise it until the Trustee rested her case. (Op. ¶¶96, 97, 100).

Finally, Lucent contends that it was entitled to a reduction of the preference amount by reason of two categories of purported new value under §547(c)(4) of the Bankruptcy Code. The trial court correctly rejected Lucent's contention. (Op. ¶150). First, the evidence (including numerous Lucent admissions) established that Lucent was secured for all of the claimed advances, and therefore Lucent was not entitled to a new value credit. (Op. ¶¶150-151). Second, Lucent failed to meet its burden of proving that it provided the alleged new value *after* the preferential transfer (Op. ¶150) or the specific amount of the new value claimed.

## COUNT ELEVEN - EQUITABLE SUBORDINATION

Lucent appeals the finding that Lucent's claims against the estate should be equitably subordinated. (Op. ¶164). The trial court relied on its earlier findings of fact establishing that Lucent was an insider in applying equitable subordination, and also held that Lucent's wrongful conduct was egregious enough to justify a finding of equitable subordination even if Lucent was not an insider. (Op. ¶¶158-159). Specifically, in addition to all of the previously discussed wrongful conduct, the trial court also found that Lucent intentionally delayed sending a refinancing notice in order to convey the misimpression that Winstar was on good footing and lure third parties into supplying over $1 billion of additional financing and equity, which enabled

Winstar to make the preferential payment. (Op. ¶¶159-162). These findings are not clearly erroneous and should be affirmed.

### COUNT SEVEN - BREACH OF THE WIRELESS SUBCONTRACT

Lucent contends that the trial court erred in finding that Lucent breached the March 1999 subcontract it had with Wireless (the "Subcontract"). (Op. ¶85). The trial court found that the Subcontract was an enforceable agreement, and that Lucent and Wireless had modified it to eliminate any requirement that a written "task order" be executed in advance of Wireless' performance of services. (Op. ¶¶82, 85). Again, under the applicable clearly erroneous standard (or, indeed, any standard), the trial court's findings should be upheld. The modification was established by the parties' course of conduct for seven consecutive quarters, and further supported by the testimony of Winstar and Lucent executives. (Op. ¶¶42-85). Because Lucent repeatedly threatened to breach the Subcontract to exert unfair pressure on Winstar, then agreed each time to proceed "one more time," the trial court held that Wireless was justified in performing the Subcontract services in the first quarter of 2001. (Op. ¶¶81-82). On appeal, Lucent abandons its argument at trial and, for the first time, concedes the obvious — that its quarterly payments to Wireless were, indeed, made under the Subcontract. But Lucent raises a new argument: that its performance quarter after quarter was based on a series of never before mentioned and undocumented "waivers", instead of the modification evidenced by the parties' conduct and the testimony of Winstar and Lucent executives. This contrived explanation fails not only because it was never raised below (and is therefore barred), but also because the evidence conclusively established that the parties modified the Subcontract.

### STATEMENT OF FACTS RELATING TO PREFERENCE AND EQUITABLE SUBORDINATION COUNTS

Lucent's one-sided statement of facts spins and distorts a small portion of the record evidence to tell the story Lucent wishes were true. The trial court decided this case on the basis of all of the evidence and the credibility of the witnesses, and rejected Lucent's sanitized version of the relationship.

## I.    BACKGROUND

On October 21, 1998, Winstar and Lucent entered into a pair of contracts — the Supply Agreement (PX-123 *B1194 et seq.*) and a credit agreement (the "First Credit Agreement") (DX-96 *B1835 et seq.*) — which created a strategic partnership and dramatically changed the companies' relationship. (Ackerman *B824-26*). The relationship gave Winstar instant credibility in the marketplace: in fact, the perceived health of the strategic relationship became a significant barometer for the viability of Winstar itself. (Uhl *B1028*; see also PX-169 *B1400-04*). Winstar employees recognized the importance of the relationship (and that Winstar was dwarfed in both size and resources by its partner) referring to the deal as "the woolly mammoth." (Ackerman *B815*). The parties agreed in the Supply Agreement that Lucent would provide a turnkey build out of Winstar's telecommunications network, providing "best of breed" equipment and services from start to finish, including design, engineering, construction, and installation services. (Op. ¶29; Kantor *B928*; Ackerman *B816, B827-28*; Harris *B670-72*). The other critical component of the deal (for Winstar) was Lucent's agreement to finance Winstar's buildout by providing up to $2 billion. (PX-3 *B1046-47*; Kantor *B933-34*).

Over the course of the First Credit Agreement, Winstar borrowed some $1.2 billion dollars from Lucent for the buildout, which Winstar repaid in May 2000 by obtaining a credit facility with a group of banks and other investors (the "Bank Facility"). (RJSF No. 8; PX-104 *B1164*). Simultaneously with the repayment, Lucent replaced the First Credit Agreement with another credit agreement (the "Second Credit Agreement"). (RJSF No. 9, PX-138 *B1352-65*). Under the terms of the Second Credit Agreement, the Bank Facility, and the security agreements (the "Security Agreements") executed between Lucent and Winstar's special purpose borrowers (WVF-1 and WVF-LU2, see p. 40-41, infra), Lucent was secured ahead of the Bank Facility lenders with respect to the assets held by the borrowers, which included all equipment financed by Lucent under the Second Credit Agreement (whether Lucent equipment, or third-party

equipment, and whether improved by subsequent services or sitting in a box).[6]  (DX-32 at §§ 2.01, 3.03 *B1795-96*; DX-33 at §§2.01, 3.03 *B1815-16*; PX-225 *B1513-14*; Perricone *B718*, *B727*).  Because Lucent was secured by all of the assets of the borrowers, it was secured for everything it sold Winstar from the date of sale, even if the borrower had not yet financed the purchase under the Second Credit Agreement.  (DX-32 *B1793-812*; DX-33 *B1813-32*; PX-225 *B1513-14*; PX-340 *B1556-57*).[7]  After the First Credit Agreement was paid off, Lucent no longer held a security interest in pre-existing network assets.  (Keefe *B712-15*; Perricone *B718*).  Those assets were instead subject to the Bank Facility's senior security interest.  (Keefe *B714-15*; Perricone *B718*).

## II.    LUCENT'S NON-ARMS LENGTH DEALINGS AND CONTROL

The trial court found that once the strategic partnership was formed, the parties' relationship evolved into a close, non-arms-length relationship where Lucent dominated and controlled Winstar, "bullying" Winstar into deals that helped Lucent but hurt Winstar.  (Op. ¶¶18, 26; Ackerman *B825*; Diroma *B858-59*).  As set forth below, these findings were amply supported by the evidence.

### 1.    The End Of Quarter Deals

Based on virtually uncontroverted evidence, the trial court found that Winstar repeatedly helped Lucent close "huge revenue gaps" by creating revenue for Lucent in massive, last minute, unneeded (by Winstar) purchases arranged by Lucent as the ends of quarters approached, enabling Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was.  (Op. ¶¶18, 71, 138; Aversano *B630-31*; Hicks *B906*, *B908-09*; Zlotnick *B1029-31*; Rubin *B995-96*; Diroma *B860-63*; PX-297 *B1529-31*).  In addition to buying unneeded Lucent equipment and services and unnecessarily accelerating payment on Pay as You Grow purchases at Lucent's request, Winstar complied with Lucent's demands that Winstar inflate Lucent's revenues through fraudulent accounting schemes, including improper bill and

---

[6]    Under the Security Agreements, Lucent also received a security interest in the "general intangibles" and "proceeds" of the borrowing entities.  (DX-32 at § 2.01 *B1793-1812*; DX-33 at § 2.01 *B1813-32*; PX-225 *B1513-14*).

[7]    Lucent conceded this fact when it filed a secured proof of claim in the Winstar bankruptcy including all of the unfinanced equipment and services it had sold.  (PX-340 *B1556-57*; see infra p. 40-42).

hold deals and a massive sham software deal. (Hicks *B907-11*; Rubin *B996-97*).

The trial court found that these end of quarter sales were highly unusual in that Winstar's purchases of Lucent equipment in end of quarter sales were on average eight times greater than Winstar purchases of Lucent equipment in other months. (Op. ¶35; PX-462 *B1637*). Excluding the bogus September 29, 2000, $135,000,000 software pool sale by Lucent to Winstar, Winstar purchased an aggregate of approximately $706,000,000 in goods and services from Lucent in calendar years 1999 and 2000. (Op. ¶71, n. 41; Pocalyko *B735*, *B754*). The amount of Lucent equipment in Winstar inventory in warehouses for each quarter from December 31, 1999, through and including September 30, 2000, continually increased.[8] (Pocalyko *B729-731*).

Lucent's control was also evidenced by the end of quarter bill and hold sales. Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment in the future. (Op. ¶36). Lucent's former CEO, Richard McGinn, testified that during his tenure (which extended from the inception of the strategic partnership until October 23, 2000) Lucent had a strict policy against entering into bill and hold transactions, because such transactions can be used to manipulate revenue numbers. (McGinn *B954-55*). Despite this policy, Lucent entered into at least one bill and hold transaction with Winstar in <u>every</u> end of quarter deal from December 1999 through September 2000. (PX-153 *B1389*; PX-462 *B1646*; Hicks *B924-26*).

McGinn's concerns were realized in these bill and hold deals: Lucent used Winstar as its instrumentality to book revenue months — and even years — ahead of Winstar's actual need for the Lucent equipment for which Winstar was paying, even causing Winstar to sign false

---

[8]  By March 31, 2001 there was, on a cost adjusted basis, approximately $327,000,000 of equipment in Winstar inventory sitting in warehouses. (Op. ¶71, n. 41). Of the $327,000,000 (on a cost adjusted basis) in Winstar inventory in warehouses on March 31, 2001, approximately $256,000,000 was Lucent equipment and approximately $71,000,000 was non-Lucent equipment. (Pocalyko *B738-50*). Only approximately $74,000,000 of the $256,000,000 of Lucent equipment could be specifically traced to the original date that Winstar purchased such equipment from Lucent. (Pocalyko *B732*, *B749-51*). The approximately $74,000,000 (on a cost-adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, that was specifically traced to the original date that Winstar purchased such equipment from Lucent, remained in warehouses undeployed on average for more than a year as of March 31, 2001. (Pocalyko *B733-34*, *B739*).

documentation prepared by Lucent so that Lucent could book the revenue.  (PX-58 *B1113-17*;

PX-70 *B1124-25*; Hicks *B924-25*; Zlotnick *B1038-41*).  Former Winstar employee Lisa Hicks

testified on Lucent's cross-examination:

> Q. I understand, I understand what you're saying.  But when you signed this [bill and hold] letter, and my question to you is, if you knew that it was inaccurate, why did you go ahead and sign the letter?
> * * *
> A. Because I was required to.
> Q. Who required you to sign this letter?
> A. Lucent.  It was a Lucent requirement that this letter be signed.
> Q. I understand that you said that, you testified earlier that Lucent drafted this letter, correct?
> A. Yes.
> Q. So how did Lucent require you to sign it if you knew that it was inaccurate?
> A. They verbally said it had to be signed.
> Q. And what would happen if you didn't sign it?
> A. That the deal wouldn't be complete.
> Q. Okay.  So you signed this letter because you wanted the deal to be complete?
> * * *
> A. I signed this letter because Lucent wanted the deal to be complete.  This was with regard to Lucent's revenue recognition.
> Q. But you work for Winstar, and you don't work for Lucent.
> A. That's correct.
> Q. Did anyone at Winstar require you to sign this letter?
> A. It was, if this is something that Lucent is requiring to make this happen, then we have to do it.

(Hicks *B924-25*; see also Zlotnick *B1038-41*).

Ms. Hicks also testified as to Lucent's power to control Winstar's purchasing:

> Q. Now, in these [end of quarter] negotiations, was Winstar ever able to turn down Lucent's proposal for items that they wanted to get out of the transaction?
> A. Items that Lucent wanted to get out of the transaction?
> Q. Yes.
> A. Not to my knowledge.

(Hicks *B922-23*).  The unneeded equipment purchased in these bill and hold deals remained in

Lucent warehouses for substantial periods of time.  (PX-462 *B1646*, Op. ¶71, n. 41).  There was

no explanation for the prepurchases:  as Lucent's expert Christopher Stark conceded, it usually

took only 7 weeks on average for a company to obtain delivery of equipment from the time it first

ordered the equipment.  (DX-702 *B2074-75*, Stark *B784-85*).

On occasion, Lucent required that Winstar simply give it revenue. For instance, Winstar repeatedly agreed to accelerate millions of dollars of payments on a program known as "Pay As You Grow." Under the Pay As You Grow program, Winstar bought switches and other equipment with greater functional capacity than justified by its present needs, and Lucent initially charged Winstar a price based on the capacity actually needed by Winstar at the time, with additional payments due as Winstar grew to need the full capacity of the equipment. (Ackerman *B835-36*). In several end of quarter deals, Winstar agreed to accelerate payment of the full price for the Pay As You Grow equipment, well before Winstar was contractually obligated to do so. Winstar received nothing in return. As Winstar executive Ackerman testified:

> Q.    Okay. So why was Winstar making a payment of 19 million dollars for pay as you grow payments that were not yet due?
> A.    To help Lucent make its numbers.

(Ackerman *B839*; see also Ackerman *B835-36*, *B848-49*; Zlotnick *B1032-33*). On many occasions, Winstar also bought inferior or overpriced goods to meet Lucent's revenue demands "in the spirit of the partnership," despite its contractual right to "best of breed" technology. (PX-320 *B1542-44*; Ackerman *B829-34*; Huber *B691-694*).

Both Winstar and Lucent employees admit that the driving purpose of these deals was to help Lucent meet its revenue targets. (Aversano *B630-31*; Zlotnick *B1030*; Hicks *B924-25*). Winstar engaged in the various end of quarter sales despite knowing that they were costly and damaging to Winstar. (PX-45 *B1081-82*; PX-148 *B1366-69*). Winstar borrowed from Lucent to pay for the Lucent equipment purchased by Winstar in end of quarter sales including end of quarter bill and hold sales. Winstar paid interest to Lucent for the money Winstar borrowed to purchase this unneeded equipment and services. (Hicks *B912-13*). Winstar also paid storage and insurance costs for the unused Lucent equipment, and in some cases ended up with equipment approaching obsolescence still sitting undeployed, such as $36 million of Lucent optronics equipment that was purchased in December 1999, which Lucent offered to repurchase in December 2000 at 30 cents on the dollar and which was still in Lucent's warehouse when Winstar

filed in bankruptcy in April 2001.  (PX–22 *B1069*; Hicks *B912-13*; Rubin *B998-1001*; Zlotnick *B1041-42*).

The deals also harmed Winstar because Lucent obtained the right to send a refinancing notice once the outstanding Winstar borrowings exceeded $500 million dollars under the Second Credit Agreement.  (PX-138 at § 2.18 *B1360-62*; PX-462 *B1642-43*).  The refinancing notice had serious repercussions for Winstar, including increased interest rates, limitations on future borrowing, and freedom for Lucent to sell off the Winstar borrowings as "conversion notes" at whatever price the market would bear.  Lucent realized the damage a refinancing notice would cause Winstar: before it served the notice in December 2000, it conducted due diligence to determine whether sending the notice would force Winstar to file in bankruptcy.  (Op. ¶¶67-76; PX-322 *B1545*; Perricone *B719*; Hayes *B678-80*).[9]  The compelled purchases of unneeded Lucent equipment and services in these end of quarter deals led to Winstar exceeding the refinancing threshold far earlier than it otherwise would have, giving Lucent additional leverage in the already unbalanced partnership.  (Rubin *B996-97, B1001-02*; PX-148 *B1366-69*).[10]

### The September 2000 End Of Quarter Deal

Lucent's control over Winstar grew throughout the relationship, as evidenced by the September 2000 deal between the parties.  By August 2000, the end of quarter deals with Lucent had harmed Winstar so significantly that some Winstar executives were suggesting that Winstar could no longer afford to help Lucent and should even attempt to reverse earlier deals by returning equipment.  (PX-131 *B1347-49*).  In early September, at least three Winstar executives — Ackerman, Uhl, and Hicks — told Lucent that Winstar could not do another deal, with Ackerman complaining that Lucent was "forcing" another deal down Winstar's throat, and Hicks

---

[9]    This due diligence could have been conducted in early November 2000, but Lucent delayed doing so until the first two weeks of December (Perricone *B724-26*).

[10]    Lucent complains that Winstar misled it in connection with the Second Credit Agreement and submitted a borrowing request to Lucent in early May 2000 which Lucent viewed as "reprehensible." (Lucent Br. at 15-16).  What Lucent fails to say, and what it tried to hide from the trial court (see Perricone *B720-21*), is that Winstar only made the unanticipated borrowing request because it needed to pay for all of the equipment it was buying prematurely to help Lucent.  As Fred Rubin explained at the time: "Winstar is being asked to take equipment early to 'help Lucent recognize revenue' and [] this equipment now has to be financed and was not built into the model originally supplied to [Lucent.]"  (PX-104 *B1164*; Perricone *B721-23*).

telling Lucent that Winstar would not do any more bill and hold or similar agreements because "we were not going to buy anything else this year that we didn't need immediately." (PX-46 *B1083*; PX-153 *B1383-94*; PX-155 *B1395*). Deborah Harris advised Nina Aversano, Lucent's President of North American Sales, that Lucent needed to exert its control over Winstar at the highest level to get more revenue:

> Bottom line is that to do an EOQ deal, we need [Winstar President] Nate [Kantor] to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they cannot immediately utilize. The deals of the past are haunting us ...
>
> ***
>
> Definitely the majority of money we are asking for is not for immediate use.
>
> ***
>
> What I need are 2 things:
> **1. A call to Nate Kantor getting agreement to move forward on an EOQ deal.**

(PX-153 *B1383*) (Emphasis in original). It took but a single call from Aversano to Kantor to eliminate Winstar's opposition. (Aversano *B632-33*). Kantor acceded to Lucent's demands: "Great to talk with you and we will help wherever possible." (PX-157 *B1396*). Kantor then instructed Ackerman to make the deal happen, which Ackerman did, in a $212 million end of quarter purchase which included the below described software pool transaction. (PX-56 *B1107-10*). The end of quarter deal pushed Winstar to the edge of its allowable capital expenditure limits under its loan agreements, and hampered Winstar's ability to continue its buildout in the final quarter of 2000. (Op. ¶58; Ackerman *B840-42*; PX-43 *B1070-80*; PX-57 *B1111-12*; PX-78 *B1130-31*; PX-107 *B1165-71*). It also pushed Winstar over the $500 million refinancing threshold in the Second Credit Agreement, when Winstar financed the invoices issued from the deal on October 23, 2000. (PX-148 *B1366-69*).

### The September 29, 2000 Software Pool

Ackerman wrote to Kantor on September 18, 2000 to advise that complying with Lucent's revenue demand would not be possible unless Ackerman got "creative:"

> I just spoke with [Lucent employee Bill] Plunkett. He informed me that you and Nina [Aversano] had met (dinner?) and you agreed to help them get to the number they need this quarter ... something around $110M, of which we've

> already spent about $45M.  There is not much I can give them that we really
> need, but there are some creative things I can do that can get us close to their
> number without being totally stupid.
>
> * * *
>
> Thus; we are working to cut another $70 [Million] in addition to the
> $117 [Million] [to meet capex covenants].  This means stopping ANY and ALL
> incremental spends for ANYTHING capex immediately, and letting contractors
> who are capitalized go . . .
>
> * * *
>
> If the answer is; both give Lucent the business, AND reduce the cap spend to
> $1B even I will need to institute some very severe measures immediately.

(PX-127 *B1345*) (Emphasis in original).

Lucent and Ackerman got very creative, entering into a transaction that was investigated by the SEC and the U.S. Attorney's Office, and resulted in the filing of a civil complaint by the SEC against Lucent, Lucent employees and Ackerman himself.  (DX-739 *B2110, B2125-28*).  Essentially, Lucent reduced the impact on Winstar's capex (which would have otherwise prevented Winstar from proceeding) by creating a huge fake software pool purchase.  (Op. ¶¶57-64; Hicks *B915-17*; Zlotnick *B1035*).  Lucent identified some $184 million of software from which Winstar was (on paper, at least) to purchase $135 million.  (PX-323 *B1546-50*).  But of the $135 million of software, less than $20 million was of actual value to Winstar.  (Zlotnick *B1036-37*).

Lucent's initial software proposal was for a much smaller amount — $25 million — but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded more than five-fold to the $135 million figure.  (PX-157 *B1396*; PX-323 *B1546-50*).  This increase occurred without the internal studies or any of the other planning documentation that the trial court recognized are typical.  (Op. ¶59).  As part of the deal, the parties also agreed to use Lucent's list pricing, rather than the reduced pricing Winstar was contractually entitled to, to further boost Lucent's revenue.  (Op. ¶60; PX-53 *B1100-02*; PX-349 *B1617*).  As Winstar executive William Zlotnick testified, Winstar agreed to price the deal at "whatever number Lucent needed for its revenue."  (Zlotnick *B1034*; PX-79 *B1132-33*; see also PX-57 *B1111-12*).

To enable Winstar to make the required cash payment for the software, the companies simultaneously entered into contracts postdated after September 29, 2000 for credits payable in the fourth quarter of 2000 (i.e., before Winstar was obligated to actually make the software payments to Lucent). (PX-54 *B1103-04*; PX-57 *B1111-12*; PX-186 *B1434-36*; PX-462 *B1661*; Rubin *B995*). On behalf of Winstar, Ackerman signed the fraudulently post-dated credit agreements, enabling Lucent to immediately book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX-167 *B1398-99*).[11]

In 2004, Lucent's trial counsel Paul Saunders downplayed Lucent's wrongdoing, explaining it away as a "failure of communication." (PX-179 *B1405-12*). The SEC then compelled Lucent to publicly acknowledge that Lucent had committed fraud in the Winstar September 2000 end of quarter software deal:

> Recent statements made by representatives of Lucent contained in [a] Fortune [magazine] article mischaracterized a $125 million transaction between Lucent and Winstar in September 2000 that is one of the transactions encompassed by the settlement in principle [with the SEC].
>
> Specifically, Lucent's representatives suggested that this transaction arose from a 'failure of communication' and not an accounting fraud. Lucent recognizes such comments regarding the transaction were both inaccurate and inconsistent with the terms of the settlement in principle. The transaction involved falsification of documents resulting in improper accounting, both of which were seriously wrong and cannot be justified.

(PX-167 *B1398*). And two key Lucent participants in this transaction, Deborah Harris and William Plunkett, asserted their Fifth Amendment rights when questioned at their depositions. (Plunkett *passim B980-94*; Harris *passim B871-905*).

Lucent argues that the software deal benefited Winstar.[12] The trial court heard this

---

[11]    Lucent ultimately determined that it would not immediately recognize the revenue from the software deal (but never reversed the transaction and sought a new value credit for a substantial portion of it at trial).

[12]    Lucent in part relies on the SEC's characterization of the transaction in its complaint against Lucent. But the SEC's pleading is not based on the evidence put before the trial court. Indeed, until the trial in this adversary proceeding was conducted, the deposition testimony was subject to confidentiality restrictions and not publicly available. Elsewhere in its brief, Lucent also contends that Winstar benefited from the Lucent relationship. (Lucent Br. at 13). As the trial court recognized, this was occasionally true; but on the whole, it was Lucent that used and manipulated Winstar: "[a]lthough Winstar benefited from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the

argument and, after reviewing the evidence, disagreed. (Op. ¶¶138-139). The purported "benefits" consisted of (1) credits to which Winstar believed it was legitimately entitled (and never later received), and (2) price reductions that Winstar could have obtained from another vendor, and which Lucent — in another exercise of its control — forced Winstar to renegotiate just three months later. (PX-462 *B1652-53*; Ackerman *B843-46*). The primary (if not only) reason Winstar agreed to this transaction was to keep Lucent happy so that Lucent would not breach its contractual duties to continue to finance and build out Winstar's network. (Ackerman *B851-52*). Winstar understood that if it failed to please Lucent, the consequences could be severe. From May 2000, through December 7, 2000, the primary facility Winstar had from which it could finance the purchases of both Lucent and non-Lucent equipment and services was the Second Credit Agreement. (PX-104 *B1164*). Moreover, Lucent was Winstar's primary vendor and, as testified to by Lucent's expert, replacing Lucent as Winstar's primary vendor could take as much as a year and would require extra money, time and effort to achieve. (Stark *B786-88*).

Even Lucent employees recognized that these purchases were not in Winstar's best interests. Before the September 2000 deal closed Greg Garrett, Lucent's new head of the Winstar program management team, recommended to Winstar that it not purchase additional Lucent equipment because of the build-up of Lucent equipment in Lucent and Winstar warehouses. (Garrett *B639-40, B647-48*). Garrett, of course, played no role in the end of quarter sales made by Lucent to Winstar — those sales were handled by Lucent's sales team and customer team. (Garrett *B641-46*). And despite Garrett's recommendation, Lucent's sales and customer teams caused Winstar to enter into a $212 million September 2000 end of quarter sale ($100 million more than Lucent initially demanded), including $77 million of Lucent equipment and services in

---

facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that Winstar was in dire financial straits until Lucent could take some more." (Op. ¶18). And as the evidence showed, Winstar frequently could not get Lucent to follow through even with the few benefits (in comparison to Lucent) that it was promised. (See PX-22 *B1069*; Wilson *B813* (Lucent never paid $10 million for the radio links referred to at Lucent Br. p. 13); See Br. supra at 14-15 (Winstar never got price breaks or credits offered with software deal)). And as to all of the $35 million that Lucent purchased from Winstar in March 2000 (backbone and radios), Lucent believed it had a valid use and could be sold by Lucent to other customers in the next quarter (DX-260 *B1845-46*; DX-364 *B1847-49*).

addition to the $135 million software deal.  (PX-323 *B1546-50*; PX-73 *B1126-29*; PX-125 *B1344*).

Numerous other trial exhibits support the trial court's finding that Lucent and Winstar were not dealing at arms length with each other in 1999 and 2000 and that the end of quarter sales evidenced Lucent's influence and control over Winstar:

a.   PX-486 *B1644* — Winstar March 1999 e-mail: "Important point: Nina [Aversano] is about $1 B[illion] behind plan this year, and we could be very helpful if we timed the $750 [million] in the most advantageous way to them.  I assured them we would;"

b.   PX-94 *B1163* — Lucent December 1999 e-mail: "P.S. [Winstar C.E.O.] Bill [Rouhana] offered to do anything he could to help this quarter.  If there is anything else that can be done now go directly to him;"

c.   PX-297 *B1529* — Lucent February 2000 e-mail: "As you know Winstar has been a key customer of ours over the last year [1999] and has consistently helped us close huge gaps each quarter;"

d.   PX-348 *B1615-16*— Lucent June 2000 e-mails: "I just told Jill [Diroma] that we'd need another Bill & Hold letter this quarter to support this URGENT EOQ deal . . ."  "I also need to call your attention to a warehousing issue involving the optronics for the long haul and metro builds.  Currently, this equipment is being shipped to Lucent's Morrow warehouse.  Again, in the past, we were able to recognize revenue . . . via Bill and Hold letters.  We must now employ another tactic . . . Our team recommends the best tactic is to get Winstar to lease the portion of the warehouse (approx. one-third) that houses the ONG equipment . . . We will need you to discuss this with Dave [Ackerman] and ask him to have Lisa [Hicks] work with us on this";

e.   PX-345 *B1614* — Quoted, <u>supra</u>, at 3;

f.   DX-26 *B1756* — Internal Lucent Memo:  Memo refers to equipment stored in Lucent's Morrow warehouse as of June 30, 2000 Lucent/Winstar end of quarter deal: "Cumulative: ONG equipment $58 M[illion] in Lucent's Morrow, GA warehouse (will be depleted by Feb/March 2001);"

g.   PX-360 *B1618* and PX-125 *B1344*, relating to accelerated Pay As You Grow payments; discussed, <u>supra</u> at 10;

h.   PX-107 *B1165*— Lucent August 2000 e-mail: "Bill [Plunkett] and I [Deborah Harris] have had some interesting meetings with Dave Ackerman over the past couple of weeks as well as subsequent meetings with members of Dave's management team.... Due to restricted spending levels as a result of a bank covenant, Winstar is hitting the brakes on spending and signaling some disturbing actions";

i.    PX-57 *B1111*— Memo prepared by Hicks during buildup to September 2000 end of quarter deal: "Total capital plan for 2000 is currently over budget by $190M ($1.260M - $1,070M = $190M). Of the $190M overage, $155M can be attributed to prior Lucent end of quarter deals . . . Lucent is requesting an additional end of quarter deal for 9/00 of $63M, which would bring the total capital budget overrun for 2000 to $253M, $218M directly attributable to Lucent deals ($155M + $63M = $218M) . . . As one way to manage the $63M request, Lucent has proposed that approximately $25M of this amount come from a "software pool;"

j.    Documents relating to the $212 million September 30, 2000 end of quarter deal, and the admittedly fraudulent $135 million software pool transaction that was part of the September 2000 end of quarter deal: PX-51 - PX-57 *B1084-112*; PX-323 *B1546-50*; PX-330 *B1555*; PX-509 *B1707-08*;

k.    PX-320 *B1542-44* — October 26, 2000, fax to Deborah Harris (who was then leading the Lucent negotiating team on the transition agreement) attaching "material" received from Nate Kantor of Winstar. The Nate Kantor "material" was a memo headed "Lucent Product Overview" and lists "Lucent Products Winstar Buys Because They are Better" and "Lucent Products Winstar Buys Because of the Partnership." A comparison of the two lists evidences the nature of the Lucent/Winstar strategic partnership; and

l.    PX-307 *B1535-36*— Lucent December 8, 2000 e-mail: "As we reviewed on our call, the following are some of the steps taken by Winstar to formalize their ownership of the electronics material in Morrow. Winstar's Asset Management Group has sent auditors to Morrow and they have inventoried the electronics material and placed bright orange 'Property of Winstar' labels on the exterior of all the cartons. The information is being entered into Winstar's MP5 Asset Management Tracking System."

## 2.    Lucent's Subcontract Threats

Lucent's manipulation and control of Winstar's purchasing decisions was strengthened by its stranglehold over Winstar's buildout through the Subcontract. Lucent witnesses testified, and the trial court found, that Lucent originally subcontracted services to Wireless because Lucent had a duty under the Supply Agreement to provide a turnkey buildout of Winstar's network and Lucent could not do so without subcontracting the services. (Op. ¶¶29-30; Diroma *B857, B865-66*; Schacht *B1009, B1016-17*, see also PX-325 *B1552-53*: "Per the contract, Lucent have [sic] the responsibility to build the client's entire network, however, there are some services which only they can perform. In order to fulfill our contractual obligation, and to strengthen strategic relationship with the client, Lucent agreed to flow the services through, by sub-

contracting [sic] the services back to the client."). The trial court found that although Winstar and Lucent never modified the Supply Agreement to eliminate Lucent's responsibility for these services, Lucent nevertheless repeatedly threatened to breach its obligations under both the Supply Agreement and the Subcontract to force Winstar to help Lucent meet its revenue targets. (Op. ¶¶80, 81).

One such instance occurred after Lucent approached Winstar with the September 2000 end of quarter deal. On September 22, 2000, Harris told Winstar that Lucent would not pay the $62 million of third quarter 2000 Wireless Subcontract services. (PX-81 *B1134-39*). Kantor's only recourse was to object to Aversano:

> I am very surprised and disappointed with this — we've only discussed and agreed on this a million times. This doesn't sit well with me and will have a major impact on our ability to help you this quarter. You've got to get this fixed.

(PX-158 *B1397*). In the end, Lucent met its contractual duty to pay Wireless for the services — after the September 2000 end of quarter deal purchase increased to $212 million, or $100 million dollars more than Lucent's initial revenue "request." (PX-56 *B1107-10*).

### 3.    Lucent's Insistence on the Preferential Payment

Lucent also used its control over the buildout to compel the preferential payment. In September 2000, Lucent committed that it would replace the Subcontract with the transition agreement required under the Supply Agreement and directly perform substantially all of the services being performed by Wireless under the Subcontract. (Harris *B651-53*; PX-109 *B1183*; PX-113 *B1192*). As the trial court found, Lucent still was not actually able to perform properly substantially all of the services being performed by Wireless under the Subcontract but wanted to establish a pretext for cutting off the Subcontract payments to further pressure Winstar. (Op. ¶48; Schacht *B1008*; PX-113 *B1191-92*).

Lucent dragged out the transition agreement talks. Although it had committed to "lockdown" negotiations in the first week of October 2000 to complete a transition agreement, Lucent did not engage in lockdown talks, nor did the talks commence in earnest until mid- to late-October. They then continued into December 2000. (PX-21 *B1056-68*; PX-62 *B1118-19*;

Aversano *B635-37*; Kantor *B937-38*). In the interim, Wireless continued to perform the Subcontract services as it had in the past. (Kantor *B938*, *B940*). When Winstar advised Lucent that Winstar was finalizing negotiations for Siemens to join the Bank Facility and make Winstar a $200 million loan and requested that Lucent allow Winstar to pay $100 million to Lucent instead of $200 million (PX-151 *B1371-82*), Lucent rejected Winstar's request. Instead, Lucent insisted on compliance with Lucent's November 7, 2000 "consent letter" which included a list of non-contractual demands that it ordered Winstar to meet. (PX-192 *B1470-79*; Montemarano *B964-66*).

When Winstar did not immediately agree to Lucent's demands, Lucent advised that it would not continue the transition agreement negotiations — which its own employees recognized Lucent was contractually obligated to complete (PX-109 *B1172-85*; Harris *B651-53*) — unless Winstar accepted Lucent's demands regarding the preferential payment:

> I have been asked to put the Services meeting on the 15th on hold until the Rick Huel (sic) & Mike Montemarano (our 2 CFOs) reach final agreement on the finical (sic) discussions they had last week. If agreement is reached on Monday or Tuesday we will be there.

(PX-136 *B1350*; PX-137 *B1351*; PX-440 *B1620*). Then, just days before the preferential payment was made, Lucent applied additional pressure on Winstar. Lucent CFO Hopkins declared that Winstar was not to be permitted to borrow any additional funds under the Second Credit Agreement — despite Winstar's contractual right to do so — unless and until Winstar paid the full amount of the Siemens loan proceeds to Lucent. (Harris *B669-70*; PX-116 *B1193*).

Once Winstar agreed with Lucent that it would pay over the full amount of the Siemens loan proceeds, Lucent resumed negotiations on the transition agreement and the parties' negotiating teams reached an agreement around the time of the preferential payment.[13] (PX-112 *B1118-90*; Harris *B656-57*; Kantor *B940*). The transition agreement approved by both

---

[13]    While Winstar agreed with Lucent that it would pay the full amount of the Siemens loan proceeds to Lucent, it had no agreement with Siemens that required it do so. To the contrary, Siemens understood that it was making a "working capital loan," and both Siemens' 30(b)(6) witness and the loan documents stated that the borrowing was to be for general corporate purposes. (Holwell *B927*; DX-721 *B2089*). Thus, the funds were not "earmarked" as Lucent suggests. (See Br., infra. at Point II.B).

negotiating teams contained all the material objectives that Lucent's senior management had instructed its negotiating team to achieve. (Harris *B657-663*). Once the preferential payment was in Lucent's pocket — and even though the transition agreement had been approved by Lucent's negotiating team and Winstar's senior management — Lucent's senior management arbitrarily rejected the transition agreement. (Kantor *B952-53*; Harris *B664-67*).

Lucent argued at trial — and continues to assert on this appeal — that it did not want Winstar to engage in the Siemens transaction and that the transaction (and Lucent's receipt of the preferential payment) was somehow bad for Lucent, relying on testimony from Montemarano, a finance executive, and Hund-Mejean, Lucent's then treasurer. Lucent's position is inconsistent with the contemporaneous evidence, and was rejected by the trial court. (Op. ¶¶89-92). For example, Hund-Mejean wrote in a November 28, 2000 e-mail about how badly Lucent wanted the $200 million: "After Carol/Debbie's meetings last week I have not heard when we get the $200 million which is an absolute must now given our cash flow situation. We need to get this done urgently." (PX-251 *B1519-20*; <u>see also</u> Montemarano *B956-57*). And when Montemarano learned Lucent would get the cash on December 7, 2000, he gleefully sent a bold faced, underlined, italicized, and oversized one word email to his co-employees: "NICE!!!" (PX-252 *B1521*). Moreover, as the trial court found, if Lucent did not want the Siemens financing to go forward, it could have stopped it by issuing the refinancing notice. (Op. ¶¶159, 162). The evidence is clear: Lucent not only wanted the Siemens money, it forced Winstar to get the money and deliberately misled Siemens and certain equity investors by withholding sending the refinancing notice until shortly after receipt of Winstar's payment.

### 4.    The December 2000 Subcontract Payment

Within a week of its receipt of the preferential payment, Lucent once again exercised its influence and control. On December 14, 2000, Lucent advised Winstar that Lucent would not pay Wireless for its services for the three-month period ending December 2000. (PX-22 *B1069*). Both Uhl and Kantor appealed to their respective Lucent counterparts. (Kantor *B943-46*). Throughout the discussions and afterward, Winstar contended that Lucent had a contractual duty

under the Subcontract to pay for the services. (Kantor *B949*; Montemarano *B978-79*; PX-264 *B1526-28*). Lucent Vice Chairman Verwaayen finally agreed on December 27, 2000, that Lucent would pay for the Wireless services under the Subcontract for the three-month period ended December 31, 2000. (Kantor *B946-47*). Lucent's documents — including a Verwaayen e-mail explaining his strategy — demonstrate that Lucent recognized its obligation to pay for the services, but threatened breach of the Subcontract to force Winstar to comply with Lucent's demands for significant changes in the Supply Agreement, the Second Credit Agreement, and the overall relationship:

> after the read out from the lawyers ... Winstar can draw upon the credit facility, including services ... We really had not the option of denying their rights here. In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change. So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship. We will create from both sides a wish list how to recreate our legal platform working together and renegotiate on those issues. I think we all understand now much better where we are and how to get out of this situation going forward.

(PX-199 *B1480-81*; see also PX-261 *B1523*: "Now we have positioned ourselves for a major overhaul of our relationship with Winstar...").

Lucent used its influence and control to force Winstar to the table in early 2001 to negotiate fundamental changes to the relationship to make it more profitable for Lucent (and less profitable for Winstar). (PX-261 *B1523*; Montemarano *B976-78*). In particular, Lucent wanted to change the Supply Agreement and the Second Credit Agreement so that Lucent would only finance the purchase of Lucent equipment, even if not best of breed, and Winstar would pay increased prices for various Lucent equipment and services. (PX-56 *B1107-10*; Montemarano *B971-75*). Winstar agreed to discuss eliminating or reducing valuable and fundamental terms in the partnership, including the "best of breed" requirement, the turnkey buildout requirement and the terms of Lucent's financing. (Id.) Winstar had no choice: as Uhl testified, Winstar's continued partnership with Lucent was vital to Winstar's perception in the marketplace and to Winstar's continued viability. (Uhl *B1028*; Jules *B706*).

### 5.    The Refinancing Notice

Because Winstar had complied with Lucent's revenue demands in the end of quarter

deals by purchasing hundreds of millions of dollars of unneeded Lucent equipment and services,

Winstar in late October 2000 crossed the $500 million borrowing threshold which gave Lucent

the right to serve a refinancing notice. (Op. ¶58; Hayes *B674-76*; PX-45 *B1081-82*; PX-148

*B1366-69*; PX-153 *B1383-94*; PX-185 *B1413-14*; PX-462 *B1642*; Salomon *B777-81*).    Lucent

had concluded as early as November 2, 2000, that issuing the refinancing notice would effectively

preclude Winstar from obtaining new or additional financing. (PX-231 *B1515*; PX-311 *B1537-*

*41*, Hund-Mejean *B700-04*).    Accordingly, Lucent did not exercise its unfairly-obtained right to

serve the refinancing notice immediately, as some of its employees were recommending. (Hayes

*B674-83*; Rogers *B755*; PX-185 *B1413-14*; PX-187 *B1464-67*; PX-188 *B1468-69*).    Lucent

delayed serving the refinancing notice even after Schacht claimed to have instructed it could be

served as early as November 15, 2000. (Schacht *B766-67*).    In one of Lucent's more flagrant

misstatements, Lucent claims that it "acquiesced" to Winstar's request that it not serve the

refinancing notice.    The trial court assessed Schacht's credibility and found, instead, that Lucent

intentionally withheld the notice to ensure that it received the preferential payment. (Op. ¶¶159,

162).    Hopkins, Lucent's CFO, described Lucent's plan to withhold the refinancing notice until

after Lucent received the money: "We should see our 188M Thursday (sic) or Friday . . . that's

even better! . . . And we believe we may want to send the notice letter re: 500M anyway after we

receive the 188m." (PX-202 *B1510*).    Hund-Mejean admitted she held back sending the

refinancing notice, because if the refinancing notice was sent, it could cause Siemens not to lend

the $200 million to Winstar. (Hund-Mejean *B700-04*; PX-231 *B1515*; PX-311 *B1537-41*).

One week after receiving the preferential payment, Lucent advised Winstar that it would

serve the refinancing notice, setting in motion the inevitable Winstar bankruptcy filing. (PX-22

*B1069*; PX-149 *B1370*).    Winstar sought to apply previously approved credits to reduce the

principal balance under the Second Credit Agreement below $500 million. (PX-443 *B1621-22*).

Lucent refused, and served the refinancing notice on December 19, 2000, commencing a 105-day

refinancing period that expired April 3, 2001. (PX-149 *B1370*; PX-138 §§ 1.01 at 33, 2.18 *B1352-65*). Two weeks after the conclusion of the refinancing period, Winstar was forced to file its bankruptcy petition, conveniently (for Lucent) outside the automatic 90-day preference period. (RJSF No. 3).

Based on this evidence, the trial court found that Lucent intentionally withheld the refinancing notice until after receipt of the preferential payment, to insure that Siemens loaned Winstar the $200 million and the additional $270 million equity investments (which were a requirement for Siemens to make its loan) were made. (Op. ¶¶18, 67, 92, 93, 159, 161, 162; Hund-Mejean *B700-04*, PX-200 *B1482-86*; PX-231 *B1515*).

### 6.    Nothing Changed By December 7, 2000

Lucent contends that "everything changed" between Lucent and Winstar once Henry Schacht took over as CEO in late October 2000. Lucent made the same contention below, and the trial court properly rejected it. The only witness who testified that "everything changed" was Schacht himself. Schacht testified that he replaced McGinn on October 23, 2000 to shift Lucent to a restructuring emphasis, rather than continued pursuit of aggressive growth. (Schacht *B758-59*). Schacht was unclear at trial as to whether he ever communicated this change in strategy to Winstar (or any of Lucent's other customers). (Compare Schacht *B760-61* with Schacht *B762-65*). And Schacht never testified in any of his four depositions about any dramatic change in Lucent's business practices, or of relaying that to Winstar. (Schacht *B1003*-07, *B1010-15*). At trial, despite his conclusory misstatement that "everything changed" between October 23 and December 7, Schacht's testimony was devoid of even a single example of something that actually changed with respect to the companies' dealings with each other in the six weeks between October 23 and December 7. When cross-examined about the specifics of what purportedly had changed, Schacht denied knowledge sufficient to answer the questions. (Schacht *B769-74*). Lucent could not produce even a single witness to testify that the relationship between Lucent and Winstar was arms length before October 23, 2000 (and only Schacht as to after October 23). Lucent's testifying experts carefully disclaimed any intention to opine that the relationship was

arms-length at any time.  (Stark *B783-84*; Salomon *B776*).

Outside of Schacht's convenient memory, contradictory trial testimony and conclusory misstatement, there is no evidence whatsoever suggesting that the Lucent/Winstar relationship became arms length by December 7.  More importantly, the Trustee proved that as of December 7, 2000, there was no significant change in the relationship:

a. Winstar continued to pay interest in October, November and December 2000 on the purchases of unneeded Lucent equipment and services it had made in the December 1999 through September 2000 end of quarter sales, including the $77 million of non-software pool purchases made by Winstar in the September 30, 2000, end of quarter transaction (Pocalyko *B736*; Schacht *B774*);

b. None of the unnecessary Winstar purchases in the December 1999 through September 2000 end of quarter sales were canceled or reversed, nor was Winstar able to return the unneeded Lucent equipment it had purchased for credit against its loan balance.  (Pocalyko *B736*; Schacht *B771-72, B775*; PX-22 *B1069*);

c. Although on November 21, 2000, Lucent announced it would not recognize $125 million in revenue on the September 29, 2000, end of quarter software pool deal, (i) the software pool deal was, in fact, not canceled and (ii) Lucent continued to contend even at trial that a portion of that transaction ($42.5 million) constituted new value to be applied against the Trustee's preference claim even though Winstar received little if any of the postdated offsetting benefits it was supposed to receive (Terrell *B794-96*);

d. Instead of the two week lockdown negotiation promised in September, Lucent's negotiating team continued to negotiate a transition services agreement in the period October to early December 2000, and then agreed upon a transition agreement with Winstar's negotiating team and Winstar's senior management shortly before December 7, 2000, whereby Lucent would be able to book revenue from doing what Wireless had been doing. (Montemarano *B962*).  The transition services agreement was not rejected by Lucent's senior management until after December 7, 2000, and even after Lucent's arbitrary rejection of its own achieved objectives, renewed negotiations ensued. (PX-22 *B1069*);

e. Lucent, in late December 2000, agreed to pay and paid $62 million to Wireless for the three-month period ended December 31, 2000, according to certain Lucent employees purportedly "as an accommodation" to Winstar (as opposed to a legal obligation under the Subcontract) for what Debra Hopkins did not view as an "arms length" contract.  This "one last time payment" (Schacht *B1022-23*) was in substance precisely the same as what occurred with the payment in September 2000 and in every quarter since March 1999.  (PX-390 *B1619*; Kantor *B944-45*);

f.   Even in December 2000 and January 2001, Lucent continued to engage in non-arms length dealings with Winstar by reason of Lucent's 2000 revenue needs and Winstar's cap ex problems in achieving what Lucent required.  Thus, for example, as set forth in PX-501, a January 9, 2001 internal Winstar email:

"As you know, we had a very large carryover from 2000, that hit 2001, because of all the late December shipments (DMC, P-Com, AFC, etc.)  All of this equipment was shipped to Lucent in 2000, and shipped by Lucent to Winstar in January, to keep it out of [Winstar's] 2000 capex."  (PX-501 *B1665-66*);

g.   Lucent forced Winstar to obtain the Siemens loan, borrow it in full immediately and pay the borrowed amount to Lucent by threatening breach of Lucent's obligation to finance Winstar and terminating the transition agreement negotiations.  (PX-136 *B1350*; PX-137 *B1351*; PX-440 *B1620*; Harris B656, *B669-70*);

h.   Lucent intentionally delayed sending the refinancing notice until after Lucent received the December 7 preferential payment.  (Schacht *B766-67*; PX-202 *B1510*; PX-220 *B1511-12*);

i.   Although McGinn, Aversano, and Plunkett left Lucent's employ prior to December 7, 2000, many other employees central to the Lucent/Winstar relationship remained (as did all the Winstar employees) as of December 7, 2000.  Thus, Hopkins remained chief financial officer of Lucent, having assumed that role in May 2000, and remained active as regards Winstar throughout all of December 2000 and thereafter (Hopkins *B687-87A*); Harris remained in a senior position on Lucent's Winstar sales team and, in fact, headed up the Lucent negotiating team on the transition services agreement into 2001; Diroma, Petrini, Perricone, Rogers, Hayes, Cocito, Rigotti, Naylor, and many others on Lucent's Winstar sales team and customer team remained employed by Lucent and engaged in the Lucent/Winstar relationship as at December 7, 2000.  Many of these same individuals had been members of Lucent's "core team" for Winstar since the inception of the strategic relationship in 1998: "members of the Lucent core team include the following key individuals:  Rogers . . . Diroma . . . Naylor . . . Petrini."  (PX-2 *B1045*); and

j.   By his own testimony, Schacht personally had no role in the Lucent/Winstar relationship for the period through at least December 31, 2000, having delegated that to Ben Verwaayen, who also still remained employed by Lucent.  (Schacht *B768-70*, B*1021-23*).

Moreover, to the extent the "change" that Schacht testified to was an internal Lucent decision to "restructure" its vendor finance and other agreements, the fact that Lucent retained all the benefits of its non-arms length dealings with Winstar and used its leverage as Winstar's strategic partner to force Winstar to renegotiate or do away with various provisions of the Supply

Agreement and Second Credit Agreement to make them more profitable for Lucent is just further evidence of the continued insider position Lucent enjoyed. (Montemarano *B971-75*; PX-262 *B1524-25*). In sum, the trial court had more than ample underlying facts on which to base its determination that Lucent was an insider of Winstar as of December 2000.

## ARGUMENT

### I.    APPLICABLE STANDARDS OF REVIEW

Lucent is noticeably silent as to the appropriate standard of review for each of the trial court's challenged findings, devoting one paragraph in its brief (Lucent Br. at 7) to a superficial statement of the standard of review generally.

The vast majority of the challenged findings are findings of fact to be reviewed under the "clearly erroneous" standard and may be overturned only if they are "completely devoid of a credible evidentiary basis or bear no rational relationship to the supporting data." Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.), 444 F.3d 203 (3d Cir. 2006). The standard requires that "a decision must strike the court as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." In re Papio Keno Club, Inc., 262 F.3d 725 (8th Cir. 2001). Furthermore, the reviewing court may not lightly disturb the trial court's findings where, as here, the findings are based upon the credibility of the witnesses observed by the trial court. Trustees of the National Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003); Dardovitch v. Haltzman, 190 F.3d 125, 140 (3d Cir. 1999); (see also Op. p. 2 and ¶18).

The preference findings (including insider, earmarking, and new value) are largely — if not entirely — governed by this standard.    At least one circuit has determined that the determination of insider status is a finding of fact reviewed only for clear error. Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1466 (5th Cir. 1991). While the Third Circuit has not decided this issue, several district courts in the Third Circuit have followed the Fifth Circuit's ruling. Ansel Prop. v. Nutri/System of Florida Assoc. (In re

Nutri/System of Florida Assoc., Inc.), 178 B.R. 645, 657 (E.D. Pa. 1995); Waslow v. MNC

Commercial Corp. (In re M. Paolella & Sons, Inc.), 161 B.R. 107, 118 (E.D. Pa. 1993), aff'd, 37

F.3d 1487 (3d Cir. 1994). Even the courts that consider insider a mixed question of fact and law

have frequently recognized that fact questions predominate because the insider determination is a

fact-intensive inquiry, to be decided on a case by case basis. In re Three Flint Hill Ltd. P'ship,

213 B.R. 292, 298 (D. Md. 1997); see also Stanziale v. Pepper Hamilton LLP (In re Student

Finance Corp.), 335 B.R. 539 (D. Del. 2005) ("the inquiry into insider status 'is fact-intensive and

can be made only on a case by case basis'" quoting Walsh v. Dutil (In re Demko), 264 B.R. 404,

408 (Bankr. W.D. Pa. 2001)).[14]

Third Circuit courts review earmarking rulings largely under the clearly erroneous

standard. See, e.g., New York City Shoes, Inc. v. Best Shoe Corp., 106 B.R. 58, 60 (E.D. Pa.

1989), aff'd, 106 B.R. 58 (E.D. Pa. 1989)(while referring to earmarking ruling as a "mixed

question," finding that debtor was free to use new loan to pay any debt — rather than specified

debt — reviewed under the clearly erroneous standard). New value is at worst a mixed question,

and was described by the Third Circuit on one occasion as a pure finding of fact. Compare

Reigle v. S.S. Mahajan (In re Kumar Bavishi & Assoc.), 906 F.2d 942 (3d Cir. 1990)

(determination of new value is a "mixed question", citing Creditors Comm. v. Spada (In re

Spada), 903 F.2d 971, 975 (3d Cir. 1990)) with In re Spada, 903 F.2d at 977 (reversing finding of

new value as clearly erroneous under § 547(c)(1): "what constitutes new value is a question of

fact").

The trial court's ruling on equitable subordination is also a finding of fact as it relates to

the insider determination, determining whether there was inequitable conduct, and the extent of

harm. Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323

---

[14]       One aspect of the trial court's findings on insider, its decision to apply a negative inference based
on two former Lucent employees' invocation of the Fifth Amendment, would be governed by an abuse of
discretion standard of review. In re Marrama, 331 B.R. 10, 16 (D. Mass. 2005), aff'd, 445 F.3d 518 (1st
Cir. 2006). As noted by this Court, abuse of discretion occurs when judicial action is "arbitrary, fanciful or
unreasonable." In re Northwestern Corp., 319 B.R. 68, 73-74 (D. Del. 2005). At bar, the inference was
amply supported and corroborated by the mass of evidence in the record and was therefore not an abuse of
discretion. (Op. ¶¶144-145).

F.3d 228, 234-35 (3d Cir. 2003); Bank of New York v. Epic Resorts (In re Epic Capital Corp.),

307 B.R. 767, 772-73 (D. Del. 2004).

Finally, for the Subcontract claim, the trial court's rulings are reviewed under the clearly

erroneous standard as to the findings of fact (including modification by course of conduct).

ATACS Corp. v. Trans World Comm'n, Inc., 155 F.3d 659, 665 (3d Cir. 1998); New Windsor

Volunteer Ambulance Corps. Inc. v. Meyers, 442 F.3d 101, 112-13 (2d Cir. 2006); see also

Travis v. Fallani and Cohn, 739 N.Y.S.2d 675, 677-78 (N.Y. App. Div. 2002) (reviewing finding

of modification under Rose v. Spa Realty as finding of fact).

## II.    THE TRIAL COURT'S FINDING OF A $188,180,000 PREFERENTIAL PAYMENT SHOULD BE AFFIRMED IN ALL RESPECTS

Lucent disputes three findings of the trial court with respect to Count VII: (i) that Lucent

was an insider of Winstar on December 7, 2000; (ii) that Winstar transferred an interest in

property to Lucent; and (iii) that Lucent provided no new value and, in any event, is barred from

alleging that it provided new value.

### A.    Lucent Was An Insider Of Winstar On December 7, 2000

The trial court found that Lucent was an insider of Winstar on December 7, 2000.

"Insider" is a defined term in the Bankruptcy Code. 11 U.S.C. § 101(31). For corporations,

insiders include, but are not limited to, any officer, director, or "person in control" of the debtor.

11 U.S.C. § 101(31)(B)(i-iii). The statutory list is not exhaustive; courts also find as insiders

parties not dealing at arms-length with the debtor, and parties who are sufficiently close to the

debtor such that their dealings are subjected to increased scrutiny. In re Holloway, 955 F.2d 1008

(5th Cir. 1992); In re Student Finance Corp., 335 B.R. at 547. Here, the trial court found that

Winstar satisfied both (i) the statutory definition in that Lucent was a "person in control" of

Winstar, (Op. ¶¶18, 138), and (ii) the non-statutory test, by finding that Lucent and Winstar did

not deal at arms-length. (Op. ¶71). Regardless of which test is applied, insider status is

determined case-by-case, by a "fact-intensive" inquiry into the closeness of the relationship. In re

Student Finance Corp., 335 B.R. at 547 (quoting In re Demko, 264 B.R. at 408); see also CPY

Co. v. Ameriscribe, Corp. (In re Chas. P. Young Co.), 145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992)

("insider status must be determined on a case by case basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs").

1.    **The Trial Court Properly Found That Lucent Was A "Person In Control" of Winstar**

Courts considering the "person-in-control" test for insiders have applied varying standards to the level of control required. Delaware's Bankruptcy Court recently found the standard met by a pleading showing that a party had "both a source of power [over the debtor and] instances in which the power was exercised." Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732, 743 (Bankr. D. Del. 2003).[15] The trial court's findings establish that the Trustee met this standard.

But the trial court applied a stricter standard for the statutory test, identifying and using a standard similar to that proposed by Lucent in its conclusions of law. (Op. ¶¶134-139, 158-159). The trial court noted that some courts define control as the ability to dictate corporate policy and the disposition of corporate assets and then found as to control:

> [i]n this case the facts indicate that Lucent controlled many of Winstar's decisions relating to the buildout of the network. Lucent forced the 'purchase' of its goods well before the equipment was needed and in many instances [including] the software agreement, never needed at all. Lucent treated Winstar as a captive buyer for Lucent's goods.

(Op. ¶138). The trial court also noted that other courts define control as showing "instrumentality" status and then found that control as well: "[t]he same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues." (Op. ¶158).

Lucent now argues that in addition to the above findings (which are what Lucent argued were required in its conclusions of law and on summary judgment), the trial court was also required to find that Lucent's conduct met other "essential" tests. But the "tests" Lucent cites are

---

[15]    The In re Exide court also described control under the statutory test as "sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets." 299 B.R. at 743 (quoting In re Aluminum Mills Corp., 132 B.R. 869, 894 (Bankr. N.D. Ill. 1991)).

merely indicia of insider control. When present, they support a finding of insider; but their absence will not compel a finding that a person is not "in control" of the debtor.

First, Lucent contends that the Trustee was required to establish "managerial control" in the sense of establishing that Lucent made personnel decisions, handled payroll or accounts receivable or otherwise managed Winstar's business (Lucent Br. at 25 et. seq.). Indisputably, managerial or operating control is a factor that courts have looked at in determining whether a party is a "person in control," and where present, establishes a party as an insider. ABC Elec. Serv., Inc. v. Rondout Elec. Inc. (In re ABC Elec. Serv., Inc.), 190 B.R. 672, 675 (Bankr. M.D. Fla. 1995). Most courts, however, have not identified managerial control as an "essential" element, but merely one of several factors in the "case by case", "fact specific inquiry" into the closeness of the relationship:

> The phrase 'person in control of the debtor' found no precise definition in cases which dealt with the issue. The interpretation of the term and, in turn, the determination of the insider status has been made on a case-by-case basis.... There is hardly any doubt that actual management of the debtor's affairs is sufficient to find the control required.

Id. 675-76 (internal citations omitted); see also De Rosa v. Buildex, Inc. (In re F&S Central Mfg. Corp.), 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985) (Control for insiders "need not be legal or absolute": creditor who is not at arms length and has relationship through which it can compel repayment of debt suffices to be deemed an insider).

To press its argument that "managerial control" is an essential element to establish "person in control", Lucent relies on cases involving banks and pure lending relationships, all of which focus on the principle that banks should not be subjected to insider status where their influence over the debtor was the result of their exercise, or threatened exercise, of legitimate contractual rights. See, e.g., Badger Freightways, Inc. v. Cont'l Nat'l Bank and Trust Co. of Chicago (In re Badger Freightways), 106 B.R. 971 (Bankr. N.D. Ill. 1989); Lynn v. Cont'l Bank, N.A. (In re Murchison), 154 B.R. 909 (Bankr. N.D.Tex. 1993). The Trustee agrees that banks are

not rendered insiders by exercising or threatening to exercise legitimate contractual rights. But that is not even close to what happened here.

Lucent was never just a lender to Winstar — it was Winstar's strategic partner, responsible for the turnkey buildout of the Winstar networks, and Winstar's main vendor. That this was not just a bank/borrower relationship, was stressed by Lucent's former Vice Chairman:

> Q. So you don't think that the credit agreement and supply agreement was in effect putting Lucent in the position of a bank?
> A. Not at all.
> Q. Why not?
> A. Because there was the direct relationship between the supply agreement and the credit agreement. The credit agreement was there to facilitate us being able to be the technology partner and to have a relationship with Winstar where Lucent got the majority of all the purchases. That was the reason for the credit agreement. (Verwaayen *B800-01*).

In addition to the existence of a strategic partnership, this case also differs from the bank/borrower cases cited by Lucent in that none of those cases featured (i) a lender who compelled its borrower to repeatedly commit fraud for the benefit of the lender; (ii) a lender who compelled its borrower to make unnecessary purchases to borrower's detriment for no reason other than to generate needed revenue for the lender; (iii) repeated non arms-length dealings between the parties; or (iv) any of the other indicia of a "close relationship" present here and discussed earlier in this brief.

Nor can Lucent claim that its actions in this case involved nothing more than legitimate exercises of contractual rights. Here, the trial court's findings were based in part on Lucent's breaches and threatened breaches of contractual duties — not on the exercise or threatened exercise of contractual rights. (See, e.g., Op. ¶¶90-92). These were not exercises of contractual rights: they were instances of financial extortion. (Op. ¶¶80, 81). Lucent can pretend that it was nothing more than a lender and did nothing more than exercise contractual rights but the clear evidence is to the contrary.

Even for banks, neither of Lucent's cases stand for a strict "managerial control" test:

a lender bank is not an 'insider' for § 547(b) purposes unless it is able to exercise actual managerial control over the debtor or has some special affinity with the

> debtor that extends beyond a business relationship . . . The requisite control is . . .
> 'sufficient authority over the corporate debtor so as to unqualifiably dictate
> corporate policy and the disposition of corporate assets.'

In re Murchison, 154 B.R. at 913 (quoting In re Badger Freightways, 106 B.R. at 982). The
actual standard employed by both the In re Murchison court and the In re Badger Freightways
court is thus the same standard employed by the trial court in finding Lucent to be an insider
under the "person in control" statutory definition test.

Lucent's second added "essential" test is that the actual preferential payment must itself
be the result of insider control. Lucent pressed this position before, and lost, because the
argument is not supported by the Bankruptcy Code or the case law. (Op. ¶137). All that is
required under the plain meaning of the Code is that Lucent be an insider at the time of the
transfer. 11 U.S.C. §547(b)(4). While it is persuasive evidence of insider status when it occurs,
there is no requirement that the challenged transfer be the direct result of the exercise of influence
or control. See, e.g., Total Technical Servs., Inc. v. Whitworth (In re Total Technical Servs.,
Inc.), 150 B.R. 893, 897-98 (Bankr. D. Del. 1993); see also In re Exide Techs., Inc., 299 B.R.
732; Koch v. Rogers (In re Broumas), 203 B.R. 385, 391 (D. Md. 1996), aff'd in relevant part,
135 F.3d 769 (4th Cir. 1998).[16]

Finally, Lucent asserts a third new requirement for finding a "person in control", to wit:
a creditor must dictate the timing of the debtor's bankruptcy filing. While this certainly is
evidence of control, the Trustee is not aware of any cases that have excluded finding a party to be
a "person in control" because that party did not control the timing of the debtor's bankruptcy.[17]

---

[16]    Lucent's self-invented "test" is satisfied here in any event because the underlying facts found by
the court demonstrate that Lucent used its insider control to compel the preferential payment. (Op.
¶¶89-94).

[17]    Here, again, the evidence demonstrates that Lucent did in fact influence the timing of the Winstar
bankruptcy filing. For instance, Lucent precipitated the bankruptcy filing when it commenced the 105 day
refinancing period by serving its refinancing notice, a notice which it deliberately withheld sending until
after it received the preferential payment. (Op. ¶159). Lucent also controlled the date of the preference:
Lucent used its insider control to force Winstar to borrow the Siemens funds on the first day they were
available, December 7, 2000, ensuring that they were borrowed before it commenced the refinancing
period. (Op. ¶¶90, 94). And, of course, Lucent breached the Subcontract and refused to make the payment
due to Wireless for the period ending March 31, 2001, which refusal occurred after the expiration of 90
days from December 7, 2000 and was the immediate cause of Winstar filing in bankruptcy.

In sum, under the appropriate test for "person in control", and even under the three additional tests Lucent has created out of whole cloth, the Trustee proved and the trial court was not clearly erroneous in finding that Lucent was an insider of Winstar on December 7, 2000, because Lucent was a "person in control" under the statutory definition of insider.

### 2. The Trial Court Properly Found That Winstar And Lucent Did Not Deal At Arm's Length

The trial court also relied on cases applying the insider test for non-statutory insiders. (Op. ¶135). For non-statutory insiders, "[t]he true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arms-length." In re Demko, 264 B.R. at 408. Numerous courts have recognized that control, while persuasive, is not required to find a non-statutory insider. See In re Broumas, 203 B.R. at 391 ("Contrary to Defendants' contention, actual control is not a predicate to finding someone to be an extra-statutory insider"); In re Allegheny Int'l, Inc., 118 B.R. 282, 298 (W.D. Pa. 1990) (determining insider under the Code for purposes of voting on reorganization plan: creditor found to be insider where it did not have "actual control or legal decision making power," but had access through due diligence to information beyond that available to other creditors, shareholders, or the general public, and "attempted to influence, in not very subtle ways, decisions made by the debtor"); In re Three Flint Hill Ltd. P'ship, 213 B.R. 292, 299-300 (D. Md. 1997) (rejecting claim of party that Butler v. Shaw, 72 F.3d 437 (4th Cir. 1996), requires finding of control for non-statutory insiders).

Instead, courts examine whether the alleged insider has a "sufficiently close relationship" with the debtor such that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor. Koch v. Rogers (In re Broumas), 135 F.3d 769, 1998 U.S. App. LEXIS 3070 at *21-22 (4th Cir. 1998); OHC Liquidation Trust v. Credit Suisse First Boston LLC (In re Oakwood Homes Corp.) 340 B.R. 510 (Bankr. D. Del. 2006) ("courts have applied insider status 'flexibly to include a broad range of parties who have a close relationship with the debtor,'" quoting In re Locke Mill Partners, 178 B.R. 697, 702 (Bankr. M.D. N.C. 1995)); In re ABC Elec. Servs., 190 B.R. at 675-76. Thus, insider status is "determined by a factual inquiry into the

debtor's relationship with the alleged insider, including whether the debtor and the alleged insider dealt at arms length". Grossman v. Charmoy (In re Craig Systems Corp.), 244 B.R. 529, 539 (Bankr. D. Mass. 2000). A non-statutory insider is anyone "with a close enough relationship with the debtor such that his conduct requires rigorous scrutiny by the courts" or "an opportunity to self-deal or exert more control than is available to other unsecured creditors," In re Chas. P. Young Co., 145 B.R. at 136, or simply "one who does not deal at arms-length with the debtor," Tennessee Wheel and Rubber Co. v. Street (In re Tennessee Wheel and Rubber Co.), 62 B.R. 1002, 1005 (Bankr. M.D. Tenn. 1986); see also In re Three Flint Hill Ltd. P'ship, 213 B.R. at 299-300 (finding that a party was an insider for purposes of creditor voting classes because it engaged in a single transaction that was not a "carefully reasoned business decision," but instead an accommodation to a business partner; additionally, the relationship between the parties was not arms length, defined as dealings "entered into in good faith in the ordinary course of business by unrelated parties with independent interests"). In In re Broumas, 135 F.3d 769, 1998 U.S. App. LEXIS 3070 at *21-22, for example, the Fourth Circuit affirmed a bankruptcy court's finding of insider status where the evidence demonstrated a long term complex relationship including numerous contractual relationships, unwritten agreements and dealings, and joint participation in an illegal "wash trade" scheme that resulted in an SEC investigation and enforcement.

Here, the trial court expressly found that Lucent and Winstar did not deal at arms length, nor could Lucent reasonably dispute that fact in light of the overwhelming evidence at trial discussed supra, at p. 7-26. (Op. ¶71, 159). The trial court also found that Lucent "continued to control Winstar throughout the course of their relationship, including in December 2000", and used Winstar as a "mere instrumentality to inflate Lucent's own revenues." (Op. ¶71, 159). Throughout its opinion, the trial court cited numerous examples of such control, including Lucent's ability to compel Winstar's participation in fraudulent transactions such as the bill and hold deals and the September 2000 software deal, and the fact that by virtue of a series of

massive, last minute end of quarter deals since at least December 1999, Winstar was essentially Lucent's "captive purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its own revenue." (Op. ¶71). These findings were supported by the evidence and anything but clearly erroneous (nor are they challenged by Lucent in its brief on appeal).

Lucent attempts to rewrite well-settled case law when it asserts that the standard is identical for non-definitional insiders and insiders under the "person in control" portion of the insider definition, and that control within the meaning of the statutory definition is required in every case for non-statutory insiders. As demonstrated above, Lucent is plainly wrong. See, e.g., In re Oakwood Homes Corp., 340 B.R. 510; In re Broumas, 203 B.R. at 391; In re Allegheny Int'l, Inc., 118 B.R. at 298.

In sum, the evidence at trial establishes beyond doubt and under any standard of review that before, on and after December 7, 2000, Lucent and Winstar were not dealing at arms length and had precisely the "close relationship" that mandates a finding that Lucent was a non-statutory insider of Winstar.

**B.    The December 7, 2000 Transfer Was Not Earmarked For Lucent**

The parties agree that to establish an earmarking defense, there must be: (1) an agreement between the new lender (Siemens) and the debtor (Winstar) that the loan funds would be used exclusively to pay a specified antecedent debt; (2) performance of the agreement in accordance with its terms; and (3) no diminution of the debtor's estate as a result of the transaction. McCuskey v. Nat'l. Bank of Waterloo (In re Bohlen Enters. Ltd), 859 F.2d 561, 566 (8th Cir. 1988); In re Kumar Bavishi & Associates, 906 F.2d at 944; AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distribution, Inc.), 315 B.R. 24, 30 (Bankr. D. Del. 2005).

**1.    The Trial Court Correctly Found That Siemens
Did Not Require Winstar To Repay Lucent**

The central inquiry for earmarking is "whether the debtor had the right to disburse the funds to whomever it wished, or whether the disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor." In re Superior Stamp and Coin Co., Inc., 223 F.3d 1004, 1009 (9th Cir. 2000); In re Ameriserve Food Distribution, Inc., 315 B.R. 24, 30

(Bankr. D. Del. 2005); New York City Shoes, Inc. v. Best Shoe Corp., 106 B.R. 58, 61 (E.D. Pa. 1989) ("For funds to be earmarked, the third party lender must exercise strict control over the distribution of the funds which it advances to the debtor"). Here, there was no agreement between Siemens and Winstar requiring Winstar to pay Lucent with the Siemens funds.

Kevin Holwell, Siemens' 30(b)(6) corporate representative (*B685-86*), testified that Siemens did not require Winstar to use the Siemens funds to pay Lucent. Instead, the Siemens loan was to provide working capital to be used as Winstar saw fit:

> A.    Approximately in the August 2000 time frame, the -- we changed; the type of loan discussion changed.
> Q.    And can you just bring me through what that change was?
> A.    Uh-huh.  The change was from being a vendor financing agreement, where, as I described earlier, they would take delivery of goods and services and draw down on the loan to facilitate payment.  It changed to a working capital loan where Siemens would provide a loan to Winstar of a certain amount, and Winstar could use that for whatever its corporate purposes were.

(Holwell *B927*) (Emphasis added).

The amendment to the Bank Facility through which Siemens joined the senior bank group likewise supports the determination that there was no agreement between Siemens and Winstar to use the Siemens funds to pay Lucent. That amendment modified the existing Bank Facility between Winstar and the senior lenders and, among other things, provided that the $200,000,000 to be lent by Siemens would be included in the Bank Facility as part of "Term Loan C". (DX-516 *B1850-1943*). The amended Bank Facility described the new credit provided by Siemens, as follows:

> (iv)  $200,000,000 for general corporate purposes under a senior secured term loan facility (the "*Term Loan C Facility*"...)

(DX-516 *B1851*) (Emphasis added). The "general corporate purposes" language contained in the Bank Facility amendment is identical to that found in the loan documents in Ameriserve Food Distribution, where the court found such language precluded earmarking. 315 B.R. at 30.

Lucent ignores Holwell's testimony and the clear language of the Bank Facility amendment.  Instead, to concoct an agreement, Lucent selectively — and deceptively — quotes

from a memorandum prepared by the Bank Facility agent to the other senior lenders. This internal Bank Facility memorandum is not an agreement between Siemens and Winstar. And the memorandum, in any event, does not support Lucent's position. The memorandum states that Winstar "intends on utilizing up to $200 million of proceeds from the Additional Capital to repay outstandings under the credit agreement with Lucent." (DX-721 *B2089*). The term "Additional Capital" is defined to include more than $1 billion of new funds to be available to Winstar:

> The Additional Capital is comprised of a (i) $270 million private equity investment...(ii) $500 million equipment leasing facility ... with an affiliate of Cisco..., (iii) $50 million equipment leasing facility with Compaq... and (iv) $200 million senior loan made by Siemens Financial Services, Inc. (the "Siemens Loan").

(DX-721 *B2089*). Thus, all the memorandum shows is that the senior bank group acknowledged that Winstar "intended" to use "up to" $200 million of the "Additional Capital" to pay Lucent. Winstar's obligation to pay Lucent arose only from the Second Credit Agreement, which was an agreement between Winstar entities and Lucent. To honor its obligation to Lucent under the Second Credit Agreement, Winstar could have used <u>other</u> funds to pay Lucent (not the Siemens funds), including the $270 million private equity investment Winstar received on December 7, 2000 as part of the "Additional Capital" under the amended Bank Facility. To establish earmarking, Lucent was required to show that the Siemens proceeds <u>had</u> to be used to pay Lucent because Winstar's agreement with <u>Siemens</u> required that the Siemens proceeds be used exclusively for that purpose. The evidence is directly to the contrary.

### 2. The Trial Court's Finding That The Transaction Diminished The Winstar Estate Was Not Clearly Erroneous

Lucent admits that the collateral securing its loans under the Second Credit Agreement differed significantly from the collateral securing the Bank Facility. The Bank Facility was secured by Winstar's network; Lucent was secured by the assets of the special purpose entities borrowing under the Second Credit Agreement, WVF-1 and WVF-LU2. Lucent argued throughout the trial that its security position was inferior to that of the Bank Facility, and contended that it was damaged by the Siemens loan because Siemens, a newcomer, would have a

stronger collateral pool than Lucent. Despite these admissions, Lucent now contends there was no diminution to Winstar when Winstar increased its debt under the Bank Facility to pay down the Lucent facility, because the Bank Facility was not over secured. This is precisely the opposite of what Lucent argued at trial, when it offered evidence, including an expert, in an attempt to prove that Winstar was solvent on December 7, 2000.

The trial court's correct, and unappealed, finding of insolvency does not support Lucent's new position that the Bank Facility was undercollateralized on December 7, 2000. The Trustee's proof, and the trial court's findings, suggested that Winstar was insolvent by "approximately $1.6 billion." (Op. ¶123). Since the Trustee proved Winstar's debts on December 7, 2000 were $4.8 billion, the approximate $3.2 billion in assets found by the trial court would appear to be more than ample to secure the $1.315 billion Bank Facility debt. Certainly, Lucent introduced no evidence to prove the Bank Facility was undercollateralized on December 7, 2000.

### 3. Lucent Stipulated That The Proceeds Of The Siemens' Loan Was A Transfer Of An Interest Of Property Of The Debtor

The trial court also correctly found that Lucent waived the earmarking defense when it stipulated that the Trustee had satisfied the requirements of Bankruptcy Code section 547(b)(1). Lucent now attempts to twist the plain meaning of that stipulation. Lucent suggests that it only stipulated to the "to or for the benefit of a creditor" language contained in section 547(b)(1). But, the stipulation is not so limited. The stipulation states that the Trustee has satisfied the requirements of Section 547(b)(1) which includes the "transfer of an interest of the debtor in property" not merely the "to or for the benefit of a creditor" requirement. If Lucent wished to so limit the stipulation it could have easily done so by stipulating only to the provisions of subdivision (1) of section 547(b). It did not do so and now cannot be relieved of the consequences of its own stipulation.

### 4. Lucent Waived The Earmarking Defense By Failing To Raise It In Its Answer Or In The Joint Pre-Trial Memorandum

The trial court also ruled that Lucent waived earmarking by failing to assert it in its answer. While Lucent argues to the contrary, some courts have placed the burden of proving

earmarking on the defendant. In re Ameriserve Food Distribution, Inc., 315 B.R. at 29-30 (considering earmarking as an affirmative defense); Wasserman v. Village Assocs. (In re Freestate Mgmt. Serv., Inc.), 153 B.R. 972, 981-82 (Bankr. D. Md. 1993).

Furthermore, Lucent never raised the issue of whether or not the preference payment was a "transfer of an interest of the debtor in property" or "earmarking" in the pre-trial order. (B172-74). Local Delaware Bankruptcy Rule 7016-2(d) requires a statement of the issues of fact which any party contends remain to be litigated which should be as detailed as circumstances permit. While Lucent specifically raised Sections 547(b)(3) (insolvency) and 547(b)(4) (insider) as issues of fact for the trial, it chose not to raise the precursor in 547(b) (that it now argues is an essential element of the claim). Lucent not only failed to raise the issue in its Answer or in the Pretrial Order; it also failed to raise the issue, and prejudiced the Trustee, by waiting until after the Trustee rested her case. (Op. ¶97). The trial court thus did not abuse its discretion when it determined that Lucent waived this issue. See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466 (3rd Cir. 1988).

### III.    THE TRIAL COURT PROPERLY REJECTED LUCENT'S SECTION 547(C)(4) NEW VALUE DEFENSE

Lucent contended below that it supplied $133,486,248.48 of new value in the form of goods and services after it received the preferential payment. The trial court rejected Lucent's claim of new value in its entirety, finding that Lucent failed to meet its burden of proving both that Lucent provided new value after December 7, 2000, and that the new value was unsecured. (Op. ¶¶148-151). On appeal, Lucent has reduced its claim to (i) $28.4 million of new value in goods and related services,[18] and (ii) $62.3 million of new value for funding a December 29, 2000 draw request.[19] Lucent's reduced claim fails for the reasons correctly found by the trial court.

---

[18]    Lucent refers to $28.6 million of new value from goods invoices collected in DX-644 (B1944-2066). At trial, it contended that there was $28,411,318.48 in new value from goods, which is the total of the invoices included in DX-644 with one stipulated correction at trial. (LFOF, ¶449-50 B572). Lucent has not explained why it has increased the value of this component of its new value claim by almost $200,000; presumably, it is ignoring its prior stipulation. We will refer to the claim as a claim for $28.4 million.
[19]    Lucent no longer seeks a new value credit for its purported extension of software licenses under the sham software deal. (See LFOF ¶¶453-54, 465 B573, B576).

A.    **Lucent Failed To Prove It Provided $28.4 Million In New Value For Goods And Related Services**

Lucent asserts that it provided $28.4 million of new value that "had absolutely nothing to do with Lucent's secured lending to Winstar or the collateral pledged to support Lucent's secured loans." (Lucent Br. at 42). If this is true, then Lucent filed — and still maintains — a fraudulent claim by virtue of its October 25, 2001 secured proof of claim. (PX-340 *B1556-64*). It would also mean that Lucent deceived the Bankruptcy Court and the Trustee when it attested to its secured position in three stipulations (collectively, the "Escrow Stipulations"). (PX-506 - PX-508 *B1667-706*).

When Lucent filed PX-340, it identified as secured virtually all of the $28.4 million of equipment and services that Lucent claims as new value. (PX-340, tab A.3 *B1556-64*; DX-644 *B1944-2066*).[20]  The Bankruptcy Court relied on Lucent's admissions in PX-340, as well as Lucent's claims that it was secured in the Escrow Stipulations. (Op. ¶150). The Bankruptcy Court also concluded that Lucent was in fact secured under the lending documents, which gave Lucent a first-position lien on all of the equipment, general intangibles, and proceeds held by the borrowing entities regardless of whether such equipment was financed under the Second Credit Agreement. (Op. ¶150; DX-32 at §§ 1.02, 2.01 *B1793-96*; DX-33 at §§ 1.02, 2.01 *B1813-16*).

Lucent raises a new argument as to why its goods and services were not secured. Lucent incorrectly claims that the invoices it prepared (See Terrell *B791*) demonstrated that the purchasers of the equipment were not WVF-1 or WVF-LU2 (the special purpose borrowers holding Lucent's collateral) but were other Winstar entities, and therefore the goods were not secured at purchase under the terms of the Security Agreements. Lucent's only support for its position is that the DX-644 invoices list other Winstar entities as the "ship to" or "bill to" parties. But that is not proof that WVF-1 or WVF-LV2 did not hold title to the equipment in question; instead it reflects the fact that the network was being built and operated by other Winstar entities

---

[20]    In her proposed findings of fact at ¶239, the Trustee prepared a chart showing the location on tab A.3 of Lucent's proof of claim of $25,354,554 of the $28 million of alleged new value invoices included in DX-644. (TFOF ¶239, *B259-61*).

— as was expressly permitted under the Second Credit Agreement and the Security Agreements. (DX-32 at §4.01 *B1797*; DX-33 at §4.01 *B1817*; DX- 29 at §6.13 *B1789-91*).  In fact, none of the invoices that were financed under the Second Credit Agreement identified WFV-1 or WVF-LU2 as the "bill to" or "ship to" party either. (See, e.g., DX-1 *B1709-23*).  The parties understood that all of these purchases were to be financed, just as the DX-1 invoices were financed, and as such that title had to be held by the special purpose entities.[21]  Lucent made no effort to prove that the borrowing entities did not hold title to the goods from the date of purchase, and as a result, failed to satisfy its burden of proof that the goods were not subject to the Security Agreements.  That Lucent understood WVF-1 and WVF-LU2 to be the owners is clear from its decision to include these invoices in PX-340, its secured claim.

Lucent's unsupported argument about ownership also fails because Lucent did not raise the issue below.  Instead, Lucent argued that the goods and services were unsecured because they had not been financed, and never contended or even suggested that the trial court should treat the purchases as unsecured because the purchases were not made by WVF-1 or WVF-LU2.  (Op. ¶¶461-466).  Had Lucent raised this issue at trial, the Trustee would have had the opportunity to present whatever evidence she deemed necessary.  Having deprived the Trustee of this opportunity, Lucent is barred from raising this issue for the first time now.

As a general rule, appellate courts will not entertain an issue on appeal that was not raised below. See, e.g., In re General Datacomm Indus., Inc., 407 F.3d 616, 624 n.13 (3d Cir. 2005); Brown v. Philip Morris Inc., 250 F.3d 789, 799 (3d Cir. 2001).[22]  Such refusal is deemed "essential in order that parties may have the opportunity to offer all the evidence they believe is relevant to the issues...[and] in order that litigants may not be surprised on appeal by final

---

[21]      As far as the Trustee is aware, the only purchase Winstar ever made in the strategic partnership that was not to be funded under the Second Credit Agreement was the software pool — which Lucent no longer claims as new value.  The Second Credit Agreement specifically stated that it could only be used for the payment of equipment "acquired" by WVF-1 and WVF-LU2. (DX-29 §6.06 *B1782*).

[22]      Only under the most exceptional circumstances, such as "a claim of illegal incarceration, a jurisdictional challenge, a claim of sovereign immunity, a serious issue of public policy, a change in law, or for error that works manifest injustice," have appellate courts exercised discretion to address an issue for the first time on appeal.  19 JAMES WM. MOORE, ET AL., MOORE'S FED. PRAC. ¶205.05[2] (3d ed. 2001). None of these exceptions apply at bar.

decision there of issues upon which they have had no opportunity to introduce evidence." Singleton v. Wulff, 428 U.S. 106, 120, 49 L.Ed.2d 826, 96 S. Ct. 2868 (1976) (quoting Hormel v. Helvering, 312 U.S. 552, 556, 85 L.Ed. 1037, 61 S. Ct. 719 (1941)). This is axiomatic at all levels of appellate review, including before the district courts. Hutchins v. Commonwealth Mortgage Corp., 165 B.R. 401, 405 (E.D. Pa. 1994) (appellant failed to raise merger argument in the bankruptcy court even though it could have and therefore waived its right to raise that issue on appeal before the district court); Jacoury v. Anderson (In re Ozark Rest. Equip. Co.), 850 F.2d 342, 345-46 (8th Cir. 1988) (district court properly determined that it could not consider an issue not raised in the bankruptcy court).

The trial court also found that Lucent failed to meet its burden of proof of showing that the $28.4 million of new value was provided after December 7, 2000. With respect to goods, new value is provided when the goods are shipped. Rushton v. E&S Enters. Inc. (In re Eleva), 235 B.R. 486 (B.A.P. 10th Cir. 1999); see also In re New York City Shoes, 880 F.2d 679 (3d Cir. 1989). For services, new value is provided when the services are performed. Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.), 321 B.R. 388 (Bankr. D. Del. 2005).

Contrary to Lucent's assertion, Vernon Terrell's testimony was far from conclusive as to when Lucent shipped its goods and performed any related services. Terrell testified that under Lucent's invoicing practice, invoices were prepared at some point after 90-95% of the underlying goods and services had been shipped or provided:

> While this order's being built and then shipped, the order manager will then electronically send an electronic folder with all the pertinent documents -- the purchase order, the firm price quote, the shipping records, et cetera, over to the building team, and we call them asset management. That's the billers, and in this process the asset manager is checking -- first of all, they understand the contract terms. They're watching the system. When I say the system, various numbers of systems to see if this order has shipped. Is it 50, 60, 70, 95% shipped?
>
> Once they verify that, they then verify the documents -- the purchase order, the quote, and has it shipped at that 90 or 95% threshold. And then they invoice the customer. And of course a collection process begins to ensue here, and we're obviously looking for cash to pay that invoice off. And that's just a brief high level [overview].

(Terrell *B791*). Terrell did not state when the shipments made to reach that threshold occurred, which is the controlling fact.[23]  Nor did Lucent provide any other evidence of shipment, such as the print out of the electronic folder referenced in Terrell's above quoted testimony.

Lucent also failed to prove the specific amount of the new value it allegedly provided, which is an essential element of the claim. In re Spada, 903 F.2d at 976-77 (creditor must prove specific amount of new value provided); Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina S.P.A. (In re R.M.L., Inc.), 195 B.R. 602 (Bankr. M.D. Pa. 1996), aff'd, 127 F.3d 1096 (3d Cir. 1997)(creditor must prove amount of 547(c)(4) new value with specificity). The amounts stated as the invoiced prices are insufficient for Lucent to meet its burden of proof on the issue of value in light of the nature of the Lucent/Winstar relationship, where the proof at trial established that Lucent regularly forced unwanted and unneeded goods on Winstar and charged Winstar more than market prices for such goods to boost its revenues.  (Op. ¶¶60, 71; PX-22 *B1069*; Hicks *B912-13*; Rubin *B998-1001*; Zlotnick *B1034, 1041-42*).

### B. Lucent Failed To Prove That it Provided $62.3 Million Of Unsecured New Value For The Subcontract Payment

Lucent also claims that it provided $62.3 million of new value on December 29, 2000 because it was undercollateralized when it paid for the Wireless Subcontracting services by funding a draw request.[24]  As with the $28.4 million claim, Lucent failed to prove both that (i) the financing was not secured and (ii) the services financed were provided after December 7, 2000.[25]

---

[23]    Terrell also testified:

Q.    Okay, now respect to the shipping time frame, did you in your analysis confirm that all of the invoices that are collected at Exhibit DX-644 were shipped by Lucent between December 8, 2000 and April 18, 2000?

A.    In my analysis that is correct.

(Terrell *B792-93*). In testifying as he did that the "invoices" "shipped", Terrell did nothing more than state that the invoices were issued after December 7, 2000.

[24]    Lucent asserts that the trial court failed to address its $62.3 million "new value" claim in its decision. We disagree: in fact, the Opinion specifically referred to Lucent's claim that it gave new value "when it continued to loan under the Second Credit Agreement" (Op. ¶148), and did not distinguish among Lucent's claims when rejecting them. (Op. ¶¶149-151). We respectfully submit that the court should have ignored Lucent's $62.3 million new value claim, because Lucent never mentioned the claim during the trial and asserted it for the first time in its proposed findings of fact and conclusions of law.

[25]    Lucent contended in its proposed findings that the claim was for new services, not new credit: "From December 7, 2000 . . . to April 18, 2001 . . . Lucent provided Winstar with $133,486,248.48 in equipment, software and services" (LFOF *B572*); "Lucent also provided Winstar with $62,324,930.00 in additional financing that Winstar used to pay for network build out services" (LFOF *B574*). Presumably,

Under the Security Agreements and the Second Credit Agreement, Lucent possessed an unavoidable security interest for any advance under the second Credit Agreement, including the $62.3 million advance in question. (PX-342 *B1589-1613*; DX-32 *B1793-812*; DX-33 *B1813-32*; PX-506-508 *B1667-706*). Lucent argues that the advance was not secured because Lucent was undercollateralized at the time of the advance and the advance financed services which Lucent asserts (without any evidentiary support) did not increase the value of Lucent's collateral pool. Lucent's argument today conflicts with its October 2001 position, when it filed its secured proof of claim and claimed under penalty that this $62.3 million loan was fully secured, <u>and</u> that the value of the collateral securing the loans was "[i]n excess of [the] dollar amount of claims [$799,060,307.68]" (see PX-342 *B1589*). At trial, Lucent never attempted to modify its proof of claim or demonstrate that its proof of claim was wrong, and never submitted any proof as to the value of its collateral at any time.

Moreover, Lucent's undercollateralization theory conflicts with the plain language of the Code. Section 547(c)(4)(A) does not distinguish between whether credit is fully secured or undersecured at the time of the advance. Instead, the Code "simply disqualifies any new value that is secured."[26] As Bankruptcy Judge Leif Clark stated:

> Thus, it appears from a plain reading of the statute[27] that even creditors, such as SPC, who are undersecured, will find the new value they extend disqualified if

---

Lucent did so because it failed to advise the Court (or the Trustee) that it would claim new credit as new value in the pretrial order (*B170-80*) and hence was precluded from doing so. Indeed, for the $62.3 million to be "new value" at all, it had to be the underlying services by Lucent (via the Wireless Subcontract) because the $62.3 million loan merely converted a $62.3 million account payable to Lucent into $62.3 million owed to Lucent to pay Lucent the account payable owed to it in an identical amount. If the new value was considered as services as Lucent previously characterized them, Lucent failed to prove that the services were provided after the preference date. Lucent provided no evidence to meet its burden of proving when the underlying services were performed, and the Trustee's evidence established that the bulk of the network buildout services were provided before December 7, 2000. (PX-241 *B1516*).

[26]    11 U.S.C. § 574(c)(4) exempts from preference recovery new value "(A) not secured by an otherwise unavoidable security interest".

[27]    The plain meaning of a statute is conclusive except in the rare cases when the literal application of a statute produces a result "demonstrably at odds with the intentions of the drafters." <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed.2d 290 (1989)(citation omitted). The Supreme Court has reiterated this strict constructionist approach. <u>Hartford Underwriters Ins. Co. v. Union Planters Bank</u>, 530 U.S. 1, 7, 120 S. Ct. 1942, 147 L. Ed.2d 1 (2000) (noting that Congress 'says in a statute what it means and means in a statute what it says there', <u>quoting</u> <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 254, 112 S. Ct. 1146, 117 L. Ed.2d 391 (1992)).

the new credit is secured, pursuant to the terms of the lender's security instruments.

\* \* \*

Any other rule would require us to value the creditor's collateral position at the point of each extension of new value to test whether the creditor were undersecured, a decidedly unwieldy and impractical burden that this court doubts was what Congress had in mind when it wrote this particular provision. The plain meaning interpretation adopted by this court both comports with the reality of secured financing documents and avoids this sort of unwieldy litigation. No ambiguities or absurdities are suggested that require a departure from plain meaning.

Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery Ltd. P'ship), 178 B.R. 426, 443-44

(Bankr. W.D. Tex. 1995), rev'd on other grounds, 171 F.3d 249 (5th Cir. 1999).[28]

Lucent cites to three cases to support its proposition. None of those cases addressed Krafsur or the plain meaning rule, and each is distinguishable. In Southern Tech. College v. Graham Props. P'ship, 199 B.R. 46 (Bankr. E.D. Ark. 1995), aff'd 89 F.3d 1381 (8th Cir. 1996) ("STC"), and Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.), 320 B.R. 242 (Bankr. D. Conn. 2005) ("ICL"), the security in question was a cash security deposit, rather than a collateral pool, and the advances were not loans governed by lending documents providing security interests, but were instead two months of unpaid rent (in STC) and unpaid-for electricity (in ICL). These differences are significant. In both STC and ICL, the parties could know at the time of the advances that the new credit exceeded the fixed amount of security provided and that the new value was not being provided on a secured basis; nor could there be a claim that advances in excess of the fixed deposits were secured under the contracts. That is not the case here, where Lucent's security, like that of the creditor in Krafsur, was based on a collateral pool whose value varied over time, and where the creditor intended to be secured and could claim to be secured in subsequent bankruptcy proceedings for the full amount of credit extended based on its loan documents – which is exactly what Lucent did in this case. Likewise, In re Hygrade Envelope Corp., 393 F.2d 60 (2d Cir. 1968), does not help Lucent.

---

[28]    As set forth above Lucent never before took the position that it made it was either unsecured or undersecured when it made the $62.3 million advance, "Absent affirmative proof that the creditor intended its credit to be unsecured, the usual (and justified) assumption is that the future advance clause rendered the advances secured." Krafsur, 178 B.R. at 444, n. 16 (emphasis in original).

In Hygrade, the Trustee sought to recover the proceeds of an insurance policy pledged to a creditor. First, Hygrade was decided under Section 60(c)[29] of the Bankruptcy Act and does not address the present statute. Secondly, the Second Circuit found that the creditor's post preference advances were not made "without security of any kind." 393 F.2d at 65. And finally, although the Court determined that the new advances could be set off against the proceeds of the policy it did so because it found that the policy constituted new collateral for the new advances made by the creditor. Thus, the case is inapposite.

Finally, although not cited by Lucent in its brief, Lucent relied below on Intercontinental Polymers, Inc. v. Equitable Chem., LP (In re Intercontinental Polymers), 2005 Bankr. LEXIS 997 (Bankr. M.D. Tenn 2005) to support its argument. Intercontinental was wrongly decided because it did not address the plain meaning of Section 547(c)(4) and incorrectly construed the Fifth Circuit decision in In re Micro Innovations Corp., 185 F.3d 329 (5th Cir. 1999). In Micro Innovations, the court allowed a new value claim because the security interest was unperfected and therefore not "unavoidable" as required under the Code. 185 F.3d at 335. The Intercontinental court incorrectly read Micro Innovations as holding that to the extent a creditor was ultimately undersecured, its security interest was avoidable, a finding directly in conflict with Krafsur. The Code does not look to the value of a creditor's security, but looks only at whether the creditor received an unavoidable security interest.

**C.    Lucent Failed To Meet its Burden To Show That It Was Undercollateralized**

Assuming that Lucent's interpretation of Bankruptcy Code Section 547(c)(4) is correct (and it is not), Lucent still has the burden to show that it was undercollateralized and by how much in order to establish that the $62.3 million advance constitutes new value. 11 U.S.C. §547(g). Lucent failed to meet its burden because it never submitted any evidence that it was undercollateralized. In fact, everything that Lucent submitted to the Bankruptcy Court, including its expert witness who testified that Winstar was solvent in December 2000 and its secured proof

---

[29]    Section 60(c) provided in pertinent part: "If a creditor has been preferred, and afterwards. . . gives the debtor further credit without security of any kind, the amount of such new credit remaining unpaid. . . may be set off against the amount which would otherwise be recoverable from him."

of claim (PX-342 *B1589-1613*), established that it was fully collateralized. This would comport with the trial court's findings. (Op. ¶123). The trial court determined that Winstar had assets as of December 7, 2000 of $3.2 billion. After deducting out the Bank Facility of $1.315 billion, Winstar still had over $1.88 billion of assets to secure Lucent's approximately $800 million secured claim. Accordingly, there was more than sufficient collateral value available to Lucent to support the $62.3 million advance. If Lucent contended otherwise, it was incumbent upon Lucent to submit evidence that its proof of claim was erroneous and to establish the extent to which Lucent was undercollateralized when it made that advance.

## IV. THE TRIAL COURT'S DECISION TO EQUITABLY SUBORDINATE LUCENT'S CLAIMS SHOULD BE AFFIRMED

Courts considering equitable subordination follow the Mobile Steel test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977). When the creditor is an insider, a bankruptcy trustee need only show "material evidence" of unfair conduct. In re N&D Prop., Inc., 799 F.2d 726, 731 (11th Cir. 1986); see also In re Epic Capital Corp., 290 B.R. 514, 524 (Bankr. D. Del. 2003), aff'd, 307 B.R. 767 (D. Del. 2004); Fabricators, Inc. v. Tech. Fabricators, Inc., 126 B.R. 239, 246 (S.D. Miss. 1989), aff'd, 926 F.2d 1458 (5th Cir. 1991) (affirming entry of summary judgment where the creditor used its insider position to improve its security and encouraged others to lend despite knowing of the financial weakness of the debtor). For non-insider claimants, "evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary." Capital Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332, 1360 (1st Cir. 1992). Nevertheless the test is the same; only the standard of proof required differs. Id.

Here, as discussed above, the trial court correctly found that Lucent was an insider. (Op. ¶146). The trial court also found that Lucent engaged in sufficiently egregious conduct to

equitably subordinate Lucent's claims even if it were not an insider, finding that "the same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues." (Op. ¶¶158, 159). In particular, the trial court found that Lucent's repeated extortion of revenue from Winstar by its threats of contractual breach and Lucent's intentional withholding of the refinancing notice to lure additional funding from other creditors and investors into the company merited equitable subordination. (Op. ¶159). The trial court found that the damage caused by Lucent's unfair conduct far exceeds the $22 million in the escrow funds, even after Lucent's repayment to the estate of the preferential payment. (Op. ¶160).

On appeal, Lucent asserts that: (i) it was not an insider of Winstar and therefore the trial court used the incorrect standard to determine equitable subordination; (ii) the trial court did not "quantify" the harm caused by Lucent to Winstar's other creditors; and (iii) the trial court incorrectly subordinated Lucent's claim to that of certain equity holders.

### A.    The Trial Court Applied The Correct Standard

Having found that Lucent was an insider, the trial court correctly noted that only "material evidence" of Lucent's misconduct was needed in order to meet the first prong of the test for equitable subordination. (Op. ¶154). Lucent apparently missed the next part of the Opinion holding that Lucent's conduct — including threatening Winstar with non-payment under the Subcontract to compel the borrowing and holding up sending the refinancing notice until new equity and financing was committed to Winstar — was sufficiently egregious to subordinate even a non-insider's claim, rendering Lucent's argument that the trial court applied the wrong standard moot. (Op. ¶159). In any event, the record in this case is replete with other examples of egregious fraud and overreaching by Lucent, all to Winstar's and its creditors' detriment. Such conduct ranges from the fraudulent bill and hold letters, to the repeated purchases of unneeded equipment (including $36 million of optronics ultimately worth no more than 30 cents on the dollar a year later) to the fraudulent September 2000 software transaction, among other things previously discussed. See, e.g., 604 Columbus Ave. Realty Trust, 968 F.2d at 1362

(subordination appropriate for claim of non-insider whose actions included improperly inflating debtor's borrowings and charging interest on the debt, thus engaging in "gross misconduct amounting to overreaching").

**B.    The Trial Court Adequately "Quantified" The Harm**

In arguing that the trial court erred by failing to quantify the harm allegedly caused to other creditors by Lucent's actions and failing to limit the equitable subordination remedy to that harm, Lucent again appears not to have read the Opinion, because the court did just that at paragraphs 160-162. The court found that Winstar had been damaged by, among other things, (i) interest paid to Lucent on its financing of Winstar's purchases of unneeded Lucent equipment; (ii) storage costs associated with the equipment purchases; (iii) withholding the refinancing notice which induced the Siemens loan and the infusion of $270 million in equity financing; and (iv) the purchase of over $244 million in unneeded Lucent equipment that was eventually sold for pennies on the dollar.[30] While the trial court did not supply an exact figure quantifying this harm, it did what it was required to do when it determined that the harm exceeded the full amount of the escrowed funds:

> In demonstrating the harm, the objecting party usually need not identify specifically each particular creditor who was harmed and quantify the injury suffered by each. If the misconduct results in harm to the entire creditor body, the objecting party need demonstrate only that the misconduct harmed the creditor body in some general, albeit concrete, manner.

In re 604 Columbus Ave. Realty Trust, 968 F.2d at 1363. Moreover, the burden of proof on the issue of harm shifted to Lucent once the Trustee showed that Lucent's conduct caused substantial harm. In re Mid-America Waste Sys., Inc., 284 B.R. 53, 72 (Bank. D. Del. 2002). If Lucent contends that the harm caused by its conduct did not exceed the amount of the subordinated escrow funds, it was up to Lucent to prove that fact. Lucent failed to do so.

---

[30] Lucent correctly notes that the unneeded equipment purchased under the Second Credit Agreement remained unpaid for (with the exception of the preference). Lucent conveniently forgets, however, that Winstar paid it $1.2 billion in May 2000 to pay off the First Credit Agreement borrowings, which included millions of dollars of unneeded purchases as well — including, for instance, the $36 million of optronics purchased in December 1999 previously discussed in this brief.

### C.    Subordination Of Lucent's Claim To Equity Is Allowed

The trial court subordinated Lucent's claims to all creditors and to the interest of those entities that infused $270 million of equity financing into Winstar during the time that Lucent withheld sending the refinance notice.  Concededly, Bankruptcy Code section 510(c) refers to subordination of claims to claims and interests to interests.  However, other courts have concluded that the doctrine is broad enough to subordinate claims to interests:

> the power of equitable subordination codified at 11 U.S.C. §510(c), allows a bankruptcy court to relegate even a secured claim to a lower tier, even to the lowest − the equity tier.

Matter of Lifschultz Fast Freight, 132 F.3d 339, 342 (7th Cir. 1997); see also, Sender v. The Bronze Group, Ltd. (In re Hedged-Inv. Assoc., Inc.), 380 F.3d 1292, 1296 (10th Cir. 2004)(Bankruptcy Court subordinated lender's claim to "equal priority with [] limited partners/equity investors": Tenth Circuit reversed on other grounds).  If this Court disagrees with the Bankruptcy Court's subordination of Lucent's claims to the equity investors, there can be no doubt that the Court should affirm the subordination of Lucent's claims to the claims of other creditors of the estate, all of whom were harmed by Lucent's inequitable conduct.

### V.    THE TRIAL COURT CORRECTLY FOUND THAT LUCENT BREACHED THE SUBCONTRACT

### A.    Background Facts

In March 1999, Lucent entered into the Subcontract with Wireless, effective January 4, 1999, under which Wireless would perform certain of the services required of Lucent in the Supply Agreement. (RJSF No. 7; PX-13 *B1048-55*; Kantor *B928-30*; Schacht *B1016-17*; Diroma *B867-69*; PX-90 *B1157-61*).  Lucent hired Wireless to perform services that Lucent was obligated to perform for Winstar under the Supply Agreement because Lucent was not capable of performing the services directly.  (Harris *B668*, *B672*; Schacht *B1008-09*, *B1016-19*; Kantor *B928-930*; Diroma *B854-56*).[31]  Lucent and Winstar expected that the services would be transitioned to Lucent as Lucent developed the necessary competencies to perform the services

---

[31]    Lucent claims that Winstar and Wireless only wanted the Subcontract to remain in place to secure "favorable accounting treatment."  But the court heard that argument below and properly rejected it based on the evidence presented. (Op. ¶30, n. 25).

directly. (Ackerman *B818-20*; Kantor *B928*; Schacht *B1008*, *B1016-17*). But Lucent never

developed the required competencies to perform all of the services directly. (Kantor *B935-36*;

Schacht *B1008*). Between January 1999 and October 2000, Lucent paid Wireless approximately

$325 million for services performed under the Subcontract. (Diroma *B855*; Aversano *B634*;

PX-92 *B1162*). And in December 2000 Lucent paid $62.3 million for such services for the period

ended December 31, 2000 (in connection with which it now seeks a new value credit). Each of

these payments was made without a prior issued Lucent task order or purchase order. (RJSF

No. 20; Diroma *B856*; Wilson *B807-08*; PX-325 *B1552*-53). During this time period, on repeated

occasions, Lucent advised that it wanted to replace the Subcontract with a transition agreement,

as originally envisioned in the Supply Agreement. (Wilson *B809-12*; DX-214 *B1844*; PX-390

*B1619*; PX-87-PX-88 *B1153-56*; PX-199 *B1480-81*). On repeated occasions, Lucent also advised

Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one

last time." (DX-214 *B1844*; PX-390 *B1619*; PX-88 *B1156*; PX-199 *B1480-81*; Schacht *B1022-*

*23*).

Several Lucent employees, including Schacht, testified that Lucent and Winstar were

engaged in a legally binding subcontracting relationship during 1999 and 2000. (Diroma *B865-*

*69*; Montemarano *B958-59*; Schacht *B1016-19*). Lucent employees admitted that: (1) Lucent

hired Wireless to perform services on its behalf throughout 1999 and 2000; (2) Lucent did so to

satisfy its turnkey obligations to Winstar under the Supply Agreement; (3) Lucent's obligations to

perform the buildout under the Supply Agreement were never modified; (4) the Subcontract was

in fact the written agreement under which Wireless performed services on Lucent's behalf; and

(5) ultimately, Lucent satisfied its monetary obligations under the Subcontract in every quarter of

1999 and 2000. (Id.; Montemarano *B968-70*; PX-325 *B1552-53*).

Lucent attacks the Trustee's breach of Subcontract claim primarily by arguing that

Lucent did not make the payment due for the 3 month period ending March 31, 2001 because the

parties did not follow the written terms of the Subcontract as regards a "task order." But the

parties stipulated that after the first quarter of 1999, Wireless and Lucent never exchanged a single task order. (RJSF No. 20).[32] Winstar employees testified, and documentary evidence demonstrates, that Winstar and Lucent did away with the task order process, exchanging instead less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. (Kantor *B949-50C*; Uhl *B1026-27*; PX-84 *B1140-41*; PX-243 *B1517-18*). And Lucent's former CEO and other Lucent witnesses testified that a binding subcontracting relationship existed. (Diroma *B857*, *B865-66*; Montemarano *B958-59*; Schacht *B1009*, *B1016-19*; RJSF No. 20).

Based on these facts, among others, the trial court found that Lucent and Wireless had entered into an enforceable agreement (the Subcontract), that they modified the Subcontract to eliminate task orders, and that Lucent then breached the Subcontract between Wireless and Lucent, causing Wireless $62,050,742.00 in damages.[33] (Op. ¶¶85-86). On appeal, Lucent argues that (i) the modification was ineffective due to a "no oral modifications" clause; (ii) the Subcontract was not modified, but that Lucent instead repeatedly "waived" the task order requirement; and (iii) the modified Subcontract was not breached. Each of these arguments fails.

### B.    The Trial Court Correctly Found That The Subcontract Was Modified

The trial court found that the parties' course of conduct established that the Subcontract had been modified to eliminate the task order requirement. (Op. ¶82). This finding is not clearly erroneous nor error under any other standard of review. Under New York law, the parties' course of conduct can in and of itself establish a modification to a contract, regardless of whether the contract contains a "no oral modification" clause. See, e.g., Rosen Trust v. Rosen, 386 N.Y.S. 2d 491, 499 (N.Y. App. Div. 1976), aff'd, 371 N.E. 2d 828 (1977) ("[A]ny written agreement... can be effectively modified by a course of actual performance."); Puma Indus. Consulting, Inc., v. Daal Assoc., Inc., 1986 WL 10281 at *3 (S.D.N.Y. Sept. 9, 1986), aff'd 808 F.2d 982 (2d Cir.

---

[32]    Even the first and only task order was itself prepared after Wireless performed the services referenced in the task order. (DX-142 *B1843*; Wilson *B805-06*).
[33]    This figure was reduced by $6.3 million in the Judgment, per the parties' stipulation on Lucent's offset claim. (Op. ¶86).

1987) ("the 1981 agreement was modified not orally, but by the parties' course of conduct. Such conduct . . . can modify an agreement which, by its own terms, requires written modification"); see also Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots, 878 F.2d 41, 45 (2d Cir. 1989) ("an agreement to modify a contract may be proven circumstantially by the conduct of the parties") (citations omitted); Hohmann and Barnard, Inc. v. Sciaky Bros., Inc., 333 F.2d 5, 9 (2d Cir. 1964) (course of conduct established modification of written contract); Rhythm & Hues, Inc. v. The Terminal Mktg. Co., Inc., 2004 WL 941908 at *13-14 (S.D.N.Y. May 4, 2004); New Line Cinema Corp. v. Atlantic Releasing Corp., 1985 WL 1622 at *4 (S.D.N.Y. June 12, 1985).

Here, the trial court correctly determined that the parties' course of conduct in performing under the Subcontract for two full years without task orders established a modification eliminating the task order requirement. (Op. ¶82). This finding was supported at trial not only by the course of conduct but also by the testimony of Winstar and Lucent executives. Winstar executives testified that the task order requirement had been eliminated from the Subcontract in favor of less formal documentation, including purchase orders, invoices, and other documents. (Op. ¶¶41-42; Kantor *B949-50C*; Uhl *B1026-27*; PX-84 *B1140-41*; PX-243 *B1517-18*). And Lucent executives, including corporate representative Jill Diroma and CEO Henry Schacht, admitted that Lucent made its payments under the Subcontract because it was contractually required to — despite the stipulated absence of any task orders. (Diroma *B865-66*; Montemarano *B958-59*; Schacht *B1009, B1016-19*).[34]

Lucent argues that despite the wealth of evidence establishing modification, the Trustee failed to provide evidence sufficient to overcome the "no oral modification" clause in the Subcontract. But even if one were to view this as a case where the modification is not by reason of the parties' course of conduct itself, an oral modification of a contract is nevertheless enforceable under certain circumstances. See, e.g., Rose v. Spa Realty Assoc., 366 N.E.2d 1279,

---

[34]    To the extent that Lucent will argue that a modification requires "consideration", the "consideration" here is self-evident: Until a transition agreement was established, Lucent would be in breach of the Supply Agreement but for the continued performance of Wireless.

1283 (N.Y. 1977) (modification can be found based on past oral exchanges or conduct of the parties); Olympia & York Battery Park Co. v. Ins. Co. of No. America Philadelphia, 1989 WL 63052 at *3 (S.D.N.Y. June 2, 1989); American Bag & Metal Co. v. Alcan Aluminum Corp., 497 N.Y.S.2d 787, 788 (N.Y. App. Div. 1985). Lucent concedes that New York law expressly recognizes two circumstances where partial performance of an oral modification is sufficient to overcome a "no oral modification" clause. First, it is well settled that such a clause will not bar an oral modification when there is partial performance that is "unequivocally referable" to such modification. Rose, supra; EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp.2d 412, 425 (S.D.N.Y. 2004) (evidence of partial performance including payments consistent with modification created triable issue of fact as to whether agreement was orally modified); Evergreen Marine Corp. v. Welgrow Int'l, 942 F. Supp. 201, 208-9 (S.D.N.Y. 1996) (payments between the parties traceable to oral modification); Sarcona v. DeGiaimo, 641 N.Y.S.2d 479 (N.Y. App. Div. 1996) (evidence of partial performance by payments in accordance with modification raised fact issue). Second, "once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, [that] party may be estopped from invoking the statute to bar proof of oral modification." PG 1044 Madison Ave. Assoc., LLC v. Sirene One, LLC, 369 F. Supp.2d 512, 516 (S.D.N.Y. 2005) (quoting Rose, 397 N.Y.S.2d 922 at 926); see also Pau v. Bellavia, 536 N.Y.S.2d 472, 474 (N.Y. App. Div. 1988) (citing Rose, 397 N.Y.S.2d 922 (N.Y. 1977)).

Here, the trial court found facts supporting the modification under both of these exceptions. (Op. ¶¶83-85). Wireless' performance of services pursuant to the Subcontract during every quarter in 1999, 2000 and into 2001 without a single task order, and Lucent's payment for such services in every quarter except the final one without the issuance of a single task order were incompatible with the express terms of the Subcontract.[35] The trial court correctly found that

---

[35]    In arguing that Winstar's conduct was otherwise referable to its need to build out the network, Lucent offers no explanation for its own conduct in paying for the services without task orders for eight

such conduct by both parties to the Subcontract was inexplicable absent the modification testified to by Winstar executives eliminating the task order requirement, and the modification was therefore enforceable regardless of the no oral modification clause. (Op. ¶85). The trial court also found that the two year history of performance — coupled with Lucent's historic use of the "one more time" strategy to pressure Winstar — induced Wireless' reliance, and barred Lucent from attempting to enforce the task order requirement in March 2001. (Op. ¶85).

### C.    Lucent's New "Waiver" Argument Is Not Supported By The Evidence

On this appeal, Lucent flipflops to a new argument that has not yet failed — but only because it was never tried below. For the first time, Lucent concedes that the quarterly payments were made under the Subcontract. Now Lucent contends, however, that the parties did not modify the Subcontract to eliminate the task order requirement, but instead agreed to a series of "waivers" of the task order requirement, which Lucent was free to end at any time. Lucent has no record evidence to support this new position — indeed, the record evidence is to the contrary.

Winstar employees testified that Winstar and Lucent eliminated the task order requirement, and not that Lucent waived it. (Kantor *B949-50C*; Uhl *B1026-27*). And the Lucent executives' testimony that the Subcontract was a binding agreement, even without task orders, is inconsistent with its new position that it could have stopped waiving the requirement at any time. (Diroma *B865-66*; Montemarano *B958-59*; Schacht *B1009, 1016-19*).

Lucent's "waiver" theory is also belied by its own conduct. On September 27, 2000, Lucent recognized that the Subcontract had been modified and that it was obligated to pay Wireless under the Subcontract even without the prior issuance of a task order when it requested Winstar's consent, in writing, to modify the Subcontract so as to require prior issuance of a purchase order before Lucent would become obligated to pay Wireless. (PX-110 *B1186-87*). If Lucent's new theory were correct, Lucent would have simply advised Winstar that Lucent would no longer "waive" the requirement of a task order. Instead Lucent sought (and given its control,

---

straight quarters, or for the testimony of its witnesses that Lucent was obligated to make the payments under the Subcontract (without reference to any "waiver").

obtained) Winstar's consent to a new requirement that Wireless services be pre-approved by Lucent (in conjunction with a written understanding that the parties would engage in immediate "lockdown" negotiations and a transition agreement would replace the Subcontract within a matter of weeks).[36]

Lucent again recognized that the Subcontract had been modified (and that (i) it had not "waived" compliance with the task order requirement and (ii) the September 27 letter did not change the Subcontract) in mid-December 2000 when Winstar requested that Lucent pay for the Wireless Subcontract services performed between October 2000 and December 2000. (Kantor *B943*). Lucent initially refused, before agreeing on December 27, 2000 to pay for the services. (Id.; Kantor *B947*; PX-22 *B1069*). Lucent advised Winstar at that time that it believed it had no contractual obligation to pay for Wireless' services. (Verwaayen *B798-99*, *B802-03*; Montemarano *B959-60*, *B968*). But internally, Lucent executives conceded that the company remained legally obligated to pay Wireless for the Subcontract services. (PX-199 *B1480-81*). Verwaayen, who "allowed" Winstar to draw down the December 2000 payment for Wireless services admitted that Lucent had no choice but to make the payment, and that Lucent used the refusal to get Winstar to agree to renegotiate the Supply and Credit Agreements:

> Well, after a read out from the lawyers and after reviewing the options with everybody on our pre call yesterday, Winstar can draw down upon the credit facility, including services. We did push back on credits (no cash, but off setting a/r's) and the 30 million request that came in Friday. We really had not the option of denying their rights here. In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change. So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship. We will create from both sides a wishlist how to recreate our legal platform working together and renegotiate on those issues. I think we all understand how much better we are and how to get

---

[36] To gain Wireless' consent, Lucent promised in the September 27, 2000 letter that it would quickly replace the Subcontract with a transition agreement under which Lucent would actually perform the Wireless services. (PX-66 *B1120-23*; PX-110 *B1186-87*; PX-113 *B1191-92*; Harris *B652-66*). Because Lucent never did so at all (let alone within the promised two weeks), the trial court concluded that the letter was just another example of Lucent's "one more time" strategy of threatening breach of the Subcontract to control Winstar. (Op. ¶80-81). In this connection, it is noteworthy that when a transition agreement was finally reached by Lucent's and Winstar's negotiating teams and approved by Winstar senior management in December 2000, Lucent's senior management arbitrarily rejected the transition agreement (after receipt of the preferential payment) even though it embodied all the terms that Lucent's senior management had instructed its negotiating team to achieve. (PX-112 *B1188-90*; Harris *B656-67*; Kantor *B940*, *B952-53*).

out of this situation going forward. We want to make this a profitable account with clear rules of engagement.

(PX-199 *B1480*).

While the evidence of modification is compelling, the evidence supporting Lucent's new waiver theory is non-existent. Accordingly, the trial court's finding that Lucent breached the modified Subcontract was not clearly erroneous and should be affirmed.

### 1.    Lucent is Barred from Asserting Waiver

Lucent's new waiver argument fails for another reason. While Lucent attempts to argue that the Bankruptcy Court "missed" what it suggests is a key distinction between what Lucent now alleges were "temporary waivers" as opposed to a "permanent modification" of the Subcontract, the "waiver" claim was never presented below — not in the pre-trial order, not at trial, not in briefs, not in the findings of fact or conclusions of law, not in the closing argument and not in briefs or the myriad post-closing argument letters which Lucent wrote to the Court. Accordingly, Lucent is barred from asserting waiver for the first time on appeal because its failure to do so deprived the Trustee of the opportunity to introduce additional evidence to refute this theory. (See cases cited supra, p. 41-42).

### D.    Lucent's Failure To Pay For The Services In March 2001 Was A Breach Of The Subcontract

Despite arguing throughout the trial and even in this appeal that there was no modification of the Subcontract, Lucent, in a last gasp attempt, seeks to recharacterize the modification to cut off its liability. Lucent argues that it had no obligation to pay for the services because the request for payment in March 2001 came from Wireless' parent company as a draw request, rather than as a Wireless invoice.[37] Lucent's argument overlooks the obvious: that the form of the request for payment has nothing to do with the obligation to pay itself. As the trial court found, Wireless and Lucent were parties to an enforceable contract in March 2001, Wireless

---

[37]    This, too, is a new argument raised by Lucent for the first time on appeal, and is barred for the reasons discussed in Point IV.C.1 above. While Lucent previously argued that the parties exchanged documentation different from that used up through September 30, 2000, it did not argue that the modified contract required Lucent's issuance of a purchase order; instead, it argued that Lucent and Winstar had been involved in a separate "subcontracting arrangement" outside of the Subcontract, which Lucent terminated in September 2000. (LCOL ¶¶19-23 *B594-96*).

performed services pursuant to that contract in the first quarter of 2001, and Lucent's failure to pay for those services was a breach. (Op. ¶85). It is just that simple.

With typical Lucent sleight-of-hand, Lucent selectively quotes from the Opinion to mischaracterize the findings as to the modification and raise its straw man, all based on its false premise that "even if the Subcontract had been modified so that an exchange of invoices and purchase orders triggered Lucent's obligation to pay, Lucent still would not have breached the Subcontract." The Trustee never argued that Lucent's obligation to pay was triggered by purchase orders or invoices: instead, Lucent's obligation to pay, in every quarter, was triggered by Wireless' performance of services on Lucent's behalf. Lucent itself recognized that its duty to pay was not triggered by purchase orders: in December 2000, Lucent paid for the Wireless services without purchase orders or invoices, using instead the identical forms of documentation as were submitted in March 2001. (Op. ¶¶72, 78-79). And Lucent ignores the fact that when it received that documentation in December 2000, its executives initially told Winstar that they would not pay (as usual), but internally conceded that they had no "option" other than to pay, and explained to Lucent's CFO that Lucent was continuing its practice of exacting concessions from Winstar by threatening breach. (Op. ¶¶73-77, 81; PX-199 *B1480-81*). If a demand was required, Lucent received it two weeks later, when Wireless included this breach of Subcontract claim in the adversary proceeding.

**E.    The Trial Court Properly Entered Judgment On The Subcontract Claim, As Opposed To Submitting Proposed Findings Of Fact And Conclusions Of Law**

In footnote 56 of its brief, Lucent (for the third time) asks this Court to hold that the Subcontract claim is non-core and that the trial court determination violated Lucent's seventh amendment right to a jury trial. This Court previously held that the Subcontract claim is part of the claims allowance process triable only in equity. (Dist. Ct. Op. p.8 *B101*). The trial court followed this Court's rulings, and determined that it could render final judgment on the Subcontract claim because 28 U.S.C. § 157(b)(2)(B) includes as core matters the allowance or disallowance of claims against the estate. The trial court also correctly noted that Lucent waived

any objection to its entry of final judgment by itself requesting final judgment on repeated occasions. (Op.¶¶5, 17). Nevertheless, Lucent argues that the Subcontract claim is not part of the claims allowance process, citing Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982). Marathon is not on point, because the defendants there did not file proofs of claim and were "otherwise uninvolved in the underlying bankruptcy proceeding." See Committee of Unsecured Creditors v. Motorola (In re: Iridium Operating LLC), 285 B.R. 822, 834 (S.D.N.Y. 2002), aff'd 165 Fed. Appx. 828 (2d Cir. 2005). Iridium is on point. There, Motorola and Iridium entered into two pre-petition contracts under which Motorola would build out and maintain Iridium's satellite system. After Iridium filed bankruptcy, it sued Motorola asserting five core and five non-core claims. Motorola's motion to withdraw the reference was denied because it had filed proofs of claim and asserted counterclaims arising from the pre-petition contracts, invoking the claims adjudication process. Like Motorola in Iridium (and unlike Marathon), Lucent filed multiple proofs of claim including claims based on the contracts between the parties. And as in Iridium, Lucent filed counterclaims and affirmative defenses arising from the same transaction and "logically connected to each other," rendering all of the claims core. Iridium, 285 B.R. at 834.

## CONCLUSION

For all of the above reasons, the Judgment should be affirmed in all aspects.

Dated:  June 15, 2006
       Wilmington, Delaware

Stephen M. Rathkopf, Esq.
David R. King, Esq.
Andrew C. Gold, Esq.
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, NY 10016
(212) 592-1400

*Attorneys for Christine C. Shubert,
Chapter 7 Trustee*

FOX ROTHSCHILD LLP

  /s/ Sheldon K. Rennie (#3772)  
Sheldon K. Rennie, Esq.
919 N. Market Street, Suite 1300
Wilmington, DE  19801-3046
Telephone (302) 654-7444

# UNREPORTED DECISIONS

## Exhibit A

LEXSEE 1998 U.S. APP. LEXIS 3070

In Re: JOHN GEORGE BROUMAS; In Re: RUTH D. BROUMAS, Debtors. JAMES P. KOCH, Trustee, Plaintiff-Appellee, v. L. LAWTON ROGERS, III, d/b/a Rogers Investments; ROGERS & KILLEEN, Defendants-Appellants. In Re: JOHN GEORGE BROUMAS; In Re: RUTH D. BROUMAS, Debtors. JAMES P. KOCH, Trustee, Plaintiff-Appellant, v. L. LAWTON ROGERS, III, d/b/a Rogers Investments; ROGERS & KILLEEN, Defendants-Appellees.

No. 97-1182, No. 97-1183

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 3070

October 30, 1997, Argued
February 24, 1998, Decided

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 6274.

**PRIOR HISTORY:** Appeals from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, District Judge. (CA-95-2429-PJM, BK-91-40752, AP-93-23).

**DISPOSITION:** AFFIRMED IN PART AND REVERSED IN PART.

**COUNSEL:** ARGUED: Howard I. Rubin, GOLD & STANLEY, P.C., Alexandria, Virginia, for Appellants.

ARGUED: James P. Koch, Baltimore, Maryland, for Appellee.

ON BRIEF: Raymond R. Pring, Jr., GOLD & STANLEY, P.C., Alexandria, Virginia, for Appellants.

**JUDGES:** Before MURNAGHAN, HAMILTON, and LUTTIG, Circuit Judges.

**OPINION:** OPINION

PER CURIAM:

This is an appeal from the United States District Court for the District of Maryland sitting as an appellate court in bankruptcy. For reasons that follow, we affirm in part and reverse in part.

I.

John Broumas (Broumas) and his wife, Ruth Broumas (collectively the Debtors), filed a voluntary petition under Chapter 7 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § § 701-66, on February 15,1991, in the United States District Court for the District of Maryland. [*2] At the time, Broumas was a banker with Madison National Bank of Virginia and a substantial shareholder in its parent company, James Madison, Limited.

James Koch was appointed as Chapter 7 Trustee of the Debtors' bankruptcy estate. In this position, Koch (the Trustee) initiated this adversary proceeding against L. Lawton Rogers (Rogers) and the law firm of which he was a partner, Rogers & Killeen (the Law Firm), (collectively the Defendants), to avoid and recover allegedly preferential or fraudulent transfers or both by the Debtors under Bankruptcy Code § § 547(b) and 548(a). See 11 U.S.C. § § 547(b) and 548.

Rogers and Broumas had a multifaceted relationship spanning fifteen years. For example, Rogers was Broumas' lawyer, and Broumas was Rogers' banker. The two were also friends and participated in several financial investments. The relationship between Rogers and Broumas was so close that Rogers allowed Broumas unlimited access to his accounts at Madison National Bank of Virginia as well as the Law Firm's account by giving Broumas signature authority over the accounts. Furthermore, over the years, Rogers and Broumas made loans to each other and pledged each other's credit.

1998 U.S. App. LEXIS 3070, *

The [*3] two ultimately participated in a wash-trade scheme to artificially inflate the price of James Madison, Ltd. stock, whereby Rogers placed orders to buy and sell the stock at Broumas' request. This scheme became the subject of an investigation by the United States Securities and Exchange Commission resulting in an injunction against Broumas barring him from purchasing or selling stock without a beneficial change in ownership. No charges were brought against Rogers.

Counts I and II of the Trustee's first amended complaint involved the Debtors' granting of two deeds of trust on their residence in favor of the Law Firm. The Debtors granted one to secure payment of a $ 50,000 flat fee they owed the Law Firm for legal representation in certain litigation known as the "Tantallon Litigation" (the $ 50,000 Deed of Trust). The Debtors granted the other to secure repayment of a $ 25,000 loan the Law Firm had made in favor of the Debtors (the $ 25,000 Deed of Trust). When the Debtors transferred the $ 50,000 Deed of Trust and the $ 25,000 Deed of Trust (collectively the Deeds of Trust) to the Law Firm, there was sufficient equity in the residence to support them, even though the residence was [*4] encumbered by a first and a second deed of trust. In July 1991, however, when the holder of the first deed of trust initiated a foreclosure sale upon the residence, insufficient equity existed in the residence to support any recovery under the Deeds of Trust. In Count I of the first amended complaint, the Trustee alleged that the grants were avoidable and recoverable as preferential transfers under Bankruptcy Code § 547(b). The Trustee alternatively alleged in Count II that the grants were avoidable and recoverable as fraudulent transfers under Bankruptcy Code § 548(a). Both the Law Firm and Rogers were named as defendants in Counts I and II.

Counts III and IV named only Rogers as a defendant and involved three parcels of land located in Ocala, Florida. On August 15, 1990 Broumas deeded two of the three parcels to Rogers. Broumas did not own the third parcel outright, but held a first mortgage on it, which he assigned to Rogers prior to September 14, 1990. Rogers acquired title to the third parcel in a foreclosure sale and sold all three parcels for a total of $ 115,000. Count III alleged that the transfers were avoidable and recoverable as preferential transfers under Bankruptcy [*5] Code § 547(b), and Count IV alleged that they were avoidable and recoverable as fraudulent transfers under Bankruptcy Code § 548(a).

Counts V and VI named both the Law Firm and Rogers as defendants and involved certain cash transfers stemming from the wash-trade scheme between Rogers and Broumas to artificially inflate the value of stock in James Madison, Limited. Count V sought to avoid and recover the transfers under Bankruptcy Code § 547(b),

and Count VI sought to avoid and recover the transfers under Bankruptcy Code § 548(a).

The bankruptcy court conducted a bench trial on all of the claims. With respect to the Law Firm, the bankruptcy court only found it liable on Count II. On that count, the bankruptcy court held that the Debtors' grant of the $ 50,000 Deed of Trust was a fraudulent transfer within the meaning of Bankruptcy Code § 548 and ordered the Law Firm to pay the Trustee $ 50,000. The bankruptcy court only found Rogers liable on Count III, and alternatively, on Count IV. The bankruptcy court ordered Rogers to pay the Trustee $ 115,000 under one count or the other.

All parties noted timely appeals to the United States District Court for the District of Maryland. [*6] On appeal before the district court, the Trustee only challenged the bankruptcy court's rulings in favor of the Defendants on Counts I and VI. The Law Firm challenged the bankruptcy court's ruling in favor of the Trustee on Count II, and Rogers challenged the bankruptcy court's rulings in favor of the Trustee on Counts III and IV.

The district court reversed the bankruptcy court's finding of no liability on Count I and ordered the Defendants jointly and severally liable for $ 75,000. The district court affirmed the bankruptcy court's finding of liability against the Law Firm on Count II, but also assessed liability against Rogers. n1 The district court affirmed the bankruptcy court's alternative findings of liability against Rogers on Counts III and IV, but also assessed the same liability against the Law Firm. n2 Finally, the district court affirmed the bankruptcy court's finding of no liability on Count VI with respect to Rogers and the Law Firm.

n1 The Trustee did not appeal the bankruptcy court's finding of no liability on Count II with respect to Rogers.

n2 The Law Firm was not even named as a party in Counts III and IV.

[*7]

All parties noted timely appeals of the district court's final order to this court. On appeal before us, Rogers and the Law Firm appeal the district court's adverse rulings on Counts I through IV. In his cross-appeal, the Trustee appeals the district court's affirmance of the bankruptcy court's finding of no liability against the Defendants on Count VI.

II.

We apply the same standard of review as the district court applied to the bankruptcy court's decision. Findings

of fact are reviewed for clear error, and conclusions of law are reviewed de novo. See In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992). We will address the challenged claims in the order in which they appear in the complaint.

III.

Under the current Bankruptcy Code, a bankruptcy trustee has "extensive power to avoid certain pre-petition transactions which adversely affect the bankruptcy estate." In re Virginia-Carolina Fin. Corp., 954 F.2d 193, 196 (4th Cir. 1992) (citing 11 U.S.C. § § 544-551, 553 (1988)). We have characterized a bankruptcy trustee's power to avoid a pre-petition transfer meeting the requirements of Bankruptcy Code § 547(b) as one of "the more important of these voidable transfer[ [*8] ]" powers. Id. In general, Bankruptcy Code § 547(b) gives a bankruptcy trustee the power to avoid "a transfer made within a limited time prior to the filing of a bankruptcy petition that enables a creditor to receive more than the creditor would otherwise receive if, instead, the creditor were limited to his or her share of a distribution resulting from a Chapter 7 liquidation." Id. Specifically, Bankruptcy Code § 547(b) provides:

. . . the trustee may avoid any transfer of an interest of the debtor in property —

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made --

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if - -

(A) the case were a case under Chapter 7 of this title;

(B) the [*9] transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Bankruptcy Code § 547(g) places the burden of proving the avoidability of a transfer under Bankruptcy Code § 547(b) on the trustee. See 11 U.S.C. § 547(g).

In Count I, the Trustee sought to avoid and recover from the Defendants the Debtors' transfers of the Deeds of Trust on their residence under Bankruptcy Code § 547(b). In defending against liability on Count I before the bankruptcy court, the Defendants primarily challenged the Trustee's ability to satisfy subsection (b)(5) of Bankruptcy Code § 547. According to the Defendants, subsection (b)(5) was not satisfied, because they did not receive more as a result of the transfers than if they had waited for liquidation and distribution of the assets of the bankruptcy estate. The bankruptcy court agreed with the Defendants, concluding that although sufficient equity in the residence existed to support the Deeds of Trust at the time of their transfer, subsection (b)(5) was not satisfied because the Defendants received no more as a result of the transfers [*10] than they would have received as creditors against the bankruptcy estate had the transfers not occurred.

On appeal to the district court, the Trustee contended that reversal was in order because the Defendants received value at the time of the transfers regardless of whether the Deeds of Trust had value at the time of liquidation and distribution. The district court agreed and reversed, stating that "the Defendants received $ 75,000 in value as of then regardless of what might have come later." (J.A. 124). We agree with the Defendants and the bankruptcy court that the Trustee's proof failed to satisfy subsection (b)(5) of Bankruptcy Code § 547. As we recently stated in Hager v. Gibson, 109 F.3d 201 (4th Cir. 1997), Bankruptcy Code § 547(b)(5) protects creditors in receipt of a pre-petition transfer "who can establish that they received no more by the payment than they

would have received as claimants in a Chapter 7 liquidation." Id. at 210. This effect, we said, "simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate [*11] than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.'" Id. (quoting In re Virginia-Carolina Fin. Corp., 954 F.2d at 199).

Here, the undisputed evidence establishes that the Defendants are no better off vis-a-vis the other creditors of the Debtors' estate than they would have been had they not received the transfers of the Deeds of Trust and waited for liquidation and distribution of the assets of the Debtors' estate. First, the undisputed evidence establishes that the Deeds of Trust only served to secure payment of certain debt. Thus, the Deeds of Trust cannot be characterized as payment of debt, as the Trustee's position seems to suggest. Second, the Deeds of Trust were never used to satisfy any of the debt. Third and finally, just months after the Debtors filed their Chapter 7 petition and prior to liquidation and distribution of their assets, the undisputed evidence establishes that the Deeds of Trust were completely and permanently worthless; thus, they could not be used to improve the Defendants' position among the creditors of the Debtors' bankruptcy estate. See 11 U.S.C. § 506(a) ("An allowed [*12] claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."). For these reasons, we reverse the district court's ruling on this claim. n3

n3 In a late attempt to bolster his position, the Trustee contended at oral argument that Bankruptcy Code § 550(a) dictates that under Bankruptcy Code § 547(b) he was entitled to recover an amount equal to the amount of equity that supported the Deeds of Trust at the times of their respective transfers. The Trustee's contention is readily rejected, because Bankruptcy Code § 550, entitled "Liability of transferee of avoided transfer," does not apply until a transfer has been determined to be avoidable. See 11 U.S.C. § 550(a) (providing that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the bankruptcy estate, the property transferred, or, if the court so orders, the value of such property").

[*13]

IV.

Next, Rogers challenges the district court's sua sponte assessment of liability against him on Count II. According to Rogers, the district court erred in assessing liability against him on Count II, because the Trustee did not appeal the bankruptcy court's entry of judgment in his favor on that count. We agree with Rogers. Because the Trustee did not appeal the bankruptcy court's adverse ruling on that count, the issue of whether the bankruptcy court erred in making the ruling was not before the district court. Accordingly, we reverse the district court's assessment of liability on Count II against Rogers.

V.

The Law Firm next challenges the district court's affirmance of the bankruptcy court's entry of judgment in favor of the Trustee on Count II. Count II alleged in relevant part that under Bankruptcy Code § 548(a) the Debtors' transfer of the $ 50,000 Deed of Trust was avoidable and recoverable as a fraudulent transfer, because it occurred within one year before the filing of the bankruptcy petition, the Debtors received less than a reasonably equivalent value in exchange for the transfer, and the Debtors were insolvent at the time of the transfer.

Bankruptcy Code [*14] § 548(a) provides, in relevant part:

[a] trustee may avoid any transfer of an interest of the debtor in property . . . that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily— . . .

(1) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer . . .; and

(B)(i) was insolvent on the date that such transfer was made. . . .

11 U.S.C. § 548(a). This is the fraudulent transfer provision of the Bankruptcy Code. It allows the trustee to avoid the transfer of a bankruptcy debtor's property made within the year preceding the filing of the debtor's bankruptcy petition that depletes the assets of the debtor's bankruptcy estate. "The statute recognizes as fraudulent those transfers made with actual intent to hinder, delay or defraud creditors, as well as those that are deemed to be constructively fraudulent, because they are made for less than [*15] reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due." 5 Collier On Bankruptcy P 548.01[1] (15th ed. 1997). There are two main differences between Bankruptcy Code § § 547(b) and 548(a). First, Bankruptcy Code § 547(b) requires that the transfer sought to be avoided have been made to or for the benefit of a creditor for or on account of an antecedent debt. See 11 U.S.C. § 547(b)(1) & (2). In contrast, Bankruptcy Code § 548(a) has no such requirement. Second, Bankruptcy Code § 548(a) requires an element of fraud or constructive fraud, see 11 %U.S.C. § 548(a)(1) & (2), where, in contrast, Bankruptcy Code § 547(b) does not.

Because the Law Firm does not contest that the Debtors were insolvent during the one year prior to the bankruptcy and that the Debtors transferred the $ 50,000 Deed of Trust within the year preceding the filing of the petition, the issue is whether reasonably equivalent value was given in exchange for the transfer. As previously stated, the $ 50,000 Deed of Trust was intended to secure a $ 50,000 antecedent debt for legal representation. After reviewing the evidence [*16] in the record on this issue, we cannot say the district court's finding that the Debtors received less than reasonably equivalent value in exchange for the transfer is clearly erroneous.

The Law Firm also contends that if the transfer is avoidable under Bankruptcy Code § 548(a), the Trustee should only be allowed to recover the $ 50,000 Deed of Trust itself, rather than its value at the time of the transfer. We agree. Once a transfer has been determined to be avoidable under Bankruptcy Code § 548, Bankruptcy Code § 550(a) provides that to the extent the transfer is avoided, "the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a). Significantly, Bankruptcy Code § 550 does not state at what time this value is to be determined or under what circumstances the court should order recovery of the value rather than the property itself. We agree with the Bankruptcy Court for the Western District of North Carolina, however, that the language of Bankruptcy Code § 550(a) evidences "a congressional intent to re-

turn the property transferred unless to do so would be inequitable." [*17] In re Morris Communications NC, Inc., 75 B.R. 619, 629 (Bankr. W.D.N.C. 1987), rev'd on other grounds, 914 F.2d 458 (4th Cir. 1990).

Here, it would not be inequitable to only allow the return of the $ 50,000 Deed of Trust, rather than its value at the time of the transfer. Indeed, to allow the Trustee to recover the value at the time of transfer would mean a windfall to the bankruptcy estate. The record is undisputed that the Law Firm never invoked its rights under the $ 50,000 Deed of Trust to any equity in the Debtors' residence. In other words, the Law Firm was never enriched by the $ 50,000 Deed of Trust. Rather, it merely held a contingent interest in the equity of the residence from which it never benefited. Furthermore, if the transfer had never occurred, the creditors of the Debtors' bankruptcy estate would be no worse off because the $ 50,000 Deed of Trust became permanently valueless prior to liquidation and distribution through no fault of the Law Firm. In short, awarding the Trustee $ 50,000 on this count unjustly enriches the bankruptcy estate. Such unjust enrichment cuts against the common sense notion that a creditor need not return a sum received from the debtor [*18] prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than it would have been had the creditor waited for liquidation and distribution of the assets of the estate. Accordingly, we affirm the avoida bility of the Debtors' transfer of the $ 50,000 Deed of Trust, but reverse the district court's affirmance of the bankruptcy court's award of $ 50,000 in favor of the Trustee on this count and order that the Trustee's recovery is limited to the $ 50,000 Deed of Trust itself.

## VI.

We next turn to the Law Firm's challenge to the district court's sua sponte assessment of liability against it on Counts III and IV involving the parcels of land located in Ocala, Florida. This challenge need not detain us long, because the Trustee has conceded that the district court erred in assessing liability against the Law Firm on Counts III and IV. Indeed, the Law Firm was not even named in Counts III and IV. We, accordingly, reverse the district court's assessment of liability against the Law Firm on Counts III and IV.

## VII.

We next consider Rogers' challenge to the district court's affirmance of the bankruptcy court's entry of judgment in favor [*19] of the Trustee on Count III. In Count III, the Trustee sought to avoid the Debtors' transfers of three parcels of land located in Ocala, Florida as preferential transfers under Bankruptcy Code § 547(b). The Trustee alleged that the transfers were avoidable as preferential transfers because they were made for the

benefit of a creditor; they were made on account of an antecedent debt owed by the Debtors before such transfer; they were made while the Debtors were insolvent between ninety days and one year before the date of the filing of the bankruptcy petition; they were made to a creditor who was an "insider" at the time of the transfers; and they enabled the creditor to receive more than he would have received as a creditor in bankruptcy. After sifting through the evidence, making credibility determinations, and making findings of fact, the bankruptcy court entered judgment in favor of the Trustee in the amount of $ 115,000. The $ 115,000 represented the combined value of the three parcels of land at issue.

Rogers first argues that judgment against him cannot be sustained because the bankruptcy court's finding under subsection (b)(4) of Bankruptcy Code § 547 that he was an "insider" [*20] at the time of the transfers is clearly erroneous. Rogers further argues that the bankruptcy court's finding under subsection (b)(4) that a particular one of the three parcels was transferred between ninety days and one year before the Debtors filed their petition is clearly erroneous. Finally, Rogers argues that the bankruptcy court's finding that the transfers were on account of an antecedent debt was clearly erroneous. We address each of these arguments in turn.

A.

The bankruptcy court found that Rogers was an "insider" within the meaning of subsection (b)(4)(B) of Bankruptcy Code § 547. Bankruptcy Code § 101(31) provides the following non-exhaustive list of the individuals who are "insiders" for purposes of the Bankruptcy Code, see Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996):

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) a corporation of which the debtor is a director, officer or person in control.

11 U.S.C. § 101(31)(A).

The fact that Rogers does not fall into any of these [*21] categories is of no moment because, as just stated, this is a non-exhaustive list. Indeed, "an insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996) (quoting Hunter v. Babcock, 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986)). Accordingly, insider status is determined by a factual inquiry into the debtor's relationship with the alleged insider. See, e.g., Browning Interests v. Allison, 955 F.2d 1008, 1011 (5th Cir. 1992).

The evidence in this case fully supports the bankruptcy court's finding that Rogers was an insider with respect to Broumas. In other words, the evidence establishes that Rogers and Broumas had a sufficiently close relationship to subject it to careful scrutiny. At various times over a period of fifteen years Rogers and Broumas have been creditor and debtor, principal and agent, joint venturers, attorney and client, landlord and tenant, and close friends. Furthermore, Broumas and Rogers made numerous loans to each other not evidenced by written promises to pay and pledged each other's credit. Additionally, [*22] Rogers permitted Broumas to make withdrawals from Rogers' and the Law Firm's bank account as if it were his own by giving him signature authority; the two were involved in investment deals without written agreements; Rogers agreed to represent Broumas in litigation without a written fee agreement; and the two made numerous purchases of bank stock in furtherance of the wash-trade scheme. In light of this evidence, we cannot say that the bankruptcy court's finding that Rogers was an insider is clearly erroneous.

B.

We now consider Rogers' argument that the bankruptcy court's finding under subsection (b)(4) that a particular one of the three parcels was transferred between ninety days and one year before the Debtors filed their petition is clearly erroneous. The parcel at issue was not owned by Broumas, but was subject to a first mortgage in his favor. At some point prior to September 1990, the United States Marshal for the Middle District of Florida seized this parcel for reasons not apparent from the record. On September 14, 1990, the Marshal conveyed the property to Rogers by quitclaim deed. The quitclaim deed stated that Rogers held a purchase money mortgage in the parcel that had [*23] been assigned to him by Broumas.

Rogers argues that although the quitclaim deed evidences Broumas' assignment of the mortgage to Rogers, the bankruptcy court's finding that the assignment occurred within one year of the filing of the petition is

clearly erroneous, because the quitclaim deed did not specify when the assignment occurred. We reject Rogers' argument, because the record contains sufficient evidence to support the bankruptcy court's finding. Ironically, the sufficient evidence comes from Rogers himself:

> Q. I believe your testimony was yesterday that you spent a week to ten days negotiating with the government regarding the issuance of this quit claim deed. Do you recall that testimony?

> A. I recall testifying about it, yes.

> Q. And would you advise the court what was the nature of these negotiations that required a week to ten days of your time.

> A. I had to first find the entity who was in a position to execute a deed at all and then I had to find the person who had authority to order that the execution be done. Then I had to explain the circumstances of--the financial circumstances of the property because the government was [*24] trying to sell the property at auction and ultimately I was able to persuade the appropriate persons that if they sold the property the price that they got for it would be less than the mortgage which was still owed on the property and which was held in Mr. Broumas' name and that therefore they should quit claim the deed rather than to go through this sale process and dealing with the government I found this to be an extraordinarily time-consuming effort.

(J.A. 569-70). A reasonable interpretation of this testimony is that the mortgage was still held in Broumas' name in early September 1990 when he commenced negotiations with the Marshal in order to obtain a quitclaim deed with respect to this third parcel, which was within one year of the filing of the petition. Therefore, we reject Rogers' argument that the bankruptcy court's finding that he transferred the parcel between ninety days and one year of the filing of the petition is clearly erroneous. n4

> n4 This is also one of the basis on which Rogers challenges the district court's affirmance of the bankruptcy court's decision in favor of the Trustee with respect to Count IV, which alleged that the transfers of the parcels located in Ocala, Florida constituted fraudulent transfers under Bankruptcy Code § 548(a). Because the evidence supports the bankruptcy court's finding that the Debtors' interest in the mortgage on the third parcel was transferred to Rogers within one year of the filing of the petition, we reject Rogers' challenge. We also note that Rogers has admitted that he gave no consideration for the assignment, thus establishing under subsection (a)(2)(A) of Bankruptcy Code § 548 that the Debtors received less than a reasonably equivalent value in exchange for the transfer. Because Rogers does not contest the remaining element of a fraudulent transfer under Bankruptcy Code § 548(a)--that the Debtors were insolvent at the time of transfer--we, accordingly, affirm the district court's decision with respect to Count IV.

[*25]

C.

As for the antecedent debt requirement under Bankruptcy Code § 547(b)(2), the record supports the bankruptcy court's finding on this issue. Specifically, the record contains a letter dated December 3, 1990, from Rogers to Broumas informing him that he sold all three parcels located in Ocala, Florida for $ 115,000. In this letter Rogers writes that "the potential profit which I may realize is . . . less than one-half of the net sales price and less than the sum previously transferred by me to you." (J.A. 683) (emphasis added). The bankruptcy court relied on this letter in finding that the Debtors had transferred the Ocala, Florida parcels on account of an antecedent debt. We cannot say that its finding is clearly erroneous.

Having rejected all of Rogers' arguments with respect to Count III, we affirm the district court's affirmance of the bankruptcy court's assessment of liability against Rogers on Count III.

VIII.

Finally, we address the Trustee's cross-appeal of the district court's affirmance of the bankruptcy court's decision in favor of the Defendants with respect to Count VI. In Count VI, the Trustee sought to recover approximately $ 98,000 from the Defendants, which [*26] the Trustee alleged was transferred to the Defendants during the wash-trade scheme. The record reflects that Broumas used a number of accounts, including accounts of the

Defendants, to orchestrate his wash-trade scheme in which he rapidly purchased and sold stock without any beneficial change in stock ownership. According to the Trustee, these transfers were avoidable and recoverable under Bankruptcy Code § 548(a). The Trustee specifically challenges the bankruptcy court's decision that he did not establish under subsection (a)(2)(A) of Bankruptcy Code § 548 that the Debtors received less than a reasonably equivalent value in exchange for the transfers. We reject the Trustee's challenge, because the record simply contains no evidence establishing that the Debtors' bankruptcy estate was diminished by the transfers.

### IX.

In conclusion, we: (1) reverse the district court with respect to its reversal of the bankruptcy court's entry of judgment in favor of Rogers and the Law Firm on Count I; (2) reverse the district court with respect to its reversal of the bankruptcy court's entry of judgment in favor of Rogers on Count II; (3) affirm the district court with respect to its affirmance [*27] of the bankruptcy court's entry of judgment against the Law Firm on Count II as it pertains to liability under Bankruptcy Code § 548(a), but reverse as it pertains to the award of $ 50,000 and order the Trustee instead to recover the $ 50,000 Deed of Trust itself; (4) reverse the district court's entry of judgment against the Law Firm on Counts III and IV; (5) affirm the district court's affirmance of the bankruptcy court's entry of judgment against Rogers on Counts III and IV; and (6) affirm the district court's affirmance of the bankruptcy court's entry of judgment in favor of Rogers and the Law Firm on Count VI.

### AFFIRMED IN PART AND REVERSED IN PART

LEXSEE 2005 BANKR. LEXIS 997

In re INTERCONTINENTAL POLYMERS, INC., Debtor. INTERCONTINENTAL
POLYMERS, INC., Plaintiff, vs. EQUISTAR CHEMICALS, LP, Defendant.

No. 03-23736, Chapter 11

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF
TENNESSEE

2005 Bankr. LEXIS 997; 54 Collier Bankr. Cas. 2d (MB) 710; 44 Bankr. Ct. Dec.
183

March 31, 2005, Filed

**PRIOR HISTORY:** [*1] Adv. Pro. No. 04-2016.

**COUNSEL:** MARK S. DESSAUER, ESQ., HUNTER,
SMITH & DAVIS, LLP, Kingsport, Tennessee, Attorney
for Intercontinental Polymers, Inc.

MARK S. FINKELSTEIN, ESQ., SHANNON,
MARTIN, FINKELSTEIN AND SAYRE PC, Houston,
Texas; ROBERT L. ARRINGTON, ESQ., WILSON
WORLEY MOORE GAMBLE & STOUT PC, Kings-
port, Tennessee, Attorneys for Equistar Chemicals, LP.

**JUDGES:** MARCIA PHILLIPS PARSONS, UNITED
STATES BANKRUPTCY JUDGE.

**OPINIONBY:** MARCIA PHILLIPS PARSONS

**OPINION:**

**MEMORANDUM**

**MARCIA PHILLIPS PARSONS**
**UNITED STATES BANKRUPTCY JUDGE**

This preference action is before the court on the par-
ties' cross-motions for summary judgment. This court
having concluded that the transfers are excepted from
avoidance under 11 U.S.C. § 547(c)(4) except to the
extent of $ 8,558.87, the motions will be granted in part
and denied in part. This is a core proceeding. See 28
U.S.C. 157(b)(2)(F).

I.

The debtor Intercontinental Polymers, Inc. ("IPI")
filed chapter 11 on October 20, 2003, and on April 7,
2004, IPI commenced the present adversary proceeding
against Equistar Chemicals, LP ("Equistar"). As set forth
in the complaint, prior to its [*2] bankruptcy filing IPI

was engaged in the business of the manufacture and sale
of polymers and fibers. As part of its polymer manufac-
turing process, IPI purchased certain raw materials in the
form of monoethylene glycol polyester ("Product") from
Equistar. During the ninety-day preference period pre-
ceding the bankruptcy, IPI made payments totaling $
380,755.40 to Equistar. According to IPI, these payments
constitute preferential transfers avoidable and recover-
able under 11 U.S.C. § § 547(b) and 550. In its answer,
Equistar denies that the payments were preferences and
raises the § 547(c) defenses of contemporaneous ex-
change, ordinary course of business, and subsequent new
value. See 11 U.S.C. § 547(c)(1), (2), and (4).

On November 5, 2004, Equistar moved for summary
judgment, asserting that the transfers are fully protected
from recovery by the new value defense set forth in §
547(c)(4) because Equistar shipped new Product to IPI
after each of the alleged preferential transfers. Alterna-
tively, Equistar asserts that IPI will be unable to establish
the third and fifth elements of a preference, that IPI was
insolvent at the time of the [*3] transfers and that the
transfers enabled Equistar to receive more than it would
have otherwise received if this case were a chapter 7
because Equistar held a perfected security interest when
the transfers were made. See 11 U.S.C. § 547(b)(3) and
(5).

On December 1, 2004, IPI filed a response in oppo-
sition to Equistar's motion for summary judgment and a
cross-motion for summary judgment on all elements of
its preference claim under § 547(b) and on all § 547(c)
defenses pled by Equistar. Subsequently, on December
30, 2004, Equistar filed a response in opposition to IPI's
cross-motion for summary judgment, wherein it main-
tained its position regarding § 547(b)(3) and (5) and §
547(c)(4), but did not challenge IPI's request for sum-
mary judgment on the remaining elements of a prefer-
ence and Equistar's contemporaneous exchange and or-

Page 2

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

dinary course of business defenses under § 547(c)(1) and (2). Noting this omission, IPI filed a reply on January 10, 2005, requesting that the court deny or strike these defenses as a matter of law based on E.D. Tenn. LBR 7007-1 which provides that a failure to respond to a motion "shall be construed by the court to mean that [*4] the respondent does not oppose the relief requested by the motion." Most recently, on January 19, 2005, Equistar filed a surreply which addressed only the § 547(c)(4) issue. From all of the foregoing, it is clear that the issues left for determination are whether the § 547(b)(3) and (5) elements have been established by IPI, and if so, whether Equistar is entitled to the subsequent new value defense under § 547(c)(4).

II.

Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056, mandates the entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56 (c). The court is not to "'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). "A genuine issue for trial exists only when there is sufficient 'evidence [*5] on which the [court] could reasonably find for the plaintiff.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc., 477* U.S. at 252).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477* U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250-52. In considering the motion, the court must construe all reasonable inferences in favor of the nonmoving party. *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.),* 323 F.3d 439, 442 (6th Cir. 2003). The party opposing a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* at 442-43 (citations omitted). "If after reviewing the record as a whole a rational factfinder [*6] could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493 (6th Cir. 2001)(quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 349 (6th Cir. 1998)).

III.

Section 547 (b) of the Bankruptcy Code provides as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
>
>> (1) to or for the benefit of a creditor,
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made--
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
>> (5) that enables such creditor to receive more than such creditor would receive if--
>
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions [*7] of this title.

11 U.S.C. § 547(b). IPI has the burden of proving that all of these elements are satisfied. *See* 11 U.S.C. § 547(g).

As previously noted, Equistar does not challenge IPI's assertion that it has established elements (1), (2), and (4) of § 547(b). The documents submitted in support of IPI's motion for summary judgment indicate that dur-

ing the 90 days preceding its bankruptcy filing, IPI paid sums totaling $ 380,755.40 to Equistar. Within the meaning of § 547(b), these payments constituted transfers of the debtor's property to a creditor in payment of an antecedent debt, n1 with the exception of a payment of $ 27,195.84 on August 18, 2003, which IPI admits was a prepayment rather than a payment of a prior debt. Thus, the sum of $ 353,559.56 is potentially subject to recovery as a preference. n2

n1 With respect to § 547(b)(1), "creditor," as defined by the Bankruptcy Code, means "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" 11 U.S.C. § 101(10)(A). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5)(A). The pleadings, answers to interrogatories, and affidavits establish that Equistar was a creditor at the time of the transfers because it had a right to payment from the debtor in the form of outstanding invoices. A debt is antecedent if it was incurred prior to the transfer of a debtor's property. See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.), 88 F.3d 311, 316 (5th Cir. 1996). Equistar's answers to interrogatories evidence that all transfers were applied to outstanding invoices, with the exception of the $ 27,300.60 payment made on August 18, 2003. Of this amount, only $ 104.76 was applied to an antecedent debt; the balance of $ 27,195.84 was a prepayment.

[*8]

n2 In its cross-motion for summary judgment, IPI reduced its preference claim from $ 380,755.40 to $ 353,664.35, conceding that $ 27,195.84 of the $ 27,300.60 payment to Equistar on August 18, 2003 was prepayment for two invoices. According to the court's calculation, however, this adjustment would reduce the preference claim to $ 353,559.56. This court is unable to determine the basis for the discrepancy.

Equistar contends, however, that these payments are not preferential because IPI was not insolvent at the time the transfers were made as required by § 547(b)(3). For purposes of § 547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preced-

ing the date of the filing of the petition." 11 U.S.C. § 547(f). This presumption is sufficient to carry IPI's burden of establishing insolvency unless Equistar comes forward with some evidence to rebut the presumption. See Whittaker v. Citra Trading Corp. (In re Int'l Diamond Exch. Jewelers, Inc.), 177 B.R. 265, 269 (Bankr. S.D. Ohio 1995). If Equistar introduces such evidence, [*9] IPI must satisfy its burden of proving insolvency by a preponderance of the evidence. See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 34 (2d Cir. 1996)(citing Clay v. Traders Bank of Kansas City, 708 F.2d 1347, 1351 (8th Cir. 1983)(presumption affords initial benefit but ultimate burden remains on trustee to prove insolvency)).

To rebut the statutory presumption of insolvency, Equistar references the schedules filed by IPI in this bankruptcy case, which indicate assets of $ 20,864,449.13 and liabilities of $ 13,029,583. In addition, Equistar argues that the scheduled assets fail to include a potential claim in the amount of $ 6 million held by IPI against its parent companies. According to Equistar, this claim omission and the representation of solvency preclude IPI from claiming insolvency during the preference period due to the doctrine of judicial estoppel.

In response, IPI submits the affidavit of David Carpenter, its chief financial officer, who states that IPI's assets were scheduled at book value rather than going concern or fair market value. IPI asserts that because insolvency under § 547(b)(3) is a measure of going [*10] concern value, its scheduled valuation at book value is irrelevant to a determination of insolvency for preference purposes and insufficient to rebut the insolvency presumption. Furthermore, judicial estoppel is not triggered, argues IPI, because its statement of book value is not inconsistent with its assertion of insolvency under a going concern analysis, citing Hamil v. Cont'l Ill. Nat'l Bank, 596 F.2d 205, 210-11 (7th Cir. 1979)(the doctrine of judicial estoppel is limited to circumstances where clearly inconsistent positions are taken). With regard to the alleged claim against its parent companies, IPI states that it did have a cause of action in the form of a promissory note from its parent companies, but as previously disclosed to all creditors in this case and as approved by the court, it sold this note postpetition for $ 1.1 million and paid $ 800,000 of this amount to SouthTrust Bank, the holder of a perfected security interest in the note. IPI contends that this asset is immaterial to the issue of its insolvency and therefore, insufficient to rebut the insolvency presumption.

Alternatively, assuming that Equistar has rebutted the presumption, IPI argues [*11] that there is a genuine issue of fact as to insolvency which precludes summary judgment in Equistar's favor. To support this assertion, IPI again references Mr. Carpenter's affidavit, wherein he

Page 4

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

notes that IPI had ceased its manufacturing operations prior to its bankruptcy filing and opines that the liabilities of IPI exceeded its assets at market or going concern value on the day IPI's bankruptcy petition was filed and on each of the preceding 90 days. IPI also cites its interrogatory responses wherein it stated that the market value of its assets on the dates of the transfers was between $ 4 million and $ 6 million.

Under the Bankruptcy Code, a debtor is insolvent when the sum of its debts exceeds its property, "at a fair valuation." *See* 11 U.S.C. § 101(32). Most courts define "fair valuation" to require a debtor's assets to be valued based on a going concern value, unless the debtor is on its "deathbed," in which case liquidation value is used. *See Brown v. Shell Can., Ltd. (In re Tenn. Chem. Co.),* 143 B.R. 468, 471 (Bankr. E.D. Tenn. 1992), *aff'd,* 112 F.3d 234 (6th Cir. 1997)("Whether the debtor was solvent or insolvent [*12] under the bankruptcy definition depends on the fair value of the debtor's property.").

At least two courts have recognized that a debtor's schedules, while not conclusive proof of insolvency, may rebut the presumption of insolvency. *See In re Tenn. Chem. Co.,* 143 B.R. at 472-73; *see also Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel),* 96 B.R. 275, 277 (B.A.P. 9th Cir. 1989)(bankruptcy court's decision that debtor's initial schedules were sufficient evidence to rebut the presumption of insolvency was not clearly erroneous). The weight of authority, however, deems a debtor's schedules insufficient to rebut the insolvency presumption where the schedules do not accurately reflect asset value. *See Lids Corp. v. Marathon Inves. Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 548 (Bankr. D. Del. 2002)(finding that the debtor's schedules, based on book value and not market value, were insufficient to rebut the presumption of insolvency); *Miller & Rhodes, Inc. Secured Creditors' Trust v. Robert Abbey, Inc. (In re Miller & Rhodes, Inc.),* 146 B.R. 950, 957 (Bankr. E.D. Va. 1992)(finding that the debtor's "schedules [*13] were materially flawed, especially with regard to the real property values, and that the defendants' reliance on these values is insufficient to overcome the presumption of insolvency"); *Harrison v. Brent Towing Co., Inc. (In re H&S Transp. Co.),* 110 B.R. 827, 833 (M.D. Tenn. 1990)("The bankruptcy court properly refused to admit the debtor's schedules into evidence inasmuch as it was shown that the figures in that document did not represent the fair value of the debtor's assets."); *W.L. Mead, Inc. v. Cent. States Pension Fund (In re W.L. Mead, Inc.),* 70 B.R. 651, 655 (Bankr. N.D. Ohio 1986)(finding that evidence of solvency in debtor's schedules is insufficient to overcome presumption of insolvency where a magnitude of discrepancy existed between the scheduled values and the actual sale prices), *quoted in Schwinn Plan Comm. v. AFS Cycle & Co., Ltd.*

*(In re Schwinn Bicycle Co.),* 192 B.R. 477, 487-88 (Bankr. N.D. Ill. 1996); *Lawrence v. B&M Plastics, Inc. (In re Luster-Coate Metallizing Corp.),* No. 01-22764, 2004 WL 432038, at *6 (Bankr. W.D.N.Y. Feb. 3, 2004)(finding that schedules not accurately setting forth the fair [*14] value of debtor's assets were insufficient to rebut the presumption of insolvency).

It is undisputed that the schedules in this case were prepared utilizing book value rather than fair market or going concern value. David Carpenter, who was CFO of IPI from March 1999 to May 2004 and currently maintains IPI's books and records, states in his affidavit that he prepared the schedules of assets and liabilities filed in IPI's bankruptcy, that the scheduled values for the equipment and machinery were based on cost less depreciation, and that the scheduled value for the inventory was cost. Because book value is not probative of the issue of fair market valuation, the schedules are insufficient to rebut the statutory presumption of insolvency.

With regard to the unscheduled claim against IPI's parent, this court similarly finds such evidence insufficient to rebut the presumption. Equistar's proof as to the existence of the asset and its value is derived from a brief filed by SouthTrust Bank in IPI's underlying bankruptcy case, wherein the Bank alleged that IPI had a $ 6 million cause of action against its foreign parent company, Tolaram, a Singapore corporation and against ASEAN, Tolaram's [*15] parent company and a Hong Kong corporation. It is highly questionable whether a representation in a brief constitutes sufficient proof of the asset's value, especially in light of IPI's response that it sold this cause of action postpetition for $ 1.1 million, after court approval and after all creditors were noticed and failed to object. More importantly, there is no evidence before the court as to the effect that this asset had on IPI's overall balance sheet and whether it was of sufficient value to have rendered IPI otherwise solvent at the time of the preferential transfers. Equistar's speculation that the inclusion of this asset would have increased IPI's margin of solvency by $ 6 million is insufficient proof to rebut the statutory presumption of insolvency. *See Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Education and Research Foundation),* 292 B.R. 68, 77 (Bankr. W.D. Pa. 2003)("Evidence constituting mere speculation as to whether the Debtors were insolvent is not sufficient to rebut the presumption."). Accordingly, Equistar is not entitled to summary judgment on this issue.

The final element of a preference, § 547(b)(5), requires [*16] a finding that the transfers enabled the creditor to receive more than it would if the case were a chapter 7 case and the transfers had not been made. As stated by one court, this requirement "simply carries out 'the common sense notion that a creditor need not return

Case 1:06-cv-00147-JJF    Document 25-2    Filed 06/14/2006    Page 14 of 25

Page 5
2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate." *Hager v. Gibson (In re Hager)*, 109 F.3d 201, 210 (4th Cir. 1997)(quoting *Smith v. Creative Fin. Mgmt., Inc. (In re Virginia-Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992)). With respect to preferential transfers to an unsecured creditor, any payment received by the creditor during the preference period is sufficient to satisfy this requirement unless there is a 100% distribution to creditors in the hypothetical chapter 7 case. *See Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir. 1991). On the other hand, "payments to a creditor who is fully secured are not preferential [*17] since the creditor would receive payment up to the full value of his collateral in a Chapter 7 liquidation." *Ray v. City Bank & Trust Co. (In re C-L Cartage Co., Inc.)*, 899 F.2d 1490, 1493 (6th Cir. 1990).

Equistar's § 547(b)(5) argument is that to the extent it is deemed a secured creditor, it did not receive more because of payments to it during the preference period than it would have otherwise received in a chapter 7 case. It is undisputed that the contract signed by IPI in connection with its purchase of Product from Equistar granted Equistar a purchase money security interest in the raw materials along with all products and proceeds thereof, and that Equistar duly perfected this security interest by filing a financing statement with the Tennessee Secretary of State. The rub, however, is that all of IPI's assets were and are subject to a blanket lien held by SouthTrust Bank, IPI's primary lender, which lien is superior to Equistar's security interest. Based on the value of IPI's assets and SouthTrust Bank's claim, it appears to be undisputed that Equistar's claim is undersecured, if not fully unsecured. And, Equistar does not challenge IPI's contention, supported [*18] by the affidavit of Mr. Carpenter, that IPI's unsecured creditors would receive nothing on their claims in a chapter 7 liquidation of IPI.

The issue of whether payments to an undersecured creditor satisfy the § 547(b)(5) preference requirement was addressed by the Fifth Circuit Court of Appeals in *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP)*, 171 F.3d 249 (5th Cir. 1999). As stated by the court therein:

To determine whether an undersecured creditor received a greater percentage recovery on its debt than it would have under chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes. Both aspects must be examined before the issue

of greater percentage recovery can be decided.

### (1) The Application Aspect

If a payment to an undersecured creditor [] is applied to the unsecured portion of the debt, then the undersecured creditor will have recovered a greater percentage on this claim if the estate cannot pay its unsecured creditors 100% of these claims. In contrast, if the undersecured creditor applies the payment to the secured portion of the debt, [*19] the creditor effectively releases a portion of its secured interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater percentage recovery. If, however, the creditor does not actually release collateral upon application of the payment, then the payment is ipso facto a payment on the unsecured portion of the claim.

. . . .

### (2) The Source Aspect

Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.

*Id.* at 254-55 (citations omitted).

Regarding the application aspect of the *El Paso Refinery* test, there is no indication that Equistar released a corresponding amount of collateral upon each payment from IPI. Instead, [*20] each payment to Equistar appeared to be "ipso facto a payment on the unsecured portion of [Equistar's] claim." *Id.* With respect to the source aspect, evidence submitted by IPI without challenge from Equistar indicates that Equistar was paid with money from a SouthTrust Bank line of credit rather than

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

from proceeds of Equistar's collateral. Thus, under both "aspects," the payments to Equistar were attributable to the unsecured portion of its claim. Because these payments permitted Equistar to receive more than it would otherwise in a chapter 7 case in light of the uncontradicted evidence that unsecured creditors would not receive 100% in a hypothetical liquidation, IPI has satisfied the fifth element of § 547(b). All of the elements of a preference under § 547(b) having been established, IPI is entitled to summary judgment unless Equistar prevails on the § 547(c)(4) defense.

IV.

Based on the massive attention devoted to the issue by the parties in their briefs, responses, and replies, it is clear that the critical issue in this adversary proceeding is whether the subsequent advance or new value defense of § 547(c)(4) is available to Equistar. On this issue, Equistar has [*21] the burden of proof. See 11 U.S.C. § 547(g); Phoenix Rest. Group, Inc. v. Ajilon Prof'l Staffing LLC (In re Phoenix Rest. Group, Inc.), 317 B.R. 491, 494 (Bankr. M.D. Tenn. 2004). Under § 547(c)(4), a preferential transfer may not be avoided--

> to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
>> (A) not secured by an otherwise unavoidable security interest; and
>> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4). This exception encourages continuation of credit extensions to distressed companies by limiting the risk of loss to those creditors who continue dealing with the debtor on a credit basis, yet insulates other creditors from harm by requiring the preferred creditor to replenish the estate with new value. See Charisma Inv. Co., N. V. v. Airport Sys., Inc. (In re Jet Fla. Sys., Inc.), 841 F.2d 1082, 1083 (11th Cir. 1988)("A subsequent advance is excepted because it is reasoned that a creditor who contributes [*22] new value in return for payments from the incipient bankrupt, should not later be deemed to have depleted the estate to the disadvantage of other creditors."); In re Phoenix Rest. Group, Inc., 317 B.R. at 495 ("New value that replenishes the debtor bal-

ances the preferential effect of a prior transfer from the debtor.").

In its motion for summary judgment, Equistar asserts that during the ninety-day preference period, it gave subsequent new value totaling $ 429,312.05 to IPI in the form of Product deliveries and that these deliveries constitute under § 547(c)(4) a complete defense to this preference action. In response, IPI maintains that this defense is unavailable as a matter of law because neither subpart (A) nor (B) of § 547(c)(4) has been satisfied. According to IPI, the new value advanced by Equistar was "secured by an otherwise unavoidable security interest" in contravention of § 547(c)(4)(A). Additionally, asserts IPI, § 547(c)(4)(B) limits Equistar's new value defense to the Product deliveries that remained unpaid as of the bankruptcy petition date. Each of the arguments raised by IPI will be addressed in turn.

With respect to subpart (A) of § 547(c)(4), [*23] the language of the statute requires that any new value not be "secured by an otherwise unavoidable security interest." Undisputably, the new value shipped by Equistar to IPI was originally secured. Equistar maintains, however, that this security interest is "avoidable" due to the superior security interest of SouthTrust Bank which renders Equistar's security interest valueless. Equistar points out that under 11 U.S.C. § 506(a), it only has an allowed secured claim to the extent of the value of its interest in the collateral and that under subsection (d) of § 506, "to the extent that a lien secures a claim against the debt that is not an allowed secured claim, such lien is void . . . ."

IPI's response to this argument is that simply because a security interest is valueless does not mean that it is avoidable. IPI notes that § 547(c)(4)(A) makes no reference to § 506. According to IPI, "if a security interest is properly created, properly documented and properly perfected, as Equistar's security interest is in this case, the security interest is not avoidable. If the security interest in the new value is not avoidable at the time the new value is advanced, [*24] then the new value is not available to the creditor as a defense."

Unfortunately, no case has addressed the precise issue raised by the parties and few courts have even discussed subpart (A) of § 547(c)(4). Those referencing § 547(c)(4)(A) often inaccurately characterize the provision as requiring that the new value be unsecured. See, e.g., Wolinsky v. Cent. Vermont Teachers Credit Union (In re Ford), 98 B.R. 669, 681 (Bankr. D. Vt. 1989). However, the statute only insists that the new value not be "secured by an otherwise unavoidable security interest." As the treatise Collier on Bankruptcy recognizes, "The debt maybe unsecured from the outset or secured by an avoidable security interest." 5 Collier on Bank-

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

ruptcy P 547.04[4] (15th ed. rev. 2005). It is clear from the language of the statute that the relevant inquiry is not whether the new value was ever secured but whether the security interest is avoidable and thus ineffective in bankruptcy. "It should be emphasized that the section requires a prior determination of whether the security interest is valid in bankruptcy. If it is not, the creditor will lose the benefit of the security interest, but will [*25] be able to use the entire, subsequent advance to protect a prior preference." 3 *Norton Bankr. L. & Prac.* 2d § 57:20 (2004).

The most instructive case in this regard is the Fifth Circuit Court of Appeals' decision in *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.),* 185 F.3d 329, 336 (5th Cir. 1999). The trustee in that case argued that the preference creditor could not utilize the § 547(c)(4) defense because it retained a security interest in the new value goods at the time of shipment although the interest was unperfected and unenforceable under Texas law due to subsequent payment by the debtor. *Id.* at 335. According to the trustee, it was irrelevant that the security interest was unenforceable, the only relevant inquiry was whether the security interest was "avoidable" by actual operation of the avoidance powers. Because it was not, argued the trustee, the shipments could not constitute new value. *Id.* The lower courts agreed with the trustee, but the Fifth Circuit Court of Appeals reversed. "We . . . hold that section § 547(c)(4)(A) prevents the application of new value against prior preferences only if that new value is subject [*26] to a security interest that is valid and enforceable at the time of the bankruptcy." *Id.* at 336. As explained by the court:

> The trustee's argument necessarily assumes that Congress was concerned with the mere existence, at any time, of security interests, rather than their enforcement and subsequent diminishing of the estate. However, the text of the statute indicates clearly that this is not the case. The statute concerns itself not with all security interests, but only with "otherwise unavoidable" security interests. This indicates that the proper temporal focus is not on the historical existence of security interests, but rather the existence of such interests at the time of bankruptcy. If security interests exist at that time and the new value rule is invoked, the court should not allow the thus secured new value to be set off against past preferences if the security interests are otherwise unavoidable. However, if at the time of bankruptcy no such interest exists, the once secured new value maybe applied against such preferences.

Since no security interest existed at the relevant time, section 547(c)(4)(A) is facially inapplicable.

This interpretation of [*27] the statute is the only sensible, real world result. A key justification for the new value exception is that while the payment of preferences to the creditor diminished the estate, other creditors are not really worse off since the subsequent advance of new value replenishes the estate. *See In re Toyota,* 14 F.3d at 1091. This logic is obviously undercut if the creditor retains a valid, enforceable security interest in the new value. If section 547(c)(4)(A) did not exist, such a creditor could not only shield a past preference, but also enforce the security interest and recover the new value. The net effect on the estate would no longer be neutral, and the other creditors would have cause for complaint. But if the security interest originally attached to the new value is unenforceable—either because it has been extinguished or is avoidable—the mere fact it once existed cannot disadvantage the other creditors. The new value remains firmly fixed in the estate and available to all the creditors. There thus is really no reason to prevent the set-off of this new value against prior preferences. *See Kroh Brothers,* 930 F.2d at 654 (stating that the availability [*28] of section 547(c)(4) "depends on the ultimate effect on the estate" and thus if a party could assert a secured claim against the estate the defense could not be invoked).

*Id.* at 335-36.

Applying this reasoning, it is immaterial in the present case that the new value shipped by Equistar was secured at the time of shipment. Instead, the appropriate inquiry is whether Equistar is secured and the extent of the security in the debtor's bankruptcy case. "If the creditor extending the credit is partially secured by a valid security interest, then the exception only applies to the extent that the creditor's collateral is less than the total claim against the debtor resulting from the extension of credit" 5 *Collier on Bankruptcy* P 547.04[4] n.46. n3 *See also* Robert H. Bowman, *The New Value Exception to the Trustee's Preference Avoidance Power: Getting The Computations Straight,* 69 Am. Bankr. L.J. 65, 83 (Winter 1995)("Subparagraph (A) would permit the offset of new value against a prior preferential payment to the

Page 8

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

extent that the new value is not secured--that is, a pro tanto approach should be taken in the case of the partially secured, or undersecured, [*29] creditor.") (citing Raymond T. Nimmer, *Security Interests in Bankruptcy: An Overview of Section 547 of the Code*, 17 Hous. L. Rev. 289, 300 (1980)). n4 In *Southen Technical College, Inc. v. Graham Props. P'ship (In re Southern Technical College, Inc.)*, 199 B.R. 46 (Bankr. E.D. Ark. 1995), *aff'd sub nom. Southern Technical College, Inc. v. Hood*, 89 F.3d 1381 (8th Cir. 1996), the preference creditor that had extended new value secured in part by a $ 11,846 security deposit was protected by the § 547(c)(4) defense to the extent of the unsecured portion. Similarly, in *El Paso Refinery*, a secured preference defendant that had subordinated a portion of its security interest in the collateral to another creditor was able to assert the new value defense to the extent of its unsecured portion. *In re El Paso Refinery, L.P.*, 178 B.R. at 444. Likewise, in the present case, because Equistar is unsecured due to the superior security interest of SouthTrust Bank, it is able to take advantage of the § 547(c)(4) defense.

> n3 The treatise on the Uniform Commercial Code by Professors White and Summers lends additional support for this view:
>
>> If the creditor is undersecured, the new advance, even though nominally secured, may satisfy 547(c)(4). Assume an outstanding debt of $ 1 million, collateral of $ 200,000. Creditor makes a new loan, bringing the total to $ 1,100,000. Although this loan was under the security agreement and was itself secured by the existing $ 200,000 of collateral, for this purpose it is not secured by an "otherwise unavoidable security interest," for under 506(a) it will be treated as an unsecured interest on liquidation of the debtor.
>
> 4 White & Summers, Uniform Commercial Code § 32-5 (5th ed. 2004).

[*30]

> n4 As stated by Professor Nimmer:
>
>> Section 547(c)(4) requires that the subsequent new value not be secured by a security interest

that is unavoidable in bankruptcy. Although arguably not explicit in this section, the drafters apparently intended to continue prior law to the effect that a partially secured advance can be used to protect a preference *to the extent* that the advance is unsecured. The purpose of such a limitation is obvious. To the extent that the subsequent new value is secured by a valid security interest, the transfer has not effectively replenished the estate. It should be emphasized at this point that the section requires a prior determination of whether any involved security interest is valid in bankruptcy. If the security interest is not valid, the creditor will lose the benefit of the security interest, but will be able to use the subsequent advance to exempt a prior preference.

Raymond T. Nimmer, 17 Hous. L. Rev. at 300 (emphasis in original).

As reasoned by the Fifth Circuit Court of Appeals in *Micro Innovations*, this conclusion is supported [*31] by the rationale underlying the § 547(c)(4) defense. To rule in favor of IPI would mean that not only does Equistar lose the benefit of its security interest, but that it also is precluded from utilizing the new value defense, notwithstanding that it replenished the estate by the new shipments of Product, in effect returning the preferential payments received by it. *See In re Micro Innovations Corp.*, 185 F.3d at 336. *See also Moglia v. American Psychological Assoc. (In re Login Bros. Book Co., Inc.)*, 294 B.R 297, 300 (Bankr. N.D. Ill. 2003)("The relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate."). The inconsistency of this result was recognized by the court in *Micro Innovations*: "The trustee . . . in effect maintains that an extinguished security interest must be treated as a live security interest for the purpose of allowing him to recover payment [under § 547(b)(5)], but as an extinguished security interest for the purpose of allowing him to maintain possession of the collateral. The bankruptcy court and the district court followed the trustee's logic. We cannot . . . ." *Id.* at 332. [*32] Based on the forgoing, this court concludes that Equistar has satisfied the element of the new value defense set forth in § 547(c)(4)(A).

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

The court turns next to subpart (B) of § 547(c)(4), which requires the creditor to establish that "on account of [the subsequent] new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4)(B). IPI maintains that under this provision, the new value must remain unpaid in order to offset the preferential transfers. The courts are split on this issue, with three circuit courts of appeals having adopted this interpretation and three others having rejected it in more recent rulings, construing the statute to only require that the subsequent new value not be paid "by an otherwise unavoidable transfer." Compare New York City Shoes, Inc. v. Bentley Intl., Inc. (In re New York Shoes, Inc.), 880 F.2d 679, 680 (3d Cir. 1989); Matter of Prescott, 805 F.2d 719, 728 (7th Cir. 1986); In re Jet Florida Sys., Inc., 841 F.2d at 1083 (all holding that the new value must remain unpaid) with Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 329 (8th Cir. 1997); [*33] Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228, 231-32 (9th Cir. 1995); Laker v. Vallette (Matter of Toyota of Jefferson, Inc.), 14 F.3d 1088, 1092 (5th Cir. 1994)(rejecting the "remain unpaid" construction). The Sixth Circuit Court of Appeals has not addressed the issue, but the "emerging view" and the consensus of the bankruptcy courts within this circuit that have considered the issue is that the "remain unpaid" approach is inconsistent with the plain language of the statute which only requires that the new value not be paid by "an otherwise unavoidable transfer." See Deborah L. Thorne & Jesus E. Batista, Are All Creditor "Animals" Equal? Treatment of New Value Under § 547, 23 Am. Bankr. Inst. J. 22 (April 2004)(noting "emerging view"); In re Phoenix Rest. Group, Inc., 317 B.R. 491, 499 (Bankr. M.D. Tenn. 2004)("Had Congress intended 'otherwise unavoidable' to mean that new value must remain unpaid, it would simply have said so."); Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.), 315 B.R. 443, 472 (Bankr. S.D. Ohio 2004)("Very few recent lower court decisions, which are clearly [*34] not bound by a particular circuit's ruling, have followed the 'new value must remain unpaid' axiom."); Information Packaging, Inc. v. Golden Eagle Products, Inc. (In re Information Packaging, Inc.), 297 B.R 521, 524 (Bankr. M.D. Tenn. 2003)("Section 547(c)(4) was not 'designed to limit credit for subsequent advances only to advances that remained unpaid . . . .'")(quoting Katz v. Ida K. Stark Trust (In re Van Dyck/Columbia Printing), 289 B.R 304, 315 (D. Conn. 2003)); Boyd v. The Water Doctor (In re Check Reporting Servs., Inc.), 140 B.R. 425, 432-33 (Bankr. W.D. Mich. 1992)(The requirement that new value remain unpaid is an "inaccurate and confusing paraphrase of a clearly stated statutory purpose.")(quoting Valley Candle

Mfg. Co. v. Stonitsch (In re Isis Foods, Inc.), 39 B.R. 645, 653 (W.D. Mo. 1984)).

This court agrees with the analyses of those courts, particularly those of my learned colleagues Judges Waldron and Lundin in Roberds and Phoenix, respectively, and concludes that § 547(c)(4)(B) only requires that the new value not be paid by an "otherwise unavoidable transfer." As explained by Judge Waldron: [*35]

> The proper inquiry directed by section 547(c)(4)(B) is whether the new value has been paid for by "an otherwise unavoidable transfer." This inquiry follows the Kroh Bros. [930 F.2d 648 (8th Cir. 1991)] rationale that a creditor should not get double credit for an advance of new value. However, instead of barring the new value defense altogether anytime new value has been repaid, this approach allows the new value defense if the trustee can recover the repayment by some other means.
>
> This analysis fully comports with the statute's plain language. While the phrase "the debtor did not make an otherwise unavoidable transfer" is complicated, it is not ambiguous and its meaning is easily discernible.

In re Roberds, Inc., 315 B.R. at 470 (citations omitted). See also Robert H. Bowmar, 69 Am. Bankr. L.J. at 75 ("A payment by the debtor made subsequent to a particular extension of new value does not diminish the new value unless the payment is not avoidable on any basis other than the (c)(4) exception itself. . . . It is only if the payment is unavoidable because of the applicability of one of the other exceptions in subsection [*36] (c) or because of the applicability of some other Code provision, that the payment should be applied to reduce the new value.").

Judge Lundin adds to this discussion by observing:

> Had Congress intended "otherwise unavoidable" to mean that new value must remain unpaid, it would simply have said so. Indeed, § 60(c) of the Bankruptcy Act, the predecessor to § 547(c)(4), specifically provided that only "the amount of such new credit remaining unpaid at the tune of the adjudication in bankruptcy

Case 1:06-cv-00147-JJF     Document 25-2     Filed 06/14/2006     Page 19 of 25

Page 10

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

may be set off against the amount which would otherwise be recoverable" from the creditor as a preference. 11 U.S.C. § 96(c) (repealed). The word "unpaid" is conspicuously absent from § 547(c)(4). Reinserting a word from the prior statute that Congress omitted is supported by no theory of statutory construction.

*In re Phoenix Rest. Group, Inc.*, 317 B.R. at 499 (citations omitted).

Based on the foregoing, the court rejects IPI's assertion that the new value must remain unpaid. Instead, "the new value defense is permitted unless the debtor [repaid] the new value by a transfer which is otherwise avoidable." *In re Roberds, Inc.*, 315 B.R. at 471. [*37] Accordingly, IPI's motion for summary judgment on this issue will be denied.

With respect to whether Equistar is entitled to summary judgment based on § 547(c)(4), it must first be noted that IPI has offered no evidence challenging the factual foundation for this defense, that Equistar provided IPI with new value shipments subsequent to and in excess of the amount of preferential payments received by Equistar. n5 According to Equistar's records submitted in support of its summary judgment motion, the subsequent new value given by Equistar in the form of Product deliveries totaled $ 429,312.05, allegedly providing a complete defense to the preference action by IPI. The court's review of the record, however, indicates that Equistar's first shipment of "new value" for which Equistar is seeking to reduce its preference exposure does not constitute new value within the meaning of § 547(c)(4) because it was not given "subsequent" to Equistar's receipt of a preferential transfer as required by the statute. The first preferential payment after the commencement of the preference period was made by wire transfer to Equistar on August 14, 2003. Equistar seeks to offset this payment by a shipment [*38] in the amount of $ 57,115.52 received by IPI after this date, but shipped by Equistar on August 13, prior to its receipt of the first preferential transfer. New value is given when the goods are shipped or given by the creditor rather than received by the debtor. *See Rushton v. E&S Int'l Enters., Inc. (In re Eleva, Inc.)*, 235 B.R. 486, 489 (B.A.P. 10th Cir. 1999)("The relevant date to determine when new value is given is the date of the shipment of the goods."); *Gonzales v. DPI Food Products Co. (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33,45 (Bankr. D. N.M. 2003)(adopting *In re Eleva); In re Tenn. Chem. Co.*, 159 B.R. at 513 (parties agreed that new value given when product shipped); *Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg., Inc.)*, 62 B.R. 684, 687 (Bankr. N.D. Ill.

1986)(observing in dicta that new value extended on date shipped); *Rovzar v. Prime Leather Finishes Co. (In re SACO Local Dev. Corp.)*, 30 B.R. 859, 862 (Bankr. D. Me. 1983)(applying date of shipment rule). *But cf. In re Schwinn Bicycle Co.*, 205 B.R. at 568 ("The new value is deemed to have been given [*39] when the goods are actually delivered to the debtor, rather than when the creditor chooses to calculate the price of the goods or to bill for them."); *Bash v. Am. Tools Cos. (In re George Worthington Co.)*, 163 B.R 115, 118 (Bankr. N.D. Ohio 1994)(same); *Fitzpatrick v. Cent. Communications and Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R 949, 957 n.2 (Bankr. E.D. Tenn. 1996)(utilizing date of delivery). This result is mandated by the plain language of the statute, which speaks in terms of new value "given" by the creditor rather than "received" by the debtor. *See* 11 U.S.C. § 547(c)(4)("to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor"). In addition, it is consistent with the policy considerations which underlie the exception.

The purpose of § 547(c)(4) is to encourage creditors to deal with troubled businesses. If that is the purpose, the Court believes that the relevant date to determine when new value is given is the date of the shipment of the goods. In this case, E & S extended credit and shipped the goods before the preference occurred. New value [*40] cannot be given as an afterthought Further, use of the delivery date would treat creditors arbitrarily based on the method of shipment used or distance the product must travel.

*In re Eleva, Inc.*, 235 B.R. at 489 (citations omitted). Because Equistar gave new value when it shipped Product to IPI on August 13, 2003, this shipment does not shelter the preferential payment made by IPI to Equistar on August 14, 2003.

n5 IPI did state in the "Conclusion" section of its motion for summary judgment that Equistar's summary judgment motion should be denied because there is a genuine issue of material fact as to "the amount of new value for which Equistar is entitled to credit against the preferential transfers received." However, IPI submitted no evidence, in affidavit form or otherwise, that contradicted Equistar's proof as to the amounts of new value given by it *See Celotex Corp. v. Catrett*, 477 U.S. at 324 (The nonmoving party must "go beyond the pleadings and by [its] own affida-

2005 Bankr. LEXIS 997, *; 54 Collier Bankr. Cas. 2d (MB) 710;
44 Bankr. Ct. Dec. 183

vits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial.'"). Absent evidentiary support, IPI's assertion that there are material facts in dispute must be rejected.

[*41]

The other shipments by Equistar, however, do appear to constitute subsequent new value for which Equistar is entitled to reduce its preference exposure. As indicated on the spreadsheet attached to this memorandum opinion, IPI's first preferential payment to Equistar was on August 14, 2003, in the amount of $ 154,887.20. Subsequently, Equistar advanced new value to IPI of $ 13,637.44 and $ 12,901.76 on August 14, 2003, and $ 13,613.12 on August 15, 2003. These transactions created a net avoidable preference balance of $ 114,734.88. The next payment by IPI to Equistar during the preference period was for $ 27,300.60, of which $ 27,195.84 was a prepayment, leaving $ 104.76 applied to antecedent debt, as discussed *supra*, and increasing the preference balance to $ 114,839.64. Equistar made additional advances of $ 13,607.04 on August 18, 2003, and $ 55,176.00 on August 19, 2003, reducing the avoidable preference balance to $ 46,056.60. IPI wired $ 101,441.00 to Equistar on August 21, 2003, increasing the avoidable preference total to $ 147,497.60, but Equistar subsequently advanced $ 27,378.24 on August 23, 2003, and $ 56,635.20 on August 25, 2003, leaving an avoidable preference total [*42] of $ 63,484.16. IPI's next payment to Equistar occurred on September 12,

2003, in the amount of $ 83,513.48, followed by an Equistar advance of $ 14,579.42 on September 13, 2003, with a new avoidable preference total of $ 132,418.22. Finally, on September 15, 2003, IPI wire-transferred $ 13,613.12 to Equistar, which then made the following seven advances: September 15, 2003, $ 64,372.86; September 17, 2003, $ 14,605.55 and $ 14,919.09; September 18, 2003, $ 14,710.06; September 20, 2003, $ 14,292.02; and September 21, 2003, $ 14,572.89. Applying these advances to the preference balance produces a remaining preference balance of $ 8,558.87. Accordingly, Equistar's motion for summary judgment based on the § 547(c)(4) defense will be granted except to the extent of $ 8,558.87.

IV.

Contemporaneously with the filing of this memorandum opinion, the court will enter an order granting in part and denying in part the parties' motions for summary judgment. The order will provide for the avoidance and recovery pursuant to 11 U.S.C. § § 547(b) and 550 of preferential payments to Equistar in the amount of $ 8,558.87 and IPI will be awarded judgment against Equistar [*43] in this amount plus prejudgment interest from the date of demand.

FILED: March 31, 2005

BY THE COURT

MARCIA PHILLIPS PARSONS

UNITED STATES BANKRUPTCY JUDGE



Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10281 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
PUMA INDUSTRIAL CONSULTING, INC.,
Plaintiff,
v.
DAAL ASSOCIATES, INC., *et al.*, Defendants.
No. 84 Civ. 3137 (SWK).

Sept. 9, 1986.

*MEMORANDUM OPINION AND ORDER*

SHIRLEY WOHL KRAM, U.S.D.J.
*1 The above-captioned matter was tried by the Court without a jury. The Court's findings of fact and conclusions of law are set forth below.

*INTRODUCTION*

Plaintiff Puma Industrial Consulting, Inc. ("Puma"), brought this suit to collect a commission of $222,751.69 it alleges it is owed pursuant to a contract with Daal Associates, Inc. ("Daal"), one of the defendants in this action. Puma's claim is essentially one for breach of contract. Puma has sued Daal, Daal Trimming and Embroidery, Inc. ("Daal T & E"), David Shamilzadeh, Al Conforti and Daal Trimming and Embroidery (a partnership formed by Shamilzadeh and Conforti). The defendants deny that any breach occurred and similarly contend that they are not liable to Puma. Daal has asserted a counterclaim for negligence against Puma, and it seeks $750,000 in damages. Puma denies any liability on this counterclaim.

*FINDINGS OF FACT*

Puma has its principal place of business in, and is incorporated under the laws of, New Jersey. Daal and Daal T & E are New York corporations with their principal places of business in New York. Shamilzadeh and Conforti are New York residents. The Court has subject-matter over this action pursuant to 28 U.S.C. § 1332(a)(1).

Puma is an industrial consulting company which assists companies in obtaining and satisfactorily performing government contracts. Puma prepares and submits companies' bids on government contracts, makes companies aware of government contracts available for bids, and assists companies in satisfying contracts once they obtain them. Charles Hollander, Puma's president, testified that Puma has performed this type of work for the past six or seven years. Puma's normal fee is 5 percent of the gross figure awarded in the government contract. Thus, Puma normally only collects a fee when the company Puma has submitted a bid for actually is awarded the government contract.

The instant dispute arises out of a written agreement Puma and Daal entered into on July 21, 1981 (hereinafter referred to as "1981 agreement"). This agreement provided that Puma would submit bids on government contracts for Daal. The agreement also provided that Puma would receive a fee of 5 percent of the gross amount of any bid accepted or contract awarded by the government, and was signed by Hollander on behalf of Puma and by David Shamilzadeh, the president of Daal, on behalf of Daal. That agreement contained the following provision.

10. This document contains the entire agreement between the parties, and may not be changed except in writing signed by both parties.

Hollander testified, and it is undisputed, that the 1981 agreement was to apply to and govern all bids on government contracts submitted by Puma on Daal's behalf. Hollander also testified that while Puma performed consulting work for other clients it did not do so for Daal. Rather, its work for Daal related only to submitting bids and obtaining government contracts. After the 1981 agreement was signed, Puma began to submit bids on Daal's behalf.

*2 Puma submitted many bids on Daal's behalf. Daal ultimately was awarded three separate govenment contracts, and actually accepted and performed only two of these: the epaulets or shoulder marks contract and the sweater contract.

Puma's fee on the shoulder marks contract, pursuant to the 1981 agreement, was to be 5 percent of the gross amount awarded. Thus, Puma's fee was to be approximately $102,000. Puma, however, agreed to accept only $63,000 as its fee for the shoulder marks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1986 WL 10281 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

contract. That contract was awarded, and Puma's fee paid, prior to the award of the sweater contract. Puma's claim involves only the sweater contract.

The evidence and testimony showed there were many instances where, the 1981 agreement notwithstanding, Puma agreed to accept significantly less than a 5 percent fee. While none of these bids were ultimately successful, the evidence established a clear course of conduct between Puma and Daal which repeatedly modified the 5 percent provision of the 1981 agreement. That agreement was never modified in writing, however.

In addition to the shoulder marks contract, Daal, through Puma, successfully bid upon and obtained the sweater contract in November, 1983. The gross amount awarded in this contract was $4,455,033.80. Puma's claim of breach, and of an unpaid fee, relates solely to that contract. To this day, Daal has paid Puma no money on the sweater contract. The evidence at trial showed that Daal offered to pay $10,000 but Puma declined that offer. It is undisputed that Puma processed all the forms for the bid on the sweater contract and that Puma is entitled to a fee. The dispute involves the amount of that fee.

The evidence showed that Hollander and Shamilzadeh had extensive negotiations about Puma's fee on the sweater contract. After discussing various proposals, the evidence shows, and Hollander conceded, that he agreed to accept 1.85 percent of the sweater contract amount as Puma's fee. The evidence also demonstrates that Shamilzadeh and Hollander had agreed, on behalf of Puma, Daal and Daal T & E, that Puma's fee on the sweater contract would be 1.85 percent, that this agreement was reached prior to the submission of Daal's bid on the sweater contract, and that no subsequent modifying agreement was reached regarding Puma's fee. Moreover, the evidence shows that Puma rejected Daal's offer to take 10 percent of gross profits as its fee on the sweater contract.

The evidence also shows that the sweater contract was awarded to Daal doing business as Daal Trimming and Embroidery ("the Daal partnership"), the partnership formed by Shamilzadeh and Conforti. Thus, as it is conceded that the sweater contract was controlled by the 1981 agreement and the parties' modification of the fee provision of that agreement, it is clear that the Daal partnership is bound by the terms, as modified, of the 1981 agreement. Thus, Daal, the Daal partnership, and the partners of the Daal partnership (Conforti and Shamilzadeh), are all

bound by, and liable for, Puma's 1.85 percent fee. Shamilzadeh clearly agreed to that term on behalf of the above-named entities, and this agreement is binding. Moreover, Shamilzadeh clearly had the authority and the right to bind Daal and the Daal partnerships.

*DAAL'S COUNTERCLAIM*

*3 Daal has interjected a counterclaim against Puma relating to the shoulder marks contract. The basis of the counterclaim is Hollander's alleged failure to check the option section of the bid submitted on the shoulder marks contract. Daal contends that because of this it lost the ability to produce additional shoulder marks pursuant to a possible option on the shoulder marks contract.

It is undisputed that Hollander failed to check the option box. Daal failed to produce any evidence to demonstrate that the government sought to exercise the option, or purchased shoulder marks elsewhere because Daal had not sought the option. Moreover, William Whalen, a procurement agent for the federal government, testified that the option would not have been exercised. He testified that the government did not seek to purchase any additional shoulder marks during the period of the unexercised option. Thus, Daal has utterly failed to show that it suffered any compensable harm because of Hollander's failure to check the option section.

*CONCLUSIONS OF LAW*

Puma seeks $222,751.69 as its 5 percent fee for the sweater contract. It alleges that the defendants breached the 1981 agreement by failing to pay that amount. Daal seeks $750,000 based on its claim that Hollander negligently failed to check the option section of the bid on the shoulder marks contract. The Court will address Puma's claim first.

The Court finds that the defendants have breached the 1981 agreement. Puma is entitled to a fee and the defendants have failed to pay any portion of that fee. The Court rejects Puma's contention that it is entitled to 5 percent. Rather, the Court finds that the parties had engaged in a clear and repeated course of conduct, subsequent to the 1981 agreement, which modified the 5 percent fee provision. While the amount of the modification varied from bid to bid, for the sweater contract the agreement was 1.85

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10281 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

percent. Thus, Puma is entitled to 1.85 percent of $4,455,033.80, the gross amount awarded under the sweater contract. Puma is, therefore, entitled to receive $82,418.13. Daal, the Daal Partnership, and Conforti and Shamilzadeh, as partners of the Daal partnerships, are jointly and severally liable for this amount.

Puma contends that it is entitled to the full 5 percent because a written contract which provides only for written modification cannot be orally modified. Puma invokes N.Y.Gen.Oblig. § 15-301(1) to support this argument. Puma's argument is rejected because the 1981 agreement was modified not orally, but by the parties' course of conduct and course of dealing. Such conduct, as outlined in the Court's findings of fact, can modify an agreement which, by its own terms, requires written modification. *See Rosen Trust v. Rosen, 53 A.D.2d 342, 352 (N.Y.App.Div.1976), aff'd, 43 N.Y.2d 693 (1977); All-Year Golf v. Products Investors Corp., 34 A.D.2d 246, 250 (N.Y.App.Div.1970).*

Even if the parties had not effectively modified the 1981 agreement through their course of conduct, which the Court finds they have, Puma is now estopped from seeking to collect more than 1.85 percent. Puma, by agreeing to accept 1.85 percent, waived its right to collect 5 percent. Daal relied on that waiver in submitting the sweater contract bid, a conclusion supported by Daal's earlier refusal to bid on certain contracts because Puma would not agree to accept a sufficiently lower commission. Because Daal relied on Puma's waiver of the 5 percent fee clause in agreeing to submit a bid on the sweater contract, Puma is now estopped from seeking to collect more than 1.85 percent. *See Rose v. Spa Realty Assoc., 42 N.Y.2d 338, 344 (1977).*

*4 Puma argues that Daal gave no consideration for Puma's fee concession; thus, Puma should not be estopped. This contention is erroneous. The consideration Daal gave was agreeing to submit a bid on the sweater contract. Daal had no legal or contractual obligation to submit a bid on any particular contract, or any contract at all. In exchange for Puma's concession Daal agreed to bid on the sweater contract with the concomitant result that Puma could obtain a fee if the contract were awarded to Daal. Thus, Puma's concession was supported by consideration from Daal.

The defendants attempt to avoid their contractual obligations by arguing that the 5 percent fee provision of the 1981 agreement is illegal and,

therefore, unenforceable. Specifically, defendants assert that the 1981 agreement is in violation of 41 U.S.C. § 254(a), which provides in relevant part:

§ 254. *Negotiated contracts*

(a) Requirements. Except as provided in subsection (b) of this section, contracts awarded after using procedures other than sealed-bid procedures may be of any type which in the opinion of the agency head will promote the best interests of the Government. Every contract awarded after using procedures other than sealed-bid procedures shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business, for the breach or violation of which warranty the Government shall have the right to annul such contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

The defendants' argument is frivolous because Puma was a bona fide commercial or selling agency maintained by the contractor (Daal) to secure business. Daal conceded this in the 1981 agreement, which stated *"Whereas,* Puma has experience contracting for the manufacture or sales of such goods for various governmental and other agencies ..." Moreover, the evidence showed that Puma had extensive business dealings in securing government contracts for six to seven years on behalf of many clients. Similarly, Puma submitted many bids on behalf of the defendants. Thus, the Court rejects defendants' affirmative defense of illegality.

### DAAL'S COUNTERCLAIM

Daal's counterclaim was wholly unsupported by even a scintilla of credible evidence that it had suffered a compensable harm as a result of Hollander's failure to check the option section of the shoulder marks bid. Thus, because it failed to establish its claim, and Puma refuted it in any event with Whalen's testimony, Daal's counterclaim is dismissed.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1986 WL 10281 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

## *CONCLUSION*

Puma is awarded $82,418.13 on its breach of contract
claim.     Defendants Daal, the Daal partnership,
Shamilzadech and Conforti are jointly and severally
liable for this amount.     Daal's counterclaim is
dismissed.    Judgment is to be entered in favor of
Puma and against the defendants in accordance with
the foregoing.

**\*5 SO ORDERED.**

S.D.N.Y.,1986.
Puma Indus. Consulting, Inc. v. Daal Associates
Not Reported in F.Supp., 1986 WL 10281 (S.D.N.Y.)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
NEW LINE CINEMA CORPORATION, Plaintiff,
v.
ATLANTIC RELEASING CORPORATION,
Defendant.
No. 82 Civ. 7867 (PKL).

June 12, 1985.

COHEN, GROSSBERG & ZINKIN, ESQS. 635
Madison Avenue New York, New York 10022, BY:
BENJAMIN ZINKIN, ESQ., of counsel.
JARBLUM & SOLOMON, P.C. 650 Fifth Avenue
New York, New York 10019, for defendant; BY:
JAMES D. FORNARI, ESQ., of counsel.

OPINION
BERNIKOW, United States Magistrate.
*1 In this diversity action plaintiff is suing for breach
of a distribution agreement between itself and
defendant. This case was referred to me, on consent
of the parties, for trial and preparation of a final
judgment. See 28 U.S.C. § 636(c). The parties
thereafter conducted their discovery and a bench trial
was held. This opinion constitutes my findings of
fact and conclusions of law after trial. See
Fed.R.Civ.P. 52(a).

Background

Plaintiff, a New York corporation and a distributor of
motion pictures, brought this action against
defendant, a Massachusetts corporation and a
producer and distributor of motion pictures, for
breach of a distribution agreement (the 'Agreement').
Pursuant to the Agreement, on or about July 5, 1978,
defendant granted plaintiff a license in the United
States and Canada to distribute, for non-theatrical
uses,[FN1] the motion pictures 'Madame Rosa,' 'La
Grande Bourgeoise,' 'Bonjour Amour,' 'Bahia,' and
'Max Havelaar.' Except for the counterclaim
discussed below, the portion of the agreement
relating to those pictures is not at issue now.

The instant controversy concerns the alleged breach
of paragraphs 4.05 and 4.06 of the Agreement.
Pursuant to paragraph 4.05 of the Agreement,[FN2]

defendant granted plaintiff the right of first refusal to
obtain non-theatrical rights to other motion pictures
acquired by defendant from time to time. Whenever
defendant received a bona fide offer from any third
party to distribute, subdistribute or otherwise
represent the non-theatrical rights for any pictures, it
was obligated to communicate in writing all of the
relevant terms of such offer to plaintiff and to allow
plaintiff 30 days from the date of such
communication to equal or better the offer. The right
of first refusal was to last for a period of five years
from the date of the Agreement. See paragraph 4.05,
supra note 2. Paragraph 4.06 requires that all
'notices' and 'statements' be sent by certified mail,
telegraph or cable.[FN3]

In an earlier action in this court, plaintiff sued
defendant for breach of the same Agreement. See
New Line Cinema Corporation v. Atlantic Releasing
Corporation, No. 80 Civ. 4715 (LPG) (April 15,
1982). In that case plaintiff claimed that defendant
breached the Agreement when it granted home video
cassette rights to 'Madame Rosa' and 'La Grande
Bourgeoise' to a third party. The court determined
that the term 'non-theatrical uses,' as specified in
paragraph 1.02 of the Agreement,[FN4] did include
home video cassette rights. Id. at 4. Plaintiff also
claimed, and defendant conceded, that defendant did
not possess the rights to 'La Grande Bourgoise' at the
time that it purportedly granted those rights to
plaintiff by the Agreement. Plaintiff recovered
damages on both of these claims. Plaintiff also
claimed that defendant breached paragraph 3.01(a) of
the Agreement[FN5] because it had previously granted
to a third party exclusive non-theatrical distribution
rights to 'Madame Rosa' in English-speaking
Canada. The court found that defendant had a viable,
prior contract with a third party and therefore
breached the Agreement when it warranted delivery
of that picture to plaintiff 'free and clear of any liens,
claims or demand of any kind or character
whatsoever . . .'. Paragraph 3.01(a).

*2 After the determination in the earlier action,
counsel for plaintiff wrote to counsel for defendant
on May 17, 1982, stating:
New Line expects Atlantic to live up to all the terms
and conditions of the Distribution Agreement, and
hopes that there will be no further breaches. In
particular, your attention is directed to paragraph 4.05
of the Distribution Agreement pursuant to which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Atlantic is obligated to offer New Line a right of first refusal with respect to the rights in question for other pictures which it may from time to time acquire.

Plaintiff's exhibit 3. This reminder of the right of first refusal, citing paragraph 4.05, is silent as to the means of communication defendant must use to fulfill its obligation. The earlier action did not concern an issue that plaintiff raises here: whether the notice requirements of paragraph 4.06 applied to paragraph 4.05.

Plaintiff now claims that in four instances defendant breached its contractual obligation to give plaintiff the right of first refusal. According to plaintiff, defendant did not communicate to plaintiff the offers it received from other companies for non-theatrical rights to motion pictures in the following instances:

*Package One*

Offer from Films, Inc. for non-theatrical rights (excluding home videocassette and videodisc rights) in the following pictures: 'Montenegro,' 'I Sent A Letter To My Love,' 'Elvira Madigan,' 'I Love You,' 'The Lady On The Bus' and 'Smash Palace.'

*Package Two*

Offer from Thorn EMI Video Programming Enterprises, Inc. for videocassette and videodisc rights in 'Montenegro.'

*Package Three*

Offer from MGM/UA Entertainment Company for videocassette and videodisc rights in 'I Love You' and 'Emily.'

*Package Four*

Offer from Vestron Video, Inc. for videocassette and videodisc rights to 'Valley Girl' and certain other pictures.

Plaintiff also claims that defendant granted the rights to those four packages to others. For the alleged breach of the distribution agreement, plaintiff seeks damages in the amount of the profits plaintiff would have realized as the distributor of Package One and the amounts of the advances paid to the licencees of

Packages Two, Three and Four.

Defendant argues that it communicated to plaintiff the terms of various offers it received on certain pictures, whenever defendant also owned the non-theatrical rights to those pictures. It is defendant's position that its method of informing plaintiff of pending offers, by regular mail, was adequate, because the Agreement does not specify that the notice provisions of paragraph 4.06 apply to these communications. Moreover, all of defendant's prior correspondence with plaintiff had been transmitted in this manner without objection. Consequently, defendant claims that it did not breach its contractual obligation to give plaintiff the right of first refusal. Defendant also claims that even if a breach occurred plaintiff has suffered no damages.

In addition, defendant filed a counterclaim alleging that plaintiff breached the Agreement by failing to provide monthly or quarterly statements of gross film rentals as required by paragraph 2.06 of the Agreement.[FN6]

*Discussion*

*3 The first issue as to each of the four packages is whether defendant complied with its obligation to give plaintiff the right of first refusal, as specified in paragraph 4.05 of the Agreement. If it breached the Agreement, the court must determine the amount of damages, if any, sustained by plaintiff. On the counterclaim, the court must determine if plaintiff breached the agreement, and if it did, whether defendant is entitled to relief.[FN7]

*Package One*

*The offer of Films, Inc. for the 'Montenegro' group, excluding home video and video disc rights.*

Plaintiff contends that defendant executed an agreement with a competitor of plaintiff, Films, Inc., for Package One, without giving proper notice of that transaction.

Defendant's evidence that it offered plaintiff the right of first refusal on Package One consists of copies of two letters, dated June 17 and August 31, 1982, defendant's exhibits O and Q, and the testimony of Tom Coleman, its president. These letters informed plaintiff that defendant was offered $25,000 for non-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

theatrical rights to 'Montenegro', June 17 letter, defendant's exhibit O, and that Films, Inc. offered $25,000 for non-theatrical rights to 'Smash Palace,' 'I Love You' and 'Lady on the Bus.' August 31 letter, defendant's exhibit Q.

Plaintiff denies that the two letters, defendant's exhibit O and Q, were ever sent. Transcript ('T.') 70, 71, 115, 139. But even if they were, plaintiff argues, the letters did not conform to the agreement because they were not sent by certified mail, were not timely, and did not accurately convey the terms of the offer.

Mr. Coleman testified that he dictated and sent the letters, dated June 17 and August 31, 1982 to plaintiff, t. 200, and that the copies in evidence were from defendant's files, specifically its New Line file. T. 201. Michael Harpster, vice president for marketing of New Line Cinema, testified that he never received these letters or any other notice from defendant of offers to distribute the pictures in Package One. T. 70, 71, 115. Janis Chaskin was director of sales for a division of New Line at the time of the hearing. She testified that she was director of non-theatrical sales from March 1982 to November 1983, and in that position her duties included making evaluations of and recommendations for new acquisitions. T. 9-10. When shown defendant's agreement with Films, Inc.. for Package One, plaintiff's exhibit 4, she testified that she had received no notice of an opportunity for plaintiff to acquire the non-theatrical rights in that package. T. 139. She also testified that if New Line had been offered such an opportunity, she would have recommended acceptance of the offer. Id.

The testimony of Ms. Chaskin and Mr. Harpster obviously contradicts Mr. Coleman's statement that he dictated the letters of June 17 and August 31 and had them sent to plaintiff. T. 200, 201. Plaintiff, of course, has the burden of proof on this factual dispute; it produced testimony of two interested witnesses. Defendant produced copies of that correspondence as well as testimony of an interested witnesses. I find that plaintiff has not its burden of persuasion and thus that defendant's exhibits O and Q are copies of letters actually sent.[FN8]

*4 Plaintiff argues that even if the letters were sent, they were ineffective because they did not conform to the requirement in paragraph 4.06 of the Agreement that notices be served by certified mail. See supra note 3. According to plaintiff, defendant should have communicated the right of first refusal by certified mail because the term 'communicate in writing' in

paragraph 4.05, has the same meaning as the term 'notice' or 'statement' used in paragraph 4.06. While paragraphs 1.14, 2.06, 3.04, and 4.02 of the Agreement employ the terms 'notice' or 'statements,' and therefore it is appropriate to impose the requirements of paragraph 4.06 on these other paragraphs, those requirements should not be imposed on paragraph 4.05, which uses the term 'communicate in writing' but does not specify 'notice' or 'statement.'

Furthermore, the practice of the parties themselves does not support plaintiff's interpretation. From the date of the Agreement to the start of this lawsuit, all previous communications regarding plaintiff's right of first refusal were made by regular mail. Defendant's exhibits A through K; t. 109, 193, 194, 276. There is no evidence that plaintiff, at anytime from 1978 to 1982, objected to defendant's method of communicating the right of first refusal. This course of performance may therefore be used as evidence of the parties' own interpretation of the Agreement. Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913); Ottley v. Palm Tree Nursing Home, 493 F.Supp. 910, 914 (S.D.N.Y. 1980), appeal withdrawn 657 F.2d 264 (2d Cir. 1981); Viacom Intern., Inc. v. Lorimar Productions, Inc., 486 F.Supp. 95, 98 (S.D.N.Y. 1980). New York courts have treated the parties' behavior 'as a course of performance and [have] given it weight in contract interpretation.' Paragon Resources v. National Fuel Gas Distribution, 695 F.2d 991, 997 (5th Cir. 1983), citing Webster's Red Seal Pubs., Inc. v. Gilberton World Wide Pubs., Inc., 67 A.D.2d 339, 342, 415 N.Y.S.2d 229, 231 (1st Dept. 1979), aff'd 53 N.Y.2d 643, 438 N.Y.S.2d 998 (1981) (modification of the agreement is implied in fact from the course of conduct of the parties).

Plaintiff also argues that if it waived defendant's obligation to use certified mail by its prior acceptance of regular mail, the waiver was terminated by its letter dated May 17, 1982. Plaintiff's exhibit 3. The letter refers to the prior legal action, see supra, pp. 3-4, and places defendant on notice that plaintiff will strictly enforce its right of first refusal, pursuant to paragraph 4.05.[FN9] But the prior litigation dealt only with the extent of plaintiff's rights, not with the means used to communicate those rights. Nor did the letter concern defendant's means of communication. Consequently, I conclude that defendant had no obligation to communicate the right of first refusal by certified mail.

Plaintiff claims that even if the letters were sent in the appropriate manner, they were not timely because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 4

defendant signed an agreement with Films, Inc., dated May 26, 1982, before it notified plaintiff of a right of first refusal. In support of this claim plaintiff produced a copy of that agreement, plaintiff's exhibit 4, and a letter also dated May 26, 1982, from Films, Inc., to Tom Coleman. Plaintiff's exhibit 5.

**\*5** An examination of plaintiff's exhibits 4 and 5 suggests a final contract was executed on or about May 26, 1982. The agreement begins 'This Agreement, made this 26th day of May, 1982,' see plaintiff's exhibit 4, page 1, and is signed, id., page 6, by Tom Coleman for defendant and Allen J. Green for Films, Inc. There is no date on the page with the signatures. The letter of May 26, 1982 begins:
Dear Tom:
I have signed and am returning herewith all 3 copies of the agreement covering our non theatrical distribution of the 6 pictures. You will note, pursuant to our telephone conversation, I have added SMASH PALACE and have made the necessary changes in the agreement, as a result of the addition of this title.

Plaintiff's exhibit 5. Allen Green asked Mr. Coleman to 'be sure to initial those change[s] I made and return one of these 3 copies to me.' Id. He also wrote that the 'initial royalty advance has been requested and they have already been sent to you.' Id.[FN10]

Although the agreement dated May 26, 1982, and accompanying letter might be construed to support plaintiff's position, this evidence is not dispositive. Mr. Green's request that Mr. Coleman initial the changes indicates that the agreement would be final when he did so, and Mr. Coleman's initials do not appear to be on the document. See t. 258, 267.

In addition, Mr. Coleman's testimony raises some doubt as to the actual date of the final agreement. According to Mr. Coleman, he began work for the distribution of 'Montenegro' at the end of 1981, and entered into negotiations with several companies. T. 198-199, 264. Films, Inc. made an offer, t. 199, and he then sent an unsigned contract to Films, Inc. T. 259. Mr. Coleman testified that Films, Inc. inserted the date of May 26, 1982, tr. 262, and returned the draft agreement to defendant 'much later.' Id. According to Mr. Coleman it was 'absolutely not' a final contract, t. 257, but was 'designed in such a way to facilitate the offer.' Id. As part of on-going negotiations, t. 279-84, it showed only the 'intent' of an 'optimistic offer.' T. 283. Only after receiving such an offer could defendant notify plaintiff to enable plaintiff to exercise its right of first refusal. T.

200, 201, 256, 260. The agreement between defendant and Films, Inc. was not finally consumated, according to Mr. Coleman, until September or October of 1982. T. 262.

According to defendant, it routinely negotiated distribution agreements by making and receiving 'offers in the form of agreements,' t. 280; see also t. 270, 283, 284, 286, and defendant always informed third parties with whom they negotiated that plaintiff had a right of first refusal. T. 284. Michael Rosenblatt testified that it was in defendant's best interest to use plaintiff's right of first refusal as a negotiating tool. T. 418-21. After receiving a third party's offer, defendant 'always hoped' that plaintiff would match that offer, because defendant could then demand a higher price from the third party. T. 419.

**\*6** The foregoing testimony makes the effect of the May 26 agreement and letter a close issue. Whether plaintiff met its burden of persuasion that there was a finalized agreement on May 26, 1982, is open to question. Nonetheless, this issue need not be determined. Even if the document dated May 26, 1982, was only an offer, and the letters in evidence were therefore timely, there is other evidence that defendant breached the Agreement.

Plaintiff argues that defendant did not notify it of 'all relevant terms' of the offer from Films, Inc., as required by paragraph 4.05 of the Agreement. The letters of June 17 and August 31, 1982, indicate a $25,000 advance for 'Montenegro' and $25,000 for three other films ('Smash Palace,' 'I Love You,' and 'Lady on the Bus,' respectively. See defendant's exhibits O and Q. Plaintiff contends that defendant did not communicate the relevant terms of the offer, i.e., the amount of the advance,[FN11] the terms, the rights being granted and the territory. Plaintiff's Post-trial Brief at 27-28.

Mr. Coleman characterized the terms, other than the advance, as pertinent or significant, t. 250, 254, but 'for the purpose of [the] agreement,' he said, 'the relevant term was the advance.' T. 25; see also t. 255. He stated that 'in the previous experience with New Line, the dollars were the issue. The advance was the issue.' Id.; see also t. 204. Further, Paragraph 4.05 of the Agreement states that 'the amount offered as a minimum guarantee shall control insofar as which offer is to be accepted.' See t. 253.

Applying Mr. Coleman's construction of the Agreement, it appears that the 'relevant term'-the advance-was not accurately communicated to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 5
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

plaintiff. The document and accompanying letter, dated May 26, 1982, establish that Mr. Green of Films, Inc. altered the agreement on or before May 26, 1982, by adding 'Smash Palace,' pursuant to a telephone conversation with Mr. Coleman. Plaintiff's exhibit 4, ¶ ¶ 4 and 5; t. 268-71. Thus Mr. Coleman had knowledge of these changes when he dictated the two letters that notified plaintiff of offers of $25,000 for 'Montenegro' and $25,000 for 'Smash Palace' and two other films. Defendant's exhibit O and Q. Taken together, these two letters indicate offers of $50,000 for four films in Package One, but, in fact, Films, Inc. had offered defendant $35,000 for six films. See plaintiff's exhibit 4, ¶ ¶ 4 and 5. If the accurate offer had been communicated, Janis Chaskin testified, she would have recommended its acceptance. See supra p. 7. In short, defendant did not notify plaintiff of the relevant terms that it had received from Films, Inc., but instead conveyed inaccurate information. See t. 255-256. Under these circumstances, defendant did not fulfill its obligation under paragraph 4.05 of the Agreement to notify plaintiff of its right of first refusal on Package One, and hence a branch occurred.

### Package Two

*The offer of Thorn-EMI Video Programming Enterprises, Inc. for video cassette and videodisc rights in 'Montenegro.'*

*7 Plaintiff alleges that defendant executed an agreement in May, 1982, with Thorn-EMI for Package Two without giving the required notice. In support of this allegation, plaintiff produced a telex from Thorn-EMI to defendant, indicating that a 'deal' or 'partnership' had been finalized. Plaintiff's exhibit 18, defendant's answer 2(a) to plaintiff's second set of interrogatories; tr. 282-83.

To counter this argument, defendant produced its contract with Thorn-EMI, dated August 1, 1982. See defendant's exhibit P; t. 276. In addition, Michael Rosenblatt testified that he had been in the process of engotiating an agreement with Thorn-EMI for many months, beginning in February, 1982. T. 417; see also plaintiff's exhibit 18, answer 2(a). Mr. Rosenblatt testified that on numerous occasions during those negotiations he told Thorn-EMI of plaintiff's right of first refusal, because that enhanced his negotiating position. T. 418. Tom Coleman explained that the telex from Thorn-EMI to defendant was part of defendant's course of negotiation; it was

merely an 'optimistic offer' and did not indicate a final contract had been signed. T. 283. This offer, Mr. Coleman said, enabled him to notify plaintiff of a bona fide offer for it to consider in deciding whether to exercise its right of first refusal. T. 279-80. The contract dated August 1, 1982, supports this testimony.

Mr. Coleman testified that he notified plaintiff of the offer from Thorn-EMI by the letter of June 17, 1982, defendant's exhibit O, and received no response from plaintiff. T. 278. Since it appears that the contract with Thorn-EMI was finalized August 1, 1982, the letter of June 17, 1982 was timely under paragraph 4.05 of the Agreement. Moreover, the letter accurately conveyed the terms of the contract: it informed plaintiff that defendant had received an offer of $75,000 for the cassette and disk rights to Montenegro. See defendant's exhibit P, schedule 5, p. 6. Accordingly, I find that plaintiff has not upheld its burden of showing defendant breached the Agreement by signing the contract for Package Two.

### Package Three

*Offer from MGM/UA Entertainment Co. for video cassette and video disc rights to 'I Love You' and 'Emily.'*

Plaintiff also argues it did not receive the right of first refusal for Package Three. T. 164. Defendant claims that it gave adequate notice to plaintiff in its letter of August 31, 1982. Defendant's exhibit Q. According to plaintiff, the August 31 letter conveyed inaccurate information:  it listed 'I Love You' but omitted 'Emily,' and it indicated an advance of $50,000.00 for 'I Love You' instead of the advance of $40,000.00 as provided in the contract. Plaintiff's Post-trial Brief at 28, 30-31; plaintiff's exhibit 10, paragraphs 1.01 and 6.03.

Defendant contends that although the contract with MGM/UA provided for distribution of the picture 'Emily' in addition to 'I Love You,' it had no obligation to offer 'Emily' to plaintiff. 'Emily' was controlled by defendant's affiliated corporation, Atlantic Television, t. 288-89, and paragraph 4.05 of the Agreement does not encompass pictures controlled by defendant's affiliates. See also paragraph 4.06(c) of the Agreement (which expressly binds plaintiff, plaintiff's subsidiaries and affiliates, and also defendant, but is silent as to defendant's subsidiaries and affiliates).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 6
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*8 Plaintiff notes that the 'Instrument of Transfer' executed in connection with defendant's agreement with MGM/UA, names defendant as Grantor of the picture 'Emily.' See plaintiff's exhibit 10, p. 13. Plaintiff contends that defendant produced no documentary evidence to sustain its claim that it did not own 'Emily.' This agreement is not without force. Nonetheless, I accept the testimony of Mr. Coleman that defendant did not own the picture 'Emily.' See tr. 287-88. Since he provided notice with respect to 'I Love You' by the letter of August 31, there does not appear to be any reason for him to neglect to report the other part of the package. Accordingly, I conclude that 'Emily' was controlled by Atlantic Television.

The fact that 'Emily' was owned by an affiliate of defendant did not obligate defendant to offer that picture to plaintiff. The testimony indicates that defendant and Atlantic Television are separate corporations. Mr. Coleman and Mr. Rosenblatt hold controlling stock in both corporations. T. 288. Nevertheless, as a 'general rule . . . corporations are treated as separate entities notwithstanding the fact they have common shareholders and officers,' City Bank v. Morgan Walton Properties, Inc., 675 F.2d 666, 669 (5th Cir.), cert. denied, 459 U.S. 107 (1982), and 'courts do not lightly disregard the separate existence of related corporations.' Coastal States Trading, Inc. v. Zenith Navigation S.A., 446 F.Supp. 330, 337 (S.D.N.Y. 1977). If there are no legal grounds for disregarding the separate existence of two corporations, the contract of one is not considered the contract of the other. City Bank v. Morgan Walton Properties, Inc., supra, 675 F.2d at 669.

Plaintiff has not shown that Atlantic Television is a 'mere instrumentality' of defendant. Fidena A.G. v. Honeywell, Inc., 501 F.Supp. 1029, 1036 (S.D.N.Y. 1980). On the other hand, defendant's testimony indicated that the corporations are separate. Tr. 427-28. There is no basis then to pierce the corporate veil that separates defendant and Atlantic Television. Defendant was under no obligation to offer 'Emily' to plaintiff because that picture is controlled by Atlantic Television. Of course, defendant was obligated to notify plaintiff of the offer for 'I Love You.'

In that regard, there remains the issue of whether defendant's letter of August 31, 1982, defendant's exhibit Q, gave timely and accurate notice to plaintiff of the offer for 'I Love You.' Defendant executed

the final contract for Package Three on November 30, 1982, defendant's exhibit R; t. 286, 287, 290, and therefore the August 31, 1982 letter was timely. Still, the letter did not accurately convey the terms of the offer from MGM/UA. It informed plaintiff of a 'separate deal . . . with an advance of $50,000,' defendant's exhibit Q, but the agreement with MGM/UA provided for an advance of $40,000 for 'I Love You.' See defendant's exhibit R, paragraph 6.03. Even Mr. Coleman conceded that the letter of August 31, 1982, did not accurately convey the terms of the MGM/UA contract. T. 292-93. It follows that on Package Three defendant did not fulfill its obligations under paragraph 4.05 of the agreement.

### Package Four

*Offer from Vestron Video, Inc., for video cassette and video disc rights to 'Valley Girl' and other films.*

*9 Plaintiff's claim regarding Package Four concerns films owned by Valley 9000, t. 239, a corporation in which Mr. Coleman and Mr. Rosenblatt are shareholders. T. 427. As discussed above regarding Atlantic Television, their status as shareholders in defendant and Valley 9000 does not permit the court to 'lightly disregard the separate existence' of separate corporations. Coastal States Trading, Inc. v. Zenith Navigation S.A., supra, 446 F.Supp. at 337. Since Valley 9000, a separate corporation, owned the pictures in Package Four, defendant has no obligation to give plaintiff the right of first refusal on that package.

In sum, plaintiff established liability on Packages One and Three but not on Packages Two and Four.

### Damages

Package One: The liability of plaintiff having been established, its damages must now be considered. 'The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.' Adams v. Lindblad Travel Co., Inc., 730 F.2d 89, 92 (2d Cir. 1984), citing Perma Research & Development v. Singer Co., 542 F.2d 111, 116 (2d Cir.), cert. denied, 429 U.S. 987 (1976).

Damages, or lost profits, may be measured 'in terms

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 7
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

of the business taken from' a plaintiff, id., or by calculating the earnings of a plaintiff's successor to a contract. Katz Communication, Inc. v. Evening News Associate, 705 F.2d 20, 25 (2d Cir. 1983). Although 'a wrongdoer has no right to insist upon a mathematically precise evaluation of damages suffered,' Contemporary Mission, Inc. v. Bonded Mailings, Inc., 671 F.2d 81, 84 (2d Cir. 1982), there must be 'a rational basis on which to calculate the lost profits.' Perma Research and Development Co. v. Singer Co., 402 F.Supp. 898-99 (S.D.N.Y.) aff'd 52 F.2d 111 (2d Cir. 1975), cert. denied, 429 U.S. 987 (1976).

Films, Inc. ultimately licensed Package One. The experience of Films, Inc. as shown in its accounts, defendant's exhibit S, provides 'a rational basis on which to calculate the lost profits.' Perma Research and Development Co. v. Singer Co., supra, 402 F.Supp. 898. As noted, it has been held that it is not unreasonable to choose the earnings of a successor to a contract as a method of calculating damages. Katz Comminications, Inc. v. Evening News Ass'n. supra, 705 F.2d at 25. Similarly, computing the earnings of a third party in its performance on the contract in this case does not seem unreasonable.

Defendant produced a document from Films, Inc. entitled 'Royalty Report for Quarter ending June 30, 1983.' Defendant's exhibit S.[FN12] The covering letter to this document refers to Package One as 'Contract III' and summarizes the data: The total revenue reported for the quarter was $11,436.75. Id. Using this quarterly amount as a base, the first year's revenue was approximately $45,747.

Three witnesses for plaintiff predicted the revenues that would have been earned in the seven year period of the agreement. Plaintiff's exhibits 20, 21, 22. All three predicted that a large percentage of the total revenues would be earned the first year, although the percentages varied slightly. Id. Two of the witnesses were employees of plaintiff at the time of the trial. Consequently, I have based my calculations on the testimony and projections of Earnest L. Raab; he was a former employee of New Line and Films, Inc., but when he testified he was national sales manager for Swank Motion Pictures. T. 504, 507, 508. Using Mr. Raab's estimates of what percentage of the seven years' revenue would be earned the first year, I have calculated that in the seven years covered by the agreement with Films, Inc., the total revenue would be approximately $101,758.61.[FN13] The net profits to Films, Inc. would be approximately $29,021.50.[FN14]

*10 In sum, the quarterly royalty report of Films, Inc., defendant's exhibit S, provides a rational basis for estimating the first year's revenues on Package One, the total revenues over seven years, and the net profits to Films, Inc. See supra notes 12 and 13. The estimated profits of this third party-$29,021.50-thus establish the damages due plaintiff on Package One.

Package Three: Plaintiff claims damages for Package Three 'equal in the amount to the advance paid by the licensee under the applicable contract.' Plaintiff's Post-trial Brief at 53. Plaintiff relies on the deposition testimony of Norman B. Smith, defendant's expert. Id. at 53-55; plaintiff's exhibit 22. Plaintiff argues that the 'advance paid under a contract for home video rights,' although not an estimate of 'the exact net profits . . . [is] a stable foundation from which a reasonable estimate can be made.' Id. at 54.

I find that the advance is a reasonable measure of damages for Package Three. Plaintiff's evidence shows that in the first seven months that MGM/UA distributed the pictures in Package Three, it earned a net profit in excess of the advance paid to defendant for 'I Love You.' Plaintiff's exhibit. 10A.[FN15] The MGM/UA contract specified an advance of $40,000.00 for 'I Love You.' In view of the experience of MGM/UA, I find plaintiff's claim for damages equal to that amount is reasonable. Accordingly, plaintiff is entitled to the sum of $40,000.00 for damages on Package Three.

Plaintiff proved its damages on Packages One and Three and is entitled to judgment in the sum of $69,021.50.

### Counterclaim

Another issue to be resolved concerns defendant's counterclaim. It charges that plaintiff breached the Agreement by failure to provide accounting statements and pay royalties. Defendant's officers testified that prior to this lawsuit it received no reports or payments on 'Madame Rosa,' t. 235, 305, 415-16, 465, and after repeated requests, received only handwritten 'income summaries' from plaintiff without any detailed 'back-up' information. T. 306-07. Defendant ordered an audit of plaintiff's books to determine the amount plaintiff owed through December 31, 1981; as of that date plaintiff owed defendant $516.00 on 'Madame Rosa.' T. 272; defendant's exhibit U.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 8
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

The affidavit of plaintiff's treasurer, Stephen Abramson, dated May 18, 1984 ('Abramson affidavit'), shows that plaintiff recouped its advances on 'Madame Rosa' and 'Max Havelaar.' Plaintiff was obligated to report these profits to defendant and pay defendant its share. Agreement, paragraphs 2.04, 2.05, 2.06. The Abramson affidavit, and the attached income summaries for the period from July 5, 1978, through March 31, 1984, show that plaintiff owed defendant a total of $9,724.16 for 'Madame Rosa' and 'Max Havelaar.' Plaintiff owed nothing on the three other pictures in the package because these pictures did not earn sufficient profits to recoup plaintiff's advances. Plaintiff argues that its losses on these three pictures should be used to offset the monies owed on 'Madame Rosa' and 'Max Havelaar.'

*11 A review of Section 2 of the Agreement and the trial record, however, shows that the parties did not intend to offset losses against profits. Under the Agreement, plaintiff must make payments to defendant on each picture after plaintiff recoups its advance on that specific picture. Paragraph 2.04(a) specifies a different advance for each picture:
(i) 'Madame Rosa'-$40,000.
(ii) 'La Grande Bourgeoise'-$30,000.
(iii) 'Bonjour Amour'-$5,000.
(iv) 'Bahia'-$5,000.
(v) 'Max Havelaar'-$10,000.

Paragraph 2.04(a) also provides that these advances 'may not be cross-collateralized.'

Defendant's share of the net film rental ('net profit') is 55%, paragraph 2.03, but is to be paid only after plaintiff recoups its advance. Paragraph 2.04. The net profit on each picture is computed by first subtracting plaintiff's costs for prints, pre-print materials, and trailers. Paragraph 2.01, 2.02. Defendant's 55% share of the net profit is then computed, and so long as that share is less than the advance, defendant would receive nothing. When defendant's 55% share of the net profit exceeds the advance, plaintiff then owes defendant the difference between the 55% share and the advance. Paragraph 2.04. For example, the gross film rental on 'Bahia' was $9,520.67; after the deduction for expenses the net profit was $5,481.69. Since defendant's 55% share of $3,014.69 was less than the advance of $5,000, see Producer's Income Summary attached to Abramson affidavit, plaintiff had no obligation to pay any portion of the net profit on 'Bahia' to defendant. In contrast, the net profit for 'Madame Rosa' was $86,112.26 and defendant's 55% share was

$47,361.75; defendant's share was therefore greater than the $40,000 advance, and plaintiff owes $7,361.75 on that film. Id.

Plaintiff now argues that the 'aggregate expenses' of all the pictures combined may be deducted from the gross film rentals of the entire package in computing monies payable to defendant. Plaintiff's post-trial brief at 57. By this method, plaintiff would use its losses on three of the five pictures to offset the profits on the other two. Id. at 58-59.

Plaintiff's argument about the method of computation is not supported by the Agreement. As noted, the Agreement does not permit the advances for the five pictures to be cross-collateralized. See Paragraph 2.04(a). At trial, plaintiff's attorney explained the bar to cross-collateralization:
MR. ZINKIN [for plaintiff]: I wish the pictures were cross-collateralized, your Honor.
We certainly would be willing to change the contract for 'Madame Rosa' and those other five pictures so they could be cross-collaterized.
But, unfortunately, they are not cross-collateralized. And the deal that New Line made with Atlantic, each picture and each picture's advance must stand on its own two feet.
And that was for the benefit of Atlantic, so that the good pictures, 'Madame Rosa,' is only given a value of $40,000, instead of having to earn $80,000 as Atlantic's share in order to start paying Atlantic, once New Line goes over the $40,000 on 'Madame Rosa' alone, even though it doesn't take in another penny on another picture, it would have to start paying money to 'Madame Rosa.'
*12 So, with respect to that part of Mr. Fornari's statement, it is incorrect.
With respect to a second part of his statement, that a company has to recoup its advance in order to go into profits, that's also incorrect.

T. 48-51 (emphasis supplied). This explanation and paragraph 2.04 of the Agreement indicate that the contract is structured so that the terms apply individually to each of the five pictures. Plaintiff was obligated to pay defendant its 55% share on each separate picture, as soon as each picture's advance was recouped.

This interpretation is supported by examination of defendant's other contracts in evidence. These contracts clearly indicate when the parties intended to have separate accounting for individual pictures in a package, and when, on the other hand, they intended to have aggregate accounting for a group of pictures.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

The Thorn-EMI contract, for example, plaintiff's exhibit 6, paragraph 6.1, provides for accounting 'separately on an individual basis' for three of the nine pictures covered by that contract. The MGM/UA contract provides for accounting in the aggregate; it specifies that 'advances paid for each Show hereunder shall be cross collateralized for purposes of recoupment.' Plaintiff's exhibit 4, paragraph 6.04. As Mr. Coleman explained, paragraph 6.04 permitted cross-collateralization on two pictures, so that the specific advance on each was 'only for show . . .. One [picture] could earn all, certain[ly] the majority of the advance.' T. 310.

These two contracts use precise wording to indicate whether or not certain films would be cross-collateralized. In the Agreement at issue paragraph 2.04(a) specifies that advances may not be cross-collateralized. If the parties had intended a different treatment for expenses, the contract would so state. Thus I find that the parties intended the accounting for the pictures to be done on an individual basis. Plaintiff's losses on three pictures, 'Bonjour Amour,' 'Bahia,' and 'La Grande Bougeoisie,' cannot be used to offset the profits on 'Madame Rosa' and Max Havelaar.'

The Abramson affidavit and accompanying documents show that plaintiff is indebted to defendant for $7,361.65 for 'Madame Rosa' and $2,362.41 for 'Max Havelaar.' Plaintiff may not offset this amount with the losses incurred on the other three pictures. Defendant proved its counterclaim and is entitled to judgment in the sum of $9,724.16.

*Conclusion*

Judgment should be entered on the complaint in the sum of $69,021.50 in plaintiff's favor and on the counterclaim in the sum of $9,724.16 in defendant's favor.

Settle judgment on five days' notice.

FN1  Paragraph 1.02(a) of the Agreement provides:
1.02  Distribution Rights:  Distributor shall have and is hereby granted throughout the licensed territory . . . the sole and exclusive right and license, under copyright and other protection . . .
(a)  To distribute, exhibit, exploit, market,

transmit, perform and otherwise use and deal in the Pictures and film, trailers thereof, any film of any kind and size (including, but not limited to 35mm, 16mm and 8mm); and by video cassette or any other means or method now or hereafter known or invented, publicly or privately, for non-theatrical uses, as that term is understood in the United States Motion Picture Industry, but specifically reserving for Producer all exploitation of the Pictures via pay cable.

FN2  Paragraph 4.05 provides:
First Right Refusal:  For the period of 5 years commencing with signing of this agreement the Producer hereby further grants Distributor a right of first refusal to obtain non-theatrical rights for other pictures which it may from time to time acquire. At such time as Producer may receive a bona fide offer from any third party to distribute, subdistribute or otherwise represent the non-theatrical rights for any such pictures, it shall communicate in writing all relevant terms of such offer to Distributor. Thereafter Distributor shall have thirty days from the date of such communication to equal or better such offer, in which event Producer shall promptly conclude a license under terms and conditions similar to this agreement for such non-theatrical rights with Distributor. For the purposes of this paragraph, the amount offered as minimum guarantee shall control insofar as which offer is to be accepted by Producer.
(emphasis added).

FN3  Paragraph 4.06 provides:
Notices:  All notices hereunder or in connection herewith and all statements shall be addressed as follows:
To  Producer:    Atlantic  Releasing Corporation 8500 Wilshire Blvd., #926 Beverly Hills, California 90211
To  Distributor:    New  Line  Cinema Corporation 853 Broadway New York, New York 10003
or at such other addresses as the respective parties may designate in writing. Such notices shall be served and statements rendered by depositing them, charges prepaid, in the mails, by certified mail, return receipt requested, or by delivering them, charges prepaid, to a telegraph or cable office. Unless otherwise in this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement specified, the date of receipt of any such notice shall constitute the date of service. Payments may also be made by mail addressed as aforesaid.

FN4  See supra, note 1.

FN5  Paragraph 3.01(a) provides:
Representations and Warranties:  Producer does hereby represent, warrant and agree as follows:
(a)    That the Picture, when delivered to Distributor, will be free and clear of any liens, claims or demands of any kind or character whatsoever, which would in any way prejudice, affect or be inconsistent with the rights herein granted to Distributor, and shall pay all costs of production in full prior to such deliver, if billed, and other costs as billed, and if not paid or payment has been deferred, such will not interfere with the exercise of the rights granted to Distributor. In all events, provided Distributor fulfills all obligations and undertakings herein, such security interest or default thereof on the part of Producer shall not interfere with the rights of Distributor granted herein.

FN6  Paragraph 2.06 provides, in pertinent part:
Statements and Payments:
Commencing with the accounting period on which the Pictures are first released and in which gross film rentals are first earned by Distributor with respect to the Pictures, Distributor shall render, in reasonable detail, statements to the Producer, on a Monthly basis for the first year of release and on a Quarterly basis thereafter, showing the gross film rental actually received by the Distributor, the amounts of deduction described in 2 above, and the amount due Producer pursuant to this agreement. The amount so shown to be due shall be paid concurrently with the rendition of each statement.

Plaintiff's breach, defendant says, entitles it to regard the contract as terminated.  Defendant does not appear to be pursuing its termination argument seriously-nor could it.  There is no evidence that defendant ever notified plaintiff that it considered the contract terminated.

FN7   In their pretrial order, the parties formulated the issues to be tried as follows:

As to each of the four packages of motion pictures described above separately:
a)    Did defendant comply with its obligations to the plaintiff pursuant to paragraph 4.05 of the Distribution Agreement.
b)  If defendant did not comply with all of its obligations to the plaintiff pursuant to paragraph 4.05 of the Distribution Agreement, did plaintiff sustain any damages as a result thereof.
c)  What is the amount of damages, if any, so sustained by plaintiff.
d)    Did plaintiff breach the Distribution Agreement by failure to pay royalties and provide statements and is defendant entitled to relief therefore through the date of trial.

FN8  If Mr. Coleman was going to fabricate these letters, it appears he would have inserted the correct amount offered by third parties.  See infra pp. 14, 19.

FN9  In its post-trial memorandum of law at 7-8, plaintiff also argues that defendant was on notice that plaintiff would 'insist upon punctilious adherence to the terms of the contract,' id. at 8, by a stipulation and agreement in the earlier action, signed by the parties in June 1982.  That stipulation specified the amount to satisfy the money judgment, plaintiff's exhibit 2, ¶ 1, provided that the parties would withdraw their appeals, id., ¶ 2, and also stated:
New Line Cinema Corporation has put Atlantic Releasing Corporation on notice that it shall vigorously enforce all of its rights under the Distribution Agreement and that if Atlantic Releasing Corporation has or shall sell, license or otherwise use or exploit any rights it has granted to New Line Cinema Corporation in the Distribution Agreement, New Line will sue Atlantic for breach of contract.
Id., ¶ 3.  As is the case with the letter of May 17, 1982, the stipulation does not mention paragraph 4.06 of the Agreement or the means defendant used to communicate the right of first refusal.

FN10  Mr. Coleman testified that although the letter from Mr. Green, plaintiff's exhibit 5, mentioned advances already paid and the issuance of a laboratory access letter, such evidence did not necessarily imply a final agreement. A laboratory access letter would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

be issued in advance of an agreement to enable a potential licensor to evaluate the quality of the prints, t. 242-245; see also paragraph 4.01(b) of plaintiff's exhibit 10. Payment of advances before a contract was finalized, according to Mr. Coleman, 'happens regularly.' T. 245.

FN11    Paragraph 2.04(a) provides: 'Advances' shall be deemed monies paid against any sums that may be due the producer [defendant] pursuant to this Agreement.

FN12 There was a dispute as to the actual period covered by the royalty report, with defendant claiming it covered the first nine months that the pictures were available. T. 228-230. The document is clearly labelled a report for a 'Quarter' and therefore I accept it as a quarterly report.

FN13  This sum is calculated from the revenue from each of the five films in Package One, as specified in the quarterly report, defendant's exhibit S.  As the following chart shows, the first year's revenue is calculated at four times the quarterly revenue reported by Films, Inc. The revenue for seven years is calculated by using percentages derived from Mr. Raab's method of calculation.  Tr. 546, 550-51; plaintiff's exhibit 22.  For example, Mr. Raab projected the first year's revenue from 'Montenegro' as $67,500.00 and a total of $132,000.00 for seven years' revenue, plaintiff's exhibit 22; $67,500.00 is 51% of $132,000.00. The first year's revenue from 'Montenegro,' based on the actual experience of Films, Inc. for three months, would be $18,674.00, and that sum is 51% of $36,615.69, the projected revenue for seven years.

The chart on the next page indicates the method of computing the profits to Films, Inc.

Computation of profits to Films, Inc.
    *  The three months' revenue is taken from defendant's exhibit S.
    **  The percentages are derived from the projections of Earnest Raab, plaintiff's exhibit 22.

FN14  Net profits to Films, Inc. were calculated by subtracting from total revenues the expenses and the 50% royalties

to defendant.  See Agreement of defendant and Films, Inc., plaintiff's exh. 4, ¶ 5 and ¶ 6(a). Films, Inc. paid defendant an advance of $35,000.00 against future royalties.  As is indicated by the royalty report, defendant's exhibit S, Films, Inc. alloted 50% of its earnings to defendant's account, but would not be required to pay royalties to defendant until $35,000.00 had been entered in defendant's account to offset the advance. Films, Inc. would begin to pay royalties only after it earned its expenses plus $70,000.00, 50% of which would offset its advance to defendant.

After subtracting $29,737.11 for print costs, see defendant's exhibit S, and $8,000.00 in advertising expenses, see plaintiff's exhibit 21, Films, Inc. would have a profit of $64,021.50, and thus would not have paid royalties to defendant beyond the $35,000.00 advance.  The net profits to Films, Inc., after subtracting the advance, would be approximately $29,021.50.

FN15  From the inception of its agreement on November 30, 1982, to June 30, 1983, MGM/UA reported net sales of $150,717 on 'I Love You.'  Plaintiff's exhibit 10A. Under the agreement for Package Three, plaintiff's exhibit 10, ¶ 7, defendant received royalties of 20%; in the seven-month report, plaintiff's exhibit 10A, the amount entered in defendant's account would be $30,143.00. It is evident that the profits to MGM/UA exceeded the advance of $40,000.00.

S.D.N.Y. 1985.
New Line Cinema Corp. v. Atlantic Releasing Corp.
Not Reported in F.Supp., 1985 WL 1622 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw**

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**
<u>Briefs and Other Related Documents</u>
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
RHYTHM & HUES, INC., Plaintiff,
v.
THE TERMINAL MARKETING COMPANY, INC.,
Defendant.
WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION, Intervenor Defendant
and Counterclaim Plaintiff,
v.
RHYTHM & HUES, INC., Counterclaim Defendant.
No. 01 Civ. 4697(DAB)GWG.

May 4, 2004.

*REPORT AND RECOMMENDATION*
<u>GORENSTEIN</u>, Magistrate J.
**\*1** In this diversity action, plaintiff and counterclaim
defendant Rhythm & Hues, Inc. ("R & H") alleged
that defendant The Terminal Marketing Company,
Inc. ("Terminal Marketing") violated its obligations
to pay R & H's suppliers under an equipment
financing agreement secured by various leases.
Terminal Marketing did not answer the complaint
and R & H has requested its default. Wells Fargo
Bank Minnesota, National Association ("Wells
Fargo"), to whom the leases were allegedly assigned,
intervened. Wells Fargo has counterclaimed against
R & H, alleging that R & H improperly refused to
make required lease payments to Wells Fargo, as
assignee.

Both R & H and Wells Fargo have now moved for
summary judgment on the issue of the validity of the
lease assignments to Wells Fargo. In addition, Wells
Fargo has moved for summary judgment with respect
to the issue of the enforceability of a waiver-of-
defenses clause contained in the leases and R & H
has moved for summary judgment on certain of
Wells Fargo's counterclaims. For the reasons set forth
below, R & H's motions should be denied and Wells
Fargo's motion should be granted.

**I. INTRODUCTION**

*A. Factual History*

The following facts are undisputed, except as
otherwise noted:

*1. Agreements Between R & H and Terminal
Marketing*

R & H is a film production studio that specializes in
producing visual effects for motion pictures,
television commercials, theme park attractions, music
videos, and computer games. Declaration of Richard
Castaldo and Exhibits in Support of Rhythm & Hues'
Opposition to Wells Fargo's Motion for Partial
Summary Judgment, dated November 19, 2001
("Castaldo Decl.") (reproduced as Ex. S to
Declaration of Judith Beall in Opposition to Wells
Fargo's Motion for Partial Summary Judgment and in
Support of Rhythm & Hues' Cross-Motion for
Summary Judgment, filed December 18, 2003
(Docket # 69) ("Beall Decl.")), ¶ 3. As part of its
business, R & H uses various pieces of highly
advanced technical equipment. *Id.* ¶ 17. From time
to time, R & H has financed the purchase of such
equipment through Terminal Marketing. *Id.* Under
this arrangement-commonly called a "sale and
leaseback"-Terminal Marketing would order the
equipment selected by R & H from various suppliers
and then lease it back to R & H for an agreed-upon
price. *Id.* ¶ 18. Terminal Marketing would pay the
suppliers and R & H would pay Terminal Marketing.
*Id.*

a. *Line of Credit Agreement and Lease No. 3855.* In
April 2000, R & H and Terminal Marketing entered
into an agreement under which Terminal Marketing
agreed to extend R & H a line of credit for working
capital ("Line of Credit Agreement"). Rhythm &
Hues' Local Rule 56.1 Statement of Undisputed
Material Facts, filed December 18, 2003 (Docket #
68) ("R & H 56.1 I"), ¶ 3; Castaldo Decl. ¶¶ 4-5
[FN1] Under this agreement, R & H was entitled to
exercise up to three "take-downs" on the line of
credit for a total of $1.5 million. R & H 56.1 I ¶ 4;
Castaldo Decl. ¶¶ 4, 11; Hughes Decl. ¶ 10.
Payments were due 30 months after each take-down.
R & H 56.1 I ¶ 5; Castaldo Decl. ¶ 11; Hughes Decl.
¶ 10. Equipment previously purchased and owned
free and clear by R & H was used as collateral for the
Line of Credit Agreement. R & H 56.1 I ¶ 14;
Castaldo Decl. ¶ 5; Hughes Decl. ¶ 10.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

FN1. R & H and Terminal Marketing apparently amended and/or superseded the Line of Credit Agreement in December 2000. *See* Castaldo Decl. ¶ ¶ 9, 12; Declaration of John Hughes and Exhibits in Support of Rhythm & Hues' Opposition to Wells Fargo's Motion for Partial Summary Judgment, dated November 19, 2001 ("Hughes Decl.") (reproduced as Ex. W to Beall Decl.), ¶ ¶ 8-9. All terms of the original agreement remained the same except that its 12-month expiration provision was eliminated. *See* Castaldo Decl. ¶ ¶ 7, 10-11; Declaration of Jeffrey Thomas and Exhibits in Support of Rhythm & Hues' Opposition to Wells Fargo's Motion for Partial Summary Judgment, dated November 20, 2001 (reproduced as Ex. V to Beall Decl.), ¶ ¶ 18, 21-22.

*2 As part of the transaction, R & H executed a number of documents in April and May 2000, including Lease No. 3855-a standard form agreement for an equipment lease. R & H 56.1 I ¶ ¶ 9-13, 18-19, 23; *see* Lease No. 3855, dated May 9, 2000 ("Lease No. 3855") (reproduced as Ex. A1 to Declaration of John C. Weidner, filed January 13, 2004 (Docket # 70) ("Weidner Decl.")). Lease No. 3855 calls for R & H to pay 30 monthly rental payments of $57,066.47 to Terminal Marketing. Lease No. 3855 at 1. It states-in what is commonly called a "hell or high water" provision-that "[R & H's] obligation to pay [Terminal Marketing] all amounts due hereunder is absolute and unconditional" and that "[R & H] shall not be entitled to any abatement, reduction, set-off, counterclaim, defense or deduction with respect" to any of this rent. *Id.* ¶ 5. Lease No. 3855 also states that it "may be assigned by [Terminal Marketing] without notice to [R & H]" and it contains a waiver-of-defenses provision providing that "[t]he assignee's rights ... shall be free from all defenses, setoffs or counterclaims which [R & H] may be entitled to assert." *Id.* ¶ 14.

No commencement date is listed on the lease. *See id.* at 1. R & H claims that the purpose of Lease No. 3855 was to secure its first take-down on the Line of Credit Agreement and that the lease was not effective until it actually made a take-down. R & H 56.1 I ¶ ¶ 6, 15-17; Castaldo Decl. ¶ 13; Hughes Decl. ¶ ¶ 11-12. R & H further claims that it never took any take-down or leased any equipment through Terminal

Marketing that would have activated its obligations under Lease No. 3855. R & H 56.1 I ¶ ¶ 24-25; Castaldo Decl. ¶ 14; Hughes Decl. ¶ 13. R & H states that on, on May 3, 2001, it cancelled the Line of Credit Agreement with Terminal Marketing. Castaldo Decl. ¶ 16.

b. *The Equipment Financing Agreement and Lease No. 3989.* In addition to the Line of Credit Agreement, R & H and Terminal Marketing entered into an equipment financing agreement. *Id.* ¶ ¶ 17-19. Under this "sale and leaseback" arrangement, Terminal Marketing agreed to order equipment from various manufacturers, pay for the equipment, and then lease it to R & H for agreed-upon monthly payments. *Id.* ¶ 18.

On June 23, 2000, R & H entered into an agreement with Terminal Marketing to obtain equipment worth $774,375.00. *Id.* ¶ ¶ 19, 21-22. Coterminously, R & H executed a number of other documents, including Lease No. 3989-a standard form agreement for an equipment lease. *Id.* ¶ 19; *see* Lease No. 3989, dated June 23, 2000 ("Lease No. 3989") (reproduced as Ex. A2 to Weidner Decl.). Lease No. 3989 calls for 24 monthly payments of $35,078.00 and contains identical wording to Lease No. 3855, including the "hell or high water" clause containing the "absolute and unconditional" language and the waiver-of-defenses provision providing for assignment "free from all defenses, setoffs or counterclaims." Lease No. 3989 at 1 & ¶ ¶ 5, 14.

*3 At the time that Lease No. 3989 was entered into, Terminal Marketing allegedly told R & H that it was in sound financial condition and that it would meet its obligations to all equipment suppliers. *See* Complaint, filed May 31, 2001 (Docket # 1) ("Complaint"). ¶ 10. Notwithstanding Terminal Marketing's representation, the company was apparently in a dire financial condition. *See id.* ¶ 12. Because of this, many of R & H's suppliers have not been paid and have refused to provide any additional equipment to R & H. *See* Castaldo Decl. ¶ ¶ 23, 26, 29.

### 2. *Securitization Agreement*

Wells Fargo is the indenture trustee for the noteholders of a series of contract-backed and lease-backed notes that were issued by a subsidiary of Terminal Marketing, Terminal Finance Corporation II ("Terminal Finance"). Weidner Decl. ¶ 4; Declaration of John Battiloro, dated December 19,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

2001 ("Battiloro Decl.") (reproduced as Ex. U to Beall Decl.), ¶ 3. According to Wells Fargo, it engaged in a transaction with Terminal Marketing and Terminal Finance commonly known as a "securitization." Weidner Decl. ¶ ¶ 5-6. The securitization arrangement called for Terminal Marketing to sell to Terminal Finance the right to payments due from various equipment leases. *Id.* ¶ 5. Terminal Finance obtained the money necessary to purchase these rights by obtaining loans from the noteholders. *Id.* ¶ ¶ 5, 9. To secure re-payment from Terminal Finance on these loans, Wells Fargo allegedly was assigned-as indenture trustee for the noteholders-the right to payments under the leases. *Id.* ¶ ¶ 6, 9.

This transaction was allegedly effectuated through a series of agreements. The first was the sale of certain leases from Terminal Marketing to Terminal Finance by means of lease acquisition agreements. The second was the assignment of those leases from Terminal Finance to Wells Fargo by means of indenture agreements. Neither Lease No. 3855 nor Lease No. 3989 was covered by the original agreements. However, the agreements contained provisions for the assignment of additional leases. Wells Fargo does not dispute that the exact manner by which the assignment of additional leases was to be made under these agreements was not followed. *See, e.g.,* Wells Fargo's Memorandum of Law in Reply to Rhythm & Hues' Opposition to Plaintiff's Motion for Partial Summary Judgment and Opposition to Rhythm & Hues' Cross-Motion for Summary Judgment on Assignment, filed January 13, 2004 (Docket # 74) ("Wells Fargo Reply Mem."), at 3. Instead, Wells Fargo argues that documents called "Warehouse Funding Reports" properly effected the assignment of these additional leases. *See, e.g., id.* at 4.

Prior to discussing the Warehouse Funding Reports, we will first consider the lease acquisition agreements and the indenture agreements and their provisions for the assignment of additional leases.

a. *Lease Acquisition Agreements Between Terminal Marketing and Terminal Finance.* The first lease acquisition agreement was entered into in August 1995. *See* Lease Acquisition Agreement, dated August 1, 1995 ("First Lease Acquisition Agreement") (reproduced as Ex. 3 to Declaration of Aaron Mowbray, filed July 17, 2002 (Docket # 43) ("Mowbray Decl. I") and as Ex. E to Beall Decl.). Under this agreement, Terminal Finance acquired Terminal Marketing's interest in certain leases. *See*

*id.* § 2.02. The agreement also stated that its terms could "not be changed orally but only by an instrument in writing signed by the party against which enforcement is sought." *Id.* § 7.01.

*4 The agreement provided that when Terminal Marketing entered into additional leases not contemplated in the agreement, certain steps were required in order to effect an assignment of those additional leases to Terminal Finance. First, any additional lease had to be in full force and effect on the date the lease was to be assigned to Terminal Finance. *See id.* § § 3.01(a)(vi), 3.04(b)(2)(i). Second, the equipment relating to the lease had to be delivered as of the date of the assignment. *See id.* § § 3.01(a)(xii), 3.04(b)(2)(i). Third, the agreement provided that any additional assignment had to be accompanied by the following:

an Amendment to Lease Acquisition Agreement for New Lease Contracts *substantially in the form of Exhibit A hereto* subjecting such Lease Contract to the provisions hereof and providing with respect to such ... Additional Lease Contract, an Amended Lease Schedule (a copy of which will be delivered to the Noteholders).

*Id.* § 3.04(b)(2)(iv) (emphasis added). The scored phrase has some significance because one of R & H's contentions in this case is that the assignments did not conform to this phrase's requirements. *See, e.g.,* Rhythm & Hues' Memorandum of Law in Opposition to Wells' [sic] Fargo's Motion for Partial Summary Judgment and in Support of Rhythm & Hues' Cross-Motion for Summary Judgment, dated December 16, 2003 (Docket # 80) ("R & H Mem. I"), at 14-17.

"Exhibit A," referenced in the above-quoted section, consisted of a form stating briefly that the leases identified on an attached schedule "are hereby sold, assigned, transferred and delivered by [Terminal Marketing] to [Terminal Finance] in accordance with this Lease Acquisition Agreement." First Lease Acquisition Agreement, Ex. A. The attached "amended lease schedule" provided space for information regarding the new leases thereby assigned. *See id.*

Terminal Marketing and Terminal Finance entered into a new lease acquisition agreement in August 2000. *See* Amended and Restated Lease Acquisition Agreement, dated August 1, 2000 ("Second Lease Acquisition Agreement") (reproduced as Ex. 4 to Mowbray Decl. I and as Ex. G to Beall Decl.).[FN2] Like the First Lease Acquisition Agreement, this agreement contained an identical provision

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specifying the requirements for assigning additional leases to Terminal Finance and an identical "Exhibit A." *See id.* § 3 .04(b)(2) & Ex. A. The new agreement also contained. the same provision requiring a writing to effect any amendment. *See id.* § 7.01.

> FN2. Terminal Marketing and Terminal Finance apparently amended the First Lease Acquisition Agreement on six occasions prior to their execution of the Second Lease Acquisition Agreement in August 2000. *See* Second Lease Acquisition Agreement at 1. The substance of any such amendment is not relevant to the instant motions.

Both of the agreements contained two signature lines, one for Terminal Marketing's President and the other for Terminal Finance's President. *See* First Lease Acquisition Agreement at 30; Second Lease Acquisition Agreement at 28. The same individual-Sanford Schneiderman-signed the agreements on behalf of both companies. *See* First Lease Acquisition Agreement at 30; Second Lease Acquisition Agreement at 28.

**\*5 b.** *Indenture Agreements Between Terminal Marketing, Terminal Finance, and Wells Fargo.* On July 1, 1998, Terminal Marketing, Terminal Finance, and Wells Fargo entered into an indenture agreement under which Terminal Finance agreed to assign to Wells Fargo all of its rights under the leases Terminal Marketing had assigned to it under the First Lease Acquisition Agreement. *See* Second Amended and Restated Indenture, dated July 1, 1998 ("Second Indenture Agreement") (reproduced as Ex. 1 to Mowbray Decl. I and as Ex. I to Beall Decl.), at 1.[FN3] The agreement also delineated the requirements for the assignment of additional leases not originally covered by the First Lease Acquisition Agreement:

> FN3. Norwest Bank Minnesota, National Association ("Norwest"), not Wells Fargo, is technically the assignee under the Second Indenture Agreement. *See* Second Indenture Agreement at 1. R & H does not dispute that Wells Fargo is entitled to exercise the rights of Norwest under this agreement. *See* R & H Mem. I at 7-8. For ease of reference, we will use the term "Wells Fargo" to include Norwest where applicable.

[Terminal Finance] shall comply with the requirements relating to ... Additional Lease Contracts as set forth in the Lease Acquisition Agreement within the time periods set forth therein. In addition, each acquisition by [Terminal Finance] of any Additional Lease Contract ... is subject to the satisfaction of the following conditions precedent ...:

....

(ii) the delivery by [Terminal Finance] to [Wells Fargo] and the Noteholders ... of an Amended Lease Schedule accompanied by an Amendment to Indenture for New Lease Contractsand [sic] Amendmentto [sic] Lease Acquisition Agreement for New Lease Contracts executed by [Terminal Finance] and [Terminal Marketing], as appropriate.

*Id.* § 4.05(a). This same provision was included as part of a later indenture agreement between Terminal Marketing, Terminal Finance, and Wells Fargo executed in August 2000. *See* Third Amended and Restated Indenture, dated August 1, 2000 ("Third Indenture Agreement") (reproduced as Ex. 2 to Mowbray Decl. I and as Ex. M to Beall Decl.), § 4.05(a).[FN4]

> FN4. Terminal Marketing, Terminal Finance, and Wells Fargo apparently amended and/or supplemented the Second Indenture Agreement on occasion prior to executing the Third Indenture Agreement. *See* Third Indenture Agreement at 1; *see also* Supplement to Indenture, Lease-Backed Notes, Series 1999-2, Class A, dated December 1, 1999 (reproduced as Ex. K to Beall Decl.); Amended and Restated Supplement to Indenture, Lease-Backed Notes, Series 1999-2, Class A, dated June 1, 2000 (reproduced as Ex. L to Beall Decl.). They also apparently amended and/or supplemented the Third Indenture Agreement immediately after executing it. *See* Supplement to Indenture, Contract-Backed Notes, Series 2000-1, Class A, dated August 1, 2000 (reproduced as Ex. O to Beall Decl.); Supplement to Indenture, Contract-Backed Notes, Series 2000-2, Class A, dated August 1, 2000 (reproduced as Ex. P to Beall Decl.). No such amendment and/or supplement is relevant to the instant motions.

Included as Exhibit B to both Indenture Agreements was a form document to be utilized for the assignment of additional leases from Terminal Finance to Wells Fargo. The document-captioned

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

"Form of Amendment to Indenture for New Lease Contracts"-stated that it was intended to comply with section 4.05(a)(ii) of the Indenture Agreements, quoted above, and that the leases identified on its attached schedule "are hereby Granted by [Terminal Finance] to [Wells Fargo] in accordance with the Indenture." Second Indenture Agreement, Ex. B; Third Indenture Agreement, Ex. B. The attached schedule, captioned "Amended Lease Schedule" or "Amended Contract Schedule," apparently was meant to include information regarding the additional leases and the equipment covered by such leases. *See* Second Indenture Agreement, Ex. B; Third Indenture Agreement, Ex. B.

Both of the Indenture Agreements were signed by Schneiderman on behalf of both Terminal Finance and Terminal Marketing. *See* Second Indenture Agreement at 87; Third Indenture Agreement at 87.

*c. Warehouse Funding Reports.* As indicated, Wells Fargo does not dispute that the written provisions for assigning additional leases under the Lease Acquisition and Indenture Agreements were not followed. *See, e.g.,* Wells Fargo Reply Mem. at 3. Instead, Wells Fargo contends that these additional leases, including Lease Nos. 3855 and 3989, were assigned to it through documents called "Warehouse Funding Reports," which were prepared by Wells Fargo, signed by Terminal Finance as "Issuer," and transmitted normally twice per month from Terminal Finance to both Terminal Marketing and Wells Fargo. *See, e.g.,* Mowbray Decl. I ¶ 7; Weidner Decl. ¶ ¶ 8-9; Deposition of Eileen O'Connor, November 6, 2003 ("O'Connor Dep.") (reproduced in part as Ex. 4 to Declaration of Ellen Bass, filed November 18, 2003 (Docket # 65) ("Bass Decl. I") and in part as Ex. Z to Beall Decl.), at 14-16, 29-33, 57; Video Deposition of Eileen O'Connor, February 20, 2003 ("O'Connor Dep. in *Nassau Broadcasting Partners"*) (reproduced in part as Ex. 3 to Bass Decl. I and in part as Ex. 3 to Second Declaration of Ellen Bass, filed January 13, 2004 (Docket # 73) ("Bass Decl. II")), at 21.

*6 The first Warehouse Funding Report was sent on June 12, 2000 and lists a number of leases entered into by Terminal Marketing. *See* Warehouse Funding Report, dated June 12, 2000 ("June 2000 Warehouse Funding Report") (reproduced as Ex. 7 to Mowbray Decl. I and as Ex. Q to Beall Decl.). Included on the schedule of leases is Lease No. 3855. *See id.* The second Warehouse Funding Report was sent on August 22, 2000 and included Lease No. 3989 on its schedule. *See* Warehouse Funding Report, dated

August 22, 2000 ("August 2000 Warehouse Funding Report") (reproduced as Ex. 8 to Mowbray Decl. I and as Ex. R to Beall Decl.). Each schedule included a list of leases subject to the report, stating for each lease: the lessee and lease number, the amount of notes being sold and purchased, the payment schedule, the then-current value, and the amount being paid to Terminal Finance by the noteholders and being paid to Terminal Marketing by Terminal Finance. *See* June 2000 Warehouse Funding Report; August 2000 Warehouse Funding Report.

The actual leases were sent to Wells Fargo by Terminal Marketing along with form delivery certificates signed by R & H. Mowbray Decl. I ¶ ¶ 4, 6; Weidner Decl. ¶ 11; O'Connor Dep. at 31-34; *see* Delivery and Acceptance Certificate and Lessee's Acknowledgment and Consent: Lease No. 3855, dated May 9, 2000 ("Lease No. 3855 Delivery Certificate") (reproduced as Ex. D1 to Weidner Decl.); Delivery and Acceptance Certificate and Lessee's Acknowledgment and Consent: Lease No. 3989, dated June 28, 2000 ("Lease No. 3989 Delivery Certificate") (reproduced as Ex. D2 to Weidner Decl.). The Warehouse Funding Reports were then issued by Terminal Finance and, according to the accompanying cover letter to Wells Fargo and Terminal Marketing, were sent "[p]ursuant to Section 4.05" of the Indenture Agreements. Letter from Yunlong Pan, Treasury Analyst, Terminal Finance, to various recipients, dated June 12, 2000 ("Pan June 2000 Letter") (reproduced as Ex. 7 to Mowbray Decl. I), at 1; Letter from Pan to various recipients, dated August 22, 2000 ("Pan August 2000 Letter") (reproduced as Ex. 8 to Mowbray Decl. I), at 1.

### B. *Relevant Procedural History*

R & H filed its complaint in this action on May 31, 2001, naming Terminal Marketing as defendant. According to R & H, Terminal Marketing failed to fulfill its obligations under the equipment financing agreement by not paying all monies owed to R & H's suppliers. *See* Complaint ¶ ¶ 16-28. Terminal Marketing did not answer the complaint and R & H has requested its default. *See* Application for Certificate of Default by the Clerk, filed July 31, 2001 (Docket # 6).[FN8] On June 27, 2001, Wells Fargo moved for leave to intervene pursuant to Fed.R.Civ.P. 24(a). *See* Motion of Wells Fargo Bank Minnesota, National Association, to Intervene, filed June 27, 2001 (Docket # 4). Wells Fargo's motion was granted without opposition. *See* Order, filed August 28, 2001 (Docket # 8).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN5. Although R & H appears to believe that its request for default has been granted, *see, e.g.,* Beall Decl. ¶ 2, the Clerk's Certificate accompanying R & H's application on file with the Court has not yet been signed.

*7 In addition to answering the claims made by R & H in its complaint, *see* Answer in Intervention of Wells Fargo Bank Minnesota National Association, filed October 16, 2001 (Docket # 16), Wells Fargo also interposed several counterclaims against R & H. *See* Counterclaim in Intervention of Wells Fargo Bank Minnesota, National Association, filed October 16, 2001 (Docket # 14). The counterclaims alleged that R & H had failed to pay Wells Fargo sums owed under Lease Nos. 3855 and 3989, that R & H's owner had breached a guarantee on those leases, and that Wells Fargo is entitled to a declaratory judgment that the leases were valid and enforceable. *See id.* ¶¶ 50-79.

On October 22, 2001, Wells Fargo moved for partial summary judgment seeking a ruling that R & H was liable to make payments to it under Lease Nos. 3855 and 3989. *See* Memorandum of Law in Support of Motion for Summary Judgment, filed October 22, 2001 (Docket # 18), at 6-18. The motion was denied on June 19, 2002. *See Rhythm & Hues, Inc. v. Terminal Mktg. Co.,* 2002 WL 1343759 (S.D.N.Y. June 19, 2002). Specifically, the court found that summary judgment was inappropriate as to Lease No. 3855 because ambiguity existed as to what R & H's obligations were under that lease and whether those obligations had yet arisen. *See id.* at *6. As to Lease No. 3989, the court ruled that summary judgment was inappropriate pending further discovery as to the validity of the alleged assignments from Terminal Marketing to Terminal Finance and from Terminal Finance to Wells Fargo-specifically, whether the transactions were intended to defraud R & H and whether Wells Fargo was complicit in any such fraud. *See id.* at *7.

Discovery in the case then proceeded. On June 20, 2002, R & H filed a motion for partial summary judgment on the issue of the assignment to Wells Fargo of Lease Nos. 3855 and 3989. *See* Memorandum of Law in Support of Rhythm & Hues' Motion for Summary Judgment, filed June 20, 2002 (Docket # 37), at 12-18. A month later, Wells Fargo filed a cross-motion for partial summary judgment on the same issue. *See* Wells Fargo's Memorandum of

Law in Opposition to Rhythm & Hues' Motion for Summary Judgment and in Support of its Cross-Motion for Partial Summary Judgment, filed July 17, 2002 (Docket # 42) ("Wells Fargo Mem. I") (reproduced in Wells Fargo's Memorandum in Support of Motion for Partial Summary Judgment on Assignment and Good Faith, filed November 18, 2003 (Docket # 63) ("Wells Fargo Mem. II")), at 4-10.

At a conference before the undersigned on July 21, 2003, the parties agreed to withdraw their motions without prejudice to renewal at the close of discovery. *See* Order, filed July 22, 2003 (Docket # 57), at 1. Discovery is now complete and the parties have filed the instant three motions for summary judgment. *See* Notice of Motion, filed November 18, 2003 (Docket # 62); Rhythm & Hues' Notice of Cross-Motion for Summary Judgment, dated December 16, 2003 (Docket # 78); Rhythm & Hues' Notice of Motion for Summary Judgment, dated December 16, 2003 (Docket # 79).[FN6] Collectively, these motions raise the following three issues: (1) the validity of the lease assignments to Wells Fargo; (2) the validity of R & H's waiver of its right to assert any defenses to its obligations under the leases; and (3) R & H's obligation to make payments under Lease No. 3855.

FN6. A number of documents, including both of R & H's notices of motion, were not filed as of the time of preparation of this Report and Recommendation. Accordingly, the Court has docketed the courtesy copies of these documents supplied by the parties. To provide some context regarding when the parties considered these documents, we cite them by the date they were signed rather than the date they were filed.

## II. SUMMARY JUDGMENT STANDARD

*8 A district court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

248. Thus, a genuine issue of material fact exists "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson,* 477 U.S. at 248). When determining whether a genuine issue of material fact exists, all factual inferences must be drawn in favor of the nonmoving party. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir.2003) (citing *Anderson,* 477 U.S. at 255); *McPherson,* 174 F.3d at 280. However, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted); *accord Harlen Assocs. v. Incorporated Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York,* 72 F.3d 1040, 1048 (2d Cir.1995) (citing *Celotex,* 477 U .S. at 322-23). "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48); *accord Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993); *Chase Manhattan Bank v. Am. Nat'l Bank & Trust Co. of Chi.,* 93 F .3d 1064, 1072 (2d Cir.1996).

### III. DISCUSSION

As indicated, the parties' motions raise three issues: (1) the validity of the lease assignments to Wells Fargo; (2) the validity of R & H's waiver of its right to assert any defenses to its obligations under the leases; and (3) R & H's obligation to make payments under Lease No. 3855. We discuss each in turn.

### A. The Validity of the Lease Assignments to Wells Fargo

Wells Fargo does not dispute that the assignments of Lease Nos. 3855 and 3989 from Terminal Marketing to Terminal Finance and from Terminal Finance to Wells Fargo did not comply with the written terms of the Lease Acquisition and Indenture Agreements inasmuch as the specific documents attached to them

as exhibits were never executed. *See, e.g.,* Wells Fargo Reply Mem. at 3. Wells Fargo's argument is instead that the Warehouse Funding Reports were sufficient to meet the requirements of the Lease Acquisition and Indenture Agreements. *See, e.g.,* Wells Fargo Mem. I at 5-7. Wells Fargo also argues that it has offered evidence that the parties intended the Warehouse Funding Reports to fulfill this function. *See, e.g., id.* at 7-10. R & H, on the other hand, claims that the parties never intended the Warehouse Funding Reports to effect any assignment under the Lease Acquisition or Indenture Agreements and that the reports in fact did not bring about any assignment because they failed to comply with the relevant sections of the Lease Acquisition and Indenture Agreements. *See, e.g.,* R & H Mem. I at 14-22; Rhythm & Hues' Reply in Support of its Cross Motion for Summary Judgment, filed February 5, 2004 (Docket # 76) ("R & H Reply Mem."), at 4-7.[FN7]

> FN7. As a preliminary matter, R & H argues that Wells Fargo's motion for summary judgment "should be stricken because it seeks to summarily adjudicate whether the Agreements have been validly assigned to Wells Fargo" and "[p]artial summary judgment simply is not available on non-dispositive fact issues or issues that are elements of claims, but not entire claims themselves." R & H Mem. I at 10. The Court rejects R & H's argument. Fed.R.Civ.P. 56(a) states that a party may move for summary judgment upon "any part" of a claim or counterclaim. As one treatise notes, "it is now well-established that a court may 'grant' partial summary 'judgment' that establishes the existence or nonexistence of certain facts, even though no actual judgment is entered on a claim." 11 James Wm. Moore, *Moore's Federal Practice* § 56.40[1], at 56-279 (3d ed.2003) (footnote omitted). Indeed, Fed.R.Civ.P. 56(d) specifically contemplates that a court in adjudicating a motion for summary judgment "shall ... make an order specifying the facts that appear without substantial controversy" and that such facts "shall be deemed established" for purposes of a trial. R & H contends that this procedure applies only where a party has made a motion for summary judgment that is unsuccessful in disposing of a particular claim in full. *See* R & H Mem. I at 10. As a matter of logic,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

however, if a court has the power under Fed.R.Civ.P. 56(d) to make a ruling regarding the establishment of facts for trial as an ancillary result of a motion for summary judgment, a court surely has the power to do so in situations where a party recognizes that a motion for summary judgment as to a particular claim is not possible. Put in terms of the language of the rule, the Court concludes that a "part" of a claim or counterclaim under Fed.R.Civ.P. 56(a) for which a motion for partial summary judgment is explicitly permitted must necessarily include the adjudication of facts contemplated by Fed.R.Civ.P. 56(d).

### 1. *New York Law Governing Assignments*

\*9 The Lease Acquisition and Indenture Agreements specify that New York law governs their construction. *See* First Lease Acquisition Agreement § 7.02; Second Lease Acquisition Agreement § 7.02; Second Indenture Agreement § 13.10; Third Indenture Agreement § 13.10. In addition, the parties in their briefs have cited New York law exclusively, thereby signaling their consent to the application of New York law. *See, e.g., Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (citing *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989)).

Under New York law, " '[a]n assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, or chattel, or other thing." ' *In re Stralem,* 303 A.D.2d 120, 122 (2d Dep't 2003) (quoting *Griffey v. N.Y. Cent. Ins. Co.,* 100 N.Y. 417, 422 (1885)). "[A]n assignment need not utilize any particular phraseology or form." *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 557 (2d Cir.1976) (discussing New York law); *accord Wells Fargo Bank Minn. v. Nassau Broad. Partners,* 2003 WL 22339299, at \*5 (S.D.N.Y. Oct. 10, 2003) ("Under New York law, '[n]o particular words or phrases are necessary to effect an assignment. A valid assignment merely requires a completed transfer of the entire interest of the assignor that divests the assignor of all control over the right assigned." ' (quoting *Richstone v. Chubb Colonial Life Ins.,* 1999 WL 287332, at \*6 (S.D.N.Y. May 7, 1999))); *Leon v. Martinez,* 84 N.Y.2d 83, 88 (1994) ("No particular words are necessary to effect an assignment; it is only required that there be a

perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." (citations omitted)). Instead, New York law requires only "some 'act or words' that manifest an intent to assign." *Prop. Asset Mgmt., Inc. v. Chi. Title Ins. Co.,* 173 F.3d 84, 87 (2d Cir.1999) (quoting *Miller,* 540 F.2d at 557).

Parties to an agreement may prohibit or restrict the ability to assign rights and obligations under that agreement. *See, e.g., Allhusen v. Caristo Constr. Corp.,* 303 N.Y. 446, 452 (1952). However, "[u]nder New York law, only *express* limitations on assignability are enforceable." *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,* 109 F.3d 850, 856 (2d Cir.1997) (emphasis in original) (citing cases); *accord Stralem,* 303 A.D.2d at 122 ("[C]ontracts are freely assignable absent language which expressly prohibits assignment." (citing cases)).

"It is elementary ancient law that an assignee never stands in any better position than his assignor." *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.,* 36 N.Y.2d 121, 126 (1975); *accord Trans-United Indus., Inc. v. Cohn,* 351 F.2d 605, 606 (2d Cir.1965) (per curiam) ("[A]n assignee gets no better rights that those of his assignor."). Accordingly, under New York law, an assignee may receive an interest in the assigned property only if the assignor held the property or right it claims to have assigned. *See, e.g., Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.,* 269 F.Supp.2d 356, 362 (S.D.N.Y.2003) ("[An assignee] is not entitled to any more rights than [the assignor] because [the assignor] cannot convey ... an interest greater than that which it possessed."); *accord Septembertide Publ'g v. Stein & Day, Inc.,* 884 F.2d 675, 682 (2d Cir.1989) ("[A]n assignor cannot assign that which it no longer owns or controls." (citing *Int'l Ribbon Mills,* 36 N.Y.2d at 126)).

\*10 Wells Fargo has the burden of proving the validity of the assignments. *See, e.g., Prop. Asset Mgmt.,* 173 F.3d at 88; *Klein v. Carey Printing Co.,* 199 N.Y.S. 19, 20 (Sup.Ct.App. Term 1923).

### 2. *Validity of the Assignments*

Under the terms of the Indenture Agreements, two steps were necessary for Wells Fargo to receive an assignment of the leases at issue: first, Terminal Marketing needed to transfer its lease rights to Terminal Finance; and second, Terminal Finance

Not Reported in F.Supp.2d                                          Page 9
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

needed to assign its lease interests to Wells Fargo. *See* Second Indenture Agreement § 4.05(a); Third Indenture Agreement § 4.05(a).

As noted, Wells Fargo does not deny that the leases at issue were not assigned using the documents annexed as exhibits to the Lease Acquisition and Indenture Agreements. *See, e.g.,* Wells Fargo Reply Mem. at 3. Instead, Wells Fargo argues that the Warehouse Funding Reports were sufficient to effect both steps for completion of the assignments. *See, e.g.,* Wells Fargo Mem. I at 5-7; Mowbray Decl. I ¶ 7; Weidner Decl. ¶ ¶ 8-9. Wells Fargo also notes that it took physical delivery of the actual leases and that the noteholders in fact paid for the equipment covered by the leases. *See* Wells Fargo Mem. I at 7-10. R & H, on the other hand, argues that the fact that the Warehouse Funding Reports did not precisely conform to the requirements of the Lease Acquisition and Indenture Agreements is fatal to Wells Fargo's claim of assignment. *See, e.g.,* R & H Mem. I at 14-17, 21-22. In addition, R & H contends that the parties did not intend the Warehouse Funding Reports to effect any assignment and that no assignment was carried out because the Warehouse Funding Reports do not contain any language of assignment. *See, e.g., id.* at 1-2, 18-21; Rhythm & Hues' Local Civil Rule 56.1 Statement in Opposition to Wells Fargo's Motion for Partial Summary Judgment and in Support of Rhythm & Hues' Cross-Motion for Summary Judgment, dated December 16, 2003 (Docket # 81) ("R & H 56.1 II"), ¶ 33.

a. *Assignment from Terminal Marketing to Terminal Finance.* Under the terms of the Lease Acquisition Agreements, a transfer of any additional lease from Terminal Marketing to Terminal Finance had to comply with section 3.04(b). This provision, which is identical in the two agreements, required any additional assignment to be accompanied by "an Amendment to Lease Acquisition Agreement for New Lease Contracts substantially in the form of Exhibit A hereto subjecting such Lease Contract to the provisions hereof and providing with respect to such ... Additional Lease Contract, an Amended Lease Schedule (a copy of which will be delivered to the Noteholders)." First Lease Acquisition Agreement § 3.04(b)(2)(iv); Second Lease Acquisition Agreement § 3.04(b)(2)(iv). "Exhibit A" to these agreements recited that the leases identified on the attached schedules "are hereby sold, assigned, transferred and delivered by [Terminal Marketing] to [Terminal Finance] in accordance with this Lease Acquisition Agreement." First Lease Acquisition Agreement, Ex. A; Second Lease Acquisition

Agreement, Ex. A.

**\*11** The Lease Acquisition Agreements-but not the Indenture Agreements, as will be discussed shortly-state that the amending document needed to be only "substantially in the form of Exhibit A." Thus, by their own terms, the Lease Acquisition Agreements do not require exact conformity with Exhibit A. The issue is therefore whether the Warehouse Funding Reports are "substantially in the form" of Exhibit A.

Exhibit A to the Lease Acquisition Agreements required that any amending document had to "include[ ] information regarding" the leases that were being assigned. First Lease Acquisition Agreement, Ex. A; Second Lease Acquisition Agreement, Ex. A. R & H's contention to the contrary notwithstanding, *see* R & H Mem. I at 15 ("The [Warehouse Funding] Reports look nothing like the amendments to the Trust Documents as they are completely different in content and form ."), the Warehouse Funding Reports and their accompanying lease schedules in fact provide such "information." They include, among other information, the leases being sold by Terminal Marketing (listed by lessee and lease number), the amount of notes being sold and purchased, the payment schedule for each lease being transferred, the then-current value of each lease, and the amount being paid by Terminal Finance to Terminal Marketing. *See* June 2000 Warehouse Funding Report; August 2000 Warehouse Funding Report. The leases at issue in the instant dispute are so described in the reports. *See* June 2000 Warehouse Funding Report (Lease No. 3855); August 2000 Warehouse Funding Report (Lease No. 3989).

For R & H, the disposition of this issue turns on the fact that the Warehouse Funding Reports do not contain assignment language similar to that contained in Exhibit A to the Lease Acquisition Agreements-namely, that the identified leases "are hereby sold, assigned, transferred and delivered." *See, e.g.,* R & H Mem. I at 16. However, even by their own terms, the Lease Acquisition Agreements do not require exact compliance but only call for the amending document to be "substantially in the form" of Exhibit A.[FN8]

> FN8. Moreover, as is demonstrated below in the context of the Court's discussion of the Indenture Agreements, the assignments from Terminal Marketing to Terminal Finance would have been effected even if the Lease Acquisition Agreements had not permitted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

the amending document to be merely "substantially in the form" required by the Lease Acquisition Agreements.

In addition, reference to the Indenture Agreements demonstrates that the parties used the Warehouse Funding Reports to effect assignments from Terminal Marketing to Terminal Finance under the Lease Acquisition Agreements. In the Second Indenture Agreement, the term "Additional Lease Contract" is defined as a lease "acquired by [Terminal Finance] pursuant to the Lease Acquisition Agreement with funds obtained in accordance with Section 12.02(d)(vii)(A) *or pursuant to a Warehouse Funding.*" Second Indenture Agreement § 1.01 (emphasis added). The Third Indenture Agreement defines "Additional Contract" as a lease "acquired by [Terminal Finance] pursuant to the Lease Acquisition Agreement *with funds obtained pursuant to a Warehouse Funding.*" Third Indenture Agreement § 1.01 (emphasis added).

Accordingly, it is clear that the parties used the Warehouse Funding Reports to transfer Terminal Marketing's interest in Lease Nos. 3855 and 3989 to Terminal Finance.

*12 b. *Assignment from Terminal Finance to Wells Fargo.* Under the terms of the Indenture Agreements, each acquisition of an additional lease by Wells Fargo required the delivery by Terminal Finance to Wells Fargo of "an Amended Lease Schedule accompanied by an Amendment to Indenture for New Lease Contractsand [sic] Amendmentto [sic] Lease Acquisition Agreement for New Lease Contracts executed by [Terminal Finance] and [Terminal Marketing]." Second Indenture Agreement § 4.05(a)(ii); Third Indenture Agreement § 4.05(a)(ii). The form of this document was included as Exhibit B to the Indenture Agreements, along with a blank page for the amended lease schedule. *See* Second Indenture Agreement, Ex. B; Third Indenture Agreement, Ex. B. Unlike the Lease Acquisition Agreements, the Indenture Agreements do not contain any clause that explicitly allows a variation from these terms-such as the "substantially in the form" language of the Lease Acquisition Agreements. *Compare* Second Indenture Agreement § 4.05(a)(ii) *and* Third Indenture Agreement § 4.05(a)(ii) *with* First Lease Acquisition Agreement § 3.04(b)(2)(iv) *and* Second Lease Acquisition Agreement § 3.04(b)(2)(iv). Thus, R & H argues that because the Warehouse Funding Reports do not contain the language exactly matching the form contained in Exhibit B to the Indenture Agreements-

namely, that the identified leases "are hereby Granted"-no assignment was effected. *See, e.g.,* R & H Mem. I at 16.

As already discussed, however, New York does not require any special "phraseology or form" to effect an assignment. *Miller,* 540 F.2d at 557; *accord Exp.-Imp. Servs., Inc. v. Int'l Eng'rs, Inc. (In re Int'l Eng'rs, Inc.),* 812 F.2d 78, 79 (2d Cir.1987) ("[N]o particular mode, form, or phraseology is necessary to effect a valid assignment ...." (internal quotation marks and citation omitted)); *Nassau Broad. Partners,* 2003 WL 22339299, at *5 ("Under New York law, no particular words or phrases are necessary to effect an assignment." (internal quotation marks and citation omitted)); *Leon,* 84 N.Y.2d at 88 ("No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." (citations omitted)); *see also Aini v. Sun Taiyang Co.,* 964 F.Supp. 762, 778 (S.D.N.Y.1997) ("The substance, not the form, prevails in determining whether a particular transaction constitutes an assignment."), *aff'd mem.,* 159 F.3d 1348 (2d Cir.1998). What is needed is only "some 'act or words' that manifest an intent to assign." *Prop. Asset Mgmt.,* 173 F.3d at 87 (quoting *Miller,* 540 F.2d at 557).

It is thus necessary to determine whether "some act or words" ' have manifested the parties' intent to assign. Wells Fargo has pointed to such "words" of intent: each of the Warehouse Funding Reports were sent to Wells Fargo along with a cover letter from Terminal Finance referencing that they were being sent "[p]ursuant to Section 4.05" of the Indenture Agreements. Pan June 2000 Letter at 1; Pan August 2000 Letter at 1. Section 4.05 is the very provision governing assignments. Thus, this case is a far cry from *Property Asset Management,* cited by R & H, *see* R & H Mem. I at 18, in which the court refused to conclude that an assignment had occurred since the only evidence of an assignment consisted of "unmemorialized intentions" and "uncommunicated subjective understandings." 173 F.3d at 87. Here, by contrast, the parties' intentions were set forth unambiguously in the words used by the parties in the documents transmitted between them.

*13 While this evidence in and of itself might be sufficient to demonstrate an assignment, Wells Fargo has submitted additional evidence making the issue clear-cut.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

c. *Additional Evidence that the Warehouse Funding Reports Were Intended to Effect Assignments Under Both the Lease Acquisition and Indenture Agreements.* Wells Fargo has shown that the Warehouse Funding Reports were used to encompass in one document both the transfer of Terminal Marketing's interest in Lease Nos. 3855 and 3989 to Terminal Finance and Terminal Finance's assignment of those lease interests to Wells Fargo. Eileen O'Connor, the Wells Fargo account manager assigned to the Terminal Finance lease portfolio and the individual who signed the Indenture Agreements on behalf of Wells Fargo, testified that Terminal Marketing regularly requested warehouse funding reports and chose which leases would be included in those reports. *See* O'Connor Dep. at 9-10, 14-17, 29-33, 51-53. She states that warehouse funding reports were prepared by Wells Fargo based upon data from Terminal Marketing and that such reports-and not the forms included as exhibits to the Lease Acquisition and Indenture Agreements-were used by the Terminal entities and Wells Fargo since the inception of Terminal Finance in 1995, for the "life of the deal." *Id.* at 29-31, 51-57, 69; *accord* Mowbray Decl. I ¶ 7. She also indicates that standard warehouse funding reports are used for each lease and that "Exhibit B"-the standard form attached to the Indenture Agreements-was never utilized by the parties to assign any lease. O'Connor Dep. at 14-17, 28-33, 51-53, 57; *accord* Mowbray Decl. I ¶ 7.

R & H of course insists that the precise terms of the agreements with respect to the form of assignment had to be followed and that the parties' conduct in actually performing the agreements is of no relevance to the resolution of this dispute. *See* R & H Mem. I at 14-15, 21-22; R & H Reply Mem. at 4-5. But, under New York law, "it is well established that a written contract may be modified by the parties' post-agreement 'course. of. performance.' " *Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, Ltd.,* 246 A .D.2d 41, 52 (2d Dep't 1998) (citations omitted); *accord Recon Car Corp. of N.Y. v. Chrysler Corp.,* 130 A.D.2d 725, 729 (2d Dep't 1987) ("Modifications of written contracts may be proved circumstantially by the conduct of the parties." (citing cases)); *see CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.,* 81 N.Y.2d 174, 179-80 (1993) (considering the parties' course of performance in determining what method and time of payment was required under the contract, as modified); *see also* Restatement (Second) of Contracts § 202 cmt. g, at 90 (1979) (indicating that "the conduct of the parties may be evidence of an agreed modification"). In

*Spartan Motors,* for example, an automobile financier and automobile dealership executed a written contract whereby the financier agreed to pay the dealer's suppliers in advance of any purchase. 246 A.D.2d at 51. However, in practice, "it was not at all unusual" for the dealer to pay its suppliers directly and for the financier to then reimburse the dealer. *Id.* The court held that there was "no merit" to the argument that, "because [the dealer] and [the financier] had diverged in practice from the literal language of their contract," the dealer was not bound to its obligations under the modified contract. *Id.* at 52; *see also Recon Car Corp.,* 130 A.D.2d at 726, 729 (although written service contract stated that it applied only to recreational vehicles, the parties' conduct-such as in submitting repair claims for nonrecreational vehicles using the same work order forms as used for recreational vehicles-"manifested an intent to modify the ... written agreement so as to expand its scope to cover all vehicles, recreational or nonrecreational").

*14 Here, all evidence regarding the parties' conduct in performing the agreements points to the conclusion that the original agreements were constructively modified to permit assignments by means of the Warehouse Funding Reports. The parties executed regular bi-monthly warehouse funding reports (accompanied by lease schedules). *See* O'Connor Dep. at 14-16, 29-33; O'Connor Dep. in *Nassau Broadcasting Partners* at 21. The original leases were delivered to Wells Fargo (along with delivery certificates signed by R & H), followed by the retention of those leases by Wells Fargo and payment by the noteholders to Terminal Marketing (through Terminal Finance). Mowbray Decl. I ¶ ¶ 4, 6-7; Weidner Decl. ¶ ¶ 8-9, 11; O'Connor Dep. at 14-17, 28-34, 51-53; *see also* Lease No. 3855 Delivery Certificate; Lease No. 3989 Delivery Certificate. Wells Fargo has submitted copies of no less than 15 warehouse funding reports-dated from March 1999 to May 2000-that were sent to it by Terminal Finance prior to the Warehouse Funding Reports at issue here. *See* Warehouse Funding Reports, various dates (reproduced as Ex. 10 to Mowbray Decl. I). The parties' consistent use of warehouse funding reports as vehicles for assignments shows that they intended to effect assignments through the Warehouse Funding Reports at issue here.

In addition, as to Lease No. 3855, Wells Fargo has submitted copies of Terminal Finance's bank records showing that Terminal Finance received payments from the noteholders totaling $10,432,622.13 and that Terminal Finance then immediately transferred those

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

monies to Terminal Marketing. *See* Statement of Transactions, June 1, 2000 through June 30, 2000 (reproduced as Ex. 11 to Mowbray Decl. I). Of that $10,432,622.13, $1,270,111.10 was attributable to Lease No. 3855. *See* Mowbray Decl. I ¶ 8; O'Connor Dep. at 62-67. As to Lease No. 3989, Terminal Finance's bank records indicate that Terminal Finance received from the noteholders-and then transferred to Terminal Marketing-payments of $9,585,357.87. *See* Transactions from 08/01/00 to 08/31/00 (reproduced as Ex. 12 to Mowbray Decl. I); *see also* Letter from Ravee Shrinivas, Chief Operating Officer, Terminal Marketing, to Lawrence Rossiter, Norwest, dated July 25, 2000 (attached to Declaration of Robert A. Jaffe, filed September 3, 2002 (Docket # 50)), at 1 (requesting payment for the leases being transferred pursuant to the August 2000 Warehouse Funding Report). Of that amount, $599,717.91 was attributable to Lease No. 3989. *See* Mowbray Decl. I ¶ 9; O'Connor Dep. at 62-67. Thus, Terminal Marketing's "act" of accepting payment from the noteholders on these leases (after delivering the original leases to Wells Fargo) demonstrates that it intended to and did in fact assign the leases to Wells Fargo through the Warehouse Funding Reports. *See Prop. Asset Mgmt., 173 F.3d at 87* (only "some 'act or words' that manifest an intent to assign" is required to effect an assignment (quoting *Miller, 540 F.2d at 557*)). In addition, at least as to Lease No. 3989, R & H has made all required monthly rental payments, even those payments due after Wells Fargo intervened in this litigation. *See* Declaration of Aaron Mowbray, filed November 18, 2003 (Docket # 66), ¶ 3; *see also Pravin Banker Assocs., 109 F.3d at 856 n. 2* (noting that, even if the assignment in that case was contractually invalid under New York law, the fact that interest payments were made to the assignee demonstrated that the parties intended an assignment).

**\*15** R & H argues that the Warehouse Funding Reports "do not reflect any *intent by Terminal Marketing* to sell or assign the Agreements to either Terminal Finance or Wells Fargo because they were prepared for and signed on behalf of *Terminal Finance.*" R & H Mem. I at 2 (second emphasis added); *accord id.* at 17 ("Legally, a single signature under the auspices of one entity does not bind both in this situation where Terminal Finance was specifically set up to *shield Terminal Marketing's assets from creditors.*" (emphasis in original)). In support, R & H notes, *see id.* at 19, that the Lease Acquisition Agreements-but not the Indenture Agreements-state that any amendment could not be made "orally but only by an instrument in writing

*signed by the party against which enforcement is sought,"* First Lease Acquisition Agreement § 7.01 (emphasis added); Second Lease Acquisition Agreement § 7.01 (emphasis added). Thus, R & H argues, because the Warehouse Funding Reports were signed on behalf of Terminal Finance, there was no "intention *by Terminal Marketing* to assign the Agreements at issue in this case." R & H Mem. I at 18 (some emphasis omitted).

Once again, however, R & H's distinction is one of form and not substance. That the individual who signed the Warehouse Funding Reports may have done so on behalf of Terminal Finance-as opposed to Terminal Marketing-is of no moment as the entities were closely related: not only was Terminal Finance a subsidiary of Terminal Marketing but the same representatives regularly signed documents for both companies. *See* O'Connor Dep. at 53-55, 58-59; Battiloro Decl. ¶ 3; *see also* First Lease Acquisition Agreement at 30 (signed by Schneiderman on behalf of both entities); Second Lease Acquisition Agreement at 28 (same); Second Indenture Agreement at 87 (same); Third Indenture Agreement at 87 (same). The particular Warehouse Funding Reports at issue here were signed by Ravee Shrinivas, an officer of both Terminal Marketing and Terminal Finance, and Kevin Redmond, the Chief Financial Officer of Terminal Marketing. *See* O'Connor Dep. at 14, 55. Moreover, the Warehouse Funding Reports were sent to Wells Fargo "from Terminal Marketing," according to the facsimile line on the top of each page, even though Terminal Finance letterhead was used. *See* June 2000 Warehouse Funding Report; August 2000 Warehouse Funding Report. This evidence is sufficient to demonstrate that the Warehouse Funding Reports were signed "by the party against which enforcement is sought." In any event, the parties' course of performance made clear that Terminal Marketing acquiesced in using the Warehouse Funding Reports to effect the assignments.

A case highly similar to the instant matter, and involving some of the same contractual provisions and parties, is *Nassau Broadcasting Partners.* In that case, Wells Fargo claimed that a warehouse funding report comparable to those in this case effected the dual assignment of an equipment lease from Terminal Marketing to Terminal Finance and from Terminal Finance to Wells Fargo. *See 2003 WL 22339299, at \*5.* The first transfer was governed by a lease acquisition agreement whose relevant language was identical to that in this case. *See id.* ("The Acquisition Agreement provides that conveyances by [Terminal

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Marketing] to [Terminal Finance] must be accompanied by an 'Amendment to Lease Acquisition Agreement for New Contracts substantially in the form of Exhibit A." '). As for the second assignment-from Terminal Finance to Wells Fargo-the indenture agreement provided that "conveyances by [Terminal Finance] to Wells Fargo must be accompanied by 'an Amendment to Indenture for New Contracts, substantially in the form attached to the Indenture [Agreement] as Exhibit B." ' *Id.* A warehouse funding report similar to those in this case, with a lease schedule reflecting the particular leases sold and assigned, was sent by Terminal Finance to Wells Fargo. *Id.; see* Warehouse Funding Report, dated December 11, 2000 (reproduced in Ex. 1 to Bass Decl. I) (warehouse funding report at issue in *Nassau Broadcasting Partners* ).

*16 In its decision following a bench trial, the court first indicated that "[a]lthough the agreements between [Terminal Marketing], [Terminal Finance] and Wells Fargo may have initially required the parties to draft assignment documents in 'substantially' the form that was attached to each agreement, nothing ... prohibited the parties from mutually agreeing to a bilateral executory contract that waives such requirement, and substituting in its place a new agreement as to how the assignment of the lease may take place." 2003 WL 22339299, at *5 (citing *Bandman v. Finn*, 185 N.Y. 508 (1906); *Wasserstrom v. Interstate Litho Corp.*, 114 A.D.2d 952 (2d Dep't 1985)). The court-relying in part on the testimony of O'Connor-held that the two-step assignment to Wells Fargo was made by means of the warehouse funding report:
Here, Terminal [Marketing] transferred over 1500 leases from 1995 through 2001 following the same steps as it regularly did on a twice-monthly basis, in which funds were transferred from the lender to Terminal [Marketing] via an account held by the trustee, Wells Fargo, and in return, Terminal [Marketing] transferred the physical leases to the trustee to hold as collateral for the loan. Wells Fargo prepared a warehouse funding report, such as the one dated December 11, 2000, which lists the [lease at issue], and confirmed a few days before the warehouse funding was prepared that Terminal [Marketing] transferred to it, for safe-keeping, a properly executed contract file, original lease document, delivery and acceptance certificate, UCC filing, and guarantees by the lessor. The long-standing performance of the parties in accordance with this practice suffices to demonstrate that the relevant parties agreed to this alternative assignment

procedure. *See* [O'Connor Dep. in *Nassau Broadcasting Partners* ] at 102 (reporting that no one, as far as O'Connor knew, had ever raised an objection to the assignment of a particular lease pursuant to the alternative assignment procedure). In regard to the [lease at issue], it is undisputed that Terminal [Marketing] delivered the originals of the executed ... lease papers to Wells Fargo through the specified two-step assignment process and that Wells Fargo's noteholders transferred to Terminal [Marketing] around half a million dollars as consideration for rights to payment from the lease. Accordingly, I concur with [Wells Fargo's] view that sufficient evidence has been presented to show that the [lease at issue] was in fact assigned to Wells Fargo as collateral for the loan provided by the noteholders.

*Id.* (additional citations omitted).

These principles are entirely applicable in this case to Lease Nos. 3855 and 3989. The only difference is that the indenture agreement in *Nassau Broadcasting Partners* provided for amendments through documents "substantially in the form" of the attached exhibit whereas the Indenture Agreements in this case have no such language. Nonetheless, *Nassau Broadcasting Partners'* underlying rationale did not hinge on this language. Indeed, the court premised its discussion by noting that "nothing ... prohibited the parties from mutually agreeing to a bilateral executory contract that waives such requirement, and substituting in its place a new agreement as to how the assignment of the lease may take place." *Id.* With or without the "substantially in the form" language, the parties' conduct demonstrates that they mutually agreed to substitute the Warehouse Funding Reports in place of the "form attached to the Indenture [Agreements] as Exhibit B." FN9

FN9. R & H argues that "the provisions in the Trust Documents ... are for the benefit of the Noteholders and [the insurance company underwriter], not Wells Fargo," and that a "party cannot waive a provision of a contract that was included for the benefit of another ." R & H Mem. I at 18-19; *accord id.* at 21-22. This argument is meritless. While the provisions may indeed have been for the noteholders' benefit as a general matter, were the provisions adhered to in the manner sought by R & H, the noteholders would have had no security for their loans to Terminal Finance. Such a result obviously

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would not be for their benefit.

**\*17** In its brief, *see* R & H Mem. I at 15, R & H relies on *Callicutt v. New York State Commissioner of Taxation & Finance,* 241 A.D.2d 778, 779 (3d Dep't 1997), which upheld a lower court's finding that no assignment had been effected by certain documents in part because the unsigned documents did not comply with a requirement in the relevant agreement that an assigning document be signed by both the assignor and the assignee. In *Callicutt,* however, there was no evidence that there had been any transfer or intent to transfer the interest. In addition, the court indicated that the testimony as to the alleged assignment was vague and not credible and that the parties' conduct in later years was inconsistent with any assignment. *See id.* Finally, there was no evidence of any delivery of the assigning documents and/or payment for the assignment. *See id. Callicutt* thus has no bearing on this case. Here, there is evidence of contemporaneous documentation of the assignment, along with actual payment and delivery. *See* Mowbray Decl. I ¶ ¶ 4, 6-9; Weidner Decl. ¶ ¶ 8-9, 11; O'Connor Dep. at 14-17, 28-34, 51-53, 62-67; Lease No. 3855 Delivery Certificate; Lease No. 3989 Delivery Certificate; Pan June 2000 Letter at 1; Pan August 2000 Letter at 1. Indeed, the conduct of the parties is consistent *only* with an assignment.[FN10]

> FN10. Another case cited by R & H-971 Madison Avenue Corp. v. Complex Associates, 90 A.D.2d 758 (1st Dep't 1982) - is inapposite because, in that case, the document allegedly granting an assignment was completely at odds with the original contract of sale. *See id.* at 758-59 (noting, for example, that the contract of sale listed a purchase price of $7 million whereas the alleged assigning document listed the price as $8.2 million).

In sum, no material issue of fact exists as to Wells Fargo's assignment of the right to receive payments under Lease Nos. 3855 and 3989. Wells Fargo's motion for partial summary judgment with respect to the validity of the lease assignments should therefore be granted. In addition, R & H's cross-motion for summary judgment with respect to this same issue should be denied.[FN11]

> FN11. In light of the Court's conclusion, it is not necessary to address Wells Fargo's argument that R & H "lacks standing to

assert the alleged technical, contract-based defects" to the assignment because it is not a party to or an intended beneficiary of the Lease Acquisition and Indenture Agreements, Wells Fargo Mem. II at 7; *accord* Wells Fargo Reply Mem. at 6.

**B.** *The Validity of the Waiver-of-Defenses Clause*

With respect to the validity of the waiver-of-defenses clause in Lease No. 3989, the court previously denied summary judgment to Wells Fargo with leave to renew "because of R & H's allegation, supported by circumstantial evidence, that Terminal [Marketing] defrauded R & H by falsely representing to R & H that it was in sound financial condition when in fact it was suffering from severe financial difficulties." *Rhythm & Hues,* 2002 WL 1343759, at \*6. The court stated that if R & H could prove that "some or all of the Terminal [Marketing]-[Terminal Finance]-Wells Fargo transaction was intended to defraud R & H, the suppliers and [Terminal Marketing's] other creditors in violation of the law," then "Lease No. 3989's waiver of defenses may be unenforceable." *Id.* at \*7; *see* Lease No. 3989 ¶ 14 ("The assignee's rights or the rights of the holder of a security interest in this lease shall be free from all defenses, setoffs or counterclaims which [R & H] may be entitled to assert."); *see also* Lease No. 3855 ¶ 14 (same). The court thus denied summary judgment with leave to renew "in order to give R & H the opportunity to investigate the complex assignment in this case" and "whether the assignment was fraudulent." *Rhythm & Hues,* 2002 WL 1343759, at \*7.

**\*18** Wells Fargo has now moved once again for summary judgment with respect to the issue of the enforceability of the waiver-of-defenses clause, this time with respect to both Lease No. 3855 and Lease No. 3989. Wells Fargo contends that there is no genuine issue of material fact that the waiver-of-defenses provision in the leases is enforceable because there is no evidence that it acted in bad faith or had knowledge of any fraud in the Terminal Marketing-Terminal Finance-Wells Fargo transaction. *See* Wells Fargo Mem. II at 8-11; *accord* Wells Fargo Reply Mem. at 7-10. In support, Wells Fargo has submitted affidavits and deposition testimony indicating that the relevant individuals at Wells Fargo learned only on January 4, 2001 that Terminal Marketing needed additional capital to pay the equipment vendors and that they had no knowledge that Terminal Marketing had not paid, or did not intend to pay, the vendors in June and August 2000, when Wells Fargo was assigned the leases. *See,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*e.g.,* Weidner Decl. ¶ 12; Deposition of John Weidner, November 5, 2003 (reproduced in part as Ex. 5 to Bass Decl. I and in part as Ex. Y to Beall Decl.), at 47-48; O'Connor Dep. at 44-45, 59-62. For example, O'Connor testified that, in 2000, her information on Terminal Marketing's finances was "very" positive-based in part on its low delinquency and default rates, its net worth being "well above [the] number that was listed as the trigger," and her knowledge that two banks were interested in doing additional business with it. O'Connor Dep. at 60-62. She stated that she learned only on January 4, 2001-to her "shock[ ]"-that Terminal Marketing needed approximately $35 million to stay afloat for another four or five months. *Id.* at 44-45, 60-61. Even on this late date, however, the source for this information was "hopeful that [Terminal Marketing] would be okay." *Id.* at 45.

R & H has produced no evidence contradicting these assertions or demonstrating that Wells Fargo had knowledge of any financial difficulties at Terminal Marketing or of any wrongdoing committed by Terminal Marketing at the time Wells Fargo took assignment of the two leases in June and August 2000. Nothing has been submitted to support R & H's contention that "Wells Fargo did not act in good faith during the securitization process with Terminal Finance," R & H Mem. I at 20. All of R & H's evidence on this issue concerns the fact that Wells Fargo "never reviewed," "never checked" or "cross-checked," or "never asked" for certain documents. R & H 56.1 II ¶ ¶ 37-43; *accord* R & H Mem. I at 23-25; R & H Reply Mem. at 8-9. In effect, R & H is arguing that Wells Fargo's practices as trustee were negligent. A claim of negligence, however, obviously does not equal a claim of bad faith (the only means by which R & H can avoid the waiver-of-defenses clause under the standard urged by R & H, *see* R & H Mem. I at 22) let alone fraud (the standard reflected in the decision denying Wells Fargo's prior motion for summary judgment, *see Rhythm & Hues, 2002 WL 1343759, at \*7).* In any event, R & H has not even demonstrated that, as indenture trustee, Wells Fargo was under an obligation to conduct any such "review," "check," or "cross-check," or to "ask" for any of these documents.

\*19 An identical argument was raised and rejected in *Nassau Broadcasting Partners:*
As the indenture trustee, Wells Fargo's duties are largely administrative, such as to handle the money on behalf of the parties involved in the assignment transaction and to hold the documents for the leases in trust in its vault.... The Indenture Agreement does

not obligate Wells Fargo to examine whether each lease is valid or to look beyond Terminal [Marketing's] representations and warranties, and verify whether and when Terminal [Marketing] actually paid the equipment vendors. Indeed, given Terminal [Marketing's] good financial history and continued interest by lenders to provide Terminal [Marketing] financing, Wells Fargo had little reason to believe that it needed to look beyond Terminal [Marketing's] representations and warranties to verify that Terminal [Marketing] had paid or would pay for the equipment underlying any particular lease. In sum, under the Indenture Agreement, Wells Fargo does not warrant nor may it be held obligated to warrant that each lease sold to [Terminal Finance] and subsequently assigned to Wells Fargo is eligible for transfer.

....

... Wells Fargo's role in the disputed sale and leaseback transaction appears to have been largely administrative. I find little evidence that Wells Fargo knew in fact that the lease [at issue], at the time of the assignment on December 11, 2000 was ineligible for assignment.... Wells Fargo's role, as specified in the Indenture Agreement, was limited, and did not include going beyond the representations and warranties supplied by Terminal [Marketing], which suggested that Terminal [Marketing] complied with its obligations.

2003 WL 22339299, at \*2, \*9 (citations omitted) (citing, *inter alia,* the testimony of O'Connor and Mowbray); *see also* O'Connor Dep. in *Nassau Broadcasting Partners;* Testimony of Aaron Mowbray, March 5, 2003 (reproduced as Ex. 1 to Bass Decl. II) (Mowbray's testimony in *Nassau Broadcasting Partners* ).

The court in *Nassau Broadcasting Partners* thus concluded that, "[g]iven Terminal [Marketing's] positive past financial performance," Wells Fargo "acted in a commercially reasonable manner, when it relied on the warranty and representation supplied to confirm that the [lease at issue] may be assigned." 2003 WL 22339299, at \*9 (citing the testimony of O'Connor and the delivery certificate signed by the lessee stating that Terminal Marketing had "satisfactorily performed all of its covenants and conditions required under the lease"); *see also* Delivery and Acceptance Certificate and Lessee's Acknowledgment and Consent, dated November 30, 2000 (reproduced in Ex. 3 to Bass Decl. I) (delivery certificate in *Nassau Broadcasting Partners* ). R & H does not dispute-nor could it-that the delivery certificates in this case, which accompanied the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

transmission to Wells Fargo of Lease Nos. 3855 and 3989, match the delivery certificate relied upon by the court in *Nassau Broadcasting Partners*. In addition, it is notable that the lease at issue in *Nassau Broadcasting Partners* was assigned on December 11, 2000, *see* 2003 WL 22339299, at *9, later than the assignment of either of the two leases at issue in this case and closer to Terminal Marketing's eventual termination as servicer in February 2001, when its deteriorating financial condition would have been, if anything, more apparent to Wells Fargo.

**\*20** Accordingly, Wells Fargo's motion for partial summary judgment with respect to the enforceability of the waiver-of-defenses clause should be granted.

### C. R & H's Obligation to Make Payments Under Lease No. 3855

R & H has moved for summary judgment with respect to the first and third counterclaims asserted by Wells Fargo (for breach of contract and guaranty as to Lease No. 3855) and for partial summary judgment with respect to Wells Fargo's fifth counterclaim (for declaratory relief that Lease No. 3855 is enforceable).[FN12] The entire basis for R & H's motion with respect to these counterclaims is its contention that it has no obligation to make any payments under Lease No. 3855. *See* Memorandum of Law in Support of Rhythm & Hues' Motion for Summary Judgment, filed December 18, 2003 (Docket # 67) ("R & H Mem. II"), at 12-24. R & H claims that the purpose of Lease No. 3855 was to secure its first take-down on the Line of Credit Agreement and that the lease was not effective until it actually made a take-down. *See, e.g.*, R & H 56.1 I ¶ ¶ 6, 15-17. R & H further claims that it never took any take-down or leased any equipment through Terminal Marketing that would have activated its obligations under Lease No. 3855. *See, e.g., id.* ¶ ¶ 24-25.

FN12. Wells Fargo's second and fourth counterclaims (for breach of contract and guaranty as to Lease No. 3989) have already been dismissed. *See* Stipulation of Dismissal, filed November 26, 2001 (Docket # 30).

The court already denied a motion for summary judgment as to Lease No. 3855-that time, filed by Wells Fargo-on the ground that the lease was ambiguous. *See* Rhythm & Hues, 2002 WL 1343759,

at *5-*6. The court held that, although the lease stated that R & H's obligation to pay rent was "absolute and unconditional," documents contemporaneously executed with Lease No. 3855 indicated that the lease was intended merely to provide security for the Line of Credit Agreement. *See id.*

For purposes of R & H's motion, it is sufficient to point to two documents demonstrating that there is at least a genuine issue of material fact as to R & H's obligation to make payments under Lease No. 3855. First, as the court recognized, the lease document itself-signed by R & H's President-states that it is a "lease of equipment" that is "non-cancelable" for 30 months and that R & H's obligation to pay rent is "absolute and unconditional," not subject to any defenses. Lease No. 3855 at 1 & ¶ ¶ 1, 5. Second, the delivery certificate accompanying transmission of Lease No. 3855 states that R & H had no defenses against Terminal Marketing, that Terminal Marketing had "fully and satisfactorily performed all covenants and conditions," that R & H had received delivery of the equipment, and that R & H consented to "assignment of the Lease to a third-party assignee ... in reliance hereon and [R & H] agrees ... that [R & H's] obligation to pay rent to Assignee under the Lease shall be absolute and unconditional and shall be payable whether or not the Lease is terminated by operation of law or otherwise and notwithstanding any defense ... whatsoever." Lease No. 3855 Delivery Certificate at 1. These provisions alone demonstrate that R & H is not entitled to summary judgment. They are simply inconsistent with R & H's contention that it has no obligation to make payments under the lease.

**\*21** R & H makes much of the fact that Lease No. 3855 has no commencement date. *See, e.g.*, R & H 56.1 I ¶ 16; R & H Mem. II at 15-16; Rhythm & Hues' Reply in Support of its Motion for Summary Judgment on the First and Third Causes of Action and Partial Summary Judgment on the Fifth Cause of Action in Wells Fargo's Counterclaim, filed February 5, 2004 (Docket # 77), at 6-7. However, in *Nassau Broadcasting Partners* the court rejected the lessee's contention that the lease had not commenced because it lacked any commencement date based upon evidence that Terminal Marketing and its lessees routinely left the space for a commencement date blank. *See* 2003 WL 22339299, at *7; *see also* Lease No. 4428, dated November 30, 2000 (reproduced as Ex. 3 to Declaration of Ellen Bass, filed January 13, 2004 (Docket # 72)) (lease at issue in *Nassau Broadcasting Partners*, which does not contain a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 17

commencement date). Likewise here, Wells Fargo has submitted evidence that the same type of form lease was used by R & H and Terminal Marketing-and by Wells Fargo as indenture trustee after assignment-on at least six prior occasions, that none of these leases had any commencement date, and that R & H has not challenged any of them. *See* Declaration of Aaron Mowbray, filed January 13, 2004 (Docket # 75) ("Mowbray Decl. II"), ¶ 4 ("[R & H] had at least six Terminal-originated leases prior to Lease [No.] 3855 that are in exactly the same format as Lease [No.] 3855, and they have no commencement dates written in.... They all appear to be signed by John Hughes, president of [R & H]. [R & H] made rental payments on these leases and never claimed that they were invalid or had not commenced ."); *see also* Leases Between R & H and Terminal Marketing, various dates (reproduced as Ex. 2 to Mowbray Decl. II) (no commencement dates listed). Indeed, Lease No. 3989 also does not have a commencement date yet R & H makes no argument that its obligations under that lease have not yet commenced.

Accordingly, material issues of fact remain as to whether R & H's payment obligations under Lease No. 3855 have already commenced. Thus, R & H is not entitled to summary judgment with respect to Wells Fargo's first, third, and fifth counterclaims.

### Conclusion

For the foregoing reasons, R & H's motions for summary judgment (Docket 78-79) should be denied and Wells Fargo's motion for summary judgment (Docket # 62) should be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Deborah A. Batts, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Batts. If a party fails to file timely objections, that party will not be permitted to raise any objections to

this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2004.
Rhythm & Hues, Inc. v. Terminal Marketing Co., Inc.
Not Reported in F.Supp.2d, 2004 WL 941908 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv04697 (Docket) (May. 31, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                            Page 1
Not Reported in F.Supp., 1989 WL 63052 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

**H**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
OLYMPIA & YORK BATTERY PARK
COMPANY and O & Y Tower Corp., Plaintiffs,
v.
INSURANCE COMPANY OF NORTH AMERICA
PHILADELPHIA, Defendant,
v.
FEI LTD., et al., Third-Party Defendants.
No. 85 CIV. 1238 (TPG).

June 2, 1989.

*OPINION*
GRIESA, District Judge. ·

*1 Two matters are presently before the court for
decision. The first is O & Y's motion to reargue the
ruling contained in the court's opinion of September
19, 1988. The second is the question of whether
INA is relieved of its surety bond obligations because
of alterations in the contract [FN1] between O & Y and
FEI.

I.

On September 19, 1988 the court handed down an
opinion dealing with various post-trial motions.
Among other things, the court denied O & Y's motion
for judgment notwithstanding the verdict, or in the
alternative, for a new trial, with respect to the jury's
answer to Interrogatory 3. O & Y has now moved
for reargument. O & Y argues that no issue or
evidence was presented to the jury which could in
any way allow it to find that the adjusted contract
price was $22 million. O & Y contends that the
adjusted contract price was conclusively established
as being $14.1 million and that indeed the court so
instructed the jury. O & Y further argues that, in any
event, the alleged adjustments of the contract price up
to $22 million could have no effect because they
were not in writing as required by the contract. O &
Y refers to a related New York statute. N.Y.General
Obligations Law § 15-301(1).

In their response to the motion for reargument, FEI
and INA have provided exhaustive citations to the
trial record, which demonstrate the lack of merit in
the O & Y contentions.

Although the questions to the jury were drawn in a
somewhat narrow and specific manner, the court's
instructions to the jury explained the nature of the
basic problem. The essential issue was whether FEI
had defaulted in performing under the contract and
whether O & Y had sustained loss or damage by
reason of such default. It was further explained to
the jury that O & Y was not making its case in regard
to default by way of contentions about specific
construction defects, delays, etc. O & Y had pitched
its case solely on the contention that FEI's default
consisted of becoming financially unable to perform
its obligations under the contract. The jury was then
told that there were further issues about whether *O &
Y* had failed to perform its obligation with regard to
supplying granite to be used by FEI and whether such
failure was the cause of FEI's financial inability, if
such inability were found. Finally, the jury was
asked to find, if the answers to the above questions
made it appropriate, the amount of expenses above
the adjusted contract price which O & Y reasonably
incurred to complete or repair FEI's work under the
contract. In the instruction regarding this issue, the
court referred to O & Y's Exhibit 15, in which O & Y
listed its contentions regarding payments over and
above the adjusted contract price. In that exhibit, O
& Y presented the figure of $14.1 million as being
the adjusted contract price and presented other
figures indicating that $12.9 million had been spent
over and above that adjusted contract price.
However, the court did not in any sense instruct the
jury that it should accept any figure from that exhibit
and told the jury that they should determine whether
the figures were accurate.

*2 The jury returned an affirmative answer to
Interrogatory 1, thus finding that FEI did become
financially unable to proceed with the contract. In
its answers to Interrogatory 2a and 2b, the jury found
that O & Y had failed to perform its obligations
regarding the furnishing of granite but that this
failure was not the cause of FEI's financial inability
to proceed with the contract.

Interrogatory 3 asked:

3. What is the amount of expenses above the adjusted
contract price, if any, that you find by a
preponderance of the evidence O & Y reasonably
incurred to complete or repair FEI's work under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1989 WL 63052 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

contract?

This interrogatory required the jury in effect to find the damage or loss to O & Y attributable to the default of FEI (the financial inability of FEI to proceed with the contract). The jury found that this amount was $600,000.

As described in the September 19, 1988 opinion, it is perfectly clear that this $600,000 related to the time following O & Y's termination of FEI in April 1986. However, O & Y contends that it was conclusively proved that the default of FEI through financial inability occurred in the fall of 1984, and that the jury was entitled to consider no other date as the time of the default. O & Y further argues that all the "extra" expenses incurred after that time were damages due to the default. Finally, O & Y argues that it was conclusively proved that the adjusted contract price was $14.1 million, which was the amount of the original contract, with formalized adjustments, as of the fall of 1984. O & Y argues that there was no basis for the jury to believe that there were any further adjustments to the contract price, and that the evidence mandates a finding that the amounts paid to or on behalf of FEI above the $14.1 million are damages due to default.

All these contentions of O & Y ignore certain prominent uncontradicted testimony presented by FEI, testimony which the jury asked to have repeated to them in the final stages of their deliberation. This testimony was that, beginning in the fall of 1984, O & Y was demanding an increased level of performance by FEI-consisting of a greatly increased commitment of labor and equipment-which raised FEI's cost levels far beyond what had been contemplated. FEI asserted that it could not possibly afford what it termed these unreasonable requests. Nevertheless, O & Y executives virtually begged FEI to stay on the job and to perform at the increased level of production. O & Y assured FEI that it would not be hurt and that it would be made whole, and followed up these assurances with $7.8 million additional payments, over and above the $14.1 million formally adjusted contract price.

A fair reading of the record shows that the jury was presented with the issue of whether these additional payments constituted further adjustments to the contract price. Moreover, there was ample evidence to support a finding that all payments made prior to FEI's termination in April 1986 were such agreed upon adjustments.

*3 There is another important consideration justifying the jury's verdict. The jury found, in its answer to Interrogatory 2a, that O & Y had not fulfilled its obligations with regard to the granite supply. Although the jury then found that this failure on the part of O & Y was not responsible for FEI's financial inability (as found in its answer to Interrogatory 1), nevertheless the jury's finding regarding the granite supply was not without significance. The record is replete with evidence, including O & Y's internal documents, indicating the gravity of the difficulties created by O & Y with regard to the granite supply, and with regard to other matters for which O & Y, not FEI, was responsible. The jury was justified in concluding that much of the additional expense, over and above the formal adjusted price of $14.1 million, was due to O & Y's own mismanagement regarding the granite supply and other circumstances which were caused by O & Y and which should not be charged to FEI.

It should be noted that the jury was not required to find, either by the court's instruction or by anything conclusively proved in the evidence, that the default by way of FEI's financial inability occurred in the fall of 1984. Under the evidence, the jury could well have found that FEI's financial problems in the fall of 1984 related to its difficulty in meeting O & Y's increased demands, rather than requirements under the original contract, and that what occurred was an alteration and adjustment of the contract rather than a default by FEI. Of course, the jury found that at some point there was a default by FEI resulting in damages to O & Y of $600,000. The jury was not asked to specify the time of the default, and no party to this action can now complain about the lack of such a specification. It can simply be said that the jury would have been justified in finding the date of default as being the time of the termination in April 1986 or some time thereabouts.

It is worth noting that the questions presented to the jury were unusually complex. As one ponders the result reached by the jury, the soundness and good sense of their decision becomes more and more apparent. With regard to the issue of damages, it is well to keep firmly in mind that the default relied upon by O & Y was the occurrence of financial inability on the part of FEI. The jury obviously had the discernment to see that this kind of default could hardly operate to magnify this project from one in the range of $10-14 million to a $22 million or a $27 million project. Those enormously increased costs must have been due to factors other than FEI's financial inability, and the jury so found.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 63052 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

As a final matter, it is necessary to deal with O & Y's argument based upon the provision of the contract with FEI requiring changes to be in writing, and the statute providing that, where there is such a contractual requirement, the contract cannot be changed by "an executory agreement unless such executory agreement is in writing." N.Y. General Obligations Law § 15-301(1). O & Y fails to cite the New York cases which state that such a contractual requirement and the New York statute are not an absolute bar to oral modifications of a contract, and that a party may be estopped by his conduct and words from insisting upon a writing. *Rose v. Spa Realty Associates*, 42 N.Y.2d 338 (1977); *American Bag & Metal Co. v. Alcan Aluminum Corp.*, 115 A.D.2d 958, 959 (4th Dept.1985). A stronger case of estoppel could hardly be imagined than that presented by the uncontradicted evidence at the trial here. O & Y urged FEI to go forward with its work, at an increased commitment of resources, for over a year. O & Y received the benefit of FEI's services and paid for them. O & Y is estopped from claiming that the adjustments to the contract are invalid because of lack of a writing.

## II.

*4 It is now necessary to deal with the contention of INA that the construction contract it bonded was materially altered, thus discharging INA from liability.

The established rule and the relevant cases are set forth in the opinion of September 19, 1988. A surety is discharged from liability on the bond if the parties to the contract covered by the bond materially alter that contract without the surety's consent.

INA has asserted several claims of material alteration. It was agreed that the court would decide these, except for one which was submitted to the jury. This was the claim that the change in priority of construction of the buildings constituted a material alteration. The schedule incorporated into the contract provided that Building C was to be completed before Building A. As it turned out, Building A was given priority over Building C. The jury was asked whether this change of priority constituted a material alteration, and answered in the negative.

The court now rules in favor of INA on its other claims of material alteration. There was a

combination of circumstances which went to make up this material alteration. It should be noted that the change in priority was part of that combination. The jury's verdict, dealing with the priority change in isolation, does not foreclose this ruling by the court.

A most important part of the contract between FEI and O & Y was the obligation of O & Y to furnish FEI granite in proper quantity and sequence. The jury has found, and the court fully agrees with the jury's finding, that O & Y materially breached this obligation. Despite this breach, and despite other difficult circumstances, including the change in priority of the buildings, FEI persevered with the job in response to the urgings of O & Y. However, the nature of FEI's work and the relationship between the parties became sharply altered from what had been contemplated and provided in the contract which was bonded by INA. A vivid indication of this can be found by comparing the original contract price with the amount ultimately paid by O & Y for the granite cladding work. The original contract price was $10.6 million, and the amount bonded by INA was $10.6 million. By the time FEI was terminated in April 1986 O & Y had paid about $22 million to, or for the benefit of, FEI. Following FEI's termination, O & Y laid out another $5 million on the job, making the total cost $27 million.

Simply put, INA did not bond a $22 million project, or a $27 million project. Over a period of time, the nature and magnitude of the job was drastically changed. It is clear that the contract bonded by INA was materially altered.

At no time did INA consent to such alteration. Although there were communications between O & Y and INA at various times, including claims under the bond and commencement of this lawsuit in early 1985, O & Y continued to pursue its dealings with FEI as already described in this opinion and in the September 19, 1988 opinion. At no time did INA consent to the adjustments which were going on. More important, it is clear that INA had nothing approaching full knowledge of what was occurring. A meaningful development of the facts did not take place until the discovery and trial in this lawsuit, a process which was difficult in the extreme.

## CONCLUSION

*5 The court rules once again that the jury's answer to Interrogatory 3 should stand. The court also rules that INA is discharged from liability on its bond

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 63052 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

because of material alteration of the contract covered
by the bond.

The remaining issues to be resolved before a final
judgment can be entered will be covered in further
proceedings.

SO ORDERED.

FN* There were actually two contracts and
two surety bonds.    However, they are
closely related and have been referred to in
the litigation in the singular-as one contract
and one bond.

S.D.N.Y.,1989.
Olympia & York Battery Park Co. v. Insurance Co.
of North American Philadelphia
Not Reported in F.Supp., 1989 WL 63052 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE: Winstar Communications, Inc., et al.

---

| | | |
|---|---|---|
| Lucent Technologies Inc., | : | |
| | : | |
| Defendant-Appellant, | : | Civil Action No.: 06-147 (JJF) |
| | : | Chapter 7 |
| v. | : | |
| | : | |
| Christine C. Shubert, Chapter 7 Trustee, | : | Bankruptcy Case No.: 01-1430 (KJC) |
| | : | |
| Plaintiff-Appellee. | : | Adv. Pro. No. 01-1063 (KJC) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 14th day of June, 2006 one (1) copy of

***Plaintiff-Appellee Chapter 7 Trustee's Brief in Opposition to The Appeal of Lucent***

***Technologies Inc. and the Appendix*** was served upon the individuals listed below in the manner

specified:

*VIA HAND DELIVERY*
Daniel J. DeFranceschi, Esquire
Richards Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899

*VIA FEDERAL EXPRESS*
Paul C. Sanders, Esquire
Daniel Slifkin, Esquire
Cravath Swain & Moore
825 8th Avenue, Room# 3906W
New York, NY 10019

*VIA HAND DELIVERY*
Office of the United States Trustees Office
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-2313

*VIA FEDERAL EXPRESS*
Craig Goldblatt, Esquire
Wilmer Cutler Pickering Hale & Dorr, LLP
2445 M. Street, NW
Washington, DC 20037

*U.S. MAIL*
Craig Goldblatt, Esquire
Wilmer Cutler Pickering Hale & Dorr, LLP
399 Park Avenue
New York, NY 10022

*/s/ Sheldon K. Rennie (#3772)*
Sheldon K. Rennie, Esquire