UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Civil Action No. 06-147(JJF) |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7 |
| Debtors. | Bankr. Case No. 01-1430 (KJC) |
| LUCENT TECHNOLOGIES INC., | Adv. Pro. No. 01-1063 (KJC) |
| Defendant-Appellant, | |
| v. | |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE, | |
| Plaintiff-Appellee. | |

## TRUSTEE CHRISTINE C. SHUBERT'S APPENDIX - VOLUME 1 OF 5

On the Brief:

    Stephen M. Rathkopf, Esq.
    David R. King, Esq.
    Andrew C. Gold, Esq.

Of Counsel:

    Sheldon K. Rennie, Esq.
    (DE Bar No. 3772)

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016-9301
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street
Suite 1300
Wilmington, Delaware 19899-2323
Telephone:    (302) 654-7444

*Attorneys for Appellee Christine C.
Shubert, Chapter 7 Trustee*

# APPENDIX

## TABLE OF CONTENTS

| | ROA | Page |
|---|---|---|

**VOLUME 1**

**PLEADINGS:**

Judgment 12/21/05 ........................................................... 351 — B1

Opinion 12/21/05 ............................................................. 347 — B5

District Court Opinion 11/18/04 ....................................... 2212 — B93

Second Amended Complaint .............................................. 69 — B104

Joint Pretrial Memorandum .............................................. 292 — B166

RJSF ............................................................................... 327 — B181

TFOF ............................................................................. 334 — B189

TCOL ............................................................................. 334 — B279

**VOLUME 2**

LFOF & LCOL ................................................................ 335 — B435

**TRIAL TRANSCRIPTS:**

Aversano ......................................................................... 363 — B629

Garrett ............................................................................ 375 — B638

Harris .............................................................................. 366 — B649

Hayes .............................................................................. 368 — B673

Holwell ............................................................................ 375 — B684

Hopkins ........................................................................... 366 — B687

Huber .............................................................................. 361 — B690

Hund-Mejean .................................................................. 369 — B695

Jules ............................................................................... 361 — B705

Keefe .............................................................................. 374 — B711

|            |                                                                   | ROA | Page |
|------------|-------------------------------------------------------------------|-----|------|
| Perricone  | ................................................................. | 375 | B716 |
| Pocalyko   | ................................................................. | 358 | B728 |
| Rogers     | ................................................................. | 375 | B755 |
| Schacht    | ................................................................. | 376 | B756 |
| Solomon    | ................................................................. | 376 | B776 |
| Stark      | ................................................................. | 374 | B782 |
| Terrell    | ................................................................. | 376 | B789 |
| Verwaayen  | ................................................................. | 368 | B797 |
| Wilson     | ................................................................. | 371 | B804 |

## VOLUME 3

**JOINT TRIAL EXHIBIT TRANSCRIPTS:**

| Ackerman   | ................................................................. | 465 | B814  |
|------------|-------------------------------------------------------------------|-----|-------|
| DiRoma     | ................................................................. | 463 | B854  |
| Harris     | ................................................................. | 478 | B871  |
| Hicks      | ................................................................. | 461 | B906  |
| Holwell    | ................................................................. | 476 | B927  |
| Kantor     | ................................................................. | 460 | B928  |
| McGinn     | ................................................................. | 466 | B954  |
| Montemarano| ................................................................. | 468 | B956  |
| Plunkett   | ................................................................. | 477 | B980  |
| Rubin      | ................................................................. | 464 | B995  |
| Schacht    | ................................................................. | 473 | B1003 |
| Uhl        | ................................................................. | 472 | B1024 |
| Zlotnick   | ................................................................. | 462 | B1029 |

ii

|  | ROA | Page |
|---|---|---|

**PLAINTIFF'S TRIAL EXHIBITS**

| Exhibit | ROA | Page |
|---|---|---|
| PX-2 | 1244 | B1043 |
| PX-3 | 1245 | B1046 |
| PX-13 | 1255 | B1048 |
| PX-21 | 1263 | B1056 |
| PX-22 | 1264 | B1069 |
| PX-43 | 1285 | B1070 |
| PX-45 | 1287 | B1081 |
| PX-46 | 1288 | B1083 |
| PX-51 | 1293 | B1084 |
| PX-53 | 1295 | B1100 |
| PX-54 | 1296 | B1103 |
| PX-55 | 1297 | B1105 |
| PX-56 | 1298 | B1107 |
| PX-57 | 1299 | B1111 |
| PX-58 | 1300 | B1113 |
| PX-62 | 1304 | B1118 |
| PX-66 | 1308 | B1120 |
| PX-70 | 1312 | B1124 |
| PX-73 | 1315 | B1126 |
| PX-78 | 1320 | B1130 |
| PX-79 | 1321 | B1132 |
| PX-81 | 1323 | B1134 |
| PX-84 | 1326 | B1140 |
| PX-86 | 1328 | B1142 |
| PX-87 | 1329 | B1153 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-88 | 1330 | B1156 |
| PX-90 | 1332 | B1157 |
| PX-92 | 1334 | B1162 |
| PX-94 | 1336 | B1163 |
| PX-104 | 1346 | B1164 |
| PX-107 | 1349 | B1165 |
| PX-109 | 1351 | B1172 |
| PX-110 | 1352 | B1186 |
| PX-112 | 1354 | B1188 |
| PX-113 | 1355 | B1191 |
| PX-116 | 1358 | B1193 |

**VOLUME 4**

| PX-123 | 1365 | B1194 |
| PX-125 | 1367 | B1344 |
| PX-127 | 1369 | B1345 |
| PX-131 | 1373 | B1347 |
| PX-136 | 1378 | B1350 |
| PX-137 | 1379 | B1351 |
| PX-138 (Excerpts) | 1380 | B1352 |
| PX-148 | 1390 | B1366 |
| PX-149 | 1391 | B1370 |
| PX-151 | 1393 | B1371 |
| PX-153 | 1395 | B1383 |
| PX-155 | 1397 | B1395 |
| PX-157 | 1399 | B1396 |
| PX-158 | 1400 | B1397 |

iv

|  | ROA | Page |
|---|---|---|
| PX-167 | 1409 | B1398 |
| PX-169 | 1411 | B1400 |
| PX-179 | 1421 | B1405 |
| PX-185 | 1427 | B1413 |
| PX-186 | 1428 | B1415 |
| PX-187 | 1429 | B1464 |
| PX-188 | 1430 | B1468 |
| PX-192 | 1434 | B1470 |
| PX-199 | 1441 | B1480 |
| PX-200 | 1442 | B1482 |
| PX-201 | 1443 | B1487 |
| PX-202 | 1444 | B1510 |
| PX-220 | 1462 | B1511 |
| PX-225 | 1467 | B1513 |
| PX-231 | 1473 | B1515 |
| PX-241 | 1483 | B1516 |
| PX-243 | 1485 | B1517 |
| PX-251 | 1493 | B1519 |
| PX-252 | 1494 | B1521 |
| PX-261 | 1530 | B1523 |
| PX-262 | 1504 | B1524 |
| PX-264 | 1506 | B1526 |
| PX-297 | 1539 | B1529 |
| PX-300 | 1542 | B1532 |
| PX-307 | 1549 | B1535 |
| PX-311 | 1553 | B1537 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-320 | 1562 | B1542 |
| PX-322 | 1564 | B1545 |
| PX-323 | 1565 | B1546 |
| PX-324 | 1566 | B1551 |
| PX-325 | 1567 | B1552 |
| PX-326 | 1568 | B1554 |
| PX-330 | 1572 | B1555 |
| PX-340 | 1582 | B1556 |
| PX-342 | 1584 | B1589 |
| PX-345 | 1587 | B1614 |
| PX-348 | 1590 | B1615 |
| PX-349 | 1591 | B1617 |
| PX-360 | 1602 | B1618 |
| PX-390 | 1632 | B1619 |
| PX-440 | 1682 | B1620 |
| PX-443 | 1685 | B1621 |
| PX-462 | 1704 | B1623 |
| PX-486 | 1728 | B1664 |
| PX-501 | 1743 | B1665 |
| PX-506 | 1748 | B1667 |
| PX-507 | 1749 | B1677 |
| PX-508 | 1750 | B1693 |
| PX-509 | 1751 | B1707 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|

**VOLUME 5**

**DEFENDANT'S TRIAL EXHIBITS**

| | ROA | Page |
|---|---|---|
| DX-1 (Excerpts) | 479 | B1709 |
| DX-22 | 500 | B1724 |
| DX-29 (Excerpts) | 507 | B1760 |
| DX-32 | 510 | B1793 |
| DX-33 | 511 | B1813 |
| DX-72 | 550 | B1833 |
| DX-96 | 574 | B1835 |
| DX-142 | 620 | B1843 |
| DX-214 | 692 | B1844 |
| DX-260 | 739 | B1845 |
| DX-364 | 843 | B1847 |
| DX-516 | 995 | B1850 |
| DX-644 | 1123 | B1944 |
| DX-702 | 1181 | B2067 |
| DX-721 | 1200 | B2088 |
| DX-739 | 1219 | B2110 |

HF 3306170v.1 #06723/0002 06/13/2006

# PLEADINGS

**Judgment 12/21/05**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WINSTAR COMMUNICATIONS, INC., et al.,<br><br>Debtors. | Chapter 7<br><br>Case No. 01-1430<br>Jointly Administered |
| CHRISTINE C. SHUBERT, CHAPTER 7<br>TRUSTEE OF WINSTAR COMMUNICATIONS,<br>INC. AND WINSTAR WIRELESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LUCENT TECHNOLOGIES INC.,<br><br>Defendant. | Adv. Pro. No. 01-01063 (JBR) |

## JUDGMENT

Counts VII, X, and XI of the Second Amended Complaint (the "Complaint") of Christine

C. Shubert (the "Trustee"), the Chapter 7 Trustee for the estates of Winstar Communications,

Inc., *et al.* (the "Winstar Estate") against Lucent Technologies Inc. ("Lucent") and Counts 5 and

6 of the Second Amended Answer and Counterclaims of Lucent (the "Counterclaims"), having

come on for trial before the Court, after due notice to the parties, and the Court having heretofore

made and filed its Memorandum of Decision Including Findings of Fact and Conclusions of Law

with Respect to Counts VII, X, and XI of the Second Amended Complaint and Counts 5 and 6 of

the Second Amended Answer and Counterclaims (the "Findings of Fact and Conclusions of

Law")[1] determining, among other things, that (i) on Count VII of the Complaint, Lucent is in

---

[1] All terms not otherwise defined herein shall be given the meaning ascribed to them in the Findings of Fact
and Conclusions of Law.

ach-for bg.TIF

B1

breach of the Subcontract; (ii) on Count X of the Complaint, all statutory elements establishing a preference have been satisfied and the payment of the Seimens proceeds constitutes a preference, and that Lucent has failed to establish the elements of the New Value defense set forth in 11 U.S.C. § 547(c)(2); (iii) on Count XI of the Complaint, Lucent's claims against the Winstar Estate shall be subordinated pursuant to 11 U.S.C. § 510(c); and (iv) that each of Lucents' Counterclaims shall be dismissed, and an order having been duly entered thereon on December 21, 2005, directing the entry of judgment in favor of the Trustee and against defendant Lucent (i) for the sum of $55,750,742 (after the set-off as agreed to by the parties), plus interest on Count VII of the Complaint; (ii) for the sum of $188,180,000, plus interest on Count X of the Complaint; (iii) subordinating Lucent's claim under 11 U.S.C. § 510(c) of the Bankruptcy Code to the claims of all creditors, including all unsecured claims which includes the deficiency claim of Seimens, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000 and preserving Lucent's lien for the benefit of the estate and transferring the lien to the Trustee in her representative capacity; and (iv) dismissing the Counterclaims, it is

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count VII of the Complaint and the Trustee shall have and recover from defendant Lucent in the sum of $55,750,742.00, plus pre-judgment interest in accordance with N.Y.C.P.L.R. 5001 at the rate set forth in N.Y.C.P.L.R. 5004 from April 18, 2001, the date of the original complaint,[2] until December 21, 2005, the date the Court issued its Decision, totaling $23,479,466.08, and in accordance with N.Y.C.P.L.R. 5002 for further pre-judgment interest from December 21, 2005, until the date this Judgment is entered in a per diem

---

[2] The Court awards interest from the date of the complaint rather than the date of the breach. *See In re USN Communications, Inc.*, 280 B.R. 573, 602-03 (Bankr. D. Del. 2002).

2

ach-bg.TIF

amount of $19,536.22, and for post-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from such date the Judgment is entered until such date that this Judgment is satisfied; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count X of the Complaint and the Trustee shall have and recover from defendant Lucent the sum of $188,180,000, plus pre-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from September 27, 2002, until December 21, 2005, the date the Court issued its Decision, totaling $10,734,642.82, plus per diem interest until the date this Judgment is entered totaling $9,390.18, and for post-judgment interest at the rate fixed pursuant to 28 U.S.C. § 1961 from such date the Judgment is entered until such date that this Judgment is satisfied; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent on Count XI of the Complaint and, pursuant thereto, (i) Lucent's claims against the Winstar Estate shall be subordinated pursuant to 11 U.S.C. § 510(c) to the claims of all creditors, including all unsecured claims which includes the deficiency claim of Siemens, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000; and (ii) any lien on or claim held by Lucent on Winstar's assets, including but not limited to the three escrow accounts established by stipulations between the Trustee and Lucent (Bankruptcy Case 01-1430 Docket Nos. 3544, 4026 and 4360), is preserved for the benefit of the Winstar Estate and transferred to the Trustee in her representative capacity; and it is further

ORDERED, ADJUDGED AND DECREED that judgment be and hereby is entered in favor of the Trustee against Lucent dismissing with prejudice any and all claims asserted by

3

ach-for bg.TIF

**B3**

Lucent in the Counterclaims, including any claims set forth in Counts 5 and 6 of the Counterclaims.

      **ORDERED, ADJUDGED AND DECREED** that the Trustee shall be awarded costs to be taxed.

      Judgment signed on this 28th day of December, 2005

*Joel B. Rosenthal*
_____
Joel B. Rosenthal
United States Bankruptcy Judge

4

ach-for bg.TIF

**B4**

**Opinion 12/21/05**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 01-1430(JBR) |
| WINSTAR COMMUNICATIONS, INC. | ) | |
| *et al.* | ) | |
| Debtors | ) | |
| | ) | |
| CHRISTINE C. SHUBERT, | ) | |
| CHAPTER 7 TRUSTEE | ) | |
| Plaintiff | ) | Adversary Proceeding |
| v. | ) | No. 01-1063 (JBR) |
| LUCENT TECHNOLOGIES INC. | ) | |
| Defendant | ) | |

**MEMORANDUM OF DECISION INCLUDING FINDINGS OF FACT AND
CONCLUSIONS OF LAW WITH RESPECT TO COUNTS VII, X, AND XI OF THE
SECOND AMENDED COMPLAINT AND COUNTS 5 AND 6 OF THE SECOND
AMENDED ANSWER AND COUNTERCLAIMS**

This matter came before the Court for trial on Counts VII (breach of subcontract),[1] X

(preference), and XI (equitable subordination) of the Second Amended Complaint[2] and

one count of fraud (Count 5) and one count of negligent misrepresentation (Count 6) of the

---

[1]The parties agree that the alleged breach is a breach of the Agreement for
Network Build-out Services (the "Subcontract") and not a breach of any funding obligation
under the credit facilities. *See* Joint Pretrial Memorandum [Adversary Proceeding Docket
(hereinafter "Docket") # 292] at Exhibit 12.

[2]On May 29 and August 7, 2003, the Bankruptcy Court, on Lucent's motion, entered
orders dismissing Count IX (breach of covenant of good faith and fair dealing), precluding
the Trustee from recovering consequential or punitive damages on any of her claims, and
prohibiting the Trustee from obtaining any affirmative monetary recovery on her equitable
subordination claim [Docket ## 85, 103]. The Trustee, with Lucent's assent, voluntarily
dismissed Counts I through VI and Count VIII [Docket #207].

Second Amended Answer and Counterclaims.[3]  As set forth in greater detail below, the

Court finds that these matters are core proceedings in which the Court may enter final

orders, or with respect to Lucent's counterclaims, even if they are related to non-core

proceedings, Lucent has consented to the entry of final orders.

In reaching its determinations, the Court considered the entire 21 days of testimony

given by 39 witnesses, considered the demeanor and credibility of the 13 witnesses who

testified in person[4] and, to the extent possible the demeanor and credibility of the 16

---

[3]Count 2 of the Second Amended Answer and Counterclaims is a count for setoff
pursuant to 11 U.S.C. § 553.  The parties have stipulated that in the event the Trustee is
awarded judgment against the Defendant under the Subcontract, the Defendant is entitled
to a total setoff of $6.3 million.  (Stipulation By and Between The Trustee and Lucent
Technologies Inc. Concerning Lucent's Counterclaim for Setoff at ¶ 1 [Docket #337]).
Counterclaim 3 is a claim for fraud and counterclaim 4 is one for negligent
misrepresentation.  Both are based on Winstar's alleged representations to Lucent during
Lucent's "due diligence" investigation in November and December 2000.  Neither of these
counterclaims were raised by Lucent in the Joint Pretrial Memorandum as required by
paragraph 7(H) and (I) of the Court's Pretrial Order of January 26, 2005 [Docket # 275]
("The parties are ordered to file ... a Joint Pretrial Memorandum approved by all counsel
and unrepresented parties, which shall set forth the following: ... (H) The issues of fact
which remain to be litigated (evidence at trial shall be limited to these issues); (I) The
issues of law to be determined....") and thus are deemed waived.  Had they not been
waived, the credible evidence supports a finding that Lucent did not carry its burden of
proof as it had sufficient knowledge of the financial condition of Winstar during the relevant
period that it could not have reasonably relied upon any allegedly misleading information.
Lucent's surviving counterclaims for fraud and negligent misrepresentation relate to the
breach of the so-called CAPEX covenant.

[4]The witnesses who testified at trial were Paul Pocalyko, Stephen Scherf, Martina
Hunt-Majean, Mark Wilson, Reginald Kipke, Kevin Collins, Christopher Stark, Michael
Keefe, Elizabeth Perricone (some of Perricone's testimony also came in via portions of
deposition testimony read at trial), Gregory Garrett, Henry Schacht (some of Schacht's
testimony also came in via videotaped deposition testimony played at trial), Vernon Terrill,
and John Solomon.

2

witnesses whose videotaped testimony was introduced,[5] considered the credibility of the witnesses whose testimony was read into the record, reviewed the over 1400 exhibits (including many duplicates) totaling many thousands of pages admitted in evidence, heard arguments of counsel, and reviewed the various pre- and post-trial pleadings submitted in support of each party's position. The following decision constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052, and as set forth below, to the extent that the district court concludes that this Court may only enter proposed finding and rulings pursuant to Fed. R. Bank. P. 9033 with respect to some or all of the counts or counterclaims, the following constitutes the Court's proposed findings and rulings with respect to such counts or counterclaims.

## EXPLANATION OF CITATIONS

The parties have stipulated to certain facts as most recently set forth in the Revised Joint Stipulation of Uncontested Facts (the "Revised Joint Stipulation"), attached as Exhibit A to the Renumbered Joint Stipulation of Uncontested Facts [Docket #331].

Citations to trial exhibits introduced by the Plaintiff are cited as "PX #"; Defendant's trial exhibits are cited as "DX #." In many instances the parties introduced the same

---

[5]The witnesses whose testimony was admitted via videotaped depositions were Nathan Kantor, Lisa Hicks, William Zlotnick, Jill Diroma, Frederic Rubin, David Ackerman, Richard McGinn (some of McGinn's testimony also came in via portions of deposition testimony read at trial), William Rouhana, Michael Montemarano, Deborah Hopkins, Gary Simpson, William Fullerton, Richard Uhl, Kevin Monaco (some of Monaco's testimony also came in via portions of deposition testimony read at trial), Gary Goldman, and Kevin Howell. As noted above some of Schacht's testimony was introduced on videotape; the Court also had the opportunity to observe this witness when he testified in person later during the trial.

3

document or portions of the same document. The Court generally has cited to duplicate documents by only one exhibit number. Citations to specific pages within a multiple-page exhibit are cited by exhibit number and Bates number or by page number if the exhibit does not contain Bates numbers.

Citations to testimony in the trial transcripts (which include only testimony from witnesses who were physically present in court and deposition testimony read into the record) identify the witness, followed by the designation "Depo" in instances where the deposition testimony was read into the record, and "Tr." along with reference to the transcript volume, the page and, where needed, line numbers. The trial transcripts appear on the docket at numbers 322-326, 338, and 351-356.

Citations to transcripts of videotaped deposition testimony (which was played during trial but not transcribed as part of the trial transcript) contain the designation "Video" and identify the witness; if necessary, whether the testimony is designated as "Direct," "Cross" or "Redirect,"[5] the page and line numbers of the transcribed deposition testimony. The transcripts of the videotaped depositions or portions thereof that were introduced at trial were admitted as exhibits and are listed in the Stipulated Joint Trial Exhibits [Docket #

---

[5]In many instances non-consecutive portions of videotaped testimony were introduced. In designating the corresponding transcripts, the parties, for some but not all of these witnesses, renumbered the pages sequentially and kept the reference to the original volume and page. In some instances while the renumbered pages introduced as a witness' direct testimony begin with page 1, so do the first pages of the witness' cross examination and redirect testimony. The Court will refer to the renumbered page designation as "direct," "cross" or "redirect" when necessary and omit reference to the original volume and page numbers unless such additional citation is necessary to avoid confusion.

4

B8

335].

## JURISDICTION

1. In order to understand the Court's conclusions with respect to its jurisdiction to enter final orders,[7] it is necessary to explore Lucent's objection to this Court's entry of a final order. On April 18, 2001 (the "Petition Date") Wireless Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Wireless" and collectively with Winstar, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. (Revised Joint Stipulation, ¶ 3). In January 2002 the cases were converted to Chapter 7 and shortly thereafter Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 trustee. (Id., ¶¶ 3 and 4).

2. This adversary proceeding was commenced by the Debtors on the Petition Date. In July 2002 the Trustee stepped in as the Plaintiff and soon thereafter filed her Second Amended Complaint and Jury Demand ("Second Amended Complaint") [Docket #89], the operative complaint in this case. As the caption of the Second Amended Complaint suggests, the Trustee requested a jury trial on all actions that could be tried to a jury. In the Second Amended Answer and Counterclaim of Defendant Lucent Technologies Inc. ("Lucent") to the Second Amended Complaint ("Second Amended

---

[7]Whether the Court treats its order as final under Fed. R. Bankr. P. 7052 or proposes findings and rulings to the district court under Fed. R. Bank. P. 9033 will affect the way in which the parties respond to the orders issued contemporaneously herewith. Moreover "a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999). *Compare* Fed. R. Bankr. P. 9033(d) *with* Fed. R. Civ. P. 8013.

5



Standard of review

Answer"), dated March 24, 2004 [Docket #156], Lucent also demanded a jury trial "on all issues properly triable thereby." Subsequently the Trustee withdrew her request for a jury trial.[8] The Trustee alleged that these proceedings are core; Lucent disagreed except with respect to the preference action. (Second Amended Complaint at ¶ 3; Second Amended Answer at ¶ 3).

3. In June 2004 Lucent sought discretionary withdrawal of the reference pursuant to 28 U.S.C. § 157(d) in the district court and a waiver of Local Bankruptcy Court Rule 5011-1 as it did not file a contemporaneous motion asking the Bankruptcy Court to determine whether these matters were core or non-core [Docket # 208].[9] In July 2004 Lucent filed a memorandum in support of its withdrawal motion [Docket # 237] and urged withdrawal of the reference on the grounds that Lucent was entitled to a jury trial on the Trustee's preference and breach of contract claims and on its own fraud and negligent misrepresentation counterclaims. The Bankruptcy Court then stayed its proceedings pending the district court's determination of the withdrawal motion.

4. In November 2004 the district court entered its Memorandum Opinion and Order [District Court Docket ## 11 and 12] denying the withdrawal motion. Specifically the

---

[8]The district court concluded that the Trustee had the right to withdraw her jury demand without Lucent's consent. Memorandum Opinion, dated November 16, 2004, at 7 entered in *Shubert v. Lucent Technologies, Inc.*, United States District Court for the District of Delaware Civil Action 04-928 [District Court Docket # 8].

[9]Contemporaneously with the filing of the withdrawal motion, Lucent filed a Motion for Summary Judgment [Docket # 210] seeking judgment from the Bankruptcy court on all three remaining counts. The motion is silent with respect to any objection to the entry of final orders.

6

district court concluded that Lucent had waived its right to a jury trial by the filing of its

proofs of claim and that Lucent did not meet the standards for a permissive withdrawal of

the reference for "cause" under *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990).

     5.  From before the filing of the withdrawal motion, through the conclusion of the

Trustee's case-in-chief in this Court when Lucent then unsuccessfully sought judgment on

partial findings pursuant to Fed. R. Bank. P. 7052, until after submission of all the

evidence, and indeed, submission of each party's proposed findings of fact and

conclusions of law in this adversary proceeding,[10] Lucent did not raise the issue that the

Bankruptcy Court lacked jurisdiction to enter final judgment.  In fact the record is clear:

Lucent sought a final order in its favor on several occasions from this Court.[11]

     6.  On the evening of June 9, 2005, Lucent filed a letter, dated June 8, 2005 [Docket

#343], "remind[ing] the Court that Lucent has not consented to the Court's jurisdiction to

---

    [10] The last day on which evidence was submitted was May 11, 2005.  Both parties
rested at that time.  Lucent electronically filed its proposed findings of fact and conclusions
of law on June 6, 2005 at 11:32 p.m.  Closing arguments, which of course are not
evidence, occurred on June 13, 2005.

    [11] Lucent sought summary judgment on Trustee's preference and breach of contract
claims as well as its own claims for fraud and negligent misrepresentation in June 2004.
There is nothing in the pleadings to suggest Lucent was asking the Court to provide
proposed findings and conclusions to the district court.  In the Pretrial Memorandum, the
parties were unable to agree as to the legal issues to be decided so each party set forth
its position.  Nowhere in Lucent's detailed 12 page statement of the legal issues, or
indeed anywhere else in the Pretrial Memorandum, does Lucent allege the Court lacked
jurisdiction to enter final orders.  At the conclusion of the Trustee's case in chief, Lucent
orally and in writing sought judgment pursuant to Fed. R. Bank. P. 7052 and again did not
raise an objection to this Court's entering a final order.  Similarly Lucent's proposed
findings and conclusions do not suggest that there is an ongoing dispute as to whether
these proceedings fall outside the core jurisdiction of the Court.

issue final orders or judgments with respect to non-core proceedings in this matter." In the letter Lucent identified the Trustee's breach of the subcontract claim and Lucent's fraud and negligent misrepresentation counterclaims as non-core. Although the June 8, 2005 letter cites to Lucent's Second Amended Answer and Counterclaims to Second Amended Complaint in support of its position that it has not consented to the entry of final orders by this Court, its failure to mention the withdrawal motion or the district court's ruling is striking and perhaps intentionally deceptive.[12]

7. At closing argument Lucent maintained that the district court's decision did not address the core/non-core issue but only whether Lucent was entitled to a jury trial. Although the district court plainly concluded that the matters on which Lucent claimed a jury trial were triable only in equity, the district court concluded that Lucent's filing of its proofs of claim triggered the claims allowance process.[13] The allowance or disallowance of

---

[12] The Court views the statement in the same June 8, 2005 letter that "[t]his court has never decided whether these claims are core or non-core" as another example of counsel's attempt to mislead this Court. The statement, although technically correct, was occasioned by Lucent's own behavior. As the district court noted, one of the grounds for denying the withdrawal motion was Lucent's failure to follow Local Bankruptcy Rule 5011-1 which required that Lucent file a motion seeking a determination by the Bankruptcy Court as to whether these counts and counterclaims were core or not. Moreover, as discussed herein, whether this Court views the claim and counterclaims as core or non-core is largely irrelevant because, contrary to Lucent's argument, the district court has definitively spoken on this issue when it found that the claims and counterclaims were part of the claims allowance process and when it refused to find, as Lucent had urged, that the claims and counterclaims were independent of the proofs of claim.

[13] "[T]he Court finds that the Trustee's subsequent preference action is now part of the claims allowance process, and is triable only in equity." Memorandum Opinion at 6-7. "The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, are now part of the claims

8

claims against the estate" is one of the specifically enumerated types of actions which fall

within the express definition of a core proceeding.  11 U.S.C. § 157(b)(2)(B).

    8.  Following the district court's decision, Lucent filed a motion seeking certification

of the district court's order pursuant to 28 U.S.C. § 1292.  That motion was pending in the

district court when this case was being tried before the Court.  Subsequently the district

court denied the motion.[14]  The district court stated that this Court "has not determined

whether this matter is a core or non-core proceeding." (Memorandum Order [District Court

Docket #21] at p.3).

    9.  The Court, however, interprets the district court's earlier findings that the claims

and counterclaims fall within the claims allowance process to necessitate a finding that

these actions are core pursuant to 28 U.S.C. § 157(b)(2)(B).  While fully cognizant of this

Court's role in following the findings and conclusions of the district court with respect to

jurisdiction in this case, lest Lucent continue to espouse the position that whether these

proceedings fall within the core jurisdiction of the Bankruptcy Court remains an open issue,

---

allowance process, triable only in equity." *Id.* at 7-8. "The Court finds that Lucent's Fraud
and Negligent Misrepresentation counterclaims involve a decision regarding distribution of
the bankruptcy estate and, thus, are now part of the claims allowance process, triable only
in equity." *Id.* at 8.

    [14]Throughout the course of this case and indeed, after closing arguments, the
parties sent a flurry of letters to the Court. Many of them were little more than recitations of
the squabbling between the parties regarding alleged misstatements of facts. Ultimately
the Court issued an order cautioning the parties that it would not tolerate such behavior
[Docket # 350]. Given the district court's Memorandum Order, however, the Court would
have expected the parties to file some type of notice advising this court of the district
court's decision. Neither parties, however, informed the Court of the district court's
decision and order. The Court only discovered the Memorandum Order when it checked
the district court docket as it was about to issue these findings and rulings.

B13

this Court seeks to be clear: even if the district court did not intend its use of the phrase "claims allowance process" to be read as synonymous with the language of section 157(b)(2)(B), the Court's independent examination of its own jurisdiction would lead to the same conclusion, namely, the counts decided herein are core pursuant to 28 U.S.C. § 157(b)(2)(B). Although the counterclaims for fraud and misrepresentation could be classified as non-core related to actions, Lucent has given its implicit consent to the entry of final orders on those counterclaims. The rationale for these findings is set forth below.

10. As set forth in greater detail below, in 1998 Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") (DX 96) whereby Lucent was the primary secured lender to Winstar, and a Supply Agreement (PX 123) whereby Lucent was to provide Winstar with a turnkey buildout of its global communications network. Because Lucent was unable or unwilling to perform the buildout, it subcontracted services to Wireless under the Network Agreement for Buildout Services (the "Subcontract") (DX 177). The expectation was that Lucent would, in time, assume all of its obligations under the Supply Agreement. Accordingly, the Supply Agreement contemplated that Lucent would "develop a transition plan with Winstar's input, review and potential approval" scheduling Lucent's assumption of the various aspects of the buildout. (PX 123 at Schedule A ¶3.3(a); *see also* PX 123 at ¶6.1 and ¶6.5). Although all obligations under the First Credit Agreement were fully paid in 2000, the First Credit Agreement was replaced by a Second Credit Agreement (DX 29). The anticipated Transition Plan never came to

10

fruition[15] and thus the parties continued to operate under the Supply Agreement and
Subcontract.

     11.  In October 2001 Lucent filed a proof of claim (the "Proof of Claim") (PX 340)
which, on its face, states Lucent held a secured claim (and to the extent not secured, an
unsecured claim) in "[a]n amount not less than $138,957,218.90" for "goods sold," "money
loaned," and "other."  In the "Summary of Supporting Documentation" attached as Tab A.2
to the Proof of Claim, Lucent described the documents which support its claim as the
"Supply Agreement ..., any amendments thereto and *any and all related documents,
agreements and statements of work.*"  (Emphasis added).  The Subcontract is certainly an
agreement related to the Supply Agreement; it is the means by which Lucent was to fulfill
its obligation to perform the network buildout.  In addition, although the parties do not
define a "statement of work," its plain meaning suggests it is nothing more than a
description or list of work performed.  The March 2001 "spreadsheet,"[16] against which
Lucent refused to pay, is a breakdown of the services performed.  (PX 245).  Thus this
spreadsheet appears to qualify as a statement of work.  Whether Lucent may have
breached the Subcontract by refusing to pay the March 2001 spreadsheet has a direct

---

    [15]The Supply Agreement defines the Transition Plan as "the plan specified in
Schedule A regarding Lucent's time periods to begin providing certain of the Services as
specified in the plan."  (PX 123 ¶1.1(qq)).  Schedule A, titled "Statement of Work,"
describes Lucent's anticipated role in designing, building, and managing the network.
Exhibit A-4 is titled "Initial Transition Plan."  The Initial Transition Plan is not the "Transition
Plan" which the parties agree never came to be.

    [16]The Court uses the term "spreadsheet" because this is a term used by the parties
to describe this document.  What the document is or should be deemed to be is the matter
of some discussion, *infra*.

11

bearing upon whether Lucent may recover under its Proof of Claim and if so, in what amount. Therefore the breach of the Subcontract claim falls within the core jurisdiction of the Court. 28 U.S.C. § 157 (b)(2)(B). *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.)*, 831 F.2d 410, 418 (3d Cir.1987)(creditor's filing a proof of claim on a pre-petition breach of contract action created an action in bankruptcy court that "[b]y its very nature [ ] fits directly under the more specific definition of a core proceeding under § 157(b)(2)(B) ...."). *See also S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702 (2d Cir.1995)(filing a proof of claim converts a pre-petition state law claim into a core proceeding); *In re NDEP Corp.*, 203 B.R. 905, 910 (D. Del. 1996).

12. The Court is cognizant of the fact the Proof of Claim was filed after the original complaint in this matter. That fact is insufficient to render the above case distinguishable and the breach of contract claim non-core. Although older cases often cite what has been describes as "a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint," *Rosa v. Resolution Trust Corporation*, 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied* 502 U.S. 981, 112 S. Ct. 582, 116 L.Ed.2d 608 (1991), the Third Circuit has recognized that the rule is not to be applied blindly.

> The principle that jurisdiction is determined at the outset of the action is simply insufficient to support the continuing applicability of [12 U.S.C.] § 1441a(l)(1) to this case. One basic difficulty with this argument is that the letter and spirit of the rule apply most clearly to diversity cases. The Supreme Court set out the rule in the diversity context. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 286, 290-92, 58 S.Ct. 586, 590, 591-92, 82 L.Ed. 845 (1938). In addition, the

12

Court crafted the rule for the removal of actions from state court, which involves a more lenient standard not relevant here. Id. Most importantly, the policies behind removal and the risks of manipulative behavior played a significant role in the Court's decision. St. Paul focused primarily on the monetary threshold for federal jurisdiction, observing that the time of filing rule prevented plaintiffs from subsequently amending their complaint to plead a lesser amount and avoid removal. Id. at 294, 58 S.Ct. at 592-93. Similar concerns applied to changes of parties that would potentially destroy diversity of citizenship. Id. at 294-95, 58 S.Ct. at 592-93. From the outset, the underlying concern of the time of filing rule was the risk that parties would deploy procedural tactics to manipulate federal jurisdiction.

The rule that jurisdiction is assessed at the time of the filing of the complaint has been applied only rarely to federal question cases. Moreover, in these rare cases, the rule has often been applied axiomatically, without extensive discussion or analysis. See Rosa v. Resolution Trust Corp., 938 F.2d 383, 392 n. 12 (3d Cir.), cert. denied, 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); see also F. Alderete General Contractors, Inc. v. United States, 715 F.2d 1476, 1480 (Fed.Cir.1983) (observing in government contracts action that "the decision below is at variance with the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties"). Even in the federal question context, however, the focus of the time of filing rule has been on preventing manipulation of jurisdiction when a claim is removed. As we observed in Westmoreland Hospital Ass'n v. Blue Cross of Western Pa., "a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." 605 F.2d 119, 123 (3d Cir.1979) (emphasis added), cert. denied, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Along with the obvious goal of judicial efficiency, we perceive the risk of strategic behavior as the primary rationale behind the time of filing rule.

Manipulation of jurisdiction is simply not at issue in this case. There is no suggestion of manipulation, nor would the facts support it. The jurisdiction-destroying transfer of assets

13

between the RTC and New Rock was an arms length transaction independent of the jurisdictional issue. Without the possibility of manipulative behavior, the primary policy behind the time of filing rule is not implicated.

Our rejection of an absolute time of filing requirement breaks no new ground. Courts that have considered the rule more fully have not hesitated to abandon it where appropriate. In *Boelens v. Redman Homes, Inc.*, 759 F.2d 504 (5th Cir.1985), the Fifth Circuit discussed the policies behind the time of filing rule and held that in a federal question case, where the plaintiff's amended complaint omitted federal counts included in the original complaint on which jurisdiction could be based, the court would look to the amended complaint and decline jurisdiction. Id. at 508. The Fifth Circuit interpreted this rule as consistent with the general principle that the amended complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." Id. at 508.

We were equally quick to reject the time of filing rule in *Lovell Mfg. v. Export-Import Bank*, 843 F.2d 725 (3d Cir.1988):

> *Lovell* ... cites several older Third Circuit cases for the proposition that our determination of jurisdiction should be based solely on the basis of the pleadings, and not on subsequent events.... We are uncertain that these cases stand for the broad proposition for which *Lovell* cites them. However, regardless of what they once might have stood for, and regardless of the merit of these principles elsewhere, plainly they do not reflect recent Third Circuit jurisprudence. As *Lovell* itself concedes, later cases clearly hold that once all federal claims have been dropped from a case, the case simply does not belong in federal court.

Id. at 734 (citations omitted). We concluded by observing "that to the extent a black-letter rule ever existed, precluding a court from relying on post-removal events ..., the Supreme Court clearly did not feel bound by it in *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)."

14

> *Id.* at 735. Although the time of filing rule certainly retains a
> large measure of persuasive efficacy, we read *Lovell* as a
> clear rejection of any iron-clad time of filing requirement. *Cf.*
> *Carr v. American Red Cross,* 17 F.3d 671, 683-84 (3d
> Cir.1994) (federal jurisdiction arising from the involvement of
> the American Red Cross in a case will cease on the dismissal
> of the Red Cross from the case).

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503-04 (3d Cir. 1996).

13.  In this case the operative complaint, the Second Amended Complaint, was filed after the filing of Lucent's Proof of Claim. Moreover, this case does not involve the issue of destroying jurisdiction by subsequent events nor is there any suggestion that the Trustee attempted to manipulate jurisdiction.

14.  In its Second Amended Answer, Lucent admitted that the preference action is a core matter but disputed that all other counts were core. (Second Amended Answer at ¶ 3). This denial would include the count for equitable subordination. "Equitable subordination is unquestionably a "core" proceeding pursuant to section 157(b)(2)." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 116 (E.D.Pa. 1993), *aff'd* 37 F.3d 1487 (3d Cir. 1994). It is an action "affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship...." *See also In re Insilco Technologies, Inc.,* 330 B.R. 512, 520 (Bankr. D.Del. 2005).

15.  Similarly Lucent's fraud and negligence counterclaims arise from Winstar's alleged conduct in connection with the Second Credit Agreement. This is also an

15

agreement related to the Supply Agreement.[17]  It provided the means by which Winstar

was to obtain financing to pay for goods and services under the Supply Agreement,

including those services subcontracted to Wireless under the Subcontract, and thus

Winstar's conduct in connection with its draws under the Second Credit Agreement is

within the ambit of the Proof of Claim.  Moreover, the Second Credit Agreement gave

Lucent the right to conduct the due diligence about which it now complains.  The

counterclaims are now part of the claims allowance process and within the core jurisdiction

of this Court.  28 U.S.C. § 157(b)(2)(B).

    16.  Finally, even if these matters were non-core, Lucent has waived its objection to

this Court's entry of final orders by its conduct.  *Abramowitz v. Palmer*, 999 F.2d 1274,

1280 (8th Cir.1993); *In re G.S.F. Corp.*, 938 F.2d 1467, 1476 (1st Cir.1991); *In re

Daniels-Head & Associates*, 819 F.2d 914, 918-19 (9th Cir.1987).[18]  Not only has Lucent

---

[17]Section 11.3(a) of the Supply Agreement expressly provides:

> Lucent shall provide WinStar financing in accordance with the
> Credit Agreement and otherwise in accordance with the terms
> of this Agreement.

[18]Although Fed. R. Bankr. P. 7012(b) provides that in non-core matters, "final orders
and judgments shall not be entered on the bankruptcy judge's order except by *express*
consent of the parties," the substantial weight of authority holds that consent may be
implied.  10 Collier on Bankruptcy ¶ 7012.11 at 7012-25 n. 3 (Bender 2003).  Moreover
courts have found expressions of consent based upon a party's actions such as filing a
complaint.  *Id.*  In its counterclaims contained in the Second Amended Answer, Lucent pled
only that counterclaims one and two were core.  The pleading is silent with respect to any
mention of whether the remaining counterclaims are core or not.  But in pleading, Lucent
requested that judgment be entered in its favor on all counterclaims which should properly
be viewed as Lucent's express consent to this Court's jurisdiction to enter final orders.

16

narrowed what counts and counterclaims it believes fall outside the core jurisdiction of the

Bankruptcy Court,[19] Lucent repeatedly sought judgment in its favor without noting that the

Court could only recommend findings and conclusions to the district court.[20]

Baldwin-United Corp. v. Thompson (In re Baldwin-United Corp.), 48 B.R. 49, 54 (Bankr.

S.D. Ohio 1985) (consent may be implied from failure to object or from any act indicating a

willingness to have the bankruptcy court determine a claim). Similarly in the Joint Pretrial

Memorandum [Docket # 292] Lucent did not raise the core or non-core nature of the

claims and counterclaims as one of the legal issues to be determined. Finally Lucent has

asserted a setoff claim against the estate which it acknowledges is a core matter. *In re*

*Iridium Operating LLC*, 285 B.R. 822, 832 (S.D.N.Y. 2002). The parties agree Lucent's

---

[19] In its closing argument Lucent argued that the Court could not enter a final order only with respect to the breach of the Subcontract claim (Tr. 22-50) and thus the Court finds Lucent waived its objection to the entry of final orders with respect to its counterclaims.

[20] During closing argument Lucent's attorney conceded, in response to questioning by the Court, that he had not raised the issue of core versus non-core jurisdiction with the Court directly but had informed the Court during the summary judgment arguments that Lucent had sought certification of the district court's order. At the summary judgment argument, counsel's sole discussion of any challenge to this Court's jurisdiction was as follows:

> Mr. Saunders: Your Honor, I should point out, unless Your Honor already knows this, that we have asked Judge Farnum to certify, under Section 1292(b), the jury trial issue.

Transcript of December 14, 2004 Hearing [Docket #274] at 20-21. Moreover the argument that this statement put the Court on notice that the core/non-core dichotomy was at issue in the district court is wholly inconsistent with Lucent's argument that the district court focused only on the jury trial issue and did not address the core/non-core issue.

17

setoff claim be set off against any monetary award on the breach of the Subcontract claim. The Court believes this is further evidence of Lucent's waiver.

17. For all of the foregoing reasons, the Court concludes these are all core matters under 28 U.S.C. § 157 and, to the extent not core matters, Lucent has consented to entry of final orders by this Court. Under the Standing Order of Reference, the Court will enter final judgment.

## OVERVIEW OF FACTS AND THE PARTIES' CLAIMS

18. At its essence this case is simply a tale of two companies -one large, one small- which entered into what each expected to be a mutually beneficial relationship to build a wireless communications network and deliver services to customers via that network. What became apparent as the evidence unfolded was that what began as a "strategic partnership" to benefit both parties quickly degenerated into a relationship in which the much larger company bullied and threatened the smaller into taking actions that were designed to benefit the larger at the expense of the smaller. Along the way some executives of each company demonstrated their incompetence and arrogance, and in some instances, now find themselves targets of criminal investigations. The Court notes that there was poor communications not only between the two companies but among each companies' employees. In fact, when Lucent replaced some of its upper level management in the fall of 2000 in response to an internal and SEC investigations, the new executives issued directives regarding the Winstar-Lucent relationship without having even

18

read the operative agreements. Officers and executives often saw the relationship unfolding from different perspectives such that, if the Court were so inclined to view each witness' testimony in isolation, it could find support for virtually any fact. Yet taking all the *credible* evidence as a whole, it is clear that Lucent used Winstar to inflate Lucent's own revenues, especially in the third and fourth quarters of 2000 when Lucent was "feeling a lot of pressure on revenue." (Hayes, Depo, Tr.13-38). Although Winstar benefitted from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that would have put the world on notice that Winstar was in dire financial straits until Lucent could take some more. Lucent used its position as Winstar's lender to ensure Winstar's cooperation by repeated threats to stop both the funding of Winstar's draw requests and the payment of Wireless's invoices for services already performed.

**Summary of the Trustee's Claims**

19. Although the parties tried this case for 21 trial days, surprisingly most of the critical facts surrounding the relationship of the Debtors and the Defendant are not disputed. The parties could have and should have saved their own and this Court's resources by agreeing to many more underlying facts which really are not disputed.

20. Prior to their bankruptcies, Winstar, a Delaware corporation, was a local and long distance telecommunications carrier and engaged in the buildout of a global broadband telecommunications network to service its customers. (DX 701 at 8). Its stock

19

was publically traded. (DX 701; PX 460). Wireless, Winstar's wholly-owned subsidiary, was also a Delaware corporation engaged in the design and construction of Winstar's network. (Revised Joint Stipulation ¶¶ 1 and 2).

21. Starting at the customer's end, Winstar would build facilities within the customer's building, known as a "B site," to connect the customer to Winstar's voice and data network via a radio and antenna located on the roof of the customer's building. Radios and antennae were also located on the roof of a Winstar's traffic collection point known as a "hub." Signals were sent between the B site and hub via the radios and antennae. (DX 699 at page 9, line 15 through page 10, line 38).[21]

22. The hubs, in turn, collected the signal traffic and distributed it to a high capacity facility known as a "central office." Typically signals were transmitted between hubs and central offices via fiber cables, either owned by Winstar or leased from an incumbent telephone company. (Id.).

23. The central offices had data and voice switching equipment which would connect transmissions from the central office either into other local or long-distance telephone companies or into Winstar's own national fiber network which provided long-haul capacity for Winstar's voice and data services. (Id.).

---

[21]DX 699 is a transcript of the testimony of David Ackerman, Winstar's former group executive/executive vice president for corporate strategy and business planning, given under oath on October 11, 2001 as part of the investigation by the Securities and Exchange Commission ("SEC") styled *In the Matter of Lucent Technologies, Inc.*, file no. HO-9128 (the "SEC Action"). The transcript of the Ackerman videotaped deposition to which DX 699 is an exhibit was admitted as Joint Trial Exhibit 6.

24. Winstar's long-haul network typically was made of fiber supplied by non-Lucent vendors and ran along routes that connected one city to another. (Kipke, Tr. 18-190). Optical equipment that amplified and transmitted the signals were generally located at each end of and at certain intervals along the fiber. (Kipke, Tr. 17-72-73).

25. Lucent, is also a Delaware corporation, whose stock is publically-traded on the New York stock exchange (DX 739 at ¶ 12). It designs and delivers telecommunications systems, services, and products, including software. (Revised Joint Stipulation ¶ 5). It was, at the relevant times, much larger in size and resources than the Debtors. (Ackerman, Video-Direct, p.17, line 18-p. 18, line 5).

26. In the late nineties, telecommunications companies were "hot" companies, and on the grow. Winstar, like many others, desired to increase the size and reach of its network and joined forces with Lucent to help accomplish the expansion. Prior to that time, Winstar and Lucent had an arms'-length vendor-creditor relationship whereby Lucent sold goods to Winstar. (Ackerman, Video-Direct at p. 4, line 12). That relationship changed in October 1998 when the two entered into what they both describe as a "strategic partnership." (Ackerman, Video-Direct at pp. 3-4). The "strategic partnership"[22] was created through a series of agreements, three of which figure prominently in this litigation.

27. In October 1998, after three weeks of "lockdown" negotiations, Lucent and Winstar entered into two related agreements: the First Credit Agreement and the Supply

---

[22]The "strategic partnership" was not actually a partnership, a fact Lucent spent considerable time emphasizing. The parties used the term simply to connote their intent to work closely and collaboratively. See October 22, 1998 Joint Press Release (PX 331).

21

Agreement. (*Id.*). Under the First Credit Agreement, dated October 21, 1998, Lucent became the primary secured lender to Winstar and provided a $2 billion line of credit (although only $500 million could be borrowed at any one time) to be used for the purchase of certain products and services in exchange for a lien in virtually all of Winstar's assets. Wireless was not a borrower, guarantor, or otherwise a signatory to the First Credit Agreement. (Revised Joint Stipulation ¶¶ 13 and 14). When the parties entered into the First and subsequently Second Credit Agreements, Lucent expected that the loans were be repaid either by borrowing from other lenders or by raising equity. (Hayes, Depo, Tr.13-36).

28. Under the Supply Agreement Lucent agreed to provide and finance (under the First Credit Agreement which was later supplanted by the Second Credit Agreement) the purchase of products and services. (Revised Joint Stipulation ¶6). Lucent was to provide equipment of a quality described as "Best of Breed" and, in instances where it could not provide Best of Breed equipment, it was obligated to finance Winstar's purchase of such equipment from other vendors.[23] (Ackerman, Video-Direct at pp.81-82; PX 123 at ¶ 11.3 and Schedule H thereto).

_____

[23] The Supply Agreement provides that 65% of the equipment and services purchased during the first year of the contract would be purchased from Lucent. The percentage increased to 70% thereafter. (PX 123 at ¶ 11.3(b)(1)). The Supply Agreement also permits Lucent to surcharge Winstar if Lucent funds the purchase of goods and services from other vendors beyond the applicable percentages. There was no evidence to suggest that Lucent ever surcharged Winstar despite the fact that the parties agree Lucent funded substantially more non-Lucent purchases than percentages set forth in the Supply Agreement.

22

29. To assure that the content of the Winstar network was primarily equipment manufactured and/or sold by Lucent, to develop and enhance its reputation for providing these type of buildout services in a "hot" telecommunications world, and ultimately to enhance its revenue production, Lucent wanted to build Winstar's entire global network, including all supporting infrastructures, on a completely turnkey basis. Consequently the Supply Agreement provided that Lucent would build and deliver a turnkey operation to Winstar. As with its obligations to finance Best of Breed equipment even if supplied by third parties, if Lucent itself was unable to perform the services needed to comply with buildout obligations, it was obligated to finance the payment of those services provided by others who would develop the turnkey system. (PX 123, section 11.3(c).

30. When the parties entered the Supply Agreement, they both recognized that Lucent did not have all the core competencies necessary to perform the buildout. Therefore the Supply Agreement provided that Lucent would prepare a transition agreement that included a schedule of its assumption of various aspects of the buildout as broadly outlined in the Supply Agreement. (PX 123 at Schedule A, § 3.3). No transition agreement was executed and it quickly became apparent that Lucent either could not or would not take over the building of the turnkey network as promptly as anticipated. (Kantor, Video-Cross at pp. 46-48).[24] In March 1999 Lucent and Wireless entered into the Subcontract, effective January 4, 1999, whereby Wireless agreed to act as Lucent's subcontractor and build the network at least until such time as Lucent was willing and able

---

[24]The transcript of Kantor's videotaped deposition testimony is Joint Trial Exhibit 1.

23

to assume that role.  (Revised Joint Stipulation ¶ 7).  Wireless would perform the services, many or most of which were the types of service it had already been performing directly for Winstar, as Lucent's subcontractor and then bill Lucent.[25]  Lucent, in turn, would bill Winstar which would pay Lucent by drawing down under the First Credit Agreement or, after May 2000, the Second Credit Agreement.  In essence Lucent loaned Winstar the money to pay Lucent for building the network; Lucent then paid the money over to Wireless.  The paperwork, especially the purchase orders, were exchanged after the work was completed.  It is Lucent's refusal to pay for services for the month of March 2001 that gives rise to the Count Seven, the breach of the Subcontract claim.

31.  As Winstar grew and required additional financing to feed its insatiable appetite for cash to grow its business, it sought bank financing and in May 2000 arranged for a consortium of bank lenders, with Bank of New York as the administrative and collateral agent, to provide a $1.15 billion revolving credit and term loan (the "Bank Facility") for part of its working capital needs.  WCI Capital Corp ("WCI Capital"), one of Winstar's subsidiaries, was the borrower; Winstar and certain other of its subsidiaries were guarantors.

32.  The First Credit Agreement, pursuant to which Winstar had borrowed approximately $1.2 billion, was paid off with a portion of the proceeds of the Bank Facility

---

[25]Lucent attempted to portray this arrangement as a scheme perpetrated and controlled by Winstar to enhance its own financials through questionable accounting practices.  The Court disagrees.  While there is evidence to suggest that this arrangement gave Winstar the means to capitalize many of its network buildout expenses, most of these expenses could be capitalized even without flowing them through Lucent.  (Harris, Depo. Tr. 11 at 47).

24

and other funds raised by Winstar. Lucent released its lien in Winstar's assets. (Revised Stipulation ¶ 8).

33.  Winstar also had raised money in the public debt and equity markets over the years. (DX 701 at 26 and 48).

34.  As Winstar was growing and building out a global telecommunications network, it was purchasing millions of dollars of equipment from Lucent. Lucent desired to keep its good customer relationship with Winstar and thus in May 2000, simultaneously with the execution of the Bank Facility and repayment of the $1.2 million owed under the First Credit Agreement, the parties entered into the Second Credit Agreement whereby Winstar received from Lucent a $2 billion line of credit with the ability to borrow up to $1 billion at any one time. WVF-I LLC ("WVF-I"), a newly formed subsidiary of Winstar was the actual borrower;[26] Winstar and WCI Capital, the borrower under the Bank Facility, were the guarantors. (DX 38). Among other things, the Second Credit Agreement permitted WVF-I to purchase both Lucent and non-Lucent equipment and in exchange WVF-I granted Lucent a security interest ahead of the Bank Facility only in the equipment Lucent financed. Lucent also took a security interest in WVF-I's "general intangibles" and "proceeds." The Second Credit Agreement also contained certain financial covenants, including a covenant

---

[26]The Second Credit Agreement contemplated the future formation of other Winstar subsidiaries to act as borrowers under the Agreement. Subsequently WVF-LU2 LLC ("WVF-LU2") was formed and was also a borrower under the Second Credit Agreement. It also acquired equipment with funds borrowed under the Second Credit Agreement and gave Lucent a security interest in that equipment. WVF-LU2 is the entity that requested the March 30, 2001 borrowing in the amount of $62,050,743.00. (DX 668). The parties, however, refer to the request as Winstar's request and throughout the conduct of this case did not draw distinctions as to which Winstar entity actually made the funding request.

25

B29

that Winstar not permit its total Cash Capital Expenditures ("CAPEX") to exceed $1.3 billion in "any year prior to and including 2001",[27] and entitled Lucent to serve a "refinance notice" on Winstar if the outstanding loans exceeded $500,000,000. It also provided that any increases in the Bank senior loan arrangement would be used to repay Lucent. It is a partial repayment made to Lucent pursuant to the Second Credit Agreement, using funds from the so-called Siemans Transaction, that gives rise to Count 10, the preference claim.

35. Winstar repeatedly and knowingly helped Lucent by making massive, last minute, allegedly unneeded purchases that were arranged by Lucent as the ends of quarters approached. These end of quarter deals enabled Lucent to report more revenue

---

[27]The Second Credit Agreement contained other financial covenants including the obligation that Winstar give Lucent Winstar's financial information signed by an officer who was to certify that the financial statements were kept according to generally accepted accounting principles and that Winstar was in compliance with the Credit Agreements. Moreover each draw request under the Credit Agreements was considered an independent certification that Winstar was in compliance with the covenants. At trial Lucent sought to introduce evidence regarding breaches of these covenants but because Lucent did not raise these issues in the Joint Pretrial Memorandum, the Court refused the introduction of such evidence. Lucent did make an offer of proof that it did not consider it its responsibility to verify the certified draw requests. Even if the evidence of these breaches was properly before the Court and even assuming that Winstar, in fact, breached these additional covenants, the outcome would be no different. As discussed *infra*, Lucent cannot divert its own independent knowledge of Winstar's true financial condition, including its complicity in trying to help Winstar meet the CAPEX requirement, by hiding behind Winstar's alleged breaches.

In addition the Second Credit Agreement also contained express covenants dealing with foreign collateral, EBITDA, and transaction fees. Again because Lucent did not raise these issues in the Pretrial Memorandum, the Court refused to consider evidence of these alleged breaches. But again, given Lucent's knowledge of the state of Winstar's affairs, it cannot feign that it was somehow deceived.

26

B30

and appear more profitable in its quarterly public reports than it really was.[28]  In fact the dollar amount of Winstar's purchases of Lucent equipment in end of quarter sales was on average eight times as high as the dollar amount of Winstar purchases of Lucent equipment in months in which a quarter did not end. Lucent used these end of quarter deals to close its own revenue gaps.

36.  In addition to the end of quarter deals, Winstar helped Lucent record revenue through alleged accounting schemes such as improper bill and hold deals,[29] whereby Winstar would pay for goods that it did not need, often were not identified with any kind of particularity, and frequently never even left the Lucent warehouse.  The Trustee alleges that the Software Pool Agreement, dated September 29, 2000 (PX 323), whereby Winstar was to pay Lucent $135 million, in four equal payments of $33.75 million to be made in January, March, June, and August 2001, for software it did not need, did not use, and had a fair market value of substantially less than the contract price was another in a series of sham transactions that were designed to do little more than inflate Lucent's revenue.[30]

---

[28]As discussed in greater detail below, the distortion of Lucent's financial picture lead to an SEC investigation that resulted in the commencement of a lawsuit for alleged violations of various securities laws against Lucent, several of its former employees, and three former employees of Winstar.

[29]Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment at a later date.

[30]Winstar could not use funding from the Second Credit Agreement to pay for its purchases under the  Software Pool Agreement.  (PX 323 at ¶ 6 "Winstar agrees that it will maintain sufficient cash on hand to meet the above-described payment obligations at the respective Invoice Dates independent of any financing arrangements in place between Lucent and Winstar.")

27

37. The actions of Lucent in allegedly forcing Winstar to enter into transactions such as the end of quarter purchases, bill and hold deals and the Software Pool Agreement, as well as Lucent's alleged delay in negotiating a transition agreement during the later part of 2000 in order to gain leverage over Winstar and its alleged delay in issuing the refinancing notice in order to improve its position viz a vie other creditors, give rise to Count 11, the claim of equitable subordination.[31]

**Summary of Lucent's Counterclaims**

38. One of the covenants of the Second Credit Agreement required Winstar's CAPEX to not exceed $1.3 billion in any year prior to and including 2001. It is Winstar's alleged CAPEX in excess of the $1.3 billion limitation, its behavior to bring its CAPEX into compliance, its failure to undertake inquiry regarding its CAPEX, and its certification in each borrowing request that all covenants have been or would be met by the time of the borrowing that give rise to both Lucent's counterclaim for fraud, Counterclaim 5, and its counterclaim for negligent misrepresentation, Counterclaim 6.

**COUNT VII: BREACH OF THE SUBCONTRACT**

---

[31] In Count XI of her Second Amended Complaint, the Trustee alleges that the Siemans loan is the transaction which give rise to her request for equitable subordination and seeks return of the Siemans loan proceeds and subordination of Lucent's claim. At trial the evidence of Lucent's alleged impermissible conduct was much broader and therefore, to the extent necessary, the Second Amended Complaint is deemed amended to conform to the evidence as such amendment in no way prejudiced Lucent's rights. *See* Fed. R. Civ. P. 15(b), made applicable by Fed. R. Bankr. P. 7015(b); *see generally* 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1491,1493 (1990 & Supp. 2003). In fact the parties themselves agreed at the end of the trial that their pleadings should be deemed amended to conform to the evidence (which would not include any of the offers of proof) as long as neither party added any new claims, counterclaims, or defenses. *See* Tr. 21-135-140.

28

B32

39.  The Trustee contends in Count Seven of the Second Amended Complaint that Lucent breached the Subcontract between Wireless and Lucent, thereby causing Wireless $62,050,742.00 in damages.  Lucent responds that it was not required to perform under Subcontract because there was no "task order" for the work performed.

**The Subcontract and Task Orders, Purchase Orders, Invoices and Spreadsheets**

40.  The Subcontract expressly provides:

1.1.  Services.  Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually a "Task Order") (the "Services").  The parties may enter into future Task Orders, to which the parties agree, from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

1.2.  Task Order.  Unless otherwise agreed by the parties in writing, each Task Order will include the following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) methods of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

41.  Even though the Subcontract called for Winstar to submit task orders to Lucent prior to Wireless's provision of services, the parties ignored this requirement and between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for

29

B33

services performed under the Subcontract, most, if not all, without a prior written task order. In fact the parties agree that after the first quarter of 1999 they never exchanged a single task order (Revised Joint Stipulation ¶ 20).[32]   Nathan Kantor, Winstar's President and Chief Operating Officer when the relevant agreements, including the Subcontract were negotiated and approved, testified that it was his understanding that Lucent and Winstar agreed that the invoices would function as the equivalent of the task orders.  (Kantor, Video at 356-57).  "The contract was administered by using the invoices and a Lucent

---

[32]The task order for that first quarter, dated January 4, 1999, was not actually executed until March 1999 when the parties also executed the Subcontract (Wilson, Tr. 16, 105-06) and this document, which the Defendant describes as the only task order executed, is actually a letter, dated January 4, 1999, from Lucent's Vice President of Emerging Services to a Winstar employee that reads as follows:

> Pursuant to our recently executed *Agreement for Network Build-out Services*, please accept this letter as my authorization for the subcontracting of Network Services from Winstar Wireless, Inc.
>
> The following is a list of services, which Lucent will subcontract to Winstar for an amount not to exceed $25 M for the period January 1, 1999 through March 31, 1999 [:]
> • Switch Site Planning & Construction
> • Hub Site Planning & Construction
> • Broadband Riser Engineering
> • Inside Wire engineering
> • Network Integration (CO & Hubs)
> • Network Integration (B Sites)
> • Site Surveys
> • Site Acquisition
> Thank you in advance for your support.

(First page, bearing Bates Stamp WC0019778, of DX 117).  Even this "task order" is devoid of the details that Lucent argues must be present for a writing to comply with the Section 1.2 of the Subcontract and be considered a "task order."

30

purchase order to reflect these task orders and the work that was performed by Winstar to Lucent and agreed to by Lucent and those invoices were paid for several years." (Kantor, Video at 361-62).

42. Yet if the letter dated January 4, 1999 is a task order, the parties quickly dispensed with the task order process, opting instead to exchange less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. Generally Winstar sent a purchase order to Lucent which, in turn, sent a purchase order to Wireless. Wireless performed the services and then sent Lucent an invoice, with or without an accompanying spreadsheet showing the breakdown of services or goods. Lucent then invoiced Winstar in the same amount as Lucent was billed by Wireless. Then, as described above, Winstar would draw down under the applicable Credit Agreement, use the draw to pay Lucent which would then pay its obligation to Wireless. In fact, Richard Uhl, Winstar's former Chief Financial Officer provided credible testimony about how payments were sought and obtained, as well as the underlying reason for dispensing with formal task orders.

> Well, Lucent, the original agreement required that Lucent issue purchase orders. Early on it was discovered that Lucent was unable or not capable of defining what should go into the purchase order. So the practice evolved, in fact, was present when I became CFO in the fall of '99 that inasmuch as Lucent could not produce the details of the purchase order, Winstar Wireless would as its subcontractor to Lucent issue an invoice which Lucent would then cover with a purchase order and that was the sequence. That was the sequence present and existing when I assumed responsibility for Chief financial Officer's position in the fall of 1999.

31

(Uhl, Video-direct at 11).[33]

43. Shortly after entering the Supply Agreement, Lucent began to balk at the arrangement and as early as June 1999, Lucent threatened to pull the plug. Shortly after entering the Subcontract, Lucent determined very quickly that the pass-through payment arrangement "yielded no material benefit for Lucent, and in fact cost [Lucent] considerable resources to process, track and manage." (DX 163; see also Wilson, Tr. 16-30). Lucent could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's employees to allow revenue recognition under the accounting rules. (PX 388 at LW 00303141; DX 523; see also DX 155 at 2WC 0016320.) Lucent was also concerned that financing any additional services would hamper its ability to sell Winstar's loans because the banks it consulted with concerning such financing were "very negative" on the inclusion of these incremental services." (DX 149 at WC 0118574; see Wilson, Tr. 16-28-29; DX 155; see also DX 137.). And Lucent was attempting to sell the Winstar loan as it was among the largest loan Lucent had financed. (Hayes, Depo, Tr. 13-33). Consequently in early June 1999, even though Lucent was still unwilling or unable to build the turnkey operation as required under the Subcontract, it informed Winstar that it would not pass through any additional services because it was "concerned about having to severely discount the paper to sell it." (DX 154.)

---

[33]The transcript of Uhl's videotaped deposition testimony is Joint Trial Exhibit 13.

32

44.  Quickly discussion escalated to the chief executive level and ultimately Lucent agreed to continue the arrangement and it did so up until March 2001 when Lucent refused to pay for the previously rendered services ostensibly because there was no task order.

45.  Lucent ultimately agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired by passing through the 2Q1999 services.  (Wilson, Tr. 16-54.)  Lucent only did so as an accommodation to Winstar, which claimed that ending the pass-through would have negative financial repercussions and which promised to negotiate a true turnkey approach to services that would allow Lucent to recognize revenue on such services in the future.  "[T]here was a large pressure from Winstar to go ahead and [pass through services because Winstar] felt like it would have implications on their earnings report since they were capitalizing these services last quarter, and had it not happened this quarter it would reflect badly on their announcement."  (Id.)  Therefore, Lucent agreed to pass through Wireless-performed services in 2Q1999 "with the agreement from Winstar that [Winstar and Lucent] would pursue a business arrangement structure around a turnkey approach to the projects and network implementation that would then, again, well define the tasks for each company to perform, orders up front from Winstar to Lucent, Lucent then going through those task lists and ordering back from Winstar what we could not perform."  (Id.; see also DX 164.)

46.  On September 8, 2000 Winstar issued a purchase order, WVF 1-00000002958 (See also DX 390 and 391 referencing Lucent's position with respect to the September 8th invoice) that in line item number 1, sought payment of $65,509,331.00.  But

33

by this time Lucent was not inclined to increase the Winstar loan. In fact, Lucent was seeking to rid itself of some or all of this debt. At about this time Lucent was seeking to sell the Winstar loan. In mid-September 2000 Deborah Hopkins (Lucent's CFO), Rich McGinn (Lucent's President and CEO), Fred Rubin (Lucent's Treasurer and Senior Vice President), Richard Uhl (Winstar's CFO), and William Rouhana (Winstar's CEO) met with senior officers of the Bank of New York at a luncheon meeting at the Water Club. One of the goals of the meeting was to get the Bank of New York to buy the Winstar debt. The deal was not consummated as the financial market collapsed on the same day as the meeting. (Uhl, Video 282-83).

47. On September 21, 2000 Deborah Harris and William Plunkett of Lucent had a conversation with David Ackerman and Richard Uhl of Winstar and informed them that Lucent would not pay the $65,509,331. The next day Deborah Harris followed up the conversation with an email and a letter (PX-15) which reads in part:

> At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a transition plan for services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.
>
> ***
>
> There is a category of services which, to date, Winstar continues to provide for itself...
>
> We have been pursuing ways to take on these services in a manner agreeable to all parties, but have not been able to reach consensus. Consequently, we believe it is not

34

B38

appropriate for Lucent to accept Purchase Orders for these
services. Specifically, we must reluctantly reject line item # 1
of the Purchase Order for $65,509,331.00, WVF 1-
00000002958 issued by Winstar on September 8, 2000.
Lucent stands ready to negotiate an arrangement under which
Lucent becomes responsible for some or all of these services,
whether via outsourcing or some other method. We suggest
that Lucent and Winstar each designate an empowered team
to move ahead with these negotiations with the goal of
completing by October 1, 2000. If you agree with this
suggestion, we are ready to start immediately beginning with a
kickoff meeting next week.

48.  At the time of the Harris letter, Lucent, however, had still not developed the core

competencies needed for it to assume the buildout by itself. The suggestion that Lucent

was ready and willing to perform the buildout and would do so but for the failure of the

parties to agree to a transition plan was nothing more than an attempt to create a pretext

for denying further draws under the Second Credit Agreement so that Lucent could

renegotiate the terms of the "strategic partnership" for its benefit.

49.  In fact, Lucent's demands for a financial concession had already begun by the

time of the Harris' letter as had its pressure on Winstar to help Lucent make its end of

quarter numbers as reflected in a September 18, 2000 email sent on Harris' behalf.

Nina and Bill:

I have tried to do a very brief summary of all the "good, bad
and ugly" on this account. Bottom line is that to do an EOQ
[end of quarter] deal, we need Nate to provide direction to
Ackerman and Uhl that this will take place. They are vehement
that they are out of money and do not want to spend money on
product that they can not immediately utilize. The deals of the
past are haunting us...there is $87M in their warehouses. But
much of this is also due to problems with Williams.

35

We have a restructured proposals that categorizes what they
need now through to long term. Definitely the majority of the
money we are asking for is not for immediate use. It also
includes pricing for the B's and Hubs which is 2 tiered, and
time sensitive. Depending on how fast we can implement and
identify cost reductions thru [sic] the breakthru [sic] items,
could cause our BGP to hover around 30% or below.

What I need are 2 things:

**1. A call to Nate Kantor getting agreement to move
forward on an EOQ deal.** Our meeting with Dave Ackerman
is first thing Tuesday morning, so this would need to happen
today. We believe they already will be spending around $46M
with us, so we are asking for another $50-60M. (I am trying to
get the total number in the $110-115M range).

**2. Agreement that we can discuss at 5:15 today,** on the
aggressiveness of the proposal.... (PX 86)(emphasis in the
original).

50.    The same email transmission further supports a finding that Lucent was not only

pressuring Winstar to do deals that were designed to benefit Lucent at Winstar's expense

but conspiring to ensure that the lucrative to Lucent end of quarter deals got done.

Following are the "headlines" for the Winstar account:

***

•    Winstar Services: We pass through around $67M/Q of
WinstarServices. We have been told to stop this practice. We will be
communicating our position to Winstar the week of 9/18, including
options of what portions of these services we can do . **We may want
to delay this move for a quarter based on this EOQ deal.**

***

•    Previous EOQ Deals: ...

- Winstar does have major inventory as a
consequence of these deals.

36

> - Credits provided in all the previous EOQ deals
> are now hitting in 4Q2000 results.... (PX 86)
> (emphasis added).

51.  Aversano placed the call to Kantor and, despite Winstar's financial condition,

the deal was done.  (Aversano, Video Tr. at 8).  As Kantor subsequently wrote to

Aversano, "Great to talk to you and we will help whenever possible."  (PX 157).  Kantor

then instructed Ackerman to make the Lucent deal, which ultimately turned into a deal for

$212 million in end of quarter purchases, happen.  (PX 56).

52.  Yet as David Ackerman wrote to Kantor in a September 18, 2000 e-mail, in

view of Winstar's CAPEX issues, complying with Kantor's instructions to provide

substantial revenue to Lucent would not be possible unless Ackerman got "creative:"

> I just spoke with [Lucent employee Bill] Plunkett. He informed me
> that you and Nina [Aversano] had met (dinner?) and you agreed
> to help them get to the number they need this quarter ...
> something around $110M, of which we've already spent about
> $45M. There is not much I can give them that we really need, but
> there are some creative things I can do that can get us close to
> their number without being totally stupid.
>
> * * *
>
> Thus; we are working to cut another $70 [Million] in addition to
> the $117 [Million] [to meet capex covenants].  This means
> stopping ANY and ALL incremental spends for ANYTHING capex
> immediately, and letting capitalized contractors go . . .
>
> * * *
>
> How much capital CAN I REALLY SPEND THIS YEAR, and how
> much do I do to give Lucent what they need for 3Q?

37

> If the answer is; both give Lucent the business, AND reduce the
> cap spend to $1B even I will need to institute some very severe
> measures immediately.

(PX-127) (Emphasis in original).

53. After receiving a copy of the September 22, 2000 email and letter, Nate Kantor, Winstar's President and COO, sent the following email to Nina Aversano, President of Lucent's North America group (PX-16):

> I am very surprised and disappointed with this-we've only
> discussed it a million times. This doesn't sit well with me and
> will have a major impact on our ability to help you this quarter.
>
> You've got to get this fixed.

54. On September 25, 2000 James Cocito, Lucent's chief operating officer of its North America Region, sent Frank Manzi an email suggesting that Lucent consider the possibility of "a one more time' strategy." (PX 88). As Cochito noted in his email, "[Kantor] has indicated there will be no deal for the QTR unless this gets fixed. Impact about 60M or more. Also, I will know as of this morning whether they are going to play with the AR as well."

55. On September 27, 2000 Nina Aversano, President of Lucent's North America Region sent Richard Uhl, Winstar's CFO,[34] a letter (PX 17)[35] that purported to modify the terms under which the two companies did business and containing the conditions under which Lucent would pay the September 8, 2000 Purchase Order.

---

[34]The letter is addressed to Uhl but contains the salutation "Dear Nate."

[35]The same document is also a Defendant's exhibit (DX 424).

38

This is to inform you that Lucent will accept your purchase order WVF 1-0000002958 [sic] conditioned upon Winstar's agreeing to the following terms and conditions. If you agree, kindly sign in the space provided below and return to me. Immediately. Nate, this is a great opportunity for us to move our relationship forward to what we envisioned-a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar's business plan. I hope you agree with me that we should seize the moment.

It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent to Winstar under our Supply Agreement dated October 21, 1998. Pursuant TO Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at that time Winstar was providing to itself. This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent. Since the signing of that contract there have been a number of attempts to formalize this broad services relationship. The last such attempt was undertaken this past June when the parties entered into two addenda- the Hub and B-Site Addendum [PX-18] and the Optical Network Addendum [PX-19]. These addenda did not include the full range of services contemplated in the Supply Contract.

I'm sure you would agree that the fault for the failure to execute on our original concept lies with both Winstar and Lucent. Happily it appears we both favor the same result-a broad services relationship. We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent. We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible, out two teams meet at your offices to finalize a broad services agreement. This would be a lock-up session to finalize a full service agreement no later than two weeks thereafter. Consistent with the principles already established in our two addenda referenced above, Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement. Lucent may either perform the work itself by acquiring expertise and personnel from Winstar, or subcontract some or all of it to third parties (including Winstar). Consistent with this model, commencing

39

October 1, 2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services that are outside the scope of work defined in this agreement.

Further, until this new service agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda referenced above or that fall within the scope of the new, as yet unexecuted, service agreement. Prior to Winstar performing any work that might rightfully fall within either of the two existing addenda referenced above, Lucent would need to issue mutually acceptable written purchase orders. Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent's behalf.

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision....

56.  Uhl signed the letter thereby acknowledging his assent and returned the same to Lucent. Uhl did not understand this letter to terminate the original agreement in the event the parties were unable to enter into a new agreement. (Uhl Video-direct at pp.16, 18, and 19). Kantor understood that Lucent's financial people were demanding a letter because they needed to book revenue. (Kantor Video-direct at 180-81).

57.  In addition to Uhl's signing the letter, Lucent extracted another and even more substantial financial concession from Winstar when, on September 29, 2000 the parties executed the Software Pool Agreement (PX 323). Under the Software Pool Agreement Winstar purchased $135 million of unneeded software. The transaction was simply a sham, however. It's purpose was to inflate Lucent's end of quarter revenues. To that end,

40

the Software Pool Agreement was successful: it alone accounted for 26% of Lucent's profits that quarter. (DX 739 at ¶ 60).

58. The end of quarter deals for the third quarter of 2000 committed Winstar to make approximately $212 million in purchases and forced Winstar out of compliance with the CAPEX covenant and over the $500 million refinancing threshold. (Ackerman Video at 605-08 and 666-69; PX 43; PX 57; PX 78; PX 107; PX 148).[36]

59. Lucent's initial software proposal was for a much smaller amount — $25 million — but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded approximately five-fold to the $135 million figure. (PX-57; PX-323, Zlotnick Video-direct at 157). This increase occurred without the numerous internal studies or any of the other planning documentation that Mr. Pocalyko testified were typical. (DX-702; Pocalyko Tr.3-41-42). As Lucent's Deborah Harris advised on September 22, 2000, "I know the overall Software request will be a surprise and that is an area where a conversation will be of (PX-52). benefit."

60. As part of this software pool transaction, the parties also agreed that Lucent's list pricing for the software, rather than Winstar's contractually-reduced pricing, would be used to further boost Lucent's revenue. (PX-53; PX-349). As Winstar executive William Zlotnick

---

[36]Lucent was well aware of the CAPEX problem. Lucent proposed the Software Pool Agreement, which called for all payments to be deferred until 2001, as a way to commit funds to Lucent without further increasing Winstar's capital expenditures. (Zlotnick Video-direct at 156; the transcript of Zlotnick's testimony is Joint Trial Exhibit 3).

41

testified, the software deal was ultimately priced "at whatever Lucent needed for its revenue." (Zlotnick Video direct at 160-61; PX-79; see also PX-57). Of the $135 million of software, less than $20 million was of value to Winstar. (Zlotnick Video-direct at 169-71). In fact, in post-deal documentation Lucent took the position that Winstar was only entitled to select $20 million of software — and would have to pay extra if it wanted more — despite Winstar's obligation to pay $135 million in cash in 2001. (PX-54). Lucent later recanted this position.

61.    To enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (*i.e.*, before Winstar was obligated to actually make the software payments to Lucent). (PX-54; PX-57; PX-186 at internal tab 2; PX-324; PX-462 at 37; Rubin 2003 152:15 — 154:11).

62.    On behalf of Winstar, Ackerman signed the post-dated credit agreements, enabling Lucent to book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX-167; DX-739). Thus, Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion.

63.    Shortly thereafter Rouhana, Winstar's Chairman and CEO, informed Schacht, one of Lucent's directors and who, as of October 23, 2000, resumed his previous position as CEO of Lucent, about the financial improprieties between the companies. Lucent retained its outside counsel to investigate its accounting procedures. The investigation resulted in Lucent's reversal of the revenue recognition from the Software Pool Agreement

42

and a shake-up of the company's accounting staff. (Schacht, Tr. 21 at 33-35).

64. The Securities and Exchange Commission ("SEC") also conducted an investigation that ultimately lead to the SEC's filing a civil complaint against Lucent, certain key Lucent employees, including Deborah Harris, who as Vice President of Sales assumed responsibilities for the Winstar account in August 2000, and Plunkett, a member of Lucent's management team overseeing the Winstar account, and former Winstar employee, David Ackerman, a "Group Executive" responsible for the build out of Winstar's network. A criminal investigation is still ongoing. When deposed as part of the SEC, both Harris and Plunkett refused to answer citing their right against self-incrimination under the Fifth Amendment to the United States Constitution. 65. Lucent in fact terminated Mr. Plunkett for his involvement in postdating documents related to the software deal. (Schacht Tr. 21-35). It did nothing, however, to terminate or otherwise punish fellow Winstar Sales Team members Deborah Harris, Vanessa Petrini or David Rigotti, all of whom remained active on the Winstar account into 2001, and who were clearly culpable in the scheme to fraudulently post-date the deal documents. (See PX-73; PX-66). Thus, while Mr. Plunkett became the scapegoat, the transaction remained in place, and the other Lucent participants remained active on the core Winstar sales team. (Schacht, TR. 21-29:3-21, 21-33:13-17, 21-35:7-14).

66. Soon after sending her September 27, 2000 letter Aversano was relieved of her duties at Lucent and formally left Lucent in December 2000. (Aversano Depo, Tr. 8-22-24.). When she left, the parties had not executed a transition agreement nor had they resolved the ongoing problem of payment of the pass-through requests.

43

67.  During this same time period Lucent was experiencing its own revenue crisis and was attempting to reduce its exposure on loans it was financing.  (PX184).   By at least mid October 2000 it drafted, but did not send, a refinancing notice as Winstar's outstanding borrowing exceeded the $500 million trigger.  (Hayes, Depo, Tr. 13-40; PX 185 ("Per the email below, we are planning to issue a Refinancing Notice to Winstar next week.").   Lucent was well aware of the impact sending such a notice could have.  By email dated November 2, 2000, Paul Hayes, Lucent's Director of Syndication and whose job was created in late 1999 or early 2000 specifically to manage the process of removing loans from Lucent's books, circulated a memorandum from Beth Perricone addressing the implications of sending a refinancing notice to Winstar.  (Hayes, Depo, Tr. 13-31; PX 187).  That memorandum provides in part:

> Paul and I have studied the implications for Winstar and
> Lucent of issuing a refinance notice....
>
> ***
>
> IV.  Implications of Issuing a Refinance Notice:
>
> Option 1-Issue a written 105 day refinance notice for all or a
> portion of the Lucent Loan
>
> Pros:
>
> - Puts pressure on Winstar to seek alternative sources of
>   capital (i.e. existing Bank Syndicate, Bondholders,
>   Equity Sponsors, and Vendors);
> - Forces parties to the table to deal with funding shortfall
>   issues;
> - Provides ability for Lucent to re-negotiate certain
>   provisions, e.g. content requirements, limit non-Lucent
>   content financing, eliminate Winstar pre-approval for
>   Lucent loan sales, improve collateral position (i.e. pari
>   passu with Bank Syndicate);

44

B48

- Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;
- Lucent can always rescind or modify the refinancing notice

Cons:

- Winstar is likely to immediately file 8-K to disclose material adverse event, disclosing the amount of the financing;
- Disclosure may result in details of Lucent's financing becoming public;
- Market rumors may further disrupt capital markets and deter new investors;
- Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;
- Potential Rating Agency implication for Lucent and Winstar;
- Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90-105 days). If winstar does not refinance, rate on Lucent Loan increases by 2% (i.e. a potential $13.8 M in additional interest cost annually on current &690 M of Lucent Loans). If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash payment coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62 M of additional interest cost annually on current $690 M of Lucent Loans)

Option 2-Meet with Winstar immediately and advise verbally of pending notice

Pros:

- Provides opportunity to negotiate right to sell up to $300 M of Lucent Loans today if Lucent desires;
- Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;
- Flush out any strategic options currently under consideration by winstar;
- Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)
- Limit public disclosure and market impacts

45

Cons:

- Time is of the essence
- 105 days required for refinance
- Rumors still may permeate the marketplace

### V. Conclusions:

- Lucent's ultimate negotiating position may be driven by our own perception of Winstar as a "going concern";
- If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;
- To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make a more informed decision; A confidential discussion may begin immediately on this;
- Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?
- Ultimately our decision should be driven by where we think this is going. In our judgment, if the capital market disruption is temporary, i.e., 3-6 months longer, than [sic] Winstar is likely to survive.

68. By November 7, 2000 Lucent had apparently decided to delay issuing the refinancing notice when Beth Perricone again wrote in an email:

As you will see below there was a meeting of the minds at Winstar yesterday. Late last nite [sic] Bill Quinn and I spoke briefly to Peter for the outcomes of that meeting. Peter described 3 capital events about to occur:

- Bank group to provide for new term loan of $200M to be supported via guaranty of Siemans. The proceeds of this loan are to paydown [sic] Lucent. Apparently Winstar will enter into long term supply agreement w/Winstar [sic] in exchange for their guaranty. Not sure how they will pay for Siemans gear if that facility is used to repay us??

- Winstar to enter into new $275M capital lease w/Cisco

46

- Winstar to inject new $25M of equity (term sheet to follow to Lucent)

This would bring our current exposure of $690M down to $490M or below the trigger amount. I am not clear from Peter whether we will issue refinance notice now, sounds like we are waiting.

Peter want complete due diligence done at Winstar so Quinn, Keller and I are coming up w/ a list today....(PX 188).

69. On November 10, 2000 Perricone sent yet another email in which she again recommended that due diligence of Winstar be undertaken to evaluate the impact of a refinancing notice prior to send such a notice. (PX 189). Lucent was clearly worried that the issuance of the refinancing notice would have dire consequences for Winstar. (Hayes, Depo, Tr 13-45). Nevertheless Hayes assuredly wrote in a November 16, 2000 email to Hunt-Majean, "Sending the refinancing will not send Winstar into a financial 'tailspin,' and I will stake my bonus from this past year on it."[37] (PX 191).

70. In November 2000 Lucent commenced its due diligence of Winstar's financial condition. As a result of the due diligence, Perricone recommended that Lucent lower Winstar's "Asset Quality Rating" or "ARQ" from 6 to 7.[38] (Perricone, Depo, Tr. 3-115).

71. Lucent replaced some of its key management in the fall of 2000 but it continued along a tumultuous path with employees in the sales and finance department continuing to have different goals and objectives. Although Lucent's upper management wanted to

---

[37]Hayes testified that the comment about staking his bonus on his opinion that the refinancing notice would not send Winstar into a tailspin was intended as a joke as Lucent did not offer bonuses. (Hayes, Depo, Tr, 13-89).

[38]The ARQ rated Lucent's borrowers on a scale of 1 to 10. The higher the rating, the higher the inherent risk of non-payment. (Perricone, Depo., Tr. 13-115).

47

extricate the company from the business of lending to its customers, or at least from

Winstar, the pressure to have Winstar continue purchasing and building out the network

continued. Indeed when Winstar did not behave as Lucent wanted, Lucent simply shut

down any discussion of a transition agreement. Lucent continued to control Winstar

throughout the course of their relationship, including in December 2000. Although their

may have been periods when Lucent's control was less apparent or even relaxed, and

indeed there were times when Winstar was able to extract concessions from Lucent, the

fact remains that these parties were not dealing at arms length. For example, the bill and

hold transactions were done at the request of Lucent (PX 462 at Exhibit N);[39] purchase

orders are vague-often describing as "miscellaneous" a purchase of several million dollars

(See, e.g., PX 462 at Exhibit H and I); the inflation of the Software Pool Agreement from

$31 million to $135 million over the course of a 9 day period (PX 462 at Exhibit P).[40]

There were also excessive end of quarter deals, unneeded equipment paid for by Winstar

but sitting in Lucent's facilities, duplicate charges, and difficulty, to say the least, in getting

---

[39]PX 462 is the Report of Paul Pocalyko who was retained as an expert by Winstar
to render an opinion as to whether the transactions were arm's-length and if Lucent exerted
undue influence and control. Lucent sought to exclude Pocalyko's testimony under
*Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579 (1993). Assuming for the sake of
argument that *Daubert* is applicable in a bench trial, the Court denied the motion. (Tr. of
March 16, 2005 hearing at 34-41) [Docket 322]. Although the Court continues to believe
its initial ruling is correct, it has used Pocalyko's report only as a convenient vehicle to refer
to relevant documents. The Court has not relied upon Pocalyko's opinions in reaching its
decision.

[40]The Software Pool Agreement prices the equipment at "list" price rather than the
reduced price that the Supply Agreement provides.

credits correctly to Winstar's accounts.[41]  Winstar was and remained Lucent's captive

purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its

own revenue.

   72.  By letter dated December 28, 2000 and addressed to Michael Montemarano,

Lucent's Vice President of Finance of Worldwide Sales and Marketing, (DX 556), Winstar

---

[41]Although the parties disputed these allegations, after weighing the credible
evidence, including the documents appended to and compiled as part of the Pocalyko
Report, the Court finds that the Plaintiff has proved that Lucent essentially dumped
excessive amount of unneeded equipment on Winstar in order to inflate Lucent's own
revenues.  For example, excluding the $135 million paid to Lucent under the Software Pool
Agreement (which itself is another indication of the sham transactions Lucent devised to
inflate its own revenues), Winstar made an aggregate of approximately $706,000,000 in
purchases from Lucent in calendar years 1999 and 2000.  During this period the amount of
Lucent equipment paid for by Winstar but sitting in Winstar's or Lucent's warehouses
continued to increase so that by March 31, 2001 there was, on an adjusted cost basis,
approximately $327 million in those warehouses.  Of that $327 million in equipment, the
overwhelming majority, indeed about $256 million was paid Lucent equipment while $71
million was non-Lucent merchandise.  And needless to say, the valuation of the Lucent
equipment at $256 million on an adjusted cost basis is less than that actual amount paid to
Lucent by Winstar for that equipment.

   Moreover closer examination of the facts relating to the warehoused equipment
purchased from Lucent reveals that of the approximately $256,000,000 (on a cost adjusted
basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001,
approximately $74 million of the $256 million of Lucent equipment could be specifically
traced as to the original date that Winstar purchased such equipment from Lucent.  Of that
$74 million of Lucent equipment, approximately $36 million (on a cost adjusted basis) of
that equipment was purchased by Winstar in a December 31, 1999, end of quarter bill and
hold sale and remained in a Lucent warehouse undeployed for 15 months as of March 31,
2001.  In fact once Winstar paid for Lucent equipment, it was not unusual for some of that
merchandise to sit in a warehouse for more than a year.

49

sent Lucent a request to borrow $62,324,930.00.[42]  Accompanying the letter was a one

page "analysis" captioned:

> Winstar Telecommunications, Inc.
> Lucent Billing for Capital Labor
> Q1 2001 Estimate

The chart lists the departments which provided the services under three general headings:

"Winstar Systems Group," "Winstar For Buildings," and "Winstar Network Services."  Each

general heading is followed by a specific list of what appear to be the various departments

which rendered services, along with the total of "internal," "external," and "Lucent billable"

labor costs incurred by each department for the months of October, November, and

December (for which month the figures are estimates) of 2000.

73.  On the evening of December 27, 2000 Montemarano sent an email (included as

part of PX 199) to several Lucent employees, including Ben Verwaayen, Lucent's Vice

Chairmen, and Hopkins, Lucent's CFO, which reads in part as follows:

> Based on a call today from winstar [sic] chairmen, president
> and CFO we took the following position as articulated by Ben.
> We could "allow" winstar [sic] to use the credit facility to fund
> their services for this quarter.  We would not engage in any
> billing/po's between the companies, but they could and do
> intend to draw down the facility for about 65M [sic].  This is
> money out the door for us.
> We agreed that the 35m [sic] credit granted in 4qtr can be used
> as a reduction to their outstanding credit facility.  It would not be
> dispersed as cash to them, but we [sic] go against the credit
> facility as "repayment."
> They also indicated they had presented a draw down last week
> of 32M [sic], Ben asked them to reconsider this given the
> extremely low lucent [sic] content.

---

[42]The letter requests that the funds be wired to WCI Capital Corp.

50

> I will work this tomorrow with their CFO and plan to ensure they
> adequately document cash draws. In addition, Ben asked the
> CT [customer team][43] to set up a meeting with winstar to get the
> relationship to a new level where both companies benefit.

74. The next morning Lucent's CFO sent the following reply via email (also part of

PX 199):

> WE HAVE ALREADY SAID no TO THE SERVICES
> FUNDING.

75. A few hours later, Verwaayen emailed (also part of PX 199) the following:

> Well, after a read out from the lawyers and after reviewing the
> options with everybody on our pre call yesterday, Winstar can
> draw down upon the credit facility, including services.
> We did push back on credits (no cash, but off setting a/r's) and
> the 30 million request that came in Friday.
> We really had not the option of denying their rights here.
> In reality, we can make their lives miserable for a couple of
> days, but they have an open line and that is what we have to
> change.
> So what we did, after all agreed in our pre call is to create a
> basis for a fundamental resetting of this relationship.
> We will create from both sides a wishlist how to recreate our
> legal platform working together and renegotiate on those
> issues.
> I think we all understand how much better we are and how to
> get out of this situation going forward.
> We want to make this a profitable account with clear rules of
> engagement.

76. But as suggested in the December 29, 2000 email Ben Verwaayen sent, Lucent

had used its influence over Winstar to set the stage for the new negotiations.

> Now we have positioned ourselves for a major overhaul of our
> relationship with Winstar, I think we should involve our partners
> in treasury and Legal in preparing a model for our negotiations

---

[43]Hayes, Depo, Tr.13-63.

51

on Jan 9 or 10.... (PX 261).

77. On the evening of January 5, 2001, Elizabeth Perricone (who was not copied on the above series of emails) sent an email (PX 119) which reads in part:

> Financing of Services on 12/29/00:
> Given our agreement to finance services on 12/29/00, legal feels it would be prudent to send Winstar a letter confirming this was a borrowing under the Credit Agreement as an accomodation [sic], and we reserve the right not to make loans for any such purpose in the future.

78. On March 27, 2001 Winstar faxed to Lucent a notice of Winstar's request to borrow $62,050,743.00 effective March 30, 2001. (DX 668). The draw request is on Winstar letterhead and is captioned "Notice of Request for Borrowing." The Notice states that the request is given "[p]ursuant to Section 2.03 of the Credit Agreement" and contains a certification "that all conditions for borrowing set forth in Section 4.03 the [sic] Credit Agreement have been satisfied or will be satisfied as of the date hereof and as of the date the borrowing is made." The Notice also indicates that the entire amount requested is to be paid to the "Borrower" for non-Lucent equipment.

79. On April 2, 2001 Winstar sent Lucent a second fax that contained the back-up detail to the Notice of Request for Borrowing (included as part of DX 668). The cover sheet contains the following note: "Please add this to the draw request as an attachment. Although this is not usually provided, this is the detail behind the services number." The detail attached is a one page chart that is captioned:

Winstar Telecommunications, Inc.
Lucent Billing for Capital Labor
Q1 2001 Estimate

52

The chart is virtually identical to the one attached to the fourth quarter 2000 request except that this request is for the months of January, February, and March (for which the figures are estimates) of 2001. The total of all of these costs is approximately $62,050,742.[44]

80.  Lucent refused to pay citing the lack of a task order. The lack of a task order was simply a ruse, however. Lucent had not required task orders in the past and, although Aversano's September 27, 2000 letter purported to set new parameters for payment, Aversano's letter extorted Winstar's assent to the reset terms by threatening nonpayment. Even Lucent's own executives testified that the documentation submitted by Winstar created a "commercially binding relationship" for the relevant time periods: "[a]t September 30th [2000], we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." (Montemarano, Video-direct at 10-11; see also Montemarano, Video-direct 68:8 — 69:24; Simpson, Video-direct at 18- 54).[45]

81.  Although, beginning as early as the communications surrounding the invoice for the second quarter of 1999, Lucent warned Winstar that it would pay for Wireless' services "one last time" without a task order, there were too many "one last times" for that warning to be effective. (See Aversano's letter of September 27, 2000; December 27, 2000 call

---

[44]This figure was calculated by the Court; the numbers listed on the line called "Grand Total" are unreadable on the exhibit. Some of the numbers throughout the exhibit are difficult to read but the total appears to be within $1 of the amount requested in the Notice of Request for Borrowing.

[45]The transcript of Montemarano's deposition testimony is Joint Trial Exhibit 9; the transcript of Simpson's testimony is Joint Trial Exhibit 11.

53

between Lucent and Winstar) (Wilson, Tr. 16-110-11). Moreover, privately Lucent employees agreed that Lucent was obligated to pay for these services. As is discussed in greater detail below, Lucent was using the threat of non-payment to get Winstar to renegotiate their various agreements to get a better deal. On repeated occasions, Lucent advised Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one last time" but always paying each invoice until March 2001 when Lucent was again trying to turn up the heat to get a better deal from Winstar. (Wilson, Tr. 16-110-11).

82. The requirement that there be "task orders" as contemplated by the Subcontract was modified by the course of conduct between the parties.

83. Lucent argues that this course of conduct between the parties is irrelevant because the Subcontract contains a "no oral modification" clause. Although such clauses are generally enforceable under New York law, there are two exceptions: (1) where an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926 (N.Y. 1977), and (2) where a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract, equitable estoppel will prevent the other party from attempting subsequent strict reliance on the written terms. *Id.*, 42 N.Y. at 344, 397 N.Y.S.2d at 927. 84. "Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims." *Barsotti's, Inc. v. Consolidated Edison Co. of New York, Inc.*, 254 A.D.2d 211, 212, 680 N.Y.S.2d 88, 89 (1998) (internal quotations and citations omitted). When the contract has

54

not been fully performed, "the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is "unequivocally referable" to the oral modification and incompatible with the contract's written terms. *Rose*, 42 N.Y.2d at 341, 344, 366 N.E.2d at 1281, 1283, 397 N.Y.S.2d at 924, 927. "Because the doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the Statute [of Frauds], to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*, 93 N.Y.2d 229, 237, 711 N.E.2d 953, 958, 689 N.Y.S.2d 674, 679-80 (1999).

85. In this case the parties' behavior resulted in a modification to the Subcontract. There can be no question that Wireless' performance was undertaken pursuant to the Subcontract. Based upon Lucent's past practices, neither Wireless nor Winstar was unreasonable in relying upon Lucent's practice of funding and paying for services upon presentation of an invoice and spreadsheet and neither was unreasonable in expecting this practice to continue. Moreover, it is not credible that almost two years after the pattern had been established that Lucent would insist upon compliance with the letter of the Subcontract, particularly when Lucent has used this tactic in the past to try to pressure Winstar and when Lucent itself was dragging its heels on negotiating the long-awaited transition agreement. In fact, after Lucent forced Uhl, under threat of non-payment of the

55

Winstar's September 8, 2000 invoice in the amount of $65,509,331, to sign Aversano's September 27, 2000 letter (PX 88) purportedly resetting the terms and conditions of the Subcontract, Lucent ignored the reset terms the very next quarter. Therefore based on the parties' behavior, the Subcontract was modified to provide for payment of purchase orders, invoices, etc. after the Wireless performed the work and thus Lucent's refusal to pay the March 2001 invoice was in breach of the Subcontract.

86.  The Trustee is awarded damages in the amount of $62,050,742.00, the amount of the March 2001 invoice which Lucent was obligated to, but did not, pay. Pursuant to the law of this case, no consequential or punitive damages are awarded in connection with the breach. (*See* Docket #85 and #103). Moreover the parties have agreed that, if the event that the Trustee should be awarded damages pursuant to this Count, Lucent would be entitled to an offset of $6.3 million. Therefore the damage award is reduced to $55,750,742.00.

**COUNT X: PREFERENCE**

87.  Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides in relevant part as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

56

(3) made while the debtor was insolvent;

(4) made--

\*\*\*

(B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

88.  The burden of proving each of these elements by a preponderance of the evidence is on the chapter 7 Trustee.   11 U.S.C. § 547(g).  *Official Committee of Unsecured Creditors v. Conceria Sabrina*, 195 B.R. 602, 612  (Bankr. M.D.Pa. 1996).

89.  In November 2000, with Lucent and Winstar still in negotiations on a transition agreement, Winstar informed Lucent that Siemans agreed to join the Bank Facility and lend Winstar an additional $200 million.

90. Prior to the closing of the Siemans loan, Winstar sought Lucent's permission  to keep all, or failing that, $100 million of the loan and pay the other $100 to Lucent even though the Second Credit Agreement called for 100% of the proceeds of any increase in the Bank Facility to be paid to Lucent.  Lucent refused and responded with a letter dated November 7, 2000 "consent letter" that was merely a list of demands.  Those demands

57

included the following:

A. First, Lucent demanded that Winstar draw all of the funds down as soon as they were available and pay them to Lucent, rather than allowing Winstar to determine whether and when it would tap the facility.

B. Second, Lucent demanded that Winstar agree to prepare a written paydown schedule for the remainder of the sums it owed Lucent under the Second Credit Agreement — even though Winstar was not obligated even to begin repaying the sums until 2005 — and insisted that Winstar help Lucent sell off the other outstanding Winstar borrowings.

C. Third, Lucent required that Winstar cooperate in Lucent's performing a due diligence review of Winstar.

91. When Winstar did not immediately agree to Lucent's demands, Lucent put the transition agreement negotiations on hold. Lucent's communications to Winstar were clear and carried the single message: agree to Lucent's demands or there would be no transition agreement.

92. When Winstar still did not acquiesce, Lucent played its ultimate trump card: give Lucent all of the Siemens proceeds or there would be no further draws under the Second Credit Agreement. Lucent, of course, could not withhold funding without breaching the Second Credit Facility. Lucent's threat was one more ploy to control Winstar.

93. Faced with the economic pressure, Winstar agreed to turn over the Siemens

58

proceeds and on December 7, 2000 closed on a $200 million increase to its syndicated loan with Bank of New York.

94. On the same day Winstar paid, by wire transfer, Lucent $188,180,000 to reduce Winstar's outstanding loan with Lucent. This transfer represented the net loan proceeds of $194 million minus $5,820,000 refund of an up-front fee Winstar had paid Lucent at the time of the borrowing under the Second credit Agreement.

95. Lucent disputes that a transfer of Winstar's interest in property was made, that Winstar was insolvent at the time of the Transfer, and that Lucent was an insider of Winstar at the time of the Transfer.

**Transfer of the Debtor's Interest**

96. Lucent waived the argument that there was not a transfer of Winstar's interest when it agreed to the following stipulated fact set forth in paragraph 6 of the Additions to Stipulated Facts, filed in open court on March 21, 2005:

> Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

97. Subsequently, after the Trustee had rested, Lucent argued its motion for partial findings under Fed. R. Civ. P. 52(c), incorporated by reference into Fed. R. Bankr. P. 7052, and asserted for the first time that the Trustee had not sustained her burden of proving that section 547(b)(1) had been satisfied. (Tr. 17-7). Having stipulated that this element has been satisfied, Lucent is not free to take back the stipulation after the Plaintiff concluded her case. But lest Lucent argue that the stipulated fact which, to the Court, is clear on its face is

59

somehow ambiguous or means something other than what is says, the Court finds that even

without the stipulation, there is more than ample evidence that a transfer of Winstar's

interest in property occurred when it paid over a portion of the Siemens proceeds to Lucent.

As Judge Fitzgerald recently stated in *In re AmeriServe Food Distribution, Inc.*

> Section 547(b) requires, inter alia, that the property transferred
> by the debtor be an "interest of the debtor in property." The
> Supreme Court has interpreted this to be "property that would
> have been part of the estate had it not been transferred before
> the commencement of bankruptcy proceedings." *Begier v. IRS*,
> 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In
> determining whether a transfer was "an interest of the debtor in
> property," courts apply the "diminution of estate doctrine,"
> under which a transfer of an interest of the debtor occurs when
> a transfer "diminish[es] directly or indirectly the fund to which
> creditors of the same class can legally resort for the payment of
> their debts, to such an extent that it is impossible for other
> creditors of the same class to obtain as great a percentage as
> the favored one." *In re Superior Stamp & Coin Co. Inc.*, 223
> F.3d 1004, 1007 (9th Cir.2000), quoting 4 Collier on
> Bankruptcy, ¶ 547.03, at 547-28 (15th ed.1993).

*AFD Funds v. Transmed Foods, Inc. (In re AmeriServe Food Distribution, Inc.)*, 315 B.R.

24, 29 (Bankr. D. Del. 2005).

98. But for the payment over to Lucent that Debtor would have had the use of those

funds. That the failure to pay Lucent upon completion of the refinancing with Siemens might

have given rise to a claim by Lucent for breach of contract does not nullify the fact that a

transfer of the Debtor's interest was made.

99. Lucent further attempts to couch this argument as one of "substitution," that is,

Siemens was substituted for Lucent on that portion of the loan it made. This argument is

factually incorrect. By Lucent's own admission, its collateral pool was different from that

60

given the Siemens. The Siemens transaction was not simply the substitution of one lender for another. Viewed another way what Lucent is really arguing is, as the Trustee correctly notes, the so-called "earmarking doctrine." Under this theory Lucent argues that Winstar had no ability to divert a vast majority of the Siemens proceeds away from Lucent. Thus, Lucent asserts Winstar had no interest in the proceeds and was somehow simply a conduit through which the money flowed. But the facts here are distinguishable from those cases in which debtors validly assign proceeds before they are acquired. Here there was no assignment, just a simple promise to pay. That contractual obligation, without more, is insufficient to convert this into an assignment. *Compare In re Computer Engr'ng Assocs., Inc.*, 337 F.3d 38 (1st Cir. 2003) (valid assignment of contract proceeds meant that debtor had no interest in proceeds as they accrued); *In re RISCmanagement, Inc.*, 304 B.R. 566 (Bankr. D. Mass. 2004) (valid assignment of contract proceeds would deprive debtor of any interest in that property, but mere agreement to pay creditor out of contract proceeds would not). Moreover there is nothing in the record evidencing an agreement between Siemans and the Debtors that the proceeds of the Siemans transaction be used to pay Lucent. *See Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates)*, 906 F.2d 942, 944 (3d Cir. 1990) (affirming preference where "record does not reflect the existence of an agreement between [new creditor] and the debtor that the funds be used to pay a specified antecedent debt"); *In re Bohlen Enters., Ltd.*, 859 F.2d 561, 566 (8th Cir. 1988); *Howdeshell of Fort Myers v. Dunham-Bush, Inc. (In re Howdeshell of Fort Myers, Inc.)*, 55 B.R. 470, 474-75 (Bankr. M.D. Fla. 1985) (rejecting earmarking where debtor decided who to pay, and third

61

party did not "condition" loan on payment to defendant).

100.  Finally, earmarking is an affirmative defense.  Lucent did not raise it in its

Answer or in the Joint Pretrial Memorandum.  Thus, even if Lucent had not previously

waived the issue in the Additional Stipulated Facts, and even if it had proved facts that

bring the Siemens proceeds under the doctrine of earmarking, it waived the defense when

it failed to plead it as an affirmative defense.

### *Insolvency*

101.  Under the Bankruptcy Code

> "insolvent" means--  (A) with reference to an
> entity other than a partnership and a municipality,
> financial condition such that the sum of such
> entity's debts is greater than all of such entity's
> property, at a fair valuation, exclusive of--
>
> (i) property transferred, concealed, or removed
> with intent to hinder, delay, or defraud such
> entity's creditors; and
>
> (ii) property that may be exempted from property
> of the estate under section 522 of this title ....

11 U.S.C. § 101 (32).

102.  This test of insolvency, the so-called "balance sheet" insolvency, compares the

"fair value" of all of the debtor's assets with the face or "stated" value of its liabilities on the

relevant date.  It is different from equity tests that focus on a debtor's current ability to pay

debts as they become due.  Moreover, although labeled as the "balance sheet" test, as

Judge Walrath noted "this may be a misnomer because the Balance sheet Test is based

upon a fair valuation and not based on Generally Accepted Accounting Principles ('GAAP'),

B66

which are used to prepare a typical balance sheet." *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002). "[A]lthough GAAP is relevant in [a] section 547 solvency analysis, it is not determinative." *Id.* at 542. "Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998).

*Fair Valuation*

103.  There are three standard approaches to determine the fair value of assets: the market approach, the income approach and the asset approach. (Scherf, Tr. 12-12-13 and 23-24). Although experts generally consider each of these approaches (Scherf, Tr 12-13), not all of the approaches are appropriate or helpful in determining the proper measure of valuation. Indeed valuation, although employing broad principles of economics, is as much an art as it is a science. Each approach may yield a different result and which approach offers the best or better framework is a determination made in light of the facts of a case. Nevertheless there are some basic tenets that guide courts in evaluation valuation evidence.

104.  Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value. *Travelers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 194 (3d Cir. 1998), *cert. denied*, 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

63

105. "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* Although the determination of what is a reasonable period of time depends upon the facts of each case, a "reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price." *Id.* at 195. Thus the Court must decide whether "fair value" under the facts of this case means that the Debtor's assets at the time of the transfer must be valued as a going concern or on some other basis, such as a liquidation sale. The answer depends on whether a liquidation in bankruptcy was "clearly imminent on the date of the challenged transfer...." *Id.* at 193. *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 131 (Bankr. D. Mass.1989)("The proper standard of valuation to be applied in determining solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities.... Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic...."). Moreover "going concern" value may not be an appropriate test in an unstable market. *In re Art Shirt, Ltd.,* 93 B.R. 333 (E.D. Pa. 1988).

106. As Lucent's insolvency expert noted in his report:

> During the 1999-2000 period telecom stocks exhibited a great deal of volatility. According to Merrill Lynch, during the period from January 1, 1999 to early March 2000 an average stock within the emerging broadband group appreciated 63% year to

64

date, then these stocks declined an average of 87% by the end
of 2000.

(DX 701 at 11).

107.  The traditional method of determining going concern value is by capitalizing

net profit." *Vadnais Lumber Supply*, 100 B.R. at 131.

108.  The Trustee and Lucent each rely upon the testimony of their respective

insolvency experts and not unexpectedly those experts reached vastly different conclusions.

The Trustee's expert, Scherf, concluded that Winstar was insolvent on December 7, 2000,

the date of the transfer; Collins, Lucent's expert, concluded the Debtor was solvent on that

date.

109.  Stephen J. Scherf, the Trustee's expert, is a Certified Public Accountant and a

Certified Valuation Analyst. He is a principal in Parente Rudulph, LLC and is well qualified

to render an expert opinion in the area of insolvency.  Lucent does not dispute his

qualifications as an expert in this matter.  Scherf's report was admitted into evidence as PX

460.

110.  Lucent relied upon the expert opinion of Kevin Collins, a managing director of

Houlihan Lokey Howard & Zukin and in charge of the valuation practice of the firm's New

York City office.  He is also well qualified to render an expert opinion in the area of

insolvency and the Trustee does not dispute his qualifications as an expert in this matter.

His report was admitted into evidence as DX 701.[48]

---

[48]Both experts have substantial experience testifying as experts.  Both have had
courts accept their opinions as correct; both have had their opinions criticized.  Because
the Court must determine solvency in light of the unique facts of *this* case, criticism by

65

111.  In this case the Trustee's expert considered all three approaches (Scherf, Tr. 12-24-25), while Lucent's expert did not consider the asset approach (Collins, Tr. 18-16).

The Market Approach

112.  The market approach measures the subject company's assets and those of similarly situate companies.

113.  Collins testified that "there was a large and active trading market for Winstar...." (Collins, Tr. 18-16).  He opined that the market approach or an income approach would be the appropriate tests for valuation.  Because the market approach considered the value only on the basis that the purchaser could only acquire a minority ownership interest via stock purchases, he then adjusted the value upward to include the increase in value that could be attributed to buying a controlling, or indeed entire, interest in the Debtors.  Based upon his analysis, he opined that Winstar was solvent on the Transfer date.

114.  Scherf rejected the stock market valuation of Winstar and he was correct to do so.  The stock market value artificially overvalued the Debtor.  For one thing market investors did not know that Lucent was holding back on issuing its refinancing notice.  Lucent, but not the average investor, knew that Winstar's true financial picture was much bleaker than the Debtors' publicized financials would indicate.  Moreover, as even Collins acknowledged, the market was unstable. [cite]  It was simply too unstable to be an adequate indicator of valuation.

---

another court of the methodology chosen by either expert in a different factual context has limited value.

66

115. Moreover, as part of his market approach, Collins, blending a market approach with principles upon which the income approach is based, examined sales of companies or controlling interest in companies that were not comparable to Winstar in performing a guideline company approach and comparable transaction methodology.

### The Asset Approach

116. Scherf and Collins both utilized an asset approach to value Winstar. This approach looks at categories of assets and determines the fair market value of those assets or categories of assets based on what it would cost to replace or reconstruct the assets, that is, their replacement cost. (Scherf, Tr. 12-24 and PX 460 at 6). This approach generally begins with a company's balance sheet but substitutes the fair market value of assets and liabilities in place of the book value.

117. The date of the transfer, in this case December 7, 2000, is the relevant date for solvency. The Debtors, however, did not have financial statements as of that date, and, even if they had, financial statements prepared according to GAAP, although relevant, are not controlling. The Debtor did, however, have internally prepared financial statements for December 1, 2000 and December 31, 2000. Thus one approach to determining solvency as of December 7, 2000 is to begin with the financial statements of December 31, 2002 and apply a technique commonly referred to as retrojection. "[T]he United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening

67

period." *In re Industrial Commercial Elec., Inc. V. Babineau ( In re Industrial Commercial Elec., Inc.),* 2004 WL 1354530, *7 (Bankr. D. Mass.) (citations omitted). There is no reason to believe that this technique, employed by both parties' experts, would not be expressly approved by the Third Circuit as well. "That rule [retrojection] provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates,' *Id.,* the debtor is deemed to have been insolvent at all intermediate times. *Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 300 (Bankr. D. Mass. 1983)." *Murphy v. Nunes (In re Terrific Seafoods, Inc.),* 197 B.R. 724, 731 (Bankr. D. Mass. 1996).

118.    There were no contemporaneously prepared audited financials for the year ended December 31, 2000. Winstar's unaudited financials for that time showed Winstar had a positive net worth *on a book value basis.* (PX 460 at 10). Book value is not the same as fair value.[47] If Winstar's net worth is evaluated on an income basis, it had a negative value.

_____

[47]In fact one indication of how poorly Winstar's book value reflected that actual market value of its assets is the optronics inventory. Because Winstar had purchased unneeded equipment from Lucent, including optronics equipment, when Winstar's financial condition was deteriorating in the fall of 2000, it made plans to institute some measures to improve its financial condition. *See* PX 68. One of those measures included selling off excess equipment, including the optronics equipment. (Kantor Video-direct at 479). But the only offer Winstar received for its excess optronics equipment came from Lucent, and it was at a reduced price. *See* PX 22 (Uhl's 12/14/00 email to Frank Jules, Fred Rubin and Nate Kantor: "Guys[,] Carole Spurrier and Debbie Harris called at 4:30 to inform as follows:...5. They have found no buyer for the Optronics. Their internal remarketing group offered to buy it at $.30 on the $1.00. (I said no thanks).").

68

119. Scherf identified four subsequent events he believed had to be accounted for in order to apply the asset approach: (1) the recognition and recording of a $1.8 billion impairment charge for the three months ended December 31, 2000 by Grant Thorton, LLP, the Debtors' independent auditors; (2) the sale of substantially all of the Debtors' assets and nor of their liabilities to IDT for $42.5 million on December 19, 2001;[46] (3) the valuation prepared for IDT in connection with the allocation of the purchase price; and (4) the administrative insolvency of the Debtors' estates, a factor which he ultimately determined did not provide evidence of solvency or insolvency on the Transfer Date. (Scherf, Tr. 12-25).

120. The impairment charge was based on projections that were prepared for a presentation on December 11, 2000. The impairment charge was clearly knowable on December 7, 2000. (Scherf, Tr. 12-33).

121. In February 2001 Monoco sent an email documenting Winstar's cash flow problems.-Monaco's email in Feb 2001 re: "Depending on the time of checks clearing, we will have difficulty getting to the end of March when we anticipate a brief reprieve by receiving $60mm from Lucent for services, etc." (PX 284). By March 30, 2001 Uhl recognized Winstar's need to file bankruptcy. (Uhl Video-direct at 242-43).

122. Valuations were prepared for IDT in connection with the December 19, 2001 sale by Deloitte & Touche, which valued just the tangible assets at $328 million, and Empire Valuation, after reviewing the work of Deloitte & Touche, determined that the tangible and

---

[46]The purchase price was paid as follows: $30 million in cash and $12.5 million in IDT Class B stock. (Scherf 12-34; PX 460 at 10).

69

intangible assets were worth $630 million.

123. Based upon his analysis, Scherf opined that Winstar was insolvent by approximately $1.6 billion on the Transfer Date. The Court agrees.

124. Lucent criticizes any reliance upon the actual sale price ultimately paid for Winstar's assets during its bankruptcy. It argues this number represents a distress sale and a price significantly less than Winstar's value on December 7, 2000. The sale price, although not the only or even the primary fact upon which Scherf's valuation is based, is relevant. Contrary to Lucent's characterization of the sale of Winstar's assets, the sale was not an auction but rather as a going concern. *See, e.g.,* Order Authorizing Sale [of substantially all assets to IDT], dated December 19, 2001 at M (entry of sale order necessary to provide uninterrupted service to Debtors' customers) [Docket # 1627]; Master/Final Execution Copy of Asset Purchase Agreement [Docket # 1629].

The Income Approach

125. The income approach estimates the value of a company based on its earnings capacity. (PX 460 at 7). There are two commonly used methods to conduct income approach valuation. The first, capitalized debt free method also called capitalization of earnings, is based on a company's debt free net cash flow for one year or some other discreet period. Winstar never had any debt free cash flow. In fact Winstar, which began its operations in 1996, lost $83 million in that year. The losses steadily increased and by 2000 the loss had grown to $870 million. Thus application of this method mandates a finding of insolvency.

126. Under the second method, the discounted cash flow method, future earnings

70

are projected and then discounted to present value, adjusted to reflect the risk that such earnings will not materialize. (PX 460 at 8). Winstar in fact had prepared projections for a ten (10) year period, until 2009. Because of Winstar's historical performance and the instability of the telecommunications industry, Scherf concluded the Winstar was insolvent using this method. His conclusion is correct. Those projections were speculative at best. They included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry. Moreover, while Winstar generally had been able to meet its revenue projections-although the ten year projections through 2009 relied heavily upon equity infusion which may or may not materialize in an unstable market, historically it understated its expenses. Finally the balance sheet for December 31, 2000 in actuality differed significantly for what Winstar had projected.

127. Collins ignored the deficiencies inherent in Winstar's projections; instead he accepted them at face value and thus his reliance on them produced a flawed result. Further he used a discounted rate of 16% to reflect the risk to investors at a time when Winstar's debt yield was in the range of 25-30%.

128. But Lucent argues that Scherf ignored contemporaneous cash flow data and future projections (which would be used to perform a valuation based on the discounted cash flow method) when performing a valuation based on the income approach and instead relied upon the capitalized debt free net cash flow method. Lucent is incorrect. The capitalized debt free net cash flow method is supported by valuation treatises and has been adopted by courts. Moreover, Scherf did not ignore the discounted cash flow method but rather rejected its use in this case given the unreliability of Winstar's future projections. The

71

discounted cash flow methodology is simply an unacceptable method to be used in this case.

<u>Amount of Liabilities</u>

129.  Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197 (3d Cir. 1998).

130.  Scherf values those liabilities at $4.8 billion as of December 7, 2000 (Tr. 12-14-15, PX 460); Collins did not value them as of that date.  (Tr.18-118).  In fact Collins testified that he was unable to value the liabilities as of December 7, 2000.  (Tr. 18-119).  He valued the liabilities as of December 31, 2000 at $4.321 billion. (Tr. 18-118).

131.  Based upon the valuation of the assets and liabilities, Winstar was insolvent on December 7, 2000, the date of the Transfer.

*Insider Status*

132.  Because the Transfer occurred during the period greater than 90 days before the Petition date but less than one year prior to the bankruptcies, the Trustee may only recover on her preference claim if she proves that Lucent was an insider at the time of the Transfer.

133.  With respect to a corporation, an insider includes a  "person in control of the debtor."  11 U.S.C. § 101 (31).

134.  Some courts have defined control as the creditor dominating the debtor.  *In re A. Tarricone, Inc.*, 286 B.R. 256, 265 (Bankr. S.D.N.Y. 2002).  Others "have used terminology such as having a 'stranglehold' over the debtor, having 'complete

72

domination' of the debtor, rendering the debtor a 'mere instrumentality or alter ego' of the lender or 'powerless to act independently.'" *Badger Freightways, Inc. v. Continental Ill. Nat'l Bank & Trust Co. Of Chicago (In re Badger Freightways, Inc.)*, 106 B.R. 971, 981-82 (Bankr. N.D. Ill. 1989)(internal citations omitted).

135.  Both Lucent and the Trustee correctly note that whether a party is or was "in control" of a debtor requires a case by case determination. "The legislative history of § 101(31) indicates that the term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'" *Official Committee of Unsecured Creditors v. Austin financial services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (quoting S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269) (legislative history 11 U.S.C. § 101(31)) (other citations omitted). "The true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length. *In re Craig Systems Corporation*, 244 B.R. 529, 539 (Bankr. D. Mass.2000). The emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the other person the power or influence to have a debt owed to it repaid.". *In re Demko*,  264 B.R. at 408.

136.   In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. *ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672 (Bankr.M.D.Fla.1995). *There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a*

73

*direct stake.*

*In re Armstrong,* 231 B.R. 746, 749-50 (Bankr. E.D.Ark. 1999).

137. That does not mean, however, as Lucent asserts that Lucent must have used its control to obtain the transfer although whether the transfer in question was done under pressure from Lucent is one fact to be considered in making the determination of control. *Walsh v. Dutil (In re Demko),* 264 B.R. 404, 408 (Bankr. W.D.Pa. 2001). Neither the Bankruptcy Code nor the case law, however, require the use of the insider's status as an insider to force the preferential payment to be made. The elements of a preference are set forth in Section 547(b) which requires, among other things, that the transfer have been made "between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider...." 11 U.S.C. § 547(b)(4)(B). There is nothing in the language that requires the causal connection between the control and the preferential transfer that Lucent claims is needed.

138. In this case the facts indicate that Lucent controlled many of Winstar's decisions relating to the buildout of the network. Lucent forced the "purchase" of its goods well before the equipment was needed and in many instances under the Software Pool Agreement, never needed at all. Lucent treated Winstar as a captive buyer for Lucent's goods. These purchases, especially those under the Software Pool Agreement were just a means for Lucent to inflate its own revenue.

139. Lucent argues, however, that Winstar is complicit in its scheme to inflate revenues. For example when Lucent required Winstar employees to sign false bill and hold letters needed for Lucent to book revenue, they did so even though Winstar knew that

74

Lucent used the process to deceive its auditors. That Winstar was a participant in Lucent's scheme does not prove that Winstar was not under Lucent control. In fact, Lucent's ability to involve Winstar's employees in Lucent duplicity is further evidence of Lucent's control.

140. Two former Lucent employees, Deborah Harris and William Plunkett refused to answer deposition questions beyond providing their names and addresses and instead asserted their right against self incrimination.[49] "The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). This Court may and chooses to draw negative adverse inferences from their testimony. Both were employees of Lucent when the relevant actions occurred.[50] Although neither is a party to this lawsuit, a fact which Lucent emphasizes to

---

[49]Prior to trial the Trustee sought a ruling that the Court could draw an adverse interest from Harris' and Plunkett's silence while Lucent disputed that their testimony was relevant and otherwise corroborated. It also argued that the questions posed to these two individuals were too specific thus rendering the examinations unfair. The Court granted the Trustee's motion but noted that it would revisit the issue after hearing the evidence upon Lucent's request. *See* Transcript of March 16, 2005 hearing [docket # 322] at 59-62. Having revisited the issue, the Court concludes that its initial ruling was correct for the reasons set forth herein.

[50]There is no dispute that Harris and Plunkett were employed by Lucent during the time when the events at issue in the specific questions which the Court finds that they would have answered adversely had they answered the questions honestly. Ms. Harris answered questions during her 2001 deposition and at the time testified she was employed by Lucent as the Vice President of Sales for the Winstar account beginning in August 2000. (Harris, Depo, Tr. 11-34). She also testified that William Plunkett the Vice President of Emerging Markets and was a member of Lucent's management team responsible for the Winstar account. (*Id.*). Mr. Plunkett was placed on administrative leave by Lucent in late November 2000 and was terminated shortly thereafter. (Wilson, Tr. 16-11). His termination was a direct result of his involvement in postdating documents relating to the Software Pool Agreement. (Schacht, Tr. 21 at 35). Both Harris and Plunkett

75

show that neither "cared whether Lucent succeeds in this litigation," their non-party status does not render admitting their testimony impermissible given the facts of this case. Nor does the fact that neither was employed by Lucent when their testimony was taken. *Red.* Both Harris and Plunkett were parties to the SEC's action (PX 739); both were employed by Lucent during the relevant time frame and the questions they refused to answer related directly to their actions as Lucent employees during this period.

141. Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *See Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558. ("the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify in response to probative evidence offered against them "); "[L]iability should not be imposed based solely upon the adverse inference." *United States v. Private Sanitation Industry Ass'n,* 899 F. Supp. 974, 982 (E.D.N.Y.1994), aff'd 47 F.3d 1158 (2d Cir.), *cert. denied sub. nom., Ferrante v. United States,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

142. During his deposition Mr. Plunkett was asked a series of questions relating to end of quarter deals, sham bill and hold transactions, the Software Poll Agreement. He asserted his Fifth Amendment privilege in response to each question but had he responded truthfully, his testimony would have added to the substantial evidence against Lucent and indeed would have been devastating to his former employer. Examples of the questions

---

reported to Nina Aversano.

76

asked of this witness are set forth below.

Q: Isn't it a fact that in 1999 and 2000 you participated in transactions between Lucent and Winstar at the end of each quarter form December 31st, 1999 through September 30th, wherein Winstar purchased substantial quantities of equipment, software, and/or services from Lucent Technologies?

A: "On advice of counsel I respectfully decline to answer on the ground that my answer may incriminate or tend to incriminate me." (Hereinafter referred to as "Fifth Amendment Response").

Q: Isn't it a fact that in December 1999 Winstar purchased over $96 million worth of goods and services from Lucent?

A: Fifth Amendment Response

Q: Isn't it a fact that this transaction was referred to as an end of quarter deal?

A: Fifth Amendment Response

Q: Isn't it a fact that certain of the equipment purchased by Winstar in the December 1999 end of quarter deal was not delivered to Winstar but was held by Lucent even through the purchase price was paid by Winstar?

A: Fifth Amendment Response

And isn't it a fact that in connection with the end of quarter deal and in order to be certain that Lucent could book the revenue

77

Lucent prepared letters which it gave to winstar which it asked

Winstar to sign?

A: Fifth Amendment Response

Q: Isn't it a fact that Winstar did, in fact, sign the letters provided

by Lucent with respect tot he December 1999 end of quarter

deal?

A: Fifth Amendment Response

Q: And isn't it, in fact, correct that these letters were not true and

correct in all respects?

A: Fifth Amendment Response

Q: Isn't it a fact that these letters falsely stated dates by which

Lucent would install the purchased equipment?

A: Fifth Amendment Response

Q: And isn't it a fact the Winstar did not need the equipment

purchased through these letters immediately but was buying the

equipment earlier to provide Lucent with additional revenue?

A: Fifth Amendment Response

Q: And isn't it a fact that the letters also stated falsely that

Winstar lacked the warehouse space to store equipment?

A: Fifth Amendment Response

Q: Isn't it a fact that some of the equipment purchased by

Winstar in the December 1999 end of quarter deal included

78

Optronics equipment?

A: Fifth Amendment Response

Q: And isn't it a fact that when your employment with Lucent

terminated in November of 2000 this equipment remained in

Lucent's warehouses?

A: Fifth Amendment Response

(Plunkett, Deposition transcript at p.11, line 25 to p.14, line 23).

143.  He was then asked virtually identical questions with respect to March 2000,

June 2000 purchases, and September 2000 end of quarter purchases and again asserted

his Fifth Amendment privilege. (Id. at p.15. Line 9 to p. 20, line 25, p. 22, line 8 to p.24, line

4). Similarly when questioned about the Software Pool Agreement, Plunkett refused to

answer.  Had he answered truthfully his testimony would support the finding that the

agreement was a sham transaction; it was nothing more than a device to inflate Lucent's

revenues. (Id. at p. 24, line 5 to p. 26, line 18).[51]

144.  Independent evidence shows that Plunkett was involved in the June 2000 end

of quarter deal.  See, e.g., PX 360 (Ackerman's June 23, 2000 email to Kantor) ("He

[Plunkett] wants us to agree to another $53M in purchases for 2Q (that includes $17M of

accelerated pay as you grow $$ for 5ESS's"). Independent evidence also proves he was

involved in the September 2000 end of quarter deal and the Software Pool Agreement.

---

[51]Although there is conflicting testimony about the actual value of the goods Winstar
was committed to purchases under the Software Pool Agreement, evidence of the value is
that it totaled somewhere between $20 and $40 million, significantly less than the $135
million Winstar was to pay.

79

B83

*See e.g.,* PX 125 (Plunkett's September 29, 2000 letter to Ackerman: "Winstar Agrees [sic] to purchase from Lucent the following ... $18,852,500 5ESS PAYG") and PX 127 (Ackerman's September 18, 2000 email to Kantor: "I just spoke with Bill [Plunkett]. He informed me that you and Nina had met (dinner?) And you agreed to help them get to the number they need this quarter...something around $110M, of which we have already spent about $45M. There is not much I can give them that we really need, but there are some creative things I can do that can get us close to their number without being totally stupid.").

146. Harris was asked virtually the same questions and also invoked her Fifth Amendment privilege. She, like Plunkett, was involved in the transactions about which she was questioned and the Court finds that had she answered truthfully, her testimony would also have been adverse to Lucent. Had Plunkett and Harris answered truthfully about the nature of the relationship between the two companies, they would have acknowledged Lucent's control over Winstar and lack of arms' length relationship between them. *Rad Services v. Aetna Cas. & Surety Co.,* 808 F.2d 271, 280-81 (3d Cir. 1986), *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976). *See also Baxter,* 425 U.S. 308; *Libutti v. U.S.,* 107 F.3d 110 (2d Cir. 1997); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir. 1995); *Davis v. The Mut. Life Ins. Co. of New York,* 6 F.3d 367 (6th Cir. 1993), *cert. denied,* 510 U.S. 1193 (1994); *Brink's Inc. v. The City of New York,* 717 F.2d 700 (2d Cir. 1983).

146. Lucent was an insider of Winstar's on December 7, 2000, the date of the Transfer.

80

**B84**

147. Consequently all of the elements of a preference have been satisfied. The payment of the Siemens proceeds was a preference.

148. Lucent argues, however, that even if the Transfer was preferential the Trustee may not recover because Lucent gave subsequent new value to Winstar when it continued to loan under the Second Credit Agreement. Although the amount that it claims it gave in new value is an ever-changing figure in this case, the inability of Lucent to fix the amount is irrelevant as it is not entitled to the benefit of the new value defense.

149. Lucent bears the burden of establishing new value. 11 U.S.C. § 547(g) (the creditor ... against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section); *Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.),* 317 B.R. 491, 494 (Bankr. M.D. Tenn. 2004).

150. Lucent's new value defense fails for two reasons. First, to the extent Lucent provided any equipment or software to Winstar after December 7, 2000, it did so on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, (DX-32; DX-33) and as admitted by Lucent in its October 11, 2001, secured proof of claim (PX-340) and the escrow fund stipulations. (PX-506; PX-507; PX-508). Second, even if the additional value were provided on an unsecured basis, Lucent has failed to show that it was provided <u>after</u> the receipt by Lucent of the preferential transfer.

151. It is well settled that to support a new value affirmative defense, section 547(c)(4)(A) requires a creditor to establish that, after receiving a preferential payment, the creditor advanced "new value" to the debtor "not secured by an otherwise unavoidable

81

security interest." *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989). Lucent provided only secured value: all Lucent equipment and software sold to Winstar was sold subject to two separate security agreements dated May 9, 2000, and December 22, 2000. (DX-32, DX-33); Lucent's proof of claim (PX-340) alleges a secured claim although it provides no evidence of the value of its collateral; the Trustee and Lucent have entered into three stipulations (PX-506, PX-507, and PX-508) which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien (subject to judgment on the Trustee's equitable subordination claim).

152.   For the foregoing reasons the Trustee is awarded judgment in the amount of $188,180,000.

## COUNT XI: EQUITABLE SUBORDINATION

153.  The Bankruptcy Code invests the Court with authority to subordinate all or part of a claim "under the principles of equitable subordination...." 11 U.S.C. § 510(c). Courts considering equitable subordination follow the *Mobile Steel* test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977). *See also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 58 (1st Cir. 2005); *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986

82

(3d Cir. 1998).

154. When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct. *In re N&D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986); *see also In re Epic Capital Corp., et. al.*, 290 B.R. 514, 524 (Bankr. D. Del. 2003), *aff'd*, 307 B.R. 767 (D. Del. 2004).

155. "For non-insider claimants, egregious conduct must be established to justify equitable subordination...." *In re Mid-American Waste Systems, Inc.*, 284 B.R. 53, 70 (Bankr. D.Del. 2002) (internal citations omitted). "[The degree of non-insider misconduct] has been variously described as 'very substantial' misconduct involving 'moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage' or as gross misconduct amounting to fraud, overreaching or spoliation." *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 119 (Bankr. E.D. Pa. 1993), citing *In re Osborne*, 42 B.R. 988, 996 (W.D. Wis.1984).

156. Nevertheless the test is the same; only the standard of proof required differs. *Mid-American Waste Systems,* 284 B.R. at 70 (internal citations omitted).

**Inequitable Conduct**

157. There are three generally recognized categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Id.*

83

158.  The same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues.

159.  Yet whether Lucent is an insider or not does not affect the outcome of the Court's conclusion that the first prong of the *Mobile Steel* test is satisfied: the facts in this case warrant equitably subordinating Lucent's claim because it was egregious.  Lucent repeatedly threatened Winstar with nonpayment after Wireless performed significant services under the subcontract, all in an effort to extract more and more from Winstar, Lucent's captive purchaser.  Ultimately, when Lucent's new management regime determined that a refinancing notice, the equivalent of a financial death knell for Winstar, had to be sent, Lucent deliberately held up the refinancing notice to ensure that the Siemens refinancing occurred and new equity was infused into the dying Winstar.

### Harm to Winstar's creditors

160.  Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors, including, apart from the preferential payment itself, the interest paid by Winstar to Lucent on unnecessary Lucent equipment and services purchased by Winstar to generate revenue for Lucent, storage costs, and insurance costs.  Winstar sustained additional damages in that the approximate $244 million (on a cost adjusted basis) of Lucent equipment in inventory in warehouses on March 31, 2001 was sold in December 2001 for approximately a penny on the dollar compared to its December 7, 2000, balance sheet stated value.

161.  In addition Winstar received $270 million in equity financing on December 7,

84

2000 through the issuance of Series H Preferred Stock. The funding came primarily from Welch Carson Anderson & Stowe and Credit Suisse First Boston Private Equity. (DX 701 at 26 and 48).

162. The Debtors and their creditors were harmed by Lucent's deliberate delay in sending the refinancing notice. Lucent intentionally waited until it had received the proceeds of the Siemans refinancing before allowing the public to learn what it already knew: Winstar was in significant financial distress and indeed, as set forth above, was insolvent. Lucent reaped a substantial benefit but at the expense of the Debtors' other creditors.

### Consistent with the Bankruptcy Code

163. Subordinating Lucent's claims is not inconsistent with the Bankruptcy Code.

164. Consequently Lucent's claim will be subordinated under section 510(c) of the Bankruptcy Code to the claims of *all* creditors, including all unsecured claims which includes the deficiency claim of Siemans, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000. The lien of Lucent is preserved for the benefit of the estate and is transferred to the Trustee in her representative capacity.

## LUCENT'S COUNTERCLAIMS

165. Lucent seeks damages from Winstar's estate on the basis of fraud and negligent misrepresentation arising from Winstar's representation implicit in at least four borrowing representations from and after January 18, 2001 that it was in compliance with

85

the CAPEX covenant.

166. "Under Delaware law, express choice of law provisions in contracts are generally given effect." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076 (D.Del. 1990).

167. Lucent must establish each of the following elements: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the representation; and (5) resulting damages. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *see also Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 784-85 (2d Cir. 2003). Each must be proved by clear and convincing evidence. *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 784-85 (2d Cir. 2003).

168. Lucent has not proved that Winstar breached the CAPEX covenant and if it did so, it did so knowingly. Winstar's employees testified that they believed that the company was in compliance with the CAPEX covenant in the first quarter of 2001. To the extent that Winstar was not in compliance with the CAPEX covenant, this "breach" is harmless. Lucent was well aware of Winstar's financial status and some of its employees were even involved in attempting to help Winstar lower its CAPEX in order to comply with the covenant.

169. Lucent has not demonstrated, and given the level of its knowledge and involvement cannot demonstrate, that it reasonably relied upon Winstar's representations. Lucent itself knew of Winstar's deteriorating financial condition in November and December

86

2000. Lucent was prepared to issue the refinancing notice as soon as it got the Siemans proceeds. For it now to argue it was duped by the Debtor is disingenuous.

170. To establish a claim of negligent misrepresentation, the claimant must prove by a preponderance of the evidence: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which others acted or failed to act; (4) to their damage; and (5) the declarant must express the words directly to one to whom it is bound by some relation or owes a special duty of care (which must involve a "closer degree of trust" than that of an ordinary buyer and seller). *Dallas Aero, Inc.*, 352 F.2d at 788; *see also Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). It must also demonstrate that its reliance on Winstar's purportedly false statements was "reasonable." *Morrissey v. GMC*, 21 Fed. Appx. 70, 73 (2d Cir. 2001).      171. As set above, Lucent has not met its burden. It cannot ignore its own knowledge and feign surprise to learn the CAPEX covenant was breached when it was deeply immersed in the financial transactions of Winstar. Therefore judgment will enter for Winstar with respect to Lucent's counterclaims.

B91

**CONCLUSION**

For the foregoing reasons, the Court finds that judgment should enter for the Plaintiff on all counts and counterclaims as set forth above.

A separate order of judgment for the Plaintiff will enter.

Dated: December 21, 2005

Joel B. Rosenthal
United States Bankruptcy Judge

88

ach-jbr.TIF

**District Court Opinion 11/18/04**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 NOV 16 PM 2: 45

| | |
|---|---|
| IN RE: | : |
| | : Chapter 7 |
| WINSTAR COMMUNICATIONS, INC., | : |
| et al., | : Bankruptcy Case No. 01-01430 |
| | : |
| Debtors. | : |
| | : |
| CHRISTINE C. SHUBERT, CHAPTER 7 | : |
| TRUSTEE OF WINSTAR COMMUNICATIONS, | : |
| INC. AND WINSTAR WIRELESS, INC., | : |
| | : Adversary No. 01-01063 |
| Plaintiff, | : |
| | : Civil Action No. 04-928 JJF |
| v. | : |
| | : |
| LUCENT TECHNOLOGIES, INC., | : |
| | : |
| Defendant. | : |

Sheldon K. Rennie, Esquire of FOX, ROTHSCHILD LLP, Wilmington, Delaware.
Of Counsel: Stephen M. Rathkopf, Esquire and David R. King, Esquire of HERRICK, FEINSTEIN LLP, New York, New York; Richard G. Smolev, Esquire of KAYE SCHOLER LLP, New York, New York.
Attorneys for Plaintiff.

Daniel J. DeFranceschi, Esquire; Rebecca L. Booth, Esquire, and Jason M. Madron, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.
Of Counsel: Paul C. Saunders, Esquire and Daniel Slifkin, Esquire of CRAVATH, SWAINE & MOORE LLP, New York, New York.
Attorneys for Defendant.

## MEMORANDUM OPINION

November 16, 2004
Wilmington, Delaware

Farnan, District Judge,

Presently before the Court is the Motion Of Defendant Lucent Technologies, Inc. To Withdraw The Reference To The Bankruptcy Court (D.I. 1). For the reasons discussed, Lucent's motion will be denied.

### Background

On April 18, 2001, Winstar Communications, Inc. and Winstar Wireless, Inc. (collectively, "Winstar") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Winstar concurrently commenced an Adversary Proceeding alleging that Lucent Technologies, Inc. ("Lucent") breached several of the contracts between Winstar and Lucent, allegedly forcing Winstar to file its bankruptcy petition. Lucent filed several proofs of claim, asserting claims against Winstar that include secured and unsecured claims for sums alleged due under agreements between Lucent and Winstar.

In January 2002, the Court converted the bankruptcy to Chapter 7 and the bulk of Winstar's assets were subsequently liquidated. Following the conversion, Christine C. Shubert ("the Trustee") interceded to prosecute this action as Plaintiff and filed the Second Amended Complaint (A.D.I. 69).

In the Second Amended Complaint, the Trustee demanded a "trial by jury as to all issues so triable," and added Count XI, a claim seeking to equitably subordinate Lucent's claims. Two

1

B94

other claims remain in the case--Count VII for Breach of the Parties' Subcontracting Arrangement and Count X for Return of Preferential Transfer.

After the Bankruptcy Court decided the Motion of Lucent Technologies Inc. to Dismiss Certain Claims Of The Second Amended Complaint (A.D.I. 70), Lucent made a demand for a jury trial and asserted four counterclaims for fraud and negligent misrepresentation. (A.D.I. 156.) Lucent asserted these counterclaims with regard to financial information that Winstar allegedly provided to Lucent during due diligence that Lucent conducted in November and December 2000.

There is currently a Motion For Summary Judgment (A.D.I. 210) filed by Lucent pending in the Bankruptcy Court.

The Bankruptcy Court has not determined whether this matter is a core or non-core proceeding.

### Parties' Contentions

By its motion, Lucent seeks to withdraw the reference of the Adversary Proceeding from the Bankruptcy Court. Lucent contends that "cause" for permissive withdrawal exists for several reasons related to its alleged right to a jury trial in the district court.

First, Lucent contends that it is entitled to a trial by jury based on the Trustee's demand for a jury trial, which, pursuant to Federal Rule of Civil Procedure 38, may not be

2

revoked without Lucent's consent.

Second, Lucent contends that it did not waive its right to a jury trial before the district court as to all claims when Lucent filed its proof of claim. Lucent contends that filing a proof of claim waives only the right to a jury trial in the district court as to claims that are necessarily part of the disallowance or allowance of the proof of claim. Lucent contends that Counts VII and X and Lucent's counterclaims are not necessary elements in the allowance or disallowance of Lucent's proofs of claim. Furthermore, Lucent contends that the district court should hear the Trustee's claim for equitable subordination, not triable to a jury as of right, because it arises from the same facts, transactions, and issues raised by Counts VII and X.

Third, Lucent contends that it would be more efficient for the district court to decide the pending motion for summary judgment in this action because it reviews de novo any such ruling made by the Bankruptcy Court.

Finally, Lucent argues that, because the Court need not determine whether the remaining claims in this lawsuit are core or non-core, Local Bankruptcy Court Rule 5011-1 should be waived.

In response, the Trustee contends that Lucent waived any right to a jury trial when it filed proofs of claim against the estate. The Trustee specifically contends that by filing the claims, Lucent submitted itself to the Bankruptcy Court's

3

equitable powers and conferred jurisdiction upon the Bankruptcy Court to consider its counterclaims as a core matter.  The Trustee further contends that, should the Court determine the matter is non-core and that Lucent has a right to a jury trial, Lucent's motion should be denied because: 1) Lucent's jury demand was defective; 2) Lucent's demand to withdraw the reference is untimely; and 3) Lucent's motion to withdraw the reference is procedurally defective because Lucent has failed to move before the Bankruptcy Court for a core/non-core determination.

**Discussion**

## I.  Legal Standard For Discretionary Withdrawal Of A Reference

Under 28 U.S.C. § 1334(b), district courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Pursuant to 28 U.S.C. § 157(a), each district court may refer cases under title 11 to the Bankruptcy Court for disposition.  However, under Section 157(d), the referred proceeding can be withdrawn from the Bankruptcy Court and returned to the district court.  Section 157(d) provides for both mandatory withdrawal and discretionary withdrawal.  In this case, Lucent seeks withdrawal only under the standards for discretionary withdrawal.

In providing for discretionary withdrawal, Section 157(d) states: "The district court may withdraw, in whole or in part,

4

any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). This Court has acknowledged that the requirement that cause be shown "creates a 'presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy.'" Hatzel & Buehler, Inc. V. Central Hudson Gas & Elec., 106 B.R. 367, 371 (D. Del. 1989)(citations omitted).

The Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal. These factors include: 1) promoting uniformity in bankruptcy administration; 2) reducing forum shopping and confusion; 3) fostering economical use of debtor/creditor resources; 4) expediting the bankruptcy process; and 5) timing of the request for withdrawal. In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990) (citing Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 999 (5th Cir. 1985)).

Local Rules for the United States Bankruptcy Court for the District of Delaware state that the movant for withdrawal shall concurrently file with the Clerk a motion for a determination by the Bankruptcy Court with respect to whether the matter or proceeding is core or non-core. Bankr. D. Del. R. 5011-1.

5

## II. Lucent's Right To A Jury Trial

The sole reason for "cause" for permissive withdrawal that Lucent cites in its briefs is Lucent's right to a jury trial on Counts VII and X of the Trustee's Second Amended Complaint and on Lucent's counterclaims for fraud and negligent misrepresentation. The parties do not dispute that these issues may, by right, be triable by a jury.

### A. Count X, Preferential Payment Claim

Count X seeks to recover $194 million paid by Winstar to Lucent in December 2000. The Court finds that Lucent may have been entitled to a jury trial on the issue of preferential payment had it presented no claim in the bankruptcy proceeding and awaited a federal action by the Trustee. See Schoenthal v. Irving Trust Co., 287 U.S. 92, 94-95 (1932). However, a creditor who submits a proof of claim against a bankruptcy estate has no right to a jury trial on issues raised in defense of such a claim. Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242, 1250 (3d Cir. 1994) (citing Langenkamp v. Culp, 498 U.S. 42, 45 (1990)).

The Court finds that, in view of the holdings in Billing and Langenkamp, Lucent's filing proofs of claim triggered the process of allowance and disallowance of those claims, thereby subjecting Lucent to the equity power of the Bankruptcy Court. Thus, the Court finds that the Trustee's subsequent preference action is

6

B99

now part of the claims allowance process, and is triable only in
equity. Id. For these reasons, the Court concludes that there
is no right to a jury trial on the issue of the alleged
preferential transfer.

Lucent contends that Langenkamp is inapplicable in these
circumstances because the Trustee made a jury demand and,
pursuant to Federal Rule of Civil Procedure 38, cannot withdraw
that jury demand without Lucent's consent. Rule 38(d), which
states that a jury demand "may not be withdrawn without the
consent of the parties," ensures that one party may rely on
another's jury demand. Fed. R. Civ. P. 38. However, the Court
finds that because Lucent waived its right to a jury trial as to
the alleged preferential transfer, its consent to the Trustee's
withdrawal of her jury trial demand is not required. See Moore,
Federal Practice 3d § 38.50[10][d].

B.    Count VII, Subcontract Claim

In Count VII, the Trustee alleges that Lucent breached the
subcontract between Lucent and Winstar Wireless, Inc. and/or
breached a legally-binding course of conduct between Lucent and
Winstar. Lucent contends that whether it is found to have
breached an alleged obligation to lend additional money to
Winstar has no bearing on Lucent's ability to recover on its
proofs of claim. The Court is not persuaded by Lucent's argument
that the determination of its proofs of claim does not depend on

7

the outcome of the Trustee's Subcontract Claim.  The Court finds
that the Trustee's Subcontract Claim may affect the ordering of
creditors or the equitable distribution of the res of the estate
and, thus, is now part of the claims allowance process, triable
only in equity.  For this reason, the Court concludes that there
is no right to a jury trial on the issue of the Subcontract
Claim.

     C.    Lucent's Counterclaims

    Similarly, the Court is not persuaded that Lucent's Fraud
and Negligent Misrepresentation Counterclaims will not affect the
allowance or disallowance of Lucent's proofs of claim.  The Court
finds that Lucent's Fraud and Negligent Misrepresentation
Counterclaims involve a decision regarding the distribution of
the bankruptcy estate and, thus, are now part of the claims
allowance process, triable only in equity.  For this reason, the
Court concludes that there is no right to a jury trial on the
issue of the Fraud and Negligent Misrepresentation Counterclaims.

**III. In Re Pruitt Factors For Cause**

    Although Lucent has not addressed the standards for "cause"
for a permissive withdrawal of a reference set forth in In re
Pruitt, 910 F.2d at 1168, the Court does not find that the
factors as a whole support the Court's withdrawing the reference
to the Bankruptcy Court for several reasons.

    First, the Court finds that the timing of the request for

8

withdrawal supports the proceeding remaining in Bankruptcy Court. The Adversary Proceeding has already been in Bankruptcy Court for over two years, and the Bankruptcy Court has overseen extensive discovery and pretrial matters, and has decided a motion to dismiss filed by Lucent.

Next, the Court finds that considerations of uniformity in bankruptcy administration support the proceeding being heard in the Bankruptcy Court. The preferential payment and equitable subordination claims are purely bankruptcy-related in nature and the resolution of these claims will affect the distribution to creditors within the proceeding.

Finally, the Court finds that maintaining the proceeding in Bankruptcy Court will diminish the risk of forum shopping and will lessen confusion by fostering consistent administration of the estate.

For these reasons, the Court concludes that the Pruitt factors do not support withdrawing the reference from the Bankruptcy Court.

### IV. Local Bankruptcy Rule 5011-1

The record does not show that Lucent has filed a motion for determination by the Bankruptcy Court as to whether the matter or proceeding is core or non-core. Thus, the Court finds that Lucent did not follow Local Bankruptcy Court Rule 5011-1. For this additional reason, the Court will maintain the proceeding

9

before the Bankruptcy Court.

### Conclusion

In sum, the Court concludes that discretionary withdrawal of the instant adversary proceeding is not warranted because: 1) Lucent has waived its right to a jury trial with regard to the claims at issue; 2) the factors set forth in In re Pruitt do not support a finding of cause; and 3) Lucent has not followed Local Bankruptcy Rule 5011-1. Accordingly, the Court will deny the Motion Of Defendant Lucent Technologies, Inc. To Withdraw The Reference To The Bankruptcy Court (D.I. 1).

An appropriate Order will be entered.

B103

**Second Amended Complaint**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------
In re:                                  :
                                        :    Chapter 7
WINSTAR COMMUNICATIONS, INC., et al.,   :
                                        :    Case No. 01-1430 (JCA)
                    Debtors,            :
                                        :    (Jointly Administered)
-----------------------------------------------------x
                                        :
CHRISTINA C. SHUBERT, CHAPTER 7         :
TRUSTEE OF WINSTAR COMMUNICATIONS,      :
INC. AND WINSTAR WIRELESS, INC.,        :
                                        :
                    Plaintiff,          :    Adv. Pro. No. 01-1063 (JCA)
                                        :
            v.                          :
                                        :
LUCENT TECHNOLOGIES, INC.               :
                                        :
                    Defendant.          :
-----------------------------------------------------
```

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Christina C. Shubert ("Plaintiff"), Chapter 7 Trustee for Winstar

Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Winstar Wireless," or

collectively the "Winstar Entities"), by and through the undersigned counsel, does hereby bring

suit against Defendant Lucent Technologies, Inc. ("Lucent" or "Defendant") and respectfully

alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has personal jurisdiction over the Defendant because it is

organized under the laws of the State of Delaware.

2.      This adversary proceeding relates to the cases of the above-captioned

Debtors pending in this Court pursuant to chapter 7 of title 11 of the United States Code, with

respect to which the Court is empowered by 11 U.S.C. §105 and Rule 7001 of the Federal Rules of Bankruptcy Procedure to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of title 11. Therefore, the Court has subject matter jurisdiction under 28 U.S.C. §1334.

        3.     This is a core proceeding under 28 U.S.C. §157(c).

        4.     Venue is properly located in this Court under 28 U.S.C. §1409.

THE PARTIES

**A.    Plaintiff**

        5.     Chistina C. Shubert is the Chapter 7 Trustee for Winstar Communications, Inc. and Winstar Wireless, Inc.

        6.     Winstar Communications, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 685 Third Avenue, New York, New York. Founded in 1990, Winstar was a leading telecommunications company, offering a wide range of high-speed voice and data (i.e., "broadband") services to businesses.

        7.     Winstar Wireless, Inc. is a corporation organized under the laws of Delaware, and a wholly owned subsidiary of Winstar that was responsible for the construction and operation of the Winstar network.

**B.    Defendant**

        8.     Lucent is a Delaware corporation headquartered in Murray Hill, New Jersey. According to its website, Lucent "designs and delivers the systems, software, silicon and services for next-generation communications networks for service providers and enterprises." Lucent states that it focuses on high-growth areas such as optical and wireless networks; Internet

2

infrastructure; communications software; Web-based enterprise solutions; *and professional network design and consulting services.*

### INTRODUCTION

9.    This complaint arises out of Lucent's callous and willful disregard of its solemn duty to perform its contractual obligations to Winstar in good faith, and to deal fairly with Winstar, under a number of agreements requiring Lucent, in a strategic partnership with Winstar, to build and finance Winstar's worldwide telecommunications network. After honoring its commitment to finance the build out of Winstar's network during the first two years of the five-year agreements, Lucent had a change of heart about its relationship with Winstar, and indeed, its vendor financing obligations in general. As Lucent's own financial picture deteriorated, it came to view its contractual obligations to Winstar as a "bad deal," and determined to force Winstar to accept fundamental changes in the agreements or unilaterally to extricate itself from them, which deprived Winstar of the benefits of its bargains. Lucent negotiated by using improper and unfair means (including making material misrepresentations), leveraging its actual and threatened nonperformance under the contracts to extract changes, and then relying on the very damages its breaches wrought on Winstar to justify repudiating its obligations altogether.

10.    Lucent engaged in a series of bad faith tactics, including setting conditions for continued performance of its existing contractual obligations it had no right to set, making it impossible for Winstar to meet the conditions it set, threatening non-performance of its most basic contractual obligation – the obligation to finance the build-out of Winstar's network – and both abusing and refusing to relinquish discretionary rights it had no intention of exercising.

3

B106

Lucent utilized all of these methods knowing or recklessly disregarding their devastating consequences upon Winstar.

11.    Winstar did not believe that a company of Lucent's size and stature would ultimately breach its contractual obligations. Because it was entirely dependent upon Lucent to finance the build-out of its telecommunications network, and because it wanted to revive and strengthen its relationship with Lucent, Winstar negotiated in good faith to accommodate many of Lucent's unreasonable demands, and went so far as to borrow from others on a secured basis to prepay part of its debt to Lucent. Because it was doing so, Winstar expected that Lucent would adhere to its obligation to finance the build-out of Winstar's network. But unbeknownst to Winstar, nothing it did, or could do, would satisfy Lucent. Lucent had already determined it would not adhere to its existing contractual obligation to finance the build-out of Winstar's network under any circumstances and intentionally and maliciously breached its legal obligations to Winstar.

### SUMMARY OF ALLEGATIONS

12.    Winstar was a leading telecommunications company, offering a wide range of high-speed voice, data and Internet services to businesses. Winstar established a unique communications network, which makes extensive use of wireless technology, in addition to fiber wiring, to provide communication services to business customers. This innovative use of wireless technology set Winstar apart from other companies in the industry, and was widely recognized as providing Winstar with a substantial competitive advantage in the marketplace in terms of cost and speed of deployment, as well as the ability to deliver broadband capacity.

13.    In 1998, Winstar was still a relative newcomer to the industry and in the infancy of its efforts to build one of the world's most widely available, end-to-end broadband networks. Its unique "last mile solution" for reaching customer premises through the use of

PH1 427667v1 09/27/02

4

**B107**

wireless technology, however, was widely recognized within both the telecommunications

industry and the investment community as presenting an exciting new proposition and a break

through opportunity to compete with incumbent carriers such as Sprint, Verizon and SBC.

Because conditions in the financial markets in the summer of 1998 had deteriorated, Winstar

needed to secure a stable source of additional long-term financing to improve its competitive

position in the industry. Winstar also wanted to find a strategic partner capable of building out

its global network, thereby allowing Winstar to focus on the operation and marketing of its

expanding business. At the same time, Lucent wanted to expand its services business in network

communications, land an exciting and large new customer with the clear potential for explosive

growth, and gain a greater foothold in the emerging service provider market.

14. As a consequence, in October 1998, the two companies, through a series

of agreements collectively referred to as the "Network Agreements," entered into a strategic

partnership. Lucent agreed to provide $2 billion in financing to Winstar, and to build on a

completely "turnkey" basis Winstar's entire global telecommunications network (and systems

support infra-structure) – meaning that Lucent would have primary responsibility for virtually all

aspects of the network build.

15. Both parties understood the importance of Lucent's uninterrupted flow of

financing to Winstar, and anticipated that Winstar would lose money for several years while its

network was built out, before becoming profitable and successful.

16. The Network Agreements contemplated that the network would be built

by Lucent largely using Lucent equipment and services. To ensure both the quality and

reliability of the network's performance, Lucent was obligated to build the network using

equipment that was "Best of Breed" in the industry, meaning that the equipment provided the

B108

best functionality available in the market for the lowest price. Lucent understood that when its own equipment was not Best of Breed, it would have to use equipment from other vendors. Similarly, Lucent understood that it would be required to hire and finance subcontractors for services necessary to perform the network build out, where it lacked the required skills or expertise to perform its duties by itself. The Network Agreements did not excuse Lucent from building or financing the network where Lucent's equipment was not Best of Breed, or Lucent was not capable of performing the necessary services.

17.    Within months of entering into the Network Agreements, Lucent had shown that it either could not or would not perform the full scope of the design, engineering, planning, construction and implementation services that it had agreed to undertake. In order to satisfy its obligations under the Agreements, Lucent retained Winstar Wireless (Winstar's operating subsidiary) to perform certain of the services for which Lucent was responsible under the contract, but was either unwilling or unable to perform. In accordance with its financing and other obligations under the Network Agreements, Lucent agreed to finance and pay for Winstar Wireless' services. Lucent's retention of Winstar Wireless was formalized by a subcontract that Lucent and Winstar Wireless executed in the early part of 1999, under which Winstar Wireless agreed to act as Lucent's subcontractor in the network build (the "Subcontract"). Pursuant to this arrangement, Winstar Wireless performed more than $390 million in services on Lucent's behalf in 1999 and 2000, all of which Lucent paid for and financed as required by the Agreements.

18.    Unfortunately, Lucent was also unable to consistently provide Best of Breed equipment. To accommodate its strategic partner, Winstar nevertheless purchased hundreds of millions of dollars of equipment even where it was not Best of Breed.

19.     For the first eighteen months of the relationship, the parties followed a course of conduct pursuant to which Winstar purchased large amounts of Lucent equipment and Lucent either provided its own services or financed Winstar Wireless's services under the Subcontract to build the network. During that time, Winstar became one of Lucent's largest customers. The apparently successful progression of the build out, and Winstar's business plan, enabled Winstar to raise additional money in the first half of 2000. Even though it was not obligated to repay the $1.15 billion in financing that Lucent had extended up until that time until the end of 2002, Winstar prepaid the entire outstanding debt in May 2000.

20.     For its part, Lucent was sufficiently pleased with the relationship that in connection with Winstar prepaying its debt, Lucent agreed to enter into an amended credit agreement with Winstar extending an additional $2 billion in financing and increasing the level of availability of those funds at any one time from $500 million to $1 billion.

21.     Upon information and belief, in or about late summer or fall of 2000, and unbeknownst to Winstar, Lucent adopted an entirely new internal policy towards its vendor financing relationships generally and its contracts and relationship with Winstar in particular. With its stock price in a nose dive, and its liquidity and financial performance declining, Lucent began replacing members of its senior management team. These new members of senior management persuaded Lucent to adopt a much more restrictive policy towards vendor financing, and to implement stringent cash conservation policies. Winstar, as Lucent's largest vendor financing obligation, became the prime immediate target of Lucent's new policies, which policies included an internal decision to repudiate or refuse to perform existing agreements with a view to either changing them dramatically in Lucent's favor or wrongfully abrogating them altogether. To make matters worse for Winstar, Lucent's new Chief Financial Officer took an

B110

immediate personal dislike to the Winstar relationship – a dislike that escalated in the coming months.

22.    The new senior management at Lucent did not bother to familiarize themselves with their contractual obligations, or understand the parties' roles in the strategic partnership. Instead, as part of formulating their policies towards vendor financing generally and Winstar in particular, they developed a series of complaints about Winstar's perceived non-performance of non-existent obligations that ran contrary to the spirit and letter of the actual agreements in place. Thus, Lucent began to complain internally:

- that Winstar was not repaying its new borrowings under the amended credit agreement quickly enough, although the amended credit agreement did not require repayment until 2005, Winstar had just negotiated the new credit facility with Lucent a few months earlier, and in so doing had repaid Lucent more than $1 billion dollars;

- that Winstar was not purchasing enough Lucent equipment and services, although the Agreements did not require the purchase of any particular amount of Lucent products or services, and although it was Lucent that consistently failed to provide Best of Breed equipment, and Lucent's lack of skills and expertise that required the hiring of third-party and subcontractors' services;

- that some of the pricing provisions for the network build were not sufficiently profitable for Lucent, even though Lucent had negotiated for and agreed to that pricing;

- that its collateral position under the credit facility was unsatisfactory, although it was the precise position it had knowingly agreed to just months earlier; and

- that the Network Agreements were not sufficiently profitable to Lucent, although there was no guaranteed level of profitability in the Agreements, and the alleged lack of profitability was the result of Lucent's own inability to manufacture and provide best of breed equipment and to perform the services it had agreed to undertake but instead had subcontracted to Winstar Wireless.

23.    These complaints began to develop in late summer 2000 and grew through the fall of 2000. A few of these concerns were voiced to Winstar, but most were not. Moreover, even those concerns that were voiced to Winstar were soft-pedaled by Lucent's sales team, such

B111

that Winstar had little or no idea of the true shift in attitude and policy that was transpiring within Lucent, particularly among the Lucent executives on the finance side of the business. Nevertheless, Winstar sought in good faith to address those baseless complaints which Lucent did voice to it, and was repeatedly advised or led to believe that it had addressed them to Lucent's satisfaction.

24.    By November 2000, however, Lucent's financial condition had taken an even further turn downward, causing Lucent to replace the remainder of its senior management team, including its Chief Executive Officer for North America and its Chairman, and virtually all of the executives who had negotiated the original agreements between the parties and understood the contractual commitments between Lucent and Winstar.  Lucent's new senior management team did not share Lucent's prior commitment to its partnership with Winstar or the company's other vendor finance partners, and internally made the decision that such relationships – and in particular, the relationship with Winstar – were no longer economically desirable or strategically beneficial to Lucent and had to be drastically altered or terminated outright as soon as possible.

25.    Upon information and belief, Lucent, desperate to avoid its financing and other commitments to Winstar in the face of its own declining financial condition, embarked upon a series of actions secretly and deliberately calculated either to compel Winstar to accept fundamental changes in the contracts that would abrogate Lucent's key obligations, or extricate Lucent completely from those obligations.  Lucent had already commenced its efforts in September 2000, when it wrongfully repudiated the Subcontract with Winstar Wireless, and threatened to discontinue financing for non-Lucent equipment and services.  Lucent stepped up its efforts in December 2000.

B112

26.    After using its leverage and control over Winstar, both contractual and extra-contractual, to squeeze a $195 million prepayment of debt out of Winstar, Lucent triggered a refinancing notice provision in the amended credit agreement. The refinancing notice provided Lucent with the option, at the end of the refinancing period, to convert its loans to Winstar (which were secured by certain assets of a Winstar subsidiary) into unsecured, high yield notes bearing interest at a rate of two percent above the yield-to-worst call of certain of Winstar's then outstanding bonds. Lucent knew that the capital markets, particularly for telecommunications companies, were in such a severe state that there would be no market for these so-called conversion notes, and that the actual exercise of this conversion option would therefore bring it no economic benefit. Thus, even though Lucent never had any intention of exercising the conversion option, it held that threat over Winstar's head, and later obstinately refused to relinquish it, even when Winstar pleaded with Lucent that its refusal to do so was severely jeopardizing Winstar's financial options to obtain financing from alternate sources.

27.    In December 2000, Lucent also initially refused to finance the network build-out services performed by Winstar Wireless under the Subcontract for the previous three months. After Winstar pressed Lucent to perform under its contract, and Lucent's attorneys advised the company internally that it was contractually obligated to do so, Lucent agreed to finance those services. It then again wrongfully repudiated its obligations under the Subcontract by threatening to no longer perform in the future absent contractual concessions to which it was not entitled -- in clear violation of its existing contractual obligations, and the custom and practice developed by the parties.

28.    At the same time, Lucent continued to set additional conditions for its continued performance of its existing obligations, and then refused to enable Winstar to meet

10

those conditions. Thus, for example, when Lucent declared it would no longer finance the

network build-out services performed by Winstar Wireless, Lucent stated that it desired to

perform the obligations itself, and demanded that Winstar entered into a full outsourcing

agreement providing for Lucent to perform those services. Upon being offered such an

agreement, however, Lucent senior management vetoed it, against the recommendation of its

negotiating team. Lucent was fully aware that by simultaneously refusing both to perform the

network build-out services or to finance their performance under the Winstar Wireless

Subcontract, it was wrongfully repudiating its obligations, and sabotaging Winstar. Lucent also

proceeded to insist upon a series of meetings to "negotiate" other changes to the parties'

agreements. Implicit in that demand was the notion that Lucent would provide the requisite

financing if Winstar acceded to certain of the changes demanded. But Lucent had no actual

intention of ever again financing the services performed for it by Winstar Wireless irrespective

of any concessions Winstar might make.

        29.    Unaware of Lucent's true intentions, Winstar met with Lucent in early

January 2001, and continued to do so throughout the first quarter, in a good faith attempt to

accommodate Lucent's alleged concerns. Winstar expected that by so doing Lucent would

adhere to its existing contractual obligations. While vehemently disagreeing with Lucent's

position, Winstar was willing, within reason, to improve its partner's position. Moreover,

Winstar had little choice but to try and appease Lucent, given its dependence upon Lucent's

financing, as well as its dependence upon Lucent as its equipment and services provider and

turnkey agent.

        30.    But Lucent's demands called for drastic and extensive changes in the

Network Agreements that would have essentially abrogated all of Lucent's principal obligations.

PH1 427667v1 09/27/02

11

In addition, Lucent refused to negotiate in good faith, and in doing so misled Winstar about its
true intentions. Thus, Winstar's good faith efforts to accommodate many of these demands did
nothing to satisfy Lucent or cause it to retreat from its wrongful refusal to honor its contractual
obligation to finance services.

## FACTUAL BACKGROUND

### A.    The Genesis of the Strategic Partnership

31.    In 1998, while dedicated to building a global broadband network, Winstar
was still in the infancy of its network construction efforts. At that time, it was one of a number
of "CLEC" companies (competitive local exchange carriers) that had been established to
compete with the incumbent providers of local and long-distance voice and data communication
services (e.g., companies such as Sprint, Verizon and SBC). Winstar, however, had a unique
value proposition that was widely recognized as setting it apart from other CLEC companies, as
well as many of the incumbent providers.

32.    First, Winstar was building its own network, whereas most other CLECs
would lease existing fiber and transmission capacity from the incumbent local providers,
particularly for the final or so-called "last mile" connection to the customer. While requiring the
expenditure of an enormous amount of capital to construct the network initially, the construction
of its own network would ultimately result in significantly lower operational costs, significant
gross margins, and greater reliability, quality and predictability of service.

33.    Second, Winstar had developed an innovative solution that utilized
broadband fixed wireless technology, rather than traditional underground fiber or copper wire, to
make the final connection to its customers. Winstar used small antennas and equipment housed
in the customer's building (otherwise known as "Business Sites") to transmit voice and data
communications to "Hubs" or collection points located around any given city, and from there

B115

transferred the signals onto its national and international fiber optic network. This innovative

use of wireless technology provided Winstar with a tremendous competitive advantage in terms

of the cost and speed of deployment to new customers as compared with the traditional

installation of underground fiber or copper wire. Moreover, this technology allowed Winstar,

which held the rights to the largest amount of radio spectrum of any carrier in the U.S., to

provide economical broadband services to thousands of businesses located in office buildings

beyond the reach of fiber or to which fiber connection would be prohibitively expensive.

      34.    Thus, while Winstar was only in the initial stages of its network expansion

in 1998, it was widely acknowledged -- including by Lucent -- as one of the top new providers in

the burgeoning area of broadband services, and as a result attracted significant investment and

capital from a variety of sources. Indeed, throughout its existence, Winstar demonstrated an

extraordinary record of attracting new capital precisely because of its unique and exciting

business model.

      35.    Nevertheless, with the sudden deterioration in the financial markets in the

fall of 1998, Winstar needed to secure a stable, long-term source of additional financing to

achieve flexibility and improve its competitive position in an industry that required enormous

expenditures of capital to build a competitive network. It also wanted to accelerate the

completion of its global network to achieve more quickly economies of scale and to meet the

growing business need for its services. Finally, Winstar was highly interested in teaming with a

partner that had the expertise, resources and credibility needed to design and construct the

network worldwide. Winstar wanted to avoid hiring the enormous number of personnel needed

to build the network (most of whom would no longer be needed once the network was built), and

13

B116

also to focus on the operation and marketing of its expanding business rather than on the construction of the network.

36. Lucent, which claims to be one of the world's leading suppliers of telecommunications equipment and services, wanted to develop and expand its services business, as well as increase its sales to Winstar (it had previously been selling voice switches and certain other miscellaneous equipment to Winstar) and other emerging providers of telecommunications services. Lucent fully recognized that Winstar's wireless technology put it ahead of its competitors, and viewed a partnership with Winstar as an opportunity to gain a greater foothold in the nascent, but rapidly expanding CLEC and broadband industries. Indeed, in the fall of 1998, Lucent was heavily engaged in an effort to convince Winstar to serve as the first user of Lucent's new long haul optronic equipment, thereby demonstrating its functionality to other potential customers in the industry.

37. Thus, on October 21, 1998, following an intense period of negotiations, Winstar and Lucent entered into a strategic partnership pursuant to which Lucent agreed to design and build Winstar's entire global telecommunications network, and further agreed to provide $2 billion in financing to Winstar to achieve that goal.

38. As stated in the Network Agreements, the overall objective of the partnership was for Winstar "to engage Lucent to design and implement a Best of Breed nationwide and global communications Network," and "leverage Lucent's core competencies in both products and services in designing and implementing the Best of Breed Network." It was Lucent's desire, as further stated in the Agreements, "to provide such products and services *and provide the requisite financing* to enable Winstar and Lucent to achieve this mutual objective."

The parties contemplated that, as a result of their strategic partnership, Winstar would become a more profitable and successful business.

39.    The partnership was widely perceived as beneficial to both parties. Winstar would receive the design, engineering and implementation expertise and resources of one of the world's leading suppliers of telecommunications equipment and services, as well as $2 billion in financing, and the capacity to expand and accelerate its worldwide network build. Lucent would gain a large and growing new customer, and more exposure in the burgeoning broadband and CLEC markets which it hoped to leverage into sales opportunities with other start-up telecommunications companies and service providers.

**B.    The Initial Agreements**

40.    The strategic partnership was embodied in two main agreements:  the Supply Agreement and the Credit Agreement, both dated October 21, 1998.

    *i.    The Supply Agreement*

41.    As stated earlier, the overall objective, as clearly articulated in the Supply Agreement, was for "Lucent to design and implement a Best of Breed nationwide and global communications Network" for Winstar and "to provide the requisite financing to enable Winstar and Lucent to achieve this mutual objective."

42.    With regard to Lucent's obligation to design and build Winstar's worldwide network, the Supply Agreement envisaged a complete turnkey arrangement in which Lucent assumed responsibility for "the design, architecture, planning, program management and implementation" of all parts of the network.  To that end, the Supply Agreement assigned Lucent "full responsibility" to:

        (i)    Develop the end-to-end design and architecture of the Network;

B118

        (ii)     Develop and design the end-to-end Network Technology, including Network Elements specifications pursuant to Best of Breed;

        (iii)    Plan and execute the implementation of the Network;

        (iv)    Acquire the requisite Network Elements for the implementation of the Network;

        (v)     Install, integrate and test the Network Elements with each other and with the appropriate OSS (Operating Support Services) and BSS (Business Support Services); and

        (vi)    Provide continued engineering support for the Network as it evolves and expands to include additional Winstar business units and Winstar customers.

43.     The Supply Agreement included an initial transition plan specifying certain time periods in which Lucent was to assume responsibility for these design, engineering and implementation services, with further details and implementation to be provided in subsequent plans. In all events, it was estimated that Lucent would take over virtually all of the build-out services within a few months of executing the Supply Agreement.

44.     In carrying out these responsibilities, moreover, Lucent represented and warranted that "[its] Services shall be rendered with promptness and diligence and shall be executed in a workmanlike manner, in accordance with the practices and high professional standards used in well-managed operations performing services similar to the [Lucent] Services," and that it would "use adequate numbers of qualified individuals with suitable training, education, experience and skill to perform the Services."

45.     The parties further agreed that the network would be Best of Breed, meaning that it would be built using "Products and/or Services that . . . have the best functionality for the lowest price," as defined in further detail in Schedule H of the Supply Agreement. Indeed, the parties expressly agreed that a shared commitment to the Best of Breed

B119

standard was "a *critical* component of the Parties success in working together under this

Agreement." Because Lucent was to have full responsibility for the design and architecture of

the network, as well as the selection and acquisition of the network components, compliance

with the Best of Breed standard was critical to ensure that Lucent did not simply utilize its own

equipment and software whenever available, rather than building the network to the highest

possible standards with the best possible equipment.

      46.     Within those confines, it was presumed that Lucent would likely be the

preferred supplier of equipment and software for the network, and that a majority of the products

and services used in the network build would be provided by Lucent's own manufacturing,

service and sales divisions (such products and services are referred to in the Supply Agreement

as "Lucent Content"). The expectation was that by the second year of the contract, Lucent

would, on an annual basis, provide at least 70% of the products and services necessary to build

out the network.

      47.     However, the parties specifically agreed that Lucent would only be the

preferred supplier so long as Lucent's products and services were Best of Breed as required by

the Agreement. Thus, paragraph 2.3 of the Supply Agreement provided that "Lucent will be

Winstar's preferred supplier *to the extent* Best of Breed Network elements exist from Lucent."

Schedule H to the Supply Agreement similarly stated that "Winstar agrees to use Lucent as its

preferred supplier and to use Lucent Products and Services *provided* that they are Best of Breed."

Schedule H set forth in detail how the Best of Breed determination would be made, and

established a process pursuant to which Lucent could participate in any such determination.

      48.     In addition, the parties expressly understood and recognized that there

would be elements of the network that would need to be provided by other vendors and even by

17

Winstar itself. Thus, the parties understood that "some of the recommended Network Elements and services may consist of Third Party products and services" as well as "Winstar provided products and services." Lucent expressed the belief "that its telecommunications Products and Services are superior and are second to no other vendor," and thus neither party had any reason to believe that the targeted percentages could not be met.

49.    Lucent did not manufacture some components of the Network, such as the radio gear essential to Winstar's innovative solution. During negotiations, Lucent intimated that it would seek out opportunities to acquire companies or product lines providing these components, which would both increase Lucent's sales, and more importantly for Winstar, improve the Lucent Content ratio.

50.    Lucent's obligations under the Supply Agreement, however, were in no way contingent on whether or not the targets for Lucent Content were attained.

51.    Similarly, Lucent undertook to finance the entire network build irrespective of whether the products and services utilized were provided by Lucent, by third party vendors, or by Winstar itself. Specifically, paragraph 11.3(b) of the Supply Agreement provided that:

> Lucent agrees to provide financing (subject to the terms and conditions set forth in the Credit Agreement) for all Lucent Products and Services purchased by Winstar under this Agreement plus $2,600,000 per Contract Year for amounts drawn down for Winstar provided RF engineering (with any excess and any other Winstar provided products and services to be treated as Other Products and Services as defined below) (collectively, the "Lucent Content"). Lucent also agrees to provide financing for non-Lucent Products and services associated with the Network, subject to the following annual total financing percentage limitations set forth below.

52.    Paragraph 11.3 then set forth certain annual total financing percentages that the parties expected to reach. In the event the contemplated targets for Lucent Content were

18

B121

not met, however, Lucent's sole contractual relief was the imposition of a financial penalty, in a maximum amount of $3 million per contract year, calculated pursuant to a formula set forth in Paragraph 11.3(b)(ii)(2) of the Supply Agreement.

53.    Paragraph 11.3(c) likewise stated that "Lucent shall provide financing . . . for any such other invoices for non-Lucent Products and services (e.g. Third Party Products and third party and Winstar provided services) delivered to Lucent by Winstar . . . ."

54.    The terms of the Supply Agreement did not permit Lucent to withhold financing if the contemplated targets were not met.

55.    The provisions of the Supply Agreement plainly reflected Winstar's reliance upon Lucent for the financing and construction of its global network. For example, section 15 of the Supply Agreement provided Winstar with the right to terminate under specified circumstances, but provided no reciprocal right of termination by Lucent. Moreover, even after expiration or termination of the Agreement, Winstar was entitled to extend all or any portion of the Supply Agreement at its sole discretion for a period of up to 12 months, in order to ensure continuity in the expansion and support of a network that was to be built and designed predominantly by Lucent. Thus, paragraph 15.4 provided:

> Upon termination or expiration of this Agreement, Winstar may extend all or any portion of the Agreement beyond the effective date of termination one or more times as it elects, at its sole discretion, provided that the total of all such extensions shall not exceed twelve months (unless a longer time period is mutually agreed upon) following the original effective date of termination (such period the "Disengagement Period").

56.    Moreover, the Supply Agreement expressly required Lucent to continue performing its obligations while any dispute was being resolved. These safety provisions demonstrated the parties' understanding that Lucent's role under the Supply Agreement was

B122

irreplaceable, and that an abrupt termination of work by Lucent would severely compromise Winstar and its network.

57.     Finally, the Supply Agreement provided that certain pre-existing agreements and addenda between Winstar and Lucent would be incorporated into and governed according to the terms of the Supply Agreement.  This included Addendum Number Two Technical Support Agreement Between Winstar Telecommunications, Inc. and Lucent Technologies Inc., dated on or around October 14, 1998 (the "Technical Support Services Addendum"), pursuant to which Lucent agreed to provide certain technical support services to Winstar.  The services included trouble-shooting and emergency support services for all Lucent products purchased by Winstar, including 24x7 access to Lucent's specialized Remote Technical Assistance Centers ("RTAC") and on-site technical support by trained Lucent maintenance personnel.  The prices to be charged for such services were to be determined on a time and material basis at specified rates.

       ii.     *The Credit Agreement*

58.     Lucent and Winstar also executed a Credit Agreement on October 21, 1998.  Under the Credit Agreement, Lucent promised to provide up to $2 billion in financing, to be drawn down in $500 million tranches, for products and services associated with the build-out of the Winstar network.  When it entered into this relationship with Winstar, Lucent understood that Winstar's ability to pay for products and services under the Supply Agreement was completely dependent upon the availability of this financing.  Indeed, Lucent was fully cognizant that companies like Winstar, which are engaged in the construction of a massive nationwide and global infrastructure, require large amounts of capital before they ever turn a profit.

59.  Thus, the Credit Agreement did not require repayment of principal until the end of 2002. (Winstar was projected to be "cash positive" by 2002). Until that time, Winstar was obligated to pay interest only on the amounts it had borrowed.

**C.  Winstar's Commitment to the Strategic Partnership in the Face of Lucent's Repeated Failures under the Supply Agreement**

60.  Following the execution of the Supply and Credit Agreements, and during the next two years of the relationship, there were numerous instances in which Lucent proved unable or unwilling to live up to its obligations and responsibilities under the Supply Agreement. As described below, it failed to take on the full scope of services for which it was responsible under the Supply Agreement; in many instances the work it did perform was of poor quality, untimely and incomplete; and it proved consistently unable to provide Best of Breed equipment and software that satisfied the requirements of the Winstar network.

61.  Nevertheless, throughout this period, and throughout the entire relationship, Winstar remained committed to its partnership with Lucent, and strove at every turn to find ways to work with Lucent to remedy these deficiencies and to improve Lucent's performance. In the end, of course, Lucent would betray this commitment and act to destroy Winstar in complete disregard of its obligations and the longstanding commitment to the relationship demonstrated by Winstar.

*i.  Lucent's Inability to Perform Services: The Subcontract*

62.  At no time during the relationship did Lucent ever perform the full scope of design, engineering, planning, acquisition, testing and implementation services for which it agreed to assume responsibility in the Supply Agreement, notwithstanding repeated efforts by Winstar to prod Lucent to perform those services.

21

63.     Indeed, it became apparent within only a few months of entering into the relationship that Lucent was either unwilling, or more likely unable, to perform the full scope of services that it had held itself out as capable of performing, and in fact had agreed to perform. Winstar's efforts to cajole Lucent into performing these services were met with resistance and inaction. Nevertheless, the performance and financing of these services remained a critical component of the network build, and Winstar was committed to making the partnership work.

64.     As a result, in early 1999, the parties entered into a mutually agreed upon practice and course of conduct pursuant to which Winstar Wireless (Winstar's subsidiary) undertook to continue performing those services which Lucent was unwilling or incapable of performing, and Lucent, in accordance with its obligations under the Supply Agreement, agreed to finance and pay for those services.

65.     This arrangement had the mutual benefit of both satisfying the continued requirements of the network build and fulfilling Lucent's service obligations under the Supply Agreement. Indeed, absent this arrangement, Lucent would have been in breach of the Supply Agreement.

66.     Furthermore, the arrangement was consistent with the Supply Agreement, which gave Winstar the exclusive option to perform services Lucent otherwise intended to subcontract to a third party.

67.     The particular practice and arrangement that developed among the parties was that Winstar Wireless would perform whatever services were necessary for the build-out of the network, above and beyond those which Lucent was performing, and, at the end of each quarter, Lucent would issue a purchase order for the services rendered. Winstar would then send

B125

an invoice and request for borrowing to Lucent, which Lucent would pay by wire transfer through the credit facility.

68.    This practice and arrangement is memorialized by the Subcontract which was titled "Agreement for Network Build-Out Services" and executed in early 1999 by Lucent and Winstar Wireless. The Subcontract specifically provides:

1.1    <u>Services</u>. [Winstar Wireless] agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedules. . . The parties may enter into future Task Orders, to which the parties may agree from time to time. . .;

4.1    <u>Invoice</u>. [Winstar Wireless] agrees to provide a written invoice to Lucent monthly in arrears for Services actually performed under each Task Order. For Services performed on a time and material basis, [Winstar Wireless] will be compensated in accordance with the applicable Task Order for work performed. For Services performed on a fixed price basis, [Winstar Wireless] agrees to invoice Lucent in accordance with the schedule of milestone payments set forth in the applicable Task Order; and

7.1    <u>Term</u>. The term of this Agreement will commence on the Effective Date and will continue until *both parties* mutually agree to terminate, unless sooner terminated pursuant to this Section 7.2. In the event of the termination of this Agreement, it shall remain in full force and effect with respect to any then-outstanding Task Orders issued under this Agreement until all such Task Orders are completed, expired or terminated.

69.    At the outset, Winstar Wireless performed roughly $25 million in network build-out services each quarter for Lucent pursuant to this arrangement. At that time, Winstar Wireless had approximately 100 engineers and other employees who had been engaged in the design, engineering and construction of the network prior to the agreement with Lucent. Winstar Wireless had anticipated retaining most of these employees notwithstanding the extensive work that Lucent had agreed to take over, because, under the Supply Agreement, Winstar still retained oversight responsibility for the network build. In addition, even under the Supply Agreement, it was understood that there was some build-out work, such as RF (radio frequency) engineering, that Winstar would likely continue to perform throughout the course of the relationship.

B126

70.    Over time, however, as its network expansion grew, so too did the volume of work that Winstar Wireless was required to reform. Thus, by the third quarter of 2000, Winstar Wireless was performing more than $60 million in services each quarter, and had been forced to hire or retain hundreds of additional employees and contractors to perform the functions that Lucent was still refusing or unable to perform, notwithstanding repeated efforts by Winstar to get Lucent to assume greater responsibility. Indeed, one of Winstar's purposes in partnering with a company like Lucent had been to avoid the need to hire hundreds of engineers and other employees who would only need to be laid off a few years down the road after the network had been substantially built. Nevertheless, Winstar and Winstar Wireless were committed to the partnership, and performed this work in Lucent's stead to preserve the relationship and ensure the overall success of the project. Lucent was likewise content with this arrangement.

71.    All told, through the end of 2000, Winstar Wireless performed more than $390 million in services pursuant to this practice and arrangement, all of which Lucent paid for and financed as required by the Supply Agreement and the Subcontract.

ii.    *Lucent's Failure to Provide Best of Breed*

72.    In addition to Lucent's failure to perform the full scope of its services responsibility under the Supply Agreement, Lucent also proved to be consistently incapable of providing Best of Breed equipment and software that met the requirements of the Winstar network. Thus, for example, its long haul and metro optronics equipment was not Best of Breed, nor were its routers, data switches, cross connects, or access gear. In fact, very little of Lucent's equipment and software turned out to be Best of Breed when compared in the lab with that of its competitors, such as Cisco and Nortel. And, in some instances, even where Lucent had

B127

equipment under development that might have been Best of Breed, it was not available for actual
production and delivery to customers such as Winstar until unspecified future dates.

73.    Again, however, Winstar was committed to the success of its partnership
with Lucent, and while not required, agreed to purchase and install hundreds of millions of
dollars of Lucent equipment, although it was only serviceable and not Best of Breed as
contractually required, and in some cases to delay its network expansion to await the delivery of
new Lucent gear.

74.    In a number of significant instances, however, Lucent simply had no
viable solution at all, or its equipment and software were so inadequate and sub par that it simply
could not be used even absent the Best of Breed consideration.  Thus, for example, prior to mid-
2000, Lucent lacked appropriate equipment for installation in the Winstar "Hubs" located within
each city, as well as in the actual customer buildings – two key pieces of the Winstar network.
This deficiency led to the installation of a competitor's equipment in more than 70 Hubs and
1500 Business Sites between October 1998 and early 2000.

75.    Lucent also failed to follow through on its commitment to acquire product
lines to fill these numerous gaps, and as a result, the replacements that Winstar was forced to
resort to, although financed by Lucent, were counted against Winstar in the Lucent Content ratio
calculation.

D.    Additional Network Agreements

76.    Notwithstanding these difficulties and failures on the part of Lucent, on
balance, the relationship remained a satisfactory one for both parties through at least the second
half of 2000.  For Winstar, the network expansion was proceeding largely as planned through its
combined efforts with Lucent.  For Lucent, while Winstar may not have been purchasing the
volume of Lucent products that Lucent had anticipated, Winstar had still become one of its

B128

largest customers, with hundreds of millions of dollars in sales, and a flagship customer for some of its newest equipment.

77.    Indeed, in September 2000, Lucent's former Chairman, Richard McGinn, publicly reaffirmed Lucent's commitment to the relationship. As recorded in a report from Credit Suisse First Boston:

> McGinn expressed quite emphatically to us that LU [Lucent] has utmost confidence in the WCII [Winstar] business model and that the vendor relationship between the two companies is as sound as ever. In addition, he was quite clear in his assurance to us that and (sic) the $2B vendor financing arrangement remains very much in force despite erroneous press reports and numerous market rumors to the contrary.

*i.    The Second Credit Agreement*

78.    In addition, by the first half of 2000, Winstar had obtained a new bank credit facility and repaid all of its borrowings from Lucent under the Credit Agreement – approximately $1.15 billion – although repayment had not been due until the end of 2002. Lucent was sufficiently pleased with the relationship that on May 4, 2000, it entered into a Second Credit Agreement extending an additional $2 billion financing to Winstar. Winstar was not required to repay any principal under the new loan facility until 2005. Until that time, Winstar was required to pay interest only.

79.    Under this new facility, Lucent's loans constituted purchase money debt. Stated otherwise, they were not secured by any assets of the Winstar group other than those specific assets that Winstar purchased with Lucent's financing, which assets were to be held by one or more Winstar subsidiaries established solely for the purpose of holding the assets financed by Lucent.

80.    In the new loan facility, Lucent also increased the availability of the funds from $500 million tranches to $1 billion. Once the outstanding debt that Winstar owed to Lucent

26

exceeded $500 million, however, Lucent had the option to issue a refinancing notice to Winstar. If Winstar failed to refinance the outstanding debt within 90 or 105 days, depending upon whether the refinancing notice was issued at or around a year-end audit, a "refinancing period" would commence. At that time, the interest rate applicable to Winstar's loans would increase by two percent, and Lucent would obtain the right to refuse any monthly draw that did not include at least 70% Lucent content. At any time during a refinancing period, Lucent also had the option of converting the outstanding debt into unsecured notes (the "Conversion Notes"). These Conversion Notes would bear an interest rate of two percent above the yield-to-worst call of Winstar's 12-3/4% notes, due in the year 2010, as of the date of conversion – i.e., a materially higher rate than the Lucent loans. However, the notes would also become unsecured obligations of the parent holding company of Winstar rather than secured obligations of the Winstar subsidiary holding those assets whose purchase Lucent had financed.

81.     Winstar borrowed funds under the Second Credit Agreement, and after a payment by Winstar of approximately $195 million in December 2000, the amount borrowed stands at approximately $735 million.

ii.     *The Master Service Agreement ("MSA")*

82.     The apparent mutual success of the parties' relationship through mid-2000 also led to the execution of other agreements expanding the scope of their relationship. Thus, on December 13, 1999, Lucent and Winstar Wireless executed a Master Service Agreement, effective as of August 1, 1999, whereby Lucent committed to purchase a minimum of $100 million of products and services offered by Winstar over a five-year period. This agreement confirmed the initial understanding of the parties calling for Lucent to purchase products and services offered by Winstar.

B130

83.     The products and services listed and available under the MSA included local and long distance calling, Internet access, frame relay, ATM, consulting, network and system design, application installation, software development, and training among others.

84.     Prior to the fourth quarter of 2000, Lucent had purchased approximately $10 million of such products and services from Winstar, but would never fulfill the remainder of its obligation.

    *iii.*     *Hub and Business Site Agreement*

85.     As described above, two of the key aspects of the Winstar network were the Hubs located throughout the cities in which Winstar offers service, and the Business Sites or buildings where each customer was located. Beginning in late 1999, Lucent and Winstar entered into discussions for Lucent to build Hubs and Business Sites using Lucent equipment and technology.

86.     The discussions ultimately culminated in an Addendum to the Supply Agreement dated June 30, 2000, in which Lucent agreed to build 100 Hubs and 2000 Business Sites across the U.S., completely on a turnkey basis, using its own equipment and resources.

87.     At that time, the price for this work was not fixed. Subsequently, however, Lucent committed to build each Business Site for a price of $20,000 per Site, and to build each Hub for a price of $400,000 per Hub. In addition, Lucent increased its commitment to 3,000 Business Sites.

88.     Lucent subsequently refused to honor those prices, and instead sought to charge Winstar higher prices for those Hubs and Business Sites which it was asked to build.

PH1 427667v1 09/27/02

### E.    Lucent's Transformation and Change of Heart

89.    In early 2000, Lucent's financial position was at its peak.  With a share price in excess of $75, Lucent had one of the largest market capitalizations *in the world*.  Lucent was flying high.

90.    Lying just below the surface, however, were signs of financial trouble. Beginning in mid to late 1999, as a result of its inability to keep up with its competitors technologically, Lucent's sales began to fall worldwide, and Lucent began experiencing difficulty meeting its quarterly revenue projections.  By the summer of 2000, Lucent was beginning to suffer liquidity problems, and by the third quarter of 2000, Lucent was losing money.  During this period, Lucent's stock price was in freefall, ultimately dropping from its high of more than $80 per share in December 1999 to less than $10 per share at the end of March 2001, a period of less than fifteen months.  This slide has continued even to the present, with Lucent's stock price having fallen below $1 per share.

91.    Under the intense pressure of this extraordinary erosion in its share price and financial condition, Lucent underwent a series of dramatic changes.  Principal among those changes was a complete overhaul of its senior leadership team, beginning with the instatement of a new Chief Financial Officer in May 2000, and ultimately culminating with the replacement of both its Chief Executive Officer for North America and its Chairman in October 2000.  In the end, Lucent replaced not only the majority of its senior management team, but virtually every executive involved in the Winstar relationship.

92.    Lucent's new management secretly implemented a strategic change in direction that ultimately involved a shift away from its relationships with emerging telecommunications companies such as Winstar, which it had once so avidly courted, towards

B132

the expansion of relations with the incumbents such as Verizon and Sprint, Winstar's competitors.

93.   A significant part of the investment community's scrutiny focused on Lucent's vendor financing portfolio, and thus Lucent's new management team also began to tighten and restrict vendor financing. Lucent implemented changes designed to minimize its financing exposure and commitments, particularly to so-called "emerging service providers" such as Winstar. Unfortunately for Winstar, it represented Lucent's largest vendor financing obligation at that time.

94.   With increasing concern over its liquidity, Lucent also began to look for ways to conserve cash. Lucent publicly admitted that it had adopted a policy of "actively" managing its vendor financing portfolio "to minimize the impact on Lucent's cash requirements." Funds borrowed for products and services provided by Winstar and third party vendors, of course, constituted a significant out flow of cash for Lucent that it wanted to end. In addition, Lucent instituted new internal rules for measuring the "profitability" of these customer accounts which would cause the Winstar relationship to suddenly be viewed as unprofitable to Lucent.

95.   These changes, and others, ultimately led Lucent deliberately and maliciously to abandon its partnership with Winstar and repudiate all of its key contractual obligations to Winstar.

96.   Upon information and belief, while Lucent was intentionally and/or recklessly breaching its contractual obligations, it was, pursuant to its newly adopted policies, also damaging, or soon to damage, its other vendor finance partners by similar conduct designed to wrongfully terminate or restrict their financing as well.

97.    Lucent's change of heart towards Winstar began in the late summer of 2000. By that time, Lucent's shares had lost nearly a quarter of their value, and Lucent was beginning to look for ways to restrict its vendor financing exposure, and to restrict the outflow of cash from the company. In addition, Lucent had hired a new Chief Financial Officer who, unbeknownst to Winstar, took an immediate and unjustified dislike to the Winstar relationship.

98.    With the hiring of a new Chief Financial Officer, and the adoption of new internal policies and attitudes, Lucent began internally to develop a series of complaints about Winstar. Thus, internally, Lucent began to complain:

- that Winstar was not repaying its new borrowings under the amended credit agreement quickly enough;

- that Winstar was not purchasing enough equipment and services from Lucent;

- about the manner in which the parties' subcontracting arrangement was carried out, and the fact that more of the services had not been outsourced to Lucent;

- that some of the pricing for the products and services Lucent was providing, including the pricing for the construction of Hubs and Business Sites, was too low;

- that its collateral position was inadequate; and

- that the overall relationship was not sufficiently profitable to Lucent.

99.    These complaints began to develop slowly in late summer 2000 and grew through the fall of 2000. A few of these concerns were voiced to Winstar, but others were not. Moreover, even those concerns that were voiced to Winstar were soft-pedaled by Lucent's sales team, such that Winstar had little or no idea of the true shift in attitude that was transpiring within Lucent, particularly among Lucent executives on the finance side of the business.

100.    In lodging all of these complaints and grievances, however, Lucent acted in complete bad faith and with a callous disregard for the contractual agreements between the parties. Indeed, there was not a single aspect of Winstar's conduct as to which Lucent began to

31

complain that was in any way inconsistent with Winstar's rights and obligations under the

Network Agreements, or the way in which the relationship had operated for two years. Thus:

- Winstar was under no obligation to repay any principal until 2005, Winstar had only just negotiated a new credit facility with Lucent a few months earlier, and in so doing had repaid Lucent more than $1.1 billion dollars.

- Winstar was not under any obligation to purchase a specified amount of Lucent products and services, but was in fact purchasing as much as it reasonably could, given Lucent's utter inability to provide equipment superior to that of its competitors and Lucent's own failure to assume the full scope of services it had promised to perform.

- Winstar had been performing services in the manner and pursuant to the arrangement upon which the parties had agreed. Moreover, Winstar would have been more than happy to have Lucent perform these services rather than Winstar, but Lucent refused to satisfy its obligations under the Supply Agreement.

- Lucent had agreed to the pricing for products and services, including the construction of Hubs and Business Sites, only a short time before.

- Lucent's had negotiated for and agreed to the collateral position in the Second Credit Agreement in May 2000.

- Any shortfall in profitability to Lucent was a function of new profitability rules instituted by Lucent in the middle of the relationship, Lucent's own failure to deliver enough products and services for the network that were Best of Breed, and Lucent's exorbitant cost structure which did not allow it to make a profit at the prices to which it had expressly agreed. Moreover, the Network Agreements contained no profit guarantees.

     101.    Upon information and belief, Lucent's new management, however, did not

care whether its manufactured complaints were justified. Indeed, none of the new executives

bothered to carefully read or even familiarize themselves with the key terms of the Network

Agreements.

     102.    Notwithstanding the unwarranted nature of these complaints and issues,

Winstar, in the interest of maintaining the good will of the partnership, sought in good faith to

address those concerns which Lucent did voice to it. Thus, Winstar made a number of efforts

during the summer and fall of 2000 to raise additional capital to repay its borrowings under the

Second Credit Agreement. That effort, however, proved to be exceedingly difficult as the capital markets began to dry up in mid-2000, as Wall Street's perspective on "high tech" and "telecom" companies began to sour.

103. Similarly, in September 2000, Lucent advised Winstar in writing that it was no longer satisfied with the Winstar Wireless Subcontract. Lucent stated it wished to meet with Winstar representatives and negotiate a full "outsourcing" agreement whereby Lucent would assume most, if not all, of the network build-out services, as originally contemplated by the Supply Agreement. Lucent's Chief Executive Officer for North America committed to reaching such an agreement within a few weeks. Winstar responded enthusiastically, in part because Lucent threatened not to finance the services that Winstar Wireless had performed over the prior quarter, but also because Winstar had long sought to have Lucent perform all of the services it had agreed to perform in the Supply Agreement. While agreement was not reached in that period, negotiating teams from Winstar and Lucent met extensively over the course of the next ten weeks to negotiate such an "outsourcing" agreement, and by early December 2000 had come to agreement on the terms of a written addendum to the Supply Agreement which provided a process for Lucent to assume the network build-out services that Winstar was performing.

104. As a result of these efforts, and others, Winstar believed that it had addressed, or was addressing Lucent's purported concerns. And, for the most part, Lucent expressed little serious ongoing concern to Winstar over these issues.

105. But by late October of 2000, Lucent's financial condition – already bad – took a turn for the worst, when Lucent announced that it had sustained a loss for the preceding quarter. Lucent also revised its future earnings prediction further downward, the third such announcement that year. Lucent's plummeting share price, down nearly 70% on the year,

33

B136

prompted wholesale changes in senior management, including first the replacement of Lucent's

Chief Executive Officer for North America, the chief architect of the Lucent/Winstar partnership,

and then Lucent's Chairman, another proponent of the Winstar relationship.  Other changes and

additions included a new Chief Financial Officer for Sales and Marketing, a new Treasurer, a

new chief of the vendor financing group, a new global account representative for Winstar, and a

revamped role for Lucent's Vice Chairman in the North American region.  Gone were all of the

senior executives who had negotiated, supported and understood Lucent's contractual obligations

and commitments to Winstar.

      106.　　Lucent's new senior management, by contrast, was not concerned with

Lucent's contractual requirements, and had no inclination to preserve the strategic partnership

with Winstar.  Nor did they care even the slightest whether any of Lucent's perceived problems

were the result of Lucent's own failures.  Lucent's new management, driven by the need for

immediate results, reached an internal determination that Lucent's relationship with Winstar was

no longer economically desirable or strategically beneficial to Lucent and had to be changed,

irrespective of what the Network Agreements provided, the impact on Winstar, Lucent's legal

obligation to deal with Winstar fairly and in good faith, and/or Lucent's own failure and inability

to deliver the requisite products and services under the Agreements.

      107.　　Having made this decision internally, and without Winstar's knowledge as

to its true intent and design, Lucent thereupon embarked upon a series of actions calculated

either to compel Winstar to accept fundamental changes in the contracts that would inure solely

to the benefit of Lucent or to extricate itself completely from its contractual commitments to

Winstar.

PH1 427667v1 09/27/02

108.    Moreover, by late 2000, the capital markets had become even more restricted for telecommunications and other "high tech" companies.  Thus, Lucent's betrayal of its partnership with Winstar could not have come at a more difficult time for Winstar, whose business plan was built on the assumption that Lucent would continue to honor, rather than repudiate, its contractual obligations – an assumption of which Lucent was well aware.

F.    **Lucent's Malicious and Bad Faith Abandonment of the Network Agreements**

  i.    *December 2000:  Lucent Commences a Secret Campaign to Abandon Its Contractual Obligations to Winstar*

109.    Lucent's plan to abandon its contractual obligations to Winstar took several forms, all based on Lucent's stranglehold on Winstar as its sole source for the build out and main source of financing.  Lucent's position of dominance gave it the power to force Winstar to act contrary to Winstar's own best interests, and to dictate new terms in the parties' relationship.

  a.    Lucent Sets Up Winstar

  1.    *Winstar is Forced to Prepay the Lucent Loan*

B138

110.    As previously alleged, Lucent had been pressuring Winstar for months to locate new sources of financing and other working capital, purportedly to alleviate Winstar's need to draw down on the Second Credit Agreement for non-Lucent Content, and to reduce the amounts of its competitors' products that Lucent was financing.

111.    In December 2000, after months of effort to accommodate Lucent, Winstar located a source of new financing. Siemens Financial agreed to extend $200 million of financing to Winstar, as senior secured debt. Winstar badly needed this capital to see it through to the approaching date when Winstar would reach profitability.

112.    After strong-arming Winstar into finding this substantial new source of financing, Lucent then demanded that the funds be used not to fund non-Lucent content, *but to pre-pay Winstar's debt to Lucent*. In the end, Lucent used its virtual headlock on Winstar to force the company to take on the additional $200 million of senior, secured debt and then turn the funds over to Lucent as a loan prepayment in the vain hope that Lucent would perform its existing contractual duties.

113.    Winstar had obtained the Siemens financing based on Lucent's statements that such financing was necessary for the parties to continue in the relationship. Lucent led Winstar to believe that obtaining the outside financing would improve the relationship, and that Lucent would thereafter continue performance as it had promised. When Lucent insisted on the prepayment of those funds, it assured Winstar that Winstar would have access to additional funding through the Second Credit Agreement.

B139

114.   Upon information and belief, Lucent's true goal was not to reduce Winstar's dependence on the Lucent credit facility, but to reduce Winstar's debt to Lucent and refill Lucent's coffers before Lucent breached the contracts.

### 2.   Lucent's Refinancing Notice and Threat of Conversion

115.   Next, in mid-December 2000, Lucent delivered a "refinancing notice" to Winstar demanding that Winstar refinance its outstanding loans with Lucent, which, after the repayment, were slightly in excess of $500 million.  Lucent intentionally waited to issue the refinancing notice until *after* it had received the prepayment from the Siemens loan.  Upon information and belief, Lucent did so because it did not want Winstar to realize that Lucent had no intention of continuing performance until the money was in its pockets.

116.   Lucent issued the refinancing notice knowing that it was extremely unlikely Winstar would have the ability to refinance the debt.  However, Lucent's principal purpose in issuing the notice was not to refinance the loan, but to obtain even further extortionary leverage over Winstar.

117.   Lucent knew the issuance of the notice would give it the option in 105 days (on April 3, 2001) to convert the Winstar debt into Conversion Notes – unsecured, high yield notes which Lucent in theory could attempt to sell in the financial markets.  Lucent, however, had already tested the waters and believed that there would be no market for such notes, given the state of the capital markets by late 2000 and the amount of Winstar paper already in circulation.  Thus, Lucent knew that the actual exercise of this conversion option would bring it no economic benefit but that the mere threat of conversion increased its leverage over Winstar.

**B140**

118.    Lucent also knew that the issuance of the refinancing notice would give it the right, beginning April 3, 2001, to refuse any further requests for borrowing that did not contain at least 70% Lucent Content. It did so knowing that such a percentage was virtually unreachable so long as it continued to refuse to perform the build-out services called for by the Supply Agreement, or acquire companies or product lines necessary for the build out that Lucent could not provide even in an inferior form. Thus, Winstar would effectively be cut off from a vast portion of Lucent's financing commitment irrespective of what actions Winstar might take.

3.    *Lucent's Refusal to Perform or Finance Services*

119.    In late December 2000, Winstar submitted a request for borrowing, in the amount of approximately $62 million, for network build-out services performed by Winstar Wireless under the Subcontract during the final quarter of 2000. The request was identical in nature and form to every other request for borrowing for services performed under the Winstar Wireless Subcontract during the preceding two years. Although Lucent concluded internally that it had no right to deny Winstar's request, it refused the request nonetheless. After vehement disagreement from Winstar, and after stringing Winstar out until the end of the year, Lucent's senior management finally agreed, at the eleventh hour, to grant Winstar's request for borrowing, and pay Winstar Wireless for its services, but threatened to no longer do so in the future in the absence of fundamental changes in the underlying agreements – in clear violation of its existing contractual obligations, and the custom and practice agreed to by the parties.

120.    Lucent stated that it would no longer finance the performance of these services unless they were "outsourced" to Lucent. At virtually the same time, however, Lucent rejected a proposed agreement whereby these services would be transitioned to Lucent, as intended by the Supply Agreement and as Lucent had been demanding. Indeed, the parties' negotiating teams had been working on such an "outsourcing" agreement since September 2000,

B141

and by early December 2000 had come to agreement on the terms of a written addendum to the

Supply Agreement which had been approved by Winstar's senior management, and by the

Lucent executives responsible for Lucent's North American operations.

      121.    In mid-December, however, Lucent's senior management abruptly, and

without explanation, rejected this proposed "outsourcing" agreement that its own representatives

had negotiated. It did so without explanation and without regard for the commitments that

Lucent had made in the Supply Agreement and in its September correspondence to Winstar.

      122.    Thus, Lucent completely repudiated its contractual obligations and

commitments to Winstar and Winstar Wireless, and by refusing to perform, finance or otherwise

provide for the completion of these critical build-out services – which by that time were running

at a pace of more than $240 million per year – Lucent deliberately and callously placed the

Winstar Entities in an extremely precarious position. Indeed, Lucent was fully aware that

Winstar had no alternative source of funding for this essential work, but understood that this

stranglehold on Winstar gave it tremendous leverage in reshaping the relationship strictly along

the lines that Lucent desired. Moreover, having established a condition for the continued

performance of its existing obligations that it was not entitled to set in the first place, Lucent then

refused to enable Winstar to meet that condition.

      b.    <u>Lucent's Further Exertion of Pressure</u>

      123.    In addition, as of December 2000, Winstar had received a total of $47

million in credits from Lucent due to Lucent's late delivery or non-compliance with the Supply

Agreement. While Lucent had agreed, at Winstar's request, to apply these credits as a reduction

against Winstar's loan balance, Lucent subsequently refused to do so, and instead unilaterally

advised Winstar that the credits could only be applied to new purchases. Ultimately, Lucent

B142

refused to grant Winstar the credit in any form, thus setting Winstar back another $47 million at a time when it knew Winstar's financial situation was tightening.

   124. Upon information and belief, at the same time that Lucent was placing Winstar in a financial vise, it was also taking other action to carry out its new strategic focus on expanding relations with the large, incumbent providers of telecommunications services over that of the emerging players such as Winstar, which included negotiations of contracts with companies such as Verizon and elimination of its vendor financing obligations through whatever means were available, to the detriment of the companies it had agreed to finance and the public at large.

   ii.  *January 2001-March 2001: Lucent's Draconian Demands Upon Winstar*

   125. Having thus begun to squeeze Winstar financially, Lucent proceeded to insist upon a series of meetings in January and February of 2001 to "negotiate" changes to the parties' agreements. During these meetings, Lucent presented Winstar with a series of demands for drastic changes to the parties' contractual relationship – changes that essentially abrogated all of Lucent's key obligations and Winstar's key benefits under the Network Agreements. Thus, for example, Lucent demanded a repayment schedule from Winstar (although the loan principal was not due to be repaid for another four years); new, higher pricing for construction of the Hubs and Business Sites (with no increased benefit to Winstar); elimination of the Best of Breed requirement that Lucent could not meet; improved collateral positions over that which it had agreed to less than eight months earlier; a fixed purchase commitment from Winstar (with no corresponding commitment to improve the quality of the equipment Lucent provided or any commitment to provide services); and immediate implementation of the 70% Lucent Content monthly borrowing limitation (which would not otherwise apply for another four months and

B143

only in the event Winstar could not meet the refinancing obligation triggered in bad faith by Lucent).

126.   Unaware of Lucent's true intentions and design, Winstar met with Lucent in early January 2001, and continued to do so throughout the first quarter of 2001, attempting to accommodate Lucent's alleged concerns, with the expectation that by so doing Lucent would adhere to its existing contractual obligations. At no time until late March 2001 did Winstar believe that a company of Lucent's stature would actually breach all of its contractual obligations. Indeed, implicit in Lucent's demands for "negotiation" of changes to the parties' relationship was the notion that Lucent would provide the requisite financing if Winstar continued to accede to Lucent's demands.

127.   Moreover, notwithstanding the draconian demands Lucent was making, Winstar expressed great willingness to negotiate some changes to benefit its strategic partner, to strengthen the relationship and to return to the turnkey concept as provided in the Supply Agreement. Of course, with Lucent's financial and strategic domination, Winstar had little choice but to attempt to accommodate Lucent's extraordinary demands on the expectation and implied promise that Lucent would then comply with its existing obligations, financing and otherwise.

128.   Thus, over the next three months, Winstar attempted to accommodate Lucent's demands as best it could in an economic environment that continued to decline rapidly for telecommunications companies. In fact, Winstar made a number of significant concessions and proposals to Lucent in an effort to address Lucent's purported concerns.

129.   What Winstar did not know, until late March 2001, was that Lucent was not "negotiating" in good faith. In fact, Lucent was not truly negotiating at all. To the contrary,

41

while Lucent's middle management continued to suggest that Lucent would finance Winstar provided services if Winstar would accede to the requested changes, in fact, Lucent's senior management had no intention of financing those services no matter what concessions Winstar might make. Thus, Lucent's senior management simply expected Winstar to agree to wholesale changes to the parties' Agreements, without any concessions on the part of Lucent, and in March 2001 communicated to Winstar's most senior management its rejection out of hand of any proposal that involved the financing of the build-out services that Winstar Wireless was performing under the Subcontract.

130.    As the capital markets continued to tighten during the first quarter of 2001, Winstar also attempted to obtain alternative sources of funding as Lucent had encouraged it to do. Until that time, Winstar had a very successful track record of attracting new investment and financing, even under adverse market conditions, because of the promise and uniqueness of its business plan. Even in the first quarter of 2001, Winstar had a number of potential investors willing to extend additional funding. However, Lucent's existing right to convert its loans to Conversion Notes, which by March 2001 would have borne an interest rate in the neighborhood of 30% or higher, posed an enormous obstacle to such discussions. No investor or lender was willing to commit additional funds to Winstar so long as Lucent maintained that right because they believed that the exercise of this conversion option by Lucent would eventually force Winstar into bankruptcy.

131.    During March 2001, Winstar repeatedly advised Lucent's senior executives that the existence of this conversion option was not only interfering with Winstar's ability to raise new capital, but also with its ability to obtain a going concern opinion from its auditors, and expressly requested that Lucent waive its conversion rights. Internally, Lucent

42

recognized that this conversion option was worthless to it because: (a) Winstar could not pay the rate of interest on the conversion notes, and (b) its loans would be transformed from an obligation secured by the assets that had been financed, to unsecured, structurally subordinated debt of the Winstar parent holding company. Thus, Lucent had no intention of exercising its conversion rights, and yet flatly refused to acknowledge its intentions to potential investors.

132.    Lucent did so with full awareness of the severe consequences that its actions were having on Winstar. Indeed, on more than one occasion, Winstar expressly advised Lucent's senior executives that it desperately needed Lucent *either* (a) to relinquish its conversion option, *or* (b) to honor its contractual obligation to finance services, in order for Winstar to continue as a going concern. But Lucent refused to do either.

133.    In doing so, Lucent acted in bad faith and with utter disregard for the rights of, and consequences to, Winstar. By refusing to relinquish a right that was worthless to Lucent and that it had no intention of exercising, Lucent inexcusably prevented Winstar from obtaining additional capital.

134.    Lucent also understood that its refusal to finance the services performed by Winstar Wireless under the Subcontract not only deprived Winstar and Winstar Wireless of desperately needed funds, but likewise interfered with Winstar's ability to raise alternate financing. Thus, in March 2001, Lucent met with two significant equity investors of Winstar who were willing to invest further funds in Winstar if Lucent would honor its obligation to finance the services, but again Lucent refused, depriving Winstar of yet another opportunity to obtain the finances it required to survive as a going concern.

   iii.    *March 2001-April 2001: Lucent Terminates the Network Agreements and Drives Winstar Into Bankruptcy*

B146

135.    In March 2001, Winstar advised Lucent that it would submit two requests for borrowing: one in the amount of approximately $37 million, for purchases made from Lucent and third party vendors ($7 million for Lucent Content, and $30 million for third party content), and one in the amount of approximately $62 million for services performed by Winstar Wireless under the Subcontract during the first three months of 2001.

136.    Lucent refused to pay either borrowing request. It did so with full knowledge that Winstar was in dire need of the funds that were due and owing, particularly those amounts that Winstar had already advanced for services performed by Winstar Wireless and by third party contractors. Lucent further understood that Winstar had an interest payment of approximately $75 million coming due to its bondholders that if, not paid, would trigger a series of cross-defaults on all of Winstar's credit lines.

137.    Lucent simply did not care. By that time, its own stock price had plummeted to less than $10 per share, and was still declining. Upon information and belief, Lucent was in a severe cash crunch of its own, and made the decision it would not extend any further financing that represented "cash out the door" – that is, amounts for anything other than the payment of Lucent's own invoices – to Winstar or its other vendor financees.

138.    At one point, in mid-March 2001, Lucent's Chief Financial Officer for Marketing and Sales advised Winstar that Lucent would pay the $37 million request. Lucent then reneged on that commitment.

139.    Two weeks later, on March 30, 2001, Lucent wrote Winstar and stated that it would finance the $7 million request for payment of outstanding Lucent invoices, but not the remainder of Winstar's $37 million request, *if Winstar waived all claims against Lucent.*

44

Winstar refused to be blackmailed in this way, and continued to advise that Lucent was breaching its contractual obligations by its refusal to pay.

140.    Prior to this time, Lucent had stated orally to Winstar's Chief Operating Officer, its Chairman and others that Lucent would not finance the $60 million request for services performed by Winstar Wireless during the first quarter of 2001, services that had been performed with the full knowledge and acquiescence of Lucent. Lucent did not give a reason for its refusal to finance the $60 million request. Of course, Lucent had determined months before that it was not going to finance the services performed by Winstar Wireless, and for the prior four months had been "negotiating" in bad faith. Thus, by refusing to fund the March request for Winstar services, Lucent was simply following through on its wrongful repudiation of the Subcontract in December 2000.

141.    In yet a third letter dated March 30, 2001, Lucent, without any evidence whatsoever, and without any advance notice, terminated the Master Service Agreement on the grounds that Winstar Wireless "ha[d] become an insolvent entity." Lucent did not acknowledge that it was refusing to finance approximately $62 million of work that Winstar Wireless had performed in Lucent's stead.

142.    On April 5, 2001, Lucent notified Winstar that it considered Winstar to be in "financial distress," and thus was suspending its obligations under the Supply Agreement until it received some form of payment assurance from Winstar. Lucent, of course, refused to acknowledge that Winstar's "distress" was caused by Lucent's refusal to adhere to its financial obligations to Winstar.

143.    On April 10, 2001, Winstar advised Lucent, in writing, that it was not entitled to seek payment assurance, and that it had no reason to feel insecure so long as it

continued to meet its financing obligations under the Supply Agreement and Second Credit Agreement, and reminded Lucent of its obligation to continue performance during the resolution of any dispute.

144.    As with its other obligations to Winstar, Lucent chose to ignore its obligation to continue performance during a dispute. Accordingly, on April 12, 2001, Lucent sent a letter to Winstar terminating the Supply Agreement on the basis that Winstar had failed to provide the payment assurance sought by Lucent.

145.    On April 16, 2001, Lucent sent Winstar notice of an Event of Default under the Second Credit Agreement. The only Event of Default to which Lucent pointed was Winstar's failure to pay certain fees that had become due. When Lucent sent that notice, however, Lucent already had willfully and maliciously breached the Second Credit Agreement and the Supply Agreement by refusing to finance Winstar's requests for borrowing; had wrongfully terminated the Supply Agreement; and had made it abundantly clear that it had no intention of honoring its obligations even if such fees and amounts were paid. Moreover, Lucent failed to take into account the approximately $47 million in credits that still remained owing to Winstar. Of course, had Lucent indicated that it would honor its contractual obligations if the disputed fees and amounts were paid, Winstar would readily have paid them.

146.    As a result of Lucent's breaches and refusal to pay amounts owing, Winstar was unable to make the interest payment on its bonds on April 16, 2001, triggering defaults on approximately $1.6 billion in bond debt and cross-defaults on approximately $1.3 billion of outstanding secured debt.

B149

147.    At Winstar's greatest hour of need, when its financial viability was on the line, and its access to alternate sources of funding limited, Lucent – its strategic partner – deliberately and maliciously sabotaged Winstar.

148.    Throughout this period of time, Winstar sought on every occasion to address Lucent's purported concerns and to work with Lucent in good faith to come to some resolution that would prompt Lucent to honor its commitments. Even toward the end of March, Winstar offered to work "round the clock" to address Lucent's concerns and issues prior to the end of the quarter. In accordance with its adopted policies and secretly-made decisions of the previous several months, Lucent was not interested.

149.    At no time did Lucent concern itself with whether it was entitled to terminate any of the Network Agreements, or the catastrophic consequences to Winstar of its actions, nor did Lucent's senior management ever make any serious effort to inform themselves as to the issues at hand or to remedy Lucent's own failures under the Supply Agreement. Lucent simply wanted out. Lucent unlawfully terminated the Network Agreements, maliciously and willfully or with reckless disregard as to the consequences that Winstar would suffer.

150.    Even after termination of the Network Agreements, Lucent deliberately continued to make life difficult for Winstar by refusing to honor its obligations to provide technical and emergency support services for Lucent equipment in the Winstar network. The lack of such support in an emergency situation placed the Winstar network at great peril, and jeopardized the entire Winstar business in the event of a severe service outage caused by a Lucent equipment failure.

151.    Lucent was required to provide those services on a time and material basis pursuant to the Supply Agreement and the Technical Support Services Addendum. In addition,

B150

Winstar had previously entered into a long term maintenance agreement with Lucent, and had prepaid Lucent approximately $10 million, for all maintenance and support of its Lucent long haul optronic equipment

152.    Nevertheless, Lucent initially refused to perform any emergency support services at all unless Winstar "prepaid" them – or, in the case of the long haul optronic equipment, repaid them.  With no choice but to comply, given the potentially catastrophic consequences that would result if Lucent refused to assist in the event of an emergency outage, Winstar agreed to prepay (and repay) for those services.  Thereafter, Lucent refused to perform those services on a time and material basis, and instead demanded that Winstar pay an exorbitant fixed monthly fee – a fee that is many multiples of the amount of support that Winstar has actually ever procured from Lucent, and that completely ignores the $10 million previously paid by Winstar.

## COUNT ONE:

### BREACH OF THE SUPPLY AGREEMENT – REFUSAL TO FINANCE

153.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 152, above, as if fully set forth herein.

154.    Lucent first breached the Supply Agreement, including Section 11.3 thereof, by refusing to finance and pay for the network build-out work performed by Winstar Wireless under the Subcontract during the first three months of 2001 in the approximate amount of $62 million.  Lucent repudiated the Supply Agreement in December 2000, when it stated that it would no longer finance the services performed by Winstar Wireless without contractual changes to which it was not entitled; again in January and February 2001, when it reiterated and refused to budge from that decision, and instead purported to "negotiate" with Winstar to implement changes in the contractual relationship when it had no real intention of moving from

PH1 427667v1 09/27/02

its position; and finally in March 2001, when it again refused to budge from that decision and refused to fund Winstar's borrowing request for services dated March 27, 2000.

155.    Lucent also breached the Supply Agreement, including Section 11.3, by refusing to finance Winstar's March 21, 2001 request for borrowing in the approximate amount of $37 million for Lucent purchases and for amounts paid to third party contractors and vendors for products and services associated with the construction of the Winstar network.

156.    Section 11.3 of the Supply Agreement specifically requires Lucent to provide financing not only for Lucent products and services, but also for products and services provided by third parties and by the Winstar Entities.

157.    Lucent fully understood that its refusal to honor its financing obligation under the Supply Agreement would severely harm the Winstar Entities, and prevent them from meeting their obligations to Winstar's bondholders; yet Lucent maliciously breached its obligation nonetheless.  As a result, the Plaintiff is entitled to damages caused by Lucent's breach.

## COUNT TWO:

### BREACH OF SUPPLY AGREEMENT – FAILURE TO PROVIDE PRODUCTS AND SERVICES

158.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 157, above, as if fully set forth herein.

159.    Lucent breached the Supply Agreement, including Section 2 thereof, by failing to provide the necessary products and services, as more fully described in Schedule A to the Supply Agreement, to implement and complete the build-out of the Winstar network; by failing to complete work which it started; by refusing to install equipment which it sold to Winstar; and by failing and refusing to build out the Winstar network according to the

49

B152

specifications and conditions set forth in the Supply Agreement. In Section 8 of the Supply

Agreement, Lucent acknowledged that its failure to perform to proper standards might "have a

materially adverse impact on the business and operations of Winstar."

160.    Lucent also breached the Supply Agreement by repeatedly refusing to take

over the full scope of services it was obligated to perform under the Supply Agreement, thus

forcing Winstar and Winstar Wireless to perform that work in Lucent's stead.

161.    Lucent willfully and maliciously breached its obligations under the Supply

Agreement, with reckless disregard as to the consequences to Winstar and with the knowledge

that this would cripple Winstar's ability to achieve the substantial gains the parties contemplated

when they entered into the Network Agreements. As a result, the Plaintiff is entitled to damages

caused by Lucent's breach.

COUNT THREE:

BREACH OF THE SUPPLY AGREEMENT – WRONGFUL TERMINATION

162.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 161 above, as if fully set forth herein.

163.    According to the terms of the Supply Agreement, Lucent did not have the

right to terminate the Supply Agreement. Nonetheless, Lucent had decided internally months

before that it no longer wished to abide by the terms of the Supply Agreement, or to honor its

strategic partnership with Winstar.

164.    By terminating the Supply Agreement without justification, and refusing

to perform any further work for Winstar, Lucent willfully and maliciously breached that

Agreement, with reckless disregard as to the consequences to Winstar and in blatant disregard of

Lucent's obligations to continue performance pending the resolution of a dispute under Sections

18.3 of the Supply Agreement.

PHI 427667v1 09/27/02

50

165.   Upon information and belief, after threatening repudiation, Lucent engaged in a series of bad faith negotiations with Winstar. Lucent falsely represented that it would renegotiate the terms of the agreements equitably, on terms that would be fair to both sides. But Lucent's true intention was to eliminate all financing obligations to Winstar, while in the process reducing Winstar's outstanding debt to the extent possible.

166.   Upon information and belief, Lucent thus used its threatened repudiation of its contractual duties to encourage, induce and/or persuade Winstar to locate $200 million of new financing, and then compelled Winstar to pay over all of the net proceeds of that financing to Lucent. Lucent accomplished this by, among other things, affirmatively misrepresenting to Winstar that Lucent would continue performance of the Network Agreements if Winstar procured alternative financing. Lucent's misrepresentations were knowingly false when made, and were made with the intention that Winstar rely on them. Winstar relied on Lucent's misrepresentations and was damaged thereby, in that it procured the Siemens financing, turned over the funds to Lucent, and Lucent nevertheless wrongfully breached its obligations under the Network Agreements less than four months later (as it had already decided to do at the time of its misrepresentations).

167.   Upon information and belief, Lucent engaged in similar conduct with its other vendor finance partners, damaging both those partners and the public at large, who would have benefited from the additional competition Winstar and these companies would have brought to the telecommunications marketplace. Lucent's wrongful and tortious conduct evidenced criminal indifference to the rights of Winstar and others and harmed the public generally.

168.   Due to Lucent's unlawful termination of the Supply Agreement, the Winstar Entities were unable to continue the build-out of their network, and suffered extensive

B154

harm to their businesses for which Lucent is liable in damages.  Because Lucent's breach would also comprise a distinct tort action, was egregious in nature, caused Winstar significant damage, and harmed the public generally, the Plaintiff is entitled to an award of punitive damages against Lucent, which damages cannot be contractually waived.

COUNT FOUR:

BREACH OF THE SUPPLY AGREEMENT – REFUSAL TO PROVIDE EMERGENCY SERVICES

169.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 168, above, as if fully set forth herein.

170.    Lucent breached the Supply Agreement and the Technical Support Services Addendum by refusing to provide technical support and emergency services at the agreed upon rates, and upon the agreed upon terms and conditions.  Lucent has further breached the Supply Agreement and its long term maintenance agreement for long haul optronic equipment by refusing to provide the requisite maintenance and support for that equipment without additional charge and on the contracted terms.

171.    Indeed, Lucent has deliberately sought to take advantage of Winstar's dependence on Lucent for these services and its financial situation by gouging the Winstar Entities with extortionary prices.  As a consequence, the Plaintiff is entitled to damages arising from Lucent's breach.

COUNT FIVE:

BREACH OF THE SECOND CREDIT AGREEMENT – REFUSAL TO FINANCE

172.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 171, above, as if fully set forth herein.

173.    Lucent breached the Second Credit Agreement, including Section 2.04 thereof, by failing to finance Winstar's requests for borrowing, as contemplated by the Second

B155

Credit Agreement. Section 2.04 specifically requires Lucent to make loan amounts available to Winstar promptly upon request.

174.    Lucent breached the Second Credit Agreement by refusing to promptly finance Winstar's request for borrowing, in the amount of approximately $62 million, for network build-out services performed by Winstar Wireless pursuant to the Supply Agreement during the first quarter of 2001. Lucent repudiated the Second Credit Agreement in December 2000 when it stated that it would no longer finance the services performed by Winstar Wireless without contractual changes to which it was not entitled; again in January and February 2001, when it reiterated and refused to budge from that decision, and instead purported to "negotiate" with Winstar to implement changes in the contractual relationship when it had no real intention of moving from its position; and finally in March 2001, when it again refused to budge from that decision and refused to fund Winstar's borrowing request for services dated March 27, 2000.

175.    Lucent further breached the Second Credit Agreement by refusing to promptly finance Winstar's request for borrowing dated March 21, 2001 in the amount of approximately $37 million.

176.    Lucent fully understood that its refusal to honor its financing obligation under the Supply Agreement would severely harm the Winstar Entities, and prevent them from meeting their obligations to Winstar's bondholders, yet Lucent maliciously breached its obligation nonetheless. As a result, the Plaintiff is entitled to damages for the harm caused by Lucent's breach.

### COUNT SIX:

### BREACH OF THE SECOND CREDIT AGREEMENT – WRONGFUL TERMINATION

177.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 176, above, as if fully set forth herein.

PH1 427667v1 09/27/02

53

B156

178.    On April 17, 2001, Lucent sent a letter to Winstar declaring that an Event of Default had occurred and that it was no longer required to perform under the terms of the Second Credit Agreement. In its letter, Lucent claimed that Winstar was in default of the Second Credit Agreement because it had failed to pay certain fees that had become due. At that time, however, Lucent had already breached and repudiated its obligations under the Supply Agreement and the Second Credit Agreement by refusing to finance Winstar's March 2001 borrowing requests; by wrongfully terminating the Supply Agreement, including the financing obligation incorporated therein; and by making clear that it had no intention of honoring any of its contractual obligations irrespective of whether Winstar paid any of the asserted fees and amounts. Moreover, many of the requested amounts were in dispute, and there was an even larger amount in credits, $47 million, that Lucent had recognized were due Winstar, but refused to apply.

179.    By declaring an Event of Default and thereby terminating the Second Credit Agreement, Lucent willfully and maliciously breached the Second Credit Agreement with reckless disregard of the consequences to the Winstar Entities. As a result of Lucent's unlawful termination of the Second Credit Agreement, the Winstar Entities ceased the build-out of their global network and were forced to file a Chapter 11 petition. The Plaintiff is entitled to damages for the harm caused by Lucent's breach.

### COUNT SEVEN:

### BREACH OF THE PARTIES' SUBCONTRACTING ARRANGEMENT

180.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 179, above, as if fully set forth herein.

181.    Throughout the course of their relationship, the parties had an agreed upon practice and arrangement whereby Winstar Wireless agreed to perform those services assigned to

PHI 427667v1 09/27/02

54

**B157**

Lucent in the Supply Agreement that Lucent was either unable or unwilling to perform, and

Lucent would finance and pay for those services, just as it would for any contractor or

subcontractor retained to perform work in connection with the build-out of the global Winstar

network. This arrangement was memorialized in part in the Subcontract executed by Lucent and

Winstar Wireless.

182.    By refusing to finance and pay for the services that Winstar Wireless

performed during the first quarter of 2001 in the amount of approximately $62 million, Lucent

breached the Subcontract, and violated the longstanding course of conduct and practice between

the parties. Lucent first repudiated the Subcontract and the parties' course of conduct in

September 2000 when it wrongfully attempted to abrogate the Subcontract, and replace it with a

materially modified agreement; and again in December 2000 when it stated it would no longer

finance the services performed by Winstar Wireless without contractual changes to which it was

not entitled; and then again in January and February 2001, when it reiterated and refused to

budge from that decision, and instead purported to "negotiate" with Winstar to implement

changes in the contractual relationship when it had no real intention of moving from its position.

Finally, in March 2001, Lucent breached its duty to Winstar Wireless when it refused to fund

Winstar's borrowing request for Winstar Wireless' services dated March 27, 2000.

183.    Lucent also refused to pay for work performed by third party contractors.

In particular, Winstar's March 21, 2001 request for borrowing includes $30 million of invoices

for work that should have been performed by Lucent or Lucent contractors, but was instead

performed by outside contractors retained by Winstar Wireless in the satisfaction of the services

and work that it was performing in Lucent's stead. Lucent's failure to pay for these amounts

B158

constitutes a further breach of the Subcontract and subcontracting arrangement entered into by the parties with mutual consent and agreement.

184.   Lucent fully understood that its refusal to pay the amounts due and owing would severely harm the Winstar Entities, and prevent them from making the interest payment to Winstar's bondholders; yet Lucent maliciously breached its obligation nonetheless. As a result, the Plaintiff is entitled to damages for the harm caused by Lucent's breach.

## COUNT EIGHT:

### BREACH OF THE MSA

185.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 184, above, as if fully set forth herein.

186.   On March 30, 2001, Lucent breached the MSA by wrongfully terminating the MSA on the pretext that Winstar Wireless was insolvent. In fact, Lucent terminated the MSA to avoid paying for services and products it would have been required to purchase under the MSA.

187.   Lucent's wrongful termination of the MSA has damaged the Plaintiff in an amount of at least $90 million.

## COUNT NINE:

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

188.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 187, above, as if fully set forth herein.

189.   Each of the Network Agreements contains an implied covenant requiring the parties to perform their obligations in good faith and to deal fairly with each other. In light of the strategic partnership that existed between the parties, and the overall level of dependence that

PHl 427667v1 09/27/02

B159

was necessarily vested in Lucent by Winstar as a result of that relationship, that duty was further

heightened.

190.    The Winstar Entities fulfilled their duties of good faith and fair dealing.

Since the summer of 2000, however, Lucent repeatedly and consistently acted in violation of its

duty of good faith and fair dealing to the Winstar Entities by, among other things:

(a)    refusing to finance the services that Winstar Wireless was performing in Lucent's stead, in clear and knowing violation of its obligations under the Supply Agreement and the parties' long standing practice, and with full knowledge of the severe impact that its decision would have on Winstar;

(b)    refusing, without cause, to perform those same services as it had agreed to do in the Supply Agreement and further committed to doing in its September 2000 correspondence to Winstar;

(c)    refusing to issue a purchase order to Winstar Wireless for those services in a badly disguised effort to avoid paying for them;

(d)    refusing to apply approximately $47 million in credits it had agreed to provide as a remedy for its own failures in performance;

(e)    issuing a refinancing notice when it knew that Winstar did not have the ability to refinance the entire Lucent loan, and that it would be unable to exercise its conversion rights thereunder, and for the sole purpose of obtaining unfair advantage and leverage over Winstar;

(f)    demanding drastic and draconian changes to the parties' contractual relationship as an implied condition of fulfilling its own contractual obligations under the Network Agreements;

(g)    refusing to abide by the Hubs and Business Sites pricing to which it had agreed;

(h)    promising Winstar that the $194 million it paid to Lucent in December 2000 would remain available to Winstar under the Lucent credit facility, and then reneging on that commitment;

(i)    fraudulently inducing Winstar to prepay its debt by misrepresenting to Winstar that if Winstar procured additional financing, Lucent would perform its obligations, compelling Winstar to obtain and turn over such funds, and then nevertheless breaching the Network Agreements;

(j)    refusing to relinquish or waive its conversion rights when it knew those rights to be worthless and had no intention of exercising them, and when it knew that its refusal was severely damaging Winstar;

B160

(k)    concealing from Winstar and potential investors the fact that it had no intention of exercising its conversion rights;

(l)    failing to take any action in the financial markets to quell damaging rumors regarding Lucent's support for Winstar;

(m)    refusing to consider at any time the impact of its actions on Winstar, and by acting with direct knowledge of, and disregard for, the harm to Winstar that it knew itself to be committing;

(n)    fabricating pretextual reasons for refusing to finance, and for terminating, the Network Agreements, in March and April 2001; and

(o)    foisting unjustified demands upon Winstar that had no basis in the parties' contracts.

191.    Upon information and belief, Lucent concealed its plans to abandon the Network Agreements and continued to induce the Winstar Entities to negotiate with Lucent, and to carry on the network build-out, even though it had no intention of proceeding with a transition agreement or of fulfilling its obligations under the Network Agreements.

192.    In sum, Lucent did not deal fairly and honestly with Winstar in these transactions; did not act in faithfulness to the agreed common objectives of the Network Agreements and Winstar's legitimate contractual expectations; destroyed Winstar's right to receive the fruits and benefits of the Network Agreements; abused its discretionary power; willfully rendered incomplete performance of its duties; engaged in subterfuge and evasion; and in every respect, acted single mindedly to bail out of a deal it had solemnly made less than three years before.

193.    As a result of Lucent's breach of its obligations to act in good faith and to deal fairly with the Winstar Entities, the Winstar Entities suffered significant harm, for which Lucent is liable in damages.

## COUNT TEN:

### RETURN OF PREFERENTIAL PAYMENTS

B161

194.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 193, above, as if fully set forth herein.

195.   At all relevant times, Lucent was a creditor of Winstar.

196.   In or about December 2000, Lucent compelled Winstar to pay it approximately $195 million on account of an antecedent debt owed by Winstar to Lucent before the transfer was made.

197.   Winstar was insolvent, within the definition of the United States Bankruptcy Code, at the time the payment was made, and Lucent knew that Winstar was insolvent.

198.   Lucent was an insider, within the definition and meaning of the United States Bankruptcy Code, at the time the transfer was made. Lucent was a person in control of Winstar, by virtue of the exercise of its financial domination over the company, as well as its critical position under the Network Agreements as the turnkey agent for the build out of Winstar's global network. Lucent repeatedly used its close relationship as Winstar's strategic partner and its leverage as Winstar's only significant source of financing, and supplier of critical goods and services, coupled with its misrepresentations as aforesaid, to compel Winstar to make the payment herein complained of.

199.   The transfer was made within one year of Winstar's filing of a petition for Chapter 11 relief.

200.   As a result of the transfer, Lucent received more than it would have otherwise received as a creditor in the course of Winstar's bankruptcy proceedings.

**B162**

COUNT ELEVEN:

EQUITABLE SUBORDINATION

201.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 200, above, as if fully set forth herein.

202.    Upon information and belief, Lucent engaged in fraudulent or inequitable conduct by using its domination and control over Winstar to pressure the company to take on $200 million dollars of additional senior, secured debt in December 2000, and then requiring Winstar to turn over the net proceeds of that financing to Lucent, a partially-secured creditor, to reduce the amount of Lucent's unsecured debt.

203.    Upon information and belief, Lucent induced Winstar to take these actions by threatening non-performance under the existing agreements, and making misrepresentations as aforesaid, thereby causing Winstar to believe that Lucent would comply with its existing contractual obligations upon receipt of the prepayment. At the time it induced Winstar to prepay its debt, however, Lucent fully intended to breach both the letter and spirit of its obligations to Winstar, and did so shortly after it wrongfully obtained the prepayment.

204.    Lucent's conduct as aforesaid damaged Winstar's other creditors. Instead of $200 million dollars of additional unsecured debt to Lucent, Winstar owes $200 million of senior secured debt to Siemens. Additionally, Lucent's conduct unfairly benefited Lucent by reducing the amount of unsecured debt at the expense of Winstar's other creditors.

205.    Lucent's claim must be equitably subordinated, to return Winstar's creditors to their rightful positions in the liquidation. To return the parties to the status quo, Lucent must be compelled to return the Siemens loan proceeds to the estate.

206.    Under these circumstances, equitable subordination of Lucent's claim is in furtherance of the purposes of the Bankruptcy Code.

B163

WHEREFORE, Plaintiff respectfully requests that this Court, with respect to all causes of action, together or in the alternative:

(1)    Enter judgment in favor of the Plaintiff and order Lucent to pay compensatory damages in the sum of at least $300 million on Counts One, Two, Three, Four, Five, Six, Seven and Nine and at least $90 million on Count Eight.

(2)    Enter judgment in favor of the Plaintiff and order Lucent to pay punitive damages in an amount to be proven at trial but no less than $2 billion on Counts Three and Nine.

(3)    Enter judgment ordering Lucent to repay the preferential payment it received in December 2000.

(4)    Enter judgment equitably subordinating Lucent's claims to the extent they are unsecured, and ordering Lucent to repay the payment received in December 2000.

(5)    Award the Plaintiff its attorneys fees, and costs and disbursements of this action.

(6)    Award the Plaintiff pre-judgment and post-judgment interest; and

(7)    Grant the Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues so triable.

FOX, ROTHSCHILD, O'BRIEN & FRANKEL LLP

Dated:  September 27, 2002
       Wilmington, Delaware

Of Counsel:

**HERRICK, FEINSTEIN LLP**
Stephen M. Rathkopf
David R. King
2 Park Avenue
New York, New York  10016-9301
Telephone:  (212) 592-1400
Facsimile:  (212) 592-1500

BY:___/s/Sheldon K. Rennie_____
    Sheldon K. Rennie (DE Bar No. 3772)
Michael G. Menkowitz, Esq.
Mellon Bank Center
919 North Market Street
Suite 1400, 14th Floor
Wilmington, DE 19801-3046
(302) 655-7460

- and -

**KAYE SCHOLER LLP**
Richard G. Smolev (RS 2222)
A Member of the Firm
425 Park Avenue
New York, New York 10022-3598
(212) 836-8000

Attorneys for Plaintiff Christina C. Shubert,
Chapter 7 Trustee

PH1 427667v1 09/27/02

**B165**

# Joint Pretrial Memorandum

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WINSTAR COMMUNICATIONS, INC., et al.,<br><br>　　　　　　　　　　　　　　Debtors.<br><br>CHRISTINE C. SHUBERT, CHAPTER 7<br>TRUSTEE OF WINSTAR<br>COMMUNICATIONS, INC. AND WINSTAR<br>WIRELESS, INC.,<br><br>　　　　　　　　　　　　　　Plaintiff,<br><br>　　　　　　v.<br><br>LUCENT TECHNOLOGIES INC.,<br><br>　　　　　　　　　　　　　　Defendant. | Chapter 7<br>Case No. 01-01430<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 01-01063 (JBR) |

## JOINT PRETRIAL MEMORANDUM

Pursuant to the Court's January 26, 2005 Pretrial Order, defendant Lucent

Technologies Inc. ("Lucent") and Christine C. Shubert, chapter 7 trustee for Winstar

Communications, Inc. and Winstar Wireless, Inc., (the "Trustee", and together with

Lucent, the "Parties") hereby submit their Joint Pretrial Memorandum.

**(A) LIVE FACT WITNESSES**

The names, addresses and telephone numbers of the fact witnesses whom the Trustee and Lucent expect to or may call at the trial of this matter are set forth in Exhibits 1 and 2, respectively.

**(B)    DEPOSITION TESTIMONY**

The witnesses whose testimony the Trustee and Lucent expect to present by deposition are set forth in Exhibits 3 and 4, respectively.  Transcripts of the pertinent portions of the deposition testimony that Lucent expects to present are included in Appendix A.

**(C)    EXPERT WITNESSES**

The expert witnesses that the Trustee and Lucent intend to call at the trial of this matter, together with any statement(s) as to an objection to their qualification, are set forth in Exhibits 5 and 6, respectively.

**(D)    INTENDED TRIAL EXHIBITS**

The exhibits that the Trustee and Lucent expect to offer or may offer if the need arises at the trial of this matter are set forth in Exhibits 7 and 8, respectively.

**(E)    OBJECTIONS TO DEPOSITION DESIGNATIONS AND INTENDED TRIAL EXHIBITS**

The objections as to the admissibility of deposition designations and intended trial exhibits that the Trustee and Lucent have reserved are set forth in Exhibits 9 and 10, respectively.

**(F)    STATEMENT CONCERNING EXCHANGE OF EXHIBITS**

The parties hereby confirm that they have exchanged copies of the intended trial exhibits set forth in Section (D) above.

2

B167

(G)    **STIPULATED FACTS**

  A Joint Stipulation of Uncontested Facts is set forth in Exhibit 11 to this Order.

(H)    **ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

  The Parties' statements of the issues of fact that remain to be litigated are set forth

in Exhibit 12.

(I)    **ISSUES OF LAW TO BE DETERMINED**

  The Parties' statements of the issues of law to be determined are set forth in

Exhibit 13.

(J)    **BRIEF STATEMENT SUMMARIZING THE PLAINTIFF'S CASE**

  A brief statement of the Trustee's case is set forth in Exhibit 14 to this Order.

(K)    **BRIEF STATEMENT SUMMARIZING THE DEFENDANT'S CASE**

  A brief statement of Lucent's case is set forth in Exhibit 15 to this Order.

(L)    **ESTIMATED LENGTH OF TRIAL**

  The Trustee anticipates that the presentation of her direct case will take 12 days,

excluding Lucent's cross-examination.  Given the Trustee's estimate of her direct case,

Lucent anticipates that it will require at least an additional 12 days for both its cross-

3

B168

examination of the Trustee's witnesses and the presentation of its direct case, excluding

the Trustee's cross-examination.

Dated: March 7, 2005.

Sheldon K. Rennie (DE Bar No. 3772)
FOX ROTHSCHILD, LLP
Mellon Bank Center, Suite 1400
919 North Market Street
Wilmington, DE 19801
(302) 622-4202


-and-

Stephen M. Rathkopf
David R. King
HERRICK, FEINSTEIN LLP
104 Carnegie Center
Princeton, NJ 08540
(609) 520-9095

*Attorneys for the Trustee*

Daniel J. DeFranceschi (DE Bar No. 2732)
Rebecca L. Booth (DE Bar No. 4031)
RICHARDS, LAYTON & FINDER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19889
(302) 651-7700

-and-

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*Lucent Technologies Inc.*

4

RLF1-2848947-1

B169

# Exhibit 12

B170

## ISSUES OF FACT THAT REMAIN TO BE LITIGATED

The Trustee and Lucent could not reach agreement on the issues of fact that remain to be litigated. Below, both parties' submissions of the issues of fact that remain to be litigated are attached.

(A)    Trustee's Issues Of Fact That Remain To Be Litigated

(1)    Whether the December 7, 2000 payment from Winstar to Lucent was a transfer to or for the benefit of a creditor;

(2)    Whether the December 7, 2000 payment from Winstar to Lucent was for or on account of an antecedent debt owed by Winstar before the transfer was made;

(3)    Whether on December 7, 2000, Winstar was insolvent, as defined by the United States Bankruptcy Code (the "Code");

(4)    Whether on December 7, 2000, Lucent was an insider of Winstar, as defined by the Code;

(5)    Whether Lucent's conduct was so inequitable as to require the subordination of Lucent's claims against the Winstar bankruptcy estates, and to what extent Lucent's claims must be subordinated;

(6)    Whether Lucent breached the Subcontract pursuant to which Wireless performed services for Lucent in the buildout of Winstar's network, or whether Lucent was obligated to pay Wireless for services rendered in the first quarter of 2001 in the amount of $62,050,743.00; and

(7)    Whether Lucent provided "new value" (as defined in the Code) to Winstar after December 7, 2000.

BFNJ1: #145477 v.1 #06723-0001 03/07/2005

(B)    **LUCENT TECHNOLOGIES INC.'S STATEMENT OF THE ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

I.    THE TRUSTEE'S CLAIMS

A.    <u>Preference Claim</u>

1.    Whether the Trustee has proved that Winstar's payment of a portion of the proceeds of the Siemens loan proceeds to Lucent ("Siemens repayment") on December 7, 2000, was a voidable preference pursuant to 11 U.S.C. § 547(b), including:

a)    Whether the Trustee has proved that the book value of Winstar's liabilities exceeded the fair market value of Winstar's assets on December 7, 2000;

b)    Whether the Trustee has proved that Lucent was a non-per se insider of Winstar at the time of the Siemens repayment, including:

(1) Whether the Trustee has proved that Lucent exercised improper influence or control over Winstar on December 7, 2000;

(2) Whether the Trustee has proved that Lucent exercised improper influence or control over Winstar with respect to the Siemens repayment itself;

(3) Whether the Trustee has proved that Winstar was Lucent's instrumentality with respect to the Siemens repayment;

(4) Whether the Trustee has proved that Lucent exercised

sufficient control over Winstar to make the managerial

decision to make the Siemens repayment;

(5) Whether the Trustee has proved that any influence or

control that Lucent exercised with respect to Winstar was

not incident to the parties' creditor-debtor relationship; and

(6) Whether the Trustee has proved that any influence or

control that Lucent exercised with respect to Winstar was

not incident to pre-existing arm's length agreements

between the parties; and

c) Whether the Trustee has proved that the Siemens repayment

enabled Lucent to receive more than it would have received if

the case were a case under chapter 7 of the Bankruptcy Code,

the transfer had not been made, and Lucent received payment

of Winstar's debt to the extent provided by the Bankruptcy

Code, including:

(1) Whether the Trustee has proved that the Siemens

repayment enabled Lucent to receive more than it would

have received pursuant to a distribution under chapter 7

based on the value of Lucent's claims in bankruptcy against

Winstar on April 18, 2001.

2. If the Court determines that the Siemens repayment was a preferential

payment pursuant to 11 U.S.C. § 547(b), then whether Lucent has

2

proved its affirmative new value defense pursuant to 11 U.S.C. §

547(c)(4), including:

    a) Whether Lucent provided goods or services to Winstar after

       December 7, 2000;

    b) Whether those goods or services were provided on an

       unsecured basis;

    c) Whether Winstar never paid Lucent for those goods or

       services;

    d) The amount of new value that Lucent provided to Winstar

       pursuant to 11 U.S.C. § 547(c)(4).

B.    Equitable Subordination

    1. Whether the Trustee has proved that Lucent's conduct requires the

       remedy of equitable subordination of its claims against Winstar,

       including:

       a) Whether the Trustee has proved that Lucent engaged in

          inequitable conduct as follows:

          (1) If Lucent is determined not to be an insider of Winstar,

             then whether the Trustee has proved with particularity

             that Lucent engaged in gross or egregious misconduct.

          (2) If Lucent is determined to be an insider, then whether

             the Trustee has proved that Lucent engaged in unfair

             conduct;

3

    b) If Lucent did engage in inequitable conduct, then whether the
       Trustee has proved that the conduct resulted in injury to
       Winstar's creditors or conferred an unfair advantage on Lucent;
       and

    c) If Lucent did engage in inequitable conduct that resulted in
       injury to Winstar's creditors or conferred an unfair advantage
       on Lucent, then whether the Trustee has proved that equitable
       subordination of Lucent's bankruptcy claims is not inconsistent
       with the provisions of the Bankruptcy Code.

2. If the Court finds that the Trustee has proved that Lucent did engage in
   conduct that requires the remedy of equitable subordination of its
   claims, then what has the Trustee proved is the extent of subordination
   necessary to offset the harm actually suffered by Winstar and its
   creditor as a result of the inequitable conduct.

C.    Breach of the Subcontract

1. Whether the Trustee has proved that Lucent has breached the terms of
   the Subcontract, including:

    a) Whether the Trustee has proved that Wireless complied with
       the terms of the Subcontract;

    b) Whether Lucent breached the terms of the Subcontract when it
       did not pay Wireless for services that Wireless performed on
       Winstar network during the first calendar quarter of 2000; and

4

      c) Whether Wireless was damaged by Lucent's refusal to pay it

         for services that Wireless performed on Winstar's network

         during the first calendar quarter of 2000.

2. Whether the Trustee has proved that there was an enforceable oral

   modification of the Subcontract despite the Subcontract's no oral

   modification provision, including:

     a) Whether the Trustee has proved an oral modification pursuant

       to the "partial performance" exception to enforcement of no

       oral modification clauses as follows:

         (1) Whether the Trustee has proved that Lucent and

           Wireless orally agreed to modify the terms of the written

           contract;

         (2) Whether the Trustee has proved that Wireless

           performed; and

         (3) Whether the Trustee has proved that Wireless's

           performance was unequivocally referable to the oral

           modification; or

     b) Whether the Trustee has proved an enforceable oral

       modification pursuant to the "equitable estoppel" exception to

       enforcement of no oral modification clauses as follows:

         (1) Whether the Trustee has proved that Lucent and

           Wireless orally agreed to modify the terms of the written

           contract;

5

(2) Whether the Trustee has proved that Wireless reasonably relied on the oral modification; and

(3) Whether the Trustee has proved that Wireless's conduct was incompatible with the express terms of the written Subcontract.

3. If the Court finds that there was an enforceable modification of the Subcontract, then whether the Trustee has proved that Lucent breached the terms of the orally modified Subcontract, including:

(1) Whether the Trustee has proved that Wireless complied with the terms of the orally modified Subcontract;

(2) Whether the Trustee has proved that Lucent breached the terms of the orally modified Subcontract when it did not pay Wireless for services that Wireless performed on Winstar's network during the first calendar quarter of 2000; and

(3) Whether the Trustee has proved that Wireless was damaged by Lucent's refusal to pay Wireless for services that Wireless performed on Winstar's network during the first calendar quarter of 2000.

## II. LUCENT'S CLAIMS

### A. Fraud

1. Whether Lucent has proved that Winstar defrauded Lucent under New York common law, including:

6

a)  Whether Lucent has proved that Winstar misrepresented a
material fact by certifying it was in compliance with the
Second Credit Agreement's Section 6.07(c) cash capital
expenditure covenant ("CAPEX covenant") for the year 2000
in its January 31, 2001 and February 28, 2001 borrowing
requests to Lucent, including;

(1) Whether Lucent has proved that Winstar certified its
January 31, 2001 and February 28, 2001 borrowing
requests knowing it was out of compliance with the
CAPEX covenant or in reckless disregard of its compliance
with the CAPEX covenant;

b)  Whether Lucent has proved that Lucent relied on Winstar's
misrepresentation because Winstar was only entitled to receive
financing from Lucent under the Second Credit Agreement if it
was in compliance with the CAPEX covenant of the Second
Credit Agreement; and

c)  Whether Lucent has proved that Lucent was damaged when it
provided Winstar with financing pursuant to the January 31,
2001 and February 28, 2001 borrowing requests.

B.    Negligent Misrepresentation

1.  Whether Lucent has proved that Winstar made negligent
misrepresentations to Lucent under New York common law,
including:

7

B178

a) Whether Lucent has proved that Winstar failed to exercise reasonable care in obtaining and communicating to Lucent whether it was in compliance with the Second Credit Agreement's CAPEX covenant for the year 2000 when it made its January 31, 2001 and February 28, 2001 borrowing requests to Lucent;

b) Whether Lucent has proved that Winstar knew that Lucent would rely on its representations that it was in compliance with the Second Credit Agreement's CAPEX covenant for the year 2000;

c) Whether Lucent has proved that it relied on Winstar's representations that it was in compliance with the Second Credit Agreement's CAPEX covenant for the year 2000 when Lucent provided Winstar with financing pursuant to its January 31, 2001 and February 28, 2001 borrowing requests;

d) Whether Lucent has proved that, to its detriment, Lucent provided Winstar with financing pursuant to the January 31, 2001 and February 28, 2001 borrowing requests; and

e) Whether Lucent has proved that it was in privity of contract with Winstar under the Second Credit Agreement.

8

B179

C.    Setoff

1.    Whether Lucent has proved that it is entitled to set off any damages
      that the Trustee is awarded with the amounts owed Lucent by Winstar
      under the Second Credit Agreement, including:

   a)    Whether Lucent has proved that its claims against Winstar for
         amounts owed pursuant to the Second Credit Agreement
         accrued prior to April 18, 2001;

   b)    Whether Lucent has proved that its debt owed to Winstar, if the
         Siemens repayment is found to be a voidable preference,
         accrued prior to April 18, 2001;

   c)    Whether Lucent has proved that its claims for amounts owed
         pursuant to the Second Credit agreement and its debt owed to
         Winstar, if the Siemens repayment is found to be a voidable
         preference, both exist between Lucent and Winstar; and

   d)    Whether Lucent's claims against Winstar for amounts owed
         pursuant to the Second Credit Agreement and Lucent's debt
         owed to Winstar, if the Siemens repayment is found to be a
         voidable preference, are both valid and enforceable.

9

B180

**RJSF**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7<br>Case No. 01-01430<br>(Jointly Administered) |
| Debtors. | |
| CHRISTINE C. SHUBERT, CHAPTER 7<br>TRUSTEE OF WINSTAR<br>COMMUNICATIONS, INC. AND WINSTAR<br>WIRELESS, INC., | Adv. Pro. No. 01-01063 (JBR) |
| Plaintiff, | |
| v. | |
| LUCENT TECHNOLOGIES INC., | |
| Defendant. | |

### RENUMBERED JOINT STIPULATION AS TO UNCONTESTED FACTS

Plaintiff Christine C. Shubert, chapter 7 trustee of Winstar Communications, Inc.

and Winstar Wireless, Inc. ("the Trustee") and defendant Lucent Technologies Inc.

#33 /
4-26-05

IINVLIT-2324201v1-3DMW-04/25/05—03:31 pl]

("Lucent") hereby revise and replace the Joint Stipulation of Uncontested Facts included in the Joint Pretrial Memorandum dated March 7, 2005, and the Joint Stipulation as to Additional Uncontested Facts dated March 21, 2005, with this Renumbered Joint Stipulation as to Uncontested Facts in order to renumber the various uncontested facts sequentially so as to avoid confusion when citing the uncontested facts. All of the uncontested facts are attached hereto as Exhibit A, which uncontested facts may be received as evidence in this action.

Dated: April 25, 2005
       Wilmington, Delaware


_____
Sheldon K. Rennie (DE Bar No. 3772)
FOX ROTHSCHILD, LLP
Mellon Bank Center, Suite 1400
919 North Market Street
Wilmington, DE 19801
(302) 622-4202


-and-

Stephen M. Rathkopf
David R. King
HERRICK, FEINSTEIN LLP
104 Carnegie Center
Princeton, NJ 08540
(609) 520-9095

*Attorneys for the Trustee*


_____
Daniel J. DeFranceschi (DE Bar No. 2732)
Rebecca L. Booth (DE Bar No. 4031)
RICHARDS, LAYTON & FINDER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19889
(302) 651-7700


-and-

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*Lucent Technologies Inc.*


2

{RLF1-2924201v1-19MW-0425/05...03-31.n}}

B182

**Revised Joint Stipulation as to Uncontested Facts**

**EXHIBIT A**

1.      At all relevant times, Winstar Communications, Inc. ("Winstar") was a
Delaware corporation in the business of providing telecommunications and related
services. At least until its filing of a petition in bankruptcy, Winstar was engaged in the
buildout of a global telecommunications network to service its customers.

2.      At all relevant times, Winstar Wireless Inc. ("Wireless") was a Delaware
corporation and a wholly-owned subsidiary of Winstar. Among other things, Wireless
was engaged in the design and construction of Winstar's network.

3.      Winstar and Wireless each commenced chapter 11 bankruptcy
proceedings on April 18, 2001. Those proceedings were each converted to chapter 7
liquidation proceedings on or about January 24, 2002.

4.      Christine C. Shubert is the chapter 7 trustee ("the Trustee") for Winstar
Communications, Inc. and Winstar Wireless, Inc.

5.      Lucent Technologies Inc. ("Lucent") is a corporation organized under the
laws of Delaware and is headquartered in Murray Hill, New Jersey. Lucent designs and
delivers telecommunications systems, services and software.

6.      On October 21, 1998, Lucent and Winstar entered into a Supply
Agreement (the "Supply Agreement") under which Lucent agreed to provide, and finance
(pursuant to a separate Credit Agreement) the purchase of, certain products and services
to Winstar.

7.      Lucent and Wireless entered into an Agreement for Network Build-Out
Services (the "Subcontract") effective January 4, 1999.

3

{NY1 IT-717420 v1-390 6W-04/25/05—03-31 n}}

B183

8.     On May 4, 2000, Winstar repaid Lucent the outstanding balance under the First Credit Agreement with funds from a new loan that Winstar obtained from the Bank of New York (the "Bank Facility").

9.     On May 4, 2000, Winstar and Lucent entered into a new Credit Agreement (the "Second Credit Agreement"), which provided for $2 billion of new Lucent financing (of which Winstar was permitted to borrow up to $1 billion at any one time) over a five-year term.

10.    On December 7, 2000, Winstar and Siemens entered into a $200 million financing agreement that was structured as an increase to the Bank Facility ("the Siemens loan") and transferred a portion of the loan proceeds to Lucent.

11.    Lucent was in privity of contract with Winstar under the Second Credit Agreement.

12.    Section 547(b)(5) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the payment to Lucent of Siemens loan proceeds constituted a voidable preference.

13.    On October 21, 1998, Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") that allowed Winstar, under certain conditions, to borrow up to $2 billion from Lucent over a term of five years (with up to $500 million available at any one time).

14.    Winstar was a signatory under the First Credit Agreement, however, its wholly owned subsidiary, Wireless, was not a borrower, guarantor or otherwise a signatory under the First Credit Agreement.

4

B184

15.    All borrowings under the First Credit Agreement were paid off on or before the execution of the Second Credit Agreement.

16.    Winstar was a signatory under the Second Credit Agreement, however, its wholly owned subsidiary, Wireless, was not a borrower, guarantor or otherwise a signatory under the Second Credit Agreement.

17.    On December 7, 2000, Winstar wire transferred $188,180,000.00 to Lucent, which represented a payment of the $194,000,000.00 net proceeds of the Siemens loan minus $5,820,000.00. The $5,820,000.00 represented a refund of an upfront fee Winstar paid to Lucent at the time of the borrowing under the Second Credit Agreement, which became due to Winstar on account of the Siemens repayment.

18.    Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

19.    Section 547(b)(2) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

20.    There were no task orders agreed to by Lucent and Wireless for work performed by Wireless on the Winstar network at any point after March 31, 1999 through and including March 31, 2001.

21.    Lucent and Wireless did not agree to a written purchase order for the services performed by Wireless on the Winstar network in the quarter ending March 31, 2001.

5

B185

22.    Lucent and Winstar did not agree to a written purchase order for the services performed by Wireless on the Winstar network in the quarter ending December 31, 2000.

23.    Once received, Winstar was required to transfer the proceeds of the Siemens loan to Lucent under the terms of the Second Credit Agreement.

24.    Between November 30, 2000 and February 28, 2001, Winstar drew down approximately $240 million under the Second Credit Agreement.

25.    Winstar submitted signed certifications with its January and February 2001 borrowing requests under the Second Credit Agreement certifying that all conditions for borrowing set forth in Section 4.03 of the Second Credit Agreement had been satisfied or would be satisfied as of the date of the borrowing request and the date that the borrowing was made.

6

B186

## CERTIFICATE OF SERVICE

I, Jason M. Madron hereby certify that on April 26, 2005 I caused copies of the foregoing

**Renumbered Joint Stipulation as to Uncontested Facts** to be served upon the following

parties in the manner indicated:

**Via Hand Delivery:**

Sheldon K. Rennie
Michael G. Menkowitz
Fox, Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, DE   19801-3046

**Via Federal Express:**

Stephen M. Rathkopf
David R. King
Herrick Feinstein LLP
2 Park Avenue
New York, NY  10016-9301

Richard G. Smolev
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598

Daniel Slifkin
Paul C. Sanders
Lillian S. Grossbard
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 8th Avenue
New York, NY  10019

David R. King
Herrick Feinstein LLP
104 Carnegie Center
Princeton, NJ 08540

Jason M. Madron (No. 4431)

RLF1-2868817-1

**B187**

**File a Motion:**
01-01063-DDS WINSTAR WIRELESS, INC. et al v. LUCENT TECHNOLOGIES, INC. et al

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Madron, Jason M. entered on 4/26/2005 at 6:04 PM EDT and filed on 4/26/2005

**Case Name:** WINSTAR WIRELESS, INC. et al v. LUCENT TECHNOLOGIES, INC. et al
**Case Number:** 01-01063-DDS
**Document Number:** 331

**Docket Text:**
Stipulation *Renumbered Joint Stipulation* Between LUCENT TECHNOLOGIES, INC. and Christine C. Shubert, Chapter 7 Trustee for Winstar Communications, Inc., et al. *as to Uncontested Facts.* Filed by LUCENT TECHNOLOGIES, INC.. (Attachments: # (1) Exhibit A# (2) Certificate of Service and Service List) (Madron, Jason)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**W:\HLP\Stipulation_0426175932_001.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/26/2005] [FileNumber=3715297-0]
[91414dac224e4dc57c414baca345674d0ee0e56cf3a010336ce9386f531d04f67da8
c0cada5300a1779eca547175ba3c9a31090df1a63e71298ba4cb3fc847bd]]
**Document description:**Exhibit A
**Original filename:**W:\HLP\Exhibit A_0426175942_001.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/26/2005] [FileNumber=3715297-1]
[2c68d79120e7a1212dbdf7315a7ab27c12814a717f58e28cb1612a3f06e08d19fe72
8fa147b6f029fb8ba9077361fc16e84c91f5336d06e399d408a5655b101e]]
**Document description:**Certificate of Service and Service List
**Original filename:**W:\HLP\Certificate_0426175948_001.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/26/2005] [FileNumber=3715297-2]
[4496bfd57eca0dafca9246f602791f5a28b24960ffa5d331c5a39720b795c1bbe40c
34e3de3c1e5c8930f506c189db0ee8f6ff397ad9c652f01311c68808d556]]

**01-01063-DDS Notice will be electronically mailed to:**

Karen C Bifferato      kcb@cblhlaw.com

Rebecca L. Booth      booth@rlf.com, RBgroup@rlf.com;Lugano@rlf.com

L. Jason Cornell      jcornell@frof.com, jcornell@frof.com

https://ecf.deb.uscourts.gov/cgi-bin/Dispatch.pl?450954909519561                    4/26/2005

**B188**

**TFOF**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., et al., | : | Case No. 01-1430 (JBR) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| —————————————————————— | x | |
| CHRISTINE C. SHUBERT, CHAPTER 7 | : | Adv. Pro. No. 01-1063 (JBR) |
| TRUSTEE OF WINSTAR COMMUNICATIONS, | : | |
| INC. AND WINSTAR WIRELESS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LUCENT TECHNOLOGIES INC., | : | |
| | : | |
| Defendant. | : | |
| —————————————————————— | : | |

### TRUSTEE'S PROPOSED FINDINGS OF FACT

Plaintiff Christine C. Shubert, chapter 7 Trustee of Winstar Communications, Inc. and Winstar Wireless, Inc. (the "Trustee"), submits the following as her proposed findings of fact from the trial in this matter, in accordance with the Court's scheduling order dated April 20, 2005.

# TABLE OF CONTENTS

**Page**

EXPLANATION OF CITATION ............................................................... iii

PROPOSED FINDINGS OF FACT ............................................................1

    I.    COUNT TEN (RETURN OF PREFERENTIAL PAYMENT)............................1

        A.    Introduction/Stipulated Elements of Claim ...............................1

        B.    Lucent Was an Insider of Winstar on December 7, 2000 ...........................3

            1.    The Strategic Partnership ...................................................3

            2.    The End Of Quarter Deals .................................................8

                The September 2000 End Of Quarter Deal....................................22

                The September 29, 2000 Software Pool ...........................24

            3.    Lucent's Subcontract Threats .........................................39

            4.    The Financing Discussions And The Siemens Repayment ...................................................41

            5.    The December 2000 Subcontract Payment....................................46

            6.    The Refinance Notice ...................................................48

            7.    Employees Of Both Parties Testified That Lucent Was An Insider ...................................................54

            8.    The Schacht Testimony...................................................55

            9.    Conclusion As To Insider Status...................................................62

        C.    Winstar Was Insolvent On December 7, 2000..........................................62

        D.    Lucent Has Failed To Establish That It Provided New Value To Winstar After December 7, 2000 ...............................................67

        E.    Conclusion As To Count Ten ...................................................72

    II.    COUNT ELEVEN (EQUITABLE SUBORDINATION) .....................................73

    III.    COUNT SEVEN (BREACH OF THE SUBCONTRACT)...................................75

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B190**

**Page**

IV.    LUCENT'S COUNTERCLAIM - COUNT TWO (SETOFF)..............................85

V.    LUCENT'S COUNTERCLAIM - COUNTS THREE THROUGH
SIX (FRAUD/NEGLIGENT MISREPRESENTATION)....................................86

CONCLUSION........................................................................................................88

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B191

## EXPLANATION OF CITATION

1.    Citations to stipulated facts refer to the Renumbered Joint Stipulation of Facts, Exhibit A, and identify the particular stipulated fact.

2.    Citations to trial exhibits in evidence are to the plaintiff's exhibit ("PX") or defendant's exhibit ("DX") reference.

3.    Citations to testimony in the trial transcripts (which includes testimony from live witnesses as well as deposition testimony read into evidence) identify the witness testifying, as well as the volume, page and line numbers, e.g., Pocalyko 3-25:15 — 3-26:5 would refer to Mr. Pocalyko's testimony in volume three of the trial transcript, from page twenty-five, line fifteen to page twenty-six, line five, or Pocalyko 3-25:15-20 would refer to Mr. Pocalyko's testimony in volume three of the trial transcript, at page twenty-five, lines fifteen to twenty.

4.    Citations to testimony from videotaped testimony (which were not separately transcribed) refer to the testimony from the Stipulated Joint Trial Exhibits filed with the Court on May 20, 2005 (Adv. Proc. Docket No. 335), and identify the witness testifying, and the page and line numbers from the written transcript supplied in the Stipulated Joint Trial Exhibit, e.g., Kantor 10:15-12:25 refers to the Stipulated Joint Trial Exhibit for Mr. Kantor, page ten, line fifteen, to page twelve, line twenty-five. Where testimony from multiple depositions for a witness has been designated, and the transcript page numbers were not continued, the designation includes a date as well, e.g., Schacht 2004, or Diroma 11/20/02. All designations to joint trial exhibits refer to the testimony designated by the Trustee, unless otherwise indicated.

5.    Citations to pleadings and other documents filed in this matter refer to the Adversary Proceeding docket number, abbreviated herein as "Adv. Proc. Docket No. ___," or to the Bankruptcy Docket No., abbreviated herein as "Bankr. Docket No. ___."

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B192

## PROPOSED FINDINGS OF FACT

I.    **COUNT TEN (RETURN OF PREFERENTIAL PAYMENT)**

    A.    **Introduction/Stipulated Elements of Claim**

        1.    In Count Ten of the Second Amended Complaint, the Trustee alleges that Winstar Communications, Inc. ("Winstar") made a preferential payment in the amount of $194,000,000 to defendant Lucent Technologies Inc. ("Lucent") on or about December 7, 2000, in accordance with 11 U.S.C. § 547.

        2.    The Trustee and Lucent (collectively, the "Parties") have stipulated to several facts related to this claim. Initially, the Parties stipulated to the fact that the transfer did in fact occur between Winstar and Lucent on December 7, 2000:

> On December 7, 2000, Winstar wire transferred $188,180,000.00 to Lucent, which represented a payment of the $194,000,000.00 net proceeds of the Siemens loan minus $5,820,000.00. The $5,820,000.00 represented a refund of an upfront fee Winstar paid to Lucent at the time of the borrowing under the Second Credit Agreement, which became due to Winstar on account of the Siemens repayment.

(Renumbered Joint Stipulated Fact No. 17). This payment is hereinafter referred to as the "Siemens Repayment."

        3.    The Parties also stipulated that three of the five elements of Count Ten have been met. First, the Parties stipulated as to 11 U.S.C. § 547(b)(1) — that a transfer of an interest of the debtor in property was made to or for the benefit of a creditor:

> Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B193**

(Renumbered Joint Stipulated Fact No. 18).

4.    Second, the Parties stipulated as to 11 U.S.C. § 547(b)(2) — that the transfer was for or on account of an antecedent debt owed by Winstar to Lucent before the transfer was made:

> Section 547(b)(2) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

(Renumbered Joint Stipulated Fact No. 19).

5.    Finally, the Parties stipulated as to 11 U.S.C. § 547(b)(5) — that the transfer enabled Lucent to receive more than it would have received from this chapter 7 case if the transfer had not been made and Lucent received payment of its debt to the extent provided under the United States Bankruptcy Code:

> Section 547(b)(5) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the payment to Lucent of Siemens loan proceeds constituted a voidable preference.

(Renumbered Joint Stipulated Fact No. 12).

6.    Based on the Joint Pretrial Memorandum, two elements of the claim in Count Ten remain in dispute: (1) 11 U.S.C. § 547(b)(3) — whether Winstar was insolvent when the payment was made; and (2) 11 U.S.C. § 547(b)(4) — whether the payment was made on or within 90 days of the filing of the bankruptcy petition, or made between ninety days or one year of the filing of the bankruptcy petition, if Lucent was at the time of the transfer an insider. Additionally, Lucent belatedly — at the conclusion of the Trustee's case — contended that it had

2

B194

not stipulated that the challenged payment represented an "interest of the debtor in property" under 11 U.S.C. § 547(b) and that the Trustee had not proved that fact.

7.     Winstar commenced its bankruptcy proceeding on April 18, 2001. (Renumbered Joint Stipulated Fact No. 3).

8.     December 7, 2000, is between 90 days and one year of the filing of Winstar's bankruptcy proceeding, and accordingly, the Trustee can satisfy 11 U.S.C. § 547(b)(4), by establishing that Lucent was an insider on December 7, 2000.

**B.     Lucent Was an Insider of Winstar on December 7, 2000**

**1.     The Strategic Partnership**

9.     On October 21, 1998, Winstar and Lucent entered into a pair of contracts — the Supply Agreement (PX-123) and a credit agreement (the "First Credit Agreement") (DX-96) — which created a strategic partnership and dramatically changed the companies' relationship.  (Ackerman 304:7 — 307:15).  These contracts were entered into after a two to three week lockdown negotiation between Winstar and Lucent in October 1998.  (Ackerman 314:20 — 317:10; Kantor 152:12 — 153:10).

10.     In the initial joint press release, Bill Rouhana, Winstar's Chairman and CEO, described the creation of the strategic partner as "a defining moment for Winstar." (PX-331).  Nate Kantor, President and Chief Operating Officer of Winstar, noted further that "Lucent is the most prestigious and desirable company with which to have this kind of strategic relationship.  Winstar and Lucent will work hand in hand in every aspect of our network buildout." (PX-331).

3

**B195**

11.    Before the creation of the strategic partnership, Winstar and Lucent had been involved in a commonplace, arms length vendor-customer relationship. (Ackerman 59:11 — 60:14, 305:21 — 306:13; Aversano 8-122:3-17). The Lucent contracts marked a significant turning point for Winstar. The relationship gave Winstar instant credibility in the marketplace: in fact, the perceived health of the strategic relationship became a significant barometer for the viability of Winstar itself. (Uhl 254:4-22, 255:2-7; see also PX-169).

12.    Winstar employees recognized the importance of the relationship (and the fact that Winstar was dwarfed in both size and resources by its partner) referring to the deal as "the wooly mammoth." (Ackerman 17:18 — 18:5).

13.    With specific, limited exceptions, the parties agreed in the Supply Agreement that Lucent would build out Winstar's telecommunications network on a turnkey basis, providing equipment and services from start to finish, including design, engineering, construction, and installation services. (Kantor 4:22 — 5:19, 23:13 — 24:25; Ackerman 30:6 — 31:5, 312:7 — 314:19; Harris 11-68:16 — 11-70:15).

14.    The network was to be "best of breed," i.e., built with the best and most cost-effective technology available, whether from Lucent or its competitors. (Ackerman 343:11 — 344:5; Huber 6-49:13-22).

15.    The other critical component of the deal (for Winstar) was Lucent's agreement to finance Winstar's buildout by providing up to $2 billion. (PX-3; Kantor 136:10-137:14).

16.    Over the course of the First Credit Agreement, Winstar borrowed some $1.2 billion dollars from Lucent for the buildout, which Winstar repaid in a May 2000 prepayment by virtue of Winstar obtaining a credit facility with a group of banks and other investors (the "Bank Facility"). (Renumbered Joint Stipulated Fact No. 8; PX-104). Winstar did so to help its partner and to honor its commitment. (Rubin 43:14-45:17). Winstar incurred significant expenses to make the prepayment to Lucent. (PX-104).

17.    Simultaneously with the prepayment, Lucent replaced the First Credit Agreement with another credit agreement, whereby Lucent provided Winstar with an additional $2 billion of financing (the "Second Credit Agreement") for both Lucent content and non-Lucent content. (Renumbered Joint Stipulated Fact No. 9, PX-138). Under the terms of the Second Credit Agreement, the Bank Facility, and the Security Agreements executed between Lucent and Winstar's special purpose borrowers, Lucent was secured ahead of the lenders under the Bank Facility with regard to any equipment purchases by Winstar — whether Lucent equipment or third-party equipment — that were financed by Lucent under the Second Credit Agreement. (DX-32 at §§ 2.01, 3.03; DX-33 at §§ 2.01, 3.03; PX-225; Perricone 20-12:6-13, 20-68:13-25). Under the Security Agreements, Lucent also received a security interest in the "general intangibles" and "proceeds" of the borrowing entity — which was neither Winstar nor Winstar Wireless, Inc. ("Wireless"), but was instead a special purpose entity created for the purpose of borrowing under the Second Credit Agreement and holding the equipment secured by Lucent's purchase money security interest. (DX-32 at § 2.01; DX-33 at § 2.01; PX-225).

18.    Lucent was secured for, inter alia, equipment and software it sold Winstar from the date of sale, even if the equipment or software had not yet been paid for by a borrowing under the Second Credit Agreement. (DX-32; DX-33; PX-225; PX-340).

5

19.     After the First Credit Agreement was paid off, Lucent no longer held a security interest in the pre-existing network assets, because those assets were not held by the special purpose entity, but by other Winstar companies. (Keefe 19-59:16 — 19-60:4, 19-63:9 — 19-64:5; Perricone 20-12:6-13). Those assets were instead subject to a senior security interest under the Bank Facility. (Keefe 19-63:9 — 19-64:5; Perricone 20-12:6-13). As a result, Lucent viewed its purchase money security interest, and its security interest in the assets of the special purpose entity, to be inferior to the security under the Bank Facility, because Lucent was undercollateralized and partially secured to the extent it provided financing for items other than equipment or hard assets. (Perricone 20-12:6-13, 20-68:9-25; Hund-Mejean 14-9:15 — 14-10:24, 14-14:25 — 14-15:10; PX-201 at LW 0072895: "Weak Loan Structure . . . Our collateral coverage is further weakened because non-Lucent component may contain services").

20.     The parties understood that Lucent needed time to assume all of its obligations under the Supply Agreement. Accordingly, the Supply Agreement required Lucent to prepare a transition agreement scheduling Lucent's assumption of the various aspects of the buildout. (Kantor (Cross) 46:21 — 47:24; Ackerman 34:11 — 36:3; PX-123 at Schedule A § 3.3).

21.     But Lucent did not complete a transition plan or take over all of the buildout promptly as it had agreed. (Kantor (Cross) 48:2 — 48:6; Harris 11-61:9-15; Ackerman 91:24 — 93:17; Schacht 9/10/02 115:2 — 24; Diroma 11/25/02 27:10-24; PX-110; PX-325).

22.     Accordingly, in March 1999, Lucent entered into a subcontract (the Agreement for Network Build-out Services, hereinafter the "Subcontract") with Wireless, effective January 4, 1999, for Wireless to perform certain of the services required of Lucent in

6

the Supply Agreement. (Renumbered Joint Stipulated Fact No. 7; PX -13; PX-90; Kantor 24:10 — 25:13; Schacht 2004 25:4 — 26:3; Schacht 10/29/02 185:17 — 186:3; Diroma 11/25/02 28:5 — 22, 29:4 — 11, 30:18-22).

23.    Although the Subcontract was intended to be a short term solution (until Lucent was able to perform the subcontracted services directly), Lucent never developed all of the expertise needed to perform the buildout services, and the parties, despite negotiating until the final days of the partnership, never reached agreement on a transition plan. (Ackerman 167:24 — 169:20, 180:19-25; Schacht 2004 25:4 — 26:3, 116:7-22).

24.    As a result, as testified to by Winstar employees, and confirmed by the testimony of Lucent's Federal Rule of Civil Procedure 30(b)(6) witness and by former CEO Henry Schacht, Lucent continued to satisfy its duties to Winstar through the Subcontract. (Kantor 23:13 — 25:19. 42:2-25; Uhl 129:9 — 130:11; Schacht 9/10/02 109:20 — 110:14, 113:16 — 114:13, 115:13 — 116:18, Schacht 2004 25:9 —26:9; Diroma 11/20/02 7:6-16, 7:23 — 8:25, 109:9-15, 183:10 — 184:24; PX-325).

25.    Lucent's employees admit that Lucent paid Wireless throughout 1999 and 2000 for the Wireless Subcontract services, in an aggregate amount of approximately $400 million. (Diroma 11/20/02 7:23 — 8:25, Diroma 11/25/02 (Cross) 69:8 — 69:14; Hopkins 11-169:18 — 11-170:12; PX-92).

26.    Once the strategic partnership was agreed to, the parties commenced a close, "non-arms length" relationship. (Ackerman 305:21 — 306:13; Diroma 11/20/02 110:7 — 11:4).

7

27.    Numerous Winstar employees testified that Winstar helped Lucent whenever it could because, as relayed by Nate Kantor (Winstar's President), "partners help each other." (Ackerman 663:24 — 664:20; Hicks 106:9-25, 128:2 — 130:3; Rubin 2003 152:5-24; Zlotnick 114:4-24).

28.    The Trustee's forensic accounting expert and Certified Fraud Examiner Paul W. Pocalyko, after an investigation of the transactions between the parties in which he and his team spent over 7,000 hours, concluded as a result of his investigation that Winstar and Lucent were not dealing with each other at arms length on December 7, 2000, and that Lucent was exerting undue influence and control over Winstar at that time. (PX-462).

## 2.    The End Of Quarter Deals

29.    The testimony is virtually uncontroverted that Winstar repeatedly helped Lucent by creating revenue for Lucent, in massive, last minute, unneeded (by Winstar) purchases that were arranged by Lucent as the ends of quarters approached, enabling Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was. (Aversano 8-25:15 — 8-26:1; Hicks 100:17 — 101:2, 105:2-15, 106:9-25; Zlotnick 111:9 — 113:10, 114:4-19; Rubin 2003 152:5 — 154:15, 154:18 — 155:8; Pocalyko 3-20:16 — 3-22:16, 3-50:2 — 3-50:14).

30.    Through these deals, Winstar regularly helped Lucent close "huge revenue gaps." (Diroma 11/20/02 151:12 — 155:4, PX-297).

31.    Winstar did so by knowingly cooperating with Lucent to inflate Lucent's revenues in end of quarter deals. In addition to buying equipment and services that exceeded Winstar's actual needs at the time of purchase and accelerating payment on Pay as You Grow

8

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B200**

services, Winstar helped Lucent record revenue through accounting schemes like improper bill and hold deals and a sham software transaction. (See proposed findings of fact nos. 56 — 71, 101 — 124, <u>infra</u>; Hicks 102:24 — 107:17, 129:15-130:3; Rubin 2003 154:19 — 157:16).

32.    As the Trustee's expert Paul Pocalyko noted, end of quarter sales in and of themselves are not unusual between companies dealing at arm's length with each other. (Pocalyko 3-117:18 — 3-118:24). Here, however, the end of quarter sales were highly unusual in that the dollar amount of Winstar's purchases of Lucent equipment in end of quarter sales was on average eight times as high as the dollar amount of Winstar purchases of Lucent equipment in months in which a quarter did not end. (Pocalyko 3-20:16 — 3-21:6).

33.    The ratio of eight to one in dollar amount of Winstar purchases of Lucent equipment in end of quarter sales compared to non end of quarter sales is very unusual in companies dealing at arm's length with each other. (Pocalyko 3-22:7 — 3-22:16; 3-118:18 — 3-119:20).

34.    Excluding a September 29, 2000, $135,000,000 software pool sale by Lucent to Winstar, Winstar made an aggregate of approximately $706,000,000 in purchases from Lucent in calendar years 1999 and 2000. (Pocalyko 3-30:17-22, 4-136:18-25).

35.    Winstar became conditioned to expect that at the end of every quarter, it would be required to help Lucent reach Lucent's revenue targets by purchasing millions of dollars of Lucent goods and services that Winstar frequently did not need when they were purchased — and in some cases, ever. (PX-45; PX-153; PX-462 at 11-16; Hicks 116:23 — 118:10, 196:24 — 200:3).

9

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

36.    Mr. Pocalyko observed that the amount of Lucent equipment in Winstar inventory in warehouses for each quarter from December 31, 1999, through and including September 30, 2000, continually increased.   (Pocalyko 3-20:16 — 3-22:16), and that the continued increase in the amount of Lucent equipment in Winstar inventory in warehouses in each quarter from December 31, 1999, through and including September 30, 2000, is very unusual in companies dealing at arm's length with each other. (Pocalyko 3-118:18 — 3-120:5).

37.    On a cost adjusted basis, there was approximately $327,000,000 of Winstar inventory in Winstar and Lucent warehouses as of March 31, 2001. (Pocalyko 3-22:21 — 3-23:4, 3-123:6-11, 3-173:7-25).

38.    The aggregate original purchase prices for the equipment in Winstar inventory in warehouses as of March 31, 2001, was higher than the cost adjusted basis of $327,000,000.   (Pocalyko 3-168:8-21, 3-173:7 — 3-174:18, 3-179:25 — 3-180:22, 4-18:4-25, 4-69:20 — 4-70:7).

39.    Of the $327,000,000 (on a cost adjusted basis) in Winstar inventory in warehouses on March 31, 2001, approximately $256,000,000 was Lucent equipment and approximately $71,000,000 was non-Lucent equipment.   (Pocalyko 3-23:10-14, 4-67:23-25, 4-69:22-25).

40.    Of the approximately $256,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, only approximately $74,000,000 of the $256,000,000 of Lucent equipment could be specifically traced as to the original date that Winstar purchased such equipment from Lucent. (Pocalyko 3-23:15-22, 4-69:5-15, 4-71:14-25).

10

41.    Of the approximately $74,000,000 (on a cost-adjusted basis) of Lucent equipment in Winstar inventory in warehouses on March 31, 2001, that could be specifically traced as to the original date of purchase by Winstar, approximately $36,000,000 (on a cost adjusted basis) of that equipment was purchased by Winstar in a December 31, 1999, end of quarter bill and hold sale and remained in a Lucent warehouse undeployed for 15 months as of March 31, 2001.  (Pocalyko 3-24:23 — 3-25:7, 3-169:9 — 3-170:16).

42.    The approximately $74,000,000 (on a cost-adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, that was specifically traced by Mr. Pocalyko as to the original date that Winstar purchased such equipment from Lucent, remained in warehouses undeployed on average for more than a year as of March 31, 2001. (Pocalyko 3-24:23 — 3-25:7, 3-170:4-16).

43.    The date of original purchase by Winstar of approximately $182,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, could not be specifically traced because of vague Lucent invoices and vague Winstar purchase orders.  (Pocalyko 3-25:8 — 3-29:4, 4-71:14-23).

44.    As noted by Mr. Pocalyko, the transactions between Winstar and Lucent were conducted without the accounting controls typically seen in transactions between companies like Winstar and Lucent.  For instance, more than $135,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, was represented by vague Lucent invoices and vague Winstar purchase orders.   (Pocalyko 3-30:12-16).

11

**B203**

45.     The amount of Winstar purchases of Lucent equipment represented by vague Lucent invoices and vague Winstar purchase orders was approximately 27% of all Lucent equipment purchased by Winstar in the calendar years 1999 and 2000. (Pocalyko 3-29:5 — 3-30:16).

46.     The amount of Winstar purchases of Lucent equipment represented by vague Lucent invoices and vague Winstar purchase orders is very unusual and in and of itself demonstrates that Lucent and Winstar were not dealing at arm's length with each other. (Pocalyko 3-30:23 — 3-32:10).

47.     Of the approximately $71,000,000 of non-Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, none was represented by vague invoices or vague Winstar purchase orders and all of the $71,000,000 of non-Lucent equipment could be specifically traced as to the date that Winstar originally purchased such equipment. (Pocalyko 3-31:6-9).

48.     The approximately $71,000,000 of non-Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, had been purchased by Winstar relatively recently with approximately $24,000,000 of that equipment having been purchased in January 2001. (Pocalyko 4-136:4-13).

49.     Of the approximately $182,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, that could not be specifically traced as to the date that Winstar originally purchased such equipment, only $12,000,000 could possibly have been purchased after September 30, 2000. (Pocalyko 3-32:19 — 3-33:10, 4-71:14-19).

12

B204

50.    Of the approximately $170,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, that could not be specifically traced as to the date that Winstar originally purchased such equipment but which could not have been purchased after September 30, 2000, one-half of that $170,000,000 was purchased by Winstar at least nine months prior to March 31, 2001, and the other half at least six to nine months prior to March 31, 2001. (Pocalyko 3-32:19 — 3-33:10, 4-69:2-15, 4-71:14-21).

51.    Winstar paid Lucent approximately $23,000,000 for duplicative invoices. The amount Winstar paid to Lucent for duplicative invoices is very unusual between companies dealing at arm's length with each other. (Pocalyko 3-42:22 — 3-43:10, 4-146:9-16).

52.    Winstar sought to deduct credits agreed upon by Lucent in the approximate amount of $47,500,000 million. Lucent's refusal to deduct the agreed upon credits is very unusual between companies dealing at arm's length with each other. (Pocalyko 3-43:11-23).

53.    There was approximately $250,000,000 (on a cost adjusted basis) of Lucent equipment pre-purchased by Winstar in end of quarter sales for a primary purpose of helping generate revenue for Lucent. (Pocalyko 3-50:2-10, 3-168:22 — 3-169:8, 3-182:17-25, 4-67:17-22, 4-69:2 — 4-70:17, 4-72:2-22).

54.    As of December 7, 2000, the approximately $250,000,000 of Lucent equipment purchased by Winstar in end of quarter sales (including bill and hold sales) that was pre-purchased for a primary purpose of helping generate revenue for Lucent, remained undeployed in Winstar inventory in Lucent and Winstar warehouses and was not reversed on Lucent's or Winstar's books and records. (Pocalyko 3-46:19-25).

13

B205

55.    In the months of October, November and December 2000, Winstar continued to pay interest to Lucent on the money borrowed by Winstar from Lucent to pay for the approximately $250,000,000 of Lucent equipment pre-purchased by Winstar for a primary purpose of helping generate revenue for Lucent. (Pocalyko 3-48:16-21).

56.    In each of the end of quarter deals from the quarter ended December 31, 1999, through the quarter ended September 30, 2000, the parties engaged in at least one bill and hold sale. (PX-58; PX-70; PX-71; PX-462 at 22).

57.    Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment at a later date. (PX-462 at 20).

58.    If requested by the customer and properly documented, bill and hold sales allow the seller to record revenue before physically delivering goods to its customer. (PX-462 at 20).

59.    Bill and hold sales at the end of quarters for the quarters ended December 31, 1999, through and including September 30, 2000, represented approximately 22% of Lucent's equipment sales to Winstar. (Pocalyko 3-38:22-25).

60.    Lucent recognized substantial revenue from these bill and hold sales. Approximately $155,000,000 of equipment and services was purchased by Winstar from Lucent in end of quarter bill and hold sales in the period December 31, 1999, through and including September 30, 2000. (Pocalyko 3-35:20-23, 3-38:22-25).

14

61.     Winstar entered into these bill and hold sales for a primary purpose of helping generate revenue for Lucent. (Pocalyko 3-50:2 — 3-51:5, 4-123:16-21; Hicks 196:22 — 199:23).

62.     Bill and hold sales do not occur frequently between companies dealing at arm's length with each other. (Pocalyko 3-39:1-7).

63.     Because of the possibility of revenue manipulation, there are seven GAAP criteria, each of which must be met, in order for a company to properly record revenue from a bill and hold sale made by that company. (Pocalyko 3-34:8 — 35:19).

64.     As testified to by the Trustee's expert, Mr. Pocalyko, the Lucent bill and hold sales to Winstar for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000, failed the GAAP test for bill and hold sales and Lucent improperly recognized revenue therefrom. (Pocalyko 3-36:17 — 3-38:25, 4-110:22 — 4-111:24).

65.     Lucent's former Chief Executive Officer, Richard McGinn, testified that during his tenure (which extended from the inception of the strategic partnership until October 23, 2000) Lucent had a strict policy against entering into bill and hold transactions, because such transactions can be used to manipulate revenue numbers. (McGinn 90:7 — 91:25).

66.     Despite this policy, Lucent entered into at least one bill and hold transaction with Winstar in every end of quarter deal from December 1999 through September 2000. (PX-153; PX-462 at 22; Hicks 196:24 — 200:5).

67.     McGinn's concerns were realized in these bill and hold deals: Lucent used Winstar as its instrumentality to book revenue months — and even years — ahead of

15

B207

Winstar's actual needs for the Lucent equipment for which Winstar was paying, even causing Winstar to sign false documentation prepared by Lucent so that Lucent could book the revenue. (PX-58; PX-70; Hicks 196:22 — 149:23; Zlotnick 180:2 — 184:24, 221:2 — 223:20).

68.    Thus, Winstar's employees testified that Lucent required them to sign false bill and hold letters needed for Lucent to book revenue, even though they knew that Lucent used the process to deceive its auditors. With respect to the June 30, 2000, bill and hold that Lisa Hicks signed, she testified on Lucent's cross-examination as follows:

> Q.    I understand, I understand what you're saying. But when you signed this [bill and hold] letter, and my question to you is, if you knew that it was inaccurate, why did you go ahead and sign the letter?
>
> * * *
>
> A.    Because I was required to.
> Q.    Who required you to sign this letter?
> A.    Lucent. It was a Lucent requirement that this letter be signed.
> Q.    I understand that you said that, you testified earlier that Lucent drafted this letter, correct?
> A.    Yes.
> Q.    So how did Lucent require you to sign it if you knew that it was inaccurate?
> A.    They verbally said it had to be signed.
> Q.    And what would happen if you didn't sign it?
> A.    That the deal wouldn't be complete.
> Q.    Okay. So you signed this letter because you wanted the deal to be complete?
>
> * * *
>
> A.    I signed this letter because Lucent wanted the deal to be complete. This was with regard to Lucent's revenue recognition.
> Q.    But you work for Winstar, and you don't work for Lucent.
> A.    That's correct.
> Q.    Did anyone at Winstar require you to sign this letter?

16

> A.  It was, if this is something that Lucent is requiring to make this happen, then we have to do it.

(Hicks 196:22 — 199:23).

69.  Ms. Hicks also testified as to Lucent's power to control Winstar's purchasing in the deals:

> Q.  Now, in these [end of quarter] negotiations, was Winstar ever able to turn down Lucent's proposal for items that they wanted to get out of the transaction?
> A.  Items that Lucent wanted to get out of the transaction?
> Q.  Yes.
> A.  Not to my knowledge.

(Hicks 186:11-17).

70.  William Zlotnick similarly testified that he signed a bill and hold letter drafted by Lucent to enable Lucent to record revenue that contained unrealistic ("very, very, very aggressive") deployment schedules. (Zlotnick 180:2 — 184:24, 221:2 — 223:20).

71.  The unneeded equipment purchased in these bill and hold deals remained in Lucent warehouses for substantial periods of time. (PX-462 at 22). In at least one instance, approximately $36 million worth of optronics equipment purchased in a December 1999 bill and hold sale to help Lucent create revenue was still languishing in Lucent's warehouse on March 31, 2001. (Pocalyko 3-24:23 — 3-25:7; PX-462 at 15). As stated by Lucent's own expert witness, Christopher Stark, at pp. 8-9 of his report, it usually took only 7 weeks on average for a carrier to obtain delivery of equipment from the time it first ordered the equipment. (DX-702, Stark 19-32:19 — 19-33:23).

72.  On many occasions, Winstar simply gave Lucent revenue. For instance, Winstar repeatedly agreed to accelerate millions of dollars of payments on a program known as

17

"Pay As You Grow." Under the Pay As You Grow program, Winstar bought switches and other equipment with greater functional capacity than justified by its present needs, and Lucent charged Winstar a price based on the capacity actually needed by Winstar at the time, with additional payments due as Winstar grew into the full capacity of the equipment. (Ackerman 371:18 — 372:21). In several end of quarter deals, Winstar agreed to accelerate payment of the full price for the Pay As You Grow equipment, before Winstar was contractually obligated. Winstar received nothing in return. There is no justification provided for these actions, other than the desire to please Lucent by meeting Lucent's revenue needs:

> Q.    Okay.   So why was Winstar making a payment of 19 million dollars for pay as you grow payments that were not yet due?
>
> A.    To help Lucent make its numbers.

(Ackerman 590:23 — 591:21; see also Ackerman 370:16 — 373:9, 654:13 — 657:4; Zlotnick 149:2-14, 159:7-21).

73.    Winstar also bought inferior or overpriced goods to meet Lucent's revenue demands "in the spirit of the partnership," despite its contractual right to best of breed technology. (PX-320; Ackerman 346:21 — 358:7; Huber 6-49:23 — 6-52:8; PX-320).

74.    Both Winstar and Lucent employees admit that the driving purpose of these deals was to help Lucent meet its revenue targets.  (Aversano 8-25:15 — 8-26:1; Hicks 196:22 — 199:15; Zlotnick 112:12 — 113:10).

75.    Indeed, the nomenclature for the deals is itself revealing.  When Lucent forwarded Winstar its proposal on September 18, 2000 (initially identifying some $65 million

18

dollars of equipment and services that Winstar had not previously realized it needed to purchase within 12 days), it was titled as a "Partnership Deal." (PX-48).

76.    When Winstar reviewed the deal internally, the title changed to "Lucent Revenue Request." (PX-67).

77.    Winstar engaged in the various end of quarter sales despite its knowledge that they were costly and damaging for Winstar. (PX-45; PX-148).

78.    Winstar borrowed from Lucent to pay Lucent for the Lucent equipment purchased by Winstar in end of quarter sales including end of quarter bill and hold sales. (Pocalyko 3-44:18-25).

79.    Winstar's end of quarter purchases of Lucent equipment not needed by Winstar at the time of purchase were detrimental to Winstar in that, among other things, Winstar paid interest to Lucent on the money Winstar borrowed from Lucent to pay for such purchases. (Hicks 132:12 — 134:9; Pocalyko 3-45:1-11, 3-48:12-21).

80.    Winstar paid Lucent interest of approximately $7,000,000 for the $74,000,000 of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, that was specifically traced by Mr. Pocalyko as to the date that Winstar originally purchased such equipment and which remained in warehouses undeployed on average for more than one year as of March 31, 2001. (Pocalyko 3-44:10-22).    Winstar also paid interest on the other approximately $170 million of Lucent equipment which Winstar purchased in end of quarter sales but did not need at the time of purchase.

19

81.   In addition to the foregoing, Winstar paid storage and insurance costs for Lucent equipment it did not need at the time of purchase, and in some cases ended up with equipment approaching obsolescence still sitting undeployed, such as Lucent optronics equipment that Lucent offered to repurchase in December 2000 at 30 cents on the dollar. (Hicks 132:6 — 134:9; Rubin 169:13 — 172:21, 174:6 — 177:3; Zlotnick 187:11 — 188:7).

82.   Winstar paid an even heavier indirect price. First, under both the Bank Facility and the Second Credit Agreement, Winstar had to meet a capital expenditure ("capex") covenant, which limited Winstar's capex for each year. (PX-138).

83.   By August 2000, Winstar was already approaching its calendar year 2000 capex limit of $1.3 billion, due in large part to the previous unnecessary purchases of Lucent equipment it had made in earlier end of quarter deals. (PX-45; PX-127; PX-462).

84.   One Winstar employee went so far as to prepare a memorandum identifying this problem, and identified some $250 million dollars of purchases made in the end of quarter deals in March and June 2000 which Winstar should request that Lucent either return or defer. (PX-131).

85.   Winstar was also harmed because Lucent obtained the right to serve a refinancing notice once the outstanding Winstar borrowings exceeded $500 million dollars under the Second Credit Agreement. (PX-138 at § 2.18; PX-462 at 18-19).

86.   The refinancing notice had serious repercussions for Winstar, including increased interest rates, limitations on future borrowing, and most significantly, freedom for Lucent to sell off the loans as "conversion notes" at whatever price the market would bear.

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B212**

Lucent realized the damage a refinancing notice would cause Winstar: before serving the notice, it conducted due diligence to determine, among other things, whether the notice would force Winstar to file in bankruptcy. (PX-322; Perricone 20-41:7-17).

87. The unnecessary purchases of Lucent equipment and services in these end of quarter deals led to Winstar's borrowings exceeding the refinancing threshold far earlier than it otherwise would have, giving Lucent additional leverage in the already unbalanced partnership. (PX-462 at 18-19; Rubin 177:4-14).

88. In a January 5, 2001 memo, Winstar executives analyzed the costs of the end of quarter help they had provided Lucent, identifying some $167 million of unneeded equipment purchases, as well as services payments advanced, which were directly responsible for Winstar exceeding the $500 million refinancing threshold. (PX-148; Rubin 2003 155:9 — 157:16).

89. On December 19, 2000, because Winstar had outstanding borrowings of more than $500,000,000 from Lucent, Lucent sent a refinancing notice to Winstar as provided in the Second Credit Agreement. (Pocalyko 3-45:17 — 3-46:4).

90. Lucent's sending of the refinancing notice to Winstar had a detrimental effect on Winstar's financial condition and Winstar's ability to gain additional equity or obtain additional financing (PX-102; Pocalyko 4-87:1 — 4-88:14).

91. Had Winstar not purchased unnecessary equipment and services from Lucent for a primary purpose of helping generate revenue for Lucent, Winstar's outstanding borrowings from Lucent would not have exceeded $500,000,000 as of December 19, 2000, and

B213

Lucent would not have been able to send a refinancing notice to Winstar pursuant to the terms of the Second Credit Agreement (PX-462 at 18; Pocalyko 3-48:1-7, 4-86:6-19).

### The September 2000 End Of Quarter Deal

92.    As demonstrated by the documents referenced in proposed finding of fact no. 135(l), and elsewhere, _infra_, the main players in the eventual September 2000 end of quarter deal included:  from Lucent, Nina Aversano (President, North American Sales), with William Plunkett (Vice President, Emerging Service Accounts) and Deborah Harris (Vice President, Winstar Account) both reporting to her, and David Rigotti and Vanessa Petrini (Assistant Vice-President, Winstar Team) supporting Harris and Plunkett.  From Winstar:   Nate Kantor (President and Chief Operating Officer), with David Ackerman (Group Executive, Winstar Network and System Services) and Richard Uhl (Chief Financial Officer) reporting to Kantor, William Zlotnick (Vice President, Program Management) reporting to Ackerman, and Lisa Hicks (Director) reporting to Zlotnick and Ackerman.

93.    By August 2000, the end of quarter deals with Lucent had harmed Winstar to the point that some Winstar executives were suggesting that Winstar could no longer afford to help Lucent and should even reverse earlier deals.  (PX-131).

94.    In early September, at least three Winstar executives — Ackerman, Uhl, and Hicks — had told Lucent that Winstar could not do another deal, with Ackerman complaining that Lucent was shoving another deal down Winstar's throat, and Hicks telling Lucent that approaching Winstar for another deal was "not a good idea" and that Winstar would not do any more bill and hold or similar agreements because "we were not going to buy anything else this year that we don't need immediately." (PX-46; PX-153; PX-155).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

95.    Deborah Harris — one of the Lucent witnesses who asserted a Fifth Amendment privilege in this Adversary Proceeding — advised Nina Aversano, Lucent's President of North American Sales, that a September 2000 deal would not happen unless Lucent exerted its influence and control at the highest level:

> Bottom line is that to do an EOQ deal, we need Nate [Kantor] to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they cannot immediately utilize. The deals of the past are haunting us ... there is $87M in their warehouses.
>
> ***
>
> Definitely the majority of money we are asking for is not for immediate use.
>
> ***
>
> What I need are 2 things:
> **1. A call to Nate Kantor getting agreement to move forward on an EOQ deal.**

(PX-153)( Emphasis in original).

96.    Despite Winstar's recognition that it could not afford to do another Lucent end of quarter deal, it took but a single call from Aversano to Kantor to change Winstar's mind. (Aversano 8-68:21 — 8-69:8).

97.    Kantor reversed Winstar's position, and immediately advised Aversano that Winstar would help:  "Great to talk with you and we will help wherever possible." (PX-157).

98.    Kantor then instructed Ackerman to make the deal happen, which Ackerman did, in a $212 million end of quarter purchase.  (PX-56).

23

**B215**

99.    The deal left Winstar critically short on the capex it needed to spend on its other vendors for the final quarter of 2000, hampering its buildout.  (Ackerman 605:22 — 608:23, 666:5 — 669:20; PX-43; PX-57; PX-78; PX-107).

100.    It also pushed Winstar over the $500 million refinancing threshold in the Second Credit Agreement, when Winstar financed the invoices issued from the deal on October 23, 2000.  (PX-148).

### The September 29, 2000 Software Pool

101.    As David Ackerman wrote to Kantor in a September 18, 2000 e-mail, in view of Winstar's capex issues, complying with Kantor's instructions to provide substantial revenue to Lucent would not be possible unless Ackerman got "creative:"

> I just spoke with [Lucent employee Bill] Plunkett. He informed me that you and Nina [Aversano] had met (dinner?) and you agreed to help them get to the number they need this quarter ... something around $110M, of which we've already spent about $45M. There is not much I can give them we really need, but there are some creative things I can do that can get us close to their number without being totally stupid.
>
> * * *
>
> Thus; we are working to cut another $70 [Million] in addition to the $117 [Million] [to meet capex covenants].  This means stopping ANY and ALL incremental spends for ANYTHING capex immediately, and letting capitalized contractors go . . .
>
> * * *
>
> How much capital CAN I REALLY SPEND THIS YEAR, and how much do I do to give Lucent what they need for 3Q?
> If the answer is; both give Lucent the business, AND reduce the cap spend to $1B even I will need to institute some very severe measures immediately.

(PX-127) (Emphasis in original).

24

102.    Lucent and Ackerman got very creative, entering into a transaction that was reversed by Lucent, investigated by the SEC and the U.S. Attorney's Office, and resulted in the filing of a civil complaint by the SEC against Lucent, Lucent employees and Ackerman himself. (DX-739).

103.    After reviewing the transaction, the Trustee's expert, Paul Pocalyko, concluded that the $135,000,000 end of quarter software pool sale by Lucent to Winstar in the quarter ended September 30, 2000, was a sham transaction which Winstar engaged in for a primary purpose of generating revenue for Lucent. (Pocalyko 3-40:12 — 3-42:10, 3-51:15 — 3-53:22; PX-462).

104.    Ackerman, at times, attempted to protect himself by testifying (contrary to the documentary evidence, other witness testimony and his own prior testimony) that Winstar had certain legitimate business justifications for engaging in these transactions with Lucent. But Ackerman's testimony in this regard cannot be credited. Thus, for example, Ackerman testified to the SEC that Winstar could not help Lucent get revenue, because Winstar was too small to make a difference. But, Winstar was, in fact, the largest vendor financed customer of Lucent next to Sprint (Hopkins 2002 180:13 — 181:2), was one of Lucent's 10 to 20 largest customers (Garrett 20-102:14 — 20-103:3), and accounted for 10-15% of the revenue in Lucent's emerging service provider group of customers. (Wilson 16-114:6-10). And according to the SEC, the software pool transaction — just one of the many deals between the companies — represented 26% of Lucent's profit for that quarter. (DX-739 at ¶ 60). Ackerman contradicted himself, for example, when he testified that, among other things, Winstar accelerated Pay as you Grow payments because "it was an easy way to get Lucent revenue." And the fact that Winstar "consistently helped [Lucent] close huge [revenue] gaps each quarter" and did anything it could

25

to help Lucent generate revenue at the end of quarters, is evidenced by uncontroverted documents (PX-94, PX-345, PX-107, PX-153, PX-57, PX-320), as well as by the testimony of other witnesses. (Diroma 10/8/02  149:16 — 150:5; Diroma 11/20/02  152:2 — 154:19).

105.    As a result of an internal Lucent investigation in November 2000, the revenue that was going to be recognized by Lucent from the $135,000,000 September 30, 2000, end of quarter software pool sale by Lucent to Winstar was not recognized by Lucent. (Pocalyko 3-41:9-19, 3-73:23 — 3-74:13).

106.    The transaction remains the subject of a criminal investigation, which led to two key Lucent witnesses, Deborah Harris and William Plunkett, asserting their Fifth Amendment rights at depositions. (Joint Trial Exhibit 18 (Plunkett transcript) *passim*; Joint Trial Exhibit 19 (Harris 2004 transcript) *passim*).    Both of the recalcitrant Lucent witnesses were named as defendants in the recent SEC civil complaint. (DX-739). The assertion of these Fifth Amendment rights by Ms. Harris and Mr. Plunkett entitles the Court to draw an inference that their answers to the questions asked would have been detrimental to Lucent. This inference is supported by other evidence adduced at trial.

107.    Lucent in fact terminated Mr. Plunkett for his involvement in postdating documents related to the software deal. (Schacht 21-35:7-14). It did nothing, however, to terminate or otherwise punish fellow Winstar Sales Team members Deborah Harris, Vanessa Petrini or David Rigotti, all of whom remained active on the Winstar account into 2001, and who were clearly culpable in the scheme to fraudulently post-date the deal documents. (See PX-73; PX-66). Thus, while Mr. Plunkett became the scapegoat, the transaction remained in place, and

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B218**

the other Lucent participants remained active on the core Winstar sales team. (Schacht 21-29:3-21, 21-33:13-17, 21-35:7-14).

108.   Essentially, Lucent reduced the impact on Winstar's capex (which would have otherwise prevented Winstar from purchasing more unneeded Lucent equipment) by creating a huge fake software pool purchase. (Zlotnick 154:17 — 157:13, 163:3-24).

109.   Lucent identified some $184 million of software from which Winstar was (on paper, at least) to purchase $135 million. (PX-323).

110.   None of Winstar's software payments were due until 2001 — which meant Winstar's capex would be incurred in 2001 rather than 2000. (Id.; PX-462 at 26).

111.   Lucent, however, was able to book the sale as immediate revenue, notwithstanding Winstar's delayed payments in 2001. (PX-462 at 26).

112.   Lucent's initial software proposal was for a much smaller amount — $25 million — but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded approximately five-fold to the $135 million figure. (PX-57; PX-323).

113.   This increase occurred without the numerous internal studies or any of the other planning documentation that Mr. Pocalyko testified were typical. (DX-702; Pocalyko 3-41:14 — 3-42:10). As Lucent's Deborah Harris advised on September 22, 2000, "I know the overall Software request will be a surprise and that is an area where a conversation will be of benefit." (PX-52).

27

B219

114.    As part of this software pool transaction, the parties also agreed that Lucent's list pricing for the software, rather than Winstar's contractually-reduced pricing, would be used to further boost Lucent's revenue. (PX-53; PX-349). As Winstar executive William Zlotnick testified, the software deal was ultimately priced "at whatever Lucent needed for its revenue." (Zlotnick 160:25 — 161:5; PX-79; see also PX-57).

115.    Of the $135 million of software, less than $20 million was of value to Winstar. (Zlotnick 169:24 — 171:12). In fact, in post-deal documentation Lucent took the position that Winstar was only entitled to select $20 million of software — and would have to pay extra if it wanted more — despite Winstar's obligation to pay $135 million in cash in 2001. (PX-54). Lucent later recanted this position.

116.    To enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (i.e., before Winstar was obligated to actually make the software payments to Lucent). (PX-54; PX-57; PX-186 at internal tab 2; PX-324; PX-462 at 37; Rubin 2003 152:15 — 154:11).

117.    On behalf of Winstar, Ackerman signed the post-dated credit agreements, enabling Lucent to book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX-167; DX-739). Thus, Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion.

118.    This wrongful conduct resulted in the aforesaid investigations by the SEC and the U.S. Attorney's Office in New Jersey, and the SEC's April 2004 civil complaint.

28

119.    Lucent recorded $1,219 million of net income for its fiscal year 2000, ended September 30, 2000. (PX-504 at 48). As a result, if Lucent had recognized $125 million of revenue from the $135,000,000 end of quarter software pool sale by Lucent to Winstar in that quarter, the revenue so recognized would have represented almost 10% of Lucent's net income for the entire year.

120.    In 2004, Lucent attorney Paul Saunders was quoted in a Fortune Magazine article as stating that the software deal did not involve fraudulent accounting, but was instead the result of a "failure of communication." (PX-179 at p. 6). The SEC then compelled Lucent to publicly acknowledge that Lucent had relied on fraudulent accounting when it initially announced its intention to record revenue from the Winstar September 2000 end of quarter deal:

> Recent statements made by representatives of Lucent contained in [a] Fortune [magazine] article mischaracterized a $125 million transaction between Lucent and Winstar in September 2000 that is one of the transactions encompassed by the settlement in principle [with the SEC].
>
> Specifically, Lucent's representatives suggested that this transaction arose from a 'failure of communication' and not an accounting fraud. Lucent recognizes such comments regarding the transaction were both inaccurate and inconsistent with the terms of the settlement in principle. The transaction involved falsification of documents resulting in improper accounting, both of which were seriously wrong and cannot be justified.

(PX-167 at p. 1).

121.    Lucent argues that the software deal benefited Winstar, because Lucent promised Winstar $80 million of credits, and Lucent agreed to construct various network components at reduced pricing. But these benefits were, at best, designed to counterbalance

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

Winstar's direct costs of helping Lucent, so that Winstar would break even in the transaction. (PX-54; PX-56; PX-57; PX-79; PX-186; PX-323; PX-324).

122.    Indeed, when Kantor asked Lucent to provide an additional $10 million credit for damages caused by Lucent delays in installing and lighting sections of Winstar's fiber optic network, Aversano advised her team that if Lucent granted the credit, it would also increase the software pool to $145 million. (PX-330).

123.    In any event, the "benefits" consisted of (1) credits — at face value — that Winstar believed it was legitimately entitled to at no cost (and never actually received), and (2) price reductions that Winstar could have obtained from another vendor which Winstar never actually received, and which Lucent forced Winstar to renegotiate just three months later. (PX-462 at 28-29; Ackerman 609:13 — 612:7, 617:25 — 618:9, 659:9 — 662:21).

124.    The primary — if not only — reason Winstar, at Kantor's direction, agreed to this transaction was to keep Lucent happy so that Lucent would not breach its contractual duties to continue to finance and build out Winstar's network. (Ackerman 663:24 — 664:20).  Had Winstar not continued to please its strategic partner, Lucent, the consequences would have been severe.  From at least May 23, 2000, until December 7, 2000, the primary facility Winstar had from which it could finance the purchases of both Lucent and non-Lucent equipment and services was the Second Credit Agreement.  (PX-104).  And, equally important, Lucent was Winstar's primary vendor and, as testified to by Mr. Stark, a Lucent expert witness, the replacement of Lucent as Winstar's primary vendor could take as much as a year and would require extra money, time and effort to achieve.  (Stark 19-42:18 — 19-44:25).

30

125. The fact that Winstar was not acting in its own best interests in engaging in these end of quarter deals is further evidenced by its capital expenditure problems, identified as early as August 2000. (PX-107; PX-131; PX-302). Thus, Winstar — despite its reluctance to buy what it did not immediately need — knowingly spent virtually all of its allowable capex by September 30, 2000, to support Lucent's revenue needs (PX-46; PX-57; PX-127; PX-302), and as a result, had to take drastic measures between October and December 2000 to comply with its capital expenditures restrictions. (PX-43; PX-78; PX-116; PX-285; PX-438). As Lucent's expert Mr. Stark testified, he had never seen or heard of a party exceeding its capital expenditure budgets before the end of a fiscal year so that it could engage in an end of quarter deal. (Stark 19-47:20 — 19-48:13).

126. John I. Salomon, a Lucent expert witness who is not a certified fraud examiner, had numerous criticisms of the testimony of the Trustee's expert, Paul Pocalyko, who is both an accountant and a certified fraud examiner, and who spent an extraordinary amount of time performing a forensic analysis of the Lucent/Winstar history of transactions through December 7, 2000, which Mr. Salomon did not endeavor to replicate. Mr. Salomon did not opine, however, that Winstar and Lucent were dealing at arms length with each other, and his criticisms, taken as a whole and even, arguendo, crediting them, are not sufficient to overcome the substance of Mr. Pocalyko's opinion and the facts underlying that opinion. Thus, for example, uncontroverted are: (a) the fraudulent September 29, 2000, software pool transaction entered into for Lucent's benefit (Pocalyko 3-51:15 — 3-53:22); (b) the unusual 8:1 volume of end of quarter sales to non-end of quarter monthly sales and the huge and constant build-up of inventory from these end of quarter sales that, by Mr. Salomon's own math, was at least 6 - 9 months old, and for which Winstar paid interest to Lucent on Winstar's borrowings made to pay

31

for such inventory (Pocalyko 3-44:14 — 3-45:1; Salomon 21-105:20 — 21-106:23); (c) the extraordinary volume of vague invoices and vague purchase orders relating to the end of quarter sales (Pocalyko 3-30:12 — 3-31:5); (d) the occurrence of a bill and hold transaction in each quarter from December 1999 through September 2000, despite its propensity for revenue manipulation (Pocalyko 3-34:1 — 3-35:19); and (e) the unusually high volume of duplicative invoices and unrealized credits as testified to by Mr. Pocalyko (Pocalyko 3-42:22 — 3-43:23). Mr. Salomon has not claimed that any of the foregoing would occur between companies dealing at arms length with each other.

127.    DX-743 and DX-745 were used by Lucent's counsel on cross-examination of Mr. Pocalyko and have been admitted into evidence for illustrative purposes only. But these exhibits are not illustrative of anything of factual significance. DX-743 is a web-based printout of an invoice dated April 16, 1999. In giving his report and rendering his testimony, Mr. Pocalyko relied on actual invoice and purchase order documentation, as opposed to web-based, later-generated documents. (See Pocalyko 3-188:16-18 — "I believe I've seen this document, but I don't know that I've seen it in this format"). Moreover, Mr. Pocalyko's report and testimony focused on transactions during the period December 1999 through December 2000. Indeed, since DX-743 is a document relating to a period of time not covered in Mr. Pocalyko's report or direct testimony, in a web-based format that he never reviewed, and containing a misleading field concerning ship dates (Terrell 21-84:13 — 21-85:7) one questions how this document is "illustrative."

128.    As to DX-745, this purportedly illustrative exhibit lifts portions of statements from three different sections of Mr. Pocalyko's report and puts them together in a manner different than what the report states or Mr. Pocalyko testified, thereby mischaracterizing

32

the statements in the report and Mr. Pocalyko's testimony. (See proposed findings of fact nos. 37-43, 47-50, 53, and 54).

129.    According to Gregory Garrett, head of Lucent's Winstar program management team from July 2000 through April 2001, overseeing the Winstar network buildout from Lucent's perspective under the Supply Agreement, Winstar set aggressive network build-out schedules that the Lucent project management team was supposed to help implement but that were not met because of various delays. (Garrett 20-91:9-21). But this testimony is consistent with Winstar buying Lucent equipment and services to help Lucent generate revenue, because the aggressive network buildout schedules were needed to justify Winstar's continued purchases of Lucent equipment to help Lucent generate revenue.

130.    Neither Mr. Garrett nor Reginald Kipke, who reported to him, were involved in the decision as to what equipment or services were sold by Lucent to Winstar in end of quarter sales, nor the terms or conditions of those sales. (Garrett 20-99:20 — 20-104:21; Kipke 18-184:6-20). All these decisions were made and negotiated by Lucent's Winstar sales team and customer team, not by Lucent's Winstar program management team. (Id.).

131.    Although there were delays caused by Williams and other third-party suppliers that caused Winstar's network build-out to proceed slower than the schedules set by Winstar which Lucent's project management team attempted to implement, these third-party delays were not the only, or even the primary, cause of the build-up of Lucent equipment in Winstar inventory. The primary cause was the fact that Winstar tried to do whatever it could to help Lucent generate revenue in end of quarter sales for at least every quarter from the quarter

33

B225

ended December 31, 1999, through the quarter ended September 30, 2000. (PX-86; PX-104; PX-94; PX-157; PX-288; PX-345).

132.    In September 2000, after just starting work on the Winstar account in July 2000, Mr. Garrett, Lucent's head of the Winstar program management team, recommended to Winstar (including David Ackerman) that Winstar not purchase additional Lucent equipment because of the build-up of Lucent equipment in Lucent and Winstar warehouses. (Garrett 20-90:23 — 20-91:8, 20-105:17 — 20-106:9). Mr. Garrett's recommendation was ignored by Winstar.   (Garrett 20-91:9-21).   In his testimony, Mr. Garrett attributed this to Winstar's aggressive (and in his view, unrealistic) network build-out schedules. (Id.). But Mr. Garrett admitted he, and those who reported to him, played no role in the end of quarter sales made by Lucent to Winstar — those sales were handled by Lucent's Winstar sales team and customer team. (Garrett 20-99:20 — 20-104:21). If one were to credit Mr. Garrett's testimony, then at best, he was unaware of the efforts of Lucent's Winstar sales and customer teams to cause Winstar to enter into a $212 million September 2000 end of quarter sale, including $77 million of equipment and services in addition to the $135 million software pool transaction. (PX-323; PX-73; PX-125).

133.    Because of delays by Williams in providing fiber to Winstar, the buildout of Winstar's telecommunications network was delayed, with 1 or 2 routes being delayed as much as six months. (DX-232). But delays in a build-out when a company relies on third parties to provide fiber or other product is not unusual (Kipke 18-192:4 — 18-193:14), and by February 15, 2000, the fact that delays of up to six months had actually occurred was well known. (DX-232). Notwithstanding the knowledge that delays usually occur and, in fact, here had occurred, Lucent continued to press Winstar to help Lucent generate revenue in March 31,

34

2000, June 30, 2000 and September 30, 2000 end of quarter sales, by purchasing substantial additional Lucent equipment that could not be presently deployed by Winstar or even deployed in the immediate future. (PX-345, PX-131).

134.    In an arms length relationship, the very delays experienced would have caused Winstar to slow down on its purchases of Lucent equipment, not continue to build up substantial inventory in warehouses in end of quarter deals, which by September 2000 had Winstar $190 million over budget ($1.260 m — $1.070 m = $190 m) on its projected $1.3 billion in calendar year 2000 capital expenditures. (PX-57). The testimony of Mr. Garrett (Garrett 20-94:5-23) as to the buildout of the entire Qwest network — similar to Winstar in size and scope — in just 2 months, even if that timetable was in part attributable to Qwest owning the fiber, serves to highlight that Winstar's end of quarter purchases had to be the result of Lucent's influence and control and Winstar's desire to please its strategic partner, Lucent.

135.    Besides the testimony of various witnesses, there is virtually uncontroverted documentary evidence that Lucent and Winstar were not dealing at arms length with each other in 1999 and 2000 and that the end of quarter sales in the quarters ending December 31, 1999, through September 30, 2000, evidenced Lucent's influence and control over Winstar:

> a.    PX-486 — Winstar March 1999 e-mail: "Important point: Nina [Aversano] is about $1 B[illion] behind plan this year, and we could be very helpful if we timed the $750 [million] in the most advantageous way to them. I assured them we would;"

> b.    PX-94 — Lucent December 1999 e-mail: "P.S. Bill [Rouhana] offered to do anything he could to help this quarter. If there is anything else that can be done now go directly to him;"

35

c.   PX-297 — Lucent February 2000 e-mail: "As you know Winstar has been a key customer of ours over the last year [1999] and has consistently helped us close huge gaps each quarter;"

d.   PX-300 — Lucent March 2000 e-mail: "I am upset with my team as they have a VERY large bill and hold for Winstar which I thought was only $20 M[illion] but now is $80 M[illion];"

e.   PX-348 — Lucent June 2000 e-mail: "I just told Jill [Diroma] that we'd need another Bill & Hold letter this quarter to support this URGENT EOQ deal . . ." "I also need to call your attention to a warehousing issue involving the optronics for the long haul and metro builds.   Currently, this equipment is being shipped to Lucent's Morrow warehouse.  Again, in the past, we were able to recognize revenue . . . via Bill and Hold letters.  We must now employ another tactic . . . Our team recommends the best tactic is to get Winstar to lease the portion of the warehouse (approx. one-third) that houses the ONG equipment . . . We will need you to discuss this with Dave [Ackerman] and ask him to have Lisa [Hicks] work with us on this.  We will work to make Winstar's lease payment to us transparent (i.e., we will give them a corresponding reduction in the price of equipment on a future proposal);"

f.   PX-345 — Winstar June 2000 memo: "2Q00 [June 2000] EOQ DEAL SUMMARY — "Stuff we need now . . . 19.69 [million dollars]; Stuff we need later this year . . . 13.3 [million dollars]; Stuff we need next year (or years after) . . . 60.7 [million dollars]; Stuff we really need this year that we could be buying instead of the next year stuff:

|  |  |
|---|---|
| Ascend 500 switches | 10 [million dollars] |
| Cisco Routers | 40 [million dollars] |
| Dell/Compaq equipment | 12 [million dollars] |
|  | 62 [million dollars];" |

Compare to PX-350 - Lucent's subsequent memo summarizing the deal; the items listed under "Stuff we need next year (or years after)" were purchased by Winstar, but described by Lucent differently.

g.   DX-26 — Internal Lucent Memo — at page LW 00228416: Memo refers to equipment stored in Lucent's Morrow warehouse as of June 30, 2000 Lucent/Winstar end of quarter deal: "Cumulative: ONG equipment $58 M[illion] in Lucent's Morrow, GA warehouse (will be depleted by Feb/March 2001);"

36

B228

h.  PX-360 and PX-125, relating to accelerated Pay As You Grow payments: (i) PX-360 — Winstar June 2000 email: "He [Plunkett] wants us to agree to another $53M[illion] in purchases for 2Q (that includes $17 M[illion] of accelerated pay as you grow $$ for 5ESS's)" and (ii) PX-125 — September 29, 2000 letter between Plunkett and Ackerman: "Winstar Agrees to purchase from Lucent the following . . . $18,852,500 5ESS PAYG;"

i.  PX-107 — Lucent August 2000 e-mail: "Bill [Plunkett] and I [Deborah Harris] have had some interesting meetings with Dave Ackerman over the past couple of weeks as well as subsequent meetings with members of Dave's management team. They have been very open about their plans and their spending requirements for the remainder of 2000 and 2001. Due to restricted spending levels as a result of a bank covenant, Winstar is hitting the brakes on spending and signaling some disturbing actions. For example, . . . Return of equipment already purchased (sitting in warehouses waiting for deployment, often as a result of EOQ deals where we also acquired radios, long haul routes to resell or use internally). We may have put this issue to bed last week;"

j.  PX-153 — September 18, 2000 Deborah Harris internal Lucent e-mail: "They are vehement that they are out of money and do not want to spend money on product that they cannot immediately utilize. The deals of the past are haunting us. . . ;"

k.  PX-57 — Memo prepared by Hicks during negotiations for September 2000 end of quarter deal: "Total capital plan for 2000 is currently over budget by $190 M ($1.260 M - $1,070 M = $190 M). Of the $190 M overage, $155 M can be attributed to prior Lucent end of quarter deals . . . Lucent is requesting an additional end of quarter deal for 9/00 of $63 M, which would bring the total capital budget overrun for 2000 to $253 M, $218 M directly attributable to Lucent deals ($155 M + $63 M = $218 M) . . . As one way to manage the $63 M request, Lucent has proposed that approximately $25 M of this amount come from a "software pool;"

l.  Documents relating to the $212 million September 30, 2000 end of quarter deal, and the admittedly fraudulent $135 million software pool transaction that was part of the September 2000 end of quarter deal: PX-57, PX-51, PX-53, PX-323, PX-55, PX-509 and PX-330. As demonstrated by these documents, the software pool transaction grew in just 9 days from a $25 or $32 million proposal to $135 million and was a fake transaction in all respects, designed solely to enable Lucent to book substantial revenue;

37

B228A

m.  PX-307 — Lucent December 8, 2000 e-mail: "As we reviewed on our call, the following are some of the steps taken by Winstar to formalize their ownership of the electronics material in Morrow. Winstar's Asset Management Group has sent auditors to Morrow and they have inventoried the electronics material and placed bight orange "Property of Winstar" labels on the exterior of all the cartons. The information is being entered into Winstar's MP5 Asset Management Tracking System;" and

n.  PX-320 — October 26, 2000, fax to Deborah Harris (who was then leading the Lucent negotiating team on the transition agreement) attaching "material" received from Nate Kantor of Winstar. The Nate Kantor "material" was a memo headed "Lucent Product Overview" and lists "Lucent Products Winstar Buys Because They are Better" and "Lucent Products Winstar Buys Because of the Partnership." A comparison of the two lists evidences the nature of the Lucent/Winstar strategic partnership.

136.  In a March 2000 end of quarter sale, Lucent — purportedly pursuant to an agreement with Winstar not in evidence in this case — purchased $35 million from Winstar in network assets, consisting of $20 million in backbone and $10 million of radios. (DX-260). This was done, in part, as payback to Winstar for Winstar agreeing to purchase over $350 million of a particular kind of Lucent equipment and entering into a March 2000 end of quarter sale to purchase equipment and services from Lucent. (DX-260; Wilson 16-129:22 — 16-131:25, 16-133:12-25). Lucent believed it had a valid use for the $35 million purchase and would resell it all to other Lucent customers in the next quarter. (DX-260; DX-364). Thus, unlike the situation with Winstar purchases from Lucent, Lucent had an immediate use for what it purchased from Winstar, even if the purchases were, in part, to pay back Winstar.

137.  In support of its contention that Lucent was not an insider of Winstar, Lucent asserts that Winstar submitted its first draw request to Lucent under the Second Credit Agreement on May 23, 2000, approximately three months earlier than Winstar had projected to Lucent just prior to the May 4, 2000 execution of these documents. (Perricone 20-19:22 — 20-

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B229**

21:3). But Winstar's reasons for doing so are explained in May 24, 2000, Perricone e-mail (which Ms. Perricone neglected to mention during her direct examination) advising various people at Lucent as to a telephone call she just had with Fred Rubin and Kevin Monaco of Winstar:

> "Winstar Sr. Management further feels that the capital markets are focused on liquidity for companies in their sector and as such they now believe that maintaining a cash balance on their books of $600-650MM is appropriate and any facilities available to them for funding should be utilized.
>
> * * *
>
> Fred [Rubin] again reiterated that their recent $1.6B high yield raise was only done to support a Bank deal which would enable Lucent to be repaid in full. To effect the HY and Bank deal, they came out of pocket for over $250MM in expenses to "help Lucent's Balance Sheet".
>
> Finally, Fred noted that now that Lucent is proposing a "turnkey" solution, Winstar is being asked to take equipment early to "help Lucent recognize revenue" and that this equipment now has to be financed and was not built into the model originally supplied to us."

(PX-104; Perricone 20-20:22 — 20-21:3, 20-52:20 — 20-55:6).

138. Moreover, Lucent relied upon a technicality to refuse to honor that draw request, and did not finance the invoices in question until almost a month later. (Perricone 20-21:4 — 20-21:14).

### 3. Lucent's Subcontract Threats

139. Lucent witnesses testified that Lucent subcontracted services to Wireless because Lucent had a duty under the Supply Agreement to provide a turnkey buildout of Winstar's network and Lucent could not do so without subcontracting the services. (Diroma

39

11/20/02 109:9-15, 183:10 — 184:24; Schacht 9/10/02 109:20 — 110:14, 113:16 — 114:13, 116:5-18; Schacht 2004 25:9 — 26:9). See also PX-325 ("Per the contract, Lucent have [sic] the responsibility to build the client's entire network, however, there are some services which only they can perform. In order to fulfill our contractual obligation, and to strengthen strategic relationship with the client, Lucent agreed to flow the services through, by sub-contracting [sic] the services back to the client.").

140.    Although Winstar and Lucent never modified the Supply Agreement to eliminate Lucent's responsibility for these services, Lucent nevertheless threatened to breach its obligations under both the Supply Agreement and the Subcontract to gain leverage over Winstar and persuade Winstar to continue to help Lucent meet its revenue targets.

141.    One such instance occurred after Lucent approached Winstar with the September 2000 end of quarter deal. On September 22, 2000, Harris told Winstar that Lucent would not pay the $62 million of third quarter 2000 Wireless Subcontract services. (PX-81).

142.    Winstar's Lisa Hicks had predicted this breach, because she expected Lucent to withhold payment to extract revenue from Winstar: "[m]y gut is telling me that Lucent is sitting on this until we hash out an end of quarter deal they are approaching us with tomorrow. . ." (PX-59).

143.    When Lucent advised that it would breach, Kantor's only recourse was to object to Aversano:

> "I am very surprised and disappointed with this — we've only discussed and agreed on this a million times. This doesn't sit well with me and will have a major impact on our ability to help you this quarter. You've got to get this fixed."

40

B231

(PX-158).

144.    In the end, Lucent met its contractual duty to pay Wireless for the services — after the September 2000 end of quarter deal purchase increased to $212 million, or $100 million dollars more than Lucent's initial revenue "request." (PX-56).

145.    In December 2000, Lucent again used the threat of breaching its obligations to obtain additional concessions from Winstar. (See discussion _infra_ at proposed findings of fact nos. 167 — 176).

### 4.    The Financing Discussions And The Siemens Repayment

146.    In September 2000, Lucent committed that it would replace the Subcontract with the transition agreement required under the Supply Agreement and directly perform substantially all, if not all, of the services being performed by Wireless under the Subcontract. (Harris 11-42:21-25, 11-44:17 — 11-45:25; PX-109 at LW 148416; PX-113).

147.    Lucent still was not actually able to perform properly substantially all of the services being performed by Wireless under the Subcontract, but wanted to undertake performance anyway so that Lucent could book the revenue represented by these services, in the approximate amount of $325 million per year. (Schacht 9/10/2002 115:2-24; PX-113).

148.    Lucent itself performing the services being performed by Wireless was consistent with the parties' original intention. (Harris 11-61:9-15).

149.    Lucent then twisted this promise to itself perform its duties under the Supply Agreement into yet another means to exert undue influence and control over Winstar. First, Lucent dragged out the transition agreement talks. Although it had committed to

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

"lockdown" negotiations in the first week of October 2000 to complete a transition agreement (as the parties had done with the original Supply Agreement and First Credit Agreement), Lucent did not engage in lock down talks, nor did the talks commence in earnest until mid- to late-October, and then continued into December 2000. (PX-21; PX-62; Aversano 8-142:14 — 8-144:8; Kantor 181:25 — 183:4).

150. In the interim, Wireless continued to perform the services which Lucent was negotiating to perform and which Wireless had been performing under the Subcontract. (Kantor 183:5-14, 194:13 — 195:11).

151. Lucent was well aware that Wireless had to continue the buildout: in May 2000, in both the Bank Facility (which Winstar had entered into to prepay the first $1.2 billion borrowed from Lucent) and the Second Credit Agreement, Winstar had obligated itself to meet specific buildout milestones. If it failed to meet the milestones, Winstar would default under both the Bank Facility and the Lucent Second Credit Agreement. (PX-138 at §§ 6.07(g) and 6.07(h)).

152. Lucent was also aware that Winstar needed Lucent to satisfy its obligations and pay for the Wireless services, and that if Lucent failed to do so it would cause Winstar considerable damage. (Harris 11-41:23 — 11-42:17, 11-46:6 — 11-48:3; PX-109 at LW00148416; PX-113).

153. In November, with negotiations on the transition agreement still continuing, Lucent again exerted its insider influence and control, this time with respect to the alleged preferential payment at issue. When Winstar advised Lucent in November 2000 that Winstar was finalizing negotiations with Siemens whereby Siemens was willing to lend Winstar

42

B233

an additional $200 million by joining in the Bank Facility, Winstar requested that Lucent agree to allow Winstar to pay $100 million of the Siemens loan to Lucent and retain the other $100 million for Winstar. (PX-151).

154.    Lucent rejected Winstar's request and, instead, insisted on compliance with its November 7, 2000 "consent letter" which included a list of demands that it ordered Winstar to meet. (PX-192; Montemarano 2004 94:24 — 95:11, 99:15-24).

155.    First, Lucent demanded that Winstar draw all of the funds down as soon as they were available and pay them to Lucent, rather than allowing Winstar to determine whether and when it would tap the facility. (Id.)

156.    Lucent also demanded that Winstar agree to prepare a written paydown schedule for the remainder of the sums it owed Lucent under the Second Credit Agreement — even though Winstar was not obligated even to begin repaying the sums until 2005 — and insisted that Winstar help Lucent sell off the other outstanding Winstar borrowings. (Id.)

157.    Lucent also required that Winstar cooperate in Lucent's performing a due diligence review of Winstar. (Montemarano 98:13 — 99:2, 99:15-19, PX-151).

158.    When Winstar did not immediately agree to Lucent's demands, Lucent advised Winstar that Lucent would not continue the transition agreement negotiations (which its own employees recognized Lucent was contractually obligated to complete (See PX-109; Harris 11-42:21-25, 11-44:17 — 11-45:25) unless Winstar accepted Lucent's demands regarding the Siemens payment:

43

**B234**

> I have been asked to put the Services meeting on the 15th on hold
> until the Rick Huel (sic) & Mike Montemarano (our 2 CFOs) reach
> final agreement on the finical (sic) discussions they had last week.
> If agreement is reached on Monday or Tuesday we will be there.

(PX-136; PX-440).

159.    After Ackerman pressed Plunkett to continue the negotiations, Plunkett

reiterated Lucent's position: "We are being told not to have meeting (sic) with Winstar until the

finance discussions are done." (PX-137; PX-440).

160.    In an internal Lucent email, Harris noted that Hopkins had declared a

freeze on the transition agreement negotiations until the financial issues were resolved. (Harris

11-48:10 — 11-48:23; PX-116).

161.    Hopkins and Lucent had been pressing Winstar for months to obtain

prepayments. (Hopkins 11-111:11 — 11-112:23, 11-116:22 — 11-117:14, 11-123:10 —

11-124:13, 11-136:15 — 11-138:20, 11-162:19 — 11-163:11, Hopkins 2002 180:13 — 181:2;

PX-44; PX-218). In the calendar years 1999 and 2000, Winstar was one of the largest vendor

financed customers of Lucent, if not the largest next to Sprint. (Hopkins 2002 180:13-181:2).

Winstar accounted for 10 - 15% of the revenue in Lucent's emerging service provider group

customers (Wilson 16-114:6-10), and was one of Lucent's 10-20 largest customers. (Garrett

20-102:14 — 20-103:3). Lucent found itself in a position of substantially declining revenue and

its cash position was significantly eroding; hence, Hopkins was pressuring Winstar for

prepayments. (Schacht 2004 109:15 — 110:2; Montemarano 139:13 — 140:25).

162.    In early December, just days before the Siemens Repayment, Lucent

applied additional pressure to force Winstar to borrow and pay over the money. Hopkins

declared that Winstar was not to be permitted to draw down any additional funds under the

44

Second Credit Agreement (despite its contractual right to do so) unless and until Winstar paid the Siemens proceeds to Lucent. (Harris 11-67:16 — 11-68:7; PX-116).

163.    Once Winstar agreed to repay the full Siemens loan proceeds, Lucent resumed negotiations on the transition agreement, and the parties' negotiating teams reached an agreement around the time of the Siemens Repayment. (PX-112; Harris 11-48:24 — 11-49:13; Kantor 194:13 - 195:5). The transition agreement approved by both negotiating teams contained all the material objectives that Lucent's senior management had instructed its negotiating team to achieve. (Harris 11-49:5 — 11-55:19).

164.    Winstar paid Lucent the Siemens funds on December 7, 2000, in the alleged preferential payment at issue. (Renumbered Joint Stipulated Fact No. 17).

165.    With the Siemens Repayment in Lucent's pocket — and even though the transition agreement had been approved by Lucent's negotiating team, Winstar's negotiating team and Winstar's senior management — Lucent's senior management then rejected the transition agreement. (Kantor 460:5 — 461:9; Harris 11-56:24 — 11-57:2, 11-58:8 — 11-59:8).

166.    Lucent has contended at times that it did not want Winstar to engage in the Siemens transaction, and that the transaction (and Lucent's receipt of almost $200 million) was somehow bad for Lucent. This nonsensical position (see Montemarano 63:25 — 66:9) is belied by the facts set forth above, and additional evidence in the record. For instance, Ms. Hund-Mejean — Lucent's then Treasurer — wrote in a November 28, 2000 e-mail about how eagerly Lucent anticipated receipt of the Siemens Repayment: "After Carol/Debbie's meetings last week I have not heard when we get the $200 million which is an absolute must now given our cash flow situation. We need to get this done urgently." (PX-251).

45

B236

**5.    The December 2000 Subcontract Payment**

167.    Within a week of the Siemens Repayment, Lucent once again asserted its influence and control. On December 14, 2000, about the time it had completed its due diligence review of Winstar, Lucent rejected six separate requests by Winstar to redress issues in the relationship. (PX-22).

168.    Among other things, Lucent, on or about December 14, 2000, advised Winstar that Lucent would not make the Subcontract payment to Wireless due for the three-month period ending December 2000 (See PX-326); that Lucent was not ready to sign the transition agreement, and if it did, would not actually perform any services for 90 days; that Lucent would serve the refinance notice; and that although Lucent would agree to Winstar's request to repurchase excess, never-used optronics purchased by Winstar as a favor to Lucent in the December 31, 1999 bill and hold deal, it would do so only at thirty cents on the dollar. (Kantor 197:16 — 199:4, PX-22).

169.    Most, if not all, of these rejections were deliberately timed to occur after Winstar made the Siemens Repayment. (See PX-202).

170.    The three most significant for Winstar were the issuance of the refinance notice, the refusal to approve the transition agreement reached by the negotiating teams (and approved by Winstar senior management), and the decision not to make the Subcontract payment for Wireless services due at the end of December 2000. Although Lucent served the refinance notice, it ultimately reconsidered its decision not to pay Wireless, although it once again used its refusal to pay to extract concessions from Winstar.

46

B237

171.    After Lucent told Winstar that it (again) wouldn't pay for the Wireless services under the Subcontract for the fourth quarter, both Uhl and Kantor appealed to their respective Lucent counterparts. (Kantor 199:24 — 204:5, 205:10 — 207:10).

172.    Lucent Vice Chairman Verwaayen finally agreed on December 27, 2000, that Lucent would pay for the Wireless services under the Subcontract for the three-month period ended December 31, 2000. (Kantor 207:11 — 208:14).

173.    Throughout the discussions and afterward, Winstar contended that Lucent had a contractual duty under the Subcontract to pay for the services. (Kantor 354:8 — 355:5; Montemarano 2004 185:17 — 186:13; PX-264).

174.    Although Lucent disagreed orally with Winstar about its duty, Lucent's documents — including a Verwaayen e-mail explaining his strategy — demonstrate that Lucent recognized its obligation to pay for the services, but threatened breach of the Subcontract to force Winstar to agree to meet and, ultimately, comply with Lucent's demands for significant changes in the Supply Agreement, the Second Credit Agreement, and the overall relationship:

> "after the read out from the lawyers, ... Winstar can draw upon the credit facility, including services ... We really had not the option of denying their rights here. In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change. So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship. We will create from both sides a wish list how to recreate our legal platform working together and renegotiate on those issues. I think we all understand now much better where we are and how to get out of this situation going forward."

(PX-199; see also PX-261 — "Now we have positioned ourselves for a major overhaul of our relationship with Winstar...").

47

B238

175.    Based on this exercise of its influence and control, Lucent succeeded in bringing Winstar to the table in early 2001 to negotiate fundamental changes to the relationship, to make it more profitable for Lucent (and, therefore, less profitable for Winstar). (PX-261; Montemarano 2004 181:9 — 185:8). In particular, Lucent desired to change the provisions of the Supply Agreement and the Second Credit Agreement so that Lucent would only finance the purchase of Lucent equipment, even if not best of breed, and that Winstar would agree to increased prices for various Lucent equipment and services, including "bs" and "hubs." (PX-56 at WC0017576-77, Montemarano 170:10 — 178:25).

176.    Winstar, as usual, had no choice but to comply with Lucent's demands in an attempt to keep Lucent as its partner, even if in a reduced role. Accordingly, Winstar was prepared to discuss changes to the fundamental basics of the relationship, including the "best of breed" requirement, the turnkey buildout requirement and the terms of Lucent's financing. (Id.) As Mr. Uhl testified, Winstar's continued partnership with Lucent was vital to how Winstar was perceived in the marketplace and to Winstar's continued viability. (Uhl 254:4-22, 255:2-7; Jules 6-14:6-18).

### 6.    The Refinance Notice

177.    As discussed above, Lucent obtained the right to serve a refinancing notice once Winstar's borrowings under the Second Credit Agreement exceeded $500 million. Winstar exceeded the $500 million limit in October 2000. (DX-453). The severe consequences to Winstar of the issuance of a refinancing notice are not in dispute.

178.    Once served, the notice set forth a 90-day or 105-day period in which Winstar was required to pay off the balance due. (PX-138 at § 2.18).

48

179.  If Winstar failed to do so, then it would be charged with a fee on the outstanding balance (an approximately $7 million charge), and Lucent would be entitled to sell the debt on the market in the form of conversion notes, which would carry high interest rates, which Winstar was unable to pay.  (Id.; PX-201).

180.  Lucent had concluded as early as November 2, 2000, that issuing the refinancing notice would effectively preclude Winstar from obtaining new or additional financing, because of the looming consequences of the refinancing period.  (PX-231; PX-311; Hund-Mejean 14-55:15 — 14-59:25).

181.  Because it bought hundreds of millions of dollars of unnecessary Lucent equipment and services to meet Lucent's revenue needs, Winstar went over the $500 million refinancing threshold in October 2000 and remained so through December 19, 2000.  (Hayes 59:11 — 62:2; PX-45; PX-148; PX-153; PX-185; PX-462 at 18).  But for these unnecessary end of quarter purchases of Lucent equipment and services, Winstar would not have been over the $500 million refinancing threshold in October, November or December 2000.  (Pocalyko 3-45:12 — 3-48:7; PX-462 at Table 5, Page 18; Salomon 21-127:21 — 21-131:18; PX-148).

182.  Lucent, however, did not exercise its unfairly-obtained right to serve the refinance notice immediately, as some of its employees recommended in October and November 2000.  (Hayes 13-40:18 — 13-48:18, 13-54:9-22; Rogers 20-135:2-12; PX-185; PX-187; PX-188).

183.  Lucent also delayed serving the refinance notice even after Lucent's then-CEO, Henry Schacht purportedly instructed that they were "free to proceed" with serving the refinance notice as early as November 15, 2000.  (Schacht 21-22:1 — 21-23:13).

49

B240

184.   Instead, Lucent intentionally withheld the notice until it received the Siemens Repayment. Debra Hopkins, Lucent's CFO, declared that Lucent should withhold the refinance notice until after Lucent received the money: "We should see our 188M thursday (sic) or Friday . . . that's even better! . . . And we believe we may want to send the notice letter re: 500M anyway after we receive the 188m." (PX-202).

185.   Martina Hund-Mejean, Lucent's Treasurer, admitted she held back sending the refinance notice, in compliance with her boss Debra Hopkins' thinking, because Hund-Mejean recognized that if the refinance notice was sent, it could cause Siemens not to lend the $200 million to Winstar. (Hund-Mejean 14-55:15 — 14-59:25; PX-231; PX-311).

186.   As soon as the Siemens Repayment was received by Lucent, however, it concluded its analysis of serving the refinance notice on Winstar. (PX-220; PX-252).

187.   Beth Perricone testified that Lucent's due diligence of Winstar was important to her in connection with the decision by Lucent as to whether Lucent should serve a refinancing notice. (Perricone 20-35:23 — 20-37:3). But Ms. Perricone admitted that Lucent could have conducted a due diligence of Winstar in early November 2000, but did not do so until the first two weeks of December. (Perricone 20-56:22 — 20-57:13, 20-57:22 — 20-58:14). Although information may have been needed from Winstar for Lucent to do the due diligence it wished to do, that information could have been requested or obtained much earlier than it was since Winstar was already over the $500 million refinancing threshold as of October 23, 2000. (Perricone 20-57:22 — 20-58:11; Hayes 13-48:8 — 13-51:1, 13-51:21 — 13-53:22; DX-453).

188.   In any event, others at Lucent apart from Ms. Perricone, including Paul Hayes and Perricone's boss, Leslie Rogers, did not share Ms. Perricone's view that completing

50

B241

the due diligence in December 2000 was an important prerequisite to sending a refinancing notice and wanted the refinancing notice sent in November or Winstar at least be told in November that it was going to be sent. (PX-187, Hayes 13-42:22 — 13-48:18, Rogers 20-135:2-12). And the decision on whether and when to send the refinance notice was made by Ms. Hund Mejean and Ms. Hopkins, Ms. Perricone's superiors. (Hund Mejean 14-40:7-11; PX-202).

189.    Once Winstar paid Lucent the $194 million net proceeds of the Siemens loan, Lucent advised Winstar within a week (i.e., on December 14) that it would serve the refinance notice, setting in progress Winstar's bankruptcy filing. (PX-22; PX-149).

190.    After being advised that Lucent intended to send a refinance notice, Winstar asked Lucent on December 15, 2000 to apply previously approved credits to reduce the principal balance under the Second Credit Agreement below $500 million. Lucent refused. (PX-443).

191.    On December 14, 2000, after much prior discussion, Lucent offered to repurchase from Winstar, at 30 cents on the dollar, $50 million of optronics, including $36 million of Lucent optronics equipment purchased by Winstar in a December 1999 end of quarter bill and hold sale that was still sitting in Lucent's warehouse. (Zlotnick 211:20 — 213:16; PX-22). Winstar rejected the offer. (PX-22).

192.    Lucent served the refinance notice on December 19, 2000, commencing a 105-day refinancing period that expired on or about April 3, 2001. (PX-149; PX-138 §§ 1.01 at 33, 2.18).

HFNJI: #146477 v.1 #06723-0001 06/06/2005

193. Approximately two weeks after the conclusion of the refinance period, Winstar filed its bankruptcy petition, conveniently (for Lucent) just outside the automatic 90-day preference period. (Renumbered Joint Stipulated Fact No. 3).

194. Lucent, of course, understood the potentially devastating consequences that serving the refinancing notice could have on Winstar. (Hayes 13-44:15 — 13-45:5).

195. As a result of the due diligence conducted in December 2000, Lucent reduced its internal Winstar credit risk rating from a 6 (average) to a 7 (poor), and determined that it was appropriate to increase the loan reserves for the Winstar debt. (PX-201). Perricone 97:4-16; Diroma 11/25/02 149:13 — 150:14). Lucent also confirmed its earlier view that Winstar could withstand Lucent sending the refinancing notice, as opposed to Lucent actually selling conversion notes after the expiration of the refinance period. (PX-201).

196. By withholding the refinance notice until after receipt of the Siemens Repayment, Lucent insured that Siemens and the equity investors (whose investment of $270 million in equity in Winstar was a requirement for Siemens to make its $200 million loan to Winstar) would remain in the dark until after Siemens loaned Winstar the money and the additional equity investments were made. (Hund-Mejean 14-55:15 — 14-59:25, PX-200; PX-231). Had the refinance notice been sent prior to December 7, 2000, and Siemens learned about it, it is likely that Siemens would not have made the loan to Winstar. (Id.).

197. The receipt by Lucent of the Siemens Repayment was beneficial to Lucent. If the Siemens Repayment were not made, then the loan balance owed to Lucent under the Second Credit Agreement at the time Winstar filed in bankruptcy might have been $200 million higher. (Under the Second Credit Agreement, even after a refinancing notice was

52

sent, Lucent continued to be obligated to finance Winstar under the terms of the Second Credit Agreement.) (Montemarano 165:20 - 165:22; PX-204; PX-138). Moreover, at least to the extent of any Lucent equipment purchased by Winstar and financed under the Second Credit Agreement, Lucent was in a senior secured position to the lenders, under the Bank Facility. (Perricone 20-12:6-13, 20-68:13-25).

198.    The Siemens Repayment was itself the result of Lucent's exercise of influence and control over Winstar. As discussed earlier, because of Lucent's declining revenues and eroding cash position, Lucent, with Debra Hopkins as it main spokesperson, had been seeking since the summer of 2000 to sell the Winstar loan obligation to third parties and/or obtain prepayment from Winstar of its loan obligations. (Hopkins 11-111:11 — 11-112:23, 11-116:22 — 11-117:14, 11-123:10 — 11-124:13, 11-136:15 — 11-138:20, 11-162:19 — 11-163:11, Hopkins 2002 180:13 — 181:2). In November 2000, Lucent learned from Winstar about the imminent $200 million Siemens loan and the proposed increase in that amount of the lending limit under the Bank Facility.    (PX-257; Montemarano 86:13 — 89:19, Hund-Mejean 14-7:14-21, 14-11:14).    Winstar subsequently requested that Lucent permit Winstar to retain $100 million of the $200 million. (Hund-Mejean 14-29:2-24; PX-151). (If there was any increase in the lending limit under the Bank Facility, Winstar was obligated under the Second Credit Agreement to pay the amount of the increase to Lucent). Lucent not only refused Winstar's request, but ceased negotiation of the already long delayed transition agreement until Winstar agreed to pay over the full amount.    (PX-136; PX-137; PX-440; Ackerman 580:10 — 581:24, 582:12 — 584:24; Harris 11-48:10-23).  If a transition agreement were not in place and Lucent followed through on its September 2000 threat that payments under the Subcontract would no longer be made, then Winstar would be unable to continue in business.

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

(Harris 11-41:23 — 11-42:17, 11-46:6 — 11-48:3). Thus ended all Winstar negotiating efforts with respect to the Siemens Repayment. The foregoing, coupled with Lucent deliberately timing the sending of its refinancing notice until after the Siemens Repayment was received by Lucent (PX-202; Schacht 21-22:1-14, 21-23:4-20, 21-15:11-18; Hund-Mejean 14-55:15 — 14-59:25), demonstrate that Winstar's payment of the Siemens loan proceeds to Lucent was itself the result of Lucent's insider position.

### 7.  Employees Of Both Parties Testified That Lucent Was An Insider

199.    Winstar employees have testified that the parties were not dealing at arms length with each other. (Ackerman 303:21 — 307:15; Rubin 2001 18:19 — 19:11).

200.    Lucent employees have so testified as well. For example, Debra Hopkins, Lucent's CFO, testified that she objected to the parties' subcontracting relationship — which continued through the end of December 2000 — along with Lucent's Chief Accountant, Bill Fullerton, because the relationship was not arms length:

> A.    I think there's a term in here if I could say one more thing that is very good in Bill [Fullerton]'s comments in the context of services. The concept of arms-length is very important and what we were being presented did not meet that criteria being an arms length contract.

(Hopkins 11-153:9-13; see also Diroma 11/20/02 109:16 — 111:4).

201.    And the testimony of certain Lucent witnesses that they actually believed Winstar was not contractually entitled to the end of December 2000 Subcontract payment (regardless of whether they were correct) is an even more damaging admission of the closeness present in the relationship on and after the December 7, 2000 Siemens Repayment. Thus, despite the fact that Lucent's revenues were declining and Lucent was conserving cash by December

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

2000, Lucent's employees assert that the company voluntarily paid $62 million to Wireless for no other reason than to accommodate Winstar. (Montemarano 71:20 — 72:21, 154:19 — 157:4). Lucent admits that it did not have the "pass through" Subcontract arrangement it had with Wireless with any other Lucent customer. (Schacht 2004 115:2 — 116:22, Schacht 9/10/2002 119:24 — 120:6; Diroma 11/20/02 89:12 — 90:15; Wilson 16-106:18 — 16-107:5).

If the Subcontract were not a legally binding obligation of Lucent in December 2000, as Lucent contends in this action (despite documentary evidence and testimony to the contrary), then the payments to Wireless for Wireless services "as an accommodation," "for customer relations," "one more time," or "one last time" in every quarter for the quarters ending March 31, 1999, through and including December 31, 2000, is further evidence of the fact that Lucent and Winstar were not dealing with each other at arms length throughout the period ending December 31, 2000. (DX-214; PX-390; PX-88; PX-199; Schacht 2004 143:13 — 145:2).

Indeed, this very pattern of manipulation as to whether Lucent would make payments or continue to make payments to Wireless — followed by Lucent then, in fact, making each and every quarterly payment through and including December 31, 2000 — is evidence of Lucent's ability to influence and control Winstar, whether or not the Subcontract was a legally binding obligation.

### 8.    The Schacht Testimony

202.    Mr. Schacht testified on May 11, 2005, that Mr. McGinn was replaced by Lucent's Board of Directors and Mr. Schacht rehired as chief executive officer because Lucent was convinced it needed a restructuring emphasis, rather than continued pursuit of aggressive expansion. (Schacht 21-8:15 — 21-9:1). Mr. Schacht further testified on May 11, 2005 that he

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

discussed the change in strategy with certain Lucent employees at some point in time after he replaced Mr. McGinn. (Schacht 21-10:25 — 21-11:20).

203.    It is not clear from his trial testimony whether Mr. Schacht claims that he communicated this change in strategy to Winstar (or any of Lucent's customers) before December 7, 2000, if at all. (Compare Schacht 21-10:25 — 21-11:20 with Schacht 21-12:23 — 21-14:16, 21-15:11-24). In any event, Mr. Schacht never testified in any of his four earlier depositions placed in evidence during the Trustee's direct case about relaying a dramatic change in Lucent's business practices to Winstar. (Schacht 2004 12:6 — 14:21, 16:11 — 17:20; Schacht 11/5/2001 15:19 —17:24; Schacht 9/10/2002 102:9 — 103:6; Schacht 10/29/2002 210:21 — 211:8).

204.    Instead, Mr. Schacht testified at his depositions that when he met with Lucent's customers in late October through November 2000, it was to understand their needs, not to advise them that Lucent was in a restructuring mode, and he previously so stated, testifying that during his customer visits, he was in a "listen" mode. (Schacht 2004 60:16-22; PX-166).

205.    Indeed, it is hard to believe that Mr. Schacht would rush out to his customers and at his first meetings with them, advise them that Lucent would be undergoing radical change. To the contrary, Mr. Rouhana testified that although he was concerned when McGinn was fired, he was reassured when he met with Mr. Schacht that the relationship was not off-track, and that Winstar was important to Lucent. (Rouhana 28:10 — 32:25).

206.    Mr. Schacht also testified on May 11, 2005 that at some point prior to November 21, 2000, after Mr. Schacht checked with certain people at Lucent, Mr. Schacht called Mr. Rouhana and responded to requests made by Mr. Rouhana to Schacht when they first met.

56

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B246**

Mr. Schacht initially testified on May 11, 2005 that he told Mr. Rouhana that Lucent would not agree to Mr. Rouhana's request that the full Siemens loan amount not be paid by Winstar to Lucent and that Lucent would be serving a refinance notice on Winstar. (Schacht 21-15:14-18). He further testified that after discussing the matter with Mr. Rouhana, that he instructed the Lucent senior executives that "they were free to proceed" with serving the refinance notice. (Schacht 21-22:1-14, 21-23:4-20, 21-15:11-18). This is a significant change from Mr. Schacht's deposition testimony, where he testified that he advised Rouhana that Lucent would serve the refinance notice after discussions with Lucent in December 2000 (Schacht 2004 135:24 — 136:15), and the documentary evidence shows that Winstar was not advised of the refinance notice until December 14, 2000. (PX-22). Moreover, Schacht's testimony also contradicts the testimony of Ms. Hund-Mejean, who testified that as of November 19, 2000, Lucent was still "wrestling with how to communicate to [Winstar] that we would like to send a refinance notice." (Hund-Mejean 14-44:3 — 14-45:4; DX-495). If Mr. Schacht in fact advised Winstar before November 21, 2005 that Lucent would serve the refinance notice, as he testified, then it further evidences that Lucent intentionally withheld the refinance notice until after Lucent received the Siemens loan proceeds. (See also PX-202; PX-220).

207.    Lucent did not produce a single witness willing to testify that the relationship between Lucent and Winstar was arms length before October 23, 2000. Indeed, Lucent's testifying experts carefully disclaimed any intention to opine that the relationship was arms-length at any time. (Stark 19-31:24 — 19-32:12; Salomon 21-123:17-21). Mr. Schacht stands alone with his May 11, 2005 testimony that the relationship changed between October 23, 2000 and December 7, 2000. Outside of Mr. Schacht, who replaced Mr. McGinn on October 23, 2000, no one else from Lucent testified as to any dramatic changes occurring in the period from

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

October 23, 2000 through December 7, 2000, or otherwise, in the Lucent-Winstar relationship.
Significantly, Mr. Schacht's testimony was devoid of even a single example of something that
actually changed with respect to how the companies dealt with each other during the six week
period between October 23, 2000, and December 7, 2000, and when asked on cross-examination
a series of questions that would demonstrate that nothing had changed, Mr. Schacht stated that he
had no knowledge sufficient to answer the questions. (Schacht 21-23:21 — 21-25:11, 21-27:2-
14, 21-28:8 — 21-30:7, 21-31:10-21).

208.    And even if Lucent's Board of Directors did adopt a restructuring
philosophy as of the October 23, 2000, replacement of Mr. McGinn by Mr. Schacht, it would
take time to implement actual changes in any customer relationship resulting from a new
philosophy. Mr. Schacht spent much of the first few weeks of his new tenure just acquainting
himself with customers and the Lucent executives generally. (Schacht 21-12:23 — 21-13:15).
As regards Winstar and the deeply embedded non-arms length relationship between Lucent and
Winstar still existing as of October 23, 2000, there is no evidence to demonstrate that the
relationship became arms length by December 7, 2000, just six weeks later. Contrary to
Mr. Schacht's unsupported, conclusory testimony that "everything changed" in the parties'
relationship after October 23, 2000 and by December 7, 2000, the following facts established at
trial show that as of December 7, 2000, there was no significant change in the relationship:

    a.    Winstar continued to pay interest in October, November and
December 2000 on the purchases it had made in the December
1999 through September 2000 end of quarter sales, including the
$77 million of non-software pool purchases made by Winstar in
the September 30, 2000, end of quarter transaction
(Pocalyko 3-48:8 — 3-48:21; Schacht 21-31:18-21);

    b.    None of the unnecessary Winstar purchases in the December 1999
through September 2000 end of quarter sales were canceled or

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

reversed, nor was Winstar able to return the unneeded Lucent equipment it had purchased for credit against its loan balance. (Pocalyko 3-48:8 — 3-48:21; Schacht 21-28:20 — 21-29:21, 21-33:13-17; PX-22);

c.  Although on November 21, 2000, Lucent announced it would not recognize $125 million in revenue on the September 29, 2000, end of quarter software pool deal, (i) the software pool deal was, in fact, not canceled and (ii) Lucent in this action seeks to recover money purportedly owed for the purchase of the $135 million software pool, claiming a portion of that transaction ($42.5 million) constitutes new value to be applied against the Trustee's preference claim (Terrell 21-68:25 — 21-69:3, 21-70:11 — 21-70:17);

d.  Despite Lucent's purported restructuring philosophy, Lucent's negotiating team continued to negotiate a transition services agreement in the period October to early December 2000, and then agreed upon a transition agreement with Winstar's negotiating team shortly before December 7, 2000, whereby Lucent would be able to book revenue from doing what Wireless had been doing. (Montemarano 78:21 — 79:10). The transition services agreement was not rejected by Lucent's senior management until after December 7, 2000, and even then, renewed negotiations ensued. (PX-22);

e.  Despite Lucent's purported restructuring philosophy, Lucent, in late December 2000, agreed to pay and paid $62 million to Wireless for the three-month period ended December 31, 2000, according to certain Lucent employees "as an accommodation" to Winstar (as opposed to a legal obligation under the Subcontract) for what Debra Hopkins did not view as an "arms length" contract. This purported "one last time payment" (Schacht 2004 143:13 — 144:4) as a purported accommodation to Winstar was in substance precisely the same as what occurred with the payment in September 2000 and in every quarter since March 1999. (PX-390; Kantor 202:11 — 203:17; See proposed findings of fact nos. 20 — 25, 139 — 145, 167 — 176, supra);

f.  Even in December 2000 and January 2001, Lucent continued to do non-arms length favors for Winstar in return for the non-arms length favors done by Winstar. Thus, for example, as set forth in PX-501, a January 9, 2001 email from Winstar's Howie Shartel to Rick Uhl titled "q101 capex estimate:"

> "As you know, we had a very large carryover from 2000, that hit 2001, because of all the late

59

December shipments (DMC, P-Com, AFC, etc.)
All of this equipment was shipped to Lucent in
2000, and shipped by Lucent to Winstar in January,
to keep it out of 2000 capex."

(PX-501).

g.    When Winstar requested in November 2000 that $100 million of
the $200 million contemplated Siemens loan be retained by
Winstar, Lucent ceased negotiation of the transition services
agreement until Winstar agreed to various demands made by
Lucent, including that the full $200 million Siemens loan proceeds
would be paid by Winstar to Lucent (PX-136; PX-137; PX-440;
Harris 11-48:10-23);

h.    In November through the first week of December 2000, Lucent
intentionally delayed sending a refinance notice until after it
received the December 7 payment at issue in this proceeding in
order that the December 7 Siemens loan would, in fact, be made,
even though Mr. Schacht testified that the decision had purportedly
been made by November 15, 2000. (Schacht 21:22:1 — 21-23:13;
PX-202; PX-220); and

i.    Although Mr. McGinn, Ms. Aversano, and Mr. Plunkett left
Lucent's employ prior to December 7, 2000, many other
employees at the heart of the Lucent/Winstar relationship remained
(as did all the Winstar employees) as of December 7, 2000. Thus,
Debra Hopkins remained chief financial officer of Lucent, having
assumed that role in May 2000, and remained active as regards
Winstar throughout all of December 2000 and thereafter
(Hopkins 11-109:18 — 11-110:4); Deborah Harris remained in a
senior position on Lucent's Winstar sales team and, in fact, headed
up the Lucent negotiating team on the transition services
agreement into 2001; Jill Diroma, Vanessa Petrini, Beth Perricone,
Leslie Rogers, Paul Hayes, James Cocito, David Rigotti, Charles
Naylor, and many others on Lucent's Winstar sales team and
customer team remained employed by Lucent and engaged in the
Lucent/Winstar relationship as at December 7, 2000. Many of
these same individuals had been members of Lucent's "core team"
for Winstar since the inception of the strategic relationship in
1998: "members of the Lucent core team include the following
key individuals: Rogers . . . Diroma . . . Naylor . . . Petrini."
(PX-2 at 4WC 0001966).

j.    By his own testimony, Mr. Schacht personally had no role in the
Lucent/Winstar relationship for the period through at least
December 31, 2000, having delegated that to Ben Verwaayen, who

60

B250

also still remained employed by Lucent. (Schacht 21-24:12 —21-25:11, 21-27:2-14, Schacht 2004 142: — 145:2).

209. Moreover, to the extent the "change" that Mr. Schacht testified to was an internal Lucent decision to "restructure" its vendor finance and other agreements, the fact that Lucent retained all the benefits of its non-arms length dealings with Winstar (Pocalyko 3-48:8 — 3-48:21), and also could use its leverage as Winstar's strategic partner to force Winstar to renegotiate or do away with various provisions of the Supply Agreement (on "best of breed") to make it more profitable for Lucent, the Credit Agreement (financing only Lucent content), the Subcontract (let Lucent perform the work instead of Wireless, even though Lucent was not capable of doing so, but to enable Lucent to book the revenue), and other agreements (increasing pricing of bs and hubs, for example) is just further evidence of the continued insider position Lucent enjoyed. (Montemarano 170:10 — 178:25; PX-262). As testified to by Richard Uhl of Winstar, it was vital to Winstar's continued viability — particularly since the capital markets had dried up — that Lucent remain its strategic partner, and continue to finance Winstar. (Uhl 254:4-22, 255:2-7; see also PX-169).

210. In all his testimony, including his May 11, 2005, trial testimony in this proceeding, Mr. Schacht could not remember crucial details from his conversations with Mr. Rouhana, including, for instance, what the favors (other than the software deal) were that Winstar had done for Lucent, or what promises Richard McGinn had made to Winstar. (Schacht 2004 17:8-20, 81:17 —82:6, Schacht 10/29/02 210:21 — 211:8). Nor could Mr. Schacht remember any of the details of Cravath and PricewaterhouseCoopers' oral reports about their Lucent-Winstar investigations concluded in late December 2000. (Schacht 2004 19:6 — 21:3, 39:18-25, 43:10 — 44:5). And it is of some note that Paul Saunders — who headed up the investigation for Lucent — did not testify as to his oral reports, nor did anyone from

61

B251

PricewaterhouseCoopers. Instead, Lucent moved to quash both of the Trustee's subpoenas to depose those parties on that topic, and as a result of Lucent's motion, the depositions did not proceed. (Adv. Proc. Docket No. 168). Accordingly, Mr. Schacht's new, detailed, selective recollections of what he and Mr. Rouhana discussed when they first met, and on his telephone call thereafter, are highly suspect.

### 9.    **Conclusion As To Insider Status**

211.    The foregoing findings of fact demonstrate that as of December 7, 2000, Lucent and Winstar were not dealing at arms length with each other, and Lucent was exerting undue influence and control over Winstar. Accordingly, Lucent was an insider of Winstar on the date of the payment, December 7, 2000.

### C.    **Winstar Was Insolvent On December 7, 2000**

212.    The fair value of the assets of Winstar was less than the stated liabilities of Winstar as of December 7, 2000, and, accordingly, Winstar was insolvent on December 7, 2000.

213.    Winstar had no prepared financial statements as of the measurement date, December 7, 2000. The Trustee's solvency expert, Stephen J. Scherf of Parente Randolph LLP, appropriately looked to the draft financial statements from the closest available date, December 31, 2000, which were prepared by Winstar management and reviewed by Winstar's independent auditor, Grant Thornton LLP. (PX-460; Scherf 12-14:17 — 12-15:10). Mr. Scherf testified that there were no material events between December 7, 2000 and December 31, 2000 that required a significant adjustment to the December 31, 2000 balance sheet, except for an adjustment to take into account Winstar's cash burn of approximately $90 million for the period December 7, 2000 to December 31, 2000. (Scherf 12-14:20 — 12-18:25).

62

B252

214.  Mr. Scherf determined that as of December 7, 2000, Winstar's stated liabilities were approximately $4.7 billion. (Scherf 12-18:4-23; PX-460).

215.  Lucent's solvency expert, Kevin P. Collins, did not determine the stated liabilities of Winstar as of December 7, 2000, or indeed, any other point in time. (Scherf 12-19:20 — 12-20:3; Collins 18-118:7 — 18-120:13; DX-701).

216.  Winstar's December 31, 2000 draft balance sheet showed a stated value of the assets of Winstar at approximately $4.9 billion. Thus, based on its balance sheet alone, Winstar was barely solvent as of December 7, 2000. (Scherf 12-23:9-15).

217.  Because the determination of insolvency under the Bankruptcy Code requires that assets be considered at fair market value, Mr. Scherf conducted further analysis to determine the fair market value of Winstar's assets as of December 7, 2000. (Scherf 12-11:11-23, 12-23:19-23).

218.  There are three standard approaches to determining fair value of assets: the income approach, the asset approach and the market approach. Mr. Scherf properly considered all three approaches. (Scherf 12-23:19 — 12-25:1).

219.  Mr. Collins considered only two approaches, ignoring the asset approach entirely. (Collins 18-16:3-13; DX-701; Scherf 12-25:2-10).

220.  Under the asset approach, the Trustee's expert witness properly considered, as evidence of value, the Grant Thornton impairment charge as of December 2000, the reports by Deloitte & Touche and Empire Valuation Consultants, Inc., concerning valuation of the assets of Winstar that have been introduced into evidence as PX-328 and PX-329, and the

63

B253

sale on December 19, 2001, to IDT of substantially all of the assets (and none of the liabilities) of Winstar. (PX-336; Scherf 12-26:1-23).

221.    The Grant Thornton impairment charge showed that Winstar's former independent auditors, relying on facts known or knowable as of December 7, 2000, concluded that Winstar's assets were impaired as of December 2000 by approximately $1.8 billion, and that Winstar's balance sheet valuation of its assets as of December 31, 2000, should have been adjusted downward by that amount. (Scherf 12-31:10 — 12-33:20; PX-335 at Note B, p. 11 of 26; PX-450).

222.    Mr. Scherf also noted that on December 19, 2001, IDT purchased a substantial portion of Winstar's assets (but assumed none of Winstar's liabilities) in a going concern sale during the bankruptcy proceeding for $42 million, plus a small amount of stock options. (Scherf 12-34:2-20; PX-505). Thus Winstar's assets, valued at approximately $4.9 billion on the balance sheet as of December 31, 2000, sold for approximately 1% of their balance sheet value less than one year later. (Scherf 12-34:21 — 12-35:17, PX-460 at 13).

223.    Based on Mr. Scherf's review of these various events and reports, he properly concluded that under the asset approach, the fair market value of Winstar's assets as of December 7, 2000 was at most $3.1 billion. Thus, Mr. Scherf properly concluded that under the asset approach, Winstar was insolvent on December 7, 2000 by a margin of at least $1.6 billion. (Scherf 12-40:2-14; PX-460 at 9).

224.    Applying the income approach, the Trustee's expert witness also properly determined that applying that methodology would lead to the conclusion that Winstar was insolvent as of December 7, 2000. (Scherf 12-40:15 — 12-44:6; 12-48:14-17; PX-460).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

225.    Both Mr. Scherf and Mr. Collins applied a discounted cash flow methodology (under the income approach), reaching very different results. Mr. Scherf properly applied the income approach; Mr. Collins did not.

226.    Among other things, Mr. Collins improperly accepted Winstar projections at face value; he used an unreasonably low discount rate; and he utilized an unrealistic and too heavily weighted terminal value which dramatically inflated the resulting fair market value of Winstar's assets under the discount cash flow methodology. These errors require the rejection of Mr. Collins' analysis under the income approach. (Scherf 12-48:18 — 12-52:12; Collins 18-76:6-22, 18-85:13 — 90:22, 18-91:3 — 18-96:1; DX-701).

227.    Mr. Scherf also considered the market approach, and both the transaction data and guideline company methodologies thereunder. Mr. Scherf properly found that the market approach could not be applied under the facts and circumstances present in this case, because under the transaction data methodology, there were no suitable comparable transactions; and because under the guideline company methodology, there was too wide a dispersion in the multiples derived from the publicly traded data. (Scherf 12-52:24 — 12-56:15, 12-65:15 — 12-67:12, 12-70:19 — 12-73:22).

228.    Mr. Collins applied the market approach. His analysis is unreliable, however, because he utilized inappropriate comparable transactions under the transaction data approach. Among other things, Mr. Collins utilized as comparable transactions supposedly being representative of "controlling interest" acquisitions, transactions that were in fact either not controlling interests, were of foreign companies with no United States operations, or involved companies in other industries. (Collins 18-101:18 — 18-106:9, 18-106:23 — 18-111:16).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B255

Moreover, at least half of the transactions cited in his report occurred before April 2000, after which time Mr. Collins acknowledged that market conditions in the telecom sector materially declined. (DX-701 at 36-37). His guideline company methodology is similarly suspect, as is the reliability of the multiples derived. (Scherf 12-67:13 — 12-70:18, 12-73:23 — 12-74:13; Collins 18-114:3 — 18-115:9, 18-115:24 — 18-116:20; DX-701).

229.    But even assuming that Mr. Collins' use of the transaction data and the guideline companies methodologies were appropriate, Mr. Collins' own testimony demonstrates that under those methodologies, given the range of valuation that Mr. Collins himself has testified to, Winstar could have been insolvent as of December 7, 2000. (Collins 18-116:21 — 18-118:6; DX-701).

230.    Furthermore, additional facts in the trial record support a finding that Winstar was insolvent on December 7, 2000. For instance, Lucent conducted due diligence during the first two weeks of December 2000. At the conclusion of the due diligence, Lucent determined that Winstar's credit rating should be decreased to "poor," and decided that it should increase its loan reserves on Winstar's debt. Lucent's decision to increase its loan reserves indicates that Lucent itself did not believe its debt would be paid in full, as Ms. Hund Mejean admitted in her testimony. (PX-201; Scherf 12-58:13 — 12-60:3, Hund-Mejean 14-53:12 — 14-54:3).

231.    In Lucent's due diligence of Winstar conducted during the first two weeks of December 2000, Lucent did not attempt to determine the fair market value of Winstar's assets. (PX-201; Perricone 20-55:12 — 20-56:21; Hund-Mejean 14-69:6-14).

66

232.    In conducting its due diligence of Winstar, Lucent, for the most part, accepted Winstar projections as true and then applied certain Lucent assumptions to the projections to see what would happen under those projections if the circumstances assumed by Lucent were to occur. (PX-201; Perricone 20-48:3 — 20-49:18). Lucent did attempt to verify certain (but not all) of the revenue streams indicated by Winstar's projections, but did not attempt to verify the costs and expenditures detailed in Winstar's projections. (PX-201; Perricone 20-62:2 — 20-64:14). As testified to by Mr. Scherf, one of the primary reasons the Winstar projections were inaccurate was not due to the revenue projections, but because of demonstrably erroneous projections as regards Winstar's costs and expenses. (Scherf 12-45:4 — 12-47:8).

233.    In sum, the testimony of Mr. Scherf was reliable, and the testimony of Mr. Collins was not. Winstar was insolvent on December 7, 2000.

**D.    Lucent Has Failed To Establish That It Provided New Value To Winstar After December 7, 2000**

234.    Lucent asserted a single affirmative defense applicable to Count Ten of the Second Amended Complaint, alleging that Lucent provided new value to Winstar under 11 U.S.C. § 547(c)(4). Specifically, Lucent asserts that it provided $71.32 million of new value in the form of unsecured goods and services provided to Winstar after December 7, 2000. (DX-644; Terrell 21-68:12 — 21-69:3, 21-70:11 — 21-70:25; PX-480).

235.    Lucent has not identified any other new value in discovery or in the Joint Pretrial Memorandum, and, in fact, Mr. Terrell testified as Lucent's Federal Rule of Civil Procedure 30(b)(6) witness on new value that Lucent is seeking the aggregate amount of $71.32 million as new value at trial and supplied an affidavit to that effect. (PX-480).

67

236.    However, for the reasons discussed below, Lucent is not entitled to retain any amount as new value against the Trustee's preference claim. First, and most importantly, Lucent has filed (under penalty of perjury) and still maintains proofs of claim in Winstar's bankruptcy in which it claims that almost the entire amount ($68 million) of the $71.32 million sought as new value was in fact provided to Winstar on a secured basis. (Terrell 21-76:15 — 21-77:17; DX-644; PX-340). Indeed, the Security Agreements are in evidence as DX-32 and DX-33, and are discussed in proposed findings of fact nos. 17-19, supra.

237.    Moreover, over half of the amount Lucent claims as new value ($42.75 million) relates to the illegitimate September 2000 software deal between Winstar and Lucent. (PX-480). The software purchase was secured and Lucent included its software pool invoices (DX-605 and DX-674) among the invoices listed as secured on PX-340. (Terrell 21-76:8 — 21-77: 6). In any event, as discussed above, (a) the $135 million software pool included less than $20 million of software that Winstar actually needed, (see proposed findings of fact nos. 103, 115, supra) and (b) the entire software pool deal was a fake transaction created in 9 days for the sole purpose of generating revenue for Lucent. (See proposed findings of fact nos. 103-120, supra). Ultimately, Winstar did not even receive all of the credits and price reductions to offset the $135 million fake "purchase." (Ackerman 593:11-25, 617:21-24; PX-56; Terrell 21-76:8 — 21-77:12).

238.    But even if the software deal were enforceable, and even if Lucent was not secured for the software, and even if Lucent had not included the invoices on its secured proofs of claim for these amounts, Lucent would not be entitled to any new value as a result of it because the software deal contract expressly stated that the software in question had already been delivered to and accepted by Winstar as of September 29, 2000. (PX-323 at ¶ 5; Terrell

68

B258

21-78:18 — 21-80:2). As a result, Lucent cannot now claim that the software in question constitutes post-December 7, 2000 new value. Additionally, if Lucent ignores the delivery and acceptance, and argues that some type of post December 7, 2000 proration of the license fees is appropriate, Lucent has failed to meet its burden of proof to establish the life expectancy for the software pool usage, the value of the software, or even the actual use by Winstar post December 7, 2000 of any of the software.

239. The remaining $28 million of new value claimed by Lucent is equally flawed. Lucent included all of the invoices related to this $28 million in DX-644. (Terrell 21-51:10 — 21-52:9; PX-480). As demonstrated below, with the exception of invoices totaling $3,056,764, all of the DX-644 invoices (listed in the order in which Lucent provided them) are identified as secured in PX-340:

| DX-644 Bates No. | Lucent Invoice No. | PX-340 Tab A.3 Location (Column.Line) | PX-340 Invoice Total | Non-PX-340 Invoice Total | Invoice Total |
|---|---|---|---|---|---|
| LW00300269 | ER102926 | 4.41 | 10,763,804 | | 10,763,804 |
| LW00300271 | ER102977 | 4.42 | 3,956,805 | | 3,956,805 |
| LW00300273 | ER103301 | 5.6 | 3,426,223 | | 3,426,223 |
| LW00300278 | ER102810 | 4.33 | 2,744,518 | | 2,744,518 |
| LW00300281 | WR103565 | 5.16 | 1,371,599 | | 1,371,599 |
| LW00300287 | ER100993 | | | 1,305,300 | 1,305,300 |
| LW00300289 | ER103548 | 3.3 | 516,297[1] | | *516,297 |
| LW00300291 | ER103700 | | | 628,485 | 628,485 |
| LW00300296 | NR101952 | 4.28 | 543,950 | | 543,950 |
| LW00300301 | ER102918 | 4.39 | 376,126 | | 376,126 |
| LW00300303 | ER102442 | | | 302,060 | 302,060 |
| LW00300304 | NR101492 | 4.17 | 292,328 | | 292,328 |
| LW00300305 | ER102907 | 4.38 | 246,101 | | 246,101 |
| LW00300307 | ER101863 | 4.14 | 224,792 | | 224,792 |
| LW00300308 | WR100610 | | | 223,132 | 223,132 |

---

[1] The corrected amount allegedly due under Invoice No. ER103548 was stipulated at trial. (Terrell 21-56:18 — 21-57:5).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B259

| DX-644 Bates No. | Lucent Invoice No. | PX-340 Tab A.3 Location | PX-340 Invoice Total | Non-PX-340 Invoice Total | Invoice Total |
|---|---|---|---|---|---|
| LW00300309 | WR103593 | | | 222,481 | 222,481 |
| LW00300311 | ER103069 | 4.51 | 197,628 | | 197,628 |
| LW00300312 | PR101850 | 5.12 | 191,164 | | 191,164 |
| LW00300313 | WR103590 | 5.17 | 190,836 | | 190,836 |
| LW00300316 | SR100994 | | | 163,200 | 163,200 |
| LW00300317 | ER103008 | 4.44 | 125,000 | | 125,000 |
| LW00300326 | PR100510 | | | 51,481 | 51,481 |
| LW00300327 | PR101843 | | | 50,072 | 50,072 |
| LW00300328 | ER102478 | 4.29 | 47,569 | | 47,569 |
| LW00300331 | 41103996 | 5.8 | 36,469 | | 36,469 |
| LW00300333 | ER103010 | 4.45 | 36,000 | | 36,000 |
| LW00300336 | ER100996 | | | 30,000 | 30,000 |
| LW00300337 | ER103004 | 4.43 | 15,000 | | 15,000 |
| LW00300338 | 31102301 | 4.35 | 13,092 | | 13,092 |
| LW00300343 | NR102464 | 4.40 | 13,008 | | 13,008 |
| LW00300344 | ER103637 | | | 9,994 | 9,994 |
| LW00300345 | ER103146 | | | 7,111 | 7,111 |
| LW00300346 | PR101291 | | | 7,111 | 7,111 |
| LW00300347 | SR103349 | | | 7,111 | 7,111 |
| LW00300348 | SR103350 | | | 7,111 | 7,111 |
| LW00300349 | SU102814 | | | 7,111 | 7,111 |
| LW00300350 | SU105103 | | | 7,111 | 7,111 |
| LW00300351 | WR101537 | | | 7,111 | 7,111 |
| LW00300352 | WR102849 | | | 7,111 | 7,111 |
| LW00300353 | WR102894 | | | 7,111 | 7,111 |
| LW00300354 | SU105111 | | | 4,326 | 4,326 |
| LW00300355 | 41104351 | 3.7 | 4,014 | | 4,014 |
| LW00300357 | SO116623 | 3.8 | 2,951 | | 2,951 |
| LW00300359 | 71101686 | 5.9 | 2,685 | | 2,685 |
| LW00300363 | 11101259 | 4.30 | 1,750 | | 1,750 |
| LW00300366 | 11101399 | 4.34 | 1,405 | | 1,405 |
| LW00300368 | 61101127 | 3.21 | 1,390 | | 1,390 |
| LW00300370 | 11100961 | 4.22 | 1,355 | | 1,355 |
| LW00300373 | SU105490 | 3.1 | 1,070 | | 1,070 |
| LW00300374 | 11101746 | 3.4 | 1,030 | | 1,030 |
| LW00300377 | 31102722 | 5.1 | 845 | | 845 |
| LW00300380 | SO114674 | | | 825 | 825 |
| LW00300381 | SO114640 | 4.47 | 720 | | 720 |
| LW00300382 | 31102970 | 5.11 | 705 | | 705 |
| LW00300383 | 51102471 | 4.36 | 695 | | 695 |
| LW00300385 | 31102793 | 5.5 | 670 | | 670 |
| LW00300387 | 11101329 | 4.31 | 660 | | 660 |
| LW00300388 | 31101535 | 4.23 | 625 | | 625 |

70

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B260

| DX-644 Bates No. | Lucent Invoice No. | PX-340 Tab A.3 Location | PX-340 Invoice Total | Non-PX-340 Invoice Total | Invoice Total |
|---|---|---|---|---|---|
| LW00300390 | 41301100 | 2.51 | 602 | | 602 |
| LW00300391 | 41303216 | 2.52 | 597 | | 597 |
| LW00300392 | 31103212 | 3.6 | 535 | | 535 |
| LW00300394 | SO116265 | 5.13 | 414 | | 414 |
| LW00300396 | 21102911 | 3.5 | 370 | | 370 |
| LW00300398 | 61100915 | 4.37 | 370 | | 370 |
| LW00300400 | 71100563 | | | 370 | 370 |
| LW00300402 | 41301036 | 3.51 | 359 | | 359 |
| LW00300404 | 41103361 | 4.32 | 335 | | 335 |
| LW00300406 | SO111088 | | | 260 | 260 |
| LW00300407 | SO116599 | | | 237 | 237 |
| LW00300408 | SO113975 | | | 213 | 213 |
| LW00300409 | SO114675 | 3.2 | 92 | | 92 |
| LW00300411 | SO115619 | | | 84 | 84 |
| LW00300412 | 51101725 | | | 70 | 70 |
| LW00300413 | 51102417 | | | 35 | 35 |
| LW00300415 | 51102470 | | | 35 | 35 |
| LW00300416 | 61101058 | | | 35 | 35 |
| LW00300417 | 71101093 | | | 35 | 35 |
| LW00300418 | 71101530 | | | 35 | 35 |
| | | | | | |
| **Totals:** | | | $ 25,354,554 | $ 3,056,764 | $ 28,411,318 |

Although footnote 2 of PX-340 asserts that certain equipment and services listed in Tab A.3 may not be subject to Lucent's security interest, Lucent has provided no evidence as to which portions of the secured invoices listed in Tab A.3 are claimed to be unsecured. Because Lucent has failed to establish any facts to the contrary, all of the invoices on Tab A.3 of PX-340 must be deemed to be subject to Lucent's security interest in their entirety.

240.    Additionally, Lucent has not met its burden of proof that Lucent actually shipped all of this $28 million of purported new value after December 7, 2000 if shipped, or, that Winstar accepted all of this $28 million.  (Terrell 21-45:8-23, 21-46:11 — 21-47:3, 21-83:22-25).  Conspicuously absent from Lucent's evidence are any documents or testimony

71

B261

establishing full delivery or Winstar's acceptance of the invoiced items. Lucent provided no such evidence at trial. (Terrell 21-63:19 — 21-64:5, 21-84:1-12).

241. Finally, with respect to much of the approximately $3 million of allegedly unsecured sales claimed as new value, even if one assumed, arguendo, that shipment occurred after December 7, 2000, Winstar's records place in question whether the sales were canceled by Winstar or on hold at the time of the bankruptcy. (PX-344). Lucent has provided no evidence to address the issue.

242. Given the many problems identified by the Trustee with Lucent's billing practices, Lucent's assurances that it delivered these goods — without any competent evidence to back up the claim — are insufficient to meet Lucent's burden of proof on this defense.

243. Accordingly, Lucent has failed to establish that it is entitled to any reduction in the amount of the preference as a result of new value.

**E.  Conclusion As To Count Ten**

244. The Parties stipulated as to three of the five elements necessary to establish that the $194 million December 7, 2000 payment from Winstar to Lucent was a voidable preference.

245. The Trustee has established at trial that the other two elements are met; namely, that Winstar was insolvent as of December 7, 2000; and that the payment was made between 90 days and one year before Winstar filed in bankruptcy, at a time that Lucent was an insider of Winstar. The Trustee also has established that the $194 million payment by Winstar to Lucent represented an interest of the debtor in property.

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B262**

246. Lucent has failed to establish that it provided any new value after December 7, 2000 to Winstar.

## II.     COUNT ELEVEN (EQUITABLE SUBORDINATION)

247. To support its claim for equitable subordination, the Trustee must establish that (1) Lucent engaged in some type of inequitable conduct, and if Lucent was an insider of Winstar, simply that there is "material evidence" that Lucent engaged in unfair conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code.

248. Lucent was an insider of Winstar as previously demonstrated, and the Trustee has identified numerous examples of unfair conduct by Lucent. For instance, the Trustee has shown that Lucent acted unfairly by:  (i) using its position as an insider of Winstar to influence, persuade and compel Winstar to engage in end of quarter sales and fraudulent bill and hold deals, to Lucent's benefit and Winstar's detriment, with Winstar paying substantial interest (as well as storage and insurance costs) on approximately $250 million of unneeded Lucent equipment purchases that Lucent financed under the Second Credit Agreement  (See proposed findings of fact nos. 53 — 55, 77 — 81, supra); (ii) deliberately delaying the sending of a refinance notice so that the Siemens loan facility could be obtained and the net proceeds of $194 million be paid over by Winstar to Lucent with a concomitant $200 million increase in the senior secured position of the lenders under the Bank Facility (See proposed findings of fact nos. 177 — 198, supra); and (iii) refusing to accept returns at more than thirty cents on the dollar of the unneeded Lucent equipment purchased by Winstar for the purpose of fulfilling Lucent's revenue needs. (See proposed findings of fact no. 168, supra).

73

249.    The Trustee has also established that Lucent has benefited from its unfair conduct to the detriment of Winstar's other creditors. It is not disputed that Lucent increased its revenues and profits through its dealings with Winstar, ultimately contributing to Winstar's bankruptcy, and resulting in losses to Winstar's other secured and unsecured creditors.

250.    Lucent also benefited by pressuring Winstar to increase borrowings to make prepurchases at a time when Winstar needed to conserve cash. (PX-127; PX-131; Hicks 194:7-23; Zlotnick 210:23 — 213:16).

251.    No showing has been made by Lucent that equitably subordinating its claims would be inconsistent in any way with the Bankruptcy Code.

252.    The harm to Winstar's other creditors from Lucent's inequitable conduct includes the $194 million Siemens Repayment (by virtue of the increase to the senior secured Bank Facility by that amount).

253.    Even if the $194 million Siemens Repayment is returned to the estate, the Winstar estate will still have been diminished by virtue of the massive amount of unnecessary purchases. First, Winstar paid interest on unnecessary purchases as well as storage and insurance costs. (Pocalyko 3-43:24 — 3-45:11; Hicks 131:21 — 133:8). Mr. Pocalyko identified $7 million of interest paid to Lucent for the $74 million of unnecessary purchases he specifically traced; and testified further that additional interest in an undetermined amount was paid for the other approximately $170 million (on a cost-adjusted basis) of unnecessary Lucent equipment purchases. (Pocalyko 3-43:24 — 3-45:11; Rubin 169:13 — 172:21). Although Mr. Pocalyko was unable to calculate the amount of interest on the $170 million of unnecessary Lucent equipment purchases that he could not specifically trace to the date of purchase, an approximate

74

calculation can be made. Thus, on the basis of the facts contained in proposed findings of fact no. 50, and the applicable interest rates for the periods in question pursuant to the Second Credit Agreement (PX-138) the interest paid by Winstar on the other approximately $170 million of unnecessary Lucent equipment purchases would be at least six million dollars.

254.    Additionally, by causing Winstar to purchase unnecessary Lucent equipment to meet Lucent's revenue needs, Lucent increased the amount of its secured claim, because all Lucent equipment was secured even ahead of the lenders under the Bank Facility. (See proposed findings of fact nos. 17-19, supra).

255.    During the course of the bankruptcy proceeding, Lucent and the Trustee stipulated on three occasions to escrow funds received by the Trustee from the sale of Winstar's assets, to pay Lucent on its secured claims. (PX-506; PX-507; PX-508). Each of those stipulations stated that the escrow funds were not required to be paid to Lucent until the resolution of the Trustee's equitable subordination claims. (PX-506; PX-507; PX-508). The damage caused by Lucent's unfair conduct far exceeds the $22 million in the aforesaid escrow funds, even after Lucent's repayment of the alleged preferential Siemens Repayment. If those escrow funds are not subordinated, Lucent will have profited from its inequitable conduct at the expense of the other creditors of Winstar.

## III.    COUNT SEVEN (BREACH OF THE SUBCONTRACT)

256.    The Trustee contends in Count Seven of the Second Amended Complaint that Lucent breached the Subcontract between Wireless and Lucent, thereby causing Wireless $62,050,742.00 in damages.

75

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

257.    Winstar Wireless entered into a contract entitled the "Network Agreement for Buildout Services," referred to by the parties as the "Subcontract." (Diroma 11/25/02 29:14 — 30:22; PX-13; PX-90).

258.    Lucent hired Wireless to perform services that Lucent was obligated to perform for Winstar under the Supply Agreement, because Lucent was not capable of performing the services directly. (Harris 11-61:9-15, 11-70:1-15; Schacht 2004 25:11 — 26:9, 121:12-22; Schacht 9/10/02 115:13 — 116:18; Kantor 23:13 — 24:25, 42:2-25; Diroma 11/20/02 7:23-85).

259.    Lucent and Winstar expected that the services would be transitioned to Lucent as Lucent developed the necessary competencies to perform the services directly. (Ackerman 34:11-37:9; Kantor 23:13 — 24:25; Schacht 2004 25:12 —26:9, Schacht 9/10/02 115:2-24).

260.    Lucent never, in fact, developed the required competencies to perform all of the services directly. (Kantor 160:5-24, 170:4-18; Schacht 9/10/02 115:2-24).

261.    Between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for services performed under the Subcontract. (DiRoma 11/20/02 8:6-25; Aversano 8-79:5-19; PX-92). Each of these payments was made without a prior issued Lucent task order or purchase order.    (Renumbered Joint Stipulated Fact No. 20; Diroma 11/20/02 21:4-22; Wilson 16-105:25 — 16-106:9; PX-325).

262.    During this time period, on repeated occasions, Lucent advised that it wanted to replace the Subcontract with a transition agreement, as originally envisioned in the

Supply Agreement.    (Wilson 16-110:25 — 16-112:2, 113:15-25; DX-214; PX-390; PX-87; PX-88; PX-199).

263.    On repeated occasions, Lucent also advised Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one last time." (DX-214; PX-390; PX-88; PX-199; Schacht 2004 143:13 — 144:11).

264.    Several Lucent employees, including, among others, Henry Schacht (the company's former Chief Executive Officer) testified that Lucent and Winstar were engaged in a legally binding subcontracting relationship during 1999 and 2000.  (Diroma 11/20/02 109:9-15, 183:10-25; Montemarano 68:8 — 69:24; Schacht 9/10/02 109:20 — 110:14, 113:16 — 114:13, 116:5-18; Schacht 2004 25:8 — 26:9, 115:1 — 116:12).

265.    Lucent employees have admitted that:   (1) Lucent hired Wireless to perform services on its behalf throughout 1999 and 2000; (2) Lucent did so to satisfy its turnkey obligations to Winstar under the Supply Agreement; (3) Lucent's obligations to perform the buildout under the Supply Agreement were never modified; (4) the "Agreement for Network Buildout Services" was in fact the written agreement under which Wireless performed services on Lucent's behalf; and (5) that, ultimately, Lucent satisfied its monetary obligations under the Subcontract in every quarter of 1999 and 2000. (Id.; Montemarano 147:4 — 151:20; PX-325).

266.    Lucent attacks the Trustee's breach of Subcontract claim primarily by arguing that the parties did not comply with the written terms in 2001 by failing to exchange a "task order." The Trustee and Lucent in fact stipulated that after the first quarter of 1999, Wireless and Lucent never exchanged a single task order.  (Renumbered Joint Stipulated Fact No. 20).

77

B267

267.    Winstar employees testified, and documentary evidence demonstrates, that Winstar and Lucent did away with the task order process, opting instead to exchange less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. (Kantor 358:6-17, 363:21 — 364:3; Uhl 164:3 — 165:14; PX-84; PX-243).

268.    Coupled with the testimony of Lucent's former Chief Executive Officer and the other Lucent witnesses who have conceded that a binding subcontracting relationship existed, the stipulated fact that no task orders were exchanged supports the testimony of Winstar witnesses that the parties modified the Subcontract to eliminate the task order requirement. (See proposed findings of fact nos. 264 — 265, supra; Renumbered Joint Stipulated Fact No. 20).

269.    Instead of task orders, Wireless and Lucent exchanged invoices, purchase orders and/or spreadsheets identifying the costs of the Wireless Subcontract services in 1999 and 2000. (Simpson, passim).

270.    Lucent executives testified that this documentation created a "commercially binding relationship" for the relevant time periods: "[a]t September 30th [2000], we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." (Montemarano 10-26:11-14; see also Montemarano 68:8 — 69:24; Simpson 18:12 — 54:8).

271.    On September 27, 2000, Lucent further recognized that it was obligated to pay Wireless under the Subcontract even without the prior issuance of a task order or the prior issuance of a purchase order when it requested Winstar and Wireless' consent, in writing, to modify the Subcontract so as to require prior issuance of a purchase order before Lucent would become obligated to pay Wireless. (PX-110).

78

272.   To gain Wireless' consent to the requested modification, Lucent committed in the September 27, 2000 letter that it would replace the Subcontract with a transition agreement under which Lucent would actually perform the Wireless services. (PX-66; PX-110; PX-113; Harris 11-44:17 — 11-4, 11-46:5).

273.   Winstar and Wireless had been discussing having Lucent take over the services throughout the entire course of the relationship.   (Ackerman 340:23 — 342:22; Aversano 8-82:15 — 8-83:15, 8-86:2 — 8-87:3).

274.   In the letter, Lucent committed, as a condition to terminating the Subcontract, to conduct negotiations on a "lock down" basis (as had been done with the original negotiations for the Supply Agreement and First Credit Agreement in October 1998) to reach a new agreement within two weeks of the negotiation start date, Monday morning, October 2, 2000. (PX-110).

275.   On the basis of Lucent's commitment, Richard Uhl executed the September 27, 2000 letter on behalf of Winstar and Wireless. (Uhl 289:19 — 291:18; Kantor 180:4 — 181:24).

276.   Lucent itself understood that Winstar's agreement to the September 27, 2000 letter (PX-110) was based on Lucent's agreement to transition the Wireless Subcontract services.  As Lucent's David Rigotti wrote in an email to Bill Zlotnick and Lisa Hicks on September 28, 2000:

> "Lastly, just wanted to make sure you were aware that Nate will also be signing an agreement on the 'Winstar Pass-through Services" agreement for going forward.  We will not be handling this in the same manner going forward.  The Agreement is to put

79

two teams together to work through having Lucent 'truly' assume
these responsibilities going forward."

(PX-66). PX-110 was originally drafted for Nate Kantor, but ultimately signed by Rick Uhl.
(Kantor 76:17 — 78:24).

277.   Lucent and Winstar did not conduct the negotiations on a lock down basis,
nor did the negotiations commence on October 2, 2000, as promised by Lucent.  (Aversano
8-112:16-24, 8-142:24 — 8-144:8; PX-62).

278.   Instead, Lucent and Winstar did not engage in significant talks to craft a
new transition agreement beginning until late October 2000, and those talks continued well into
2001. (Harris 11-59:20 — 11-60:14, 11-70:16 — 11-71:12).

279.   On or before October 20, 2000, however, Lucent agreed that it would pay
for Wireless' services retroactively even before a new transition agreement was executed.
(PX-375).

280.   Lucent employees testified that Lucent had made a commitment (i.e., it
was a condition to termination of the Subcontract), to reach expedited agreement on a transition
agreement in lieu of the Subcontract, and recognized that breaching this commitment would
cause Winstar and Wireless considerable damage.  (Harris 11-44:17 — 11-48:3; PX-109;
PX-113).

281.   Lucent, however, nevertheless failed to satisfy its commitment made
orally and in the September 27, 2000 letter. (Harris 11-56:11 — 11-59:8; Montemarano
78:17-79:20).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B270

282.    On or before December 7, 2000, Lucent and Winstar's negotiating teams reached agreement on a transition agreement. (Ackerman 376:2-23; Harris 11-56:11 — 11-57:8, 11-63:14-25; PX-111; PX-112; PX-116).

283.    The transition agreement contained all of the material terms that Lucent's senior management had instructed the Lucent negotiating team to obtain. (Harris 11-49:5 — 11-55:6).

284.    Winstar's senior management approved the terms of the transition agreement. (Ackerman 376:24 — 377:3; Kantor 194:10-22).

285.    But Lucent's senior management rejected the agreement, and Winstar and Lucent then began discussing a transition agreement with terms that were even more favorable for Lucent. (Kantor 194:23 — 195:9; Harris 11-58:8-21, 11-70:16 — 11-72:14).

286.    In mid-December 2000, Winstar requested that Lucent pay for the Wireless subcontract services performed between October 2000 and December 2000. (Kantor 199:24 — 200:6).

287.    Lucent initially refused, before agreeing on December 27, 2000 to pay for the services. (Id.; Kantor 208:11-14; PX-22).

288.    Lucent advised Winstar at that time that it believed it had no contractual obligation to pay for Wireless' services. (Verwaayen 13-179:12 — 13-180:1, 13-206:13 — 13-207:24; Montemarano 71:20 — 72:21, (Cross)146:4 — 147:23).

81

B271

289.    Internally, however, Lucent executives conceded that the company was legally obligated to pay Wireless for the Subcontract services. (PX-199). As discussed above, Verwaayen, who "allowed" Winstar to draw down the December 2000 payment for Wireless services (i.e., for Lucent to pay Wireless, and be repaid by Winstar) admitted that Lucent had no choice but to make the payment, but that Lucent had used the refusal to force Winstar to renegotiate the parties' agreements. (See discussion supra at proposed findings of fact nos. 171 — 176).

290.    Lucent employee Beth Perricone agreed that Lucent had to pay Wireless: "I must note that our credt (sic) agreement relates back to our Supply Agreement, so that if we are selling them services under that 10/21/98 supply agreement, I believe we'd be required to fund those services." (PX-229).

291.    Lucent, again, advised Winstar that it was paying for the services "one last time." (Montemarano (Cross) 41:15 — 42:6; Verwaayen 13-207:11 — 13-207:24).

292.    Lucent did not require that Wireless provide a purchase order or task order in connection with the Fourth Quarter 2000 services. Instead, Wireless merely provided a spreadsheet (in the same format as it provided in the past) identifying all of Wireless' subcontract costs. (Simpson 18:18 - 20:13, 32:7-14, 37:2-7, 37:13 - 38:13, 38:18 - 39:2; PX-243).

293.    The spreadsheet identified $62,324,930.00 of Wireless costs incurred under the Subcontract. (PX-243). Lucent paid the Wireless subcontract charges by providing financing on December 29, 2000. (PX-260).

82

B272

294.    Between December 2000 and March 2001, Lucent and Winstar continued to negotiate a transition agreement with terms more favorable to Lucent. (Harris 11-70:16 — 11-72:14).

295.    Wireless also continued to provide buildout services on Lucent's behalf. (Ackerman 235:8-11).

296.    On March 27, 2001, Wireless advised Lucent that it had incurred $62,050,742.00 in costs under the Subcontract, and requested payment. (Simpson 41:19 — 42:24; PX-145).

297.    As had been done in prior quarters, Winstar provided a supporting spreadsheet identifying the costs Wireless had incurred. (Simpson 40:14 — 42:24; PX-245).

298.    On March 30, 2001, Lucent refused to pay Wireless for the services performed under the Subcontract. (PX-39; Uhl 296:7-14; Kantor 352:11 — 353:9).

299.    The March 2001 Subcontract services that Lucent rejected were supported by the same form of documentation as the December 2000 Subcontract services that Lucent paid. (Simpson 68:20 — 70:9; PX-245).

300.    For each of the quarters ending March 1999, through December 2000, Wireless had been paid its services under the Subcontract by virtue of financing under the original credit agreement or the Second Credit Agreements. (Diroma 11/20/02 8:6-25; Aversano 8-79:5-19; Kantor 208:11-14; PX-92; PX-325). Thus, Lucent would invoice Winstar based on Wireless invoices to Lucent and Winstar would borrow from the Lucent credit facilities to repay Lucent for Lucent paying Wireless. (PX-325).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B273

301.    Lucent asserts, among other things, that it had no obligation to finance the Wireless services under the Subcontract for the quarter ended March 31, 2001, because Winstar was in breach of the $1.3 billion limitation on Winstar capital expenditures for calendar year 2000 under the Second Credit Agreement and the Bank Facility.  Lucent has not met its burden of proving that Winstar exceeded the capital expenditures limitation for calendar year 2000. Thus, for example, as of January 18, 2001, it would appear that Winstar capital expenditures for calendar year 2000 were in the amount of $1.311 billion "at this point."  (DX-61).  But, Winstar's books were not closed and, as demonstrated by PX-438 and testified to by Mr. Salomon, Lucent's expert, there were still open items that might have reduced the $11 million excess to the $1.3 billion required limit.  (Salomon 21-127:4 — 21-127:20, 21-132:6 — 21-133:1; PX-438).  And neither Mr. Salomon nor any other witness in this case has testified, nor has any document in evidence demonstrated, that Winstar did, in fact, exceed the $1.3 billion capital expenditure limitation for calendar year 2000.  (Salomon 21-125:5-12).

302.    But even if Winstar did exceed the aforesaid capital expenditure covenant limitation, Winstar would not have exceeded that limitation if Winstar had not made the unneeded end of quarter purchases of Lucent equipment and services that Winstar made in calendar year 2000 to help Lucent book revenue.  Nor would Winstar have exceeded the aforesaid capital expenditure limitation if certain duplicate payments had not been made by Winstar or if Lucent issued certain agreed upon credits to reduce the loan balance under the Second Credit Agreement.  (Pocalyko 3-45:25 — 3-48:7; Salomon 21-131:3-18).

303.    Under the Subcontract, the process of exchanging Wireless invoices for Lucent invoices in identical amounts and having Wireless be paid by Winstar borrowing the money under the Second Credit Agreement and "repaying" Lucent, constitutes a method of

84

payment by Lucent to Wireless. The Subcontract does not itself provide a method as to how Lucent should make payments to Wireless. (PX-13; Diroma 11/25/02 43:14 — 45:2; Kantor 352:16 — 353:9). Another method, although not previously followed by the parties, would be for Lucent to pay Wireless directly. Under the Subcontract, Lucent had an obligation to pay Wireless for Wireless services, regardless of whether payment was via direct payment by Lucent to Wireless or via financing under the original or Second Credit Agreement. (PX-13; Aversano 8-130:18-21). The services were performed by Wireless with the expectation of being paid ultimately, regardless of anything that Lucent might be saying to the contrary, since no transition agreement had yet replaced the Subcontract. (Kantor 183:5-14; Uhl 286:7 — 295:18, 331:17 — 334:25).

## IV.    LUCENT'S COUNTERCLAIM - COUNT TWO (SETOFF)

304.    Lucent alleges in Count Two of its Second Amended Counterclaim (Adv. Proc. Docket No. 156) that it is entitled to set off any judgment recovered by the Trustee in this adversary proceeding, based on its proofs of claim filed in the Winstar bankruptcy.

305.    With respect to Count Seven (Breach of the Subcontract), the Parties have stipulated that Lucent is entitled to setoff $6.3 million of any judgment recovered by the Trustee on behalf of Wireless. (Stipulation By and Between the Trustee and Lucent Technologies Inc. Concerning Lucent's Counterclaim For Setoff, May 23, 2005, Adv. Proc. Docket No. 337).

306.    With respect to Count Ten (Return of Preferential Payment), because of the unpaid balances due under the debtors-in-possession financing and the Bank Facility, it is unlikely that Lucent will receive any distributions from the estate's remaining assets. (Adv. Proc. Docket Nos. 1146, 4000). In any event, Lucent is not entitled to setoff any judgment

recovered by the Trustee on behalf of Winstar as a matter of law. (See proposed conclusions of law nos. 67-70).

## V.    LUCENT'S COUNTERCLAIM - COUNTS THREE THROUGH SIX (FRAUD/NEGLIGENT MISREPRESENTATION)

307.    Lucent has not met its burden of proof on its counterclaims for fraud and negligent misrepresentation (Counts Three through Six of Lucent's Second Amended Answer and Counterclaims, Adv. Proc. Docket No. 156). With respect to Counts Three and Four of Lucent's Counterclaims, Lucent has pleaded these claims, but did not raise them as issues in the Joint Pretrial Memorandum. No testimony was adduced on these issues at trial. In any event, even considering Lucent's claims, Lucent has not demonstrated that Winstar employees knew that Winstar was insolvent under the definition of the Bankruptcy Code when they signed the draw request certification in December 2000, (see Uhl 242:25 — 243:14), or that Lucent reasonably relied on the covenant certification as regards solvency. Having concluded its own due diligence of Winstar on December 15, 2000, (PX-201), there was no basis for Lucent's reliance on Winstar's December 2000 certification. (PX-201; Uhl 249:17 — 250:15).

308.    With respect to Counts Five and Six, Lucent has not demonstrated (among other things) that it reasonably relied on the financing certificates signed by Winstar as regards compliance with the capital expenditure loan covenant, since as early as August 2000, Lucent was aware of Winstar's capital expenditure problem and that knowledge continued through and including December 2000 when it permitted the end of December Winstar draw downs. (PX-76; PX-107; PX-116; PX-153; PX-438). In fact, Lucent actually helped Winstar meet its capex limit for 2000 by taking Winstar-ordered third party equipment in 2000 and delivering it to Winstar in 2001. (PX-501).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

B276

309.  Moreover, Lucent has not met its burden of proof to establish that Winstar did, in fact, exceed the $1.3 billion capital expenditure limitation in calendar year 2000. Winstar's CFO testified that Winstar was in compliance. (Uhl (Cross) 55:21 — 56:20, 76:24 — 77:14, 80:2-5).  Lucent's own expert, Mr. Salomon, did not opine on the issue at all.  (Salomon 21-125:5-12).  Nor did Gary Goldman — the lead partner for Winstar from Winstar's independent accountants Grant Thornton — testify that the capex covenant was breached in 2000: to the contrary, after reviewing Winstar management's March 2001 calculation showing that Winstar was compliant by a margin of $380,000, Mr. Goldman stated that he did not dispute the accuracy of the calculation with Winstar before the bankruptcy.  (Goldman 84:22 — 85:6, 86:2-19).

310.  In any event, even if such facts were present and Lucent's burden of proof were met, there is no proof of any damages sustained by Lucent not already subsumed by the proofs of claim Lucent has already filed, which proofs cover all of the Winstar borrowings under the Second Credit Agreement and all Lucent equipment and services sold to Winstar but not financed or otherwise paid for.  (PX-340; PX-341; PX-342; PX-343).

HFNJ1: #146477 v.1 #06723-0001 06/06/2005

**B277**

## CONCLUSION

Based on the above proposed findings of fact, the Trustee's proposed conclusions of law, and the evidence adduced at trial, the Trustee respectfully requests that judgment be entered in her favor on Counts Seven, Ten and Eleven of the Second Amended Complaint, and on Counts Two through Six of Lucent's Second Amended Counterclaim.


|                 /S/                 |                 /S/                 |
| Stephen M. Rathkopf | Sheldon K. Rennie (DE Bar No. 3772) |
| David R. King | FOX, ROTHSCHILD LLP |
| HERRICK, FEINSTEIN LLP | Mellon Bank Center, Suite 1400 |
| 104 Carnegie Center | 919 North Market Street |
| Princeton, NJ 08540 | Wilmington, DE  19801-3046 |
| (609) 520-3800 | (302) 622-4202 |

*Attorneys for the Trustee*

88

B278

This is page 72 of 100.

**TCOL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., et al., | : | Case No. 01-1430 (JBR) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| ——————————————————x | : | |
| | : | |
| CHRISTINE C. SHUBERT, CHAPTER 7 | : | Adv. Pro. No. 01-1063 (JBR) |
| TRUSTEE OF WINSTAR COMMUNICATIONS, | : | |
| INC. AND WINSTAR WIRELESS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LUCENT TECHNOLOGIES INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## TRUSTEE'S PROPOSED CONCLUSIONS OF LAW

Plaintiff Christine C. Shubert, chapter 7 Trustee of Winstar Communications, Inc.
and Winstar Wireless, Inc. (the "Trustee"), submits the following as her proposed conclusions of
law from the trial in this matter, in accordance with the Court's scheduling order dated April 20,
2005. Defined terms in the Trustee's proposed findings of fact are similarly applied here.

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................... ii

EXPLANATION OF CITATION ...................................................................... ix

CONCLUSIONS OF LAW ..................................................................................1

    I.       COUNT TEN (RETURN OF PREFERENTIAL PAYMENT)..............................1

          A.     The Alleged Preference Was A Transfer Of An
                Interest of The Debtor In Property...............................................2

          B.     Lucent Was An Insider On December 7, 2000 ...........................5

          C.     Winstar Was Insolvent On December 7, 2000............................8

          D.     Lucent Has Not Established Any New Value
                Under 11 U.S.C. § 547(c)(4)......................................................16

    II.     COUNT ELEVEN (EQUITABLE SUBORDINATION) ....................................22

    III.    COUNT SEVEN (SUMS OWED TO WINSTAR
          WIRELESS, INC. UNDER THE SUBCONTRACT)............................................23

    IV.    LUCENT'S COUNTERCLAIM - COUNT TWO (SETOFF) .............................27

          A.     Setoff Against A Recovery Under Count Ten of The
                Second Amended Complaint ......................................................28

          B.     Setoff Against A Recovery Under Count Seven of The
                Second Amended Complaint ......................................................30

    V.     LUCENT'S COUNTERCLAIM - COUNTS THREE
          AND FIVE (FRAUD).........................................................................................30

    VI.    LUCENT'S COUNTERCLAIM - COUNTS FOUR
          AND SIX (NEGLIGENT MISREPRESENTATION) ..........................................32

CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

ABC Elec. Servs. v. Rondout Elec. (In re ABC Elec. Servs.), 190 B.R. 672
    (Bankr. M.D. Fla. 1995)...............................................................................6

AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distrib., Inc.),
    315 B.R. 24 (Bankr. D. Del. 2004) .............................................................2, 4

Anjelino v. The New York Times Co., 200 F.3d 73 (3d Cir. 1999)...............................18

Baxter v. Palmigiano, 425 U.S. 308 (1976)......................................................................8

Begier v. IRS, 496 U.S. 53 (1990)..................................................................................2

Brink's Inc. v. The City of New York, 717 F.2d 700 (2d Cir. 1983) ...............................8

CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131
    (Bankr. S.D.N.Y. 1992).............................................................................6, 7

Chaitman v. Paisan Automotive Liquids (In re Almarc), 62 B.R. 684
    (Bankr. N.D. Ill. 1986)...............................................................................29

Charisma Investment Company v. Airport Systems, Inc.
    (In re Jet Florida System, Inc.), 841 F.2d 1082 (11th Cir. 1988) ......................21

Citicorp Venture Capital, Ltd v. Committee of Creditors Holding Unsecured
    Claims (In re Papercraft), 323 F.3d 228 (3d Cir. 2003)....................................22

Claybrook v. SOL Bldg. Materials Corp. (In re US Wood Prods.), 2004
    Bankr. LEXIS 520 (Bankr. D. Del., Apr. 22, 2004) ......................................17

Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.),
    144 B.R. 663 (Bankr. S.D.N.Y. 1992).....................................................12, 13

Comm. of Creditors Holding Unsecured Claims v. Citicorp
    Venture Capital (In re Papercraft Corp.), 187 B.R. 486
    (Bankr. W.D. Pa. 1995), aff'd, Citicorp Venture Capital v. Comm.
    Holding Unsecured Claims, 160 F.3d 982 (3d Cir. 1998), cert. denied,
    540 U.S. 825 (2003).............................................................................5, 6, 7

Conan Properties, Inc. v. Mattel, Inc.,712 F. Supp. 353 (S.D.N.Y. 1989),
    rev'd on other grounds, 1990 U.S.Dist.Lexis 16481 ......................................26

Consol. Edison, Inc. v. Northeast Utils., 249 F. Supp. 2d 387
    (S.D.N.Y. 2003)......................................................................................34

Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573 (1st Cir. 1980) ..................10

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B281

**Page**

Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775 (2d Cir. 2003)..........................................30, 33

Davis v. The Mut. Life Ins. Co. of New York, 6 F.3d 367 (6th Cir. 1993),
   cert. denied, 510 U.S. 1193 (1994) .......................................................................8

DeRosa v. Buildex Inc. (In re F&S Central Mfg. Corp.), 53 B.R. 842
   (Bankr. E.D.N.Y. 1985)...........................................................................................9

Denburg v. Parker Chapin Flattau & Klimpl, 82 N.Y.2d 375 (N.Y. 1993)....................................25

DiCola v. American S.S. Owners Mut. Protection and Indem. Ass'n, Inc.
   (In re Prudential Lines), 148 B.R. 730 (Bankr. S.D.N.Y. 1992),
   aff'd in part and rev'd in part on other grounds, 170 B.R. 222
   (S.D.N.Y. 1994) ....................................................................................................27

Fabricators, Inc. v. Technical Fabricators, Inc., 126 B.R. 239
   (S.D. Miss. 1989), aff'd, 926 F.2d 1458 (5th Cir. 1991) ...................................22

Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,
   45 F.3d 969 (5th Cir. 1995) ....................................................................................8

Foley v. Briden (In re Arrowhead Gardens, Inc.), 32 B.R. 296 (Bankr. D.
   Mass. 1983), aff'd sub. nom. Briden v. Foley, 776 F.2d 379
   (1st Cir. 1985) ............................................................................................11, 12, 13

Gander Mountain Inc. et al. v. Impact Indus. Inc. (In re Gander Mountain, Inc.),
   29 B.R. 260 (Bankr. E.D.Wis. 1983).....................................................................29

Georgia Steel, Inc. v Atlantic Gas Light Co. (In re Georgia Steel, Inc.),
   38 B.R. 829 (Bankr. M.D.Ga. 1984)..................................................................28, 29

Gillman v. Scientific Research Prod. Inc. of Delaware (In re Mama
   D'Angelo, Inc.), 55 F.3d 552 (10th Cir. 1995).........................................8, 10, 13

Gray v. Chace (In re Boston Publishing Co., Inc.), 209 B.R. 157 (Bankr.
   D. Mass. 1997).........................................................................................................9

Grumman Allied Indus. v. Rohr Indus., Inc., 748 F.2d 729 (2d Cir. 1984) ...................................31

Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996) ................................................................24

Hassan v. Middlesex County Nat'l Bank (In re Mystic Pipe & Supply Co.),
   333 F.2d 838 (1st Cir.), cert. denied, 379 U.S. 932 (1964) ...............................11

Howdeshell of Ft. Myers v. Dunham-Bush, Inc. (In re Howdeshell of Ft. Myers),
   55 B.R. 470 (Bankr. M.D. Fla. 1985) ...............................................................4, 11, 13

iii

**Page**

Hudson Feather & Down Prod., Inc. v. B&B Assoc., Inc.
    (In re Hudson Feather & Down Prod., Inc.), 22 B.R. 247
    (Bankr. E.D.N.Y. 1982)...................................................................29

Hutt v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 466 N.Y.S.2d 28
    (2d Dep't 1983)..........................................................................30

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8 (2d Cir. 2000) ...........................33, 34

In re Bay State York Co., Inc., 140 B.R. 608 (Bankr. D. Mass. 1992)...........................................27

In re Bohlen Enters., Ltd., 859 F.2d 561 (8th Cir. 1988)..............................................................3, 4

In re Chase and Sanborn Corp., 124 B.R. 371 (Bankr. S.D.Fla 1991) .....................................28, 29

In re Chemical Separations Corp., 38 B.R. 890 (Bankr. E.D. Tenn. 1984)....................................13

In re Epic Capital Corp., et. al., 290 B.R. 514 (Bankr. D. Del. 2003),
    aff'd, 307 B.R. 767 (D. Del. 2004) .........................................................22

In re Holloway, 955 F.2d 1008 (5th Cir. 1992) ................................................................6

In re Missionary Baptist Foundation, Inc., 712 F.2d 206 (5th Cir. 1983) ........................................6

In re Mobile Steel Co., 563 F.2d 692 (5th Cir. 1977)..............................................................22, 23

In re N&D Properties, Inc., 799 F.2d 726 (11th Cir. 1986)...........................................................22

In re Newcomb, 744 F.2d 621 (8th Cir. 1984).......................................................................6

In re Orbcomm Global, L.P., 2003 WL 21362192
    (Bankr. D. Del. Jun. 12, 2003) ...........................................................10

In re Spada, 903 F.2d 971 (3d Cir. 1990) ...............................................................20

In re Worldcom, 2003 WL 23861928 (Bankr. S.D.N.Y. 2003) .......................................................10

Industrial, Commercial Electrical, Inc. v. Babineau (In re Industrial,
    Commercial Electrical, Inc.), 2004 Bankr.Lexis 438
    (Bankr. D. Mass., April 7, 2004) ...........................................................14

Jet Florida, Inc. v. American Airlines (In re Jet Florida Systems, Inc.),
    861 F.2d 1555 (11th Cir. 1988) ...........................................................20

Koch v. Rogers (In re Broumas), 203 B.R. 385 (D. Md. 1996),
    aff'd in part, rev'd in part on other grounds, 135 F.3d 769
    (4th Cir. 1998)..........................................................................7

iv

B283

**Page**

Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30
    (2d Cir. 1996) .................................................................................................9, 10

Libutti v. U.S., 107 F.3d 110 (2d Cir. 1997)..........................................................................8

Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),
    281 B.R. 535 (Bankr. D. Del. 2002) .................................................9, 10, 14, 15

Lines v. Bank of America Nat'l Trust & Savings Ass'n, 743 F. Supp. 176
    (S.D.N.Y. 1990) ........................................................................................................27

MNC Commercial Corp. v. Ryerson & Son, Inc., 882 F.2d 615 n.2 (2d Cir. 1989).....................27

Mack v. Newton, 737 F.2d 1343 (5th Cir. 1984).............................................................28

Medical Research Assoc., P.C. v. Medcon Fin. Serv., Inc.,
    253 F. Supp.2d 643 (S.D.N.Y. 2003)..................................................................25

Mellon Bank, N.A. Official Comm. of Unsecured Creditors of R.M.L.
    (In re R.M.L., Inc.), 92 F.3d 139 (3d Cir. 1996)...........................................9, 13

Morris v. Sampson Travel Agency, Inc. (In re US Interactive, Inc.),
    321 B.R. 388 (Bankr. D. Del 2005) ....................................................................22

Morrissey v. GMC, 21 Fed. Appx. 70 (2d Cir. 2001)......................................................33

New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),
    880 F.2d 679 (3d Cir. 1989)..........................................................................17, 19

Nunez v. Simms, 341 F.3d 385 (5th Cir. 2003)..............................................................25

Official Comm. of Asbestos Personal Injury Claimants et al. v.
    Sealed Air Corp. (In re W.R. Grace & Co.), 281 B.R. 852
    (Bankr. D. Del. 2002) ..........................................................................................13

Official Comm. of Unsecured Creditors v. Credit Suisse First Boston
    (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003) ..........................5, 7

Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor
    Freight, Inc.), 848 F.2d 414 (3d Cir.) cert. denied, 488 U.S. 967 (1988) ...................18

PPI Enters. (U.S.) v. Del Monte Foods Co., 2003 U.S. Dist. LEXIS 16006
    (S.D.N.Y. Sept. 11, 2003)............................................................................33, 34

Page v. Rogers, 211 U.S. 575 (1909)..............................................................................29

Peltz v. Worldnet Corp. (In re USN Communications, Inc.), 280 B.R. 573
    (Bankr. D. Del. 2002) ............................................................................................9

v

B284

Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC
    (In re Phoenix Restaurant Group, Inc.), 317 B.R. 491
        (Bankr. M.D. Tenn. 2004) .........................................................................................16, 21

Rad Services v. Aetna Cas. & Surety Co., 808 F.2d 271 (3d Cir. 1996).........................................8

Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates), 906 F.2d 942
        (3d Cir. 1990)...........................................................................................................................4

Roeder v. Climax Molybeam Co. (In re Old Electralloy Corp.), 164 B.R. 501
        (Bankr. W.D. Pa. 1994) .........................................................................................................29

Rose v. Spa Realty Associates, 42 N.Y.2d 338, 397 N.Y.S.2d 922 (N.Y. 1977).........................24

Rushton v. E&S International Enterprises, Inc. (In re Eleva), 235 B.R. 486
        (BAP 10th Cir. 1999).............................................................................................................19

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355
        (3d Cir. 1996)....................................................................................................................17, 18

Scherling v. Hellman Electric Corp. (In re Westchester Structures, Inc.),
        181 B.R. 730 (Bankr. S.D.N.Y. 1995)................................................................................27

Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d at 98 ...................................................30, 31

Schwinn Plan Committee v. AFS Cycle & Co., Ltd., (In re Schwinn Bicycle Co.),
        192 B.R. 477 (Bankr. N.D. Ill. 1996) ...................................................................................9

Seligson v. New York Produce Exchange, 394 F. Supp. 125 (S.D.N.Y. 1975) ...........................11

Sentinel Prod. Corp. v. Dennison Mfg. Co., Inc., 192 B.R. 41
        (N.D.N.Y. 1996) ......................................................................................................................27

Shappirio v. Goldberg, 192 U.S. 232 (1904) ................................................................................31

Shaw v. Walter Heller & Co., 385 F.2d 353 (5th Cir. 1967), cert. denied,
        390 U.S. 1003 (1968).............................................................................................................28

Tennessee Wheel and Rubber Co. v. Street (In re Tennessee Wheel
        and Rubber Co.), 62 B.R. 1002 (Bankr. M.D. Tenn. 1986)................................................6

Three Flint Hill Ltd. Pshp. v. Prudential Ins. Co. (In re Three Flint
        Hill Ltd. Pshp.), 213 B.R. 292 (D. Md. 1997) .....................................................................6

Total Technical Servs., Inc. v. Whitworth (In re Total Technical Servs., Inc.),
        150 B.R. 893 (Bankr. D. Del. 1993) ......................................................................................7

vi

Page

Travelers Int'l AG v. Trans World Airlines, Inc. (In re Trans World
    Airlines, Inc.), 134 F.3d 188 (3d Cir. 1998), cert. denied, 523 U.S.
    1138 (1998) ...............................................................................................8, 9, 10

United States Lines S.A. v. United States (In re McLean Indus.), 132 B.R. 247
    (Bankr. S.D.N.Y. 1991), aff'd, 162 B.R. 410 (S.D.N.Y. 1993),
    rev'd on other grounds, 30 F.3d 385 (2d Cir. 1994),
    cert. denied, 513 U.S. 1126 (1995) .............................................................11, 14

Waslow v. Interpublic Group of Cos. (In re M Group, Inc.), 308 B.R.
    697 (Bankr. D. Del. 2004) ..............................................................................1

Webster v. Harris Corp. (In re Nettel Corporation), 319 B.R. 290
    (Bankr. D.C. 2004)........................................................................................21

Wechsler v. Hunt Health Systems, Ltd., 330 F. Supp.2d. 383
    (S.D.N.Y. 2004) .............................................................................................24

Young v. Scandore Paper Box Corp. (In re Lucasa Int'l, Ltd.),
    13 B.R. 596 (Bankr. S.D.N.Y. 1981) ...........................................................11


**Federal Statutes**

11 U.S.C. § 101 ..................................................................................................5, 7, 9

11 U.S.C. § 502 ..................................................................................................29

11 U.S.C. § 510 ..................................................................................................23

11 U.S.C. § 547 ..................................................................................1, 4, 5, 7, 8, 16

11 U.S.C. § 553 ..................................................................................................27


**Federal Rules**

Federal Rule of Civil Procedure 30 ..............................................................3, 16, 18

Federal Rule of Civil Procedure 52 ..............................................................1


**State Statutes**

New York General Obligations Law § 15-501 ...............................................26

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**B286**

**Page**

## **References**

Collier on Bankruptcy..................................................................................................9, 23, 29

viii

**B287**

## **EXPLANATION OF CITATION**

1.    Citations to stipulated facts refer to the Renumbered Joint Stipulation of Facts, Exhibit A, and identify the particular stipulated fact.

2.    Citations to trial exhibits in evidence are to the plaintiff's exhibit ("PX") or defendant's exhibit ("DX") reference.

3.    Citations to testimony in the trial transcripts (which includes testimony from live witnesses as well as deposition testimony read into evidence) identify the witness testifying, as well as the volume, page and line numbers, e.g., Pocalyko 3-25:15 — 3-26:5 would refer to Mr. Pocalyko's testimony in volume three of the trial transcript, from page twenty-five, line fifteen to page twenty-six, line five, or Pocalyko 3-25:15-20 would refer to Mr. Pocalyko's testimony in volume three of the trial transcript, at page twenty-five, lines fifteen to twenty.

4.    Citations to testimony from videotaped testimony (which were not separately transcribed) refer to the testimony from the Stipulated Joint Trial Exhibits filed with the Court on May 20, 2005 (Adv. Proc. Docket No. 335), and identify the witness testifying, and the page and line numbers from the written transcript supplied in the Stipulated Joint Trial Exhibit, e.g., Kantor 10:15 — 12:25 refers to the Stipulated Joint Trial Exhibit for Mr. Kantor, page ten, line fifteen, to page twelve, line twenty-five. Where testimony from multiple depositions for a witness has been designated, and the transcript page numbers were not continued, the designation includes a date as well, e.g., Schacht 2004, or Diroma 11/20/02. All designations to joint trial exhibits refer to the testimony designated by the Trustee, unless otherwise indicated.

B288

5.      Citations to pleadings and other documents filed in this matter refer to the Adversary Proceeding docket number, abbreviated herein as "Adv. Proc. Docket No. __," or to the Bankruptcy docket number, abbreviated herein as "Bankr. Docket No. ___."

6.      References to "proposed findings of fact nos. ___" refer to the Trustee's proposed findings of fact filed June 6, 2005.

B289

## CONCLUSIONS OF LAW

### I.    COUNT TEN (RETURN OF PREFERENTIAL PAYMENT)

1.    The Trustee bears the burden of proving the elements of a Section 547(b) preferential transfer by a preponderance of the evidence.  11 U.S.C. § 547(g).

2.    Subject to exceptions enumerated in § 547(c), the Trustee may avoid any transfer of an interest of the debtor in property:   (1) to or for the benefit of a creditor (§ 547(b)(1)); (2) for or on account of an antecedent debt owed by the debtor before such transfer was made (§ 547(b)(2)); (3) made while the debtor was insolvent (§ 547(b)(3)); (4) made (A) on or within 90 days before the date of the filing of the petitions or (B) between 90 days and one year before the date of the filings of the petition, if such creditor at the time of such transfer was an insider (§ 547(b)(4)); and (5) that enables such creditor to receive more than such creditor would receive if — (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of [Title 11] (§ 547(b)(5)).  11 U.S.C. § 547(b); Waslow v. Interpublic Group of Cos. (In re M Group, Inc.), 308 B.R. 697, 699-700 (Bankr. D. Del. 2004).

3.    The parties stipulated in advance of trial that § 547(b)(1), § 547(b)(2), and § 547(b)(5) were satisfied, leaving § 547(b)(3) and § 547(b)(4) to be established at trial.  Lucent also asserted during its Fed.R.Civ.Proc. 52(c) motion at trial — for the first time — that the Trustee had to establish that the alleged preferential payment was "an interest of the debtor in property."

### A.    The Alleged Preference Was A Transfer Of An Interest Of The Debtor In Property

4.    Upon conclusion of the Trustee's proof at trial, although neither pleaded nor raised as an issue in the Joint Pretrial Memorandum, Lucent argued that the challenged payment was not a transfer of an interest of the debtor in property. Lucent's argument is contrary to the prevailing authorities. The United States Supreme Court has held that property that would be part of the estate had it not been transferred before the commencement of bankruptcy proceedings satisfies this standard. Begier v. IRS, 496 U.S. 53, 58 (1990). Here, had Winstar received the Siemens proceeds and then filed for bankruptcy before paying over the proceeds to Lucent pursuant to the terms of the Second Credit Agreement, it is indisputable that the estate would have retained the funds, subject only to a potential unsecured breach of contract claim from Lucent, and accordingly, the Siemens Repayment constituted a transfer of an interest of the debtor in property. Id.

5.    Courts also apply the "diminution of estate doctrine," under which a transfer of an interest of the debtor in property occurs whenever a transfer "diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one." AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distrib., Inc.), 315 B.R. 24, 29 (Bankr. D. Del. 2004). It is undisputed here that the Winstar estate was diminished by virtue of the transfer. Winstar replaced $194 million of undersecured, junior Lucent debt with $200 million of debt fully secured by a variety of Winstar's network assets and other assets and revenues under the senior secured Bank Facility. (See proposed findings of fact nos. 17-19). Because Lucent received more from the Siemens Repayment than it would have from a liquidation of the debtor (See Renumbered Joint Stipulated Fact No. 12), and

because Lucent has not shown that it released any of its security following the Siemens Repayment, the estate was diminished as a result of the Siemens Repayment, and a transfer of an interest of the debtor in property occurred.

6.     Lucent may argue that the Siemens funds did not constitute an interest of the debtor in property because under the terms of the Second Credit Agreement, Winstar was contractually obligated to pay over the Siemens proceeds to Lucent upon receipt. (Renumbered Joint Stipulated Fact No. 23). In essence, Lucent may argue that the alleged preferential payment was "earmarked" for Lucent and, therefore, not a transfer of an interest of the debtor in property.

7.     For Lucent to show that the Siemens Repayment is protected under the earmarking doctrine, Lucent has the burden of proving all three elements of the defense: (1) that there was an agreement between Siemens and Winstar that the funds advanced by Siemens would be used to pay the Lucent debt; (2) that Winstar performed the agreement according to its terms; and (3) that the transaction as a whole did not result in any diminution of the debtor's estate. In re Bohlen Enters., Ltd., 859 F.2d 561, 566 (8th Cir. 1988).

8.     Lucent cannot meet its burden of proof on any of these elements. Lucent has not established the first two elements because it has failed to provide any evidence that Siemens and Winstar agreed or contracted for the Siemens funds to be paid over to Lucent. The Second Credit Agreement is an agreement between Winstar and Lucent, and not Siemens. The Siemens loan documents are totally silent on the issue of what Winstar is to do with the funds; and in fact, Mr. Holwell — Siemens' Federal Rule of Civil Procedure 30(b)(6) witness — testified that the Siemens loan was structured as a "working capital" loan. (PX-234; Holwell

3

B292

20:15-21:17). Because Lucent has not identified any agreement between Siemens and Winstar requiring that the funds be paid to Lucent, Lucent cannot establish that the funds were earmarked for it. Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates), 906 F.2d 942, 944 (3d Cir. 1990) (affirming preference where "record does not reflect the existence of an agreement between [new creditor] and the debtor that the funds be used to pay a specified antecedent debt"); In re Bohlen Enters., Ltd., 859 F.2d at 566; Howdeshell of Fort Myers v. Dunham-Bush, Inc. (In re Howdeshell of Fort Myers, Inc.), 55 B.R. 470, 474-75 (Bankr. M.D. Fla. 1985) (rejecting earmarking where debtor decided who to pay, and third party did not "condition" loan on payment to defendant).

9.    Lucent cannot meet the third element either, because the Lucent debt was junior to the Bank Facility debt and Lucent was undersecured. (See proposed findings of fact nos. 17-19). Thus, any loan prepayment by Winstar would be directed entirely to the unsecured portion of the debt, because Lucent has not shown that it released any of its liens at the time of the repayment (it held the same security interests the day before December 7, 2000, as it did the day after December 7, 2000). Because Winstar owed an additional $200 million of fully secured debt under the Bank Facility, the estate was therefore diminished by the amount of the Siemens Repayment, and the earmarking doctrine does not apply. In re Ameriserve Food Distrib., Inc., 315 B.R. at 29.

10.    Finally, having not pleaded "earmarking" as an affirmative defense and, more importantly, having not raised it as an issue in the Joint Pretrial Memorandum, Lucent is precluded from raising the issue upon the conclusion of the Trustee's direct case at trial. Indeed, having stipulated to three of the five elements under 11 U.S.C. § 547(b), Lucent implicitly

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**B293**

stipulated to the precondition to all of the elements of 11 U.S.C. § 547(b) — that there was a transfer of an interest of the debtor in property.

## B.    Lucent Was An Insider On December 7, 2000

11.    The alleged December 7, 2000, preferential payment was made between 90 days and one year before Winstar filed its bankruptcy petition. It remains for the Trustee to establish under § 547(b)(4) that Lucent was an insider at the time of the December 7, 2000, transfer.

12.    The definition of "insider" in the Bankruptcy Code lists certain persons who are automatic or *per se* insiders of the debtor. 11 U.S.C. § 101(31). These persons "include," in the case of a debtor corporation, any officer, director, or "person in control" of the debtor. 11 U.S.C. § 101(31)(B)(i-iii).

13.    A party is a "person in control of the debtor" under 11 U.S.C. § 101(31), that is, a *per se* insider, where it both has a source of power over the debtor, and actually exercises that power. Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003). The Trustee has shown at trial that Lucent did, in fact, have power over Winstar — both contractual and extra-contractual — and that Lucent exercised that power. (See generally proposed findings of fact nos. 9-211).

14.    Courts interpreting the insider definition have consistently held that the use of the word "includes" in the statute means that insiders are not limited to the enumerated *per se* insiders identified in the statute. Comm. of Creditors Holding Unsecured Claims v. Citicorp Venture Capital (In re Papercraft Corp.), 187 B.R. 486, 494 (Bankr. W.D. Pa. 1995), aff'd, Citicorp Venture Capital v. Comm. Holding Unsecured Claims, 160 F.3d 982 (3rd Cir.

5

B294

1998), cert. denied, 540 U.S. 825 (2003) (noting that the "[Courts of Appeals] which have addressed the issue agree that use of the word 'includes' in defining 'insider' suggests an expansive interpretation of the term rather than a limited one," citing In re Holloway, 955 F.2d 1008 (5th Cir. 1992); In re Newcomb, 744 F.2d 621 (8th Cir. 1984); In re Missionary Baptist Foundation, Inc., 712 F.2d 206 (5th Cir. 1983)).

15.    To identify non-per se insiders, courts examine whether the alleged insider has a "sufficiently close relationship with the debtor such that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." In re Papercraft Corp., 187 B.R. at 494; ABC Elec. Servs. v. Rondout Elec. (In re ABC Elec. Servs.), 190 B.R. 672, 675-76 (Bankr. M.D. Fla. 1995).

16.    Alternatively, courts have held insiders to be anyone "with a close enough relationship with the debtor such that his conduct requires rigorous scrutiny by the courts" or "an opportunity to self-deal or exert more control than is available to other unsecured creditors," CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992), or simply "one who does not deal at arms-length with the debtor," Tennessee Wheel and Rubber Co. v. Street (In re Tennessee Wheel and Rubber Co.), 62 B.R. 1002, 1005 (Bankr. M.D. Tenn. 1986). See also Three Flint Hill Ltd. Pshp. v. Prudential Ins. Co. (In re Three Flint Hill Ltd. Pshp.), 213 B.R. 292, 299-300 (D. Md. 1997) (finding that a party was an insider for purposes of creditor voting classes because it engaged in a single transaction that was not a "carefully reasoned business decision," but instead an accommodation to a business partner; additionally, the relationship between the parties was not arms length, defined as dealings "entered into in good faith in the ordinary course of business by unrelated parties with independent interests").

6

**B295**

17.    As a result, a company will be deemed to be an insider of another company if the business dealings between the companies are not at arms length.  See In re Papercraft, supra; In re Chas. P. Young, supra.  For instance, in Koch v. Rogers (In re Broumas), 203 B.R. 385, 391 (D. Md. 1996), aff'd in part, rev'd in part on other grounds, 135 F.3d 769 (4th Cir. 1998), a district court upheld a bankruptcy court's ruling that a lawyer and his law firm were insiders where the evidence demonstrated a "long term complex relationship" including numerous contractual relationships, unwritten agreements and dealings, and joint participation in an illegal "wash trade" scheme that resulted in an SEC investigation and enforcement.  The determination of whether parties are dealing at arms length with each other is a factual determination made by considering the totality of the facts.  In re Chas. P. Young Co., 145 B.R. at 136 ("insider status must be determined on a case by case basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs").

18.    Contrary to Lucent's argument, which has already been rejected by this Court, there is no linkage in the Bankruptcy Code requiring that the actual preferential payment be the result of insider control or influence.  If the recipient of the transfer is an insider at the time of the transfer, and the transfer is otherwise preferential, it can be recovered regardless of whether it was made as a result of the exercise of insider influence or control.  See, e.g., Total Technical Servs., Inc. v. Whitworth (In re Total Technical Servs., Inc.), 150 B.R. 893, 897-98 (Bankr. D. Del. 1993); see also In re Exide Technologies, Inc., 299 B.R. 732; In re Broumas, 203 B.R. 385, 391.  Put another way, the task of determining who is an insider under 11 U.S.C. § 101(31) is separate from the task of determining whether the payment itself is preferential under 11 U.S.C. § 547(b).

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

19.    In addition to all of the factual evidence adduced at trial, as already determined by this Court, the Court may draw an adverse inference from the fact that two former Lucent employees have invoked the Fifth Amendment privilege against self-incrimination rather than answer questions about the nature of the relationship and dealings between Lucent and Winstar. Rad Services v. Aetna Cas. & Surety Co., 808 F.2d 271, 280-81 (3d Cir. 1986), quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). See also, Baxter, 425 U.S. 308; Libutti v. U.S., 107 F.3d 110 (2d Cir. 1997); Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland, 45 F.3d 969 (5th Cir. 1995); Davis v. The Mut. Life Ins. Co. of New York, 6 F.3d 367 (6th Cir. 1993), cert. denied, 510 U.S. 1193 (1994); Brink's Inc. v. The City of New York, 717 F.2d 700 (2d Cir. 1983).

20.    In sum, the evidence at trial establishes in overwhelming fashion that Lucent and Winstar were not dealing at arms length before, on, or after December 7, 2000. (See proposed findings of fact nos. 9-211). Accordingly, Lucent was an insider of Winstar on the date of the alleged preferential transfer.

C.    **Winstar Was Insolvent On December 7, 2000**

21.    The final element the Trustee must prove at bar under § 547(b) is that Winstar was insolvent at the time of the alleged December 7, 2000, preferential transfer. 11 U.S.C. § 547(b)(3). See Gillman v. Scientific Research Prod. Inc. of Delaware (In re Mama D'Angelo, Inc.), 55 F.3d 552, 554 (10th Cir. 1995).

22.    Whether a company is insolvent under the Bankruptcy Code is a mixed question of law and fact. Travelers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998), cert. denied, 523 U.S. 1138 (1998). The

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**B297**

Bankruptcy Court, however, "has broad discretion when considering evidence to support a finding of insolvency." Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 35 (2d Cir. 1996) (citations omitted).

23.    Insolvency is defined under the Code as a "'financial condition that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.'" 11 U.S.C. § 101(32); Mellon Bank, N.A. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.), 92 F.3d 139, 154 (3d Cir. 1996), quoting 11 U.S.C. § 101(32)(A); see also, Peltz v. Worldnet Corp. (In re USN Communications, Inc.), 280 B.R. 573, 584-85 (Bankr. D. Del. 2002) (citing Collier on Bankruptcy ¶ 547.03[5] at 547-37 - 547-38 (15th Ed. 2001)).

24.    This "fair valuation" test is sometimes referred to as the "balance sheet test." Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.), 281 B.R. 535, 540 (Bankr. D. Del. 2002).    The balance sheet test "contemplates a conversion of assets into cash during a reasonable period of time." In re Trans World Airlines, Inc., 134 F.3d at 194.

25.    Asset values carried on a debtor's balance sheet, even if derived in accordance with generally accepted accounting principles, do not necessarily reflect fair value. See, e.g., In re Lids Corp., 281 B.R. at 540; DeRosa v. Buildex Inc. (In re F&S Central Mfg. Corp.), 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985).    Thus, in applying the balance sheet test, courts do not rely solely on asset book values contained in a debtor's financial statement or bankruptcy schedules. Gray v. Chace (In re Boston Publishing Co., Inc.), 209 B.R. 157, 171 (Bankr. D. Mass. 1997); Schwinn Plan Committee v. AFS Cycle & Co., Ltd., (In re Schwinn Bicycle Co.), 192 B.R. 477, 487 (Bankr. N.D. Ill. 1996) ("[d]ebtor's schedules are not persuasive, let alone dispositive or controlling. For analysis of possible insolvency, reliance

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

should be on more accurate evidence, such as current appraisals, opinion valuation testimony, or actual sales of the assets") (citations omitted). As noted by the Tenth Circuit, "there is no talismanic inquiry; we must review the entire financial picture of the debtor." In re Mama D'Angelo, Inc., 55 F.3d at 555.

26.    In the context of a going concern, fair value is determined by the "fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." In re Roblin Indus., Inc., 78 F.3d at 36. See In re Lids Corp., 281 B.R. at 541. The "determination of·fair value is an inexact science, and there is no precise formula to determine solvency." In re Worldcom, 2003 WL 23861928 at *41 (Bankr. S.D.N.Y. 2003),[1] citing Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 577 (1st Cir. 1980).

27.    Unlike assets, liabilities are measured by their face (i.e., book) value. In re Trans World Airlines, Inc., 134 F.3d at 196; see also, In re Orbcomm Global, L.P., No. 00-3636, 2003 WL 21362192 at *3 (Bankr. D. Del. Jun. 12, 2003);[2] In re Lids Corp., 281 B.R. at 545.

28.    The Trustee established at trial that Winstar was insolvent on December 7, 2000, through, among other things, the testimony of her expert witness, Stephen Scherf. Mr. Scherf considered the three traditional approaches to determining solvency — the asset, income and market approaches. Under the asset approach, Mr. Scherf relied on several undisputed facts as evidence of the value of Winstar's assets on December 7, 2000, including the sale on December 19, 2001 to IDT of substantially all of the assets (and none of the liabilities) of

---

[1] A copy of the decision is annexed hereto as Exhibit A.
[2] A copy of the decision is annexed hereto as Exhibit B.

10

Winstar, and the Grant Thornton impairment charge to the December 31, 2000 balance sheet. (See proposed findings of fact no. 220).

29.    Because there is rarely direct evidence of solvency available for a particular date, courts frequently look to later occurring evidence from which insolvency may be inferred (this is sometimes referred to as "retrojection"). Hassan v. Middlesex County Nat'l Bank (In re Mystic Pipe & Supply Co.), 333 F.2d 838, 840 (1st Cir.), cert. denied, 379 U.S. 932 (1964) (reversing district court that rejected retrojection: "Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other factors from which the ultimate fact of insolvency on the transfer date must be inferred or presumed"). Put another way, "where it is established that a debtor was insolvent at a date subsequent to the date of transfer, and where it is further shown that the debtor's financial condition had not changed substantially from the date of the transfer to said subsequent date, then insolvency at the prior time can be inferred from the actual and proven insolvency at the later date." United States Lines, S.A. v. United States (In re McLean Indus., Inc.), 132 B.R. 247, 258 (Bankr. S.D.N.Y. 1991), aff'd, 162 B.R. 410 (S.D.N.Y. 1993), rev'd on other grounds, 30 F.3d 385 (2d Cir. 1994), cert. denied, 513 U.S. 1126 (1995). See also, In re Howdeshell of Ft. Myers, 55 B.R. at 473; Foley v. Briden (In re Arrowhead Gardens, Inc.), 32 B.R. 296, 301 (Bankr. D. Mass. 1983), aff'd sub. nom. Briden v. Foley, 776 F.2d 379, 382-83  (1st Cir. 1985) (expressly approving "retrojection" analysis to find insolvency); Seligson v. New York Produce Exchange, 394 F. Supp. 125, 129-130 (S.D.N.Y. 1975) (court could draw inference from "wretched condition of the bankrupt" at the time of adjudication and infer insolvency at earlier date, where showing of no intervening change in financial condition was made); Young v. Scandore Paper Box Corp. (In re Lucasa Int'l, Ltd.), 13 B.R. 596, 600 (Bankr. S.D.N.Y. 1981).

11

30.    In re Arrowhead Gardens, Inc., 32 B.R. 296, is instructive.    There, a debtor's unaudited balance sheet dated April 30, 1979 was prepared in June 1981 and revised in June 1982, and transfers sought to be avoided as preferential occurred in March and April 1979, with the bankruptcy filed in October 1979.    On appeal, the First Circuit Court of Appeals found that the April 1979 balance sheet, after being adjusted for material overstatements of value, showed the debtor was insolvent as of April 30, 1979, and the court then inferred that the debtor also was insolvent in March 1979, when the earlier transfer was made.    In re Arrowhead Gardens, Inc., 776 F.2d at 382.

31.    Based on the foregoing cases, the testimony of Mr. Scherf that the sale of substantially all of Winstar's assets in December 2001 to IDT (for approximately 1% of their stated value on Winstar's December 31, 2000, unaudited balance sheet) provides evidence that Winstar was insolvent on December 7, 2000, should be credited.    (See proposed findings of fact no. 222).    For this Court to simply ignore a decrease in the stated balance sheet asset value of approximately 99% just one year after the valuation date would be improper under the controlling cases.    For the same reasons, Mr. Scherf's testimony regarding PX-328 and PX-329 should be credited.    (See proposed findings of fact nos. 220, 223).

32.    It was also appropriate for Mr. Scherf to consider the $1.8 billion impairment charge to Winstar's December 31, 2000 balance sheet (see proposed findings of fact nos. 220, 221), as evidence of insolvency on December 7, 2000.    See, e.g., Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 667-68 (Bankr. S.D.N.Y. 1992).    In In re Coated Sales, a debtor had falsified its books pre-bankruptcy to secure additional financing.    The company filed in bankruptcy shortly after the fraud was discovered.    In a preference action, the court considered the subsequently discovered fraud in determining

12

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**B301**

solvency as of the transfer date. 144 B.R. at 68, quoting In re Chemical Separations Corp., 38 B.R. 890, 895 (Bankr. E.D. Tenn. 1984). The court emphasized that fair value, "though presumed to be determined free of impermissible hindsight, is not determined in a vacuum – free of external stimuli. In fact, fair market value presumes that all relevant information is known by seller and buyer." Id. "It is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as 'current awareness' or 'current discovery' of the existence of a previous set of circumstances. The finding of false accounts receivable, nonexistent inventory and illegal transfers must be taken into account in accurately determining CSI's financial condition at the transfer date." Id.; see also In re Mama D'Angelo, Inc., 55 F.3d at 556, quoting In re Chemical Separations Corp., 38 B.R. at 895-96 (Bankr. E.D.Tenn. 1984); Official Comm. of Asbestos Personal Injury Claimants et al. v. Sealed Air Corp. (In re W.R. Grace & Co.), 281 B.R. 852, 869 (Bankr. D. Del. 2002). Similarly, in In re R.M.L., Inc., the Third Circuit affirmed a bankruptcy court's insolvency ruling, where that court adjusted asset values on the debtor's balance sheet downward, because it was known or knowable that contingencies necessary for the assets to have value would not come to pass, holding that the bankruptcy court did not engage in hindsight by doing so. 92 F.3d at 155-56. Material errors in the debtor's prior financial statements that are later corrected and adjusted can be considered in assessing value. See In re Arrowhead Gardens, Inc., 776 F.2d at 382; In re Howdeshell of Ft. Myers, 55 B.R. at 473 (subsequently discovered errors and omissions in debtor's financial statement and balance sheet cannot be ignored by the court in assessing insolvency, "if the error tainted the record."). Based on all the foregoing authorities, Mr. Scherf's reliance on the $1.8 billion impairment charge as evidence of insolvency was appropriate.

13

**B302**

33.    Mr. Scherf's use of Winstar's December 31, 2000, financial statements was also appropriate.  In In re McLean Indus., Inc., 132 B.R. at 258-59, the court relied upon a debtor's financial statement prepared about seven weeks after a preferential transfer date as reflecting a more accurate picture of the debtor's financial condition than two other statements issued in the month of the transfer and one month before.  The court found that the later statement reflected a restated value of the debtor's financial condition that showed insolvency, and that the debtor therefore had to be insolvent on the earlier transfer date where there was no substantial change in the debtor's financial condition from the transfer date to the date of the later financial statement.  Here, Mr. Scherf testified that there was no substantial change in the debtor's financial condition from the December 7, 2000 transfer date to the December 31, 2000 financial statement.  (See proposed findings of fact no. 213).

34.    While bankruptcy courts will consider solvency analyses conducted under the market and income approaches, the asset approach is favored.  In re Lids Corp., 281 B.R. 535.  Most courts conduct a balance sheet (i.e., asset approach) analysis wherein "asset values shown on the most contemporaneous balance sheet available" are adjusted to reflect fair market value.  Industrial, Commercial Electrical, Inc. v. Babineau (In re Industrial, Commercial Electrical, Inc.), 2004 Bankr.Lexis 438 at *22 (Bankr. D. Mass., April 7, 2004).[3]  Here, of course, the Trustee's expert, Mr. Scherf, conducted an asset approach analysis, which established that Winstar was insolvent by a margin of at least $1.6 billion on the December 7, 2000; Lucent's expert, Mr. Collins, failed to perform an asset approach analysis.  (Scherf 12-40:2-14; PX-460 at 9; Collins 18-16:3-13; DX-701).

---

[3] A copy of the decision is annexed hereto as Exhibit C.

14

B303

35.    In <u>In re Lids Corp.</u>, Mr. Collins also testified as a valuation expert on insolvency. There, Bankruptcy Judge Mary F. Walrath (now Chief Bankruptcy Judge) for the District of Delaware rejected all of Mr. Collins' opinions of value, finding material flaws in his analysis. Mr. Collins has repeated many of the same errors he made in <u>In re Lids Corp.</u> in his analysis in this case.

36.    For example, in his Winstar insolvency analysis, Mr. Collins testified (and stated in his report) that in conducting his discounted cash flow analysis under the income approach to assess asset value, he accepted Winstar management's projections at face value, without doing any analysis of the merits of the projections. (<u>See</u> proposed findings of fact no. 226). In <u>Lids</u>, the court rejected a discounted cash flow analysis performed by Mr. Collins in part because he relied on the debtor's projections at face value. Mr. Scherf's rejection of the Winstar projections as unreliable, based on his analysis of the projections, is proper under the controlling cases, including <u>In re Lids</u>.

37.    In his Winstar insolvency analysis, Mr. Collins also used the comparable transaction methodology under the market approach to determine asset value, but it was established on cross examination that many of the comparable transactions he included as supposedly being representative of "controlling interest acquisitions" were, in fact, either not controlling interests, were of foreign companies with no United States operations, or involved companies in other industries. (<u>See</u> proposed findings of fact no. 228). Moreover, at least half of his cited transactions occurred prior to April 2000, after which time Mr. Collins himself acknowledged in his report that market conditions in the telecom sector had materially declined (DX-701, at pp. 36-37), once again echoing the errors he committed in <u>Lids</u>.

15

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B304

**D.     Lucent Has Not Established Any New Value Under
11 U.S.C. § 547(c)(4)**

38.     Lucent contends in (i) the Joint Pretrial Memorandum, (ii) through the testimony of its Federal Rule of Civil Procedure 30(b)(6) witness Vernon Terrell, and (iii) in its May 2004 motion for summary judgment, that it is entitled to retain $71.32 million of any preference recovery because it provided "new value" to Winstar consisting primarily of equipment and software.  (Joint Pretrial Memorandum (Adv. Proc. Docket No. 292), Exhibit 12(B) (Lucent's Issues of Fact Remaining to be Litigated) at (I)(A)(2), Exhibit 15 (Lucent's Brief Statement of Case) at (A)(2); PX-480).

39.     Lucent bears the burden of establishing new value.  11 U.S.C. § 547(g) (the creditor … against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section); Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.), 317 B.R. 491, 494 (Bankr. M.D. Tenn. 2004).  Lucent's new value defense fails for two reasons.  First, to the extent Lucent provided any equipment or software to Winstar after December 7, 2000, it did so on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, (DX-32; DX-33) and as admitted by Lucent in its October 11, 2001, secured proof of claim (PX-340) and the escrow fund stipulations.  (PX-506; PX-507; PX-508).  Second, even if the additional value were provided on an unsecured basis, Lucent has failed to show that it was provided <u>after</u> the receipt by Lucent of the preferential transfer.

40.     It is well settled that to support a new value affirmative defense, section 547(c)(4)(A) requires a creditor to establish that, after receiving a preferential payment, the creditor advanced "new value" to the debtor "not secured by an otherwise unavoidable security

16

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B305

interest." New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.), 880 F.2d 679, 680 (3d Cir. 1989); Claybrook v. SOL Bldg. Materials Corp. (In re US Wood Prods.), 2004 Bankr. LEXIS 520 (Bankr. D. Del., Apr. 22, 2004).[4]

41.     Lucent provided only secured value, which fact is evidenced in three ways. First, all Lucent equipment and software sold to Winstar was sold subject to two separate security agreements dated May 9, 2000, and December 22, 2000. (DX-32, DX-33). Second, Lucent, under penalty of perjury, filed a proof of claim on October 11, 2001 (PX-340), stating that the invoices listed in the proof of claim were secured. This proof of claim includes all but approximately $3 million of the equipment and software sold by Lucent to Winstar that Lucent alleges constitutes the "new value." (See proposed findings of fact no. 240). Third, the Trustee and Lucent have entered into three stipulations (PX-506, PX-507, and PX-508) which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien (subject to judgment on the Trustee's equitable subordination claim).

42.     By filing its October 11, 2001 secured proof of claim and maintaining its new value defense in this litigation, Lucent is taking inconsistent positions. For distribution purposes Lucent wants to be secured, as evidenced by the secured proof of claim, the escrow stipulations and the security agreements. Yet, in defense of the preference action it wants to be unsecured so it can press its purported "new value" defense. Lucent is not permitted to do so under the doctrine of judicial estoppel, which bars a party "from asserting a position inconsistent with one [it] has previously asserted in the same or in a previous proceeding." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996). The doctrine is

---

[4] A copy of the decision is annexed hereto as Exhibit D.

17

B306

designed to prevent a party from playing "fast and loose" with the court. Id. at 361. Application of the doctrine requires a two-part inquiry: (i) is the present position of the party sought to be estopped inconsistent with a previously asserted position; and (ii) if so, did that party assert either or both positions in bad faith, i.e., with the intent to play fast and loose with the court. Id.

43.    In discussing the bad faith requirement, the Ryan Operations court explained that the inconsistent positions must be intentionally asserted as a means of obtaining an unfair advantage, rather than as a result of a good faith mistake. Ryan Operations, 81 F.3d at 362. Once a party makes an intentional decision to assert a certain factual position, judicial estoppel prevents that party from later taking an inconsistent position. Anjelino v. The New York Times Co., 200 F.3d 73, 100 (3d Cir. 1999). The intentional assertion of an inconsistent position is the playing "fast and loose" with the courts that judicial estoppel is designed to prevent. Compare Ryan Operations 81 F.3d at 362 (not applying judicial estoppel because the debtor's failure to list a claim in bankruptcy schedules, without more, does not evidence bad faith), with, Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d 414, 419-20 (3d Cir.), cert. denied, 488 U.S. 967 (1988) (applying judicial estoppel where the debtor failed to list a claim against a creditor in its schedules but listed the debt owed to that same creditor).

44.    Here, Lucent not only intentionally filed its proof of claim as secured; it also has intentionally maintained its proof of claim as secured, even after being advised by the Trustee on repeated occasions — the Federal Rule of Civil Procedure 30(b)(6) deposition of Lucent's new value witness Mr. Terrell, and in the Trustee's opposition to summary judgment, among others — that the Trustee would argue that Lucent was judicially estopped from seeking

18

B307

new value.  Accordingly, Lucent's conduct epitomizes the "fast and loose" conduct to which
judicial estoppel applies.

45.    Lucent argues that its secured proof of claim is really an unsecured claim,
in whole or in part, by virtue of the asterisked language in PX-340.  That language suggests that
if any portion of its claim is not secured, then PX-340 will be deemed an unsecured claim for
that amount.  This language does not aid Lucent in its "new value" argument.  It is clear from the
supporting documents set forth in the proof of claim, and as discussed above, that Lucent has two
security agreements (DX-32 and DX-33) that gave Lucent a security interest in the software and
equipment it sold to Winstar.  Lucent cannot get around this fact merely by inserting the
asterisked language in PX-340.  Accordingly, the only rational interpretation of the asterisked
language is that if there was a determination that the value of Lucent collateral did not equal or
exceed its claim, then any deficiency should be treated as an unsecured claim and Lucent did not
have to file a separate proof for its deficiency claim.  However, the fact that Lucent's collateral
may have deteriorated in value subsequent to its sale is not relevant for "new value" purposes.
The fact is that at the time of the sale Lucent retained a security interest in the equipment and
software and as such did not give "new value".

46.    Lucent's new value claim also fails because Lucent has failed to meet its
burden to show that it provided new value after its receipt of the preferential payment.  The law
is clear that with respect to goods "new value" is given when the goods are shipped.  Rushton v.
E&S International Enterprises, Inc. (In re Eleva), 235 Bankr. 486, 489 (BAP 10th Cir. 1999)
(relevant date to determine new value is given date of the shipment of the goods); see also, In re
New York City Shoes, 880 F. 2d 679 (3d Cir. 1989).

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B308

47.    Among the $71.32 million of new value sought by Lucent, Lucent claims as new value approximately $42.5 million of software invoices billed under the September 29, 2000, software agreement between Winstar and Lucent. (PX-323). That contract, however — even ignoring that it is an unenforceable sham transaction (see proposed findings of fact nos. 101-124) and that it is secured — expressly provides that the software was delivered on September 29, 2000, and includes a form of delivery and acceptance signed on that date by representatives of Winstar and Lucent. (PX-323). Thus, this $42.5 million of software cannot constitute "new value" because it was delivered over two months before the preferential payment.

48.    Lucent apparently takes the position that notwithstanding the delivery and acceptance of the software two months prior to the preference payment, Winstar received $42.5 million of new value after the Siemens Repayment because the software was used by Winstar between December 8, 2000 and April 18, 2001. But Lucent has not proved that Winstar used any of the software, or if it did, the value attributable to the software used between December 8, 2000 and April 18, 2001. It is Lucent's burden to show specifically the dollar amount of new value provided to Lucent. In re Spada, 903 F.2d 971, 975-76 (3d Cir. 1990); Jet Florida, Inc. v. American Airlines (In re Jet Florida Systems, Inc.), 861 F.2d 1555, 1559 (11th Cir. 1988) (creditor must show "specific dollar valuation of the "new value"…that the debtor received…").

49.    Lucent apparently calculates the $42.5 million of new value for the software simply by adding together two of the unpaid installments for the software with some type of proration calculation. But the payment schedule is not even a colorable basis for calculating new value. Under the Supply Agreement, incorporated by reference in the

20

B309

September 29, 2000 software agreement (PX-323 at § 3), Winstar received a perpetual license in the software. (PX-123, page 21). In such circumstances at least one court has held that new value is not determined by the amount of unpaid installments but is determined by prorating the total purchase amount over the life span of the software and then determining what portion is attributable to the time period between the preference and the bankruptcy filing. Since Lucent failed to provide this evidence it cannot establish any amount of new value with respect to the software, even if the transaction was not a sham, was not secured, and was not identified as secured on Lucent's October 11, 2001 secured proof of claim. Webster v. Harris Corp. (In re Nettel Corporation), 319 B.R. 290 (Bankr. D.C. 2004).

50.    Furthermore, it is uncontroverted that Winstar never used and never intended to use the majority of the software in that the entire transaction was a sham, with less than $20 million of usable software. (See proposed findings of fact nos. 101-124). Courts have generally required the estate to be materially benefited by the "new value" for the creditor to be protected by this defense. Charisma Investment Company v. Airport Systems, Inc. (In re Jet Florida System, Inc.), 841 F.2d 1082 (11th Cir. 1988). In In re Jet Florida, for instance, the 11th Circuit held that the mere fact that leased premises were available to the debtor did not constitute new value when the debtor neither occupied or sublet the space. 841 F.2d at 1084. Accordingly, because Lucent has not shown that the unused software benefited Winstar, Lucent is not entitled to any new value related to it.

51.    Similarly, with respect to the remaining $28 million of "new value," Lucent has failed to meet its burden of proving that the equipment was shipped after Lucent's receipt of the preferential payment. In re Phoenix Restaurant Group, Inc., 317 B.R. at 496. Lucent has failed to provide testimony or other evidence sufficient to meet this burden. (See

21

B310

proposed findings of facts nos. 241-243). And if Lucent's claimed new value included any services, Lucent similarly failed to meet its burden to establish that the services were provided after the preference and before the bankruptcy filing. <u>Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)</u>, 321 B.R. 388, 394-95 (Bankr. D. Del 2005).

## II.    COUNT ELEVEN (EQUITABLE SUBORDINATION)

52.    Courts considering equitable subordination follow the <u>Mobile Steel</u> test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. <u>In re Mobile Steel Co.</u>, 563 F.2d 692, 700 (5th Cir. 1977).

53.    When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct. <u>In re N&D Properties, Inc.</u>, 799 F.2d 726, 731 (11th Cir. 1986); <u>see also</u> <u>In re Epic Capital Corp., et. al.</u>, 290 B.R. 514, 524 (Bankr. D. Del. 2003), <u>aff'd</u>, 307 B.R. 767 (D. Del. 2004); <u>see, e.g.</u>, <u>Fabricators, Inc. v. Technical Fabricators, Inc.</u>, 126 B.R. 239, 246 (S.D. Miss. 1989), <u>aff'd</u>, 926 F.2d 1458 (5th Cir. 1991) (affirming entry of summary judgment where the creditor used its insider position to improve its security and encouraged others to lend despite knowing of the financial weakness of the debtor).

54.    In addition to the recovery of the preference received by Lucent, this Court has the authority to equitably subordinate Lucent's secured claim to the approximately $22,500,000 escrow funds to the full extent of the damages Lucent's conduct caused the creditors of Winstar's estate. <u>Citicorp Venture Capital, Ltd v. Committee of Creditors Holding Unsecured</u>

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

Claims (In re Papercraft), 323 F.3d 228 (3d Cir. 2003), cert. denied 540 U.S. 825 (2003); In re Mobile Steel, 563 F.2d 692 (5th. Cir. 1977). Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors, including, apart from the preferential payment itself, the interest paid by Winstar to Lucent on unnecessary Lucent equipment and services purchased by Winstar to generate revenue for Lucent, storage costs, and insurance costs. (See proposed findings of fact 252-254). Winstar sustained additional damages in that the approximate $244 million (on a cost adjusted basis) of Lucent equipment in inventory in warehouses on March 31, 2001 was sold in December 2001 for approximately a penny on the dollar compared to its December 7, 2000, balance sheet stated value. (See proposed findings of fact nos. 42, 43, 49, 50, and 222; see also PX-340; PX-341; PX-342; PX-343). Accordingly, Lucent's secured claims to the escrow funds in the total amount of approximately $22,500,000 (PX-506, PX-507 and PX-508) should be subordinated, in that the harm caused by Lucent's inequitable conduct, even after the repayment of the preferential transfer, exceeds the amount of the escrow funds.

      55.    Once this Court has determined that Lucent's conduct warrants that its secured claim be equitably subordinated, Bankruptcy Code § 510(c)(2) permits the Court to transfer the lien held by Lucent in the escrow funds to the estate so that the monies can be used to pay creditor's claims. As stated by Collier's, "the subordinated claim becomes unsecured and the property securing such claim becomes part of the debtor's estate." Collier on Bankruptcy, ¶ 510.05 (2005).

## III.   COUNT SEVEN (SUMS OWED TO WINSTAR WIRELESS, INC. UNDER THE SUBCONTRACT)

      56.    In Count Seven of the Second Amended Complaint, the Trustee contends that Wireless is entitled to damages as a result of Lucent's breach of a subcontract. The Trustee

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

bears the burden of proving this claim by a preponderance of the evidence. According to the terms of the subcontract, New York law governs this claim. (PX-13 at § 8.5).

57.    The Trustee must establish (1) that a contract existed between the parties; (2) that Wireless performed its obligations under the contract; (3) that Lucent did not perform its obligation under the contract; and (4) that Wireless was damaged by Lucent's breach. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); Wechsler v. Hunt Health Systems, Ltd., 330 F. Supp.2d. 383, 420 (S.D.N.Y. 2004). The Trustee has met her burden of proof with respect to each of these elements.

58.    Lucent concedes that Wireless and Lucent entered into the Subcontract effective January 4, 1999. (Renumbered Joint Stipulated Fact No. 7). Lucent contends, however, that Wireless was not performing services under the Subcontract, because the Subcontract required the issuance of a task order prior to Wireless performing services.

59.    During the entire course of the Subcontract, however, Wireless never issued a task order before performing services for Lucent. (Renumbered Joint Stipulated Fact No. 20). Indeed, even for the first quarter of 1999 — the only quarter in which a task order was ever issued — the task order was issued at the end of the quarter, after the Wireless services had already been performed. (See proposed findings of fact nos. 261, 266).

60.    Lucent argues that this course of conduct between the parties is irrelevant because the Subcontract contains a "no oral modification" clause. Although such clauses are generally enforceable under New York law, there are two exceptions: (1) where an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, the oral modification will be enforced, Rose v. Spa Realty Associates,

24

B313

42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926 (N.Y. 1977), and (2) where a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract, equitable estoppel will prevent the other party from attempting subsequent strict reliance on the written terms, id., 42 N.Y. at 344, 397 N.Y.S.2d at 927. Both of these exceptions apply here. (See proposed findings of fact nos. 259 - 303).

      61.    The Subcontract could not be terminated unilaterally by Lucent. (PX-13 at § 7.1). Lucent may argue, however, that the Subcontract was modified or terminated by virtue of the September 27, 2000 letter from Nina Aversano signed by Rick Uhl. (PX-110). The September 27, 2000, letter, however, contained a condition subsequent to the modification or termination of the Subcontract: Lucent was required to replace the Subcontract with a transition agreement under which Lucent would itself perform and finance the services. (See proposed findings of fact nos. 271 - 276). Any other result would leave Winstar without the fruits of its bargain under the Supply Agreement — a network built out and financed by Lucent. (See proposed findings of fact nos. 13-15, 258-260).

      62.    Under New York law, where an agreement to terminate an existing contract contains a condition, the failure to satisfy that condition leaves the original contract intact and enforceable. Medical Research Assoc., P.C. v. Medcon Fin. Serv., Inc., 253 F. Supp.2d 643, 648 (S.D.N.Y. 2003) (Parties' agreement to release defendant from performance under existing contract upon performance under new contract was accord which was not satisfied until performance of new agreement was completed); Denburg v. Parker Chapin Flattau & Klimpl, 82 N.Y.2d 375, 383-84 (N.Y. 1993); see also Nunez v. Simms, 341 F.3d 385, 390 (5th Cir. 2003) (condition subsequent is "a condition referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail

25

himself of the condition"). In <u>Conan Prop., Inc. v. Mattel, Inc.</u>, for example, the Southern District held that a termination agreement requiring performance of conditions was an executory accord under New York General Obligations Law § 15-501 (McKinney 1988), which, when breached by the defendant, entitled the plaintiff to sue under either the original contract or the terminating contract. 712 F. Supp. 353, 366 (S.D.N.Y. 1989), <u>rev'd on other grounds</u>, 1990 U.S.Dist.Lexis 16481 (reversing summary judgment because plaintiff party failed to establish that breach of executory accord was "material"). It is undisputed that Lucent never in fact replaced the Subcontract with a transition agreement, as required under the September 27, 2000 letter, although Winstar negotiated in good faith to do so (and even agreed to a transition agreement proposed by Lucent that Lucent's senior management later rejected). (<u>See</u> proposed findings of fact nos. 277-285). Additionally, Lucent continued to perform under the Subcontract even after the execution of the September 27, 2000 letter by Winstar. (<u>See</u> proposed findings of fact nos. 286-293). While Lucent pleaded accord and satisfaction as a defense in its Second Amended Answer and Counterclaims (Adv. Proc. Docket No. 156), clearly, no satisfaction occurred. Accordingly, any argument by Lucent that the Subcontract was modified or terminated by virtue of the September 27, 2000, letter must be rejected.

63. Indeed, Lucent itself conceded that the Subcontract was in place when it again paid and financed Wireless' services in late December 2000. (PX-199). At that time, Mr. Verwaayen, Lucent's Vice-Chairman, conceded, among other things, that "after the read out from the lawyers . . . Winstar can draw upon the credit facility, including services . . . we really had not the option of denying their rights here." (PX-199). As of March 31, 2001, no transition agreement had replaced the Subcontract and, accordingly, the Subcontract remained in full force

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B315

and effect and Wireless was entitled to payment for its services rendered thereunder, just as it was in December 2000, when Lucent made the payment.

## IV.   LUCENT'S COUNTERCLAIM - COUNT TWO (SETOFF)

64.   In Count Two of its Second Amended Counterclaim, Lucent contends that it is entitled to setoff any judgment awarded to the Trustee. The Bankruptcy Code allows for setoff in 11 U.S.C. § 553. The Code does not provide an independent source for setoff rights, but merely preserves the right of a creditor under applicable state law, with additional restrictions. Scherling v. Hellman Electric Corp. (In re Westchester Structures, Inc.), 181 B.R. 730, 738-39 (Bankr. S.D.N.Y. 1995); DiCola v. American S.S. Owners Mut. Protection and Indem. Ass'n, Inc. (In re Prudential Lines), 148 B.R. 730, 751 (Bankr. S.D.N.Y. 1992), aff'd in part and rev'd in part on other grounds, 170 B.R. 222 (S.D.N.Y. 1994). Lucent bears the burden of establishing a right to setoff. In re Westchester Structures, Inc., 181 B.R. at 739.

65.   Setoff requires mutuality:  the debts and credits must (1) be in the same right (e.g., both prepetition), (2) between the same parties, and (3) with the parties standing in the same capacities. Id., citing Lines v. Bank of America Nat'l Trust & Savings Ass'n, 743 F. Supp. 176 (S.D.N.Y. 1990) and In re Bay State York Co., Inc., 140 B.R. 608, 613 (Bankr. D. Mass. 1992).  Mutuality is strictly construed against the party seeking the benefit of setoff. In re Westchester Structures, 181 B.R. at 739. A claim is not mutual where the offsetting claim of a creditor involves a parent and a subsidiary, as opposed to a single corporation. MNC Commercial Corp. v. Ryerson & Son, Inc., 882 F.2d 615, 618 n.2 (2d Cir. 1989) ("under federal bankruptcy law, a subsidiary's debt may not be set off against the credit of a parent"); Sentinel Prod. Corp. v. Dennison Mfg. Co., Inc., 192 B.R. 41, 45-46 (N.D.N.Y. 1996) (Denying

27

**B316**

bankruptcy setoff where offsetting claims were not with one party, but parent and subsidiary corporations).

66.    Here, the Trustee seeks judgment, <u>inter alia</u>, for a preferential payment made by Winstar (Count Ten) and for breach of the Subcontract between Lucent and Wireless (Count Seven). Each claim is addressed separately below.

### A.    Setoff Against A Recovery Under Count Ten of The Second Amended Complaint

67.    Lucent has argued that it is entitled to setoff any recovery by The Trustee on behalf of Winstar under Count Ten of the Second Amended Complaint for the $194 million December 7, 2000, preferential payment. The law is to the contrary.

68.    A creditor cannot setoff its preference liability against either a separate debt owed to it by the debtor or the original liability on account of which the preferential transfer was made. <u>See Shaw v. Walter Heller & Co.</u>, 385 F.2d 353, 357-58 (5th Cir. 1967), <u>cert. denied,</u> 390 U.S. 1003 (1968); <u>In re Chase and Sanborn Corp.</u>, 124 B.R. 371, 373-374 (Bankr. S.D.Fla 1991); <u>Georgia Steel, Inc. v Atlantic Gas Light Co. (In re Georgia Steel, Inc.)</u>, 38 B.R. 829, 839-40 (Bankr. M.D.Ga. 1984), <u>rev'd on other grounds,</u> 66 B.R. 932 (M.D. Ga. 1986); <u>see also, Mack v. Newton</u>, 737 F.2d 1343, 1366 (5th Cir. 1984) (setoff cannot be made against fraudulent conveyance recovery).    To allow setoff of a preference would vitiate the purpose of the preference provision (fair distribution of the estate's assets), because it would enable the creditor to retain the fruits of its preference to the detriment of the other creditors:

> The reasoning for this rule is that allowing the creditor to offset the amount of the transfer would merely continue the preference, thereby rendering the preference statute useless because the

28

B317

preference would not become available for *pro rata* distribution to
all creditors.

Collier on Bankruptcy, ¶553.03 at 553-43-44 (15th ed. 2004). Additionally, because it is the
Trustee, and not the debtor, that is recovering the preference, at least one court has held that
setoff is also unavailable to Lucent because mutuality is lacking. Chaitman v. Paisano
Automotive Liquids, Inc. (In re Almarc Mfg., Inc.), 62 B.R. 684, 687 n.3 (N.D. Ill. 1986).

69.    Additionally, Bankruptcy Code Section 502(d) also prevents setoff against
the preference recovery. This section requires the Court to disallow a creditor's claims unless
and until the creditor pays the amount of any preference recovery. See Georgia Steel, 38 B.R. at
839-40; Hudson Feather & Down Prod., Inc. v. B&B Assoc., Inc. (In re Hudson Feather & Down
Prod., Inc.), 22 B.R. 247 (Bankr. E.D.N.Y. 1982).

70.    A narrow exception was created in Page v. Rogers, 211 U.S. 575 (1909),
which permitted a preference recipient to offset the preference from the amount of the
distribution it was to receive. Page has been limited to its facts and only applies if "the dividend
can be quickly and easily determined, and the dividend is immediately payable." Roeder v.
Climax Molybeam Co. (In re Old Electralloy Corp.), 164 B.R. 501, 506 (Bankr. W.D. Pa. 1994);
Gander Mountain Inc. et al. v. Impact Indus. Inc. (In re Gander Mountain, Inc.), 29 B.R. 260,
265 (Bankr. E.D.Wis. 1983); In re Chase and Sanborn, 124 B.R. at 374. That is not the case
here. In fact, because of the unpaid balances due under the debtor-in-possession financing and
the Bank Facility, it is unlikely that Lucent will receive any distributions on its unsecured claim
from the estate's remaining assets. (Bankr. Docket Nos. 1146, 4000).

29

B318

**B.**     **Setoff Against A Recovery Under Count Seven of The Second Amended Complaint**

71.     The Parties stipulated that Lucent is entitled to setoff $6.3 million of any recovery by the Trustee on behalf of Wireless against Lucent under Count Seven of the Second Amended Complaint. (See Stipulation By and Between the Trustee and Lucent Technologies Inc. Concerning Lucent's Counterclaim for Setoff dated May 23, 2005, Adv. Proc. Docket No. 337). No further setoff is allowed against the Wireless claim under the terms of the Parties' stipulation.

**V.     LUCENT'S COUNTERCLAIM - COUNTS THREE AND FIVE (FRAUD)**

72.     In Counts Three and Five of its Second Amended Counterclaim, Lucent alleges that it is entitled to damages against Winstar for fraud. (Adv. Proc. Docket No. 156). Under New York law, each element of a fraud claim must be proven by clear and convincing evidence. Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 784-85 (2d Cir. 2003) citing Hutt v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 257, 466 N.Y.S.2d 28, 30 (2d Dep't 1983) (noting that New York law has "long imposed a far more demanding burden when a serious accusation involving moral turpitude, such as fraud, is leveled.").

73.     Lucent must establish each of the following elements: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the representation; and (5) resulting damages. Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997); see also Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 784-85 (2d Cir. 2003).

74.     In Count Three, Lucent alleges that Winstar defrauded Lucent in December 2000 when it submitted a draw request (with covenant compliance certification)

30

**B319**

without advising Lucent that Winstar was insolvent at that time. Lucent did not include this issue in the Joint Pretrial Memorandum as a factual issue to be litigated or a legal issue to be determined, nor did it adduce any testimony at trial to support the claim. (See proposed findings of fact no. 307). In any event, Lucent's claim require Lucent to prove, by clear and convincing evidence, that Winstar was aware in December 2000 that it was insolvent. It also requires Lucent to prove that Lucent did not know Winstar was insolvent, a fact belied by Lucent's own due diligence. (PX-201; Scherf 12-58:13 - 12-60:3). At a minimum, Lucent's December 2000 due diligence afforded Lucent the same opportunity as Winstar to determine compliance with any solvency requirement. As Winstar's CFO Rick Uhl testified:

> "Lucent people were engaged in continuing due diligence at Winstar since I believe late November, early December of 2000 and that was a continuing event. They were privy to our plans. They were privy to our monthly results and they certainly could see on their own whether or not we were in compliance."

(Uhl 249:17 - 250:5). If a claimant "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." Schlaifer Nance & Co., 119 F.3d at 98 (citations omitted). The Schlaifer court noted that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." Id., quoting Grumman Allied Indus. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984); see also Shappirio v. Goldberg, 192 U.S. 232, 241-42 (1904).

75.    In Count Five Lucent alleges that Winstar committed fraud by submitting false certifications in January and February 2001 that it was in compliance with its capital

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

expenditure ("capex") loan covenant. Lucent did not specifically plead any other covenant violation in Count Five of its Counterclaim, nor did it identify any other alleged covenant breaches in the Joint Pretrial Memorandum. (Adv. Proc. Docket Nos. 156, 292).

76.    Lucent has not provided any evidence, let alone clear and convincing evidence, that Winstar made a material misrepresentation, because it has failed to prove that Winstar was actually in breach of the covenant. Winstar repeatedly maintained that it was in compliance with the capex covenant for 2000. (See proposed findings of fact no. 309). Winstar's independent accountants had not closed their audit and had not concluded whether Winstar had breached the capex covenant. (See proposed findings of fact no. 309). And even Lucent's own expert witness refused to opine on the issue. (See proposed findings of fact no. 309).

77.    Furthermore, because Winstar's employees testified that they believed they were in compliance with the capex covenant, even if the Court could find that Winstar was not in compliance, Lucent cannot show that Winstar employees intended to deceive Lucent.

78.    Nor can Lucent establish reasonable reliance. Lucent was well aware that Winstar might be over the capital expenditure limit and even helped Winstar stay below the limit. (See proposed findings of fact no. 308).

## VI.    LUCENT'S COUNTERCLAIM - COUNTS FOUR AND SIX (NEGLIGENT MISREPRESENTATION)

79.    In Counts Four and Six of its Second Amended Counterclaim, Lucent asserts that Winstar negligently misrepresented its compliance with the Second Credit Agreement in December 2000 by failing to advise of Winstar's insolvency (Count Four) and for

32

failing to advise that Winstar was allegedly in breach of the capex covenant when it certified

loan compliance in January and February 2001 (Count Six). Again, Lucent did not plead any

other covenant violations in its Second Amended Counterclaim, and in the Joint Pretrial

Memorandum only raised the capex covenant. (Adv. Proc. Docket Nos. 156, 292).

80. To establish a claim of negligent misrepresentation, the claimant must

prove by a preponderance of the evidence: (1) carelessness in imparting words; (2) upon which

others were expected to rely; (3) and upon which others acted or failed to act; (4) to their

damage; and (5) the declarant must express the words directly to one to whom it is bound by

some relation or owes a special duty of care (which must involve a "closer degree of trust" than

that of an ordinary buyer and seller). Dallas Aero, Inc., 352 F.2d at 788; see also Hydro

Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

81. With respect to Count Six, for the reasons discussed in proposed

conclusions of law no. 76 above and proposed findings of fact no 309, Lucent cannot meet its

burden, because it has failed to establish that a misrepresentation actually occurred.

82. And with respect to both Counts Four and Six, under New York law, to

succeed on its negligent misrepresentation claim (as with its claim in fraud), Lucent must

demonstrate that its reliance on Winstar's purportedly false statements was "reasonable."

Morrissey v. GMC, 21 Fed. Appx. 70, 73 (2d Cir. 2001). In PPI Enters. (U.S.) v. Del Monte

Foods Co., the court dismissed a negligent misrepresentation claim on multiple grounds,

including the fact that the plaintiff failed to establish reasonable reliance because it was a

sophisticated business entity, and it had access to critical information that should have indicated

to the plaintiff that the defendant's representation was incorrect. The court found that the

33

plaintiff's reliance on the defendants' representations was not reasonable, but rather reckless, as it demonstrated that the plaintiff "acted in disregard of a risk known to [it] or so obvious that [it] must be taken to have been aware of it..." PPI Enters. (U.S.) v. Del Monte Foods Co., 2003 U.S. Dist. LEXIS 16006, at *93-95 (S.D.N.Y. Sept. 11, 2003).[5] See also, Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d at 21 (2d Cir. 2000) (affirming summary judgment against a plaintiff's negligent misrepresentation claim because the plaintiff could not establish reasonable reliance); Consol. Edison, Inc. v. Northeast Utils., 249 F. Supp. 2d 387, 405 409 (S.D.N.Y. 2003) (no reasonable reliance where plaintiff was sophisticated party given 'ample opportunity during due diligence' to obtain any necessary information).

83.    Here, as discussed above, Lucent was on notice of the capex covenant compliance issue, and even went so far as to help Winstar stay below the limit. (See proposed findings of fact no. 308). And Lucent similarly had as good an opportunity as Winstar to examine Winstar's solvency during its December due diligence. Lucent's failure to examine Winstar's compliance further, whether in its December due diligence or in an additional round of due diligence, establishes a lack of reasonable reliance on Lucent's part.

---

[5] A copy of the decision is annexed hereto as Exhibit E.

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

B323

## CONCLUSION

Based on the above proposed conclusions of law, the Trustee's proposed findings of fact, and the evidence adduced at trial, the Trustee respectfully requests that judgment be entered in her favor on Counts Seven, Ten and Eleven in the Second Amended Complaint, and on Counts Two through Six of Lucent's Second Amended Counterclaim.

| /S/ | /S/ |
|---|---|
| Stephen M. Rathkopf | Sheldon K. Rennie (DE Bar No. 3772) |
| David R. King | FOX, ROTHSCHILD LLP |
| HERRICK, FEINSTEIN LLP | Mellon Bank Center, Suite 1400 |
| 104 Carnegie Center | 919 North Market Street |
| Princeton, NJ 08540 | Wilmington, DE 19801-3046 |
| (609) 520-3800 | (302) 622-4202 |

*Attorneys for the Trustee*

HFNJ1: #146497 v.1 #06723-0001 06/06/2005

**B324**

**EXHIBIT A**

Westlaw.

Not Reported in B.R.

Page 1

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

▷
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re: WORLDCOM, INC., et al., Debtors.
No. 02-13533(AJG).

Oct. 31, 2003.

Marc E. Albert, Darrell W. Clark, Carrie McGuire, Stinson Morrison Hecker, LLP, David A. Handzo, Jenner & Block, Eric R. Markus, Wilmer, Cutler & Pickering, Adam P. Strochak, Weil, Gotshal & Manges, LLP, Washington, DC, Sylvia Mayer Baker , Alfredo R. Perez, Weil, Gotshal & Manges, LLP, Houston, TX, Kristen Bancroft, Orrick, Herrington & Sutcliffe, LLP, Martin J. Bienenstock, Lori R. Fife, Marcia L. Goldstein, Weil, Gotshal & Manges LLP, Thomas R. Califano, Piper Marbury Rudnick & Wolfe LLP, Alice B. Eaton, Simpson Thacher & Bartlett, Carren B. Shulman, Heller Ehrman White & McAuliffe LLP, Timothy W. Walsh, Piper Rudnick, LLP, New York, NY, Darryl M. Bradford, Megan Fahey, R. Douglas Rees, Jennifer B. Salvatore, Jenner & Block, LLC, Chicago, IL, Mark S. Carder, Teresa L. Clark, W. Anthony Feiock, Patricia A. Konopka, Lori O. Locke, Greta A. McMorris, Amy R. Miller, Mark A. Shaiken, Stewart M. Stein, Stinson Morrison Hecker, LLP, Kansas City, MO, Sam Della Fera, Jr., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, Mark G. Ledwin, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY, Stephen D. Lerner, Squire Sanders & Dempsey LLP, Cincinnati, OH, Andrew C. McElmeel, Stinson Morrison Hecker, LLP, Omaha, NE, Sharon L. Stolte, Stinston Morrison Hecker LLP, Overland Park, KS, Bruce H. White, Patton Boggs LLP, Stephen A. Youngman, Weil, Gotshal & Manges, LLP, Dallas, TX, for Debtors.

FINDINGS OF FACT AND CONCLUSIONS OF

LAW (1) APPROVING (i) SUBSTANTIVE CONSOLIDATION AND (ii) THE SETTLEMENTS UNDER DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003, AND (2) CONFIRMING DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003

GONZALEZ, Bankruptcy J.

*1 On September 8, 9, 12, 15, 16, 17 and 19, 2003 and October 14, 15, 21 and 30 2003, this Court held [FN1] a confirmation hearing (the "Confirmation Hearing") to consider a plan of reorganization under chapter 11 of the Bankruptcy Code jointly proposed by WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"). During the course of the Confirmation Hearing, the Debtors filed Debtors' Second Amended Joint Plan of Reorganization, dated September 12, 2003, which was subsequently modified. Debtors thereafter filed Debtors' Modified Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, dated October 21, 2003 ("Modified Second Amended Plan"). [FN2]

> FN1. This Court has subject matter jurisdiction over these cases under 28 U.S.C. §§ 157(a) and 1334(b) and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(L). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed. R. Bankr.P. 7052 and Fed. R. Bankr.P. 9014. To the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B326**

Not Reported in B.R.                                                              Page 2

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

FN2. Capitalized terms used in this Memorandum of Decision that are not otherwise defined herein shall have the same meanings ascribed to them in the Modified Second Amended Plan.

The Court has reviewed and considered the Modified Second Amended Plan, all affidavits submitted, as well as the testimony proffered and adduced, the exhibits admitted into evidence at the Confirmation Hearing and the arguments of counsel presented at the Confirmation Hearing. The Court has also considered all objections to confirmation of the Plan. This Court is cognizant of the compromises and settlements of the parties, and other relevant factors affecting these Chapter 11 Cases, and takes judicial notice of the entire record. Based upon the following findings of fact and conclusions of law, the Court will approve substantive consolidation, approve the settlements under the Modified Second Amended Plan and confirm the Modified Second Amended Plan and herein disposes of all objections to confirmation not otherwise previously resolved or withdrawn.

I. FINDINGS OF FACT
A.  BACKGROUND, THE PLAN, AND SOLICITATION AND NOTICE

(i) Background

The Debtors current corporate structure results from a series of prepetition mergers and acquisitions including that involving WorldCom, Inc. and MCI Communications Corporation ("MCIC" and the merger with WorldCom Inc., sometimes referred to as the "Merger").

On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and 221 of its direct and indirect subsidiaries commenced voluntary cases under the Bankruptcy Code. By

Orders, dated July 22, 2002 and November 12, 2002, the Debtors' Chapter 11 Cases were consolidated for procedural purposes and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee"). No trustee has been appointed in these Chapter 11 Cases.

On October 29, 2002 this Court entered an Order Pursuant to Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). (Docket No. 1780.) The Bar Date Order established 5:00 p.m. (Eastern Time) on January 23, 2003 (the "Bar Date") as the deadline for filing proofs of claims in the Debtors' cases, subject to specified exceptions.

(ii) The Plan

*2 On May 23, 2003, the Debtors filed with this Court the proposed Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Disclosure Statement") and Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "May 23 Plan"). (Debtors' Ex. 274.)

On May 28, 2003, after due notice and a hearing held on May 19, 2003 and May 22, 2003, this Court entered an order (the "May 28 Disclosure Statement Order"), which, among other things, approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the May 23 Plan. (Docket No. 6110.) In accordance with the May 28 Disclosure Statement Order, on June 12, 2003 the Debtors commenced the solicitation of votes on the May 23 Plan. (Debtors' Ex. 301, June 18, 2003 Sullivan Aff.)

On July 9, 2003, the Debtors filed with this Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B327**

Not Reported in B.R.                                                                     Page 3

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

the proposed Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "First Supplement") and Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 9, 2003 (the "July 9 Plan"). (Debtors' Ex. 273.) The modifications to the May 23 Plan embodied in the July 9 Plan related to the incorporation of the Bank Settlement (described below) and the creation of the corresponding Class 3A, a revision to the SEC Settlement, and the clarification of certain implementation provisions. The First Supplement provided disclosure with respect thereto.

On July 11, 2003, after due notice and a hearing held on July 9, 2003, this Court entered an order (the "First Supplemental Disclosure Statement Order"), which, among other things, approved the First Supplement, finding that the First Supplement, together with the Disclosure Statement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' solicitation of votes by holders of Claims in Class 3A and the distribution of the First Supplement and the July 9 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan, and extended the deadline for filing objections to confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No. 7297.) In accordance with the First Supplemental Disclosure Statement Order, on July 11, 2003 the Debtors commenced the solicitation of votes of holders of Claims in Class 3A on the July 9 Plan (which amended the May 23 Plan), and commenced the distribution of the First Supplement and July 9 Plan to parties in interest. (Debtors' Ex. 301, July 25, 2003 Sullivan Aff.)

On July 31, 2003, the Court entered an Order: (1) Directing Debtors to File a Second Supplement to Debtors' Disclosure Statement; (2) Setting Objection Deadline Related Thereto; and (3) Extending Voting Deadlines and Adjourning Date for Commencement of Confirmation Hearing (the "July 31 Order"). Pursuant to the July 31 Order, the Court directed the Debtors to file a second

supplement to the Disclosure Statement in respect of certain newly commenced governmental investigations and actions, extended the deadline for casting votes on the Amended Plan to August 26, 2003 and adjourned the hearing to consider confirmation of the Amended Plan to September 8, 2003. (Docket No. 7961.)

*3 On August 6, 2003, pursuant to the July 31 Order, the Debtors filed with the Court the proposed Second Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Second Supplement"), which notified parties of the voting and objection deadlines established by the July 31 Order, provided disclosure in respect of then-recent investigations and actions by certain governmental agencies and departments, and set forth the Debtors' position with respect to the allegations raised thereby, the potential impact, if any, on the Debtors' estates, and other related information. (Debtors' Ex. 272.)

On August 7, 2003, after due notice and a hearing held on August 6, 2003, this Court entered an order (the "Second Supplemental Disclosure Statement Order"), which, among other things, approved the Second Supplement, finding that the Second Supplement, together with the Disclosure Statement and the First Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Second Supplement to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the Amended Plan, and extended the deadline for filing objections to confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No. 8128.) In accordance with the Second Supplemental Disclosure Statement Order, on August 9, 2003 the Debtors commenced the distribution of the Second Supplement to parties in interest. (Debtors' Ex. 301, August 22, 2003 Sullivan Aff.)

On August 29, 2003, the Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on August 29,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B328**

Not Reported in B.R.                                                                  Page 4

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

2003 (the "Initial Vote Certification") was filed with the Court on behalf of the Debtors' voting and tabulation agent, Innisfree M & A Incorporated. (Debtors' Ex. 302, Docket No. 8603.) The July 9 Plan was accepted by holders of more than two-thirds in amount and more than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex. 302.)

The hearing to consider confirmation of the July 9 Plan commenced on September 8, 2003. Among the parties that had interposed objections to confirmation were the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, Platinum Partners Value Arbitrage Fund, L.P. ("Platinum"), Deutsche Bank Securities, Inc. ("Deutsche"), and HSBC Bank USA ("HSBC"). (Docket Nos. 8033, 7938, 7939, 8038, 7707, 8011.) On September 9, 2003, the Debtors informed the Court that agreements had been reached with the Ad Hoc MCI Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders, as well as with other objectors such as Platinum, Deutsche, and HSBC, pursuant to which, among other things, the Debtors would further amend the July 9 Plan and such objections would be withdrawn.

On September 12, 2003, the Debtors filed with this Court the proposed Third Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (as thereafter modified, the "Third Supplement") and Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 12, 2003 (the "September 12 Plan"). (Debtors' Ex. 335.) The modifications to the July 9 Plan embodied in the September 12 Plan reflect the resolution of issues with the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, HSBC, and other objectors such as Platinum and Deutsche that had asserted unique reliance arguments based upon their pre-merger trade claims, and include a settlement regarding the treatment of MCIC Subordinated Debt Claims, a reduction to the recovery by the holders of MCIC Senior Debt Claims, a contribution of plan

consideration by the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, and provision for additional recoveries to Class 6 creditors that can establish that their Claims qualify as MCI Pre-merger Claims. The Third Supplement provided disclosure with respect thereto and related provisions and addressed the extent to which (if at all) the modifications would affect creditor recoveries.

*4 On September 12, 2003, after due notice by announcement of the Court on the record on September 9, 2003 and a hearing held on September 11, 2003 and September 12, 2003, this Court entered an order (the "Third Supplemental Disclosure Statement Order," and collectively with the Disclosure Statement Order, the First Supplemental Disclosure Statement Order, and the Second Supplemental Disclosure Statement Order, the "Disclosure Statement Orders"), which, among other things, approved the Third Supplement, finding that the Third Supplement, together with the Disclosure Statement, the First Supplement, and the Second Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Third Supplement and the September 12 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the July 9 Plan and established October 8, 2003 as the deadline therefor, and established September 30, 2003 as the deadline for filing objections to confirmation based upon the modifications reflected in the September 12 Plan. (Docket No. 8893.) In accordance with the Third Supplemental Disclosure Statement Order, on September 15, 2003 the Debtors commenced the distribution of the Third Supplement and September 12 Plan to parties in interest. (Debtors' Ex. 301, September 19, 2003 Sullivan Aff.) [FN3]

> FN3. On September 19, 2003, the September 12 Plan was modified to incorporate a settlement among the Debtors, the Committee, and an Ad Hoc Committee of Intermedia Preferred Stockholders (the "Intermedia Preferred

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 5

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Settlement"). Notice of such modification was filed on September 24, 2003.

On October 10, 2003, the Supplemental Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on October 10, 2003 (the "Supplemental Vote Certification," and together with the Initial Vote Certification, the "Vote Certifications") was filed with the Court on behalf of the Debtors' voting and tabulation agent, Innisfree M & A Incorporated. (Debtors' Ex. 338; Docket No. 9355.) The September 12 Plan was accepted by holders of more than two-thirds in amount and more than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex. 338.)

At the October 15, 2003, the Court heard evidence and oral argument in respect of the remaining objections to the September 12 Plan. The objectors raised various arguments in opposition to the September 12 Plan, including that the classification of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims together in one Class violated section 1123(a)(4) of the Bankruptcy Code.

On October 20, 2003, the Court ruled concerning the objections based on section 1123(a)(4) of the Bankruptcy Code (the "October 20 Ruling"). In the October 20 Ruling, the Court held that Class 6 of the September 12 Plan did not comply with the requirements of section 1123(a)(4) of the Bankruptcy Code. The Court directed the Debtors to separately classify WorldCom General Unsecured Claims, the MCI Pre-merger Claims, and the members of the Ad Hoc MCI Trade Claims Committee. Although the class of Ad Hoc Trade Claims receives the same treatment as the WorldCom General Unsecured Claims under the September 12 Plan, the Court preferred separate classification of those classes for voting purposes because of the Court's concern that the members of the Ad Hoc Trade Claims Committee could, arguably, unduly influence the outcome of the vote if the two groups were merged into one class. The Court also directed that the constituency of the MCI Pre-merger Claim class would be determined by a

creditor election to opt into that class. Finally, the Court directed the Debtors to advise the Court as to whether the Debtors intended to re-solicit the holders of the newly separately-classified claims or whether the Debtors would seek to confirm the September 12 Plan, as modified, under section 1129(b) of the Bankruptcy Code with respect to these Classes.

*5 In compliance with the October 20 Ruling, on October 21, 2003, the Debtors advised the Court that they would seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code. At such time, the Court scheduled a hearing to consider confirmation of the Plan under section 1129(b) of the Bankruptcy Code for October 30, 2003.

On October 21, 2003 the Debtors filed the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 21, 2003 (the "Modified Second Amended Plan"), which modifies the September 12 Plan by, *inter alia*, reclassifying the Claims in former Class 6 (WorldCom General Unsecured Claims) into Classes 6, 6A, and 6B. The Modified Second Amended Plan, thus, separately classifies (i) into Class 6A, MCI Pre-merger Claims, which are Claims arising solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998, the holders of which relied on the separate credit of MCIC or any subsidiary of MCIC as of that date, (ii) into Class 6B, solely for voting purposes, Ad Hoc MCI Trade Claims Committee Claims, which are the General Unsecured Claims of the Ad Hoc MCI Trade Claim Committee and (iii) into Class 6, all other General Unsecured Claims against the WorldCom Debtors. [FN4]

> FN4. As set forth by the Debtors on the record at the October 21, 2003 hearing, the other modifications include a modification to the Exculpation Provision, which was agreed to by the Debtors, the Committee and the United States Trustee, and conforming changes relating to the Intermedia Preferred Settlement, none of which implicates or adversely impacts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B330**

Not Reported in B.R.                                                              Page 6

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

creditor recoveries.

Each holder of an Allowed Class 6 WorldCom General Unsecured Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom General Unsecured Claim and (ii) Cash in an amount equal to .1785 multiplied by the Allowed amount of such WorldCom General Unsecured Claim. Each holder of an Allowed Class 6A MCI Pre-merger Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed MCI Pre-merger Claim and (ii) Cash in an amount equal to .4215 multiplied by the Allowed amount of such MCI Pre-merger Claim. The Claims of the Ad Hoc MCI Trade Claims Committee Claims are separately classified in Class 6B solely for voting purposes and not for treatment purposes. Holders of Claims in Class 6B will receive the same treatment as Class 6 creditors. They will also receive additional value from the contributions from the holders of Claims in Classes 9 and 10.

Although the original Class 6 (which included Class 6A Claims) overwhelmingly accepted the plan, Classes 6 and 6A are deemed to have voted to reject for purposes of seeking confirmation of the Modified Second Amended Plan pursuant to section 1129(b) of the Bankruptcy Code. The Class 6B Ad Hoc MCI Trade Claims Committee Claims are deemed to be an "accepting" Class because the members of the Ad Hoc MCI Trade Claims Committee have agreed to the treatment and to support the Modified Second Amended Plan pursuant to the Integrated Settlement and related stipulations.

The Modified Second Amended Plan constitutes the "Plan."

(iii) Solicitation And Notice

*6 The Disclosure Statement (Debtors' Ex. 274), the First Supplement (Debtors' Ex. 273), the Second Supplement (Debtors' Ex. 272), the Third Supplement (Debtors' Ex. 335), the Plan (Debtors' Ex. 335; Docket No. 9004), the Ballots (Docket Nos. 6110, 7297, 8893), the notice of the Confirmation Hearing (Docket No. 6110), and the Disclosure Statement Orders (Docket Nos. 6110, 7297, 8128, 8893) (as applicable, the "Solicitation Materials") were transmitted and served in compliance with the Bankruptcy Rules and the Disclosure Statement Orders. As described in the Affidavits of Service of Innisfree M & A Incorporated, sworn to by Jane Sullivan on June 18, 2003, July 8, 2003, July 25, 2003, July 30, 2003, August 22, 2003, September 19, 2003 and September 26, 2003 (each a "Sullivan Affidavit" and collectively, the "Sullivan Affidavits") (Debtors' Ex. 301), (i) the transmittal and service of the Solicitation Materials were adequate and sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and sufficient notice of the Confirmation Hearing (including the July 28, 2003, August 4, 2003, August 19, 2003, September 30, 2003 and October 27, 2003 deadlines for filing and serving objections to confirmation) and other requirements, deadlines, hearings and matters described in the Disclosure Statement Orders were provided in compliance with the Bankruptcy Rules and the Disclosure Statement Orders, and no other or further notice is required.

In addition, Debtors appropriately served Notice of Modifications to Debtors' Second Amended Plan of Reorganization dated September 19, 2003, which among other things, revealed that Debtors agreed to provide a 5% recovery to the holders of Intermedia Preferred Stock and that such modification did not have an adverse effect upon the recovery of any class of creditors. (Docket No. 9066)

The Objectors at the October 15, 2003 hearing on confirmation included America West Airlines, Inc. ("America West"), CIT Lending Services Corporation ("CIT"), Next Factors, Inc. [FN5] ("Next Factors"), the United States Trustee for the Southern District of New York ("United States Trustee"), and Wells Fargo Bank, N.A. ("Wells Fargo"). [FN6] The Objector at the October 30, 2003 hearing on confirmation was Liquidity Solutions Inc ("LSI"). [FN7]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B331**

FN5. Next Factors' denial of receipt of the Third Supplement is insufficient to rebut the presumption of its receipt of same. There is a rebuttable presumption that the addressee of a properly addressed and mailed notice receives that notice. *Hagner v. United States,* 285 U.S. 427, 430, 52 S.Ct. 417, 76 L.Ed. 861 (1932). A party must do more than merely deny receipt of the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption. *In re Ms. Interpret,* 222 B.R. 409, 413 (Bankr.S.D.N.Y.1998); *In re Adler, Coleman Clearing Corp.,* 204 B.R. 99, 105 (Bankr.S.D.N.Y.1997). The Court has reviewed certain Assignment of Claims filed in this case and the address used by Next Factors therein is identical to the address used by the Debtors to serve Next Factors. Indeed, Next Factor's counsel has used that same address in his submissions with this Court. Because Next Factors was provided with proper notification of the deadline to file objections to the Plan and failed to file its objection by such objection deadline and because Next Factors has failed to provide sufficient justification or excuse for such failure, Next Factors is barred from objecting to the Second Amended Plan. In any event, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule Next Factors objections on the merits.

FN6. The America West and CIT objections to confirmation of the Plan were later withdrawn pursuant to stipulations and agreed orders between the Debtors and America West and between the Debtors and CIT.

FN7. For the reasons set forth more fully at the hearing, LSI offered no convincing excuse or evidence for its failure to abide by the objection deadline. Moreover, the Court finds that allowing LSI's to file an untimely objection that, inter alia, sought a continuance of the hearing would prejudice the Debtors at this stage of the case. The Court therefore did not have to consider its objection. Nevertheless, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule LSI's objections on the merits.

The Disclosure Statement, the First Supplement, the Second Supplement, and the Third Supplement provide to holders of Claims against and Equity Interests in the Debtors "adequate information" within the meaning of section 1125 of the Bankruptcy Code. Votes on the Plan were solicited after disclosure to holders of Claims against and Equity Interests in the Debtors of "adequate information" as defined in section 1125 of the Bankruptcy Code. The procedures used to distribute and tabulate the Ballots were fair, properly conducted, and in accordance with the Disclosure Statement Orders and all applicable Bankruptcy Rules.

B. SUBSTANTIVE CONSOLIDATION

The Plan provides for the substantive consolidation of the WorldCom Debtors and the separate substantive consolidation of the Intermedia Debtors. (Plan §§ 5.01, 5.02.)

(i) The Debtors' Operations

*7 The WorldCom enterprise is comprised of over 400 legal entities. (Debtors' Ex. 268.) Of these, 222 are debtors in these Chapter 11 Cases.

Historically, all the Debtors operated under common senior management. This has continued during the Chapter 11 Cases, with the appointment of Michael Capellas as Chairman of the Board of Directors and Chief Executive Officer for all of the Debtors. (Debtors' Ex. 202.) Debtors never prepared separate legal entity financial statements for public financial reporting purposes. (9/15/03 Tr. at 100.) The Debtors historically have done all public financial reporting on a consolidated basis. (*See, e.g.,* Debtors' Ex. 226.) The Debtors likewise

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 8

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

filed consolidated federal income tax returns. (*See, e.g.,* Debtors' Ex. 271.)

(ii) Transfer Of Assets From WorldCom, Inc. to MCIC

After the 1998 acquisition of, and merger with, MCIC, WorldCom substantially restructured its corporate organization.

Through a series of restructuring transactions in December 1998, June 1999 and September 1999, the Debtors transferred significant assets from WorldCom, Inc. to MCIC and its subsidiaries, including the following:
• WorldCom, Inc. transferred all shares of Management Company to MCIC.
• WorldCom, Inc. transferred several of its direct subsidiaries into UUNET, an indirect legacy WorldCom subsidiary. As a result of this transfer, UUNET Technologies, Inc. ("UUNET") held all of the internet operations of the Company and UUNET's direct subsidiary held all of the value-added assets and operations.
• IDB WorldCom, Inc. ("IDBWC"), a direct subsidiary of WorldCom, Inc., and a direct subsidiary of IDBWC Inc. were merged with and into MCIC.
• MCIC conveyed most of the assets and employees of the former IDBWC and its subsidiary to other subsidiaries of MCIC.
• MFS Communications Company ("MFSCC"), a legacy WorldCom subsidiary, was merged with and into MCIC.
• MCIC conveyed all assets of the former MFSCC to Network Services but did not transfer any liabilities. This transfer resulted in legacy WorldCom subsidiaries that were former subsidiaries of MFSCC, such as UUNET, becoming indirect subsidiaries of Network Services.
• WorldCom conveyed its interest in WorldCom Pacific LLC to MCIC, and MCIC merged Pacific into MCIWC Communications.
• Network Services conveyed its sales-related assets and employees as well as the interconnection agreements of the former MFSCC to MCIWC Communications.

• WorldCom Network Services, Inc. ("WNS"), a legacy WorldCom subsidiary, was merged with and into Network Services.
(*See* Debtors' Exs. 33-95, 113-22, 144-65 and 331 and Creditors' Committee's Ex. 2.)

(iii) Operational Integration of the Debtors

In furtherance of the post-merger corporate restructuring efforts, the Debtors continued and expanded operational integration of the various legal entities. Although each of the Debtors exists as a separate legal entity, WorldCom's business, both before and after the MCI merger, was and is organized along operational and functional lines rather than by legal entities. (9/15/03 Tr. at 29-30.)

*8 Debtors are comprised of two general types of business units--sales units and operating units. (9/15/03 Tr. at 28-29.) The Debtors' sales and marketing functions are organized along three major sales channels-- International, Business and Consumer. International is everything outside the United States. Business markets covers everything from small- and medium-sized businesses to the largest global account customers. Consumer, or mass markets, covers residential customers and very small businesses. (Deposition of Fred M. Briggs ("Briggs Dep.") at 80.)

The Debtors' operating units provide services and support to the sales units. The operating units include: Operations and Technology, Finance, Human Resources, Purchasing, Legal, and Marketing. (9/15/03 Tr. at 29; Declaration of Matthew Johnson ("Johnson Decl.") ¶ 1.)

Although the operations of all the Debtors are integrated, the finances of the 17 Intermedia Debtors were not integrated with those of the remaining Debtors. After the 2001 acquisition of Intermedia by WorldCom, the Intermedia Debtors continued to prepare separate financial statements, annual reports and other filings with the Securities and Exchange Commission. Those filings, however, are done on a consolidated basis for all of the Intermedia entities. (Debtors' Exs. 319, 320, 327.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B333**

Not Reported in B.R.                                                Page 9

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

(iv) Network Operations Are Integrated

The Debtors operate a fully-integrated telecommunications network. The Debtors' Operations and Technology unit builds, maintains, supports, operates and acquires network capacity on behalf of the entire enterprise without regard to separate legal entities. The only notable exception is the Skytel paging business, which operates a separate network. (Briggs Dep. at 24-25, 34-37, 91.)

The integrated network platforms, products and services provided by the Operations and Technology unit support all three of the major sales channels and provide network services to the entire enterprise. (Briggs Dep. at 80, 91- 92; Debtors' Exs. 121-22.) The costs of building, operating and maintaining the Debtors' telecommunications network are allocated to the major sales channels for management reporting purposes. (Briggs Dep. at 82-83.)

(v) Procurement Operations Are Integrated

The Debtors operate a centralized procurement department. The purchasing department purchased the vast majority of all capital and non-capital items that were acquired by any of the Debtors. (Johnson Decl. ¶ 3.)

The Debtors' centralized purchasing department performs, among others, the following primary functions: (a) determines that certain goods or services are needed for the Debtors' family of companies or receives an internal request for goods or services; (b) identifies potential vendors that could supply the good or services; (c) negotiates with those vendors; (d) awards contracts to the winning vendors; and (e) actually buys, through the centralized procurement department's purchase order, the goods or services needed within the Debtors' organization. (Johnson Decl. ¶ 4.)

*9 The centralized purchasing department does not send the purchase orders on behalf of any particular legal entity. The Debtors' standard purchase order provides that, "This purchase is made by WorldCom Purchasing, LLC as agent for the

Subsidiaries of MCI WORLDCOM, Inc." Purchase orders did not reference the particular legal entity with which the vendor was transacting business. (Johnson Decl. ¶ 5 & Ex. A; Debtors' Exs. 249-64.)

The centralized procurement department does not know what legal entity will receive or use the goods or services that it purchases. As a result, the Debtors' centralized procurement department does not communicate to the vendors that any particular legal entity is acquiring the goods or services or will be financially responsible for the vendor's invoice for the goods or services. (Johnson Decl. ¶ 6; Briggs Dep. at 44.)

The invoices vendors submit for goods or services they sold to the Debtors under a purchase order are paid by the Debtors' centralized accounts payable department—not by any particular legal entity. The checks paying these invoices identify only the ultimate parent corporation (that is, WorldCom, Inc.). (Johnson Decl. ¶ 7.)

Numerous trade creditors have filed exactly the same claim against multiple Debtors. This has resulted from the creditors' inability to determine which particular Debtor is the proper entity against which a proof of claim should be filed. Many creditors have filed the same claim against all 222 Debtors. (Johnson Decl. ¶ 8; Debtors' Ex. 248.)

(vi) Cash Management Functions Are Integrated

The Debtors operate a centralized cash management system which handles substantially all cash received by, and paid by, all of the Debtors. The Debtors' treasury department does not manage the enterprise's cash on a legal entity basis. Rather, it tracks to bank accounts. (Deposition of Mary Chastka at 15 hereafter "Chastka Dep.")

The Debtors have several hundred bank accounts. (Chastka Dep. at 16.) There is no correlation between legal entities and bank accounts. (Id. at 18.)

Customer payments generally are made to lockbox accounts. The lockbox accounts are swept on a daily basis and all funds therein are transferred to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B334**

Not Reported in B.R.                                                Page 10

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

the Debtors' single cash concentration account. (Chastka Dep. at 16-17, 22.)

The funds in the concentration account are then sent out to cover drafts on the Debtors' various disbursement accounts, which pay payroll expenses, vendor invoices, employee benefits and all other operational expenses of the enterprise. (Chastka Dep. at 22-23.)

Any surplus of cash in the concentration account is invested overnight in one of several money market accounts. (Chastka Dep. at 23.)

External sources of cash, such as bank borrowing, are deposited directly into the concentration account. (Chastka Dep. at 79-80.)

(vii) Actions During the Chapter 11 Cases

The Debtors and their major creditor constituencies, including the Creditors' Committee, appear to have recognized from the start of these Chapter 11 Cases that the ability to create separate legal entity financial statements, as well as the existence of substantial intercompany claims, were important issues in connection with evaluating the need for substantive consolidation of the estates. (9/15/03 Tr. at 217-19.)

**\*10** The Creditors' Committee retained FTI Consulting Inc. ("FTI") as its forensic accountant and charged FTI with investigating intercompany accounts, among other things. (9/15/03 Tr. at 95-96.) The Debtors cooperated with this effort, providing documents, access to the company's accounting systems, and access to key accounting and financial personnel. (9/15/03 Tr. at 223-25.) FTI served as a fact-finder, sharing the results of its investigations with the Creditors' Committee, as well as the Debtors, in a series of reports. (Creditors' Committee's Exs. 2-4; 9/15/03 Tr. at 95, 224.)

In addition, the Debtors provided all major creditor constituencies with equal access to financial data, establishing a data room in their Washington, DC offices where documents and access to the Essbase

financial system (described below) were available. (9/15/03 Tr. at 223-24.)

As a result of the substantial investigations that have taken place, the Debtors' historical accounting systems are well understood and there is an extensive record demonstrating the many historical deficiencies that make it impossible for the Debtors to prepare accurate and reliable separate legal entity financial statements on a historical basis.

(viii) The Debtors' Complex Accounting System

The Debtors' accounting systems are very complex and not well integrated. (9/15/03 Tr. at 30.) The Debtors have multiple ledger systems, the largest of which is SAP (a general ledger system). There are two SAP systems--one for domestic operations and one for international operations. (9/15/03 Tr. at 30-31.) These two systems, however, did not effectively communicate. (9/15/03 Tr. at 102-03.)

In addition, some of the Debtors business units operate on a Lawson system, while still others operate on an Oracle system. (9/15/03 Tr. at 31.) These various systems are aggregated in a system referred to as Essbase which consolidates all of the financial data into one system. (9/15/03 Tr. at 31.)

There are multiple accounting systems that feed these general ledgers, including approximately sixty-five billing systems that feed the general ledger system through a variety of processes, both automated and manual. (9/15/03 Tr. at 31-32.)

There are also twenty-three accounts receivable systems that feed the billing systems. The accounts receivable systems also have hundreds of front-end systems (such as order entry, provisioning, call record tracking and rating). (9/15/03 Tr. at 32.) None of the accounts are reconciled to the general ledger. For example, the sixty-five billing systems and the twenty-three AR systems were never reconciled at the sub ledger. (9/15/03 Tr. at 45.)

There are approximately 20,000 general ledger accounts and sub accounts that are used to capture transactions for specific items such as service,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B335**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

general and administrative and balance sheets. (9/15/03 Tr. at 32.)

There is no specific accounting for legal entities in SAP; instead accounting is by company code. There are more than 1,100 company codes notwithstanding that there are only approximately 400 legal entities. (9/15/03 Tr. at 33.)

*11 Debtors maintained their financial books on a general ledger company code basis, not on a legal entity basis. (9/15/03 Tr. at 99.) Each company code does not represent a separate legal entity as there are multiple company codes for each legal entity. In addition, there are company codes that do not represent legal entities. (9/15/03 Tr. at 33.) There exists no current accurate or complete map which ties these company codes to legal entities. (9/15/03 Tr. at 33.)

The ownership of assets, the receipt of revenues and the incurrence of expenses are accounted for in this complex accounting system. The Debtors, however, do not have records of the assets that are owned by each of the separate legal entities. (9/15/03 Tr. at 78-79.) The Debtors are unable to determine the ownership of the assets on a separate entity separate debtor basis. (9/15/03 Tr. at 138.)

(ix) Intercompany Accounting

Intercompany accounts are used to track transactions between related companies. There are approximately 1,400 intercompany accounts and various sub general ledger systems. The Debtors actively use approximately 300 to 320 of these accounts. (9/15/03 Tr. at 55.) Millions of transactions have flowed through these intercompany accounts and there are aggregate balances of approximately $1,000,000,000,000 (one trillion) in these accounts. (9/15/03 Tr. at 55.)

For the month of November 2002, there were over six hundred thousand transactions alone. This equates to over seven million transactions per year. (9/15/03 Tr. at 104.)

W-100 is an account counterparty in the SAP

system. When the SAP system was interacting with another general ledger company code that did not have an SAP company code, the system would record the transaction in the W-100 account. The transaction in W-100 reflects the transaction that should be booked in another general ledger system, such as Lawson. (9/15/03 Tr. at 112-13.)

W-100 does not represent a distinct legal entity, and where such an account was listed as the counterparty it does not provide any relevant information concerning the actual identity of the counterparty. (9/15/03 Tr. at 113.)

The Debtors never checked to see that W-100 entries were actually made in the Lawson ledgers because such a control never existed. (9/15/03 Tr. at 114.)

As of March 12, 2003, FTI, was able to identify counterparties for only about two thirds of the $1,000,000,000,000 or so of intercompany accounts. (9/15/03 Tr. at 114-15.)

From a consolidated standpoint, intercompany accounts should offset to zero in a properly functioning accounting system. The Debtors, however, never systematically balanced their intercompany accounts and the accounts therefore have a significant net out-of-balance. (9/15/03 Tr. at 55-56.)

As a basic accounting principle, the total amount of intercompany payables should equal the total amount of intercompany receivables. However, as of the Commencement Date, the sum of the receivables and payables for all of the entities did not equal zero but was out of balance by approximately $233,000,000. (9/15/03 Tr. at 108.)

*12 At the end of 2000, the intercompany accounts, on a consolidated basis, were out of balance by a receivable amount of approximately $115,000,000. By the end of 2001, that out-of-balance had flipped and the accounts were out of balance by a payable amount of about $175,000,000. And then in June of 2002, the out-of-balance had flipped again and the accounts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B336

Not Reported in B.R.                                                                Page 12

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

were out of balance by a receivable of approximately $275,000,000. (9/15/03 Tr. at 56-57.)

These are net figures in which out-of-balances on the receivables side are offset against out-of-balances on the payables side. The actual aggregate out of balance is in the billions of dollars. (9/15/03 Tr. at 57-58.) Therefore, the intercompany account balances between legal entities cannot be accurately determined. (9/15/03 Tr. at 128.) Without internal controls in place, the likelihood of material errors occurring is significant. As a result, there is no way to rely on the systems to generate accurate legal entity information or accurate intercompany transactions information by legal entity. (9/15/03 Tr. at 130.)

Intercompany transactions were recorded without regard for the proper general ledger and the Debtors often failed to record significant entries in their intercompany accounts. (9/15/03 Tr. at 132-33.) For example, FTI found the following three large errors: (i) an entry for $4,300,000,000 where cash was improperly stated in a legal entity as well as an intercompany account; (ii) an error in excess of $8,000,000,000 involving transfer pricing entries; and (iii) an error in excess of $5,000,000,000 in which transfer pricing charges were incorrectly recorded as an intercompany liability. (9/15/03 Tr. at 132; Creditors' Committee's Ex. 36 at 12.) In addition, FTI also found that a billion dollar correcting entry was never made relating to intercompany transfer pricing and that interest was not charged on all intercompany accounts. (9/15/03 Tr. at 133; Creditors' Committee's Ex. 36 at 13.)

Without knowing the intercompany receivables and the intercompany payables, the Debtors cannot prepare accurate separate legal entity financial statements as of the bankruptcy filing. (9/15/03 Tr. at 135-36.) The Debtors cannot review the accuracy of each of the underlying intercompany transactions to determine if they were appropriately entered and charged to the correct legal entities because of a lack of documentation, lack of personnel with institutional knowledge and improper historic controls. (9/15/03 Tr. at 60.)

As the Debtors acquired entities, performed restructurings and consolidated their ledgers, the integrity of the intercompany accounts was impaired. (9/15/03 Tr. at 80-81.) While lack of information regarding intercompany accounts is not a significant issue on a consolidated basis, on a legal entity basis they could not simply be written-off because there has to be an intercompany payable and receivable attached to specific legal entities. (9/15/03 Tr. at 82-83.)

(x) The Debtors Are Unable to Create Accurate or Reliable Historical Separate Legal Entity Financial Statements

*13 Accurate and reliable separate entity historical financial statements cannot be created and the data in the Debtors' financial system are an unreliable base from which to prepare accurate separate legal entity financial statements. (9/15/03 Tr. at 135-38, 140-42.)

All of the Debtors' current restatement efforts are focused on generating restated financials on a consolidated basis, not on an entity-by-entity basis. (9/15/03 Tr. at 35, 41.) Virtually the entire accounting staff of the Debtors has turned over since June 2002. Approximately 400 new professionals have been hired. (9/15/03 Tr. at 44.)

Debtors have established that it would not be possible to restate results for each legal entity because the Debtors did not manage their business by legal entity, there was never a review of financial statements by legal entity on a timely basis, there was a lack of controls or policies in place by legal entity, no intercompany reconciliations were performed and the work force was not trained on the importance of doing legal entity accounting. (9/15/03 Tr. at 36, 41.) Reconstruction of legal entity books and records is further impossible due to the lack of documentation for some transactions and the loss of individuals with institutional knowledge. (9/15/03 Tr. at 60.)

(xi) Lack of Historic Internal Controls

KPMG conducted an exhaustive and detailed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B337**

Not Reported in B.R.                                                                Page 13

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

analysis of the Debtors' internal accounting controls in preparation of its audit of the Debtors' 2000, 2001 and 2002 restated consolidated financial statements. (9/15/03 Tr. at 40-41; Debtors' Ex. 195.)

As a result of that analysis KPMG identified ten "material weaknesses" in the Debtors' internal financial controls and operations which it formalized in its June 3, 2003 letter to management and which was filed by the Debtors as part of a Form 8-K on or about June 9, 2003:

  1.1 The Company needs to increase the experience and depth of its financial management and accounting personnel. The Company has several key financial management and numerous other accounting positions that remain vacant. These positions are critical to record, process, summarize and report financial data consistent with assertions of management in the financial statements and internal management reports.

1.2 The Company needs to implement procedures and controls to review, monitor and maintain general ledger accounts. Significant efforts will be required to implement procedures and controls to ensure the maintenance and integrity of the general ledger. All general ledger accounts should be assigned to individuals who would be responsible for documenting the composition of ending balances and for determining that activity in those accounts is appropriate. Those individuals would also be responsible for reconciling account balances to underlying ledgers.

1.3 The Company must implement procedures to ensure that reconciliations between subsidiary ledgers and the general ledger are performed. During our review of a substantial number of general ledger accounts, including accounts receivable, various liability accounts and property, plant and equipment, we noted that the Company has not historically consistently reconciled the subsidiary ledgers to the general ledger. We also noted that the Company has not consistently reconciled numerous cash accounts.

*14 1.4 The Company's consolidation process is highly automated and extremely complex. We have found that the process is largely undocumented, and only a few individuals have a limited understanding of only certain parts of the process.

1.5 Significant improvement needs to be made in segregation of duties, responsibilities and management review controls. We noted certain accounting personnel have had the ability and responsibility to post and reconcile accounts under their control without an independent review. This lack of segregation of duties allowed accounting personnel to manipulate financial information that went undetected. Additionally, procedures need to be implemented to ensure that management personnel with appropriate knowledge and understanding review reconciliations and other financial information.

1.6 Policies, procedures and standardization of internal controls need to be implemented. There is a severe lack of policies, procedures and standardization of operating and financial controls and a general lack of documentation related to existing controls. These basic control weaknesses allowed journal entries to be posted without adequate support and documentation. Management should develop Company-wide standards of internal control to document its commitment to compliance with applicable laws and regulations, reliable operational and financial reporting and integrity of business activities and records. Good internal controls are fundamental to the Company achieving its key initiatives and goals. Such Company-wide standards of internal control should be applicable to all subsidiaries, units, groups and departments worldwide. The standards generally should reflect control objectives and not attempt to describe specific procedures required in each business.

1.7 The Company's operating management must be provided with appropriate financial information and appropriate procedures must be in place such that operating management is confident that financial information being used to manage their businesses is ultimately included in the Company's externally reported financial information. In the past, the Company's process for management reporting and review limited operating management's access to financial information. This was particularly noted in revenue, line costs and property, plant and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B338**

Not Reported in B.R.                                                                Page 14

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

equipment. Through well defined management reporting supported by strong budget to actual analysis, together with confidence in the financial reporting process, operating management can be assured that externally reported results are consistent with actual operating results.

1.8 Review, monitoring and oversight of the global business units needs to be increased.

1.9 Sufficient analysis and documentation of non-routine transactions needs to occur. Examples of non-routine transactions are derivatives and Indefeasible Rights of Use (IRUs). In a number of cases we noted that non-routine transactions were not identified or otherwise brought to the attention of and reviewed by accounting personnel with the appropriate level of expertise to properly analyze and account for these transactions. In addition, in some cases inappropriate accounting decisions were reached such as in the accounting for Avantel, Embratel and certain capitalized costs. We are also informed that management had not performed an impairment analysis of its long-lived assets nor could we find documentation as to where impairment was considered or analysis performed.

*15 1.10 The items identified in Section 4 *Accounting Matters* require the attention of appropriate levels of financial management and must be addressed in the Company's preparation of its restated financial statements.

(Debtors' Ex. 195.)

KPMG identified specific areas of concern under each of these broad topics which relate to the inability of the Debtors to generate accurate and reliable separate financial statements by legal entity. For example, KPMG found that:

1.3.1 Reconciliations throughout the revenue generating process were not performed, documented or analyzed in a timely manner to ensure that the accounting records are complete and accurate.

1.3.3 A formal process had not been established to ensure that cash transfers between accounts receivable platforms were properly reconciled in both the accounts receivable subledgers and the general ledger.

1.3.12 The unapplied cash account was inappropriately used to record unreconciled differences between accounts receivable platforms and the general ledger regardless of the nature of the differences. Policies and procedures to monitor and reconcile the unapplied cash general ledger account to accounts receivable platforms and subsidiary ledgers should be developed and implemented.

1.4.2 Organizational and account structures in the general ledger system (SAP) do not match the structural configuration of the consolidation tool (Essbase). Therefore, SAP and Essbase do not necessarily match the Company's operational legal structure as old and non-operating or non-consolidating companies still exist in SAP and Essbase.

1.4.3 The legal entity structure documented by the Company does not currently match the operational legal structure within SAP and Essbase.

1.4.4 The Company does not appear to have established or documented policies and procedures to ensure the proper recording of elimination journal entries.

In addition to KPMG's findings, in its Report of Investigation dated March 31, 2003, the Special Investigative Committee of the Board of Directors of WorldCom, Inc. found that many of the accounting records were in disarray or non-existent and that Arthur Andersen, the Debtors' predecessor auditors, did not perform any testing to justify reliance on WorldCom's internal controls. (Debtors' Ex. 267, at 26.)

(xii) Remediation of Internal Controls and Accounting Restatement

The Debtors have established teams and developed plans to remediate the internal control weaknesses identified by KPMG on a going-forward basis and have retained a significant team of professionals from Deloitte & Touche to conduct a complete assessment of the Debtors' internal control environment, remediate the internal control weaknesses identified in the KPMG letter, and develop remediation plans for any other weaknesses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B339

Not Reported in B.R.                                                                 Page 15

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

that may be discovered. (9/15/03 Tr. at 52.)

Developing appropriate controls on a going-forward basis, however, will not enable the Debtors to recreate accurate and reliable separate legal entity financial statements on a historical basis for each of the Debtors. (9/15/03 Tr. at 53.) The Debtors do, however, intend to produce reliable, restated financial results on a consolidated basis for the 2000 through 2002 time period and have devoted significant resources toward that end. (9/15/03 Tr. at 38- 40 .) The Debtors have made substantial progress on the restatement project. Most of the project teams have detailed action plans and are very close to completing their tasks. (9/15/03 Tr. at 61.) KPMG has been auditing each area of the restatement as it has been concluded. (9/15/03 Tr. at 38, 61.)

(xiii) Benefits of Substantive Consolidation

*16 In addition to the fact that the Debtors simply are not able to produce accurate and reliable separate legal entity financial statements on a historical basis, substantive consolidation provides significant benefits to the creditor constituency as a whole.

WorldCom operates in a highly competitive industry. (9/15/03 Tr. at 215-16.) There was substantial consensus among major creditor constituencies that a speedy emergence from chapter 11 was in the best interest of the Debtors and all creditors, a view shared by the Debtor's senior management and professionals. (9/15/03 Tr. at 215-16, 242, 249.)

Absent substantive consolidation, there likely would be massive intercreditor litigation regarding the validity and enforceability of intercompany claims, as well as litigation under chapter 5 of the Bankruptcy Code regarding intercompany payments and transfers of billion of dollars in assets that occurred in the various restructuring transactions. (9/15/03 Tr. at 225, 254- 46.) The costs attendant to litigation of these intercreditor disputes, both in terms of out of pocket transactional costs and the diminution of enterprise value that likely would

result from a prolonged stay in chapter 11, would have a material adverse effect on all creditor recoveries and the chances of a successful reorganization. (Transcript of Hearing held on September 16, 2003 ("9/16/03 Tr.") at 74-87.)

C. THE SETTLEMENTS

The Plan incorporates and provides for three compromises and settlements (the "Settlements") under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)") referred to as The Intermedia Settlement, The Bank Settlement and The MCIC Settlement:

• *Intermedia Settlement.* This settlement resolves all issues relating to (a) the validity, enforceability and priority of the Intermedia Intercompany Note (as defined below), including certain claims and causes of action that WorldCom, Inc. may have to avoid the Intermedia Intercompany Note as a fraudulent transfer or to recover payments of principal and interest thereon as preferential transfers and (b) the transfer of certain assets of Intermedia to the WorldCom Debtors (the "Intermedia Settlement"). (9/16/03 Tr. at 81-87; Plan §. 5.06; Disclosure Statement at 41-49.) Under the Intermedia Settlement, WorldCom, Inc. will transfer $1,029,000,000 in value, [FN8] in the form of notes and stock (the "Intermedia Settlement Consideration"), to Intermedia in complete satisfaction of any claims related to the Intermedia Intercompany Note. (9/16/03 Tr. at 82; Notice of Amendment to Debtors' Second Amended Plan of Reorganization, Docket No. 9004.) Pursuant to the Plan, the Intermedia Settlement Consideration will be distributed to holders of Intermedia Senior Debt Claims (for an estimated recovery of 93.5%), and Intermedia Subordinated Debt Claims (for an estimated recovery of 46.4%). (Disclosure Statement at 43; Plan §§ 4.11-4.15; Notice of Amendments to Debtors' Second Amended Plan of Reorganization, Docket No. 9004.) In addition, the WorldCom Debtors will fund the distributions under the Plan to holders of allowed Intermedia General Unsecured Claims (for an estimated recovery of 83 .2%). (9/16/03 Tr. at 90, 96.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B340**

Not Reported in B.R.                                                Page 16

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

FN8. On September 15, 2003, the Debtors announced that, based upon negotiations among representatives of the Intermedia Preferred Stock Interests, the Creditors' Committee and the Debtors, an additional $29 million in cash would be transferred to Intermedia to provide a 5 percent recovery to holders of Intermedia Preferred Stock Interests. As a result, the objection filed by OZ Management, L.L.C. and OZF Management L.P. (together, "Och-Ziff")--a holder of Intermedia Preferred Interests--was withdrawn.

**\*17 • Bank Settlement.** This is a settlement with the Ad Hoc Bank Committee of all issues relating to (i) the claims of twenty-five institutional lenders [FN9] (the "Banks") arising under (a) the $2.65 billion 364-day revolving credit facility dated as of June 8, 2001 (the "364-Day Facility"), between WorldCom, Inc., as borrower, and the Banks, as lenders and (b) the $1.6 billion revolving credit facility (the "Revolving Credit Facility"), dated as of June 8, 2001, between WorldCom, Inc., as borrower and certain of the Banks, as lenders and (ii) any and all causes of action that the Banks have against the Debtors, the Reorganized Debtors, or any of their respective current or former officers or directors relating to or arising from the 364-Day Facility and the Revolving Credit Facility, including without limitation, the Constructive Trust Action and the Maryland Action (as defined below) (the "Bank Settlement"). Pursuant to the Bank Settlement, under the Plan, the Banks (whose claims are classified in Class 3A) will receive a pro rata share of New Notes of the reorganized Debtors in the aggregate principal amount of $75,000,000. Distribution of the New Notes pursuant to the Bank Settlement is contingent upon the Banks dismissing the Constructive Trust Action and obtaining from the Banks party to the Maryland Action (the "MD Banks") a dismissal with prejudice of the Maryland Action. [FN10]

FN9. The institutional lenders include ABN Amro Bank, N.V., Allfirst Bank, Arab Bank PLC, Banca de Roma S.P.A.,

Banco Bilbao Vizcaya Argentaria, S.A., The Bank of Nova Scotia, The Bank of Tokyo-Mitsubishi, Ltd., New York Branch, Bank One, NA, Bayerische Landesbank, New York Branch, BNP Paribas, Deutsche Bank AG, New York Branch, Fleet National Bank, Fortis Capital Corp., The Governor & Company of the Bank of Scotland, Lloyds TSB Bank PLC, Mizuho Corporate Bank, Ltd., Norddeutsche Landesbank Girozentrale, New York Branch, The Royal Bank of Scotland PLC, New York Branch, UFJ Bank Limited, New York Branch, Wells Fargo Bank, National Association, Westdeutsche Landesbank Girozentrale, New York Branch and Westpac Banking Corporation.

FN10. The Banks have agreed to pay to the MD Banks approximately $15 million in order to obtain the dismissal of the Maryland Action. First Supplement at 2.

**• MCIC Settlement.** This is a settlement with the Ad Hoc Committee of MCIC Noteholders of all issues relating to the defenses of the holders of Senior MCIC Notes to the substantive consolidation of the WorldCom Debtors (the "MCIC Settlement"). Pursuant to the MCIC Settlement, the holders of MCIC Senior Debt Claims will receive a recovery under the Plan on the principal amount of their outstanding claims equal to 80 cents on the dollar, (9/15/03 Tr. at 216-27; Plan § 5.06(c)), which recovery is reduced to 79.2% after giving effect to additional proposed settlements reached in these cases. (Second Amended Plan, Docket No. 8900.) (9/15/03 Tr. at 213-15; Disclosure Statement, at 41-49; Supplement to Disclosure Statement, at 1-4.)

The Settlements embodied in the Plan reflect the culmination of extensive, good faith arm's length negotiations with the Covered Parties, the major economic parties in interest, and are based upon analyses of the issues undertaken by the Debtors' and the Creditors' Committee's professionals and analysts, and by the professionals for other parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B341**

Not Reported in B.R.                                                                     Page 17

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

in interest. (9/15/03 Tr., testimony of Frank Savage.)

(i) The Intermedia Settlement

On July 1, 2001, WorldCom, Inc. consummated the acquisition (the "Intermedia Merger") of Intermedia Communications, Inc. ("Intermedia"). (See Debtors' Exs. 304-06.) WorldCom, Inc. acquired Intermedia for approximately $12 billion in value, including cash, a note, stock and the assumption of long-term debt, pursuant to the merger of a wholly-owned subsidiary of WorldCom, Inc. with and into Intermedia. (See Debtors' Exs. 304-06 and 318.)

*18 In connection with the Intermedia Merger, stockholders of Intermedia received one share of WorldCom group stock (57.1 million WorldCom group shares in the aggregate) and 1/25th of a share of MCI group stock (or 2.3 million MCI group shares in the aggregate) for each share of Intermedia common stock they owned. Holders of Intermedia preferred stock, other than Intermedia's 13.5% Series B Redeemable Exchangeable Preferred Stock due 2009, received in exchange for their Series B securities one share of a class or series of WorldCom, Inc. preferred stock, having terms substantially identical to the exchanged Series B securities. (See Debtors' Exs. 304-06 and 318.)

To consummate the Intermedia Merger, WorldCom, Inc. created and capitalized Wildcat Acquisition Corp. ("Wildcat"), a wholly-owned subsidiary of WorldCom, Inc. Specifically, WorldCom, Inc. issued to WildCat a note, due June 15, 2009 in the aggregate principal amount of $7,074,929,250, bearing interest at the rate of 7.69% per annum, payable semiannually (the "Intermedia Intercompany Note") and paid to Wildcat $70,750 in cash in exchange for shares of Wildcat Junior Preferred Stock, par value $1.00 per share, having an aggregate liquidation preference of $7,075,000,000. Pursuant to the merger agreement, Wildcat was then merged with and into Intermedia, resulting in (i) the shares of Wildcat Junior Preferred Stock becoming shares of Intermedia Junior Preferred Stock and (ii) the transfer of the cash and Intermedia Intercompany Note to Intermedia. (See Debtors' Exs. 304-06 and 309.)

The issuance and transfer of the Intermedia Intercompany Note enabled Intermedia to remain in compliance with the indenture covenants contained in its outstanding bond debt, including certain capitalization requirements (Creditors' Committee's Ex. 4.)

Following the Intermedia Merger and until the Commencement Date, WorldCom, Inc. recorded up to $1,390,000,000 in prepayments on the Intermedia Intercompany Note and Intermedia recorded approximately $434,592,000 in interest payments. (Transcript of hearing held on September 16, 2003 ("9/16/03 Tr.") at 75-77; Creditors' Committee's Ex. 4.) These payments were allocated to various debt redemptions of Intermedia and for general corporate purposes, including funding of the Digex, Inc. business plan. Most of these payments were made in installments within the one year preceding the Commencement Date. (Creditors' Committee's Ex. 4.)

As of the Commencement Date, approximately $5.6 billion was outstanding under the Intermedia Intercompany Note. (Creditors' Committee's Ex. 4; 9/16/03 Tr. at 81.) During the Chapter 11 Cases, the Debtors reviewed the Intermedia Intercompany Note, the circumstances under which it arose, and the prepetition payments recorded. Based upon this review, the Debtors determined that WorldCom, Inc. may be able to assert fraudulent conveyance or preference theories to void the Intermedia Intercompany Note, recover the prepetition payments, or reduce the amounts owed by WorldCom, Inc. to Intermedia thereunder. (9/16/03 Tr. at 81, 87.)

*19 When the Debtors shared their views with the interested constituents, the Ad Hoc Committee of WorldCom Noteholders supported the Debtors' arguments. Certain significant Intermedia investors--the Ad Hoc Committee of Intermedia Noteholders and the Matlin Patterson Investors--disputed these contentions as well as the amount of the prepayments by WorldCom, Inc., whether the prepayments in fact were made, and if made, the purposes for which they were used. (9/16/03 Tr. at 84-86.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                          Page 18

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

The Intermedia Intercompany Note is an asset of the Intermedia estate. The validity and enforceability of the Intermedia Intercompany Note would greatly impact the recovery to Intermedia creditors as the remaining assets of Intermedia do not have significant value. (*See* Ex. C to Disclosure Statement.)

Litigation of the issues surrounding the Intermedia Note--including fraudulent transfer and preference theories, would require complex factual and legal determinations of, among other things, solvency, valuation and the proper application of section 502(d) of the Bankruptcy Code, implicating extensive discovery, expert witness investigations, and a lengthy multifaceted trial, with a risk for the Debtors of a potential for a loss on all issues. (9/16/03 Tr. at 74-87.)

Although the Debtors' restated consolidated balance sheets for year-end 2001 show that the WorldCom Debtors were insolvent based on book values calculated on a GAAP basis, given the ongoing financial restatement process, the Debtors did not during the Chapter 11 Cases, and were not in a position to, undertake a traditional fraudulent transfer solvency analysis or even determine solvency on a book value basis with respect to WorldCom, Inc. as of July 1, 2001. (9/16/03 Tr. at 209-13.)

Although Intermedia's restated financial consolidated statements for year-end 2002 show that the Intermedia Debtors were insolvent on a consolidated basis based on book values calculated on a GAAP basis, they do not resolve the question of Intermedia's insolvency on the date of the Intermedia Merger. (9/16/03 Tr. at 213-15.)

In the absence of a consensual resolution of the Intermedia Intercompany Note issues, the Debtors' ability to propose a consensual chapter 11 plan would have been diminished significantly. Protracted litigation and the delay in the reorganization process would adversely affect asset values and the amounts available for distribution to all creditors. (9/16/03 Tr. at 74-87.)

The present benefits of settling these issues for an amount less than the full face amount of the Intermedia Intercompany Note far out weigh any benefit that may accrue from an extended and protracted litigation. By settling all issues surrounding the Intermedia Intercompany Note, the Debtors weighed their relative risks of litigation and the benefits of settling, including, but not limited to, their ability to emerge from chapter 11 quickly and the benefit to their chapter 11 estates. (9/16/03 Tr. at 86-92.)

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Intermedia Settlement (including exploration of alternatives to the settlement) and determined that the Intermedia Settlement is fair and reasonable. (9/16/03 Tr. at 89-91.)

*20 The $1,029,000,000 to be distributed in satisfaction of the Intermedia Note is a fair compromise of the issues surrounding the Intermedia Intercompany Note. [FN11] It represents approximately one-half of the recovery that would have been realized by the Intermedia estate if the validity and enforceability of the Intermedia Intercompany Note were entirely upheld by a final judicial determination of the issues. (9/16/03 Tr. at 89.) Such an analysis does not even take into account potential recoveries of alleged preferential transfers. (9/16/03 Tr. at 81, 82.)

> FN11. The total consideration was increased by $29,000,000 as a consequence of the Intermedia Preferred Settlement.

The Intermedia Settlement is the result of extensive, good-faith arm's length negotiations among the Covered Parties over a period of forty-five to sixty days. (9/16/03 Tr. at 77-80, 87, 92.) Absent the Intermedia Settlement, it is likely that the Ad Hoc Committee of Intermedia Noteholders and the Intermedia Preferred Shareholders would oppose the Plan. Such a result would likely unduly delay confirmation of the Plan, and reduce recoveries to creditors.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B343**

Not Reported in B.R.                                                                    Page 19

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Pursuant to the Objection to Confirmation of WorldCom's Plan of Reorganization, dated July 30, 2003, filed by Dr. Seymour Licht, as supplemented (the "Licht Objection"), Dr. Licht has interposed an objection to the Intermedia Settlement. Philip S. Braunstein joined in Dr. Licht's objection. Dr. Licht and Mr. Braunstein assert claims against WorldCom, Inc. (Licht Obj. at 1; Braunstein Obj. at 1.) Dr. Licht and Mr. Braunstein's claims are classified in Class 5 (WorldCom Senior Note Claims) under the Plan. Dr. Licht and Mr. Braunstein do not assert any claims against any Intermedia Debtors.

The Intermedia Settlement is supported by the Creditors' Committee. (Memorandum of Law of Creditors' Committee in Support of Confirmation, Docket No. 8648.) Class 5, which includes Dr. Licht's and Mr. Braunstein's WorldCom Senior Note Claims voted overwhelmingly in amount and number to accept the Plan. (Debtors' Ex. 302.)

(ii) The Bank Settlement

On May 16, 2002, WorldCom, Inc. drew on its revolving credit facility (the "Credit Facility") in advance of its expiration and converted the $2.65 billion borrowing into a term loan, thereby extending the repayment period to June 7, 2003. ( *See* Debtors' Ex. 276 ¶¶ 39-51.) On June 25, 2002, the Company issued a press release stating that certain of its historical transactions were not made in accordance GAAP, requiring a restatement of its earnings. (*See* Debtors' Ex. 276 ¶ 57.)

On July 12, 2002, the Banks commenced an action against WorldCom, Inc. in the Supreme Court for the State of New York, County of New York (the "Constructive Trust Action"), seeking damages of approximately $2,500,000,000. (*See* Debtors' Ex. 276.) The Constructive Trust Action relates to the 364-Day Facility, pursuant to which twenty-seven lenders (including the Banks) established the Credit Facility to enable WorldCom, Inc. to borrow, repay and reborrow monies up to a maximum amount outstanding of $2.65 billion. (*See* Debtors' Ex. 276 ¶ 32.)

\*21 Each lender's obligation to lend its portion of the total amount of the Credit Facility was subject to WorldCom, Inc.'s making and abiding by certain terms, conditions, representations, warranties and covenants contained in the governing credit agreement and in compliance certificates and other documents to be provided by WorldCom, Inc. to the lenders pursuant to the credit agreement. (*See* Debtors' Ex. 276 ¶ 33.)

The Banks alleged that WorldCom, Inc. procured funding under the Credit Facility based upon fraudulent representations concerning, *inter alia*, the accuracy of WorldCom, Inc.'s financial statements. Specifically, the Banks alleged that WorldCom, Inc. represented that its then-current financials were prepared in accordance with GAAP, and that on this basis, the Banks and the other lenders funded the Credit Facility. (Debtors' Ex. 276.)

The Banks' complaint in the Constructive Trust Action requested the imposition of a constructive trust over, and payment of damages equal to, the proceeds of the Credit Facility, that is, approximately $2,650,000,000. The Banks immediately sought a temporary restraining order, preventing WorldCom, Inc. from "transferring, using, concealing or otherwise dissipating" the approximately $2,650,000,000 drawn down by WorldCom, Inc. thereunder. (*See* Debtors' Ex. 276.)

The New York Supreme Court rejected the Banks' request for a temporary restraining order, stating that the Banks, as creditors, were not entitled to priority over other creditors, and expressing concern that the cash lent to WorldCom, Inc. under the Credit Facility may have been "commingled" with other cash proceeds. However, that court made no final determination. (Debtors' Ex. 278.)

The Constructive Trust Action was removed to the United States District Court for the Southern District of New York, after which the Debtors and the Banks entered into a stipulation, which provided that the parties would not take any steps to prosecute or defend the Constructive Trust Action for a period of 70 days from July 18, 2002. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Page 20

addition, WorldCom, Inc. agreed not to transfer or dissipate any stock of its subsidiaries, or any claims it may have against its subsidiaries for a period of 80 days from July 18, 2002. (See Debtors' Ex. 281.)

The Constructive Trust Action was thereafter stayed as a result of the commencement of WorldCom's chapter 11 case. 11 U.S.C. § 362(a). The Banks did not move this Court to modify the stay to proceed with the Constructive Trust Action. However, on August 7, 2002, certain Banks filed a Complaint in the Circuit Court for Montgomery County, Maryland (the "Maryland Action") against WorldCom, Inc.'s then-Senior Vice President and Treasurer, seeking $2,150,000,000 in damages for alleged acts of negligence and negligent misrepresentation allegedly committed in her capacity as an officer of WorldCom, Inc. The Banks alleged that the truthfulness, accuracy, and correctness of the representations made in connection with the draw-down of the Credit Facility were affirmed by the treasurer. The Debtors sought and received a stay of the Maryland Action from this Court. (See Debtors' Ex. 277.)

*22 Beginning prior to April 19, 2003 and continuing extensively thereafter, the Debtors conducted negotiations with the Banks in an effort to settle the Constructive Trust Action and the Maryland Action, and to resolve all causes of action against the Debtors, or any of their respective current or former officers or directors relating to or arising from the 364-Day Facility and the Credit Facility, and the funding of any amounts thereunder. (9/15/03 Tr. at 227-31.)

The Banks contended that the lowest intermediate balance to which its trust could attach was between $150,000,000 and $250,000,000, while the Debtors asserted that a constructive trust would be denied. The agreement to resolve the Constructive Trust Action and the Maryland Action for $75 million in New Notes (an incremental recovery to the Banks of $48 million) was the result of a negotiation between those two positions. It represents less than half the amount the Banks would receive if they succeeded in the Constructive Trust Action. (9/15/03 Tr. at 227-31.)

The distribution of New Notes pursuant to the Bank Settlement will reduce, dollar for dollar, the unsecured portion of the aggregate amount of any claims by the Banks. As a result, the Banks' overall recovery under the Plan is increased by approximately $48 million. (Plan §§ 1.12, 1.13, 4.04.) No party in interest objected to the Bank Settlement. [FN12]

> FN12. Wells Fargo Bank has filed an objection to the Plan. The Debtors and Wells Fargo have stipulated to adjudicate that objection in the context of the claims objection process Wells Fargo, however, preserved its right to, and in fact did, object to Debtors' settlement with the Intermedia Preferred Shareholders.

The Bank Settlement is the result of extensive, good-faith arm's-length negotiations. (9/15/03 Tr. at 229-30.) Absent the Bank Settlement, the complexity, cost and delay of litigation to address the issues resolved by the Bank Settlement would be substantial. The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Bank Settlement (including exploration of alternatives to the settlement) and determined that the Bank Settlement is fair and reasonable. (9/15/03 Tr. at 230-31.)

Absent the Bank Settlement, it is likely that the Banks would oppose the Plan. Such a result would likely unduly delay confirmation of the Plan and reduce recoveries to creditors.

(iii) The MCI Settlement

In September 1998, WorldCom, Inc. completed a $40 billion acquisition of MCIC and its affiliates (collectively with MCIC, "MCI") pursuant to the merger of MCIC with and into a wholly-owned subsidiary of WorldCom, Inc. (Debtors' Exs. 235, 226.)

Several series of public notes issued by MCIC prior to the merger (the MCIC Senior Notes and the MCIC Subordinated Notes) were unaffected by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B345**

Not Reported in B.R.                              Page 21

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Merger. The MCIC Senior Notes represent MCIC Senior Debt Claims (Class 9 under the Plan) arising under the (i) senior debt indenture, dated October 15, 1989, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 7-1/2% Senior Notes due August 20, 2004; 8-1/4% Senior Debentures dues January 20, 2023; 7-3/4% Senior Debentures due March 15, 2024; and 7-3/4% Senior Debentures due March 23, 2025 and (ii) the senior debt indenture, dated February 17, 1995, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 6.95% Senior Notes due August 15, 2006; 6-1/2% Senior Notes due April 15, 2010; and 7.125% Debentures due June 15, 2027. (See Plan §§ 1.64, 1.65.)

\*23 At the inception of the Debtors' Chapter 11 Cases, an informal committee of holders of MCIC Senior Notes (the "Ad Hoc Committee of MCIC Senior Noteholders") contended that the WorldCom Debtors should not be substantively consolidated with the MCI Debtors. (9/15/03 Tr. at 216-28.)

During the course of the cases, the Debtors determined that a settlement with the MCI Senior Noteholders was appropriate and of benefit to the estate in light of their particular arguments with respect to substantive consolidation and the Debtors' objective to achieve a consensus among major classes of creditors. The MCIC Settlement enabled the Debtors to propose a plan of reorganization supported by the Creditors' Committee and the representatives of 90% of the debt of the consolidated enterprise. (9/15/03 Tr. at 220-25.)

After extensive negotiation, the Debtors, the Creditors' Committee, the Ad Hoc Committee of WorldCom Noteholders, the Matlin Patterson Investors and the Ad Hoc Committee of MCIC Senior Noteholders agreed to the MCIC Settlement, pursuant to which holders of MCIC Senior Debt Claims would receive a recovery, in New Notes, of 80% of the principal amount of their debt. [FN13] (9/15/03 Tr. at 216-27.)

FN13. As a result of the subsequent

settlement with the Ad Hoc MCI Trade Claims Committee, this recovery is reduced to 79.2%.

In agreeing to the settlement, the Debtors considered the effect of the contractual subordination provision contained in the governing indentures and the resulting "roll-up" to the holders of the MCIC Senior Debt Claims of any recovery that holders of MCIC Subordinated Debt Claims would receive. Analytically, the MCIC Settlement represented a distribution pursuant to the Plan to all MCIC bondholders (including the holders of MCIC Subordinated Debt Claims) of approximately 62 cents per dollar on account of their claims, with the holders of the MCIC Senior Debt Claims receiving the benefit of the distribution that would have been payable to the holders of the MCIC Subordinated Debt Claims, absent their indentures' governing subordination provisions. (Disclosure Statement at 47.) [FN14]

> FN14. Since the initial settlement, the parties agreed to a recovery to holders of MCIC Subordinated Debt Claims of approximately 44%.

The holders of the MCIC Senior Debt Claims asserted that absent substantive consolidation, they were entitled to payment in full of their claims, including pre- and post-petition interest, equaling roughly 113% of their principal amount due. The Debtors and the Ad Hoc Committee of WorldCom Noteholders asserted that under a substantive consolidation plan, the MCIC Senior Debt Claims were only entitled to a 35% recovery. (Disclosure Statement at 47.)

The MCIC Settlement was the result of extensive, good faith arm's-length negotiations among the Covered Parties that took place over four or five months. (9/15/03 Tr. at 217, 221.) The MCIC Senior Debt Claims are an entire class under the Plan. (Plan § 4.10.) Absent the MCIC Settlement, the complexity, cost and delay of litigation to address the issues resolved by such settlement would be substantial.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B346**

Not Reported in B.R.

Page 22

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the MCIC Settlement (including exploration of alternatives to the settlement) and determined that the MCIC Settlement is fair and reasonable. (9/15/03 Tr. at 223-26.) Absent the MCIC Settlement, there would not have been a consensual plan. The MCIC Senior Noteholders asserted that they would have rejected the Plan and would have opposed it. Such a result would have significantly complicated and delayed any confirmation hearing and potentially reduced recoveries to creditors.

D. SECTION 1129 OF THE BANKRUPTCY CODE

(i) 1129(a)(1)

*24 The Debtors are the proponents of the Plan. (Debtors' Ex. 335.)

The reliance by creditors upon the creditworthiness of MCIC or any of its subsidiaries in extending credit to an MCIC entity prior to the Merger is distinct from the reliance by creditors upon the creditworthiness of the Debtors (including MCIC and its subsidiaries after the Merger) in extending credit to a Debtor following the Merger. The Plan separately classifies WorldCom General Unsecured Claims and MCI Pre-merger Claims based upon the unique reliance and prejudice arguments that have been asserted by holders of MCI Pre-merger Claims that extended credit to an MCIC entity prior to the Merger. The Claims of the Ad Hoc MCI Trade Claims Committee Claims in Class 6B are separately classified solely for voting purposes and not for treatment purposes. Claims in Class 6B will receive the same treatment as Claims in Class 6.

The Debtors separately classified the MCIC Senior Debt Claims and MCIC Subordinated Debt Claims based upon the contractual subordination provisions in the MCIC Subordinated Notes Indenture.

Pursuant to the Plan, the subordination provisions in the MCIC Subordinated Notes Indenture will be cancelled on the Effective Date. The cancellation of

the subordination provisions on the Effective Date is necessary to protect the holders of MCIC Subordinated Debt Claims from the risk that holders of MCIC Senior Debt Claims would seek to enforce subordination with respect to their recoveries under the Second Amended Plan.

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims, and Article III of the Plan designates Classes of Claims and Classes of Equity Interests.

Article III of the Plan specifies Class 1 and Class 3 as unimpaired and Classes 2, 3A, 4, 5, 6, 6A, 6B, 7, 8, 9, 10, 11, 12, 13, 14 and 15 as impaired.

Article IV of the Plan specifies the treatment of each impaired Class of Claims and Equity Interests.

The Plan provides the same treatment for each Claim or Equity Interest in a Class.

Pursuant to the July 9 Plan, each holder of an MCIC Senior Debt Claim was entitled to receive New Notes in an amount equal to .80 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim. (Debtors' Ex. 273.) Prior to its modification, holders of Class 9 MCIC Senior Debt Claims voted to accept the July 9 Plan. (Debtors' Ex. 302.) Pursuant to the Plan, each holder of an MCIC Senior Debt Claim is entitled to receive New Notes in an amount equal to .792 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim as a result of their contribution to the Ad Hoc MCI Trade Claims Committee (the "MCI Senior Contribution"). Such reduced recovery was subject to Class 9 having an opportunity to reconsider its prior vote. As set forth in the Sullivan Vote Certification, Class 9 voted overwhelmingly to accept the Plan and make the MCI Senior Contribution. It is, therefore, apparent that the MCI Senior Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the previously accepted recovery of the holders of MCIC Senior Debt Claims.

*25 Pursuant to the Plan, the Debtors cannot

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B347**

Not Reported in B.R.

Page 23

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

compel the holders of MCIC Subordinated Debt Claims to contribute any of their recovery to the Ad Hoc MCI Trade Claims Committee. Rather, the contribution by the holders of MCIC Subordinated Debt Claims to the Ad Hoc MCI Trade Claims Committee (the "MCI Subordinated Contribution," and together with the MCI Senior Contribution, the "Contributions") was expressly contingent upon the acceptance of the Plan by Class 10. (Debtors' Exs. 335, 339.) If Class 10 had voted to reject the Plan and the Debtors had crammed down the Plan on the holders of Class 10 Claims, no contribution from Class 10 would have been made or could have been compelled. Class 10 has overwhelmingly voted to accept to the Plan, and thus, to make the MCI Subordinated Contribution to the Ad Hoc MCI Trade Claims Committee. It is, therefore, apparent that the MCI Subordinated Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the recovery of the holders of MCIC Subordinated Debt Claims.

If the Contributions were not made, the amounts represented thereby would not inure to the benefit of any WorldCom General Unsecured Claim, but rather would be paid under the Plan and remain available to the Classes contributing the respective amounts. The Contributions do not in any way implicate or diminish the recoveries of Classes 6, 6A and 6B creditors.

Absent the Contributions, the Ad Hoc MCI Trade Claims Committee could pursue its objection to the Plan. Although the Plan contains a condition to effectiveness that the Contributions be made, such condition can be waived.

The Plan provides adequate means for its implementation.

Section 9.03 of the Plan provides that the Certificates of Incorporation and Bylaws for each of the Reorganized Debtors that are corporations shall prohibit the issuance of nonvoting equity securities.

Article IX of the Plan contains provisions with respect to the manner of selection of officers and directors of the Reorganized Debtors that are

consistent with the interests of creditors, equity security holders, and public policy.

(ii) 1129(a)(2)

Pursuant to the Disclosure Statement Orders entered after due notice and hearings, the Court approved the Disclosure Statement, First Supplement, Second Supplement and Third Supplement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. On August 29, 2003 and October 10, 2003, the Vote Certifications were filed on behalf of the Debtors' Court-appointed voting and tabulation agent.

As set forth in the Vote Certifications, the Disclosure Statement and May 23 Plan, the First Supplement and July 9 Plan, the Second Supplement and the Third Supplement and the Plan, together with the additional solicitation materials approved by the Court in the Disclosure Statement Orders, were transmitted to each creditor that was entitled to vote, as well as to other parties in interest in this case. The Debtors did not solicit the acceptance or rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement.

*26 Creditors that were not entitled to vote to accept or reject the Plan and equity interest holders (who are deemed to reject the Plan) were provided with certain non-voting materials approved by the Court in compliance with the Disclosure Statement Orders.

Because the Debtors have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in full, plus interest required under section 506(b), Class 2 is unimpaired and Claims in Class 2 are conclusively presumed to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan are impaired and were entitled to vote to accept or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B348**

Not Reported in B.R.                                                                          Page 24

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

reject the Plan. Classes 6 and 6A are impaired and are deemed to have voted to reject the Plan. Class 6B is impaired, however, because the members of the Ad Hoc MCI Trade Claims Committee has already agreed to support the Plan by virtue of a stipulation with the Debtors, among others, Class 6B is conclusively presumed to have voted to accept the Plan. (Docket No. 9132.)

The Debtors solicited acceptances or rejections of the Plan from the holders of all Allowed Claims in each Class of impaired claims that are to receive distributions under the Plan and that are otherwise not deemed to reject the Plan. [FN15] Classes 7, 8 and 15 of the Plan will not receive any distributions under the Plan, and therefore, Claims and Equity Interests in such Classes are deemed to have rejected the Plan. Class 14, which is impaired but will receive a distribution under the plan, is deemed to reject the Plan. The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in each of Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan.

> FN15. Prior to the Court's October 20 Ruling requiring the separate classification of the various Class 6 groups, the former Class 6 was solicited as an impaired class and voted to accept the Plan.

(iii) 1129(a)(3)

On June 13, 2003, the Ad Hoc MCI Trade Claims Committee filed a notice of appeal from the Order, dated June 4, 2003, Authorizing the Debtors to Assume as Amended Certain Executory Contracts with Electronic Data Systems Corporation and EDS Information Services LLC (the "EDS Appeal"). (Docket No. 6524.) On July 31, 2003, the Ad Hoc Committee of Dissenting Bondholders filed an objection to the July 9 Plan and a memorandum of law in support thereof (together, the "Dissenting Bondholder Objection"). (Docket Nos. 7938, 7939.) On August 4, 2003, the Ad Hoc MCI Trade Claims Committee filed an objection to the July 9 Plan (the "Trade Claims Committee Objection"). (Docket No. 8033.) The issues raised in the Dissenting

Bondholder Objection and the Trade Claims Committee Objection were vigorously disputed by the Debtors. (Docket No. 8650.)

On August 18, 2003, the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee each filed a notice of appeal from the Order of the Court, dated August 6, 2003, Approving the Settlement with the Securities and Exchange Commission. (Docket Nos. 8305, 8287.) On September 5, 2003, HSBC Bank USA ("HSBC"), the indenture trustee under the MCIC Subordinated Notes Indenture, also filed a Notice of Appeal from the Final Judgment of the United States District Court for the Southern District of New York approving the settlement with the Securities and Exchange Commission (collectively, the "SEC Appeals," and together with the EDS Appeal, the "Appeals").

*27 Prior to the September 8, 2003 Confirmation Hearing, Platinum, Deutsche, and certain other objectors (collectively, the "Pre-merger Objectors") filed objections to the July 9 Plan asserting that they were pre-Merger creditors whose reliance arguments deserved recognition on a basis similar to the MCIC Senior Debt Claims. Prior to the Confirmation Hearing, the Debtors and, among other parties, the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims Committee and the Pre-merger Objectors engaged in substantial discovery in preparation for such hearing.

The Confirmation Hearing commenced on September 8, 2003 at which time the Court was informed that the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee had been engaged in negotiations and that an opportunity for further discussions could enable the parties to resolve the issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection. (Confirmation Hearing Transcript ("Tr.") at 40 (Sept. 8).) Based upon these representations, the Court adjourned the remainder of the day's hearing to allow the parties to continue negotiations. (9/8/03 Tr. at 41.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B349**

Not Reported in B.R.                                                          Page 25

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

On September 9, 2003, the Court was informed that, following extensive arm's-length, good faith negotiations, agreements had been reached with the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee. The Debtors also announced resolutions with the Pre-merger Objectors on September 9 and 12, 2003. Pursuant to such agreements, (i) the Debtors would further amend the July 9 Plan to embody the Integrated Settlement (as defined in the Debtors' Memorandum Of Law In Support Of Confirmation Of Debtors' Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, Dated September 12, 2003 And In Response To Certain Objections Thereto, dated October 13, 2003), (ii) stipulations with the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee would be entered into by the Debtors, the Committee, and other creditor representatives, and (iii) the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee would withdraw their objections. In addition, (i) the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims Committee, and HSBC would abate their respective SEC Appeals and (ii) the Ad Hoc MCI Trade Claims Committee would abate the EDS Appeal. (Debtors' Exs. 339, 340.)

The Debtors' prompt emergence from chapter 11 is crucial to the continuing viability of the Debtors' businesses. The modifications to the July 9 Plan eliminate significant litigation surrounding confirmation and eliminate the Appeals, paving the way for the Debtors' expeditious emergence from chapter 11. The agreements embodied in the Plan are effectuated by modifications to the July 9 Plan. The Contributions to the Ad Hoc MCI Trade Claims Committee are outside the scope of the administration of the estates.

*28 The Plan is the product of extensive, arm's-length negotiations among the Debtors, the Committee and significant creditor constituencies in an effort to obtain a resolution of the issues in these cases and enable the Debtors to formulate and propose a plan of reorganization that would provide the most value to the Debtors' creditors. (9/15/03

Tr. at 214-58.) The provisions of the Plan were derived based upon analyses of the issues undertaken by the Debtors' and the Committee's professionals and analysts, and by the professionals for other parties in interest. (9/15/03 Tr. testimony of Frank Savage.) The Covered Parties have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code.

The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (Docket Nos. 9409, Declaration of Mark A. Neporent ("Neporent Decl.") ¶ 5.) The settlements, in turn, are key components of the nearly fully consensual Plan. (Docket No. 9409, Neporent Decl. ¶ 5.) The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan were vital to the successful negotiation of the terms of the Plan in that without such provisions, the Covered Parties would have been less likely to negotiate the terms of the settlements and the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.)

Each of the Covered Parties bargained for its respective inclusion in the Exculpation Provision and the Obligation to Defend Provision as part of the various compromises that form the basis of the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.) The Covered Parties relied upon the benefits proposed to be provided in the Exculpation Provision and the Obligation to Defend Provision in deciding to support the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.)

The Debtors do not believe that the Obligation to Defend provision creates material liability or adversely impacts their "fresh start." Entering into the Obligation to Defend provision is a reasonable exercise of the Debtors' business judgment.

(iv) 1129(a)(4)

All payments made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B350**

Not Reported in B.R.                                                                 Page 26

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of the Court as reasonable.

(v) 1129(a)(5)

On August 29, 2003 the Debtors disclosed that Michael D. Capellas, Dennis R. Beresford, W. Grant Gregory, Judith Haberkorn, Laurence Harris, Eric Holder, Nicholas deB. Katzenbach, David Matlin and C.B. Rogers, Jr. will comprise the initial Board of Directors of Reorganized WorldCom. The Debtors, in consultation with the Committee, will add up to three additional directors to the Board of Directors of Reorganized WorldCom prior to the Effective Date. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Board of Directors of Reorganized WorldCom. (Debtors' Ex. 303.)

*29 On September 5, 2003, the Debtors disclosed that Robert Blakely and Richard R. Roscitt will comprise the initial Board of Directors of each of the other Reorganized Debtors. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Boards of Directors of each of the other Reorganized Debtors. (Docket No. 8650.)

(vi) 1129(a)(6)

The Plan does not provide for rate changes by any of the Reorganized Debtors.

(vii) 1129(a)(7)

In a hypothetical liquidation of the WorldCom Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $6.5 billion. (9/15/03 Tr. at 202; Debtors' Ex. 333.) In that case, general unsecured creditors of the WorldCom Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 92 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In a hypothetical liquidation of the Intermedia Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $140 million. (9/15/03 Tr. at 203; Debtors Ex. 333.) In that case, general unsecured creditors of the Intermedia Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 48.5 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In light of the factors established by the Debtors as to substantive consolidation of the WorldCom Debtors and the Intermedia Debtors, the Debtors are not able to provide a separate liquidation analysis for each Debtor.

(viii) 1129(a)(8)

The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims in Classes 3A, 4, 5, 9, 10, 11, 12, and 13 of the Plan. (Debtors' Ex. 338.)

Of the $1,714,120,000 in dollar amount of Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, $1,614,120,000 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.17% in dollar amount of Bank Settlement Claims voting. Of the 16 Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, 15 Ballots were cast to accept the Plan, representing acceptance of the Plan by 93.75% in number of Bank Settlement Claims voting. (Debtors' Ex. 338.)

Of the $24,565,091.14 in dollar amount of Ballots received from holders of Convenience Claims eligible to vote in Class 4, $19,301,067.08 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 78.57% in dollar amount of Convenience Claims voting. Of the 3,413 Ballots received from holders of Convenience Claims eligible to vote in Class 4, 2,748 Ballots were cast to accept the Plan, representing acceptance of the Plan by 80.52% in number of Convenience Claims voting. (Debtors'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B351**

Not Reported in B.R.                                                          Page 27

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Ex. 338.)

**\*30** Of the $18,604,112,613.76 in dollar amount of Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, $18,422,495,649.56 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.02% in dollar amount of WorldCom Senior Debt Claims voting. Of the 9,589 Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, 9,023 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.10% in number of WorldCom Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $1,709,080,191 in dollar amount of Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, $1,681,044,191 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 98.36% in dollar amount of MCIC Senior Debt Claims voting. Of the 2,017 Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, 1,914 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.89% in number of MCIC Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $398,294,100 in dollar amount of Ballots received from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, $395,877,925 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.39% in dollar amount of MCIC Subordinated Debt Claims voting. Of the 5,065 Ballots received from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, 4,900 Ballots were cast to accept the Plan by 96.74% in number of MCIC Subordinated Debt Claims voting. (Debtors' Ex. 338.)

Of the $602,307,815 in dollar amount of Ballots received from holders of Intermedia Senior Debt Claims eligible to vote in Class 11, $599,297,815 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.50% in dollar amount of Intermedia Senior Debt Claims voting. Of the 368 Ballots received from holders of Intermedia Senior Debt Claims eligible to vote in Class 11, 366 Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.46% in number of Intermedia Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $24,438,900.82 in dollar amount of Ballots received from holders of Intermedia General Unsecured Claims eligible to vote in Class 12, $24,397,826.26 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.83% in dollar amount of Intermedia General Unsecured Claims voting. Of the 20 Ballots received from holders of Intermedia General Unsecured Claims eligible to vote in Class 12, 19 Ballots were cast to accept the Plan, representing acceptance of the Plan by 95.00% in number of Intermedia General Unsecured Claims voting. (Debtors' Ex. 338.)

Of the $164,300,000 in dollar amount of Ballots received from holders of Intermedia Subordinated Debt Claims eligible to vote in Class 13, $164,300,000 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 100% in dollar amount of Intermedia Subordinated Debt Claims voting. Of the 35 Ballots received from holders of Intermedia Subordinated Debt Claims eligible to vote in Class 13, 35 Ballots were cast to accept the Plan, representing acceptance of the Plan by 100% in number of Intermedia Subordinated Debt Claims voting. (Debtors' Ex. 338.) [FN16]

> FN16. Prior to the October 20 Ruling requiring separate classification of the former Class 6, of the $642,039,986.96 in dollar amount of Ballots received from holders of WorldCom General Unsecured Claims eligible to vote in Class 6, $544,663,538.61 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 84.83% in dollar amount of WorldCom General Unsecured Claims voting. Of the 773 Ballots received from holders of WorldCom General Unsecured Claims

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B352**

Not Reported in B.R.                                                                              Page 28

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

eligible to vote in Class 6, 620 Ballots were cast to accept the Plan, representing acceptance of the Plan by 80.21% in number of WorldCom General Unsecured Claims voting. (Debtors' Ex. 338). Pursuant to the Court's October 20 Ruling, separate classes were formed for the former members of Class 6 and the Debtors elected not to re-solicit votes. Rather, the newly constituted Classes 6, and 6A are deemed to reject the Plan and the Debtors are seeking confirmation of the Plan pursuant to section 1129(b)(1) of the Bankruptcy Code. Class 6B is deemed to accept the Plan in connection with a stipulation reached with Debtors, among others, to support the Plan.

(ix) 1129(a)(9)

*31 Except to the extent that the holder of an Allowed Claim of a kind specified in section 507(a)(1) of the Bankruptcy Code has agreed to less favorable treatment, the Plan provides that on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, the holder of such Claim will receive on account of such Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Section 4.01 of the Plan provides that on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable, each holder of an Allowed Other Priority Claim will receive on account of such

Claim Cash in the Allowed amount of such Claim.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or has agreed to a different treatment of such Claim, the Plan provides that each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable or upon such other terms agreed to by the parties or determined by the Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(x) 1129(a)(11)

The Debtors have prepared a three-year business plan and a consolidated financial forecast for the three-year period ending December 31, 2005. (Debtors' Ex. 273.) The Debtors' financial forecast reflects the anticipated financial performance of the Debtors with a properly capitalized balance sheet. (9/15/03 Tr. at 188-94.) The Debtors' financial forecast projects earnings before interest, taxes, depreciation, and amortization ranging from $2.67 billion in 2003 to $4.07 billion in 2005. The forecast further projects total net income ranging from $535 million in 2003 to $1.19 billion in 2005. (9/15/03 Tr. at 192); Debtors Ex. 332.) The Debtors' financial projections appear reasonable and achievable. (9/15/03 Tr. at 192.)

The Debtors will emerge from chapter 11 with no more than approximately $5.665 billion in debt. (Debtors' Ex. 335.) Based upon the Debtors' financial forecast, the Reorganized Debtors will be able to service this debt level. (9/15/03 Tr. at 192.)

*32 No parties in interest have questioned the Debtors' three-year business plan or consolidated financial forecast, or challenged the feasibility of the Plan. No creditor has prosecuted an objection to the Plan on the basis that the Plan is likely to be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B353**

Not Reported in B.R.                                                    Page 29

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

followed by the liquidation, or the need for further financial reorganization, of the Debtors.

(xi) 1129(b)

Acknowledgement of intercreditor contractual subordination provisions and prejudice to holders of (i) MCIC Senior Debt Claims, (ii) MCIC Subordinated Debt Claims, and (iii) MCI Pre-merger Claims resulting from the substantive consolidation of the WorldCom Debtors is a valid business justification and reasonable basis for the disparate treatment of MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, MCI Pre-merger Claims (to the extent treatment of MCI Pre-merger Claims would be deemed disparate from WorldCom General Unsecured Claims), and WorldCom General Unsecured Claims (all of which are unsecured claims against the substantively consolidated WorldCom Debtors).

The holders of Class 6 WorldCom General Unsecured Claims hold Claims against the WorldCom Debtors generally arising from transactions with WorldCom Debtors following the Merger or from transactions with WorldCom, Inc. or its subsidiaries prior to the Merger.

None of the Claims classified in Class 5 or Class 6 arises from a transaction with an MCIC entity that both predated the Merger and evidenced the reliance by the holder of such Claim on the independent creditworthiness of a pre-Merger MCIC entity.

Classes 5 and 6 are similarly situated both legally, as general unsecured Claims against the Debtors' estates, and equitably, as Claims that do not represent the holders' reliance on a pre-Merger MCIC entity.

In extending credit to the Debtors, holders of Claims in Classes 6A, 9 and 10 relied on the credit of an MCI entity prior to the Merger and, in the case of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, relied on offering memoranda and prospectuses issued by MCIC.

In formulating the Plan, the Debtors, the Committee, and various creditor constituencies negotiated a series of formal and informal settlements resulting in the structure of the proposed plan of reorganization--a structure already overwhelmingly approved by creditors voting in favor of the September 12 Plan-- which provides for distribution premiums for pre-Merger MCI creditors in respect of the asserted prejudice relating to the substantive consolidation of the WorldCom Debtors.

The Plan is premised upon the substantive consolidation of the Debtors' estates and a series of settlements, including the MCIC Senior Debt Claims settlement and the Integrated Settlement, that address the asserted prejudices to pre-merger creditors of MCIC entities that would result therefrom.

As the record in these Chapter 11 Cases shows, the Debtors would be mired in litigation for an indefinite period of time if substantive consolidation were contested and, undoubtedly, appealed. Resolution of these disputes by virtue of the differing treatment of differently situated classes of unsecured creditors, as provided in the Plan, avoids potentially massive and protracted litigation over the following issues: the precise allocation of assets and liabilities among entities; the enforceability or validity of different types of intercompany claims; the amount of intercompany claims; which Debtor is liable on each of the thousands of claims for which proofs of claim were filed against multiple Debtors; and whether there were fraudulent or otherwise voidable transfers made.

*33 Resolution of such disputes also eliminates the need for a complex solvency analyses of multiple Debtors, which cannot produce reliable separate financial statements.

The delay caused by such protracted litigation of multiple issues would undoubtedly require the Debtors to remain in chapter 11 for an indeterminable amount of time, causing irreparable harm and threatening the very reorganization of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B354**

Not Reported in B.R.                                                                Page 30

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Debtors that chapter 11 is designed to promote.

The degree of discrimination regarding Class 6 is in direct proportion to its rationale.

The Debtors' evidence has demonstrated the reasonableness and good faith of the 80.0% recovery by Class 9 MCIC Senior Debt Claims represented by the MCIC Senior Debt Claims settlement. (9/15/03 Tr. at 217, 221, 223-26.) The treatments afforded Class 6A MCI Pre-merger Claims and Class 10 MCIC Subordinated Debt Claims are based upon the relative and similar reliance and prejudice arguments of the holders of such Claims.

The Debtors' determination to provide additional recovery to the holders of Class 6A Claims compared to Class 6 Claims is consistent with the distributions afforded holders of Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and the rationale therefore.

Holders of Class 6A MCI Pre-merger Claims hold General Unsecured Claims arising from pre-Merger transactions or series of transactions in which they relied on the separate creditworthiness of a pre-Merger MCIC entity.

The enhanced recovery provided to the holders of Class 6A MCI Pre-merger Claims is a component of the Integrated Settlement among the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders, and the Ad Hoc MCI Trade Claims Committee.

Prior to the formulation of the Integrated Settlement, various parties asserted that providing pre-Merger trade creditors and post-Merger trade creditors with the same distribution ignored the reliance and prejudice arguments of the holders of MCI Pre-merger Claims and was inconsistent with the principles underlying the settlement with the holders of MCIC Senior Debt Claims. (Docket No. 8038 Platinum Partners Value Arbitrage Fund L.P.'s Objection to Confirmation of the Debtors' Amended Joint Plan of Reorganization and Joinder in the Ad

Hoc MCI Trade Claims Committee's Objection to Debtors' Joint Plan of Reorganization; Docket No. 7709 Objection of Deutsche Bank Securities Inc. to Confirmation of the Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code). The enhanced treatment afforded holders of Class 6A MCI Pre-merger Claims resulted from the Debtors' good-faith negotiations with these holders, the recognition of the merits of their arguments, and consideration of the relativity of their recoveries to the recoveries by the holders of Class 9 and Class 10 Claims.

Recognizing the reasonableness of the distribution of 80% to the holders of MCIC Senior Debt Claims, the parties who negotiated the Integrated Settlement agreed that the respective recoveries of 60% and approximately 47% by Classes 6A and 10, respectively, reflected the relative legal rights of such holders compared to Class 9 MCIC Senior Debt Claims as well as the other Classes of unsecured claims.

**\*34** By virtue of the different contractual rights and reliance and prejudice arguments of the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, discrimination among pre-Merger creditors is warranted.

The degree of discrimination regarding Class 6A is in direct proportion to its rationale.

All classes of preferred Equity Interests in the Intermedia Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the WorldCom Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the Intermedia Debtors are receiving the same treatment under the Plan.

No holder of a Claim or Equity Interest that is junior to MCIC Subordinated Debt Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B355**

Not Reported in B.R.

Page 31

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Under the Plan, the only Claims against, and Equity Interests in, the Debtors that are junior to the Claims in Classes 6 and 6A are the Claims in Class 7 (WorldCom Subordinated Claims) and the Equity Interests in Class 8 (WorldCom Equity Interests).

No holder of a Claim or Equity Interest that is junior to WorldCom General Unsecured Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

No holder of a Claim or Equity Interest that is junior to MCI Pre-merger Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest

No holder of a Claim or Equity Interest that is junior to WorldCom Subordinated Claims will receive or retain any property on account of such junior Claim or Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Preferred Stock will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to WorldCom Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

**II. CONCLUSIONS OF LAW**
**A. SUBSTANTIVE CONSOLIDATION**

Bankruptcy courts have the general equitable power to order substantive consolidation. *See, e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir.1992) (authority for substantive consolidation comes from the bankruptcy court's general equitable powers under § 105 of the Bankruptcy Code); *In re Continental Vending Mach. Corp.,* 517 F.2d 997, 1000 (2d Cir.1975) (noting power to consolidate comes from equity); *In*

*re Leslie Fay Cos.,* 207 B.R. 764, 779 (Bankr.S.D.N.Y.1997) ("Substantive consolidation derives from the bankruptcy court's general equitable powers provided in section 105(a) of the Bankruptcy Code."); *Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.),* 179 B.R. 773, 777 (Bankr.S.D.N.Y.1995) (same); *In re Richton Int'l Corp.,* 12 B.R. 555, 557 (Bankr.S.D.N.Y.1981) (same), 2 COLLIER ON BANKRUPTCY ¶ 105.09[1][6], at 105-85 (L. King 15th rev. ed.2002) ("the authority of a bankruptcy court to order substantive consolidation derives from its general discretionary equitable powers").

\*35 The Bankruptcy Code itself contemplates that substantive consolidation may be used to effectuate a plan of reorganization. Section 1123(a) provides, in relevant part:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall -

....

(5) provide adequate means for the plan's implementation, such as -

....

(C) merger or consolidation of the debtor with one or more persons....

11 U.S.C. § 1123(a)(5)(C); *In re Stone & Webster, Inc.,* 286 B.R. 532, 540-41 (Bankr.D.Del.2002) (noting that substantive consolidation is contemplated by section 1123(a)(5) of the Bankruptcy Code); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Substantive consolidation has the effect of consolidating the assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single legal entity. *Colonial Realty Co.,* 966 F.2d at 58; *Leslie Fay,* 207 B.R. at 779. In the course of satisfying the liabilities of the consolidated debtors from the common pool of assets, intercompany claims are eliminated and guaranties from co-debtors are disregarded. *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 518 (2d Cir.1988); *Deltacorp,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B356

Not Reported in B.R.                                                        Page 32

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

179 B.R. at 777 (multiple claims against consolidated debtors eliminated; creditor receives only one recovery).

As an equitable remedy, substantive consolidation is to be used to afford creditors equitable treatment and thus may be ordered when the benefits to creditors therefrom exceed the harm suffered. *Augie/Restivo,* 860 F.2d at 518-19; *see also Stone v. Eacho (In re Tip Top Tailors, Inc.),* 127 F.2d 284, 288 (4th Cir.1942).

Traditionally, bankruptcy courts have considered the following factors in determining whether to approve substantive consolidation:
•  The presence or absence of consolidated financial statements;
•  The unity of interest and ownership among various corporate entities;
•  The degree of difficulty in segregating and ascertaining individual assets and liabilities;
•  The transfers of assets without formal observance of corporate formalities;
•  The commingling of assets and business functions;
•  The profitability of consolidation at a single physical location;
•  The disregard of legal formalities.
*See, e.g., Augie/Restivo,* 860 F.2d at 518; *Soveriero v. Franklin Nat'l Bank,* 328 F.2d 446, 447-48 (2d Cir.1964); *In re Food Fair, Inc.,* 10 B.R. 123, 126 (Bankr.S.D.N.Y.1981). As shown by each decision granting substantive consolidation, a decision to substantively consolidate affiliated debtors need not be supported by the presence of all such factors.

In *Augie/Restivo,* the Second Circuit synthesized the foregoing factors into two, and ruled that the existence of even one such factor may justify substantive consolidation. Specifically, the Second Circuit held that substantive consolidation is required if it is demonstrated
**\*36** (i) that the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved;
*or*

(ii) that creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of a debtor in extending credit.
*Augie/Restivo,* 860 F.2d at 518; *see also In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo* ] suggests that the two cited factors are alternatively sufficient criteria.").

When deciding whether to order substantive consolidation, the courts in this circuit also use a balancing test to determine whether the relief achieves the best results for all creditors. *Colonial Realty,* 966 F.2d at 60 ("The propriety of [substantive consolidation] must, then, be determined solely in light of the principles and rules of equity"); *see also In re Affiliated Foods, Inc.,* 249 B.R. 770, 780 (Bankr.W.D.Mo.2000) (ordering substantive consolidation because "in the final analysis the benefits of consolidation substantially outweigh the harm to creditors"); *White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.),* 195 B.R. 680, 690 (Bankr.S.D.Ohio 1996) ("the ultimate inquiry [for a court deciding substantive consolidation] involves a balancing of the equities based on the bankruptcy court's inherent powers pursuant to § 105").

Courts have "a good deal of discretion" in determining whether substantive consolidation is appropriate. *Deltacorp,* 179 B.R. at 777. Using that discretion, numerous courts in the Second Circuit have ordered substantive consolidation in circumstances similar to those of the MCI/WorldCom Debtors and the Intermedia Debtors, including *In re I.R.C.C., Inc.,* 105 B.R. 237 (Bankr.S.D.N.Y.1989); *In re Richton Int'l Corp.,* 12 B.R. 555 (Bankr.S.D.N.Y.1981); *In re Food Fair, Inc.,* 10 B.R. 123, 127-28 (Bankr.S.D.N.Y.1981), and *In re D.H. Overmyer Co., Inc.,* 1976 WL 168421 (S.D.N.Y.1976). Additionally, the case of *In re Affiliated Foods, Inc.,* 249 B.R. 770 (Bankr.W.D.Mo.2000), provides a model for substantively consolidating debtors in a fact pattern similar to this case.

To prevail on substantive consolidation, the Debtors are not required to prove that an allocation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                     Page 33

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

of assets and liabilities to the various legal entities cannot be achieved under any circumstances. Rather, it is sufficient to demonstrate that it would be so costly and difficult to untangle the Debtors' financial affairs, such that doing so is a "practical impossibility," making substantive consolidation appropriate. *Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.),* 369 F.2d 845, 848 (2d Cir.1966) (ordering substantive consolidation because of "expense and difficulty amounting to *practical impossibility* of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets") (emphasis added); *see also In re Bonham,* 229 F.3d 750, 766-67 (9th Cir.2000) (adopting *Augie/Restivo* test and stating that entanglement factor is satisfied if disentangling the debtors' affairs would be "needlessly expensive and possibly futile"); *In re Affiliated Foods, Inc.,* 249 B.R. at 780 (ordering substantive consolidation when separating the debtors' accounts "would be 'a real nightmare" ' and achieving a separate allocation "probably would not be possible"). Alternatively, the Debtors must show that it is not possible to create *accurate* financial data for each legal entity. *Augie/Restivo,* 860 F.2d at 519.

**\*37** The Court concludes that the substantive consolidation proposed in the Plan is necessary and appropriate and satisfies both prongs of the *Augie/Restivo* test.

The facts amply demonstrate that the Debtors' operational and financial affairs are so entangled that the accurate identification and allocation of assets and liabilities either could never be accomplished, or, even if it could be accomplished, would take so long and be so costly such that creditors as a whole would be substantially harmed by the effort. Thus, disentangling the financial affairs of the Debtors is a practical impossibility. The factors that led to this conclusion are set forth in in the Court's Findings of Fact, above, but include:

• common management and control of the Debtors;
• the substantial operational integration and entanglement of the Debtors' business operations,

including the creation of a unified telecommunications network that serves substantially all of the Debtor entities, the existence of centralized administrative functions, such as cash management, purchasing, human resources, and finance, and presentation of products and services to the marketplace on an integrated basis;
• public financial reporting on a consolidated basis;
• financial entanglement resulting from internal financial management being conducted on a business line and functional basis, rather than legal entity basis;
• inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls;
• the Debtors' present inability to create accurate and reliable historical financial statements on a separate legal entity basis; and
• acute lack of institutional knowledge and documentation making reconstruction of historical financial information on a separate legal entity basis exceedingly difficult and perhaps impossible.

The cost of disentangling the estates, if it ever could be accomplished, is not simply the out-of-pocket expenses to pay the accountants, lawyers, and other professionals, who would have to reconstruct years of financial data and litigate significant intercreditor disputes regarding the validity of intercompany claims. It also includes the enormous employee resources that would have to be devoted to the effort, detracting from business operations, as well the incalculable diminution of enterprise value that likely would result from a protracted chapter 11 case.

The Court further concludes that a substantial portion of creditors dealt with the Debtors as a single economic unit and did not rely on the separate identity of any particular Debtor entity in extending credit. Accordingly, both prongs of the *Augie/Restivo* test have been satisfied in these cases, with respect to both the WorldCom Debtors and the Intermedia Debtors.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B358

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Page 34

In the final analysis here, the benefits of substantive consolidation far outweigh any possible harm to creditors. Accordingly, use of substantive consolidation as an equitable remedy is appropriate in this case.

B. THE SETTLEMENTS

*38 The Plan's provision for each of the Settlements is authorized by 11 U.S.C. § 1123(b)(3) and is appropriate. Due notice of the Settlements and the hearing to be held thereon has been given and all parties in interest have had an opportunity to appear and be heard with respect thereto.

This Court is required to make an independent determination of the fairness to the Debtors and their estates of each of the Settlements embodied in the Plan. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re W.T. Grant Co.*, 699 F.2d 599, 605-06 (2d Cir.1983).

In approving each of the Settlements, this Court has considered, among other things:
• the balance of the likelihood of success of claims asserted by the claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors;
• the balance of the likelihood of success of claims asserted by the Debtors against the likelihood of success of the defenses or counterclaims possessed by the claimants;
• the complexity, cost, and delay of litigation that would result in the absence of settlements;
• whether any creditor of the Debtors or other party in interest has objected to the settlement and the acceptance of the Plan by a substantial majority of the holders of claims; and
• the fact that the Plan, which gives effect to the settlements, is the product of extensive arm's-length and good faith negotiations between and among the Debtors and the claimants.
*See, e.g., W.T. Grant Co.*, 699 F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr.S.D.N.Y.1991); *In re Texaco Inc.*, 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988).

Approval of a settlement does not require a "mini-trial" on the merits. *See also In re Purofied Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y.1993) ( "the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"). In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness." ' *W.T. Grant Co.*, 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972)).

In assessing the fairness of a compromise or settlement embodied in a plan of reorganization, the court does not have to be convinced that the compromise or settlement is the best possible agreement or that the parties have maximized their recovery. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y.1994). Further, the Court is not required to assess the minutia of each and every claim being compromised. *Id.*

(i) The Intermedia Settlement

Intermedia is a Debtor and an affiliate and insider of WorldCom, Inc. *See* 11 U.S.C. § 101(2)(B), 101(31)(E).

Because under the Plan, the estates of the Intermedia Debtors are not substantively consolidated with the estates of the WorldCom Debtors, assets of the Intermedia Debtors' estates are not available for distribution to satisfy allowed claims against WorldCom Debtors.

*39 Pursuant to the Bar Date Order, unless otherwise ordered by the Court, Intermedia is not required to file a proof of claim in the Debtors' cases. Bar Date Order, at 3-4 ("ORDERED that the following persons or entities are *not* required to file a proof of claim on or before the Bar Date: ... any Debtor having a claim against another Debtor ..."); *id.* at 8 ("ORDERED that entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing the date by which holders of claims *not* subject to the Bar Date

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B359**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Page 35

established herein must file such claims against one or more of the Debtors or be forever barred from ... receiving any payment or distribution of property from the Debtors, the Debtors' estates, or their successors or assigns with respect to such claims...."). Accordingly, Intermedia's claim for amounts under the Intermedia Intercompany Notes is unaffected by the Bar Date Order. [FN17]

> FN17. While the language of the Bar Date Order could be read, as set forth in the Licht Objection, as merely affecting the timing of the filing of a claim by Intermedia, it is clear from the entire document that the intent of the Bar Date Order was that Intermedia would not be subject to the requirement to file a proof of claim, while preserving the Debtors' ability to seek a further order requiring the filing of such claim if subsequently determined to be necessary. According to the Debtors, as the claim related to the Intercompany Note was settled, the Debtors did not consider the filing of a proof of claim necessary and did not seek to have a date certain set for the filing of such claim. Under the circumstances, the filing of a proof of claim would serve no meaningful purpose.

As of the date hereof, the claim held by Intermedia against WorldCom, Inc. for amounts under the Intermedia Intercompany Note have not been either disallowed or allowed in these cases. Accordingly, the claim in respect of the Intermedia Intercompany Note may be compromised and settled pursuant to Bankruptcy Rule 9019.

Moreover, as the Debtors noticed the Intermedia Settlement, pursuant to 11 U.S.C. § 1123(b)(3)(A) and Bankruptcy Rule 9019, for consideration by the Court in the context of the confirmation of the Plan and as the Intermedia Settlement was subject to objection in that context, the absence of a filed proof of claim relating to the claim based on the Intercompany Note did not impair the ability of any party in interest to object to the proposed treatment of the Intercompany Note or the ability of the Court

to review such treatment. Indeed, Dr. Licht, who filed an objection to the procedural posture of the proceeding as well as the substantive basis for the Intermedia Settlement, participated in the Confirmation Hearing and voiced his concerns related to the treatment of the Intercompany Note under the Intermedia Settlement and the Plan.

Inasmuch as an opportunity was afforded to parties in interest to object to the proposed treatment of the Intercompany Note and for the Court to review such treatment in the context of the proposed Intermedia Settlement under the Plan, Intermedia was not required to file a proof of claim before it could receive a distribution or before the dispute concerning the Intermedia Note could be settled. Upon confirmation of the Plan, which includes the Intermedia Settlement, all proceedings with respect to Intermedia's claim will be completed, thereby obviating the need to require Intermedia to submit a proof of claim by any future date.

Section 544(b) of the Bankruptcy Code, authorizes a debtor in possession to avoid any transfer of an interest of the debtor that is "voidable under applicable law." 11 U.S.C. § 544(b)(1); see, e.g., Traina v. Whitney Nat'l Bank, 109 F.3d 244, 246 (5th Cir.1997) ("Applicable law" means state law).

*40 In considering the Debtors' potential fraudulent transfer claims with respect to the Intermedia Intercompany Note, a conflict of law analysis must first be undertaken to determine which state's substantive law is applicable under section 544. In determining the choice of law issue, the federal common law choice-of-law rules would likely apply. See, e.g., In re Best Products, 168 B.R. 35, 51 (Bankr.S.D.N.Y.1994), aff'd, 68 F.3d 26 (2d Cir.1995). The federal common law approach is to employ the law of the jurisdiction with the most significant relationship to the transaction and to the parties. Id. (choice of law test for torts under § 145 of the Restatement (Second) of Conflicts of Laws (the "Restatement") is applicable to fraudulent conveyances). Under section 145 of the Restatement, contacts to be taken into account include the place where the injury occurred, the place where the conduct causing the injury

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B360**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Page 36

occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered. Restatement, § 145. Thus, under this analysis, "applicable law" could be the law of the state in which the debtor is incorporated, the transferee's principal place of business is located, the merger was negotiated and consummated, the state where the creditors are located, or the state whose law would provide the most benefit to the creditors as a group. *See Best Products,* 168 B.R. at 52 (stating that the law where the majority of the creditors were located and where the transaction was negotiated and consummated would probably apply).

Although Intermedia creditors may have argued otherwise, [FN18] New York Debtor and Creditor Law ("DCL"), §§ 273, 274, may be the law applicable in such an action. Under that statute, a transfer or obligation can be avoided if the debtor did not receive fair consideration therefor and (i) the debtor was rendered insolvent by the transfer, (ii) the transfer left the debtor with unreasonably small capital, or (iii) the debtor believed when it made the transfer and incurred its obligations that it would incur debts beyond its ability to pay as they mature. An avoidance action must be commenced within six years of the date of the transfer. DCL §§ 273, 274.

FN18. Georgia law, for example, would require proof of actual intent to defraud.

The burden of proof of all elements of a fraudulent transfer action under section 544(b) of the Bankruptcy Code, would be on WorldCom, Inc., as the party seeking to avoid the transfer. *See, e.g., Lippe v. Bairnco Corp.,* 249 F.Supp.2d 357, 376 n. 6 (S.D.N.Y.2003); *America Investment Bank v. Marine Midland Bank,* 191 A.D.2d 690, 595 N.Y.S.2d 537 (N.Y.App.Div.1993). In that regard, WorldCom, Inc. would need to establish each element of the fraudulent transfer action by a preponderance of the evidence. *See, e.g., Lippe,* 249 F.Supp.2d at 376 n. 6.

Section 271 of the DCL provides that an entity is

insolvent when "the present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured." There are various tests used to determine insolvency under the DCL, none of which is generally accepted as the correct test. *In re Best Products,* 168 B.R. at 52. These tests include the balance sheet approach and the going concern approach. *Id.* In deciding whether the debtor was insolvent at the time of the alleged fraudulent transfer, New York courts value the debtor's assets at the time of the challenged transfer, not at some later time. *See In re Le Café Crème, Ltd.,* 244 B.R. 221 (Bankr.S.D.N.Y.2000).

*\*41* Whether a company is insolvent for fraudulent transfer purposes requires a "fair valuation" of its assets and liabilities. The determination of fair valuation is an inexact science, and there is no precise formula to determine solvency. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 577 (1st Cir.1980); *Briden,* 776 at 382. A determination of insolvency should be based on appraisals and expert testimony, but appraisals are neither the exclusive nor dispositive means to make the determination. *See Lawson v. Ford Motor Company (In re Roblin Industries, Inc.),* 78 F.3d 30, 34 (2d Cir.1996).

Thus, to make a prima facie showing of a fraudulent transfer under section 544 of the Bankruptcy Code, the Debtors would be required to prove that WorldCom, Inc. was insolvent on the date of the transfer of the Intermedia Intercompany Note.

Fair consideration has two prongs--the adequacy of the consideration and good faith. DCL § 272; *see also Ede v. Ede,* 193 A.D.2d 940, 598 N.Y.S.2d 90 (N.Y.App.Div.1993) (holding that fair consideration for fraudulent transfer purposes under New York law requires that the exchange be for equivalent value and be made in good faith).

The existence of reasonably equivalent value for a transfer or obligation is a question of fact. *See Branch v. Federal Deposit Insurance Corp.,* 825

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B361

Not Reported in B.R.                                                        Page 37

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

F.Supp. 384, 399 (D.Mass.1993); *In re Lawrence Paperboard, Co.,* 76 B.R. 866, 873 (Bankr.D.Mass.1987). "Reasonable equivalence" requires a comparison of the value of what went out with the value of what was received. *Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.),* 121 B.R. 983, 994 (Bankr.N.D.Ill.1990); *see also In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990) (the focus is placed on adequacy of consideration received by a debtor under the measurement test in which all aspects of the transaction are examined to calculate economic value of all the benefits and burdens to the debtor, direct or indirect; collapsing the transaction in question to look at the net effect of the overall transfer).

Courts generally find reasonably equivalent value for a transfer from a parent to its wholly owned subsidiary, because the parent, as the sole stockholder of the subsidiary corporation, receives a benefit in the form of increased stock value resulting from the increased financial strength of the parent. *See Branch v. Federal Deposit Insurance Corporation,* 825 F.Supp. 384, 399-400 (D.Mass.1993).

Courts have found a parent's transfer of assets to a subsidiary to be for less than reasonably equivalent value when the subsidiary was insolvent at the time of transfer. *See In re Duque Rodriguez,* 77 B.R. 939, 941-42 (Bankr.S.D.Fla.1987); *In re First City Bancorporation of Texas, Inc.* 1995 WL 710912 *18 (Bankr.N.D.Tex.1995).

*42 However, courts will also collapse multiple transactions into one to view the overall consideration received. *In re Suburban Motor Freight, Inc.,* 124 B.R. 984 (Bankr.S.D.Ohio 1990) ( citing *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988)); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir.1994)

In order to avoid the Intermedia Intercompany Note as a fraudulent transfer pursuant to section

544(b) of the Bankruptcy Code and the DCL, the Debtors would have to show, among other things, that it did not receive fair consideration in return for the Intermedia Intercompany Note. This, in turn, would require a valuation of the assets received by WorldCom in exchange therefor.

To qualify as a voidable preference, a transfer must (1) benefit a creditor, (2) be on account of an antecedent debt, (3) be made while the debtor was insolvent, (4) be made within ninety days preceding the filing of the bankruptcy petition, and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. 11 U.S.C. § 547(b); *see also Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 529-30, 116 L.Ed.2d 514 (1991) . Where the transfer was to an insider of the debtor, the ninety-day period is extended to one year preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(5)(C). The debtor in possession has the burden of proving the avoidability of a transfer under section 547(b) by a preponderance of the evidence. *Id.* § 547(g); *Lawson v. Ford Motor Company (In re Roblin Industries, Inc.),* 78 F.3d at 34.

Whether the principal prepayments and interest payments made during the one-year period prior to the chapter 11 filing on account of the Intermedia Intercompany Note satisfy the requirements for a preferential transfer set forth in section 547 of the Bankruptcy Code would require determinations of WorldCom, Inc.'s solvency at each point in time that a payment was made.

There are multiple statutory defenses that also could be raised in defense of potentially preferential transfers under section 547(c) of the Bankruptcy Code. Moreover, even if the Debtors were to prevail on their preference theory, complex issues attendant to the repayment of amounts by Intermedia to WorldCom, Inc. under section 502(d) of the Bankruptcy Code would require resolution.

Wells Fargo filed an objection to the modification of the Second Amended Plan of Reorganization as it relates to the increase of $29,000,000 over the $1,000,000,000 to be paid by the WorldCom estates

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B362

Not Reported in B.R.                                                                 Page 38

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

to the Intermedia Debtors under the proposed settlement as set forth in the Plan. The $29,000,000 increase was agreed to as a resolution of the objection filed by certain preferred shareholders of Intermedia to the Intermedia Settlement. WellsFargo's objection is limited to the modification. Wells Fargo argues among other things, [FN19] that the WorldCom creditors should not be burdened with the obligation to pay equity of Intermedia Debtors As the Court found at the hearing on the Intermedia Settlement when it was advised of the $29,000,000 increase, such amount was not significant in the context of a $1,000,000,000 amount to be paid by the World Com Debtors to Intermedia and therefore not a materially adverse change. As subsequently detailed, the Intermedia Settlement, including the $29,000,000 modification satisfies the standards for a Bankruptcy Rule 9019 settlement.

> FN19. As previously noted, pursuant to stipulation, the balance of Wells Fargo's objections will be addressed when the Debtors' objection to Wells Fargo's claims are considered in the context of the claims resolution process.

*43 Further, the issue of a payment to equity of Intermedia is an issue for the Intermedia creditors, not the WorldCom Debtors' creditors. The $29,000,000 was agreed to by the AdHoc Committee of Intermedia Noteholders and such increase was noticed to all creditors. Pursuant to the Notice of Modifications to Debtors' Second Amended Plan of Reorganization, dated September 19, 2003, Intermedia creditors in Classes 11, 12 and 13 were informed of the 5% recovery that holders of Intermedia Preferred Stock would receive. Thus, prior to the October 8, 2003 deadline to determine whether to amend their vote, such classes were given sufficient notice of the modification providing for recovery to Class 14. Following, the October 8, 2003 deadline, the tabulation of the Intermedia creditor classes continued to show overwhelming support for confirmation. Thus, taking into consideration the notice provided Classes 11, 12 and 13 prior to the October 8, 2003 voting deadline to amend their vote, and the fact that even with the

disclosure, the tabulation of votes reflecting the votes cast prior to the October 8, 2003 deadline continued to show overwhelming support to confirm the Plan, and in light of the de minimis amount of money at issue in comparison to the $1,000,000.00 available for distribution to those classes under the Intermedia Settlement, the Court deems Classes 11, 12 and 13 as having accepted the treatment of the Intermedia Preferred Shareholders and supported confirmation of the Plan, which included the modifications. There is no challenge to the validity of the vote. Thus, with respect to the Intermedia creditors, the absolute priority rule does not apply. Wells Fargo's objection is overruled.

The Intermedia Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Intermedia Settlement falls within the range of reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is fair and equitable and in the best interests of the Debtors, their estates, and their creditors and equity interest holders. The Intermedia Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Intermedia Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. See In re Baldwin United Corp., 43 B.R. 888 (Bankr.S.D.Ohio 1984).

The Intermedia Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. In re Teltronics Servs., Inc., 762 F.2d 185, 188-89 (2d Cir.1985); In re W.T. Grant Co., 699 F.2d at 608; In re Int'l Distrib. Ctrs., Inc., 103 B.R. at 423.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B363**

Not Reported in B.R.                                                    Page 39

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Furthermore, the Intermedia Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

*44 Accordingly, the Licht Objection and Wells Fargo's objection are overruled.

(ii) The Bank Settlement

The elements of a claim for constructive trust are (i) a confidential or fiduciary relationship, (ii) a promise, express or implied, (iii) a transfer in reliance on the promise, and (iv) unjust enrichment. *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 353 (2d Cir.1992). However, courts use these elements merely as guideposts, not as rigid requirements. Because the doctrine of constructive trust is equitable in nature, courts focus on the fairness of the transaction. *See Simonds v. Simonds,* 45 N.Y.2d 233, 243, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978).

Litigation of the Constructive Trust Action would require a determination of complex factual and legal issues, including the Banks' ability to demonstrate each of the elements of their claim, their ability to trace the property to which such constructive trust could attach, *see United States v. Benitez,* 779 F.2d 135, 140 (2d Cir.1985), the amount that would be subject to the trust, where funds have been commingled, *see In re Drexel Burnham Lambert Group, Inc.,* 142 B.R. 633 (S.D.N.Y.1992), and the Debtors' ability to invoke their avoiding powers under section 544(a) of the Bankruptcy Code to avoid any constructive trust that would be imposed in the event the Banks were to prevail on their theory.

In the event that the Banks succeeded in the Maryland Action, Ms. Mayer would have a claim for indemnification against the Debtors. The allowance of that claim could be the subject of further litigation.

The Bank Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Bank Settlement falls within the range of reasonableness and provides for the resolution of complex litigation that would likely implicate multiple appeals. The Bank Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Bank Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.,* 43 B.R. 888 (Bankr.S.D.Ohio 1984).

The Bank Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.,* 762 F.2d 185, 188-89 (2d Cir.1985); *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.,* 103 B.R. at 423. Furthermore, the Bank Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

(iii) The MCIC Settlement

*45 Courts have the general equitable power to order substantive consolidation. *See, e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.;* 966 F.2d at 59 (authority for substantive consolidation comes from the bankruptcy court's general equitable powers under section 105 of the Bankruptcy Code); *In re Continental Vending Mach. Corp.,* 517 F.2d 997, 1000 (2d Cir.1975).

Substantive consolidation is appropriate if the debtors demonstrate: (i) that the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved *or* (ii) that creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B364**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

debtor in extending credit. *Augie/Restivo,* 860 F.2d at 518; *see In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996).

Litigation of the issues resolved by the MCIC Settlement would be highly fact-intensive, complex and protracted, involving expert analyses and detailed testimony regarding the extent of the WorldCom Debtors' accounting and operational entanglement, including complex issues attendant to millions of intercompany claims aggregating more than a trillion dollars, (Disclosure Statement at 41), as well as evidence of the extent to which each holder of an MCIC Senior Debt Claim that opposes substantive consolidation relied upon the separate legal identity of MCIC when it extended credit, *see, e.g., In re Bonham,* 229 F.3d 750, 767 (9th Cir.2000) (under *Augie/Restivo,* the burden is on the creditors opposed to substantive consolidation to overcome presumption that they did not rely on separate credit of debtors). While the Debtors believe that even if particular creditors are able to demonstrate that they did rely on the separate credit of a particular debtor, substantive consolidation is warranted if the debtors satisfy the entanglement factor, *id.; In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo* ] suggests that the two cited factors are alternatively sufficient criteria"), the Ad Hoc Committee of MCIC Senior Noteholders could argue that, based upon the strength of their reliance defense, denial of substantive consolidation would yield the most equitable result for creditors.

The MCIC Settlement represents a resolution of issues with an entire class of creditors, and therefore, with the support of the Ad Hoc Committee of MCIC Senior Noteholders eliminated the risk that the Debtors would have to cramdown a plan of reorganization over the dissent of that class. *See* 11 U.S.C. § 1129(b)(1).

The MCIC Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The MCIC Settlement falls within the range of

reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is in the best interests of the Debtors, their estates and creditors. The MCIC Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The MCIC Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.,* 43 B.R. 888 (Bankr.S.D.Ohio 1984) (approving a compromise and finding that the value of a settlement was significantly enhanced and the debtors received additional value by eliminating the possibility of costly litigation).

\*46 The MCIC Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.,* 762 F.2d 185, 188-89 (2d Cir.1985); *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.,* 103 B.R. at 423. Furthermore, the MCIC Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

## C. SECTION 1129 OF THE BANKRUPTCY CODE

A debtor, as the proponent of the Plan, bears the burden of proof under section 1129 of the Bankruptcy Code. A debtor must meet this burden by a preponderance of the evidence. *See Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises., Ltd. II (In re Briscoe Enterprises., Ltd. II),* 994 F.2d 1160, 1165 (5th Cir.1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

appropriate standard of proof under both § 1129(a) and in a cramdown").

The Debtors have demonstrated, by a preponderance of the evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

(i) 1129(a)(1)

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must "compl [y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R.Rep. No. 95-595, at 412 (1977); S.Rep. No. 95-989, at 126 (1978); *In re Johns-Manville Corp.,* 68 B.R. 618, 629 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir.1988); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). As demonstrated below the Plan complies fully with the requirements of sections 1122 and 1123, as well as other applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1127(a), (c).

>Section 1122

Pursuant to section 1122(a), a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to other claims or interests in that class. *See* 11 U.S.C. § 1122(a). The Plan adequately and properly classifies all Claims and Equity Interests. A reasonable basis exists for the classification of Claims and Equity Interests in the Plan. Claims and Equity Interests within each particular Class are substantially similar and the classification of Claims and Equity Interests in the Plan is reasonable and necessary to implement the Plan.

*47 Consistent with the October 20 Ruling and the requirements of section 1122, the Plan provides for the separate classification of WorldCom General

Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. Each of the Claims in each particular Class is substantially similar to the other Claims in such Class. Such classification is proper.

Even if the Court were to determine that WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims are "substantially similar" to each other, section 1122(a) would not require that all such substantially similar claims be classified together. Rather, section 1122(a) requires that, if claims are classified together, then they must be substantially similar. *See In re One Times Square Associates Ltd. Partnership,* 159 B.R. 695, 703 (Bankr.S.D.N.Y.1993); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992) A debtor need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification. *See Times Square Associates,* 159 B.R. at 703.

Based upon the existence of the subordination provisions of the MCIC Subordinated Notes Indenture and the unique prejudice and reliance arguments of holders of pre-Merger Claims, the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims are dissimilar in their legal nature and their equitable rights. The separate classification of the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims under the Plan is appropriate.

Section 1122(b) of the Bankruptcy Code provides: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). Consistent with section 1122(b), for administrative convenience, general unsecured claims against the Debtors in an amount of $40,000 or less have been classified together in Class 4.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B366**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

Accordingly, the classification of claims and equity interests in the Plan complies with section 1122 of the Bankruptcy Code.

>Section 1123(a)

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). The Plan fully complies with each such requirement.

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims and Article III of the Plan designates Classes of claims and Classes of equity interests as required by section 1123(a)(1). Articles III and IV of the Plan specify whether each Class of claims and equity interests is impaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.

*48 The Plan also complies with the requirements of section 1123(a)(4) and the October 20 Ruling. Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest." Each Claim in Classes 6, 6A and 6B will receive the same treatment as other Claims in each of these Classes, unless such holder agreed to less favorable treatment. [FN20] As the holders of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims have been separately classified in Classes 6, 6A, and 6B, respectively, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code and addresses the Court's October 20 Ruling.

FN20. Pursuant to section 4.08(b) of the Plan, if a holder of an MCI Pre-merger Claim is a member of the Ad Hoc MCI Trade Claims Committee, then such holder's recovery will be reduced by the amount received by such holder on account of such Claim pursuant to the contributions from the holders of MCIC

Senior Debt Claims and MCIC Subordinated Debt Claims set forth in Sections 4.12 and 4.13 of the Plan. The members of the Ad Hoc MCI Trade Claims Committee have consented to such treatment.

Articles V, VI, VIII, and IX and various other provisions of the Plan set forth the means for implementation of the Plan as required by section 1123(a)(5). For example, the substantive consolidation provisions set forth in Sections 5.01 and 5.02 of the Plan are authorized by section 1123(a)(5). *See In re Stone & Webster, Inc.,* 286 B.R. 532, 540-41 (Bankr.D.Del.2002).

Section 9.03 of the Plan provides for the prohibition of the issuance of nonvoting equity securities in the Certificates of Incorporation and the By-laws of Reorganized WorldCom and each of the other Reorganized Debtors to ensure compliance with section 1123(a)(6).

Finally, Article IX of the Plan contains provisions with respect to the manner of selection of officers and directors of Reorganized WorldCom and each of the other Reorganized Debtors that are consistent with the interests of creditors, equity security holders, and public policy in accordance with section 1123(a)(7).

>Section 1123(b)

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan. The Plan is consistent with section 1123(b). Specifically, pursuant to Article IV of the Plan, Classes 1 and 3 are rendered unimpaired and Class 2 and Classes 3A through 15 are impaired, as contemplated by section 1123(b)(1) . As contemplated by section 1123(b)(2), Article VIII of the Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed or rejected (or subject to pending requests for assumption or rejection) under section 365 of the Bankruptcy Code. Section 5.06 of the Plan provides for the approval, pursuant to Bankruptcy Rule 9019,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B367**

Not Reported in B.R.                           Page 43

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

of the Intermedia Settlement, the MCIC Settlement, and the Bank Settlement, as contemplated by section 1123(b)(3). Each of the Settlements is discussed in greater detail in section I.B. above.

Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code, and thus, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

(ii) 1129(a)(2)

*49 Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See In re Johns-Manville Corp.,* 68 B.R. 618, 630 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir.1988); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984); H.R.Rep. No. 95-595, at 412 (1977); S.Rep. No. 95-989, at 126 (1978) ( "Paragraph (2) [of section 1129(a) ] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."). The Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126, regarding disclosure and Plan solicitation.

>Section 1125

Section 1125 of the Bankruptcy Code provides in pertinent part:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a

hearing, by the court as containing adequate information....

(c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125(b), (c).

As set forth more fully above, the Debtors did not solicit the acceptance or rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement. Debtors transmitted the Disclosure Statement to each creditor that was entitled to vote to accept or reject the Plan, as well as to other parties in interest in this case, in compliance with section 1125 and this Court's Orders. In addition, creditors that were not entitled to vote to accept or reject the Plan and equity interest holders (who are deemed to reject the Plan) were provided with certain non-voting materials approved by the Court in compliance with the Court's orders.

Additionally, the Debtors have complied with section 1125 with respect to the Third Supplement and the Plan. In connection with soliciting votes on the September 12 Plan, the Court has already determined that the Third Supplement contains "adequate information" of the kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject either the September 12 Plan. The Third Supplement includes a detailed discussion of the relative rights, reliance arguments, and bases for different treatment among WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. The September 12 Plan was solicited in accordance with the Court's prior orders and received overwhelming support from all Classes.

*50 The Debtors are not required to re-solicit votes of holders of Claims in Classes 6, 6A, or 6B based upon the modifications to the September 12 Plan embodied in the Plan. Classes 6 and 6A are deemed to reject the Plan. Class 6B is conclusively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Page 44

presumed to accept the Plan.

Accordingly, Debtors complied with section 1125 of the Bankruptcy Code.

>Section 1126

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan. *See* 11 U.S.C. § 1126. As set forth in section 1126:

(a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan....

(f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g) Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the holders of all Allowed claims in each Class of impaired claims that are to receive distributions under the Plan and that are not otherwise deemed to reject the Plan. Classes 1 and 3 of the Plan are unimpaired. As a result, pursuant to section 1126(f), holders of claims in those Classes are conclusively presumed to have accepted the Plan. Pursuant to Section 4.02 of the Plan, the Debtors have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in full, plus interest required under section 506(b),

thereby rendering Class 2 unimpaired. As a result, Class 2 now is also conclusively presumed to have accepted the Plan. *See* 11 U.S.C. §§ 1124, 1126(f).

Classes 3A, 4, 5, 6, 6A, 6B, 9, 10, 11, 12, 13 and 14 of the Plan are impaired. As a result, pursuant to section 1126(a), holders of Claims in such Classes that were not deemed to reject the Plan were entitled to vote to accept or reject the Plan. [FN21] Classes 7, 8, and 15 of the Plan will not receive any distributions under the Plan. As a result, pursuant to section 1126(g), holders of claims and equity interests in such Classes are deemed to have rejected the Plan.

FN21. Classes 6, 6A and 14 were deemed to reject the Plan. Class 6B was deemed to accept the Plan, pursuant to their agreement to support the Plan in a stipulation entered with the Debtors, among others.

As to impaired classes entitled to vote to accept or reject a plan, sections 1126(c) and 1126(d) specify the requirements for acceptance of a plan by classes of claims and classes of equity interests, respectively:

*51 (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

(d) A class of interests has accepted the plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c), (d).

The Plan has been accepted by creditors holding in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B369

Not Reported in B.R.                                                             Page 45

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

excess of two-thirds in amount and one-half in number of the Allowed claims entitled to vote in each class.

As set forth above, Class 6 (WorldCom General Unsecured Claims) and Class 6A (MCI Pre-merger Claims) are deemed to reject the Plan. In addition, Class 7 (WorldCom Subordinated Claims), Class 8 (WorldCom Equity Interests), and Class 15 (Intermedia Equity Interests) will receive no recoveries under, and thus are deemed to have rejected, the Plan. Nevertheless, as set forth below, pursuant to section 1129(b) of the Bankruptcy Code, the Plan may be confirmed over the deemed rejections because the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. See 11 U.S.C. § 1129(b).

The Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126, 1127(a) .. Based upon the foregoing, the requirements of section 1129(a)(2) have been satisfied.

(iii) 1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr.S.D.N.Y.1997) (quoting In re Texaco Inc., 84 B.R. 893, 907 (Bankr.S.D.N.Y.), appeal dismissed, 92 B.R. 38 (S.D.N.Y.1988)). "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan." Leslie Fay, 207 B.R. at 781 (citations omitted). The primary goal of chapter 11 is to promote the rehabilitation of the debtor. Congress has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy

through the preservation of jobs and continued production of goods and services. The Supreme Court similarly has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); see also In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992) (quoting Bildisco ). In addition, courts have stressed the importance of payment of creditors in Chapter 11 Cases. See In re Ngan Gung Restaurant, 254 B.R. 566, 571 (Bankr.S.D.N.Y.2000).

*52 The Plan proposed by the Debtors accomplishes these rehabilitative goals by restructuring the Debtors' obligations and providing the means through which the Debtors may continue to operate as a viable enterprise. The Plan is the result of extensive good faith, arm's-length negotiations among the Debtors, the Committee, the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc Committee of MCIC Senior Noteholders, the Ad Hoc Committee of WorldCom Noteholders, the Ad Hoc Bank Committee, the MatlinPatterson Investors and other economic parties in interest. The Plan is overwhelmingly supported by creditors and other parties in interest in this case. The support of the Plan by each of these key constituencies with divergent interests and the Committee reflects their acknowledgment that the Plan provides fundamental fairness to creditors and equity interest holders. It is indisputable that the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code.

Nevertheless, on October 9, 2003, the United States Trustee filed an objection that, inter alia, objected to the "Obligation to Defend" provision in the Plan. The United States Trustee argues that the provision is one not typically found in plans, violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability.

The United States Trustee argues that the provision is onerous for the Debtors because it requires the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B370**

Not Reported in B.R.                                                                 Page 46

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Debtors to pay legal, settlement and judgment costs of the Covered Parties. The United States Trustee views this obligation as potentially impacting on the Debtors' "fresh start" because the Debtors will be responsible for an indeterminate amount of legal fees in connection with litigation involving the conduct of other parties with respect to the plan process. As a practical matter, the United States Trustee contends Debtors will be responsible for the Covered Parties gross negligence and willful misconduct because most matters are resolved prior to the entry of a final judgment. The United States Trustee also adds that the Obligation to Defend provision was incorporated after the Covered Parties had reached an agreement.

In addressing the United States Trustee's objection, the Court is mindful that the Bankruptcy Code does not prohibit the inclusion of the Obligation to Defend. Stated differently, the Bankruptcy Code does not require that this Court substitute its judgment for the judgment of the debtor in possession or other stakeholders in this case. Indeed, parties with an economic stake in the outcome of this case and the continued viability in the Reorganized Debtors have not objected to its inclusion. The issue thus appears to be whether the Court should sustain the objection to the Obligation to Defend in light of what the United States Trustee views as a provision which would undermine the integrity of the reorganization process.

As a threshold matter, the Court holds that the record amply demonstrates that not only was the Plan proposed in good faith but that the inclusion of the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (*See* Neporent Decl. ¶ 5.) To the extent that the United States Trustee challenges the sufficiency of the record, the Court notes that the United States Trustee could have cross-examined Mark A. Neporent. On behalf of the Covered Parties, Mark A. Neporent provided in a declaration that the Obligation to Defend Provision in the Plan was vital to the successful negotiation of the Plan and that without such provision the Covered Parties would have been less

likely to negotiate the terms of the settlement and Plan. The United States Trustee did not cross-examine Mr. Neporent. The uncontradicted evidence, therefore, supports the conclusion that the Obligation to Defend Provision facilitated the plan process and ultimately facilitated Debtors' reorganization and rehabilitation. The Court can find nothing untoward or indicative of a lack of good faith to sustain the United States Trustee's objection.

**\*53** Concerning the United States Trustee's argument that the Obligation to Defend Provision violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability, the Court finds that the United States Trustee's argument is more appropriately suited to questioning the feasibility of the Plan and not to questioning Debtors' good faith. As will be discussed further below, the feasibility of the Plan has been established in accordance with the prevailing legal standard.

Moreover, if the Court were to sustain the United States Trustee's objection, the Court would effectively be endorsing the proposition that the inclusion of the Obligation to Defend Provision somehow transformed an otherwise arm's-length plan negotiated after many months with the participation of a representative cross-section of creditor constituencies, into a plan not proposed in good faith for purposes of section 1129(a)(3). Nothing that the United States Trustee relies upon supports this conclusion. Although the United States Trustee (in fulfilling her duties) is understandably concerned with the integrity of the chapter 11 reorganization process, WorldCom's case has been under the scrutiny of, among others, an active creditor body, the District Court through its appointed corporate monitor and a number of governmental entities, as well as this Court. Despite the fact that parties in interest were cognizant of the Obligation to Defend Provision, no one, other than the United States Trustee, objected or even questioned the propriety of the provision. This is not a chapter 11 case where because of its size and/or lack of creditor interest that a debtor is attempting to impose an onerous term and thereby

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B371

Not Reported in B.R.                                                                    Page 47

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

take advantage of the lack of constituent participation. In such a situation, it is clear that the United States Trustee's scrutiny is essential. In sum, in the Court's view, the integrity of WorldCom's reorganization process was protected in this case and was not put at risk by the Obligation to Defend Provision.

Further, the Court recognizes that there are certain issues that warrant aggressive scrutiny from the United States Trustee (e.g., conflicts of interest, creditor committee member conduct, etc.) notwithstanding the level of creditor participation; however, the Court does not view the Obligation to Defend, under the circumstances of this case, as one of those instances.

Accordingly, the Court overrules the objection of the United States Trustee. The Plan has been proposed in good faith and not by any means forbidden by law.

Based upon the foregoing, the requirements of section 1129(a)(3) have been satisfied.

(iv) 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable. Specifically, section 1129(a)(4) requires that:

*54 Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court. *See In re*

*Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr.S.D.N.Y.1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y.1987), aff'd, Kane v. Johns-Manville Corp. 843 F.2d 636 (2d Cir.1988).

Pursuant to the interim application procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in this case. All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Effective Date, remain subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code. 11 U.S.C. § 330. In addition, pursuant to sections 503(b)(3) and (4), the Court must review any applications for substantial contribution to ensure compliance with the statutory requirements and that the fees requested are reasonable. Further, all payments to be made in connection with the Effective Date or which relate to the success of the reorganization or which otherwise are required to be disclosed, including any amounts to be paid to officers and directors, have been disclosed previously. Finally, the Plan provides a mechanism for the Court to approve certain payments of fees and expenses to certain indenture trustees.

The foregoing procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4). *See In re Elsinore Shore Assos.*, 91 B.R. 238, 268 (Bankr.D.N.J.1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr.S.D.Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions-- e.g., §§ 328, 329, 330, 331 and 503(b)--and need not be explicitly provided for in a Chapter 11 plan.").

Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B372**

Not Reported in B.R.

Page 48

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

(v) 1129(a)(5)

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. 11 U.S.C. § 1129(a)(5).

**\*55** The employment of officers and directors by the Reorganized Debtors, is consistent with the interests of creditors and is essential to the ongoing viability of the Debtors' business. The individuals associated with the prior wrongdoings of the Debtors have either resigned or have been discharged by the Debtors. The current directors have exemplary reputations, and distinguished credentials. The current officers of the Debtors are intimately familiar with the Debtors' business and are needed to maintain critical business relationships with lenders, suppliers, customers, and other parties. *See In re Apex Oil Co.,* 118 B.R. 683, 704-05 (Bankr.E.D.Mo.1990); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149-50 (Bankr.S.D.N.Y.1984).

Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(5).

(vi) 1129(a)(6)

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6).

The foregoing provision appears inapplicable in the instant cases. The Plan does not provide for rate changes by Reorganized WorldCom or any of the other Reorganized Debtors. Accordingly, such regulatory approval is unnecessary under the terms

of the statute, and the requirements of section 1129(a)(6) are met.

(vii) 1129(a)(7)

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:
  With respect to each impaired class of claims or interests--
  (A) each holder of a claim or interest of such class--
  (i) has accepted the plan; or
  (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date ...
11 U.S.C. § 1129(a)(7)(A).

This section, referred to as the "best interests" test, focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." *203 North LaSalle,* 526 U.S. at 440; *United States v. Reorganized CF & I Fabricators, Inc.,* 518 U.S. 213, 228, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.

In the instant case, the best interests test is satisfied as to each unimpaired Class of claims. Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a claim in Classes 1 and 3 is deemed to have accepted the Plan. Moreover, because the Debtors have determined to pay claimants in Class 2, in full, in cash, plus interest required under section 506(b), such Class also is rendered unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the best interests test is satisfied with respect to Classes 1, 2 and 3.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B373**

Not Reported in B.R.                                                         Page 49

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

*56 Debtors' liquidation analysis demonstrates that the values that may be realized by the holders of claims and equity interests in the respective Classes of claims and equity interests upon disposition of the Debtors' assets pursuant to a chapter 7 liquidation are significantly less than the value of the recoveries to such Classes provided for under the Plan. Specifically, the liquidation analysis demonstrates that holders of claims and equity interests in Classes 3A through 15 would not receive any distributions in a chapter 7 liquidation as there would be no funds for distribution after payment of claims having priority over general unsecured claims. The distributions to these Classes under the Plan, therefore, far exceed the distributions under a chapter 7 liquidation.

The Debtors do not have the ability to produce separate legal entity liquidation analyses, which is why the Debtors are seeking to substantively consolidate. In addition, the Bankruptcy Code and applicable case law make clear that the Debtors need not provide non-consolidated financial information in a disclosure statement relating to a substantive consolidation plan. *See In re Stone & Webster, Inc.,* 286 B.R. 532, 544-46 (Bankr.D.Del.2002); *In re Affiliated Foods, Inc.,* 249 B.R. 770, 789 (Bankr.W.D.Mo.2000). In fact, the Debtors are not obligated to provide information regarding any other possible or proposed plan of reorganization. *See* 11 U.S.C. § 1125(a)(1); *see also Kirk v. Texaco Inc.,* 82 B.R. 678, 684 (S.D.N.Y.1988); *In re Aspen Limousine Service, Inc.,* 193 B.R. 325, 334 (D.Colo.1996).

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

(viii) 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accepts the plan, as follows:
    With respect to each class of claims or interests -
    (A) such class has accepted the plan; or
    (B) such class is not impaired under the plan.
11 U.S.C. § 1129(a)(8).

Classes 1 and 3 are unimpaired under the Plan and are conclusively presumed pursuant to section 1126(f) to have accepted the Plan. Moreover, as a result of the Debtors' determination to pay creditors in Class 2 of the Plan, in full, in cash, plus interest required under section 506(b), Class 2 also is unimpaired and conclusively presumed pursuant to section 1126(f) to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12, 13, which are impaired Classes of Claims, have affirmatively voted to accept the Plan. Class 6B is impaired and is deemed to have accepted the Plan because of the stipulation entered into with the Debtors, among others, to support the Plan.

Thus, as to these (i) unimpaired and (ii) impaired and accepting Classes, the requirements of section 1129(a)(8) have been satisfied.

Classes 6, 6A, 7, 8, 14, and 15 are deemed to have rejected the Plan. Nonetheless, as set forth below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

(ix) 1129(a)(9)

*57 Unless the holder of a particular claim agrees to different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) receive specified cash payments under the plan. *See* 11 U.S.C. § 1129(a)(9) . The Plan provides for payment of Claims of a kind specified in sections 507(a)(1) through 507(a)(8) of the Bankruptcy Code in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. 11 U.S.C. § 1129(a)(9).

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

(x) 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B374**

Not Reported in B.R.                                          Page 50

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

least one Class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The Plan satisfies this requirement because more than one class of impaired claims have accepted the Plan, without including the acceptance of the Plan by insiders, if any, in any such Classes.

(xi) 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition precedent to confirmation, the Court determine that the Plan is feasible. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

As described below, the Plan is feasible within the meaning of this provision. The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. *See, e.g., In re The Leslie Fay Cos.,* 207 B.R. 764, 788 (Bankr.S.D.N.Y.1997). The Second Circuit has provided that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988); *see also In re U.S. Truck Co.,* 47 B.R. 932, 944 (E.D.Mich.1985), *aff'd,* 800 F.2d 581 (6th Cir.1986) ; *In re One Times Square Assocs. Ltd. Partnership,* 159 B.R. 695, 709 (Bankr.S.D.N.Y.1993); *In re Texaco Inc.,* 84 B.R. 893, 910 (Bankr.S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against speculative plans. As noted by the United States Court of Appeals for the Ninth Circuit:

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*\*58 Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See U.S. Truck,* 47 B.R. at 944.

Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

> (1) the adequacy of the capital structure;
> (2) the earning power of the business;
> (3) economic conditions;
> (4) the ability of management;
> (5) the probability of the continuation of the same management; and
> (6) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Leslie Fay,* 207 B.R. at 789; *see also Texaco Inc.,* 84 B.R. at 910; *Prudential Energy,* 58 B.R. at 862-63. The foregoing list is neither exhaustive nor exclusive. *Drexel Burnham,* 138 B.R. at 763; *cf. In re U.S. Truck Co.,* 800 F.2d 581, 589 (6th Cir.1986) .

For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors have analyzed their ability to fulfill their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for each of the three fiscal years for the period ending December 31, 2005 (the "Projections"). The Projections establish that the Debtors will have sufficient cash to meet all of their obligations under the Plan.

Based upon information contained in the record before this Court, after making all payments required pursuant to the Plan, the Reorganized

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B375**

Not Reported in B.R.

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

Debtors appear to be a competitive viable operating entity. Significantly, Reorganized WorldCom will have a little more than $5.5 billion of debt as compared to approximately $32 billion prior to the Commencement Date. Accordingly, the Debtors established at the Confirmation Hearing that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

Based upon the foregoing, the Plan satisfies the feasibility standard of section 1129(a)(11).

(xii) 1129(a)(12)

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(1). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that all such fees and charges, to the extent not previously paid, will be paid in cash on the Effective Date or as soon thereafter as is practicable. *See* Plan §§ 13.05, 13.06. Thus, the Plan satisfies the requirements of section 1129(a)(12).

(xiii) 1129(a)(13)

*\*59 Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code. The Plan provides that the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits. *See* Plan, § 8.10. Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

(xiv) 1129(b)

Section 1129(b) allows for confirmation of a plan where the plan has not been accepted by all impaired classes of claims. Section 1129 of the Bankruptcy Code provides, in relevant part:
Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. § 1129(b)(1). This procedure is known as "cram down" as it allows the Court–in cases where all requirements of section 1129(a) are met, other than 1129(a)(8)–to cram down the plan notwithstanding objections as long as the Court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the dissenting classes. [FN22]

> FN22. The holders of Class 14 Intermedia Preferred Stock are receiving a distribution from the estates of Intermedia and, thus, Class 14 is not junior to Class 6A.

Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr.S.D.N.Y.1990); *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1986), *aff'd,* 843 F.2d 636 (2d Cir.1988). Thus, if under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination. *See, e.g. Buttonwood Partners,* 111 B.R. at 63.

To determine whether a plan discriminates unfairly, courts consider whether (1) there is a reasonable basis for discriminating, (2) the debtor cannot

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B376**

Not Reported in B.R.                                                     Page 52

2003 WL 23861928 (Bankr.S.D.N.Y.)

(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))

consummate the plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is in direct proportion to its rationale. *See Buttonwood*, 111 B.R. at 63; *In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650 (9th Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), *In re Rochem, Ltd.*, 58 B.R. 641 (Bankr.D.N.J.1985).

A mechanism that enables the Debtors to recognize the unique reliance and prejudice arguments of the holders of (i) MCIC Senior Debt Claims, (ii) MCIC Subordinated Debt Claims, and (iii) MCI Pre-merger Claims, which those creditors, as parties that extended credit to an MCIC entity prior to the Merger, possess in relation to the substantive consolidation of the WorldCom Debtors, is a valid business justification and reasonable basis for the disparate treatment of WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims.

*60 Because the recoveries by holders of Class 5 Claims and Class 6 Claims are equivalent, the treatment of Class 5 does not unfairly discriminate against Class 6. *See In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986).

It is appropriate for the Debtors to consider the relative prejudice to creditors that may have relied upon the separate credit of MCIC or its subsidiaries prior to the Merger in order to formulate a fundamentally fair chapter 11 plan. *See, e.g., Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.)*, 179 B.R. 773, 777 & n. 5 (Bankr.S.D.N.Y.1995).

Class 6 WorldCom General Unsecured Claims are not similarly situated to Class 6A MCI Pre-merger Claims, Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and there is a reasonable basis for the Plan's differentiation of them. *See In re Rochem, Ltd.*, 58 B.R. 641, 643-44 (Bankr.D.N.J.1985).

The discrimination among Classes 6, 6A, 9 and 10 under the Plan is not unfair because it is

appropriate, reasonably proportional to the issues of the case and necessary to the reorganization. *See In re Kliegl Bros. Universal Electric Stage Lighting Co.*, 149 B.R. 306, 309 (Bankr.E.D.N.Y.1992)

The Debtors have demonstrated that the disparity of treatment between Classes 5 and 6 on the one hand, and Classes 6A, 9 and 10 on the other hand, which is based primarily upon the relative prejudice and reliance arguments of pre-Merger creditors, is not only warranted, but necessary to achieve fundamental fairness. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr.S.D.N.Y.1990).

The Debtors have acted in good faith in determining to provide additional recoveries to the holders of Class 6A Claims compared to recoveries Class 6 Claims.

The 35.7% distribution provided on account of Class 6 WorldCom General Unsecured Claims is both meaningful and consistent with the legal and equitable rights of similarly situated creditors and the Plan's overall distribution scheme.

The treatment afforded Class 6A does not unfairly discriminate against Class 6 and the distribution of a pre-Merger premium is "equitable for the unsecured creditors as a whole." *In re Pattni Holdings*, 151 B.R. 628, 631 (Bankr.N.D.Ga.1992).

The Plan's provision for differing treatment among Classes 6A, 9 and 10 is reasonable because it appropriately reflects the complexities of the priorities of the Claims in these Classes *inter se*. *See Buttonwood Partners*, 111 B.R. at 62.

The record demonstrates that the Debtors have continuously sought to ensure that the Plan treats all creditors fairly and that the discrimination among Classes was proposed in good faith. *See Federal Deposit Insurance Corp. v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir.1992).

Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes is not a treatment of these Claims under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B377

Not Reported in B.R.                                          Page 53

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

plan and does not constitute unfair discrimination. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 612 (Bankr.D.Del.2001), (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir.1993)); *In re McCorp Financial Inc.*, 160 B.R. 941 (Bankr.S.D.Tex.1993).

**\*61** The greater value received by the members of the Ad Hoc MCI Trade Claims Committee as a result of the Contributions does not violate the Bankruptcy Code, because the Contributions are the result of other creditors (holders of MCI Senior Debt Claims and MCI Subordinated Debt Claims) voluntarily sharing their recoveries under the Plan with the members of the Ad Hoc MCI Trade Claims Committee. (Debtors' Exs. 335 and 339.) The greater value received by the members of the Ad Hoc MCI Trade Claims Committee is not the result of the Debtors' distribution of estate property to such creditors. Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan by other creditors are not impacted. *See Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1313 (1st Cir.1993); *In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D.Tex.1993); *In re Teligent, Inc.*, 282 B.R. 765 (Bankr.S.D.N.Y.2002); *In re Nuclear Imaging*, 270 B.R. 365 (Bankr.E.D.Pa.2001); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr.D.Del.2001); *In re White Glove, Inc.*, 1998 WL 731611 (Bankr.E.D.Pa.1998); *In re Parke Imperial Canton, Ltd.*, 1994 WL 842777 (Bankr.N.D.Ohio 1994).

The Plan does not discriminate unfairly against Class 6 or Class 6A.

A plan is considered fair and equitable with respect to a class of unsecured claims where:
(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior

claim or interest any property.
11 U.S.C. § 1129(b)(2)(B).

No Class of Claims or Equity Interests that is junior to WorldCom General Unsecured Claims and MCI Pre-merger Claims will receive any property under the Plan on account of such Claims or Equity Interests.

The absolute priority rule is inapplicable to contributions of Plan recoveries made by certain creditors to other creditors. *See In re SPM*, 984 F.2d at 1313; *In re MCorp*, 160 B.R. 941. Agreements by creditors to share their recoveries under a plan of reorganization with other creditors need not benefit an entire class. *See, In re White Glove, Inc.*, 1998 WL 7311611; *In re Parke Imperial Center*, 1994 WL 842777. Moreover, the contributing creditor need not be a secured creditor. *See In re MCorp.*, 160 B.R. at 960. The holding of *Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1313 (1st Cir.1993) and its progeny affirming the propriety of contributions by certain creditors to other creditors under the Bankruptcy Code is applicable to the Contributions, which are in furtherance of a consensual plan of reorganization.

**\*62** The Plan is fair and equitable with respect to Class 6 and Class 6A.

With respect to each of Classes 7, 8, 14 and 15 under the Plan, the Plan (i) does not discriminate unfairly and (ii) is fair and equitable within the meaning of 1129(b) of the Bankruptcy Code. 11 U.S.C. § 1129(b).

The Plan meets all of the requirements for confirmation under sections 1127 and 1129 of the Bankruptcy Code.

The Integrated Settlement embodied in the Plan need not be approved under Bankruptcy Rule 9019.

The increase by $29,000,000,000 to the Intermedia Settlement (which will be distributed *pro rata* to the holders of Intermedia Preferred Stock) is not a material change to the Intermedia Settlement and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B378**

Not Reported in B.R.                                                    Page 54

2003 WL 23861928 (Bankr.S.D.N.Y.)

**(Cite as: 2003 WL 23861928 (Bankr.S.D.N.Y.))**

does not adversely impact recoveries to any Class of creditors under the Plan.

Each of the objections to the July 9 Plan, September 12 Plan or the Plan not heretofore withdrawn or resolved by written or oral agreement stated and made a part of the record of the Confirmation Hearing, is overruled and denied.

### III. SUMMARY

Substantive consolidation is warranted and approved. Each of the Settlements is approved. The Plan is confirmed.

An appropriate Order will be entered.

2003 WL 23861928 (Bankr.S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B379**

**EXHIBIT B**

B380

**Westlaw.**

Not Reported in B.R.

Page 1

2003 WL 21362192 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 127

**(Cite as: 2003 WL 21362192 (Bankr.D.Del.))**

**c**

United States Bankruptcy Court,
D. Delaware.
In re: ORBCOMM GLOBAL, L.P., et al., Debtors.
Carol HANNA, as Liquidating Trustee for the OC
Global Liquidating Trust,
Plaintiff,
v.
Stanton CRENSHAW, Defendant.
Nos. 00-3636 (MFW), 00-3637(MFW),
00-3638(MFW), 00-3639(MFW),
00-3640(MFW), 00-
3641(MFW), 00-3642(MFW), 00-3643(MFW),
02-1914(MFW).

June 12, 2003.
William H. Sudell, Derek C. Abbott, Michael G.
Busenkell, Morris Nichols Arsht & Tunnell, LLP,
Wilmington, DE, for Plaintiff.

Roland Gary Jones, New York, NY, for Stanton
Crenshaw.

Jeffrey M. Boyer, Snyder & Associates, P.A.,
Wilmington, DE, for Stanton Crenshaw.

*MEMORANDUM OPINION* [FN1]

FN1. This Opinion constitutes the findings
of fact and conclusions of law of the Court
pursuant to Federal Rule of Bankruptcy
Procedure 7052.

WALRATH, Bankruptcy J.

*1 This matter is before the Court on the Motion
filed by Carol Hanna, as Liquidating Trustee for the
OC Global Liquidating Trust ("the Liquidating
Trustee") for Summary Judgment in its action to
avoid an alleged preferential payment made to
Stanton Crenshaw ("Crenshaw"). For the reasons
set forth below, the Motion will be granted.

*I. FACTUAL BACKGROUND*

ORBCOMM Global, L.P., and its affiliates and
subsidiaries (collectively, "the Debtors") all filed
voluntary Chapter 11 petitions on September 15,
2000. As of that date, the Debtors' liabilities
exceeded $250 million. On April 23, 2001, the
Debtors sold substantially all their assets for
$500,000 in cash, two promissory notes totaling
$6,750,000 and a 5% equity stake in the buying
entity. The Debtors' Liquidating Plan of
Reorganization ("the Plan") was confirmed on
November 15, 2001, and became effective on
December 31, 2001. In accordance with the Plan,
all assets of the Debtors were transferred as of the
Effective Date to the Liquidating Trustee. On
February 7, 2002, the Liquidating Trustee filed a
complaint against Crenshaw to avoid and recover an
alleged preferential transfer of $31,472.68 to
Crenshaw.

*II. JURISDICTION*

This Court has jurisdiction over this proceeding
pursuant to 28 U .S.C. § 157(b)(2)(F).

*III. DISCUSSION*

*A. Standard for Summary Judgment*

The underlying purpose of summary judgment is to
avoid the inefficiencies of conducting an
unnecessary trial. *Goodman v. Mead Johnson & Co.,*
534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429
U.S. 1038 (1977). Under Fed.R.Civ.P. 56(c),
summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." [FN2] *Celotex Corp.
v. Catrett,* 477 U.S. 317, 322 (1986). When
presented with a motion for summary judgment, all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B381**

Not Reported in B.R.                                                                                    Page 2

2003 WL 21362192 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 127

**(Cite as: 2003 WL 21362192 (Bankr.D.Del.))**

of the facts must be reviewed and any reasonable inferences must be drawn in the non-moving party's favor. *See Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587 (1986).

> FN2. Rule 56 of the Federal Rules of Civil Procedure is made applicable to adversary proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

B. *Standard for Avoidance of a Preference*

Under section 547(b), the trustee may avoid a transfer if it was:
  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3) made while the debtor was insolvent;
  (4) made—
  (A) on or within 90 days before the date of the filing of the petition; or
  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive if -
  (A) the case were a case under chapter 7 of this title;
  (B) the transfer had not been made; and
  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
*2 11 U.S.C. § 547(b). The Liquidating Trustee has the burden of proof on all elements of a preference.

In this case, Crenshaw concedes that the Liquidating Trustee has established all elements except the fourth one, that the Debtors were insolvent at the time of the transfer.

C. *The insolvency requirement of § 547*

Crenshaw's sole argument in support of its assertion that the transfer to it was not preferential is that the Debtors were solvent at the time of the transfer. Section 547(f) creates a presumption that a debtor was insolvent for the ninety (90) days prior

to the filing of its bankruptcy petition. [FN3] The party challenging an avoidance action bears the burden of rebutting that presumption by offering non-speculative evidence sufficient to permit a court to conclude that the debtor was indeed solvent at the time of the transfer. 11 U.S.C. § 547(g). If that burden is satisfied, the burden of proof then shifts back to the moving party, obligating it to show that the debtor was, in fact, insolvent. *Id. See also Brothers Gourmet Coffees, Inc. v. Armenia Coffee Corporation*, 271 B.R. 456, 458 (Bankr.D.Del.2002).

> FN3. In this case the alleged preferential transfer was within ninety days of the Debtors' filing under chapter 11.

Insolvency is a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at fair valuation...." 11 U.S.C.A. § 101(32) (1993). A debtor is presumed insolvent on and during the 90 days before filing for bankruptcy.... The party seeking to rebut the presumption must introduce some evidence to show that the debtor was solvent *at the time of the transfer*.... Summary judgment in favor of the trustee is appropriate when the party seeking to rebut the presumption fails ... or when there is no genuine issue of material fact concerning insolvency and the trustee is entitled to judgment as a matter of law....
*Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp* ., 158 F.3d 312, 315 (5th Cir.1998) (emphasis in original).

Crenshaw contends that, in order to determine whether the Debtors were solvent, it is necessary to look at the "fair market value" of both the assets and the debts. Specifically, Crenshaw asserts that the language "fair valuation" in section 101(32)(A) applies to debt as well as assets. Crenshaw notes that, at the time of the transfer, the Debtors' business was, for all intents and purposes, on its "financial deathbed." Therefore, it asserts that the Debtors' public debt must be discounted below its face value to reflect the Debtors' true worth.

In response, the Liquidating Trustee asserts that for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B382**

Not Reported in B.R.                                                              Page 3

2003 WL 21362192 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 127

(Cite as: 2003 WL 21362192 (Bankr.D.Del.))

insolvency purposes we must compare the fair market value of the assets with the face value of the debts. It asserts that there is no basis to discount the debt.

Both the Liquidating Trustee and Crenshaw rely upon the case *Travelers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 134 F.3d 188 (3d Cir.1998). [FN4] In that case, the Third Circuit concluded that the proper standard of valuation of the debt is face value, rather than market value, if the debtor is treated as a going concern. *Id.* at 196. Crenshaw asserts, however, that the Debtors here were not sold as a going concern, but were liquidated. Therefore, Crenshaw asserts that the *Trans World Airlines* case does not mandate that the debt be kept at face value.

> FN4. All the cases cited by Crenshaw dealt with the appropriate standard for the valuation of assets and are, therefore, not applicable to this issue. *See, e.g., Utility Stationary Stores, Inc. v. Southworth Company* (*In re Utility Stationary Stores, Inc.*), 12 B.R. 170 (Bankr.N.D.Ill.1981); *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166 (7th Cir.1990); *Fryman v. Century Factors, Factor for New Wave* (*In re Art Shirt Ltd.*), 93 B.R. 333 (E.D.Pa.1988); *Neuger v. Casgar* (*In re Randall Construction*), 20 B.R. 179 (N.D.Ohio 1981).

*3 We disagree. The Court in *Trans World Airlines* foresaw the fallacy of Crenshaw's argument. "If holders of claims are fully informed of the debtor's affairs and the asset values are less than the face amount of the claims, they would never value their claims at more than the value of the assets. Likewise, the fully informed debtor would never be willing to pay claimants more than claimants would be willing to take. Thus, the value of the claims would never exceed the value of the assets and insolvency could never occur." 134 F.3d at 197 n. 7 (*citing In re Trans World Airlines, Inc.*, 180 B.R. 389, 424 (Bankr.D.Del.1994)). We agree with this reasoning. If Crenshaw's argument were correct, insolvency could never occur, which is an absurd

result. Therefore, we conclude for purposes of determining whether a debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value. Crenshaw has failed, therefore, to present credible evidence to rebut the presumption in section 547(f) that the Debtors in this case were insolvent at the time of the transfer.

III. *CONCLUSION*

For the foregoing reasons, the Liquidating Trustee's Motion for Summary Judgment will be granted.

An appropriate Order will be entered.

*ORDER*

AND NOW, this 12TH day of JUNE, 2003, upon consideration of the Plaintiff's Motion for Summary Judgment and the response of the Defendant thereto, it is hereby

ORDERED that the Motion is hereby GRANTED; and it is further

ORDERED that judgment is entered in favor of the Plaintiff and against the Defendant in the amount of $31,472.68.

2003 WL 21362192 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 127

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B383**

# EXHIBIT C

B384

LEXSEE 2004 BANKR.LEXIS 438

In re INDUSTRIAL, COMMERCIAL ELECTRICAL, INC., et al., Debtors.
INDUSTRIAL, COMMERCIAL ELECTRICAL, INC., et al. (as debtors-in-
possession), Plaintiffs, v. KENNETH J. BABINEAU, and NEW HORIZONS
TECHNOLOGIES, INC., Defendants.

Chapter 11, Case No. 02-45451-JBR, Adversary Proceeding No. 02-4591-JBR

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
MASSACHUSETTS

2004 Bankr. LEXIS 438; 42 Bankr. Ct. Dec. 249

April 7, 2004, Decided
April 8, 2004, Entered on Docket

**DISPOSITION:** [*1] Findings of fact and conclusions of law following trial of adversary proceeding. Judgment entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, affiliated corporate bankruptcy debtors-in-possession, brought an adversary proceeding against defendant, a former officer and stockholder of the debtors, seeking to avoid a transfer of cash by a debtor to the officer as stock redemption, capital distribution, and loan repayments, and seeking subordination of the amounts due to the officer. The Committee of unsecured creditors joined the action as an intervenor-plaintiff.

**OVERVIEW:** The debtors and the committee contended that the transfer to the officer was made at a time when the transferor debtor was insolvent, or caused such insolvency, and thus the transfer was avoidable under state law. For the same reasons, the committee argued that the officer was liable for amounts paid by the transferor debtor which was insolvent or was rendered insolvent, and that any amount remaining due to the officer under a promissory note was subordinate to the claims of unsecured creditors. The bankruptcy court first held that neither the debtors nor the committee had standing to seek avoidance of the transfer by asserting the rights of an unsecured creditor pursuant to 11 U.S.C.S. § 544, in the absence of a showing that an unsecured creditor existed whose claim arose prior to the transfer. However, reliable expert testimony properly established the transferor debtor's assets and liabilities as of the date of the transfer and such evidence indicated that the transfer rendered the debtor insolvent. Thus, the officer was liable for the portion of the transfer which rendered the transferor debtor insolvent and remaining amounts due to the officer were equitably subordinated.

**OUTCOME:** The claim of the debtors and the committee for avoidance of the transfer was dismissed for lack of standing, but judgment was rendered in favor of the committee on its claim for recovery of unlawful distributions and equitable subordination.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1] See Fed. R. Civ. P. 15(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN2] The term "responsive pleading" as used in Fed. R. Civ. P. 15(a) is defined by reference to Fed. R. Civ. P. 7(a), which distinguishes between pleadings and motions, and provides an exclusive list of pleadings: a complaint (including a third party complaint), an answer to a complaint or a cross-claim, and a reply to a counterclaim.

**B385**

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN3] See 11 U.S.C.S. § 544(b).

*Civil Procedure > Entry of Judgments > Enforcement & Execution > Fraudulent Transfers*
[HN4] See Mass. Gen. Laws ch. 109A, § 6(a).

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN5] Under 11 U.S.C.S. § 544(b), a trustee or debtor-in-possession succeeds to the rights of an actual unsecured creditor who could have avoided under state law the payments made to or on behalf of a creditor. The burden is on the trustee or debtor-in-possession to demonstrate the existence of such a qualified unsecured creditor.

*Civil Procedure > Justiciability > Standing*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN6] It is incumbent upon a plaintiff to demonstrate his standing in an 11 U.S.C.S. § 544(b) action.

*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN7] It is well settled that a creditor must be unsecured to pursue a claim pursuant to 11 U.S.C.S. § 544.

*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN8] 11 U.S.C.S. § 544(b) borrows applicable nonbankruptcy law which would be available to an unsecured creditor of the debtor.

*Civil Procedure > Justiciability > Standing*
*Civil Procedure > Entry of Judgments > Enforcement & Execution > Fraudulent Transfers*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN9] Pursuant to 11 U.S.C.S. § 544(b) and Mass. Gen. Laws ch. 109A, § 6, respectively, a bankruptcy court's analysis of standing must focus on two main inquiries: (1) whether there is an unsecured creditor of the debtor; and if so (2) whether the creditor's claim arose before the transfer was made or the obligation was incurred.

*Civil Procedure > Justiciability > Standing*
[HN10] The issue of standing must be addressed by a court and cannot be waived by the parties.

*Civil Procedure > Justiciability > Standing*

*Civil Procedure > Entry of Judgments > Enforcement & Execution > Fraudulent Transfers*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN11] If there are no creditors against whom a transfer is voidable under applicable state law, a trustee is powerless to act under 11 U.S.C.S. § 544(b).

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Shareholder Duties & Liabilities*
*Business & Corporate Entities > Corporations > Finance > Dividends & Reacquisition of Shares*
[HN12] See Mass. Gen. Laws ch. 156B, § 45.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Shareholder Duties & Liabilities*
*Business & Corporate Entities > Corporations > Finance > Dividends & Reacquisition of Shares*
*Bankruptcy Law > Examiners & Trustees > Fraudulent Transfers*
[HN13] For bankruptcy claims brought pursuant to Mass. Gen. Laws ch. 156B, § 45, the proper test of insolvency to be applied is the standard balance sheet test for determining insolvency prescribed by 11 U.S.C.S. § 548.

*Bankruptcy Law > Examiners & Trustees > Fraudulent Transfers*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN14] In making factual determinations of solvency, it is appropriate to adjust the asset values shown on the most contemporaneous balance sheet available to reflect the fair market price of a bankruptcy debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts. The total value of the assets, as adjusted to fair value, is then compared to the recorded liabilities to determine whether a condition of solvency or insolvency exists.

*Bankruptcy Law > Examiners & Trustees > Fraudulent Transfers*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN15] The United States Court of Appeals for the First Circuit expressly approves the technique of retrojection, whereby a bankruptcy trustee may meet his burden of proof on the issue of insolvency by showing that a debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period.

*Bankruptcy Law > Examiners & Trustees > Fraudulent Transfers*
*Bankruptcy Law > Examiners & Trustees > Voidable Transfers*
[HN16] Goodwill is not a factor in determining insolvency, at least in liquidation cases, because goodwill cannot be separately sold to satisfy the bankruptcy claims of creditors.

*Evidence > Witnesses > Credibility & Impeachment*
[HN17] Whether or not a party is interested goes to the weight of the party's testimony.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*
[HN18] Whether separate legal entities should be consolidated on an accounting basis is not determinative of whether a creditor of one legal entity has the legal or equitable right to reach the assets of another separate but related entity to satisfy that creditor's claim. In determining whether separate corporate identities should be disregarded, Massachusetts courts examine, among other factors, whether there exists: (i) a pervasive control of the corporations by the dominant shareholders; (ii) a confused intermingling of the corporations' business assets; (iii) thin capitalization; (iv) non-observance of corporate formalities; (v) the absence of corporate records; (vi) a siphoning away of corporate assets by affiliates; (vii) the use of one corporation for another's transactions; and (viii) the use of the various corporations in promoting a fraud. Common ownership of the stock of two or more corporations with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another.

*Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Priority Claims*
[HN19] See 11 U.S.C.S. § 510(c).

COUNSEL: For Debtors: Vladimir von Timroth, Esq., Aframe, Barnhill and von Timroth, Worcester, MA.

For Plaintiff: Vladimir von Timroth, Esq., Aframe, Barnhill and von Timroth, Worcester, MA.

For The Official Committee Of Unsecured Creditors, Plaintiff-Intervenor: Michael J. Fencer, Esq., Jager Smith, PC, Boston, MA.

For Kenneth J. Babineau, New Horizon Tech., Inc., Defendants: Michael J. Michaels, Esq., Wolfson Keenan Cotton & Meagher, Worcester, MA.

JUDGES: Joel B. Rosenthal, United States Bankruptcy Judge.

OPINIONBY: Joel B. Rosenthal

OPINION:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This above-captioned adversary proceeding (the "Adversary Proceeding") is before the Court on the complaint (the "Complaint") of Industrial Commercial Electrical, Inc. (the "Debtors") against Kenneth Babineau (the "Defendant" or "Babineau") and New Horizons Technologies ("New Horizons"). The Official Committee of Unsecured Creditors (the "Committee") of Industrial Commercial Electrical, Inc. ("ICE"), I.C.E. Management Corp. ("Management"), and I.C.E.-Conn, Inc. ("CONN") (collectively, the "Debtors") is pursuing the Complaint [*2] as an intervening plaintiff in the Adversary Proceeding. The Committee subsequently filed an amended complaint (the "Amended Complaint"), as a matter of course, n1 entitled *Joinder of Intervening Plaintiff in Complaint of Debtors*, adding Count IX for recovery of unlawful distributions pursuant to Mass. Gen. Laws ch. 156B, § 45. Although the Complaint lists eight counts against Defendant and New Horizons, counsel to the Committee stated at trial that the Committee would not present evidence on seven of the eight counts in the Complaint and thus waived those counts. No counts were pursued against New Horizons. Therefore, the only two counts before the Court are Count I as set forth in the Complaint for avoidance of a fraudulent transfer pursuant to Bankruptcy Code section 544(b) and Massachusetts General Laws chapter 109A and Count IX as set forth in the Amended Complaint. After a two-day trial, the Court took the matter under advisement and now makes the following findings of fact and rulings of law n2 pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052 [*3] .

> n1 "According to Fed.R.Civ.P. 15(a), [HN1] '[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.' [HN2] The term "responsive pleading" is defined by reference to Fed.R.Civ.P. 7(a), which distinguishes between pleadings and motions, and provides an exclusive list of pleadings: a complaint (including a third party complaint), an answer to a complaint or a cross-claim, and a reply to a counterclaim." *Yuhasz v. Brush Wellman, Inc.,* 341 F.3d 559, 569 (6th Cir. 2003). The Committee filed the Amended

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

Complaint before any of these responsive pleadings were filed.

n2 The following contains mixed findings of fact and conclusions of law.

## I. Findings of Fact

1. On and prior to January 10, 2001, Defendant, David P. LeBlanc ("LeBlanc"), and Daniel J. Kennedy ("Kennedy") each held one third (1/3) of the outstanding common stock of ICE, Management, and CONN. [*4] (*Joint Pretrial Memorandum* ("J.P. Mem.") at pg. 6-7).

2. On and prior to January 10, 2001, LeBlanc was the president of ICE, Management, and CONN; Defendant was the vice-president of ICE, Management, and CONN; and Kennedy was the treasurer and chief financial officer of ICE, Management, and CONN.

3. On and prior to January 10, 2001, ICE, Management, and CONN were separate legal entities that each maintained one or more deposit accounts at Flagship Bank & Trust Company ("Flagship") in their respective names. (J.P. Mem. at pg. 12).

4. On and prior to January 10, 2001, Defendant, LeBlanc, and Kennedy were each a trustee of the CLM Realty Trust ("CLM") a Massachusetts real estate trust that owned real property situated at 9 Short Street, Worcester, Massachusetts ("9 Short Street").

5. On and prior to January 10, 2001, Kennedy was the trustee of, and Defendant, LeBlanc, and Kennedy were each the holders of one third (1/3) of the beneficial interest of the T&A Realty Trust ("T&A"), a Massachusetts real estate trust that owned real property situated at 3 Bethany Street, Worcester, Massachusetts ("3 Bethany Street") (together with 9 Short Street, the "Realty Trust Properties") (J. [*5] P. Mem. at pg. 7-8).

6. On and prior to January 10, 2001, ICE leased from CLM and T&A the Realty Trust Properties, and all buildings and structures situated thereon, pursuant to written lease agreements that provided for ICE to pay to CLM and T&A fair market rent for the use of the Realty Trust Properties (J.P. Mem. at pg. 7-8; Jan. 13, 2004 Tr. at pg. 31-32).

7. On December 21, 2000, Flagship and ICE, Management, and CONN executed a certain *Loan Agreement* (the "Loan Agreement") and a *Demand Note* pursuant to which Flagship provided to ICE, Management, and CONN a revolving line of credit with a usage not to exceed $ 1,500,000. Also on December 21, 2000, CLM and T&A each executed and delivered to Flagship real estate mortgages on the Realty Trust Properties to secure the obligations of ICE, Management,

and CONN under the revolving line of credit (J.P. Mem. at pg. 9).

8. On or before January 31, 2001, Kennedy generated individual balance sheets dated as of December 31, 2000 for each of ICE (the "ICE December 31, 2000 Balance Sheet), Management, and CONN (collectively, the "December 31, 2000 Balance Sheets), which, as required under the terms of the Loan Agreement, were published [*6] to Flagship on or about January 31, 2001 (J.P. Mem. at pg. 11). A review of the December 31, 2000 Balance Sheets, coupled with the testimony of the Plaintiffs' expert witness, established that the December 31, 2000 Balance Sheets are not only internally consistent and substantively consistent with the stipulated facts and documents in evidence (Pl.'s Exs. 4 and 6; J.P. Mem. at pg. 11), but also that they are temporally consistent with the transactions that are the subject matter of this Adversary Proceeding (Pl.'s Exs. 1, 2, 3, 4, 6, and 8). Therefore, the information contained in the December 31, 2000 Balance Sheets is a substantially accurate accounting portrayal of the assets and liabilities of those entities on December 31, 2000.

9. According to the ICE Balance Sheet, the reported historical value of the assets of ICE on December 31, 2000 was, rounded to the nearest dollar, $ 2,509,761 (Pl.'s Ex. 4 at pg. 6). On that same date, the total reported liabilities of ICE was, rounded to the nearest dollar, $ 2,262,000, (Pl.'s Ex. 4 at pg. 7). ICE was solvent on an accounting basis on December 31, 2000 by the amount of $ 247,761.

10. On January 10, 2001, Babineau and ICE executed the [*7] *Stock Redemption Agreement and Employment Termination and Equities Transfer Agreement* (the "Agreement"). Sections I, II and III are relevant to the issues before the Court.

11. Pursuant to Section I of the Agreement, entitled *Stock Redemption*, on January 10, 2001 ICE transferred to Babineau the amount of $ 200,000 (Pl.'s Ex. 3; J.P. Mem. at pg. 11) (the "Initial ICE Stock Redemption Transfer"), and executed and delivered to Babineau a *Promissory Note* in the principal amount of $ 800,000 (the "Note") (Pl.'s Ex. 2; J.P. Mem. at pg. 11). In exchange, Defendant tendered his ICE stock back to ICE (Pl.'s Ex. 1 at pg. 2-3). The Agreement stated "The Total Redemption value of KJB's [Babineau's] entire interest in the Corporation shall be the agreed upon value of One Million ($ 1,000,000.00) Dollars." Between February 2001 and May 2002, ICE transferred to Defendant in partial payment of the Note, sixteen separate ICE checks, totaling $ 288,549.96 (J.P. Mem. at pg. 12-14). The total amount transferred by ICE to Defendant pursuant to Section I of the Agreement was $ 488,549.96 (the "Total ICE Stock Redemption Transfers").

Case 1:06-cv-00147-JJF    Document 26-6    Filed 06/14/2006    Page 28 of 35

Page 5

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

12. Pursuant to Section II of the Agreement, entitled [*8] *Termination of Employment Relationship*, on January 10, 2001 Defendant covenanted: (i) that he would not disclose to any entity or person the proprietary business information and/or trade secrets of ICE; and (ii) that he would not solicit, nor cause to be solicited, for a period of one (1) year either any customer or client or account of ICE existing on January 10, 2001 or any ICE employees then so employed on January 10, 2001 (Pl.'s Ex. 1 at pg. 4-5; Jan. 13, 2004 Tr. at pg. 47). Also pursuant to Section II of the Agreement, ICE: (i) transferred to Defendant (a) a life insurance policy purchased by ICE insuring the life of Defendant; (b) a trade tool set and related equipment designated by Defendant for electrical contracting work; (c) office furniture and equipment (Pl.'s Ex. 1 at pg. 5-6; Jan. 13, 2004 Tr. at pg. 47-48); and (ii) agreed to release and indemnify Defendant with regard to any claims of trade vendors concerning the liabilities of ICE, Management, and/or CONN (Pl.'s Ex. 1 at pg. 5-7; Pl.'s Ex. 3; Jan. 13, 2004 Tr. at pg. 52). Neither party offered any evidence of the value of these covenants and the life insurance policy, trade tool set, or office furniture and equipment. [*9]

13. On January 10, 2001, pursuant to Section III of the Agreement, Defendant transferred to LeBlanc and Kennedy any and all beneficial interest he held in the fully encumbered Realty Trust Properties (Pl.'s Ex. 1 at pg. 8; Jan. 13, 2004 Tr. at pg. 75, 106). On that same date, and also pursuant to Section III of the Agreement, Defendant transferred to ICE his shares of common stock held in various related corporations, including: Industrial Commercial Electrical Data, Inc.; I.C.E.D. Commercial Systems, Inc.; Industrial Commercial Energy Management, Inc.; Industrial Commerical Design, Inc.; Commercial Lens Management, Inc.; ICE Management Corporation; and CONN. No evidence of the value of the shares of stock was put into evidence.

14. On January 10, 2001, ICE transferred to Babineau the amount of $ 142,983.24 as a capital distribution, in an amount purportedly equal to those amounts of corporate capital previously distributed to LeBlanc and/or Kennedy (the "Make-up Transfer") (Jan. 12, 2004 Tr. at pg. 33, 91-93; Jan. 13, 2004 Tr. at pg. 44).

15. On January 10, 2001 ICE transferred to Defendant $ 38,306 in repayment of undocumented loans by Babineau to ICE (the "Insider Loan Transfer") [*10] (Pl.'s Ex. 1 at pg. 1, 3; Jan. 13, 2004 Tr. at pg. 44) (together with the Initial ICE Stock Redemption Transfer and the Make-up Transfer, the "Transfers").

16. The total distribution of cash made by ICE to Defendant is $ 669,839.20 - composed of the Total ICE Stock Redemption Transfers of $ 488,549.96, the Make-up Transfer of $ 142,983.24, and the Insider Loan Transfer of $ 38,306.

## II. Conclusions of Law

### COUNT I

Count I of the Complaint is for avoidance of fraudulent transfers pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Law ch. 109A, § 8. Pursuant to § 544(b), [HN3] "...the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor *holding an unsecured claim* that is allowable under section 502 of this title or that is not allowable only under section 502(e)." (italics added). The Committee asserts that chapter 109A, § 6 of the Massachusetts General Laws ("UFTA") is the applicable law under § 544(b). n3 Section 6(a) of the UFTA provides [HN4] "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose [*11] claim *arose before the transfer was made or the obligation was incurred* if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." (italics added).

> n3 Count I of the Complaint is for avoidance of a fraudulent transfer pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 8. Section 8 simply lists the types of relief available in an action under chapter 109A, and does not provide a cause of action. At trial, as well as in the *Proposed Findings of Fact and Conclusions of Law of Intervening Plaintiff Official Committee of Unsecured Creditors*, it became clear that the Committee was pursuing Count I under chapter 109A, § 6.

Neither the Committee, whose standing is based upon that of ICE, nor ICE itself, have standing to pursue a claim under 11 U.S.C. § 544 [*12] (b). The Committee, as intervening plaintiff, relies exclusively on the UFTA made applicable by § 544(b). [HN5] "Under 544(b), the Trustee [here, the debtor-in-possession] succeeds to the rights of an actual unsecured creditor who could have avoided under UFTA the payments made to or on behalf of [a creditor]. The burden is on the Trustee to demonstrate the existence of such a qualified unsecured creditor." n4 *Tomsic v. Pitocchelli (In re Tri-Star Technologies Co., Inc.)*, 260 B.R. 319, 328 (Bankr.

Case 1:06-cv-00147-JJF    Document 26-6    Filed 06/14/2006    Page 29 of 35

Page 6

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

D. Mass. 2001). In a footnote in *Pitocchelli*, Judge Boroff recognized that courts disagree as to whether a trustee is required to establish the existence of a specific creditor in order to have standing under § 544(b), *id.* at 329 (citing, *inter alia*, *Lassman v. Goldstein* (*In re Goldstein*), 194 B.R. 1, 2-3 (Bankr. D. Mass. 1996); *Ferrari v. Barclays Business Credit, Inc.* (*In re Morse Tool, Inc.*), 148 B.R. 97, 131 (Bankr. D. Mass. 1992)), and further stated "This Court agrees with those cases which hold that the estate representative must identify the existence of a relevant creditor and respectfully disagrees that this [*13] necessary predicate can be established by the Court's inferences with respect to the state of the case file. Standing is an essential element of a § 544(b) action and this Court ought not take judicial notice of a missing element of a party's proof by 'poking around' in the case files after the close of evidence and without affording prior notice to and an opportunity to be heard by the party prejudiced thereby." *Pitocchelli*, 260 B.R. at 329, n. 10. This Court agrees with Judge Boroff. [HN6] It is incumbent upon a plaintiff to demonstrate his standing in a section 544(b) action.

n4 [HN7] It is well settled that a creditor must be unsecured to pursue a claim pursuant to 11 U.S.C. § 544. *See House and Senate Reports (Reform Act of 1978)* ("Subsection (b) is derived from current section 70e. It gives the trustee the rights of actual unsecured creditors under applicable law to void transfers. It follows *Moore v. Bay*, 284 U.S. 4, 76 L. Ed. 133, 52 S. Ct. 3 (1931), and overrules those cases that hold section 70e gives the trustee the rights of secured creditors."); *see also Colliers*, P 544.09[1] ("The drafters of section 544(b) made it clear that this section overrules those cases that hold [former] Section 70e gives the trustee the rights of secured creditors.")

[*14]

"Section 544(b) ... [HN8] borrows applicable nonbankruptcy law which would be available to an *unsecured* creditor of the debtor...." *Le Cafe Creme, Ltd. v. Le Roux* (*In re Le Cafe Creme, Ltd.*), 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000) (italics added); *see Goldstein*, 194 B.R. at 3 ("Under § 544(b), the Trustee bears the burden of proving the existence of a qualified unsecured creditor...") (citing *Morse Tool*, 148 B.R. at 130 ("...the Trustee must prove that there exists at least one qualified unsecured creditor: a creditor holding an allowable unsecured claim who could bring the same avoidance action the Trustee seeks to bring.")). Thus, [HN9] pursuant to § 544(b) and M.G.L. 109(a) respectively, the Court's analysis of standing in this case

must focus on two main inquiries about such a creditor: (1) whether there is an *unsecured* creditor of the debtor; and if so (2) whether the creditor's *claim arose before the transfer was made or the obligation was incurred. Young v. Paramount Communications, Inc.* (*In re Wingspread Corp.*), 178 B.R. 938, 945-46 (Bankr. S.D.N.Y. 1995) ("Before a trustee is able to utilize applicable [*15] state or federal law referred to in Section 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable law, attacked and set aside the transfer under consideration." (citation omitted)).

Here, the Committee offered no evidence to prove the existence of a creditor that meets both requirements. In fact, the Committee addressed the issue of standing for the first time in its *Proposed Findings of Fact and Conclusions of Law* submitted after the close of evidence. The Committee simply makes the bald assertion that "since Flagship currently holds a claim against ICE that arose before ICE made the Transfers, and before ICE made the Note, both the Bankruptcy Code and applicable state law confer standing upon the Debtors, and the Committee as an intervening plaintiff, to bring this action...." That Flagship's claim arose before the Transfers is undisputed, but merely satisfies the second of the two inquiries required. Pursuant to § 544(b), Flagship must also hold an unsecured claim in order to have standing. The Committee has not addressed this issue, and [*16] therefore failed to meet its burden of proof in identifying the existence of a relevant creditor. n5

n5 Even if the Court were to exceed the scope of its inquiry and engage in the type of "poking around" proscribed by *Pitocchelli*, Debtors' schedules offer no support for the assertion that Flagship has standing under § 544(b). Flagship appears as a secured creditor on Debtors' Schedule D *Creditors Holding Secured Claims*, with a further notation that there is no unsecured portion of its claim. Further, in its *Emergency Motion For Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (ii) Granting Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code; and (III) Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001(c)*, P 48, Debtors assert that Flagship has an equity cushion of $ 600,000.

In addition, of the 155 creditors listed on Debtors' Schedule F *Unsecured Nonpriority Claims*, all except Defendant were listed as

having incurred a claim in 2002, while the Transfer occurred in 2001. UFTA § 6(a) bars these claimants from pursuing a claim under that section because it states "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose *before the transfer was made or the obligation was incurred...*" Similarly, all eleven creditors listed on Debtors' Schedule E *Unsecured Priority Claims* are listed as having incurred a claim in 2002, and are also barred from pursuing a claim under UFTA § 6(a).

Debtors' Schedule D lists another secured creditor, Ford Motor Credit Company. According to a motion for relief, all retail sales contracts were entered into between February and October of 2001, revealing that UFTA § 6(a) would also bar this claimant from pursuing a claim.

No amendments to these schedules have been filed. Therefore, not only has the Plaintiff failed to assert the existence of a creditor with standing, a review of the record reveals that such a creditor probably does not exist.

[*17]ʹ

Unfortunately, the issue of standing was not raised by either party throughout the course of the Adversary Proceeding. [HN10] The issue of standing must be addressed by the Court, however, and cannot be waived by the parties. *See Van Leeuwen v. United States*, 868 F.2d 300, 301 (8th Cir. 1989) (affirming district court's *sua sponte* dismissal of plaintiffs' complaint on grounds that, among other things, they lacked standing); *Reynolds v. Feldman (In re Unger & Assocs.)*, 292 B.R. 545 (Bankr. E.D. Tex. 2003) ("Parties cannot waive an objection to standing which even the appellate Courts may raise *sua sponte*." (citation omitted)); *In re Euell*, 271 B.R. 388, 390 (Bankr. D. Co. 2002) (finding *sua sponte* examination of party's standing to pursue an exception to discharge proper because "standing to sue is an essential element to a justiciable cause. It is a jurisdictional prerequisite that is not subject to waiver. Federal courts have an independant obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." (citations omitted)).

Plaintiffs have not met their burden in proving the [*18] existence of a creditor who would have standing pursuant to § 544(b). [HN11] "If there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)." *Le Cafe Creme, Ltd.*, 244 B.R. at 238 (citing 5 L. King, COLLIER ON BANKRUPTCY, P

544.09, at 544-17 (15th ed. rev.1999)). Debtors did not have standing to pursue an action under § 544(b), and therefore neither does the Creditors' Committee as intervening plaintiff.

## COUNT IX

The Committee requests this Court subordinate the obligation incurred by ICE in connection with the Note to those of the Debtors' unsecured creditors, and award ICE damages for distributions made by ICE that exceed those amounts which could have been made without rendering ICE insolvent, together with pre-judgment interest, post-judgment interest, attorneys' fees, and costs pursuant to Mass. Gen. Laws ch. 156B, § 45. This section states, in relevant part:

> [HN12] Stockholders to whom a corporation makes any distribution, whether by way of dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation, [*19] if the corporation is, or is thereby rendered, insolvent shall be liable to the corporation for the amount of such distribution made, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in either event, only to the extent of the amount paid or distributed to them respectively.

Section 45 does not dictate how "insolvency" is to be determined and the parties have not cited, nor can the Court find, any cases addressing this issue. Cases addressing M.G.L. ch. 156B, § 61, which deals with distributions made by a corporation which is "insolvent or is rendered insolvent," are instructive, however. n6 In *Murphy v. Robinson*In re Ipswich Bituminous Concrete Products, Inc., 79 B.R. 510, 518 (Bankr. D. Mass. 1987), the Chapter 7 trustee brought an adversary complaint pursuant to, among others, Bankruptcy Code section 548(a)(2), Mass. Gen. Laws ch. 109A, and 156B, § 61. There, the court first examined the section 548(a)(2) claim, and noted that the Bankruptcy Code prescribes a standard balance sheet test for determining solvency, which "focuses on the fair market value of the debtor's [*20] assets and liabilities within a reasonable time of the transfers. Asset valuation need not be exact. Assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts." *Id.* at 517 (citations and internal quotation marks omitted). Further, the court noted that the "First Circuit has held that 'unaudited financial statements may be admissible as the best available evidence and that it is for the trier of

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

fact to assess the accuracy of such statements.'" *Id.* (citations omitted). After applying this test and finding the defendant insolvent for purposes of the section 548 claim, the court turned its attention to the claims brought pursuant to M.G.L. ch. 156B, § 61. The court found liability under this provision, stating "since the Court has found that the Debtor was insolvent (or at least rendered insolvent by the distribution), the Court has no difficulty finding that [the directors] are jointly and severally liable for the $ 100,000 pursuant to section 61 of the MBCL [ch. 156B] as well as section 548 of the Bankruptcy Code." *Id.* at 518; *see also First Fed. Sav. & Loan Assoc. of Galion, Ohio v. Napoleon*, 428 Mass. 371, 701 N.E.2d 350, 354 n.4 (Mass. 1998) [*21] (Courts making a determination of solvency under the Massachusetts UFTA employ a balance sheet test to measure the fair value of the debtors' assets against the value of the debtor's liabilities.) Therefore, the Court concludes that [HN13] the proper test of insolvency to be applied is the standard balance sheet test for determining insolvency prescribed by the Bankruptcy Code.

n6 Section 61 provides, in relevant part: Directors of a corporation who vote to authorize any distribution by the corporation to one or more of its stockholders, whether by way of a dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation, which is in violation of the corporation's articles of organization shall be jointly and severally liable to the corporation for the amount by which such distributions exceeds that which could have been made without violation of the corporation's articles of organization, but only to the extent such excess distribution is not repaid to the corporation. If the corporation is insolvent or is rendered insolvent by the making of any such distribution, whether or not in violation of the articles of organization, the directors who voted to authorize such distribution shall be jointly and severally liable to the corporation for the amount of such distribution made when the corporation is insolvent, or for the amount of such distribution which exceeds

that which could have been made without rendering the corporation insolvent, but in either event only to the extent such distribution, or such excess, is not repaid to the corporation.

[*22]

[HN14] In making factual determinations of solvency, it is appropriate to adjust the asset values shown on the most contemporaneous balance sheet available to reflect "the fair market price of the debtor's *assets* that could be obtained if sold in a prudent manner within a reasonable period of time *to pay the debtor's debts." Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996) (emphasis added); *see also Travellers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 134 F.3d 188, 193-94 (3d Cir. 1998). The total value of the assets, as adjusted to fair value, is then compared to the recorded liabilities to determine whether a condition of solvency or insolvency exists. *First Fed. Sav.*, 701 N.E.2d at 354 n.4.

The December 31, 2000 Balance Sheet for ICE created by Kennedy and published to Flagship constitutes the most contemporaneous and consistent financial information available, *see Viscount Air Servs., Inc. v. Cole* (*In re Viscount Air Servs., Inc.*), 232 B.R. at 437-38; *Ipswich Bituminous*, 79 B.R. 511, 518; In re Arrowhead Gardens, Inc., 32 B.R. 296, 298-99 (Bankr. D. Mass. 1983), [*23] and is, therefore the appropriate starting point to determine the issue of the solvency of ICE on January 10, 2001. In addition, the December 31, 2000 Balance Sheet for ICE is a substantially accurate accounting portrayal of ICE's assets and liabilities on December 31, 2000. *See Arrowhead Gardens*, 32 B.R. at 299. The parties did not raise the issue of whether the values listed on the Balance Sheet reflect the fair market value of such items and therefore the Court finds they are, with the exception of the vehicles addressed later in this decision. Rather, the parties disagree as to what additional items should be added to or subtracted from the Balance Sheet. Therefore with the December 31, 2000 Balance Sheet as its staring point, the Court must determine what adjustments, if any, must be made in order to determine ICE's financial condition on January 10, 2001, the date of the Agreement.

The Committee presented the expert testimony of Craig R. Jalbert of Verdolino & Lowey, P.C., a Certified Insolvency and Restructuring Advisor (Jan. 12, 2004 Tr. at pg. 17-21). In the course of his professional practice, Mr. Jalbert has performed an estimated 1,000 prior insolvency [*24] analyses, as well as preferences and fraudulent conveyance analyses, and other types of forensic accounting investigations (Jan. 12, 2004 Tr. at

Case 1:06-cv-00147-JJF    Document 26-6    Filed 06/14/2006    Page 32 of 35

Page 9

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

pg. 20-21) for trustees, debtors-in-possession, and official committees (Jan. 12, 2004 Tr. at pg. 19). Moreover, Mr. Jalbert has previously qualified as an expert to opine on the issue of insolvency in other Bankruptcy Courts in the First Circuit (Jan. 12, 2004 Tr. at pg. 20-21).

Mr. Jalbert employed a balance sheet test to determine the solvency of ICE as of the relevant date. To do this, he started with the December 31, 2000 Balance Sheet, and then reviewed it to determine what additional information would be required to determine the value of assets and the extent of liabilities. Mr. Jalbert's testimony revealed that, in this particular engagement: (i) the facts and data upon which his opinion of insolvency was based were sufficient (Jan. 12, 2004 Tr. at 25-28); (ii) that the methodologies he employed are generally recognized in bankruptcy as reliable means for conducting an insolvency analysis (Jan. 12, 2004 Tr. at pg. 22-24); (iii) that he employed those methodologies in the proper manner after having made certain reasonable assumptions [*25] (Jan. 12, 2004 Tr. at pg. 29-38, 77-80, 81-84); and (iv) that he focused his analysis on January 10, 2001, the only date relevant in this adversary proceeding (Jan. 12, 2004 Tr. at pg. 24).

Mr. Jalbert provided credible testimony that the fair value of the assets of ICE as of January 10, 2001 was $ 2,765,553. Mr. Jalbert began his calculation with the total current assets of $ 2,509,760.98 listed on the December 31, 2000 ICE Balance Sheet. Mr. Jalbert then made the reasonable and undisputed assumption that no material transactions took place between December 31, 2000, the date of the most contemporaneous financial statements, and January 10, 2001 (Jan. 12, 2004 Tr. at pg. 32). See Ipswich Bituminous, 79 B.R. at 517 [HN15] ("...the United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period." (citations omitted)).

Mr. Jalbert reduced the cash [*26] listed as an asset by $ 342,983, the total amount of the $ 200,000 Initial ICE Stock Redemption Transfer made on the Note plus the $ 142,983.24 Make-up Transfer. Mr. Jalbert also testified that he increased the value of ICE's assets to reflect the fair value of motor vehicles owned and potentially owned by ICE in the amount of $ 598,775; he apparently took this approach because although the vehicles were fully depreciated on the Balance Sheet they were still operational and had value. Mr. Jalbert calculated this adjustment by compiling a list of every vehicle owned by any of ICE and its affiliates, and

determining the fair value of the vehicles by referring to the January 2001 periodical edition of the *Official Used Car Guide* published by the National Automobile Dealer's Association. Mr. Jalbert also testified that he gave full value to the accounts receivable portion of the assets listed on ICE's Balance Sheet, without a reserve for bad debts, despite his experience that receivables are not one hundred percent collectable, even in an ongoing business. n7

> n7 Mr. Jalbert testified that he took the most the most conservative approach he could to his analysis in order to give Defendant every "benefit of the doubt." (Jan. 12. Tr. at 31). While the Court notes that the value ascribed to both the vehicles and the accounts receivables are higher than their probable actual value, the Court credits these values as no contrary evidence was proffered.

[*27]

Mr. Jalbert provided credible testimony that on January 10, 2001 the total liabilities of ICE was $ 3,062,000. Mr. Jalbert began his calculation with total liabilities of $ 2,261,999.83 listed on the December 31, 2000 ICE Balance Sheet. Mr. Jalbert then increased this figure by the $ 800,000 amount due on the Note, calculating the total liabilities of ICE as of January 10, 2001 at $ 3,062,000.

Mr. Jalbert's calculation of assets of $ 2,765,553 and liabilities of $ 3,062,000 reflects that ICE was insolvent on January 10, 2001 by the amount of $ 296,447 (Jan. 12, 2004 Tr. at pg. 36). The Court credits Mr. Jalbert's testimony on the issue of the solvency of ICE on January 10, 2001 and adopts his conclusions as its finding that ICE was in fact rendered insolvent by the Transfers and obligations incurred under the Agreement on January 10, 2001.

Defendant offered the expert testimony of Jon H. Fudeman, C.P.A., who had never, prior to the trial in this adversary proceeding, rendered any opinion of insolvency with respect to any business or entity (Jan. 13, 2004 Tr. at pg. 95-96), and furthermore admitted that he did not, prior to trial, conduct an insolvency analysis of either ICE alone [*28] or the combined Debtors using generally accepted methods, (Jan. 13, 2004 Tr. at pg. 101-102). Without impugning either Mr. Fudeman's personal or professional credibility, and with all due respect to his expertise in business valuations, Mr. Fudeman's testimony is given little weight due to the methodologies he employed.

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

Fudeman testified that the net worth of ICE, standing alone, on January 10, 2001 was approximately $ 622,409 excluding goodwill, and approximately 2.5 million inclusive of goodwill. Mr. Fudeman began this analysis with Mr. Jalbert's testimony that ICE was insolvent as of January 10, 2001 by about $ 295,000. (Jan. 13 Tr. at 85). To this figure, Fudeman added a $ 100,000 receivable from Kennedy and LeBlanc for the purchase of Defendant's interests in the CLM and T&A realty trusts, $ 324,000 that ICE owed to ICE Management, the $ 142,183 Make-up Payment (even though there was a check for this amount on January 10, 2001, Fudeman stated that he felt it was simply an "evening up of stuff" that LeBlanc had taken out previously" and should not be counted), and $ 350,000 of inventory and equipment that Defendant testified had existed at the time of the Agreement. Fudeman also [*29] testified that the companies should be considered as one entity because of common control and a "confused intermingling."

The Court declines to credit Mr. Fudeman's testimony because this approach does not comport with the correct balance sheet approach to be applied in an insolvency analysis nor with the evidence presented. Mr. Fudeman included a number of inappropriate factors in his calculation, including the following:

A. *Goodwill*

Contrary to Defendant's assertions, [HN16] goodwill is not a factor in determining insolvency, at least in liquidation cases, because goodwill cannot be separately sold to satisfy the claims of creditors. *GATX Financial Copr. v. National Fairways Partners I, Ltd. P'ship*, 2003 Conn. Super. LEXIS 88, 2003 WL 231673, *2 (Conn. Super. 2003) ("It seems unlikely that goodwill would be considered an asset in judging solvency pursuant to General Statutes § 52-552c(a), providing that '[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.'"); *see also United States v. Paradise*, 127 F. Supp.2d 951, 956 (N.D. Ill. 2000) ("The law looks to the attainment of practical results, and a solvency [*30] which it cannot employ in the payment of the debts of an unwilling debtor is certainly not distinguishable by an valuable difference from an insolvency.'" (citation omitted)).

B. *Value of the Real Estate Trusts*

Defendant asserts that the value of the CLM & and T&A realty trusts should be included in the value of ICE. The Court finds no merit in this argument. T&A and CLM were never under the ownership of ICE, but rather were transferred to third party insiders. These trusts engaged in arms-length dealings at fair market value for the rental of the Realty Trust Properties. (J.P. Mem. At pg. 7-8).

Mr. Fudeman further testified that under the Agreement, ICE actually paid $ 900,000 for the ICE Stock Redemption Transfer and gave $ 100,000 to Kennedy and LeBlanc to purchase Defendant's interest in the trusts, and ICE should therefore have a $ 100,000 receivable on its Balance Sheet reflecting this $ 100,000 "loan." Mr. Fudeman assumed this receivable existed because Kennedy and LeBlanc received Defendant's interest in the CLM and T&A trusts. Looking to the plain language of the Agreement, the Court finds no support for this argument, and declines to credit Mr. Fudeman's testimony [*31] on this point.

C. *Inventory not Reflected on the Balance Sheet*

Defendant testified that there was approximately $ 250,000 of inventory stored at the ICE warehouse, which was not reflected on the Balance Sheets of December 31, 2000. Inventory was not included on any of the ICE balance sheets in evidence preceding December 31, 2000 or subsequent thereto. No explanation was offered for the absence of inventory on the balance sheets. It is unclear from Defendant's testimony which portion of this $ 250,000 in inventory belonged to ICE and which portion may have belonged to its affiliates. Further, Defendant did not produce any corroborating testimony from anyone that would have been aware of such inventory. The only other evidence of the amount of inventory was Stephen Wentzell's report that there was between $ 35-70,000 in inventory when he was appointed as examiner almost two years after the Agreement. While the Court recognizes that there was likely some inventory not reflected on the Balance Sheet, it also notes that Defendant's testimony is this regard is wholly unsubstantiated, vague and clearly self-serving. Therefore, the Court gives little weight to this testimony. *See* [*32] *Leisy v. U.S.*, 102 F. Supp. 789, 791-92 (Minn. 1952) [HN17] ("Whether or not a party is interested goes to the weight of their testimony.")

D. *Equipment*

Similarly, Defendant testified that there was approximately $ 100,000 of equipment stored in the vehicles owned by ICE and its affiliates that was not included on the Balance Sheet. Again, this testimony is wholly uncorroborated and self serving, and the Court gives it little weight. *See Leisy*, 102 F. Supp. at 791-92. In addition, the December Balance Sheets of some of the affiliates and the Debtor do list equipment as an asset. No testimony in the record addresses whether the equipment on the various balance sheets includes the equipment Defendant testifies was stored in the trucks, and the Court declines to speculate.

E. *Make-up Payment*

Case 1:06-cv-00147-JJF     Document 26-6     Filed 06/14/2006     Page 34 of 35

Page 11

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

Mr. Fudeman testified that he would add the value of the Make-up Payment back into the value of ICE for determining insolvency. Mr. Fudeman testified that this amount was not part of the redemption amount, and thus it was "different." (Jan. 13 Tr. at 110). As Plaintiff points out, however, this is a distribution that reduces the capital of ICE. The Court thus declines [*33] to credit Mr. Fudeman testimony on this point.

### F. Debt Owed to ICE Management

Mr. Fudeman testified that he added $ 324,000 back into the value of ICE on account of a debt owed by ICE to ICE Management. Mr. Fudeman stated that he believed this liability was in question because there was no consideration given for it. No other evidence was presented to support this assertion, although Mr. Fudeman stated that he based his testimony in this regard on opinions of various bank personnel. (Jan. 13 Tr. at 123). In the absence of any evidence supporting this conclusion, the Court declines to credit Mr. Fudeman's testimony on this point.

### G. Consolidation

Finally, Defendant argues that both the Debtors and the non-debtor affiliates should be consolidated for purposes of determining solvency. The assets and liabilities of ICE, Management, CONN, CLM, and T&A will not be consolidated for the purposes of determining solvency because Defendant, as the proponent of consolidation, failed to satisfy his burden of proof that the separate identity of those entities should be disregarded. See Nat'l Med. Care, Inc. v. Home Med. of America, Inc., 2002 Mass. Super. LEXIS 338, 2002 WL 31187683, *4 (Mass. Super. [*34] Ct., August 9, 2002) ("There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary."(citations omitted)).

Defendant's expert stated that he believed that the ICE, Management, CONN, CLM, and T&A should be consolidated on an accounting basis because of common control (Jan. 14, 2004 Tr. at 88-89). [HN18] Whether separate legal entities should be consolidated on accounting basis, though, is not determinative of whether a creditor of one legal entity has the legal or equitable right to reach the assets of another separate but related entity to satisfy that creditor's claim, which in this instance is the appropriate test. Established Massachusetts law controls. In determining whether separate corporate identities should be disregarded, Massachusetts courts examine, among other factors, whether there exists: (i) a pervasive control of the corporations by the dominant shareholders; (ii) a confused intermingling of the corporations' business assets; (iii) thin capitalization; (iv) non-observance of

corporate formalities; (v) the absence of corporate records; (vi) a siphoning away of corporate assets [*35] by affiliates; (vii) the use of one corporation for another's transactions; and (viii) the use of the various corporations in promoting a fraud. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 751-52 (Mass. 1968); Pepsi Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985). "Common ownership of the stock of two or more corporations with common management, standing alone, will not give rise to the liability on the part of one corporation for the acts of another." My Bread Baking, 233 N.E.2d at 752.

In this case, the stipulated facts and other evidence establish that each of the subject entities were legally existing entities that maintained separate books and records, filed separate tax returns (Jan. 13, 2004 Tr. at pg. 82, 115-116), and maintained separate banking accounts (J.P. Mem. at pg. 11-12). In addition, ICE entered into arm length lease agreements with CLM and T&A, (J. P. Mem. at pg. 7-8), both of which paid their own mortgages on the Realty Trust Properties (Jan. 13, 2004 Tr. at pg. 55). Defendant offered no evidence, by way of testimony or documentation, that [*36] any of the assets or liabilities of the various related entities were in any way intermingled, much less confusingly intermingled. Nor did Defendant offer evidence that any of the corporations or real estate trusts ever failed to observe the necessary formalities. On the contrary, Defendant testified that the real estate trusts each collected rent from ICE and paid their own mortgages (Jan. 13, 2004 Tr. at pg. 31-32, 55). Additionally, Defendant's expert testified to having reviewed separate tax returns for each of the above referenced entities, (Jan. 13, 2004 Tr. at pg. 82), as well as separate financial statements, (Jan. 13, 2004 Tr. at pg. 115-116). Therefore, since the only evidence adduced by Defendant in support of consolidation is common ownership and common management, that evidence, standing alone, is insufficient to warrant the consolidation of those entities' individual assets and liabilities in this proceeding. My Bread Baking, 233 N.E.2d at 752. Therefore, the appropriate inquiry of insolvency on January 10, 2001 is one involving only ICE as the party to the Agreement, and as the sole maker of the Note and the Total ICE Stock Redemption Transfers.

The [*37] Court also declines to add the value of the affiliate stock that ICE received pursuant to Section III of the Agreement. Defendant could have but did not raise this issue prior to or at trial. Moreover, there is no meaningful analysis in evidence of the value of the stock of any of these affiliates. According to the December 31, 2000 Balance Sheet, the only significant equity is in ICE Management. This equity is composed largely of the $

Case 1:06-cv-00147-JJF    Document 26-6    Filed 06/14/2006    Page 35 of 35

Page 12

2004 Bankr. LEXIS 438, *; 42 Bankr. Ct. Dec. 249

324,000 debt owed to Management by ICE, and is also composed of equipment and inventory. From the record, there is no way for the Court to determine which assets are attributable to which affiliate, and the risk of double counting assets is virtually certain. n8

n8 *Industrial Commercial Electrical, Inc. and Affiliates Combined Financial Statements, June 30, 2001 and 2000* further reveals that the affiliate stock was not brought onto the books by ICE's accountant after the Agreement.

Based upon the stipulated facts in evidence, and the exhibits and all the testimony, the Court [*38] finds that ICE was rendered insolvent on January 10, 2001 by the amount of $ 296,447 as a result of having made the Transfers and the Note. n9 Defendant is liable to the ICE estate pursuant to Mass. Gen. Laws ch. 156, § 45 in the amount of $ 373,392.20, the portion of the total distribution of $ 669,839.20 made to Defendant in excess of the $ 296, 447 that could have been made without rendering ICE insolvent. The Court awards post-judgment interest pursuant to 28 U.S.C. section 1961. The Court does not award attorneys' fees and costs as requested by the Plaintiff as there is no basis for this request. Finally, the Court finds the amount due Defendant under the remainder of the Note should be equitably subordinated pursuant to 11 U.S.C. section 510(c). n10 *In re SPM Mfg. Corp.*, 163 B.R. 411, 416-20 (Bankr. D. Mass. 1994) (holding that while Mass. Gen. Laws. ch. 156B, section 45 would give parity with all other unsecured claims to a claim for the balance due under a note delivered by a corporation in connection

with redemption of its stock, Bankruptcy Code section 510(c) requires subordination [*39] of such a claim to all unsecured claims.)

n9 In fact, Defendant's counsel conceded in opening arguments that without the addition of certain assets advocated by Defendant's expert ICE, standing alone, was insolvent on the relevant date.. (Jan. 12, 2004 Tr. at pg. 10).

n10 Section 510(c) provides, in relevant part: [HN19] "...after notice and a hearing, the court may - (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest;"

## III. CONCLUSION

For the reasons set forth herein, Count I of the Complaint is dismissed, and Judgment shall enter for Plaintiff on Count IX.

A separate order shall enter.

Dated: April 7, 2004

Joel B. Rosenthal

United States Bankruptcy Judge

**EXHIBIT D**

B397

LEXSEE 2004 BANKR. LEXIS 520

**IN RE: US WOOD PRODUCTS INC., Debtor. MONTAGUE CLAYBROOK, CHAPTER 7 TRUSTEE, Plaintiff, v. SOL BUILDING MATERIALS CORPORATION, Defendant.**

Chapter 11, Cases No. 00-3198 (MFW), Adversary No. 03-53711 (MFW)

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

2004 Bankr. LEXIS 520; 42 Bankr. Ct. Dec. 271

April 22, 2004, Decided

**DISPOSITION:** [*1] Defendant's motion for summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant supplier filed a motion for summary judgment in connection with plaintiff trustee's action, pursuant to 11 U.S.C.S. § 547, to avoid and recover preferential transfers made by a debtor.

**OVERVIEW:** Prior to filing for bankruptcy, the supplier provided the debtor with birch plywood that the debtor used in its business. The debtor paid two invoices for the supplied goods. In addition to supplying the debtor with birch plywood, the supplier also bought goods from the debtor, which were received and accepted by the supplier. The supplier paid the debtor for the purchases. The trustee sought to avoid the transfers which the debtor made to the supplier. The supplier alleged that the payments received from the debtor were not preferential because it provided new value to the debtor in excess of those transfers. The court held that because the payments made to the supplier by the supplier were in payment of an antecedent debt, they did not constitute "new value" under 11 U.S.C.S. § 547(c)(4). Further, because the supplier received all of the goods it had ordered from the debtor and the payments it made were on account of outstanding balances, even if the supplier provided "new value" to the debtor, the "new value" defense was not available because the supplier was fully compensated for those payments.

**OUTCOME:** The court denied the supplier's motion for summary judgment.

LexisNexis(R) Headnotes

*Bankruptcy Law > Preferential Transfers*
[HN1] 11 U.S.C.S. § 547 allows a trustee to avoid any transfer made within 90 days of the debtor's bankruptcy filing in which the debtor transfers its property while insolvent thereby enabling a creditor to receive more than it otherwise would have received in the bankruptcy. 11 U.S.C.S. § 547(b).

*Bankruptcy Law > Preferential Transfers*
[HN2] 11 U.S.C.S. § 547(c) provides that a trustee may not avoid a transfer to the extent that the creditor gave "new value" to the debtor after the transfer. 11 U.S.C.S. § 547(c)(4).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] Summary judgment is appropriate if there exists no genuine issue of material fact such that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party.

*Bankruptcy Law > Preferential Transfers*

B398

[HN5] There are three elements to the new value defense under 11 U.S.C.S. § 547(c). First, the creditor must have received a transfer that is otherwise voidable under 11 U.S.C.S. § 547(b). Second, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition. If a creditor satisfies these elements, it is entitled to set off the amount of "new value" against the amount which the creditor is required to return to the trustee on account of the preferential payments it received.

*Bankruptcy Law > Preferential Transfers*
[HN6] See 11 U.S.C.S. § 547(a)(2).

*Contracts Law > Consideration*
*Bankruptcy Law > Preferential Transfers*
[HN7] The definition of "new value" in 11 U.S.C.S. § 547(a)(2) was intended to codify the usual rules of consideration.

*Contracts Law > Consideration*
[HN8] The payment of a debt, not in dispute, does not constitute valid consideration.

*Bankruptcy Law > Preferential Transfers*
[HN9] A transfer in payment of an antecedent debt does not constitute "new value" under 11 U.S.C.S. § 547(a)(2).

*Bankruptcy Law > Preferential Transfers*
[HN10] A creditor may not use the "new value" defense when the debtor has fully compensated the creditor for the "new value" as of its bankruptcy filing.

**COUNSEL:** For Montague S. Claybrook, Trustee: Montague S. Claybrook, PENTA Advisory Services, Wilmington, DE.

For DNP America, Inc, Creditor: Christopher W. Combs, LEAD ATTORNEY, Kirkland & Ellis, Los Angeles, CA.

For Montague S. Claybrook, Trustee: L. Jason Cornell, Fox Rothschild O'Brien & Frankel, L, Wilmington, DE.

For Teamsters Union 25 Health Services & Insurance Plan, Creditor: Christina E. Duddy, LEAD ATTORNEY, Dwyer, Duddy and Facklam, P.C., Boston, MA.

For Timberline Specialties Incorporated, Creditor: Michael F. Duggan, Phillips, Goldman & Spence, Wilmington, DE usa.

For Pepper Hamilton LLP for CCD-Bammel Road, Ltd., Creditor: Aaron A. Garber, Pepper Hamilton LLP, Wilmington, DE usa.

For US WOOD PRODUCTS, INC., Debtor: Bruce Grohsgal, Laura Davis Jones, Pachulski, Stang, Ziehl Young & Jones, Wilmington, DE usa.

For GE Capital Corporation, Creditor: Kevin Gross, Rosenthal Monhait Gross & Goddess, Wilmington, DE usa.

For International Paper, Decorative Products Division, Other Prof.: James E. Huggett, Flaster Greenberg, Wilmington, DE usa.

For Timber Products Sales [*2] Company, d/b/a Timber Products Co., Teamsters Union 25 Health Services & Insurance Plan, Creditors: James E. Huggett, Flaster Greenberg, Wilmington, DE usa.

For Adelman Lavine Gold and Levin, PC, Attorney: Raymond Howard Lemisch, Adelman Lavine Gold and Levin, PC, Wilmington, DE.

For Montague S. Claybrook, Trustee: Michael G. Menkowitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA usa.

For Hyster Credit Company, Creditor: Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE usa.

For Official Committee of Unsecured Creditors, Interested Party: Rick S. Miller, Jason Custer Powell, Ferry & Joseph, Wilmington, DE usa.

For CMD Realty Investment Fund II LP, Interested Party: Alex P. Montz, LEAD ATTORNEY, Mayer, Brown & Platt, Chicago, IL.

For AMB Property LP, Interested Party: Debra B. Pearson, LEAD ATTORNEY, Magruder & Associates PC.

For Ferry & Joseph, P.A., Special Counsel: Jason Custer Powell, Ferry & Joseph, Wilmington, DE usa.

For Montague S. Claybrook, Trustee: Sheldon K. Rennie, Fox Rothschild O'Brien & Frankel LL, Wilmington, DE usa.

Page 3

2004 Bankr. LEXIS 520, *; 42 Bankr. Ct. Dec. 271

For Fox Rothschild LLP, Attorney: Sheldon K. Rennie, Fox Rothschild O'Brien & Frankel [*3] LL, Wilmington, DE usa.

For Round Rock Independent School District, Creditor: Lori Gruver Robertson, LEAD ATTORNEY, Linebarger Goggan, Austin, TX.

For Montague S. Claybrook, Trustee: Magdalena Schardt, Fox Rothschild O'Brien & Frankel LL, Philadelphia, PA.

For General Electric Credit Corporation, Creditor: William F. Taylor, Jr., McCarter & English LLP, Wilmington, DE usa.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINIONBY:** Mary F. Walrath

**OPINION:**

**MEMORANDUM OPINION** n1

n1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

Before the Court is the Motion for Summary Judgment filed by SOL Building Materials Corporation ("the Defendant") in response to the Complaint filed by the Chapter 7 Trustee ("the Plaintiff") on behalf of US Wood Products, Inc. ("the Debtor") to avoid and recover preferential transfers made by the Debtor pursuant to section 547 of the Bankruptcy Code. [*4] For the following reasons, we deny the Defendant's Motion.

I. FACTUAL BACKGROUND

Prior to filing for bankruptcy, the Debtor sold lumber and lumber related products. The Defendant supplied the Debtor with birch plywood that the Debtor used in its business. On March 27, 2000, the Defendant issued an invoice to the Debtor in the amount of $ 15,844.00 for goods supplied. On May 16, 2000, the Debtor paid $ 15,685.56 to the Defendant for the invoice, and on July 14, 2000, the Debtor paid the remaining amount due ($ 158.44).

In addition to supplying the Debtor with birch plywood, the Defendant was also a customer of the Debtor. On or about May 1, 2000, the Defendant ordered goods from the Debtor in the amount of $ 11,440.00. On May 10, 2000, the Defendant ordered additional goods

from the Debtor in the amount of $ 8,043.75. The goods were shipped by the Debtor on April 24, 2000, and May 3, 2000, respectively. All of the goods were received and accepted by the Defendant n2. The Defendant paid $ 11,440.00 for the May 1 purchase from the Debtor on July 14, 2000, and $ 8,043.75 for the May 10 purchase on July 23.

n2 The transactions between the Debtor and Defendant are summarized chronologically on Exhibit A, attached hereto.

[*5]

On July 31, 2000, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. On July 29, 2002, the case was converted to chapter 7. On June 4, 2003, the Plaintiff filed a complaint to avoid and recover the $ 15,685.56 transfers which the Debtor made to the Defendant pursuant to section 547 of the Bankruptcy Code. On March 12, 2004, the Defendant filed a Motion for Summary Judgment asserting that the alleged preferential transfers are not avoidable because it provided new value to the Debtor in excess of those transfers. The Trustee opposes the Motion. A notice of completion of briefing was filed on April 2, 2004, and the matter is ripe for decision.

II. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § § 1334(b) and 157(b)(2)(A), (E), (F), & (O).

III. DISCUSSION

Section 547 of the Bankruptcy Code [HN1] allows a trustee to avoid any transfer made within ninety days of the debtor's bankruptcy filing in which the debtor transfers its property while insolvent thereby enabling a creditor to receive more than it otherwise would have received in the bankruptcy. See 11 U.S.C. § 547(b). [*6] However, section 547(c) [HN2] provides that a trustee may not avoid a transfer to the extent that the creditor gave "new value" to the debtor after the transfer. See 11 U.S.C. § 547(c)(4). The Plaintiff contends that the two payments made by the Debtor to the Defendant were preferential under section 547(b). In the Motion for Summary Judgment, the Defendant contends that the payments received from the Debtor were not preferential as a matter of law because it provided new value to the Debtor in excess of the alleged preferential transfers.

A. Standard for Summary Judgment

[HN3] Summary judgment is appropriate if there exists no genuine issue of material fact such that the

Case 1:06-cv-00147-JJF    Document 26-7    Filed 06/14/2006    Page 5 of 38

Page 4

2004 Bankr. LEXIS 520, *; 42 Bankr. Ct. Dec. 271

moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). [HN4] In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

B. New Value

[HN5] There [*7] are three elements to the new value defense under section 547(c).

> First, the creditor must have received a transfer that is otherwise voidable under section 547(b). Second, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

In re New York City Shoes, Inc., 880 F.2d 679, 680 (3d Cir. 1989). If a creditor satisfies these elements, it is entitled to set off the amount of "new value" against the amount which the creditor is required to return to the trustee on account of the preferential payments it received. Id.

Here, it is uncontested that the first element is satisfied. The Defendant received two transfers from the Debtor that are otherwise voidable under section 547(b). However, the Defendant contends that it is protected by section 547(c) because it advanced "new value" to the Debtor in excess of the alleged preferential transfers.

Section 547(a)(2) provides that

> [HN6] "new value" means money or money's worth in goods, services, or [*8] new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2). Applying the definition of "new value" as stated in the Bankruptcy Code, the Defendant contends that it provided "new value" because it gave the Debtor "money" in the form of two checks. Accordingly, the Defendant asserts that the Plaintiff should be

precluded from recovering the alleged preferential payments as a matter of law.

We disagree. [HN7] The definition of "new value" was intended to codify the usual rules of consideration. See Spada v. Spada (In re Spada), 903 F.2d 971, 976 (3d Cir. 1990). [HN8] The Restatement Second of Contracts provides that the payment of a debt, not in dispute, does not constitute valid consideration. Restatement (Second) of Contracts § 76. Accordingly, [HN9] a transfer in payment of an antecedent debt does not constitute "new value." See Peltz v. New Age Consulting Servs., Inc., 279 B.R. 99, 103-04 (Bankr. D. Del. 2002). [*9] Here, the Defendant admits that the payments made to the Debtor were on account of an antecedent debt. (Memorandum in Support of Defendant's Motion for Summary Judgment p. 2.) Consequently, we conclude that the payments made by the Defendant to the Debtor do not constitute "new value" under section 547(c)(4).

Additionally, our conclusion is bolstered by the Third Circuit's third element of a "new value" defense. See New York City Shoes, 880 F.2d at 680. [HN10] A creditor may not use the "new value" defense when the debtor has fully compensated the creditor for the "new value" as of its bankruptcy filing. Id. Here, the Defendant admits that it received all of the goods it had ordered from the Debtor and that the payments were on account of the outstanding balances. Therefore, even if we were to agree that the Defendant provided "new value" to the Debtor, the "new value" defense is not available because the Defendant was fully compensated for those payments.

IV. CONCLUSION

For the reasons set forth above, we deny the Defendant's Motion for Summary Judgment.

An appropriate order is attached.

BY THE COURT:

Dated: April 22, 2004

Mary F. Walrath

United States [*10] Bankruptcy Judge

**Exhibit A**

Summary of Transfers between SOL Building Materials and US Wood Products

March 27, 2000:
- SOL Building Materials issued invoice to US Wood for goods sold in the amount of $ 15,844.00.

May 1, 2000:

Case 1:06-cv-00147-JJF    Document 26-7    Filed 06/14/2006    Page 6 of 38

Page 5

2004 Bankr. LEXIS 520, *; 42 Bankr. Ct. Dec. 271

- SOL Building Materials agrees to purchase goods from US Wood in the amount of $ 11,400.00.

May 10, 2000:
    - SOL Building Materials agrees to purchase goods from US Wood in the amount of $ 8,043.75.

May 16, 2000: alleged preferential transfer
    - US Wood paid SOL Building Materials $ 15,685.56 for the March 27 invoice.

July 14, 2000: asserted "new value" transfer
    - SOL Building Materials paid US Wood $ 11,440.00 for the May 1 agreement to purchase.

July 14, 2000: alleged preferential transfer
    - US Wood paid SOL Building Materials $ 158.44 for the remaining balance of the March 27 invoice.

July 23, 2000: asserted "new value"
    - SOL Building Materials paid US Wood $ 8,043.75 for the May 10 agreement to purchase.

July 31, 2000: Petition Date
    - US Wood filed voluntary petition under Chapter 11 of the Bankruptcy Code.

**ORDER**

AND NOW, [*11] this 22d day of April, **2004**, upon consideration of the Motion for Summary Judgment by SOL Building Materials Corporation, it is hereby

**ORDERED** that the Motion is **DENIED.**

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

EXHIBIT E

B403

LEXSEE 2003 US.DIST.LEXIS 16006

**PPI ENTERPRISES (U.S.), INC., Plaintiff, v. DEL MONTE FOODS COMPANY
and MORGAN STANLEY & CO., INC., Defendants. DEL MONTE FOODS
COMPANY, Third-party Plaintiff, v. W.R. HUFF ASSET MANAGEMENT CO.,
L.P., W.R. HUFF ASSET MANAGEMENT CO., L.L.C., and CHARTERHOUSE
EQUITY PARTNERS, L.P., Third-party Defendants.**

**99 Civ. 3794 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2003 U.S. Dist. LEXIS 16006**

**September 11, 2003, Decided
September 11, 2003, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by
PPI Enters. (U.S.), Inc. v. Del Monte Foods Co., 2003
U.S. Dist. LEXIS 19076 (S.D.N.Y., Oct. 23, 2003)

**PRIOR HISTORY:** PPI Enters. v. Del Monte Foods
Co., 2000 U.S. Dist. LEXIS 11887 (S.D.N.Y., Aug. 16,
2000)

**DISPOSITION:** [*1] Del Monte's motion for summary
judgment granted in part and denied in part. Morgan
Stanley's motion for partial summary judgment granted.
Charterhouse and Huff's motion for summary judgment
on Third-Party Complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff stockholder sued
defendants, a corporation and the corporation's financial
advisor, alleging claims for fraud, negligent
misrepresentation, and breach of contract against the
corporation and a claim for fraud against the financial
advisor. Defendants moved for summary judgment.
Third-party defendants, other stockholders, moved for
summary judgment as to the corporation's third-party
claims for contribution and indemnification.

**OVERVIEW:** The stockholder and the corporation
entered into a stockholders agreement, requiring the
corporation to provide financial information to the
stockholder. The stockholder alleged that defendants
made misrepresentations or omissions regarding the
corporation's financial condition and prospective
purchasers of the corporation when negotiating to
purchase the stockholder's shares. The court found that
New York law applied to the tort claims under interest
analysis. The court determined that defendants were
entitled to summary judgment as to the fraud claims
because the stockholder was a sophisticated business
entity subject to a higher level of scrutiny and did not
reasonably rely on the alleged misrepresentations; the
stockholder failed to act upon the disclosures made by
defendants. The negligent misrepresentation claim failed
because it was duplicative of the breach of contract claim
and the stockholder could not show reasonable reliance.
The breach of contract claim survived because factual
questions existed as to whether the stockholder's requests
and the corporation's responses were reasonable.

**OUTCOME:** The court granted the corporation's
summary judgment motion as to the stockholder's fraud
and negligent misrepresentation claims but denied the
motion as to the breach of contract claim. The court
granted the financial advisor's summary judgment
motion as to the stockholder's fraud claim. The court
granted the other stockholders' summary judgment
motion on the third-party complaint.

**LexisNexis(R) Headnotes**

2003 U.S. Dist. LEXIS 16006, *

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Fed. R. Civ. P. 56(c) provides that summary judgment is proper if the pleadings, depositions, answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Mere conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] If the moving party meets its burden of identifying those portions of the record that it believes demonstrate the absence of genuine issues of material fact, the burden then shifts to the non-moving party to demonstrate to the court the existence of a genuine issue of material fact. To meet this burden, the non-moving party must come forward with affirmative evidence showing a genuine issue of material fact exists for trial.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. Nonetheless, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN4] It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort and contract claims in a given suit.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN5] In diversity cases, federal courts must look to the laws of the forum state to resolve issues regarding conflicts of law.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN6] New York law employs an "interest analysis" in choice of law analysis of tort claims, under which courts apply the law of the jurisdiction having the greatest interest in the litigation. According to this principle, fraud claims are governed by the laws of the jurisdiction where the injury is deemed to have occurred - which usually is where the plaintiff is located. Indeed, the traditional view has been that when a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent misrepresentations are made. For business entities such as corporations, the place of injury is the principal place of business or location of the business, as opposed to the place of incorporation or organization.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN7] The internal affairs doctrine recognizes that only one State should have the authority to regulate a corporation's internal affairs - matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders - because otherwise a corporation could be faced with conflicting demands. However, this doctrine appears to apply only in those cases where a corporation owed a fiduciary duty to shareholders.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN8] The proponent of foreign law must show that it differs materially from New York law. The law of the forum state applies where there is a false conflict.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN9] In the context of a fraud claim, courts in both Delaware and Maryland consider the sophistication of a plaintiff when considering whether reliance is justifiable.

*Torts > Business & Employment Torts > Deceit & Fraud*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN10] To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance. Also, under New York law, the plaintiff bears the burden of proving each element of a fraud claim by clear and convincing evidence, and not a mere preponderance. This evidentiary standard demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN11] In New York, it is well settled that a plaintiff cannot establish justifiable reliance when by the exercise of ordinary intelligence it could have learned of the

2003 U.S. Dist. LEXIS 16006, *

information it asserts was withheld. It is equally well settled that the level of scrutiny applied to a plaintiff in fraud cases is heightened in transactions between sophisticated business entities. When sophisticated parties fail to exercise care in their affairs, they will not be heard to complain that they were induced to enter into the transaction by misrepresentations. Accordingly, even if a defendant made a misrepresentation or material omission, this is not enough to eliminate the plaintiff's duty to examine current financial statements and other information about the defendant's business. This is particularly true when a party possesses, but fails to read the very disclosures it claims were withheld from it. In short, the "justifiable reliance" requirement ensures that a causal connection exists between the misrepresentation and the plaintiff's injury. Reckless conduct by the plaintiff that rises to a level of culpability comparable to the defendant's breaks this chain of causation and renders the plaintiff's reliance unjustifiable.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN12] In the context of fraud under New York law, when matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth. However, the fact that information may be peculiarly known to one entity does not end the analysis in the case of sophisticated players. Sophisticated players must protect themselves from misrepresentations and can do so by including protective language to that effect.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN13] In the fraud context, parties cannot demand judicial protection when they could have protected themselves with a reasonable inquiry into any misrepresented facts.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN14] In the fraud context, where a party has been put on notice of the existence of material facts which have not been documented and it nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, it may truly be said to have willingly assumed the business risk that the facts may not be as represented.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN15] In order to recover on a theory of negligent misrepresentation, a plaintiff must establish that because of some special relationship with the defendant which generally implies a closer degree of trust than the ordinary buyer-seller relationship, the law imposes on that defendant a duty to use reasonable care to impart correct information, that the information is false or incorrect, and that the plaintiff reasonably relied upon the information given. New York law does permit a finding of such a special relationship in a commercial context based upon a contract that places two parties in privity.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN16] Under Maryland law, there is an implied duty of good faith and fair dealing in all contracts.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
*Contracts Law > Breach > Causes of Action*
[HN17] New York law does not permit a tort claim to stand when it merely duplicates an alleged breach of contract. It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract. Indeed, if the only interest at stake is that of holding the defendant to a promise, the plaintiff may not transmogrify the contract claim into one for tort.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
*Contracts Law > Breach > Causes of Action*
[HN18] New York's "economic loss" rule restricts a claimant who has not suffered personal or property injury, but only "economic loss," to an action in contract for the benefit of its bargain. New York retains this rule in order to preserve the distinction between tort and contract, in an attempt to keep contract law from drowning in a sea of tort. Therefore, if the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN19] In the context of a negligent misrepresentation claim, even where a duty to disclose may exist, it does not necessarily follow that a party, even one with a special relationship, reasonably relied on misrepresentations or omissions.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*

[HN20] Under Maryland law, the interpretation of a written contract is ordinarily a question of law for the court. Furthermore, Maryland courts adhere to the "objective interpretation of contracts" principle, under which courts give the words of a contract their ordinary and usual meaning, in light of the context within which they are employed as opposed to the meaning that the parties may have intended at the time. Thus, where the terms of a contract are unambiguous, the court determines its meaning and application as a matter of law. Language which is merely general in nature or imprecisely defined is not necessarily ambiguous.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN21] When there is a bona fide ambiguity in the contract's language or legitimate doubt as to its application under the circumstances the contract is submitted to the trier of the fact for interpretation. Ambiguity arises if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language. In such cases - where the writing is not clear as to preclude doubt by a reasonable man of its meaning - the interpretation function passes from the court to the jury.

*Contracts Law > Contract Modifications*
[HN22] Under Maryland law, parties to a contract may waive provisions of that contract by behavior that is inconsistent with the intention to insist upon enforcing such provisions. Waiver is defined as the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from the circumstances. Moreover, parties to a contract can make an oral agreement, expressly or implicitly, that effectively waives the requirements of a written contact. Notably, this is so notwithstanding a written agreement that any change to a contract must be in writing. Such an oral modification of a written contract may be established by a preponderance of the evidence. Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived. However, such a clause may be waived by implication as well as by express agreement.

*Contracts Law > Contract Conditions & Provisions > Waivers*
[HN23] In the context of waiving provisions of a contract, the question of waiver is one for the fact-finder.

*Contracts Law > Remedies*

[HN24] In Maryland, it is well settled that every injury to the rights of another imports damages, and if no other damages is established, the party injured is at least entitled to a verdict for nominal damages.

*Torts > Multiple Defendants > Contribution & Indemnity*
[HN25] Under New York law, it is firmly established that contribution is not available when the underlying claim is for breach of contract. The principles of contribution codified by N.Y. C.P.L.R. § 1401 apply only to tort liability and no other common-law form of contribution is applicable to liability arising from contract. Thus, the remedy of contribution is not available to a defendant whose potential liability to the plaintiff is for economic loss resulting from an alleged breach of contract.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Torts > Multiple Defendants > Contribution & Indemnity*
[HN26] Implied indemnification is available where a defendant is held vicariously liable for the tortious acts of others, or where the liability is based on a defendant's passive negligence in failing to discover or remedy the wrongdoing of another party. However, where a plaintiff's underlying complaint charges a defendant with direct liability for breach of contract and not constructive or vicarious liability based on its relationship with other parties, there can be no third-party claim for indemnification for that breach of contract.

*Torts > Multiple Defendants > Contribution & Indemnity*
[HN27] Where the party seeking indemnification is himself at least partially at fault, indemnity will not be implied.

COUNSEL: For PPI Enterprises (US), Inc, PLAINTIFF: Steven E Greenbaum, Brown, Rudnick, Belack, Israels, LLP, New York, NY USA.

For Del Monte Foods Company, DEFENDANT: Howard S Zelbo, Clearly, Gottlieg, Steen & Hamilton, New York, NY.

For Morgan Stanley & Co, Incorporated, DEFENDANT: Kenneth M Kramer, Shearman & Sterling, LLP, New York, NY USA.

For Del Monte Foods Company, THIRD-PARTY PLAINTIFF: Howard S Zelbo, Clearly, Gottlieg, Steen & Hamilton, New York, NY:

2003 U.S. Dist. LEXIS 16006, *

For WR Huff Asset Management Co, LP, WR Huff Asset Management Co, LP, WR Huff Asset Management CO LLC, THIRD-PARTY DEFENDANTS: Wiliam G McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York, NY USA.

For Del Monte Foods Company, COUNTER-DEFENDANT: Howard S Zelbo, Clearly, Gottlieg, Steen & Hamilton, New York, NY.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** BARBARA S. JONES

**OPINION:**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Plaintiff PPI Enterprises (U.S.), Inc. ("PPIE") filed this action in May of 1999 against Defendant Del Monte Foods Company ("Del Monte") and Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") alleging fraud, breach of contract, negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Del Monte and Morgan Stanley moved to dismiss PPIE's claims pursuant to Fed. R. Civ. P. 12(c), and this Court issued an opinion on their motions in September 2000. n1 In the 2000 opinion, the Court granted Del Monte's motion to dismiss the breach of fiduciary duty claim, but denied its motion to dismiss the breach of contract, fraud, and negligent misrepresentation claims. With respect to Morgan [*2] Stanley's motion, the Court dismissed PPIE's claims of negligent misrepresentation and aiding and abetting a breach of fiduciary duty. It denied, though, Morgan Stanley's motion to dismiss the fraud claim. After this opinion issued, Del Monte and Morgan Stanley filed motions for summary judgment on the remaining claims. These motions are now before the Court.

n1 The September 2000 opinion amended an earlier decision issued on August 18, 2000.

Also before the Court are motions by the Third-Party Defendants in this case, W.R. Huff Asset Management, Co., L.P., W.R. Huff Asset Management, Co., L.L.C. (collectively "Huff Asset Management"), and Charterhouse Equity Partners, L.P. ("Charterhouse"). Del Monte impleaded these Third-Party Defendants, asserting claims of contribution and indemnification. The Third-Party Defendants have moved for summary judgment as to these claims.

**I. FACTUAL BACKGROUND**

The following chronology of events is based on the Court's review of the extensive record in this matter. [*3] Unless otherwise indicated, all facts are undisputed.

**A. Preliminary Background**

PPIE was formed in May 1988 by its corporate parent, Polly Peck International PLC ("Polly Peck"), to expand Polly Peck's global presence in the produce industry. (Compl. P 11). In January 1990, PPIE acquired for $ 12.6 million all of the outstanding shares of Series D Preferred Stock and 10,000 shares of Class A Common Stock of Del Monte Foods Company ("Del Monte"), a Maryland corporation previously known as DMPF Holdings Corp. (Compl. P 13). PPIE's stake in Del Monte represented approximately 2.6% of Del Monte's total common stock and 5.9% of the liquidation value of Del Monte's preferred stock, which had been issued in a number of series. Dividends on the Series D Preferred Stock (as well as the other series) were payable in-kind, and Series D Preferred Stock was, by its terms, junior in liquidation preference to the Series A and B Preferred Stock, which had been issued to other stockholders. The other major stockholders of Del Monte included Huff Asset Management Co. (which held approximately 37.7% of the liquidation value of Del Monte's total preferred stock outstanding and 24.7% of [*4] its total common stock outstanding), Charterhouse (which held approximately 18.4% of the liquidation value of Del Monte's total preferred stock outstanding and 8.2% of its total common stock outstanding), Merrill Lynch, Kikkoman Corporation and members of Del Monte management.

In connection with the acquisition of the Del Monte stock, PPIE, the other stockholders and Del Monte entered into a Stockholders Agreement dated January 9, 1990 (the "Stockholders Agreement"). (Compl. P 14). The Stockholders Agreement placed restrictions on the transferability of the preferred stock and provided the holders of the preferred stock with veto rights with respect to certain change of control transactions. (DM Ex. 2, § § 3, 4). In addition, the Stockholders Agreement provided in § 2.12 that:

> [Del Monte] shall, at its expense, provide to each Stockholder ... (b), as promptly as practicable, such financial statements and other information, including, without limitation, monthly management reports as such Stockholder may reasonably request.

(Compl. P 14.).

2003 U.S. Dist. LEXIS 16006, *

In October 1990, Polly Peck was placed in insolvency administration, the U.K. equivalent of a bankruptcy proceeding. (Compl. [*5] P 20). The administrators of Polly Peck were employees of the accounting firm Coopers & Lybrand, now known as PriceWaterhouseCoopers. (Kett Dep. at 16-18). Thereafter, PPIE's primary focus was to liquidate its assets and reduce its expenses. (Compl. P 20). These efforts were led by Michael Herz ("Herz"), PPIE's sole employee, who was at the time based in Connecticut. n2 (Herz Dep. at 13, 459). In carrying out his activities, Herz apparently conferred regularly with Polly Peck's London-based administrators, primarily Anthony Kett ("Kett"). (Herz Dep. at 13-14; 33).

n2 In November 1996, Herz moved from Connecticut to New York.

In September 1991, PPIE vacated its office space in Manhattan, despite the fact that its lease had seven years remaining. (Compl. P 20). The landlord, Solow Building Company, which was controlled by Shelden Solow (together "Solow"), commenced litigation against PPIE in the United States District Court for the Southern District of New York in November 1991. (Compl. P 20). In October 1992, [*6] Solow won a judgment against PPIE, but an assessment of damages was deferred pending a separate trial. (Compl. P 20).

In September 1992, PPIE asked whether Merrill Lynch, another stockholder of Del Monte, would be interested in acquiring its Del Monte stock. (Compl. P 16). In response to Merrill Lynch's indication that it might be interested in acquiring PPIE's Del Monte stock for approximately $ 2 million and to the fact that Del Monte itself might be interested in acquiring PPIE's Del Monte stock for $ 2.5 million, PPIE requested from Del Monte the opportunity to review information that would assist it in evaluating a potential sale of the Del Monte stock, at these values. (Compl. P 17). After executing a confidentiality agreement prepared by Del Monte, PPIE was given the opportunity to review all relevant non-public financial information in Del Monte's possession. (Compl. P 17). PPIE subsequently decided not to sell its Del Monte stock at that time. (Compl. P 17).

In July 1993, an investor group led by Mexican financier Carlos Cabal offered to purchase Del Monte for an equity value of $ 325 million, an offer that was subsequently reduced to $ 276 million. (DM Exs. 6, 7). In October [*7] 1993, Del Monte's investment banker notified Del Monte's stockholders, including PPIE, of the proposed transaction with Cabal. (Compl. P 18). During the course of the negotiations that took place after the offer was made, PPIE was provided with detailed

information about the proposed transaction and, subject to the confidentiality agreement, was invited to participate in negotiating sessions with Cabal and in meetings of Del Monte's Board of Directors. (Compl. P 18). Thereafter, the stockholders, relying upon information provided by Del Monte, agreed among themselves about the allocation of the proposed purchase price, with PPIE to receive approximately $ 10 million for its Del Monte stock. (Compl. P 19). In June 1994, Del Monte entered into a merger agreement with Cabal. (DM Ex. 1). However, the transaction failed to close for reasons unrelated to this matter. (Compl. P 19).

B. 1995: PPIE's Seeks to Sell Its Del Monte Stock

In June 1995, Herz (PPIE's sole employee) and Kett, as representative of Polly Peck's London-based administrators, Coopers & Lybrand, met with Del Monte in an attempt to convince Del Monte and/or its other stockholders to allow PPIE to sell or transfer [*8] its Del Monte stock to Solow. (Compl. P 21). Alternatively, they asked whether Del Monte or any of the other stockholders would be interested in acquiring its Del Monte stock for a "fair price." (Compl. P 21). At that meeting, Del Monte resisted any sale or transfer to Solow, and indicated that it was unlikely to be interested in acquiring PPIE's Del Monte stock for a price in excess of $ 500,000, since the total equity value of the company had declined to less than $ 100 million. (Compl. P 12; DM Exs. 8, 9; Kett Dep. at 46; see DM Mem. at 6, DM Ex. 8 at 6414). Del Monte discussed some of the operational and financial challenges that it was currently facing and told Herz and Kett that it expected to hire Morgan Stanley as its new investment banker to advise Del Monte on its alternatives, including an operational restructuring, with the potential for an initial public offering within two years time. (DM Ex. 8 at 6413-14).

Shortly after this meeting, Del Monte sent Kett detailed financial information, including its internal financial projections for the fiscal year ending June 30, 1996, upon condition that this information be kept confidential. (DM Ex. 13 at 6388). In late June [*9] or early July 1995, PPIE asked Prudential Securities Incorporated ("Prudential") to provide it with a "desk assessment" of the value of PPIE's Del Monte stock and to act as "financial advisor" to PPIE. (DM Ex. 14 at 6903-04). On July 7, 1995, Kett sent financial information on Del Monte, including financial projections, n3 to Prudential. (See DM Ex. 14). On August 1, 1995, Prudential sent a letter to Kett stating its view that the value of PPIE's stock was $ 3-$ 5 million to a financial buyer, but perhaps up to $ 12 million if the shares could be converted into common stock and traded publicly. (DM Ex. 15 at 6963-64).

2003 U.S. Dist. LEXIS 16006, *

n3 The cover letter from Kett to Prudential indicates that Del Monte's financial "forecast income statements for the years 1994 to 2001 as submitted to the banks" were enclosed. These forecasts are not themselves part of the record of this case. It is unclear from the record which projections were actually sent to Prudential.

In August 1995, Morgan Stanley was formally retained as Del Monte's financial [*10] advisor. n4 (DM Ex. 10). In October 1995, Morgan Stanley provided Del Monte's Board of Directors with a preliminary analysis of the company's restructuring alternatives, and advised that the company pare back its non-core, non-U.S. businesses. (MS Exs. 15 at 6-7; 20 at 13). Morgan Stanley suggested that, once such restructuring steps were taken, Del Monte would be better situated for a potential sale, merger or initial public offering. (MS Ex. 15). Del Monte's Board instructed Morgan Stanley to convey to the market that Del Monte was not for sale, but would be willing to listen to unsolicited proposals. (MS Ex. 16 at 81). From November 1995 through August 1996, Del Monte streamlined its business by selling a number of non-core businesses and changed its pricing strategy, which enabled it to improve financial performance and better position itself for a potential sale, merger or initial public offering. (MS Exs. 15 at 6-7, 20 at 13).

n4 PPIE was aware that Morgan Stanley was (or was about to be) Del Monte's investment banker as early as July 14, 1995. (See DM Ex. 11 at 6364).

[*11]

C. 1996: PPIE's Continued Efforts to Sell Its Del Monte Stock

On January 31, 1996, a representative of Coopers & Lybrand, acting on behalf of PPIE, offered to sell its Del Monte stock to Del Monte for $ 4 million, the midpoint of the valuation range that had been suggested by Prudential. (MS Ex. 7). On March 6, 1996, Del Monte's Board of Directors authorized the company to pay up to $ 2 million for PPIE's Del Monte stock, and instructed Morgan Stanley to approach PPIE with an initial offer of $ 1 million. (Herz Dep. at 5). At about the same time, representatives of Texas Pacific Group ("TPG"), a financial buyer of operating businesses, expressed to Morgan Stanley and to Huff Asset Management (Del Monte's largest shareholder) its strong interest in

exploring the acquisition of Del Monte. n5 (PPIE Ex. 50 at 962). At that time, TPG was told that Del Monte was in the midst of restructuring its operations and would not consider offers for the company until that process was complete. (PPIE Ex. 50).

n5 The March 1996 expression of interest by TPG is referred to only in a September 1996 letter from TPG to Morgan Stanley discussed infra. No other details are part of the record in this case.

[*12]

On April 4, 1996, in response to Solow's motion to set a trial date for the damages phase of its action against PPIE for breach of the lease, PPIE filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware, the state of its incorporation. Despite PPIE's bankruptcy filing, negotiations among the parties regarding the possible sale of PPIE's stock to Del Monte continued.

On April 30, 1996, Kett met with Morgan Stanley and requested Del Monte's latest interim financial results. (Kett Dep. at 171-173). On May 2, 1996, Del Monte provided Kett with its interim financial results for the quarters ending September 30 and December 31, 1995 and its internal financial model dated April 30, 1996, which contained projections for the remaining two months in its fiscal year ending June 30, 1996. (DM Ex. 19 at 18669). This financial model showed projected earnings before interest, taxes, depreciation and amortization ("EBITDA") of $ 85 million for the fiscal year ending June 30, 1996. (DM Ex. 19).

The aggregate value of the company was then estimated by multiplying the projected EBITDA by a multiple, which was based on an analysis of comparable companies and transactions. [*13] The company's debt was then subtracted from the aggregate value to arrive at an estimate of the equity value of the company. n6 (DM Ex. 19). Based on an EBITDA multiple of 6.25x and approximately $ 420 million of projected debt, these materials showed a total equity value of Del Monte of $ 102.5 million. (DM Ex. 19). This estimate stood in contrast to the accreted value n7 of the four series of preferred stock senior to the Series D Preferred Stock held by PPIE (designated Series A1, Series A2, Series B and Series C), which as of June 30, 1996, n8 was projected to be approximately $ 384 million. (DM Ex. 19). As a result, in a liquidation scenario that generated $ 102.5 million of equity value, PPIE's Series D Preferred Stock would have no "economic value." In a sale or liquidation, the Series D Preferred Stock would,

however, have some "holdup" value, given its veto rights with respect to certain types of transactions.

> n6 This method of valuation, known as the EBITDA multiple method, is a widely used method of valuation. PPIE has not contested the appropriateness of this methodology.n7 The preferred stock paid dividends "in-kind," meaning that rather than a cash payment the holders received additional face value of preferred stock on every dividend date. As a result, the face value of the preferred stock "accreted," or increased in value, periodically. [*14]

n8 PPIE makes reference to an April 30, 1996 analysis prepared by Morgan Stanley, which they argue shows that, in fact, PPIE's Del Monte stock could have been worth up to $ 5.6 million at that time. (PPIE Mem. at 29-30). The meaning of the Morgan Stanley analysis referred to and included in the record, however, is not self-evident and there is no explanation of it, in testimony or otherwise. (See PPIE Ex. 15). The Court, therefore, places little weight on the significance of this analysis.

In the May 2, 1996 cover letter to Kett that accompanied these financial materials, Del Monte's Chief Financial Officer wrote that Del Monte was projecting "a very strong performance" for its fiscal fourth quarter ending June 30, 1996, and invited Kett to call with any questions. (DM Ex. 19). Kett does not recall asking any follow-up questions or forwarding any of this material to Herz. (DM Mem. at 9). On May 7, 1996, though, Kett informed Del Monte that he intended to provide the financial information to Prudential. n9 Kett also requested that Del Monte send him interim financial statements for its [*15] fiscal third quarter ending March 30, 1996 when available. (Kett Dep. at 174-75). On May 22, 1996, Del Monte complied with this request by sending Kett the company's interim results for the quarter ending March 31, 1996. (DM Ex. 20).

> n9 Although Kett also indicated that he would be authorizing Prudential to speak directly on PPIE's behalf, there is no evidence that Prudential ever actually did so.

Shortly thereafter, on June 4, 1996, Kett spoke with Robert Berner ("Berner") of Morgan Stanley n10 to continue the negotiations regarding Del Monte's

willingness to buy back PPIE's Del Monte stock. (PPIE Ex. 7, pp. 82-84). Berner told him that he believed the total equity value of Del Monte to be between $ 90-$ 175 million as of June 30, 1996, based on a multiple of 6-7x projected EBITDA of $ 85 million and $ 420 million of projected debt. (MS Ex. 29). Berner also told him that PPIE's Del Monte stock thus had "zero economic value" because the senior series of preferred stock had an aggregate accreted value of $ [*16] 384 million. (MS Ex. 29). Berner further stated that the value of the senior series of preferred stock had been increasing at a greater rate than the rate at which Del Monte's earnings were growing, thus suggesting that time was working against PPIE in the negotiations. (MS Ex. 29; Tr. 185-87).

> n10 Berner was a Principal in Morgan Stanley's Investment Banking Department, and apparently had primary senior-level responsibility for Morgan Stanley's assignments on behalf of Del Monte, which included making presentations to Del Monte's Board of Directors.

In that same conversation, Kett asked Berner whether there was "any prospect on the horizon" for a sale of Del Monte. (MS Ex. 29). Berner replied "no" and added that the company had been up for sale for a time but that there had been no buyers, particularly none in the food industry. (MS Ex. 29). However, Kett's notes of the conversation, which he adopted at his deposition, indicate that Berner went on to say that there was "likely to be a financial buyer in [*17] a year's time." (Kett Dep. at 212-213; MS Ex. 29). Notably, Kett did not inform either Prudential or Herz of Berner's statement about the likelihood of a financial buyer. n11 (Kett Dep. at 212-213; MS Ex. 29).

> n11 Kett explains that he did not inform Prudential or Herz of Berner's statement because he did not take Berner's comment literally, believing instead that there was "no real prospect for a sale." (Kett Dep. at 213-215). Nonetheless, it is undisputed that Berner did tell Kett there would be a financial buyer in a year's time.

### D. June - September 1996: PPIE Negotiates with Del Monte Regarding a Sale of Its Del Monte Stock and Makes Requests for Information

On June 24, 1996, Berner wrote to Kett and indicated that Del Monte was prepared to pay $ 1 million for PPIE's Del Monte stock, and that this offer would

remain open until July 15, 1996. (MS Ex. 9 at 6780-81). As justification for this offer, the letter stated that, using an EBITDA valuation methodology and a range of multiples of 6-7x, [*18] the total equity value of Del Monte would be in the range of $ 105-$ 190 million. (MS Ex. 9). The letter further stated that, at this range of equity values, PPIE's Del Monte stock had "no economic value" since the accreted value of the senior series of preferred stock was $ 384 million. (MS Ex. 9). Kett forwarded this letter to Herz shortly after he received it. (Herz Dep. at 143).

Herz then spoke with Philip Shantz, a Senior Vice-President at Prudential, in an apparent attempt to reconcile the $ 1 million offer from Del Monte with Prudential's previous view that PPIE's Del Monte stock was worth $ 3-$ 5 million. (DM Ex. 26 at 2994; Herz Dep. at 254). Prudential orally replied that it was their current belief that Prudential could not sell PPIE's Del Monte stock for much more than $ 1 million, and that the earlier $ 3-$ 5 million valuation was based on factors that were no longer present. n12 (DM Ex. 26 at 2995). As a result, Prudential "strongly recommended" that PPIE accept the $ 1 million offer. (DM Ex. 26 at 2295). Herz did not share with Del Monte the fact that Prudential had revised its valuation downward, as Herz understood that he and Del Monte were engaged in "arm's length" [*19] negotiations regarding the sale of the Del Monte stock. (Herz Dep. at 274; 255-257).

n12 In particular, Prudential based its conclusions on a belief that Del Monte had not achieved its targeted results for the nine months ending March 31, 1996, "[would] most likely not achieve their targeted results for the year," and that Del Monte's business volume appeared to be declining rather than growing. The record is not clear regarding what information Prudential relied upon in making these assessments.

During the summer, of 1996, Herz spoke to Berner a number of times about Del Monte's $ 1 million offer. (See Herz Dep. at 231). In one of their July 1996 conversations, Herz asked Del Monte for "any and all information regarding Del Monte, its affairs, in order to assist [PPIE] in determining whether or not a million dollars was a fair price and the highest and best price that [PPIE] could achieve." (Herz Dep. at 182). Herz acknowledged that he did not specify what information he wanted and that he left [*20] it to Del Monte to determine what information to send to PPIE. (Herz Dep. at 185-86). Del Monte replied that the company year-end financial statements (for the fiscal year ending June 30, 1996) would be published shortly and would be

delivered to Herz at that time. (Herz Dep. at 184). On August 23, 1996, Herz again spoke to Del Monte and asked specifically for the June 30, 1996 audited financial statements. (Herz Dep. at 194). Although the final audited financial statements had not yet been completed, on August 28, 1996, Del Monte sent Herz detailed drafts of its June 30, 1996 financial statements. (DM Ex. 27). Subsequently, Herz was provided with the final audited financial statements. (MS Ex. 32).

Additionally, during their conversations that summer, Berner told Herz that PPIE's Del Monte stock had no inherent value but only had blocking or veto power. (Herz Dep. at 2993). He also told Herz several times during those months that Del Monte was regularly receiving unsolicited, general expressions of interest from potential buyers, but that there was nothing "specific." (Herz Dep. at 2993; see also Herz Dep. at 230-31). Finally, Berner informed Herz that no due diligence concerning [*21] a potential acquisition of Del Monte was occurring. (Herz Dep. at 231).

On September 4, 1996, Herz asked Berner for any other information, in addition to the June 30 financial statements which he had already received, n13 that Morgan Stanley could provide that would help him evaluate the $ 1 million offer. (MS Ex. At 10). In response, Berner referred to the existence of an offering memorandum related to an exchange offer and agreed to send it to Herz. n14 (Herz Dep. at 287). Also during this September 4, 1996 conversation, Berner told Herz that Del Monte "had been in play and was on a regular basis receiving inquiries from potential interested parties." (Herz Dep. at 287, 299). Herz made no further inquiries about the identities of these interested parties, nor did he convey the fact that Del Monte had received such inquiries to Prudential, though he did convey it to Kett. (Herz Dep. at 301).

n13 It is unclear whether Herz had received the final audited statements at this time or only the draft financial statements. n14 This document was provided to PPIE in November 1997 and is discussed infra.

[*22]

In response to PPIE's request for an extension of the deadline on Del Monte's $ 1 million offer for the Del Monte stock (apparently made by Herz during this same September 4, 1996 conversation), by letter dated September 4, 1996 Berner confirmed to Herz that the deadline had been extended through September 30, 1996. (DM Ex. 28 at 2344-45). Using identical language to the language used in Berner's June 24, 1996 letter to Kett

(which Herz had previously seen), this letter to Herz again estimated the equity valuation of Del Monte at $ 105-$ 190 million. (DM Ex. 28 at 2344-45). Herz understood that the valuation contained in the September 4 letter was based on Del Monte's EBITDA as of June 30, 1996, and therefore that the September 4 letter did not contain an updated valuation of Del Monte. (Herz Dep. at 208-09).

Then, on September 23, 1996, TPG wrote a letter to Berner of Morgan Stanley in which it reiterated its "strong interest in exploring the acquisition of Del Monte" and stated that it understood that "the Company's board is now considering the sale of Del Monte itself." (PPIE Ex. 50 at 962). This document was not provided to PPIE.

Later that month, on September 30, 1996, Del [*23] Monte provided Huff Asset Management (its largest shareholder) with its internal financial projection model dated as of September 26, 1996. (PPIE Ex. 51 at 144-151). This model showed that Del Monte's actual EBITDA for the fiscal year ending June 30, 1996 (after adjusting for a number of non-recurring items) was $ 92 million, or $ 7 million higher than the $ 85 million that the model provided to PPIE on June 2, 1996 had shown. n15 (PPIE Ex. 51 at 144-151). It also showed a projected EBITDA of $ 103 million for the twelve months ending December 31, 1996 (i.e. a different time period than that used in the projections previously provided to PPIE). (PPIE Ex. 51 at 144-151) (emphasis added). Using a multiple range of 6-7x and a projected debt balance as of December 31, 1996 of $ 357 million (compared to $ 420 million as of June 30, 1996), Del Monte indicated that its projected total equity value as of December 31, 1996 was $ 262-$ 365 million. (PPIE Ex. 5 at 144-151) (emphasis added). The foregoing analysis was also not provided to PPIE. n16

n15 In calculating the $ 92 million figure, Del Monte made a number of pro forma adjustments to reflect the sale of certain non-core assets that it had completed during fiscal 1996. Although PPIE had received the detailed draft of the June 30, 1996 financial statements as well as the actual audited financial statements, it is unlikely that it would have been able to arrive at the $ 92 million figure on its own from these documents. However, as mentioned before, the September 4, 1996 supplement to the July 15, 1996 offering memorandum, which was provided to PPIE, stated that the company's actual operating performance in fiscal 1996 was $ 6-11 million higher than earlier projected. PPIE would have

been able to calculate the EBITDA at $ 91 to $ 97 million had they used this information. [*24]

n16 The Court notes, however, that even at the top end of the range of values included in the analysis given to Huff Asset Management, PPIE's Del Monte stock would still have had no "economic value."

### E. October - December 1996: Del Monte Exchanges Confidential Information with Potential Acquirers and Provides Disclosure Updates to PPIE

Meanwhile, Del Monte had begun to position itself for a major structural transition: either an "equity restructuring" or a "sale/merger." (PPIE Ex. 49 at 19469). In September or October 1996, Morgan Stanley created a new project name for its work in this regard with Del Monte, which it called "Project Lodge." n17 (Weinberg Tr. at 15-16). The existence of this new "Project Lodge" was not divulged to PPIE. (PPIE Mem. at 14). Specifically, on October 7, 1996, Del Monte executed an engagement letter with Morgan Stanley, pursuant to which Morgan Stanley was retained to work with Del Monte "in connection with the exploration of certain strategic alternatives, including the sale, recapitalization or initial public offering" of the company. (PPIE Ex. [*25] 52 at 10736).

n17 Morgan Stanley's previous work for Del Monte, which involved advising on the sale of certain assets and a possible refinancing of certain of its indebtedness, had been called "Project Kilimanjaro." (Weinberg Tr. at 15-16; Halpern Ex. 19, 22).

At an October 22, 1996 special meeting of Del Monte's Board of Directors, Morgan Stanley informed the Board that "certain informal inquiries had been received from certain potential buyers interested in obtaining information with respect to [Del Monte's] U.S. business." (MS Ex. 33 at 2). After discussion, the Board formally authorized Del Monte's management and Morgan Stanley to respond to these inquiries, execute confidentiality agreements and provide preliminary financial and business information to interested parties. (MS Ex. 33 at 2).

On October 28, 1996, apparently in connection with its preparation of a financial information package for distribution to potential buyers, Del Monte provided to Morgan Stanley an updated internal financial model, [*26] showing projected pro forma EBITDA for calendar 1996 of $ 115 million. n18 (PPIE Ex. 56 at

2003 U.S. Dist. LEXIS 16006, *

153). This model also showed projected pro forma EBITDA of $120 million for the fiscal year ending June 30, 1997. n19 (PPIE Ex. 56 at 153). On this same date in October, Herz spoke to Del Monte's Chief Financial Officer by phone, and again inquired whether Del Monte had any additional information that could assist PPIE in evaluating the $1 million offer for the Del Monte stock. (Compl. P 33). Herz was told that no further information existed. (Compl. P 33). Moreover, Del Monte made no reference to Project Lodge, to the Board's recent decision to enter into confidentiality agreements with potential buyers or to the projection model that had been provided on that date to Morgan Stanley. n20

n18 The significant difference between this figure and the $103 million figure that had been provided to Huff on September 30, 1996 is not accounted for in the record. The Court assumes that it relates to additional or different pro forma adjustments that the company was making in order to present its best face to the market in the upcoming sale process. [*27]

n19 This is the first reference to projections for the full fiscal year ending June 30, 1997.n20 As discussed infra, a more complete disclosure of the status of the potential sale process was provided to Herz approximately two weeks later.

Between October 28, 1996 and November 5, 1996, TPG and Hicks Muse (another financial buyer of operating assets) entered into confidentiality agreements with Del Monte and were provided with certain business and financial information about Del Monte. (DM Exs. 29 at 21413, 30). On November 7, 1996, TPG held business and financial due diligence meetings with Del Monte's management. n21 (PPIE Ex. 72 at 2805).

n21 Hicks Muse held a similar meeting with Del Monte on November 19, 1997. (PPIE Ex. 72 at 2802).

On November 8, 1996, Morgan Stanley made a presentation to Del Monte's Board of Directors. (PPIE Ex. 60). Morgan Stanley reported to the Board that Del Monte's equity [*28] value had been enhanced by the restructuring of its operations and favorable business conditions, and that the timing might be right to pursue a sale of the company. (PPIE Ex. 60 at 369). Morgan Stanley's preliminary valuation analysis as of that date suggested that the equity value of Del Monte could be in

the range of $270-$375 million. n22 (PPIE Ex. 60 at 377). Morgan Stanley recommended that Del Monte formally respond to the expressions of interest that had been received, and proceed to more detailed discussions and information sharing only if acceptable valuation ranges were provided. (PPIE Ex. 60 at 408).

n22 This analysis was based on Del Monte's average pro forma EBITDA for the three years ending June 30, 1996 through June 30, 1998 of $113 million and an estimated debt balance of $420 million. (PPIE Ex. 60 at 378). The upper end of the valuation range was based on a discounted cash flow analysis. (PPIE Ex. 60 at 378). The Court again notes that, even at the upper end of this valuation range, PPIE's Del Monte stock would have had no economic value due to the liquidation value of the senior series of preferred stock, although, presumably, the "hold-up" value would increase with an increasing valuation range.

[*29]

PPIE was not made aware of or given access to the materials presented by Morgan Stanley at this Board meeting. However, Del Monte's outside counsel and Del Monte's Chief Financial Officer called Herz immediately after the November 8 Board meeting and told Herz that potential buyers had approached Del Monte, that Del Monte's Board of Directors had authorized management to go forward with the sale process, that confidentiality agreements had been signed and that prospective purchasers were to begin due diligence. n23 (Samuels Dep. at 181-82). Herz asked for no additional information.

n23 PPIE does not offer evidence to dispute that this disclosure was made and the record does contain a letter from Meyers to Herz that refers to a November 8 phone call between them. (PPIE Ex. 30 at 5465)

Rather, between November 5, 1996 and November 11, 1996, Herz and Berner continued, by phone, to negotiate the price that Del Monte was willing to pay for the stock. By November 11, 1996, the parties had agreed to a price of [*30] $1.6 million, plus an additional $400,000 payment if Del Monte were sold within two years. n24 (PPIE Ex. 33; Herz Tr. at 322, 324, 329-32, 355-60).

2003 U.S. Dist. LEXIS 16006, *

n24 Although PPIE alleges in its Memorandum of Law that during these negotiations it relied on "the defendants' persistent and repeated representations that the stock had nothing more than nuisance value and that no sale of the company was in process" (PPIE Ex. 60 at 378), this claim is unsupported. The record does not contain any evidence that Morgan Stanley made any representation that PPIE's Del Monte stock had "nothing more than nuisance value" during any of these November phone calls and it reflects that Herz knew that a sale of Del Monte might be in progress.

On November 14, 1996, Del Monte's Chief Financial Officer sent Herz a draft stock purchase agreement for PPIE's Del Monte stock, which reflected the $ 1.6 million agreement, along with certain "disclosure updates which I described in our telephone conversation of Friday [November 8]." (PPIE Ex. [*31] 30 at 5465). The "disclosure updates" included (1) an Offering Memorandum to the holders of certain of Del Monte's subordinated debt securities (the "Offering Memorandum"), dated July 15, 1996 with supplements dated August 22, 1996 and September 4, 1996; (2) a draft notice of redemption to be sent to the holders of certain of Del Monte's subordinated debt securities, dated November 18, 1996 (the "Draft Notice of Redemption"); (3) a copy of the audited financial statements for the fiscal year ending June 30, 1996; and (4) Del Monte's unaudited interim financial statements for the quarter ending September 30, 1996. (DM Exs. 1, 35).

These documents contained information previously disclosed to PPIE only orally. For example, Page 7 of the Offering Memorandum stated:

> The Company believes that the completion of a financial restructuring ... coupled with the focus by the Company on its core ... operations [and] divestiture of non-core operations ... will increase the Board of Directors' flexibility in reviewing its options to maximize shareholder value through a sale of the Company or an initial public offering ... The Board of Directors intends after the completion of the [*32] Exchange Offer ... to monitor the success of the Company's recently implemented business strategy ... and the efforts to sell Del Monte Latin America and to restructure the Company's equity, and to consider all relevant factors to determine what

additional measures could be implemented to maximize shareholder value, including a sale or initial public offering, which could occur at any time.

(DM Ex. 1 at 5188) (emphasis added). Page 2 of the Draft Notice of Redemption (which contains only two pages in total) stated in a section entitled "Inquiries from Interested Parties":

> The Company has recently received unsolicited inquiries from certain parties which have requested information to determine if they may be interested in pursuing an acquisition of [Del Monte]. The Company has executed confidentiality agreements with such parties and has made certain financial and business information available to them. The Board of Directors of the Company has not solicited offers and has made no determination to sell the Company.

(DM Ex. 35 at 5510) (emphasis added). The September 4, 1996 supplement to the Offering Memorandum also informed the reader that the company's [*33] actual operating performance in fiscal 1996 was $ 6-$ 11 million higher than previously projected. (MS Ex. 32 at 5153). The September 1997 interim financial statement, for its part, showed that Del Monte's earnings were significantly higher in the three months ending September 30, 1996 than in the comparable year-earlier period, with operating income having increased by $ 16 million and gross margin increasing from 13.9% to 21.5%. (DM Ex. 35 at 5514, 5518). Although the cover letter accompanying these financial statements invited Herz to call either Del Monte or Morgan Stanley with any questions, Herz did not do so. (Herz Dep. at 348).

In fact, Herz reviewed these disclosure documents only "briefly" and then filed them. He did not send these documents to Prudential and does not recall whether he had sent them to Kett or to anyone at Coopers & Lybrand. (DM Ex. Herz Dep. at 337-38). Nor does he recall reading the disclosure regarding the execution of confidentiality agreements and the commencement of due diligence. (Herz Dep. at 334-337).

Herz conceded that, had he been aware that confidentiality agreements were executed and certain parties were conducting due diligence - the very [*34] information contained in the Offering Memorandum and Draft Notice of Redemption - he would have considered it important and would have asked follow up questions of Del Monte. (Herz Dep. at 330-31). Kett testified to the same effect, i.e. that, had he seen the disclosure

contained in the Offering Memorandum and Draft Notice of Redemption, he would have asked Del Monte to disclose the identities of the interested parties and to provide copies of any information provided to these parties. (Kett Dep. at 227; 502-504).

Nevertheless, on or about November 21, 1996, PPIE's bankruptcy counsel filed a motion with the Bankruptcy Court specifically asking it to approve the sale of PPIE's Del Monte stock to Del Monte on the terms contained in the draft stock purchase agreement. n25 (Compl. P 35). The draft stock purchase agreement included an express disclaimer by PPIE of reliance on any representations by Del Monte not contained in the agreement, including representations regarding the "operations, financial condition, plans, [or] prospects" of Del Monte. (PPIE Ex. 30 at 5475). In addition, the draft stock purchase agreement contained a representation by PPIE that, among other things, it was [*35] a sophisticated investor and was satisfied that all its questions had been answered. n26 (PPIE Ex. 30 at 5475-76).

> n25 Because PPIE had filed a bankruptcy petition, it required the approval of the Bankruptcy Court before it could enter into a binding agreement to sell its Del Monte stock. n26 The stock purchase agreement that PPIE executed with Solow on January 23, 1997 (discussed infra) contained a similar representation by PPIE.

**F. December 1996 - January 14, 1997: The Parties' Dealings with the Bankruptcy Court**

On December 3, 1996, TPG indicated to Morgan Stanley that it did not think the total equity value of Del Monte was greater than $ 100-$ 150 million. (MS Ex. 6 at 43). This amount was much lower than the values projected by Morgan Stanley in its November 8, 1996 presentation to Del Monte's Board of Directors, and was considered an "insult" by Del Monte management. (MS Ex. 6 at 44, 46). Because Del Monte's Board of Directors had informed Morgan Stanley that it was unlikely [*36] to entertain offers below a $ 200 million total equity value, Morgan Stanley did not regard this valuation range as potentially leading to the sale of Del Monte. (MS Ex. 44, 46). PPIE was not informed of this offer.

The following day, December 4, 1996, the Bankruptcy Court held a hearing on PPIE's proposed sale of its stock to Del Monte. PPIE told the court that it had concluded "based on valuations that had been provided [by] Del Monte ... [that] the equity [of its Del Monte stock] was worth little or nothing." (Compl. P 39).

Solow, PPIE's largest unaffiliated creditor, objected to PPIE's agreement to sell its Del Monte stock to Del Monte for $ 1.6 million. (Peress Dep. 3/29/01 at 13-14). Consequently, at a December 19, 1996 hearing, the Bankruptcy Court ordered that PPIE's Del Monte stock be auctioned. (DM Ex. 38 at 1289). At that hearing, Del Monte's outside counsel pressed the Bankruptcy Court to require that the auction be concluded by January 15, 1997. When asked by the Bankruptcy Court for its rationale for this date, Del Monte's counsel referred to an ongoing financial restructuring of Del Monte in an attempt to ward off a potential bankruptcy filing by Del Monte itself [*37] as well as to "other dynamics that will come into play [after January 15] which I'm not at liberty to discuss." (PPIE Ex. 85 at 559). PPIE claims that Del Monte's representations were not true, arguing that there is circumstantial evidence - namely that Del Monte was acquired in April 1997 - that Del Monte wanted this January 15 date so that it could more easily proceed with that sale. Regardless, the Bankruptcy Court ordered that the auction be concluded by January 10, 1997. (DM Ex. 38 at 1287).

In preparation for a Bankruptcy Court hearing scheduled for January 8, 1997 to address a motion by Solow to dismiss the bankruptcy proceeding, PPIE's bankruptcy counsel, David Peress ("Peress"), and Herz held a conference call with Del Monte's Chief Financial Officer and Berner of Morgan Stanley on January 7, 1997. (Herz Dep. at 410; Peress Dep. 3/8/01 at 44). During that call, Berner told him that Del Monte was "exploring all avenues of investment or potential investment" and that it was still "in play" but that there was "nothing in the offing or nothing that they felt [he] should be aware of." (Peress Dep. 3/8/01 at 46).

Peress took this to mean that there were "no imminent transactions [*38] ... nothing that could be identified." (Peress Dep. 3/8/03 at 46-47). Peress explained that, in his mind, the terms "offers" and "expressions of interest" were synonymous, so he was left with the impression that there had also not been any expressions of interest by potential buyers. (Peress Dep. 3/8/03 at 47). Peress did assume, however, that it was likely that interested parties had entered into confidentiality agreements and were conducting due diligence (MS Ex. 3 at 54-55). Indeed, at the time of this conversation, Peress had read in certain publicly available documents that Morgan Stanley had been retained by Del Monte "for the purposes of pursuing additional investment or transactions, such as the sale of all or part of the company." (Peress Dep. 3/8/01 at 45) (emphasis added).

On January 9, 1997, Del Monte's Board of Directors met telephonically to discuss the potential purchase of PPIE's Del Monte stock at the upcoming auction, which

had been mandated by the Bankruptcy Court. (PPIE Exs. 62, 63). At that meeting, the Board of Directors authorized Del Monte to spend up to $ 15 million to purchase the Del Monte stock from PPIE. (PPIE Exs. 62, 63). A spreadsheet prepared by [*39] Morgan Stanley on that same date analyzed the allocation of Del Monte's total equity value, assuming that PPIE's Del Monte stock had been repurchased by Del Monte from PPIE, at a total equity valuation range of $ 350-$ 450 million. n27 (PPIE Ex. 70 at 2720). The Court notes that this analysis appears to contemplate scenarios in which the junior series of preferred stock would receive a partial payout before the senior series of preferred stock received a 100% payout. There is no assertion that anyone outside Morgan Stanley was sent this document, nor is there anything on the record as to what prompted its creation.

n27 As discussed supra, on November 8, 1996 (about two months earlier) Morgan Stanley had advised Huff Asset Management that the total equity value was in the range of $ 270-375 million.

By the close of business on January 10, 1997, Del Monte's $ 1.6 million bid for PPIE's Del Monte stock was the only offer that had been received. (Peress Dep. 3/8/01 at 202). On that date, therefore, both Peress [*40] and Herz sought information from Del Monte and Morgan Stanley to assist PPIE in convincing the Bankruptcy Court to approve the sale at a hearing scheduled for the following Monday, January 13, 1997. (Peress Dep. 3/8/01 at 198; Peress Dep. 2/29/01 at 130-31). PPIE required this information because neither Del Monte nor Morgan Stanley was willing to make a representative available to testify at the January 13 hearing. (Peress Dep. 3/8/01 at 202).

Peress asked Morgan Stanley whether it had prepared any "analyses in connection with the efforts to seek investment or possible acquisition." (Peress Dep. 3/8/01 at 203). Morgan Stanley responded that it was "in the process of working with the company to provide and prepare analyses of value, but that there was nothing available" for PPIE to review. (MS Ex. 4 at 2-162). Peress was "suspicious" about whether or not that was true. (MS Ex. 4 at 2-162).

Herz contacted Del Monte and "requested a schedule prepared by [Del Monte's Chief Financial Officer] or somebody under his control to support the notion [before the Bankruptcy Court] that there was little or no economic value to the [PPIE's Del Monte stock]" and "to convey to the court that [*41] [PPIE was] getting the highest and best offer" for the stock. (Herz Dep. at 392,

394). Herz told Del Monte that he wanted the most current information possible in the analysis. (Herz Dep. at 392). Later that day, Del Monte's Chief Financial Officer faxed to Herz a one-page chart showing that the total equity value for all of Del Monte was $ 35 million. (DM Ex. 39 at 6078-79). This chart was clearly labeled that it was based on the audited financial statements for the fiscal year 1996, which ended on June 30, 1996. (DM Ex. 39 at 6079). The chart stated that Del Monte's EBITDA for that period was $ 82 million, to which was applied a multiple of 6.0x. From an aggregate enterprise value of $ 492 million, debt of $ 457 million was subtracted, yielding an equity value of $ 35 million. n28 (DM Ex. 39 at 6079).

n28 The "as of June 30, 1996" $ 35 million valuation analysis differs significantly from the valuation analysis provided to Kett by Morgan Stanley on June 24, 1996 (which showed a valuation range of $ 105-190 million). The June 24, 1996 analysis used an (a) EBITDA of $ 85 million, (b) a range of multiples of 6-7x, and (c) an estimated debt of $ 420 million.

[*42]

What if any impact the receipt of this valuation had upon PPIE is unclear for two reasons. First, Herz testified that he did not consider the valuation further due diligence to use in analyzing the value of Del Monte. (Herz Dep. at 391). Second, given the large differential between the $ 35 million valuation provided on January 10, 1997 and the $ 105-$ 190 million valuation previously provided to PPIE on June 24, 1996, it is unlikely that PPIE actually believed that, as of January 10, 1997, the total equity value of all of Del Monte was only $ 35 million.

On January 12, 1997, Herz again spoke with Del Monte's Chief Financial Officer, (Herz Dep. at 411), who told him that PPIE's Del Monte stock had no economic, veto or blocking value, and that it had only "nuisance value." (Herz Dep. at 412). Herz was left with the "general understanding" from that conversation that Del Monte was not being sold, though he does not recall specifically what words were used. (Herz Dep. at 412-13). Herz also noted that his conversations with Morgan Stanley during this time period similarly left him with the "understanding" that there "was no definitive sale of Del Monte, proposed or contemplated" and [*43] that no definitive offers had been made. (Herz Dep. at 417-421).

On or around January 12, 1997, the Bankruptcy Court received a bid from Solow of $ 1.65 million for the Del Monte stock, and ordered PPIE's bankruptcy counsel

2003 U.S. Dist. LEXIS 16006, *

to proceed with an auction between Solow and Del Monte. (Compl. P 45; DM Ex. 40). The bidding continued until Del Monte bid $ 10.15 million. (Compl. P 48). Solow then increased his bid to $ 10.6 million plus $ 400,000 if Del Monte were sold within two years. At this point, the auction was adjourned for the day. (Compl. P 48).

On the morning of January 14, 1997, Del Monte withdrew from the bidding. (Compl. P 50). Later that afternoon, the Bankruptcy Court held an in-chambers conference during which it asked Del Monte's counsel why Del Monte had been willing to pay so much more than its previous $ 1.6 million offer, and whether there was a transaction or event that provided the impetus for Del Monte's bid. (Herz. Dep. at 541-42; see also Peress Dep. 3/29/01 at 47-48). Del Monte's counsel was specifically asked by Solow's attorney whether any transaction was "in prospect", to which Del Monte's counsel responded "no." (Peress Dep., 3/29/01 at 60). Del Monte's [*44] counsel further stated that there was "nothing more than that which had already been disclosed to the court and the parties" and that Del Monte's bidding was motivated by a desire to "simplify its capital structure." (MS Ex. 4 at 2; Peress Dep. 3/29/01 at 48). Del Monte's counsel also told the court that Del Monte was undergoing a financial restructuring and that part of the financial restructuring was "seeking interest by investors or potential acquirers." (Peress Dep. 3/29/01 at 59).

At a hearing later in the afternoon of January 14, 1997, Peress told the Bankruptcy Court that:

> If asked whether [PPIE] would consider holding the stock at this point, ... Mr. Herz's answer would be no; that Del Monte's fortunes have declined ... with the income trend being a downward one as profitable operations have been sold in order to raise funds ... leaving Del Monte with the ... relatively unprofitable ... canning business; that [its Del Monte Stock is subject to] the risk that Del Monte might one day have to engage in a restructuring transaction which could have the effect of further diluting ... or eliminating [PPIE's] interests. n29

(DM Ex. 4 at 35-36). The Bankruptcy [*45] Court, therefore, orally approved the sale to Solow on the afternoon of January 14, 1997. However, because Solow had not decided whether he was willing to purchase the Del Monte stock subject to the Stockholders Agreement, a written order approving the sale was not entered on that

date. (DM Ex. 4 at 44-46). Thus, as of January 14, 1997, there was no final sale of the stock.

> n29 The Court notes that Peress's assessment is inconsistent with the interim financial statements for the quarter ending September 30, 1996 which had been provided to PPIE.

### G. January 15-21, 1997: Morgan Stanley Provides Del Monte with an Updated Valuation and Solicits Firm Bids for the Company

In response to an early January 1997 request from Charterhouse (another of Del Monte's stockholders) for a valuation of its stake in Del Monte for purposes of its own efforts to raise capital, on January 15, 1997, Morgan Stanley provided Charterhouse with a written valuation stating that the total equity value of Del Monte was $ [*46]  350-$ 450 million. (MS Ex. 23, 24). This valuation was based on projected average EBITDA for the two fiscal years ending June 30, 1997 of $ 113 million and a range of multiples of 6.5-7.5, and incorporated "values implicit in recent unsolicited indications of interest." n30 (MS Ex. 23 at 190, 196). The letter to Charterhouse describing this valuation referred to a "possible sale of Del Monte." (MS Ex. 23 at 190). A spreadsheet attached to this valuation shows an allocation to PPIE's Del Monte stock of $ 13.3-$ 23.7 million, based on a range of values of $ 350-$ 450 million. (MS Ex. 23 at 197). On January 21, 1997, Morgan Stanley sent an almost-identical letter to Del Monte, including a valuation of $ 350-$ 450 million, to be used by Del Monte for "income tax purposes." (DM Ex. 42 at 4017, 4109).

> n30 This apparently refers to TPG's early December 1996 assessment that Del Monte's equity was worth $ 100-150 million. Morgan Stanley testified that this indication caused it to reduce, rather than increase, the valuation range that it provided to Charterhouse. (See MS Ex. 6 at 119).

[*47]

On January 21, 1997, Morgan Stanley circulated to Del Monte a draft of a letter dated January 27, 1997 to be sent to interested parties. (MS Ex. 25). This letter instructed the interested parties to submit firm offers for Del Monte by February 12, 1997. (MS Ex. 25). Later on January 21, Del Monte's Board of Directors authorized Morgan Stanley to send out the letter and solicit firm bids. n31 (MS Ex. 6 at 113).

n31 The bid solicitation letters, along with a draft Merger Agreement, were sent to TPG and Hicks Muse on January 29, 1997. (MS Mem. at 19). These letters asked for firm bids by February 12, 1997.

**H. January 23, 1997: Del Monte Provides Further Disclosure to the Bankruptcy Court and the Sale to Solow is Approved**

On January 23, 1997, Del Monte's counsel submitted a letter to the Bankruptcy Court and to PPIE's counsel to "supplement the information provided to the [Bankruptcy] Court on January 14, 1997 respecting Del Monte's equity restructuring and sale process." (DM Ex. 43). The letter [*48] explained that, since that date, Del Monte had received an analysis from Morgan Stanley suggesting that the fair market value of all of Del Monte's equity was in the range of $ 350-$ 450 million, and that the range of values for PPIE's Del Monte Stock was $ 13.3-$ 23.7 million. (DM Ex. 43). The letter acknowledged that Morgan Stanley had reviewed "the values implicit in certain non-binding, unsolicited indications of interest expressed by certain potential purchasers of Del Monte." (DM Ex. 43). The letter emphasized that the values set forth were based on a possible sale of Del Monte, that such a sale may not be consummated at all or at the valuation indicated, and that the value stated was "subject to significant uncertainties." (DM Ex. 43). At the time this letter was received by the Bankruptcy Court, it had yet to enter a written order approving the sale of PPIE's Del Monte stock to Solow.

Peress discussed the letter with both Del Monte's counsel as well as with Herz immediately after it was received. (Peress Dep. 2/29/01 at 65-66). There is no evidence that either Herz nor Peress sought any clarification of the letter from Del Monte or its counsel. At the following Bankruptcy [*49] Court hearing on January 23, 1997, Peress explained that he still wanted to go through with the sale to Solow, because "it isn't like [Del Monte or its counsel] are saying we have a deal in hand that is going to return 13 million dollars." (MS Ex. 42 at 6). Peress told the court that, despite being aware that Morgan Stanley was having discussions with potential acquirers "the record shouldn't really change in the sense that [PPIE] has gotten the highest and best offer for the [Del Monte S]tock," and he indicated his belief that there was no benefit to remarketing PPIE's Del Monte stock. (PPIE Ex. 73 at 1073). Likewise, Herz believed that "a bird in hand is always worth more than two in the bush." (Herz Dep. at 103). In addition, Del Monte's counsel explained to the Bankruptcy Court that

"it [was] not Del Monte's position that the letter should alter what the Court would otherwise do." (PPIE Ex. 73 at 1075). Thus, late in the afternoon of January 23, 1997, the Bankruptcy Court entered a written order approving the sale of the Del Monte stock to Solow for $ 10.6 million, plus $ 400,000 in the event that Del Monte was sold within two years. (DM Ex. 45 at 4). As part of the Stock [*50] Purchase Agreement between PPIE and Solow, PPIE signed a disclaimer similar to the one it had proposed to the Bankruptcy Court.

**I. February - April 1997: Del Monte is Sold to TPG**

On February 12, 1997, in response to the bid solicitation letter which it had sent out, Morgan Stanley received bids for Del Monte from TPG, Hicks Muse, Dole Foods and Tri-Valley Growers, though the only bids that were not subject to further due diligence were from TPG and Hicks Muse. (DM Ex. 47-50). TPG bid for an aggregate enterprise value n32 of $ 890 million which equated to total equity value of $ 436 million), while Hicks Muse bid $ 220 million total equity value. (DM Ex. 49 at 830; Ex. 48 at 1290). Morgan Stanley was "stunned" by the amount of TPG's bid, particularly given the great value differential between the TPG and Hicks Muse bids. (Berner Dep. at 290-291; see also Meyers Dep. at 405).

n32 Aggregate enterprise value refers to the total value to be paid for the company's business, before subtracting amounts necessary to pay off all of the company's existing indebtedness. For example, if Del Monte had $ 400 million of debt and received a bid for an aggregate enterprise value of $ 800 million, the total equity value would be $ 400 million ($ 800 million minus $ 400 million).

[*51]

PPIE argues that Del Monte was actually aware that TPG would bid an aggregate enterprise value of approximately $ 800 million as early as January 8, 1996. It points to a January 8, 1997 presentation that TPG made to potential financing sources related to a potential bid for Del Monte for that amount. (PPIE Ex. 64; Meyers Dep. at 281-82). A copy of this presentation, prepared by TPG in connection with this meeting, was discovered in the files of Del Monte's Treasurer. (PPIE Ex. 64 at 11519). PPIE argues that because this document was found in Del Monte's files, it must have had access to this document prior to the sale of the stock. However, Del Monte's General Counsel knew of no Del Monte employees who had attended the January 8 meeting nor any Del Monte employees who were aware of the

2003 U.S. Dist. LEXIS 16006, *

amount that TPG would bid for the company before bids were actually received on February 12, 1997. (Sawyers Dep. at 137). Further, Thomas Gibbons, Del Monte's Treasurer since 1995, has submitted a declaration stating that "I did not receive, see or learn of this document ... until mid-April 1997, nor did I have any knowledge of the contents of that document until after February 12, 1997." n33 (DM Gibbons [*52] Decl. PP 2-4). Morgan Stanley also denies having had knowledge of what TPG was going to bid for the company prior to February 12, 1997.

n33 A notation in a Morgan Stanley contact sheet indicates that Del Monte's Controller participated in a conference call with TPG on January 8, 1997. (MS Ex. 34 at 2805). However, Del Monte's Controller has submitted a declaration stating that, while it is possible that he participated in such a conversation, he is certain that TPG did not indicate to him prior to February 12, 1997 what it intended to bid for Del Monte. (DM French Decl. P 3).

On February 14, 1997, Del Monte's stockholders (including Solow) met to discuss a possible allocation of the $ 436 million of proceeds that they were to receive in the TPG transaction. (Banks Dep. at 262-63). Solow took an aggressive negotiating posture, threatening to veto the transaction if he did not receive a very favorable allocation of the proceeds. (Banks Dep. at 131-32; 263-65). The other stockholders eventually acceded to Solow's demands, [*53] and he received a $ 31 million allocation, which was a higher percentage of the accreted value of his stock than was received by at least one class of preferred stock higher in seniority to the stock held by Solow. (Banks Dep. at 132, 264; DM Ex. 52-53). In mid-April 1997, TPG acquired Del Monte, with Solow receiving $ 31 million for his Del Monte stock. (Compl. at P 54; DM Ex. 53 at 3243).

## II. SUMMARY JUDGMENT STANDARD

[HN1] Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Mere "conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). [HN2] If the moving party

meets its burden of identifying those portions of the record that it believes demonstrate [*54] the absence of genuine issues of material fact, "the burden then shifts to the non-moving party to demonstrate to the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit Info. Co., 970 F.2d 1110, 1112 (2d Cir. 1992). To meet this burden, the non-moving party "must come forward with affirmative evidence showing a genuine issue of material fact exists for trial." Chandra Corp. v. Val-Ex, Inc., 2001 U.S. Dist. LEXIS 7718, Civ.A. No.99-9061, 2001 WL 669252, at *2 (S.D.N.Y. Jun. 14, 2002) (citing Celotex, 477 U.S. at 324)).

[HN3] Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In this case, [*55] PPIE claims the evidence demonstrates disputed facts as to whether Del Monte and Morgan Stanley lied and omitted material facts when negotiating to purchase PPIE's holdings of Del Monte stock. PPIE claims, inter alia, that Del Monte failed to inform PPIE, before it sold its stock to Solow, that: (1) Del Monte had retained Morgan Stanley to explore strategic alternatives, including the sale of Del Monte; (2) third parties had expressed an interest in purchasing Del Monte; (3) prospective purchasers were conducting due diligence of Del Monte; and (4) Del Monte's financial condition was improving. With respect to its fraud claim against Morgan Stanley, PPIE claims that Morgan Stanley (1) misrepresented that there were no prospective buyers for Del Monte at the time that Morgan Stanley was engaged in serious negotiations with several potential buyers; (2) made false representations about the value of the Series D Shares and told PPIE that the Series D shares had "no economic value" and were "worthless"; and (3) knew to a near certainty by no later than December 1996 that Del Monte would receive offers from one or more interested purchasers that would value the equity in excess of $ 350 [*56] million." (MS Ex. 43 at P 68). PPIE alleges that due to these misrepresentations and omissions, it suffered approximately $ 20 million in losses: the difference between the auction price of its Del Monte Stock and the price that Solow later received for the stock when TPG acquired Del Monte.

Del Monte and Morgan Stanley for their parts deny making affirmative misstatements and assert that they

2003 U.S. Dist. LEXIS 16006, *

made appropriate disclosures to PPIE. They assert that PPIE's claims should be dismissed because the record demonstrates sufficient disclosures so as to negate the notion of misstatements or omissions. Additionally, they argue that because of their disclosures, PPIE could not justifiably rely on any purported misstatements or omissions, and to the extent that PPIE lacked information it was due to its own indifference to the information that Del Monte had provided.

### III. CHOICE OF LAW

Before turning to the substantive law to decide whether there are disputes as to material issues of fact in this case, this Court must determine which state law applies to the tort and contract claims. While the parties agree that Maryland law governs PPIE's contract claim against Del Monte due to a choice [*57] of law provision in the contract at issue, they dispute which state law should govern the tort claims. n34 See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1540 (2d Cir. 1997) [HN4] ("It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort and contract claims in a given suit."). This case involves three sets of tort claims: a claim for fraud and a claim for negligent misrepresentation against Del Monte and a claim for fraud against Morgan Stanley. PPIE argues that either Delaware or Maryland should apply to these tort claims. Del Monte and Morgan Stanley each seek application of New York law.

n34 It is worth noting that the contract between Del Monte and PPIE does not influence the choice of law as to the tort claims in this case. The pertinent contract provision provides that "this Agreement shall be construed and enforced in accordance with and governed by the law of the State of Maryland." Such language is too narrow to apply to the tort claims asserted by PPIE in this case. See Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (finding that a choice of law provision stating that the contract "shall be governed by and construed with the laws of [Massachusetts]" did not apply to the tort claims asserted by the plaintiff).

[*58]

"It is well-settled that, [HN5] in diversity cases, federal courts must look to the laws of the forum state to resolve issues regarding conflicts of law." Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)). Since this suit was

brought in the Southern District of New York, the Court must look to New York law to determine which state's law should apply. Generally, [HN6] "New York law employs an 'interest analysis' in choice of law analysis of tort claims, under which courts apply 'the law of the jurisdiction having the greatest interest in the litigation.'" Cromer Finance Ltd. v. Berger, 158 F. Supp. 2d 347, 357 (S.D.N.Y. 2001) (quoting Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)).

According to this principle, "fraud claims are governed by the laws of the jurisdiction where the injury is deemed to have occurred - which usually is where the plaintiff is located." Pinnacle Oil Co. v. Triumph Oklahoma, L.P., 1997 U.S. Dist. LEXIS 8985, Civ.A. No.93-3434, 1997 WL 362224, at *1 (S.D.N.Y. Jun. 27, 1997) (citing Sack v. Low, 478 F.2d 360, 366 (2d Cir. 1973) [*59] (Friendly, J.)); Cooney v. Osgood March., Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) ("If conflict-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."). Indeed, "the traditional view has been that ... when a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent misrepresentations are made." Sack, 478 F.2d at 366 (citations omitted). "For business entities such as corporations, the place of injury is the principal place of business or location of the business, as opposed to the place of incorporation or organization." Pinnacle, 1997 U.S. Dist. LEXIS 8985, 1997 WL 362224, at * 1.

Under this traditional interest analysis, PPIE and Del Monte disagree as to whether New York or Delaware has a greater interest. n35 Upon review of the record, it is clear that New York law should apply. The fraud alleged in this case was committed in pertinent part from June 1995 through January 1997. During this period, PPIE has alleged that Del Monte made false statements [*60] to Herz and Kett. During those periods, Herz, PPIE's sole representative in the United States, was first based in Connecticut and, as of mid to late 1996, he relocated to New York. As he conducted business from his residence, the Court views his home as PPIE's principal place of business. Kett was either in New York or London. n36 In addition, New York was not only PPIE's principal place of business, but it was also the place of the great majority of communications at issue in this case, which were transmitted from California, where Del Monte's Chief Financial Officer David Meyers worked, to Herz in New York. Such communications included the myriad phone calls, faxes, and mailings described earlier.

2003 U.S. Dist. LEXIS 16006, *

n35 PPIE does not argue that Maryland law should apply based on this analysis, but relies instead on the internal affairs doctrine discussed *infra*.n36 Neither party argues that Connecticut or British law should apply in this case. In any event, the Court would find that New York still has the greatest interest because the majority of the alleged fraud was completed in New York.

[*61]

Far less communication between Del Monte and PPIE occurred in Delaware, and these communications were limited to the month of January 1997, when PPIE auctioned its stock under the auspices of the Delaware Bankruptcy Court. During this month, Del Monte made specific representations to PPIE that it had no information to turn over to it that it had not already disclosed. These representations replicated earlier representations made to PPIE in New York. The other set of representations made by Del Monte in Delaware involve the January 23, 1997 letter in which Del Monte reassessed the value of PPIE's Del Monte Stock. While perhaps significant, this one letter communication does not trump the series of communications that allegedly occurred in New York. Therefore, the Court concludes that New York has the greater interest in this lawsuit.

Nevertheless, PPIE argues that Maryland law should apply due to a specialized application of the interest analysis rule: the internal affairs doctrine. See BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999). [HN7] The internal affairs doctrine "recognizes that only one State should have the authority to regulate [*62] a corporation's internal affairs - matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders - because otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645-46, 73 L. Ed. 2d 269, 102 S. Ct. 2629 (1982). Accordingly, PPIE maintains that since Del Monte is a Maryland corporation, Maryland laws should control the relationship between Del Monte and PPIE, one of its shareholders. However, this doctrine appears to apply only in those cases where a corporation owed a fiduciary duty to shareholders. See, e.g., Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 (2d Cir. 1980); BBS Norwalk One, 60 F. Supp. 2d at 129; Hart v. General Motors Corp., 129 A.D.2d 179, 185, 517 N.Y.S.2d 490 (1st Dep't 1987). In this case, though, the remaining tort claims do not involve a claim for a breach of fiduciary duty. Moreover, the allegations in this case are not peculiar to the corporate setting and could have arisen between two parties with no corporate relationship. Therefore, the internal the internal affairs

doctrine is [*63] inapplicable, and the Court will apply New York law to PPIE's claims against Del Monte.

Likewise, the Court applies New York law to PPIE's fraud claim against Morgan Stanley. As with its claims against Del Monte, PPIE argues under the interest analysis doctrine, that Delaware law should apply. However, New York has a greater interest in PPIE's claims against Morgan Stanley than Delaware. With regard to the domicile of the parties, Morgan Stanley's principal place of business was in New York at all times relevant to this action. PPIE, operating out of Herz's office in New York during the times relevant to this claim, was also domiciled in New York. The locus of the alleged tort also requires the application of New York law. Berner, the only Morgan Stanley representative to communicate with PPIE, worked out of Morgan Stanley's New York office. In November 1996, when Berner was discussing the sale of PPIE's Del Monte stock with Herz, PPIE was also domiciled in New York. (Second Herz Dep. at 480). Thus, any alleged misrepresentations made by Berner were sent from Morgan Stanley and received by PPIE in New York. By contrast, Delaware has no relationship whatsoever to PPIE's fraud claims [*64] against Morgan Stanley; Morgan Stanley did not participate in any of the Delaware Bankruptcy Court proceedings, nor did it attend the auction of PPIE's Del Monte stock. Under the circumstances, New York has the greater interest in this case, and, therefore, New York law applies.

The Court also rejects the suggestion that the internal affairs doctrine dictates the application of Maryland law to PPIE's claims against Morgan Stanley. Morgan Stanley has no corporate, contractual or statutory relationship whatsoever with PPIE. PPIE's fraud claims against Morgan Stanley are separate and distinct from PPIE's relationship with Del Monte. Accordingly, the Court is not dissuaded from its conclusion that New York law should apply.

Alternatively, the Court would apply New York law in this case because PPIE has not demonstrated that New York law differs significantly from either Maryland or Delaware law. [HN8] The proponent of foreign law must show that it differs materially from New York law. Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506, 530-31 (S.D.N.Y. 1997) (the law of the forum state applies where there is a false conflict). The only difference that PPIE claims between [*65] New York's and Delaware and Maryland's laws focuses on the reasonable reliance element of a fraud claim, which all three states share. PPIE claims that, unlike New York, neither Delaware nor Maryland take a plaintiff's sophistication into account in deciding whether reliance is justifiable. (PPIE brief at 26-27). This, however, is not accurate.

2003 U.S. Dist. LEXIS 16006, *

[HN9] Courts in both Delaware and Maryland do consider the sophistication of a plaintiff when considering whether reliance is justifiable. See, e.g., Steigerwald v. Bradley, 136 F. Supp. 2d 460, 470 (D.Md. 2001) ("As an experienced businessman," plaintiff could not justifiably rely); J.A. Moore Constr. Co. v. Sussex Assocs., L.P., 688 F. Supp. 982, 990-91 (D.Del. 1998); Gaffin v. Teledyne, Inc., 611 A.2d 467, 475 (Del. 1992); Maryland Nat'l Bank v. Traenkle, 933 F. Supp. 1280, 1285 (D.Md. 1996); Mater City Bagels, L.L.C. v. Am. Bagel Co., 50 F. Supp. 2d 460 (D.Md. 1999). Based on the similarity of the law in all three states, this Court is required to apply the tort law of New York state with respect to PPIE's claims against Del Monte.

## IV. PPIE'S FRAUD CLAIMS [*66] AGAINST DEL MONTE AND MORGAN STANLEY ARE DISMISSED

[HN10] To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; n37 (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance. Banque Arabe de Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). Also, under New York law, the plaintiff bears the burden of proving each element of a fraud claim by clear and convincing evidence, and not a mere preponderance. See Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1996) (citing Accusystems, Inc. v. Honeywell Info. Sys. Inc., 580 F. Supp. 474, 482 (S.D.N.Y. 1984) (citing cases)). "This evidentiary standard demands a high order of proof ... and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." Abrahami v. UPC Constr. Co., 224 A.D.2d 231, 638 N.Y.S.2d 11, 13 (1st Dep't 1996) (internal citation omitted).

n37 To prove concealment, a plaintiff must also establish that the defendant had a duty to disclose information to the plaintiff. See Brass v. Am. Film Tech., Inc., 987 F.2d 142, 152 (2d Cir. 1992).

[*67]

In this case, the question of whether Del Monte and Morgan Stanley made material misrepresentations or omissions with respect to their knowledge of a pending sale of Del Monte or their valuations of PPIE's Del Monte stock is a close one. As the factual record recounted earlier shows, there is no direct evidence, although there is some circumstantial evidence, that the

companies knew that a sale of Del Monte to TPG was in the making at the time of PPIE's stock sale. More significantly, there is evidence that the two companies had increased their valuations of Del Monte, and, therefore, PPIE's Del Monte Stock. Of course, valuations of companies, by their nature, are not facts but rather are estimates of a range of values based upon assumptions. That said, the companies chose to turn over only selected portions of these valuations to PPIE. This Court, accordingly, cannot determine as a matter of law that a reasonable juror could not find that Del Monte and Morgan Stanley made material misstatements or omissions. This is so even under New York's heightened pleading standard. Nevertheless, PPIE cannot demonstrate that it has met its burden under the third element of New York's fraud standard: [*68] reasonable reliance. The Court, therefore, turns to an analysis of this element.

### A. New York's Reasonable Reliance Standard

[HN11] In New York, it is well settled that a plaintiff cannot establish justifiable reliance when "by the exercise of ordinary intelligence" it could have learned of the information it asserts was withheld. Abrahami, 638 N.Y.S.2d at 14 (quoting Schumaker v. Mather, 133 N.Y. 590, 596, 30 N.E. 755, 4 Silv. A. 224 (1982)). It is equally well settled that the level of scrutiny applied to a plaintiff in fraud cases is heightened in transactions between sophisticated business entities. When sophisticated parties fail to exercise care in their affairs, they "will not be heard to complain that [they were] induced to enter into the transaction by misrepresentations." Abrahami, 638 N.Y.S. at 14 (quoting Schumaker, 133 N.Y. at 596); see also Grumman Allied Indus. Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly [*69] disinclined to entertain claims of justified reliance."); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) ("[A] party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."); Siemens Solar Indus. v. Atlantic Richfield Co., 251 A.D.2d 82, 673 N.Y.S.2d 674, 674 (1st Dep't 1998) ("Sophisticated entity's opportunities to obtain knowledge of the matters that are subjects of the alleged misrepresentations preclude its claims of reasonable reliance.").

Accordingly, even if a defendant made a misrepresentation or material omission, this is "not enough to eliminate the [plaintiff's] duty to examine current financial statements and other information about

the [defendant's] business." Giannacopoulos v. Credit Suisse, 37 F. Supp. 2d 626, 632 (S.D.N.Y. 1999). This is particularly true when a party possesses, but fails to read the very disclosures it claims were withheld from it. See Treacy v. Simmons, 1991 U.S. Dist. LEXIS 5362, Civ. A. No. 89-7052, 1991 WL 67474, at *4-*5 (S.D.N.Y. Apr. 23, 1991) (plaintiff's reliance on [*70] a broker's alleged misrepresentations was unjustifiable because the plaintiff failed to read the investments' prospectuses); Brown v. E.F. Hutton Group, 735 F. Supp. 1196 (S.D.N.Y. 1990) (same), aff'd, 991 F.2d 1020 (2d Cir. 1993). In short, "The 'justifiable reliance' requirement ensures that a causal connection exists between the misrepresentation and the plaintiff's injury ... Reckless conduct by the plaintiff that rises to a level of culpability comparable to the defendant's breaks this chain of causation and renders the plaintiff's reliance unjustifiable ...." Treacy, 1991 U.S. Dist. LEXIS 5362, 1991 WL 67474, at 5 (quoting Grubb v. Fed. Deposit Ins. Co., 868 F.2d 1151, 1163 (10th Cir. 1989)).

## B. PPIE is a Sophisticated Business Entity Subject to Higher Level of Scrutiny

It is clear that PPIE qualifies under New York law as a sophisticated entity with a heightened duty to investigate and protect itself in business transactions. PPIE, incorporated in the United States, was formed in 1988 (almost ten years prior to the stock sale at issue in this case) to acquire companies in both North and South America in order to expand [*71] the global presence of its corporate parent, Polly Peck International PLC. (MS Ex. 43 at P 11). Herz, PPIE's sole employee at the time of the stock sale, was a certified public accountant who had been in charge of PPIE's affairs since 1991. Additionally, during the stock negotiations, PPIE was advised by its administrators in London, Coopers & Lybrand, one of the largest accounting firms in the world. It had the further advice of Prudential, the investment bank it had hired specifically to assist it in valuing the worth of its Del Monte stock.

Notably, during its interactions with Del Monte throughout 1996 and 1997, PPIE viewed itself as a sophisticated business entity involved in an arms-length transaction with Del Monte, the initial intended buyer of PPIE's Del Monte stock. Indeed, Herz noted that he felt he was under no obligation to reveal the information that Prudential gave to him with regard to the price of PPIE's Del Monte stock because PPIE and Del Monte were involved in an "arms-length" transaction. (Herz Dep. at 274). In fact, when PPIE submitted to the Bankruptcy Court for its approval the draft stock purchase agreement between itself and Del Monte in which it would sell [*72] its Del Monte stock for $ 1.6 million, it included a section in that agreement that contained a representation

by PPIE that it was a "sophisticated investor with a long-time equity interest in [Del Monte] and its business ... that it had engaged and received the advice of an investment banking firm with respect to the value of the Shares, and that [PPIE was] fully able to evaluate the merits of the transaction contemplated by this Agreement." (DM Ex. 3 at 5475-76). PPIE made a similar representation again in its stock purchase agreement with Solow. (DM Ex. 3). This record, therefore, clearly establishes that PPIE was not only a sophisticated business entity but that it viewed itself as such and professed to function in such a manner.

## C. PPIE Failed to Heed Critical Information Disclosed by Del Monte and Morgan Stanley

Despite its sophistication, the record demonstrates that PPIE either failed to pursue or failed to reasonably incorporate into its own analysis of its Del Monte stock's value a series of disclosures made by Del Monte and Morgan Stanley. For example, by letter dated May 2, 1996, Meyers, Del Monte's Chief Financial Officer, sent Kett a Del Monte internal [*73] Financial Model and the Del Monte quarterly financial statements for the quarters ending September 30, 1995 and December 31, 1995. The cover letter to this package indicated Del Monte was "expecting a very strong performance in the fourth quarter, which ends June 30, 1996." By letter dated May 22, 1996, Meyers sent Kett the Del Monte third quarter financial statements ending March 31, 1996, which showed a continuing improvement in financial performance. This improved performance was confirmed by the September 30, 1996 quarterly financial statements, which were higher in the three months ending September 30, 1996 than in the comparable year-earlier period, with operating income having increased by $ 16 million. This statement also showed earnings of $ 6-$ 11 million higher than Del Monte's previous projections, which Del Monte had disclosed to PPIE.

With this and other information, PPIE easily could have performed its own analysis of Del Monte's value to discover that the projections it had earlier received from Del Monte were no longer relevant. In fact, based upon this information, William Purcell, n38 Del Monte's uncontroverted expert whom the Court credits, explained that a reasonable [*74] investor "would have arrived at an independent valuation of $ 350 million to $ 450 million or higher for the equity value of the Company." n39 (DM Ex. 36, p. 17). Notably, this is the same estimate as that offered to PPIE in the January 23, 1997 letter. To reach this conclusion, Purcell used a similar analysis to that used by Prudential in August 1995 and July 1996, when PPIE had asked Prudential to conduct an independent valuation of its Del Monte stock. n40

2003 U.S. Dist. LEXIS 16006, *

n38 Purcell has been an investment banker for over 30 years, and was elected Managing Director at Dillon, Read & Co. Inc ("Dillon Read") in 1982. He specializes in all areas of corporate finance, especially mergers and acquisitions. Currently, he is the Managing Director of investment banking firms in Washington, D.C. Purcell has a B.A. in economics from Princeton University and an MBA from New York University.n39 Purcell explained that had PPIE compared the September 30, 1995 quarterly statement with the September 30, 1996 quarterly statement, PPIE would have concluded that the rolling EBITDA for Del Monte was between $ 107 million and $ 115 million, and with an assumption of reasonable growth of 5%-15%, could have projected a June 30, 1997 fiscal year end EBITDA of $ 120 million. (DM Ex. 36 at 17). Using the same EBITDA multiple valuation method described in Berner's June 24, 1996 letter, PPIE on its own could have easily arrived at an estimated equity of $ 350 million to $ 450 million. [*75]

n40 The Court also notes, as Purcell commented in his report, that "experienced financial people clearly know that an equity valuation is not a guarantee that one can 'take to the bank,' but that it is a best estimate range based on various assumptions some of which might be inaccurate, subject to valid differences of opinion, or speculative." (DM Ex. 36, p. 6).

In fact, in September 1996, Herz "thought it important to have some third party make a determination as to the value of the [Series D Shares]." (Herz Dep. at 134). He sent the financial information he had received from Del Monte n41 to Prudential and requested that Prudential update the valuations it had previously performed. (Herz Dep. at 129-30). However, while Prudential had agreed to perform the previous valuation at no charge, it refused to conduct another valuation without a fee. (Herz Dep. at 130). Because PPIE did not have the funds available to pay for this valuation, Herz asked the Administrators for financial assistance, but Kett and the Administrators refused his request. (Herz Dep. at 132). Thus, despite the fact that [*76] in 1996 the Administrators thought it prudent to obtain an independent valuation before responding to Del Monte's offer to purchase PPIE's Del Monte stock (MS Ex. 17), and the fact that the Administrators received approximately $ 1.5 million to $ 3 million for their services to Polly Peck in 1996, (MS Ex. 5 at 324), they nonetheless refused to pay for a valuation of the Series D Shares. Therefore, before the sale of its stock to Solow,

PPIE did not obtain an independent evaluation from Prudential or conduct its own valuation to update the valuations Prudential had performed in August of 1995 and July of 1996. Such neglect does not comport with the duty imposed by New York law to investigate. n42

n41 Herz did not specify which information he gave Prudential, remembering only that he sent the most recent information that the had. (Herz Dep. at 129).n42 Herz's inattention is perhaps explained by the fact that the Administrators for Polly Peck had, by the fall of 1996, stopped paying Herz for his services, and by the end of 1996, were in arrears to Herz for approximately $ 10,000. (Herz Dep. 315-317; 339).

[*77]

Another prime example of inattention occurred on January 14, 1997, when PPIE represented to the Bankruptcy Court that Del Monte's "fortunes [had] declined ... with the income trend being a downward one ...." (DM Ex. 4 at 35). This assessment was clearly wrong in light of Del Monte's September 1996 financial statements, which were in PPIE's possession as early as November 1996. The record is clear that while there may have been information upon which PPIE relied to its detriment, it did so in the face of disclosures that clearly indicated an increase in the value of Del Monte and, hence, its Del Monte stock.

Likewise, despite PPIE's claims that Del Monte and Morgan Stanley withheld information from it with regard to Del Monte's potential sale, the record demonstrates that PPIE was given numerous indications that a sale of the company was likely. The record also shows, that as with the financial projections, PPIE failed to use the information that it was given to assess the value of its Del Monte stock. For example, Kett testified that as early as June of 1996, Berner of Morgan Stanley told him that while there were no prospects on the horizon for a sale of Del Monte in the food [*78] industry, there would "likely ... be a financial buyer in a year's time." (Kett Dep. at 212-213; MS Ex. 29). Kett did not believe this information to be of significance and did not report it to Herz. Herz, for his part, testified that from his few conversations with Berner, he was aware that Morgan Stanley has been retained by Del Monte to explore strategic alternatives, including a potential sale. (Herz Dep. at 225, 226). Herz acknowledged that a sale of Del Monte "had always been a possibility" and that Berner had informed him that Del Monte was receiving unsolicited expressions of interest. (Herz Dep. at 225-226, 228-30).

2003 U.S. Dist. LEXIS 16006, *

Herz also admitted that later, in September 1996, Berner told him that Del Monte was "in play" and was receiving inquiries from potentially interested parties on a regular basis. (Herz Dep. at 299). Despite this disclosure, Herz neither shared this information with Kett nor did he make an effort to ascertain the identity of the potential purchasers or the status of their inquiries. (Herz Dep. at 299-300). Such conduct fails to demonstrate the level of care expected of a sophisticated party in carrying out its duty to investigate.

A series of significant disclosures [*79] were also made in November 1996. On or about November 8, Del Monte's outside counsel and Del Monte's CFO Meyers orally informed Herz that Del Monte's Board of Directors had authorized management to proceed with the sale process and that Del Monte had executed confidentiality agreements with prospective purchasers, who had already begun due diligence. (Samuels Dep. at 181-82). Also in November 1996, Del Monte provided Herz with the Offering Memorandum containing detailed financial information about Del Monte. (See DM Ex. 1). Although Herz admits Meyers sent this to him in response to Herz's request for information that could assist PPIE in deciding whether to sell the Del Monte stock, Herz only "spent a few minutes looking" at the Offering Memorandum and failed to provide it to Coopers & Lybrand, Prudential or anyone else. (Herz Dep. at 345-46). Herz's inattention caused him not to notice the pointed disclosure on page 7 that "a sale of the Company ... could occur at any time." (DM 1 at 7; Herz Dep. at 347).

He also apparently did not read the two-page November 18, 1996 draft notice of mandatory redemption that Meyers sent him in November. (Herz Dep. at 594-5). Thus, Herz did not [*80] read the paragraph - under the clear heading "Inquiries From Interested Parties" - disclosing that prospective purchasers had signed confidentiality agreements with Del Monte and were conducting due diligence. As a result, Herz was unaware of these executed agreements. Significantly, Herz admits that had he been aware, he would have investigated further, asked who the prospective purchasers were and sought to see the due diligence material. (Herz Dep. at 330-31). Herz did none of these things, nor did he even contact Meyers or Berner of Morgan Stanley with any follow-up questions after receipt of these documents, despite Meyers' express written invitation to do so. (DM Ex. 33 at 5465; Herz Dep. at 348).

Kett acknowledged that Herz's failure to forward these documents to Coopers & Lybrand or to tell them about Del Monte's sale process might have been a mistake. (Kett Dep. at 387). Had Herz told him of these disclosures, he "would have asked questions to understand more fully what was meant by these statements" and sought the "identity of these potential third party purchasers" and "copies of information or documents that were provided to third parties pursuant to the confidentiality [*81] agreements." (Kett Dep. at 460, 504). Kett testified that had he known of these disclosures beforehand, he would not have approved the initial agreement to sell the Del Monte stock to Del Monte and would have conducted a further investigation before approving the later agreement to sell the Del Monte stock to Solow. (Kett Dep. at 461).

Thus, before PPIE auctioned its stock on January 12, 1997, it had been provided with ample financial information to perform updated valuations of Del Monte and its Del Monte stock, (DM Ex. 36 at PP 30-38), but had chosen not to do so. It had also been informed about the progress of Del Monte's sale process, but had failed to read Del Monte's disclosures. Clearly, PPIE acted indifferently toward its own business (indeed, its only asset) and ignored the critical information it was given. Under these circumstances, it cannot now complain that it reasonably relied on selected segments of Del Monte's and Morgan Stanley's representations, ignoring those disclosures that contained red flags that its Del Monte stock was more valuable than previously thought.

Moreover, after PPIE had agreed to the sale of its stock to Solow, but before finalization of that [*82] sale by the Bankruptcy Court, Del Monte made yet another disclosure to PPIE. On January 23, 1997, Samuels, Del Monte's lawyer, informed PPIE that Morgan Stanley had provided it with valuations estimating that the Del Monte stock could be worth more than double what Solow had bid. Nevertheless, Herz instructed his attorney to inform the court that PPIE still wanted to complete the sale. Herz explained at deposition his belief that it was worth seizing the "bird in the hand." (Herz Dep. at 103, 444). This is further evidence of the lack of causation between Del Monte's disclosures and PPIE's decision to sell its stock. n43

n43 Recognizing the implication of their decision to complete the sale to Solow in the face of the January 23, 1997 letter disclosure, PPIE claims that it did so for the additional reason that it feared that Solow would sue if it backed out. Significantly, PPIE does not support this claim with any evidence that it actually spent any time considering holding on to its stock, that it discussed this option and its consequences with its counsel, or even thought to raise the subject with the Bankruptcy Court. PPIE's utter failure to weigh the advantages - the potential for a higher sale price against the unsupported fear of

litigation make this claim nothing more than speculation. Of course, even assuming it was PPIE's fear of litigation that motivated its decision to go through with the sale, the Court's conclusion that PPIE's reliance was unreasonable before the January 1997 letter remains unchanged.

[*83]

PPIE has pointed to several cases in which courts refused to grant summary judgment against a plaintiff because they found the defendant had withheld information that was "peculiarly within defendant's knowledge." See Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980). It is true that [HN12] under New York law, "when matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he was no independent means of ascertaining the truth." Mallis, 615 F.2d at 80; Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997). However, the Second Circuit has noted that the fact that information may be peculiarly known to one entity does not end the analysis in the case of sophisticated players. Lazard Freres, 108 F.3d at 1543. As the Second Circuit has noted, sophisticated players must protect themselves from misrepresentations and can do so by including protective language to that effect. n44

n44 In fact, PPIE did calculate for the risk that Del Monte could be sold shortly after it sold its stock. It negotiated with Del Monte and then with Solow for an equity kicker, which provided that if Del Monte were to be sold within two years of the date of the Stock Sale Agreement, the buyer would pay PPIE an additional amount over the purchase price not to exceed $ 400,000. (DM Ex. 3 at 2 P4).

[*84]

In DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 321 (S.D.N.Y. 2002), the district court encountered a situation similar to the one in this case where a sophisticated plaintiff argued that the peculiar information exception should apply. In that case, the court concluded that where the plaintiff had signed a waiver of representations and knew that it was in possession of only selected information, it could not demonstrate reasonable reliance. See DynCorp, 215 F. Supp. 2d at 321-22.

Likewise, here, PPIE was on notice that it was in possession of only selected information. For example,

the Offering Memorandum indicated that Del Monte had entered confidentiality agreements with potential buyers, but Del Monte did not specify to PPIE who those potential buyers were. Despite being on notice that it had received partial and not full information, however, it signed a contract with Solow in which it stated that "it [was] knowledgeable about Del Monte and its business and the industry in which Del Monte operates, that it had engaged and received the advice of an investment banking firm with respect to the value of the Shares, and that [it was] fully able [*85] to evaluate the merits on the transaction contemplated by [the Stock Sale] Agreement." (DM Ex. 3 at 5-6 at P 9). n45 Under such circumstances, PPIE cannot now complain that it was harmed by information that Del Monte did not turn over when it was the party that failed to pursue clear disclosures.

n45 PPIE had also been willing to sign an agreement with Del Monte when it believed that Del Monte would be the purchaser of its stock, and it had submitted this agreement to the Bankruptcy Court for approval. If signed, PPIE would have disclaimed any reliance on Del Monte's express or implied representations. It also would have acknowledged that it had "the full opportunity to ask questions of and obtain information from the Company with respect to all matters relating to the transaction contemplated by this Agreement." (PPIE Ex. 30).

Indeed, even if certain misrepresentations or omissions had been made by Del Monte, [HN13] "parties cannot demand judicial protection when they could have protected themselves with a reasonable [*86] inquiry into any misrepresented facts." Giannacopoulos, 37 F. Supp. 2d at 632. PPIE cannot now, in hindsight, make out a claim for fraud because it regrets its decision to sell to Solow and wishes to hold Del Monte responsible for its own lack of attention and care to its business affairs. For these reasons, this Court finds that PPIE (1) was a sophisticated business entity, (2) did not heed the significant disclosures by Del Monte that indicated its stock's value was in excess of $ 1.6 million and (3) did not justifiably rely on alleged misrepresentations and omissions by either Del Monte or Morgan Stanley. Indeed, [HN14] "where, as here, a party has been put on notice of the existence of material facts which have not been documented and [it] nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, [it] may truly be said to have willingly assumed the business risk that the facts may not be as

represented." Lazard Freres, 108 F.3d at 1543 (2d Cir. 1997) (quoting Rodas v. Manitaras, 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)).    [*87] Accordingly, PPIE's fraud claims are dismissed.

## V. PPIE'S NEGLIGENT MISREPRESENTATION CLAIM AGAINST DEL MONTE IS DISMISSED

PPIE has brought a claim against Del Monte for negligent misrepresentation based on an alleged breach of a duty of care stemming from the contractual relationship between the parties. PPIE claims that based on the contractual relationship, namely the Stockholders Agreement, Del Monte had a duty to disclose information to PPIE, which Del Monte violated by allegedly withholding information as well as disclosing misinformation.

[HN15] In order to recover on a theory of negligent misrepresentation, a plaintiff must establish that because of some special relationship with the defendant which generally implies a closer degree of trust than the ordinary buyer-seller relationship, the law imposes on that defendant a duty to use reasonable care to impart correct information, that the information is false or incorrect, and that the plaintiff reasonably relied upon the information given.

Pappas v. Harrow Stores, Inc., 140 A.D.2d 501, 528 N.Y.S.2d 404 (2d Dep't 1988) (emphasis added). As argued by PPIE, New York law does permit [*88] a finding of such a special relationship in a commercial context based upon a contract that places two parties in privity. See Kimmell v. Schaefer, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1987) (citing Int'l Prods. Co. v. Erie R.R. Co., 244 N.Y. 331, 338, 155 N.E. 662 (1927)); Schroders, Inc. v. Hogan Systems, Inc., 137 Misc. 2d 738, 522 N.Y.S.2d 404, 406 (N.Y. Sup. Ct. 1987) (Baer, J).

In this case, if the Court were to find a special relationship existed between Del Monte and PPIE, the duty of care imposed upon Del Monte would be a duty of care in the disclosure of information to PPIE. This, however, is the same duty that the parties codified in the Stockholders Agreement. As noted earlier in this Opinion, the Stockholders Agreement provides in § 2.12 that Del Monte provide "as promptly as practicable, such financial statements and other information, including, without limitation, monthly management reports as such Stockholder may reasonably request." Thus, under the

Stockholders Agreement, Del Monte was required to reasonably respond to requests for information in good faith. See Wootton Enters., Inc. v. Subaru of American, Inc., 134 F. Supp. 2d 698, 704 n.5 (D.Md. 2001) [*89] [HN16] ("Under Maryland law, there is an implied duty of good faith and fair dealing in all contracts."). Thus, the duty of care under the negligent misrepresentation theory in this case would be no greater than the scope of the obligation arising from the contract itself.

[HN17] New York law, however, does not permit a tort claim to stand when it merely duplicates an alleged breach of contract.

It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract has been violated ... This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.

Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (N.Y. 1987) (citations omitted); Lasalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc., 2003 U.S. Dist. LEXIS 4315, CIV.A. No.02-7868, 2003 WL 1461483, at *3-*4 (S.D.N.Y. Mar. 21, 2003). Indeed, "if the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract [*90] claim into one for tort." Robehr Films, Inc. v. Am. Airlines, Inc., 1989 U.S. Dist. LEXIS 10998, CIV.A. No.85-1072, 1989 WL 111079, at *2 (S.D.N.Y. Sept. 19, 1989) (quoting Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 899 (2d Cir. 1980)).

Here, the contract itself is the sole basis for the imposition of a special duty, but that duty only extends as far as the contract's scope - the reasonable disclosure of information by Del Monte to PPIE. PPIE "failed to show that there was a legal duty imposed upon [Del Monte] independent of the contract itself, or that [Del Monte] engaged in tortious conduct 'separate and apart from [its] failure to fulfill [its] contractual obligations.'" D'Ambrosio v. Engel, 292 A.D.2d 564, 741 N.Y.S.2d 42, 44 (2d Dep't 2002) (quoting New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995)). In other words, "if [Del Monte's] conduct is evaluated as if there were no contract here, [PPIE] clearly would not be able to claim that" Del Monte was liable for negligent misrepresentation because "the underlying foundation for such a claim

2003 U.S. Dist. LEXIS 16006, *

would be [PPIE's] reliance on [Del Monte's duty to disclose information [*91] to it], an untenable position if not for the contract." Robehr Films, 1989 U.S. Dist. LEXIS 10998, 1989 WL 111079, at *3; Edwil Indus., Inc. v. Stroba Instruments Corp., 131 A.D.2d 425, 516 N.Y.S.2d 233, 233 (2d Dep't 1987) (dismissing plaintiff's tort claim because a contract obligated the defendant to render accurate statements of sales, which was the "gravamen" of the tort claim); Maharaja Travel, Inc. v. Bank of India, 1997 U.S. Dist. LEXIS 3914, CIV.A. No.94-8308, 1997 WL 154044, at *4 (S.D.N.Y. Apr. 2, 1997) ("It is insufficient as a matter of law to assert a tort claim along with a breach of contract claim unless the Complaint alleges negligent misrepresentation regarding circumstances wholly collateral to the breach of contract claim or there is a legal duty independent of the contract that exists between the parties.").

Moreover, the Court must consider that [HN18] "New York's 'economic loss' rule restricts a claimant who has not suffered personal or property injury, but only 'economic loss,' to an action in contract for the benefit of its bargain." Robehr Films, 1989 U.S. Dist. LEXIS 10998, 1989 WL 111079, at *4. New York retains this rule in order to preserve the distinction between tort and contract, [*92] in an "attempt to keep contract law 'from drown[ing] in a sea of tort.'" Carmania Corp., N.V. v. Hambrecht Terrel Intern., 705 F. Supp. 936, 938 (1989) (quoting East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 866, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986)). Therefore, "if the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." Carmania, 705 F. Supp. at 938.

In this case, PPIE "alleges only economic loss in its proposed negligence claim. It does not claim any personal injury or damage to property, as is required to recover in tort." Robehr Films, 1989 U.S. Dist. LEXIS 10998, 1989 WL 111079, at * 5. This factor, therefore, also points to the fact that, although PPIE's claim sounds in tort, it is actually a claim for a breach of contract. See Maharaja Travel, 1997 U.S. Dist. LEXIS 3914, 1997 WL 154044, at *4 (S.D.N.Y. Apr. 2, 1997) (dismissing plaintiff's fraudulent misrepresentation claim because, inter alia, "all damages alleged by [plaintiff] as arising from the alleged fraud are recoverable as damages under [plaintiff's] breach of contract claim"). Accordingly, PPIE's claim for negligent [*93] misrepresentation is dismissed.

In any event, the Court would dismiss the negligent misrepresentation claim for the same reason that it dismissed the fraud claims: that PPIE could not have reasonably relied on the alleged misrepresentations or omissions. n46 The Second Circuit has explained that [HN19] even where a duty to disclose may exist, it does

not necessarily follow that a party, even one with a special relationship, reasonably relied on misrepresentations or omissions. Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 21 (2d Cir. 2000) (affirming summary judgment against plaintiff's negligent misrepresentation claim because plaintiff could not establish reasonable reliance); Consol. Edison, Inc. v. Northeast Utils., 249 F. Supp. 2d 387, 409 (S.D.N.Y. 2003) (dismissing negligent misrepresentation claim despite fact that there might have been special relationship because plaintiff failed to establish reasonable reliance); Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001) (same).

n46 The Second Circuit has noted that omissions are "nothing more than affirmative misrepresentations" for purposes of deciding whether a party has a duty to disclose. Grumman, 748 F.2d at 738 (1984).

[*94]

In this case, as explained above, PPIE had access to critical information, including: (1) a statement by Berner of Morgan Stanley in June 1996 that he believed that there would be a financial buyer for Del Monte within one year's time; (2) oral disclosures that Del Monte was "in play" and was on a regular basis receiving inquiries from potential interested parties; (3) Del Monte's September 1996 quarterly financial statement, which disclosed that Del Monte's operating income in the first fiscal quarter of 1997 was $ 16 million higher than the previous year; (4) Del Monte's Offering Memorandum and Draft Notice of Redemption, which indicated that potential purchasers of Del Monte who had executed confidentiality agreements were conducting due diligence of the Company; (5) a November 1997 oral disclosure by Del Monte's outside counsel and CFO to the same effect; and (6) the January 1997 letter informing PPIE and the Bankruptcy Court that Del Monte now valued PPIE's Del Monte stock at $ 13.3-$ 23.7 million.

This information should have indicated to PPIE that the value of its Del Monte stock had likely increased since Del Monte had offered it $ 1.6 million for the stock in November 1996. [*95] Therefore, PPIE's reliance on Del Monte's earlier representations and alleged omissions was not reasonable, but rather reckless, as it demonstrated that PPIE "acted in 'disregard of a risk known to [it] or so obvious that [it] must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'" Stern & Stern Textiles, Inc. v. LBY Holding Corp., 1987 U.S. Dist.

2003 U.S. Dist. LEXIS 16006, *

LEXIS 750, CIV.A. No. 84-3295, 1987 WL 6434, at *2 (S.D.N.Y. Feb. 5, 1987) (quoting Dupuy v. Dupuy, 551 F.2d 1005 (5th Cir. 1977, per Judge Wisdom) (quoting W. Prosser, Handbook of the Law of Torts § 34 at 185 (4th ed. 1971)). Accordingly, PPIE's claim for negligent misrepresentation is dismissed both because it is duplicative of the breach of contract claim and because PPIE could not reasonably rely on the alleged misrepresentations and omissions of Del Monte as a matter of law.

## VI. PPIE'S BREACH OF CONTRACT CLAIM

PPIE alleges that Del Monte failed to provide information it was required to provide - upon request - under the Stockholders Agreement. As noted above, § 2.12 of the Stockholders Agreement required Del Monte to provide to PPIE all information that [*96] PPIE reasonably requested. n47 It is undisputed that PPIE made repeated requests for any and all information that might help it evaluate the value of its Del Monte stock. The question is whether Del Monte satisfied its obligation once these requests were made.

n47 Again, the precise language of the contract stated that Del Monte must provide: "as promptly as practicable, such financial statements and other information, including, without limitation, monthly management reports as such stockholder may reasonably request."

[HN20] Under Maryland law, "the interpretation of a written contract is ordinarily a question of law for the court ...." ABC Imaging of Washington, Inc. v. The Travelers Indem. Co. of Am., 150 Md. App. 390, 820 A.2d 628, 632 (Md. Ct. Spec. App. 2003). Furthermore, Maryland courts adhere to the "objective interpretation of contracts" principle, under which courts give the words of a contract "their ordinary and usual meaning, in light of the context within which they are employed" [*97] as opposed to the meaning that the parties may have intended at the time. ABC Imaging, 820 A.2d at 633. Thus, where the terms of a contract are unambiguous, the court determines its meaning and application as a matter of law. See Auction & Estate Representatives, Inc. v. Ashton, 354 Md. 333, 731 A.2d 441, 444 (Md. 1999) ("the The clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean."). The Maryland Court of Appeals has also made clear that "language which is merely general in nature or imprecisely defined is not necessarily ambiguous." Truck Ins. Exch. v. Marks Rentals, Inc., 288 Md. 428, 418 A.2d 1187, 1190 (Md. 1980).

Nonetheless, [HN21] "when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances ... the contract [is] submitted to the trier of the fact for interpretation." Monumental Life Ins. Co. v. U.S. Fid. And Guar. Co., 94 Md. App. 505, 617 A.2d 1163, 1174 (Md. Ct. of Spec. App. 1993) (citing Board of Trustees v. Sherman, 280 Md. 373, 373 A.2d 626 (Md. 1977); [*98] 4 Williston on Contracts § 616 (1961)). "Ambiguity arises if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." The Board of Educ. of Charles County v. Plymouth Rubber Co., 82 Md. App. 9, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990) (citing Truck Ins., 418 A.2d at 1187)). In such cases - where "the writing is not clear as to preclude doubt by a reasonable man of its meaning" - the interpretation function passes from the court to the jury. Bethesda Place Ltd P'ship v. Reliance Ins. Co, 1992 U.S. Dist. LEXIS 6522, Civ.A. No.91-1719, 1992 WL 97342, at * 2 (D.Md. Apr. 22, 1992).

The contract in this case "requires a factual determination as to what is deemed to be" a reasonable disclosure of documents by Del Monte. Trimed, Inc. v. Sherwood Medical Co., 772 F. Supp. 879, 885 (D.Md. 1991) (finding that the interpretation of a "best efforts" clause in a contract was properly submitted to the jury). Whether the requests for documents by PPIE were reasonable and whether Del Monte adequately responded to those reasonable [*99] requests is a question best left to a trier of fact who is "in the best position to make this factual determination, which is dependent on the circumstances of the case." Trimed, 772 F. Supp. at 885; see also Wood v. Allstate Ins. Co., 21 F.3d 741, 747 (7th Cir. 1994)(finding that whether defendant satisfied her contractual duty to respond to reasonable requests made by her insurance company was a material question of fact for the jury). The jury's decision may, of course, be influenced by evidence as to custom and usage in the industry, evidence that was not presented on this motion. See Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993)("If ... resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.") (citing World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992)). Thus, the Court finds that the interpretation of the contract as well as its application should be referred to the jury.

Del Monte argues [*100] that the contract claim should nonetheless be dismissed because, regardless of the meaning and application of § 2.12, its "supposed

duty to provide information never came into effect." (DM Memo at 44). Del Monte points to § 6.6 of the Stockholder's Agreement, which provides that "All notices and other communications provided for herein shall be in writing and shall be delivered by hand or sent by certified mail ... to the Company." Del Monte claims that because PPIE never made a written request pursuant to § 6.6, PPIE's claim under § 2.12 must fail. n48

n48 There is in the record, however, evidence that PPIE made one written request for a copy of Del Monte's Board minutes, to which, PPIE alleges, Del Monte did not respond. (PPIE Ex. 39). Whether such a request qualifies as reasonable request under the § 2.12 is a question for the jury.

As explained above, when the language of the contract is unambiguous, it is within the province of the Court to interpret the contract. Here, § 6.6 clearly provides that [*101] "all notices and other communications" with Del Monte, which are provided for in the contract, are to be in writing. This language is unambiguous, and the Court finds that it is broad enough to incorporate those communications contemplated by § 2.12. To find otherwise, would be to disregard the plain language of § 6.6. Therefore, according to the contract, PPIE should have made requests in writing.

Nevertheless, PPIE argues that Del Monte waived any claim that it might have to enforce § 6.6 with regard to § 2.12 because of its course of conduct, namely its continual response to PPIE's oral requests for documents and information. n49 In response to this claim, Del Monte points to § 6.5 of the Stockholders Agreement, which states that: "any term of [the] Agreement ... may be amended and the observance of any such term may be waived ... only with the written consent of (a) the Company and (b) Stockholders holding at least 66-2/3% of the outstanding Shares held by all the Stockholders." Del Monte maintains that because the contract has a specific waiver provision requiring written waiver, it could not have waived § 2.12 through its conduct.

n49 There are many instances of such behavior, exemplified by the following two examples. In July of 1996, Herz orally asked Del Monte for "any and all information regarding Del Monte" that would "assist" PPIE in evaluating Del Monte's one million dollar offer. In response to this, Del Monte promised to send its June 30, 1996 financials, which would soon be completed.

On August, 23, 1996, Herz again spoke to Del Monte to obtain those financials, which Del Monte did eventually send. Later, when Herz requested financial information from Del Monte that it could bring to the Bankruptcy Court to substantiate the reasonableness of Del Monte's offer, Del Monte faxed PPIE a chart showing Del Monte's total equity value at $ 35 million.

[*102]

However, [HN22] under Maryland law, parties to a contract may waive provisions of that contract by behavior that is "inconsistent with the intention to insist upon enforcing such provisions." Parks v. CAI Wireless Systems, Inc., 85 F. Supp. 2d 549, 555 (D.Md. 2000). The Maryland Court of Appeals has defined waiver as "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from the circumstances." BarGale Indus., Inc. v. Robert Realty Co., 275 Md. 638, 343 A.2d 529, 533 (Md. 1975); Guardian Life Ins. Co. v. U.S. Tower Servs., Ltd., 122 Md. App. 550, 714 A.2d 204, 210-211 (Md. Ct. Spec. App. 1998) (same). Moreover, parties to a contract can make an oral agreement, expressly or implicitly, that effectively waives the requirements of a written contact. See Hoffman v. Glock, 20 Md. App. 284, 315 A.2d 551, 554-55 (Md. Ct. Spec. App. 1974); Fantle v. Fantle, 140 Md. App. 678, 782 A.2d 377, 382 (Md. Ct. Spec. App. 2001). Notably, "this is so notwithstanding a written agreement that any [*103] change to a contract must be in writing." Univ. of Nat'l Bank v. Wolfe, 279 Md. 512, 369 A.2d 570, 576 (Md. 1977) (emphasis added) (citing Taylor v. University Nat'l Bank, 263 Md. 59, 282 A.2d 91, 93-94 (Md. 1971)). n50 Such an

oral modification of a written contract may be established by a preponderance of the evidence ... Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived. However, such a clause may be waived by implication as well as by express agreement.

Taylor, 282 A.2d at 93-94 (internal citations omitted) (quoting Freeman v. Stanbern Const. Co., 205 Md. 71, 106 A.2d 50, 55 (Md. 1954))) (emphasis added); Battista v. Savings Bank of Baltimore, 67 Md. App. 257, 507

A.2d 203, 209 (Md. Ct. Sp. App. 1986) (noting that "the decisions permitting waiver of contractual rights despite a non-waiver clause requiring a written waiver are consistent with Maryland decisions"); Mayor and City Counsel of Baltimore v. Ohio Cas. Ins. Co., 50 Md. App. 455, 438 A.2d 933, 936 (Md. Ct. Spec. App. 1982) [*104] ("oral modification of a contract, despite a provision requiring all modifications to be in writing, is permitted in Maryland"). Therefore, it is possible under Maryland law for Del Monte to have waived both the waiver provision and the written notice provision.

n50 The University Nat'l Bank case involved a similar waiver provision to the one in this case. It provided that "the rights or authority of the Bank under [the] agreement shall not be changed or terminated by said depositors or either of them except by written notice." 369 A.2d 576. The waiver provision in this case differs to the extent that it involves a third party - the other stockholders of the company. While this difference is important, Maryland law appears clearly to favor upholding the common law rule of waiver by course of conduct. Since PPIE attempts to hold only Del Monte liable based on its course of conduct, not the other stockholders, their lack of a direct stake in the action counsels against precluding a finding by the jury of waiver by course of conduct.

[*105]

[HN23] The question of waiver, though, is one for the fact-finder and should therefore go to the jury. See Battista, 507 A.2d at 209 (stating that "the question of waiver [is] one for the jury," as the question of whether defendant intended to waive is "best left to the fact-finder"); Ohio Cas., 438 A.2d at 936 (factual disputes regarding the extent of modification are for the jury to resolve).

Finally, Del Monte argues that PPIE's breach of contract claim fails because "PPIE can point to no piece of information Del Monte withheld that would have altered the outcome one iota." (DM Memo at 46). While it may indeed be difficult to assess damages in this case, [HN24] "in Maryland, 'it is well settled that every injury to the rights of another imports damages, and if no other damages is established, the party injured is at least entitled to a verdict for nominal damages.'" Planmatics, Inc. v. Showers, 137 F. Supp. 2d 616, 624 (D.Md. 2001) (quoting Cottman v. Dep't of Natural Res., 51 Md. App. 380, 443 A.2d 638, 640 (1982) (quoting Baltimore v. Appold, 42 Md. 442, 457 (1875)). In any event, it is a question of fact [*106] whether or not there were actual

damages in this case, and, therefore, this issue too shall be left for the jury. n51 Accordingly, for the above reasons, Del Monte's motion for summary judgment on the breach of contract claim is denied.

n51 Del Monte also argues that § 3.4(a)(ii) of the Stockholders Agreement restricts PPIE's breach of contract claim with respect to PPIE's assertion that Del Monte withheld information from it with respect to the potential sale of the company. Section 3.4(a)(ii) provides that a stockholder shall "provide written notice ... of such Offer to the Company and to each of the Other Stockholders not later than the thirtieth day prior to the consummation of the sale ...." Del Monte argues that, based on this clause PPIE was not entitled to such information prior to thirty days before a sale of Del Monte. This interpretation of the clause, however, is inapposite to the plain language of § 3.4(a)(ii) for two reasons. First, § 3.4(a)(ii) refers to the obligation of the stockholders to inform one another and the company of a potential sale. It does not create an obligation for Del Monte. Second, the language of the clause clearly establishes the minimum time frame by which stockholders must notify one another and the company of a sale. It does not limit disclosure prior to that time frame.

[*107]

## VII. THE MOTIONS FOR SUMMARY JUDGMENT ON THE THIRD-PARTY COMPLAINT

As noted above, Del Monte's Third-Party Complaint impleaded Charterhouse and Huff Asset Management, Del Monte's former stockholders, alleging claims against them for indemnification and contribution for any liability it may incur with respect to PPIE's tort and contract claims against it. According to Del Monte, Charterhouse and Huff Asset Management ("Third-Party Defendants") were primarily responsible for, actively engaged in and were the parties that stood to benefit from the allegedly wrongful conduct pleaded in PPIE's Complaint. Del Monte alleges that due to the Third-Party Defendants' control of Del Monte, they owed fiduciary duties to both PPIE and Del Monte, including the duty to disclose all material information to PPIE regarding the real value of or any potential sale of Del Monte. Del Monte alleges that since the Third-Party Defendants breached their fiduciary duties, they caused PPIE's alleged damages and thus Del Monte is entitled to indemnity or contribution for any damages it may incur

from PPIE's suit. Third-Party Defendants now move for summary judgment on the Third-Party Complaint.

While [*108] Del Monte initially brought claims for indemnification and contribution as to the fraud, negligent misrepresentation, and breach of contract claim, the only claim that has survived summary judgment is the breach of contract claim. The Court therefore considers whether Del Monte can bring these claims for contribution and indemnification with respect to PPIE's breach of contract claim.

The contribution claim clearly falls. [HN25] Under New York law, it is firmly established that contribution is not available when the underlying claim is for breach of contract. n52 See, e.g., Board of Educ. of Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley, 71 N.Y.2d 21, 28, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987); Rothberg v. Reichelt, 270 A.D.2d 760, 705 N.Y.S.2d 115, 117-118 (2d Dep't 2000); County of Chautauqua v. Pacos Constr. Co., 195 A.D.2d 1021, 600 N.Y.S.2d 585, 586 (4th Dep't 1993); Lawrence Dev. Corp. v. Jobin Waterproofing, Inc., 167 A.D.2d 988, 562 N.Y.S.2d 902, 902-903 (4th Dep't 1990). As the New York Court of Appeals has confirmed, the principles of contribution codified by N.Y. C.P.L.R. § 1401 apply only [*109] to tort liability and no other common-law form of contribution is applicable to liability arising from contract. Sargent, 71 N.Y.2d at 26-29 (quoting Lawrence Dev. Corp., 562 N.Y.S.2d at 902-03). Thus, "the remedy of contribution is not available to a defendant whose potential liability to the plaintiff is for economic loss resulting from an alleged breach of contract." County of Chautauqua, 600 N.Y.S.2d at 586. In keeping with this unambiguous rule, Del Monte's claim for contribution on PPIE's underlying claim for breach of contract is dismissed.

> n52 The parties appear to agree that New York law applies to the contribution and indemnification claims. See Int'l Bus. Mach. Inc. v. Liberty Mutual Fire Ins. Co., 303 F.3d 419, 423 (2d Cir. 2002).

The Court next turns to Del Monte's indemnification claims. Del Monte does not allege that the Third-Party Defendants were contractually bound to indemnify Del Monte, but rests its claim on a theory of [*110] implied indemnification. [HN26] Implied indemnification is available where a defendant is held vicariously liable for the tortious acts of others, or where the liability is based on a defendant's passive negligence in failing to discover or remedy the wrongdoing of another party. See Trustees of Columbia University v. Mitchell/Giurgola Associates,

109 A.D.2d 449, 492 N.Y.S.2d 371, 375; County of Westchester v. Welton Becket Associates, 102 A.D.2d 34, 478 N.Y.S.2d 305, 314; Am. Transtech Inc. v. U.S. Trust Corp., 933 F. Supp. 1193, 1202 (S.D.N.Y. 1996).

However, where as here, a plaintiff's underlying complaint charges a defendant with direct liability for breach of contract and not constructive or vicarious liability based on its relationship with other parties, there can be no third-party claim for indemnification for that breach of contract. See Lawrence Dev. Corp., 562 N.Y.S.2d at 903 ("because plaintiff seeks to hold defendant liable for its active negligence and breach of contract, defendant has no cause of action ... based upon the theory of implied indemnity"); Columbus v. McKinnon Corp. v. China Semiconductor Co., 867 F. Supp. 1173, 1178-1179 (W.D.N.Y. 1994) (dismissing third-party complaint for [*111] failure to state a claim for indemnification and contribution with respect to breach of contract claims); Rochester v. Holmsten Ice Rinks, Inc., 155 A.D.2d 939, 548 N.Y.S.2d 959, 960-961 (4th Dep't 1989) (defendants could not seek indemnity because the "complaint charged [defendants] only with direct liability for breach of contract and not vicarious liability based upon their relationship to another party. Thus, there is no basis for express or implied indemnity against [third-party defendant]."); Resolution Trust Corp. v. Young, 925 F. Supp. 164, 169 (S.D.N.Y. 1996) (dismissing indemnification claim where no contractual provision or vicarious liability alleged).

In the instant case, a finding of liability against Del Monte on any of PPIE's claims would be a finding of active misconduct, thereby precluding Del Monte's eligibility for indemnification as a matter of law. Indeed, if Del Monte were found liable to PPIE on the basis of the breach of contract, its liability would be grounded in its own breach of its § 2.12 duty to provide financial information to PPIE and its other stockholders. n53 Section 2.12 of the Stockholders Agreement unequivocally creates an exclusive [*112] obligation from Del Monte to its stockholders. The stockholders have no such contractual obligation to one another and none is alleged. Accordingly, indemnification is not available to Del Monte for its alleged breach of its contractual obligation to PPIE. The Third-Party complaint is therefore dismissed

> n53 Del Monte argues that indemnity is available here because any potential wrongdoing that occurred was "done by and at the direction" of Third-Party Defendants in violation of their fiduciary duty to Del Monte and because Third-Party Defendants were relatively more at fault than it. These arguments are unavailing.

2003 U.S. Dist. LEXIS 16006, *

Although a passively negligent party may obtain indemnification from an actively negligent third-party, it is clear in this case that, if Del Monte were to be held liable, it would be for their active participation in wrongdoing - albeit at the alleged behest of Third-Party Defendants. [HN27] "Where the party seeking indemnification is himself at least partially at fault, indemnity will not be implied." Columbus, 867 F. Supp. 1173, 1178.

[*113]

**CONCLUSION**

Del Monte's motion for summary judgment is granted with respect to PPIE's fraud and negligent misrepresentation claims and denied with respect to PPIE's breach of contract claim. Morgan Stanley's motion for summary judgment on the fraud claim is granted. Charterhouse and Huff's motion for summary judgment on the Third-Party Complaint is granted.

Del Monte and PPIE are ordered to submit a joint pre-trial order on or before October 23, 2003.

**SO ORDERED:**

Barbara S. Jones

United States District Judge

Dated: September 11, 2003