UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Civil Action No. 06-147(JJF) |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7 |
| Debtors. | Bankr. Case No. 01-1430 (KJC) |
| LUCENT TECHNOLOGIES INC., | Adv. Pro. No. 01-1063 (KJC) |
| Defendant-Appellant, | |
| v. | |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE, | |
| Plaintiff-Appellee. | |

## TRUSTEE CHRISTINE C. SHUBERT'S APPENDIX - VOLUME 2 OF 5

On the Brief:

    Stephen M. Rathkopf, Esq.
    David R. King, Esq.
    Andrew C. Gold, Esq.

Of Counsel:

    Sheldon K. Rennie, Esq.
    (DE Bar No. 3772)

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016-9301
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street
Suite 1300
Wilmington, Delaware 19899-2323
Telephone:    (302) 654-7444

*Attorneys for Appellee Christine C.
Shubert, Chapter 7 Trustee*

**APPENDIX**

**TABLE OF CONTENTS**

|  | ROA | Page |
|---|---|---|
| **VOLUME 1** | | |
| **PLEADINGS:** | | |
| Judgment 12/21/05 ................................................................. 351 | | B1 |
| Opinion 12/21/05 ................................................................. 347 | | B5 |
| District Court Opinion 11/18/04 ........................................ 2212 | | B93 |
| Second Amended Complaint ................................................. 69 | | B104 |
| Joint Pretrial Memorandum ................................................. 292 | | B166 |
| RJSF ..................................................................................... 327 | | B181 |
| TFOF ..................................................................................... 334 | | B189 |
| TCOL ..................................................................................... 334 | | B279 |
| **VOLUME 2** | | |
| LFOF & LCOL ..................................................................... 335 | | B435 |
| **TRIAL TRANSCRIPTS:** | | |
| Aversano ............................................................................... 363 | | B629 |
| Garrett ................................................................................... 375 | | B638 |
| Harris ..................................................................................... 366 | | B649 |
| Hayes ..................................................................................... 368 | | B673 |
| Holwell................................................................................... 375 | | B684 |
| Hopkins ................................................................................. 366 | | B687 |
| Huber ..................................................................................... 361 | | B690 |
| Hund-Mejean ......................................................................... 369 | | B695 |
| Jules ....................................................................................... 361 | | B705 |
| Keefe ..................................................................................... 374 | | B711 |

|  | ROA | Page |
|---|---|---|
| Perricone | 375 | B716 |
| Pocalyko | 358 | B728 |
| Rogers | 375 | B755 |
| Schacht | 376 | B756 |
| Solomon | 376 | B776 |
| Stark | 374 | B782 |
| Terrell | 376 | B789 |
| Verwaayen | 368 | B797 |
| Wilson | 371 | B804 |

## VOLUME 3

### JOINT TRIAL EXHIBIT TRANSCRIPTS:

| | ROA | Page |
|---|---|---|
| Ackerman | 465 | B814 |
| DiRoma | 463 | B854 |
| Harris | 478 | B871 |
| Hicks | 461 | B906 |
| Holwell | 476 | B927 |
| Kantor | 460 | B928 |
| McGinn | 466 | B954 |
| Montemarano | 468 | B956 |
| Plunkett | 477 | B980 |
| Rubin | 464 | B995 |
| Schacht | 473 | B1003 |
| Uhl | 472 | B1024 |
| Zlotnick | 462 | B1029 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|

**PLAINTIFF'S TRIAL EXHIBITS**

| Exhibit | ROA | Page |
|---|---|---|
| PX-2 | 1244 | B1043 |
| PX-3 | 1245 | B1046 |
| PX-13 | 1255 | B1048 |
| PX-21 | 1263 | B1056 |
| PX-22 | 1264 | B1069 |
| PX-43 | 1285 | B1070 |
| PX-45 | 1287 | B1081 |
| PX-46 | 1288 | B1083 |
| PX-51 | 1293 | B1084 |
| PX-53 | 1295 | B1100 |
| PX-54 | 1296 | B1103 |
| PX-55 | 1297 | B1105 |
| PX-56 | 1298 | B1107 |
| PX-57 | 1299 | B1111 |
| PX-58 | 1300 | B1113 |
| PX-62 | 1304 | B1118 |
| PX-66 | 1308 | B1120 |
| PX-70 | 1312 | B1124 |
| PX-73 | 1315 | B1126 |
| PX-78 | 1320 | B1130 |
| PX-79 | 1321 | B1132 |
| PX-81 | 1323 | B1134 |
| PX-84 | 1326 | B1140 |
| PX-86 | 1328 | B1142 |
| PX-87 | 1329 | B1153 |

iii

|  | ROA | Page |
|---|---|---|
| PX-88 | 1330 | B1156 |
| PX-90 | 1332 | B1157 |
| PX-92 | 1334 | B1162 |
| PX-94 | 1336 | B1163 |
| PX-104 | 1346 | B1164 |
| PX-107 | 1349 | B1165 |
| PX-109 | 1351 | B1172 |
| PX-110 | 1352 | B1186 |
| PX-112 | 1354 | B1188 |
| PX-113 | 1355 | B1191 |
| PX-116 | 1358 | B1193 |

**VOLUME 4**

| PX-123 | 1365 | B1194 |
| PX-125 | 1367 | B1344 |
| PX-127 | 1369 | B1345 |
| PX-131 | 1373 | B1347 |
| PX-136 | 1378 | B1350 |
| PX-137 | 1379 | B1351 |
| PX-138 (Excerpts) | 1380 | B1352 |
| PX-148 | 1390 | B1366 |
| PX-149 | 1391 | B1370 |
| PX-151 | 1393 | B1371 |
| PX-153 | 1395 | B1383 |
| PX-155 | 1397 | B1395 |
| PX-157 | 1399 | B1396 |
| PX-158 | 1400 | B1397 |

iv

|  | ROA | Page |
|---|---|---|
| PX-167 ...................................................................................... 1409 | | B1398 |
| PX-169 ...................................................................................... 1411 | | B1400 |
| PX-179 ...................................................................................... 1421 | | B1405 |
| PX-185 ...................................................................................... 1427 | | B1413 |
| PX-186 ...................................................................................... 1428 | | B1415 |
| PX-187 ...................................................................................... 1429 | | B1464 |
| PX-188 ...................................................................................... 1430 | | B1468 |
| PX-192 ...................................................................................... 1434 | | B1470 |
| PX-199 ...................................................................................... 1441 | | B1480 |
| PX-200 ...................................................................................... 1442 | | B1482 |
| PX-201 ...................................................................................... 1443 | | B1487 |
| PX-202 ...................................................................................... 1444 | | B1510 |
| PX-220 ...................................................................................... 1462 | | B1511 |
| PX-225 ...................................................................................... 1467 | | B1513 |
| PX-231 ...................................................................................... 1473 | | B1515 |
| PX-241 ...................................................................................... 1483 | | B1516 |
| PX-243 ...................................................................................... 1485 | | B1517 |
| PX-251 ...................................................................................... 1493 | | B1519 |
| PX-252 ...................................................................................... 1494 | | B1521 |
| PX-261 ...................................................................................... 1530 | | B1523 |
| PX-262 ...................................................................................... 1504 | | B1524 |
| PX-264 ...................................................................................... 1506 | | B1526 |
| PX-297 ...................................................................................... 1539 | | B1529 |
| PX-300 ...................................................................................... 1542 | | B1532 |
| PX-307 ...................................................................................... 1549 | | B1535 |
| PX-311 ...................................................................................... 1553 | | B1537 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-320 | 1562 | B1542 |
| PX-322 | 1564 | B1545 |
| PX-323 | 1565 | B1546 |
| PX-324 | 1566 | B1551 |
| PX-325 | 1567 | B1552 |
| PX-326 | 1568 | B1554 |
| PX-330 | 1572 | B1555 |
| PX-340 | 1582 | B1556 |
| PX-342 | 1584 | B1589 |
| PX-345 | 1587 | B1614 |
| PX-348 | 1590 | B1615 |
| PX-349 | 1591 | B1617 |
| PX-360 | 1602 | B1618 |
| PX-390 | 1632 | B1619 |
| PX-440 | 1682 | B1620 |
| PX-443 | 1685 | B1621 |
| PX-462 | 1704 | B1623 |
| PX-486 | 1728 | B1664 |
| PX-501 | 1743 | B1665 |
| PX-506 | 1748 | B1667 |
| PX-507 | 1749 | B1677 |
| PX-508 | 1750 | B1693 |
| PX-509 | 1751 | B1707 |

HF 3306170v.1 #06723/0002 06/13/2006

| | ROA | Page |
|---|---|---|

## VOLUME 5

**DEFENDANT'S TRIAL EXHIBITS**

| | ROA | Page |
|---|---|---|
| DX-1 (Excerpts) | 479 | B1709 |
| DX-22 | 500 | B1724 |
| DX-29 (Excerpts) | 507 | B1760 |
| DX-32 | 510 | B1793 |
| DX-33 | 511 | B1813 |
| DX-72 | 550 | B1833 |
| DX-96 | 574 | B1835 |
| DX-142 | 620 | B1843 |
| DX-214 | 692 | B1844 |
| DX-260 | 739 | B1845 |
| DX-364 | 843 | B1847 |
| DX-516 | 995 | B1850 |
| DX-644 | 1123 | B1944 |
| DX-702 | 1181 | B2067 |
| DX-721 | 1200 | B2088 |
| DX-739 | 1219 | B2110 |

HF 3306170v.1 #06723/0002 06/13/2006

# PLEADINGS

**LFOF & LCOL**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WINSTAR COMMUNICATIONS, INC., et al.,<br><br>Debtors. | Chapter 7<br>Case No. 01-01430<br>(Jointly Administered) |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE OF WINSTAR COMMUNICATIONS, INC. AND WINSTAR WIRELESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LUCENT TECHNOLOGIES INC.,<br><br>Defendant. | Adv. Pro. No. 01-01063 (JBR) |

## LUCENT TECHNOLOGIES INC.'S PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

Daniel J. DeFranceschi (DE #2742)
Rebecca L. Booth (DE #4031)
Jason M. Madron (DE #4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
(302) 651-7700

-and-

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*Lucent Technologies Inc.*

June 6, 2005

# TABLE OF CONTENTS

**Page(s)**

Explanation of Citation Conventions ..................................................................... ix

## PROPOSED FINDINGS OF FACT

I.  BACKGROUND ........................................................................................... 1

    A.  The Parties ........................................................................................ 1

    B.  The Trial ............................................................................................ 1

    C.  Witnesses and Other Involved Parties ............................................ 3

        i.    Past and present Lucent employees ............................... 3

        ii.   Former Winstar employees ............................................ 7

        iii.  Grant Thornton ................................................................ 9

        iv.   Siemens ........................................................................... 9

    D.  The Agreements ............................................................................... 9

    E.  Winstar's Network .......................................................................... 11

II.  THE TRUSTEE'S BREACH OF THE SUBCONTRACTING
    ARRANGEMENT CLAIM (COUNT VII) ............................................ 12

    A.  Lucent Did Not Breach Any of the Written Terms of the Subcontract. ....12

    B.  Lucent and Wireless Did Not Make a Written Modification to the
        Subcontract ..................................................................................... 13

    C.  Lucent and Wireless Did Not Orally Modify the Subcontract ................. 14

    D.  Lucent and Winstar Developed a Practice in Several Quarters in
        1999 and 2000 in Which Lucent Would Finance and "Pass Through"
        the Cost of Wireless-Performed Services. ................................................ 15

    E.  In September 2000, Lucent and Winstar Agreed in Writing
        to End the Parties' Practice of Passing Through Wireless-
        Performed Services. ........................................................................ 23

i

B436

F.   Lucent and Wireless Did Not Engage in Any Commercial
Transactions After September 2000...........................................................25

G.   Lucent Was Not Obligated to Build Winstar's Network ...........................30

III.   THE TRUSTEE'S PREFERENCE CLAIM (COUNT X) ...................................34

A.   Winstar Was Not Insolvent as of December 7, 2000................................34

i.   The parties introduced evidence of solvency through
expert testimony...............................................................................34

ii.   Collins and Scherf utilize the same approaches in
determining whether Winstar was insolvent as of
December 7, 2000 ............................................................................35

iii.   The book value of Winstar's liabilities.............................................36

iv.   The fair market value of Winstar's assets........................................37

a.   The market approach indicates that Winstar
was solvent as of December 7, 2000....................................37

(i)   The public market valuation indicates that
it was solvent as of December 7, 2000 ..................37

(ii)   The market multiple methodology indicates that
Winstar was solvent as of December 7, 2000........41

(iii)   The comparable transaction methodology
Indicates that Winstar was solvent as of
December 7, 2000 ..................................................43

(iv)   Winstar's shares traded on an efficient market......45

(v)   Private market transactions involving Winstar
on December 7, 2000 indicate that Winstar
was solvent..............................................................47

b.   The income approach indicates that Winstar was
was solvent as of December 7, 2000....................................50

(i)   The discounted cash flow methodology
indicates that Winstar was Solvent as of
December 7, 2000 ..................................................50

ii

**B437**

       (ii)    Scherf's application of the income approach is not credible..............................................................52

    c.    The asset approach was not properly used to determine whether Winstar was solvent as of December 7, 2000 ......55

   v.    The weight of the competent evidence shows that Winstar was solvent as of December 7, 2000 ...............................61

B.   The Transfer of the Siemens Loan Proceeds to Lucent Was Not The Transfer of an Interest of the Debtor in Property ...............................62

C.   Lucent Was Not an Insider of Winstar on December 7, 2000 ...................64

   i.    The traditional indicia of insider status are absent in this case.........................................................................64

   ii.   The Siemens Loan was an arm's-length transaction between Lucent and Winstar ...................................................................65

    a.    Background of the Siemens Loan ........................................65

    b.    Lucent did not compel Winstar to make the Siemens Repayment ..........................................................................66

    c.    The Siemens Loan provided Winstar with substantial benefits.............................................................................67

    d.    Lucent did not compel or otherwise cause Winstar to obtain the Siemens Loan ...................................68

    e.    Lucent was displeased with the Siemens Loan.................71

    f.    Lucent did not compel Winstar to draw the Siemens Loan down immediately ....................................................75

    g.    Lucent did not compel the Siemens Repayment through other December 2000 Actions .............................76

       (i)    Lucent did not manipulate the Transition Agreement negotiations .........................................76

       (ii)    Lucent did not use its refinancing right to compel the Siemens Repayment and the timing of the Refinancing Notice had nothing to do with the Siemens Loan ...................76

iii

(iii) Lucent did not breach any agreement with Winstar to modify its Refinancing Notice rights .....................................................................78

iii.    Other December 2000 and subsequent events confirm that Lucent was not an insider on December 7, 2000 ...................79

iv.    The parties' December 1999 through September 2000 transactions do not prove that Lucent was an insider of Winstar on December 7, 2000 ....................................................80

a.    Lucent underwent significant changes between September 2000 and December 7, 2000 ...........................80

b.    Winstar did not purchase equipment it did not need in "end of quarter" deals ................................................83

(i) Lucent did not force Winstar to purchase equipment it did not need......................................83

(ii) Winstar negotiated substantial concessions from Lucent in the end-of-quarter deals ................87

(iii) Winstar's undeployed equipment when it filed for bankruptcy does not establish that it purchased equipment it did not need .................92

(iv) Pocalyko failed to recognize the real reasons why Winstar accumulated undeployed equipment...........................................................97

c.    Lucent's invoices were not "vague" and do not establish that Lucent was an insider of Winstar on December 7, 2000 ...........................................................100

d.    The parties' "bill and hold" transactions do not show that Lucent was an insider on December 7, 2000 ............102

(i) The bill and hold transactions made business sense for Winstar...............................................103

(ii) Lucent's accounting for the bill and hold transactions is irrelevant to whether the transactions made business sense for Winstar .....108

iv

e.  The September 2000 end-of-quarter deal does not establish that Lucent was an insider on December 7, 2000 ...........................................111

    (i)  The September 2000 deal made business sense for Winstar .........................................112

    (ii) The statements of Winstar's more junior employees and Ackerman's "negotiating volleys" do not show that Lucent forced Winstar to enter into the September 2000 deal.............................................113

v.  Other events between December 1999 and September 2000 show that Lucent was not an insider on December 7, 2000 .................115

    a.  Lucent extended financing to Winstar for services and non-Lucent equipment despite the fact that Lucent received no benefits by doing so.....................................115

    b.  Lucent entered into the Second Credit Agreement with Winstar in May 2000, which contained substantially less favorable terms for Lucent than did the First Credit Agreement ........................................116

    c.  Winstar was able to borrow under the Second Credit Agreement earlier than Lucent wanted and Winstar prevented Lucent from selling those loans on favorable terms to Lucent .................................................118

vi. Pocalyko's testimony is unreliable ...............................................120

D.  Lucent's Affirmative Defense of New Value ..........................................128

i.  From December 7, 2000 (the date of the alleged preferential payment), to April 18, 2001 (the date of Winstar's bankruptcy), Lucent provided Winstar with $133,486,248.48 in equipment, software and services ............................................128

    a.  Lucent provided Winstar with $28,411,318.48 in goods and services ...........................................................128

    b.  Lucent also provided Winstar with $42,750,000.00 in software licenses ................................................129

    c.  Lucent also provided Winstar with $62,324,930.00 in additional financing that Winstar used to pay for

v

network buildout services ...............................................130

     (i)    Winstar never paid Lucent for the $133,486,248.48 in equipment, software and services Winstar received ...............................................................130

     (ii)   The $133,486,248,48 in equipment, software and services provided by Lucent were not secured ....131

IV.    THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM (COUNT XI)..133

V.    LUCENT'S FRAUD COUNTERCLAIM (COUNTERCLAIM COUNT 5)......134

    A.    Winstar Made Requests for Borrowing to Lucent in January and February of 2001 that Included Representations of Winstar's Compliance with Financial Covenants, including the CAPEX Covenant of the Second Credit Agreement...........................................134

    B.    In late 2000, Senior Management at Winstar, including Nathan Kantor, Richard Uhl, Fred Rubin, and David Ackerman were aware Winstar would exceed its § 6.07 (c) CAPEX covenant.........................................135

    C.    Winstar Exceeded its $1,300,000,000.00 billion CAPEX limit for the Year 2000, and was Therefore Out of Compliance with Section 6.07(c) and in Default of Section 4.03 of the Second Credit Agreement (DX 29 at 113 (§ 6.07 (c)) and 81 (§ 4.03).).......................................................137

    D.    Winstar's Senior Management was Aware in Early 2001 that the 2000 CAPEX was Above the Section 4.03(c) Covenant Requirement ............139

    E.    Winstar Submitted False Borrowing Requests to Lucent on January 26, 2001, and February 23, 2001, that Contained False Certifications..........140

    F.    Lucent Relied to its Detriment on Winstar's Signed Certifications of Compliance with Section 4.03 of the Second Credit Agreement on January 26, 2001 and February 23, 2001, by Loaning Winstar a Total of $83,017,021.18 .......................................................................141

VI.   LUCENT'S NEGLIGENT MISREPRESENTATION COUNTERCLAIM (COUNTERCLAIM COUNT 6) .......................................................................143

VII.  LUCENT'S SETOFF COUNTERCLAIM (COUNTERCLAIM COUNT 2).....144

B441

## PROPOSED CONCLUSIONS OF LAW

I.  LUCENT DID NOT BREACH THE SUBCONTRACT OR ANY
    "SUBCONTRACTING ARRANGEMENT" WITH WIRELESS .....................145

    A.  The Trustee's Burden..............................................................145

    B.  Lucent Did Not Breach the Written Terms of the Subcontract ..............145

    C.  The Subcontract was Not Orally Modified..............................146

    D.  Lucent Did Not Breach the Terms of the Allegedly Orally
        Modified Subcontract...........................................................149

    E.  The Fact that the Parties Had Previously Engaged in the Pass-Through
        Did Not Obligate Lucent to Continue that Practice or Otherwise
        to Pay Wireless for Services Allegedly Performed Building the
        Winstar Network .................................................................150

    F.  The Supply Agreement between Lucent and Winstar Did
        Not Create Any Rights or Obligations Between Lucent
        and Wireless......................................................................152

II. THE TRUSTEE FAILED TO MEET HER BURDEN OF PROVING THAT
    THE SIEMENS REPAYMENT WAS A PREFERENTIAL TRANSFER.........152

    A.  The Trustee Has Failed to Meet Her Burden of Proving That
        Winstar Was Insolvent on December 7, 2000 ..........................153

    B.  The Trustee Has Failed to Meet Her Burden of Proving That the
        Siemens Repayment Was a Transfer of an "Interest of the Debtor
        In Property".......................................................................156

    C.  The Trustee Has Failed to Meet Her Burden of Proving That Lucent
        Was An Insider of Winstar on December 7, 2000 ...................158

        i.  Lucent was not a *per se* insider..................................160

        ii.  Lucent was not a non-*per se* insider ...........................162

            a.  The Siemens Repayment is the most
                relevant transaction ..........................................162

            b.  Lucent was not a non-*per se* insider even if the Court
                does consider transactions other than the Siemens
                Repayment ....................................................168

B442

D.    Lucent's Affirmative Defense of New Value ...........................................170

    i.    If the Court determines that the Siemens Repayment was a
          preferential payment, Lucent has met its burden that it
          provided new value to Winstar ...................................................170

III.    THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM (COUNT XI)..175

IV.    LUCENT'S FRAUD COUNTERCLAIM (COUNTERCLAIM COUNT 5)......177

    A.    Winstar Defrauded Lucent in its January 26, 2001 and February 23,
          2001 Certified Borrowing Requests That Materially Misrepresented
          Compliance with the CAPEX Covenant of the Second Credit
          Agreement..............................................................................................177

V.    LUCENT'S NEGLIGENT MISREPRESENTATION COUNTERCLAIM
      (COUNTERCLAIM COUNT 6) ..........................................................................180

    A.    Winstar Made Negligent Misrepresentations to Lucent in its January 26,
          2001 and February 23, 2001 Certified Borrowing Requests That It was
          in Compliance with the CAPEX Covenant of the Second Credit
          Agreement When It Was Not in Compliance .........................................180

VI.    LUCENT'S SETOFF COUNTERCLAIM (COUNTERCLAIM COUNT 2).....184

B443

## EXPLANATION OF CITATION CONVENTIONS

The following citation conventions will be used throughout the Proposed Findings of Fact and Conclusions of Law:

- Citations to the trial testimony, including deposition designations read into the record, are in the following form: "[NAME] [DIRECT / CROSS], Tr. [TRIAL VOLUME]-[PAGE NUMBER(S)]".

- Citations to Plaintiff's Exhibits and Defendant's Exhibits are in the following form: "PX [ ] at [ ]" and "DX [ ] at [ ]".

- Citations to videotaped deposition designations, which are compiled in Joint Exhibits 1 through 19, are in the following form: "[NAME] [DIRECT / CROSS], JX [JOINT EXHIBIT NUMBER] at [PAGE AND LINE NUMBER]".

- Citations to the Docket Index in this Adversary Proceeding are in the following form: "A.D.I. [ ]".

- Citations to the Bankruptcy Docket Index are in the following form: "D.I. [ ]".

ix

# FINDINGS OF FACT

I.    **BACKGROUND.**

A.    **The Parties.**

1.    Winstar Communications, Inc. ("Winstar") was a Delaware corporation in the business of providing telecommunications and related services. At least until its filing of a petition in bankruptcy, Winstar was engaged in the buildout of a global telecommunications network to service its customers. (Renumbered Joint Stipulation as to Uncontested Facts, dated April 25, 2005, ("Stip. Facts") ¶ 1, A.D.I. 331.)

2.    Winstar Wireless, Inc. ("Wireless") was a Delaware corporation and a wholly owned subsidiary of Winstar. Among other things, Wireless was engaged in the design and construction of Winstar's network. (*Id.* ¶ 2.)

3.    Winstar and Wireless each commenced Chapter 11 bankruptcy proceedings on April 18, 2001. Those proceedings were each converted to Chapter 7 liquidation proceedings on January 24, 2002. (*Id.* ¶ 3.)

4.    Christine C. Shubert is the Chapter 7 Trustee ("the Trustee") for Winstar and Wireless. (*Id.* ¶ 4.)

5.    Lucent Technologies Inc. ("Lucent") is a corporation organized under the laws of Delaware and is headquartered in Murray Hill, New Jersey. Lucent designs and delivers telecommunications systems, services and software. (*Id.* ¶ 5.)

B.    **The Trial.**

6.    The trial in the matter of *In Re Winstar Communications, Inc.*, Adv. Pro. No. 01-01063 (JBR) commenced on March 21, 2005, before the Honorable Joel B. Rosenthal in Worcester, Massachusetts. Following the opening arguments, which were

**B445**

completed during the morning of March 21, the Trustee began the presentation of her case-in-chief.

7.    During her case-in-chief, the Trustee presented the testimony of the following witnesses: Nathan Kantor (March 21 and 22); Lisa Hicks (March 22); William Zlotnick (March 22, 24 and 25); Paul Pocalyko (March 23 and 24); Jill Diroma (March 25 and 28); Frank Jules (March 28); Frederic Rubin (March 28); Dennis Huber (March 28); David Ackerman (March 28, 29, 30); Nina Aversano (March 30 and 31); Richard McGinn (March 31); William Rouhana (March 31); Michael Montemarano (April 1 and 11); Deborah Harris (April 11); William Plunkett (April 11); Deborah Hopkins (April 11 and 13); Stephen Scherf (April 12); Paul Hayes (April 13); Elizabeth Perricone (April 13); Bernárdus ("Ben") Verwaayen (April 13); Gary Simpson (April 13); William Fullerton (April 14); Richard Uhl (April 15) and Henry Schacht (May 2).

8.    The Trustee rested her case on May 2, 2005, at which point Lucent moved for judgment on partial findings under Fed R. Civ Pro. Rule 52(c). Lucent's motion was denied.

9.    On April 14, 2005, Lucent presented the testimony of Martina Hund-Mejean. Following the Trustee's case, Lucent presented the testimony of the following witnesses: Mark Wilson (May 2); Reginald Kipke (May 3 and 4); Kevin Collins (May 4); Christopher Stark (May 5); Michael Keefe (May 5); Elizabeth Perricone (May 10); Gregory Garrett (May 10); John Gregg (May 10); Leslie Rogers (May 10); Kevin Monaco (May 10); Timothy Graham (May 10); Gary Goldman (May 10); Kevin Holwell (May 10); Henry Schacht (May 11); Vernon Terrell (May 11) and John Salomon (May 11). Lucent rested its case on May 11, 2005.

2

10.    Closing arguments are scheduled for June 13, 2005.

**C.    Witnesses and Other Involved Parties.**

   **i.    Past and present Lucent employees.**

11.    **Nina Aversano** was employed by Lucent from 1996 through December 2000. She was President for Lucent's North America Region and was responsible for sales to North American clients in the service provider business, including Winstar. Aversano was relieved of her duties in October 2000 and formally left Lucent in December 2000. (Aversano Direct, Tr. 8-22-24.)

12.    **Jill Diroma** was a member of the CFO organization at Lucent. (Wilson Direct, Tr. 16-32.)

13.    **William Fullerton** joined Lucent in February 2000 as the Controller for the Service Provider Networks segment. In September 2000, he became Chief Accountant and Assistant Controller for Lucent. (Fullerton Direct, JX 12 at 5:13-6:18.)

14.    **Gregory Garrett** joined at Lucent in September 1997 in the Program Management Division and became the Vice-President of Program Management for the Winstar Global Account. He worked in that position from June or July 2000 to May 2001. As Vice President, Garrett oversaw the delivery of all programs to Winstar. (Garrett Direct, Tr. 20-71-72.)

15.    **John Gregg** was the Program Management Director for the Winstar program from January 1, 1998, to August 1, 2000. Mr. Gregg was responsible for a variety of Program Management functions including managing and deploying Lucent Network Solutions to Winstar. (Gregg Direct, Tr. 20-112-113.)

16.    **Deborah Harris** was the Vice President of Sales for the Winstar account starting in August 2000. (Harris Direct, Tr. 11-34.)

3

**B447**

17.    **Paul Hayes** joined Lucent in 1998 and worked in a variety of positions within the Treasury organization. He served as the Director of Syndication and as the Director of INS Customer Finance Group. As Director of Syndication, Hayes managed the process of selling Lucent's customer finance loans to third parties. (Hayes Direct, Tr. 13-30-33.)

18.    **Deborah Hopkins** was the Chief Financial Officer at Lucent from April 24, 2000 to May 4, 2001. (Hopkins Direct, Tr. 11-110.)

19.    **Martina Hund-Mejean** joined Lucent on November 1, 2000 as Senior Vice President and Treasurer. As Treasurer, she oversaw Lucent's vendor finance department. She left Lucent in early December 2002. (Hund-Mejean Direct, Tr. 14-5-7) 14-7, 14-28, 14-40.)

20.    **Michael Keefe** is currently the Law Vice President for Corporate and between 1998 and 2001 was Corporate Counsel in which role he worked with the Treasury organization. He advised the Treasury organization, including the Vendor Financing Group. Keefe was involved in the negotiations of both the First and Second Credit Agreements. (Keefe Direct, Tr. 19-56-58.)

21.    **Reginald Kipke** has worked for Lucent in various sales and Program Management positions since its spin-off from AT&T in 1996. Kipke worked on the Winstar account from December 1998 to the Summer of 2001, first as the Program Controls Director and then as the Director of Optical Implementation. He was responsible for managing the construction of Winstar's long haul optical network. (Kipke Direct, Tr. 17-47-48.) In late 2000, Kipke assumed responsibility for Winstar's Metro Network. (*Id.* at Tr. 17-173.)

4

22.    **Robert Lewine** was the Director of the Hubs and Bs program under Garrett.  Lewine worked on the Lucent/Winstar Transition Plan in late 1998 and early 1999.  (Gregg Direct, Tr. 20-113; Garrett Direct, 20-75-76.)

23.    **Richard McGinn** became the President of Lucent in 1996.  In 1997, McGinn became CEO and Chairman.  He stepped down from those positions when he left Lucent on October 23, 2000.  (McGinn Direct, JX 7 at 6:8-21 (4/8/04 Dep.).)

24.    **Michael Montemarano** worked for Lucent from October 2000 to May 2002 as Vice President for Finance of Worldwide Sales and Marketing.  (Montemarano Direct, JX 9 at 5:22-24, 6:5-7:19.)

25.    **Charles Naylor** was the Sales Director until approximately the late Summer or Fall of 2000 on the Winstar Account and worked under Mark Wilson.  (Wilson Direct, Tr. 16-12; Kipke Cross, Tr. 18-179.)

26.    **Elizabeth Perricone** worked for Lucent from February 2000 to September 2002, first as a Senior Manager in the Treasury Division of Lucent in the Project Finance Group for North America.  She became Director of Customer Finance for North America in April 2001.  Perricone worked, among other things, on the Lucent/Winstar vendor financing relationship and was involved in the negotiation of the Second Credit Agreement, Lucent's December 2000 due diligence and the issuing of the Refinancing Notice.  (Perricone Direct, Tr. 20-7-9.)

27.    **Vanessa Petrini** was responsible for product sales to Winstar and worked under Wilson and Naylor.  (Wilson Direct, Tr. 16-13.)

28.    **William Plunkett** was a member of Lucent's management team responsible for the Winstar account.  (Harris Direct, Tr. 11-34.)  He was placed on a leave of absence

in late November 2000 and was soon thereafter terminated from the company. (Wilson Direct, Tr. 16-11.)

29.    **David Rigotti** was a member of the Lucent sales team. He was responsible for sales of services to Winstar and worked under Wilson and Naylor. (Wilson Direct, Tr. 16-12.)

30.    **Leslie Rogers** was employed at Lucent from January 20, 1998 to March 23, 2001. She joined Lucent as Director of Customer Finance for North America and was promoted to Managing Director of North American Customer Finance. Rogers was involved in the negotiation of the First Credit Agreement. (Rogers Direct, Tr. 20-120-121.) Rogers also played a leading role for Lucent in the negotiations of the Second Credit Agreement. (*See id.* at 20-27.)

31.    **Henry Schacht** was the founding CEO of Lucent from the Fall of 1995 to the Fall of 1997. He remained Chairman of the Board through February 1998 and a Director through the Fall of 2000. Schacht resumed the position of CEO in October 2000 and served in that role until February 2002. He remained Chairman until February 2003 and is a Director today. (Schacht Direct, Tr. 21-6-7.)

32.    **Vernon Terrell** has worked at Lucent (and AT&T before Lucent was spun-off from AT&T) for the past 18 years. In 1998, Terrell became the Senior Manager for Billing and Accounts Receivable. Three years later, in 2001, Terrell became the Director for Billing And Accounts Receivable. In his position as Director for Billing and Accounts Receivable, Terrell was involved in the invoicing and billing to many of Lucent's customers. (Terrell Direct, Tr. 21-37-40.) In addition, Terrell designed Lucent's web-based Oracle invoicing system. (*Id.* at 21-59-60.)

6

**B450**

33.    **Bernardus ("Ben") Verwaayen** became the Vice-Chairman of Lucent Technologies in October 1999.  (Verwaayen Direct, Tr. 13-164-165.)

34.    **Mark Wilson** has worked for Lucent (and AT&T before Lucent was spun-off from AT&T) since 1980.  In mid-1998, he was the Sales Vice President for Lucent working with emerging service providers on the east coast.  Wilson was the lead negotiator of the Supply Agreement.  Wilson was also involved in the negotiation of the Subcontract and he signed it for Lucent.  (Wilson Direct, Tr. 16-10-14.)

        **ii.    Former Winstar employees.**

35.    **David Ackerman** was a Group Executive at Winstar and was responsible for business and corporate development and strategic planning.  Ackerman was the Winstar executive with primary responsibility for the build-out of Winstar's network.  (Ackerman Direct, JX 6 at 4:24-6:25, 299:13-18.)

36.    **Timothy Graham** began work at Winstar in 1994 as General Counsel.  He later became Executive Vice President of the company.  Graham was involved in the negotiations of the Supply Agreement and various other aspects of the Lucent/Winstar relationship.  (Graham Direct, Tr. 20-144-145.)

37.    **Rif Haffar** was the Relationship Manager between Winstar and Lucent and also held some operations roles.  (Wilson Direct, Tr. 16-33.)

38.    **Lisa Hicks** worked for Winstar Communications from October 1997 to December 2001.  (Hicks Direct, JX 2 at 14:3-15:10.)  She was a relatively junior employee. (Ackerman Direct, JX 6 at 647:7-648:3 (3/5/04 Dep.).)

39.    **Dennis Huber** joined Winstar in May 1996 and became Vice President of Engineering in 1999. (Huber Direct, Tr. 6-44-45.)

**B451**

40.    **Frank Jules** was the President and COO of U.S. Operations at Winstar from August 2000 through April 2001. (Jules Direct, 6-9-11.)

41.    **Nathan Kantor** was the President and Chief Operating Officer of Winstar Communications from at least 1995 until Winstar filed for bankruptcy in April 2001. (Kantor Direct, JX 1 at 125:20-126:11.)

42.    **Robert McGuire** was the President of Winstar Large Accounts. (Jules Direct, Tr. 6-12.)

43.    **Kevin Monaco** was Winstar's Assistant Treasurer from June 1999 to June 2001. Monaco tracked Winstar's compliance with its covenants in the Second Credit Agreement. (Monaco Direct, Tr. 20-139-141.) He also was involved in the negotiations of financing with Siemens. (Monaco Direct, JX 15 at 10:23-11:10.)

44.    **Doreen Nidowicz** was a Treasury Analyst. (Rubin Cross, JX 5 at 15:10-15:12 (7/3/01).)

45.    **William Rouhana** was Winstar's Chairman and CEO from the company's inception. (Rouhana Direct, JX 8 at 4:9-4:16.)

46.    **Frederic Rubin** was the Treasurer of Winstar from 1997 to April 2001 and Senior Vice President from 2000 to 2001. (Rubin Direct, JX 5 at 4:15-5:3 (12/9/03).) Rubin was involved in the negotiations of the First and Second Credit Agreements. (Rubin Cross, JX 5 at 19:8-19:12.)

47.    **Gary Simpson** joined Winstar in August 1999 as Director of Property Accounting. He became Senior Director of Capital Expenditure, Planning and Reporting in the first quarter of 2000. (Simpson Direct, JX 11 at 11:18-13:2.)

8

48.    **Richard Uhl** was Winstar's Chief Financial Officer from October 1999 through April 2001. (Uhl Cross, JX 13 at 175:20-175:22.)

49.    **Allan Zendle** was involved in the transition plan submitted by Lucent to Winstar. Additionally, he was involved in conversations with Mark Wilson about Winstar services pass-throughs. (Wilson Direct, Tr. 16-27-29.)

50.    **William Zlotnick** was Vice President for Program Management. In that position, Zlotnick reported to Ackerman and was responsible for program management of the Winstar Network build. (Zlotnick Direct, JX 3 at 10:10-11:23.)

**OTHER PARTIES:**

      iii.    **Grant Thornton.**

51.    **Gary Goldman** is a partner at the accounting firm Grant Thornton LLP and was the Account Partner for Winstar. (Goldman Direct, JX 16 at 8:1-8:12, 8:16-8:19, 9:5-9:13.)

      iv.    **Siemens.**

52.    **Kevin Holwell** was the Vice President of Business Administration at Siemens. He testified as the Siemens corporate representative in this action as to the Siemens financing arrangement. (Tr. at 155-56.)

    **D.    The Agreements**

53.    On October 21, 1998, Lucent and Winstar entered into a Supply Agreement (the "Supply Agreement") under which Lucent agreed to provide, and finance (pursuant to a separate Credit Agreement) the purchase of certain products and services to Winstar. (Stip. Facts ¶ 6.)

54.    On October 21, 1998, Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") that allowed Winstar, under certain conditions, to borrow

9

up to $2 billion from Lucent over a term of five years (with up to $500 million available at any one time).  (*Id.* ¶ 13.)

55.    Lucent and Wireless entered into an Agreement for Network Buildout Services (the "Subcontract") effective January 4, 1999.  (*Id.* ¶ 7.)

56.    On May 4, 2000, WCI Capital Corp., as borrower ("Bank Borrower"), Winstar and certain other of Winstar's subsidiaries, as guarantors, entered into a $1.15 billion revolving credit and term loan agreement with a group of commercial banks and other financial institutions (the "Bank Facility"), with the Bank of New York as letter of credit issuer, administrative agent and collateral agent for the lenders.  (DX 284 at 2WC 0057696.)  A portion of the proceeds from the Bank Facility were used to pay all of the loans outstanding under the First Credit Agreement.  (Stip. Facts ¶ 8.)

57.    On May 4, 2000, Winstar and Lucent entered into a new Credit Agreement (the "Second Credit Agreement"), which provided for $2 billion of new Lucent financing (of which Winstar was permitted to borrow up to $1 billion at any one time) over a five-year term.  (*Id.* ¶ 9.)

58.    Under the Second Credit Agreement, a newly formed Winstar subsidiary, WVF-I LLC ("WVF-I"), was to serve as the borrower.  (DX 29 at 22.)  The Second Credit Agreement permitted WVF-I to use the funds advanced by Lucent to purchase either Lucent or non-Lucent equipment so long as WVF-I "acquired" such equipment.  (*Id.* at 111 (§6.06).)  To secure its obligations, WVF-I granted to Lucent a blanket security interest in all its assets.  (DX 32 at LW 00003849 (§ 82.01).)  Winstar and the Bank Borrower guaranteed the obligations under the Second Credit Agreement.  (DX 38 at LWI 00003812-13 (§81.01).)

10

59.    The Second Credit Agreement also contemplated the future formation of new Winstar subsidiaries to act as borrowers. In that regard, WVF-LU2 LLC ("WVF-2" and collectively with WVF-I, the "Winstar Borrowers") was formed. (*See* DX 33 at L001732 ("Grantor is a borrower under the Credit Agreement").) It functioned as a borrower in a like manner to WVF-I, and granted to Lucent a parallel security interest. (*Id.* at L001734 (§ 82.01).)

E.    **Winstar's Network**

60.    Winstar was a local and a long distance telecommunications carrier, and its end to end network was built to support that business. (DX 699 at 9:15-10:6.)

61.    Starting from the customer's end of the network, Winstar would build facilities within a customer's building (known as a "B site") to connect that customer to Winstar's voice and data network. That connection would be made by placing a radio and antenna on the roof of the customer's building, which would transmit and receive a signal to and from another antenna and radio on the roof of a Winstar traffic collection point (known as a "hub"). (*Id.*)

62.    Equipment placed in the hub collected traffic and distributed it to a high-capacity facility known as a central office ("CO"). Transmission from the hub to the CO was typically accomplished using Winstar's own fiber, or using leased facilities from an incumbent telephone company. (*Id.*)

63.    At the CO, Winstar had data and voice switching equipment which would connect into the other local or long-distance telephone companies or to Winstar's own national fiber network which provided long-haul capability for Winstar's voice and data services. (*Id.*)

11

**B455**

64.    Winstar's long-haul network was built using fiber principally supplied by two third-party vendors, Williams Communications and MFN. (Kipke Cross, 18-190.) The fiber was laid along routes that went between cities, typically running along existing gas pipelines. Optical transmission equipment was located at the ends of each of those routes, with equipment that amplified the optical signal placed around every 20 to 30 miles in between. (Kipke Direct, Tr. 17-72-73.)

65.    In addition, fiber laterals connected the routes on the long-haul network to central offices within the cities. (*Id.* at 17-73.)

## II.    THE TRUSTEE'S BREACH OF THE SUBCONTRACTING ARRANGEMENT CLAIM (COUNT VII).

### A.    Lucent Did Not Breach Any of the Written Terms of the Subcontract.

66.    The Subcontract only imposes obligations on Lucent and Wireless with respect to the Task Order that is actually attached to the Subcontract. It states that "[s]ervices shall be provided in accordance with the provisions of this Agreement and the applicable Task Order" to which the parties have agreed. (DX 117 at WC 0019780 (§ 1,1).)

67.    The Subcontract states that "Lucent desires Contractor to perform certain network build-out services, *to be specified in an attached, task description(s), for the benefit of Lucent and its customers*". (*Id.* (1st whereas clause) (emphasis added).) It further provides that Wireless "agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s)". (*Id.* (§ 1.1).)

68.    Payment, likewise, is to be made in accordance with an agreed-upon Task Order:

> "Invoice. Contractor agrees to provide a written invoice to Lucent monthly in arrears for Services actually performed under each Task Order.

12

For Services performed on a time and materials basis, Contractor will be compensated in accordance with the applicable Task Order for work performed. For Services performed on a fixed price basis, Contractor agrees to invoice Lucent in accordance with the schedule of milestone payments set forth in the applicable Task Order." (*Id.* at WC 0019781 (§ 4.1).)

69.   While the Subcontract provides that the parties *may* agree to future Task Orders, there is no obligation to do so: "The parties may enter into future Task Orders, to which the parties may agree from time to time". (*Id.* at WC 0019780 (§ 1.1).)

70.   The Subcontract attaches a Task Order authorizing Wireless to perform up to $25 million of specified services for the quarter ending March 31, 1999. (*Id.* at WC 0019785, 0019778.)

71.   There were no Task Orders agreed to by Lucent and Wireless for work performed by Wireless on the Winstar network at any point after March 31, 1999 through and including March 31, 2001. (Stip. Facts ¶ 20.)

72.   Lucent therefore did not breach the terms of the Subcontract by not paying Wireless for work it allegedly performed on the Winstar network for the quarter ending March 31, 2001, because Lucent and Wireless did not agree to a Task Order authorizing Wireless to perform such services.

**B.    Lucent and Wireless Did Not Make a Written Modification to the Subcontract.**

73.   The Subcontract requires that any modification be made in a signed writing: "[n]o modification, amendment, supplement to or waiver of this Agreement or any Task Order hereunder, or any of their provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties". (DX 117 at WC 0019783 (§ 8.6).)

74.   The Subcontract also provides that any waiver must be made in a signed writing and will not be considered to be continuing:

13

"No waiver shall be effective unless in a writing signed by an authorized representative of the party against whom enforcement of the waiver is sought. Neither the failure of either party to exercise any right of termination, nor the waiver of any default or breach shall constitute a waiver of the rights granted in this Agreement with respect to any subsequent other default or breach." (*Id.* (§ 8.8).)

75.    There is no evidence that Lucent and Wireless made a written modification, amendment, supplement or waiver of the Subcontract to eliminate the Task Order requirement. (*See* Wilson Direct, Tr. 16-64.)

**C.    Lucent and Wireless Did Not Orally Modify the Subcontract.**

76.    Even if the Subcontract permitted oral modifications, there is no competent evidence that Lucent and Wireless orally agreed to modify the terms of the Subcontract. Nor has the Trustee presented any evidence of consideration by Wireless to Lucent for the alleged oral modification.

77.    The Trustee has not presented any evidence concerning *who* on behalf of either party made the alleged oral agreement, *when* that oral agreement was made and *what* its specific terms were. Instead, she cites only Kantor's testimony that his "understanding" was that Winstar and Lucent had agreed to allow purchase orders and invoices to take the place of Task Orders and that he "thinks" that purchase orders and invoices could be Task Orders. (*See* Kantor Direct, JX 1 at 358:6-19, 363:3-9; Kantor Cross, JX 1 at 363:23-364:3.)

78.    The speculation of Nate Kantor regarding his "understanding" of Lucent and Winstar's exchange of purchase orders and invoices and what he "thinks" happened with respect to Task Orders does not show that Lucent and Wireless in fact orally agreed to modify the terms of the Subcontract. (*Id.*)

14

B458

79.    Kantor says nothing about Lucent and Winstar agreeing to allow "spreadsheets"—the only kind of document accompanying Winstar's March 2001 request for services funding (*see infra* ¶ 126)—to take the place of Task Orders. (*Id.*) Indeed, the Trustee has presented absolutely no evidence that Lucent and Wireless ever spoke about "spreadsheets" recording Wireless-performed services, much less orally agreed to have spreadsheets replace Task Orders under the Subcontract. The evidence is that Winstar only sent Lucent spreadsheets on two occasions and that they were sent to support Winstar's financing request, not payments to Wireless. (DX 556; DX 668.) Neither the spreadsheets nor the transmittal letters accompanying them refer to Wireless. (*Id.*) In addition, the transmittal letter to one of the two spreadsheets sent to Lucent states on its face that such spreadsheets are "not usually provided" to Lucent. (DX 668 at 3WC 0008253.)

80.    The affirmative testimony of Mark Wilson, who signed the Subcontract on Lucent's behalf is that it was never amended or modified orally or in writing. (Wilson Direct, Tr. 16-64.)

**D.    Lucent and Winstar Developed a Practice in Several Quarters in 1999 and 2000 in Which Lucent Would Finance and "Pass Through" the Cost of Wireless-Performed Services.**

81.    Before Lucent and Winstar executed the Supply Agreement, Kantor had a plan to have Lucent take on and then subcontract back to Winstar network build-out services. On October 2, 1998, in response to Lucent's draft "WinStar/Lucent Partnership Concept", Kantor wrote to Rouhana:

> "I doubt whether [Lucent has] all the skills in place to 'actually' make this happen. My idea is to create a Winstar subsidiary that does Engineering, Program Management, Construction, etc.—kind of a combo Ackerman/Simons org that will actually work with Lucent providing the 'outsource management' of the contract or some professional services. I

15

want Lucent to actually buy services from us as part of the deal and wrap it all under this agreement. We should be able to finance and capitalize all this and possibly even get revenue (not sure if I am stretching this a bit—want you to think about it). Typically I would outsource this stuff and have our folks become Lucent employees, but I am concerned about stock options, etc. I think we have built a machine that would be too difficult for Lucent to duplicate, the perfect solution is to put them together as a team so [w]e get best of both worlds. Please think about how we can do this and I will start pointing them in this 'combined' direction." (DX 695.)

82.    In late 1998, Winstar approached Lucent about "passing through" Wireless-performed services. (Wilson Direct, Tr. 16-29-30.) Winstar proposed that it order certain network services already being performed by Wireless from Lucent, which would in turn subcontract those services back to Wireless, which would actually perform the work. (*See* DX 141; Kantor Direct, JX 1 at 26:1-21 (network build-out services performed by Winstar before, during and after Supply Agreement).) The arrangement was described as a "pass-through" because the arrangement was a financial wash to Lucent—the amounts paid to Lucent for services performed would equal the amount that Lucent paid out. (Wilson Direct, Tr. 16-30.)

83.    Winstar did not take the position that Lucent had a contractual obligation to pass through Wireless-performed services, but asked Lucent to do so as an accommodation. (*Id.*) Neither the Supply Agreement, nor any other agreement, required Lucent to do so. (*See infra* ¶¶ 129-44.)

84.    Winstar wanted to "pass through" Wireless-performed services because the arrangement would allow Winstar to capitalize otherwise non-capitalizable costs associated with the build-out. (Wilson Direct, Tr. 16-29-30; *see also* Diroma Direct, JX 4 at 20:9-20, 29:2-10, 151:12-18 (11/20/02 Dep.); Diroma Cross, JX 4 at 9:2-20, 10:13-11:12, 14:4-13 (11/20/02 Dep.).) Numerous Winstar internal documents confirm that one

16

of the main goals of the pass-through was to allow Winstar to capitalize additional costs, which would, among other things, improve its EBITDA position. (DX 103; DX 125; *see also* DX 141; DX 144; DX 154.)

    85.   In January 1999, Winstar's independent accountants, Grant Thornton LLP, approved Winstar's proposed accounting treatment. Winstar's Joe Dwyer told Winstar's President and COO Nathan Kantor and Chairman and CEO William Rouhana:

> "Great news! We structured a methodology with Grant Thornton today which will allow WinStar the accounting treatment which we were looking for re: subcontracting of services, effective 10/98.

> To make this work, we will now need to complete the PO's with Lucent, obtain their agreement to subcontract to us each of the related services we've discussed, and to obtain their agreement on the appropriate document wording to support this accounting treatment." (DX 125 at 2WC 0065860.)

    86.   Winstar sent a draft of the Subcontract to Lucent in early March 1999. (*See* DX 130 at LW00298972.)

    87.   On March 30, 1999, Lucent wrote Winstar that it was "willing to consider providing additional services to Winstar under [the parties'] Supply Agreement dated October 21, 1998", but that it "[had] not yet determined whether these services [would] be financed by Lucent". (DX 142.) Lucent told Winstar that "[i]f Lucent agree[d] to provide such services" it expected that Lucent would subcontract $115 million of those services to Wireless. (*Id.*) Lucent went on to state that "Lucent's plans will continue to be refined during the year. As such, this letter is a non-binding statement of Lucent's anticipated plans" and "solely [ ] a basis of further discussions". (*Id.*) Finally, Lucent told Winstar that "[n]o legally binding relationship [would] be created, implied, or inferred until an appropriate Amendment to the Supply Agreement is executed by

17

WinStar and Lucent and until the parties execute a subcontract and other related documents regarding the subject matter to this letter". (*Id.*)

88.    On March 31, 1999, Lucent and Wireless executed the Subcontract, with an effective date of January 4, 1999, and Lucent authorized the subcontracting of services to Wireless for calendar 1Q1999 in "an amount not to exceed $25M" pursuant to an attached Task Order. (DX 117; *see also* Wilson Direct, Tr. 16-42-43 (Subcontract and Task Order dated January 4, 1999, but were executed in late March 1999).)

89.    Winstar also requested that Lucent finance the services pursuant to the Credit Agreement. (*See* DX 137.) Winstar understood that the money provided for Wireless-performed services was a loan that had to be repaid:

> "Q. Let's use $100 million. Let's assume Lucent paid Winstar 100 million under the subcontract to perform services.
>
> A. Right.
>
> Q. Did Winstar owe Lucent anything in respect of that particular transaction?
>
> A. Yeah, we had to pay it back."
> (Kantor Cross, JX 1 at 385:4-10.)

90.    In order to facilitate the financing and the favorable accounting treatment that Winstar desired, the parties structured a pass-through of the services as follows: Winstar sent a purchase order to Lucent for services performed by Wireless in building out Winstar's network, and Lucent sent a purchase order for the same services to Wireless. Wireless then invoiced Lucent for the services performed, and Lucent invoiced Winstar in the same amount for the same services. Winstar paid Lucent's invoice with money drawn under the Credit Agreement and Lucent received a note receivable. Lucent paid Wireless's invoice. Both payments took place on the same day so that there was no

18

accounts receivable issue. (DX 274 at LW00079833-34; DX 239 at LW00005926-27; *see also* Diroma Cross, JX 4 at 63:8-64:8 (11/25/02 Dep.); Wilson Direct, Tr. 16-44-45; Uhl Direct, JX 13 at 165:9-14.)

91.    Lucent determined very quickly that the pass-through arrangement "yielded no material benefit for Lucent, and in fact cost [Lucent] considerable resources to process, track and manage". (DX 163; *see also* Wilson Direct, Tr. 16-30.) Lucent lost resources on the pass-through arrangement for two primary reasons.

92.    *First*, Lucent could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's employees to allow revenue recognition under the accounting rules. (PX 388 at LW 00303141; DX 523; *see also* DX 155 at 2WC 0016320.)

93.    *Second*, Lucent was concerned that financing any additional services would hamper its ability to sell Winstar's loans because the banks it consulted with concerning such financing were "very negative on the inclusion of these incremental services". (DX 149 at WC 0118574; *see* Wilson Direct, Tr. 16-28-29; DX 155; *see also* DX 137.)

94.    In early June 1999, Lucent informed Winstar that it would not pass through any additional services because it was "concerned about having to severely discount the paper to sell it". (DX 154.)

95.    Recognizing that it would be "a huge ebitda issue for q2 and 1999" if Lucent did not pass through services, the issue was immediately escalated within Winstar to Kantor. (*Id.*; DX 155 at 2WC 0016320-21.) After corresponding by e-mail, Kantor arranged a personal meeting with the President of Lucent's North American Sales

19

Organization, Nina Aversano, to try get her to agree to further subcontracting. (*See* DX 155 at 2WC 0016320; DX 156 at 2WC 0060428.)

96.    On July 13, Aversano confirmed that Lucent would not subcontract services back to Wireless in future quarters as it had done for 1Q1999.  Lucent explained that it had "agreed to trial [the] subcontracting arrangement for (calendar) Q1", but that the "trial yielded no material benefit to Lucent, and in fact cost us considerable resources to process, track and manage.  Based on the result of our Q1 trial, it is not feasible for Lucent to consider this same approach for WinStar Services in Q2." (DX 163.)

97.    Kantor forwarded Aversano's e-mail to Winstar's CFO and Treasurer. (*Id.*) Kantor did not indicate that Lucent was breaching any obligation to Winstar or Wireless, but simply told his fellow executives:  "I don't understand this-please review and let's discuss.  This may or may not be consistant [*sic*] with my discussions with Nina". (*Id.*)

98.    There is no evidence that Lucent agreed to any further transactions pursuant to the Subcontract, and no further Task Orders were agreed to by Lucent and Wireless (Stip. Facts ¶ 20).

99.    Lucent did, however, ultimately agree to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired by passing through the 2Q1999 services. (Wilson Direct, Tr. 16-54.)  Lucent only did so as an accommodation to Winstar, which claimed that ending the pass-through would have negative financial repercussions and which promised to negotiate a true turnkey approach to services that would allow Lucent to recognize revenue on such services in the future: "there was a large pressure from Winstar to go ahead and [pass through services]" because Winstar "felt like it would have implications on their earnings report since they

20

were capitalizing these services last quarter, and had it not happened this quarter it would reflect badly on their announcement". (*Id.*) Therefore, Lucent agreed to pass through Wireless-performed services in 2Q1999 "with the agreement from Winstar that [Winstar and Lucent] would pursue a business arrangement structure around a turnkey approach to the projects and network implementation that would then, again, well define the tasks for each company to perform, orders up front from Winstar to Lucent, Lucent then going through those task lists and ordering back from Winstar what we could not perform". (*Id.*; *see also* DX 164.)

100.  The pass-through for 2Q1999 was accomplished through an exchange of identical purchase orders, invoices and payments as in the previous quarter. (*See supra* ¶ 90.) Lucent and Wireless did not agree to any Task Orders pursuant to the Subcontract. (Stip. Fact ¶ 20.)

101.  Pursuant to Winstar and Lucent's agreement to pursue a true "turnkey" relationship, Lucent and Winstar began negotiating a new services agreement in late July 1999 that would have Lucent "program manage as much of the build as possible" so that Lucent would be able to recognize revenue for services. (DX 164; DX 168 at LW00053258.)

102.  In August 1999, Lucent provided Winstar with a proposed turnkey approach under which Lucent would provide "[o]verall management of the build out WinStar's network" in which "**all** products and services . . . flow through Lucent". (DX 168 at LW 00053258 (emphasis in original).) As proposed by Lucent, Winstar would provide Lucent with purchase orders for services to be performed and Lucent would manage fulfillment of those orders, whether providing services itself or subcontracting to a third

21

party or Winstar to provide the services. (*Id.*) Lucent proposed that the new approach be implemented by October 1, 1999, and agreed to allow Winstar to pass-through calendar 3Q1999 services in view of that implementation date. (*Id.* at LW00053257; *see also* Wilson Direct, Tr. 16-61.)

103. While Winstar negotiated with Lucent, its internal position (not communicated to Lucent) was that it still did not want to give Lucent "control of the network build". (DX 169 at 3WC 0004499.) Winstar's negotiator Howard Shartel told Winstar's CFO, "What we won't do [is] advise Lucent of what we need, and empower them to go out and act as our agent." (*Id.*) While Lucent might "subcontract[ ] work on [Winstar's] behalf in specific areas", that too would be something that Winstar would "carefully control". (*Id.*)

104. Winstar continued to negotiate various iterations of the turnkey proposal with Lucent throughout 4Q1999. (*See* DX 185; DX 195.) At the end of that quarter, Winstar again approached Lucent to pass through services. (Wilson Direct, Tr. 16-62.) Lucent agreed to allow the pass-through again on the condition that Lucent and Winstar continue to work on moving the relationship forward toward a turnkey relationship. (*Id.*; *see also* DX 214.) Lucent told Winstar that it could not continue to pass through services after 4Q1999. (DX 221; DX 705.)

105. Despite Lucent's admonitions, Winstar continued to approach Lucent at the end of each quarter to request that Lucent pass through and finance Wireless-performed services. (Wilson Direct, Tr. 16-49.) Lucent continued initially to decline Winstar's requests (*see* DX 321; DX 363), but the request would quickly get escalated to Kantor and Aversano (Wilson Direct, Tr. 16-49). The result of the escalation was that Lucent

22

continued "facilitating the near-term request with an agreement from Winstar that [the parties] would work in the next quarter to try to get in front of it and try to go back to more of a turnkey approach". (*Id.* at 50; Diroma Cross, JX 4 at 81:21-82:13 (11/20/2002 Dep.).)

106.    The pass-through each quarter was accomplished through an exchange of identical purchase orders, invoices and payments, as in previous quarters. (*See supra* ¶ 90.) Lucent and Wireless did not agree to any Task Orders pursuant to the Subcontract. (Stip. Facts ¶ 20.) The Trustee has presented no evidence that the pass-through included "spreadsheets".

### E.    In September 2000, Lucent and Winstar Agreed in Writing to End the Parties' Practice of Passing Through Wireless-Performed Services.

107.    In September 2000, Lucent determined to end the "practice of 'subcontracting' Winstar services back to Winstar via the exchange of Purchase orders and invoices" and created a plan to inform Winstar of its decision. (DX 378 at LW 00148360; *see also* DX 382; Harris Direct, Tr. 11-38; Hopkins Direct, Tr. 11-150.)

108.    On September 22, 2000, Lucent informed Winstar in writing that it was rejecting Winstar's September 8, 2000, services purchase order for calendar 3Q2000 services. (DX 390 at LW00101021.) Lucent explained that the assumption of services under the Supply Agreement "was contingent upon the development and successful execution of a transition plan for the services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent". (*Id.* at LW00101020.) Lucent noted that the parties had been "pursuing ways to take on [Wireless-performed] services in an agreeable manner to all parties, but ha[d] been unable to reach consensus". (*Id.* at LW 00101021.) Lucent therefore declined as

23

B467

inappropriate purchase orders for services that Winstar continued to provide to itself. (*Id*.)

109.   In response to Lucent's September 22 letter, Kantor responded to Lucent's Aversano that she had to "get this fixed" and threatened that Lucent's position would "have a major impact on our ability to help you this quarter". (DX 399 at 2WC 0097886.)

110.   On September 27, 2000, Lucent sent a revised letter to Winstar, replacing the September 22 letter, in which Lucent agreed to pass through services for 3Q2000, but only based on Winstar's written agreement that no more such exchanges would take place. (DX 424 at ZWC 0126823.) The letter, which was countersigned by Winstar, reflecting Winstar's agreement with its contents, further provided that:

> "commencing October 1, 2000, Winstar would perform [network build-out services] work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any performed services by Winstar presumably on Lucent's behalf". (*Id*.)

111.   As Nina Aversano explained: "From [Lucent's] business relationship point of view, not legal point of view, [Aversano] thought that it would be best to honor it and then move forward with a different way of doing business where everyone understood that going forward it was going to be a different type of relationship". (Aversano Direct, Tr. 8-144-45.)

112.   Winstar's CFO, Richard Uhl, who executed the September 27 letter on behalf of Winstar acknowledged that the letter was an agreement between Winstar and Lucent:

> "Q. Can you identify Uhl Exhibit 7 [DX 424]?

24

B468

A. I can.

Q. What is it?

A. It's-it is first and foremost a letter agreement dated September 27th between Lucent and Winstar which Nina Aversano addressed, executed and addressed to me in which I acknowledged and agreed to." (Uhl Cross, JX 13 at 143:7-14; *see also id.* at 146:9-16.)

113. Winstar understood that, to the extent that Lucent and Winstar had been engaged in a practice whereby Lucent passed through Wireless-performed services that were not expressly authorized by Lucent in advance, the September 27, 2000 letter agreement eliminated any such practice on a going-forward basis. (*See* DX 424 at ZWC 0126821.) Uhl forwarded the executed letter to his fellow Winstar executives and summarized the agreement as follows: "This is to advise that, commencing October 1, 2000 Lucent will not accept service charges from Winstar until such time Winstar and Lucent agree as to the exact services to be provided and Lucent issues Winstar a purchase order in accordance with the attached letter." (*Id.; see also* Uhl Cross, JX 13 at 143:7-144:11.) Uhl's contemporaneous memorandum does not indicate that Winstar believed Lucent was breaching any obligation to Winstar or Wireless under the Subcontract or any other agreement. (DX 424 at 2WC 0126821.)

**F.    Lucent and Wireless Did Not Engage in Any Commercial Transactions After September 2000.**

114. Lucent and Wireless's commercial relationship with respect to network build-out services ended after Lucent passed through Wireless-performed services for 3Q2000. (*See* Montemarano Cross, Tr. 10-26.)

115. Lucent and Winstar did not agree to any written purchase orders for services performed by Wireless on the Winstar network after September 2000. (Stip. Facts ¶¶ 21,

25

22.)  Nor did Lucent otherwise authorize Wireless to perform services on Lucent's behalf after September 2000.  (Montemarano Cross, JX 9 at 35:20-36:14, 36:17-21.)

116.  There is no evidence that Lucent and Wireless issued or exchanged any invoices for work performed after September 2000—the only requests for payment relating to Wireless-performed services were Winstar requests for financing pursuant to the Second Credit Agreement.  (*See* DX 9; DX 668.)

117.  Lucent did not pay Wireless for services performed after September 2000.  (*See* DX 564; *see also* Diroma Cross, JX 4 at 69:15-24, 70:1-4, 70:6) (11/25/02 Dep.); Harris Cross, Tr. 11-101.)

118.  On December 29, 2000, Winstar submitted a draw request for $62 million pursuant to the Second Credit Agreement to finance network build-out services performed during calendar 4Q2000.  (DX 9.)  There is no evidence that Wireless submitted an invoice to Lucent or otherwise requested payment from Lucent for those services—the request was solely a request by Winstar for financing.  (*See id.*)  Lucent initially refused to fund the request.  (Kantor Direct, JX 1 at 197:22-198:13.)

119.  After Rouhana made a direct appeal to Lucent's Vice-Chairman Ben Verwaayen, Verwaayen decided to allow Winstar to draw down the funds.  (Verwaayen Cross, Tr. 13-204-07.)  Verwaayen decided to fund the draw request as a business accommodation to get the Winstar-Lucent relationship back on track, not because Lucent was obligated to fund the request.  (*Id.*; Harris Cross, Tr. 11-102, 11-106; Montemarano Cross, JX 9 at 39:20-40:5, 40:10-15, 40:18-24; Montemarano Cross, Tr. 10-38, 10-40-41; *see also* Kantor Direct, JX 1 at 208:21-209:5.)

26

120. Lucent's internal correspondence concerning the December 2000 financing is not an "admission" by Lucent that it was obligated to pay for Wireless-performed services. The relevant internal e-mail was written by Verwaayen and reads as follows:

> "Well, after the read out from the lawyers and after reviewing the options with everybody on our pre call yesterday, Winstar can draw upon the credit facility, including services.
> We did push back on credits (no cash, but off setting a/r's) and the 30 million request that came in Friday.
> We really had not the option of denying their rights here.
> In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change."
> (PX 199 at LW00059739.)

121. *First*, Verwaayen's e-mail only discusses whether Winstar can borrow money for services pursuant to the Second Credit Agreement, not whether Lucent owes money to Wireless under a subcontracting arrangement. (*Id.*)

122. *Second*, Verwaayen's statement that, "We really had not the option of denying their rights here. In reality we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change" does not refer to rights that Winstar had to finance services. (*Id.*) It refers instead to the "30 million request that came in Friday" mentioned just prior to those lines in the e-mail. (*Id.*) On December 22, 2000, Winstar had submitted a $32 million draw request to finance equipment, of which $30 million was for non-Lucent equipment. (DX 8.) Lucent was required under the terms of the Supply and Second Credit Agreement to finance that request despite the very low Lucent content because it could not enforce the Supply Agreement's content provision on a draw-by-draw basis until the Refinancing Period. (*See* DX 550.)

123. Lucent funded Winstar's December 27, 2000, draw request. (*See* DX 556; DX 564.) That financing was merely a loan pursuant to the Second Credit Agreement

27

accompanied by a draw request and certification of compliance with the terms of the Second Credit Agreement like any other financing. (*See id.*)  Lucent did not subcontract any services to Wireless, nor did the parties issue or exchange any purchase orders invoices for the services that Wireless claimed to have performed. (*See id.*; Diroma Cross, JX 4 at 69:15-21, 70:2-7 (11/25/02 Dep.); *see also* Stip. Facts ¶ 22.; Harris Cross, Tr. 11-101.)  Nor did Lucent pay Wireless for services. (*See* DX 556; DX 564; *see also* Diroma Cross, JX at 69:1-23, 70:1-4, 70:6 (11/25/02 Dep.); Harris Cross, Tr. 11-101.)

124.    When it funded the December 2000 draw request for services, Lucent told Winstar that the funding was a one-time accommodation and would not be repeated in 2001. (Montemarano Cross, JX 9 at 41:15-42:6.)  Lucent reminded Winstar of that fact throughout the first quarter of 2001. (Verwaayen Direct, Tr. 13-196; Montemarano Cross, JX 9 at 45:6-17; Kantor Direct, JX 1 at 227:16-228:12, 242:9-14, 243:17-245:5; DX 596; DX 599; DX 601 at LW00071067; DX 603 at LW00131010; DX 610 at LW00144686; DX 653 at LCI00035843; DX 658 at LW0005941.)

125.    Nevertheless, on March 27, 2001, Winstar submitted a draw request to Lucent for $62 million to finance network build-out services for 1Q2001. (DX 668.)  Lucent never authorized Wireless (or any other entity) to perform those services. (*See* Montemarano Direct, JX 9 at 35:20-36:14, 36:17-21.)  Nor did Lucent and Winstar agree to or exchange purchase orders for those services. (*See* Stip. Facts ¶ 21.)  Nor is there any evidence that Wireless submitted an invoice to Lucent or otherwise requested payment from Lucent for those services—the request was solely a request by Winstar for financing pursuant to the Second Credit Agreement. (*See* DX 668.)

28

B472

126.  The only documentation that accompanied Winstar's draw request was a spreadsheet that does not mention Wireless, but which purports to show the "Q1 2001 Estimate" of Winstar's capital labor costs. (*See id.* at 3WC 0008253-54.) The transmittal letter to the spreadsheet states that such spreadsheets were "not usually provided to Lucent". (*Id.* at 3WC 0008253.)

127.  Rick Uhl, who signed the certification for the March 27, 2001, draw request was unable to testify when asked as to what the items were in that spreadsheet: "I think we could save some time here. I don't have any independent recollection as to what is in each of these numbers here". (Uhl Direct, JX 13 at 133:13-141:12.) Gary Simpson, who was responsible for compiling Winstar's capital labor expenses, but who was not involved in the actual engineering work, likewise could not testify what specific activities are included in the spreadsheets or who performed those activities. (*See* Simpson Cross, JX 11 at 71:6-8, 72:17-18, 74:7-75:15.) Thus, even if the Trustee had presented any evidence that Lucent and Wireless had orally modified the Subcontract to allow such a spreadsheet to take the place of a Task Order, that does not establish that Wireless actually performed the services for which Winstar requested financing and for which the Trustee (on behalf of Wireless) now requests payment.

128.  Lucent rejected Winstar's March 27, 2001, draw request because Lucent was under no contractual obligation to fund it. (Montemarano Cross, JX 9 at 50:25-51:4.) The Trustee has not presented evidence that Winstar was in compliance with the terms of the Second Credit Agreement or that Lucent was obligated to fund that request.[1]

---

[1] The Court has ruled that Lucent could not put on evidence concerning Winstar's compliance with covenants other than the capital expenditures covenant. If the Court had

29

### G.    Lucent Was Not Obligated To Build Winstar's Network.

129.    Neither the Supply Agreement, nor any transition plan or other services agreement obligated Lucent to build out Winstar's network.

130.    Henry Schacht's deposition testimony concerning Lucent's "obligation" to build Winstar's network under the Supply Agreement is not an admission of a legal obligation. Schacht testified that had never read the Supply Agreement prior to his March 15, 2004, deposition and did not understand what it required or permitted of Lucent. (Schacht Direct, Tr. 21-20.)

131.    During the negotiation of the Supply Agreement, Lucent told Winstar that Lucent did not have what the parties termed the "core competence" to take over the build-out of Winstar's network. (Wilson Direct, Tr. 16-23.) Winstar's executives and those negotiating the Supply Agreement recognized that Lucent did not have those competencies. (Kantor Cross, JX 1 at 52:22-53:5; Rouhana Cross, JX 8 at 67:11-22; DX 695; DX 88 at ZWC 0097905.) Because Lucent was not in a position to take on all of the network build-out services, the parties instead agreed that they would develop a transition plan under which Lucent "would work together with Winstar on how to transition those services and those capabilities to Lucent as Lucent acquired those core competencies and both parties were comfortable that [Lucent was] able to assume them". (Wilson Direct, Tr. 16-23; *see also* Kantor Cross, JX 1 at 52:22-53:5; Ackerman Direct, JX 6 at 34:11-22; Aversano Direct, Tr. 8-81; DX 396 at 2WC0123758; DX 382 at LW00101017.)

---

allowed Lucent to present such evidence in defending against the Trustee's Subcontract claim, then it would have proved that Winstar was also not entitled to draw down under the Second Credit Agreement in March 2001 because it was not in compliance with a number of its financial covenants. The substance of the evidence that Lucent would have offered is contained in the various offers of proof that were submitted throughout the trial.

30

132.  Consistent with the parties' negotiations, the Supply Agreement provides that Lucent is only required to perform services ordered by Winstar "[s]ubject to the Transition Plan". (DX 28 at WC 0007104 (§ 6.1(a)), WC 0007091 (§ 1.1(kk)).)  The Transition Plan, in turn, identifies and schedules Lucent's "assumption of responsibility" for services based on certain "prerequisites", including "Lucent core competency" and "Lucent's evolving core competencies". (DX 28 at WC 0007152 (Schedule A § 3.3(a)).)

133.  The Supply Agreement recognizes that construction and deployment are not within Lucent's core competence and provides that Lucent will be allowed up to the full five-year term of the Agreement to take over such functions:  "The Parties intend that certain functions, such as those that, as of the Effective Date, are performed by WinStar's Engineering and Network Construction & Deployment departments, although not currently within Lucent's core competence, will be assumed by Lucent during the [five-year] Term". (DX 28 at WC 0007153 (Schedule A § 3.3(b)); *see also id.* at WC 0007097 (§ 3.1).)

134.  The Supply Agreement also provides that Lucent will never take over responsibility for certain network build-out functions:  "Certain functions, although necessary to the implementation of the Network, will remain WinStar's responsibility. This includes site acquisition, regulatory compliance, numbering/dial plans, ILEC facilities negotiation, build-out of common space at the customer building and management of business relationships with WinStar customers". (DX 28 at WC 0007153 (Schedule A § 3.3(c)).)

135.  Finally, the Supply Agreement provides that it cannot create any rights in third parties or obligations to any third parties. (*Id.* at WC 0007135 (§ 20.13).)

31

136. Lucent and Winstar (in particular, Bob Lewine for Lucent and Allan Zendle for Winstar) exchanged drafts of the Transition Plan throughout December 1998 and in January 1999. (*See* DX 110 at WC 0035073; DX 114 at LW00104826; Gregg Cross, Tr. 20-117; *see also* Wilson Direct, Tr. 16-25-26.) On January 14, 1999, "[i]n compliance with Schedule A, Subparagraph 3.3 of the Supply Agreement effective on October 21, 1998", Lucent submitted its "Transition Plan for Lucent Resource Integration" to Winstar. (DX 190 at LW00094561.) As required by the Supply Agreement, the Transition Plan "addresses Lucent's assumption of responsibility for work scope in all areas other than the traditional responsibility for E, F & I activities related to Lucent products". (*Id.* at LW00094564.)

137. On January 20, 1999, Winstar's Rif Haffar wrote to Zendle to follow up on acceptance of the Transition Plan: "Hey Bro. I understand that Lucent has provided the final review on the Transition Plan, and are now waiting for us to accept it. Do you have an update in that activity?" (DX 123.)

138. Lucent "never actually got an official answer back from Winstar" concerning the Plan; the Plan was never agreed to. (Wilson Direct, Tr. 16-26-27.)

139. Lucent and Winstar continued to negotiate a services agreement over the course of their relationship, but no agreement was ever reached.

140. In addition to the services negotiations that took place while Lucent was passing through Wireless-performed services (*see supra* ¶¶ 101-04), Winstar and Lucent began a new series of services negotiations on October 4, 2000, after the September 27, 2000 letter agreement ended the pass-through practice. (DX 432; DX 435.) Those negotiations continued through March 2001. (Montemarano Cross, Tr. 10-27.)

141.    Lucent wanted the services agreement to be a true outsourcing agreement because that was the only way that Lucent would be able to recognize revenue on the network build-out. (DX 523; DX 531 at LW00019149; *see* Harris Cross, Tr. 11-97-98.) As Jill Diroma made clear to Vanessa Petrini in an e-mail dated 11/16/2000: "Unfortunately we are not able to get revenue on the Winstar performed portion of this transaction. Bill Fullerton, the Chief Accountant, reporting to Jim Lusk Senior VP and Controller has ruled that we can only take revenue on the management fees associated with the Winstar performed services. Once we take over the functions fully as expected in the outer years, then revenue can be recognized." (DX-492 at LW00012795; *see also* DX 507; DX 523; Hopkins Direct, Tr. 11-146). Lucent made several presentations to Winstar and proposed examples of what an outsourcing arrangement might look like. (Harris Cross, Tr. 11-89, 11-98; Hopkins Cross, Tr. 13-18-19; *see, e.g.*, DX 507.)

142.    Winstar, however, refused to enter into a services agreement that had Lucent hire Wireless's employees or otherwise take over control of the network build-out, but wanted to continue the pass-through relationship: "[I]t almost became apparent Winstar really didn't want Lucent to take the people." (Hopkins Cross, Tr. 13-19.) E-mails between Lisa Hicks and Dennis Huber, two of Winstar's employees negotiating the services agreement, reveal Winstar's negative response. Hicks wrote to Huber on October 23, 2000: "Lucent seems determined to 'hire' each individual person. I have no intention of giving them all the detail they have requested below…. My perspective on this process is very simple—we develop a scope of work and associated deliverables, Lucent sub-contracts back to Winstar to provide the work covered in the scope. The process should be that Lucent hires Winstar to provide X deliverable defined in the

33

B477

scope, which would be one PO with a set price, and Winstar just does the work. Am I seeing this differently than you are?". (DX 452 at WC 0108595; *see also* DX 442; Montemarano Cross, Tr. 10-28; Harris Cross, Tr. 11-90.) Huber agreed: "Exactly correct. Anything else will result in a mass exodus of this place when this deal is announced." (DX 452 at WC 0108595.)

143. A services agreement was "never consummated with the customer". (Montemarano Cross, Tr. 10-33; Uhl Cross, JX 13 at 154:4-23.)

144. In sum, even if Lucent's obligations to Winstar under the Supply Agreement were relevant to Lucent's obligations to Wireless under the Subcontract, neither the Supply Agreement, nor any subsequent Transition Plan or other services agreement obligated Lucent to build out Winstar's network. Therefore, neither the Supply Agreement, nor any Transition Plan or other services agreement obligated Lucent to subcontract network build-out services to Wireless.

**III.    THE TRUSTEE'S PREFERENCE CLAIM (COUNT X).**

    **A.    Winstar Was Not Insolvent as of December 7, 2000.**

145. The Trustee did not meet her burden of establishing that Winstar was insolvent on December 7, 2000.

        **i.    The parties introduced evidence of solvency through expert testimony.**

146. At trial, the parties introduced evidence on Winstar's solvency as of December 7, 2000, through the testimony of experts.

147. The Trustee did not present the Court with anything from Winstar's books and records or its public filings suggesting that Winstar was insolvent. Moreover, not a single fact witness testified to that effect.

34

148. Lucent's solvency expert was Kevin Collins of Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey"). Collins is a managing director in charge of Houlihan Lokey's valuation practice in the New York office. (Collins Direct, Tr. 18-8.) Collins's report was introduced into evidence as DX 701 and it reflects his opinions and the basis and reasons therefor. (*Id.* at 18-13; DX 701.)

149. The Trustee's solvency expert was Stephen Scherf of Parente Randolph. Scherf also offered a written report and testimony on whether Winstar was solvent as of December 7, 2000. His report was entered into evidence as PX-460.

150. Both experts have had their opinions agreed with and disagreed with in other matters. However, there was no objection made to either expert's credentials in this action, and both were accepted as experts by the Court. (Collins Direct, Tr. 18-12; Scherf Direct, Tr. 12-7.)

### ii. Collins and Scherf utilize the same approaches in determining whether Winstar was insolvent as of December 7, 2000.

151. Both Collins and Scherf apply the same test in formulating their opinion as to whether Winstar was insolvent on December 7, 2000.

152. As the law requires, the test calculates the fair market value of Winstar's assets on December 7, 2000. The fair market value is "the price at which an asset would change hands between a willing buyer and willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able and willing to trade and are well informed about the asset and the market value of that asset". (DX 701 at 1.)

35

153. The fair market value of Winstar's assets are then compared to the stated book value of Winstar's liabilities on that same date. (Collins Direct, Tr. 18-13-14; Scherf Direct, Tr. 12-11-12.)

154. If the fair market value of the assets exceeds the book value of the liabilities, then Winstar was solvent as of the valuation date. (*Id.*)

155. There are a number of accepted methods that can be used for determining the fair market value of the assets. (Scherf Direct, Tr. 12-12-13.) Those methods are the market approach, which examines how the marketplace, or comparable transactions in the marketplace, reflect the value of a company (*id.* at 12-24); the income approach, which examines the expected future income of a company to derive its present value (*id.*); and the asset approach, which examines categories of assets on the company's balance sheet and converts them from a cost basis to a fair market value basis (*Id.* at 12-24).

### iii.   The book value of Winstar's liabilities.

156. Winstar's liabilities for purposes of making a solvency determination are stated at their book value. (Collins Direct, Tr. 18-22; Scherf Direct, Tr. 12-18.)

157. The book value of Winstar's liabilities on September 30, 2000, was approximately $3,947,000,000. (DX 701 at 6.) The book value of Winstar's liabilities on December 30, 2000, was approximately $4,321,500,000. (*Id.*)

158. Working capital is defined as the "current assets and current liabilities of the business" (Collins Direct, Tr. 18-24), which includes accounts payable and accrued expense liabilities. Mr. Collins did not include "accounts payable and accrued expense liabilities in [his] calculations of liabilities [ ] because the valuation methodologies that [he relied] upon to determine the [fair market value of Winstar's assets] already

36

incorporate[d] the assumption of these liabilities as part of working capital." (DX 701 at 6.)

159. As Mr. Collins pointed out, if additional current liabilities were added to the stated liabilities, then the current assets must also be added to the value of Winstar's assets. (Collins Direct, Tr. 18-25.) Mr. Collins explained that "I've looked at the balance sheets, the net effect of that is the current assets were greater than the current liabilities at that point in time. And so our excess of assets over liabilities would actually go up if we were to use that approach." (*Id.*)

   **iv.**   **The fair market value of Winstar's assets.**

     **a.**   **The market approach indicates that Winstar was solvent as of December 7, 2000.**

160. The application of the market approach to Winstar as of December 7, 2000, indicates that Winstar was solvent as of that date.

161. Both Collins and Scherf utilized three accepted methodologies under the market approach (although they used different terms for them) to determine Winstar's value: the public market value, the market multiple methodology and the comparable transaction methodology. (Scherf Direct, Tr. 18-53; DX 701 at 16, 33, 36.)

     **(i)**   **The public market valuation of Winstar indicates that it was solvent as of December 7, 2000.**

162. The public market value indicates what multiple buyers and sellers are willing to pay for Winstar's common equity (*i.e.*, the value of the company after its debts are paid) in the marketplace. (Collins Direct, Tr. 18-26-27). As Collins testified, minority shareholders buying and selling Winstar shares are "setting the price for the common equity, the last piece of the Winstar capital structure, if you will, after all of the

37

debt's been satisfied". (*Id.* at 18-26.) That evidence indicates that Winstar was in fact solvent on December 7, 2000.

163. That valuation is a significant indication of solvency because, as IRS Revenue Ruling 59-60 states: "[a]s a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented." (DX 701 at 4.)

164. On December 7, 2000, Winstar's stock closed at $12.50, thus giving it approximately a $1.1 billion market capitalization. (*Id.* at 16.) The December 7 price "was a low point [and] the recent historical prices, and the prices after that were higher." (Collins Direct, Tr. 18-26.) In addition, the 30-day average for Winstar's stock was greater than $12.50. (*Id.*) Scherf also performed a public market valuation and calculated the same market capitalization as Collins. (Scherf Direct, Tr. 12-56-57; Collins Direct, Tr. 18-26-27.)

165. Collins also examined whether Winstar's market capitalization was based on trading on an active and liquid market by informed investors, using guidance provided by Rev. Rul. 59-60. (DX 701 at 15.) Based on his analysis of the relevant market data, Collins "concluded that Winstar's public market capitalization on December 7, 2000 was reasonable." (*Id.*)

166. However, Scherf testified that Winstar's market capitalization value was not a valid indication that Winstar was solvent. (Scherf Direct, Tr. 12-57.) His reasons for arriving at that conclusion are not persuasive and he has not applied the standard valuation principles and methods reliably to the facts of this case.

38

167. In his testimony, Scherf asserted—without explanation—that the market was not measuring the fair value of Winstar's assets because Winstar was a "distressed business". (*Id.*) Neither Scherf, nor the Trustee, presented any facts that demonstrated that Winstar was a "distressed business" on December 7, 2000. Rather, that was an unsupported conclusion Scherf reached to enable him to disregard the actual evidence. Thus, Scherf discarded Winstar's $1.1 billion market capitalization as evidence of solvency because "shares of stock can only trade at a positive price", even when applied to a distressed company. (*Id.*)

168. However, none of the evidence in the marketplace supports Scherf's unsupported conclusion that Winstar was in fact a distressed company. As Collins testified, all of the market data shows that Winstar's stock provided an accurate indication of Winstar's value at the time: the stock was not trading for pennies, but rather for $12.50; its market capitalization was over a billion dollars; there was significant institutional ownership in Winstar; there was sufficient float in Winstar stock; and Winstar was widely covered by research analysts. (Collins Direct, Tr. 18-26-29.) In order to accept Scherf's opinion that Winstar was a distressed company, the Court would have to conclude that all of that contemporaneous market evidence of Winstar's value was wrong.

169. Scherf also testified that Lucent, in performing due diligence on Winstar in December 2000, concluded that Winstar was insolvent based on, among other things, a due diligence report drafted by Lucent (PX 201). (Scherf Direct, Tr. 12-58-60.) The evidence does not support that conclusion.

39

B483

170.  Beth Perricone, a former Lucent employee and author of PX 201, testified that in connection with the Lucent due diligence performed in December 2000, she analyzed Winstar's assets to determine whether they were valued properly on Winstar's balance sheet; had discussions with Winstar employees—none of whom suggested Winstar's assets were overstated; and saw nothing to cause her to question Winstar's solvency in December of 2000. (Perricone Direct, Tr. 20-43-44.)

171.  In addition, Ms. Perricone's testimony shows that Scherf incorrectly interpreted the conclusions made by Lucent in PX 201.

172.  Scherf testified that the 20 percent cost of financing and 15.7 percent loan loss reserve noted in PX 201 indicated that Lucent believed it was going to lose "35 cents on the dollar" on its loans to Winstar, which Scherf equated to a conclusion that Winstar was insolvent. (Scherf Direct, Tr. 12-58-60.) However, Ms. Perricone testified that those two numbers are not related and should not be summed, as Scherf did in his testimony. (Perricone Direct, Tr. 20-46.) The cost of financing is Lucent's estimate of what Winstar's paper would sell for on the market in December 2000. (*Id.* at 20-45.) That number is derived from prevailing market conditions at the time—not from a conclusion that Winstar was insolvent. (*Id.* at 20-45, 20-64-65) Likewise, the loan loss reserve did not suggest that Winstar was insolvent as of December 2000. (*Id.* at 20-46.) Instead, the loan loss reserve measured the risk that Lucent might experience a loss on the Winstar loan in the future. (*Id.*) The first payments under the loan were years away and there was a risk that conditions might change and that Winstar might be unable to make payments. (*Id.*) Ms. Perricone further testified that if Lucent had believed that Winstar was insolvent at the time of the due diligence review in December 2000, it would have taken a

40

loan loss reserve of 100% and referred the matter to Lucent's "work-out group". (*Id.* at 20-64-65.) Lucent did neither, and Ms. Perricone's testimony was unrebutted.

173.  In addition, both Ms. Perricone and Martina Hund-Mejean testified that the change Lucent made to Winstar's asset quality rating ("AQR")—on which the loan loss reserve was based—did not indicate that Lucent believed Winstar to be insolvent. (Perricone Direct, Tr. 20-46-47; Hund-Mejean Direct, Tr. 14-50-51.)  In fact, Lucent concluded the opposite: Winstar would still be a viable company even if it had to pay a higher interest rate on its paper.  (Hund-Mejean Direct, 14-50-51.)

**(ii)    The market multiple methodology indicates that Winstar was solvent as of December 7, 2000.**

174.  The market multiple methodology, which seeks to value Winstar based on the stock price of comparable companies, also indicates that Winstar was solvent as of December 7, 2000.

175.  Under that method, as applied by Collins, firms that had operational and economic similarity with Winstar, and whose securities were actively traded, were selected for comparative purposes. (DX 701 at 28, 32.)  After analyzing the public market prices for those companies, separate multiples were calculated for revenue and property, plant and equipment ("PP&E") based on what investors were paying for those companies' securities. (Collins Direct, Tr. 18-36.)  In addition, a risk analysis performed by Collins incorporated both quantitative and qualitative risk factors (including factors that relate to the nature of the industry, relative size, profitability, and growth rates) into the market multiple calculation. (DX 701 at 28.)

176.  In addition, Collins added a control premium to the analysis because to gain control over the assets, a purchaser would have to pay a premium over the public price of

41

the equity. (DX 701 at 33; Collins Direct Tr., 18-38-39.) Accordingly, Collins examined acquisition data and premiums paid on transactions from around the relevant timeframe and calculated a 30 percent equity control premium. (*Id.*)

177. After doing that, Collins concluded that Winstar was solvent on December 7, 2000, and stated that "[a]fter accounting for an equity control premium [of $104 to $284 million], Winstar's enterprise value indication, on a controlling interest basis, ranged from approximately $4.1 billion to $4.9 billion". (DX 701 at 33.)

178. In applying the market multiple approach—which Scherf calls the guideline company approach—he derived "fair market values of Winstar as of December 7, 2000, of approximately $2.1 billion to $2.9 billion" (PX 460 at 18), which is what Winstar was worth after subtracting out its interest bearing debt (*Id.* at Exh. E). Notably, Scherf valued Winstar's assets at $6.2 billion (*id.*), which is a higher price than Collins calculated (Collins Direct, Tr. 18-40) and which also indicates that Winstar was solvent on December 7, 2000.

179. Scherf admitted on cross examination that if his calculation was assumed to be correct, then Winstar was solvent under his guideline company approach. (Scherf Cross, Tr. 12-133.)

180. However, Scherf stated that his own calculation was not a reliable indicator of Winstar's solvency as of December 7, 2000. (PX 460 at 18.) The primary reason he gave for that conclusion was that the dispersion among the multiples used in the calculation was too great. (Scherf Cross, Tr. 12-129-130.)

181. However, Scherf admitted in his testimony that *he* selected the companies used in *his* analysis. (*Id.* at 12-133.) He then critiqued the results of his own selection

42

process (which yielded a value of Winstar's assets far in excess of Collins's calculation) as having too much dispersion. (*Id.* at 12-133-134.) Scherf's rejection of his own calculation is not credible.

182.  Moreover, nowhere in his testimony or his report does Scherf, nor the Trustee, define what an acceptable amount of dispersion would be, nor does he point to any professional standards that could be applied to make such a determination. Thus, there is no way to evaluate whether his rejection of his own analysis is correct even by the standards he purports to apply.

183.  Scherf also testified that there was an investment bubble in the technology sector that affected the value of Winstar's stock as of December 7, 2000. (*Id.* at 12-137.) As discussed below (at ¶¶ 190-200), Scherf's assertion that Winstar's value was inflated as of that date is not supported by the record evidence or any reliable principles or methodology.

### (iii)    The comparable transaction methodology indicates that Winstar was solvent as of December 7, 2000.

184.  The comparable transactions methodology values Winstar based on actual change in control transactions for comparable companies; it does not look at the trading price of Winstar's stock. (*See* Collins Direct, Tr. 18-41.) That methodology also indicates that Winstar was solvent as of December 7, 2000.

185.  Using that methodology, Collins examined controlling interest transactions in the telecommunications industry for companies with operations similar to Winstar's business. (DX 701 at 6; Collins Direct, Tr. 18-41-42.) Those transactions represented the most recent completed transactions prior to the December 7, 2000, valuation date that Collins could identify, and all of them closed in 2000. (DX 701 at 6; Collins Direct, Tr.

43

18-42.) Those transactions were then used to derive multiples that were employed to calculate Winstar's fair market value. (DX 701 at 6; Collins Direct, Tr. 18-42-43.)

186. In deriving those multiples, Collins recognized that the conditions in the telecommunications industry changed throughout 2000, and selected multiples that properly accounted for that change in market conditions. (DX 701 at 36.)

187. The results of the comparable transaction methodology suggested an "enterprise value range of Winstar, on a controlling interest basis, of $4.1 billion to $4.7 billion" (*id.*), which is the lowest range of all Collins's calculations (Collins Redirect, Tr. 18-139). Nonetheless, it indicates that Winstar was solvent.

188. On cross examination, counsel for the Trustee sought to establish that the transactions Collins selected were not comparable to Winstar. (*See* Collins Cross, Tr. 18-102-114.) However, it is clear that Collins utilized his professional judgment both in selecting companies that were comparable to Winstar and in appropriately adjusting the multiples generated from those companies to ensure that his analysis was accurate. (Collins Direct, Tr. 18-44-46.)

189. In applying the comparable transaction methodology, Scherf testified that he reviewed 100 transactions, but found that *none* of them was comparable to Winstar. (Scherf Direct, Tr. 12-66.) Scherf's conclusion is not credible. As Collins testified, Winstar was a telecommunications company and, while "not every single company is directly comparable … they're sufficiently comparable that an investor looking at the data could make an assessment of the value of Winstar". (Collins Direct, Tr. 18-45-46.) Accordingly, the comparable transaction methodology is "an appropriate methodology

44

and [those] transactions did provide valuable data to produce an indication of the value of the assets of Winstar." (*Id.* at 18-46.)

(iv)    **Winstar's shares traded in an efficient market.**

190.    The calculations made under the market approach are reliable because Winstar's securities traded in an efficient market.

191.    The evidence points to a presumption that Winstar's securities traded in an efficient market. *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). Winstar was listed on the NASDAQ as of December 7, 2000. (Scherf Cross, Tr. 12-143.) It had substantial trading volume (DX 701 at 18), significant institutional ownership (*id.* at 15) and was followed by a number of securities analysts (*see id.* at 23). Moreover, Winstar made a number of Form S-3 filings (*see* DX 320 & DX 365) and, as discussed below, its stock price reacted to subsequent events affecting Winstar.

192.    In examining whether the market was appropriately valuing Winstar securities, Collins analyzed Winstar's float, its institutional ownership and analyst coverage. (DX 701 at 15.) He concluded that Winstar's common stock was an actively traded, liquid security and that the market was well informed about the company, its performance and its future expectations and risks. (*Id.*)

193.    In fact, based on actual market data, Collins's concluded that Winstar stock, when evaluated with comparable companies, generally: (1) was more actively traded; (2) had a larger portion of its outstanding stock in the public market; and (3) a larger portion of its stock that was in the hands of the public market (the float) was traded on a daily basis. (*Id.* at 19-21, 23.)

194.    Further, Collins stated that Winstar was actively followed by the larger investment brokers, which is an indication that the market was well informed about the

45

B489

company. (*Id.* at 23.) And, the profile of the institutional shareholders that held 48 percent of Winstar's common equity illustrated the appetite of sophisticated investors for Winstar securities, which is a general indication of wide market acceptance of the company, its business plan and its operations. (*Id.* at 24.)

195. In addition, Winstar's stock reacted to new information supplied to the marketplace. The price of Winstar's stock in March 2000 went as high as $60 a share (Scherf Cross, Tr. 12-138), and peaked at over $80 a share in 2000 (*id.* at 12-139-140). Subsequently, new information about the telecommunications market was introduced to the marketplace. For example, Scherf testified that prices of telecommunications equipment declined throughout 2000 and that that was known to market by at least May 2000. (*Id.* at 12-184.) In light of that—and other information—by December 7, 2000, Winstar's stock price had dropped to $12.50, a loss of almost $70 per share during the year. (*Id.* at 12-140.)

196. On the other hand, the Trustee did not put forth any evidence to show that the market was inefficient, and, in fact, her expert admitted that Winstar's stock traded in an efficient market. (*See* Scherf Cross, Tr. 12-143.)

197. Nonetheless, even though Winstar's stock was trading at $12.50 in an efficient market, Scherf rejected calculations (including his own) made under the market approach that clearly indicate that Winstar was solvent as of December 7, 2000. (Scherf Direct, Tr. 12-57.)

198. Scherf's basis for that rejection is premised on his misunderstanding of the "random walk" theory of the market. Scherf testified that the random walk theory means that "randomly as you go down the market, stocks are efficient, but that doesn't explain

46

the assumption that we all see that there are bubbles in the market. All that does is it says that stocks can be undervalued and stocks can be overvalued. And that undervaluation and the overvaluation is a function of a random walk down the street and that's what it says." (Scherf Cross, Tr. 12-144-145.) Thus, he opines, without any supporting facts, that Winstar's stock was being traded in an irrational market. (*Id.*)

199.  The "random walk" theory does not suggest that Winstar's share price was incorrectly valued by the marketplace as of December 7, 2000. Rather, it indicates that the past movement of a stock price cannot be used to predict its future movement. As Collins testified: "The concept [of the random walk theory] is that when you have an active trading market such as we had here, the price—the current price for the stock reflects all of the available information that's out there in the market. So the current price reflects all information. Any future price movement, it could be – the price could go up or it could go down, but because the current price reflects all available information, any future movement would be a random price movement." (Collins Direct, Tr. 18-29-30.)

200.  Thus, Scherf's assertion that the calculations made under the market approach are tainted by an irrational market that incorrectly valued Winstar's stock price as of December 7, 2000, is not credible. The Trustee has failed to produce any facts to show that Winstar's stock was not trading in an efficient market.

> **(v)   Private market transactions involving Winstar on December 7, 2000 indicate that Winstar was solvent.**

201.  Private market transactions involving Winstar on or about December 7, 2000, further indicate that Winstar was solvent as of that date.

202.  Both Collins and Scherf agree that it is a controlling, as opposed to a minority, interest in Winstar that must be valued. (*See, e.g.,* DX 701 at 33; PX 460 at 7.)

B491

In that regard, Scherf pointed out that in determining whether Winstar was solvent on a control basis, "[a] control buyer of Winstar would have access to reasonable knowledge of relevant facts that would not be otherwise available to the minority shareholder who is purchasing and selling shares on the open market". (PX 460 at 14.) He then equated the access allowed to a control buyer with the ability to perform due diligence on Winstar. (PX 460 at 7; Scherf Cross, Tr. 12-150-151)

203.  It is undisputed that Winstar obtained hundreds of millions of dollars in investment capital and financing from a variety of sophisticated companies and investors on the valuation date, December 7, 2000.  Specifically, Microsoft, Credit Suisse First Boston Private Equity, Welsh Carson Anderson & Stowe and Compaq made a $270 million investment in Winstar on December 7, 2000. (DX 701 at 26.)  In addition, Siemens provided Winstar with a $200 million loan.  (*Id.*)  Thus, almost half a billion dollars was obtained from those sophisticated investors on the valuation date.

204.  Prior to making that investment, both CSFB and Welsh Carson had employees on Winstar's board of directors, thus giving them access to information not available to minority shareholders.  (*Id.* at 48.)

205.  In addition, those companies were supplied with other non-public information (Collins Direct, Tr. 18-32-33), including Winstar's internal financial projections.  (*See, e.g.*, DX 430 (Winstar Projections dated October 2000 produced by CSFB).)

206.  Siemens conducted due diligence on Winstar prior to lending Winstar the $200 million (Holwell Direct, JX 17 at 51:13-52:8), and Scherf acknowledged that it is likely that the other companies conducted their own due diligence prior to making their

48

B492

investment (Scherf Cross, Tr. 12-161). It is clear that "[p]eople who are investing in a company would typically not be doing it if they believed that the company was insolvent." (Collins Direct, Tr. 18-31.)

207. In addition, there is no contemporaneous evidence from on or about December 7, 2000, showing that Winstar was insolvent.

208. Indeed, Fred Rubin, Winstar's treasurer and an executive officer of the company, testified that he believed that Winstar was solvent on December 7, 2000. (Rubin Cross, JX 5 at 58:22-59:17 (12/9/03 Dep.).) That testimony was not rebutted or disputed by any fact witnesses.

209. Nonetheless, Scherf speculated that "[w]hat they must have been doing was they must have been making a bet that although Winstar was insolvent on this date that at some point in time in the future if everything went right that they would be solvent because I can't say that they would have done something irrational, so they had to be making a bet." (Scherf Direct, Tr. 12-61.)

210. That hypothesized guess that transactions were speculative "bets" is not credible. The record evidence shows that those sophisticated institutional investors had access to information not available to minority shareholders and still elected to invest hundreds of millions of dollars in Winstar. Scherf testified that he "can't explain why they did what they did" and that he has seen no evidence of what those companies were actually thinking when they made the investment. (Scherf Cross, Tr. 12-164.)

211. Moreover, sophisticated institutional investors such as CSFB and technology companies such as Microsoft make informed, rational investment decisions

B493

and do not "do their business by making bets", as Scherf suggests. (Collins Direct, Tr. 18-33.)

212.  Accordingly, the fact that numerous sophisticated companies that conducted due diligence and investors who had access beyond that of minority shareholders—as defined by Scherf—to Winstar provided Winstar with such a large amount of investment capital and financing further indicates that Winstar was solvent on December 7, 2000.

> **b.    The income approach indicates that Winstar was solvent as of December 7, 2000.**

213.  Applying the income approach to value Winstar as of December 7, 2000, further indicates that Winstar was in fact solvent on that date.

> **(i)    The discounted cash flow methodology indicates that Winstar was solvent as of December 7, 2000.**

214.  The discounted cash flow method ("DCF") is a methodology under the income approach frequently used to determine the fair market value of an enterprise. The method requires an estimate of the present value of the projected future cash flows of the enterprise. (DX 701 at 29.) Those projected future cash flows are discounted at a rate that appropriately reflects the risk inherent in the company having the ability to actually achieve those cash flows. (*Id.*) Thus, as Collins testified "[t]he projected cash flows reflect the expected growth in a company's business whereas the discount rate captures the risk associated in achieving those projections." (*Id.*)

215.  Because the projections end at a given year, the value of the business as it continues into the future beyond the projections must be calculated. (*Id.* at 41.) That is known as a "terminal value" and it is added into the DCF calculation. (*Id.*)

216.  In his DCF analysis, Collins "examined two sets of financial projections prepared close to the Valuation Date" (*Id.* at 38), one of which was very similar to the

50

projections Scherf referred to in his report (Collins Direct, Tr. 18-50; Scherf Direct, Tr. 12-44).

217. Collins, in the ordinary course of performing valuations for his clients, examines the projections provided to him using his judgment and experience to ensure that they are a reliable indication of value. (Collins Direct, Tr. 18-52.) In this case, Collins took steps to assure himself that those projections were reasonable through the examination of Winstar's historical performance, analyst research reports and other industry information. (*Id.* at 18-52, 18-75-76.)

218. Indeed, Lucent concluded that similar projections provided by Winstar, which Lucent evaluated in its two-week due diligence review, were reasonable. (Perricone Direct, Tr. 20-63-64.) Specifically, in connection with those projections, Lucent evaluated and tested Winstar's revenue numbers. (*Id.*) As Ms. Perricone testified: "some of the things we did to look at that were to get copies of contracts, look at their accounts receivable aging, how many customers did they have, are the customers paying, because revenues is the first source to cash flow." (*Id.* at 20-64.)

219. Additionally, there was no record evidence presented that showed that the recipients of the projections believed them to be unreliable or speculative at the time.

220. The first set of projections (DX 493) yielded a fair market value of Winstar's assets ranging from $6.1 billion to $7.7 billion after applying a 16 percent discount rate. (DX 701 at 38, 43.)

221. The discount rate of 16 percent applied to the projections was calculated from a weighted average cost of equity and debt based on "comparable company debt to equity ratios, using the cost of equity and after-tax cost of debt based on long-term

51

corporate bonds". (DX 701 at 42-45.) That is the standard way of calculating an appropriate discount rate. (Collins Direct, Tr. 12-68.)

222. The Trustee's contention that the discount rate must be tailored to Winstar's capital structure (Scherf Direct, Tr. 12-49-50) is incorrect. The value of Winstar's assets—which the DCF method measures—is determined independent of Winstar's capital structure. (Collins Direct, Tr. 18-68-69.) As Collins explained, "[t]he assets are independent of the capital structure . . . so it's not Winstar's capital structure that's relevant for determining the value of the assets, but what an appropriate industry based capital structure would be . . . [I]f you and I owned identical houses and you had – I didn't have a mortgage on my mine and you had a mortgage on yours, the fact that you had debt and a borrowing cost associated it – with it and I don't is irrelevant. The houses are identical, they should sell for identical prices. What you would realize out of a sale of your house versus what I would realize out of a sale of mine would different, but the point is that the value of the houses is the same." (*Id.* at 18-68-69.)

223. The second set of projections (DX 430) yielded a fair market value of Winstar's assets ranging from $5.7 billion to $7.4 billion using a 30 percent discount rate. (DX 701 at 38, 43.) An increased discount rate was used by Collins to account for the incremental risk associated with achieving the more aggressive projected cash flows in DX 430. (DX 701 at 43.)

> **(ii)    Scherf's application of the income approach is not credible.**

224. Scherf also purported to utilize the income approach as part of the basis for his opinion that Winstar was insolvent. (Scherf Cross, Tr. 12-85.) He employed two

52

different methodologies under the income approach in doing so, but neither methodology was applied reliably to the facts of this case.

225. The first approach that he applied was the DCF method (Scherf Cross, Tr. 12-85), which was the same methodology used by Collins. However, unlike Collins, Scherf did not actually perform a calculation under his DCF analysis. (*Id.* at 12-86-87.) Instead, Scherf asserted that the "projections were so bad that I couldn't even adjust them" and therefore "I didn't do the math because it was speculative to do the math". (*Id.*)

226. In addition, Scherf was asked by counsel for Lucent whether his "view was those projections are *unusable*, so [he] didn't come out with a discounted cash flow number". (*Id.* at 12-87 (emphasis added).) He answered: "That's correct. Because had I done that I wouldn't have created an opinion within a reasonable degree of professional certainty, which I am required to do." (*Id.*)

227. However, Scherf nevertheless asserted that the DCF method shows Winstar to be insolvent. (Scherf Cross, Tr. 12-98-99.) But, in doing so, Scherf contradicts his own testimony in which he stated: "I agree with the general presumption that if I have unreliable projections that I shouldn't use the discounted cash flow method because it's gonna produce an opinion – that wouldn't be within a reasonable degree of professional certainty". (Scherf Cross, Tr. 12-97.) If the projections are unusable for making a calculation under the DCF method, then they cannot be used to conclude that Winstar was insolvent under that same method.

228. Moreover, Scherf agreed that *PPC's Guide to Business Valuations* ("PPC Guide"), an accepted treatise in the valuation field, states that the DCF method should not

53

be used where insufficient data exists to make a reliable forecast of net cash flow or earnings for a reasonable period into the future. (*Id.* at 12-102-104.)

229.  Yet, despite the fact that he "didn't come out with a discounted cash flow number" (*id.* at 12-87), Scherf still asserted in his testimony that the numbers "would have said that they were insolvent". (*Id.* at 12-98-99.)  However, Scherf admitted on cross examination that he never performed a DCF calculation using those projections. (*Id.* at 12-199-200.)  Thus, his conclusion is speculative and not supported by either an application of the DCF method or by any actual analysis in Scherf's report or testimony. Since he did not perform any calculations under the DCF method, he cannot "conclude" what those calculations would have been had he actually performed the calculations.

230.  Thus, even if the projections are unreliable, the DCF method yields no conclusion from them.  Accordingly, the DCF method does not establish that Winstar was insolvent as of December 7, 2000, for purposes of the Trustee meeting her burden of proof.

231.  In addition to the DCF method, Scherf also utilized another method—the capitalized debt free net cash flow method ("CCF")—as a basis for his opinion that Winstar was insolvent. (Scherf Cross, Tr. 12-112.)  Under that method, one "estimates the value of a subject company by capitalizing a single year's debt free net cash flow or the average of several years' debt free net cash flow at a market derived capitalization rate". (*Id.*)

232.  But, historically Winstar had no earnings and thus no debt free net cash flow. (*Id.* at 12-113.)  The PPC Guide clearly states that "if the adjusted benefit stream to be capitalized is either negative or marginally positive, it should not be capitalized into an

54

B498

estimate of the company's value". (*Id.* at 12-119.) Rather, the valuation expert should "use a different benefit stream . . . or a different valuation method". (*Id.*)

233.   Nonetheless, despite the fact that an accepted and authoritative treatise on valuation states that the CCF method should not be used under these circumstances, Scherf improperly proceeded to conclude that "historical operating results would indicate that Winstar would have no value and, therefore, its assets would not exceed its liabilities rendering it insolvent as of December 7, 2000." (PX 460 at 8.) In arriving at that conclusion, Scherf admitted that he performed no actual calculation using the CCF method, nor did he provide an actual value for Winstar as of the valuation date. (Scherf Cross, Tr. 12-117.)

234.   As Collins pointed out, Scherf's application of the CCF method would indicate "that all start-up companies and all early stage companies [would] never have any value until they attain positive debt free cash flow, which is contrary to overwhelming market observation". (DX 701 at 49.) Indeed, Scherf admitted on cross examination that under the CCF method, as he was applying it, Winstar was insolvent throughout the years 1997, 1998 and 1999. (Scherf Cross, Tr. 12-123.)

235.   That conclusion is not supported by any evidence from the marketplace, and Scherf's testimony concerning the income approach is not credible.

      **c.   The asset approach was not properly used to determine whether Winstar was solvent as of December 7, 2000.**

236.   A final approach used by valuation experts in making solvency determinations is the asset approach. Under that approach, individual categories of assets on the company's balance sheet are analyzed and converted from a cost basis to a fair market value basis. (Collins Direct, Tr. 18-16-17.)

55

237.  The use of the asset approach is not suited for making a determination of Winstar's solvency as of December 7, 2000.  Winstar and other comparable companies do not typically enter into transactions where they sell categories of their assets.  (*Id.*) Accordingly, there is little information available on discrete trades of individual classes or categories of assets for telecommunications companies comparable to Winstar.  (*Id.*) That information is necessary for a proper application of the asset approach.

238.  In addition, Winstar and other telecommunications companies were valued using an income or market approach, rather than an asset approach, by analysts and others at the time because there was a large and active trading market for those companies.  (*Id.* at 18-16-17.)

239.  Accordingly, Collins did not use the asset approach in his solvency analysis.

240.  Scherf purported to utilize an asset approach (Scherf Cross, Tr. 12-171-172), but did not actually do the analysis necessary to calculate the fair market value of Winstar's assets.

241.  Scherf did not group Winstar's assets and compare them with available information, if any, relating to the value of similar assets in the marketplace as of December 7, 2000.

242.  Moreover, Scherf rejected the standards that govern how a valuation analysis should be performed.  For example, the PPC Guide states as follows: "the valuation consultant should only gather data where it's available and discernible as of the valuation date.  Although the valuation process is concerned with the future benefits of ownership, the consultant must approach the engagement from the perspective of the valuation date.  That means the consultant can only use information that was available or

56

determinable as of the valuation date, however this may not be entirely true in estate and gift tax state cases as discussed in section 1002." (*Id.* at 12-173.)

243.   In addition, the Institute of Business Appraisers—of which Scherf is a member—promulgates the following standard: "An appraisal shall be based upon what a reasonably informed person would have knowledge of as of a certain date . . . This shall be known as the appraisal date evaluation or effective date and accordingly reflect the appraisers supportable conclusion as of that date.  Information unavailable or unknown on the date of valuation *must* not influence the appraiser or contribute to the concluding opinion of value." (*Id.* at 12-176-177.)

244.   Nonetheless, Scherf conceded that he applied the "principles from the tax cases"—despite the fact that this is not a tax case—because, as he said, "in this situation I felt like I had to." (*Id.* at 12-175-176.)  Scherf further explained that he had to look at subsequent events because "if I'm trying to figure out the truth as to whether Winstar's solvent or insolvent and to provide a truthful opinion to the Court, *I need to do that no matter what the standard says.*  I need to do what I need to do to provide evidence if that's what it is.  I can't ignore things.  I'm not going to sit here and put blinders on." (*Id.* at 177-178 (emphasis added).)

245.   Thus, Scherf's testimony is not the product of reliable valuation principles and methods, nor did he apply those principles and methods reliably to the facts of this case.  The relevant valuation guidelines clearly require Scherf to value Winstar using information that was known or determinable as of December 7, 2000. (*Id.* at 12-173-77.)  To the extent Scherf departed from those standards, his opinion is not reliable.

57

B501

246.  In that regard, Scherf's use of the December 19, 2001, sale of Winstar's assets to IDT to value Winstar as of December 7, 2000, is clearly inappropriate.  Scherf admits that the sale to IDT was not known or knowable on December 7, 2000.  (*Id.* at 12-179.)

247.  The sale occurred over a year after the valuation date, by which time the industry had changed significantly.  (*Id.* at 12-183.)  Additionally, the sale occurred under distressed circumstances while Winstar was in bankruptcy.  Still, when that sale did occur, the Chairman of IDT valued Winstar's assets at $5 billion and stated that "[i]t might not top the Dutch settlers buying the island of Manhattan for $24, but it comes pretty close".  (*Id.* at 12-180.)

248.  Likewise, Scherf's reliance on the Deloitte & Touche valuation report (PX-328) and the Empire analysis of Winstar's assets as of December 19, 2001 (PX-329) to value Winstar as of December 7, 2000, is wrong.  Again, he admitted that the information in those documents "was clearly not known or knowable as of December 2000".  (*Id.* at 12-182-183.)

249.  Scherf also improperly relied on an asset impairment charge taken by IDT in August 2002, over six months after it purchased a portion of Winstar's assets.  (PX-335.)  That charge was based on a conclusion reached by Grant Thornton which, in turn, examined work performed by a valuation company, Empire.  (Scherf Cross, Tr. 12-186-187.)  The charge was taken as of December 31, 2000.  (PX-355.)

250.  The weight of the evidence clearly establishes that, at the time, neither Winstar nor its outside auditors, Grant Thornton, believed that Winstar's assets were impaired on December 7, 2000.

251.  In performing its year-end audit of Winstar for 2000, Grant Thornton did not require Winstar to take an asset impairment charge for that year.

252.  While that audit was not completed, there is no mention in Grant Thornton's contemporaneous work papers, which contain numerous "open items" for consideration in the audit, that it or Winstar contemplated the need to take an impairment charge on the assets. (*See* Scherf Cross, Tr. 12-193.)  In fact, Gary Goldman—Winstar's outside auditor—testified that he did not recall Grant Thornton considering an asset impairment charge for Winstar through Winstar's filing for bankruptcy. (Goldman Direct, JX 16 at 132:24-133:6; 135:13-16; 135:19-136:2; 136:4-5.)

253.  Accordingly, there is no evidence from the audit that an asset impairment charge was necessary.

254.  In 2002, Grant Thornton stated that it was relying on hindsight in coming to its conclusion to take the impairment charge on Winstar's assets as of December 31, 2000.  In their work papers, Grant Thornton wrote: "In *hindsight*, the signs developing in the market in mid to late 2000 represented a trend that led to the permanent correction in [Winstar's] value and eventually its bankruptcy.  This decline below book value may not have been recognized by the market *at the time* but can be concluded as reasonable through cash flow analysis, with the comfort of knowing what happened *subsequently*." (PX-450 at GT/IDT 00211 (emphasis added); Scherf Cross, Tr. 12-188-189.)  Thus, while the August 2002 impairment charge was taken "as of" December 31, 2000, it was not based on information that was known or knowable as of December 2000.  Accordingly, under the applicable professional standards, the impairment charge should not be considered in performing a valuation of Winstar as of December 7, 2000.

59

255.  In purporting to apply the asset approach, Scherf also relied on an analysis of certain Winstar assets performed by Empire (designated PX 450).  Scherf's use of that document, which was objected to as being incomplete (Tr. 17-45), is unreliable and it does not support his conclusion that, under proper valuation standards, Winstar was insolvent as of December 7, 2000.

256.  Empire used the income approach—and not the asset approach—to value a portion of Winstar's assets. (Scherf Cross, Tr. 12-196.) Moreover, the analysis set forth in the document employed the same projections (though slightly rounded) that Scherf previously rejected and deemed "unusable" for use in his own analysis of the income approach. (*Id.* at 12-197-198.)

257.  In applying the asset approach, Scherf must value all of Winstar's assets as of December 7, 2000.  However, the Empire valuation analysis examined only 30 percent of the revenues attributable to Winstar's assets. (*Id.* at 12-199.) In addition, that reduced amount of revenue was further discounted by Empire as part of the asset impairment charge analysis. (*Id.* at 12-205-206.)

258.  Scherf offers no explanation of which assets (or which revenues) were analyzed by Empire in their analysis. (*Id.* at 12-199-200.) Nor does he explain how the 70 percent of revenues not accounted for by Empire, or the discounting of the remaining revenues, affected his valuation analysis. Thus, his reliance upon the Empire valuation document is not credible.

259.  Accordingly, Scherf's purported analysis of Winstar's value under the asset approach is not based on sufficient or reliable facts and data and it improperly relies on hindsight.

60

### v.    The weight of the competent evidence shows that Winstar was solvent as of December 7, 2000.

260.  Collins concluded that Winstar was solvent because the fair market value of Winstar's assets as of December 7, 2000, is reasonably stated in the range of $4.5 to $5.5 million.  (DX 701 at 6.)

261.  Collins arrived at that conclusion after looking at all of the accepted valuation approaches and indications of value discussed above.  (Collins Direct, Tr. 18-21-22.)  After applying those approaches and examining the resultant calculations of value, Collins applied his professional judgment to the evidence and the calculations and determined that it yielded a range of $4.5 to $5.5 million.  (*Id.* at 18-22.)  He then compared that range with the stated value of Winstar's liabilities.  (*Id.*)  Collins concluded that Winstar was solvent on December 7, 2000, and that its aggregate assets exceeded its stated liabilities by an amount ranging from $179,000,000 to $1,553,000,000 (DX 701 at 6.)

262.  The Court finds that Collins's conclusion is based on competent evidence and sufficient facts and data.  The Court further finds that it is the product of reliable principles and methods and that Collins has applied those principles and methods reliably to the facts of this case.

263.  The Court concludes that the weight of the competent evidence from all of the accepted methodologies shows that Winstar's assets measured at fair market value exceeded the book value of its liabilities by a range of $179,000,000 to $1,553,000,000. Therefore, the Trustee has failed to meet her burden of establishing that Winstar was insolvent as of December 7, 2000.

B505

### B.    The Transfer of the Siemens Loan Proceeds to Lucent Was Not the Transfer of an Interest of the Debtor in Property.

264.    Siemens and the other Bank lenders understood that the proceeds of the Siemens Loan would be used to repay Winstar's outstanding debt under the Second Credit Agreement.  According to the Bank of New York, the Administrative Agent for the Bank Loan, one of the amendments that needed to be made to allow the Siemens increase to the Bank Loan was an amendment allowing Winstar to use such proceeds to "repay outstandings under the credit agreement with Lucent".  (*See* DX 721 at Siemens ICN 02210.)  Siemens was copied on correspondence concerning that amendment.  (*Id.* at Siemens ICN 02209.)

265.    Furthermore, Winstar's failure to pay any indebtedness over $25 million when due constituted an Event of Default under the terms of the Bank Loan to which Siemens was becoming a signatory.  (DX 284 at 2WC 0057787 (§ 9.01(f)).)  Winstar's failure to pay the proceeds of the Siemens Loan to Lucent pursuant to the terms of the Second Credit Agreement (*see* Stip. Facts ¶ 23) would have put Winstar in default of the Bank agreement—a fact that Siemens presumably was aware of based on its due diligence.  (*See* Holwell Direct, JX 17 at 51:13-52:8.)

266.    With that knowledge, Siemens and the other Bank lenders evidenced their agreement that Winstar use the funds to repay Lucent outstandings when they signed the New Lender Agreement on December 6, 2000.  (*See* DX 516.)

267.    Winstar likewise understood and agreed that the Siemens Loan proceeds would be used to repay Winstar's Lucent debt.  (DX 486; *see also* DX 511 at 2WC 0023840-41; DX 521.)  Upon receiving the proceeds of the Siemens Loan on December 7, Winstar wire-transferred $188,180,000 to Lucent (the "Siemens

62

B506

Repayment"), which represented a payment of the $194,000,000 net proceeds of the

Siemens Loan minus $5,820,000. The $5,820,000 represented a refund of an upfront fee

Winstar paid to Lucent at the time of the borrowing under the Second Credit Agreement,

which became due to Winstar on account of the Siemens repayment. (Stip. Facts ¶ 17.)

268. In addition, although Siemens and Lucent had certain security interests

under their respective credit agreements, they were both effectively unsecured creditors

vis-à-vis Winstar on December 7, 2000. Winstar was, in essence, a holding company for

the various Winstar subsidiaries. (*See In re Winstar Communications, Inc.* (Case No. 01-

01430), D.I. 546, 547, 548, 560, 561, 570, 586, 588, 590, 593 (Summary of Schedules

and Statements of Financial Affairs of Winstar Communications, Inc. and various

subsidiaries filed in the Bankruptcy Proceeding).) Winstar was also an obligor with

respect to both the Bank Loan and the Second Credit Agreement. (DX 284 at 2WC

0057804 (unexecuted copy); DX 29 at 145.) While Winstar (and certain of its

subsidiaries) had granted the Bank lenders a security interest in substantially all of its

assets, excluding assets financed under the Second Credit Agreement (Keefe Direct, Tr.

19-63-64), Winstar (again, speaking strictly of the parent company) had not granted a

security interest to Lucent at all (*see* DX 29 at Exh. I; DX 32). Lucent was therefore an

unsecured lender vis-à-vis Winstar.

269. If the Court credits the testimony of the Trustee's solvency expert that

Winstar was insolvent on December 7, 2000 (*see generally* Scherf Direct, Tr. 12-1-75),

then Siemens was also an unsecured creditor as of that date, as evidenced by Scherf's

testimony that the Bank Loan was trading at 85 cents on the dollar (*Id.* at 12-64). On the

Trustee's own theory, Siemens's security interest was worthless because the Bank Loan

B507

was already under-collateralized at the time that Siemens became a lender in that facility.[2]

270.  The transfer of the Siemens Loan proceeds to Lucent therefore was not a transfer of Winstar's interest in any property, but only substituted one unsecured Winstar creditor (Lucent) for another (Siemens) and had no effect on Winstar's property whatever.

### C.    Lucent Was Not an Insider of Winstar on December 7, 2000.

#### i.    The traditional indicia of insider status are absent in this case.

271.  There is no evidence that Lucent had any representatives on Winstar's board of directors.  (*See* Pocalyko Cross, Tr. 3-58.)

272.  There is no evidence that any Lucent employee was an officer of Winstar. (*See id.*)

273.  There is no evidence that Lucent was a partnership in which Winstar was a general partner.  (*See id.* at 3-57.)

274.  There is no evidence that Lucent was a general partner of Winstar.

275.  There is no evidence that Lucent was "a relative of a general partner, director, officer or person in control" of Winstar.

276.  There is no evidence that Lucent owned equity or any other ownership interest in Winstar.  (*See id.* at 3-57.)

277.  There is no evidence that any Winstar employees or executives were also employed by Lucent or paid any money by Lucent.  (*See id.* at 3-58.)

---

[2] Scherf's testimony concerning solvency should not be credited.  (*See supra* ¶¶ 146-259.)  In the event that the Court does credit the testimony, however, then the logical result is that Siemens's security interest was in fact worthless.

64

278. There is no evidence that Lucent made or participated in management decisions concerning the hiring or firing of Winstar's employees. (*See id.* at 3-64.)

279. There is no evidence that Lucent directed the payment of Winstar's payroll or other expenses. (*See id.* at 3-65-66.)

280. There is no evidence that Lucent had access to or signature authority over any Winstar bank accounts or that it was able to take money from any Winstar bank account. (*See id.* at 3-67.)

281. There is no evidence that any Winstar employee was secretly on Lucent's payroll or receiving kickbacks or bribes. (*See id.* at 3-68.)

282. Lucent did not manage Winstar's employees. (*See* Kipke Direct, Tr. 17-50.)

283. There is no evidence that Lucent was an affiliate of Winstar.

284. There is no evidence that Lucent was a managing agent of Winstar.

ii.    **The Siemens Loan was an arm's-length transaction between Lucent and Winstar.**

a.    **Background of the Siemens Loan.**

285. On December 7, 2000, Winstar closed on a $200 million increase to its existing senior secured Bank Facility. (*See* DX 474.) That increase (the "Siemens Loan") was funded by Siemens Information and Communications Networks, Inc. ("Siemens"), which was and remains a competitor of Lucent. (*See, e.g.*, Montemarano Cross, JX 9 at 15:11-12.) In connection with the Siemens Loan, Winstar committed to buying $150 million of Siemens equipment and services over the next three years. (*See* DX 473 at TRU 000318; Montemarano Cross, JX 9 at 15:15-19.)

65

286.  That same day, Winstar wire-transferred $188,180,000 to Lucent. (*See* Stip. Facts ¶ 17.)

287.  The Siemens Repayment represented a payment of the $194,000,000 net proceeds of the Siemens Loan, minus $5,820,000. The $5,820,000 represented a refund of an upfront fee Winstar paid to Lucent at the time of the borrowing under the Second Credit Agreement, which became due to Winstar on account of the Siemens Repayment. (*Id.*) Accordingly, the maximum amount the Trustee can recover on her preference claim is $188,180,000.

> **b.    Lucent did not compel Winstar to make the Siemens Repayment.**

288.  Lucent did not compel Winstar to make the Siemens Repayment.

289.  "Once received, Winstar was required to transfer the proceeds of the Siemens loan to Lucent under the terms of the Second Credit Agreement". (Stip. Facts ¶ 23.) That is because Winstar and Siemens structured the Siemens Loan as an increase to Winstar's senior secured Bank Facility and the Second Credit Agreement required Winstar to use the net proceeds of any such increase to the Bank Facility to repay its outstanding Lucent loan balance. (*See, e.g.*, DX 512 at LW 00022990; DX 439 at 2WC 0159128; DX 29 at 118 (§6.12(d).)

290.  Lucent did not dictate or otherwise have any involvement in the structuring of the Siemens Loan as an increase to the Bank Facility. To the contrary, that structure was a result of Siemens's insistence that the loan it would be making to Winstar be senior to Lucent's existing financing. (*See, e.g.*, Holwell Direct, JX 17 at 18:16-21:17; DX 369.)

66

291.    Winstar always understood that structuring the Siemens Loan as a Bank Facility increase would require it to use the proceeds to make a partial repayment to Lucent. As Monaco, Winstar's Assistant Treasurer, explained in an October 8, 2000, e-mail: "If the $200mm from Siemens is *not* used to repay Lucent, then we also need Lucent's consent to increase the bank facility." (DX 439 at ZWC 0159128 (emphasis in original).)  However, Winstar hoped to persuade Lucent to waive its contractual right to the partial repayment. (*See, e.g.*, DX 486 at WC 0069328.)  Lucent declined Winstar's request, instead choosing to exercise its contractual right under the Second Credit Agreement. (*See, e.g.*, DX 498 at LW 0029352; Schacht Direct, Tr. 21-15.)

c.    **The Siemens Loan provided Winstar with substantial benefits.**

292.    Notwithstanding the fact that Winstar understood it would have to use the proceeds of the Siemens Loan to repay part of its outstanding debt to Lucent, Winstar nevertheless decided to proceed with the Siemens Loan, which provided it with substantial benefits.

293.    *First*, Winstar's newly expanded relationship with Siemens facilitated Winstar's purchase of the Siemens equipment and services it wanted, and which prompted it to obtain the Siemens Loan in the first place. (*See infra* ¶¶ 293-306.)

294.    *Second*, by partially repaying Lucent, Winstar was able to free additional borrowing capacity under the Second Credit Agreement. According to Grant Thornton's (Winstar's independent auditor) minutes of Winstar's November 7, 2000, Board of Directors Meeting, Rouhana, Winstar's CEO and Chairman, told Winstar's Board that "the proceeds of the Siemens financing was most likely going to be used in whole or in part to pay down Lucent outstandings, *which should open up more availability under*

67

*their facility*". (DX 476 at GT 001490 (emphasis added); *see also* Rouhana Direct, JX 8 at 282:19-283:16.) Winstar took advantage of that refreshed borrowing capacity almost immediately. (*See infra* ¶ 310.)

295. *Third*, Winstar's ability to raise such substantial financing provided it with a boost in the financial markets. As Siemens's Holwell testified: "Now obviously through the financing, you know, they were getting the benefit of the backing from another large, global entity to assure the marketplace themselves that they had sufficient—an adequate business plan as well as a strong enough management team and a good enough operating function to survive as a business. And the financing from Siemens would be seen in the market as a vote of support in that direction. . . ." (Holwell Direct, JX 17 at 30:4-13.)

### d. Lucent did not compel or otherwise cause Winstar to obtain the Siemens Loan.

296. Lucent did not compel or otherwise cause Winstar to commence financing discussions with Siemens.

297. Winstar began discussing financing with Siemens by no later than April 2000. (*See, e.g.*, DX 272; DX 275.) There is no evidence that Lucent was aware of the Winstar-Siemens discussions at that time. Indeed, in April 2000, Winstar was in the process of repaying its remaining loan balance under the First Credit Agreement and Lucent and Winstar were on the verge of entering into the Second Credit Agreement, which closed on May 4, 2000. (*See, e.g.*, DX 278.) Winstar's discussions thus could not have been motivated by any alleged Lucent demand for a loan repayment and Lucent would have had no leverage over Winstar as a lender when Winstar began its financing negotiations with Siemens.

68

298. Ackerman, the senior Winstar executive responsible for overseeing the build-out of Winstar's network (*see, e.g.,* Ackerman Cross, JX 6 at 7:2-8 (6/28/01 Dep.)), laughed out loud at the suggestion that it was "Lucent's idea that [Winstar] should go and talk to Siemens", testifying that "I doubt that very much, but perhaps . . . I wouldn't expect that that would have been the case" (*id.* at 510:18-23). Rubin, Winstar's Treasurer, confirmed that Lucent did not compel Winstar to obtain the Siemens Loan. He rejected the allegation in the Trustee's complaint (SAC ¶ 112, A.D.I. 69) that Lucent "strong-armed" Winstar into obtaining the Siemens Loan: "I don't recall anybody ever saying 'Do X, Y, and Z because Lucent is strong-arming' or 'compelling' or whatever similar word you want to use in there". (Rubin Cross, JX 5 at 34:21-25, 35:4-11; *see also id.* at 35:25-36:3 ("[T]here was no arm-twisting or strong-arming or brow-beating or— whatever, that I can recall.").)

299. Rather, Winstar pursued Siemens financing for its own business reasons. Winstar wanted to buy equipment and services from Siemens, including equipment and services that Lucent already was selling to Winstar or that Lucent hoped to sell to Winstar in the future. According to Rubin: "Winstar wanted Siemens's product and was interested in working with Siemens to figure out a way to get its product since the Lucent product that Lucent believed was comparable was not comparable from a technical standpoint." (*Id.* at 25:2-13.) Holwell explained that Winstar wanted equipment and financing from Accelerated Networks, a start-up company in which Siemens held an equity position. (Holwell Direct, JX 17 at 15:2-16:4.) Because Accelerated Networks was unable to provide financing, "Siemens was asked to consider participating in a three-way relationship where we would facilitate the sale of the goods and services from

69

Accelerated to Winstar and at the same time provide financing to facilitate the transactions". (*Id.* at 16:1-10.)

300.  Significantly, Accelerated Networks manufactured equipment for hubs and building sites (also known as "hubs and Bs"). (*See, e.g.*, Ackerman Cross, JX 6 at 509: 7-22 (3/5/04 Dep.).) Hubs and Bs were a key element of Winstar's network buildout. (*See, e.g., id.* at 454:21-455:6.) A Siemens/Accelerated Networks deal thus would deprive Lucent of business. As Ackerman explained to Kantor, the deal would put Winstar in "position to both move ahead aggressively with the network build and present to ourselves and Lucent a viable strategic partner who can deliver world class [hubs and Bs] technology". (DX 288.) Zendle was even more explicit, noting that the Siemens proposal was "intended to cover capital equipment and construction costs associated with 100 hubs and up to 2000 buildings [Bs] in a program which parallels the Lucent turnkey hubs/b-site initiative". (*Id.; see also* DX 383 at ZWC 0159088 (Huber's reaction to the Siemens deal: "I love to give Lucent a little competition").)

301.  Ackerman even noted to Kantor in May 2000 that the proposed Siemens deal could be a prelude to Siemens (or Nortel, another Lucent competitor) also winning Winstar's long haul and switching business from Lucent:  "This could become an interesting horse-race[.] Please recall that Siemens is, along with Nortel a major supplier of long-haul optronics (not in this deal at this time), as well as Class 4/5 switching world wide." (DX 288.)

302.  Thus, despite the parties' supposed "strategic partnership", Winstar felt free to consider and negotiate with other equipment vendors that were competitors of Lucent. Indeed, Winstar also entered into "strategic" relationships with Lucent's competitors,

70

B514

including Siemens. (*See* DX 520 at Siemens ICN 01072; DX 336 at 2WC 0063276 (Winstar explored a "strategic partnership" with Lucent competitor Cisco).) As Monaco testified, "anybody we were entering into business relationships with we would consider a strategic partner". (Monaco Direct, JX 15 at 13:16-18.)

303. Winstar kept its Siemens negotiations secret from Lucent for several months, even as it negotiated the Second Credit Agreement with Lucent, in which Lucent agreed to a much less favorable financing terms than were in effect under the First Credit Agreement (*see infra* ¶ 425-28). Thus, on October 3, 2000—more than five months into the Siemens negotiations—Kantor checked with his senior executives: "I presume no one has let Lucent know about this [order for Siemens equipment]—please confirm[.] We need to discuss with Lucent as part of an overall plan[.]" (DX 433 at 3WC 0012170; *see also* DX 392 at ZWC 0098142 ("[W]e also need to lay the groundwork for the [C]isco and [S]iemens deals somehow and maybe this is a way or a context in which to do that[.]"); DX 439 at ZWC 0159128-30 (Per Kantor October 8, 2000, e-mail to Rubin: "Don't plan on discussing these items [Siemens Loan issues] with Lucent . . . ").) Indeed, Winstar even kept the Siemens discussions secret from one of its own executives to make sure word did not leak to Lucent prematurely. (*See* DX 287 (Per Grayson May 12, 2000, e-mail to Zendle: "I understand you told Don that news of this discussion [with Siemens] needed to be kept from Lucent, and that was why we were not informed up front of the NY meeting. Do you believe that my folks and I put that Winstar confidential information at risk?").)

### e. Lucent was displeased with the Siemens Loan.

304. Lucent was displeased when it finally did learn of the Siemens Loan. Hund-Mejean, Lucent's former Treasurer, who testified voluntarily, stated that Lucent

71

B515

perceived the Siemens Loan as bad for Lucent because the new loan would be senior to Lucent's financing, it would weaken Lucent's already deficient collateral position (*see infra* ¶ 425-26), and Winstar would be committing to buying a significant amount of equipment and services from Lucent's competitor (Hund-Mejean Direct, Tr. 14-15).

305. Other Lucent executives reached a similar conclusion. Montemarano, Lucent's Vice-President of Finance for Worldwide Sales, opposed the Siemens Loan because it "allowed Winstar to purchase product from a competitor", "put [Lucent] in a junior position from a financing point of view to Siemens" and "from a collateral point of view, I couldn't secure the Siemens equipment to support the financing arrangement that I had with Winstar in a bankruptcy situation". (Montemarano Cross, JX 9 at 14:19-15:6.) Likewise, Perricone, a former Senior Manager in Lucent's Treasury department who testified voluntarily, stated that she was "alarmed and disturbed" by the Siemens Loan. (Perricone Direct, Tr. 20-29-30.) She explained: "My concerns with the transaction were that there was a competitor of Lucent now selling equipment to Winstar, that there could have been a situation where Lucent actually ended up financing that equipment of the competitor through draws under the Lucent credit facility. My further concern was that it meant additional debt at a senior level above the Lucent credit facility, so more debt on the company at a more senior position." (*Id.* at 20-32; *see also* Montemarano Cross, JX 9 at 13:14-16, 13:19-21 14:11-17, 14:19-15:25 (Derrick, Lucent's Assistant Treasurer for Customer Finance, shared Montemarano's opposition to the Siemens Loan); DX 467 at LW 00064150 (November 1, 2000, internal Lucent presentation recommending that Lucent "Decline" permission for the Siemens Loan because it "limits the amount that can be spent on Lucent equipment (CAPEX limitation covenant), puts a competitor in a

72

senior position to Lucent in a bankruptcy situation, and further deteriorates Lucent's collateral position by the purchase of equipment outside of the Lucent facility.").)

306. Accordingly, Lucent wanted to stop the Siemens Loan from proceeding. It initially (and mistakenly) believed that Winstar needed its consent to close the transaction, and Lucent decided to refuse that consent. (*See, e.g.*, Hund-Mejean Direct, Tr. 14-17-18; DX 467 at LW 00064197.) Lucent ultimately realized, however, that it did not have the power to stop the Siemens Loan. (Hund-Mejean Direct, Tr. 14-18.)

307. Receiving the net proceeds from the Siemens Loan did not make it an attractive transaction for Lucent in light of the negative consequences discussed above. Montemarano's e-mail, in which he wrote "NICE!!!!" (PX 252) in response to word that Lucent received the wire with the Siemens Repayment, did not reflect his, let alone Lucent's, happiness with the Siemens Loan transaction as a whole. To the contrary, Montemarano testified that the Siemens Repayment came at a price that was "not acceptable" to Lucent. (Montemarano Cross, JX 9 at 17:5-13; *see also* Montemarano Direct, Tr. 10-9 ("That is a standard [e-mail] I do if we collect a lot of cash"); Hund-Mejean Direct, Tr.14-35 ("[W]henever we get a cash payment in from a customer, in particular in the vendor finance . . . Michael has produced the large letter 'nice' emails."))

308. Receiving cash from the Siemens Loan did not override Lucent's objections to the transaction because, among other reasons, Lucent understood that Winstar could simply reborrow the money right back. As Rogers, Lucent's Managing Director of Customer Finance, wrote on November 16, 2000: "They are doing us no favors by paying us the cash [because repayment was required by the Second Credit Agreement]. Further, they have nothing to stop them from simultaneously borrowing an additional

73

$200MM from the Lucent facility, rendering our position no better than before."
(DX 491 at LWI 00037184.)

309.  As such, Lucent understood that it effectively would be financing Winstar's future purchases from Siemens. As Perricone wrote on November 7, 2000:  "I am concerned that if they use the proceeds of the new Bank tranche [the Siemens Loan] to repay Lucent Loans, how will they pay and buy Siemens gear, other than to come back to us for draws for non-Lucent content and we end up financing the Siemens gear."
(DX 477.) At trial, Perricone explained that her concern was "that technically Winstar could come to Lucent with a draw request, and given we were financing a portion of non-Lucent equipment, that Lucent's cash, in effect, could go out to purchase Siemens gear".
(Perricone Direct, Tr. 20-32-33.)

310.  Lucent's fears about Winstar reborrowing the money proved to be well-founded.  Just three weeks later, on December 29, 2000, Winstar borrowed approximately $92 million from Lucent (approximately $90 million of which was used for non-Lucent content).  (See DX 8 at 3WC 0008176; DX 9 at LW 00071187.)  Winstar borrowed approximately another $83 million from Lucent in January and February 2001 (approximately $60 million for non-Lucent content).  (See DX 10 at 3WC 0008192; DX 11 at 3WC 0008219.)  Moreover, on November 30, 2000, shortly before closing the Siemens Loan, Winstar borrowed from Lucent approximately $64 million (approximately $30 million for non-Lucent).  (DX 7 at LW 00071205.)  In sum, between November 30, 2000, and February 28, 2001, Winstar borrowed approximately $240 million from Lucent.  (See Stip. Facts ¶ 24.)

B518

f.    **Lucent did not compel Winstar to draw the Siemens Loan down immediately.**

311.    Winstar drew down the Siemens Loan immediately upon closing because that was always its intention.  Winstar did not do so in response to a November 7, 2000, letter from Hund-Mejean.

312.    On November 3, 2000—four days before Hund-Mejean's letter (DX 487)—Winstar and Siemens had already agreed that Winstar would draw the Siemens Loan in full in December 2000.  (*See* DX 712 at Siemens ICN 00688 (Per draft commitment letter, Siemens's loan obligation would "terminate and be of no further force or effect if . . . the Loan has not been funded . . . by . . . December 15, 2000); *see also* DX 427 at TRU 000338 (Per November 6, 2000, executed consent letter, Siemens's loan commitment would terminate on December 15, 2000).)

313.    Indeed, as early as September 1, 2000, Siemens understood that "Winstar is asking for $200M in cash *upon financial closure*".  (DX 711 at Siemens ICN 00209) (emphasis added).)  The same day, Rubin confirmed the fact that Siemens would "fund[] Winstar with $200 [million] on *financial closure*" was "consistent with our discussion".  (DX 719 at Siemens ICN 02118, 02119) (emphasis added).)  And, on October 6, 2000, Kantor indicated that he intended to draw the Siemens Loan down immediately upon closing (at a time when Winstar hoped that the deal would be closing sooner than December 2000).  (DX 439 at ZWC 0159130) ("Are we on target to close and have *check in hand* by October 15th???) (emphasis added).)

314.    Against those facts, no witness testified—and no document in evidence shows—that Lucent compelled Winstar to draw the Siemens Loan immediately upon closing.

75

g.   **Lucent did not compel the Siemens Repayment through other December 2000 actions.**

(i)   **Lucent did not manipulate the Transition Agreement negotiations.**

315.   Lucent did not manipulate the negotiations for a new Transition Agreement regarding Winstar network services (*see supra* ¶¶ 140-43) to compel the Siemens Repayment.

316.   Winstar was contractually obligated to make the Siemens Repayment.  (*See supra* ¶ 289.)  Thus, even if, as the Trustee contends, Lucent delayed certain Transition Agreement discussions until Winstar acknowledged that it would follow the Second Credit Agreement and use the Siemens Loan proceeds to partially repay Lucent, Lucent did no more than refuse to negotiate a new contract until it was sure that Winstar would honor the parties' existing contract.  That does not constitute a lack of arm's-length dealing by Lucent.

(ii)   **Lucent did not use its refinancing right to compel the Siemens Repayment and the timing of the Refinancing Notice had nothing to do with the Siemens Loan.**

317.   Lucent did not use its Refinancing right to compel the Siemens Repayment.

318.   Under the Second Credit Agreement, Lucent had the right to issue a Refinancing Notice to Winstar when Winstar's outstanding loan balance exceeded $500 million.  (*See* DX 29 at 61 (§ 2.18).)  Upon issuance of a Refinancing Notice, and the passage of the applicable Refinancing period, Lucent was entitled to certain benefits, including increased interest and the right to convert its Winstar loans to marketable notes carrying a higher interest rate.  (*See id.*)  Winstar exceeded the refinancing trigger on October 23, 2000.  (*See* DX 6 at WC 0040718; DX 285.)  Lucent issued a Refinancing Notice on December 19, 2000.  (DX 544.)

76

**B520**

319. The timing of that Refinancing Notice had nothing to do with the Siemens Loan. (*See* Hund-Mejean Cross, Tr. 14-58-59; Perricone Direct, Tr. 20-41-42.) As Hund-Mejean testified, Lucent did not want to issue the Refinancing Notice until it was sure whether Winstar could afford the higher interest rate and other new economic terms the Refinancing Notice would bring. (Hund-Mejean Direct, Tr. 14-40-41; *see also* Perricone Direct, Tr. 20-36, 41 (Lucent wanted to determine the health of Winstar's financial condition before issuing the Refinancing Notice).)

320. In order to determine what the effect of a Refinancing Notice would be on Winstar, Lucent needed to perform a due diligence review, to which it was entitled under the Second Credit Agreement. (Hund-Mejean Direct, Tr. 14-27-28; Perricone Direct, Tr. 20-41; DX 29 at 87 (§ 5.06).) On November 7, 2000, Lucent formally asked Winstar to allow it to conduct a due diligence. (*See* PX 192 at WC 0039833.) Although Winstar consented to the due diligence, it took Winstar several weeks to provide Lucent with the information and access it needed (*see* Perricone Direct, Tr. 20-59), and Lucent did not begin the actual due diligence, which took approximately two weeks, until December 1, 2000 (*see* PX 201 at LW 00072886). It was only upon completion of that review that Lucent decided to issue a Refinancing Notice. (*See* Hund-Mejean Direct, Tr. 14-40-41; Perricone Direct, Tr. 20-42.)

321. Lucent did not delay issuing the Refinancing Notice so as not to dissuade Siemens from closing on the Siemens Loan. Hund-Mejean testified that Siemens "was not a factor in terms of considering the timing of the refinancing note. And in fact, I do not know what would have happened to the Siemans [sic] refinance—or the Siemans [sic] financing if we would have sent it." (Hund-Mejean Cross, Tr. 14-58-59.) Indeed,

77

given that Lucent initially wished to stop the Siemens Loan by withholding its consent

(*see supra* ¶ 306), it stands to reason that Lucent would have issued the Refinancing

Notice before December 7, not after, if it really believed that issuing the Refinancing

Notice would have derailed the Siemens Loan.

**(iii)  Lucent did not breach any agreement with Winstar to modify its Refinancing Notice rights.**

322.  Lucent never agreed to increase the refinancing trigger from $500 million to

$550 million.  One Montemarano e-mail (DX 475) does refer to a $550 million

refinancing trigger, but follow-up e-mails the next morning between Montemarano and

others at Lucent clearly show that Montemarano simply made a typographical error in a

late-night e-mail, which Montemarano acknowledged at the time.  (*See* DX 475; *see also*

Keefe Direct, Tr. 19-76-78.)

323.  There is no competent evidence that Lucent agreed not to issue the

Refinancing Notice if Winstar would enter into an end-of-quarter deal in September

2000.  Although the Trustee contends that McGinn made that promise to Rouhana,

McGinn testified that he made no such promise (McGinn Direct, JX 7 at 49:5-11) and

Rouhana did not mention it, despite testifying about other financial discussions with

McGinn in that time period (*see* Rouhana Direct, JX 8 at 234:9-236:15, 239:6-240:3).  In

contrast, Aversano's uncertain recollection that McGinn told her that Winstar "would be

willing to do an end of quarter buy and that—*I'm not sure he told me per se, that they

weren't going to sell the paper, but I knew that.* (Aversano Direct, Tr. 8-100) (emphasis

added) is not based on her personal knowledge of any conversation between McGinn and

Rouhana.  Moreover, Winstar never claimed that the Refinancing Notice was contrary to

any alleged McGinn-Rouhana agreement, even as it argued that it was ineffective for

78

other reasons. (*See* DX 535 at ZWC 0144084.) Nor did Rouhana mention the alleged

agreement with McGinn when, in November 2000, he asked Schacht, Lucent's new

chairman, to agree not to issue the Refinancing Notice. (*See* Schacht Direct, Tr. 21-22.)

   iii.   **Other December 2000 and subsequent events confirm that Lucent**
          **was not an insider on December 7, 2000.**

324.   In addition to the Siemens Loan, Winstar also received $270 million from

the sale of preferred stock on December 7, 2000. (*See* DX 482 at WC 0015341.) Winstar

did not pay those funds to Lucent. If Lucent really were in control of Winstar on

December 7, 2000, it would have required Winstar to turn over that $270 million as well,

notwithstanding the fact that Lucent had no contractual right to that money. Instead, the

only payment Winstar made to Lucent on December 7, 2000, was the Siemens

Repayment, which was required by the Second Credit Agreement. (*See supra* ¶ 289.)

325.   In late December 2000, Lucent allowed Winstar to borrow approximately

$62 million to finance its internal services, despite having no contractual obligation to do

so. (*See supra* ¶¶ 118-19.) Even if Lucent were contractually obligated to provide that

financing, it is clear that Lucent did not want to make that loan (*see supra* ¶ 118-24), and

if Lucent had the power to control Winstar it would not have done so.

326.   In addition, in late December 2000, Lucent allowed Winstar to borrow

approximately $30 million to pay for non-Lucent content (other than the services

mentioned above). (*See* DX 8 at 3WC 0008176.) Lucent did not want to lend Winstar so

much money for non-Lucent content (*see* Montemarano Cross, JX 9 at 21:12-23:4), and

even asked Winstar to reconsider the borrowing request (*see* DX 564). However,

Winstar did not amend the draw request, and Lucent honored it. (*See* DX 560 at LW

B523

00146788; Montemarano Cross, Tr. 10-39-40.) It is plain that Lucent would not have provided that financing if it had the power to control Winstar.

327.  In January and February 2001, Lucent lent Winstar a total of approximately $60 million for non-Lucent content. (*See* DX 10; DX 11.) Lucent did not want to fund those loans, but did so because it believed that it was contractually obligated to do so. (Montemarano Cross, JX 9 at 23:5-24:17, 24:20-27:25, 30:14-33:15; DX 49 at LW 00146611-12.) Lucent would not have provided that financing if it had the power to control Winstar.

> iv.  **The parties' December 1999 through September 2000 transactions do not prove that Lucent was an insider of Winstar on December 7, 2000.**
>
>> a.  **Lucent underwent significant changes between September 2000 and December 7, 2000.**

328.  The parties' December 1999 through September 2000 transactions (discussed in more detail below) do not show that Lucent was an insider of Winstar on December 7, 2000, because Lucent underwent significant management and other changes between September 2000 and December 7, 2000. The parties' dealings prior to those Lucent changes thus are not probative of the Lucent-Winstar relationship on December 7, 2000.

329.  The opinion of the Trustee's expert, Paul Pocalyko, that "[n]othing in the relationship changed" between September 2000 and December 7, 2000 (Pocalyko Direct, Tr. 3-48), is contradicted by the record evidence.

330.  Between December 1999 and October 1, 2000, the principal Lucent decision makers with respect to Winstar were McGinn (Lucent's CEO), Aversano

80

(President of Lucent's North America Sales Region) and Plunkett (starting in June 2000).

None of those people had any involvement with Winstar on December 7, 2000.

- On October 11, 2000, Aversano left her job. (Aversano Direct, Tr. 9-18.)

- On October 23, 2000, Schacht, Lucent's founding CEO, returned to that position, replacing McGinn. (Schacht Direct, Tr. 21-8.)

- On November 28, 2000, Lucent put Plunkett on involuntary leave of absence, pursuant to which "he was not allowed . . . to interact with customers or people within the company". (Wilson Direct, Tr. 16-11.) Lucent terminated Plunkett "soon thereafter". (*Id.*)[3]

331. In addition to those changes, in mid-October 2000, Montemarano became Lucent's Vice-President of Finance for World-Wide Sales and Marketing. (Montemarano Cross, JX 9 at 6:5-21) and, on November 1, 2000, Hund-Mejean joined Lucent as Senior Vice-President and Treasurer. (Hund-Mejean Direct, Tr. 14-6.) Both Montemarano and Hund-Mejean played significant roles with respect to Winstar once they joined Lucent.

332. Lucent's business strategy also changed with Schacht's return as CEO. As he explained, Lucent "essentially changed from a very aggressive selling mode to a retrenchment mode. And this meant very much pulling back on how we did vendor financing, it meant very much changed attitude towards bidding for future business, it meant a changed attitude toward the way we ran the business." (Schacht Direct, Tr. 21-11.)

---

[3] Wilson was involved with the Winstar account between December 1999 and "the end of March [2000]". (Wilson Direct, Tr. 16-88.) Although Wilson remains a Lucent employee, there is no evidence he played any role with respect to the Siemens Repayment.

81

333.  Lucent and Winstar also made clear that Lucent would not be responsible for any Wireless-performed services that it did not authorize in advance in writing.  (*See supra* ¶ 113.)

334.  In addition, in late November 2000, after an internal Lucent investigation prompted when Rouhana "threat[ened]" Schacht after Schacht reiterated that Lucent would not waive its rights under the Second Credit Agreement, Lucent voluntarily reversed $125 million in revenue it had preliminary booked in connection with the parties' September 2000 end-of-quarter deal (discussed *infra*, ¶¶ 409-21) and Lucent notified the SEC and the public about that revenue recognition issue.  (Schacht Direct, Tr. 21-15-16.)  As a result, the SEC commenced an investigation.  (PX 178 at LW 00303788.)

335.  Accordingly, Schacht is correct that "everything at Lucent had changed" between September 2000 and December 7, 2000.  (Schacht Direct, Tr. 21-10.)  As he testified:

> "Everything changed—the way we did business, who was in charge, the way we organized, the policies of the company, and I can't describe any more graphically—we had new people, new organization, new way of doing business, a completely different philosophy—we were on a very rapid expansion, pushing very hard for sales.  We pulled back quite substantially in all of the policies we were doing, reset the company for what turned out to be correctly a retrenchment mode as opposed to a heavy expansion mode. . . .  And so I can't think of anything that didn't change, quite the contrary to what's been said here [by Pocalyko]." (*Id.* at 21-12.)

336.  Schacht also made clear that Lucent did not control Winstar on December 7, 2000:  "Well, if we were controlling Winstar, then in fact we wouldn't have lost $750 million.  We certainly would not have allowed them to use our credit to buy other people's equipment.  So I don't understand how in any way we could be controlling them

82

and end up in the position we did and end up them using credit they took from us to buy other people's equipment." (*Id.* at 21-17.) Schacht's testimony in that regard was unchallenged and no fact witness testified that Lucent had the ability to or did exercise control over Winstar on December 7, 2000.

337.   The Trustee's purported evidence of control in December 7, 2000, relates solely to transactions that occurred months before the relevant date, and those transactions are irrelevant to a determination of insider status and control as of December 7, 2000, due to the dramatic intervening changes at Lucent and in the Lucent-Winstar relationship described in the preceding paragraphs.

> **b.   Winstar did not purchase equipment it did not need in "end of quarter deals".**

338.   Even if the dealings between Lucent and Winstar during the December 1999 through September 2000 timeframe were probative of whether Lucent was in control of Winstar on December 7, 2000—and for the reasons described above they are not—those prior transactions do not demonstrate that Lucent had insider-control over Winstar, either on December 7, 2000, or at any other time.

> **(i)   Lucent did not force Winstar to purchase equipment it did not need.**

339.   Lucent did not force Winstar to purchase equipment it did not need in the December 1999 through September 2000 end-of-quarter transactions.

340.   As Pocalyko conceded, there is nothing inherently unusual about end-of-quarter transactions. (PX 462 at 13 ("The use of end of quarter transactions is not necessarily unusual.").) Indeed, end-of-quarter transactions are common in the telecommunications industry. (*See, e.g.*, Stark Direct, Tr. 19-23-25; Wilson Direct, Tr. 16-67.)

83

341. Here, Winstar exercised its independent business judgment in the end-of-quarter transactions to purchase the equipment and services it believed it would need over a reasonable period, and on terms it believed to be favorable.

342. Ackerman—the Winstar executive who oversaw Winstar's network build-out in the relevant period—testified that Winstar's purchasing decisions were based on his own "business judgments". (Ackerman Cross, JX 6 at 486:10-12 (3/5/04 Dep.).) He explained that Winstar made purchases based on what routes it expected to build in the upcoming months, which in turn was based on information Winstar received from its major suppliers of fiber optic cable, Williams Communications and MFN:

> "[S]o we'd have schedules from our two primary fiber suppliers, MFN and Williams, and Lucent and Winstar would be looking at the same schedules. And so we'd be purchasing the optronics equipment from Lucent that we'd use to light that fiber. And so we'd know what fiber segments were going to be delivered. We'd know. We'd have the schedule from both MFN and Williams. So we would purchase end of quarter against that schedule." (DX 699 at 21:42-22:8.).[4]

343. Ackerman was emphatic that Winstar only bought the equipment it believed it needed, not the equipment Lucent wanted to sell. He testified before the SEC in October 2001 that Winstar's purchases were not "driven by Lucent's desire to sell", stating: "I wouldn't do it. Wouldn't do it. I mean, here we are a tiny little company. At least to my knowledge, we wouldn't do it because here we are this big and here they are

---

[4] Ackerman was deposed for three days in this action, for two days in May 2001 and again in March 2004. Ackerman also was deposed by the SEC on October 11, 2001. (See DX 699.) At the time of Ackerman's SEC deposition, Winstar, as debtor-in-possession, still was the plaintiff in this action (see First Amended Complaint, dated October 26, 2001, D.I. 54) and Ackerman still was an executive of Winstar (see DX 699, at 8:5-15). At his SEC deposition, Ackerman was represented by the same law firm that represented Winstar in this action. (See id. at 3:40-4:14, First Amended Complaint, D.I. 54 at 58) Ackerman's SEC deposition transcript (DX-699) was admitted into evidence in this case without objection. (See Tr. 8-19.)

that big, and there's—how am I going to make Lucent successful anyway doing that? And we can't afford to do that. We just couldn't afford to do that." (DX 699 at 23:26-33.)  Ackerman also told the SEC that

> "At various ends of quarters, not necessarily all the ends of quarters, Lucent would propose to us that we would purchase so much. Typically, it was based on their understanding of what we needed for the next quarter or two anyway. It was done in dollar values because that was the easiest parameter to use, but it was based on equipment volumes that they saw we needed because we were doing this joint planning/engineering/ architecting/ building of the network. So they knew as well as we did what we'd need over the next three months, six months, nine months, twelve months. So they also knew that if they were counting on us as a source of revenue, that if we gave it to them now, it wasn't going to be there later if it was, you know, next quarter. . . . So while there were numbers laid out, it was based on an understanding of what we could really use. It wasn't just an arbitrary number; at least my perspective was it didn't appear to be just an arbitrary number. But it was built against, well, we know what you need." (DX 699 at 18:13-39.)

344.  The testimony of Lucent employees is in accord with Ackerman's testimony. Kipke, the Lucent program manager responsible for managing the build-out of Winstar's long-haul (inter-city) optical network between 1999 and 2001 and its metro (intra-city) network starting in late 2000 (*see* Kipke Direct, Tr. 17-48, 18-173), confirmed that Winstar's purchasing process started with Winstar telling Lucent the routes it intended to build next and what kind of traffic it wanted to carry (*id.* at 17-53). Lucent would then design the routes and suggest to Winstar what equipment it needed. (*Id.* at 17-53-54.) Lucent did not, however, have the authority to actually purchase equipment on Winstar's behalf or the power to cause Winstar to make any purchases. (*See id.* at 17-54.)

345.  Accordingly, Winstar only bought equipment it intended to use on specific, identified routes. It did not buy equipment it did not believe it needed. As Kipke testified, "[e]very piece of equipment they purchased was for a specific site on a specific

85

route that was to be deployed in a specific time frame". (*Id.* at 17-55.) Similarly, Garrett, Lucent's Vice-President of Program Management for the Winstar build-out (starting in late June 2000), testified that it was "very much my understanding and my belief that all the equipment Winstar purchased was necessary for the build-out". (Garrett Direct, Tr. 20-79; *see also id.* at 20-80 (Garrett "got a detailed list of the equipment that they would purchase and I knew it was equipment that was needed for the switching program or for the optical metro program or for the long-haul program, so I never saw any—or the hub's and b's—never saw any equipment that wasn't needed for one of those build-outs").)

346.  Garrett and Kipke—both of whom met with their Winstar counterparts on a regular basis—confirmed that Winstar never complained to them about purchasing unneeded equipment. (Garrett Direct, Tr. 20-80; Kipke Direct, Tr. 17-61.) Kipke also testified that he did not know of anyone at Lucent that told Winstar to buy equipment that it did not need. (Kipke Direct, Tr. 17-61.)

347.  Lucent also did not prevent Winstar from buying equipment from its competitors when Winstar asserted that Lucent's equipment was not "best of breed" within the meaning of the Supply Agreement. Thus, for example, Winstar rejected Lucent's digital cross-connects and routers in favor of equipment from Lucent competitors TellLabs and Cisco, respectively, and Winstar rejected Lucent's AnyMediaFast solution in favor of equipment from a company called AFC. (*See* Ackerman Cross, JX 6 at 427:2-428:6, 428:18-20; 428:23-429:16 (3/5/04 Dep.).) Winstar also made sure to test new Lucent equipment proposed for purchase to ensure that, in Winstar's own view, it was best of breed before agreeing to purchase it. (*See* DX 699 at 15:31-16:20.) In addition, Winstar felt free to say no when it did not like Lucent's

86

B530

proposals, even at the end of a quarter. (*See* DX 253 (Winstar response to Lucent proposal: "By my calculation this still represents $6.3M for 36 units. No thanks.").)

**(ii)    Winstar negotiated substantial concessions from Lucent in the end-of-quarter deals.**

348.   That Winstar may have referred to "helping" Lucent does not indicate that Lucent forced Winstar to buy equipment it did not need.  Winstar did not "help" Lucent at the expense of its own business interest.  To the contrary, Winstar "helped" Lucent by savvily extracting substantial concessions from Lucent in exchange for buying equipment it needed anyway (albeit perhaps shortly later).

349.   As Ackerman testified to the SEC, Winstar's "help" never extended to "mak[ing] decisions that are bad for Winstar".  (DX 699 at 39:3-9; *see also* Ackerman Cross, JX 6 at 423:10-424:8 (3/5/04 Dep.) (confirming that his SEC testimony was "an accurate description of the relationship between Winstar and Lucent"); DX 699 at 98:28-31 ("[T]he nature of the partnership was, I would agree to anything that Lucent wanted *if it wouldn't harm Winstar, and if it were in Winstar's benefit,* of course I would.") (emphasis added).)  Similarly, in his testimony in this case, Ackerman stated that he never did "anything that was affirmatively bad for Winstar just because [he] had a [strategic] partnership" with Lucent.  (Ackerman Cross, JX 6 at 424:11-24 (3/5/04 Dep.).)  Ackerman concluded: "I think what you're asking me is would I do anything to harm Winstar?  No. . . . Would I do things that were in Winstar's benefit?  I would try to." (*Id.* at 444:5-8, 445:13-14.)  Likewise, Zlotnick testified that Kantor ultimately was "the person who was responsible for deciding what deals Winstar should do and what deals they shouldn't do" and that Kantor acted in what he believed to be Winstar's interest. (Zlotnick Cross, JX 3 at 225:5-13, 225:17-226:7.)

87

**B531**

350. Winstar's strategy in negotiating end-of-quarter transactions with Lucent was to extract additional concessions from Lucent in exchange for increasing purchases, while taking care not to buy anything Winstar did not need. As Ackerman testified to the SEC: "I always tried to look at it as, what do we really need in our network, versus what does Lucent need in terms of their requirement. And if I could satisfy that by maybe extending, maybe buying more, and getting something else in return, that's okay by me." (DX 699 39:17-22.) Hicks confirmed that Winstar was able to "extract concessions" from Lucent in the end-of-quarter deals. (*See* Hicks Cross, JX 2 at 188:12-15, 185:20-21, 185:24-186:6.) As Cocito (Lucent's chief operating officer of Lucent's North American Region) recognized in May 2000: "They are tough negotiators, and typically do what is in their best interest, leaning at times on us, due to our own needs for revenue quarter-to-quarter." (DX 297 at LW 00299368.)

351. Accordingly, as discussed below, in the end-of-quarter transactions Winstar was able to obtain numerous favorable concessions, including millions of dollars of credits, significant price discounts and Lucent's agreement to purchase equipment and services from Wireless. In addition, Lucent permitted the Wireless services pass-throughs to continue, despite the negative impact on Lucent. (*See supra* ¶ 91-94.)

352. Lucent provided Winstar with millions of dollars in credits in each of the December 1999 through September 2000 end-of-quarter transactions to compensate Winstar for claimed Lucent deficiencies. (*See* DX 210; DX 268; DX 329; DX 413.) Lucent did not believe that Winstar was entitled to such extensive credits, but agreed to them as customer concessions. (*See, e.g.,* Wilson Direct, Tr. 16-76-77 (Lucent agreed to Winstar's request for a credit in December 1999 despite the lack of "documentation" or

88

"substantiation" for "customer satisfaction reasons obviously and to continue to do business on the optical front with Winstar"); DX 207 (Per December 29, 1999, e-mail from Wilson to Ackerman: "I'm going to do this $3M [credit] for Joe [Dwyer, of Winstar]. I don't feel totally comfortable doing this. I agree we helped contribute to the overrun on network costs but not sure to this extent."); DX 411 (Harris reaction to September 28, 2000, Winstar request for a $10 million credit: "COME ON!!! Where did this come from?"); DX 426 (Plunkett reaction to the September 28, 2000 Winstar credit request: "No I am not [okay with the credit]. We missed no dates.").) Although Ackerman testified that he believed Winstar was entitled to the credits, he understood that he was able to use Lucent's desire to make sales at the ends of quarters as "leverage" to secure the credits. (Ackerman Direct, JX 6 at 613:19-614:4 (3/5/04 Dep.).)

353. Ackerman left no doubt that, in seeking credits from Lucent, he was not inhibited by Lucent's financial or revenue issues:

> "And my position always was, hey, credits are credits against stuff you screwed up or you owe us and I can document that, and I have. *So that's your problem if you're not selling me enough stuff to compensate for the credits.* I feel for you and you're my buddy and whatever. So we've had those several discussions. So in the back of my mind there would have been knowledge that they have a problem. *But that's their problem, just like I have problems when I have to manage my business.*" (DX 699 at 94:21-29 (emphasis added).)

354. Winstar also managed to negotiate price discounts from Lucent in exchange for business. As Wilson testified, in December 1999, Lucent faced significant competition from a company called Sycamore for Winstar's long-haul optical business. To win that competition, Winstar required Lucent to, among other things, lower its prices by 30%. (Wilson Direct, Tr. 16-70; *see also* DX 234 (Per Ackerman March 7, 2000 e-mail: "Had a good meeting with Lucent today. They agreed to meet the 'Lisa price'.

They will come back to us[] with 100 hubs and 2000 constructed B's for her $103M price point.").)

355.    In order to win business from Winstar, Lucent also agreed to buy equipment and services from Wireless (*see, e.g.*, Wilson Direct, Tr. 16-70), which provided Wireless with revenue. As Wilson explained to his Lucent colleagues in March 2000, Lucent agreed to buy $35 million "in network assets" from Wireless in order to, among other things, "help secure over $350M of orders this quarter for the Winstar build. This agreement on the $35M diverted a $400M purchase decision (3 year spend) from our competitor[s] in the access space." (DX 260 at LW 00052908; *see also* DX 216 ("In order to capture additional business with Winstar we have agreed to buy communication services from them. . . .Then at the end of this past quarter we agreed to an additional $10M."); DX 201 (Lucent agreed to buy $10 million in radio links from Wireless as part of the December 1999 end-of-quarter deal).)

356.    At trial, Wilson explained that Winstar believed Lucent "should also be a large consumer and partner in them selling their services" and that "one of the prerequisites for winning this deal was to take a certain portion of those services as part of this agreement". (Wilson Direct, Tr. 16-71.) Wilson testified that Lucent agreed because "we needed to win the business . . . this was an important product to us. It was a very large amount of revenue for us and our product, and it was a key piece of the Winstar network that we wanted to be a part of." (*Id.*)

357.    Lucent's purchases were so beneficial to Winstar that, internally, it referred to the end-of-quarter transactions with Lucent as "reciprocal" deals. (*See, e.g.*, DX 222; DX 231.) One Winstar executive was so pleased with the relationship that he referred to

90

Lucent as "the chicken that laid the golden egg". (DX 259 at ZWC 0104187.) Reciprocal revenue deals were very important to Winstar, which also insisted on reciprocity with Siemens. (*See* DX 287 ("Siemens is doing NOTHING to facilitate any meaningful business with us. . . . $50M in business [Winstar's original commitment to Siemens] needs to get specific reciprocity built into the deal, or it is not a good deal for Winstar."); DX 288 (Per Kantor May 15, 2000, e-mail to Ackerman regarding Siemens: "We also need to understand how they will be able to buy service from us—so far we have little luck.").)

358. To the extent that, in return for the benefits and concessions discussed above, Winstar purchased some equipment in advance of when it expected to deploy it, Winstar's behavior was similar to that of other carriers at that time. (*See* Stark Direct, Tr. at 19-19.) Moreover, that purchasing behavior did not create the risk of equipment obsolescence. (*See* Stark Redirect, Tr. 19-52-53; *see also infra* ¶ 399.)

359. There is no evidence that Lucent's purchases in those "reciprocal" transactions resulted in false revenue to Winstar or otherwise were improper. Although Lucent would not have made those purchases absent pressure from Winstar, Lucent believed at the time that it could resell the purchases to other customers. (*See* Wilson Direct, Tr. 16-81-83; DX 260 at LW 00052908-909.)

360. The foregoing facts demonstrate that Lucent and Winstar were engaged in ordinary, arm's-length business dealings, with each party acting independently in pursuit of its own business objectives. Such a relationship is inconsistent with the notion that Lucent controlled Winstar or otherwise was in a position to make decisions about Winstar's business.

91

(iii)    **Winstar's undeployed equipment when it filed for bankruptcy does not establish that it purchased equipment it did not need.**

361.    That Winstar owned undeployed Lucent equipment at the time of its bankruptcy does not show that Lucent forced Winstar to buy equipment it did not need. The testimony of the key Winstar and Lucent participants in the transactions, and the contemporaneous documents, establish that, at the time the equipment was purchased, Winstar and Lucent believed it would be deployed within a reasonable time. However, Winstar's expectations were frustrated by, among other things, the delays of third-party vendors, delays with site acquisition (*i.e.*, obtaining building access rights) and other miscellaneous delays.

362.    Ackerman testified about Winstar's dependence on external forces beyond its control and how that dependence resulted in uninstalled equipment:

> "Real world conditions change. Remember I think even today we discussed how external forces impacted the availability of network build. So for example, to have more hubs and Bs to build, we needed leases on the hubs and Bs, which were a function of the CFO's organization and external individuals who had their own time schedules as to when, you know, the owners of the buildings. The optronics build was a function of getting the fiber turned over by Williams. So in fact, we may have predicted things that turned out to be longer than in reality. So yes. The short answer to your question, did we buy stuff too early, yes, because as it turned out, then we couldn't use it in the time frame we expected to." (Ackerman Cross, JX 6 at 480:5-18 (3/5/04 Dep.).)

363.    Similarly, Ackerman explained to the SEC how dependent Winstar was on third-party fiber vendors and on obtaining building access rights, and how delays in those areas prevented Winstar from deploying equipment as planned. With respect to Winstar's long-haul build-out, Ackerman testified:

> "We'd have the schedule from both MFN and Williams. So we would purchase end of quarter against that schedule. And, now, if one of those third parties didn't fulfill, then we might get stuck with equipment in the

92

**B536**

warehouse a bit longer than we intended. But at the time we made the decision, the commitments from our two vendors were there in schedules, firm schedules. But outside forces happen to them. They don't get rights-of-way permits. Something doesn't work. You know, they run into a problem." (DX 699 at 21:34-22:16.)

With respect to the build-out of Winstar's metro network, Ackerman testified to the SEC:

"We talked about how our network was built in customer locations. So say we wanted to get into . . . a commercial building with a commercial owner, and we wanted to provide service in this building. And we'd have to buy equipment in this building. But the owner of the building, we've negotiated a lease, and he's sitting there . . . with this lease, and they have no sense of urgency. So our leasing people now say—we're doing 100 building a month, 200 buildings a month. At the time we filed for Chapter 11, we had gotten up to about 300, 350 buildings a month. So you can imagine how many of these leases are in various stages of signing, not signing, going back and forth between lawyers, every lawyer wanting to have his or her little piece. So we have a projected building count for the next month and a projected hub on which these buildings are built. Well, if the hub falls through, then the 50-100 buildings surrounding it can't get built." (*Id.* at 22-35-23:14; *see also* DX 211 at 20 (Per Winstar 1999 10-K, to build its network Winstar needed to secure building access rights and zoning and other governmental approvals and it could not assure it would be "able to obtain these approvals in a timely manner, or at all".).

364. Kipke and Garrett confirmed Ackerman's testimony. With respect to the long-haul build-out, Kipke testified: "Williams was constantly shifting the schedules of when they were going to deliver routes. They would make commitments, saying that they would have things available and then a month before delivery they would say no, it's not gonna be available." (Kipke Direct, Tr. 17-82.) According to Garrett:

"[Q]uite simply, Winstar had created schedules based upon their assumption of when facilities would be made available by Williams Communications, when power would be made available by Williams Communications, when fiber laterals would be available from MF[N] and as well as other third parties who were providing facilities on other programs. And unfortunately in many cases, those schedules slipped by these third parties so what it caused was really ordering in advance of needs because schedules kept slipping. So that created a growing accumulation of equipment in the warehouse and staging facility." (Garrett Direct, Tr. 20-81-82.)

93

365. As to the metro build-out, Garrett testified:

> "Winstar had to deal with numerous land owner[s], building owner[s], zoning and licensing permits, with counties in various jurisdictions. And Winstar was constantly being delayed, not able to meet their original schedules, what they had planned. So the equipment that they had ordered based on the assumption of certain schedules didn't come to fruition. We had those problems on the metro optical program. They had problems getting access to certain roofs, facilities, getting power, getting fiber to the buildings. It was just a whole host of delays that was impacting Winstar during that time period." (*Id.* at 20-83.)

366. Kipke, who was familiar with Winstar's metro build-out and who was responsible for that build-out starting in late 2000 (Kipke Direct, Tr. 18-173), confirmed that Winstar experienced third-party and other delays with the metro build-out, resulting in stranded Lucent equipment (*id.* at 18-160, 18-173).

367. Winstar's own missteps also contributed to deployment delays. Kipke testified that Winstar experienced 6-to-12 month deployment delays due to its failure to secure fiber lateral connections between Winstar's central office to the local Williams office. (*Id.* at 17-87-88.) Winstar's delays in provisioning routes also contributed to some equipment delays, and, in 2000, Winstar even asked Lucent "to not deploy a couple of routes, to delay them until they could catch up with provisioning". (*Id.* at 17-89.)

368. The contemporaneous documents further confirm that Winstar experienced serious delays with Williams and other vendors in the network build-out. (*See, e.g.*, DX 232 (Per March 2, 2000, Zlotnick e-mail: "The date slipped by six months because Williams slipped it[.]"); DX 387 (Per Zlotnick October 23, 2001, e-mail to Ackerman: "Current schedule has Lucent delivering to us all [Florida long haul] routes on 10/23. Basic cause—Williams delays in space and power."); DX 609 (Per Garrett February 12, 2001, e-mail: "Winstar continues to reschedule or push out Lucent orders due to Winstar's lack of funds, Williams' and Winstar's lack of space and power, Winstar's

94

frequent engineering changes, and Winstar's lack of operational readiness"); Garrett

Direct, Tr. 20-88-89.)

369. To the extent that more junior Winstar employees may have believed that

Winstar purchased Lucent equipment it did not need, those junior employees lacked

personal knowledge regarding Winstar's overall business objectives and rationales for

buying equipment from Lucent. Thus, the August 2000 "talking points" memo that

Hicks prepared for a meeting with Lucent, in which she proposed that Kantor tell Lucent

that "Winstar has pre-purchased equipment that will not be deployed during 2000 in an

effort to meet revenue commitments" (PX 131 at 2WC 0073218), does not prove that

Winstar in fact bought equipment it knew it did not need.

370. Hicks is not an engineer. (*See* Hicks Direct, JX 2 at 14:3-25.) Nor was she

a "purchasing person". (DX 699 at 30:23-24.) Hicks was an "administrative person".

(*Id.*). As such, her perspective was extremely limited. Ackerman, who was Hicks's

boss's boss (*see* Ackerman Cross, JX 6 at 487:16-488:8 (3/5/04 Dep.)), testified that she

had only a "little snapshot view of things" (Ackerman Direct, JX 6 at 637:12-13). He

explained:

> "So Lisa sees stuff that isn't being used, but part of the reason it's not
> being used may be we didn't get the leases on the hubs and Bs, we didn't
> get the fiber delivered by Williams. So at the time it was purchased, while
> it might have helped Lucent—did make—help Lucent make its revenue
> requirements because they sold the stuff, they made revenue. But was it,
> quote, prepurchased? What you're implying is a bad thing because it was
> purchased ahead of time. The plan might have been to use that equipment
> during 2000, and then reality occurred, and we were unable to use that
> equipment during 2000 because buildings weren't ready, fiber wasn't in
> the ground, other external issues, or we just plain were wrong in terms of
> estimating what we'd need by when. So Lisa's perspective on things is
> hey, we purchased something, and we didn't use it, and we're not going to
> use it this year looks like because we can't use it. So she's saying there's
> only one reason why we did it from her perspective. I'm saying Lisa is a

95

> manager level person, maybe senior manager by then—I'm not sure—
> which is not a very senior position in the organization, and she has one
> view of things." (*Id.* at 637:13-638:11.)

371.  Similarly, Ackerman testified to the SEC that, "at the more junior levels . . .

there was always some friction going on because they didn't necessarily understand the

strategic value of some of the things one way or the other". (DX 699 at 31:3-7.)

372.  In light of Hick's limited perspective, Ackerman compared her attempt to

describe Winstar's previous purchases to that of a blind woman trying to describe an

elephant:

> "When you have a number of people who report to you, let's say we asked
> five blind people to grab an elephant and then describe an elephant. Each
> of those five people will give you an honest description of that elephant.
> They will all be different.  All be different.  And the job of the manager is
> to synthesize all of those inputs he or she is receiving from the people in
> his organization or her organization and outside that organization, and
> attempt to synthesize that into a common hole.  And because one
> individual in the organization said an elephant is a scraggly thing that's
> very scratchy because he grabbed the tail doesn't mean that that's what an
> elephant is.  I'm sorry.  It's a component of the elephant." (Ackerman
> Direct, JX 6 at 638:12-639:1 (3/5/04 Dep.).)

373.  Hicks acknowledged that she did not know "the full extent of what Winstar

was going to get out of the end of quarter deals" and that others at Winstar "had

additional information that [she] may not have been privy to". (Hicks Cross, JX 2 at

201:2-5, 201:24-202:2, 202:5-7, 202:10.)

374.  In addition, Hicks was ill around that time.  Ackerman believed that Hicks's

illness interfered with her work performance and led her at times to provide him with

information that he "felt was unreliable".  (DX 699 at 44:21-23; *see also id.* at 45:6-15

("[T]here were times at which—that I didn't trust her judgment.").)

375.  Plaintiff's Exhibit 345 also does not prove that Lucent forced Winstar to

buy equipment it did not need.  There is no evidence in the record regarding who wrote

that document or what he or she meant by the various categories of material described therein. It also is unknown for what purpose the document was created, for example, whether it was created for "posturing purposes" for negotiations with Lucent. (*See infra* ¶ 420.)

### (iv) Pocalyko failed to recognize the real reasons why Winstar accumulated undeployed equipment.

376. On cross-examination, Pocalyko dismissed the substantial evidence that Winstar accumulated inventory because of build-out delays, and not because Lucent forced it to buy unneeded equipment. According to Pocalyko: "it strikes me as odd in early December of '99 that such delays were occurring they would go and order inventory that to the date of bankruptcy still sat in a Lucent warehouse. Several weeks after this existed, it just doesn't make sense to me and that's what I've said." (Pocalyko Cross, Tr. 3-131.) However, Pocalyko failed to recognize the real reasons why Winstar accumulated undeployed equipment, and his testimony is contrary to the uncontradicted testimony of fact witnesses with personal knowledge of what happened. In addition, Pocalyko's conclusion as to how much Lucent equipment Winstar actually had on hand when it filed for bankruptcy is not reliable. (*See infra* ¶ 442.)

377. Kipke explained that the fiber site-availability schedules kept changing, making it very difficult to predict when the equipment could be deployed: "[F]irst we would get a three-month delay, then another three months, then another, so you know, at any given point in time, there was a belief we were gonna be shortly deploying the equipment". (Kipke Direct, Tr. 17-86.) Plaintiff's Exhibit 306 illustrates just how rapidly—and unpredictably—the schedule could change. That document shows that in December 1999, Winstar purchased Lucent optical networking equipment for an Oakland

B541

to Modesto route. However, in January 2000, Lucent was told that the Williams fiber sites would not be available—and thus the equipment could not be deployed—until September 18, 2000, only to be told weeks later, on February 15, 2000, that the equipment could be deployed on June 19, 2000, after all. However, even that revised deployment date turned out to be incorrect, and, as of December 2000, the equipment had not been deployed. (*Id.* at 17-104-05; *see also id.* at 17-101-03; PX 306 at LW 00079255-56.)

378.   Winstar and Lucent both believed that Winstar could spur Williams and the other vendors to fix the delays in short order. According to Kipke, Winstar was "very good at escalating issues and getting companies to deliver things very quickly. I was frequently amazed at some of the things they could achieve in terms of getting people to improve schedules". (Kipke Cross, Tr. 18-208.) Kipke explained that "Winstar was not accepting those delivery schedules from Williams. Their chairman was escalating with the chairman of Williams on a regular basis. I personally attended meetings in Tulsa where Zlotnick, you know, was quite irate with Williams about their, how they had to pull these specific routes schedules in, because they needed to have these routes built sooner." (*Id.* at 18-207-08.)

379.   Accordingly, Kipke testified, despite the delays on some routes, Winstar did not want to redirect equipment slated for delayed routes on to new routes because "there were still delivery schedules from Williams that showed us being able to deploy those routes in 2000, you know, just a few months later. Winstar continued to be extremely aggressive. They were escalating the situation on a weekly basis with Williams trying to pull the routes up. They remained committed to that very aggressive deployment and

98

insisted that we remained committed as well." (Kipke Direct, Tr. 17-94-95.) Indeed,

when, in September or October 2000, Garrett suggested to Winstar that it "reduce their

number of orders during that particular timeframe" because of its undeployed equipment,

Winstar rejected Garrett's advice. (*See* Garrett Direct, Tr. 20-90-91.) Garrett testified:

> "Well, Zlotnick and Huber . . . we had this conversation on more than one
> occasion during the time period—basically expressed to me their
> requirement to build the programs and the network out as rapidly as
> possible. They assured me that they were working with Williams and
> these other third parties to improve the integrity of their schedules and that
> there wouldn't be the further slips that they encountered in the past. And
> they assured me that they wanted to do everything possible to build out the
> network as rapidly as possible." (*Id.* at 20-91.)

380.  Lucent was unable to improve Williams's, and the other vendors'

performance on its own initiative. Lucent did offer to try to work with Winstar's other

vendors but Winstar told Lucent "very specifically that we were not supposed to get

involved with those parties, that Winstar was the keeper of the schedule and they

coordinated with the other third parties and they did not want us to be involved". (*Id.* at

20-86); *see also* DX 355 (Per August 17, 2000, Garrett e-mail, Winstar instructed Lucent

not to intervene with Williams to try to fix delays).)

381.  In addition, it often was technologically or economically unfeasible to

cannibalize equipment. According to Garrett: "you have to remember that a lot of this

equipment was staged and pre-packaged and specific to specific routes and specific sites

and some of it was cabling and had specific dimensions for the locations. So that wasn't

always practical or cost-effective". (Garrett Direct, Tr. 20-92.) (*See infra* ¶¶ 392-98

regarding staging and packaging of equipment.) Nevertheless, on at least one occasion, it

was reasonable to divert equipment from a delayed route, and that is what the parties did.

(*See* Garrett Direct, Tr. 20-92; Kipke Direct, Tr. 17-95.) There is no evidence that

99

Winstar ever wanted to cannibalize any additional equipment. In addition, to assist Winstar, Lucent allowed Winstar to exchange equipment it had purchased for delayed routes for equipment that was needed for routes with earlier deployment dates. (Kipke Direct, Tr. 17-96-97; DX 646.)

        c.    **Lucent's invoices were not "vague" and do not establish that Lucent was an insider of Winstar on December 7, 2000.**

382. Pocalyko testified that Lucent's invoices to Winstar were insufficiently detailed, and thus indicate that Lucent and Winstar did not transact business at arm's length. According to Pocalyko: "[M]y experience tells me that parties that transact business at arm's length don't do it with vague documentation. If you want to know what you're getting, you put it on an invoice, you get a description, you get information about the purchase and the sale. And you have the ability to quantify, track, and account for it in a meaningful manner." (Pocalyko Direct, Tr. 3-31.)

383. The evidence shows, however, that Lucent's invoices to Winstar were not vague and thus the invoices do not show that Lucent was an insider of Winstar on December 7, 2000.

384. On cross-examination, Pocalyko conceded that he considered an invoice to be vague based on what information *he* could determine from it. He admitted that he did not take into account whether the invoice would have been vague *to the relevant Winstar personnel* who worked with the invoices at the time. (Pocalyko Cross, Tr. 4-91 ("I've not said that Winstar couldn't track them.").)

385. In fact, the invoices were not vague to the relevant Winstar and Lucent personnel. Terrell, the Lucent employee responsible for Lucent's North American billing operations and accounts receivable in the relevant period (Terrell Direct, Tr. 21-47),

testified that Lucent's invoices to Winstar were typical of its invoices to its other customers that placed similarly "complex" orders. (*See id.* at 21-47-49.) It is typical, therefore, for Lucent's invoices for complex orders, such as Winstar's, to "simply say material, engineering, installation, right to use just a default". (*Id.* at 21-48.)

386. Terrell explained that Lucent did not intend for an invoice to be a record of each piece of equipment provided and each service rendered, but rather prepared invoices to "facilitate payment, to make that invoice easy to understand, match the[] [customer's Purchase Order] to the best of our ability and then to remove obstacles to facilitate cash". (*Id.* at 21-46-47.) Moreover, Terrell explained, it is typical with complex orders for Lucent's customers to issue purchase orders at a high level of detail, likening the process to buying a car: "You know, you don't wanna know if you got the radiator and the oil plate and the tires. You want your car. Well, that's what they're ordering is a car. So most of the P.O.s that we get for a complex job is gonna be 'I want a car in this make and model'. And that's how we bill it back." (*Id.* at 21-49.)

387. Nonetheless, Winstar and Lucent both knew what Winstar ordered and for what Lucent billed based on the detailed documentation underlying the purchase orders and invoices. (*See id.* at 21-44-45.)

388. Indeed, a 1999 Winstar internal audit report concerning the process by which Lucent invoices were handled within Winstar, upon which Pocalyko relies in his report (*see* PX-462, Exhibit Y at 3WC 0004228-31), makes plain that Winstar would not pay invoices until it confirmed that the goods had been received, and that Winstar had an established process for resolving any questions that might arise with Lucent invoices. (*Id.*).

101

**B545**

### d. The parties' "bill and hold" transactions do not show that Lucent was an insider on December 7, 2000.

389. The parties' "bill and hold" transactions do not show that Lucent was an insider of Winstar on December 7, 2000.

390. The December 1999, March 2000 and June 2000 end-of-quarter deals included "bill and hold" components, whereby Lucent shipped certain equipment (mostly optical equipment) to Lucent facilities for pre-deployment staging rather than to Winstar warehouses. Winstar provided Lucent with letters which, among other things, acknowledged that Winstar accepted title to, and risk of loss of, the equipment upon shipment to the Lucent staging center and identified some of the business reasons why Winstar wanted the equipment shipped to Lucent. (*See* DX 209 (December 1999 letter); DX 542 at 2WC 0067104-05 (March 2000 letter); DX 542 at 2WC 0067106 (June 2000 letter).) Lucent recognized revenue upon shipment to a Lucent staging center on at least a portion of that equipment sold on a bill and hold basis. The September 2000 end-of-quarter deal also originally included a bill and hold component (*see* DX 423; DX 425), but Lucent did not recognize any September 2000 bill and hold revenue (*see* DX 219).

391. Pocalyko testified as to his belief that Lucent improperly recognized revenue on the bill and hold transactions and that the "volume" of bill and hold transactions is not "something that happens between companies dealing at arm's length". (Pocalyko Direct, Tr. 3-38-39.) Pocalyko also claimed that "the intention of the parties was not as provided in those bill and hold letters and that the transactions were conducted in effort to increase Lucent's quarterly revenues, and in fact that the participants in those transactions committed fraud". (*Id.* at 3-50-51.)

102

### (i)    The bill and hold transactions made business sense for Winstar.

392.    Contrary to Pocalyko's opinion, however, the bill and hold transactions made business sense for Winstar. The bill and hold transactions permitted Winstar to take advantage of Lucent staging centers to prepare equipment for deployment into the network.

393.    As Kipke explained, a staging center is "a central facility where you have all the equipment that is going to be used to build a network stored so that you can then ship exactly the equipment you need to the specific site where you're gonna be working when you need to have it. It's a way of managing all of the geography and the vast number of sites." (Kipke Direct, Tr. 17-63.) The parties used staging centers to "manage the most important component which is the equipment to make sure you did not send equipment out early, to make sure it does not get lost, to make sure you have all the equipment, so that when you send an installation person out, they have exactly what they need to do to work." (*Id.*; *see also* Stark Direct, Tr. 18-63; DX-702 at 9.)

394.    A staging center is very different from a traditional storage warehouse. Christopher Stark, who testified as an expert witness based on his almost 20 years experience in the telecommunications industry, including his personal experience with the build-out of telecommunications networks in the United States in the 1999 to 2001 period as an executive for Alcatel (Stark Direct, Tr. 19-5-8), explained:

> "[I]n our experience there was a difference between warehousing equipment and staging it. From our perspective, staging required us to stand the equipment up and apply power to the equipment. It also required us to have test equipment on site. It required us to have people who understood how to put the equipment together. Warehousing was more of a packing and sort of rack and stack issue where the warehouse would just be environmentally controlled and the equipment would be shipped and stored for a period of time before going on to site." (*Id.* at 19-13.)

103

Kipke confirmed that storage warehouses are "not the same thing [as staging centers] in terms of either the space or the kind of operation that you're running". (Kipke Direct, Tr. 17-79.)

395.  Kipke testified that the use of staging centers was imperative in light of the aggressive, nationwide build-out Winstar commenced in late 1999. (*Id.* at 17-54-55, 65.) The parties did not use a staging center when Winstar deployed its first several routes, in the Spring and Summer of 1999 (*id.* at 17-65), and they experienced significant problems as a result (*id.* at 17-70).

396.  The lack of staging created problems on those early routes because the build-out of even a single route required the installation of hundreds of different pieces of equipment in multiple sites, often in the middle-of-the-night in remote repeater huts in rural locations. (*Id.* at 17-63-64, 17-75-76.) Complicating matters even further, the equipment, which would be shipped from up to a dozen different Lucent facilities plus third-party vendors, needed to be combined in specific ways and needed to be deployed in a certain order. (*Id.* at 17-75-76.) As Kipke explained, prior to the introduction of staging:

> "the way that we had been supporting installation would be to ship all of the components, all 100 or so items to the local warehouse from Lucent the closest site, closest warehouse and the local installation personnel would have to open up all the boxes, try to find the right components they needed to take up to the site to precondition it. Hopefully, all the boxes had been received in the warehouse. Again, being a large regional warehouse, the—you now, sometimes components weren't there, sometimes they were lost. Frequently the installation person would take what they thought were all the right items to the site and not be able to perform work." (*Id.* at 17-75.)

397.  Accordingly, when, in the Fall of 1999, Winstar decided to build a national network—rather than just a few individual routes, as it had been doing (*id.* at 17-55-

104

57)—it asked Lucent to come up with a way to improve the process (*id.* at 17-66). In response to that request, Lucent proposed the establishment of a Winstar staging center at Lucent's facility in Morrow, Georgia, where Lucent already was staging equipment for other carriers, such as Bell South and KMC. Lucent proposed to use the staging center to sort, stock and configure equipment, and ultimately shrink-wrap and ship it to the field ready for deployment, ensuring that the installers at the site would have all the necessary equipment. (*Id.* at 17-77; *see also* DX 80 (Lucent staging proposal to Winstar).)

398. As part of that staging proposal, Lucent recommended that Winstar purchase the equipment it expected to need approximately six months in advance. (*See* DX-80 at 2WC 0004526 ("Equipment will be bulk ordered in advance, warehoused, staged, and stocked by orderable item for quick deployment."); Kipke Direct, Tr. 17-68-69.) It made sense for Winstar to purchase at least the equipment it expected to need over the coming six months to allow sufficient time for staging and to protect itself against any product shortages. As Stark testified, Winstar's purchasing strategy was common in the industry: "My experience was that carriers would hold inventory of varying levels to ensure that when they brought the equipment together at a single site to build that site out, they have that particular variable under control. We were very much pushed to ensure that we met dates for delivery and that we didn't slow the network build-out by lack of equipment." (Stark Direct, Tr. 19-18-19.)

105

399. Stark further explained that equipment obsolescence was not a concern in the industry at that time:

> "Q. When, in your experience in the telecom industry in 1999 and 2000 when customers pre-purchased equipment that was held in inventory for some period of time, in your experience, were those customers concerned about the risk that the equipment that they held in inventory would become obsolete?
>
> A. No.
>
> Q. Could you expand on that at all?
>
> A. Yeah. The customers were building with a technology at the time and the selection of a vendor and they had plans to build with that particular technology and that vendor over the next year, 2 years, or whatever. So they — it was more a logistical issue from their side about making — just having the equipment available for when they needed to deploy it. Certainly there wasn't a suggestion that the equipment itself would become obsolete in a short period of time." (Stark Redirect, Tr. 19-52-53.)

400. Purchasing more than a quarter in advance was especially beneficial to Winstar in late 1999, at the outset of its nation-wide build-out (*see supra* ¶ 395) because in that period and continuing through "most of early 2000" period, Lucent experienced shortages with the 400G optical equipment Winstar was buying. (*See* Kipke Redirect, Tr. 18-238 (Lucent was "just starting to produce the product, so there was a fixed amount of product that was available"); DX 291 (In May 2000, Lucent put an "allocation process . . . in place" for 2.5G, 10G and OLS 400G optical networking equipment, with "hard orders taking priority"); DX 213 (Per January 6, 2000, Lucent press release, in the quarter ended December 31, 1999, Lucent experienced "greater than expected demand for OC-192 capability on the 80-channel systems, which resulted in near term manufacturing capacity and deployment constraints".) Accordingly, Kipke explained, because "a number of other customers had indicated they wanted to build similar networks", there "was a lot of

106

B550

competition for the product" at that time, and Lucent could "sell all of the 400G equipment it could make during that time period". (Kipke Redirect, Tr. 18-238-39.)

401. Winstar required staging for a related reason. Winstar's build-out schedule was very "aggressive" (*id.* at 17-52, 54-55, 57-58), and Winstar mandated that Lucent complete deployment within 45 days of the date that Williams made a route available (*see id.* at 17-57 (Winstar "wanted to have individual routes built in a very short time frame of about six weeks"); DX 234 (Per Ackerman March, 7, 2000 e-mail: "[Lucent] will also work to a 45 day done/done after turn-over from Williams on all future routes.")). Kipke explained that it would have been "impossible" for Lucent to meet that schedule unless the equipment had been pre-ordered and already staged. (Kipke Direct, Tr. 17-63-65.) Kipke testified: "It was really the only way to accomplish the objective that they had of building this network so quickly. And I mean, absolutely, it would have been impossible to coordinate all these activities that I'm just describing and do all that in, you know two weeks. I mean, it would have been, just unbelievable amounts of people to try and do otherwise." (*Id.* at 17-77-78.)

402. Winstar readily accepted Lucent's staging proposal. As Kipke testified: "Dave [Ackerman] was very pleased that we'd been able to come up with a recommendation. He was very happy, he was very supportive. I candidly was kind of surprised. I had been yelled at many times by Ackerman for a number of things that we'd been late on, and he—it was one of the few times I saw the man smile." (*Id.* at 17-69.) Kipke also explained that although Winstar could have elected to establish its own staging center, it made little sense for Winstar to do so, and that, with few exceptions, other similar carriers chose not to stage for themselves. (*Id.* at 17-79) Stark confirmed

107

that "some of the newer, younger carriers didn't have the infrastructure, the buildings that enabled them" to stage equipment. (Stark Direct, Tr. 19-13.)

> **(ii)    Lucent's accounting for the bill and hold transactions is irrelevant to whether the transactions made business sense for Winstar.**

403.    Pocalyko ignored the substantial benefits Winstar received from the bill and hold transactions. Rather, he based his conclusion that the bill and holds were evidence of Lucent's alleged undue influence and control on his view that Lucent should not have recognized revenue on the transactions when it did.

404.    However, the accounting criteria regarding bill and hold transactions is intended to guide whether Lucent should recognize revenue. That accounting guidance is irrelevant to whether the transactions made business sense for Winstar. (*See* DX 72A at 25.) Thus, for example, transactions that would not qualify for bill and hold revenue recognition by the seller might nevertheless be more beneficial for the buyer than transactions that do. (*See* Pocalyko Cross, Tr. 4-114-17; DX 72A at 25 ("[E]ven if Lucent had improperly recognized revenue on bill and hold transactions, the transactions might have been beneficial to Winstar because of favorable pricing.").) Here, shipping the equipment to Lucent's staging center made business sense for Winstar whether or not it was proper for Lucent to recognize revenue upon such shipment.

405.    Pocalyko also is incorrect that Winstar necessarily recorded improper payables in its accounting records if the timing of Lucent's revenue recognition was incorrect. (*See* Pocalyko Cross, Tr. 4-112.) Pocalyko did not identify any specific improper payable or other Winstar accounting entry, and Salomon, Lucent's accounting expert, testified that he had seen "nothing to demonstrate that Winstar'[s] recorded a payable with respect to these transactions at the time the bill and hold transactions were

entered into". (Salomon Direct, Tr. 21-110.) Salomon also explained that whether Winstar properly recorded a payable is distinct from whether Lucent properly recognized revenue, because there are different accounting criteria "for recognizing payables and liabilities and acquisitions of assets" than the criteria for recognizing revenue under a bill and hold. (*Id.*) Salomon's testimony stands unrebutted.

406.  In addition, Pocalyko's criticisms of Lucent's accounting for the bill and hold transactions are not well-founded. *First*, Pocalyko conflates the issue of which party requested the transaction with which party requested the *documentation* for the transaction.  As discussed above, Winstar needed to use Lucent's staging centers to have any chance to meet its aggressive build-out schedule. (*See supra* ¶ 401.)  Under those circumstances, there is nothing improper about Lucent wanting to be paid for, and recognize revenue on, the equipment it would be selling to and staging for Winstar, nor is there anything improper about Lucent asking Winstar to document the terms of the transaction.  Moreover, it stands to reason that, since the bill and hold letters would be used for Lucent's accounting requirements, Lucent initially would propose the language for the letters. (Indeed, Winstar asked Lucent to document the quarterly credits that Lucent granted (*see supra* ¶ 352-53) and it proposed language for that documentation (*see, e.g.*, DX 208; DX 258; DX 264)).

407.  *Second*, Winstar did not have the space to stage the equipment. Accordingly, statements in the March and June 2000 bill and hold letters that Winstar did not have warehouse space for the equipment were true.  According to Kipke: "We understood Winstar did not have a staging center.  They may well have had warehouse space, I don't know, but they did not have a staging center, and had made it very clear

109

they wanted us to stage the equipment as part of the build out." (Kipke Cross, Tr. 18-162.)[5] Indeed, Zlotnick, who signed two bill and hold letters in September 2000—which were substantially the same as the March 2000 and June 2000 letters, including the statement about the lack of warehouse space—testified that the statements in the letters he signed were "true and correct". (Zlotnick Direct, JX 3 at 19:2-20.)

408. *Third*, with respect to deployment delays, as already discussed, at the time of the transactions, Winstar believed that it would deploy the equipment in a timely fashion. However, build-out delays prevented Winstar from deploying the equipment as quickly as it originally expected. (*See supra* ¶¶ 361-75.) Indeed, even Hicks testified that she believed that the June 2000 bill and hold equipment would be deployed according to the schedule stated in the June 2000 bill and hold letter.

> "Q. . . . . I would like to direct your attention to the second to last paragraph of this letter, which reads, 'Delivery of all optical networking equipment to final sites is to be complete by September 30th, 2000.' Do you see that?
>
> A. Yes, I do.
>
> Q. Do you know if you believe that to be an accurate statement at the time you signed this letter?
>
> A. At the time I signed this letter, I believed it to be accurate.
>
> Q. You believed that Lucent would deliver the optical networking equipment to the final sites by September 30th, 2000?
>
> A. Yes. (Hicks Cross, JX 2 at 203:4-18)

---

[5] The December 1999 bill and hold letter did not say anything about warehouse space. (*See* DX 209.)

e.    **The September 2000 end-of-quarter deal does not establish that Lucent was an insider on December 7, 2000.**

409.    The September 2000 end-of-quarter deal does not establish that Lucent was an insider on December 7, 2000.

410.    In September 2000, the parties entered into their final end-of-quarter deal, which included a $135 million "software pool" transaction. In addition, Winstar negotiated for and obtained various forms of "credits" from Lucent, including a $10 million credit, a $35 million credit against future optical equipment purchases, a $45 million credit towards the construction of an enterprise integration lab, and sharply discounted Lucent pricing on hubs and Bs. (*See* Ackerman Cross, JX 6 at 446:13-447:6, 447:8-24, 448:21-449:14, 449:19-23, 449:25-450:1, 450:24-451:4, 451:6-8 (3/5/04 Dep.); DX 414; DX 445).) Lucent ultimately—and, notably, prior to December 7, 2000— corrected and reversed the $125 million in revenue it originally reported on that transaction. (*See supra* ¶ 334.)

411.    Pocalyko opined that the September 2000 transaction "was nothing more than a sham and that the participants' intention in entering into that transaction was to fraudulently report revenue". (Pocalyko Direct, Tr. 3-51.) Pocalyko overstates the facts.

412.    Regardless of the propriety of Lucent's revenue recognition, the evidence is overwhelming that the September 2000 transaction, taken as a whole, was a real transaction with real economic substance for both Winstar and Lucent and it was concluded after substantial negotiations between the companies. (*See infra* ¶¶ 413-16, 418, 420-24.) Moreover, far from being a one-sided deal in Lucent's favor, if either party had the upper-hand in the negotiations, it was Winstar. (*See infra* ¶ 416.)

111

### (i)    The September 2000 deal made business sense for Winstar.

413.    Ackerman testified that Winstar received "substantial benefits" from the September 2000 deal. (DX 699 at 25:19-20; *see also id.* at 76:21-23 ("[I]n the aggregate . . . the commercial transactions combination [that comprised the September 2000 transaction] were good for Winstar"); Ackerman Cross, JX 6 at 470:17-20 (3/5/04 Dep.) (September 2000 deal "was a fair deal for both companies").

414.    Ackerman explained that the discounted hub and B pricing and the enterprise integration lab Winstar negotiated for were especially valuable, describing them as "things [he] very much wanted". (Ackerman Cross, JX 6 at 451:11-17 (3/5/04 Dep.).) As he testified to the SEC:

> "All I was thinking was the deal is done I got what I wanted. I got the hubs and B's and I got an integration lab. And hey, and I got this gravy too. I've gotten our credit which we—you know, which I felt was appropriate and due and coming to us anyway. So that's what I was thinking, that *I got something that I'd been trying to get, in terms of the hubs and B's pricing and an integration lab, for literally a year-and-a-half.*" (DX 699 at 105:13-22) (emphasis added).)

4]5.    The discounted hubs and B's pricing Ackerman was able to extract from Lucent was so good that Ackerman told the SEC that he would "almost sell my soul for that". (*Id.* at 25:40-26:12; *see also id.* at 25:22-24 (Winstar received "[s]ubstantially reduced pricing for the major elements of our network build, which were very, very important to us".) Ackerman also told the SEC that Winstar would not have signed the software pool agreement without, "[a]mong other conditions", the discounted hub and B pricing because "I thought I had a great negotiating ply [sic] in order to gain things from Lucent that I'd been looking for, again, as I'd said to you, for about a year-and-a-half. So that was a great mechanism for me, and so it worked." (*Id.* at 116:7-19; *see also*

112

Ackerman Direct, JX 6 at 614:18-615:9 (3/5/04 Dep.) (describing how Ackerman used

"leverage" against Lucent, which "levered back" to Winstar, which then countered with a

demand for lowered pricing).)

  416.  Indeed, the SEC ultimately concluded that, in negotiating the September

2000 deal, "Ackerman understood Lucent's critical need to recognize revenue in its fiscal

year ending September 30, 2000, and used that leverage to gain very favorable additional

terms for Winstar". (DX 739, ¶ 54.)

>   **(ii)** **The statements of Winstar's more junior employees**
> **and Ackerman's "negotiating volleys" do not show**
> **that Lucent forced Winstar to enter into the**
> **September 2000 deal.**

  417.  Ackerman explained to the SEC how more junior employees at Winstar did

not appreciate the value of the software Winstar was purchasing:

> ". . . I want to try to help you understand what happens in software.  I
> could buy a piece of software that provides—well, take a simple function,
> call forwarding in a switch.  Today marketing doesn't offer call
> forwarding. . . . But I look at that software, if I'm Dennis [Huber] or Jamie
> [Bullen] and I say, I don't need that software.  It's not in the business plan
> for this year.  Marketing doesn't offer that product, call forwarding.  I'm
> not going to spend money on it.  Nate [Kantor] and I have a discussion
> about future products with marketing, and marketing says, well, of course
> we want to offer call forwarding.  We just haven't been able to get the
> brochures out or price it yet.  So my decision is, well, we need the
> software that provides call forwarding.  Is it worth anything to us today?
> Jamie says, I don't need that.  Dennis says, I don't need that.  I say, I want
> that because now marketing can offer it.  And if I get a concomitant
> benefit for having done that, hey, all the better for Winstar." (DX 699 at
> 48:14-34.)

  418.  Ackerman also testified that in his negotiations with Lucent he took

advantage of the fact that Winstar's more junior employees undervalued the software in

the software pool, explaining that, "at the more junior level the troops took a look at that

software and came back with an immediate valuation as to what could be used

113

immediately, but there were certainly elements in there that had value that the troops at their level might not have seen as value to Winstar immediately, but even had value to Winstar immediately or had other value. But it worked out well for me to have the troops using that lower value so that I could extract higher value from Lucent elsewhere."
(Ackerman Direct, JX 6 at 619:3-17 (3/5/04 Dep.).)

419.    That Hicks may have told Lucent in September 2000 that Winstar did not want to do an end-of-quarter deal does not show that Lucent forced Winstar into the transaction. Hicks was "a relatively junior level person" and it was not up to her to decide whether Winstar should enter into such a deal. (Ackerman Direct, JX 6 at 647:7-648:2 (3/5/04 Dep.).)

420.    Ackerman's statements to Lucent while negotiating the transaction also do not show that Lucent forced Winstar into doing anything it did not want to do. Ackerman explained that he sometimes would posture and send Lucent "negotiating volley[s]", which did "not necessarily [reflect] what I was thinking". (DX 699 at 78:11-15.) Thus, Ackerman testified that he told Lucent in September 2000 that Winstar already had software that it could not integrate as a "negotiating ploy" (*id.* at 79:32) for the enterprise integration lab and a credit:

> "What I was trying to do was show them that I wanted more value, that ultimately they were going to have to give me more value in terms of credits for equipment in which I'd had a hard time doing this, or more functional capability that would assure me of this. *So I'm posturing with them* based on their poor performance in the past and saying, well, it's going to continue in the future, guys, so I want protections. I want an integration lab. I want stuff that's going to help protect Winstar if I'm going to agree to purchase that much. *And I'm posturing*." (*Id.* at 79:41-80:19 (emphasis added); *see also id.* at 80:24-30.)

Similarly, Ackerman explained, any other statements he may have made to Lucent to the effect that Winstar was buying material it did not need would have been for "posturing

purposes". (Ackerman Direct, JX 6 at 644:24-645:3 (3/25/04 Dep.) (referring to alleged statements attributed to him in PX 155).)

421.  That the software pool component of the September 2000 deal increased in size over time also does not show that Lucent forced Winstar to enter into the transaction. Ackerman explained that as the size of the software pool element of the deal increased, he "offset that" by getting a "better business deal" for Winstar via the credits, the discounted pricing and the enterprise integration lab. (DX 699 at 73:7-15.)  In addition, it is not the case that Lucent forced Winstar to be "creative" in purchasing material in September 2000 that it did not want or need.  Ackerman testified that he meant that "I was trying to be creative, not in terms of what we gave Lucent, but in terms of how we managed our business to stay within the—that [CAPEX] cap." (Ackerman Direct, JX 6 at 607:3-12 (3/5/04 Dep.) (discussing PX 107).)

> v.  **Other events between December 1999 and September 2000 show that Lucent was not an insider on December 7, 2000.**

422.  The record reveals several significant arm's length transactions between Lucent and Winstar at or around the time of the transactions discussed above.  Those transactions are inconsistent with the notion that Lucent was an insider of Winstar on December 7, 2000, or at any other time.

> a.  **Lucent extended financing to Winstar for services and non-Lucent equipment despite the fact that Lucent received no benefits by doing so**

423.  Between December 1999 and September 2000, Lucent allowed Winstar to borrow millions of dollars for Wireless-performed services, despite having no contractual obligation to do so, as discussed above. (*See supra* ¶¶ 83-106.)  Even if Lucent was contractually obligated to allow that financing—and it was not (*see supra id.*)—it is clear

115

that Lucent did not want to make those loans (*see supra* ¶¶ 91-94) and it would not have
done so if it had the power to control Winstar.

424.   Lucent lent Winstar substantial sums for non-Lucent content.  For example,
between June 2000 and September 2000, Winstar borrowed just under $500 million from
Lucent, of which more than half (approximately $261 million) was for non-Lucent
content.  (*See* DX 285.) ·Winstar's significant non-Lucent financing was a sore subject
between the companies.  (*See* Ackerman Cross, JX 6 at 187:22-24 (6/28/01 Dep.))
(content issue "was something that was important to Lucent").)  Winstar nevertheless felt
free to "ignore" Lucent's concerns.  (Ackerman Direct, JX 6, at 564:20-23 (3/5/04 Dep.).)
Indeed, on March 14, 2000, just two weeks before the March 2000 end-of-quarter deal,
Uhl (Winstar's CFO) threatened to abandon Lucent for another vendor altogether in
response to Lucent's request to amend the Supply Agreement to require Winstar to buy
more Lucent content—Uhl instructed his team: "You must stay with . . . no change in the
supply agreement.  This is the center of our business arrangement unless they are asking
us to find another business partner (which we will do)[.]" (DX 241, at WC 0039463); *see
also id.* at WC 0039464 (Per Monaco March 14, 2000, e-mail, Lucent withdrew proposed
condition in Second Credit Agreement commitment letter that Winstar agree to Supply .
Agreement amendment "after we [Winstar] immediately objected to the language").)

        **b.    Lucent entered into the Second Credit Agreement with
Winstar in May 2000, which contained substantially less
favorable terms for Lucent than did the First Credit
Agreement.**

425.   Lucent agreed to the Second Credit Agreement in May 2000, which was far
less favorable to Lucent than were the terms of the 1998 Credit Agreement.  For example,
under the 1998 Credit Agreement, Winstar could not borrow more than $500 million at

116

any one time; under the Second Credit Agreement, Winstar could owe Lucent up to $1 billion at any one time. (*See, e.g.*, Keefe Direct, Tr. 19-59, 62-63.) In addition, under the 1998 Credit Agreement, Lucent was Winstar's senior creditor and substantially all of Winstar's assets served as collateral for Lucent's loans. (*See id.* at 19-59-60.) Under the Second Credit Agreement, by contrast, Lucent's only collateral was the Lucent equipment that it financed. (*See, e.g., id.* at 19-62-63; Perricone Direct, Tr. 20-12; DX 224.)

426.   According to Perricone, it was "very unusual" for Lucent not to be a customer's senior lender. (Perricone Direct, Tr. 20-12; *see also id.* at 20-13 ("The collateral position that we were in relative to the other senior lenders was not a favorable collateral position . . . It was not your typical financing."); DX-281 ("Lu customer financing—typically sr. secured: Lu.").) Moreover, because the borrower under the Second Credit Agreement was a Winstar holding company with limited assets, Lucent was structurally subordinated to Winstar's other lenders. (*See, e.g.*, Keefe Direct, Tr. 19-63-64; *see also* Perricone Direct, Tr. 20-13.) Indeed, Lucent was structurally subordinated even to Winstar's trade creditors. (*See, e.g.*, DX-78.)

427.   The Second Credit Agreement was unfavorable to Lucent in other ways. Most significantly, Lucent only was able to negotiate limited rights to assign, or sell, its Winstar loans without Winstar's consent. (*See, e.g.*, Perricone Direct, Tr. 20-10.) That was unusual for Lucent, which usually obtained "freely-assignable rights" in its financing contracts. (*Id.* at 20-10-11; *see also* Keefe Direct, Tr. at 19-70.) Had Lucent been able to control Winstar, it stands to reason that it would have obtained more favorable terms for itself on the Second Credit Agreement.

117

428. In light of those facts, Lucent understood that the Second Credit Agreement entailed greater risk than it faced under the 1998 Credit Agreement. (See, e.g., Keefe Direct, Tr. 19-64-65; Perricone Direct, Tr. at 20-13). Lucent did attempt to negotiate various provisions to mitigate that increased risk. (See DX 78; Keefe Direct, Tr. 19-73-76 (explaining proposed mitigants discussed in DX 78).) However, Lucent largely was unsuccessful in getting Winstar to agree to those terms. (See Keefe Direct, Tr. 19-75-76.)

### c. Winstar borrowed under the Second Credit Agreement earlier than Lucent wanted and Winstar prevented Lucent from selling those loans on favorable terms to Lucent.

429. Further evidencing Lucent's lack of control, Lucent permitted Winstar to borrow almost $250 million under the Second Credit Agreement on June 23, 2000, just days before the June 2000 end-of-quarter deal. During the negotiations for the Second Credit Agreement, Winstar initially represented to Lucent that it did not intend to borrow under the Second Credit Agreement until the Fall of 2000. (See Perricone Direct, Tr. 20-17.) Approximately a day or two before the loan closed, however, Winstar notified Lucent during a conference call that it needed to revise its drawdown projections, because it might need to borrow in July or August 2000 instead. (See id.) Lucent was not happy about that—indeed, one Lucent employee was so angry that she brandished a baseball bat to the telephone after Winstar informed Lucent of its revised projection (see id. at 20-17-18.)—but Lucent proceeded with the deal (see id. at 20-19).

430. Winstar did not, in fact, wait until July or August to make its first drawdown. Just a few weeks after the Second Credit Agreement closed, on May 23, 2000, Winstar submitted a draw down request in the amount of approximately $160 million. (DX 686; see also Perricone Direct, Tr. 20-20.) Perricone was "completely shocked" by that request in light of Winstar's only recently revised draw

118

down projection, plus the fact that Winstar had a significant amount of cash on hand at that time. (Perricone Direct, Tr. 20-20; *see also* DX 295 (Winstar had approximately $600 million in cash at that time); DX-687 (same).)

431.  Perricone testified that while Lucent did not fund the May 23 draw request because of certain technical problems with the request (for example, the invoices to be paid were in the name of the wrong Winstar subsidiary), Lucent worked with Winstar to fix those technical defects, and Lucent did fund Winstar's June 23, 2000, superseding draw request (which encompassed the amounts previously requested in May, as well as additional amounts) in the amount of approximately $248 million. (*Id.* at 20-20-22; DX 309.) Lucent did so despite its displeasure with Winstar's actions. (*See* Rogers Direct, Tr. 20-130 ("I would say when parties sign and rep and warrant that what they have presented is true and 3 weeks later they come back with a completely different scenario, then you can structure against anything but fraud."); DX 295 (Per Rogers May 23, 2000, e-mail: "This is not in the spirit of the new deal. This is reprehensible. The company [Winstar] lied to us about the usage"); DX 292 (Per Rogers May 17, 2000 e-mail responding to inquiry whether Winstar would be borrowing under the Second Credit Agreement that quarter: "They contractually have to use other funds before they can access our loan. Winstar is just jerking us around.").) Lucent would not have allowed approximately $250 million in cash out the door, especially at the end of a quarter, under those circumstances if it had been in control of Winstar.

432.  In addition, in the closing days of June 2000, Winstar vetoed a favorable sale of Lucent's Winstar loans to two investment banks. (*See* Perricone Direct, Tr. 20-23-25; DX 310.) In response to Lucent's surprise at having to lend so much money so

119

soon, Winstar gave Lucent permission to market the loans to two investment banks, Bear Stearns and DLJ. (*See* Perricone Direct, Tr. 20-23-24.) (As discussed above, Lucent could not sell its Winstar loans without Winstar's consent. (*See supra* ¶ 427).) Lucent negotiated favorable terms with the investment banks—a sale of the full $248 million for approximately 93 cents on the dollar (*see* Perricone Direct, Tr. 20-24-25)—which would have provided Lucent with more than $230 million in cash and Lucent's loan "exposure . . . would have dropped to zero" (*id.* at 20-27). However, after Lucent funded the loan on June 23, 2000, Winstar decided not to consent after all. (*See id.* at 20-25-27; DX 310.) As a result, Lucent was unable to sell the loans, it did not collect the approximately $230 million in cash and it was left with those loans on its balance sheet when Winstar declared bankruptcy. If Lucent had been in control of Winstar, it would have forced Winstar to consent to those favorable loan sales.

### vi.     Pocalyko's testimony is unreliable.

433.    Pocalyko's testimony regarding the December 1999 through September 2000 transactions is unreliable.

434.    Pocalyko testified that at the time Winstar filed for bankruptcy, it owned approximately $250 million of what he called "unnecessary pre-purchased equipment" that it bought from Lucent. (*See, e.g.*, Pocalyko Direct, Tr. 3-46.)[6] That testimony is based on numerous errors.

435.    Pocalyko derives his figure of $250 million in equipment by subtracting $77 million, which he estimates is a reasonable amount of Lucent equipment for Winstar

---

[6] On cross-examination, Pocalyko contended that his $250 million figure reflected the "adjusted cost" of the equipment. (Pocalyko Cross, Tr. 4-68.) As discussed below, that contention is not supported by the evidence. (*See infra* ¶ 440.)

120

to have had on hand in April 2001, from a March 31, 2001, Winstar Equipment Report showing total equipment on hand of $327 million. (*See* Pocalyko Cross, Tr. 3-181-82; Pocalyko Direct, Tr. 3-22-23.) In Pocalyko's view, it would not have been reasonable for Winstar to keep on hand more Lucent equipment than it could deploy over three to four months, which he concluded was $77 million of equipment. (*See* Pocalyko Cross, Tr. 3-·174-75.) Pocalyko estimated how much Lucent equipment Winstar could deploy in four months from the "Materials (Equipment)" column of Exhibit A to his expert report (PX 462) for the months April 1999 through July 1999, which, he testified, reflects the Lucent equipment Winstar actually "installed" in those months.[7] (*Id.* at 3-183.) Pocalyko's assumptions and conclusion are deeply flawed.

436.    *First*, Pocalyko's assertion that Winstar should have had no more than four months' worth of equipment on hand is contrary to the undisputed record that six months' worth of optical equipment was appropriate for staging purposes and that it was common in the industry for carriers to purchase equipment six months or more before the equipment was to be deployed. (*See supra* ¶ 398.) Moreover, Pocalyko does not consider the concessions and other benefits Winstar obtained from Lucent in exchange for purchasing more equipment upfront. (*See supra* ¶¶ 348-60.)

437.    *Second*, Winstar's build-out was in the very early stages in the April through July 1999 period, making that period a poor indicator of what Winstar could have deployed over four months in 2000 or early 2001. According to Kipke, in the April to July 1999 period, Winstar was building out a single, approximately 200-mile long

---

[7] As discussed below (*see infra* ¶ 445), Pocalyko offered inconsistent testimony on direct and cross examination as to whether the "Materials (Equipment)" column in Exhibit A represented deployed equipment or purchased equipment.

route between New York City and Washington, D.C., and then three other relatively short routes. (Kipke Direct, Tr. 17-55-56.) That activity was not representative of Winstar's build-out plan in 2000 and 2001. Kipke testified that Winstar's plans called for it to build out approximately 12,000 miles worth of network in 2000. (*Id.* at 17-56) As Rouhana similarly testified, in 2000, Winstar "elected to try and go faster" with its network build-out. (Rouhana Cross, JX 8 at 75:6-12; *see also* Kantor Direct, JX 1 at 170:7-14 ("the level of the network build up got bigger" in 2000).) Indeed, Winstar planned to build approximately 40 percent of its entire network in 2001. (*See* Kipke Direct, Tr. 17-85.) Kipke explained that, the more network to be built, the more equipment Winstar needed because "[o]ptical networks need to have the signal amplified and regenerated about every 20 to 30 miles. So, there's equipment placed every 20 to 30 miles along the route between any given two points." (*Id.* at 17-56-57.)

438. Pocalyko's $77 million estimate of a reasonable amount of equipment for Winstar to have on hand also is unreliable because, according to Pocalyko's Exhibit A, Winstar deployed more equipment—approximately $90 million worth—in the April 2000 through July 2000 period. (*See* PX 462, Exhibit A.) Thus, even on Pocalyko's own terms, he understated the maximum amount of deployable equipment.

439. *Third*, Pocalyko did not deduct the approximately $71 million of non-Lucent equipment that he acknowledged is included in the $327 million equipment total. (*See* Pocalyko Cross, Tr. 4-67-68.) It goes without saying that a calculation of purportedly unnecessary *Lucent* equipment should not include what is indisputably *not* Lucent equipment. Nevertheless, Pocalyko tried to justify that failure on the supposed

122

ground that the $327 million equipment total reflected a downward accounting

adjustment. He testified:

> "Q. If that 250 million does not include non-Lucent product and your report says that there's at least $71 million of non-Lucent product in the warehouse, where is it?
>
> A. It's the adjustment. There's an accounting adjustment. That is the cost basis of the equipment. Would you like to also pay me for the right offs that Winstar took? I was conservative. I didn't put those right offs in. That would be an additional amount. This stuff sat. It was obsolete. The auditors for Winstar made them book adjustments. Grant Thornton had millions and millions of dollars of impairment adjustments that they made Winstar take." (Pocalyko Cross, Tr. 4-72-73.)

440. As Pocalyko conceded, he did not mention any such downward cost

adjustment in his expert report. (See id. at 4-139-140.) More important, Salomon

established that Winstar made no such adjustment. Salomon explained that, except for

approximately $79 million classified as assets held for sale, Winstar accounted for the

undeployed equipment at issue as "network construction in progress", which, he

explained, is a "subsection of property and equipment". (Salomon Direct, Tr. 21-116-

17.) Salomon further established that under Generally Accepted Accounting Principles

("GAAP"), property and equipment should be stated at cost (id. at 21-118), and that

Winstar's financial statements show that Winstar did account for the equipment in

accordance with GAAP because "the property and equipment is recorded at cost, and the

way that it's reported within the financial statements itself it [the bulk of the undeployed

equipment] hasn't been depreciated" (Id. at 21-119). Salomon's testimony was

unrebutted.

441. Accordingly, even if all of Pocalyko's other assumptions and calculations

were correct, he should have subtracted from his $250 million figure the $71 million of

non-Lucent equipment. (See id. at 21-122.)

123

442.    Moreover, Pocalyko simply asserts, with no foundation or personal knowledge and without providing any explanation or back-up, that only $71 million of the equipment on hand was non-Lucent equipment. (*See* Pocalyko Direct, Tr. 3-23; PX 462 at 15 n.21.) But Garrett (the Lucent program manager for the Winstar build-out at the time of Winstar's bankruptcy (*see supra* ¶ 14)) testified that Winstar owned only approximately $30-35 million worth of Lucent non-long-haul equipment in April 2001. (Garrett Direct, Tr. 20-93.) Garrett explained that he had "a very good knowledge" about Winstar's on-hand equipment based on, among other things, "numerous face to face meetings with Zlotnick and Huber, members of their organization and team who had provided us regular status as to the equipment that they had in the Winstar warehouses". (*Id.*) Adding $30 to $35 million to the approximately $52 million of equipment Pocalyko testified was in Lucent's facilities (*see* Pocalyko Direct, Tr. 3-23), the best evidence is that Winstar owned less than $90 million of Lucent equipment when it filed for bankruptcy.

443.    That is consistent with Pocalyko's own First In, First Out ("FIFO") analysis. In that analysis, Pocalyko traced "part numbers and specific product identifiers" on a Winstar equipment report as of March 31, 2001, against "part numbers and specific identifiers" on Lucent invoices. (Pocalyko Direct, Tr. 3-23-24.) In that process, Pocalyko only was able to identify approximately $74 million of the equipment Winstar had on hand as coming from Lucent. (*See id.*)

444.    *Fourth*, Pocalyko did not deduct the almost $79 million of assets held for sale. (*See* Pocalyko Cross, Tr. 4-73-74.) Pocalyko conceded that those assets held for sale generally were equipment that was "not available for network build-out". (*Id.* at 4-

124

75.) Thus, the fact that that equipment was not deployed in Winstar's network does not prove anything about why Winstar purchased it. Accordingly, even if all of Pocalyko's other assumptions and calculations were correct, he should have subtracted from his $250 million figure the approximately $79 million of assets held for sale. (*See* Salomon Direct, Tr. 21-122.)

445. *Fifth*, Pocalyko was internally inconsistent. For example, on cross-examination, he testified that the "Material (Equipment)" column in Exhibit A to his expert report reflected Lucent equipment that had been deployed in the relevant months and he was adamant that that it was "absolutely incorrect" that the column only showed equipment that had been invoiced and shipped. (Pocalyko Cross, Tr. 4-35-36.) On direct examination, however, Pocalyko testified that the "Material (Equipment)" did *not* only show deployed equipment: "if you refer to Exhibit A, page 2, I detail the material and equipment *purchases* at page 2 of Exhibit A. You can aggregate those *purchases* on the same FIFO basis. You will note that there are approximately $12 million of *purchases* that occur between October and February . . ." (Pocalyko Direct, Tr. 3-33 (emphasis added).)

446. *Sixth*, Pocalyko made unjustified assumptions that were contradicted by the undisputed evidence. For example, Pocalyko testified that the "delivery date" field on a particular Lucent invoice (DX 742) indicated the earliest date that the equipment on that invoice was delivered to Winstar. (Pocalyko Cross, Tr. 4-51.) Pocalyko further testified that, because the delivery date was after the invoice date, "[a]s a matter of professional certainty, this is a bill and hold transaction". (*Id.* at 4-33.) Pocalyko also testified that he was "[a]bsolutely certain" about that, and that there was no question in his mind about

125

that. (*Id.*) But he was mistaken. Terrell demonstrated that the "delivery date" field had "[n]othing at all to do" with when equipment was delivered to a customer. (Terrell Direct, Tr. 21-59-60.) Rather, Terrell explained, that field indicates when the invoice was loaded, or delivered, onto Lucent's web-based Oracle invoicing system. (*Id.*) Terrell was "absolutely certain" of that, based on the fact that he "designed the original requirements for the web-based [invoicing] system". (*Id.*)

447. In addition to all of the foregoing reasons why Pocalyko's contention that Winstar had $250 million of "unnecessary prepurchased Lucent equipment" is wrong, his testimony and opinion are also not credible because Pocalyko used circular reasoning in performing his "analysis". Pocalyko purportedly posed three questions to help him determine whether the Lucent-Winstar transactions were conducted at arm's length and whether they were the product of Lucent's improper influence and control. However, on cross-examination, he testified that he could not use those same three questions to decide whether a hypothetical transaction was conducted at arm's length and reflected undue influence and control without first being told whether it was conducted at arm's length. (Pocalyko Cross, Tr. 4-22-23.) Accordingly, Pocalyko's "methodology" is not a reliable way to determine whether any Lucent-Winstar transactions were conducted at arm's length or were the product of undue influence or control.

448. Finally, Pocalyko's conclusions with respect to the December 1999 through September 2000 transactions are inconsistent with the fact that Winstar did not disclose them in its financial statements, including its audited financial statement. Salomon explained that GAAP (specifically FASB 57) requires the disclosure in financial statements of "non-arm's length transactions that related parties have entered into".

126

(Salomon Direct, Tr. 21-113-14.) Salomon further testified that FASB 57 would have required Winstar to disclose the transactions in its financial statements if they "were not arm's length, and if they were the result of Lucent's undue influence and control". (*Id.* at 21-114; *see also* Pocalyko Cross, Tr. 4-147 (agreeing that "public companies are required in their 10K . . . in the 10Q to describe related party transactions"). Winstar's 10-K for 1999 was audited by Grant Thornton, Winstar's independent auditor (*see* DX 211 at F-2), and the financial statements included in its 10-Qs for the first three quarters of 2000 "would have [been] reviewed by the accounting firm prior to their issuance". (Salomon Direct, Tr. 21-115.) The relevant Winstar SEC filings, including its audited financial statement, do not disclose as related party or non-arm's length transactions any of the December 1999 through September 2000 transactions upon which Pocalyko relies. (*See* DX 270; DX 325; DX 429; *see also* Salomon Direct, Tr. 114-15.) In addition, Lucent's audited financial statements in its 2000 10-K also did not disclose the transactions as related party or non-arm's length transactions. (*See* PX 504.) The Trustee offered no rebuttal to Salomon's testimony. Thus, for the Court to credit Pocalyko's testimony in that regard, it would have to conclude that not only Winstar and Lucent failed to include such disclosures in their SEC filings, but also that their respective independent outside auditors at Grant Thornton and PricewaterhouseCoopers failed to notice that omission in the course of their audit work. There is no evidence in the record to support such a finding.

127

**D. Lucent's Affirmative Defense of New Value.**

    **i.  From December 7, 2000 (the date of the alleged preferential payment), to April 18, 2001 (the date of Winstar's bankruptcy), Lucent provided Winstar with $133,486,248.48 in equipment, software and services.**

        **a.  Lucent provided Winstar with $28,411,318.48 in goods and services.**

449.  The invoices contained in DX 644 reflect $28,411,318.48 in goods and services that Lucent provided and invoiced to Winstar for payment. (DX 644; *see also* Terrell Direct, Tr. 21-51.)

450.  At trial, the parties stipulated on the record that one of the invoices contained in DX 644—bates number LW 00300290, in the amount of $671,186.27—was incorrect and was rebilled by Lucent in the amount of $516,297.13. (Terrell Direct, Tr. 21-54-57.)  The lower amount was used to calculate the $28,411,318.48 worth of goods and services that Lucent provided Winstar.

451.  Vernon Terrell, the Lucent employee with extensive personal knowledge of Lucent's invoicing and accounts receivable processes in 1998 to 2001 (Terrell Direct, Tr. 21-38-41), testified that in his analysis of DX 644, he was able to confirm that all those invoices represent goods and services that were shipped by Lucent to Winstar between December 8, 2000, and April 18, 2001. (Terrell Direct, Tr. 21-51-52.)

452.  While Terrell was not involved with the particular transactions related to DX 466 (*see* Terrell Cross, Tr. 21-63-64), that is irrelevant because Terrell established that the Lucent invoices in DX 644 are business records that were prepared in the normal course of business (Terrell Direct, Tr. 21-46-47); consist of a compilation of data such as purchase order numbers (*id.* at 21-48); were prepared by an "invoicer" — a person with knowledge of "how and when to issue an invoice" (*Id.* at 21-46); and were prepared

128

contemporaneously with the time of shipping (*Id.*). In addition, as the former Lucent director of North America billing and accounts receivable, Terrell testified as to the standard invoicing process at Lucent and how, on this basis, he knows that the equipment or services for a particular invoice were shipped. (Terrell Direct, Tr. 21-45-46.) The Trustee produced no evidence to rebut or dispute that the equipment or services represented by these invoices were not supplied to Winstar.

**b.  Lucent also provided Winstar with $42,750,000.00 in software licenses.**

453.  Lucent invoiced Winstar for $67.5 million under the Software Pool Agreement in the relevant period. (DX 605 and DX 674; Terrell Direct, Tr. 21-60.) The $42,750,000.00 worth of software licenses were for Winstar's right to use Lucent's software on a pro rata basis from December 8, 2000 to April 18, 2001. The fee attributable to the period from December 8, 2000 to December 31, 2000 is calculated by prorating the quarterly software fee of $33,750,000.00 (DX 421 at 3WC 0008399) over a period of twenty-four days for a total of approximately $9,000,000.00. The fee attributable to the period January 1, 2001 through April 18, 2001 is the quarterly software fee of $33,750,000.00. (*Id.*)

454.  The Software Pool Agreement expressly states that the software licenses were delivered:

> "Lucent warrants that the Software set forth in Attachment A is Generally Available (GA), has been delivered to Winstar . . . Winstar agrees that the Software items set forth in Attachment A are Generally Available, have been delivered and have been accepted for use by Winstar on the Effective Date of this Agreement. Lucent will provide to Winstar, software access codes at the time in which Winstar selects the software application features for use in their network, from the software pool delineated in Attachment A."
> (DX 421 at 3WC 0008398.)

129

      **c.**    **Lucent also provided Winstar with $62,324,930.00 in
additional financing that Winstar used to pay for network
buildout services.**

455.  On December 29, 2000, Winstar submitted a draw request to Lucent in the
amount of $62,324,930.00 to pay for network buildout services. (DX 9 at LW00071187-
99.)

456.  Lucent funded Winstar's $62,324,930.00 draw request for services. (DX 46
at Tab A.4.)

      **(i)**    **Winstar never paid Lucent for the $133,486,248.48 in
equipment, software and services Winstar received.**

457.  Terrell confirmed that Lucent did not receive payment from Winstar for any
of its $28,411,318.48 worth of goods and services invoices.  (DX 644; Terrell Direct, Tr.
21-52.)  Based on his review of the Lucent systems for tracking customer disputes
regarding invoices, Terrell was able to determine that only one of the invoices contained
in DX-644 was disputed by Winstar, and upon dispute, it was re-billed by Lucent at a
lower amount, which lower amount Winstar never paid Lucent.  (Terrell Direct,
Tr. 21-52-53;  21-56-57.)

458.  Similarly, in his analysis of the software invoices, each of which was for
$33.75M (DX 605 and DX 674), Terrell determined that the software invoices were
never disputed by Winstar, and that Winstar never paid Lucent for those invoices.
(Terrell Direct, Tr. 21-60-61.)

459.  Finally, although Lucent provided Winstar with $62,324,930.00 in
additional financing for Winstar's network buildout services, Winstar never repaid
Lucent on that loan.  (DX 46 at Tab A.4.)

460.  Accordingly, the evidence shows—and indeed there is no contrary evidence in the record—that Winstar never paid Lucent for the $133,486,248.48 in equipment, software, services and credit Winstar received during the relevant time period.

### (ii) The $133,486,248.48 in equipment, software and services provided by Lucent were not secured.

461.  According to the terms of the Second Credit Agreement, Lucent had a security interest only in the equipment Winstar purchased through financing under the Second Credit Agreement.  (DX 29 at Exhibit I.)  Pursuant to the Lucent Security Agreement (an executed copy of which appears at DX 32, dated May 9, 2000), Lucent was granted a security interest in all of Winstar's "Collateral", which is defined to include:  "all (a) Equipment, (b) General Intangibles (but excluding General Intangibles to the extent that an assignment thereof would violate a restriction on assignment contained therein), and (c) Proceeds".  (DX 29, Exhibit I at 2 (§ 1.02).)

462.  Michael Keefe, Law Vice President for Corporate at Lucent, testified that under the Second Credit Agreement:

> "Lucent only had loans on the specific equipment that it was financing.  It didn't have liens or collateral on any other Winstar assets, or any other Winstar entities . . . we only had liens on against specific assets that we were financing rather than the general assets of Winstar itself".
> (Keefe Direct, Tr. 19-56; 19-63.)

463.  The invoices for goods and services (DX 644) and software licenses (DX 605 and DX 674) that Lucent provided Winstar were not financed under the Second Credit Agreement and were therefore not secured.

464.  Although Lucent invoiced Winstar for $28,411,318.48 in goods and services (DX 644), Winstar never submitted draw requests to Lucent under the Second Credit Agreement to pay for those invoices.  Thus, none of the $28,411,318.48 in goods

131

and services Lucent provided Winstar was financed or secured under the Second Credit Agreement. (*See* DX 8; DX 9; DX 10; DX 11.)

465.  Although Lucent invoiced Winstar for $67.5 million in software licenses (DX 605; DX 674), Winstar never submitted draw requests to Lucent under the Second Credit Agreement for those invoices. (*See* DX 5; DX 6; DX 7; DX 8; DX 9; DX 10; DX 11.)  Thus, none of the $42,750,000.00 worth of software licenses, that Lucent provided Winstar and that are attributable to the period from December 8, 2000 to April 18, 2000 was financed or secured under the Second Credit Agreement.

466.  Neither the $28,411,318.48 in goods and services, nor the $42,750,000.00 applicable to the December 7 through April 18, 2001 period was financed under the Second Credit Agreement and, on October 11, 2001, Lucent filed a Proof of Claim in the Winstar bankruptcy proceeding for monies Winstar owed Lucent. (PX 340.)  Although Lucent's Proof of Claim (PX 340 at Exhibit A.I) was styled as a secured proof of claim, Lucent's statement that its claim was secured included the express condition:  "to the extent that all or a portion of these claims is not secured, this proof of claim also shall be deemed to be a proof of claim for unsecured claims in such amount".  (*Id.* at 1; *see also* Terrell Redirect, Tr. 21-82-83.)

467.  Although Lucent provided $62,324,930 to or for the benefit of Winstar in financing for services under the Second Credit Agreement, it was effectively unsecured. Lucent only had a security interest in the specific assets or equipment—not services— financed under the Second Credit Agreement. (*See*  DX 29, Exhibit I at 1-2 (§ 1.02); *see also* Keefe Direct, Tr. 19-56; 19-63.)  When Winstar financed an additional $62,324,930 in December 2000, because that incremental financing was exclusively for services, it

132

had no corresponding increase in Lucent's collateral base, and was thus effectively an unsecured increment to the loan. Lucent's collateral position with respect to Winstar's outstanding loan balance was less than the amount of these loans: "You don't have a security interest if you have services. I would argue a significant amount of the [Winstar] loan is of services nature." (Montemarano Cross, Tr. 10-45; *see also* DX 346 at LW00197421 ("We currently finance these services for Winstar which is not collateralized since the loan collateral under the new facility is only the actual assets we finance").) As Jill Diroma testified, financing Winstar's services in December of 2000 in the amount of $62,324,930.00 was "cash out the door" for Lucent. (DX 557 at LW00303200; Diroma Cross, JX 4 at 69:22-24.)

## IV.    THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM (COUNT XI)

468.    We hereby incorporate by reference Lucent's Findings of Fact regarding the Trustee's preference claim because those facts are relevant to the equitable subordination claim (Count XI).

469.    Lucent was not an insider of Winstar. (*See supra* ¶¶ 271-448.)

470.    Lucent did not engage in fraudulent or inequitable conduct with respect to the Siemens Loan. As discussed above, Lucent did not compel Winstar to obtain the Siemens Loan (*see supra* ¶¶ 296-303) or to make the Siemens Repayment (*see supra* ¶¶ 288-91), nor did it compel Winstar to draw the Siemens Loan down immediately upon closing (*see supra* ¶¶ 311-14). In addition, Lucent did not compel the Siemens Repayment through other December 2000 actions. (*See supra* ¶¶ 315-23.)

133

## V.    LUCENT'S FRAUD COUNTERCLAIM (COUNTERCLAIM COUNT 5)

### A.    Winstar Made Requests for Borrowing to Lucent in January and February of 2001 that Included Representations of Winstar's Compliance with Financial Covenants, Including the CAPEX Covenant of the Second Credit Agreement.

471.    The financial covenants of the Second Credit Agreement contained in Section 6.07 provide that Winstar shall not permit total Cash Capital Expenditures ("CAPEX") to exceed $1,300,000,000.00 for "any year prior to and including 2001". (DX 29 at 113 (§ 6.07(c)).)

472.    Failure to comply with the CAPEX covenant constitutes an Event of Default under the Second Credit Agreement.  (*Id.* at 121 (Art. VII (c)).)  In the event of default, Lucent is not required to loan Winstar money under the Second Credit Agreement.  (*Id.* at 81 (§ 4.03(b)) ("[a]t the time of and immediately after giving effect to such Borrowing no Default shall have occurred and be continuing").)

473.    Accordingly, in order to borrow under the Second Credit Agreement after December 31, 2000, Winstar was required to certify, *inter alia*, that its CAPEX for the year 2000 was no greater than $1,300,000,000.00.  (*See* DX 29 at 113 (§ 6.07(c)) and at 81 (§ 4.03(b)).)

474.    The Second Credit Agreement further provides that each borrowing "shall be deemed to constitute a representation and warranty" that no Default has occurred and is continuing.  (DX 29 at 81-82 (§ 4.03(b)).)  When Winstar borrowed in January 2001 and February 2001, each of its borrowings constituted a representation and warranty they were not in default under the Second Credit Agreement.  (*See id.*)

B578

B.    **In Late 2000, Senior Management at Winstar, Including Nathan Kantor, Richard Uhl, Fred Rubin, and David Ackerman Were Aware Winstar Would Exceed Its § 6.07(c) CAPEX Covenant.**

475.    Early in the Fall of 2000, Winstar management understood from financial projections that they needed to take serious steps to reduce spending in order to "avoid a train wreck" with their CAPEX limit.  (DX 496 at 2WC 0065139; *see also* DX 54 at 3WC 0012149; DX 70 at WC0018085; DX 71 at 3WC 0012007; Ackerman Cross, JX 6 at 527:6-528:13 (3/5/04 Dep.); DX 459 at ZWC 0160297-99; DX 485 at ZWC 0160020.)

476.    By December 2000, Senior Winstar Management knew that the company was not going to be able to comply with its CAPEX limit under the Second Credit Agreement.

477.    In a December 1, 2000, e-mail from Fred Rubin to Bill Zlotnick and Rick Uhl, Rubin explains the rush to get Winstar's international CAPEX numbers in as early as possible "to see what we must do from a Cap Ex and a COR standpoint for the quarter. That is the primary reason for the sense of urgency. It is such a hot topic, that Bill R[ouhana] wants to be involved as well".  (DX 727 at 3WC 0008927.)

478.    In the last days of fiscal year 2000, Ackerman asked Zlotnick in an e-mail whether a "'two minute drill' and 'hail Mary'" (DX 58 at 2WC 0073714) to get CAPEX under $1.3 billion was possible.  Zlotnick responded that being out of compliance with Winstar's CAPEX covenant at this late date was "past the two minute drill at this point—it's like calling players back on the field and putting time back on the clock for one more play". (*Id.*) Zlotnick later testified that his e-mail response to Ackerman meant it was not possible to get CAPEX under $1.3 billion: "I don't think so. I think that's what I'm saying. It's like–it's already booked". (Zlotnick Cross, JX 3 at 46:19-49:25.) Ackerman passed Zlotnick's information along to Winstar's CFO, Rick Uhl, stating that he thought

135

**B579**

"we were OK with the capex for the company". (DX 58 at 2WC 0073715.) Uhl responded: "We are not Ok." (*Id.* at 2WC 0073714.)

479.    On December 28, 2000, Gary Simpson, Senior Director of capital expenditure planning and reporting at Winstar, reported that Winstar's CAPEX was at $1,327,000,000.00. (DX 554 at WC 0039854.) That same day, December 28, 2000, Zlotnick wrote in an e-mail to Ackerman that Winstar was "$40-50m over the $1.3bn" in reference to Winstar's CAPEX covenant in its credit facility. (DX 58 at 2WC 0073715.)

480.    The next day, December 29, 2000, Zlotnick wrote in another e-mail to Ackerman that Winstar was $20-25 million over its year 2000 CAPEX covenant. (DX 58 at 2WC 0073714.)    Zlotnick later testified about this e-mail, explaining that even at this late stage Winstar wanted to try and reduce its CAPEX to $1.3 billion, but it was not possible. (*See* Zlotnick Cross, JX 3 at 46:19 - 49:25.)

481.    In the last days of fiscal year 2000, Winstar was out of compliance with its CAPEX covenant by anywhere from $20 to $50 million and attempting highly improper transactions to alter its true position. Winstar tried unsuccessfully to reduce its CAPEX to $1.3 billion by planning to go to such extraordinary lengths as removing equipment that was already installed in its network in order to attempt to return it as being defective, and trying to sell equipment held in Winstar warehouses that it needed to build out its network, intending to purchase the same equipment immediately thereafter, and engaging in accounting gimmicks such as reclassifying assets as "assets held for resale".

482.    By mid-December 2000, Winstar tried to move equipment internally to get it off Winstar's domestic balance sheet and bring down its CAPEX. On December 10, 2000, Bill Zlotnick told Fred Rubin: "[w]e also need to decide if we can move $50m of

136

optronics into assets held for (potential) resale as we do not have a buyer yet. Can international take one for the team here?" (DX 56.) On December 19, 2000, Winstar actually moved $26M of radios from its "network build to resale inventory" in order to reduce its year 2000 CAPEX. (*Id.*)

483. On December 21, 2000, David Ackerman told his staff to continue to try to return equipment to Lucent as defective and then repurchase that same equipment in the new year because doing so was "critical to [Winstar] making the cap ex covenant". (DX 57.) Ackerman directed his staff to try and return the equipment as defective even though his staff told him the equipment was "currently up and working and awaiting completion of the 72 hour test. It would be difficult to return equipment as defective under these circumstances". (*Id.*)

**C.    Winstar Exceeded Its $1,300,000,000.00 CAPEX Limit for the Year 2000, and was Therefore Out of Compliance with Section 6.07(c) and in Default of Section 4.03 of the Second Credit Agreement. (DX 29 at 113 (§ 6.07(c)) and 81 (§ 4.03).)**

484. As of January 18, 2001, Winstar was out of compliance with its $1.3 billion CAPEX covenant prior to and including fiscal year 2001.

485. On January 18, 2001, Bill Zlotnick, Vice President for Program Management in Winstar's network services group and Winstar's CAPEX "compliance officer", wrote an e-mail to David Ackerman (DX 61 at 3WC 0010156) stating that Winstar was at "$1311" for CAPEX—$11 million over its CAPEX covenant with Lucent. (Zlotnick Cross, JX 3 at 27:22-28:3.) Further, Zlotnick, who was the person most closely connected to monitoring CAPEX at Winstar, testified that between January 18, 2001, and when he left the company in March or April of 2001, he never

137

learned that Winstar brought its 2000 CAPEX below $1.3 billion. (Zlotnick Cross, JX 3 at 217:8-218:18; 219:12-17; 219:20-24; 220:2-6; 220:8-13.)

486. Notwithstanding the fact it was out of compliance, in 2001 Winstar continued to try and meet its $1.3 billion CAPEX limit by manipulating its 2000 CAPEX figures. Although financial statements for fiscal year 2000 should "not include transactions that occurred after December 31 [of that year]" (Goldman Direct, JX 16 at 96:4-97:5), Winstar tried to do so, but still could not reduce its CAPEX to below $1.3 billion. Winstar never did comply with its $1.3 billion CAPEX covenant.

487. On January 13, 2001, Nate Kantor questioned why Winstar was trying to sell Lucent optronics equipment in its warehouse when he was simultaneously hearing that optronics equipment would be needed in March 2001 after Williams delivered the necessary fiber for the optronics equipment: "This was the confusing issue I mentioned in the last e-mail. Why aren't we deploying the Lucent stuff we have in the warehouse already-so that it is ready to go when we get the fiber???" (DX 60 at ZWC 0159295.) Ackerman responded that Winstar needed to sell the equipment in order to "'Make' 2000 capex". (*Id.* at ZWC 0159294.) Kantor asked Rick Uhl whether Winstar should sell the Lucent equipment or deploy it. (*Id.*) Uhl, and Rubin in turn, responded that they believed Winstar needed to sell the equipment to make CAPEX (*id.*), even though Winstar knew that it would have to replace the optronics equipment in the short term in order to deploy necessary data circuits in its network: "We've gone complete circle. Are we selling this stuff and at what price. Sounds like we would have to do something else from either Cisco or Nortel to get the data circuits in." (DX 61 at 3WC 0010156.)

488. By January 9, 2001, Winstar had neither returned nor sold enough Lucent optronics equipment to meet its CAPEX covenant, leading Zlotnick to ask Gary Simpson whether it was "too late for 2000 to move this equipment to assets held for resale". (DX 59 at WC 0032914.)

489. On January 18, 2001, because it was $11 million over its $1.3 billion covenant, Winstar attempted to engage in additional accounting gimmicks by trying to sell equipment in order to reduce its year 2000 CAPEX because it was $11 million over its $1.3 billion covenant. Bill Zlotnick wrote David Ackerman saying: "Lorie will be in contact with Bell South to see about the possibility of selling this gear. There is no deal at this point in time. Company is at $1311 for capex for 2000 at this point". (DX 61 at 3WC 0010156; *see also* Zlotnick Cross, JX 3 at 56:17-57:18.)

490. Against that voluminous evidence that shows Winstar was out of compliance with its 2000 CAPEX covenant (*See supra* §§ B-C), there is no evidence in the trial record that shows Winstar was in compliance with its 2000 CAPEX covenant.

**D.    Winstar's Senior Management Was Aware in Early 2001 that the 2000 CAPEX Was Above the Section 4.03(c) Covenant Requirement.**

491. In January 2001, the same month in which Winstar submitted certified compliance certifications to Lucent to draw down under the Second Credit Agreement, Senior Management at Winstar, including Fred Rubin, the Senior Officer who certified the January and February 2001 draw requests (*see* DX 10 at 3WC 0008193; DX 11 at 3WC 0008220), knew Winstar was out of compliance with its Section 6.07(c) CAPEX covenant.

492. On January 13, 2001, David Ackerman informed Nate Kantor via e-mail that Winstar was still "attempting to sell the Lucent stuff in the warehouse so that Rick

B583

can 'Make' 2000 capex". (DX 60 at ZWC 0159294.)  Ackerman's e-mail was forwarded

in turn to Rick Uhl and Fred Rubin, both of whom said, on January 15, 2001, they

believed the equipment needed to be sold to 'make CAPEX' rather than deployed into

Winstar's network. (Id.)

493.  Zlotnick testified that he directly informed Ackerman on January 18, 2001,

that Winstar was 11 million over its CAPEX covenant.  (Zlotnick Cross, JX 3 at 56:6-

56:16; 57:11-18.)

494.  Gary Goldman, lead partner at Grant Thornton (Winstar's outside auditor

for the Winstar account), testified that in Grant Thornton's year-end audit of Winstar in

2000, Grant Thornton had "a number of conversations with accounting staff, as well as

senior management, as to whether the company was in compliance with their own

covenants . . . about whether they were meeting [and] managing its CAPEX

expenditures". (Goldman Direct, JX 16 at 13:15-14:9; 84:9-21; 87:20 - 88:8.)

495.  Goldman also testified that he would "need to know" if Winstar had internal

plans to sell current inventory to third parties who would hold it until Winstar was ready

to deploy it into their network, and that reclassifying assets as held for resale to reduce

CAPEX was "inappropriate" conduct about which he would have "serious

considerations" and would "have to characterize . . . as negative".  (Goldman Direct,

JX 16 at 91:16-20; 91:23-25; 93:19-24; 94:3-9; 94:12-21; 95:9-15.)

**E.    Winstar Submitted Borrowing Requests to Lucent on January 26, 2001,
       and February 23, 2001 that Contained False Certifications.**

496.  Notwithstanding the fact it was over its $1.3 billion CAPEX covenant,

Winstar submitted representations with its January and February 2001 borrowing

requests, and in fact borrowed under the Second Credit Agreement, certifying that all

**B584**

conditions for borrowing set forth in Section 4.03 of the Second Credit Agreement had

been satisfied, or would be satisfied as of the date of the borrowing request and the date

that the borrowing was made. (Stip. Facts ¶ 24-25.) The conditions for borrowing set

forth in Section 4.03 include compliance with the CAPEX covenant. (DX 29 at 81

(§ 4.03(b)).)

497. On January 26, 2001, Winstar submitted a request for borrowing to Lucent

in the amount of $48,735,275.74. In that borrowing request, Winstar's Treasurer,

Frederic E. Rubin certified, on behalf of Winstar, that "all conditions for borrowing set

forth in Section 4.03 the Credit Agreement have been satisfied or will be satisfied as of

the date hereof and the date the borrowing is made". (DX 10 at 3WC 0008192-93; *see*

*also* Stip. Facts ¶ 25.)

498. On February 23, 2001, Winstar submitted a request for borrowing to Lucent

in the amount of $34,281,745.44. In that borrowing request, Winstar's Treasurer,

Frederic E. Rubin certified, on behalf of Winstar, that "all conditions for borrowing set

forth in Section 4.03 the Credit Agreement have been satisfied or will be satisfied as of

the date hereof and the date the borrowing is made". (DX 11 at 3WC 0008219-20; *see*

*also* Stip. Facts ¶ 25.)

> F.  **Lucent Relied to Its Detriment on Winstar's Signed Certifications of Compliance with Section 4.03 of the Second Credit Agreement on January 26, 2001 and February 23, 2001, by Loaning Winstar a Total of $83,017,021.18.**

499. Were it not for Winstar's certifications of compliance with Section 4.03 of

the Second Credit Agreement in its draw requests of January 26, 2001 (DX 10 at 3WC

0008192-93) and February 23, 2001 (DX 11 at 3WC 0008219-20), Lucent would not

have loaned Winstar $83,017,021.18 in response to those requests.

141

500.  Michael Montemarano, Vice President of Finance for worldwide marketing and sales at Lucent, testified that if Winstar had not certified its compliance with Section 4.03 of the Credit Agreement for each draw request, Lucent would not have funded those draw requests. (Montemarano Cross, JX 9 at 29:12-14, 29:17-25, 32:16-17.)

501.  Leslie Rogers, former Director of North America Customer Finance at Lucent, testified that Lucent relied on Winstar's certified draw down requests to ascertain whether Winstar was in compliance with the financial covenants—including CAPEX—of the Second Credit Agreement:  "It is prudent as a lender to keep abreast of the finances of your borrowers.  Winstar had a requirement to give us financial information on a quarterly basis and had an officer sign that the financials were in accordance with generally accepted accounting practices and that the company was in compliance with the loan agreement, which had financial covenants in it." (Rogers Direct, Tr. 20-132-133.)

502.  Similarly, Beth Perricone, former Senior Manager and Interim Managing Director for Project Finance North America at Lucent, testified that Lucent relied on Winstar's signed certified draw requests: "if the company [Winstar] was in compliance as certified typically by an officer of the company [Lucent] would fund the obligations or the requests made on a monthly basis". (Perricone Direct, Tr. 13-106.)

503.  Perricone further testified that Lucent's reliance on Winstar's certifications of compliance was reasonable: "Winstar is charged with ensuring that it is in compliance with a credit document.  Lenders monitor on a frequent basis certain aspects of a credit agreement. . . .  But we're relying on the executives and officers of Winstar when they provide monthly draw down requests to Lucent that they are representing and warranting by signing that compliance certificate that they are in compliance. . . .  We don't view it as

142

**B586**

our responsibility to ensure compliance with the Credit Agreement. Particularly when the customer is representing and warranting that they're in compliance". (Perricone Cross, Tr. 13-154-155.)

504. Lucent never recovered the $83,017,021.18 it loaned Winstar on the basis of its certified January 26, 2001 and February 23, 2001 draw requests. (DX 46 at Tab A.4.)

## VI.    LUCENT'S NEGLIGENT MISREPRESENTATION COUNTERCLAIM (COUNTERCLAIM COUNT 6)

505. We hereby incorporate by reference Lucent's Findings of Fact for its Fraud Counterclaim (Counterclaim Count 5) because those facts are relevant to Lucent's Negligent Misrepresentation Counterclaim (Counterclaim Count 6). In addition, the following facts are also relevant to Lucent's Negligent Misrepresentation Counterclaim.

506. Winstar owed a duty of care to Lucent because Lucent and Winstar were in privity of contract pursuant to the Second Credit Agreement. (Stip. Facts ¶ 11.)

507. Winstar did not exercise care when it represented to Lucent in certified borrowing requests in January and February of 2001 that all conditions for borrowing set forth in Section 4.03 of the Second Credit Agreement had been satisfied. Senior Management at Winstar, including Fred Rubin, the Senior Officer who certified the January and February 2001 draw requests on behalf of Winstar (*see* DX 10 at 3WC 0008193; *see* DX 11 at 3WC 0008220), testified that he did not take any affirmative steps to satisfy himself that Winstar was in compliance with the terms of Second Credit Agreement. Rather, he testified that he believed that Winstar was in compliance because no one had told him otherwise. (Rubin Cross, JX 5 at 138:19-139:3.) (*See also supra* at ¶ 492.)

143

508.   In light of the information Senior Management at Winstar possessed concerning the company's non-compliance with its CAPEX covenant in January 2001 (*see* Zlotnick Cross, JX 3 at 27:22-28:3; DX 61 at 3WC 0010156; Zlotnick Cross, JX 3 at 56:17-57:18; and DX 60 at ZWC 0159294), and the fact there is no evidence on the record that Winstar was actually in compliance with its 2000 CAPEX covenant, Winstar was—at minimum—negligent, if not fraudulent, in making representations of compliance in its certified borrowing requests to Lucent in January and February of 2001.

## VII.   LUCENT'S SETOFF COUNTERCLAIM (COUNTERCLAIM COUNT 2)

509.   The Trustee and Lucent have stipulated that "in the event that the Trustee recovers a judgment against Lucent under the Wireless Subcontract claim, Lucent shall be entitled to an award of setoff in the total amount of $6,300,000.00 against any judgment in favor of Wireless on the Wireless Subcontract Claim". (Stipulation By and Between the Trustee and Lucent Technologies Inc. Concerning Lucent's Counterclaim for Setoff, dated May 23, 2005, A.D.I. 337.)

144

B588

## CONCLUSIONS OF LAW

I.    **LUCENT DID NOT BREACH THE SUBCONTRACT OR ANY "SUBCONTRACTING ARRANGEMENT" WITH WIRELESS.**

    **A.    The Trustee's Burden.**

    1.    In order to prove her breach of the subcontracting arrangement claim under New York law, the Trustee must show by a preponderance of the evidence: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998); see also *Republic Corp. v. Procedyne Corp.*, 401 F.Supp. 1061, 1068 (S.D.N.Y.1975) ("Plaintiff, having made this claim, has the burden of proving each of these elements [of an action for breach of contract] by a fair preponderance of the credible evidence.").[8]

    **B.    Lucent Did Not Breach Any of the Written Terms of the Subcontract.**

    2.    The Subcontract requires that "[s]ervices shall be provided in accordance with the provisions of this Agreement and the applicable Task Order" to which the parties have agreed. Payment, likewise, is only required to be made in accordance with an agreed upon Task Order. (*See* Findings ¶¶ 66-68.)

    3.    The Trustee has stipulated that there was no agreed upon Task Order governing the services performed by Wireless for the March 2001 quarter. (*See id.* ¶ 71.)

    4.    Lucent's issuance of an appropriate Task Order requesting that Wireless perform particular services thus was a condition precedent to Wireless's authority to

---

[8] The Subcontract, pursuant to which the Trustee purports to bring this claim, provides that, "This agreement and related Task Orders shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law rules". (DX 117 at WC 0019783 (§ 8.5).)

B589

undertake, and Lucent's obligation to pay for, such services under the Subcontract. That condition precedent was not satisfied. *See Preferred Mortgage Brokers, Inc. v. Byfield,* 723 N.Y.S.2d 230, 231 (App. Div. 2001) ("A condition precedent is an act or event . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.") (citation omitted).

     5.    The Trustee likewise has not met her burden of proving breach of the Subcontract because absent a Task Order she has not shown the obligations that Wireless was to perform or that Lucent purportedly breached. *First Investors,* 152 F.3d at 168.

**C.    The Subcontract Was Not Orally Modified.**

     6.    To address the fact that Lucent and Wireless did not agree to a Task Order for the March 2001 quarter as required under the written terms of the Subcontract, the Trustee claims that Lucent and Wireless orally modified the Subcontract to eliminate the Task Order provision in favor of the exchange of purchase orders and invoices and sometimes spreadsheets.

     7.    The written Subcontract provides, however, that it cannot be orally modified, but may only be modified by a writing signed by both parties. (*See* Findings ¶ 73.)

     8.    New York law is clear that "no oral modification" provisions are to be enforced:

> "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301, subd. 1; *see also John Street Leasehold LLC,* 196 F.3d 379, 382 (2d Cir. 1999) ("New York law . . . does not permit oral modification when the original written agreement provides that modifications must be in writing and signed."); *Nat'l Westminster Bank U.S.A. v. Ross,* 130 B.R. 656, 676 (S.D.N.Y. 1991).

146

B590

9.    New York will enforce oral modifications despite a no oral modification provision in only two, narrow circumstances: "where there has been (1) partial performance or (2) reliance—but only where the subsequent performance or reliance is 'unequivocally referable to the modification'". *John Street*, 196 F.3d at 382. Performance or reliance is "unequivocally referable to the modification" where the only possible explanation for the performance or reliance is the alleged oral modification. *Blue Ridge Inves., LLC v. Anderson-Tully Co.*, 2005 WL 44382, at *5 (S.D.N.Y. Jan. 10, 2005) (Appendix Tab 1). The Trustee has not met her burden of proving that Wireless satisfies either of those exceptions.

10.    *First*, the Trustee has presented no competent evidence of the primary element of an enforceable oral modification: the oral agreement to modify. (*See* Findings ¶¶ 76-79.) The only evidence that the Trustee has offered is the speculation of Nate Kantor as to how the parties came to exchange purchase orders and invoices. (*See id.* ¶¶ 77-78.) Kantor does not provide any testimony concerning *who* made the alleged agreement, *when* it was allegedly made and *what* were the specific terms of the agreement. (*See id.*) There is no testimony from Mr. Kantor or any other witness concerning eliminating the Task Order requirement in favor of spreadsheets. (*See id.* ¶ 79.) Lucent's Mark Wilson, who signed the Subcontract, testified that there was no such modification. (*See id.* ¶ 80.)

11.    *Second*, the Trustee has not proved that Wireless's performance of services building out Winstar's network (which is also how Wireless allegedly relied) was "unequivocally referable" to the alleged oral modification. Wireless was a wholly owned subsidiary and the engineering arm of Winstar that was created to perform the build-out

147

of Winstar's network. (*See id.* ¶¶ 2, 81-82.) The reason that Wireless performed network build-out services in the March 2001 quarter is that building Winstar's network was Wireless's purpose, irrespective of any agreements with Lucent. The fact that Wireless performed those services in the March 2001 quarter is therefore not "unequivocally referable" to any alleged oral modification. *See John Street*, 196 F.3d at 382 (complaining party's actions not unequivocally referable to oral modification where party would have taken actions anyway); *Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, No. 03 Civ. 6146(DC), 2004 WL 1871525, at *6 (S.D.N.Y. Aug. 19, 2004) (Appendix Tab 2) (same). The Trustee has offered no proof, let alone met her burden of proof, that the only reason Wireless performed these services was the alleged oral modification.

12.    *Third*, the Trustee has not provided any proof that Wireless relied on the alleged oral modification when it performed services in the March 2001 quarter. As an initial matter, Winstar agreed in writing in September 2000 that Lucent would not be responsible for Wireless-performed services absent a signed services agreement and an agreed upon prior purchase order authorizing Wireless to perform those services. (*See* Findings ¶¶ 107-13.) In addition, Lucent told Winstar executives throughout the March 2001 quarter that it would not pay for or finance any Wireless-performed services that quarter. (*See id.* ¶ 124.) The overwhelming record evidence is that Wireless did not rely on the alleged oral modification, but knew that Lucent would not pay for or finance Wireless-performed services. (*See id.*)

13.    The Trustee's oral modification claim also fails because she has not presented any evidence of consideration for the alleged oral modification. (*See id.* ¶ 76.)

148

**B592**

Under New York Law, "[f]resh consideration is required for an oral modification of a written contract or a novation". *Ershow v. Site Holdings, Inc.*, No. 95 Civ. 2451 (RPP), 1995 WL 384457, at *4 (S.D.N.Y. June 28, 1995) (Appendix Tab 3); *see* N.Y. Gen. Oblig. Law § 5-1103 (McKinney 2005); *Tierney v. Capricorn Investors, L.P.*, 592 N.Y.S.2d 700, 703 (N.Y. App. Div. 1993). The Trustee has not shown such consideration.

### D. Lucent Did Not Breach the Terms of the Allegedly Orally Modified Subcontract.

14. Even if there were an enforceable oral modification of the Subcontract, Lucent did not breach the terms of the Subcontract as allegedly modified.

15. The Trustee claims that the Subcontract was modified to eliminate the Task Order requirement in favor of exchanging purchase orders and invoices and sometimes spreadsheets recording Wireless-performed services.

16. Lucent and Wireless did not exchange purchase orders and invoices, however, and Lucent did not pay Wireless for network build-out services performed after September 2000. (*See* Findings ¶¶ 114-17.)

17. Although Lucent did receive a spreadsheet of Winstar's "estimated" capital labor expenses for the March 2001 quarter, that spreadsheet did not come from Wireless, nor does it mention Wireless. (*See id.* ¶ 126.) Instead, the spreadsheet came from Winstar and supported a request for financing under the Second Credit Agreement. (*See id.*.) There is no evidence that Wireless never invoiced or otherwise requested payment from Lucent that quarter.

18. Thus, even if the Subcontract was orally modified, the Trustee has not met her burden of proving that Wireless performed or that Lucent breached because Lucent

149

and Wireless did not exchange purchase orders, invoices or even spreadsheets as required by the allegedly modified agreement. *First Investors Corp.*, 152 F.3d at 168; *Byfield*, 723 N.Y.S.2d at 231.

> **E.    The Fact That The Parties Had Previously Engaged In The Pass-Through Did Not Obligate Lucent To Continue That Practice Or Otherwise To Pay Wireless For Services Allegedly Performed Building The Winstar Network.**

19.    The Trustee's claim relies in large part on the fact that Lucent and Winstar engaged in a "pass-through" of Wireless-performed services in several quarters in 1999 and 2000 to accommodate Winstar's desire to finance services and facilitate a favorable accounting treatment for services, one piece of which was payment by Lucent to Wireless.  (*See* Findings ¶ 81-106.)

20.    The Trustee's reliance on the parties' prior conduct to support her breach of contract claim is inappropriate where there is an express contract in place.  Under New York law, where an express contract already covers the subject-matter at issue, the fact that two parties engage in a particular practice cannot create a contractual obligation for the parties to continue to engage in that practice. *See Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp.2d 399, 408-09 (S.D.N.Y. 1998) (citing *Miller v. Schloss*, 218 N.Y. 400, 406-07 (N.Y. Ct. App. 1916)); *Hanan v. Corning Glass Works*, 35 A.D.2d 697, 698 (N.Y. Sup. Ct. 1970) (continued performance by the parties could not create implied in fact contract where the parties had an express agreement).  The Trustee therefore cannot prove a breach of the alleged "subcontracting arrangement" based on Lucent and Winstar's conduct.

21.    Even if the parties' practice could obligate Lucent to continue to pass through Wireless-performed services, the parties agreed in writing on September 27,

150

2000 that they would no longer engage in that practice after the September 2000 quarter. (*See* Findings ¶¶ 107-13.) After September 2000, Lucent no longer passed-through any Wireless-performed services, nor did Lucent pay Wireless or Wireless even request payment. (*See id.* ¶¶ 114-25.) After September 2000, the only requests that Lucent received with respect to services were requests from Winstar to finance services pursuant to the Second Credit Agreement. (*See id.* ¶¶ 118, 125.) After September 2000, the only transaction that occurred between Lucent and Winstar with respect to network build-out services was that Lucent provided financing to Winstar on a single occasion as a customer accomodation. (*See id.* ¶¶ 119-20, 123.)

22.    Winstar's provision of spreadsheets to Lucent to support its financing requests in December 2000 and March 2001 cannot change that fact because Lucent and Winstar's prior pass-through practice did not include spreadsheets. (*See id.* ¶¶ 90, 100, 106.) There is no evidence that Lucent received any "spreadsheets" from either Winstar or Wireless up to and through September 2000. (*See id.* ¶ 79.) Although Lucent did receive a spreadsheet describing Winstar's capital labor expenses in the December 2000 and the March 2001 quarter, those spreadsheets did not come from Wireless, nor do they mention Wireless. (*See id.*) Instead, the spreadsheets came from Winstar to support requests for financing under the Second Credit Agreement. (*See id.*)

23.    Lucent's failure to pass-through services for the March 2001 quarter was likewise not a breach because Winstar and Wireless did not perform pursuant to that practice—they did not do what had previously been done, *i.e.*, they did not exchange purchase orders and invoices with Lucent, nor did Winstar pay Lucent in the amount of

151

B595

services performed by Wireless—that quarter. (*See* Findings ¶ 125); *First Investors Corp.*, 152 F.3d at 168; *Byfield*, 723 N.Y.S.2d at 231 .

> **F.    The Supply Agreement Between Lucent And Winstar Did Not Create Any Rights Or Obligations Between Lucent And Wireless.**

24.    Lucent's obligations pursuant to the Supply Agreement with Winstar are irrelevant to the Trustee's claim that Lucent breached the Subcontract or some subcontracting arrangement with Wireless because the Subcontract does not impose any obligations on Lucent with respect to the Supply Agreement. *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996) (to establish breach of contract, plaintiff must show, *inter alia*, that defendant breached some obligation imposed by the agreement allegedly breached).

25.    Moreover, the Supply Agreement itself provides that it cannot create any rights in third parties or any obligation to any third parties. (*See* Findings ¶ 135.)

26.    Finally, even if Lucent's Supply Agreement obligations were relevant to the Trustee's Subcontract claim, neither the Supply Agreement nor any other agreement obligated Lucent to build Winstar's network or to subcontract to Wireless to do so and therefore cannot support a breach of the Subcontract or any "subcontracting arrangement". (*See id.* ¶¶ 129-44.)

## II.    THE TRUSTEE FAILED TO MEET HER BURDEN OF PROVING THAT THE SIEMENS REPAYMENT WAS A PREFERENTIAL TRANSFER

27.    To prevail on the preference claim, the Trustee has the burden to prove that there was a "transfer of an interest of the debtor in property". *See* 11 U.S.C. § 547(b). The Trustee also must prove that (1) such transfer was to or for the benefit of Lucent; (2) such transfer was for or on account of an antecedent debt owed by Winstar before it was made; (3) such transfer was made while Winstar was insolvent; (4) Lucent was an insider

152

of Winstar; and (5) the transfer enabled Lucent to receive more than it would have received (A) if the case were a case under Chapter 7; (B) the transfer had not been made and (C) Lucent received payment of such debt to the extent provided by the provisions of the Bankruptcy Code. *Id.* § 547(b)(1)-(5). Three of those elements are in dispute: whether there was a transfer of Winstar's interest in property, whether Winstar was insolvent on the December 7, 2000, date of the challenged transfer and whether Lucent was an insider on that date. The Trustee failed to meet her burden of proof with respect to each of those three elements.

**A.    The Trustee Has Failed to Meet Her Burden of Proving That Winstar Was Insolvent on December 7, 2000.**

28.    Since the alleged preferential payment in question took place more than 90 days after Winstar declared bankruptcy, the Trustee bears the burden of proving that Winstar was insolvent on the date that Winstar paid Lucent the proceeds of the Siemens financing. 11 U.S.C. § 547(b)(3) & (g) (2005); *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121 (5th Cir. 1994); *Burdick v. Lee*, 256 B.R. 837, 841 (D. Mass. 2001).

29.    The Bankruptcy Code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation". 11 U.S.C. § 101(32)(A) (2005). Winstar's assets are valued at their fair market value as of the valuation date, whereas its liabilities are valued at their face value. *See Travellers Int'l AG v. Trans World Airlines, Inc.*, 134 F.3d 188, 196 (3d Cir. 1998).

30.    For the reasons set forth in the Findings of Fact, the weight of the evidence demonstrates that Winstar was solvent as of December 7, 2000. That conclusion is based on the following.

153

31.    The market approach has been widely recognized by the courts. *See, e.g.*,

*Okerlund v. United States*, 53 Fed. Cl. 341, 347-51 (Fed. Cl. 2002). Under that approach,

both parties applied the public market valuation, the market multiple method and the

comparable transaction method in evaluating Winstar's solvency as of December 7, 2000.

There is no dispute as to the use of those three methodologies.

32.    *First*, the public market valuation, which is the value of the company after

its debts are paid, was $1.1 billion on December 7, 2000. (Findings at ¶¶ 162-64.)

*Second*, both Collins and Scherf made calculations using the market multiple method that

showed Winstar to be solvent. (*Id.* at ¶¶ 174-79.) *Third*, Collins also found that the

comparable transactions method indicated that Winstar was solvent. (*Id.* at ¶¶ 184-87)

In addition, evidence from the private capital markets, which both experts agree is

relevant (*id.* at ¶ 202), supports the data from the public markets. In particular, the fact

that sophisticated investors, some of whom had employees sitting on Winstar's board of

directors, invested almost $500 million in Winstar on December 7, 2000, confirms the

market valuation of Winstar on that date. For those reasons, and other reasons outlined in

the Findings of Fact (at ¶¶ 160-212), the Court finds that the market approach indicates

that Winstar was solvent.

33.    Under the income approach, both parties agree that the discounted cash

flow method ("DCF") is an appropriate methodology for making a solvency

determination. Moreover, the DCF method has been recognized by courts as being

appropriate for that purpose. *See In re Value-Vulcan Mold Co.*, No. 99-4129, 2001 WL

224066, at * 3 (6th Cir. Feb. 26, 2001) (Appendix, Tab 6) ("discounted cash-flow

valuation [is] a well-recognized methodology for determining a business's going-concern

values"); *Okerland*, 53 Fed. Cl. at 351 (applying the DCF method and noting that where "the asset is a going concern . . . a terminal value . . . is calculated.") Collins calculated that Winstar was solvent under the DCF method because its assets, using two sets of projections, were valued at between $5.7 and $7.7 billion. For those reasons, and other reasons outlined in the Findings of Fact (at ¶¶ 213-35), the Court finds that the income approach indicates that Winstar was solvent.

34.    Under the asset approach, the fair market value of Winstar's assets is determined by how much those assets can be sold for "'in a reasonable time' assuming a 'willing seller' and 'willing buyer'". *Travellers*, 134 F.3d at 193-94 (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994)). Winstar must be valued at a "market value", and not at a "distress[ed] value". *Id.* at 193. While Scherf purported to determine the fair market value of Winstar under the asset approach, he relied exclusively on values determined after Winstar entered into bankruptcy and subsequently sold its assets in an auction. Those values necessarily reflect a distressed value.

35.    In addition, the case law recognizes that "the value of the thing . . . must be estimated as of the time when the act is done". *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929). If subsequent data were allowed to determine value, then "there would be little need to resort to the courts in valuation cases". *Okerland*, 53 Fed. Cl. at 355 (quoting *Estate of Gillet v. Comm'r of Internal Revenue*, 50 T.C.M. (CCH) 636, 645, 1985 WL 15056 (T.C. Aug. 7, 1985) (Appendix, Tab 4). Because Scherf relied upon subsequent evidence in determining the fair market value of Winstar's assets under his asset approach (Findings at ¶¶ 246-59), the Court finds that his analysis is not based on

155

reliable principles and methods, nor is it a reliable application of those principles and methods to the facts of this case.

36.   Overall, Collins concluded that Winstar had assets valued at a fair market value which exceeded the book value of its liabilities as of December 7, 2000, in the range of $179,000,000 to $1,553,000,000 after considering all of the standard valuation methods.

37.   Therefore, the Court concludes that the weight of the competent evidence from all of the accepted methodologies demonstrates that Winstar was solvent on December 7, 2000.  Therefore, the Trustee has failed to meet her burden of proving by the preponderance of the evidence that Winstar was insolvent as of December 7, 2000.

**B.    The Trustee Has Failed to Meet the Burden of Proving That the Siemens Repayment Was a Transfer of an "Interest of the Debtor in Property".**

38.   The Trustee bears the burden of proving by a preponderance of the evidence that the transfer of the Siemens loan proceeds to Lucent was a transfer of "an interest of the debtor in property".  11 U.S.C. § 547(b) and (g)(2005); *Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)*, 137 F.3d 1087, 1089 (8th Cir. 1998).  Where, as here, the funds of one creditor are used to pay down the debtor's debt to another creditor, there is no avoidable transfer because the loan never became part of the debtor's property. *See id.*

39.   The Trustee is wrong in her claim that earmarking needs to be pleaded as an affirmative defense.  The case that she cited for that proposition at trial (*see* Tr. at 17-25), *AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distrib., Inc.)*, 315 B.R. 24 (Bankr. D. Del. 2004), does not state or hold that earmarking is an affirmative defense.  The Court only refers to earmarking as an "affirmative defense" in that case because it was in fact pleaded as an affirmative defense by the defendant in that action. *See id.* at

156

B600

28, 29. Courts addressing the issue have held that earmarking is not an affirmative defense, but that the absence of earmarking is specifically a part of the plaintiff's proof of a preferential payment, and the burden is therefore on plaintiff to show that earmarking does not apply. *Heitkamp*, 137 F.3d at 1089; *In re Safe-T-Brake of S. Fla. Inc.*, 162 B.R. 359, 364-65 (Bankr. S.D. Fla. 1993). Furthermore, the Eighth Circuit has even heard and applied the earmarking doctrine when raised for the first time on appeal. *In re Ward*, 230 B.R. 115, 118-19 (BAP 8th Cir. 1999).

40.     The earmarking doctrine applies where: (1) "the new lender and a debtor agree to use loaned funds to pay a specified antecedent debt"; (2) "the agreement's terms are actually performed"; and (3) "the transaction viewed as a whole does not diminish the debtor's estate". *Heitkamp*, 137 F.3d at 1088-89; *see also McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 566 (8th Cir. 1988). The Trustee has failed to prove each of those three elements.

41.     *First*, both Siemens (the new lender) and Winstar (the debtor) knew and agreed when they entered into their agreement that the proceeds of the Siemens Loan would be transferred to Lucent to repay outstandings under the Lucent credit facility. (*See* Findings ¶¶ 264-66.) Winstar had no control over the disposition of those funds because the terms of the Second Credit Agreement required that they be paid to Lucent. (*See id.* ¶¶ 267, 289.)

42.     *Second*, the parties performed the agreements pursuant to their terms: Siemens and Winstar closed on the Siemens Loan on December 7, 2000, and Winstar paid over the proceeds of the Siemens Loan to Lucent that same day as required by the Second Credit Agreement. (*See id.* ¶ 267.)

157

B601

43. *Third*, there was no diminution of the Winstar estate because Winstar simply substituted one unsecured creditor (Siemens as the new lender under the Bank Loan) for an existing unsecured lender (Lucent). (*See id.* ¶¶ 268-69.) While Siemens, because it loaned pursuant to an amendment to the Bank Loan, technically had a security interest in certain Winstar assets, if the Trustee's solvency expert is credited, then the Siemens loan was in fact wholly unsecured on December 7, 2000, because the Bank Loan was already under-collateralized at the time that Siemens became a lender in that facility. (*See id.* ¶ 269.) Siemens did not receive any money or property in exchange for the loan and the "security exception" to earmarking does not apply. *See Brown v. First Nat'l Bank of Little Rock, Ark.*, 748 F.2d 490, 491-92 (BAP 8th Cir. 1984); 4 Collier on Bankruptcy ¶ 547.03[2].

44. The transfer of the Siemens Loan proceeds to Lucent satisfies all the elements of earmarking. The Trustee has not met her burden of showing that the transfer was a transfer of the interest of a debtor in property, and her preference claim must fail. *See Heitkamp*, 137 F.3d at 1088-89.

**C.    The Trustee Has Failed to Meet Her Burden of Proving That Lucent Was An Insider of Winstar on December 7, 2000.**

45. Because Winstar made the Siemens Repayment more than 90 days before its April 18, 2001, bankruptcy petition, the Trustee must show that Lucent was an "insider" of Winstar on the transfer date. *See* 11 U.S.C. 547(b)(4)(B), (g). The Trustee bears the burden of proving that Lucent was an insider. *See, e.g, McWilliams v. Gordon (In re Camp Rockhill, Inc.)*, 12 B.R. 829, 831 n.3 (E.D. Pa. 1981).

46. Whether Lucent was an insider of Winstar on any date other than December 7, 2000, is not the proper inquiry. To prevail, the Trustee must show that

158

Lucent was an insider on December 7, 2000. *See, e.g., Butler v. David Shaw, Inc.*, 72 F.3d 437, 441 (4th Cir. 1996) ("[T]he question before us is not whether [the defendant] was an insider, but rather whether [it] was an insider at the time of the challenged transfers."); McWilliams, 12 B.R. at 834 ("[T]he existence of an insider relationship *before* the date of the challenged transfer is not the proper test to be applied under the preferential section. The language of section 547(b)(4)(B) clearly states that an insider relationship is to be determined on the *exact date* of the challenged transfer.").

47.    Congress' "purpose" in enacting the power to avoid preferential transfers was to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor". *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (quotation omitted). Congress made insiders subject to a year-long preference period "[b]ecause of the concern that corporate insiders (such as officers and directors) who are creditors of their own corporation have an unfair advantage over outside creditors". *DG Creditor Corp. v. Am. Express Bank Ltd. (In re DG Acquisition Corp.)*, 188 B.R. 918, 923 (Bankr. D. Del. 1995) (quotation omitted). As the court explained in *Hirsch v. Tarricone (In re Tarricone)*, 286 B.R. 256, 264-65 (Bankr. S.D.N.Y. 2002): "[T]he reason for the extended preference period is that insiders are far more likely to be given preferential treatment in debt repayment than creditors who deal with the debtor at arm's length."

48.    The Bankruptcy Code specifically identifies certain persons as *per se* insiders of corporate debtors. Thus, members of a corporate debtor's board of directors, its officers and general partners, partnerships in which the debtor is a general partner, "persons in control" of the debtor, and relatives of directors, officers, general partners and

159

"persons in control" of a debtor always are insiders. *See* 11 U.S.C. § 101(31)(B). In addition, affiliates and managing agents of the debtor are insiders. *See id.* §§ 101(31)(E), (F). Congress presumed that *per se* insiders' transactions with the debtor involve unfair influence or advantage, without requiring a specific showing that the allegedly preferential transfer itself was improper. *See, e.g., Hirsch*, 286 B.R. at 264-65; *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69-70 (B.A.P. 9th Cir. 1991).

### i.    Lucent was not a *per se* insider.

49.    Lucent did not have any representatives on Winstar's board, no Lucent employee was an officer of Winstar, Lucent was not a general partner of Winstar, Lucent was not a general partnership in which Winstar was a general partner and Lucent was not a relative of a general partner, director, officer or "person in control" of Winstar. Nor was Lucent an affiliate or managing agent of Winstar. (*See* Findings ¶¶ 283-84.) In addition, the other traditional indicia of insider status are absent here. (*See* Findings ¶¶ 271-84.) Thus, Lucent only could have been a *per se* insider of Winstar if it was "a person in control" of Winstar, within the meaning of 11 U.S.C. § 101(31)(B)(iii).

50.    A "person in control" is one who has sufficient power over the debtor either to "exert[] dominion and control" over the debtor or to "exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets". *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 743 (D. Del. 2003) (citations omitted); *see also Gray v. Manklow (In re Optical Techs., Inc.)*, 252 B.R. 531, 539 (M.D. Fla. 2000) ("[T]o be determined to be a person in control, the person must hold the ability to control the

160

company so as to dictate corporate policy and disposition of corporate assets without limit".).

51.    Here, the record amply demonstrates that Lucent neither possessed nor exercised the requisite dominion and control over Winstar on December 7, 2000, or at any other time.  It is undisputed that Lucent did not exercise day-to-day control over Winstar's business, nor is there any claim that Lucent oversaw Winstar's management decisions.  There is no allegation that all of Winstar's transactions with Lucent were non-arm's length transactions; rather, the Trustee attacks only some of the parties' transactions.  Further, when those transactions that she attacks are examined, it is clear that they were arm's length dealings between Lucent and Winstar.  (*See* Findings ¶¶ 338-60, 389-421.)  It also is clear from other transactions that Lucent did not have control over Winstar.  The Siemens Loan itself disproves Lucent's alleged control over Winstar, as that was a transaction Lucent viewed as unfavorable and which it opposed.  (*See* Findings ¶ 285-316.)  If Lucent had the power to "unquantifiably dictate" Winstar's "corporate policy", it would not have permitted Winstar to enter into the Siemens Loan.

52.    Moreover, Winstar entered into numerous other transactions both before and after the Siemens Loan that were contrary to Lucent's interests and that Lucent would not have permitted if it had the power to unquantifiably dictate Winstar's corporate policy.  For example, if Lucent exercised dominion and control over Winstar it would not have:

- permitted Winstar to borrow hundreds of millions of dollars to buy equipment from Lucent's competitors over the course of the parties' relationship, including approximately $90 million (out of a total approximate borrowing of $92 million) for non-Lucent content on December 29, 2000 (*see* Findings ¶¶ 423-24);

161

- agreed to replace the parties' 1998 Credit Agreement with the far-less-favorable Second Credit Agreement in May 2000 (*see id.* ¶¶ 425-28);

- permitted Winstar to borrow approximately $250 million under the Second Credit Agreement in the last week of the June 2000 quarter, months earlier than Winstar had recently represented that it would first borrow under the new loan (*see id.* ¶¶ 429-31); and

- permitted Winstar to veto Lucent's sale on very favorable terms of the approximately $250 million loan it made to Winstar in June 2000 (*see id.* ¶ 432).

### ii.    Lucent was not a non-*per se* insider.

53.    Lucent also was not a "non-statutory" or "non-*per se*" insider on

December 7, 2000. Non-*per se* insiders are persons that are not specifically mentioned in

the Bankruptcy Code definition of insiders, but who nevertheless are treated as insiders

based on the circumstances of a particular case. *See, e.g., Hirsch*, 286 B.R. at 262.

However, as discussed below, unlike *per se* insiders, who are insiders for all purposes,

non-*per se* insiders only are insiders to the extent that treating them as such prevents the

"unfair advantage" against which the preference avoidance power was designed to

protect.

### a.    The Siemens Repayment is the most relevant transaction.[9]

54.    The most relevant transaction in determining whether Lucent was a non-

*per se* insider of Winstar on December 7, 2000, is the Siemens Repayment itself. *See*

*Pheiffer v. Thomas (In re Reinbold)*, 182 B.R. 244, 246-47 (D.S.D. 1995) (defendant was

not an insider despite the parties' relationship because "the transfer in question" was not

---

[9] Lucent respectfully submits that, for the reasons set forth in its summary judgment papers and in its papers support of its *in limine* motion No. 4, the Siemens transaction is the only relevant transaction.

162

"anything less than an arm's length transaction"). The parties' actual dealings on December 7, 2000, provide the best evidence of their relationship on that date.

55.    As the court explained in *Hirsch*, "the task of this Court is to examine all of the evidence and to determine, based upon the particular facts in this case, whether [the defendant's] loan to [the debtor] and its repayment within one year prior to [the] bankruptcy filing was a commercially-motivated, arm's length transaction". 286 B.R. at 263. Only if challenged transaction was not a commercially motivated, arm's length transaction, the *Hirsch* court explained, would the court have to examine the "relationship of the parties". *Id.* at 263. Numerous other courts have made clear that for the defendant to be a non-*per se* insider based on control, the challenged transaction itself must have been the product of its alleged control. *See ABC Elec. Servs. v. Rondout Elec. (In re ABC Elec. Servs.)*, 190 B.R. 672, 676 (Bankr. M.D. Fl. 1995) (insider status determined by, *inter alia*, "considering . . . whether the transaction between the transferee and the debtor was conducted at arm's length"); *Three Flint Hill Ltd. P'shp. v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'shp.)*, 213 B.R. 292, 298 (D. Md. 1997) (non-*per se* insider status determined by, *inter alia*, "whether the transaction between the transferee and debtor was conducted at 'arm's length'"); *Rush v. Riddle (In re Standard Stores, Inc.)*, 124 B.R. 318, 324 (Bankr. C.D. Cal. 1991) (court must determine whether the challenged transaction was not conducted [at] arm's length).

56.    The Court is not aware of any decision finding a defendant to be a non-*per se* insider on the basis of its control over the debtor without a showing that the challenged transaction itself was the product of the defendant's control.

163

B607

57. Accordingly, Lucent only was a non-*per se* insider if it enjoyed an "unfair advantage" over other creditors with respect to the Siemens Repayment. Lucent enjoyed no such unfair advantage over other creditors with respect to the Siemens Repayment because Winstar made the repayment at arm's length. The Second Credit Agreement required the Siemens Repayment because the Siemens Loan was structured as an increase to the Bank Loan and Lucent did not dictate or otherwise have any involvement in structuring the Siemens Loan that way. (*See* Findings ¶¶ 289-91.)

58. Lucent also did not compel Winstar to obtain the Siemens Loan. Winstar procured financing from Siemens because it wanted to buy equipment and services from Siemens, a Lucent competitor. (*See id.* ¶ 293.) Indeed, Winstar kept its Siemens discussions secret from Lucent for months. (*See id.* ¶ 303.) When Winstar did finally tell Lucent about the Siemens Loan, Lucent was displeased, because the new Siemens Loan would be senior to Lucent's financing, it would weaken Lucent's already inadequate collateral position, and Winstar would be committing to buying a significant amount of equipment and services from Lucent's competitor. (*See id.* ¶¶ 304-10.) Lucent even wanted to block the deal by withholding its consent, but Winstar did not need Lucent's consent. (*See id.* ¶ 306.)

59. In addition, Lucent did not force Winstar to draw the Siemens Loan immediately. Winstar always intended to draw the loan down immediately upon closure. (*See id.* ¶ 311-14.) Nor did Lucent use the Transition Agreement negotiations or its Refinancing Notice rights under the Second Credit Agreement to compel the Siemens Repayment. (*See id.* ¶¶ 315-21.)

164

60.   Absent special circumstances not present here, a lender continues to deal at arm's-length with a borrower even when it exercises financial control that is "incident to the[] creditor-debtor relationship". *Markowitz v. Heritage Bank, N.A. (In re Jefferson Mortgage. Co.)*, 25 B.R. 963, 970 (Bankr. D.N.J. 1982); *see also Tidwell v. Amsouth Bank, N.A. (In re Cavalier Homes of Georgia, Inc.)*, 102 B.R. 878, 883 (Bankr. M.D. Ga. 1989). "[C]ourts which have considered the insider preference issue as between a debtor and a creditor-bank have adopted a view that a creditor-lending institution must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider." *Huizar v. Bank of Robstown (In re Huizar)*, 71 B.R. 826, 832 (Bankr. W.D. Tx. 1987).

61.   Even a lender's superior bargaining power over a distressed borrower is just such an incident of the lender-borrower relationship, and thus does not transform the lender into an insider. *See, e.g., Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991) ("'The fact that a debtor has a weak bargaining position and few choices does not indicate that the other party is an insider . . .'" (quoting *Badger Freightways, Inc. v. Continental Ill. Nat'l Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 982 (Bankr. N.D. Ill. 1989)); *Schick Oil & Gas, Inc. v. Federal Deposit Ins. Corp. (In re Schick Oil & Gas, Inc.)*, 35 B.R. 282, 285 (Bankr. W.D. Okla. 1983) ("Simply because the bank had financial power over the debtor does not make the bank an insider for that reason. The type of control alluded to by the trustee was an incident of their debtor-creditor relationship."). That is so even where the lender's power is so great that it can "compel payment of its debt", *Johnson*, 124 B.R. at 530, or obtain "concessions" from the borrower, *Tidwell*, 102 B.R. at 883-84; *Markowitz*, 25 B.R. at 970.

165

**B609**

62.    Rather, for a lender to be treated as an insider, it must have been "in a position to make the decision authorizing" the allegedly preferential transaction. *Johnson*, 124 B.R. at 530; *see also Badger*, 106 B.R. at 982 ("[T]he key issue is whether the lending institution, like the corporate officer, is in a position to make the decision authorizing the transfer."). Accordingly, mere pressure is insufficient; the debtor must have been the "mere alter ego" or "instrumentality" of the lender, unable to exert managerial control over its own business. *Burner v. Security State Bank (In re Burner)*, 109 B.R. 216, 226 (Bankr. W.D. Tx. 1989); *see also Tidwell*, 102 B.R. at 883 (plaintiff must show that lender "exercised . . . managerial control over Debtor or required that Debtor obtain its advice or consent before exercising managerial decisions").

63.    In *Johnson*, for example, the court ruled that a lender was not an insider, even where the debtor allegedly could not obtain alternative financing and the lender allegedly would have "shut down Debtor's operations" unless it agreed to the challenged transfer. 124 B.R. at 530. As the court explained: "[E]ven if the Bank did have the power to shut down Debtor's operations, such control was financial influence as opposed to operating or managerial control, and as such would not cause the Bank to be an 'insider' . . . ." *Id.*; *see also Herzog v. Leighton Holdings, Inc. (In re Kids Creek Partners, LP)*, 212 B.R. 898, 929 (Bankr. N.D. Ill. 1997) ("[C]ontrol does not exist simply because bargaining power was greatly skewed in favor of the lender; otherwise this would invariably be true whenever a . . . lender is on the verge of terminating debtor's operations.").

64.    Similarly, a creditor who exercises power obtained by virtue of a pre-existing, arm's-length agreement with the debtor is not an insider. In *Committee of*

166

*Unsecured Creditors for Pittsburgh Cut Flower Co. v. Hoopes (In re Pittsburgh Cut Flower Co.)*, 124 B.R. 451 (Bankr. W.D. Pa. 1991), the court rejected the claim that a former limited partner's sale of his partnership interest to the debtor was not at arm's length, despite the fact that the debtor, which was in financial distress, only bought the partnership interest because it was "eager" to sell certain partnership property and the alleged insider was "in a position to thwart debtor's efforts" as long as he remained a limited partner. 124 B.R. at 457, 460. The court reasoned that "the partnership, as originally created, was between relative strangers whose mutual needs had brought them together for a specific business purpose." *Id.* at 460. As such, "[a]ny advantage that defendant ultimately derived from the original partnership agreement and subsequent agreements was achieved through arm's-length transactions. Clearly, at the date of initial execution of the agreements and through the various amendments, defendant was in no position to exercise dominion and control over debtor." *Id.*; *see also Germain v. RFE Inv. Partners IV, LP (In re Wescorp, Inc.)*, 148 B.R. 161, 164 (Bankr. D. Conn. 1992) (lender was not an insider because its "potential control over the debtor was . . . established under the terms of an arms-length creditor-debtor agreement").

65.    The present case is directly analogous to *Johnson* and *Pittsburgh Cut Flower*. At most, Lucent was a lender with bargaining power. There is no evidence that it managed or operated Winstar's business or that Winstar was Lucent's "alter ego" or "instrumentality". In addition, as in *Pittsburgh Cut Flower*, any "leverage" Lucent may have had over Winstar was derived from its position as Winstar's lender and supplier by virtue of the Supply Agreement and Credit Agreements, and there is no suggestion that those contracts were not arm's length. Thus, as in *Pittsburgh Cut Flower*, any "control"

167

or "leverage" that Lucent allegedly had over Winstar was incident to prior arm's length agreements between the parties and cannot, as a matter of law, make Lucent an insider.

66.    The parties' so-called "strategic relationship" also did not transform Lucent into an insider of Winstar. The record shows that that term had no particular meaning. (*See* Findings ¶ 302.) The Court declines to read any legal significance to that term under the Bankruptcy law.

   **b.    Lucent was not a non-*per se* insider even if the Court does
          consider transactions other than the Siemens Repayment.**

67.    The Court concludes that Lucent was not a non-*per se* insider on December 7, 2000, even taking into consideration the parties' other transactions.

68.    The Trustee is mistaken in her characterization of the September 1999 through December 2000 transactions that she claims show that Lucent was an insider on December 7, 2000.

69.    *First,* Lucent underwent significant changes between September 2000 and December 7, 2000, such that the parties' prior dealings are not probative of their relationship on December 7. Not only did the key Lucent decision makers regarding Winstar change, but Lucent changed its business attitude in that period. (*See* Findings ¶¶ 328-37.)

70.    *Second,* Lucent did not force Winstar to buy equipment it did not need in end-of-quarter deals. Winstar exercised its business judgment to purchase the material it expected to use over a reasonable period. (*See id.* ¶ 341-47.) In addition, Winstar was able to extract substantial concessions and other benefits from Lucent in the end-of-quarter transactions. (*See id.* ¶¶ 348-60.) That Winstar ultimately did not deploy all the Lucent equipment it purchased does not show that the equipment was unneeded when

B612

purchased. Delays of third-party vendors, delays with site-acquisition and other miscellaneous delays prevented Winstar from deploying some equipment as quickly as it originally intended. (*See id.* ¶¶ 361-75.)

71.    *Third,* Lucent's invoices to Winstar were not "vague" and do not demonstrate a lack of arms'-length dealings. Lucent's invoices to Winstar were not intended to itemize each piece of equipment sold and each service rendered, and were typical of its invoices to other customers who placed orders for similar equipment and services. (*See id.* ¶ 385.) Moreover, the level of detail in Lucent's invoices to Winstar largely were a function of the detail Winstar provided to Lucent in its purchase orders. (*See id.* ¶ 386.)

72.    *Fourth,* the parties' "bill and hold" transactions served Winstar's business objectives by allowing Winstar to utilize Lucent's staging centers. (*See id.* ¶ 390, 392-402.) The propriety of Lucent's accounting for the bill and hold transactions is irrelevant to whether Winstar achieved a rational business objective from the deals. (*See id.* ¶ 403-05.)

73.    *Fifth,* far from reflecting Lucent's purported control over Winstar, the September 2000 software pool transaction shows the significant leverage that Winstar had over Lucent at the time. In that transaction, Winstar negotiated for, among other things, substantially discounted pricing on hubs and B's--pricing that was so low that the Winstar senior executive who negotiated the deal testified that he would "almost sell [his] soul for that". (DX 699 at 25:40-26:12; *see also* Findings ¶ 413-16.) Accordingly, after an extensive investigation of the September 2000 transaction, the SEC concluded that Winstar "understood Lucent's critical need to recognize revenue in its fiscal year ending

169

**B613**

September 30, 2000, and used that leverage to gain very favorable additional terms for Winstar." (DX 739 ¶ 54; *see also* Findings ¶ 416.)

74. *Sixth*, other transactions and events between December 1999 and September 2000 are inconsistent with the notion that Lucent had the power to control Winstar in that period. (*See* Findings ¶ 422-32.)

### D. Lucent's Affirmative Defense of New Value

#### i. If the Court determines that the Siemens repayment was a preferential payment, Lucent has met its burden that it provided new value to Winstar.

75. If the Court determines that the Siemens repayment was a preferential payment pursuant to 11 U.S.C. § 547(b), then in order for Lucent to prevail on its affirmative defense that it provided "new value" to Winstar, it must prove that: (i) Lucent provided goods or services to Winstar after December 7, 2000; (ii) those goods or services were provided on an unsecured basis; and (iii) Winstar never paid Lucent for those goods or services. *See* 11 U.S.C. § 547(c)(4); *see also Claybrook v. Pizza Hut, Inc. (In re Discovery Zone, Inc.)*, 300 B.R. 856, 860-61 (Bankr. D. Del. 2003). Under 11 U.S.C. § 547(g), Lucent has met its burden that it provided Winstar with "new value" by establishing each of those three elements.

76. *First*, Lucent provided Winstar with $133,486,248.48 in equipment, software and services between December 8, 2000 (the date after the alleged preferential payment), and April 18, 2001 (the date of Winstar's bankruptcy). (*See* Findings ¶¶ 449-56.) Lucent provided $28,411,318.48 in goods and services (*see* Findings ¶¶ 449-52); $42,750,000.00 worth of software licenses (*see* Findings ¶¶ 453-54; *see also In re Discovery Zone, Inc.*, 300 B.R. at 861 (license fees were prorated for the relevant time

170

period)); and $62,324,930.00 in additional financing for Winstar's network buildout services. (*See* Findings ¶¶ 455-56.)

77.    Vernon Terrell, the Lucent employee with extensive personal knowledge of Lucent's North American invoicing and accounts receivable process for the relevant period, testified that the invoices for $28,411,318.43 establish that Lucent shipped those corresponding goods and services between December 8, 2000, and April 18, 2001 (*see* Findings ¶ 457.)

78.    Similarly, Terrell testified that Lucent provided Winstar with invoices for $67.5 million in software licenses during the same period (*see* Findings ¶ 458); on a pro-rata basis $42.75 million of that amount applies to the period from 12/8/00 through 4/18/01. (*See* Findings ¶ 453.)  Copies of invoices accompanied by the sworn testimony of the employee responsible for collections constitutes good evidence for a claim that "new value" has been provided, but not paid for.  *See In re Trans-End Tech. Inc.*, 228 B.R. 181, 186-87 (Bankr. N.D. Ohio 1998) (finding combination of affidavit by Manager of Collections and invoices constitute proper evidence for a claim of unpaid new value).  *In re TWA Inc. Post Confirmation Estate*, 305 B.R. 221, 228 (Bankr. D. Del. 2004) (finding affidavit of Senior Property Manager and spreadsheet listing invoices (with no meaningful analysis thereof) insufficient evidence to satisfy burden of proof on defense of new value) is not inconsistent.  Evidence on this record includes the actual invoices at issue—not mere spreadsheets summarizing invoices.  (*See* Findings ¶¶ 449, 453.)  Further, Vernon Terrell, who was responsible for Lucent's North American billing operation and accounts receivable, testified as to the significance of those invoices, and

171

thereby provided meaningful analysis of those invoices (*see* Findings ¶¶ 451-52, 457-58), establishing proper evidence for a claim of unpaid new value.

79.    Finally, Lucent funded Winstar's $62,324,930.00 December 29, 2000 draw request in the relevant period, and this value inured "to or for the benefit of" Winstar. (11 U.S.C. § 547(c)(4); *see also* Findings ¶ 456.)

80.    *Second*, none of the $133,486,248.48 in equipment, software and services Lucent provided Winstar was secured. (*See* Findings ¶¶ 461-67.) According to the terms of the Second Credit Agreement, Lucent had a security interest only in "Collateral"—the equipment Winstar purchased through financing under the Second Credit Agreement. (DX 29, Exhibit I at 2 (§ 1.02).) The record shows that Winstar never submitted draw requests to pay for Lucent's invoices on the approximately $28 million in goods and services or $42.75 million in software licenses. Since none of the approximately $28 million in goods and services, or $42.75 million (out of $67.5 million in invoices) in software licenses was financed under the Second Credit Agreement, none of that value is secured. (*See* Findings ¶¶ 461-66.)

81.    Although Lucent's October 11, 2001, Proof of Claim in this action was styled as a secured proof of claim and included the invoices for goods and services and software licenses for which Winstar had not paid Lucent (*see* Findings ¶ 467; *see also* PX 340 at 1), that Proof of Claim also included the express condition that: "to the extent that all or a portion of those claims is not secured, this proof of claim also shall be deemed to be a proof of claim for unsecured claims in such amount". (*See* Findings ¶ 467.) Accordingly, Lucent is not hereby precluded from arguing that those amounts are secured, indeed the *Federal Rules of Civil Procedure* expressly permit such arguments in

172

**B616**

the alternative. (*See* Fed. R. Civ. P. 8(e) ("A party may set forth two or more statements of a claim or defense alternatively or hypothetically. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency".))

82.    Further, filing a secured proof of claim does not mean that Lucent has a secured claim, in fact, it is irrelevant: "[n]ot only are proofs of claim not conclusive on the question of secured status, they are irrelevant to it" (*see In re Robert W. Earley,* 305 B.R. 837, 840 (Bankr. N.D. Ill. 2004). Secured proofs of claim are irrelevant because the claims allowance process under 11 U.S.C. §§501 and 502 says "nothing at all about whether the claim is secured or unsecured". (*Id.*) Therefore, by filing its proof of claim, Lucent "established that it had a valid claim . . . [b]ut the proof of claim did not establish that the claim was secured", instead, "the valuation of collateral and the determination of secured status require judicial action". (*Id.* at 840-41.)

83.    Finally, although Lucent provided Winstar with $62,324,930.00 in additional financing under the Second Credit Agreement to pay for Winstar's network buildout services, it was effectively unsecured. Lucent only had a security interest in the specific assets of equipment—not services—financed under the Second Credit Agreement. (*See* Findings ¶ *id.*) As of December 2000, however, Lucent's collateral position was significantly less than Winstar's outstanding loan balance. (*See* Findings ¶ *Id.*) Thus, when Winstar financed an additional $62,324,930.00 in December 2000, because that incremental financing was exclusively for services, it provided no corresponding increase for Lucent's collateral base, and was effectively an undercollateralized loan. (*See Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.*), 393 F.2d 60, 65 (2d Cir. 1968.)

173

84.    If the Court credits the testimony of the Trustee's solvency expert that Winstar was insolvent on December 7, 2000 (*see* Findings ¶¶ 147-263), then the appropriate inquiry for this court is the extent of Lucent's security in the Winstar bankruptcy estate. *See Intercontinental Polymers, Inc. v. Equistar Chems., L.P. (In re Intercontinental Polymers, Inc.)*, slip op. at 16 (Bankr. E.D. Tenn. Mar. 31, 2005) (Appendix, Tab 5) (holding that "§ 547(c)(4)(A) prevents the application of new value against prior preferences only if that new value is subject to a security interest that is valid and enforceable at the time of the bankruptcy") (citing *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336 (5th Cir. 1999)). If Lucent had no security interest at the time of the Winstar bankruptcy case, then "section 547(c)(4)(A) is facially inapplicable". (*See id.*) Since Lucent's collateral was sold in the bankruptcy case for approximately $21 million (*see* PX 507 at ¶¶ 2, 6; PX 508 at ¶ 3; PX 506 at ¶1), the Court should conclude that all monies Lucent loaned Winstar in excess of $21 million were wholly unsecured.

85.    In addition, the collateral should be applied to the oldest of the draws that remain outstanding. *See Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242, 253-54 (Bankr. D. Conn. 2005) (citing *L&B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 91 (2d Cir. 1988) ("As a general rule, payment is applied to debts in the order in which they accrue.")). Thus, for the purpose of determining new value, it would be appropriate to consider, not only the approximately $133 million Lucent gave Winstar after December 7, 2000, in equipment, software and services, but the approximately $175 million that Lucent funded under the Second Credit Agreement after December 7, 2000 (*see* Findings ¶ 310), which was

174

unsecured because immediately prior to making those advances Winstar's debt to Lucent was more than $500 million, (see DX 544) an amount that clearly exceeds the approximately $21 million worth of collateral.

86.    *Third*, it is undisputed that Winstar never paid Lucent for the $133,486,248.48 in equipment, software and services it provided Winstar between December 8, 2000, and April 18, 2001. (*See* Findings ¶¶ 457-60.)

87.    Accordingly, in the event that the Court determines that the Siemens repayment was a preferential payment pursuant to 11 U.S.C. § 547(b), Lucent is entitled to set off against that claim for the "new value" it provided Winstar between December 8, 2000 and April 18, 2001, in the amount of $133,486,248.48. Pursuant to 11 U.S.C. § 547(c)(4), the amount recoverable by the Trustee should be likewise reduced. *See In re Discovery Zone*, 300 B.R. at 860-61.

## III.    THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM (COUNT XI)

88.    Pursuant to § 510(c) of the Bankruptcy Code, the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim". *See* 11 U.S.C. § 510(c).

89.    Equitable subordination is "an unusual remedy which should be applied only in limited circumstances". *Cohen v. The KB Mezzanine Fund II, L.P. (In re Submicron Sys. Corp.)*, 291 B.R. 314, 327 (Bankr. D. Del. 2003).

90.    Because Lucent was not an insider (*see supra* ¶ 45-74), the Trustee must prove that Lucent "engaged in gross or egregious misconduct such as fraud, spoliation or overreaching". *Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*, 284 B.R. 415, 428 (Bankr. E.D. Pa. 2002) (internal citations omitted). That is an extremely stringent standard; mere "wrongful" conduct by a non-insider is insufficient to

175

warrant equitable subordination. *In re After Six, Inc.*, 177 B.R. 219, 232 (E.D. Pa. 1995) ("Even if the [defendant's] decision could be classified as 'wrongful' in light of its status as a creditor, this conduct certainly falls far short of he 'egregious conduct' standard that applies to non-insiders in order to justify subordination of their claims.") As the Seventh Circuit observed: "Cases subordinating the claims of creditors that dealt at arm's length with the debtor [and thus are not insiders] are few and far between." *Kham & Nate's Shoes No. 2 Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990).

91.    The only conduct that the Trustee's complaint alleges justifies equitable subordination relates to the Siemens Loan. The SAC alleges that Lucent "engages in fraudulent or inequitable conduct by using its domination and control over Winstar to pressure the company to take on $200 million dollars of additional senior, secured debt in December 2000, and then requiring Winstar to turn over the net proceeds of that financing to Lucent, a partially-secured creditor, to reduce the amount of Lucent's unsecured debt". (*See* SAC ¶ 202, A.D.I. 69.) The Trustee further alleges that Lucent's conduct "damaged Winstar's other creditors" and "unfairly benefited Lucent by reducing the amount of unsecured debt at the expense of Winstar's other creditors." (*Id.* ¶ 204.)

92.    However, as discussed above, Winstar obtained the Siemens Loan for its own business reasons, and it made the Siemens Repayment because it was contractually required to do so.

93.    Lucent's exercise of its contract right to receive the Siemens Repayment cannot constitute inequitable conduct. *See Kham & Nate's Shoes*, 908 F.2d at 1356 ("[W]e are not willing to embrace a rule that requires participants in commercial

176

transactions not only to keep their contracts but also do 'more'—just how much more resting in the discretion of a bankruptcy judge assessing the situation years later.")

94.    The Trustee cannot rely on other transactions besides the Siemens Loan and Repayment to support her equitable subordination claim, as she did not plead any "fraudulent or inequitable" conduct besides the Siemens Loan and Repayment, nor did she allege that any other Lucent conduct damaged other creditors or benefited Lucent. (*See* SAC ¶¶ 201-06.)

## IV.    LUCENT'S FRAUD COUNTERCLAIM (COUNTERCLAIM COUNT 5)

### A.    Winstar Defrauded Lucent in Its January 26, 2001 and February 23, 2001 Certified Borrowing Requests that Materially Misrepresented Winstar's Compliance with the CAPEX Covenant of the Second Credit Agreement.

95.    Under New York common law, for Lucent to succeed on its counterclaim that Winstar defrauded Lucent in its January 26, 2001 and February 23, 2001, certified borrowing requests, Lucent must prove that: (i) Winstar materially misrepresented it was in compliance with the Second Credit Agreement's § 6.07(c) CAPEX covenant prior to and including 2001; (ii) Winstar did so knowing its representation of compliance was false, or in reckless disregard of its falsity; (iii) Winstar offered the false certification to deceive or induce Lucent to act upon it; (iv) Lucent relied on Winstar's material misrepresentation; (v) doing so caused Lucent damages; and (vi) Lucent's damages were a natural and probable—or foreseeable—consequence of Winstar's misrepresentation. *See Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001). Lucent has met its burden by proving each of these six elements.

96.    *First*, the certified borrowing requests that Winstar submitted to Lucent on January 26, 2001, and February 23, 2001 (DX 10 and DX 11) were false when certified

177

B621

because Winstar was not in compliance with its $1,300,000,000.00 CAPEX covenant (DX 29 at 113 (§ 6.07(c))) for the year 2000. Bill Zlotnick, Vice President for Program Management at Winstar, and Winstar's CAPEX "compliance officer", said on January 18, 2001, that Winstar was $11 million over its CAPEX covenant in 2000, and he never knew that Winstar came under its $1.3 billion CAPEX limit. (*See* Findings ¶ 485.) There is no evidence on the record that Winstar ever complied with its year 2000 CAPEX covenant. (*See* Findings ¶ 490.) Because failure to comply with the CAPEX covenant of § 6.07(c) constitutes an event of default under the Second Credit Agreement, in certifying its borrowing requests in January and February of 2001 (DX 10 and DX 11), Winstar made material misrepresentations to Lucent.

97.    *Second*, not only did Winstar materially misrepresent its CAPEX compliance in its January and February 2001 borrowing requests, it did so knowing that its representations were false or in reckless disregard of their falsity. Senior officer Fred Rubin, Winstar's Treasurer who certified the January and February 2001 requests for borrowing on behalf of Winstar (Stip. Facts ¶ 25; *see also* DX 10 at 3WC 0008193; DX 11 at 3WC 0008220), did so knowing those representations were false. Not only did Winstar's Senior Management know as early as October of 2000 that the company was going to exceed its CAPEX covenant (*see* Findings ¶475), by the final days of fiscal year 2000 and the beginning of 2001, it understood that Winstar was millions of dollars over its CAPEX limit. (*See* Findings ¶¶ 476-89.)

98.    At minimum, Fred Rubin certified the January and February 2001 draw requests on behalf of Winstar in reckless disregard of the falsity of those representations. Rubin testified that he took no affirmative action to confirm Winstar was in compliance

178

with the financial covenants—including CAPEX—of the Second Credit Agreement, but believed that Winstar was in compliance because no one told him otherwise. (*See* Findings ¶ 507.) However, Rubin knew on January 15, 2001 that Lucent needed to "make" its 2000 CAPEX and was therefore not in compliance. (*See* Findings ¶ 487.)

99.    *Third*, Winstar misrepresented compliance with its CAPEX covenant to borrow money from Lucent because Lucent was under no obligation to loan money under the Second Credit Agreement in the event of Winstar's Default. (*See* Findings ¶ 472; *see also* DX 29 at 121 (Art. VII (c)); DX 29 at 81 (§ 4.03(b)).) Thus, Winstar induced Lucent to act upon its material misrepresentations, and allow it to draw down $48,735,275.74 in January 2001 and $34,281,745.44 in February 2001.

100.    *Fourth*, Lucent did in fact rely on Winstar's material misrepresentations. Were it not for Winstar's certifications of compliance with § 4.03 of the Second Credit Agreement, Lucent would not have been required to honor Winstar's requests for borrowing. (*See* Findings ¶¶ 472-73.) Further, Michael Montemarano, Vice President of Finance for Worldwide Marketing Sales at Lucent, testified that had it known Winstar was out of compliance, Lucent would not have loaned Winstar a total of $83,017,021.18 in January and February of 2001. (*See* Findings ¶ 500.)

101.    *Fifth*, Lucent was damaged by its reliance on Winstar's falsely certified borrowing requests by loaning Winstar $48,735,275.74 in January 2001, and $34,281,745.44 in February 2001 (*see* Findings ¶ 496-98), because Lucent never received payment for the total amount of $83,017,021.18 it loaned Winstar. (*See* Findings ¶ 504; *see also* DX 46 at Exhibit A.4.)

179

102. *Sixth*, Lucent's $83,017,021.18 in damages is the foreseeable consequence of Winstar's material misrepresentations. Indeed, Winstar certified false borrowing requests precisely in order to borrow approximately $83 million from Lucent. Beth Perricone, former Senior Manager and Interim Managing Director for Project Finance North America at Lucent testified that: "if [Winstar] was in compliance as certified typically by an officer of the company [Lucent] would fund the obligations". (*See* Findings ¶ 502.)

103. Accordingly, Lucent is entitled to recover "out of pocket" damages in the amount of $83,017,021.18, which Lucent allowed Winstar to borrow as a consequence of its misrepresentations that it was not in default under the Second Credit Agreement. (DX 29 at 81 (§ 4.03(b)); *See Orbit Holding Corp. v. Anthony Hotel Corp.*, 121 A.D.2d 311, 315, 503 N.Y.S.2d 780, 783 (N.Y. App. Div. 1986)).

## V. LUCENT'S NEGLIGENT MISREPRESENTATION COUNTERCLAIM (COUNTERCLAIM COUNT 6)

### A. Winstar Made Negligent Misrepresentations To Lucent In Its January 26, 2001 And February 23, 2001 Certified Borrowing Requests That It Was In Compliance With The CAPEX Covenant Of The Second Credit Agreement When It Was Not In Compliance.

104. Under New York common law, for Lucent to succeed on its counterclaim that Winstar made negligent misrepresentations to Lucent in its January 26, 2001 and February 23, 2001 certified borrowing requests, Lucent must prove that: (i) Winstar was "careless in imparting words" to Lucent concerning its compliance with the Second Credit Agreement's financial covenants, including CAPEX; (ii) Winstar expected Lucent to rely on those words; (iii) Lucent acted (or failed to act) in reasonable reliance on those words; (iv) Lucent did so to its detriment; and (v) Winstar expressed its words to Lucent directly, with whom Winstar was bound in privity. *Dallas Aerospace Inc. v. CIS Air*

180

*Corp.*, 352 F.3d 775, 788 (2d Cir. 2003); *Kimmel v. Schaefer*, 89 N.Y.2d 257, 675 N.E.2d 450, N.Y.S.2d 715 (N.Y. 1996). Lucent has satisfied its burden of proof with respect to each element.

105. *First*, Winstar was—at minimum—"careless in imparting words", or made negligent misrepresentations to Lucent when it certified its compliance with the financial covenants of the Second Credit Agreement to Lucent in January and February of 2001. Winstar's certified requests for borrowing were not mere casual words, but the type of representation one would expect a sophisticated commercial party to make in order to obtain funds under a financing agreement. *See Kimmel*, 89 N.Y.2d at 263 (internal citation omitted) ("a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information"). Not only was Winstar out of compliance with its CAPEX covenant by January, 2001 (*see* Findings ¶¶ 484-95, 505), Senior Management at Winstar, including its Treasurer, Fred Rubin, who certified the January and February 2001 draw requests, testified that he took no affirmative action to satisfy himself that Winstar was in compliance with the terms of the Second Credit Agreement. (*See* Findings ¶¶ 507, 505.) Rubin's lack of verification is—at minimum— careless in light of the fact Rubin knew on January 15, 2001, that Winstar was not in compliance with its CAPEX covenant. (*See* Findings ¶¶ 487, 505; *see also* DX 60 at 2WC 0159294.)

106. *Second*, Winstar made negligent misrepresentations to Lucent in its certified borrowing requests in January and February of 2001 for the express purpose of borrowing money from Lucent because Lucent was not required to loan Winstar money if

181

Winstar was in default of the Second Credit Agreement. (*See* Findings ¶¶ 472, 505; *see also* DX 29 at 121 (Art. VII(c)); DX 29 at 81 (§ 4.03(b)).) Thus, Winstar induced Lucent to rely on its misrepresentations and loan Winstar a total of $83,017,021.18 in January and February of 2001.

107. *Third*, Lucent acted in reasonable reliance on the negligent misrepresentations Winstar made when it loaned Winstar $83,017,021.18 for the certified borrowing requests at issue. (*See* Findings ¶¶ 499-503, 505.) Absent Winstar's certified borrowing requests, Lucent had no contractual obligation to lend Winstar money, and the record shows that Lucent would not, in fact, have done so. (*See* Findings ¶¶ 473, 505.) Beth Perricone testified that Lucent's reliance on Winstar's certified borrowing requests in January and February of 2001 was reasonable: "Winstar is charged with ensuring that it is in compliance with the credit document. . . . We're relying on the executives and officers of Winstar when they provide monthly drawdown requests to Lucent that they are representing and warranting by signing that compliance certificate that they are in compliance". (*See* Findings ¶¶ 503, 501, 505.) Accordingly, each borrowing Winstar made under the Second Credit Agreement constituted a representation and warranty that it was in compliance and was not in Default, upon which Lucent reasonably relied. (*See* Findings ¶¶ 474, 505; *see also* DX 29 at 81 (§ 4.03(b)).)

108. *Fourth*, Lucent was damaged through its reliance on Winstar's negligent misrepresentations by loaning Winstar $48,735,275.74 for its January 26, 2001 draw request, and $34,281,745.44 for its February 23, 2001 draw request. (*See* Findings ¶¶ 499, 505.) Lucent never received payment for any of the $83,017,021.18 it loaned

182

Winstar on the basis of negligent misrepresentations that it was in compliance with the Second Credit Agreement. (*See* Findings ¶¶ 504, 505; *see also* DX 46 at Exhibit A.4.)

109. *Fifth*, Winstar submitted its January and February 2001 draw requests directly to Lucent (*see* Findings ¶¶ 497-98, 505), and Winstar was bound to Lucent in privity. (*See* Stip. Facts ¶ 11.) Winstar was in a special position of confidence and trust with Lucent, and Lucent, in turn, relied upon Winstar's certification in its borrowing requests. *See Dallas Aerospace, Inc.*, 352 F.3d at 788 (citing *Kimmel*, 89 N.Y.2d at 652) (stating that liability for negligent misrepresentation is imposed on those "who are in a special position of confidence and trust with the injured party").

110. Accordingly, Lucent is entitled to recover as damages $83,017,021.18, for Winstar's borrowings in January and February 2001 under the Second Credit Agreement, since those loans were based on Winstar's negligent misrepresentations to Lucent that it was in compliance with its financial covenants when it was actually in default of the Second Credit Agreement. (*See Wrynn v. Subaru Town Motor Inc.*, 119 Misc.2d 960, 962, 464 N.Y.S.2d 936, 938 (N.Y. City Civ. Ct. 1983)).

183

## VI.    LUCENT'S SETOFF COUNTERCLAIM (COUNTERCLAIM COUNT 2).

111.    The Trustee and Lucent have stipulated that "in the event that the Trustee

recovers a judgment against Lucent under the Wireless Subcontract claim, Lucent shall

be entitled to an award of setoff in the total amount of $6,300,000.00 against any

judgment in favor of Wireless on the Wireless Subcontract Claim". (*See* Findings ¶ 509.)

Dated: June 6, 2005
        Wilmington, Delaware

Daniel J. DeFranceschi (DE #2372)
Rebecca L. Booth (DE #4031)
Jason M. Madron (DE #4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

-and-

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

*Attorneys for Defendant
Lucent Technologies Inc.*

184

# TRIAL TRANSCRIPTS

**Aversano**

8-22

```
1   your cross to be?
2           MR. SAUNDERS:  Sixteen minutes, Your Honor.
3           THE COURT:  All right.
4           MR. KING:  May I approach, Your Honor?
5           THE COURT:  Yes.
6       (Pause in proceedings)
7           THE COURT:  Proceed.
8           MR. KING:  Your Honor, we have a brief bridge
9   statement --
10          THE COURT:  Go ahead.
11          MR. KING:  -- from Ms. Aversano.  Nino Aversano
12  served as Lucent's president of emerging service providers from
13  Lucent spin off in 1996 through April, 2000, when she was
14  promoted to the position of president, North American sales,
15  service provider networks.  She was relieved of her
16  responsibilities by Richard McGinn on or about October 11th,
17  2000.  Ms. Aversano was sued by the SEC in May, 2004, in a
18  civil proceeding, for among other things, her role and
19  transactions between Winstar and Lucent.  Ms. Aversano's
20  testimony relates to the establishment of the strategic
21  partnership, the party's performance under the subcontract, and
22  the end of quarter transactions between the parties, including
23  the September 2000, software deal.  And Ms. Swatski is going to
24  be playing the part of Ms. Aversano.
25      (Mr. King and Ms. Swatski role playing deposition
```

1    A.    It was a common practice, yes.

2    Q.    I'd like to focus specifically on the year 2000.  First of

3    all, can you just explain to me how Lucent's fiscal year

4    operated as opposed to calendar year, because they appear to

5    differ, right?

6    A.    Calendar, of course, is calendar.

7    Q.    Right.

8    A.    Lucent's fiscal year began October 1st, ended September

9    30th.

10    Q.    Okay.  I'm going to be referring to quarters a couple times

11    during this deposition.  If I say, you know, end of quarter, or

12    if I use a designation first quarter, fourth quarter, I'm going

13    to be referring to fiscal quarters.

14    A.    Fine.

15    Q.    Okay.  Why did end of quarter deals take place?

16    A.    We -- at the time Lucent was attempting to deliver the

17    revenue numbers that we had committed to deliver.

18    Q.    By revenue numbers that Lucent had committed to deliver are

19    you talking about the revenue forecast that Lucent would make

20    to Wall Street?

21    A.    They would roll up to those numbers, yeah.

22    Q.    Okay.  So the end of quarter deals were in part motivated

23    by efforts to reach revenue goals?

24    A.    Yes.

25    Q.    We're talking about Lucent's revenue goals, correct?

1  A.  Yes.

2  Q.  Do you have any recollection as to the rough size of some

3  of these deals that were involved -- that occurred with Lucent

4  at end of quarters?

5  A.  No.

6  Q.  Okay.  Who would be involved in negotiating an end of

7  quarter deal during the year 2000, on Lucent's side?

8  A.  A variety of people within the company would be involved.

9  Q.  Okay.  Let's talk about the fiscal fourth quarter deal in

10  the year 2000, which would have been the September 30th, 2000,

11  transaction, correct?  Do you recall who was involved in

12  negotiating that end of quarter deal between Lucent and

13  Winstar?

14  A.  I was.  There were many other people as well, however.

15  Q.  Can you recall any of their names?

16  A.  Bill Plunkett was, Debbie Harris-Brown, numerous people

17  from the product organization, people in the finance group,

18  people in the legal group.  I could -- I'd have to think about

19  the names.  It's been an awfully long time, but there were --

20  there was a large team involved from all the disciplines within

21  the business.

22  Q.  Do you recall who -- scratch that.  You mentioned that you

23  were personally involved in negotiating that particular end of

24  quarter deal, correct?

25  A.  That's right.

8-68

1   A.   That's right.

2   Q.   Is that correct?

3   A.   That's what it shows.

4   Q.   Now in the e-mail forwarding over that deal it states,

5   {quote}, "I can't thank you enough for your support and look

6   forward to closing this deal." {End quote}.  Do you know what

7   you meant by that?

8   A.   I think I probably had a friendly conversation with Nate

9   and was appreciative of it.

10  Q.   You used the word support though.  Does that indicate that

11  Winstar somehow was supporting Lucent in this deal?

12  A.   I think it just might have.  It might just have been my

13  style, how I was talking to him at that point.  I don't know

14  that I'd put more into it other than, you know, we're going to

15  get together, we're going to talk about this, thank you for

16  accepting the call and being open minded.  I think that's

17  probably the only extent of it.

18  Q.   Do you recall what you said to Nate Kantor that led to him,

19  you know, agreeing to consider this proposal?

20  A.   I don't recall specifically, no.

21  Q.   The message that was being sent, at least to Debbie Harris,

22  was that Winstar was not going to do an end of quarter deal, is

23  that correct?

24  A.   That's what it appears to be the case, yes.

25  Q.   And you made a call to Nate Kantor and later that day

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B632

1  you're sending over a proposed end of quarter deal, correct?

2  A.  Items for his consideration, right.

3  Q.  Right.  Do you recall anything in your conversation with

4  Kantor that struck you as persuading Nate that they should, in

5  fact, do an end of quarter deal?

6  A.  No, I think it was he accepted the call.  It was a friendly

7  call and he agreed to look at the information.  If I kind of

8  recollect it, it was just a positive call.

9  Q.  Had he committed at that point to actually doing a deal

10  with Lucent?

11  A.  No, I don't believe he had committed.  I think it was, take

12  a look, here's some things we believe would be helpful to you.

13  Q.  If you go back to Aversano-3 for a moment --

14  A.  Yes.

15  Q.  -- there's another section of that e-mail in which Deb

16  Harris noted that there were other headlines for the Winstar

17  account, I guess you could say, right?

18  A.  Right.

19  Q.  The second bullet point down discusses Winstar's services.

20  A.  Right.

21  Q.  And it says, {quote}, "We passed through around $67 million

22  per quarter of Winstar services.  We've been told to stop this

23  practice."  {End quote}.  Do you see that?

24  A.  Yes.

25  Q.  It also says, {quote}, "We'll be communicating our position

1  Q.   Now, your answer to my question a few moments ago was that

2  Lucent was going to adhere more closely to the terms of that

3  agreement?

4  A.   Both party, I would think, would adhere more closely.

5  Q.   Okay.   Is it your testimony then that that agreement was

6  still in place as of September of 2000?

7  A.   I would think so, yeah.   There was no reason -- yes.

8  Q.   Okay.   I'm going to put a document in front of you that's

9  labeled Aversano-8.

10  A.   Okay.

11  Q.   Before we go into Aversano-8, the subcontract that we were

12  discussing a moment ago related to Winstar Wireless performing

13  services for Lucent.   Were the payments -- were payments made

14  to Winstar through the Financing Agreement for the work that

15  Winstar Wireless was performing under that subcontract?

16  A.   I believe so.

17  Q.   Was that done in a quarterly basis throughout 1999 and

18  2000?

19  A.   I believe so.

20  Q.   Do you recall roughly what the amounts of that financing

21  were?

22  A.   I don't remember the exact numbers but -- I really don't

23  remember those numbers, but I remember either Debbie Harris or

24  somebody saying to me that those numbers were increasing or had

25  increased over the time frame of the contract.

1  this letter says, that it would honor the purchase order even

2  if Winstar didn't sign this letter?

3  A.  As I said, members of the team may have said that to them.

4  They were never intending to make this an unpleasant

5  experience.  We wanted to just implement what we had already

6  agreed to back in June and the prior time.  So it really was

7  intended to keep our business relationship going and move

8  forward.

9  Q.  Other than the conditions that are set forth in the

10  September 27th letter, Aversano-12, are you aware of any other

11  conditions that Lucent placed upon Winstar before it would

12  honor this purchase order?

13  A.  No, I'm not.

14  Q.  What was your understanding of what was supposed to happen

15  after this letter was signed by Mr. Uhl in terms of the

16  Transition Agreement taking place?

17  A.  It was my understanding there was going to be a meeting,

18  possibly a series of meetings, and the operational plan would

19  be put in place to implement the agreement.

20  Q.  And by implement the agreement, you're referring to Lucent

21  taking over complete control of the work covered by the scope

22  of work the parties mutually defined in the new agreement?

23  A.  Correct.

24  Q.  Now this letter stated that there would be a lock up

25  session to finalize a full services agreement no later than two

1  weeks after October 2nd.  Do you see that on the first page on
2  the bottom paragraph?
3  A.  I do see that, right.
4  Q.  Do you know when the full services agreement discussed in
5  this letter was finalized?
6  A.  No.
7  Q.  Do you know if, in fact, the full services agreement was
8  ever finalized?
9  A.  No.
10  Q.  As of October 11th or October 16th, either date, do you
11  know what the status was of the negotiation for this new
12  Services Agreement?
13  A.  I don't.
14  Q.  To your knowledge had anything been done to get a Service
15  Agreement finalized?
16  A.  I think the intent was to just schedule meetings, and I
17  think that was always happening, but I don't know specifically.
18  Q.  Who would know whether or not progress had been made on
19  that Services Agreement?
20  A.  I would imagine Debbie Harris would have been the person
21  who was coordinating all that and sending it all out.
22  Q.  Was she responsible for this completion of that Services
23  Agreement?
24  A.  That would have been her responsibility, others of course,
25  as well as -- as well as that she would have been the primary

1   person responsible.

2   Q.  Do you know if that meeting scheduled for October 2nd took

3   place?

4   A.  I don't believe it did take place October 2nd.  I think it

5   was pushed out, but where and how far I don't know.

6   Q.  Do you know who pushed that date off?  Was it Lucent?  Was

7   it Winstar?  Both?

8   A.  I don't recall it.  I think it was just scheduling issues.

9   Q.  We discussed in Aversano-8 that Lucent rejected a purchase

10  order that Winstar had supplied to you.  Do you recall that?

11  A.  I do recall that.

12  Q.  And you stated that you believed that originally under the

13  purchase order was for past services rather than future

14  services, correct?

15  A.  Originally we thought -- we -- Lucent thought it was for

16  future services.

17  Q.  Thank you for correcting me.  I had that backwards, I

18  realize that.  Upon learning that the purchase order actually

19  reflected past services rather than future services, did you

20  believe that Winstar -- that Lucent was obligated to honor that

21  purchase order?

22  A.  From my business relationship point of view, not legal

23  point of view, I thought that it would be best to honor it and

24  then move forward with a different way of doing business where

25  everone understood that going forward it was going to be a

**Garrett**

1   (Defendant's Exhibit-609 admitted into evidence)

2                   DIRECT EXAMINATION

3   BY MR. SLIFKIN:

4   Q.   Thank you, Mr. Garrett.   When you answer questions you

5   should try and speak into the microphone.   That will help us

6   all and help the Court.   If you please state your name.

7   A.   Gregory A. Garrett.

8   Q.   Okay, and by whom are you employed?

9   A.   I'm currently employed by Lucent Technologies.

10  Q.   Okay, since when have you been employed by Lucent?

11  A.   I joined Lucent Technologies in September of 1997.

12  Q.   And what have your responsibilities been since you started

13  with Lucent?

14  A.   When I joined Lucent Technologies in 1997 I served as the

15  Director of Global Program Management for the corporation.   I

16  did that for a few years, then the corporation asked me to

17  serve as the Vice President of Program Management for our West

18  Coast Operations based in Denver, Colorado.   I supported U.S.

19  West and Quest.   And then the corporation asked me to become

20  the Vice President of Program Management for the Winstar Global

21  Account, which I did for a period of time until the termination

22  of that particular account.   And then I worked as the Vice

23  President of Commercial North America Wireless Accounts for 2

24  years.   In the past year and a half I've served as the Vice

25  President of Program Management for all of our Government

1  Q.  Who's the "we" that you're referring to?

2  A.  Lucent Corporation, myself and my sales partners, we were

3  there to support the customer.

4  Q.  Well, did you discuss this issue of proceeding with the

5  sales team?

6  A.  Oh, very much so.  I was adamant that it was extremely

7  important to have a master integrated schedule to hold all the

8  parties accountable, and the sales partners understood the

9  logic and the reason and why it was a good business practice.

10  But they also knew that that was not something that Winstar was

11  willing to agree to, and we together coordinated and agreed

12  that, you know, we would proceed with the business and do the

13  best we could with Winstar directing the schedules and the lack

14  of coordination.

15  Q.  So, who ultimately was controlling this -- these schedules

16  in this build-out?

17  A.  Winstar completely controlled the schedules and the build-

18  out.  We offered support and guidance.  We offered best

19  practices.  We would prepared detail schedules when they asked

20  us to, but again, they were constantly changing the dates on

21  all of these programs for a variety of reasons that I mentioned

22  earlier.

23  Q.  Okay, given the issues that you've identified for us, did

24  you ever suggest to Winstar that they slow down their network

25  build?

1    A.    I actually suggested to them, if memory serves me, in the

2    September/October timeframe to actually reduce their number of

3    orders during that particular timeframe because there was so

4    much equipment building up in their warehouses and our

5    warehouses that I had knowledge of that I didn't feel like it

6    was prudent to order more equipment at that particular time

7    until we got more of the equipment that was sitting in the

8    warehouses fully deployed.

9    Q.    Okay, and what was Winstar's reaction to that?  What did

10   they tell you?  What did the people you were discussing it with

11   tell you?

12   A.    Well, Mr. Zlotnick and Mr. Huber on -- and again, we had

13   this conversation on more than one occasion during the time

14   period -- basically expressed to me their requirement to build

15   the programs and the network out as rapidly as possible.  They

16   assured me that they were working with Williams and these other

17   third parties to improve the integrity of their schedules and

18   that there wouldn't be the further slips that they had

19   encountered in the past.  And they assured me that they wanted

20   to do everything possible to build out the network as rapidly

21   as possible.

22   Q.    Okay.  Well, did you ever suggest to the Winstar people you

23   were dealing with the that some of the equipment be diverted to

24   different routes?

25   A.    I recall at least on one occasion where there was an

Garrett - Cross                    20-99

1   knowledge of the -- how the program operated prior to my

2   arrival that I suggested that the most informed party would be

3   Mr. John Gregg, who was my predecessor.

4   Q.   Well, let's at -- let me ask you to look at page 26 of your

5   deposition, sir.

6   A.   Okay.

7   Q.   And on page 26 at line 7 the question was asked, "You're

8   not in a position to comment on the adequacy or inadequacy of

9   the services and support that was provided by Lucent prior to

10  your assignment to the Winstar account?"  And your answer was,

11  "I believe that question would be best responded to by my

12  predecessor.  I believe he would be in a position of more

13  information."  And your -- the next question was, "You don't

14  consider yourself to be in a position to comment, that is all

15  I'm trying to determine."  And your answer was, "As it pertains

16  to work activities prior to my tenure, I have no personal

17  knowledge."  Was that testimony truthful, sir?

18  A.   Yes.

19       (Pause in proceedings)

20  Q.   Now, do you recall being asked at your deposition what the

21  scope of your work responsibilities were?

22  A.   Yes, I recall.

23  Q.   And do you recall testifying at your deposition that you

24  had no responsibility for the sale of engineering installation

25  and project management services to Winstar?

1  A.   I believe I was asked if I was engaged in the sales

2  activity and I said that was the responsibility of others.   I

3  was the program management.   There was a sales team and a sales

4  Vice President that was responsible for those negotiations.

5  Q.   And you testified that you didn't have any role in

6  negotiation of deals or financial terms or conditions

7  associated with deals, correct?

8  A.   I believe my testimony at the time was in regards to the

9  end of quarter deals that I was not personally or substantially

10  involved in the actual negotiations.   Again, that was --

11  involved our sales folks and CFO and financial people, that was

12  their job and their responsibility.   I did the program

13  management work.

14  Q.   In fact, you testified, did you not, that the business

15  decisions relating to customers were always made at Lucent by

16  the sales team or the customer team, correct?

17  A.   I believe my testimony was to the fact that our sales team

18  is responsible for the customer relationship, and so that

19  ultimately, the customer sales Vice President had a senior

20  position on the decision as to any business matters.   But of

21  course, I believe I also caveated that with they had to get it

22  reviewed by our CFO, our financial team and our legal team,

23  appropriate counsel, and of course, you know, I would provide

24  support and advice as it related to program management

25  functions, but I wasn't personally involved in any of the

Garrett - Cross                                    20-101

1  negotiations.

2  Q.  Right, in fact on page 91 at line 10 of your testimony you

3  stated under oath before that "Business decisions within Lucent

4  as relates to a customer are always made by the sales team and

5  our senior executives, I should qualify in cooperation with

6  counsel as appropriate, CFO and other support organizations,"

7  right?

8  A.  I'm sorry, that was page 91?

9  Q.  Page -- I'm sorry, sir, page 91, lines 10 through 15.  That

10  was your testimony, correct?

11  A.  If you'll allow me just a moment, trying to find it.  Yes,

12  and I believe that's consistent with what I just said.

13      (Pause in proceedings)

14  Q.  In fact, you weren't even necessarily aware of all the

15  terms of the transactions between the parties, were you?

16  A.  You have to clarify what you mean by the terms.

17  Q.  Well, for instance, in the September 2000 deal, were you

18  aware that Lucent had agreed to provide Winstar a $35 million

19  credit related to the long-haul optronics network and

20  deployment issues?

21  A.  I was -- as I testified to earlier, I was not involved in

22  the negotiations.  I did learn about it after the fact, but no,

23  I was not involved in the actual negotiations.

24  Q.  Well, let me refer to you to page 117 of your deposition,

25  sir.  In July of 2001 when you were asked the question that

1   starts at line 16 which reads, "Are you aware, Mr. Garrett,

2   that in or about September of 2000 Lucent agreed to give

3   Winstar a $35 million credit for issues arising with Lucent's

4   performance in the area of long-haul optronics and deployment?"

5   Your answer was, "I have no personal knowledge of that."  Is

6   that correct?

7   A.   Absolutely a correct statement.

8   Q.   Now, do you remember testifying at your deposition about a

9   meeting in August 2000 where the Lucent/Winstar -- where

10  Lucent's and Winstar's sales team was discussing the Winstar

11  relationship?

12  A.   Excuse me, I actually recall meetings in the August

13  timeframe.  You'd have to be more specific.

14  Q.   Do you remember a meeting that took place in August 2000

15  where the sales team was discussing finalizing revenue

16  projections for that fiscal year and looking at sales

17  opportunities for fiscal year 2001?

18  A.   Again, I actually recall several meetings on that topic in

19  that timeframe.  You'd have to be more specific.

20  Q.   Well, sir, do you remember at any of those meetings that

21  Winstar's -- Lucent's -- excuse me, Lucent's Winstar customer

22  team advising that Winstar was a top 10 or 20 account for the

23  company globally?

24  A.   I recall at the meeting that we held in New York City, I

25  believe it was convened at the Renaissance Hotel down by Times

1  Square, where Lucent's Sales Vice President brought in the

2  sales directors from throughout the world.  That was one of the

3  items of discussion.

4  Q.  And do you recall discussing with -- actually, withdrawn.

5  Do you recall discussing the September 2000 end of quarter deal

6  during the course of your deposition?

7  A.  Yes, I believe we did there.  I was asked a few questions

8  in regards to the September end of quarter deal.

9  Q.  And do recall testifying at that deposition that you had no

10 personal knowledge of the deal outside of a pricing issue that

11 you were involved in with respect to building out Winstar's b's

12 and hub's?

13 A.  I recall being asked questions in regards to that, and

14 again, I recall that my response was I wasn't personally

15 involved in the negotiations on that particular deal.

16 Q.  Well, let me ask you to turn to page 157 in your

17 deposition, sir, and I'd like to point specifically to the

18 question and answer that starts at line 10, and this is in

19 reference to the September 2000 end of quarter deal, is that

20 correct?

21      MR. SLIFKIN:  May I have a scope objection to this?

22 This goes well beyond the direct examination.  There was no

23 testimony about end of quarter deals, September deals, none of

24 that.

25      MR. KING:  Your Honor, the entire focus of this

Garrett - Cross                                    20-104

1   witness' direct examination was on the propriety of Winstar's
2   purchases.  We're looking at the end of quarter deals which has
3   been a central issue in this case as to whether those deals
4   were appropriate or not.  I'm trying to inquire as to this
5   witness' knowledge.
6         THE COURT:  Objection overruled.
7   BY MR. KING:
8   Q.  Now, the question and answer on page 157 that starts at 10,
9   that's referring to the September 2000 end of quarter deal,
10  correct?
11  A.  I believe that's what the question was referring to.
12  Q.  Okay, and the question on line 10 reads, "Just so I'm
13  clear, you don't have personal knowledge of there being a
14  larger deal, but you had heard at some point in time there
15  was?"  And your answer was, "I have no personal knowledge of
16  the larger deal.  I had heard during October through December
17  varies pieces of information about there being a larger deal."
18  Was that your testimony at that point in time, sir?
19  A.  Yes, sir.
20  Q.  And that was truthful?
21  A.  Absolutely.
22  Q.  Now, I want to go back to a bit of your testimony from
23  earlier this morning with Mr. Slifkin and you had -- you
24  testified that at some point in time you advised Winstar that
25  it shouldn't buy some equipment?

Garrett - Cross                                    20-105

1   A.   Well, I would phrase it as I did, I think, earlier this

2   morning when I was asked the question.  It was clear to me as a

3   result of the increasing volume of equipment in our warehouses

4   and staging facility that as a result of the ongoing slips by

5   Williams Communications and the delays in the space and the

6   power and the delays from MFN that the inventory was

7   accumulating, and so perhaps it wouldn't be prudent as a good

8   business practice to buy additional equipment at that time.

9   And again, I believe as I commented earlier, I was told by my

10  counterparts, the Vice President of Program Management, Bill

11  Zlotnick, and Dennis Huber, the Vice President of Engineering,

12  that Winstar wanted to go ahead and make purchases because the

13  felt it was appropriate because they wanted to build out their

14  network as quickly and as rapidly as possible and that they

15  were doing everything they could to try to mitigate those

16  ongoing delays with Williams and MFN and other parties.

17  Q.   Do you recall when you advised Winstar that they should not

18  purchase additional equipment?

19  A.   Again, I believe it was in the September/October timeframe

20  that we had some ongoing discussions in our weekly meetings,

21  and then I also recall in October that we had detailed

22  discussions, we had an off-site meeting down in Williamsburg

23  and we, you know -- it was clear at that point in time that we

24  had an accumulated inventory across their warehouses, our

25  warehouses, and so it would be a prudent business practice to,

Garrett - Cross                    20-106

1  you know, cut down on some of their immediate purchases.

2  Q.  Now, did you give this advice to Winstar about what would

3  be a prudent business practice on their purchasing to them

4  before or after Winstar engaged in the September 2000 end of

5  quarter deal?

6  A.  As I recall, this was a topic of frequent discussion.  It

7  was not just a one time conversation and that it had started in

8  discussions in September and carried through in October and

9  into November.  So this was an ongoing series of discussions.

10 Q.  Now, in your role as the head of project management on this

11 Winstar account, were you involved at all in the process of

12 helping Winstar choose appropriate selection of -- or choose

13 appropriate software for its network?

14 A.  Now I personally was not involved in their selection of

15 software.

16 Q.  Okay, so you had no recommendations then for Winstar with

17 respect to the software that they purchased in the September

18 2000 deal?

19 A.  I was personally never asked or consulted in that regard.

20        MR. KING:  Your Honor, we have no further questions

21 for this witness.

22        MR. SLIFKIN:  I have no redirect, Your Honor.

23        THE COURT:  Let me just make sure I don't have any

24 questions.  I have nothing.  Thank you.

25        MR. RATHKOPF:  Your Honor?

**Harris**

```
 1   Don't go anywhere.  I want to get somebody checking on this
 2   deposition page --
 3          MR. KING:  We'll set everything up in the meantime,
 4   Your Honor.
 5          THE COURT:  Okay, why don't you do that.
 6      (Recess)
 7          THE CLERK:  Please be seated.
 8          THE COURT:  Proceed.
 9          MR. KING:  Your Honor, we have a short bridge
10   statement from Ms. Harris.  Debra Harris was the vice president
11   of sales at Lucent.  She was placed in charge of the Winstar
12   account as of August 1st, 2000, and served in that position
13   through and after Winstar's filing in bankruptcy.  Ms. Harris
14   was sued by the SEC in May 2004, in a civil proceeding for her
15   role in transactions between Winstar and Lucent.  Ms. Harris
16   was deposed by Winstar in July 2001, but not on the Trustee's
17   preference claim, and was deposed again on written questions by
18   the Trustee in 2004 when she invoked the 5th Amendment and
19   refused to answer any questions.
20          Ms. Harris' testimony relates to Lucent's performance
21   under the subcontract, negotiations between the parties to
22   enter into a transition agreement and Lucent's knowledge of
23   Winstar's capital expenditures in 2000.  And Your Honor, just
24   for the record, the deposition read we're going to be doing
25   right now is from the 2001 deposition.  The attorney for
```

11-41

1  services moving forward.

2  Q.  So is the thought process that the arrangement would be

3  terminated and discussions then entered into so that Lucent

4  could take over those services that Winstar was performing and

5  being financed?

6  A.  So the discussion was for us to -- yes, to stop, and then

7  to start the discussions of how we would move to more of an

8  outsourcing arrangement.

9  Q.  Was there any consideration given to not terminating the

10 arrangement immediately but continuing until such time as there

11 was an outsourcing arrangement entered into?

12 A.  Yes, there was consideration, and that's ultimately where

13 we ended up, because Nina sent out a letter that put that

14 process in place.

15 Q.  What was your understanding as to whether or not these

16 services would continue to be financed while you were

17 discussing how to get to an outsourcing arrangement?

18 A.  In September the final letter we issued on the subject is

19 that we would pay for the previous quarter and we would

20 immediately enter into discussions, but not -- we would not be

21 paying for that quarter unless we entered into these

22 discussions and came to some agreement.

23 Q.  If I could just briefly turn your attention back to Harris

24 Exhibit-1, if you could flip back to the fourth page, it has

25 the Bates #29265 at the bottom right corner, "Winstar Executive

1    Briefing." At the top it states, {quote}, "What is Winstar's

2    current condition budget constraints?" {End quote}. And the

3    first bullet, so to spoke, says, {quote}, "Winstar is facing

4    severe budget problems due to Capex spend limitations imposed

5    by their bank covenants." {End quote}. Do you see that?

6    A.  Yes.

7    Q.  Do you recall that being the case at that time?

8    A.  Yes.

9    Q.  In light of the severe budget problems that Winstar was

10   facing as of the end of August of 2000, was there any

11   discussion in the group leading up -- prior to the sending of

12   your letter, was there any discussion about how Winstar was

13   going to pay for the services if Lucent wasn't going to finance

14   them?

15   A.  I think my answer's the same. That's the mode I would be

16   in as far as having a discussion around that, but specific

17   recall as to what was said, I can't really remember.

18   Q.  And I take it you don't specifically recall that it was

19   discussed. It's your presumption that it was?

20   A.  Yes.

21   Q.  For the record, Ms. Harris has been handed what's been

22   marked as Harris Exhibit-5, which is an e-mail dated October

23   30th, 2000, from Audrey Dollins to Ms. Harris and others, Bates

24   #LW 148405 to 148418. It's an e-mail and attachment.

25   A.  Okay.

1  Q.  Turn a few pages back to Bates #148416 titled, "Issues."

2  The first diamond states, {quote} "If we elect to move forward

3  with the business" {end quote}, and it's got a series of bullet

4  points -- bullets below that, the third of which is, {quote}

5  "Adverse customer impact if we terminate" {end quote}.  Do you

6  see that?

7  A.  Yes.

8  Q.  Can you explain what was meant by that?

9  A.  Well, while we were under negotiations, we were very aware

10 that Winstar wanted us to continue to cover the services that

11 they were performing.  And that was brought up on several

12 occasions.

13 Q.  And what was the adverse customer impact?  What did you

14 mean by, {quote} "adverse customer impact" {end quote}?

15 A.  I don't know if I can be very specific on the adverse

16 customer impact.

17 Q.  The next diamond states, {quote} "If we elect to not move

18 forward with the business" {end quote} and the first bullet

19 point says, {quote} "Nina letter, breaking the commitment,"

20 {end quote}.  Do you see that?

21 A.  Yes.

22 Q.  Can you explain what that means?

23 A.  I would need the Nina letter to help refresh my complete

24 memory of that.  But what I believe -- what we said in the Nina

25 letter that we were going to move forward with constructing an

1   outsourcing agreement together.

2   Q.   And that's the commitment that's being referred to here?

3   A.   That's what I believe is the commitment.

4   Q.   So is the implication here that if Lucent chose not to do

5   so, that it would be breaking that commitment that had been

6   made in Ms. Aversano's letter?

7   A.   Again, I'd like to see Nina's letter again to fully

8   understand what we said in that and what the commitment was.

9   Q.   For the record, Harris Exhibit-6 is a letter dated

10  September 27, 2000, from Ms. Aversano to Mr. Richard J. Yuel.

11  Bates #LW-1680 to 1681.

12  A.   Okay.

13  Q.   Harris Exhibit-6.  Is this the Ms. Aversano letter that

14  we've been talking about this morning?  The one that's referred

15  to in Harris Exhibit-5 -- is that the letter?

16  A.   Yes, this is the letter.  Sorry, I didn't understand if

17  that was a question.

18  Q.   Having seen the letter, would you agree going back to

19  Harris Exhibit-5 that if Lucent chose not to move forward with

20  an outsourcing agreement that that would be breaking the

21  commitment that Ms. Aversano had made?

22  A.   The commitment that I believe Nina was making in her letter

23  was to pursue and reach agreement on an outsourcing

24  arrangement.  So what we were referring to there was that we

25  would move forward.  A mutually agreeable services agreement.

11-46

1  Q.  So if Lucent chose not to enter into one, then that would

2  be breaking that commitment?

3  A.  Well, as I reread the letter, I guess I would say that

4  commitment was perhaps too strong of a word.  But that was

5  certainly what we were referring to.

6  Q.  If you look at the second -- back on Harris Exhibit-5, the

7  next bullet below Nina letter breaking the commitment, it says,

8  {quote} "Winstar business problems get worse, if we elect not

9  to move forward with the business, Winstar business problems

10  get worse," {end quote}.  Can you explain what that means?

11  A.  Winstar was sharing with us their concerns over their

12  spending level.  The level they came -- can spend from a Capex

13  perspective.  And what their restrictions were from a bank

14  covenant perspective.  So at that point in time, we were

15  talking about the services.  When they processed it through us,

16  they were capitalized.  And so this, I guess, further

17  exasperated that whole spending level.  So I think we were

18  referring to their overall spending.  In addition, what was

19  indicated at that point in time and what I subsequently learned

20  later was more of a focus -- was their ability to get financing

21  on the services.

22  Q.  How does the ability to get financing on the services --

23  just so I'm clear -- how does that relate to this comment about

24  Winstar business problems getting worse?

25  A.  Well, they needed our financing in order to cover the

1   services.

2   Q.  I just wanna make sure I understand.  So when it says,

3   {quote} "If we elect not to move forward with the business,

4   Winstar business problems get worse," {end quote} -- do I

5   understand correctly that part of what is meant here is that

6   Lucent did not want to finance the services and if it didn't

7   choose to do the services, that would put Winstar in a

8   predicament with regard to how to get the services done and get

9   them paid for?

10  A.   Well, Winstar shared with us on several occasions that they

11  needed us to cover the financing of services.  I don't know if

12  they gave very specific reasons on it.  But they certainly

13  indicated to us that they needed us to cover the services from

14  a financing perspective.  We thought it was both a need to

15  capitalize services as well as the financing.  Subsequent

16  conversations with Rick Uhl certainly showed that it was more

17  of a financing perspective versus having to capitalize the

18  services because it turned out that most of the services

19  already could be capitalized.

20  Q.   Turn two pages further back -- Bates #148418, {quote} "The

21  strategic risks of no deal," {end quote}.

22  A.   Yes.

23  Q.   Third diamond states, {quote}, "Winstar will suffer

24  negative financial ramifications," {end quote}.  Can you

25  explain what that means?

11-48

1  A.  I think we were following the same train of thought as we

2  had earlier in our presentation.  They needed us to cover the

3  services from a financing perspective.

4  Q.  Do you recall what happened then after this document was

5  prepared?  Was there further discussions with the executives

6  about this in late October?

7  A.  Well, that's what I don't remember.  If this was the first

8  meeting, I don't know -- there were several discussions.  But I

9  don't know if this was the first or the last.

10  Q.  Do you recall then in early November, Winstar expressing a

11  desire to come to agreement and finish off an outsourcing

12  agreement?

13  A.  I don't know if I can be specific on the time frame.  But I

14  think there was on both parties' part of a desire to finish the

15  agreement.

16  Q.  Do you recall there being a -- I don't know what the right

17  word would be, so I'll throw it out -- cessation of discussion

18  between the working teams for two or three week period during

19  November while there were internal discussions going on at

20  Lucent about financial issues and other issues?

21  A.  We did put negotiations on hold between Winstar and Lucent.

22  I don't know if it was an official hold.  We did have a series

23  of discussions within Lucent for a period of time.

24  Q.  To the best of your knowledge, is this the final draft

25  addendum that the working teams agreed upon to take their

11-49

1  management --

2            MR. KING:  Your Honor, this is referring to Exhibit-8.

3  A.  If it's not the final, it's probably close to the final

4  draft.

5  Q.  And was the final draft addendum a document that the Lucent

6  working team was happy with?

7  A.  I would say the final draft was what the Lucent team was --

8  I mean, we agreed with the language that was in here from the

9  working team perspective, yes.

10  Q.  And you agreed that this was a reasonable proposal for

11  moving forward?

12  A.  With the guidance that we had up to that point in time, we

13  felt this was a good agreement that we had come up with.

14  Q.  If I could turn your attention back -- keep that out for a

15  second, but back to Harris Exhibit-5, which is the October 30

16  e-mail --

17  A.  Right.

18  Q.  If you could turn to the fourth page, 148408, which are

19  business principles.  I think I had asked earlier whether

20  Winstar ultimately agreed on each of these five points, and I

21  think you said that you would need to see the final draft

22  addendum to make that determination.  Assuming that Harris-8 is

23  that final -- or close to the final -- can you now tell me

24  whether or not Winstar agreed to each of these five?

25  A.  Would you like me to read through the contract to determine

11-50

1   that?

2   Q.  Sure.  And Ms. Harris, have you now had a chance to take a

3   look through this document, or at least some portion of this

4   document?

5   A.  Yes.

6   Q.  Can you tell me what part you looked at -- what part you

7   reviewed?

8   A.  I reviewed the document that had the underlines on it.

9   Q.  For the record is that numbers 305 -- WC-30537 through

10  30544?

11  A.  Correct.

12  Q.  My question is, do you know whether Winstar ultimately

13  agreed to these five business principles?

14  A.  Well, there was a couple of points in our business

15  principle that we struggled with in putting into contractual

16  language.  Providing the option to Lucent to terminate was a

17  key point to Lucent.  We had quite a bit of discussion around

18  use of the word, {quote} "terminate."  What we ultimately came

19  up with was that Lucent would have the authority to select,

20  remove, and replace personnel from the performance of the

21  deliverables.  So it was not a termination.  We came up with

22  language which reflected an intent to change out the personnel

23  from not -- but not to terminate the personnel from the

24  project.

25  Q.  Just so I'm clear.  The first business principle, where it

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B658

11-51

1    says, {quote} "Right to terminate" {end quote} -- that's right

2    to terminate personnel as opposed to the right to terminate the

3    agreement to provide deliverable?

4    A.  Sorry, I was on the third bullet.

5    Q.  Oh, okay.

6    A.  We wanted to have the right both ways.  I was on the point

7    of the termination of personnel, and actually, now that I look

8    at it, I don't know if that was point one or three -- there

9    where we intended that.  Well, the point I'm talking about was

10   the right to terminate personnel.  And that's where the

11   language that we ultimately agreed to did not say terminate.

12   And we came up with the language to get around that.

13   Q.  Where in the agreement -- what language in the agreement

14   are you referring to -- which paragraph number and page number?

15   A.  30538 in the first full paragraph.  First line.

16   Q.  You understand looking at that, it says, {quote} "Select,

17   remove, and replace personnel" {end quote}.  Your understanding

18   that removing and replacing is different than terminating?

19   A.  Yes, it was.  We had quite a bit of discussion around that

20   point.

21   Q.  How is it different?

22   A.  Well, the objective to, {quote} "terminate" {end quote},

23   was the insinuation that it was firing the personnel.  Winstar

24   would have the option of -- if we did replace -- that they

25   would perhaps use the people elsewhere in the business.  But

11-52

1   they wouldn't be terminated from the company.

2   Q.   This would be Winstar employees?

3   A.   Right.

4   Q.   Okay.

5   A.   We further expanded on the business principle that talked

6   about, {quote} "Lucent actively managing the contractors

7   internal and external and Winstar employees.  Lucent clearly

8   accountable for deliverables" {end quote}.  We expanded upon

9   that concept where we talked about -- and I'm trying to find

10  the place again, where we talked about that we would jointly

11  develop.  So I'm in the same paragraph as before -- a little

12  further down.  Where we would have mutually agreed upon and

13  mutually defined the criteria.  And we would be jointly

14  developing criteria for the work product.  So we did provide --

15  it was not just a singular Lucent accountability.  There was

16  joint accountability that was further agreed upon, different

17  from the business principle.

18  Q.   So is this the joint accountability for -- you lost me, I'm

19  sorry.  Joint development of the criteria for the work product?

20  A.   Right.

21  Q.   Which business principle are you referring to?

22  A.   Where it says, {quote} "Lucent's clearly accountable for

23  the deliverables" {end quote}.  And we had quite a bit of

24  discussion around that point.

25  Q.   If you look at paragraph two of the addendum, {quote}

11-53

1    "Completion of deliverables" {end quote} -- the first sentence

2    says, {quote} "Lucent will manage and be accountable for the

3    successful completion of the deliverables" {end quote}.

4    Correct?

5    A.   But Winstar was participating in the definition of those.

6    Q.   Of what the deliverables would be?

7    A.   Right.

8    Q.   If you look at the last sentence of page one, that runs

9    over to page two, it says, {quote} "Responsibility for

10   completion of deliverables will include the selection and

11   management by Lucent" {end quote} --

12   A.   Where are you?

13   Q.   I'm sorry.  Bottom of page one, at addendum 30537.  The

14   sentence that runs over to the next page.  It starts, {quote}

15   "Responsibility for completion of deliverables will include the

16   selection and management by Lucent personnel and subcontractors

17   required to complete such deliverables concerning certain

18   Winstar employees and contractors and Lucent employees and

19   contractors" {end quote}.  Do you see that?

20   A.   Yes.

21   Q.   And is that consistent with the first business principle in

22   Harris Exhibit-5, correct?

23   A.   For the first line of the business principle, yes.

24   Q.   And also the last line of the first business principle,

25   "Option for contractors and employees to be directed to

11-54

1    Lucent."

2    A.  Yes.

3    Q.  If you look at the second business principle.  {End quote}

4    -- or {quote} "Transition plan must recognize Lucent has option

5    to exclude certain activities from scope" {end quote}.   The

6    addendum provides for that, does it not?

7    A.  Yes.

8    Q.  The third business principle we've covered.   The fourth

9    one, {quote} "Winstar will be Lucent's preferred supplier based

10   on its performance meeting defined metrics" {end quote}.   Just

11   to help you with that, if you look at page two of the

12   agreement, 30538, Draft Agreement, the first full paragraph,

13   {quote} "Lucent will have the authority to select" {end quote}.

14   And then the second sentence states, {quote} "During the

15   transition period, Winstar will be Lucent's preferred

16   subcontractor as long as the work performed by Winstar meets

17   objective -- mutually agreed upon and mutually defined criteria

18   with regard to quality" {end quote}.   Is that consistent with

19   the fourth business principle?

20   A.  Yes.

21   Q.  And the fifth business principle, {quote} "Must alter

22   supply agreements provision for Winstar approval, Lucent

23   subcontractors" {end quote}.   Does that addendum address that

24   principle?

25   A.  Well, I think that's what we're referring to -- that we

11-55

1    actually had to go into the supply agreement document and meet

2    that change.

3    Q.  But this was going to be an addendum to the supply

4    agreement, correct?

5    A.  Right, but there was some discussion as to whether we

6    actually had to change the language in the supply agreement.

7    Q.  I think you could set that aside after all of that.  Do you

8    recall there subsequently being the overview for this proposal

9    on December 7th, 2000?

10   A.  I have certain dates committed to memory, but not all --

11   dates.

12   Q.  For the record, Harris Exhibit-9 is an e-mail dated

13   December 15th, 2000.  From Ashley Brunner to Ms. Petrini and a

14   list of other people.  Bates #LW-16017 through 16019.  I only

15   intend to ask you about the first page -- the part relating to

16   Winstar.

17   A.  Okay.

18   Q.  Does this refresh your recollection of the overview being

19   presented or conducted on or about December, 2000?

20   A.  Yes.

21   Q.  Well, was that a presentation to Mr. Montemarano, do you

22   recall?

23   A.  No, it was not a presentation.  Usually people are fairly

24   well versed in the deal by the time we get to that point.

25   Q.  Presentation is maybe not the right word.  Who was the

11-56

1   person conducting the deal review?

2   A.  The deal review -- there's actually a process that defines

3   a deal review.  So I may not be exact in my process.  But it is

4   run by the finance organization, so Michael Montemarano had the

5   North America finance responsibility at the time.  I believe he

6   was on the conference call, and there's a contingent of other

7   people who have different roles and sign-off responsibility

8   that participate in a typical deal review.  And it depends on

9   if it pertains to a product unit or services business --

10  whatever -- they have to have sign-off.

11  Q.  Just in the interest of time, I have a document -- internal

12  Lucent document that appears to be a deal review presentation.

13  I hope that's the right word.  A set of documents with the

14  business case and it has approval signature lines for Ms.

15  Spurrier and Mr. Montemarano.  Does that -- does me telling you

16  that -- does that in any way refresh your recollection that

17  those were the two folks that were being asked to sign off and

18  approve the services addendum at this point?

19  A.  I don't know if Carol was actually on that call

20  specifically.  So, during the deal review call we would get a

21  set of constituencies that would participate and then the sign-

22  off sheets would go.  Then as a follow-up basis to those people

23  who needed to sign off on them.

24  Q.  Turning back to Harris Exhibit-9, do you recall Mr.

25  Montemarano at this point approving the deal based on his

1  understanding set forth in the document?

2  A.  Yes.

3  Q.  Was there a discussion on the call with Mr. Montemarano

4  about that deal?

5  A.  I have had previous discussions with Michael, so we had --

6  we did not need to go through a full discussion on that deal

7  call.  So we had pretty well prepped Michael in advance of what

8  he had done.  So these are already his caveats.

9        MR. KING:  And I believe that should read, "What we

10  had done."

11  Q.  Question, do you remember anything that was discussed in

12  particular on the deal call -- the deal review call?

13  A.  There was a key constituent who was not there.  So we did

14  not have a full discussion of it on the call, from the finance

15  organization.

16  Q.  Who was that?

17  A.  Bill Fullerton.

18  Q.  Do you remember anything that was discussed?

19  A.  I really don't think we went -- my recollection is we did

20  not go through a discussion on that call.  It was not

21  necessary.  We had already done it with Michael, and we had

22  some follow-up activities that had to be done.  But those

23  constituencies weren't on the call at that point in time.

24  Q.  There was a call?

25  A.  There was a call.

1  Q.  What was talked about?

2  A.  Well, because as you see in here, the call was not just on

3  Winstar.  It was also on Qwest and Verizon.  So they basically

4  said Michael already had the discussions on Winstar, they moved

5  onto the other accounts.

6  Q.  Thank you.

7  A.  You're welcome.

8  Q.  That was my confusion.  So what happened with the services

9  addendum internally at Lucent after the date of this e-mail,

10 December 15th?

11 A.  Well, what happened was that we did not gain approval to

12 move forward in the way that the contract had been constructed.

13 Q.  You did not gain approval from whom?

14 A.  It was mainly from the finance organization.

15 Q.  Other than Mr. Montemarano?

16 A.  Yes.

17 Q.  Who other than Mr. Montemarano?

18 A.  I know that Bill Fullerton raised objections to the way

19 that the contract was structured.

20 Q.  Anybody else?

21 A.  I think it was mainly a finance objection.

22 Q.  Was Ms. Hopkins involved?

23 A.  I do not know if the finance organization escalated to Deb

24 Hopkins.  I was not personally involved in discussions with Deb

25 on this that I remember.

1   Q.   Who communicated that to you?

2   A.   I believe it was a communication with Carol Spurrier --

3   gave to me based on discussions that she had with others in the

4   business.  But I can't be clear as to her discussions with

5   them.

6   Q.   Do you remember what she said to you?

7   A.   That we could not proceed with this contract as structured.

8   We did not have approval.

9   Q.   Did you have any impression as to whether Ms. Spurrier was

10  pleased or displeased with the decision that had been made?

11  A.   Well I would say that Carol and I were both not happy with

12  the final outcome of what -- of where we were on that decision.

13  Q.   We looked earlier at a document in early October in which

14  there was discussion of having a transition period with Winstar

15  employees being paid on a T&M basis.  Do you know why it was --

16  it wasn't until mid-December that someone at Lucent said, "We

17  can't do that," after months of discussion?

18  A.   I don't know why.  I can answer why that came up in mid-

19  December.  It was not raised as an issue.

20  Q.   For the record, Ms. Harris is being handed what's been

21  marked as Harris Exhibit-10 which is an e-mail dated October

22  27th, 2000, from Lee Fawcett to Nick DeTura and others, cc'd to

23  Miss Harris and Miss Gaines.  Bates numbered LW-17843 to 17844.

24  A.   Okay.

25  Q.   Do you recognize the document?

11-61

```
1   arrangement, and because initially Lucent will not acquire any
2   headcount, there's virtually no risk in this proposal.
3   Therefore, the only real downside is low margins for the first
4   year" {end quote}.  Do you see that?
5   A.  Yes.
6   Q.  Did you agree with that statement?
7   A.  Did I agree with it at the time?  Yes.  At the time, I
8   agreed with it.
9   Q.  If you look at the top paragraph, it states, {quote} "The
10  original intent of the general agreement with Winstar was for
11  Lucent to perform many of the operational tasks deliverables.
12  Lucent has not done so.  So Winstar developed its own
13  capability.  They still want Lucent to take on a much larger
14  role." Do you agree with those statements?
15  A.  Yes, that was our understanding of the agreement.
16  Q.  For the record, you've been handed Harris Exhibit-11, which
17  is a document titled, "Business Status -- Winstar New Services
18  Briefing."  Bates #LW-28748 to 28749.
19  A.  Okay.
20  Q.  If you look at the very last bullet point on that page, it
21  states, {quote} "Lack of clarity, WRT" {end quote} -- which I
22  assume means "with regard to?"
23  A.  Correct.
24  Q.  {Quote} "Addressing the year-end deal and Nina's letter
25  commitments" {end quote}.  Do you see that?
```

1  end of September deal for that quarter, and it was kind of

2  confusing situation.  And I don't know that at this point I

3  understood all the nuances around the situation.  But how the

4  credit was applied seemed to be of concern to both Rick Uhl and

5  to Michael Montemarano.  They had several conversations on that

6  subsequent to his e-mail as far as whether it was an actual

7  draw down against the finance agreement or whether it was a

8  credit that was put against future purchases.  So there was

9  more of a discussion as to how it applied versus whether it was

10  an agreed upon credit.

11  Q.  You state that it is a contractual obligation.  Was it your

12  understanding that there was no dispute what -- that the credit

13  was owed, it was just a question of how it was going to be

14  applied?

15  A.  Right.

16  Q.  The last sentence of paragraph two states, {quote} "Deb

17  Hopkins has frozen all money to Winstar" {end quote}.  Do you

18  see that?

19  A.  I see that.

20  Q.  Do you know what that refers to?

21  A.  Deb Hopkins wanted -- would not allow us to do any

22  processing of Winstar draw downs unless it had her approval

23  first.  So it was not an automatic.  She had to get approval on

24  it.

25        MR. KING:  I believe it says "Give approval on it."

1  Q.  Do you recall when she implemented that freeze, for lack of
2  a better word?
3  A.  I think it was in this time frame that it occurred.
4  Q.  Do you know why she did that?
5  A.  I think Deb at that time had a concern regarding getting
6  the 200 million from Winstar prior to releasing any additional
7  monies.
8  Q.  Given the rejection of the services addendum that had been
9  drafted, what was Lucent's view and proposal about how to
10 proceed with regard to outsourcing towards the end of December?
11 A.  Well, I think the view was that we needed to reset the
12 relationship overall.  We needed to have discussions at the
13 senior level and that we would readdress that services
14 outsourcing agreement and how to move forward based on the
15 discussions we started holding at the senior level.
16 Q.  What do you mean by, {quote} "Reset the relationship" {end
17 quote}?
18 A.  I guess what I mean is there were aspects of the supply
19 agreement which the situation had changed for both companies.
20 So we weren't exactly following what a lot of the terms had
21 been set originally.  So the original version of the supply
22 agreement, that each of our companies were in different spaces,
23 so we ought to relook at what the agreement had been and what
24 was the relationship we wanted to -- wanted as we moved forward
25 together.

1          MR. KING:  Just to correct, on 143, line 13, I believe

2   it says "vision" rather than "version."

3   Q.   What do --

4        (Role play deposition testimony interrupted)

5          THE COURT:  What line, Counsel?

6          MR. KING:  I'm sorry, Your Honor?

7          THE COURT:  What line?

8          MR. KING:  143, line 13.  It's the last line on page

9   43 of the printout.

10         THE COURT:  And you see -- think that should be

11  version?

12         MR. KING:  Well, she -- I'm sorry, she read it as

13  version --

14         THE COURT:  Oh, okay.

15         MR. KING:  -- it should be vision, just wanted to

16  correct the record.

17         THE COURT:  The record that they won't type?

18       (Laughter)

19         MR. KING:  They're typing this -- they're typing the

20  reads.

21         THE COURT:  That's true.  This they will type.

22         MR. KING:  They're correct, they're typing in the

23  reads.

24         THE COURT:  You're right.

25       (Role play deposition testimony continues)

1   Q.   What do you mean when you say, {quote} "Each of our

2   companies were in different spaces" {end quote}?

3   A.   If you look at the supply agreement, when it was written,

4   it was with certain assumptions that did not happen as we saw

5   in the services area.   So Winstar had gone ahead and they were

6   performing a lot of the services already.   So we were both --

7   we were doing different things that we had originally

8   envisioned that we were going to do in the supply agreement.

9   So we saw it as an opportunity to talk about that, and see what

10  we wanted to do, going forward.

11  Q.   When you say certain assumptions that didn't happen in the

12  services area, was it your understanding that the intent of the

13  supply agreement was that Lucent would be performing those

14  services that Winstar was doing?

15  A.   That was the original intent.

16  Q.   And in the early part of 2001, am I correct in

17  understanding that Lucent made a proposal to Winstar to move to

18  what Lucent called "the vendor-integration model"?

19  A.   Yes, we did.

20  Q.   And that model, as I understand it -- correct me if I'm

21  wrong -- envisions a best solution rather than a best of breed

22  standard?

23  A.   Correct.

24  Q.   So would it be fair to say that that was a change in the

25  preexisting relationship between the parties?   Let me put it

**Hayes**

13-29

1    identification)

2         THE COURT:  -- 577, thank you.  Hearing no objection

3    they're admitted.

4       (Defendants Exhibit-368 admitted into evidence)

5       (Defendants Exhibit-577 admitted into evidence)

6         MR. SAUNDERS:  Thank you, Your Honor.

7         MR. KING:  Your Honor, we have no redirect for Ms.

8    Hopkins.  Our next witness is Paul Hayes and we have -- this is

9    a deposition read again.  Mr. Jeff Press is gonna be doing the

10   reading for the witness.

11        THE COURT:  Paul Hayes.

12        MR. KING:  Excuse me?

13        THE COURT:  Is that what you said, Hayes?

14        MR. KING:  Paul Hayes, H-A-Y-E-S.  May I approach,

15   Your Honor?

16        THE COURT:  Yes, please.

17      (Pause in proceedings)

18        THE COURT:  Proceed.

19        MR. KING:  Your Honor, we have a short, brief bridge

20   statement for Paul Hayes.  Paul Hayes served as Lucent's

21   Director of Syndication in the Treasury Department from

22   December 1999 through Winstar's filing in bankruptcy.  Mr.

23   Hayes' testimony relates to Lucent's efforts to obtain pre-

24   payments from Winstar in 2000.

25        THE CLERK:  Excuse me, sir, who's doing the reading

13-40

1  A.  No, I don't -- I don't recall at what point his departure

2  was, but --

3  Q.  Who replaced him?

4  A.  Debbie Hopkins.

5  Q.  Did she continue this focus on reducing loans and loan

6  commitments?

7  A.  Yes.

8  Q.  Let me mark this as Hayes-2.  Mr. Hayes, I just put another

9  document in front of you that has been labeled as Hayes-2.

10 This is an e-mail chain.  I would like you, if you could, to

11 focus on the e-mail that is the second one down on the page.

12 It's dated October 19th, 2000.

13 A.  Okay.

14 Q.  It's from Peter Derrick to Deborah Hopkins.  It's appears

15 to be forward -- a forwarding of another e-mail below that was

16 sent to you.

17 A.  Where I was copied, yes.

18 Q.  Okay, do you recall whether or not Lucent drafted a re-

19 finance notice by October 19th of 2000 to be sent to Winstar?

20 A.  Yes, I recall a re-financing notice.

21 Q.  Lucent had, in fact, drafted one?

22 A.  Yes.

23 Q.  You're just not sure whether this e-mail was forwarding

24 that re-financing notice?

25 A.  Right, and I don't know if the re-finance notice that I saw

1  was the one that was ultimately sent.

2  Q.  Okay, do you know if the re-finance notice was sent as --

3  let me read the quote, I'm sorry.  The e-mail reads, {quote}

4  "Per the e-mail below, we're planning to issue a re-finance

5  notice next week to Winstar," {end quote} and the e-mail below,

6  I think, was redacted, although there is no redact stamp on

7  here because there's no e-mail below.  Did Lucent issue a re-

8  finance notice the following week to Winstar?

9  A.  I don't recall the timing of the re-finance notice.

10  Q.  Okay, we can come back to that.  Do you see the e-mail

11  above from Deborah Hopkins to Peter Derrick?

12  A.  Yes, I do.

13  Q.  You testified earlier that the re-financing threshold was

14  $500 million, is that correct?

15  A.  Yes.

16  Q.  Does this e-mail indicate that the Lucent loans are gonna

17  be over $500 million on or shortly after October 19th when this

18  borrowing request was honored?

19  A.  I want to say yes, but it actually is a conflicting

20  statement in here.

21  Q.  In what way?

22  A.  The first bullet seems to indicate, like you said, that it

23  says 189 million is going to be drawn down, and that would

24  bring the total to 685 million.  If you do the math of 189 from

25  685, that's less than 500 million, but then the last bullet

1  says in the present tense, since now the loans exceed 500

2  million.  The last bullet seems to indicate it's already in

3  excess of 500 million.  So, I would presume that the last

4  bullet, even though it appears to conflict with the first

5  bullet, is speaking -- intending to speak in the future tense

6  and it should have been written, you know, since the loans will

7  -- will then exceed 500 million once this drawn down takes

8  place.

9  Q.  Reading the e-mails you just suggested, which I think makes

10  sense, would this suggest to you that on or about October 19th,

11  Winstar -- on or shortly after October 19th Winstar was going

12  to exceed the $500 million threshold?

13  A.  Yeah, it looks like from the e-mail that Winstar was about

14  to exceed the 500 million threshold.

15  Q.  And at this point, Lucent has already drafted a re-finance

16  notice to be sent to Winstar, correct?

17  A.  Yeah, my recollection is the re-finance notice was drafted

18  before time.

19  Q.  And you don't recall if the re-finance notice went out the

20  next week?

21  A.  No, I don't.

22  Q.  Let's mark this one as Hayes-4.  You were involved fairly

23  heavily in the decision of whether or not this re-finance

24  notice was to go out, isn't that right?

25  A.  I was involved from the standpoint of being aware of the

1  terms within the document because my role was to manage the
2  sale of loan, drawn loans in particular, you know, sale of
3  loans -- sale of loans and pre-payment of loans and so as part
4  of that, this being one of the larger loan transactions, it's
5  natural for me to be -- to look into and be aware of whether or
6  not I could sell the drawn loans or, you know -- what the
7  rights are of Lucent within the document to either effect the
8  sale of the loans or effect the pre-payment of the loans.  And
9  so my role in sending out the finance notice was I would
10 characterize as largely bringing it to people's attention.  I
11 wanted to have an active role, frankly, in the negotiating with
12 the customer that might result from sending out the re-finance
13 notice, but -- and I remember pushing to that end but I wasn't
14 -- I wasn't involved.  I was not directly involved in the
15 negotiations with the customer or actually the physical sending
16 out of the notice.
17 Q.  You wanted to be involved, but you ended up not being
18 involved?
19 A.  I wanted to be directly involved, yeah.  In the sending out
20 of the notice and negotiation with the customer, but I wasn't.
21 Q.  Why did you want to be directly involved?
22 A.  I was -- I felt it was important to send out the notice and
23 it -- in my experience, sometimes Lucent is reluctant to take
24 such steps, so I -- I wanted to be involved in directly making
25 it happen.

1  Q.  Are you suggesting that you were pushing for the re-finance
2  notice to go out?
3  A.  Yes, I was.
4  Q.  And there was some resistance at Lucent to that idea?
5  A.  I think that it is more of the case that I anticipated that
6  the company may not elect to send out the notice and that I
7  recall specifically anybody saying that wouldn't be a good
8  idea.  In fact, my recollection is I -- I shaped -- I explained
9  the terms of the mechanism to people, Beth and Martina and
10 others within Treasury, described why I thought it was
11 important to send out the notice, and my recollection is that
12 people within Treasury that I spoke to were -- generally seemed
13 to think it was a good analysis or a reasonable judgment to
14 send out the notice.
15 Q.  So, the people within Treasury agreed with you that sending
16 out the re-finance notice would be a good idea?
17 A.  Well, my recollection was the initial response was along
18 the lines of it was useful for me to bring this -- for me to
19 bring this to people's attention, but then I remember that
20 there was some discussion about what the implications of
21 sending out the notice and in fact, partially as a result of
22 the sum of the questions I raised.  For instance, I raised
23 questions like I wasn't sure whether -- by sending out the
24 notice it would be a discloseable event for Winstar or Lucent
25 or both.  And I think within the credit team or within the

1 customer finance team a concern was articulated as to whether
2 the notes would be sellable or Winstar would be able to pre-
3 pay. So, there was a -- a question emerged which is the
4 financial condition of Winstar and the implications of sending
5 out the notice.
6 Q. Was there a concern that sending out the re-finance notice
7 could bankrupt Winstar or harm Winstar significantly?
8 A. I think there are two questions there. On bankrupt, I
9 don't recall specifically anything. I don't recall any concern
10 about bankruptcy, and I know in my own mind I was nowhere close
11 to thinking that was a possibility on sending out the notice.
12 But to the question of whether it might cause some financial
13 harm, I think that I was aware and other people were aware that
14 sending out a notice like that had financial implications for
15 Winstar.
16 Q. Did other people -- to your knowledge, did other people at
17 Lucent have concern about whether or not the re-finance notice
18 might harm Winstar?
19 A. Yeah, I think that there was concern, and I'm not sure
20 where it emanated from, but after -- after I had advocated --
21 after I made people aware of sending this mechanism, this
22 mechanism for sending out the notice, after people understood
23 it, and generally I think several people articulated some
24 interest in taking the next steps towards that direction --
25 that from some quarter there became this concern about the

1   financial condition of Winstar in response to that notice.  It

2   would be from -- I could only speculate where it would be, but

3   I would suspect or speculate it would be within the customer

4   finance or credit team.  So Leslie Rogers, Beth Pericone or the

5   credit organization, but more likely, the form of Leslie Rogers

6   or Beth Pericone.

7   Q.  Let's take a step back for a second.  There's been

8   documents looked at already today that showed it as early as

9   October 19th or October 20th Lucent was contemplating issuing

10  the re-finance notice, right, if you look back at Hayes-2?

11  A.  I would say we contemplated it when we negotiated it.  So,

12  on day one of the agreement we anticipated that as a very

13  important mechanism and central to the agreement -- fundamental

14  to the agreement, in fact.

15  Q.  I understand what you're saying, but you couldn't

16  contractually issue a re-finance notice until Winstar exceeded

17  $500 million of loans, correct?

18  A.  That's what I recall.

19  Q.  In Hayes-2 we saw that Winstar was about to exceed that

20  $500 million threshold around October 19th of 2000, right?

21  A.  Yes, that's what the e-mail says, but I also made the point

22  that it also -- I don't know, but you would have to look at the

23  record.  But it also might have been exceeded prior to that

24  because it's possible for the loan balance to go down as well

25  as up, so it's possible at an earlier date it was above that

1   500 million threshold and paid down and then -- so it was

2   exceeding for a second or third time as of the date of that e-

3   mail.  It's possible.  I don't know.

4   Q.  I understand what you're saying.  Here's my question.  The

5   right to send a re-financing notice -- it was a right, it

6   wasn't an obligation.  Lucent could issue a re-finance notice

7   or it could choose not to, correct?

8   A.  Yes.

9   Q.  Did Lucent intend to issue the re-finance notice as soon as

10  the $500 million threshold was reached?

11  A.  Now, if that's the same question you were asking earlier, I

12  understand it better.  But I think there would be a different

13  answer, depending on how you asked, but that was clearly from

14  my perspective -- my intention.  And in my role as managing

15  this loan the -- managing the sale of loans and the pre-payment

16  of loans to the portfolio whole, absolutely, yeah -- that that

17  -- it was my intent to send out -- to -- in the case of

18  Winstar, send out the re-finance notice when I could, not

19  before.  Not before or after, but when it came time, but yeah -

20  - when it came time -- when I could send out the re-finance

21  notice that I would because --

22  Q.  Okay.

23  A.  -- because I had allocated by the terms of the deal $500

24  million of drawn loan exposure was allocated to Winstar before

25  that mechanism would hit.  But then above that mechanism --

1   above that threshold my recollection is that I then had certain

2   rights to remove that, some of that exposure.  And by the way,

3   the removing of the drawn loan exposure opened up new

4   commitments for them.

5   Q.  Which is why it was a revolver as you said before?

6   A.  Yeah, I would describe it as a revolver.  I think that's an

7   accurate term.

8   Q.  Let me follow up on a point you made before.  You've

9   testified a couple of times today that you weren't sure if this

10  was the first and by this, I'm talking about October 20th -- if

11  this was the first time that Winstar exceeded the $500 million

12  threshold?

13  A.  Right.

14  Q.  But you just testified that in your mind you wanted to --

15  you were tracking Winstar and it was your intent to issue the

16  re-finance or to press for issuing a re-finance notice as soon

17  as the $500 million threshold was reached, right?

18  A.  Right.

19  Q.  So if the $500 million threshold had been reached at an

20  earlier point in time, would you have pressed at that point to

21  issue the re-finance notice?

22  A.  I think I would have and I think I may have.  I don't know

23  the timing of these events, but I recall pressing.  I recall

24  sending out an e-mail to the -- I recall doing -- doing a

25  thorough review of the document and understanding the details

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

**B682**

1  Q.  What is your reading of what she's suggesting in that

2  fourth bullet point?

3  A.  Well, to be honest, I find it a confusing e-mail and a

4  confusing point.  But she's -- but she's articulating a concern

5  about Winstar's financial condition.

6  Q.  I'm sorry, back track to Hayes-4 for one second.  The e-

7  mail on the front, the first page of it.

8  A.  Yes.

9  Q.  The November 2nd e-mail from yourself to Peter Derrick, do

10 you see that?

11 A.  Yes.

12 Q.  The first sentence says, {quote} "As discussed before, in

13 my opinion the best course of action is to send the re-finance

14 notice for the full amount that is drawn and know that we will

15 immediately enter into -- enter a negotiation period", {end

16 quote}, do you see that?

17 A.  Yes.

18 Q.  Does that accurately reflect what your position was on

19 about November 2nd?

20 A.  Yes.

21 Q.  Do you remember this e-mail?

22 A.  Yes.

23 Q.  Okay, you have a document labeled Hayes-5 in front of you,

24 do you see that?

25 A.  Yes.

**Holwell**

1          MR. WERBIN:   (Indiscern.).

2          THE COURT:   That's what all the politicians say.

3      (Pause in proceedings)

4          THE COURT:   Are we ready?

5      (Video is played)

6          MR. SLIFKIN:   We have one more videotape for this

7      afternoon, Your Honor.  That is the examination of Mr.

8      Hollwell.  Hand up the books.

9          THE COURT:   Thank you.

10         MR. SLIFKIN:   Okay, may I read the bridge statement?

11         THE COURT:   Please.

12         MR. SLIFKIN:   Mr. Hollwell testifies that Winstar

13     began discussions with Siemens in late Winter, early Spring of

14     2000 about adding a financing vehicle to Siemens' and Winstar's

15     equipment contract and that Winstar never mentioned Lucent as a

16     reason that it was seeking financing.  Mr. Hollwell testifies

17     that the structure of the Siemens loan was dictated by Siemens,

18     not Lucent.  In August 2000, Siemens and Winstar changed the

19     structure of the loan from a vendor financing agreement with

20     the delivery of goods and services to a working capital loan

21     wherein Winstar could use the loan for any corporate purpose,

22     not tied to delivery of goods.  Mr. Hollwell testifies that

23     this change in structure was required by Siemens in order to

24     increase its security status from the equivalent to Lucent

25     under the vendor financing agreement to being above Lucent with

1    bank level security status.  And for convenience, I'll offer

2    into evidence three documents with -- sort of come in either in

3    our designations or theirs.  DX-474.

4            THE COURT:  Yes.

5            MR. SLIFKIN:  DX-516.

6            THE COURT:  Yes.

7            MR. SLIFKIN:  And DX-520.  Thank you.

8            THE COURT:  Hearing no objections, they're admitted.

9        (Defendant's Exhibit-474 admitted into evidence)

10       (Defendant's Exhibit-516 admitted into evidence)

11       (Defendant's Exhibit-520 admitted into evidence)

12       (Video is played)

13           THE COURT:  Stop the tape, please.  Who is this guy?

14   Usually your bridge statement tells me who he is or the

15   introductory questions tell me who he is.

16           MR. SLIFKIN:  Yes.

17           THE COURT:  I have no clue who he is.

18           MR. SLIFKIN:  I think problem here was he was

19   originally gonna be offered in the Trustee's case and argument,

20   but --

21           THE COURT:  Who cares what the reason is.  You tell me

22   who he is.

23           MR. SLIFKIN:  Yeah.  He's from Siemens.

24           THE COURT:  Thank you.

25           MR. KING:  Your Honor, he's a 30(b)(6) witness from

20-156

```
 1   Siemens.
 2            MR. SLIFKIN:  Yes, he's a Siemens corporate
 3   representative.
 4            THE COURT:  Okay.  Thank you.  Start the tape.
 5            MR. SLIFKIN:  Could we start it again.
 6            THE COURT:  Yes.
 7       (Video is played)
 8            MR. KING:  Your Honor, we have no cross for this
 9   witness.
10            THE COURT:  Well, since it's warm and I'm tired, I'm
11   getting a little testy.  That testimony seems to me to have
12   been a waste of time and could have been dealt with with a two-
13   sentence -- maybe a whole paragraph of an agreed statement.  So
14   we just wasted a half hour of our time listening to uncontested
15   testimony.  And I suspect that it was never even raised as a
16   point of discussion between you.  On that note, we'll see you
17   at 9:30 tomorrow morning.  And I understand we have three live
18   witnesses tomorrow.
19            MR. SLIFKIN:  Yes.  Mr. Schacht, Mr. Terrell, and then
20   Mr. Solomon.
21            THE COURT:  Very well.  See you in the morning.  You
22   could leave your stuff if you want.
23            ALL:  Good evening, Your Honor.
24       (Court adjourned)
25
```

**Hopkins**

11-109

```
1    statement for Ms. Hopkins.
2             THE COURT:  Proceed.
3             MR. KING:  Just give me one moment, Your Honor.
4         (Pause in proceedings)
5             MR. KING:  Deborah Hopkins served as Lucent's Chief
6    Financial Officer from April 24th, 2000, through May 4th, 2001.
7    Ms. Hopkins' testimony relates to Lucent's efforts to obtain
8    prepayments of Winstar financing, the nature of the parties'
9    relationship, Lucent's decision to withhold issuing a refinance
10   letter until after receiving the Siemens' repayment, Lucent's
11   payment to wireless, Lucent's policy against bill and hold
12   deals, and Lucent's internal investigation into transactions
13   between the parties.  The 2001 deposition that we'll be
14   reading, Your Honor, was conducted by Mr. Greenblatt from
15   Shearman and Sterling on behalf of the Winstar Companies.  And
16   Mr. Slifkin of Cravath Swaine and Moore represented Lucent.
17        (Mr. King and Ms. Nelson role play deposition testimony)
18   Q.  Ms. Hopkins, my name is Jon Greenblatt, from Shearman and
19   Sterling.  I'll be asking you questions today.  We're on an
20   expedited discovery schedule so I have no intention of wasting
21   your time or anybody's time in this room.  I'm gonna try to get
22   right to it and dispense with a lot of the background questions
23   that we might otherwise go through in a different kind of
24   deposition.  If you could just very briefly outline for me your
25   time, the period of time you were at Lucent and what positions
```

1   you held.

2   A.   Starting April 24th, I believe was the date -- is when I

3   accepted the position and I was the chief financial officer of

4   Lucent until May 4th of 2001, during that entire period.

5   Q.   Okay.  When was the first time you became aware of the

6   Winstar account?

7   A.   Early on was aware that it was a large account in the

8   company.  So probably May I knew of Winstar.

9   Q.   Did you have discussions with Mr. McGinn about Winstar

10  sometime early in the period of time after you started at

11  Lucent?

12  A.   We probably talked about it as -- I'd say, like, June, you

13  know.  Early on about important customer.  We talked about a

14  lot of customers, not just obviously Winstar.

15  Q.   No, I understand that.  Right now I'm trying to focus on

16  Winstar.

17  A.   Right.

18  Q.   What did Mr. McGinn say about Winstar in this period of

19  time?

20  A.   I don't recall specifically.  Only thing I would remember

21  is just saying this is, you know, one of a large client in this

22  emerging market space and we want to continue with the

23  relationship with this client.

24  Q.   Did he describe what the relationship was?

25  A.   No, not at that point.

11-169

1  situation.  So it's hard to believe things deteriorated to that

2  extent that quickly over that short amount of time.

3  Q.  Do you know, do you know?

4  A.  I haven't audited the books myself, but it seems highly

5  likely.

6  Q.  What does?

7  A.  That the information that was shared with us -- I'll put it

8  in nice terms, overly optimistic, and my concern is with our

9  experience with this client I'm not sure what we were shown.

10  Q.  Do you have any evidence that you were shown something that

11  wasn't accurate?

12  A.  I did not go back into because at that point in time they

13  had then filed, so it was really out of our hands to start

14  going back into and auditing what we were given in December.

15  Q.  So do you or don't you have any evidence?

16  A.  I do not have first-hand evidence.  I think it would be an

17  interesting thing to go back and do.

18  Q.  Yes.  We've marked at Exhibit-15 a series of e-mails that

19  are reflected on Bates numbers LW 00059739 through 40.  The

20  bottom e-mail is from Mr. Montemarano to a number of people,

21  and I'm trying to see if you're on here, including yourself,

22  and then you respond in the top memorandum as Mr. Verwaayen's

23  response to your memo, your e-mail dated December 28th, 2000.

24  Now the memorandum from Mr. Montemarano states that Lucent

25  would allow Winstar to use the credit facility to fund services

1  for this quarter, meaning the quarter ending the calendar year

2  2000.  And then your response it goes on, then your response

3  says, "We've already said no to the services funding."  And

4  then above it is Mr. Verwaayen's explanation.  Now focusing for

5  a minute on yours, yours said, "We already said no to the

6  services funding."  What were you referring to?

7  A.  The continuation of yet again doing this pass through PO

8  process with something we said is not going to happen.  We're

9  not going to do it again.

10  Q.  Is that what you understood Winstar to be requesting, to

11  reinitiate the pass through PO process?

12  A.  That's what I recall.

13  Q.  Did you have that conversation with Mr. Verwaayen when you

14  received this e-mail, either Mr. Montemarano's e-mail or Mr.

15  Verwaayen's response to your e-mail?

16  A.  I was not in the office.  I'm not sure where I was.  This

17  is after Christmas.  I don't recall if I spoke to him or just

18  wrote on e-mail.

19  Q.  Do you recall ever speaking to Mr. Verwaayen about the

20  decision to fund services at the end of the year?

21  A.  Oh, yes.

22  Q.  Okay.  What did you discuss with Mr. Verwaayen in those

23  conversations?

24  A.  What the hell did he do -- did you do.  I said, "We had

25  agreed that this is not what we were going to do.  I don't

**Huber**

6-44

1        MR. KING:  Your Honor, what's next is a deposition
2  read from Dennis Huber.
3        THE COURT:  How long will that take?
4        MR. KING:  That's a good question.  My estimate would
5  be probably between an hour and two hours.
6        THE COURT:  Well, why don't we just -- if the readers
7  will be tired, we'll take our break part way through.  Then
8  you'll get the chance to -- and then I'm going to instruct you
9  not to talk to the witness.
10       (Laughter)
11       (Pause in proceedings)
12       THE COURT:  Go ahead.
13       (Attorneys David King and Charles Persing role play
14  deposition of Dennis Huber)
15  Q.  If I could have you begin by stating your name, business
16  and residential address please.
17  A.  Okay.  It's Dennis Huber and business address is Winstar,
18  2545 Horse Pen Road in Herndon, Virginia.  Residence is 1130
19  Spring Vale Road, in Great Falls, Virginia.
20  Q.  Okay.  Did there come a time when you then became employed
21  at Winstar?
22  A.  Yes.  I started working for Winstar in May of 1996.
23  Q.  You mentioned when you first began with Winstar in May of
24  1996 that you began having some interaction with Lucent, is
25  that correct?

1   agreement and the MFN agreement.  So she is familiar with
2   agreements as they stand.  If I had a question about what the
3   agreement means, I usually go to Lisa to find out.  So I view
4   her as a knowledgeable individual.  The purpose of this email
5   is to summarize for me the conversation that he was going to
6   have with Nina Aversano to explain to her where we stood in the
7   budget world as it stood in August of last year so that Nate
8   could clearly paint a picture for Nina of what we were planning
9   to do for the rest of the year, and probably into this year;
10  how much money we had to spend, and how we wanted to spend it.
11  And wanted to make sure that Nina was aware of it, and
12  hopefully brought into the plan.
13  Q.  You talked this morning some about the best of breed
14  requirement and the supply agreement and process surrounding
15  that.  Can you tell me what your understanding is as to the
16  purpose of the best of breed requirement and the supply
17  agreement?
18  A.  The purpose of the best of breed was to ensure that we were
19  able to build the very best possible network that we could and
20  that we wouldn't populate the network, the Winstar network,
21  with the best Lucent equipment, but with the best equipment
22  that was available to Winstar at the time.
23  Q.  Okay.  We talked this morning about the Lucent long haul
24  optronics vis-a-vis Sycamore and some other competitors.  The
25  time that Winstar agreed to purchase the Lucent long haul

1  optronics, were they best of breed?

2  A.   The Lucent optronics at the time that we acquired then were

3  probably not the best of breed.  Nortel, for instance, had

4  developed OC-192 capability where Lucent was still at the

5  OC-48.   There was a number of vendors who were providing an

6  ability to utilize one fiber strand in both directions at the

7  same time.  Lucent's equipment required two fiber strands.

8  Lucent's equipment suffered from size and power deficiencies

9  which would not necessarily make it less than best of breed

10  unless space and power were a big issue.  And in Winstar's

11  case, it was a big issue because we were not a large teleco and

12  we didn't have a lot of space and power.

13  Q.   Can you tell me how Lucent optronics compared with the

14  competition in terms of power, space, and cost?

15  A.   Compared to a company like Sycamore, the space requirements

16  were about -- for the same functionality, were about three

17  times the size for Lucent gear.  Power requirement was about

18  four times the amount for Lucent gear.  And the Sycamore

19  equipment was less expensive, probably in the order of 30% less

20  expensive.

21  Q.   You talked about the OC-192 capability.  Did Lucent give

22  Winstar assurances that it would develop and provide OC-192

23  capability?

24  A.   Yes, it did.  And in fact, we deployed the Lucent equipment

25  with four OC-48 cards in the current deployment of the optical

1  equipment, and Lucent agreed that at some point they would come

2  back and replace those OC-48's with an OC-192 card.

3  Q.  Have they ever done so?

4  A.  They have not done so yet.

5  Q.  Returning to the metro-optronics gear, am I correct in

6  understanding that -- well, I'll restate that.  With regard to

7  the metro-optronics gear, what product -- metro-product has

8  Winstar purchased from Lucent and deployed?

9  A.  We have purchased their optical network system 2.5G

10  equipment and 10G equipment.  The 2.5G essentially stands for

11  10-OC-48 capacity route.  The 10G is essentially 40 -- excuse

12  me, the 10G is essentially 4-OC-48's.  And in addition to that

13  equipment, something called an FT-2000, which is a fiber

14  terminal that allows us to break that optical signal down to an

15  electrical signal.  You need to have both boxes for the Lucent

16  solution in order to convert the optical carrier to an

17  electrical carrier that you can actually using your network.

18  Q.  Is the 2.5G product best of breed?

19  A.  No, it's not.  It falls in the category of too large,

20  again, in consuming more electricity -- more power than its

21  competition.  We looked at the Sycamore solution for metro and

22  came away with the conclusion that the price was about the

23  same, so there was no price advantage.  But in terms of space

24  and power, there was still a factor of three to four on both

25  the space and power.  And we chalked that up to the age of the

1  equipment.  Lucent had built this actually -- it was several

2  years old design and the Sycamore solution was brand new.  And

3  in all high-tech fields, the latest box is typically the

4  smallest and the most efficient.  So, we looked at other

5  providers and really focused in on Cisco's CerNet solution as

6  an optical solution for us to use in the network; not so much

7  because of the optical solution but because of its electrical

8  capabilities and its ability to groom the network.

9  Q.  Do you still have a copy of the supply agreement?

10 A.  I do.  I've got the big version.

11 Q.  Which was not marked as an exhibit to your deposition, but

12 it is Ackerman Exhibit-2?

13 A.  Yes.

14 Q.  Supply agreement between Winstar and Lucent -- if I could,

15 if you could turn your attention back to Schedule A(1) --

16 Schedule A, rather, page A-1 of the agreement.

17      MR. KING:  Your Honor, we have attached a supply

18 agreement into the Huber exhibit book with tabs to help find

19 the appropriate schedules.

20      THE COURT:  And that's PX-123?

21      MR. KING:  Yes, Your Honor.

22 A.  Yes.

23 Q.  And I believe that Counsel discussed with you this morning

24 the bottom portion, second half of paragraph 1.1 that states,

25 "As more fully described herein, Lucent will have full

**Hund-Mejean**

1    MARTINA HUNT-MAJEAN, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. SAUNDERS:

4    Q.  Ms. Hunt-Majean, could please state your full name and your

5    employment for the record.

6    A.  Martina Hunt-Majean.  I am the Senior Vice President and

7    treasurer of Tyco, International.

8    Q.  And could you briefly give us a very brief resume of your

9    educational background?

10   A.  I graduated with a Masters of Economics of the University

11   of Fryeburg in Germany, and then a couple years later I started

12   my MBA at the University of Virginia, the Darden School, and I

13   graduated from that, too.

14   Q.  And I'm going to ask you about your employment at Lucent

15   Technologies, but could you tell us by whom you were employed

16   before you were employed by Lucent Technologies?

17   A.  Yeah, I was a credit analyst at Dow Chemical in Germany.

18   After my graduate degree in the United States, I started with

19   General Motors in the Treasurer's Office in New York City.  I

20   was with General Motors for 12 years, mostly in New York City,

21   but for 3 years I also went over to their subsidiary in the

22   U.K. and was the Treasurer and Comptroller there.  And then I

23   left General Motors in November of -- just late October 2000

24   and I joined Lucent.  And I was with Lucent until December 4th

25   or 5th of 2002, when I joined Tyco International as part of the

1    you can, you know, borrow again $200 million under it.  That

2    $200 million, in this case, would be dropped from the total $2

3    billion availability.  So if you were to repay it, the

4    availability goes down to 1.8.  It's not what's called a

5    revolving line.

6    Q.  It doesn't refresh itself?

7    A.  No, it doesn't.

8    Q.  All right.  Could I direct your attention to the page that

9    has bates #2954.  I think it's the seventh page of the exhibit

10   under heading "Finance Organization Chart #2."  Is that your

11   handwriting --

12   A.  That's Correct.

13   Q.  -- on that page?  Let me see if we can -- first of all, can

14   you tell us what this page purports to represent?

15   A.  Well, this was a page helping me to understand where

16   actually the loan obligation and any collateral that we might

17   have actually reside within the structure of the borrower.  So

18   I mean, obviously we can't read all of the boxes anymore, but

19   it was showing on the very low end where the borrowing was

20   actually residing, so which legal entity borrowed.  And then

21   the other scribble showed basically what kind of guarantees et

22   cetera (indiscern.) is borrowing.  And then I made a number of

23   other notes on it just to try to understand how it relates to

24   the bank loan that the company had.  And in fact, what resulted

25   out of this is that I understood fairly quickly that the Lucent

1   loan that's extended to Winstar was junior to the bank loans.

2   Q.  Just above the word "Lucent" in the middle of the page,

3   there are initials WVF, and next to that there's handwriting --

4         MR. SAUNDERS:  Perhaps we can blow that up.

5   BY MR. SAUNDERS:

6   Q.  Can you tell us what that is a reference to?

7   A.  WF U.S. --

8   Q.  It looks to me like U.S. borrower?

9   A.  U.S. equal borrower, I think, Yes.

10  Q.  Do you know --

11  A.  It's probably an equal-sign borrower.

12  Q.  Do you know WVF was?

13  A.  Well, that was the Winstar entity that would have been the

14  borrower for the loan.

15  Q.  All right.  And next to that there's an arrow and there's

16  some further handwriting.  On the right-hand side it appears to

17  -- can you tell us what that says?  That's your handwriting?

18  A.  This is subordinated to the bank loan and --

19  Q.  Big debt?

20  A.  Big debt.

21  Q.  And what did you mean by that?

22  A.  Basically what it means that if something were to happen to

23  the borrower, that the banks have first dibs on any assets

24  ahead of the Lucent credit.

25  Q.  All right, if you look at the next page of this exhibit,

1        MR. RATHKOPF:  What's the relevance of her state of

2  mind.  Her decision might be relevant, but who cares about her

3  state of mind unless we're accusing her of fraud.  We want to

4  know whether she has a state of mind that was fraudulent.

5        MR. SAUNDERS:  Your Honor, may I continue?

6        THE COURT:  Yes, would you address the hearsay issue?

7  It's not a relevance question.  She's just going on and on

8  about what people told her.

9        MR. SAUNDERS:  Right.  I'm not offering that for the

10  truth of what they told her.  I'm offering that for her

11  understanding of what she was told because she then made some

12  decisions based upon that understanding.  I'm going to ask her

13  in just a minute what decisions she took as a result of that

14  presentation.  Whether what the people told her was actually

15  true or accurate is not what I'm offering this witness'

16  testimony for, Your Honor.  There's enough in the record

17  already to support that.  May I continue, Your Honor?

18        THE COURT:  I'm thinking, Counselor.

19        MR. SAUNDERS:  All right, thank you, Your Honor.

20        THE COURT:  Yes, I'll let you continue if that's where

21  the testimony takes you.  If not, I'm sure Mr. Rathkopf will be

22  moving to strike and I'll be inclined to do so.  Go ahead.

23        MR. SAUNDERS:  Thank you, Your Honor.

24  BY MR. SAUNDERS:

25  Q.  Now, if you would look at the next page of this

1    presentation, Ms. Hunt-Majean, there's a page entitled

2    "Recommendation."  Can you tell His Honor what that refers to?

3    A.   Yeah, that refers to the first request, and in terms of the

4    Siemans loan and whether or not we should be accepting or

5    declining that request.  And the recommendation was to decline

6    the request simply because it puts another competitor --

7    Siemans is a competitor to Lucent -- in a senior position to

8    our loan.  And so that would be a further $200 million that

9    would eat ahead of us into any potential collateral that the

10   company may have.

11   Q.   So the people who were making this presentation were

12   recommending to you that you --

13   A.   Correct.

14   Q.   -- decline the first request?

15   A.   Correct.

16   Q.   And did you ultimately agree with that recommendation?

17   A.   Ultimately I did.

18   Q.   And can you tell His Honor why?

19   A.   As I just said, Siemans would be ahead of Lucent by $200

20   million that would be senior to us.  They would have first

21   claim, similar to the bank group, on any collateral in the

22   company should there be a bankruptcy situation.  And I was not

23   about to let our position deteriorate.

24   Q.   All right.  If you would look at the next page of this

25   exhibit, there's another page entitled "Recommendation."  This

1   would be before the due diligence was concluded, would it not

2   be?

3   A.   The due diligence was concluded on December 15, and almost

4   every day I got an update on the due diligence as evidenced in

5   one of the emails you already have reviewed.

6   Q.   In your November 7, 2000 letter, item 4, where you're

7   writing to --

8   A.   Which is --

9           THE COURT:  What exhibit please, for the record?

10          MR. RATHKOPF:  Oh, yes, I'm sorry, Your Honor.  The

11  Defendant's Exhibit -- it's part of Defendant's Exhibit-487.

12  BY MR. RATHKOPF:

13  Q.   Item 4 in that letter that Mr. Saunders read to you --

14  A.   Is it the November 7th letter?

15  Q.   Page 2, your November 7th letter, you wrote it to Richard

16  Uhl, so you testified.  And Mr. Saunders questioned you, and

17  among other things pointed to item 4 in your letter where it

18  says, "Winstar will provide" -- as a condition, "Winstar will

19  provide Lucent with full access to its books, records and

20  business plans to enable Lucent to provide an extensive due

21  diligence review of the Winstar business.  This will be done to

22  provide Lucent with a better understanding of Winstar's

23  business and plans."  But it was also going to be done, was it

24  not, in order for you -- to help you to assess the effect the

25  refinance notice was going to have if you served it?

1   A.   Absolutely.

2   Q.   But you didn't state that in this letter, did you?

3   A.   Why should I?

4   Q.   I didn't ask you why you should, I asked if you did --

5   A.   No, I didn't.

6   Q.   -- but you didn't.  No.  Now, there's a whole series of

7   emails back and forth in November 2000 talking about serving

8   the refinance notice.  And in one of them, Plaintiff's Exhibit-

9   318, which is this email from you to Paul Hayes, dated Thursday

10  November 16, you say to him, "This is a very good note you

11  wrote and lays out the issues clearly.  We are working on being

12  able to send the notice or {parenthesis} (or threatening to

13  send the notice) {end paren}."  What were you doing when you

14  were working on being able to send the notice?  What did you

15  mean when you said you were working on it?  The due diligence

16  didn't begin until December 1, so what working were you doing?

17  A.   I was -- I wanted to understand, even ahead of the due

18  diligence, if we sent a refinancing notice what implications

19  does that have for the bank credit agreement, for other

20  creditors that have money into Winstar, as well as possibly

21  whether it has any implications for any equity financing that

22  was or would be provided in the future.

23  Q.   And that's a very nice litany, but I think you left out one

24  thing, didn't you?  What effect it would have on the proposed

25  Siemans increase to the bank facility?  Weren't you also

1  considering that at the time as one of those elements?

2  A.  On November 16?

3  Q.  You just said that you were working on it, even in advance

4  of the due diligence, you were considering it as to what effect

5  a refinancing notice might have on equity investment in

6  Winstar.  Weren't you also considering what effect it might

7  have on obtaining the Siemans loan and increasing the bank

8  facility?  Wasn't that all tied together?

9  A.  By November 16 I already knew that the client could obtain

10  the Siemans financing without our consent, so there was nothing

11  that I could do.

12  Q.  Well, if you had served the refinancing notice before

13  December 7th, before the Siemans loan was actually signed,

14  committed to and funded, don't you think that might have had an

15  effect on whether the Siemans loan was made or not?

16  A.  If didn't.

17  Q.  It didn't?  You didn't serve the refinancing notice before

18  December 7th.

19  A.  We didn't, yes.

20  Q.  Yeah, you didn't.  But you didn't -- isn't it true that you

21  didn't because you knew, as a person with your experience and

22  your economic background, that if that notice were sent, the

23  Siemans loan would not be made?

24  A.  The --

25          MR. SAUNDERS:  Objection, Your Honor, there's no

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B702

1    foundation whatsoever for that question.

2        THE COURT:  Overruled.

3    A.   The -- what we did is we wanted to ascertain what

4    implications the refinancing note would have on the financial

5    viability of the customer.  Remember, the customer is

6    purchasing products from Lucent, which was very important to

7    us.  That's why we do vendor financing.  So our primary goal to

8    ascertain whether or not to send the refinancing note was

9    making sure that we understand what impact it has on Winstar,

10   including the financial model.  In order to do that, we had to

11   do a due diligence.  And you can see there was a 4-week delay

12   from the first time that I requested my staff to do a due

13   diligence until we could do it, and then it took us 2 weeks.

14   So we had to take that time in order to understand the effect

15   of a refinancing note.

16       MR. RATHKOPF:  Move to strike as non-responsive to my

17   question, Your Honor, and then I'd like to --

18       THE COURT:  Well, I think it was responsive, but

19   perhaps not complete.  I'll -- the Motion to Strike is denied.

20   Ask your question again and let's see whether you get the rest

21   of the answer you're looking for.

22   BY MR. RATHKOPF:

23   Q.   Isn't it a fact that if you had served the refinance notice

24   prior to the time that the Siemans loan was made on December 7,

25   the Siemans loan would not have been made, and that was one

1 factor that you were considering in -- as to when to send the
2 refinancing notice?
3 A.  No, it was not a factor in terms of considering the timing
4 of the refinancing note.  And in fact, I do not know what would
5 have happened to the Siemans refinance -- or the Siemans
6 financing if we would have sent it.
7 Q.  So if you were the Treasurer of Siemans and the refinancing
8 notice got sent, which would have triggered all of the
9 possibilities you just discussed, including selling conversion
10 notes on the open market 100 days later, your testimony is you
11 would have made that loan, it wouldn't have affected your
12 decision anyway?
13 A.  I don't know what the Siemans Treasurer would have done.
14 Q.  But what would you have done, ignored it?
15 A.  I would have not ignored it, but I would have looked at
16 what we do all the time in terms of what is the market for
17 Winstar loans, whether -- is this loan saleable in the market
18 and is the market deep enough.
19 Q.  All right, and your memo reflects the answer to that does
20 it not, that due diligence memo that you just said summarizes
21 that facts?
22 A.  What we said is --
23 Q.  I didn't ask you what you said.  I just said your memo
24 reflects an answer to that, does it not?
25 A.  That is correct.

**Jules**

1      MR. KING:  That's it, Your Honor.  Your Honor, the

2 next witness that we would like to read into the Court is Frank

3 Jules.  Mr. Jules' deposition was not video taped and Mr.

4 Persing is going to do us the honor of playing the part of

5 Frank Jules.  Would you like him to read from the witness

6 stand, Your Honor?

7      THE COURT:  It would probably be easier in the sense

8 that the microphone system would pick it up better.

9      MR. KING:  Okay.

10      THE COURT:  Do you have exhibits?

11      MR. KING:  Oh, yes.

12     (The Court and Clerk confer)

13      MR. KING:  May I approach, Your Honor?

14     (The Court receives documents)

15      MR. KING:  Your Honor, we have a brief bridge

16 statement for Mr. Jules as well.

17      THE COURT:  Go ahead.

18      MR. KING:  Frank Jules was hired as Winstar's

19 President and Chief Operating Officer in August 2000, reporting

20 to Nathan Kantor.  Mr. Jules' testimony relates to Winstar's

21 financial situation and relationship with Lucent in late 2000

22 and early 2001.

23      THE COURT:  Go ahead.

24    (Attorneys David King and Charles Persing role playing

25 deposition testimony of Francis Jules)

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*    **B705**

1  speculation in the street that Lucent was going to have

2  troubles of their own or walk away from Winstar and walk away

3  from other customers, which put a lot of nervousness in the

4  industry.  It was a very small industry, that was the trouble

5  we were having.

6  Q.  Was there any other trouble that Winstar was having that

7  isn't, in your mind, tied to Lucent funding of Winstar products

8  and services?

9  A.  No, all our troubles were wrapped up in Lucent at that

10 point in time.  Remember, Lucent built our network, planned our

11 network, designed our network, financed our network.  We had

12 all their switches, software, our operational systems, DSS

13 systems.  They did everything for us.  That was going to be an

14 issue if they did not continue to perform those services or

15 continue to fund, or if we lost our credit line or they didn't

16 pay the $92 million.  All those things were going to be very,

17 very problematic because we were so reliant upon Lucent to

18 deploy, build, manage, and maintain our network.

19 Q.  Let me mark as Jules Exhibit-1 document bearing production

20 #ZWC0161529 through 30.

21 A.  Okay, I have an answer to this question.

22 Q.  Do you recall seeing this document before?

23 A.  Let me read it for a second.

24 Q.  Sure.

25 A.  Now that you showed this to me, I remember this.

1  Q.  Do you recall seeing this document before?

2  A.  Yes.

3  Q.  Can you identify it please?

4  A.  It is a memo from Dennis Huber to Frank Jules subject

5  Lucent content for 2001.  It's dated March 26, 2001.

6  Q.  Who is Dennis Huber?

7  A.  Dennis runs engineering.  He works for Mike Locke.

8  Q.  Mike Locke is President Network Services, is that correct?

9  A.  Correct.

10  Q.  Do you recall receiving this memo on or around March 26,

11  2001.

12  A.  I would say that would be a safe assumption.

13  Q.  Do you have any reason to believe you didn't receive it on

14  or around that date?

15  A.  No.

16  Q.  Did you mark the document that we have marked as Exhibit-1?

17  A.  Did I just mark it?

18  Q.  Yes.

19  A.  Yes, I circled a number.

20  Q.  What number did you circle, just for the record, so we have

21  that clear?

22      MR. KING:  And there's an instruction from the

23  attorney, "You should not mark exhibits.  From now on don't

24  mark the exhibits."  "Okay."  "And put on the record what you

25  did mark."

```
1         (Role playing of deposition testimony continues)
2    Q.  For the record, could you identify the marking that you
3    made on Exhibit-1.
4    A.  God, I feel terrible.  I circled a number on the document.
5    That number says 265.9.
6    Q.  Why did you circle that number?
7    A.  I circled that number because you were asking me a question
8    and I thought to get to that number, if I just looked at the
9    number and circled it.
10   Q.  What does that number, 265.9, signify to you?
11   A.  It signals Dennis Huber's view of what he could potentially
12   spend with Lucent.
13   Q.  During what time period?
14   A.  His memo states the 2001 time period, post Q1 expenditures.
15   Q.  Setting aside what had already been spent at that point in
16   Q1 2001, this was Mr. Huber's number going forward, is that
17   your understanding?
18   A.  Of the potential expenditures and certain product
19   categories and certain services with Lucent.
20   Q.  Do you recall having discussions with Mr. Huber or others
21   about what amount of money Winstar could spend on Lucent
22   content during 2001 going forward from this March 26, 2001
23   date?
24   A.  Yes.
25   Q.  Did you have a different position regarding the amount of
```

1 money that Winstar could spend on Lucent going forward from

2 that March 26, 2001 timeframe?

3 A.  Let me understand it.  Did I have a different position?

4 What I was trying to do is understand the pricing of the Lucent

5 elements, what we were trying to build the network, and how

6 much of that could be Lucent.  So this sort of -- this was sort

7 of a recommendation to me for my discussions; actually just a

8 recommendation to me to talk about how we could utilize Lucent

9 in the network on a going forward basis.  That is what this

10 was.  I was asking my team to tell me what we can do for

11 Lucent.  This is, I guess, a response to that.

12 Q.  Stay in the late March 2001 timeframe.  Did you receive

13 other recommendations from your team that had dollar amounts

14 regarding Lucent content spend?

15 A.  I don't remember.  You mean other documents?  Ask the

16 question again.

17 Q.  Do you recall recommendations, other recommendations, from

18 members of your team that would quantify Lucent content spend

19 as Mr. Huber did in his memo to you?

20 A.  I don't remember.

21 Q.  Do you recall any recommendations that had significantly

22 different amounts for Lucent content spend than the one set

23 forth in Mr. Huber's memo?

24 A.  I don't remember.

25 Q.  Do you recall whether or not you had a discussion with Mr.

1  Huber about the amount in his memo and whether or not that was
2  an appropriate amount?
3  A.  It was a view.  You see, the view depends on how fast you
4  will build the network, how many markets you would go into, how
5  much capital you will spend.  It is a view.  This would be the
6  engineering view in terms of how many elements of the network
7  you could build.  We had a big discussion because I wanted
8  Lucent to build more b's because we had an attractive price
9  from Lucent to build b's.  So my discussions on this were why
10  can't Lucent build every b we have to get us to the 10,000
11  number.  This looks light on b's.  If we could build more b's
12  Lucent would have more revenue.  It would be bigger than this
13  and we would get the b's built at a very reasonable rate vis-a-
14  vis other people would be building b's.  So my response on this
15  wasn't that it isn't probably big enough for Lucent, we've got
16  to figure out a way to make it bigger.  Then there was the
17  whole technical mumbo jumbo on what b's they could build or not
18  build based on the hubs that were already in the network.
19  Lucent was trying to figure out a way to build a retrofit hub
20  so they could put Lucent b's behind the non-Lucent hubs.  There
21  was this whole -- we were getting into a discussion of how much
22  we can give to Lucent, how do we get closer to the 70/30.  I
23  would be pushing the team to say this is a view, but this view
24  only has a measly 1,000 b's.  Why can't we do the other 4,000
25  b's which would take this up then, plus service, plus hubs,

**Keefe**

```
1       MR. PASKIN:  -- and 475.

2       THE COURT:  Hearing no objection, they're admitted.

3   (Defendant's Exhibit-78 admitted into evidence)

4   (Defendant's Exhibit-224 admitted into evidence)

5   (Defendant's Exhibit-475 admitted into evidence)

6       MR. PASKIN:  Thank you, Your Honor.

7                   DIRECT EXAMINATION

8   BY MR. PASKIN:

9   Q.  Please state your name, sir.

10  A.  Michael Keefe.

11  Q.  By whom are you employed?

12  A.  Lucent Technologies.

13  Q.  And what is your job with Lucent?

14  A.  I'm currently Law Vice President for corporate.

15  Q.  How long have you worked with Lucent?

16  A.  Since it first began in 1996.

17  Q.  And before that time did you work with Lucent's

18  predecessor, AT&T?

19  A.  Yes, I did.  Since the end of 1990.

20  Q.  And were all of those jobs at Lucent and AT&T in the

21  capacity of being a company lawyer?

22  A.  Yes, they were.

23  Q.  Focusing on the period from 1998 to 2001, could you tell me

24  what your position was at Lucent?

25  A.  Yes, I was a Corporate Counsel and my primary
```

Keefe - Direct                                        19-59

1   October 1998 credit agreement that you were talking about?

2   A.  Yes, that is the credit agreement we entered into in

3   October of 1998.

4   Q.  And is this -- that's an agreement that you personally were

5   involved in the execution of?

6   A.  Yes.

7   Q.  And is that a document that you've read?

8   A.  Yes.

9   Q.  I just want to ask you briefly about some of the principal

10  terms in the first credit agreement.  Could you tell me, under

11  the first credit agreement, what was the total amount of the

12  loan that Lucent made to Winstar?

13  A.  It was a total line of credit of $2 billion, but one of the

14  provisions provided that the total credit exposure Lucent would

15  have at any one time would not exceed $500 million.

16  Q.  And then in the first credit agreement, and you can refer

17  to it if you need to, but what do you recall as being Lucent's

18  collateral position to secure that loan?

19  A.  Sure.  Lucent had loans on substantially all of the --

20  let's see, probably not real estate, but most of the other

21  assets of Winstar and its subsidiaries; basically the core

22  operating network, accounts receivable, and those types of

23  assets.

24  Q.  And under the first credit agreement, what was Lucent's

25  position within Winstar's hierarchy of Creditors?

Keefe - Direct                    19-60

1   A.  Yeah.  I believe we were primarily the only Secured

2   Creditor of Winstar.  Winstar might have had other select

3   secured debt for specific pieces of property, but for the most

4   part we were the only Secured Creditor of Winstar.

5   Q.  Now, you testified a few minutes ago that in May of 2000,

6   Lucent and Winstar entered into a new credit agreement, which

7   we've been referring to here as the second credit agreement, do

8   you recall that?

9   A.  Yes.

10  Q.  And could you just explain for me the circumstances by

11  which Lucent and Winstar came to enter into this new credit

12  agreement?

13  A.  Winstar started talking to Lucent around the end of 1990,

14  beginning of 2000, about wanting to change some of its

15  financial capital structure; raising some additional capital

16  market debt, entering into a bank credit agreement, and we'd

17  want to refinance Lucent's credit agreement.

18        MR. KING:  Your Honor -- sorry, I thought you were

19  done.

20        MR. PASKIN:  I was just gonna say maybe it was what

21  Mr. King was gonna say.  You said 1990, were you referring to

22  the end of 1999?

23  A.  I'm sorry, 1999.  I apologize, end of 1999.  Sorry, okay.

24  So discussions began around that time and went on through the

25  early part of 2000 'til the credit agreement was executed in I

Keefe - Direct                          19-63

1  really special purpose, limited purpose subsidiaries of Winstar

2  whose purpose was to basically borrow money and hold the assets

3  that were being purchased with the loans.  In addition, under

4  the second credit agreement, Lucent only had loans on the

5  specific equipment that it was financing.  It didn't have liens

6  or collateral on any other Winstar assets, or any other Winstar

7  entities.  And there were no guarantees from any of the other

8  Winstar entities or the operating entities of Winstar.

9  Q.  My next question was gonna be how did the collateral

10  position under the second credit agreement differ from under

11  the first.  You may have just answered that question, but if

12  there's anything to elaborate, please do.

13  A.  Well, the collateral position under the second credit

14  agreement was much less advantageous to Lucent than it was

15  under the first credit agreement because, I mean, having -- you

16  know, we only had liens on against specific assets that we were

17  financing rather than the general assets of Winstar itself.

18  Q.  And then with respect to Lucent's seniority among the

19  hierarchy of Winstar's Creditors, could you tell me what

20  Lucent's position was under the second credit agreement?

21  A.  I mean, we were, in effect, structurally subordinated

22  because a lot of Winstar's operating assets were in

23  subsidiaries that were not guarantors of Lucent's loans.  And

24  the banks had the advantage of either -- those subsidiaries

25  were either the borrower or the guarantors of the bank.  There

1 ┃ was also bank credit agreement at that time.  So the banks had

2 ┃ the benefit of that collateral and because Winstar did not have

3 ┃ any claims under any of these other operating subsidiaries,

4 ┃ Lucent was structurally subordinated as well for the general

5 ┃ Creditors of these other Winstar subsidiaries.

6 ┃ Q.  So we've just talked through some of the general principal

7 ┃ terms of the two credit agreements.  In terms of overall

8 ┃ exposure to risk, how did Lucent's position under the second

9 ┃ credit agreement compare to under the first credit agreement?

10 ┃ A.  As far --

11 ┃          THE COURT:  Are you asking his opinion?

12 ┃          MR. PASKIN:  I'm asking him based on his work on both

13 ┃ credit agreements and working with them on a daily basis as

14 ┃ counsel for Lucent.

15 ┃          THE COURT:  Okay.

16 ┃          MR. KING:  Your Honor -- never mind, go ahead.

17 ┃ A.  Lucent had much less -- fewer advantages and was much -- I

18 ┃ say riskier from a collateral and guarantee standpoint under

19 ┃ the second credit agreement than the first credit agreement

20 ┃ because of the absence of guarantees from the various other

21 ┃ Winstar operating subsidiaries.  And also under the second

22 ┃ credit agreement, the lack of collateral of the general Winstar

23 ┃ assets.

24 ┃ BY MR. PASKIN:

25 ┃ Q.  Then do you have an understanding as to why Lucent entered

Perricone

Perricone - Direct                    20-6

1    they're admitted.

2         (Defendant's Exhibit-282 admitted into evidence)

3         (Defendant's Exhibit-310 admitted into evidence)

4         (Defendant's Exhibit-477 admitted into evidence)

5         (Defendant's Exhibit-521 admitted into evidence)

6         (Defendant's Exhibit-525 admitted into evidence)

7         (Defendant's Exhibit-530 admitted into evidence)

8         (Defendant's Exhibit-534 admitted into evidence)

9         (Defendant's Exhibit-545 admitted into evidence)

10         (Defendant's Exhibit-686 admitted into evidence)

11         MR. PASKIN:  Why don't you pull a little bit closer to

12    the microphone, Ms. Perricone.

13         THE COURT:  You can sit back, it will slide towards

14    you.  I promise, it won't hurt you.  Go ahead.

15                        DIRECT EXAMINATION

16    BY MR. PASKIN:

17    Q.   Please state your name for the record.

18    A.   Elizabeth Perricone.

19    Q.   By whom are you employed?

20    A.   Wachovia Bank.

21         THE COURT:  Would you spell you last name please, Ms.

22    Perricone?

23    A.   Sure, it's P as in Peter, E-R-R-I-C-O-N-E.

24         THE COURT:  Thank you.

25    BY MR. PASKIN:

1   Q.   And by whom are you employed?

2   A.   Wachovia Bank.

3   Q.   Have you ever worked for Lucent Technologies?

4   A.   Yes.

5   Q.   When?

6   A.   February of 2000 through September of 2002.

7   Q.   And while you were working at Lucent, could you tell the

8   Court what position or positions you held?

9   A.   When I first joined Lucent I was a Senior Manager in the

10  Treasury Division of Lucent in the Project Finance Group for

11  North America.  And then I was promoted to the Director of

12  Customer Finance for North America in approximately April of

13  2001.  And when I left Lucent I was the Director of Investor

14  Relations.

15  Q.   Prior to your job in Investor Relations, could you briefly

16  explain what your responsibilities were in your jobs relating

17  to Customer Finance at Lucent?

18  A.   My responsibilities for Customer Finance were to work with

19  Lucent's clients who were looking to obtain financing for

20  Lucent equipment, primarily, and we would analyze business

21  plans of those clients, financial models of those clients, and

22  determine if Lucent could provide financing.  We would

23  structure the financing, we would document the financing, close

24  the financing, and we would often take part in syndicating the

25  financings.

1    provisions to this Credit Agreement because of the fact that we

2    did not have the typical assignment rights that one would

3    normally have in a vendor financing like this.  So it gave

4    Lucent flexibility in this document.

5    BY MR. PASKIN:

6    Q.  Now, under the second Credit Agreement what was Lucent's

7    seniority position vis-a-vis Winstar's bank Creditors?

8    A.  The bank Creditors had a priority lien to Lucent's lien.

9    They had a lien on all assets of the company, it was a first

10   lien position.  In this Credit Agreement, Lucent had liens on

11   the specific equipment that Lucent would finance, what we would

12   call purchase money liens, and we were subordinate to the bank

13   lending group.

14   Q.  Now, in your experience in working in vendor financing in

15   Lucent and the specific other vendor financing arrangements

16   that you worked on, did you ever see any other situations where

17   Lucent was in a subordinate position to a borrower's banks?

18   A.  No, typically we would be in that primary collateral

19   position.  This was a very unusual type of transaction for

20   Lucent.

21   Q.  Now, overall, from a commercial lending perspective, did

22   Lucent's treasury organization, yourself included, consider the

23   second Credit Agreement to be a good agreement for Lucent?

24          MR. KING:  Objection, Your Honor, can we have the

25   witness' testimony and not her opinion as to what the entire

1   not issuing the re-finance notice to re-negotiating or trying

2   to re-negotiate the entire, you know, relationship with Lucent

3   and then --

4   Q.  Do you mean with Winstar?

5   A.  With Lucent and Winstar, yes.  And then on the second page,

6   it gives a recommendation.

7   Q.  Okay, now you mentioned in your answer there the re-finance

8   notice.  Could you explain to me what connection, if any, there

9   is between the re-finance notice issue and the due diligence

10  that you conducted?

11  A.  Well, the -- one of the prime purposes of doing the due

12  diligence was to look at Winstar's then current financial

13  condition.  And one of the things we were trying to determine

14  was the health of the company, the financial condition of the

15  company, the ability of the company to perhaps raise additional

16  capital or attract additional capital in order to decide do we

17  issue the re-finance notice.

18  Q.  In that case, was it important to you that Lucent complete

19  its due diligence before making a decision about issuing the

20  re-finance notice?

21  A.  Absolutely.

22  Q.  Now, with respect to the timing of the re-finance notice,

23  which as we saw before was December 19th of 2000, was the

24  timing of issuing that re-finance notice motivated in any way

25  by anything having to do with the Winstar/Siemens transaction?

Perricone - Cross                          20-52

1          THE COURT:  Mr. King.

2          MR. KING:  Thank you, Your Honor.

3                   CROSS EXAMINATION

4    BY MR. KING:

5    Q.  Good morning, Ms. Perricone.

6    A.  Hi.

7    Q.  I just have a couple of quick questions for you that follow

8    up on your testimony from this morning.  If my voice starts to

9    go I apologize.  I'm on the cusp of a cold.  During your

10   testimony this morning, Mr. Paskin showed you DX-686, which was

11   -- you can look at it -- which was a draw request that Winstar

12   made as of May 23rd, 2000, is that correct?

13   A.  686 you mentioned?

14   Q.  Yes.

15   A.  Yes, that's a draw request of May 23rd.

16   Q.  And it was your testimony that Lucent did not honor that

17   draw request, it honored a subsequent draw request later in

18   time, correct?

19   A.  We did not fund this draw request, right.

20   Q.  Now, I'd like to show you an exhibit that's already in

21   evidence in this case, it's been marked as PX-104.

22          MR. KING:  May I approach, Your Honor?

23          THE COURT:  Please.

24      (Plaintiff's Exhibit-104 previously marked for

25   identification)

```
 1   BY MR. KING:
 2   Q.  Have you had a chance to look at that, ma'am?
 3   A.  If you could just give me a few seconds.
 4       (Pause in proceedings)
 5   Q.  You've read it?
 6   A.  Yes.
 7   Q.  Now, during your testimony this morning you weren't asked
 8   any questions about this memo, correct?
 9   A.  That's correct.
10   Q.  But this memo, in fact, was prepared by you the day after
11   you received that draw request, is that correct?
12   A.  That's correct.
13   Q.  And in this memorandum you discussed comments received from
14   Mr. Rubin and Mr. Monaco on that draw down request, is that
15   correct?
16   A.  I basically was summarizing a conversation, and in some
17   cases almost verbatim, from Mr. Rubin and Mr. Monaco.
18   Q.  And you recall, in fact, sending this memorandum to Ms.
19   Aversano and Mr. Casito and Mr. Vercaro?
20   A.  Yes.
21   Q.  Do you remember advising those persons in the third bullet
22   point that Winstar's senior management feels -- further feels
23   that the capital markets are focused on liquidity for companies
24   in their sector, and as such they now believe that maintaining
25   a cash balance on the books of 600 to $650 million is
```

1  appropriate.  And any facilities available to them for funding

2  should be utilized?

3  A.   That was basically Mr. Rubin and Mr. Monaco's comment to me

4  that that was their feeling.

5  Q.   Well, you've said before this was basically verbatim, what

6  you had heard from Winstar, correct?

7  A.   Uhm-hum, yes.

8  Q.   Do you recall advising in the fifth bullet point that Fred

9  -- I assume that's Mr. Rubin -- had reiterated that their

10  recent $1.6 billion high yield raise was only done to support a

11  bank deal which would enable Lucent to be re-paid in full to

12  affect the HY's, is that high yield?

13  A.   HY is high yield, yes.

14  Q.   To effect the high yield and bank deal that came out of

15  pocket of over $250 million in expenses to {quote} "Help

16  Lucent's balance sheet," do you see that?

17  A.   I see that.

18  Q.   And that again is information that you were relaying to Ms.

19  Aversano and Mr. Casito and Mr. Vercaro?

20  A.   Yeah, and that was Mr. Rubin's opinion.

21  Q.   And finally, just one more question about this document,

22  the next bullet down, you also advised them that Mr. Rubin

23  noted that now that Lucent is proposing a {quote} "Turnkey

24  solution, Winstar is being asked to take equipment early to

25  {quote} 'help Lucent recognize revenue' {end quote} and that

1  this equipment now has to be financed and was not built into

2  the model originally supplied to us," do you see that?

3  A.  Yes, I see that.

4  Q.  And these accurately reflected your understanding of the

5  situation following that May 23rd draw request?

6  A.  No, this memo states Mr. Rubin's feelings on the matter.

7  Q.  Okay, thank you.  I'd just like to move on to another topic

8  at this point.  You discussed your due diligence report as well

9  with Mr. Paskin this morning and that was Exhibit PX-201, do

10  you recall that?

11  A.  Yes.

12  Q.  Isn't it a fact, Ms. Perricone, that nowhere in your due

13  diligence report is there any analysis of the fair market

14  valuation of Winstar's assets compared to its stated

15  liabilities?

16  A.  I would need to take a look through the document.

17       THE COURT:  Take your time.

18  A.  I don't recall.

19  BY MR. KING:

20  Q.  Go ahead.

21     (Pause in proceedings)

22  A.  Although the document does not specifically say the terms

23  you described, the fair market value relative to the

24  liabilities, there are certain sections within the document

25  that point to the value of the network and value of the

Perricone - Cross                    20-56

1    business, but not specifically assets versus liabilities.

2    Q.  But your testimony this morning with Mr. Paskin was that

3    you prepared a fair market valuation of Winstar's assets.

4    There's no specific reference to that in your due diligence

5    report that you forwarded on to Lucent?

6    A.  I don't believe that was my testimony.

7              MR. PASKIN:  Objection, Your Honor, that mis-

8    characterizes her prior testimony.

9              THE COURT:  Well, let's find out what her prior

10   testimony -- what she intended her prior testimony to be.

11   BY MR. KING:

12   Q.  Do you recall this morning Mr. Paskin asking you questions

13   about whether or not you performed a fair market valuation of

14   Winstar's assets?

15   A.  I don't believe Mr. Paskin's question was specific to a

16   fair market value appraisal or analysis.

17   Q.  You in fact didn't perform such an analysis, did you?

18   A.  Typically, we look at the viability of a company, we look

19   at the cash flow of the company.  We are not appraisers, we do

20   not go out and prepare appraisals and calculate fair market in

21   a due diligence like this.

22   Q.  Thank you.  I'd like to show you one more exhibit.  Again,

23   this is already in evidence, PX-311.

24              MR. KING:  May I approach, Your Honor?

25              THE COURT:  Yes.

1      (Plaintiff's Exhibit-311 previously marked for

2   identification)

3      (Pause in proceedings)

4   BY MR. KING:

5   Q.   Have you had a moment to look at this exhibit now, ma'am?

6   A.   If you could give me a few minutes.

7   Q.   I'm really just gonna ask you one question about this and

8   I'm just gonna use this to refresh your recollection.   Your

9   testimony this morning, you weren't clear as to when Winstar

10  actually exceeded the re-finance notice, do you recall that?

11  A.   I don't --

12  Q.   The re-finance threshold?

13  A.   I don't recall the specific date.

14  Q.   Right, would this refresh your recollection that at least

15  as of November 2nd, 2000, Winstar was over the re-finance

16  limit?   And this is a memo in which Lucent is considering in

17  fact serving a re-finance notice?

18       MR. PASKIN:   Objection, is the question just does it

19  refresh her recollection or is he characterizing the document

20  in the question or is he asking if that's what the document is?

21  BY MR. KING:

22  Q.   I'll withdraw the question and I'll ask you to just look at

23  the memorandum that you prepared -- well, let me ask you this.

24  Did you prepare the attached memorandum dated November 2nd to

25  Mr. Derrick?

Perricone - Redirect                    20-58

1  A.   I did.

2  Q.   And that's dated November 2nd, 2000, correct?

3  A.   That's correct.

4  Q.   And if you look at the highlights of the Winstar/Lucent

5  loan agreement, the first bullet point, it says there that $690

6  million of Lucent loans are currently outstanding, do you see

7  that?

8  A.   Yes.

9  Q.   Does this refresh your recollection that as of November

10 2nd, Winstar was over the re-financing threshold --

11 A.   Yes.

12 Q.   -- of the Credit Agreement?  Did Winstar refuse to allow

13 Lucent to conduct a due diligence earlier in November?

14 A.   No.

15        MR. KING:   Your Honor, I have no further questions for

16 the witness.

17        MR. PASKIN:   I just a have a few questions, Your

18 Honor.

19                  REDIRECT EXAMINATION

20 BY MR. PASKIN:

21 Q.   Ms. Perricone, you just testified that Winstar did no

22 refuse to allow -- that Winstar did not refuse to allow Lucent

23 to conduct due diligence in November of 2000.  Do you recall

24 whether there were any delays in beginning the due diligence

25 process that you began in December?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-529-0191*

B726

1                    RECROSS EXAMINATION
2   BY MR. KING:
3   Q.  Just clarifying your testimony from this morning, Ms.
4   Perricone, you were discussing security with respect to
5   Winstar's purchases of equipment.
6           THE COURT:  You mean collateral, isn't that --
7           MR. KING:  Collateral, yes, Your Honor, thank you.
8   BY MR. KING:
9   Q.  If Lucent sold equipment to Winstar and that equipment was
10  financed, it's your testimony that Lucent would have a purchase
11  money lien on that equipment, is that correct?
12  A.  I believe so.
13  Q.  Okay, and was it your testimony this morning that Lucent's
14  purchase money lien on that specific purchased equipment would
15  come behind the bank's security interest?
16  A.  No, I don't believe that's how purchase money lien works.
17  What I think I said, or what I meant, was that the overall
18  network, all the other assets of the company, would be ahead of
19  Lucent in terms of a collateral position.
20  Q.  But not with respect to the specific equipment that was
21  secured?
22  A.  My understanding of purchase money lien is that you are the
23  first lien holder on that specific equipment, but there was a
24  fair amount of non-Lucent and basically working capital that we
25  financed that was unsecured.

**Pocalyko**

3-5

```
 1            MR. KING:  -- Palm Pilot.
 2            THE COURT:  -- their names?
 3            MR. KING:  You mean of the specific devices?  Oh, the
 4   people?
 5            THE COURT:  If they're photo cell phones, they won't
 6   get in.
 7            MR. KING:  They're not photo cell phones.
 8            THE COURT:  Do you have the names?
 9            MR. KING:  Of the people?
10            THE COURT:  Yes.
11            MR. KING:  Charles Persing and Will Haines.
12            THE COURT:  And they want to bring in --
13            MR. KING:  The cell phone --
14            THE COURT:  Non-photo cell phone --
15            MR. KING:  -- and a PDA, I think each of them has the
16   device?  Right?  Yes.
17            THE COURT:  All right, would you do what you have to
18   do -- bring it up and I'll sign it.  Thank you.
19            MR. KING:  Thank you, Your Honor.
20            THE COURT:  They're employees of Herrick, Feinstein.
21            MR. KING:  Your Honor, at this point we'd like to put
22   on our expert, Paul Pocalyko.  Mr. Rathkopf is going to handle
23   the direct examination.
24        (Pause in proceedings)
25            THE COURT:  Go ahead.
```

1   employed in preparing that analysis.  As you know, there are

2   many millions of dollars of transactions that occurred between

3   these parties, that's why it took 7,000 hours.  That and the

4   documentation wasn't all available on day one.  We had to make

5   requests, we had to determine what was missing, and we had to

6   incorporate additional documents into the analysis subsequent

7   to receipt of those documents.

8   Q.  Okay.  Now let's go back a little bit to your testimony.  I

9   had asked you some questions about what your forensic

10  accounting analysis of the financial records uncovered, whether

11  there were any areas that came to you as areas of concern in

12  connection with your opinion, and you've already testified to

13  that.  Let's start to talk about those.  Let's start with the

14  first one you mentioned, which was end-of-quarter deals.

15  A.  Yes.

16  Q.  Could you tell me what you saw in the end-of-quarter deals,

17  if anything, that led you to believe there was something

18  further to look at?

19  A.  There were a series of transactions that occur on a regular

20  interval at the end of calendar quarters between Winstar and

21  Lucent.  Winstar was purchasing equipment from Lucent and on an

22  average basis, the end-of-quarter transactions were eight-fold

23  the non-end-of-quarter transactions.  When I looked at the

24  sales on an historical basis, I saw that the end-of-quarter

25  transactions were significantly higher than the non-end-of-

1   quarter transactions.  That was coupled with an accumulation of

2   inventory in Winstar's warehouses.  At the same time I saw

3   these ever-increasing volumes of sales, I saw an ever-

4   increasing volume of warehouse inventory accumulating at both

5   Winstar and Lucent.  The inventory that Winstar was purchasing

6   was accumulating over time and purchases were escalating.

7           MR. RATHKOPF:  May I approach, Your Honor.

8           THE COURT:  Yes.

9           MR. RATHKOPF:  I apologize in advance for this blow

10  up.

11          THE COURT:  As long as it's (indiscern.).

12  BY MR. RATHKOPF:

13  Q.  Mr. Pocalyko, could you tell us what this demonstrative

14  exhibit is?

15  A.  Yes.  This is a blow-up of two exhibits from our report on

16  page 13, the chart 1 is the top chart.  And at Exhibit D

17  appended to our report, the bottom chart.

18  Q.  Could you tell us what those charts are demonstrating?

19  A.  Yeah.  Might I get up and explain, Your Honor?

20          THE COURT:  Sure.  I think there may be a pointer over

21  there if you need it.

22  A.  I can probably do it pretty easily for you, sir.

23          THE COURT:  Fine, fine.  Watch your step, this might

24  be a minefield up here.

25  A.  What I did in the top chart, Your Honor, is just compared

1   on average what I saw on the financial sales.  This was a

2   series of end-of-quarter transactions that I --

3          THE COURT:  Excuse me one minute, will you pick that

4   up?  If you want to -- there's a microphone.  All right, go

5   ahead.

6   BY MR. RATHKOPF:

7   A.   I'll speak as loud as I can -- $80 million on average

8   whereas on a non-end-of-quarter basis, there were $10 million

9   in sales.  I found that eight-fold increase to be high,

10  something that I typically don't see, well it's the end of the

11  quarter.  That disparity is unusual.  Then, you'll note that

12  each of these graphic points on the line are significantly

13  higher than the non-end-of-quarter transactions.  In essence,

14  there was a trend where the parties would continue to purchase

15  and the deals were done at the very end of the quarter.  They

16  were almost in the last few days in the month.

17         THE COURT:  Thank you.

18         MR. RATHKOPF:  May I approach?

19         THE COURT:  Yes.

20  BY MR. RATHKOPF:

21  Q.   Now, do you know how much equipment was in -- how much

22  equipment was in warehouses as Winstar inventory as of March

23  30, 2001?

24  A.   Yes.  Actually the date I had as the inventory listing was

25  March 31, 2001, so that the record's clear.  On page 14 of my

1    report at table 2, there is an inventory summary that came from

2    the inventory documents showing that as of that date there was

3    approximately $327 million of uninstalled network equipment on

4    hand in Winstar and Lucent's warehouses.

5    Q.  And do you know how much of that was in Winstar warehouses

6    and how much of that was in Lucent warehouses as of that March

7    31, 2000 date?

8    A.  Yes.  Approximately $275 million was in the Winstar

9    warehouses and $52 million was in the Lucent warehouses.

10   Q.  Of the $327 million in inventory, how much of it was Lucent

11   equipment, if any?

12   A.  Approximately $256 million was Lucent equipment.

13   Q.  And non-Lucent equipment?

14   A.  Approximately $71 million.

15   Q.  Of the $256 million in Lucent equipment that was in

16   inventory on March 31, 2001, were you able to specifically

17   identify when any of that equipment was originally purchased?

18   A.  Yes.  Using what is known as a FIFO inventory calculation

19   method, first in first out.  We applied an analytical procedure

20   to match the invoices to the purchase orders and ship dates and

21   we verified $74 million of that inventory and the time that it

22   remained in the warehouses of either Lucent or Winstar.

23   Q.  Well, let me understand how you identified it.  Could you

24   explain, before you get to the FIFO portion, how you were able

25   to identify approximately $74 million of Lucent equipment?

1   A.   Yes.  We had an inventory listing that was prepared by

2   Winstar on March 31st.  We had part numbers and specific

3   product identifiers on that inventory listing.  We were then

4   able to trace those back to the part numbers and specific

5   identifiers on some of the invoices that Lucent sent to Winstar

6   for purchases of that network equipment.

7   Q.   So you were able to -- using that process, you were able to

8   match up -- if that's the right word -- approximately $74

9   million of equipment so you could trace when it was first

10  originally purchased?

11  A.   Yes, we were able to determine the original purchase date

12  based on the inventory item numbers and the invoicing.

13  Q.   So where does FIFO come in?

14  A.   We needed to make a determination of how long the inventory

15  was there.  And we wanted to do a conservative calculation.

16  And if you buy three items in January and three items in

17  February, but you've used two in January, you have four left.

18  Which of the six did you use?  We needed to apply a methodology

19  that was conservative, and we wanted to show the shortest

20  holding periods to give Lucent every benefit of the doubt in

21  the calculation.  By using that methodology, we utilized the

22  shortest holding periods for the inventory.

23  Q.   And what did you discover as to that $74 million of Lucent

24  equipment that was in the warehouses on March 31, 2001 that you

25  were able to specifically trace?

Pocalyko - Direct                    3-25

1    A.   The first thing that we found was that 36 million of the

2    $74 million of inventory had been in Lucent's warehouses, not

3    Winstar's, since December of 1999, 15 months prior to the date

4    of the inventory listing.  We found additional amounts of

5    inventory, approximately $23 million that had been in the

6    warehouses from June of 2000 or prior, and that is graphically

7    shown at page 15 of my report.

8    Q.   Now, I may not be great at math, but if I subtract

9    approximately $74 million from approximately 256 million of

10   Lucent equipment, that leaves approximately 182 million?  Is my

11   math right?

12   A.   Your math is correct.  That's about $182 million of other

13   inventory that was on hand at March 31.

14   Q.   And why were you not able to trace that inventory

15   specifically to see when it was purchased and how long it had

16   been sitting in warehouses?

17   A.   We had a very difficult problem, as I mentioned, with vague

18   invoicing.  The parties had a practice of issuing vague

19   accounting documentation for the purchases and sales of this

20   equipment.

21   Q.   Well, what do you mean by vague?  What was vague about the

22   invoices that Lucent rendered or the Winstar purchase

23   documents?

24   A.   The documents provided limited information about the actual

25   purchases that were being made between the parties.  One line

1          (Plaintiff's Exhibit-347 previously marked for

2    identification)

3          (Plaintiff's Exhibit-347 admitted into evidence)

4              MR. RATHKOPF:  Your Honor, we can collect the exhibit

5    and pass it up at the next break, if you'd like?

6              THE COURT:  That's all right, I found Exhibit G and H,

7    and I -- thank you.

8              MR. RATHKOPF:  We're encouraged, Your Honor.

9              THE COURT:  Haven't read them, I've only found them.

10   Go ahead.

11   BY MR. RATHKOPF:

12   Q.   And I believe you just testified that the percentage of

13   overall Winstar purchases of Lucent equipment that were

14   represented by this type of vague documentation was

15   approximately 27%, is that your testimony?

16   A.   That's correct.

17   Q.   And how much Lucent equipment and services were purchased

18   by Winstar in the aggregate in 1999 and 2000?

19   A.   Approximately $706 million.

20   Q.   Does that include the $135 million software pool

21   transaction in September 2000?

22   A.   No, it does not.

23   Q.   How does the percentage of vague invoices here compare to

24   the percentage of vague invoices you have seen in other

25   engagements where you have been asked to review purchase and

Pocalyko - Direct                                3-48

1    Q.  So based on your table 5 calculations, would Lucent have

2    been able to serve a refinance notice at any time in December

3    2000 if the transactions were backed out?

4    A.  If the arm's length transactions were -- if the non-arm's

5    length were reversed, they would not have been able to serve

6    that refinancing notice, as the balance would have been under

7    $500 million.

8    Q.  Your forensic examination of financial records focused

9    largely on transactions and events that ended around September

10   30, 2000.  Is that correct?

11   A.  That's correct.

12   Q.  What is the basis in the financial records for your

13   conclusion that as of December 7th, 2000, Lucent and Winstar

14   were not dealing at arm's length and that Lucent exhibited

15   influence and control over Winstar?

16   A.  Nothing in the relationship changed.  The prior non-arm's

17   length transactions were not reversed.  Lucent continued to

18   charge interest on these transactions.  Winstar was unable to

19   return the inventory that it had pre-purchased.  The -- there

20   was nothing changed.  The relationship continued.  The

21   financial transactions were still in place and enforced.

22   Q.  Now, I think you testified earlier that once you at least

23   did an initial completion of your forensic analysis of the

24   financial accounting records -- I'm sorry, let me withdraw that

25   question and try to get it right.  I believe you testified

Pocalyko - Cross                          3-123

1          THE COURT:  My understanding was that was the cost --

2          MR. SAUNDERS:  All right, fine.  I used the wrong

3    word.  I apologize, Your Honor.

4          THE COURT:  All right.

5    BY MR. SAUNDERS:

6    Q.  What was the cost of the equipment in the Winstar warehouse

7    on the date of its bankruptcy?

8    A.  The adjusted cost, lower from purchase price by Winstar,

9    was $327 million.

10   Q.  $327 million, right?

11   A.  In Lucent and Winstar warehouses.

12   Q.  Now is it your testimony that some of that equipment was

13   pre-purchased unnecessary equipment?

14   A.  Yes.

15   Q.  All right, sir.  Now, did you -- in reaching the conclusion

16   that some of that equipment was unnecessary, did you consider

17   other possible explanations for the existence of that equipment

18   in the Winstar warehouse?

19   A.  Counselor, I'm going to give you the same answer.  I

20   considered the totality of the evidentiary matter, including

21   the forensic analysis of the financial records, the testimony

22   of the witnesses, the other documents.  All that went into my

23   consideration.

24         MR. SAUNDERS:  Your Honor, could I have an answer to

25   my question?

1  Q.  I'll withdrawal that question.  Does this document suggest

2  to you that Winstar probably did, in fact, order the Dell and

3  Compaq computers from Lucent?

4  A.  Take the -- probably, okay.  When you say "did in fact,"

5  take that out of your question.

6  Q.  I'll withdrawal those.  Is the answer to that question yes?

7  A.  They probably ordered it under a purchase order.

8  Q.  Thank you.  Now, in your direct examination and in your

9  report you testified about the dollar, I guess, price paid by

10 Winstar for the equipment that was in its network -- in its

11 warehouse and in the Lucent warehouse as of the date of its

12 bankruptcy.

13 A.  Incorrect, I used the term adjusted cost.  It was not the

14 price they paid.  They had taken intermittent adjustments

15 downward on those purchase prices in their inventory.

16 Q.  And that adjusted cost was what?

17 A.  For all of the inventory --

18 Q.  Yes.

19 A.  -- or the Lucent inventory?

20 Q.  All of the inventory.

21 A.  $327 million 481,028, page 14 of my report.

22 Q.  Now, you conclude that some portion of that was pre-

23 purchased unnecessarily by Winstar, correct?

24 A.  Yes.

25 Q.  And by unnecessarily I take it that you mean that Winstar

1   A.   I've testified to that.

2   Q.   Yes, I know you did and I'm gonna ask you about it.

3   A.   Okay.

4   Q.   Now, in reaching the conclusion that Winstar purchased

5   equipment that it didn't need that you gave in your direct

6   examination, did you consider the testimony given by Mr.

7   Ackerman that I read to you earlier?

8   A.   I considered the totality of the evidentiary matter; that

9   included Mr. Ackerman's testimony, other testimony and

10  inventory that sat in warehouses for --

11  Q.   Right.

12  A.   -- 15 months, 6 months, 9 months, a long time, much of

13  which was still there years after it was purchased.  Never got

14  used --

15  Q.   Well --

16  A.   -- even after the bankruptcy.

17          MR. SAUNDERS:  Your Honor, I move to strike that.  I

18  simply asked him whether he considered that testimony it not.

19  It's a yes or no question.

20          THE COURT:  And he answered yes.

21          MR. SAUNDERS:  Thank you.  I move to strike the rest,

22  Your Honor.

23          THE COURT:  Denied.

24  BY MR. SAUNDERS:

25  Q.   Mr. Pocalyko, when you did consider the Ackerman testimony,

1   A.  -- if you isolate it.

2          MR. SAUNDERS:  Thank you, Your Honor.

3          THE COURT:  Let's keep going.

4   BY MR. SAUNDERS:

5   Q.  Now, I -- we're back now on the $327 million number.

6   A.  Okay.

7   Q.  I want to see if I understand exactly what you're saying.

8   You're saying that this adjusted cost number, however you

9   describe it, vowed -- I don't know what word to use to describe

10  it.  How -- what word should I use to describe the $327 million

11  number?

12  A.  The network equipment on hand in Winstar's warehouse as

13  Winstar accounted for it at March 31st, 2001.  That would be a

14  precise description.

15  Q.  Okay.

16  A.  Their number on their balance -- it's the number on their

17  financial statements.

18  Q.  Right, so just by shorthand can I call it the value or the

19  cost or the price, or what should I call it?

20  A.  It's not the value, it's not the cost, it's an adjusted

21  cost.  They took --

22  Q.  Right.

23  A.  Because the inventory had lost value, they made downward

24  adjustments in their accounting for it.  They bought it for $10

25  in 1999.  By March 31, 2001 --

1  Q.  Right.

2  A.  -- there was a downward adjustment.  It lost value.

3  Q.  All right, now, so the adjusted cost of the equipment on

4  hand in the Winstar warehouse and in the Lucent warehouse under

5  the bill and holds was $327 million, right?

6  A.  Not under the bill and holds --

7  Q.  All right --

8  A.  -- that's the total value of inventory.

9  Q.  In the Winstar warehouse and in the Lucent warehouse?

10  A.  That's correct.

11  Q.  Okay.

12  A.  As of the date March 31.

13  Q.  The total value of the inventory.

14  A.  Not value, the adjusted cost of the inventory in Winstar

15  and Lucent's warehouses as of March 31, 2001.  It's not the

16  value, it's the adjusted cost

17  Q.  The adjusted cost --

18  A.  -- on that inventory.

19  Q.  Now, did you reach a conclusion as to what a reasonable

20  amount of uninstalled network equipment would be?  That is,

21  what would be a reasonable amount for Winstar to have had on

22  hand?

23  A.  A reasonable -- I reached a conclusion when I made my

24  adjustments, as I've testified before, that a reasonable amount

25  would be a 3 to 4 month supply and I looked at their actual

1    A.   Only Lucent equipment.

2    Q.   All right, fine, thank you.  So, and just -- track 4, so

3    that we can see -- and I'll give this in hard copy Your Honor

4    and counsel -- the $77 million is based upon the April to July

5    1999 draw request, that's where the number comes from?

6    A.   That's -- I've looked at the period that had the most

7    activity, one where they installed the most equipment.

8    Q.   Right, and they -- and the $77 million is the total of the

9    Lucent equipment that Winstar acquired during those 4 months?

10   A.   Yes, sir.

11   Q.   And you used that then as a proxy for your conclusion that

12   that would be a reasonable amount of product for Winstar to

13   have on -- to have had on hand as of the date of its

14   bankruptcy, right?

15   A.   Not as of the date of its bankruptcy, as of the date of the

16   calculation I did in December.  I did it as of December 2000

17   and --

18   Q.   Well --

19   A.   -- that's only one of the things that --

20   Q.   Well, I'm sorry, I don't mean to interrupt you, but let me

21   tell you where I'm going.  You have 300 --

22        MR. RATHKOPF:  Well, why don't you not interrupt him

23   so --

24   BY MR. SAUNDERS:

25   Q.   The 327 million number is as of the date of the bankruptcy,

Pocalyko - Cross                    3-180

1    right?

2    A.   The adjusted cost basis.  Understand that inventory --

3    they'd taken millions of dollars of reductions on that value.

4    They bought it for much more than 327.

5    Q.   I'm sorry --

6           MR. RATHKOPF:  Excuse me, Mr. Saunders, would you

7    please --

8           MR. SAUNDERS:  -- I apologize.

9           MR. RATHKOPF:  -- let him finish his answer?  This is

10   the fifth time I've had to stand up for no reason.

11          MR. SAUNDERS:  I apologize.

12          THE COURT:  Are you done with your answer, sir?

13   A.   No, I -- he's asked me is this the only thing -- I think

14   he's asked me --

15          MR. SAUNDERS:  No, I didn't ask that, Your Honor.  All

16   I asked was whether the $327 million number was as of the date

17   of Winstar's bankruptcy --

18   A.   And my response --

19          MR. SAUNDERS:  -- that's all I asked.

20   A.   -- is it's the adjusted cost of the inventory at the date

21   of filing.  It is not what they paid for it.  What they paid

22   for it was much greater.

23   BY MR. SAUNDERS:

24   Q.   I didn't ask that.

25   A.   It's important for where you're going, Counselor.  It's

1 important you understand that.

2          THE COURT:  Thank you, next question.

3 BY MR. SAUNDERS:

4 Q.  All right.  The $77 million number is calculated based upon

5 purchases made in 1999, right?

6 A.  Those are the periods of greatest purchase in a sequential

7 period under a heavy installation where they were buying Lucent

8 materials.  I didn't see all this other stuff -- it was an

9 unimpacted period.  I didn't see non-arm's length things going

10 on back then.  I didn't see all this extra stuff happening.

11 This was a period that seemed clean, and that's why I went to

12 it.  And it was the largest installations during those periods.

13 Q.  Is the answer to my question yes?

14 A.  Yes.

15 Q.  Thank you.  Now, would you look at your -- look again at

16 your Exhibit A.  We've already looked at -- let me just --

17          MR. SAUNDERS:  If you go back, please, Mr. Operator,

18 to put chart 6 back up.

19 BY MR. SAUNDERS:

20 Q.  You added those numbers up and you got roughly 77 million

21 and you concluded that that would be a reasonable amount for

22 Winstar to spend at any -- to have on hand at any time, right?

23 A.  Since they could do a end-of-quarter deal --

24 Q.  Right?

25 A.  -- and purchase inventory quarterly, I said, "Well, they

1  can buy it quarterly, look at 4 months, what's the largest,

2  unimpacted period that doesn't have non-arm's length

3  transactions --

4  Q.   Okay.

5  A.   -- that's the period."

6  Q.   Okay.  And then just so that we're clear, you then subtract

7  that number from --

8  A.   The adjusted --

9  Q.   -- 327 --

10  A.   -- costs --

11  Q.   I'm sorry, Mr. Pocalyko, I made --

12        THE COURT:  Well, let him ask the questions, too.

13  A.   I'm sorry, my fault.

14  BY MR. SAUNDERS:

15  Q.   Did I ask -- I have to ask the questions.

16  A.   Okay, I apologize.

17  Q.   You subtract that number from 327 and you get 250 million?

18  A.   Yes.

19  Q.   Right?  And then you conclude that that 250 million

20  represents pre-purchased unnecessary equipment, right?

21  A.   That's how I got the number and I confirmed it through

22  another process as well.  That -- there are two steps here.

23  That's that first step, yes, sir.

24        THE COURT:  That's one way you got to the 250.

25  A.   That's one way I got the number.

1  BY MR. SAUNDERS:

2  Q.  Thank you, okay.  Now, on Exhibit A, if you look over on

3  the right hand side of Exhibit A -- if you look over on the

4  right hand side of your Exhibit A, there's a column entitled

5  "missing and other," do you see that?

6  A.  Yes.

7  Q.  What is that?

8  A.  These are adjustments and other purchases and credits that

9  are included within the monthly draw request that Winstar

10 submitted to Lucent.

11 Q.  But why aren't they included in your $77 million number?

12 A.  They're not equipment purchases.  The equipment purchases -

13 - the Lucent equipment purchases -- I'm talking about adjusting

14 Lucent equipment.  What's a reasonable amount of Lucent

15 equipment to have on hand?  I concluded 77 was a reasonable

16 amount.

17 Q.  All right.

18 A.  That's what they installed.  You're -- that's -- they got

19 paid based on installations, okay?  And they're drawing based

20 on what they install and what they're using, and that's what's

21 going into the network.

22          MR. SAUNDERS:  Your Honor, may I approach the chart?

23          THE COURT:  If the chart doesn't object.

24          MR. SAUNDERS:  Thank you.  I think Your Honor said

25 there was a pointer here.

1       THE COURT:  Is there one on the shelf on that

2  blackboard.  There used to be one, I think.

3       MR. SAUNDERS:  May I, Your Honor?

4  BY MR. SAUNDERS:

5  Q.  Mr. Pocalyko, do you see on the right hand side under

6  invoice total?  The total invoices -- these were all Lucent

7  invoices, right?

8  A.  No, these are Winstar's -- it's the summary of the WNE

9  draws by month.

10  Q.  Right.

11  A.  Winstar Network Enterprises draws.

12  Q.  For Lucent products.

13  A.  For -- no, the only Lucent product is the ones you've got

14  highlighted.  That's the Lucent products that are going in.

15  Q.  All right, so, but the total -- these are taken from the

16  draw requests.  The total draw request is much greater than $77

17  million.

18  A.  Yes, if you look to the left it includes installation,

19  software and professional services.  Those are in those totals,

20  not equipment.

21  Q.  Right.

22  A.  The total --

23  Q.  It also includes "missing and other," which are not

24  installation, software and professional services, not -- I

25  can't read that (indiscern.) --

1  And you make adjustments downward to the extent you're carrying

2  excess inventory.  In fact, that circumstance curbed Winstar

3  here.

4  Q.  What does that standard have to do with the proposition

5  that a certain level of inventory makes business sense to have

6  on hand and a certain level of inventory does not make business

7  sense to have on hand?

8  A.  As an accountant, when you are looking at inventory levels

9  and the inventory is overvalued because of lengthy holding

10  times or obsolescence, and the client is making reductions,

11  it's clear there's too much when you take a reduction.  I had a

12  client that made circuit boards for electronic watches in the

13  '80s and millions and millions of dollars of circuit boards

14  that they manufactured and held in inventory.  Well, people

15  stopped buying watches that required these circuit boards.

16  They took inventory reductions.  They made too much inventory

17  -- they carried too much inventory.  The accounting guides

18  require us to audit their adjustment downward, make sure it was

19  proper and that the reserves they were booking on that excess

20  inventory were, in fact, accurate.

21  Q.  Were there any such reserves booked in this case?

22  A.  Yes, sir.  There were direct adjustments to the inventory

23  accounting.  You can go to the inventory listing and check and

24  trace it to invoices.  And the inventory values carried by

25  Winstar are lower than the inventory values of the invoices.

Pocalyko - Cross                    4-69

1    BY MR. SAUNDERS:

2    Q.  Could you explain again why -- {what's wrong?}  You're

3    saying that the $250 million is attributable to Lucent

4    equipment only?

5    A.  Yes.  You can validate the $250 million per my direct

6    testimony.  As I testified, I was able to specifically identify

7    $74 million of Lucent inventory that sat in warehouses.  Mr.

8    Rathkopf asked me about the other inventory, and I've testified

9    on direct that of the remaining 182 million, 170 million was

10   over 6 months old.  About half of it is 6-9 months old.  About

11   half of it is over 9 months old.  I think this is pretty clear

12   on the direct.  If you take the 170 plus the 74 I identified,

13   you get 244.  I used 250.  I got there two ways.  I did it this

14   way, which is what I was asked about on my deposition.  I

15   verified it going the other way, which no one ever asked me.

16   Q.  Didn't you say in your report on page 15, footnote 21, that

17   at the time of Winstar's bankruptcy there was $71 million of

18   non-Lucent equipment?

19   A.  Yes.

20   Q.  But you don't think it's appropriate to subtract that from

21   the 250 million?

22   A.  Let's go through it real slow, counselor.  'Cause I don't

23   think you're understanding it.  There's $327 million of

24   inventory, okay.  Seventy-one is non-Lucent content, leaving

25   you 256.  The 256 has been adjusted down by Winstar for the

Pocalyko - Cross                    4-70

1  devaluation, the market value adjustments.  The accounting
2  adjustments I talked about earlier today.  The 256 when
3  purchased was purchased for something greater than 256.  They
4  made millions and millions of dollars of adjustments in the
5  accounting records, you can trace from the inventory listing to
6  an invoice, a product that they purchased for -- this is an
7  example, 100,000, but it's in the inventory listing for 80,000.
8  Q.  So your testimony is that it's not appropriate to subtract
9  the 71 from the 250 million?
10  A.  No, sir.  It's appropriate to do it.  I'm validating the
11  250.  You're talking about subtracting the 71.  That's a 77.
12  You subtract the 71 from the total inventory.  That gives you
13  the Lucent content of 256.  The Lucent content, 256, adjusted
14  cost number is not what Winstar paid.  They paid more than
15  that.  They already took a reduction.  It's already valued at -
16  - the stuff has been sitting for 6-9 months, bought under
17  transactions that we've discussed.
18  Q.  Let me see if I can sharpen up my question.  The 327
19  million includes Lucent and non-Lucent products.  Right?
20  A.  Correct.
21  Q.  $71 million of that at least is non-Lucent product.
22  A.  Correct.
23  Q.  Right?
24  A.  Leaving 256.
25  Q.  Leaving 256.

1    A.   Cost.

2    Q.   Right.

3    A.   In the inventory.

4    Q.   Right.

5    A.   Not what they paid for it.  They paid far more.

6    Q.   Okay.  So, then in order to determine the amount of

7    unnecessary prepurchased equipment, you must then subtract from

8    that number 256, the amount that you say would be reasonable to

9    have on hand, or 77 million.

10   A.   No.  Incorrect.

11   Q.   The delta would be --

12   A.   Incorrect.

13   Q.   -- the excess inventory, right?

14   A.   You are incorrect.  There are two tests that were done to

15   validate the $250 million.  The first test I did --

16   irrespective of the way you've asked the questions -- was I

17   took the inventory that was over six months old that they had

18   purchased, there was 12 million in purchases between October

19   and February, 182 is the remaining, okay?  Do you understand

20   how we got the 182?  Got 182, deduct 12, 170 is left.  It's not

21   identified.  Vague invoices.  Know conclusively it's there for

22   approximately half, six to nine months, the other half over

23   nine months.  To that I had 74 I specifically identified.  One

24   seventy plus seventy four got me 244.  I said, "Let's check it

25   again."  I looked at the installations and I said, "Well, on an

Pocalyko - Cross                                4-87

1   Q.  On page 19 in the next sentence you say, "When this

2   occurred Lucent's rights under the second Credit Agreement to

3   serve a refinancing notice were triggered.  Lucent exercised

4   these rights on December 18, 2000, less than two weeks after

5   Winstar's payment to Winstar's considerable detriment."

6   A.  Yes, sir.

7   Q.  What was the detriment?

8   A.  Well, the detriment is -- I think we covered it on my

9   direct, at least two things I recall.  The rate of interest on

10  the note would go up by 2%, 90 days hence, and the debt would

11  be able to be sold into the secondary market, creating a

12  negative impact.

13  Q.  When could the debt be sold into the secondary market?

14  A.  It's either 90 or 120 days.  I --

15  Q.  105?

16  A.  105.  It -- I'd have to go back to the agreement.  You're

17  really testing my memory.

18  Q.  But not right away?

19  A.  No, not right away.  And the interest, I think, is the

20  same.  It's some period after.

21  Q.  The interest did not kick in when the refinancing notice

22  was given, right?

23  A.  It's -- I think it's 90 days, but it might -- there are

24  different dates on each of these parameters.  We could pull the

25  Credit Agreement out, I could tell you, but I don't recall

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B752

Pocalyko - Cross                    4-88

1  specifically --

2  Q.  So there was no immediate detriment to Winstar?

3  A.  No, no, it was immediate.

4  Q.  Well, they didn't have to refinance the note right away,

5  they didn't have to pay increased interest right away, what was

6  the immediate detriment?

7  A.  The fact that the refinancing was occurring.  The fact that

8  they had notice.  There's a notice of a refinancing that's

9  going to cause a future series of events.  You've now got to

10  replan, you've now got to --

11  Q.  Okay.

12  A.  I mean, if my bank sends me a notice that they're going to

13  increase my rate I feel that I've got to -- a problem.

14  Q.  All right.  There's no doubt that the contract provided for

15  refinancing notice under these circumstances, right?

16      MR. RATHKOPF:  Objection.  These circumstances?  What

17  are we talking about?

18      MR. SAUNDERS:  Yeah, if the loan balance exceeded

19  $500 million there's no doubt that the contract permitted

20  Lucent to serve a refinancing notice.

21      THE COURT:  Are you asking this expert now to testify

22  as to the legality of the results of the -- legal results of

23  that financing agreement?  Because I don't think that's what

24  he's being offered for.

25      MR. SAUNDERS:  No, Your Honor.  I'm simply asking him

Pocalyko - Cross                        4-136

1   March.

2   Q.  So the first in is the first out?

3   A.  Correct.

4   Q.  So your FIFO analysis excludes the $71 million of equipment

5   that you said was non-Lucent equipment, right?

6   A.  That's correct.

7   Q.  You don't do a separate FIFO analysis with respect to that

8   equipment, do you?

9   A.  I did.  I didn't put it in the report.

10  Q.  Why didn't you put it in the report?

11  A.  The inventory wasn't old.  Most of that came from Siemens

12  purchases in January and February, $25 million.  Wasn't

13  relevant.  The stuff was new.

14  Q.  All right.  In footnote 21 on page 15 you state that your

15  FIFO analysis does not include the $135 million of equipment

16  that you say was purchased through vague invoices.

17  A.  Correct.

18  Q.  And that represents approximately 35% of all the equipment

19  that Winstar purchased from Lucent, right?

20  A.  I don't think that number's in my report.

21  Q.  My not be, but you know whether it's right?

22  A.  It's wrong.  On my direct I think you'll find the record's

23  clear.  It's about $706 million between '99 and 2000.  Doesn't

24  include '98 or '01 sales.  So it's a much smaller percentage.

25  Q.  All right.

**Rogers**

1  views Winstar.

2  Q.  Did you at any time express your views as to whether the

3  re-financing notice should or should not be sent to Winstar?

4  A.  Yes, I did privately.

5  Q.  By privately, do you mean not to people at Lucent?

6  A.  No, only to people at Lucent.

7  Q.  Who might have you expressed your views to?

8  A.  Beth Perricone, Peter Derrick, Debbie Hopkins, Bill Vecara.

9  Q.  What was your position with respect to sending out the

10  refinancing notice?

11  A.  The nanosecond this hit 500, they should have received the

12  notice.

13  Q.  Okay, and then Rogers Exhibit-19 is marked, which is PX-339

14  also in evidence.  Exhibit-19 is an email dated November 7 of

15  2000 from Paul Hayes to Peter Derrick, cc'd to Leslie Rogers

16  and others.  The second email -- or rather it's the first email

17  I suppose in the chain, is an email from Beth Perricone to

18  Leslie Rogers, Michael Keith and Paul Hayes dated November 7th,

19  2000.  Ms. Rogers, do you recognize Exhibit-19?

20  A.  Yes, I think so.

21  Q.  If you look at the text beside April 10, 2000 in the

22  summary chronology --

23  A.  Yes.

24  Q.  -- it states about three sentences down {quote}, "At that

25  point, Winstar informed Lucent that they might have to borrow

**Schacht**

1    THE CLERK:  Please be seated.  The United States

2  Bankruptcy Court for the District of Delaware with the

3  Honorable Joel B. Rosenthal presiding.  <u>Winstar Communications,</u>

4  <u>Incorporated</u>, 01-1430, Adversary proceeding 01-1063.  Counsel

5  please identify themselves for the record.

6    MR. KING:  Good morning, Your Honor.  David King,

7  Barry Werbin, and Mr. Rathkopf, who is appearing by telephone,

8  for the Trustee, Christine Shubert, from Herrick Feinstein.

9    THE COURT:  Good morning.

10    MR. SAUNDERS:  Good morning, Your Honor.  Paul

11  Saunders, Daniel Slifkin, and Michael Paskin for Lucent

12  Technologies.

13    THE COURT:  Good morning, gentlemen, are we ready to

14  proceed?

15    MR. SAUNDERS:  Yes, Your Honor.

16    THE COURT:  All right.  Call your next witness,

17  please.

18    MR. SAUNDERS:  We call Henry Schacht.

19    (Witness takes stand)

20        HENRY SCHACHT, DEFENDANT'S WITNESS, SWORN

21      THE COURT:  Proceed.

22            DIRECT EXAMINATION

23  BY MR. SAUNDERS:

24  Q.  Would you state your full name for the record, please, sir?

25  A.  Yes.  Henry Brewer Schacht.

Schacht - Direct                21-6

1   Q.  Are you currently -- I'm --

2           THE COURT:  Excuse me, would you spell your last name,

3   please?

4   A.  Yes, sir.  S-C-H-A-C-H-T.

5           THE COURT:  Thank you.

6   BY MR. SAUNDERS:

7   Q.  Mr. Schacht, are you currently a member of the Board of

8   Directors of Lucent Technologies?

9   A.  I am.

10  Q.  And how long have you been a member of the board?

11  A.  Of Lucent Technologies --

12  Q.  Yes.

13  A.  -- since the fall of '95.

14  Q.  And is that approximately when Lucent was separated from

15  AT&T?

16  A.  Actually that was when it was decided -- and it was finally

17  separated in the spring of '96.

18  Q.  All right.  Now were you ever -- withdrawn.  Did you ever

19  hold any positions at Lucent Technologies other than as a

20  member of the Board of Directors?

21  A.  Yes.  I was the founding chief executive officer from the

22  fall of '95 through the fall of '97.  Then I was a chairman

23  through the -- February of '98, I was a nonresident advisor, in

24  '99, remained as a director 'til I was asked to return in the

25  fall of 2000.  I was the chief executive, second time, from the

1  Q.  All right.  And are you affiliated with any not-for-profit

2  organizations?

3  A.  Yes.  I'm the financial chairman for the Metropolitan

4  Museum of Art, and the chairman of a small school for autistic

5  kids called Gillen Brewer.

6  Q.  All right.  Do you have a relationship with Warburg Pinkus?

7  A.  I'm the -- I'm now a partner and a managing director of

8  Warburg Pinkus, had been since I left Lucent, yes.

9  Q.  All right.  Can you be more specific about the date in the

10  fall of 2000 when you returned to Lucent as chief executive?

11  A.  I believe it was October 23rd.  I believe that's the

12  correct date.

13  Q.  All right, sir.  And what were the circumstances under

14  which you returned to Lucent as chief executive?

15  A.  The company had been going through a difficult period, as

16  the telecom expansion had appeared to slow, and there was a

17  debate at the Board of Directors as to the future course of the

18  company.  And the board decided that the then-chief executive,

19  Rich McGinn's position -- that this was a recovery of Lucent in

20  a market that was still growing -- was not correct.  We

21  believed at the time that this was a market in the -- ought to

22  be in precipitous decline.  And that what was needed was a

23  restructuring as opposed to a continued pursuit of aggressive

24  expansion.  And I was asked to resume the title of chairman and

25  chief executive and undertake a retrenchment as opposed to an

Schacht - Direct                    21-9

1  expansion policy that had been followed up to then.

2  Q.  All right, sir.  During your first term as chief executive

3  at Lucent Technologies, did you have anything directly to do

4  with Winstar?

5  A.  I did not.

6  Q.  All right.  And -- I'm gonna ask you in a minute about what

7  happened after you returned.  But before I do that, I would

8  like to put up on the screen one page from the trial testimony

9  in this case, of Mr. Peter -- Mr. Paul Pocalyko who was a

10 witness called by the Trustee.  And this is from page 3-48 of

11 Mr. Pocalyko's direct testimony.  I'd like to direct your

12 attention to the --

13         THE COURT:  Excuse me, can you read that, sir?

14         MR. SAUNDERS:  I'm gonna blow it up, Your Honor --

15 A.  I have a screen here, sir --

16         THE COURT:  Oh.

17 A.  -- thank you.  Which is very helpful.

18         MR. SAUNDERS:  Yeah.  Could you blow that up a little

19 bit?

20 BY MR. SAUNDERS:

21 Q.  I'm gonna direct your attention to the question that begins

22 at line 8, and all the way down to line 21.  Question, "Your

23 forensic examination of financial records focused largely on

24 transactions and events that ended around September 30, 2000,

25 is that correct?"  Answer, "That's correct."  Question, "What

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

B759

1  is the basis in the financial records for your conclusion that

2  as of December 7th, 2000, Lucent and Winstar were not dealing

3  at arms length and that Lucent exhibited influence and control

4  over Winstar?"  Answer, "Nothing in the relationship changed.

5  The prior non-arm's length transactions were not reversed.

6  Lucent continued to charge interest on these transactions.

7  Winstar was unable to return the inventory that it had

8  prepurchased, the -- there was nothing changed.  The

9  relationship continued.  The financial transactions were still

10  in place and enforced."  Do you see that, sir?

11  A.  I do.

12  Q.  What is your reaction to that testimony?

13  A.  Well, my reaction is that everything at Lucent had changed.

14  And I'd be glad to describe the particular relationships, but

15  let me describe what had changed at Lucent.  I was asked to

16  come back to make a fundamental change in the way the company

17  was exercising its activities.  And basically, before I was

18  asked to come back, we were on a -- expansion mode, heavy

19  emphasis on selling and recovery, because the position that was

20  taken at the time was that this was a Lucent problem, not a --

21  industry problem.  The board had concluded this was an industry

22  problem and we needed to move to a restructuring mode, and that

23  the skill set needed to be changed at the CEO level, and we

24  believed that we had to change what we were doing.

25      And so when I got there, essentially, what I did was talk

1  to a lot of the customers, and virtually everyone in the senior

2  management one-on-one, with a series of meetings.  And the

3  phrase I used with everybody was "old model, new model."  And

4  the old model was essentially a -- aggressive pursuit of

5  business, of a full-scale press to grow a very heavy use of

6  vendor financing, a very aggressive use of bidding for

7  business, offering discounts for future business if it were

8  bought earlier, and essentially, came to the conclusion that as

9  we were worried about, that the business was running way too

10 hot.

11      And so what I was -- what I said to everyone after having

12 interviewed almost all the senior management and having spent a

13 lot of time in the early days -- we're talking about just a few

14 weeks here -- talking to customers, it was very clear to me

15 that we had to change the way we were doing business top to

16 bottom.  And so we essentially changed from a very aggressive

17 selling mode to a retrenchment mode.  And this meant very much

18 pulling back on how we did vendor financing, it meant very much

19 changed attitude towards bidding for future business, it meant

20 a changed attitude toward the way we ran the business.

21      When I got back, we had a small cadre of staff folks and

22 then we had -- I think it was 11 small divisions, each of which

23 was trying to pursue different parts of the product strategy.

24 We changed that completely.  I reorganized the company.  I took

25 Ben Verwaayen, who was really without portfolio, and put him in

1    charge of all the marketing.  I took Bob Holder, who was an
2    operations guy, and I consolidated all the operations under
3    him.  And I took Deb Hopkins, who was a relatively new chief
4    financial officer, and put all of the administrative units
5    under them.  And then the strategy was under Bill O'Shea.  And
6    those were the four senior people, none of whom had any of
7    those portfolios before.

8        So, this -- the basis that nothing changed from September
9    to December is just plain not true.  Everything changed -- the
10   way we did business, who was in charge, the way we organized,
11   the policies of the company, and I can't describe any more
12   graphically -- we had new people, new organization, new way of
13   doing business, a completely different philosophy -- we were on
14   a very rapid expansion, pushing very hard for sales.  We pulled
15   back quite substantially in all of the policies we were doing,
16   reset the company for what turned out to be correctly a
17   retrenchment mode as opposed to a heavy expansion mode.

18       So, new organization, new people, and we had a brand new
19   treasurer who took a very, very detailed look at where we were
20   on the financial side.  That was not a pretty picture.  And so
21   I can't think of anything that didn't change, quite the
22   contrary to what's been said here.

23   Q.   Now, after you came back, did you have an opportunity to
24   meet with anyone at Winstar?
25   A.   Yes, one of the things I did was not only talk to all of

1  the folks that -- internally to see what was going on there

2  both collectively and individually, to impress upon them how

3  different our approach was gonna be.  But I also went out and

4  met with all the major customers.  I started with the Bell

5  operating companies, and then started to work through the

6  competitive local exchange carriers, and one of the first calls

7  I made was to Winstar.

8  Q.  And could you tell the Court about that call?

9  A.  Yes.  I did the same thing there that I did in all the

10  other relationships.  I went in, said, "Describe for me what

11  the business is, how we doing," et cetera et cetera.  And I met

12  with Mr. Rohana, and he described for me the relationship, went

13  back, and how much the two companies were interdependent, the

14  kinds of things that -- they had bought a lot of equipment from

15  us, they had borrowed a lot of money from us.

16      It was a relationship he valued as their major vendor, and

17  that he would -- was not comfortable with the approach of the

18  new chief financial officer or the new treasurer.  He was not

19  comfortable with the new person in charge, Carol Spurrier, who

20  was then in charge of the account.  She was one of our most

21  senior account executives at Lucent.  She had taken over the

22  account, had done a complete review of the account and he was

23  not comfortable with the fact that we were pressing on some

24  legal requirements around their loan agreement that he was

25  uncomfortable with.

1    He asked me at the close of the meeting if we in fact
2  would forego our legal option of notifying them that the debt
3  we held -- we had to give 'em 105 days notice on the debt we
4  held that we were in fact going to sell it.  We couldn't sell
5  it unless we gave 'em prior notice.  He was going to do some
6  financing, he said to me, "Look, I want you not to do that.
7  That's not something that would be helpful."  And I didn't
8  respond.  I said okay, and he said the other thing, we are
9  thinking of doing some financing with Siemens and we'd prefer
10  that you not exercise your rights to have that money go to
11  Lucent to pay down your debt.  And I said I understand that.
12  Let me go back and talk to our folks and see what the answers
13  would be to those questions.  He said, "Well I hope you can
14  accommodate on -- accommodate this -- accommodate us on this,
15  we've had a good relationship in the past and would you please
16  get back to me?"  I said I would.
17  Q.  And did you?
18         THE COURT:  Mr. King -- excuse me, Mr. --
19         MR. SAUNDERS:  I'm sorry.
20         MR. KING:  I'd just like to present an objection.
21  We've now heard in the past 10 minutes, two -- probably six or
22  seven minute monologues from this witness without any questions
23  to develop the examination here.  In addition to which,
24  frankly, I'm a little bit disturbed at Mr. Schacht's testimony
25  because he's discussing things that were discussed at four

Schacht - Direct                                    21-15

1   separate depositions that he never once mentioned, that we're

2   now hearing about for the first time.

3            THE COURT:  Well, you can cross examine him --

4            MR. KING:  We will, Your Honor.

5            THE COURT:  -- with respect to that.

6            MR. KING:  We will.

7            THE COURT:  Let's ask questions and get answers

8   instead of --

9            MR. SAUNDERS:  Certainly, Your Honor.

10  BY MR. SAUNDERS:

11  Q.  Did you get back to Mr. Rohana?

12  A.  I did.

13  Q.  And what did you tell him?

14  A.  I told him that we were going to pursue our rights under

15  the two -- under the contract and that we were going to go

16  ahead with 105 degree notice, and secondly that we were going

17  to require them to pay us the 200 million that they get from

18  Siemens.

19  Q.  And did Mr. Rohana say anything during that conversation

20  that gave you concern?

21  A.  Yes.  Mr. Rohana made a series of comments -- the exact

22  nature of which I don't remember, that caused me to say, "I

23  don't like the tone of that."  I know a threat when I hear one,

24  and I went back and called the General Counsel and said --

25  Q.  Excuse me -- don't.  Please don't tell us what you asked

Schacht - Cross                    21-22

1  Q.  Sure, at any time between October 23rd, 2000 and December

2  7th, 2000, were you aware of the fact that Lucent was

3  considering serving a refinancing notice on Winstar?

4  A.  I testified that we were going to give the 105 day notice,

5  yes.  If that's what you're referring to.

6  Q.  And is your testimony that that occurred before December

7  7th, 2000?

8  A.  That it actually occurred or we were discussing it?

9  Q.  The discussion, sir.

10  A.  Yes.

11  Q.  When did that conversation occur?

12  A.  Well, I was -- what I told Mr. Rohana we were going to

13  proceed, I went back and told our people that they were free to

14  proceed.  I don't know the exact date when they proceeded.

15  Q.  Now you testified also on direct that in this conversation

16  with Mr. Rohana you went back to him and you said no on the

17  Siemens, and no on the refinancing notice.  Correct -- that you

18  weren't gonna defer serving a refinance -- is that what you

19  testified?  That you weren't gonna defer serving a refinance

20  notice?

21  A.  No, I said we weren't gonna waive our rights to it and that

22  we would expect that if they got the money from Siemens it

23  would be used to repay the loans.

24  Q.  And did both of those discussions occur in the same

25  conversation?

Schacht - Cross                    21-23

1   A.   Yes.

2   Q.   You don't recall the date of that conversation?

3   A.   No, I don't.

4   Q.   Isn't it a fact, Mr. Schacht, that you didn't have this

5   conversation until on or about December 14th, 2000?

6   A.   No.   That's not a fact.   It had to be before that.   Well

7   before that.   Because it was -- it had to be sometime in --

8   prior to -- certainly prior to November 21st, and certainly,

9   probably prior to November 15th.   And the reason I know that is

10  that it was -- that was the conversation that caused me to ask

11  for the review of the actions between Winstar and Lucent which

12  caused us to go to the SEC in November.   I think it was

13  November 21st.

14        MR. KING:   Just one moment, Your Honor.

15     (Pause in proceedings)

16  Q.   Mr. Schacht, are you aware of the fact that the refinance

17  notice was not in fact sent to Winstar until December 19th,

18  2000?

19  A.   I think I've already told you I don't know when it was

20  sent.

21  Q.   At any time between October 23rd and December 7th, were you

22  aware of the fact that Deborah Harris was leading a team that

23  was negotiating a transition services agreement to replace the

24  subcontract that I believe you testified about earlier this

25  morning, so that Lucent could perform some or all of the

1  services that Winstar Wireless had been performing under the

2  subcontract?

3  A.  I knew there was a -- ongoing series of discussions about

4  the subcontracting, yes.

5  Q.  And did you know that Deborah Harris was leading that team?

6  A.  Not at the time, no.

7  Q.  Did you take any action to replace the leader of that

8  negotiating team?

9  A.  No.

10  Q.  Did you take any action to stop the negotiation from going

11  forward?

12  A.  I wasn't in -- directly involved in the day-to-day

13  relationships with Winstar.  That was the province of Carol

14  Spurrier, Ben Verwaayen -- Carol Spurrier and her team, and

15  whatever conversations they had directly with Winstar, I don't

16  have any direct knowledge of.

17  Q.  Are you aware of the fact that at the end of December 2000,

18  Lucent's senior management had not approved a final transition

19  services agreement, sir?

20  A.  Am I aware -- was I aware of it then, or am I aware of it

21  now?

22  Q.  Were you aware of it then?

23  A.  I don't remember.

24  Q.  Are you aware of it now?

25  A.  Well, we never did complete it, I do know that, yes.

Schacht - Cross                        21-25

1    Q.   So --

2    A.   And we eventually stopped the practice.

3    Q.   So, is it your testimony then that in December of 2000 you

4    weren't aware that a transition services agreement was being

5    negotiated or you just weren't aware whether one had been

6    consummated?

7    A.   Well, I knew there was a series of discussions about the

8    whole relationship around the service agreement, and I know

9    that was a matter of some continual discussion between Ben

10   Verwaayan, Carol Spurrier, and the team, but I wasn't aware of

11   the details, no.

12   Q.   Are you aware of the fact that at the end of December 2000,

13   even though there was no transition services agreement in

14   place, Lucent paid for the services performed by Wireless in

15   the fourth quarter of 2000?

16   A.   I'm not aware of the details.

17         MR. SAUNDERS:  Objection, Your Honor.  There's no

18   foundation for that question.  None at all.

19         THE COURT:  Why not?

20         MR. SAUNDERS:  Because the question was that Lucent

21   paid for the services.  The record is that Lucent financed the

22   services.  That's the only record on that subject, Your Honor.

23         THE COURT:  Objection sustained.  You can rephrase,

24   though, Mr. --

25         MR. KING:  First of all, I disagree with Mr. Saunders,

BY MR. KING:

Q.  Mr. Schacht, are you aware of the fact that at the end of December 2000 even though Lucent's senior management had not approved a transition services agreement, Lucent financed the services performed by Wireless in the fourth quarter of 2000?

A.  I think I've already told you I wasn't aware of the details of the transaction at the time.

Q.  So, were you aware of whether or not that payment in December 2000 was supposedly made for one last time?

A.  I know there was a series of discussions between -- that I was briefed on -- between the -- Ben, Carol, and the finance folks about whether we would continue that or not and for how long.  And we were trying to terminate that and get to a more clear relationship.  But when that happened, I don't know.

Q.  Now are you aware of the fact that in September 2000, before you returned, Lucent had paid for the Wireless services for the September 2000 quarter also supposedly one last time?

          MR. SAUNDERS:  Same objection, Your Honor.

          THE COURT:  Well, but that -- they had paid for them.

          MR. SAUNDERS:  No.  They -- there was a draw request -- it was a borrowing made under the credit agreement.  It was not a payment.

          MR. KING:  Yeah, I think, Your Honor, this is probably one of the central facts that's an issue in this dispute.

          THE COURT:  I'll allow the question.  I think it is

1   one of the key issues here.  And I'm not sure you're correct.

2   I think depending on your view of the evidence there is or

3   there isn't anything on the record on it.  But I think it's a

4   fair question.  If the witness understands it.

5   BY MR. KING:

6   Q.   Can you answer the question, sir?

7   A.   Could you repeat it for me?

8   Q.   Certainly.  Are you aware of the fact that in September

9   2000, before you returned as CEO and chairman of the board,

10  Lucent had paid for the Wireless services for the September

11  2000 quarter also supposedly one last time?

12  A.   No, I wouldn't have been aware of that at the time.

13  Q.   Now, on November 21st, 2000, Lucent issued a press release.

14  Is that correct, sir?

15  A.   That's correct.

16  Q.   And in that press release, Lucent advised that it was not

17  going to recognize $125 million of revenue from the September

18  2000 software transaction between Winstar and Lucent, correct?

19  A.   That's correct.

20  Q.   Lucent did not cancel or reverse the transaction itself,

21  though, correct?

22  A.   Technically what we -- I don't think you're correct, but

23  can you tell me -- what we did is we issued a press release

24  saying that we'd reversed the 125 million of sales.  We did not

25  have to correct our documents because we hadn't yet filed them.

1   So all we had to do was correct the statement that that 125 was

2   included in the sales.  And I believe we did reverse it.

3   Q.  Well, Mr. Schacht, isn't it a fact that Lucent is seeking

4   to be paid amounts that it claims to be due under that very

5   transaction in this adversary proceeding?

6   A.  I can't answer that question.

7   Q.  And isn't it a fact that Lucent is seeking as a new value

8   credit monies that would have been payable under that same

9   transaction that you just testified you believed was reversed?

10  A.  That's not something I'm competent to give you an answer

11  on.  I just don't know.

12  Q.  Isn't it a fact that although Lucent is seeking payment for

13  the software in this case, Lucent never gave Winstar all of the

14  credits or the price reductions that were also a part of that

15  transaction?

16  A.  Well, the transaction never occurred, best I understand.

17  We reversed the transaction.  The transaction that happened, we

18  reversed.  And it was -- and we did not take credit for any of

19  the sales.  So, I don't understand what you're saying for that.

20  I don't understand your -- would you repeat the question?

21  Perhaps I didn't understand.

22  Q.  Sure, I'll repeat the question for you, sir.  Isn't it a

23  fact that although Lucent is seeking payment for the software

24  in this case, Lucent never gave Winstar all of the credits and

25  the price reductions that were a part of that transaction?

1  A.  I'm not familiar with -- I should not answer that question

2  because I don't know what the final accounting was.

3  Q.  You lack the personal knowledge to be able to discuss that

4  -- the answer to that question, is that fair?

5  A.  Well, the question as you posed it is whether it was booked

6  or not.  And at a later date -- and the answer is, I don't

7  know.

8  Q.  Now, we played testimony from your depositions earlier in

9  this case.  During the Trustee's direct case, concerning

10  Lucent's investigation of the entirety of the Winstar

11  relationship.  Isn't it a fact that the month-long, all-

12  inclusive investigation of the Winstar/Lucent relationship did

13  not conclude until Cravath and Price Waterhouse Coopers

14  rendered an oral report to Lucent's Board of Directors on or

15  about December 21st, 2000?

16  A.  Well, what I know is that the -- we are given a review of

17  all of the Winstar transactions, and the only one we found to

18  be not correct was the 125.  We then asked to review all the

19  other transactions with other folks.  And whether they -- that

20  -- whether that also included further look at Winstar or not, I

21  don't know.

22  Q.  Well, your testimony's clear that's in the record.  So we

23  don't need to go further into that.  But at this point in time,

24  sir, you don't remember whether or not the month-long -- was

25  there an investigation that concluded on or about December

Schacht - Cross                    21-31

1  21st, 2000?

2  A.  Yes.

3  Q.  At this point in time, you don't remember whether that

4  investigation included an investigation of all of the Winstar

5  transactions?

6  A.  I was not privy to -- my instructions to the people doing

7  the investigation was to look at everything that they wanted to

8  look at and that's what they did.  And what they came back to

9  me was the transactions that we changed.

10 Q.  Now consistent with your answer from a moment ago, you

11 should be able to answer this question, I think.  Were any of

12 the end of quarter purchases that Winstar made from Lucent in

13 December of 1999, March of 2000, or June of 2000 reversed on or

14 before December 7th, 2000, or at any time --

15 A.  Not that I know of, no.

16 Q.  -- before or after?

17 A.  Not that I know of, no.

18 Q.  And to your knowledge, did Winstar continue to pay interest

19 for the purchases it made in those transactions during October,

20 and November, and December of 2000?

21 A.  The best of my knowledge, yes.

22      MR. KING:  Just one more moment, Your Honor, please.

23      THE COURT:  Sure.

24      MR. KING:  Your Honor, we have no further questions.

25      MR. SAUNDERS:  Just one last question, Your Honor.

Schacht- Redirect                    21-33

1  answer the question, if you know.

2  A.    Thank you, Your Honor.   I believe we reversed the sales

3  that we had included in the press release of 125 million.

4  BY MR. SAUNDERS:

5  Q.    You reversed the recognition of revenue on your books?

6        MR. KING:  Objection, Your Honor.

7        THE COURT:  I object to that.

8        MR. SAUNDERS:  I'm sorry.

9        MR. KING:  He's leading the witness.

10       THE COURT:  That's a mischaracterization.

11       MR. SAUNDERS:  I -- objection.

12  BY MR. SAUNDERS:

13  Q.    When you say you reversed the sales, what did you mean?

14  A.    When we issued our press release, it had a total amount of

15  sales for the quarter.  And that amount was overstated by 125

16  million.  So, we issued the press release and said that -- our

17  sales were not X, they were X minus 125 million.

18  Q.    All right.  Thank you very much.

19       MR. SAUNDERS:  Thank you, Your Honor.

20       THE COURT:  Anything else, Mr. King?

21       MR. KING:  No further cross for this witness.

22       THE COURT:  I may have a question or two, one moment,

23  please.

24  BY THE COURT:

25  Q.    Sir, when the board determined to replace Mr. McGinn

**Solomon**

Solomon - Cross                    21-123

1   deli, if you like.  But why don't we take a break.  Let us know

2   as soon as you're ready, please.

3           MR. KING:  Certainly.

4           THE COURT:  Thank you.

5           MR. KING:  Thank you, Your Honor.

6           THE CLERK:  All rise.

7       (Recess)

8           THE CLERK:  Please be seated.

9           THE COURT:  Mr. King, ready to proceed on cross?

10          MR. KING:  Yes, I am, Your Honor.

11                      CROSS EXAMINATION

12  BY MR. KING:

13  Q.  Good afternoon, Mr. Solomon.

14  A.  Good afternoon.

15  Q.  Are you a certified fraud examiner?

16  A.  No, I'm not.

17  Q.  Now, isn't it a fact that you rendered no opinion in your

18  report or your testimony today as to whether Winstar or Lucent

19  -- Winstar and Lucent were dealing with each other at arm's

20  length as of December 7, 2000, or any other time?

21  A.  That's correct.

22  Q.  Now, you've reviewed Mr. Pocalyko's report, correct?

23  A.  Yes.

24  Q.  And while you've criticized aspects of Mr. Pocalyko's

25  methodology and now during your testimony this morning some of

1  MR. KING: Your Honor, I apologize. I'm not gonna

2  ask any questions of PX-72.

3  BY MR. KING:

4  Q. Now, in your report you criticize specifically five things

5  that Winstar was considering doing to reduce its 2000 Capex

6  figure, do you recall that?

7  A. Yes, five potential strategies, correct.

8  Q. Right. Now, you don't know for a fact that you were aware

9  of or had seen all of the measures that Winstar was taking to

10 attempt to reduce its final 2000 Capex number, correct?

11 A. I'm sorry, could I hear that question again? I'm sorry, I

12 missed part of it.

13 Q. You don't for a fact that you've seen all of the various

14 measures that Winstar was considering doing to attempt to --

15 (cough) excuse me -- to attempt to reduce its final 2000 Capex

16 number, correct?

17 A. That's correct.

18 Q. So it's possible that Winstar might have been considering

19 doing other things to reduce Capex that you didn't consider?

20 A. That's correct.

21 Q. I'd like to present you with a hypothetical, Mr. Solomon.

22 Let's assume that in November and December of 2000 Winstar

23 approached Lucent and it asked it to repurchase $50 million of

24 optronics equipment that it had purchased but did not need, and

25 let's further assume that Lucent offered to repurchase this

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

B777

Solomon - Cross                                21-128

1  equipment but only at thirty cents on the dollar, you following
2  me?
3  A.   Yes.
4  Q.   Now, if Winstar had returned that equipment to Lucent in
5  December of 2000 at any price would Winstar have been able to
6  reduce its Capex number by whatever Lucent repaid it?
7  A.   Yes.
8  Q.   And even if using the example that I provided, even if
9  Lucent paid Winstar thirty cents on the dollar Winstar would
10 have been able to reduce it Capex by $15 million, based on the
11 $50 million in equipment, correct?
12 A.   I think probably could reduce it by $50 million and take
13 the hit for the rest of it.
14 Q.   Fair enough.  Now, let's ask you another question.  Are you
15 familiar with the pay-as-you-grow program between Winstar and
16 Lucent?
17 A.   At great length, not detail per se.
18 Q.   Okay.  Well, let me ask it then as a hypothetical.  Let's
19 assume that Winstar and Lucent engaged in a program called
20 pay-as-you-grow under which Winstar would purchase equipment
21 from Lucent, like switches, for example, that had greater
22 capacity than Winstar needed at the time of purchase, and
23 Winstar and Lucent agreed under this pay-as-you-grow program
24 that Winstar would pay a reduced price at purchase related to
25 the capacity that it actually needed at that time and that it

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B778

1  would pay additional money to Lucent as it actually used the

2  extra capacity, you understand?

3  A.  Yes, I do.

4  Q.  Okay.  Now, I want you to assume that Winstar agreed as

5  part of end of quarter deals in June 2000 and September 2000 to

6  accelerate payments under this program and to pay Lucent $35

7  million in accelerated pay-as-you-grow before those payments

8  were due to help Lucent get revenue.  You follow that

9  assumption?

10  A.  Yes.

11  Q.  Now, if Winstar had in fact done that would those

12  accelerated pay-as-you-grow payments have increased its Capex

13  calculation for 2000?

14  A.  I don't know.  I'm not sure that they would or wouldn't.

15  Q.  It's possible that it might have reduced it?

16  A.  It's possible it might have been --

17  Q.  Under the hypothetical?

18  A.  -- increased and not reduced.

19  Q.  Increased?

20  A.  I think you asked the question -- I'm sorry, I can't answer

21  that question.  If you could ask it again.

22  Q.  You're correct.  It's possible that if Winstar had made

23  those payments it would have increased its Capex calculation?

24  A.  Yeah, but I really don't think so.  It is possible but I

25  don't think so.  I think it more likely would be a prepaid

1  amount and not classified as property and equipment, because

2  from the understanding that you asked me to assume, there was

3  no obligation for them to make this payment until they needed

4  it, so it would be -- you called it a pay-as-you-grow program,

5  I believe, and therefore it would seem to take the form to me

6  of a voluntarily payment or as a deposit against something that

7  would be used in a later date.

8  Q.  Okay.  I'm gonna move to another question.  You reviewed

9  Mr. Pocalyko's report where he identified millions of dollars

10  of duplicative invoices that Winstar had paid.  Do you recall

11  that?  It's not gonna be in the short excerpt that you have,

12  I'm confident, but do you recall that in Mr. Pocalyko's report,

13  or hearing it in his testimony at trial?

14  A.  That I refuted what his statement was with respect to --

15  Q.  No, no, I'm not asking what your opinion, sir, was with

16  respect to the duplicative payments.  I'm asking if you, in

17  fact, recall Mr. Pocalyko testifying that there were millions

18  of dollars in duplicate invoices?

19        MR. SAUNDERS:  Your Honor, I think this goes beyond

20  not only Mr. Solomon's direct examination, but also beyond his

21  expert report.  I don't think there's anything in his report

22  about duplicate invoices.

23        MR. KING:  Your Honor, I'm going to Capex here.

24        MR. SAUNDERS:  Oh, I'm sorry.

25        MR. KING:  I'm asking questions about Capex.

Solomon - Cross                    21-131

1    THE COURT:  Proceed.

2    BY MR. KING:

3    Q.  Do you recall Mr. Pocalyko's testimony that there were

4    instances were duplicative invoices were sent by Lucent that

5    were paid by Winstar in the millions of dollars?

6    A.  I recall it a little differently than that.  I recall that

7    what he indicated was that Winstar had submitted duplicate

8    invoices to Lucent to be funded under the credit agreement.

9    Q.  Fair enough.  And if those duplicate invoices were in fact

10   paid more than once or financed more than once under the credit

11   agreement it would be appropriate for Lucent to return or

12   refund those payments, correct?

13   A.  Yes.

14   Q.  Now, would those refunds have resulted in reduced Capex as

15   well, if they related to the purchases of Lucent equipment or

16   services?

17   'A.  If they related to the payment of Lucent equipment or

18   services for the network build, yes, it would.

19   Q.  Okay.  I'd like to show you a document that is marked as

20   PX-438.

21       (Plaintiff's Exhibit-PX-438 previously marked for

22   identification)

23           MR. KING:  I don't believe this is in evidence yet,

24   Your Honor.  I would like to move it into evidence.

25           THE COURT:  What number is it?

**Stark**

Stark - Voir Dire                    19-5

1      THE COURT:  Fine.

2      MR. PASKIN:  Lucent calls Christopher Stark.  May I

3  approach, Your Honor?

4      THE COURT:  Yes.

5  (Witness takes the stand)

6      CHRISTOPHER STARK, DEFENDANT'S WITNESS, SWORN

7      THE COURT:  Sir, just -- be comfortable, but please

8  use the microphone.  It's flexible, it will move toward you.

9  You can slide it close to you, but just use it.  Thank you.  Go

10  ahead.

11                          VOIR DIRE

12  BY MR. PASKIN:

13  Q.  Please state your name, sir.

14  A.  Christopher Stark.

15  Q.  Did you submit an expert report in this litigation?

16  A.  Yes, I did.

17  Q.  I place Defendant's Exhibit-702 in front of you.  Is

18  Defendant's Exhibit-702 a copy of your expert report?

19      (Defendant's Exhibit-702 previously marked for

20  identification)

21  A.  Yes, it is.

22  Q.  Now, if you see, sir, at the back of your expert report, as

23  Appendix A, there's a curriculum vitae.  Do you see that?

24  A.  Yes.

25  Q.  And is that your resume, sir?

1  United States --

2  A.  Yes.

3  Q.  -- correct?  And you also testified that you have no

4  personal knowledge whatsoever about what the particular

5  practices were at Lucent during that time period, is that

6  correct?

7  A.  That's correct.

8  Q.  And you also testified, I believe, that you didn't look at

9  any of the documents or materials that were produced in this

10 matter, correct?

11 A.  No, I didn't.

12 Q.  Now, you testified, I believe -- or you didn't testify,

13 excuse me.  Your report states that during the course of your

14 preparation, you reviewed a report by an expert who the Trustee

15 had engaged, Robert Ott.  Correct?

16 A.  Yes, I did.

17 Q.  And Mr. Ott in his report stated that he had reviewed

18 documents that were produced in the litigation as he formulated

19 his opinions, correct?

20 A.  Yes.

21 Q.  And after reading that you nevertheless did not go and

22 review any of the documents that were produced in this case?

23 A.  No, I didn't.

24 Q.  So is it safe to sum up just this line of questioning that

25 you didn't reach any conclusions or opinions specifically about

1  the relationship in place between Winstar and Lucent between

2  1999 and 2000?

3  A.  No, I didn't.

4  Q.  And you also didn't reach any conclusions or opinions about

5  any particular dealings or transactions or series of

6  transactions between Winstar and Lucent between 1999 and 2001?

7  A.  No, I didn't.

8  Q.  And you're not rendering an opinion in any way today as to

9  whether or not the relationship between Lucent and Winstar was

10  arm's length at any point in time?

11  A.  No.  I'm not offering an opinion between -- on the

12  relationship between Lucent and Winstar.

13  Q.  Now, in your report you reached three conclusions, correct?

14  A.  (No verbal response).

15  Q.  At page 4?

16  A.  Yes.

17  Q.  Do you see that?

18  A.  Yes.

19  Q.  Now on page 8 of your report, if you can turn to that.  You

20  noted under Section D, I believe, that customers expected goods

21  to be delivered in 7 weeks, whereas manufacturers needed as

22  much as 30 weeks notice to provide equipment.  Correct?

23  A.  Yes.

24  Q.  And that's based on your experience at Alcatel?

25  A.  When we say 30 weeks work, what I mean there is that when

1  you went to build some of the equipment, when you go to get --

2  buy the components that go into the equipment, some of the

3  component suppliers were closing up the 30 weeks lead time for

4  that particular component.  So --

5  Q.  So for -- I'm sorry.

6  A.  So ideally for us not to build equipment, at necessarily

7  our risk, it would have been desirable to have had 30 weeks

8  notice from a carrier on any order.

9  Q.  Right, and this flows into my next question, which is you

10  noted also in your report that manufacturers were -- I think it

11  says "launching at risk the procurement of parts and some

12  manufacturing to enable the delivery expectations to be met."

13  You're talking about the delivery expectations of the

14  customers?

15  A.  Yes.

16  Q.  Or the carriers, right?

17  A.  Yes.

18  Q.  So manufacturers were taking the risk and preparing

19  equipment in advance of orders to make sure they would have

20  shorter lead times?

21  A.  Yes, we were.  Again, I suppose I ought to stress that this

22  is from my experience in Alcatel on what we did on

23  manufacturing.

24  Q.  Now, I'd like to turn your attention to page 11 of your

25  report where you're discussing inventory.  And I believe Mr.

1    THE COURT:  All right, well your characterization is

2    stricken.  Ask the question.

3    BY MR. KING:

4    Q.  Okay.  Mr. Stark, I'll refer you to two sections of this

5    document.  It's labeled "Second Quarter 2000 End of Quarter

6    Deal Summary," do you see that?  Or "EOQ Deal Summary."

7    A.  Yes.

8    Q.  And it has four divisions of items; stuff we need now,

9    stuff we need later this year, stuff we need next year or years

10   after, and stuff we really need this year that we could be

11   buying instead of the next year stuff.  Do you see that?

12   A.  Yes.

13   Q.  Now, you didn't refer to any instances in your report where

14   you had knowledge that customers were buying equipment or being

15   asked to buy equipment that they knew they wouldn't need until

16   years after, did you?

17   A.  That's correct.

18   Q.  Now, I'd like to just turn you back to page 4, to your

19   second conclusion.  You concluded at page 4 of your report that

20   vendor and technology substitution were possible but required

21   planning and extra cost to operations, is that --

22   A.  Yes.

23   Q.  -- correct?

24   A.  Yes.

25   Q.  And at page 13 and 14 of your report, you make a number of

1  statements with regard to that conclusion, including at page 14

2  that replacing a vendor {quote} "required time, money, and

3  effort" {end quote}, and also could typically take a year or

4  more. Do you see that?

5  A.  Yes.

6  Q.  Now, based on this conclusion, and your --

7        THE COURT:  Excuse me, I don't see it.  Where is it?

8        MR. KING:  I'm sorry, Your Honor.

9        THE COURT:  Page 13?

10       MR. KING:  Page 14, I believe this is in the summary

11 -- "In summary" paragraph.

12 A.  It's the paragraph starting --

13       THE COURT:  Ah, thank you.

14 A:  -- "In summary," yeah.

15       THE COURT:  Thank you.

16 BY MR. KING:

17 Q.  Based on this conclusion and based on your experience at

18 Alcatel, you have no reason to believe that it would have been

19 easy for Winstar to go out and find a new vendor to replace

20 Lucent, do you?

21 A.  What -- my experience -- if I can put some context around

22 it.  My experience on vendor substitution or a carrier's

23 ability to bring in another equipment vendor was this  is that

24 we felt -- and I think it was, as I've testified in the

25 document, we felt that it was difficult for them to do that.

1  However, what we found was that carriers were very keen to make

2  sure that their supplier performed, both in quality and

3  delivery and so on.  So the problem we always faced was that

4  there was an implied threat that another vendor would be

5  brought in to replace us.  And so the term of a new vendor

6  being brought in to the lab, would be used at a time to try and

7  put some pressure on us.  I think it's -- I think from our

8  perspective it was always true that it was difficult for a

9  carrier to replace a vendor in a short time, but we were all

10  building on the basis that these networks were going to have

11  almost an annuity in terms of equipment supply for a number of

12  years.  So being at the heart of the network, being a good

13  supplier into the network meant a lot to us.

14       MR. KING:  Your Honor, I'll move to strike that

15  answer.  It's totally nonresponsive to my question, which is a

16  very simple question.

17       MR. PASKIN:  I disagree, Your Honor.  I think it's

18  absolutely responsive.  Mr. King just doesn't happen to like

19  the answer.

20       THE COURT:  Motion is denied.  Proceed.

21  BY MR. KING:

22  Q.  Well, in any event, replacing -- Winstar replacing Lucent

23  certainly would have required significant time, money and

24  effort, as you said?

25  A.  Yeah.  I was merely trying to put some context around it.

**Terrell**

1        MR. PASKIN:  -- 644 --

2        (Defendant's Exhibit-644 previously marked for

3   identification)

4        THE COURT:  Yes.

5        MR. PASKIN:  -- and 674.

6        (Defendant's Exhibit-674 previously marked for

7   identification)

8        THE COURT:  674?

9        MR. PASKIN:  674, Your Honor.

10        THE COURT:  Hearing no objection, they're admitted.

11   (Defendant's Exhibit-605 admitted into evidence)

12   (Defendant's Exhibit-644 admitted into evidence)

13   (Defendant's Exhibit-674 admitted into evidence)

14                    DIRECT EXAMINATION

15   BY MR. PASKIN:

16   Q.  Mr. Terrell, by whom are you employed?

17   A.  Lucent Technologies.

18   Q.  For how long have you worked for Lucent?

19   A.  Coming up on about 18 years.

20   Q.  And I take it that that would be both with Lucent and its

21   predecessor AT&T before the spin off?

22   A.  That is correct.

23   Q.  Could you briefly for the Court walk through a chronology

24   of the positions that you've held during your tenure with

25   AT&T/Lucent?

Terrell - Direct                    21-38

A.  Yes.  I started in 1987, off the street as a non-management

employee.  In that job I basically did miscellaneous billing,

pricing.  I was then -- did that for about six months.  Was

then promoted to my first management level and at Lucent the

management grades are -- at now, they're at alpha, A, B, C, and

my current level D for director.  And then executive.  I was

promoted to an A2 level.  And I was responsible for doing the

accounts receivable analysis and results reporting.  Did that

for a few years and then was promoted to an A4, again non-

supervisory, and did training for Lucent, basic leadership,

soft skill training.

      And that quickly turned into a quality consulting

internal-type role.  In that quality consultant role, I was

responsible for facilitating quality improvement teams and flow

charting the process for the -- at that time was known as the

financial operations center, which included billing, accounts

receivable, as well as payroll, accounts payable, and the like.

In that job that's where I really began to learn and understand

the breadth of the Lucent systems, particularly around the

billing and the accounts receivable.

Q.  And approximately what time period is that?

A.  Gosh, that was in the -- early '90s to mid '90s, somewhere

in there.  I did the quality consultant role for a good four to

five years.  It really became what was known as the quality

person for the financial -- internal financial center.  I was

1  others, to begin writing these specifications.

2      What these specifications do is they are transmitted to

3  the factory or the provider.  And that factory begins building

4  the equipment.  And that equipment is then staged -- most

5  likely if it's a complex job, staged at some type of warehouse

6  or staging facility.  And if there's installation, of course

7  that's scheduled as well.

8      While this order's being built and then shipped, the order

9  manager will then electronically send an electronic folder with

10  all the pertinent documents -- the purchase order, the firm

11  price quote, the shipping records, et cetera, over to the

12  building team, and we call them asset management.  That's the

13  billers, and in this process the asset manager is checking --

14  first of all, they understand the contract terms.  They're

15  watching the system.  When I say the system, various number of

16  systems to see if this order has shipped.  Is it 50, 60, 70,

17  95% shipped?

18      Once they verify that, they then verify the documents --

19  the purchase order, the quote, and has it shipped at that 90 or

20  95% threshold.  And then they invoice the customer.  And of

21  course a collection process begins to ensue here, and we're

22  looking obviously for cash to pay that invoice off.  And that's

23  just a brief high level.

24  BY MR. PASKIN:

25  Q.  Thank you, Mr. Terrell.

Terrell - Direct                    21-51

1    THE COURT:  -- goods are manufactured, they're

2   shipped, they're received and they're billed for.  I mean,

3   that's not -- their system flow may be a little bit different,

4   but that's pretty much what everybody --

5         MR. PASKIN:  Okay.

6         THE COURT:  -- is supposed to do, so let's move on.

7         MR. PASKIN:  Right.  Well then I'll skip forward, Your

8   Honor.

9   BY MR. PASKIN:

10  Q.  Focusing on Defendant's Exhibit-644, I'll represent to you

11  and the Trustee that it's the same collection of exhibits that

12  -- same collection of invoices that was submitted as an exhibit

13  to the declaration that you submitted with Lucent's summary

14  judgment papers.  And I'll also represent to you that the sum

15  total of the number of the total values of those invoices is

16  approximately $28 million.  Had you performed any analysis with

17  respect to this collection of invoices?

18  A.  Yes, sir, I did an analysis months ago on that set of

19  invoices where I went into the Lucent systems to validate --

20  really two key points at that time -- was validate the shipping

21  time frame and to validate whether or not this invoice was

22  paid.  That was my first analysis.

23  Q.  Okay, now with respect to the shipping time frame, did you

24  in your analysis confirm that all of the invoices that are

25  collected at Exhibit-644 were shipped by Lucent between

Terrell - Direct                              21-52

1  December 8th, 2000 and April 18th, 2001?

2  A.   In my analysis that is correct.

3         THE COURT:  April what?

4         MR. PASKIN:  April 18th, 2001, Your Honor.

5  BY MR. PASKIN:

6  Q.   And in the analysis that you performed, did you confirm

7  whether or not those invoices in Exhibit-644 had been paid by

8  Winstar?

9  A.   The invoices were not paid by Winstar in my analysis.

10  Q.   Now, you said that that was the analysis that you did

11  originally.  Is there any analysis that you've done more

12  recently with respect to these same invoices?

13  A.   Yes, sir.

14  Q.   And what have you done?

15  A.   In addition to the shipment, I also did a second analysis

16  on disputes to see if any of these invoices were disputed by

17  the customer.  And also the second part of the analysis.  I

18  reverified -- actually I had someone else on my team -- an

19  expert also on payment -- analyze, were these in fact paid.

20  Just to check my prior -- and --

21  Q.   And did you find that there -- well, in rechecking the

22  payment issue --

23  A.   Yes.

24  Q.   -- did you find that any of these invoices had been paid?

25         MR. KING:  Objection, Your Honor.  Just to the extent

*Writer's Cramp, Ina.*
Certified Court Transcribers
732-329-0191                              **B793**

1    Lucent's Motion for Summary Judgment.  Do you recall that?

2    A.  Yes, sir.

3    Q.  I'd like to provide you with a copy of that affidavit.

4            MR. KING:  May I approach, Your Honor?

5            THE COURT:  Yes.

6    A.  Thank you.

7            THE COURT:  Is this -- no, this -- is this in

8    evidence already?

9            MR. KING:  Your Honor, it may not be because this

10   relates to the Defendant's case.  If it's not then I'd like to

11   move it into evidence.

12           THE COURT:  Well, let's see, it's PX-480.

13      (Plaintiff's Exhibit-PX-480 previously marked for

14   identification)

15           MR. KING:  PX-480.

16           THE COURT:  Hearing no objection it's admitted.

17      (Plaintiff's Exhibit-PX-480 admitted into evidence)

18   BY MR. KING:

19   Q.  Okay.  Now, this is your declaration that was filed in

20   support of Lucent's Motion for Summary Judgment, correct?

21   A.  From what I remember, yes, sir.

22   Q.  And you recall we went through this affidavit in some

23   detail during your deposition, right?

24   A.  Yes, sir.

25   Q.  Okay.  And if we just look briefly at paragraphs 3 and 6,

1  those paragraphs identify the total amount of new value that
2  Lucent is seeking in this trial, correct?
3  A.  Again, this is the amount that I was briefed on, yes.
4  Q.  As Lucent's 30(b)(6) witness this is what you testified
5  Lucent was seeking as new value in the case, correct?
6          MR. PASKIN:  Just objection, Your Honor, I don't know
7  if he's asking for testimony regarding Lucent's legal theory or
8  the witness's knowledge about what he wrote in his declaration.
9          THE COURT:  I think he's asking with respect to his
10  declaration.
11          MR. KING:  Your Honor, I'm asking as Lucent's -- he
12  provided testimony as Lucent's new value 30(b)(6) witness as to
13  these numbers, and I'm simply confirming that he testified as a
14  30(b)(6) witness that these were the amounts that Lucent
15  claimed as new value.
16          THE COURT:  Well, I'm not sure he can testify as to
17  legal theory.  He can testify as to what he said, what invoices
18  for what periods and the like.
19          MR. PASKIN:  Thank you, Your Honor.
20          THE COURT:  I think that's what the objection is, and
21  I think the objection is well-founded.  You can ask him what he
22  said in 3 and 6 --
23          MR. KING:  Certainly, Your Honor.
24          THE COURT:  -- whether it supports the legal theory
25  or something else is not for him to say.

BY MR. KING:

Q.  Now Mr. Terrell, in paragraph 3 you provided this declaration in which you stated under oath that $42.7 million of license fees from the Lucent software deal were, I guess, due from the period December 8th through the time of the filing in --

          MR. KING:  I'm gonna withdraw that question, Your Honor.

     (Pause in proceedings)

BY MR. KING:

Q.  Now Mr. Terrell, in paragraph 3 of your affidavit you stated that the amount of software fees that were due from the period December 8th through the last date of invoicing for the software pool was a total of $42.75 million, correct?

A.  Yes, I testified 42.75 of those license fee are for the right to use Lucent software in the period beginning December 8th.

Q.  And in paragraph 6 you testified, and I believe you testified briefly about this this morning, that there were approximately $28,566,000 of other goods and services that were provided after December 8th through the filing of the bankruptcy, correct?

A.  That's what it says, yes, sir, in paragraph 6.

Q.  And those are the invoices set forth in DX-644, right?

A.  Yes, sir.

**Verwaayen**

13-163

1  have the reading of Mr. Verwaayen's testimony as our next

2  witness.

3        THE COURT:  Fine.

4        MR. KING:  May I approach, Your Honor?

5        THE COURT:  Sure.

6     (Pause in proceedings)

7        THE COURT:  Thank you so much.

8        MR. RATHCOPF:  I know Your Honor is sorry that these

9  readings are over, but --

10        THE COURT:  Well, you know, I thought long and hard

11  whether I wanted to read these by myself but I came to the

12  conclusion I never would have read them.

13     (Laughter)

14     (Pause in proceedings)

15        THE COURT:  Go ahead.

16        MR. KING:  Your Honor, we have again a brief bridge

17  statement for Mr. Verwaayen.  Bernard S. Verwayaan was to

18  serve as vice president -- excuse me, that's vice chairman of

19  Lucent from October 1999 through Winstar's bankruptcy.  He

20  first became involved in the Winstar relationship in December

21  2000.  Mr. Verwayaan's testimony relates to the subcontract

22  and certain communications between Lucent and Winstar.  This

23  deposition, Your Honor, was taken on July 3rd, 2001.  The

24  questioning attorney for the Plaintiffs, at that point Winstar

25  Communications and Winstar Wireless, was Jonathan Greenblatt

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

**B797**

1  A.  As I said, I was not involved in the account in that

2  respect.

3  Q.  So you didn't know one way or another whether that

4  happened?

5  A.  Right.

6  Q.  Do you know how long the transition was envisioned?

7  A.  No.

8  Q.  Do you know whether Winstar attempted to have Lucent take

9  these services that it was performing prior to December of

10  2000?

11  A.  I don't know.

12  Q.  Let me draw your attention to #11.  There's -- I guess, 13

13  points in this Winstar discussion document that we're talking

14  about -- Exhibit-4.  Number 11 states, {quote} "I assume I

15  cannot stop Winstar draws between now and April 1st, 2001.  In

16  effect, I can stop them after that date by managing the 70/30

17  composition since Lucent controls the selling motion," {end

18  quote}.  Answer, {quote} "That is correct," {end quote}.  Is

19  that consistent with your understanding at the time that

20  Lucent could not stop Winstar from making draws even if

21  outside the 70/30 requirement until after April 1st, 2001?

22  A.  It was not my understanding.

23  Q.  And what was your understanding?

24  A.  I testified to that.  My understanding was we were not

25  obliged to pay.  I only made the decision to pay because based

13-180

1   on the business relationship.

2   Q.  This would sound like somebody thought you were obliged to

3   pay.  Do you agree with that?

4   A.  I don't know who this is.  This to me is I've never seen

5   this document.  I don't see a name on this document, so I

6   don't know what it is.

7   Q.  I'm just asking whether -- I'm not asking you to adopt it,

8   I understand you haven't seen it, but it is a Lucent document

9   that was produced to us.

10  A.  Okay, well, I take your word for it, but I've never seen

11  it before.

12  Q.  I'm gonna ask the Court Reporter –

13      (Role play deposition testimony interrupted)

14      THE COURT:  I'm going to ask you to take a break for

15  a few minutes right here.

16      (Recess)

17      THE CLERK:  Please be seated.

18      THE COURT:  Go ahead.

19      (Role play deposition testimony continues)

20  Q.  I'm gonna ask the Court Reporter to mark as Verwaayen

21  Exhibit-5 an e-mail dated December 29th, 2000, from Mr.

22  Verwaayen to Carol Spurrier, and Michael Montemarano, and

23  copies to a number of people, including Ms. Hopkins, Ms.

24  Hundmejean.  Let me just read you the first paragraph of this

25  document.  It says, (quote) "Now we have positioned ourselves

13-182

1    that going forward, you also will not be able to fulfill your

2    obligations, I'm willing to reset the clock.  So let's see

3    whether that's what you want from the Winstar side.  From our

4    side, what -- we want nothing else than fulfilling the

5    obligations from both sides.  Because if everybody would

6    fulfill their obligations, it would be a very good deal from

7    both sides.

8    Q.  When you say you didn't wanna act as their bank, the fact

9    is the existing relationship had a $2 billion credit

10   relationship between Lucent and Winstar, isn't that correct?

11   A.  No more acting as the bank.  What I intended there was

12   that we spent most of our discussions about the financing

13   side.  What we should do is have such a balance in the

14   relationship that what we do as Lucent is being a technology

15   partner for service providers.  And that's how we should act.

16   Q.  Whether that's the way Lucent should act or not, do you

17   acknowledge that that's not the nature of the relationship

18   that had been entered into between Lucent and Winstar in

19   connection with the Credit Agreement and Supply Agreement?

20   A.  No.  I don't agree with that.

21   Q.  So you don't think that the Credit Agreement and Supply

22   Agreement was in effect putting Lucent in the position of a

23   bank?

24   A.  Not at all.

25   Q.  Why not?

13-183

1    A.   Because there was the direct relationship between the

2    Supply Agreement and the Credit Agreement.   The Credit

3    Agreement was there to facilitate us being able to be the

4    technology partner and to have a relationship with Winstar

5    where Lucent got the majority of all the purchases.   That was

6    the reason for the Credit Agreement.

7    Q.   How do you know about the relationship between the two

8    documents if you've never reviewed them?

9    A.   Because, as I said, I had extensive discussion with my

10   team and said where are we, what's our objectives going

11   forward, and how's this relationship structured?   So I knew

12   about the relationship -- the structure of the relationship.

13   You don't need to read all those documents to have the

14   understanding.

15   Q.   Even at a 70/30 relationship on a $2 billion facility

16   there's a banking aspect of that relationship, isn't there?

17   A.   But you don't act as their bank.

18   Q.   Well, you act as their bank to the tune of at least 30%,

19   don't you?

20   A.   You act as their technology partner who is providing

21   financing.

22   Q.   But financing is part of the relationship?

23   A.   Financing -- the Credit Agreement was part of the

24   relationship, sure.

25   Q.   And financing for non-Lucent content would be part of the

13-206

1  Q.  During the course of this initial briefing, was there any

2  discussion about whether Winstar had attempted to transition

3  the services portion of the work to Lucent and Lucent had

4  resisted?

5  A.  No.  We're talking 10 days before the end of the quarter

6  somebody asking $32 million.

7  Q.  Did they recommend paying the $32 million?

8  A.  They said to me, there are two sides of the equation here.

9  We're not obliged to pay, but given the fact that we have an

10  all-out effort to try to get this relationship back on track,

11  the sales people recommended at that point in time to at least

12  be willing to consider.

13  Q.  Did they say what the basis was for their statement they

14  were not obliged?  You were not obliged to pay?

15  A.  No.  I didn't ask.

16  Q.  Do you know whether that was correct?

17  A.  Well, I think it is correct, yes.  It's my understanding

18  at that point in time after consulting with counsel, the

19  finance people and with the business people that we are not

20  obliged to pay.  But I decided for the business relationship

21  reasons to pay anyway.  And that's what I told Nate.

22  Q.  When you told that to -- well, we'll come back to the

23  conversation with Nate in a minute.  You said you also spoke

24  to finance people.  Who did you speak to in finance?

25  A.  My CFO.

13-207

1   Q.   Only Mr. Montemarano?   I think you described him as your

2   CFO before.

3   A.   Yes.

4   Q.   What did Mr. Montemarano say?

5   A.   He said you should be aware that we're not obliged to pay.

6   This is an account that is out of balance already, for a long

7   period of time.   We need to get it back on track.   Now you're

8   involved, I need your help to get this account back on track.

9   Q.   Did you discuss the agreements that existed between them?

10  A.   No.   I asked him advice and I got advice.

11  Q.   As a result of that advice, you decided to pay?

12  A.   And as a result of that advice, no.   As a result of the

13  input I got from various sources, I called Nate back and told

14  him what my struggle was.   So I made crystal clear that I had

15  a different side of the house giving me different viewpoints.

16  And in view of the relationship, and the way to go forward, I

17  decided this one more time that I would pay $32 million.   But

18  I said to him, this is absolutely the last time we'll do that.

19  We have to get back on track with this relationship.   And you

20  should understand that if you would give me a call in the next

21  quarter with the same request, that I will not pay.   And you

22  have now more than three months time to go and get our house

23  in order and to find other sources if in any reason we're not

24  at the 70/30 level.   And he said he understood.

25  Q.   Did he say he agreed?

**Wilson**

1    (Defendant's Exhibit-154 admitted into evidence)

2    (Defendant's Exhibit-155 admitted into evidence)

3    (Defendant's Exhibit-168 admitted into evidence)

4    (Defendant's Exhibit-185 admitted into evidence)

5    (Defendant's Exhibit-190 admitted into evidence)

6    (Defendant's Exhibit-201 admitted into evidence)

7    (Defendant's Exhibit-207 admitted into evidence)

8    (Defendant's Exhibit-210 admitted into evidence)

9    (Defendant's Exhibit-214 admitted into evidence)

10   (Defendant's Exhibit-221 admitted into evidence)

11   (Defendant's Exhibit-252 admitted into evidence)

12   (Defendant's Exhibit-258 admitted into evidence)

13   (Defendant's Exhibit-260 admitted into evidence)

14   (Defendant's Exhibit-268 admitted into evidence)

15                  DIRECT EXAMINATION

16   BY MR. SAUNDERS:

17   Q.  Mr. Wilson, would you please tell the Court by whom you are

18   currently employed and in what capacity?

19   A.   I currently work for Lucent Technologies.  I'm in the sales

20   organization, and I have sales responsibility for sales of our

21   products and services to the enterprise market.

22   Q.  And what is the enterprise market?

23   A.  The enterprise market is typically Fortune 500 concerns

24   within the U.S. and North America.  We also serve our service

25   provider customers, Verizon, Sprint and the like, supporting

Wilson - Cross                                          16-102

1  A.  Not my testimony, no, sir.

2  Q.  Not your testimony.  Let's talk about your testimony.

3  Would you look at Defendant's Exhibit-142?  You have it in

4  front of you?

5      (Defendant's Exhibit-142 previously marked for

6  identification)

7  A.  Yes, I do.

8  Q.  I believe you testified that you sent this letter on March

9  30, 1999?

10 A.  Yes.

11 Q.  May I show you Defendant's Exhibit-118, please?

12         MR. RATHKOPF:  Your Honor, if I -- thank you.

13     (Defendant's Exhibit-118 previously marked for

14 identification)

15 BY MR. RATHKOPF:

16 Q.  Take a moment, please, and read Defendant's Exhibit-118

17 next to Defendant's Exhibit-142.  I think you'll see that

18 except for some spacing, and a date -- one letter being dated

19 January 4, 1999, and the other letter being dated March 30,

20 1999 -- these are two identical letters both bearing your

21 signature, is that correct?

22 A.  It appears so, yes.

23 Q.  Yeah.  When did you send the January 4, 1999 letter?

24 A.  I would think I probably sent it around March 30th

25 timeframe.

1  Q.  You back dated?

2  A.  I would say yes.

3  Q.  Now by the way, while you have that subcontract in front of

4  you, the one that we've been talking about, would you turn to

5  the third page, paragraph 7.1?  There's a --

6          THE COURT:  Which exhibit?

7          MR. RATHKOPF:  That's Defendant's -- I'm sorry,

8  Plaintiff's --

9          THE COURT:  Plaintiff's-164?

10         MR. RATHKOPF:  Yeah, you'll forgive me, Your Honor.

11 I'm not 100%.  Plaintiff's Exhibit-164.

12 BY MR. RATHKOPF:

13 Q.  If you look at the third page, paragraph 7.1, the agreement

14 has a term, doesn't it?

15 A.  Yes.

16 Q.  And it says the term of the agreement will commence on the

17 effective date.  And what was the effective date?  January 4,

18 1999?  Is that correct?

19 A.  Correct.

20 Q.  And will continue until both parties mutually agree to

21 terminate unless sooner terminated pursuant to this section,

22 7.2.  And 7.2 goes on to talk about termination for cause.  So

23 there is a term expressly in this agreement.  It's not one

24 quarter.  It's until you mutually agree to terminate this

25 document, is that not correct?

1  of doing this for accounting purposes for Winstar?

2  A.   No, I did not.

3  Q.   No.   Do you know whether if Wireless did these services

4  without the subcontract they could have still capitalized most

5  of the cost of those services?

6  A.   I do not know that.   I just was going on what I was told by

7  Winstar.

8  Q.   Right.   Now, each quarter that you were involved in this

9  account, from after March 1999, I believe you've testified that

10 come the end of the quarter or time in the quarter and then

11 there'd be one more time that you would -- that Lucent would

12 agree to make these payments to Winstar.

13        MR. SAUNDERS:   Objection, Your Honor.   That's not what

14 he said.

15        MR. RATHKOPF:   I believe that's what he said, that

16 ultimately that --

17        MR. SAUNDERS:   Well --

18        MR. RATHKOPF:   Okay.

19        MR. SAUNDERS:   Talked about exchange of purchase

20 orders.

21        THE COURT:   We don't have a current record, so let's -

22 - if that's not what he said, then he'll respond appropriately.

23        MR. SAUNDERS:   Thank you.

24 BY MR. RATHKOPF:

25 Q.   All right.   Each quarter from after March 1999, June '99,

1  September '99, December '99 and March 2000.  All of those were

2  quarters where you were still involved with the Winstar

3  account.  Correct?

4  A.  I was still involved with the account.

5  Q.  Yeah.  And in every one of those quarters, did Lucent pay

6  Wireless for the services that Wireless was performing?

7  A.  At the end of every quarter we accepted an order, we did an

8  order swap, and we allowed Winstar to draw down from the credit

9  facility to pay for those services performed by Winstar.

10  Q.  Right, so the answer is yes?

11       MR. SAUNDERS:  Objection --

12  A.  The answer --

13       MR. SAUNDERS:  -- Your Honor, the answer is what he

14  gave.

15       THE COURT:  Move on, Mr. Rathkopf.  I'll decide

16  whether it was yes or something other than that.

17  BY MR. RATHKOPF:

18  Q.  Did you, during those same -- let's see.  The same, what,

19  five quarters?  Am I counting --

20  A.  Five quarters --

21  Q.  Five quarters --

22  A.  -- would be accurate.

23  Q.  -- did to your knowledge, in your area, that you were in

24  charge of -- you know, CLECS, emerging service providers, did

25  Lucent have any other arrangement with any other customer where

1  opposed to it, but ultimately it happened every quarter.  And

2  it happened because {quote} "The decision got escalated and

3  other people higher up at Lucent made the decision to go

4  forward with it."

5  A.  So there was certainly a real concern --

6  Q.  By you --

7  A.  -- across myself and others in the organization, including

8  Treasury, about the end of quarter request from Winstar.  We

9  communicated Lucent's position, not just Mark Wilson's personal

10 position, but Lucent's position that we were not willing to go

11 forward with these transactions and then it got escalated.

12 Q.  Meaning other people at Lucent made the determination to go

13 forward with it?  Is that correct?

14 A.  Certainly after pressure from Winstar and a lot of

15 discussion around Winstar's agreement to move forward with a

16 more practical turnkey approach, there was agreement to move

17 forward --

18        MR. RATHKOPF:  Move to strike --

19 A.  -- with the transaction.

20        MR. RATHKOPF:  -- and I'd like to ask the question

21 again.  That's not responsive to the question.

22        THE COURT:  I think it is.

23        MR. RATHKOPF:  All right, I'll ask again.

24 BY MR. RATHKOPF:

25 Q.  For whatever reasons, your decision -- your suggestion that

Case 1:06-cv-00147-JJF    Document 27-6    Filed 06/14/2006    Page 52 of 55

1   it not be done, notwithstanding the pressure that you got from

2   Winstar -- because obviously you were dealing with Winstar, you

3   testified you personally were dealing with them.  You were

4   getting that pressure.  You were opposed to doing it.  But

5   people at Lucent that were higher up than you ultimately made

6   the decision, for whatever their reasons were and despite what

7   you advised them, they decided to make -- go forward with the

8   arrangement?

9   A.  So let me take a different slant on this as well.  Nina and

10  the executive team at Lucent looked to the team supporting them

11  to help counsel them on how to make decisions.  The Lucent --

12  not just myself, but other people within Lucent, the position

13  was we did not want to move forward with these end of quarter

14  requests.  Winstar would escalate to Nate Kantor, to Nina

15  Aversano.  You saw some emails where she actually got feedback

16  from our team, and her response to Nate was in line with that

17  feedback.  We always agreed to do these on a one-time basis,

18  predicated upon Winstar's engagement around a more sane turnkey

19  approach to how to approach the services pass through.

20  Q.  All right.  And each quarter, ultimately there was an

21  exchange of purchase orders and the arrangement continued

22  without having Lucent take over through a transition agreement

23  or any other agreement the services that Wireless was

24  performing, correct?

25  A.  Every quarter there was agreement to do the end of quarter

1   exchange of orders with the assumption that we'd be working

2   towards a turnkey approach going forward.

3   Q.   Right.  And if you stopped paying Wireless for doing the

4   services -- if your recommendation were followed and Wireless

5   did not perform its services, was Lucent going to -- was it

6   Lucent's intention -- because you say there was supposed to be

7   a transition agreement.  Lucent was gonna take over and perform

8   those services for Wireless that Wireless had been performing,

9   that was the intention that you had?

10          MR. SAUNDERS:  Your Honor, since we don't have a

11  transcript, it's really hard to deconstruct that question.  But

12  I think the record is going reflect that the first part of that

13  question was a phrase by Mr. Rathkopf, if you stopped paying

14  Wireless.  And then the question goes on.  I object to that

15  portion of the question, if that's what the question really is,

16  for the reasons I've articulated in the past.  But at the

17  moment, I can't really tell where the question --

18          THE COURT:  I think you're right on that one.

19          MR. SAUNDERS:  -- is stopped in the middle.

20          THE COURT:  Mr. Saunders, I think you're right.  I

21  think that was the preface to your question.  And this witness

22  has not testified that they were paying Wireless.  Wireless was

23  ultimately getting paid --

24          MR. RATHKOPF:  That's correct.

25          THE COURT:  -- you made that point.  So why don't you

~~Case 1:06-cv-00147-JJF    Document 27-6    Filed 06/14/2006    Page 54 of 55~~

1  ask the question in a different fashion?

2  BY MR. RATHKOPF:

3  Q.  Okay.  If Wireless was not ultimately paid via the

4  arrangement you've described, with this exchange of purchase

5  orders and borrowing from the Lucent facility, and therefore,

6  what was your intention?  Was it your intention that Lucent

7  take over performing some or all of what Wireless was doing?

8  A.  The way these deals happened, there was no assumption of

9  work to take over.  The work that had already been performed by

10 the time we got the purchase order from Winstar to perform the

11 work.

12 Q.  Were they doing -- okay.  We're gonna come back to this.

13 We're gonna come back to this.

14     (Pause in proceedings)

15 Q.  I believe you testified that the reason that Lucent

16 ultimately continued to exchange the purchase orders with

17 Wireless and allow a draw down on the facility was customer

18 satisfaction reasons.  Do you recall that testimony?

19 A.  Customer satisfaction issues and the assurance that we

20 would approach a turnkey model going forward.

21 Q.  Right.  And you were assured every quarter, but every

22 quarter it didn't happen, and every quarter we repeated the

23 same drill, based on your testimony, through at least March

24 2000.  Correct?

25 A.  Pass through orders through March.

1    (Witness receives document)

2  A.  Thank you.

3  BY MR. RATHKOPF:

4  Q.  Take a moment, if you would, and look at that, and in

5  particular items 5 and 6 -- numbered 5 and 6 in that document.

6  A.  Okay.

7  Q.  Looking at item 5, "they" -- meaning Lucent -- "have found

8  no buyer for the optronics.  Their internal remarketing group

9  offered to buy at 30 cents on the dollar.  I said no thanks."

10  This offer of 30 cents on the dollar to re-buy certain

11  optronics, isn't that some of the optronics that had been

12  purchased by Winstar in the December 1999 bill and hold sale?

13  A.  I don't know.

14  Q.  Okay.  And item 6, "I inquired about the timing of their

15  payment to us of the 10 million they owe for radios.  They did

16  not have answer.  Will let me know tomorrow."  You testified

17  that you bought -- that Lucent bought radios from Winstar.  Did

18  you pay for them?

19  A.  I do not know.  I don't know if this is the same 10 million

20  or not.  I don't know.  This is well past my time in the

21  account.

22  Q.  Now, I'd like to show you Plaintiff's Exhibit-300.

23    (Plaintiff's Exhibit-300 previously marked for

24  identification)

25    MR. KING:  May I approach, Your Honor?