UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Civil Action No. 06-147(JJF) |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7 |
| Debtors. | Bankr. Case No. 01-1430 (KJC) |
| LUCENT TECHNOLOGIES INC., | Adv. Pro. No. 01-1063 (KJC) |
| Defendant-Appellant, | |
| v. | |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE, | |
| Plaintiff-Appellee. | |

**TRUSTEE CHRISTINE C. SHUBERT'S APPENDIX - VOLUME 3 OF 5**

On the Brief:

    Stephen M. Rathkopf, Esq.
    David R. King, Esq.
    Andrew C. Gold, Esq.

Of Counsel:

    Sheldon K. Rennie, Esq.
    (DE Bar No. 3772)

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016-9301
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street
Suite 1300
Wilmington, Delaware 19899-2323
Telephone:    (302) 654-7444

*Attorneys for Appellee Christine C. Shubert, Chapter 7 Trustee*

# APPENDIX

## TABLE OF CONTENTS

|  | ROA | Page |
|---|---|---|

**VOLUME 1**

**PLEADINGS:**

| | ROA | Page |
|---|---|---|
| Judgment 12/21/05 | 351 | B1 |
| Opinion 12/21/05 | 347 | B5 |
| District Court Opinion 11/18/04 | 2212 | B93 |
| Second Amended Complaint | 69 | B104 |
| Joint Pretrial Memorandum | 292 | B166 |
| RJSF | 327 | B181 |
| TFOF | 334 | B189 |
| TCOL | 334 | B279 |

**VOLUME 2**

| | ROA | Page |
|---|---|---|
| LFOF & LCOL | 335 | B435 |

**TRIAL TRANSCRIPTS:**

| | ROA | Page |
|---|---|---|
| Aversano | 363 | B629 |
| Garrett | 375 | B638 |
| Harris | 366 | B649 |
| Hayes | 368 | B673 |
| Holwell | 375 | B684 |
| Hopkins | 366 | B687 |
| Huber | 361 | B690 |
| Hund-Mejean | 369 | B695 |
| Jules | 361 | B705 |
| Keefe | 374 | B711 |

|  | ROA | Page |
|---|---|---|
| Perricone | 375 | B716 |
| Pocalyko | 358 | B728 |
| Rogers | 375 | B755 |
| Schacht | 376 | B756 |
| Solomon | 376 | B776 |
| Stark | 374 | B782 |
| Terrell | 376 | B789 |
| Verwaayen | 368 | B797 |
| Wilson | 371 | B804 |

## VOLUME 3

**JOINT TRIAL EXHIBIT TRANSCRIPTS:**

| Ackerman | 465 | B814 |
|---|---|---|
| DiRoma | 463 | B854 |
| Harris | 478 | B871 |
| Hicks | 461 | B906 |
| Holwell | 476 | B927 |
| Kantor | 460 | B928 |
| McGinn | 466 | B954 |
| Montemarano | 468 | B956 |
| Plunkett | 477 | B980 |
| Rubin | 464 | B995 |
| Schacht | 473 | B1003 |
| Uhl | 472 | B1024 |
| Zlotnick | 462 | B1029 |

|  | ROA | Page |
|---|---|---|

**PLAINTIFF'S TRIAL EXHIBITS**

| | ROA | Page |
|---|---|---|
| PX-2 | 1244 | B1043 |
| PX-3 | 1245 | B1046 |
| PX-13 | 1255 | B1048 |
| PX-21 | 1263 | B1056 |
| PX-22 | 1264 | B1069 |
| PX-43 | 1285 | B1070 |
| PX-45 | 1287 | B1081 |
| PX-46 | 1288 | B1083 |
| PX-51 | 1293 | B1084 |
| PX-53 | 1295 | B1100 |
| PX-54 | 1296 | B1103 |
| PX-55 | 1297 | B1105 |
| PX-56 | 1298 | B1107 |
| PX-57 | 1299 | B1111 |
| PX-58 | 1300 | B1113 |
| PX-62 | 1304 | B1118 |
| PX-66 | 1308 | B1120 |
| PX-70 | 1312 | B1124 |
| PX-73 | 1315 | B1126 |
| PX-78 | 1320 | B1130 |
| PX-79 | 1321 | B1132 |
| PX-81 | 1323 | B1134 |
| PX-84 | 1326 | B1140 |
| PX-86 | 1328 | B1142 |
| PX-87 | 1329 | B1153 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-88 | 1330 | B1156 |
| PX-90 | 1332 | B1157 |
| PX-92 | 1334 | B1162 |
| PX-94 | 1336 | B1163 |
| PX-104 | 1346 | B1164 |
| PX-107 | 1349 | B1165 |
| PX-109 | 1351 | B1172 |
| PX-110 | 1352 | B1186 |
| PX-112 | 1354 | B1188 |
| PX-113 | 1355 | B1191 |
| PX-116 | 1358 | B1193 |

**VOLUME 4**

| PX-123 | 1365 | B1194 |
| PX-125 | 1367 | B1344 |
| PX-127 | 1369 | B1345 |
| PX-131 | 1373 | B1347 |
| PX-136 | 1378 | B1350 |
| PX-137 | 1379 | B1351 |
| PX-138 (Excerpts) | 1380 | B1352 |
| PX-148 | 1390 | B1366 |
| PX-149 | 1391 | B1370 |
| PX-151 | 1393 | B1371 |
| PX-153 | 1395 | B1383 |
| PX-155 | 1397 | B1395 |
| PX-157 | 1399 | B1396 |
| PX-158 | 1400 | B1397 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-167 | 1409 | B1398 |
| PX-169 | 1411 | B1400 |
| PX-179 | 1421 | B1405 |
| PX-185 | 1427 | B1413 |
| PX-186 | 1428 | B1415 |
| PX-187 | 1429 | B1464 |
| PX-188 | 1430 | B1468 |
| PX-192 | 1434 | B1470 |
| PX-199 | 1441 | B1480 |
| PX-200 | 1442 | B1482 |
| PX-201 | 1443 | B1487 |
| PX-202 | 1444 | B1510 |
| PX-220 | 1462 | B1511 |
| PX-225 | 1467 | B1513 |
| PX-231 | 1473 | B1515 |
| PX-241 | 1483 | B1516 |
| PX-243 | 1485 | B1517 |
| PX-251 | 1493 | B1519 |
| PX-252 | 1494 | B1521 |
| PX-261 | 1530 | B1523 |
| PX-262 | 1504 | B1524 |
| PX-264 | 1506 | B1526 |
| PX-297 | 1539 | B1529 |
| PX-300 | 1542 | B1532 |
| PX-307 | 1549 | B1535 |
| PX-311 | 1553 | B1537 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-320 | 1562 | B1542 |
| PX-322 | 1564 | B1545 |
| PX-323 | 1565 | B1546 |
| PX-324 | 1566 | B1551 |
| PX-325 | 1567 | B1552 |
| PX-326 | 1568 | B1554 |
| PX-330 | 1572 | B1555 |
| PX-340 | 1582 | B1556 |
| PX-342 | 1584 | B1589 |
| PX-345 | 1587 | B1614 |
| PX-348 | 1590 | B1615 |
| PX-349 | 1591 | B1617 |
| PX-360 | 1602 | B1618 |
| PX-390 | 1632 | B1619 |
| PX-440 | 1682 | B1620 |
| PX-443 | 1685 | B1621 |
| PX-462 | 1704 | B1623 |
| PX-486 | 1728 | B1664 |
| PX-501 | 1743 | B1665 |
| PX-506 | 1748 | B1667 |
| PX-507 | 1749 | B1677 |
| PX-508 | 1750 | B1693 |
| PX-509 | 1751 | B1707 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|

## VOLUME 5

**DEFENDANT'S TRIAL EXHIBITS**

| | ROA | Page |
|---|---|---|
| DX-1 (Excerpts) | 479 | B1709 |
| DX-22 | 500 | B1724 |
| DX-29 (Excerpts) | 507 | B1760 |
| DX-32 | 510 | B1793 |
| DX-33 | 511 | B1813 |
| DX-72 | 550 | B1833 |
| DX-96 | 574 | B1835 |
| DX-142 | 620 | B1843 |
| DX-214 | 692 | B1844 |
| DX-260 | 739 | B1845 |
| DX-364 | 843 | B1847 |
| DX-516 | 995 | B1850 |
| DX-644 | 1123 | B1944 |
| DX-702 | 1181 | B2067 |
| DX-721 | 1200 | B2088 |
| DX-739 | 1219 | B2110 |

HF 3306170v.1 #06723/0002 06/13/2006

# JOINT TRIAL EXHIBIT
# TRANSCRIPTS

**Ackerman**

ackerman part 3 - dated 6-28-01

| | | |
|---|---|---|
| 00:14:06.11 | 15 | MR. SCHROEDER:  Define the time |
| 00:14:06.54 | 16 | frame. |
| 00:14:07.04 | 17 | A.    Depends on the time frame. |
| 00:14:08.01 | 18 | Q.    Start at '96, tell me how things |
| 00:14:08.91 | 19 | progressed. |
| 00:14:13.82 | 20 | A.    Oh, well, in '96 I think, I think I |
| 00:14:18.32 | 21 | may have had a very preliminary discussion with |
| 00:14:22.39 | 22 | regard to Lucent providing some engineering and |
| 00:14:28.16 | 23 | operational support services for our business.  I |
| 00:14:33.20 | 24 | then moved to a different role and so had very |
| 00:14:38.14 | 25 | limited contact, if any, with Lucent up until the |

==============================================

Page 0
| | | |
|---|---|---|
| 00:14:42.78 | 0 | MANHATTAN REPORTING CORP., A LegaLink Company |
| 00:14:42.78 | 0 | |

==============================================

Page 16                                                                    16
| | | |
|---|---|---|
| 00:14:42.78 | 0 | |
| 00:14:42.78 | 1 | 1        DAVID W. ACKERMAN - CONFIDENTIAL |
| 00:14:42.78 | 2 | '98 time frame. |
| 00:14:44.38 | 3 | Q.    Right.  What happened in '98? |
| 00:14:47.25 | 4 | A.    In '98, through a series of |
| 00:14:50.29 | 5 | discussions between my boss and other very senior |
| 00:14:54.92 | 6 | executives at Lucent a strategic partnership |
| 00:15:00.56 | 7 | relationship discussion ensued. |
| 00:15:04.53 | 8 | Then we initiated discussions as a |
| 00:15:06.94 | 9 | consequence of that relating to an entire range |
| 00:15:12.71 | 10 | of equipment and services that Lucent would |
| 00:15:17.41 | 11 | provide to WinStar. |
| 00:15:21.58 | 12 | Q.    When in 1998 did that start? |
| 00:15:25.69 | 13 | A.    Approximately the September, October |
| 00:15:29.06 | 14 | time frame.  I can't tell you exactly when the |
| 00:15:31.46 | 15 | senior discussions started because I wasn't |
| 00:15:34.03 | 16 | there. |
| 00:15:34.90 | 17 | Q.    But you learned about it in |
| 00:15:35.96 | 18 | September, October time frame? |
| 00:15:37.97 | 19 | A.    Yes, whenever that meeting was that |
| 00:15:40.77 | 20 | Nina and Nate called us to, if that is an English |
| 00:15:44.71 | 21 | sentence. |
| 00:15:46.61 | 22 | Q.    When you say Nate you are referring |
| 00:15:48.48 | 23 | to Mr. Kantor? |
| 00:15:49.38 | 24 | A.    That's correct. |
| 00:15:50.55 | 25 | Q.    When you said your boss you were |

==============================================

Page 0
| | | |
|---|---|---|
| 00:15:51.61 | 0 | MANHATTAN REPORTING CORP., A LegaLink Company |
| 00:15:51.61 | 0 | |

==============================================

Page 17                                                                    17
| | | |
|---|---|---|
| 00:15:51.61 | 0 | |
| 00:15:51.61 | 1 | 1        DAVID W. ACKERMAN - CONFIDENTIAL |
| 00:15:51.61 | 2 | referring to Mr. Kantor? |
| 00:15:52.25 | 3 | A.    That's correct. |
| 00:15:53.35 | 4 | Q.    When you say Nina you are referring |
| 00:15:54.42 | 5 | to Nina Aversano? |

Page 4

B814

ackerman part 3 - dated 6-28-01

| 00:15:55.58 | 6 | A. | That's correct. |

00:15:55.58  6   A.    That's correct.
00:15:56.65  7   Q.    when you said senior discussions were
00:16:00.02  8   you referring to Ms. Aversano at Lucent or other
00:16:01.62  9   people?
00:16:03.73 10   A.    Perhaps other people. It is not -- I
00:16:07.63 11   don't know who Nate specifically spoke with.
00:16:13.70 12   Q.    But to the best of your knowledge
00:16:14.44 13   this relationship from '98 onward started with
00:16:19.47 14   discussions with Mr. Kantor and senior people at
00:16:21.78 15   Lucent?
00:16:23.35 16   A.    That is to the best of my knowledge,
00:16:24.15 17   correct.
00:16:25.75 18   Q.    In this context of this relationship
00:16:30.19 19   with Lucent, have you heard the phrase Woolly
00:16:32.02 20   Mammoth?
00:16:33.56 21   A.    Yes. Has been for years.
00:16:37.33 22   Q.    What was Woolly Mammoth?
00:16:38.56 23   A.    Woolly Mammoth was the name we gave
00:16:43.80 24   to the negotiations for the strategic
00:16:47.97 25   partnership, what came out of it, the Supply

==================================================

Page 0
00:16:50.24  0                    MANHATTAN REPORTING CORP., A LegaLink Company
00:16:50.24  0

==================================================

Page 18
00:16:50.24  0                                                        .18
00:16:50.24  1           1        DAVID W. ACKERMAN - CONFIDENTIAL
00:16:50.24  2   Agreement and the Credit Agreement.
00:16:55.18  3   Q.    Were you part of the Woolly Mammoth
00:16:56.21  4   team?
00:16:57.48  5   A.    Yes.
00:16:58.95  6   Q.    How was that team organized?
00:17:01.78  7   A.    I was responsible for the
00:17:04.19  8   negotiations, the actual substantive discussions
00:17:08.52  9   between Lucent and WinStar for the Supply
00:17:11.29 10   Agreement.
00:17:13.06 11   Rif Haffar was responsible for the
00:17:16.53 12   administrative organization of those sessions and
00:17:22.44 13   making sure that we stayed in sync with the work
00:17:27.64 14   that was going on, I don't even know if it was in
00:17:30.95 15   New York or New Jersey, on the Credit Agreement.
00:17:34.85 16   So there was a separate organization for the
00:17:37.09 17   Credit Agreement. I really don't know how that
00:17:40.52 18   was organized.
00:17:41.99 19   Then we had outside counsel and
00:17:45.93 20   in-house counsel supporting me. Then at various
00:17:48.83 21   times I would say subject matter experts from
00:17:52.50 22   WinStar supporting the negotiations.
00:17:55.00 23   On the Lucent side, Mark Wilson was
00:17:57.07 24   my counterpart. And he had a similar team and
00:18:01.54 25   in-house counsel I don't know if Lucent, I can't

==================================================

Page 0
00:18:06.95  0                    MANHATTAN REPORTING CORP., A LegaLink Company
00:18:06.95  0

Page 5

**B815**

ackerman part 3 - dated 6-28-01
*******************************************************

Page 30
| | | |
|---|---|---|
| 00:29:18.85 | 6 | Q.    In your understanding was Lucent |
| 00:29:21.79 | 7 | responsible for the entire build-out of the |
| 00:29:25.16 | 8 | WinStar Network? |
| 00:29:27.70 | 9 | A.    Yes.  We wanted them to be.  The |
| 00:29:29.83 | 10 | intent of the contract was for them to be. |
| 00:29:33.84 | 11 | Q.    In your understanding were they |
| 00:29:34.97 | 12 | responsible for doing that? |
| 00:29:36.71 | 13 | A.    Were they responsible? |
| 00:29:38.34 | 14 | MR. SCHROEDER:    Asked and answered. |
| 00:29:41.28 | 15 | A.    That is what I said.  I said that the |
| 00:29:42.71 | 16 | contract contemplated them being responsible for |
| 00:29:45.31 | 17 | the entire build-out of the network. |
| 00:29:47.92 | 18 | Q.    Could Lucent decide how to build it, |
| 00:29:50.75 | 19 | when to build it with complete discretion? |
| 00:29:53.56 | 20 | A.    No.  It was within the parameters of |
| 00:29:55.92 | 21 | the WinStar business plan. |
| 00:29:58.66 | 22 | Q.    Was that -- |
| 00:29:59.39 | 23 | A.    And the contract. |
| 00:30:00.53 | 24 | Q.    Was the WinStar business plan |
| 00:30:02.06 | 25 | something separate and apart from the contract? |

========================================================

Page 0
| | | |
|---|---|---|
| 00:30:04.53 | 0 | MANHATTAN REPORTING CORP., A LegaLink Company |
| 00:30:04.53 | 0 | |

========================================================

Page 31
| | | | |
|---|---|---|---|
| 00:30:04.53 | 0 | | 31 |
| 00:30:04.53 | 1 | 1        DAVID W. ACKERMAN - CONFIDENTIAL | |
| 00:30:04.53 | 2 | A.    Yes. | |
| 00:30:06.27 | 3 | Q.    Was that something that you advised | |
| 00:30:07.57 | 4 | Lucent of? | |
| 00:30:09.47 | 5 | A.    Yes. | |
| 00:30:10.77 | 6 | Q.    So, I take it you would direct Lucent | |
| 00:30:14.54 | 7 | as to what to do in terms of network build-out | |
| 00:30:17.71 | 8 | consistent with the WinStar business plan? | |
| 00:30:22.78 | 9 | A.    Depends upon which element, at which | |
| 00:30:25.32 | 10 | time.  It is a complex set of services, some | |
| 00:30:34.66 | 11 | services required that kind of specific | |
| 00:30:38.00 | 12 | oversight.  Other services were more generic in | |
| 00:30:41.34 | 13 | nature and wouldn't have required that sort of | |
| 00:30:44.27 | 14 | specific oversight. | |
| 00:30:46.88 | 15 | Q.    So this was somewhat fluid, I take | |
| 00:30:49.08 | 16 | it? | |

========================================================

*******************************************************

Page 31
| | | |
|---|---|---|
| 00:30:50.61 | 18 | A.    No.  Not necessarily fluid, just |
| 00:30:53.48 | 19 | different. |
| 00:30:55.28 | 20 | Q.    So from the moment the Supply |
| 00:30:57.02 | 21 | Agreement was signed, is it your testimony it was |
| 00:30:59.95 | 22 | understood as to who would be doing what from |

Page 9

ackerman part 3 - dated 6-28-01
00:31:01.69 23  that moment on?
00:31:04.19 24  A.    No.  Lucent was to prepare a
00:31:05.69 25  transition plan.

===================================================

Page 0
00:31:07.50  0                        MANHATTAN REPORTING CORP., A LegaLink Company
00:31:07.50  0

===================================================

Page 32
00:31:07.50  0                                                               32
00:31:07.50  1           1          DAVID W. ACKERMAN - CONFIDENTIAL
00:31:07.50  2  Q.    After that transition plan was in
00:31:08.96  3  place, would it then be clear who was doing what
00:31:12.23  4  from that moment on?
00:31:13.67  5  A.    It was intended that it would be.
00:31:17.27  6  Q.    With no further direction from
00:31:18.67  7  WinStar except review of the product?
00:31:20.38  8  A.    No.  There would be continual
00:31:21.71  9  modification and changes because the world
00:31:24.11 10  changes.
00:31:26.01 11  Q.    So if WinStar --
00:31:27.65 12  A.    Oversight.
00:31:28.72 13  Q.    Let me try to understand.  Once there
00:31:30.69 14  was a transition plan, right, WinStar might
00:31:35.96 15  change that transition plan in light of changes
00:31:38.96 16  in its business plan?
00:31:40.53 17  A.    No.  The transition plan wouldn't be
00:31:42.13 18  changed.  Certain of the work elements might be
00:31:46.70 19  changed in terms of time or scope, but the
00:31:50.07 20  responsibility for the work and what work was to
00:31:53.34 21  be done wouldn't be changed.  Not dramatically.
00:31:57.05 22  Q.    When you say work elements, how is
00:31:59.38 23  that distinct from what is in the transition
00:32:00.95 24  plan?
00:32:01.88 25  A.    Because the transition plan defines,

===================================================

Page 0
00:32:04.19  0                        MANHATTAN REPORTING CORP., A LegaLink Company
00:32:04.19  0

===================================================

Page 33
00:32:04.19  0                                                               33
00:32:04.19  1           1          DAVID W. ACKERMAN - CONFIDENTIAL
00:32:04.19  2  would intend to define these various areas of
00:32:06.72  3  services.  So there would be work elements within
00:32:09.92  4  each of these elements of services.
00:32:12.26  5  Q.    So work elements in your
00:32:13.66  6  understanding is sort of a much, is a more
00:32:15.76  7  detailed description of what needs to be done
00:32:18.33  8  within a certain broad element of service?
00:32:21.67  9  A.    I guess that's reasonable.
00:32:23.17 10  Q.    Right.  And the specifics of the work
00:32:26.24 11  details would change over time depending on how
00:32:29.61 12  your business was going and what your plans were?
00:32:32.35 13  A.    Well, not just only on that basis, on
                              Page 10

ackerman part 3 - dated 6-28-01

| | |
|---|---|
| 00:32:34.35 | 14 | the basis the whole intent of the partnership was |
| 00:32:36.58 | 15 | for Lucent to perform these services so that Bell |
| 00:32:40.66 | 16 | Labs could develop the appropriate equipment to |
| 00:32:43.73 | 17 | be deployed as agreed equipment in the network. |
| 00:32:46.90 | 18 | That was the value of the partnership to both |
| 00:32:48.63 | 19 | companies. Lucent would get a lead in the |
| 00:32:51.40 | 20 | industry. And we, WinStar, would get accelerated |
| 00:32:55.07 | 21 | through the relationship with Lucent and, of |
| 00:32:58.97 | 22 | course, the financing. |
| 00:33:00.18 | 23 | So that the work product would change |
| 00:33:04.11 | 24 | as Lucent created the more enhanced versions of |
| 00:33:07.28 | 25 | the network products that they themselves were |

===============================================

Page 0
00:33:10.62  0                    MANHATTAN REPORTING CORP., A LegaLink Company
00:33:10.62  0

===============================================

Page 34
00:33:10.62  0                                                                    34
00:33:10.62  1            1         DAVID W. ACKERMAN - CONFIDENTIAL
00:33:10.62  2  giving themselves the information to design. So
00:33:13.62  3  it was intended to be dynamic. The very nature
00:33:17.39  4  of the partnership. That was the value of the
00:33:19.76  5  partnership.
00:33:21.10  6  Q.    Right. Turn back to your affidavit.
00:33:26.17  7  Let me ask you a couple of questions.
00:33:28.37  8  Specifically on the language there. Can you turn
00:33:37.68  9  to paragraph 9, please. Do you have that?
00:33:46.62 10  A.    Yes.
00:33:48.16 11  Q.    In the first sentence you state that
00:33:54.93 12  it was anticipated by the Supply Agreement that
00:33:57.73 13  Lucent would "eventually" assume certain
00:34:01.94 14  responsibilities.
00:34:03.14 15  Do you see that?
00:34:04.24 16  A.    Yes.
00:34:05.17 17  Q.    Why did you use the word
00:34:06.24 18  "eventually"?
00:34:07.04 19  A.    Because the moment the Supply
00:34:09.01 20  Agreement is signed it is absolutely unreasonable
00:34:12.51 21  to expect that instantaneously anyone would do
00:34:17.12 22  anything. There has to be a transition period.
00:34:21.66 23  Q.    How long did you contemplate that
00:34:22.76 24  being?
00:34:24.56 25  A.    On the order of two months.

===============================================

Page 0
00:34:27.80  0                    MANHATTAN REPORTING CORP., A LegaLink Company
00:34:27.80  0

===============================================

Page 35
00:34:27.80  0                                                                    35
00:34:27.80  1            1         DAVID W. ACKERMAN - CONFIDENTIAL
00:34:27.80  2  Q.    When you say a transition period, is
00:34:33.40  3  that distinct from the transition plan?
00:34:37.57  4  A.    Yes. The period is time. A plan is
                                Page 11

B818

ackerman part 3 - dated 6-28-01

| 00:34:38.67 | 5 | how. |
| 00:34:40.64 | 6 | Q.    So after the contract was signed did |
| 00:34:42.34 | 7 | you contemplate a plan would be prepared, a |
| 00:34:44.58 | 8 | transition plan? |
| 00:34:45.28 | 9 | A.    Yes. |
| 00:34:46.05 | 10 | Q.    That would take some time, I take it? |
| 00:34:47.22 | 11 | A.    That would take a month, month and a |
| 00:34:48.62 | 12 | half, maybe two months.  Then the transition |
| 00:34:49.75 | 13 | would occur. |
| 00:34:51.45 | 14 | Q.    After the plan was accepted? |
| 00:34:52.79 | 15 | A.    Yes.  Because we won't be sitting |
| 00:34:54.29 | 16 | there doing nothing for two months.  Lucent would |
| 00:34:56.79 | 17 | be preparing to take over.  We would be having |
| 00:34:59.19 | 18 | communication during this period of time. |
| 00:35:02.46 | 19 | Q.    After the transition plan was in |
| 00:35:05.13 | 20 | place, was it your view it would be implemented |
| 00:35:09.37 | 21 | within a couple months after it was in place? |
| 00:35:13.94 | 22 | A.    Yes.  Certainly.  At least within a |
| 00:35:15.44 | 23 | couple months. |
| 00:35:17.45 | 24 | Q.    So when you use eventually in |
| 00:35:22.25 | 25 | paragraph 9, what you're talking about is a few |

===================================================

Page 0
| 00:35:26.52 | 0 | MANHATTAN REPORTING CORP., A LegaLink Company |
| 00:35:26.52 | 0 | |

===================================================

Page 36                                                              36
| 00:35:26.52 | 0 | |
| 00:35:26.52 | 1 | 1      DAVID W. ACKERMAN - CONFIDENTIAL |
| 00:35:26.52 | 2 | months after the contract was assumed? |
| 00:35:29.26 | 3 | A.    Correct.  Not a long period of time. |
| 00:35:36.13 | 4 | Q.    Not over the term of the contract? |
| 00:35:38.20 | 5 | A.    Certainly not over the period of five |
| 00:35:40.54 | 6 | years.  But more like most. |
| 00:35:47.38 | 7 | Q.    We will come back to that in a |
| 00:35:48.18 | 8 | moment. |
| 00:35:51.51 | 9 | You also put in that first sentence |
| 00:35:53.52 | 10 | of paragraph 9 that Lucent would assume most, if |
| 00:35:58.19 | 11 | not all, responsibility for certain functions. |
| 00:36:01.82 | 12 | Do you see that? |
| 00:36:02.62 | 13 | A.    Yes. |
| 00:36:06.80 | 14 | Q.    Why did you put in "if not all"? |
| 00:36:09.46 | 15 | A.    Because we specifically carved out an |
| 00:36:14.07 | 16 | area that Lucent did not feel comfortable |
| 00:36:17.31 | 17 | performing services in.  Again, if that is an |
| 00:36:19.67 | 18 | English sentence.  I apologize if it is not. |
| 00:36:22.38 | 19 | The area of RF engineering, which is |
| 00:36:25.91 | 20 | radio frequency, it is the engineering of radio |
| 00:36:29.75 | 21 | components of the network and the provision of |
| 00:36:34.56 | 22 | the radio equipment itself was an area that |
| 00:36:37.86 | 23 | Lucent had said they did not believe was |
| 00:36:40.60 | 24 | strategic for them.  And they said it was the |
| 00:36:44.07 | 25 | only area in which they did not have the skills. |

===================================================

Page 0
| 00:36:46.94 | 0 | MANHATTAN REPORTING CORP., A LegaLink Company |
| 00:36:46.94 | 0 | |

Page 12

ackerman part 3 - dated 6-28-01

================================================================

Page 37
00:36:46.94  0                    1          DAVID W. ACKERMAN - CONFIDENTIAL                 37
00:36:46.94  1
00:36:46.94  2     So they didn't expect that they would be able to
00:36:49.74  3     take over the services in that area.
00:36:54.01  4     Every other area they assured us they
00:36:57.08  5     had the competency, skill and desire to provide
00:36:59.58  6     the services.  So that is why I wanted to be
00:37:02.02  7     precise in here and say, look, we never expected
00:37:04.79  8     Lucent to do it all.  In fact we specifically
00:37:07.82  9     carved out the area of RF engineering.
00:37:11.73 10     Q.    Other than RF engineering was it your
00:37:14.10 11     view that the Supply Agreement obliged Lucent to
00:37:17.23 12     do all the work in these categories you
00:37:20.07 13     identified?
00:37:25.44 14     A.    Yes.


================================================================

****************************************************

Page 39
00:39:38.41 12     Q.    Have you had a chance to look at
00:39:40.88 13     Ackerman 2?
00:39:41.61 14     A.    Yes.
00:39:42.58 15     Q.    This is the Supply Agreement we have
00:39:43.61 16     been referring to?
00:39:44.65 17     A.    Appears to be.
00:39:50.25 18     Q.    You see certain schedules to the
00:39:53.86 19     Supply Agreement? After the document itself there
00:39:58.13 20     is some schedules.  If you look at the footers.
00:40:03.77 21     A.    Yes.
00:40:06.80 22     Q.    It refers to Schedule A and so
00:40:08.00 23     forth.
00:40:09.50 24     MR. SCHROEDER:   If you don't mind.
00:40:10.37 25     If you look at the blue pages, I believe.


================================================================

Page 0
00:40:12.91  0                         MANHATTAN REPORTING CORP., A LegaLink Company
00:40:12.91  0


================================================================

Page 40
00:40:12.91  0                    1          DAVID W. ACKERMAN - CONFIDENTIAL                 40
00:40:12.91  1
00:40:12.91  2     Q.    After the text of the agreement you
00:40:13.84  3     will find --
00:40:20.28  4     A.    What do you want me to look at?
00:40:22.05  5     Q.    I want you to turn to Schedule A.
00:40:38.77  6     You have Schedule A?
00:40:39.87  7     A.    Yes.
00:40:41.07  8     Q.    Did you understand this to be part of
00:40:43.07  9     the Supply Agreement?
00:40:44.24 10     A.    Yes.
0:40:45.04 11      Q.    This is something that your team was
0:40:47.21 12      involved in negotiating?
                         Page 13

```
                                    ackerman part 7 - dated 6-28-01
03:15:14.89 18    in this letter "We have been pursuing ways to
03:15:19.86 19    take on these services in an agreeable manner to
03:15:25.50 20    all parties, but have been unable to reach
03:15:27.83 21    consensus." Do you see that?
03:15:29.30 22    A.    Yes.
03:15:30.17 23    Q.    Do you agree with that?
03:15:36.28 24    A.    Reach consensus, do I agree with
03:15:37.98 25    that? Yes.
```

==========================================================

```
Page 0
03:15:45.15  0                    MANHATTAN REPORTING CORP., A LegaLink Company
03:15:45.15  0
```

==========================================================

```
Page 167
03:15:45.15  0                                                           167
03:15:45.15  1             1          DAVID W. ACKERMAN-CONFIDENTIAL
03:15:47.72  2                              Page 167
03:15:45.15  2    Q.    Do you know whose fault it was that
03:15:47.75  3    consensus could not be reached?
03:15:51.96  4    A.    Nothing is ever 100 percent anyone's
03:15:53.59  5    fault, in my opinion.  I would not look to place
03:15:56.86  6    blame.  This was a partnership, we were trying to
03:15:59.16  7    do things together.
03:16:02.67  8    Q.    You see below there is a reference to
03:16:04.80  9    a purchase order?
03:16:06.07 10    A.    Yes.
03:16:07.41 11    Q.    Issued by WinStar.  You see how
03:16:17.02 12    Lucent says they are ready to negotiate an
03:16:19.82 13    arrangement by which Lucent becomes responsible
03:16:22.96 14    for these services?
03:16:24.12 15    A.    Yes.
03:16:24.92 16    Q.    Do you recall such discussions taking
03:16:27.26 17    place in the fall of 2000?
03:16:29.80 18    A.    Yes.
03:16:31.40 19    Q.    Were the parties able to come to an
03:16:32.80 20    agreement as to who would do these services?
03:16:35.70 21    A.    Yes.
03:16:37.10 22    Q.    Yes.  And what was the nature of that
03:16:39.04 23    agreement?
03:16:40.51 24    A.    We drafted and reached, at least Deb
03:16:46.15 25    Harris and I, since you are talking about this
```

==========================================================

```
Page 0
03:16:48.48  0                    MANHATTAN REPORTING CORP., A LegaLink Company
03:16:48.48  0
```

==========================================================

```
Page 168
03:16:48.48  0                                                           168
03:16:48.48  1             1          DAVID W. ACKERMAN-CONFIDENTIAL
03:16:52.62  2                              Page 168
03:16:48.48  2    letter, and our respective teams, drafted an
03:16:52.65  3    agreement over a period of several weeks, our
03:16:55.19  4    teams working mostly on it.  Then in the final
03:16:57.32  5    days Deb and I working together to reach
03:17:00.56  6    conclusion.  And she and I reached agreement on a
                                  Page 3
```

ackerman part 7 - dated 6-28-01

```
03:17:04.96  7   Transition Plan and for Lucent to pick up the
03:17:08.50  8   majority share of the services.
03:17:12.34  9   Q.    But not all of the services?
03:17:14.64 10   A.    Yes, that's correct.
03:17:15.91 11   Q.    When was that agreement you just
03:17:19.01 12   described reached?
03:17:20.61 13   A.    To the best of my memory it was in
03:17:22.38 14   December -- excuse me, it was either late
03:17:25.75 15   November, early December of 2000.
03:17:29.69 16   Q.    Was that agreement executed?
03:17:31.49 17   A.    No.
03:17:32.69 18   Q.    Why not?
03:17:34.26 19   A.    I don't know.
03:17:35.66 20   Q.    You don't know.  Was it executed by
03:17:38.30 21   WinStar?
03:17:43.00 22   A.    Was it executed? By executed you mean
03:17:44.14 23   signed by WinStar?
03:17:44.84 24   Q.    Signed.  Right.
03:17:47.14 25   A.    You know, I don't know.  I believe I
```

===============================================

```
Page 0
03:17:50.11  0                    MANHATTAN REPORTING CORP., A LegaLink Company
03:17:50.11  0
```

===============================================

```
Page 169
03:17:50.11  0                                                            169
03:17:50.11  1        1           DAVID W. ACKERMAN-CONFIDENTIAL
03:17:52.71  2                              Page 169
03:17:50.11  2   may have initialed it for Deb so she had for
03:17:52.75  3   herself a demonstration that I accepted the
03:17:56.82  4   agreement, it was fine with us.  But I don't
03:17:58.75  5   recall if I did.
03:18:00.52  6   Q.    Was that agreement passed --
03:18:01.95  7   withdrawn.
03:18:03.46  8   Did you discuss that agreement with
03:18:04.59  9   your superiors Mr. Kantor and Mr. Rouhana?
03:18:06.43 10   A.    Yes.  With Mr. Kantor.
03:18:07.86 11   Q.    Just with Mr. Kantor?
03:18:09.46 12   A.    Mr. Kantor.
03:18:11.16 13   Q.    What was his reaction to that
03:18:12.23 14   agreement?
03:18:13.30 15   A.    Mr. Kantor approved it and said he
03:18:16.07 16   was prepared to sign it.  And asked me what the
03:18:19.77 17   status was in Lucent.  I said my understanding is
03:18:23.41 18   that Deb and her attorneys approved and accepted
03:18:28.08 18   accepted
03:18:28.11 19   the agreement.  And it was pending signature of
03:18:31.05 20   her senior management.
03:18:35.32 21   Q.    At about this time, the time you got
03:18:37.62 22   the letter from -- withdrawn.
03:18:40.83 23   At about the time you got --
03:18:41.83 24   withdrawn.
03:18:43.33 25   At about the date of this letter in
```

===============================================

```
Page 0
03:18:46.63  0                    MANHATTAN REPORTING CORP., A LegaLink Company
03:18:46.63  0
```

B822

ackerman part 7 - dated 6-28-01

Page 180

| | | |
|---|---|---|
| 03:31:21.32 | 0 | |

180

| | |
|---|---|
| 03:31:21.32 | 1 |

1              DAVID W. ACKERMAN-CONFIDENTIAL

| | |
|---|---|
| 03:31:22.96 | 2 |

Page 180

| | | |
|---|---|---|
| 03:31:21.32 | 2 | I apologize in front of Lucent.  I |
| 03:31:22.99 | 3 | apologize in front of all my people.  I want my |
| 03:31:25.29 | 4 | people to be aware I screwed up personally.  It |
| 03:31:29.06 | 5 | has nothing to do with Lucent.  Nothing to do |
| 03:31:30.76 | 6 | with the relationship and I made a mistake. |
| 03:31:34.43 | 7 | I don't know if I sent out an E-mail, |
| 03:31:36.34 | 8 | I made it clear to my people to immediately |
| 03:31:39.10 | 9 | rescind that decision I had made.  So it is very |
| 03:31:44.41 | 10 | important you understand that context.  While you |
| 03:31:47.25 | 10 | you |
| 03:31:47.28 | 11 | are asking me these very specific questions this |
| 03:31:51.02 | 12 | is the first time I ever been embarrassed that |
| 03:31:52.62 | 13 | way in my life I can recall.  So it stands out in |
| 03:31:55.35 | 14 | my mind that I acted in bad faith for a day in |
| 03:32:00.69 | 15 | terms of this partnership because I literally did |
| 03:32:03.83 | 16 | what you suggested I should have done.  Then |
| 03:32:06.57 | 17 | Lucent -- that I should have waited for a PO, but |
| 03:32:10.40 | 18 | was chastised by Lucent for so doing. |
| 03:32:16.74 | 19 | Q.    This agreement you were negotiating |
| 03:32:18.91 | 20 | was never signed by Lucent; right? |
| 03:32:24.12 | 21 | A.    To my knowledge, that's correct. |
| 03:32:25.82 | 22 | Q.    Your understanding was that Lucent |
| 03:32:27.75 | 23 | ultimately the Lucent management said no, we are |
| 03:32:31.06 | 24 | not doing this deal? |
| 03:32:32.12 | 25 | A.    That is my understanding. |

=============================================================

Page 0

| | |
|---|---|
| 03:32:33.76 | 0 |

MANHATTAN REPORTING CORP., A LegaLink Company

| | |
|---|---|
| 03:32:33.76 | 0 | |

=============================================================

Page 181

| | |
|---|---|
| 03:32:33.76 | 0 |

181

| | |
|---|---|
| 03:32:33.76 | 1 |

1              DAVID W. ACKERMAN-CONFIDENTIAL

| | |
|---|---|
| 03:32:35.26 | 2 |

Page 181

| | | |
|---|---|---|
| 03:32:33.76 | 2 | Q.    In the meantime you continued |
| 03:32:35.29 | 3 | building out the network; right? |
| 03:32:37.76 | 4 | A.    We continued acting in good faith |
| 03:32:39.26 | 5 | because I was embarrassed now. |
| 03:32:43.17 | 6 | Q.    You were doing all the network |
| 03:32:45.24 | 7 | build-out work that WinStar sought to do, it got |
| 03:32:47.84 | 8 | done? |
| 03:32:49.81 | 9 | A.    That's correct.  As much as we could |
| 03:32:51.71 | 10 | do.  In the mode we had always been operating for |
| 03:32:55.55 | 10 | for |
| 03:32:55.58 | 11 | the last four quarters or whatever. |
| 03:32:58.22 | 12 | Q.    In that fourth quarter of 2000 did |
| 03:33:02.25 | 13 | Lucent ever ultimately issue a purchase order to |
| 03:33:06.36 | 14 | WinStar for that work? |
| 03:33:09.19 | 15 | A.    I don't know.  Don't know. |
| 03:33:12.46 | 16 | Q.    Did Lucent finance the work the |
| 03:33:16.50 | 17 | WinStar folks were doing to build-out WinStar |
| 03:33:19.27 | 18 | Networks? |
| 03:33:21.84 | 19 | A.    That WinStar and Lucent were doing, I |
| 03:33:23.38 | 20 | believe they did. |
| 03:33:28.55 | 21 | Q.    Thereafter in the first quarter of |

Page 11

B823

ackerman part 2 - dated 6-29-01

Page 299

| | | |
|---|---|---|
| 00:00:32.29 | 3 | Page 299 |
| 00:00:30.06 | 3 | Mr. Ackerman, are you an engineer |
| 00:00:32.33 | 4 | by training? |
| 00:00:32.69 | 5 | A.    Yes, I am. |
| 00:00:34.00 | 6 | Q.    And do you have any degrees in |
| 00:00:36.97 | 7 | engineering? |
| 00:00:37.43 | 8 | A.    Yes, I have two. |
| 00:00:37.87 | 9 | Q.    Can you tell us what they are, |
| 00:00:38.10 | 10 | please. |
| 00:00:38.77 | 11 | A.    Bachelors degree and masters |
| 00:00:41.24 | 12 | degree in electrical engineering from Cornell. |
| 00:00:45.41 | 13 | Q.    In October 1998 when the Supply |
| 00:00:47.34 | 14 | Agreement with Lucent was executed, did you have |
| 00:00:50.35 | 14 | have |
| 00:00:50.38 | 15 | principal responsibility for the engineering and |
| 00:00:52.31 | 16 | design of WinStar's global telecommunications |
| 00:00:54.28 | 17 | network? |
| 00:00:55.58 | 18 | A.    Yes, I did. |
| 00:00:56.99 | 19 | Q.    Were you involved in discussions, |
| 00:00:58.99 | 20 | negotiations with Lucent that led up to the |
| 00:01:00.99 | 21 | execution of the Supply Agreement? |
| 00:01:01.99 | 22 | A.    Yes, I was. |
| 00:01:02.49 | 23 | Q.    Okay. |
| 00:01:02.99 | 24 | What role did you have in those |
| 00:01:04.99 | 25 | negotiations? |

===================================================

Page 300

| | | |
|---|---|---|
| 00:01:06.13 | 0 | Page 300 |
| 00:01:07.26 | 1 | Page 300 |
| 00:01:06.13 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 00:01:07.26 | 1 | II |
| 00:01:07.30 | 2 | A.    As I said, I'd prefer to |
| 00:01:10.30 | 3 | characterize them as discussions that enabled us |
| 00:01:12.30 | 4 | to reach a common objective for the partnership |
| 00:01:17.31 | 5 | for both parties, but I had lead responsibility |
| 00:01:21.28 | 6 | for the WinStar position. |

===================================================

*****************************************************

Page 304

| | | |
|---|---|---|
| 00:06:16.44 | 7 | Page 304 |
| 00:06:07.46 | 7 | Q.    Yesterday during your testimony I |
| 00:06:16.47 | 8 | believe you indicated that prior to the |
| 00:06:18.47 | 9 | commencement of the negotiations, discussions |
| 00:06:21.48 | 10 | between the WinStar and Lucent teams that there |
| 00:06:24.48 | 11 | was a meeting with Nina Aversano and Nate |
| 00:06:28.45 | 12 | Kantor, is that correct? |
| 00:06:28.95 | 13 | A.    Yes, that's correct. |
| 00:06:29.45 | 14 | Q.    Can you tell us about that |
| 00:06:30.45 | 15 | meeting? |
| 00:06:31.45 | 16 | A.    Yes. |
| 00:06:32.45 | 17 | To the best of my recollection |
| 00:06:34.46 | 18 | Nate had sent us an E-mail either a day or two |
| 00:06:38.46 | 19 | before asking that we -- that a number of us |
| 00:06:42.46 | 20 | attend a meeting to be held out of our offices |
| 00:06:47.47 | 21 | in a hotel across the parking lot from our |
| 00:06:50.47 | 22 | offices in Tysons Corner, and it was a late |

Page 1

ackerman part 2 - dated 6-29-01
00:06:56.48 23  afternoon, early evening meeting to be followed
00:06:58.45 24  by dinner, and when we arrived we found that
00:07:05.45 25  there were people there from Lucent as well and

=================================================

Page 305
00:07:07.96  0  Page 305
00:07:10.43  1                              Page 305
00:07:07.96  1  DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:07:10.43  1  II
00:07:10.46  2  we sat around a table much like this, perhaps a
00:07:14.46  3  little bit bigger and Nina and Nate had prepared
00:07:20.47  4  a very simple presentation that I think they had
00:07:24.47  5  both termed heads of agreement.  And they
00:07:28.48  6  together each presented in terms of what the --
00:07:35.45  7  how they envisioned the nature of the
00:07:37.45  8  partnership between the two companies would
00:07:39.45  9  work, what was the basis of the partnership, why
00:07:43.46 10  it would be good for both companies and what
00:07:45.46 11  each company was to do for or with the other
00:07:50.47 12  company and how we had complementary business
00:07:53.44 12  business
00:07:53.47 13  strategies and how in addressing those
00:07:57.47 14  strategies ourselves we could help each other to
00:08:00.48 15  each become more successful.
00:08:04.48 16  We used I think there was a two
00:08:08.45 17  or possibly three-page presentation and we used
00:08:10.45 18  that as the basis for beginning the discussions
00:08:14.46 19  which became the Supply Agreement.  I'm not sure
00:08:18.46 20  about the Credit Agreement.  Sorry.
00:08:19.46 21  Q.      And during that meeting you used
00:08:23.47 22  the word partnership.  Is that how Ms. Aversano
00:08:27.47 23  and Mr. Kantor explained the nature of the
00:08:29.47 24  relationship?
00:08:30.14 25  A.      To the best of my knowledge the

=================================================

Page 306
00:08:30.81  0  Page 306
00:08:31.44  1                              Page 306
00:08:30.81  1  DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:08:31.44  1  II
00:08:31.47  2  two of them used that term frequently and as
00:08:34.48  3  often as possible to help set the discussions
00:08:40.45  4  and to make sure that everybody understood that
00:08:43.45  5  the nature of the relationship was changing
00:08:44.45  6  because we already had a relationship with
00:08:49.46  7  Lucent that Lucent was acting as a vendor
00:08:50.46  8  supplier to us and we were a customer.
00:08:52.46  9  So I think that it was important
00:08:54.46 10  to Nate and Nina at the time to emphasize that
00:08:58.47 11  the nature of the relationship was changing,
00:09:02.47 12  that it was no longer this arms length supplier
00:09:04.47 13  customer relationship.
00:09:05.47 14  Q.      And is that how the parties
00:09:09.48 15  approached the discussions that followed with an
00:09:10.48 16  eye toward building a partnership?
00:09:13.45 17  A.      Certainly looked -- I mean we
00:09:16.45 18  certainly did and from all indications in terms
00:09:18.45 19  of how we addressed the discussions it certainly
00:09:22.46 20  appeared that Lucent did as well.
                              Page 2

B825

```
                              ackerman part 2 - dated 6-29-01
00:09:23.46 21    Q.      To the best of your knowledge did
00:09:25.46 22    WinStar continue to treat the relationship as a
00:09:29.46 23    strategic partnership throughout the life of the
00:09:30.47 24    agreement?
00:09:31.47 25    A.      Yes, absolutely to the best of
```

==========================================================

```
Page 307
00:09:32.47  0    Page 307
00:09:33.44  1                                    Page 307
00:09:32.47  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:09:33.44  1    II
00:09:33.47  2    our ability.
00:09:36.47  3    Q.      And during the course of the
00:09:38.47  4    relationship did other members of Lucent
00:09:40.48  5    management indicate to you that they too viewed
00:09:42.48  6    the relationship as one of a partnership?
00:09:43.48  7    A.      Absolutely, absolutely and
00:09:45.45  8    frequently.
00:09:46.45  9    Q.      And who were those?
00:09:47.45 10    A.      Well, Nina Aversano, of course,
00:09:51.45 11    Mark Wilson, Bill Plunkett, Chuck Naylor, Debbie
00:09:58.46 12    Harris, Jon Greg, numerous others.  I mean I'm
00:10:03.47 13    leaving out at least seven or eight people.  I
00:10:07.47 14    dealt with people from Lucent on an almost daily
00:10:09.47 15    basis.
```

==========================================================

*****************************************************

B826

ackerman part 4 - dated 6-29-01

Page 312

| | | |
|---|---|---|
| 00:15:33.43 | 7 | Page 312 |
| 00:15:30.69 | 7 | Q.      Turning to the terms of the |
| 00:15:33.46 | 8 | Supply Agreement that was ultimately concluded, |
| 00:15:35.46 | 9 | can you tell me generally what you understand |
| 00:15:37.47 | 10 | Lucent's obligations to be under the Supply |
| 00:15:40.47 | 11 | Agreement with respect to the design and |
| 00:15:42.47 | 12 | build-out of the WinStar network. |
| 00:15:44.47 | 13 | A.      Lucent would as soon as possible |
| 00:15:49.48 | 14 | take over responsibility for the architecting, |
| 00:15:51.45 | 15 | design, engineering and construction of the |
| 00:15:54.45 | 16 | network with a few minor carve outs in areas |
| 00:15:57.45 | 17 | that Lucent had indicated either, A, they might |
| 00:16:02.46 | 18 | not want to develop the skill and did not have |
| 00:16:06.46 | 19 | the skill or knew they did not have the skill |
| 00:16:08.46 | 20 | and didn't desire to develop that skill over |
| 00:16:12.47 | 21 | time.  So we had those two distinct carve outs. |
| 00:16:16.47 | 22 | Q.      Which were I think you said RF |
| 00:16:17.47 | 23 | Engineering was one.  I can't recall the other |
| 00:16:20.48 | 24 | one? |
| 00:16:20.81 | 25 | A.      RF Engineering and they were |

==========================================================

Page 313

| | | |
|---|---|---|
| 00:16:21.14 | 0 | Page 313 |
| 00:16:21.44 | 1 | Page 313 |
| 00:16:21.14 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 00:16:21.44 | 1 | II |
| 00:16:21.48 | 2 | reluctant in the area of data and data products, |
| 00:16:26.45 | 3 | data communications, but that was really part of |
| 00:16:28.45 | 4 | this whole partnership was to pull Lucent into |
| 00:16:30.45 | 5 | the data communications and product age.  So at |
| 00:16:35.46 | 6 | the more junior level Lucent had concerns at the |
| 00:16:37.46 | 7 | senior level they were saying push us, push us |
| 00:16:41.46 | 8 | or pull us into that area product. |
| 00:16:43.47 | 9 | Q.      Other than those two areas that |
| 00:16:45.47 | 10 | you've identified, were there any other areas |
| 00:16:47.47 | 11 | relating to the build-out of the WinStar network |
| 00:16:50.47 | 12 | that Lucent indicated it had no desire or intent |
| 00:16:53.48 | 13 | to undertake? |
| 00:16:55.48 | 14 | A.      I don't know if desire or intent |
| 00:16:57.48 | 15 | is -- there were some areas that we mutually |
| 00:17:02.45 | 16 | agreed were perhaps not appropriate for Lucent |
| 00:17:06.45 | 17 | to take over.  That was the site acquisition and |
| 00:17:09.46 | 18 | building acquisition, and I don't know, there |
| 00:17:14.46 | 19 | might have been a couple of other minor areas, |
| 00:17:16.46 | 20 | but the biggest area that was sort of a question |
| 00:17:20.47 | 21 | mark to me and to my counterparts at Lucent |
| 00:17:23.47 | 22 | which is sort of down a notch from the very |
| 00:17:26.47 | 23 | senior level, if I could characterize, the very |
| 00:17:28.48 | 24 | senior level sort of was saying I don't think we |
| 00:17:30.48 | 25 | ever want to do that, but down a notch we were |

==========================================================

Page 314

| | | |
|---|---|---|
| 00:17:31.95 | 0 | Page 314 |
| 00:17:33.42 | 1 | Page 314 |
| 00:17:31.95 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 00:17:33.42 | 1 | II |
| 00:17:33.45 | 2 | saying perhaps the civil portion of what WinStar |
| 00:17:36.45 | 3 | was doing, the civil engineering and civil |

Page 1

B827

ackerman part 4 - dated 6-29-01

| | | |
|---|---|---|
| 00:17:39.45 | 4 | construction would be beneficial for Lucent to |
| 00:17:42.46 | 5 | take over so that it could become this full |
| 00:17:45.46 | 6 | integrator company and have this key strategic |
| 00:17:48.46 | 7 | advantage in a marketplace. |
| 00:17:49.46 | 8 | So I don't think the Lucent very |
| 00:17:51.47 | 9 | senior exec saw that as necessary. As I said, |
| 00:17:55.47 | 10 | down a notch we were sort of saying let's see |
| 00:17:57.47 | 11 | how this partnership evolves and what makes the |
| 00:18:00.48 | 12 | most sense because if you folks can do it and |
| 00:18:03.48 | 13 | want to do it we'd like you to do it, but if you |
| 00:18:05.45 | 14 | don't think it really adds value to your whole |
| 00:18:07.45 | 15 | proposition then we'll retain it and then we'd |
| 00:18:10.45 | 16 | still have to take -- we'd still have to get |
| 00:18:12.45 | 17 | concurrence from the more senior folks that yes, |
| 00:18:15.46 | 18 | we should move the partnership in that |
| 00:18:16.46 | 19 | direction. |
| 00:18:17.46 | 20 | Q.     Turning to the discussions, we |
| 00:18:21.46 | 21 | lawyers call negotiations, you call discussions |
| 00:18:24.47 | 22 | themselves, over what period of time did those |
| 00:18:26.47 | 23 | discussions take place? Do you recall? |
| 00:18:28.47 | 24 | A.     I can't, I can't remember |
| 00:18:30.47 | 25 | exactly. I guess it was sometime early fourth |

====================================================

Page 315

| | | |
|---|---|---|
| 00:18:31.97 | 0 | Page 315 |
| 00:18:33.44 | 1 |                            Page 315 |
| 00:18:31.97 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 00:18:33.44 | 1 | II |
| 00:18:33.48 | 2 | quarter, you know, sometime in October and it |
| 00:18:35.48 | 3 | was over a period of two to three weeks. |
| 00:18:36.48 | 4 | Q.     Okay. |
| 00:18:37.48 | 5 | How extensive were the |
| 00:18:39.45 | 6 | discussions during that two or three-week |
| 00:18:41.45 | 7 | period? |
| 00:18:42.45 | 8 | A.     They were intensive and |
| 00:18:43.45 | 9 | extensive. We would start early in the morning, |
| 00:18:50.46 | 10 | you know, around 8 o'clock. We'd get in at 7:30 |
| 00:18:53.46 | 11 | and chat awhile first, but the formal meetings |
| 00:18:56.46 | 12 | would start around 8, no later than 8:30. |
| 00:19:01.47 | 13 | We'd have breakfast brought in. |
| 00:19:04.47 | 14 | We had meals brought in and so we worked right |
| 00:19:08.48 | 15 | through the lunch hour from, you know, we'd take |
| 00:19:13.45 | 16 | small breaks here and there just for physical |
| 00:19:16.45 | 17 | needs and then we'd do the same thing, work |
| 00:19:19.45 | 18 | through dinner and we'd typically conclude |
| 00:19:21.46 | 19 | around 8 o'clock again in the evening jokingly |
| 00:19:24.46 | 20 | referring to having worked only half a day |
| 00:19:28.46 | 21 | twelve hours. |
| 00:19:30.47 | 22 | And then the attorneys, as I |
| 00:19:32.47 | 23 | recall it was our outside counsel, WinStar's |
| 00:19:34.47 | 24 | outside counsel would attempt to what we called |
| 00:19:37.47 | 25 | flip the document. So we had a living document |

====================================================

Page 316

| | | |
|---|---|---|
| 00:19:38.97 | 0 | Page 316 |
| 00:19:40.44 | 1 |                            Page 316 |
| 00:19:38.97 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 00:19:40.44 | 1 | II |
| 00:19:40.48 | 2 | that we were dealing with every day and what |

                            Page 2

B828

ackerman part 6 - dated 6-29-01
```
00:53:04.15 21    Q.      As a general proposition just
00:53:06.15 22    speaking generally was Lucent itself able over
00:53:09.15 23    the course of the relationship to provide
00:53:11.15 24    WinStar with best of breed equipment?
00:53:12.15 25    A.      It's the word able that concerns
```

======================================================

```
Page 346
00:53:13.66  0    Page 346
00:53:15.12  1                                    Page 346
00:53:13.66  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:53:15.12  1    II
00:53:15.16  2    me.
00:53:16.16  3    Q.      Okay.  Let me rephrase that.
00:53:17.16  4    As a general proposition did
00:53:19.16  5    Lucent itself provide WinStar with equipment
00:53:21.16  6    that was best of breed?
00:53:22.66  7    A.      In some instances they did and in
00:53:24.17  8    many instances, when you say provide meaning
00:53:30.17  9    Lucent manufacture or Lucent OEM equipment, in
00:53:34.18 10    some instances there was Lucent manufacture and
00:53:36.14 11    OEM equipment that was best of breed and in many
00:53:39.11 11    many
00:53:39.15 12    instances it was not.
```

======================================================

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
Page 346
00:54:03.14 21                                   Page 346
00:54:01.17 21    Q.      Can you give us some examples
00:54:03.17 22    where Lucent's equipment or proposed equipment
00:54:06.17 23    was not best of breed?
00:54:07.18 24    A.      The digital cross connects or
00:54:09.18 25    DACSs as they're called were clearly not best of
```

======================================================

```
Page 347
00:54:11.65  0    Page 347
00:54:14.12  1                                    Page 347
00:54:11.65  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:54:14.12  1    II
00:54:14.15  2    breed.  The routers that Lucent provided or
00:54:22.16  3    never provided, had were not best of breed.  The
00:54:29.16  4    metro optronics were not best of breed.  The
00:54:33.17  5    long haul optronics were not best of breed.  And
00:54:43.14  6    the ATM equipment was not best of breed.
00:54:48.15  7    ATM is asynchronous transfer mode
00:54:52.15  8    switching equipment not credit card machines or,
00:54:57.16  9    you know, the bank machines.
00:54:58.16 10    Q.      Are those data switches?
00:54:59.16 11    A.      Yes.
```

======================================================

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Page 348

B829

ackerman part 6 - dated 6-29-01
Page 348

```
00:56:21.01 12
00:56:19.74 12    Q.    Okay.
00:56:21.04 13    Can you tell us briefly about
00:56:21.81 14    WinStar's experience with the Nexabit router.
00:56:25.35 15    A.    Well, we were purchasing routers
00:56:30.09 16    from Cisco and that, of course, was upsetting to
00:56:34.56 17    Lucent because Lucent and Cisco are or Lucent
00:56:38.66 18    intends to be a strong competitor of Cisco,
00:56:40.96 19    Cisco intends to be a strong competitor of
00:56:42.03 20    Lucent.  I don't know the right way to say that.
00:56:45.07 21    So Lucent asked us to take a look at that router
00:56:52.04 22    as a replacement or alternative to the Cisco
00:56:56.04 23    product and we initially did a paper analysis
00:56:59.05 24    and demonstrated to Lucent feature for feature,
00:57:02.05 25    function for function, capability for capability
```

===============================================================

Page 349

```
00:57:04.05  0    Page 349
00:57:06.02  1                              Page 349
00:57:04.05  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:57:06.02  1    II
00:57:06.05  2    and price that, in fact, it was not close, not
00:57:11.06  3    even close to being equal in performance.
00:57:14.06  4    I can't remember if it was -- I
00:57:17.07  5    think it was Bill Plunkett, I'm almost certain
00:57:20.07  6    it was Bill Plunkett asked me, he said, look, in
00:57:22.04  7    the spirit of the partnership why don't you put
00:57:25.04  8    one into the lab and we'll compare them
00:57:30.05  9    side-by-side and then at least we'll be able to
00:57:34.05 10    know so that we can take back what we've got to
00:57:35.05 11    do to make ours as good or better, but we still
00:57:38.05 12    think that when you look at this thing
00:57:40.06 13    side-by-side you're going to see in its
00:57:43.06 14    performance that it is at least equivalent to.
00:57:44.06 15    The simple fact is we never got
00:57:45.06 16    it to work in the lab.  So we were unable to
00:57:51.07 17    obviously purchase any of that equipment.  But
00:57:58.04 18    we did, you know, make an effort to work with
00:58:00.04 19    them to help them understand at least where its
00:58:05.05 20    shortfalls were in terms of the needs of the
00:58:07.05 21    industry.
00:58:07.72 22    Q.    Okay.
00:58:08.38 23    Where does the router fit in the
00:58:09.05 24    network structure?
00:58:10.05 25    A.    Well, it fits in two places.  You
```

===============================================================

Page 350

```
00:58:11.05  0    Page 350
00:58:12.02  1                              Page 350
00:58:11.05  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
00:58:12.02  1    II
00:58:12.05  2    can put a router at the edge of the network on
00:58:15.06  3    the customer's premise and then you have routers
00:58:17.06  4    in the service node as a place of switching data
00:58:21.06  5    as well.  It's another form of data switch, IP
00:58:24.07  6    data meaning Internet protocol data.
00:58:26.07  7    Q.    Okay.
00:58:27.07  8    When you said the customer
00:58:28.07  9    location, is it the B sites?
```

Page 8

```
                            ackerman part 6 - dated 6-29-01
00:58:30.04 10    A.       Yeah.

==================================================
*********************************************

Page 351
01:00:02.03 14                                Page 351
00:59:54.06 14    Q.        You indicated earlier that the
01:00:02.06 15    Lucent long haul optronics were not best of
01:00:05.07 16    breed.
01:00:06.07 17    Do you recall who the competitor
01:00:07.07 18    was that was best of breed?
01:00:08.07 19    A.        Well, there were several
01:00:09.04 20    competitors.  What we determined with Lucent to
01:00:13.04 21    use as the yard stick that they agreed with
01:00:17.05 22    Sycamore, but Nortel, Siemens and others had
01:00:22.05 23    equipment that was also superior to what Lucent
01:00:26.05 24    had.
01:00:26.72 25    And the reason we needed to agree

==================================================

Page 352
01:00:27.39  0    Page 352
01:00:28.02  1                                Page 352
01:00:27.39  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
01:00:28.02  1    II
01:00:28.06  2    to a yardstick is that what I did again in the
01:00:32.06  3    spirit of the partnership was say, okay, since
01:00:35.06  4    best of breed was designed as price performance
01:00:39.07  5    if Lucent can beat the price and eventually I
01:00:45.04  6    agreed to I think meet the price, although now
01:00:48.04  7    I'm not absolutely certain, of the competitor
01:00:50.05  8    for equivalent capacity and functionality then I
01:00:57.05  9    would purchase the equipment in the spirit of
01:01:00.06 10    the partnership and we'd use the Lucent product.
01:01:08.06 11    I took a lot of heat from my
01:01:11.07 12    staff for that decision because I ignored
01:01:15.04 13    performance in many ways.  The Lucent product
01:01:18.04 14    did not have equivalent capacity to the
01:01:21.04 15    competitor's product.
01:01:23.04 16    So in return Lucent agreed that
01:01:27.05 17    when they developed equivalent capacity they
01:01:30.05 18    would replace what we had with the new
01:01:33.05 19    capability for free, upgrade it to the
01:01:37.06 20    equivalent capacity for free.  So I said to my
01:01:39.06 21    staff, see, it's not a problem and, but in
01:01:43.06 22    effect it is because now we still have to go in
01:01:46.07 23    and replace it which could create problems on
01:01:48.07 24    the network and disruptions of service to
01:01:51.04 25    customers.

==================================================

Page 353
01:01:51.71  0    Page 353
 1:01:52.34  1                                Page 353
 1:01:51.71  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
 1:01:52.34  1    II
01:01:52.37  2    So that was one area that again,
01:01:53.04  3    in the spirit of the partnership I sort of found
                            Page 9
```

**B831**

ackerman part 6 - dated 6-29-01

| | | |
|---|---|---|
| 01:01:56.04 | 4 | a way to make the Lucent product work. |
| 01:01:58.05 | 5 | The other two areas that were |
| 01:02:01.05 | 6 | extremely important was in the physical space |
| 01:02:03.05 | 7 | that the equipment actually took up and it took |
| 01:02:07.06 | 8 | up two to three times the physical space of the |
| 01:02:11.06 | 9 | competitors. Why is that important? Space |
| 01:02:14.06 | 10 | costs money and in many instances we had to |
| 01:02:17.07 | 11 | co-locate this equipment or place it in |
| 01:02:19.07 | 12 | facilities that weren't ours. So we had to pay |
| 01:02:23.04 | 13 | for the space that we had to use to install the |
| 01:02:27.04 | 14 | equipment and since it took up more space we had |
| 01:02:30.05 | 15 | to pay more money. |
| 01:02:32.05 | 16 | In the spirit of the partnership |
| 01:02:35.05 | 17 | WinStar absorbed that incremental operating |
| 01:02:37.05 | 18 | cost. Again, something my staff didn't think |
| 01:02:40.06 | 19 | was such a great idea that I was willing to do, |
| 01:02:42.06 | 20 | but I'm the boss. So for that component of best |
| 01:02:47.06 | 21 | of breed we looked the other way. |
| 01:02:49.06 | 22 | The other most important |
| 01:02:52.07 | 23 | component or important component of best of |
| 01:02:55.04 | 24 | breed in this case was the consumption of power, |
| 01:02:57.04 | 25 | and again, consumption of power equals cost |

=================================================

Page 354

| | | |
|---|---|---|
| 01:02:59.54 | 0 | Page 354 |
| 01:03:02.01 | 1 | Page 354 |
| 01:02:59.54 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:03:02.01 | 1 | II |
| 01:03:02.04 | 2 | particularly if you are co-locating you need |
| 01:03:04.05 | 3 | more power and you also then get to a point |
| 01:03:06.05 | 4 | where if you're in the service node the power |
| 01:03:10.05 | 5 | plant may not be sufficient to support the |
| 01:03:12.05 | 6 | incremental power requirements and then you'd |
| 01:03:13.05 | 7 | have to upgrade the power plant costing you more |
| 01:03:17.06 | 8 | money for an equivalent capability, and again, |
| 01:03:21.06 | 9 | we looked the other way on that performance |
| 01:03:25.07 | 10 | criteria, deployed the equipment anyway and gave |
| 01:03:30.01 | 10 | gave |
| 01:03:30.04 | 11 | Lucent the turnkey responsibility and we've |
| 01:03:31.04 | 12 | already discussed how that went. |
| 01:03:32.04 | 13 | Q.      You indicated that Lucent agreed |
| 01:03:39.05 | 14 | that it was going to upgrade or replace the long |
| 01:03:43.05 | 15 | haul optronics when they hadn't improved the |
| 01:03:46.05 | 16 | product. |
| 01:03:46.55 | 17 | Have they done so? |
| 01:03:47.06 | 18 | A.      To the best of my knowledge, no. |
| 01:03:49.06 | 19 | Q.      Okay. |
| 01:03:57.07 | 20 | You indicated that Lucent's metro |
| 01:03:58.07 | 21 | optronics also were not best of breed. Can you |
| 01:04:01.07 | 22 | tell us a little more about that. |
| 01:04:02.04 | 23 | A.      Well, the metro optronics for |
| 01:04:09.04 | 24 | WinStar, and again another great reason for |
| 01:04:12.05 | 25 | Lucent to perform the services, our locations, |

=================================================

Page 355

| | | |
|---|---|---|
| 01:04:14.05 | 0 | Page 355 |
| 01:04:16.02 | 1 | Page 355 |
| 01:04:14.05 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:04:16.02 | 1 | II |

Page 10

**B832**

ackerman part 6 - dated 6-29-01

| 01:04:16.05 | 2 | hubs, we call hubs are in commercial buildings |
| 01:04:19.05 | 3 | where we have to install the optronics, the |
| 01:04:22.06 | 4 | equipment and space in commercial buildings and |
| 01:04:25.06 | 5 | power are at an extreme premium because there |
| 01:04:29.06 | 6 | you're paying for commercial office space rather |
| 01:04:32.07 | 7 | than central office co-location space, and so |
| 01:04:35.04 | 8 | the physical space -- and sometimes you just |
| 01:04:38.04 | 9 | can't get more than a certain amount of square |
| 01:04:40.04 | 10 | feet in a commercial office building and if the |
| 01:04:43.04 | 11 | building is ideal for the location of a hub, |
| 01:04:45.05 | 12 | that is it has the ability to have line of sight |
| 01:04:50.05 | 13 | to a large number of Bs or customer premise |
| 01:04:53.05 | 14 | locations, it's important that we be able to use |
| 01:04:55.06 | 15 | that. |
| 01:04:57.56 | 16 | The Lucent equipment did not fit, |
| 01:05:00.06 | 17 | physically fit into the space, whereas |
| 01:05:05.07 | 18 | competitors' equipment did fit physically into |
| 01:05:10.04 | 19 | the space.  So we were just physically unable to |
| 01:05:12.04 | 20 | use the equipment notwithstanding even the |
| 01:05:14.04 | 21 | incremental power requirements for a number of |
| 01:05:17.05 | 22 | instances. |
| 01:05:18.55 | 23 | To Lucent's credit they did was |
| 01:05:20.05 | 24 | they went out and acquired a company that had an |
| 01:05:23.02 | 24 | an |
| 01:05:23.05 | 25 | appropriate solution.  The issue at the time |

================================================

Page 356

| 01:05:25.55 | 0 | Page 356 |
| 01:05:28.02 | 1 | Page 356 |
| 01:05:25.55 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:05:28.02 | 1 | II |
| 01:05:28.06 | 2 | that the relationship started to I'll call it |
| 01:05:31.06 | 3 | worsen was that Lucent was trying to convince us |
| 01:05:36.06 | 4 | to delay deployment of our metro fiber other and |
| 01:05:41.07 | 5 | also they didn't have equivalent capacity.  Sort |
| 01:05:44.04 | 6 | of already discussed that in the long haul.  So |
| 01:05:47.04 | 7 | and we needed the capacity so that we could sell |
| 01:05:50.05 | 8 | services and sell to customers. |
| 01:05:52.05 | 9 | So Lucent wanted us to delay the |
| 01:05:56.05 | 10 | deployment of the optronics so that the product |
| 01:06:02.06 | 11 | would be available from the company that they |
| 01:06:05.06 | 12 | had just purchased and they could use that, and |
| 01:06:10.07 | 13 | I said we just can't delay because we have |
| 01:06:15.04 | 14 | service needs and it's costing us money to use |
| 01:06:18.04 | 15 | alternative facilities. |
| 01:06:20.04 | 16 | In lieu of putting in our own |
| 01:06:21.54 | 17 | fiber network we have to buy facilities from the |
| 01:06:23.04 | 18 | underlying telephone companies.  This impacts |
| 01:06:27.05 | 19 | our EBITDA because it's an expense of operating |
| 01:06:30.05 | 20 | the business.  So for us to meet our EBITDA |
| 01:06:33.05 | 21 | goals and objectives we had to deploy the |
| 01:06:38.06 | 22 | optronics so that we could go off the facilities |
| 01:06:42.06 | 23 | that were costing us monthly rent, if you will, |
| 01:06:45.07 | 24 | and impacting EBITDA and replace it with this |
| 01:06:48.07 | 25 | more economic capital solution. |

================================================

Page 357

| 01:06:48.54 | 0 | Page 357 |
| 01:06:49.00 | 1 | Page 357 |

Page 11

**B833**

ackerman part 6 - dated 6-29-01

| | | |
|---|---|---|
| 01:06:48.54 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:06:49.00 | 1 | II |
| 01:06:49.04 | 2 | So we're trading capital for |
| 01:06:51.04 | 3 | operating cost, but then long-term your costs |
| 01:06:55.04 | 4 | are substantially lowered because the facilities |
| 01:06:56.04 | 5 | are already in place with orders of magnitude |
| 01:06:59.05 | 6 | more capacity. |
| 01:07:00.05 | 7 | Again in the spirit of the |
| 01:07:04.05 | 8 | partnership we looked at delaying as long as |
| 01:07:09.06 | 9 | possible the deployment of the optronics where |
| 01:07:14.06 | 10 | we could, but I said in one area in particular |
| 01:07:18.07 | 11 | we were desperate to deploy it because of the |
| 01:07:20.07 | 12 | cost that we were experiencing in Boston and we |
| 01:07:23.04 | 13 | physically -- I said to Lucent let's go up |
| 01:07:25.04 | 14 | together and look at these spaces. Let's take |
| 01:07:28.04 | 15 | your equipment there with us and let's see if we |
| 01:07:29.04 | 16 | can find a way to fit it in. If there's a way |
| 01:07:33.05 | 17 | we can fit it in and then you'll replace it with |
| 01:07:35.05 | 18 | your other stuff then we'll do it or you could |
| 01:07:37.05 | 19 | go buy somebody else's stuff. I don't care who, |
| 01:07:41.06 | 20 | put it in there until your stuff is available |
| 01:07:45.06 | 21 | and then replace it and then you can go sell |
| 01:07:47.06 | 22 | that stuff in the marketplace or do whatever you |
| 01:07:50.07 | 23 | want with it or we'll keep it. I mean whatever |
| 01:07:51.07 | 24 | you want us to do we'll do so that we can |
| 01:07:54.07 | 25 | provide a satisfactory solution. |

=================================================

Page 358

| | | |
|---|---|---|
| 01:07:55.04 | 0 | Page 358 |
| 01:07:56.00 | 1 |                          Page 358 |
| 01:07:55.04 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:07:56.00 | 1 | II |
| 01:07:56.04 | 2 | That was I think in the time |
| 01:07:58.04 | 3 | frame of fourth quarter and we never got to |
| 01:08:00.04 | 4 | deploy it, but again, there were considerable |
| 01:08:04.05 | 5 | issues and problems surrounding this what is |
| 01:08:05.05 | 6 | best of breed and what can we do to help the |
| 01:08:09.05 | 7 | partnership. |
| 01:08:10.05 | 8 | Q.      Fourth quarter last year? |
| 01:08:11.05 | 9 | A.      Yes. |
| 01:08:14.06 | 10 | Q.      Okay. |
| 01:08:17.06 | 11 | Can you tell us briefly about |
| 01:08:19.06 | 12 | WinStar's experience with Lucent with regard to |
| 01:08:21.06 | 13 | the converged architecture or access product. |
| 01:08:25.07 | 14 | A.      Well, now we're talking about the |
| 01:08:27.07 | 15 | current generation of access product in contrast |
| 01:08:31.04 | 16 | to AnyMedia-Fast and what we were looking for |
| 01:08:35.04 | 17 | and what the architecture called for for our |
| 01:08:40.05 | 18 | network and what converged means is the |
| 01:08:42.05 | 19 | integration of voice and data into a common |
| 01:08:45.05 | 20 | infrastructure from the B site through the hub |
| 01:08:48.06 | 21 | to the service node and Lucent was -- it was |
| 01:08:54.06 | 22 | working. They had performed the architecture. |
| 01:08:57.07 | 23 | While they hadn't done the actual |
| 01:08:59.07 | 24 | network planning and city planning they |
| `1:09:02.04 | 25 | understood the needs well enough so that they |

=================================================

Page 359

| | | |
|---|---|---|
| 01:09:03.04 | 0 | Page 359 |

Page 12

B834

```
                                    ackerman part 6 - dated 6-29-01
01:22:37.05 20    of actually developing the network elements we
01:22:42.06 21    didn't have the resources to help there.
01:22:43.06 22    Now, on the systems side we did
01:22:46.06 23    over time develop the resources there and we
01:22:50.07 24    did, in fact, work with Lucent to develop many
01:22:53.07 25    of the system's capabilities.  So that was a
```

=====================================================

```
Page 370
01:22:55.04  0    Page 370
01:22:57.01  1                                    Page 370
01:22:55.04  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
01:22:57.01  1    II
01:22:57.04  2    different area.
01:22:58.04  3    Q.      Okay.
01:23:38.05  4    You touched on briefly a few
01:23:40.05  5    moments ago WinStar's agreement to, I don't
01:23:45.05  6    recall the exact words you used, prepurchase I
01:23:48.06  7    think quantities of Lucent's optronic equipment?
01:23:51.06  8    A.      Yes.
01:23:52.06  9    Q.      Is that correct?
01:23:55.06 10    Were there other times during the
01:23:58.07 11    relationship that WinStar also agreed to
01:24:00.07 12    prepurchase large quantities of other products
01:24:03.04 13    and services from Lucent?
01:24:06.04 14    A.      I think that, yeah, I don't know
01:24:08.04 15    that pre-- prepurchase --
01:24:10.05 16    Q.      I don't remember the word you
01:24:11.05 17    used.
01:24:12.05 18    A.      Yeah, I don't know, but I want to
01:24:14.05 19    make sure that we get the situation straight.
01:24:17.05 20    What we would do particularly and the reason we
01:24:22.06 21    did so in long haul and in the optronics arena
01:24:27.06 22    is that we had a schedule that was based on
01:24:30.07 23    deliveries from others to us.
01:24:33.07 24    We also had schedules for other
01:24:36.04 25    elements of network build-out that were based on
```

=====================================================

```
Page 371
01:24:37.04  0    Page 371
01:24:38.01  1                                    Page 371
01:24:37.04  1    DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II
01:24:38.01  1    II
01:24:38.04  2    our expectations with regard to obtaining
01:24:44.05  3    leases, for example.  We discussed that
01:24:46.05  4    yesterday I think, that the actual leasing or
01:24:50.05  5    obtaining lease rights to customer premise and
01:24:53.05  6    hubs was external to WinStar, half of the
01:24:56.06  7    function was external.  We're dealing with
01:24:59.06  8    building owners.
01:24:59.56  9    So we knew that we would have a
01:25:00.06 10    need for this equipment within months or
01:25:06.07 11    quarters.  So and that need could accelerate or
01:25:10.04 12    decelerate and so again because we had this
01:25:13.04 13    partnership and Lucent was trying to manage its
1:25:18.05 14    business as we're trying to manage ours we
1:25:20.05 15    sometimes purchased some network elements
1:25:27.06 16    earlier than we might have purchased them in
01:25:35.06 17    terms of months or quarters.
01:25:38.07 18    We also sometimes overlooked or
                                  Page 18
```

B835

ackerman part 6 - dated 6-29-01

| | | |
|---|---|---|
| 01:25:43.04 | 19 | agreed to accelerate payments that we hadn't |
| 01:25:50.05 | 20 | previously, now how is the right way to say |
| 01:25:52.05 | 21 | this?  In the contract we had something we |
| 01:25:54.05 | 22 | called SNAP-D which was really in layman's |
| 01:25:57.05 | 23 | terminology pay as you grow which meant that we |
| 01:26:01.06 | 24 | would purchase equipment from Lucent, but pay -- |
| 01:26:07.06 | 25 | but in order to make sure that we engineered it |

======================================================

Page 372

| | | |
|---|---|---|
| 01:26:08.06 | 0 | Page 372 |
| 01:26:09.03 | 1 | Page 372 |
| 01:26:08.06 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:26:09.03 | 1 | II |
| 01:26:09.06 | 2 | properly and we're able to design the equipment |
| 01:26:15.04 | 3 | properly we purchased in appropriate engineering |
| 01:26:21.04 | 4 | quantities, but it was substantially more |
| 01:26:24.05 | 5 | capacity than we'd need up front. |
| 01:26:25.05 | 6 | It's a very complex situation. |
| 01:26:29.05 | 7 | Just difficult to explain, but so that WinStar |
| 01:26:33.05 | 8 | would only pay Lucent for what we really needed, |
| 01:26:36.06 | 9 | but would properly engineer the equipment with |
| 01:26:39.06 | 10 | Lucent.  So that Lucent could properly engineer |
| 01:26:42.06 | 11 | it we would pay them less than the total fee for |
| 01:26:48.07 | 12 | the entire set of equipment that we'd initially |
| 01:26:54.04 | 13 | install, and then over time based on how we |
| 01:26:58.05 | 14 | utilize that incremental equipment we would make |
| 01:27:01.05 | 15 | periodic payments to Lucent as it was used, and |
| 01:27:04.05 | 16 | then there was what we called a true up interval |
| 01:27:07.06 | 17 | and I can't remember what they were for each |
| 01:27:08.06 | 18 | different element of equipment, but we specified |
| 01:27:12.06 | 19 | many of them or we attempted to in the Supply |
| 01:27:14.06 | 20 | Agreement and then over time we specified more |
| 01:27:17.07 | 21 | when possible. |
| 01:27:20.07 | 22 | At the end of that there was a |
| 01:27:21.07 | 23 | true up that said, hey, if WinStar hasn't used |
| 01:27:25.04 | 24 | it that's WinStar's problem.  The equipment is |
| 01:27:28.04 | 25 | there.  We've got to pay Lucent for everything |

======================================================

Page 373

| | | |
|---|---|---|
| 01:27:28.54 | 0 | Page 373 |
| 01:27:29.01 | 1 | Page 373 |
| 01:27:28.54 | 1 | DAVID W. ACKERMAN - CONFIDENTIAL - VOLUME II |
| 01:27:29.01 | 1 | II |
| 01:27:29.04 | 2 | and so we set these true up intervals. |
| 01:27:34.05 | 3 | What we did in some instances was |
| 01:27:35.05 | 4 | eliminate that whole pay as you grow concept, |
| 01:27:38.05 | 5 | pay Lucent for everything up front so that they |
| 01:27:42.06 | 6 | could, in fact, recognize the revenue when they |
| 01:27:45.06 | 7 | ship the equipment or install the equipment, |
| 01:27:48.06 | 8 | whenever they recognize revenue.  I don't -- |
| 01:27:50.07 | 9 | it's magic to me. |

======================================================

*************************************************

**B836**

ackerman part 10 - dated 3-05-04

```
03:46:10.80  1   were
03:46:10.84  2   contacted by Ben Verwaayen, who came into the picture
03:46:14.81  2   picture
03:46:14.84  3   around that time, and he requested these meetings.
03:46:20.81  3   meetings.
03:46:20.85  4   And I think -- I think I learned of that through, you
03:46:22.81  5   know, my relationships with the folks at Lucent.  To
03:46:30.82  6   the best of my memory that's how they came about.
03:46:32.79  6   about.
03:46:32.82  7   Q    Now, did Winstar go forward with these
03:46:34.83  8   discussions with Lucent?
03:46:35.83  9   A    Yes.
03:46:35.83 10   Q    Did they ever reach any agreement with
03:46:38.83 11   Lucent about how they could change the relationship?
03:46:40.80 11   relationship?
03:46:40.83 12   A    I'm not sure.  I can't remember.
03:46:43.84 13   Q    Do you know -- do you know why Winstar was
03:46:47.81 13   was
03:46:47.84 14   negotiating with Lucent to try to make the
03:46:49.84 15   relationship more profitable for them?
03:46:52.84 16   A    I don't know.  I don't know if that's --
03:46:58.82 17   that might be the way Lucent characterized it.  I
03:47:01.82 18   don't know if Winstar was characterizing it that
03:47:03.82 19   way.  But we were participating in the negotiations
03:47:08.79 19   negotiations
03:47:08.83 20   because we needed to keep the relationship in place.
03:47:12.80 20   place.
03:47:12.83 21   Q    Had Lucent -- To your knowledge had Lucent
03:47:15.83 22   said the relationship was not going to continue if it
03:47:17.84 23   was not made more profitable for Lucent?
03:47:21.84 24   A    I can't recall if they said that in so many
03:47:24.84 25   words, but through sitting through some of those
```

==================================================

```
Page 587
03:47:29.81  0
             587
03:47:36.79  1                          Page 587
03:47:29.81  1   meetings I came to believe that if Lucent couldn't
03:47:36.82  2   get some things restructured, that they would end the
03:47:42.79  2   the
03:47:42.83  3   relationship.
03:47:44.83  4   Q    Do you recall whether Lucent referred to
03:47:47.83  5   those negotiations as win-win negotiations?
03:47:51.84  6   A    I don't specifically recall.  They may
03:47:54.84  7   have.
03:47:55.84  8   Q    Okay.  And during these negotiations do you
03:47:58.84  9   recall there being any part of the negotiations
03:48:02.81 10   dedicated to making the relationship better or more
03:48:05.78 10   more
03:48:05.82 11   profitable for Winstar?
03:48:12.82 12   A    I don't specifically recall that, but that
03:48:16.83 13   doesn't mean that there might not have been.  I just
03:48:18.80 13   just
03:48:18.83 14   don't specifically recall it.
```

==================================================

```
*************************************************
```

Page 669

Page 8

**B837**

ackerman part 5 - dated 3-05-04

| | | |
|---|---|---|
| 03:49:44.78 | 17 | here's |
| 03:49:44.82 | 18 | the price per hub and the price per B, perform that |
| 03:49:49.79 | 18 | that |
| 03:49:49.82 | 19 | multiplication, and that's really how much |
| 03:49:50.82 | 20 | commitment.  And that might have been more than the |
| 03:49:51.79 | 20 | than the |
| 03:49:51.82 | 21 | software pool or than any of the other commitments |
| 03:49:54.79 | 21 | commitments |
| 03:49:54.83 | 22 | put together because of the total -- the big total |
| 03:49:57.83 | 23 | that that might have represented.  I just don't |
| 03:49:59.83 | 24 | remember the numbers off the top of my head. |
| 03:50:01.83 | 25 | Q    Well, let me ask you to look at Exhibit 55 |

==================================================

**Page 589**

| | | |
|---|---|---|
| 03:50:05.84 | 0 | |
| | 589 | |
| 03:50:07.81 | 1 | Page 589 |
| 03:50:05.84 | 1 | quickly. |
| 03:50:07.84 | 2 | A    We have the documents in front of us. |
| 03:50:09.84 | 3 | Q    I believe you test -- |
| 03:50:09.84 | 4 | A    55. |
| 03:50:10.84 | 5 | Q    55.  I believe you testified earlier that |
| 03:50:21.82 | 6 | this -- this document was a part of or memorialized a |
| 03:50:25.79 | 6 | a |
| 03:50:25.82 | 7 | part of the end of quarter deal in that quarter; is |
| 03:50:28.83 | 8 | that correct? |
| 03:50:28.83 | 9 | A    Correct. |
| 03:50:29.83 | 10 | Q    This document shows Winstar committing to |
| 03:50:31.83 | 11 | buy 77.8 million dollars from Lucent in the third |
| 03:50:37.84 | 12 | quarter; is that correct? |
| 03:50:37.84 | 13 | A    Yes.  But you see why I also said that's |
| 03:50:43.84 | 14 | not clear how much was incremental.  Look just before |
| 03:50:46.81 | 14 | before |
| 03:50:46.85 | 15 | that line. |
| 03:50:46.85 | 16 | Q    Right.  There's an item that says 47 |
| 03:50:50.82 | 17 | million Lucent business previously committed.  Is |
| 03:50:54.82 | 18 | that what you're referring to? |
| 03:50:54.82 | 19 | A    Yes. |
| 03:50:54.82 | 20 | Q    And there's an item above that that shows |
| 03:50:58.82 | 21 | 50 million 800 thousand as the subtotal of all the |
| 03:51:00.83 | 22 | other items, which apparently were not previously |
| 03:51:01.83 | 23 | committed to -- |
| 03:51:01.83 | 24 | A    Yeah.  So that's -- |
| 03:51:01.83 | 25 | Q    -- is that correct? |

==================================================

**Page 590**

| | | |
|---|---|---|
| 03:51:01.83 | 0 | |
| | 590 | |
| 03:51:04.80 | 1 | Page 590 |
| 03:51:01.83 | 1 | A    -- why it's -- yes, it appears that way, |
| 03:51:04.83 | 2 | but it doesn't add up, so it's confusing to me. |
| 03:51:07.83 | 3 | Q    You're correct.  The math would have to be |
| 03:51:10.84 | 4 | 30.  This is a -- you know, it's a fax -- been faxed |
| 03:51:11.84 | 5 | a couple of times.  It probably is supposed to be |
| 03:51:14.84 | 6 | 30. |
| 03:51:15.84 | 7 | A    Uh-huh. |
| 03:51:15.84 | 8 | Q    And I think if we did -- |
| 03:51:15.84 | 9 | A    Yes, that's probably 30. |
| 03:51:17.84 | 10 | Q    -- the math, that's what it would add up. |

Page 7

ackerman part 5 - dated 3-05-04

| | |
|---|---|
| 03:51:19.84 11 | A    Right.  It doesn't add up.  That should be |
| 03:51:20.85 12 | 30 then I guess.  So that's why I'm having a hard |
| 03:51:22.81 13 | time characterizing the numbers in the -- as to what |
| 03:51:26.79 13 | what |
| 03:51:26.82 14 | was -- how much you really -- how much really |
| 03:51:28.82 15 | incremental business did we commit to as a total in |
| 03:51:33.83 16 | that third quarter transaction.  And as I said, I |
| 03:51:35.83 17 | think the biggest part of it you would find out to be |
| 03:51:39.80 17 | be |
| 03:51:39.83 18 | is hubs and Bs and not any of these numbers. |
| 03:51:43.84 19 | Q    Okay.  So this 30 million here, this |
| 03:51:46.84 20 | doesn't include the incremental purchases by Winstar |
| 03:51:46.81 20 | Winstar |
| 03:51:46.84 21 | of hubs and Bs; is that correct? |
| 03:51:48.84 22 | A    That's correct. |
| 03:51:50.84 23 | Q    Does this 30 million here include any of |
| 03:51:53.85 24 | the pay as you grow payments? |
| 03:51:55.81 25 | A    It's in this letter here. |

==================================================

Page 591

| | |
|---|---|
| 03:51:59.82  0 | |
|     591 | |
| 03:52:00.79  1 | Page 591 |
| 03:51:59.82  1 | Q    Which item? |
| 03:52:00.82  2 | A    18 million.  The 55.  Exhibit 55 you can |
| 03:52:03.82  3 | see pay as you grow.  It's right there. |
| 03:52:05.82  4 | Q    Okay. |
| 03:52:05.82  5 | A    It's called out.  18,852,5, assuming those |
| 03:52:11.83  6 | numbers are correct in faxing. |
| 03:52:11.83  7 | Q    So that shows that almost 19 million of the |
| 03:52:14.83  8 | 30 million dollars -- |
| 03:52:16.84  9 | A    Was pay as you grow. |
| 03:52:18.84 10 | Q    -- that was new purchases was a pay as you |
| 03:52:19.84 11 | grow acceleration? |
| 03:52:21.84 12 | A    Right.  Appears to be. |
| 03:52:22.84 13 | Q    Do you know if those pay as you grow |
| 03:52:24.84 14 | payments were due at the time that this agreement was |
| 03:52:26.81 14 | agreement was |
| 03:52:26.85 15 | signed? |
| 03:52:26.85 16 | A    No, they wouldn't have been.  I mean that's |
| 03:52:29.81 17 | why we included them separately. |
| 03:52:31.82 18 | Q    Okay.  So why was Winstar making a payment |
| 03:52:34.79 18 | payment |
| 03:52:34.82 19 | of 19 million dollars for pay as you grow payments |
| 03:52:39.82 20 | that were not yet due? |
| 03:52:40.83 21 | A    To help Lucent make its numbers. |
| 03:52:49.83 22 | Q    Okay.  Now, you also talked about the Bs |
| 03:52:52.84 23 | and hubs commitments.  I'm going to ask you to look |
| 03:53:00.81 23 | look |
| 03:53:00.85 24 | at 56, Exhibit 56, which is the fax from Lisa Hicks |
| 03:53:13.83 25 | that had the detail, status and implications summary |
| 03:53:17.80 25 | summary |

==================================================

Page 592

| | |
|---|---|
| 03:53:17.83  0 | |
|     592 | |
| 03:53:18.80  1 | Page 592 |
| 03:53:17.83  1 | of the third quarter deal.  Do you see that? |
| 03:53:18.83  2 | A    Uh-huh. |

Page 8

ackerman part 5 - dated 3-05-04

| | | |
|---|---|---|
| 04:09:34.81 | 9 | number |
| 04:09:34.84 | 10 | without being totally stupid.  Do you see that? |
| 04:09:37.84 | 11 | A    Uh-huh. |
| 04:09:39.84 | 12 | Q    You're saying in here to Nate that -- that |
| 04:09:41.81 | 13 | Winstar doesn't need much at the time of this third |
| 04:09:47.79 | 13 | third |
| 04:09:47.82 | 14 | quarter deal; is that correct? |
| 04:09:49.82 | 15 | A    We didn't need in the short term that much, |
| 04:09:53.83 | 16 | but could always use it, so -- |
| 04:09:58.83 | 17 | Q    Now, you qualified that in the short term. |
| 04:10:00.83 | 18 | What is the short term in your mind? |
| 04:10:02.83 | 19 | A    Within the next quarter or two. |
| 04:10:05.84 | 20 | Q    So within the next six months there wasn't |
| 04:10:07.84 | 21 | that much that Winstar needed; is that fair? |
| 04:10:10.84 | 22 | A    Right.  But we could use stuff that we |
| 04:10:15.81 | 23 | didn't need.  So it's hard to -- it's hard to really |
| 04:10:18.82 | 24 | characterize. |
| 04:10:19.82 | 25 | Q    Okay.  I hear what you're saying.  You |

==================================================

Page 605

| | | |
|---|---|---|
| 04:10:23.82 | 0 | |
| | 605 | |
| 04:10:27.79 | 1 | Page 605 |
| 04:10:23.82 | 1 | could use stuff, but you didn't need it.  The rest of |
| 04:10:27.83 | 2 | this e-mail is focused on Winstar's issue of reducing |
| 04:10:31.83 | 3 | its capital expenditure, correct? |
| 04:10:33.83 | 4 | A   Well, I think so.  It relates to Frank |
| 04:10:38.84 | 5 | having told me to cut my budget more and me saying I |
| 04:10:45.81 | 5 | saying I |
| 04:10:45.84 | 6 | didn't even know how I was going to get to the higher |
| 04:10:48.78 | 6 | higher |
| 04:10:48.81 | 7 | budget.  Now I've got to get to a lower budget, and |
| 04:10:48.78 | 7 | and |
| 04:10:48.81 | 8 | you're telling me I also need to support Lucent's |
| 04:10:54.82 | 9 | need, help them make the number that they're trying |
| 04:10:57.79 | 9 | trying |
| 04:10:57.82 | 10 | to make.  How am I going to do this? |
| 04:11:00.83 | 11 | Q    Well, let me take you further down this |
| 04:11:01.83 | 12 | e-mail.  There's a paragraph that is about six lines |
| 04:11:05.83 | 13 | above where the math starts in it.  And it says -- |
| 04:11:11.84 | 14 | and you looked at this earlier -- how much capital |
| 04:11:13.84 | 15 | can I really spend this year, and how much do I do to |
| 04:11:16.81 | 15 | do to |
| 04:11:16.84 | 16 | give Lucent what they need for third quarter?  And |
| 04:11:19.81 | 16 | And |
| 04:11:19.84 | 17 | the next thing you say is if the answer is both give |
| 04:11:22.78 | 17 | give |
| 04:11:22.81 | 18 | Lucent the business and reduce the cap spend to one |
| 04:11:26.79 | 18 | one |
| 04:11:26.82 | 19 | billion, even I will need to institute some very |
| 04:11:29.82 | 20 | severe measures immediately.  Do you see that? |
| 04:11:31.82 | 21 | A    Yes.  Yes. |
| 04:11:35.83 | 22 | Q    In this e-mail you're considering |
| 04:11:38.83 | 23 | instituting severe measures in order to give Lucent |
| 04:11:42.80 | 23 | Lucent |
| 04:11:42.83 | 24 | this business?  Is that a fair, accurate read of what |
| 04:11:45.80 | 24 | what |
| 04:11:45.84 | 25 | you're talking about here? |

==================================================

Page 16

B840

ackerman part 5 - dated 3-05-04

Page 606
04:11:46.84  0
    606
04:11:46.81  1                              Page 606
04:11:46.84  1   A    Yes.
04:11:46.84  2   Q    Why was it so critical to give Lucent the
04:11:49.84  3   business that they had asked for, the 110 million
04:11:52.84  4   dollars?
04:11:52.84  5   A    That I don't know.  That is -- that's a
04:11:55.81  6   question for Nate.  I mean it's critical to me
04:11:58.82  7   because I'm being told to do something by my boss.
04:12:02.79  7   boss.
04:12:02.82  8   Actually he's my -- at this point he's my boss'
04:12:05.82  9   boss.  So I'm saying to Nate if I'm going to do what
04:12:08.83  10  you tell me to do and if I'm going to do what Frank's
04:12:12.80  10  Frank's
04:12:12.83  11  telling me to do, who is really my boss, I can't
04:12:16.84  12  without doing some severe things, which you're also
04:12:19.80  12  also
04:12:19.84  13  telling me not to do, and stop the buildout.
04:12:22.84  14  Q    So in other words, to meet the budget
04:12:26.85  15  limitations that you're being given and at the same
04:12:28.78  15  same
04:12:28.81  16  time satisfy Lucent, you would have to take severe
04:12:33.79  16  severe
04:12:33.82  17  measures?
04:12:33.82  18  A    Right.  But this is my understanding, and I
04:12:37.82  19  could even be -- you know, this is my understanding
04:12:39.79  19  understanding
04:12:39.82  20  of how the numbers worked out, but I'm not sure it's
04:12:45.80  20  it's
04:12:45.83  21  an accurate depiction of how the numbers worked out.
04:12:47.80  21  out.
04:12:47.83  22  Q    Did you ever learn later that you were
04:12:50.84  23  misunder -- that you misunderstood how the numbers
04:12:51.80  23  numbers
04:12:51.84  24  worked out?
04:12:52.84  25  A    They changed frequently.  So I'm not sure

============================================================

Page 607
04:12:56.84  0
    607
04:12:59.81  1                              Page 607
04:12:56.84  1   that this was actually how they worked out, but I was
04:12:59.81  1   was
04:12:59.84  2   feeling a squeeze.
04:13:01.81  3   Q    Okay.  In this third quarter deal did you
04:13:05.82  4   have to come up with creative ways in order to give
04:13:08.79  4   give
04:13:08.82  5   Lucent the revenue that it was asking for?
04:13:11.82  6   A    Did I have to come up with creative ways?
04:13:15.83  7   Q    Or creative things.  You say up top there
04:13:17.83  8   are some creative things I can do.
04:13:18.83  9   A    Well, we use creative in a very generic
04:13:21.83  10  way.  I was trying to say how to be creative, not in
04:13:32.81  10  in
04:13:32.84  11  terms of what we gave Lucent, but in terms of how we
04:13:35.78  11  how we
04:13:35.81  12  managed our business to stay within the -- that cap.
04:13:39.78  12  cap.
04:13:39.82  13  I had to figure out something, and I needed help from
                                  Page 17

ackerman part 5 - dated 3-05-04

```
04:13:41.79 13   from
04:13:41.82 14   the financial guys because it was by me as to how we
04:13:46.79 14   we
04:13:46.83 15   were going to do this.  It was beyond my knowledge
04:13:52.80 15   knowledge
04:13:52.83 16   base, and I think you can read between the lines and
04:13:54.80 16   and
04:13:54.83 17   see.  Particularly in the last sentence it says
04:14:00.84 18   please provide direction prior, caps, to the meeting
04:14:03.81 18   meeting
04:14:03.84 19   with Lucent Tuesday morning.
04:14:05.84 20   Q    Well, let me take you a little bit further
04:14:07.81 21   up in the e-mail from where you just were.  And it's
04:14:10.78 21   it's
04:14:10.82 22   right after the section I just quoted.  You write my
04:14:14.79 22   my
04:14:14.82 23   recommendation, assuming we need to help Lucent, is
04:14:17.79 23   Lucent, is
04:14:17.82 24   to give me a total cap spend for 2000 of one billion
04:14:22.79 24   billion
04:14:22.83 25   150 million dollars.  I'll use this to help Lucent,
```

============================================================

Page 608
```
04:14:25.83  0
             608
04:14:29.80  1                              Page 608
04:14:25.83  1   continue our rollout, and not put the brakes on
04:14:29.83  2   anything important.  Do you recall if you had the
04:14:30.84  3   option of having an additional cap spend of another
04:14:35.81  3   another
04:14:35.84  4   150 million dollars?
04:14:36.84  5   A    No.  I don't know.  And that relates to my
04:14:40.81  6   confusion of covenant versus budget, various
04:14:45.82  7   covenants versus budget, and whether I really could
04:14:48.79  7   could
04:14:48.82  8   do that without breaking some covenant.  I had no
04:14:52.82  9   idea.  So that's why I'm sort of proposing things and
04:14:55.79  9   and
04:14:55.83 10   saying help.  How do we count these things under the
04:14:59.80 10   the
04:14:59.83 11   various covenants and the various budgets?  Here's my
04:15:03.80 11   Here's my
04:15:03.84 12   idea.  Shoot me or, you know, tell me what to do.
04:15:05.84 13   Q    Okay.  During the fourth quarter of 2000
04:15:10.84 14   did Winstar start to slash some of the other costs
04:15:15.81 15   that they were incurring in the course of the
04:15:20.82 16   buildout?
04:15:20.82 17   A    During which?
04:15:23.82 18   Q    During the fourth quarter of 2000.
04:15:25.82 19   A    I believe we did start to cut.
04:15:26.83 20   Q    And you instituted some spending controls?
04:15:30.83 21   A    Yes, I believe we -- well, we had -- yes,
04:15:31.83 22   we instituted some potentially severe spending
04:15:35.83 23   controls I believe.
04:15:35.83 24   Q    Do you recall whether Winstar started to
04:15:37.84 25   stretch out or delay its payments to other vendors of
04:15:40.81 25   vendors of
```

============================================================

B842

ackerman part 5 - dated 3-05-04

04:15:40.84  0
609

04:15:43.81  1                          Page 609
04:15:40.84  1   the company?
04:15:43.84  2   A    I know that we did based on what I was
04:15:46.85  3   told, but the timing of those stretch-outs and delays
04:15:51.78  3   delays
04:15:51.82  4   I couldn't -- I can't tell you when that started to
04:15:53.82  5   occur.
04:15:53.82  6   Q    Did that occur because Winstar went forward
04:15:57.82  7   with this third quarter deal with Lucent and didn't
04:16:00.83  8   have enough capital expenditure room in its covenant?
04:16:03.80  8   covenant?
04:16:03.83  9   A    Oh, I -- I -- I can't tell you that.  The
04:16:04.83  10  financial folks are the people who have to -- that's
04:16:06.83  11  what I'm saying.  I didn't understand all of that
04:16:08.83  12  stuff.
04:16:08.83  13  Q    Okay.  We also talked about earlier this
04:16:15.84  14  morning when Mr. Slifkin was asking you questions
04:16:17.84  15  about credits being a part of this end of quarter
04:16:21.81  16  deal.  Do you recall that?
04:16:22.81  17  A    Yes.
04:16:22.81  18  Q    And specifically you discussed I believe a
04:16:33.83  19  35 million dollar credit, which I believe I marked
04:16:36.83  20  earlier as Exhibit 59.  Can you take that out?
04:16:47.84  21  A    Got it.
04:16:47.84  22  Q    Now, it was your testimony that this credit
04:16:51.84  23  was actually a part of what Winstar got out of that
04:16:56.78  23  that
04:16:56.82  24  third quarter deal; is that correct?
04:16:57.82  25  A    Well, I'm -- I'm -- not -- I wouldn't quite

=========================================================

Page 610
04:17:00.82  0
610
04:17:05.79  1                          Page 610
04:17:00.82  1   characterize it that way.  It was an element of the
04:17:05.82  2   third quarter deal that I felt we had coming anyway,
04:17:12.80  2   anyway,
04:17:12.83  3   but that the -- I hate the word used, the
04:17:20.84  4   convenience, but the ability to get it was made
04:17:25.84  5   easier because of the third quarter deal and Lucent's
04:17:30.78  5   Lucent's
04:17:30.82  6   need to have us do things.
04:17:32.82  7   Q    Was it your understanding that Lucent would
04:17:35.82  8   have given you this 35 million dollar credit if you
04:17:38.82  9   hadn't entered into the third quarter deal?
04:17:41.81  10  A    I believe that eventually I would have
04:17:44.83  11  negotiated a substantial credit for this aspect of
04:17:50.84  12  failure on the part of Lucent.  Would it have been 35
04:17:54.81  12  35
04:17:54.84  13  or 37 or 33 or -- I'm not sure.  And would we have
04:18:01.81  14  eventually gotten it?  My heart tells me we would
04:18:05.82  15  have, but I don't know.  You'd have to ask Lucent if
04:18:08.79  15  if
04:18:08.82  16  they would have given it to us, notwithstanding the
04:18:12.79  16  the
04:18:12.82  17  pressure of the third quarter deal, had given it to
04:18:16.83  18  us otherwise.
04:18:16.83  19  Q    Let's take a step back.  What was this
04:18:19.83  20  credit for optical equipment?  What was wrong with
                          Page 19

ackerman part 5 - dated 3-05-04

```
04:18:22.80 20  with
04:18:22.83 21  the optical equipment?
04:18:23.84 22  A    We had had serious problems in all of the
04:18:28.84 23  fiber network that we had attempted to turn up.  It
04:18:32.81 23  It
04:18:32.84 24  failed periodically on and off.  They couldn't get it
04:18:36.82 25  up.  It wouldn't meet their own specifications.  We
```

=================================================

Page 611
```
04:18:42.82  0
             611
04:18:45.79  1                          Page 611
04:18:42.82  1  provided -- there were outages to customers.  There
04:18:45.79  1  There
04:18:45.82  2  were all -- we couldn't sell capacity on the network
04:18:47.83  3  to others all because of failures in the optronics
04:18:54.83  4  equipment and the -- that is essentially the biggest
04:18:59.84  5  issue --
04:18:59.84  6  Q    Did this credit --
04:19:01.84  7  A    -- or the biggest issues.
04:19:02.84  8  Q    Did this credit relate specifically to any
04:19:06.85  9  particular optical equipment that -- that Winstar had
04:19:09.78  9  had
04:19:09.81 10  purchased from Lucent?
04:19:10.82 11  A    It was -- I think it was both the metro --
04:19:13.82 12  and now I'm trying to remember -- metro and long
04:19:17.82 13  haul.  And that what I had asked the several
04:19:20.83 14  organizations involved to do was calculate for me --
04:19:23.80 14  --
04:19:23.83 15  this is well before even entering the third quarter
04:19:28.83 16  transaction -- to keep track of how much money it was
04:19:30.80 16  was
04:19:30.84 17  costing us due to these failures.  So it was
04:19:34.84 18  primarily the optronics equipment.
04:19:37.84 19  Q    Do you know when Winstar purchased the
04:19:40.81 20  optronics equipment that was the subject of this
04:19:43.82 21  credit?
04:19:43.82 22  A    No, not -- I don't recall.
04:19:46.82 23  Q    Could it have been as early as 1999?
04:19:50.82 24  A    It's possible.  I just don't remember.
04:19:54.83 25  Q    Do you recall if in 1999 as part of an end
```

=================================================

Page 612
```
04:19:58.83  0
             612
04:20:01.80  1                          Page 612
04:19:58.83  1  of quarter deal Winstar purchased a significant
04:20:01.83  2  quantity of optical equipment in a bill and hold
04:20:07.84  3  arrangement with Lucent?
04:20:08.84  4  A    We may have.  I just -- I don't recall.
04:20:11.84  5  Q    Okay.  In any event, do you believe that
04:20:15.81  6  Winstar was due a credit for that equipment?
04:20:17.82  7  A    Absolutely.  Absolutely.
04:20:20.82  8  Q    And to get the credit at this time, Winstar
04:20:24.82  9  had to enter into this third quarter deal with
04:20:27.83 10  Lucent?
04:20:30.83 11  A    I'm not sure I would quite characterize it
04:20:37.84 12  that way.  The at this time perhaps is a good
04:20:42.84 13  characterization of it.  That's how we finally got it
```
                          Page 20

B844

ackerman part 5 - dated 3-05-04

Page 616
04:25:21.82   0
              616
04:25:26.79   1                              Page 616
04:25:21.82   1   A    I looked at it strategically as Lucent had
04:25:26.83   2   described to us one of the ways they wanted to
04:25:28.83   3   position themselves was as a full network and
04:25:35.83   4   services systems provider, and so by establishing
04:25:39.84   5   this lab in which they could take their systems
04:25:43.84   6   software and couple it with their network systems and
04:25:46.81   6   and
04:25:46.85   7   network software, and then integrate the two and show
04:25:49.78   7   show
04:25:49.81   8   how they interacted seamlessly for business and
04:25:54.82   9   operational support systems tied to the network, they
04:25:57.79   9   they
04:25:57.82  10   would have a strategic advantage in the marketplace.
04:26:01.79  10   marketplace.
04:26:01.83  11   So my position with them was this is as much good for
04:26:04.80  11   for
04:26:04.83  12   you as it is for us in that now you'll have a
04:26:08.83  13   showcase and a place to point to that says see, look,
04:26:12.80  13   look,
04:26:12.84  14   buy from Lucent, buy everything from Lucent because
04:26:13.81  14   because
04:26:13.84  15   we can do the whole thing.
04:26:15.84  16   Q    Who was going to own this enterprise
04:26:18.84  17   integration laboratory?
04:26:20.81  18   A    I assume it was Winstar.
04:26:26.82  19   Q    But Lucent would be able to use it for
04:26:30.82  20   their other customers?
04:26:31.82  21   A    No.  Would be able to use it as a showpiece
04:26:35.83  22   for their other customers to say -- and I think we
04:26:38.83  23   would have allowed them to bring customers in to
04:26:40.83  24   look, but that it would have given them this test bed
04:26:45.80  24   bed
04:26:45.84  25   where they could create this integrated

=====================================================

Page 617
04:26:49.84   0
              617
04:26:52.81   1                              Page 617
04:26:49.84   1   infrastructure that they could sell to other
04:26:52.84   2   customers certainly, which was at that time thought
04:26:53.81   2   thought
04:26:53.85   3   of as a -- it was a key strategic issue in the
04:26:56.82   4   telecom space.  Who was going to be building the
04:26:59.82   5   systems to support the operations of the network?
04:27:02.82   6   And that everybody believed they'd be tightly
04:27:05.82   7   coupled, and the way that's evolved is really in the
04:27:08.83   8   IP space.
04:27:09.83   9   Q    Do you know if the 45 million dollars that
04:27:13.83  10   Lucent was committing to provide in this letter would
04:27:16.80  10   would
04:27:16.84  11   have covered the entire cost of creating this
04:27:19.84  12   enterprise integration lab?
04:27:21.84  13   A    My recollection is that it would not have,
04:27:24.84  14   but it was a lion share of it.
04:27:26.85  15   Q    So Winstar would have to pay some money to
04:27:30.82  16   complete the laboratory?
                                 Page 23

ackerman part 5 - dated 3-05-04

| | | |
|---|---|---|
| 04:27:30.82 | 17 | A    Yes, to the best of my memory. |
| 04:27:32.82 | 18 | Q    And who would Winstar have been paying that |
| 04:27:35.79 | 18 | that |
| 04:27:35.82 | 20 | money to? |
| 04:27:35.82 | 20 | A    My -- my guess is Lucent. |
| 04:27:41.83 | 21 | Q    Did Winstar ever actually get the |
| 04:27:43.83 | 22 | enterprise integration laboratory that it negotiated |
| 04:27:47.80 | 22 | negotiated |
| 04:27:47.83 | 23 | for as part of that third quarter deal? |
| 04:27:49.83 | 24 | A    Not to my knowledge. |
| 04:27:54.84 | 25 | Q    Now, we also looked a little bit earlier at |

===============================================

Page 618

| | | |
|---|---|---|
| 04:27:56.84 | 0 | |
| | 618 | |
| 04:28:00.78 | 1 | Page 618 |
| 04:27:56.84 | 1 | a ten million dollar credit that was Exhibit 61. |
| 04:28:00.81 | 2 | Could you pull that out?  And I think you testified |
| 04:28:12.82 | 3 | that this was a part of the third quarter deal as |
| 04:28:15.83 | 4 | well; is that correct? |
| 04:28:15.83 | 5 | A    Yes, based on the documents I saw today. |
| 04:28:21.83 | 6 | Q    Is this also a credit that you believe |
| 04:28:24.84 | 7 | Winstar was due regardless of whether or not it |
| 04:28:26.84 | 8 | entered into the end of quarter deal? |
| 04:28:28.84 | 9 | A    Yes. |
| 04:28:29.84 | 10 | Q    And is this, like the other credit we |
| 04:28:32.84 | 11 | looked at, a credit that Winstar was able to get |
| 04:28:36.82 | 12 | because it entered into the third quarter deal? |
| 04:28:39.82 | 13 | A    Again I'd have to characterize it the same |
| 04:28:42.82 | 14 | way.  It provided a mechanism to get -- to finally |
| 04:28:46.83 | 15 | get it done, but ultimately I believe we were due |
| 04:28:51.83 | 16 | this credit. |
| 04:28:55.83 | 17 | Q    Do you have any reason to believe that |
| 04:28:56.84 | 18 | Lucent would have given you this credit had you not |
| 04:28:59.80 | 18 | not |
| 04:28:59.84 | 19 | entered into that end of quarter deal within a |
| 04:29:03.84 | 20 | reasonable period of time? |
| 04:29:05.84 | 21 | A    I can't say either way.  Can't say either |
| 04:29:09.81 | 22 | way. |
| 04:29:11.82 | 23 | Q    But it's your testimony that you believed |
| 04:29:16.82 | 24 | at that time that Winstar was entitled to this credit |
| 04:29:24.80 | 24 | credit |
| 04:29:24.83 | 25 | regardless of whether or not it entered into an end |
| 04:29:27.80 | 25 | end |

===============================================

Page 619

| | | |
|---|---|---|
| 04:29:27.83 | 0 | |
| | 619 | |
| 04:29:27.80 | 1 | Page 619 |
| 04:29:27.83 | 1 | of quarter deal? |
| 04:29:27.83 | 2 | A    That's correct. |
| 04:29:32.84 | 3 | Q    Now, my understanding of your discussion of |
| 04:29:37.84 | 4 | the software deal from earlier today is that of that |
| 04:29:42.81 | 5 | 135 million dollars, Winstar only really valued the |
| 04:29:47.82 | 6 | software at a smaller number; is that correct? |
| 04:29:50.82 | 7 | A    Right.  That was yes and no.  I mean yes in |
| 04:29:56.83 | 8 | that the -- at the more junior level the troops took |
| 04:30:02.83 | 9 | a look at that software and came back with an |
| 04:30:05.84 | 10 | immediate valuation as to what could be used |

Page 24

B846

ackerman part 5 - dated 3-05-04

| | | |
|---|---|---|
| 05:15:34.83 | 1 | would Nina, Nate and I have -- why would Nina have |
| 05:15:38.80 | 1 | have |
| 05:15:38.84 | 2 | gotten Bill on the phone? It just sticks out in my |
| 05:15:41.84 | 3 | mind. So it could have been some other time. It |
| 05:15:43.84 | 4 | could have been some other issue. But that's how I |
| 05:15:46.81 | 4 | I |
| 05:15:46.81 | 5 | remember it. |

===================================================

*****************************************************

Page 653

| | | |
|---|---|---|
| 05:15:49.78 | 6 | Page 653 |
| 05:15:49.38 | 6 | Q     In this third quarter deal did you |
| 05:15:49.81 | 7 | understand that for Winstar to help Lucent, the |
| 05:15:53.82 | 8 | company would have to agree to buy equipment and |
| 05:15:56.79 | 8 | and |
| 05:15:56.82 | 9 | services before it needed them, within your |
| 05:16:00.83 | 10 | definition of need, within the next quarter or two? |
| 05:16:03.83 | 11 | A     No. It's -- it wasn't clear. If you're |
| 05:16:13.84 | 12 | saying at this point, at the beginning, what we were |
| 05:16:15.81 | 12 | were |
| 05:16:15.84 | 13 | going to have to do in order to help Lucent and not |
| 05:16:21.78 | 13 | not |
| 05:16:21.81 | 14 | do anything totally stupid, and I -- it wasn't clear. |
| 05:16:25.82 | 15 | Q     Did you later come to the conclusion that |
| 05:16:28.82 | 16 | you'd have to buy equipment and services before you |
| 05:16:31.79 | 16 | you |
| 05:16:31.82 | 17 | really needed them? |
| 05:16:33.83 | 18 | MR. SLIFKIN:   Objection. |
| 05:16:36.83 | 19 | A     As I said, we always bought equipment and |
| 05:16:38.83 | 20 | services before we really needed them because that's |
| 05:16:41.80 | 20 | that's |
| 05:16:41.83 | 21 | the only way you could get them delivered when you do |
| 05:16:42.80 | 21 | you do |
| 05:16:42.83 | 22 | need them. |
| 05:16:42.83 | 23 | Q     Okay. Recognizing that what you're saying |
| 05:16:45.84 | 24 | by before could be one day, I'm talking about your |
| 05:16:48.81 | 24 | your |
| 05:16:48.84 | 25 | description of need before was within a quarter or |

===================================================

Page 654

| | | |
|---|---|---|
| 05:16:51.84 | 0 | 654 |
| 05:16:53.81 | 1 | Page 654 |
| 05:16:51.84 | 1 | two. Were you buying equipment and services from |
| 05:16:53.81 | 1 | from |
| 05:16:53.85 | 2 | Lucent to help Lucent in this end of quarter deal |
| 05:16:58.82 | 3 | possibly more than two quarters before you needed |
| 05:17:00.79 | 3 | needed |
| 05:17:00.82 | 4 | it? |
| 05:17:01.82 | 5 | MR. SLIFKIN: Objection. |
| 05:17:02.82 | 6 | A     I don't know, because what we ended up |
| 05:17:06.83 | 7 | really buying for Lucent was the -- was the software |
| 05:17:08.79 | 7 | software |
| 05:17:08.83 | 8 | pool, and the elements in there, it's not clear to me |
| 05:17:14.83 | 9 | because I didn't understand the details when we'd |
| 05:17:16.84 | 10 | actually take down and use that -- those various |
| 05:17:19.84 | 11 | software elements. So I don't know. It's hard for |

Page 44

B847

ackerman part 5 - dated 3-05-04

05:17:24.84 12    me to characterize that way.  Perhaps.
05:17:28.81 13    Q    As part of this particular deal and as part
05:17:31.82 14    of some of the other earlier deals, Winstar had
05:17:35.82 15    accelerated pay as you go -- as you grow payments,
05:17:37.79 15    payments,
05:17:37.82 16    correct?
05:17:37.82 17    A    Correct.
05:17:39.82 18    Q    Did Winstar receive any benefit directly
05:17:43.83 19    from paying Lucent pay as you grow payments before
05:17:47.80 19    before
05:17:47.83 20    they were due?
05:17:48.83 21    MR. SLIFKIN:  Objection.
05:17:51.84 22    A    Unless you say that it gave us a better
05:17:55.84 23    negotiating position for other things, no, there were
05:17:58.81 23    were
05:17:58.84 24    no direct benefits of that.
05:18:00.81 25    Q    Is it fair to say that Winstar's prepayment

===============================================

Page 655
05:18:04.82  0
      655
05:18:06.79  1                              Page 655
05:18:04.82  1    of pay as you grow payments -- and by prepayment, I
05:18:06.79  1    prepayment, I
05:18:06.82  2    mean paying them before you were contractually
05:18:09.82  3    obligated to -- was one way in which Winstar got
05:18:14.83  4    Lucent to give it back some things in these deals?
05:18:19.83  5    A    No.  I would say it was an easy -- I'd say
05:18:22.83  6    no.  It was an easy way for us to help them meet
05:18:26.84  7    their revenue goals without doing anything stupid,
05:18:31.84  8    that it was a strictly financial thing, and as long
05:18:33.85  9    as finance was okay with accelerating the payments,
05:18:37.78  9    payments,
05:18:37.82 10    it was an easy thing for me to do because I clearly
05:18:40.79 10    clearly
05:18:40.82 11    wasn't buying something before I needed it in your
05:18:43.79 11    your
05:18:43.82 12    term, in your words, right?  It was just a financial
05:18:47.83 13    transaction, and as long as the CFO in his
05:18:49.83 14    organization said okay, I understand you're
05:18:52.83 15    accelerating a payment, then I'm okay.
05:18:59.84 16    Q    Were you aware that in the credit agreement
05:19:01.84 17    between the two parties there was a refinancing
05:19:02.84 18    threshold where if Winstar borrowed a certain amount
05:19:05.81 18    amount
05:19:05.84 19    of money, Lucent could take certain action?
05:19:08.81 20    A    I sort of became aware of something that
05:19:14.82 21    sounds like that, but when -- I don't know when I
05:19:18.82 22    became aware of it.  So are you saying during this
05:19:23.83 23    time frame am I aware of that?  I don't think so.
05:19:26.83 24    But I couldn't tell you for sure.
05:19:28.83 25    Q    Would purchasing -- Would making

===============================================

Page 656
05:19:31.84  0
      656
05:19:35.81  1                              Page 656
05:19:31.84  1    prepayments of page as you grow payments push Winstar
05:19:35.81  1    Winstar

                              Page 45

ackerman part 5 - dated 3-05-04

| 05:19:35.84 | 2 | closer to that trigger number? |
| 05:19:36.84 | 3 | A    I don't know.  Somebody from finance could |
| 05:19:39.84 | 4 | tell you that. |
| 05:19:40.81 | 5 | Q    Okay.  And was it your understanding that |
| 05:19:41.81 | 6 | when Winstar borrowed money under the financing |
| 05:19:44.82 | 7 | agreement, it had to pay Lucent interest on that |
| 05:19:47.82 | 8 | money? |
| 05:19:47.82 | 9 | A    Just in lay terms I assumed we did, but I |
| 05:19:50.82 | 10 | had no -- no specific knowledge of the financing |
| 05:19:54.83 | 11 | agreement to be able to say yes, we were paying |
| 05:19:57.83 | 12 | interest or no, we weren't. |
| 05:19:58.83 | 13 | Q    By Winstar making prepayments on the pay as |
| 05:20:02.80 | 13 | as |
| 05:20:02.83 | 14 | you grow obligations, it was obligating itself to pay |
| 05:20:06.81 | 14 | pay |
| 05:20:06.84 | 15 | more interest than it otherwise would have had to, |
| 05:20:09.81 | 15 | to, |
| 05:20:09.84 | 16 | correct? |
| 05:20:09.84 | 17 | A    I think you'd have to ask the financial |
| 05:20:12.84 | 18 | folks that question. |
| 05:20:24.82 | 19 | Q    But it's your testimony that the pay as you |
| 05:20:27.83 | 20 | grow payments were paid earlier because it was an |
| 05:20:29.79 | 20 | an |
| 05:20:29.83 | 21 | easy way to help Lucent get its revenue? |
| 05:20:32.83 | 22 | A    It was easy for me, yes.  And then as long |
| 05:20:35.83 | 23 | as finance agreed, it was fine with me. |
| 05:20:42.84 | 24 | Q    And prepaying pay as you grow payments, |
| 05:20:48.81 | 25 | that would have in fact -- in fact affect Winstar's |

========================================================

**Page 657**

| 05:20:51.82 | 0 | |
| | | 657 |
| 05:20:56.79 | 1 | Page 657 |
| 05:20:51.82 | 1 | cap ex calculation, correct? |
| 05:20:56.82 | 2 | A    I'm not certain, but I believe it would. |
| 05:20:58.82 | 3 | That's again something that finance would have to |
| 05:21:01.83 | 4 | answer. |

========================================================

************************************************

**Page 657**

| 05:21:20.78 | 9 | Page 657 |
| 05:21:17.84 | 9 | Q    Let me withdraw it.  I'll rephrase. |
| 05:21:20.81 | 10 | Did you ever communicate to anyone at |
| 05:21:21.81 | 11 | Lucent that Winstar had these cap ex issues? |
| 05:21:24.82 | 12 | MR. SLIFKIN:  Objection. |
| 05:21:25.82 | 13 | A    I -- I can't remember specifically, but I |
| 05:21:27.82 | 14 | must have because I just must have said I've got |
| 05:21:32.82 | 15 | constraints that I -- that I've got to work under. |
| 05:21:35.83 | 16 | Q    Do you know if anyone else at Winstar |
| 05:21:39.83 | 17 | communicated to Lucent that the company had a cap ex |
| 05:21:42.80 | 17 | cap ex |
| 05:21:42.83 | 18 | covenant that it was approaching? |
| 05:21:44.84 | 19 | A    I think I've seen e-mails even today |
| 05:21:46.84 | 20 | that -- that -- that indicated that, so I would |
| 05:21:48.84 | 21 | imagine that that's the case, but I can't recall |
| 05:21:51.84 | 22 | specifically someone doing that as we're sitting |
| 05:21:55.81 | 23 | here. |

Page 46

ackerman part 5 - dated 3-05-04
05:22:13.83 24    Q    Did anyone from Lucent propose a means of
05:22:16.84 25    doing an end of quarter deal that would not push

===============================================================

Page 658
05:22:21.84  0
        658
05:22:28.78  1                              Page 658
05:22:21.84  1    Winstar closer to the cap ex covenant?
05:22:28.81  2    A    I don't -- I can't answer that.  I don't
05:22:28.81  3    know if anyone at Lucent proposed anything to anyone
05:22:32.78  3    anyone
05:22:32.82  4    at Winstar that might have done that.  I don't know.
05:22:40.79  4    know.
05:22:40.83  5    Q    Let me ask about you specifically.  Were
05:22:42.83  6    you approached by Lucent about the idea of increasing
05:22:46.80  6    increasing
05:22:46.83  7    the size of the software pool as a means of getting
05:22:50.84  8    Lucent more revenue without adding to Winstar's cap
05:22:55.81  8    cap
05:22:55.84  9    ex burden?
05:22:56.84 10    A    I don't know about the without adding to
05:22:59.84 11    Winstar's cap ex burden because I'm not sure how that
05:23:02.78 11    how that
05:23:02.81 12    would be booked.  I thought it was cap ex.  Maybe it
05:23:05.78 12    Maybe it
05:23:05.82 13    isn't.  But I was approached to increase the level of
05:23:08.79 13    of
05:23:08.82 14    the software pool, I thought for different reasons,
05:23:10.79 14    reasons,
05:23:10.82 15    because it would be easier for Lucent to deliver in
05:23:14.83 16    the shortened time frame that we had available to us
05:23:17.80 16    us
05:23:17.83 17    to do the transaction.
05:23:18.83 18    Q    Were you aware that the software deal
05:23:21.83 19    didn't require any payments by Winstar until 2001?
05:23:25.84 20    A    Only when I saw the final document that had
05:23:29.84 21    been negotiated between Rick Uhl and whoever it was
05:23:33.81 21    was
05:23:33.85 22    at Lucent did I become aware of that.  At least to
05:23:44.82 23    the best of my knowledge that's when I became aware
05:23:47.79 23    aware
05:23:47.83 24    of it.
05:23:58.84 25    Q    Did anyone from Lucent communicate to you

===============================================================

Page 659
05:24:00.84  0
        659
05:24:04.81  1                              Page 659
05:24:00.84  1    why they wanted to use this software -- why they
05:24:04.84  2    wanted to sell Winstar 135 million dollars of
05:24:08.81  3    software where you had told them that the software
05:24:11.78  3    software
05:24:11.82  4    only had 20 million dollars of value to Winstar?
05:24:15.82  5    A    I don't recall if it was specifically why
05:24:21.83  6    they wanted to sell.  Whether I inferred it or it was
05:24:29.83  7    implied or whether it was specifically stated, it was
05:24:33.84  8    obviously to meet some target of theirs.
05:24:37.84  9    Q    Winstar engaged in the software deal in
05:24:42.81 10    part to help Lucent meet its revenue number; is that
                              Page 47

ackerman part 5 - dated 3-05-04

| | | |
|---|---|---|
| 05:24:46.79 | 10 | that |
| 05:24:46.82 | 11 | correct? |
| 05:24:46.82 | 12 | A    I would have to say yes, at least in part. |
| 05:24:58.83 | 13 | Q    Winstar committed itself to pay 135 million |
| 05:25:01.83 | 14 | dollars for software that at least the documents |
| 05:25:04.84 | 15 | suggest Winstar was valuing at actually 20 million |
| 05:25:08.84 | 16 | dollars; is that correct? |
| 05:25:09.84 | 17 | MR. SLIFKIN:  Objection. |
| 05:25:11.84 | 18 | A    We were telling Lucent the value to us was |
| 05:25:14.81 | 19 | 20 million dollars, and we agreed to pay 135 million |
| 05:25:17.78 | 19 | million |
| 05:25:17.78 | 20 | for it. |

=========================================================

*********************************************************

Page 663

| | | |
|---|---|---|
| 05:30:06.70 | 10 |                              Page 663 |
| 05:30:03.16 | 10 | Q    Okay.  We'll try to finish up quickly, Mr. |
| 05:30:06.73 | 11 | Ackerman.  There's just some questions about the |
| 05:30:15.74 | 12 | questioning earlier today, some follow-up.  Now, you |
| 05:30:25.71 | 12 | you |
| 05:30:25.75 | 13 | were asked a question, when Mr. Slifkin went and |
| 05:30:29.75 | 14 | looked at some of your SEC testimony, about whether |
| 05:30:32.72 | 14 | whether |
| 05:30:32.75 | 15 | or not purchases were driven by Lucent's desire to |
| 05:30:37.69 | 15 | to |
| 05:30:37.73 | 16 | sell.  Do you recall that? |
| 05:30:37.73 | 17 | A    Yes. |
| 05:30:39.73 | 18 | Q    Do you want to repeat your answer so I |
| 05:30:41.73 | 19 | don't characterize it for you? |
| 05:30:43.73 | 20 | A    I think what I -- what I said was that -- |
| 05:30:46.74 | 21 | that all purchases are a function of the selling |
| 05:30:50.74 | 22 | party's desire to sell.  So to that extent our |
| 05:30:55.74 | 23 | purchases were a function of Lucent's desire to sell. |
| 05:30:58.71 | 23 | sell. |
| 05:30:58.75 | 24 | Q    And I think you also said something to the |
| 05:31:00.75 | 25 | effect that Winstar exercised business judgment in |
| 05:31:03.72 | 25 | in |

=========================================================

Page 664

| | | |
|---|---|---|
| 05:31:03.75 | 0 | |
| | | 664 |
| 05:31:07.69 | 1 |                              Page 664 |
| 05:31:03.75 | 1 | terms of what it would acquire in these end of |
| 05:31:07.72 | 2 | quarter deals, correct? |
| 05:31:08.72 | 3 | A    Right. |
| 05:31:08.72 | 4 | Q    Does that business judgment that Winstar |
| 05:31:12.73 | 5 | exercised include factoring in a desire or a need to |
| 05:31:17.73 | 6 | help Lucent so it could strengthen the partnership? |
| 05:31:21.74 | 7 | A    Yes, I think that that was a component |
| 05:31:25.74 | 8 | certainly -- well, I'm conjecturing now.  I'm |
| 05:31:30.75 | 9 | thinking at my boss' and his boss' level, at Nate and |
| 05:31:33.75 | 10 | Frank and Bill's level, it was to strengthen the |
| 05:31:36.75 | 11 | partnership, and my desire -- at my level it was if I |
| 05:31:39.72 | 11 | I |
| 05:31:39.75 | 12 | can help Lucent help us get the job done, then that's |
| 05:31:43.69 | 12 | that's |
| 05:31:43.73 | 13 | beneficial. |

Page 48

B851

ackerman part 5 - dated 3-05-04

05:31:43.73 14    Q    Did any of the people you just mentioned
05:31:46.73 15    ever communicate to you that that was part of the
05:31:47.70 15    the
05:31:47.73 16    reason why we're doing the end of quarter deals, why
05:31:50.70 16    why
05:31:50.73 17    Winstar was doing end of quarter deals?
05:31:52.73 18    A    I believe I've looked at e-mails from Nate
05:31:55.74 19    that indicate that it's our desire to help Lucent in
05:31:57.74 20    the spirit of the partnership, yes.
05:32:11.75 21    Q    Now, you were also asked a question about
05:32:14.72 22    whether or not Winstar sold radios to Lucent, and I
05:32:17.69 22    I
05:32:17.73 23    believe you answered yes, but McGuire or Kantor or
05:32:23.70 23    or
05:32:23.73 24    Uhl would know more about that, right?
05:32:25.73 25    A    Yes.

==================================================

Page 665
05:32:26.74  0
     665
05:32:28.70  1                                    Page 665
05:32:26.74  1    Q    Do you know if those radios were sold to
05:32:28.74  2    Lucent for resale so Lucent could resell them to
05:32:32.74  3    other people?
05:32:32.74  4    A    I think what I said was that there were two
95:32:34.74  5    ways I believed Lucent could use them; one, to resell
05:32:35.71  5    resell
05:32:35.74  6    them to their customers, and two, internally for
05:32:37.75  7    internal communication services.
05:32:41.75  8    Q    Now, when you were being questioned about
05:32:44.75  9    Ackerman 41 -- I don't know if you need to take it
05:32:47.72 10    out or not -- you testified that the Siemens
05:32:52.73 11    proposals gave Winstar leverage for the first time I
05:32:56.70 11    I
05:32:56.73 12    believe you said.  Do you recall that?
05:32:58.73 13    A    Yes, I think I said that, put it that way.
05:33:03.74 14    Q    Is that accurate that --
05:33:06.74 15    A    It's pretty accurate.  I mean it may be not
05:33:09.74 16    the first time, but a -- but that a major supplier
05:33:13.75 17    was in a position to offer us competitive or
05:33:18.75 18    comparable equipment.
05:33:22.72 19    Q    Were you suggesting that Winstar didn't
05:33:24.73 20    have the leverage it needed to negotiate better
05:33:27.73 21    prices until it had a competing price?
05:33:29.73 22    A    It wasn't just price.  It was the financing
05:33:32.73 23    piece.  And that was always key is that if I could
05:33:38.74 24    find someone else to provide the equipment, I didn't
05:33:42.71 24    didn't
05:33:42.74 25    -- couldn't necessarily get the pricing that I -- I

==================================================

Page 666
05:33:45.75  0
     666
05:33:50.72  1                                    Page 666
05:33:45.75  1    mean the -- the financing to go along with it.  So to
05:33:50.75  2    me they were both important because the biggest
05:33:54.72  3    source of funding was vendor financing for Winstar,
05:34:02.70  3    Winstar,
05:34:02.70  4    at least to my understanding.
                                      Page 49

B852

```
                         ackerman part 10 - dated 3-05-04
                                        Page 669
05:38:46.72 21
05:38:44.75 21    Q    Okay.  I'm going to switch topics, and this
05:38:46.75 22    is my last line of questioning or last two lines of
05:38:51.75 23    questioning.  I promise.  Have you been contacted by
05:38:56.69 23    contacted by
05:38:56.73 24    the SEC concerning an investigation of the
05:39:00.73 25    transactions that we've discussed today?
```

=============================================================

```
Page 670
05:39:01.73  0
    670
05:39:02.70  1                                Page 670
05:39:01.73  1    A    Yes.
05:39:02.73  2    Q    You provided testimony to the SEC; is that
05:39:05.73  3    correct?
05:39:05.73  4    A    Yes.
```

=============================================================

*********************************************************

```
Page 671
05:40:07.70  5                            Page 671
05:40:04.73  5    Q    With respect to -- to the more recent SEC
05:40:07.73  6    investigation, what was your understanding as to what
05:40:09.70  6    what
05:40:09.73  7    the scope of that investigation was?
05:40:11.73  8    A    That they were investigating Lucent with
05:40:20.74  9    regard to how they accounted for certain
05:40:29.75 10    transactions.  I don't know.  I guess that's my
05:40:29.75 11    understanding.
05:40:29.75 12    Q    Were you ever advised by the SEC, or to
05:40:33.76 13    your knowledge was your attorney advised by the SEC
05:40:35.69 13    the SEC
05:40:35.72 14    that you were in any way a subject of the
05:40:40.73 15    investigation?
05:40:41.73 16    A    Yes.
05:40:45.73 17    Q    Do you know if any other employees at
05:40:47.74 18    Winstar and Lucent are also subjects of that
05:40:49.74 19    investigation?
05:40:50.74 20    A    No.
05:40:55.74 21    Q    Do you know whether the SEC has asked any
05:40:57.75 22    other persons to testify in the context of that
05:41:00.75 23    investigation?
05:41:01.75 24    A    By implication, but not known.  It's been
05:41:07.72 25    implied to me that there have been others.
```

=============================================================

```
Page 672
05:41:09.72  0
    672
05:41:12.69  1                            Page 672
05:41:09.72  1    Q    Who implied that to you?
05:41:12.73  2    A    The SEC.
05:41:14.73  3    Q    And who did they imply to you was also
05:41:22.74  4    being deposed?
05:41:22.74  5    A    They did not say specifically.
05:41:22.74  6    Q    Okay.  So they just said other people were?
05:41:22.74  7    A    Something like that.
                                Page 9
```

B853

**DiRoma**

**11/20/2002  DiRoma, Jill (Corp. Rep.)**

REDACTED

```
 6          Q      Now, one of the topics that you

 7    are going to be testifying as a corporate

 8    representative on behalf of Lucent is Lucent's

 9    arrangement with WinStar Services, which we know

10    as the WinStar Services arrangement, correct?

11              MS. NAKLY:  Objection as to form.

12          A      Yes.

13          Q      And this WinStar Services

14    arrangement is something you were intimately

15    familiar with, correct?

16          A      Yes.

17              MS. NAKLY:  Objection as to form.

18              MR. CARMODY:  What's the

19    objection?

20              MS. NAKLY:  Only because you are

21    misstating the precise topic that she is

22    designated to discuss.

23          Q      We know that the WinStar Services

24    arrangement is an arrangement wherein Winstar

25    hired Lucent to perform certain services but
```

7

CONFIDENTIAL

**B854**

```
 1            JILL B. DiROMA - CONFIDENTIAL
 2    Lucent didn't perform those services and instead
 3    subcontracted back to Winstar to perform those
 4    services, correct?
 5         A      Yes.
 6         Q      Over the course of about two years
 7    Winstar performed $325 million of these services,
 8    correct?
 9         A      That's my memory of the number,
10    yes.
11         Q      For these $325 million of
12    services, these were services performed by
13    Winstar but run through Lucent's books, correct?
14         A      Yes, it was a balance sheet
15    account.
16         Q      And Lucent didn't recognize any
17    revenue on any of these $325 million of Winstar
18    performed services, correct?
19         A      Correct.
20         Q      But Lucent did run these $325
21    million worth of services through Lucent's books,
22    correct?
23              MS. NAKLY:  Objection as to form.
24         A      Yes, over an 18 month period that
25    was done.
```

8

CONFIDENTIAL                    LW 00301751

11/20/2002  DiRoma, Jill (Corp. Rep.)

1          JILL B. DiROMA - CONFIDENTIAL

2              MS. NAKLY:  Objection as to form.

3      A      Yes, I guess.

4      Q      What we've learned in this

5  lawsuit, ma'am, is the way Lucent and Winstar

6  facilitated this WinStar Services arrangement was

7  to exchange purchase orders and invoices with

8  each other at the end of a quarter, correct?

9              MS. NAKLY:  Objection as to form.

10     A      That's typically when it would

11  happen, yes.

12     Q      So there would be no accounts

13  receivable or accounts payable on Lucent's books,

14  correct?

15             MS. NAKLY:  Objection as to form.

16     A      No, the actual purchase order

17  exchange isn't what generated the accounts

18  receivable issue, it was the invoicing of it and

19  that could be done -- that would be done in the

20  following quarter and was not typically done at

21  the end of the quarter, it was actually typically

22  done in the middle of the quarter.

23     Q      Through Lucent's own participation

24  in the WinStar Services arrangement it tried to

25  keep accounts payable or accounts receivable from

21

CONFIDENTIAL                           LW 00301764

B856

11/20/2002  DiRoma, Jill (Corp. Rep.)

1              JILL B. DiROMA - CONFIDENTIAL

2

3

4                            REDACTED

5

6

7

8            Q        You would also -- let me backup.

9                     For each of the purchase orders

10      that WinStar sent to Lucent under this Winstar

11      Services arrangement, Lucent subcontracted back

12      to WinStar each and every one of those services

13      that WinStar in the first instance asked Lucent

14      to perform, correct?

15            A        Yes.

16            Q        Lucent never had any oversight or

17      control over the Winstar Services, the $325

18      million worth of Winstar Services that were

19      passed through Lucent, correct?

20                     MS. NAKLY:  Objection as to form.

21            A        Yeah, I don't think we had any

22      oversight on that.

23            Q        Or control?

24            A        No, correct.

25            Q        Not an arms length agreement,

109

11/20/2002  DiRoma, Jill (Corp. Rep.)

```
 1              JILL B. DiROMA - CONFIDENTIAL

 2     correct?

 3                   MS. NAKLY:  Objection as to form.

 4         A      I'm not a lawyer, I don't know how

 5     to evaluate whether it's considered arms length

 6     or not.

 7         Q      Well, in your prior -- you've

 8     sworn under oath before with us, haven't you?

 9         A      Um-hum, yes.

10         Q      You've described what an arms

11     length agreement was, didn't you?

12         A      Oh, from a third-party

13     perspective.

14         Q      Did you previously testify that

15             "The relationship between Lucent and

16             WinStar from an accounting perspective

17             probably wouldn't be arms length?"

18         A      What page are we referring to so I

19     can see it?

20         Q      36.

21         A      I said it probably wouldn't be

22     arms length enough.

23         Q      My question to you is in this

24     Winstar Services arrangement, was the

25     relationship between WinStar and Lucent arms
```

110

CONFIDENTIAL                                     LW 00301853

11/20/2002  DiRoma, Jill (Corp. Rep.)

1              JILL B. DiROMA - CONFIDENTIAL

2       length?

3                   MS. NAKLY:   Objection as to form.

4            A     I guess not.

5

6

7

8

9

10

11

12

13                         REDACTED

14

15

16

17

18

19

20

21

22

23

24

25

111

CONFIDENTIAL                          LW 00301854

B859

11/20/2002 DiRoma, Jill (Corp. Rep.)

1    JILL B. DiROMA - CONFIDENTIAL

2

3

4

5

6    REDACTED

7

8

9

10

11

12        Q      What we see is WinStar being able

13   to capitalize for yet another quarter

14   expenditures or more expenditures than they could

15   capitalize on their own, correct?

16            MS. NAKLY:  Objection as to form.

17        A      That's what they always said they

18   needed it for, yes.

19        Q      And, in turn, we see Lucent

20   gaining revenue by, according to Mr. Nate Kantor,

21   WinStar's help, correct?

22            MS. NAKLY:  Objection as to form.

23        A      I don't know how to -- what's not

24   a clear -- he's willing to help us, he's willing

25   to purchase from us.

151

```
 1            JILL B. DiROMA - CONFIDENTIAL
 2      Q      What we have for many quarters
 3  between Lucent and WinStar, WinStar consistently
 4  helped Lucent close huge revenue gaps each
 5  quarter, correct?
 6            MS. NAKLY:  Objection as to form.
 7      A      There were end of quarter deals
 8  done, yes, with WinStar.
 9      Q      Consistently between Lucent and
10  WinStar, correct?
11            MS. NAKLY:  Objection as to form.
12      A      Yes, they were fairly consistent
13  that we did some significant deals at the end of
14  the quarter.
15      Q      Where WinStar helped Lucent
16  recognize revenue, correct?
17            MS. NAKLY:  Objection as to form.
18      A      I don't know if they looked at it
19  as helping Lucent recognize revenue or take
20  advantage of the fact that Lucent wanted to
21  recognize revenue and therefore they could get a
22  good deal on whatever they needed.
23      Q      Well, it doesn't sound like a
24  wonderful deal if we go back together and look at
25  Exhibit number 12, because what Lucent writes
```

152

LW 00301895

**B861**

11/20/2002 DiRoma, Jill (Corp. Rep.)

```
 1              JILL B. DiROMA - CONFIDENTIAL
 2      here is, "The deals of the past are haunting us.
 3      There is still $87 million of Lucent product in
 4      WinStar warehouses."
 5              Do you see that?
 6          A      Where is that?  Yes.
 7          Q      And Lucent further says when it's
 8      talking about the previous end of quarter deals
 9      with WinStar, says, "WinStar still has a major
10      inventory as a consequence of the deals of the
11      past," correct?
12              MS. NAKLY:  Objection as to form.
13          A      Yes.
14          Q      So, when Nate Kantor talks about
15      WinStar's ability to help Lucent, it looks like
16      that is, in fact, what's happening, because
17      WinStar, according to Lucent's own e-mail dated
18      September 18th of 2000, is still holding a
19      surplus of Lucent inventory, correct?
20              MS. NAKLY:  Objection as to form.
21          A      I mean, I can't surmise exactly
22      why WinStar does the deals that they do.  I mean
23      I don't know what's in their head.
24          Q      What you have previously sworn
25      under oath in this lawsuit, though, is Lucent
```

153

CONFIDENTIAL                    LW 00301896

B862

11/20/2002 DiRoma, Jill (Corp. Rep.)

```
1              JILL B. DiROMA - CONFIDENTIAL
2      helped WinStar with the WinStar Services
3      arrangement and WinStar helped Lucent close huge
4      revenue gaps each quarter, correct?
5              A       I don't think I said exactly that.
6              Q       Take a look on page 149 and 150 of
7      your deposition.
8                      Let's read together, if we can.
9                      I have previously asked you under
10     oath in this very lawsuit, I said, "WinStar
11     helped Lucent as I can see --
12             A       Where are you?
13             Q       I have previously asked you this
14     question under oath, I said, "WinStar helped
15             Lucent, as I can see, at the end of many
16             quarters in a row by buying millions of
17             dollars worth of Lucent product at the end
18             of Lucent's fiscal quarters, correct?"
19                     And you said, "Yes."
20             A       Yes.
21             Q       And then I said, "and Lucent, in
22             turn, helped WinStar through the WinStar
23             Services arrangement, correct?"
24                     And your answer was, "Yes?"
25             A       Yes.
```

154

CONFIDENTIAL                    LW 00301897

**B863**

**11/20/2002 DiRoma, Jill (Corp. Rep.)**

1          JILL B. DiROMA - CONFIDENTIAL

2          Q     And, of course, you stand by that

3     sworn testimony as you sit here today?

4          A     Yes, I do.

5

6

7

8

9

10

11

12

13

14

15                    REDACTED

16

17

18

19

20

21

22

23

24

25

155

11/20/2002 DiRoma, Jill (Corp. Rep.)

1    JILL B. DiROMA - CONFIDENTIAL

2

3

4

5                          REDACTED

6

7

8

9

10        Q      Let's talk about what Lucent did.

.11   If we talk about the WinStar Services transaction

12   and kind of step back a second together, what we

13   first of all see is WinStar initiating the

14   transaction by sending a purchase order to

15   Lucent, correct?

16        A      Yes.

17        Q      But Lucent wouldn't perform any of

18   the services in that purchase order, correct?

19        A      Lucent had an agreement to

20   subcontract those services back to WinStar.

21        Q      So, the very same services and the

22   very same amount that WinStar had ordered from

23   Lucent, Lucent ordered back from WinStar,

24   correct?

25        A      That was the arrangement.

183

CONFIDENTIAL                    LW 00301926

**B865**

11/20/2002 DiRoma, Jill (Corp. Rep.)

1           JILL B. DiROMA - CONFIDENTIAL

2                Q       In dueling purchase orders,

3       correct?

4                        MS. NAKLY:  Objection as to form.

5                A       In purchase orders of the same

6       amount, yes.

7                Q       And then we would see both parties

8       invoicing one another in the very same amount,

9       correct?

10               A       Yes.

11               Q       In other words, Lucent would not

12      only submit a purchase order to WinStar, but

13      would actually send an invoice to WinStar for

14      services, correct?

15               A       Yes.

16               Q       Yet none of Lucent's employees

17      ever performed any of the services under the

18      purchase orders or the invoices, correct?

19               A       Correct.

20               Q       They were all performed by WinStar

21      employees who were hired by WinStar to build out

22      WinStar's network, correct?

23                       MS. NAKLY:  Objection as to form.

24               A       That's my understanding, yes.

25               Q       So we had these papers going back

184

CONFIDENTIAL                        LW 00301927

**B866**

```
1      3              Under what contract was Lucent and
2      4      WinStar passing -- let me backup.
3      5              Under what contract was WinStar
4      6      passing through its own performed services
5      7      through Lucent's books?
6      8      A      I'm not sure, I mean there was a
7      9      services agreement that we entered into with them
8     10      specifically on that.
9     11              So, from a legal perspective I
10    12      guess that's the contract that we worked under.
11    13      Q      What services agreement is that,
12    14      ma'am?
13    15      A      There was -- I mean, I don't have
14    16      it in front of me, so I can't really describe it,
15    17      there was a services agreement that supposedly
16    18      covered these services that we were performing --
17    19      working with them on.
18    20      Q      Was it the subcontract agreement?
19    21      A      I guess that was the name of it, I
20    22      don't know, I don't remember.
21    23      Q      Take a look, please, at exhibit
22    24      number 35.
23    25              (The above described document was
24
```

CONFIDENTIAL

LW 00301943

B867

**11/25/2002 Diroma, Jill (a.m.) (Corp. Rep.)**

| 1 | 2 | marked Exhibit 35 for identification as of |
| 2 | 3 | this date.) |
| 3 | 4 | Q    Is Exhibit number 35 what's |
| 4 | 5 | entitled "Agreement for network build out |
| 5 | 6 | services," is this the agreement that WinStar was |
| 6 | 7 | passing through its own services through Lucent's |
| 7 | 8 | books? |
| 8 | 9 | A    I thought there was another |
| 9 | 10 | agreement after this, I'm not quite sure if this |
| 10 | 11 | is the one that was being used or not. |
| 11 | 12 | Q    Let me ask it this way, was |
| 12 | 13 | WinStar passing its services through Lucent's |
| 13 | 14 | books under the parties' supply agreement entered |
| 14 | 15 | into in October of 1998? |
| 15 | 16 | A    That's not my understanding. |
| 16 | 17 | Q    You're best understanding is |
| 17 | 18 | Exhibit number 35 is the or was the operative |
| 18 | 19 | contract under which WinStar was passing its |
| 19 | 20 | services through Lucent's books? |
| 20 | 21 | A    Either this or some version of |
| 21 | 22 | this. |
| 22 | 23 | Q    If you would take a look to the |
| 23 | 24 | first page of exhibit number 35, it's |
| 24 | 25 | identified -- I'm sorry, ma'am, if you take a |

29

CONFIDENTIAL                LW 00301944

**B868**

11/25/2002  Diroma, Jill (a.m.) (Corp. Rep.)

1   2   look to the cover page, it's identified by Lucent

2   3   lawyers as the subcontract agreement.

3   4            Is that your understanding?

4   5       A    I haven't looked at this in two

5   6   and a half years, I can't, you know, say with

6   7   certainty.

7   8            I would have to go back and just

8   9   doublecheck the records with all the parties

9   10  involved to ensure that this is the version that

10  11  was being used.

11  12       Q    The bottom line is, though, that

12  13  either Exhibit 35 or some version of Exhibit

13  14  number 35 is the operative contract under which

14  15  WinStar was passing its services through Lucent's

15  16  books, correct?

16  17       A    Can you repeat the question?

17  18       Q    Absolutely.  Either Exhibit number

18  19  35 or some other version of Exhibit number 35 is

19  20  the operative contract under which WinStar was

20  21  passing its services through Lucent's books?

21  22       A    Yes.

22  23       Q    Now, take a look at exhibit number

23  24  36, if we can.

24  25            (The above described document was

3′

CONFIDENTIAL                    LW 00301945

**B869**

• **Defendant's Deposition Designations**

[64:14]                    11/25/2002  Diroma, Jill (a.m.) (Corp. Rep.)

page 64
14          15          A     That's my understanding.

[68:9] - [69:23]           11/25/2002  Diroma, Jill (a.m.) (Corp. Rep.)

page 68
9           10          Q     Take a look at Exhibit number 38.
10          11                (The above described document was
11          12          marked Exhibit 38 for identification as of
12          13          this date.)
13          14          Q     Exhibit number 38 is an internal
14          15     Lucent document containing two different e-mails,
15          16     correct?
16          17          A     Yes.
17          18          Q     We can see on the bottom of the
18          19     page there is an e-mail from a Michael
19          20     Montemarano to a number of people, correct?
20          21          A     Yes.
21          22          Q     And Lucent had already said no to
22          23     the Winstar Services arrangement continuing at
23          24     this point back in December of 2000, correct?
24          25          A     Yes.
page 69
1           2           Q     But a decision was made by Ben
2           3      Verwaayen on behalf of Lucent who is one of the
3           4      officers of that company -- let me back up.
4           5                 Ben Verwaayen was one of the
5           6      officers of Lucent, correct?
6           7           A     Yes.
7           8           Q     And Mr. Verwaayen makes a decision
8           9      to allow WinStar to -- let me back up.
9           10                Mr. Verwaayen allows WinStar to
10          11     use Lucent's credit facility to fund WinStar's
11          12     services for that quarter back in December of
12          13     2000, correct?
13          14          A     Yes.
14          15          Q     But, Lucent says, "We will not
15          16          engage in any billing or purchase orders
16          17          between the companies, but they could draw
17          18          down on our financing facility for about
18          19          $65 million."
19          20                Do you see that?
20          21          A     Yes.
21          22          Q     And Lucent writes, "This would be
22          23     cash out the door for us," correct?
23          24          A     Yes.

[70:1] - [70:4]           11/25/2002  Diroma, Jill (a.m.) (Corp. Rep.)

page 70
1           2           Q     So Lucent finally puts a stop to
2           3      the paperwork between Lucent and WinStar that was
3           4      part and parcel of this pass-through arrangement
4           5      in December 27th of 2000, correct?

[70:6]                    11/25/2002  Diroma, Jill (a.m.) (Corp. Rep.)

page 70
6           7           A     Yes.

16-7
8-9

B870

2

**Harris**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE



In re:  WINSTAR

COMMUNICATIONS, INC., et al.,

        Debtors,

                          Case No.

                          01-1430 (JBR)

CHRISTINA C. SHUBERT,

CHAPTER 7 TRUSTEE

OF WINSTAR COMMUNICATIONS, INC.

AND WINSTAR WIRELESS, INC.,

        Plaintiff,          Adv. Pro. No.

      vs.                01-1063 (JBR)

LUCENT TECHNOLOGIES, INC.,

        Defendant.

~ ~ ~ ~ ~

       Deposition of DEBORAH HARRIS,

called for examination under the Applicable

Rules of Federal Civil Procedure, taken before

me, Eva Petrone, a Notary Public in and for the

State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Baker & Hostetler, LLP, 3200 National City

Center, 1300 East Ninth Street, Cleveland,

Ohio, on Friday, March 19, 2004, at 10:00 a.m.

~ ~ ~ ~ ~

**LEGALINK**
A **WORDWAVE** COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

B871

Page 2

1    APPEARANCES:

2

3        On behalf of Deborah Harris:

4        Baker & Hostetler, LLP, by

5          MEGAN P. FRIENT, ESQ.

6          3200 National City Center

7          1300 East Ninth Street

8          Cleveland, Ohio  44114-3485

9          (216) 861-7067

10                ~ ~ ~ ~ ~

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B872

Page 3

1          DEBORAH HARRIS, of lawful age,

2   called for examination, as provided by the

3   Federal Rules of Civil Procedure, being by me

4   first duly sworn, as hereinafter certified,

5   deposed and said as follows:

6          MS. FRIENT:  Good morning.  My name

7   is Megan Frient and I'm here representing

8   Deborah Harris in the case of In re:  Winstar

9   Communications, Inc. No. 01-1430, Adversarial

10  Proceeding No. 01-1063.  We are here for Ms.        10:10:18

11  Harris's deposition taken upon written

12  questions that have been propounded by the

13  Trustee.

14          I would ask the court reporter to

15  mark the questions as Exhibit A.                    10:10:30

16              -  -  -  -  -

17          (Thereupon, Deposition Exhibit A was

18          marked for purposes of

19          identification.)

20              -  -  -  -  -

21      EXAMINATION OF DEBORAH HARRIS

22  BY THE NOTARY:

23      Q.    Did you meet with counsel, in

24  person or by telephone, before appearing to

    answer these questions?                             10:11:04

LEGALINK MANHATTAN (212) 557-7400

Page 4

1          A.    On advice of counsel, I am

2    asserting my privilege under the Fifth

3    Amendment of the United States Constitution.

4          Q.    Have you had a chance to review

5    questions 2 through 174?                    10:11:29

6          A.    I have reviewed all questions and

7    again, on advice of counsel, I am asserting my

8    right under the Fifth Amendment for all those

9    questions.

10               MS. FRIENT:  We also have some      10:11:47

11    questions that have been submitted by

12    Defendant, Lucent Technologies, and I would ask

13    the court reporter to mark those questions as

14    Exhibit B.

15                    -  -  -  -  -

16               (Thereupon, Deposition Exhibit B was

17               marked for purposes of

18               identification.)

19                    -  -  -  -  -

20    BY THE NOTARY:                              10:12:08

21          Q.    Isn't it true that, as an employee

22    of Lucent, you only began working on matters

23    concerning Winstar in August 2000?

24          A.    On advice of counsel, I am

     asserting my privilege under the Fifth

B874

Page 5

1    Amendment of the United States Constitution.

2        Q.    Isn't it true that you have no

3    personal knowledge of matters relating to the

4    relationship or business dealings between

5    Winstar and Lucent prior to August 2000?        10:12:43

6        A.    On advice of counsel, I am

7    asserting my privilege under the Fifth

8    Amendment of the United States Constitution.

9        Q.    Isn't it true that you were

10   terminated from your employment at Lucent?      10:13:04

11       A.    On advice of counsel, I am

12   asserting my privilege under the Fifth

13   Amendment of the United States Constitution.

14

15       (The deposition concluded at 10:13 a.m.)

16           - - - - -

17

18

19

20

21

22

23

24

25

B875

1                    CERTIFICATE

2    The State of Ohio,     )

3                                    SS:

4    County of Cuyahoga.   )

5

6              I, Eva Petrone, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, DEBORAH HARRIS,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19             I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

B876

Page 7

1            I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5            IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this          day of

8                  , 2004.

9

10

11

12

13

14            Eva Petrone, Notary Public

15            within and for the State of Ohio

16

17    My commission expires February 1, 2008.

18

19

20

21

22

23

24

25

B877



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------

In re:                                          :

WINSTAR COMMUNICATIONS, INC., et al.,           :        Chapter 7

                         Debtors,               :        Case No. 01-1430 (JBR)

                                                :        (Jointly Administered)
----------------------------------------------x

CHRISTINA C. SHUBERT, CHAPTER 7                  :
TRUSTEE OF WINSTAR COMMUNICATIONS,              :
INC. AND WINSTAR WIRELESS, INC.,                :

                         Plaintiff,             :        Adv. Pro. No. 01-1063 (JBR)

                                                :
             v.                                 :

LUCENT TECHNOLOGIES, INC.                        :

                         Defendant.             :

------------------------------------------------

**RESPONSE TO LUCENT'S OBJECTIONS TO PLAINTIFF'S DEPOSITION UPON
WRITTEN QUESTIONS OF DEBORAH HARRIS**

To:      George Stamboulidis, Esq.
         Baker & Hostetler LLP
         666 Fifth Avenue
         New York, New York  10103

         Michael Paskin, Esq.
         Cravath, Swain & Moore, LLP
         825 8th Avenue
         New York, New York 10019

Plaintiff, Christina C. Shubert, Trustee, hereby propounds the following revised

written questions pursuant to Federal Rule of Bankruptcy Procedure 7031 and Federal Rule of

HFNJ1: #140893 v.1 #06723-0001 03/01/2004

Civil Procedure 31, upon the witness, Deborah Harris, residing at 2824 Drummond Place, Cleveland, Ohio, and requests that Ms. Harris appear before Eva Patrone (the "Officer") on March 19, 2004, at 10:00 a.m. at the offices of Baker & Hostetler, 3200 National City Center, 1900 East 9th Street, Cleveland, Ohio 44114-3485 and answer the direct examination questions below, and any written questions served by the parties as cross examination, redirect examination, or recross examination under oath.

## QUESTIONS

1.    Q.    Did you meet with counsel, in person or by telephone, before appearing to answer these questions?

2.    Q.    Did you review any documents during the course of your meeting?

3.    Q.    Have you communicated with anyone at Lucent Technologies Inc. (refereed to hereafter as "Lucent") since your employment with Lucent ended?

4.    Q.    Have you had any communications with anyone at or on behalf of Lucent with respect to this adversary proceeding?

5.    Q.    Have you had any communications with anyone at or on behalf of Lucent about governmental investigations by state or federal authorities with respect to Lucent?

B879

6.  Q.  Have you or your attorney been advised that you are a target of investigation by any federal or state authority or regulatory body?

7.  Q.  Do you have any knowledge of any investigations of Lucent by any federal or state authority or regulatory body?

8.  Q.  Have you been questioned by any federal or state authority or regulatory body with respect to any investigation of Lucent?

9.  Q.  Have you been subpoenaed in connection with any such investigation?

10.  Q.  Are your claims of Fifth Amendment privilege taken in connection with the events that occurred during your employment at Lucent?

11.  Q.  To your knowledge, has Lucent been the subject of any investigation by any federal or state authority or regulatory body concerning events that transpired during your employment at Lucent?

12.  Q.  To your knowledge, has Lucent been the subject of any investigation by any federal or state authority or regulatory body concerning transactions between Lucent Technologies Inc. and Winstar Communications, Inc. (referred to hereinafter as ("Winstar")?

B880

13.   Q.   Did your duties at Lucent Technologies included communicating with and negotiating with representatives of Winstar concerning certain transactions between the parties?

14.   Q.   Isn't it a fact that in 1999 and 2000, Lucent and Winstar engaged in transactions at the ends of quarters in which Winstar would purchase Lucent goods, services, and/or software?

15.   Q.   Isn't it a fact that in August 2000, Winstar employees advised Lucent that they needed to return some of the goods purchased in the earlier end of quarter deals?

16.   Q.   Isn't it a fact that Winstar advised Lucent that it was approaching the limits of capital expenditures it was allowed to make in the year 2000 under covenants contained in its financing agreements with Lucent and its other lenders?

17.   Q.   Isn't it a fact that Winstar also advised Lucent that it could not afford to help Lucent with another end of quarter deal in part because it was running out of cash?

17A.  Q.   Isn't it a fact that Winstar also advised Lucent that it could not afford to help Lucent with another end of quarter deal in part because it was nearing its capital expenditure limitations?

18.   Q.   Isn't it a fact that in September 2000, Lucent knew that Winstar had over $87 million of inventory in Lucent and Winstar warehouses as a result of these earlier end of quarter deals?

19.   Q.   Isn't it a fact that Lucent refused to accept the return of any goods purchased by Winstar under these earlier end of quarter deals?

20.   Q.   Isn't it a fact that in September 2000, Lucent again approached Winstar and asked it to enter into an end of quarter deal?

21.   Q.   Isn't it a fact that Winstar and Lucent subsequently entered into an end of quarter deal in September of 2000?

22.   Q.   Isn't it a fact that in that end of quarter deal, Winstar purchased over $77 million of equipment and services from Lucent?

23.   Q.   Isn't it a fact that in the September 2000 end of quarter deal, Lucent drafted bill and hold letters for Winstar to sign?

24.   Q.   Isn't it a fact that these letters were not true and correct in all respects?

25.   Q.   Isn't it a fact that the bill and hold letters stated falsely the dates by which Winstar would install the purchased equipment?

26.   Q.   Isn't it a fact that Winstar did not need the equipment purchased through these bill and hold letters immediately but was buying the equipment earlier to provide Lucent with additional revenue?

B882

27.   Q.   Isn't it a fact that the letters also stated falsely that Winstar lacked the warehouse space to store the equipment?

28.   Q.   Isn't it a fact that the September 2000 end of quarter deal also included a software deal in which Winstar agreed to pay Lucent $135 million in four installments in the year 2001 to purchase Lucent software?

29.   Q.   Isn't it a fact that although Winstar was obligated to pay $135 million for software in 2001 under this agreement, Lucent actually understood that Winstar was actually entitled to receive only $20 million worth of software?

30.   Q.   Isn't it a fact that Lucent initially booked $135 million of revenue for the software deal even though Winstar was not obligated to pay Lucent any money until 2001?

31.   Q.   Isn't it a fact that Lucent expected Winstar to pay more than $135 million if it purchased more than $20 million of software from the pool?

32.   Q.   Isn't it a fact that in exchange for Winstar's commitments under the software deal, Lucent agreed that it would give Winstar certain credits that it could take in the fourth quarter of 2000?

33.   Q.   Isn't it a fact that before Winstar paid Lucent any money for the software deal, Lucent extended Winstar $35 million in credit for damages arising from the sale of optronics equipment?

B883

34.    Q.    Isn't it a fact that Lucent also agreed to build hubs and b's in the future for Winstar at significantly reduced pricing?

35.    Q.    Isn't it a fact that Lucent later refused to build hubs and b's for the prices agreed to during that end of quarter deal?

36.    Q.    Isn't it a fact that after receiving the credits given by Lucent and the reduced pricing terms Lucent offered on the b's and hubs, Winstar was only going to be out of pocket $20 million for the software pool?

37.    Q.    Isn't it a fact that the software deal was created to get Lucent revenue it could book immediately while enabling Winstar to defer capital expenses into 2001?

38.    Q.    Isn't it a fact that Lucent understood that Winstar needed to defer capital expenditures into 2001 because it had pre-purchased equipment from Lucent in the earlier end of quarter deals?

39.    Q.    Isn't it a fact that notwithstanding Winstar's capital expenditure restrictions, Lucent required Winstar to find a way to help Lucent book additional revenue?

40.    Q.    Isn't it a fact that the software deal was created to enable Winstar to help Lucent book more revenue without violating Winstar's capital expenditure covenants?

B884

41.    Q.    Isn't it a fact that the main purpose of these end of quarter deals was to enable Lucent to book more revenue?

42.    Q.    Isn't it a fact that as part of these end of quarter deals, Lucent required Winstar to participate in transactions such as the bill and hold deals?

42A.    Q.    Isn't it a fact that Lucent did so in order to book more revenue?

43.    Q.    Isn't it a fact that Lucent required Winstar to enter into the software deal?

43A.    Q.    Isn't it a fact that lucent did so in order to book more revenue?

44.    Q.    Isn't it a fact that Lucent required Winstar to engage in these end of quarter transactions as conditions for Lucent continuing to perform its obligations under the agreements between the parties?

45.    Q.    Isn't it a fact that Lucent understood that Winstar was dependent upon Lucent's continued performance of its obligations, including specifically its financing of Winstar?

45A.    Q.    Isn't it a fact that Lucent used promises of continued performance as leverage to extract concessions from Winstar in the end of quarter deals?

B885

46.  Q.  **Isn't it a fact that Winstar communicated to you that it was entering into the bill and hold components of the end of quarter deals to help Lucent book revenue?**

46A.  Q.  **Isn't it a fact that Winstar communicated to you that it did so to obtain Lucent's continued financing of the build-out of the Winstar network?**

46B.  Q.  **Isn't it a fact that Winstar communicated to you that it was entering into the September 29, 2000, to help Lucent book revenue?**

46C.  Q.  **Isn't it a fact that Winstar communicated to you that it did so to obtain Lucent's continued financing of the build-out of the Winstar network?**

47.  Q.  For attached exhibit Harris 1, state whether you recognize the e-mail.

48.  Q.  For attached exhibit Harris 1, state whether you recognize the e-mail and attachments.

49.  Q.  For attached exhibit Harris 1, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

50.  Q.  For attached exhibit Harris 1, state whether you prepared the attachments in the ordinary course of your business activities at Lucent.

9

B886

51.    Q.    For attached exhibit Harris 1, state whether it was your regular practice at Lucent to make or keep such documents.

52.    Q.    For attached exhibit Harris 3 state whether you recognize the e-mail.

53.    Q.    For attached exhibit Harris 3 state whether you recognize the e-mail and attachment.

54.    Q.    For attached exhibit Harris 3, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

55.    Q.    For attached exhibit Harris 3, state whether you prepared the attachments in the ordinary course of your business activities at Lucent.

56.    Q.    For attached exhibit Harris 3, state whether it was your regular practice at Lucent to make or keep such documents.

57.    Q.    For attached exhibit Harris 4, state whether you recognize the e-mail.

58.    Q.    For attached exhibit Harris 4, state whether you recognize the e-mail and attachment.

B887

59.    Q.    For attached exhibit Harris 4, state whether you prepared the attachment in the ordinary course of your business activities at Lucent.

60.    Q.    For attached exhibit Harris 4, state whether it was your regular practice at Lucent to make or keep such documents.

61.    Q.    For attached exhibit Harris 5, state whether you recognize the e-mail.

62.    Q.    For attached exhibit Harris 5, state whether you recognize the e-mail and attachment.

63.    Q.    For attached exhibit Harris 5, state whether you received the e-mail and attachment in the ordinary course of your business activities at Lucent.

64.    Q.    For attached exhibit Harris 5, state whether it was your regular practice at Lucent to make or keep such documents.

65.    Q.    For attached exhibit Harris 6, state whether you recognize the document.

66.    Q.    For attached exhibit Harris 6, state whether you received the document in the ordinary course of your business activities at Lucent.

B888

67.    Q.    For attached exhibit Harris 6, state whether it was your regular practice at Lucent to make or keep such documents.

68.    Q.    For attached exhibit Harris 7, state whether you recognize the e-mail.

69.    Q.    For attached exhibit Harris 7, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

70.    Q.    For attached exhibit Harris 7, state whether it was your regular practice at Lucent to make or keep such documents.

71.    Q.    For attached exhibit Harris 9, state whether you recognize the e-mail.

72.    Q.    For attached exhibit Harris 9, state whether you received the e-mail in the ordinary course of your business activities at Lucent.

73.    Q.    For attached exhibit Harris 9, state whether it was your regular practice at Lucent to make or keep such documents.

74.    Q.    For attached exhibit Harris 10, state whether you recognize the e-mail.

75.   Q.   For attached exhibit Harris 10, state whether you received the e-mail in the ordinary course of your business activities at Lucent.

76.   Q.   For attached exhibit Harris 10, state whether it was your regular practice at Lucent to make or keep such documents.

77.   Q.   For attached exhibit Harris 11, state whether you recognize the document.

78.   Q.   For attached exhibit Harris 11, state whether you prepared or received the document in the ordinary course of your business activities at Lucent.

79.   Q.   For attached exhibit Harris 11, state whether it was your regular practice at Lucent to make or keep such documents.

80.   Q.   For attached exhibit Harris 15, state whether you recognize the e-mail.

81.   Q.   For attached exhibit Harris 15, state whether you recognize the e-mail and attachment.

82.   Q.   For attached exhibit Harris 15, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

13

B890

83.   Q.   For attached exhibit Harris 15, state whether you prepared the attachments in the ordinary course of your business activities at Lucent.

84.   Q.   For attached exhibit Harris 15, state whether it was your regular practice at Lucent to make or keep such documents.

85.   Q.   For attached exhibit Harris 16, state whether you recognize the e-mail.

86.   Q.   For attached exhibit Harris 16, state whether you recognize the handwriting on the e-mail.

87.   Q.   For attached exhibit Harris 16, state whether you prepared or received the e-mail in the ordinary course of your business activities at Lucent.

88.   Q.   For attached exhibit Harris 16, state whether it was your regular practice at Lucent to make or keep such documents.

89.   Q.   For attached exhibit Harris 18, state whether you recognize the e-mails starting with the December 28, 2000 e-mail from Bernardus Verwaayen through the December 27, 2000 e-mail from Michael Montemarano.

B891

90.   Q.   For attached exhibit Harris 18, state whether you received these e-mails in the ordinary course of your business activities at Lucent.

91.   Q.   For attached exhibit Harris 18, state whether it was your regular practice at Lucent to make or keep such documents.

92.   Q.   For attached exhibit Harris 19, state whether you recognize the e-mail.

93.   Q.   For attached exhibit Harris 19, state whether you recognize the attachments.

94.   Q.   For attached exhibit Harris 19, state whether you received the document in the ordinary course of your business activities at Lucent.

95.   Q.   For attached exhibit Harris 19, state whether it was your regular practice at Lucent to make or keep such documents.

96.   Q.   For attached exhibit Harris 20, state whether you recognize the e-mails.

97.   Q.   For attached exhibit Harris 20, state whether you received the document in the ordinary course of your business activities at Lucent.

B892

98.    Q.    For attached exhibit Harris 20, state whether it was your regular practice at Lucent to make or keep such documents.

99.    Q.    For attached exhibit Harris 21, state whether you recognize the notes.

100.    Q.    For attached exhibit Harris 21, state whether you prepared the document in the ordinary course of your business activities at Lucent.

101.    Q.    For attached exhibit Harris 21, state whether it was your regular practice at Lucent to make or keep such documents.

102.    Q.    For attached exhibit Harris 22, state whether you recognize the notes.

103.    Q.    For attached exhibit Harris 22, state whether you prepared the document in the ordinary course of your business activities at Lucent.

104.    Q.    For attached exhibit Harris 22, state whether it was your regular practice at Lucent to make or keep such documents.

105.    Q.    For attached exhibit Harris 23, state whether you recognize the notes.

HFNJ1: #140893 v.1 #06723-0001 03/01/2004

B893

106.　Q.　For attached exhibit Harris 23, state whether you prepared the document in the ordinary course of your business activities at Lucent.

107.　Q.　For attached exhibit Harris 23, state whether it was your regular practice at Lucent to make or keep such documents.

108.　Q.　For attached exhibit Harris 24, state whether you recognize the notes.

109.　Q.　For attached exhibit Harris 24, state whether you prepared the document in the ordinary course of your business activities at Lucent.

110.　Q.　For attached exhibit Harris 24, state whether it was your regular practice at Lucent to make or keep such documents.

111.　Q.　For attached exhibit Harris 26, state whether you recognize the notes.

112.　Q.　For attached exhibit Harris 26, state whether you prepared the document in the ordinary course of your business activities at Lucent.

113.　Q.　For attached exhibit Harris 26, state whether it was your regular practice at Lucent to make or keep such documents.

B894

114.    Q.    For attached exhibit Harris 27, state whether you recognize the notes.

115.    Q.    For attached exhibit Harris 27, state whether you prepared the document in the ordinary course of your business activities at Lucent.

116.    Q.    For attached exhibit Harris 27, state whether it was your regular practice at Lucent to make or keep such documents.

117.    Q.    For attached exhibit Harris 28, state whether you recognize the notes.

118.    Q.    For attached exhibit Harris 28, state whether you prepared the document in the ordinary course of your business activities at Lucent.

119.    Q.    For attached exhibit Harris 28, state whether it was your regular practice at Lucent to make or keep such documents.

120.    Q.    For attached exhibit Harris 29, state whether you recognize the notes.

121.    Q.    For attached exhibit Harris 29, state whether you prepared the document in the ordinary course of your business activities at Lucent.

HFNJ1: #140893 v.1 #06723-0001 03/01/2004

B895

122.   Q.   For attached exhibit Harris 29, state whether it was your regular practice at Lucent to make or keep such documents.

123.   Q.   For attached exhibit Harris 30, state whether you recognize the notes.

124.   Q.   For attached exhibit Harris 30, state whether you prepared the document in the ordinary course of your business activities at Lucent.

125.   Q.   For attached exhibit Harris 30, state whether it was your regular practice at Lucent to make or keep such documents.

126.   Q.   For attached exhibit Harris 31, state whether you recognize the document.

127.   Q.   For attached exhibit Harris 31, state whether you prepared or received the document in the ordinary course of your business activities at Lucent.

128.   Q.   For attached exhibit Harris 31, state whether it was your regular practice at Lucent to make or keep such documents.

129.   Q.   For attached exhibit Harris 33, state whether you recognize the e-mail.

19

B896

130.   Q.   For attached exhibit Harris 33, state whether you recognize the attachment.

131.   Q.   For attached exhibit Harris 33, state whether you received the document in the ordinary course of your business activities at Lucent.

132.   Q.   For attached exhibit Harris 33, state whether it was your regular practice at Lucent to make or keep such documents.

133.   Q.   For attached exhibit Harris 34, state whether you recognize the document.

134.   Q.   For attached exhibit Harris 34, state whether you prepared or received the document in the ordinary course of your business activities at Lucent.

135.   Q.   For attached exhibit Harris 34, state whether it was your regular practice at Lucent to make or keep such documents.

136.   Q.   For attached exhibit Harris 35, state whether you recognize the e-mails.

137.   Q.   For attached exhibit Harris 35, state whether you prepared or received the document in the ordinary course of your business activities at Lucent.

HFNJ1: #140893 v.1 #06723-0001 03/01/2004

B897

138.    Q.    For attached exhibit Harris 35, state whether it was your regular practice at Lucent to make or keep such documents.

139.    Q.    For attached exhibit Harris 36, state whether you recognize the e-mails.

140.    Q.    For attached exhibit Harris 36, state whether you recognize the attachments.

141.    Q.    For attached exhibit Harris 36, state whether you received the document in the ordinary course of your business activities at Lucent.

142.    Q.    For attached exhibit Harris 36, state whether it was your regular practice at Lucent to make or keep such documents.

143.    Q.    For attached exhibit Harris 37, state whether you recognize the e-mails.

144.    Q.    For attached exhibit Harris 37, state whether you received the document in the ordinary course of your business activities at Lucent.

145.    Q.    For attached exhibit Harris 37, state whether it was your regular practice at Lucent to make or keep such documents.

HFNJ1: #140893 v.1 #06723-0001 03/01/2004

B898

146.    Q.    For attached exhibit Harris 38, state whether you recognize the e-mails.

147.    Q.    For attached exhibit Harris 38, state whether you received the document in the ordinary course of your business activities at Lucent.

148.    Q.    For attached exhibit Harris 38, state whether it was your regular practice at Lucent to make or keep such documents.

149.    Q.    For attached exhibit Harris 39, state whether you recognize the e-mails.

150.    Q.    For attached exhibit Harris 39, state whether you prepared and received the e-mails in the ordinary course of your business activities at Lucent.

151.    Q.    For attached exhibit Harris 39, state whether it was your regular practice at Lucent to make or keep such documents.

152.    Q.    For attached exhibit Harris 40, state whether you recognize the document.

153.    Q.    For attached exhibit Harris 40, state whether you received the document in the ordinary course of your business activities at Lucent.

B899

154.  Q.  For attached exhibit Harris 40, state whether it was your regular practice at Lucent to make or keep such documents.

155.  Q.  For attached exhibit Harris 41, state whether you recognize the e-mail from Barbara Kelly dated January 8, 2001.

156.  Q.  For attached exhibit Harris 41, state whether you recognize the attachment.

157.  Q.  For attached exhibit Harris 41, state whether you prepared the attachment in the ordinary course of your business activities at Lucent.

158.  Q.  For attached exhibit Harris 41, state whether it was your regular practice at Lucent to make or keep such documents.

159.  Q.  For attached exhibit Harris 42, state whether you recognize the e-mails.

160.  Q.  For attached exhibit Harris 42, state whether you received the document in the ordinary course of your business activities at Lucent.

161.  Q.  For attached exhibit Harris 42, state whether it was your regular practice at Lucent to make or keep such documents.

B900

162.    Q.    For attached exhibit Harris 43, state whether you recognize the e-mail from you dated September 20, 2000.

163.    Q.    For attached exhibit Harris 43, state whether you recognize the attachments.

164.    Q.    For attached exhibit Harris 43, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

165.    Q.    For attached exhibit Harris 43, state whether you prepared the e-mail and attachments in the ordinary course of your business activities at Lucent.

166.    Q.    For attached exhibit Harris 43, state whether it was your regular practice at Lucent to make or keep such documents.

167.    Q.    For attached exhibit Harris 44, state whether you recognize the e-mails from you dated September 22, 2000.

168.    Q.    For attached exhibit Harris 44, state whether you recognize the attachments.

169.    Q.    For attached exhibit Harris 44, state whether you prepared the e-mail in the ordinary course of your business activities at Lucent.

B901

170.  Q.  For attached exhibit Harris 44, state whether you prepared the e-mail and attachments in the ordinary course of your business activities at Lucent.

171.  Q.  For attached exhibit Harris 44, state whether it was your regular practice at Lucent to make or keep such documents.

172.  Q.  For attached exhibit Harris 45, state whether you recognize the letter.

173.  Q.  For attached exhibit Harris 45, state whether you prepared the document in the ordinary course of your business activities at Lucent.

174.  Q.  For attached exhibit Harris 45, state whether it was your regular practice at Lucent to make or keep such documents

HERRICK, FEINSTEIN LLP
Attorneys for Plaintiff
Christine C. Shubert, Chapter 7 Trustee
104 Carnegie Center
Princeton, New Jersey 08540
(609) 452-3800

By: _____
David R. King

B902



HERRICK, FEINSTEIN LLP

104 CARNEGIE CENTER
PRINCETON, N.J. 08540-6232

TELEPHONE: (609) 452-3800
FAX: (609) 520-9095



## FAX COVER MEMO

| FROM: | Dolores A. Dudley, Secretary to David R. King, Esq. | DATE: | March 17, 2004 |
|---|---|---|---|
| DIRECT DIAL#: | (609) 452-3812 | CLIENT/MATTER #: | 6723-0001 |

Please deliver as soon as possible to:

| | RECIPIENT | COMPANY | FAX# | TELEPHONE # |
|---|---|---|---|---|
| 1. | Kelly Morantz | | (216) 263-7070 | (216) 523-1313 X 101 |

Total number of pages including cover: 3

If there are any problems concerning the transmission of this material, please call (609) 452-3800.

**COMMENTS:**

Kelly:  Attached are the questions for written cross-examination
from the Cravath law firm in the deposition of Deborah Harris
which is scheduled for March 19th.
Please call me if you have any questions.

**CONFIDENTIALITY NOTE**

This facsimile contains privileged information intended only for the use of the individual or entity named above. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of the facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original facsimile to us at the above address via the U.S. Postal Service. Thank you.

FROM CRAVATH SWAINE & MOORE LLP                    (FRI) 3. 9 04 13:33/ST. 13:32/NO. 4001113102 F. 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| WINSTAR COMMUNICATIONS, INC., et al., | Case No. 01-1430 |
| Debtors, | (Jointly Administered) |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE OF WINSTAR COMMUNICATIONS, INC. AND WINSTAR WIRELESS, INC., | Adv. Pro. No. 01-1063 (JBR) |
| Plaintiff, | |
| v. | |
| LUCENT TECHNOLOGIES INC. | |
| Defendant. | |

### NOTICE OF DEPOSITION UPON WRITTEN CROSS-EXAMINATION QUESTIONS OF DEBORAH HARRIS PURSUANT TO RULE 31

PLEASE TAKE NOTICE that, pursuant to Rule 7031 of the Federal Rules of Bankruptcy Procedure, and Rule 31 of the Federal Rules of Civil Procedure, defendant Lucent Technologies Inc. ("Lucent") serves the following written cross questions upon Deborah Harris, residing at 2824 Drummond Place, Cleveland, Ohio, and requests that Ms. Harris appear before Eva Patrone on March 19, 2004, at 10:00 a.m. at the offices of Baker & Hostetler, 3200 National City Center, 1900 East 9th Street, Cleveland, Ohio 44114-3485 and answer the questions below.

B904

TOTAL P.03

### Cross-Examination Questions

1. Isn't it true that, as an employee of Lucent, you only began working on matters concerning Winstar in August 2000?

2. Isn't it true that you have no personal knowledge of matters relating to the relationship or business dealings between Winstar and Lucent prior to August 2000?

3. Isn't it true that you were terminated from your employment at Lucent?

March 5, 2004

CRAVATH, SWAINE & MOORE LLP

by _____

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

JONES DAY
Michelle Morgan Harner
77 West Wacker
Chicago, IL 60601
(312) 782-3939

RICHARDS, LAYTON & FINGER
Daniel J. DeFranceschi
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 658-6541

*Attorneys for Defendant*
*Lucent Technologies Inc.*

- 2 -

B905

**Hicks**

hicks disks 1 - 3

01:55:42.83 24    sales goals that they needed to meet for the end
01:55:45.40 25    of the quarter.  Winstar would have a list of

======================================================

Page 100
01:55:48.14  0
      100
01:55:48.14  1                    1                    LISA HICKS
01:55:48.14  2    their sales goals that they needed to meet at the
01:55:50.64  3    end of the quarter.
01:55:52.24  4    And we would negotiate a deal so that the
01:55:54.81  5    two companies could meet their sales goals for the
01:55:57.45  6    quarter.
01:55:59.05  7    Q.  Okay.  Did you use that term, "end of
01:56:05.49  8    quarter deal," in your communications with Lucent?
01:56:09.56  9    A.  Yes.
01:56:10.69 10    Q.  Do you recall whether Lucent employed that
01:56:12.16 11    term with Winstar, as well, with you?
01:56:15.86 12    A.  I believe so.
01:56:18.03 13    Q.  Did you ever have anyone from Lucent
01:56:20.24 14    express confusion or uncertainty when you said
01:56:23.67 15    something about an end of quarter deal?
01:56:25.34 16    A.  No.
01:56:32.68 17    Q.  Were you personally involved in
01:56:34.55 18    negotiating any of the end of quarter deals with
01:56:36.59 19    Lucent?
01:56:39.19 20    A.  Not the final details -- I mean, I mean,
01:56:41.86 21    not the, the high level.  I was involved with
01:56:45.03 22    working out the final details.  Meaning, I was
01:56:49.83 23    given the criteria.
01:56:51.13 24    Q.  Okay.  Okay.  Who, who came up with the
01:56:54.17 25    criteria that would be given to you to work with?

======================================================

Page 101
01:56:57.64  0
      101
01:56:57.64  1                    1                    LISA HICKS
01:56:57.64  2    A.  Well, Lucent actually would originate the
01:57:02.38  3    documents, and they would send them to Winstar.
01:57:07.98  4    And the documents would list, you know, switching
01:57:11.89  5    equipment, X number of millions of dollars and
01:57:15.76  6    long-haul equipment, X number of millions of
01:57:18.19  7    dollars.
01:57:21.56  8    Q.  Okay.  So who would that initial proposal
01:57:33.28  9    go to from Lucent?
01:57:37.01 10    A.  Well, usually, it would go to Dave
01:57:39.05 11    first -- well, no, actually, we were all probably
01:57:42.72 12    sent at the same time.
01:57:45.85 13    Q.  Come over by e-mail?
01:57:46.59 14    A.  By e-mail, normally.
01:57:48.96 15    Q.  And they'd send it to Dave and who else?
01:57:51.46 16    A.  Me, Bill Zlotnick.
01:57:54.33 17    Q.  Okay.  Did the deals normally get sent to
01:57:56.60 18    Nate Kantor?
01:57:58.63 19    A.  I have no idea.
01:58:01.30 20    Q.  When you got the e-mails, you'd see who it
01:58:02.67 21    was being -- well, I'll withdraw that.
01:58:07.61 22    Did Nate typically get involved in
01:58:10.81 23    negotiating the end of quarter deals with Lucent?
01:58:15.02 24    A.  Usually, it was Dave negotiating the end
                                 Page 6

```
                            hicks disks 1 - 3
01:58:17.59 25   of quarter deals.  I do recall that Nate had some
```

=====================================================

```
Page 102
01:58:22.99  0
     102
01:58:22.99  1            1                  LISA HICKS
01:58:22.99  2   meetings with Lucent.
01:58:32.80  3   Q.  Okay.  I want to talk specifically about
01:58:34.30  4   the, the end of quarter deal from the third
01:58:37.87  5   quarter of 2000.  I understand, from your
01:58:41.28  6   testimony earlier, earlier today, that that is a,
01:58:43.85  7   was a difficult time for you.  But we're going to
01:58:46.82  8   see, you know, what you can remember with the help
01:58:49.35  9   of, I believe, some documents.  And then we'll see
01:58:52.22 10   what we can, what testimony you can provide.
01:58:58.59 11   First, did Winstar in fact enter into an
01:59:00.36 12   end of quarter deal with Lucent in September 2000?
01:59:03.53 13   A.  Yes.
01:59:06.07 14   Q.  Now, we looked at some documents earlier,
01:59:10.81 15   and in particular, you can refer back to Hicks 3,
01:59:12.77 16   if you'd like.  I asked you a couple of questions
01:59:19.82 17   about whether or not Winstar and specific people
01:59:23.69 18   at Winstar wanted to engage in an end of quarter
01:59:26.52 19   deal with Lucent, do you recall that?
01:59:29.06 20   A.  No.
01:59:29.93 21   Q.  You don't?
01:59:30.53 22   A.  I don't recall you asking me that
01:59:31.69 23   question.
01:59:32.09 24   Q.  Okay.  Well, we'll do it now then.  Hicks
01:59:37.17 25   3, I think you identified as a memorandum that,
```

=====================================================

```
Page 103
01:59:39.80  0
     103
01:59:39.80  1            1                  LISA HICKS
01:59:39.80  2   that you had prepared, which you believed you
01:59:43.67  3   showed to David and probably Bill Zlotnick,
01:59:46.04  4   correct?
01:59:50.91  5   A.  I prepared this document for Dave
01:59:52.28  6   Ackerman.
01:59:53.58  7   Q.  Okay.  The first item in Hicks 3, and,
01:59:59.42  8   again, this document is labeled, "Nate's Mission:
02:00:01.22  9   To get Lucent to agree to all points listed
02:00:03.19 10   below."  The first item is, "No more EOQ deals
02:00:07.83 11   with Lucent effective immediately."  And that's in
02:00:10.43 12   bold writing, do you see that?
02:00:12.03 13   A.  Yes.
02:00:16.14 14   Q.  Whose suggestion was it that that be a
02:00:19.37 15   part of Nate's mission for this August 21st
02:00:21.74 16   meeting?
02:00:24.21 17   A.  That -- I was, I felt very strongly that
02:00:25.95 18   way.
02:00:26.62 19   Q.  Why did you feel strongly about that?
02:00:29.18 20   A.  Because I didn't feel that Winstar was in
02:00:31.72 21   the right financial position to continue to do
02:00:34.42 22   that.
02:00:36.56 23   Q.  Were there any other reasons why you felt
02:00:37.56 24   Winstar shouldn't be doing any more end of quarter
02:00:41.83 25   deals?
```

Page 7

B907

hicks disks 1 – 3

=====================================================================

Page 104
02:00:42.60  0
   104
02:00:42.60  1              1                    LISA HICKS
02:00:42.60  2    A.  No, I just thought it was bad business.
02:00:44.53  3    Q.  Okay.  And specifically, under item number
02:00:47.24  4    1, you wrote, "There's no capital budget left to
02:00:49.47  5    negotiate with."  Do you see that?
02:00:50.81  6    A.  Yes, I do.
02:00:52.21  7    Q.  Do you recall that being essentially true?
02:00:54.78  8    A.  I recall having numerous conversations
02:00:56.75  9    with the finance department over overextending the
02:01:00.05 10    capital budget.
02:01:01.58 11    Q.  Okay.  Do you know how Winstar's capital
02:01:03.29 12    budget got overextended?
02:01:08.02 13    A.  No, not exactly.  I mean, I didn't have
02:01:11.03 14    access to the capital budget, in that --
02:01:13.33 15    Q.  Okay.
02:01:13.60 16    A.  -- I didn't prepare it, I didn't follow
02:01:16.06 17    it, you know, monitor it.
02:01:18.93 18    Q.  Did the earlier end of quarter deals that
02:01:21.30 19    Winstar had done with Lucent impact the capital
02:01:25.11 20    budget?
02:01:25.31 21    A.  My understanding is yes.
02:01:29.95 22    Q.  Do you know how you came by that
02:01:31.25 23    understanding?
02:01:33.22 24    A.  Through information given to me from the
02:01:34.68 25    finance department.


=====================================================================

Page 105
02:01:38.09  0
   105
02:01:38.09  1              1                    LISA HICKS
02:01:38.09  2    Q.  Okay.  The next sentence reads, "First
02:01:40.46  3    quarter 2000, second quarter 2000, reciprocal
02:01:42.79  4    revenue deals used future purchases as part of
02:01:45.86  5    negotiations."  Do you see that?
02:01:47.30  6    A.  Yes, I do.
02:01:48.26  7    Q.  And it reads on, "Winstar has prepurchased
02:01:49.97  8    equipment that will not be deployed during 2000 in
02:01:52.40  9    an effort to meet revenue commitments."  Do you
02:01:54.27 10    see that?
02:01:54.84 11    A.  Yes, I do.
02:01:55.30 12    Q.  Whose revenue commitments was Winstar
02:01:57.81 13    trying to meet when they were prepurchasing
02:01:59.64 14    equipment?
02:02:00.91 15    A.  Lucent's.
02:02:18.23 16    Q.  Now, you made this recommendation in a
02:02:20.36 17    memo that you gave to David Ackerman.  Do you
02:02:22.80 18    recall what his response was to your belief or a
02:02:27.30 19    suggestion that there be no more end of quarter
02:02:29.74 20    deals in, with Lucent?
02:02:33.48 21    A.  No, I don't.
02:02:36.31 22    Q.  Do you know if he disagreed with your
02:02:37.58 23    opinion fervently, said, that's crazy, we can't do
02:02:40.48 24    that?
02:02:43.05 25    A.  No, I don't.

                                Page 8

B908

hicks disks 1 - 3

Page 106
02:02:45.32  0
     106
02:02:45.32  1              1              LISA HICKS
02:02:45.32  2    Q.  Okay.  You have no recollection whatsoever
02:02:48.22  3    how he responded?
02:02:49.52  4    A.  No.
02:02:49.99  5    Q.  Okay.  To your understanding, those
02:02:57.10  6    statements that you made under item 1 on this memo
02:03:00.27  7    were true, correct?
02:03:02.27  8    A.  Yes.
02:03:04.54  9    Q.  Do you know why Winstar had prepurchased
02:03:06.48 10    equipment that it wouldn't be deploying during
02:03:08.31 11    2000 to meet Lucent's revenue commitments?
02:03:14.32 12    A.  As part of the end of quarter deal.
02:03:15.88 13    Q.  Okay.  And why was Winstar trying to meet
02:03:21.96 14    Lucent's revenue commitments in the end of quarter
02:03:24.39 15    deal?
02:03:25.53 16    A.  I will be giving you my understanding
02:03:28.93 17    only.
02:03:29.40 18    Q.  That's fine.
02:03:29.90 19    A.  Is that we were in a partnership.
02:03:36.47 20    Q.  And what did being in a partnership have
02:03:38.11 21    to do with trying to help Lucent meet its revenue
02:03:39.94 22    commitments?
02:03:41.14 23    A.  It was my understanding that we were both
02:03:44.55 24    working together for the mutual goals of
02:03:49.38 25    successful companies.

Page 107
02:03:54.99  0
     107
02:03:54.99  1              1              LISA HICKS
02:03:54.99  2    Q.  Did you, do you know how you came by that
02:03:59.43  3    understanding?
02:04:08.84  4    A.  I don't recall anybody, you know,
02:04:10.44  5    specifically saying that to me, no.
02:04:14.94  6    Q.  Is that an understanding that was, to your
02:04:17.15  7    knowledge, shared at Winstar by other people?
02:04:19.65  8    A.  To my knowledge, yes.
02:04:21.28  9    Q.  Who else do you think shared that
02:04:22.28 10    understanding?
02:04:23.52 11    A.  That we were working toward successful
02:04:24.82 12    partnership?
02:04:26.72 13    Q.  That the end of quarter deals were being
02:04:29.59 14    done because of the desire to mutually succeed in
02:04:35.40 15    this partnership?
02:04:36.53 16    A.  Oh, I believe Dave Ackerman held that
02:04:37.97 17    view.  I believe Bill Zlotnick held that view.
02:04:55.05 18    Q.  Now, we also looked earlier at Hicks 4.
02:04:57.55 19    Do you want to move to that?  Actually, let's not
02:05:01.49 20    move to that quite yet.  Let's look a little bit
02:05:03.66 21    further at Hicks 3, and I apologize.  Item 2 on
02:05:07.63 22    Hicks 3 talks about delaying, canceling or
02:05:12.47 23    rebooking deals made in the first and second
02:05:14.27 24    quarters of 2000, do you see that?
02:05:15.77 25    A.  Yes.

B909

hicks disks 1 – 3

02:09:23.49   0
112
02:09:23.49   1                    1                    LISA HICKS
02:09:23.49   2    A.  It just didn't make financial sense to me.
02:09:25.45   3    It seemed to me that Winstar was really
02:09:27.59   4    overextending themselves.
02:09:34.26   5    Q.  Did you believe that the benefits that
02:09:36.20   6    Winstar was deriving, if any, from these end of
02:09:40.60   7    quarter deals did not make up for the burdens it
02:09:44.57   8    was placing on the company?
02:09:47.24   9    A.  I believed that our management believed
02:09:49.14  10    that.
02:09:51.98  11    Q.  Management believed what?
02:09:54.92  12    A.  That the risks were worth the benefit.
02:09:58.42  13    Q.  Okay.  And who in the management are you
02:10:00.02  14    referring to when you say that?
02:10:02.32  15    A.  The, the final decision-makers on any of
02:10:04.96  16    these end of quarter deals.
02:10:06.30  17    Q.  And who would that be?
02:10:07.00  18    A.  Well, as far as, in my realm, it was Dave
02:10:10.47  19    Ackerman.
02:10:13.34  20    Q.  Was he the person that had the, to, to
02:10:14.77  21    your knowledge, was he the person that had the
02:10:16.31  22    final say on whether we did these deals?
02:10:17.71  23    A.  You know, I'm not sure the answer to that
02:10:19.37  24    question.
02:10:20.01  25    Q.  Okay.  And by "we," I'm referring to

Page 113
02:10:21.61   0
113
02:10:21.61   1                    1                    LISA HICKS
02:10:21.61   2    Winstar.
02:10:22.18   3    A.  Right.
02:10:22.68   4    Q.  I'm not actually Winstar anymore, nor was
02:10:24.95   5    I ever.
02:10:35.59   6    Now, you just testified a moment ago that
02:10:36.56   7    you were, I think you said vocal about not doing
02:10:41.90   8    end of quarter deals, and that you had talked
02:10:43.77   9    about it with Vanessa Petrini, and she knew that
02:10:46.30  10    you did not want to do end of quarter deal in the
02:10:48.27  11    end of quarter 2000, correct?
02:10:50.24  12    A.  Yes.
02:10:52.54  13    Q.  Looking at Hicks 4, the second sentence in
02:10:58.95  14    that e-mail reads, and this is respect -- with
02:11:01.42  15    respect to Lucent approaching Winstar, again, with
02:11:04.35  16    the request for a deal, reads, "I told her that
02:11:07.29  17    this was not a good idea, and it would receive the
02:11:09.26  18    same reaction as before."  Do you see that?
02:11:11.73  19    A.  Yes, I do.
02:11:14.56  20    Q.  Had you told Vanessa Petrini on other
02:11:17.57  21    occasions, than the conversation referred to in
02:11:21.27  22    here, that Winstar was not going to do an end of
02:11:24.57  23    quarter deal?
02:11:28.08  24    A.  First of all, I never told anyone at
02:11:29.58  25    Lucent that Winstar was not going to do an end of

Page 114
02:11:31.95   0

Page 12

B910

hicks disks 1 - 3

02:29:32.56  7   whatever the final number turned out to be at the
02:29:34.23  8   end of each quarter, I believe that was the goal,
02:29:41.77  9   to help Lucent financially.
02:29:51.78 10   Q.  Were you surprised that the company went
02:29:54.15 11   forward and did this end of quarter deal with
02:29:56.08 12   Lucent in the third quarter 2000?
02:29:59.12 13   A.  No.
02:30:03.53 14   Q.  Why weren't you surprised?
02:30:06.63 15   A.  Because it had been standard practice for
02:30:09.93 16   the time that I was associated with the contract.
02:30:30.19 17   Q.  Did Winstar care about helping Lucent meet
02:30:33.69 18   that revenue target that they put in their
02:30:35.66 19   proposal?
02:30:37.19 20   MR. ZACH:  Objection.
02:30:39.19 21   MR. KING:  What's the basis of your
02:30:39.80 22   objection?
02:30:40.46 23   MR. ZACH:  Vague and ambiguous.
02:30:41.90 24        24   BY MR. KING:
02:30:41.90 25   Q.  You can answer.

Page 129
02:30:43.63  0
             129
02:30:43.63  1        1                    LISA HICKS
02:30:43.63  2   A.  I can only speak to my little realm, my,
02:30:47.70  3   my department and my immediate supervisors, yes.
02:30:50.61  4   Dave Ackerman, yes.
02:30:51.94  5   Q.  He cared?
02:30:52.61  6   A.  Felt that we were working towards a
02:30:55.71  7   partnership.  He was very, felt very strongly that
02:30:59.82  8   way, that there was a partnership between the two
02:31:01.52  9   companies.
02:31:04.49 10   Q.  Did you understand that, that he -- what
02:31:08.36 11   was your understanding of his reason as to why the
02:31:11.86 12   end of quarter deals would help the partnership?
02:31:28.11 13   A.  My understanding was that revenue
02:31:30.61 14   recognition for both companies would help them.
02:31:46.09 15   Q.  Now, the, the purchases that Winstar made
02:31:48.63 16   in these end of quarter deals, do you have an
02:31:52.30 17   understanding as to whether or not the equipment
02:31:54.24 18   that was being purchased was equipment that
02:31:57.27 19   Winstar needed immediately for its network?
02:32:02.01 20   A.  No, it wasn't.
02:32:03.95 21   Q.  Do you have an understanding as to how far
02:32:05.58 22   out Winstar projected it would be using the
02:32:07.88 23   equipment that it was buying in these deals?
02:32:12.75 24   A.  I don't remember exactly, at least a year.
02:32:20.36 25   Q.  So was Winstar essentially prepurchasing

Page 130
02:32:23.33  0
             130
02:32:23.33  1        1                    LISA HICKS
02:32:23.33  2   this equipment before it needed it?
02:32:24.73  3   A.  Yes.
02:32:27.70  4   Q.  Did that damage Winstar?  Did it cost
02:32:31.14  5   Winstar more money to buy the stuff in advance
02:32:33.58  6   than it would to buy it when it actually needed
02:32:35.58  7   it?

Page 20

B911

hicks disks 1 - 3

```
02:32:39.68   8   A.  I can't answer that question.  I don't, I
02:32:42.78   9   didn't have access to Winstar's finances,
02:32:45.95  10   Winstar's books.
02:32:52.26  11   Q.  Well, let me ask you to look at Hicks 8,
02:32:54.90  12   which is an e-mail that you sent to Rick Uhl on
02:32:56.16  13   September 20th.  And this is, I'm looking
02:33:07.91  14   specifically at point 1 on this e-mail.  I, I
02:33:10.35  15   believe you testified that you remembered the
02:33:14.95  16   issues that were talked about in this e-mail.  I
02:33:16.95  17   don't know if you recalled specifically the e-mail
02:33:18.59  18   itself.  But it's an e-mail from you to Rick Uhl,
02:33:23.06  19   dated September 20th.
02:33:26.33  20   And I'd like you to look specifically at
02:33:34.14  21   the second line of this first paragraph.  It says,
02:33:36.74  22   "In previous end of quarter deals, Lucent has
02:33:40.24  23   required Winstar to sign 'bill and hold' letters
02:33:43.61  24   which would allow Lucent to 'ship' to their own
02:33:46.25  25   warehouses, and Winstar would immediately assume
```

Page 131

```
02:33:49.42   0
     131
02:33:49.42   1              1              LISA HICKS
02:33:49.42   2   title and risk of loss, thereby allowing Lucent to
02:33:51.75   3   get the revenue."  Do you see that?
02:33:53.09   4   A.  Yes, I do.
02:33:54.36   5   Q.  Does that, again, refresh your, you know,
02:33:56.76   6   your -- does that, again, mesh with your
02:33:59.23   7   understanding of what the purpose of these bill
02:34:01.43   8   and hold letters was?
02:34:02.43   9   A.  Yes.
02:34:03.50  10   Q.  And what was their purpose?
02:34:05.70  11   A.  For revenue recognition for Lucent.
02:34:08.47  12   Q.  Now, it reads on, "This procedure has been
02:34:10.34  13   disallowed by Lucent's auditors.  Lucent is
02:34:12.91  14   requesting an amendment to the supply agreement to
02:34:14.98  15   address this."  Do you see that?
02:34:16.21  16   A.  Yes, I do.
02:34:19.01  17   Q.  Did in fact Winstar do bill and hold
02:34:22.85  18   letters in the third quarter deal, even though
02:34:25.09  19   Lucent's auditors supposedly had disallowed it?
02:34:27.19  20   A.  I don't know.
02:34:29.09  21   Q.  Okay.  I'll ask you that question later
02:34:33.36  22   when we're looking at some bill and hold letters
02:34:34.90  23   and see if they refresh your recollection.  In the
02:34:39.84  24   second paragraph, you wrote, "As a result of prior
02:34:44.51  25   deals we have made, we have an abundance of
```

Page 132

```
02:34:47.11   0
     132
02:34:47.11   1              1              LISA HICKS
02:34:47.11   2   equipment currently sitting in Lucent warehouses
02:34:49.04   3   that will not deploy until next year."  To your
02:34:51.48   4   understanding, is that an accurate statement?
02:34:53.22   5   A.  Yes.
02:34:53.72   6   Q.  Do you have any idea how much money was
02:34:54.85   7   actually sitting in Lucent warehouses, or how much
02:34:56.79   8   equipment?
```

Page 21

hicks disks 1 - 3

| | | |
|---|---|---|
| 02:34:57.22 | 9 | A.  I don't know.  It was a lot. |
| 02:35:00.42 | 10 | Q.  Was it millions of dollars? |
| 02:35:03.33 | 11 | A.  I would say yes. |
| 02:35:11.13 | 12 | Q.  The next sentence says, "We have to carry |
| 02:35:12.77 | 13 | additional insurance to cover this, and we lose |
| 02:35:14.90 | 14 | control of equipment not witting," which I assume |
| 02:35:17.41 | 15 | is supposed to be sitting, "in Winstar controlled |
| 02:35:20.01 | 16 | space."  Do you see that? |
| 02:35:21.04 | 17 | A.  Yes, I do. |
| 02:35:24.35 | 18 | Q.  I asked you a question a few moments ago |
| 02:35:25.68 | 19 | about whether or not Winstar incurred any costs |
| 02:35:28.68 | 20 | from prepurchasing equipment.  Does this refresh |
| 02:35:30.35 | 21 | your recollection at all? |
| 02:35:32.52 | 22 | A.  Yes, this is information that I remember |
| 02:35:34.82 | 23 | receiving from our, our procurement department. |
| 02:35:40.96 | 24 | Q.  And you recall now that prepurchasing this |
| 02:35:43.27 | 25 | equipment cost Winstar additional money in terms |

Page 133

| | | |
|---|---|---|
| 02:35:46.84 | 0 | |
| | | 133 |
| 02:35:46.84 | 1 | 1                              LISA HICKS |
| 02:35:46.84 | 2 | of insurance expenses, is that correct? |
| 02:35:48.27 | 3 | A.  Yes. |
| 02:35:49.77 | 4 | Q.  Do you know if it also cost Winstar |
| 02:35:51.47 | 5 | additional money in interest expenses on the |
| 02:35:53.74 | 6 | credit line? |
| 02:35:55.71 | 7 | A.  Well, my assumption would be yes, based on |
| 02:35:59.01 | 8 | my knowledge of how credit operates. |
| 02:36:07.52 | 9 | Q.  Now, your last comment in that line that I |
| 02:36:09.79 | 10 | just read was that, "We lose control of equipment |
| 02:36:11.96 | 11 | not sitting in Winstar controlled space."  Was |
| 02:36:13.66 | 12 | that a concern? |
| 02:36:15.13 | 13 | A.  Yes, it was. |
| 02:36:16.40 | 14 | Q.  Why is that? |
| 02:36:16.87 | 15 | A.  It was a concern with procurement and with |
| 02:36:24.01 | 16 | being able to have adequate audit detail, you |
| 02:36:26.91 | 17 | know, documents because we didn't, we couldn't |
| 02:36:30.18 | 18 | physically touch the equipment. |
| 02:36:34.65 | 19 | Q.  So it, so how is that a negative for |
| 02:36:39.35 | 20 | Winstar? |
| 02:36:40.36 | 21 | A.  Well, Winstar had to rely on Lucent to, we |
| 02:36:44.16 | 22 | had to take Lucent's word for it, so to speak, |
| 02:36:47.30 | 23 | "we" being Winstar, that, you know, the equipment |
| 02:36:49.83 | 24 | was sitting there.  I remember having to ask |
| 02:36:53.64 | 25 | Lucent for serial numbers of all of the equipment |

Page 134

| | | |
|---|---|---|
| 02:36:56.27 | 0 | |
| | | 134 |
| 02:36:56.27 | 1 | 1                              LISA HICKS |
| 02:36:56.27 | 2 | that was sitting there, for them to provide that |
| 02:36:58.51 | 3 | to our procurement department. |
| 02:37:02.71 | 4 | Q.  Is it fair to say that, for all you know, |
| 02:37:04.71 | 5 | Lucent hadn't actually put equipment in a |
| 02:37:06.65 | 6 | warehouse for Winstar? |
| 02:37:08.82 | 7 | A.  I have no direct knowledge that Lucent |
| 02:37:10.49 | 8 | actually put any equipment in their warehouses.  I |
| 02:37:13.46 | 9 | did not see, I didn't go to any Lucent warehouse. |

Page 22

B913

hicks disks 1 – 3

02:54:23.69 17  memorandum?
02:54:24.35 18  A.  No.
02:54:27.19 19  Q.  Do you believe you might have prepared
02:54:28.36 20  this memorandum in February?
02:54:30.89 21  A.  I believe that's probably the case.
02:54:33.83 22  Q.  Okay.  Otherwise, you'd have a hard time
02:54:34.76 23  discussing a briefing from February 6th, correct?
02:54:37.37 24  A.  I, I don't even recall anything on that
02:54:40.87 25  particular date.

===================================================

Page 149
02:54:43.71  0
          149
02:54:43.71  1          1                    LISA HICKS
02:54:43.71  2  Q.  The handwriting in the fax cover sheet, is
02:54:46.01  3  that your handwriting, "resend clean copy?"
02:54:47.24  4  A.  Yes.
02:54:47.94  5  Q.  Okay.  So it looks like at least at some
02:54:51.05  6  point you physically had this fax cover sheet in
02:54:54.12  7  your possession?
02:54:54.65  8  A.  Yes.
02:55:03.96  9  Q.  Now, the memorandum provides an overview
02:55:07.00 10  of the Winstar/Lucent commitments from the third
02:55:10.13 11  quarter 2000, do you see that?
02:55:11.73 12  A.  Yes.
02:55:18.77 13  Q.  And it says under, "Details, 1, software
02:55:22.21 14  pool."  And it has a couple of items related to
02:55:25.95 15  the generally available GA issues we were talking
02:55:30.12 16  about earlier?
02:55:31.19 17  A.  Yes.
02:55:32.49 18  Q.  And then it says, "Realities of deal, A,
02:55:36.76 19  approximately 20 million dollars undefined
02:55:38.59 20  software in pool of actual use to Winstar."  Do
02:55:41.06 21  you see that?
02:55:41.60 22  A.  Yes.
02:55:42.76 23  Q.  And it says, "B, balance of pool intended
02:55:45.23 24  to fund, 1, 45 million dollar EIL."  Does that
02:55:49.40 25  stand for the Enterprise Integration Lab?

===================================================

Page 150
02:55:51.07  0
          150
02:55:51.07  1          1                    LISA HICKS
02:55:51.07  2  A.  Yes.
02:55:51.74  3  Q.  "2, 35 million optical credit."  Do you
02:55:54.78  4  see that?  And "3, reduced hubs and b's prices."
02:55:58.15  5  Do you see that?
02:55:58.51  6  A.  Yes.
02:56:00.82  7  Q.  Did Winstar's understanding of the
02:56:03.22  8  software pool change after that October exchange,
02:56:09.46  9  in accordance with this realities of the deal
02:56:11.26 10  language?
02:56:13.50 11  A.  My understanding changed.  My
02:56:16.03 12  understanding is that's what it was.
02:56:19.33 13  Q.  That's what the deal ended up actually
02:56:20.84 14  being?
02:56:21.40 15  A.  Yes.

===================================================

B914

hicks disks 1 - 3

Page 153
02:59:12.77  0
153
02:59:12.77  1            1                    LISA HICKS
02:59:12.77  2   Q.  Okay.  That's usually the response from
02:59:15.54  3   the witness.  Get it over with.
02:59:18.35  4   Okay, Hicks 19.  You have that in front of
02:59:20.72  5   you?
02:59:21.15  6   A.  Yes, I do.
02:59:27.82  7   Q.  Do you recall seeing this memorandum at
02:59:29.99  8   any point in time?
02:59:34.06  9   A.  No, not specifically, no.
02:59:37.97 10   Q.  I'm going to ask you to go through the
02:59:38.50 11   substance of it and, and ask you if you recall
02:59:40.37 12   whether or not this information is accurate, to
02:59:45.27 13   the best of your recollection.  And this appears
02:59:52.61 14   to have been sent over at the time the end of
02:59:56.45 15   quarter deal was for 63 million dollars, if you
02:59:58.85 16   look at point 3, do you agree with that?
03:00:11.60 17   A.  It appears to have, yes, be somewhere
03:00:13.30 18   between October 1st and December 31st, yes.
03:00:17.04 19   Q.  Okay.  Well, actually, what I'm suggesting
03:00:19.94 20   is that it appears, to me, this document was
03:00:21.64 21   earlier.  And the reason why I would say that is
03:00:24.28 22   because item 3 says, "Lucent is requesting an
03:00:27.68 23   additional end of quarter deal for September 2000
03:00:30.49 24   of 63 million dollars," which makes it sound like
03:00:32.65 25   it hasn't happened yet, would you agree with that?

Page 154
03:00:35.16  0
154
03:00:35.16  1            1                    LISA HICKS
03:00:35.16  2   A.  I missed that.  Where are we?  Oh, up
03:00:36.36  3   above.  Okay, yes.
03:00:37.93  4   Q.  I'm sorry, were you looking at the point
03:00:39.23  5   3?
03:00:39.53  6   A.  I was looking at point 3.
03:00:41.00  7   Q.  I'm sorry, I'm sorry.
03:00:41.40  8   A.  Point 3, up above.
03:00:41.90  9   Q.  I'm looking at the point 3 on the, on the
03:00:43.47 10   top section.
03:00:44.03 11   A.  Okay.  All right.
03:00:45.23 12   Q.  And in fact, the end of quarter deal that
03:00:48.50 13   was originally submitted, if you recall, included
03:00:51.84 14   a 63 million dollars for other revenue, do you
03:00:54.08 15   recall that, we looked at that?
03:00:56.58 16   A.  Oh, we looked at that document.
03:00:58.38 17   Q.  Right.  That was the September 20th
03:01:00.35 18   proposal?
03:01:00.85 19   A.  Right, yes.
03:01:02.25 20   Q.  Would you agree then that this appears to
03:01:04.25 21   have been dated about, on or about September 20th
03:01:06.69 22   or shortly after, just for purposes of working
03:01:09.52 23   with the document?
03:01:10.23 24   A.  Yes.
03:01:13.96 25   Q.  On or about that time, do you know if the

Page 155

Page 32

hicks disks 1 - 3

03:01:15.66  0
155
03:01:15.66  1                    1                    LISA HICKS
03:01:15.66  2    capital plan for 2000 was over budget?
03:01:19.00  3    A.  It's my understanding it was, yes.
03:01:20.80  4    Q.  Do you know if the figure up at the top
03:01:21.87  5    would appear to be accurate, that they were over
03:01:22.90  6    budget by 190 million dollars?
03:01:24.94  7    A.  I don't know.
03:01:27.81  8    Q.  And the next point, point 2 says, "of the
03:01:30.28  9    190 million dollar overage, 155 million can be
03:01:33.78  10   attributed to prior Lucent end of quarter deals
03:01:35.62  11   broken down as follows."  And it lists seven
03:01:38.85  12   items.  Do you recall trying to calculate the
03:01:43.16  13   amounts of the earlier end of quarter deals that
03:01:47.13  14   went against the, the capital plan?
03:01:50.73  15   A.  I recall working with finance.  Finance
03:01:56.04  16   was trying to determine how far over budget
03:02:01.14  17   Winstar was.
03:02:06.05  18   Q.  And you recall working with them on that
03:02:07.22  19   project?
03:02:07.85  20   A.  Yes.
03:02:09.22  21   Q.  Would that have been in or about the
03:02:10.19  22   middle of September?
03:02:13.46  23   A.  I, I believe so.
03:02:16.02  24   Q.  Okay.  Does that number appear to be
03:02:23.70  25   accurate to you, as to the, the extent of the, the

Page 156
03:02:27.04  0
156
03:02:27.04  1                    1                    LISA HICKS
03:02:27.04  2    prior Lucent end of quarter deals and how that
03:02:28.60  3    affected the capital plan?
03:02:32.11  4    A.  I don't know.
03:02:33.34  5    Q.  Okay.  That's -- now, the next section
03:02:41.48  6    reads, "Proposals to address both overruns and new
03:02:43.89  7    end of quarter requests."  Do you see that?
03:02:45.52  8    A.  Yes.
03:02:47.59  9    Q.  And it reads, under point 1, "As one way
03:02:49.26  10   to manage the 63 million dollar request, Lucent
03:02:52.39  11   has proposed that approximately 25 million of this
03:02:54.93  12   amount come from a 'software pool.'"  Going down
03:03:01.40  13   further in the paragraph, it reads, "Lucent, in
03:03:03.47  14   theory, would be able to get revenue in September
03:03:05.44  15   using this letter of intent, and the capital
03:03:07.38  16   expense would not hit Winstar's books until 2001
03:03:10.48  17   because the billing would be deferred."  Do you
03:03:12.45  18   see that?
03:03:12.81  19   A.  Yes.
03:03:13.25  20   Q.  Is that your understanding of, of what
03:03:15.48  21   happened in the software deal?
03:03:16.72  22   A.  I, I don't remember.
03:03:19.32  23   Q.  Okay.  The, the 25 million dollar figure
03:03:24.13  24   though, that is lower than the software deal ended
03:03:26.43  25   up actually being for us, is that correct?

Page 157
03:03:29.80  0

Page 33

B916

hicks disks 1 - 3

157

| 03:03:29.80 | 1 | 1 | LISA HICKS |

03:03:29.80  2    A.  It appears so, yes.
03:03:31.07  3    Q.  The, the end number was 135 million?
03:03:34.64  4    A.  135 million.
03:03:39.98  5    Q.  Now, under point 3, it reads, "Also in
03:03:44.51  6    theory, Lucent has proposed exploring providing
03:03:47.05  7    credit to Winstar of up to 30 million dollars,
03:03:49.59  8    which would fall in our fourth quarter, Lucent's
03:03:52.49  9    first quarter, for network software.  In order to
03:03:55.79 10    do this, Lucent would have to inflate the
03:03:57.39 11    'software pool,'" software pool, again, in quotes,
03:04:00.70 12    "to reflect the amount to the credit."  Do you see
03:04:02.00 13    that?
03:04:02.53 14    A.  Yes.
03:04:04.67 15    Q.  Do you recall ever having any discussions
03:04:06.10 16    with Lucent where they proposed inflating a
03:04:09.94 17    software pool to increase their revenue and
03:04:12.67 18    Winstar's credits?
03:04:17.58 19    A.  I don't recall.
03:04:21.32 20    Q.  Do you recall ever, anyone else at Winstar
03:04:22.88 21    ever saying that they had had a conversation with
03:04:24.92 22    Lucent where that was proposed?
03:04:27.96 23    A.  I don't remember.
03:05:10.50 24    Q.  I apologize for the delay.  I'm just
03:05:11.13 25    trying to keep moving as expeditiously as

========================================================

Page 158
03:05:14.40  0
158

| 03:05:14.40 | 1 | 1 | LISA HICKS |

03:05:14.40  2    possible.  We were looking before at Hicks 16.  If
03:05:17.47  3    you could just go back to that briefly?  Do you
03:05:33.19  4    recall what you did or -- to, to prepare this
03:05:39.33  5    memorandum?
03:05:45.87  6    A.  I remember Dave asking me to prepare an
03:05:48.00  7    overview with current status.
03:05:52.51  8    Q.  Do you know why you were asked to do that?
03:05:54.41  9    Did he explain why he wanted you to do that?
03:05:58.65 10    A.  No, I don't recall.
03:06:05.49 11    Q.  Were you ever told that this summary of
03:06:08.69 12    the Winstar and Lucent commitments was inaccurate
03:06:11.23 13    or incorrect?
03:06:13.36 14    A.  No.
03:06:29.34 15    Q.  Now, we discussed a couple of, of times
03:06:31.28 16    today, in passing, that these end of quarter deals
03:06:33.38 17    included portions that were done on a bill and
03:06:37.59 18    hold basis, correct?
03:06:38.82 19    A.  Yes.
03:06:40.79 20    Q.  What is your understanding of the actual
03:06:42.29 21    term "bill and hold?"
03:06:48.03 22    A.  That Winstar would be invoiced for it, but
03:06:51.57 23    it would be residing in Lucent's warehouse, the
03:06:53.94 24    equipment.
03:07:03.91 25    Q.  Now, we looked earlier at Hicks 20.  You

========================================================

Page 159
03:07:06.92  0
159

B917

hicks disks 1 - 3

| | | |
|---|---|---|
| 03:07:06.92 | 1 | 1                    LISA HICKS |
| 03:07:06.92 | 2 | can take that out quickly.  And this appears to be |
| 03:07:10.32 | 3 | a collection of bill and hold letters relating to |
| 03:07:14.52 | 4 | the sales of optical equipment from Lucent.  Would |
| 03:07:17.69 | 5 | you say that that's a fair representation of this |
| 03:07:20.23 | 6 | fax? |
| 03:07:23.97 | 7 | A.  Yes. |
| 03:07:25.77 | 8 | Q.  Do you recall why you were forwarding |
| 03:07:30.51 | 9 | these, I guess, three bill and hold letters to |
| 03:07:35.24 | 10 | Rick Uhl in December of 2000? |
| 03:07:37.01 | 11 | A.  No, I don't. |
| 03:07:41.12 | 12 | Q.  Do you know how long, how far back Winstar |
| 03:07:44.09 | 13 | had been engaging in end of quarter in -- excuse |
| 03:07:46.05 | 14 | me, in bill and hold deals with Lucent? |
| 03:07:49.96 | 15 | A.  I don't know.  I can only speak to the |
| 03:07:51.49 | 16 | period of time that I was there. |
| 03:07:53.56 | 17 | Q.  Okay. |
| 03:07:54.66 | 18 | A.  So at least until the last quarter of '99. |
| 03:07:57.90 | 19 | Q.  Okay.  The -- |
| 03:07:59.13 | 20 | A.  Or starting, starting the last quarter of |
| 03:08:00.67 | 21 | '99. |
| 03:08:01.57 | 22 | Q.  Okay.  So the bill and hold transactions |
| 03:08:04.04 | 23 | began no later than last quarter of '99? |
| 03:08:07.91 | 24 | A.  The only ones that I am aware of. |
| 03:08:10.85 | 25 | Q.  But are you aware of bill and hold |

Page 160
03:08:12.01  0
160

| | | |
|---|---|---|
| 03:08:12.01 | 1 | 1                    LISA HICKS |
| 03:08:12.01 | 2 | transactions that took place from that quarter on? |
| 03:08:13.42 | 3 | A.  I'm not -- oh, from that quarter on? |
| 03:08:15.22 | 4 | Q.  Yes. |
| 03:08:15.75 | 5 | A.  Yes. |
| 03:08:27.33 | 6 | Q.  Do you know if Winstar actually received |
| 03:08:30.77 | 7 | payment for the goods that were purchased under |
| 03:08:32.43 | 8 | these bill and hold agreements? |
| 03:08:38.77 | 9 | A.  Winstar was buying stuff.  Winstar |
| 03:08:40.51 | 10 | wouldn't get payment. |
| 03:08:42.51 | 11 | Q.  I'm sorry, I must have misphrased.  Do you |
| 03:08:44.45 | 12 | know if Lucent was receiving payment for the goods |
| 03:08:47.08 | 13 | that were purchased under these bill and hold |
| 03:08:48.52 | 14 | letters? |
| 03:08:50.39 | 15 | A.  My understanding is that, every time |
| 03:08:52.52 | 16 | Winstar paid Lucent outstanding invoices, that |
| 03:08:59.66 | 17 | these things got paid for.  They were in the piles |
| 03:09:01.60 | 18 | of outstanding invoices. |
| 03:09:04.43 | 19 | Q.  It's your understanding that they were |
| 03:09:05.47 | 20 | paid? |
| 03:09:05.93 | 21 | A.  Yes. |
| 03:09:07.67 | 22 | Q.  In the normal course of Winstar paying its |
| 03:09:10.27 | 23 | Lucent invoices? |
| 03:09:11.14 | 24 | A.  Yes. |
| 03:09:24.12 | 25 | Q.  Do you know if those payments for the bill |

Page 161
03:09:25.55  0
161

| | | |
|---|---|---|
| 03:09:25.55 | 1 | 1                    LISA HICKS |

Page 35

B918

hicks disks 1 - 3

| | | |
|---|---|---|
| 03:09:25.55 | 2 | and hold purchases were made under the Lucent |
| 03:09:29.29 | 3 | credit agreement? |
| 03:09:30.69 | 4 | A.  My understanding is they were. |
| 03:09:32.16 | 5 | Q.  They were financed? |
| 03:09:33.16 | 6 | A.  Yes, that's my understanding. |
| 03:09:39.13 | 7 | Q.  Did the end of quarter deals, that Winstar |
| 03:09:42.27 | 8 | was engaging in, increase the amount of money that |
| 03:09:46.48 | 9 | Winstar had to borrow from Lucent under the credit |
| 03:09:48.41 | 10 | agreement? |
| 03:09:51.95 | 11 | A.  Well, of course, it would. |
| 03:09:54.48 | 12 | Q.  Sometimes I ask a simple question.  Do you |
| 03:10:00.22 | 13 | recall whether or not there was a refinancing |
| 03:10:04.86 | 14 | trigger in the credit agreement between Winstar |
| 03:10:07.33 | 15 | and Lucent? |
| 03:10:09.23 | 16 | A.  I don't, I didn't have -- I didn't study |
| 03:10:11.17 | 17 | the credit agreements. |

=============================================

*************************************************

Page 164

| | | |
|---|---|---|
| 03:14:30.76 | 16 | Q.  -- I'll try to rephrase it in a way that, |
| 03:14:33.83 | 17 | that you'll better understand.  You've testified |
| 03:14:38.20 | 18 | that Winstar bought goods under these bill and |
| 03:14:40.84 | 19 | hold letters as far as back as December of '99, |
| 03:14:43.84 | 20 | correct? |
| 03:14:44.24 | 21 | A.  Yes. |
| 03:14:46.78 | 22 | Q.  In those bill and hold letters, I believe |
| 03:14:49.68 | 23 | you also testified Winstar was purchasing |
| 03:14:52.51 | 24 | equipment that it didn't need immediately, is that |
| 03:14:55.75 | 25 | correct? |

=============================================

Page 165

| | | |
|---|---|---|
| 03:14:56.35 | 0 | |
| | 165 | |
| 03:14:56.35 | 1 | 1                    LISA HICKS |
| 03:14:56.35 | 2 | A.  Yes. |
| 03:14:56.82 | 3 | Q.  It was prepurchasing equipment that it |
| 03:14:58.52 | 4 | might not use, I believe you testified, for up to |
| 03:14:59.99 | 5 | a year later, correct? |
| 03:15:01.76 | 6 | A.  Right, right. |
| 03:15:04.83 | 7 | Q.  If Winstar had not purchased the equipment |
| 03:15:07.00 | 8 | when it did, do you have any knowledge as to |
| 03:15:10.80 | 9 | whether it would not have been able to buy the |
| 03:15:12.17 | 10 | equipment later? |
| 03:15:13.10 | 11 | A.  No. |
| 03:15:15.17 | 12 | Q.  Is it your understanding that Winstar |
| 03:15:16.24 | 13 | could in fact have bought the equipment later if |
| 03:15:17.71 | 14 | it wanted to? |
| 03:15:18.51 | 15 | A.  Yes. |
| 03:15:19.11 | 16 | Q.  It would have been available? |
| 03:15:20.31 | 17 | A.  Yes. |
| 03:15:21.41 | 18 | Q.  That's what I was asking. |
| 03:15:22.14 | 19 | A.  Thank you. |
| 03:15:26.01 | 20 | Q.  And I'm sorry that I asked it so poorly |
| 03:15:27.22 | 21 | before.  Now, you also testified a little bit |
| 03:15:36.33 | 22 | earlier today about the services that Winstar |
| 03:15:42.03 | 23 | Wireless was performing on behalf of Lucent, do |

Page 36

B919

hicks disks 1 – 3
03:17:52.63 25    to, weren't going to finance it.

═══════════════════════════════════════════════════════════════════════

Page 168
03:17:57.83  0
     168
03:17:57.83  1                    1                    LISA HICKS
03:17:57.83  2    Q.  Did they use that as, as leverage in some
03:17:59.74  3    way?
03:18:01.70  4    A.  Well, I believe so, but that's my opinion.
03:18:05.97  5    Q.  Okay.  How about for the third quarter of
03:18:08.98  6    2000?  And I'm going to ask you to look again at
03:18:15.42  7    Exhibits 29 and 30, which were the letters from
03:18:19.96  8    Deborah Harris to Mr. Ackerman and Mr. Uhl about
03:18:33.50  9    the third quarter purchase order for services.  Do
03:18:36.71 10    you recall looking at those?
03:18:37.64 11    A.  Yes.
03:18:46.95 12    Q.  And I also want to refer you to Hicks 23.
03:18:57.59 13    Now, you wrote on Hicks 23, on September 18th,
03:19:02.30 14    about the purchase order that is later referred to
03:19:06.13 15    in Hicks 29 and Hicks 30, "I have heard absolutely
03:19:11.51 16    nothing on this.  My gut is telling me that Lucent
03:19:14.94 17    is sitting on this until we hash out an end of
03:19:17.21 18    quarter deal they are approaching us with
03:19:18.55 19    tomorrow.  But I have no information to confirm
03:19:20.88 20    this."  Do you see that?
03:19:22.08 21    A.  Yes.
03:19:27.56 22    Q.  And in fact, with respect to that purchase
03:19:29.06 23    order, Lucent did reject the purchase order
03:19:31.73 24    initially, is that correct?
03:19:34.90 25    A.  My understanding is they did.

═══════════════════════════════════════════════════════════════════════

Page 169
03:19:38.37  0
     169
03:19:38.37  1                    1                    LISA HICKS
03:19:38.37  2    Q.  And at the time you wrote this e-mail,
03:19:42.27  3    looking at your correspondence from earlier in the
03:19:44.47  4    day, you had advised Vanessa Petrini that Winstar
03:19:50.98  5    didn't want to do a deal, didn't want to do a
03:19:53.42  6    deal, and it wasn't going to be purchasing
03:19:55.88  7    anything that it didn't need immediately, is that
03:19:57.55  8    correct?
03:19:58.05  9    A.  Earlier in the day?
03:19:59.52 10    Q.  Yeah, if we look back to --
03:20:00.79 11    A.  You're referencing --
03:20:01.26 12    Q.  Yeah, I'm referencing an exhibit that we
03:20:02.72 13    looked at earlier today, which is Hicks 4, which
03:20:08.83 14    is also apparently from on or about September
03:20:14.94 15    18th.  Certainly, it's printed on September 18th.
03:20:26.92 16    A.  Okay.
03:20:28.95 17    Q.  You understand what I was asking?
03:20:29.99 18    A.  I do.  It appears, from the dates and
03:20:32.59 19    times, that Exhibit 4 was sent before Exhibit 23
03:20:37.93 20    was.
03:20:38.53 21    Q.  Okay.  And in Exhibit 4, you relayed a
03:20:41.30 22    conversation with Vanessa Petrini that, that
03:20:44.17 23    Winstar didn't want to even receive an end of
03:20:46.07 24    quarter proposal, and that the company wasn't
03:20:50.04 25    going to buy anything else that it didn't need
                                   Page 38

hicks disks 1 - 3

==========================================================

Page 170
03:20:51.67   0
   170
03:20:51.67   1                    1                    LISA HICKS
03:20:51.67   2   immediately?
03:20:52.74   3   A.  Yes.
03:20:55.58   4   Q.  At the same time, you're writing to David
03:20:59.25   5   Ackerman saying, I haven't heard anything with
03:21:01.42   6   respect to the purchases service order, "my gut is
03:21:03.32   7   telling me that they're sitting on it until we
03:21:05.02   8   hash out an end of quarter deal."  Do you see
03:21:06.66   9   that?
03:21:07.19  10   A.  Yes.
03:21:09.32  11   Q.  And I'm asking you if you believe in the
03:21:14.13  12   third quarter, or if you believed in the third
03:21:16.20  13   quarter of 2000 that Lucent was going to use its
03:21:20.07  14   financing of services under the subcontract as
03:21:23.27  15   leverage to exact a deal, or a better deal out of
03:21:26.34  16   Winstar?
03:21:27.14  17   A.  It appears that that is what I believed at
03:21:29.54  18   the time.
03:21:32.68  19   Q.  And your belief was subsequently
03:21:34.38  20   confirmed, is that correct?
03:21:37.92  21   A.  I guess it was since they initially said
03:21:40.12  22   they weren't going to finance it.
03:21:47.70  23   Q.  And in the period from September 18th
03:21:49.93  24   through the time when the deal was finally closed,
03:21:54.74  25   the size of this end of quarter deal grew

==========================================================

Page 171
03:21:57.27   0
   171
03:21:57.27   1                    1                    LISA HICKS
03:21:57.27   2   significantly, didn't it?
03:21:58.14   3   A.  Yes, it did.
03:22:01.31   4   Q.  From an initial revenue request of 63
03:22:03.01   5   million dollars to a software pool of 135 million
03:22:07.15   6   dollars and 77 million dollars for other
03:22:09.65   7   purchases, is that correct?
03:22:11.19   8   A.  I don't --
03:22:11.65   9   Q.  You don't know the exact number?
03:22:12.59  10   A.  -- have all the exact numbers.  I don't
03:22:13.72  11   remember all the exact numbers, but it sounds
03:22:15.96  12   right.
03:22:38.31  13   Q.  Now, we also looked at a document earlier
03:22:40.18  14   today that concerned negotiations for a new
03:22:44.85  15   services arrangement between the parties.  Do you
03:22:46.52  16   recall looking at that document?
03:22:47.92  17   A.  Yes.
03:22:49.46  18   Q.  And it was, and in looking at Hicks 26,
03:22:51.93  19   and Mr. Ackerman told you that, "We should push
03:22:54.23  20   for Lucent to take on everything.  Why would we
03:22:57.90  21   want to retain anything?"  Do you recall that?
03:23:00.40  22   A.  Yes.
03:23:04.71  23   Q.  Did Lucent in fact ever agree to undertake
03:23:06.81  24   the services that were being negotiated in that
03:23:08.64  25   transition agreement?

Page 39

B921

hicks disks 1 - 3

=================================================

*************************************************

Page 182
03:34:34.85 22    A.  I had no reason to believe that the terms
03:34:37.68 23    of this letter were any different than any of the
03:34:40.52 24    other bill and hold letters that Winstar had
03:34:42.52 25    signed.

=================================================

Page 183
03:34:57.50  0
          183
03:34:57.50  1                    1                    LISA HICKS
03:34:57.50  2    Q.  Now, when you signed this letter, did you
03:34:59.37  3    understand that Lucent would be using the letter
03:35:01.17  4    to make representations to its internal and
03:35:03.58  5    external accountants that would then be used to
03:35:05.54  6    support the numbers in Lucent's public financial
03:35:07.68  7    statements?
03:35:09.88  8    A.  It was my understanding that Lucent used
03:35:11.85  9    these letters for revenue recognition.  The
03:35:14.59 10    nitty-gritty of how it got there, I have no idea.
03:35:18.76 11    Q.  But you knew they were going to use this
03:35:19.89 12    then to recognize revenue and include that in
03:35:22.06 13    their financial statements?
03:35:23.13 14    A.  That was my understanding.
03:35:24.20 15    Q.  And you understood that when you signed
03:35:25.23 16    it?
03:35:25.70 17    A.  That was my understanding.
03:35:36.68 18    Q.  Now, you previously testified that, in
03:35:39.75 19    these end of quarter deals, Winstar and Lucent
03:35:41.91 20    would get together and enter into negotiations
03:35:44.42 21    about what would be in the deals?
03:35:47.49 22    A.  Yes, after receiving initial the write-up
03:35:49.59 23    from Lucent.
03:35:51.16 24    Q.  Right.  And Lucent would provide --
03:35:53.16 25    present Winstar with a write-up of what it wanted

=================================================

Page 184
03:35:55.16  0
          184
03:35:55.16  1                    1                    LISA HICKS
03:35:55.16  2    to get out of the deal?
03:35:56.53  3    A.  That's correct.

=================================================

*************************************************

Page 186
03:38:01.89 11    Q.  Now, in these negotiations, was Winstar
03:38:04.92 12    ever able to turn down Lucent's proposal for items
03:38:08.16 13    that they wanted to get out of the transaction?
03:38:11.60 14    A.  Items that Lucent wanted to get out of the
03:38:12.83 15    transaction?
03:38:13.43 16    Q.  Yes.

B922

hicks disks 1 - 3
03:38:17.10 17    A.  Not to my knowledge.

═══════════════════════════════════════════════

*************************************************

Page 187
03:39:33.51 19    Q.  Okay.  Can I show you Exhibit 4, Hicks 4,
03:39:41.29 20    which we've looked at a lot today.  If you look at
03:39:48.06 21    the very last sentence, it says, "I, again, today
03:39:51.83 22    refused to sign any amendments to the supply
03:39:53.83 23    agreement."
03:39:54.57 24    A.  Yes.
03:39:55.23 25    Q.  Does that refresh your recollection?

═══════════════════════════════════════════════

Page 188
03:39:57.14  0
      188
03:39:57.14  1            1                    LISA HICKS
03:39:57.14  2    A.  Of this.
03:39:57.94  3    Q.  Okay.
03:39:58.60  4    A.  This was, Lucent wanted an amendment which
03:40:03.18  5    basically, my understanding was, basically said
03:40:07.78  6    the same thing as the bill and hold letters.
03:40:12.38  7    Q.  And to your recollection, was that
03:40:13.52  8    amendment ever signed?
03:40:14.32  9    A.  I, I don't know.
03:40:17.89 10    Q.  And the last exhibit I'd like you to look
03:40:20.49 11    at is Hicks 3, which is the one immediately before
03:40:24.26 12    this one.
03:40:27.77 13    A.  Oh, this is 31.  Okay.
03:40:28.47 14    Q.  Okay.  If you look at the very top of that
03:40:36.44 15    document, it reads, "Nate's Mission:  To get
03:40:38.81 16    Lucent to agree to all points listed below."
03:40:41.58 17    A.  Uh-huh.
03:40:45.12 18    Q.  Was this, did Nate Kantor tell you to --
03:40:49.55 19    what his mission was?
03:40:51.16 20    A.  No.

═══════════════════════════════════════════════

*************************************************

Page 189
03:40:58.60  3    A.  It was, this was a joke between me and
03:41:01.73  4    Dave Ackerman, along the lines of, "and your
03:41:04.67  5    mission is," that type of thing.
03:41:08.34  6    Q.  So this was, Nate Kantor never told you
03:41:09.78  7    that this was his mission?
03:41:11.68  8    A.  No, no, he didn't.
03:41:23.32  9    Q.  And this isn't what he wanted -- Nate
03:41:25.12 10    Kantor never told you that this is what he wanted
03:41:27.13 11    to do?
03:41:28.79 12    A.  No, my directive came from Dave Ackerman.

═══════════════════════════════════════════════

*************************************************

Page 43

B923

hicks disks 1 - 3 2nd half

03:49:39.32  8   have any doubts about the veracity or the accuracy
03:49:41.62  9   of the information that you've testified to today?
03:49:44.46 10   A.  No.
03:49:46.39 11   Q.  So the, the place where your memory would
03:49:48.46 12   be affected would be questions where you deferred
03:49:50.26 13   knowledge or couldn't remember?
03:49:51.76 14   A.  That's correct.
03:49:52.50 15   Q.  But the questions you answered, you're
03:49:53.57 16   comfortable that you remembered and accurately
03:49:55.87 17   testified?
03:49:56.57 18   A.  Yes.

=========================================================

*********************************************************

**Page 196**
03:50:06.35 23              23   BY MR. ZACH:
03:50:06.35 24   Q.  I'd like to go back to Hicks 20, and,
03:50:16.56 25   again, to the last page.  You testified on

=========================================================

**Page 197**
03:50:25.56  0
            197
03:50:25.56  1              1                  LISA HICKS
03:50:25.56  2   Mr. King's redirect examination that you thought
03:50:28.77  3   that part of this letter was in fact inaccurate.
03:50:33.64  4   What part was that?
03:50:35.67  5   A.  The sentence, "Winstar does not have the
03:50:37.51  6   physical space to store the required equipment."
03:50:40.35  7   Q.  And are there any other inaccuracies in
03:50:42.28  8   this letter?
03:50:52.86  9   A.  The rest of it, the entire letter is
03:50:54.59 10   Lucent language.  It was developed by Lucent, not
03:50:57.66 11   by Winstar.
03:50:59.46 12   Q.  I understand.  But are there any other
03:51:03.30 13   inaccuracies that you can see?
03:51:18.85 14   A.  I can only speak to my opinion.  My
03:51:21.75 15   opinion would be that the second sentence that,
03:51:24.82 16   "Winstar requires Lucent ship the needed products
03:51:27.33 17   to the appropriate Lucent facilities," my opinion
03:51:30.13 18   is that, since I knew that we had physical space,
03:51:35.53 19   that that was inaccurate also.
03:51:37.87 20   Q.  Okay.  And did you know that that was
03:51:39.54 21   inaccurate at the time that you signed this
03:51:40.84 22   letter?
03:51:46.85 23   A.  This, I don't know how to make this clear.
03:51:48.31 24   This was just standard status quo that we had gone
03:51:55.05 25   through every quarter.  And we had hashed this out

=========================================================

**Page 198**
03:52:02.09  0
            198
03:52:02.09  1              1                  LISA HICKS
03:52:02.09  2   with Lucent initially with the -- I believe the
03:52:07.40  3   first end of quarter letter that I saw was the one
03:52:10.10  4   for the last quarter of '99.
03:52:12.80  5   And we had hashed out all these issues
                                    Page

```
                              hicks disks 1 - 3 2nd half
03:52:14.87   6    with Lucent, and my understanding, coming back
03:52:17.68   7    from Lucent, was that it had to be this way, and
03:52:20.65   8    it had to read this way.  And so, therefore, it
03:52:24.48   9    was just status quo, every quarter.
03:52:28.05  10    Q.  I understand, I understand what you're
03:52:29.65  11    saying.  But you signed this letter, and my
03:52:32.46  12    question to you is, if you knew that it was
03:52:34.16  13    inaccurate, why did you go ahead and sign the
03:52:35.66  14    letter?
03:52:36.23  15    A.  Because I --
```

=================================================

*************************************************

```
Page 198
03:52:38.00  17    A.  Because I was required to.
03:52:47.67  18    Q.  Who required you to sign this letter?
03:52:49.94  19    A.  Lucent.  It was a Lucent requirement that
03:52:52.68  20    this letter be signed.
03:52:56.72  21    Q.  I understand that you said that, you
03:52:58.42  22    testified that Lucent drafted this letter,
03:53:01.09  23    correct?
03:53:01.49  24    A.  Yes.
03:53:04.86  25    Q.  So how did Lucent require you to sign it
```

=================================================

```
Page 199
03:53:06.69   0
             199
03:53:06.69   1                  1                    LISA HICKS
03:53:06.69   2    if you knew that it was inaccurate?
03:53:10.56   3    A.  They verbally said it had to be signed.
03:53:16.20   4    Q.  And what would happen if you didn't sign
03:53:17.07   5    it?
03:53:19.30   6    A.  That the deal wouldn't be complete.
03:53:20.91   7    Q.  Okay.  So you signed this deal -- you
03:53:22.41   8    signed this letter because you wanted the deal to
03:53:24.14   9    be complete?
```

=================================================

*************************************************

```
Page 199
03:53:26.11  12    Q.  Correct?
03:53:27.65  13    A.  I signed this letter because Lucent wanted
03:53:31.58  14    the deal to be complete.  This was with regard to
03:53:34.49  15    Lucent's revenue recognition.
03:53:50.20  16    Q.  But you work for Winstar, and you don't
03:53:51.74  17    work for Lucent.
03:53:52.50  18    A.  That's correct.
03:53:52.84  19    Q.  Did anyone at Winstar require you to sign
03:53:54.17  20    this letter?
03:53:57.88  21    A.  It was, if this is something that Lucent
03:54:00.75  22    is requiring to make this happen, then we have to
03:54:03.88  23    do it.
03:54:06.08  24    Q.  And that's why you signed it, even though,
03:54:08.29  25    according to your testimony now, parts of this
```

Page

hicks disks 1 - 3 2nd half
======================================================

Page 200
03:54:09.89  0
        200
03:54:09.89  1              1                   LISA HICKS
03:54:09.89  2       were inaccurate?
03:54:10.66  3       A.  Yes.

======================================================

****************************************************

Page 200
03:54:37.92  6       Q.  To your knowledge.  Do you ordinarily sign
03:54:40.55  7       letters that are inaccurate?
03:54:42.09  8       A.  No.

======================================================

****************************************************

Page 29
00:28:27.24 16              16   BY MR. KING:
00:28:27.24 17       Q.  Hicks 3 is Bates-numbered 2WC 24005, and
00:28:37.11 18       it is a memorandum that is labeled at the top,
00:28:43.18 19       "8/21/00 Nate/Nina meeting -- Nate's Mission:  To
00:28:47.96 20       get Lucent to agree to all points listed below."
00:28:52.19 21       Do you see that?
00:28:53.36 22       A.  Yes, I do.
00:28:54.33 23       Q.  Okay.  Do you recall preparing this
00:28:55.83 24       memorandum?
00:28:56.56 25       A.  Yes, I do.

======================================================

Page 30
00:29:02.67  0
        30
00:29:02.67  1              1                   LISA HICKS
00:29:02.67  2       Q.  Is this a memorandum that you prepared in
00:29:04.74  3       the course of your duties at Winstar?
00:29:07.58  4       A.  Yes, it was.
00:29:09.21  5       Q.  And was it within the scope of your duties
00:29:12.78  6       at Winstar to prepare a memorandum of this nature?
00:29:16.58  7       A.  When I was asked, specifically asked to do
00:29:19.25  8       so, yes.
00:29:20.16  9       Q.  Okay.  In this case, were you specifically
00:29:21.52 10       asked to prepare this memorandum?
00:29:22.86 11       A.  Yes, I was.
00:29:24.39 12       Q.  Who asked you to prepare this memorandum?
00:29:25.89 13       A.  David Ackerman.
00:29:28.96 14       Q.  Do you recall when he asked you to prepare
00:29:30.50 15       this memorandum?
00:29:31.43 16       A.  No, I do not.
00:29:33.87 17       Q.  Was it before August 21st of 2000?
00:29:37.61 18       A.  Oh, yes, it was intended to be prior to
00:29:39.54 19       the meeting.
00:29:42.58 20       Q.  Do you recall discussing this memorandum
00:29:44.38 21       with anyone?
00:29:46.61 22       A.  No, I don't.
00:29:48.75 23       Q.  Did you forward this memorandum to anyone?
                                   Page

**Holwell**

• Defendant's Deposition Designations

```
13    A.    Yes.
14    Q.    That's when that occurred?
15    A.    Yeah, that's my recollection.  Yes.
```

[17:22] - [22:2]    3/18/2004    Holwell, Kevin

page 17
```
22    Q.    (BY MS. GROSSBARD)  Let's start with the
23    initial $65 million.  What was the structure of
24    that going to be?
25    A.    The initial discussions were all in a --
```
page 18
```
1     more of a standard vendor financing arrangement
2     where goods, services would be delivered, and the
3     borrower would draw down on the loan in order to
4     pay the operating company for delivery of the
5     goods and services and thereby expand their loan
6     position as they grew their business and as they
7     took delivery of equipment.  That was the initial
8     structural discussion.
9     Q.    And then did that structure change as
10    the Siemens' products came on and the amount of
11    financing increased?
12    A.    No.  When we were in the discussion of
13    the amount of equipment and so forth and the types
14    of equipment, that structure didn't change.  It
15    didn't change for that reason, no.
16    Q.    At some point in time, did that
17    structure change?
18    A.    Yes, it did.
19    Q.    And when was that?
20    A.    Approximately in the August 2000 time
21    frame, the -- we changed; the type of loan
22    discussion changed.
23    Q.    And can you just bring me through what
24    that change was?
25    A.    Uh-huh.
```
page 19
```
1           The change was from being a vendor
2     financing agreement, where, as I described
3     earlier, they would take delivery of goods and
4     services and draw down on the loan to facilitate
5     payment.
6           It changed to a working capital loan
7     where Siemens would provide a loan to WinStar of
8     a certain amount, and WinStar could use that for
9     whatever its corporate purposes were.
10          It was not directly tied to the delivery
11    of individual sets of goods and services, but
12    there were provisions that we had, inside
13    agreements, which did require them to buy certain
14    amounts of goods and services that were related
15    to -- as terms that were -- conditions that were
16    required for us to extend the financing.
17    Q.    Okay.  Who proposed this change in
18    structure?
19    A.    The way the change in structure came
20    about was, in the course of our discussions with
21    our corporate headquarters to get approvals to
22    extend financing on a vendor basis, our internal
23    intentions and direction was that we should take
24    all steps to be able to sell in the marketplace
25    the loans that we would have outstanding from
```
page 20
```
1     WinStar to other investors.
2           In the initial structure, where the loan
3     was just going to be a vendor financing agreement,
4     our security status would have been equivalent to
5     the status that Lucent had in its vendor financing
```

B927

**Kantor**

```
03:55:25.16 11    Q.    Did that work increase, decrease or
03:55:27.49 12    remain the same?
03:55:28.83 13    A.    Actually it increased because the
03:55:30.63 14    level of the network build up got bigger and
03:55:32.76 15    Lucent's ability to take on increased
03:55:35.53 16    responsibility didn't grow as fast as the need.
03:55:38.84 17    So it actually got bigger.  Not necessarily in
03:55:46.48 18    scope, but in terms of size.
03:55:50.51 19    Q.    Your network continued to be
03:55:52.22 20    built-out, though, during the year 1999 and year
03:55:53.98 21    2000?
03:55:55.95 22    A.    That's correct.
```

=================================================

*************************************************

```
Page 23
00:24:05.41 13    Q.    Let me make sure I have this
00:24:07.04 14    straight.  WinStar was providing services for
00:24:11.05 15    itself and it was your idea that Lucent would in
00:24:15.05 16    effect buy those services from WinStar and
00:24:17.05 17    provide them back to WinStar?
00:24:19.05 18    A.    No.  The arrangement was that Lucent
00:24:25.06 19    was responsible for complete turnkey network plan
00:24:29.06 20    and build.  As part of their responsibility, a
00:24:33.07 21    small portion was to be out-sourced to WinStar
00:24:35.07 22    until such time as Lucent would be able to . .
00:24:37.07 23    transition and take over that work.
00:24:47.05 24    Q.    Mr. Kantor, I want to go back to the
00:24:49.05 25    second sentence of the second paragraph of
00:24:51.05 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

=================================================

```
Page 24
00:24:51.05 0                                                    24
00:24:51.05 1         1         NATHAN KANTOR - CONFIDENTIAL
00:24:51.05 2    Exhibit 2.  This is what I am asking you about.
00:24:55.06 3    You say "My idea is to create a
00:24:57.06 4    WinStar subsidiary that does engineering, program
00:25:01.06 5    management, construction, kind of a combo
00:25:05.07 6    Ackerman/Simons organization that will actually
00:25:07.07 7    work with Lucent providing the out-source
00:25:09.07 8    management of the contract or some professional
00:25:11.07 9    services."
00:25:13.04 10   Is it correct that what you had in
00:25:21.05 11   mind was that WinStar was providing those
00:25:27.06 12   services to itself and that Lucent would then
00:25:33.06 13   contract with WinStar for the provision of those
00:25:35.06 14   services so that Lucent could provide them to
00:25:39.07 15   WinStar; is that right?
00:25:41.07 16   A.    I want to be clear about that.
00:25:43.07 17   Lucent had the responsibility to provide a
00:25:47.04 18   complete turnkey network plan and build, both
00:25:51.05 19   domestically and internationally.  That was the
```

```
00:25:53.05 20    contract and that was the concept.
00:25:55.05 21    As part of their responsibility for
00:25:59.05 22    areas that they did not have core competency,
00:26:01.06 23    they would contract to WinStar to provide those
00:26:05.06 24    services until such time as it would be
00:26:07.06 25    transitioned to Lucent.
00:26:13.07 25               MANHATTAN REPORTING CORP., A LegaLink Company
```

==================================================================

Page 25
```
00:26:13.07  0                                                   25
00:26:13.07  1            1       NATHAN KANTOR - CONFIDENTIAL
00:26:13.07  2    Q.    But at the time under your idea,
00:26:15.07  3    Lucent contracted with WinStar for those
00:26:19.07  4    services, who was performing the services, who
00:26:19.07  5    was actually performing the services?
00:26:23.04  6    A.    WinStar and its contractors.
00:26:27.05  7    Q.    Okay.  And after Lucent contracted
00:26:29.05  8    with WinStar for the provision of those services
00:26:33.05  9    who was actually performing those services?
00:26:35.06 10    A.    Well, Lucent took on responsibility
00:26:39.06 11    of providing certain services, then those that
00:26:41.06 12    they could not provide was contracted to WinStar
00:26:43.06 13    and its contractors.
00:26:45.07 14    Q.    So that after that contractual
00:26:51.07 15    arrangement WinStar was still performing for
00:26:53.04 16    itself those very services that Lucent could not
00:26:55.04 17    perform; right?
00:26:57.05 18    A.    WinStar was performing services for
00:27:01.05 19    Lucent under a subcontract arrangement.
00:27:03.05 20    Q.    I will get to subcontract in a
00:27:03.05 21    minute.
00:27:05.05 22    A.    For Lucent to provide the overall
00:27:07.06 23    turnkey responsibility.
00:27:09.06 24    Q.    I just want to know who was actually
00:27:09.06 25    doing the work?
00:27:13.06 25               MANHATTAN REPORTING CORP., A LegaLink Company
```

==================================================================

Page 26
```
00:27:13.06  0                                                   26
00:27:13.06  1            1       NATHAN KANTOR - CONFIDENTIAL
00:27:13.06  2    A.    Some was done by Lucent.  Some was
00:27:15.06  3    done by WinStar and its contractors.
00:27:17.07  4    Q.    With respect to the work done by
00:27:23.07  5    WinStar, that work was done by WinStar before,
00:27:25.07  6    during and after this arrangement with Lucent;
00:27:29.04  7    right? It was done by WinStar throughout that
00:27:31.05  8    entire period of time?
00:27:31.05  9    A.    Some was and some was not.
00:27:33.05 10    Q.    I am just asking about the work that
00:27:39.05 11    was done by WinStar.  The work that was done by
00:27:41.06 12    WinStar continued to be done by WinStar?
00:27:43.06 13    A.    Not necessarily.  Some was
00:27:45.06 14    transitioned to Lucent.
```

```
00:27:47.06 15   Q.   But some was performed by WinStar?
00:27:51.07 16   A.   Some were performed by WinStar.
00:27:53.07 17   Q.   That was true with respect to that
00:27:55.07 18   work that was performed by WinStar, that was true
00:27:59.07 19   before and after the Supply Agreement with
00:28:01.04 20   Lucent; right?
00:28:03.04 21   A.   That's correct.
```

===============================================

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

```
Page 42
00:48:49.79  2   Q.   Now why would Lucent have to
00:48:51.06  3   subcontract work to WinStar if WinStar was
00:48:53.06  4   already performing the work for itself? Why would
00:48:55.06  5   Lucent have to subcontract to WinStar?
00:48:57.07  6   A.   Because Lucent was responsible for
00:48:59.07  7   the overall turnkey arrangements and program
00:49:03.07  8   management in getting everything organized.  So
00:49:05.07  9   the small amounts of work that WinStar was doing
00:49:07.04 10   just fit into the total scope of what Lucent was
00:49:07.04 11   responsible for.
00:49:11.05 12   Q.   But if the work that WinStar was
00:49:15.05 13   performing for itself was not part of Lucent's
00:49:17.05 14   core competency, why would Lucent have to
00:49:19.05 15   subcontract with WinStar to perform that work?
00:49:23.06 16   Why wouldn't they just say that's, you are doing
00:49:25.06 17   it for yourself, you keep doing it for yourself?
00:49:29.06 18   A.   Because Lucent was responsible for
00:49:31.07 19   planning and building the entire network and
00:49:33.07 20   program managing it.  So that is a piece of the
00:49:37.07 21   work that needed to be coordinated and
00:49:41.04 22   performed.  As well as integrated within the
00:49:45.05 23   network from an engineering perspective and it
00:49:47.05 24   was part of the overall arrangements that they
00:49:49.05 25   would be responsible for that.
```

===============================================

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

```
Page 351
01:17:55.40 25   Q.   Let's look at Exhibit 11.  Exhibit 11
01:17:57.41 25                 MANHATTAN REPORTING CORP., A LegaLink Company
```

===============================================

```
Page 352
01:17:57.41  0
352
01:17:57.41  1         1          NATHAN KANTOR - CONFIDENTIAL
01:17:57.41  2   is the so-called subcontract; right?
01:18:01.41  3   A.   I guess so.
01:18:01.41  4   Q.   Is that one of the agreements that
01:18:05.41  5   WinStar is claiming that Lucent breached by
```

• Defendant's Deposition Designations

```
14          A.     I don't see a date either.  I assume
15    it is the October '98 time frame.  And it is an
16    E-mail from me to Nina.
17          Q.     Right.  She had sent you a draft of
18    Lucent/WinStar partnership concept; right? And
19    you're responding to that?
20          A.     Yes.
21          Q.     Is that what this is?
22          A.     Yes.
23          Q.     In the third paragraph there is a
24    reference to financing.
25          A.     Correct.
page 44
1              NATHAN KANTOR - CONFIDENTIAL
2          Q.     The $1.5 billion financing --
3          A.     Correct.
4          Q.     -- that we talked about a moment ago.
5    And in the fourth paragraph you say "I am
6    concerned about Lucent's ability to actually do
7    the entire scope of work as described.  For you"
8    -- that means Lucent -- "to duplicate everything
9    WinStar has built in terms of internal
10   infrastructure is too time-consuming and probably
11   counterproductive.  What we need to figure out is
12   how we can use the combined skills towards this
13   single objective such that we don't recreate the
14   wheel or duplicate efforts."
15             Do you see that, sir? Now what's that
16   about?
17         A.     Same thing we described.  Lucent had
18   overall responsibility for providing an
19   end-to-end global network.  And as part of that,
20   there were core competencies that WinStar had
21   that Lucent did not have and we had to figure out
22   how to make that work.
23         Q.     What you're proposing is that you not
24   try to duplicate the work that WinStar was
25   already doing for itself?
page 45
1              NATHAN KANTOR - CONFIDENTIAL
2          A.     Some of it, that's correct.
3          Q.     That was your understanding of the
4    way the arrangement was supposed to work?
5          A.     That's correct.  There was supposed
6    to be small amounts of core competency that
7    WinStar was able to provide.  And that was
8    arranged for through the overall scope of the
9    arrangements that Lucent still had responsibility
10   for planning and building the network.
11         Q.     Well, when you say in this sentence
12   use the phrase "internal infrastructure" you say
13   "For to you duplicate everything WinStar has
14   built in terms of internal infrastructure is too
15   time-consuming and counterproductive."
16             What do you mean by "internal
17   infrastructure"?
18         A.     That would include both people and
19   systems, process for certain areas of work that
20   were unique with respect to WinStar's core
21   competency.
```

[46:21] - [48:10]      8/6/2001    Kantor, Nathan

```
page 46
21         Q.     Now, when you -- I will come back and
22   ask you about that more in a minute.  But when
23   you say transitioned, what was the contemplation?
24   What do you mean by transitioning work?
```

• **Defendant's Deposition Designations**

```
                    25        A.     That Lucent would take over the
page 47
1                        NATHAN KANTOR - CONFIDENTIAL
2          work.  That they would do --
3                    Q.     On day one?
4                    A.     Not necessarily day one, but
5          throughout the agreement and there was a
6          Transition Plan that they had to take over the
7          work with respect to certain functions and there
8          was a time frame that they were to accomplish it.
9                    Q.     You say there was a Transition Plan,
10         what's that?
11                   A.     In the contract there was a
12         Transition Plan that was, that broadly outlined
13         the transition responsibilities, the scope of
14         work and the time frame that Lucent was required
15         to take over the work.
16                   Q.     I take it that Lucent and WinStar
17         were obligated to come up with a joint Transition
18         Plan?
19                   A.     There was a Transition Plan already
20         in the Supply Agreement.  In addition to that,
21         after the Supply Agreement was to be executed,
22         there was supposed to be further definitization
23         of that Transition Plan which took place and was
24         executed.
25                   Q.     It did?
page 48
1                        NATHAN KANTOR - CONFIDENTIAL
2                    A.     As far as I know, yes.
3                    Q.     And did Lucent in fact take over the
4          work that it was required to take over in the
5          Transition Plan?
6                    A.     No.
7                    Q.     Did it take over any of it?
8                    A.     Yes.
9                    Q.     Approximately how much?
10                   A.     I can't tell you.  I don't know.
```

[49:19] - [53:5]          8/6/2001    Kantor, Nathan

```
page 49
19                       MR. SAUNDERS:  Let me ask the
20         reporter to mark this as Kantor Exhibit 5.
21                             (Kantor Exhibit 5 for
22         identification, document bearing Bates production
23         number 3WC 0007346 through 47.)
24                   Q.     Do you have Kantor Exhibit 5?
25                   A.     Yes.
page 50
1                        NATHAN KANTOR - CONFIDENTIAL
2                    Q.     Let's start at the bottom because I
3          think these are E-mails that are read
4          chronologically beginning with the bottom one; is
5          that right?
6                    A.     I am sorry, say that again.
7                    Q.     These are E-mails but they are in
8          reverse chronological order.  So if you start
9          with the last one that would be the first one in
10         time; right?
11                   A.     Right.
12                   Q.     So the last one is an E-mail to you,
13         I take it, Bill Rouhana and Charlie Dickson from
14         Gary Holmes dated October 17, '98.  Do you see
15         that?
16                   A.     Yes.
17                   Q.     And he says "I revised the materials
18         to incorporate Nate's comments.  I think we might
```

============================================================

```
Page 135
03:04:03.96  0                                                        135
03:04:03.96  1              1          NATHAN KANTOR - CONFIDENTIAL
03:04:03.96  2     Q.    Kantor Exhibit 4.  Yes.
03:04:05.97  3     A.    Oh, okay.
03:04:07.97  4     Q.    Same document.
03:04:09.97  5     A.    It was probably another E-mail in
03:04:09.97  6     between.
03:04:21.95  7     Q.    Before this one.  Okay.  Because this
03:04:23.95  8     was undated.  Hold Kantor Exhibit 4 in in front
03:04:25.95  9     of you.
03:04:25.95 10     A.    Okay.
03:04:57.95 11     Q.    Let me give to you -- Ms. Reporter,
03:04:59.95 12     will you mark as Kantor Exhibit 16 for
03:05:05.95 13     identification a two page document Bates stamped
03:05:25.95 14     numbered 2WC 0065542.
03:05:41.96 15             15              (Kantor Exhibit 16 for
03:05:41.96 16             16    identification, document bearing Bates
            production
03:05:41.96 17             17    number 2WC 0065542 through 43.)
03:05:41.96 18     A.    Okay.
03:05:43.96 19     Q.    You now have in front of you Kantor
03:05:45.97 20     Exhibit 16 for identification.
03:05:45.97 21     A.    That's correct.
03:05:47.97 22     Q.    Can you identify that document?
03:05:53.94 23     A.    This is an E-mail, actually an E-mail
03:05:57.95 24     from me to Bill Rouhana.  I don't know the date
03:06:01.95 25     of that.  Subject is strategic partnership, but
03:06:05.95 25             MANHATTAN REPORTING CORP., A LegaLink Company
```

============================================================

```
Page 136
03:06:05.95  0                                                        136
03:06:05.95  1              1          NATHAN KANTOR - CONFIDENTIAL
03:06:05.95  2     it forwards a message, an E-mail that I sent to
03:06:11.96  3     Nina Aversano on September 30th also on the
03:06:13.96  4     subject of strategic partnership.
03:06:19.97  5     Q.    Is this E-mail in response to --
03:06:19.97  6     A.    Number 15?
03:06:21.97  7     Q.    -- Kantor 15?
03:06:27.94  8     A.    Yes, it is.  That is noted below that
03:06:29.94  9     is her memo that I was responding to.
03:06:31.95 10     Q.    What was the purpose of your E-mail
03:06:31.95 11     to Ms. Aversano?
03:06:35.95 12     A.    Just to communicate that I was
03:06:41.96 13     anxious to get started in terms of consummating
03:06:45.96 14     the overall strategic partnership.  I wanted to
03:06:47.96 15     be clear about a couple of things so there was no
03:06:51.97 16     misconception.  A couple of them were operational
03:06:55.97 17     things in terms of she asked me to try and
03:06:57.94 18     postpone the decision on optronics, which I tried
03:06:59.94 19     to do if I could.
03:07:03.94 20     The subject of the outage that we
```

```
03:07:07.95 21   incurred in New York City as it relates to
03:07:11.95 22   Lucent's performance would have to be a separate
03:07:15.96 23   part, not part of the strategic discussions.
03:07:21.96 24   Here I also wanted to make sure she
03:07:23.96 25   understood the financing part of the agreement
03:07:29.97 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

===================================================================

```
Page 137
03:07:29.97  0                                                    137
03:07:29.97  1            1         NATHAN KANTOR - CONFIDENTIAL
03:07:29.97  2   that had to be all done as part of the deadline
03:07:33.94  3   that we tried to establish of October 15th, not
03:07:35.94  4   that we would get started in terms of the
03:07:37.95  5   financing, but it would all be concluded as part
03:07:43.95  6   of the deal.  And that we wouldn't, that we
03:07:45.95  7   wouldn't be able to consummate a deal unless that
03:07:47.96  8   was all part of it.
03:07:49.96  9   Then I suggested that it would be
03:07:53.96 10   best for the two of us to outline the deal points
03:07:57.97 11   or term sheet or in terms of what are the macro
03:08:01.97 12   terms of the overall arrangement.  Then let the
03:08:05.94 13   negotiating teams actually definitize with our
03:08:09.94 14   supervision the details of the agreement.
03:08:13.95 15   Q.    Is that what occurred?
03:08:13.95 16   A.    That is exactly what occurred.
03:08:21.96 17   Q.    Now, did you respond to -- sorry, did
03:08:23.96 18   you receive a response from Ms. Aversano to your
03:08:27.96 19   E-mail captured in Kantor Exhibit 16?
03:08:33.97 20   A.    I think I got a new E-mail, yes, with
03:08:37.94 21   revised proposal that have been more consistent
03:08:37.94 22   with our conversation.
03:08:43.94 23   Q.    Let me have the reporter mark as
03:08:51.95 24   Kantor Exhibit 17 for identification a two-page
03:09:01.96 25   document Bates stamp number 4WC 0001967 and
03:09:03.96 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

===================================================================

```
Page 138
03:09:03.96  0                                                    138
03:09:03.96  1            1         NATHAN KANTOR - CONFIDENTIAL
03:09:03.96  2   1968.
03:09:21.95  3            3                  (Kantor Exhibit 17 for
03:09:21.95  4            4    identification, document bearing Bates
production
03:09:21.95  5            5    number 4WC 0001967 and 1968.)
03:09:21.95  6   Q.    Can you identify that document?
03:09:25.95  7   A.    It is a document it says
03:09:29.96  8   "WinStar/Lucent Partnership Concept" dated
03:09:31.96  9   October 2, 1998.
03:09:37.97 10   Q.    Was that the document that
03:09:41.97 11   Ms. Aversano sent to you in response to your
03:09:47.94 12   E-mail which is now part of Kantor Exhibit 16?
03:09:55.95 13   A.    Would you repeat that question
03:09:57.95 14   again.
```

Page 159

| | | |
|---|---|---|
| 03:40:13.70 | 16 | Q.    Now you talked earlier about the fact |
| 03:40:20.37 | 17 | the agreement had an initial Transition Plan and |
| 03:40:26.75 | 18 | thereafter another Transition Plan that was dated |
| 03:40:33.12 | 19 | in draft form earlier in December then another |
| 03:40:36.92 | 20 | one December 31; do you remember that? December |
| 03:40:39.36 | 21 | 31, 1998? |
| 03:40:41.53 | 22 | A.    That was the attachment shown |
| 03:40:42.76 | 23 | earlier? |
| 03:40:43.83 | 24 | Q.    Yes.  On examination by |
| 03:40:47.47 | 25 | Mr. Saunders. |
| 03:40:48.67 | 25 | MANHATTAN REPORTING CORP., A LegaLink Company |

Page 160

| | | | |
|---|---|---|---|
| 03:40:48.67 | 0 | | 160 |
| 03:40:48.67 | 1 | 1            NATHAN KANTOR - CONFIDENTIAL | |
| 03:40:48.67 | 2 | A.    I don't know if I recall that | |
| 03:40:51.00 | 3 | specific document, but I knew I saw a document | |
| 03:40:52.64 | 4 | that was like that. | |
| 03:40:55.91 | 5 | Q.    Okay.  You talked also earlier that | |
| 03:40:57.51 | 6 | you anticipated that WinStar would retain certain | |
| 03:41:00.48 | 7 | work under the Supply Agreement during a | |
| 03:41:04.45 | 8 | transition period.  You described it earlier, I | |
| 03:41:11.46 | 9 | believe as a very small portion; do you remember | |
| 03:41:18.67 | 10 | that testimony? | |
| 03:41:19.83 | 11 | A.    Yes, I do. | |
| 03:41:43.89 | 12 | Q.    Would you please take out Kantor | |
| 03:41:45.56 | 13 | Exhibit 11 which is headed "Agreement for Network | |
| 03:41:49.06 | 14 | Build-out Services."  You will note this is an | |
| 03:42:10.45 | 15 | agreement between Lucent and WinStar Wireless. | |
| 03:42:14.42 | 16 | What is WinStar Wireless? | |
| 03:42:16.76 | 17 | A.    It is the operating unit of WinStar | |
| 03:42:20.79 | 18 | that was responsible for the build-out of the | |
| 03:42:24.83 | 19 | network. | |
| 03:42:26.47 | 20 | Q.    Did WinStar Wireless perform the | |
| 03:42:28.74 | 21 | services that you had earlier testified was | |
| 03:42:31.87 | 22 | retained, so to speak, by WinStar for that | |
| 03:42:34.11 | 23 | interim period? | |
| 03:42:36.21 | 24 | A.    As far as I know, yes. | |

Page 170

| | | |
|---|---|---|
| 03:54:56.76 | 4 | Q.    You mentioned earlier that WinStar |
| 03:55:01.00 | 5 | Wireless was performing services under the, what |
| 03:55:08.27 | 6 | we called subcontract which is Kantor |
| 03:55:11.14 | 7 | Exhibit 11.  Can you tell me whether WinStar |
| 03:55:15.88 | 8 | Wireless continued to perform services under that |
| 03:55:19.22 | 9 | agreement going into the year 2000? |
| 03:55:22.49 | 10 | A.    Yes we did. |

| 04:08:16.93 | 13 | time. |
| 04:08:26.57 | 14 | Q.    Let me show you what was marked |
| 04:08:45.96 | 15 | earlier by Mr. Saunders as Kantor Exhibit 12 for |
| 04:09:03.84 | 16 | identification. Can you take that out of that |
| 04:09:05.94 | 17 | pile of exhibits, please. |
| 04:09:19.89 | 18 | A.    Okay. |
| 04:09:31.37 | 19 | Q.    On examination by Mr. Saunders you |
| 04:09:33.44 | 20 | recalled that you had received this letter or a |
| 04:09:38.24 | 21 | draft of this letter addressed to you; is that |
| 04:09:40.14 | 22 | correct? |
| 04:09:41.18 | 23 | A.    That's correct. |
| 04:09:43.18 | 24 | Q.    And you said you had a discussion |
| 04:09:45.35 | 25 | with Ms. Aversano concerning this letter; is that |
| 04:09:48.25 | 25 | MANHATTAN REPORTING CORP., A LegaLink Company |

Page 180

| 04:09:48.25 | 0 | | 180 |
| 04:09:48.25 | 1 | 1          NATHAN KANTOR - CONFIDENTIAL |
| 04:09:48.25 | 2 | correct? |
| 04:09:49.19 | 3 | A.    I certainly did. |
| 04:09:50.65 | 4 | Q.    Now what I would like you to do is |
| 04:09:52.96 | 5 | tell me exactly what your discussion was with |
| 04:09:55.13 | 6 | Ms. Aversano, what you said to her and what she |
| 04:09:56.46 | 7 | said to you with respect to the second and third |
| 04:10:04.74 | 8 | pages of Kantor Exhibit 12, which is a letter |
| 04:10:08.64 | 9 | from Nina Aversano to Rick Uhl dated September |
| 04:10:11.78 | 10 | 27th, 2000. |
| 04:10:14.64 | 11 | A.    Basically I was pleased with the |
| 04:10:16.78 | 12 | letter in terms of reaffirming the commitments |
| 04:10:19.45 | 13 | and responsibilities that Lucent had under the |
| 04:10:23.55 | 14 | Supply Agreement. And that she was finally in a |
| 04:10:28.09 | 15 | position to be able to move forward and finally |
| 04:10:30.09 | 16 | get it accomplished pursuant to that agreement. |
| 04:10:34.80 | 17 | I didn't understand some of this |
| 04:10:38.00 | 18 | language later on in the agreement. Told her |
| 04:10:41.14 | 19 | there was no reason why I would ever accept that |
| 04:10:44.54 | 20 | in terms of the language, it was just really |
| 04:10:47.11 | 21 | unnecessary. We ought to just go ahead and get |
| 04:10:49.55 | 22 | it done. |
| 04:10:51.52 | 23 | And I was very pleased she was |
| 04:10:52.92 | 24 | finally agreeing to a lock up agreement starting |
| 04:10:55.32 | 25 | Monday morning on October 2nd so that the whole |
| 04:10:59.66 | 25 | MANHATTAN REPORTING CORP., A LegaLink Company |

Page 181

| 04:10:59.66 | 0 | | 181 |
| 04:10:59.66 | 1 | 1          NATHAN KANTOR - CONFIDENTIAL |
| 04:10:59.66 | 2 | subject of Lucent taking on turnkey |
| 04:11:02.69 | 3 | responsibilities with some small portion of it |
| 04:11:05.26 | 4 | being in WinStar would finally get resolved once |
| 04:11:07.66 | 5 | and for all. |
| 04:11:10.37 | 6 | She indicated to me the only reason |
| 04:11:12.34 | 7 | why she had to send this letter was to get the |

```
04:11:14.27  8    financial people to agree on making the payment
04:11:17.51  9    for that quarter.
04:11:21.55 10    It would also position Lucent for
04:11:23.95 11    taking on that responsibility so that Lucent
04:11:26.15 12    would now be able to start booking revenue, which
04:11:28.49 13    they had never done before in terms of these
04:11:32.32 14    services.
04:11:36.16 15    So I indicated to her I would be
04:11:37.96 16    traveling, I was out of town.  She should discuss
04:11:39.96 17    it with Rick Uhl in concept with also the end of
04:11:42.40 18    quarter arrangement and discuss it with him.  But
04:11:44.87 19    I wanted to get this finalized.
04:11:48.51 20    I was actually happy we would finally
04:11:50.44 21    get this resolved once and for all.  I had her
04:11:52.88 22    assurance that this would get behind us.  I would
04:11:56.88 23    be happy about the result and we would be able to
04:12:00.85 24    have this as a non-issue going forward.
04:12:33.68 25    Q.    What was your expectation as to what
04:12:39.09 25                      MANHATTAN REPORTING CORP., A LegaLink Company
```

---

```
Page 182.
04:12:39.09  0                                                        182
04:12:39.09  1              1         NATHAN KANTOR - CONFIDENTIAL
04:12:39.09  2    was going to occur after you had this discussion
04:12:44.16  3    with Nina Aversano?
04:12:45.80  4    A.    My expectation the teams would meet
04:12:47.80  5    on October 2nd, finalize a broad Services
04:12:51.67  6    Agreement.  Lucent would take on complete turnkey
04:12:54.37  7    responsibility.  WinStar would have certain
04:12:58.14  8    services responsibility to Lucent under the
04:13:04.61  9    overall Supply Agreement.
04:13:07.98 10    And Lucent would be able to then book
04:13:10.49 11    it as revenue, which seemed to be important to
04:13:12.86 12    them.  And everybody would be happy, including
04:13:15.43 13    her financial people.  And we would be able to go
04:13:19.00 14    forward.
04:13:21.37 15    Q.    Did that in fact occur, did you have
04:13:23.10 16    a lock up session October 2, 2001?
04:13:25.50 17    A.    No, we did not.
04:13:27.90 18    Q.    What did occur?
04:13:29.71 19    A.    What happened then was Nina was let
04:13:34.04 20    go or left the company.  Then Rick McGuinn also
04:13:37.91 21    left who was the Chairman of the company.
04:13:43.45 22    Basically nothing happened.  I mean we didn't
04:13:46.66 23    have a lock up agreement.  And I don't remember
04:13:48.69 24    the exact date, but I think it was toward maybe
04:13:52.86 25    the end of October, early November.  So we had a
04:13:55.90 25                      MANHATTAN REPORTING CORP., A LegaLink Company
```

---

```
Page 183
04:13:55.90  0                                                        183
04:13:55.90  1              1         NATHAN KANTOR - CONFIDENTIAL
04:13:55.90  2    period of concern at that particular point in
```

B937

```
04:13:59.64   3   time in terms of a major change in the management
04:14:02.27   4   at Lucent.
04:14:04.24   5   Q.    During this period of time in October
04:14:06.81   6   did you continue business as usual, in other
04:14:08.48   7   words, did WinStar continue to perform services?
04:14:10.71   8   A.    Absolutely.  Yes.   We couldn't stop
04:14:13.78   9   the network build.  Lucent didn't say that we
04:14:17.35  10   should.  As a matter of fact, if anything, they
04:14:19.16  11   were providing assurances they would continue to
04:14:21.22  12   support and we had new account people joining the
04:14:28.03  13   WinStar team on an executive level that continued
04:14:32.44  14   to work with us consistent with this.
04:14:54.93  15   MR. POLAK:    I am going to ask the
04:14:56.99  16   reporter to mark two documents as Kantor
04:15:04.57  17   Exhibit 27 and 28.   The first appears to be a
04:15:15.41  18   draft of a hub and B site addendum and it is
04:15:22.45  19   marked WC 0002323 through WC 0003556.  And I
04:15:34.23  20   would like the reporter to mark this document as
04:15:39.20  21   Kantor Exhibit 27 for identification.
04:16:01.19  22   Now I am going to ask the reporter to
04:16:04.19  23   mark as Kantor Exhibit 28 for identification a
04:16:09.70  24   multipage document entitled "Optical Network
04:16:13.37  25   Addendum."  It is Bates stamped number WC 0003549
04:16:21.58  25        MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 184
```
04:16:21.58   0                                                    184
04:16:21.58   1           1         NATHAN KANTOR - CONFIDENTIAL
04:16:21.58   2   through 3556.
04:16:44.23   3           3                   (Kantor Exhibit 27 for
04:16:44.23   4           4   identification, document bearing Bates
production
04:16:44.23   5           5   number WC 0002323 through 3548.)
04:16:44.23   6           6                   (Kantor Exhibit 28 for
04:16:44.23   7           7   identification, document bearing Bates
production
04:16:44.23   8           8   number 0003549 through 3556).
04:16:44.23   9   Q.    If you would, Mr. Kantor, before we
04:16:48.61  10   get to those documents, go back to Kantor
04:16:52.31  11   Exhibit 12 and to the first page of Nina
04:16:59.92  12   Aversano's letter dated September 27, 2000 the
04:17:05.46  13   end of second paragraph.  It states "The last
04:17:13.33  14   such attempt was undertaken this past June when
04:17:16.17  15   the parties entered into two addenda, the Hub And
04:17:19.57  16   B Site Addendum and the Optical Network
04:17:21.84  17   Addendum.   These addenda did not include the full
04:17:25.71  18   range of service contemplated in the supply
04:17:27.54  19   contract."  Do you see that?
04:17:28.45  20   A.    Yes.
```

*****************************************************

```
04:28:40.18 10    requirement in accordance with the resource plan
04:28:42.29 11    which would be a mix of WinStar employees
04:28:45.46 12    utilized on a contract basis, Lucent employees
04:28:47.92 13    and contract employees of Lucent's choosing.
04:28:55.67 14    WinStar will maintain overall
04:28:57.23 15    contract management of Lucent deliverables.  So
04:29:00.20 16    we would maintain oversight management.
04:29:02.97 17    And the scope of the agreement would
04:29:04.71 18    be global in nature to include all of our
04:29:06.24 19    international operations.
04:29:11.82 20    Next page titled "Transaction Plan"
04:29:14.25 21    kind of tried to scope out time frames and the
04:29:19.92 22    way the deal would be priced and accountability.
04:29:22.99 23    So it would start off early on as a
04:29:25.43 24    cost plus arrangement and wind up with Lucent
04:29:30.57 25    taking over complete 100 percent accountability
04:29:33.27 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

```
Page 193
04:29:33.27 0                                                              193
04:29:33.27 1            1            NATHAN KANTOR - CONFIDENTIAL
04:29:33.27 2    on a fixed price deliverable basis.
04:29:39.94 3    Next page starts with transition,
04:29:43.41 4    model and phases.  Model shows phases for one
04:29:49.25 5    WinStar department, assuming one WinStar business
04:29:55.13 6    line.  I guess this was the optical network long
04:29:58.46 7    haul group.  And it assumes the model proposes
04:30:00.56 8    and assumes one corporate project management
04:30:03.73 9    office providing scope, schedule and priorities
04:30:07.30 10   on a business line and per department basis.
04:30:11.27 11   And every department and position had
04:30:13.71 12   been categorized by operations focus, network
04:30:16.95 13   build or growth, corporate services and different
04:30:20.48 14   transitions would be expected depending upon the
04:30:23.55 15   department category.
04:30:26.19 16   Next charts address a network build
04:30:27.92 17   department.  So basically it was a transition
04:30:31.19 18   model of how Lucent would wind up taking over the
04:30:34.10 19   work and the responsibilities.
04:30:38.44 20   The next chart is a chart that talks
04:30:40.70 21   about the basic transition model that kind of
04:30:44.01 22   goes into more detail of the actual transition
04:30:46.78 23   phases.
04:30:52.65 24   Then the next chart is phase 1, cost
04:30:56.09 25   plus fixed fee basis.  Next one Lucent was the
04:30:59.62 25             MANHATTAN REPORTING CORP., A LegaLink Company
```

```
Page 194
04:30:59.62 0                                                              194
04:30:59.62 1            1            NATHAN KANTOR - CONFIDENTIAL
04:30:59.62 2    functional manager on a cost plus fee basis.
04:31:02.19 3    That was phase 2.  Phase 3 priced deliverables on
04:31:07.53 4    a fixed price basis.
```

```
04:31:14.94  5    Then it described all the Services
04:31:17.91  6    Agreement break out functions and transition
04:31:20.68  7    timing, again, from cost plus, not only from a
04:31:22.85  8    price but also when it would occur and who would
04:31:26.45  9    be responsible for making all that happen.
04:31:32.69 10    Q.    Were you in agreement with this
04:31:34.39 11    approach that is included in Kantor Exhibit 30?
04:31:40.53 12    A.    Generally, yes.  I was in agreement.
04:31:46.50 13    Q.    Do you know whether the parties
04:31:49.54 14    entered into negotiating a Transition Plan which
04:31:52.18 15    would include the elements that you have just
04:31:54.71 16    described when you reviewed Kantor Exhibit 30?
04:31:58.35 17    A.    As far as I know the answer is yes.
04:32:00.42 18    They entered into negotiation and reached
04:32:02.75 19    agreement.  Both parties reached agreement.
04:32:06.79 20    Q.    Did WinStar approve the plan?
04:32:08.59 21    A.    WinStar approved the plan and Lucent
04:32:10.26 22    did not.
04:32:13.26 23    Q.    When did you learn that Lucent did
04:32:14.73 24    not?
04:32:16.70 25    A.    Quite a ways down the road after
04:32:19.24 25           MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 195

```
04:32:19.24  0                                                195
04:32:19.24  1         1        NATHAN KANTOR - CONFIDENTIAL
04:32:19.24  2    that.  It kind of went into never-neverland.  We
04:32:21.37  3    didn't know what the status was.  Then the report
04:32:24.11  4    back that we got later on that it was not
04:32:32.22  5    approved by Deb Hopkins of Lucent.
04:32:39.46  6    Q.    Let me take you forward.  During
04:33:08.62  7    October you mentioned earlier that Wireless
04:33:12.09  8    continued to perform services for your network?
04:33:16.26  9    A.    That's correct.
04:33:18.93 10    Q.    That was pursuant to the subcontract?
04:33:21.10 11    A.    That's correct.
04:33:24.23 12    Q.    You do know that WinStar made
04:33:29.34 13    requests for borrowing in connection with the
04:33:31.91 14    services on a quarterly basis?
04:33:34.21 15    A.    That's correct.
04:33:35.81 16    Q.    And do you also know that --
04:33:37.91 17    A.    Well, actually services that are
04:33:39.85 18    specifically related to WinStar but there were
04:33:41.39 19    services included on a monthly basis of third
04:33:44.29 20    party services.
04:33:46.82 21    Q.    That is what I was about to get.  You
04:33:47.86 22    just beat me to that.
04:33:50.06 23    A.    Okay.
04:33:51.36 24    Q.    I was going to ask whether you are
04:33:53.30 25    also aware that WinStar submitted an invoice on a
04:33:56.70 25           MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 196

```
04:33:56.70  0                                                    196
04:33:56.70  1            1              NATHAN KANTOR - CONFIDENTIAL
04:33:56.70  2    monthly basis with respect to payments which
04:33:59.47  3    WinStar or WinStar Wireless made to third parties
04:34:03.71  4    in connection with the network build-out?
04:34:05.24  5    A.    That's correct.  We did.
04:34:07.74  6    Q.    Did you submit to Lucent invoices
04:34:11.28  7    with respect to the payments that WinStar or
04:34:14.42  8    WinStar Wireless made in connection with the
04:34:17.82  9    third party services in October of 2000?
04:34:20.99 10    A.    As far as I know we did, yes.
04:34:23.03 11    Q.    Do you recall whether Lucent paid for
04:34:26.03 12    those services?
04:34:27.50 13    A.    Yes, we were paid.
04:34:29.83 14    Q.    If I ask you for what occurred during
04:34:32.54 15    the month of November with respect to the
04:34:35.47 16    submission of invoices and payment of those,
04:34:39.41 17    would your answer be the same?
04:34:40.94 18    A.    That's correct.
04:34:45.25 19    Q.    Now let me take you to December of
04:34:48.59 20    2000, if I may.  Let me ask the reporter to mark
04:35:00.86 21    as Kantor Exhibit 31 for identification a
04:35:04.27 22    one-page document which is Bates stamped number
04:35:08.21 23    2WC 0016071.
04:35:47.78 24            24                        (Kantor Exhibit 31 for
04:35:47.78 25            25    identification, document bearing Bates
production
04:35:47.78 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

================================================================

```
Page 197
04:35:47.78  0                                                    197
04:35:47.78  1            1              NATHAN KANTOR - CONFIDENTIAL
04:35:47.78  2            2     number 2WC 0016071.)
04:35:47.78  3    Q.    I show you what has been marked as
04:35:50.51  4    Kantor Exhibit 31 for identification.  I ask you
04:35:52.48  5    whether you can identify that document?
04:35:54.02  6    A.    Yes, I can.
04:35:55.35  7    Q.    What is it?
04:35:56.85  8    A.    That is an E-mail from Rick Uhl to
04:36:01.02  9    Frank Jules; myself and Fred Rubin with a copy to
04:36:04.56 10    Bill Rouhana.  Subject Lucent.  It was dated
04:36:08.17 11    December 14th, 2000.
```

================================================================

```
*************************************************

Page 197
04:36:24.15 16    Q.    What was your understanding -- well,
04:36:30.25 17    this E-mail reflects a conversation that Carol
04:36:33.96 18    Spurrier and Debbie Harris had with Rick Uhl?
04:36:36.43 19    A.    That's what this memo says, that
04:36:39.83 20    Carole Spurrier and Deb Harris called at about
```

04:36:43.00 21    4:30 to inform him of several things.
04:36:49.21 22    Q.    What is he telling you was the topic
04:36:52.74 23    of discussions that he had with Ms. Spurrier and
04:36:54.58 24    Ms. Harris?
04:36:56.71 25    A.    One, that Lucent would not pay 35
04:37:00.05 25                    MANHATTAN REPORTING CORP., A LegaLink Company

=================================================================

Page 198
04:37:00.05 0                                                              198
04:37:00.05 1              1        NATHAN KANTOR - CONFIDENTIAL
04:37:00.05 2    million as trade for prorata increase in price of
04:37:05.69 3    B sites.  Two, would not finance services for our
04:37:12.00 4    fourth quarter.  Three, with regard to the new
04:37:17.10 5    Services Agreement, while we may be signing this
04:37:21.14 6    agreement shortly, it will not operate until
04:37:23.51 7    deliverables are agreed upon and accepted on a
04:37:25.14 8    project by project basis.
04:37:27.34 9    Carol and Debbie estimated this
04:37:29.08 10   process, getting to acceptance, would take about
04:37:31.98 11   90 days and they call this process the phase 1
04:37:34.42 12   discovery period.  The implication we are on our
04:37:37.72 13   own until late spring.
04:37:41.69 14   Four, Debbie Harris will send me a
04:37:45.63 15   draft letter tomorrow in which Lucent will be
04:37:48.07 16   electing to exercise its rights when we have
04:37:50.27 17   borrowed more than $500 million.
04:37:53.77 18   Five, they have found no buyer for
04:37:56.44 19   the optronics, their internal remarketing group
04:37:59.24 20   offered to buy it at 30 cents on a dollar.  He
04:38:00.74 21   said no thanks.
04:38:02.88 22   Six, he inquired about timing of
04:38:05.05 23   their payment to us of the $10 million they owe
04:38:08.09 24   us for radios.  They purchased radios as part of
04:38:11.86 25   the services.  And they did not have an answer
04:38:15.69 25                    MANHATTAN REPORTING CORP., A LegaLink Company

=================================================================

Page 199
04:38:15.69 0                                                              199
04:38:15.69 1              1        NATHAN KANTOR - CONFIDENTIAL
04:38:15.69 2    and would let him know tomorrow.  And he would
04:38:17.66 3    like to discuss this with us first thing
04:38:18.96 4    tomorrow.
04:38:20.46 5    Q.    Go back, if you would, to item three
04:38:21.87 6    on that memorandum.
04:38:25.37 7    A.    Okay.
04:38:27.10 8    Q.    Was that an understanding that you
04:38:29.71 9    had prior to receiving this E-mail that there
04:38:32.68 10   would be a period of time, 90 days before they
04:38:40.75 11   would accept portions of the Transition Agreement
04:38:44.32 12   that was expected to be signed?
04:38:47.52 13   A.    No.  That was not my understanding.
04:38:49.46 14   My understanding is that they would continue to
04:38:51.29 15   provide financing until they were able to

```
04:38:53.63 16   completely transition, so that there would be no
04:38:56.30 17   break in the financing of services.  So this
04:39:01.64 18   basically says they are not going to finance us
04:39:04.74 19   for 90 days, which would put us in serious
04:39:08.25 20   jeopardy.
04:39:10.11 21   Q.   Is this a new position as presented
04:39:11.88 22   to you?
04:39:13.42 23   A.   As far as I know that's correct.
04:39:15.49 24   Q.   Item number two.
04:39:19.06 25   A.   Item two says they won't even finance
04:39:21.86 25           MANHATTAN REPORTING CORP., A LegaLink Company
```

============================================================

```
Page 200                                                            200
04:39:21.86  0
04:39:21.86  1        1        NATHAN KANTOR - CONFIDENTIAL
04:39:21.86  2   us for what we already were incurring.
04:39:24.33  3   Q.   Those are the services performed by
04:39:26.03  4   WinStar Wireless October, November and December
04:39:27.76  5   of 2000?
04:39:29.77  6   A.   That's correct.
04:39:32.80  7   Q.   Did you have a discussion with
04:39:34.30  8   Mr. Uhl regarding this telephone discussion?
04:39:37.34  9   A.   I believe so.
04:39:39.44 10   Q.   Do you remember what the discussion
04:39:42.31 11   was with Mr. Uhl?
04:39:45.25 12   A.   If I remember correctly I encouraged
04:39:47.65 13   him to have a conversation with Michael
04:39:51.12 14   Montemarano to see -- who was Lucent's U.S. Chief
04:39:59.20 15   Financial Officer to see if he would be able to
04:40:03.30 16   work through all of this.  And that if he
04:40:06.37 17   couldn't he should contact me.
04:40:13.61 18   Q.   What was the progress in his
04:40:15.48 19   discussions with Mr. Montemarano?
04:40:18.62 20   A.   Not very good.
04:40:20.55 21   Q.   Did he report to you?
04:40:22.09 22   A.   Later on.  I am not exactly sure what
04:40:23.62 23   date, but certainly later on in December, because
04:40:26.82 24   I know he called me when I was on vacation in
04:40:29.66 25   Florida.
04:40:32.46 25           MANHATTAN REPORTING CORP., A LegaLink Company
```

============================================================

```
Page 201                                                            201
04:40:32.46  0
04:40:32.46  1        1        NATHAN KANTOR - CONFIDENTIAL
04:40:32.46  2   Q.   What did he say to you?
04:40:34.03  3   A.   It was toward the end of quarter.  He
04:40:35.50  4   said he was not able to make much progress and I
04:40:37.77  5   would have to get it resolved at a more senior
04:40:40.44  6   level at Lucent.
04:40:42.74  7   Q.   Did you do anything in response to
04:40:43.87  8   that?
04:40:45.04  9   A.   Yes, I did.
04:40:46.71 10   Q.   What did you do?
```

04:40:47.91 11  A.    I spoke to Carol Spurrier who was
04:40:49.98 12  theoretically the senior, the Nina Aversano look
04:40:52.22 13  alike in terms of Lucent.  I had a conversation
04:40:55.95 14  with her.  And she indicated to me or someone
04:40:58.09 15  indicated to me I would also have to have
04:41:00.96 16  conversation with Ben Verwaayen who was Lucent's
04:41:05.20 17  vice chairman to get this resolved.  Which I did.
04:41:10.93 18  Q.    Tell me about the discussion you had
04:41:12.54 19  with Mr. Verwaayen.  Excuse me.  Take the first
04:41:21.95 20  discussion, if there were more.  But do you
04:41:24.68 21  remember when approximately that discussion
04:41:26.05 22  occurred?
04:41:27.55 23  A.    I know it was at the end of the
04:41:29.39 24  month.
04:41:30.85 25  Q.    December?
04:41:33.82 25                  MANHATTAN REPORTING CORP., A LegaLink Company

=================================================================

Page 202
04:41:33.82 0                                                           202
04:41:33.82 1           1          NATHAN KANTOR - CONFIDENTIAL
04:41:33.82 2  A.    End of December.  End of the
04:41:36.03 3  quarter.  So this got to be, obviously, a very
04:41:38.26 4  critical situation.  Or Rick wouldn't have called
04:41:45.44 5  me on it.
04:41:46.27 6  So I spoke to Ben on two occasions.
04:41:48.14 7  First occasion was to at least, I mean we had
04:41:50.64 8  never spoken before.  This is the first time I
04:41:53.31 9  had never spoken to him.  I wasn't even sure he
04:41:57.38 10  was involved in this up until then.
04:41:59.65 11  Q.    You had not discussed this matter
04:42:00.55 12  before.  That is the network build-out with
04:42:01.42 13  Mr. Verwaayen?
04:42:03.72 14  A.    No.  Never discussed anything with
04:42:06.62 15  him.  I never met him or had any discussions with
04:42:09.29 16  him, so I talked to him.  I told him how critical
04:42:12.86 17  this was.
04:42:14.77 18  Q.    You talked to him in person, by
04:42:16.00 19  telephone?
04:42:17.30 20  A.    By telephone.
04:42:18.74 21  Q.    Okay.
04:42:20.00 22  A.    Then we followed it up --
04:42:21.51 23  Q.    No.  Go back to the first
04:42:24.17 24  conversation.  What did you tell him?
04:42:25.98 25  A.    That it was critical.
04:42:30.41 25                  MANHATTAN REPORTING CORP., A LegaLink Company

=================================================================

Page 203
04:42:30.41 0                                                           203
04:42:30.41 1           1          NATHAN KANTOR - CONFIDENTIAL
04:42:30.41 2  Q.    What did he say as well?
04:42:31.98 3  A.    This was very critical for WinStar.
04:42:33.68 4  It was consistent with the overall agreement
04:42:35.42 5  between the two companies.  This was happening

```
04:42:37.62   6   for years and we were clearly spending money on
04:42:40.06   7   the basis of this continuing.
04:42:45.00   8   He said to me that Lucent is a great
04:42:47.80   9   supplier, but a bad banker.  Something to that
04:42:51.54  10   effect.  That the relationship was not good for
04:42:59.24  11   Lucent in terms of the financials.  And wanted to
04:43:05.55  12   meet later on to discuss the overall strategic
04:43:09.92  13   direction of both companies.  And that he would
04:43:14.86  14   look into the situation.
04:43:16.69  15   He didn't seem to be familiar with
04:43:18.16  16   the details of that.  And that we would have a
04:43:20.23  17   call in a couple of days to resolve it.
04:43:25.84  18   Q.    When you said it was critical, what
04:43:27.97  19   was your "it" referring to?
04:43:30.87  20   A.    The finances.  We had already spent
04:43:32.78  21   the money in terms of providing the services,
04:43:35.98  22   expecting Lucent to reimburse us for it.
04:43:40.62  23   Q.    Did the second conference call take
04:43:41.85  24   place?
04:43:43.02  25   A.    It did.
04:43:47.72  25                  MANHATTAN REPORTING CORP., A LegaLink Company
```

===============================================================

```
Page 204
04:43:47.72   0                                                        204
04:43:47.72   1            1         NATHAN KANTOR - CONFIDENTIAL
04:43:47.72   2   Q.    Who was in attendance?
04:43:49.03   3   A.    My recollection it was myself, Carol
04:43:50.16   4   Spurrier, Deb Harris, Rick Uhl and David
04:43:54.23   5   Ackerman.
```

===============================================================

************************************************

```
Page 205
04:45:18.08  10   Q.    Just before we broke, Mr. Kantor, we
04:45:22.79  11   talked about a conference call that you were
04:45:26.16  12   going to have with Ben Verwaayen and others; is
04:45:28.76  13   that correct?
04:45:30.06  14   A.    That's correct.
04:45:32.23  15   MR. POLAK:    In that connection I
04:45:34.30  16   would like the reporter to mark as Kantor
04:45:36.53  17   Exhibit 32 for identification a two page document
04:45:39.87  18   which is Bates stamp numbered 0026772 through
04:45:50.18  19   73.
04:46:06.06  20           20                       (Kantor Exhibit 32 for
04:46:06.06  21           21    identification, document bearing Bates
production
04:46:06.06  22           22    number 0026772 through 73.)
04:46:06.06  23   Q.    I show you what is marked Kantor
04:46:07.76  24   Exhibit 32 for identification and I ask you
04:46:11.27  25   whether you can identify that document?
04:46:16.07  25                  MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 206

| | | | 206 |
|---|---|---|---|
| 04:46:16.07 | 0 | | |
| 04:46:16.07 | 1 | 1          NATHAN KANTOR - CONFIDENTIAL | |
| 04:46:16.07 | 2 | A.    Yes, I can. | |
| 04:46:20.14 | 3 | Q.    Is that your handwriting? | |
| 04:46:21.75 | 4 | A.    Yes, it is my handwriting. | |
| 04:46:24.85 | 5 | Q.    The typed portion of it represents an | |
| 04:46:26.72 | 6 | E-mail; is that correct? | |
| 04:46:27.98 | 7 | A.    That's correct. | |
| 04:46:29.89 | 8 | Q.    Regarding the setting up a conference | |
| 04:46:31.82 | 9 | call with Ben Verwaayen on December 27th? | |
| 04:46:36.09 | 10 | A.    That's correct. | |
| 04:46:38.43 | 11 | Q.    Do you recall whether the conference | |
| 04:46:40.60 | 12 | call with Ben Verwaayen in fact occurred on | |
| 04:46:42.57 | 13 | December 27? | |
| 04:46:45.70 | 14 | A.    I am pretty sure it did, I don't know | |
| 04:46:47.20 | 15 | for sure. | |
| 04:46:50.54 | 16 | Q.    Would you now tell us what occurred, | |
| 04:46:53.78 | 17 | what was said during this telephone conference | |
| 04:46:58.08 | 18 | call on or about December 27th between yourself | |
| 04:47:02.55 | 19 | and Ben Verwaayen and others. | |
| 04:47:09.49 | 20 | A.    Again, we were all spread out, so I | |
| 04:47:13.06 | 21 | was not physically with the other people. | |
| 04:47:15.87 | 22 | Q.    Were you on vacation? | |
| 04:47:18.07 | 23 | A.    I was on vacation, right.  I was | |
| 04:47:21.14 | 24 | actually surprised it would include a lot of | |
| 04:47:24.21 | 25 | other people.  I thought it was just Ben getting | |
| 04:47:28.11 | 25 | MANHATTAN REPORTING CORP., A LegaLink Company | |

Page 207

| | | | 207 |
|---|---|---|---|
| 04:47:28.11 | 0 | | |
| 04:47:28.11 | 1 | 1          NATHAN KANTOR - CONFIDENTIAL | |
| 04:47:28.11 | 2 | back to me with respect to getting familiar with | |
| 04:47:29.55 | 3 | the situation and talking to me in terms of | |
| 04:47:32.12 | 4 | resolving the issue.  Somehow they all wanted a | |
| 04:47:34.79 | 5 | conference call. | |
| 04:47:38.32 | 6 | Anyway, we went through it.  These | |
| 04:47:40.36 | 7 | are my handwritten notes that kind of covered | |
| 04:47:44.09 | 8 | things that I was thinking about, that would say | |
| 04:47:46.46 | 9 | as well as some details.  So at least I was | |
| 04:47:49.80 | 10 | familiar with what was going on to some degree. | |
| 04:47:53.34 | 11 | Q.    What we really want to do is tell us | |
| 04:47:54.81 | 12 | to the best of your recollection what was said in | |
| 04:47:58.34 | 13 | the conference call.  What you said, what Ben | |
| 04:48:00.81 | 14 | said, what others said. | |
| 04:48:03.48 | 15 | A.    Based upon my recollection it was | |
| 04:48:05.85 | 16 | very similar to the first conversation.  That the | |
| 04:48:09.59 | 17 | whole relationship was deteriorating.  That we | |
| 04:48:13.69 | 18 | would work together with Ben to get it back on | |
| 04:48:16.19 | 19 | track.  WinStar services would put WinStar at | |
| 04:48:21.40 | 20 | great risk.  That it was negotiated in good faith | |
| 04:48:24.37 | 21 | as part of the original overall Supply | |

```
04:48:26.67 22    Agreement. And has been a concept from the
04:48:29.11 23    original agreement where we were operating on
04:48:32.68 24    that basis. And we thought it was a win-win
04:48:35.38 25    scenario for Lucent as well to provide turnkey
04:48:39.45 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

=====================================================================

```
Page 208
04:48:39.45  0                                                       208
04:48:39.45  1              1         NATHAN KANTOR - CONFIDENTIAL
04:48:39.45  2    services as part of their overall strategy.
04:48:48.13  3    My recollection is that Ben agreed to
04:48:51.76  4    pay the services for that quarter on that call.
04:48:56.23  5    And wanted my commitment to meet with the senior
04:49:02.47  6    Lucent people to talk about the relationship as
04:49:05.94  7    soon as I got back from vacation to figure out
04:49:08.05  8    how you could make it a win-win scenario since he
04:49:12.22  9    felt that it was not a good relationship for
04:49:14.79 10    Lucent. And we agreed to do that.
04:49:22.06 11    Q.    Did Lucent in fact make payment of
04:49:25.83 12    the services performed by Wireless, WinStar
04:49:29.13 13    Wireless for the quarter ended December 2000?
04:49:31.64 14    A.    Yes, they did. Yes, they did.
04:49:34.94 15    Q.    Did you also, did WinStar or WinStar
04:49:38.71 16    Wireless submit an invoice for services which
04:49:44.85 17    they paid to third parties for the month of
04:49:46.75 18    December?
04:49:48.09 19    A.    That's correct. That was paid as
04:49:49.09 20    well.
04:49:52.19 21    Q.    All right. Anything else you recall
04:49:53.99 22    about the telephone discussion, the conference
04:49:56.29 23    call?
04:49:57.69 24    A.    Other than Ben's talking about being
04:49:59.26 25    a lousy banker and a great supplier, and wanted
04:50:02.33 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

=====================================================================

```
Page 209
04:50:02.33  0                                                       209
04:50:02.33  1              1         NATHAN KANTOR - CONFIDENTIAL
04:50:02.33  2    my commitment that we would try and work together
04:50:06.30  3    as soon as I returned to create a relationship
04:50:11.41  4    that was a win-win for both parties. I certainly
04:50:14.28  5    agreed to that.
```

=====================================================================

************************************************

```
Page 76
01:44:02.24 12    Let me ask the reporter to mark this
01:44:05.41 13    document as Kantor Exhibit 12, please.
01:45:09.40 14              14                   (Kantor Exhibit 12 for
01:45:09.40 15              15    identification, document bearing Bates
production
```

**B947**

```
01:18:07.42  6   failing to lend money to WinStar?
01:18:13.39  7   A.   I am not familiar with the exact
01:18:15.39  8   filing.
01:18:17.39  9   Q.   The exact filing of the litigation?
01:18:17.39 10   A.   Yes.
01:18:29.40 11   Q.   All right.  Do you know whether
01:18:33.41 12        12   Lucent breached this agreement?
01:18:33.41 13   A.   In terms of paying for the services.
01:18:33.41 14   Q.   In any respect.
01:18:35.41 15   A.   Yes.
01:18:37.41 16   Q.   You believe --
01:18:37.41 17   A.   Yes, sir.
01:18:41.42 18   Q.   -- you believe Lucent did breach --
01:18:41.42 19   A.   Yes.
01:18:43.39 20   Q.   -- the subcontract set forth as
01:18:45.39 21   Kantor Exhibit 11?
01:18:45.39 22   A.   Yes.
01:18:49.39 23   Q.   How did Lucent breach that contract?
01:18:49.39 24   A.   By failure to pay.
01:18:51.39 25   Q.   By failure to pay what?
01:18:53.40 25                  MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 353
```
01:18:53.40  0
                 353
01:18:53.40  1           1          NATHAN KANTOR - CONFIDENTIAL
01:18:53.40  2   A.   For the services that were provided.
01:18:55.40  3   Q.   When did that occur?
01:19:03.41  4   A.   It occurred in the first quarter of
01:19:03.41  5   2001, if I remember correctly.
01:19:09.41  6   Q.   Is it your testimony that WinStar
01:19:11.41  7   complied with all of its obligations under the
01:19:15.42  8   so-called subcontract?
01:19:17.39  9   A.   As far as I know, yes.
01:19:23.39 10   Q.   Have you ever actually read the
01:19:27.40 11   subcontract prior to this litigation?
01:19:31.40 12   A.   I probably read it quickly a long
01:19:31.40 13   time ago.
01:19:33.40 14   Q.   Have you read it since then?
01:19:37.41 15   A.   Not in a lot of detail.  I just went
01:19:39.41 16   over it, yes.
01:19:39.41 17   Q.   When did you go over it?
01:19:43.41 18   A.   I would say last couple weeks.
01:19:45.41 19   Q.   The last couple weeks.  You have gone
01:19:47.42 20   over it pretty carefully?
01:19:47.42 21   A.   No.
01:19:49.42 22   Q.   Well, sir, if you haven't gone over
01:19:51.39 23   it pretty carefully, how can you testify that
01:19:53.39 24   Lucent breached it?
```

Page 354

```
01:20:01.40  3    A.    Because we were providing services to
01:20:05.40  4    them under the agreement, we had been paid for
01:20:09.40  5    two years and then all of a sudden Lucent decided
01:20:11.41  6    not to pay us for those services.
01:20:13.41  7    Q.    Is that the sole basis of your
01:20:17.41  8    testimony that Lucent breached the agreement?
01:20:19.41  9    A.    We fulfilled all the obligations
01:20:21.42 10    under the agreement.  It was consistent with what
01:20:23.39 11    we did every time and they decided not to pay us.
01:20:27.39 12    Q.    Is that sum total of the basis for
01:20:29.39 13    your testimony that Lucent breached the
01:20:29.39 14    agreement?
01:20:31.39 15    A.    That is the overall essence of it.
01:20:35.40 16    Q.    All right, sir, let's look at the
01:20:43.41 17    agreement.  First paragraph makes it clear that
01:20:47.41 18    the agreement is between Lucent and WinStar
01:20:47.41 19    Wireless; right?
01:20:51.41 20    A.    Correct.
01:20:53.42 21    Q.    Not WinStar Communications?
01:20:55.42 22    A.    It says WinStar Wireless.
01:21:01.39 23    Q.    Under paragraph number 1, the
01:21:03.39 24    agreement says, under the heading "Services and
01:21:07.40 25    Scope of Work", paragraph 1.1 -- you have read
01:21:09.40 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

===========================================================

```
Page 355
01:21:09.40  0
355
01:21:09.40  1         1         NATHAN KANTOR - CONFIDENTIAL
01:21:09.40  2    this before; haven't you?
01:21:11.40  3    A.    I said I briefly read it before, yes.
01:21:15.40  4    Q.    Let's read it carefully.  "Services.
01:21:19.41  5    Contractor agrees to perform for Lucent the
01:21:23.41  6    tasks, responsibilities and services described on
01:21:27.42  7    the attached task-specific schedules
01:21:41.40  8    (Individually a 'task order') ('The
01:21:45.40  9    services')."  Do you see that?
01:21:45.40 10    A.    Yes.
01:21:49.40 11    Q.    The contractor is WinStar Wireless;
01:21:49.40 12    right?
01:21:51.41 13    A.    Correct.
01:21:55.41 14    Q.    This says WinStar Wireless agrees to
01:22:01.42 15    perform the tasks that are described on the
01:22:05.39 16    attached task-specific schedule; right?
01:22:07.39 17    A.    Correct.
01:22:07.39 18    Q.    Where is it?
01:22:13.40 19    A.    I don't know where it is.  Probably
01:22:13.40 20    in the back.
01:22:15.40 21    Q.    Well, why don't you take a look at
01:22:19.40 22    it.  See if you can find it.
01:22:23.41 23    A.    It says see attached task order
01:22:23.41 24    number 1.  See attached.
01:22:29.41 25    Q.    Right.  Have you ever seen that?
01:22:29.41 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

```
01:24:47.42 21    describes that process other than this contract?
01:24:53.39 22    A.    I can't recall.  But it was going on
01:24:55.39 23    for probably two years.
01:25:07.40 24    Q.    This contract, would you look at
01:25:17.41 25    paragraph 8.6 of the Supply Agreement.  Under the
01:25:19.41 25                    MANHATTAN REPORTING CORP., A LegaLink Company
```

====================================================

```
Page 358
01:25:19.41  0
358
01:25:19.41  1              1          NATHAN KANTOR - CONFIDENTIAL
01:25:19.41  2    heading "Entire agreement."
01:25:23.39  3    A.    Yes.
01:25:23.39  4    Q.    Do you see that?
01:25:23.39  5    A.    Yes.
01:25:27.39  6    Q.    That paragraph says, "No
01:25:29.39  7    modification, amendment, supplement to or waiver
01:25:33.40  8    of this agreement or any task order hereunder, or
01:25:37.40  9    any of their provisions shall be binding upon the
01:25:41.40 10    parties hereto unless made in writing and duly
01:25:43.41 11    signed by both parties."
01:25:47.41 12    Do you know whether any such
01:25:49.41 13    amendments were ever made?
01:25:51.41 14    A.    I don't know about amendments.  But I
01:25:53.42 15    do know what the process was.
01:25:55.42 16    Q.    I am not asking you about the
01:25:57.39 17    process, Mr. Kantor.  If you answer my
01:25:57.39 18    questions --
01:25:57.39 19    A.    I don't know.
01:25:59.39 20    Q.    Mr. Polak can ask you any questions
01:26:01.39 21    he likes when he has his turn.  You answer my
01:26:03.39 22    questions, we will get through this much
01:26:05.39 23    quicker.
01:26:07.40 24    Have you ever seen any such
01:26:09.40 25    modifications or amendments?
01:26:09.40 25                    MANHATTAN REPORTING CORP., A LegaLink Company
```

====================================================

```
Page 359
01:26:09.40  0
359
01:26:09.40  1              1          NATHAN KANTOR - CONFIDENTIAL
01:26:09.40  2    A.    I'm not sure.
01:26:15.40  3    Q.    Have you ever seen a task order as
01:26:15.40  4    defined in paragraph 1.1?
01:26:17.41  5    A.    I don't know.
01:26:21.41  6    Q.    Sir, if you haven't seen a task order
01:26:25.41  7    how can you testify that Lucent breached this
01:26:27.42  8    contract?
01:26:27.42  9    A.    Well, when you take a look at the
01:26:29.42 10    Supply Agreement and the work that was required,
01:26:33.39 11    and the subcontract, and the process and the
01:26:35.39 12    details and the purchase orders that were cut,
01:26:39.39 13    Lucent did not pay WinStar in accordance with
```

01:26:39.39 14    those agreements.
01:26:43.40 15    Q.    Let's continue to look at the
01:26:47.40 16    subcontract.  You say we have to look at the
01:26:49.40 17    subcontract.  Let's continue to look at the
01:26:49.40 18    subcontract.
01:26:53.41 19    The next sentence reads "The parties
01:26:57.41 20    may enter into future task orders to which the
01:26:59.41 21    parties may agree from time to time, with each
01:27:03.39 22    task order to be consecutively numbered and
01:27:05.39 23    attached hereto."
01:27:07.39 24    Do you know whether there ever were
01:27:09.39 25    any such subsequent task orders?
01:27:13.40 25                    MANHATTAN REPORTING CORP., A LegaLink Company

═══════════════════════════════════════════════════════════════

Page 360
01:27:13.40 0
360
01:27:13.40  1              1        NATHAN KANTOR - CONFIDENTIAL
01:27:13.40  2    A.    I don't know.  It depends upon the
01:27:15.40  3    definition of the task order and it may have been
01:27:17.40  4    the purchase orders that were cut and invoices
01:27:19.40  5    that were used every single month and quarter.
01:27:25.41  6    Q.    Let's look at the definition of task
01:27:31.41  7    order, paragraph 1.2 of the subcontract.  Under
01:27:35.42  8    the heading "Task Order.  Unless otherwise agreed
01:27:39.39  9    by the parties in writing each task order will
01:27:43.39 10    include the following information:  (i), a
01:27:47.40 11    description of the services to be performed."
01:27:47.40 12    Do you see that?
01:27:47.40 13    A.    Yes.
01:27:51.40 14    Q.    Does that suggest to you that the
01:27:53.40 15    task order has to come before the services are
01:27:55.40 16    performed?
01:27:57.41 17    A.    This word does.
01:28:01.41 18    Q.    "(ii), the targeted commencement and
01:28:05.41 19    completion dates of the services." That has to be
01:28:07.42 20    in the task order, too, right?
01:28:07.42 21    A.    Correct.
01:28:11.39 22    Q.    Little (iii), "A list of deliverables
01:28:17.39 23    to be provided by the contractor."  Right?
01:28:19.39 24    A.    Correct.
01:28:25.40 25    Q.    "And targeted delivery dates for
01:28:25.40 25                    MANHATTAN REPORTING CORP., A LegaLink Company

═══════════════════════════════════════════════════════════════

Page 361
01:28:25.40 0
361
01:28:25.40  1              1        NATHAN KANTOR - CONFIDENTIAL
01:28:25.40  2    those deliverables"?
01:28:27.40  3    A.    Right.
01:28:27.40  4    Q.    That has to be in the task order too,
01:28:27.40  5    right?
01:28:27.40  6    A.    According to this.

```
01:28:29.40  7    Q.    This is the contract.
01:28:31.41  8    A.    That is all right.  But the contract
01:28:33.41  9    could be modified in terms of how people operate
01:28:35.41 10    under the contract.
01:28:37.41 11    Q.    Well, I'm sorry, sir, the contract
01:28:43.39 12    says and we just read paragraph 8.6 the contract
01:28:47.39 13    said it can't be modified unless made, the
01:28:49.39 14    modification is made --
01:28:49.39 15    A.    The contract --
01:28:51.39 16    Q.    Sorry.  Let me finish.
01:28:55.40 17    Paragraph 8.6 says the contract
01:28:57.40 18    cannot be modified unless the modification is
01:29:03.41 19    made in writing and duly signed by both parties.
01:29:03.41 20    That is paragraph 8.6; right?
01:29:05.41 21    A.    The contract was administered by
01:29:09.41 22    using the invoices and a Lucent purchase order to
01:29:13.42 23    reflect these task orders and the work that was
01:29:17.39 24    performed by WinStar to Lucent and agreed to by
01:29:19.39 25    Lucent and those invoices were paid for several
01:29:19.39 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 362
```
01:29:19.39  0
362
01:29:19.39  1          1        NATHAN KANTOR - CONFIDENTIAL
01:29:19.39  2    years.
01:29:23.39  3    Q.    The contract says, does it not, that
01:29:25.39  4    the contract may not be modified unless in
01:29:29.40  5    writing signed by both parties; does it not say
01:29:29.40  6    that, sir?
01:29:31.40  7    A.    Where does it say that?
01:29:45.41  8    Q.    Paragraph 8.6.  Last sentence.  "No
01:29:49.42  9    modification, amendment, supplement to or waiver
01:29:53.39 10    of this agreement or any task order hereunder, or
01:29:55.39 11    any of their provisions shall be binding upon the
01:29:59.39 12    parties hereto unless made in writing and duly
01:30:01.40 13    signed by both parties."
01:30:03.40 14    Do you see that, sir?
01:30:03.40 15    A.    Yes, I do.
01:30:09.40 16    Q.    Let's go back to paragraph 1.2.
01:30:21.42 17    Little (iv), "Method of compensation to be
01:30:25.39 18    provided to the contractor, e.g., time and
01:30:31.39 19    materials, firm fixed price or otherwise," that
01:30:33.40 20    has to be in the task order too; right?
01:30:33.40 21    A.    According to this.
01:30:37.40 22    Q.    "And other appropriate pricing terms
01:30:45.41 23    such as hourly rates" and little (v), "Other
01:30:47.41 24    information the parties agreed to include."
01:30:49.41 25    Do you see that, sir?
01:30:49.41 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

Page 363

**B950b**

```
01:30:49.41  0
363
01:30:49.41  1              1              NATHAN KANTOR - CONFIDENTIAL
01:30:49.41  2    A.    Yes.
01:30:51.41  3    Q.    Do you know whether that information
01:30:55.42  4    was ever set forth in a task order pursuant to
01:30:59.39  5    this subcontract Kantor Exhibit 11?
01:31:03.39  6    A.    I think the parties used the purchase
01:31:09.40  7    orders and invoices to define the work and it was
01:31:11.40  8    agreed to by both parties.  It was used in terms
01:31:13.40  9    of these definitions of task orders.
```

```
==========================================================
```

```
**************************************************
```

```
Page 174
04:00:30.89 18    MR. POLAK:    Ms. Reporter, would you
04:00:33.96 19    kindly mark as Kantor Exhibit 25 for
04:00:36.83 20    identification a multipage document which has
04:00:40.70 21    been Bates stamped ZWC 0163429 through 433.
04:01:07.46 22              22              (Kantor Exhibit 25 for
04:01:07.46 23              23    identification, document bearing Bates
production
04:01:07.46 24              24    number ZWC 0163429 through 433.)
04:01:07.46 25    Q.    Mr. Kantor, I show you what has been
04:01:10.03 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

```
==========================================================
```

```
Page 175                                                                   175
04:01:10.03  0
04:01:10.03  1              1              NATHAN KANTOR - CONFIDENTIAL
04:01:10.03  2    marked as Kantor Exhibit 25 for identification
04:01:12.37  3    and ask you whether you can identify that
04:01:13.60  4    document?
04:01:18.31  5    A.    This is a document from Debbie Harris
04:01:24.15  6    of Lucent to myself and Frank Jules, Frank was
04:01:33.16  7    from WinStar.  I believe it was dated
04:01:36.06  8    September 22, 2000 the subject was WinStar
04:01:41.06  9    services purchase order.
04:01:48.64 10    Q.    The attachments were two letters from
04:01:50.24 11    Lucent addressed one to Rick Uhl and the other to
04:01:56.28 12    David Ackerman?
04:02:02.35 13    A.    That's correct.
04:02:04.05 14    Q.    Do they appear to be identical
04:02:05.22 15    letters?
04:02:08.16 16    A.    Looks like it.
04:02:11.46 17    Q.    Did you read these letters?
04:02:20.50 18    A.    I presume so, yes.
04:02:24.27 19    Q.    Do you recall your understanding of
04:02:27.84 20    the purpose of these letters when you received
04:02:28.88 21    it?
04:02:39.42 22    A.    I need to read it to refresh my
04:02:40.79 23    memory.
```

• **Defendant's Deposition Designations**

```
 1              NATHAN KANTOR - CONFIDENTIAL
 2       Q.    That is not my question.  That is
 3  contrary to your testimony with respect to your
 4  understanding of the arrangements.
 5       A.    That's correct.  That's correct.
 6       Q.    Right?
 7       A.    That's correct.
 8       Q.    It clearly wasn't Mr. Wilson's
 9  understanding; was it?
10       A.    I don't know what his understanding
11  was.
12       Q.    Well, as described in this letter his
13  understanding is different from your testimony;
14  right?
15       A.    I think so.
16       Q.    Then he goes on to say very similar
17  to what is in Mr. Haffar's letter, Kantor
18  Exhibit 59, "This letter is a non-binding
19  statement of Lucent's anticipated plans.  This
20  letter is intended solely as a basis for further
21  discussions and is not intended to be and does
22  not constitute a legally binding obligation of
23  the parties"; so on and so forth.  Do you see
24  that?
25       A.    Yes.
```

[351:25] - [352:3]    8/7/2001    Kantor, Nathan

```
page 351
25       Q.    Let's look at Exhibit 11.  Exhibit 11
page 352
 1              NATHAN KANTOR - CONFIDENTIAL
 2  is the so-called subcontract; right?
 3       A.    I guess so.
```

[363:23] - [364:6]    8/7/2001    Kantor, Nathan

```
page 363
23              Have you ever seen a task order that
24  contains the information set forth in paragraph
25  1.2 of the subcontract, Kantor Exhibit 11?
page 364
 1              NATHAN KANTOR - CONFIDENTIAL
 2       A.    I have not seen a task order that
 3  specifically describes that.
 4       Q.    Now would you look at Kantor
 5  Exhibit 62, just hold Exhibit 11, now look at
 6  62.
```

[364:10] - [365:15]    8/7/2001    Kantor, Nathan

```
page 364
10       Q.    Kantor Exhibit 62 purports to be a
11  letter from Mr. Wilson of Lucent to Mr. Haffar
12  dated March 30, 1999.
13       A.    Yes.
14       Q.    Have you ever seen this before?
15       A.    I don't think so.
16       Q.    Well, Mr. Wilson says, "Pursuant to
17  our recently executed agreement for network
18  build-out services," do you see that?
19       A.    Yes.
20       Q.    I take it that is the subcontract,
21  that's Exhibit 11?
22       A.    I think that is a reasonable
23  assumption.
24       Q.    "Please accept this letter as my
25  authorization for the subcontracting of network
```

```
03:23:41.41  1              1       NATHAN KANTOR - HIGHLY CONFIDENTIAL
03:23:41.41  2   I think there were several different solutions
03:23:45.42  3   depending upon the particular scope of work.
03:23:47.42  4   So --
03:23:49.42  5   Q.    Do you know whether there ever was in
03:23:51.42  6   fact another agreement between WinStar and
03:23:51.42  7   Lucent?
03:23:53.42  8   A.    Yes.  Well, the teams reached
03:23:55.43  9   agreement, Lucent and WinStar with respect to
03:23:57.43 10   this.  This entire thing.
03:23:59.43 11   Q.    You just don't remember what the
03:23:59.43 12   agreement was?
03:24:03.43 13   A.    No.  I think we, there is documents
03:24:07.44 14   that reflect that in these 29 tasks and
03:24:09.44 15   everything else.  There was an agreement.  That
03:24:15.41 16   was agreed to by WinStar and actually -- and
03:24:17.41 17   Lucent, then went up the chain and was then
03:24:21.41 18   rejected by Lucent people after their people at
03:24:23.42 19   the negotiating table agreed to it.
03:24:25.42 20   Q.    So there wasn't an agreement?
03:24:27.42 21   A.    There was an agreement at the team
03:24:27.42 22   level.
03:24:29.43 23   Q.    But I don't care whether there was an
03:24:31.43 24   agreement at the team level.  Was there
03:24:35.43 25   ultimately agreement, a binding agreement with
03:24:37.43 25              MANHATTAN REPORTING CORP., A LegaLink Company
```

===========================================================================

```
Page 460
03:24:37.43  0
460
03:24:37.43  1              1       NATHAN KANTOR - HIGHLY CONFIDENTIAL
03:24:37.43  2   respect to this subject between Lucent and
03:24:37.43  3   WinStar?
03:24:37.43  4   A.    No.
03:24:39.44  5   Q.    There never was?
03:24:39.44  6   A.    Well, there was in terms of the
03:24:43.44  7   original Supply Agreement, but in terms of the
03:24:49.41  8   definitization of a transition plan that finally
03:24:51.42  9   got killed by Lucent senior management.
03:24:55.42 10   Q.    You don't remember what the proposal
03:24:57.42 11   was that was killed by Lucent senior management?
03:24:59.42 12   A.    I think it was a combination of these
03:25:03.43 13   things where we out-sourced a substantial amount
03:25:05.43 14   of the work where Lucent took on a lot of the
03:25:07.43 15   responsibilities, they did it on a transition
03:25:11.44 16   basis, it was cost plus first, fixed price later
03:25:15.44 17   on.  I have to take a look at the documents to be
03:25:19.41 18   more specific.  Then there may have been some
03:25:21.41 19   things where WinStar, again, as an example, site
03:25:23.41 20   acquisition would continue to perform.
03:25:25.42 21   Q.    If you look at the last few pages of
03:25:31.42 22   this exhibit, there is what appears to be a draft
03:25:31.42 23   addendum to the Supply Agreement?
03:25:43.43 24   A.    Uh-huh.
03:25:45.44 25   Q.    I am not going to go through all of
```

03:25:47.44 25                    MANHATTAN REPORTING CORP., A LegaLink Company

======================================================

Page 461
03:25:47.44  0
461
03:25:47.44  1            1        NATHAN KANTOR - HIGHLY CONFIDENTIAL
03:25:47.44  2    it, but if you look at that addendum there are
03:25:49.44  3    various places where it has Lucent's proposal and
03:25:53.41  4    WinStar's proposal with no resolution.
03:25:55.41  5    A.    Yes.  At that point, but I think it
03:25:55.41  6    was resolved.
03:25:59.42  7    Q.    I am asking do you know what the
03:26:03.42  8        8    resolution was?
03:26:03.42  9    A.    Depends upon what the subject was.  I
03:26:03.42 10    don't have the document in front of me.
03:26:05.42 11    Q.    All the subjects being discussed in
03:26:11.43 12    this executive review on November 7th, 2000?
03:26:15.43 13    A.    The resolution would have been
03:26:19.44 14    reflected in the agreement negotiated and agreed
03:26:23.44 15    to by the negotiating team.  Somewhere there is a
03:26:25.41 16    document as it relates to it.  I don't really
03:26:29.41 17    have it in terms of specific details.  Pretty
03:26:29.41 18    detailed agreement.
03:26:31.42 19    Q.    You don't remember what it was?
03:26:33.42 20    A.    Well, my sense was it had a
03:26:35.42 21    combination of things like I described before.
03:26:39.42 22    On certain things Lucent took over turnkey
03:26:41.43 23    responsibility to out-source, take over complete
03:26:43.43 24    responsibility for certain activities in a
03:26:47.43 25    transition mode, started on a cost plus fixed fee
03:26:49.43 25                    MANHATTAN REPORTING CORP., A LegaLink Company

======================================================

Page 462
03:26:49.43  0
462
03:26:49.43  1            1        NATHAN KANTOR - HIGHLY CONFIDENTIAL
03:26:49.43  2    basis and moved over to a firm fixed price
03:26:49.43  3    basis.
03:26:51.44  4    On some items WinStar remained
03:26:55.44  5    responsible for providing the services.  Again,
03:26:55.44  6    under the Supply Agreement.
03:26:57.44  7    I don't think there was one solution
03:27:01.41  8    fit all.  Depending upon what the scope of work
03:27:05.42  9    was.  And what Lucent's competencies were.
03:27:07.42 10    But clearly we wanted to continue to
03:27:09.42 11    give Lucent more and more of the turnkey
03:27:13.42 12    responsibility as originally specified under the
03:27:13.42 13    agreement.
03:27:19.43 14    Q.    Do you remember what the answer was
03:27:21.43 15    to the fundamental accounting issue as set forth
03:27:23.43 16    in Exhibit 67?
03:27:29.44 17    A.    I think we let Lucent exercise
03:27:31.44 18    control over the things that made sense so that

McGinn

mcginn 4-8-04 disk 1 to 2

01:55:48.80 11   A.    Excuse me, I'm sorry, so that
01:55:50.80 12   included me as well.
01:55:50.80 13   Q.    The answer is yes.
01:55:52.80 14   A.    Yes, sir.
01:55:56.81 15   Q.    Through October 23rd of 2000?
01:56:00.81 16   A.    Yes.  I exited at that time and gave
01:56:04.82 17   up -- relinquished all responsibilities which
01:56:04.82 18   would include that.
01:56:06.82 19   Q.    As a member of the audit committee,
01:56:10.82 20   did your responsibilities include reviewing the
01:56:12.82 21   transactions that the company was entering into?
01:56:20.80 22   A.    Well, not everyone, almost by
01:56:22.80 23   definition, because there are literally tens of
01:56:26.80 24   thousands.  What we would be reviewing would be
01:56:38.82 25   the information from finance, the information

==================================================

Page 89
01:56:44.82   0
            89
01:56:44.82   1                    1
01:56:46.79   2                               Page 89
01:56:44.82   2   from internal and external audit, the private
01:56:46.82   3   session information that the external auditors
01:56:52.83   4   would have with us, the representations by the
01:56:54.80   5   members of the various organizations of which I
01:57:00.81   6   just spoke.  Going over critical accounting
01:57:00.81   7   policies and the like.
01:57:06.81   8   It is infrequent that we would hear
01:57:08.81   9   about a specific transaction unless it were a
01:57:12.82  10   bid; for instance, in Brazil or something like
01:57:16.82  11   that where it was a very, very large bid and we
01:57:18.82  12   were being asked to review that information.
01:57:22.83  13   Q.    So as a member of the audit
01:57:24.83  14   committee, you would not review transactions like
01:57:26.80  15   these bill and hold transactions.
01:57:28.80  16   A.    No, we would not.
01:57:30.80  17   Q.    Who would review transactions like
01:57:32.80  18   these bill and hold transactions at Lucent?
01:57:34.81  19   A.    I would imagine that it would include
01:57:42.81  20   divisional finance, and that would have to adhere
01:57:46.82  21   to the corporate policies, all accounting policy
01:57:48.82  22   but including, but not limited to, bill and hold
01:57:50.82  23   transactions.  And that they would be subject to
01:57:54.83  24   internal review by the corporate finance
01:58:02.80  25   comptroller's organization, internal audit, and

==================================================

Page 90
01:58:04.80   0
            90
01:58:04.80   1                    1
01:58:06.77   2                               Page 90
01:58:04.80   2   as a normal course of business, external audit.
01:58:06.80   3   That's my expectation.  I could have missed
01:58:08.81   4   someone in there.
01:58:12.81   5   Q.    Mm-hmm.  And --
01:58:14.81   6   A.    Probably legal as well.  I'm sorry.
01:58:16.81   7   Q.    And it's your testimony that before
01:58:18.82   8   this deposition today you were never advised that
01:58:22.82   9   Winstar and Lucent were engaging in bill and hold
                              Page 27

mcginn 4-8-04 disk 1 to 2

| | | |
|---|---|---|
| 01:58:26.82 | 10 | deals on a quarterly basis? |
| 01:58:28.83 | 11 | A.    That is correct.  In fact, I thought |
| 01:58:36.80 | 12 | that there was a specific directive that we did |
| 01:58:38.80 | 13 | not engage in bill and hold transactions. |
| 01:58:42.81 | 14 | Q.    How long do you think that directive |
| 01:58:44.81 | 15 | was in place at Lucent? |
| 01:58:46.81 | 16 | A.    I couldn't tell you a date but that's |
| 01:58:52.82 | 17 | my state of mind on the matter.  It would be a |
| 01:59:02.83 | 18 | really, really rare circumstance, I'm making it |
| 01:59:04.83 | 19 | up but force majeure situation where a hurricane |
| 01:59:08.80 | 20 | exists and customer's warehouse is destroyed but |
| 01:59:12.80 | 21 | they want to take delivery and move it and so |
| 01:59:14.81 | 22 | on.  It would be truly a rare situation to enter |
| 01:59:16.81 | 23 | into bill and hold transactions. |
| 01:59:26.82 | 24 | Q.    Why did Lucent have -- in your mind, |
| 01:59:30.82 | 25 | why would Lucent have a policy that it was |

===================================================

Page 91

| | | |
|---|---|---|
| 01:59:32.82 | 0 | |
| | 91 | |
| 01:59:32.82 | 1 |                     1 |
| 01:59:34.79 | 2 |                            Page 91 |
| 01:59:32.82 | 2 | extremely rare to enter into a bill and hold |
| 01:59:34.83 | 3 | transaction and it would have to be caused by |
| 01:59:36.83 | 4 | some force majeure type situation? |
| 01:59:38.80 | 5 | A.    Wouldn't have to be.  I'm just giving |
| 01:59:40.80 | 6 | it as an example. |
| 01:59:40.80 | 7 | Q.    Okay. |
| 01:59:42.80 | 8 | A.    All I'm saying is that in the normal |
| 01:59:46.80 | 9 | course of business, I don't see that these things |
| 01:59:48.81 | 10 | occur very frequently. |
| 01:59:50.81 | 11 | Q.    But at least from documents you've |
| 01:59:54.81 | 12 | seen today, they appear to occur pretty |
| 01:59:56.81 | 13 | frequently in the Winstar relationship.  Is that |
| 01:59:56.81 | 14 | fair to say? |
| 01:59:58.82 | 15 | A.    In the case where you showed me |
| 02:00:00.82 | 16 | documents today, there are numerous examples |
| 02:00:02.82 | 17 | where this has occurred. |
| 02:00:04.82 | 18 | Q.    Does that distinguish from other |
| 02:00:04.82 | 19 | customers of Lucent? |
| 02:00:08.83 | 20 | A.    I can't tell you because my belief |
| 02:00:14.80 | 21 | was that Lucent was not engaging in these |
| 02:00:20.81 | 22 | transactions.  Or if it were, it would be very, |
| 02:00:24.81 | 23 | very rare.  You've shown me several examples |
| 02:00:28.81 | 24 | where there have been, it appears to be instances |
| 02:00:30.82 | 25 | where that's occurred. |

===================================================

*************************************************

Page 94

| | | |
|---|---|---|
| 02:03:50.78 | 14 |                            Page 94 |
| 02:03:44.81 | 14 | Q.    Now, you testified earlier today |
| 02:03:50.82 | 15 | about a software -- you called it a software |
| 02:03:52.82 | 16 | buyout. |
| 02:03:52.82 | 17 | A.    That is correct. |
| 02:03:54.82 | 18 | Q.    Is that also described as a software |
| 02:03:56.82 | 19 | pool, to your knowledge? |
| 02:03:58.82 | 20 | A.    Well, I don't know all the things |

Page 28

B955

**Montemarano**

```
                              new 2 direct montemarano 6-25-04
01:00:44.37 22    the company, was in that time frame.
```

=========================================================

✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩✩

```
Page 63
01:04:04.11 20                          Page 63
01:04:05.77 20    Q.    Now, you testified earlier that you
01:04:09.24 21    believed that the facility was an $800 million
01:04:13.88 22    facility?
01:04:14.98 23    A.    That was my recollection.  It is a
01:04:16.22 24    few years ago, but that's what I recall.
01:04:17.65 25    Q.    I want to talk about the Siemens
```

=========================================================

```
Page 64
01:04:21.66  0    Page 64
01:04:22.32  1                          Page 64
01:04:21.66  1    MICHAEL MONTEMARANO
01:04:22.36  2    repayment because there was a considerable
01:04:25.16  3    amount of testimony about that this morning, and
01:04:28.23  4    I believe your testimony was that you viewed the
01:04:31.87  5    Siemens transaction as actually a bad thing for
01:04:34.17  6    Lucent.
01:04:34.50  7    Is that correct?
01:04:36.14  8    A.    The ramifications that came out of
01:04:37.51  9    it were a bad thing for Lucent, most definitely.
01:04:39.04 10    Q.    Now, the first thing that you
01:04:43.81 11    described as being a bad ramification, I guess,
01:04:47.22 12    of this deal was that it allowed Winstar to buy
01:04:50.22 13    equipment from someone else, correct?
01:04:52.02 14    A.    Correct, from Siemens.
01:04:56.19 15    Q.    Did entering into this deal give
01:04:59.06 16    Winstar the right to buy equipment from Siemens?
01:05:00.46 17    A.    Entering into which deal?
01:05:00.86 18    Q.    The Siemens transaction.
01:05:02.83 19    A.    Entering into that transaction, I
01:05:09.00 20    believe was a requirement they needed to
01:05:10.81 21    purchase a certain amount of product from
01:05:13.07 22    Siemens.
01:05:13.48 23    Q.    Winstar was free to purchase
01:05:15.01 24    equipment from Siemens before it ever entered
01:05:16.85 25    into that deal, though, correct?
```

=========================================================

```
Page 65
01:05:18.38  0    Page 65
01:05:20.55  1                          Page 65
01:05:18.38  1    MICHAEL MONTEMARANO
01:05:20.58  2    A.    Yes, that would seem logical.
01:05:21.65  3    Q.    Are you aware of any restrictions
01:05:22.98  4    whatsoever on who Winstar could buy its
01:05:25.02  5    equipment from?
01:05:26.96  6    A.    No.
01:05:27.46  7    Q.    So the bad ramification that came
01:05:29.86  8    out of this was the fact that Winstar now had an
01:05:32.39  9    obligation to buy $150 million of Siemens
01:05:39.63 10    equipment?
01:05:41.00 11    A.    Correct.
01:05:41.94 12    Q.    That's a fair rephrasing or
                                   Page 4
```

B956

new 2 direct montemarano 6-25-04

```
01:05:45.64 13   explanation of your testimony?
01:05:49.34 14   A.    Yes, it is.
01:05:50.71 15   Q.    Now, the second negative
01:05:52.18 16   ramification that you identified was that the
01:05:56.18 17   Siemens transaction put Siemens in a position
01:06:00.62 18   where its security interest was senior to
01:06:03.53 19   Lucent's, correct?
01:06:04.53 20   A.    Correct.
01:06:05.19 21   Q.    And Siemens presumably had a $200
01:06:11.17 22   million senior secured interest as a result of
01:06:13.10 23   this transaction, correct?
01:06:14.20 24   A.    Correct.
01:06:14.50 25   Q.    But, in fact, Lucent had already
```

=========================================================

Page 66
```
01:06:17.44  0   Page 66
01:06:19.84  1                              Page 66
01:06:17.44  1   MICHAEL MONTEMARANO
01:06:19.87  2   been paid $200 million the day that this
01:06:22.31  3   transaction occurred, correct?
01:06:23.71  4   A.    I don't know if it was the day it
01:06:24.91  5   occurred, but, yes, we were paid $200 million.
01:06:29.42  6   Q.    So Siemens has a $200 million
01:06:30.75  7   senior secured interest but Lucent has $200
01:06:33.22  8   million in cash, correct?
01:06:34.22  9   A.    Correct.
```

=========================================================
*********************************************************

Page 67
```
01:07:16.00  0   Page 67
01:07:16.46  1                              Page 67
01:07:16.00  1   MICHAEL MONTEMARANO
01:07:27.11  4   Q.    Are you aware of whether Siemens
01:07:29.38  5   has gotten anything back from these bankruptcy
01:07:32.18  6   proceedings on its $200 million loan?
01:07:33.95  7   A.    No, I'm actually not aware of
01:07:36.18  8   anything.
01:07:40.12  9   Q.    But, again, Lucent actually got
01:07:41.42 10   $200 million up front as a result of that
01:07:43.46 11   transaction?
01:07:43.99 12   A.    Yes, they did.
01:07:44.46 13   Q.    I'd like to switch gears a little
01:08:01.14 14   bit and talk about the Winstar services that you
01:08:07.38 15   discussed, as well, earlier this morning.
01:08:14.72 16   You seem to draw a distinction
01:08:17.33 17   between the services that Lucent paid for before
01:08:24.40 18   September 2000 and the services that Lucent paid
01:08:27.80 19   for in December 2000 and refused to pay for in
01:08:30.64 20   March 2001.
01:08:31.97 21   Would you agree with that?
01:08:32.77 22   A.    Yes, I would.
01:08:35.21 23   Q.    Can you just explain for me what
01:08:36.91 24   that distinction was?
01:08:38.95 25   A.    In December of 2000 the payment was
```

=========================================================

Page 68

Page 5

```
                              new 2 direct montemarano 6-25-04
01:08:41.68   0   Page 68
01:08:43.39   1                                   Page 68
01:08:41.68   1   MICHAEL MONTEMARANO
01:08:43.42   2   made to Winstar at the direction of the
01:08:45.19   3   vice-chairman as an accommodation to the
01:08:46.79   4   customer because there was no underlying
01:08:50.39   5   agreement that would say we had to pay for what
01:08:52.83   6   they were presenting as a draw for services.  We
01:08:55.16   7   had not authorized them to do any work.
01:08:58.27   8   Q.    In September 2000, it's your
01:08:59.90   9   testimony then that Winstar was authorized to
01:09:02.10  10   perform services?
01:09:03.71  11   A.    My testimony is that there was an
01:09:05.51  12   underlying agreement between the two companies.
01:09:09.64  12   companies.
01:09:09.68  13   Q.    That supported the services that
01:09:11.08  14   Winstar had performed up to September 2000?
01:09:13.15  15   A.    Correct.
01:09:14.32  16   Q.    Are you aware that Lucent, in fact,
01:09:17.29  17   refused to pay Winstar for services in September
01:09:20.29  18   2000?
01:09:21.19  19   A.    No, I'm not.
01:09:22.16  20   Q.    Can you explain why Lucent would
01:09:24.89  21   refuse to pay for services, for Winstar's
01:09:27.33  22   services in September 2000, if it had a
01:09:29.36  23   contractual obligation to pay for them?

==================================================

**************************************************

Page 68
01:09:34.97  25                                   Page 68
01:09:33.40  25   A.    Having not been an employee of

==================================================

Page 69
01:09:35.00   0   Page 69
01:09:35.50   1                                   Page 69
01:09:35.00   1   MICHAEL MONTEMARANO
01:09:35.54   2   Lucent at that time period, it would be
01:09:36.07   3   speculation.  I don't know why.
01:09:39.84   4   Q.    I think another thing -- I recall
01:09:41.71   5   another thing that you testified to earlier this
01:09:43.65   6   morning about the subcontract relationship was
01:09:47.65   7   that Lucent previously authorized Winstar to
01:09:50.79   8   perform the work up to September 2000.
01:09:52.79   9   Is that correct?
01:09:53.15  10   A.    Correct.
01:09:54.09  11   Q.    Do you know who previously
01:09:55.92  12   authorized Winstar to perform its services in
01:09:58.29  13   the quarters up to September 2000?
01:10:01.10  14   A.    I don't know specifically.  I would
01:10:02.56  15   assume it would have been either Debbie Harris,
01:10:04.43  16   as the sales leader, or her supervisor, which
01:10:07.57  17   was Nina Aversano.
01:10:08.97  18   Q.    Have you ever seen any
01:10:12.74  19   documentation where Lucent authorized Winstar,
01:10:16.44  20   before September 2000, to perform services under
01:10:19.88  20   under
01:10:19.91  21   a subcontract?
                                          Page 6
```

new 2 direct montemarano 6-25-04
O1:10:24.35 22    A.    My recollection, there were
O1:10:25.22 23    probably some documents that I saw when I first
O1:10:27.09 24    joined Lucent that described that.
O1:10:29.29 25    Q.    You think you saw some documents.

================================================

Page 70
O1:10:30.49  0    Page 70
O1:10:31.19  1                                        Page 70
O1:10:30.49  1    MICHAEL MONTEMARANO
O1:10:31.23  2    On a quarterly basis?
O1:10:33.06  3    A.    No, most certainly not on a
O1:10:34.83  4    quarterly basis.
O1:10:35.96  5    Q.    What is your recollection of the
O1:10:36.97  6    documents that you saw that authorized Winstar
O1:10:39.47  7    to perform services on behalf of Lucent?
O1:10:42.54  8    A.    My recollection is it was a letter
O1:10:44.07  9    advice between the two companies.
O1:10:48.14 10    Q.    When was that letter advice issued?
O1:10:50.85 11    A.    That I don't remember.
O1:10:52.51 12    Q.    Do you have a rough recollection,
O1:10:53.65 13    was it '99, was it 2000?
O1:10:56.48 14    A.    My recollection is it was in 2000.
O1:11:00.16 15    Q.    A 2000 letter?
O1:11:00.16 16    A.    Um-hum.

================================================

**************************************************

Page 71
O1:12:29.58 20                                       Page 71
O1:12:26.01 20    Q.    Now, I want to move forward to the
O1:12:29.61 21    December services payment that you testified
O1:12:35.32 22    about again, and I believe that that was
O1:12:38.45 23    actually -- the draw request was actually
O1:12:41.59 24    Montemarano-6.
O1:12:46.19 25    Is that correct?

================================================

Page 72
O1:12:48.83  0    Page 72
O1:12:52.07  1                                        Page 72
O1:12:48.83  1    MICHAEL MONTEMARANO
O1:12:52.10  2    A.    Yes, that is correct.
O1:12:55.24  3    Q.    Now, if I heard you correctly this
O1:12:58.94  4    morning, your testimony was that Lucent had no
O1:13:02.41  5    obligation to fund the $62 million draw request,
O1:13:06.05  6    but it did it as a business accommodation.
O1:13:09.82  7    A.    Correct.
O1:13:10.19  8    Q.    Did Lucent frequently lend $62
O1:13:12.89  9    million to its customers where it had no
O1:13:14.52 10    contractual obligations to do so?
O1:13:16.83 11    A.    Not that I was aware of.
O1:13:18.56 12    Q.    So you would characterize this then
O1:13:20.03 13    as an unusual event?
O1:13:22.40 14    A.    Yes, I would characterize it as an
O1:13:23.23 15    unusual event.
O1:13:26.20 16    Q.    Do you know why Winstar as a
O1:13:29.84 17    customer was given this accommodation by Lucent
O1:13:32.81 18    at the end of December 2000?
                                        Page 7

```
                          new 2 direct montemarano 6-25-04
01:13:35.71 19    A.    Other than the fact that the
01:13:36.81 20    vice-chairman wanted to do it, no, I do not know
01:13:46.55 21    why.
01:13:47.76 22    Q.    Now, another thing that you
01:13:49.09 23    testified to concerning this payment was the
01:13:52.63 24    fact that Lucent was interested in resetting the
01:13:58.83 25    relationship at that point in time.  Is that
```

=========================================================

```
Page 73
01:14:01.74  0    Page 73
01:14:02.47  1                              Page 73
01:14:01.74  1    MICHAEL MONTEMARANO
01:14:02.50  2    correct?
01:14:02.84  3    A.    Yeah, I recall that from the e-mail
01:14:04.24  4    that I read this morning.
01:14:05.21  5    Q.    They wanted to rework the contracts
01:14:06.91  6    between the parties.  Is that fair to say?
01:14:08.14  7    A.    I don't know if rework is the right
01:14:10.95  8    terminology, but we certainly wanted to get more
01:14:14.38  9    of our equipment sold into the business and get
01:14:17.65 10    out of financing third party.
01:14:20.39 11    Q.    And Lucent also wanted to end the
01:14:23.16 12    process of financing services of Winstar or its
01:14:29.06 13    operating subsidiaries, correct?
01:14:31.30 14    A.    We actually felt we ended that
01:14:33.17 15    practice for the entire time period I was there.
01:14:36.27 16    The payment in December was, again, a customer
01:14:39.37 17    relationship payment, had nothing to do with
01:14:41.31 18    work performed.
01:14:46.28 19    Q.    One of the things that Lucent
01:14:47.45 20    wanted to see come about following this payment
01:14:50.79 21    was the completion of an outsourcing deal for
01:14:53.05 22    services.  Is that correct?
01:14:54.76 23    A.    We were in discussions with Winstar
01:14:56.06 24    for an outsourcing relationship around this same
01:14:58.03 25    time period.
```

=========================================================

```
Page 74
01:14:58.46  0    Page 74
01:14:58.99  1                              Page 74
01:14:58.46  1    MICHAEL MONTEMARANO
01:14:59.03  2    Q.    Are you aware that on or about
01:15:01.80  3    December 14th, 2000, or shortly thereafter,
01:15:06.30  4    Lucent rejected an outsourcing deal?
01:15:10.37  5    A.    There was a lot of back and forth
01:15:11.71  6    negotiation between the two companies.  That
01:15:13.71  7    possibly could have occurred.  I don't recall
01:15:15.24  8    that firsthand.
01:15:16.21  9    Q.    Well, you recall from your first
01:15:17.61 10    deposition testifying that you actually approved
01:15:20.32 11    a draft outsourcing deal in mid-December,
01:15:23.82 12    correct?
01:15:24.45 13    A.    I actually don't recall that.
01:15:26.49 14    Q.    Let's see if we can refresh your
01:15:29.49 15    recollection?
```

=========================================================

```
*******************************************************
                          Page 8
```

new 2 direct montemarano 6-25-04

| | | |
|---|---|---|
| O1:18:15.26 | 20 | in that e-mail in place? |
| O1:18:19.56 | 21 | A.   There actually isn't an outsourcing |
| O1:18:20.96 | 22 | transaction in place as a result of this e-mail. |
| O1:18:23.77 | 23 | Q.   May I borrow that for one second? |
| O1:18:26.33 | 24 | A.   Sure. |

==============================================

✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰✰

Page 77

| | | |
|---|---|---|
| O1:18:32.31 | 0 | Page 77 |
| O1:18:32.61 | 1 | Page 77 |
| O1:18:32.31 | 1 | MICHAEL MONTEMARANO |
| O1:18:38.88 | 2 | This deal, in fact -- this |
| O1:18:40.45 | 4 | document, in fact, is labeled "A Deal Review |
| O1:18:43.52 | 5 | Approval Notification," is that correct? |
| O1:18:45.49 | 6 | A.   Correct. |
| O1:18:46.05 | 7 | Q.   Dated December 7, 2000? |
| O1:18:47.66 | 8 | A.   Correct. |
| O1:18:48.52 | 9 | Q.   And it lists as the domestic |
| O1:18:49.86 | 10 | opportunities a Winstar Services Addendum to |
| O1:18:53.73 | 11 | Supply Agreement.  Do you see that? |
| O1:18:55.23 | 12 | A.   Yes, I do. |
| O1:18:55.96 | 13 | Q.   Do you know if that, in fact, was |
| O1:18:58.10 | 14 | the outsourcing agreement that had been under |
| O1:19:00.00 | 15 | discussion between the parties? |
| O1:19:02.17 | 16 | A.   I don't, in fact, know that, but it |
| O1:19:03.41 | 17 | seems reasonable to say it is. |
| O1:19:05.87 | 18 | Q.   It's described as a one billion |
| O1:19:07.28 | 19 | dollar revenue opportunity to manage and |
| O1:19:09.11 | 20 | complete Winstar's network buildout." |
| O1:19:10.51 | 21 | Do you see that? |
| O1:19:11.48 | 22 | A.   Yes, I do. |
| O1:19:12.35 | 23 | Q.   Does that refresh your recollection |
| O1:19:13.58 | 24 | at all as the whether this is referring the an |
| O1:19:15.75 | 25 | outsourcing deal? |

==============================================

Page 78

| | | |
|---|---|---|
| O1:19:16.28 | 0 | Page 78 |
| O1:19:16.99 | 1 | Page 78 |
| O1:19:16.28 | 1 | MICHAEL MONTEMARANO |
| O1:19:17.02 | 2 | A.   It clearly refers to an outsourcing |
| O1:19:18.35 | 3 | deal. |
| O1:19:18.65 | 4 | Q.   Let me go back one second and I'll |
| O1:19:22.32 | 5 | just ask that question again. |
| O1:19:25.49 | 6 | At the time that Lucent decided to |
| O1:19:28.40 | 7 | accommodate Winstar with the $62 million |
| O1:19:33.17 | 8 | services draw, had that outsourcing deal been |
| O1:19:37.67 | 9 | agreed to by Lucent? |
| O1:19:40.11 | 10 | A.   No, it had not.  That's not what |
| O1:19:41.21 | 11 | this document is. |
| O1:19:42.51 | 12 | Q.   I'm not suggesting that that |
| O1:19:43.65 | 13 | document is.  I'm asking, independent of that |
| O1:19:45.75 | 14 | document, to your knowledge, at the end  -- |
| O1:19:47.78 | 15 | A.   To my knowledge, there was nothing |
| O1:19:48.72 | 16 | in place at the end of December. |
| O1:19:50.02 | 17 | Q.   To your knowledge, was there ever |
| O1:19:52.15 | 18 | an outsourcing deal entered into between Winstar |
| O1:19:54.19 | 19 | and Lucent? |
| O1:19:55.56 | 20 | A.   Not that I recall. |

Page 10

new 2 direct montemarano 6-25-04

01:20:02.00 21    Q.    Yet you had approved, at the least
01:20:03.57 22    at the early stage, an outsourcing deal as of
01:20:06.43 23    December 7th?
01:20:07.90 24    A.        Based on this document, which is a
01:20:09.07 25    standard document to review all commercial

============================================================

Page 79
01:20:10.07  0    Page 79
01:20:11.07  1                                    Page 79
01:20:10.07  1    MICHAEL MONTEMARANO
01:20:11.11  2    transactions with customers, we approve it based
01:20:14.11  3    on the criteria laid out on this document, which
01:20:16.08  4    are about nine or ten bullet points that need to
01:20:18.65  5    get done, including legal signoff, including
01:20:21.62  6    contingent upon services organization signoff,
01:20:24.39  7    so this is the financial team saying, as
01:20:26.69  8    structured, this transaction is a good
01:20:28.42  9    transaction to proceed on, but it is not an
01:20:31.03 10    approval of a final consummated deal.
01:20:33.60 11    Q.    Do you know why this deal died?
01:20:37.63 12    A.    I actually don't recall if it died.
01:20:40.87 13    I don't even know if it died.
01:20:43.67 14    Q.    But you do know that it wasn't
01:20:44.87 15    entered into at any point in time between the
01:20:49.11 16    parties?
01:20:49.44 17    A.    I know for a fact that we did not
01:20:50.98 18    have an outsourcing arrangement with Winstar at
01:20:53.82 19    the time period from October of 2000 through
01:20:58.45 20    first quarter of 2001?

============================================================

************************************************

Page 86
01:27:19.00 15                                    Page 86
01:27:11.49 13    MR. KING:    I'd like to mark this as
01:27:14.33 14    the next document.
01:27:15.46 15    (Defendant's Exhibit 12 marked for
01:27:19.03 16    identification, Bates LW 72925.)
01:27:20.67 17    BY MR. KING:
01:27:22.27 18    Q.    Do you have the document in front
01:27:25.51 19    of you, Mr. Montemarano?
01:27:28.01 20    A.    Yes, I do.
01:27:29.11 21    Q.    Can you identify it, please?
01:27:31.61 22    A.    Appears to be an e-mail, it's an
01:27:34.85 23    e-mail from me to a variety of people in the
01:27:39.52 24    business, salespeople, attorneys.
01:27:42.76 25    Q.    Now, just point you to the first

============================================================

Page 87
01:27:46.70  0    Page 87
01:27:57.64  1                                    Page 87
01:27:46.70  1    MICHAEL MONTEMARANO
01:27:57.67  2    paragraph of your e-mail.  We're obviously
01:28:00.41  3    looking at your e-mail, not the Peter Derrick
01:28:02.51  4    FYI e-mail above it.
01:28:03.98  5    Do you recall drafting this e-mail?
01:28:08.78  6    A.    I don't specifically recall it, but
                                    Page 11

```
                        new 2 direct montemarano 6-25-04
01:32:55.94  4   not going to remark it. Take a second to look
01:32:59.64  5   at this.
01:33:00.14  6   A.     Do you want me to read the whole
01:33:17.26  7   document?
01:33:21.03  8   Q.     Really, I'm going to focus just on
01:33:33.24  9   the first couple of pages up to the signature.
01:33:36.21 10   You don't need to read the general due diligence
01:33:38.58 11   suggested questions that follow.
01:33:40.02 12   A.     Okay.
```

```
================================================
************************************************
```

```
Page 92
01:34:08.74 18                                     Page 92
01:34:07.61 18   Q.     Well, this e-mail that you sent on
01:34:08.78 19   November 6th about this draft agreement, this
01:34:13.48 20   Hayes-9 exhibit is dated November 7th, correct?
01:34:21.06 21   A.     Yes, it is.
01:34:21.36 22   Q.     So it followed the next day?
01:34:22.76 23   A.     Yes, it did.
01:34:23.86 24   Q.     And it appears to me to be a letter
01:34:25.89 25   from Richard Uhl -- or a letter from Martina
```

```
================================================
```

```
Page 93
01:34:29.80  0   Page 93
01:34:30.20  1                                     Page 93
01:34:29.80  1   MICHAEL MONTEMARANO
01:34:30.23  2   Hund-Mejean to Richard Uhl at Winstar.
01:34:31.17  3   A.     Correct.
01:34:32.57  4   Q.     Did you see a copy of this letter?
01:34:34.24  5   A.     Not that I recall.
01:34:38.01  6   Q.     Were you told that this was going
01:34:39.24  7   to be Lucent's response, essentially, to being
01:34:41.94  8   advised about the Siemens financing?
01:34:43.65  9   A.     Not that I recall specifically.
01:34:46.25 10   Q.     Would you agree that this letter
01:34:48.62 11   does not capture the terms that you had
01:34:51.85 12   negotiated with Winstar on November 6th?
01:34:54.99 13   A.     Negotiated is a very strong term
01:34:56.46 14   for what that e-mail is capturing.  The sentence
01:34:58.46 15   I used in the beginning captures the
01:34:59.69 16   conversation/agreement.  That was my recap of
01:35:02.80 17   what we talked about in the room.  It was
01:35:04.60 18   business conversation.  It was clearly not a
01:35:06.47 19   negotiation.
01:35:08.44 20   Q.     But you referred to it as an
01:35:09.50 21   agreement?
01:35:10.77 22   A.     I believe I called it a
01:35:11.67 23   conversation/agreement, yeah, in both places I
01:35:14.44 24   certainly called it the agreement.  The
01:35:16.14 25   paragraph before that calls it the
```

```
================================================
```

```
Page 94
01:35:17.81  0   Page 94
01:35:18.61  1                                     Page 94
01:35:17.81  1   MICHAEL MONTEMARANO
01:35:18.65  2   conversation/agreement.
                                 Page 14
```

new 2 direct montemarano 6-25-04

| | | |
|---|---|---|
| 01:35:19.18 | 3 | Q.     I don't want to bandy this about |
| 01:35:21.32 | 4 | back and forth with you, but was this, in fact, |
| 01:35:25.75 | 5 | at least the beginnings of an understanding |
| 01:35:27.96 | 6 | between the two parties that you thought you had |
| 01:35:29.52 | 7 | negotiated? |
| 01:35:30.16 | 8 | A.     That's a much fairer |
| 01:35:30.73 | 9 | characterization.  It's the beginning of a |
| 01:35:32.59 | 10 | conversation between the two parties. |
| 01:35:34.36 | 11 | Q.     Not the beginning of a |
| 01:35:35.23 | 12 | conversation, the beginning of an understanding, |
| 01:35:37.27 | 13 | beginning of an agreement? |
| 01:35:38.10 | 14 | A.     Beginning of an understanding.  I |
| 01:35:40.47 | 15 | won't go as far as beginning of an agreement |
| 01:35:41.70 | 16 | because it was not. |
| 01:35:43.64 | 17 | Q.     But you did call it an agreement in |
| 01:35:44.94 | 18 | your e-mail to the other Lucent people? |
| 01:35:46.37 | 19 | A.     Yes, I did. |
| 01:35:47.51 | 20 | Q.     Just so we're clear.  I understand |
| 01:35:49.31 | 21 | what you're saying and I want to make sure that |
| 01:35:50.88 | 22 | the document that you wrote is clear as well. |
| 01:35:54.28 | 23 | A.     Okay. |
| 01:35:55.88 | 24 | Q.     November 7th Lucent, through |
| 01:35:58.79 | 25 | Martina Hund-Mejean, who was apparently advised |
| 01:35:59.75 | 25 | advised |

===============================================================

Page 95

| | | |
|---|---|---|
| 01:35:59.79 | 0 | Page 95 |
| 01:36:00.56 | 1 | Page 95 |
| 01:35:59.79 | 1 | MICHAEL MONTEMARANO |
| 01:36:00.59 | 2 | of your agreement in Montemarano-12 by Peter |
| 01:36:01.79 | 3 | Derrick.  Do you see that? |
| 01:36:04.59 | 4 | A.     Yes, I do. |
| 01:36:05.89 | 5 | Q.     Sends a letter to Rick Uhl and she |
| 01:36:08.43 | 6 | says in No. 1 in this letter, "Lucent will |
| 01:36:12.13 | 7 | consent to increasing the loans or commitments |
| 01:36:14.10 | 8 | under the bank credit agreement by $200 million |
| 01:36:18.21 | 9 | on the following condition." |
| 01:36:20.28 | 10 | You see that? |
| 01:36:20.91 | 11 | A.     Yes, I do. |
| 01:36:21.44 | 12 | Q.     She probably meant to say |
| 01:36:22.38 | 13 | conditions because it looks like there's a lot. |
| 01:36:24.91 | 14 | Would you agree with that? |
| 01:36:26.45 | 15 | A.     Certainly more than one. |
| 01:36:33.19 | 16 | Q.     What she says -- let's look at the |
| 01:36:36.36 | 17 | second bullet point, "The bank amendment will |
| 01:36:39.73 | 18 | provide that the entire $200 million increase in |
| 01:36:43.53 | 19 | the bank credit agreement will be drawn |
| 01:36:45.03 | 20 | immediately," and then further on, "To prepay |
| 01:36:50.34 | 21 | outstanding loans under the credit agreement." |
| 01:36:52.34 | 22 | Do you see that? |
| 01:36:53.88 | 23 | A.     Yes, I do. |
| 01:36:54.24 | 24 | Q.     Winstar will also pay all accrued |
| 01:36:55.64 | 25 | interest on the $200 million of loans being |

===============================================================

Page 96

| | | |
|---|---|---|
| 01:36:58.58 | 0 | Page 96 |
| 01:37:00.22 | 1 | Page 96 |
| 01:36:58.58 | 1 | MICHAEL MONTEMARANO |
| 01:37:00.25 | 2 | repaid." |

Page 15

B964

new 2 direct montemarano 6-25-04

| 01:37:00.52 | 3 | Do you see that? |
| 01:37:00.88 | 4 | A.    Yes, I do. |
| 01:37:01.08 | 5 | Q.    Winstar had already said that they |
| 01:37:02.32 | 6 | were willing to do that in that |
| 01:37:05.55 | 7 | conversation/agreement that they had with you |
| 01:37:08.22 | 8 | the day before, correct? |
| 01:37:10.56 | 9 | A.    Yes, they did. |
| 01:37:12.56 | 10 | Q.    Or at least that they are willing |
| 01:37:13.56 | 11 | to pay the money over whenever it did get drawn |
| 01:37:16.36 | 12 | down? |
| 01:37:16.77 | 13 | A.    Yeah, I don't think they made the |
| 01:37:17.70 | 14 | interest reference, but they did indicate the |
| 01:37:19.33 | 15 | 200 million would be paid back. |

==================================================

**************************************************

Page 97

| 01:38:02.31 | 4 | Page 97 |
| 01:38:01.31 | 4 | Q.    Now, Martina Hund-Mejean, in her |
| 01:38:02.34 | 5 | letter to Rick Uhl the day after this |
| 01:38:04.35 | 6 | conversation/agreement occurred, says in |
| 01:38:14.12 | 7 | Paragraph 3, "The dollar threshold at which |
| 01:38:17.26 | 8 | Lucent can exercise its refinancing option under |
| 01:38:20.36 | 9 | the credit agreement will remain at $500 |
| 01:38:22.60 | 10 | million, and Sections 2.18 and 2.19 of the |
| 01:38:26.74 | 11 | credit agreement will not be amended." |
| 01:38:29.34 | 12 | You see that? |
| 01:38:30.07 | 13 | A.    Yes, I do. |
| 01:38:31.37 | 14 | Q.    That's a change from the |
| 01:38:33.34 | 15 | conversation/agreement that you had talked about |
| 01:38:35.41 | 15 | about |
| 01:38:35.44 | 16 | with Winstar the day before.  Is that correct? |
| 01:38:43.55 | 17 | A.    Actually, I don't see that |
| 01:38:48.09 | 18 | language, I'm sorry. |
| 01:38:49.69 | 19 | Q.    You don't? |
| 01:38:50.13 | 20 | A.    No, I do not. |
| 01:38:50.93 | 21 | Q.    Let's look at the third line down |
| 01:38:53.16 | 22 | from the agreement, the third paragraph down. |
| 01:38:55.33 | 23 | It says, "Lucent will initiate triggers to |
| 01:38:58.60 | 24 | change the interest rate and other financing |
| 01:39:00.40 | 25 | claims when the amount of our financing exceeds |

==================================================

Page 98

| 01:39:02.34 | 0 | Page 98 |
| 01:39:03.47 | 1 | Page 98 |
| 01:39:02.34 | 1 | MICHAEL MONTEMARANO |
| 01:39:03.51 | 2 | $550 million." |
| 01:39:04.11 | 3 | Do you see that? |
| 01:39:05.27 | 4 | A.    Yes, I do. |
| 01:39:07.91 | 5 | Q.    It says in Paragraph 3, "The dollar |
| 01:39:10.05 | 6 | threshold at which Lucent can exercise its |
| 01:39:11.88 | 7 | refinancing option will remain at $500 million." |
| 01:39:13.78 | 8 | Do you see that? |
| 01:39:14.62 | 9 | A.    Yes, I do. |
| 01:39:16.28 | 10 | Q.    Is there a difference between 550 |
| 01:39:23.93 | 11 | and $500 million? |
| 01:39:27.80 | 12 | A.    Yes, there is. |
| 01:39:29.76 | 13 | Q.    Now, in Paragraph 4 Ms. Hund-Mejean |

Page 16

```
                              new 2 direct montemarano 6-25-04
01:39:35.10 14    also states, as apparently one of the conditions
01:39:41.01 15    for Lucent's consent that Winstar will provide
01:39:44.28 16    Lucent with full access and allow Lucent to do
01:39:46.58 17    due diligence, right?
01:39:47.48 18    A.      Correct.
01:39:52.15 19    Q.      And then in Paragraph 6
01:39:54.86 20    Ms. Hund-Mejean says that, "By November 30th
01:39:58.09 21    Winstar will prepare a written plan satisfactory
01:40:00.73 22    to Lucent detailing the manner and timing by
01:40:03.80 23    which Winstar will refinance loans under the
01:40:05.67 24    credit agreement."
01:40:06.30 25    Do you see that?
```

================================================

```
Page 99
01:40:06.94  0    Page 99
01:40:07.17  1                                    Page 99
01:40:06.94  1    MICHAEL MONTEMARANO
01:40:07.20  2    A.      Yes, I do.
```

================================================

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

```
Page 99
01:40:38.23 15                                    Page 99
01:40:34.76 15    Q.      To your knowledge, was Lucent
01:40:38.27 16    contractually entitled to any of the demands
01:40:41.80 17    that are listed here in Ms. Hund-Mejean's
01:40:46.41 18    letter?
01:40:52.38 19    A.      Not to my knowledge.
01:40:55.35 20    Q.      Do you recall what happened with
01:40:57.95 21    respect to the Siemens financing after this
01:40:59.85 22    November 7th letter?
01:41:03.02 23    A.      I recall the Siemens financing was
01:41:04.59 24    put in place by Winstar.
01:41:05.49 25    Q.      But you don't recall Winstar's
```

================================================

```
Page 100
01:41:07.36  0    Page 100
01:41:08.16  1                                    Page 100
01:41:07.36  1    MICHAEL MONTEMARANO
01:41:08.20  2    response to this November 7th letter?
01:41:10.20  3    A.      No, I don't.
01:41:12.97  4    Q.      Let's look at another document.
01:41:14.60  5    This may help refresh your recollection.
01:41:16.57  6    MR. KING:  We're up to
01:41:19.77  7    Montemarano-13.
01:41:26.18  8    (Defendant's Exhibit 13 marked for
01:41:34.99  9    identification, Bates LWI 37191.)
01:41:38.59 10    BY MR. KING:
01:41:42.16 11    Q.      Take a moment to review it and I'm
01:41:44.90 12    going to focus mostly on the second e-mail from
01:41:47.94 13    Beth Perricone to those other people with a copy
01:41:51.37 14    to you.
01:41:53.58 15    A.      Okay.  Would you like me to read
01:42:02.35 16    the whole thing?
01:42:07.82 17    Q.      Yes, just let me know when you're
01:42:09.56 18    ready.
01:42:09.76 19    A.      Okay.
```

B966

new 2 direct montemarano 6-25-04

| | | |
|---|---|---|
| 02:30:04.03 | 20 | this e-mail? |
| 02:30:06.54 | 21 | A.    Distinguishing this particular |
| 02:30:07.97 | 22 | e-mail is a tough comment to relate to. |
| 02:30:10.27 | 23 | Discontinuing the fact that you raised is very |
| 02:30:12.44 | 24 | easy.  We weren't selling them the services that |
| 02:30:14.78 | 25 | they took the draw on at the end of December. |

=====================================================

Page 144

| | | |
|---|---|---|
| 02:30:16.95 | 0 | Page 144 |
| 02:30:17.75 | 1 |                          Page 144 |
| 02:30:16.95 | 1 | |
| 02:30:17.78 | 2 | MICHAEL MONTEMARANO |
| | | We were selling them our services or in prior |
| 02:30:20.05 | 3 | quarters we've sold them services through the |
| 02:30:21.65 | 4 | subcontractor relationship.  That did not exist |
| 02:30:24.45 | 5 | at December.  We paid that as an accommodation. |
| 02:30:26.96 | 6 | There was no selling from us to them going on. |
| 02:30:30.59 | 7 | Q.    Was Lucent selling services back in |
| 02:30:33.00 | 8 | September of 2000 and June of 2000 when Lucent |
| 02:30:36.57 | 9 | did fund services? |
| 02:30:39.54 | 10 | A.    I'd have to say I don't know.  I |
| 02:30:42.34 | 11 | would assume so, but I don't know. |
| 02:30:44.31 | 12 | Q.    Now, you testified already that you |
| 02:30:46.21 | 13 | never read the supply agreement. |
| 02:30:47.51 | 14 | A.    Correct. |
| 02:30:48.24 | 15 | Q.    Do you know if, in fact, Lucent had |
| 02:30:49.98 | 16 | an obligation to do the very services that |
| 02:30:55.25 | 17 | Winstar was performing under this subcontract? |
| 02:30:57.69 | 18 | A.    I wouldn't know that firsthand. |
| 02:31:02.06 | 19 | Q.    You would presume, wouldn't you, |
| 02:31:03.19 | 20 | that Lucent would only subcontract services that |
| 02:31:05.79 | 21 | it actually had an obligation to perform in the |
| 02:31:07.53 | 22 | first place; is that a fair statement? |
| 02:31:09.16 | 23 | A.    That's a fair statement. |
| 02:31:11.77 | 24 | Q.    Do you know what changed between |
| 02:31:14.54 | 25 | September and December with respect to Lucent's |

=====================================================

Page 145

| | | |
|---|---|---|
| 02:31:17.47 | 0 | Page 145 |
| 02:31:17.94 | 1 |                          Page 145 |
| 02:31:17.47 | 1 | |
| 02:31:17.97 | 2 | MICHAEL MONTEMARANO |
| | | obligation to perform the services that Winstar |
| 02:31:21.01 | 3 | was performing such that it no longer had to |
| 02:31:24.28 | 4 | fund in December 2000?  Do you understand the |
| 02:31:26.62 | 5 | question? |
| 02:31:27.62 | 6 | A.    Rephrase it again. |

=====================================================

********************************************************

Page 145

| | | |
|---|---|---|
| 02:31:54.31 | 20 |                          Page 145 |
| 02:31:52.37 | 20 | Q.    To your knowledge, did anything |
| 02:31:54.34 | 21 | change in the contractual relationships between |
| 02:31:58.78 | 22 | these parties between September 2000 and |
| 02:32:03.09 | 23 | December 2000 such that Lucent no longer had an |
| 02:32:07.42 | 24 | obligation to perform the services that it had |
| | |                          Page 36 |

B967

```
                          new 2 direct montemarano 6-25-04
02:32:10.46 25    previously subcontracted to Winstar?
```

===================================================================

*****************************************************

```
Page 146
02:32:16.27  3                                        Page 146
02:32:14.76  3    A.     From the point I joined the company
02:32:16.30  4    in October, there was not in existence a
02:32:19.00  5    relationship between us and Winstar from a
02:32:21.77  6    subcontractor point of view to have them do
02:32:24.17  7    services on our behalf and then have that billed
02:32:27.71  8    to Lucent.  There was no agreement to that
02:32:30.88  9    effect.
02:32:32.25 10    Q.     You hedged this by saying from the
02:32:33.88 11    time you joined Lucent in October.  Are you
02:32:37.49 12    aware of what the agreement was before you
02:32:39.96 13    joined Lucent when Lucent did, in fact, pay
02:32:43.56 14    these services in September 2000?
02:32:46.40 15    A.     My recollection, even from
02:32:47.60 16    testimony today, is that I described a letter
02:32:50.33 17    agreement that existed between Lucent and
02:32:53.34 18    Winstar and, as I recall, in the September time
02:32:56.17 19    frame, Nina Aversano recanted that agreement and
02:33:00.58 19    and
02:33:00.61 20    said we need to go for an outsourcing
02:33:02.95 21    arrangement, we're not going to continue the
02:33:04.75 22    exchange of POs for services.  That was in
02:33:07.62 23    September of 2000, as I recall.
02:33:10.45 24    Q.     So Nina Aversano wrote a letter in
02:33:12.75 25    September 2000 that said, "We're not going to do
```

===================================================================

```
Page 147
02:33:16.12  0    Page 147
02:33:16.33  1                                        Page 147
02:33:16.12  1    MICHAEL MONTEMARANO
02:33:16.36  2    this any more"?
02:33:16.49  3    A.     That's my recollection.
```

===================================================================

*****************************************************

```
Page 147
02:33:46.72 17                                        Page 147
02:33:43.62 17    Q.     A few moments ago you testified, I
02:33:46.76 18    believe, that Lucent would only agree to
02:33:52.23 19    subcontract services that it was obligated to
02:33:54.66 20    perform.  You recall that answer?
02:33:56.60 21    A.     Correct, yes, I do.
02:33:58.20 22    Q.     So presumably through September
02:34:00.97 23    2000, when Lucent was paying Winstar's
02:34:05.21 24    subsidiary for these services, it was doing so
02:34:07.78 25    because it had a contractual obligation to
```

===================================================================

```
Page 148
02:34:09.44  0    Page 148
```

B968

new 2 direct montemarano 6-25-04

Page 148

| 02:34:09.65 | 1 | |
| 02:34:09.44 | 1 | MICHAEL MONTEMARANO |
| 02:34:09.68 | 2 | provide the services in the first place, fair |
| 02:34:11.41 | 3 | enough? |
| 02:34:11.65 | 4 | A.    Fair enough. |

============================================

*************************************************

Page 148

| | | Page 148 |
| 02:34:14.18 | 6 | |
| 02:34:13.48 | 6 | Q.    Do you agree with that? |
| 02:34:14.22 | 7 | A.    Yes, it's a fair statement of a |
| 02:34:15.75 | 8 | subcontractor relationship and how it would |
| 02:34:17.49 | 9 | work. |
| 02:34:19.45 | 10 | Q.    To your knowledge, did anything |
| 02:34:20.76 | 11 | change, after September 2000, that eliminated |
| 02:34:25.43 | 12 | Lucent's obligation to perform the services that |
| 02:34:27.96 | 13 | it had subcontracted? |
| 02:34:29.03 | 14 | A.    To my knowledge, that agreement was |
| 02:34:30.30 | 15 | no longer in effect. |
| 02:34:33.40 | 16 | Q.    What agreement was it under which |
| 02:34:36.81 | 17 | Lucent was subcontracting to Wireless, under |
| 02:34:40.08 | 18 | your understanding of -- |
| 02:34:41.24 | 19 | A.    I don't know what the agreement |
| 02:34:42.78 | 20 | was, but I do recall in September 2000 there was |
| 02:34:45.18 | 21 | a document created that said we're not going to |
| 02:34:47.55 | 22 | do this any more. |
| 02:34:50.49 | 23 | Q.    You're aware that Lucent also |
| 02:34:52.29 | 24 | subcontracted to Winstar throughout 1999? |
| 02:34:55.52 | 25 | A.    Only by conversations we've had in |

============================================

Page 149

| 02:34:56.99 | 0 | Page 149 |
| 02:34:59.09 | 1 | |
| 02:34:56.99 | 1 | Page 149 |
| 02:34:59.13 | 2 | MICHAEL MONTEMARANO |
| 02:35:01.26 | 3 | here today. |
| 02:35:03.60 | 4 | Q.    But it's your testimony that a 2000 |
| 02:35:08.60 | 5 | letter authorized Winstar to perform services |
| 02:35:10.24 | 6 | for Lucent under this subcontract? |
| 02:35:11.97 | 7 | A.    No.  My testimony is there was a |
| 02:35:14.61 | 8 | letter created in September of 2000 that said |
| 02:35:16.81 | 9 | we're not going to do subcontracting |
| 02:35:18.51 | 10 | relationships any more.  We want to move to an |
| 02:35:20.18 | 11 | outsourcing arrangement. |
| 02:35:21.58 | 12 | Q.    But you previously testified there |
| 02:35:24.25 | 13 | was a letter agreement in place that allowed |
| 02:35:26.72 | 14 | Winstar to perform services for Lucent, right? |
| 02:35:29.66 | 15 | A.    I don't actually recall saying |
| 02:35:33.20 | 16 | there was a letter in place.  I said if we're |
| 02:35:35.30 | 17 | doing it, there had to be an agreement in place. |
| 02:35:37.80 | 18 | If I said a letter, I misspoke, I apologize. |
| 02:35:39.50 | 19 | Q.    It's my understanding -- and maybe |
| 02:35:41.94 | 20 | I've missed it now, but I'm sure the record is |
| 02:35:44.57 | 21 | going to be clear -- that you testified earlier |
| 02:35:49.31 | 22 | that there was some letter in 2000 under which |
| 02:35:52.75 | 23 | Winstar was authorized to perform services for |
| | | Lucent under this subcontract. |

Page 38

B969

new 2 direct montemarano 6-25-04

| 02:35:54.95 | 24 | A. | Okay.  I don't recall saying that. |
| 02:35:56.95 | 25 | Q. | You don't recall saying that? |

==================================================

Page 150

| 02:35:58.02 | 0 | Page 150 |
| 02:35:58.75 | 1 | Page 150 |
| 02:35:58.02 | 1 | MICHAEL MONTEMARANO |
| 02:35:58.79 | 2 | A.    No, I do not. |
| 02:36:06.20 | 3 | Q.    So, in your view, this Hopkins 37 |
| 02:36:08.46 | 4 | e-mail where Beth Perricone says, "If we're |
| 02:36:11.90 | 5 | selling them services under that supply |
| 02:36:13.74 | 6 | agreement, I believe we'd be required to fund |
| 02:36:15.87 | 7 | those services," is irrelevant? |
| 02:36:19.64 | 8 | A.    Right, because we weren't selling |
| 02:36:20.68 | 9 | them the services, that's why it's irrelevant. |
| 02:36:22.64 | 10 | Q.    Why was Beth Perricone raising this |
| 02:36:24.25 | 11 | point, do you know? |
| 02:36:26.95 | 12 | A.    I don't. |
| 02:36:27.45 | 13 | Q.    Did you ask her, well, why are you |
| 02:36:28.82 | 14 | sending this e-mail, we're not selling them |
| 02:36:31.59 | 15 | services under this supply agreement? |
| 02:36:34.82 | 16 | A.    I may have reacted to it that way. |
| 02:36:36.23 | 17 | I don't recall if I did or not. |
| 02:36:39.70 | 18 | Q.    To your knowledge, did anyone else |
| 02:36:41.56 | 19 | say to Beth Perricone, thanks for your input, |
| 02:36:44.00 | 20 | but you're totally off point; this is completely |
| 02:36:46.40 | 21 | irrelevant what you're saying? |
| 02:36:47.40 | 22 | A.    Not to my knowledge. |
| 02:36:50.97 | 23 | Q.    But that's your reaction on looking |
| 02:36:52.37 | 24 | at this right now, correct, that this is an |
| 02:36:54.01 | 25 | irrelevant point, didn't need to be raised? |

==================================================

Page 151

| 02:36:55.84 | 0 | Page 151 |
| 02:36:56.25 | 1 | Page 151 |
| 02:36:55.84 | 1 | MICHAEL MONTEMARANO |
| 02:36:56.28 | 2 | A.    The selling point is an irrelevant |
| 02:36:57.15 | 3 | point, right, that we weren't selling it. |
| 02:36:59.18 | 4 | Q.    The fact that Lucent would have to |
| 02:37:00.55 | 5 | finance if they were selling services under this |
| 02:37:03.75 | 6 | supply agreement is an irrelevant point, in your |
| 02:37:05.82 | 7 | testimony today? |
| 02:37:06.62 | 8 | A.    Correct. |
| 02:37:08.19 | 9 | Q.    But no one went back to Beth |
| 02:37:09.99 | 10 | Perricone, to your knowledge, and said, that's |
| 02:37:12.93 | 11 | irrelevant, you're missing the point here, has |
| 02:37:15.03 | 12 | nothing to do with our decision to finance |
| 02:37:16.63 | 13 | services yesterday? |
| 02:37:17.63 | 14 | A.    To my knowledge, I don't know if |
| 02:37:18.53 | 15 | anybody got back to Beth.  I don't recall if I |
| 02:37:20.50 | 16 | got back to Beth. |
| 02:37:21.67 | 17 | Q.    Again, she's someone who you |
| 02:37:22.77 | 18 | testified as being a competent, reliable |
| 02:37:25.07 | 19 | employee? |
| 02:37:25.57 | 20 | A.    Absolutely, trusted employee. |
| 02:37:31.95 | 21 | Q.    Now I'd like to show you another |
| 02:37:36.89 | 22 | version of your e-mail about the payment of |
| 02:37:52.00 | 23 | services on that date.  This was marked at your |
| 02:37:54.57 | 24 | last deposition, it's Montemarano-17, and I |

Page 39

new 2 direct montemarano 6-25-04

02:56:09.33 22   Do you see that?
02:56:10.67 23   A.    Yes.
02:56:10.90 24   Q.    Do you recall whether or not Lucent
02:56:12.03 25   actually put together a list of must haves and

================================================================

Page 170
02:56:14.27  0   Page 170
02:56:14.80  1                                    Page 170
02:56:14.27  1   MICHAEL MONTEMARANO
02:56:14.84  2   nice to haves?
02:56:16.14  3   A.    As I recall, we went down there
02:56:17.41  4   prepared to talk about equipment, outsourcing,
02:56:21.38  5   things of that ilk, very specific on the
02:56:23.41  6   equipment, what we wanted to install and have
02:56:26.45  7   them purchase and things like that.
02:56:30.05  8   MR. KING:  Let's mark this as the
02:56:31.59  9   next exhibit.
02:56:32.29 10   (Defendant's Exhibit 17 marked for
02:56:42.43 11   identification, Bates LW 275476 through 275477.)
02:56:51.21 12   BY MR. KING:
02:56:59.98 13   Q.    Let me know when you've had a
02:57:03.99 14   chance to read through it.
02:57:09.06 15   A.    Okay, I scanned it.
02:57:12.69 16   Q.    You've looked at it, okay.
02:57:19.54 17   Now, he just referred to -- in
02:57:21.47 18   Montemarano-16 Ben referred to an A list and a B
02:57:24.11 19   list, right?
02:57:24.74 20   A.    Yes, he did.
02:57:25.47 21   Q.    Do you recall seeing this list?
02:57:27.54 22   A.    I actually don't, but the contents
02:57:29.88 23   of it I recall having discussions around.
02:57:32.31 24   Q.    Does this appear to you to be the A
02:57:33.58 25   and B list that Ben Verwaayen was asking you

================================================================

Page 171
02:57:35.62  0   Page 171
02:57:36.75  1                                    Page 171
02:57:35.62  1   MICHAEL MONTEMARANO
02:57:36.79  2   have prepared?
02:57:37.02  3   A.    I wouldn't know that firsthand.
02:57:39.45  4   Q.    You said you recall the various
02:57:42.26  5   bullets that are listed in here, right?
02:57:43.79  6   A.    Yes, I do.
02:57:44.46  7   Q.    These are all things that Lucent
02:57:46.56  8   wanted, right?
02:57:47.16  9   A.    All, I don't know.  Some of them I
02:57:50.13 10   recall.  The best of breed commentary I recall,
02:57:53.37 11   but to say all of them is -- I couldn't do that.
02:58:00.58 12   Q.    Is there anything on this A list or
02:58:02.31 13   B list that, in your understanding, would
02:58:04.61 14   actually be to Winstar's benefit as opposed to
02:58:09.99 15   detriment?  Take a moment and look at it and see
02:58:13.26 16   if there's anything you can find on this list
02:58:14.76 17   that actually helps Winstar as opposed to
02:58:20.46 18   hurting them.
02:58:22.93 19   A.    You want me to call them out
02:58:28.77 20   singularly when I see them?
02:58:34.58 21   Q.    Sure.
02:58:35.41 22   A.    Yeah, I think the whole issue
                                 Page 49

B971

new 2 direct montemarano 6-25-04

| 02:58:42.85 | 23 | around content and the network that was totally |
| 02:59:00.34 | 24 | Lucent equipment made it much easier and less |
| 02:59:02.40 | 25 | expensive for Winstar to maintain it.  That was |

==================================================

Page 172

| 02:59:04.01 | 0 | Page 172 |
| 02:59:04.41 | 1 | Page 172 |
| 02:59:04.01 | 1 | MICHAEL MONTEMARANO |
| 02:59:04.44 | 2 | a position we took with them constantly. |
| 02:59:06.78 | 3 | The best of breed concept of having |
| 02:59:08.24 | 4 | -- |
| 02:59:09.71 | 5 | Q.    Let's go through them one at a |
| 02:59:10.48 | 6 | time, rather than having you list them all and |
| 02:59:14.15 | 7 | having to go back to them, it's going to be |
| 02:59:15.45 | 8 | harder to keep them clear. |
| 02:59:16.95 | 9 | A.    Okay. |
| 02:59:17.45 | 10 | Q.    You're looking at the -- |
| 02:59:19.29 | 11 | A.    One, two, three, four -- |
| 02:59:21.82 | 12 | Q.    Fifth bullet down about Lucent's |
| 02:59:23.43 | 13 | services being limited, right? |
| 02:59:24.89 | 14 | A.    No, the one before, "Finance a |
| 02:59:30.43 | 15 | hundred percent Lucent content only versus 75 |
| 02:59:38.67 | 16 | percent Lucent content and 25 percent non-Lucent |
| 02:59:40.94 | 16 | non-Lucent |
| 02:59:40.98 | 17 | content. " |
| 02:59:41.51 | 18 | Q.    So that's actually the fourth |
| 02:59:42.88 | 19 | bullet down, right? |
| 02:59:43.68 | 20 | A.    Yes. |
| 02:59:44.35 | 21 | Q.    Now, what you're telling me is that |
| 02:59:47.82 | 22 | you believe that's to Winstar's benefit? |
| 02:59:49.42 | 23 | A.    Yes, it is. |
| 02:59:50.25 | 24 | Q.    Not to be able to borrow for |
| 02:59:51.42 | 25 | non-Lucent material but only for Lucent? |

==================================================

Page 173

| 02:59:56.33 | 0 | Page 173 |
| 02:59:56.96 | 1 | Page 173 |
| 02:59:56.33 | 1 | MICHAEL MONTEMARANO |
| 02:59:56.99 | 2 | A.    Moving the content to a hundred |
| 02:59:57.63 | 3 | percent Lucent is the benefit I see to Winstar. |
| 03:00:00.46 | 4 | Having a network that was a totally Lucent |
| 03:00:03.37 | 5 | network would be a less expensive network for |
| 03:00:05.33 | 6 | them to manage and run.  Those were the |
| 03:00:06.97 | 7 | operating conversations we were having with |
| 03:00:09.24 | 8 | them. |
| 03:00:09.61 | 9 | Q.    That's based on your opinion of the |
| 03:00:11.67 | 10 | quality of the Lucent equipment and its ability |
| 03:00:15.04 | 11 | to -- Lucent ability to actually provide a |
| 03:00:17.88 | 12 | hundred percent of a network? |
| 03:00:19.55 | 13 | A.    Correct. |
| 03:00:20.92 | 14 | Q.    To your knowledge, could Lucent |
| 03:00:22.35 | 15 | provide a hundred percent of the Winstar |
| 03:00:23.72 | 16 | network? |
| 03:00:25.15 | 17 | A.    To my knowledge, they could, yes. |
| 03:00:26.92 | 18 | Q.    Why don't you point out the next |
| 03:00:29.79 | 19 | bullet point that you think actually helps |
| 03:00:31.36 | 20 | Winstar instead of hurting them. |
| 03:00:36.40 | 21 | A.    The best of breed concept of |
| 03:00:38.00 | 22 | ensuring the network had the best product |

Page 50

B972

new 2 direct montemarano 6-25-04

```
03:00:39.67 23    available in the network, I think that was a
03:00:42.04 24    valuable one to the vendor as well.
03:00:44.24 25    Q.      Would you agree that the best of
```

======================================================

```
Page 174
03:00:45.37  0    Page 174
03:00:45.91  1                              Page 174
03:00:45.37  1    MICHAEL MONTEMARANO
03:00:45.94  2    breed concept was put in the agreements to
03:00:47.78  3    protect Winstar's ability to get the best
03:00:51.91  4    network possible?
03:00:53.52  5    A.      That's why the clause was put in
03:00:54.58  6    there, yes, I would agree with that.
03:00:56.69  7    Q.      So -- let's take a step back.
03:00:59.35  8    What's enhanced best of breed mean; do you have
03:01:01.39  9    an understanding what that means?
03:01:02.59 10    A.      I don't know what the term
03:01:03.36 11    "enhanced best of the breed" meant.  I know what
03:01:04.89 12    best of breed meant in the context.  I don't
03:01:06.80 13    know what the enhanced comment meant.
03:01:09.10 14    Q.      What was your understanding as to
03:01:10.17 15    what Lucent wanted on this A list when they're
03:01:12.10 16    talking about best of breed?
03:01:13.74 17    A.      They wanted to ensure the network
03:01:14.77 18    had the best components available to deliver
03:01:16.74 19    what Winstar wanted.
03:01:18.04 20    Q.      Those would be a hundred percent
03:01:19.47 21    Lucent?
03:01:20.38 22    A.      Hundred percent Lucent content or
03:01:22.01 23    content that Lucent would source that they
03:01:23.85 24    considered to be best of breed.
03:01:31.42 25    Q.      Do you know if this enhanced best
```

======================================================

```
Page 175
03:01:32.79  0    Page 175
03:01:32.82  1                              Page 175
03:01:32.79  1    MICHAEL MONTEMARANO
03:01:32.86  2    of breed comment was kind of referring to the
03:01:35.69  3    whole Lucent as a systems integrator rather than
03:01:41.43  4    a vendor integrator?  Do you recall that
03:01:44.87  5    discussion between the parties in January of
03:01:46.57  6    2001?
03:01:47.27  7    A.      Yes, I do.  I do recall the system
03:01:49.34  8    integrator notion versus being a box seller.
03:01:52.84  9    Q.      And is that what this best of breed
03:01:55.71 10    bullet is talking about?
03:01:56.45 11    A.      I don't recall.
03:01:58.51 12    Q.      Anything else on here you think
03:01:59.68 13    actually helps Winstar instead of hurting it?
03:02:02.45 14    A.      The rest of the points are very
03:02:03.39 15    much focused at the financing, and I'm not in a
03:02:05.89 16    position to say whether that was good or bad for
03:02:07.66 17    Winstar, to be quite candid with you.
03:02:09.16 18    Q.      But these are all things that
03:02:10.46 19    certainly Lucent believed were helpful for
03:02:12.03 20    Lucent?
03:02:12.93 21    A.      Nice to haves.
03:02:13.86 22    Q.      Let's look at the B list and the
03:02:17.17 23    same question:  Is there anything on this B list
                                   Page 51
```

**B973**

new 2 direct montemarano 6-25-04

03:02:19.54 24    of must have that you think actually helps
03:02:29.68 25    Winstar instead of hurting it?

======================================================

Page 176
03:02:38.85  0    Page 176
03:02:44.56  1                                    Page 176
03:02:38.85  1    MICHAEL MONTEMARANO
03:02:44.59  2    A.     It's very much focused at the
03:02:46.66  3    financing and improving our position from a
03:02:48.73  4    financing point of view, as I read it.
03:02:50.43  5    Q.     Do any of these things help
03:02:51.53  6    Winstar?
03:02:55.70  7    A.     I'd rather not speculate on that.
03:03:05.31  8    Q.     The first one, renegotiate supply
03:03:07.28  9    agreement for minimum purchases equal to at
03:03:09.22 10    least Lucent commitment, do you see that?
03:03:11.42 11    A.     Um-hum.
03:03:13.19 12    Q.     What appears to be the goal here is
03:03:16.16 13    to create a minimum purchase requirement for
03:03:18.69 14    Winstar?
03:03:18.96 15    A.     That's what that bullet looks at.
03:03:21.26 16    Q.     That's not something that would
03:03:22.73 17    necessarily help Winstar, right?
03:03:24.77 18    A.     If I speculated on it, it
03:03:25.93 19    absolutely would.  A dedicated network of all
03:03:28.50 20    Lucent equipment would be a much better
03:03:30.24 21    functioning network that we could service or
03:03:32.67 22    they could service more efficiently.
03:03:34.31 23    Q.     You're saying that as a salesperson
03:03:36.31 24    of Lucent, correct?
03:03:37.35 25    A.     I'm actually not a sales person but

======================================================

Page 177
03:03:38.78  0    Page 177
03:03:41.75  1                                    Page 177
03:03:38.78  1    MICHAEL MONTEMARANO
03:03:41.78  2    I am saying that from that lens, absolutely.
03:03:44.75  3    Q.     Certainly Winstar might be better
03:03:46.05  4    served if it could choose to buy as much Lucent
03:03:48.79  5    stuff as it wanted but didn't have to, right,
03:03:51.09  6    but had the flexibility, wouldn't that be a
03:03:52.46  7    better thing?
03:03:53.03  8    A.     Assuming it had the capability to
03:03:58.97  9    make that decision, well, yes, I guess it would
03:04:02.47 10    be better then.
03:04:02.97 11    Q.     Did you believe Winstar didn't have
03:04:04.11 12    the capability to do what was best for --
03:04:05.94 13    A.     This is where it would get into
03:04:06.81 14    speculation based on the conversation that I was
03:04:08.68 15    hearing.  You could certainly ask more technical
03:04:10.11 16    people if they had that capability or not.
03:04:18.35 17    Q.     Let's go down five bullets to where
03:04:21.52 18    it says, "At event of default if non-compliant
03:04:24.03 19    with content provisions versus no event of
03:04:26.53 20    default, merely an annual maximum penalty of $3
03:04:29.40 21    million."  Do you see that?
03:04:30.87 22    A.     Yes, I do.
03:04:31.70 23    Q.     First of all, is that your
03:04:33.97 24    understanding of what actually happened if
                                    Page 52

new 2 direct montemarano 6-25-04
03:04:36.41 25    Winstar didn't meet the content requirements,

==================================================

Page 178
03:04:38.24  0    Page 178
03:04:39.21  1                              Page 178
03:04:38.24  1    MICHAEL MONTEMARANO
03:04:39.24  2    that it'd just get charged $3 million?
03:04:40.24  3    A.     I don't recall.  I don't know.
03:04:41.34  4    That would be outside the field of activity I
03:04:42.98  5    would be involved in.
03:04:43.58  6    Q.     It's certainly what this list
03:04:44.58  7    suggests, though, right?
03:04:45.28  8    A.     It's very treasury related.  That's
03:04:46.78  9    what the list suggests, but this is very much
03:04:48.82 10    driven by the treasury team here.
03:04:50.69 11    Q.     Would adding an additional event of
03:04:52.45 12    default if Winstar purchased something that was
03:04:58.93 13    -- purchased more goods than it was allowed to
03:05:00.96 14    on the Lucent content ratio be something that
03:05:03.30 15    could in any way help Winstar?
03:05:06.37 16    A.     No.  An eventual of default would
03:05:07.44 17    not be helpful to Winstar.
03:05:08.90 18    Q.     That would hurt Winstar, right, if
03:05:10.91 19    they needed to finance more than the limit of
03:05:14.18 20    non-Lucent content, they would now be defaulting
03:05:17.51 21    on the credit agreement, right?
03:05:19.28 22    A.     Correct.
03:05:19.98 23    Q.     So that would not be something that
03:05:20.98 24    would help Lucent, that would hurt it, correct?
03:05:24.19 25    A.     Correct.

==================================================

Page 179
03:05:25.49  0    Page 179
03:05:28.69  1                              Page 179
03:05:25.49  1    MICHAEL MONTEMARANO
03:05:28.72  2    Q.     I don't think we need to go through
03:05:31.63  3    the entire list one by one.
03:05:39.23  4    We are close to wrapping up.  Just
03:05:40.74  5    a couple more things I want to look at quickly.
03:05:44.67  6    MR. KING:  Mark this one.
03:05:45.47  7    (Defendant's Exhibit 18 marked for
03:05:55.08  8    identification, Bates LW 131383 through 131384.)
03:06:03.36  9    BY MR. KING:
03:06:11.63 10    Q.     Don't even read it, let me ask you
03:06:12.90 11    a question about the other one and I'll ask you
03:06:14.20 12    about this in a second.
03:06:18.24 13    Did you have an understanding of
03:06:20.41 14    what it was Winstar wanted to get from the
03:06:25.25 15    resetting of the legal platform that Lucent had
03:06:28.22 16    put in motion, I guess, at the end of December?
03:06:31.09 17    A.     The only item I recall was they
03:06:32.62 18    wanted revised pricing on the hubs and Bs.  I
03:06:37.06 19    don't remember what the Bs acronym stands for.
03:06:39.56 20    That's something that just sticks in my mind for
03:06:42.63 21    some reason.
03:06:43.87 22    Q.     It's your understanding that they
03:06:46.74 23    wanted to revise the pricing?
03:06:48.20 24    A.     On that particular component in the
03:06:49.77 25    network.
                            Page 53

B975

new 2 direct montemarano 6-25-04

==================================================

Page 180

| | | |
|---|---|---|
| 03:06:50.24 | 0 | Page 180 |
| 03:06:50.34 | 1 | Page 180 |
| 03:06:50.24 | 1 | MICHAEL MONTEMARANO |
| 03:06:50.37 | 2 | Q.    And they wanted to lower it? |
| 03:06:52.24 | 3 | A.    I'm sure.  I don't recall but I'm |
| 03:06:53.64 | 4 | sure it was a lowering. |
| 03:06:57.55 | 5 | Q.    Anything else you can think of that |
| 03:06:58.71 | 6 | Winstar was hoping to get from resetting the |
| 03:07:02.15 | 7 | contractual relationships? |
| 03:07:04.45 | 8 | A.    Not that I recall.  But I do recall |
| 03:07:05.65 | 9 | at the meeting they had their list as we had |
| 03:07:07.62 | 10 | ours. |
| 03:07:11.43 | 11 | Q.    The contract never actually got |
| 03:07:13.46 | 12 | reset, right, nothing ever changed? |
| 03:07:14.96 | 13 | A.    Not that I recall, no. |
| 03:07:16.73 | 14 | Q.    Now, let's look at 18.  You can |
| 03:07:18.47 | 15 | focus on the second e-mail on the page, which is |
| 03:07:20.64 | 16 | your January 9 e-mail.  You can look at all if |
| 03:07:22.87 | 17 | you want, but that's what I'm going to ask you |
| 03:07:39.56 | 18 | questions about. |
| 03:07:52.43 | 19 | A.    My e-mail to Mark White and others? |
| 03:08:18.23 | 20 | Q.    Yes. |
| 03:08:20.80 | 21 | A.    Okay. |
| 03:08:26.50 | 22 | Q.    You've read it now? |
| 03:08:27.54 | 23 | A.    Just my e-mail in the middle, yes. |
| 03:08:30.81 | 24 | Q.    Let's look at the first paragraph. |
| 03:08:32.04 | 25 | This is an e-mail dated January 9, 2001 that you |

==================================================

Page 181

| | | |
|---|---|---|
| 03:08:35.44 | 0 | Page 181 |
| 03:08:36.68 | 1 | Page 181 |
| 03:08:35.44 | 1 | MICHAEL MONTEMARANO |
| 03:08:36.71 | 2 | sent to Mark White, Peter Derrick, Deb Harris, |
| 03:08:37.98 | 3 | Deb Hopkins, Martina Hund-Mejean, Carol Spurrie |
| 03:08:44.92 | 4 | and copies to a couple other people, right? |
| 03:08:46.82 | 5 | A.    Correct. |
| 03:08:52.26 | 6 | Q.    In the first paragraph you're |
| 03:08:53.26 | 7 | saying, "I wanted to give you a brief read on |
| 03:08:55.00 | 8 | the Winstar session today." |
| 03:08:57.27 | 9 | Do you recall having a meeting with |
| 03:08:58.47 | 10 | Winstar on or about January 9? |
| 03:09:00.17 | 11 | A.    Yes. |
| 03:09:02.91 | 12 | Q.    And you're basically giving a |
| 03:09:04.11 | 13 | summary of what happened at the meeting, |
| 03:09:06.01 | 14 | correct? |
| 03:09:06.38 | 15 | A.    Correct. |
| 03:09:07.31 | 16 | Q.    And you state, "Ben, I felt, did a |
| 03:09:10.18 | 17 | superb job of putting the company on notice that |
| 03:09:13.28 | 18 | the relationship must change to make it |
| 03:09:15.12 | 19 | profitable for both us and them." |
| 03:09:17.42 | 20 | You see that? |
| 03:09:18.15 | 21 | A.    Yes, I do. |
| 03:09:19.86 | 22 | Q.    And then you say, "He said we would |
| 03:09:22.02 | 23 | not finance services outside of a full |
| 03:09:24.23 | 24 | services," quote, deal, end quote, "with the |
| 03:09:27.43 | 25 | pricing reflective of financing." |

Page 54

**B976**

new 2 direct montemarano 6-25-04
===============================================

Page 182
```
03:09:29.00  0    Page 182
03:09:29.23  1                                Page 182
03:09:29.00  1    MICHAEL MONTEMARANO
03:09:29.26  2    Do you see that?
03:09:29.57  3    A.    Yes.
03:09:37.97  4    Q.    Looking at this e-mail, do you
03:09:43.01  5    recall who was driving the effort to reset the
03:09:48.98  6    legal relationship, was it Winstar or was it
03:09:51.52  7    Lucent?
03:09:55.79  8    A.    When you say "legal relationship,
03:09:56.99  9    that's where I'm somewhat confused.  At this
03:09:58.53 10    point this was very much an operational
03:10:00.73 11    discussion versus a legal one.
03:10:03.43 12    Q.    But the end goal here was to reset
03:10:08.04 13    the legal platform, isn't that correct, isn't
03:10:10.11 14    that what Verwaayen said in the December 28th
03:10:12.37 15    e-mail?
03:10:14.28 16    A.    If that's what it said that's what
03:10:15.41 17    he said, then yes.
03:10:16.55 18    Q.    Let's go back and look at it if
03:10:17.55 19    you're not sure.  It's Montemarano-17 from the
03:10:20.52 20    first day.  He said, "What we'll do is try to
03:10:43.77 21    recreate our legal platform working together,"
03:10:45.71 22    right?
03:10:46.84 23    A.    The sentence before he actually
03:10:48.14 24    said, "Create a basis for a fundamental
03:10:50.55 25    resetting of this relationship," and then he
```

===============================================

Page 183
```
03:10:52.75  0    Page 183
03:10:53.92  1                                Page 183
03:10:52.75  1    MICHAEL MONTEMARANO
03:10:53.95  2    said, "This would recreate our legal platform."
03:10:55.25  3    So Ben was adamant about resetting
03:10:59.72  4    the operational and not letting the financing
03:11:02.76  5    and the legal team drive it.  He wanted a new
03:11:05.63  6    operational relationship, so obviously a
03:11:07.60  7    contract would fall out of that.
03:11:09.00  8    Q.    But he wanted to put in place new
03:11:11.40  9    contracts that would provide the framework for
03:11:14.24 10    the relationship, reset the legal platform?
03:11:17.14 11    A.    Um-hum, that's fair statement.
03:11:19.27 12    Q.    And he said the same thing the
03:11:21.21 13    following day, as well, didn't he, when -- in
03:11:26.95 14    Montemarano-16 from today --
03:11:32.09 15    A.    "Major overhaul of our relationship
03:11:33.36 16    with Winstar"?
03:11:33.76 17    Q.    Right, "We should involve our
03:11:34.92 18    partners in treasury and legal in preparing the
03:11:36.53 19    model."  What he's talking about here is
03:11:39.96 20    essentially getting to a new contractual
03:11:42.26 21    relationship with the parties, right?
03:11:43.52 22    A.    Yes.
03:11:48.74 23    Q.    It was Lucent that was driving this
03:11:50.71 24    effort to reach new contractual arrangements,
03:11:54.01 25    correct, not Winstar?
```

===============================================
Page 55

B977

new 2 direct montemarano 6-25-04

Page 184

| | | |
|---|---|---|
| 03:11:54.74 | 0 | Page 184 |
| 03:11:55.78 | 1 | Page 184 |
| 03:11:54.74 | 1 | MICHAEL MONTEMARANO |
| 03:11:55.81 | 2 | A.    This is very much a joint effort |
| 03:11:58.25 | 3 | between the two companies. |
| 03:11:59.58 | 4 | Q.    Did Winstar -- to your knowledge, |
| 03:12:01.88 | 5 | did anyone from Winstar ever say to you, it's |
| 03:12:03.79 | 6 | really good, let's recreate the contracts and |
| 03:12:07.19 | 7 | change things, anything like that? |
| 03:12:12.49 | 8 | A.    Not with that specific language to |
| 03:12:13.86 | 9 | change the contracts, because they -- again, the |
| 03:12:15.80 | 10 | hub and B item comes to mind.  That was a |
| 03:12:17.50 | 11 | significant pricing item for them and they did |
| 03:12:19.70 | 12 | want to go back and look at the pricing and |
| 03:12:21.30 | 13 | reset that. |
| 03:12:21.84 | 14 | So, yes, they wanted to open up |
| 03:12:23.54 | 15 | this relationship.  They wanted to move to an |
| 03:12:25.51 | 16 | outsourcing arrangement as well.  This was not |
| 03:12:28.24 | 17 | just Lucent pushing in their direction. |
| 03:12:34.12 | 18 | Q.    Did Winstar indicate any interest |
| 03:12:37.19 | 19 | in trying to make all of these things on this A |
| 03:12:39.25 | 20 | and B list happen? |
| 03:12:42.26 | 21 | A.    Not that I recall. |
| 03:12:44.43 | 22 | Q.    They weren't exited about changing |
| 03:12:46.53 | 23 | the contracts the way that Lucent was talking |
| 03:12:48.33 | 24 | about in the A list and the B list, right, those |
| 03:12:50.47 | 25 | weren't things that helped Winstar? |

============================================================

Page 185

| | | |
|---|---|---|
| 03:12:51.33 | 0 | Page 185 |
| 03:12:52.33 | 1 | Page 185 |
| 03:12:51.33 | 1 | MICHAEL MONTEMARANO |
| 03:12:52.37 | 2 | A.    They clearly were not -- I don't |
| 03:12:53.70 | 3 | know if excited is the right word to use. |
| 03:12:55.74 | 4 | The financing changes were not |
| 03:12:57.74 | 5 | something that made it more difficult for them |
| 03:12:59.81 | 6 | to operate.  But, again, we were becoming their |
| 03:13:02.54 | 7 | bank, so we needed to act like a bank to ensure |
| 03:13:05.45 | 8 | the credit risk was a worthy one? |
| 03:13:21.60 | 9 | Q.    One final thing and I think we can |
| 03:13:24.73 | 10 | wrap up. |
| 03:13:31.47 | 11 | MR. KING:  Let's mark this, please. |
| 03:13:32.74 | 12 | (Defendant's Exhibit 19 marked for |
| 03:13:53.30 | 13 | identification, Bates 3WC 8377 through 8379.) |
| 03:14:09.71 | 14 | BY MR. KING: |
| 03:14:26.13 | 15 | Q.    You've read it? |
| 03:14:26.66 | 16 | A.    Yes. |
| 03:14:28.93 | 17 | Q.    Now earlier today I think |
| 03:14:30.27 | 18 | Mr. Slifkin asked you some questions about the |
| 03:14:38.34 | 19 | forecast that Winstar provided saying that they |
| 03:14:41.21 | 20 | wanted to draw $60 million in services in March. |
| 03:14:43.88 | 21 | Do you remember looking at that document? |
| 03:14:46.65 | 22 | A.    Yes, I do. |
| 03:14:47.05 | 23 | Q.    And then you reviewed a letter that |
| 03:14:49.45 | 24 | you sent back the next say day that said, our |
| 03:14:51.55 | 25 | position is clear, we're not going to finance |

============================================================

Page 56

**B978**

new 2 direct montemarano 6-25-04

Page 186

```
03:14:54.16   0    Page 186
03:14:54.39   1                              Page 186
03:14:54.16   1    MICHAEL MONTEMARANO
03:14:54.42   2    services, right?
03:14:54.69   3    A.    Right.
03:14:54.96   4    Q.    Do you recall getting this letter
03:14:58.03   5    in response?
03:14:58.66   6    A.    Yes, I do.
03:15:01.50   7    Q.    Was Winstar's position clear
03:15:03.20   8    throughout this process as well, that they
03:15:04.70   9    believed they were entitled to have these
03:15:07.37  10    services financed?
03:15:08.47  11    A.    Yes.
03:15:10.57  12    Q.    And that never changed, correct?
03:15:12.27  13    A.    Correct.
```

===============================================

**************************************************

B979

**Plunkett**

Page 1

**ORIGINAL**

1          IN THE UNITED STATES BANKRUPTCY COURT

              FOR THE DISTRICT OF DELAWARE

2     IN RE:                    )(   Chapter 7

3     WINSTAR COMMUNICATIONS,    )(

      INC., ET AL.,             )(

4        Debtors.              )(

      ------------------------------

5     CHRISTINA C. SHUBERT,     )(

      CHAPTER 7 TRUSTEE OF WINSTAR )(

6     COMMUNICATIONS, INC. AND   )(

      WINSTAR WIRELESS, INC.    )(

7                               )(   CASE NO. 01-1430(JBR)

      VS.                       )(   (Jointly Administered)

8                               )(   ADV. PRO. NO. 0-1063(JBR)

      LUCENT TECHNOLOGIES, INC.  )(

9

10

       ------------------------------------------------

11         ORAL AND VIDEOTAPED DEPOSITION OF

12             WILLIAM PLUNKETT

13            FEBRUARY 3, 2004

       ------------------------------------------------

14

15       ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM PLUNKETT, produced

16   as a witness at the instance of the PLAINTIFF, and duly sworn,

17   was taken in the above styled and numbered cause on the 3rd day

18   of February, 2004, from 9:59 a.m. to 10:36 a.m. before Tracy K.

19   Bates, CSR in and for the State of Texas, reported by machine

20   shorthand, at the offices of Hughes Luce, 1717 Main Street,

21   Suite 2800, Dallas, Texas 75201, in accordance with the notice

22   issued and the agreement stated on the record.

23

24

25


**LEGALINK**
A **WORDWAVE** COMPANY

LegaLink Manhattan          tel (212) 557-7400    www.legalink.com
420 Lexington Avenue, Suite 2108    tel (800) 325-3376
New York, NY 10170          fax (212) 692-9171

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

B980

```
 1                    A P P E A R A N C E S
 2   FOR PLAINTIFF:
         David R. King
 3       Herrick, Feinstein, LLP
         104 Carnegie Center
 4       Princeton, New Jersey 08540
         TEL (609) 452-3802
 5       FAX (609) 520-9095
         dking@herrick.com
 6
     FOR DEFENDANT:
 7       Michael A. Paskin
         Cravath, Swain & Moore, LLP
 8       825 8th Avenue
         New York, New York  10019
 9       TEL (212) 474-1000
         FAX (212) 474-3700
10       mpaskin@cravath.com
11   FOR WITNESS:
         Mr. Bobby Rubarts
12       Hughes Luce, LLP
         1717 Main Street
13       Suite 2800
         Dallas, Texas 75201
14       TEL (214) 939-5500
         FAX (214) 939-5849
15
     ALSO PRESENT:  Lisa Tatem, Videographer
16
                          INDEX
17
                                               PAGE
18
     Appearances                                  2
19
     WILLIAM PLUNKETT
20       Examination by Mr. King                  3
         Examination by Mr. Paskin               29
21
     Signature and Changes                       31
22
     Reporter's Certificate                      32
23
                        EXHIBITS
24   NO.     DESCRIPTION                        PAGE
     1       PLUNKETT 1 -Letter from Plunkett Dated 11/21/03    7
25
```

33 Plunkett 2-3-04 disk 1 of 1 transcript

Page 3

| | | |
|---|---|---|
| 00:00:06.30 | 2 | THE VIDEOGRAPHER:  Here begins volume 1, |
| 00:00:11.87 | 3 | videotape number 1 in the deposition of William Plunkett in the |
| 00:00:16.68 | 4 | matter of Winstar Communications Incorporated, et al. versus |
| 00:00:23.95 | 5 | Christina Shubert, Chapter 7 Trustee of Winstar Communications, |
| 00:00:28.16 | 6 | et al.  The case number is 01-1063.  Today's date is February |
| 00:00:36.13 | 7 | 3rd, 2003.  The time on the video monitor is 9:59 a.m.  Will |
| 00:00:43.51 | 8 | counsel please introduce themselves, after which the court |
| 00:00:49.58 | 9 | reporter will swear in the witness. |
| 00:00:51.68 | 10 | MR. KING:  David King from Herrick, Feinstein on |
| 00:00:54.92 | 11 | behalf of Plaintiff Christine Shubert -- Christina C. Shubert, |
| 00:00:57.29 | 12 | the Trustee. |
| 00:00:59.35 | 13 | MR. PASKIN:  Michael Paskin from Cravath, Swain & |
| 00:01:01.26 | 14 | Moore for Lucent. |
| 00:01:02.59 | 15 | MR. RUBARTS:  And Bobby Rubarts.  I'm here for |
| 00:01:04.13 | 16 | Bill Plunkett. |
| 00:01:05.33 | 17 | WILLIAM PLUNKETT, |
| 00:01:05.83 | 18 | 18   having been first duly sworn, testified as follows: |
| 00:01:05.83 | 19 | EXAMINATION BY PLAINTIFF |
| 00:01:06.80 | 20 | 20   BY MR. KING: |
| 00:01:06.80 | 21 | Q   Good morning, Mr. Plunkett.  As you just heard, my |
| 00:01:23.65 | 22 | name is David King.  I'm from the law firm of Herrick, Feinstein |
| 00:01:26.78 | 23 | and we represent the trustee of Winstar Communications, Inc. and |
| 00:01:30.25 | 24 | Winstar Wireless, Inc. in an adversary proceeding that has been |
| 00:01:33.66 | 25 | brought against Lucent Technologies, Inc.  That's the reason why |

Page 4

| | | |
|---|---|---|
| 00:01:36.99 | 0 | |
| | 4 | |
| 00:01:36.99 | 1 | we've called you in today.  Are you appearing here in response |
| 00:01:40.93 | 2 | to a subpoena that was served on you? |
| 00:01:42.86 | 3 | A   Yes. |
| 00:01:45.87 | 4 | Q   And are you represented by counsel at the deposition |
| 00:01:48.87 | 5 | here today? |
| 00:01:48.87 | 6 | A   Yes. |
| 00:01:48.87 | 7 | Q   Is that Mr. Rubarts seated to your right? |
| 00:01:52.87 | 8 | A   (Witness nods head affirmatively.) |
| 00:01:52.87 | 9 | Q   Did you meet in advance of the deposition with |
| 00:01:54.88 | 10 | Mr. Rubarts? |
| 00:01:56.88 | 11 | A   Briefly. |

Page 5

| | | |
|---|---|---|
| 00:02:47.86 | 1 | |
| 00:02:47.86 | 1 | ************************* |
| 00:02:47.86 | 1 | |
| 00:02:47.86 | 2 | Q   Okay.  Have you communicated with anyone at Lucent |
| 00:02:51.87 | 3 | since your employment with Lucent ended? |
| 00:02:54.87 | 4 | A   On advice of counsel I respectfully decline to answer |
| 00:02:58.87 | 5 | on the grounds that my answer may incriminate or may tend to |
| 00:03:01.88 | 6 | incriminate me. |
| 00:03:03.88 | 7 | Q   Were you employed by Lucent Technologies at any point |
| 00:03:06.88 | 8 | in time? |
| 00:03:11.89 | 9 | MR. RUBARTS:  Go ahead. |
| 00:03:11.89 | 10 | A   On advice of counsel I respectfully decline to answer |
| 00:03:15.89 | 11 | on the ground that my answer may incriminate or tend to |
| 00:03:18.89 | 12 | incriminate me. |

Page 1

B982

33 Plunkett 2-3-04 disk 1 of 1 transcript

Page 6

```
00:04:25.89 11
00:04:25.89 11
00:04:25.89 11                    ************************
00:04:25.89 12    Q    Mr. Plunkett, you testified a few moments ago that
00:04:29.86 13    you're appearing here in response to a subpoena; is that
00:04:33.87 14    correct?
00:04:34.87 15    MR. RUBARTS:  Objection.  Asked and answered.
00:04:36.87 16    Q    You can answer the question.
00:04:40.88 17    MR. RUBARTS:  Go ahead.  Say yes.
00:04:41.88 18    A    Sure.
00:04:43.88 19    Q    Under that subpoena were you also requested to produce
00:04:47.88 20    documents to the trustee?
00:04:49.88 21    MR. RUBARTS:  Mr. Plunkett has already produced
00:04:53.89 22    some documents to you, I believe, Mr. King.  I think you've got
00:04:55.89 23    them.
00:04:56.89 24    MR. KING:  I would just like his testimony that,
00:04:57.89 25    in fact -- he did, in fact, produce the documents that were sent
```

Page 7

```
00:04:59.86  0
             7
00:04:59.86  1    over on November 21st, 2003.
00:05:02.86  2    MR. RUBARTS:  I'm answering for him that we did
00:05:04.87  3    produce documents.
00:05:06.87  4    MR. KING:  I'd like the witness to answer the
00:05:07.87  5    questions today.. Go ahead.  Read your --
00:05:09.87  6    A    On advice of counsel I respectfully decline to answer
00:05:13.88  7    on the grounds that my answer may incriminate or tend to
00:05:16.88  8    incriminate me.
00:05:17.88  9    MR. KING:  I'd like to mark as Exhibit Plunkett 1
00:05:22.88 10    this document, please.
00:05:43.87 11    MR. PASKIN:  Do you have a copy?
00:05:45.87 12    MR. KING:  Actually for this I do not.  This
00:05:47.88 13    is --
00:05:48.88 14    MR. PASKIN:  Can I just take a look at it first?
00:05:52.88 15    MR. KING:  Absolutely.
00:05:54.88 16    (Exhibit No. 1 marked.)
00:05:57.89 17    Q    Mr. Plunkett, I've just placed in front of you a
00:06:00.89 18    document that has been marked for identification as Plunkett 1
00:06:04.89 19    at this deposition.  It appears to be a letter from you to me,
00:06:07.86 20    dated November 21st, 2003.  Do you recognize that document?
00:06:12.87 21    A    On advice of counsel I respectfully decline to answer
00:06:15.87 22    on the grounds that my answer may incriminate or tend to
00:06:18.87 23    incriminate me.
00:06:31.89 24    Q    On or about November 21st, 2003, did you produce to
00:06:35.89 25    counsel for the trustee a series of documents in response to
```

Page 8

```
00:06:39.86  0
             8
00:06:39.86  1    this subpoena that has been served upon you?
00:06:43.87  2    A    On advice of counsel I respectfully decline to answer
00:06:46.87  3    on the ground that my answer may incriminate or tend to
00:06:50.87  4    incriminate me.
00:06:52.87  5    Q    Can you answer the question today of where you
00:06:53.88  6    obtained the documents that you produced in response to the
00:06:57.88  7    trustee's subpoena on November 21st, 2003?
```

Page 2

B983

33 Plunkett 2-3-04 disk 1 of 1 transcript

| | | |
|---|---|---|
| 00:07:01.88 | 8 | A     On advice of counsel I respectfully decline to answer |
| 00:07:04.89 | 9 | on the grounds that my answer may incriminate or tend to |
| 00:07:07.89 | 10 | incriminate me. |
| 00:07:09.89 | 11 | Q     Were the documents that you produced on November 21st, |
| 00:07:14.86 | 12 | 2003, materials that you had obtained in the performance of your |
| 00:07:15.86 | 13 | duties at Lucent Technologies, Inc.? |
| 00:07:19.87 | 14 | A     On advice of counsel I respectfully decline to answer |
| 00:07:22.87 | 15 | on the ground that my answer may incriminate or tend to |
| 00:07:26.88 | 16 | incriminate me. |
| 00:07:33.88 | 17 | Q     Was it within the scope of your duties at Lucent |
| 00:07:36.89 | 18 | Technologies to prepare and/or receive the documents that you |
| 00:07:41.89 | 19 | produced in response to the trustee's subpoena on November 21st, |
| 00:07:41.89 | 20 | 2003? |
| 00:07:44.89 | 21 | A     On advice of counsel I respectfully decline to answer |
| 00:07:48.86 | 22 | on the ground that my answer may incriminate or tend to |
| 00:07:49.86 | 23 | incriminate me. |
| 00:08:27.87 | 24 | Q     Isn't it a fact, Mr. Plunkett, that you were employed |
| 00:08:29.87 | 25 | at Lucent Technologies, Inc. as senior vice president through |

Page 9
00:08:32.87   0
              9

| | | |
|---|---|---|
| 00:08:32.87 | 1 | and until November of 2000? |
| 00:08:37.88 | 2 | A     On advice of counsel I respectfully decline to answer |
| 00:08:39.88 | 3 | on the ground that my answer may incriminate or tend to |
| 00:08:43.89 | 4 | incriminate me. |
| 00:08:45.89 | 5 | Q     Isn't it a fact that in your employment at Lucent |
| 00:08:48.89 | 6 | Technologies during the year 2000 you reported directly to Nina |
| 00:08:48.89 | 7 | Adarsano (phonetics.) |
| 00:08:51.89 | 8 | A     On advice of counsel I respectfully decline to answer |
| 00:08:54.86 | 9 | on the ground that my answer may incriminate or tend to |
| 00:08:57.87 | 10 | incriminate me. |
| 00:09:02.87 | 11 | Q     Have you had any communications with anyone at or -- |
| 00:09:04.87 | 12 | at or on behalf of Lucent Technologies with respect to this |
| 00:09:09.88 | 13 | adversary proceeding? |
| 00:09:11.88 | 14 | A     On advice of counsel I respectfully decline to answer |
| 00:09:14.88 | 15 | on the ground that my answer may incriminate or tend to |
| 00:09:17.89 | 16 | incriminate me. |
| 00:09:18.89 | 17 | Q     Have you had any communications with anyone at or -- |
| 00:09:20.89 | 18 | excuse me -- at or on behalf of Lucent about governmental |
| 00:09:25.89 | 19 | investigations by state or federal authorities with respect to |
| 00:09:29.86 | 20 | Lucent Technologies? |
| 00:09:30.87 | 21 | A     On advice of counsel I respectfully decline to answer |
| 00:09:34.87 | 22 | on the ground that my answer may incriminate or tend to |
| 00:09:37.87 | 23 | incriminate me. |
| 00:09:39.87 | 24 | Q     Have you or your attorney been advised that you're a |
| 00:09:42.88 | 25 | target of investigation by any federal or state authority or |

Page 10
00:09:46.88   0
              10

| | | |
|---|---|---|
| 00:09:46.88 | 1 | regulatory body? |
| 00:09:48.88 | 2 | A     On advice of counsel I respectfully decline to answer |
| 00:09:50.89 | 3 | on the grounds that my answer may incriminate or tend to |
| 00:09:55.89 | 4 | incriminate me. |
| 00:09:55.89 | 5 | Q     Do you have any knowledge of any investigations of |
| 00:09:55.89 | 6 | Lucent Technologies by any federal or state authority or |
| 00:09:58.89 | 7 | regulatory body? |
| 00:09:59.86 | 8 | A     On advice of counsel I respectfully decline to answer |

Page 3

33 Plunkett 2-3-04 disk 1 of 1 transcript

| | | |
|---|---|---|
| 00:09:59.86 | 9 | on the grounds that my answer may incriminate or tend to |
| 00:10:05.87 | 10 | incriminate me. |
| 00:10:06.87 | 11 | Q    Have you been questioned by any federal or state |
| 00:10:09.87 | 12 | authority or regulatory body with respect to any investigation |
| 00:10:12.87 | 13 | of Lucent Technologies? |
| 00:10:14.88 | 14 | A    On advice of counsel I respectfully decline to answer |
| 00:10:16.88 | 15 | on the ground that my answer may incriminate or tend to |
| 00:10:19.88 | 16 | incriminate me. |
| 00:10:20.88 | 17 | Q    Have you been subpoenaed in connection with any such |
| 00:10:23.89 | 18 | investigation? |
| 00:10:25.89 | 19 | A    On advice of counsel I respectfully decline to answer |
| 00:10:27.89 | 20 | on the ground that my answer may incriminate or tend to |
| 00:10:31.89 | 21 | incriminate me. |
| 00:10:34.86 | 22 | Q    Isn't it a fact that the claims of Fifth Amendment |
| 00:10:39.87 | 23 | privilege that you're making today are taken based -- are in |
| 00:10:41.87 | 24 | connection with the events that occurred during your employment |
| 00:10:44.87 | 25 | at Lucent Technologies? |

Page 11

| | | |
|---|---|---|
| 00:10:46.88 | 0 | |
| | 11 | |
| 00:10:46.88 | 1 | A    On advice of counsel I respectfully decline to answer |
| 00:10:49.88 | 2 | on the ground that my answer may incriminate or tend to |
| 00:10:52.88 | 3 | incriminate me. |
| 00:10:54.88 | 4 | Q    To your knowledge, has Lucent been the subject of any |
| 00:10:56.89 | 5 | investigation by any federal or state authority or regulatory |
| 00:10:59.89 | 6 | body concerning events that transpired during your employment at |
| 00:11:03.89 | 7 | Lucent? |
| 00:11:04.89 | 8 | A    On advice of counsel I respectfully decline to answer |
| 00:11:07.86 | 9 | on the ground that my answer may incriminate or tend to |
| 00:11:09.86 | 10 | incriminate me. |
| 00:11:12.87 | 11 | Q    To your knowledge, has Lucent been the subject of any |
| 00:11:13.87 | 12 | investigation by any federal or state authority or regulatory |
| 00:11:18.87 | 13 | body concerning transactions between Lucent and Winstar? |
| 00:11:20.88 | 14 | A    On advice of counsel I respectfully decline to answer |
| 00:11:24.88 | 15 | on the ground that my answer may incriminate or tend to |
| 00:11:26.88 | 16 | incriminate me. |
| 00:11:28.88 | 17 | Q    Isn't it a fact that your duties at Lucent |
| 00:11:31.89 | 18 | Technologies included communicating with and negotiating with |
| 00:11:34.89 | 19 | representatives of Winstar Communications, Inc. and/or Winstar |
| 00:11:37.89 | 20 | Wireless, Inc. concerning certain transactions between the |
| 00:11:39.86 | 21 | parties? |
| 00:11:40.86 | 22 | A    On advice of counsel I respectfully decline to answer |
| 00:11:40.86 | 23 | on the ground that my answer may incriminate or tend to |
| 00:11:47.87 | 24 | incriminate me. |
| 00:11:47.87 | 25 | Q    Isn't it a fact that in 1999 and 2000 you participated |

Page 12

| | | |
|---|---|---|
| 00:11:51.87 | 0 | |
| | 12 | |
| 00:11:51.87 | 1 | in transactions between Lucent and Winstar at the end of each |
| 00:11:55.88 | 2 | quarter from December 31st, 1999, through September 30th, 2000, |
| 00:11:59.88 | 3 | wherein Winstar purchased substantial quantities of equipment, |
| 00:12:04.89 | 4 | software, and/or services from Lucent Technologies? |
| 00:12:06.89 | 5 | A    On advice of counsel I respectfully decline to answer |
| 00:12:10.89 | 6 | on the ground that my answer may incriminate or tend to |
| 00:12:13.86 | 7 | incriminate me. |
| 00:12:14.86 | 8 | Q    Isn't it a fact that in December 1999 Winstar |
| 00:12:16.87 | 9 | purchased over $96 million worth of goods and services from |

Page 4

                    33 Plunkett 2-3-04 disk 1 of 1 transcript
00:12:20.87 10   Lucent?
00:12:21.87 11   A    On advice of counsel I respectfully decline to answer
00:12:21.87 12   on the ground that my answer may incriminate or tend to
00:12:27.88 13   incriminate me.
00:12:28.88 14   Q    Isn't it a fact that this transaction was referred to
00:12:30.88 15   by Winstar and Lucent as an end of quarter deal?
00:12:33.88 16   A    On advice of counsel I respectfully decline to answer
00:12:37.89 17   on the ground that my answer may incriminate or tend to
00:12:39.89 18   incriminate me.
00:12:45.89 19   Q    Isn't it a fact that certain of the equipment
00:12:47.86 20   purchased by Winstar in the December 1999 end of quarter deal
00:12:50.87 21   was not delivered to Winstar but was held by Lucent even though
00:12:53.87 22   the purchase price was paid by Winstar?
00:12:56.87 23   A    On advice of counsel I respectfully decline to answer
00:12:59.87 24   on the ground that my answer may incriminate or tend to
00:13:02.88 25   incriminate me.

Page 13
00:13:04.88  0
              13
00:13:04.88  1   Q    And isn't it a fact that in connection with the end of
00:13:06.88  2   quarter deal and in order to be certain that Lucent could book
00:13:09.88  3   the revenue Lucent prepared letters which it gave to Winstar
00:13:12.89  4   which it asked Winstar to sign?
00:13:12.89  5   A    On advice of counsel I respectfully decline to answer
00:13:21.86  6   on the ground that my answer may incriminate or tend to
00:13:21.86  7   incriminate me.
00:13:21.86  8   Q    Isn't it a fact that Winstar did, in fact, sign the
00:13:23.87  9   letters provided by Lucent with respect to the December 1999 end
00:13:27.87 10   of quarter deal?
00:13:28.87 11   A    On advice of counsel I respectfully decline to answer
00:13:32.87 12   on the ground that my answer may incriminate or tend to
00:13:34.88 13   incriminate me.
00:13:35.88 14   Q    And isn't it, in fact, correct that these letters were
00:13:38.88 15   not true and correct in all respects?
00:13:39.88 16   A    On advice of counsel I respectfully decline to answer
00:13:46.89 17   on the ground that my answer may incriminate or tend to
00:13:48.89 18   incriminate me.
00:13:49.89 19   Q    Isn't it a fact that the letter stated falsely the
00:13:51.89 20   dates by which Winstar would install the purchased equipment?
00:13:56.87 21   A    On advice of counsel I respectfully decline to answer
00:13:56.87 22   on the ground that my answer may incriminate or tend to
00:13:59.87 23   incriminate me.
00:14:00.87 24   Q    And isn't it a fact that Winstar did not need the
00:14:02.87 25   equipment purchased through these letters immediately but was

Page 14
00:14:05.87  0
              14
00:14:05.87  1   buying the equipment earlier to provide Lucent with additional
00:14:09.88  2   revenue?
00:14:09.88  3   A    On advice of counsel I respectfully decline to answer
00:14:09.88  4   on the ground that my answer may incriminate or tend to
00:14:10.88  5   incriminate me.
00:14:15.88  6   Q    And isn't it a fact that the letters also stated
00:14:19.89  7   falsely that Winstar lacked the warehouse space to store the
00:14:23.89  8   equipment?
00:14:23.89  9   A    On advice of counsel I respectfully decline to answer
00:14:23.89 10   on the ground that my answer may incriminate or tend to
                              Page 5

B986

|  |  |  |
|---|---|---|
|  |  | 33 Plunkett 2-3-04 disk 1 of 1 transcript |
| 00:14:24.89 | 11 | incriminate me. |
| 00:14:30.87 | 12 | Q    Isn't it a fact that some of the equipment purchased |
| 00:14:31.87 | 13 | by Winstar in the December 1999 end of quarter deal included |
| 00:14:35.87 | 14 | Optronics equipment? |
| 00:14:38.87 | 15 | A    On advice of counsel I respectfully decline to answer |
| 00:14:38.87 | 16 | on the ground that my answer may incriminate or tend to |
| 00:14:38.87 | 17 | incriminate me. |
| 00:14:44.88 | 18 | Q    And isn't it a fact that when your employment with |
| 00:14:46.88 | 19 | Lucent terminated in November of 2000 this equipment remained in |
| 00:14:51.89 | 20 | Lucent's warehouses? |
| 00:14:52.89 | 21 | A    On advice of counsel I respectfully decline to answer |
| 00:14:56.89 | 22 | on the ground that my answer may incriminate or tend to |
| 00:14:58.89 | 23 | incriminate me. |
| 00:14:58.89 | 24 | Q    And isn't it a fact that when your employment |
| 00:15:02.86 | 25 | terminated Lucent stored other Winstar equipment in its |

Page 15
| 00:15:06.87 | 0 |  |
|  | 15 |  |
| 00:15:06.87 | 1 | warehouses purchased in its end of quarter deal December 1999 |
| 00:15:10.87 | 2 | with Winstar? |
| 00:15:12.87 | 3 | MR. PASKIN:  Objection to form. |
| 00:15:13.88 | 4 | A    On advice of counsel I respectfully decline to answer |
| 00:15:16.88 | 5 | on the ground that my answer may incriminate or tend to |
| 00:15:19.88 | 6 | incriminate me. |
| 00:15:20.88 | 7 | MR. KING:  What was the objection, counsel? |
| 00:15:21.88 | 8 | MR. PASKIN:  Calls for speculation. |
| 00:15:27.89 | 9 | Q    Isn't it a fact that in March 2000 Winstar purchased |
| 00:15:29.89 | 10 | over $20 billion worth of goods and services from Lucent |
| 00:15:34.86 | 11 | Technologies? |
| 00:15:34.86 | 12 | A    On advice of counsel I respectfully decline to answer |
| 00:15:37.87 | 13 | on the ground that my answer may incriminate or tend to |
| 00:15:40.87 | 14 | incriminate me. |
| 00:15:42.87 | 15 | Q    Isn't it a fact that certainly the equipment purchased |
| 00:15:45.87 | 16 | by Winstar in the March 2000 end of quarter deal was not |
| 00:15:48.88 | 17 | delivered to Winstar but was held by Lucent even though the |
| 00:15:51.88 | 18 | purchase price was paid by Winstar? |
| 00:15:54.88 | 19 | A    On advice of counsel I respectfully decline to answer |
| 00:15:54.88 | 20 | on the ground that my answer may incriminate or tend to |
| 00:15:54.88 | 21 | incriminate me. |
| 00:15:57.89 | 22 | Q    And isn't it a fact that in connection with this March |
| 00:16:01.89 | 23 | 2000 end of quarter deal and in order to be certain that Lucent |
| 00:16:03.89 | 24 | could book the revenue Lucent prepared letters which it gave to |
| 00:16:07.86 | 25 | Winstar which it asked Winstar to sign? |

Page 16
| 00:16:09.86 | 0 |  |
|  | 16 |  |
| 00:16:09.86 | 1 | A    On advice of counsel I respectfully decline to answer |
| 00:16:09.86 | 2 | on the ground that my answer may incriminate or tend to |
| 00:16:09.86 | 3 | incriminate me. |
| 00:16:16.87 | 4 | Q    Isn't it a fact that Winstar did, in fact, sign the |
| 00:16:19.87 | 5 | letters provided by Lucent in March 2000? |
| 00:16:25.88 | 6 | A    On advice of counsel I respectfully decline to answer |
| 00:16:25.88 | 7 | on the ground that my answer may incriminate or tend to |
| 00:16:25.88 | 8 | incriminate me. |
| 00:16:28.88 | 9 | Q    And isn't it, in fact, correct that these letters were |
| 00:16:32.89 | 10 | not true and correct in all respects? |
| 00:16:33.89 | 11 | A    On advice of counsel I respectfully decline to answer |

Page 6

```
                              33 Plunkett 2-3-04 disk 1 of 1 transcript
00:16:36.89 12    on the ground that my answer may incriminate or tend to
00:16:39.86 13    incriminate me.
00:16:42.86 14    Q       Isn't it a fact that the letter stated falsely the
00:16:43.87 15    dates by which Winstar would install the purchased equipment?
00:16:54.88 16    A       On advice of counsel I respectfully decline to answer
00:16:54.88 17    on the ground that my answer may incriminate or tend to
00:16:54.88 18    incriminate me.
00:16:54.88 19    Q       Isn't it a fact that Winstar did not need the
00:16:55.88 20    equipment purchased through these letters immediately but was
00:16:59.88 21    buying the equipment earlier to provide Lucent with additional
00:17:02.88 22    revenue?
00:17:04.89 23    A       On advice of counsel I respectfully decline to answer
00:17:04.89 24    on the ground that my answer may incriminate or tend to
00:17:04.89 25    incriminate me.
```

**Page 17**
```
00:17:08.89  0
             17
00:17:08.89  1    Q       And isn't it a fact that the letters also stated
00:17:11.89  2    falsely that Winstar lacked the warehouse space to store this
00:17:14.86  3    equipment?
00:17:15.86  4    A       On advice of counsel I respectfully decline to answer
00:17:15.86  5    on the ground that my answer may incriminate or tend to
00:17:20.87  6    incriminate me.
00:17:23.87  7    Q       Isn't it a fact that some of the equipment purchased
00:17:26.88  8    by Winstar in the March 2000 end of quarter deal included
00:17:29.88  9    Optronics equipment?
00:17:31.88 10    A       On advice of counsel I respectfully decline to answer
00:17:34.88 11    on the ground that my answer may incriminate or tend to
00:17:36.89 12    incriminate me.
00:17:37.89 13    Q       And at that time isn't it also a fact that Winstar
00:17:40.89 14    purchased PSAX 2300s and CopperCom 30 systems that were stored
00:17:46.86 15    in Lucent warehouses?
00:17:49.86 16    A       On advice of counsel I respectfully decline to answer
00:17:49.86 17    on the ground that my answer may incriminate or tend to
00:17:49.86 18    incriminate me.
00:17:52.87 19    Q       And isn't it a fact that when your employment with
00:17:54.87 20    Lucent terminated in November 2000 this equipment remained in
00:17:57.87 21    Lucent's warehouses?
00:17:59.87 22    A       On advice of counsel I respectfully decline to answer
00:17:59.87 23    on the ground that my answer may incriminate or tend to
00:17:59.87 24    incriminate me.
00:18:08.88 25    Q       Isn't it a fact that in June 2000 Winstar purchased
```

**Page 18**
```
00:18:12.89  0
             18
00:18:12.89  1    over $112 million worth of goods and services from Lucent?
00:18:16.89  2    A       On advice of counsel I respectfully decline to answer
00:18:16.89  3    on the ground that my answer may incriminate or tend to
00:18:16.89  4    incriminate me.
00:18:24.87  5    Q       Isn't it a fact that certain of the equipment
00:18:25.87  6    purchased by Winstar in the June 2000 end of quarter deal was
00:18:29.87  7    not delivered to Winstar but was held by Lucent even though the
00:18:34.88  8    purchase price was paid by Winstar?
00:18:36.88  9    A       On advice of counsel I respectfully decline to answer
00:18:36.88 10    on the ground that my answer may incriminate or tend to
00:18:37.88 11    incriminate me.
00:18:41.88 12    Q       And isn't it a fact that in connection with this end
```
                              Page 7

33 Plunkett 2-3-04 disk 1 of 1 transcript

| | |
|---|---|
| 00:18:42.88 13 | of quarter deal and in order to be certain that Lucent could |
| 00:18:45.89 14 | book the revenue Lucent prepared letters which it gave to |
| 00:18:48.89 15 | Winstar which it asked Winstar to sign? |
| 00:18:51.89 16 | A     On advice of counsel I respectfully decline to answer |
| 00:18:51.89 17 | on the ground that my answer may incriminate or tend to |
| 00:18:51.89 18 | incriminate me. |
| 00:18:56.87 19 | Q     And isn't it a fact that Winstar did, in fact, sign |
| 00:18:59.87 20 | the letters provided by Lucent? |
| 00:19:01.87 21 | A     On advice of counsel I respectfully decline to answer |
| 00:19:01.87 22 | on the ground that my answer may incriminate or tend to |
| 00:19:02.87 23 | incriminate me. |
| 00:19:07.88 24 | Q     And isn't it, in fact, correct that these letters were |
| 00:19:10.88 25 | not true and correct in all respects? |

**Page 19**

00:19:12.88  0
               19

| | |
|---|---|
| 00:19:12.88 1 | A     On advice of counsel I respectfully decline to answer |
| 00:19:12.88 2 | on the ground that my answer may incriminate or tend to |
| 00:19:12.88 3 | incriminate me. |
| 00:19:21.89 4 | Q     Isn't it a fact that the letter stated falsely the |
| 00:19:23.89 5 | dates by which Winstar would install the purchased equipment? |
| 00:19:29.86 6 | A     On advice of counsel I respectfully decline to answer |
| 00:19:29.86 7 | on the ground that my answer may incriminate or tend to |
| 00:19:29.86 8 | incriminate me. |
| 00:19:34.87 9 | Q     And isn't it a fact that Winstar did not need the |
| 00:19:36.87 10 | equipment purchased through these letters immediately but was |
| 00:19:39.87 11 | buying the equipment earlier to provide Lucent with additional |
| 00:19:42.88 12 | revenue? |
| 00:19:43.88 13 | A     On advice of counsel I respectfully decline to answer |
| 00:19:43.88 14 | on the ground that my answer may incriminate or tend to |
| 00:19:46.88 15 | incriminate me. |
| 00:20:06.10 21 | |
| 00:20:06.10 21 | ************************* |
| 00:20:06.10 21 | |
| 00:20:06.10 22 | MR. KING:  Just for the record, we were just |
| 00:20:09.10 23 | advised by Mr. Rubarts that he was going to step out for a few |
| 00:20:12.77 24 | minutes but that we could continue without him present.  So we |
| 00:20:16.51 25 | will continue the questioning at this point, but the record |

**Page 20**

00:20:21.02  0
               20

| | |
|---|---|
| 00:20:21.02 1 | should reflect that at this point Mr. Rubarts is no longer in |
| 00:20:23.82 2 | the room.  He may return. |
| 00:20:25.39 3 | Q     My last question, Mr. Plunkett, which I believe you |
| 00:20:34.63 4 | took your Fifth Amendment claim to was that Winstar did not need |
| 00:20:38.57 5 | the equipment purchased through the bill and hold letters |
| 00:20:41.07 6 | immediately but was buying the equipment earlier to provide |
| 00:20:43.87 7 | Lucent with additional revenue.  Let me ask you a follow-up |
| 00:20:47.71 8 | question.  Isn't it a fact that the letters also stated falsely |
| 00:20:51.11 9 | that Winstar lacked the warehouse space necessary to store the |
| 00:20:54.12 10 | equipment? |
| 00:20:54.88 11 | A     On advice of counsel I respectfully decline to answer |
| 00:20:54.88 12 | on the ground that my answer may incriminate or tend to |
| 00:20:54.88 13 | incriminate me. |
| 00:21:00.89 14 | Q     And isn't it a fact that some of the equipment |
| 00:21:02.89 15 | purchased by Winstar in the June 2000 end of quarter deal |
| 00:21:05.86 16 | included Optronics equipment? |

Page 8

B989

33 Plunkett 2-3-04 disk 1 of 1 transcript

| 00:21:09.86 | 17 | A      On advice of counsel I respectfully decline to answer |
| 00:21:09.86 | 18 | on the ground that my answer may incriminate or tend to |
| 00:21:09.86 | 19 | incriminate me. |
| 00:21:13.87 | 20 | Q      Isn't it a fact that when your employment with Lucent |
| 00:21:15.87 | 21 | terminated in November 2000 this equipment remained in Lucent's |
| 00:21:19.87 | 22 | warehouses? |
| 00:21:19.87 | 23 | A      On advice of counsel I respectfully decline to answer |
| 00:21:19.87 | 24 | on the ground that my answer may incriminate or tend to |
| 00:21:19.87 | 25 | incriminate me. |

**Page 21**

00:21:27.88  0
            21

| 00:21:27.88 | 1 | Q      Isn't it a fact that in August 2000 Winstar employees |
| 00:21:29.88 | 2 | advised Lucent that they needed to return some of the goods |
| 00:21:33.89 | 3 | purchased in the earlier end of quarter deals? |
| 00:21:35.89 | 4 | A      On advice of counsel I respectfully decline to answer |
| 00:21:35.89 | 5 | on the ground that my answer may incriminate or tend to |
| 00:21:36.86 | 6 | incriminate me. |
| 00:21:41.86 | 7 | Q      Isn't it a fact that Winstar advised Lucent that it |
| 00:21:45.87 | 8 | was approaching the limits of its capital expenditure covenants |
| 00:21:50.87 | 9 | which it was allowed to make in the year 2000 under its |
| 00:21:55.88 | 10 | financing agreements with Lucent and its other lenders? |
| 00:21:58.88 | 11 | A      On advice of counsel I respectfully decline to answer |
| 00:21:58.88 | 12 | on the ground that my answer may incriminate or tend to |
| 00:21:58.88 | 13 | incriminate me. |
| 00:22:02.88 | 14 | Q      And isn't it a fact that at that time Winstar also |
| 00:22:05.89 | 15 | advised Lucent that it could not afford to help Lucent with |
| 00:22:09.89 | 16 | another end of quarter deal because it was running out of cash |
| 00:22:11.19 | 17 | and nearing its capital expenditure limitations? |
| 00:22:13.53 | 18 | A      On advice of counsel I respectfully decline to answer |
| 00:22:16.73 | 19 | on the ground that my answer may incriminate or tend to |
| 00:22:19.37 | 20 | incriminate me. |
| 00:22:21.30 | 21 | Q      And isn't it a fact that Lucent knew that Winstar had |
| 00:22:21.87 | 22 | over $87 million of inventory in Lucent and Winstar warehouses |
| 00:22:26.88 | 23 | as a result of these earlier end of quarter deals? |
| 00:22:30.88 | 24 | A      On advice of counsel I respectfully decline to answer |
| 00:22:30.88 | 25 | on the ground that my answer may incriminate or tend to |

**Page 22**

00:22:30.88  0
            22

| 00:22:30.88 | 1 | incriminate me. |
| 00:22:35.88 | 2 | Q      And isn't it a fact that Lucent refused to accept the |
| 00:22:38.89 | 3 | return of any goods purchased by Winstar under earlier end of |
| 00:22:42.89 | 4 | quarter deals? |
| 00:22:42.89 | 5 | A      On advice of counsel I respectfully decline to |
| 00:22:42.89 | 6 | on the ground that my answer may incriminate or tend to |
| 00:22:42.89 | 7 | incriminate me. |
| 00:22:48.86 | 8 | Q      Isn't it a fact that in September 2000 Lucent again |
| 00:22:50.87 | 9 | approached Winstar and asked it to enter into an end of quarter |
| 00:22:55.87 | 10 | deal? |
| 00:22:56.87 | 11 | A      On advice of counsel I respectfully decline to answer |
| 00:22:56.87 | 12 | on the ground that my answer may incriminate or tend to |
| 00:22:56.87 | 13 | incriminate me. |
| 00:22:59.87 | 14 | Q      And isn't it a fact that Winstar and Lucent did |
| 00:23:03.88 | 15 | subsequently enter into an end of quarter deal in September of |
| 00:23:06.88 | 16 | 2000? |
| 00:23:07.88 | 17 | A      On advice of counsel I respectfully decline to answer |

Page 9

33 Plunkett 2-3-04 disk 1 of 1 transcript

| | |
|---|---|
| 00:23:07.88 18 | on the ground that my answer may incriminate or tend to |
| 00:23:08.88 19 | incriminate me. |
| 00:23:11.89 20 | Q    And in that end of quarter deal Winstar purchased over |
| 00:23:16.86 21 | $77 million of equipment and services from Lucent; isn't that |
| 00:23:18.86 22 | correct? |
| 00:23:19.86 23 | A    On advice of counsel I respectfully decline to answer |
| 00:23:19.86 24 | on the ground that my answer may incriminate or tend to |
| 00:23:19.86 25 | incriminate me. |

===============

Page 23

| | |
|---|---|
| 00:23:24.87 0 | |
| | 23 |
| 00:23:24.87 1 | Q    And isn't it a fact that in the September 2000 end of |
| 00:23:27.87 2 | quarter deal Lucent again drafted bill and hold letters for |
| 00:23:30.87 3 | Winstar to sign? |
| 00:23:31.87 4 | A    On advice of counsel I respectfully decline to answer |
| 00:23:31.87 5 | on the ground that my answer may incriminate or tend to |
| 00:23:32.87 6 | incriminate me. |
| 00:23:38.88 7 | Q    And isn't it, in fact, correct that these letters were |
| 00:23:41.88 8 | not true and correct in all respects? |
| 00:23:47.89 9 | A    On advice of counsel I respectfully decline to answer |
| 00:23:47.89 10 | on the ground that my answer may incriminate or tend to |
| 00:23:47.89 11 | incriminate me. |
| 00:23:50.86 12 | Q    Isn't it a fact that the letter stated falsely the |
| 00:23:52.86 13 | dates by which Winstar would install the purchased equipment? |
| 00:23:57.87 14 | A    On advice of counsel I respectfully decline to answer |
| 00:23:57.87 15 | on the ground that my answer may incriminate or tend to |
| 00:23:57.87 16 | incriminate me. |
| 00:24:03.87 17 | Q    Isn't it a fact that Winstar did not need the |
| 00:24:05.87 18 | equipment purchased through these letters immediately but was |
| 00:24:09.88 19 | buying the equipment earlier to provide Lucent with additional |
| 00:24:13.88 20 | revenue? |
| 00:24:14.88 21 | A    On advice of counsel I respectfully decline to answer |
| 00:24:14.88 22 | on the ground that my answer may incriminate or tend to |
| 00:24:15.88 23 | incriminate me. |
| 00:24:18.89 24 | Q    And isn't it a fact that the letters also stated |
| 00:24:20.89 25 | falsely that Winstar lacked the warehouse space to store the |

===============

Page 24

| | |
|---|---|
| 00:24:22.89 0 | |
| | 24 |
| 00:24:22.89 1 | equipment? |
| 00:24:23.86 2 | A    On advice of counsel I respectfully decline to answer |
| 00:24:23.86 3 | on the ground that my answer may incriminate or tend to |
| 00:24:24.86 4 | incriminate me. |
| 00:24:31.87 5 | Q    Isn't it a fact that the September 2000 end of quarter |
| 00:24:34.87 6 | deal also included a software deal in which Winstar agreed to |
| 00:24:38.87 7 | pay Lucent $135 million in four installments in the year 2001 to |
| 00:24:43.88 8 | purchase Lucent software? |
| 00:24:47.88 9 | A    On advice of counsel I respectfully decline to answer |
| 00:24:47.88 10 | on the ground that my answer may incriminate or tend to |
| 00:24:48.88 11 | incriminate me. |
| 00:24:51.89 12 | Q    And isn't it a fact that although Winstar was |
| 00:24:53.89 13 | obligated to pay $135 million for software in 2001 under this |
| 00:24:58.86 14 | agreement Lucent believed that Winstar was actually entitled to |
| 00:25:01.86 15 | receive only $20 million worth of software? |
| 00:25:05.87 16 | A    On advice of counsel I respectfully decline to answer |
| 00:25:05.87 17 | on the ground that my answer may incriminate or tend to |
| 00:25:10.87 18 | incriminate me. |

Page 10

B991

33 Plunkett 2-3-04 disk 1 of 1 transcript

| | | |
|---|---|---|
| 00:25:10.87 | 19 | Q    And isn't it a fact that Lucent initially booked $135 |
| 00:25:15.88 | 20 | million of revenue for the software deal even though Winstar was |
| 00:25:18.88 | 21 | not paying any money until 2001? |
| 00:25:21.88 | 22 | A    On advice of counsel I respectfully decline to answer |
| 00:25:23.89 | 23 | on the ground that my answer may incriminate or tend to |
| 00:25:28.89 | 24 | incriminate me. |
| 00:25:28.89 | 25 | Q    And isn't it a fact that Lucent expected Winstar to |

Page 25

| | | |
|---|---|---|
| 00:25:30.86 | 0 | |
| | 25 | |
| 00:25:30.86 | 1 | pay more than $135 million if it purchased more than $20 million |
| 00:25:33.86 | 2 | of software from the pool? |
| 00:25:35.86 | 3 | A    On advice of counsel I respectfully decline to answer |
| 00:25:35.86 | 4 | on the ground that my answer may incriminate or tend to |
| 00:25:36.87 | 5 | incriminate me. |
| 00:25:40.87 | 6 | Q    And isn't it a fact that in exchange for Winstar's |
| 00:25:44.87 | 7 | commitments under the software deal Lucent agreed that it would |
| 00:25:48.88 | 8 | give Winstar certain credits that it could take in the fourth |
| 00:25:51.88 | 9 | quarter of 2000? |
| 00:25:54.88 | 10 | A    On advice of counsel I respectfully decline to answer |
| 00:25:54.88 | 11 | on the ground that my answer may incriminate or tend to |
| 00:25:54.88 | 12 | incriminate me. |
| 00:25:56.89 | 13 | Q    And isn't it a fact that before Winstar paid Lucent |
| 00:25:58.89 | 14 | any money for the software deal Lucent was to extend Winstar $35 |
| 00:26:03.86 | 15 | million in credit for Optronics damages? |
| 00:26:07.86 | 16 | A    On advice of counsel I respectfully decline to answer |
| 00:26:07.86 | 17 | on the ground that my answer may incriminate or tend to |
| 00:26:10.87 | 18 | incriminate me. |
| 00:26:11.87 | 19 | Q    And isn't it a fact that Lucent also agreed to build |
| 00:26:15.87 | 20 | hubs and b's in the future for Winstar at significantly reduced |
| 00:26:19.87 | 21 | pricing? |
| 00:26:20.88 | 22 | A    On advice of counsel I respectfully decline to answer |
| 00:26:20.88 | 23 | on the ground that my answer may tend to |
| 00:26:21.88 | 24 | incriminate me. |
| 00:26:25.88 | 25 | Q    And isn't it a fact that Lucent later refused to build |

Page 26

| | | |
|---|---|---|
| 00:26:29.88 | 0 | |
| | 26 | |
| 00:26:29.88 | 1 | hubs and b's for the prices agreed to during that end of quarter |
| 00:26:33.89 | 2 | deal? |
| 00:26:34.89 | 3 | A    On advice of counsel I respectfully decline to answer |
| 00:26:34.89 | 4 | on the ground that my answer may incriminate or tend to |
| 00:26:34.89 | 5 | incriminate me. |
| 00:26:38.86 | 6 | Q    And isn't it a fact that after the credits given by |
| 00:26:40.86 | 7 | Lucent in the reduced pricing terms it offered on the b's and |
| 00:26:45.87 | 8 | hubs Winstar was only going to be out of pocket $20 billion for |
| 00:26:49.87 | 9 | the software pool? |
| 00:26:51.87 | 10 | A    On advice of counsel I respectfully decline to answer |
| 00:26:51.87 | 11 | on the ground that my answer may incriminate or tend to |
| 00:26:51.87 | 12 | incriminate me. |
| 00:26:53.88 | 13 | Q    Isn't it a fact that the software deal was created to |
| 00:26:57.88 | 14 | get Lucent revenue it could book immediately while enabling |
| 00:27:01.88 | 15 | Winstar to defer capital expenses into 2001? |
| 00:27:04.89 | 16 | A    On advice of counsel I respectfully decline to answer |
| 00:27:04.89 | 17 | on the ground that my answer may incriminate or tend to |
| 00:27:05.89 | 18 | incriminate me. |
| 00:27:09.89 | 19 | Q    And isn't it a fact that Lucent understood that |

Page 11

33 Plunkett 2-3-04 disk 1 of 1 transcript

00:27:12.86 20  Winstar needed to defer capital expenditures into 2000 -- into
00:27:17.87 21  2001 because it had pre-purchased equipment from Lucent in the
00:27:21.87 22  earlier end of quarter deals?
00:27:23.87 23  A    On advice of counsel I respectfully decline to answer
00:27:23.87 24  on the ground that my answer may incriminate or tend to
00:27:23.87 25  incriminate me.

Page 27
00:27:26.88  0
27
00:27:26.88  1  Q    Isn't it a fact that notwithstanding Winstar's capital
00:27:30.88  2  expenditure restrictions Lucent required Winstar to find a way
00:27:35.88  3  to help Lucent book additional revenue?
00:27:38.89  4  A    On advice of counsel I respectfully decline to answer
00:27:38.89  5  on the ground that my answer may incriminate or tend to
00:27:39.89  6  incriminate me.
00:27:41.89  7  Q    And isn't it a fact that the software deal was created
00:27:43.86  8  to enable Winstar to help Lucent book more revenue without
00:27:48.86  9  violating Winstar's capital expenditure covenants?
00:27:52.87 10  A    On advice of counsel I respectfully decline to answer
00:27:52.87 11  on the ground that my answer may incriminate or tend to
00:27:55.87 12  incriminate me.
00:27:58.87 13  Q    Isn't it a fact that the main purpose of these end of
00:28:00.88 14  quarter deals was to enable Lucent to book revenue?
00:28:03.88 15  A    On advice of counsel I respectfully decline to answer
00:28:03.88 16  on the ground that my answer may incriminate or tend to
00:28:11.89 17  incriminate me.
00:28:12.89 18  Q    And as part of those end of quarter deals Lucent
00:28:15.89 19  required Winstar to participate in transactions such as the bill
00:28:19.86 20  and hold deals to enable Lucent to book more revenue?
00:28:22.86 21  A    On advice of counsel I respectfully decline to answer
00:28:22.86 22  on the ground that my answer may incriminate or tend to
00:28:28.87 23  incriminate me.
00:28:28.87 24  Q    Isn't it a fact that Lucent also required Winstar to
00:28:30.87 25  enter into the software deal to enable Lucent to book more

Page 28
00:28:35.88  0
28
00:28:35.88  1  revenue?
00:28:35.88  2  A    On advice of counsel I respectfully decline to answer
00:28:38.88  3  on the ground that my answer may incriminate or tend to
00:28:42.88  4  incriminate me.
00:28:42.88  5  Q    Isn't it a fact that Lucent required Winstar to engage
00:28:44.89  6  in these end of quarter transactions as conditioned for Lucent
00:28:48.89  7  continuing to perform performance obligations under the
00:28:51.86  8  agreements between the parties?
00:28:52.86  9  A    On advice of counsel I respectfully decline to answer
00:28:52.86 10  on the ground that my answer may incriminate or tend to
00:28:52.86 11  incriminate me.
00:28:59.87 12  Q    Isn't it a fact that Winstar knew that Winstar was
00:29:01.87 13  dependent upon Lucent's continued performance of its
00:29:06.88 14  obligations, including specifically its financing of Winstar,
00:29:07.88 15  and use Lucent's promise of continued performance as leverage to
00:29:12.88 16  extract concessions from Winstar in the end of quarter deals?
00:29:16.89 17  A    On advice of counsel I respectfully decline to answer
00:29:16.89 18  on the ground that my answer may incriminate or tend to
00:29:18.89 19  incriminate me.
00:29:19.89 20  Q    In some -- isn't it a fact that by the bill and hold
Page 12

```
                     33 Plunkett 2-3-04 disk 1 of 1 transcript
00:29:22.89 21   components of the end of quarter deals and by the September
00:29:27.86 22   29th, 2000, software deal Winstar was trying to help Lucent book
00:29:31.87 23   revenue so that Lucent would continue to finance Winstar's
00:29:36.87 24   build-out of the Winstar network?
00:29:37.87 25   A     On advice of counsel I respectfully decline to answer
```

===================================================================

```
Page 29
00:29:37.87  0
             29
00:29:37.87  1   on the ground that my answer may incriminate or tend to
00:29:41.88  2   incriminate me
```

===================================================================



B994

**Rubin**

```
                              rubin direct
02:48:49.06  1    FREDERIC E. RUBIN
02:48:50.57  2    Q.    It was done to help Lucent get
02:48:52.77  3    revenue?
02:48:53.63  4    A.    I don't know why it was done, but
02:48:57.34  5    it was usually at the behest of Lucent.
```

======================================================

**************************************************

```
Page 152
02:58:00.62  5                                    Page 152
02:57:58.35  5    Q.    To your knowledge did Winstar
02:58:00.65  6    engage in these end-of-quarter deals with Lucent
02:58:02.45  7    at least in part to help Lucent book revenue
02:58:05.99  8    earlier than it otherwise would have?
02:58:11.06  9    A.    I don't know what Lucent's
02:58:14.00 10    motivation was for the transactions, and I don't
02:58:16.73 11    want to guess.
02:58:21.14 12    Q.    I'm sorry.  I'm not asking you for
02:58:21.90 13    Lucent's motivation.
02:58:23.47 14    A.    Okay.
02:58:25.51 15    Q.    I'm asking if you know if Winstar
02:58:26.71 16    engaged in these deals in part to help Lucent
02:58:29.54 17    book revenue earlier than it otherwise would.
02:58:34.65 18    A.    I don't know if it was to book
02:58:35.42 19    revenue, but I think, you know, Lucent was an
02:58:37.72 20    important strategic partner of Winstar's, and
02:58:43.26 21    Winstar would have done things to help its
02:58:48.43 22    strategic partner, that the partner asked.  And
02:58:51.53 23    by deferring the payments and such, I think that
02:58:53.50 24    that tried to equalize things in some way,
02:58:57.24 25    shape, or form there.
```

======================================================

```
Page 153
02:58:58.01  0    Page 153
02:58:58.77  1                                    Page 153
02:58:58.01  1    FREDERIC E. RUBIN
02:58:58.81  2    Q.    And deferring payments made it
02:58:59.47  3    possible for Winstar to do these deals?
02:59:02.54  4    A.    Partially, yes.  Part of it I
02:59:05.48  5    presume was pricing and -- typical things that
02:59:10.62  6    would go on in any negotiation.
02:59:13.52  7    Q.    Do you recall whether Winstar had a
02:59:16.89  8    capital crunch, essentially, in 2000?  They had
02:59:21.50  9    covenants that restricted their capital
02:59:22.73 10    expenditures; correct?
02:59:24.87 11    A.    Yes.  There was a covenant in the
02:59:25.33 12    bank --
02:59:26.70 13    Q.    Do you recall if Winstar was
02:59:31.21 14    running close to exceeding those covenants?
02:59:34.18 15    A.    I believe we were tight on that,
02:59:35.01 16    yes.
02:59:36.68 17    Q.    So would deferring the payments in
02:59:38.35 18    these end-of-quarter deals help Winstar?
02:59:40.95 19    A.    I don't know.  I'm not an
02:59:42.28 20    accountant.  I don't know what the
02:59:45.02 21    capitalization rules are, and when they take
02:59:48.72 22    place, and such.
02:59:50.26 23    Q.    To your knowledge could Winstar
                                    Page 10
```

rubin direct

02:59:51.13 24    have done these deals if Lucent didn't agree to
02:59:53.26 25    defer the payments?

===================================================

Page 154
02:59:54.60  0    Page 154
02:59:55.30  1                                    Page 154
02:59:54.60  1    FREDERIC E. RUBIN
02:59:55.33  2    A.    I don't know.
02:59:57.30  3    Q.    Let me ask the question slightly
02:59:59.73  4    different and see if it helps.  To your
03:00:01.60  5    knowledge, could Winstar have done these deals
03:00:03.87  6    without exceeding their capital expenditure
03:00:07.04  7    covenants?
03:00:12.41  8    A.    I don't -- I don't know.  I don't
03:00:15.32  9    know when receipt takes place.  I don't know
03:00:17.82 10    when that -- how that works.  I don't know how
03:00:19.89 11    that works.
03:00:41.41 12    Q.    To your knowledge did Winstar buy
03:00:45.31 13    goods and services from Lucent in these
03:00:47.38 14    end-of-quarter deals months or even quarters
03:00:50.65 15    before it needed those goods for the network?

===================================================

*************************************************

Page 154
03:01:00.43 18                                   Page 154
03:00:56.69 18    A.    I think I said that earlier, yes.
03:01:00.46 19    Q.    And do you know if Winstar had
03:01:01.23 20    hundreds of millions of dollars' worth of
03:01:04.43 21    inventory sitting in warehouses from these
03:01:06.70 22    end-of-quarter deals?
03:01:08.54 23    A.    I don't know the dollar amount, but
03:01:10.20 24    we had a fair amount of inventory, yeah.
03:01:13.81 25    Q.    Do you know if that inventory was

===================================================

Page 155
03:01:14.71  0    Page 155
03:01:15.41  1                                   Page 155
03:01:14.71  1    FREDERIC E. RUBIN
03:01:15.44  2    still sitting there at the time you left your
03:01:16.44  3    position with Winstar?
03:01:18.98  4    A.    There was inventory.  I don't know
03:01:20.15  5    if it was specifically related to any given
03:01:23.28  6    quarter-end transaction, but there was inventory
03:01:25.65  7    in our warehouses as well as other places, I
03:01:29.36  8    believe.
03:01:31.49  9    Q.    Let me ask you to pull out Rubin
03:01:32.29 10    53.
03:01:33.90 11    A.    Okay.
03:01:42.00 12    Q.    See if this refreshes your
03:01:43.77 13    recollection at all.  Your cover e-mail for the
03:01:49.81 14    charts that are attached reads, "Per our
03:01:55.28 15    discussions earlier this week" -- this is an
03:01:56.92 16    e-mail to Rick Uhl from yourself in January
03:02:00.22 17    2001, which is after the refinance note;
03:02:03.19 18    correct?
                                Page 11

rubin direct

03:02:04.43 19    A.     Yes.
03:02:04.99 20    Q.     "Per our discussions earlier this
03:02:06.63 21    week, we have compiled the attached analysis
03:02:09.26 22    attempting to derive the correct balance owed to
03:02:12.50 23    Lucent, assuming the application of the earned
03:02:15.04 24    credits, elimination of the disputed payment,
03:02:17.84 25    and return of the equipment and services that

==========================================================

Page 156
03:02:20.47  0    Page 156
03:02:20.91  1                                          Page 156
03:02:20.47  1    FREDERIC E. RUBIN
03:02:20.94  2    Winstar acquired based on quarterly transactions
03:02:23.28  3    and commitments made by Lucent." Do you see
03:02:25.58  4    that?
03:02:26.25  5    A.     Yes.
03:02:26.98  6    Q.     Do you recall either preparing
03:02:32.79  7    these charts yourself or having your
03:02:33.86  8    subordinates prepare charts to calculate how
03:02:36.19  9    much equipment and services Winstar was holding
03:02:39.66 10    from these quarterly transactions that it didn't
03:02:41.73 11    need?
03:02:44.40 12    A.     I believe I had people -- the
03:02:45.60 13    people who -- I believe one of you two gentlemen
03:02:51.21 14    asked me earlier about this, and I think --
03:02:55.21 15    actually I think it was you, David, about KPM,
03:02:57.14 16    Gary, and Doreen. And I believe they prepared
03:03:01.62 17    this analysis, which does highlight that, yes.
03:03:09.06 18    Q.     Let me ask you to turn to page --
03:03:10.59 19    the page Bates-numbered 73646.
03:03:16.00 20    A.     Yep.
03:03:17.03 21    Q.     Do you have that in front of you?
03:03:17.77 22    A.     Yes, I do.
03:03:18.77 23    Q.     Do you recall whether yourself or
03:03:23.00 24    your subordinates conducted an analysis to
03:03:27.01 25    determine the exact amounts of equipment that

==========================================================

Page 157
03:03:28.71  0    Page 157
03:03:30.41  1                                          Page 157
03:03:28.71  1    FREDERIC E. RUBIN
03:03:30.44  2    was unused, prepurchased Lucent equipment and
03:03:33.68  3    software as of January 2001?
03:03:36.15  4    A.     That's what this looks like.
03:03:36.82  5    That's what looks like is captured here, yes.
03:03:39.39  6    Q.     This shows a total listing of $167
03:03:42.99  7    million. Do you see that?
03:03:44.56  8    A.     Yes.
03:03:52.37  9    Q.     Does that refresh your recollection
03:03:53.87 10    as to whether or not Winstar had, you know, over
03:03:57.57 11    a hundred of millions of dollars sitting in its
03:03:59.84 12    warehouses as a result of these end-of-quarter
03:04:01.41 13    deals?
03:04:02.84 14    A.     Yes, it does.
03:04:03.68 15    Q.     And the answer is yes?
03:04:05.28 16    A.     Yes. I believe so.

==========================================================

B997

rubin direct

| | | |
|---|---|---|
| 03:08:48.43 | 1 | FREDERIC E. RUBIN |
| 03:08:48.93 | 2 | in Macon, Georgia? |
| 03:08:52.30 | 3 | A.    I think it's Morrow, Georgia. |
| 03:08:54.70 | 4 | Q.    Morrow.  Thank you.  Are you aware |
| 03:09:12.82 | 5 | of whether anyone at Winstar ever recommended |
| 03:09:17.63 | 6 | that Winstar stop engaging in these |
| 03:09:23.10 | 7 | end-of-quarter deals before the September 2000 |
| 03:09:25.53 | 8 | end-of-quarter deal? |

=================================================

*************************************************

Page 161
| | | |
|---|---|---|
| 03:09:32.67 | 10 | Page 161 |
| 03:09:29.97 | 10 | A.    I can't -- I don't know what |
| 03:09:32.71 | 11 | everybody did.  I don't know how to answer that |
| 03:09:34.74 | 12 | question. |
| 03:09:44.02 | 13 | Q.    Do you know if anyone at Winstar |
| 03:09:45.25 | 14 | wanted to reverse or delay some of these |
| 03:09:52.16 | 15 | end-of-quarter deals, realization of the sales? |

=================================================

*************************************************

Page 161
| | | |
|---|---|---|
| 03:10:00.50 | 17 | Page 161 |
| 03:09:57.77 | 17 | A.    I think that the note that we just |
| 03:10:00.54 | 18 | looked at, the January note, showed that we |
| 03:10:04.51 | 19 | wanted to reverse some of those transactions. |
| 03:10:06.34 | 20 | But I'm not sure about anything other than that. |
| 03:10:09.21 | 21 | Q.    By "reverse," you mean -- |
| 03:10:12.98 | 22 | A.    Take credits where they should be |
| 03:10:14.25 | 23 | applied and such. |
| 03:10:17.08 | 24 | Q.    Take credits and return the |
| 03:10:17.69 | 25 | equipment? |

=================================================

Page 162
| | | |
|---|---|---|
| 03:10:18.35 | 0 | Page 162 |
| 03:10:18.79 | 1 | Page 162 |
| 03:10:18.35 | 1 | FREDERIC E. RUBIN |
| 03:10:18.82 | 2 | A.    Yeah.  Yes. |

*************************************************

Page 169
| | | |
|---|---|---|
| 03:18:45.79 | 13 | Page 169 |
| 03:18:43.19 | 13 | Q.    Mr. Rubin, we were talking about |
| 03:18:45.83 | 14 | the end-of-quarter deals. |
| 03:18:48.20 | 15 | A.    Yes. |
| 03:18:50.60 | 16 | Q.    What impact, if any, did these |
| 03:18:53.60 | 17 | end-of-quarter deals have on Winstar's financial |
| 03:18:56.00 | 18 | condition? |
| 03:18:59.91 | 19 | A.    I -- I'm not sure.  What's the |
| 03:19:06.08 | 20 | question? |
| 03:19:09.25 | 21 | Q.    What impact did these deals have on |
| 03:19:10.42 | 22 | Winstar's financial condition? |

Page 14

B998

rubin direct

03:19:12.92 23    A.     I should have expected that.  I
3:19:16.59 24    guess we would have higher inventory, higher
03:19:19.06 25    accounts payable, and in certain instances,

==================================================

Page 170
03:19:20.39  0    Page 170
03:19:21.16  1                              Page 170
03:19:20.39  1    FREDERIC E. RUBIN
03:19:21.20  2    greater debt.
03:19:23.87  3    Q.     And you testified earlier it was
03:19:25.87 .4    your understanding that these end-of-quarter
03:19:27.30  5    deals were financed through the credit
03:19:28.54  6    agreement; is that correct?
03:19:29.87  7    A.     Yes.
03:19:32.21  8    Q.     Would that lead to increased
03:19:33.24  9    interest payments due on the credit agreement?
03:19:35.51 10    A.     It depends on when the items
03:19:39.98 11    purchased became due.  When they became due and
03:19:43.75 11    and
03:19:43.78 12    payable is when the interest would start to
03:19:45.42 13    accrue.
03:19:47.12 14    Q.     So for items that weren't deferred
03:19:48.22 15    under these end-of-quarter deals would that lead
03:19:50.26 16    to higher interest payments?
03:19:51.69 17    A.     Yes.  That's correct.

==================================================

age 171
3:20:16.52  0    Page 171
03:20:17.79  1                              Page 171
03:20:16.52  1    FREDERIC E. RUBIN
03:20:46.31 12    Q.     For equipment that Winstar had
03:20:47.35 13    purchased ahead of time, would it also have to
03:20:50.35 14    pay warehousing charges and insurance charges
03:20:54.26 15    and other charges associated with holding onto
03:20:57.43 16    the equipment?
03:20:59.43 17    A.     I'm not sure, but there may have
03:21:00.83 18    been some fees associated with that.  I don't
03:21:05.87 19    know if there were incremental, but there would
03:21:08.04 20    have been fees associated with that if they were
03:21:10.04 21    not standard Winstar facilities, which would
03:21:16.24 22    have been covered by our own rent expense,
03:21:20.21 23    insurance cost, et cetera.
03:21:25.22 24    Q.     Do you recall whether or not the
03:21:26.22 25    interest payments that Winstar paid to Lucent

==================================================

Page 172
03:21:27.22  0    Page 172
03:21:28.19  1                              Page 172
03:21:27.22  1    FREDERIC E. RUBIN
03:21:28.22  2    under the credit agreement were financed?  Or
03:21:31.23  3    were they actually cash payments?
03:21:35.23  4    A.     They were paid in cash.
03:21:36.23  5    Q.     So Winstar would have to make
03:21:39.23  6    actual cash payments --
03:21:42.87  7    A.     Yes.
3:21:43.57  8    Q.     -- to satisfy the interest charges
3:21:44.54  9    from excess goods ordered under these deals.
                              Page 15

B999

```
                                      rubin direct
03:21:49.41 10    A.     Winstar would make --
```

=================================================

*****************************************************

**Page 172**
```
03:21:53.92 12                                    Page 172
03:21:52.11 12    A.     I believe Winstar would make cash
03:21:53.95 13    payments for interest on whatever the balance
03:21:55.88 14    was that was due.
03:21:58.32 15    Q.      If that balance included goods
03:21:58.92 16    ordered under end-of-quarter deals that Winstar
03:22:01.16 17    didn't need for three months or six months, they
03:22:03.82 18    would be paying cash out the door for the
03:22:09.16 19    purchase --
03:22:09.90 20    A.      If those goods were due and payable
03:22:10.97 21    at that time, yes.
```

=================================================

*****************************************************

**Page 174**
```
03:23:31.71 6                                     Page 174
03:23:29.81 6     Q.      Do you know if Winstar ever
03:23:31.75 7     approached Lucent and asked it to repurchase
03:23:34.12 8     some of the goods that it bought in advance on
03:23:38.05 9     these end-of-quarter deals?
03:23:40.89 10    A.      I think so, yes.
03:23:42.26 11    Q.      Do you recall specifically Winstar
03:23:43.82 12    asking Lucent to repurchase optronics?
03:23:45.86 13    A.      I believe so.
03:23:49.30 14    Q.      Do you recall when that occurred?
03:23:53.67 15    A.      I don't.  I don't recall
03:23:56.30 16    specifically, no.
03:24:01.21 17    Q.      Do you recall, a rough estimate,
03:24:03.11 18    how much optronics Winstar had purchased that it
03:24:05.01 19    wanted to resell to Lucent?
03:24:06.98 20    A.      I don't recall the dollar amount.
03:24:07.98 21    I think there's a number on that schedule.
03:24:09.98 22    Q.      Now, optronics, once again, is
03:24:16.99 23    telecom gear; correct?
03:24:17.99 24    A.      My understanding, yes.
03:24:18.99 25    Q.      It's what is used to light the
```

=================================================

**Page 175**
```
03:24:19.99 0     Page 175
03:24:20.96 1                                     Page 175
03:24:19.99 1     FREDERIC E. RUBIN
03:24:21.00 2     fiber?
03:24:22.00 3     A.      That's my understanding, yeah.
03:24:36.01 4     Q.      Do you know if Lucent agreed to
03:24:39.01 5     repurchase the optronics gear?
03:24:40.98 6     A.      I don't know if they agreed to
03:24:42.98 7     repurchase or to look for somebody to buy it.
03:24:45.99 8     I'm not sure.
03:25:28.00 9     Q.      I ask you to pull out Rubin 51.
03:25:31.00 10    A.      Sure.
```
                                      Page 16

B1000

rubin direct

| | | |
|---|---|---|
| 03:25:41.01 | 11 | Q.    It's an e-mail from Rick Uhl to |
| 03:25:45.98 | 12 | Frank Jules, Nate Kantor, and Fred Rubin, on |
| 03:25:50.99 | 13 | December 14th; correct? |
| 03:25:52.25 | 14 | A.    Yes. |
| 03:25:53.19 | 15 | Q.    Can you look at item No. 5 and tell |
| 03:25:54.32 | 16 | me if that refreshes your recollection as to |
| 03:25:57.53 | 17 | whether or not Lucent agreed to either |
| 03:25:59.53 | 18 | repurchase or help resell the optronics? |
| 03:26:00.53 | 19 | A.    No.  I think I said that was my |
| 03:26:01.53 | 20 | understanding, that they did try to help resell. |
| 03:26:04.53 | 21 | I think I didn't know when or how much.  That |
| 03:26:06.53 | 22 | was your question, I think. |
| 03:26:09.54 | 23 | Q.    Do you recall being told that |
| 03:26:10.54 | 24 | Lucent had found no buyer for the optronics and |
| 03:26:14.54 | 25 | wouldn't take them back themselves? |

=======================================================

*****************************************************

Page 176

| | | |
|---|---|---|
| 03:26:26.52 | 4 | Page 176 |
| 03:26:26.85 | 4 | A.    I thought it said so right here. |
| 03:26:26.85 | 5 | Q.    Lucent, in fact, offered to |
| 03:26:29.52 | 6 | repurchase the optronics at 30 cents on the |
| 03:26:32.53 | 7 | dollar; isn't that correct? |
| 03:26:33.53 | 8 | A.    That's my understanding from this |
| 03:26:35.53 | 9 | e-mail, yes. |
| 03:26:41.44 | 10 | Q.    So the optronics that Winstar had |
| 03:26:45.11 | 11 | purchased through these end-of-quarter deals to |
| 03:26:47.78 | 12 | help Lucent get revenue, Lucent wanted to |
| 03:26:52.28 | 13 | repurchase for 30 cents on the dollar? |

=======================================================

*****************************************************

Page 176

| | | |
|---|---|---|
| 03:27:01.79 | 16 | Page 176 |
| 03:27:00.29 | 16 | A.    I -- I don't know.  This says here |
| 03:27:01.82 | 17 | that they offered to buy it back at 30 cents on |
| 03:27:03.72 | 18 | the dollar.  So that's a substantial discount |
| 03:27:07.13 | 19 | from when it was purchased. |
| 03:27:08.93 | 20 | Q.    And you included optronics in your |
| 03:27:10.30 | 21 | January 5th e-mail -- |
| 03:27:12.33 | 22 | A.    Yes. |
| 03:27:13.70 | 23 | Q.    -- that listed the equipment that |
| 03:27:15.34 | 24 | had been acquired based on quarterly |
| 03:27:18.81 | 25 | transactions and commitments made by Lucent; |

=======================================================

Page 177

| | | |
|---|---|---|
| 03:27:19.57 | 0 | Page 177 |
| 03:27:19.91 | 1 | Page 177 |
| 03:27:19.57 | 1 | FREDERIC E. RUBIN |
| 03:27:19.94 | 2 | correct? |
| 03:27:20.64 | 3 | A.    Yes. |
| 03:27:33.92 | 4 | Q.    Did engaging in these |
| 03:27:35.12 | 5 | end-of-quarter deals also push Winstar's |
| 03:27:36.59 | 6 | borrowings closer to the refinance trigger? |
| 03:27:41.06 | 7 | A.    When the purchased items became |

Page 17

B1001

rubin direct

```
03:27:42.33  8    due, yes.
03:27:45.70  9    Q.    So other than for items that were
03:27:46.67 10    deferred, where payment was deferred,
03:27:49.54 11    end-of-quarter transactions pushed Winstar
03:27:51.94 12    closer to the refinance threshold?
03:27:54.61 13    A.    Or for deferred items as they came
03:27:56.01 14    due.
```

=================================================

B1002

**Schacht**

**11/5/2001 Schacht, Henry**

1  approximately 125 million of revenue in its fourth

2  fiscal quarter.

3                    Do you see that?

4  A     I do.

5       Q     What was that revenue recognition issue?

6  A     It was an issue involving Winstar, where we

7  had negotiated a software pooling agreement, but that

8  there were credits given against that that would have

9  made that not recordable.

10      Q     The second paragraph of the press release

11 has a quotation -- quote -- "We wanted to make this

12 public as soon as we discovered the issue" -- close

13 quote.

14                   Do you see that?

15 A     Uh-hum.

16      Q     What did you mean by that?

17 A     Just as it said:  I wanted to make it public

18 that we had a revenue recognition issue.

19      Q     Did you have any role in the discovery of

20 the issue?

21 A     Yes.

22      Q     And what was that?

23 A     I had asked our counsel, after a conversation

24 with the chairman of Winstar, to look at that

25 transaction and see if there was anything involving

                                                      15

**11/5/2001 Schacht, Henry**

1    that transaction that was not totally properly

2    recorded.

3        Q    Am I correct that that was something that

4    you learned, in the course of a conversation with the

5    chairman of Winstar, that led you to want to look

6    into this issue?

7    A    Something I'd learned?

8        Q    Yes.

9    A    Yes.

10       Q    How soon before the November 21st

11   announcement had you had that conversation with the

12   chairman of Winstar?

13   A    I don't remember the exact dates. I came back

14   on October 23rd. Sometime, I would suspect, in the

15   next week or so, I had a long conversation with the

16   chairman of Winstar about the relationships, and

17   about some transactions that he was considering in

18   which he would need our concurrence in if he was

19   going to proceed.

20       I came back; discussed, with my colleagues,

21   the discussion. We decided that we would not be able

22   to proceed on the basis that he asked us to, and I

23   communicated that to him; and during that

24   conversation, he suggested that we had been -- that

25   they had been doing things to accommodate us and that

16

CONFIDENTIAL

B1004

11/5/2001 Schacht, Henry

1    they would not otherwise have done, and he suggested

2    that we should continue that practice.

3           That sounded to me like something I wanted to

4    know the details of, and I went back and asked

5    counsel to look at it.

6           Q    Who was the chairman of Winstar with whom

7    you had these conversations?

8    A      Bill Rohana (phonetic).

9           Q    Did Mr. Rohana indicate what he meant

10   about things that Lucent had done to accommodate

11   Winstar?

12   A      He did not.

13          Q    Did Mr. Rohana indicate that whatever it

14   was that Lucent had done to accommodate Winstar had

15   been done near the end of the fourth --

16          MR. SAUNDERS:   I think you've got that

17          backwards.

18          Q    Let me try it again.   Did Mr. Rohana

19   indicate to you whether the things that he said would

20   have justified an accommodation from Lucent dated

21   back in some way to the fourth fiscal quarter of

22   2000?

23   A      He didn't identify any particular time that I

24   remember.

25

**REDACTED**

17



9/10/2002 Schacht, Henry

1       HENRY SCHACHT

2       A.    That's correct.                                    10:12:30

3       Q.    Did you believe that Lucent had                    10:12:31

4    maybe engaged in shady or unlawful acts?                    10:12:33

5             MR. GOLD:   Objection.                             10:12:38

6       Q.    Based on your conversation with                    10:12:39

7    this Mr. Ruhana?                                            10:12:40

8             MR. GOLD:   Objection; form.                       10:12:43

9       A.    I have no knowledge of what the act                10:12:44

10   was but I elected on return -- there were two               10:12:45

11   conversations actually, as I remember it, but in            10:12:48

12   substance a continuation of the same, and I                 10:12:51

13   believe I testified to that before.  And the --             10:12:55

14   I came back and asked Rich Rawson to look into              10:12:59

15   this and get our lawyers and look into this                 10:13:02

16   because I didn't like the tone in which it was              10:13:05

17   said.                                                       10:13:07

18      Q.    And tell us, if you can, with                      10:13:07

19   specifics, what was the tone in which it was                10:13:09

20   said?                                                       10:13:12

21      A.    Simply that.  The tone was simply                  10:13:12

22   that we've been -- we've helped you out before              10:13:14

23   and we need your help now and we expect you to              10:13:18

24   give it to us.                                              10:13:24

25      Q.    Did it look like he was wanting a                  10:13:25

102

CONFIDENTIAL                          LW 00301574

B1006

9/10/2002 Schacht, Henry

1                    HENRY SCHACHT

2    quid pro quo?                                    10:13:27

3          A.     I don't know.  It just -- I don't   10:13:30

4    remember the exact conversations, but it         10:13:30

5    obviously caused me enough concern to go back    10:13:34

6    and ask for it to be investigated.               10:13:35

7

8

9

10

11

12

13

14

15

16                        REDACTED

17

18

19

20

21

22

23

24

25

103

CONFIDENTIAL                          I W 00301575

9/10/2002 Schacht, Henry

```
 1              HENRY SCHACHT
 2        Q.    Well, explain to us why Lucent was      10:31:56
 3   running through its own books services that        10:31:58
 4   Winstar performed for its own network with         10:32:01
 5   Winstar employees?                                 10:32:05
 6        A.    It was to be a temporary --             10:32:06
 7   temporary arrangement until we got our people      10:32:07
 8   trained to do the work.                            10:32:09
 9        Q.    Do you understand, sir, that your       10:32:10
10   people never, ever did the work?                   10:32:12
11              MR. GOLD:  Objection; form.             10:32:18
12        Q.    Not in a full year and a half?          10:32:18
13        A.    I don't have any knowledge of the       10:32:19
14   detailed transactions.  What I've been told in     10:32:21
15   review is that the thesis, the original thesis     10:32:23
16   was our services organization would do the work.   10:32:27
17   When it turned out they weren't capable, this is   10:32:29
18   my understanding, when it turned out they were     10:32:31
19   incapable of doing it, we subcontracted that       10:32:34
20   work to Winstar people until we could become       10:32:37
21   capable.                                           10:32:40
22              When it became very clear that we       10:32:40
23   were no longer going to do it this was no longer   10:32:44
24   an interim arrangement and we terminated it.       10:32:45
25        Q.    When did you terminate it?              10:32:47
```

115

B1008

9/10/2002 Schacht, Henry

| 1  | HENRY SCHACHT                                   |            |
|----|------------------------------------------------|------------|
| 2  | A.    It was -- I don't know the exact         | 10:32:52   |
| 3  | date, but it was late in 2000, that's my       | 10:32:52   |
| 4  | understanding.                                 | 10:32:53   |
| 5  | Q.    Can you tell us if Lucent wasn't         | 10:32:53   |
| 6  | performing services for Winstar why Lucent     | 10:32:56   |
| 7  | would, in its own words, run Winstar performed | 10:32:58   |
| 8  | services through Lucent's book?                | 10:33:03   |
| 9  | A.    The contract read -- that was the        | 10:33:07   |
| 10 | way the contract -- as I understand it and I'm | 10:33:07   |
| 11 | not familiar with the details, the way the     | 10:33:12   |
| 12 | contract read is that we would pay -- we would | 10:33:12   |
| 13 | do those services and when it turned out we    | 10:33:14   |
| 14 | couldn't do the services, we subcontracted to do| 10:33:16  |
| 15 | it and therefore, the payment's perfectly      | 10:33:18   |
| 16 | logical, the fact that we subcontracted to     | 10:33:21   |
| 17 | Winstar was only to be temporary.  When it     | 10:33:23   |
| 18 | wasn't temporary we terminated it.             | 10:33:26   |

19

20

21

22                          **REDACTED**

23

24

25

116

B1009

**10/29/2002 Schacht, Henry**

1    HENRY B. SCHACHT

2

3

4

5

6

7

8

9                         REDACTED

10

11

12

13

14

15

16

17

18

19

20

21        Q.    So my question is, did you find out

22   what promises that Rich McGinn made to Bill

23   Rouhana of Winstar?

24        A.    This is a third-hand message.  What

25   my remembrance is what I said in here, is the

210

10/29/2002 Schacht, Henry

1    HENRY B. SCHACHT

2    following. I don't remember the exact words. I

3    remember we better make sure we understand, and

4    obviously what it was that caused Bill to give

5    me the impression that they've done favors for

6    us and we ought to not call the monies which

7    were now entitled to call, which was the big

8    deal.

9

10

11

12

13

14

15

16

17                       REDACTED

18

19

20

21

22

23

24

25

211

I W 00301744

B1011

```
                          15 1 new v2 schacht 3-16-04 disk 1 to 3
00:09:38.21 19     recognition issue?
00:09:39.21 20     "Answer:  It was an issue involving
00:09:42.21 21     Winstar where we had initiated a software
00:09:45.21 22     pooling agreement, but there were credits given
00:09:47.22 23     against that that would have made that not
00:09:50.22 24     recordable."
00:09:50.22 25     Turning your attention back down to
```

=========================================================

```
Page 12
00:09:52.22  0
          12
00:09:52.22  1              1                HENRY B. SCHACHT
00:09:56.19  2                                   Page 12
00:09:52.22  2     line 23 so that you have my questions in
00:09:56.22  3     context, you testified, "I had asked our counsel
00:10:01.20  4     after a conversation with the chairman of
00:10:03.20  5     Winstar."
00:10:04.20  6     Could you describe the conversation
00:10:06.20  7     you had with the chairman of Winstar?  And
00:10:10.21  8     first, when did that occur?
00:10:14.21  9     A.      Shortly after I came back from --
00:10:19.21 10     to become CEO, I had a call from the chairman of
00:10:25.22 11     Winstar, and we arranged for a meeting that
00:10:28.22 12     occurred shortly thereafter.  And we had a
00:10:31.19 13     general discussion of the mutual relationship
00:10:37.20 14     between Winstar and Lucent.  We had extended
00:10:42.20 15     them a considerable amount of credit.  They were
00:10:44.21 16     buying quite a bit of stuff from us.
00:10:46.21 17     We had a general discussion.  He
00:10:50.21 18     described the fact that we were going through
00:10:56.22 19     some very sensitive transactions.  They were
00:10:59.22 20     going to try to raise some money.  My
00:11:03.22 21     predecessors had requested that if they raised
00:11:05.19 22     money, that we would be paid back that amount
00:11:09.20 23     over what the limit of our credit agreement was.
00:11:12.20 24     He wanted me to think about that.
00:11:14.20 25     He asked me about how we'd feel if
```

=========================================================

```
Page 13
00:11:19.21  0
          13
00:11:19.21  1              1                HENRY B. SCHACHT
00:11:21.18  2                                   Page 13
00:11:19.21  2     they used some other equipment; if people would
00:11:21.21  3     extend credit, that we wouldn't -- he may
00:11:28.22  4     have -- there may have been more things.  Quite
00:11:32.22  5     a lengthy conversation.  A couple hours.
00:11:33.22  6     Q.      Was that a dinner meeting?
00:11:35.22  7     A.      No.  At a meeting in his offices in
00:11:38.19  8     New York.  It wasn't dinner.
00:11:39.59  9     Q.      You had contacted him or he had
00:11:40.13 10     contacted you?
00:11:40.70 11     A.      I believe he had contacted me.
00:11:46.03 12     MR. RATHKOPF:  Off the record for
00:11:46.53 13     one second.
00:11:49.64 14              (Discussion off the record.)
00:11:49.64 15     THE VIDEOGRAPHER:  Back on the
00:11:50.07 16     record.
00:11:50.91 17     THE WITNESS:  I hadn't finished my
                                   Page 5
```

15 1 new v2 'schacht 3-16-04 disk 1 to 3

```
00:11:51.31 18   answer.
00:11:53.94 19   Q.     Please.
00:11:58.21 20   A.     You asked me specific question
00:12:00.35 21   about this.  Subsequent to that conversation I
00:12:06.05 22   went back and met with our people.  And I
00:12:10.06 23   believe the next conversation I told them was
00:12:14.06 24   that, on the phone, was that we did not want to
00:12:18.07 25   extend them credit, and if Cisco or others
```

Page 14
```
00:12:27.04  0
             14
00:12:27.04  1                 1                 HENRY B. SCHACHT
00:12:27.01  2                                       Page 14
00:12:27.04  2   wanted to, that that would -- wasn't something
00:12:27.04  3   that we could object to.
00:12:29.04  4   And in a subsequent conversation I
00:12:31.05  5   went back and said that -- I don't remember
00:12:34.05  6   these timings, I believe it was the subsequent
00:12:36.05  7   one -- that we could not accept the 200.  We
00:12:39.05  8   were going to use our legal rights and accept
00:12:42.06  9   the 200.  He protested that quite vehemently at
00:12:46.06 10   that time.
00:12:46.06 11   And that's when this event
00:12:50.07 12   occurred, to the best of my recollection.
00:12:52.07 13   That's what I'm referring to here, that there
00:12:55.04 14   had been some -- they had done some -- helped us
00:12:58.01 14   us.
00:12:58.04 15   out on the end of the quarter, and that we'd had
00:13:03.04 16   a very good relationship back and forth, a lot
00:13:06.05 17   of -- they bought the equipment, they had done
00:13:09.05 18   this, and that he was disappointed in the answer
00:13:12.05 19   and he hoped I'd reconsider.
00:13:15.06 20   That's when I went back to ask our
00:13:18.06 21   counsel to look into what he was talking about.
00:13:20.06 22   Q.     And the 200 million that you
00:13:22.06 23   mentioned and the money that they wanted to not
00:13:24.07 24   turn over to you to reduce the -- fully to
00:13:27.07 25   reduce the line, is that what became the Siemens
```

Page 15
```
00:13:30.04  0
             15
00:13:30.04  1                 1                 HENRY B. SCHACHT
00:13:32.01  2                                       Page 15
00:13:30.04  2   loan proceeds that were then --
00:13:31.41  3   A.     That's correct.
```

Page 15
```
00:13:58.03 12                                       Page 15
00:13:54.70 12   Q.     Now, is it as a result of that
00:13:58.07 13   series of conversations that you caused counsel
00:14:02.04 14   to conduct an investigation?
00:14:03.04 15   A.     That's correct.
00:14:04.04 16   Q.     And who was that counsel?  Was that
                                       Page 6
```

B1013

```
                    15 1 new v2 schacht 3-16-04 disk 1 to 3
00:14:06.04 17  Cravath?
00:14:07.04 18  A.      Well, I talked to our internal
00:14:09.04 19  counsel and told him to get with our external
00:14:12.05 20  counsel, which was Cravath.
00:14:14.05 21  Q.      And Cravath then did, in fact,
00:14:18.05 22  conduct an investigation?
00:14:19.05 23  A.      That's correct.
00:14:20.06 24  Q.      And did they conduct an
00:14:23.06 25  investigation in concert with
```

===================================================

```
Page 16
00:14:24.06  0
    16
00:14:24.06  1                1               HENRY B. SCHACHT
00:14:26.03  2                                    Page 16
00:14:24.06  2  PricewaterhouseCoopers?
00:14:26.06  3  A.      I believe that came later.
00:14:27.63  4  Q.      That came later. So the initial
00:14:29.23  5  investigation, what did you ask your in-house
00:14:32.00  6  counsel to have investigated by Cravath?
00:14:36.27  7  A.      To look at the transaction at the
00:14:37.71  8  end of the quarter and to make sure that it was
00:14:42.71  9  properly -- to find out what he was talking
00:14:44.71 10  about.
00:14:46.72 11  Q.      Now, in your testimony, though, you
00:14:48.72 12  didn't mention anything about Mr. Rouhana saying
00:14:53.72 13  they helped you out in the end of the quarter.
00:14:55.72 14  In fact, you mentioned in your testimony
00:14:57.73 15  something about equipment and just generally had
00:15:00.73 16  helped you out. What caused you, in talking to
00:15:03.70 17  your counsel, to only investigate the, at that
00:15:07.70 18  time, the most recent end-of-quarter transaction
00:15:12.71 19  with Winstar?
00:15:13.71 20  A.      I don't remember exactly what it
00:15:14.71 21  was. I think I testified I don't remember the
00:15:16.71 22  exact phraseology used that led me to believe
00:15:21.72 23  that there was a recent transaction.
00:15:23.72 24  Q.      Nothing he said led you to believe
00:15:24.72 25  that there might be other transactions between
```

===================================================

```
Page 17
00:15:26.72  0
    17
00:15:26.72  1                1               HENRY B. SCHACHT
00:15:29.69  2                                    Page 17
00:15:26.72  2  Winstar and Lucent that should be looked at as
00:15:29.72  3  well at that time?
00:15:34.70  4  A.      Best of my recollection, we started
00:15:36.70  5  with the transaction that it seemed to me we
00:15:40.70  6  ought to look at. Of course, that led to
00:15:42.70  7  looking at all the transactions with Winstar.
00:15:44.17  8  Q.      But didn't Mr. Rouhana tell you
00:15:46.41  9  that Winstar had been doing favors, they had
00:15:49.61 10  been doing things to help you out, they had
00:15:52.61 11  engaged in practices using, in each instance,
00:15:55.58 12  the multiple, not just a transaction or a favor
00:15:58.59 13  or a practice?
00:15:59.59 14  A.      I don't remember the specifics, but
00:16:00.59 15  I do remember the discussion was one of a mutual
                                Page 7
```

B1014

15 1 new v2 schacht 3-16-04 disk 1 to 3

| | |
|---|---|
| 00:16:04.59 16 | partnership where they'd been buying a lot of |
| 00:16:06.59 17 | equipment from us. We'd extended them a lot of |
| 00:16:08.60 18 | credit. We were their favored supplier. And |
| 00:16:12.60 19 | that, in turn, they had helped us out from time |
| 00:16:14.60 20 | to time. |
| 00:16:17.61 21 | Q.    So after that investigation -- |
| 00:16:19.61 22 | after that -- I'm sorry -- conversation, an |
| 00:16:22.61 23 | investigation was conducted. What was the scope |
| 00:16:25.61 24 | of the investigation? Was it only that |
| 00:16:27.58 25 | last-quarter transaction of September 2000 |

==================================================

Page 18
00:16:30.59  0
        18

| | | |
|---|---|---|
| 00:16:30.59 1 | 1 | HENRY B. SCHACHT |
| 00:16:33.56 2 | | Page 18 |
| 00:16:30.59 2 | between Lucent and Winstar? Was that what you |
| 00:16:33.59 3 | asked to have investigated? |
| 00:16:35.59 4 | A.    No. After we found the first |
| 00:16:37.59 5 | transaction to be flawed, when we found the |
| 00:16:40.60 6 | documents that Mr. Plunkett subsequently was |
| 00:16:43.60 7 | dismissed for, I ordered that we would then get |
| 00:16:51.61 8 | external accountants in there and examine any |
| 00:16:53.61 9 | transactions that they felt they should look at |
| 00:16:56.61 10 | without any limitation. |
| 00:16:57.61 11 | Q.    As to Winstar? Or as to all |
| 00:17:01.58 12 | relationships? |
| 00:17:02.58 13 | A.    Both. |
| 00:17:03.59 14 | Q.    But focusing now on just the first |
| 00:17:05.59 15 | investigation, not the second investigation, the |
| 00:17:08.59 16 | scope of the first investigation that you |
| 00:17:11.59 17 | requested to be conducted, was that limited to |
| 00:17:14.60 18 | the Winstar/Lucent September 2000 end-of-quarter |
| 00:17:18.57 18 | end-of-quarter |
| 00:17:18.60 19 | transaction? |
| 00:17:19.60 20 | A.    I don't remember it being that |
| 00:17:21.60 21 | specific. But it was -- to the best of my |
| 00:17:30.61 22 | knowledge, there was a reference to transac- -- |
| 00:17:30.61 23 | to a transaction that I believed we ought to |
| 00:17:32.61 24 | check out, and that was so -- what I'd asked |
| 00:17:34.58 25 | them to do was look at transactions with Winstar |

==================================================

Page 19
00:17:36.58  0
        19

| | | |
|---|---|---|
| 00:17:36.58 1 | 1 | HENRY B. SCHACHT |
| 00:17:41.56 2 | | Page 19 |
| 00:17:36.58 2 | to see if there's anything that is untoward. |
| 00:17:41.59 3 | Q.    And to your knowledge was that |
| 00:17:44.59 4 | done? |
| 00:17:44.59 5 | A.    I believe it was, yes. |
| 00:17:45.59 6 | Q.    And about how long before you got a |
| 00:17:48.60 7 | report back from Cravath as to the result of the |
| 00:17:52.60 8 | investigation? |
| 00:17:53.60 9 | A.    Oh, it was a matter of days on the |
| 00:17:55.60 10 | specific transaction that we're referring to |
| 00:17:58.61 11 | here. |
| 00:17:58.61 12 | Q.    Do you know if Cravath spoke to |
| 00:18:00.61 13 | anyone at Winstar in the course of that |

Page 8

15 1 new v2 schacht 3-16-04 disk 1 to 3

| | |
|---|---|
| 00:23:17.49 10 | would not otherwise have done, and he suggested |
| 00:23:22.50 11 | that we should continue that practice." |
| 00:23:24.50 12 | You'll notice the word "things" in |
| 00:23:26.50 13 | your testimony.  And there are other places in |
| 00:23:30.47 14 | this transcript, two of the others that we'll go |
| 00:23:34.48 15 | through, that you've used the testimony |
| 00:23:37.48 16 | "practices," "favors" in the plural.  Did you |
| 00:23:41.48 17 | ever discover, as we sit here today, any other |
| 00:23:44.49 18 | favors or practices or things that Winstar was |
| 00:23:46.49 19 | claiming to have done for Lucent beyond the |
| 00:23:50.49 20 | September 2000 end-of-quarter transaction? |
| 00:23:54.50 21 | A.    Well, they had done a lot of |
| 00:23:57.50 22 | things.  They had bought a lot of equipment from |
| 00:24:06.47 23 | us.  We had extended them a lot of credit. |
| 00:24:06.47 24 | There was the fact that we had -- there were |
| 00:24:12.48 25 | many complex relationships with Winstar.  There |

===============================================

Page 24

| | |
|---|---|
| 00:24:15.48 0 | 24 |
| 00:24:15.48 1 | 1                        HENRY B. SCHACHT |
| 00:24:19.45 2 | Page 24 |
| 00:24:15.48 2 | was the whole service agreement concept where we |
| 00:24:19.45 2 | we |
| 00:24:19.49 3 | had done them a favor and were continuing to do |
| 00:24:23.49 4 | it, although we stopped it later. |
| 00:24:29.50 5 | So, you know, things that related |
| 00:24:34.50 6 | to a lot of -- I understood we had a very long |
| 00:24:38.47 7 | conversation in the previous conversation.  But |
| 00:24:41.48 8 | the thing I'm alluding here is the practice |
| 00:24:44.48 9 | we went and looked at, which was the software |
| 00:24:47.48 10 | pooling. |
| 00:24:47.48 11 | Q.    I will focus again to line 23 on |
| 00:24:50.49 12 | page 16, going down to page 17, line 2. |
| 00:24:57.49 13 | A.    Uh-huh. |
| 00:24:58.49 14 | Q.    You say, "And during that |
| 00:25:00.50 15 | conversation he suggested that we had been -- |
| 00:25:01.50 16 | that they had been doing things to accommodate |
| 00:25:04.50 17 | us and that they would not otherwise have done." |
| 00:25:08.50 18 | Let's just stop there. |
| 00:25:09.47 19 | A.    Yeah. |
| 00:25:10.47 20 | Q.    My question is -- maybe I phrased |
| 00:25:12.47 21 | it poorly the last time -- is: Other than the |
| 00:25:16.48 22 | September 2000 end-of-quarter software |
| 00:25:20.48 23 | transaction, did you ever discover, as we sit |
| 00:25:22.48 24 | here today, anything else that Winstar had |
| 00:25:26.49 25 | purportedly done to accommodate Lucent that |

===============================================

Page 25

| | |
|---|---|
| 00:25:29.49 0 | 25 |
| 00:25:29.49 1 | 1                        HENRY B. SCHACHT |
| 00:25:33.46 2 | Page 25 |
| 00:25:29.49 2 | Winstar would not otherwise have done? |
| 00:25:33.50 3 | A.    I can't think of any specifics, no. |
| 00:25:35.50 4 | Q.    And you mentioned that you, Lucent, |
| 00:25:42.49 5 | had done a favor for Winstar in connection with |
| 00:25:45.47 6 | the Winstar Wireless services agreement; is that |
| 00:25:49.48 7 | correct? |

Page 11

```
                        15 1 new v2 schacht 3-16-04 disk 1 to 3
00:25:50.48  8      A.      Yes.
00:25:52.48  9      Q.      When you say you had done them a
00:25:55.48 10      favor, what was that favor?
00:25:57.49 11      A.      Well, the agreement was originally
00:26:00.49 12      that we would -- our service people would build
00:26:04.49 13      out their network for them.  As I understand it,
00:26:09.50 14      this is before I returned.  And that we began to
00:26:13.50 15      do that.  And it turned out we didn't -- we
00:26:16.47 16      didn't -- unfortunately did not have the
00:26:19.47 17      capacity we believed we had when we entered into
00:26:21.44 17      into
00:26:21.48 18      the agreement.
00:26:22.48 19      So we subcontracted them to do it
00:26:25.48 20      until we could get up to speed.  After a
00:26:30.49 21      subsequent period of time it looked like we were
00:26:32.49 22      not going to get up to speed, so we told them we
00:26:34.49 23      were going to discontinue that.  They asked us
00:26:38.49 24      to continue it.  We said we have no reason to
00:26:41.50 25      continue it.  They said it would help us if you
```

==================================================

```
Page 26
00:26:43.50  0
            26
00:26:43.50  1            1                    HENRY B. SCHACHT
00:26:47.47  2                                     Page 26
00:26:43.50  2      could, I'm told.  And we did for a period of
00:26:47.50  3      time.
00:26:48.50  4      Q.      Who told you this?
00:26:49.47  5      A.      Our people.
00:26:52.04  6      Q.      Who is your people that told you
00:26:52.91  7      this?
00:26:53.78  8      A.      Oh, it would be Debbie Hopkins.
00:26:55.88  9      Ben Verwaayen.  It would be Nina Aversano.
```

==================================================

**********************************************

```
Page 31
00:34:54.76 21                                    Page 31
00:34:48.82 21      Let me next show you a transcript
00:34:54.79 22      of extracts of testimony purportedly given by
00:34:57.79 23      you on September 10, 2002 in a litigation
00:35:01.80 24      brought by Obtek, O-B-T-E-K, against Lucent
00:35:06.80 25      Technologies and others.
```

==================================================

```
Page 32
00:35:10.81  0
            32
00:35:10.81  1            1                    HENRY B. SCHACHT
00:35:12.54  2                                     Page 32
00:35:10.81  2      MR. RATHKOPF:  We'll mark that as
00:35:12.57  3      Schacht Exhibit 3.
00:35:44.54  4            4                    (Schacht Exhibit 3 for
00:35:44.54  5            5      identification, transcript of extracts, 9-10-02,
00:35:44.54  6            6      production Nos. LW 00302811 through LW
00:35:44.54  7            7      00301600.)
00:35:44.54  8      Q.      Looking at that transcript, do you
00:35:46.64  9      recall giving testimony on or around September
                                          Page 12
```

B1017

                    15 1 new v2 schacht 3-16-04 disk 1 to 3
02:07:21.28 21    substantially" is not one that has any
02:07:24.28 22    definition to it.  I would say that Lucent's
02:07:27.28 23    sales had fallen, and I would have to go back
02:07:31.29 24    and check exactly the cash position.  But that
02:07:34.26 25    clearly, as a the sales fell, our margins were

==============================================================

Page 110
02:07:39.00  0
   110
02:07:39.00  1                    1                 HENRY B. SCHACHT
02:07:54.51  2                                      Page 110
02:07:39.00  2    squeezed quite substantially, yes.

==============================================================

**************************************************

Page 114
02:13:36.39  9                                      Page 114
02:13:32.42  9    Did Lucent characterize its
02:13:36.42 10    relationship with Winstar as a strategic
02:13:40.42 11    partnership?  Was that a fair statement of the
02:13:42.39 12    terminology that Lucent had used as to its
02:13:45.40 13    Winstar relationship?
02:13:47.40 14    A.      That's certainly the way it was
02:13:49.40 15    characterized to me by Bill Rouhana.  But I
02:13:55.41 16    would say that it was a very important customer
02:13:57.41 17    of ours and we had a very extensive relationship
02:14:03.41 18    with it, yes.

==============================================================

**************************************************

Page 115
02:14:38.95  2                                      Page 115
02:14:35.68  2    Q.      I'd like to have you look again,
02:14:38.98  3    please, at Schacht Exhibit 3, which is your
02:14:41.98  4    September 10, 2002 testimony.  I'd like you to
02:14:45.99  5    look at page 119 at the bottom, line 24, through
02:14:53.00  6    page 120, line 6.
02:14:58.97  7    The question was:
02:15:00.97  8    "Question:  Did Lucent have this
02:15:03.97  9    very same type of arrangement with any of its
02:15:06.98 10    customers?
02:15:06.98 11    "Answer:  We may have had an
02:15:09.98 12    arrangement where we performed" --
02:15:11.98 13    A.      I'm sorry.  Where are you?
02:15:12.98 14    Q.      I'm on page 119 --
02:15:15.99 15    A.      Got it.
02:15:16.99 16    Q.      -- line 24.
02:15:18.99 17    "Question:  Did Lucent have this
02:15:21.99 18    very same type of arrangement with any of its
02:15:24.99 19    other customers?
02:15:27.00 20    "Answer" -- line 3, page 120.  "We
02:15:30.00 21    may have had an arrangement where we performed
02:15:31.93 21    performed
02:15:31.97 22    services, but I don't know of an arrangement
02:15:33.97 23    where we billed people to do the services we're
02:15:35.97 24    supposed to do."
02:15:37.97 25    In that testimony are you referring
                                      Page 29

B1018

15 1 new v2 schacht 3-16-04 disk 1 to 3

========================================================

Page 116
02:15:39.98   0
   116
02:15:39.98   1              1                    HENRY B. SCHACHT
02:15:42.95   2                                   Page 116
02:15:39.98   2    to the arrangement with Winstar Wireless where
02:15:42.98   3    you were financing Winstar Wireless under a
02:15:45.98   4    subcontract to do the services that Lucent was
02:15:47.98   5    supposed to be doing under the supply agreement?
02:15:50.99   6    Is that what your testimony is relating to?
02:15:52.99   7    A.      Yes, but I don't think it worked
02:15:54.99   8    exactly that way.  We had an arrangement where
02:16:00.00   9    we were supposed to do the services.  It
02:16:03.00  10    didn't -- we weren't able to do it, so we
02:16:06.97  11    subcontracted to Winstar for them to do it.
02:16:09.97  12    That's what I'm referring to here.
02:16:11.97  13    Q.      If I misstated -- that's what I
02:16:13.98  14    thought I said.
02:16:14.98  15    A.      You may well have.
02:16:15.98  16    Q.      I may not have.  Is that what
02:16:18.98  17    you're referring to in this testimony?
02:16:20.98  18    A.      Yes.
02:16:20.98  19    Q.      And you did not have that
02:16:22.99  20    arrangement, to your knowledge, with any other
02:16:24.99  21    customer?
02:16:24.99  22    A.      Not to my knowledge, no.


========================================================

*****************************************************

Page 120
02:21:12.28  16                                   Page 120
02:21:09.31  16    Q.      You previously testified that you
02:21:12.31  17    were told by Lucent executives, including Mr.
02:21:17.28  18    Verwaayen, that Lucent wanted to terminate the
02:21:21.28  19    payment for Wireless services and that the
02:21:24.29  20    December 30 -- or the December 2000 payment was
02:21:26.26  20    was
02:21:26.29  21    going to be the last time.  Do you recall that
02:21:29.29  22    testimony?
02:21:30.29  23    A.      Yes.  I think what I said was that
02:21:31.29  24    we wanted to terminate the practice of the
02:21:35.30  25    pass-through.


========================================================

Page 121
02:21:35.30   0
   121
02:21:35.30   1              1                    HENRY B. SCHACHT
02:21:40.27   2                                   Page 121
02:21:35.30   2    Q.      And the payment in December 2000
02:21:40.30   3    Mr. Verwaayen said to you was going to be one
02:21:45.31   4    last time.
02:21:45.31   5    A.      You're saying specifically about
02:21:47.31   6    the payment.  What I remember is we're going to
02:21:49.31   7    stop doing this.  Stop.
02:21:52.28   8    Q.      Ah.  Okay.  And therefore if it had
02:21:57.29   9    stopped, there would be no obligation to make a
                                  Page 30

15 1 new v2 schacht 3-16-04 disk 1 to 3

| 02:21:58.29 | 10 | payment. |
| 02:21:59.29 | 11 | A.    That's the presumption. |
| 02:22:10.30 | 12 | Q.    Was there a discussion at the time |
| 02:22:11.30 | 13 | in connection with stopping the pass-through |
| 02:22:14.30 | 14 | practice of having Lucent actually do the |
| 02:22:17.31 | 15 | buildout as it originally was intended? |
| 02:22:20.31 | 16 | A.    I don't recall any discussion of |
| 02:22:22.31 | 17 | that, because it's my remembrance that we had |
| 02:22:26.28 | 18 | concluded that we weren't able to do that. |
| 02:22:29.29 | 19 | Q.    But you were obligated to do that |
| 02:22:32.29 | 20 | under your supply agreement, were you not? |
| 02:22:34.29 | 21 | A.    We were obligated to have it done, |
| 02:22:36.29 | 22 | but we then subcontracted that obligation. |
| 02:22:39.30 | 23 | Q.    But you just testified that you |
| 02:22:41.30 | 24 | wanted to -- Lucent wanted to end the practice |
| 02:22:44.30 | 25 | of subcontracting its Wireless. |

==============================================

Page 122
02:22:47.30  0
122

| 02:22:47.30 | 1 | 1                    HENRY B. SCHACHT |
| 02:22:48.20 | 2 |                      Page 122 |
| 02:22:47.30 | 2 | A.    That's right. |
| 02:22:48.24 | 3 | Q.    So who was going to perform |
| 02:22:49.81 | 4 | Lucent's obligation under the supply agreement? |
| 02:22:51.67 | 5 | A.    The same people performing it now. |
| 02:22:52.91 | 6 | The Winstar people. |
| 02:22:54.54 | 7 | Q.    Without being paid by Lucent? |
| 02:22:56.31 | 8 | A.    That's right. |
| 02:22:59.58 | 9 | Q.    Was there any discussion by Lucent |
| 02:23:02.92 | 10 | as to how Winstar was going to pay for it if it |
| 02:23:06.92 | 11 | wasn't allowed to draw down on the credit |
| 02:23:08.93 | 12 | facility? |
| 02:23:09.49 | 13 | A.    I'm sure we would have provided the |
| 02:23:11.39 | 14 | payment for it if we went forward, but we were |
| 02:23:13.80 | 15 | no longer going to go through with the |
| 02:23:15.47 | 16 | pass-through of it.  The financial arrangements, |
| 02:23:17.47 | 17 | I don't remember the details. |
| 02:23:20.44 | 18 | Q.    You also just testified that Lucent |
| 02:23:22.74 | 19 | had determined it couldn't do what Winstar |
| 02:23:25.21 | 20 | Wireless had been doing and you wanted Winstar |
| 02:23:27.51 | 21 | Wireless to do it itself but without the |
| 02:23:29.95 | 22 | pass-through; am I correctly -- |
| 02:23:31.81 | 23 | A.    The pass-through was a payment back |
| 02:23:34.98 | 24 | and forth.  What we wanted to do was just do |
| 02:23:37.99 | 25 | that -- there's no sense -- we wanted to |

==============================================

Page 123
02:23:39.99  0
123

| 02:23:39.99 | 1 | 1                    HENRY B. SCHACHT |
| 02:23:40.96 | 2 |                      Page 123 |
| 02:23:39.99 | 2 | simplify it.  They're doing the work.  They do |
| 02:23:40.99 | 3 | the work.  We'll work out the financial |
| 02:23:44.99 | 4 | relationships.  There's no sense them paying us |
| 02:23:49.00 | 5 | 5    and we paying them.  That made no sense. |
| 02:23:49.00 | 6 | Q.    So that was going to stop, but if |
| 02:23:50.97 | 7 | Lucent wasn't going to do the work, Wireless was |
| 02:23:53.97 | 8 | going to perform it and be able to draw directly |

Page 31

B1020

15 1 new v2 schacht 3-16-04 disk 1 to 3

Page 137
02:41:31.36    0
      137
02:41:31.36    1              1                  HENRY B. SCHACHT
02:41:35.33    2                                    Page 137
02:41:31.36    2     that the only reason Winstar was in excess of
02:41:35.37    3     the 500 million credit facility was because of
02:41:38.37    4     the end-of-quarter transactions it had engaged
02:41:41.37    5     in with Lucent in fiscal year 2000?
02:41:43.34    6     A.     No.
02:41:45.34    7     Q.     Did any of them -- withdraw that.
02:41:56.35    8     Did any of them advise you that Lucent had the
02:42:03.36    9     technical legal right to issue a refinance
02:42:06.36   10     notice as early as September 2000?
02:42:14.37   11     A.     My recollection is that I knew that
02:42:16.34   12     we'd had the right previously and had elected
02:42:19.34   13     not to use it, but that we were going to now.
02:42:22.35   14     Q.     And when you used it, it was after
02:42:25.35   15     the $200 million net proceeds from the Siemens
02:42:29.35   16     loan were repaid to you; is that correct?
02:42:31.55   17     A.     I'd have to check the dates. I
02:42:32.82   18     don't remember the timing.


============================================================

************************************************************


Page 141
02:47:36.39    5
      141
02:47:36.39    5              1                  HENRY B. SCHACHT
02:47:40.36    5                                    Page 141
02:47:45.40    5     Q.     And do you know the effect on
02:47:47.40    6     Winstar of Lucent sending a refinancing notice,
02:47:50.41    7     what the legal -- what you were advised as to
02:47:52.41    8     what the legal ramifications of a refinance
02:47:55.41    9     notice were under the Winstar agreements with
02:47:57.41   10     Lucent?
02:47:59.38   11     A.     What I was advised is we had the
02:48:01.38   12     right to issue the refinancing that set a period
02:48:08.39   13     in tolling, at the end of which we had the
02:48:11.39   14     opportunity to convert into bonds and to then
02:48:15.40   15     make them marketable.
02:48:16.40   16     Q.     Was there any discussion at Lucent
02:48:17.40   17     as to what effect that would have on Winstar's
02:48:20.40   18     ability to raise financing from a source other
02:48:22.41   19     than Lucent?
02:48:24.41   20     A.     Bill raised the question with me,
02:48:27.41   21     obviously, and said this would not be good for
02:48:30.41   22     them. And we made the determination it was in
02:48:32.38   23     our best interest to do that.
02:48:37.39   24     Q.     And you also made the determination
02:48:38.39   25     that it was not in your best interest to do that


============================================================


Page 142
02:48:41.39    0
      142
02:48:41.39    1              1                  HENRY B. SCHACHT
02:48:43.36    2                                    Page 142
02:48:41.39    2     until after you got the Siemens loan; isn't that
                                      Page 33

B1021

```
                        15 1 new v2 schacht 3-16-04 disk 1 to 3
02:48:43.39  3   correct?
02:48:44.39  4   A.     I've already testified that the
02:48:46.40  5   timing is not something that I have any
02:48:49.40  6   recollection of.
02:48:50.40  7   Q.     And you've already testified that
02:48:54.40  8   you have no recollection of the negotiations on
02:48:57.41  9   the transition services agreement.
02:49:00.41 10   A.     That's correct.
02:49:00.41 11   Q.     And you have no recollection that
02:49:03.41 12   an agreement was reached by December 2000,
02:49:07.38 13   approved by Winstar management, senior
02:49:09.39 14   management, and rejected after the Siemens loan
02:49:12.39 15   proceeds were paid over?  Rejected by Lucent
02:49:15.39 16   after the Siemens loan proceeds were paid over?
02:49:18.39 17   A.     You're asking details of
02:49:20.40 18   discussions that were held between the Lucent
02:49:22.40 19   team and Winstar.  And while I was aware of the
02:49:28.40 20   general undertakings, the details of the
02:49:31.41 21   negotiation, the timings of the negotiation are
02:49:42.39 22   not something either I was aware of or have any
02:49:42.39 23   recollection of.
02:49:42.39 24   Q.     But this relationship, the
02:49:42.39 25   Winstar/Lucent relationship, was the one that
```

```
=============================================
```

```
Page 143
02:49:42.39  0
       143
02:49:42.39  1            1                    HENRY B. SCHACHT
02:49:44.35  2                                   Page 143
02:49:42.39  2   triggered all of your investigations.  Did you
02:49:44.39  3   have no sensitivity to all of these aspects and
02:49:48.39  4   want to know everything about the decisions
02:49:50.39  5   being made as regards that relationship come
02:49:54.40  6   December 2000?
02:49:56.40  7   A.     Ben Verwaayen was in charge of all
02:49:59.40  8   the relationships all over.  We had many things
02:50:01.40  9   going on at the time.  Ben had overall
02:50:03.41 10   responsibility for all of our customers and
02:50:06.41 11   handled the negotiations with a whole variety of
02:50:09.41 12   customers.
02:50:09.41 13   Q.     And you don't recall any discussion
02:50:11.38 14   between you and Ben regarding the timing of
02:50:14.38 15   rejecting the transition services agreement?
02:50:17.39 16   A.     Of the transition services?
02:50:20.39 17   Q.     That's correct.
02:50:20.39 18   A.     Yes.  I remember him saying we're
02:50:22.39 19   going to do it one more time in December.
02:50:24.39 20   Q.     That's not the transition services
02:50:28.40 21   agreement.  The transition services agreement
02:50:31.40 22   was an agreement that Winstar and Lucent were
02:50:32.40 23   negotiating where Lucent was going to try to do
02:50:35.41 24   the buildout.
02:50:36.41 25   A.     The only thing I remember about
```

```
=============================================
```

```
Page 144
02:50:38.41  0
       144
02:50:38.41  1            1                    HENRY B. SCHACHT
02:50:41.38  2                                   Page 144
```

Page 34

B1022

```
                          15 1 new v2 schacht 3-16-04 disk 1 to 3
02:50:38.41   2    that is that we were not going to do the
02:50:41.41   3    buildout, and Ben said we will go through the
02:50:43.41   4    pass-through one more time.
02:50:47.98   5    Q.     You don't recall Ben having any
02:50:49.02   6    discussion with you about when to advise Winstar
02:50:52.52   7    that you're not going to go forward with the
02:50:54.69   8    buildout?
02:50:55.99   9    A.     I believe Ben told me that he told
02:50:57.66  10    Winstar we'll do it one more time and that will
02:50:59.66  11    be the end, in December.
02:51:02.27  12    Q.     But do you know -- was there any
02:51:04.03  13    discussion by Ben with you about not
02:51:07.10  14    communicating that to Winstar until the Siemens
02:51:09.11  15    loan proceeds were paid over to Lucent?
02:51:11.11  16    A.     No.  Not that I recall.
02:51:14.11  17    Q.     Do you recall one way or the other?
02:51:16.11  18    Or you --
02:51:17.11  19    A.     I just don't recall.
02:51:19.12  20    Q.     Do you recall when you were advised
02:51:22.12  21    by Ben Verwaayen you were not going to do the
02:51:24.09  22    buildout?
02:51:27.32  23    A.     I don't remember the exact time,
02:51:28.79  24    but I remember it was December.  Ben decided he
02:51:31.19  25    was going to tell them we were going to do the
```

===================================================

```
Page 145
02:51:33.13   0
              145
02:51:33.13   1            1                    HENRY B. SCHACHT
02:51:55.65   2                                     Page 145
02:51:33.13   2    transition one more time, but that was it.
```

===================================================

*****************************************************
*****************************************************

B1023

**Uhl**

11 uhl 7-25-01 v2 disk 1 to 2
☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆

Page 128

| | | |
|---|---|---|
| 02:24:15.31 | 7 | Now, Uhl Exhibit 3 is your |
| 02:24:17.32 | 8 | request for funding set forth that you signed on |
| 02:24:23.32 | 9 | March 27th, 2001. |
| 02:24:24.32 | 10 | Now, your testimony earlier was |
| 02:24:29.33 | 11 | that Lucent was obligated under the Supply |
| 02:24:32.33 | 12 | Agreement to provide this funding to WinStar, |
| 02:24:42.31 | 13 | correct? |
| 02:24:42.31 | 14 | A.      Well, the Credit Agreement |
| 02:24:43.31 | 15 | required that they fund certain things that are |
| 02:24:48.31 | 16 | provided for under the Supply Agreement that are |
| 02:24:50.32 | 17 | required by Lucent to deliver under the Supply |
| 02:24:52.32 | 18 | Agreement. |
| 02:24:52.32 | 19 | Q.      So your testimony is that Lucent |
| 02:25:00.33 | 20 | was contractually obligated to, under the Credit |
| 02:25:05.33 | 21 | Agreement to lend sixty-two million fifty |
| 02:25:09.30 | 22 | thousand seven hundred and forty-three dollars |
| 02:25:13.31 | 23 | to WinStar for products and services that |
| 02:25:16.31 | 24 | WinStar was obligated to provide to -- that |
| 02:25:20.31 | 25 | Lucent was obligated to provide to WinStar under |

==========================================================

Page 129

| | | |
|---|---|---|
| 02:25:23.32 | 0 | |
| | 129 | |
| 02:25:23.32 | 1 | 1                    RICHARD J. UHL |
| 02:25:23.32 | 2 | the Supply Agreement. |
| 02:25:25.32 | 3 | Have I got that right?  Let me |
| 02:25:32.32 | 4 | try this another way. |
| 02:25:32.32 | 5 | A.      Yes. |
| 02:25:32.32 | 6 | Q.      Let me try this another way. |
| 02:25:33.33 | 7 | There's sixty-two million -- |
| 02:25:35.33 | 8 | A.      Right. |
| 02:25:35.33 | 9 | Q.      -- sixty-two million dollars and |
| 02:25:37.33 | 10 | change that you're seeking to borrow from Lucent |
| 02:25:42.30 | 11 | on March 27th, 2001 and this lawsuit is about in |
| 02:25:49.31 | 12 | part Lucent's failure to provide that financing |
| 02:25:57.32 | 13 | to WinStar, right? |
| 02:25:58.32 | 14 | A.      Correct. |
| 02:26:00.32 | 15 | Q.      Okay. |
| 02:26:00.32 | 16 | What was the sixty-two million |
| 02:26:05.32 | 17 | dollars to be used for? |
| 02:26:07.33 | 18 | A.      Lucent had been and had during |
| 02:26:16.30 | 19 | almost the entire life of the Supply Agreement |
| 02:26:19.30 | 20 | contracted with WinStar for certain of the |
| 02:26:29.31 | 21 | engineering and construction and design elements |
| 02:26:32.32 | 22 | required for the build-out of WinStar's network |
| 02:26:38.32 | 23 | and WinStar had supplied those services to list |
| 02:26:44.33 | 24 | Lucent as a subcontractor which Lucent would |
| 02:26:47.30 | 25 | then ~~build~~ back to WinStar. |

*billed*

==========================================================

Page 130

| | | |
|---|---|---|
| 02:26:52.30 | 0 | |
| | 130 | |
| 02:26:52.30 | 1 | 1                    RICHARD J. UHL |
| 02:26:52.30 | 2 | Q.      So your testimony is that Lucent |
| 02:26:54.31 | 3 | had an obligation to build out part of the |
| 02:26:56.31 | 4 | WinStar network.  WinStar was actually doing |

Page 4

B1024

11 uhl 7-25-01 v2 disk 1 to 2

```
02:27:03.32   5    that work and Lucent would hire WinStar as its
02:27:11.32   6    subcontractor with respect to that work,
02:27:17.33   7    correct?
02:27:17.33   8    A.      That is correct.
02:27:17.33   9    Q.      Is that what this sixty-two
02:27:19.33  10    million dollars is for?
02:27:19.33  11    A.      Yes, it is.
```

============================================

*********************************************

```
Page 131
02:29:08.31  17    Q.      Now, what steps did you take to
02:29:18.32  18    make sure that this sixty-two million dollars
02:29:22.32  19    that you were requesting Lucent to lend to you
02:29:26.33  20    was going to be used only for things that under
02:29:34.30  21    your understanding Lucent was obligated to do
02:29:38.30  22    for WinStar?  How did you go about making sure
02:29:42.31  23    that you weren't seeking financing for other
02:29:46.31  24    things?
02:29:46.31  25    A.      I had a pretty good knowledge of
```

============================================

```
Page 132
02:29:51.32   0
             132
02:29:51.32   1              1              RICHARD J. UHL
02:29:51.32   2    the activities of each one of the departments
02:29:55.32   3    who were engaged in some aspect of contributing
02:30:01.33   4    to the build-out of the WinStar network.
02:30:05.33   5    These were activities ranging
02:30:08.30   6    from software design required to operate the
02:30:13.31   7    network to the real estate activity that's
02:30:18.31   8    required in advance of obtaining license
02:30:21.31   9    agreements to install equipment onto the network
02:30:26.32  10    and so I generally knew, had a pretty good
02:30:29.32  11    knowledge of what each one of those departments
02:30:31.32  12    was doing because I was reviewing their monthly
02:30:34.33  13    operating reports and I certainly was very
02:30:41.30  14    cognizant of what their business plans and
02:30:43.30  15    budgets were.
02:30:43.30  16    Q.      Well, let's assume that WinStar
02:30:46.31  17    once a month sent bills to its customers, would
02:30:51.31  18    Lucent be obligated to pay the postage for those
02:30:54.31  19    bills or lend money to WinStar for the postage?
02:30:58.32  20    A.      No.
02:30:59.32  21    Q.      Or the preparation of the bills?
02:31:00.32  22    A.      No, not the preparation of the
02:31:05.32  23    bills.
02:31:05.32  24    Q.      All right, sir.
02:31:07.33  25    I take it you had people working
```

============================================

```
Page 133
02:31:09.33   0
             133
02:31:09.33   1              1              RICHARD J. UHL
02:31:09.33   2    for you who were assigned the task of making
02:31:12.33   3    sure that you were seeking funding only for
02:31:14.30   4    things that Lucent was obligated to provide?
                              Page 5
```

B1025

```
                        11 uhl 7-25-01 v2 disk 1 to 2
02:38:18.32  9    Q.      But you have no idea what's in
02:38:21.33 10    these numbers?
02:38:21.33 11    A.      Not sitting here today I do not
02:38:23.33 12    have any independent recollection.
```

```
======================================================

******************************************************
```

158

```
        1              RICHARD J. UHL
        2    A F T E R N O O N   S E S S I O N
        3    (1:48 p.m.)
       17              EXAMINATION BY MR. SAUNDERS:
```

```
======================================================

******************************************************
```

142

```
        1              RICHARD J. UHL
       22    (Whereupon, letter agreement
       23    dated September 27th between Lucent and WinStar
       24    which Nina Aversano executed and addressed to
       25    Richard Uhl, acknowledged and agreed to by
```

143

```
        1              RICHARD J. UHL
        2    Mr. Uhl, cover memorandum transmitting that
        3    letter agreement from Richard Uhl to Ackerman,
        4    Jules, Kantor, Maloney, Rubin and Zlotnick, is
        5    received and marked as Uhl Exhibit 7 for
        6    Identification.)
```

```
======================================================

******************************************************
```

```
Page 159
02:56:58.78 25    Q.      Prior to your receipt of the
```

```
======================================================
```

```
Page 160
02:57:05.78  0
    160
02:57:05.78  1         1              RICHARD J. UHL
02:57:05.78  2    letter from Nina Aversano dated September 27th,
02:57:11.76  3    2000 for some period of time Lucent would lend
02:57:21.77  4.   money to WinStar for the build-out of the
02:57:26.77  5    WinStar network, correct?
02:57:30.78  6    A.      Well, I think, in fact, what was
02:57:33.78  7    going on and did go on after that letter was
02:57:38.78  8    that Lucent was, in fact, paying WinStar
02:57:41.75  9    Wireless for the services that it was performing
02:57:45.76 10    under its subcontract which were then financed.
```

```
======================================================

******************************************************
```

```
Page 164
03:00:47.77  3
    164
```

Page 10

**B1026**

11 uhl 7-25-01 v2 disk 1 to 2

| | | 1 | RICHARD J. UHL |
|---|---|---|---|
03:00:47.77 3
03:00:48.77 3   At some point WinStar Wireless
03:00:51.78 4   sent a bill to Lucent, right?
03:00:54.78 5   A.      That is correct.
03:00:54.78 6   Q.      And then Lucent sent what to
03:01:01.75 7   WinStar?
03:01:01.75 8   A.      Well, Lucent, the original
03:01:06.76 9   agreement required that Lucent issue purchase
03:01:09.76 10  orders.  Early on it was discovered that Lucent
03:01:12.76 11  was unable and not capable of defining what
03:01:16.77 12  should go into the purchase order.
03:01:18.77 13  So the practice evolved, in fact,
03:01:21.77 14  was present when I became CFO in the fall of '99
03:01:25.78 15  that inasmuch as Lucent could not produce the
03:01:28.78 16  details of the purchase order, WinStar Wireless
03:01:31.78 17  would as its subcontractor to Lucent issue an
03:01:37.76 18  invoice which Lucent would then cover with a
03:01:40.76 19  purchase order and that was the sequence.  That
03:01:44.76 20  was the sequence present and existing when I
03:01:48.77 21  assumed responsibility for Chief Financial
03:01:49.77 22  Officer's position in the fall of 1999.
03:01:53.77 23  Q.      All right.
03:01:53.77 24  Did any money actually change
03:01:55.77 25  hands?

============================================================

Page 165
03:01:55.77 0
    165
03:01:55.77 1                   1               RICHARD J. UHL
03:01:55.77 2   A.      Lucent would pay WinStar
03:02:00.78 3   Wireless.
03:02:00.78 4   Q.      Then who would pay Lucent?
03:02:04.78 5   A.      WinStar, a WinStar entity whoever
03:02:11.76 6   at the time was the special purpose financing
03:02:14.76 7   subsidiary of WinStar would, in fact, borrow
03:02:18.76 8   money from Lucent to pay Lucent.
03:02:19.77 9   Q.      So Lucent paid WinStar Wireless.
03:02:28.77 10  Another company borrowed money from Lucent and
03:02:30.78 11  paid it back to Lucent, is that what happened?
03:02:34.78 12  A.      Which then paid WinStar Wireless.
03:02:38.78 13  Q.      Are these all the same amounts?
03:02:40.75 14  A.      They're all the same amounts.
03:02:43.76 15  Q.      Did WinStar Wireless recognize
03:02:45.76 16  any revenue when it received a payment from
03:02:48.76 17  Lucent?
03:02:48.76 18  A.      No, it did not.
03:02:50.76 19  Q.      Did WinStar, any part of WinStar
03:02:55.77 20  recognize any revenue on that payment?
03:02:57.77 21  A.      Not on a consolidated basis it
03:02:59.77 22  did not.
03:03:00.77 23  Q.      On any basis?
03:03:01.77 24  A.      I can only tell you on a
03:03:03.78 25  consolidated basis.

============================================================

Page 166
03:03:05.78 0
    166
03:03:05.78 1                   1               RICHARD J. UHL
03:03:05.78 2   Q.      So do you know of anybody, any
                              Page 11

B1027

```
                            11 uhl 7-25-01 v2 disk 1 to 2
04:58:05.14 21    Agreement?
04:58:08.15 22    A.      Lucent people were engaged in
04:58:11.15 23    continuing due diligence at WinStar since I
04:58:16.15 24    believe late November, early December of 2000
04:58:21.16 25    and that was a continuing event.  They were
```

===========================================================

```
Page 250
04:58:26.13  0
      250
04:58:26.13  1                   1                RICHARD J. UHL
04:58:26.13  2    privy to our plans.  They were privy to our
04:58:29.13  3    monthly results and they certainly could even
04:58:31.14  4    see on their own whether or not we were in
04:58:34.14  5    compliance.
```

===========================================================

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
Page 254
05:03:12.15  4    Q.      How much money did WinStar need
05:03:16.15  5    in order to avoid bankruptcy?
05:03:20.16  6    A.      What WinStar needed was more than
05:03:21.16  7    just an amount of money.  What WinStar needed
05:03:24.13  8    was all the things that it had in place before.
05:03:26.13  9    It needed the relationship with Lucent to
05:03:28.13 10    continue on because that was a, provided a level
05:03:33.14 11    of credibility and support to the belief that
05:03:37.14 12    our customers, in particular our large customer
05:03:41.15 13    had that they should transact with WinStar.
05:03:43.15 14    Those transactions with WinStar
05:03:46.15 15    by our large customer supplied a great deal of
05:03:47.15 16    WinStar's cash flow to say nothing of our small
05:03:52.16 17    to medium size business which certainly relied
05:03:58.13 18    on WinStar being present in its relationship
05:04:00.13 19    with Lucent which had been articulated to the
05:04:06.14 20    world really as being a good relationship, one
05:04:08.14 21    which Lucent was supporting WinStar in the
05:04:11.14 22    build-out of its network and financing.
05:04:12.14 23    MR. SAUNDERS:  I'll move to
05:04:13.14 24    strike that answer as --
05:04:15.15 25    Q.      Are you finished?
```

===========================================================

```
Page 255
05:04:15.15  0
      255
05:04:15.15  1                   1                RICHARD J. UHL
05:04:15.15  2    A.      So how much is a continuum.  It
05:04:20.15  3    is not a dollar amount that we would have
05:04:23.15  4    received on a date certain, but it really is a
05:04:26.16  5    series of flows of money that in large part
05:04:33.13  6    dependent upon WinStar and Lucent's continuing
05:04:38.14  7    relationship.
```

===========================================================

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

B1028

**Zlotnick**

```
                        zlotnick 1-15-04 disks 1 - 3 transcript
04:22:28.66 24    it's one sentence which says, "Deployment of this
04:22:30.66 25    equipment in hub and B sites is to be complete by
```

=================================================

Page 224
```
04:22:34.66  0
    224
04:22:34.66  1              1              BILL ZLOTNICK
04:22:34.66  2    March 31, 2000."  I guess my first question is, is
04:22:37.67  3    that a typo?  Should that read March 31, 2001?
04:22:40.67  4    A    Probably.
04:22:41.67  5    Q    Okay.
04:22:42.67  6    MR. KING:  A very aggressive schedule.
04:22:44.64  7    BY MR. PASKIN:
04:22:45.64  8    Q    And in that case, Winstar's deployment
04:22:48.64  9    schedule for that equipment would be as described in
04:22:50.64 10    this letter, notwithstanding the typo, correct?
04:22:52.65 11    A    Yes.
```

=================================================

*************************************************

Page 110
```
02:10:50.44 20    Q    That's fine.  Now there's been some
02:10:54.61 21    discussion earlier today about a transaction that
02:10:58.58 22    took place in the third quarter of 2000.  Do you
02:11:01.59 23    recall that?
02:11:01.59 24    A    Yes.
02:11:06.59 25    Q    Was that a unique transaction, or were
```

=================================================

Page 111
```
02:11:11.60  0
    111
02:11:11.60  1              1              BILL ZLOTNICK
02:11:11.60  2    there deals that took place between Winstar and
02:11:13.60  3    Lucent pretty much at the end of most quarters?
```

=================================================

*************************************************

Page 111
```
02:11:16.60  5    THE WITNESS:  There were deals -- there was
02:11:17.60  6    an end-of-quarter deal most -- if not all quarters,
02:11:22.61  7    up until that point at the end of each quarter.
02:11:25.61  8    BY MR. KING:
02:11:26.61  9    Q    Okay.  Now, you used the term
02:11:28.61 10    "end-of-quarter deal."  What do you understand that
02:11:31.58 11    to mean?
02:11:32.58 12    A    Well, I understand that to mean at the --
02:11:34.59 13    at the end of every quarter, both companies would
02:11:37.59 14    meet about their mutual revenue and profit
02:11:39.59 15    objectives and how they could help each other to
02:11:41.59 16    reach those objectives.
02:11:42.59 17    Q    Okay.  Did you communicate with people at
02:11:51.60 18    Lucent about end-of-quarter deals from time to time?
02:11:53.61 19    A    Most specifically on the end of third
02:11:55.61 20    quarter 2000 I did.  On other ones, I was not
02:11:59.61 21    involved in.
```

B1029

zlotnick 1-15-04 disks 1 - 3 transcript

| | | |
|---|---|---|
| 02:12:00.61 | 22 | Q    Okay.  In your communications with Lucent, |
| 02:12:02.61 | 23 | do you recall if Lucent employees similarly referred |
| 02:12:04.62 | 24 | to these transactions as end-of-quarter deals? |
| 02:12:07.59 | 25 | A    I don't recall. |

==========================================================

**Page 112**

| | | |
|---|---|---|
| 02:12:07.59 | 0 | |
| | 112 | |
| 02:12:07.59 | 1 | 1                     BILL ZLOTNICK |
| 02:12:07.59 | 2 | Q    Okay.  Do you recall who would typically |
| 02:12:16.59 | 3 | approach who with respect to doing an end-of-quarter |
| 02:12:20.60 | 4 | deal?  Which company would approach which company? |
| 02:12:22.60 | 5 | A    My memory is Lucent would approach us. |
| 02:12:24.60 | 6 | Q    Okay.  Did you ever have any communications |
| 02:12:32.61 | 7 | with people at Lucent where you were told why Lucent |
| 02:12:37.62 | 8 | wanted to do an end-of-quarter deal with Winstar? |
| 02:12:39.58 | 9 | A    No, not specifically. |
| 02:12:40.59 | 10 | Q    Did you have an understanding from -- or |
| 02:12:44.59 | 11 | let me ask you this.  Withdrawn. |
| 02:12:45.59 | 12 | Did you ever have any conversations with |
| 02:12:48.59 | 13 | other Winstar employees where you were told by them |
| 02:12:53.60 | 14 | their understanding as to why Lucent wanted to do |
| 02:12:56.60 | 15 | end-of-quarter deals? |
| 02:12:58.60 | 16 | A    Yes. |
| 02:12:58.60 | 17 | Q    Who were those communications with? |
| 02:12:59.60 | 18 | A    Mostly with Dave Ackerman, a little bit |
| 02:13:02.61 | 19 | with Allan Zendle, and with Lisa. |
| 02:13:06.61 | 20 | Q    Okay.  And what was the understanding -- |
| 02:13:08.61 | 21 | what was their understanding as to why Lucent wanted |
| 02:13:11.58 | 22 | to do end-of-quarter deals? |
| 02:13:12.58 | 23 | A    To meet their -- meet their revenue plan. |
| 02:13:15.59 | 24 | Q    Okay.  Did they tell you what the source of |
| 02:13:24.60 | 25 | their knowledge was, how they obtained their |

==========================================================

**Page 113**

| | | |
|---|---|---|
| 02:13:27.60 | 0 | |
| | 113 | |
| 02:13:27.60 | 1 | 1                     BILL ZLOTNICK |
| 02:13:27.60 | 2 | understanding as to why Lucent wanted to do these |
| 02:13:30.60 | 3 | deals? |
| 02:13:30.60 | 4 | A    No.  It seemed -- it seemed common |
| 02:13:32.60 | 5 | knowledge. |
| 02:13:32.60 | 6 | Q    Okay.  It was common knowledge? |
| 02:13:33.61 | 7 | A    Yes. |
| 02:13:39.61 | 8 | Q    Was that your understanding as well, as to |
| 02:13:41.61 | 9 | why Lucent wanted to do these deals? |
| 02:13:42.38 | 10 | A    Yes. |

==========================================================

**********************************************

**Page 114**

| | | |
|---|---|---|
| 02:14:27.59 | 4 | Q    Do you recall whether or not Winstar did in |
| 02:14:31.60 | 5 | fact engage in these end-of-quarter deals? |
| 02:14:33.60 | 6 | A    Yes. |
| 02:14:34.60 | 7 | MR. PASKIN:  Objection to form. |
| 02:14:35.60 | 8 | BY MR. KING: |
| 02:14:36.60 | 9 | Q    And did Winstar engage in these |

Page 9

B1030

zlotnick 1-15-04 disks 1 - 3 transcript

```
02:14:38.60 10  end-of-quarter deals, at least in part, to help
02:14:43.61 11  Lucent meet its revenue goals?
02:14:45.61 12  A    Yes.
02:14:52.58 13  Q    Do you know why Winstar as a company wanted
02:14:54.59 14  to help Lucent meet its revenue goals?
02:14:59.59 15  A    In part I do.
02:15:00.59 16  Q    Can you tell us?
02:15:03.60 17  A    I actually asked Nate about it at one
02:15:05.60 18  point, and what he said was we're in partnership
02:15:07.60 19  with them.  Partners help each other.
02:15:13.61 20  Q    And that was a quote from Nate Kantor?
02:15:16.61 21  A    I don't know if it's exact quote, but
02:15:18.61 22  pretty much --
02:15:19.61 23  Q    You're paraphrasing now?
02:15:21.61 24  A    Yeah.
02:15:22.61 25  Q    During the course of these deals, do you
```

Page 115
```
02:15:24.62  0
            115
02:15:24.62  1              1              BILL ZLOTNICK
02:15:24.62  2  recall whether Lucent ever asked Winstar to do
02:15:28.59  3  things that it did not want to do?
02:15:29.59  4  A    Yes.
02:15:30.59  5  Q    Do you recall whether Winstar actually did
02:15:32.59  6  things that it did not want to do to help Lucent?
02:15:35.59  7  A    Winstar didn't do things that it did not
02:15:38.60  8  want to do.  It's kind of -- you know, it wouldn't
02:15:46.60  9  have done it if -- it would not have done those
02:15:47.61 10  things if it did not want to do them.
02:15:47.61 11  Q    Let me ask --
02:15:50.61 12  A    It's kind of a word thing.
02:15:51.61 13  Q    Okay.  I hear what you're saying.  Did
02:15:53.61 14  Winstar ever end up doing something that originally
02:15:57.62 15  it didn't think it wanted to do to help Lucent in an
02:16:00.59 16  end-of-quarter deal?
02:16:01.59 17  A    Hard to characterize Winstar as an entity.
02:16:04.59 18  Winstar did things that some people thought it
02:16:07.59 19  shouldn't do.  That's the best way I can put it, if
02:16:09.59 20  that's what you're looking for.
02:16:10.60 21  Q    I'm just looking for your testimony.  I
02:16:12.60 22  just want to hear --
02:16:13.60 23  A    I can't -- it's hard for -- I can't say
02:16:16.60 24  what the it wanted or didn't want to do.  It did
02:16:19.60 25  what it did, so it wanted to do it.
```

Page 116
```
02:16:21.61  0
            116
02:16:21.61  1              1              BILL ZLOTNICK
02:16:21.61  2  Q    It's fair to say you don't want to
02:16:24.61  3  generalize on behalf of Winstar as a company --
02:16:24.61  4  A    Yes.
02:16:25.61  5  Q    -- in answering that question?
02:16:26.61  6  A    Yes.
02:16:27.61  7  Q    Who specifically at Winstar are you
02:16:29.61  8  referring to that -- that didn't necessarily think
02:16:32.58  9  that Winstar was doing things it should be doing?
02:16:38.59 10  A    Each of us, in various times and various
```

Page 10

B1031

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

Page 148
02:54:36.97  0
     148
02:54:36.97  1                    1                    BILL ZLOTNICK
02:54:36.97  2   category reading, "Intermediate," a category
02:54:39.97  3   reading, "Long-term," and -- and that appears to be
02:54:43.98  4   it for the new business portion.  Do you see that?
02:54:46.98  5   A    Yes.
02:54:54.95  6   Q    Did this proposal include, in the long-term
02:54:59.96  7   section, payments for the pay-as-you-go program --
02:55:05.96  8   pay-as-you-grow program?
02:55:08.97  9   A    It appears to.
02:55:08.97 10   Q    Do you know whether in fact payments were
02:55:12.97 11   due on the pay-as-you-grow program to Lucent?
02:55:15.97 12   A    I don't believe that they were.
02:55:20.98 13   Q    Okay.  And, specifically, what was the
02:55:22.98 14   pay-as-you-grow program?
02:55:23.98 15   A    It was a program under which Winstar could
02:55:25.98 16   buy switches at some portion of their actual price
02:55:29.95 17   and then, as we added capacity to those switches, we
02:55:33.96 18   would pay Lucent for the capacity.  Instead of
02:55:36.96 19   buying the whole switch up front, we'd buy it as we
02:55:39.96 20   used it.  That enabled us to get going in business
02:55:42.97 21   for less capital up front.
02:55:43.97 22   Q    Okay.  Now, you just testified a moment ago
02:55:48.97 23   that to your knowledge pay-as-you-grow payments
02:55:51.98 24   weren't due at that end of quarter?
02:55:52.98 25   A    Yes.

=================================================

Page 149
02:55:53.98  0
     149
02:55:53.98  1                    1                    BILL ZLOTNICK
02:55:53.98  2   Q    What benefit would Winstar obtain from
02:55:55.98  3   making a prepayment for a pay-as-you-grow payment?
02:55:58.98  4   A    None.
02:55:58.98  5   Q    None?
02:55:59.98  6   A    None.
02:56:01.95  7   Q    Would Lucent obtain a benefit from Winstar
02:56:05.96  8   making a prepayment of a pay-as-you-grow payment?
02:56:07.96  9   A    Yes.
02:56:07.96 10   Q    And they would get revenue?
02:56:08.96 11   A    Yes.
02:56:09.96 12   Q    Sooner than they otherwise would receive
02:56:11.96 13   it?
02:56:11.96 14   A    Yes.

=================================================

**************************************************

Page 150
02:57:04.05  4   Q    Okay.  Now we've seen some communications
02:57:05.98  5   and you were examined by Mr. Paskin this morning
02:57:08.95  6   about Winstar's capital expenditures limitations,
02:57:12.96  7   correct?
02:57:12.96  8   A    Yes.
02:57:13.96  9   Q    Do you recall whether in September of 2000
02:57:16.96 10   Winstar was aware of and concerned about its capital
02:57:19.96 11   ex -- expenditure limitations?
                                 Page

B1032

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

| | | |
|---|---|---|
| 03:07:27.87 | 12 | end-of-quarter proposal that Deborah Harris sent |
| 03:07:30.88 | 13 | over on December 22, 2000.  Do you see that? |
| 03:07:33.88 | 14 | A    Yes. |
| 03:07:33.88 | 15 | Q    And that proposal appears to be attached; |
| 03:07:36.88 | 16 | is that correct? |
| 03:07:36.88 | 17 | A    This was the real substance of what he was |
| 03:07:39.88 | 18 | forwarding, was the last two pages -- |
| 03:07:41.89 | 19 | Q    Right. |
| 03:07:42.89 | 20 | A    -- this list of software. |
| 03:07:43.89 | 21 | Q    Okay.  But he's also attached the |
| 03:07:48.89 | 22 | end-of-quarter proposal that was sent to him, |
| 03:07:50.86 | 23 | correct? |
| 03:07:50.86 | 24 | A    Yes. |
| 03:07:50.86 | 25 | Q    Can you just take a quick look at this |

Page 159

| | | |
|---|---|---|
| 03:07:54.87 | 0 | |
| | | 159 |
| 03:07:54.87 | 1 | 1                    BILL ZLOTNICK |
| 03:07:54.87 | 2 | end-of-quarter proposal, and, as of September 22nd, |
| 03:08:00.87 | 3 | when Ms. Harris forwarded this over, had the |
| 03:08:02.87 | 4 | software commitment grown from $31 million to $100 |
| 03:08:06.88 | 5 | million? |
| 03:08:08.88 | 6 | A    Yes. |
| 03:08:08.88 | 7 | Q    And did the pay-as-you-grow commitment grow |
| 03:08:10.88 | 8 | from what I think earlier was $17 million to $28.8 |
| 03:08:14.89 | 9 | million? |
| 03:08:14.89 | 10 | A    I see -- where's pay as you grow?  Yes, |
| 03:08:19.89 | 11 | there it is.  Okay. |
| 03:08:20.89 | 12 | Q    Now, earlier you mentioned that there was |
| 03:08:22.89 | 13 | no real benefit to Winstar from prepaying for the |
| 03:08:26.86 | 14 | pay-as-you-grow program, correct? |
| 03:08:28.87 | 15 | A    Correct. |
| 03:08:28.87 | 16 | Q    So there would be no added benefit from |
| 03:08:31.87 | 17 | paying more.  Is that also true? |
| 03:08:33.87 | 18 | A    Correct. |
| 03:08:34.87 | 19 | Q    In fact, it would -- it would cost Winstar |
| 03:08:36.87 | 20 | more? |
| 03:08:36.87 | 21 | A    Yes. |
| 03:08:43.88 | 22 | Q    Did you have any discussions about this new |
| 03:08:45.88 | 23 | proposal that you recall? |
| 03:08:48.89 | 24 | A    Yes. |
| 03:08:49.89 | 25 | Q    You did.  Do you see how, in the e-mail |

Page 160

| | | |
|---|---|---|
| 03:08:55.89 | 0 | |
| | | 160 |
| 03:08:55.89 | 1 | 1                    BILL ZLOTNICK |
| 03:08:55.89 | 2 | from Deb Harris to David Ackerman she's saying, |
| 03:08:59.86 | 3 | "Attached is the new version of the EOQ proposal. |
| 03:09:03.87 | 4 | As you'll see, it reflects some changes which are |
| 03:09:06.87 | 5 | different than we discussed but are the result of |
| 03:09:09.87 | 6 | some senior level discussions"?  Do you see that? |
| 03:09:13.88 | 7 | A    Yes. |
| 03:09:13.88 | 8 | Q    Do you know whether those senior level |
| 03:09:15.88 | 9 | discussions were within Lucent or within Winstar or |
| 03:09:18.88 | 10 | between the two companies? |
| 03:09:19.88 | 11 | A    I don't know. |

. Page

B1033

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half
================================================================

*****************************************************

**Page 160**
```
03:10:05.80 13    Can you take out Zlotnick 21, please?  Now, again,
03:10:20.88 14    this is an e-mail from Lisa Hicks to -- to David
03:10:23.88 15    Ackerman and yourself.  The subject is "Third
03:10:25.88 16    Quarter Software Pool with Comments," and this is as
03:10:28.89 17    of September 25th, so we're 3 days later, correct?
03:10:33.89 18    A    Yes.
03:10:33.89 19    Q    Lisa notes in this e-mail that, "All
03:10:37.86 20    software increases reflect list pricing.  All
03:10:40.87 21    discounts have been removed."
03:10:42.87 22    A    Yes.
03:10:42.87 23    Q    Do you see that?
03:10:43.87 24    A    Mm-hmm.
03:10:43.87 25    Q    Is that your recollection of how the
```

================================================================

**Page 161**
```
03:10:45.87  0
        161
03:10:45.87  1          1                    BILL ZLOTNICK
03:10:45.87  2    software deal was priced?
03:10:47.87  3    A    My recollection of how this was priced was
03:10:53.88  4    it was priced at whatever number Lucent needed for
03:10:55.88  5    its revenue.  That's my recollection.
03:10:57.88  6    Q    Okay.  And it reads in the next paragraph,
03:11:06.89  7    "My understanding from Vanessa is this.  When we
03:11:10.86  8    purchase equipment next year, we will not be charged
03:11:13.87  9    for software.  Lucent will credit Winstar against
03:11:15.87 10    next year's equipment purchase.  The delta" -- which
03:11:17.87 11    I assume she means by that the difference.  Is that
03:11:19.87 12    a fair understanding?
03:11:22.87 13    A    I don't remember this specific piece of the
03:11:24.88 14    deal.
03:11:24.88 15    Q    Okay -- "Lucent will credit Winstar against
03:11:27.88 16    net year's equipment purchase the delta between the
03:11:30.88 17    list price reflected here and the Winstar discounted
03:11:33.89 18    price."  Do you see that?
03:11:34.89 19    A    Yes.
03:11:34.89 20    Q    And it says, "Lucent will receive $100
03:11:37.89 21    million less revenue next year.  Lucent can only put
03:11:41.89 22    this agreement in writing in a side letter."  Do you
03:11:43.86 23    see that?
03:11:43.86 24    A    Yes.
03:11:43.86 25    Q    Do you recall discussing with Lisa whether
```

================================================================

**Page 162**
```
03:11:45.86  0
        162
03:11:45.86  1          1                    BILL ZLOTNICK
03:11:45.86  2    or not her understanding from Vanessa about the
03:11:47.87  3    software deal was -- was accurate?
03:11:49.87  4    A    I don't remember specific discussion.
03:11:52.87  5    Q    Do you know if in fact what she's saying
03:11:55.87  6    here turned out to be accurate?
03:11:57.88  7    A    I don't remember.  I don't think so, but I
                                    Page
```

B1034

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

03:12:04.88  8   don't remember.
03:12:04.88  9   Q    Do you know why Lisa was told or understood
03:12:07.89 10   from Vanessa that Lucent could only put this
03:12:11.89 11   agreement in a side letter?
03:12:13.89 12   A    I don't know why.
03:12:15.89 13   Q    Did it concern you?
03:12:17.86 14   A    Yes.
03:12:37.88 15   Q    Now, the value of the software that's
03:12:38.88 16   included in the poll -- the pool, according to this
03:12:43.89 17   attachment on Zlotnick 21, is $178,350,000; is that
03:12:49.86 18   correct?
03:12:49.86 19   A    Yes.
03:12:49.86 20   Q    Is it your understanding that the actual
03:12:51.86 21   software pool contents didn't change.  It's just
03:12:55.87 22   that the value became increased because you're now
03:12:58.87 23   using the list price rather than Winstar's
03:13:00.87 24   agreed-upon discount price?
03:13:01.87 25   A    To the best of my knowledge, that's my

=================================================================

Page 163
03:13:03.88  0
             163
03:13:03.88  1                    1               BILL ZLOTNICK
03:13:03.88  2   understanding.
03:13:04.88  3   Q    Okay.  Now, the software pool was all --
03:13:10.88  4   the payment obligations were all deferred into 2001,
03:13:13.89  5   correct?
03:13:13.89  6   A    Yes.
03:13:14.89  7   Q    So by reflecting list pricing rather than
03:13:21.89  8   the discounted pricing, did Winstar increase its
03:13:25.86  9   revenue from this deal?
03:13:29.87 10   A    Increase its -- Winstar had no revenue from
03:13:33.87 11   this deal.
03:13:34.87 12   Q    I'm sorry.  Did Lucent increase its revenue
03:13:36.87 13   from this deal?
03:13:37.88 14   A    I don't know for sure, but that's the way
03:13:38.88 15   it looked to me.
03:13:39.88 16   Q    Okay.  And Winstar would -- would be made
03:13:44.88 17   up -- made whole for the difference in 2001 when it
03:13:46.88 18   actually picked software, according to this e-mail?
03:13:48.89 19   A    That's what it's saying.
03:13:49.89 20   Q    Okay.  To your knowledge, is that what the
03:13:52.89 21   actual intention of the -- of the parties was?
03:13:57.86 22   A    It was to move to help Lucent with their
03:14:00.87 23   revenue and to not hit 2000's cap budget, because
03:14:04.87 24   that was another project we were managing.
03:14:10.88 25   Q    Now, we've looked at some of the documents

=================================================================

Page 164
03:14:12.88  0
             164
03:14:12.88  1                    1               BILL ZLOTNICK
03:14:12.88  2   about the -- the software deal during the course of
03:14:15.88  3   the examination today, and can you just sum up for
03:14:22.89  4   me the total net payment by Winstar of -- for this
03:14:30.86  5   $135 million software deal?  Do you understand the
03:14:32.86  6   question?
03:14:33.87  7   A    I think so.
03:14:34.87  8   Q    Okay.  Do you need any clarification?
                                   Page

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half
03:18:52.89 13    A    From where I sat, that was my perspective.

=================================================

*************************************************

Page 168
03:19:15.75 22    Q    Did Lucent in fact give credits to Winstar
03:19:18.88 23    following the software pool deal?
03:19:21.89 24    A    I'm pretty sure we got at least one of the
03:19:23.89 25    credits.  I don't remember every -- there were

=================================================

Page 169
03:19:26.89  0
    169
03:19:26.89  1                    1                    BILL ZLOTNICK
03:19:26.89  2    several different ones that were requested, and I
03:19:31.86  3    think we got one of them or two of them, but not all
03:19:34.87  4    of them.
03:19:39.87  5    Q    With respect -- going back a second.  With
03:19:42.87  6    respect to the negotiation of the software pool
03:19:44.88  7    deal, did Winstar have any of its technical people
03:19:50.88  8    considering the -- the software that was being
03:19:53.89  9    proposed?
03:19:54.89 10    A    Yes.
03:19:55.89 11    Q    Who was doing that?
03:19:55.89 12    A    Dennis Huber and Jamie Bullen.
03:19:59.89 13    Q    Okay.  Just ask you to go back for a second
03:20:16.87 14    to Zlotnick 15, which you looked at earlier, which
03:20:18.88 15    is the October 23rd e-mail from Lisa Hicks to David
03:20:24.88 16    Ackerman, yourself, and Dennis Huber.  Do you have
03:20:26.88 17    that?
03:20:26.88 18    A    Yes.
03:20:27.89 19    Q    Do you recall, we looked a little bit
03:20:33.89 20    earlier at the part two of the, "Things we're in
03:20:36.86 21    disagreement on," where it talked about the software
03:20:38.86 22    pool?
03:20:39.86 23    A    Yes.
03:20:39.86 24    Q    And, to your recollection, did this summary
03:20:59.88 25    of Winstar's position that Ms. Hicks put together

=================================================

Page 170
03:21:02.89  0
    170
03:21:02.89  1                    1                    BILL ZLOTNICK
03:21:02.89  2    accurately convey the company's understanding of
03:21:05.89  3    what it was getting in the software pool agreement?
03:21:11.86  4    A    Yes.  Understand about the 20 million
03:21:18.87  5    number.  That was 20 million based on the price in
03:21:20.87  6    the list there, not that the Winstar people actually
03:21:24.88  7    thought it was worth 20 million, but the software
03:21:27.88  8    that was sitting there was software that they might
03:21:29.88  9    eventually used that was priced at 20 million.
03:21:32.88 10    Q    Okay.  Are you saying that the $20 million
03:21:34.89 11    was actually Lucent's list price for the software,
03:21:38.89 12    not the discounted price?
03:21:39.89 13    A    It was a -- it was a price in excess of
03:21:41.89 14    what we -- any of us thought its real value was.  I
                                 Page

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

| | | |
|---|---|---|
| 03:21:44.86 | 15 | don't know exactly where it falls between list and |
| 03:21:48.87 | 16 | discount. |
| 03:21:48.87 | 17 | Q    So the software pool actually included less |
| 03:21:51.87 | 18 | than $20 million of software, in Winstar's view, |
| 03:21:55.54 | 19 | than it really needed? |

==================================================

**************************************************

Page 170

| | | |
|---|---|---|
| 03:22:00.51 | 21 | THE WITNESS:  Based on someone's judgment. |
| 03:22:02.88 | 22 | Everyone had an opinion on that. |
| 03:22:03.88 | 23 | BY MR. KING: |
| 03:22:04.88 | 24 | Q    Whose judgment would you say was it that -- |
| 03:22:06.88 | 25 | that it wasn't worth even $20 million? |

==================================================

Page 171

| | | |
|---|---|---|
| 03:22:07.89 | 0 | |
| | 171 | |
| 03:22:07.89 | 1 | 1                        BILL ZLOTNICK |
| 03:22:07.89 | 2 | A    The only one I know for sure was my |
| 03:22:10.89 | 3 | judgment that it wasn't worth 20 million. |
| 03:22:10.89 | 4 | Q    It was you judgment? |
| 03:22:12.89 | 5 | A    Yeah.  The only one I can say for sure, but |
| 03:22:14.89 | 6 | I believe that view was shared by others who looked |
| 03:22:19.86 | 7 | at it. |
| 03:22:19.86 | 8 | Q    who do you think shared your opinion? |
| 03:22:21.87 | 9 | A    Dennis, Jaime, Lisa. |
| 03:22:23.87 | 10 | Q    The technical people? |
| 03:22:25.87 | 11 | A    Most of us in the business and technical |
| 03:22:27.87 | 12 | side of the business who looked at the list. |
| 03:22:34.88 | 13 | Q    Just ask you to look at Zlotnick 23 for a |
| 03:22:38.88 | 14 | second.  Actually, I'm sorry.  Zlotnick 24.  And I |
| 03:22:49.86 | 15 | think you testified earlier that you recognized this |
| 03:22:51.86 | 16 | as a memorandum that you had reviewed? |
| 03:22:57.87 | 17 | A    Yep.  This was a Lisa thing, I'm pretty |
| 03:23:00.87 | 18 | sure. |
| 03:23:00.87 | 19 | Q    You think this was a Lisa Hicks' document? |
| 03:23:04.88 | 20 | A    I think.  Hard to -- I can't be sure but -- |
| 03:23:08.88 | 21 | Q    Okay.  Let's just look at the top section. |
| 03:23:11.88 | 22 | Item 1, "The total capital plan for 2000 is |
| 03:23:13.89 | 23 | currently over budget by 190 million."  Is that your |
| 03:23:17.89 | 24 | recollection?  Is that accurate, based on the |
| 03:23:19.89 | 25 | analysis that you guys had done in September? |

==================================================

Page 172

| | | |
|---|---|---|
| 03:23:22.89 | 0 | |
| | 172 | |
| 03:23:22.89 | 1 | 1                        BILL ZLOTNICK |
| 03:23:22.89 | 2 | A    I don't remember.  We did -- we were doing |
| 03:23:24.86 | 3 | analysis every other day, so -- and the numbers |
| 03:23:28.87 | 4 | moved every other day. |
| 03:23:28.87 | 5 | Q    So that might be an updated analysis? |
| 03:23:31.87 | 6 | A    There were -- there were probably 50 |
| 03:23:33.87 | 7 | analyses that we did in the course of two or |
| 03:23:35.87 | 8 | 3 months of that particular item. |
| 03:23:37.88 | 9 | Q    Okay.  And Item 2 reads, "Of the $190 |

Page

B1037

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

```
03:30:16.87 13   A    We got credits of some kind, I know that.
03:30:36.86 14   Q    Okay.  There was some testimony earlier
03:30:37.86 15   today about bill-and-hold documents.  Do you recall
03:30:41.87 16   that?
03:30:41.87 17   A    Yep.
03:30:41.87 18   Q    In fact, they were the first two exhibits
03:30:44.87 19   that Mr. Paskin put in front of you this morning?
03:30:46.87 20   A    Yes.
03:30:47.87 21   Q    And I'd like you to take those back out, if
03:30:49.87 22   you don't mind.
03:30:52.88 23   A    Okay.
03:30:52.88 24   Q    They were Zlotnick 1 and Zlotnick 2.
03:30:55.88 25   A    I'll find them.
```

==========================================================

```
Page 179
03:30:56.88  0
     179
03:30:56.88  1              1              BILL ZLOTNICK
03:30:56.88  2   Q    Do you have them?
03:31:06.89  3   A    Yes.
03:31:07.89  4   Q    Okay.  And you testified that you
03:31:09.86  5   recognized these, and these were your signatures on
03:31:12.86  6   these bill-and-hold letters?
03:31:13.87  7   A    Yes.
03:31:13.87  8   Q    Do you know whether or not Winstar and
03:31:16.87  9   Lucent frequently exchanged bill-and-hold letters in
03:31:20.87 10   these end-of-quarter deals?
03:31:23.88 11   A    I don't know what the definition of
03:31:24.88 12   "frequently" is.  I'm pretty sure we did some
03:31:27.88 13   bill-and-hold at the end of the second quarter 2000
03:31:31.88 14   end-of-quarter deal, and I -- and, obviously, we did
03:31:33.89 15   them this time, but I don't know.
03:31:35.89 16   Q    You don't know --
03:31:36.89 17   A    I don't know of other times.
03:31:38.89 18   Q    You don't know if there were bill-and-hold
03:31:41.89 19   letters exchanged even earlier?
03:31:42.89 20   A    I don't.
03:31:44.86 21   Q    Why was Winstar buying goods on a
03:31:47.87 22   bill-and-hold basis?  Do you know?
03:31:48.87 23   A    We were going to deploy them sooner or
03:31:51.87 24   later.  We were helping Lucent with their revenue,
03:31:53.87 25   and we didn't have any place to put the stuff.
```

==========================================================

```
Page 180
03:31:56.87  0
     180
03:31:56.87  1              1              BILL ZLOTNICK
03:31:56.87  2   Q    Okay.  You say you were going to deploy
03:32:00.88  3   them sooner or later.  Were these goods that were
03:32:03.88  4   being bought under these deals goods that Winstar
03:32:06.88  5   anticipated it would be putting into the network
03:32:08.89  6   within a month or two?
03:32:08.92  7   A    No.  No.
```

==========================================================

****************************************************

B1038

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

Page 180
```
03:32:11.79 11   Q    How long out is it your understanding was
03:32:17.86 12   it that the equipment under these bill-and-hold
03:32:19.86 13   letters was actually anticipated to be used in the
03:32:21.87 14   network?
03:32:22.87 15   A    In this one, Exhibit 1, I had firsthand
03:32:27.87 16   knowledge that the stuff would have been deployed
03:32:29.87 17   over the coming year.
03:32:31.88 18   Q    The Lucent optical equipment?
03:32:32.88 19   A    Yes.
03:32:33.88 20   Q    So over the coming year meaning when
03:32:35.88 21   would -- when would the last of the equipment
03:32:37.88 22   probably have been used?
03:32:38.88 23   A    Second quarter of '01.
03:32:40.89 24   Q    Okay.  So up to 6 months later?
03:32:41.89 25   A    Yeah.
```

========================================================

Page 181
```
03:32:46.89  0
             181
03:32:46.89  1                1              BILL ZLOTNICK
03:32:46.89  2   Q    How about the Lucent stinger D slams and
03:32:49.86  3   cabinets in Zlotnick 2?
03:32:53.87  4   A    Fourth quarter and first quarter of '01.
03:32:57.87  5   Q    So, again, up to perhaps 6 months out?
03:33:00.87  6   A    Yes.
03:33:01.87  7   Q    Okay.  Do you know if in fact the equipment
03:33:03.88  8   did get used in that six-month period?
03:33:05.88  9   A    Some of this stuff did.  Some of the
03:33:07.88 10   optronics did.  None of -- I don't believe any of
03:33:10.88 11   this stuff ever got deployed or maybe a bit of -- a
03:33:14.89 12   very little bit of it, but none of it ever got
03:33:18.89 13   turned up in the network.  It was installed, but not
03:33:22.89 14   turned up.
03:33:22.89 15   Q    Okay.  If the equipment wasn't needed
03:33:24.86 16   immediately, why did Winstar buy it at the point in
03:33:31.67 17   time that it did?
```

========================================================

****************************************************

Page 181
```
03:33:35.54 19   THE WITNESS:  We would buy it as part of
03:33:38.88 20   helping our partner, Lucent, at the end of the
03:33:40.88 21   quarter.
03:33:42.88 22   BY MR. KING:
03:33:42.88 23   Q    Okay.  Do you remember who drafted these
03:33:49.89 24   bill-and-hold letters?
03:33:52.89 25   A    I believe someone at Lucent drafted them,
```

========================================================

Page 182
```
03:33:55.89  0
             182
03:33:55.89  1                1              BILL ZLOTNICK
03:33:55.89  2   but I'm not sure.
03:33:56.86  3   Q    So they were prepared by Lucent and sent
03:34:00.87  4   over to Winstar.  Is that your understanding?
```
                              Page

B1039

```
                      zlotnick 1-15-04 disks 1 - 3 transcript 2nd half
03:34:02.87   5     A     That's my recollection.
03:34:10.88   6     Q     Okay.  If you could, could you just turn
03:34:13.88   7   back quickly to Zlotnick 23?  And I'd ask you just
03:34:29.86   8   to turn to paragraph 4 on the second page where it
03:34:31.86   9   says, "Bill and Hold Letters."  Do you see that?
03:34:35.87  10     A     Yes.
03:34:35.87  11     Q     And it reads, "Under separate cover, bill
03:34:37.87  12   and hold letters were sent by B. Genner and R.
03:34:40.87  13   Helfrich."  Do you know who those people are?
03:34:43.88  14     A     Yes.
03:34:43.88  15     Q     Who are they?
03:34:44.88  16     A     Beau Genner and Richard Helfrich.  They
03:34:47.88  17   were guys who worked in the Lucent sales
03:34:50.88  18   organization, sales administration guys.
03:34:51.88  19     Q     Okay.  It says further on, "Please copy
03:34:53.89  20   both on to Winstar letterhead, sign and fax to Rich
03:34:57.89  21   Helfrich at," the fax number.  "Please give Rich a
03:35:01.89  22   call when they are faxed."
03:35:04.86  23   Does this refresh your recollection that
03:35:06.86  24   these materials were in fact prepared and sent over
03:35:09.87  25   by Lucent?
```

=====================================================

```
Page 183
03:35:09.87   0
     183
03:35:09.87   1              1                    BILL ZLOTNICK
03:35:09.87   2     A     Yes.
03:35:10.87   3     Q     Now, you testified this morning that the
03:35:12.87   4   letters were accurate.  You read them and they were
03:35:14.87   5   accurate?
03:35:14.87   6     A     Yes.
03:35:15.87   7     Q     Did Lucent call you to discuss the
03:35:19.88   8   statements in here about Winstar's ability to store
03:35:21.88   9   the equipment and its need for these things on an
03:35:25.88  10   immediate basis?
03:35:26.88  11     A     No.
03:35:27.89  12     Q     Okay.  Do you know if Lucent called anyone
03:35:32.89  13   at Winstar to -- to verify the facts that are
03:35:35.89  14   enclosed in these bill-and-hold letters?
03:35:37.86  15     A     I don't know if they did or they didn't.
03:35:39.86  16     Q     Okay.  Were you told why Lucent wanted
03:35:42.87  17   Winstar to sign these bill-and-hold letters?
03:35:44.87  18     A     Yes.  So they could -- they needed that for
03:35:49.87  19   their accounting so they could recognize the
03:35:51.88  20   revenue, that the stuff had shipped out of their
03:35:53.88  21   warehouse at the end of the quarter.
03:35:54.88  22     Q     Okay.  But the stuff wasn't actually
03:35:57.88  23   shipped out of their warehouse, right?
03:35:59.88  24     A     Well, they created a Winstar warehouse
03:36:02.89  25   within their warehouse to ship it to.
```

=====================================================

```
Page 184
03:36:04.89   0
     184
03:36:04.89   1              1                    BILL ZLOTNICK
03:36:04.89   2     Q     A separate section of the warehouse?
03:36:05.89   3     A     Yeah.  And my understanding was that it was
03:36:08.89   4   separately fenced, separate entrance, and so forth.
03:36:16.87   5     Q     Do you know how many warehouses Winstar
                                    Page
```

B1040

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half

| | | |
|---|---|---|
| 03:36:23.88 | 6 | maintained? |
| 03:36:25.88 | 7 | MR. PASKIN:  Objection to form. |
| 03:36:26.88 | 8 | THE WITNESS:  Don't know exactly how many. |
| 03:36:27.88 | 9 | BY MR. KING: |
| 03:36:27.88 | 10 | Q    Okay.  Do you know if Winstar didn't have |
| 03:36:29.88 | 11 | space in their warehouses for this equipment? |
| 03:36:32.88 | 12 | A    Again, I don't have firsthand knowledge, |
| 03:36:34.89 | 13 | but I believe that to be the case. |
| 03:36:36.89 | 14 | Q    Okay.  So you don't know if these materials |
| 03:36:40.89 | 15 | were in fact kept in Lucent warehouses for the |
| 03:36:43.86 | 16 | convenience of Lucent? |
| 03:36:44.86 | 17 | A    Partly for the convenience of Lucent.  In |
| 03:36:48.87 | 18 | the case of the optical gear, we had engaged Lucent |
| 03:36:52.87 | 19 | as the contractor for installing that gear |
| 03:36:53.87 | 20 | throughout the country -- |
| 03:36:53.87 | 21 | Q    Mm-hmm. |
| 03:36:54.87 | 22 | A    -- so it was most convenient for both |
| 03:36:57.88 | 23 | parties for them to have immediate access to it when |
| 03:37:00.88 | 24 | they needed it, based on their schedules. |
| 03:37:03.88 | 25 | Q    Now, when Lucent engaged in a bill-and-hold |

===================================================

Page 185

| | | |
|---|---|---|
| 03:37:06.88 | 0 | |
| | | 185 |
| 03:37:06.88 | 1 | 1                          BILL ZLOTNICK |
| 03:37:06.88 | 2 | transaction like this, they would pay for the goods |
| 03:37:08.89 | 3 | before they deployed them in the network, correct? |
| 03:37:11.89 | 4 | A    "They would pay for the goods"? |
| 03:37:13.89 | 5 | Q    Winstar would pay for the goods? |
| 03:37:15.89 | 6 | A    Yes. |
| 03:37:15.89 | 7 | Q    In fact, the bill-and-hold letter requires |
| 03:37:20.87 | 8 | Winstar to pay, if you look at the last section, |
| 03:37:24.87 | 9 | correct? |
| 03:37:24.87 | 10 | A    Yes. |
| 03:37:27.87 | 11 | Q    Regardless of when the equipment is |
| 03:37:30.88 | 12 | actually delivered to Winstar's possession? |
| 03:37:32.88 | 13 | A    Yes. |
| 03:37:37.88 | 14 | Q    Do you know how much inventory Winstar had |
| 03:37:40.89 | 15 | sitting in its warehouses at the time it filed for |
| 03:37:43.89 | 16 | bankruptcy, April 18, 2001? |
| 03:37:45.89 | 17 | A    Don't have a specific recollection of it. |
| 03:37:47.89 | 18 | Q    Do you know if it was a large amount? |
| 03:37:49.86 | 19 | A    Very large. |
| 03:37:50.86 | 20 | MR. PASKIN:  Objection to form. |
| 03:37:51.86 | 21 | BY MR. KING: |
| 03:37:51.86 | 22 | Q    Over $300 million, perhaps? |
| 03:37:57.87 | 23 | A    I don't remember the number.  It was a |
| 03:37:58.87 | 24 | nine-figure number though. |

===================================================

***************************************************

Page 186

| | | |
|---|---|---|
| 03:38:32.87 | 13 | Q    Okay.  Winstar was paying interest on the |
| 03:38:34.87 | 14 | money it borrowed, correct? |
| 03:38:36.87 | 15 | A    Yes. |
| 03:38:36.87 | 16 | Q    And don't these bill-and-hold letters |
| 03:38:39.88 | 17 | require that Winstar pay for the costs of insuring |
| 03:38:42.88 | 18 | the goods while they sit in storage? |

Page

B1041

zlotnick 1-15-04 disks 1 - 3 transcript 2nd half
03:38:44.88 19    A    Yes.
03:38:44.88 20    Q    And Winstar actually takes title to the
03:38:49.89 21 equipment and is at risk if the equipment should be
03:38:52.89 22 destroyed while it's still remaining in Lucent's
03:38:55.89 23 possession, correct?
03:38:55.89 24    A    Yes.

================================================

************************************************

Page 189
03:41:07.89  2    Q    Now, we looked at some materials, during
03:41:10.86  3 Mr. Paskin's questioning this morning, that showed
03:41:14.87  4 Winstar trying to resell Lucent equipment in
03:41:18.87  5 December of 2000, correct?
03:41:19.87  6    A    Yes.
03:41:20.87  7    Q    A number of documents showing them trying
03:41:24.88  8 to get Lucent to repurchase it or Lucent to sell it
03:41:28.88  9 to someone else?
03:41:29.88 10    A    I believe so, yes.
03:41:30.88 11    Q    Did Lucent ever resell any of the product
03:41:37.89 12 that it had sold to Winstar under these deals?
03:41:39.89 13    A    I don't know for sure, but I don't think
03:41:56.87 14 so.
03:41:56.87 15    Q    Were you concerned at all, with these
03:41:57.88 16 bill-and-hold deals, that the equipment you were
03:42:00.88 17 buying at the time you were signing it might not be
03:42:02.88 18 available for purchase later?
03:42:04.88 19    A    No.

================================================

************************************************

Page 197
03:50:57.80  3    Q    Did anyone discuss with you the contents of
03:51:02.80  4 this September 27th letter or Mr. Uhl's September
03:51:07.81  5 29th memo forwarding it on?
03:51:09.81  6    A    No.
03:51:09.81  7    Q    Did you have an understanding as to what
03:51:13.81  8 this letter meant?
03:51:14.82  9    A    Yes.
03:51:14.82 10    Q    What was your understanding?
03:51:16.78 11    A    The letter from Nina?
03:51:20.79 12    Q    Yes.
03:51:20.79 13    A    The letter -- the letter meant that
03:51:23.79 14 Winstar's cash flow was enabled by this amount, and
03:51:30.80 15 the cover memo meant that we had to make a new
03:51:33.80 16 arrangement with Lucent for this to continue.
03:51:36.80 17    Q    Okay.  Was it your understanding -- what
03:51:39.81 18 was your understanding with respect to making that a
03:51:41.81 19 new arrangement?  Was that something that both
03:51:43.81 20 parties were going to work towards?
03:51:44.81 21    A    Yes.
03:51:44.81 22    Q    Do you know who suggested that the parties
03:51:47.82 23 enter into a new arrangement?
03:51:48.82 24    A    I believe it was Lucent, and I believe it
03:51:53.79 25 was in this letter.

Page

# PLAINTIFF'S TRIAL EXHIBITS

OCT-05-2000  14:23                                                          P.87

Aversano, Nina (Nina), 09:05 PM 09/30/1998 +0000, Strategic Partnership

From: "Aversano, Nina (Nina)" <aversano@lucent.com>
To: "nkantor@winstar.com" <nkantor@winstar.com>
Subject: Strategic Partnership
Date: Wed, 30 Sep 1998 17:05:41 -0400
Importance: high
X-Mailer: Internet Mail Service (5.5.1960.3)

September 30, 1998

Nate,

Thanks again for dinner Monday night and inviting Lucent to WinStar's
network planning table.  As we discussed, Lucent is extremely interested in
strengthening our relationship with WinStar and look forward to the
opportunity to leverage our core competency, designing and building "best in
breed" communication networks, with your leadership team.

I briefed my WinStar team on our Strategic Partnership discussions and
needless to say we're eager to get to work.  Attached please find our
suggested framework to begin this new chapter in our relationship.  You'll
note, we've organized our approach into 3 sections which need to be jointly
agreed upon to ensure mutual success:  What is the definition of a
WinStar/Lucent Strategic Partnership?; What are the goals and benefits
derived from this Strategic Partnership?; and How do we operationalize our
aspirations and goals to make our success a reality?

As we take the next step and form a core team to tackle this project I ask
for your consideration of the following:

1.  Lucent strongly recommends that WinStar post-pone your decision on new
optronics and access technologies until after our Strategic Partnership core
team meets and determines what shape/form a Letter of Agreement might take.
As discussed, it may not be in WinStar's long-term best interest to make
these key technology decisions while a Strategic Partnership with Lucent is
being explored.  FYI, Lucent has provided your team briefings/proposals for
each of these technologies and can deploy within your timeframes.

2.  WinStar's requested financial remuneration for NYC outage will be
considered as part of this Strategic Partnership agreement.

Nate, my team stands ready to begin discussions with your core team members.
Please review and let me know if your team is ready to meet next week in
Tysons Corner, VA.

  <<Strateg2.doc>>

Regards,



---

Printed for Nate Kantor <nkantor@winstar.com>



CONFIDENTIAL                    1
4WC 0001964

B1043

P.09

OCT-25-2000  14:24

# WINSTAR AND LUCENT TECHNOLOGIES

## FRAMEWORK FOR A STRATEGIC PARTNERSHIP
### Prepared: September 29, 1998

### Strategic Partnership Definition

A strategic partnership between WinStar and Lucent Technologies is a jointly profitable long term relationship that leverages the core competencies of both companies to support mutual business objectives.

### Intent and Benefits

The intent of this partnership is to realize the accelerated deployment of a global WinStar network using best in breed technologies to support WinStar's current and planned service offerings. In order to facilitate this, Lucent brings the following core competencies to the partnership: network engineering and design, integration testing, operation planning support, project financing and ongoing network optimization consulting.

As WinStar's network solutions consultant, Lucent would provide the expertise and resources to develop network design options that meet your customers' dynamic business needs. These network options would allow for quick deployment of new service offerings with inherent flexibility to sell/market varying levels of Quality of Service to your global customer base. These solutions would include the best technologies available and may include non Lucent solutions. Lucent may provide turnkey financing to facilitate the network buildout.

WinStar could be assured of integrated end-to-end solutions that significantly leverage the embedded network infrastructure. Network elements would include: Optronics, access, radios/hubs, circuit and packet switches, in-building distribution media and network operations systems. Technical evaluations of new technologies will ensure consideration of cost-savings network components. New data technologies will be paramount in Lucent network designs. Integration testing provided by Lucent can provide pre-installation data regarding service feature functionality, interoperability and predict customer impact.

In addition, Lucent would formulate operational support plans to help facilitate daily operations. In support of these plans, Lucent could provide professional network

CONFIDENTIAL
4WC 0001965

B1044

OCT-05-2000  14:24

management services, Operational Support Systems (OSS) or assist WinStar in the migration to its own Network Operations Center.

As WinStar's network evolves, Lucent would perform optimization reviews to maximize network performance and minimize points of failure. This area of professional services can provide valuable traffic engineering studies and services, software integration assurance and post-installation support.

## Operational Plan

In order to execute this strategic partnership, both companies will appoint an empowered team to meet over the next two weeks to construct a more detailed partnership framework. This framework will include a *Letter of Agreement* that will define the resources each company will commit to the relationship and a preliminary term sheet for possible financing. The members of the Lucent core team include the following key individuals: Leslie Rogers, Managing Director Project Finance Organization; Marc Epstein, Corporate Counsel; Georgia Papathomas, VP Network Solutions; Jill Diroma, GCM Chief Financial Officer; Mark Wilson, VP GCM Emerging Markets; Chuck Naylor, AVP CLECS-Mid Atlantic; Vanessa Petrini, Sales Director.

CONFIDENTIAL
4WC 0001966

**Printer Printer**

| | |
|---|---|
| **From:** | Nate Kantor [nkantor@winstar.com] |
| **Sent:** | Tuesday, May 08, 2001 5:22 PM |
| **To:** | Bill Rouhana |
| **Subject:** | Re: FW: Winstar Partnership Concept |



Bill,

Per my last e-mail.

  Nate


>To: Nina Aversano
>From: Nate Kantor <nkantor@winstar.com>
>Subject: Re: FW: Winstar Partnership Concept
>In-Reply-To: <8]]E6C6868E0D]11A4B70000C07AF7E64447ED@txdj00exch004u.micro.lucent.com>
>
>
>Nina,
>
>I am responding only to you-alot of this is sensative stuff that I have not shared with
my team as yet-not the complete scope.
>
>I like it, but have the following comments (not trying to nit pick the words-just
focusing on the intent):
>
>I don't like the financing verbage and the continued "hesitancy".  For this deal to
happen, Lucent must provide $1.5 billion in turn-key financing for everything under the
agreement.  Obviously, the terms must be competitive and acceptable to both parties, but
this has to be completed and part of the deal that will be executed on Oct 15th.  The
entire deal is subject to both Boards approving, but we have to be very comfortable that
this will happen, otherwise, we are just wasting our time.
>
>I am concerned about Lucent's ability to actually do the entire scope of work as
described.  For you to duplicate everything WinStar has built in terms of internal
infrasture is too time consuming and probably counter productive.  What we need to figure
out is how we can use the "combined" skills towards this single objective such that we
don't recreate the wheel or duplicate efforts.  This will also be extremely sensitive to
my folks currently doing much of this so I want to work this out with you before we start
having rumors flying all over the place-I'm sure you understand.  I have some ideas that
we should discuss, but I wanted to give you some time to think about this.  Using combined
resources will be the best solution.
>
>All in all, this is heading in the right direction and I am pleased with the progress and
spirit.  We need to talk about schedules, since Tues afternoon looks like the best time to
assemble the teams.  I want to discuss this with you-where are you.  I am in Vermont and
will be going home tomorrow morning and then on to Wash, but would like to discuss with
you before  and finalize plans.
>
>Take care and hope you are having a good weekend.  I am happy with the resolution
regarding the outage/credit stuff and am double checking to make sure the words fit.
>
> Let me know how to get a hold of you,
>
>  Nate
>
>
>At 06:39 PM 10/2/98 -0400, Plunkett, William Montgomery, II (Bill) wrote:
>>Nate
>>Please find attached a copy of the WinStar/Lucent Partnership Concept.  We
>>are look forward to discussing this with you and your team next week.  We



1

CONFIDENTIAL 2WC 0065530

B1046

```
>>think it is a good starting paper but we have lots of details to work out.
>>
>>                                    Nina Aversano
>>
>>----------
>>From:   Plunkett, William Montgomery, II (Bill)
>>Sent:   Friday, October 02, 1998 2:11 PM
>>To:   Aversano, Nina (Nina)
>>Subject:  FW: Winstar Partnership Concept
>>
>>
>>
>> <<Memorandum of Understanding 2.doc>>
>>
>>
>>
>>
>>
```

2

CONFIDENTIAL  2WC  0065531

B1047

# WINSTAR◇

## AGREEMENT FOR NETWORK BUILD-OUT SERVICES

This agreement for network build-out services (the "Agreement") is made and entered into as of the 4th day of January, 1999 (the "Effective Date"), by and between LUCENT TECHNOLOGIES INC., a Delaware corporation with offices at 600 Mountain Avenue, Murray Hill, New Jersey 07974 ("Lucent") and WINSTAR WIRELESS, INC., a Delaware corporation with offices located at 230 Park Avenue, New York, New York 10169 ("Contractor").

WHEREAS, Lucent desires Contractor to perform certain network build-out services, to be specified in an attached, task description(s), for the benefit of Lucent and its customers; and

WHEREAS, Contractor is willing to perform such services subject to and in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, Lucent and Contractor hereby agree as follows:

1. **SERVICES AND SCOPE OF WORK**

   1.1. <u>Services</u>. Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually, a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties may agree from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

   1.2. <u>Task Order</u>. Unless otherwise agreed by the parties in writing, each Task Order will include the following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) method of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

2. **INDEPENDENT CONTRACTOR AND SUBCONTRACTING**

   2.1. <u>Independent Contractor</u>. Contractor is performing the Services as an independent contractor and as such has the sole right and obligation to supervise, manage and perform all work to be performed by its personnel under this Agreement.

Confidential

DEPOSITION EXHIBIT
Kanhr 11
8-6-01
TAMMEY M. PASTOR, R.P.R.



PLAINTIFF'S
EXHIBIT
PX 19

**B1048**



2.2.    Subcontracting.  Contractor may subcontract any of the Services without the express written consent of Lucent.  Contractor will be responsible for the performance of the Services performed by any such subcontractors.

3.    PERSONNEL

3.1.    Qualifications.  The personnel that Contractor assigns to perform the Services will be qualified for the specific Services they are to perform.

3.2.    Personnel Rules and Regulations.  Contractor personnel shall comply with Lucent's and its customers' reasonable security regulations made known to Contractor in connection with its performance of the Services.

3.3.    Non-solicitation.  Unless otherwise mutually agreed to by the parties in writing, Lucent agrees not to hire, or to solicit for employment of, any Contractor personnel or subcontractors directly or indirectly associated with Services under any Task Order during the term of such Task Order and for a period of twelve (12) consecutive months thereafter.

4.    FEES, EXPENSES, RECORDS AND TAXES

4.1.    Invoice.  Contractor agrees to provide a written invoice to Lucent monthly in arrears for Services actually performed under each Task Order.  For Services performed on a time and materials basis, Contractor will be compensated in accordance with the applicable Task Order for work performed.  For Services performed on a fixed price basis, Contractor agrees to invoice Lucent in accordance with the schedule of milestone payments set forth in the applicable Task Order.

4.2.    Out-of-Pocket Expenses.  Lucent will reimburse Contractor for out-of-pocket expenses incurred by Contractor in performance of the Services.

4.3.    Taxes.  Lucent agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services, if any, or, in lieu thereof, Lucent shall provide Contractor with a certificate acceptable to the taxing authorities exempting Lucent from payment of these taxes.  In no event shall Lucent be responsible for taxes based on net income or gross receipts of Contractor.

5.    LIMITATION OF LIABILITY

IN NO EVENT WILL EITHER PARTY BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  EACH PARTY'S MAXIMUM

Confidential

-2-

**B1049**

LIABILITY TO THE OTHER UNDER THIS AGREEMENT SHALL BE THE RECOVERY OF ACTUAL DAMAGES UP TO THE AMOUNT PAYABLE BY LUCENT UNDER THE APPLICABLE TASK ORDER SUBJECT OF THE CLAIM.

6.    WARRANTIES

CONTRACTOR MAKES NO WARRANTY FOR ANY PRODUCTS OR SERVICES PROVIDED UNDER THIS AGREEMENT, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.    TERM AND TERMINATION

7.1.    Term. The term of this Agreement will commence on the Effective Date and will continue until both parties mutually agree to terminate, unless sooner terminated pursuant to this Section 7.2. In the event of the termination of this Agreement, it shall remain in full force and effect with respect to any then-outstanding Task Orders issued under this Agreement until all such Task Orders are completed, expired or terminated.

7.2.    Termination for Cause. This Agreement and/or any Task Order issued under it may be terminated by either party in the event the other party has materially breached this Agreement or any Task Order (i) upon receipt of written notice thereof if such material breach is incapable of cure; or (ii) upon the expiration of thirty (30) days (or such additional cure period as the non-breaching party may authorize in writing) after receipt of written notice thereof if the material breach is capable of cure and has not been cured.

8.    GENERAL

8.1.    Assignment. This Agreement shall be binding on the parties hereto and their respective successors and assigns. Neither party may, or shall have the power to, assign this Agreement without prior written consent of the other, which consent shall not be unreasonably withheld.

8.2.    Force Majeure. In the event performance of this Agreement or a particular Task Order is prevented or interfered with by reason of acts of God, fires, floods, epidemic, strikes, or any other circumstances beyond the reasonable control and without the fault or negligence of the party affected, the party so affected, upon giving notice to the other party of the circumstances causing its delay or failure to perform and of its plans and efforts to implement a work-around solution, shall be excused from such performance until such until the delay, restriction or interference has ceased.

8.3.    Informal Dispute Resolution. The parties agree that, prior to initiating formal dispute resolution, they will attempt to resolve disputes informally by working together to

Confidential

-3-

B1050

promptly address problems and escalate issues within their respective companies as reasonably required.

8.4.   Notices.  Any notices or communication under this Agreement and/or any Task Order shall be in writing and shall be hand delivered or sent by registered mail return receipt requested to the party receiving such communication at the address first set forth above, or such other address as either party may in the future specify to the other party in accordance with this notice provision.

8.5.   Governing Law.  This Agreement and related Task Orders shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law rules.

8.6.   Entire Agreement.  This Agreement and each Task Order attached hereto set forth the entire understanding and agreement of the parties as to the subject matter therein, and supersedes all prior agreements and representations, whether written or oral, with respect to the subject matter of this Agreement, and each Task Order attached hereto, between the parties.  No modification, amendment, supplement to or waiver of this Agreement or any Task Order hereunder, or any of their provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties.

8.7.   Counterparts.  This Agreement and any Task Order may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same Agreement.

8.8.   No Waiver.  No waiver shall be effective unless in a writing signed by an authorized representative of the party against whom enforcement of the waiver is sought. Neither the failure of either party to exercise any right of termination, nor the waiver of any default or breach shall constitute a waiver of the rights granted in this Agreement with respect to any subsequent other default or breach.

8.9.   Severability.  In the event any one or more of the provisions of this Agreement or of any Task Order is invalid or otherwise unenforceable, the enforceability of remaining provisions shall be unimpaired.

8.10.  Survival.  Any provision of this Agreement which contemplates performance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect.

8.11.  Headings.  The section headings in this Agreement are intended for reference purposes only and shall in no way be construed to modify or restrict any of the terms or provisions of this Agreement.

Confidential

-4-

B1051

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

LUCENT TECHNOLOGIES INC.

By: _____

Name: _MARK WILSON_

Title: _VICE-PRESIDENT_

WINSTAR WIRELESS, INC.

By: _____

Name: _RIF HAFFAL_

Title: _SVP_

Confidential

-5-

B1052

TASK ORDER NO. 1

See attached.

Confidential

B1053



**WINSTAR**

Lucent Technologies Inc.
5 Wood Hollow Rd
Parsippany, New Jersey 07054

Attn: Mark Wilson

Re: Agreement for Network Build-out Services

Dear Mr. Wilson:

As you are aware, Lucent Technologies Inc. ("Lucent") and WinStar Wireless, Inc. ("WWI) entered into that certain Agreement for Network Build-out Services, effective as of January 4, 1999 (the "Network Build-out Agreement"), whereby WWI will be providing agreed upon network build-out services to Lucent as Lucent's subcontractor under that certain Supply Agreement between WinStar Communications, Inc. ("WinStar") and Lucent, effective as of October 21, 1998 (the "Supply Agreement"). Notwithstanding anything to the contrary in the Supply Agreement, WinStar and Lucent agree as follows:

1. Lucent shall be relieved of any warranty breach or other liability under the Supply Agreement if and to the extent such breach or liability was caused by services performed by WWI under the Network Build-out Agreement.

If the foregoing accurately represents our agreement, please have an authorized representative sign and date this letter in the space provided below and return an original copy to me.

Best regards,

WinStar Communications, Inc.

By: _____
Name: _____
Title: _____

ACCEPTED AND AGREED:

Lucent Technologies Inc.

By: _____
Name: _MARK WILSON_
Title: _VICE PRESIDENT_

B1054

## Winstar Subcontract Documentation

Order of documents (Number corresponds to number in bottom right hand corner of document):

**Services for 1Q99**
1.  Winstar Invoice 663039                  $25,000,000

**Services for 2Q99**
2.  Winstar PO  WNE 2797
3.  Winstar Invoice 663158                  $33,873,091

**Services for 3Q99**
4.  Winstar Invoice 663535                  $36,536,473
5.  Lucent Invoice ER911395               $38,000,000     (ref: Winstar PO WNE 3548)
6.  Winstar backup

**Services for 4Q99**
7.  Lucent PO AS025971                     $38,500,000
8.  Winstar Invoice to Lucent             $38,758,042     (ref: Lucent PO AS025971)
9.  Lucent Invoice ER002010               $38,758,042     (ref: Winstar PO WNE 4579)
10. Backup to Winstar invoice

**Services for 1Q00**
11. Winstar PO WNE 5737
12. Lucent PO AS026074
13. Winstar invoice to Lucent            $55,485,175     (ref: Winstar PO WNE 5737)
14. Lucent invoice SU012489              $55,485,175     (ref: Lucent PO AS026074)
15. Backup to Winstar invoice

**Services for 2Q00**
16. Winstar PO WVF1 1221
17. Lucent PO AS026145
18. Winstar invoice to Lucent            $67,400,000     (ref: Lucent PO AS026145)
19. Lucent invoice SU019955              $67,388,372     (ref: Winstar PO WVF1 1166)
20. Backup to Winstar invoice

**Services for 3Q00**
21. Winstar PO WFV1 2958
22. Lucent PO to Winstar
23. Winstar invoice to Lucent
24. Lucent invoice SU023859              $67,291,934     (ref: Winstar PO WVF1 2958)
25. Winstar Backup

B1055

David Ackerman, 05:19 PM 10/13/00 -0400, Fwd: RE: Transition Proposal          Page 1 of 2

X-Sender: dackerman@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Fri, 13 Oct 2000 17:19:18 -0400
To: jeverding@winstar.com
From: David Ackerman <dackerman@winstar.com>
Subject: Fwd: RE: Transition Proposal

Here's the correct Proposal to print for Nate, Frank, Rick and me.

Thanks....Dave


From: "Hanson, Barbara E (Barbara)" <hansonb@lucent.com>
To: dackerman@winstar.com, lhicks@winstar.com, bzlotnick@winstar.com,
   dhuber@winstar.com, "Hanson, Barbara E (Barbara)" <hansonb@lucent.com>
Subject: RE: Transition Proposal
Date: Fri, 13 Oct 2000 15:45:48 -0400
X-Mailer: Internet Mail Service (5.5.2650.21)

RESEND:

I had mistakenly left off one of the attachments.

Sorry for any confusion.

Thanks,

Barbara Hanson
hansonb@lucent.com
Assistant to Gregg Garrett
(703) 326-6320 (Voice)

<<CapBilling-revfinal>>  <<WS-services10-13rfinal>>

> ----------
> From:       Hanson, Barbara E (Barbara)
> Sent:       Friday, October 13, 2000 3:32 PM
> To:   'dackerman@winstar.com'; 'lhicks@winstar.com';
> 'bzlotnick@winstar.com'; 'dhuber@winstar.com'
> Subject:    Transition Proposal
>
> All,

Printed for Judi Everding <jeverding@winstar.com>



CONFIDENTIAL          10/13/00
3WC 0008535

**B1056**

David Ackerman, 05:19 PM 10/13/00 -0400, Fwd: RE: Transition Proposal          Page 2 of 2

>
> Per your discussion with Lee Fawcett & Debbie Harris, attached you will
> find the latest transition proposal.
>
> Thank you,
>
>
> Barbara Hanson
> hansonb@lucent.com
> Assistant to Gregg Garrett
> (703) 326-6320 (Voice)
>
> <<File: WS-services10-13rfinal.ppt>>
>

 CapBilling-revfinal.xls

 WS-services10-13rfinal1.ppt

CONFIDENTIAL
3WC 0008536

10/13/00

B1057



# New Winstar/Lucent Services Approach

- ◆ Scope of the Deal
- ◆ Structure of Services Arrangement
- ◆ Transition Approach
- ◆ Key Decision Points
- ◆ Lucent / Winstar Impacts
- ◆ Executive Guidance Review

Executive Review Of Winstar Services
October 12, 2000
LUCENT/WINSTAR - PROPRIETARY

CONFIDENTIAL
3WC 0008537

B1058

# Direction



◆ Move Forward with the Original Supply Agreement Intentions

  – Winstar to be "Master Architect" and Operator of the Network

  – Winstar to outsource to Lucent the providing of Design, Engineering, Buildout services to deploy the network

  – Winstar focuses on their strengths

◆ Establish a Transition Plan that demonstrates Both Companies Commitment to the SA

  – Lucent to be more aggressive and innovative in approach to transition management of Winstar functions

  – Winstar to design a communications plan that supports the agreed to transitions with all levels of Winstar management

Executive Review Of Winstar Services
October 18, 2000
LUCENT / WINSTAR — PROPRIETARY

CONFIDENTIAL
3WC 0008538

B1059

# Structure of Services.

## Definition

In concert with the Original Supply Agreement between Winstar and Lucent, it is the intent of both companies that Lucent will provide as many Services as possible in the following Functional Areas. A Responsibility Assignment Matrix will be jointly developed by Lucent and Winstar to reflect this agreement.

- Business Planning and Business Development Consulting Support
- Network Planning and Design
- Network Deployment
  - Site Acquisition
  - Network Construction
  - Network Engineering and Installation
  - Network Element, Systems, and Network Integration
  - Network Acceptance Testing
- Network and Systems Operations
  - Operations Procedures Definition
  - Winstar Operations Training
- Business Systems
  - Systems Architecture Planning
  - Systems Design
  - Systems Integration and Testing
- Program Management

Each of these Services Functional Areas will be provided for following Winstar Business

- Local Wireless
- Local/Metro Fiber
- Long Haul Fiber
- Data Network
- Data Centers/Web Hosting
- Business & Operations Support Systems

W17151.20

EXECUTED VERSION OF WINSTAR SERVICES
OCTOBER 6, 2000
LUCENT / WINSTAR — PROPRIETARY

CONFIDENTIAL
3WC 0008539

B1060

# Operational Structure

- Lucent will be Accountable for providing Deliverables for each of the Functional Areas
  - Deliverables will be defined for each sub-Function
  - Payment will be based upon meeting specific quarterly objectives for each of the defined Deliverables
  - During the first year (begining 10/1/2000), payment will transition from Cost Plus Fixed Fee (CPFF) structure to a Fixed Price Per Deliverable structure (Pricing TBD)
  - The attached Transition Plan depicts the time-phased transition from Cost Plus to Fixed Price

- Lucent will meet the Deliverable requirements in accordance with a Resource Plan (TBD), which will be a mix of:
  - Winstar Employees utilized on a contract basis
  - Lucent Employees
  - Contract Employees of Lucent's choosing.

- Winstar will maintain overall contract management of Lucent Deliverables as follows:
  - Winstar Strategic Direction and Oversight
  - Lucent performs services via the 2 sources specified above
  - Lucent delivers completed services/network to the Winstar oversight authority who will validate delivery in accordance with cost scope, and time frame specified in original P.O.

- The scope of this Agreement is Global in nature



Exhibit A Review of Master Services
October 15, 2000
LUCENT / WINSTAR — PROPRIETARY

CONFIDENTIAL
3WC 0008540

B1061



Transition Plan

CONFIDENTIAL
3WC 0008541

B1062

# Transition Model & Phases

◆ **Model shows phases for one Winstar Department -** assuming one Winstar business line (e.g. ONG Long Haul)

◆ **Model proposes & assumes one corporate PM Office** providing Scope, schedule & priorities on a business line & per department basis.

◆ **Model assumes every department & position has been categorized as;**

— Operations focussed (e.g. 5E translations)

— Network build or growth (e.g installation)

— Corporate services (e.g desktop IT support)

◆ **Different transitions would be expected depending on the department category--next charts address a "Network Build" department.**



Exhibits Review Of Winstar Systems
October 17, 0
LUCENT / WINSTAR -- PROPRIETARY

CONFIDENTIAL
3WC 0008542

B1063



# The Basic Transition Model – phases follow . . . .

- **Goals + Priorities by Business line**
- Funding envelopes, timing or constraints
- Forecasts (3, 6, 9 & 12 month)

- **Integrated Priorities by Department**
- Funding targets, timing or constraints
- Forecasts (3, 6, 9 & 12 month)

Business
Priorities · Plans · Goals

Corporate
PM Office

**Work Flow**

INPUTS
- Forecast
- Assignment
- Delivery

OUTPUTS
- Quality
- Delivery
- Billing

Winstar Dept XXX

Contractors

Interface
Manager

Interface
Manager

Lucent Dept

**Payment Framework**
- Set per phase

Lucent Closes
Deliverables
Pays
Contractor & Winstar
Invoices

CONFIDENTIAL
3WC 0008543

B1064



CONFIDENTIAL
3WC 0008544

B1065



Phase 2 - Lucent Function Manager with Cost + Fee

• Lucent Functional Manager
• Winstar Oversight

CONFIDENTIAL
3WC 0008545

B1066



# Phase 3 - Priced Deliverables with Fixed Fee

- Priced Deliverables
- Lucent Functional Dept

CONFIDENTIAL
3WC 0008546

B1067

# Services Agreement Breakout

## Functions & Transition Timing

### From Cost plus (+) to *Fixed Price Deliverables*

| Function | | | | | | | |
|---|---|---|---|---|---|---|---|
| Site Acquisition | L | na | | | | | |
| Network Construction | L | na | | | | | |
| Net Engineering & Installation | L | na | Q1-01 | Q1-01 | Q1-01 | Q1-01 | |
| Network & Element Integration | L | na | Q1-01 | Q1-01 | Q1-01 | Q1-01 | |
| Network Acceptance Testing | L | na | Q1-01 | Q1-01 | Q1-01 | Q1-01 | |
| Winstar Ops Training | L | na | Q1-01 | Q1-01 | Q1-01 | Q1-01 | |
| Operations Procedures Dev'l | L | na | Q1-01 | Q1-01 | Q1-01 | Q1-01 | |
| Bus Systems Arch Planning | L | na | Q2-01 | Q2-01 | Q2-01 | Q2-01 | |
| Systems Design | L | na | Q2-01 | Q2-01 | Q2-01 | Q2-01 | |
| Systems Integration & Testing | L | na | Q2-01 | Q2-01 | Q2-01 | Q2-01 | |
| Financial Administration | W | no | Q4-00 | Q4-00 | Q4-00 | Q4-00 | |
| Commission Systems | W | no | Q4-00 | Q4-00 | Q4-00 | Q4-00 | |
| NSO Field Operations | W | no | | | | | |
| Winstar Network Installations | W | no | | | | | |
| Network Management Center | W | no | | | | | |

CONFIDENTIAL
3WC 0008547

B1068

**Printer Printer**

| | |
|---|---|
| From: | Richard J. Uhl [ruhl@winstar.com] |
| Sent: | Thursday, December 14, 2000 4:55 PM |
| To: | fjules@winstar.com; nkantor@winstar.com; frubin@winstar.com |
| Cc: | brouhana@winstar.com |
| Subject: | Lucent |
| | |
| Importance: | High |

Guys

Carole Spurrier and Debbie Harris called at 4:30 to inform as follows:

1. Will not pay $35mm as trade for pro rata increase in price of B sites

2. Will not finance services for our 4th Q

3. With regard to new Services Agreement; While we may be signing this agreement shortly , it will not operate until Deliverables are agreed upon and accepted on a project by project basis. Carole and Debbie estimated that this process (get to acceptance) would take around 90 days (they call this process the phase one discovery period). Implication, we are on our own until late Spring.

4. Debbie Harris will send me a draft letter tomorrow in which Lucent will be electing to exercise it's rights when we have borrowed more than $500mm

5. They have found no buyer for the Optronics. Their internal re marketing group offered to buy at $.30 on the $1.00. ( I said no thanks)

6. I inquired about timing of their payment to us of the $10mm they owe for radios. They did not have an answer. Will let me know tomorrow.

I would like to discuss this with you first thing tomorrow

Rick





CONFIDENTIAL 2WC 0016071



**Printer A**

| | |
|---|---|
| **From:** | Frank Jules [fjules@winstar.com] |
| **Sent:** | Friday, November 10, 2000 6:40 AM |
| **To:** | jmarco@winstar.com |
| **Subject:** | Fwd: Re: Fwd: Re: Fwd: Re: Fwd: Re: Fwd: Actions |

pls schedule..print and pend

X-Sender: hshartel@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Thu, 09 Nov 2000 18:33:16 -0500
To: Frank Jules <fjules@winstar.com>
From: Howard Shartel <hshartel@winstar.com>
Subject: Re: Fwd: Re: Fwd: Re: Fwd: Re: Fwd: Actions

sure, Frank. I'll get on your calendar next week, when it's convenient for you.

Howie

At 05:33 PM 11/09/2000 -0500, you wrote:

can you and i schedule time next week to review,proposed actions plus, actions taken to date

X-Sender: nkantor@10.0.2.2
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Thu, 26 Oct 2000 08:07:04 -0400
To: Frank Jules <fjules@winstar.com>, ruhl@winstar.com
From: Nate Kantor <nkantor@winstar.com>
Subject: Re: Fwd: Re: Fwd: Re: Fwd: Actions

Frank and Rick,

I think Howie has alot of good ideas-I agree with Frank regarding the Nextel stuff-let's do it. Frank, most of your people use this operationally so make sure we coordinate this properly.

We've got other decisions to make regarding Howies suggestions.  Would like your joint recommendations on Monday.

Thanks,

Nate



57



CONFIDENTIAL ZWC 0160958

**B1070**

At 06:19 PM 10/25/2000 -0400, Frank Jules wrote:

any additional actions.. i am in favor of nextel idea w proper notification...rick you may
want to put out a memo on actions and rational to clear up confusion

X-Sender: hshartel@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Wed, 25 Oct 2000 15:55:45 -0400
To: Frank Jules <fjules@winstar.com>
From: Howard Shartel <hshartel@winstar.com>
Subject: Re: Fwd: Re: Fwd: Actions
Cc: Fred Rubin <frubin@winstar.com>, Rick Uhl <ruhl@winstar.com>

Frank:

My direction was to await authorization to implement, after review by you, Rick, and
Fred. However, I've noted in <u>BOLD UNDERLINED CAPS</u> below what we have, in
fact, done to date, what has not been done and why, and lastly, have made some
recommendations for additional actions that require executive management
approval.

thanks,

Howie

At 02:56 PM 10/25/2000 -0400, you wrote:

how much did you implement?also have we closed are open po's?

X-Sender: hshartel@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Mon, 16 Oct 2000 10:51:46 -0400
To: "Richard J. Uhl" <ruhl@winstar.com>, fjules@winstar.com,
    dackerman@winstar.com
From: Howard Shartel <hshartel@winstar.com>
Subject: Re: Fwd: Actions
Cc: nkantor@winstar.com

I can be reached all day and tonight at either of the following numbers:

703-929-9270
703-868-4247

Howie

58

CONFIDENTIAL ZWC 0160959

**B1071**

At 10:35 AM 10/16/2000 -0400, Richard J. Uhl wrote:

Frank,Dave,
A lot of good material here. We need to review and decide on much of this today. (Joe Ragan is unavailable to talk until after 2pm CDT). Howie should be around
Rick

X-Sender: hshartel@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Mon, 16 Oct 2000 10:18:36 -0400
To: Rick Uhl
From: Howard Shartel
Subject: Fwd: Actions

Rick:

as requested.

Howie

Date: Sun, 15 Oct 2000 10:17:03 -0400
To: Fred Rubin <frubin@winstar.com>
From: Howard Shartel <hshartel@winstar.com>
Subject: Actions

Fred:
Per our conversation last night, here are some ideas and comments on some actions we have taken, and others we are considering:

**1. Make no payments to suppliers going forward for at least the next several weeks, possibly through year end.**

-PAYMENT "SLOWDOWN HAS BEEN IMPLEMENTED BY ACCOUNTS PAYABLE".

-STRATEGIC SUPPLIERS LIST HAS NOT BEEN DRAWN UP, NOR HAVE KEY SUPPLIERS BEEN NOTIFIED OF OUR ACTIONS; REQUEST APPROVAL TO

59

CONFIDENTIAL ZWC 0160960

**B1072**

**HAVE BRYAN CARTER AND DON KERNDT IN ACCOUNTS PAYABLE**
**PROCEED WITH PREPARING THE LIST, SECURING APPROVAL, AND**
**CONTACTING THE STRATEGIC SUPPLIERS TO GET THEM ON BOARD.**

Risks

-Some equipment will still be needed from time to time, to augment existing inventory; suppliers may not ship to us.
- We are required by the ICC ( Tariffs) to pay our freight vendors within 7 days after invoice receipt. We already have severely past due balances with most carriers. Withholding payment may limit, and in some case eliminate our ability to move product among the Tier 2's. We must have this flexibility to live with existing inventory.
- Winstar's Professional Services P.O.'s require payment, in almost all cases, within 15 days. We are already severely behind in paying these suppliers. We cannot hurt our customers in this area.
- Our NMC, Provisioning group, and Field Operations dept., to name a few, depend on a variety of contractors' services to operate. Being placed in a credit hold status by essential contractors could hurt the ability of these groups to function.
- By continuing to withhold payment, we risk severely damaging relationships with critical suppliers such as Tellabs, Cisco, Siemens, Hughes, and others. We can expect reduced credit limits, advance payment requirements, and COD shipments.

Recommendations

-Identify specific "strategic" suppliers that we must pay to continue to execute our business plan, and pay them the minimum amounts necessary to keep these relationships in place. We must personally, carefully manage these relationships at the executive level.
-Identify those suppliers with whom we are, already, severely delinquent, and work with them to make the minimum payments that they will accept.
-Identify small suppliers whose viability may be jeopardized by our not making payment, and make the minimum payments necessary to keep them from experiencing financial difficulty that we would be responsible (and potentially liable) for.
-Increase our communications with suppliers calling in for payment. Not getting a return call, and telling suppliers we have no information has proven to be inflammatory. We must be available by phone, and cite reasons for our late payment, whether it's problems with our Payables Systems, loss of key people, a loss of data, or whatever, we must cite a reason for our actions, and provide dates by which we will make payments, and meet these dates.

60

CONFIDENTIAL ZWC 0160961

B1073

2. Issue no purchase orders for capex, or operating supplies/services until further notice.

-ALL PURCHASE REQUISITIONS, OTHER THAN VERY FEW EXCEPTIONS AUTHORIZED BY EXECUTIVE MGMT, ARE NOT BEING PROCESSED.

-EMPLOYEE CONCERN IS RISING; RECOMMEND THAT EXECUTIVE MGMT COMMUNICATE TO VP OR SVP AND UP THE ACTIONS WE HAVE TAKEN, AND THE BASIS FOR THEM. WE NEED THE SUPPORT OF THE SENIOR MANAGEMENT TEAM ON THIS. I HAVE RECOMMENDED TO FRED THAT WE ISSUE A MESSAGE OF SOME KIND.

-THIS MORNING, WE RECEIVED EMAIL NOTICE OF WNSS RADIO REQUIREMENTS FOR THE REMAINDER OF THE YEAR. I HAVE ADVISED FRED AND RICK THAT WE WILL HAVE A RECOMMENDATION ON WHAT WE FEEL CAN BE DEFERRED (RADIOS) LATE TODAY. WE'RE WORKING ON IT NOW.

-DECISION MADE LAST FRIDAY TO DEFER RADIO SHIPMENTS, BUT RESCINDED DUE TO CONCERNS ABOUT WNSS REQUIREMENTS. THESE CONCERNS WERE WELL FOUNDED, AS WNSS USAGE, COMBINED WITH ANTICIPATED NEED FOR LARGE ACCOUNTS INVENTORY WILL REQUIRE THAT WE DEFER FEWER LINKS THAN ORIGINALLY ANTICIPATED, AND WE MAY, IN FACT, HAVE TO ORDER SOME ADDITIONAL P-COM 8XDS1 LINKS TO MEET WNSS REQUIREMENTS.

-ONCE THE EXTENT OF RADIO DEFERRALS INTO 2001 IS CLEAR, LATER TODAY, WE WILL NEED TO PROPERLY COMMUNICATE THIS DIRECTION TO P-COM AND DMC, AS THEIR BUSINESSES MAY BE ADVERSELY AFFECTED BY OUR ACTIONS.

Risk
-Equipment may be needed for a demand build site and it is not in inventory.

Recommendation
-We need to establish a process for emergency purchases, as an example, if we are out of RF space in the DC market, and need ATM cards to solve a problem. We must not allow this action to have a negative impact on our customers.

3. Turn away shipments of materials that are en route from our loading docks.

-AS WE RECOMMENDED, NO RADIO SHIPMENTS IN TRANSIT WERE TURNED AWAY. THIS WAS THE CORRECT ACTION, AS WE CONTINUE TO DEPLOY

CONFIDENTIAL ZWC 0160962

B1074

## EVERYTHING CURRENTLY IN THE PIPELINE

**Risks**
-We are liable for all inbound and return freight charges. We also will incur restocking fees of up to 25 percent for non-stock, custom shelf goods returned to our suppliers. Many of the items we buy are custom built for us (cable assemblies, harnesses, Network Cable, B site cabinets, and radios ( 38GHZ) and are not returnable.)

 -A surprise move like this would be viewed very negatively by our suppliers. To accomplish what is necessary, we must secure their buy-    in. Rejecting products that we have ordered would not save us much, and would really hurt these relationships.

**Recommendation**
-We have a minimal amount of equipment currently in transit (I can better quantify this tomorrow morning). Depending on the value, we should accept the small amount of equipment that is in transit.

4. Either (a) advise our key radio and other suppliers that they must defer shipments into January, or (b) as has been discussed, we authorize the shipment of materials in late December, and we will not, technically, have "received" the products this year.

## SEE COMMENTS UNDER ITEM TWO ABOVE. PROCUREMENT WILL PROVIDE SPECIFIC RECOMMENDATIONS ON DEFERRAL OF RECEIPTS AGAINST EXISTING PURCHASE ORDERS LATER TODAY.

Risks:
-This issue has been on the table for one full week, with no decision. Every week we delay advising our suppliers that they must defer shipments, (P-Com is a good example), we lose the opportunity to defer $5 Million in product (hurting ourselves), and we cause our suppliers more harm, as their ability to manage around the negative effects of our actions on their businesses will present a greater challenge to them:

Recommendation:
-We MUST make a decision on this, and immediately advise ALL suppliers that they are to defer shipments into January, or the last several days of December. We cannot afford to

62

**B1075**

continue receiving products this year.
-Although we will damage some relationships and hurt some of our smaller suppliers, we must advise these companies that we will not be taking any further product this year, and that they are to suspend shipments. Some exceptions will have to be made to preserve relationships that we MUST have to continue to execute our business plan. And, we must do what is necessary so we don't put anyone out of business. This will be a challenge.

**5. Attempt to locate a third party to whom we can sell all inventory that we do not expect to deploy between now and 12/31. Winstar receives payment for the agreed upon value of the materials, and pays a carrying fee to the third party for their having taken title.**

WE HAVE BEEN ADVISED THAT LUCENT HOLDS A SECURITY INTEREST IN ALL NETWORK INVENTORY. THIS PROHIBITS US FROM RESALE, FLOATING, OR FACTORING THIS EQUIPMENT FOR CASH. OTHER RECOMMENDATIONS ON HOW WE MIGHT PROCEED HAVE BEEN FORWARDED TO FRED AND RICK.

Risks/Concerns
-Title Issues: Lucent holds title to much of the inventory that would fall into this category, bringing into question whether or not we could actually "sell" our inventory. I understand that, during the discussion Thursday, other collateralization was mentioned, as well.
-Time: with approx. 9 working weeks left in the quarter, structuring the sale of $100M in inventory would be a challenge.
-Perception: This could be viewed as a borderline "panic" action, and when made public, could result in much speculation as to our financial condition, affecting our ability to secure future financing, and other areas.
-Inventory Sale Value: It is questionable as to whether or not we could sell our remaining inventory for anywhere near what it is worth. If Lucent is willing to buy the inventory for close to book value, this may not be an issue.
-Selling our inventory would put in an extremely difficult position entering January, unless some provision could be made to transfer ownership back very quickly, so it would be available for our use.

Recommendations
-Given Lucent's ownership of much of our inventory, pursue a transfer agreement with them. If they are willing to consider this, we must carefully assess whether the terms and cost of such a transaction are in our best interests.
-As an alternative to "Selling Inventory", aggressively defer all

63

CONFIDENTIAL ZWC 0160964

**B1076**

shipments for the remainder of the quarter. Wherever appropriate, re-classify network inventory over to COR for Large Accounts. During the last several quarters, we have established a strong record of selling equipment at end of Q, that, in one view, would make such an action completely appropriate. -Combined with the re-classification to COR mentioned above, identify the major components of remaining inventory, by supplier. Work with the suppliers these materials were purchased from in an effort to sell CAREFULLY TARGETED "blocks" of materials, that give us the most bang for the buck in terms of dollar value.

Summary / Conclusions

Fred: In addition to the recommendations above, here are a few other ideas designed to generate immediate savings. They have NOT been fully thought out, but each one could, potentially, result in significant cash savings this year, and beyond. They are what some would consider draconian in nature, and they would, in all likelihood, be very poorly received within the company, but under the circumstances, they should be considered:

1. KILL THE NEXTEL PROGRAM

<u>NO AUTHORIZATION RECEIVED TO TERMINATE THE NEXTEL DIRECT BILL PROGRAM. EXPENSES CONTINUE AT RUN RATE REFERENCED BELOW. EXECUTIVE MGMT APPROVAL REQUIRED TO PROCEED WITH THIS.</u>

With the exception of truly critical Operations and NMC people, KILL (OR POSSIBLY SUSPEND) the Nextel Direct Bill program EFFECTIVE IMMEDIATELY. ONLY THOSE INDIVIDUALS IN WNSS WHO ABSOLUTELY MUST HAVE A PHONE WOULD BE EXEMPT. INDIVIDUALS IN SENIOR MANAGEMENT, ACROSS THE ENTIRE COMPANY, HAVE THE ABILITY TO CARRY THEIR OWN CELL COSTS AND SUBMIT FOR REIMBURSEMENT, and don't need nextel phones.
I understand from Joe Ragan that the current run rate with Nextel is approx. $250,000 per month. As I advised Richard Schorr at the time, implementing the Nextel deal on a "Direct-Bill" basis was a terrible mistake. If we terminate it now, people would have to request cell phone call reimbursement on T/E Vouchers, as we all did previously, and as other companies typically operate. Although this would be an extremely unpopular move within the

64

company, I estimate that we would save $175-200K per month, especially during the first several months, before T/E requests start coming in. Overall, our monthly cell phone costs would drop considerably, as the Nextel units are widely used for both business and personal use, and many people have them who don't need them.
Nextel phones are a convenient business tool, but the real question is "Can we afford to be spending $250,000 a month on them?"..

Note: Customers that we have been issued Nextel phones would, of course, retain them

2.
IMMEDIATELY TERMINATE THE USE OF ALL TEMPORARY ADMINISTRATIVE WORKERS AT ALL LOCATIONS

NO ACTIONS TAKEN TO DIRECT MANAGEMENT TO TERMINATE THE USE OF TEMPORARY EMPLOYEES, OR TO STOP BRINGING IN NEW TEMPORARY EMPLOYEES. EXECUTIVE MGMT APPROVAL IS REQUIRED TO PROCEED HERE.

Quickly terminate the services of all administrative temps, as in the end of this week. This action would cause hardship throughout the company. Management at all levels would come under additional pressure to fill in the gaps, and we would have to step up. General administrative services and support would be reduced, and we'd all have to live with that. We would all have to pull together, but WE WOULD SAVE A LOT OF MONEY. I don't know what we're spending on temps, but I'm sure the number is a big one. Joe Ragan would know the run rate.

3. ACCELERATE/REVIEW THE NECESSITY OF RETAINING EVERY SINGLE NON-ADMINISTRATIVE CONTRACTOR POSITION, PARTICULARLY THE HIGHLY COMPENSATED IT CONTRACTORS, AND TERMINATE THOSE NOT DEEMED ESSENTIAL TO THE BUSINESS PLAN, EFFECTIVE IMMEDIATELY.

NO ACTION TAKEN. APPROVAL OF EXECUTIVE MGMT REQUIRED TO PROCEED.

65

CONFIDENTIAL ZWC 0160966

**B1078**

I know we're already doing a lot of this, but with strong buy-in from executive management, I am certain that additional savings can be achieved in this area.

4. IMPLEMENT AN IMMEDIATE, ACROSS THE BOARD HIRING FREEZE.

No new headcount until further notice. period. No exceptions with executive management approval. No new people, temps, contractors, or employees. If an offer has not been made, the headcount is gone. We all have to work smarter and harder. We save on salary/benefits, and our requirements for space are reduced. Savings...

**EXECUTIVE MGMT. ACTION REQUIRED. HIRING CONTINUES.**

5. EFFECTIVE IMMEDIATELY, WE REQUIRE THAT ALL TRAVEL BE APPROVED AT THE GROUP EXECUTIVE LEVEL, IN ADVANCE, TO RECEIVE APPROVAL, EVERY INDIVIDUAL WOULD HAVE TO DEMONSTRATE A TRULY COMPELLING NEED TO TRAVEL. ALL BUT THE MOST CRITICAL TRAVEL REQUESTS WOULD BE TURNED DOWN. This, too, would be a hardship for some departments, but, as a company, we travel too much. Our people need to be much more aware of the high cost of travel. This would force that awareness, and would save a lot of money, effective immediately upon implementation.

**NO ADDITIONAL CONTROLS ON TRAVEL HAVE BEEN IMPLEMENTED.**

The key to successfully implementing the sweeping measures above would, of course, be to ensure that our customers are insulated from the effects of each. This would be our primary challenge, as the management team. Again, they will all be very unpopular, but under the circumstances, may be necessary.

thanks,

Howie

<<<<

</blockquote></x-html>

66

CONFIDENTIAL ZWC 0160967

**B1079**

CONFIDENTIAL ZWC 0160968

B1080

8/21/00 Nate/Nina Meeting --    NATE'S MISSION:   TO GET LUCENT TO AGREE TO ALL POINTS LISTED BELOW

1) **No more EOQ deals with Lucent effective immediately.**
There is no capital budget left to negotiate with.  1Q00, 2Q00 reciprocal revenue deals used future purchases as part of negotiations; Winstar has pre-purchased equipment that will not be deployed during 2000 in an effort to meet revenue commitments.

2) **We need to delay/cancel/rebook deals made 1Q00, 2Q00.**
Finance department is researching the possibility of reclassing these EOQ deal pre-purchases from the Fixed Asset account into a Prepaid Account, which would (potentially) allow us to not have to recognize these purchases as capital for this year. If this is not possible, we need to:
    a)  Delay shipments through the rest of the year for equipment/services we purchased as part of EOQ deals, and/or
    b)  Cancel orders remaining from EOQ deals, and/or
    c)  Return pre-purchased equipment.
This means we will in effect be asking Lucent to restate all revenue they have already recognized from these deals. They would have to restate their quarterly earnings for the past two quarters.  If they agree to do this (which I don't believe they will) they may require us to also restate our revenue for the last two quarters as they may want to cancel their part of the EOQ deals.
Specifically we need to delay into 2001:

| | | | |
|---|---|---|---|
| a) | Software licenses | $26M | |
| b) | Switch Pay-as-you-grow | $17M | |
| c) | Ascend switches | $22M | |
| d) | Optronics spares/BWM | $15M | (BWM = Bandwidth Managers – used with Optronics) |
| | | $80M | (Lucent has already booked as revenue) |
| e) | Data Center | $23M | |
| f) | Hubs/B's Turnkey | $83M | |

$106M (Committed to Lucent as revenue they would receive in 2000 – they have not booked this yet, but are anticipating being able to book this during CY2000)

    g)  ONG equipment/installation

| | | |
|---|---|---|
| – scheduled 2000 deployment pre-purchased | $44.6M | |
| – scheduled 2001 deployment pre-purchased | $23.2M | |
| | $67.8M | (Lucent has already booked as revenue) |

Additionally, we need to reengineer Hub/B-Site designs to reflect smaller configurations using minimal equipment.

3) **Need to delay Seattle NMC build and the NMC disaster recovery project to 2001.**
These projects were not included as part of EOQ negotiations, but Lucent has already begun work on them and has staffed for project completion.

4) **Effective 9/1/00, we need to terminate all C-5 services, other Professional Services projects, with the exception of the Hubs/B's and ONG Turnkey Program Management.**
Risks to Winstar:
    a)  Loss of 27 Lab positions.
    b)  Capacity Planning project stops.
    c)  No more Lucent Architecture Design support.
    d)  Loss of OSS/BSS design support.
    e)  Loss of 14 City Planning positions.
    f)  Loss of Engineering support, including ASAP/TBS work.
    g)  Loss of Systems consultant support.
Lucent may wish to impose financial penalties on Winstar for "layoff" of these positions.



DEPOSITION EXHIBIT
Rubin 55
17'91
MARLENE LEE, CSR, RPR, CRR    03



Hicks 3
EXHIBIT
01/22/04 W

CONFIDENTIAL   2WC  0024005



PLAINTIFF'S
EXHIBIT
PX 45

B1081

**Additional Issues/Risks to Winstar:**

1)   2000 Supply Agreement contractual Lucent content percentage for financing ≈ 75% of total financing.
Historically, Winstar has been closer to 40% content; there are financial penalties written in contract for failure to meet content percentage – Lucent has not imposed penalties to date, but may wish to now.

2)   Winstar may lose the ability to finance through Lucent internal labor and overhead for remainder of the year.
Potential financial impact = $60M cash flow/quarter, $4M/quarter missed overhead capitalization.

CONFIDENTIAL  2WC  0024006

B1082

dackerman, bzlotnick, 05:23 PM 9/18/00 -0400, Lucent meeting 9/19

To: dackerman, bzlotnick
From: Lisa Hicks <lhicks@winstar.com>
Subject: Lucent meeting 9/19
Cc:
Bcc:
Attached:

Dave/Bill-

Spoke with Vanessa Petrini - Lucent is planning to approach us again tomorrow with a request for an end of quarter deal. I told her that this was not a good idea and it would receive the same reaction as before. They also would like to tell us about what they are calling an "innovative" approach to the Hubs/Bs pricing - they are going to propose that the $35K per B would be applicable for the commitment we made with the $133M PO, and when that funding is gone they would reduce to $27.5K per B. They're figuring they can get about 2600 B's at $35K from the $133M commitment, which, based on our forecast for next year would mean that we probably wouldn't see pricing of $27.5K until sometime in 2002. They are also going to ask us to sign both the ONG and Hubs/B's addenda; per the last conversation I had with Fred (two weeks ago), he requested that we not sign anything until the financing issues were resolved. Finally, they intend to ask us to sign an amendment to the Supply Agreement which would address the issue of shipping and receiving; they can no longer do Bill and Hold letters, which is how they were able to "ship in place" and have us "receive" for these end of quarter deals. They have been pressing for an amendment to the Supply Agreement all year - we have refused. I again today refused to sign any amendments to the Supply Agreement, and relayed to Vanessa that this "shipping and receiving" would no longer be an issue since we were not going to buy anything else this year that we didn't need immediately.

Lisa

Printed for Lisa Hicks <lhicks@winstar.com>                                              1





TRU004211

B1083

**Lisa Hicks, 03:12 PM 9/20/00 , Fwd: FW: Deal Documents**

---

X-Sender: lhicks@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
Date: Wed, 20 Sep 2000 15:12:29 -0400
To: ruhl@winstar.com
From: Lisa Hicks <lhicks@winstar.com>
Subject: Fwd: FW: Deal Documents


>From: "Harris, Deborah K (Deborah Kristine)" <dharrisbrown@lucent.com>
>To: dackerman@winstar.com
>Cc: "Aversano, Nina" <aversano@lucent.com>,
>       "Plunkett, William"
>       <wmplunkett@lucent.com>, bzlotnick@winstar.com,
>       lhicks@winstar.com
>Subject: FW: Deal Documents
>Date: Wed, 20 Sep 2000 13:14:21 -0400
>X-Mailer: Internet Mail Service (5.5.2650.21)
>
>Dave
>
>I apologize for the delay in providing this document to you.  We have
>continued to try to incorporate more value in the software pool and as you
>can see,  the amount is over $32M.
>
>I believe Vanessa has been in contact with Lisa on this proposal and
>communicating the overall framework.  I look forward to our ability to reach
>a mutually beneficial agreement.
>
>Debbie
>
> > ----------
> > From:         Petrini, Vanessa H (Vanessa)
> > Sent:         Wednesday, September 20, 2000 1:08 PM
> > To:   Harris, Deborah K (Deborah Kristine)
> > Cc:   Newsom, Janice Gilliam (Janice); Rigotti, David Roy (David); Genner,
> > Byron A (Byron)
> > Subject:      Deal Documents
> >
> >
> > Debbie,
> >
> > Attached are the deal documents for you to send to Winstar.
> >
> > Vanessa
> >
> >
> >       <<4Q2000 Deal Parameters.xls>>        <<Sept2000 software
> > commitment.doc>>
> >
> >
> >

    

4Q2000 Deal Parameters.xls  Sept2000 software commitment1.doc



---

Printed for "Richard J. Uhl" <ruhl@winstar.com>

CONFIDENTIAL          1
3WC 0008467



## Winstar/Lucent 2000 Partnership Deal
### Prepared 9/20/2000

Lucent agrees to defer Billing until 1/2/2001 for the following Lucent Product and Services for which Winstar has committed or Lucent had planned to invoice in Calendar 4Q2000:

| | Amount | Description |
|---|---|---|
| | $ 23,000,000 | Data Center |
| | $ 7,690,000 | Management Software (June, 2000 Deal which included Irrevocable Letter of Intent: billing should have been held until 1/01) |
| | $ 18,725,000 | Hub and B Deployment Services |
| | $ 14,000,000 | Miscellaneous Services (C–5, Eng, install., Integration, NKC, etc.and/or other products as mutually agreed) |
| | $ 63,415,000 | Total Deferment amount |

In Return Winstar Agrees to purchase from Lucent the following items for delivery & invoicing in CY3Q2000:

| | Amount | Description |
|---|---|---|
| | $ 32,206,891 | Software Commitment (See Attachment) |
| | $ 840,000 | NKC Services |
| | $ 1,300,000 | OS Upgrades |
| | $ 171,000 | Front End Systems Engineering |
| | $ 8,500,000 | 500 Stingers and rolled up services (shipped to Winstar warehouse) |
| | $ 1,875,509 | SESS PAYG |
| | $ 1,146,000 | Storage Equipment for SF data center (EMC) |
| | $ 63,039,400 | Subtotal |
| | $ 47,000,000 | Lucent business previously committed and due to bill by 9/30/00 (Sheet 2) |
| | $ 110,039,400 | Total Calendar Year Q3 |
| Option: | $ 2,420,000 | Springtide Solution to support VPN services (reduce PAYG payments accordingly) |

## Deal parameters

| B/Hub Site | |
|---|---|
| $35K per B-site pricing on first 2600 sites (subject to the fence guidelines), $27.5K per B-site for greater then 2600 sites. | |
| $450K per Hub site (subject to the fence guidelines) | |

CONFIDENTIAL
3WC 0008468

B1085

## Winstar/Lucent 2000 Partnership Deal
*Prepared 9/20/2000*

| | |
|---|---|
| | Winstar commits to deploy Lucent converged access solution in all Bs of of new Hubs and all new Bs off of new A sites. |
| IP Solution | |
| | To review Bell Labs Network Planning team results regarding IP network requirements, and if a parallel IP network is justified, then Winstar agrees to grant Lucent the first right of refusal to supply an IP network solution that meets Winstar's requirements. |
| Supply Agreement Amendment/Addenda | |
| | Winstar signs Supply Agreement Amendment changing Title, Risk of Loss, Product Acceptance Terms; Winstar signs ONG, Hub/B Buildout Addenda to include Lucent product content provision, payment terms per the Supply Agreement. |
| Optical Networking | |
| | Winstar agrees to exclusive build of long haul and metro networks with Lucent solution. |
| Radio Replenishment | |
| | Lucent agrees to continue to support the Lucent/Winstar Radio/Spectrum co-marketing program based on a mutually agreed business plan. Lucent will replenish stock of digital radios sold from it's stock in the prior quarter based on pricing levels reflecting market conditions. |

CONFIDENTIAL
3WC 0008469

B1086

### Lucent Fiscal Q4 2000 Expected Revenue
### Prepared September 20, 2000
### (Excluding Deal)

| Description | | Revenue |
|---|---|---|
| **Optical Networking** | | |
| 400G | | $7,300,000 |
| BWM | | 5,300,000 |
| Spares | | 800,000 |
| 2.5G | | 3,800,000 |
| | Subtotal | 17,200,000 |
| | | |
| **Switching** | | 2,300,000 |
| | | |
| **Services** | | |
| Hubs and Bs | | 5,500,000 |
| Data E&I | | 500,000 |
| Enhanced Services | | 12,000,000 |
| | Subtotal | 18,000,000 |
| | | |
| **Radio (PTP)** | | 7,000,000 |
| | | |
| **Data Center** | | 1,100,000 |
| | | |
| **Software Products (SGP)** | | 1,000,000 |
| | | |
| **TOTAL** | | $46,600,000 |

CONFIDENTIAL
3WC 0008470

**B1087**

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

**Optical Networking Products – Software Upgrade**

**FT-2000 OC-48  Release 7.2 to Release 9.1**         $1,295,274

Application –  SONET terminals deployed in Winstar's  Metro and Long Haul Routes

Benefits of upgrade:

- This release will allow the termination of FT-2000 OC-48 rings on BWMs directly without terminals in Service node.  Existing FT-2000 rings can be re-homed on the BWM eliminating the FT-2000 terminal in the service node thus reducing space.
- Red line services protects against accidental deletion of cross-connects for high priority services.  This feature introduces an extra step in that cross-connects cannot be deleted until Red Line Services is turned off.
- Supports interworking between Wavestar 2.5G terminals at release 4.0 and FT-2000 terminals at release 9.1 on the same ring.  This will provide flexibility to add the newer 2.5G terminals to an existing FT-2000 ring.

**Wavestar 2.5G OC-48  Release 3 to Release 4**         $1,365,417

Application – SONET terminals now being deployed for current and future OC-48 rings in Long Haul and Metro environments

Benefits of upgrade:

- Timing enhancements including full line timing and timing outputs to other SONET gear in the same office.  Other enhancements include incoming and outgoing Byte Synch Messsaging transported on the S1 byte. A new timing pack is introduced that includes the capability to select SF or ESF timing inputs.
- Supports in-service upgrade from 2.5G to 10G.
- Supports compatible optics into the Wavestar 400G DWDM system thus eliminating OTUs.  This will reduce future requirements for growth slots and result in overall cost reductions for Long haul deployments.
- Supports interworking between Wavestar 2.5G terminals and FT-2000 terminals at release 9.1 on the same ring.  This will provide flexibility to add the newer 2.5G terminals to an existing FT-2000 ring.

**SNMS Release 2.1 to  3.1/4.0 Upgrade**         $350,000

Application- Winstar is utilizing the SNMS to manage the Wavestar 400G DWDM and 2.5/10G SONET terminals

Benefits of upgrade:

- Support of newer network elements including Wavestar 2.5G release 3 , BWM release 2.1, and Wavestar 400G release 3.0.
- Release 4.0 adds support for 2.5G release 4 and BWM release 3.0

09/20/00

1

CONFIDENTIAL
3WC 0008471

B1088

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

✍ DWDM NE Optical Connection Provisioning – The 400G DWDM NEs require that associations be established between OTU's , OMU's , and ODU ports specifying system connectivity. Generally several optical associations are needed to specify the complete connectivity. This release simplifies this association for establishing complete optical connections through the NE's.

✍ Enhanced surveillance to include non-alarmed standing conditions and notification for transient events. This includes notification that APSD condition is active after a LOS in the 400G.

SNC Release 9 to Release 10 upgrade                          $15,000

Application – Winstar is utilizing the SNMS to manage the FT-2000, DDM-2000, and 40G DWDM terminals.

Benefits of upgrade:

✍ Support of newer network elements such as DDM-2000 release 15 for direct terminations on Titan 5500 DCS and FT-2000 release 9.1.

Wavestar 400G Release 2 to Release 3 upgrade               $9,937,500

Application –  The Wavestar 400G DWDM equipment is deployed in the long haul network to increase the bandwidth capacity of the leased fibers. Winstar currently has Wavestar 400G release 2.03 software loaded in the routes installed since it was available in June 1999. Release 3.0 is now generally available with twenty additional features added to the capabilities of the original release. Several of the key features are listed below. The pricing includes the cost for Release 3 software for Winstar's projected network (routes currently identified.)

Benfits of upgrade:

✍ OC-192 Forward Error Correction- The WaveWrapper technology provides out-of-band (strong) forward error correction (FEC) to support longer distances for OC-192 applications before the signal needs to be regenerated. The routes have been designed with engineering rules that take this additional distance into consideration. In the future, this will allow additional wavelengths to be added at the OC-192 rate.

✍ Linear Gain Tilt Compensation – The OLS400G optimizes its capacity and reach performance for DWDM networks deployed with Non-Zero Dispersion Shifted Fibers by incorporating linear tilt compensation.  This will allow maximum route distances for OC-192 wavelengths.

✍ OLS compatible optics – This feature allows signals from TDM terminals with compatible optics to be directly terminated on the 400G terminals without the use of OTUs. This capability saves equipment costs and central office floor space by reducing the number of OTUs required.

✍ High Speed Broadband Optical Interfaces - OLS 400G provides an open optical interface to multi-vendor terminal equipment for optical signals ranging from 100Mb/s to 2.5 Gb/s. The High Speed Broadband Translator Units (HSBB OTUs) translates incoming

2

09/20/00

CONFIDENTIAL
3WC 0008472

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

wavelengths into the ones compatible with OLS 400G. This OTU is capable of handling SONET/SDH and other asynchronous optical signals within the broadband range. It has been tested for OC-3/12/48, Gigabit Ethernet, IBM ESCON (200 Mb/s) and Serial Digital Interface (SDI) video (177,270, & 300 Mb/s). This can be used to bring in less than a OC-48 signal without interfacing a TDM terminal if required.

☞ Enhanced Maintenance Abilities – adds a group of features designed to provide value in maintaining the 400G routes after they are installed. These include database backup improvements, alarm provisioning, OTU AIS response provisioning, and performance monitoring features.

Total Optical Products Software upgrades                $12,963,191

09/20/00

CONFIDENTIAL
3WC 0008473

B1090

## OSS / BSS Products

__Macstar for 250K Lines for Federal__                    $2,100,000

The major objective of the *Macstar* System, also a primary goal of the service providers, is to support Centrex and to maintain Centrex as a viable and cost-effective alternative to customer premise based Private Branch Exchanges (PBX's). This objective is achieved by improving Centrex features and promoting high quality service by adding end customer management control to Centrex. Centrex clients for enriching the Centrex offering deem the functions provided by the Macstar System most important.

The *Macstar* System is a computer based Operations System that allows the end customer to prepare and implement feature changes and configurations and manage the routing of the outgoing Centrex traffic. These functions are known respectively as Customer Station Rearrangement (CSR) and Facility Management. Both capabilities can be performed conveniently from a terminal or personal computer located on the end customer's premise without requiring a service order and the associated cost and delay in implementation.

__CONNECTVU Aucto Code Openings (ACO)__          $900,000

The CONNECTVU-APX Automated Code Opening (ACO) Feature dramatically alters the code administration process by automating most of the activity currently performed manually by translations technicians. By implementing the ACO feature, Service Provider's can free experienced translators from the rigorous demands of manually creating the translations required to provision code openings in the 5ESS switches across their network. The automated ACO feature also eliminates high error rates typically associated with manual translations and, through its scheduling capability, insures that the recent changes are delivered to and occur in the switches at the proper time.

In order to provide an end-to-end flow-through solution to Lucent's CLEC customers, Lucent Technologies (LT) has partnered with a third-party application provider to develop a "LERG Pre-Processor" CAS (code administration application). This bundled Code Administration application will provide a seamless interface to the CONNECTVU ACO (Automated Code Openings) feature functionality to allow for flow-through provisioning of local NXX code openings. This off-the-shelf LERG-ACO task automation package will be utilized to automate the switch provisioning activity of growth code openings and tandem homing rearrangements occurring in a CLEC's service area (i.e., NPA and LATA).

__Arbor ® /OM for Federal__                     $800,000

Arbor OM is a multi-service order management system, can order multiple communication services, display the flow of orders and tasks to complete orders, interface with all critical subsystems, and ensure that services ordered become services billed. Its design offers flexibility, scalability, rapid time to results, and minimal investment risk. Its order entry interface takes the complexity out of account and service order creation by providing a unified view of the customer to the diverse parts of the provider's organization. Like *Arbor/BP*, customizable GUIs can support the specific needs of different users for a potentially significant

09/20/00

4

CONFIDENTIAL
3WC 0008474

__B1091__

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

combination of operational efficiency and cost-effectiveness. And, it lets providers define the workflow associated with provisioning components of an order.

*Arbor*/OM integrates seamlessly with *Arbor*/BP so changes to accounts and services are updated in the customer database in real time. The *Arbor*/OM GUIs can provide a real time view to new and pending orders and help ensure secure handling of customer orders and inquiries. The GUIs promote rapid account creation (including real time credit card validation, credit scoring, and address validation), service establishment, product provisioning and service activation, and workflow management. The *Arbor*/OM order creation interface features a graphical drag-and-drop process using icons to represent customer accounts, service types, prod-ucts, contracts, and product packages. For each type of service ordered — wireline, data services, and mobile telephony — views open automatically, prompting the CSR to enter the required informa-tion for that service type. For customer validation, *Arbor*/OM enables CSRs to quote the recurring and non-recurring charges included in the order. A change in schedule of an order or task automatically triggers changes in dependent tasks. Furthermore, since *Arbor*/OM can support an unlimited number of account hierarchies, CSRs can quickly and easily address inquiries from within all parts of a customer's organization.

### BILLDATS® Data Manager                          $1,500,000

Our convergent billing mediation software reflects in-depth expertise in billing data acquisition and management. It captures the vital network usage data in near real time, performs specialized processing, and speeds relevant data downstream to the operator's choice of billing management applications (for example, for marketing, network analysis, fraud manage-ment, and bill rendering).

### Interprenet™ IP for 50 tracker support            $1,999,300

Interprenet™ IP usage and mediation family offers detailed, accurate, and timely usage accounting within IP networks for usage-based and quality-of-service billing, network usage analysis, customer analysis, and other user-defined applications. Primary components include: Tracker — An in-network device that correlates IP usage with users in real time. Data Manager — A central mediation platform that collects, correlates, stores, and formats usage events. Reporter — A flexible, user-defined tool that generates reports on usage data. These components make the *Interprenet* family one of the most comprehensive IP usage and mediation solutions available today, enabling service providers to charge for IP-based services and potentially increase revenues. Also, in-network, real time correlation helps network analysts understand usage characteristics for capacity planning and roll-out of new IP-based services. The *Interprenet* IP usage and mediation family provides a true, real time usage collection architecture, which is essential for usage and quality-of-service rating, as well as other user-defined functions.

### Strategist for Federal                            $600,000

Strategist® software is a *Kenan* decision-support and analysis application that can transform customer data into business-impacting information. This application suite empowers end-users, from executives to advanced users, to develop insight into their customers and their business, so they can take appropriate actions to deliver measurable results. Fully integrated with the *Arbor*/BP and *Arbor*/OM systems, *Strategist* software incorporates data from multiple sources into a single centralized database. From this database, end-users can run a multitude of

B1092

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

sophisticated analyses quickly and easi-ly, including churn analysis, customer segmentation, modeling, and profiling. And, they can implement programs such as intelligent debt collection and full-scale marketing-campaign management, to help increase customer satisfaction and retention.

<u>OneVision NFM Additional Core</u>                    $500,000

This RTU provides support for an additional instance (e.g., European NOC) of OneVision NFM. This system can be connected to the domestic system to provide additional monitoring capabilities for Winstar's global operations.

<u>OneVision NFM Support for additional 50 NEs</u>        $1,200,000

This RTU provides support for an additional 50 NE s  (e.g. European NOC) of OneVision NFM, per terms of OSS/BSS Addendum.

<u>OneVision NFM Feature Package: Support for SNMP</u>    $300,000

This feature translates SNMP traps into human-readable ASCII format and then forwards it to *OneVision* NFM's data collection module. In addition, a user is able to issue SNMP GET/SET messages to SNMP devices via a GUI interface. *OneVision* NFM keeps a log of all GET/SET transactions. Also, a GUI-based MIB browser is available to interactively query the values of variables on SNMP agents.

*OneVision* NFM translates and logs all SNMP traps and GET responses into an *OneVision* NFM data source. This allows the basic *OneVision* NFM features, such as data distributor rules and thresholding, to be utilized against the SNMP device data.

SNMP calls for two types of traps: generic and specific. Generic traps are used consistently by all SNMP agents. Specific traps are those traps that are unique to the device and vendor of the device.

<u>NetMinder⁺ Systems' Packet Traffic Management (PTM)</u>   $2,700,000

To avoid network congestion that can affect Quality of Service in data networks, you need a way to monitor and manage your data packet loads in near-realtime. It's the only way you can handle unexpectedly high packet volumes across multiple service layers (voice and data) and optimize service for your customers. The *NetMinder⁺* Systems' Packet Traffic Management (PTM) Feature Set, an emerging feature set within Lucent Technologies' *NetMinder⁺* System solution, is specifically positioned to meet this need.

The *NetMinder⁺* Systems' PTM Feature Set extends the *NetMinder⁺* System solution to provide Performance Management of data networks. By measuring and monitoring performance in both the core and access portions of the data packet network, network managers can optimize efficiency while providing consistent quality of service. Additionally, network managers who are providing voice services over data packet networks can use the PTM feature set along with other *NetMinder⁺* System feature sets (such as NTP) to provide a complete view of network performance at the element, network, and service layers.

6

B1093

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

**Total OSS/BSS**          **$12,599,300.00**

09/20/00

7

CONFIDENTIAL
3WC 0008477

**B1094**

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

### IP, PSAX and Lightship Product –Software Commitment – September 2000

__IP  Navigator__                                                    $915,000

Provides ability to run MPLS on the core and edge ATM network which
allows: IP VPNs over MPLS, Absolute QoS for IP applications, Efficient IP
multicast features for advanced services, Traffic engineering capabilities for
IP backbones.  1 copy per switch
*Benefits:*
1. Software extends life of ATM infrastructure
2. Delays near term IP spend

__Lightship__                                                        $ 50,000

LightShip Element Manager for Sun Solaris - Graphical tool to manage up
to 25 SpringTide IP Service Switches
*Benefits:*
1. Enables configuration mgmt, provisioning and alarming of tunnel
aggregation tool

__Total $       965,000__

8

CONFIDENTIAL
3WC 0008478

**B1095**

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

## Software and Feature licenses for Winstar's imbedded base of 5ESS switches

as of September 15, 2000 (a total of 39 5ESS switches):

| 5E15 Base Software | Generic software providing base 5E15 features for the existing 5ESS switches in Winstar's network. | $1,612,000.00 |
|---|---|---|

| Final Route Trigger | 99-5E4187.A  Adds the option to query an AIN SCP when a route index is exhausted. | $167,400.00 |
|---|---|---|

The following Software Features are licensed for $100,000 per switch:

| Easy Access to Voice Mail | 99-5E-7284 | Allows a subscriber to *XX dialing (speed dialing) get to their voice mail |
|---|---|---|
| Call Waiting Tone for FCCS | 99-5E-7447 | Allows a subscriber to use call waiting while monitoring a call being left on their voice mail system when they have the Forward Call - Call Screening feature. |
| Per-Use Package | 99-5E-7082 | Enables subscriber to forward calls instead of taking messages or giving out private numbers |
| Per-Use Package | 99-5E-7598 | Provides usage sensitive 6-way calling |
| Call Waiting Fax Ring | 99-5E-4923 | Prevents an active incoming FAX from being call waited or sent to a voice mail system. |
| Increase the number of MLHG to 8191 | 99-5E-7087 | Provides an increase of MLHG from 2000 to 8191 per SM. |
| Audible Calling Name on *69 | 99-5E-7495 | Provides the incoming callers NAME, telephone number, date, and time of call with auto call back |
| Talking Call Waiting Interlata enhancement | 99-5E-7604 | Talking Call Waiting interLATA feature causes a TCW interLATA IP DN to be routed through a Selected IXC and the billing record for the call is suppressed.Routing and Billing Capabilities are Independent Capabilities |

B1096

Lucent Technologies and Winstar Agreement -- September 2000
Software Purchases

| | | |
|---|---|---|
| Forwarded Call Call Screening | 99-5E-2652 | Voice Mail subscriber would dial an access code to activate call screening As soon as a call goes to voice mail, called party will get a "ping" ring When the phone is picked up, the called party will be able to hear the calling party without their knowledge To engage in the conversation, the called party could simply press the flash-hook and connect the call |
| Non-Restrictive ANI Over PF | 99-5E-7781 | This feature allows service providers to provide the delivery of 10-digit ANI over a private facilities trunk without having to assign a Private Facilities (PF) or Automatic Route Selection (ARS) feature to their originating subscribers. |
| TBCT Notification to Controller | 99-5E-7268 | Two B-Channel Transfer notification of call completion to controller |
| DID PBX Query enhancemnt | 99-5E-7168 | Provides an office option to prevent Number Portability queries from being launched for Direct Inward Dial PBX numbers |
| Apnd BAF Mod 164 w/Chgbl AN CAN Rec | 99-5E-7304 | Create better billing records for calls coming from or going to an Access Tandem Switch (7304, 7486) |
| ASP Toll Free Interact W/Flex ANI | 99-5E-7302 | Supports ASP Toll Free Vs. switch based Toll Free calls which originate from pay phones. |
| ASP Mid_Call Events | 99-5E-7115 | Allows the calling party to continue to make calls without having to re-establish their call setup |
| ASP AMA Rec Aband STOR Connects | 99-5E-7404 | Creates an AMA record for Calls that allow caller to interact with an IP (e.g. Voice Mail System) but doesn't actually route calls |
| ASP Term Bus/NA Trig. Sub Evnt | 99-5E-4132 | ASP Terminating Busy/No Answer Triggers detect Busy and No Answer conditions on the terminating portion of the call |
| PBX calling ID | 99-5E-7431 | Provides the main Directory Number from a PBX over a T1 facility |
| Number Pooling Using Number Pooling | 99-5E-7210 | Allocates Directory Numbers in "pools" of 1,000 verses 10,000 numbers |
| ASP TAT for Trunk Group | 99-5E-7588 | Allows Trunk group triggers to be assigned to Private Trunk Interfaces (PRI, PF, DID), thus enabling invocation of AIN services on behalf of the PBX |
| 64Kbps X.75/X.75 Trunk Groups | 99-5E-7021 | This feature requires the 5ESS to increase the ISDN X.75/X.75 trunk datarate from 56 kbps currently supported to also allow 64 kbps as specified in the X.75 and GR-301-CORE. |
| RC Translation Protection | 99-5E-7336 | Provides an extra level of security for translations considered critical |
| NP-Capture CIC in CNA AMA Record | 99-5E-7486 | Allows the received Carrier Identification Code (CIC), if any, to be recorded in the CNA AMA record. |
| DAS and Rate Center Increase | 99-5E-7473 | Increases rate areas (RAX) limit from 99 to 999 |

10

09/20/00

CONFIDENTIAL
3WC 0008480

**B1097**

Lucent Technologies and Winstar Agreement – September 2000
Software Purchases

| | | |
|---|---|---|
| Proxy Database | 99-5E-7127 | This feature introduces the initial environment to support a full copy of the 5ESS® Static ODD on the ASM processor. This feature introduces solutions for ASM DBMS initialization, ASM DBMS fault recovery, ASM % AM/CMP/SMs synchronization to be able to support the copy of the 5ESS® ODD. |
| Remove CGA from MCC | 99-5E-7258 | Removes carrier group alarm |
| AIN TSTRC Timer Minutes Expanded | 99-5E-7568 | Increases the amount of time a caller can be allowed to be connected to the Intelligent Peripheral |
| Recreate LD CIC in Term Tandem | 99-5E-7242 | Presently, the LD Carrier Identification Code (CIC) is stripped by the LD carrier before a call is sent to the terminating Tandem. This feature recreates the LD CIC in the terminating Access Tandem switch so that the information can be sent to the ICO end office as part of the call. |
| AMA Module 104 Direction Indicator | 99-5E-7500 | This feature is an enhancement to Automatic Message Accounting (AMA) for cases where the Bellcore Trunk Identification Module (Module 104) is appended to existing AMA records. This feature adds a direction indicator to the information provided in Module 104 to indicate whether the trunk in question is incoming or outgoing. |
| ACB/AR Point Code Routing | 99-5E-7567 | The Originating AR/AC Destination Point Code feature modifies the Automatic Recall and Automatic Callback (AR/AC) features at the originating 5ESS®switch in an AR/AC session to send all AR/AC TCAP messages following the Initial Query message using Point Code routing. Without this feature, messages following the Initial Query TCAP message use Global Title Translation (GTT) routing. |
| II/OLI Dlvry for Ntnl ISDN PRI | 99-5E-7469 | This feature is being provided on a 5ESS® Switch End Office with National ISDN PRIs serving a PBX or external platforms. When the new field provided on RC/V View 5.1 set to "N" (the default) for the PRI trunk group, calls terminating to that trunk group will behave the same way they always have, namely this feature is not activated and all SETUP messages do not contain the newly defined Informational Element for II/OLI information. When this field is set to "Y", and the II/OLI information is available and valid for this call, the outgoing SETUP message will include the new IE for II/OLI information. |

| | |
|---|---|
| Features for 39 switches | $3,900,000.00 |
| 5E15 Base Software | $1,612,000.00 |
| Final Route Trigger | $167,400.00 |
| Total: | $5,679,400.00 |

B1098

Lucent Technologies and Winstar Agreement — September 2000
Software Purchases

Software Commitment — Totals

| | |
|---|---|
| Optical Networking Software Products | $ 12,963,191 |
| OSS/BSS Software Products | $12,599,300 |
| IP, PSAX and Lightship Software Products | $    965,000 |
| 5E15 Software | $ 5,679,400 |
| | |
| TOTAL | $32,206,891 |

09/20/00

12

CONFIDENTIAL
3WC 0008482

B1099

**Printer Printer**

| | |
|---|---|
| **From:** | David Ackerman [dackerman@winstar.com] |
| **Sent:** | Monday, December 11, 2000 11:29 AM |
| **To:** | jeverding@winstar.com |
| **Subject:** | Fwd: 3Q Software Pool with comments |



9-22 s. POOL.lsb

&lt;x-flowed&gt;P.
&gt;X-Sender: lhicks@mail.winstar.com
&gt;X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
&gt;Date: Mon, 25 Sep 2000 17:06:48 -0400
&gt;To: dackerman@winstar.com, bzlotnick@winstar.com
&gt;From: Lisa Hicks &lt;lhicks@winstar.com&gt;
&gt;Subject: 3Q Software Pool with comments
&gt;Cc: gsimpson@winstar.com, ibensman@winstar.com, sclement@winstar.com,
&gt;      dhuber@winstar.com, jbullen@winstar.com
&gt;
&gt;Dave/Bill-
&gt;
&gt;Attached is Lucent's most recent software pool request.  I have provided
&gt;(in red) the things that are different from the previous pool request.
&gt;
&gt;All software increases reflect list pricing - all discounts have been
&gt;removed.  The switching software pool contains ALL possible 5ESS software
&gt;- including features that we do not use or need.
&gt;
&gt;My understanding from Vanessa is this:- when we purchase equipment next
&gt;year, we will not be charged for software.  Lucent will credit Winstar
&gt;against next year's equipment purchase the delta between the list price
&gt;reflected here, and the Winstar discounted price.  Lucent will receive
&gt;$100M less revenue next year.  Lucent can only put this agreement in
&gt;writing in a side letter.
&gt;
&gt;Lisa
&gt;
&gt;
&gt;
&gt;
&gt;

&lt;/x-flowed&gt;



HICKS 11
EXHIBIT
01 22 [?] 07

PLAINTIFF'S
EXHIBIT
PX-63

CONFIDENTIAL WC 0069515

**B1100**

9/22/00

Version 4

## Software Pool Summary

| SOFTWARE | | CURRENT RELEASE | UPGRADE RELEASE | TOTAL # UNITS | UNIT PRICE | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
| **ONG** | | | | | | | | | |
| FT2000 OC-48 | | 7.2 | 9.1 | 61 | $ | 24,990.00 | $ | 1,523,780.00 | Up $330K |
| Wavestar 2.5G OC-48 | | 3 | 4 | 81 | $ | 33,750.00 | $ | 2,733,750.00 | Up $1.4M |
| 400G | | 2 | 3 | 445 | $ | 36,000.00 | $ | 16,020,000.00 | |
| | Upgrades | | 3 | 175 | $ | 72,000.00 | $ | 12,600,000.00 | |
| | New | | | | | | $ | 28,620,000.00 | Up $16.7M |
| 400G Subtotal | | | | | | | | | |
| SNMS | | 2.1 | 3.1 | 1 | $ | 350,000.00 | $ | 350,000.00 | same |
| SNC | | 9 | 10 | 1 | $ | 15,000.00 | $ | 15,000.00 | same |
| Total ONG Pricing | | | | | | | $ | 33,242,530.00 | |
| | | | | | | | | | |
| **OSS/BSS** | | | | | | | | | |
| Fraud Management System (FMS) 20 - 30M CDRs | | | | 1 | $ | 2,550,000.00 | $ | 2,550,000.00 | new addition - not on previous pool request |
| Abor BIP (Add'l $1B ABR) | | 9.1 | | 1 | $ | 9,875,000.00 | $ | 9,875,000.00 | new addition - not on previous pool request |
| Mactar-Federal | | MAC12 | | 1 | $ | 2,625,000.00 | $ | 2,625,000.00 | Up $550K |
| CONNECTVU Support for add'l 50 switches | | R 6.2 | | 1 | $ | 1,524,000.00 | $ | 1,524,000.00 | Up $600K |
| CONNECTVU ACO | | R 6.2 | | 1 | $ | 1,143,000.00 | $ | 1,143,000.00 | new addition - not on previous pool request |
| Abor/IOM-Federal | | | | 1 | $ | 1,000,000.00 | $ | 1,000,000.00 | Up $200K |
| Abor/IOM-Europe | | | | 1 | $ | 1,000,000.00 | $ | 1,000,000.00 | new addition - not on previous pool request |
| BILLDATS | | | | 1 | $ | 1,875,000.00 | $ | 1,875,000.00 | Up $300K |
| Interpronet | | | | 1 | $ | 2,299,195.00 | $ | 2,299,195.00 | Up $400K |
| Strategist for Federal | | | | 1 | $ | 690,000.00 | $ | 690,000.00 | Up $90K |
| Strategist for Global | | | | 1 | $ | 2,070,000.00 | $ | 2,070,000.00 | new addition - not on previous pool request |

CONFIDENTIAL WC 0069516

**B1101**

| SOFTWARE | CURRENT RELEASE | UPGRADE RELEASE | TOTAL # UNITS | UNIT PRICE | TOTAL | |
|---|---|---|---|---|---|---|
| OneVision NFM Additional Cores | | | 2 | $ 650,000.00 | $ 1,300,000.00 | Up $800K |
| OneVision NFM 1st Add'l 50 NE Support (up to 100 NEs) | 10 | | 1 | $ 1,950,000.00 | $ 1,950,000.00 | Up $750K |
| OneVision NFM 2nd Add'l 50 NE Support (up to 150 NEs) | 10 | | 1 | $ 1,950,000.00 | $ 1,950,000.00 | new addition - not on previous pool request |
| OneVision-NFM SNMP | 10 | | 1 | $ 390,000.00 | $ 390,000.00 | Up $90K |
| NetMinder PTM | 1 | | 1 | $ 3,510,000.00 | $ 3,510,000.00 | Up $810K |
| TOTAL OSS/BSS | | | | | $ 35,751,195.00 | |
| IP Navigator | N/A | 5.1 | 67 | $ 15,000.00 | $ 1,305,000.00 | Up $400K |
| Lightship | N/A | 1.1 | 50 | $ 1,000.00 | $ 50,000.00 | sans |
| PSAX | 6.1.5 | 5.2.2 | 211 | $ 6,000.00 | $ 1,266,000.00 | new addition - not on previous pool request |
| Navis Provisioning Manager for Slinger | N/A | 5.0.1 | 2100 | $ 575.00 | $ 1,247,500.00 | new addition - not on previous pool request |
| NavisAccess Hash Code Pre-Purchase | N/A | 5.0 | 2100 | $ 2,995.00 | $ 6,289,500.00 | new addition - not on previous pool request |
| TOTAL DATA | | | | | $ 10,158,000.00 | |
| SWITCHING Software Pool | 14 | 15 | 39 | $ 2,491,882.69 | $ 97,183,425.00 | new addition - not on previous pool request |
| 5ESS Generic | 14 | 15 | 31 | $ 65,000.00 | $ 2,015,000.00 | new addition - not on previous pool request |
| Total Switching | | | | | $ 99,198,425.00 | new addition - not on previous pool request |
| Grand Total | | | | | $ 178,350,150.00 | |
| TOTAL ONG, OSS/BSS, DATA SOFTWARE | | | | | $ 79,151,725.00 | All list pricing - no discounts |
| TOTAL SWITCHING SOFTWARE | | | | | $ 99,198,425.00 | Includes all 5ESS software available - not currently used by Winstar because not needed |

CONFIDENTIAL WC 0069517

Printer Printer

| | |
|---|---|
| **From:** | David Ackerman [dackerman@winstar.com] |
| **Sent:** | Monday, December 11, 2000 12:55 PM |
| **To:** | jeverding@winstar.com |
| **Subject:** | Fwd: Re: software pool notes |

<x-flowed>p
>X-Sender: lhicks@mail.winstar.com
>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>Date: Thu, 19 Oct 2000 16:47:19 -0400
>To: David Ackerman <dackerman@winstar.com>
>From: Lisa Hicks <lhicks@winstar.com>
>Subject: Re: software pool notes

>Dave -
>
>I'm on the phone with Vanessa right now. She's telling me that the
>software agreement between you and Bill Plunkett is thus: you told Bill
>that only approx. $20M of the pool was valuable to Winstar. The balance
>of the $135M, or $115M, was used to fund 1) $45M for the integration lab,
>2) $35M credit, 3) $15M finance charges, 4) pricing down the hubs and
>B's, 5) some unknown amount for radios. Any software purchased over the
>$20M identified, even if in the pool, we would pay for!!! This makes no
>sense to me. What is going on? Further, she is telling me that they did
>not agree to include any software that becomes GA during 00/01 - it was
>not their intention to keep making software eligible for purchase from the
>pool. This would be counter to the above, where we would pay for anything
>over $20M.
>
>She's also telling me that the hubs and B's pricing is only effective
>10/1/00 for any new hubs, B's begun after that date. I disagreed and told
>her that it was supposed to be retro to the beginning of the project, as
>Lucent has not delivered anything yet so all are new to Winstar. She did
>not take this well - major disconnect here. (Is it mine?) We also
>started a discussion (argument?) on what "all inclusive" means...Lucent
>believes that A&E and construction/program management costs are over and
>above the committed pricing. I've taken the opposite stance - "all
>inclusive" means exactly that. Finally, did you agree with Debbie that
>Lucent would include in the pricing a radio allowance, and any amount over
>that we would pay for?
>
>Further, she's telling me that there is supposed to be some kind of lock
>down session all week next week, which Dennis is leading, with a core team
>from Winstar and a core team from Lucent to hash out the details of this
>services agreement and make it happen by the end of the month. Am I
>supposed to be included in this? I know nothing about this lock down session.
>
>I'm supposed to sit down with Vanessa et al tomorrow for 3 hours and
>outline all of our disconnects regarding all the elements included in the
>EOQ. I have a headache already.
>
>Remind me to never miss an end of quarter again. You make a mess. :-)
>
>Emotionally, I'm up and down this week. I have to have another surgery
>next week - still have precancerous cells showing in the tissue removed,
>although it is a much smaller section than before. Before you question
>the number of surgeries I am going through (like everyone else is), it is
>my preference to do whatever is necessary to preserve my breast. I have
>an excellent surgeon who is fully aware of this fact, and is attempting to
>remove as little tissue as possible. I don't care how many surgeries it
>takes. The easy solution would be to have a mastectomy, but there is
>nothing that would make me WILLINGLY chose that option. Fortunately, we
>are dealing with precancerous cells now, and not full cancer cells - that
>was all removed 4 weeks ago. I do think I am reaching my emotional limit,
>though, I would like to be able to move on to the chemo and radiation and
>get on with my life.





CONFIDENTIAL WC 0069479

**B1103**

>How's your vacation going so far?
>
>Lisa
>
>
>At 03:56 PM 10/19/2000 -0400, you wrote:
>>Of course the document addresses all the integration!!
>>That's what the $45M covers.
>>And yes; any s/w that is GA in '01 is also covered.
>>
>>Dave
>>
>>(How are you doing?:)
>>
>>At 02:56 PM 10/19/00 -0400, you wrote:
>>>Dave-
>>>
>>>In your hand written notes there are two regarding the software pool:
>>>
>>>1)  Lucent agrees that pool can be expanded to include any other s/w
>>>madeGA during 00/01.
>>>2)  Lucent must integrate all s/w purchased into any/all network
>>>elements and systems during 00/01 for no additional charge.
>>>
>>>Is it your understanding that these things were indeed included in the
>>>agreement, even though the document you signed addresses neither?
>>>
>>>Lisa

</x-flowed>

2

CONFIDENTIAL WC 0069480

dackerman, bzlotnick, dhuber, 09:13 PM 10/23/2000 -0400, Lucent/Winstar EOQ disconnects

To: dackerman, bzlotnick, dhuber
From: Lisa Hicks <lhicks@winstar.com>
Subject: Lucent/Winstar EOQ disconnects
Cc: sclement, gsimpson
Bcc:
Attached:

All -

The results of our meeting with Lucent on Friday, 10/20, to discuss the details of the EOQ deal for the third quarter:

*I they absolutely changed their minds. Have email to this effect.*

Things we are in agreement on:

1) Deferred billing/service delivery until January 2001
   $23M data center (NY construction)
   $7.7M Onevision billed in error.  Lucent will confirm that this invoice has been credited off our account.
   $18.7M Hubs/B's billing through EOY.  Some disagreement on actual amount - this should be resolved when we resolve the disagreement on when the new Hubs/B's          pricing begins (see below).
   $14M miscellaneous services.  Winstar need to define what is included here.
   Agreement on no work stoppage through the end of the year.  Work will continue as is;  Winstar will not accept work as delivered until January 2001.  (Nothing must be signed off as being complete before January.  Lucent will make their PM's aware that they will not be receiving formal acceptance until that time.

2) $35M credit.  Lucent has already received an order for some metro equipment which triggers this credit.  I requested that we receive credit before the end of October.  Vanessa to discuss with Lucent's CFO, as she is not aware of this agreement.

3) $10M credit.  No issues.

Things we are in disagreement on:

1) $45M integration lab.
   · Lucent position - funds applicable to development of lab and integration activities within lab only.  Includes current network elements; does not include new software.          elements.
      Winstar position - funds applicable to all integration activities, both in lab and in network.  Includes all current network elements and any we may wish to examine for          future use, both from Lucent and other vendors.
   We were informed that the SOW's are already being created by Alan Fulton in conjunction with someone in Jamie's organization, based on Lucent's understanding of the agreement.  I requested that nothing be created without my input.

2) Software Pool.
      Lucent's position - $135M includes only $20M in software that Winstar has said actually has

---

Printed for Lisa Hicks <lhicks@winstar.com>                                                    1



CONFIDENTIAL  WC 0017579

PLAINTIFF'S
EXHIBIT
PX-55

B1105

**dackerman, bzlotnick, dhuber, 09:13 PM 10/23/2000 -0400, Lucent/Winstar EOQ disconnects**

value. Lucent is expecting to see a list of this software. Lucent believes that remaining approx. $115M covers their costs associated with: 1) hubs and b's pricing concessions, 2) $45M integration lab, 3) $35M credit, 4) $15M in finance charges sitting on Lucent's books, 5) some amount in radio costs. (They are deducting all these costs from the $115M pool, leaving a balance of $0 in the pool.) Lucent also says that we have agreed that if we wish to purchase any software in the pool over the $20M to be identified, we will pay for it. Lucent is not intending to add any future software to the pool as it becomes GA.

Winstar's position - $135M does cover the hubs and b's pricing concessions, but it was not intended that Lucent deduct the rest of the EOQ deal from the remaining balance. We believe that $45M integration lab and $35M credit were stand alone agreements and not associated with the software pool. We further believe that agreements were reached that future GA software would be added to the pool.

3) Hubs/B's pricing.

Lucent's position - new pricing effective for hubs and b's turned over to Lucent after 10/1/00. They have no intention of reversing previous amounts invoiced, as these were all prior to 10/1/00. Further, they fully expect to receive $17K per stinger for the order placed at the end of September. Pricing includes Hub and B hard costs only; does not include A&E work, construction management, ASAP model creation, or Program Management. Lucent is requesting a radio allowance - expects Winstar to pay for any amount exceeding allowance. They further desire a "fence" which would allow them to charge us for any work exceeding the "normal" construction pricing of $20K and $400K. They are proposing that they will bill us for any costs that exceed $25K for b's; the hubs they expect will be addressed on a case by case basis for deviations from the "normal" scope and they will be able to bill for the difference.

Winstar's position - new pricing is effective for all hubs and b's delivered complete and accepted by Winstar after 10/1/00. Since Lucent has delivered nothing, pricing is effective for all items/work to date, and we are requesting a full reversal of previous billings. Pricing is turnkey for a complete hub or b - this includes all hard costs and all "overhead" costs listed above. Fence, proposal and radio allowance open for discussion.

4) Services deal.

Preliminary discussion. Presentation made of Winstar's desire to have Lucent PM our entire network build. This would include new ATM hubs @ $400K, new SERPs - both ATM and TDM, price to be negotiated, new b's on ATM hubs @ $20K, new b's on TDM hubs @ $20K, augments to hubs and b's, price to be negotiated. Lucent must deploy existing infrastructure as necessary. Winstar to purchase turnkey products, both for converged architecture and legacy architecture; Lucent would need to procure and deploy all equipment (including competitors'.)

Lucent's initial reaction was refusal to OEM or procure any competitors' equipment. Their understanding of the deal is that it is for services only - they would deploy equipment that Winstar would ship to them. They wish to focus on a phased transition to this deal; Winstar desires them to pick up our contractor costs immediately through the end of the quarter.

Lisa

CONFIDENTIAL WC 0017580

B1106



**winstar**

2545 Horse Pen
1st Floor
Herndon, VA 20171

## FACSIMILE TRANSMITTAL SHEET

Date: 2/7/01   2/8/01          Time:

To:  Rick Uhl                  Company:

Telephone Number:              Fax Number: 212-584-4001

From:  Lisa Hicks             Telephone Number:  (703) 889- 4299

                              Fax Number:        (703) 889-6436

Subject:  Lucent 3Q Recap

*Comments:   Confidential*

reread – clean copy

Number of pages (including cover sheet):      4

Original to follow by:        O  Overnight Mail
                              O  Regular Mail
                              O  Courier
                              O  None

*If you do not receive all of the pages listed above, please contact the sender*



Hicks 16
**EXHIBIT**
01/22/04



PLAINTIFF'S
EXHIBIT
PX-56

CONFIDENTIAL WC 0017575

**B1107**

Winstar/Lucent Commitments – 3Q00
Details, Status and Implications

**OVERVIEW:**

**Winstar Commitments:**
* $135M Software Pool payable in 4 installments due 1/15/01, 3/30/01, 6/29/01, 8/29/01
* Purchase Commitment = $77.8M included services, Stingers, 5ESS PAYG, data center equipment
* Reduced Hubs/B's pricing – commitment to 300 B's deployed with Lucent solution in 2001; if leasing problems than 1500 deployed 2001, 1500 deployed 2002.
* Optical Networking – exclusive build of long haul and metro networks in domestic US with Lucent Solution

**Lucent Commitments:**
* Reduced Hubs/B's pricing = $20K per B, $400K per Hub - all inclusive and pricing retro to start date of project
* $45M credit for development of Enterprise Integration Lab
* $35M Optical Equipment credit
* $10M credit for compensation for Winstar losses
* Assumption of Winstar contractors effective 10/1/00
* Deferred billing until 1/1/01 for services to be delivered during 4Q00
* Optical Networking – Lucent to meet competitor pricing

**DETAILS:**

1) **Software Pool:**
   a) verbal commitment received from Lucent that pool would expand to include all software made GA during 00/01 – commitment not honored by Lucent in signed agreement.
   b) verbal commitment received from Lucent to fully integrate any/all network elements and software at no additional cost to Winstar – commitment not honored by Lucent in signed agreement.
   Realities of Deal:
   a) Approx. $20M (undefined) software in pool of actual use to Winstar
   b) Balance of pool intended to fund 1) $45M EIL, 2) $35M Optical credit, 3) reduced hubs/B's pricing

   Current Status: incomplete
   * Winstar has received one (1) license of all software listed on pool agreement
   * $35M credit taken by Winstar against financing 12/00
   * $20M usable software not purchased
   * EIL not underway – inter-company disagreement on major objectives of development
   * No hubs/B's reduced pricing in place
   * Winstar has received first installment invoice for $33.75M from Lucent

   Implications to Winstar:
   * Pool dependent on all items it was created to fund. Winstar has only received one of the items listed to date. (Note: Lucent does not want to honor reduced hubs/B's pricing.)

2) **Winstar purchase commitment of $77.8M**
   * All PO's committed to were issued 9/30/00. Lucent has invoiced for all items.
   Current Status: complete

3) **Reduced Hubs/B's Pricing**
   * Prior to 9/30/00 commitment date, Winstar had received approx. $36m in billing against this project.

CONFIDENTIAL WC 0017576

B1108

- Upon notice from Lucent that all original invoicing would be repriced to reflect new arrangements, Winstar cancelled original PO. Lucent informed that new PO would be issued with new pricing as soon as pricing details were received from Lucent. (Original PO cancelled 11/00)
- Upon Executive directive within Lucent, no repricing for original invoicing was offered, no adjusted pricing for new PO was offered, no invoice revisions received.
- Lucent informed Winstar of desire to not honor reduced pricing commitment.

Current Status: incomplete
- Jan. Exec. Meeting placed subject on hold – business would continue as usual.
- Lucent desires new PO in place with as yet undefined pricing
- No original billing reversed/repriced to reflect reduced pricing. Currently Lucent has invoiced for $41M and has provided notice that additional $15M is ready to be invoiced
- No Lucent constructed hubs or B's have been deployed or are operational to date (Note: loss of customers/revenue in LOS has already been experienced due to hub not being operational)
- Outstanding equipment problems
  - Architecture can not support private line service. Lucent commitment to resolve issue mid 2000 – still unresolved. Projected resolution 6/01. Lucent has provided work around solution that will require deployment of additional equipment
  - Lack of redundancy alarming within NMC for PSAX, Stingers – no timeframe projected for resolution.

4) Enterprise Integration Lab – $45M credit
- Lucent created Statement of Work for development of EIL issued to Winstar 12/00.
- Winstar did not accept SOW; disagreements between companies on details of development and what is included

Current Status: incomplete
- Winstar to rewrite SOW to reflect Winstar objectives – incomplete

5) Optical Networking Credit $35M
Current Status: complete

6) $10M for compensation for Winstar losses due to technology availability issues resulting in deployment delays
Current Status: complete – Winstar received credit invoice 12/00

7) Assumption of Winstar contractors effective 10/1/00
Current Status: incomplete

8) Deferred billing
- Total projected to be deferred ≈ $63.4M; actual amount deferred approx. $32M
Current Status: complete

9) Optical Networking
Current Status: incomplete. $46M prepurchased optical equipment remaining undeployed.

CONFIDENTIAL WC 0017577

**B1109**

**SERVICES AGREEMENT:**

Lucent requests:
a) Full control of work including hiring/firing of Winstar employees
b) Aggressive transition plan
c) Payment upon quarterly objectives
d) T&M pricing to Fixed Pricing based on implementation of transition plan
e) No restrictions on sub-contracting
f) Termination terms for any deliverable 90 days after notice
g) Right to not be obligated to all deliverables – ability to chose from list

Winstar requests:
a) No control over Winstar employees with regard to hiring/firing
b) If Lucent can not take deliverable in house, sub-contract to Winstar for implementation with responsibility for deliverable with Lucent
c) Payment upon Winstar receipt of completed deliverables
d) Fixed pricing per deliverable from onset
e) Notice to terminate effective 6 months after notice with proper transition plan back to Winstar
f) Sub-contract to 3rd parties other than Winstar subject to Best of Breed provision in Supply Agreement
g) Obligated to all deliverables with right to terminate subject to e) above

Agreement on hold as of end of December 2000.  Lucent decided to not moved forward at that time.

Current Status:  incomplete
Briefing 2/6/01
- New proposal from Lucent to immediately take over 4 of 29 total deliverables (Project Management, Program Management, Lab Testing, Web Hosting)
- No transition plan; function transfers to Lucent immediately
- Remaining proposals developed over next 6 months – no acceptance of PO's for work to be performed by Winstar for balance during 6 month proposal process, no ability for Winstar to finance internal costs
- Choice of deliverables/tasks within deliverables; may require Winstar to retain control of some functions – no ability for Winstar to PO for work performed, no ability to finance internal costs
- No sub-contracting to Winstar
- Lucent will implement only those deliverables most likely to involve complete outsourcing to Lucent
- Payment terms according to Supply Agreement
- Termination after 6 months of providing notice; no mention of transition plan back to Winstar
- Lucent will not warrant Network implemented as result of proposals will interoperate
- Winstar to indemnify Lucent for claims by Winstar employees, contractors, sub-contractors
- Assessment Team created by Lucent to assess/create proposals – total 6 month process

Implications to Winstar:
- Immediate reduction of employees, HR issues
- Additional Lucent staff in proposals = additional capital cost to Winstar
- T&M cost structure
- 4 proposed projects assumed by Lucent within 6 weeks of Letter of Intent from Winstar
- Cost of Assessment Team for 6 months = $5M SG&A
- Warranty/indemnification clauses change Supply Agreement

CONFIDENTIAL WC 0017578

**B1110**

## THE FACTS (AS APPLICABLE TO LUCENT)

.. Total capital plan for 2000 is currently over budget by $190M.  ($1.260M - $1.070M = $190M)

:. Of the $190M overage, $155M can be attributed to prior Lucent end of quarter deals, broken down as ollows:

Software Licenses    $26M
Turnkey Hubs/Bs     $27M
Data Center         $23M
Network Sync        $ 4M
Switch Equipment    $39M
Optronics           $15M
Other               $19M

. Lucent is requesting an additional end of quarter deal for 9/00 of $63M, which would bring the total capital budget overrun for 2000 to $253M, $218M directly attributable to Lucent deals  ($155M + $63M = $218M).

## PROPOSALS TO ADDRESS BOTH OVERRUNS AND NEW END OF QUARTER REQUEST

. As one way to manage the $63M request, Lucent has proposed that approximately $25M of this amount come from a "software pool." The theory behind this idea is that Winstar would commit, via an irrevocable letter of intent, to purchase this amount of software over the next year, with all billing deferred into 2001. Lucent, in theory, would be able to get revenue in Sept. using this letter of intent, and the capital expense would not hit Winstar's books until 2001 because the billing would be deferred.

ssuming this works, there would be a balance of $38M in capital expenses that would hit in Sept.  Would duce the overage of $218M (above) to $193M. ($218M - $25M = $193M)

Of the above total $155M, we are requesting that Lucent defer billing or services until 2001:

Software Licenses    $ 7M
Turnkey Hubs/Bs     $20M
Data Center         $23M
Other               $14M                total = $64M

educes overage to $129M. ($193M - $64M = $129M)

Also in theory, Lucent has proposed exploring providing credit to Winstar of up to $30M, which would fall in our 4th quarter (Lucent's 1st quarter) for network software.  In order to do this, Lucent would have to inflate the "software pool" to reflect the amount of the credit.  Lucent would be able to get this revenue in Sept, again using the irrevocable letter of intent.  Credit would be given in 4th quarter, again reducing capital expenses.

duces overage to $99M. ($129M - $30M = $99M)





CONFIDENTIAL WC 0033652

**B1111**

(This overrun is based on the capital target of $1.070M. If this target is increased to $1.150M, then the overage would only be $19M, assuming all of the above is accomplished. $1.150M – $1.070M = $80M; $99M – $80M = $19M.)

4. To "sweeten" the request, Lucent is offering $35K/B, $450K/Hub pricing.. This offer is made for all future work, and is linked to the existing $133M PO commitment made in our 1ˢᵗ quarter. Lucent is estimating they will be able to bill us for approx. 2,600 B's at this price. After the funding on this PO is exhausted, Lucent will reduce pricing for B's to $27.5K per.

## RISKS

1. Software pool of $25M as proposed contains $1.3M costs for Europe, $11.3M network related software, $12.7M systems software. Jamie's initial review of this

CONFIDENTIAL WC 0033653

**B1112**

DEC-19-2000  15:50                                                    P.02/05

winstar

December 30, 1999

Chuck Naylor
Lucent Technologies
13241 Woodland Park Road – Suite 120
Herndon, VA 20171

Dear Chuck,

Winstar Wireline Engineering has requested the shipment of Optical networking equipment
(including the WaveStar 400G OLS) on Purchase Order WNE-4576 to the Lucent Warehouse in
Morrow, Georgia by December 31, 1999.  This equipment, covered under the normal terms of
our Supply Agreement, will enable Winstar to extend our long-haul network and allow us to
quickly utilize dark fiber, which has been provided through a separate arrangement with Williams.
These routes include: Kansas City – Denver; Denver – Salt Lake City; Tallahassee – New Orleans;
Jacksonville – Miami; Cleveland – New York; delivery of all equipment to final sites scheduled to
complete by March 31, 2000 (per attached schedule).  The Lucent proposal and deployment of
this equipment is designed to meet Winstar's priorities both near term and long term, and to
support the future convergence of services onto a common network backbone.

Coordination of all deployments is imperative to ensure the efficient utilization of dark fiber and
the ability to reduce expense associated with leased facilities from other carriers.  Preparation
and coordination to receive equipment at sites along a route is required for timely route turn-up.
To ensure that Network Service is ready as required and further to ensure availability of the
Optical Network equipment from Lucent, Winstar requires that Lucent ship the needed products
to the Lucent facility in Morrow as described above.  Winstar will assume title and risk of loss
upon shipment.  Furthermore, Winstar agrees to accept the equipment when shipped.  Warranty
begins upon certified installation of the equipment in the Winstar network.

Winstar acknowledges that Lucent is acting as its agent for the temporary storage of this
equipment and that Lucent has no liability for damages or other loss related to such equipment
outside of Lucent's reasonable control while in Lucent custody.  Winstar agrees to maintain
adequate insurance as it deems appropriate for the equipment.

Sincerely,

Allan M. Zendle



PLAINTIFF'S EXHIBIT PL-50

CONFIDENTIAL 2WC 0067102

B1113

DEC-19-2000  15:49                                          P.01/05



winstar

2545 Horse Pen
1st Floor
Herndon, VA 20171

## FACSIMILE TRANSMITTAL SHEET

Date:  12/19/00                    Time:

To:  Rick Uhl                      Company:

Telephone Number:                  Fax Number:  212-584-4001

From:  Lisa Hicks                  Telephone Number:  (703) 889-4299

                                   Fax Number:      (703) 889-6436

Subject:  Optical Equipment Bill and Hold Letters - Lucent

*Comments:*

Number of pages (including cover sheet):        5

Original to follow by:      O  Overnight Mail
                            O  Regular Mail
                            O  Courier
                            ⌗  None

*If you do not receive all of the pages listed above, please contact the sender*



CONFIDENTIAL  2WC  0067103

**B1114**

DEC-19-2003  15:50                                                          P.03/05

**Post-it® Fax Note    7671**  | Date 6/2/00 | # pages ▸ 2
To: _Lisa Haha_                | From: _Wade Peters_
Co./Dept.                      | Co.
Phone # _703 889 299_          | Phone # _703 246 349_
Fax #                          | Fax #

**winstar**
                                                         2 LAS Hope Park Road
                                                         Herndon, VA 22173
                                                         (703) 845-5000

March 31, 2000

Chuck Naylor
Lucent Technologies
13248 Woodland Park Road
Herndon, Virginia 20171

Dear Chuck,

WinStar Wireline Engineering has requested the shipment of Optical networking equipment (including the
WaveStar 400G OLS), 1ESS Switching equipment and various Data networking equipment to the
appropriate Lucent Warehouses by March 31, 1999. This equipment will enable us to extend our long-
haul network and allow us to quickly utilize dark fiber, which has been provided through a separate
arrangement with Williams. It will also allow us to grow our facilities by adding additional Hubs and
Building sites. This equipment is covered under Purchase Orders WNE-0000005212 dated February 28,
2000; WNE-0000005662 dated March 24, 2000; WNE-0000005825 dated March 29, 2000 and WNE-
0000005783-5798; WNE-0000005802-5822 dated March 29, 2000.

The Lucent proposal and deployment of this equipment is designed to meet WinStar's priorities both near
term and long term in expanding the capacity of our network.

Coordination of all deployments is imperative to ensure the efficient utilization of dark fiber and the ability
to reduce expense associated with leased facilities from other carriers. Preparation and coordination to
receive the optical networking equipment at sites along a route is required for timely route turn-up.
Additionally the switching and data equipment will allow us to be prepared to add new sites as quickly as
our customer base increases without waiting for equipment deliveries.

Currently, WinStar does not have the physical space to store the required equipment. To ensure that
Network Service is ready as required and further to ensure availability of all the required Optical Network,
Switching and Data equipment from Lucent, WinStar requires that Lucent ship the needed products to the
appropriate Lucent facilities and provide interim warehousing. WinStar agrees that Lucent will invoice
WinStar and that WinStar will assume title and risk of loss upon shipment. Furthermore, WinStar agrees to
accept all the equipment when shipped to the Lucent warehouses. The warranty period for such equipment
will commence upon shipment and will expire the number of months provided for in the Supply Agreement
following successful installation of such equipment. All warranties and representations contained in
Section 14 of the supply agreement pertain to this agreement.

WinStar acknowledges that Lucent is acting as its agent for the temporary storage of this equipment and
that Lucent has no liability for damages or other loss related to such equipment while in Lucent custody not
caused by the negligent acts of Lucent or Lucent's agents. WinStar agrees to maintain adequate insurance
as it deems appropriate for such damages or other loss. Lucent agrees to provide relevant shipping
information in a timely manner to support WinStar's insurance requirements.

Delivery of all Optical networking equipment to final sites is to be complete by June 30, 2000 per the
following schedule.

43    sites by May 31, 2000
19    sites by June 30, 2000

CONFIDENTIAL  2WC 0067104

**B1115**

DEC-15-2000  15:50                                          P.04/05

Delivery of all Switching equipment to final sites will be completed by June 15, 2000. Delivery of all Data equipment to Winstar's designated facility is to be completed by May 15, 2000

Irrespective of the delivery dates mentioned above, Winstar is obligated to pay Lucent in accordance with normal payment terms, as defined by the supply agreement.

Sincerely,

Allan M. Zemlic

ACCEPTED AND AGREED

By: _____
Lucent Technologies, Inc

TOTAL P.03

NO.795   S25

CONFIDENTIAL 2WC 0067105

**B1116**

DEC-19-2000  15:50                                                      P.05/05

## winstar

2545 Horse Pen Road
Herndon, VA 20171

June 30, 2000

Ms. Vanessa Petrini
Lucent Technologies
13241 Woodland Park Road
Herndon, Virginia 20171

Dear Vanessa,

WinStar Wireline Engineering has requested the shipment of Optical networking equipment (including the WaveStar 400G OLS), to the appropriate Lucent Warehouses by June 30, 2000. This equipment will enable us to extend our long-haul and metro networks and allow us to quickly utilize dark fiber, which has been provided through a separate arrangement with Williams. This equipment is covered under Purchase Orders: WVF1-0000001179; WVF1-0000001128; WVF1-000000; 1243, 1244, 1245, 1246, 1247; WVF1-000000; 1242, 1241 dated from June 28 through June 30, 2000. In addition Winstar has requested shipment of various long haul spares and data networking equipment to our locations by June 30, 2000 under Purchase Order numbers WVF1-000000; 1322, 1155, 1136, 1134, 1135, 1218, 1220, 1139, 1217, 1219, 1240, 1176, 1337; WVF1-000000; 1232, 1233, 1234, 1235, 1236, 1237, 1248, 1249; WVF1-0000001321 dated from June 28 through June 30, 2000.

The Lucent proposal and deployment of this equipment is designed to meet WinStar's priorities both near term and long term in expanding the capacity of our network.

Coordination of all deployments is imperative to ensure the efficient utilization of dark fiber and the ability to reduce expense associated with leased facilities from other carriers. Preparation and coordination to receive the optical networking equipment at sites along a route is required for timely route turn-up.

Currently, WinStar does not have the physical space to store the required equipment. To ensure that Network Service is ready as required and further to ensure availability of all the required Optical Network equipment from Lucent, WinStar requires that Lucent ship the needed products to the appropriate Lucent facilities and provide interim warehousing. For all Purchase Orders noted above, WinStar agrees that Lucent will invoice WinStar and that WinStar will assume title and risk of loss upon shipment. Furthermore, WinStar agrees to accept all the equipment when shipped to the Lucent warehouses as well as various designated locations. The warranty period for such equipment will commence upon shipment and will expire the number of months provided for in the Supply Agreement following successful installation of such equipment. All warranties and representations contained in Section 14 of the supply agreement pertain to this agreement.

WinStar acknowledges that Lucent is acting as its agent for the temporary storage of this equipment and that Lucent has no liability for damages or other loss related to such equipment while in Lucent custody. WinStar agrees to maintain adequate insurance as it deems appropriate for such damages or other loss. Lucent agrees to provide relevant shipping information in a timely manner to support Winstar's insurance requirements.

Delivery of all Optical networking equipment to final sites is to be complete by September 30, 2000.

Irrespective of the delivery dates mentioned above, we are obligated to pay Lucent in accordance with normal payment terms, Net 30 Days.

Sincerely,

Lisa Hicks

TOTAL P.05

CONFIDENTIAL  2WC  0067106

B1117

**Printer Printer**

| | |
|---|---|
| **From:** | David Ackerman [dackerman@winstar.com] |
| **Sent:** | Monday, December 11, 2000 4:24 PM |
| **To:** | jeverding@winstar.com |
| **Subject:** | Fwd: Re: Lucent Contractor Services |

<x-flowed>p
>Date: Wed, 04 Oct 2000 14:38:56 -0400
>To: Lisa Hicks <lhicks@winstar.com>
>From: David Ackerman <dackerman@winstar.com>
>Subject: Re: Lucent Contractor Services
>Cc: bzlotnick@winstar.com
>
>Thanks for the update.
>We should push for them to take on everything...why would we (want to)
>retain anything?
>
>Dave
>Good luck tomorrow...we'll be thinking about you.
>Need you back here to finish this deal...don't think you are going to get
>off this easy, and not have to get this done!
>
>
>At 02:12 PM 10/4/00 -0400, Lisa Hicks wrote:
>>Dave-
>>
>>Bill and I just met with the Lucent team for this preliminary
>>meeting. The consensus of the meeting that this was a bigger project
>>than Lucent just assuming our contractors. We all agreed that the scope
>>of this would encompass potentially all WNSS departments related to the
>>network build. With that in mind, we reviewed all WNSS departmental
>>functions currently included on the quarterly billing to Lucent and
>>determined those functions that are potential opportunities for Lucent
>>and those we feel Winstar would retain. Lucent is going to construct a
>>matrix which will identify these departments as either Lucent opportunity
>>or Winstar retained. The idea is that this matrix, along with bulleted
>>items on the potential benefits/risks to both companies, will be
>>presented to Nate and Nina for the meeting next week.
>>
>>Meanwhile, we are going to determine those contractors currently working
>>as employees and Lucent will take these costs over as soon as
>>possible. These are the costs you were referring to when you stated that
>>Lucent would assume responsibility now and bill in January. We are also
>>immediately providing copies of our organizational charts and written job
>>and departmental descriptions.
>>
>>Lucent did confirm all the points I raised yesterday, but I believe we
>>can negotiate around most of them in order to cover this final
>>quarter. The issue of not contracting for deployment of other vendors'
>>equipment was thought to be a decision that would have to be made at
>>higher levels, but it is a very real possibility that Lucent will not
>>agree to take on this function. They also require, from an audit
>>standpoint, complete control and responsibility for any functions they do
>>take on.
>>
>>Lucent will be providing the draft matrix and their risks/benefits to
>>Bill and me for review. I will prepare the Winstar risks/benefits
>>document. All documents will be forwarded to you for review before they
>>are distributed anywhere else.
>>
>>It is important to note that if we do not have a process in place that
>>outlines a transition plan for these internal functions, we will no
>>longer be able to pass through any internal costs. We will also have to
>>demonstrate that transition is taking place in order to satisfy Lucent's
>>CFO and auditors.
>>
>>Lisa

1



CONFIDENTIAL WC 0069393



B1118

</x-flowed>

2

CONFIDENTIAL WC 0069394

B1119

X-Sender: ruhl@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 3.0.5 (32)
Date: Fri, 15 Dec 2000 11:46:04 -0500
To: mexadaktilos@winstar.com
From: "Richard J. Uhl" <ruhl@winstar.com>
Subject: FW: End Of Quarter Deal

>From: "Rubin, Fred" <frubin@winstar.com>
>To: "Uhl, Richard" <ruhl@winstar.com>
>Subject: FW: End Of Quarter Deal
>Date: Fri, 29 Sep 2000 08:24:42 -0400
>X-Mailer: Internet Mail Service (5.5.2650.21)
>
>FYI...
>
>> -----Original Message-----
>> From:      Rigotti, David Roy (David) [mailto:drigotti@lu.cenl.com]
>> Sent:      Thursday, September 28, 2000 11:38 PM
>> To: Zlotnick, Bill; Hicks, Lisa
>> Cc:  Genner, Byron; Harris, Deborah; Petrini, Vanessa; Newsom, Janice;
>> O'Grady, Kevin; Castellon, Karen; Helfrich, Richard; Rubin, Fred
>> Subject:    End Of Quarter Deal
>>
>> Bill,
>>
>> Since you're performing double duty, here is a comprehensive email that
>> outlines what we believe needs to be done to finalize this EoQ deal.
>>
>> 1. SW Pool:  Attached is an acceptance letter that we will have Bob Hannan
>> execute.  This will acknowledge receipt of the software identified in the
>> Software Pool.  Documentation on the Software Pool is included in the
>> attached sign-off document (though there are some final minor revisions
>> being made - so look for an updated version tomorrow).  We have checked
>> with Bob and Jaime and they agree with having Bob accept all software
>> packages.  Hopefully, this is OK with you.  We just wanted to make sure
>> you were on board with what we are doing.
>>
>> Also, for the record, the actual Software Pool contractual agreement is
>> being handled at the highest levels of our company's.  We believe that
>> Nate will be the signer for Winstar and that will occur tomorrow.  Debbie
>> Harris is working this part of the deal with Fred Rubin.
>>
>>
>> <<Winstar Software Pool Sign v1>>
>>
>> 2. Partnership Deal documentation: Bill, this document requires review and
>> countersignature by Winstar.  Vanessa will be sending it to you in the
>> morning.
>>
>> 3. Purchase requisitions that need to be converted to POs: (EMC, NKS, OS
>> upgrades, Stinger under separate cover).
>>
>> Pay As You Grow for the 5ESS:
>>
>> <<Austin Pay As You Grow>> <<Cincinnati Pay As You Grow>>
>> <<Indianapolis Pay As You Grow>> <<Memphis Pay As You Grow>> <<New

PLAINTIFF'S
EXHIBIT
PX-46

Hicks 17
EXHIBIT
01/22/04

>> Orleans Pay As You Grow>> <<Pittsburgh Pay As You Grow>> <<Richmond Pay
>> As You Grow>> <<San Jose Pay As You Grow>> <<SM Growth Atlanta PAYG>>
>> <<SMgrowth Chicago PAYG>>
>>
>> Data Center Storage for San Francisco (PR request & Quote):
>>
>> <<EMC PR for San Fran PR>> <<EMC PR for San Fran Quote>>
>>
>> NKC Services PR:
>>
>> <<NKC Services PR>>
>> OS upgrades:  Our team is working with Bob Hannan to secure the proper
>> authorizations to continue this work.  We have a PO and are just looking
>> to continue this effort.
>>
>> Front End Systems Engineering: This issue has been resolved, and we have
>> a PO and are continuing our work.
>>
>> Stinger DSLAMS:  PR sent to Fred Rubin and Lisa Hicks.  Can you check on
>> status of PO?  Need to get PO as quickly as possible to ship the product
>> this fiscal year!
>>
>>
>> 4. Bill and Hold Letters: Under separate cover, bill and hold letters were
>> sent by B. Genner and R. Helfrich.  The former covers Stinger DSLAMs and
>> associated cabinets and the latter covers optical equipment.  Please copy
>> both on to Winstar letterhead, sign and fax to Rich Helfrich at
>> 703-326-6340.  Please give Rich a call at 703-326-6356 when they are
>> faxed.
>>
>>
>> 5. Lastly, just wanted to make you aware that Nate will also be signing an
>> agreement on the "Winstar Pass-through Services" agreement for going
>> forward.  We will not be handling this in the same manner going forward.
>> The agreement is to put two teams together to work through having Lucent
>> "truly" assume these responsibilities going forward.  More to follow on
>> this one.......
>>
>> If you have any questions about any of these items please call myself on
>> my cell phone listed below, or Bo Genner on his cell phone (202 255 6725).
>>
>> How about if we plan to get together with you around 10:00 to review these
>> documents and answer any questions, and see what we need to do to conclude
>> this effort before your college buddies arrive?
>>
>> Thanks,
>>
>> David R. Rigotti :-)
>> Lucent Technologies <<...>>
>> Services Sales Director - WinStar
>> *(703) 326-6348 (Work)
>>    (703) 980-7450 (Mobile)
>> *drigotti@lucent.com
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

Winstar Software Pool Sign v1.doc

Austin Pay As You Grow.xls

Cincinnati Pay As You Grow.xls

Indianapolis Pay As You Grow.xls

Memphis Pay As You Grow.xls

New Orleans Pay As You Grow.xls

Pittsburgh Pay As You Grow.xls

Richmond Pay As You Grow.xls

San Jose Pay As You Grow.xls

CONFIDENTIAL
3WC 0008449

12/15/2000

B1122

Richard J. Uhl, 11:46 AM 12/15/2000 -0500, FW: End Of Quarter Deal                     Page 4 of 4

SM Growth Atlanta PAYG.xls

SMgrowth Chicago PAYG.xls

EMC PR for San Fran PR.xls

EMC PR for San Fran Quote.xls

NKC Services PR.xls

winstar™

September 29, 2000

Ms. Vanessa Petrini
AVP
Lucent Technologies
13241 Woodland Park Road
Herndon, VA 20171

RE: Bill and Hold Letter for Lucent Optical Equipment

Dear Vanessa,

Winstar Wireline Engineering has requested the shipment of Optical Networking equipment (including the WaveStar 400G OLS, BandWidth Manager, 2.5G, FT2000, DDM2000) to the Lucent Warehouse in Morrow, Georgia by September 29, 2000.  This optical equipment is included on orders WVF1-1128-1133: 1241-1242. This equipment will enable Winstar to extend our long-haul and metro networks and allow us to quickly utilize dark fiber, which has been provided through a separate arrangement with Williams.  The Optical Network Extensions include: Cleveland – Boston – New York Long Haul Route, New York City Metro, Philadelphia Metro, Boston Metro, Dallas Metro, Houston Metro, Chicago Metro and San Francisco Metro. The Lucent proposal and deployment of this equipment is designed to meet Winstar's priorities both near term and long term, and to support the future convergence of services onto a common network backbone.

Coordination of all deployments is imperative to ensure the efficient utilization of dark fiber and the ability to reduce expense associated with leased facilities from other carriers.  Preparation and coordination to receive equipment at sites along a route is required for timely network turn-up.  Currently, Winstar does not have the capacity to store the required equipment.  To ensure Network Service is ready as required and to further ensure availability of the Optical Network equipment from Lucent, Winstar requires that Lucent ship the needed products to the Lucent facility in Morrow, Georgia and provide interim warehousing for all Optical Networking products associated with the deployment of Winstar's optical network. Winstar agrees that Lucent will invoice Winstar and that Winstar will assume title and risk of loss upon shipment.  Furthermore, Winstar agrees to accept the equipment when shipped to the Lucent warehouse.  The warranty period for such equipment will commence upon shipment to the field and will expire the number of months provided for in the Supply Agreement following successful installation of such equipment. All warranties and representations contained in Section 14 of the Supply Agreement pertain to this agreement.

Winstar acknowledges that Lucent is acting as its agent for the temporary storage of this equipment and that Lucent has no liability for damages or other loss related to such equipment while in Lucent custody unless said damage is actually caused by negligent acts of Lucent or its employees.  Winstar agrees to maintain adequate insurance as it deems appropriate for such damages or other loss.

Delivery of all Optical networking equipment to final sites is to be complete by December 31st, 2000 per the following schedule:

| | |
|---|---|
| 38 | sites by November 1st 2000 |
| 15 | sites by December 1st 2000 |
| 10 | sites by December 31st 2000 |





EXHIBIT
Votnick 1
1/15/04    JC



PLAINTIFF'S
EXHIBIT
PX-70

Confidential

LW00007097

B1124

Irrespective of the delivery dates mentioned above, we are obligated to pay Lucent in accordance with normal payment terms, Net 30 Days.

Sincerely,

Bill Zlotnick
VP

Confidential

LW00007098

B1125

**Rubin, Fred**

| | |
|---|---|
| **From:** | Bill Zlotnick [bzlotnick@winstar.com] |
| **Sent:** | Friday, September 29, 2000 11:45 AM |
| **To:** | frubin@winstar.com |
| **Subject:** | Fwd: FW: Deal Parameter Docs |

   

4Q2000 Deal          4Q2000 Deal          4Q2000 Deal          ATT117274.txt
Parameters V5-1.do...   Parameters V5-2.do...   Parameters V5-3.do...

Please call me to discuss your comments. I want your input before I call Lucent back.


>From: "Petrini, Vanessa H (Vanessa)" <vpetrini@lucent.com>
>To: "Bill Zlotnick" <bzlotnick@winstar.com>
>Cc: "Plunkett, William Montgomery, II (Bill)" <wmplunkett@lucent.com>,
>      "Harris, Deborah K (Deborah Kristine)" <dharrisbrown@lucent.com>
>Subject: FW: Deal Parameter Docs
>Date: Fri, 29 Sep 2000 11:10:43 -0400
>X-Mailer: Internet Mail Service (5.5.2650.21)
>
>
>Bill,
>
>Attached are our three deal documents for your review.  Jamie and Alan
>Fulton are still working on the OSS Integration language.  We also still owe
>you a $35M credit letter (should be coming to you shortly).
>
>Please call me on 703-326-6349 with questions.
>
>Thanks,
>
>Vanessa
>
>
> >  <<4Q2000 Deal Parameters V5-1.doc>>  <<4Q2000 Deal Parameters V5-2.doc>>
> >  <<4Q2000 Deal Parameters V5-3.doc>>
> >
>
>

PLAINTIFF'S
EXHIBIT
PX-73


EXHIBIT
Zlotnick 22
11/5/04 JC

1

CONFIDENTIAL WC 0026022

**B1126**

October 16, 2000                                **DRAFT**

Mr. Dave Ackerman
EVP Winstar Network Services
2545 Horse Pen Rd.
Herndon, VA 20171

Dear Dave,

Please provide your concurrence to the information below.

Sincerely,

Bill Plunkett
Sr. VP, Sales

| Winstar Agrees to purchase from Lucent the following items for delivery & invoicing in CY3Q2000: | |
|---|---|
| $ 135,000,000 | Software Commitment |
| $ 840,000 | NKC Services |
| $ 1,300,000 | OS Upgrades |
| $ 171,000 | Front End Systems Engineering |
| $ 8,500,000 | 500 Stingers and rolled up services (shipped to Winstar warehouse) |
| $ 18,852,500 | 5ESS PAYG |
| $ 1,146,000 | Storage Equipment for SF data center (EMC) |
| | |
| $ 165,809,500 | Subtotal |
| $ 47,000,000 | Lucent business previously committed and due to bill by 9/30/00 |
| | |
| $ 212,809,500 | Total Calendar Year Q3 |

Dave Ackerman
_____

Date

CONFIDENTIAL WC 0026023

B1127

October 16, 2000                                    **DRAFT**

Mr. Dave Ackerman
EVP Winstar Network Services
2545 Horse Pen Rd.
Herndon, VA 20171

Dear Dave,

Following are our deal parameters for your signature.

Sincerely,

Bill Plunkett
Sr. VP, Sales

| Lucent agrees to defer Billing until 1/2/2001 for the following Lucent Product and Services for which Winstar has committed or Lucent had planned to invoice in Calendar 4Q2000: | | |
|---|---|---|
| $ | 23,000,000 | Data Center |
| $ | 7,690,000 | Management Software (June, 2000 Deal which included Irrevocable Letter of Intent; billing should have been held until 1/01) |
| $ | 18,725,000 | Hub and B Deployment Services |
| $ | 14,000,000 | Miscellaneous Services (C-5, Eng. Install., Integration, NKC, etc.and/or other products as mutually agreed) |
| | | |
| $ | 63,415,000 | Total Deferment amount |

Dave Ackerman _____

Date _____

CONFIDENTIAL WC 0026024

**B1128**

October 16, 2000                          **DRAFT**

Mr. Dave Ackerman
EVP Winstar Network Services
2545 Horse Pen Rd.
Herndon, VA 20171

Dear Dave,

Following are our deal parameters for your signature.

Sincerely,


Bill Plunkett
Sr. VP, Sales


- **B/Hub Site**
  Effective October 1, 2000 for all new B's, Hubs:  $20K per B site pricing; $400K Hub pricing.
  Winstar commits to deploy Lucent converged access solution in 3000 B's in 2001.
- **Winstar Subcontractors**
  Lucent will bargain in good faith with Winstar to assume Winstar's subcontractors.
- **Optical Networking**
  Winstar agrees to exclusive build of long haul and metro networks with Lucent solution.  Lucent
  will meet Sycamore pricing for the same product with like features, capacity and network design.
- **Enterprise NW Development/Test Lab**
  **Integration Lab**


_____
Dave Ackerman

_____
Date


CONFIDENTIAL WC 0026025

B1129

**Printer Printer**

| | |
|---|---|
| From: | Rubin, Fred [frubin@winstar.com] |
| Sent: | Wednesday, October 04, 2000 9:56 AM |
| To: | Uhl, Richard |
| Subject: | FW: Capital Spend – 2000 and 2001 |

FYI...

-----Original Message-----
From: Bill Zlotnick [mailto:bzlotnick@winstar.com]
Sent: Wednesday, October 04, 2000 9:51 AM
To: dhuber@winstar.com; gsimons@winstar.com; jbullen@winstar.com;
klombardo@winstar.com; mfink@winstar.com
Cc: David Ackerman; sclement@winstar.com; gsimpson@winstar.com;
ibensman@winstar.com; frubin@winstar.com
Subject: Capital Spend – 2000 and 2001

EXHIBIT
Zlotnick 4
1/15/04   JC

PLEASE DO NOT FORWARD THIS TO OTHER EMPLOYEES UNTIL WE DISCUSS TOGETHER AT
THE STAFF MEETING ON FRIDAY.

Here are our directions for capital spend for the remainder of this year:
        -Spend only on special b-sites connected to special hubs that will
both be
completed (PR)
             before the end of December. Immediately stop spending on any
other b's
and hubs.
        - Spend only on lighting fiber where expenses can be deferred into
2001
i.e. Lucent Services
        - Spend only on customer installations related to revenue to be
realized
during 2000.
        - Spend only on systems deployment that support the above including
Project Welcome - no new initiatives
        - Do not spend on other network initiatives - data network , data
centers etc.
        - Dave A must personally approve any new hire , replacement ,
contractor ,
or temp

Requisitions for Systems initiatives will have to be dealt with on a
case-by-case basis as they affect the entire company.

Anything we can do to return material to vendors that does not conflict
with the above instructions or defer payment for services into 2001 should
be undertaken. Each of you should review your open POs to see what options
we have. Gary Simpson can help you with this. I am personally reviewing all
requisitions coming through to insure that we are in compliance with these
directions. Please do your part to insure that  reqs that don't support the
above plan are not generated.

Lisa Hicks and I are working with Lucent today to work out an arrangement
where they will absorb the costs for our contractors for 4Q and bill us in
January for this. We will keep you posted , but in the meantime - all
contractors that are not working on the above priorities should be let go.

Our target capital spend for WNSS for 2001 is $850m. Scott, Ian , and Gary
are putting together some options as to how this could be allocated amongst
the various initiatives we have for next year. We plan to share this with
you as soon as possible , but not later than next Wednesday at 10am.

Dave - I think I speak for most of us in saying that we should communicate

1

PLAINTIFF'S
EXHIBIT
1148

CONFIDENTIAL
3WC 0012149

B1130

to our people what we are doing and why so that our actions are not misunderstood.

If anyone has any questions , please call me. Having this spin around in e-mail before we have all talked about it together would not be good. Thx BZ

CONFIDENTIAL
3WC 0012150

2

B1131

X-Sender: ruhl@mail.winstar.com
X-Mailer: QUALCOMM Windows Eudora Pro Version 3.0.5 (32)
Date: Fri, 15 Dec 2000 11:54:09 -0500
To: mexadaktilos@winstar.com
From: "Richard J. Uhl" <ruhl@winstar.com>
Subject: Fwd: 3Q Software Pool with comments

>X-Sender: nkantor@10.0.2.2
>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>Date: Tue, 26 Sep 2000 07:29:23 -0400
>To: ruhl@winstar.com
>From: Nate Kantor <nkantor@winstar.com>
>Subject: Fwd: 3Q Software Pool with comments
>
>
>Rick,
>
>FYI
>
>    Nate
>
>
>
>>X-Sender: dackerman@mail.winstar.com
>>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>>Date: Mon, 25 Sep 2000 21:40:23 -0400
>>To: nkantor@winstar.com, fjules@winstar.com
>>From: David Ackerman <dackerman@winstar.com>
>>Subject: Fwd: 3Q Software Pool with comments
>>
>>FYI
>>
>>This may make sense....
>>
>>Dave
>>
>>
>>>X-Sender: lhicks@mail.winstar.com
>>>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>>>Date: Mon, 25 Sep 2000 17:06:48 -0400
>>>To: dackerman@winstar.com, bzlotnick@winstar.com
>>>From: Lisa Hicks <lhicks@winstar.com>
>>>Subject: 3Q Software Pool with comments
>>>Cc: gsimpson@winstar.com, ibensman@winstar.com, sclement@winstar.com,
>>>       dhuber@winstar.com, jbullen@winstar.com
>>>
>>>Dave/Bill-
>>>
>>>Attached is Lucent's most recent software pool request. I have provided
>>>(in red) the things that are different from the previous pool request.
>>>
>>>All software increases reflect list pricing - all discounts have been
>>>removed. The switching software pool contains ALL possible 5ESS software
>>>- including features that we do not use or need.
>>>
>>>My understanding from Vanessa is this: when we purchase equipment next

EXHIBIT

Yohnick 26
1/15/04   JC



>>>year, we will not be charged for software. Lucent will credit Winstar
>>>against next year's equipment purchase the delta between the list price
>>>reflected here, and the Winstar discounted price. Lucent will receive
>>>$100M less revenue next year. Lucent can only put this agreement in
>>>writing in a side letter.
>>>
>>>Lisa
>>>
>>>
>>>
>>>
>>
>>
>
>
>

9-22 s. POOL.xls

CONFIDENTIAL
3WC 0008497      12/15/2000

B1133

## Mark, Robert M (Rob)

| | |
|---|---|
| **From:** | Harris, Deborah K (Deborah Kristine) |
| **Sent:** | Friday, September 22, 2000 12:25 PM |
| **To:** | dackerman@winstar.com; ruhl@winstar.com |
| **Cc:** | Aversano, Nina; Plunkett, William; bzlotnick@winstar.com; lhicks@winstar.com; jritter@winstar.com; fruben@winstar.com |
| **Subject:** | Winstar Services Purchase Order |
| **Importance:** | High |

Dave and Rick,

As Bill Plunkett and I indicated in our phone conversations on Thursday, September 21st, attached is a letter explaining the Lucent position regarding the Puchase Order for Services issued by Winstar on September 8th.
Debbie

<<File: dwawinstar.doc> <<File: rjuwinstar.doc>>





EXHIBIT

Zlotnick 30
1/8/04 JC

1

B1134

**Mark, Robert M (Rob)**

| | |
|---|---|
| **From:** | Harris, Deborah K (Deborah Kristine) |
| **Sent:** | Friday, September 22, 2000 12:26 PM |
| **To:** | dackerman@winstar.com; ruhl@winstar.com |
| **Cc:** | Aversano, Nina; Plunkett, William; bzlotnick@winstar.com; lhicks@winstar.com; jritter@winstar.com; fruben@winstar.com |
| **Subject:** | Winstar Services Purchase Order |
| **Importance:** | High |

Dave and Rick,

As Bill Plunkett and I indicated in our phone conversations on Thursday, September 21st, attached is a letter explaining the Lucent position regarding the Puchase Order for Services issued by Winstar on September 8th.
Debbie


rjwinstar.doc


dwwinstar.doc

1

CONFIDENTIAL

B1135

 

**Lucent Technologies**
Bell Labs Innovations

Deborah K. Harris · Lucent Technologies, Inc.
*Vice President*  Room A2-E52
*Global Sales*  283 King George Road
*Winstar Account*  Warren, New Jersey 07059
Telephone 908 559 5983
Facsimile 908 559 2338
email: dharrisbrown@lucent.com

September 22, 2000

Mr. Richard J. Uhl
Group Executive and Chief Financial Officer
Winstar Communications
685 Third Avenue
New York, New York 10017

Dear Rick,

At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a transition plan for the services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

In the past year, Lucent has in fact executed a broad spectrum of services support valued at $100M such as: Architecture Planning, Network/City Planning, Integration Test Lab, Capacity Management, Detailed Equipment Engineering, Installation, Program Management, Integration Testing, Kenan Billing Integration, Construction Management, Monitoring & Surveillance, Operations Technicians, Disaster Recovery analysis, etc.

There is tremendous potential in both the volume and content of services which Lucent can continue to provide and expand upon in support of Winstar's rapid growth. As Lucent becomes much more active in the actual construction of Winstar's Hubs and Bs/Cs worldwide, expansion of Metros in North America, and growth of the Long Haul Optical Network in North America, and potentially in Europe, the volume of business can grow significantly. In addition there are other untapped areas for Lucent services growth.

Clearly, Winstar is growing globally and the need to ensure a consistent high level of execution, based upon proven best practices, is required. Currently, Winstar does not have a Global Program Management Office (GPMO) to plan, coordinate, and ensure flawless execution worldwide. Lucent is prepared to provide the people, processes, and tools to Winstar to quickly establish a GPMO as a value added service to support Winstar International operations.

There is a category of services which, to date, Winstar continues to provide for itself. These services include:

Radio RF engineering
Site acquisition
Winstar Systems Group Services:
- CSP Host development
- BSS systems testing
- Production Operations

Winstar Network Services management
Leased facilities acquisition

We have been pursuing ways to take on these services in an agreeable manner to all parties, but have been unable to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item #1 of the Purchase Order for $65,509,331.00, WVF1-00000002958 issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 15, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

If you have any questions, please contact me.

Sincerely,

Letter to:
D. W. Ackerman

Copy to:
N. Aversano
L. Hicks
W. Plunkett
F. Rubin
J. Ritter
B. Zlotnick

CONFIDENTIAL

B1137

 

**Lucent Technologies**
Bell Labs Innovations

| | |
|---|---|
| **Deboah K. Harris** | Lucent Technologies, Inc. |
| *Vice President* | Room A2-E52 |
| *Global Sales* | 283 King George Road |
| *Winstar Account* | Warren, New Jersey 07059 |
| | Telephone 908 559 5983 |
| | Facsimile 908 559 2338 |
| | email: dharrisbrown@lucent.com |

September 22, 2000

Mr. David W. Ackerman
Group Executive
Winstar Communications
2545 Horse Pen Road
Herndon, Virginia 20171

Dear Dave,

At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a transition plan for the services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

In the past year, Lucent has in fact executed a broad spectrum of services support valued at $100M such as: Architecture Planning, Network/City Planning, Integration Test Lab, Capacity Management, Detailed Equipment Engineering, Installation, Program Management, Integration Testing, Kenan Billing Integration, Construction Management, Monitoring & Surveillance, Operations Technicians, Disaster Recovery analysis, etc.

There is tremendous potential in both the volume and content of services which Lucent can continue to provide and expand upon in support of Winstar's rapid growth. As Lucent becomes much more active in the actual construction of Winstar's Hubs and Bs/Cs worldwide, expansion of Metros in North America, and growth of the Long Haul Optical Network in North America, and potentially in Europe, the volume of business can grow significantly. In addition there are other untapped areas for Lucent services growth.

Clearly, Winstar is growing globally and the need to ensure a consistent high level of execution, based upon proven best practices, is required. Currently, Winstar does not have a Global Program Management Office (GPMO) to plan, coordinate, and ensure flawless execution worldwide. Lucent is prepared to provide the people, processes, and tools to Winstar to quickly establish a GPMO as a value added service to support Winstar International operations.

CONFIDENTIAL

LWT 00042436

B1138

There is a category of services which, to date, Winstar continues to provide for itself. These services include:

Radio RF engineering
Site acquisition
Winstar Systems Group Services:
- CSP Host development
- BSS systems testing
- Production Operations
Winstar Network Services management
Leased facilities acquisition

We have been pursuing ways to take on these services in an agreeable manner to all parties, but have been unable to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item #1 of the Purchase Order for $65,509,331.00, WVF1-00000002958 issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 15, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

If you have any questions, please contact me.

Sincerely,


Letter to:
R. J. Uhl

Copy to:
N. Aversano
L. Hicks
W. Plunkett
F. Rubin
J. Ritter
B. Zlotnick


CONFIDENTIAL                    LWT 00042437

From:           Dowdy, Mary M (Mary)
Sent:           Wednesday, August 09, 2000 11:42 AM
To:             Dworra, Jill B (Jill)
Subject:        FW: Lucent Bill

Jill,

here's the spread sheet.

Mary

From:           Lisa Hicks[SVTP:hicks@winstar.com]
Sent:           Tuesday, June 27, 2000 11:53 AM
To:             Dowdy, Mary M (Mary)
Subject:        Fwd: Lucent Bill

Lucent Billing       ATT124820.txt
Estimate for 2Q...

CONFIDENTIAL



LUTX1009296



CONFIDENTIAL                      LW00303084

B1140



CONFIDENTIAL

LUTX1009297

CONFIDENTIAL

LW00303085

B1141

| _From: | Kemer, Margaret (Margaret) on behalf of Harris, Deborah K (Deborah Kristine) |
|---|---|
| Sent: | Monday, September 18, 2000 8:41 AM |
| To: | Aversano, Nina (Nina); Plunkett, William Montgomery, II (Bill) |
| Cc: | Cecito, James Vincent (Jim); Lill, Lisa M (Lisa); Mcguinn, Mary Teresa (Mary); Harris, Deborah K (Deborah Kristine) |
| Subject: | Status of Winstar account |
| Importance: | High |

Nina and Bill,

I have tried to do a very brief summary of all the "good, bad and ugly" on this account. Bottom line is that to do an EOQ deal, we need Nate to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they can not immediately utilize. The deals of the past are haunting us...there is $87M in their warehouses. But much of that is also due to the problems with Williams.

We have a restructured proposal that categorizes what they need now through to long term. Definitely the majority of money we are asking for is not for immediate use. It also includes pricing for the B's and Hubs which is 2 tiered, and time sensitive. Depending on how fast we can implement and identify cost reductions thru the breakthru teams, could cause our SGP to hover around 30% or below.

What I need are 2 things:

1. A call to Nate Kantor getting agreement to move forward on an EOQ deal. Our meeting with Dave Ackerman is first thing Tuesday morning, so this would need to happen today. We believe they already will be spending around $45M with us, so we are asking for another $50-60M. (I am trying to get the total number in the $110-115M range).

2. Agreement that we can discuss at 5:15 today, on the aggressiveness of the proposal.

Following are the "headlines" for the Winstar account:

- Financing: Supposed to be a reschedule of Rouhanna/McGinn/Hopkins meeting. Have not heard of a date; did hear today that there have been discussions.
- Winstar Services: We pass through around $67M/Q of Winstar Services. We have been told to stop this practice. We will be communicating our position to Winstar the week of 9/18, including options of what portion of these services we can do. We may want to delay this move for a quarter based on this EOQ deal.
- Lucent Content: Contractually, Winstar should be spending 70% content; currently running around 54%; Winstar uses the "Best of Breed" clause as justification.
- Winstar Budget: Mid August stated they had $400M for 2H2000; we identified $165M Lucent addressable. Feedback: all $$$ are spent; only money for Data and Data Centers; refuse to purchase anything they can not utilize right now.
- Previous EOQ Deals: Separate attachment outlines the result of each EOQ2000 deal.
  - 2QF2000 a commitment was made by Winstar to purchase $133M and to date only $19M has billed. The agreement was to replace the Max 20's with Stinger LS; in this same deal we purchased $35M in Radios and IRU's.
  - Winstar does have major inventory as a consequence of these deals.
  - Credits provided in all of the previous EOQ deals are now hitting in 4Q2000 results.

Confidential

PLAINTIFF'S EXHIBIT
72

PLAINTIFF'S EXHIBIT
TX-86

LUTX0187296

LW00303099



B1142

- Radios and IRU's: Currently holding inventory worth $20M Radios, $25M IRU's and $10M CIO Radios; ATG our hottest prospect; expectation of Winstar is for Lucent to replenish; we may consider based on agreement on the EOQ deal.
- Accounts Receivables: Around $80M; held up based on resolution of Financing draw down.
- EOQ-4Q2000 Deal:
  - based on Winstar feedback: review their budget;bid on laundry list of projects;stop negotiating constantly;settle on annual #.
  - proposal: Spending for remaining of 2000C according to budget(we thought); spending amount for 2001C; major forward pricing of Hubs and B's solution (thought were hitting targets, but the targets had moved down); areas to spend money were no longer in line with how they wanted to spend their money.
  - we also recommended how to save money in not deploying IP Network right now because the ATM capacity was capable but we were challenged on our intentions.
- Proposal for 9/19:
  - still rolls up the remaining of 2000/2001
  - aggressive B and Hub pricing
  - divided offer into categories of urgent, intermediate, long term
  - version attached here includes a total of $102M...we are trying to revise to be more at the $110-115 M.

- Files relevant to the Winstar account and EOQ deal:



EOQ Deal    Partnership Deal    Partnership Deal
            090800 v7            091700 v8.xls_

Debbie

2

Confidential                                        LUTY0187297

CONFIDENTIAL                                        L W00303100

**B1143**

LUCENT/WINSTAR END OF QUARTER DEALS
FISCAL YEAR 2000
*Prepared September 14, 2000*

| Quarter | Winstar PO's | Lucent Billed Rev | Winstar Sales to Lucent | Equipment Stored in Warehouse | Lucent Revenue Credits to Winstar |
|---|---|---|---|---|---|
| Q1 | 396,791,532 | $113,902,392 | $9204 (Radios) | | |
| Q2 | $377,854,368 (includes $12204 PO for $3,709 Mini 20's which were never ordered; $700 PSAX 2500's which were all shipped; only $1994 of this PO actually billed) | $114,977,992 | $3804 (Radios; $25M (Lit Fiber IRU's)) | PSAX 2300: 190 systems ($11,9M) stored in Lucent's Columbia, MD warehouse; CopperCom: 20 systems ($4,9M) staged in Lucent's Columbia, MD warehouse | $13ND |
| Q3 | $112,928,100 | $130,650,799 | $3804 (Radios) | CBX 500: 23 Systems ($7,5M) in Winstar DE warehouse; GX330: 10 systems ($3,5M) in Winstar DE warehouse; Cambio-e: ONG equipment: $38M in Lucent's Monroe, GA warehouse (will be deployed by Febbruach 2002) 5ESS: 1 Model 2A ($1.3M) stored in Lucent warehouse for approx. one year | $14,347; $53k?; $2.9M) |
| TOTAL | $537,373,930 | $359,930,282 | $55,000,000 | $87,100,000 | $27,700,000 |

* These were not the only PO's received from Winstar during these quarters. This list includes the PO's that were involved in the EOQ deals.

Confidential                                                           LUTX0187298

CONFIDENTIAL                                          LW00303101

B1144

## Winstar/Lucent 2000-2001 Partnership Deal:

**Lucent Commitment:**

> In the spirit of true risk sharing, Lucent agrees to forward price its B site and Hub site technology and services to align with Winstar's budget targets for 2001. This pricing will be extended to all B sites and Hub sites provisioned and deployed by Lucent in 4Q 2000 and throughout 2001.

**Winstar Commitment:**

> Winstar agrees to purchase Lucent products and services such that:
> - At least $100M in billable revenue will be realized by Lucent in 3Q2000.
> - At least $300M in billable revenue will be realized by Lucent in Q4 2000.
> - At least $600M in billable revenue will be realized by Lucent in calendar year 2001.

**Key Winstar Benefits:**

- B and Hub site pricing that supports Winstar's 2001 Business Plan ($35K/B-site migrating to $27K/B-site, $450K/Hub)
- Converged Architecture conserves radio spectrum, reduces cost of revenue, supports EBITDA positive attainment
- Converged solution minimizes operations, inventory and other expenses
- Lucent offer provides predictable pricing level for Hub/B/C buildout (based on criteria included in Attachment A)

**Key Partnership Benefits:**

Partnership relationship means:
- Dedicated Lucent marketing team to support customer acquisition and retention programs
- Co-branded programs to increase awareness and recognition of Winstar brand in the market
- Improved content Lucent ratio (per stipulation in the Supply Agreement)
- Winstar positioned as one of Lucent's premier customers with all associated benefits (i.e. access to Lucent's technical stakeholders. CTO information exchange forums such as the upcoming Global Technology Summit)

<div align="center">Lucent / Winstar Proprietary<br>(DATE)</div>

Confidential

LUTX0187299

CONFIDENTIAL                    I W00303102

**B1145**

*Business Plan Framework:*

*Lucent agrees:*

- To assume risk of reducing B/C and Hub site costs over the course of the next 15 months
- To flawless execution in the deployment of Winstar's network
- To deploy a consistent global network architecture and topology per Winstar requirements
- To uniform approach to global network deployment (program management principles and methodologies)
- To shape development of products and services to directly respond to Winstar requirements. Two cases in point include:
    1) Lucent's B Site Optimization initiative (downsizing electronics, cabinet and power along with assessment of RF integration into MTU optimized DSLAM)
    2) Lucent's advanced IP services initiative (economical and scalable IP solution that will deliver IP QoS, bi-directional policing, VPN, BoD, subscriber service selection, security and voice on a single CPE device)
- To partner with Winstar to establish an ongoing program to foster the sale of Winstar services in select tier III and tier IV cities   (NOTE: this is a placeholder, Kevin to provide language – this term may or may not be included in final draft)

*Winstar agrees:*

- To $600 Million in global purchases from Lucent Technologies for Calendar 2001 for exclusive builds in the following technology areas:
    Metro and Long Haul ONG solutions and buildout services
    Circuit and packet switching solutions
    Operations systems solutions
    Broadband ATM solutions
    Router and IP solutions
    Hub and B site access deployments
    (Pricing for items listed above, except for Hub and B pricing, will be as set forth in the Supply Agreement)

- To maintain or exceed existing level of Professional Services, including Architecture, City Planning, Buildout and Lab
- To purchase $450M of the $600M commitment noted above in Lucent products and services within the first 3 calendar quarters of 2001
- To purchase by September 25, 2000 the items in Attachment B

<div align="center">
Lucent / Winstar Proprietary<br>
[DATE]
</div>

Confidential

LUTX0187300

CONFIDENTIAL                    LW00303103

B1146

- To execute Addenda to Supply Agreements for ONG, Hubs and Bs to include Lucent product content provision, payment terms per the Supply Agreement
- To execute a Title, Risk of Loss, Acceptance Amendment to Supply Agreement
- To maintain reasonable Account Receivables levels (averaging <$50M per month)
- To review Bell Labs Network Planning team results regarding IP network requirements and if a parallel IP network is justified, then Winstar agrees to grant Lucent the last right of refusal to supply an IP network solution that meets Winstar's requirements
- To work out an arrangement with Lucent such that Lucent product shipments go to Winstar facilities
- To establish an OSS/BSS Integration/test/development lab and to spend $25M for this project in calendar year 2001
- To ensure executive review of Lucent's Cyber-Carrier Data Center reference architecture for Winstar's data center deployments going forward
- To test and review and deploy Lucent's radio solution(s) if it meets Winstar requirements

Lucent / Winstar Proprietary
(DATE)

Confidential

LUTX0187301

CONFIDENTIAL

LW00303104

B1147

### Lucent Pricing for B-Site Deployments

| Item # | Pricing Elements | Price | Fixed/Variable | Notes | Needed Pricing | New Design Pricing | |
|---|---|---|---|---|---|---|---|
| 1 | Stinger LS | $14,500 | Fixed | Separately negotiated item. True up of $5K at the end of 24 months. | 8,332 | 18,000 | 10000 |
| 2 | Cabinet Assemblies | $ 9,000 | Fixed | Cabinet shell and misc components | 5,462 | 8,500 | |
| 3 | Cabinet Assembly | $ 1,500 | Fixed | Physical assembly of material, elements and cabinet materials | 914 | 1,000 | |
| 4 | Pre-wire Construction Materials | $ 4,800 | Fixed | Field installation materials such as cabling, etc. | 2,802 | 4,500 | |
| 5 | Per Site Engineering | $ 751 | Fixed | | 464 | 761 | |
| 6 | B-Site Construction (Provisioning Ready) | $ 13,980 | Fixed | Field Cabinet installation, site prep work, etc. | 9,585 | 13,400 26,178 | 26,261 |
| 7 | PMP Radio | $ 9,500 | Variable | Separately negotiated item. Lucent provided at Winstar set price plus 7.5% markup. Engineerable on a per site basis. | 5,177 | | |
| 8 | PMP Installation | $ 2,700 | Variable | Separately negotiated item. Lucent provided at Winstar set price plus markup. | 1,545 6,822 | | 6822 |
| 9 | Total | $ 57,461 | | | $35,000 | $ 48,261   36,261 | |
| | Winstar Price Point | 35,000 | | | | | |
| | % of Current Pricing | 67% | | | | | |
| | Svcs only | $31,781 | | | | | |
| | Cabinets | $11,281 | 8,281 | | | | |

Confidential

LUTX0187302

CONFIDENTIAL                    LW00303105

**B1148**

| | | Hub breakdown | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PO line | Number | Line Item Description | | | | Unit $ | Extended $ | |
| | | Materials (XA) | | | | | | |
| 8 | 99 | PacketStar AXXXX XDM Access Concentrator - Siemens Config | | | | 267,329 | 23,369,379 | |
| 7 | 89 | PacketStar AXXXX XDM Access Concentrator - Hughes Config | | | | 308,289 | 82,943,380 | |
| NA | 9A | Fabric Multi-Point & Point to Point Radio | | | | 880,888 | $ 90,000 | 56,379    61,890 |
| 8 | 199 | DS3-1, DSX-3, CHIP, Misc. | | | | 194,397 | 86,676,739 | |
| | | Network Engineering Services (XB) | | | | | | |
| 9 | 199 | ASAP Data Entry | | | | 39,835 | 3957,880 | |
| | | EWO Generation | | | | | | |
| | | Detailed Equipment Engineering (XB) | | | | | | |
| | 9 | Order Specification Creation and Maintenance | | | | 342,494 | 912,484 | |
| | 99 | ALLVIEW Record Creation and Management | | | | 54,998 | 9888,888 | |
| | | Field Installation Support and Change Order Management | | | | | | |
| NA | | Construction Activities (XA,C) | | | | | | |
| | 199 | Construction, Doors, Multiflashers, Dageway, HVAC, | | | | 3394,000 | $ 394,000 | 248,565    541,291 |
| | | Antenna & CCU Installation, Routing, Structural, Cable | | | | | | |
| 10 | | Installation Activities (XB) | | | | | | |
| | 199 | Pre-constructing, native ladder rack, Synergy, grey mat, power | | | | 108,000 | 28,896,000 | |
| | 199 | Cross Connect Installation | | | | 311,329 | 53,793,596 | |
| | 199 | Optical Hub Interconnect Panel (OHIP) | | | | $2,309 | $394,888 | |
| | 199 | DCS, Misc. Equipment | | | | 20,000 | 9808,388 | |
| NA | 199 | Point to Multi-Point Radio IOW | | | | 320,000 | $ 20,000 | 12,618 |
| | | Staging Activities - Comstalk OFC (XB) | | | | | | |
| 11 | 199 | Relevate Pre-Load, Test & Tune-up | | | | 54,000 | 8888,888 | |
| | | Circuit Pack Install per ASAP Model | | | | | | |
| | | Pre-provisioning IP Address and Test | | | | | | |
| | | | | | Total fixed costs per Hub | $   209,290 | $ 209,290 | 132,057 |
| | | | | | Total estimated Hub price | | $ 713,290 | |
| | | | | | | Target | 450,000 | 450,000 |

Confidential

LUTX0187303

CONFIDENTIAL                                LW00303106

B1149

% of total        63%

Confidential

LUTX0187304

CONFIDENTIAL                          LW00303107

## ATTACHMENT B

| | A | B | Purchase Orders Identified in Partnership Deal | | E | F |
|---|---|---|---|---|---|---|
| 1 | | | Previously Committed Business/Work in Progress Business | | | |
| 2 | | | (POs to be released by September 25, 2000 | | | |
| 3 | | | | PO Value | Sept Billable | Calendar Yr. 4Q Billable |
| 4 | | URGENT | | | | |
| 5 | | | Professional Services and Labor | | | |
| 6 | | | PO for NKC Services (Previous POs for $925K, $3.3M already invoiced & paid) | 5,949,125 | 840,000 | 2,219,600 |
| 7 | | | PBI for DS upgrades (43 AM prices) PCs ... already released & paid) ...cord B | 3,400,000 | 1,500,000 | |
| 8 | | | paid) | 1,000,000 | 200,000 | 800,000 |
| 9 | | | URGENT - COMMITTED/WIP BUSINESS SUBTOTAL | 10,349,125 | 2,540,000 | 3,019,600 |
| 10 | | | | | | |
| 11 | | | New Business: | PO Value | Sept Billable | 4Q Invoice |
| 12 | | URGENT | | | | |
| 13 | | | Service Nodes | | | |
| 14 | | | Lab Expansion Data Equipment - 5SO & 5SE | 669,000 | 669,000 | |
| 15 | | | Hub Sites | | | |
| 16 | | | PO for Construction Management Services in support of Hubs and its deployment (12 months) | 3,394,000 | - | 850,000 |
| 17 | | | B Sites | | | |
| 18 | | | Revised PO for 100 Singers + rolled up services | 1,700,000 | 1,700,000 | |
| 19 | | | Optical Networking | | | |
| 20 | | | PO for SNC SNMS upgrade | 350,000 | 350,000 | |
| 21 | | | PO for ONG Buildout Services (6 months) | 1,400,000 | - | 700,000 |
| 22 | | | PO for Metro 4Q Services | 750,000 | - | 500,000 |
| 23 | | | Savvis Upgrade | 500,000 | - | 500,000 |
| 24 | | | Maintenance Materials & Misc Optical Equipment | 500,000 | 500,000 | |
| 25 | | | Professional Services and Labor | | | |
| 26 | | | Maintenance for Data Equipment - 5SO & 5SE | 1,800,000 | 200,000 | 800,000 |
| 27 | | | PO for MACSTAR software (including 250K lines + interface) | 2,700,000 | 2,050,000 | 650,000 |
| 28 | | | Data Centers | | | |
| 29 | | | Storage Equipment for SF Data Center (EMC) | 3,146,000 | 3,146,000 | |
| 30 | | | URGENT NEW BUSINESS SUBTOTAL | 14,189,000 | 8,615,000 | 3,800,000 |

Confidential

LUTX0187305

CONFIDENTIAL                    LW00303108

B1151

## ATTACHMENT B

| | A | B | | E | F |
|---|---|---|---|---|---|
| | | | **Purchase Orders Identified in Partnership Deal** | | |
| 11 | | | New Business | PO Value | Sept Billable | 4Q Invoice |
| 31 | | | | | | |
| 32 | INTERMEDIATE | | | | | |
| 33 | | Central Offices | | | | |
| 34 | | | Signed Irrevocable Letter of Intent for 5E15 buyout | 5,512,000 | 5,512,000 | |
| 35 | | Service Nodes | | | | |
| 36 | | | PO for Springdale solution to support VPN services | 4,000,000 | - | 4,000,000 |
| 37 | | Hub Sites | | | | |
| 38 | | B Sites | | | | |
| 39 | | | PO for 1,000 CellPipe IAD's | 1,500,000 | - | 1,500,000 |
| 40 | | | Revised PO for 1600 Stingers + rolled up services | 25,500,000 | 6,800,000 | 18,700,000 |
| 41 | | Optical Networking | | | | |
| 42 | | | PO for 400G R5 software & implementation services | 5,562,500 | 5,562,500 | ? |
| 43 | | | New York to DC long haul extension | 1,000,000 | 1,000,000 | |
| 44 | | | Phoenix-Houston 400G long haul tune-up | 3,000,000 | 3,000,000 | |
| 45 | | Professional Services and Labor | | | | |
| 46 | | | PO for CONNECTVU feature ACD/ERG Software | 900,000 | 900,000 | |
| 47 | | | INTERMEDIATE SUBTOTAL | 46,374,500 | 22,774,500 | 24,200,000 |
| 48 | | | | | | |
| 49 | LONG TERM | | | | | |
| 50 | | Central Offices | | | | |
| 51 | | | PAYG 5ESS | 15,900,000 | 15,900,000 | |
| 52 | | | PAYG Growth SMs | 8,106,000 | 8,106,000 | |
| 53 | | | LONG TERM SUBTOTAL | 24,006,000 | 24,006,000 | - |
| 54 | | | | | | |
| 55 | | | Total | 95,438,663 | 55,935,500 | 31,018,800 |
| 56 | | | | | | |
| 59 | Lucent Anticipated Revenue from On-going Business | | | | 46,500,000 | |
| 60 | 3rdQ Billable Revenue Target | | | | 102,435,500 | 31,018,800 |

Confidential

LUTX0187306

CONFIDENTIAL                    LW00303109

B1152

Heron, Vanonda (Va Nonda)

From:       Nate Kantor[SMTP:nkantor@winstar.com]
Sent:       Sunday, September 24, 2000 5:05 PM
To:         Aversano, Nina (Nina)
Subject:    Fwd: FW: Winstar Services Purchase Order

  

rjuwinstar1.doc      dwawinstar1.doc


Nina,

I am very surprised and disappointed with this-we've only discussed and
agreed on this a million times. This doesn't sit well with me and will
have a major impact on our ability to help you this quarter.

You've got to get this fixed.

    Nate

>From: "Harris, Deborah K (Deborah Kristine)" <dharrisbrown@lucent.com>
>Sender: "Kerner, Margaret (Margaret)" <mkerner@lucent.com>
>To: "'nkantor@winstar.com'" <nkantor@winstar.com>,
>        "'jules@winstar.com'"
>        <jules@winstar.com>
>Subject: FW: Winstar Services Purchase Order
>Date: Fri, 22 Sep 2000 15:36:19 -0400
>Importance: high
>X-Mailer: Internet Mail Service (5.5.2650.21)
>.
>Nate Kantor
>Frank Jules
>
>I have been asked by Rick Uhl to forward this to you.
>
>Debbie
>
>
> > ────────
> > From:      Harris, Deborah K (Deborah Kristine)
> > Sent:      September 22, 2000 12:25 PM
> > To:  dackerman@winstar.com; ruhl@winstar.com
> > Cc:  Aversano, Nina; Plunkett, William; bzlotnick@winstar.com;
> > fhicks@winstar.com; jritter@winstar.com; fruben@winstar.com
> > Subject:    Winstar Services Purchase Order
> > Importance:  High
> >
> > Dave and Rick,
> > As Bill Plunkett and I indicated in our phone conversations on Thursday,
> > September 21st, attached is a letter explaining the Lucent position
> > regarding the Puchase Order for Services-issued by Winstar on September
> > 8th.
> > Debbie
> >
> >
> >
> > <<rjuwinstar.doc>>  <<dwawinstar.doc>>
> >
                                            Page 1



NA 004434



LUCENT CONFIDENTIAL FOR
PURPOSES OF THE RRR,
LUCENT SECURITIES LITIGATION

CONFIDENTIAL                                    LW00303110



**Lucent Technologies**
Bell Labs Innovations

Deborah K. Harris    Lucent Technologies, Inc.
Vice President    Room A3-E52
Global Sales    283 King George Road
Winstar Account    Warren, New Jersey 07059
Telephone 908 898 9983
Facsimile 908 898 2308
email: dharrisbrown@lucent.com

September 22, 2000

Mr. Richard J. Uhl
Group Executive and Chief Financial Officer
Winstar Communications
685 Third Avenue
New York, New York 10017

Dear Rick,

At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a transition plan for the services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

In the past year, Lucent has in fact executed a broad spectrum of services support valued at $100M such as: Architecture Planning, Network/City Planning, Integration Test Lab, Capacity Management, Detailed Equipment Engineering, Installation, Program Management, Integration Testing, Kenan Billing Integration, Construction Management, Monitoring & Surveillance, Operations Technicians, Disaster Recovery analysis, etc.

There is tremendous potential in both the volume and content of services which Lucent can continue to provide and expand upon in support of Winstar's rapid growth. As Lucent becomes much more active in the actual construction of Winstar's Hubs and BeICs worldwide, expansion of Metros in North America, and growth of the Long Haul Optical Network in North America, and potentially in Europe, the volume of business can grow significantly. In addition there are other untapped areas for Lucent services growth.

Clearly, Winstar is growing globally and the need to ensure a consistent high level of execution, based upon proven best practices, is required. Currently, Winstar does not have a Global Program Management Office (GPMO) to plan, coordinate, and ensure flawless execution worldwide. Lucent is prepared to provide the people, processes, and tools to Winstar to quickly establish a GPMO as a value added service to support Winstar International operations.

NA 004435

LUCENT CONFIDENTIAL FOR
PURPOSES OF THE IN RE
LUCENT SECURITIES LITIGATION

CONFIDENTIAL    LW00303111

B1154

AUG-25-2002(HU)  11:58   SUSMAN GODFREY LLP          [FAX]211 151 1955        P.020 034

There is a category of services which, to date, Winstar continues to provide for itself. These services include:

Radio RF engineering
Site acquisition
Winstar Systems Group Services:
- CSP Host development
- BSS systems testing
- Production Operations
Winstar Network Services management
Leased facilities acquisition

We have been pursuing ways to take on these services in an agreeable manner to all parties, but have been unable to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item #1 of the Purchase Order for $85,509,331.00, WVF1-0000000295B issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 15, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

If you have any questions, please contact me.

Sincerely,


Letter to:
D. W. Ackerman

Copy to:
N. Aversano
L. Hicks
W. Plunkett
F. Rubin
J. Ritter
B. Zlotnick


NR 084436

LUCENT CONFIDENTIAL FOR
PURPOSES OF THE IPOC
LUCENT SECURITIES LITIGATION


CONFIDENTIAL                    LW00303112

**From:** Cocito, James Vincent (Jim)
**Sent:** Monday, September 25, 2000 6:09 AM
**To:** Manzi, Frank P (Frank)
**Subject:** Winstar Services

Frank

As expected our letter to Winstar was not recieved well. Nina has a nastygram from Nate. He has indicated that there will be no deal for the QTR unless this gets fixed. Impact about 60M or more. Also, I will know this morning as to whether they are going to play with the AR as well.

This will get escalated. I would suggest we evaluate the possibility of "a one more time" strategy".

JVC

14



Confidential                                          LUTX0175381

CONFIDENTIAL                              LW00303113

**B1156**

| | |
|---|---|
| From: | Hsu, Diane Law (Diane) |
| Sent: | Friday, April 13, 2001 10:33 AM |
| To: | O'Hara, Thomas M (Tom) |
| Cc: | Mark, Robert M (Rob) |
| Subject: | subcontract agreement |

Tom,

This is the agreement that Mary faxed.

Diane

Subcontract.tif

Diane Law Hsu
Corporate Counsel
(703) 873-1077

PLAINTIFF'S
EXHIBIT
38

PLAINTIFF'S
EXHIBIT
TK-90

Confidential

LUTX0139017

CONFIDENTIAL                                    LW00303190

B1157

FP09                    FAX NO.                    Apr. 13 2001 10:50AM  P3

# WINSTAR

## AGREEMENT FOR NETWORK BUILD-OUT SERVICES

This agreement for network build-out services (the "Agreement") is made and entered into as of the _____ day of _____, 199_, (the "Effective Date") by and between LUCENT TECHNOLOGIES INC., a Delaware corporation with offices at 600 Mountain Avenue, Murray Hill, New Jersey 07974 ("Lucent") and WINSTAR WIRELESS, INC., a Delaware corporation with offices located at 230 Park Avenue, New York, New York 10169 ("Contractor").

WHEREAS, Lucent desires Contractor to perform certain network build-out services, to be specified in an attached task description(s), for the benefit of Lucent and its customers; and

WHEREAS, Contractor is willing to perform such service subject to and in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual premises set forth herein, Lucent and Contractor hereby agree as follows:

1.    **SERVICES AND SCOPE OF WORK**

    1.1.    **Services.** Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually, a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties may agree from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

    1.2.    **Task Order.** Unless otherwise agreed by the parties in writing, each Task Order will include the following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) method of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

2.    **INDEPENDENT CONTRACTOR AND SUBCONTRACTING**

    2.1.    **Independent Contractor.** Contractor is performing the Services as an independent contractor and as such has the sole right and obligation to supervise, manage and perform all work to be performed by its personnel under this Agreement.

Confidential

WinStar Telecommunications
7799 Leesburg Pike, Suite 1010, Falls Church, VA 22043 • Tel 703 245 1177

P.2                    FROM WE CTS DISTRIBUTORS •TELEPHONE 313 234 8864

LUTX0189019

Confidential

CONFIDENTIAL                              LW00303191

B1158

FROM :                    FAX NO.              Apr. 17 2001 10:00PM P3

OF ACTUAL DAMAGES UP TO THE AMOUNT PAYABLE BY LUCENT UNDER THE
APPLICABLE TASK ORDER SUBJECT OF THE CLAIM.

6.    WARRANTIES

CONTRACTOR MAKES NO WARRANTY FOR ANY PRODUCTS OR SERVICES
PROVIDED UNDER THIS AGREEMENT, EXPRESS OR IMPLIED, INCLUDING BUT NOT
LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR
A PARTICULAR PURPOSE.

7.    TERM AND TERMINATION

7.1.    Term. The term of this Agreement will commence on the Effective Date and will continue
until both parties mutually agree to terminate, unless sooner terminated pursuant to this
Section 7.2. In the event of the termination of this Agreement, it shall remain in full force
and effect with respect to any then-outstanding Task Orders issued under this Agreement
until all such Task Orders are completed, expired or terminated.

7.2.    Termination for Cause. This Agreement and/or any Task Order issued under it may be
terminated by either party in the event the other party has materially breached this
Agreement or any Task Order (i) upon receipt of written notice thereof if such material
breach is incapable of cure; or (ii) upon the expiration of thirty (30) days (or such
additional cure period as the non-breaching party may authorize in writing) after receipt of
written notice thereof if the material breach is capable of cure and has not been cured.

8.    GENERAL

8.1.    Assignment. This Agreement shall be binding on the parties hereto and their respective
successors and assigns. Neither party may, or shall have the power to, assign this
Agreement without prior written consent of the other, which consent shall not be
unreasonably withheld.

8.2    Force Majeure. In the event performance of this Agreement or a particular Task Order is
prevented or interfered with by reason of acts of God, fires, floods, epidemic, strikes, or
any other circumstances beyond the reasonable control and without the fault or negligence
of the party affected, the party so affected, upon giving notice to the other party of the
circumstances causing the delay or failure to perform and of its plans and efforts to
implement a work-around solution, shall be excused from such performance until such
until the delay, restriction or interference has ceased.

8.3.    Informal Dispute Resolution. The parties agree that, prior to initiating formal dispute
resolution, they will attempt to resolve disputes informally by working together to

Confidential

-1-

Confidential                                          LUTX0199020

CONFIDENTIAL                          LW00303192

**B1159**

promptly address problems and escalate issues within their respective companies as reasonably required.

8.4.  **Notices.** Any notices or communication under this Agreement and/or any Task Order shall be in writing and shall be hand delivered or sent by registered mail return receipt requested to the party receiving such communication at the address first set forth above, or such other address as either party may in the future specify to the other party in accordance with this notice provision.

8.5.  **Governing Law.** This Agreement and related Task Orders shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law rules.

8.6.  **Entire Agreement.** This Agreement and each Task Order attached hereto set forth the entire understanding and agreement of the parties as to the subject matter therein, and supersedes all prior agreements and representations, whether written or oral, with respect to the subject matter of this Agreement, and each Task Order attached hereto, between the parties.  No modification, amendment, supplement to or waiver of this Agreement or any Task Order hereunder, or any of their provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties.

8.7.  **Counterparts.** This Agreement and any Task Order may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same Agreement.

8.8.  **No Waiver.** No waiver shall be effective unless in a writing signed by an authorized representative of the party against whom enforcement of the waiver is sought.  Neither the failure of either party to exercise any right of termination, nor the waiver of any default or breach shall constitute a waiver of the rights granted in this Agreement with respect to any subsequent other default or breach.

8.9.  **Severability.** In the event any one or more of the provisions of this Agreement or of any Task Order is invalid or otherwise unenforceable, the enforceability of remaining provisions shall be unimpaired.

8.10.  **Survival.** Any provision of this Agreement which contemplates performance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect.

8.11.  **Headings.** The section headings in this Agreement are intended for reference purposes only and shall be in no way be construed to modify or restrict any of the terms or provisions of this Agreement.

Confidential

Confidential

LUTX0189021

CONFIDENTIAL

LW00303193

B1160

FROM :                    FAX NO. :              Apr. 13 2001 18:25PM

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date
first above written.

LUCENT TECHNOLOGIES INC.                    WINSTAR WIRELESS, INC.

By: _____                       By: _____

Name: MARK GLESON                           Name: ZIF HAFFAR

Title: VP GENERAL SERVICE PROVIDER          Title: GVP PMO

Confidential

Confidential                                                LUTX0189022

CONFIDENTIAL                         LW00303194

B1161

Diroma, Jill B (Jill)

| | |
|---|---|
| From: | Diroma, Jill B (Jill) |
| Sent: | Thursday, March 29, 2001 12:38 PM |
| To: | Fullerton, William K (Bill) |
| Cc: | Christian, Dawn Marie (Dawn) |
| Subject: | Winstar Services Pass thru |
| Importance: | High |

Bill,

Here are the dates and amounts that we processed as Winstar Pass Thru Services.

| | |
|---|---|
| June 1999 | $25,000,000 |
| August 1999 | $33,873,000 |
| Nov. 1999 | $36,536,473 |
| Mar. 2000 | $38,758,042 |
| Jun 2000 | $55,485,175 |
| Sept 2000 | $67,388,370 |
| Oct 2000 | $67,291,934 |

As I stated in prior emails no revenue was ever taken on these services. This process was also reviewed by Bob Moogan in Internal Audit and he also concluded that no revenue was taken on these transactions.

Please let me know if you have any other questions.

Jill

Confidential



PLAINTIFF'S
EXHIBIT
2
10/8/02 (JG



LUTX0178241



CONFIDENTIAL                                    LW00303140

B1162

Peterson, Donald K (Don)

| | |
|---|---|
| **From:** | Avercano, Nina (Nina) |
| **Sent:** | Monday, December 20, 1999 4:10 PM |
| **To:** | McGinn, Richard A (Rich) |
| **Cc:** | Peterson, Donald K (Don); Russo, Patricia (Patricia); Wilson, Mark (Mark); Davidson, Janet G (Janet) |
| **Subject:** | FW: Winstar |
| **Importance:** | High |

Rich.

Thanks for the feedback on your discussion with Bill. I'm clear on the issue and will continue to follow through with Don. I also agree that systematic updates with the CFO would be extremely valuable. I will set up an initial face-to-face meeting ASAP with Don Peterson, Nate Kanter, Rick Uhl, myself, and get an invite to Bill Rouhana as well. Thereafter, we will set up monthly calls.

With regard to this quarter, we will work with Bill and I'll keep you posted on our progress. WinStar presents certain challenges, however they are a good and loyal customer.

Again, I appreciate your offer of support as we push to close every potential deal.

Nina

| | |
|---|---|
| **From:** | McGinn, Richard A (Rich) |
| **Sent:** | Monday, December 20, 1999 3:37 PM |
| **To:** | Peterson, Donald K (Don); Avercano, Nina (Nina) |
| **Cc:** | Russo, Patricia (Patricia) |
| **Subject:** | Winstar |
| **Importance:** | High |

Don,
Nina,

Spoke to Bill Rouhana at Winstar. He is very supportive of us and what we have/are doing with them. Concerned about the recent hiccup re financing (PWC change of opinion). You know the issue re the request to double funding to $1B and $4B. I am presuming you are examining it. (I told him you would, but it is very difficult.)

He wants to have a brief (10-15 min.) monthly CFO call to 1) keep both firms aligned, 2) avoid issues, and 3) look at the pipeline of activity. Rick Uhl is his CFO. Nina, please set this up to keep us going.

Rich

P.S. Bill offered to do anything he could to help this quarter. If there is anything else that can be done now go directly to him.

CONFIDENTIAL          LUCI 00016500



LUTX0113666

Confidential



CONFIDENTIAL          LW00303206          B1163

Printer Printer

| | |
|---|---|
| **From:** | Perricone, Elizabeth (Beth) |
| **Sent:** | Wednesday, May 24, 2000 5:40 PM |
| **To:** | Viqueira, William (William); Cocito, James Vincent (Jim); Aversano, Nina (Nina) |
| **Cc:** | Naylor, Charles L (Chuck); Rogers, Leslie L (Leslie); Colross, Susan M (Susan); Keefe, Michael C (Michael); Diroma, Jill B (Jill); Quinn, William N (William); Petrini, Vanessa H (Vanessa) |
| **Subject:** | Winstar Update |

I received a call from Fred Rubin and Kevin Monaco of Winstar today explaining the company's position on yesterday's drawdown request for $160MM. To summarize, their position is as follows:

- Fred approached Jim Cocito yesterday to extend the payment date on current invoices out to 7/1/00. Lucent's response was that we expected to be paid cash now to clear these invoices.
- Winstar Sr. Management viewed this response as an "unwillingness" to work with Winstar and ordered Fred and Kevin to draw under our facility to pay the invoices.
- Winstar Sr. Management further feels that the capital markets are focused on liquidity for companies in their sector and as such they now believe that maintaining a cash balance on their books of $600-650MM is appropriate and any facilities available to them for funding should be utilized.
- Winstar Sr. Management feels there was a good working relationship between Nate Cantor and Nina Aversano, and Bill Ruhanna and Rich McGinn but they are very disappointed that given we have a new CFO, and one they've read is focused/concerned about customer finance, that they haven't yet received a call from her or had a meeting arranged with her.
- Fred again reiterated that their recent $1.6B high yield raise was only done to support a Bank deal which would enable Lucent to be repaid in full. To effect the HY and Bank deal, they came out of pocket for over $250MM in expenses to "help Lucent's Balance Sheet".
- Finally, Fred noted that now that Lucent is proposing a "turnkey" solution, Winstar is being asked to take equipment early to "help Lucent recognize revenue" and that this equipment now has to be financed and was not built into the model originally supplied to us.
- Winstar feels that the various teams at Lucent are at odds in terms of how we view the relationship. He noted that Finance is rewarded for a clean balance sheet, Jim Cocito's team is rewarded for Accounts Receivable Collection and Nina's Sales team is rewarded for more equipment sales. His recommendation is that Lucent Sr. Management decide "what is important to us" and that Rick Uhl is available all day in his office to receive a call from someone in Lucent's Sr. Management team.

I expressed our disappointment that borrowings were already occurring given our understanding from them initially that this would not occur until after 10/1/00 and then was revised 2 days prior to closing to a draw in August/September timeframe. In addition, it was our expectation that corporate cash would be depleted first prior to utilizing our Facility. I questioned cash flow and draw down expectations over the next few months, asking specifically when they would reach the $250MM level. Fred's answer was 7/1/00.

From a financing perspective, Winstar is now legally entitled to use our Facility. If the business decision is made to allow this $160MM drawdown, the current invoices will need to be assigned to our new Borrower and [REDACTED]. As many of you know, the negotiation process for this Facility was strained with Winstar re-trading on many issues in our commitment. We came through on many compromises but in my opinion, they have now totally disappointed us on "hand shake" promises and now seem to be attempting to punish us for what is happening in the capital markets as they question us, "are we committed to a relationship".

Please let me know if there is any further information you need to access this business decision. We need to respond to them on whether we will honor this drawdown request. Thank you.

*Beth Perricone*
*Director*
*Customer Finance N.A.*
*Phone: (908) 582-0366*
*Fax: (908) 582-2237*
*Email: eperricone@lucent.com*

1

PLAINTIFF'S
EXHIBIT


PLAINTIFF'S
EXHIBIT
TX-104

Confidential

LUTX0098712

CONFIDENTIAL      LW00303255      B1164

Kerner, Margaret (Margaret)

| | |
|---|---|
| **From:** | Harris, Deborah K (Deborah Kristine) |
| **Sent:** | August 27, 2000 6:57 PM |
| **To:** | Aversano, Nina; Hopkins, Deborah C (Deborah) |
| **Cc:** | Plunkett, William |
| **Subject:** | FW: Winstar Briefing |

Nina and Deb

This is starting to feel like a weekly phenomena to send Sunday briefings for Monday evening meetings with Winstar. I have updated the note and attached briefing documents to reflect updates. (Deb ...for your information, we had provided a briefing document for Nina's dinner with Nate last week) I will be joining you tomorrow evening and can respond to any questions during our ride into Manhattan.

Attached is a briefing document, an analysis of Winstar's budget for the remainder of 2000 and 2001 and a write up from our Legal org regarding a Winstar Services Addendum.

Bill and I have had some interesting meetings with Dave Ackerman over the past couple of weeks, as well as subsequent meetings with members of Dave's management team. They have been very open about their plans and their spending requirements for the remainder of 2000 and 2001 Due to restricted spending levels as a result of a bank covenant, Winstar is hitting the brakes on spending and signaling some disturbing actions. For example

- Cancellation of C-5 Services: includes Lab resources, Architecture Planning, City Planning,etc. Potential to displace 27 people working on Winstar projects and will absolutely slow down Winstar's deployment abilities. Key meeting on Aug 28th to review the value of these services.
- Return of equipment already purchased (sitting in warehouses waiting for deployment, often as a result of EOQ deals where we also acquired radios, long haul routes to resell or use internally) We may have put this issue to bed last week.
- $12M Pending PO's/Proposals on Hold

Our plan is to construct an offer that captures the entire Lucent Addressable Budget identified in "Winstar CAPX Budget" document for both 2000 and 2001. This will leave us light in revenue for F1Q01 but hopefully buy us time to help work a plan which alleviates the restriction on spending levels (Not sure if this will be possible, but we have received some positive indications from PFO). It will also allow Lucent to get into some areas where Winstar may not consider us "Best in Breed" but where we are building capabilities (ie, IP Networks). Following is the framework of an Offer that we are packaging:

- Lucent Requirements: Forward price on the Hubs and B's initiative to the level of $25-35Kper building and $450Kper Hub. Definitely not supportable with our current cost structure but we have launched a breakthru initiative that explores a new and innovative design specific to Winstar's network and services structure. We will need a commitment out of the PU's to support this effort, as well as feature enhancements desired by Winstar for products also to be included in this deal (ie, Nexabit). In addition, we will need a COMMITMENT from CIO to use Winstar services.
- Winstar Requirements: If we were to take the risk with such a forward looking price structure for the Hubs and B's initiative, as well as product design for Winstar we would need an irrevocable commitment to purchase from Lucent: All Optical networks(Metro and Long Haul), IP Network Solutions and Hold the current level of the Services business. There may be more we want to include in here but basically it is a scenario where they tell us what they are trying to accomplish, we bring the product and services to the table within that budget. It could be a very powerful agreement.

An update on some important meetings with Winstar last week:
- Monday am: Meeting with Kathleen Flaherty and her management team from Europe to improve performance on business outside of the US. Definitely opened a more positive discussion on business outside of the US.
- Monday-Wed: We held our Global Winstar team Account Planning kickoff. Dave Ackerman's team attended for a couple of hours and helped validate ideas we had on how to improve the Lucent-

Page 1

---

EXHIBIT

*Harris #1*

*7/31/01*

PLAINTIFF'S EXHIBIT

PX 104

CONFIDENTIAL

LW00029262

B1165

Winstar relationship, how we can improve/re-commit to the strategic partnership and how we can do business differently.   We also held an emergency IP Network Solutions review since Cisco is close to winning all the router business   We definitely  at least, were invited into the discussion and will be holding numerous meetings over the next week.
- Tuesday evening.   Winstar  invited the entire Lucent GAM leadership to the "Broadband One Launch" reception and dinner.  This turned into a great opportunity to have serious discussions with a full scope of Winstar senior leadership

I look forward to hearing Nate's and Rick's ideas Monday evening.  During my brief tenure, it is very apparent that the relationship needs strengthening at all levels in both companies.  We have ideas on how to do that and what it will take for Lucent to improve their performance in Winstar's eyes   But, it will definitely mean we establish a unique experience for Winstar.  What does that mean? Development teams dedicated to Winstar projects. Lucent CTO's ACTIVE interface with Winstar to brainstorm innovative ways to solve opportunities, improved understanding of the financial impact of Lucent solutions on Winstar's business plans. a truly Global approach to their business and last, but not least, Flawless Execution.

See you both on Monday

Debbie

Winstar Additional
ervices Addendum 1.d

Winstar CAPX
Budget.doc

Aug.2K Update V4.doc

Page 2

CONFIDENTIAL

LW00029263

B1166

| Remaining Calendar 2000 Winstar CAPX Budget | 400,000,000 |
|---|---|
| | |
| **Offsets (reductions to CAPX budget)** | |
| NAR SNIPS | 13,000,000 |
| NAR Account Receivables | 55,000,000 |
| Winstar IRUs | 65,500,000 |
| B/C site AFC equipment | 38,400,000 |
| Systems Services | 46,000,000 |
| CO Construction and TellLabs DACSs | 12,000,000 |
| Projected International SNIPS | 10,000,000 |
| Offset Totals | 238,900,000 |
| | |
| Lucent addressable portion of remaining 2000 Budget | 161,100,000 |

| Calendar 2001 Winstar CAPX Budget | 1,000,000,000 |
|---|---|
| | |
| **Offsets (reductions to CAPX budget)** | |
| NAR SNIPS | 10,000,000 |
| NAR Account Receivables | 20,000,000 |
| Winstar IRUs | 170,000,000 |
| Hub and B/C Sites | 38,000,000 |
| Systems Services | 200,000,000 |
| CO Construction and TellLabs DACSs | 39,000,000 |
| Projected International SNIPS | 10,000,000 |
| Offset Totals | 487,000,000 |
| | |
| Lucent addressable portion of remaining 2001 Budget | 513,000,000 |

CONFIDENTIAL

LW00029264

B1167

**WINSTAR – EXECUTIVE BRIEFING**
*August 28, 2000*

*What is Winstar's current condition?*

### Budget Constraints

- Winstar is facing severe budget problems (all non emergency PO's are being held) due to capex spending limitations imposed by their bank covenants.
- The situation is extremely serious and they may be contemplating returning unused purchased equipment back to Lucent.
- Due to budget constraints, Winstar has indicated they will cancel our "C-5 Services" (with the exception of turnkey ONG, Hub/B services) as of 9/1/00 which include NW Architecture Planning, City Planning, Technology Selection, Capacity Planning, Integration Lab (to bill approx. $24M in 2000). We feel this will negatively affect their ability to deploy their network.

### Financing

- A new credit facility was put in place May 4, 2000.
- Financing of non-Lucent content has continued to grow. In 1999 Winstar used the previous facility for 54% non-Lucent content. The Supply Agreement called for a $3M maximum financial penalty if they exceeded 35% non-Lucent content (never imposed).
- In 2000 they are to be penalized if they go above 30% non-Lucent content. To date they are 54% non Lucent content.
- Rick Uhl has indicated Winstar wishes to restructure their financing agreement with Lucent to benefit both companies.

*What are our major project issues with Winstar?*

### B/Hub Site Buildout Project

- Lucent received $133M PO in March (EOQ deal). Included pricing for products and services for Lucent to build 100 Hubs/2,000 B's; product only for Winstar to build 100Hubs/3,000 B's
- PO included MAX 20 DSLAM's (commitment for 5,000 units). In return, Lucent bought $35M of product from Winstar
- Since then, Winstar has decided to deploy Stinger LS's instead of MAX 20's.
- We've offered the Stingers under a Pay As You Grow plan; we've received a Furnish Only PO for 100 Stinger LS's under this pricing plan.

CONFIDENTIAL

LW00029265

**B1168**

- Winstar will not order additional Stingers at current costs; they need a total buildout price of $25K per B site (current Lucent B site cost is $57K); $450K per Hub site (current Lucent Hub site cost is $750K)
- Winstar is asking us to "forward price" our access solution until we can develop a more integrated, cost-effective solution that meets their needs; in the meantime, they will award us all Lucent addressable business in their remaining 2000 budget and their 2001 budget.

**Action Plan:**  We've formed a core team from our BB Wireless, INS BU's (under the leadership of Fred Kemmerer) to develop a more integrated access solution for Winstar that will cut $30K from the in-building solution and $300K from the hub solution (Siemens, Accelerated have been talking to Winstar about this also.) We'd like to make this solution available to Winstar in 2001. We'd also like to construct a deal that would enable us to agree to this pricing and win all of the Lucent addressable business for the remainder of this calendar year and next year (includes new business consisting of IP routers, Data Center equipment).

### *IP Solutions*

- There is considerable opportunity for IP business at Winstar: $4M opportunity for IP services (Springtide), $50M opportunity for IP core routers
- Winstar has designed an IP network without Lucent's involvement
- They've been evaluating Cisco (presently use) and Juniper and say they'll make a decision within the next several weeks.
- Total value of the project could be $40-$60M (there may be some immediate deployment needs)
- Winstar has evaluated the Nexabit router and has determined it does not have the features/functions needed now in order to deploy it in their network
- Winstar is predisposed to buying Cisco but states they'd be willing to buy Juniper through Lucent in the short term until the Nexabit product is ready (6 mos. – 1yr.)
- The CT is working with Linda Manchester to determine the structure of a relationship with Juniper

**Action Plan:**  Lucent hosted a meeting to review Winstar's functional, capacity requirements for their network. Winstar will engage Lucent's Bell Labs Network Planning team to conduct a network analysis to determine the optimal solution and deployment timing (possible phased approach based on economics, fiber availability, traffic.) If it is confirmed there is immediate need to deploy IP routers, Lucent would like to deploy Juniper routers. We would concurrently work to develop the features/functions on the Nexabit router to place in Winstar's network in the future.

2

CONFIDENTIAL

LW00029266

**B1169**

### Data Center Project

- Lucent received a $39M PO for Data Center equipment/services at the end of Q3.
- We've subsequently determined we are unable to perform the construction work (worth approx. $23M)
- Lucent's CyberCarrier offer as it stands now does not match the Winstar defined architecture. We're still struggling with taking their orders for business now with the intention to transition Winstar to a more favorable Data Center architecture for future business.

### What is Winstar's current relationship with Lucent?

- Winstar acknowledges the hard work and dedication of the Lucent team but is disappointed in our execution in several key areas: Lack of innovative, cost effective solutions (Lucent's solutions are not innovative, are too costly and too big; we supply products that don't meet their needs – IP router, IBM Data Ctr equipment); Inconsistent global approach to Winstar (Lucent needs to demonstrate consistent support of Winstar globally and have integrated business operations, services and sales around the world); Lack of system and product support (Winstar is concerned about the lack of flow through provisioning and lack of OAM&P considerations when we sell them our products).

- Bob McGuire is unhappy with the lack of progress in bringing Winstar services onto the Lucent network. There is a list of qualified projects that has been stonewalled by CIO and Shared Network Services. No Winstar services have been brought on-net. A meeting is planned with Larry Kittelberger and Bob McGuire in September to move things forward.

### Lucent Analysis

- The Lucent team realizes the Winstar account has evolved to the point where a restructure of our team and a focus on total solutions to support Winstar's business model are mandatory. We're constructing a Global Account Team under the leadership of Debbie Harris to ensure a consistent global approach, develop cost effective solutions that will help accelerate Winstar's business and integrate product and operation system strategies and execution.
- We also must continue our joint development efforts (currently on ONG solutions) but need to expand this into other Business Units (INS, SPG). We're putting an action plan in place to develop a relationship between Winstar and Business Unit executives to drive development to better meet Winstar's needs.

3

CONFIDENTIAL

LW00029267

**B1170**

### Winstar Additional Services Addendum

The Additional Services Addendum for "turn key" services started out as one document covering the ONG long haul build out and the build out of the Hubs and B-sites. During the development of the Addendum, it was realized that the two jobs vary to a large degree and it was decided to split them up into two (2) separate Addendum's. The Addendum's were separated and sent to Winstar. For a variety of reasons, the negotiation of this Addendum's stalled both at Winstar request and Lucent's request. Winstar also took our proposal and created Statements of Work out of them. They want to attach these Statements of Work to the Addendum's.

At the end of last quarter we insisted on the Addendum's being signed and Winstar signed them on June 30, 2000. Since they were not finalized, we told Winstar that we would meet with them whenever they were ready to discuss and finalize these Addendum's. Schedule conflict and vacations prevented us from meeting until yesterday, August 25, 2000. We could not complete the negotiation yesterday because Winstar people had to leave and go to another meeting. We have scheduled the continuation of the negotiations to take place Monday, August 28, 2000 from 1:00-4:00.

One of the key provisions in the Addendum's is where it states that Lucent is allowed to hire Winstar as a subcontractor for some of the work being performed. This provision will allow Lucent to "pass through" the Winstar services that Winstar performs PURSUANT to our purchase order requesting the services. We will have to have Winstar issue a PO to Lucent PRIOR to the work being performed. These Winstar services must be a portion of the larger purchase order for these "turn key" services. We will then issue a PO to Winstar hiring them for these specific services as a part of the bigger PO received from Winstar. The services invoiced to Lucent by Winstar must be directly related to the PO issued to Lucent by Winstar.

A key business issue is that Winstar wants us to perform these additional services for non-Lucent products. Our concern is that we do not want to do this if the majority of the products are not Lucent's. This is not really an issue for the ONG long haul addendum in that the job is almost complete and all of the products are lucent products. However, it is an issue in the Hub and B-site addendum.

CONFIDENTIAL

| | |
|---|---|
| **From:** | Dollins, Audrey M (Audrey) |
| **Sent:** | Monday, October 30, 2000 8:15 AM |
| **To:** | Harris, Deborah K (Deborah Kristine); Petrini, Vanessa H (Vanessa); Walsh, Darren A (Darren); Rigotti, David Roy (David); Garrett, Gregory A (Gregory); Fawcett, Lee F (Lee); Epstein, Marc N (Marc); Hsu, Diane Law (Diane); Follmer, Marie C (Marie); Watson, Peter D (Peter); Butze, David M (David); Gaines, Ruth L (Ruth); Diroma, Jill B (Jill); Switt, Thomas M (Tom); Fulton, Alan W (Alan); Kent, Frederick S (Fred); Elmendorf, Charles (Chuck); Mc Mahon, Rose M (Rose); Montemarano, Michael A (Michael); Tuomenoksa, David L (Dave) |
| **Cc:** | Gilbert, Raymond Scott (Ray); Dowdy, Mary M (Mary); Salow, Roger E (Roger); Hanson, Barbara E (Barbara) |
| **Subject:** | Exec. Review & Bus. Case Approval Call |

Attached are the updated files for the call today. Please see below for details about the meeting.

  

Internal Bus case     Business Case - WS     WinStar_Services
Review.ppt           services CO...          Summary.xls

*Audrey Dollins*
703-326-6354 - ph
703-326-6340 - fax
adollins@lucent.com

Team,

An Executive Review & Business case approval for the Winstar Services Offer has been scheduled for Monday Oct 30 from 12:00 noon until 2:00 PM.  Participation is mandatory for the organizations represented by those in the TO: List.

**Bridge Details:**
Start: 10/30/2000 12:00 pm Eastern Time
Bridge Number:     800-260-3754
Code:              127355
Other Time Zones:  11:00 AM Central     10:00 AM Mountain     09:00 AM Pacific
Duration:          2:00 hour(s) or less
Size:              25 ports

**Purpose:**
To review the outline of the proposed Extended Services Offer for Winstar and agree on our Business Case parameters & approve the Lucent position that will be presented to Winstar on Tues morning Oct 31.

**Agenda:**
- Quarterly Passthrough
- Business Principles
- Business Case Overview & Expectations
- Strategic Benefits & Risks
- Approval & Recommendations for Positioning with Winstar

**Actions Required:**
- Participate or assign an empowered delegate.

1



EXHIBIT
Harris #5
7/31/01

PLAINTIFF'S
EXHIBIT
PX-104

CONFIDENTIAL

LW00148405

**B1172**

- Forward any comments or concerns prior to the call to V. Petrini, D. Rigotti, & R. Gilbert
- Where required provide contact info (alternate email, fax etc) so the chart packages can be delivered on Monday morning (Please inform R. Gilbert, D. Rigotti & B. Hanson if special arrangements are needed)

<u>**Background Info & 1st Draft of the Charts:**</u>

*Note: Updated Charts & other material will be issued Monday Morning*

2

CONFIDENTIAL

LW00148406

**B1173**

*New Winstar/Lucent Services Approach*
*Internal Communications Package*

❖ **Winstar Services Quarterly Passthrough review**

❖ **Marc Epstein's Business Principles**

❖ **Business Case Review**

❖ **Strategic Benefits and Risks**



CONFIDENTIAL

LW00148407

**B1174**

## Business Principles

- ❖ Lucent actively manages contractors (internal and external) and Winstar employees. Lucent clearly accountable for deliverables. Right to terminate, replace, etc. Option for contractors and/or employees to be directed to Lucent.

- ❖ Transition plan must recognize Lucent has option to exclude certain activities from scope.

- ❖ Contract will include option for Lucent to terminate, either partially or completely, with appropriate protections for Winstar.

- ❖ Winstar will be Lucent's preferred supplier based on its performance meeting defined metrics (quality, cost, timeliness). Best of breed concept.

- ❖ Must alter supply agreement's provision for "Winstar approval" of Lucent subcontractors.



CONFIDENTIAL

LH0014840B

**B1175**

## *Direction*

**Business Case:**

**To create a solutions based approach with an Outsourcing model.**

Creating a structure to transition services now performed by Winstar to Lucent. The goal is a structure with firm fixed prices and appropriate margins for an extensive set of deliverables. At this point, there is not enough data to determine if this goal can be achieved. Therefore we have developed a phased approach.

Phase I - Lucent actively manages Winstar services, and its people and contractors providing those services. These will be on a cost plus percentage basis. Lucent will increase its PM and NPS staffing at current rates to perform this management function.

Phase II - Evaluation of detailed data to develop firm fixed prices for appropriate deliverables and functions to be directly assumed by Lucent.

Phase III - Firm Fixed Price - within one year - outsource model.

Lucent has ability to terminate all or some of the deliverables if financial or operational goals cannot be met.

winstar

CONFIDENTIAL

LW00148409

**B1176**

## Consulting Services Business Anomaly

- ◆ Winstar has translated their business needs into 26 areas of what they have termed deliverables.

- ◆ Normal consultant business model for not "well defined" scope of work is to perform work on a "headcount for a price" or level of effort basis. Winstar's definitions of their 26 deliverables includes varying levels of truly definable activities.

- ◆ With the Winstar opportunity when you think in terms of Winstar
  - · Having people doing work to provide the deliverable today
  - · They have determined the number of people, at what cost they are producing that deliverable today

You have now establishing a baseline budget for that activity. With a set budget and Winstar's desire for Lucent to take over the responsibility and accountability for that deliverable, the firm fixed price model provides us flexibility in gaining margin above and beyond the cost plus model, by injecting efficiency and expertise into the processes.



## Structure of Services

### Expected Breakdown:

| | |
|---|---|
| NNS | 42% |
| SPG | 40% |
| NPS | 18% |

• Lucent resources are not included in the cost plus pricing.
They are at normal markup & margin

### Deliverable Summary:

| Item | Descriptions | Prime |
|---|---|---|
| 0 | Lucent Transition PMs/Mgt | NNS |
| 1 | R&D & new product intro | NPS |
| 2 | Product Engineering | NPS |
| 3 | Lab Testing | NPS |
| 4 | Program Management | NNS |
| 5 | Project Management | NNS |
| 6 | New product implementation | NNS |
| 7 | Long Haul ONG Program | NNS |







CONFIDENTIAL

LW00148411

B1178

## Structure of Services (continued)

### Deliverable Summary:

| Item | Descriptions | Prime |
|------|-------------|-------|
| 8 | Metro ONG | NNS |
| 9 | Service Node Deployments | NNS |
| 10 | Hub | NNS |
| 11 | Small Extended Range Sites | NNS |
| 12 | B Site Deployments | NNS |
| 13 | Broadband Network | NNS |
| 14 | ASP Data Centers | NPS |
| 15 | NMC Deployment | NPS |
| 16 | Network Numbering Project | na |
| 17 | City Planning | NPS |
| 18 | Capacity Planning | NPS |
| 19 | Enterprise Network | NPS |
| 20 | Internal Telecoms | ? |
| 21 | Customer Installations | na |
| 22 | 5E Translations(network) | NPS |



winstar

CONFIDENTIAL

LW00148412

**B1179**

## Structure of Services (continued)

## Deliverable Summary:

| Item | Descriptions | Prime |
|------|-------------|-------|
| 23 | BSS Deployment | SPG |
| 24 | OSS Deployment | SPG |
| 25 | System Engineering Projects | SPG |
| 26 | Systems Architecture Projects | SPG |



CONFIDENTIAL

LN00148413

B1180

## Initial Business Case Framework







CONFIDENTIAL

LW00148414

**B1181**

## Business Case

**Scenario 1 (= ~15%)**

| Lead BU | # Deliverables | | Year 1 | | | Year 2 | | | Year 3 | | |
| | Trans in 8 Months | Trans in 12 Months | Revenue | Margin | % | Revenue | Margin | % | Revenue | Margin | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NNS | 8 | 2 | $ 161,628 | $ 29,652 | 18.79% | $ 161,628 | $ 56,570 | 35.00% | $ 161,628 | $ 56,570 | 35.00% |
| NPS | 3 | 6 | $ 65,945 | $ 10,627 | 16.11% | $ 65,945 | $ 23,081 | 35.00% | $ 65,945 | $ 23,081 | 35.00% |
| SPG | 0 | 4 | $ 148,844 | $ 19,414 | 13.04% | $ 148,844 | $ 52,095 | 35.00% | $ 148,844 | $ 52,095 | 35.00% |
| Add'l** | | | $ 8,400 | $ 3,200 | 50.00% | $ 8,400 | $ 3,200 | 50.00% | $ 8,400 | $ 3,200 | 50.00% |
| Total | 11 | 12 | $ 382,817 | $ 62,793 | 16.40% | $ 382,817 | $ 134,948 | 35.25% | $ 382,817 | $ 134,948 | 35.25% |

**Scenario 2 (= ~30%)**

| Lead BU | # Deliverables | | Year 1 | | | Year 2 | | | Year 3 | | |
| | Trans in 8 Months | Trans in 12 Months | Revenue | Margin | % | Revenue | Margin | % | Revenue | Margin | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NNS | 8 | 2 | | | | | | | | | |
| NPS | 3 | 6 | | | | | | | | | |
| SPG | 0 | 4 | | | | | | | | | |
| Add'l** | | | | | | | | | | | |
| Total | 11 | 12 | | | | | | | | | |

**Scenario 3 (= ~20%)**

| Lead BU | # Deliverables | | Year 1 | | | Year 2 | | | Year 3 | | |
| | Trans in 8 Months | Trans in 12 Months | Revenue | Margin | % | Revenue | Margin | % | Revenue | Margin | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NNS | 8 | 2 | $ 165,797 | $ 33,720 | 20.34% | $ 165,797 | $ 58,029 | 35.00% | $ 165,797 | $ 58,029 | 35.00% |
| NPS | 3 | 6 | $ 68,129 | $ 12,811 | 18.80% | $ 68,129 | $ 23,845 | 35.00% | $ 68,129 | $ 23,845 | 35.00% |
| SPG | 0 | 4 | $ 155,315 | $ 25,898 | 16.67% | $ 155,315 | $ 54,360 | 35.00% | $ 155,315 | $ 54,360 | 35.00% |
| Add'l** | | | $ 6,400 | $ 3,200 | 50.00% | $ 6,400 | $ 3,200 | 50.00% | $ 6,400 | $ 3,200 | 50.00% |
| Total | 11 | 12 | $ 395,641 | $ 75,617 | 19.11% | $ 395,641 | $ 139,434 | 35.24% | $ 395,641 | $ 139,434 | 35.24% |

* One of 6 actually never transitions to EFP.

** Add'l is the 2% of gross billings attributable to added Lucent management headcount required to supervise this effort. These services will be provided with normal Lucent professional services margins (50%).

$ is thousands.



Executive Review 99 Initiative Summary
October 26, 2000
LUCENT / WINSTAR -- PROPRIETARY

CONFIDENTIAL

LW00148415

B1182

## *Issues*

- ❖ If we elect to move forward with the business:
    - – Low Margins in Phase I
    - – Transition to Phase II may not be as quick as we need
    - – Adverse Customer impact if we terminate.
    - – Need dedicated commitment to outsourcing business from NPS

- ❖ If we elect to not move forward with the business:
    - – Nina Letter - Breaking the commitment
    - – Winstar business problems get worse
    - – Strategic relationship gets worse/disappears ($500M revenue stream)



CONFIDENTIAL

LW00148416

B1183

## *Strategic Benefits and Risks*

# Strategic Benefits of the Deal

- ❖ Fulfills Supply Agreement intent for Lucent to have full responsibility to plan, execute implementation of the network
- ❖ Grow new revenue sources ($300M+ annually)
- ❖ Expand services portfolio
- ❖ Improve Winstar's business practices resulting in a more efficient, profitable company
- ❖ Enhance Winstar/Lucent strategic relationship

winstar



CONFIDENTIAL                                            LN00148417

B1184

## *Strategic Benefits and Risks*

## Strategic Risks of No Deal

❖ Winstar may find another strategic partner

❖ Inability to grow Lucent revenues greater than $500M per year

❖ Winstar will suffer negative financial ramifications



CONFIDENTIAL                                    LW00148418

B1185

 

**Lucent Technologies**
Bell Labs Innovations

| Nina Aversano | 3 Wood Hollow Road |
| President North America | Room 1K-08 |
| Service Provider Networks | Parsippany, NJ 07054 USA |
| | Phone 973 386 6100 |
| | Fax 973 386 6106 |

September 27, 2000

Mr. Richard J. Uhl
Group Executive & Chief Financial Officer
Winstar Communications
685 Third Avenue
New York, New York 10017

Dear Nate,

This is to inform you that Lucent will accept your purchase order WVFI-C000002958 conditioned upon Winstar agreeing to the following understandings and conditions. If you agree, kindly sign in the space provided below and return to me immediately. Nate, this is a great opportunity for us to move our relationship forward toward what we originally envisioned – a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar's business plan. I hope you agree with me that we should seize the moment.

It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent under our Supply Contract dated October 21, 1998. Pursuant to Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at the time Winstar was providing to itself. This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent. Since the signing of that contract there have been a number of attempts to formalize this broad services relationship. The last such attempt was undertaken this past June when the parties entered into two addenda – the Hub and B-Site Addendum and the Optical Network Addendum. These addenda did not include the full range of service contemplated in the Supply Contract.

I'm sure you would agree that fault for the failure to execute on our original concept lies with both Winstar and Lucent. Happily, it appears that we both favor the same result – a broad services relationship. We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent. We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible, our two teams meet at your offices to finalize a broad services agreement. This would be a lock-up session to finalize a full services agreement no later than two weeks thereafter. Consistent with the principles already established in our two addenda referenced above, Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement. Lucent may either perform the work itself by





CONFIDENTIAL    ZWC    0126822

B1186

acquiring expertise and personnel from Winstar, or subcontract some or all of it to third parties (including Winstar). Consistent with this model, commencing October 1, 2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any performed services by Winstar presumably on Lucent's behalf. In addition, Lucent would not be able to accept purchase orders or invoices for Winstar performed services that are outside the scope of work defined in the agreement.

Further, until this new services agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda referenced above or that fall within the scope of the new, as yet unexecuted, services agreement. Prior to Winstar performing any work that may rightfully fall within either of the two existing addenda referenced above, Lucent would need to issue mutually acceptable written purchase orders. Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent's behalf.

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision. If you have any questions, please call me on 973-581-4100.

*Nina Aversano*

Nina Aversano
President, North America

I agree

*[signature]*

Richard J. Uhl
For Winstar Communications, Inc.

CONFIDENTIAL    ZWC    0126823

**B1187**

From:       Brunner, Ashley (Ashley)
Sent:       Friday, December 15, 2000 5:14 PM
To:         Petrini, Vanessa H (Vanessa); De Leon, Esperanza V (Esperanza); Johnsen, Richard C
            (Rich); Chang, Hsin-Chieh (Joy); Eder, George F (George); Deady, Mark A (Mark); Norcross,
            Christine E (Christine); Bisson, Jody (Jody); Roberts, Cynthia B (Cynthia); Kilyk, Alan J (Alan);
            Gallagher, Daniel J (Dan); Springer, Kenneth Lee (Kenneth); Bova, Joseph P (Joe); Grant,
            Robert J (Robert); Grant, Mary E (Mary); Kulaga, Kenneth J (Kenneth); Murphy, Brian P
            (Brian); Diroma, Jill B (Jill); Spurrier, Carole J (Carole); Kionsky, David R (David); Bomer, B
            (Bob); Head, Doris Jean (Doris Jean); Jones, Audrey S (Audrey); Mark, Robert M (Rob);
            Vogel, Michael Vincent (Mike); Wanless, Kelly L (Kelly); Assimopoulos, Constantin
            (Constantin); Evans, Sandra M (Sandy); Kales, Paul A (Paul); Fullerton, William K (Bill);
            Helgeson, Malvin F (Mal); Hopkins, Deborah C (Debby/CFO); Kelly, Charles (Chuck); Khoo,
            Susan Cheng Su (Susan); Lovalt, Daniel J (Dan); McCartin, Annemarie (Annemarie);
            Montemarano, Michael A (Michael); Rosen, Stephen R (Stephen); Schnell, Susan M (Susan);
            Shah, Haresh (Haresh); White, Mark R (Mark)
Subject:    On Behalf of Susan Schnell - 12/7/2000 - NAR Deal Approval Notification: Winstar, Quest, &
            Verizon

Printed & In E-Mail 12/18

December 7, 2000
Deal Review Approval Notification

Domestic Opportunities:

Winstar – Services Addendum to Supply Agreement

$1.0B revenue opportunity to manage and complete Winstar's network build-out.

Michael Montemarano has _APPROVED_ this deal based on the following:

- Commercial terms and conditions are from the Supply Agreement approved in October, 1998.
- H. Shah (Accounting Policy) to set up a conference call for B. Fullerton, D. Harris, M.
  Montemarano, R. Mark, and J. Bisson to discuss issues related to revenue recognition.
    - Revenue recognized only upon full ownership of network operation or with a true
      subcontracting relationship.
    - Invoice once on day one of service, and again as the services are phased out, over 180
      days.
    - Program managers have been hired to oversee business and discovery period (Lucent being
      paid a fee for these services).
    - 15% markup during transition period if Winstar services flow through the Lucent books.
    - Additional markup if financing is used to pay for service.
    - Separate pricing for outsourcing.
- Approval contingent on NNS and NPS signoff.
- Approval contingent on Legal signoff.

Quest – DSL /ATM Expansion

1

**EXHIBIT**

Harris #9
7/31/0(

PLAINTIFF'S
EXHIBIT
PX-112

CONFIDENTIAL                                                    LW00016017

**B1188**

Request for re-approval of $1.5B revenue opportunity to deploy the Stinger product in remote terminal and central office locations in the former US West 14-state region, including engineering, installation, and maintenance.

Michael Montemarano has _APPROVED_ this deal based on the following:

- Opportunity to win back share from Cisco and to position Lucent for future sales opportunities.
- Joe Nacchio and Henry Schacht met previously on this deal
  - Lucent named primary vendor (Cisco named second vendor).
  - Provision for true up payment has been removed from the offer.
  - Minimum purchase commitment has been removed from the offer.
- Decision to be made over whether or not to include the third party cabinet in the price of the deal; business case currently assumes that Quest purchases their own cabinets.
  - If included, the cost is to be spread among INS and Services.
- Pay As You Grow pricing requires Treasury approval.
- Percentage of completion accounting to be used to recognize revenue.
- Approval contingent on INS and Services signoff.
- Approval contingent on Legal signoff.

### Quest - GPA

Request for preliminary approval of a General Purchase Agreement (GPA) for ~$7.4B revenue opportunity over three years.

Michael Montemarano has _APPROVED_ this deal based on the following:

- The GPA proposed consolidates over 29 separate GPAs currently in existance with Quest.
- $7.4B revenue opportunity assumes 51% market share for Lucent.
- GPA will include a provision for purchase commitments, annually, with a true up at the end of each calendar year.
- The Quest CT expects to have a pre-negotiation meeting with Quest to discuss commercial terms and conditions.
- The Quest CT will bring this GPA back for re-approval once negotiations begin.
  - Negotiations to begin next week; GPA expected to be in place by January 31, 2001.

### Verizon GSI

Request for re-approval of $264M revenue opportunity for a global network infrastructure build-out in 26 cities with estimated growth to 42 or more cities.

Michael Montemarano has _APPROVED_ this deal based on the following:

- Multi-product and services solution, including SPG, NPS, Services, INS, and ONG.
- Opportunity to beat Nortel as they are the other competitor aggressively pursuing this deal.
- A win on this deal would give Lucent the exclusive right to provide ONG and Data products.

2

CONFIDENTIAL

LW00016018

**B1189**

- Verizon is expected to build out slowly due to capital constraints and the need for revenue on the network; this affords Lucent time to operationalize the offer (through cost curve improvements, etc.).
- Incentives are delivered as credits against purchases; no additional price discounts.
- Approval contingent on SPG, NPS, Services, INS, and ONG signoff.
- Approval contingent on Legal signoff.

3

CONFIDENTIAL

LW00016019

**B1190**

**Harris, Deborah K (Deborah Kristine)**

| | |
|---|---|
| **From:** | Fawcett, Lee F (Lee) |
| **Sent:** | Friday, October 27, 2000 3:20 PM |
| **To:** | De Tura, Nick; Swift, Thomas M (Tom); Butze, David M (David) |
| **Cc:** | Harris, Deborah; Gaines, Ruth L (Ruth) |
| **Subject:** | WinStar Services Proposal |

Dave:
Nick:
Tom:

We have an opportunity. The WinStar team that has been chartered (by Nina Aversano) to drive to a Services proposal ($325M per year) by end of October. We have done considerable work to craft a framework, which will become an addendum to the general contract. It is a concept supported by both the Lucent Legal and Lucent CFO communities with respect to accountability, responsibility, and cost transfer, as well as revenue recognition criteria. The drafting of this Addendum is underway. Therefore we have moved through what we call the Legal/GAP 'gate'.

To meet the end-of-October objective, we will be reviewing the Addendum (proposal) with the WinStar EVP on Tuesday, from noon-2:00pm EST in Virginia, with the intent to reach closure, if at all possible, at that time.

What is before us then are several business (not legal or accounting) issues which need immediate and urgent attention.

1. For the Cost+ model, we need to establish the "+". This can be in several forms. One proposal is to use different rates for different deliverables, driven by which we expect to move to Fixed-Price and those we expect will never move. Those that would move, may start out with a lower mark-up than those that we expect will never change. Another approach is to use the same common mark-up rate. This is not a Consulting engagement, so the customer will not be able to support 50% margins (100% markup). At the same time, we have been passing radios through at approximately 7% GM. That bounds the issue. I would expect that we could get 10% markup, perhaps 15%, and certainly not more than 20%. We need a decision from the NPS team as to what is the minimum markup acceptable.
2. Lucent has asserted that the mark-up will apply ONLY to WinStar provided services/resources. Lucent provided resources/services will be provided at our current pricing levels (e.g. we currently charge S25K per month for Program Management services). This may be a point of contention with WinStar.
3. We need to understand the TOTAL WinStar costs (i.e. LOADED rates), since we need to establish a baseline for the deliverables cost as we assess feasibility and profitability of a FIXED Price approach to each. Whether those Overhead rates flow through or not during the COST+ mode, must also be decided.
4. Retroactivity: There is a disconnect with WinStar on this. Lucent's strong position is that this is ONLY a go-forward proposition. Any costs incurred by WinStar during October would not be accepted by Lucent. The source of the question is interpretation of commitments made at the end of September. The only implication here is that, while revenue would be recognized, it would also be at low margins (due to the mark up).
5. If we decide to move forward with this, with the margins in the "teens", then we would structure this to be tied to a greater business share level with WinStar.

If we agreed that the mark-up for the first (evaluation) year were 15%, we would generate about $42M Gross Margin, which is 13%. This would increase slightly by the good margins on the relatively small revenues generated early on by Lucent resources (e.g. Program Management).

Bottom Line:

CONFIDENTIAL

EXHIBIT
Harris #10
7/31/01

PLAINTIFF'S
EXHIBIT
PX-113

LW00017843

B1191

The original intent of the General Agreement with WinStar was for Lucent to perform many of the operational tasks/deliverables. Lucent has not done so, so WinStar developed its own capability. They still want Lucent to take on a much larger role. The risk of not doing this is:

1. Lucent agreed to pursue this, given our ability to reach a business agreement and we would be harming our credibility.
2. Winstar's business will be negatively impacted, which will then impact on Lucent's revenue opportunities
3. The strategic relationship will be negatively impacted.

We have the opportunity to assess (for up to a year) WinStar's operations in many parts of its business, to determine whether there are areas in which Lucent can generate good margins (say 30-35%) by truly Outsourcing these operations at a Fixed Price. This would be $325M revenue generating $42M Gross Margin during this first year evaluation (if we use 15% markup). Lucent will have the right to terminate the agreement. If we see no way to generate better margins after full and careful evaluation, we can terminate the business.

For the first year, because of the Cost+ arrangement and because initially Lucent will not acquire any headcount, there is virtually no risk in this proposal. Therefore the only real downside is low margins for the first year.

We need a decision quickly. We have a Lucent call on Monday at noon EST to finalize our business strategy. Please plan on attending, or sending an informed and empowered team member to make these decisions. Call in information will follow, as will additional information.

We appreciate your support.

Thanks.....

Debbie Harris
Lee Fawcett

Page 2

CONFIDENTIAL

LN00017844

B1192

**Harris, Deborah K (Deborah Kristine)**

| | |
|---|---|
| From: | Harris, Deborah K (Deborah Kristine) |
| Sent: | Sunday, December 03, 2000 8:20 PM |
| To: | Spurrier, Carole J (Carole) |
| Cc: | Alexander, Linda M (Linda); Petrini, Vanessa H (Vanessa) |
| Subject: | Winstar Financial issues |
| Importance: | High |

Carole

There are a series of Financial issues with Winstar which need to be resolved Monday, or Tuesday at the latest.

1. Winstar Services: We made tremendous progress on Friday and today reaching preliminary agreement on a draft contract. The one BIG issue is making the contract retroactive to October 1st. As I mentioned on Friday, a compromise position may be that we allow them to use the Financing vehicle for the 4Q Calendar and we don't flow anything thru our books. Winstar has asked that we work this issue through Tim Graham, their General Counsel to discuss alternative arrangements. This would probably be between $65-80M. We could probably apply the cost of money to this arrangement. Need your help resolving this issue.

*· $24M of onhand contractors - bills us back in January*

2. The lingering issue from Friday and that is to allow the draw down for the $37.5M credit that we owe Winstar this quarter. That is a contractual obligation. If we allow them to use the financing for this, they have agreed in return to give us value for this credit which we did not previously have, that would apply approximately $12.4K to each B price, raising it from $20K to $32K. This is much more tolerable from a cost perspective. Need your help resolving this issue. Deb Hopkins has frozen all money to Winstar.

*· New-edidge Phase 2 $2.5M extension of credit · return to purchase ATM $550*

*9K* 3. Rick Uhl has sent me an email stating their intention to pay us the $200M(net proceeds which is down to $187M) by mid week based on the finalization of their loan. I will work with Treasury to resolve the $13K difference. Due Diligence did start on Friday.

4. EOQ deal issues:  these reflect their need to be under $1B bank covenant for CAPEX spending
- External contractor deferring payments to January (need to investigate...thought this was a dead issue.
- Winstar requested that part of the $45M committed on the EIL Lab be used to pay for Winstar *credit newstedge De-wit* folks who had already started the process this quarter. (need to investigate)
- Reconciliation of what they have spent on B's and Hub's and adjust based on new pricing.(this is underway...desperately need a resource from Linda Alexander to help this process) *-how much? $25M (winstar) -apply to table purchase.*

I am sure there will be others, but I wanted to capture the hot ones for Monday.

Thanks for your support.
Debbie

*Contracts · Deck = $15M of services from 2001→2001*
*$1M/end · Optionics - sell off = $40M; CNS inventory Building, 2:1, IRV*
*in, octH joscontrol maint serv*

*· Audio - never sent invoice $1M - port of 26 $2000 done*
*· yet received rebate Page 1 = $10,555,000*

*· Vocall = April $700K needs to be resolved*
*that winstar does not have to pay us is what they are asking for*

*· 100 Building project - 1st solution/ondone / decided against / verbal $33M*



CONFIDENTIAL

EXHIBIT
_Harris #16_
7/31/01

PLAINTIFF'S
EXHIBIT
116

LW00075610

**B1193**