UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Civil Action No. 06-147(JJF) |
| WINSTAR COMMUNICATIONS, INC., et al., | Chapter 7 |
| Debtors. | Bankr. Case No. 01-1430 (KJC) |
| LUCENT TECHNOLOGIES INC., | Adv. Pro. No. 01-1063 (KJC) |
| Defendant-Appellant, | |
| v. | |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE, | |
| Plaintiff-Appellee. | |

## TRUSTEE CHRISTINE C. SHUBERT'S APPENDIX - VOLUME 4 OF 5

On the Brief:

    Stephen M. Rathkopf, Esq.
    David R. King, Esq.
    Andrew C. Gold, Esq.

Of Counsel:

    Sheldon K. Rennie, Esq.
    (DE Bar No. 3772)

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York  10016-9301
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street
Suite 1300
Wilmington, Delaware  19899-2323
Telephone:    (302) 654-7444

*Attorneys for Appellee Christine C. Shubert, Chapter 7 Trustee*

HF 3306091v.1 #06723/0002 06/13/2006

# APPENDIX

# TABLE OF CONTENTS

|  | ROA | Page |
|---|---|---|

**VOLUME 1**

**PLEADINGS:**

| | ROA | Page |
|---|---|---|
| Judgment 12/21/05 | 351 | B1 |
| Opinion 12/21/05 | 347 | B5 |
| District Court Opinion 11/18/04 | 2212 | B93 |
| Second Amended Complaint | 69 | B104 |
| Joint Pretrial Memorandum | 292 | B166 |
| RJSF | 327 | B181 |
| TFOF | 334 | B189 |
| TCOL | 334 | B279 |

**VOLUME 2**

| | ROA | Page |
|---|---|---|
| LFOF & LCOL | 335 | B435 |

**TRIAL TRANSCRIPTS:**

| | ROA | Page |
|---|---|---|
| Aversano | 363 | B629 |
| Garrett | 375 | B638 |
| Harris | 366 | B649 |
| Hayes | 368 | B673 |
| Holwell | 375 | B684 |
| Hopkins | 366 | B687 |
| Huber | 361 | B690 |
| Hund-Mejean | 369 | B695 |
| Jules | 361 | B705 |
| Keefe | 374 | B711 |

|  | ROA | Page |
|---|---|---|
| Perricone | 375 | B716 |
| Pocalyko | 358 | B728 |
| Rogers | 375 | B755 |
| Schacht | 376 | B756 |
| Solomon | 376 | B776 |
| Stark | 374 | B782 |
| Terrell | 376 | B789 |
| Verwaayen | 368 | B797 |
| Wilson | 371 | B804 |

## VOLUME 3

### JOINT TRIAL EXHIBIT TRANSCRIPTS:

| Ackerman | 465 | B814 |
|---|---|---|
| DiRoma | 463 | B854 |
| Harris | 478 | B871 |
| Hicks | 461 | B906 |
| Holwell | 476 | B927 |
| Kantor | 460 | B928 |
| McGinn | 466 | B954 |
| Montemarano | 468 | B956 |
| Plunkett | 477 | B980 |
| Rubin | 464 | B995 |
| Schacht | 473 | B1003 |
| Uhl | 472 | B1024 |
| Zlotnick | 462 | B1029 |

HF 3306170v.1 #06723/0002 06/13/2006

| | ROA | Page |
|---|---|---|

**PLAINTIFF'S TRIAL EXHIBITS**

| | | |
|---|---|---|
| PX-2 | 1244 | B1043 |
| PX-3 | 1245 | B1046 |
| PX-13 | 1255 | B1048 |
| PX-21 | 1263 | B1056 |
| PX-22 | 1264 | B1069 |
| PX-43 | 1285 | B1070 |
| PX-45 | 1287 | B1081 |
| PX-46 | 1288 | B1083 |
| PX-51 | 1293 | B1084 |
| PX-53 | 1295 | B1100 |
| PX-54 | 1296 | B1103 |
| PX-55 | 1297 | B1105 |
| PX-56 | 1298 | B1107 |
| PX-57 | 1299 | B1111 |
| PX-58 | 1300 | B1113 |
| PX-62 | 1304 | B1118 |
| PX-66 | 1308 | B1120 |
| PX-70 | 1312 | B1124 |
| PX-73 | 1315 | B1126 |
| PX-78 | 1320 | B1130 |
| PX-79 | 1321 | B1132 |
| PX-81 | 1323 | B1134 |
| PX-84 | 1326 | B1140 |
| PX-86 | 1328 | B1142 |
| PX-87 | 1329 | B1153 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|
| PX-88 ................................................................ | 1330 | B1156 |
| PX-90 ................................................................ | 1332 | B1157 |
| PX-92 ................................................................ | 1334 | B1162 |
| PX-94 ................................................................ | 1336 | B1163 |
| PX-104 .............................................................. | 1346 | B1164 |
| PX-107 .............................................................. | 1349 | B1165 |
| PX-109 .............................................................. | 1351 | B1172 |
| PX-110 .............................................................. | 1352 | B1186 |
| PX-112 .............................................................. | 1354 | B1188 |
| PX-113 .............................................................. | 1355 | B1191 |
| PX-116 .............................................................. | 1358 | B1193 |

**VOLUME 4**

| PX-123 .............................................................. | 1365 | B1194 |
| PX-125 .............................................................. | 1367 | B1344 |
| PX-127 .............................................................. | 1369 | B1345 |
| PX-131 .............................................................. | 1373 | B1347 |
| PX-136 .............................................................. | 1378 | B1350 |
| PX-137 .............................................................. | 1379 | B1351 |
| PX-138 (Excerpts) ............................................. | 1380 | B1352 |
| PX-148 .............................................................. | 1390 | B1366 |
| PX-149 .............................................................. | 1391 | B1370 |
| PX-151 .............................................................. | 1393 | B1371 |
| PX-153 .............................................................. | 1395 | B1383 |
| PX-155 .............................................................. | 1397 | B1395 |
| PX-157 .............................................................. | 1399 | B1396 |
| PX-158 .............................................................. | 1400 | B1397 |

iv

|  | ROA | Page |
|---|---|---|
| PX-167 | 1409 | B1398 |
| PX-169 | 1411 | B1400 |
| PX-179 | 1421 | B1405 |
| PX-185 | 1427 | B1413 |
| PX-186 | 1428 | B1415 |
| PX-187 | 1429 | B1464 |
| PX-188 | 1430 | B1468 |
| PX-192 | 1434 | B1470 |
| PX-199 | 1441 | B1480 |
| PX-200 | 1442 | B1482 |
| PX-201 | 1443 | B1487 |
| PX-202 | 1444 | B1510 |
| PX-220 | 1462 | B1511 |
| PX-225 | 1467 | B1513 |
| PX-231 | 1473 | B1515 |
| PX-241 | 1483 | B1516 |
| PX-243 | 1485 | B1517 |
| PX-251 | 1493 | B1519 |
| PX-252 | 1494 | B1521 |
| PX-261 | 1530 | B1523 |
| PX-262 | 1504 | B1524 |
| PX-264 | 1506 | B1526 |
| PX-297 | 1539 | B1529 |
| PX-300 | 1542 | B1532 |
| PX-307 | 1549 | B1535 |
| PX-311 | 1553 | B1537 |

v

|  | ROA | Page |
|---|---|---|
| PX-320 | 1562 | B1542 |
| PX-322 | 1564 | B1545 |
| PX-323 | 1565 | B1546 |
| PX-324 | 1566 | B1551 |
| PX-325 | 1567 | B1552 |
| PX-326 | 1568 | B1554 |
| PX-330 | 1572 | B1555 |
| PX-340 | 1582 | B1556 |
| PX-342 | 1584 | B1589 |
| PX-345 | 1587 | B1614 |
| PX-348 | 1590 | B1615 |
| PX-349 | 1591 | B1617 |
| PX-360 | 1602 | B1618 |
| PX-390 | 1632 | B1619 |
| PX-440 | 1682 | B1620 |
| PX-443 | 1685 | B1621 |
| PX-462 | 1704 | B1623 |
| PX-486 | 1728 | B1664 |
| PX-501 | 1743 | B1665 |
| PX-506 | 1748 | B1667 |
| PX-507 | 1749 | B1677 |
| PX-508 | 1750 | B1693 |
| PX-509 | 1751 | B1707 |

HF 3306170v.1 #06723/0002 06/13/2006

|  | ROA | Page |
|---|---|---|

## **VOLUME 5**

**DEFENDANT'S TRIAL EXHIBITS**

| | ROA | Page |
|---|---|---|
| DX-1 (Excerpts) | 479 | B1709 |
| DX-22 | 500 | B1724 |
| DX-29 (Excerpts) | 507 | B1760 |
| DX-32 | 510 | B1793 |
| DX-33 | 511 | B1813 |
| DX-72 | 550 | B1833 |
| DX-96 | 574 | B1835 |
| DX-142 | 620 | B1843 |
| DX-214 | 692 | B1844 |
| DX-260 | 739 | B1845 |
| DX-364 | 843 | B1847 |
| DX-516 | 995 | B1850 |
| DX-644 | 1123 | B1944 |
| DX-702 | 1181 | B2067 |
| DX-721 | 1200 | B2088 |
| DX-739 | 1219 | B2110 |

HF 3306170v.1 #06723/0002 06/13/2006

# PLAINTIFF'S TRIAL EXHIBITS

B





SUPPLY AGREEMENT

BY AND BETWEEN

WINSTAR COMMUNICATIONS, INC.

AND

LUCENT TECHNOLOGIES INC.

Effective as of October 21, 1998

B1195

# TABLE OF CONTENTS

1.    DEFINITIONS ...........................................................................................................1
1.1.   Certain Definitions. ................................................................................................1
1.2.   Other Terms. ..........................................................................................................6

2.    SCOPE AND STRUCTURE ....................................................................................6
2.1.   General. .................................................................................................................6
2.2.   Other Entities. .......................................................................................................6
2.3.   Strategic Relationship. ...........................................................................................7
2.4.   Existing Agreements ..............................................................................................9
2.5.   International Aspects. .............................................................................................9

3.    TERM .......................................................................................................................10
3.1.   Initial Term and Extension .....................................................................................10
3.2.   Interim Extension. ..................................................................................................10

4.    PURCHASING AND ORDERING ...........................................................................10
4.1.   Purchase Orders. ...................................................................................................10
4.2.   Administrative Changes. ........................................................................................12
4.3.   Timing of Delivery. .................................................................................................12
4.4.   Cancellation and Rescheduling of Purchase Orders ..............................................13
4.5.   Termination of Purchase Orders. ...........................................................................15

5.    SHIPPING AND DELIVERY ...................................................................................15
5.1.   Incorrect Delivery. .................................................................................................15
5.2.   Purchase Order Tracking. ......................................................................................15
5.3.   Packing. .................................................................................................................16
5.4.   Labeling. ................................................................................................................16
5.5.   Calibration and Testing. .........................................................................................16
5.6.   Shipping .................................................................................................................16
5.7.   Title and Risk of Loss. ...........................................................................................17

6.    DELIVERY OF SERVICES .....................................................................................17
6.1.   Transition/Ramp-up of Lucent Service Capabilities. ..............................................17
6.2.   Use of Third Parties. ..............................................................................................17
6.3.   Key Lucent Positions. ............................................................................................18
6.4.   Required Consents .................................................................................................19
6.5.   Implementation Plans, Milestones and Milestone Dates. .......................................19

7.    ACCEPTANCE TESTING AND FINAL ACCEPTANCE ........................................19
7.1.   Acceptance Testing and Cure. ...............................................................................19
7.2.   Acceptance. ...........................................................................................................19

8.    PERFORMANCE STANDARDS .............................................................................20
8.1.   General. .................................................................................................................20
8.2.   Failure to Perform. .................................................................................................20
8.3.   Periodic Reviews. ..................................................................................................20
8.4.   Measurement and Monitoring Tools. ......................................................................21

9.    SOFTWARE LICENSES AND PROPRIETARY RIGHTS .......................................21
9.1.   Licenses. ................................................................................................................21
9.2.   Proprietary Rights. .................................................................................................22
9.3.   Source Code Availability ........................................................................................23

10.   WINSTAR RESPONSIBILITIES .............................................................................24
10.1.  Facilities and Resources. .......................................................................................24
10.2.  Savings Clause ......................................................................................................24

- i -

B1196

11.     CHARGES ...................................................................................................24
11.1.   General ....................................................................................................24
11.2.   Taxes .......................................................................................................25
11.3.   Financing .................................................................................................26
11.4.   Incidental Expenses .................................................................................27

12.     INVOICING AND PAYMENT ....................................................................28
12.1.   Invoicing .................................................................................................28
12.2.   Payment Due ...........................................................................................29
12.3.   Accountability .........................................................................................29
12.4.   Proration .................................................................................................29
12.5.   Set Off ....................................................................................................29
12.6.   Disputed Charges .....................................................................................29
12.7.   Encumbrances ..........................................................................................29

13.     CONFIDENTIALITY ....................................................................................30
13.1.   Confidential Information ..........................................................................30
13.2.   Obligations ..............................................................................................30
13.3.   Exclusions ...............................................................................................30
13.4.   No Implied Rights ....................................................................................31

14.     REPRESENTATIONS, WARRANTIES AND COVENANTS ......................31
14.1.   Pass-Through Warranties .........................................................................31
14.2.   Non-Infringement ....................................................................................32
14.3.   Ownership or Use .....................................................................................32
14.4.   Authorization ...........................................................................................32
14.5.   Inducements ............................................................................................32
14.6.   Work Standards ........................................................................................32
14.7.   Product Warranties ...................................................................................33
14.8.   Discontinued Lucent Products ..................................................................35
14.9.   Compliance ..............................................................................................35
14.10.  Documentation .........................................................................................35
14.11.  Viruses ....................................................................................................35
14.12.  Disabling Code .........................................................................................35
14.13.  Integration Test ........................................................................................36
14.14.  Year 2000 ................................................................................................36
14.15.  Disclaimer ...............................................................................................37

15.     TERMINATION ...........................................................................................37
15.1.   Termination for Cause ..............................................................................37
15.2.   Termination by Lucent .............................................................................37
15.3.   Termination Option for Lucent's Failure to Provide Financing .................38
15.4.   Disengagement Assistance ........................................................................38

16.     LIABILITY ...................................................................................................38
16.1.   General Intent ..........................................................................................38
16.2.   Liability Restrictions ................................................................................38
16.3.   Force Majeure ..........................................................................................39

17.     INDEMNIFICATION ....................................................................................40
17.1.   Indemnities by Lucent ..............................................................................40
17.2.   Indemnities by WinStar ............................................................................40
17.3.   Infringement ............................................................................................41
17.4.   Indemnification Procedures ......................................................................41

18.     DISPUTE RESOLUTION .............................................................................42
18.1.   Informal Dispute Resolution .....................................................................42

- ii -

18.2. Litigation .................................................................................................. 43
18.3. Continued Performance ............................................................................. 43
18.4. Governing Law .......................................................................................... 44

19.   INSURANCE REQUIREMENTS ............................................................... 44

20.   GENERAL ................................................................................................... 44
20.1. Binding Nature and Assignment ............................................................... 44
20.2. Entire Agreement ...................................................................................... 45
20.3. Notices ...................................................................................................... 45
20.4. Counterparts .............................................................................................. 46
20.5. Relationship of Parties .............................................................................. 46
20.6. Severability ............................................................................................... 46
20.7. Consents and Approval ............................................................................. 46
20.8. Waiver of Default ...................................................................................... 46
20.9. Cumulative Remedies ................................................................................ 47
20.10. Survival .................................................................................................... 47
20.11. Public Disclosures ................................................................................... 47
20.12. Service Marks .......................................................................................... 47
20.13. Third Party Beneficiaries ........................................................................ 48
20.14. Amendment .............................................................................................. 48
20.15. Interpretation ........................................................................................... 48
20.16. Incorporation by Reference and Order of Precedence ............................ 49

### LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule A | Statement of Work |
| Exhibit A-1 | Lucent Responsibility Matrix by Technology |
| Exhibit A-2 | International |
| Exhibit A-3 | WinStar/Lucent Market Deployment Responsibility Matrix |
| Exhibit A-4 | Transition Plan |
| Exhibit A-5 | Product Spec Principles |
| Exhibit A-6 | Current Network Diagrams |
| Exhibit A-7 | Future Network Diagrams |
| Schedule B | Performance Standards |
| Schedule C | Pricing |
| Exhibit C-1 | Lucent Product Price List |
| Exhibit C-2 | WinStar Product Discounts |
| Exhibit C-3 | Reference Pricing |
| Exhibit C-4 | Switch Pricing |
| Exhibit C-5 | Pricing for Lucent Services |
| Exhibit C-6 | Pricing for Interoperability Testing Lab |
| Exhibit C-7 | Pricing for Optical Networking Technologies |
| Exhibit C-8 | Pricing for International Services |
| Schedule D | Documentation and Specifications |
| Schedule E | Testing and Acceptance |
| Schedule F | Credit Agreement |
| Schedule G | International Consideration |
| Schedule H | Best of Breed |
| Schedule I | Warranty Periods |
| Schedule J | Key Lucent Positions |
| Schedule K | Lucent Indicia Use Guidelines |

B1198

SUPPLY AGREEMENT

BY AND BETWEEN

WINSTAR COMMUNICATIONS, INC.

AND

LUCENT TECHNOLOGIES INC.

This Supply Agreement (the "Agreement"), effective as of October 21, 1998 (the "Effective Date"), is entered into by and between WINSTAR COMMUNICATIONS, INC., a Delaware corporation with offices located at 230 Park Avenue, New York, New York 10169 ("WinStar"), and LUCENT TECHNOLOGIES INC., a Delaware corporation with offices located at 600 Mountain Avenue, Murray Hill, New Jersey 07974 ("Lucent"). As used in this Agreement, "Party" means either WinStar or Lucent, as appropriate, and "Parties" means WinStar and Lucent. The Parties agree that the following terms and conditions shall apply to the products and services to be provided by Lucent under this Agreement in consideration of certain payments to be made by WinStar.

1.     DEFINITIONS

   1.1.     Certain Definitions.

      As used in this Agreement:

      (a)     "Acceptance" has the meaning set forth in Section 7.2.

      (b)     "Acceptance Criteria" mean the criteria used to determine whether a Deliverable is ready for Acceptance, as set forth more fully in Schedule E. The Acceptance Criteria require, unless otherwise mutually agreed in writing, that the Deliverable:

         (i)     Meets or exceeds the Specifications applicable to such Deliverable, as well as all applicable warranties;

         (ii)     Integrates in accordance with the approved Network design, architecture and technology;

         (iii)     Complies with applicable Documentation;

         (iv)     Complies with Applicable Standards; and

         (v)     Complies with all additional mutually agreed-upon testing criteria and plans as may be developed and agreed upon by the Parties in accordance with the terms of this Agreement.

      (c)     "Acceptance Test Period" for a Deliverable shall mean the applicable period specified in Schedule E. In the event an Acceptance Test Period for a particular Deliverable is not specified in Schedule E and is not otherwise mutually agreed

B1199

upon, the Acceptance Test Period shall be thirty (30) days from either Lucent Certification, if installed or implemented by Lucent, or delivery of the Deliverable, if not installed or implemented by Lucent.

(d)    "Affiliate" means, with respect to any entity, any other entity Influencing, Influenced by or under common Influence with such entity.

(e)    "Agreement" has the meaning set forth in the preamble to this Agreement.

(f)    "Applicable Standards" means (i) all industry standards (whether domestic or international) applicable to the Deliverable, including NEBS (1, 2 and 3), Underwriters Laboratory, EIA/TIA, Bellcore, ANSI, IEEE, ATM-Forum, NESC, ITU-T and NEC, all as may be amended from time to time, and (ii) all domestic and international federal, state and local laws, regulations, ordinances, codes and requirements applicable to the Deliverable, all as may be amended from time to time.

(g)    "Best of Breed" shall have the meaning set forth in Schedule H.  Best of Breed analyses shall be used for all Products and Services to be provided or implemented as part of the Network design and architecture.

(h)    "City-Specific Plan" means a plan that addresses the timing (including Milestones), network, cost/budget, functionality and scope of implementation (addition or augmentation) for a particular network design.

(i)    "Contract Year" shall have the meaning set forth in Section 11.3(b).

(j)    "Credit Agreement" shall refer to that certain Credit Agreement, dated as of October 21, 1998 among WinStar Network Expansion LLC, WinStar Communications, Inc., the Lenders party thereto, State Street Bank and Trust Company as collateral agent, and Lucent Technologies Inc. as administrative agent.  A copy of the Credit Agreement is attached hereto as Schedule F.

(k)    "Custom Product" shall mean a Product that requires engineering to WinStar's specific and unique requirements.

(l)    "Customer Colocation" means the existence of WinStar customer equipment and associated software and peripherals interconnected with a WinStar network and located in WinStar's premises (whether owned, leased or licensed by WinStar).

(m)    "Customer Virtual Colocation" means the existence of WinStar customer equipment and associated software and peripherals interconnected with a WinStar network and not located in WinStar's premises (whether owned, leased or licensed by WinStar).

(n)    "Deliverable" means a Product or an end product of a Service delivered by Lucent pursuant to this Agreement and the applicable Schedules.

(o)    "Developed Deliverable" has the meaning set forth in Section 9.2.

---

B1200

(p)     "Documentation" has the meaning set forth in Section 9.1(f).

(q)     "Effective Date" has the meaning set forth in the preamble to this Agreement.

(r)     "Equipment" means the equipment, hardware, firmware, cabling and embedded Software components that may be purchased, or with respect to embedded Software, licensed by WinStar from or through Lucent under this Agreement. As of the Effective Date, the categories of Equipment include the categories identified as such in Schedule C.

(s)     "Extended Warranty Period" has the meaning set forth in Section (ss).

(t)     "Influence" and its derivatives means (i) legal, beneficial, or equitable ownership, directly or indirectly, of more than an Interest of outstanding capital stock (or other ownership interest, if not a corporation) of an entity ordinarily having voting rights or (ii) with respect to entities incorporated or principally operating in the United States, management or operational control over such entity.

(u)     "Interest" means thirty-three and one third percent (33⅓%) with respect to entities incorporated or principally operating in the United States, and five percent (5%) with respect to all other entities.

(v)     "Lucent" has the meaning set forth in the preamble to this Agreement.  With respect to the obligation to fulfill Purchase Orders, "Lucent" shall also include Lucent's distributors; provided, however, Lucent shall remain fully responsible for the performance of such distributors.

(w)     "Lucent Certification" shall mean Lucent's written certification to WinStar that (i) it has fully and successfully tested the Deliverable in accordance with the developed test plan (individually and as integrated into the Network), (ii) the Deliverable has met the Acceptance Criteria to Lucent's satisfaction and (iii) the Deliverable is available for WinStar's testing in accordance with the applicable test plan.

(x)     "Lucent Product" means any product created, sold through, distributed or branded by Lucent or its distributors, and shall include those products identified in this Agreement and otherwise made commercially available by Lucent or its distributors.

(y)     "Milestone" has the meaning set forth in Section 6.5(a).

(z)     "Milestone Date" has the meaning set forth in Section 6.5(a).

(aa)    "Network" means the physical, transport and application network layers of the communication infrastructure used by WinStar to connect to its domestic and foreign customers and central offices in a variety of combinations. The demarcation points of the Network shall be coincident with the WinStar customer demarcation points. It is anticipated that the Network will include

B1201

domestic intra-city networks, inter-city networks, international networks and international intra-city networks.

(bb)    "Network Architecture" means the overall design and architecture specification for the Network, including sizing and engineering requirements, from which the Network Technology is developed.

(cc)    "Network Element" means any product or transport service necessary for the proper operation of the Network, which will be set forth in the Network Technology.

(dd)    "Network Technology" means the Deliverable developed from the Network Architecture by Lucent for review and approval by WinStar, all as set forth in Schedule A, that identifies the Product and transport specifications for implementation as part of the City-Specific Plans.

(ee)    "Nonconformity" has the meaning set forth in Schedule E.

(ff)    "Out-of-Pocket Expenses" means reasonable and actual out-of-pocket expenses incurred by a Party, but not including that Party's overhead costs (or allocations thereof), administrative expenses or other mark-ups.

(gg)    "Party" and "Parties" has the meaning set forth in the preamble to this Agreement.

(hh)    "Product" means Lucent Products and Third Party Products.

(ii)    "Purchase Order" has the meaning specified in Section 4.1(a).

(jj)    "Required Consents" means such third party consents with regard to Third Party Products or other items as may be required for Lucent's provision of Services and Deliverables.

(kk)    "Service" means the services provided by Lucent pursuant to this Agreement and (i) described in any Purchase Order, or (ii) not specifically described in a Purchase Order, but implied by or required for the proper performance and provision of services included in a Purchase Order. As of the Effective Date, the Services that WinStar may purchase from Lucent include those services identified as such in Schedule A subject to the Transition Plan specified therein, as well as those services described in Schedule G.

(ll)    "Software" means software, including applicable documentation, that may be licensed by WinStar from Lucent under this Agreement or that is developed by Lucent as a Deliverable pursuant to this Agreement.

(mm)    "Source Code" means both machine-readable and human-readable copies of Software consisting of instructions to be executed upon a computer in the language used by its programmers (i.e., prior to compilation or assembly) in a form in which the program logic of the Software is deducible by a human being, fully commented, and including all related flow diagrams and all other

---

B1202

documentation and manuals which would allow WinStar to properly effect modifications and support for Software Deliverables provided under this Agreement.

(nn)   "Specifications" means published engineering specifications, including Network design standards and Lucent's or the relevant Product manufacturers' specifications for particular Products furnished hereunder.

(oo)   "Stock Product" shall mean a Product that is not a Custom Product.

(pp)   "Third Party Product" means any product that is not a Lucent Product.

(qq)   "Transition Plan" means the plan specified in Schedule A regarding Lucent's time periods to begin providing certain of the Services as specified in the plan.

(rr)   "Virus" means: (i) program code, programming instruction or set of instructions intentionally constructed with the ability to damage, interfere with or otherwise adversely affect computer programs, data files or operations; or (ii) other code typically designated to be a virus.

(ss)   "Warranty Period" means, for each Deliverable, the applicable period set forth in Schedule I measured from the earlier of Acceptance or thirty (30) days following the date of Lucent Certification. Lucent shall advise WinStar of the price, if any, determined pursuant to the charging methodology and process set forth in Schedule C and applicable to WinStar's extension of the Warranty Period. WinStar may extend the Warranty Period one or more times in its sole discretion upon payment of such price, which shall in no event exceed Lucent's published standard rates applicable to commercial accounts similar to WinStar's less the applicable discount percentage set forth in Exhibit C-2 (the aggregate of such extensions being referred to as the "Extended Warranty Period").

(tt)   "WinStar" has the meaning set forth in the preamble to this Agreement.

(uu)   "Year 2000 Compliant" means the ability of a Deliverable provided or developed by Lucent pursuant to this Agreement to (i) correctly process, provide, interpret, manipulate and receive date data within and between the twentieth and twenty-first centuries, without causing logical or mathematical inconsistencies, processing errors, loss of functionality or performance, or other failures, and (ii) interoperate with other technical systems (including but not limited to hardware and software) having the characteristics described in (i) and with date data of the twentieth and twenty-first centuries. With respect to any data that is generated or provided in conjunction with the Deliverables, such data shall contain such information or be so formatted as to permit hardware or software with the characteristics described in (i) of the foregoing sentence to correctly process, provide, interpret, manipulate and receive such data within and between the twentieth and twenty-first centuries, without causing logical or mathematical inconsistencies, processing errors, loss of functionality or performance, or other failures with respect to such Deliverables.

---

Supply Agreement                                          Confidential – WinStar/Lucent

B1203

1.2.  **Other Terms.**

Other terms used in this Agreement are defined in the context in which they are used and have the meanings there indicated.

2.  **SCOPE AND STRUCTURE**

2.1.  **General.**

(a)  This Agreement sets forth the general terms and conditions under which WinStar may purchase and receive Deliverables and Services from Lucent and financing the Network-related Third Party Products and services purchased directly by WinStar.

(b)  This Agreement is being made and entered into with reference to the following:

(i)  It is WinStar's objective to engage Lucent to design and implement a Best of Breed nationwide and global communications Network;

(ii)  By entering into this Agreement, WinStar and Lucent desire to leverage Lucent's core competencies in both products and services in designing and implementing the Best of Breed Network; and

(iii)  Lucent desires to provide such products and services and provide the requisite financing to enable WinStar and Lucent to achieve this mutual objective.

(c)  The Parties acknowledge that this Agreement does not grant to Lucent an exclusive privilege to sell or otherwise provide to WinStar any or all of the Deliverables or Services of the type described in this Agreement. WinStar may contract with other manufacturers and suppliers for the procurement of comparable equipment, software, systems, deliverables or services. Lucent is not restricted from selling the types of products or services that may be purchased and ordered by WinStar hereunder to other parties, except as provided in Section 9.2.

2.2.  **Other Entities.**

(a)  As of the Effective Date, Lucent shall provide Deliverables and Services to WinStar and any WinStar Affiliates designated by WinStar from time to time in its sole discretion. For the purposes of this Agreement, Deliverables and Services provided to WinStar's Affiliates shall be deemed to be Deliverables and Services provided to WinStar, and WinStar's Affiliates shall be entitled to the rights of WinStar hereunder with respect to Deliverables and Services purchased by such Affiliates. Payment for Deliverables and Services to Affiliates either will be guaranteed by WinStar or may be conditioned upon the Affiliates' ability to pay.

---

B1204

(b)　　Except as may be otherwise provided by the terms and conditions of the Credit Agreement, WinStar shall have the right to assign, transfer, sell, alienate, lease or sublicense Lucent Products to third parties in conjunction with (i) the disposal of such Products, (ii) Customer Colocations involving such Products, or (iii) Customer Virtual Colocations involving such Products, and pass through to such third parties the rights (and the applicable warranty exclusions) granted to WinStar under this Agreement that are applicable to such Lucent Products, subject to the following:

　　　　(i)　　Each third party shall agree in writing that its license for any Software to which Lucent maintains title under this Agreement is revocable by Lucent in the event such third party materially breaches the licensing restrictions imposed upon WinStar under this Agreement pursuant to Section 9.1;

　　　　(ii)　　Each such third party shall agree in writing to confidentiality terms and conditions substantially similar to those set forth in Article 13; and

　　　　(iii)　　With respect to rights granted to WinStar under Article 14 and passed through to such third parties, the Parties will agree upon a reasonable means of administering Lucent's fulfillment of its obligations with respect to such rights.

Where WinStar substantially complies with the obligations set forth above, WinStar shall have no liability to Lucent for any action or omission of such third parties except for providing Lucent reasonable assistance in bringing claims as against the third party for reasonable claims.

(c)　　The Parties will proactively pursue entering into mutual value-added reseller or similar relationships as business needs dictate. Such relationships may also include co-marketing activities where Lucent would also sell WinStar products in conjunction with Lucent products.

2.3.　　**Strategic Relationship.**

(a)　　**Best of Breed Commitment and Preferred Supplier Status.** The Parties agree that a critical component of the Parties success in working together under this Agreement is sharing in the following objectives and commitments: (i) the Network and associated services will be Best of Breed; and (ii) subject to the Parties following the Best of Breed selection process set forth in Schedule H, Lucent will be WinStar's preferred supplier to the extent Best of Breed Network Elements exist from Lucent. Consistent with this mutual objective and commitment, Lucent understands that as part of the Best of Breed analysis and subsequent recommendation, some of the recommended Network Elements and services may consist of Third-Party Products and services, even where Lucent has a competing product and service.

(b)　　**Preferred Customer Status.** In consideration of WinStar's agreement to treat Lucent as a preferred supplier, Lucent agrees to treat WinStar as a preferred

---

B1205

customer. This preferred customer status shall include providing WinStar with any preferential treatment that Lucent may provide to its other significant customers, including, expediting orders, providing access to new technologies, competitive pricing and discounts, invitations to Lucent-run conferences, customer events and educational activities (including finance-related educational events Lucent may provide), and potential business referrals. Nothing herein will require Lucent to violate any of its existing agreements.

(c)    **Lucent-provided Roof Rights and Building Access.** If requested by WinStar, Lucent shall grant to WinStar, at no cost, roof and interior space and conduit rights to buildings for which Lucent can obtain or has such rights pursuant to industry standard terms. In addition, Lucent shall assist WinStar in obtaining such rights with respect to any other buildings leased or occupied by Lucent. Nothing herein shall obligate Lucent to violate any of its existing real property lease agreements. Within ninety (90) days of the Effective Date and semi-annually thereafter, Lucent shall provide WinStar with a written list of all addresses of current real estate properties owned, leased or otherwise occupied by Lucent.

(d)    **Mutual Marketing Support.** The Parties will provide reasonable marketing support to the each other in connection with the Network and associated business opportunities of each Party. This shall include WinStar's ability to use, subject to Section 20.12 and Schedule K, the Lucent name, logos and service marks (including use of the "Bell Labs" and "Bell Laboratories" names, logos and service marks in the same manner that Lucent uses such names, logos and service marks) in WinStar advertising and marketing materials. Lucent will credit to an account of WinStar on an annual basis one quarter of one percent of the total purchase price for Lucent Products and Services during the previous Contract Year. Said credit will be accrued by Lucent and utilized for co-branding and co-marketing activities related to promoting WinStar in the marketplace.

(e)    **Technology Summit.** Semiannually after the Effective Date and during the Term, the Parties shall meet to discuss their plans and objectives with respect to the development and deployment of new network-related solutions. As part of such discussion (i) WinStar shall share with Lucent its plans for potential future service offerings, potential market demand and anticipated product needs and (ii) Lucent shall share with WinStar its plans regarding product enhancements and evaluations as well as new products under development.

(f)    **Lucent Lab/Testing Facilities.** Lucent shall provide the testing and lab facilities as provided in Schedule A and Exhibit C-6.

(g)    **Demonstration Products.** From time to time and at WinStar's reasonable request, Lucent shall, at no charge, provide WinStar with limited quantities of Lucent Products not previously introduced to the market generally by Lucent for the purpose of WinStar's evaluation (or demonstration) for a trial period.

B1206

(h)    Regulatory Assistance. If Lucent affirmatively takes a position in the United States regulatory environment, it will be in favor of a level playing field and in support of competition. Lucent agrees to meet and consult with WinStar regarding United States regulatory issues, including with regard to WinStar's licensed spectrum and Equal Access II concerns. Outside of the United States, Lucent shall assist and support all of WinStar's regulatory-related efforts in connection with obtaining required licenses, approvals or otherwise in connection with WinStar's implementation of its network.

(i)    Government Business. Lucent and WinStar will develop and implement a cooperation strategy to assist both companies in obtaining Federal government business (e.g., to respond to future GSA MAA proposals). In particular, this shall include the following: (1) provided it is legally capable of doing so, Lucent will agree to be a subcontractor team member, at WinStar's election, to WinStar Federal Services, LLC on the GSA WITS2001 project and will assist in the preparation and review of the proposal; and (2) provided it is legally capable of doing so, Lucent and WinStar will mutually investigate making WinStar Federal Services, LLC a subcontractor on the Lucent ViViD contract for the U.S. Navy.

2.4.    Existing Agreements

As of the Effective Date, the Parties have entered into a General Agreement (Contract No. LNS960531CRWIN) (the "GA"), the Product Purchase Addendum to the General Agreement (Contract No. LNS960609CRWIN) (the "PPA"), the Professional Services Agreement (Contract No. LNS960819MTWIN) (the "PSA"), and related Exhibits, Attachments and Lists to the foregoing, all of which have been executed between the Parties (the GA, PPA, PSA, Exhibits and Attachments collectively hereinafter referred to as the "Existing Agreements"). Notwithstanding the Existing Agreements, (a) all services and products ordered by WinStar after the Effective Date (or after October 15, 1998 in the case of certain 5ESS purchase orders that may be issued by WinStar to Lucent) shall be governed by the terms of this Agreement, and (b) any unused portions of any credits to which WinStar is entitled under the Existing Agreements or any such other agreements between Lucent and WinStar or its Affiliates shall be carried over to this Agreement and apply to reduce amounts payable by WinStar under this Agreement. The Parties shall also carry forward and make available to WinStar any additional benefits that were to be provided by Lucent under the Existing Agreements and the Parties shall identify such benefits in Product addenda hereto.

2.5.    International Aspects.

The Parties agree that as of the Effective Date the terms of this Agreement shall apply with respect to Lucent's provision of products and services outside of the United States to WinStar and WinStar's Affiliates, and such products and services shall be deemed Products and Services, as applicable. The Parties agree that they shall amend this Agreement (in a writing signed by both parties and in a manner consistent with the terms of this Agreement) to the extent necessary to account for local law and practice issues unique to such Products and Services and to the country in which they are to be provided.

---

B1207

3.    **TERM**

3.1.    **Initial Term and Extension**

The term of this Agreement shall begin upon the Effective Date and shall continue for a period of five years, unless terminated earlier or extended in accordance with this Agreement (the "Term"). Upon giving written notice to Lucent no less than thirty (30) days prior to the then-existing expiration date of this Agreement, WinStar shall have the right to extend the Term of this Agreement for additional one (1) year periods on the terms and conditions then in effect; provided, however, that Lucent reserves the right to renegotiate the pricing set forth in Schedule C of this Agreement subject to Section 3.2.

3.2.    **Interim Extension**

In the event that WinStar provides notice to Lucent pursuant to Section 3.1 of its desire to extend the Term, and Lucent exercises its right to renegotiate pricing as described in Section 3.1, the Term of this Agreement shall be deemed extended upon the terms and conditions then in effect (including with respect to the pricing set forth in Schedule C) for any period of time during which the Parties are renegotiating such pricing. In the event that such renegotiation terminates in an agreement between the Parties with respect to Schedule C pricing, the Term shall be extended pursuant to Section 3.1, and such agreement between the Parties will apply retroactively beginning upon the immediately prior expiration of the Term. In the event that such renegotiation terminates without an agreement between the Parties with respect to Schedule C pricing, this Agreement shall expire upon such termination of renegotiations.

4.    **PURCHASING AND ORDERING**

4.1.    **Purchase Orders.**

(a)    All purchases of Deliverables or Services shall be made by means of orders (each, a "Purchase Order") issued by WinStar to Lucent from time to time pursuant to this Section, unless otherwise expressly agreed by the Parties in writing. WinStar will not be liable to Lucent for any charges, additional or otherwise, for Deliverables or Services provided by Lucent unless set forth in a Purchase Order, or otherwise mutually agreed upon by the Parties in writing.

(b)    Lucent agrees to provide and deliver, and WinStar agrees to purchase:

(i)    Any Deliverable or Service listed in a Schedule hereto that is specified by WinStar in a Purchase Order that conforms to Subsection (e) of this Section; and

(ii)    Any other Deliverable or Service specified by WinStar in a Purchase Order that conforms to Subsection (e) of this Section and is accepted by Lucent.

(c)    With respect to any Purchase Order that is either consistent with (i) the requirements of a City-Specific Plan, or (ii) Lucent's ordering intervals set forth

---

Supply Agreement                                      Confidential -- WinStar/Lucent

B1208

in Schedule C for the Products identified therein or Lucent's standard ordering intervals for any other Products, then Lucent shall be deemed to have accepted a Purchase Order immediately upon receipt of such Purchase Order. Otherwise, Lucent shall be deemed to have accepted a Purchase Order on the tenth (10th) business day following receipt of such Purchase Order pursuant to Section 20.3 if Lucent has not notified WinStar in writing of its rejection of the Purchase Order pursuant to Section 20.3 prior to such time. In the event of a disaster declared by WinStar, Lucent will use commercially reasonable efforts to expedite the acceptance of any Purchase Orders that are submitted by WinStar as a means of mitigating the adverse effects to WinStar of such disaster; provided, however, that the terms and conditions of Section 4.3(c) shall not apply to such Purchase Order.

(d)   Estimates or forecasts furnished by WinStar to Lucent shall not constitute Purchase Orders or commitments for purchases.

(e)   Purchase Orders placed under this Agreement may be made by means of mail or fax pursuant to Section 20.3, or upon mutual agreement of the Parties, electronic data interchange. No Purchase Order or other ordering document which would otherwise modify or supplement this Agreement or any Schedule shall add to or vary the terms of this Agreement. All such proposed variations or additions (whether submitted by either Party) are objected to and deemed material. Each Purchase Order shall contain, at a minimum, the following information:

(i)    The date of the Purchase Order;

(ii)   A written reference to this Agreement;

(iii)  Any applicable discounts as set forth in Schedule C;

(iv)   With regard to Products:

(1)   The quantity and a brief written description of each Product ordered, including any applicable part, accessory or product number;

(2)   The unit price of each Product ordered, calculated pursuant to this Agreement, as well as subtotals and Purchase Order totals for Products; and

(3)   The required delivery date and place;

(v)    With regard to other Deliverables or Services:

(1)   The quantity and a brief written description of each Service ordered;

(2)   The price of each Service ordered (e.g., applicable rates or fixed fees), calculated pursuant to this Agreement, as well as subtotals and Purchase Order totals for Services;

---

B1209

(3)     In the case of a Deliverable, the required delivery date, and in the case of a Service, the required performance date or dates; and

(4)     In the case of a Deliverable, the required place of delivery, and in the case of a Service, the required place of performance.

(f)     With respect Third Party Products provided by Lucent pursuant to this Agreement, Lucent shall:

(i)     Use commercially reasonable efforts to effect a formal original-equipment manufacturer ("OEM") or similar relationship with the third-party sellers, manufacturers, lessors or licensors of such Third Party Products that is consistent with Lucent's then-current OEM policies and standards; and

(ii)    To the extent Lucent does not have an OEM or similar relationship with the third party sellers, manufactures, lessors or licensors of such Third Party Product: (1) pass through to WinStar the benefits of any rights and remedies it has with respect to such Third Party Products to the extent that Lucent is able pursuant to any agreements between Lucent and the third-party sellers, manufacturers, lessors or licensors of such Third Party Products, and enforce such warranties and indemnities on behalf of WinStar as directed by WinStar; and (2) use commercially reasonable efforts to obtain terms and conditions that are favorable to WinStar.

4.2.    **Administrative Changes.**

Lucent will notify WinStar at least thirty (30) calendar days in advance of any administrative changes with respect to any Product set forth in Schedule A or previously provided by Lucent to WinStar, such as changes in product part numbers or descriptions, as well as newly compatible products or components.

4.3.    **Timing of Delivery.**

(a)     Delivery dates for Deliverables and Services shall be firm. Lucent will deliver Deliverables and Services strictly in accordance with the terms and conditions of this Agreement.

(b)     If Lucent discovers any potential delay that threatens the timely delivery or the full delivery of Deliverables or Services with respect to a Purchase Order, Lucent shall immediately notify WinStar of such delay. If requested by WinStar, Lucent shall provide a written plan for correction of such delay.

(c)     Subject to Sections 4.1(c), 10.2 and 16.3, if Lucent fails to deliver such Deliverable or Services in accordance with the scheduled delivery or performance date set forth in the corresponding Purchase Order, then after five (5) business days following the scheduled delivery or performance date, WinStar

---

Supply Agreement                                         Confidential – WinStar/Lucent

B1210

shall be entitled to deduct from the price of such Deliverable or Service an amount equal to one percent (1%) of the price of such Deliverable or Service for each seven (7) calendar days of delay after such grace period until actual delivery of such Deliverable or performance of such Service, up to a maximum deduction of one hundred percent (100%) of the price for such Deliverable or Service (the "Delivery Pricing Adjustment"). Notwithstanding the preceding sentence, Lucent shall not be liable for a Delivery Pricing Adjustment to the extent that Lucent can demonstrate that its failure to deliver a Deliverable or Service in accordance with the scheduled delivery or performance date set forth in the corresponding Purchase Order is reasonably caused by the wrongful actions of WinStar or a change, revision, modification, or special requirement with respect to such Deliverable or Service, or the delivery or performance date for such Deliverable or Service, that is requested by WinStar and approved by Lucent after Lucent has accepted the Purchase Order corresponding to such Deliverable or Service. In the event WinStar has not otherwise terminated the Purchase Order as provided in Subsection 4.5 below and WinStar elects to take the Delivery Pricing Adjustment as provided above, such adjustment shall be WinStar's sole and exclusive monetary remedy with respect to the delay attributable to the failure to complete the Purchase Order; provided, however, in the event Lucent has persistent delays over multiple Purchase Orders, such Delivery Pricing Adjustment shall be in addition to any other rights or remedies WinStar may have under this Agreement or at law or in equity. Lucent agrees not to make an economic determination not to deliver a Deliverable or Service under a particular Purchase Order due to the Delivery Pricing Adjustment.

(d)     If Lucent fails to make any delivery of a Deliverable or performance of a Service within the lesser of

(i)     forty-five (45) calendar days after the scheduled delivery or performance date set forth in the corresponding Purchase Order, and

(ii)     such other time period as mutually agreed by the Parties,

Then WinStar shall be entitled to terminate the corresponding Purchase Order in accordance with Section 4.5.

4.4.     Cancellation and Rescheduling of Purchase Orders

(a)     WinStar can cancel Purchase Orders for Stock Products in whole or in part at no cost or liability anytime prior to thirty (30) days prior to the scheduled delivery date set forth in the Purchase Order. Should WinStar cancel any Purchase Order for Stock Products, in whole or in part, other than for cause during the thirty (30) day period prior to the scheduled delivery date, WinStar agrees to pay to Lucent cancellation and reconfiguration charges equal to the lesser of (i) Lucent's actual and reasonable Out-of-Pocket Expenses associated with reconfiguring and restocking the Stock Products canceled and (ii) ten percent (10%) of the Purchase Order price for the canceled Stock Products.

B1211

(b)　WinStar can cancel Purchase Orders for Custom Products in whole or in part at no cost or liability anytime prior to sixty (60) days prior to the scheduled delivery date set forth in the Purchase Order. Should WinStar cancel any Purchase Order for Custom Products, in whole or in part, other than for cause during the sixty (60) day period prior to the scheduled delivery date, WinStar agrees to pay to Lucent cancellation and reconfiguration charges equal to the lesser of (i) Lucent's Out-of-Pocket Expenses associated with reconfiguring and restocking the Custom Products canceled and (ii) the following percentage of the Purchase Order price for the particular canceled Custom Products based on the number of calendar days of prior notice provided by WinStar: (1) fifty percent (50%) if the notice is within nine (9) days prior to or on the scheduled delivery date set forth in the Purchase Order, (2) twenty percent (20%) if the notice is less than fifty-five (55) days but more than nine (9) days prior to the scheduled delivery date set forth in the Purchase Order, and (3) ten percent (10%) if the notice is less than sixty (60) days but more than fifty-five (55) days prior to the scheduled delivery date set forth in the Purchase Order.

(c)　WinStar may change the "ship to" destination of any Purchase Order by submitting notice to Lucent in writing at least ten (10) calendar days prior to shipment. If such change is requested by WinStar with less than forty-eight hours of notice prior to shipment, Lucent will use all reasonable efforts to implement such change. WinStar will be responsible for unavoidable Out-of-Pocket Expenses that Lucent reasonably incurs as a direct result of such change. Lucent will provide WinStar with an estimate of such Out-of-Pocket Expenses as soon as possible following WinStar's notice.

(d)　Purchase Orders shall not be subject to cancellation after shipment except as expressly provided in this Agreement.

(e)　WinStar may reschedule any Purchase Order for Stock Products at anytime prior to actual shipment. WinStar can reschedule any Purchase Order with respect to Stock Products at no cost or liability up to ninety (90) days from the original scheduled shipment date specified in the applicable Purchase Order.

(f)　WinStar may reschedule any Purchase Order for Custom Products at no cost or liability at anytime prior to the actual shipment; provided, however, if the reschedule request is within thirty (30) days of the scheduled delivery date set forth in the Purchase Order, the rescheduled delivery date requested by WinStar will be subject to Lucent's reasonable approval, but in no event shall the rescheduled delivery date be more than ten (10) days later than WinStar's requested rescheduled delivery date. If the new shipment date is within thirty (30) days of the scheduled shipment date, then Lucent shall arrange and pay for all additional transportation and storage costs for the Purchase Order. If the new shipment date is more than thirty (30) days after the scheduled shipment date but less than ninety (90) days after the scheduled shipment date, then such reasonable additional storage Out-of-Pocket Expenses incurred by Lucent shall be payable by WinStar. Except as provided in the preceding sentence, WinStar can reschedule any Purchase Order at no cost or liability up to ninety (90) days

B1212

from the original scheduled shipment date specified in the applicable Purchase Order.

(g)    All references in this Section to the scheduled delivery date specified in the Purchase Order shall be extended day-for-day by the number of days Lucent is delayed in meeting the scheduled delivery date.

4.5.    Termination of Purchase Orders.

In the event that Lucent:

(a)    Fails to correct the failure of a Deliverable to comply with a representation, warranty or covenant as set forth in this Agreement;

(b)    Fails to achieve Acceptance with respect to a Lucent Product as set forth in Section 7.2; or

(c)    Fails to make delivery in a timely fashion as set forth in Section 4.3(d) or 1.1(b);

Then WinStar may, by giving written notice to Lucent, terminate the corresponding Purchase Order, in whole or in part, for cause as of a date specified in the notice of termination.  In such event, WinStar may return any associated Deliverables (if delivered) to Lucent, in which case Lucent shall promptly refund (in the form of a credit for future purchases) to WinStar all charges paid by WinStar to Lucent for such Deliverables, and WinStar shall have no further payment obligations to Lucent with respect to such Deliverables.

5.    SHIPPING AND DELIVERY

5.1.    Incorrect Delivery.

(a)    Early deliveries of Products may be refused due to space or security considerations and returned or stored at Lucent's expense and risk of loss.

(b)    WinStar assumes no liability for Products produced, processed, rendered or shipped in excess of the amounts specified in any Purchase Order submitted pursuant to this Agreement.

(c)    If Lucent makes a proper shipment in a timely manner and the WinStar facility is not prepared to receive the shipment, WinStar will be responsible for unavoidable Out-of-Pocket Expenses that Lucent reasonably incurs as a direct result of WinStar's failure to prepare.  Lucent will provide WinStar with an estimate of such Out-of-Pocket Expenses as soon as possible following WinStar's notice.

5.2.    Purchase Order Tracking.

Lucent shall be responsible for tracking the delivery of all Products from receipt of the corresponding Purchase Order until delivery of such Products to the WinStar-designated

---

B1213

place of delivery. Lucent will provide WinStar with current status reports and information on Purchase Orders and such other information and reports as reasonably requested by WinStar regarding Purchase Orders.

5.3.    Packing.

All Products delivered to WinStar pursuant to this Agreement shall be preserved, packaged and packed by Lucent to ensure safe delivery to their destinations without damages due to shipment.

5.4.    Labeling.

(a)    Lucent will label each component of any Product no later than at the time of installation of such component. Lucent will use reasonable and good faith efforts to label each component of any Product, each container and each set of packing documentation with any WinStar-provided asset identification information prior to the installation of such component.

(b)    Lucent will mark each shipping carton with (i) a brief description of the contents and quantities of the Products shipped within such shipping carton, and (ii) the address of the delivery destination specified on the applicable Purchase Order.

5.5.    Calibration and Testing.

Lucent will calibrate and test Products shipped to ensure that such Products meet the applicable Specifications.

5.6.    Shipping

(a)    Lucent will notify WinStar of Lucent's intent to ship Products within a reasonable time prior to the scheduled delivery date as specified in the Order at the delivery destination address specified in a Purchase Order, so as to permit WinStar to make necessary arrangements for receipt of the shipment. The foregoing notwithstanding, Lucent shall deliver such Products consistent with the agreed upon City-Specific Plan.

(b)    Lucent will ship all Products to the delivery destination specified by WinStar in the corresponding Purchase Order. All shipments to WinStar's premises shall be consistent with WinStar's shipping and delivery processes and procedures provided or identified to Lucent. Lucent will (i) ship all deliveries complete, and (ii) not ship any substitute item in place of a Product specified in a Purchase Order that differs in form, fit or function, unless otherwise agreed by WinStar in writing.

(c)    Unless otherwise instructed by WinStar, Lucent will:

(i)    Enclose a packing memorandum with each shipment and, when more than one package is shipped, identify the one which contains the memorandum;

B1214

(ii)    Verify that bills of lading match corresponding shipping invoices; and

(iii)    Forward applicable bills of lading and shipping notices with items shipped.

(d)    All shipments will be F.O.B. destination, unless otherwise agreed in writing by WinStar. WinStar will reimburse Lucent for actual, reasonable freight and insurance costs on an Out-of-Pocket expenses basis; provided, however that upon reasonable request by WinStar, Lucent substantiates such costs by providing WinStar with freight bills or other written documentation that adequately verifies such charges. Lucent will ship all items by means of a common carrier or carriers designated by WinStar.

### 5.7.    Title and Risk of Loss.

Risk of loss and title to any item shipped to WinStar will pass to WinStar upon delivery into the interior of the WinStar destination facility or as otherwise specified in writing by WinStar. WinStar will notify Lucent as soon as reasonably practicable of any claim with respect to loss which occurs while Lucent has the risk of loss and shall provide reasonable cooperation to facilitate the settlement of any claim.

## 6.    DELIVERY OF SERVICES

### 6.1.    Transition/Ramp-up of Lucent Service Capabilities.

(a)    Subject to the Transition Plan, Lucent shall perform the Services ordered by WinStar hereunder.

(b)    If Lucent fails to achieve the transition on or before the completion date as set forth in the Transition Plan for reasons other than the wrongful actions of WinStar, then Lucent shall pay WinStar for additional Out-of-Pocket Expenses incurred by WinStar as a result of such failure.

### 6.2.    Use of Third Parties.

(a)    Lucent shall not subcontract any of its obligations under this Agreement, without WinStar's prior written consent, which shall not be unreasonably withheld. WinStar shall have the right to revoke its prior approval of a subcontractor and direct Lucent to replace such subcontractor if (i) the subcontractor's performance is deficient, (ii) there have been misrepresentations by or concerning the subcontractor, or (iii) good faith doubts exist concerning the subcontractor's ability to render future performance because of changes to the subcontractor's ownership, personnel, management, financial condition, or otherwise.

(b)    Lucent will remain responsible for obligations performed by its subcontractors to the same extent as if such obligations were performed by Lucent employees. Lucent shall be WinStar's sole point of contact regarding Deliverables and Services provided by such subcontractors, including with respect to payment. Lucent will not disclose Confidential Information of WinStar to a subcontractor

---

B1215

unless and until such subcontractor has agreed in writing to protect the confidentiality of such information in a manner substantially equivalent to that required of Lucent under this Agreement, and in all respects, only on a "need-to-know" basis.

(c)    Upon WinStar's request, Lucent shall provide program management with respect to WinStar's personnel and third party service providers contracted directly by WinStar to perform services related to the Deliverables and Services. In the event Lucent intends to subcontract a particular component of the Services to a third party, Lucent shall notify WinStar and WinStar shall have the option, in its sole discretion, to perform such services itself or through its own subcontractor. Such WinStar personnel and third parties shall not be considered Lucent subcontractors for the purposes of this Agreement.

6.3.    **Key Lucent Positions.**

(a)    "Key Lucent Positions" shall be the positions set forth as such in Schedule J, as Schedule J is amended from time to time by the mutual written agreement of the Parties.

(b)    Lucent shall fill such Key Lucent Positions and shall cause each of the personnel filling the Key Lucent Positions to devote substantially his or her full time and effort to the provision of the Services on-site at WinStar's facilities. WinStar will provide reasonable facilities for the use of the personnel in Key Lucent Positions.

(c)    WinStar, with Lucent's written approval, which approval shall not be unreasonably withheld, may from time to time change the positions designated as Key Lucent Positions under this Agreement provided that the number of Key Lucent Positions shall not exceed the number set forth in Schedule J as of the Effective Date.

(d)    Before assigning an individual to a Key Lucent Position, whether as an initial assignment or a subsequent assignment, Lucent shall notify WinStar of the proposed assignment and shall provide WinStar with a resume and other information about the individual reasonably requested by WinStar. If WinStar in good faith objects to the proposed assignment, the Parties shall attempt to resolve WinStar's concerns on a mutually agreeable basis. If the Parties have not been able to resolve WinStar's concerns within five (5) days, Lucent shall not assign the individual to that position and shall propose to WinStar the assignment of another individual of suitable ability and qualifications.

(e)    Personnel filling Key Lucent Positions may not be transferred or re-assigned until a suitable replacement has been reasonably approved by WinStar and the functions and responsibilities of the individual being transferred or reassigned have been properly transitioned to the replacement.

---

B1216

6.4.    Required Consents

(a)    Lucent, with the cooperation of WinStar, but at Lucent's expense, shall obtain any Required Consents.  In the event that such expense is not commercially reasonable and Lucent cannot provide a reasonable monetary or non-monetary alternative to the third party, the Parties shall work together to achieve an appropriate resolution.

(b)    If a Required Consent is not obtained, then, unless and until such Required Consent is obtained, Lucent shall determine and adopt, subject to WinStar's prior approval, such alternative approaches as are necessary and sufficient to provide the Deliverables and Services without such Required Consents.

6.5.    Implementation Plans, Milestones and Milestone Dates.

For all Services that result in the creation of a Deliverable:

(a)    Lucent shall prepare for WinStar's review, comment and approval, a detailed, task-level implementation plan delineating milestones (each, a "Milestone"), Milestone completion dates (each, a "Milestone Date"), together with each Party's respective responsibilities associated with the installation or implementation work.

(b)    If Lucent fails to achieve a Milestone on or before the corresponding Milestone Date, (i) Lucent's President of Global Commercial Markets (or in the event such position no longer exists, an executive with a similar level of responsibility) will meet with WinStar in person at WinStar's facilities, explain to WinStar the root cause for the delay, and present to WinStar a plan to remedy such failure, and (ii) Lucent will take appropriate preventive measures so that the failure does not recur, and reasonably demonstrate to WinStar that such measures have been performed.

7.    ACCEPTANCE TESTING AND FINAL ACCEPTANCE

7.1.    Acceptance Testing and Cure.

As described more fully in Schedule E, each Deliverable shall be subject to acceptance testing by WinStar.  If a Deliverable meets its Acceptance Criteria (including all applicable Specifications), WinStar will notify Lucent that such Deliverable has received Acceptance pursuant to Section 7.2.  If a Deliverable does not meet its Acceptance Criteria, WinStar may notify Lucent of the failures of the Deliverable to meet its Acceptance Criteria, and of WinStar's Acceptance of such Deliverable pursuant to Section 7.2 upon the condition that such failures will be corrected by Lucent within a period of time specified by WinStar (such acceptance a "Conditional Acceptance").

7.2.    Acceptance.

A Deliverable shall be deemed to be accepted (the "Acceptance") only upon the earliest of: (a) receipt by Lucent of written notice by WinStar certifying that the Deliverable

B1217

conforms to its Acceptance Criteria; (b) satisfaction of all conditions underlying a Conditional Acceptance as described in Section 7.1, or (c) the expiration of the Acceptance Testing Period for such Deliverable without notice of non-acceptance or of the terms of a Conditional Acceptance by WinStar. Notwithstanding anything to the contrary herein, Acceptance of a Deliverable shall only occur in accordance with the terms of this Agreement.

8.   PERFORMANCE STANDARDS

   8.1.   General.

   All Deliverables and Services provided by Lucent shall at all times meet or exceed the quantitative and qualitative performance standards identified in Schedule B (the "Performance Standards"), including those Performance Standards that are critical to WinStar's business functions (the "Critical Performance Standards"). In addition, all Services provided by Lucent shall at all times be consistent with (i) WinStar's methods, operations and procedures as of the Effective Date and in any event (ii) standards satisfied by well-managed operations performing services similar to the Services.

   8.2.   Failure to Perform.

   (a)   Lucent recognizes that its failure to meet Critical Performance Standards may have a materially adverse impact on the business and operations of WinStar. Accordingly, in the event that Lucent fails to meet a Critical Performance Standard for reasons other than the wrongful actions of WinStar or circumstances that constitute force majeure under this Agreement, WinStar may elect in lieu of pursuing other monetary remedies to recover as liquidated damages the amounts calculated pursuant to Schedule B (the "Performance Standard Credits").

   (b)   If Lucent fails to meet any Performance Standard, Lucent shall (i) investigate and report on the root causes of the problem; (ii) advise WinStar, as and to the extent requested by WinStar, of the status of remedial efforts being undertaken with respect to such problems; (iii) correct the problem and begin meeting the Performance Standards; and (iv) take appropriate preventive measures so that the problem does not recur.

   8.3.   Periodic Reviews.

   Within three (3) months after the expiration of the first year following the Effective Date and at least annually thereafter, WinStar and Lucent shall review the Performance Standards and shall make adjustments to them as appropriate to reflect improved performance capabilities associated with advances in the technology and methods used to provide the Deliverables and perform the Services. The Parties expect and understand that the Performance Standards will become more stringent over time.

---

B1218

8.4.   Measurement and Monitoring Tools.

Lucent shall use the measurement and monitoring tools and procedures required to measure and report Lucent's performance of the Services against the applicable Performance Standards. Such measurement and monitoring will permit reporting at a level of detail sufficient to verify compliance with the Performance Standards and will be subject to audit by WinStar. Lucent shall provide WinStar with information and access to such tools and procedures upon request, for purposes of verification.

9.    **SOFTWARE LICENSES AND PROPRIETARY RIGHTS**

9.1.   Licenses.

(a)    Commencing upon delivery of Software pursuant to this Agreement, Lucent grants WinStar and its Affiliates a perpetual, transferable (as provided herein), nonexclusive, fully-paid, royalty-free, irrevocable (except as provided by Subsection (b) of this Section) and world-wide right and license (or sublicense in the case of Software owned by a third party) to use, copy (as provided herein), access, display, operate and process the Software provided to WinStar pursuant to a Purchase Order (collectively, the "Licenses"). These rights may be exercised through officers, employees and agents for the sole purpose of providing services to WinStar and its Affiliates. WinStar may copy the Software for back-up purposes and for uses that are in accordance with this Agreement. Any such reproduction will include any copyright or similar proprietary notice contained in the Software being reproduced. WinStar may not decompile, disassemble or reverse engineer the Software.

(b)    Lucent may revoke a particular License if and only if WinStar fails to pay undisputed licensing fees associated with such License, and such nonpayment is not cured within thirty (30) calendar days after written notice of such nonpayment provided by Lucent to WinStar.

(c)    If Lucent is unable to secure the rights specified in Section 9.1 with respect to Software associated with Third Party Products, it shall be excused from that obligation, provided that it gives WinStar prior written notice of such inability sufficiently in advance so that WinStar may seek alternate means of obtaining such rights.

(d)    WinStar may, at no charge, relocate any Software to another location for reuse with Equipment with which it was originally delivered when such Equipment is itself to be relocated consistent with this Agreement. Such relocation or reuse shall not alter the Licenses.

(e)    WinStar shall have the right to transfer any of the Licenses in the event WinStar sells the Equipment with which such Software is utilized or any component thereof, or in the event of an assignment or change in control in accordance with Section 20.1. Such transfers shall be subject to (i) the transferee undertaking the restrictions and covenants of the license, (ii) reasonable creditworthiness of the

B1219

transferee, and (iii) a limitation that the transferee is not a direct competitor of Lucent in the area of telecommunications equipment manufacture.

(f)   Lucent agrees to furnish and convey, at no additional charge to WinStar, such documentation, training materials, manuals, appropriate designs, appropriate drawings, and other media and material pertaining to the use and operation of Deliverables as is necessary to permit WinStar to use and maintain such items in accordance with this Agreement (the "Documentation"). Lucent will provide the Documentation in both hard- and soft-copy formats. WinStar may make a reasonable number of copies of the Documentation; provided, however, that all such copies shall contain the copyright legends placed on the original versions by Lucent.

(g)   In the event that a WinStar employee violates the License restrictions set forth in this Section (a), WinStar shall, at its own expense take such reasonable actions as may be necessary to remedy such violation and cooperate in all reasonable respects to minimize the violation and any damage resulting therefrom.

(h)   WinStar acknowledges that, in the event it attempts to decompile, disassemble or reverse engineer Software other than any Developed Deliverable, Lucent may proceed directly to court. If a court of competent jurisdiction should find that WinStar has attempted to decompile, disassemble or reverse engineer such Software, WinStar agrees that without any additional findings of irreparable · injury or other conditions to injunctive relief, it shall not oppose the entry of an appropriate order restraining it from any further attempt to decompile, disassemble or reverse engineer such Software.

9.2.   Proprietary Rights.

(a)   Title to the Software shall remain in Lucent or its suppliers except as otherwise provided herein.

(b)   The Parties do not expect that Lucent will develop custom Software in the course of performance under this Agreement.

(c)   Notwithstanding the foregoing, title to any Software or Deliverables created by WinStar or created by Lucent for WinStar pursuant to mutually agreed-upon terms, conditions and fees set forth in a Purchase Order shall vest in WinStar (such Software and Deliverables the "Developed Deliverables"). Developed Deliverables shall be considered "works made for hire" for WinStar. To the extent any Developed Deliverable is not deemed a "work for hire" by operation of law, Lucent hereby irrevocably assigns, transfers and conveys to WinStar without further consideration all of its right, title and interest in such Developed Deliverable, including all rights of patent, copyright, trade secret or other proprietary rights in such materials. Lucent acknowledges that WinStar and the assigns of WinStar shall have the right to obtain and hold in their own name any intellectual property rights in and to Developed Deliverables. Lucent agrees to execute any documents or take any other actions as may reasonably be necessary, or as WinStar may reasonably request, to perfect WinStar's ownership

B1220

of any Developed Deliverables. Concurrently with the delivery of Developed Deliverables, Lucent will provide to WinStar the Source Code for Software included within the scope of the Developed Deliverables as well as all documentation and other information necessary for WinStar to exercise its rights granted by this Agreement with respect to such Source Code. To the extent that Lucent adds to or modifies such Source Code as part of the Services, Lucent shall provide such additions or modifications to the Source Code and any associated documentation to WinStar concurrently with the performance of such Services.

(d) .    WinStar grants to Lucent a worldwide, fully paid-up, nonexclusive license during the Term to use, copy, maintain, modify, enhance and create derivative works of the Developed Deliverables (including the Source Code applicable to such Developed Deliverables) for the sole purpose of providing the Services pursuant to this Agreement. For any items provided by WinStar for Lucent's use hereunder, Lucent shall maintain the confidentiality of such items in accordance with the terms hereof. Lucent will not use Developed Deliverables or any other items provided by WinStar for the benefit of any entities other than WinStar without the prior written consent of WinStar, which may be withheld at WinStar's sole discretion. Except as otherwise requested or approved by WinStar, upon expiration or termination of this Agreement, Lucent will cease all use of Developed Deliverables and other items provided by WinStar and promptly return all such items to WinStar.

9.3.    Source Code Availability

(a)    As used herein, a "Source Code License Trigger Event" shall mean the satisfaction of any of the following conditions: (i) Lucent ceases to maintain or support a previously supported version of the Software; (ii) the insolvency of Lucent or the institution by Lucent of insolvency, receivership or bankruptcy proceedings; (iii) a general assignment by Lucent for the benefit of creditors; (iv) the appointment of a receiver for Lucent; (v) the filing of creditors of Lucent of a petition in bankruptcy against Lucent which is not stayed or dismissed within sixty (60) calendar days; or (vi) other permitted access to the Source Code as provided in Section 365n of the U.S. Bankruptcy Code.

(b)    Upon the occurrence of a Source Code License Trigger Event, Lucent shall immediately deliver and hereby grants to WinStar at no additional charge a license to use, copy, access, display, modify, enhance, operate, process and create derivative works of the Source Code for the Lucent Product(s) then being used by WinStar (provided, that with respect to the Source Code License Trigger Event described in Subsection (a)(i) above, such delivery shall be limited to the applicable non-supported or non-maintained Software), any Software development programs, and any associated documentation for such Software to the extent necessary for WinStar to modify, maintain and enhance for its use in accordance with the terms of this Agreement the Software that WinStar has the right to use under this Agreement; provided, however, such release will not be required where WinStar can obtain, with Lucent's assistance (e.g., by providing third party with Source Code or by any other appropriate method), the same

---

Supply Agreement                                         Confidential – WinStar/Lucent

B1221

support services that Lucent is required to provide under this Agreement from another entity (either working with or independently from Lucent) at a price that is equal to or less than prices for such support as provided herein. Any such released Source Code shall be subject to the confidentiality provisions set forth in this Agreement.

(c)    Lucent acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligation to provide the Source Code license as provided in this Section 9.3, WinStar will be irreparably harmed. In such a circumstance, WinStar may proceed directly to court. If a court of competent jurisdiction should find that Lucent has breached (or attempted or threatened to breach) any such obligations, Lucent agrees that without any additional findings of irreparable injury or other conditions to injunctive relief, it shall not oppose the entry of an appropriate order compelling performance by Lucent and restraining it from any further breaches (or attempted or threatened breaches).

## 10.    WINSTAR RESPONSIBILITIES

### 10.1.    Facilities and Resources

WinStar's responsibility for providing facilities, personnel and other resources as necessary to permit Lucent to deliver the Deliverables and Services shall be as set forth in this Agreement. Lucent shall be responsible for providing all other necessary facilities, personnel and other resources.

### 10.2.    Savings Clause

WinStar's failure to perform any of its responsibilities set forth in this Agreement (other than WinStar obligations to pay undisputed amounts under Article 11.3) shall not constitute a material breach of the Agreement or otherwise be deemed to be grounds for extra compensation to, or termination by, Lucent. However, Lucent's nonperformance of its obligations under this Agreement shall be excused if and to the extent: (a) such nonperformance is a direct result of WinStar's failure to perform its responsibilities, (b) Lucent provides WinStar with reasonable notice of such nonperformance, and (c) Lucent uses commercially reasonable efforts to perform notwithstanding WinStar's failure to perform.

## 11.    CHARGES

### 11.1.    General.

The charging mechanisms and pricing methodologies for Products, other Deliverables and Services are set forth in Schedule C. The Parties agree to supplement Schedule C in a manner consistent with the other pricing terms of this Agreement as necessary if and when WinStar purchases Deliverables and Services for which pricing is not set forth in Schedule C. WinStar will not be liable to Lucent for any charges, additional or otherwise, for Deliverables or Services provided by Lucent unless such charges are

B1222

expressly set forth in a Purchase Order, this Agreement (including its Schedules) or as otherwise may be mutually agreed by the Parties in writing.

11.2.   Taxes.

The Parties' respective responsibilities for taxes arising under or in connection with this Agreement shall be as follows:

(a)   Each Party shall be responsible for personal property taxes on property it owns or leases, for franchise and privilege taxes on its business, and for taxes based on its net income or gross receipts.

(b)   Lucent shall be responsible for sales, use, excise, value-added, services, consumption, and other taxes and duties payable by Lucent on any goods or services that are used or consumed by Lucent in providing the Deliverables and Services.

(c)   WinStar shall be responsible for sales, use, excise, value-added, services, consumption, and other taxes existing as of the Effective Date that are assessed on any particular Deliverable or Service received by WinStar from Lucent. If and to the extent any such tax is reduced or eliminated during the Term, Lucent shall reduce or eliminate any charges for such taxes, as appropriate.

(d)   In the event that a sales, use, excise, value added, services, consumption, or other tax is assessed on the provision of any of Deliverable or Services, the Parties shall work together to segregate the payments under this Agreement into three (3) payment streams:

(i)    Payments for taxable Deliverables and Services;

(ii)   Payments where Lucent functions merely as a payment agent for WinStar in receiving goods, supplies, or services (including leasing and licensing arrangements); and

(iii)  Payments for other nontaxable Deliverables and Services.

(e)   The Parties agree to cooperate with each other to enable each to more accurately determine its own tax liability and to minimize such liability to the extent legally permissible. Lucent shall use commercially reasonable efforts to minimize WinStar's taxes payable hereunder. Lucent's invoices shall separately state the amounts of any taxes Lucent is collecting from WinStar. Each Party shall provide and make available to the other any resale certificates, information regarding out-of-state or out-of-country sales or use of equipment, materials or services, and other exemption certificates or information reasonably requested by either Party.

(f)    Lucent shall promptly notify WinStar of, and coordinate with WinStar the response to and settlement of, any claim for taxes asserted by applicable taxing authorities for which WinStar is responsible hereunder. With respect to any

---

B1223

claim arising out of a form or return signed by a Party to this Agreement, such Party shall have the right to elect to control the response to and settlement of the claim, but the other Party shall have all rights to participate in the responses and settlements that are appropriate to its potential responsibilities or liabilities. If WinStar requests Lucent to challenge the imposition of any tax, WinStar shall reimburse Lucent for the reasonable legal fees and expenses it incurs. WinStar shall be entitled to any tax refunds or rebates granted to the extent such refunds or rebates are of taxes that were paid by WinStar.

11.3.    **Financing.**

(a)    Lucent shall provide WinStar financing in accordance with the Credit Agreement and otherwise in accordance with the terms of this Agreement.

(b)    Lucent agrees to provide financing (subject to the terms and conditions set forth in the Credit Agreement) for all Lucent Products and Services purchased by WinStar under this Agreement plus up to $2,600,000 per Contract Year for amounts drawn down for WinStar provided RF engineering (with any excess and any other WinStar provided products and services to be treated as Other Products and Services as defined below) (collectively, the "Lucent Content"). Lucent also agrees to provide financing for non-Lucent Products and services associated with the Network ("Other Products and Services"), subject to the following annual total financing percentage limitations set forth below. For purposes of this Subsection (b) the following definitions shall apply: (1) "Contract Year" shall refer to each year of the Term of this Agreement, with the initial Contract Year commencing on the Effective Date, (2) "Total Contract Year Draw Down" shall refer to the total dollar amount drawn down by WinStar under the Credit Agreement during a Contract Year, and (3) "Total Surcharge Amount" for each Contract Year shall equal a total of U.S. $3,000,000.

(i)    WinStar may use up to thirty-five percent (35%) of the Total Contract Year Draw Down during the first Contract Year for Other Products and Services. During each of the second, third, fourth and fifth Contract Years (each, a "Subsequent Contract Year"), WinStar may use up to thirty percent (30%) of the Total Contract Year Draw Down for Other Products and Services.

(ii)    At the end of each Contract Year, Lucent shall provide for WinStar's review, and subject to WinStar's confirmation, a reconciliation statement that specifies the percentage of the Total Contract Year Draw Down that was used for Lucent Content and for Other Products and Services and the amount of the Total Surcharge Amount that is due Lucent, if any, based upon the following:

(1)    If the actual percentage for Other Products and Services is less or equal to thirty percent (30%) for the First Contract Year and less than or equal to twenty-five percent (25%) during any Subsequent Contract Year, as the case may be, there will be no

---

B1224

portion of the Total Surcharge Amount due and payable by WinStar;

(2) Where the actual percentage for Other Products and Services exceeds thirty percent (30%) in the First Contract Year or exceeds twenty-five percent (25%) in a Subsequent Contract Year, as the case may be, the portion of the Total Surcharge Amount due and payable by WinStar shall be an amount equal to six thousand dollars (U.S. $6,000) per each one hundredth of a percentage (1/100%) in excess of thirty percent (30%) for the First Contract Year and twenty-five percent (25%) in a Subsequent Contract Year, but in each case no greater than the Total Surcharge Amount.

(c) Subject to the terms set forth in Subsection (b) above, this Agreement and the Credit Agreement, Lucent shall provide financing and act as the paying agent for any such other invoices for non-Lucent Products and services (e.g., Third Party Products and third party and WinStar provided services) delivered to Lucent by WinStar. Lucent shall pay all such delivered invoices in accordance with the payment terms set forth on such invoice or as otherwise directed by WinStar.

(d) Lucent shall continue to provide WinStar with financing for Deliverables and Services during the Disengagement Period as described in Section 15.4(a) subject to the terms set forth in Subsection (b) above.

(e) Should WinStar acquire any significant interest in any company to which Lucent is currently providing financing pursuant to an independent contractual agreement, Lucent hereby consents and agrees, at no cost to WinStar for such consent, to continue to honor such contractual agreement if all the terms and conditions of such agreement other than change in ownership are met under WinStar's acquisition of such significant interest.

11.4.  Incidental Expenses.

(a) Lucent acknowledges that, except as provided in Subsection (b) of this Section, expenses that Lucent expects to incur in performing under this Agreement (including document reproduction and long-distance telephone) are included in Lucent's charges under in this Agreement. Accordingly, such Lucent expenses are not separately reimbursable by WinStar unless, on a case-by-case basis for unusual expenses, WinStar has agreed in advance and in writing to reimburse Lucent for the expense.

(b) WinStar will reimburse Lucent for the verifiable travel and travel-related Out-of-Pocket Expenses incurred by Lucent that are necessary to provide the Services to the extent that such Out-of-Pocket Expenses are consistent with WinStar's expense policies, provided that Lucent obtains WinStar's consent in advance of incurring any such expenses.

B1225

11.5. **Most Favored Customer.**

(a)    At any time during the Term of this Agreement, WinStar will receive Lucent Products and Services at prices and on payment terms no less favorable to WinStar, taking into account all material contract terms (including financing) viewed collectively, than those offered or made available by Lucent to any other customer who are involved in transactions of similar or lesser volumes.

(b)    To the extent Lucent provides more favorable prices to another customer (the "Offer") pursuant to this Section, Lucent shall, commencing on the effective date of such Offer, adjust its prices, to WinStar so as to implement the more favorable prices contained in the Offer.

12.    **INVOICING AND PAYMENT**

12.1. **Invoicing.**

(a)    <u>Products</u>. Upon shipment of Products pursuant to a Purchase Order, Lucent will invoice WinStar for amounts due pursuant to this Agreement for such Products. Such invoice shall include: invoice date, shipment number, Product part numbers and descriptions, quantities, unit prices and total amount due. That invoice shall also indicate the corresponding Purchase Order for each invoiced Product.

(b)    <u>Other Deliverables and Services</u>. With respect to Product-related engineering and installation Services, Lucent will invoice WinStar upon completion of the performance of such Services. With respect to other Deliverables and Services, Lucent shall render a single consolidated invoice for charges due under this Agreement on a monthly basis in arrears. Such invoice shall include invoice date, quantities, unit prices and total amount due. Each invoice shall also indicate the corresponding Purchase Order for each line item and the corresponding milestone for each Service that will produce a Deliverable.

(c)    On each invoice, Lucent shall include the calculations utilized to establish any charges, and each invoice shall show details and information as to charges as may be reasonably specified by WinStar, including as necessary to satisfy WinStar's internal accounting; provided, however, that to the extent that a firm pricing quotation previously delivered to WinStar by from Lucent expressly provides such calculations, details and information, Lucent may cross-reference such quotation in the applicable invoice in lieu of including such calculations, details or information, as applicable, in such invoice. Each invoice shall also (i) separately state the amounts of any taxes Lucent is collecting from WinStar and (ii) identify that the invoice is a Lucent issued invoice.

(d)    To the extent a credit may be due WinStar pursuant to this Agreement, Lucent shall provide WinStar with an appropriate credit against amounts then due and owing; if no further payments are due to Lucent, Lucent shall pay such amounts to WinStar within thirty (30) calendar days.

---

B1226

12.2. **Payment Due.**

    (a)    Subject to the other provisions of this Article 12, charges shall be due and payable by WinStar within thirty (30) calendar days after receipt of a proper invoice for such amount.

    (b)    All amounts due and payable to Lucent under this Article 12 shall be paid, at WinStar's option, (i) by check payable to the order of Lucent, (ii) through draw-down of Lucent-provided financing under the Credit Agreement, or (iii) by electronic funds transfer to Lucent from account(s) designated by WinStar.

12.3. **Accountability.**

Lucent shall maintain complete and accurate records of and supporting documentation for the amounts billable to and payments made by WinStar hereunder, in accordance with generally accepted accounting principles applied on a consistent basis. Lucent agrees to provide WinStar with documentation and other information with respect to each invoice as may be reasonably requested by WinStar to verify accuracy and compliance with the provisions of this Agreement. Upon WinStar's reasonable request, WinStar and its authorized agents and representatives shall have access to such records for purposes of audit during normal business hours during the Term and during the period for which Lucent is required to maintain such records.

12.4. **Proration.**

Periodic charges under this Agreement are to be computed on a calendar month basis, and shall be prorated for any partial month.

12.5. **Set Off.**

With respect to any amount to be paid by WinStar hereunder, WinStar may set off against such amount any amount that Lucent is obligated to pay WinStar hereunder.

12.6. **Disputed Charges.**

Subject to Section 12.5, WinStar shall pay undisputed charges when such payments are due under this Article 12. WinStar may withhold payment of particular charges that WinStar disputes in good faith.

12.7. **Encumbrances.**

Except to the extent granted in the Credit Agreement or otherwise expressly set forth in this Agreement, Lucent shall not perfect a security interest, lien or other encumbrance upon any Deliverable, Deliverable component or Service provided pursuant to this Agreement.

---

**B1227**

13.    CONFIDENTIALITY

13.1.    Confidential Information.

Lucent and WinStar each acknowledge that they may be furnished with, receive, or otherwise have access to information of or concerning the other Party that such Party considers to be confidential, proprietary, a trade secret or otherwise restricted. As used in this Agreement and subject to Section 13.3, "Confidential Information" means all information, in any form, furnished or made available directly or indirectly by one Party (the "Disclosing Party") to the other (the "Receiving Party") that (i) concerns the operations, affairs and businesses of the Disclosing Party, the financial affairs of the Disclosing Party, and the relations of the Disclosing Party with its customers, employees and service providers, or (ii) is marked confidential, restricted, proprietary, or with a similar designation. The terms and conditions of this Agreement shall be deemed Confidential Information.

13.2.    Obligations.

The following obligations with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of seven (7) years or such longer period as required by regulation, law or court order.

(a)    Each Party's Confidential Information shall remain the property of that Party except as expressly provided otherwise by the other provisions of this Agreement. Each Party shall each use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent unauthorized disclosure of Confidential Information as it employs to avoid unauthorized disclosure of its own information of a similar nature. Except as otherwise permitted hereunder, the Parties may disclose such information to entities performing services required hereunder where: (i) use of such entity is authorized under this Agreement, (ii) such disclosure is necessary or otherwise naturally occurs in that entity's scope of responsibility, and (iii) the entity agrees in writing to assume the obligations described in this Section 13.2. Any disclosure to such entity shall be under the terms and conditions as provided herein.

(b)    Each Party shall take reasonable steps to ensure that its employees comply with this Section 13.2. In the event of any disclosure or loss of, or inability to account for, any Confidential Information of the Disclosing Party, the Receiving Party shall promptly, at its own expense: (i) notify the Disclosing Party in writing; (ii) take such actions as may be necessary and cooperate in all reasonable respects with the Disclosing Party to minimize the violation and any damage resulting therefrom.

13.3.    Exclusions.

(a)    "Confidential Information" shall exclude any particular information that the Receiving Party can demonstrate:

B1228

(i)    At the time of disclosure, was in the public domain or in the possession of the Receiving Party;

(ii)    After disclosure, is published or otherwise becomes part of the public domain through no fault of the Receiving Party;

(iii)    Was received after disclosure from a third party who had a lawful right to disclose such information to the Receiving Party without any obligation to restrict its further use or disclosure;

(iv)    Was independently developed by the Receiving Party without reference to Confidential Information of the Disclosing Party; or

(v)    Was required to be disclosed to satisfy a legal requirement of a competent government body; provided that, immediately upon receiving such request and to the extent that it may legally do so, the Receiving Party advises the Disclosing Party promptly and prior to making such disclosure in order that the Disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information.

(b)    Either Party may disclose the terms and conditions of this Agreement to third parties that (1) have expressed a bona fide interest in consummating a significant financing, merger or acquisition transaction between such third parties and such Party, (2) have a reasonable ability (financial and otherwise) to consummate such transaction, and (3) have executed a nondisclosure agreement that includes within its scope the terms and conditions of this Agreement and also includes a procedure to limit the extent of copying and distribution of this Agreement. Each Party shall endeavor to delay the disclosure of the terms and conditions of this Agreement until the status of discussions concerning such transaction warrants such disclosure.

13.4.    No Implied Rights.

Nothing contained in this Section shall be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

14.    REPRESENTATIONS, WARRANTIES AND COVENANTS

14.1.    Pass-Through Warranties.

Without limiting any other representation, warranty or covenant contained in this Article 14, Lucent may from time to time provide certain Products and other items for which Lucent is entitled to warranties and indemnities from the manufacturers, lessors or licensors of such items. Lucent shall pass through to WinStar the benefits of such warranties and indemnities to the extent that Lucent is able pursuant to any agreements

---

B1229

between Lucent and such manufacturers, lessors or licensors, and enforce such warranties and indemnities as directed by WinStar.

14.2.    Non-Infringement.

Lucent represents, warrants and covenants that it shall perform its responsibilities under this Agreement in a manner that does not infringe, or constitute an infringement or misappropriation of, any patent, copyright, trademark, trade secret or other proprietary rights of any third party.

14.3.    Ownership or Use.

(a)    Lucent represents, warrants and covenants that it is either the owner of, or authorized to distribute, sublicense and use, the Deliverables provided by Lucent pursuant to this Agreement.

(b)    Lucent represents, warrants and covenants that WinStar shall receive marketable title to all Products and Developed Deliverables provided pursuant to this Agreement and shall be entitled to the rights of possession and quiet enjoyment thereto, free of any liens or encumbrances, except as provided in the Credit Agreement.

14.4.    Authorization.

(a)    Each Party represents and warrants to the other that:

(i)    It has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement; and

(ii)    the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party.

(b)    Lucent represents, warrants and covenants that it is not subject to any contractual or other obligation that would prevent it from entering into this relationship.

14.5.    Inducements.

Each Party represents, warrants and covenants that it has not offered or provided any inducements in violation of law or the other Party's policies, of which it has been given notice, in connection with this Agreement.

14.6.    Work Standards.

(a)    Lucent represents, warrants and covenants that the Services shall be rendered with promptness and diligence and shall be executed in a workmanlike manner, in accordance with the practices and high professional standards used in well-

---

Supply Agreement                                     Confidential -- WinStar/Lucent

B1230

managed operations performing services similar to the Services. Lucent represents and warrants that it shall use adequate numbers of qualified individuals with suitable training, education, experience, and skill to perform the Services.

(b)    If the Services prove not to be performed as warranted within a nine (9) month period commencing on the date of completion of the applicable Services, Lucent shall correct the defect or non-conforming Services at no additional cost or expense to WinStar. In the event the Services cannot be corrected within the applicable time periods specifically identified in this Agreement or thirty (30) days of WinStar's notice, whichever period is shorter (or such additional period of time as may be mutually agree upon), Lucent shall at WinStar's option render a full refund or credit based on the original charges for the Services.

14.7.    **Product Warranties.**

(a)    During the Warranty Period and any Extended Warranty Periods for each Lucent Product, Lucent shall perform the specific warranty and extended warranty Services as may be set forth in Schedule A.

(b)    During the Warranty Period and any Extended Warranty Periods, Lucent represents, warrants and covenants that Deliverables (other than Third Party Products) provided under this Agreement shall be free from defects in design, material and workmanship, and shall operate in accordance with applicable Acceptance Criteria, industry standards and intended purposes during the Warranty Period and any Extended Warranty Periods.

(c)    Lucent represents, warrants and covenants that all Lucent Product components (except for spare parts provided in the course of repair or replacement, which may be refurbished or re-manufactured) provided hereunder shall be new, not refurbished or re-manufactured.

(d)    With respect to the Software associated with Lucent Products, Lucent represents, warrants and covenants that it shall provide to WinStar, at no additional charge, error-fixes, corrections and revisions to the Software that are necessary to maintain those Deliverables in compliance with the Acceptance Criteria or as otherwise generally provided to any other customer of Lucent. Lucent will provide on-site assistance (including installation and problem resolution Services) necessary to correct Nonconformities with such Software at no additional charge to WinStar. Lucent shall also replace such Software if the media is destroyed or damaged and as a result such Software is unusable or fails to operate in accordance with the applicable Acceptance Criteria. The foregoing representations, warranties and covenants shall also apply with respect to new versions, upgrades and enhancements provided by Lucent to the Software; provided that, if such new versions, upgrades and enhancements are chargeable to Lucent's other customers, WinStar must also pay a fee pursuant to the applicable prices and pricing methodologies contained in Schedule C.

---

B1231

(e)   Lucent represents, warrants and covenants that it shall provide updated Documentation reflecting any changes to Deliverables (other than Third Party Products).

(f)   During the Warranty Period and any Extended Warranty Periods, Lucent represents, warrants and covenants that it shall provide telephone support to WinStar in order to assist WinStar to locate and correct functional or operational problems with Deliverables (other than Third Party Products). Such support shall be provided on a 24-hour, 7-days-per-week basis. Lucent shall provide a toll-free number for WinStar's calls to Lucent.

(g)   Lucent represents, warrants and covenants that it shall stock spare Equipment parts for Deliverables other than Third Party Products and provide 24-hour availability of such parts, unless Lucent's standard published policies provide otherwise and specified in a Product addendum herein.

(h)   Lucent represents, warrants and covenants that it will provide all upgrades to Deliverables components (other than Third Party Products) during the Warranty Period and Extended Warranty Periods (as applicable) and that such upgrades shall be backward compatible to within two (2) immediately preceding revision levels for the Deliverables in use by WinStar.

(i)   During the Warranty Period and any Extended Warranty Periods, Lucent represents, warrants and covenants that it shall provide access to technical resources to resolve any problem with Deliverables (other than Third Party Products) that WinStar cannot resolve through lower level support, including help desk support and on-site service support for problems that cannot be remotely diagnosed and cured. If on-site support reveals that the problem originated with WinStar or a third-party, Lucent may charge WinStar reasonable time and material rates for the on-site support.

(j)   Subject to Section 20.9 of the Agreement, in the event that any Deliverable fails to comply with the representations, warranties or covenants contained in this Section 14.7, WinStar will notify Lucent, specifying the nature of the failure in reasonable detail. Lucent shall correct the failure at no additional charge to WinStar so that the Deliverable complies with such representations, warranties and covenants, in accordance with the Performance Standards set forth in Schedule B. Lucent shall make available to WinStar on-site personnel as necessary to repair, replace or correct such Deliverable at no additional charge to WinStar. The repair and replace time intervals are set forth in Schedule A. Notwithstanding the foregoing, if, after a reasonable number of repeated efforts (but not more than three (3) attempts or more than a total of three (3) business days after WinStar's initial notification to Lucent of noncompliance with a representation, warranty or covenant), Lucent is unable to correct the failure, then, at WinStar's option, Lucent shall provide WinStar with a refund, pro-rated according to the useful life, of amounts paid for any affected Deliverable.

---

B1232

14.8.  **Discontinued Lucent Products**

(a)  Lucent shall notify WinStar at least one (1) year before Lucent discontinues accepting Purchase Orders from WinStar for a Lucent Product. Where Lucent generally offers an equivalent Lucent Product (based upon form, fit and function) this notification period may vary but shall in no event be less than six (6) months.

(b)  Lucent shall, in addition to its obligations under this Agreement (including with respect to the Product warranties set forth in this Agreement), make available ongoing Warranty Period and Extended Warranty Period support during Extended Warranty Periods upon the terms and conditions of this Agreement for a period of five (5) years after such Product's discontinued availability effective date.

14.9.  **Compliance.**

Lucent represents, warrants and covenants that all Deliverables delivered hereunder operate in conformance with all applicable domestic and international laws and regulations, including, FCC requirements and specifications as well as safety and environmental laws and regulations. Upon WinStar's request, Lucent will issue to WinStar written statements of compliance that Deliverables provided to WinStar comply with the foregoing representation, warranty and covenant.

14.10.  **Documentation.**

Lucent represents, warrants and covenants that all Documentation provided by Lucent will (a) accurately reflect the operations and capabilities of any corresponding Deliverables, (b) be accurate, complete and written in a manner understood by WinStar, and (c) be updated from time to time to reflect the changes to the Deliverables.

14.11.  **Viruses.**

Lucent represents, warrants and covenants that it will exercise reasonable care in recommending Third Party Products that are free of Viruses and that there are no Viruses coded or introduced into (a) any Lucent Product or (b) other Deliverable that is not a Third Party Product. Lucent agrees that, in the event a Virus is found to have been introduced into any such Lucent Product or other Deliverable that is not a Third Party Product, Lucent shall use its best efforts, at no additional charge, to assist WinStar in reducing the effects of the Virus and, if the Virus causes a loss of operational efficiency or loss of data, to assist WinStar to the same extent to mitigate and restore such losses.

14.12.  **Disabling Code.**

Lucent represents, warrants and covenants that, without the prior written consent of WinStar, Lucent shall not insert into any Deliverable any code which would have the effect of disabling or otherwise shutting down all or any portion of a Deliverable ("Disabling Code"). Lucent further represents, warrants and covenants that, with respect to any Disabling Code that may be part of any Deliverable, Lucent shall not invoke such

---

Supply Agreement                                    Confidential – WinStar/Lucent

B1233

Disabling Code at any time, including upon expiration or termination of this Agreement (in whole or in part) for any reason, without WinStar's prior written consent.

### 14.13. Integration Test.

Lucent represents, warrants and covenants that

(a)   It is familiar with the intended use by WinStar of the Network as described in this Agreement and that the Network and its associated Deliverables are suitable for and will satisfy such use and the terms of this Agreement in all respects, including the Network Architecture and design and Product recommendations.

(b)   The Network, if implemented in accordance with the Network Architecture, is designed to and will interface and interoperate in accordance with the Network Architecture, Applicable Standards and other corresponding Specifications in this Agreement as a fully integrated system. If the Network fails to so interface and interoperate during the Term of this Agreement, Lucent shall initiate corrective actions after receipt of notice of the defect or failure and shall promptly cure such defect at Lucent's sole cost and expense. This warranty shall not apply to the extent that (i) the Network is installed by a party other than Lucent not in accordance with the Network Architecture or (ii) such failure to operate directly results from a failure or defect in Lucent or Third-Party Products to operate in accordance with their specifications. This warranty shall not be deemed to extend or limit any warranty for any individual Product provided by Lucent.

### 14.14. Year 2000.

Lucent represents, warrants and covenants:

(a)   that it will exercise reasonable care in recommending Third Party Products that are Year 2000 Compliant;

(b)   that, during the longer of (i) the Warranty Periods and Extended Warranty Periods and (ii) December 31, 2001, Lucent Products, and other Deliverables other than Third Party Products, shall be Year 2000 Compliant; and

(c)   to the extent that Lucent provides testing and validation Services with respect to a Network (which Services may be performed in Lucent's sole discretion) and certifies that such Network is Year 2000 Compliant, that such Network is Year 2000 Compliant.

At WinStar's reasonable request, Lucent agrees to cooperate and assist WinStar and its designated third party contractors in connection with WinStar's other Year 2000 compliance efforts.

B1234

14.15. Disclaimer

(a)  The foregoing warranties will not extend to defective conditions or non-conformities to the extent resulting from the following, if not consistent with the applicable Specifications and Documentation: WinStar modification, misuse, neglect, accident, abuse, improper wiring, repairing, splicing, alteration, installation, storage or maintenance.

(b)  THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. WINSTAR'S SOLE AND EXCLUSIVE REMEDY FOR A BREACH OF THE PRODUCT WARRANTY SET FORTH IN SECTION 14.8 HEREUNDER SHALL BE LUCENT'S OBLIGATION TO REPAIR, REPLACE, CREDIT OR REFUND AS PROVIDED HEREIN.

15.  TERMINATION

15.1.  Termination for Cause.

In the event that Lucent:

(a)  Commits a material breach of this Agreement, which breach is not cured within thirty (30) calendar days after notice of breach from WinStar to Lucent,

(b)  Commits a material breach of this Agreement which is not capable of being cured within thirty (30) calendar days and fails to (i) proceed promptly and diligently to correct the breach, (ii) develop within thirty (30) calendar days following written notice of breach from WinStar a complete plan for curing the breach, and (iii) cure the breach within sixty (60) calendar days of notice thereof, or

(c)  Commits numerous breaches of its duties or obligations which collectively constitute a material breach of this Agreement,

Then WinStar may, by giving written notice to Lucent, terminate this Agreement or any affected Purchase Orders, in whole or in part, for cause as of a date specified in the notice of termination.

15.2.  Termination by Lucent.

In the event that WinStar fails to pay Lucent when due undisputed charges under a Purchase Order within thirty (30) calendar days of notice from Lucent of the failure to make such payment within the payment period described in Section 12.2, Lucent may, by giving written notice to WinStar, terminate such Purchase Order as of a date specified in such notice of termination.

---

B1235

**15.3.  Termination Option for Lucent's Failure to Provide Financing.**

In the event Lucent fails to continue to provide financing under the Credit Agreement at terms and conditions satisfactory to WinStar, WinStar may upon notice to Lucent elect to terminate this Agreement in whole or in part. Any such termination shall be at no cost or liability to WinStar.

**15.4.  Disengagement Assistance.**

(a)  Upon termination or expiration of this Agreement, WinStar may extend all or any portion of the Agreement beyond the effective date of termination one or more times as it elects, at its sole discretion, provided that the total of all such extensions shall not exceed twelve months (unless a longer time period is mutually agreed upon) following the original effective date of termination (such period the "Disengagement Period").

(b)  Upon termination or expiration of this Agreement, Lucent agrees to provide WinStar and its designated third party providers all reasonable assistance as necessary to effect a smooth transition to a new supplier. In the event this Agreement is terminated by WinStar for cause pursuant to this Agreement, Lucent shall bear WinStar's reasonable and verifiable Out-of-Pocket Expenses incurred with respect to transitioning to a new supplier.

**16.  LIABILITY**

**16.1.  General Intent.**

Subject to the specific provisions of this Article 16, it is the intent of the Parties that each Party shall be liable to the other Party for any actual damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by this Agreement.

**16.2.  Liability Restrictions.**

(a)  IN NO EVENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT), SHALL A PARTY BE LIABLE FOR INDIRECT OR CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

(b)  Subject to Subsections (c) and (d) of this Section, each Party's total liability to the other, whether in contract or in tort (including breach of warranty, negligence and strict liability in tort) shall be limited to an amount equal to one hundred fifty million U.S. Dollars (U.S. $150,000,000).

(c)  The limitation set forth in Subsection (b) of this Section shall not apply with respect to: (i) damages occasioned by willful misconduct or gross negligence; (ii) claims of breach of confidentiality, (iii) claims subject to indemnification

B1236

pursuant to the Agreement, (iv) financing charges, fees or costs that are assessed on any unused financing amounts (including to the extent owed or paid by WinStar and included as part of any damages to which WinStar is or becomes entitled pursuant to law), (v) failure to comply with applicable laws and regulations, (vi) damages occasioned by the improper or wrongful termination or abandonment of work by Lucent; and (vii) any amounts paid by WinStar that are refundable (either by credit or payment) by Lucent pursuant to this Agreement..

(d)  For the purposes of this Section 16.2, all amounts payable or paid to third parties in connection with claims that are eligible for indemnification pursuant to this Agreement shall be deemed direct damages.

16.3.  Force Majeure.

(a)  No Party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by fire, flood, lightning, earthquake, elements of nature or acts of God, riots, civil disorders, rebellions or revolutions in any country, with respect to Lucent, its sole suppliers or its subcontractors, or any other cause beyond the reasonable control of such Party; provided, however, that (i) the non-performing Party is without fault in causing such default or delay, and (ii) such default or delay could not have been prevented by reasonable precautions and cannot reasonably be circumvented by the non-performing Party through the use of alternate sources, workaround plans or other means, including to the extent contemplated by applicable disaster recovery processes or procedures).

(b)  In such event the non-performing Party shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent possible without delay. In addition, in such event, Lucent shall give priority status to WinStar vis-a-vis other customers to recommence performance or observance of its obligations. Any Party so delayed in its performance shall immediately notify the Party to whom performance is due by telephone (to be confirmed in writing within two (2) business days of the inception of such delay) and describe at a reasonable level of detail the circumstances causing such delay.

(c)  If any event under Subsection (a) of this Section above substantially prevents, hinders, or delays Lucent's performance for more than thirty (30) consecutive calendar days, then at WinStar's option: (i) WinStar may terminate for convenience at no charge to WinStar or modify any affected portion of any Purchase Order, or terminate for convenience at no charge to WinStar any affected portion of this Agreement, and the charges payable hereunder shall be equitably adjusted to reflect such termination; or (ii) WinStar may terminate this Agreement without liability to WinStar or Lucent as of a date specified by WinStar in a written notice of termination to Lucent. Lucent shall not have the right to any additional payments from WinStar for costs or expenses incurred by Lucent as a result of any force majeure occurrence.

B1237

17.    INDEMNIFICATION

17.1.    **Indemnities by Lucent.**

Lucent agrees to indemnify, defend and hold harmless WinStar and its Affiliates and their respective officers, directors, employees, agents, successors, and assigns, from any and all Losses and threatened Losses arising from, in connection with, or based on allegations of, any of the following:

(a)    Lucent's failure to observe or perform any duties or obligations to third parties (e.g., duties or obligations to subcontractors);

(b)    Any claims of infringement of any patent, trade secret, copyright or other proprietary rights, alleged to have occurred based upon the provision of Deliverables or performance of Services by Lucent, except to the extent that such claims arise from (i) modification of a Deliverable or any component thereof by WinStar that is not recommended or otherwise approved by Lucent, (ii) maintenance of a Deliverable by WinStar other than in accordance with the Specifications and the provisions set forth in this Agreement that is not recommended or otherwise approved by Lucent, or (iii) use of a Deliverable by WinStar in combination with deliverables furnished by third parties that is not recommended or otherwise approved by Lucent;

(c)    The death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of Lucent;

(d)    The damage, loss or destruction of any real or tangible personal property caused by the tortious conduct of Lucent; or

(e)    Any claim, demand, charge, action, cause of action, or other proceeding asserted against WinStar but resulting from an act or omission of Lucent in its capacity as an employer of a person.

17.2.    **Indemnities by WinStar.**

WinStar agrees to indemnify, defend and hold harmless Lucent and its Affiliates and their respective officers, directors, employees, agents, successors, and assigns, from any and all Losses and threatened Losses arising from, in connection with, or based on allegations of, any of the following:

(a)    WinStar's failure to observe or perform any duties or obligations to third parties (e.g., duties or obligations to subcontractors);

(b)    Any claims of infringement of any patent, trade secret, copyright or other proprietary rights, alleged to have occurred based upon misuse of Deliverables by WinStar, including (i) modification of a Deliverable or any component thereof by WinStar that is not recommended or otherwise approved by Lucent, (ii) maintenance of a Deliverable performed by WinStar other than in accordance with the Specifications and the provisions set forth in this Agreement

B1238

that is not recommended or otherwise approved by Lucent, or (iii) use of a Deliverable by WinStar in combination with deliverables furnished by third parties that is not recommended or otherwise approved by Lucent;

(c)   The death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of WinStar;

(d)   The damage, loss or destruction of any real or tangible personal property caused by the tortious conduct of WinStar; or

(e)   Any claim, demand, charge, action, cause of action, or other proceeding asserted against Lucent but resulting from an act or omission of WinStar in its capacity as an employer of a person.

### 17.3.  Infringement.

If any Deliverable or other item used by Lucent to provide the Services becomes, or in Lucent's reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceeding, in addition to indemnifying WinStar as provided in Section 17.1 and to the other rights WinStar may have under this Agreement, Lucent shall, promptly at Lucent's expense:

(a)   Secure the right to continue using the Deliverable or item, or

(b)   If the action described in Subsection (a) cannot be accomplished by Lucent, replace or modify the Deliverable or item to make it non-infringing, provided that any such replacement or modification will not degrade the fit, form or function of the affected Deliverables or Services, or

(c)   If the action described in Subsection (b) of this Section cannot be accomplished by Lucent, and only in such event, provide WinStar with a full refund for the affected Deliverables and Services.

### 17.4.  Indemnification Procedures.

With respect to third-party claims, the following procedures shall apply:

(a)   Promptly after receipt of notice of the commencement or threatened commencement of any civil, criminal, administrative, or investigative action or proceeding involving a claim in respect of which Indemnitee will seek indemnification pursuant to this Article 17, Indemnitee will notify Indemnitor of such claim in writing. No failure to so notify Indemnitor will relieve Indemnitor of its obligations under this Agreement except to the extent that it can demonstrate damages attributable to such failure. Within fifteen (15) calendar days following receipt of written notice from Indemnitee relating to any claim, but no later than ten (10) calendar days before the date on which any response to a complaint or summons is due, Indemnitor will notify Indemnitee in writing if Indemnitor elects to assume control of the defense and settlement of that claim (a "Notice of Election").

---

B1239

(b)  If Indemnitor delivers a Notice of Election relating to any claim within the required notice period, Indemnitor shall be entitled to have sole control over the defense and settlement of such claim; provided that (i) Indemnitee shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim, and (ii) Indemnitor shall obtain the prior written approval of Indemnitee before entering into any settlement of such claim or ceasing to defend against such claim. After Indemnitor has delivered a Notice of Election relating to any claim in accordance with the preceding paragraph, Indemnitor shall not be liable to Indemnitee for any legal expenses incurred by Indemnitee in connection with the defense of that claim. In addition, Indemnitor shall not be required to indemnify Indemnitee for any amount paid or payable by the Indemnitee in the settlement of any claim for which the Indemnitor has delivered a timely Notice of Election if such amount was agreed to without the written consent of the Indemnitor.

(c)  If Indemnitor does not deliver a Notice of Election relating to any claim within the required notice period, Indemnitee shall have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of Indemnitor. Indemnitor shall promptly reimburse Indemnitee for all such costs and expenses.

## 18.   DISPUTE RESOLUTION

Any dispute between the Parties arising out of or relating to this Agreement, including with respect to the interpretation of any provision of this Agreement and with respect to the performance by Lucent or WinStar, shall be resolved as provided in this Article 18; provided, however, that any dispute arising out of the Best of Breed process described in Schedule H shall not be subject to Sections 18.1 and 18.2, but rather shall be subject to the dispute resolution process described in Schedule H.

### 18.1.  Informal Dispute Resolution.

(a)  Prior to the initiation of formal dispute resolution procedures, the Parties shall first attempt to resolve their dispute informally pursuant to this Section. Upon the written request of a Party, each Party shall appoint a designated representative who does not devote substantially all of his or her time to performance under this Agreement, whose task it will be to meet for the purpose of endeavoring to resolve such dispute.

(i)  The designated representatives shall meet as often as the Parties reasonably deem necessary in order to gather and furnish to the other all information with respect to the matter in issue which the Parties believe to be appropriate and germane in connection with its resolution. The representatives shall discuss the problem and attempt to resolve the dispute without the necessity of any formal proceeding.

(ii)  During the course of discussion, all reasonable requests made by one Party to another for non-privileged information, reasonably related to this Agreement, shall be honored in order that each of the Parties may be fully advised of the other's position.

---

Supply Agreement                                    Confidential – WinStar/Lucent

**B1240**

(iii)    The specific format for the discussions shall be left to the discretion of the designated representatives.

(b)    The Parties agree that disputes, controversies or claims between them shall not be subject to the provisions of this Section where:

(i)    A Party makes a good faith determination that a breach of the terms of this Agreement by the other Party is such that a temporary restraining order or other injunctive relief is the only appropriate and adequate remedy; or

(ii)    Institution of formal proceedings earlier than as set forth in Section 18.2(a) is necessary to avoid the expiration of any applicable limitations period or to preserve a superior position with respect to other creditors.

(c)    If a Party files a pleading with a court seeking immediate injunctive relief and this pleading is challenged by the other Party and the injunctive relief sought is not awarded in substantial part, the Party filing the pleading seeking immediate injunctive relief shall pay all of the costs and attorneys' fees of the Party successfully challenging the pleading.

18.2.    **Litigation.**

(a)    Formal proceedings for the resolution of a dispute may be commenced after the earlier of:

(i)    The designated representatives described in Section 18.1 conclude in good faith that amicable resolution through continued negotiation of the matter does not appear likely; or

(ii)    Thirty (30) calendar days after the initial written request to appoint a designated representative pursuant to Subsection 18.1(a) above (this period shall be deemed to run notwithstanding any claim that the process described in this Section 18.1 was not followed or completed).

(b)    The Parties consent to the jurisdiction of the courts of the State of New York and to jurisdiction and venue in the United States District Court for the Southern District of New York for all litigation that may be brought with respect to the terms of, and the transactions and relationships contemplated by, this Agreement. The Parties further consent to the jurisdiction of any state court located within a district that encompasses assets of a Party against which a judgment has been rendered for the enforcement of such judgment or award against the assets of such Party.

18.3.    **Continued Performance.**

Each Party agrees to continue performing its obligations under this Agreement while any dispute is being resolved except to the extent the issue in dispute precludes performance (dispute over payment shall not be deemed to preclude performance).

---

B1241

**18.4.   Governing Law.**

This Agreement and performance under it shall be governed by and construed in accordance with the laws of the State of New York without regard to its choice of law principles.

**19.    INSURANCE REQUIREMENTS**

During the Term, Lucent shall have and maintain in force the following insurance coverages:

(a)    **Worker's Compensation and Employer's Liability.** Lucent is required to comply with applicable federal and state workers' compensation and occupational disease statutes. If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability section of Lucent's insurance policy. Employer's liability coverage of at least $1,000,000 shall be required, except in States with exclusive or monopolistic funds that do not permit workers' compensation to be written by private carriers.

(b)    **General Liability.** Lucent shall carry general liability insurance coverage for product liability of at least $1,000,000 per occurrence; bodily injury written on the comprehensive form or policy of at least $1,000,000 per occurrence per person; property damage of at least $1,000,000 per occurrence.

(c)    **Automobile Liability.** Lucent shall carry automobile liability insurance written on the comprehensive form of policy. The policy shall provide for bodily injury and property damage liability covering the operation of all automobiles used in connection with performing under the Agreement. Policies covering automobiles operated in the United States shall provide coverage of at least $1,000,000 per occurrence for bodily injury and $300,000 per occurrence for property damage. The amount of liability coverage on other policies shall be commensurate with any legal requirements of the locality and sufficient to meet normal and customary claims.

The foregoing insurance coverages shall be primary and non-contributing with respect to any other insurance or self insurance that may be maintained by WinStar. Lucent shall cause its insurers to issue certificates of insurance evidencing that the coverages and policy endorsements required under this Agreement are maintained in force and that not less than thirty (30) calendar days written notice shall be given to WinStar prior to any modification, cancellation or non-renewal of the policies. The minimum limits of coverage specified herein are not intended, and shall not be construed, to limit any liability or indemnity of Lucent under this Agreement.

**20.·   GENERAL**

**20.1.   Binding Nature and Assignment.**

(a)    This Agreement shall accrue to the benefit of and be binding upon the Parties hereto and any purchaser or any successor entity into which either Party has

---

B1242

been merged or consolidated or to which either Party has sold or transferred all or substantially all of its assets.

(b)    Neither Party may, or shall have the power to, assign this Agreement or delegate such Party's obligations hereunder without the prior written consent of the other, except that WinStar may assign its rights and obligations under this Agreement without the approval of Lucent to

(i)    an entity which acquires all or substantially all of the assets of WinStar,

(ii)    to any Affiliate, or

(iii)    to a successor in a merger or acquisition of WinStar;

provided, however, that in the event that the financing provided by Lucent under the Credit Agreement is terminated as a result of such assignment, then Lucent's consent to such assignment shall be required if the entity has credit worthiness less than that of WinStar.

20.2.   **Entire Agreement.**

This Agreement, including any attached Schedules, constitutes the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

20.3.   **Notices.**

All notices, requests, demands, and determinations under this Agreement (other than routine operational communications), shall be in writing and shall be deemed duly given (i) when delivered by hand, (ii) one (1) business day after being given to an express, overnight courier with a reliable system for tracking delivery, (iii) when sent by confirmed facsimile with a copy delivered by another means specified in this Section, or (iv) four (4) business days after the day of mailing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

| If to WinStar: | If to Lucent: |
|---|---|
| WinStar Communications, Inc.<br>7799 Leesburg Pike<br>Falls Church, Virginia 22043<br>Attn: Senior VP, Network Operations<br>Facsimile: (703) 761-0309 | Lucent Technologies Inc.<br>5 Wood Hollow Rd<br>Parsippany, New Jersey 07054<br>Attn: President, Global Commercial<br>Markets<br>Facsimile: (973) 581-4106 |
| With a copy to: | With a copy to: |
| WinStar Communications, Inc.<br>230 Park Avenue<br>New York, New York 10169<br>Attn: General Counsel<br>Facsimile: (212) 922-1637 | Lucent Technologies Inc.<br>283 King George Rd.<br>Warren, New Jersey 07059<br>Attn: Vice President of Law<br>Facsimile: (908) 559-3042 |

B1243

A Party may from time to time change its address or designee for notification purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

**20.4.  Counterparts.**

This Agreement may be executed in several counterparts, all of which taken together shall constitute one single agreement between the Parties hereto.

**20.5.  Relationship of Parties.**

Lucent, in furnishing Deliverables and Services hereunder, is acting as an independent contractor, and Lucent personnel (including its subcontractors) shall not be considered or represented as employees or agents of WinStar. Lucent is not otherwise an agent of WinStar and has no authority to represent WinStar as to any matters, except as expressly authorized in this Agreement. Lucent is solely responsible for: (a) performing its responsibilities under this Agreement, (b) management and control of its personnel; (c) the payment of all compensation owed to its personnel, including payment of employment-related taxes, benefits, and worker's compensation insurance; (d) the filing of all required employment returns and reports; and (e) the withholding and payment of all applicable federal, state, and local taxes and other wage or employment assessments, including but not limited to income tax, social security tax, and unemployment insurance premiums for its personnel.

**20.6.  Severability.**

In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of this Agreement shall remain in full force and effect.

**20.7.  Consents and Approval.**

Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under this Agreement, such action shall not be unreasonably delayed or withheld. An approval or consent given by a Party under this Agreement shall not relieve the other Party from responsibility for complying with the requirements of this Agreement, nor shall it be construed as a waiver of any rights under this Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

**20.8.  Waiver of Default.**

No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under this Agreement shall not be construed to be a waiver

B1244

thereof. A waiver by either of the Parties hereto of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant herein contained.

20.9.    **Cumulative Remedies.**

Except as otherwise expressly provided herein, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

20.10.    **Survival.**

Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement (in whole or in part) shall survive any termination or expiration of this Agreement (in whole or in part, as applicable) and continue in full force and effect. Without limiting the generality of the foregoing, WinStar shall have the right to extend any Warranty Period pursuant to Section 1.1(ss) and order spare parts and Products following termination of this Agreement, and each Party's obligations with respect to such Services and Products (including those set forth in Sections 9.3 and 14.8) shall survive expiration or termination of this Agreement (in whole or in part, as applicable) and continue in full force and effect.

20.11.    **Public Disclosures.**

All media releases, public announcements, and public disclosures relating to this Agreement or the subject matter of this Agreement, including promotional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, shall be coordinated with and shall be subject to approval by WinStar prior to release.

20.12.    **Service Marks.**

(a)    Lucent agrees that it shall not, without WinStar's prior written consent, use the name, service marks or trademarks of WinStar or its Affiliates.

(b)    WinStar may use the names, tradenames, trademarks, service marks, trade devices, logos, codes, brand names or other symbols of Lucent or its Affiliates (collectively, the "Lucent Indicia") subject to the following terms and conditions:

(i)    WinStar shall not use Lucent Indicia unless and until approval is rendered pursuant to Subsection (ii) of this Subsection (b).

(ii)    WinStar shall submit all proposed usage of Lucent Indicia for approval by Lucent on such written or electronic forms as may be developed by Lucent and provided to WinStar from time to time. Lucent shall either accept or reject WinStar's proposed usage of Lucent Indicia in writing

B1245

within three (3) business days of receipt of WinStar's request. If Lucent fails to provide such written acceptance or rejection within such three-day period, WinStar's proposed usage shall be deemed approved by Lucent.

(iii)    WinStar shall be entitled to use the Lucent Indicia as proposed by WinStar to the extent approved by Lucent pursuant to Subsection (ii) of this Subsection (b); provided, however, that such use conforms to the guidelines set forth in Schedule K (the "Lucent Indicia Co-Marketing Program Guidelines"), except that for the purposes of Schedule K, WinStar shall be deemed enrolled in the Co-Marketing Program. Without limiting the Lucent Indicia Use Guidelines, the following shall also apply:

(1)    WinStar may not conduct business as Lucent under Lucent's name or logo;

(2)    WinStar may not use any Lucent Indicia or variations thereof to identify WinStar or WinStar's products or services except as specifically permitted by the Lucent Indicia Use Guidelines; and

(3)    WinStar may not use any of the Lucent Indicia in a manner that is likely to confuse the public concerning the relationship of the Parties.

(iv)    Except as otherwise required by, and without limiting the terms of, this Agreement, WinStar acknowledges that it has no ownership or other interest in the Lucent Indicia and shall make no claim with respect to the ownership or other interest in such Indicia. WinStar's rights to use the Lucent Indicia shall not be exclusive; Lucent expressly reserves the right to contract with others to use the Lucent Indicia.

20.13.    **Third Party Beneficiaries.**

Except as otherwise provided in this Agreement, this Agreement shall not be deemed to create any rights in third parties, including suppliers and customers of a Party, or to create any obligations of a Party to any such third parties.

20.14.    **Amendment.**

This Agreement shall not be modified, amended or in any way altered except by an instrument in writing signed by both Parties.

20.15.    **Interpretation**

(a)    Terms other than those defined in this Agreement shall be given their plain English meaning, and those terms, acronyms and phrases known in the telecommunications and information technology services industries shall be interpreted in accordance with their generally known meanings. Unless the

---

B1246

context otherwise requires, words importing the singular include the plural and vice-versa. Terms defined in the Credit Agreement shall not be superceded by the same terms defined in this Agreement.

(b) References to "Article", "Section", "Subsection" and "Schedule" mean references to an article, section, subsection or schedule of this Agreement, as appropriate, unless otherwise specifically stated.

(c) The article and section headings in this Agreement are intended to be for reference purposes only and shall in no way be construed to modify or restrict any of the terms or provisions of this Agreement.

(d) The words "include," "includes", and "including", when following a general statement or term, are not to be construed as limiting the general statement or term to any specific item or matter set forth or to similar items or matters, but rather as permitting the general statement or term to refer also to all other items or matters that could reasonably fall within its broadest scope.

(e) All dollar amounts set forth herein are in United States dollars.

20.16. Incorporation by Reference and Order of Precedence.

(a) All Schedules attached hereto are hereby incorporated by reference into this Agreement. Subject to Section 20.14, any amendments to this Agreement (including with respect to Schedules), and any additional Schedules that are agreed upon by the Parties subsequent to the Effective Date, shall likewise be incorporated by reference into this Agreement.

(b) Any conflict among or between the documents making up this Agreement will be resolved in accordance with the following order of precedence (in descending order of precedence):

(i) This Agreement;

(ii) The Schedules;

(iii) The Exhibits to the Schedules; and

(iv) Purchase Orders.

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the undersigned officers, thereunto, duly authorized, as of the date first written above.

WINSTAR COMMUNICATIONS, INC.　　　　　LUCENT TECHNOLOGIES INC.

By: _____　　　By: _____
Name: _____　　Name: _____
Title: _____　　Title: _____
Date: _____　　Date: _____

Supply Agreement　　　　　　　　　　　Confidential – WinStar/Lucent

B1247

Schedule A

Statement of Work

1.    General.

    1.1.    General.

This Statement of Work describes certain services, functions and responsibilities of Lucent, including the design, architecture, planning, program management and implementation of the Network.

The Services described in this Statement of Work are intended to be comprehensive as to the categories of services to be performed by Lucent, but may not necessarily be all inclusive in describing the particular activities, resources or other details necessary for the performance of those Services. Appropriate additional implementation details and procedures for the Services described herein will be included in documents subsequently developed under this Agreement.

As more fully described herein, Lucent will have full responsibility to:

    (i)    Develop the end-to-end design and architecture of the Network;

    (ii)    Develop and design the end-to-end Network Technology, including Network Elements specifications pursuant to Best of Breed;

    (iii)    Plan and execute the implementation of the Network;

    (iv)    Consistent with the terms of this Agreement, acquire (on WinStar's behalf) the requisite Network Elements for the implementation of the Network;

    (v)    Install, integrate and test the Network Elements with each other and with the appropriate OSS and BSS; and

    (vi)    Provide continued engineering support for the Network as it may evolve and expand to include additional WinStar business units and WinStar customers.

    1.2.    Current WinStar Topology, Network Building Blocks And Elements.

    (a)    Network Building Blocks. The current Network consists of independent voice and data networks. The voice network is entirely TDM based while the data network is a combination of TDM and packet technologies. The network elements of the voice and data networks are being physically colocated to afford all of WinStar's customers the opportunity to access all products and services in a seamless manner. The WinStar network is comprised of the following major building blocks:

---

B1248

(i)    **Central Offices.** The Central Office is the service node for all voice and data services. It houses a voice switch, an ATM switch, frame relay switch, microwave radios, transmission gear, host loop carrier equipment, distribution frames and all necessary power, network management devices, data service gateways, HVAC and environmental controls. Many Central Offices also serve as Hubs, as defined below.

(ii)    **Hubs.** An access node, primarily utilizing wireless technology, consisting of microwave radios, host loop carrier equipment, transmission gear, distribution frames, network management devices and all necessary power, HVAC and environmental controls. A Hub in many cases is also a B-Site in that it serves WinStar customers that reside in the Hub building.

(iii)    **B-Sites.** A customer building, also known as a WinStar Building that houses microwave radios, remote loop carrier equipment, intra-building connectivity facilities and/or gear to reach WinStar's customer demarcation point and all necessary power. A B-Site can also serve as a Hub in a reduced configuration.

(iv)    **Colos.** WinStar can physically or virtually colocate a subscriber loop or transmission/mux gear with LECs, IXCs and CAPs. WinStar uses LECs and CAPs to access unbundled loops and/or T1/T3 facilities for the provisioning of service to WinStar customers.

(v)    **Data-Only Points.** In other markets, there may be WinStar services deployed that are not built around a 5ESS anchor. These other markets may also require a Central Office environment with engineered access, power, transmission and switching. Lucent will extend EF&I services to these markets in a similar program managed environment as is being provided in core cities.

(b)    **Topology.** The network topology currently consists of a centralized switching platform that provides all of the features, services and switching functionality for all customers in a particular Network Serving Area. Each switch delivers services to and from WinStar customers through interconnect facilities to and from the LEC, IXCs and Internet Peering Points to which WinStar has connections. Today, Switches connect to Hubs in a hub-and-spoke topology. Also, Hubs connect to B-Sites in a hub-and-spoke topology. Exhibit A-6 sets forth the current Network topology.

(c)    **Switching.** The voice network today consists of the Lucent 5ESS, typically deployed one per city and operated as the centralized switching platform for the entire market. All Switches provide local service through interconnect arrangements with the incumbent LEC. All WinStar switches provide long distance service to WinStar local customers and most switches provide long distance services to WinStar switched access long distance customers. The data

---

Schedule A to the
Supply Agreement    - A-2 -    Confidential – Winstar/Lucent
Execution Version

B1249

network consists of a Newbridge 36170 ATM switch and a Cascade 9000 frame relay switch in the Central Office.

(d) **Interconnect.** The Interconnect facilities are the physical connections from WinStar's Switch to other carrier networks for the provisioning of services to WinStar customers. These facilities connect to the LECs, IXCs, Internet Peering Points, Carrier Hotels (locations with a large concentration of carrier POPs) and CAPs. The capacity of the interconnect facilities varies from T-1 to multiple OC-12 and OC-48. The interconnect network can consist of:

    (i) Leased telco facilities on copper and/or fiber;

    (ii) Point-to-point microwave radio facilities operating on the 18, 23, 28 and 38 GHz bands; or

    (iii) Fiber that has been procured through long-term IRUs and uses optronics owned and operated by WinStar.

(e) **Transmission.** The transmission network provides connections from the Switch to the Hubs, Colos and Switches in other WinStar Network Serving Areas. The capacity of the transmission facilities varies from T-1 to multiple OC-12 and OC-48. The transmission network can consist of:

    (i) Leased telco facilities on copper and/or fiber;

    (ii) Point-to-point microwave radio facilities operating on the 18, 23, 28, 38 GHz bands; or

    (iii) Fiber that has been procured through long-term IRUs and uses optronics owned and operated by WinStar.

(f) **Access.** The access network provides connections from B-Sites to Hubs and Switches. While the preferred and most widely used access medium is WinStar's Wireless Fiber$^{SM}$, the access network can consist of any of the following:

    (i) Dedicated, TDM-based, point-to-point microwave radio facilities operated on primarily the 28 and 38 GHz bands where WinStar owns licenses. WinStar does use other radio bands if and when they are available or appropriate. The geographical coverage areas, as defined and authorized by the FCC where WinStar owns 38 GHz licenses, are called Licensed Serving Areas("LSAs"). The geographical coverage areas authorized by the FCC and where WinStar owns 28 GHz licenses are called Basic Trading Areas("BTAs");

    (ii) Dedicated, leased telco facilities on copper or fiber;

    (iii) Colocation with LECs, ISCs or CAPs utilizing unbundled loops; or

---

B1250

       (iv)     Fiber that has been procured through long-term IRUs and uses optronics owned and operated by WinStar.

The capacity of the access network is primarily 8xT1 or DS-3 in the case of microwave radio facilities. In the case of leased facilities or WinStar fiber, the capacity varies from T1 to OC-12 and OC-48.

    (g)    **CTE/CPE.** The CTE/CPE employed today consists of channel banks, digital loop carrier equipment, DSUs, routers, bridges and hubs. Most B-Sites have loop carrier equipment deployed as a matter of course to provision voice services. Other devices are selected and deployed at the time of customer order based on the services to be offered to the customer.

## 1.3.    WinStar Network Services

WinStar offers a wide range of communications services to its customers, including: Local Voice, LD Voice, Network Transport, Internet Services, LAN/WAN Integration, and other Professional Services. This functionality may include

    (a)    **Domestic Voice Functionality.** Voice service products may or may not be tariffed. Tariffed services must interoperate and interwork with other like tariffed services, if offered, from incumbent carriers in a service area. On a service-by-service basis, non-tariffed enhanced services may or may not interwork or interoperate with other non-tariffed like offerings in a service area.

        (i)     Basic and Enhanced Voice,

        (ii)    CLASS,

        (iii)   Operator services,

        (iv)   Directory services,

        (v)    911 services,

        (vi)   Local switching (Class 5), AIN,

        (vii)   LD switching (Class 4) and IN,

        (viii)  Least Cost Routing,

        (ix)   DXC Access integration,

        (x)    800/888 services,

        (xi)   Information/900 services,

        (xii)   Centrex,

        (xiii)  ISDN.

B1251

(xiv)  Call center outsourcing services,

(xv)   Network-based voicemail,

(xvi)  Voice conference services,

(xvii) Voice network design,

(xviii) Outsourcing services,

(xix)  CPE, and

(xx)   PBX CTI.

(b)  **Domestic Data Functionality.** Data service products may or may not be tariffed. Tariffed services must interoperate and interwork with other like tariffed services, if offered, from incumbent carriers in a service area. On a service by service basis, non-tariffed enhanced services may or may not interwork or interoperate with other non-tariffed like offerings in a service area.

(i)    Point to Point Connectivity,

(ii)   Internet Access,

(iii)  UseNet groups,

(iv)   Web hosting, e-commerce,

(v)    VPN connectivity,

(vi)   Email, Network Notes services,

(vii)  IP telephony/fax,

(viii) Multimedia and video,

(ix)   IP multimedia conferencing services,

(x)    CPE,

(xi)   WAN professional services,

(xii)  LAN professional services,

(xiii) Security services,

(xiv)  E Commerce,

(xv)   Web/Intranet systems integration,

---

B1252

    (xvi)   Private Peering,

    (xvii)  Customer Network Management,

    (xviii) TCP/IP,

    (xix)   Frame Relay, and

    (xx)    X.25 / SNA integration.

**1.4.**   **Planned WinStar Network Evolution.**

WinStar anticipates certain changes in the topology of the Network as new technologies and Network Elements evolve. WinStar will work closely with Lucent to plan and implement this evolution under the principles of SNAP-D and Best of Breed so that the Network continues to be efficient from a cost, products, services, features, reliability and maintainability standpoint. Exhibit A-7 sets forth a view of the planned Network topology. While this section and Exhibit A-7 set forth the anticipated network evolution, the final architecture will depend on future requirements, cost and availability of access and transmission bandwidth, technologies and services.

It is the intent of the Parties to merge voice and data services into common local infrastructure where these service share common "Next Generation" Network Elements. In addition, a common inter-city transport network is required to support combined voice and data functionality. This integrated metropolitan and national network will employ Best of Breed technology.

(a)    Switching. The Network today consists of a centralized switching topology connected to access nodes via transmission facilities. This topology is expected to gradually evolve to a more distributed switching architecture whereby many former access nodes become service nodes.

    (i)    The building blocks formerly referred to as Switches, and perhaps several of the Hubs, will become Integrated Core Service Nodes ("ICSNs"). The ICSN may contain many of the Network Elements as it did before, however it will now be configured and integrated in a manner that the provisioning of service and utilization of transmission and access facilities will become more efficient and seamless relative to the voice, data and video services provided. Also, it is anticipated that there will be more than a single ICSN in a particular market, which will offer additional efficiencies via more localized, multiple interconnect facilities to other carrier networks.

    (ii)   Hubs that do not qualify as ICSNs because of traffic density or operating costs will become Integrated Edge Service Nodes ("IESNs"). The IESN will be much like the ICSN, but it will not have direct interconnect facilities to other carrier networks and the switching functionality will be less sophisticated.

---

Schedule A to the
Supply Agreement        - A-6 -       Confidential – Winstar/Lucent
Execution Version

B1253

(b)    Interconnect. The interconnect facilities defined in the previous section are expected to evolve in three major ways:

    (i)    Facilities will migrate from hard partitioning for voice and data services to clear pipes over which voice and data traffic will be transported via packet technologies;

    (ii)    With the addition of new, distributed service nodes, there will be multiple interconnection points to other carrier networks from the numerous ICSNs as opposed to a single interconnect point with the centralized switching architecture; and

    (iii)    The Interconnect facilities will continue to use the mediums as previously described but the use of WinStar fiber procured through long-term IRUs and using optronics owned and operated by WinStar is expected to increase. Also, it is anticipated that long-term trends in bandwidth requirements and increased WinStar market share will drive the capacity of these facilities much higher than today.

(c)    Transmission. Fundamental to advanced services is the deployment of Lucent Optical Networking solutions in the Network (locally and nationally), switching and restoration capabilities for multiple optical rings, and the appropriate terminating equipment required to deliver services to WinStar customers. Network bandwidth requirements are expected to increase to multiple OC-192s in the coming years in order to support rapidly expanding Internet Protocol (IP) traffic. IP traffic is expected to be pervasive in the local loop, over radio facilities and in the long haul network. The Transmission network is expected to evolve in the following ways:

    (i)    The topology will migrate from a hub-and-spoke topology to a ring and/or mesh topology where it is determined to be the most cost-effective and efficient solution.

    (ii)    The transmission facilities will be configured in such a way as to allow dynamic allocation of bandwidth. Transmission facilities that are currently partitioned for voice and data will gradually evolve into simply "pipes" over which voice and data services are transported seamlessly via packet technologies.

    (iii)    The physical provisioning that is required today will be greatly reduced and gradually replaced by logical and virtual connections.

    (iv)    The transmission facilities will continue to use the mediums as previously described but the use of WinStar fiber procured through long-term IRUs and using optronics owned and operated by WinStar is expected to increase dramatically. Also, it is anticipated that long-term trends in bandwidth requirements and increased WinStar market share will drive the capacity of these facilities much higher than today.

---

B1254

(d)    Access. The Access network will evolve in the following ways:

    (i)    The access network medium will become increasingly more dependent on wireless vs. leased telco facilities as the number of B-Site and Hub leases increases which in turn will greatly increase the number of constructed wireless access points;

    (ii)    The wireless access medium will allow dynamic allocation of bandwidth over the air interfaces via packet technologies;

    (iii)    Increased bandwidth requirements and new technologies for advanced services will cause the average wireless bandwidth per building to increase from 8xT1 and DS-3 bandwidth to OC-3 speeds and higher;

    (iv)    New point-to-multipoint radio technologies will become commercially available and offer "sharing" or "trunking" of WinStar's wireless spectrum to multiple B-Sites simultaneously with an air interface that has evolved from TDM to packet technologies. The Access network will become a hybrid wireless network consisting of a combination of dedicated high-capacity point-to-point radio and point-to-multipoint radio technologies; and

    (v)    WinStar will continue to acquire spectrum in different portions of the wireless spectrum, which will create opportunities for new Access topologies and schemas.

(e)    CTE/CPE. The CTE/CPE employed today is expected to change dramatically to integrated edge devices and customer premises equipment, which will provide flow-through logical and virtual provisioning as a much more graceful solution to the current challenges of physical provisioning of broadband integrated voice, data and video services. These edge devices, unlike today's solutions, will be deployed as a matter of course based on the expectation that cost-effective solutions will be developed to justify doing so.

2.    Network Architecture and Technology.

    2.1.    General.

    Lucent's Network design will consist of two primary components (Network Architecture and Network Technology), which will be detailed and analyzed at two levels: overall and city-specific. The city-specific level will be divided into four application areas: domestic intra-city, domestic inter-city, international intra-city and international inter-city. Following development of the Network design, Lucent will develop city-specific project plans that define the timing, cost, functionality and scope of the implementation for each city.

Schedule A to the
Supply Agreement    - A-8 -    Confidential – Winstar/Lucent
Execution Version

B1255

2.2.    **WinStar Engineering Requirements.**

(a)    WinStar will be responsible for identifying the short- and long-term engineering requirements and business constraints of the Network (overall and at a city-specific level), including products supported, functionality, performance standards and volume, based upon WinStar's engineering product plans. Lucent will analyze and comment on these requirements, including using commercially reasonable efforts to identify any omitted services that are required or related. After consideration of Lucent's review and comment, WinStar will specify its final engineering requirements. These requirements will include year one by quarter, year two by half-year, and a target year three estimation.

(b)    WinStar will provide information regarding WinStar-managed or -controlled elements of the implementation along with associated timing, cost and functionality requirements.

(c)    The Network Architecture and Network Technology developed by Lucent shall be capable of handling a margin of deviation above or below the network capacity defined by market projections and sales forecast volumes provided by WinStar. Changes to the Network, Network Architecture or Network Technology to accommodate volumes beyond this acceptable margin of deviation shall be handled as a special project in accordance with Section 5.4 of this Schedule A. In particular, the acceptable margin of deviation shall be as follows:

| Timeframe | Acceptable Deviation (+/-) |
| --- | --- |
| First quarter of year one | Ten percent (10%) |
| Second quarter of year one | Twelve and one-half percent (12½%) |
| Third quarter of year one | Fifteen percent (15%) |
| Fourth quarter of year one | Seventeen and one-half percent (17½%) |
| First half of year two | Twenty percent (20%) |
| Second half of year two | Twenty-five percent (25%) |
| Year three | Thirty percent (30%) |

2.3.    **Baseline Analysis.**

Within forty-five (45) days after the Effective Date, Lucent will complete a baseline analysis of the existing state of the Network. Initially, this analysis will include a documentation of the architecture of the Network as of the Effective Date, including current services supported, objective and actual network performance, and operations criteria. Part of the analysis will be a gap analysis, which is an assessment of problems and issues with that architecture in light of WinStar's short and longer-term target services, network performance, and operating criteria. The remainder of the analysis will be a set of multiple network architecture views (generic, local and inter-city to support a broad product set including voice, data and video), services offered, end-to-end performance criteria, operations criteria (e.g. flow-through), and service product features, functionality and estimated cost points. WinStar agrees to provide timely internal information, expertise and participation in order to meet the schedule. Lucent

B1256

will assign a chief architect (with a properly staffed supporting team) to initiate the baseline analysis within one week of the Effective Date.

2.4.    **Overall Network Architecture.**

Within ninety (90) days after the Effective Date, Lucent will develop and submit a Network Architecture, based upon WinStar's final engineering requirements and in compliance with Applicable Standards, to WinStar for review and potential approval. This document will be the master specification for the Network and will describe the final architecture anticipated for implementation under the Agreement. Where appropriate, the Network Technology specifications described below will be incorporated by reference. The Network Architecture will include recommended technical performance standards with regard to system and Network Element performance (e.g., MTBF, reliability, recoverability, availability and throughput) and will describe how all Network Elements interface with each other, as well as all protocol conversions and encapsulations. The specification will fully describe the Network and endpoint and NOC access thereto, alternate access technologies and co-location strategies. The Network Architecture will support views of year one by quarter, year two by half-year, and a target year three view. This document will be updated quarterly to reflect changes in WinStar's business plan, Lucent and Third Party Products, new technologies and evolving standards.

2.5.    **Overall Network Technology.**

Lucent will develop a Network Technology plan that specifies the Network Elements composing the Network, as designed in the WinStar-approved Network Architecture. The Network Technology will include:

(a)    **Public Network Specifications.** For each public network interface included in the Network Technology, Lucent will submit a set of interface specifications as part of the Network Technology. Each interface specification will describe the interface standards and options to be implemented for a specific public network, including network management and data interfaces.

(b)    **Product Specifications.** For each item of Equipment and Software included in the Network design, Lucent will submit a specification as part of the Network Technology. Lucent's development of these specifications shall include the following:

(i)    Lucent will perform technical evaluations of required Products, based on feature content, cost-effectiveness (including impact of SNAP-D), operational efficiency and availability, the Product Spec Principles set forth in Exhibit A-5 and Schedule B and migration considerations.

(ii)   Lucent will perform validation, operations and interoperability testing, as set forth below in Section 4, and Lucent Certification of required Products.

---

B1257

(iii)    Lucent will review and present to WinStar a sufficient number of system options prior to deciding on a technical cost-effective solution. The options will cover popular industry solutions and suppliers.

2.6.    City-Specific Network Architecture and Technology.

Lucent will develop Network Architecture and Network Technology plans at a city-specific level, divided into four application areas: domestic intra-city, domestic inter-city, international intra-city and international inter-city. The city-specific Network design and architecture developed by Lucent will include actual sizing and deployment of specific Network Elements as determined by WinStar's city-specific engineering requirements, as well as preconditioning for growth and a SNAP-D plan, as appropriate. The Parties agree to employ, where feasible and practical, pre-defined equipment models in developing City-Specific Plans. Lucent will perform validation, operations and interoperability testing and acceptance of the city-specific plans, as set forth below. After appropriate testing, the city specific Network Architecture and Network Technology plans will be submitted to WinStar for review and potential approval.

2.7.    Systems Architecture and Design.

(a)    To achieve an integrated end-to-end network solution for WinStar, it will be necessary to integrate all Network Elements with WinStar's Operations Support Systems and Business Support Systems (OSS/BSS). These systems are used in the day-to-day management and administration of WinStar's business and support the following broad business functions:

(i)    Network configuration management;

(ii)    Network fault management;

(iii)    Network performance management;

(iv)    Network security management;

(v)    WinStar customer provisioning;

(vi)    WinStar customer billing; and

(vii)    Management information reporting.

(b)    Lucent will work collaboratively with WinStar to facilitate the integration of Network Elements into WinStar's BSS/OSS environment. Lucent will define network event data generated by all Network Elements and will provide the data and interface specifications to WinStar. All Network Elements will be compliant with applicable industry standard network management interfaces, including but not limited to SNMP and TMN Q3.

B1258

2.8.  **Engineering and Consulting Services.**

(a)  **Review and Re-Optimizing.**  WinStar will assess the Network design in terms of its internal five-year business model and the "City Success Model." This assessment may lead to an iterative process to resolve discrepancies and omissions. In addition, Lucent (with WinStar's input, review and potential approval) will continually review and re-optimize the Network design (Architecture and Technology) per a mutually agreed-upon schedule as new users are added, WinStar develops new products, volumes change and technology evolves.

(b)  **Engineering Services.**  On an on-going basis, but consistent with the transition plan described in Section 3.3 of this Schedule A, Lucent's shall be responsible for engineering, which shall include the following services, as applicable and necessary for functions set forth in the Responsibility Matrices at Exhibits A-1 and A-3:

(i)  Network architecture, planning and engineering;

(ii)  Providing technical expertise in network management and transport technologies;

(iii)  Performing ongoing technology assessment, developing technology feasibility studies, and coordinating and determining budgetary costs regarding the Network;

(iv)  Evaluating, recommending, and analyzing design aspects of Equipment, Software, network and circuit changes and enhancements;

(v)  Switch and services engineering;

(vi)  Capacity planning and management;

(vii)  Transmission and facilities engineering;

(viii)  Wireless engineering;

(ix)  Local access facilities and equipment engineering;

(x)  In-building equipment and facilities engineering;

(xi)  End user product/services engineering;

(xii)  Inter-city network engineering;

(xiii)  International network engineering;

(xiv)  Mechanical/electrical site engineering;

B1259

(xv)   Managing documentation requirements of the Network; and

(xvi)  Providing overall technical consulting as requested by WinStar.

(c)   **Documentation.** Lucent's performance of engineering services shall be supported through its use of the following documentation and specifications. The structure and specific content of the documentation shall be mutually agreed upon by the Parties. However, it is expressly agreed that the documentation shall include, at a minimum, the current WinStar information content for these documents.

(i)    **EOS Generation.** The Engineering Order Specification defines WinStar functional and capacity requirements used to order Network Elements. An EOS is required prior to ordering Network Elements.

(ii)   **Installation Methods and Procedures.** The installation-related Methods and Procedures outline the steps necessary to install a Network Element in the Network.

(iii)  **Capacity Reports Generation.** Capacity reports show network and equipment utilization, including traffic characteristics and utilization of ports, memory, CPU and other system resources.

(iv)   **Network Trunking Design.** The network trunking design depicts how a WinStar switch is connected to other networks for a given market.

(v)    **Circuit Service Orders.** Circuit Service Orders specify new or augmentation quantities of circuits needed. Circuit Service Orders are also used to communicate translations requirements associated with new circuits.

(vi)   **Equipment Growth Orders.** Equipment Growth Orders specify hardware growth requirements.

(vii)  **Switch Services Engineering Plans.** Switch Services Engineering Plans, define new or existing city switch engineering requirements. Typical SSE Plans include central office configuration diagrams, central office connectivity design, CLLI codes, points of contact for ILEC and other service providers, Product engineering requirements and a new technology architectural description.

(viii) **Office Data Administration and Translations Requirements.** The ODA specifies new switch translations requirements. Translations Requirements specify translations for existing systems.

(ix)   **Test Plans.** Test Plans define actions needed to test a new feature or system, as described more fully below.

---

B1260

(x)　**End User Product/Services Engineering Plans.** End-to-end Network Element functionality and interoperability required to support WinStar-defined end user products and services, including WinStar customer provisioning guidelines for new services;

(xi)　**Network Administration and Network Optimization Orders.** Network Administration and Network Optimization orders define actions needed to improve network efficiency. Examples of network administration and network optimization orders might include an order to groom two customers with small counts of DS0s into a single switch facility or to move a trunk group from one switch SM to another in order to balance switch traffic.

3.　**Planning Services and Program Management.**

3.1.　**Program Management.**

Lucent will be responsible for overall program management of the functions performed by Lucent and WinStar, including functions performed in designing, engineering and building the Network, but not including on-going Network operations (e.g., NOC operations, product maintenance and support). Lucent will manage the overall master schedule for functions performed by Lucent, Lucent subcontractors, WinStar and WinStar's third-party contractors in accordance with Exhibits A-1 and A-3 (and Exhibit A-2 (International) as mutually agreed). As functions transition from WinStar to Lucent in accordance with the transition plan, the project plan will be modified to reflect the transition of responsibility and accountability. Also in accordance with the transition plan, Lucent will assume EF&I program management responsibility for network components (e.g., B-sites, Hubs, Central Office and transmission sites including customer collocation). Lucent's performance of the overall program management function does not imply responsibility for budget, cost or performance of work functions not directly controlled by Lucent or its subcontractors. The Lucent program management role, as the single point of contact for the overall design, engineer, and build function, will include:

(a)　Typical activities such as program/project schedule development and maintenance, roles and responsibility matrix development and maintenance, action register administration, high-level document control, change control, critical item/jeopardy escalation process management and program progress reporting;

(b)　Managing and communicating with the various responsible parties (i.e., Lucent and its subcontractors, WinStar and WinStar-directed third party resources) as appropriate so that the Implementation meets established objectives of time, cost, functionality and service quality, as defined in the relevant City-Specific Plan. WinStar will provide a single point of contact to monitor status, resolve issues and make commitments to Lucent with regard to each WinStar-performed function or required input; and

(c)   Attending regularly scheduled progress reviews with appropriate WinStar personnel to communicate project status and resolve issues in cooperation with WinStar.

3.2.   **City Implementation Planning.**

(a)   WinStar will develop and provide to Lucent a roll-out schedule that, among other things, indicates cities in which WinStar will commence offering services, the scope of those services, budget, scope, target markets (buildings to be targeted) and timeframes.

(b)   Lucent will develop and submit City-Specific Project Plans for WinStar's review and potential approval. Each such City-Specific Project Plan will be based upon the corresponding city-specific Network Architecture and Network Technology plans and will include specific disaster, recovery and back-out procedures. The City-Specific Plans will schedule and detail each of the responsibilities set forth in the matrix in Exhibit A-3, as applicable to the particular city (i.e., for augmentation of existing cities, only a subset will be applicable). Lucent will also take into account WinStar input regarding WinStar functions (e.g., site acquisition, regulatory compliance, numbering/dial plans, ILEC facilities negotiation and build-out of common space at the customer building). The City-Specific Project Plans will be updated as responsibilities are completed and Network Elements are implemented so as to incorporate developing best practices, Best of Breed solutions and issue resolution.

3.3.   **Transition Planning.**

(a)   Except as otherwise specified in Exhibit A-4, within forty-five (45) days after the Effective Date, Lucent will develop a transition plan with WinStar's input, review and potential approval, consistent with the matrices set forth in Exhibits A-1 and A-3; provided, however, Lucent will develop a transition plan with WinStar's input, review and potential approval for Network Engineering/Traffic Engineering within fifteen (15) days of the Effective Date. This plan will address transfer of responsibility for: network architecture and technology, planning services, program management, testing and implementation. The transition plan will identify and schedule Lucent assumption of responsibility based upon the following prerequisites:

(i)    Lucent core competency and Best of Breed decisions (e.g., Lucent RF engineering and radio and data products respectively);

(ii)   Understanding (detail) of WinStar expectations;

(iii)  Lucent's evolving core competencies ; and

(iv)   A joint (Lucent and WinStar) development of appropriate business processes to transition those responsibilities, which will include a process for positive acknowledgement of responsibility transfer.

---

Confidential – Winstar/Lucent
Execution Version

B1262

(b)    The Parties intend that certain functions, such as those that, as of the Effective Date, are performed by WinStar's Engineering and Network Construction & Deployment departments, although not currently within Lucent's core competence, will be assumed by Lucent during the Term.

(c)    Certain functions, although necessary to the implementation of the Network, will remain WinStar's responsibility. This includes site acquisition, regulatory compliance, numbering/dial plans, ILEC facilities negotiation, build-out of common space at the customer building and management of business relationships with WinStar customers.

(d)    WinStar and Lucent agree to providing the required subject matter expertise, time and resources required to complete the transition plan on schedule.

4.    **Testing.**

4.1.    **Test Beds.**

(a)    Test Facilities. Lucent will develop and maintain test facilities to support the test and acceptance process necessary to drive the technical evaluation and selection set forth in this Section ("Test Facilities").

(i)    The Test Facilities will include a functional replica of the Network environment, including each Network Element to be implemented per the Network design. At no additional cost to WinStar, Lucent will provide WinStar with at least one of each Lucent Product purchased by WinStar for implementation into the Test Facilities. Title in all such Test Facilities Network Elements shall vest in WinStar, and WinStar shall be entitled to continue to use such Elements in its Test Facilities following termination or expiration of the Agreement. The Test Facilities must be adequate to support the following types of network testing:

(1)    End-to-end integration testing;

(2)    Network topology changes;

(3)    Integration testing of new/individual Network Elements within the existing Network (including Lucent Products and Third-Party Products) and with the OSS/BSS;

(4)    Integration testing of WinStar customer CPE and network applications within the then-current Network;

(5)    Performance, load, and stress testing;

(6)    Trouble/fault isolation;

(7)    Year 2000 compliance testing; and

---

**B1263**

(8)    Verify support of, and compliance with, Applicable Standards.

(ii)    The Test Facilities will be capable of supporting concurrent testing on current and future configurations/systems and will support testing by WinStar and WinStar's customers and third-party vendors (subject to such third-party vendors signing a confidentiality agreement protecting Lucent's intellectual property). The Test Facilities will also be used for certifying new WinStar hardware/software configurations as well as simulating Network trouble conditions if necessary for real-time trouble-shooting or maintenance support.

(iii)    Lucent will install in the test beds a reasonable number of new product evaluation units for the purpose of testing such new products and technology.

(iv)    Support connection for integration testing of the WinStar Operations Support Systems ("OSS") and Business Support Systems ("BSS") as individual and integrated Network Elements and technology. Act as a WinStar customer demonstration center where WinStar customers can, on a pre-negotiated basis, observe interoperability of their equipment and network applications with WinStar Network Elements, OSS and BSS.

(b)    Test Bed Scheduling.  Lucent will be responsible for scheduling and coordinating the Test Facilities as required to support the testing requirements of Lucent, WinStar (including OSS, BSS and Year 2000 compliance), WinStar's customers and third-party vendors.

(i)    The Lucent test bed will be dedicated to WinStar.

(ii)    WinStar will advise Lucent, on a monthly basis, of the anticipated testing requirements.  Lucent will take these testing requirements into account in developing the testing schedule for the next ninety (90) days.

(iii)    WinStar will be responsible for supporting testing, as reasonably required, when conducted by Lucent or WinStar or in support of WinStar customers and third-party vendors.

4.2.    **Test Plans.**

Lucent will develop test plans and scripts for a structured, hierarchical test program that will verify the functionality of individual Network Elements and the ability of the Network Elements to inter-operate with each other in the Network as described in the WinStar-approved design specifications.  The test plans will include test conditions and the anticipated acceptable outcome thresholds (e.g. with regard to interoperability, manageability, engineering guidelines, product specs, Y2K, IEEE, and NEBs compliance).

B1264

4.3.    Conduct of Lab Testing.

Lucent will perform lab testing according to the WinStar-approved test plans, and will provide the results to WinStar as input to the review and approval process. Lab testing will be performed to validate the Network Architecture and Network Technology, to validate additions and changes thereto, and for standards compliance and interoperability with other Network Elements, WinStar OSS and BSS, and WinStar customer CPE. This testing will include:

(a)    Product testing, performed through factory acceptance tests, which demonstrate the ability of individual Network Elements to provide the functionality described in the associated design specifications. These tests should verify all interface and standards compliance for the Network Elements, employing simulation or stimulation devices.

(b)    Network Element integration and validation testing, to verify the ability of the Network Elements to interface with other Network Elements in the Network, as appropriate. These tests may include use of load generators to create synthesized data streams.

(c)    Inter-operability Testing, to verify the ability of all components of the Network to interact and perform as a system, ensuring interoperability and network integrity and reliability. This testing may include stress loading devices to generate sufficient levels of traffic to drive the Network Elements towards operation at capacity to verify the ability of the system to function under stress conditions.

(d)    Integration and acceptance testing of all changes to the Network.

(e)    Load and recovery testing and support for WinStar in pilot trials prior to deployment to the production environment.

(f)    WinStar will provide reasonable access to OSS/BSS development test or production environments, as appropriate, to facilitate network and systems integration testing.

5.    Implementation.

5.1.    Procurement/Acquisition.

To the extent necessary to implement the Network Architecture and Network Technology, Lucent will provision Lucent Products as indicated in the attached Exhibit C-1 (or any successor thereto). This responsibility shall include:

5.2.    Installation.

Lucent will be responsible for the installation of Network Elements in accordance with the City-Specific Plan, Network design and the Product Standards. This includes:

---

B1265

(a)    Decomissioning of existing equipment and equipment disposal per WinStar instructions.

(b)    Overseeing proper performance of installation functions on all Network Elements, including installing Lucent Products and selecting the installation contractor (except where such selection would interfere with Product warranty requirements) and program managing the installation;

(c)    Connecting customer building access equipment, cross-connects and central office connections;

(d)    Performing logical assignments in WinStar network facilities provisioning databases (e.g., ASAP);

(e)    Physical inventory and loading of inventory data into appropriate WinStar databases and systems;

(f)    Other installation services as may be mutually agreed to by the Parties from time to time; and

(g)    Performing required acceptance testing.

5.3.    **Support.**

Lucent will be responsible for supporting the Lucent Products as set forth in this Section and Section 14.7 of the Agreement during the Warranty and Extended Warranty Periods. This responsibility will include:

(a)    Tendering complete documentation (including inventory information) in association with replacement of Product components.

(b)    Providing advanced/accelerated replacement service (i.e., delivering a replacement Product, part or component on an overnight basis) based upon an understanding that WinStar will return the defective Product, part or component as soon as practicable, unless Lucent's standard published policies provide otherwise and are specified in a Product addendum to the Agreement.

(c)    Providing standard replacement service (as elected by WinStar) that will provide replacement Products, parts or components with a turn-around intervals of less than twenty-four (24) calendar days.  Lucent shall be responsible for the costs of shipping to and from Lucent in connection with the standard replacement service.

(d)    Delivering a quarterly report that tracks root causes of failures for all replacements of Products, parts or components, with tallies of incidents that are similar in nature or cause.

(e)    Lucent will be responsible for recommending (and delivering per WinStar's order) an adequate field supply and inventory of spare parts for every Lucent

---

B1266

Product under Warranty or Extended Warranty. The quantity and positioning of the spares will be sufficient for Lucent to meet applicable Service Levels. This shall also include:

(i)    Lucent will be responsible for replenishing the spare parts inventory with quality spare parts. These parts shall either be new parts or have been certified by Lucent's quality control as suitable for use in a production environment.

(ii)   Lucent will develop spare parts stocking plans based on equipment concentrations, locations, and failure rates. The parts stocking plan will establish Recommended Spare Parts Lists for engineer-carried, local, regional, and central stocked quantities of all parts.

(f)    Within thirty (30) days of the Lucent issuance of a new upgrade or release for any Lucent Product, Lucent will notify WinStar of the release and its functional content. Lucent will also propose a test and implementation schedule. WinStar may, at its option, defer or bypass the implementation. Lucent and WinStar will work together to assure that WinStar does not fall two (2) release levels behind the current release, unless test results indicate instability or diminished capacity as a result of the new release. In no case should WinStar be permitted to operate on an unsupported software release.

5.4.    Disaster and Recovery.

Lucent's responsibility for disaster and recovery for the Network shall be as follows:

(a)    Provide WinStar with a comprehensive disaster recovery plan for all Network Elements and connectivity; and

(b)    Perform specific disaster recovery services as may be mutually agreed upon by the Parties.

5.5.    Training.

Lucent will provide, at no additional cost to WinStar, reasonable numbers of WinStar-designated individuals with reasonable levels of appropriate training in the installation, operation, configuration, maintenance and repair of Lucent Products so that WinStar may, at its option, use, operate, configure and maintain those Products without Lucent's assistance. In addition, Lucent shall provide similar training, at no additional cost to WinStar (other than Out-of-Pocket Expenses incurred by Lucent and paid to the third party vendor providing training, if applicable), for those Third Party Products to be implemented into the Network that Lucent is authorized or otherwise certified to provide training. If Lucent utilizes a third party vendor to provide the training identified in the preceding sentence, WinStar will reimburse Lucent for its cost for such third party vendor on an Out-of-Pocket Expenses basis.

---

B1267

6.    Special Projects

Lucent will support WinStar's need for ad hoc performance of large, one-time projects that are related to the Network and individual case basis requirements not otherwise included in the Services (each, a "Special Project"). With regard to such Special Projects, the following Services shall apply:

6.1.    Program Management.

Lucent will assign a program manager and sufficient resources within the program management office to assess and assemble the Lucent team that will address the Special Project. Lucent will use best reasonable efforts to support the deadlines specified by WinStar with regard to Special Projects. Within one week of notification of the Special Project, Lucent will either provide a schedule that allows for those deadlines or suggest another deadline and associated schedule or alternative method to meet the requirement.

6.2.    Products.

Lucent will provide Lucent Products required to meet the schedule on an accelerated basis and propose an engineering plan that will meet WinStar's business objectives as defined in the Special Project request.

6.3.    Services.

Lucent will perform services to support the Special Project as defined in this Agreement and, as mutually agreed upon after pricing, provide other services as required to meet the objectives of the Special Project. Other services may include:

(a)    Engineering Assessment. Provide a professional assessment of a network to be purchased as to the interoperability with the Network and the costs and interval for such interoperability to be accomplished.

(b)    Proposal Support. Provide technical support for large proposals and evaluations of technology requested and the applicability and suitability of Lucent Products and services to meet the requirements set forth by an RFP-type document or other such bid as may be received by WinStar.

(c)    Engineering Design Services. Provide engineering analysis and offer a design that meets the initiative in a cost-effective manner.

(d)    Other Support. Price and provide other support such as implementation, testing or inside connectivity.

6.4.    Personnel.

It is anticipated that Lucent will need to use personnel other than those assigned to the Network project in order to meet Special Project-related demands. If Lucent wishes to use the same personnel from the Network project to meet the requirements for Special

B1268

Projects, the roll out of the Network and associated activities must stay on the agreed-upon schedule unless otherwise agreed to by WinStar.

6.5.    **Pricing.**

Lucent shall provide preliminary pricing for Special Projects within five (5) business days and final pricing within ten (10) business days of notification of the Special Project.

Exhibit A-1

Lucent Responsibility Matrix by Technology

**Technologies By Functional Services - Transition Planning**

| Functions/services (Apply to initial deployment and growth/evolution) | Ckt Switch | Trans | Access | PWR | Radio | Data | MDF | Cable Rack | Premise wiring | OSS | CPE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Network architecture | Y | Y | Y | Y | Y | Y | Y | | | Y | TBD |
| Technology selection/network design, testing | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | TBD |
| City plan – Network Techn. & Tech Planning | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Equipment Engineering | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Delivery | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Staging | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Installation/Turnover | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Equipment/Site Integration | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Drawings | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Records | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Product Warranty Support | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Logical Assignments Provisioning | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Traffic Eng/Capacity Planning | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

LEGEND:

"Y" - Lucent Competency Targeted for Transition.

"TBD" - Transition Planning Process will analyze and determine timeframe for Implementation.

Exhibit A-1 to the
Supply Agreement

- A-1-1 -

Confidential -- Winstar/Lucent
Execution Version

B1270

Confidential —WinStar / Lucent

**Exhibit A-2**

**International Responsibility Matrix**

The following is a listing of some of the international related services Lucent shall provide. The Parties will develop a responsibility matrix for these services and such other mutually agreed upon services as soon as practicable following the Effective Date. The Parties intend to complete the responsibility matrix as part of developing the associated international related pricing that is to be developed within thirty (30) days following the Effective Date.

B1271

Confidential --WinStar / Lucent

| Pre-Implementation | Consultancy | Including: business planning; network planning, architecture design, and engineering; RF engineering; operations planning (build MOPs); interoperability testing; and disaster recovery planning |
|---|---|---|
| | Services | Including: licenses and permits; site surveys; site acquisition; and civil engineering and construction |
| Implementation | Services | Including: logistics (warehousing, delivery and inventory); staging; installation; testing; network testing; interworking testing (an ORT plan will be developed); program management; and functional end-to-end testing |
| Operations | Services | Including: training; maintenance (dispatch, repair and replace); field support; remote management (Netcare, including IP Gateway); operations (monitor, provision, remote management, customer care, global WinStar NOC monitoring, Netcare services); staffing; and civil construction |

B1272

Exhibit A-3

Responsibility Matrix

| ID | Process | Owner | Inputs | Outputs |
|----|---------|-------|--------|---------|
| 1 | Market Definition | WinStar | License Information<br>Building Universe<br>D&B (ABI) Tenant Data | Rate/Wire Center Priorities<br>Product Descriptions<br>Demand Forecasts (2 years)<br> • Volume<br> • Number of Lines |
| 2 | Regulatory Approval | WinStar | Rate/Wire Center Priorities | CLEC Authority |
| 3* | Dial Plan | Lucent | Rate/Wire Center Priorities<br>Calling Plan | Switch Dial Plan |
| 4 | Preliminary City Plan | Lucent | Rate/Wire Center Priorities<br>Demand Forecasts (2 years)<br>Building Priorities | Claritas Data<br> • Cluster Maps<br> • Building Data<br>Tandem Locations<br>Connectivity Analysis<br>Refined Rate Centers<br>Additional NXX Requirements |
| 5 | Interconnect Agreements | WinStar | Rate/Wire Center Priorities | Interconnect Agreements<br>Interconnect Guidelines/Restrictions |
| 6 | Switch Analysis | Lucent | Connectivity Analysis<br>Demand Forecasts (2 years) | Preliminary Switch Requirements<br>Switch Building Requirements |
| 7 | Preliminary Field Survey | WinStar/Lucent | Building, Clusters and Maps<br>Tandem Locations<br>Switch Building Requirements<br>Broker Switch Site Candidates | Hub Candidates        (WinStar)<br> • On-net coverage<br> • Constructability<br> • Owner Interest<br>Switch Site Candidates    (Lucent)<br> • Usable square footage |

Exhibit A-3 to the
Supply A    ment

Confidential – Winstar/Lucent
Exr    'l Version

B1273

| ID | Process | Owner | Inputs | Outputs |
|---|---|---|---|---|
| 8 | Switch Site Selection | WinStar | Rate/Wire Center Priorities<br>Site Candidates (RR and Broker)<br>Switch Building Requirements Tandem Locations<br>Connectivity Options | • Distance to Tandem<br>• Connectivity Options          (Lucent)<br>Target Switch Sites (2 or 3 per area) |
| 9 | Switch Site LOI | WinStar | Target Switch Sites | Switch Site LOI (1 per area) |
| 10 | Switch Site Lease | WinStar | Switch Site LOI | Switch Site Lease |
| 11 * | CLLI/SS7 Point Code Application / Administration | Lucent | Switch Site Lease | CLLI Codes<br>SS7 Point Codes |
| 12 | Dial Plan Administration | Lucent | Rate/Wire Center Priorities<br>Products Descriptions<br>Demand Forecasts | Calling Plans<br>Dialing Plans<br>NPA/NXX's |
| 13 | Dialing/Calling Plan Review | WinStar | Switch Dialing Plans<br>Calling Plan (with Call Type) | Dialing Plan Approval |
| 14 | NXX Application | WinStar | CLLI Code<br>Rate/Wire Center Priorities | WinStar NXX Codes |
| 15 | Network Capacity Planning | Lucent | Demand Forecasts | Network Trunking Forecast<br>Network Capacity Reports |
| 16 | Preliminary Connectivity Plan | Lucent | Switch Site LOI<br>Switch Site Lease<br>Network Trunking Forecast<br>Tandem Locations | Preliminary Connectivity Plan |
| 17 | ILEC Planning | WinStar/Lucent | Interconnect Agreements<br>Switch Site LOI | POI                    (Lucent)<br>Trunking Plans        (Lucent)<br>ASR's (from ILEC)    (WinStar) |
| 18 | City Network Design | Lucent | City Serving Plan<br>Demand Forecast<br>Trunking Forecast | Network Topology<br>Connectivity Plan (Switch to ILEC)<br>Facility Inventory |

| ID | Process | Owner | Inputs | Outputs |
|---|---|---|---|---|
| | | | Switch Site LOI<br>Trunking Plan<br>Local & Access Tandems<br>Capacity Requirements<br>Interconnection Guidelines/Restrictions | Equipment Inventory<br>Budget |
| 18 | Switch Site Survey | WinStar/Lucent | | |
| 19 | Room Plans | Lucent | Site Visit | Floor Plan<br>Cable Rack & Lighting Plan |
| 20 | Switch EOS | Lucent | Demand Forecast<br>Site Visit<br>Preliminary Switch Requirements | Switch EOS |
| 21 | CO Site Construction | WinStar/Lucent | Site Visit | (WinStar – Civil Construction/HVAC) |
| 22 | Switch Design/Manufacture | Lucent | Switch EOS<br>Interconnection Agreements | Delivered Switch |
| 23 | ODA Questionnaire | Lucent | NPA/NXX Calling Plans<br>Switch Dialing Plan<br>Transmission Facility Orders | ODA Questionnaire<br>Translation Requirements<br>Integration Test Plan<br>ODA "Models |
| 24 | Transmission Area | Lucent | Demand Forecast<br>Floor Plan<br>Cable Rack & Lighting Plan | Transmission Equipment Layout<br>Transmission EOS |
| 25 | Central Office Plan Review | WinStar | Transmission Plan/EOS<br>Switch Plan/EOS<br>Connectivity Plan | Central Office Plan Approval |
| 26 | Facilities and Trunk Provisioning | WinStar | Interconnect Facility Orders<br>Transmission Facility Orders<br>ASR's from ILEC<br>FOC/DLR from ILEC<br>Trunking Plans | ASR's to LEC<br>FOC/CLR |

Exhibit A ^ 'o the
Supply . nent

Confidential – Winstar/Lucent<br>Exr 1 Version

**B1275**

| ID | Process | Owner | Inputs | Outputs |
|---|---|---|---|---|
| 27 | Ongoing Translations | WinStar | ODA Questionnaire<br>LERG Update | ODA Updates |
| 28 | CO Installation (Switch and Transmission Room) | Lucent | Delivered Switch<br>Room Layout<br>Connectivity Plan<br>CO Plan Approval<br>Translation Requirements<br>Switch EOS<br>Switch Lease | Completed Central Office<br>Installed Switch<br><br>(WinStar – Civil Construction/HVAC) |
| 29 | Integration Testing | Lucent | Integration Test Plan | Switch Integration Test Results |
| 30 | Hub Site Selection | WinStar/Lucent | Hub Candidates<br>On-net coverage          (WinStar)<br>Constructibility          (WinStar)<br>Owner Interest          (WinStar)<br>Connectivity Options          (Lucent) | Target Hub List (2 or 3 hubs per cluster to pursue) |
| 31 | Hub Site Leasing | WinStar | Target Hub List | One Hub Lease per Cluster |
| 32 | Hub A&E Review | WinStar/Lucent | Hub Target List<br>Connectivity Plan | Hub Selection/Approval |
| 33 | Backhaul Design | Lucent | Hub Lease<br>Switch Site LOI<br>Demand Forecast<br>Connectivity Plan<br>IRVs (if any) | Hub Connectivity Document<br>Hub Engineering Plans |
| 34 | Hub Engineering Package | Lucent | Hub Lease<br>Backhaul Design | Hub Engineering Package |
| 35 | Hub Equipment Order | WinStar | Purchase Order | FOC<br>Due Date |
| 36 | Hub Construction | WinStar/Lucent | Hub Lease<br>Backhaul EPAC | Constructed Hub<br>(WinStar – Civil Construction/HVAC) |

- A-34 -

Confidential – Winstar/Lucent<br>Execution Version

| ID | Process | Owner | Inputs | Outputs |
|---|---|---|---|---|
| 37 | Hub Acceptance Testing | WinStar | Constructed Hub Backhaul EPAC | OPS Acceptance |
| 38 | B-Site Selection | WinStar | Hub Candidates Building Data | B-Site Target List |
| 39 | B-Site Leasing | WinStar | B-Site Target List | B-Site Leases |
| 40 | Connectivity Design (B-Site to Hub) | WinStar (transition to Lucent) | Hub Site Lease B-Site Target List | Connectivity EPAC |
| 41 | B-Site Construction | WinStar/Lucent | B-Site Lease Connectivity EPAC | Constructed B-Site (WinStar – Civil Construction/HVAC) |
| 42 | B-Site Ops Acceptance Testing | WinStar | Constructed B-Site Connectivity EPAC | B-Site OPS Acceptance |
| 43 | ORT Test Planning | WinStar/Lucent | Transition Requirements Translation Updates Dialing Plans Product Descriptions Switch Integration Test Results | ORT Test Plan |
| 44 | ORT Testing | WinStar | ORT Test Plan | ORT Results - Defect Log (owners assigned) - Resolution Estimates |
| 45 | Switch Ops Acceptance Test | WinStar | Integration Test Results | Switch OPS Acceptance |
| 46 | General Availability | WinStar | Switch OPS Acceptance Hub OPS Acceptance B-Site OPS Acceptance ORT Results | General Availability |

\* Regarding items 3 and 11 above, Lucent intends to begin performing these Services within six (6) months of the Effective Date of the Agreement. In the event Lucent cannot perform these Services within such timeframe, Lucent agrees to hire WinStar (or its designee) as a subcontractor to perform these Services as part of a city-specific plan.

Confidential – WinStar/Lucent
Ex        tt Version

Exhibit A-4

Initial Transition Plan

1.    **General**

All contracted services for engineering, furnishing and installation (E, F&I) and Services for program management shall migrate to Lucent within six (6) months of the Effective Date.

An initial ramp-up time period is specified for Lucent to fully provide specific Services. During this period, WinStar personnel will assist Lucent personnel in familiarization with currently employed practices and procedures where they exist. This period varies by Service and specifically includes the items listed below.

1.1.    **Checklist for Transition**

For each of the Services set forth below, WinStar and Lucent will develop a checklist for items to be transitioned from WinStar to Lucent. As each service or network element is transitioned, there will be a document developed by WinStar and Lucent which will be signed by the appropriate WinStar Network Services VP and the Lucent Program Management office indicating that the service has been transitioned and Lucent has accepted responsibility for the service.

1.2.    **Specific Transition Timeframes**

An initial ramp-up time period is specified for Lucent to fully provide specific Services. During this period, WinStar personnel will assist Lucent personnel in familiarization with currently employed practices and procedures where they exist. The transition timeframes set forth below apply to all Network technologies with the exception of radio, packet switching (data) and CPE. Transition timeframes for these technologies will be mutually agreed during the transition plan process defined in Section 3.3 of Schedule A.

(a)    Engineering of Network Elements, including:

(i)    WinStar fiber optic systems will be migrated within thirty (30) days of the Effective Date. Fiber optic systems include optronics deployed in metropolitan areas and systems deployed for long haul transmission. Fiber optic system engineering includes evaluation of existing and future dark fiber routes for loss budget, amplifier and repeater spacing requirements, protection switching and capacity growth.

(ii)    WinStar Collocation at ILEC central office sites will be migrated within sixty (60) days of the Effective Date. Collocation at ILEC central offices includes subscriber loop carrier equipment and digital loop carrier equipment

(iii)    WinStar Broadband Services only sites will be migrated within ninety (90) days of the Effective Date. Broadband Services sites may include

- A-4-1 -

Confidential – Winstar/Lucent
Execution Version

**B1278**

packet switching or packet concentrating equipment, multiplex or cross connect equipment, auto answer modems, and UPS equipment and optronics.

(iv)    WinStar B sites will be migrated within one hundred and twenty (120) days of the Effective Date. B sites may include rack mounted and roof mounted radio equipment, multiplex equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing, or concentrating equipment and UPS equipment.

(v)    WinStar Hub sites will be migrated within one hundred and twenty (120) days of the Effective Date. Hub sites may include rack mounted and roof mounted radio equipment, multiplex equipment or cross connect equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing, or concentrating equipment, fiber optic equipment, UPS equipment, battery plant and associated power and stand-by power generating equipment.

(vi)    WinStar Central Office and Transmission sites including Customer Collocation will be migrated within one hundred and twenty (120) days of the Effective Date. Central Office sites may include rack-mounted and roof-mounted radio equipment, voice switching equipment, multiplex equipment or cross-connect equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing or concentrating equipment, fiber optic equipment, UPS equipment, battery plant and associated power and stand-by power generating equipment

(vii)    WinStar Customer Termination Equipment Engineering will be migrated within thirty (30) days of the Effective Date. Customer Termination Equipment may include multiplex equipment, subscriber loop carrier equipment, digital loop carrier equipment, and packet routing or concentrating equipment.

(viii)    WinStar Customer Premise Equipment and Inside Connectivity will be migrated within one hundred and twenty (120) days of the Effective Date. Customer Premises Equipment may include PBXs, telephone sets, LANs, bridges, video conferencing equipment etc. Inside connectivity is the method for connecting from a B building common space demarcation point to a demarcation point on the customer premise.

(b)    Network Engineering/ Traffic Engineering will be migrated as set forth below. This shall include sizing of trunks for interconnection to the LEC, 911 services, operator services, SS7 and AIN and interconnection of hub-to-hub and hub-to-switch inter-city connectivity, data services, etc. For new cities (i.e., cities planned for implementation in 1999), Lucent will assume the responsibility within thirty (30) days of the Effective Date. For existing cities, Lucent will develop and present a schedule within sixty (60) days of the Effective Date, with assumption of these Services in the first city within seventy-five (75) days of the

B1279

Effective Date. If Lucent cannot meet this responsibility within the timeframes specified, it shall subcontract the responsibility to WinStar. In such case, the payment to WinStar for this responsibility shall be the amount set forth in Exhibit C-5, prorated monthly (i.e., WinStar will pay Lucent that amount for the Service and Lucent will pay WinStar that same amount as a subcontractor).

(c)     Documentation and entry of data into WinStar Systems to support tracking and provisioning of Network Elements will commence concurrently with the Lucent Engineering of each Network Element. The initial ramp up time period for Lucent provided documentation and entry into WinStar Systems will exist concurrently with the ramp up time period specified for Lucent provided Engineering for each Network Element. In cases where documentation and entry of data into WinStar Systems is provided for Network Elements for which Lucent is not providing Engineering Services, the Lucent ramp up period will be defined per the Transition Plan as specified in Section 3.3 of Schedule A.

## 1.3.    Other.

The Agreement and its Schedules anticipate that the Network will evolve into a different and new structure with Network Elements that have not been explicitly defined herein. If, during the transition period, these new Network Elements are deployed in the Network, Lucent agrees to support them at the time of transition unless otherwise mutually agreed by the Parties. Engineering Services for these elements will also be provided by Lucent at that time.

Exhibit A-4 to the
Supply Agreement

- A-4-3 -

Confidential – Winstar/Lucent
Execution Version

B1280

Exhibit A-5

Product Performance Specifications

1.    **5ESS Switches**

Switches will be deployed in phases.  Phases are based on modular capacity models.

1.1.    **Initial Deployment**

The initial deployment will be based on two Switch Modules ("SMs") based on Lucent's pre-designed Model 2A.  This phase will be equipped to support the following capacity per SM:

(a)    TR008 analog lines: 800

(b)    TR303 lines: 2,400

(c)    ISDN PRI DS0s: 3,048

(d)    Digital DS0s for PBX customers: 1,032

(e)    Software.  The switch will include but will not be limited to software for the following services:

   (i)    Local Services;

   (ii)    CENTREX;

   (iii)    CLASS Features;

   (iv)    Long Distance; and

   (v)    LNP.

1.2.    **First Growth Job**

When additional capacity is needed the first two SMs will be grown to the following size before additional SMs are deployed:

(a)    TR008 analog lines: 800

(b)    TR303 lines: 7,500 @ 2.66 : 1 concentration

(c)    Digital DS0s for PBX and ISDN: 5,000

(d)    Interconnection DS0s: 2,000

(e)    Spare DS0s: 500

---

Confidential – Winstar/Lucent
Execution Version

B1281

**I.3.     Additional Growth**

The switch will grow to support at a minimum the customers below before a new switch is deployed:

(a)     Total SMs: 10

(b)     TR008 Analog Lines: 8,000

(c)     TR303 Analog Lines: 105,000 @ 2.66 : 1 concentration

(d)     Total Customer Digital Trunks: 37,000

(e)     Interconnection Trunks: 20,000

(f)     Unassigned ports: 15,000 DS0s

Total Ports (Lines or Trunks) used by WinStar revenue-generating customers: 150,000

Assuming:

Lines used at 6 CCS

Trunks used at 28 CCS

B1282



Exhibit A-6

Combined Transmission Network

T-1s in place today
T-1s New Trunks
DS-3 in place today
OC-3 needed today
DS-3 needed today
New build out in 3 to 4
months at DS-3/OC-3

Exhibit A-6 to the
Supply    tment

B1283



Exhibit A-6

WDS – Integrated Data Network

B1284



Exhibit A-6
WBS – Integrated Network

**Network Peering**
- Local
- NNI/UNI
- Internet Peering Points

**Regional/City Core Access**
- 5ESS
- ATM
- ES

**Remote City Access**
- ES
- FRS
- Private Line
- Frame Relay
- ATM IMA
- Native ATM

**National Core Transport Network**
- 5ESS
- ATM
- 5ESS
- ATM

**National Core Transmission Network**
- Combination of Multiple OC-3/12/48
- OC-48 under IRU
- OC-3/12 under lease

DS-3
OC-3/12/48
under lease

NNI: Network to Network Interface
UNI: User Network Interface
IWF: Interworking Functionality
IMA: Inverse Multiplexing over ATM

ATM: Asynchronous Transfer Mode
ES: Edge Switch
FRS: Frame Relay Switch
TDM: Time Division Multiplexing

Exhibit A-6 to the
Supply Agreement

Confidential – Winstar/Lucent
Ex     Version

B1285

Exhibit A-6

WinStar Network – Current Topology



LEC ———— Type 2 Customers

↓ Leased Access

HUB — TDM PTP Wireless Access

Type 1 Customers

Other WinStar Networks

TDM/ ATM / FR

HUB — WinStar Customers

TDM

Type II WinStar Customers

LEC

TDM ATM FR

IXC

TDM ATM FR

Switch

TDM

HUB — WinStar Customers

TDM

PSAP

TDM

LEC COLO — TDM

WinStar Customers

Internet Peering Points

TDM/ ATM / FR

CAP COLO w/ LEC

TDM

WinStar Customers

• A-6-4 •

Confidential – WinStar/Lucent
Execution Version



Exhibit A-7

Potential Future WinStar Network

The Transport Network

(Packet Technologies)

Integrated Core Service Node

Integrated Edge Service Node

Integrated Edge Service Node

Integrated Core Service Node

Integrated Edge Service Node

LE

CAP

IXC

Internet Peering Points

LE

CAP

IXC

Internet Peering Points

WinStar Type II Customers

Other WinStar Networks

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

Confidential – WinStar/Lucent on Version

Exhibit A-7 to the Supply Agreement

B1287



Exhibit A-7

ATM Edge to Core

Confidential — Winstar/Lucent
Execution Version

- A-7-2 -

Exhibit A-7 to the
Supply Agreement

**B1288**

Schedule B

Performance

1.   **General**

1.1.   **Introduction.**

This Schedule B sets out Performance Standards for Lucent's performance of engineering and design Services.

1.2.   **Future Direction.**

The Parties agree to work together to develop an affirmative approach to incent Lucent to adopt a WinStar customer satisfaction-focused approach to delivering the Services. The Parties anticipate that this approach may involve gainsharing, incentives or changes to WinStar's commitment to spending volume and Lucent content.

2.   Engineering Services.

Consistent with the transition plan, Lucent is required to provide Engineering Services for the WinStar Network. The Services to be provided include but are not limited to Base General Architecture, City Plans, Site Plans, Switch EOS, ODA Development, Backhaul Design, Engineering Plan for Hubs, Connectivity Design for Hubs, Network Capacity Plan, Future Architecture, Baseline Evaluation of existing network and others that may be required for implementation and ongoing serviceability of the WinStar Network. A number of these Services are still under evaluation by both Parties and a decision as to whether Lucent will provide those Services will be made as part of the development of the transition plan.

2.1.   **Service Delivery.**

Except as otherwise mutually agreed to by the Parties, Lucent will deliver the Services within the following intervals:

(a)   Architecture Services:

(i)   RF Engineering (Individual Path) – one (1) working day;

(ii)   City-Specific Plans – forty (40) working days after request and delivery of forecast;

(iii)   Network Architecture – forty-five (45) days after the Effective Date;

(iv)   Gap assessment of Existing Network – two (2) months after the Effective Date; and

(v)   Network Technology – three (3) months after the Effective Date.

(b)   Other Engineering Services:

---

B1289

    (i)      Site Plans including Hub and Central Office – two (2) weeks after request;

    (ii)     Switch EOS – two (2) weeks after request;

    (iii)    ODA Development – three (3) weeks after request;

    (iv)    Backhaul Design – three (3) weeks after request;

    (v)     Engineering Plan for Hubs – two (2) weeks after delivery of base building drawings;

    (vi)    Connectivity Design for Hubs – two (2) weeks after Hub selection;

    (vii)   Network Capacity Plan – one (1) week after need for augment, network elements or connectivity is determined; and

    (viii)  Documentation for Network Elements (with respect to placement and connectivity within the Network) – within three (3) business days of installation of the Network Element.

**2.2.    Change Requests.**

In the event that WinStar desires a change to generic individual Engineering Packages for Network Elements, Lucent will provide change documentation within thirty (30) days of request unless otherwise mutually agreed.

**3.    Availability and Reliability**

Network Elements made up of Lucent Products and Deliverables must perform up to the manufacturer's specification. The end-to-end network availability is an objective, not a specification, until WinStar approves the final design produced by Lucent. An availability calculation will then be performed by Lucent. Based upon the outcome of the calculations, Lucent will recommend that the design be adjusted or that the outcome of the calculation be accepted as the specification for the Network. This recommendation will be submitted to WinStar for review and potential approval.

**3.1.    Reliability Standards.**

Reliability standards are defined for the following four major network segments as shown in Figure 1. These standards encompass:

    (a)    **Distribution:** Distribution consists of the Network segment starting at the customer demarcation point in the customer space and ending at the Central Office. When CPE is provided by Lucent, distribution objectives include the CPE:

    (b)    **Switch:** The Network's central office switches.

---

Schedule B to the
Supply Agreement          – B-2 –          Confidential – Winstar/Lucent
Execution Version

B1290

(c)    **Facility Entrance:** The facility entrance network segment includes Equipment such as analog-to-digital converters (channel banks, loop carrier equipment), multiplexers, Digital Cross Connects, etc.

(d)    **Interoffice:** The interoffice transmission facility segment is used to transmit calls from one central office switch to the other.



Figure 1 End to End Network Availability Objective

**3.2.    End-to-End Network Reliability Objective (Figure 1)**

Since it is important from the customer's view that there be a high probability of obtaining a path through the network, a high level of end-to-end (customer to customer) network availability is desirable. The end-to-end availability requirement in accordance with Bellcore Standards is ninety-nine and ninety-three hundredths percent (99.93%) from the customer viewpoint. This is approximately three hundred and sixty-five (365) minutes per year or one (1) minute per day of unavailability. The availability must be met regardless of equipment failures or network congestion.

**3.3.    Distribution Network Segment (Figure 2).**

The distribution network segment includes both the feeder and the loop from the switch to the customer's home/office demarcation point, including customer terminal equipment (e.g., DLC) and inside wiring, excluding customer premise equipment (e.g., PBX or key sets). The objective on the distribution segment availability is ninety-nine and ninety-nine hundredths percent (99.99%). This would give a maximum downtime objective of approximately fifty-three (53) minutes per year per customer line.

B1291



Figure 2  Distribution Network Segment Unavailability Objective

3.4.    **Circuit Switch Segment (Figure 3).**

(a)    The total switch down time objective is three (3) minutes per year. In addition the total downtime for individual lines is twenty-eight (28) minutes per year, and the total downtime for individual trunks is also twenty-eight (28) minutes per year.

(b)    For a transmission through-path traversing the switch from a line to a trunk, the maximum unavailability objective is the sum of the line and trunk unavailability minus three (3) minutes per year, since the total outage objective is included in both the line and trunk objectives and need only be considered once on a through-path. This results in a through-path downtime objective (line to trunk, or customer to interconnection trunk) of fifty-three (53) minutes per year or one hundred of a percent (0.01%).



Figure 3  Switch Network Segment Unavailability Objective (Through Path)

3.5.    **Facility-Entrance Network Segment (Figure 4).**

The facility-entrance network segment is allocated five ten-thousandths of a percent (0.0005%) unavailability at each end or a total of one-hundredth of a percent (0.01%) for both. This results in about five (5) minutes per year unavailability.

---

Confidential – Winstar/Lucent
Execution Version

**B1292**



Figure 4 Facility Entrance Network Segment Availability

3.6.    Interoffice Network Segment.

The interoffice transmission minimum availability objective is ninety-nine and ninety-eight hundredths percent (99.98%). This equates to ninety-nine and ninety-eight hundredths percent (99.98%) availability at two hundred and fifty (250) miles.

3.7.    Common Channel Signaling SS7 Network (Figure 5).

The common channel signaling SS7 network downtime objectives are shown in Figure 5.

Each SS7 user (e.g. 5ESS) interface segment should be down (an average of) no more than three (3) minutes per year.

Each network access segment should be down (an average of) no more than two (2) minutes per year, and

The backbone network segment should be down a negligible amount of time (that is, close to zero (0) minutes downtime per year). Note that downtime for this segment includes failures that prevent use of the backbone segment but do not by themselves disable any other segment(s).

The above allocation assumes an ANSI-based reference architecture with two-way diversity for the A-link sets and three-way diversity for the B-/D-link sets. If three-way diversity is not achievable in the backbone segment, the downtime of that segment may no longer be negligible. Hence, the ten (10) minute end-to-end objective may no longer be achievable.

B1293



4.    **Other Services**

It is recognized that evolution and development of the WinStar Network is ongoing. As the Network grows and changes, Lucent will develop and WinStar will approve new or revised Engineering Services and Design functions to support it.

5.    **Standards and Remedies**

Lucent recognizes that in providing services and network elements that such tasks are to be performed within industry standards and products must be Best of Breed. The reliability and availability of the Network and the delivery of engineering Services are critical to WinStar's business.

5.1.    **Architecture Services.**

With regard to Engineering Services for Base Generic Architecture, Future Architecture, City Plans and baseline architecture of existing networks as referred to in Section 2.1(a) of this Schedule B, the following standards and remedies shall apply:

(a)    **Standard.** Lucent shall deliver all Deliverables of such Services within the timeframes specified.

(b)    **Remedy.** If, for any reason, Lucent anticipates a delay in the delivery of the service, it shall notify WinStar as soon as possible. In addition:

(i)    If Lucent's delivery of the Service is, or is expected to be, delayed more than five (5) business days, then the Lucent Vice-President of Network Solutions shall notify the WinStar Senior Vice-President of Engineering of the delay and of the plan to cure such delay within (10) business days of the original due date. The president of Lucent Global Commercial markets will also be notified at this time.

B1294

  (ii)  If Lucent cannot deliver the affected Service within ten (10) days of the original due date, the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officer to explain the reason for the delay in service and to confirm a new plan to deliver the service within twenty (20) business days from the original due date. WinStar and Lucent may mutually agree to extend the timeframes for such Services. If WinStar and Lucent cannot mutually agree to extend delivery dates for the affected Service, WinStar shall be given the option to terminate the affected service in its sole discretion.

5.2.  **Other Engineering Services.**

With regard to Engineering Services for site plans, switch EOS, ODA development, backhaul design, engineering plan for Hubs, Network capacity plan, connectivity designs for Hubs, RF engineering, and documentation, as referred to in Sections 2.1(b) of this Schedule B, the following standards and remedies shall apply.

(a)  **Standard.** Lucent shall deliver all Deliverables of such Services within the timeframes specified. In particular, Lucent shall achieve on-time delivery of ninety-five percent (95%) of all services ordered in a given Service.

(b)  **Remedies.** If, for any reason, Lucent anticipates a delay in the delivery of the service, it shall notify WinStar as soon as possible.

  (i)  If Lucent's on-time delivery falls below the ninety-five percent (95%) threshold in any given service category, the Lucent Vice-President of Network solutions shall notify the WinStar Senior Vice-President of Engineering of the delay and deliver a plan to cure the affected Service within five (5) Business days. The president of Lucent Global Commercial Markets will also be notified at this time.

  (ii)  If Lucent cannot cure the affected Service in the five (5) day cure period then the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officers to explain the delay in Service. WinStar and Lucent may mutually agree to extend the timeframes for the affected Services. If WinStar and Lucent cannot Mutually agree to extend delivery dates for the affected service, then WinStar shall be given the option to terminate the affected Service in its sole discretion.

5.3.  **Reliability and Availability**

For failure to meet the switch reliability standards set forth in Section 3.4 of this Schedule B or the end-to-end Network reliability specification as calculated in Section 3.2 of this Schedule B after the new Network Architecture and Technology plans are provided by Lucent, the following standards and remedies shall apply:

---

B1295

    (a)    **Standards.** Lucent shall meet or exceed the performance metrics for the switch and end-to-end Network as set forth in Sections 3.4 and 3.2 of this Schedule B, as measured on a monthly basis.

    (b)    **Remedies.** If Lucent fails to meet a stated objective in any given month then Lucent will notify WinStar and present a plan to cure the affected Service in the following measurement period.

        (i)    If Lucent's performance objective is not achieved for two months of any given six month period, then Lucent will place into escrow an amount equal to one percent (1%) of the charges for all Products and Services provided pursuant to this Agreement over the preceding twelve (12) months. The president of Lucent Global Commercial Markets will also be notified at this time.

        (ii)    If Lucent does not achieve a performance metric in any three (3) months in any given six (6) month period, then the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officer and provide a plan to improve performance of the Network. Lucent will also forfeit the escrow deposit described above to WinStar.

        (iii)    If Lucent cures the underlying problem so that the Network achieves the affected performance metric for six (6) consecutive months, the escrow deposit will be released and returned to Lucent.

5.4.    **Limitations.**

The following limitations shall apply to the remedies set forth in this Schedule B:

    (a)    Credits to WinStar pursuant to this Section will be capped at Two Million Dollars (S2,000,000) for any given calendar year.

    (b)    The remedies apply only to Lucent Products and Deliverables.

    (c)    The remedies will not apply in situations of third party Equipment not performing to Specifications or third party catastrophic outages (other than those that should have been reasonably foreseen and accounted for by Lucent's design) or where WinStar has failed to meet its responsibilities as required for Lucent to perform the Service.

Schedule B to the
Supply Agreement    - B-8 -    Confidential – Winstar/Lucent
Execution Version

B1296

Schedule C

Charges

1.   General

  1.1.   General

    This Schedule C describes the charging methodologies and processes for both Products and Services. For Products, Lucent's list prices, WinStar's discounts, the Best of Breed process and SNAP-D interact to produce prices for individual Products. For Services, charges will be determined on a fixed price schedule, either annually or per Network segment.

  1.2.   Definitions

    (a)   "Ramp-up Period" means:

      (i)    For addition of new cities to the Network, a time period of twenty-four (24) months for switches and fifteen (15) months for all other Network Elements, both as measured beginning with cutover to production traffic; or

      (ii)   For augmentation of cities already included in the Network, the twelve-month period of time following acceptance of the corresponding new capacity.

    (b)   "Target Volume" means the volume of projected traffic forecast by the City Success Model (or other WinStar forecast) during the Ramp-up Period.

    (c)   "SNAP-D Term" means a Ramp-up Period for a specific city or Product, as applicable, but shall terminate before the expiration of the Ramp-up Period if the corresponding Target Volume is achieved earlier.

2.   Pricing Process for Products

  The pricing process implements five operations on the price offered by Lucent for each Lucent Product. These include comparison to the market, comparison to list prices with discounts, comparison to reference scales, Best of Breed protection and SNAP-D.

  2.1.   Market-Competitive Pricing.

    Lucent is committed to competitive market pricing on all Lucent Products (price and extended warranty fees) deployed in the Network.

B1297

2.2.    **Price Lists and Discounts**

(a)    **Price Lists.** Exhibit C-1 sets forth a "Price List" for the initial set of Lucent Products that may be purchased under this Agreement and represents the price at which such Products are offered to other customers. Future products may be added to the Price List as they are brought out to market. For such additions, WinStar may participate, at its election, in early product trials or first office applications and will be given a priority position to obtain Products once they achieve general availability. Products will be retired from the Price List as Lucent discontinues availability, provided that replacement products with comparable functionality are substituted on the Price List.

(b)    **Discounts.** Exhibit C-2 sets forth the discounts applicable throughout the Term to the initial set of Lucent Products. Each "Initial Start-up Discount" designated on Exhibit C-2 will apply to WinStar's purchase of the corresponding Product. The "Incremental Growth Discount" will apply to WinStar's purchase of parts and components to augment the capacity of the corresponding Product. As Products are added to the Price List, corresponding discounts shall be provided by Lucent that are at least as favorable as those set forth on Exhibit C-2.

(c)    **Calculation.** For each Lucent Product, the "Discount Price" shall be the product of the applicable discount and the corresponding price from the Price List.

2.3.    **Reference Scaling**

(a)    **FOT, Access And Cross Connect.**

(i)    Exhibit C-3 sets forth the "Reference Price" for three pricing categories: fiber optics technologies, access and cross connect. The Reference Prices are intended to be indicative of specific configurations required for each product category.

(ii)    For each Lucent Product that falls into one of these pricing categories, the Reference Scale Price shall be the lower of the Discount Price and the corresponding Reference Price, assuming an appropriately scaled product configuration. Appropriately scaled product configuration means that the Reference Price will be adjusted as agreed to by the Parties to account for differences between the configuration of the Reference Price model and the Product actually purchased by WinStar.

(b)    **Switching.** For each Lucent Product in the switching category, Exhibit C-4 sets forth the applicable Start-up Price and Incremental Price. Those prices will be adjusted as agreed to by the Parties to account for differences between the configuration of the Reference Price model in Exhibit C-4 and the Product actually purchased by WinStar. For such products, Sections (c), 2.5(a)(i) and 2.5(a)(ii) shall not apply.

(c)    **Other.** For all other Products, the Reference Price shall be the Discount Price.

---

B1298

2.4.    Best of Breed Pricing (BoB)

In accordance with the BoB process set forth in Schedule H, an appropriate cost will be determined for the Best of Breed solution. For each Lucent Product other than those in the switching category, the BoB Price will be the lesser of that cost or the Reference Scale Price.

2.5.    SNAP-D Charging.

(a)    For each Network Element that is a Lucent Product, Lucent will identify two budget elements in the City-Specific Plan: a "Start-up Price" and an "Incremental Price."

(i)    The Start-up Price for each Lucent Product shall be the corresponding BoB Price for that Product, less a minimum of five percent (5%) for Lucent-branded Products or a minimum of ten percent (10%) for Lucent-created Products.

(ii)    The Incremental Price for each Lucent Product shall be the difference between the Start-up Price and the BoB Price, divided by a standard measure of volume that reflects the growth in traffic volume with respect to that Product over the Ramp-Up Period (e.g., port-months or voice minutes).

(b)    The charges for each Lucent Product that is implemented as a Network Element of a City-Specific Plan shall be invoiced to WinStar as follows:

(i)    Upon Product shipment, Lucent shall charge WinStar the Start-up Price.

(ii)    Each month during the corresponding Ramp-up Period, assuming the Target Volume has not yet been achieved, Lucent shall charge WinStar an amount equal to the Incremental Price multiplied by the amount of corresponding volume units actually attributable to that month.  If the Target Volume is achieved during the course of a month, the charge for that month shall be equal to the Incremental Price multiplied by the difference between the volume at the close of the preceding month and the Target Volume.

(iii)    If, at the expiration of that Ramp-up Period, the Target Volume has not been achieved, Lucent shall charge WinStar an amount equal to the Incremental Price multiplied by the difference between the Target Volume and the actual volume.

(iv)    Following the Ramp-up Period, the Parties shall consider each such Product to have been fully paid-for.

B1299

Exhibit C-1

**Lucent Equipment Price List**

Complete list of Lucent Products to be provided by Lucent within ten days of the Effective Date.

B1300

Exhibit C-2

WinStar Equipment Discounts

| Switching | Initial Startup Discount % | Growth Window Discount % |
|---|---|---|
| 5ESS-2000 | 85% | 85% |
| VCDX | 85% | 85% |
| Remote SM | 78% | 78% |

*Note: Other 5ESS Equipment and software (such as adjunct processors, etc.) carry various discount levels that are quoted separately from the 5ESS switch. WinStar will have one (1) six-month growth window as described in Schedule C 5ESS SNAP-D pricing that will provide for eighty-five percent (85%) discount.*

| SONET/OPTICAL NETWORKING/DWDM | Initial Start-Up Discount % | Incremental Growth Discount % |
|---|---|---|
| DDM-2000 OC-3 | 45% | 45% |
| DDM-2000 OC-12 | 45% | 45% |
| FT-2000 | 40% | 40% |
| WaveStar OLS 40G | 30% | 30% |
| WaveStar OLS 400G | 30% | 30% |
| WaveStar 2.5 G | 30% | 30% |
| WaveStar 10G | 30% | 30% |
| WaveStar Bandwidth Mgr. | 30% | 30% |
| **Access** | | |
| SLC Series 5 | 35% | 35% |
| SLC 2000 | 40% | 40% |
| SLC Connect Reach | 30% | 30% |
| SLC Line Reach | 35% | 35% |
| SLC-2000 MSDT | 35% | 35% |
| SLC-Fiber Reach | 40% | 40% |
| Anymedia FAST | 25% | 25% |
| **Digital Cross-connect** | | |
| DACS II | 40% | 40% |
| DACS IV-2000 | 45% | 45% |
| **Data** | | |
| Port Master (Remote Access) | 50% | 55% |
| AC (Access Concentrator) | 40% | 45% |
| MX1000 (ATM Edge) | 40% | 45% |
| PC ACS (ATM Core Switch) | 35% | 40% |
| PS 6400 (IP Core) | 35% | 40% |
| PS ITS (IP Telephony) | 40% | 50% |
| PS AS (Packet End Office) | 40% | 50% |

Exhibit C-2 to the
Supply Agreement

Confidential — Winstar/Lucent
Execution Version

B1301

**Diagram 1: SLC Connect Reach Voice Model**

# SLC Connect Reach Voice Model



Lucent Technologies Proprietary

B1302

Diagram 2: SLC Connect Reach Voice & Data Model

# SLC Connect Reach Voice & Data Model



x 12 End User Nodes

Hub Node

Service Node

Lucent Technologies Proprietary

**B1303**

Diagram 3: AnyMedia FAST/IRX Router Model

# AnyMedia FAST / IRX Router Model



Lucent Technologies Proprietary

B1304

Diagram 4: AnyMedia FAST / ATM Access Model

# AnyMedia FAST / ATM Access Model



Lucent Technologies Proprietary

B1305

**Exhibit C-4**

**Switch Pricing**

1.  **General**

This SNAP-D quote for the 5ESS is predicated on Lucent Quick-Start Model 2A agreed upon with WinStar Engineering on October 10, 1998. The corresponding configuration is:

(a)  Lines / Customer provisionable total lines = 6,144

(b)  Trunks / Customer provisionable total trunks = 8,400

1.2.  **Configuration Parameters:**

(a)  The initial model switch configuration consists of one 3B21 Administrative Module at 5E13 Base Generic, or the then available Generic, one CM2 Communications Module (two pairs), and two SM-2000 Switching Modules containing the following:

(b)  SM001 - This switching module contains all of the miscellaneous functions as well as POTS line interfaces via IDCU TR008, a mix of analog and ISDN lines via DNU-S TR303 and digital trunk interfaces via DNU-S STSX-1(8) and DLTU2.

(c)  SM002 - This switching module provides a mix of analog and ISDN lines via DNU-S TR303 and digital trunk interfaces via DNUS-S STSX-1(8).

(d)  ODA to meet WinStar's network requirement.

1.3.  **WinStar Benefits:**

(a)  Minimized up front investment;

(b)  Includes an IDCU allowing WinStar the ability to transition from TR008 to TR303;

(c)  Full compliment of current WinStar software features including Long Distance; and

(d)  System is pre-conditioned to allow for quick growth of the next SM-2000.

Exhibit C-4 to the
Supply Agreement                    - C-4-1 -

Confidential – Winstar/Lucent
Execution Version

**B1306**

2.  **Terms**

  2.1.  **Pricing.**

    Prices for the 5ESS shall be as follows:

    (a)  Start-up Price shall be Nine Hundred and Sixty-Five Thousand Dollars ($965,000), which includes the first forty (40) DS1s to meet Winstar's requirement for the initial activation.

    (b)  There is no Incremental Price attributable to the first forty (40) DS1s activated for each 5ESS. The Incremental Price corresponding to each DS1 thereafter shall be Four Thousand One Hundred and Fifty Dollars ($4,150).

  2.2.  **Terms and Conditions:**

    (a)  There will be a monthly true-up to determine numbers of DS1s that have been activated

    (b)  At the end of twenty-four (24) months, if any remaining DS1s have not been activated, WinStar will pay the balance of DS1 activation charges.

    (c)  WinStar must pay for the full value of the Switch (which is the remaining non-activated DS1s from the initial four hundred and forty-eight (448) DS1s) before any additional STSX packs or additional SM2000 is added to the Switch.

    (d)  Model pricing is subject to change consistent with any changes in the model configurations.

    (e)  Lucent shall provide one eighty-five percent (85%) discount window per year per switch site for hardware and software orders received over a six (6) month period designated by WinStar. This provision applies for the duration of the Agreement.

    (f)  The 5ESS implementation interval will be eighteen (18) weeks from receipt of a WinStar Purchase Order to Turnover (i.e., not including the period between Turnover and Cutover, which is approximately three (3) weeks).

    (g)  Spare 5ESS switch circuit packs, one (1) per pack code are included in this proposal. Also included is a complement of spare fuses and blank DAT tape cartridges.

    (h)  Previous Professional Services credit of One Hundred and Twenty Thousand Dollars ($120,000) per new switch does not apply to purchases of 5ESS pursuant to this Exhibit C-2.

B1307

2.3.    Power and E&I

Additional amounts not included in the Start-up Price and Incremental Price set forth above are as follows (with approximate regional averages quoted therefor):

(a)    Engineering and Installation    $238,349

(b)    Power (switch only)    $162,256

(c)    Framework    $ 27,117

B1308

Exhibit C-5

Pricing for Lucent Network-Related Services

| Line Item | | Price Year 1 | Price Year 2 | Price Year 3 | Price Year 4 | Price Year 5 |
|---|---|---|---|---|---|---|
| 001 | Network Architecture (Baseline) | | | | | |
| 002 | Overall Network Architecture | $ 480,000 | $ 480,000 | $ 480,000 | $ 480,000 | $ 480 |
| 003 | Overall Network Technology/Network Design | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | |
| 004 | Network Solution Development | $ 5,000,000 | $ 3,150,000 | $ 3,150,000 | $ 3,150,000 | $ 3,150 |
| 005 | Interoperability Lab / Technology Selection | $ 1,650,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000 |
| 006** | City Plan (per New City) | $ 4,500,000 | $ 8,600,000 | $ 5,100,000 | $ 5,100,000 | $ 5,100 |
| 006*** | Is-Site (per New City) | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150 |
| 007*** | Existing City Traffic Engineering/Capacity Planning (per City per year) | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75 |
| 008 | Equipment Engineering | Included in Lucent Firm Price Quote | | | | |
| 009 | Battery | Included in Lucent Firm Price Quote | | | | |
| 010 | Staging | Included in Lucent Firm Price Quote | | | | |
| 011 | Installation/Turnover | Included in Lucent Firm Price Quote | | | | |
| 011 | Drawings | Included in Lucent Firm Price Quote | | | | |
| 013 | Records | Included in Lucent Firm Price Quote | | | | |
| 013 | Logical Assignment Provisioning | Included in Lucent Firm Price Quote | | | | |
| 014 | Product Warranty | Standard Warranty Included in price of the product | | | | |
| 017 | Program Management ($$ based on Business Case Quantities) | | | | | |
| 017a | Program Management Office | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000 |
| 017b | New City CO (per city) | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2 |
| 017c | Hub Site (per site) | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1 |
| 017d | Is-Site (per site - less than 1000) | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1 |
| 017d | Is-Site (per site - greater than 1000) | $ 500 | $ 500 | $ 500 | $ 500 | |
| 017 | Connectivity | Included in PM line item above | | | | |
| 017j | Growth (Augment) | Included in PM line item above | | | | |
| 017k | PM of WinStar Responsible Functions | Included in PM line item above | | | | |
| 010 | Special Projects Pricing | TBD (SOW based) | | | | |

The elements priced above are based on Schedule A Statement of Work. Not all content of the Statement of Work is printed herein.

** This Price does not include RF re-clustering based on final functionality residing with WinStar.

NOTE: 1 Price structure above to be canceled to the International as applicable.

Exhibit C-5 to the
Supply Agreement

Confidential -- Winstar/Lucent
Execution Version

B1309

Exhibit C-6

Pricing for Interoperability Test Lab

1.    **Introduction**

This Exhibit sets forth the functionality, scope, composition, staffing and pricing for the Test Facilities to be provided by Lucent under this Agreement. Further description of the use of the Test Facilities is set forth in Section 4 of Schedule A.

2.    **Functionality**

2.1.    **Functionality.**

The Testing Facilities provided by Lucent pursuant to Section 4 of Schedule A shall encompass the following functionality:

(a)    **Architecture and Design Support.** Functionality and interoperability testing of Network Elements, technical evaluation and selection of network elements, WinStar customer tours, direct technical interface with suppliers of Network Elements in resolving all technical performance and interoperability issues. Deliverables are engineering standards, recommended standard installation configurations and provisioning requirements. The Test Lab will also serve as a testbed for Level 4 support in replicating problems found in the Network for purposes of problem diagnosis and resolution.

(b)    **Network Operations Support.** Development of High Level Process Requirements and Functional Interface Requirements between Network Management and Element Management systems and the appropriate Network Elements. Deliverables are requirements documents for WinStar OSS/BSS systems, fault management rules to be used to manage the network, and changes to Network Elements as appropriate and necessary to support WinStar OSS/BSS functionality.

(c)    **Network Verification Testing.** Development of Network Verification Tests to verify that a chosen set of Network Elements that constitute a network Architecture support products and services offered by WinStar (customer products). Deliverable is a set of Network Verification Tests that have been successfully executed in the Interoperablility Laboratory environment and criteria for successfully executing such tests in a field environment.

(d)    **SME Access.** Lucent will provide access to at least twenty (20) virtual Subject Matter Experts (SMEs) in other Lucent laboratory environments as required to support technical efforts related to the activities of the Interoperablity Laboratory.

(e)    **Technical Training.** The testing facility staff will provide access to the laboratory, including configuration of Network Elements to support WinStar's efforts to provide training in engineering, construction, provisioning and maintenance. Testing facility staff will participate in and support training as required. Training classes will not exceed a reasonable percentage of the normal work week so as not to deter the prime purpose of the laboratory..

---

B1310

2.2.    **Scope and Composition.**

(a)    The Testing Facilities will test Lucent Products and Third-Party Products that are or may be used as Network Elements in the Network, to include interoperability of CPE as required to support WinStar-provided products and services. Scheduling of such testing is directly linked to the staffing level and equipment availability of the testing facility.

(b)    WinStar will specify and provide a site at which the Testing Facility will be located. WinStar will be responsible for all facility costs such as rent, utilities, telephone service and communications. WinStar will provide any required access to the Network and the BSS/OSS data communications network (DCN).

(c)    WinStar will be responsible for supply of those Third-Party Products deployed as Network Elements that are not purchased through Lucent. Lucent will coordinate the installation and maintenance of those Elements in the testing facility. Lucent will supply and maintain all other Equipment, Software and other Services (including but not limited to a 5ESS switch, racks, DC power equipment, cabling, test and analysis equipment necessary to implement the Test Facilities. Lucent will also make shared-use Equipment owned by Lucent available whether on site or through remote connectivity as required by the Test Facility.

2.3.    **Staffing.**

(a)    Initial Levels. Table 1 contains the Parties' expectation for the staffing of the Test Facilities over the Term, in numbers of on-site Lucent personnel dedicated to the WinStar Test Facilities. It also indicates an approximate breakdown of staff per area, corresponding to the work activities described in Section 2.1 of this Exhibit.

(b)    Efficiencies. Lucent will advise WinStar of any opportunities for efficiencies or adjustments in staffing for the Testing Facilities that would permit savings without sacrificing functionality. The Parties will work together to adjust the staffing levels as appropriate to support the design and implementation of the Network over the Term, with corresponding adjustments in the billing to WinStar.

| Table 1: Initial Staffing Levels (FTEs) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Design Support | 14 | 24 | 15 | 15 | 15 |
| Network Operations Support | 2 | 7 | 5 | 5 | 5 |
| Network Verification Testing | 2 | 1 | 1 | 1 | 1 |
| Total | 18 | 32 | 21 | 21 | 21 |

3:    **Pricing**

3.1.    **Test Facilities Staff Pricing.**

Table 2 sets forth the pricing levels attributable to the staffing indicated in Table 1. These pricing levels represent annual caps that correspond to staffing levels set forth in Section 2.3 of this Exhibit. Notwithstanding the foregoing, the Parties may mutually agree to adjust these levels pursuant to Section 3.2 of this Exhibit.

| Table 2: Pricing for Initial Staffing Levels ($K) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Totals | 4,500,000 | 8,000,000 | 5,200,000 | 5,200,000 | 5,200,000 |

3.2.    Adjustments.

(a)    Within sixty (60) days of the Effective Date, Lucent will develop a set of blended rates applicable to the staff of the Testing Facilities, divided into three personnel categories (e.g., junior, mid-level and senior technical personnel).

(b)    In the event that WinStar requests a reduction in staffing of the Testing Facilities (whether in response to a Lucent notice of an efficiency opportunity pursuant to Section 2.3(b) or otherwise), Lucent will work with WinStar to accommodate that request without loss of functionality. In cases where Lucent believes that a reduction in Scope of Work or functionality will result from the request, the impact will be provided to WinStar within fifteen (15) days of the request. When such a reduction in staffing becomes effective, the charges set forth in Section 3.1 shall be reduced by the blended rates attributable to such person(nel).

B1312

Exhibit C-7

Pricing for Optical Networking Technology

1.    **Definitions**

1.1.    **Lucent's DWDM Solutions:**

The OLS 400G DWDM system utilizes a global platform approach to provide complete optical networking solutions for WinStar. The DWDM system supports up to 40 wavelengths of OC-192, 80 wavelengths of OC-48, or a mix up to 400 Gb/sec per fiber. There are four components to the solution as follows:

(a)    **OLS 400G DWDM End Terminal.** This DWDM terminal terminates the four fibers (two transmit and two receive) to support WinStar's initial application as well as future growth to 400 Gb/sec. It provides the multiplexing and demultiplexing of wavelengths from the high speed DWDM line rate (400 Gb/sec) fibers to the individual SONET TDM terminals. The SONET TDM terminals interface to the OLS 400G DWDM End Terminal and each input is assigned an individual wavelength (color) for multiplexing into the OLS 400G DWDM system. A signal from a Lucent SONET terminal (FT-2000 OC-48 or WaveStar 10G OC-192 system) can directly feed the OLS 400G DWDM End Terminal. The OLS 400G system also supports an open interface to other vendors SONET TDM equipment via Lucent's Optical Translator Unit or OTU.

In the WinStar specific network design, the OLS 400G DWDM End Terminal is equipped with OC-48 OTUs for the through NYC to Washing D.C. express wavelengths. The three Lucent FT-2000 OC-48 SONET terminals are equipped with Lucent Compatible Optics so that OTUs are not required.

(b)    **OLS 400G DWDM Optical Add/Drop Terminal.** The optical add/drop sites contain the OLS 400G Optical Add/Drop Terminal, which allows wavelengths to be dropped to or added from SONET OC-48 or OC-192 TDM terminals. All other wavelengths are expressed through the Optical Add/Drop Terminal. This function in the DWDM network is analogous to the Linear Add/Drop function in the SONET environment.

(c)    **OLS 400G Optical Amplification Terminal.** These sites contain the stand-alone Optical Amplifiers where optical amplification is required. These Erbium-doped amplifiers have the wide band amplification pass bands required to support the fully equipped OLS 400G system (same amp for all 80/40 wavelengths of OC48/OC192; no additional amplifiers are required throughout the system growth). These OLS 400G DWDM terminals can be upgraded in-service to an OLS 400 G Optical Add/Drop Terminal if required.

(d)    **OLS 400G Regeneration Terminal.** This terminal is used once in the NYC/DC design. The purpose of this system is to fully regenerate the DWDM signals once the limit of concatenated amplified spans has been reached. This is necessary to eliminate the build up of signal degradation and second order effects in the amplification process.

**B1313**

1.2.    Lucent's SONET TDM Solutions:

(a)    **FT-2000 OC-48 SONET TDM Terminal.** These are OC-48 SONET terminals, which multiplex lower speed signals up to the OC-48 rate. They contain optics that output the correct wavelength for direct input into the OLS 400G DWDM Terminals.

(b)    **WaveStar 10G (OC-192) SONET TDM Terminal.** These are OC-192 SONET TDM terminals, which multiplex lower speed signals (DS3, EC1, OC-3, Oc-12, Oc-48) up to the Oc-192 rate. These terminals are quipped with OLS 400G DWDM System Compatible Optics that output the correct wavelengths for input to the OLS 400G DWDM terminals.

2.    **Optronics Network Solution**

2.1.    **Description.**

The attached Diagrams 1, 3 and 4 represent the Lucent solution to supporting WinStar's identified traffic requirements, as indicated in Diagram 2. As described in Exhibit C-3, the solution relies upon OC-48 (see Diagram 3, the "OC-48 Solution") until Lucent is able to offer the OC-192 solution (see Diagram 4, the "OC-192 Solution"). The detail behind the diagrams is as follows:

(a)    Diagram 1 sets forth the Span Engineering for the Lucent solution. It is based upon the following:

(i)    Assumptions.

(1)    TrueWave Plus fiber to be used throughout this portion of the Network;

(2)    There are four (4) fibers between Jersey City and Washington DC;

(3)    0.30 dB/km;

(4)    1.6 km/mile;

(5)    2 dB into/out of wavelength add/drop;

(6)    1.5 dB into/out of end terminal; and

(7)    1 dB loss per OA.

(ii)    Engineering Rules. WaveStar OLS 400G OC-192 on TrueWave + Release 1.0

---

**B1314**



Diagram 1: Optronics Solution Span Engineering

(b)    Diagram 2 represents WinStar's indication of its traffic support requirements. The Lucent solution set forth in Diagram 1 was developed by Lucent to be capable of accommodating this traffic support.



Diagram 2: WinStar Traffic Support Requirements

B1315

(c) Diagram 3 depicts the OC-48 Solution.



Diagram 3: OC-48 Solution

(d) Diagram 4 depicts the OC-192 Solution.



Diagram 4: OC-192 Solution

2.2. Component Pricing.

(a) Table 3 indicates the component-level list prices for Lucent Products used in the optronics Network solution. These prices will be adjusted as set forth in Schedule C (i.e., discounts, reference scaling, BoB and SNAP-D) before being charged to WinStar.

---

B1316

(b)    Tables 4 and 5 indicate component level pricing for other Lucent Products used in the optronics Network solution. This pricing is the Discount Price and will be adjusted as set forth in Schedule C (i.e., reference scaling, BoB and SNAP-D) before being charged to WinStar.

| Table 1: OC-48 Solution | | | | |
|---|---|---|---|---|
| Site | Description | # Systems | Unit Price | Total Price |
| New York City | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | FT-2000 OC-48 e/w no lowspeed (for future service) | 1 | 91,000 | 91,000 |
| | FT-2000 OC-48 e/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Jersey City | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Newark Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Hopewell | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Philadelphia Jct | OLS 400G DWDM Optical Regeneration Terminal | 1 | 1,031,555 | 1,031,555 |
| | FT-2000 OC-48 e/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Wilmington Jct | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Elkton | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| New Site A+A7 | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Baltimore Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 e/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Washington DC | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | FT-2000 OC-48 e/w no lowspeed (for future service) | 1 | 91,000 | 91,000 |
| | FT-2000 OC-48 e/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 e/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| | | | | $6,290,899 |

B1317

| Table 2: OC-192 Solution | | | | |
|---|---|---|---|---|
| Site | Description | # systems | Unit Price | Total Price |
| New York City | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | WaveStar 10G (OC-192) c/w 1 OC-48, 8 OC3, 24 DS3, one additional oc48 rail unused | 1 | 402,000 | 402,000 |
| Jersey City | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| | WaveStar 10G (OC0192) c/w 4 1+1 protected OC3 three additional oc48 rail unused | 1 | 360,000 | 360,000 |
| Newark Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| | WaveStar 10G (OC-192) c/w 4 1÷1 protected OC3 three additional oc48 rail unused | 1 | 360,000 | 360,000 |
| Hopewell | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Philadelphia | OLS 400G Regeneration Terminal | 1 | 970,512 | 970,512 |
| Jct | WaveStar 10G (OC-192) c/w 8 1+1 protected OC-3; 24 DS3 two additional oc48 rail unused | 1 | 398,000 | 398,000 |
| Wilmington Jct | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Elkton | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| (New Site A) | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Baltimore | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| Jct | WaveStar 10G (OC-192) c/w 8 1+1 protected OC-3; 24 DS3 two additional oc48 rail unused | 1 | 398,000 | 398,000 |
| Washington DC | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | WaveStar 10G (OC-192) c/w 1 OC-48, 8 OC3, 24 DS3 one additional oc48 rail unused | 1 | 402,000 | 402,000 |
| | | | | $6,958.727 |

**B1318**

| Table 3: Linearized 10G (OC-192) TDM SONET Terminal Pricing Models | |
|---|---|
| Model | List Price |
| **10G 2F** | |
| Startup (1.3u high speed) | $278,312 |
| per 1xN DS3/EC1 (8 port) | $1,615 |
| per 1+1 OC3 (4 port SR) | $6,357 |
| per 1+1 OC3 (4 port LR) | $9,200 |
| per 1+1 OC12 (2 port SR) | $15,454 |
| per 1+1 OC12 (2 port LR) | $25,000 |
| per OC48 BLSR (1.3u) | $38,788 |
| **10G 4F** | |
| Startup (1.3u high speed) | $533,338 |
| per 1xN DS3/EC1 (8 port) | $1,615 |
| per 1+1 OC3 (4 port SR) | $6,357 |
| per 1+1 OC3 (4 port LR) | $9,200 |
| per 1+1 OC12 (2 port SR) | $15,454 |
| per 1+1 OC12 (2 port LR) | $25,000 |
| per OC48 BLSR (1.3u) | $38,788 |
| **Interface Packs** | |
| DS3 Prot. Switch Relay | $2,400 |
| OC48 1.3u | $19,394 |
| OC48 1.5u | $24,546 |
| OC48 OLS Compatible | $40,000 |
| OC3 1.3 4 port Long Reach | $18,400 |
| OC3 1.3 4 port Short Reach | $12,714 |
| OC12 1.3 2 port Long Reach | $25,000 |
| OC12 1.3 2 port Short Reach | $15,454 |
| DS3/EC1 8 port pack | $10,000 |
| DS3 Terminal Block | $3,000 |

OC192 2 Fiber HS Shelf Common

| Item | Count | List |
|---|---|---|
| OC192 Shelf/BP/Fan | 1 | $14,000 |
| CTL/SYS50DM | 1 | $9,334 |
| DCC/EIU | 1 | $5,600 |
| PPROC/STS192 | 4 | $32,000 |
| Switch/STS576 | 2 | $10,600 |
| TMG | 2 | $4,000 |
| OC192 1.5 | 2 | $140,000 |
| OC192 Software | 1 | $20,000 |
| Basic cables | 1 | $462 |
| Total HS | | $235,996 |

OC192 2 Fiber LS Shelf Common

| Item | Count | List |
|---|---|---|
| OC48 Shelf/BP/Fan | 1 | $10,000 |
| CTL/SYS50DM | 1 | $9,334 |
| DCC/EIU | 1 | $5,600 |
| SWITCH/STS576 | 2 | $10,600 |
| TMG | 2 | $4,000 |
| Intershelf cables | 1 | $2,320 |
| Basic Cables | 1 | $462 |
| Total LS | | $42,316 |

B1319

| Table 4: Linearized FT-2000 (OC-48) TDM SONET Terminal Pricing Models | |
|---|---|
| Model | WinStar Price |
| FT-2000 OC-48 System | |
| Startup | 24,500 |
| Optics | |
| OLS compatible optics (T&R,1+1 protected) | 67,000 |
| Standard 1.3 optics (T&R, 1+1 protected) | 39,200 |
| Lowspeed packs | |
| per 1XN DS3 ( 3 ports per card, includes allocated protection pack cost &misc associated equip) | 868 |
| per 1XN EC1 (3 ports per card, includes allocated protection pack cost & misc associated equip) | 911 |
| per 1÷1 OC3 (includes allocated cost of Trib Overhead Controller -TOHCTL) | 5,095 |

B1320

| Table 5: Equipment List: FT-2000 OC-48 Bay (up to 2 systems per bay) | | | |
|---|---|---|---:|
| **Part No.** | | | **Price** |
| **OC-48 System #1** | | | |
| ED8C902-30 | G-1 | 2 Fiber Add/Drop Ring Term includes the following: | 14,697 |
| E/W | | | |
| J68974E1 | L-7 | 2 F A/D Ring Term | |
| J68974E1 | L-36 | Low Speed Prom Sw  LAA12B | |
| J68974E1 | L-41 | TG3 (DS1) Cp  LAA18 | |
| J68974E1 | L-70 | Overhead Controller  LAA21 | |
| J68974E1 | L-46 | System Controller  LAA23B | |
| J68974E1 | L-50 | System Memory 4 Mbyte  LAA25 | |
| J68974E1 | L-66 | Line Controller (4Mg) A/D & ring  LAA28 | |
| **OC-48 System #2** | | | |
| ED8C902-30 | G-1 | 2 Fiber Add/Drop Ring Term includes the following: | 14,697 |
| E/W | | | |
| J68974E1 | L-7 | 2 F A/D Ring Term | |
| J68974E1 | L-41 | TG3 (DS1) Cp  LAA18 | |
| J68974E1 | L-70 | Overhead Controller  LAA21 | |
| J68974E1 | L-46 | System Controller  LAA23B | |
| J68974E1 | L-50 | System Memory 4 Mbyte  LAA25 | |
| J68974E1 | L-66 | Line Controller (4Mg) A/D & ring  LAA28 | |
| **Standard High Speed (OC48) Optics** | | | |
| J68974E1 | L-78 | OC-48 RCVR (A/D STS-1) 839B5 | 7,000 |
| J68974E1 | L-83 | 1.3 Transmitter Standard Power 24dB 739B5 | 12,600 |
| J68974E1 | L-84 | 1.3 Transmitter High Power 27dB 739C5 | 18,900 |
| J68974E1 | L-104 | 1550 Transmitter 23dB 739J5 | 35,910 |
| **OLS Compatible High Speed (OC48) Optics** | | | |
| J68974E1 | L-79 | 1.5 OLS compatible Receiver 839E5 | 9,500 |
| J68974E1 | L-251-266 | 1.5 OLS compatible Transmitter 739E5 | 24,000 |
| **Lowspeed Cards** | | | |
| J68974E1 | L-21 | OC-3 Long Reach Interface - one port per card (LAA10) | 2,310 |
| J68974E1 | L-23 | IS3 Circuit pack - one port per card (LAA5) | 1,575 |
| J68974E1 | L-33 | OC-12 Optical Extension (T939A) | 9,240 |
| J68974E1 | L-25 | DS3 Interface - three ports per card (LAA2) | 2,100 |
| J68974E1 | L-30 | EC-1 Low Speed Interface  - three ports per card (LAA4) | 2,205 |
| J68974E1 | L-39 | Tributary Overhead Controller (LAA26) | 2,772 |

(continues)

Exhibit C-7 to the
Supply Agreement

- C-7-9 -

Confidential -- Winstar/Lucent
Execution Version

B1321

| Table 5: Equipment List: FT-2000 OC-48 Bay (continued) | | | |
|---|---|---|---|
| Part No. | | | Price |
| **Software** | | | |
| J68974ES-2 | L-1 | R7.2 Disk | - |
| J68974ES-2 | L-M1R | R7.2 App RTU | 2,310 |
| J68974ES-2 | L-P1R | R7.2 OS RTU | 6,930 |
| J68974ES-2 | L-A | R7.2 User/Service Manual | - |
| **Miscellaneous** | | | |
| | | Required FT-2000 bay, Shelf, Cable, and Miscellaneous Items | |
| J68974EI | L-109 | 9824AG Line Buildout (1 per DS3 circuit) | 25 |
| J68974EI | L-107 | -48V DC pwr input Ca overhead | 33 |
| J68974EI | L-116 | lightguide buildout set ST's (choose 2 per optics) | 23 |
| J68974EI | L-126 | lightguide buildout set FC's (choose 2 per optics) | 33 |
| J68974EI | L-136 | lightguide buildout set SCs (choose 2 per optics) | 33 |
| J68974EI | L-117 | lightguide buildout set STs for OC-3 (1.3 STD) | 18 |
| J68974EI | L-118 | lightguide buildout set ST's for IS3 & OC12 | 33 |
| ED8C900-20 | G-102 | DS3 to DSX3/4 gr.A,B,& C 100ft. (one per DS3/STS1) c/w | 141 |
| ED8C900-20 | G-6BA | (6) Straight BNC Connectors, near end factory install | 88 |
| ED8C900-20 | G-6LA | (6) Straight BNC Connectors, far end loose | 29 |
| ED8C805-50 | G-1 | Anchor Bolt 7' Fr. Zone 1&2 | 37 |
| ED8C805-50 | -G-2 | Anchor Bolt 7' Fr. Zone 3&4 | 43 |
| ED8C805-50 | G-6 | FLOOR MOLDING 10' Lg | 30 |
| | | Optional Cables and Miscellaneous Items | |
| ED7G001-22 | G-53 | TMG IN OR OUT 150 ft. | 73 |
| ED7G001-22 | G-251 | SER TLM (TBOS) intfc 150 ft. | 75 |
| ED7G001-22 | G-351 | ALMs & PAR TLM intfc 150 ft. | 90 |
| ED7G001-22 | G-451 | SONET Overhead Chs. 150ft. | 98 |
| ED7G001-22 | G-652 | X.25 Cable 150 ft | 100 |
| ED7G001-22 | G-752 | DTE Link (CIT) 150 ft. | 100 |
| ED8C120-50 | G-89 | Ft. of 1/4 in spiral wrap | - |
| 901011320 | | WRIST STRAP > 6 1/2 in. Circumference | 24 |
| S45264118 | | Terminal ESD grounding | 157 |
| | | Documentation | |
| I07373094 | | FT-2000 OC-48 Installation Manual | 113 |

Exhibit C-8

Pricing for International Services

The Parties have deferred agreement upon pricing for international Services until thirty (30) days following the Effective Date. The Parties agree that the pricing shall be developed consistent with the pricing and pricing methodologies and processes (including most favored customer, BOB and SNAP-D) set forth in this Agreement for the United States based pricing.

**B1323**

**Schedule D**

**Documentation and Specifications**

See attached

Confidential – Winstar/Lucent
Execution Version

B1324

Schedule E

Acceptance Testing

1.  **Acceptance Testing and Final Acceptance.**

    Lucent will develop and WinStar will approve standards for acceptance procedures, testing and final acceptance. Until these procedures are developed, it is agreed that the attachments in Schedule E will govern acceptance criteria and will be the methodology employed for acceptance unless or until new procedures are proposed by Lucent and accepted by WinStar. "Nonconformity" shall mean failure to comply with the Acceptance Criteria and such other criteria as are set forth in this Agreement.

    1.1.  **Acceptance Testing and Cure.**

        Lucent will perform joint testing as described in Schedule E for each Hub, B site and Central Office it provides to WinStar under this contract. Full documentation countersigned by each party or their representatives will be provided to WinStar. Lucent will maintain a copy of each site accepted for a period of five (5) years.

    1.2.  **Failure to Meet Acceptance Criteria.**

        In the event that a site or link does not pass the agreed upon testing and acceptance, Lucent will begin immediately upon notification to correct the cause for non-acceptance in the following manner:

        (a)  **B Sites.** Unless otherwise agreed to by WinStar, Lucent will identify and correct the defect within two (2) working days. In the event that Lucent can not resolve the defect within the specified time frame, WinStar may, at its option, extend the time for acceptance conformity or take action to resolve the defect itself. If WinStar chooses to resolve the defect, actual out of pocket costs to do so will be deducted from the price Lucent bills WinStar for that site.

        (b)  **Hub Site.** Lucent shall have five (5) working days to resolve any defects or non conformity to acceptance criteria as defined in Schedule E. Remedies for failure to resolve shall be as described in (a) above (including time extension).

        (c)  **Central Office.** Lucent shall have ten (10) working days to resolve any defects or non-conformity to acceptance criteria as defined in Schedule E. Acceptance testing and final acceptance of the Central Office will include all Network Elements in the CO, i.e., Switch, DXC, etc. Remedies for failures to resolve shall be as defined in Section (a) above (including time extension).

    1.3.  **WinStar's Responsibilities.**

        WinStar will bear responsibility to promptly perform test and acceptance for Network Elements (NE's) which Lucent notifies WinStar are ready for service. Failure to meet deadlines for acceptance will be deemed as Acceptance.

Confidential – Winstar/Lucent
Execution Version

**B1325**

(a)   **B-Sites.**  Acceptance tests and walk through will be performed within two (2) working days of notification.

(b)   **Hub Sites.**  Acceptance tests and walk through will be performed within five (5) working days of notification.

(c)   **Central Office.**  Acceptance tests and ORT will be performed within thirty (30) calendar days of notification.

(d)   **WinStar Systems.**  Lucent will also be responsible to update WinStar Systems with as built circuit and Equipment placement as it relates to floor plans and WinStar Provisioning Systems prior to acceptance.

1.4.   **Other Test and Acceptance.**

As the WinStar Network grows and evolves, it is anticipated that new technologies and Network Elements (NE's) will be placed into the network.  Prior to any purchase order being placed for such Network Elements (NE's) and Services, Lucent will propose and WinStar will approve a test and acceptance procedure which will become an addendum to this contract.

1.5.   **Change Methodology.**

If Lucent develops a new test procedure that enhances or automates test and acceptance, it will submit a proposal to WinStar who will provide approval or disapproval of the new procedure.  In no instance will any new acceptance criteria be introduced that does not meet standard industry practices and methods of evaluation for fitness for service or the manufacturer's specification whichever is more stringent.  No new acceptance procedures will be instituted without prior WinStar approval.

B1326

Confidential —WinStar / Lucent

## Schedule F

### Financing

*See attached copy of Credit Agreement*

B1327

## Schedule G

### International Considerations

1.  **General.**

    1.1.  **General.**

        (a)  Purchase of Products and Services from Lucent by WinStar International will be pursuant to this Agreement (including most favored customer, BOB and SNAP-D), and all of the rights and responsibilities will attach thereto, including financing in accordance with the terms of the Agreement and the Credit Agreement.

        (b)  Services and products delivered by Lucent to WinStar International shall be considered "Services" and "Products," respectively, for all purposes within the scope of this Agreement.

        (c)  Internationally, Lucent will perform the Services of Network Architecture and Technology, Planning and Program Management, Testing, Implementation and Special Projects as described in Schedule A, with appropriate modifications to account for differences in the regulatory and technical environments. In addition, Lucent's scope of responsibility internationally will include (if requested by WinStar):

            (i)  Planning and execution of the build-out of the Network including site selection (including line of site surveys), site acquisition, RF Engineering, obtaining SS7 links and other interconnection arrangements;

            (ii)  Provisioning of IP Gateways; and

            (iii)  Maintaining the network and providing monitoring and the use of Lucent's Netcare facilities.

    1.2.  **Operations.**

        (a)  **Start Up Phase.** WinStar International is in the initial stages of building portions of the Network in international markets and has not yet begun an operational phase. The first build is contemplated to be in Amsterdam, where a data switch node and hub sites are under construction.

        (b)  **Data-Only Strategy.** Unlike WinStar's domestic operations, WinStar International will not initially have a voice product, but will focus on selling data products to medium and large business customers. Therefore, the international components of the Network will be packet-based instead of circuit-based. There may be a voice product introduced in the future, but the Parties expect such a product to be packet-based (e.g., voice over IP or ATM).

---

B1328

1.3.    **Service Offerings for Remote or International Cities**

This section describes the set of WinStar's international service offerings, as applicable to the scope of responsibility assumed by Lucent internationally.

With an architecture that support a range of deployed infrastructure, WinStar can offer a subset of its full services suite globally with customization suited to local conditions. In such cities functionality can include the following:

(a)    Point to Point Connectivity,

(b)    Internet Access,

(c)    Web hosting, e-commerce,

(d)    VPN connectivity,

(e)    Email, Network Notes services,

(f)    IP telephony/fax,

(g)    IP multimedia conferencing services,

(h)    CPE,

(i)    WAN professional services,

(j)    LAN professional services,

(k)    Security services,

(l)    E Commerce,

(m)    Web/Intranet systems integration,

(n)    Customer Network Management,

(o)    TCP/IP,

(p)    ATM, and

(q)    Frame Relay.

B1329

Schedule H

Best of Breed (BOB)

1.  **General Principles**

    (a)    Lucent believes that its telecommunications Products and Services are superior and are second to no other vendor.

    (b)    WinStar agrees to use Lucent as its preferred supplier and to use Lucent Products and Services provided that they are Best of Breed.

2.  **Definitions**

    (a)    "Best of Breed" or "BOB" means Products and/or Services that are commercially available and that have the best functionality for the lowest price as set forth in more detail in Section 4.

    (b)    The "BOB Highest Authority" or "BHA" means, in the case of Lucent, the President – Global Commercial Markets, and in the case of WinStar, the Chief Operating Officer.  The BHA for each company can be changed by written notice to the other party by Lucent or WinStar, as appropriate.

    (c)    The "BOB Intermediate Team" or "BIT" means Lucent's Vice President of Network Solutions and WinStar's Senior Vice President of Engineering.  The BOB Intermediate Team Member can be changed by written notice to the other party by Lucent or WinStar, as appropriate.

    (d)    The "BOB Review Team" or "BRT" has the meaning set forth below (See Section 3.1 of this Schedule H).  The "TPM" are The Primary Members of the BRT.

3.  **How BOB works**

    3.1.    **The BOB Review Team**

    (a)    Immediately upon execution of this Agreement, Lucent's BHA will appoint two Lucent personnel (one primary and one back up) to serve on the BOB Review Team on behalf of Lucent, and WinStar's BHA will appoint two WinStar personnel (one primary and one back up) to serve on the BOB Review Team on behalf of WinStar. If a vacancy occurs on the BOB Review Team, a replacement will immediately be appointed by the appropriate BOB Highest Authority. The two primary members (TPM) of the BOB Review Team shall make all determinations, except that if one or both of the TPMs are unavailable for any reason, the back up member for the absent TPM will have the authority to make the determination required by BOB.

---

B1330

(b)    Contemporaneously with any quote that is provided to WinStar by Lucent, there will be a presentation made to the BOB Review Team by the person or persons who are submitting the quote; provided, however, that if there already has been a BOB Review completed on the Product(s) or Service(s) in question, no additional BOB review will be required; provided further, however, if there is some significant change in features, functionality or price of a Lucent or non-Lucent Product or Service, another BOB could be done at either WinStar's or Lucent's request. The BOB Presentation should address the criteria set forth in Section 4 of this Schedule H. Within five business days of the BOB Presentation, the BOB Review Team must make a determination as to whether the Product(s) and/or Service(s) are BOB. If they are BOB, then WinStar shall approve the Purchase Order for the Product(s) and/or Service(s) in question.

(c)    If, on the other hand, one or more of the Product(s) and/or Service(s) are found by the BOB Review Team to fail the BOB test, then the person(s) who submitted the quote must either:

(i)    Try to adjust one or more of the criteria to satisfy the BOB test (by, for example, adjusting the purchase price downward) or

(ii)    Decide to recommend a non-Lucent product.

(d)    If, however, the BOB Review Team fails to act within the five business day period or fails to reach a consensus, then the matter must promptly be escalated to the BOB Intermediate Team.

3.2.    The BOB Intermediate Team (BIT)

BIT must make a BOB determination within five business days from the day that the matter is referred to them by the BOB Review Team. Within the five business day time period, the BIT must have asked for materials and/or presentations from their respective organizations to familiarize themselves with the basis for the BOB dispute.

(a)    If the BIT determines that the BOB test has been satisfied their judgment is final, and WinStar shall order the Product(s) and/or Service(s) in question.

(b)    If, however, the BIT cannot reach consensus or does not act within the five business days, the matter is referred to the BHA.

3.3.    The BOB Highest Authority (BHA)

(a)    Within five business days from the date that the matter is received from the BIT, the BHA must have asked for materials and/or presentations from their respective organizations to familiarize themselves with the basis for the BOB dispute.

(b)    The BHA must meet in person and must resolve the dispute and decide the course of action that will be taken. If the BHA cannot agree on a decision and

B1331

course of action within five business days of their face to face meeting, then the decision of the WinStar BHA shall be final and binding.

4.    **Determination of BOB**

In determining whether Lucent Products and/or Services are BOB, there are some overall basic principles that should be considered. These principles, which are listed below, are not in any order of priority, and during one analysis could carry a different weight than on a previous analysis, when all of the circumstances of the decision are considered. These principles or criteria are to be judged in terms of what is commercially available from other vendors and the price(s) that WinStar could obtain from such vendors.

(a)    The technology and Network Elements selected must interoperate with the appropriate PSTN, be scalable and servicable in both size and function, and meet international and domestic standards including, but not necessarily limited to CCITT Recommendation/Standards, ITUR Standards, FCC type acceptance, NEBS, IEEE, Y2K and other applicable local codes and practices.

(b)    Network Element(s) must support WinStar required functionality and be consistent with the approved architecture. End-to-end Network performance and reliability should be considered as well as the individual performance and functionality of individual Network Elements.

(c)    With respect to the performance of the Network Elements, all of the following should be evaluated: MTTR, MTBF, steady state specifications, environment, capacity, growability, reliability, etc.

(d)    Sufficient product must be available in sufficient quantities at time(s) required.

(e)    Optimal price performance over the life-cycle of the Network Element including end-to-end network costs for both capital and on-going operations.

(f)    Care should be taken to ensure that the physical size, weight, dimensions and environmental requirements (e.g., HVAC and power) of any selected elements does not cause a retrofit or upgrade in the physical space and existing environmentals in which it is to be placed.

(g)    The length of warranty and other warranty terms offered by other vendors is important to consider as well as the repair/return policies that other vendors provide.

B1332

Confidential —WinStar / Lucent

## Schedule I

### Warranty Periods

Lucent will provide a minimum warranty of one (1) year for all new Equipment purchased from Lucent and of the longer of six (6) months or any remaining period of the underlying Product warranty for repaired products and parts. The actual warranty will be determined on a product-by-product basis and will be stated in the product addendums, which will be attached to the Agreement.

The warranties provided by third party vendors on Third Party Products purchased by Lucent on WinStar's behalf will flow through to WinStar in accordance with the terms of the Agreement.

B1333

Schedule J

Key Lucent Positions

1.    **Key Positions**

The following positions shall be the Key Lucent Positions, provided that they cover the body of responsibility set forth in Section 2 of this Schedule J. In the event that these positions do not encompass all such responsibility, additional Key Lucent Positions shall be designated by WinStar with Lucent's input, to cover the remaining responsibility.

  (a)    Program Management Director;

  (b)    Network Solutions Vice President;

  (c)    Director of Integration Test Laboratory;

  (d)    Director of Engineering; and

  (e)    Sales Director.

2.    **Key Positions Responsibilities**

The Lucent Program Management Office (PMO) will have overall responsibility for delivery of EF&I services under this agreement. In addition to the PMO, other key Lucent management roles have been identified as part of this agreement with specific Project Office responsibilities. The high level functional responsibility of each of these Project Office individuals is outlined in the following organization chart.

It is Lucent's responsibility to staff each Project Office with adequate resources to carry out the scope of this agreement. Each Project Office Manager will issue weekly status update reports to identified WinStar oversight personnel. Each Project Office Manager will regularly meet with WinStar personnel and will also serve as the single point of contact for status and escalations within their respective areas of responsibility. WinStar retains the right to approve the selection of the PMO executive appointed by Lucent.

2.1.    **Program Management Office**

  (a)    Contracts

  (b)    Schedules

  (c)    Forecasts

  (d)    Sub Contractors

  (e)    Tracking & Reporting

B1334

(xv)    Managing documentation requirements of the Network; and

(xvi)   Providing overall technical consulting as requested by WinStar.

(c)    **Documentation.** Lucent's performance of engineering services shall be supported through its use of the following documentation and specifications. The structure and specific content of the documentation shall be mutually agreed upon by the Parties. However, it is expressly agreed that the documentation shall include, at a minimum, the current WinStar information content for these documents.

(i)    **EOS Generation.** The Engineering Order Specification defines WinStar functional and capacity requirements used to order Network Elements. An EOS is required prior to ordering Network Elements.

(ii)   **Installation Methods and Procedures.** The installation-related Methods and Procedures outline the steps necessary to install a Network Element in the Network.

(iii)  **Capacity Reports Generation.** Capacity reports show network and equipment utilization, including traffic characteristics and utilization of ports, memory, CPU and other system resources.

(iv)   **Network Trunking Design.** The network trunking design depicts how a WinStar switch is connected to other networks for a given market.

(v)    **Circuit Service Orders.** Circuit Service Orders specify new or augmentation quantities of circuits needed. Circuit Service Orders are also used to communicate translations requirements associated with new circuits.

(vi)   **Equipment Growth Orders.** Equipment Growth Orders specify hardware growth requirements.

(vii)  **Switch Services Engineering Plans.** Switch Services Engineering Plans, define new or existing city switch engineering requirements. Typical SSE Plans include central office configuration diagrams, central office connectivity design, CLLI codes, points of contact for ILEC and other service providers, Product engineering requirements and a new technology architectural description.

(viii) **Office Data Administration and Translations Requirements.** The ODA specifies new switch translations requirements. Translations Requirements specify translations for existing systems.

(ix)   **Test Plans.** Test Plans define actions needed to test a new feature or system, as described more fully below.

---

B1260

(x) **End User Product/Services Engineering Plans.** End-to-end Network Element functionality and interoperability required to support WinStar-defined end user products and services, including WinStar customer provisioning guidelines for new services;

(xi) **Network Administration and Network Optimization Orders.** Network Administration and Network Optimization orders define actions needed to improve network efficiency. Examples of network administration and network optimization orders might include an order to groom two customers with small counts of DS0s into a single switch facility or to move a trunk group from one switch SM to another in order to balance switch traffic.

3. **Planning Services and Program Management.**

3.1. **Program Management.**

Lucent will be responsible for overall program management of the functions performed by Lucent and WinStar, including functions performed in designing, engineering and building the Network, but not including on-going Network operations (e.g., NOC operations, product maintenance and support). Lucent will manage the overall master schedule for functions performed by Lucent, Lucent subcontractors, WinStar and WinStar's third-party contractors in accordance with Exhibits A-1 and A-3 (and Exhibit A-2 (International) as mutually agreed). As functions transition from WinStar to Lucent in accordance with the transition plan, the project plan will be modified to reflect the transition of responsibility and accountability. Also in accordance with the transition plan, Lucent will assume EF&I program management responsibility for network components (e.g., B-sites, Hubs, Central Office and transmission sites including customer collocation). Lucent's performance of the overall program management function does not imply responsibility for budget, cost or performance of work functions not directly controlled by Lucent or its subcontractors. The Lucent program management role, as the single point of contact for the overall design, engineer, and build function, will include:

(a) Typical activities such as program/project schedule development and maintenance, roles and responsibility matrix development and maintenance, action register administration, high-level document control, change control, critical item/jeopardy escalation process management and program progress reporting;

(b) Managing and communicating with the various responsible parties (i.e., Lucent and its subcontractors, WinStar and WinStar-directed third party resources) as appropriate so that the Implementation meets established objectives of time, cost, functionality and service quality, as defined in the relevant City-Specific Plan. WinStar will provide a single point of contact to monitor status, resolve issues and make commitments to Lucent with regard to each WinStar-performed function or required input; and

B1261

    (c)    Attending regularly scheduled progress reviews with appropriate WinStar personnel to communicate project status and resolve issues in cooperation with WinStar.

**3.2.    City Implementation Planning.**

    (a)    WinStar will develop and provide to Lucent a roll-out schedule that, among other things, indicates cities in which WinStar will commence offering services, the scope of those services, budget, scope, target markets (buildings to be targeted) and timeframes.

    (b)    Lucent will develop and submit City-Specific Project Plans for WinStar's review and potential approval. Each such City-Specific Project Plan will be based upon the corresponding city-specific Network Architecture and Network Technology plans and will include specific disaster, recovery and back-out procedures. The City-Specific Plans will schedule and detail each of the responsibilities set forth in the matrix in Exhibit A-3, as applicable to the particular city (i.e., for augmentation of existing cities, only a subset will be applicable). Lucent will also take into account WinStar input regarding WinStar functions (e.g., site acquisition, regulatory compliance, numbering/dial plans, ILEC facilities negotiation and build-out of common space at the customer building). The City-Specific Project Plans will be updated as responsibilities are completed and Network Elements are implemented so as to incorporate developing best practices, Best of Breed solutions and issue resolution.

**3.3.    Transition Planning.**

    (a)    Except as otherwise specified in Exhibit A-4, within forty-five (45) days after the Effective Date, Lucent will develop a transition plan with WinStar's input, review and potential approval, consistent with the matrices set forth in Exhibits A-1 and A-3; provided, however, Lucent will develop a transition plan with WinStar's input, review and potential approval for Network Engineering/Traffic Engineering within fifteen (15) days of the Effective Date. This plan will address transfer of responsibility for: network architecture and technology, planning services, program management, testing and implementation. The transition plan will identify and schedule Lucent assumption of responsibility based upon the following prerequisites:

    (i)    Lucent core competency and Best of Breed decisions (e.g., Lucent RF engineering and radio and data products respectively);

    (ii)    Understanding (detail) of WinStar expectations;

    (iii)    Lucent's evolving core competencies ; and

    (iv)    A joint (Lucent and WinStar) development of appropriate business processes to transition those responsibilities, which will include a process for positive acknowledgement of responsibility transfer.

---

B1262

(b)    The Parties intend that certain functions, such as those that, as of the Effective Date, are performed by WinStar's Engineering and Network Construction & Deployment departments, although not currently within Lucent's core competence, will be assumed by Lucent during the Term.

(c)    Certain functions, although necessary to the implementation of the Network, will remain WinStar's responsibility. This includes site acquisition, regulatory compliance, numbering/dial plans, ILEC facilities negotiation, build-out of common space at the customer building and management of business relationships with WinStar customers.

(d)    WinStar and Lucent agree to providing the required subject matter expertise, time and resources required to complete the transition plan on schedule.

4.    **Testing.**

4.1.    **Test Beds.**

(a)    Test Facilities. Lucent will develop and maintain test facilities to support the test and acceptance process necessary to drive the technical evaluation and selection set forth in this Section ("Test Facilities").

(i)    The Test Facilities will include a functional replica of the Network environment, including each Network Element to be implemented per the Network design. At no additional cost to WinStar, Lucent will provide WinStar with at least one of each Lucent Product purchased by WinStar for implementation into the Test Facilities. Title in all such Test Facilities Network Elements shall vest in WinStar, and WinStar shall be entitled to continue to use such Elements in its Test Facilities following termination or expiration of the Agreement. The Test Facilities must be adequate to support the following types of network testing:

(1)    End-to-end integration testing;

(2)    Network topology changes;

(3)    Integration testing of new/individual Network Elements within the existing Network (including Lucent Products and Third-Party Products) and with the OSS/BSS;

(4)    Integration testing of WinStar customer CPE and network applications within the then-current Network;

(5)    Performance, load, and stress testing;

(6)    Trouble/fault isolation;

(7)    Year 2000 compliance testing; and

---

                                                         Confidential – Winstar/Lucent
Execution Version

(8)    Verify support of, and compliance with, Applicable Standards.

(ii)    The Test Facilities will be capable of supporting concurrent testing on current and future configurations/systems and will support testing by WinStar and WinStar's customers and third-party vendors (subject to such third-party vendors signing a confidentiality agreement protecting Lucent's intellectual property). The Test Facilities will also be used for certifying new WinStar hardware/software configurations as well as simulating Network trouble conditions if necessary for real-time trouble-shooting or maintenance support.

(iii)    Lucent will install in the test beds a reasonable number of new product evaluation units for the purpose of testing such new products and technology.

(iv)    Support connection for integration testing of the WinStar Operations Support Systems ("OSS") and Business Support Systems ("BSS") as individual and integrated Network Elements and technology. Act as a WinStar customer demonstration center where WinStar customers can, on a pre-negotiated basis, observe interoperability of their equipment and network applications with WinStar Network Elements, OSS and BSS.

(b)    Test Bed Scheduling. Lucent will be responsible for scheduling and coordinating the Test Facilities as required to support the testing requirements of Lucent, WinStar (including OSS, BSS and Year 2000 compliance), WinStar's customers and third-party vendors.

(i)    The Lucent test bed will be dedicated to WinStar.

(ii)    WinStar will advise Lucent, on a monthly basis, of the anticipated testing requirements. Lucent will take these testing requirements into account in developing the testing schedule for the next ninety (90) days.

(iii)    WinStar will be responsible for supporting testing, as reasonably required, when conducted by Lucent or WinStar or in support of WinStar customers and third-party vendors.

## 4.2.    Test Plans.

Lucent will develop test plans and scripts for a structured, hierarchical test program that will verify the functionality of individual Network Elements and the ability of the Network Elements to inter-operate with each other in the Network as described in the WinStar-approved design specifications. The test plans will include test conditions and the anticipated acceptable outcome thresholds (e.g. with regard to interoperability, manageability, engineering guidelines, product specs, Y2K, IEEE, and NEBs compliance).

B1264

4.3.    **Conduct of Lab Testing.**

Lucent will perform lab testing according to the WinStar-approved test plans, and will provide the results to WinStar as input to the review and approval process. Lab testing will be performed to validate the Network Architecture and Network Technology, to validate additions and changes thereto, and for standards compliance and interoperability with other Network Elements, WinStar OSS and BSS, and WinStar customer CPE. This testing will include:

(a)    Product testing, performed through factory acceptance tests, which demonstrate the ability of individual Network Elements to provide the functionality described in the associated design specifications. These tests should verify all interface and standards compliance for the Network Elements, employing simulation or stimulation devices.

(b)    Network Element integration and validation testing, to verify the ability of the Network Elements to interface with other Network Elements in the Network, as appropriate. These tests may include use of load generators to create synthesized data streams.

(c)    Inter-operability Testing, to verify the ability of all components of the Network to interact and perform as a system, ensuring interoperability and network integrity and reliability. This testing may include stress loading devices to generate sufficient levels of traffic to drive the Network Elements towards operation at capacity to verify the ability of the system to function under stress conditions.

(d)    Integration and acceptance testing of all changes to the Network.

(e)    Load and recovery testing and support for WinStar in pilot trials prior to deployment to the production environment.

(f)    WinStar will provide reasonable access to OSS/BSS development test or production environments, as appropriate, to facilitate network and systems integration testing.

5.    **Implementation.**

5.1.    **Procurement/Acquisition.**

To the extent necessary to implement the Network Architecture and Network Technology, Lucent will provision Lucent Products as indicated in the attached Exhibit C-1 (or any successor thereto). This responsibility shall include:

5.2.    **Installation.**

Lucent will be responsible for the installation of Network Elements in accordance with the City-Specific Plan, Network design and the Product Standards. This includes:

---

B1265

(a)  Decommissioning of existing equipment and equipment disposal per WinStar instructions.

(b)  Overseeing proper performance of installation functions on all Network Elements, including installing Lucent Products and selecting the installation contractor (except where such selection would interfere with Product warranty requirements) and program managing the installation;

(c)  Connecting customer building access equipment, cross-connects and central office connections;

(d)  Performing logical assignments in WinStar network facilities provisioning databases (e.g., ASAP);

(e)  Physical inventory and loading of inventory data into appropriate WinStar databases and systems;

(f)  Other installation services as may be mutually agreed to by the Parties from time to time; and

(g)  Performing required acceptance testing.

5.3.  **Support.**

Lucent will be responsible for supporting the Lucent Products as set forth in this Section and Section 14.7 of the Agreement during the Warranty and Extended Warranty Periods. This responsibility will include:

(a)  Tendering complete documentation (including inventory information) in association with replacement of Product components.

(b)  Providing advanced/accelerated replacement service (i.e., delivering a replacement Product, part or component on an overnight basis) based upon an understanding that WinStar will return the defective Product, part or component as soon as practicable, unless Lucent's standard published policies provide otherwise and are specified in a Product addendum to the Agreement.

(c)  Providing standard replacement service (as elected by WinStar) that will provide replacement Products, parts or components with a turn-around intervals of less than twenty-four (24) calendar days. Lucent shall be responsible for the costs of shipping to and from Lucent in connection with the standard replacement service.

(d)  Delivering a quarterly report that tracks root causes of failures for all replacements of Products, parts or components, with tallies of incidents that are similar in nature or cause.

(e)  Lucent will be responsible for recommending (and delivering per WinStar's order) an adequate field supply and inventory of spare parts for every Lucent

---

B1266

Product under Warranty or Extended Warranty. The quantity and positioning of the spares will be sufficient for Lucent to meet applicable Service Levels. This shall also include:

    (i)    Lucent will be responsible for replenishing the spare parts inventory with quality spare parts. These parts shall either be new parts or have been certified by Lucent's quality control as suitable for use in a production environment.

    (ii)    Lucent will develop spare parts stocking plans based on equipment concentrations, locations, and failure rates. The parts stocking plan will establish Recommended Spare Parts Lists for engineer-carried, local, regional, and central stocked quantities of all parts.

    (f)    Within thirty (30) days of the Lucent issuance of a new upgrade or release for any Lucent Product, Lucent will notify WinStar of the release and its functional content. Lucent will also propose a test and implementation schedule. WinStar may, at its option, defer or bypass the implementation. Lucent and WinStar will work together to assure that WinStar does not fall two (2) release levels behind the current release, unless test results indicate instability or diminished capacity as a result of the new release. In no case should WinStar be permitted to operate on an unsupported software release.

5.4.    **Disaster and Recovery.**

Lucent's responsibility for disaster and recovery for the Network shall be as follows:

    (a)    Provide WinStar with a comprehensive disaster recovery plan for all Network Elements and connectivity; and

    (b)    Perform specific disaster recovery services as may be mutually agreed upon by the Parties.

5.5.    **Training.**

Lucent will provide, at no additional cost to WinStar, reasonable numbers of WinStar-designated individuals with reasonable levels of appropriate training in the installation, operation, configuration, maintenance and repair of Lucent Products so that WinStar may, at its option, use, operate, configure and maintain those Products without Lucent's assistance. In addition, Lucent shall provide similar training, at no additional cost to WinStar (other than Out-of-Pocket Expenses incurred by Lucent and paid to the third party vendor providing training, if applicable), for those Third Party Products to be implemented into the Network that Lucent is authorized or otherwise certified to provide training. If Lucent utilizes a third party vendor to provide the training identified in the preceding sentence, WinStar will reimburse Lucent for its cost for such third party vendor on an Out-of-Pocket Expenses basis.

---

Schedule A to the
Supply Agreement        - A-20 -        Confidential – Winstar/Lucent
Execution Version

B1267

6.    **Special Projects**

Lucent will support WinStar's need for ad hoc performance of large, one-time projects that are related to the Network and individual case basis requirements not otherwise included in the Services (each, a "Special Project"). With regard to such Special Projects, the following Services shall apply:

6.1.    **Program Management.**

Lucent will assign a program manager and sufficient resources within the program management office to assess and assemble the Lucent team that will address the Special Project. Lucent will use best reasonable efforts to support the deadlines specified by WinStar with regard to Special Projects. Within one week of notification of the Special Project, Lucent will either provide a schedule that allows for those deadlines or suggest another deadline and associated schedule or alternative method to meet the requirement.

6.2.    **Products.**

Lucent will provide Lucent Products required to meet the schedule on an accelerated basis and propose an engineering plan that will meet WinStar's business objectives as defined in the Special Project request.

6.3.    **Services.**

Lucent will perform services to support the Special Project as defined in this Agreement and, as mutually agreed upon after pricing, provide other services as required to meet the objectives of the Special Project. Other services may include:

(a)    Engineering Assessment. Provide a professional assessment of a network to be purchased as to the interoperability with the Network and the costs and interval for such interoperability to be accomplished.

(b)    Proposal Support. Provide technical support for large proposals and evaluations of technology requested and the applicability and suitability of Lucent Products and services to meet the requirements set forth by an RFP-type document or other such bid as may be received by WinStar.

(c)    Engineering Design Services. Provide engineering analysis and offer a design that meets the initiative in a cost-effective manner.

(d)    Other Support. Price and provide other support such as implementation, testing or inside connectivity.

6.4.    **Personnel.**

It is anticipated that Lucent will need to use personnel other than those assigned to the Network project in order to meet Special Project-related demands. If Lucent wishes to use the same personnel from the Network project to meet the requirements for Special

B1268

Projects, the roll out of the Network and associated activities must stay on the agreed-upon schedule unless otherwise agreed to by WinStar.

6.5.    **Pricing.**

Lucent shall provide preliminary pricing for Special Projects within five (5) business days and final pricing within ten (10) business days of notification of the Special Project.

B1269

Exhibit A-1

Lucent Responsibility Matrix by Technology

| Functions/services (Apply to initial deployment and growth/evolution) | Technologies By Functional Services - Transition Planning | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ckt Switch | Trans | Access | PWR | Radio | Data | MDF | Cable Rack | Premise wiring | OSS | CPE |
| Network architecture | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | TBD |
| Technology selection/network design, testing | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | TBD |
| City plan -- Network Techn. & Tech Planning | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Equipment Engineering | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Delivery | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Staging | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Installation/Turnover | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Equipment/Site Integration | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Drawings | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Records | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Product Warranty Support | Y | Y | Y | Y | TBD | TBD | Y | Y | Y | Y | TBD |
| Logical Assignments Provisioning | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Traffic Eng/Capacity Planning | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

LEGEND:

'Y' - Lucent Competency Targeted for Transition.
'TBD' - Transition Planning Process will analyze and determine timeframe for Implementation.

- A-1-1 -

Exhibit A-1 to the
Supply Agreement

Confidential -- Winstar/Lucent
Execution Version

Confidential —WinStar / Lucent

**Exhibit A-2**

**International Responsibility Matrix**

The following is a listing of some of the international related services Lucent shall provide. The Parties will develop a responsibility matrix for these services and such other mutually agreed upon services as soon as practicable following the Effective Date. The Parties intend to complete the responsibility matrix as part of developing the associated international related pricing that is to be developed within thirty (30) days following the Effective Date.

B1271

Confidential --WinStar / Lucent

| Pre-Implementation | Consultancy | Including: business planning; network planning, architecture design, and engineering; RF engineering; operations planning (build MOPs); interoperability testing; and disaster recovery planning |
|---|---|---|
| | Services | Including: licenses and permits; site surveys; site acquisition; and civil engineering and construction |
| Implementation | Services | Including: logistics (warehousing, delivery and inventory); staging; installation; testing; network testing; interworking testing (an ORT plan will be developed); program management; and functional end-to-end testing |
| Operations | Services | Including: training; maintenance (dispatch, repair and replace); field support; remote management (Netcare, including IP Gateway); operations (monitor, provision, remote management, customer care, global WinStar NOC monitoring, Netcare services); staffing; and civil construction |

Exhibit A-3

Responsibility Matrix

| ID | Process | Owner | Inputs | Outputs |
|----|---------|-------|--------|---------|
| 1 | Market Definition | WinStar | License Information<br>Building Universe<br>D&B (ABI) Tenant Data | Rate/Wire Center Priorities<br>Product Descriptions<br>Demand Forecasts (2 years)<br>• Volume<br>• Number of Lines |
| 2 | Regulatory Approval | WinStar | Rate/Wire Center Priorities | CLEC Authority |
| 3* | Dial Plan | Lucent | Rate/Wire Center Priorities<br>Calling Plan | Switch Dial Plan |
| 4 | Preliminary City Plan | Lucent | Rate/Wire Center Priorities<br>Demand Forecasts (2 years)<br>Building Priorities | Claritas Data<br>• Cluster Maps<br>• Building Data<br>Tandem Locations<br>Connectivity Analysis<br>Refined Rate Centers<br>Additional NXX Requirements |
| 5 | Interconnect Agreements | WinStar | Rate/Wire Center Priorities | Interconnect Agreements<br>Interconnect Guidelines/Restrictions |
| 6 | Switch Analysis | Lucent | Connectivity Analysis<br>Demand Forecasts (2 years) | Preliminary Switch Requirements<br>Switch Building Requirements |
| 7 | Preliminary Field Survey | WinStar/Lucent | Building, Clusters and Maps<br>Tandem Locations<br>Switch Building Requirements<br>Broker Switch Site Candidates | Hub Candidates          (WinStar)<br>• On-net coverage<br>• Constructability<br>• Owner Interest<br>Switch Site Candidates     (Lucent)<br>• Usable square footage |

Exhibit A-3 to the
Supply ^   ˀment

| ID | Process | Owner | Inputs | Outputs |
|----|---------|-------|--------|---------|
| 8 | Switch Site Selection | WinStar | Rate/Wire Center Priorities<br>Site Candidates (RR and Broker)<br>Switch Building Requirements Tandem<br>Locations<br>Connectivity Options | • Distance to Tandem<br>Connectivity Options    (Lucent)<br>Target Switch Sites (2 or 3 per area) |
| 9 | Switch Site LOI | WinStar | Target Switch Sites | Switch Site LOI (1 per area) |
| 10 | Switch Site Lease | WinStar | Switch Site LOI | Switch Site Lease |
| 11 * | CLLI/SS7 Point Code<br>Application / Administration | Lucent | Switch Site Lease | CLLI Codes<br>SS7 Point Codes |
| 12 | Dial Plan Administration | Lucent | Rate/Wire Center Priorities<br>Products Descriptions<br>Demand Forecasts | Calling Plans<br>Dialing Plans<br>NPA/NXX's |
| 13 | Dialing/Calling Plan Review | WinStar | Switch Dialing Plans<br>Calling Plan (with Call Type) | Dialing Plan Approval |
| 14 | NXX Application | WinStar | CLLI Code<br>Rate/Wire Center Priorities | WinStar NXX Codes |
| 15 | Network Capacity Planning | Lucent | Demand Forecasts | Network Trunking Forecast<br>Network Capacity Reports |
| 16 | Preliminary Connectivity Plan | Lucent | Switch Site LOI<br>Switch Site Lease<br>Network Trunking Forecast<br>Tandem Locations | Preliminary Connectivity Plan |
| 17 | ILEC Planning | WinStar/Lucent | Interconnect Agreements<br>Switch Site LOI | POI    (Lucent)<br>Trunking Plans    (Lucent)<br>ASR's (from ILEC)    (WinStar) |
| | City Network Design | Lucent | City Serving Plan<br>Demand Forecast<br>Trunking Forecast | Network Topology<br>Connectivity Plan (Switch to ILEC)<br>Facility Inventory |

| ID | Process | Owner | Inputs | Outputs |
|----|---------|-------|--------|---------|
| | | | Switch Site LOI<br>Trunking Plan<br>Local & Access Tandems<br>Capacity Requirements<br>Interconnection Guidelines/Restrictions | Equipment Inventory<br>Budget |
| 18 | Switch Site Survey | WinStar/Lucent | | |
| 19 | Room Plans | Lucent | Site Visit | Floor Plan<br>Cable Rack & Lighting Plan |
| 20 | Switch EOS | Lucent | Demand Forecast<br>Site Visit<br>Preliminary Switch Requirements | Switch EOS |
| 21 | CO Site Construction | WinStar/Lucent | Site Visit | (WinStar – Civil Construction/HVAC) |
| 22 | Switch Design/Manufacture | Lucent | Switch EOS<br>Interconnection Agreements | Delivered Switch |
| 23 | ODA Questionnaire | Lucent | NPA/NXX Calling Plans<br>Switch Dialing Plan<br>Transmission Facility Orders | ODA Questionnaire<br>Translation Requirements<br>Integration Test Plan<br>ODA "Models" |
| 24 | Transmission Area | Lucent | Demand Forecast<br>Floor Plan<br>Cable Rack & Lighting Plan | Transmission Equipment Layout<br>Transmission EOS |
| 25 | Central Office Plan Review | WinStar | Transmission Plan/EOS<br>Switch Plan/EOS<br>Connectivity Plan | Central Office Plan Approval |
| 26 | Facilities and Trunk Provisioning | WinStar | Interconnect Facility Orders<br>Transmission Facility Orders<br>ASR's from ILEC<br>FOC/DLR from ILEC<br>Trunking Plans | ASR's to LEC<br>FOC/CLR |

Exhibit A "o the
Supply .    uent

Confidential – WinStar/Lucent
Exr       ↑Version

**B1275**

| ID | Process | Owner | Inputs | Outputs |
|---|---|---|---|---|
| 27 | Ongoing Transitions | WinStar | ODA Questionnaire<br>LERG Update | ODA Updates |
| 28 | CO Installation (Switch and Transmission Room) | Lucent | Delivered Switch<br>Room Layout<br>Connectivity Plan<br>CO Plan Approval<br>Translation Requirements<br>Switch EOS<br>Switch Lease | Completed Central Office<br>Installed Switch<br><br>(WinStar – Civil Construction/HVAC) |
| 29 | Integration Testing | Lucent | Integration Test Plan | Switch Integration Test Results |
| 30 | Hub Site Selection | WinStar/Lucent | Hub Candidates     (WinStar)<br>On-net coverage   (WinStar)<br>Constructability   (WinStar)<br>Owner Interest<br>Connectivity Options  (Lucent) | Target Hub List (2 or 3 hubs per cluster to pursue) |
| 31 | Hub Site Leasing | WinStar | Target Hub List | One Hub Lease per Cluster |
| 32 | Hub A&E Review | WinStar/Lucent | Hub Target List<br>Connectivity Plan | Hub Selection/Approval |
| 33 | Backhaul Design | Lucent | Hub Lease<br>Switch Site LOI<br>Demand Forecast<br>Connectivity Plan<br>RFVs (if any) | Hub Connectivity Document<br>Hub Engineering Plans |
| 34 | Hub Engineering Package | Lucent | Hub Lease<br>Backhaul Design | Hub Engineering Package |
| 35 | Hub Equipment Order | WinStar | Purchase Order | FOC<br>Due Date |
| 36 | Hub Construction | WinStar/Lucent | Hub Lease<br>Backhaul EPAC | Constructed Hub<br>(WinStar – Civil Construction/HVAC) |

- A-3-4 -

Confidential – Winstar/Lucent<br>Execution Version

B1276

| ID | Process | Owner | Inputs | Outputs |
|----|---------|-------|--------|---------|
| 37 | Hub Acceptance Testing | WinStar | Constructed Hub Backhaul EPAC | OPS Acceptance |
| 38 | B-Site Selection | WinStar | Hub Candidates Building Data | B-Site Target List |
| 39 | B-Site Leasing | WinStar | B-Site Target List | B-Site Leases |
| 40 | Connectivity Design (B-Site to Hub) | WinStar (transition to Lucent) | Hub Site Lease B-Site Target List | Connectivity EPAC |
| 41 | B-Site Construction | WinStar/Lucent | B-Site Lease Connectivity EPAC | Constructed B-Site (WinStar – Civil Construction/HVAC) |
| 42 | B-Site Ops Acceptance Testing | WinStar | Constructed B-Site Connectivity EPAC | B-Site OPS Acceptance |
| 43 | ORT Test Planning | WinStar/Lucent | Transition Requirements Translation Updates Dialing Plans Product Descriptions Switch Integration Test Results | ORT Test Plan |
| 44 | ORT Testing | WinStar | ORT Test Plan | ORT Results - Defect Log (owners assigned) - Resolution Estimates |
| 45 | Switch Ops Acceptance Test | WinStar | Integration Test Results | Switch OPS Acceptance |
| 46 | General Availability | WinStar | Switch OPS Acceptance Hub OPS Acceptance B-Site OPS Acceptance ORT Results | General Availability |

\* Regarding items 3 and 11 above, Lucent intends to begin performing these Services within six (6) months of the Effective Date of the Agreement. In the event Lucent cannot perform these Services within such timeframe, Lucent agrees to hire WinStar (or its designee) as a subcontractor to perform these Services as part of a city-specific plan.

Confidential – WinStar/Lucent Ex    n Version

**Exhibit A-4**

**Initial Transition Plan**

1.    **General**

All contracted services for engineering, furnishing and installation (E, F&I) and Services for program management shall migrate to Lucent within six (6) months of the Effective Date.

An initial ramp-up time period is specified for Lucent to fully provide specific Services. During this period, WinStar personnel will assist Lucent personnel in familiarization with currently employed practices and procedures where they exist. This period varies by Service and specifically includes the items listed below.

1.1.    **Checklist for Transition**

For each of the Services set forth below, WinStar and Lucent will develop a checklist for items to be transitioned from WinStar to Lucent. As each service or network element is transitioned, there will be a document developed by WinStar and Lucent which will be signed by the appropriate WinStar Network Services VP and the Lucent Program Management office indicating that the service has been transitioned and Lucent has accepted responsibility for the service.

1.2.    **Specific Transition Timeframes**

An initial ramp-up time period is specified for Lucent to fully provide specific Services. During this period, WinStar personnel will assist Lucent personnel in familiarization with currently employed practices and procedures where they exist. The transition timeframes set forth below apply to all Network technologies with the exception of radio, packet switching (data) and CPE. Transition timeframes for these technologies will be mutually agreed during the transition plan process defined in Section 3.3 of Schedule A.

(a)    Engineering of Network Elements, including:

(i)    WinStar fiber optic systems will be migrated within thirty (30) days of the Effective Date. Fiber optic systems include optronics deployed in metropolitan areas and systems deployed for long haul transmission. Fiber optic system engineering includes evaluation of existing and future dark fiber routes for loss budget, amplifier and repeater spacing requirements, protection switching and capacity growth.

(ii)    WinStar Collocation at ILEC central office sites will be migrated within sixty (60) days of the Effective Date. Collocation at ILEC central offices includes subscriber loop carrier equipment and digital loop carrier equipment

(iii)    WinStar Broadband Services only sites will be migrated within ninety (90) days of the Effective Date. Broadband Services sites may include

B1278

packet switching or packet concentrating equipment, multiplex or cross connect equipment, auto answer modems, and UPS equipment and optronics.

(iv)    WinStar B sites will be migrated within one hundred and twenty (120) days of the Effective Date. B sites may include rack mounted and roof mounted radio equipment, multiplex equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing, or concentrating equipment and UPS equipment.

(v)    WinStar Hub sites will be migrated within one hundred and twenty (120) days of the Effective Date. Hub sites may include rack mounted and roof mounted radio equipment, multiplex equipment or cross connect equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing, or concentrating equipment, fiber optic equipment, UPS equipment, battery plant and associated power and stand-by power generating equipment.

(vi)    WinStar Central Office and Transmission sites including Customer Collocation will be migrated within one hundred and twenty (120) days of the Effective Date. Central Office sites may include rack-mounted and roof-mounted radio equipment, voice switching equipment, multiplex equipment or cross-connect equipment, subscriber loop carrier equipment, digital loop carrier equipment, packet switching, routing or concentrating equipment, fiber optic equipment, UPS equipment, battery plant and associated power and stand-by power generating equipment

(vii)   WinStar Customer Termination Equipment Engineering will be migrated within thirty (30) days of the Effective Date. Customer Termination Equipment may include multiplex equipment, subscriber loop carrier equipment, digital loop carrier equipment, and packet routing or concentrating equipment.

(viii)  WinStar Customer Premise Equipment and Inside Connectivity will be migrated within one hundred and twenty (120) days of the Effective Date. Customer Premises Equipment may include PBXs, telephone sets, LANs, bridges, video conferencing equipment etc. Inside connectivity is the method for connecting from a B building common space demarcation point to a demarcation point on the customer premise.

(b)    Network Engineering/ Traffic Engineering will be migrated as set forth below. This shall include sizing of trunks for interconnection to the LEC, 911 services, operator services, SS7 and AIN and interconnection of hub-to-hub and hub-to-switch inter-city connectivity, data services, etc. For new cities (i.e., cities planned for implementation in 1999), Lucent will assume the responsibility within thirty (30) days of the Effective Date. For existing cities, Lucent will develop and present a schedule within sixty (60) days of the Effective Date, with assumption of these Services in the first city within seventy-five (75) days of the

Exhibit A-4 to the
Supply Agreement

- A-4-2 -

Confidential – Winstar/Lucent
Execution Version

B1279

Effective Date. If Lucent cannot meet this responsibility within the timeframes specified, it shall subcontract the responsibility to WinStar. In such case, the payment to WinStar for this responsibility shall be the amount set forth in Exhibit C-5, prorated monthly (i.e., WinStar will pay Lucent that amount for the Service and Lucent will pay WinStar that same amount as a subcontractor).

(c)     Documentation and entry of data into WinStar Systems to support tracking and provisioning of Network Elements will commence concurrently with the Lucent Engineering of each Network Element. The initial ramp up time period for Lucent provided documentation and entry into WinStar Systems will exist concurrently with the ramp up time period specified for Lucent provided Engineering for each Network Element. In cases where documentation and entry of data into WinStar Systems is provided for Network Elements for which Lucent is not providing Engineering Services, the Lucent ramp up period will be defined per the Transition Plan as specified in Section 3.3 of Schedule A.

## 1.3.    Other.

The Agreement and its Schedules anticipate that the Network will evolve into a different and new structure with Network Elements that have not been explicitly defined herein. If, during the transition period, these new Network Elements are deployed in the Network, Lucent agrees to support them at the time of transition unless otherwise mutually agreed by the Parties. Engineering Services for these elements will also be provided by Lucent at that time.

Exhibit A-4 to the
Supply Agreement

- A-4-3 -

Confidential – Winstar/Lucent
Execution Version

B1280

Exhibit A-5

Product Performance Specifications

1.    5ESS Switches

Switches will be deployed in phases.  Phases are based on modular capacity models.

1.1.    **Initial Deployment**

The initial deployment will be based on two Switch Modules ("SMs") based on Lucent's pre-designed Model 2A.  This phase will be equipped to support the following capacity per SM:

(a)    TR008 analog lines: 800

(b)    TR303 lines: 2,400

(c)    ISDN PRI DS0s: 3,048

(d)    Digital DS0s for PBX customers: 1,032

(e)    Software.  The switch will include but will not be limited to software for the following services:

      (i)    Local Services;

      (ii)    CENTREX;

      (iii)    CLASS Features;

      (iv)    Long Distance; and

      (v)    LNP.

1.2.    **First Growth Job**

When additional capacity is needed the first two SMs will be grown to the following size before additional SMs are deployed:

(a)    TR008 analog lines: 800

(b)    TR303 lines: 7,500 @ 2.66 : 1 concentration

(c)    Digital DS0s for PBX and ISDN: 5,000

(d)    Interconnection DS0s: 2,000

(e)    Spare DS0s: 500

---

Confidential – Winstar/Lucent
Execution Version

B1281

I.3.    **Additional Growth**

The switch will grow to support at a minimum the customers below before a new switch is deployed:

(a)    Total SMs: 10

(b)    TR008 Analog Lines: 8,000

(c)    TR303 Analog Lines: 105,000 @ 2.66 : 1 concentration

(d)    Total Customer Digital Trunks: 37,000

(e)    Interconnection Trunks: 20,000

(f)    Unassigned ports: 15,000 DS0s

Total Ports (Lines or Trunks) used by WinStar revenue-generating customers: 150,000

<u>Assuming:</u>

Lines used at 6 CCS

Trunks used at 28 CCS

B1282



Exhibit A-6

WDS – Integrated Data Network



# High Speed National Core

## Stage 1 Remote City Connections

Backhaul Frame Relay Connections through UniSpan Consorila or WinStar Direct Network to Network Interconnects

Frame Relay

## Stage 2 Remote City Connections

Economic Model Supports Lower Cost Access & Aggregation Edge Switch Facility

Private Line - Frame Relay ATM IMA - Native ATM

## Stage 3 City Data Hub Expansion

Leased Line Services or IRUs Based on Capacity Economic Model

IP Telephony and/or AAL 0/5 Data Voice Facilities

National/Regional Core Transmission & Transport Network

IP Transport

Physical Transport

OC-48 under IRU

Combination of Multiple OC-3/12/48

National Core Transmission Network

OC-3/12 under lease

T1/T3/OC3 - Leased Line Services

Private Line Frame Relay ATM IMA Native ATM Internet/IP Data Voice



Exhibit A-6

WBS – Integrated Network

**Network Peering**

Local
NNI/UNI
Internet Peering Points

**National Core Transport Network**

**Regional/City Core Access**

5ESS

**National Core Transmission Network**

Combination of Multiple OC-3/12/48

OC-48 under IRU

OC-3/12 under lease

5ESS

ATM

DS-3
OC-3/12/48
under lease

5ESS

ATM

5ESS

ATM

ES

**Remote City Access**

FRS

ES

Private Line
Frame Relay
ATM IMA
Native ATM

NNI: Network to Network Interface
UNI: User Network Interface
IWF: Interworking Functionality
IMA: Inverse Multiplexing over ATM

ATM: Asynchronous Transfer Mode
ES: Edge Switch
FRS: Frame Relay Switch
TDM: Time Division Multiplexing

Exhibit A-6 to the
Supply Agreement

Confidential – W......er/Lucent
Ex          t Version

B1285

Exhibit A-6

WinStar Network – Current Topology

Exhibit A-6 to the
Supply Agreement

- A-6-4 -

Confidential – WinStar/Lucent
Execution Version

B1286



Exhibit A-7

Potential Future WinStar Network

The Transport Network

(Packet Technologies)

Integrated Core Service Node

Integrated Edge Service Node

Integrated Core Service Node

Integrated Edge Service Node

Integrated Edge Service Node

LE
CAP
IXC
Internet Peering Points

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Type II Customers

LE
CAP
IXC
Internet Peering Points

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

Other WinStar Networks

WinStar Customers Served Via ATM Access on Point-to-Multipoint Radio

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

WinStar Customer Served Via Dedicated HI-CAP TDM Wireless Access

Confidential – ^star/Lucent
^   on Version

Exhibit A-7 to the
Supply Agreement

B1287

Exhibit A-7

ATM Edge to Core



Confidential — Winstar/Lucent
Execution Version

- A-7-2 -

Exhibit A-7 to the
Supply Agreement

B1288

**Schedule B**

**Performance**

1. **General**

    1.1. **Introduction.**

    This Schedule B sets out Performance Standards for Lucent's performance of engineering and design Services.

    1.2. **Future Direction.**

    The Parties agree to work together to develop an affirmative approach to incent Lucent to adopt a WinStar customer satisfaction-focused approach to delivering the Services. The Parties anticipate that this approach may involve gainsharing, incentives or changes to WinStar's commitment to spending volume and Lucent content.

2. **Engineering Services.**

    Consistent with the transition plan, Lucent is required to provide Engineering Services for the WinStar Network. The Services to be provided include but are not limited to Base General Architecture, City Plans, Site Plans, Switch EOS, ODA Development, Backhaul Design, Engineering Plan for Hubs, Connectivity Design for Hubs, Network Capacity Plan, Future Architecture, Baseline Evaluation of existing network and others that may be required for implementation and ongoing serviceability of the WinStar Network. A number of these Services are still under evaluation by both Parties and a decision as to whether Lucent will provide those Services will be made as part of the development of the transition plan.

    2.1. **Service Delivery.**

    Except as otherwise mutually agreed to by the Parties, Lucent will deliver the Services within the following intervals:

    (a)    Architecture Services:

        (i)    RF Engineering (Individual Path) – one (1) working day;

        (ii)   City-Specific Plans – forty (40) working days after request and delivery of forecast;

        (iii)  Network Architecture – forty-five (45) days after the Effective Date;

        (iv)   Gap assessment of Existing Network – two (2) months after the Effective Date; and

        (v)    Network Technology – three (3) months after the Effective Date.

    (b)    Other Engineering Services:

---

<table>
<tr><td>Schedule B to the<br>Supply Agreement</td><td align="center">– B-1 –</td><td align="right">Confidential – Winstar/Lucent<br>Execution Version</td></tr>
</table>

B1289

(i)     Site Plans including Hub and Central Office – two (2) weeks after request;

(ii)    Switch EOS – two (2) weeks after request;

(iii)   ODA Development – three (3) weeks after request;

(iv)    Backhaul Design – three (3) weeks after request;

(v)     Engineering Plan for Hubs – two (2) weeks after delivery of base building drawings;

(vi)    Connectivity Design for Hubs – two (2) weeks after Hub selection;

(vii)   Network Capacity Plan – one (1) week after need for augment, network elements or connectivity is determined; and

(viii)  Documentation for Network Elements (with respect to placement and connectivity within the Network) – within three (3) business days of installation of the Network Element.

2.2.    Change Requests.

In the event that WinStar desires a change to generic individual Engineering Packages for Network Elements, Lucent will provide change documentation within thirty (30) days of request unless otherwise mutually agreed.

3.    Availability and Reliability

Network Elements made up of Lucent Products and Deliverables must perform up to the manufacturer's specification. The end-to-end network availability is an objective, not a specification, until WinStar approves the final design produced by Lucent. An availability calculation will then be performed by Lucent. Based upon the outcome of the calculations, Lucent will recommend that the design be adjusted or that the outcome of the calculation be accepted as the specification for the Network. This recommendation will be submitted to WinStar for review and potential approval.

3.1.    Reliability Standards.

Reliability standards are defined for the following four major network segments as shown in Figure 1. These standards encompass:

(a)     Distribution: Distribution consists of the Network segment starting at the customer demarcation point in the customer space and ending at the Central Office. When CPE is provided by Lucent, distribution objectives include the CPE:

(b)     Switch: The Network's central office switches.

---

B1290

(c)    **Facility Entrance:** The facility entrance network segment includes Equipment such as analog-to-digital converters (channel banks, loop carrier equipment), multiplexers, Digital Cross Connects, etc.

(d)    **Interoffice:** The interoffice transmission facility segment is used to transmit calls from one central office switch to the other.



Figure 1 End to End Network Availability Objective

**3.2.    End-to-End Network Reliability Objective (Figure 1)**

Since it is important from the customer's view that there be a high probability of obtaining a path through the network, a high level of end-to-end (customer to customer) network availability is desirable. The end-to-end availability requirement in accordance with Bellcore Standards is ninety-nine and ninety-three hundredths percent (99.93%) from the customer viewpoint. This is approximately three hundred and sixty-five (365) minutes per year or one (1) minute per day of unavailability. The availability must be met regardless of equipment failures or network congestion.

**3.3.    Distribution Network Segment (Figure 2).**

The distribution network segment includes both the feeder and the loop from the switch to the customer's home/office demarcation point, including customer terminal equipment (e.g., DLC) and inside wiring, excluding customer premise equipment (e.g., PBX or key sets). The objective on the distribution segment availability is ninety-nine and ninety-nine hundredths percent (99.99%). This would give a maximum downtime objective of approximately fifty-three (53) minutes per year per customer line.

Schedule B to the
Supply Agreement    - B-3 -    Confidential – Winstar/Lucent
Execution Version

B1291



Figure 2 Distribution Network Segment Unavailability Objective

### 3.4. Circuit Switch Segment (Figure 3).

(a)    The total switch down time objective is three (3) minutes per year. In addition the total downtime for individual lines is twenty-eight (28) minutes per year, and the total downtime for individual trunks is also twenty-eight (28) minutes per year.

(b)    For a transmission through-path traversing the switch from a line to a trunk, the maximum unavailability objective is the sum of the line and trunk unavailability minus three (3) minutes per year, since the total outage objective is included in both the line and trunk objectives and need only be considered once on a through-path. This results in a through-path downtime objective (line to trunk, or customer to interconnection trunk) of fifty-three (53) minutes per year or one hundred of a percent (0.01%).



Figure 3 Switch Network Segment Unavailability Objective (Through Path)

### 3.5. Facility-Entrance Network Segment (Figure 4).

The facility-entrance network segment is allocated five ten-thousandths of a percent (0.0005%) unavailability at each end or a total of one-hundredth of a percent (0.01%) for both. This results in about five (5) minutes per year unavailability.

---

B1292



Figure 4 Facility Entrance Network Segment Availability

3.6.    Interoffice Network Segment.

The interoffice transmission minimum availability objective is ninety-nine and ninety-eight hundredths percent (99.98%). This equates to ninety-nine and ninety-eight hundredths percent (99.98%) availability at two hundred and fifty (250) miles.

3.7.    Common Channel Signaling SS7 Network (Figure 5).

The common channel signaling SS7 network downtime objectives are shown in Figure 5.

Each SS7 user (e.g. 5ESS) interface segment should be down (an average of) no more than three (3) minutes per year.

Each network access segment should be down (an average of) no more than two (2) minutes per year, and

The backbone network segment should be down a negligible amount of time (that is, close to zero (0) minutes downtime per year). Note that downtime for this segment includes failures that prevent use of the backbone segment but do not by themselves disable any other segment(s).

The above allocation assumes an ANSI-based reference architecture with two-way diversity for the A-link sets and three-way diversity for the B-/D-link sets. If three-way diversity is not achievable in the backbone segment, the downtime of that segment may no longer be negligible. Hence, the ten (10) minute end-to-end objective may no longer be achievable.



4.    **Other Services**

It is recognized that evolution and development of the WinStar Network is ongoing. As the Network grows and changes, Lucent will develop and WinStar will approve new or revised Engineering Services and Design functions to support it.

5.    **Standards and Remedies**

Lucent recognizes that in providing services and network elements that such tasks are to be performed within industry standards and products must be Best of Breed. The reliability and availability of the Network and the delivery of engineering Services are critical to WinStar's business.

5.1.    **Architecture Services.**

With regard to Engineering Services for Base Generic Architecture, Future Architecture, City Plans and baseline architecture of existing networks as referred to in Section 2.1(a) of this Schedule B, the following standards and remedies shall apply:

(a)    **Standard.** Lucent shall deliver all Deliverables of such Services within the timeframes specified.

(b)    **Remedy.** If, for any reason, Lucent anticipates a delay in the delivery of the service, it shall notify WinStar as soon as possible. In addition:

(i)    If Lucent's delivery of the Service is, or is expected to be, delayed more than five (5) business days, then the Lucent Vice-President of Network Solutions shall notify the WinStar Senior Vice-President of Engineering of the delay and of the plan to cure such delay within (10) business days of the original due date. The president of Lucent Global Commercial markets will also be notified at this time.

B1294

(ii)    If Lucent cannot deliver the affected Service within ten (10) days of the original due date, the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officer to explain the reason for the delay in service and to confirm a new plan to deliver the service within twenty (20) business days from the original due date. WinStar and Lucent may mutually agree to extend the timeframes for such Services. If WinStar and Lucent cannot mutually agree to extend delivery dates for the affected Service, WinStar shall be given the option to terminate the affected service in its sole discretion.

5.2.    **Other Engineering Services.**

With regard to Engineering Services for site plans, switch EOS, ODA development, backhaul design, engineering plan for Hubs, Network capacity plan, connectivity designs for Hubs, RF engineering, and documentation, as referred to in Sections 2.1(b) of this Schedule B, the following standards and remedies shall apply.

(a)    **Standard.** Lucent shall deliver all Deliverables of such Services within the timeframes specified. In particular, Lucent shall achieve on-time delivery of ninety-five percent (95%) of all services ordered in a given Service.

(b)    **Remedies.** If, for any reason, Lucent anticipates a delay in the delivery of the service, it shall notify WinStar as soon as possible.

(i)    If Lucent's on-time delivery falls below the ninety-five percent (95%) threshold in any given service category, the Lucent Vice-President of Network solutions shall notify the WinStar Senior Vice-President of Engineering of the delay and deliver a plan to cure the affected Service within five (5) Business days. The president of Lucent Global Commercial Markets will also be notified at this time.

(ii)    If Lucent cannot cure the affected Service in the five (5) day cure period then the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officers to explain the delay in Service. WinStar and Lucent may mutually agree to extend the timeframes for the affected Services. If WinStar and Lucent cannot Mutually agree to extend delivery dates for the affected service, then WinStar shall be given the option to terminate the affected Service in its sole discretion.

5.3.    **Reliability and Availability**

For failure to meet the switch reliability standards set forth in Section 3.4 of this Schedule B or the end-to-end Network reliability specification as calculated in Section 3.2 of this Schedule B after the new Network Architecture and Technology plans are provided by Lucent, the following standards and remedies shall apply:

B1295

    (a)    **Standards.** Lucent shall meet or exceed the performance metrics for the switch and end-to-end Network as set forth in Sections 3.4 and 3.2 of this Schedule B, as measured on a monthly basis.

    (b)    **Remedies.** If Lucent fails to meet a stated objective in any given month then Lucent will notify WinStar and present a plan to cure the affected Service in the following measurement period.

        (i)    If Lucent's performance objective is not achieved for two months of any given six month period, then Lucent will place into escrow an amount equal to one percent (1%) of the charges for all Products and Services provided pursuant to this Agreement over the preceding twelve (12) months. The president of Lucent Global Commercial Markets will also be notified at this time.

        (ii)    If Lucent does not achieve a performance metric in any three (3) months in any given six (6) month period, then the Lucent President of Global Commercial Markets will personally visit the WinStar Chief Operating Officer and provide a plan to improve performance of the Network. Lucent will also forfeit the escrow deposit described above to WinStar.

        (iii)    If Lucent cures the underlying problem so that the Network achieves the affected performance metric for six (6) consecutive months, the escrow deposit will be released and returned to Lucent.

5.4.     **Limitations.**

The following limitations shall apply to the remedies set forth in this Schedule B:

    (a)    Credits to WinStar pursuant to this Section will be capped at Two Million Dollars (S2,000,000) for any given calendar year.

    (b)    The remedies apply only to Lucent Products and Deliverables.

    (c)    The remedies will not apply in situations of third party Equipment not performing to Specifications or third party catastrophic outages (other than those that should have been reasonably foreseen and accounted for by Lucent's design) or where WinStar has failed to meet its responsibilities as required for Lucent to perform the Service.

Schedule B to the
Supply Agreement      - B-8 -      Confidential – Winstar/Lucent
Execution Version

B1296

Schedule C

Charges

1.  General

    1.1.  General

        This Schedule C describes the charging methodologies and processes for both Products and Services. For Products, Lucent's list prices, WinStar's discounts, the Best of Breed process and SNAP-D interact to produce prices for individual Products. For Services, charges will be determined on a fixed price schedule, either annually or per Network segment.

    1.2.  Definitions

        (a)  "Ramp-up Period" means:

            (i)  For addition of new cities to the Network, a time period of twenty-four (24) months for switches and fifteen (15) months for all other Network Elements, both as measured beginning with cutover to production traffic; or

            (ii)  For augmentation of cities already included in the Network, the twelve-month period of time following acceptance of the corresponding new capacity.

        (b)  "Target Volume" means the volume of projected traffic forecast by the City Success Model (or other WinStar forecast) during the Ramp-up Period.

        (c)  "SNAP-D Term" means a Ramp-up Period for a specific city or Product, as applicable, but shall terminate before the expiration of the Ramp-up Period if the corresponding Target Volume is achieved earlier.

2.  Pricing Process for Products

    The pricing process implements five operations on the price offered by Lucent for each Lucent Product. These include comparison to the market, comparison to list prices with discounts, comparison to reference scales, Best of Breed protection and SNAP-D.

    2.1.  Market-Competitive Pricing.

        Lucent is committed to competitive market pricing on all Lucent Products (price and extended warranty fees) deployed in the Network.

2.2.    **Price Lists and Discounts**

(a)    **Price Lists.** Exhibit C-1 sets forth a "Price List" for the initial set of Lucent Products that may be purchased under this Agreement and represents the price at which such Products are offered to other customers. Future products may be added to the Price List as they are brought out to market. For such additions, WinStar may participate, at its election, in early product trials or first office applications and will be given a priority position to obtain Products once they achieve general availability. Products will be retired from the Price List as Lucent discontinues availability, provided that replacement products with comparable functionality are substituted on the Price List.

(b)    **Discounts.** Exhibit C-2 sets forth the discounts applicable throughout the Term to the initial set of Lucent Products. Each "Initial Start-up Discount" designated on Exhibit C-2 will apply to WinStar's purchase of the corresponding Product. The "Incremental Growth Discount" will apply to WinStar's purchase of parts and components to augment the capacity of the corresponding Product. As Products are added to the Price List, corresponding discounts shall be provided by Lucent that are at least as favorable as those set forth on Exhibit C-2.

(c)    **Calculation.** For each Lucent Product, the "Discount Price" shall be the product of the applicable discount and the corresponding price from the Price List.

2.3.    **Reference Scaling**

(a)    **FOT, Access And Cross Connect.**

(i)    Exhibit C-3 sets forth the "Reference Price" for three pricing categories: fiber optics technologies, access and cross connect. The Reference Prices are intended to be indicative of specific configurations required for each product category.

(ii)   For each Lucent Product that falls into one of these pricing categories, the Reference Scale Price shall be the lower of the Discount Price and the corresponding Reference Price, assuming an appropriately scaled product configuration. Appropriately scaled product configuration means that the Reference Price will be adjusted as agreed to by the Parties to account for differences between the configuration of the Reference Price model and the Product actually purchased by WinStar.

(b)    **Switching.** For each Lucent Product in the switching category, Exhibit C-4 sets forth the applicable Start-up Price and Incremental Price. Those prices will be adjusted as agreed to by the Parties to account for differences between the configuration of the Reference Price model in Exhibit C-4 and the Product actually purchased by WinStar. For such products, Sections (c), 2.5(a)(i) and 2.5(a)(ii) shall not apply.

(c)    **Other.** For all other Products, the Reference Price shall be the Discount Price.

---

Confidential – Winstar/Lucent
Execution Version

B1298

2.4.    Best of Breed Pricing (BoB)

In accordance with the BoB process set forth in Schedule H, an appropriate cost will be determined for the Best of Breed solution. For each Lucent Product other than those in the switching category, the BoB Price will be the lesser of that cost or the Reference Scale Price.

2.5.    SNAP-D Charging.

(a)    For each Network Element that is a Lucent Product, Lucent will identify two budget elements in the City-Specific Plan: a "Start-up Price" and an "Incremental Price."

      (i)    The Start-up Price for each Lucent Product shall be the corresponding BoB Price for that Product, less a minimum of five percent (5%) for Lucent-branded Products or a minimum of ten percent (10%) for Lucent-created Products.

      (ii)    The Incremental Price for each Lucent Product shall be the difference between the Start-up Price and the BoB Price, divided by a standard measure of volume that reflects the growth in traffic volume with respect to that Product over the Ramp-Up Period (e.g., port-months or voice minutes).

(b)    The charges for each Lucent Product that is implemented as a Network Element of a City-Specific Plan shall be invoiced to WinStar as follows:

      (i)    Upon Product shipment, Lucent shall charge WinStar the Start-up Price.

      (ii)    Each month during the corresponding Ramp-up Period, assuming the Target Volume has not yet been achieved, Lucent shall charge WinStar an amount equal to the Incremental Price multiplied by the amount of corresponding volume units actually attributable to that month. If the Target Volume is achieved during the course of a month, the charge for that month shall be equal to the Incremental Price multiplied by the difference between the volume at the close of the preceding month and the Target Volume.

      (iii)    If, at the expiration of that Ramp-up Period, the Target Volume has not been achieved, Lucent shall charge WinStar an amount equal to the Incremental Price multiplied by the difference between the Target Volume and the actual volume.

      (iv)    Following the Ramp-up Period, the Parties shall consider each such Product to have been fully paid-for.

B1299

Exhibit C-1

**Lucent Equipment Price List**

Complete list of Lucent Products to be provided by Lucent within ten days of the Effective Date.

B1300

Exhibit C-2

WinStar Equipment Discounts

| Switching | Initial Startup Discount % | Growth Window Discount % |
|---|---|---|
| 5ESS-2000 | 85% | 85% |
| VCDX | 85% | 85% |
| Remote SM | 78% | 78% |

*Note: Other 5ESS Equipment and software (such as adjunct processors, etc.) carry various discount levels that are quoted separately from the 5ESS switch. WinStar will have one (1) six-month growth window as described in Schedule C 5ESS SNAP-D pricing that will provide for eighty-five percent (85%) discount.*

| SONET/OPTICAL NETWORKING/DWDM | Initial Start-Up Discount % | Incremental Growth Discount % |
|---|---|---|
| DDM-2000 OC-3 | 45% | 45% |
| DDM-2000 OC-12 | 45% | 45% |
| FT-2000 | 40% | 40% |
| WaveStar OLS 40G | 30% | 30% |
| WaveStar OLS 400G | 30% | 30% |
| WaveStar 2.5 G | 30% | 30% |
| WaveStar 10G | 30% | 30% |
| WaveStar Bandwidth Mgr. | 30% | 30% |
| **Access** | | |
| SLC Series 5 | 35% | 35% |
| SLC 2000 | 40% | 40% |
| SLC Connect Reach | 30% | 30% |
| SLC Line Reach | 35% | 35% |
| SLC-2000 MSDT | 35% | 35% |
| SLC-Fiber Reach | 40% | 40% |
| Anymedia FAST | 25% | 25% |
| **Digital Cross-connect** | | |
| DACS II | 40% | 40% |
| DACS IV-2000 | 45% | 45% |
| **Data** | | |
| Port Master (Remote Access) | 50% | 55% |
| AC (Access Concentrator) | 40% | 45% |
| MX1000 (ATM Edge) | 40% | 45% |
| PC ACS (ATM Core Switch) | 35% | 40% |
| PS 6400 (IP Core) | 35% | 40% |
| PS ITS (IP Telephony) | 40% | 50% |
| PS AS (Packet End Office) | 40% | 50% |

Exhibit C-2 to the
Supply Agreement                         - C-2-1 -

Confidential – Winstar/Lucent
Execution Version

B1301

**Diagram 1: SLC Connect Reach Voice Model**



# SLC Connect Reach Voice Model

B1302

Diagram 2: SLC Connect Reach Voice & Data Model



Lucent Technologies Proprietary

B1303

**Diagram 3: AnyMedia FAST/IRX Router Model**

## AnyMedia FAST / IRX Router Model



Lucent Technologies Proprietary

x 15 End User Nodes          Hub Node          Service Node

B1304

Diagram 4: AnyMedia FAST / ATM Access Model



AnyMedia FAST / ATM Access Model

B1305

**Exhibit C-4**

**Switch Pricing**

1.    **General**

This SNAP-D quote for the 5ESS is predicated on Lucent Quick-Start Model 2A agreed upon with WinStar Engineering on October 10, 1998. The corresponding configuration is:

(a)    Lines / Customer provisionable total lines = 6,144

(b)    Trunks / Customer provisionable total trunks = 8,400

1.2.    **Configuration Parameters:**

(a)    The initial model switch configuration consists of one 3B21 Administrative Module at 5E13 Base Generic, or the then available Generic, one CM2 Communications Module (two pairs), and two SM-2000 Switching Modules containing the following:

(b)    SM001 - This switching module contains all of the miscellaneous functions as well as POTS line interfaces via IDCU TR008, a mix of analog and ISDN lines via DNU-S TR303 and digital trunk interfaces via DNU-S STSX-1(8) and DLTU2.

(c)    SM002 - This switching module provides a mix of analog and ISDN lines via DNU-S TR303 and digital trunk interfaces via DNUS-S STSX-1(8).

(d)    ODA to meet WinStar's network requirement.

1.3.    **WinStar Benefits:**

(a)    Minimized up front investment;

(b)    Includes an IDCU allowing WinStar the ability to transition from TR008 to TR303;

(c)    Full compliment of current WinStar software features including Long Distance; and

(d)    System is pre-conditioned to allow for quick growth of the next SM-2000.

**B1306**

2.    **Terms**

   2.1.    **Pricing.**

Prices for the 5ESS shall be as follows:

     (a)   Start-up Price shall be Nine Hundred and Sixty-Five Thousand Dollars (S965,000), which includes the first forty (40) DS1s to meet Winstar's requirement for the initial activation.

     (b)   There is no Incremental Price attributable to the first forty (40) DS1s activated for each 5ESS. The Incremental Price corresponding to each DS1 thereafter shall be Four Thousand One Hundred and Fifty Dollars (S4,150).

   2.2.    **Terms and Conditions:**

     (a)   There will be a monthly true-up to determine numbers of DS1s that have been activated

     (b)   At the end of twenty-four (24) months, if any remaining DS1s have not been activated, WinStar will pay the balance of DS1 activation charges.

     (c)   WinStar must pay for the full value of the Switch (which is the remaining non-activated DS1s from the initial four hundred and forty-eight (448) DS1s) before any additional STSX packs or additional SM2000 is added to the Switch.

     (d)   Model pricing is subject to change consistent with any changes in the model configurations.

     (e)   Lucent shall provide one eighty-five percent (85%) discount window per year per switch site for hardware and software orders received over a six (6) month period designated by WinStar. This provision applies for the duration of the Agreement.

     (f)   The 5ESS implementation interval will be eighteen (18) weeks from receipt of a WinStar Purchase Order to Turnover (i.e., not including the period between Turnover and Cutover, which is approximately three (3) weeks).

     (g)   Spare 5ESS switch circuit packs, one (1) per pack code are included in this proposal. Also included is a complement of spare fuses and blank DAT tape cartridges.

     (h)   Previous Professional Services credit of One Hundred and Twenty Thousand Dollars (S120,000) per new switch does not apply to purchases of 5ESS pursuant to this Exhibit C-2.

Exhibit C-4 to the
Supply Agreement        - C-4-2 -        Confidential – Winstar/Lucent
Execution Version

B1307

2.3.    Power and E&I

Additional amounts not included in the Start-up Price and Incremental Price set forth above are as follows (with approximate regional averages quoted therefor):

(a)    Engineering and Installation        $238,349

(b)    Power (switch only)                 $162,256

(c)    Framework                           $ 27,117

B1308

Exhibit C-5

Pricing for Lucent Network-Related Services

| Line Item | | Description | Price Year 1 Lucent Price | Price Year 2 Lucent Price | Price Year 3 Lucent Price | Price Year 4 Lucent Price | Price Year 5 |
|---|---|---|---|---|---|---|---|
| 001 | | Network Architecture (Baseline) | $ 480,000 | $ 480,000 | $ 480,000 | $ 480,000 | $ 480 |
| 002 | | Overall Network Architecture | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ |
| 003 | | Overall Network Technology/Network Design | $ 3,000,000 | $ 3,150,000 | $ 3,150,000 | $ 3,150,000 | $ 3,150 |
| 004 | | Network Solution Development | $ 1,050,000 | $ 1,050,000 | $ 1,050,000 | $ 1,000,000 | $ 1,000 |
| 005 | | Interoperability Lab / Technology Selection | $ 4,500,000 | $ 4,500,000 | $ 8,000,000 | $ 5,100,000 | $ 5,100 |
| 006** | | City Plan (per New City) | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150 |
| 007** | | Existing City Traffic Engineering/Capacity Planning (per City per year) | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75 |
| 008 | | Equipment Engineering | Included in Lucent Firm Price Quote | | | | |
| 009 | | Battery | Included in Lucent Firm Price Quote | | | | |
| 010 | | Staging | Included in Lucent Firm Price Quote | | | | |
| 011 | | Installation/Turnover | Included in Lucent Firm Price Quote | | | | |
| 012 | | Drawings | Included in Lucent Firm Price Quote | | | | |
| 013 | | Records | Included in Lucent Firm Price Quote | | | | |
| 014 | | Logical Assignment Provisioning | Included in Lucent Firm Price Quote | | | | |
| 015 | | Product Warranty | Standard Warranty Included in price of the product | | | | |
| 017 | | Program Management ($$ based on Business Case Quantities) | | | | | |
| 017a | | Program Management Office | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000 |
| 017b | | New City CO (per city) | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2 |
| 017c | | Hub Site (per site) | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1 |
| 017d | | In-Site (per site - less than 1000) | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1 |
| 017e | | In-Site (per site - greater than 1000) | $ 500 | $ 500 | $ 500 | $ 500 | $ |
| 017f | | Connectivity | Included in PM line item above | | | | |
| 017g | | Growth (Augment) | Included in PM line item above | | | | |
| 017h | | PM of WinStar Responsible Functions | Included in PM line item above | | | | |
| 010 | | Special Project Pricing | TBD (SOW based) | | | | |

The asterisk priced above are based on Schedule A Statement of Work. Not all content of the Statement of Work is priced herein.

** This Price does not include RF reciptering based on that functionality residing with WinStar.

NOTE: 1 Price structure above are to be canceled to the International as applicable.

Exhibit C-5 to the
Supply Agreement

Confidential -- Winstar/Lucent
Execution Version

**B1309**

Exhibit C-6

Pricing for Interoperability Test Lab

1.    **Introduction**

This Exhibit sets forth the functionality, scope, composition, staffing and pricing for the Test Facilities to be provided by Lucent under this Agreement. Further description of the use of the Test Facilities is set forth in Section 4 of Schedule A.

2.    **Functionality**

2.1.    **Functionality.**

The Testing Facilities provided by Lucent pursuant to Section 4 of Schedule A shall encompass the following functionality:

(a)    **Architecture and Design Support.** Functionality and interoperability testing of Network Elements, technical evaluation and selection of network elements, WinStar customer tours, direct technical interface with suppliers of Network Elements in resolving all technical performance and interoperability issues. Deliverables are engineering standards, recommended standard installation configurations and provisioning requirements. The Test Lab will also serve as a testbed for Level 4 support in replicating problems found in the Network for purposes of problem diagnosis and resolution.

(b)    **Network Operations Support.** Development of High Level Process Requirements and Functional Interface Requirements between Network Management and Element Management systems and the appropriate Network Elements. Deliverables are requirements documents for WinStar OSS/BSS systems, fault management rules to be used to manage the network, and changes to Network Elements as appropriate and necessary to support WinStar OSS/BSS functionality.

(c)    **Network Verification Testing.** Development of Network Verification Tests to verify that a chosen set of Network Elements that constitute a network Architecture support products and services offered by WinStar (customer products). Deliverable is a set of Network Verification Tests that have been successfully executed in the Interoperablility Laboratory environment and criteria for successfully executing such tests in a field environment.

(d)    **SME Access.** Lucent will provide access to at least twenty (20) virtual Subject Matter Experts (SMEs) in other Lucent laboratory environments as required to support technical efforts related to the activities of the Interoperablity Laboratory.

(e)    **Technical Training.** The testing facility staff will provide access to the laboratory, including configuration of Network Elements to support WinStar's efforts to provide training in engineering, construction, provisioning and maintenance. Testing facility staff will participate in and support training as required. Training classes will not exceed a reasonable percentage of the normal work week so as not to deter the prime purpose of the laboratory..

Exhibit C-6 to the
Supply Agreement                              - C-6-1 -

Confidential – Winstar/Lucent
Execution Version

**B1310**

**2.2.** **Scope and Composition.**

    (a)    The Testing Facilities will test Lucent Products and Third-Party Products that are or may be used as Network Elements in the Network, to include interoperability of CPE as required to support WinStar-provided products and services. Scheduling of such testing is directly linked to the staffing level and equipment availability of the testing facility.

    (b)    WinStar will specify and provide a site at which the Testing Facility will be located. WinStar will be responsible for all facility costs such as rent, utilities, telephone service and communications. WinStar will provide any required access to the Network and the BSS/OSS data communications network (DCN).

    (c)    WinStar will be responsible for supply of those Third-Party Products deployed as Network Elements that are not purchased through Lucent. Lucent will coordinate the installation and maintenance of those Elements in the testing facility. Lucent will supply and maintain all other Equipment, Software and other Services (including but not limited to a 5ESS switch, racks, DC power equipment, cabling, test and analysis equipment necessary to implement the Test Facilities. Lucent will also make shared-use Equipment owned by Lucent available whether on site or through remote connectivity as required by the Test Facility.

**2.3.** **Staffing.**

    (a)    Initial Levels. Table 1 contains the Parties' expectation for the staffing of the Test Facilities over the Term, in numbers of on-site Lucent personnel dedicated to the WinStar Test Facilities. It also indicates an approximate breakdown of staff per area , corresponding to the work activities described in Section 2.1 of this Exhibit.

    (b)    Efficiencies. Lucent will advise WinStar of any opportunities for efficiencies or adjustments in staffing for the Testing Facilities that would permit savings without sacrificing functionality. The Parties will work together to adjust the staffing levels as appropriate to support the design and implementation of the Network over the Term, with corresponding adjustments in the billing to WinStar.

| Table 1: Initial Staffing Levels (FTEs) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Design Support | 14 | 24 | 15 | 15 | 15 |
| Network Operations Support | 2 | 7 | 5 | 5 | 5 |
| Network Verification Testing | 2 | 1 | 1 | 1 | 1 |
| Total | 18 | 32 | 21 | 21 | 21 |

**3:** **Pricing**

**3.1.** **Test Facilities Staff Pricing.**

Table 2 sets forth the pricing levels attributable to the staffing indicated in Table 1. These pricing levels represent annual caps that correspond to staffing levels set forth in Section 2.3 of this Exhibit. Notwithstanding the foregoing, the Parties may mutually agree to adjust these levels pursuant to Section 3.2 of this Exhibit.

| Table 2: Pricing for Initial Staffing Levels ($K) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Totals | 4,500,000 | 8,000,000 | 5,200,000 | 5,200,000 | 5,200,000 |

B1311

3.2.    Adjustments.

(a)    Within sixty (60) days of the Effective Date, Lucent will develop a set of blended rates applicable to the staff of the Testing Facilities, divided into three personnel categories (e.g., junior, mid-level and senior technical personnel).

(b)    In the event that WinStar requests a reduction in staffing of the Testing Facilities (whether in response to a Lucent notice of an efficiency opportunity pursuant to Section 2.3(b) or otherwise), Lucent will work with WinStar to accommodate that request without loss of functionality. In cases where Lucent believes that a reduction in Scope of Work or functionality will result from the request, the impact will be provided to WinStar within fifteen (15) days of the request. When such a reduction in staffing becomes effective, the charges set forth in Section 3.1 shall be reduced by the blended rates attributable to such person(nel).

Exhibit C-6 to the
Supply Agreement                    - C-6-3 -

Confidential -- Winstar/Lucent
Execution Version

Exhibit C-7

Pricing for Optical Networking Technology

1.  **Definitions**

1.1.  **Lucent's DWDM Solutions:**

The OLS 400G DWDM system utilizes a global platform approach to provide complete optical networking solutions for WinStar. The DWDM system supports up to 40 wavelengths of OC-192, 80 wavelengths of OC-48, or a mix up to 400 Gb/sec per fiber. There are four components to the solution as follows:

(a)  **OLS 400G DWDM End Terminal.** This DWDM terminal terminates the four fibers (two transmit and two receive) to support WinStar's initial application as well as future growth to 400 Gb/sec. It provides the multiplexing and demultiplexing of wavelengths from the high speed DWDM line rate (400 Gb/sec) fibers to the individual SONET TDM terminals. The SONET TDM terminals interface to the OLS 400G DWDM End Terminal and each input is assigned an individual wavelength (color) for multiplexing into the OLS 400G DWDM system. A signal from a Lucent SONET terminal (FT-2000 OC-48 or WaveStar 10G OC-192 system) can directly feed the OLS 400G DWDM End Terminal. The OLS 400G system also supports an open interface to other vendors SONET TDM equipment via Lucent's Optical Translator Unit or OTU.

In the WinStar specific network design, the OLS 400G DWDM End Terminal is equipped with OC-48 OTUs for the through NYC to Washing D.C. express wavelengths. The three Lucent FT-2000 OC-48 SONET terminals are equipped with Lucent Compatible Optics so that OTUs are not required.

(b)  **OLS 400G DWDM Optical Add/Drop Terminal.** The optical add/drop sites contain the OLS 400G Optical Add/Drop Terminal, which allows wavelengths to be dropped to or added from SONET OC-48 or OC-192 TDM terminals. All other wavelengths are expressed through the Optical Add/Drop Terminal. This function in the DWDM network is analogous to the Linear Add/Drop function in the SONET environment.

(c)  **OLS 400G Optical Amplification Terminal.** These sites contain the stand-alone Optical Amplifiers where optical amplification is required. These Erbium-doped amplifiers have the wide band amplification pass bands required to support the fully equipped OLS 400G system (same amp for all 80/40 wavelengths of OC48/OC192; no additional amplifiers are required throughout the system growth). These OLS 400G DWDM terminals can be upgraded in-service to an OLS 400 G Optical Add/Drop Terminal if required.

(d)  **OLS 400G Regeneration Terminal.** This terminal is used once in the NYC/DC design. The purpose of this system is to fully regenerate the DWDM signals once the limit of concatenated amplified spans has been reached This is necessary to eliminate the build up of signal degradation and second order effects in the amplification process.

B1313

1.2.   Lucent's SONET TDM Solutions:

(a)   FT-2000 OC-48 SONET TDM Terminal.  These are OC-48 SONET terminals, which multiplex lower speed signals up to the OC-48 rate.  They contain optics that output the correct wavelength for direct input into the OLS 400G DWDM Terminals.

(b)   WaveStar 10G (OC-192) SONET TDM Terminal.  These are OC-192 SONET TDM terminals, which multiplex lower speed signals (DS3, EC1, OC-3, Oc-12, Oc-48) up to the Oc-192 rate.  These terminals are quipped with OLS 400G DWDM System Compatible Optics that output the correct wavelengths for input to the OLS 400G DWDM terminals.

2.   Optronics Network Solution

2.1.   Description.

The attached Diagrams 1, 3 and 4 represent the Lucent solution to supporting WinStar's identified traffic requirements, as indicated in Diagram 2.  As described in Exhibit C-3, the solution relies upon OC-48 (see Diagram 3, the "OC-48 Solution") until Lucent is able to offer the OC-192 solution (see Diagram 4, the "OC-192 Solution").  The detail behind the diagrams is as follows:

(a)   Diagram 1 sets forth the Span Engineering for the Lucent solution.  It is based upon the following:

(i)   Assumptions.

(1)   TrueWave Plus fiber to be used throughout this portion of the Network;

(2)   There are four (4) fibers between Jersey City and Washington DC;

(3)   0.30 dB/km;

(4)   1.6 km/mile;

(5)   2 dB into/out of wavelength add/drop;

(6)   1.5 dB into/out of end terminal; and

(7)   1 dB loss per OA.

(ii)   Engineering Rules. WaveStar OLS 400G OC-192 on TrueWave + Release 1.0

---



Diagram 1: Optronics Solution Span Engineering

(b)    Diagram 2 represents WinStar's indication of its traffic support requirements. The Lucent solution set forth in Diagram 1 was developed by Lucent to be capable of accommodating this traffic support.



Diagram 2: WinStar Traffic Support Requirements

B1315

(c)    Diagram 3 depicts the OC-48 Solution.



Diagram 3: OC-48 Solution

(d)    Diagram 4 depicts the OC-192 Solution.



Diagram 4: OC-192 Solution

2.2.    **Component Pricing.**

(a)    Table 3 indicates the component-level list prices for Lucent Products used in the optronics Network solution. These prices will be adjusted as set forth in Schedule C (i.e., discounts, reference scaling, BoB and SNAP-D) before being charged to WinStar.

B1316

(b)  Tables 4 and 5 indicate component level pricing for other Lucent Products used in the optronics Network solution. This pricing is the Discount Price and will be adjusted as set forth in Schedule C (i.e., reference scaling, BoB and SNAP-D) before being charged to WinStar.

| Table 1: OC-48 Solution | | | | |
|---|---|---|---|---|
| Site | Description | # Systems | Unit Price | Total Price |
| New York City | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | FT-2000 OC-48 c/w no lowspeed (for future service) | 1 | 91,000 | 91,000 |
| | FT-2000 OC-48 c/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Jersey City | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Newark Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Hopewell | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Philadelphia Jct | OLS 400G DWDM Optical Regeneration Terminal | 1 | 1,031,555 | 1,031,555 |
| | FT-2000 OC-48 c/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Wilmington Jct | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Elkton | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| New Site A+A7 | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Baltimore Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 567,212 | 567,212 |
| | FT-2000 OC-48 c/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| Washington DC | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | FT-2000 OC-48 c/w no lowspeed (for future service) | 1 | 91,000 | 91,000 |
| | FT-2000 OC-48 c/w (2) 1+1 prot OC-3s | 1 | 104,000 | 104,000 |
| | FT-2000 OC-48 c/w (4) 1+1 prot OC-3s & 24 prot DS3s | 1 | 135,000 | 135,000 |
| | | | | $6,290,899 |

B1317

| Table 2: OC-192 Solution | | | | |
|---|---|---|---|---|
| Site | Description | # systems | Unit Price | Total Price |
| New York City | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | WaveStar 10G (OC-192) e/w 1 OC-48, 8 OC3, 24 DS3, one additional oc48 rail unused | 1 | 402,000 | 402,000 |
| Jersey City | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| | WaveStar 10G (OC0192) e/w 4 1+1 protected OC3 three additional oc48 rail unused | 1 | 360,000 | 360,000 |
| Newark Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| | WaveStar 10G (OC-192) e/w 4 1÷1 protected OC3 three additional oc48 rail unused | 1 | 360,000 | 360,000 |
| Hopewell | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Philadelphia | OLS 400G Regeneration Terminal | 1 | 970,512 | 970,512 |
| Jct | WaveStar 10G (OC-192) e/w 8 1+1 protected OC-3; 24 DS3 two additional oc48 rail unused | 1 | 398,000 | 398,000 |
| Wilmington Jct | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Elkton | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| (New Site A) | OLS 400G DWDM Optical Amplification Terminal | 1 | 294,799 | 294,799 |
| Baltimore Jct | OLS 400G DWDM Optical Add/Drop Terminal | 1 | 506,169 | 506,169 |
| | WaveStar 10G (OC-192) e/w 8 1÷1 protected OC-3; 24 DS3 two additional oc48 rail unused | 1 | 398,000 | 398,000 |
| Washington DC | OLS 400G DWDM End Terminal | 1 | 485,256 | 485,256 |
| | WaveStar 10G (OC-192) e/w 1 OC-48, 8 OC3, 24 DS3 one additional oc48 rail unused | 1 | 402,000 | 402,000 |
| | | | | $6,958,727 |

**B1318**

| Table 3: Linearized 10G (OC-192) TDM SONET Terminal Pricing Models ||
|---|---|
| Model | List Price |
| **10G 2F** | |
| Startup (1.3u high speed) | $278,312 |
| per 1xN DS3/EC1 (8 port) | $1,615 |
| per 1+1 OC3 (4 port SR) | $6,357 |
| per 1+1 OC3 (4 port LR) | $9,200 |
| per 1+1 OC12 (2 port SR) | $15,454 |
| per 1+1 OC12 (2 port LR) | $25,000 |
| per OC48 BLSR (1.3u) | $38,788 |
| **10G 4F** | |
| Startup (1.3u high speed) | $533,338 |
| per 1xN DS3/EC1 (8 port) | $1,615 |
| per 1+1 OC3 (4 port SR) | $6,357 |
| per 1+1 OC3 (4 port LR) | $9,200 |
| per 1+1 OC12 (2 port SR) | $15,454 |
| per 1+1 OC12 (2 port LR) | $25,000 |
| per OC48 BLSR (1.3u) | $38,788 |
| **Interface Packs** | |
| DS3 Prot. Switch Relay | $2,400 |
| OC48 1.3u | $19,394 |
| OC48 1.5u | $24,546 |
| OC48 OLS Compatible | $40,000 |
| OC3 1.3 4 port Long Reach | $18,400 |
| OC3 1.3 4 port Short Reach | $12,714 |
| OC12 1.3 2 port Long Reach | $25,000 |
| OC12 1.3 2 port Short Reach | $15,454 |
| DS3/EC1 8 port pack | $10,000 |
| DS3 Terminal Block | $3,000 |

OC192 2 Fiber HS Shelf Common

| Item | Count | List |
|---|---|---|
| OC192 Shelf/BP/Fan | 1 | $14,000 |
| CTL/SYS50DM | 1 | $9,334 |
| DCC/EIU | 1 | $5,600 |
| PPROC/STS192 | 4 | $32,000 |
| Switch/STS576 | 2 | $10,600 |
| TMG | 2 | $4,000 |
| OC192 1.5 | 2 | $140,000 |
| OC192 Software | 1 | $20,000 |
| Basic cables | 1 | $462 |
| Total HS | | $235,996 |

OC192 2 Fiber LS Shelf Common

| Item | Count | List |
|---|---|---|
| OC48 Shelf/BP/Fan | 1 | $10,000 |
| CTL/SYS50DM | 1 | $9,334 |
| DCC/EIU | 1 | $5,600 |
| SWITCH/STS576 | 2 | $10,600 |
| TMG | 2 | $4,000 |
| Intershelf cables | 1 | $2,320 |
| Basic Cables | 1 | $462 |
| Total LS | | $42,316 |

B1319

| Table 4: Linearized FT-2000 (OC-48) TDM SONET Terminal Pricing Models | |
|---|---|
| Model | WinStar Price |
| FT-2000 OC-48 System | |
|    Startup | 24,500 |
| Optics | |
|    OLS compatible optics (T&R, 1+1 protected) | 67,000 |
|    Standard 1.3 optics (T&R, 1+1 protected) | 39,200 |
|    Lowspeed packs | |
|    per 1XN DS3 (3 ports per card, includes allocated protection pack cost &misc associated equip) | 868 |
|    per 1XN EC1 (3 ports per card, includes allocated protection pack cost & misc associated equip) | 911 |
|    per 1÷1 OC3 (includes allocated cost of Trib Overhead Controller -TOHCTL) | 5,095 |

B1320

| Table 5: Equipment List: FT-2000 OC-48 Bay (up to 2 systems per bay) | | | |
|---|---|---|---|
| Part No. | | | Price |
| OC-48 System #1 | | | |
| ED8C902-30 | G-1 | 2 Fiber Add/Drop Ring Term includes the following: E/W | 14,697 |
| J68974EI | L-7 | 2 F A/D Ring Term | |
| J68974EI | L-36 | Low Speed Prom Sw  LAA12B | |
| J68974EI | L-41 | TG3 (DS1) Cp  LAA18 | |
| J68974EI | L-70 | Overhead Controller LAA21 | |
| J68974EI | L-46 | System Controller  LAA23B | |
| J68974EI | L-50 | System Memory 4 Mbyte  LAA25 | |
| J68974EI | L-66 | Line Controller (4Mg) A/D & ring  LAA28 | |
| OC-48 System #2 | | | |
| ED8C902-30 | G-1 | 2 Fiber Add/Drop Ring Term includes the following: E/W | 14,697 |
| J68974EI | L-7 | 2 F A/D Ring Term | |
| J68974EI | L-41 | TG3 (DS1) Cp  LAA18 | |
| J68974EI | L-70 | Overhead Controller  LAA21 | |
| J68974EI | L-46 | System Controller  LAA23B | |
| J68974EI | L-50 | System Memory 4 Mbyte  LAA25 | |
| J68974EI | L-66 | Line Controller (4Mg) A/D & ring  LAA28 | |
| Standard High Speed (OC48) Optics | | | |
| J68974EI | L-78 | OC-48 RCVR (A/D STS-1) 839B5 | 7,000 |
| J68974EI | L-83 | 1.3 Transmitter Standard Power 24dB 739B5 | 12,600 |
| J68974EI | L-84 | 1.3 Transmitter High Power 27dB 739C5 | 18,900 |
| J68974EI | L-104 | 1550 Transmitter 23dB 739J5 | 35,910 |
| OLS Compatible High Speed (OC48) Optics | | | |
| J68974EI | L-79 | 1.5 OLS compatible Receiver 839E5 | 9,500 |
| J68974EI | L-251-266 | 1.5 OLS compatible Transmitter 739E5 | 24,000 |
| Lowspeed Cards | | | |
| J68974EI | L-21 | OC-3 Long Reach Interface - one port per card (LAA10) | 2,310 |
| J68974EI | L-23 | IS3 Circuit pack - one port per card (LAA5) | 1,575 |
| J68974EI | L-33 | OC-12 Optical Extension (T939A) | 9,240 |
| J68974EI | L-25 | DS3 Interface - three ports per card (LAA2) | 2,100 |
| J68974EI | L-30 | EC-1 Low Speed Interface  - three ports per card (LAA4) | 2,205 |
| J68974EI | L-39 | Tributary Overhead Controller (LAA26) | 2,772 |

(continues)

B1321

| Table 5: Equipment List: FT-2000 OC-48 Bay (continued) | | | |
|---|---|---|---|
| Part No. | | | Price |
| **Software** | | | |
| J68974ES-2 | L-1 | R7.2 Disk | - |
| J68974ES-2 | L-M1R | R7.2 App RTU | 2,310 |
| J68974ES-2 | L-P1R | R7.2 OS RTU | 6,930 |
| J68974ES-2 | L-A | R7.2 User/Service Manual | - |
| **Miscellaneous** | | | |
| | | Required FT-2000 bay, Shelf, Cable, and Miscellaneous Items | |
| J68974EI | L-109 | 9824AG Line Buildout (I per DS3 circuit) | 25 |
| J68974EI | L-107 | -48V DC pwr input Ca overhead | 33 |
| J68974EI | L-116 | lightguide buildout set ST's (choose 2 per optics) | 23 |
| J68974EI | L-126 | lightguide buildout set FC's (choose 2 per optics) | 33 |
| J68974EI | L-136 | lightguide buildout set SCs (choose 2 per optics) | 33 |
| J68974EI | L-117 | lightguide buildout set STs for OC-3 (1.3 STD) | 18 |
| J68974EI | L-118 | lightguide buildout set ST's for IS3 & OC12 | 33 |
| ED8C900-20 | G-102 | DS3 to DSX3/4 gr.A,B,& C 100ft. (one per DS3/STS1) c/w | 141 |
| ED8C900-20 | G-6BA | (6) Straight BNC Connectors, near end factory install | 88 |
| ED8C900-20 | G-6LA | (6) Straight BNC Connectors, far end loose | 29 |
| ED8C805-50 | G-1 | Anchor Bolt 7' Fr. Zone 1&2 | 37 |
| ED8C805-50 | -G-2 | Anchor Bolt 7' Fr. Zone 3&4 | 43 |
| ED8C805-50 | G-6 | FLOOR MOLDING 10' Lg | 30 |
| | | Optional Cables and Miscellaneous Items | |
| ED7G001-22 | G-53 | TMG IN OR OUT 150 ft. | 73 |
| ED7G001-22 | G-251 | SER TLM (TBOS) intfc 150 ft. | 75 |
| ED7G001-22 | G-351 | ALMs & PAR TLM intfc 150 ft. | 90 |
| ED7G001-22 | G-451 | SONET Overhead Chs. 150ft. | 98 |
| ED7G001-22 | G-652 | X.25 Cable 150 ft | 100 |
| ED7G001-22 | G-752 | DTE Link (CIT) 150 ft. | 100 |
| ED8C120-50 | G-89 | Ft. of 1/4 in spiral wrap | - |
| 901011320 | | WRIST STRAP > 6 1/2 in. Circumference | 24 |
| S45264118 | | Terminal ESD grounding | 157 |
| | | Documentation | |
| 107373094 | | FT-2000 OC-48 Installation Manual | 113 |

**B1322**

Exhibit C-8

Pricing for International Services

The Parties have deferred agreement upon pricing for international Services until thirty (30) days following the Effective Date.  The Parties agree that the pricing shall be developed consistent with the pricing and pricing methodologies and processes (including most favored customer, BOB and SNAP-D) set forth in this Agreement for the United States based pricing.

Exhibit C-8 to the
Supply Agreement                    - C-8-1 -

Confidential – Winstar/Lucent
Execution Version

B1323

**Schedule D**

**Documentation and Specifications**

See attached

Confidential – Winstar/Lucent
Execution Version

B1324

Schedule E

Acceptance Testing

1.    **Acceptance Testing and Final Acceptance.**

Lucent will develop and WinStar will approve standards for acceptance procedures, testing and final acceptance. Until these procedures are developed, it is agreed that the attachments in Schedule E will govern acceptance criteria and will be the methodology employed for acceptance unless or until new procedures are proposed by Lucent and accepted by WinStar. "Nonconformity" shall mean failure to comply with the Acceptance Criteria and such other criteria as are set forth in this Agreement.

1.1.    **Acceptance Testing and Cure.**

Lucent will perform joint testing as described in Schedule E for each Hub, B site and Central Office it provides to WinStar under this contract. Full documentation countersigned by each party or their representatives will be provided to WinStar. Lucent will maintain a copy of each site accepted for a period of five (5) years.

1.2.    **Failure to Meet Acceptance Criteria.**

In the event that a site or link does not pass the agreed upon testing and acceptance, Lucent will begin immediately upon notification to correct the cause for non-acceptance in the following manner:

(a)    **B Sites.** Unless otherwise agreed to by WinStar, Lucent will identify and correct the defect within two (2) working days. In the event that Lucent can not resolve the defect within the specified time frame, WinStar may, at its option, extend the time for acceptance conformity or take action to resolve the defect itself. If WinStar chooses to resolve the defect, actual out of pocket costs to do so will be deducted from the price Lucent bills WinStar for that site.

(b)    **Hub Site.** Lucent shall have five (5) working days to resolve any defects or non conformity to acceptance criteria as defined in Schedule E. Remedies for failure to resolve shall be as described in (a) above (including time extension).

(c)    **Central Office.** Lucent shall have ten (10) working days to resolve any defects or non-conformity to acceptance criteria as defined in Schedule E. Acceptance testing and final acceptance of the Central Office will include all Network Elements in the CO, i.e., Switch, DXC, etc. Remedies for failures to resolve shall be as defined in Section (a) above (including time extension).

1.3.    **WinStar's Responsibilities.**

WinStar will bear responsibility to promptly perform test and acceptance for Network Elements (NE's) which Lucent notifies WinStar are ready for service. Failure to meet deadlines for acceptance will be deemed as Acceptance.

B1325

(a)    **B-Sites.** Acceptance tests and walk through will be performed within two (2) working days of notification.

(b)    **Hub Sites.** Acceptance tests and walk through will be performed within five (5) working days of notification.

(c)    **Central Office.** Acceptance tests and ORT will be performed within thirty (30) calendar days of notification.

(d)    **WinStar Systems.** Lucent will also be responsible to update WinStar Systems with as built circuit and Equipment placement as it relates to floor plans and WinStar Provisioning Systems prior to acceptance.

1.4.    **Other Test and Acceptance.**

As the WinStar Network grows and evolves, it is anticipated that new technologies and Network Elements (NE's) will be placed into the network. Prior to any purchase order being placed for such Network Elements (NE's) and Services, Lucent will propose and WinStar will approve a test and acceptance procedure which will become an addendum to this contract.

1.5.    **Change Methodology.**

If Lucent develops a new test procedure that enhances or automates test and acceptance, it will submit a proposal to WinStar who will provide approval or disapproval of the new procedure. In no instance will any new acceptance criteria be introduced that does not meet standard industry practices and methods of evaluation for fitness for service or the manufacturer's specification whichever is more stringent. No new acceptance procedures will be instituted without prior WinStar approval.

**B1326**

Confidential —WinStar / Lucent

Schedule F

Financing

*See attached copy of Credit Agreement*

Confidential – Winstar/Lucent
Execution Version

**B1327**

## Schedule G

### International Considerations

1. **General.**

 1.1. **General.**

  (a)   Purchase of Products and Services from Lucent by WinStar International will be pursuant to this Agreement (including most favored customer, BOB and SNAP-D), and all of the rights and responsibilities will attach thereto, including financing in accordance with the terms of the Agreement and the Credit Agreement.

  (b)   Services and products delivered by Lucent to WinStar International shall be considered "Services" and "Products," respectively, for all purposes within the scope of this Agreement.

  (c)   Internationally, Lucent will perform the Services of Network Architecture and Technology, Planning and Program Management, Testing, Implementation and Special Projects as described in Schedule A, with appropriate modifications to account for differences in the regulatory and technical environments. In addition, Lucent's scope of responsibility internationally will include (if requested by WinStar):

   (i)   Planning and execution of the build-out of the Network including site selection (including line of site surveys), site acquisition, RF Engineering, obtaining SS7 links and other interconnection arrangements;

   (ii)   Provisioning of IP Gateways; and

   (iii)   Maintaining the network and providing monitoring and the use of Lucent's Netcare facilities.

 1.2. **Operations.**

  (a)   **Start Up Phase.** WinStar International is in the initial stages of building portions of the Network in international markets and has not yet begun an operational phase. The first build is contemplated to be in Amsterdam, where a data switch node and hub sites are under construction.

  (b)   **Data-Only Strategy.** Unlike WinStar's domestic operations, WinStar International will not initially have a voice product, but will focus on selling data products to medium and large business customers. Therefore, the international components of the Network will be packet-based instead of circuit-based. There may be a voice product introduced in the future, but the Parties expect such a product to be packet-based (e.g., voice over IP or ATM).

---

B1328

1.3.  **Service Offerings for Remote or International Cities**

This section describes the set of WinStar's international service offerings, as applicable to the scope of responsibility assumed by Lucent internationally.

With an architecture that support a range of deployed infrastructure, WinStar can offer a subset of its full services suite globally with customization suited to local conditions. In such cities functionality can include the following:

(a)  Point to Point Connectivity,

(b)  Internet Access,

(c)  Web hosting, e-commerce,

(d)  VPN connectivity,

(e)  Email, Network Notes services,

(f)  IP telephony/fax,

(g)  IP multimedia conferencing services,

(h)  CPE,

(i)  WAN professional services,

(j)  LAN professional services,

(k)  Security services,

(l)  E Commerce,

(m)  Web/Intranet systems integration,

(n)  Customer Network Management,

(o)  TCP/IP,

(p)  ATM, and

(q)  Frame Relay.

Schedule H

Best of Breed (BOB)

1.    **General Principles**

    (a)    Lucent believes that its telecommunications Products and Services are superior and are second to no other vendor.

    (b)    WinStar agrees to use Lucent as its preferred supplier and to use Lucent Products and Services provided that they are Best of Breed.

2.    **Definitions**

    (a)    "Best of Breed" or "BOB" means Products and/or Services that are commercially available and that have the best functionality for the lowest price as set forth in more detail in Section 4.

    (b)    The "BOB Highest Authority" or "BHA" means, in the case of Lucent, the President – Global Commercial Markets, and in the case of WinStar, the Chief Operating Officer.  The BHA for each company can be changed by written notice to the other party by Lucent or WinStar, as appropriate.

    (c)    The "BOB Intermediate Team" or "BIT" means Lucent's Vice President of Network Solutions and WinStar's Senior Vice President of Engineering.  The BOB Intermediate Team Member can be changed by written notice to the other party by Lucent or WinStar, as appropriate.

    (d)    The "BOB Review Team" or "BRT" has the meaning set forth below (See Section 3.1 of this Schedule H).  The "TPM" are The Primary Members of the BRT.

3.    **How BOB works**

    3.1.    **The BOB Review Team**

        (a)    Immediately upon execution of this Agreement, Lucent's BHA will appoint two Lucent personnel (one primary and one back up) to serve on the BOB Review Team on behalf of Lucent, and WinStar's BHA will appoint two WinStar personnel (one primary and one back up) to serve on the BOB Review Team on behalf of WinStar. If a vacancy occurs on the BOB Review Team, a replacement will immediately be appointed by the appropriate BOB Highest Authority. The two primary members (TPM) of the BOB Review Team shall make all determinations, except that if one or both of the TPMs are unavailable for any reason, the back up member for the absent TPM will have the authority to make the determination required by BOB.

---

B1330

(b)     Contemporaneously with any quote that is provided to WinStar by Lucent, there will be a presentation made to the BOB Review Team by the person or persons who are submitting the quote; provided, however, that if there already has been a BOB Review completed on the Product(s) or Service(s) in question, no additional BOB review will be required; provided further, however, if there is some significant change in features, functionality or price of a Lucent or non-Lucent Product or Service, another BOB could be done at either WinStar's or Lucent's request. The BOB Presentation should address the criteria set forth in Section 4 of this Schedule H. Within five business days of the BOB Presentation, the BOB Review Team must make a determination as to whether the Product(s) and/or Service(s) are BOB. If they are BOB, then WinStar shall approve the Purchase Order for the Product(s) and/or Service(s) in question.

(c)     If, on the other hand, one or more of the Product(s) and/or Service(s) are found by the BOB Review Team to fail the BOB test, then the person(s) who submitted the quote must either:

(i)     Try to adjust one or more of the criteria to satisfy the BOB test (by, for example, adjusting the purchase price downward) or

(ii)    Decide to recommend a non-Lucent product.

(d)     If, however, the BOB Review Team fails to act within the five business day period or fails to reach a consensus, then the matter must promptly be escalated to the BOB Intermediate Team.

3.2.    The BOB Intermediate Team (BIT)

BIT must make a BOB determination within five business days from the day that the matter is referred to them by the BOB Review Team. Within the five business day time period, the BIT must have asked for materials and/or presentations from their respective organizations to familiarize themselves with the basis for the BOB dispute.

(a)     If the BIT determines that the BOB test has been satisfied their judgment is final, and WinStar shall order the Product(s) and/or Service(s) in question.

(b)     If, however, the BIT cannot reach consensus or does not act within the five business days, the matter is referred to the BHA.

3.3.    The BOB Highest Authority (BHA)

(a)     Within five business days from the date that the matter is received from the BIT, the BHA must have asked for materials and/or presentations from their respective organizations to familiarize themselves with the basis for the BOB dispute.

(b)     The BHA must meet in person and must resolve the dispute and decide the course of action that will be taken. If the BHA cannot agree on a decision and

---

B1331

course of action within five business days of their face to face meeting, then the decision of the WinStar BHA shall be final and binding.

4.    **Determination of BOB**

In determining whether Lucent Products and/or Services are BOB, there are some overall basic principles that should be considered. These principles, which are listed below, are not in any order of priority, and during one analysis could carry a different weight than on a previous analysis, when all of the circumstances of the decision are considered. These principles or criteria are to be judged in terms of what is commercially available from other vendors and the price(s) that WinStar could obtain from such vendors.

(a)    The technology and Network Elements selected must interoperate with the appropriate PSTN, be scalable and servicable in both size and function, and meet international and domestic standards including, but not necessarily limited to CCITT Recommendation/Standards, ITUR Standards, FCC type acceptance, NEBS, IEEE, Y2K and other applicable local codes and practices.

(b)    Network Element(s) must support WinStar required functionality and be consistent with the approved architecture. End-to-end Network performance and reliability should be considered as well as the individual performance and functionality of individual Network Elements.

(c)    With respect to the performance of the Network Elements, all of the following should be evaluated: MTTR, MTBF, steady state specifications, environment, capacity, growability, reliability, etc.

(d)    Sufficient product must be available in sufficient quantities at time(s) required.

(e)    Optimal price performance over the life-cycle of the Network Element including end-to-end network costs for both capital and on-going operations.

(f)    Care should be taken to ensure that the physical size, weight, dimensions and environmental requirements (e.g., HVAC and power) of any selected elements does not cause a retrofit or upgrade in the physical space and existing environmentals in which it is to be placed.

(g)    The length of warranty and other warranty terms offered by other vendors is important to consider as well as the repair/return policies that other vendors provide.

---

**B1332**

Confidential —WinStar / Lucent

### Schedule I

### Warranty Periods

Lucent will provide a minimum warranty of one (1) year for all new Equipment purchased from Lucent and of the longer of six (6) months or any remaining period of the underlying Product warranty for repaired products and parts. The actual warranty will be determined on a product-by-product basis and will be stated in the product addendums, which will be attached to the Agreement.

The warranties provided by third party vendors on Third Party Products purchased by Lucent on WinStar's behalf will flow through to WinStar in accordance with the terms of the Agreement.

B1333

Schedule J

Key Lucent Positions

1.    **Key Positions**

The following positions shall be the Key Lucent Positions, provided that they cover the body of responsibility set forth in Section 2 of this Schedule J. In the event that these positions do not encompass all such responsibility, additional Key Lucent Positions shall be designated by WinStar with Lucent's input, to cover the remaining responsibility.

   (a)    Program Management Director;

   (b)    Network Solutions Vice President;

   (c)    Director of Integration Test Laboratory;

   (d)    Director of Engineering; and

   (e)    Sales Director.

2.    **Key Positions Responsibilities**

The Lucent Program Management Office (PMO) will have overall responsibility for delivery of EF&I services under this agreement. In addition to the PMO, other key Lucent management roles have been identified as part of this agreement with specific Project Office responsibilities. The high level functional responsibility of each of these Project Office individuals is outlined in the following organization chart.

It is Lucent's responsibility to staff each Project Office with adequate resources to carry out the scope of this agreement. Each Project Office Manager will issue weekly status update reports to identified WinStar oversight personnel. Each Project Office Manager will regularly meet with WinStar personnel and will also serve as the single point of contact for status and escalations within their respective areas of responsibility. WinStar retains the right to approve the selection of the PMO executive appointed by Lucent.

2.1.    **Program Management Office**

   (a)    Contracts

   (b)    Schedules

   (c)    Forecasts

   (d)    Sub Contractors

   (e)    Tracking & Reporting

---

**B1334**

2.2.    Lucent Sales Team

    (a)    National Account Manager

    (b)    Sales Specialists

    (c)    Support Specialists

2.3.    Network Services Management

    (a)    Network Planning

    (b)    Service Engineering

    (c)    High Level Design

    (d)    Detailed Design

    (e)    Diversity and Protection and Restoration

    (f)    Test Lab

    (g)    Operations Support / 3rd Level Support

2.4.    Element Configuration

    (a)    Initial Load Definition

    (b)    OS and Generic Upgrades

2.5.    Installation Management

    (a)    Service Planning issues

    (b)    Site selection coordination

    (c)    Installation

    (d)    Network Facility Provisioning

2.6.    Logistics

    (a)    Warehousing

    (b)    Shipping/Receiving

    (c)    Staging

2.7.    IT Engineering

    (a)    Network Management Systems

B1335

         (b)     DNS

         (c)     E Commerce

         (d)     Customer Web Access

2.8.    Performance Assurance

         (a)     Performance Quality assurance

         (b)     Performance Monitoring and Analysis

         (c)     Traffic control

         (d)     Performance Management Control

2.9.    Premises Services

         (a)     Wire Management

         (b)     ILEC Coordination

         (c)     Riser Access

         (d)     CPE Support

Schedule K

<u>Lucent Indicia Co-Marketing Program Guidelines</u>

*The following pages represent the guidelines for use of Lucent trade and service marks.*

B1337

## Introduction to Co-Marketing

### Sharing Brand Equity Helps You Increase Your Revenue

Lucent Technologies is the world's leading provider of telecommunications data and voice systems. Leveraging the Lucent brand can provide a significant advantage for you — our customer. Research shows that the Lucent and Bell labs brands communicate high quality and innovation to end-users. In fact, Lucent has reached high brand awareness with business leaders and consumers in a very short period of time.

### Both a New and Long-Established Identity

While the Lucent name was created in 1996, Bell Laboratories --a brand with a powerful heritage-- is also identified with our Lucent name. More important, Bell Labs continues to be an integral part of our company.

For more than a century, Bell Labs has developed many patents -- everything from the invention of the transistor to the foundation of all digital technology traces their origins to Bell Labs.

The Bell Labs heritage and the highly successful launch of our corporate name make Lucent a powerful co-marketing partner to help you broaden your promotional reach to generate additional revenue.

Everything you need to co-market with Lucent is right here in this handy portfolio. See for yourself -- read through the guidelines and tools you'll need to get started.

## Co-Marketing General Guidelines

### How to Link Our Brand Strengths With Yours

When you leverage the powerful Lucent brand in your promotions, you create a third "bigger" brand that benefits us both. Our goal is simple: every time you publicize Lucent's role in your network, you enhance your own image. We call this "Contribution Branding." The result: stronger customer loyalty and potential new revenue.

### Are You Eligible? And How Can You Enroll?

The program is available to you when you include a Co-Marketing Program agreement in your contract. Your Lucent Customer Team Representative can confirm your eligibility.

Just fill out a Lucent Co-Marketing Program Enrollment Form (which signifies agreement to conform with all Co-Marketing Program guidelines) and FAX everything to:

**Lucent Co-Marketing Program Office (908) 559-3994 or (908) 559-1680**

Once your application is approved, it will be counter-signed and immediately returned to you.

### Creating a Co-Marketing Plan

Your Customer Team Representative can play a vital role in helping you structure a beneficial co-marketing plan based on your marketing goals.

### Promotions That Cut Through the Clutter

With co-marketing, you can use our Co-Marketing logo, Lucent brands and product names in advertising or promotions, with a

2

B1338

phrase linking Lucent to your network. The Lucent Co-Marketing logo is unique because it can include a "linking phrase" – embedded in the logo itself –that identifies the specific advantage your network offers by using Lucent products and services. The Lucent Co-Marketing logo and linking phrase can only be used by participants in the Co-Marketing Program.

Using our logo with the linking phrase leverages the brand equity Lucent has built to increase the impact of your promotions.

Ask your Customer Team Representative about existing authorized linkage statements, or the possibility of creating your own customized statement.

### Linking Phrase Requirements

You can use our brand as a means of competitive differentiation. But the Program does not permit customers to position themselves directly against other Lucent customers. Here are examples of (A) Correctly Worded Linking phrases and (B) Incorrect Wording.

#### (A) Correctly Worded Linking Phrases

Linking phrases which are authorized include:











All of the linking phrases shown above have one thing in common: They are factual statements informing the end user your network is based on technology from Lucent.

#### (B) Incorrect Wording of Linking Phrases

You cannot use phrases with the Lucent logo which seek to establish a competitive advantage like these:

"Better digital quality Lucent network"
"Better sound by Bell Labs"
"The Best Network Supplied By"

The Incorrectly Worded linking phrases have this in common: They state a network is "better" because of Lucent. Using a linking phrase to claim superiority because of Lucent products or services is not permissible.

### Advance Creative Approval of Promotions Required

All advertising and promotions supported under the Co-Marketing Program must be submitted for advance creative approval (including specific wording of the linking phrase, correct use of the Lucent Co-Marketing logo, and other Co-Marketing Program requirements).

### Unique Co-Marketing Logos

If you receive approval for a unique linking phrase to use with the Lucent Co-Marketing logo in your promotions, Lucent will provide you with small, medium and large versions (color and black and white) of this unique logo in the electronic format(s) of your choice. The Co-Marketing logo must never be altered and must be reproduced from the Lucent supplied logo sheets or diskettes.

The following trademark acknowledgment must also appear within your trademark notification copy:

3

B1339

"The Lucent logo is a registered trademark of
Lucent Technologies."

## Co-Marketing Logo Requirements

There are other important requirements for the
way Lucent's name and Innovation Ring are
presented visually in advertising and promotions
to: 1) ensure that Lucent's identity is consistent
wherever it appears and 2) to protect our
trademark. (See Brand and Logo Usage
Guidelines booklet in this portfolio.)

### Backgrounds – Incorrect Usage

◆ Do not position the logo within a contained
  space.

◆ Do not place the logo on a patterned
  background.

◆ Do not add any additional graphic elements
  or text to the logo.

◆ Do not alter parts of the logo in any way.

◆ Do not separate parts of the logo in any way.

### Other Important Co-Marketing
### Requirements

◆ As part of our divestiture agreement with
  AT&T and to avoid confusing your
  customers, it is important that Lucent not be
  perceived through the Co-Marketing
  Program as a partner in providing service.
  We provide the network or network
  elements. You provide the service to your
  customers.

◆ The Lucent brand and Co-Marketing logo
  must not be used in any advertising or
  promotions that disparagingly refer to other
  customers of Lucent Technologies.

◆ Advertising and promotions must not
  misrepresent features and/or benefits of
  Lucent Technologies.

◆ Participation in the Co-Marketing Program
  should not be construed as approval by
  Lucent of any brand, product or company
  name.

◆ All advertising and promotions must be in
  compliance with federal, state and local law.
  By its advance approval of advertising and
  promotions under Co-Marketing, Lucent
  does not assume responsibility for
  compliance of the advertising or promotions
  with relevant laws or regulation.

◆ Lucent reserves the right to refuse approval
  of advertising and promotions.

### Program Changes With Notice

Lucent Technologies reserves the right to amend
the Co-Marketing Program at any time. If
changes are made, participants will be given 60
days' notice.

**Ingredient Branding Program**

# Leverage the Lucent Brand in
# Your Promotion Efforts

### Terms and Conditions

You may use the Lucent Co-Marketing logo and
linkage statement in your advertising and direct
marketing program, provided you follow all
Program Guidelines.

Lucent will furnish all necessary Co-Marketing
logo materials at no cost.

### Getting Creative Approval

Before you run a Co-Marketing promotion with
the Lucent name and Co-Marketing logo and
linkage statement, contact the Lucent
Co-Marketing Program Office. Simply, FAX
final creative with a media list before it runs to:

4

B1340

Lucent Co-Marketing Program Office
(908) 559-3994  or  (908) 559-1680

A Creative Approval form we provide in this portfolio must accompany your request. A signed copy of the form will be returned to you within two business days. If we suggest a few changes, they will accompany this form.

**What You Need to Send:**

For print: FAX a final proof of your Co-Marketing ad showing all headlines and body copy as it will appear.

For television: FAX a storyboard of your complete television commercial including the Lucent name and Co-Marketing logo and voiceover text.

For radio: FAX complete commercial script.

For direct mail: FAX a completed proof with all headlines, text and artwork of the direct mail piece as it will appear.

For outdoor: FAX a completed proof of your board as it will appear with all copy and artwork.

**What Media Can You Use?**

Advertising:
Newspapers (general interest, daily, Sunday, weekly)
Magazines
Television (broadcast or cable)
Radio
Outdoor
Direct Mail

**Please Call For Approval To Use:**

Trade Show Exhibits
Special Events
Seminars
Sales Incentives
Telemarketing

**After Your Co-Marketing Promotion Runs**

Within 90 days after your advertising or promotion runs, send documentation to our Co-Marketing Program agency addressed to:

> Lucent Co-Marketing Program
> c/o TradeOne Marketing
> 440 Ninth Avenue
> New York, NY 10001

For print: Send a complete full-page tearsheet showing name and date of the publication. Provide a list of publications in which the ad appeared.

For broadcast: Send ANA/RAB, ANA/TVB, and/or ANA/CAB certification forms from all stations carrying your commercials along with scripts and storyboards.
For outdoor: Send a picture of the outdoor board and the outdoor company's list of outdoor locations.

NOTE:  *If you run the same ad/promotion within a 6-month period, creative approval is NOT needed again. But please forward materials to TradeOne EVERY time you run an ad or promotion and attach a copy of your Creative Review form.*

If you have any questions about the Lucent Co-Marketing Program or wish to explore additional Co-Marketing opportunities with Lucent, speak with your Customer Team Representative.

**Good Luck and Good Marketing!**

**B1341**

10/13/95  TUE 11:03 FAX                                                     @006

**Lucent Technologies**
Bell Labs Innovations

Planning Form

**Company Information**

Co-Marketing Acct. No._____(Provided by Lucent Co-Marketing Program Office)

Company Name _____

Form Completed By:

Name _____ Title _____

Phone _____ Fax _____ E-mail _____

Address_____

**Proposed Activity**

Program Theme _____ Product Group Promoted _____

Program Description _____

_____

**Marketing Plan**

Target Audience _____ Target Geography _____

Activity Dates:      From ___/___/___  to ___/___/___

Advertising Medium Types:

(check all that apply)
- ☐ Newspaper          ☐ Magazine          ☐ Other_____
- ☐ Radio              ☐ Outdoor           _____
- ☐ TV                 ☐ Direct Mail       _____

Publications or Media: _____
(be specific)

Estimated Project Cost          $_____

**Strategic Objectives**

Business Objective_____

_____

How will the Co-Marketing Program contribute to this goal?_____

Is there a promotional offer included?      ☐ Yes ☐ No      What is it? _____

What are the incremental sales expected from this promotion?          % $_____

How will you measure program effectiveness? _____

Will you share results with Lucent?      ☐ Yes ☐ No

All creative must be submitted for creative review by Lucent prior to placement.

**For Internal Use**

Lucent Customer Representative Approval _____ Date _____

Lucent CFO Approval _____ Date _____

Fax or overnight approval form to:    Lucent Technologies Co-Marketing         Contact: Alan Aiken
                                      283 King George Rd.
                                      Room A2C22                               Phone: (908) 559-7208
                                      Warren, NJ 07059                         Fax:   (908) 559-3994

SS07FM  8/18

**B1342**

10/13/98   TUE 11:04 FAX                                                                            ☰007

**Lucent Technologies**
Bell Labs Innovations

## Creative Approval Form

### Company Information

Co-Marketing Acct. No. _____ (Provided by Lucent Co-Marketing Program Office)

Company Name _____

Form Completed By:

Name _____    Title _____

Phone _____ Fax _____ E-mail _____

Address _____

### Activity Description

Publication or Media Name (or attach a media list): _____

Advertising Medium Type: (check all that apply)

☐ Newspaper          ☐ Magazine          ☐ Outdoor
☐ Radio              ☐ Direct Mail        ☐ Other_____
☐ TV

Run Dates Expected: _____
(be specific)

Attach creative to this form for approval.

### For Lucent Co-Marketing Office Use Only          ☐ Approved    ☐ NOT Approved

Reason _____

_____

_____

Lucent Co-Marketing Signature _____    Date _____

PLEASE NOTE:
- All creative bearing the Lucent Co-Marketing logo, name and/or other Lucent product trademarks must be approved prior to placing the creative in any media.
- When Lucent requires modifications to meet the approved guidelines, all required revisions must be made and resubmitted to Lucent for final approval.
- Complete performance (e.g. tearsheet) must be submitted to Lucent Co-Marketing Program (address below) upon completion of promotional activity.

Please mail or fax to:
LUCENT TECHNOLOGIES
ATTN: ALAN AIKEN
283 King George Road, Rm. A2C22
Warren, NJ 07059
Tel: 908-559-7208
Fax: 908-559-3994

6561FM  8/98

**B1343**



Lucent Technologies
Bell Labs Innovations

$C3$

September 29, 2000

Mr. Dave Ackerman
EVP Winstar Network Services
2545 Horse Pen Rd.
Herndon, VA 20171

Dear Dave,

Please provide your concurrence to the information below.

Sincerely,

Bill Pfeifer
Sr. VP, Sales

Winstar Agrees to purchase from Lucent the following items for delivery & invoicing in CY 3Q 2000:

$    840,000 NXC Services
$  1,500,000 OS Upgrades
$    171,000 Front End Systems Engineering
$  8,500,000 500 Edgers and rolled up services (shipped to Winstar warehouse)
$ 18,652,500 5ESS PAYG
$  1,145,000 Storage Equipment for SF data center (EMC)

$ 50,808,500 Subtotal
$ 47,000,000 Lucent business previously committed and due to bill by 8/30/00

$ 77,808,500 Total additional Year '00

Dave Ackerman     9/29/00

Date

EXHIBIT
55

PLAINTIFF'S
EXHIBIT
PX-125


W  000810

CONFIDENTIAL TREATMENT REQUESTED BY WINSTAR

CONFIDENTIAL          ZWC  0144192

B1344

**Printer Printer**

From:       David Ackerman [dackerman@winstar.com]
Sent:       Monday, December 11, 2000 3:34 PM
To:         jeverding@winstar.com
Subject:    Fwd: Lucent and Capex

<x-flowed>p
>Date: Mon, 18 Sep 2000 18:03:54 -0400
>To: Kanlor Nate
>From: David Ackerman <dackerman@winstar.com>
>Subject: Lucent and Capex
>Cc: Frank Jules, Judi
>
>I just attempted to call you, but could not get through (tried your cell
>phone three times)
>I just spoke with Plunkett. He informed me that you and Nina had met
>(dinner?) and you agreed to help them get to the number they need this
>quarter....something around $110M, of which we've already spent about
>$45M. There is not much I can give them that we really need, but there
>are some creative things I can do that can get us close to their number
>without being totally stupid.
>However, Frank just told me this morning that I have to get the total cap
>spend down to no more than $1B (even) and not the $1,070M that we had
>agreed to earlier in the month. Please note that to get to the $1,070M
>number you and I needed to find a way to get Lucent to "give back" or "get
>creative" wrt $140Million that we have already committed to them (please
>see cap spend memo of several weeks ago). This has not happened, although
>there is about $23M of (data center related) services that we will not use
>until '01, so I can probably subtract that out. Otherwise they have BOOKED
>the rest of the $140M. However, there may be a way to reclassify some
>(perhaps as much as half) of the remaining $117M (140 -23) as material
>purchased for future resale (for example to the third tier carriers that
>McGuire is working with). That would then enable me to get close to the
>$1,070M number (but Frank indicated that's not enough).
>Thus; we are working to cut another $70 in addition to the $117. This
>means stopping ANY and ALL incremental spends for ANYTHING capex
>immediately, and telling contractors who are capitalized go..... Jamie will
>start to do this with the capitalized contractors tomorrow in a very low
>key way.
>However, I want to make sure that we are all "in synch".
>How much capital CAN I REALLY SPEND THIS YEAR, and how much do I do to
>give Lucent what they need for 3Q?
>If the answer is; both give Lucent the business, AND reduce the cap spend
>to $1B even I will need to institute some very severe measures immediately.
>My recommendation, assuming we need to help Lucent, is to give me a total
>cap spend for '00 of $1,150.
>I'll use this to help Lucent, continue our roll-out and not put the
>"brakes" on anything important.
>It will still require me to do some slashing (since the budget would have
>been 1,070 + 140 = 1,210.)
>       subtract $23 = $1,187
>       Add $65   =  1,252  (to give Lucent what they need in 3Q)
>
>Ackerman finds $102 to save somewhere:
>       half the $117 (see above) = $55
>       Slow Data Backbone      =   7
>       Other                   = 40
>    (I'm still working on this....contractors and other cap spends)
>
>Hope you can work through the numbers above.
>
>Please provide direction PRIOR to the meeting with Lucent Tuesday morning
>at 8:30
>
>If you need to call me at home;  703-757-6241   Car;  202-674-2114
>
>Thanks...Dave

1

EXHIBIT
62

CONFIDENTIAL WC 0069417



PLAINTIFF'S
EXHIBIT
PX-127

B1345

>
>Judr, plse print for me
>thx

</x-flowed>

2

CONFIDENTIAL WC 0069418

B1346

**Printer Printer**

| | |
|---|---|
| From: | Lisa Hicks [lhicks@winstar.com] |
| Sent: | Sunday, August 20, 2000 3:50 PM |
| To: | nkantor@winstar.com |
| Cc: | dackerman@winstar.com; bzlotnick@winstar.com; fjules@winstar.com; frubin@winstar.com; ruhl@winstar.com; sclement@winstar.com; dhuber@winstar.com; gsimpson@winstar.com |
| Subject: | Lucent meeting talking points |

   Nate-

```
Attached is a document outlining issues you will need to address with
Lucent in your meeting with Nina tomorrow night.  We have a conference
call
scheduled on your calendar tomorrow morning at 9:00 to fill you in on
all
the details.

Lisa
```



1

CONFIDENTIAL 2WC 0073217

B1347

8/21/00 Nate/Nina Meeting –    NATE'S MISSION:    TO GET LUCENT TO AGREE TO ALL POINTS LISTED BELOW

**1)** No more EOQ deals with Lucent effective immediately.
There is no capital budget left to negotiate with. 1Q00, 2Q00 reciprocal revenue deals used future purchases as part of negotiations. Winstar has pre-purchased equipment that will not be deployed during 2000 in an effort to meet revenue commitments.

**2)** We need to delay/cancel/rebook deals made 1Q00, 2Q00.
Finance department is researching the possibility of reclassing these EOQ deal pre-purchases from the Fixed Asset account into a Prepaid Account, which would (potentially) allow us to not have to recognize these purchases as capital for this year. If this is not possible, we need to:
     a) Delay shipments through the rest of the year for equipment/services we purchased as part of EOQ deals, and/or
     b) Cancel orders remaining from EOQ deals, and/or
     c) Return pre-purchased equipment.
This means we will in effect be asking Lucent to restate all revenue they have already recognized from these deals. They would have to restate their quarterly earnings for the past two quarters. If they agree to do this (which I don't believe they will) they may require us to also restate our revenue for the last two quarters as they may want to cancel their part of the EOQ deals.
Specifically we need to delay into 2001:

| | | |
|---|---|---|
| a) Software licenses | $26M | |
| b) Switch Pay-as-you-grow | $17M | |
| c) Ascend switches | $22M | |
| d) Optronics spares/BWM | $15M | (BWM = Bandwidth Managers – used with Optronics) |
| | $80M | (Lucent has already booked as revenue) |
| | | |
| e) Data Center | $23M | |
| f) Hubs/B's Turnkey | $83M | |
| | $106M | (Committed to Lucent as revenue they would receive in 2000 – they |

have not booked this yet, but are anticipating being able to book this during CY2000)

| | | |
|---|---|---|
| g) ONG equipment/installation | | |
| - scheduled 2000 deployment pre-purchased | $44.6M | |
| - scheduled 2001 deployment pre-purchased | $23.2M | |
| | $67.8M | (Lucent has already booked as revenue) |

Additionally, we need to reengineer Hub/B-Site designs to reflect smaller configurations using minimal equipment.

**3)** Need to delay Seattle NMC build and the NMC disaster recovery project to 2001.
These projects were not included as part of EOQ negotiations, but Lucent has already begun work on them and has staffed for project completion.

**4)** Effective 9/1/00, we need to terminate all C-5 services, other Professional Services projects, with the exception of the Hubs/B's and ONG Turnkey Program Management.
Risks to Winstar:
     a) Loss of 27 Lab positions.
     b) Capacity Planning project stops.
     c) No more Lucent Architecture Design support.
     d) Loss of OSS/BSS design support.
     e) Loss of 14 City Planning positions.
     f) Loss of Engineering support, including ASAP/TBS work.
     g) Loss of Systems consultant support.
Lucent may wish to impose financial penalties on Winstar for "layoff" of these positions.

CONFIDENTIAL 2WC 0073218

B1348

Additional Issues/Risks to Winstar:

1) 2000 Supply Agreement contractual Lucent content percentage for financing = 75% of total financing.
Historically, Winstar has been closer to 40% content; there are financial penalties written in contract for failure to meet content percentage -- Lucent has not imposed penalties to date, but may wish to now.

2) Winstar may lose the ability to finance through Lucent internal labor and overhead for remainder of the year.
Potential financial impact = $60M cash flow/quarter, $4M/quarter missed overhead capitalization.

CONFIDENTIAL 2WC 0073219

B1349

**Printer Printer**

| | |
|---|---|
| **From:** | William J. Rouhana Jr. [brouhana@winstar.com] |
| **Sent:** | Friday, November 10, 2000 5:59 PM |
| **To:** | Nate Kantor |
| **Subject:** | Re: Fwd: Services Meeting on 15th |

<x-flowed>nate
this isnt right
we need to discuss this
bill
At 04:28 PM 11/10/2000 -0500, you wrote:

>Bill
>
>FYI-the plot thickens
>
>   Nate
>
>
>>X-Sender: dackerman@mail.winstar.com
>>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>>Date: Fri, 10 Nov 2000 14:50:46 -0500
>>To: ruhl@winstar.com
>>From: David Ackerman <dackerman@winstar.com>
>>Subject: Fwd: Services Meeting on 15th
>>Cc: ljules@winstar.com, nkantor@winstar.com
>>
>>Please see attached.
>>Do you know what this is all about?
>>Should I insist on meeting anyway?
>>How should I respond?
>>
>>Dave
>>
>>
>>>From: "Plunkett, William Montgomery, II (Bill)" <wmplunkett@lucent.com>
>>>To: dackerman@winstar.com
>>>Subject: Services Meeting on 15th
>>>Date: Fri, 10 Nov 2000 11:35:35 -0500
>>>X-Mailer: Internet Mail Service (5.5.2650.21)
>>>
>>>Dave
>>>I have been ask to put the Services meeting on the 15th on hold until the
>>>Rick Huel & Mike Montemarano (our 2 CFOs) reach final agreement on the
>>>finical discussions they had last week.  If agreement is reached on Monday
>>>or Tuesday we will be there.  Give me a yell if you have any questions.
>>>Bill Plunkett


</x-flowed>

1



EXHIBIT

53

CONFIDENTIAL 2WC 0065154

B1350

**Printer Printer**

| | |
|---|---|
| From: | David Ackerman [dackerman@winstar.com] |
| Sent: | Monday, December 11, 2000 4:57 PM |
| To: | jeverding@winstar.com |
| Subject: | Fwd: RE: Services Meeting |

<x-flowed>p
>Date: Mon, 13 Nov 2000 11:27:13 -0500
>To: nkantor@winstar.com, ruh@winstar.com
>From: David Ackerman <dackerman@winstar.com>
>Subject: Fwd: RE: Services Meeting
>Cc: jules@winstar.com
>
>Please see attached.
>>Please help me understand what is going on so I know how to respond more
>specifically.
>What is (are) the issue(s) and when will they be resolved?
>
>Thanks....Dave
>
>
>Date: Mon, 13 Nov 2000 11:25:10 -0500
>>To: "Plunkett, William Montgomery, II (Bill)" <wmplunkett@lucent.com>
>>From: David Ackerman <dackerman@winstar.com>
>>Subject: RE: Services Meeting
>>
>>My point is that whatever the finance issue(s) is (are), they will  get
>>resolved soon.  If we put off this meeting and getting the deal done/done
>>it will just delay things.  Why not do  it in parallel and be ready to
>>close this when the finance issues are resolved?
>>
>>Dave
>>
>>At 08:12 AM 11/13/00 -0600, you wrote:
>>>Dave
>>>We are being told not to have meeting with Winstar until the finance
>>>discussions are done.  Do you think this will happen today?
>>>Bill Plunkett
>>>
>>>       -------
>>>       From: David Ackerman [SMTP:dackerman@winstar.com]
>>>       Sent: Sunday, November 12, 2000 9:13 PM
>>>       To: Plunkett, William Montgomery, II (Bill)
>>>       Subject: Services Meeting
>>>
>>>       I would like to proceed with the Services Meeting and get the
>>>Services
>>>       Agreement DONE DONE regardless of  whatever other activity is
>>>occurring.
>>>       We need to do this anyway, so lets get it done, and if for some
>>>reason it
>>>       can't be signed until some other things take place, at least we
>>> will
>>>be
>>>       ready to do so as soon as those activities are completed.
>>>       I will be out of town Monday, but I have asked BZ, Jonathan Ritter,
>>>and
>>>       Judi to get the meeting scheduled asap.
>>>
>>>       Thanks....Dave
>>>
</x-flowed>

1

CONFIDENTIAL WC 0069330

EXHIBIT
54

PLAINTIFF'S
EXHIBIT
PX-137

C





DEPOSITION EXHIBIT
TAMMEY M. PASTOR, R.P.R.



CONFORMED COPY

CREDIT AGREEMENT

Dated as of May 4, 2000

among

WVF-I LLC, as Initial Borrower,

Any Additional Borrowers Party Hereto,

WINSTAR COMMUNICATIONS, INC.,

The Lenders Party Hereto,

THE BANK OF NEW YORK,
as Collateral Agent,

and

LUCENT TECHNOLOGIES INC.,
as Administrative Agent

[Reference No. 7725-064]

B1353

TABLE OF CONTENTS

Page

ARTICLE IDefinitions

SECTION 1.01.   Defined Terms ............................ 1
SECTION 1.02.   Classification of Loans and Borrowings ... 41
SECTION 1.03.   Terms Generally ......................... 41
SECTION 1.04.   Accounting Terms ........................ 42

ARTICLE IIThe Loans

SECTION 2.01.   Commitments ............................. 42
SECTION 2.02.   Loans and Borrowings .................... 42
SECTION 2.03.   Requests for Borrowings ................. 43
SECTION 2.04.   Funding of Borrowings ................... 45
SECTION 2.05.   Interest Elections ...................... 46
SECTION 2.06.   Termination and Reduction of Commitments . 48
SECTION 2.07.   Repayment of Loans; Evidence of Debt ..... 49
SECTION 2.08.   Amortization of Loans ................... 50
SECTION 2.09.   Prepayment of Loans ..................... 50
SECTION 2.10.   Fees .................................... 51
SECTION 2.11.   Interest ................................ 52
SECTION 2.12.   Alternate Rate of Interest .............. 53
SECTION 2.13.   Increased Costs ......................... 53
SECTION 2.14.   Break Funding Payments .................. 54
SECTION 2.15.   Taxes ................................... 55
SECTION 2.16.   Payments Generally; Pro Rata Treatment;
                   Sharing of Set-offs .................. 58
SECTION 2.17.   Mitigation Obligations; Replacement of ....
        Lenders 60
SECTION 2.18.   Refinancing Requirement ................. 61
SECTION 2.19.   Conversion Notes ........................ 63
SECTION 2.20.   Replacement Borrowers ................... 64
SECTION 2.21.   Borrower Payment Allocations ............ 66
SECTION 2.22.   Mandatory Assignment of Loans ........... 67

ARTICLE IIIRepresentations and Warranties

SECTION 3.01.   Corporate Organization and Power ........ 69
SECTION 3.02.   Subsidiaries ............................ 69
SECTION 3.03.   Corporate Authority ..................... 69
SECTION 3.04.   Binding Obligation ...................... 70
SECTION 3.05.   Litigation; Labor Controversies ......... 70
SECTION 3.06.   Governmental Approvals; No Conflicts ..... 70
SECTION 3.07    Financial Condition ..................... 71
SECTION 3.08.   Taxes ................................... 71
SECTION 3.09.   Margin Regulations; Margin Stock ........ 72
SECTION 3.10.   Compliance with ERISA ................... 72
SECTION 3.11.   Investment Company and Holding Company
                   Status ............................... 73
SECTION 3.12.   Properties and Licenses ................. 73

B1354

SECTION 3.13.   Telecommunications Business and
                Telecommunications Licenses 73
SECTION 3.14.   Investments .............................. 74
SECTION 3.15.   Compliance with Laws and Charter
                Documents ............................... 74
SECTION 3.16.   Environmental Protection ................. 75
SECTION 3.17.   Insurance ............................... 76
SECTION 3.18.   Compliance with Agreements .............. 76
SECTION 3.19.   Full Disclosure ......................... 76
SECTION 3.20.   Supply Agreement ........................ 76
SECTION 3.21.   Security Documents ...................... 77


                ARTICLE IVConditions

SECTION 4.01.   Effective Date .......................... 77
SECTION 4.02.   First Borrowing ......................... 79
SECTION 4.03.   Each Borrowing .......................... 81
SECTION 4.04.   Replacement Borrower .................... 81
SECTION 4.05.   Released Borrower ....................... 84


                ARTICLE VAffirmative Covenants

SECTION 5.01.   Financial Statements; Compliance
                Certificates ............................ 84
SECTION 5.02.   Corporate Existence ..................... 86
SECTION 5.03.   Conduct of Business ..................... 86
SECTION 5.04.   Taxes ................................... 86
SECTION 5.05.   Insurance ............................... 87
SECTION 5.06.   Inspection .............................. 87
SECTION 5.07.   Maintenance of Records .................. 87
SECTION 5.08.   Maintenance of Property ................. 88
SECTION 5.09    ERISA ................................... 88
SECTION 5.10.   Notice of Adverse Developments .......... 89
SECTION 5.11.   Environmental Matters ................... 90
SECTION 5.12.   Interest Rate Protection ................ 90
SECTION 5.13.   Measurement Date ........................ 90
SECTION 5.14.   Information Regarding Collateral ........ 91
SECTION 5.15.   Casualty and Condemnation ............... 92
SECTION 5.16.   Temporary Restricted Subsidiaries ....... 93
SECTION 5.17.   Leasing of Collateral ................... 93


                ARTICLE VINegative Covenants

SECTION 6.01.   Limitation on Indebtedness .............. 93
SECTION 6.02.   Limitations on Mergers, Consolidations and
                Sales of Assets ......................... 98
SECTION 6.03.   Limitations on Liens .................... 99
SECTION 6.04.   Investments, Acquisitions, Loans, Advances
                and Guaranties .......................... 102
SECTION 6.05.   Dividends, Purchase of Stock ........... 108
SECTION 6.06.   Use of Proceeds ........................ 110
SECTION 6.07.   Phase 1 Financial Covenants ............ 110
SECTION 6.08.   Phase 2 Financial Covenants ............ 113

[NTCORP; 1087700.1:4459B:06/14/00-5:50p]

B1355

SECTION 6.09.    Consolidated Senior Debt to Consolidated ...
                Annualized EBITDA ......................... 115
SECTION 6.10.    EBITDA to Consolidated Debt Service ..... 116
SECTION 6.11.    Certain Prepayments of Indebtedness ..... 116
SECTION 6.12.    Amount of Bank Facilities ............... 116
SECTION 6.13.    Use of Collateral ...................... 117
SECTION 6.14.    Activities of Borrower ................. 120

ARTICLE VII Events of Default

ARTICLE VIII The Agents

ARTICLE IX Miscellaneous

SECTION 9.01.    Notices ................................. 126
SECTION 9.02.    Waivers; Amendments ..................... 127
SECTION 9.03.    Expenses; Indemnity; Damage Waiver ...... 128
SECTION 9.04.    Successors and Assigns .................. 130
SECTION 9.05.    Survival ................................ 133
SECTION 9.06.    Counterparts; Integration; Effectiveness 134
SECTION 9.07.    Severability ............................ 134
SECTION 9.08.    Right of Setoff ......................... 134
SECTION 9.09.    Governing Law; Jurisdiction; Consent to ...
                Service of Process ...................... 135
SECTION 9.10.    WAIVER OF JURY TRIAL .................... 136
SECTION 9.11.    Headings ................................ 136
SECTION 9.12.    Confidentiality ......................... 136
SECTION 9.13.    Interest Rate Limitation ................ 137

ARTICLE X Subsidiaries

SECTION 10.01.    Restricted Subsidiaries ................ 137
SECTION 10.02.    Principal Subsidiaries ................. 140
SECTION 10.03.    Designated Foreign Subsidiaries ........ 141
SECTION 10.04.    Temporary Restricted Subsidiaries ...... 142
SECTION 10.05.    Administrative Agent Duties ............ 142
SECTION 10.06.    Additional Subsidiaries ................ 142
SECTION 10.07.    Designation of Subsidiaries Under Bank ....
                 Credit Agreement ...................... 142
SECTION 10.08.    Conversions Upon Prepayment ............ 142

Contents, p. 6

6

EXHIBITS:

Exhibit A -- Form of Assignment and Acceptance
Exhibit B -- Form of Conversion Agreement
Exhibit C -- Form of Conversion Indenture
Exhibit D -- Form of Equipment Owner Agreement
Exhibit E -- Form of Equipment User Agreement
Exhibit F -- Form of Guarantee Agreement
Exhibit G -- Form of Perfection Certificate
Exhibit H -- Form of Pledge Agreement
Exhibit I -- Form of U.S. Security Agreement
Exhibit J -- Form of Compliance Certificate

SCHEDULES:

Schedule 2.01   -   Commitments
Schedule 3.02   -   Subsidiaries
Schedule 3.05A -   Litigation
Schedule 3.05B -   Labor Controversies
Schedule 3.07   -   Material Adverse Changes
Schedule 3.13A -   Telecommunications Licenses
Schedule 3.13B -   Adverse Events Affecting Licenses
Schedule 3.14   -   Investments
Schedule 4.01   -   Post-Restructuring Parent Subsidiaries
Schedule 6.01   -   Existing Indebtedness
Schedule 6.03   -   Existing Liens
Schedule 6.13   -   Customer Premises Collateral

B1357

CREDIT AGREEMENT dated as of May 4, 2000, among WVF-I LLC, a Delaware limited liability company, as Initial Borrower, any additional Borrowers party hereto, WINSTAR COMMUNICATIONS, INC., a Delaware corporation, the LENDERS party hereto, THE BANK OF NEW YORK, as Collateral Agent, and LUCENT TECHNOLOGIES INC., as Administrative Agent.

The parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquired Indebtedness" means Indebtedness of any Person outstanding on the date on which such Person is acquired, by merger or otherwise (other than Indebtedness Incurred in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of transactions pursuant to which such Person was acquired).

"Adjusted Gross PP&E" means gross property, plant and equipment of the Consolidated Group on a consolidated basis less (i) the Loans then outstanding, (ii) Non-Fiber Capital Lease Obligations for the Consolidated Group on a consolidated basis and (iii) the gross property, plant and equipment of the Principal Subsidiaries and Designated Foreign Subsidiaries on a consolidated basis to the extent that such gross property, plant and equipment exceeds 10% of the gross property, plant and equipment of the Consolidated Group on a consolidated basis.

"Adjusted LIBO Rate" means, with respect to any LIBOR Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means Lucent, in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

Refinancing Indebtedness are commercially reasonable at the time of such Refinancing; _provided further_ that Refinancing Indebtedness Incurred by the Parent to refinance Loans shall not be subject to this clause (v).

"_Refinancing Notice_" has the meaning assigned to such term in Section 2.18.

"_Refinancing Period_" means any period commencing on the date of occurrence of a Refinancing Period Trigger Event and ending on the next day on which the Borrowers shall have prepaid an aggregate principal amount of Loans equal to the aggregate principal amount of Loans required to have been refinanced pursuant to the Refinancing Notice that resulted in the occurrence of such Refinancing Period Trigger Event and any Refinancing Notices subsequently delivered with respect to which the Refinancing Trigger Date occurred during such period. It is understood that, if a Refinancing Notice requires that all outstanding Loans be refinanced, the Borrowers shall be deemed not to have satisfied such requirement until there are no Loans outstanding.

"_Refinancing Trigger Date_" means, with respect to any Refinancing Notice, the date that is 90 days (or, if necessary in order to complete a year-end audit, 105 days) after the date such Refinancing Notice is delivered to the Borrowers.

"_Refinancing Trigger Event_" means the failure of the Borrowers to prepay Loans in the amount required by a Refinancing Notice prior to the Refinancing Trigger Date with respect to such Refinancing Notice; _provided_ that, if a Refinancing Trigger Date occurs during a Refinancing Period that commenced on a previous date and is continuing, no Refinancing Period Trigger Event shall be deemed to occur on such Refinancing Trigger Date. References herein to the date of occurrence of a Refinancing Period Trigger Event shall be deemed to refer to the Refinancing Trigger Date prior to which the Borrowers failed to prepay Loans resulting in the occurrence of such Refinancing Period Trigger Event.

"_Register_" has the meaning set forth in Section 9.04.

"_Related Parties_" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

SECTION 2.18. Refinancing Requirement. (a) At any time that the aggregate principal amount of outstanding Lucent Loans equals or exceeds $500,000,000, Lucent may, in its sole discretion, require by notice to the Borrowers and the Parent (a "Refinancing Notice") that the Borrowers and the Parent refinance all (or, in Lucent's sole discretion, a specified portion) of the outstanding Loans. If a Refinancing Notice is given and the Borrowers fail to prepay the required amount of Loans by the Refinancing Trigger Date with respect to such Refinancing Notice, then such failure shall not constitute an Event of Default, but shall result in the commencement of a Refinancing Period (unless a Refinancing Period previously commenced and is then continuing, in which case the requirements of such Refinancing Notice shall be taken into consideration in determining the end of such Refinancing Period). Lucent may deliver Refinancing Notices from time to time hereunder whenever it is entitled to do so, and delivery of a Refinancing Notice requiring the refinancing of less than all outstanding Loans shall not prevent Lucent from subsequently delivering a Refinancing Notice requiring the refinancing of additional Loans provided only that the aggregate outstanding principal amount of Lucent Loans equals or exceeds $500,000,000 at the time any Refinancing Notice is given. Any failure or delay by Lucent in giving a Refinancing Notice when it is entitled to do so shall not be construed as a waiver of Lucent's rights to give Refinancing Notices. It is understood that, if a Refinancing Notice

requires that all outstanding Loans be refinanced, the Borrowers shall be deemed not to have satisfied such requirement until there are no Loans outstanding.

(b)  Subject to paragraph (c) below, during any Refinancing Period the Applicable Margin with respect to all outstanding Loans will be increased by 2.0% per annum.  In addition, during any Refinancing Period, Borrowings will be permitted only for the purpose of making payments of the Purchase Price of Lucent Products, except that Third Party Products purchased by the Designated Borrower pursuant to the Supply Agreement may be financed during a Refinancing Period to the extent that, for any applicable Borrowing, the Purchase Price of such Third Party Products does not exceed the greater of (i) the maximum non-Lucent content percentage allowed under the Supply Agreement in relation to the Purchase Price of the Lucent Products financed by the same Borrowing or (ii) an amount less than or equal to the Eligible Equipment and Services comprised of Lucent Products purchased under the Supply Agreement after April 15, 2000, and not financed by any Loans hereunder.  The foregoing shall not be construed to limit Lucent's other rights and remedies during any Refinancing Period.

(c)  If a Refinancing Period has commenced and is continuing but (i) all lending commitments under the Bank Credit Agreement are fully funded, (ii) a refinancing of outstanding Loans has occurred subsequent to the date of the Refinancing Notice that resulted in the commencement of such Refinancing Period but such refinancing was insufficient to prepay the required amount of Loans and, due solely to adverse market conditions (as determined by Lucent), a refinancing could not be consummated in an amount sufficient to prepay a greater principal amount of outstanding Loans and (iii) the aggregate principal amount of outstanding Loans does not exceed $250,000,000 after giving effect to such refinancing, then the 2.0% per annum increase in the Applicable Margin during such Refinancing Period (as provided in paragraph (b) above) will not apply to any Loans advanced during the remainder of such Refinancing Period (but shall continue to apply during such Refinancing Period to Loans outstanding prior to satisfaction of the conditions referred to in clauses (i), (ii) and (iii) of this paragraph); provided that (A) the other rights and remedies applicable during a Refinancing Period will continue to apply so long as such Refinancing Period continues and (B) if at any time thereafter during such Refinancing Period the aggregate outstanding principal amount of Lucent Loans equals or exceeds $500,000,000 and Lucent gives another Refinancing Notice to the Borrowers and the Parent, then on and after the Refinancing Trigger Date with respect to such

63

Refinancing Notice, if a Refinancing Period is continuing, the 2.0% per annum increase in the Applicable Margin specified in paragraph (b) above will apply to all outstanding Loans for the remainder of such Refinancing Period, notwithstanding any subsequent prepayment of Loans that is insufficient to terminate such Refinancing Period and notwithstanding satisfaction of the conditions referred to in clauses (i), (ii) and (iii) of this paragraph.

SECTION 2.19.  <u>Conversion Notes.</u>  (a)  During any Refinancing Period, Lucent may elect to convert at any time in whole, or from time to time in part, the outstanding Lucent Loans to Conversion Notes in accordance with this Section and the Conversion Indenture.  In order to effect any such conversion, Lucent shall execute and deliver a Conversion Certificate to the Conversion Trustee in accordance with Section 2.02 of the Conversion Indenture. Lucent shall deliver to each of the Borrowers, the Parent and the Agents  a copy of each Conversion Certificate so delivered to the Conversion Trustee, at the time such Conversion Certificate is so delivered to the Conversion Trustee.  Effective upon authentication and delivery by the Conversion Trustee of any Conversion Notes in accordance with Section 2.02 of the Conversion Indenture, Lucent Loans in an aggregate principal amount equal to the principal amount of such Conversion Notes shall be deemed to have been converted to such Conversion Notes for all purposes of the Loan Documents.

(b)  On each date on which Lucent Loans are converted to Conversion Notes as provided herein, each Borrower shall pay to the Administrative Agent, for distribution to Lucent, all accrued and unpaid interest on its Lucent Loans so converted.

(c)  On each occasion that Lucent delivers a Conversion Certificate as contemplated hereby, Lucent shall notify the Administrative Agent and the Borrowers of the specific Lucent Loan or Lucent Loans that are to be converted.  If there is more than one Borrower at the time, such notice shall comply with Section 2.21.

(d)  Upon any conversion of Lucent Loans to Conversion Notes, the indebtedness of the applicable Borrower or Borrowers represented by the Lucent Loans so converted shall become indebtedness of the Parent as a result of such conversion and shall cease to constitute "Loans" for all purposes of the Loan Documents, and the applicable Borrower or Borrowers shall be released from their liability in respect thereof.

**B1362**

112

SECTION 6.07.  <u>Phase 1 Financial Covenants.</u>  Until December 31, 2002, the Consolidated Group Members shall:

(a)  <u>Maximum EBITDA Losses/Minimum EBITDA.</u>  Not permit EBITDA for any fiscal quarter referred to below to be less than the amount set forth opposite such fiscal quarter:

| Quarter Ended | Amount |
|---|---|
| March 31, 2000 | $(48,000,000) |
| June 30, 2000 | $(42,000,000) |
| September 30, 2000 | $(38,000,000) |
| December 31, 2000 | $(28,000,000) |
| March 31, 2001 | $(17,000,000) |
| June 30, 2001 | $(9,000,000) |
| September 30, 2001 | $(5,000,000) |
| December 31, 2001 | $1,000,000 |
| March 31, 2002 | $28,000,000 |
| June 30, 2002 | $44,000,000 |
| September 30, 2002 | $60,000,000 |
| December 31, 2002 | $76,000,000 |

(b)  <u>Minimum Revenues.</u>  Not permit Consolidated Revenue for any fiscal quarter referred to below (calculated as of the last day of any fiscal quarter end and based on the results of the quarter then ended) to be less than the amount set forth opposite such fiscal quarter:

| Quarter Ended | Amount |
|---|---|
| March 31, 2000 | $118,000,000 |
| June 30, 2000 | $129,000,000 |
| September 30, 2000 | $139,000,000 |
| December 31, 2000 | $163,000,000 |
| March 31, 2001 | $173,000,000 |
| June 30, 2001 | $188,000,000 |
| September 30, 2001 | $199,000,000 |
| December 31, 2001 | $217,000,000 |
| March 31, 2002 | $240,000,000 |
| June 30, 2002 | $268,000,000 |
| September 30, 2002 | $294,000,000 |
| December 31, 2002 | $328,000,000 |

B1363

113

(c)  <u>Maximum Cash Capital Expenditures.</u>  Not
permit total Cash Capital Expenditures during any fiscal
year referred to below to exceed the amount set forth
opposite such fiscal year; <u>provided</u> that unused amounts
permitted to be expended in any fiscal year may be carried
forward one year with all capital expenditures deemed first
applied to any carry-forward amounts; <u>provided further</u> that
on any date that any Bank Loan Party receives Net Cash
Proceeds from permitted Indebtedness (other than Refinancing
Indebtedness) or equity in excess of $1.5 billion, on a
cumulative basis from the Effective Date, the Bank Borrower
may increase, at its discretion, the maximum Cash Capital
Expenditures in any year or years by an aggregate amount
equal to such Net Cash Proceeds that exceed $1.5 billion;
<u>provided further</u> that any such amount of increase shall be
deemed a utilization of Unrestricted Proceeds; and <u>provided
further</u> that under no circumstances shall the maximum annual
Cash Capital Expenditures exceed (excluding carry over
amounts) $1.3 billion for any year prior to and including
2001 and $1.0 billion in any year thereafter while this
covenant is applicable:

| Fiscal Year | Amount |
|---|---|
| 2000 | $1,300,000,000 |
| 2001 | $1,150,000,000 |
| 2002 | $ 550,000,000 |

(d)  <u>Maximum Consolidated Senior Secured Debt to
Consolidated Total Capitalization.</u>  Not permit the ratio of
Consolidated Senior Secured Debt to Consolidated Total
Capitalization to exceed 25% at any time.  For the purpose
of calculating Consolidated Total Capitalization, paid-in
capital shall be given effect as of the date paid in.

(e)  <u>Maximum Consolidated Total Debt to
Consolidated Total Capitalization.</u>  Not permit the ratio of
Consolidated Total Debt to Consolidated Total Capitalization
to exceed 75% at any time.  For the purpose of calculating
Consolidated Total Capitalization, paid-in capital shall be
given effect as of the date paid in.

(f)  <u>Maximum Consolidated Senior Secured Debt to
Adjusted Gross PP&E.</u>  Not permit the ratio of Consolidated
Senior Secured Debt to Adjusted Gross PP&E to exceed 50% at
any time.

B1364

114

(g)  <u>On-Network Hubs.</u>  Not permit the number of On-Network Hubs as of the last day of any fiscal quarter referred to below to be less than the amount set forth opposite such fiscal quarter:

| Quarter Ended | On-Network Hubs |
|---|---|
| March 31, 2000 | 125 |
| June 30, 2000 | 142 |
| September 30, 2000 | 159 |
| December 31, 2000 | 175 |
| March 31, 2001 | 190 |
| June 30, 2001 | 204 |
| September 30, 2001 | 219 |
| December 31, 2001 | 234 |
| March 31, 2002 | 249 |
| June 30, 2002 | 263 |
| September 30, 2002 | 267 |
| December 31, 2002 | 268 |

(h)  <u>On-Network Buildings</u>:  Not permit the number of On-Network Buildings as of the last day of any fiscal quarter referred to below to be less than the amount set forth opposite such fiscal quarter:

| Quarter Ended | On-Network Buildings |
|---|---|
| March 31, 2000 | 1,649 |
| June 30, 2000 | 2,322 |
| September 30, 2000 | 3,320 |
| December 31, 2000 | 4,477 |
| March 31, 2001 | 5,981 |
| June 30, 2001 | 7,366 |
| September 30, 2001 | 8,755 |
| December 31, 2001 | 10,147 |
| March 31, 2002 | 10,256 |
| June 30, 2002 | 10,366 |
| September 30, 2002 | 10,475 |
| December 31, 2002 | 10,585 |

**Printer Printer**

| | |
|---|---|
| From: | Rubin, Fred [frubin@winstar.com] |
| Sent: | Friday, January 05, 2001 5:23 PM |
| To: | Uhl, Richard |
| Cc: | Nidowicz, Doreene; 'kpm'; 'gary' |
| Subject: | LU Balance Analyis |



010301 LU Balance &
Credit.xsl...    Rick,

Per our discussions earlier this week, we have compiled the attached
analysis, attempting to derive the correct balance owed to Lucent assuming
the application of the earned credits, elimination of the disputed payments,
and return of the equipment and services that Winstar acquired based on
quarterly transactions and commitments made by Lucent.

Please review and let's discuss on Monday.

Thanks,

Fred

<<010301 LU Balance & Credits.xls>>





CONFIDENTIAL 2WC 0073643

B1366

## LU Balance Calculation

| Draw Date | Borrower | LU-Dom | LU-Intl | Non-LU | Svcs | Credits | Total | Cum. Balance |
|---|---|---|---|---|---|---|---|---|
| 6/23/00 | WVF-1 | 112,507,995.66 | 3,161,336.24 | 80,808,699.13 | 55,485,175.00 | (4,000,000.00) | 248,064,106.03 | 248,064,106.03 |
| 7/31/00 | WVF-1 | 26,622,129.13 | 6,394,850.29 | | 56,956,728.03 | (17,574,000.00) | 72,399,710.05 | 320,433,824.08 |
| 8/31/00 | WVF-1 | 16,354,953.40 | 1,804,486.83 | | 55,381,451.41 | | 73,540,891.64 | 393,974,715.72 |
| 9/29/00 | WVF-1 | 32,263,353.00 | 3,407,043.11 | | 87,388,372.00 | | 103,058,768.11 | 497,033,483.83 |
| 10/23/00 | WVF-1 | 64,695,206.93 | 4,216,096.59 | 56,728,213.35 | 67,291,934.00 | | 192,932,320.87 | 689,965,804.70 |
| 11/30/00 | WVF-1 | 29,398,976.24 | 4,214,993.80 | 30,002,934.38 | | | 63,604,904.42 | 753,570,709.12 |
| 12/7/00 | WVF-1 | | | | | | (194,000,000.00) | 550,570,709.12 |
| 12/29/00 | WVF-1-LU2 | 841,288.51 | 1,327,333.70 | 30,000,052.04 | 62,324,930.00 | (161,708.24) | 94,331,898.01 | 653,902,605.13 |
| Totals | | 282,671,802.87 | 24,517,020.56 | 197,620,898.90 | 384,828,591.04 | (21,735,708.24) | 653,902,605.13 | |

| | |
|---|---|
| Credits | (49,794,333.86) |
| Disputes | (8,031,107.00) |
| Amended Loan Balance | 595,177,044.27 |
| Equipment to Return | (93,462,889.00) |
| Software to Return | (43,079,133.00) |
| Switches to Return | (20,078,638.00) |
| Turnkey Development Charges | (11,000,000.00) |
| **Final Amended Balance:** | **427,556,384.27** |

Loan Balance

Winstar Confidential

5/9/01 2:34 PM

CONFIDENTIAL 2WC 0073644

B1367

5/9/01
2:34 PM

## Lucent Credits Due Winstar

| Line Item | Description | Amount | Notes |
|-----------|-------------|--------|-------|
| 1 | Optical Equipment Credit - reduction to Draw 6 | 35,000,000.00 | Per Bill Plunkett letter (10/20/00) |
| 2 | Newbridge Switch Credit - reduction to Draw 6 | 2,574,970.00 | Lucent Invoice #SU029095 |
| 3 | 3rd Qtr COR Credit | 10,000,000.00 | Lucent Invoice #SU028448 |
| 4 | Marketing Credit | 117,500.00 | Per Jim Rooney e-mail (10/05/00) |
| 5 | MAX 20 Credit | 497,070.01 | Lucent credit per 12/29 email from Louis St. Peter |
| 6 | PSAX Credit | 1,604,853.85 | Lucent credit per 12/29 email from James Vickers |
|   | **Subtotal CREDITS** | 49,794,393.86 | |
| 7 | Items Paid on Draw 5 that are in dispute | 6,462,776.00 | Adj. for Assets held for sale (paid cash) and PSAX equip |
| 8 | Items Paid on Draw 5 that are not approved | 2,468,391.00 | |
|   | **Subtotal Disputes** | 8,931,167.00 | |
|   | **GRAND TOTAL** | 58,725,560.86 | |

Winstar Confidential

Credits

CONFIDENTIAL 2WC 0073645

5/9/01
2:34 PM

## UNUSED PREPURCHASED LUCENT EQUIPMENT & SOFTWARE

**Equipment**

| | | |
|---|---|---|
| Buffalo 5ESS switch | $3,652,899 | |
| Optical equipment (Morrow) | $46,412,393 | ** per Winstar physical inventory |
| 400G - Miami route | $6,500,000 | **deployed equipment currently being deinstalled by Engineering |
| Octel | $4,575,018 | ** purchased 23 units 1Q, 6 deployed    17 unused |
| CBX500 | $11,500,000 | ** purchased 23 2Q, all undeployed |
| Gateway | $3,996,525 | ** purchased 30 - all deployed, per Engineering deinstall and return to Lucent |
| B-Site Cabinets | $671,000 | ** purchased 1000 cabinet shells - 329 B-sites in factory   671 unused |
| Slingers | $4,624,682 | ** purchased 600 slingers - 329 B-sites in factory  271 unused |
| PSAX equipment (pre-purchased for turnkey) | $11,530,372 | ** purchased 200 PSAX - 14 hubs under construction or fully accepted.  106 PSAX unused |
| | $93,462,889 | |

**Software**

| | | |
|---|---|---|
| (These should be included - unused at this time) | | |
| Onevision Software | $7,659,133 | |
| Pay as you Grow | $35,420,000 | Q2 &Q3 |
| | $43,079,133 | |

Deployed 5ESS switches - per Engineering deinstall and return to Lucent

| | |
|---|---|
| CHA | $2,666,685 |
| JAC | $4,842,014 |
| ORL | $4,736,103 |
| NAS | $4,962,093 |
| RIC | $2,871,743 |
| | $20,078,638 |

Turnkey development charges - no discernable value  $11,000,000

**TOTAL**  $167,620,660

Returns

Winstar Confidential

CONFIDENTIAL 2WC 0073646

B1369

*FYI — Tim Graham, Rich Uhls*
*Ken Zinghini; Kevin Mosco*



**Lucent Technologies**
Bell Labs Innovations

Elizabeth T. Perricone
Director-North America
Customer Finance

600 Mountain Avenue
Murray Hill, NJ 07974
Phone: 908-582-0366
Fax: 908-582-7237
Email: eperricone@lucent.com

December 19, 2000    *105 Days · April 3, 2001*

VIA FACSIMILE (212 584 4001)

Winstar Communications, Inc.
WVF-I LLC
The Winstar Building
685 Third Avenue, 9th Floor
New York, NY 10017
Att:  Treasurer and General Counsel

Re:  Lucent Credit Facility

Ladies and Gentlemen:

Reference is made to the Credit Agreement (the "Agreement"), dated as of May 4, 2000, among you, Lucent Technologies Inc., as administrative agent and lender, and The Bank of New York, as collateral agent.  Capitalized terms not defined in this letter shall have the meanings ascribed to them in the Agreement.  As of the date hereof, the principal amount of outstanding Lucent Loans exceeds $500,000,000.

Pursuant to Section 2.18(a), Lucent hereby requires that the Borrower and the Parent refinance all outstanding Loans under the Agreement.  This letter is a Refinancing Notice pursuant to Section 2.18(a) of the Agreement.

Lucent Technologies Inc.

By *[signature] Perricone*





CONFIDENTIAL WC 0038865

B1370

DEPOSITION EXHIBIT
Rubin 43
12 '9 '03
MARLENE LEE, CSR, RPR, CRR

*Kenin YM 9YI*

Frederic E. Rubin~
Senior Vice President
Treasurer
Winstar Communications

The Winstar Building
685 Third Avenue
9th Floor
New York, NY 10017
T (212) 792 9039
F (212) 584 4073

November 13, 2000

Martina Hund-Mejean
Senior Vice President & Treasurer
Lucent Technologies Inc.
600 Mountain Avenue
Murray Hill, NJ  07974

Re    Winstar/Lucent Financings

Dear Martina:

Thanks for your November 7th letter  Congratulations on your new position with Lucent and I look forward to meeting you as we continue to develop the strategic partnership between our companies  We value our partnership with Lucent  I believe that this partnership continues as a valuable asset to both companies and it has been the basis upon which we have consistently provided significant value to each other over the past two years.

I would like to take this opportunity to reflect the approach discussed during the Winstar/Lucent meeting on Monday, November 7, 2000. As you know, Winstar has obtained a commitment for an additional $200 million of loans under our Senior Secured Credit facility  We intend to close that transaction in the next couple of weeks. Winstar also agreed to pay to Lucent the net proceeds from the $200 million financing per the terms of our existing Agreement. As we stated in our meeting on November 7, we would, however, prefer Lucent to consider accepting $100 million of those proceeds, and permit Winstar to retain the balance. The enhanced working capital would help to continue to build our business even more quickly, which, we believe, ultimately benefits Lucent as our principal supplier.  We look forward to your positive response to this request.

In addition, and in the spirit of our partnership, we also offered Lucent the right to convert its Winstar loans at "all times" instead of waiting for the $500 million trigger point currently required in our Agreement. The financial terms, associated with reaching $500 million of loans on Lucent's balance sheet, however, would remain, as per our current Agreement.  In addition, we would, of course, provide you with marketing support in connection with these and other types of sales of Lucent's Winstar paper.



CONFIDENTIAL WC 0039829

B1371

Martina Hund-Mejean
November 13, 2000
Page 2

Finally, regarding your request to conduct due diligence, we would be most happy to work with you on an update of Winstar's plan. As you know, your people on the supply side have been working very closely with us in the deployment of our network. We would welcome this opportunity to update your group as it is our belief that a thorough understanding of our current operations would give you even more confidence in our future success as well as the opportunities that we both have when we work closely together.

I look forward to working out a mutually beneficial plan for the continued growth of this very important partnership

Very truly yours,

Frederic E Rubin
Senior Vice President & Treasurer

CONFIDENTIAL WC 0039830

B1372

< 11/07/00  19:42 FAX 908 559 1705     LUCENT TREASURY                    @001

**Lucent Technologies**
Bell Labs Innovations

# FAX

Date: Nov. 4, 2000.
Number of pages including cover sheet: 11

To: Rick Uhl - Winstar

From:
Donna Weidman
Executive Secretary

Phone:
Fax phone: 212-584-4001
CC:

Phone: 908-582-0311
Fax phone: 908-582-0294

REMARKS:    ☐ Urgent    ☒ For your review    ☐ Reply ASAP    ☐ Please comment

Please find attached.
① Winstar letter signed by Martina
② General Due Diligence Questions

CC: Nate.
Bill

CONFIDENTIAL WC 0039831

B1373



Lucent Technologies
Bell Labs Innovations

608 Mountain Avenue
Murray Hill, NJ 07974-0636 USA

Marina Hund-Mejean                    Room 7D-525
Sr. V.P. & Treasurer                  Telephone 908 582-4556
                                      Facsimile 908 582-0294

November 7, 2000

Richard J. Uhl
Group Executive and Chief Financial Officer
Winstar Communications, Inc.
685 Third Avenue
New York, NY 10017

     Re:  Lucent Vendor Financing

Dear Richard:

This will confirm our understanding regarding the Credit Agreement dated May 4, 2000, among Winstar Communications, Inc., WVF-I LLC, Lucent Technologies and other parties (the "Credit Agreement").   Capitalized terms that are not defined in this letter shall have the meanings ascribed to those terms in the Credit Agreement.

1.    Lucent will consent to increasing the loans and commitments under the Bank Credit Agreement by $200 million, on the following condition:

- Lucent is reasonably satisfied with the terms of any amendments or the changes to the Bank Credit Agreement (the "Bank Amendment") required to increase the Bank Credit Agreement from $1.15 billion to $1.35 billion.

- The Bank Amendment will provide that the entire $200 million increase in the Bank Credit Agreement will be drawn immediately upon the effectiveness of the Bank Amendment and will be disbursed to Lucent to prepay outstanding Loans under the Credit Agreement.  Winstar will also pay all accrued interest on the $200 million of Loans being prepaid.

- The other conditions of this letter are satisfied, including Lucent completing its initial due diligence under paragraph 4 below.

CONFIDENTIAL WC 0039832

B1374

11/07/00  13:42 FAX 908 559 1709        LUCENT TREASURY                    ☒003

Page 2

2.   Winstar will provide to Lucent today a copy of the final, executed term sheet for a
     $250 million equity investment in Winstar, and Lucent shall be satisfied with the
     terms thereof.  Lucent will notify Winstar whether Lucent is satisfied with the
     terms of the equity promptly after receipt of the term sheet.

3.   The dollar threshold at which Lucent can exercise its refinancing option under the
     Credit Agreement will remain at $500 million, and Sections 2.18 and 2.19 of the
     Credit Agreement will not be amended.

4.   Winstar will provide Lucent with full access to its books, records and business
     plans to enable Lucent to provide an extensive due diligence review of the
     Winstar business.   This will be done to provide Lucent with a better
     understanding of Winstar's business and plans.

5.   Winstar will use its reasonable best efforts and cooperate diligently with Lucent to
     assist Lucent to market the existing Loans and Commitments under the Credit
     Agreement immediately.  As part of this, Lucent and Winstar will agree on a class
     or group of eligible institutions to which Lucent may sell loans without consent of
     Winstar.  In addition, Lucent will have the benefit of market flex provisions to
     enable Lucent to increase the pricing on Loans and Commitments and make other
     necessary changes to enable Lucent to sell Loans and Commitments at par.  The
     letter agreement between Winstar and Lucent regarding up-front fees will be
     amended so that Lucent may utilize all up-front fees to offset any and all costs of
     selling all Loans (including any future Loans) and Commitments under the Credit
     Agreement prior to Lucent being required to rebate any funds to Winstar.

6.   On or before November 30, 2000, Winstar will prepare a written plan satisfactory
     to Lucent detailing the manner and timing by which Winstar will refinance Loans
     under the Credit Agreement.

This letter does not constitute an amendment, waiver, consent or other modification to the Credit
Agreement.  This letter constitutes Winstar's and Lucent's understanding for amendments,
consents and/or modifications to the Credit Agreement to be entered into by the parties, and such
amendments, consents or modifications shall be effective only upon execution by all necessary
parties (including any required third party consents) of definitive documentation.

The understandings set forth herein are being agreed upon on the basis that the increase in the
Bank Amendment will be completed and effective by November 30, 2000.  If the Bank
Amendment is not effective by such date, this letter shall be null and void.

CONFIDENTIAL WC 0039833

Page 3

If this correctly sets forth your understanding, please execute a copy of this letter on the space provided below. If a copy of this letter executed by Winstar is not received by us before 12:00 noon. New York time on Wednesday November 8, 2000, this letter shall be null and void.

Lucent Technologies Inc.

By: _____

Martina Hund-Mejean

Sr. V.P. & Treasurer

Agreed and accepted:

Winstar Communications, Inc.

By: _____

CONFIDENTIAL WC 0039834

B1376



*General Due Diligence Questions*

**Company Overview / Corporate Strategy**

- Please provide an update to the Company's current business plan and strategy for either expanding or contracting from its existing markets. Has the Company's mission changed and if so, please explain? How is the Company looking to be perceived by Customers?
- What are the critical success factors of this plan? What are the Company's greatest challenges going forward? Please explain the Company's strategy around each of the identified critical success factors and challenges.
- Please provide copies of the Company's budgeted versus actual financial reports covering the last 12 months and describe any major differences.
- Please provide copies of the Company's original projections vs revised projections covering the last 12 months and describe any major differences
- Please provide a 10 year electronically linked financial model in excel format reflecting the current plan and proposed capital structure.
- Describe the Company's long-term goals regarding future business opportunities / acquisitions / expansion plans, etc
- Please provide updated charts reflecting any changes to the current corporate structure

**Senior Management Team / Board of Directors**

- Please provide an update to the Company's organizational chart from a management team perspective
- Is there any management employment contracts in place? What are the nature and length of these contracts? Are non-compete clauses included in these contracts?
- Is there any required management performance targets and / or incentive schemes in place at this time?
- Have there been any recent changes to the management team?
- For any senior management team positions not filled at this time, please provide an update of the status, strategy and timeline for filling these positions.
- Have members of the senior management team made equity contributions into the Company? If yes, what percentage of the Company is currently owned by the senior management team?
- Please provide detail on any changes to the current members of the Board of Directors  What value does each of the Board members bring to the Company?

**Sponsors / Equity / Strategic Partners**

- Please provide a complete updated list of sponsors and investors including their ownership percentage and the size of investment   (Please include proforma ownership as it relates to any pending capital raising efforts.)
- Provide a summary of the Sponsor's respective rights and obligations to/from the Company? What role will the Sponsors' play going forward (i.e. silent partners, members of the management team, seats on the Board, etc )?
- Please provide background / summary sponsor information including historical financials and financial projections, if available.
- What does each sponsor bring to the Company?  Is their investment strategic or financial in nature? If strategic, please describe the nature of the relationship and how the relationship fits into the Company's strategic plan.

CONFIDENTIAL WC 0039835



**Lucent Technologies**
Bell Labs Innovations

**Sponsors / Equity / Strategic Partners Cont'd**

- Are there additional Strategic Partners that are not Sponsors? Who are they? How does this relationship benefit the Company? How does it fit into the Company's strategic plan? Do these Strategic Partners share in any financial risk of the project? If yes, please explain
- What are the plans for additional capital from either existing or new sponsors/shareholders? What is the anticipated form of such capital?
- What is the anticipated timing of these infusions? What milestones or events will trigger future infusions? Please provide copies of executed commitment letters / documentation related to these future investments.
- What are the Sponsors long-term strategy for their investments in the Company?
- Is there a time period in which Sponsors are restricted from selling their stock?

**Capital Requirements / Capital Structure**

- What are the total capital requirements needed for execution of the current plan?
- What are the total capital requirements needed to build-out, expand or upgrade the network? What are the capital requirements by deployment phases and / or the deployment factor? What does this translate to on a metrics basis (i.e. per Covered POP, per CO, per addressable access line, per route mile, per square foot, etc) and how does this compare to the competition's network costs?
- Is the plan fully funded? If not, how much capital remains to be raised to fully fund the plan? What are the Company's plans and timelines for raising the capital?
- Does the Company have a financial advisor? If yes, what is the nature of the relationship and what exactly has the financial advisor been engaged to execute? Please provide contact names and numbers. If no, are discussions under way with potential financial advisors? Please describe the nature and status of such discussions and the timeline for engaging a financial advisor.
- What is the planned capital structure of the Company in the near term, medium term and long term?
- If the entire network plan is not fully funded, is the plan scalable (by phases, by markets, etc.) and self-sustaining based on the capital raised? Have financial projections and scenarios been run and analyzed based on different levels of capital? Please provide the current capital view of the financial projections.
- Are all components of the capital structure in local currency? If not, what components are in foreign currency? How will the Company hedge its foreign exchange risk? How is foreign exchange handled in the financial projections?
- How much of the debt structure consists of floating debt? How will the Company hedge against interest rate increases? How is hedging incorporated into the financial projections?

**Service / Product Offering**

- Please describe any changes to your current product and service offerings and explain any future offerings.
- For those products to be offered in the future are the corresponding revenues included in the financial projections or do they represent additional revenue opportunities?
- For those products to be offered in the future, what development work needs to be done or what additional network expenditures need to take place to make these services available to customers? Are these expenses or expenditures incorporated into the financial projections?
- Please breakdown the products and services by targeted customer segment (i.e. wholesale, large business, small & medium business, residential, etc.), if applicable.

CONFIDENTIAL WC 0039836

**B1378**

11/07/00  19:43 FAX 908 559 1709        LUCENT TREASURY                                    ✉007



Lucent Technologies
Bell Labs Innovations

### Service / Product Offering Cont'd

- How are the products and services fulfilling the needs of each customer segment? How are the products and services positioned to the customer? What is the value proposition?
- How do the Company's products and services differ from the competition?
- Please describe the price points and pricing structures for the various products and services? How do these prices compare to the competition? Please provide any industry information, competitive analysis and / or market research to support pricing assumptions.
- What is the Company's current strategy toward bundling of services?
- Are or will customer contracts be used? Please summarize the general terms and conditions of customer contracts.
- Do the revenue streams in the model reflect specific products and services or product categories?  Please provide the relationships between the revenue streams in the model and the products and services outlined in the business plan.
- Is the Company planning on offering customer equipment subsidies?  If yes, how are these subsidies incorporated into the financial projections?

### Market Demand & Competition

- Please provide copies of materials (industry research & forecasts, market research studies, economic studies, focus group results, political & regulatory environment publications, demographic information, teledensity information, etc.) demonstrating the current market demand and the anticipated growth in the targeted regions.
- Please provide a comprehensive competitive analysis by market. This analysis should outline the current and known future players in each market and include information on the competition's key strengths and weaknesses, overall strategy, target markets, respective market share, network strategy, current build-out, future deployment / expansion plans, etc on a company by company basis.
- What are the Company's primary competitive advantages verse each competitor?
- What is the Company's overall strategy for tackling the competition in an effort to meet its plan?
- How does the Company's overall cost structure compare to the competition?  In what areas will the Company be able to realize cost savings? How does this translate through to the EBITDA margin in the projections verse the competition?
- How does the Company plan on responding to a marketing / price war?
- How does the Company anticipate the competition to react to a new entrant?
- How much market share does the Company plan to garner over time?  How much market share does the Company anticipate the competition to garner / maintain over time?
- Is the Company's strategy to take market share, capitalize on industry growth or unleash an untapped market via a differentiated / niche offering? Please explain.
- What barriers to entry, if any, exist for future new entrants in the Company's markets (product and / or geographic)?

### Sales / Marketing / Distribution

- What is the Company's overall sales and marketing strategy for the targeted market(s)?
- Please discuss the difference in sales and marketing plans between the various products and services?  What are the related marketing expenditures?
- Please discuss the difference in sales and marketing plans between customer segments (i.e. wholesale, business, residential), if applicable.  What percentage of revenues does the Company anticipate deriving from each customer segment?
- How is the Company positioning its services in the marketplace?
- What mediums will be used to reach the target markets?
- How has the Company's brand name and / or slogan been received in its markets?

CONFIDENTIAL WC 0039837

**B1379**

11/07/00  19:43 FAX 908 559 1709        LUCENT TREASURY                        @008



**Sales / Marketing / Distribution Cont'd**

- How does the Company's sales and marketing strategy differ from the competition?
- What types of sales channels are being used and what changes if any are being considered? Is the Company relying primarily on direct sales (via direct customer meetings, company-owned stores, etc) or indirect sales (via ISPs, national retailers, regional retailers, local retailers, etc)? If both, what percentage of sales are to be made via each channel?
- What discussions have taken place with potential indirect channels? Have any agreements been entered into with indirect sales channels? What are the nature of these agreements? How is the commission to be structured for the indirect channels?  Has the commission structure been incorporated into the financial projections?
- What is the current and anticipated size and structure of the sales organization over time?
- How does the Company view the local market for recruiting sales talent?
- What compensation / incentive plans will be used to attract and retain qualified salespeople?
- How do the compensation / incentive plans relate to the Company's objectives for attracting new customers, growing existing customer base revenue and increasing customer retention? Have these financial relationships been incorporated into the projections?
- Please describe the training mechanism(s) used by the Company for new salespeople?  How often is training provided / required?
- When does marketing / sales efforts begin in new markets relative to service availability?
- What are the Company's projected acquisition costs per customer?  How do they compare to the competition?

**Regulatory**

- Briefly describe the local regulatory environment as it relates to the Company's service offerings.
- Please describe the nature of the Company's relationship with regulators and the local government
- Please describe the competition's relationship with regulators and the government.
- Please comment on any legal or regulatory issues / action that may affect the Company
- What changes in the regulatory environment are foreseen over the next 5-10 years?  What impact might such changes have on the Company?
- What regulatory filings or certifications need to be received to offer the planned services in each region / market?
- Has the Company already received the required certifications for any expansion markets or new service offerings?  If yes, please provide appropriate documentation.  If not, what is the current status of the certification / regulatory approvals?  What requirements does the Company still need to meet in order to apply for / receive certification?
- What are the Company's timelines, by market, for applying for and receiving the required certification?  How does this timeline relate to the network deployment schedule?
- Who is leading these efforts internally?  What is their background in this area?
- Has a third party been engaged to assist in the process?  What is the third party's background in this area?  What agreements are in place with this third party? Please provide contact names and numbers.
- Describe any concessions, if applicable

CONFIDENTIAL WC 0039838

**B1380**



Lucent Technologies

### Network / Deployment / Network Strategy

- Please provide an overview of the Company's network strategy and network architecture over time.
- Please provide a detailed deployment timeline by phase, by market, by functionality for any expansion markets.
- What are the primary risks related to the network strategy and corresponding deployment timeline?
- Please outline all major activities (site identification and acquisition, CO approvals, rights of way, IRUs, long-haul capacity, etc.) that must take place as part of the deployment process and provide the current status of these activities.
- What is the status of interconnect agreements? What interconnect agreements are in place and what interconnect agreements are still outstanding? Please provide documentation.
- For those outstanding, what is the timeline for negotiating interconnect agreements? How does this relate to the Company's deployment timeline? What are the Company's options in the event interconnect agreements are not negotiated on time? Who is leading the interconnect negotiations? What is their background in this area? Are any third parties involved in the process? What is their background in this area?
- Please provide a map of the proposed coverage area. Is the topography of the coverage area suited to the technology?
- When will the network be operational and service be available in each of the expansion markets? How aggressive are these timeframes? What is the worst case scenario?
- How critical are time to market and network coverage to the Company's strategy in light of the competitive environment?
- Please provide detail on the portions of the network that are to be and are not to be owned and operated by the Company.
- Please outline any construction / deployment activities that are going to be outsourced. Who will be providing these services? What is their experience in the contracted area? What are the major terms of the contract (price, timeframes, penalties, etc)? Please provide copies of the contracts
- What are the primary advantages of the Company's network over the competition's existing or future network?
- How does the Company's network cost structure compare to the competition's?
- Where and how are the monthly network costs incorporated into the model? Please provide detail regarding all underlying network assumptions. Please provide a clear breakdown of the fixed and variable components of the monthly network costs.
- If Dark Fiber IRUs are part of the Company's network strategy, please provide details and documentation of the terms. How are the IRUs reflected in the projections?

### Licenses (if applicable)

- Does the Company require licenses to execute its revised business plan? If so, what types of licenses does the Company need?
- What licenses does the Company currently own? Please provide a detailed list of license properties.
- Does the Company need to obtain additional licenses to build-out the coverage area as reflected in both the business and financial plan? If yes, what are the Company's plans to obtain additional licenses (acquisitions, auctions, etc)? Please explain.
- Have any assumptions been made in the financial projections regarding future license purchases? Please outline the underlying assumptions.
- What company within the Company's legal structure holds the licenses? Where will future licenses be held?
- What is the nature of the License agreements (i e build-out requirements, transferability, assignability, duration, etc.)?

CONFIDENTIAL WC 0039839

 Lucent Technologies

**Personnel / Labor**
- Describe any positive / negative characteristics of the labor environment.
- What are the projected labor requirements for each area of the business over time? Please point to where headcount requirements can be found in the financial projections.
- Describe availability of labor in local market for key jobs including sales, technical support, administrative and operations.
- What is the Company's strategy for recruiting and hiring personnel in the different areas mentioned above?
- What is the historical unemployment rate for the past two years?
- Who is leading the recruiting efforts? What is their background in this area? Are any third parties assisting in the effort? If yes, please explain the nature of the relationship.
- What types of training mechanisms will be implemented? How often will training be offered / required?
- What proportion of the labor force is expected to be unionized? For the unionized labor force, when does the union contract expire? Please describe the Company's relationship with the union?
- Have increased salaries and wages been forecasted in the financial projections? What annual percentage increase is reflected in the financial projections?
- What is the current inflation rate? What is the historical inflation rate for the past two years? What is the forecasted inflation rate? How have current and forecasted inflation rates been incorporated into the salaries and wages forecasts in the financial projections?
- Please provide an analysis of GDP per capita and per capita income as reflected in the salaries and wages forecasts in the financial projections

**Contractual / Legal**
- Please identify and describe any contractual and legally binding agreements that have not been addressed in previous sections.
- Please describe any issues with the Company's current insurance coverage (i e  network, corporate, business interruption, key man life insurance, etc).
- Please describe any current or future litigation and expected impact and costs (if any)?

**Political / Economic Environment**
- Please describe the Company's view of the political and economic scenarios which underlie the Company's international portion of its business plan including:
    - Political stability
    - Economic expansion / domestic consumption
    - Economic stability
    - Exchange rate stability

CONFIDENTIAL WC 0039841

**B1382**



**Harris, Deborah K (Deborah Kristine)**

From:       Kemer, Margaret (Margaret) on behalf of Harris, Deborah K (Deborah Kristine)
Sent:       Monday, September 18, 2000 11:40 AM
To:         Aversano, Nina (Nina); Plunkett, William Montgomery, II (BJ)
Cc:         Cocito, James Vincent (Jim); Lill, Lisa M (Lisa); Mcguinn, Mary Teresa (Mary); Harris, Deborah K.
            (Deborah Kristine)
Subject:    Status of Winstar account
Importance: High

Nina and Bill,

I have tried to do a very brief summary of all the "good, bad and ugly" on this account. Bottom line is that to do an EOQ deal, we need Nate to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they can not immediately utilize. The deals of the past are haunting us...there is $87M in their warehouses. But much of that is also due to the problems with Williams.

We have a restructured proposal that categorizes what they need now through to long term. Definitely the majority of money we are asking for is not for immediate use. It also includes pricing for the B's and Hubs which is 2 tiered, and time sensitive. Depending on how fast we can implement and identify cost reductions thru the breakthru teams, could cause our SGP to hover around 30% or below.

What I need are 2 things:

1. **A call to Nate Kantor getting agreement to move forward on an EOQ deal.** Our meeting with Dave Ackerman is first thing Tuesday morning, so this would need to happen today. We believe they already will be spending around $46M with us, so we are asking for another $50-60M. (I am trying to get the total number in the $110-115M range).

2. Agreement that we can discuss at 5:15 today, on the aggressiveness of the proposal.

Following are the "headlines" for the Winstar account:

- Financing: Supposed to be a reschedule of Rouhanna/McGinn/Hopkins meeting. Have not heard of a date; did hear today that there have been discussions.
- Winstar Services: We pass through around $67M/Q of Winstar Services. We have been told to stop this practice. We will be communicating our position to Winstar the week of 9/18, including options of what portion of these services we can do. We may want to delay this move for a quarter based on this EOQ deal.
- Lucent Content: Contractually, Winstar should be spending 70% content; currently running around 54%; Winstar uses the "Best of Breed" clause as justification.
- Winstar Budget: Mid August stated they had $400M for 2H2000; we identified $165M Lucent addressable. Feedback: all $$$ are spent; only money for Data and Data Centers; refuse to purchase anything they can not utilize right now.
- Previous EOQ Deals: Separate attachment outlines the result of each EOQ2000 deal.
  - 2Q2000 a commitment was made by Winstar to purchase $133M and to date only $19M has billed. The agreement was to replace the Max 20's with Stinger LS; in this same deal we purchased $35M in Radios and IRU's.
  - Winstar does have major inventory as a consequence of these deals.
  - Credits provided in all of the previous EOQ deals are now hitting in 4Q2000 results.

Page 1

CONFIDENTIAL



LW00018182

B1383

- Radios and IRU's: Currently holding inventory worth $20M Radios, $25M IRU's and $10M CIO Radios; ATG our hottest prospect; expectation of Winstar is for Lucent to replenish; we may consider based on agreement on the EOQ deal.
- Accounts Receivables: Around $80M; held up based on resolution of Financing draw down.
- EOQ-4Q2000 Deal:
  - based on Winstar feedback: review their budget;bid on laundry list of projects;stop negotiating constantly;settle on annual #.
  - proposal: Spending for remaining of 2000C according to budget(we thought); spending amount for 2001C; major forward pricing of Hubs and B's solution (thought were hitting targets, but the targets had moved down); areas to spend money were no longer in line with how they wanted to spend their money.
  - we also recommended how to save money in not deploying IP Network right now because the ATM capacity was capable but we were challenged on our intentions.
- Proposal for 9/19:
  - still rolls up the remaining of 2000/2001
  - aggressive B and Hub pricing
  - divided offer into categories of urgent, intermediate, long term
  - version attached here includes a total of $102M...we are trying to revise to be more at the $110-115 M.

- Files relevant to the Winstar account and EOQ deal:


EOQ Deal.doc


Partnership Deal 050500 v7.doc


Partnership Deal 051700 v8.xls

Debbie

Page 2

CONFIDENTIAL

LN00018183

B1384

## LUCENT DESCRIPTIONS FOR "ATTACHMENT B" PARTNERSHIP DEAL

| | Previously Committed Business | Description |
|---|---|---|
| Professional Services and Labor | PO for NKG Services (portion already performed) | • Need PO to clean up previous invoicing & to finish out the year.<br>• Need Certification PO to complete Portland (going on now) and other planned late by year end. |
| | PO (or OS upgrades ($3.4M original PO) | LU wants to complete work originally contracted for. |
| | PO for Front end systems engineering ($1M original PO) | LU wants to complete work originally contracted for. This is important work needed to implement large quantity of OSS software already purchased (no OS margin). |

| | New Business | Description |
|---|---|---|
| **URGENT** | | |
| Service Nodes | Lab Expansion Data Equipment - 500 & 550 | • Dan Thomas, Thomas Gannady requested PSAX 50, 100, 500, 2300 interfaces, CBX500, GX550 product for the lab.<br>• All of the PSAX components were not previously provided to the lab, so Lucent is providing them free of charge.<br>• The CBX500, GX550 components were all duplicate to product already provided by Lucent at no charge; in some cases, more than one item has been provided for free.<br>• The 500, 550 product is required to do some international testing and to test additional domestic service offerings. This testing is being done in parallel to tests currently running on the 500/550 systems already installed in the lab. |
| Hub Sites | PO for Construction Management Services in support of Hubs and Ba deployment (12 months) | • Started work on 2/28. Had previously staffed up from 100 bundle project & on word from WS that LU would get this business.<br>• Originally contracted for 44 weeks to end in 2000.<br>• Lisa Hicks authorized use of line item for 100 bundle funding of $077K.<br>• Line it em scheduled to exhaust mid October at current run rate. |
| B Sites | Revised PO for 100 Slingers + rolled up services | • Slingers needed for EOY deployment |
| Optical Networking | | |

CONFIDENTIAL

LW00018184

B1385

## LUCENT DESCRIPTIONS FOR "ATTACHMENT B" PARTNERSHIP DEAL

| | |
|---|---|
| PO for SNC, SNMS upgrade | • Upgrade of ONG EMS systems installed in Winstar's NOC; SNMS Release 2.1 to 3.1 (R4.0 will be provided free of charge in November); SNC from Release 9.0 to 10.0 installed in Winstar<br>• SNMS enhancements include support for newer network elements: 2.5GR3, 10G, BWM 3.0, CLS40G R3.0.<br>• SNC enhancements will support DDM-2000 OC3 release 15 for direct ring terminations on Titan 5500 and FT-2000 R9.1 for direct terminations on BWM. |
| PO for ONG Buildout Services (6 months) | • ONG long haul buildout services to cover another 6 months (January-June 2001) |
| PO for Metro 4Q Services | • Services to cover 4th quarter deployment of ONG equipment already purchased. |
| Savvis Upgrade | • 10G upgrade in NY to support additional SAVVIS requirements. |
| Maintenance Materials & Misc Optical Equipment | • Power supplies, fillers needed for ONG spares |
| **Professional Services and Labor** | |
| Maintenance for Data Equipment — 500 & 550 | • This proposal replaced original $30M deal to provide maintenance for current and future LU products in WS network.<br>• Current proposal is ONLY for existing products deployed in WS network through end of 2000.<br>• LU has been providing maintenance services since June, will only charge for services starting in September |
| PO for MACSTAR software (including 260K lines + interface) | • The product is an optional adjunct to the 5ESS switch to provide customer controlled station moves and changes.<br>• This was a requirement of government contracts. |
| **Data Centers** | |
| Storage Equipment (for SF Data Center (EMC) | • EMC storage equipment for SF Data Center. |
| **INTERMEDIATE** | |
| **Central Offices** | |
| Signed irrevocable Letter of Intent for 5E16 buyout | • Software w/ features needed by WS<br>• Buy now and get 20% discount and 12 months to pay!<br>• Future 5E16 features being developed that will require additional PO(s) |
| **Service Nodes** | |
| PO for Sprintmlide solution to support VPN services | |
| **Hub Sites** | |
| **B Sites** | |
| PO for 1,000 Cell/Pipe IAD's | • IAD's to support     buildout |

CONFIDENTIAL

LW00018185

B1386

## LUCENT DESCRIPTIONS FOR "ATTACHMENT B" PARTNERSHIP DEAL

| Revised PO for 1500 Slingers + rolled up services | | |
|---|---|---|
| **Optical Networking** | | |
| | PO for 400G R3 software & Implementation services | • Winstar currently has 400G R2.03 software (GA June, 1999) loaded in the installed routes; R3.0 is GA with 20 additional features |
| | | • Several key features include: OC192 Forward Error Correction, Linear Gain Tilt Compensation, CLS Compatible Optics, High Speed Broadband Optical Interfaces; Enhanced Maintenance Abilities |
| | New York to DC long haul extension | • Extension consists of the addition of the Winstar CO at 165 Halsey as part of the NE ring. |
| | | • Includes the implementation of 3 shelf bays of 2.5G TDM systems at 1101 Market St. in Philadelphia and 1850 M St. in DC to terminate SONET traffic from 165 Halsey. |
| | Phoenix-Houston 400G long haul true-up | • Proposal includes OTU's not inventoried in Morrow, GA. |
| | | • Extensive redesign of route to include traffic drops in three cities |
| **Professional Services and Labor** | | |
| | PO for CONNECTVU feature ACO/LERG software | • Automate updates, changes to area code lists in CONNECTVU |
| **LONG TERM** | | |
| **Central Offices** | | |
| | PAYG 5ESS | • Remaining PAYG payments for (8) Model 2A 5ESS switches in the network |
| | PAYG Growth SMs | • Remaining PAYG payments for (14) SM's in the network installed in (7) cities |

CONFIDENTIAL

LW00018186

B1387

**LUCENT FISCAL Q4 2000 EXPECTED REVENUE**
*Prepared September 18, 2000*

| Description | Revenue |
|---|---|
| Optical Networking | $17.8M |
| Switching | 2.3M |
| Services | 20.0M |
| Radio | 7.0M |
| Access | 7.0M |
| Broadband Data | |
| Software Products | 1.0M |
| | |
| TOTAL | $55.1M |

should we be more specific pd's etc?

CONFIDENTIAL

LW00018187

B1388

## LUCENT/WINSTAR END OF QUARTER DEALS
### FISCAL YEAR 2000
*Prepared September 14, 2000*

| Quarter | Winstar PO's | Lucent Billed Rev | Winstar Sales to Lucent | Equipment Stored in Warehouse | Lucent Revenue Credits to Winstar |
|---|---|---|---|---|---|
| Q1 | $96,791,372 | $113,902,391 | $10M (Radios) | | |
| Q2 | $327,824,158 (Includes $133M PO for 5,200 Max 20's which were never ordered; 200 PSAX 2300's which were all shipped; only $19M of this PO actually billed) | $114,977,092 | $10M (Radios) $25M (Lit Fiber IRU's) | PSAX 2300: 190 systems ($11.9M) staged in Lucent's Columbia, MD warehouse; CopperCom: 30 systems ($4.9M) staged in Lucent's Columbia, MD warehouse | ($3M) |
| Q3 | $112,728,000 | $130,050,799 | $10M (Radios) | CBX 500: 23 Systems ($7.5M) in Winstar DD warehouse; OX550: 10 systems ($3.5M) in Winstar DB warehouse; | ($14M) ($3M) ($2.9M) |
| | | | | Cumulative: ONG equipment: $55M in Lucent's Morrow, GA warehouse (will be depleted by Feb/March 2001) SESS: 1 Model 2A ($1.3M) stored in Lucent warehouse for approx. one year | |
| TOTAL | $537,355,930 | $358,930,282 | $55,000,000 | $87,100,000 | $12,900,000 |

* These were not the only PO's received from Winstar during these quarters. This list includes the PO's that were involved in the EOQ deals.

CONFIDENTIAL

LW00018188

B1389

## Winstar/Lucent 2000-2001 Partnership Deal:

*Lucent Commitment:*

In the spirit of true risk sharing, Lucent agrees to forward price its B site and Hub site technology and services to align with Winstar's budget targets for 2001. This pricing will be extended to all B sites and Hub sites provisioned and deployed by Lucent in 4Q 2000 and throughout 2001.

*Winstar Commitment:*

Winstar agrees to purchase Lucent products and services such that:
- At least $XXM in billable revenue will be realized by Lucent in Q3 2000.
- At least $XXM in billable revenue will be realized by Lucent in Q4 2000.
- At least $600M in billable revenue will be realized by Lucent in calendar year 2001.

*Key Winstar Benefits:*

- B and Hub site pricing that supports Winstar's 2001 Business Plan ($35K/B-site migrating to $27K/B-site, $450K/Hub)
- Converged Architecture conserves radio spectrum, reduces cost of revenue, supports EBITDA positive attainment
- Converged solution minimizes operations, inventory and other expenses
- Lucent offer provides predictable pricing level for Hub/B/C buildout (based on criteria included in Attachment A)

*Key Partnership Benefits:*

Partnership relationship means:
- Dedicated Lucent marketing team to support customer acquisition and retention programs
- Co-branded programs to increase awareness and recognition of Winstar brand in the market
- Improved content Lucent ratio (per stipulation in the Supply Agreement)
- Winstar positioned as one of Lucent's premier customers with all associated benefits (i.e. access to Lucent's technical stakeholders, CTO information exchange forums such as the upcoming Global Technology Summit)

Lucent / Winstar Proprietary
09/18/00

CONFIDENTIAL

LW00018189

B1390

## Business Plan Framework:

### Lucent agrees:

- To assume risk of reducing B/C and Hub site costs over the course of the next 18 months
- To flawless execution in the deployment of Winstar's network
- To deploy a consistent global network architecture and topology per Winstar requirements
- To uniform approach to global network deployment (program management principles and methodologies)
- To shape development of products and services to directly respond to Winstar requirements. Two cases in point include:
  1) Lucent's B Site Optimization Initiative (downsizing electronics, cabinet and power along with assessment of RF integration into MTU optimized DSLAM)
  2) Lucent's advanced IP services initiative (economical and scalable IP solution that will deliver IP QoS, bi-directional polling, VPN, BoD, subscriber service selection, security and voice on a single CPE device).
- To partner with Winstar to establish an ongoing program to foster the sale of Winstar services in select tier III and tier IV cities  (NOTE: this is a placeholder, Kevin to provide language – this term may or may not be included in final draft)

### Winstar agrees:

- To $600 Million in global purchases from Lucent Technologies for Calendar 2001 for exclusive builds in the following technology areas:
  - Metro and Long Haul ONG solutions and buildout services
  - Circuit and packet switching solutions
  - Operations systems solutions
  - Broadband ATM solutions
  - Router and IP solutions
  - Hub and B site access deployments
  *(Pricing for items listed above, except for Hub and B pricing, will be as set forth in the Supply Agreement)*

- To maintain or exceed existing level of Professional Services, including Architecture, City Planning, Buildout and Lab
- To purchase $480M of the $600M commitment noted above in Lucent products and services within the first 3 calendar quarters of 2001
- To purchase by September 25, 2000 the items in Attachment B
- To execute Addenda to Supply Agreements for ONG, Hubs and Bs to include Lucent product content provision, payment terms per the Supply Agreement
- To execute a Title, Risk of Loss, Acceptance Amendment to Supply Agreement
- To maintain reasonable Account Receivables levels (averaging <$50M per month)
- To review Bell Labs Network Planning team results regarding IP network requirements and if a parallel IP network is justified, then Winstar agrees to grant Lucent the first right of refusal to supply an IP network solution that meets Winstar's requirements

Lucent / Winstar Proprietary
09/10/00

CONFIDENTIAL

LW00018190

**B1391**

- To work out an arrangement with Lucent such that Lucent product shipments go to Winstar facilities
- To establish an OSS/BSS integration/test/development lab and to spend $25M for this project in calendar year 2001
- To ensure executive review of Lucent's Cyber-Carrier Data Center reference architecture for Winstar's data center deployments going forward
- To test and review and deploy Lucent's radio solution(s) if it meets Winstar requirements

Lucent / Winstar Proprietary
09/18/00

CONFIDENTIAL

LW00018191

B1392

Calendar 2000
Partnership Dow 000000 v5.xls

## Winstar remaining 2000 budget analysis



Lucent Technologies Inc.
Proprietary

CONFIDENTIAL

Winstar Global 2001 Budget Analysis

CONFIDENTIAL

Lucent Technologies Inc.
Proprietary



134

Winstar

Very negative reaction
→ No buying from them — "Never forcing
this down throat"

→ "Haven't bought anything, don't intend
to buy — sold a bunch of stuff
that's not going to be used?

↓ Not working —
David — not meeting any of
our parameters. No value

→ Look at opportunity / Oracle

↓ Bought things — don't need...
"Can't help"
Software licenses — $26m̄
can't deliver
Pay as grow — $17m̄
$80m̄ stuff —
↓ 23m̄ data center; hubs / B. at wrong
price / 50K per building. —

→ Hut — 800K — wants 475K
Want price reduced / going
backward / forward —

LUCENT CONFIDENTIAL
FOR PURPOSES OF THE NRE
LUCENT SECURITIES LITIGATION

A 006732


PLAINTIFF'S
EXHIBIT
PX-155

B1395

Thank you.

Kelly Baroney



**Me**

From:        Aversano, Nina (Nina)
Sent:        Tuesday, September 19, 2000 11:54 AM
To:          Nate Kantor
Subject:     RE: WinStar/Lucent Deal

Importance:  High

Nate,

Our teams are meeting on this today, and will get clarification. More to follow at the conclusion of their session.

Thanks again for your support.

Nina

> From:     Nate Kantor[SMTP:rkantor@winstar.com]
> Sent:     Tuesday, September 19, 2000 7:11 AM
> To:       Aversano, Nina (Nina)
> Subject:  Re: WinStar/Lucent Deal

Nina,

Great to talk to you and we will help wherever possible. I am a bit confused with the attachment-could you tell me what is the S46M that we already spent. I think we have some confusion here and I want to be focused on this since we do not have alot of time to sort things out.

   Thanks,

   Nate

At 04:52 PM 09/18/2000 -0400, you wrote:
>Nate,
>
>Per our conversation, attached is a list of items which are of value to
>WinStar, and hence, serve to advance our mutual goal's. I'm obviously
>prepared to work with you and the team - and will make myself available 24x7
>during the next couple of weeks.
>
> <<Partnership Deal 091700 V9 - Attchmnt B>>
>
>I can't thank you enough for your support, and look forward to closing this
>deal.
>
>Nina

45

LUCENT CONVENTION THE PER
IT. BRUSES OF THE INA2
LUCENT SECURRITES LITIGATION

NA 002644



**B1396**



**Heron, Vanonda (Va Nonda)**

From:     Nate Kantor[SMTP:nkantor@winstar.com]
Sent:     Sunday, September 24, 2000 6:05 PM
To:       Aversano, Nina (Nina)
Subject:  Fwd: FW: Winstar Services Purchase Order



rjewinster1.doc        dwawinster1.doc

Nina,

I am very surprised and disappointed with this-we've only discussed and
agreed on this a million times.  This doesn't sit well with me and will
have a major impact on our ability to help you this quarter.

You've got to get this fixed.

   Nate

>From: "Harris, Deborah K (Deborah Kristine)" <harrisbrown@lucent.com>
>Sender: "Kernar, Margaret (Margaret)" <mkernar@lucent.com>
>To: "nkantor@winstar.com" <nkantor@winstar.com>,
>      "fjules@winstar.com"
>      <fdes@winstar.com>
>Subject: FW: Winstar Services Purchase Order
>Date: Fri, 22 Sep 2000 15:36:19 -0400
>Importance: high
>X-Mailer: Internet Mail Service (5.5.2650.21)
>
>Nate Kantor
>Frank Jules
>
>I have been asked by Rick Uhl to forward this to you.
>
>Debbie
>
>
> >
> > From:     Harris, Deborah K (Deborah Kristine)
> > Sent:     September 22, 2000 12:25 PM
> > To:       deckerman@winstar.com; ruhl@winstar.com
> > Cc:       Aversano, Nina; Plunkett, Wallace; bzletrick@winstar.com;
> > bhicks@winstar.com; jfuller@winstar.com; fruben@winstar.com
> > Subject:  Winstar Services Purchase Order
> > Importance: High
> >
> > Dave and Rick
> > As Bill Plunkett and I indicated in our phone conversations on Thursday,
> > September 21st, attached is a letter explaining the Lucent position
> > regarding the Purchase Order for Services issued by Winstar on September
> > 8th.
> > Debbie
> >
> >
> >
> > <<rjawinstar.doc>> <<dwawinstar.doc>>
> >

Page 1

CONFIDENTIAL

LW00001697

Lucent Technologies comments on <I>Fortune</I> magazine article about its SEC investi... Page 1 of 2

| Home | Solutions and Products | Customer Support | Bell Labs | **About Lucent** | | Glossary |

**Search**

[        ] (Go)

Advanced search

**Lucent Techr**
Bell Labs

### About Lucent:

News & Events

> Press Releases
 - Press Archive
> Features
> Events/Speakers
> Photo Gallery
> Press Contacts

Investor Relations

Industry Analyst Relations

Company Information

Work@Lucent

Partner Programs

[Select Month ▼] (Go)

Search press releases

[        ]

(Go)

## Lucent Technologies comments on *Fortune* magazine article about its SEC investigation

FOR RELEASE TUESDAY JULY 15, 2003

**MURRAY HILL, N.J.** – Lucent Technologies (NYSE: LU) issued the following statement today regarding a recent *Fortune* magazine article ("The Whistleblower and the CEO," July 7, 2003):

"In February 2003, we reached a settlement in principle with the SEC staff to resolve its investigation of the company. That settlement is still subject to the approval of the Commission. Without admitting or denying any wrongdoing, we agreed to consent to an injunction enjoining the company from future violations of the anti-fraud, reporting, books and records and internal controls provisions of the federal securities laws. We remain committed to the settlement in principle.

"Recent statements made by representatives of Lucent contained in the Fortune article mischaracterized a $125 million transaction between Lucent and Winstar in September 2000 that is one of the transactions encompassed by the settlement in principle.

"Specifically, Lucent's representatives suggested that this transaction arose from a 'failure of communication' and not an accounting fraud. Lucent recognizes such comments regarding the transaction were both inaccurate and inconsistent with the terms of the settlement in principle. The transaction involved falsification of documents resulting in improper accounting, both of which were seriously wrong and cannot be justified. That is why we reported the issue to the SEC immediately and took aggressive and appropriate steps to rectify the problem.

"We have always appreciated the seriousness of such conduct and we have taken the necessary actions to ensure that it will not recur."

For more information, reporters may contact:

Mary Lou Ambrus
Lucent Technologies
908-582-3060 (office)
800-759-8888 Pin # 1641002 (pager)
Email: mambrus@lucent.com

Bill Price
Lucent Technologies


PLAINTIFF'S
PX-17


EXHIBIT

McGinn 6
4/8/04

Lucent Technologies comments on <I>Fortune</I> magazine article about its SEC investi...   Page 2 of 2

908-582-4820 (office)
800-759-8888 Pin # 2584777 (pager)
Email: williamprice@lucent.com

View the Information and policies regarding
Lucent's press release archive.

Terms of use    Privacy statement
Copyright © 2004 Lucent Technologies. All rights reserved.

B1399

**DESK NOTES**

**SUISSE**                                    CREDIT SUISSE FIRST BOSTON CORPORATION

Americas        U.S. Telecommunications/CLECs                    September 29, 2000

**STRONG BUY**       # Winstar Communications                    **WCII**

**MID CAP**

Upbeat investor field trip hosted by CSFB; Lucent Vendor
relationship rock-solid; 3Q00 on track; Reiterate Strong Buy

**Mark Kastan, CFA**
1 212 325 5441
mark.kastan@csfb.com

**Martin Dropkin**
1 212 325 6615
martin.dropkin@csfb.com

- On September 28, we hosted an investor field trip to Winstar Communications (WCII) where we heard a series of upbeat presentations from the senior management team that highlighted a strong fundamental outlook.

- Management reiterated confidence in our 3Q00, FY00 and FY01 estimates. Our 3Q00 revenue forecast is $185.0M, and our EBITDA loss estimate is $34.4M.

- Just prior to the field trip, Lucent CEO Rich McGinn assured us that the $2B vendor finance line with WCII remains very much in force despite erroneous press reports and numerous market rumors to the contrary. WCII has $600M immediately available on this facility.

- WCII appears to have numerous funding alternatives available to close the 2H01 funding gap including additional strategic equity, local bandwidth sales and/or additional vendor financing relationships.

| Price 9/28'00 | | Target (12 Months) | Dividend | Yield | Mkt. Value (Millions) | | 52-Week Price Range |
|---|---|---|---|---|---|---|---|
| 16.00 | | $79 | NA | NA | $1,433.6 | | $66.5 – 14.1 |
| | | Annual EPS | Prev. EPS | Abs. P/E | Rel. P/E | EV/ EBITDA | EBITDA/ Share |
| 12 01E | | $(10.05) | | NA | | NM | $(0.04) |
| 12 00E | | $(11.55) | | NA | | NM | $(0.59) |
| | | March | June | September | December | | FY End |
| 2000E | | $(2.05) | $(3.84) | $(2.79) | $(2.82) | | Dec-31 |
| ROIC (12'99) | NA | Total Debt (12'99) | | $2,970 | Book Value/Share (12'99) | | $(5.01) |
| WACC (12'99) | NA | Debt/Total Capital (12 99) | | 45% | Common Shares | | 89.6 |
| EP Trend* | Positive | Est. 5-Yr. EPS Growth | | NM | Est. 5-Yr. Div. Growth | | NM |

On 09/28/00 DJIA closed at 10824.1 and S&P 500 at 1458.28.
*Economic profit trend.

Winstar is a facilities-based provider of broadband telecommunications services with offerings such as local and long distance voice services, broadband data services, web hosting, applications service provider (ASP) products, and content services in both domestic and international markets.



DEPOSITION EXHIBIT
McGinn 4
7 31 '01
Richard Gemoson, C.S.R. R.P.R. C.R.R.

PLAINTIFF'S
EXHIBIT
PX 164

CONFIDENTIAL                                    LW00123997

**B1400**

Winstar Communications

CREDIT | FIRST
SUISSE | BOSTON

### Investment Summary

On September 28, we hosted an investor field trip to Winstar Communications (WCII) where we heard a series of upbeat presentations from the senior management team. Key members of the senior management team presenting to our group included: Bill Rouhana (CEO), Nate Kantor (COO), Rick Uhl (CFO), Frank Jules (newly appointed COO of US Operations), and Dave Ackerman (CTO).

Key highlights of the presentations were as follows:

- Reiteration of management's confidence in our 3Q00, FY00 and FY01 estimates;

- Detailed status review of the current Lucent (LU) S2B vendor financing relationship which appears solidly in place with $600M still immediately available to WCII notwithstanding recent erroneous press reports and market rumors to the contrary; and,

- · WCII appears to have numerous funding alternatives available to close the 2H01 funding gap including additional strategic equity, local bandwidth sales and/or additional vendor financing relationships.

Additional topics covered during the field trip ranged from the status and cost outlook of the local broadband network deployment as well as an update on the progress of recent ASP initiatives.

Overall, we came away from the meeting with a high degree of confidence in the current tone of business, the long-term growth prospects for the company as well as the encouraging outlook for funding over the near term, and thus we view the recent weakness in the stock as an excellent buying opportunity. We reiterate our Strong Buy recommendation on WCII shares.

### Highlights of the daylong management presentations are as follows:

**Lucent Vendor Facility Update:** The evening before our field trip to WCII's operations center in Herndon, Virginia, we had the opportunity to speak with Lucent's (LU) CEO Rich McGinn in order to better understand the vendor financing relationship between WCII and LU, its lead equipment vendor. McGinn expressed quite emphatically to us that LU has utmost confidence in the WCII business model and that the vendor relationship between the two companies is as sound as ever. In addition, he was quite clear in his assurance to us that and the S2B vendor financing arrangement remains very much in force despite erroneous press reports and numerous market rumors to the contrary.

Key details of the LU vendor facility are as follows: WCII has a total of S2B available in two-$1B tranches, and in order to gain access to the second $1B tranche, WCII must refinance the first one (i.e. remove the liability from LU's balance sheet by placing this instrument in the secondary credit market). In addition, after WCII utilizes over $500M of LU vendor financing (an event we expect will occur during 4Q00), LU has *the right* (but not the requirement) to notice WCII to syndicate the first $500M. If, following this notice, WCII does not refinance the $500M within 100 days, LU is then at liberty to sell off this first $500M tranche in the secondary market while the rate WCII incurs for future borrowings under this facility increases by 200 basis points to LIBOR + 575 basis points. It is important to note, however, that for every dollar that either WCII or LU refinances of the vendor facility, WCII has new financing available of that amount, up to the $2B maximum amount.

**Funding:** In addition to $600M currently remaining under the first $1B vendor financing tranche, WCII's $400M in cash on the balance sheet at 2Q00 end

---

–2–

LW00123998

**B1401**

Winstar Communications                                      CREDIT | FIRST
                                                           SUISSE | BOSTON

should fund the company to mid-01. We learned that WCII is currently exploring a number of financing alternatives designed to close the anticipated $500-700M funding gap for 2H01 including the following: 1) refinancing the first $500M outstanding LU vendor facility tranche that would free up additional borrowing capacity (see above); 2) additional equity infusions from existing strategic equity partners; 3) new strategic equity partners; 4) local bandwidth sales to long haul carriers, foreign telcos, ISPs, ASPs and/or other CLECs; and, 5) new vendor financing relationships with additional equipment vendors.

**3Q00 Outlook:** CFO Rick Uhl indicated strong confidence in our 3Q00 revenue forecast of $185.0M and in our EBITDA loss estimate of $34.4M. We learned that the impact from the recently settled 3-week Verizon strike in the Bell Atlantic states is negligible for the quarter, as WCII is almost completely on-net within the territory and thus the company provisions and maintains those customers' services internally. We maintain our view that WCII will turn EBITDA breakeven during 1H01, and we now think that our FY01 EBITDA loss estimate of $3.6M could be conservative to the extent that the company may finish the year in positive territory.

**Network Deployment Update:** WCII is on track to meet or exceed our forecast of 9,700 on-net buildings by YE01, and we continue to forecast that the company will have 3,000 on-net buildings at 3Q00 end. More importantly, we learned that per building equipment costs are coming down significantly, and the current installation cost estimate of $50,000 per building could potentially be cut by 50% over the near to intermediate term due to equipment cost reductions as well as scale efficiencies as WCII ramps up the number of on-net buildings. Delivery of WCII's 4 fibers on the 15,000 route mile Williams network is on track to be complete by YE01, with approximately one-third of the expected total delivered to date.

**Fixed Wireless Developments:** Deployment of Point to Consecutive Point (PCP) radios began last month, and we expect WCII to disclose the vendor it is currently using shortly as well as to begin testing Triton (TNSI) PCP radios in its lab by YE00. WCII is currently deploying Point to Point (PTP) radios with up to OC-3 (155 Mbps) capacity, and the company is testing OC-6 (311 Mbps) now and will begin testing OC-12 (622 Mbps) soon. In addition to PCP and PTP technologies, WCII continues to deploy Point to Multipoint radios (PMP) with a capacity of four DS-3s (45 Mbps) per sector. WCII uses a combination of all three technologies in its network design, deploying each type as appropriate.

**ASP Initiatives:** WCII continues to enhance its application service provider (ASP) initiatives, and CEO Rouhana reported that existing relationships with both Microsoft and Oracle continue to progress well. Typical revenues from a typical ASP customer currently run in the range of $4,000 per month for services such as messaging and e-mail, more than double the $1,650 per month level for traditional voice and data customers.

**Note:** Several private investment funds, sponsored by Credit Suisse Group, participated in a $400 million investment in Winstar Series G Senior Cumulative Participating Convertible Preferred Stock and certain employees of CSFB, including Mark Kastan as the author of this report, have an economic interest in this transaction.

–3–

CONFIDENTIAL

LW00123999

**B1402**

# SUISSE

| | | |
|---|---|---|
| AMSTERDAM | 31 20 5754 890 | |
| ATLANTA | 1 404 656 9500 | |
| AUCKLAND | 64 9 302 5500 | |
| BALTIMORE | 1 410 223 3000 | |
| BEIJING | 86 10 6410 6611 | |
| BOSTON | 1 617 556 5500 | |
| BUDAPEST | 36 1 202 2188 | |
| BUENOS AIRES | 54 11 4394 3100 | |
| CHICAGO | 1 312 750 3000 | |
| FRANKFURT | 49 69 75 38 0 | |
| GENEVA | 41 22 394 70 00 | |
| HOUSTON | 1 713 220 6700 | |
| HONG KONG | 852 2101 6000 | |
| LONDON | 44 20 7888 8888 | |
| MADRID | 34 91 423 16 00 | |
| MELBOURNE | 61 3 9280 1666 | |
| MEXICO | 52 5 283 89 00 | |
| MILAN | 39 02 7702 1 | |
| MOSCOW | 7 501 967 8200 | |
| MUMBAI | 91 22 230 6333 | |
| NEW YORK | 1 212 325 2000 | |
| PALO ALTO | 1 650 614 5000 | |
| PARIS | 33 1 40 76 8888 | |
| PASADENA | 1 626 395 5100 | |
| PHILADELPHIA | 1 215 851 1000 | |
| PRAGUE | 420 2 210 83111 | |
| SAN FRANCISCO | 1 415 836 7600 | |
| SÃO PAULO | 55 11 3841 6000 | |
| SEOUL | 82 2 3707 3700 | |
| SHANGHAI | 86 21 6881 8418 | |
| SINGAPORE | 65 538 6322 | |
| SYDNEY | 61 2 8205 4400 | |
| TAIPEI | 886 2 2715 6388 | |
| TOKYO | 81 3 5404 9000 | |
| TORONTO | 1 416 352 4560 | |
| VIENNA | 43 1 512 3023 | |
| WARSAW | 48 22 695 0050 | |
| WELLINGTON | 64 4 474 4400 | |
| ZUG | 41 41 727 97 00 | |
| ZURICH | 41 1 333 55 55 | |

Copyright Credit Suisse First Boston, and its subsidiaries and affiliates, 2001. All rights reserved

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Credit Suisse First Boston or its subsidiaries or affiliates (collectively "CSFB") to any registration or licensing requirement within such jurisdiction. All material presented in this report, unless specifically indicated otherwise, is under copyright to CSFB. None of the material, nor its content, nor any copy of it, may be altered in any way, transmitted to, copied or distributed to any other party, without the prior express written permission of CSFB. All trademarks, service marks and logos used in this report are trademarks or service marks or registered trademarks or service marks of CSFB.

The information, tools and material presented in this report are provided to you for information purposes only and are not to be used or considered as an offer or the solicitation of an offer to sell or to buy or subscribe for securities or other financial instruments. CSFB has not taken any steps to ensure that the securities referred to in this report are suitable for any particular investor.

Information and opinions presented in this report have been obtained or derived from sources believed by CSFB to be reliable, but CSFB makes no representation as to their accuracy or completeness and CSFB accepts no liability for loss arising from the use of the material presented in this report where permitted by law and/or regulation. This report is not to be relied upon in substitution for the exercise of independent judgment. CSFB may have issued other reports that are inconsistent with, and reach different conclusions from, the information presented in this report. Those reports reflect the different assumptions, views and analytical methods of the analysts who prepared them.

CSFB may, to the extent permitted by law, participate or invest in financing transactions with the issuer(s) of the securities referred to in this report, perform services for or solicit business from such issuers, and/or have a position or effect transactions in the securities or options thereon. In addition, it may make markets in the securities mentioned in the material presented in this report. CSFB may, to the extent permitted by law, act upon or use the information or opinions presented herein, or the research or analysis on which they are based, before the material is published. CSFB may have, within the last three years, served as manager or co-manager of a public offering of securities for, or currently may have a primary interest in, issues of, any or all of the companies mentioned in this report. Additional information is available on request.

Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgment at its original date of publication by CSFB and are subject to change. The value and income of any of the securities or financial instruments mentioned in this report can fall as well as rise, and is subject to exchange rate fluctuations that may have a positive or adverse effect on the price or income of such securities or financial instruments. Investors in securities such as ADRs, the values of which are influenced by currency volatility, effectively assume this risk.

Structured securities are complex instruments, typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. The market value of any structured security may be affected by changes in economic, financial and political factors (including, but not limited to, spot and forward interest and exchange rates), time to maturity, market conditions and volatility, and the credit quality of any issuer or reference issuer. Any investor interested in purchasing a structured product should conduct its own investigation and analysis of the product and consult with its own professional advisers as to the risks involved in making such a purchase.

This report is distributed in Europe by Credit Suisse First Boston (Europe) Limited, which is regulated in the United Kingdom by The Securities and Futures Authority ("SFA"). It is not for distribution to private customers as defined by the rules of The SFA. This report is distributed in the United States by Credit Suisse First Boston Corporation; in Canada by Credit Suisse First Boston Securities Canada, Inc.; in Brazil by Banco de Investimentos Credit Suisse First Boston Garantia S.A.; in Japan by Credit Suisse First Boston Securities (Japan) Limited; elsewhere in Asia/Pacific by Credit Suisse First Boston (Hong Kong) Limited, Credit Suisse First Boston Australia Equities Limited, Credit Suisse First Boston NZ Securities Limited, Credit Suisse First Boston Singapore Branch and elsewhere in the world by an authorised affiliate.

In jurisdictions where CSFB is not already registered or licensed to trade in securities, transactions will only be effected in accordance with applicable securities legislation, which will vary from jurisdiction to jurisdiction and may require that the trade be made in accordance with applicable exemptions from registration or licensing requirements. Non-U.S. customers wishing to effect a transaction should contact a CSFB entity in their local jurisdiction unless governing law permits otherwise. U.S. customers wishing to effect a transaction should do so only by contacting a representative at Credit Suisse First Boston Corporation in the U.S.

WCII Field Trip.doc

CONFIDENTIAL

LW00124000

**B1403**

mmunications

**CREDIT | FIRST**
**SUISSE | BOSTON**

– 5 –

CONFIDENTIAL

LW00124001

**B1404**

PLAINTIFF'S
EXHIBIT
PX-174

DEPOSITION EXHIBIT
_Schacht 6_
3   1/16/04
MARLENE LEE, CSR, RPR, CRR

Source: News & Business > News > By Individual Publication > F > Fortune [i]
Terms: schacht (Edit Search)

✦Select for FOCUS™ or Delivery
☐

*Fortune, July 7, 2003*

Copyright 2003 Time Inc.
Fortune

July 7, 2003

**SECTION:** FEATURES; Pg. 88

**LENGTH:** 4823 words

**HEADLINE:** The Whistleblower And The CEO;
In the Lucent scandal, the ex-boss will walk. The woman who accused him is now an SEC target. And guess who's paying the penalty? Owners like you.

**BYLINE:** Carol J. Loomis

**BODY:**
Unless you are a voracious reader of the news, it was a story you may well have missed. On an otherwise quiet Friday the 13th in June, the Wall Street Journal reported in its B section that the Securities and Exchange Commission had given two former Lucent employees, Nina Aversano and Bill Plunkett, what are called "Wells notices," alerts that they are likely to be the target of a civil action by the government. The following day, the Bergen Record, based not far from Lucent's New Jersey headquarters, noted the Journal story in under 300 words. And the Washington Post covered it in a single paragraph. The New York Times didn't chime in at all.

The news, however, was far bigger than the play it got. Aversano, once a high-up Lucent sales executive, had made headlines as a whistleblower who claimed she'd been fired for trying to stop the company from making misstatements about its prospects. The notion that she was now in the government's legal cross hairs was not only a strange twist in a years-long SEC investigation, but also--surprise, surprise--an actual new chapter in a once-riveting corporate scandal that had seemed to fade from notice. For a long spell Lucent had been the accounting blowup that time forgot. And unfortunately so--for it is a case that offers no shortage of morals for today's shareholders.

It was way back in December 2000 that Lucent reported it had overstated its revenues for its latest quarter by nearly $ 700 million. The headlines rolled then in a size and blackness that fit this company's fame. Spun off from AT&T in 1996 and taking with it icon Bell Labs, Lucent caught the telecom boom just right, riding it to $ 258 billion in market value. By 2000, Lucent had more shareholders, 5.3 million, than any company around.

But by then Lucent also was losing market share and missing its earnings targets. Behind the scenes there was denial: Richard A. McGinn, Lucent's CEO, a salesman to the core--and a man who had just used $ 45 million of Lucent's money to build a golf course near its headquarters!--kept optimistically talking about "recovery" and driving to make it happen. He blamed his managers for poor execution when the problem had deeper roots. Employees reacted by manufacturing cotton-candy "revenues" and the profits that tag along. So now this mighty company was saying, just like some two-bit player, that it had cooked the books.

Not by a small amount either. We didn't know in late 2000 about the colossal scandals to

come--about Enron, or HealthSouth, or the unimaginable $ 11 billion of accounting fraud at WorldCom. So when Lucent disclosed its $ 700 million overstatement of revenues, for a single quarter, the figure looked--and was--enormous. Said a senior regulator then to FORTUNE: "Wow, $ 700 million. I think you could see some people ending up in striped suits in this one."

It is now 2 1/2 years later, and no one has donned stripes or even been indicted. Until the Aversano-Plunkett news came along, no one had even seemed about to be nailed by the SEC, which, though it cannot bring criminal charges against wrongdoers, can make their lives miserable with civil sanctions, such as forever barring them from big jobs in public companies. Even the matter of Aversano the Whistleblower has vaporized, culminating early this year in a settlement with deeply secret terms.

Meanwhile, Lucent's stock has been destroyed. From the peak of $ 258 billion, hit in December 1999, the company's market value has calamitously gone to $ 15.6 billion. (Included in that figure is $ 6.8 billion of current value for two companies that Lucent recently spun off, Avaya and Agere Systems.) And to people like Lucent's erstwhile chairman, Henry Schacht, that anemic $ 15.6 billion figure, reflecting a $ 2.13 share price for Lucent, looks almost thrilling: The company's shares got down to roughly a quarter of that in 2002.

Most of the stock's cratering, of course, is not attributable to fraud. To anyone who will look, Schacht displays a colorful chart tracking his industry. The chart shows that in mid-May, 30 large telecoms (including Lucent) had from their peaks lost a stunning $ 3.8 trillion in market value. Schacht's point, at heart, is that you didn't have to be charged with wrongdoing to lose huge value. Nevertheless, Lucent was charged--and so far no individuals but its shareholders are taking the rap.

That is the maddeningly unfair aspect of today's corporate scandals. Inanimate, Delaware-incorporated creatures like Lucent don't commit crimes. People do. Sometimes they leave their fingerprints all over the scene--there is certainly some of that in the Lucent saga. And sometimes they just instill a "tone at the top" that can encourage employees to go too far-- and there is that in Lucent too. In either case, punishment is typically delayed or may be too light when it comes or may not fall at all on a principal player. Meanwhile, the small investors who thought they couldn't go wrong with a piece of Bell Labs, and all the onetime AT&T shareholders (the proverbial "widows and orphans") who unwarily tucked this spinoff into their portfolios, and the entire continuing horde of Lucent shareholders--4.7 million of them still--suffer. This outcome is not fair when it falls on a single person, much less on more than the combined populations of Los Angeles and Detroit. But it is the miserable way the system works.

If punishment is now finally coming, it will probably fall under the rubric of "revenue recognition," meaning that certain employees will be accused of booking revenues that didn't deserve the name or wrestling them into quarterly reporting periods where they didn't belong. Criminal charges remain possible: Lucent says the U.S. Attorney for the District of New Jersey is conducting an investigation into what some of the company's employees did.

But when all the targets become known, they will almost surely not include the man once at Lucent's top: Rich McGinn, 56, who was fired as CEO two months before the $ 700 million disclosure. McGinn, says Schacht, was not fired for doing anything illegal and hasn't since been found culpable. No, the signal event in McGinn's life after Lucent is that he collected $ 12.5 million in severance. If you are a bigtime CEO, true, getting fired is ignominious stuff. But $ 12.5 million certainly makes the going easier.

McGinn's escape raises real questions about the nature of guilt in these affairs. By a definition that could rationally be plugged into every corporate dictionary, McGinn did do wrong--by demanding too much. In 2000 he pushed his managers for results they could not

B1406

deliver--not, apparently, without some crossing a legal line. The pressures that McGinn applied were described in the complaint that Aversano filed, which charged that he and the company had set unreachable goals that caused them to mislead the public. Obviously that was an adversary's claim, undermined in addition by the SEC charges that may be made against Aversano. But McGinn's push was acknowledged as well by **Schacht**, now 68, who had preceded McGinn as CEO, stayed on the Lucent board, and returned to take over when McGinn was ousted. Talking two weeks later to his top managers, **Schacht** said that under McGinn, Lucent was "driven by Wall Street expectations that were beyond the capacity of the company to meet." **Schacht** spoke also of complaining customers he'd just interviewed and the damage done Lucent: "What has happened to us is that our execution and processes have broken down under the white-hot heat of driving for quarterly revenue growth."

Looking back today, **Schacht** says carefully that McGinn's regime may have included "bad judgments." Some of those in fact got him fired. In October 2000, just after Lucent had ended its 2000 fiscal year, and seen its stock fall by almost 75% in ten months even before the company had unearthed any internal wrongdoing, McGinn was still talking about "recovery." Lucent's board had by then had its fill of McGinn's optimism and thought that what was needed instead was a sober restructuring of the business. So McGinn was out.

Today McGinn is a partner in RRE Ventures, a private equity firm founded by James Robinson III, who once headed American Express and got shoved out himself. McGinn, who refused to speak with FORTUNE on the record until just before presstime, said he had always been tough on unethical behavior at Lucent and that he did not "overreach" in 2000. He describes Aversano's account of her firing as "pure fantasy." The problem with Aversano, he says, was that she was not up to the job into which he had promoted her--"My mistake"--and kept proving it by failing to deliver.

The voluminous documents in the Aversano case, though, suggest that the situation was more complicated. There was something in Rich McGinn that couldn't accept Lucent's fall from its early triumphs. He described himself once as imposing "audacious" goals on his managers, believing the stretch for performance would produce dream results. Henry **Schacht** defends McGinn's thinking to a degree: "The job of the CEO is to lift the sights of the people under him." **Schacht** also points out that while McGinn was CEO, he never sold a share of Lucent stock (except once in connection with options that were expiring). But asked about "tone at the top," **Schacht** nods confirmingly, indicating that it was a problem to be reckoned with.

Compounding Lucent's troubles were a growing number of shareholder suits. They were so multitudinous and in need of order that they were eventually tagged Lucent 1 and Lucent 2. And then there was Aversano.

Lucent 1 occurred because Lucent's own private bubble burst, ahead of telecom's, in the first quarter of its 2000 fiscal year. Up to that time Lucent had both grown mightily and been a champion--for 14 quarters--at beating analysts' expectations. Most analysts were thinking that the 15th quarter, ending Dec. 31, 1999, would be another rouser. But on Jan. 6 of the new year, Rich McGinn grimly announced that Lucent had run into special problems during the quarter--including disruptions in its optical networking business--and would report both flat revenues and a big drop in earnings. That day the stock fell by 28%, losing a colossal $ 64 billion.

There was no hint of anything nefarious, but that doesn't matter much in shareholder suits these days. "As does night follow day," says Paul Saunders, a Cravath Swaine & Moore partner who is Lucent's outside counsel, investors filed suits charging Lucent, McGinn, and others with fraud. Saunders, though, classifies the charges as having a "plain vanilla" character: "Your stock dropped, and you must have been doing all sorts of bad things-- although we don't know what they are."

B1407

At Milberg Weiss Bershad Hynes & Lerach, name partner David Bershad, who was representing one of the new plaintiffs, attacked this little problem of details by putting the firm's investigatory team, headed by a former FBI agent, to work on Lucent. That team fanned out to talk to former Lucent people and pulled together, says Bershad, a picture of a company under far greater strain than McGinn had let on in January. There was, for example, "enormous pressure at the end of quarters to report revenues," Bershad's investigators found.

The legwork that Bershad had commissioned helped get his firm appointed lead counsel when a judge in Newark's federal court went on to consolidate the cases. But the suit dragged on, going nowhere much at all. Then, in the fall of 2000, this slow-moving buggy got dramatically overtaken by both Lucent 2 and the Aversano case.

Chronologically, except for skullduggery not yet uncovered, the first move was Aversano's. Now 58, Aversano was a longtime Bell employee whom McGinn in May 2000 had made president of North American sales to the "service provider" companies--including the regional Bells and their many upstart competitors. In that important job, in this company that has been way above average in putting women into high-ranking spots, Aversano reported to executive vice president Patricia Russo.

Aversano, says a former Lucent financial executive, was a hard-charger who reminded him of still another woman, Carly Fiorina, who'd left Lucent in 1999 to become CEO of Hewlett-Packard. After Aversano was promoted, she oversaw about 3,000 people bringing in 25% of Lucent's revenues. Counting 100,000 options given her in early 2000, Lucent figured her pay for the year, so Aversano testified, at a handsome $ 4.5 million.

In 2000 generally, Lucent was a pressure cooker in which McGinn was trying to generate results that would offset the year's terrible beginning. In this environment Pat Russo was an early casualty. She left in August, after McGinn restructured her out of a job. Later, in a deposition, McGinn described Russo's shortcomings as he saw them: "She would give me a forecast and tell me she was going to accomplish X, and then two weeks later come back and say, 'Oh, we're not going to do X [because] what we thought was going to happen isn't going to happen.' And there were ten different reasons every time."

After Russo's departure, Aversano reported directly to McGinn and, in effect, took over the job of saying that X wasn't going to happen. An immediate challenge at that moment was the fourth quarter. McGinn had originally told analysts to expect earnings growth of 20% for the period. Then, in July, he backtracked to 15%. And now, in August, even that goal was looking unrealistic.

To cope with her part of the problem, Aversano was holding weekly conference calls to deal with "gap closure," meaning the difference between what her division thought it could deliver in revenues and what McGinn wanted. In mid-August, McGinn unexpectedly joined Aversano's call, seeking firsthand information. McGinn's wish then for the quarter, which he had built into his 15% prediction for earnings, was $ 5.7 billion of revenues from Aversano. But on the call she said $ 5.2 billion was the outlook. The next day a manager who'd been on the call wrote an e-mail describing McGinn's reaction, which was that he "went ballistic."

The steam blowing may have done McGinn some good, but not much: On Oct. 10 he was forced to report that unexpected problems had constrained revenues and that fourth-quarter earnings would actually be down by at least 25%. The revenue contribution from Aversano's group? Some $ 5.5 billion. But that figure, as the world was about to learn, was infused with wrongdoing.

Before that fact became public, though, Aversano had a confrontation with McGinn that led to

B1408

her departure from Lucent. In depositions she has made, she claims that in mid-2000 she became more and more concerned about the sharp contrast between Lucent's desperate scrambling behind the scenes to produce revenues and McGinn's optimistic statements to the world. The scrambles, according even to **Schacht**, included a never-ending pursuit of "pull-ups." They typically involved special, costly deals with customers at the very end of a quarter that sucked revenues into that period, therefore making it look better than it would have otherwise. But great sucking successes of that kind put immediate pressure on the following quarter, which itself then needs a pull-up. And on and on. Aversano claims she thought time was running out for these and other end-of-the-quarter "miracles." And she became convinced, she has testified, that in hiding their existence McGinn was fraudulently misleading investors.

So on Oct. 9, in a meeting that was shortened by an interruption, and again on Oct. 11, she presented McGinn with arguments as to why his goals for fiscal 2001 were unreachable and why he needed, she says, "to come clean with the Street." McGinn had told analysts in July that Lucent expected both revenues and earnings to rise in 2001 by 20%. On Oct. 10, in between his two meetings with Aversano, he muffled that expectation, announcing bad fourth-quarter results and adding that they would "impact and lower" guidance for 2001. But Aversano claims that McGinn was still aiming way too high. The July expectation for her business in 2001 had been $ 25.5 billion. In her meeting with McGinn, she said the outlook, in an industry that had begun to reel, was no better than $ 21 billion and probably less. McGinn, she claims, dismissed even $ 21 billion as unacceptable. And then, according to her, he dismissed Aversano as well, saying, "I think you should retire." McGinn disputes this account, contending instead that Aversano began her sessions with him by saying she wanted to retire.

McGinn himself was ousted a few days later. In the meantime, in a fact that backs her contention that she didn't voluntarily quit, Aversano had begun negotiating what even Lucent calls a "severance package." It would have paid her $ 2 million over two years and also would have accelerated the vesting of some stock options. But then progress on the deal absolutely stopped, with no money paid. The reason was Lucent's discovery of wrongdoing and its belief that Aversano was implicated.

It was Henry **Schacht** who first got wind of bad stuff. Tall and distinguished in appearance ("He would have looked great in front of a jury," concedes Milberg Weiss's Bershad), he began his new job as CEO by diligently calling on Lucent's big customers. Among them were some of the CLECs--competitive local exchange carriers--to which Lucent had been supplying sorely needed vendor financing. Visiting one CLEC, Winstar, in Manhattan on a Friday in mid-November, **Schacht** dropped the dreaded news that Lucent was not going to increase its vendor financing to Winstar (which in fact, starved generally of credit, soon after went bankrupt). The Winstar executive he was talking to, says **Schacht**, came back with a sharp warning that Lucent might want to reconsider that plan, because "we've done favors for you."

Immediately apprehensive, **Schacht** asked Lucent's outside counsel, Paul Saunders, to use the weekend to examine the company's dealings with Winstar. And what Saunders and team quickly discovered was a large transaction that had taken place in the last few days of Lucent's fiscal year, ending Sept. 30, and that smelled. Ostensibly Winstar had simply bought a $ 125 million software pool (in essence, a license) from Lucent. But in actuality the Lucent sales team negotiating the transaction--which Lucent says was headed by Nina Aversano-- had sweetened the deal by granting Winstar about $ 100 million in credits and price discounts to be used when it made future purchases.

In an accounting sense, the existence of the credits and discounts made this a "multiple-element transaction," in which neither the revenues nor the offsets should have been recorded until all parts of the deal were completed. But somehow the sales division did not tell the numbers crew that the tie-ins had been negotiated, which meant that accounting

B1409

booked the $ 125 million in revenues in the fourth quarter. Cravath's Saunders calls that a "failure of communication," not an accounting fraud. When asked if that failure was intentional, he responds, "I don't know. I don't think so."

But there is no question that in the midst of the September transaction there was outright misbehavior: Someone--allegedly Bill Plunkett, a sales vice president who reported directly to Aversano--postdated the documents bestowing the credits and discounts, giving them an October date. (Plunkett, through his lawyer, declined comment.) That magically, if illicitly, transported these items from 2000, the true year in which they'd been negotiated, to 2001. It also deftly removed any timing tarnish from the $ 125 million in revenues. Had all this not been detected, the revenues would have stayed on the 2000 books, no questions asked.

As it was, Saunders and two Lucent executives, general counsel Richard Rawson and new CFO Deborah Hopkins (who has since gone to Citigroup), were on the phone to the SEC on Nov. 21. They said Lucent was reducing the fourth quarter's revenues from continuing operations by $ 125 million (to $ 9.2 billion), a move cutting net income by an estimated $ 65 million (to $ 532 million). They also said Plunkett had been fired and that Lucent was launching a no-holds-barred investigation to see if there was more to be confessed than the $ 125 million.

There was indeed. A month later Lucent announced that its investigation had shown it needed to cut fourth-quarter revenues by an additional $ 554 million and earnings by around $ 195 million. This raised the total vanishing act for revenues to $ 679 million and for earnings to about $ 260 million. The bulk of the new disappearing revenues came from transactions in the late part of fiscal 2000 in which Lucent induced two distributors, Graybar and Anixter, to buy some high-tech optical-networking equipment. By the first weeks of the new fiscal year the distributors had determined they couldn't resell the equipment and wanted to return it. Had they had a right to do so, Lucent should not have recorded the sales, amounting to $ 452 million. But the distributors' purchase contracts specifically said they had no such right. The contracts even said that verbal promises to take back the goods were meaningless. Still, there was some evidence, Saunders says, that Lucent people had made verbal promises of that kind. Besides, these were two important customers. So Lucent undid the sales.

By this time, just before Christmas, Lucent stock had taken new jolts from both the announcements of wrongdoing and the bad earnings news of October, falling in the wake of all this by another crunching $ 60 billion. And again, as night follows day, the old shareholder suits were amended and new ones came forth. A co-lead counsel, Bernstein Litowitz Berger & Grossmann, was appointed, and a courtroom christening took place: The early consolidated case would be called Lucent 1; the new one simmering, Lucent 2.

In still another major development before Christmas, Nina Aversano filed both a breach-of-contract and a whistleblower suit. The case moved forward glacially, but finally, in fall 2002, began to look as if it might be tried. Then suddenly, in January of this year, it was settled as a simple breach-of-contract action--on unannounced terms. All parties signed a confidentiality agreement so tight that lawyers for Aversano and Lucent cannot even give out case documents to reporters.

A few weeks later Lucent secured a settlement more satisfying--announcing it had reached an "agreement in principle" with the SEC's staff in which it would be charged with, but not fined for, committing fraud. That is light punishment, consistent with an SEC policy of avoiding the reinjuring of shareholders who've already been socked by fraud. For its part in the agreement, Lucent will sign a consent decree, neither admitting nor denying anything but promising, in any case, not to be bad in the future.

Assuming that the settlement is next approved by the commission (as it must be), the SEC

B1410

Case 1:06-cv-00147-JJF    Document 29-5    Filed 06/14/2006    Page 2 of 75

may well indicate that Lucent's exemplary behavior throughout--including its immediate reporting of wrongdoing and a follow-up investigation--is a reason for its getting no more than a slap on the wrist. In contrast, when the SEC fined Xerox $ 10 million in 2002 for accounting fraud, it said the fine partly reflected Xerox's·"lack of full cooperation" in the SEC's long investigation.

A harsher form of punishment, announced in March, is a payment Lucent must make to settle Lucent 1 and 2 and certain other shareholder, bondholder, and employee actions as well--a huge 54 cases in all. The amount advertised for this "global" settlement is roughly $ 600 million (including a payment, perhaps $ 30 million, from spinoff Avaya). But only $ 148 million of that, which is to be paid by Lucent's insurance companies, is cash. Lucent itself will pay, first, $ 315 million of stock (it has the option to pay in cash, but likely won't) and, second, 200 million warrants assigned an initial value of $ 100 million. The warrants, a wild card, will have a three-year life and entitle their holders to buy Lucent stock at $ 2.75 a share.

This total package of cash and securities is intended to be divided up among the buyers of Lucent securities in the period in which the consolidated suits charge the company with having committed fraud, which is Oct. 26, 1999 (when fiscal 1999 earnings were announced) to Dec. 21, 2000. Just how many claimants there'll be is invincibly uncertain. Daniel Berger, of co-lead counsel Bernstein Litowitz, guesses there will be upwards of 100,000. Bershad of Milberg Weiss thinks the total will be at least several hundred thousand and perhaps even one million.

Against these boxcar numbers, the $ 600 million figure needs close inspection. In one sense, it is very big--second, among class-action settlements, only to the towering $ 3.5 billion Cendant settlement. In three other ways it's small. First, it pales beside the $ 190 billion in market value that Lucent stock lost during the class period. Second, it is far less than the billions the plaintiffs were seeking. And third, it won't go far when it is spread among the birds feeding on it--including institutions of buzzard size. If there are 100,000 claimants, they will receive (leaving aside lawyers' fees, laughably unrealistic though that exclusion is) an average of $ 6,000. If Bershad's one million were possibly to materialize, the average would be $ 600.

In the court file in Newark, there is an outraged letter from one Salvatore Aprea, 69, of Sun City West, Ariz., who wants to know when in tarnation he's going to get something that might offset the $ 32,000 in Lucent losses he suffered as this decade began. Well, Sal, we hate to break it to you, but this is not a settlement that's going to change your life.

So why, you ask, isn't the settlement bigger? Very simple: Lucent's part is about the most the company could afford. This was a bloodless turnip if ever there was one. Not only did the collapse of telecom plunge Lucent into crisis, but in addition the lawsuits themselves hung over it like the sword of Damocles, threatening to administer a terminal blow. At one point during settlement negotiations, carried on for the myriad plaintiffs by an "ability-to-pay committee," the company's stock fell below 60 cents. Judge Joel Pisano, who was running the litigation, brooded over Lucent's wasted condition. Then he became a dedicated mediator who struggled to get the two sides to agreement rather than trial. And in the end the plaintiffs' lawyers, says Bershad, faced up to the fact that trial could well result in their getting a "Pyrrhic victory," in which they won their billions but Lucent didn't survive to pay. So the plaintiffs settled for their $ 600 million.

While all those legal troubles were consuming the company, **Schacht** and the Lucent board conducted a long search for a president and CEO, and ultimately, in January 2002, brought Pat Russo back. Saunders calls her "completely in the clear" with the SEC. So all she has to worry about is a management job that is prodigiously hard. Now 51, she has made customer satisfaction her highest priority. But in the workaday world she has had to deal with zero

B1411

Case 1:06-cv-00147-JJF    Document 29-5    Filed 06/14/2006    Page 3 of 75

upturns in business, persistent losses, and unremitting cuts in employment. From the top (adjusting for spinoffs), Lucent has amazingly gone from a headcount of 106,000 to 35,000. **Schacht** himself believes Lucent "is bouncing along the bottom." The bounces extend to the company's stock: Many days it leads the "most active" list, trading in prodigious volumes. Of course, at $ 2.13 a pop, you can whip around a lot of shares for relatively little money.

Sometime soon the SEC will no doubt file its complaints. The company will then have to endure a version of the movie Groundhog Day, in which all those misdeeds will again draw the light. For a company that has struggled to restore its reputation, those reminders of error, says **Schacht**, are tough to take. But that is the price of getting it wrong in the first place. It is also a price, alas, that is paid by the crowd that never deserved to be punished: Lucent's owners.

FEEDBACK cloomis@fortunemail.com

Lucent was "driven by Wall Street expectations that were beyond the capacity of the company to meet."

Aversano claims she told McGinn "to come clean with the Street." Then he told her, she says, "I think you should retire."

**GRAPHIC:** COLOR PHOTO: ST. JOHN'S UNIVERSITY, Breach of faith Nina Aversano said ex-boss Rich McGinn misled investors about Lucent's prospects.; COLOR PHOTO: ERIN PATRICE O'BRIEN, [See caption above]; COLOR PHOTO: ROBERT WRIGHT, Plaintiffs' poster boy Bershad has charted Lucent's fall along with its alleged falsehoods.; COLOR PHOTO: ROBERT WRIGHT, Cleanup man Lucent's first CEO, **Schacht** returned as chairman at crisis time.; COLOR PHOTO: SEAN GALLUP--GETTY IMAGES, Back as boss Pushed aside in 2000, Russo was rehired as CEO in early 2002.

**LOAD-DATE:** June 23, 2003

Source:  News & Business > News > By Individual Publication > F > Fortune ⓘ
Terms:  schacht (Edit Search)
View:  Full
Date/Time:  Sunday, November 23, 2003 - 1:01 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

B1412



Perricone, Elizabeth (Beth)

| From: | Derrick, Peter (Peter) |
|---|---|
| Sent: | Friday, October 20, 2000 2:20 PM |
| To: | Derrick, Peter (Peter); Hopkins, Deborah C (Debby/CFO) |
| Cc: | Keefe, Michael C (Michael); Perricone, Elizabeth (Beth); Fasciano, Annette L (Annette) |
| Subject: | RE: Winstar Refinance Notice |

Debby,

I am writing to provide you with another update since my last message. We have now reviewed the Winstar drawdown request with legal, CFO, and the CT. We are informed the overdue A/R is due to a good faith dispute, and the Lucent content issue does not constitute a breach. Therefore, we will continue to process their drawdown request on Monday.

Regards,

Peter

> ——Original Message——
> **From:** Derrick, Peter (Peter)
> **Sent:** Thursday, October 19, 2000 6:36 PM
> **To:** Hopkins, Deborah C (Debby/CFO)
> **Cc:** Keefe, Michael C (Michael); Perricone, Elizabeth (Beth)
> **Subject:** FW: Winstar Refinance Notice
>
> Debby,
>
> I understand from the commercial team that Winstar will be requesting a meeting with you next week, and for your information I attach an outline of the current situation with them. In summary the situation is as follows:
>
> - This week Winstar issued a borrowing request for $189M ($124M non-Lucent content, $65M Lucent content). This will bring the total Lucent loans to $685M.
> - Winstar continue to be non-compliant with the Lucent content restriction, and they may be in breach of the agreement to clear all outstanding A/R (we are verifying this).
> - Since the loans now exceed $500M, Lucent has the option to require Winstar to refinance all or a portion of the outstanding loans.
>
> Please call if you require any additional information.
>
> Regards,
>
> Peter
>
> > ——Original Message——
> > **From:** Perricone, Elizabeth (Beth)
> > **Sent:** Thursday, October 19, 2000 4:50 PM
> > **To:** Derrick, Peter (Peter)
> > **Cc:** Rogers, Leslie L (Leslie); Alfred, Adrian (Adrian); Fasciano, Annette L (Annette); Hayes, Paul (Paul); Keefe, Michael C (Michael)
> > **Subject:** Winstar Refinance Notice
> >
> > Per the email below, we are planning to issue a Refinance Notice next week to Winstar. I am happy to discuss in further detail with you this memo.
> >
> > I have learned from the commercial team that Winstar Senior Management has requested a meeting with Rich McGinn and Debbie Hopkins for next Monday, Oct. 23rd, but that a meeting has not yet been confirmed. The contents of the memo below are likely to be a topic on their agenda. If a meeting is to occur, I think it is important

1

CONFIDENTIAL

LW00071926

PLAINTIFF'S EXHIBIT PX-105

B1413

for us to speak with Debby to alert her of this pending event.

Thanks.

<< File: BP Refi Memo (10-19-00).doc >>

2

CONFIDENTIAL

LW00071927

B1414

# Winstar
# Executive Briefing

## October 20, 2000

| | |
|---|---|
| Tab 1 | Overview of Winstar |
| Tab 2 | End of Quarter Deals |
| Tab 3 | Global Winstar Account Team |
| Tab 4 | Global Account Plan |
| Tab 5 | Financing Background |



PLAINTIFF'S
EXHIBIT
PX-186

EXHIBIT
HARRIS
34

CONFIDENTIAL

LW00029295

B1415



CONFIDENTIAL

LW00029296

**B1416**

## WinStar Executive Briefing
*Prepared October 26, 2000*

### *Company Overview*

Winstar Communications, Inc. is a global communications company serving business customers with local, long distance, broadband, Internet and information services. WinStar uses its Wireless Fiber technology to connect to customers. This technology is a fixed, broadband wireless local communication service provided through licenses in the 28 and 38 GHz frequency band. They are building an end to end broadband network to serve the world's top 110 markets – 60 in the U. S. and 50 internationally. WinStar's entire sales and marketing philosophy and approach are customer and building centric. They identify the individual buildings they want to put on their network, engineer and install it and work to directly sell and serve their target customers.

Winstar's 1999 operating revenues totaled $445M. Their key services include the following: high speed Internet access and data transport; Office.com (online business service for small and medium sized businesses); enhanced Internet services including Web site hosting, e-commerce solutions, Web consulting and outsourcing, intranet/extranet site management and LAN/WAN and legacy systems integrations; web enabled applications such as Microsoft's Office Online, Exchange and Outlook applications, interactive multimedia and streaming applications and services; local and long distance basic and enhanced voice services.

### *Lucent/Winstar Strategic Agreement*

In October 1998 WinStar signed a five year $2B strategic agreement (Supply Agreement) with Lucent to engage Lucent to design, build, deploy and finance a Best of Breed nationwide and global communications network. The strategic relationship included the provisions that Lucent would be Winstar's preferred supplier to the extent Best of Breed network elements exist from Lucent and Lucent would treat Winstar as a preferred customer. In addition, Lucent agreed to provide financing with the stipulation that Winstar could use up to 35% of the money during the first contract year and up to 30% during years two through five for non Lucent products and services. Under the financing facilities, the non-Lucent content in year one was 50% and is currently 54% in year two.

### *Network Architecture*

The target architecture Lucent has designed for WinStar is based on the following elements:

- Use DWDM as the basis for core transport. It is ideal to accommodate the rapid increase of traffic expected in the WinStar network. Deploy a 6-8 SONET ring system to be interconnected using a Bandwidth Manager.
- Use an ATM based common backbone to carry all the services: Voice, IP, Frame, ATM and Private Lines. This is in contrast to today's overlay networks and the

CONFIDENTIAL

LW00029297

**B1417**

multitude of systems needed to manage them. This converged network will propel WinStar ahead of other major carriers.

- Evolve circuit switched voice traffic to packet to improve the economics of transport and management of voice trunks.
- Implement a converged access architecture beginning in October, 2000. It integrates voice, IP and Frame Relay using Cellpipe IADs (Integrated Access Device) on customer premises. Using SDSL, the IADs will allow WinStar to use existing copper inside the office buildings. A Stinger LS DSLAM inside each building will multiplex/demodulate the traffic from the IADs before it is sent over the Radio to the network. With this converged access architecture, the ATM layer is extended all the way to the customer's floor. This access solution will conserve on both radio spectrum and backhaul facilities.  There currently is a major initiative headed by Fred Kemmerer to develop a more integrated B site solution for Winstar.
- Structure the operations infrastructure using the TMN model and deploy new tools/processes to address the converged target architecture.

### _Lucent Fiscal 2000 Revenues_

NAR: $544M - ONG: $119M; Services: $95M; Switching:  $81M; Radios: $55M; INS: $34M; SPG: $31M; Octel: $10M; Software Pool: $135M (will be debited by $16.25M in credits)

Worldwide: $29M

### _Installed Base – Domestic_

WinStar has an installed base of (40) 5ESS Switches and has deployed Octel Voice Messaging Systems to support their voice mail requirements (displacing Centigram). A CBX500/GX550 network has been deployed and is already carrying Frame and some Private Line traffic. The voice trunking traffic (5ESS based) will also be carried by this network in the first half of 2001.

Lucent is currently helping WinStar design a service architecture to provide advanced IP services, namely Bandwidth-on-Demand and VPN (Virtual Private Networks). Such architecture may require enhancements to the current IADs and an "Access Aggregator" such as the Lucent SpringTide product. Routing of IP traffic in the backbone is currently being handled by separate routers (Cisco). Lucent is proposing to WinStar the use of IP Navigator on the CBX500 to eliminate the need for additional separate routers.

Winstar currently has a Data Center in Virginia and plans to deploy at least three more in the U.S. in 2001. Their architecture consists of SUN, EMC, Foundry, Cisco Alteon, AP, Nokia Firewalls and Intel Servers.  In terms of supporting Winstar we've provided core services infrastructure, but have failed to deliver on demand, customer specific web hosting configurations.  We've also been unable to support the construction of these centers and are trying to get this business through an agency relationship with a mutually

CONFIDENTIAL

LW00029298

**B1418**

agreed upon contractor. Our objective is to approach Winstar's Data Center business from a more strategic standpoint. We'll begin by targeting those services where we have competence (operations, maintenance) and target applications that could help grow Winstar's business.

WinStar was the first Service Provider to deploy Lucent's WaveStar OLS 400G DWDM System and has deployed a combination of SONET OC-48 terminals and 40G DWDM Systems to support their metropolitan networks. An optical mux that has the ability to provide ATM functions typical of an access concentrator with DWDM capability would be beneficial in the metro networks. The current strategy is to continue to deploy SONET OC-48 rings with upgrades to OC-192 until the Metropolis solutions are available (Feb, 2001). The Bandwidth Manager will be deployed in several of the Service Nodes to terminate the SONET OC-48 rings and groom traffic to the ATM switches, 5ESS's and long haul network.

WinStar has also invested in a suite of Lucent OS Systems including ConnectVu, NFM, NTM, NTP, TDM ACTIVIEW, OneVision: INC, DNA Performance Analyzer, IPNC, PIM (Xpercom), ATM-CM (Syndesis) and Arbor B/P. This platform will support the following business objectives: maximize automation of service activation functions, support future proof, extensible applications, gain a competitive advantage.

### Installed Base – International

Winstar has ATM based broadband wireless data networks (no voice) deployed in: Netherlands, Belgium, Germany, France, UK, Argentina. Their infrastructure includes Netro radios, CBX 500's, PSAX, Max 20's, DSL pipes from Lucent. They will deploy SDH metro rings in Amsterdam and London and have plans for metro and long haul DWDM rings in Germany, Pan European countries. They also plan to implement regional NOC's to support the operations of their global network.

### Competition

There are indications that Winstar may soon be entering into strategic partnership agreements with Siemens/ Accelerated Networks and Cisco. These agreements could include financing.

AFC is Winstar's incumbent access vendor with equipment installed in approximately 160 Hubs and 3,000 B sites. Winstar will cap the deployment of AFC's DLC equipment in favor of deploying ATM based access solutions. Although we have drastically reduced the price of our converged access solution (DSLAM, PSAX, services), Winstar has stated they will award half of their 2001 network build to Lucent and half to Accelerated Networks. They have stated they do not want to be too reliant upon Lucent to supply their building technology solutions.

Winstar has edge, core routers from Cisco installed in their network (7500's, 12,000's). Cisco has been diligently working with Winstar's engineers to help design a separate

CONFIDENTIAL

LW00029299

**B1419**

backbone IP network to carry traffic. Due to budgetary constraints, Winstar has not purchased additional Cisco routers but has stated their intention to do so in the beginning of their next fiscal year.

### _Key Account Issues_

Following are several key issues that are important to WinStar:

Financing:

- See separate Attachment on that issue.

Technology:

- Overarching requirement to drive cost out of their in-building technology solution
- Ability of existing ATM network to scale and handle increased IP traffic or deploy a separate IP network
- Technology choice in delivering enhanced IP services to end customers
- ONG solutions must have a smaller footprint, draw less power and support multiple services.
- OSS/BSS infrastructure must support fool proof record keeping, flow through provisioning and development of enhanced services

Strategic Relationship:

- Treat Winstar as a strategic partner and develop solutions that leverage their business model
- Move forward with original Supply Agreement intentions for Winstar to outsource to Lucent the design, engineering, buildout services of their network
- Lucent to provide consistent global support, pricing, technology to Winstar

CONFIDENTIAL                                    LW00029300

**B1420**

**WinStar Executive Briefing**
*Prepared October 19, 2000*

### Company Overview

Winstar Communications, Inc. is a global communications company serving business customers with local, long distance, broadband, Internet and information services. WinStar uses its Wireless Fiber technology to connect to customers. This technology is a fixed, broadband wireless local communication service provided through licenses in the 28 and 38 GHz frequency band. They are building an end to end broadband network to serve the world's top 110 markets – 60 in the U. S. and 50 internationally. WinStar's entire sales and marketing philosophy and approach are customer and building centric. They identify the individual buildings they want to put on their network, engineer and install it and work to directly sell and serve their target customers.

Winstar's 1999 operating revenues totaled $445M. Their key services include the following: high speed Internet access and data transport; Office.com (online business service for small and medium sized businesses); enhanced Internet services including Web site hosting, e-commerce solutions, Web consulting and outsourcing, intranet/extranet site management and LAN/WAN and legacy systems integrations; web enabled applications such as Microsoft's Office Online, Exchange and Outlook applications, interactive multimedia and streaming applications and services; local and long distance basic and enhanced voice services.

### Lucent/Winstar Strategic Agreement

In October 1998 WinStar signed a five year $2B strategic agreement (Supply Agreement) with Lucent to engage Lucent to design, build, deploy and finance a Best of Breed nationwide and global communications network. The strategic relationship included the provisions that Lucent would be Winstar's preferred supplier to the extent Best of Breed network elements exist from Lucent and Lucent would treat Winstar as a preferred customer. In addition, Lucent agreed to provide financing with the stipulation that Winstar could use up to 35% of the money during the first contract year and up to 30% during years two through five for non Lucent products and services. Under the financing facilities, the non-Lucent content in year one was 50% and is currently 64% in year two.

### Network Architecture

The target architecture Lucent has designed for WinStar is based on the following elements:

- Use DWDM as the basis for core transport. It is ideal to accommodate the rapid increase of traffic expected in the WinStar network. Deploy a 6-8 SONET ring system to be interconnected using a Bandwidth Manager.
- Use an ATM based common backbone to carry all the services: Voice, IP, Frame, ATM and Private Lines. This is in contrast to today's overlay networks and the

Page 1

CONFIDENTIAL

LW00029301

B1421

multitude of systems needed to manage them. This converged network will propel WinStar ahead of other major carriers.

- Evolve circuit switched voice traffic to packet to improve the economics of transport and management of voice trunks.
- Implement a converged access architecture beginning in October, 2000. It integrates voice, IP and Frame Relay using Cellpipe IADs (Integrated Access Device) on customer premises. Using SDSL, the IADs will allow WinStar to use existing copper inside the office buildings. A Stinger LS DSLAM inside each building will multiplex/demodulate the traffic from the IADs before it is sent over the Radio to the network. With this converged access architecture, the ATM layer is extended all the way to the customer's floor. This access solution will conserve on both radio spectrum and backhaul facilities. There currently is a major initiative headed by Fred Kemmerer to develop a more integrated B site solution for Winstar.
- Structure the operations infrastructure using the TMN model and deploy new tools/processes to address the converged target architecture.

### *Lucent Fiscal 2000 Revenues*

NAR: $550M (ONG: $119M; Services: $95M; Switching: $81M; Radios: $55M; INS: $34M; SPG: $31M; Octel: $10M; Software Pool: $175M (includes $10M credit)

Worldwide: $29M

### *Installed Base – Domestic*

WinStar has an installed base of (40) 5ESS Switches and has deployed Octel Voice Messaging Systems to support their voice mail requirements (displacing Centigram). A CBX500/GX550 network has been deployed and is already carrying Frame and some Private Line traffic. The voice trunking traffic (5ESS based) will also be carried by this network in the first half of 2001.

Lucent is currently helping WinStar design a service architecture to provide advanced IP services, namely Bandwidth-on-Demand and VPN (Virtual Private Networks). Such architecture may require enhancements to the current IADs and an "Access Aggregator" such as the Lucent SpringTide product. Routing of IP traffic in the backbone is currently being handled by separate routers (Cisco). Lucent is proposing to WinStar the use of IP Navigator on the CBX500 to eliminate the need for additional separate routers.

Winstar currently has a Data Center in Virginia and plans to deploy at least three more in the U.S. in 2001. Their architecture consists of SUN, EMC, Foundry, Cisco Alteon, AP, Nokia Firewalls and Intel Servers. In terms of supporting Winstar we've provided core services infrastructure, but have failed to deliver on demand, customer specific web hosting configurations. We've also been unable to support the construction of these centers and are trying to get this business through an agency relationship with a mutually agreed upon contractor. Our objective is to approach Winstar's Data Center business

Page 2

CONFIDENTIAL

LW00029302

B1422

from a more strategic standpoint. We'll begin by targeting those services where we have competence (operations, maintenance) and target applications that could help grow Winstar's business.

WinStar was the first Service Provider to deploy Lucent's WaveStar OLS 400G DWDM System and has deployed a combination of SONET OC-48 terminals and 40G DWDM Systems to support their metropolitan networks. An optical mux that has the ability to provide ATM functions typical of an access concentrator with DWDM capability would be beneficial in the metro networks. The current strategy is to continue to deploy SONET OC-48 rings with upgrades to OC-192 until the Metropolis solutions are available (Feb, 2001). The Bandwidth Manager will be deployed in several of the Service Nodes to terminate the SONET OC-48 rings and groom traffic to the ATM switches, 5ESS's and long haul network.

WinStar has also invested in a suite of Lucent OS Systems including ConnectVu, NFM, NTM, NTP, TDM ACTIVIEW, OneVision: INC, DNA Performance Analyzer, IPNC, PIM (Xpercom), ATM-CM (Syndesis) and Arbor B/P. This platform will support the following business objectives: maximize automation of service activation functions, support future proof, extensible applications, gain a competitive advantage.

### _Installed Base – International_

Winstar has ATM based broadband wireless data networks (no voice) deployed in: Netherlands, Belgium, Germany, France, UK, Argentina. Their infrastructure includes Netro radios, CBX 500's, PSAX, Max 20's, DSL pipes from Lucent. They will deploy SDH metro rings in Amsterdam and London and have plans for metro and long haul DWDM rings in Germany, Pan European countries. They also plan to implement regional NOC's to support the operations of their global network.

### _Competition_

There are indications that Winstar may soon be entering into strategic partnership agreements with Siemens/ Accelerated Networks and Cisco. These agreements could include financing.

AFC is Winstar's incumbent access vendor with equipment installed in approximately 160 Hubs and 3,000 B sites. Winstar will cap the deployment of AFC's DLC equipment in favor of deploying ATM based access solutions. Although we have drastically reduced the price of our converged access solution (DSLAM, PSAX, services), Winstar has stated they will award half of their 2001 network build to Lucent and half to Accelerated Networks. They have stated they do not want to be too reliant upon Lucent to supply their building technology solutions.

Winstar has edge, core routers from Cisco installed in their network (7500's, 12,000's). Cisco has been diligently working with Winstar's engineers to help design a separate backbone IP network to carry traffic. Due to budgetary constraints, Winstar has not

CONFIDENTIAL                                    LW00029303

**B1423**

purchased additional Cisco routers but has stated their intention to do so in the beginning of their next fiscal year.

### Key Account Issues

Following are several key issues that are important to WinStar:

Technology:

- Overarching requirement to drive cost out of their in-building technology solution
- Ability of existing ATM network to scale and handle increased IP traffic or deploy a separate IP network
- Technology choice in delivering enhanced IP services to end customers
- ONG solutions must have a smaller footprint, draw less power and support multiple services.
- OSS/BSS infrastructure must support fool proof record keeping, flow through provisioning and development of enhanced services

Strategic Relationship:

- Treat Winstar as a strategic partner and develop solutions that leverage their business model
- Move forward with original Supply Agreement intentions for Winstar to outsource to Lucent the design, engineering, buildout services of their network
- Lucent to provide consistent global support, pricing, technology to Winstar

FINANCING:
- See Seperate Attached on that issue.

Page 4

CONFIDENTIAL

LW00029304

B1424

Challenges
Oct 26, 2000
targeted

| Issue | Status | Solution |
|---|---|---|
| 1. Financing | • Discussions held between Rouhana and McGinn/Hopkins | • Senior level agreement |
| 2. Winstar Services | • The original agreement between Lucent and Winstar envisioned a "turnkey" operation where Lucent would begin performing a broader spectrum of functions. In anticipation, we have passed through approximately $67M/quarter of Winstar services (but have not recognized revenue). | • Communicated via a 9/22/00 letter to Winstar that we would no longer support this policy since, to date, we have not achieved full "turnkey" status. Based on a further discussion between Nina and Nate Kantor, we agreed to accept the 2Q00 Purchase order with the agreement to immediately re-open such discussions, with a dedicated team to reach a decision to move ahead targeted for 10/31/00. Discussion were started and a lock-up session is targeted to begin October 24. Commitment to the "turnkey" arrangement is shaky. |
| 3. Lucent Content | • Contractually, Winstar should be spending 70% on Lucent content; they are currently running around 54%; (getting a new view - maybe even lower) Winstar utilizes the "Best of Breed" clause as justification. There are clearly decisions being made in Winstar which ignore this requirement. There are also differing views on "BOB" clause. | • Lucent has provided proposals which facilitate this level of spending. Lucent needs to continue challenging Winstar decisions when we feel we have a superior or equal solution. This will become a major issue this month especially since we can charge them up to $3M for being in breach of the contract in October. Last year the $3M was waived. |
| 4. Previous EOQ Deals | | |
| 1) 2QOOF | • Commitment to a $133M purchase order for the Converged Access Solution<br>    • To date $19M has been honored<br>    • Pricing was agreed upon<br>    • Subsequent product replacement from Max 20's to Stinger LS<br>    • Winstar no longer agrees to Lucent's pricing nor the level of purchase (see Hubs & Bs) | • 4QOOF partnership deal adjusts pricing level and decreases the amount of our market share. |
| 2) Lucent purchase of Winstar radios and IRUs | • 1QOOF: Lucent CIO purchased $10M of radios. Have not deployed due to a variety of issues.<br>• This purchase does count against the $100M after 5 years MSA investment. | • Twofold action plan<br>    • CTO discussion between companies to explore Lucent's (CIO) reluctance to move forward.<br>    • Lucent CIO request for NAR to prioritize which service providers we should move forward with for internal services. |

CONFIDENTIAL

LW00029305

B1425

| Issue | Status | Solution |
|---|---|---|
| | • 2QOOF: Lucent purchased $10M of radio and $25M of IRUs | • Radios: Focus has been on ATG as a first customer (does not appear that sale will occur prior to end of September); business plan on how to manage the radios moving forward.<br>• 1Q01 F we are refocusing more sales resources on these assets as a Solution; Sales teams will be compensated on positive results |
| | • 3QOOF: Lucent purchased $10M radios | • Same as above |
| | • Winstar believes there is a commitment by Lucent to "replenish" any radios sold and continue practice on an ongoing basis; Lucent believes no such commitment was made | • Business plan will document potential process and how to run this as a viable business<br>• No agreements have been made to replenish |
| 3) Winstar purchased product remaining in warehouse | • As a consequence of these EOQ deals, Winstar has realized a large inventory of product due to slower deployment plans than anticipated<br>  • We have utilized build and hold letters since the product remains in our warehouses<br>  • Williams slow deployment has contributed to this inventory | • Get Winstar to agree to the amendment on Title and Risk of Loss agreements.<br>  • Also implement a separate warehousing agreement where Winstar pays a nominal fee for product stored in Lucent warehouses.<br>  • Future shipments will be to Winstar warehouses.<br>• In the 4Q00 F deal we had CFO approval to move forward with bill and hold letters one last time. Position was reversed in October and over $17M of product was not recognized in revenue. |
| 4) Credits associated with "damages" included in EOQ deals | • Close to $23M in credits agreed to in 2-3QOOF deals are now being applied to 4QOOF revenue<br>• New request by Winstar for credits in this current deal | • Only damages identified is for a global job – provide credit in quarter<br>• Must change behavior; Reduce/eliminate practice of credits unless there is specific projects where damages have been incurred. |
| 5. Accounts Receivable | • Close to $80M as of September 2000 and not reduced significantly<br>• October Financing initially shown no intention to correct this situation | • CFOP/PFO has surfaced issue with Winstar in this latest October drawdown.<br>• Need a strong action plan, with owners and dates to understand Winstar problems/solution. Right now is a constant bone of contention.. |
| 6. Product and Services Sales to Winstar | | |

CONFIDENTIAL

LW00029306

**B1426**

| Issue | Status | Solution |
|-------|--------|----------|
| 1) Annual growth | • 1998 - $45M<br>• 1999 - $263M<br>• 2000 (projected) - $550M<br>• 2001 (projected) - $250M<br>• Winstar is restricted, based on a bank covenant, at a spending level of $1B/2001C<br>• Winstar is out of cash for CY 2000<br>• Winstar only wants to spend money on data and data center projects. | • Identified Lucent's addressable share and what solutions/products need to be developed and proposed to capture non-traditional Lucent areas.<br>• Need to help Winstar stimulate more revenue growth to drive them to EBITDA positive in June and to a more stable/enhanced financial situation.<br>• 4Q00 F deal tried to alleviate CY2000 budget problems<br>  – Deferred billing $3M<br>  – Software Pool with invoicing starting in March<br>  – Price Action<br>  – September Credit of $10M |
| 2) Hubs & Bs | • Lucent believes we won the new business in the $133M P.O. received at the EO2QF.<br>• Winstar insists prices need to be $25K/B, $450K/hub.<br>• Lucent pricing to date: $51K/B + pay as you grow for stingers, $850K/hub<br>• Considerable activity with competition AFC: Incumbent supplier but with greater number of Bs off of hub will position itself as prime vendor.<br>• Accelerated: They have arrived with Siemens and financing; price at the $13K/B level (without services); and are using connection with @Link as a preferred supplier. | • In August, formed a breakthru team focused on cost effecting innovations for the Converged Access Solution.<br>• Initial EOQ4F deal offered $30K/B and $450K/hub starting January 2001; $50K/B and $850K/hub through to end of 2000C.<br>• Final 4Q00 deal resulted in $20K/B and $400K/Hub; effective October 1,2000<br>• Evaluating a methodology to build Lucent Bs off of AFC hubs.<br>• Trying to get an in with @Link to change their mind. |
| 3) Optical | • Committed to date to a Lucent solution.<br>• Winstar is testing Sycamore in lab.<br>• Positive initial reaction to Chromatis Metro Solution. | • 4Q00 F deal says Winstar will use Lucent for long haul and metro: long haul solution will reflect Sycamore pricing. |
| 4) Switching | • No additional switches will be purchased | • Focus on software as well as helping Winstar sell more of the 5E feature set.<br>• Position in 2001: 7R/E and programmable switches. |
| 5) Data Networks (IP & ATM) | | |

CONFIDENTIAL

LW00029307

| Issue | Status | Solution |
|---|---|---|
| a) ATM Backbone | • Lucent Network<br>• Not at full capacity<br>• Believe addition of IP Navigator can make efficient use of network for IP services. | • We have provided a proposal on more effectively utilizing ATM networks vs. putting in an IP Network; major source of contention with IP zealots in Winstar<br>• Continue focus on how we can provide a solution for layering services utilizing ATM network and the revenue for Winstar. |
| b) IP Backbone Network | • Winstar indicates they will buy routers from Cisco or Juniper.<br>• Unclear as to reason so anxious to move quickly.<br>• Negative reaction to Nexabit – won't allow in lab; 6 months prior to correct feature set. | • Tried a 1st Right of Refusal clause – rejected.<br>• Tried to pursue OEM arrangement of Juniper – would be extremely negative to Nexabit program.<br>• Continue to couple IP Navigator with ATM network as a means to save lots of money. |
| c) IP Access Solution | • Swat team focused on a single device solution that will supply differentiable IP services for Winstar. | • Another example of innovation.<br>• Rich Services:<br>  ▪ VPN<br>  ▪ Layer 3 QOS<br>  ▪ End to end security |
| 6) New Opportunities | • Data Centers<br>• New Media<br>• Web Hosting<br>• Co-Marketing of Services | • Overall staffing/realignment of CT to support these growth areas.<br>• Specifically on data centers, pursuing KMC/KPT to handle construction/civils. |
| 7) Services | • Services revenue has grown to over $100M in 2000.<br>• Winstar recently did a review to decrease the budget spent on services and to reprioritize. | • Focus on flawless execution.<br>• Turnkey services in the ONG and Hubs/Bs area.<br>• Aggressively pursue complete turnkey operation with due date of 10/31/00 |

CONFIDENTIAL

LW00029308

B1428

| Issue | Status | Solution |
|---|---|---|
| 1. Financing | • Discussions held between Rouhana and McGinn/Hopkins | • Senior level agreement |
| 2. Winstar Services | • The original agreement between Lucent and Winstar envisioned a "turnkey" operation where Lucent would begin performing a broader spectrum of functions. In anticipation, we have passed through approximately $67M/quarter of Winstar services (but have not recognized revenue). | • Communicated via a 9/22/00 letter to Winstar that we would no longer support this policy since, to date, we have not achieved full "turnkey" status. Based on a further discussion between Nina and Nate Kantor, we agreed to accept the 2Q00 Purchase order with the agreement to immediately re-open such discussions, with a dedicated team to reach a decision to move ahead targeted for 10/31/00. Discussion were started and a lock-up session is targeted to begin October 24. Commitment to the "turnkey" arrangement is shaky. |
| 3. Lucent Content | • Contractually, Winstar should be spending 70% on Lucent content; they are currently running around 54%; (getting a new view – maybe even lower) Winstar utilizes the "Best of Breed" clause as justification. There are clearly decisions being made in Winstar which ignore this requirement. There are also differing views on "BOB" clause. | • Lucent has provided proposals which facilitate this level of spending. Lucent needs to continue challenging Winstar decisions when we feel we have a superior or equal solution. This will become a major issue this month especially since we can charge them up to $3M for being in breach of the contract in October. Last year the $3M was waived. |
| 4. Previous EOQ Deals | | |
| 1) 2QOOF | • Commitment to a $133M purchase order for the Converged Access Solution<br>  - To date $19M has been honored<br>  - Pricing was agreed upon<br>  - Subsequent product replacement from Max 20's to Stinger LS<br>  - Winstar no longer agrees to Lucent's pricing nor the level of purchase (see Hubs & Bs) | • 4QOOF partnership deal adjusts pricing level and decreases the amount of our market share. |
| 2) Lucent purchase of Winstar radios and IRUs | • 1QOOF: Lucent CIO purchased $10M of radios. Have not deployed due to a variety of issues.<br>• This purchase does count against the $100M after 5 years MSA investment. | • Twofold action plan<br>  • CTO discussion between companies to explore Lucent's (CIO) reluctance to move forward<br>  • Lucent CIO request for NAR to prioritize which service providers we should move forward with for internal services. |

CONFIDENTIAL

LW00029309

**B1429**

| Issue | Status | Solution |
|-------|--------|----------|
| 1) Annual growth | <ul><li>1998 – $45M</li><li>1999 – $263M</li><li>2000 (projected) – $550M</li><li>2001 (projected) – $250M</li><li>Winstar is restricted, based on a bank covenant, at a spending level of $1B/2001C</li><li>Winstar is out of cash for CY 2000</li><li>Winstar only wants to spend money on data and data center projects.</li></ul> | <ul><li>Identified Lucent's addressable share and what solutions/products need to be developed and proposed to capture non-traditional Lucent areas.</li><li>Need to help Winstar stimulate more revenue growth to drive them to EBITDA positive in June and to a more stable/enhanced financial situation.</li><li>4Q00 F deal tried to alleviate CY2000 budget problems<br>– Deferred billing $3M<br>– Software Pool with invoicing starting in March<br>– Price Action<br>– September Credit of $10M</li></ul> |
| 2) Hubs & Bs | <ul><li>Lucent believes we won the new business in the $133M P.O. received at the EO2QF.</li><li>Winstar insists prices need to be $25K/B, $450K/hub.</li><li>Lucent pricing to date: $51K/B + pay as you grow for stingers, $850K/hub</li><li>Considerable activity with competition AFC: Incumbent supplier but with greater number of Bs off of hub will position itself as prime vendor.</li><li>Accelerated: They have arrived with Siemens and financing; price at the $13K/B level (without services); and are using connection with @Link as a preferred supplier.</li></ul> | <ul><li>In August, formed a breakthru team focused on cost effecting innovations for the Converged Access Solution.</li><li>Initial EOQ4F deal offered $30K/B and $450K/hub starting January 2001; $50K/B and $850K/hub through to end of 2000C.</li><li>Final 4Q00 deal resulted in $20K/B and $400K/Hub; effective October 1,2000</li><li>Evaluating a methodology to build Lucent Bs off of AFC hubs.</li><li>Trying to get an in with @Link to change their mind.</li></ul> |
| 3) Optical | <ul><li>Committed to date to a Lucent solution.</li><li>Winstar is testing Sycamore in lab.</li><li>Positive initial reaction to Chromatis Metro Solution</li></ul> | <ul><li>4Q00 F deal says Winstar will use Lucent for long haul and metro; long haul solution will reflect Sycamore pricing.</li></ul> |
| 4) Switching | <ul><li>No additional switches will be purchased</li></ul> | <ul><li>Focus on software as well as helping Winstar sell more of the 5E feature set.</li><li>Position in 2001: 7R/E and programmable switches.</li></ul> |
| 5) Data Networks (IP & ATM) | | |

CONFIDENTIAL

LW00029310

**B1430**

| Issue | Status | Solution |
|---|---|---|
| | • 2QOOF: Lucent purchased $10M of radio and $25M of IRUs | • Radios: Focus has been on ATG as a first customer (does not appear that sale will occur prior to end of September); business plan on how to manage the radios moving forward.<br>• IQ01 F we are refocusing more sales resources on these assets as a Solution; Sales teams will be compensated on positive results |
| | • 3QOOF: Lucent purchased $10M radios | • Same as above |
| | • Winstar believes there is a commitment by Lucent to "replenish" any radios sold and continue practice on an ongoing basis; Lucent believes no such commitment was made | • Business plan will document potential process and how to run this as a viable business<br>• No agreements have been made to replenish |
| 3) Winstar purchased product remaining in warehouse | • As a consequence of these EOQ deals, Winstar has realized a large inventory of product due to slower deployment plans than anticipated<br>  • We have utilized build and hold letters since the product remains in our warehouses<br>  • Williams slow deployment has contributed to this inventory | • Get Winstar to agree to the amendment on Title and Risk of Loss agreements.<br>  • Also implement a separate warehousing agreement where Winstar pays a nominal fee for product stored in Lucent warehouses.<br>  • Future shipments will be to Winstar warehouses.<br>• In the 4Q00 F deal we had CFO approval to move forward with bill and hold letters one last time. Position was reversed in October and over $17M of product was not recognized in revenue. |
| 4) Credits associated with "damages" included in EOQ deals | • Close to $23M in credits agreed to in 2-3QOOF deals are now being applied to 4QOOF revenue<br>• New request by Winstar for credits in this current deal | • Only damages identified is for a global job— provide credit in quarter<br>• Must change behavior; Reduce/eliminate practice of credits unless there is specific projects where damages have been incurred |
| 5. Accounts Receivable | • Close to $80M as of September 2000 and not reduced significantly<br>• October Financing  initially shown no intention to correct this situation | • CFO/PFO has surfaced issue with Winstar in this latest October drawdown.<br>• Need a strong action plan, with owners and dates to understand Winstar problems/solution.  Right now is a constant bone of contention. |
| 6. Product and Services Sales to Winstar | | |

CONFIDENTIAL

**B1431**

| Issue | Status | Solution |
|---|---|---|
| a) ATM Backbone | • Lucent Network<br>• Not at full capacity<br>• Believe addition of IP Navigator can make efficient use of network for IP services. | • We have provided a proposal on more effectively utilizing ATM networks vs. putting in an IP Network; major source of contention with IP zealots in Winstar<br>• Continue focus on how we can provide a solution for layering services utilizing ATM network and the revenue for Winstar. |
| b) IP Backbone Network | • Winstar indicates they will buy routers from Cisco or Juniper.<br>• Unclear as to reason so anxious to move quickly.<br>• Negative reaction to Nexabit – won't allow in lab; 6 months prior to correct feature set. | • Tried a 1st Right of Refusal clause – rejected.<br>• Tried to pursue OEM arrangement of Juniper – would be extremely negative to Nexabit program.<br>• Continue to couple IP Navigator with ATM network as a means to save lots of money. |
| c) IP Access Solution | • Swat team focused on a single device solution that will supply differentiable IP services for Winstar. | • Another example of innovation.<br>• Rich Services:<br>  ▪ VPN<br>  ▪ Layer 3 QOS<br>  ▪ End to end security |
| 6) New Opportunities | • Data Centers<br>• New Media<br>• Web Hosting<br>• Co-Marketing of Services | • Overall staffing/realignment of CT to support these growth areas.<br>• Specifically on data centers, pursuing KMC/KPT to handle construction/civils. |
| 7) Services | • Services revenue has grown to over $100M in 2000.<br>• Winstar recently did a review to decrease the budget spent on services and to reprioritize. | • Focus on flawless execution.<br>• Turnkey services in the ONG and Hubs/Bs area.<br>• Aggressively pursue complete turnkey operation with due date of 10/31/00 |

CONFIDENTIAL

2

CONFIDENTIAL

LW00029313

B1433

**LUCENT/WINSTAR END OF QUARTER DEAL**
**FISCAL YEAR Q42000**
*Prepared October 19, 2000*

### *Q4 Billed Revenue*

$158M (Included $135M Software pool)

### *Deferred Billing*

Lucent agreed to defer $32.7M in expected Services billing until January 2, 2001

### *Pricing Commitments*

B/Hub Site: Effective October 1, 2000 for all new B's, Hubs: $20K per B site pricing (previous price was $57K); $400K per Hub pricing (previous price was $713K). Winstar committed to deploy Lucent's converged access solution in at least 3,000 B's. Winstar committed to provide Lucent these 3,000 B's in 2001 or at least half of the total build program of 2001 if building issues prevent Winstar from providing Lucent with 3,000 B's. If the latter is the case, the remaining B's will be built in 2002.

Optical Networking: Winstar agreed to exclusive build of long haul and metro networks in the domestic U.S. with Lucent's solution. Lucent agreed to meet Sycamore pricing for the same product with like features, capacity and network design.

Note: Account Team Concerns: Imminent award of a portion of their 2001 network build to Siemens/Accelerated Networks; Possible financing deal with Cisco for network core/edge router equipment.

### *Winstar Contractors*

Lucent agreed to pick up Winstar's contractors retroactive to October 1, 2000 subject to contract negotiations to be completed by the end of October, 2000.

### *Enterprise Integration Laboratory*

Lucent committed to provide up to $45M worth of equipment and services for the development of an Enterprise Integration Laboratory as needed for a term of 18 months commencing November 15, 2000. The lab will demonstrate flow through provisioning and fool proof record keeping across network technologies.

### *Credits*

$35M (to be applied in fiscal Q12001)

CONFIDENTIAL

## LUCENT/WINSTAR END OF QUARTER DEALS
### FISCAL YEAR 2000
*Prepared September 14, 2000*

| Quarter | Winstar PO's* | Lucent Billed Rev | Winstar Sales to Lucent | Equipment Stored in Warehouse | Lucent Revenue Credit to Winstar |
|---|---|---|---|---|---|
| Q1 | $96,791,572 | $113,902,391 | $10M (Radio) | | |
| Q2 | $327,834,338 (includes $123M PO for 5,200 Max 20's which were never ordered; 200 PSAX 2200's which were all shipped; only $19M of this PO actually billed) | $114,977,092 | $10M (Radio) $25M (L/L Fiber IRU's) | PSAX 2300: 190 systems ($11.9M) staged in Lucent's Columbia, MD warehouse; CopperCom: 30 systems ($4.9M) staged in Lucent's Columbia, MD warehouse | ($3M) ($9M) |
| Q3 | $112,728,000 | $130,050,799 | $10M (Radio) | CBX 500: 23 Systems ($7.5M) in Winstar DB warehouse; OX550: 10 systems ($1.5M) in Winstar DB warehouse; | ($14M) ($2.9M) |
| | | | | Cumulative: ONG equipment: $58M in Lucent's Morrow, GA warehouse (will be depleted by Feb/March 2001) 5ESS: 1 Model 2A ($1.3M) stored in Lucent warehouse for approx. one year | |
| TOTAL | $537,353,930 | $358,930,283 | $55,000,000 | $87,100,000 | $22,900,000 |

* These were not the only PO's received from Winstar during these quarters. This list includes the PO's that were involved in the EOQ deals.

CONFIDENTIAL

LW00029315

B1435

# $135M Software Pool Allocations
## Fiscal Q42000 EOQ Deal
### Prepared October 20, 2000

| Amount | Description |
|---|---|
| $135M | Total Software Pool |
| ($20M) | Useful Software |
| $115M | Subtotal |
| ($35M) | Credit |
| $80M | Subtotal |
| ($45M) | Enterprise Integration Lab |
| $35M | Total  (this amount is being used to partially fund the B/Hub pricing discounts which are projected to total at least $120M if Lucent builds 3,000 B's/20Hubs) |

CONFIDENTIAL

LW00029316

B1436

3

CONFIDENTIAL

LW00029317

B1437



CONFIDENTIAL

LW00029318

B1438

4

CONFIDENTIAL

LW00029319

B1439



Lucent Technologies
Bell Labs Innovations

winstar
Brave New World of Ideas

# Global Account Plan
## 2001

October 12, 2000
Kevin O'Grady
Doug Forrester
Emerging Service Providers

Lucent Restricted - Version 1

winstar

CONFIDENTIAL

LW00029320

B1440



Lucent Technologies
Bell Labs Innovations

winstar

## Plan Outline

- Winstar Global Account Vision

- Winstar Profile

- Winstar Financials

- Key Drivers for Winstar

- Global Strategies for Success in 2001

CONFIDENTIAL

LW00029321

B1441




# Winstar Global Account Vision

**winstar**

**Lucent Technologies**
Bell Labs Innovations

We will become Winstar's most trusted business partner, by enabling them to differentiate their offers and provide maximum value to their customers and shareholders. We will accelerate (Winstar's and our own) profitable growth by providing best of breed solutions, services and marketing support that will maximize the reach and utility of it's broadband network.

CONFIDENTIAL

LW00029322

B1442



Global Winstar Customer Team

CONFIDENTIAL

winstar

Winstar Expands E: Enter i Winstar
Footprint With Spe; Suite o; ____ New
Grant In Germany      Launches The

Lucent Technologies and Winstar

Winsta  Winstar Awarded Eleventh p tters
Enter I  Government Contract
Partne

NEW YORK, AUGUST 1, 2000 - WINSTAR COMMUNICATIONS,
INC. (NASDAQ: WCII), a leading broadband services company, today
announced that it has been awarded a Metropolitan Area Acquisition
(MAA) award from the General Services Administration's (GSA)
Federal Technology Service (FTS) for the city and surrounding
metropolitan area of Boston, MA. Winstar, along with AT&T,
Southwestern Bell and Bell Atlantic, will share this contract, which has
a potential value of $270 million over eight years.

ctrum

Inte
M
W
W  Int
A;

Broadban_   _  _  with Advancc_ _  _dband
Commercial Office Properties   _unications Services

August 31, 2000            __ __, 2000

                           April 13, 2000

August 8, 2000

CONFIDENTIAL

winstar

Lucent Technologies
Bell Labs Innovations

# Winstar Profile

## Customer Profile:

- Broadband services company with global footprint

- Services include high speed Internet and data, Web hosting and design, phone services, Web based application, e-commerce, professional services, and Office.com.

- 4,400 employees

- 60 US markets served

- 13 International markets served

- 7 Internet data centers

- 810,000 total lines Installed

- 11,400 building access rights

- 42% on net percentage

- 27,500 cumulative customers

- $1,650 average revenue per customer

- $445.6M 1999 operating revenues

- ($297.3M) EBITDA

## Strategic Relationship:

- Global $2B finance, technology agreement, network buildout program with Lucent

- Strategic partnership with Oracle to host and deliver Oracle's e-business applications

- Strategic agreement with Great Plains to host and distribute their e-business applications

- Strategic partnership with WAMINET to provide media file management & transfer

- $900M financing, distribution agreement with Microsoft for office productivity applications

- CBS ownership of 1/3 of Office.com

- Strategic agreements with Williams 15,000 Miles long-haul fiber by EOY 2001.

- Strategic agreement with MFN for Intra-city fiber-6000 miles by EOY 2001

## Innovative Service Provider with Leading Edge Technology

CONFIDENTIAL

LW00029325

B1445

winstar



**Lucent Technologies**
Bell Labs Innovations

# Winstar Profile

**Leading Edge Technology/Infrastructure:**

- "Wireless Fiber" services

- DWDM as basis for core transport (Wavestar OLS 400G)

- ATM based common backbone to carry services (CBX500, GX550)

- Converged ATM access architecture integrating voice, IP, FR at customer premises (Cellpipe IAD, Stinger LS)

- One Vision OS architecture

**Winstar's 2001 Priorities:**

- Data Centers (additional construction, sell "sticky" services to customers)

- Data Networking (IP backbone, advanced IP services, voice over core ATM network)

- OSS Integration Lab (demonstrate seamless operation of management/operational systems)

## Innovative Service Provider with Leading Edge Technology

CONFIDENTIAL

LW00029326

B1446



CONFIDENTIAL

LW00029327

B1447

Lucent Technologies
Bell Labs Innovations

# Winstar Strategy

winstar

**Build a widely available broadband network**

**Make the network useful and important to customers**

Rick Calder- Chief Marketing Officer Winstar Communications

CONFIDENTIAL

LW00029328

**B1448**



winstar

Lucent Technologies
Bell Labs Innovations

# Key Drivers for Winstar

- **Everything flows from Broadband Network**
  - Addresses barriers to entry
  - Enhances value of customer centered applications

- **What Winstar Offers to Their Customers**
  - Low cost bundle of services
  - Voice, Data, High Speed Internet Access, Web Hosting, Content
  - One Point of Contact, One Bill, Industry Specific Applications

- **What Winstar needs from Lucent**
  - Solutions at prices that allow them to compete
  - Innovative solutions that are scalable for customer base
  - Simplified provisioning, billing and flow through of bundled services

## Broadband Network is Enabling Technology To Provide Services

CONFIDENTIAL

LW00029329

B1449

## Global Deployments

Lucent Technologies
Bell Labs Innovations

- NAR (significant US wide VOICE/DATA network)
- EMEA (data only)
  - Netherlands
  - Belgium
  - Germany
  - UK
  - France (limited)
- CALA (data only)
  - Argentina
  - Peru (planned for 2001)
  - Brazil (planned for 2001)
- China (data only)
  - Hong Kong (PSINet JV, const. underway)
- A/P (data only)
  - Japan (JV w/ KDD)
  - Thailand (planned for 2001)

winstar

CONFIDENTIAL

LW00029330

B1450



## Lucent Global Revenues from Winstar ($M)

CONFIDENTIAL

LW00029331

**B1451**

# 2001 Revenue Opportunity ($M)

winstar

Lucent Technologies
Bell Labs Innovations

| Winstar | 2001 CAPX | TAM | PAM | Funnel |
|---|---|---|---|---|
| Global | 1000 | 640 | 575 | 516 |
| U.S. | | 583 | 518 | 450 |
| Impact of 4Q00 Deal | | | | 200 |
| New U.S. Total 2001 | | | | 250 |
| International | | | | |
| EMEA | | | | 30 |
| CALA | | | | 22 |
| A/P, China | | | | 14 |
| International Totals | | | | 66 |
| Global Total | | | | 316 |

CONFIDENTIAL

LW00029332

B1452

# Winstar Global Overview

Lucent Technologies
Bell Labs Innovations



**Customer:** Winstar    $450M

**Top FY2001 Opportunities**
• Global Footprint expansion
• Hub & B's Build
• Metro Optical Network
• IP Data Network
• Data Centers
• Complete OAM&P Vision
• Expanded scope of services

**Top 1Q01 Opportunities**
• New market builds - Hong Kong, CALA
• Continue long haul and metro builds
• Expanded scope of services
• OS integration lab
• Data/Centers/ASP business
• Stimulate revenue generating services for Winstar
• Sell radios coupled w/additional revenue opportunities

**Obstacles**
• Lack of IP Data strategy and expertise
• Ability to execute on a data center solution
• Speedy, cost reduced solutions targeted for Winstar's business model (converged access solution)
• Cross B/U commitment to implement Network Management & Provisioning Plan
• Winstar's CAPX budget limitations

Winstar

550
300
250
200
150
100
50
0

124 — 1Q
121 — 2Q
140 — 3Q
194 — 4Q
316.0 — FY01

40.0 — 1Q01
75

40    60    101

● 99 Act  = $276M
□ '00 Act = $579M

| Yr/Yr: 310% | 200% | 139% | 259% |

**ANNUAL**
REVENUE: $579M
Yr/Yr: 210%

B1453



# Global Strategies for Success in 2001

Lucant Technologies
Bell Labs Innovations

winstar

- Enhance the Dynamics of the Relationship

- Achieve Globalization Goals.

- Drive Revenue Generating Services
  ( EBITDA Positive by June 2001)

- Create Innovative Products and Solutions

CONFIDENTIAL

LW00029334

B1454



winstar

# Enhance Dynamics of the Relationship

Lucent Technologies
Bell Labs Innovations

- **Redefinition of "Strategic Partnership" at Senior Executive level and cascade to all levels of Winstar/Lucent teams**
  - Aversano, Plunkett, Harris, 10/31
- **Determine Scope of "Services", agreement, and operationalize**
  - Harris, Fawcett, Mark, 10/31
- **Establish "CTO Exchange Forum" between companies**
  - Need Executive Owner, 10/11
- **Implement Communications Plan that utilizes a variety of vehicles to improve continuous communication to Winstar**
  - Harris, ongoing
- **Flawless Execution on post-sale and turnkey projects**
  - Garrett, ongoing

CONFIDENTIAL

LW00029335

B1455

Lucent Technologies
Bell Labs Innovations

winstar

## Achieve Globalization Goals

- **Establish and operate as a Global Account**
  - Harris, ongoing
- **Formalize knowledge transfer across the world**
  - Ouderkerk, Cinicolo, Kneisz, Forrester, immediate
- **Create a global price policy and model**
  - Newsom, Forrester, 11/1
- **Standardize service definitions and Statements of Work**
  - Gilbert, Forrester, Linnell 1/01

CONFIDENTIAL

LW00029336

**B1456**

# Drive Revenue Generating Services.  Lucent Technologies
Bell Labs Innovations

Winstar

## Situation

Winstar is "data-centric" carrier

US initial network deployment included circuit switched voice-

- Underserved small/medium businesses provided market opportunity to establish revenue base.
- International market deployments are targeting data opportunity. Regulatory environments with PTT dictate that profit opportunity with circuit switched voice is negligible.

## Implication

Technology trend for Winstar is out of Lucent core strength

- International markets are key battlefield for account control
- Revenue opportunity for data POP is 25% of voice POP
- Lucent must understand marketplace from Winstar's eyes and service delivery intentions

## Actions

Lucent must step up to support Winstar revenue growth plans

- Support Winstar success in targeting new Markets and services and expanding current markets and services
  - Help to define new services available on backbone ATM & Optical Networks
  - Market opportunity analysis
  - Geomarketing information (Castellon team)
  - Creation of OSS integration Lab to support delivery of services (Petrini Team, NPG team)
  - Facilitate Entry into new markets
  - Support License applications
  - Facilitate teaming with other ASP's in need of broadband Access (Regional teams)
- Facilitate growth of existing markets
  - Support Building (Rooftop Acquisition) (Regional teams)
  - Broadband Radio & Access sales plan to capitalize on Winstar Radio Spectrum in Tier 3 & 4 markets in US (O'Grady Team, Winstar Large Accounts)

CONFIDENTIAL

LW00029337

B1457

Lucent Technologies
Bell Labs Innovations

winstar

# Provide Innovative Products and Services

## Situation

- **Converged services market is critical area for Winstar's services portfolio.**
- Wall Street is monitoring breadth of portfolio and customer acquisition cost
- Winstar needs to be able to offer a bundle of services that can be implemented and billed at market speed.
- Winstar needs to provide competitive pricing
- CyberCarrier opportunity is critical as Winstar plans build out of Data Centers to support Internet strategy

## Implications

**This is not Lucent's traditional area of strength. (Winstar Perception)**

- Process of bringing scalable integrated access solutions to market is problematic. (Focus on low end converged access solution is just beginning)
- We are not the incumbent in this market niche.
- CyberCarrier strategy needs flesh and bones.

## Actions

**Execution is the key**

- We must outperform the competition in anticipating and exceeding Winstar's product & service offering needs.
- We must focus on solutions that leverage the capability of Winstar's broadband access capabilities.
- We must stridently integrate ourselves in Winstar's business planning process for Data Center builds.
  - Services to be offered
  - Current architecture plans
- We must become the prime consultant in Winstar Data Center/ Internet Service business planning
- We must build on a base of integrated software platforms that provide a strategic advantage for Winstar
- Outcomes from Global Solutions Summit will dictate next Actions

CONFIDENTIAL

LW00029338

B1458

**5**

CONFIDENTIAL

LW00029339

B1459

**Harris, Deborah K (Deborah Kristine)**

| | |
|---|---|
| **From:** | Perricone, Elizabeth (Beth) |
| **Sent:** | Thursday, October 26, 2000 2:08 PM |
| **To:** | Petrini, Vanessa H (Vanessa); Harris, Deborah K (Deborah Kristine); Dollins, Audrey M (Audrey) |
| **Subject:** | FW: Winstar Refinance Notice |

Here is the status memo on the financing. I am waiting to hear from Peter Derrick on Debby Hopkins' thoughts on the refinance notice. At this point we have not given the notice pending hearing from Debby.

Please note that the actual draw down request ended up at $193M, representing $124M non-Lucent content and $69M Lucent content. The ratios therefore, since the closing of the new facility in May 2000, would be as follows:

Lucent Content: $305M or 44%
Non-Lucent Content: $385M or 56%

———Original Message———

| | |
|---|---|
| **From:** | Derrick, Peter (Peter) |
| **Sent:** | Thursday, October 19, 2000 8:36 PM |
| **To:** | Hopkins, Deborah C (Debby/CFO) |
| **Cc:** | Keele, Michael C (Michael); Perricone, Elizabeth (Beth) |
| **Subject:** | FW: Winstar Refinance Notice |

Debby,

I understand from the commercial team that Winstar will be requesting a meeting with you next week, and for your information I attach an outline of the current situation with them. In summary the situation is as follows:

- This week Winstar issued a borrowing request for $189M ($124M non-Lucent content, $65M Lucent content). This will bring the total Lucent loans to $685M.
- Winstar continue to be non-compliant with the Lucent content restriction, and they may be in breach of the agreement to clear all outstanding A/R (we are verifying this).
- Since the loans now exceed $500M, Lucent has the option to require Winstar to refinance all or a portion of the outstanding loans.

Please call if you require any additional information.

Regards,

Peter

———Original Message———

| | |
|---|---|
| **From:** | Perricone, Elizabeth (Beth) |
| **Sent:** | Thursday, October 19, 2000 4:50 PM |
| **To:** | Derrick, Peter (Peter) |
| **Cc:** | Rogers, Leslie L (Leslie); Alfred, Adrian (Adrian); Fasciano, Annette L (Annette); |

Page 1

CONFIDENTIAL

LW00029340

**B1460**

Hayes, Paul (Paul); Keefe, Michael C (Michael)
Subject:   Winstar Refinance Notice

Per the email below, we are planning to issue a Refinance Notice next week to Winstar. I am happy to discuss in further detail with you this memo.

I have learned from the commercial team that Winstar Senior Management has requested a meeting with Rich McGinn and Debbie Hopkins for next Monday, Oct. 23rd, but that a meeting has not yet been confirmed. The contents of the memo below are likely to be a topic on their agenda. If a meeting is to occur, I think it is important for us to speak with Debby to alert her of this pending event.

Thanks.



BP Refi Memo
(10-19-00).doc

Page 2

CONFIDENTIAL

LW00029341

B1461

# Memorandum

**To:**   Peter Derrick

**From:**  Beth Perricone

**CC:**   Leslie Rogers, Paul Hayes, Michael Keefe, Adrian Alfred

**Date:**  10/26/00

**Re:**   WVF-I LLC ("Winstar")-Refinancing Requirement

---

### Background

On May 4, 2000 Lucent entered into a $2B senior secured financing with WVF-I LLC, a subsidiary of Winstar Communications, Inc. (NASDAQ: WCII). The purpose of this facility is to support purchases of eligible equipment under the Lucent Supply Agreement dated 10/21/98. This Lucent financing was provided in conjunction with a recapitalization of WCII, which included the following:

- $900M Equity Investment

- $1.6B Public Debt Offering

- $1.150B Senior Secured Bank Facility

At the time of Lucent's approval, it was our understanding from the Winstar treasurer that borrowings would not exceed $250M as of 9/30/00. It was therefore negotiated that if outstanding Lucent Loans (a defined term in our Credit Agreement) exceeded $500M, Lucent could require a refinancing of all or a portion of the Lucent Loans.

### Status of Lucent Loans

This week Winstar supplied Lucent a borrowing request for an additional $189M, consisting of $124M Non-Lucent Content and $65M Lucent Content. With this request WVF-I LLC will have drawn Lucent Loans of over $685M. Since the closing of this new facility in May, the draws for Lucent and Non-Lucent content have been as follows:

**Lucent Content**      $301M or 44%

**Non-Lucent Content**  $384.5M or 56%

The current Lucent Supply Agreement mandates that at least 70% of all purchases be made for Lucent Content, with the balance of 30% allowable for Non-Lucent Content purchases made via the Supply Agreement. This requirement is monitored annually by the Commercial Team and is likely to not be met again this year. If Winstar does not comply with the content restriction, Winstar is liable for a penalty based upon the amount the non-Lucent content exceeds the 30% limit, up to a maximum penalty of $3M. (Last year Winstar was not in compliance, and the penalty waived by the Commercial Team.) Winstar is expecting to be in breach again and will be subject to the maximum $3M penalty.

● Page 1

CONFIDENTIAL

LW00029342

**B1462**

We also believe Winstar may be in breach of the Lucent Supply Agreement, as there are outstanding past due Lucent A/R. In the past, Winstar has often refused to clear all A/R with their draw down request, claiming there were disputed items. If they are in breach of the Lucent Supply Agreement, this would mean that the Company has misrepresented their Borrowing Requests on several occasions, specifically compliance with Section 4.03 (c) of our Credit Agreement.

### Refinance Notice

As mentioned above, Lucent will have the option at the time Lucent Loans exceed $500M to require a refinance of all or a portion of its outstanding loans. Once notice is provided, Winstar has 90 days (or 105, if necessary to complete a year end audit) to refinance the Lucent Loans. A shelf registration is required to be in place for at least the amount of the outstanding Lucent Loans in order to effect this refinance. (This was a requirement of closing that has been satisfied.) If at the end of the 90 or 105-day period, the Lucent Loans are not refinanced, Lucent has the right to convert any of the Lucent Loans to what is referred to in the Credit Agreement as Conversion Notes. These Conversion Notes could be priced as high as 2% above WCII's 12.75% Sr. Notes due 2010. Currently these notes carry a YTW of 18.70%, which in effect means that if Lucent could force a conversion today, we could price our Conversion Notes at 20.70%.

### Next Steps

The entire reason for creating the above structure was to limit the balance sheet impact to Lucent. It was also Winstar's verbal commitment to us that we would never be in a position to have this level of exposure to Lucent. We plan to deliver to Winstar shortly the refinance notice and begin to work with financial institutions to market the paper in anticipation of issuing Conversion Notes if we are not refinanced within the 105 days. (WCII's FYE is 12/31, so this refinance notice will fall at time of year end audits.)

Until the 105 days passes, Lucent is required to seek Winstar's consent to any assignments, however, there are certain provisions for exempt assignments, whereby the purchasers of the paper would have limited voting rights. Given the short term nature of the loan sale (up to 105 days), and the possibility that either the loans will be repaid or converted to senior notes at premiums above the current market, it may be possible to find a financial institution willing to purchase our paper under an exempt assignment. It should be noted, however, that the term Lucent Loans has been carefully defined in our Credit Agreement to allow refinancing and conversion to Conversion Notes of Loans for which Lucent has provided only a partial guarantee. For prior sales of Winstar loans, we have been able to obtain true sale accounting treatment for sales with 10% recourse. If this type of loan sale could occur for the $620M of Lucent Loans, this could greatly reduce our balance sheet impact to as low as $62M.

It is likely that senior management of Winstar will contact our senior management and object to our providing Winstar with a refinancing notice and attempts to encourage us to change our view for the "relationship".

I have attached Michael Keefe's memorandum, which provides some of the legal analysis of the Credit Agreement.

● Page 2

CONFIDENTIAL

LW00029343

**B1463**



| From: | Hayes, Paul (Paul) |
|---|---|
| Sent: | Thursday, November 02, 2000 10:35 AM |
| To: | Derrick, Peter (Peter) |
| Cc: | Quinn, William N (William); Keefe, Michael C (Michael); Rogers, Leslie L (Leslie); Perricone, Elizabeth (Beth) |
| Subject: | RE: Winstar: Implications of Refinance Notice |

Peter,

As discussed before, in my opinion the best course of action is to send the refinancing notice for the full amount that is drawn, and know that we will immediately enter a negotiation period. We should enter the netotiation with the objective of preserving an exit at par. I believe that this is possible, but not within the 105 days for the full amount, which is where we can offer some flexibility.

Regards,
Paul

| ----Original Message---- | |
|---|---|
| From: | Perricone, Elizabeth (Beth) |
| Sent: | Thursday, November 02, 2000 11:02 AM |
| To: | Derrick, Peter (Peter) |
| Cc: | Quinn, William N (William); Keefe, Michael C (Michael); Rogers, Leslie L (Leslie); Hayes, Paul (Paul) |
| Subject: | Winstar: Implications of Refinance Notice |

Attached is a memo collectively prepared to address the pros and cons of issuing a refinance notice to Winstar. Please advise if there is any additional information you need.

I do have a call into Jill Diroma to confirm the following issues which may impact any decision we may to consider a discounted sale of our paper:

- What is Lucent's current reserve for this account?
- What has Lucent generated in revenues and profitability on this relationship?

<< File: Refi Implications for Winstar.doc >>

1



CONFIDENTIAL                    LW00201651

**B1464**

# M E M O R A N D U M

**TO:**          Peter Derrick

**FROM:**        Beth Perricone

**CC:**          Leslie Rogers, Bill Quinn, Paul Hayes, Michael Keefe

**DATE:**        November 2, 2000

**SUBJECT:**     **WINSTAR REFINANCE NOTICE**
                 **IMPLICATIONS FOR WINSTAR AND LUCENT**

Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice. What follows is a summary of the current situation as well as our view of the various outcomes. These conclusions are not comprehensive but provide a broad overview of the most evident outcomes. To further refine the potential outcomes and help ultimately affirm any Lucent decision on a refinance strategy, we would require an opportunity to engage Winstar to better understand their plans to accommodate our refinance need, as well as canvas the capital markets for additional details as to the current investor demand for incremental Winstar debt or equity.

As you know, much of the history of Lucent's relationship with this account is that we have continuously made concessions to Winstar's demands as it relates to their financing needs in the interest of the Lucent/Winstar relationship. PFO was not in favor of the current financing in particular, however, in an effort to accommodate our customer once again, the refinance language was specifically engineered by PFO as a means to limit Lucent exposure and use Winstar's potential access to the capital markets as a source for repayment of our loans.

## I. Highlights of the Winstar/Lucent Loan Agreement:

- $690M of Lucent Loans ( a defined legal term) currently outstanding;
- Lucent Loans represent purchase money debt below the bank borrower level;
- Winstar can currently increase its Lucent Loans up to $1B without restriction;
- Current Lucent content is less than 50% while Supply Agreement stipulates 70/30 ratio;
- Lucent has the right to issue a Refinance Notice (a defined legal term) for all or a portion of Lucent Loans;
- Refinance Notice provides Winstar 90-105 days for Winstar to refinance Lucent Loans (all or a portion);
- Lucent needs to obtain Winstar's consent for loan sales before and until the end of the 90-105 day Refinance Period (a defined legal term);
- Refinance Notices do not trigger an event of default for Winstar, so Winstar may continue to borrow under the Lucent facility up to the $1B level;
- Lucent is not limited to a particular number of Refinance Notices; i.e. Lucent may give multiple Refinance Notices in varying amounts.

## II. Current Situation of Winstar:

- A recent Bear Stearns analyst report cites $583M of cash on hand as of June 2000. Winstar's current cash burn rate is $350M per quarter and without access to the additional $1B Lucent tranche, Winstar is funded only through Q2 2001;
- Winstar's access to the capital markets is more limited than in the past and strategic investors may be one of the few sources of future funding for Winstar given the current capital markets environment;

CONFIDENTIAL

LW00016795

**B1465**

- Bear Stearns believes that due to unfavorable conditions facing the CLEC market, along with an existing bank facility of over $1B, Winstar's ability to access the syndicated loan market to repay the Lucent Loans is highly unlikely.

**III.  Current Capital Market Read:**

- Winstar has some amount of access to the capital markets, however how much, what type of security and at what price, is at question;
- A recent indication of interest to Lucent Syndications was for up to $200M at 85.  This is the likely barometer for today's investor appetite for purchase money debt of Winstar.

**IV.  Implications of Issuing a Refinance Notice:**

**Option 1-Issue a written 105 day refinance notice for all br a portion of the Lucent Loans**

**Pros:**

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors and Vendors);
- Forces parties to table to deal with funding shortfall issues;
- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);
- Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;
- Lucent can always rescind or modify the refinance notice

**Cons:**

- Winstar is likely to immediately file 8-K to disclose material adverse event, disclosing the amount of the refinancing;
- Disclosure may result in the details of Lucent's arrangement becoming public;
- Market rumors may further disrupt capital markets and deter new investors;
- Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;
- Potential Rating Agency implications for Lucent and Winstar;
- Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90-105 days).  If Winstar does not refinance, rate on Lucent Loans increases by 2% (i.e. a potential $13.8M in additional interest cost annually on current $690M of Lucent Loans).  If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash pay coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62M of additional interest cost annually on current $690M of Lucent Loans)

**Option 2-Meet with Winstar immediately and advise verbally of pending notice**

**Pros:**

- Provides opportunity to negotiate right to sell up $300M of Lucent Loans today if Lucent desires;
- Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;
- Flush out any strategic options currently under consideration by Winstar;
- Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)
- Limit public disclosure and market impacts

CONFIDENTIAL

LW00016796

**B1466**

**Cons:**

- Time is of the essence
- 105 days required for refinance
- Rumors may still permeate the marketplace

**V.  Conclusions:**

- Lucent's ultimate negotiating position may be driven by our perception of Winstar as a "going concern";
- If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;
- To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make more informed decision; A confidential discussion may begin immediately on this;
- Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor?  Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?
- Ultimately our options should be driven by what where we think this is going.  In our judgement, if the capital market disruption is temporary, i.e., 3-6 months longer, than Winstar is likely to survive.

CONFIDENTIAL

LW00016797

**B1467**

EXHIBIT
Hayes 5
5/7/03

| From: | Hayes, Paul (Paul) |
|---|---|
| ent: | Tuesday, November 07, 2000 10:10 AM |
| o: | Derrick, Peter (Peter) |
| Cc: | Perricone, Elizabeth (Beth); Rogers, Leslie L (Leslie); Keefe, Michael C (Michael); Damiano, Richard J (Richard) |
| Subject: | Winstar Recourse Removal |
| Importance: | High |
| Categories: | Winstar |

Peter,

From a "recourse removal" perspective, we should send the refinancing notice, and flexibly negotiate a par exit path.

I also had a conversation with Jill Diroma, who has been the customer team CFO, and she indicates Winstar represents very little continuing business for us.

Certainly if this is the case, then there is no reason to be flexible except to the extent that it maximizes our loan value. I strongly suggest that we retain a financial advisor to help us maximize our loan value in the even of any renegotiations/restructurings of our agreements.

One obvious way to get to a par exit path, if Winstar is unable to refinance the full amount of the outstanding, is to insist on an amount of Winstar warrants that compensates for any concessions that we make due to their inability to refinance. And there is no question that we should tightly restrict the amount of non-Lucent financing in return for any concessions.

Paul

——Original Message——
From:     Perricone, Elizabeth (Beth)
Sent:     Tuesday, November 07, 2000 9:20 AM
To:       Rogers, Leslie L (Leslie); Keefe, Michael C (Michael); Hayes, Paul (Paul)
Cc:       Perricone, Elizabeth (Beth)
Subject:  FW: winstar

As you will see below there was a meeting of the minds at Winstar yesterday. Late last nite Bill Quinn and I spoke briefly to Peter for the outcomes of that meeting. Peter described 3 capital events about to occur:

- Bank group to provide for new term loan of $200M to be supported via guaranty of Siemens. The proceeds of this loan are to paydown Lucent. Apparently Winstar will enter into some long term supply agreement w/Winstar in exchange for their guaranty. Not sure how they will pay for Siemens gear if that facility will be used to repay us???
- Winstar to enter into new $275M capital lease w/Cisco
- Winstar to inject new $250M of equity (term sheet to follow to Lucent)

This would bring our current exposure of $690M down to $490M or below trigger amount. I am not clear from Peter whether we will issue refinance notice now, sounds like we are waiting.

Peter wants complete due diligence done at Winstar so Quinn, Keller and I are coming up w/ a list today.

We can discuss on our call later. I am interested in more details, particularly the mention below of raising our threshold on refinance to $550M and co-marketing of our paper???

REDACTED

390

CONFIDENTIAL     LWI 00042246     

B1468

REDACTED

391

CONFIDENTIAL                    LWI 00042247

B1469

 

Lucent Technologies
Bell Labs Innovations

600 Mountain Avenue
Murray Hill, NJ· 07974-0636 USA

Martina Hund-Mejean                  Room 7D-525
Sr. V.P. & Treasurer                 Telephone 908 582-8556
                                     Facsimile  908 582-0294

November 7, 2000

EXHIBIT
Hayes 9
7/17/03 Vy H

Richard J. Uhl
Group Executive and Chief Financial Officer
Winstar Communications, Inc.
685 Third Avenue
New York, NY 10017

        Re:  Lucent Vendor Financing

Dear Richard:

This will confirm our understanding regarding the Credit Agreement dated May 4, 2000, among
Winstar Communications, Inc., WVF-I LLC, Lucent Technologies and other parties (the "Credit
Agreement").   Capitalized terms that are not defined in this letter shall have the meanings
ascribed to those terms in the Credit Agreement.

1.      Lucent will consent to increasing the loans and commitments under the Bank
        Credit Agreement by $200 million, on the following condition:

    •   Lucent is reasonably satisfied with the terms of any amendments or
        the changes to the Bank Credit Agreement (the "Bank
        Amendment") required to increase the Bank Credit Agreement
        from $1.15 billion to $1.35 billion.

    •   The Bank Amendment will provide that the entire $200 million
        increase in the Bank Credit Agreement will be drawn immediately
        upon the effectiveness of the Bank Amendment and will be
        disbursed to Lucent to prepay outstanding Loans under the Credit
        Agreement. Winstar will also pay all accrued interest on the $200
        million of Loans being prepaid.

    •   The other conditions of this letter are satisfied, including Lucent
        completing its initial due diligence under paragraph 4 below.



CONFIDENTIAL WC 0039832

B1470

Page 2

2. Winstar will provide to Lucent today a copy of the final, executed term sheet for a $250 million equity investment in Winstar, and Lucent shall be satisfied with the terms thereof. Lucent will notify Winstar whether Lucent is satisfied with the terms of the equity promptly after receipt of the term sheet.

3. The dollar threshold at which Lucent can exercise its refinancing option under the Credit Agreement will remain at $500 million, and Sections 2.18 and 2.19 of the Credit Agreement will not be amended.

4. Winstar will provide Lucent with full access to its books, records and business plans to enable Lucent to provide an extensive due diligence review of the Winstar business. This will be done to provide Lucent with a better understanding of Winstar's business and plans.

5. Winstar will use its reasonable best efforts and cooperate diligently with Lucent to assist Lucent to market the existing Loans and Commitments under the Credit Agreement immediately. As part of this, Lucent and Winstar will agree on a class or group of eligible institutions to which Lucent may sell loans without consent of Winstar. In addition, Lucent will have the benefit of market flex provisions to enable Lucent to increase the pricing on Loans and Commitments and make other necessary changes to enable Lucent to sell Loans and Commitments at par. The letter agreement between Winstar and Lucent regarding up-front fees will be amended so that Lucent may utilize all up-front fees to offset any and all costs of selling all Loans (including any future Loans) and Commitments under the Credit Agreement prior to Lucent being required to rebate any funds to Winstar.

6. On or before November 30, 2000, Winstar will prepare a written plan satisfactory to Lucent detailing the manner and timing by which Winstar will refinance Loans under the Credit Agreement.

This letter does not constitute an amendment, waiver, consent or other modification to the Credit Agreement. This letter constitutes Winstar's and Lucent's understanding for amendments, consents and/or modifications to the Credit Agreement to be entered into by the parties, and such amendments, consents or modifications shall be effective only upon execution by all necessary parties (including any required third party consents) of definitive documentation.

The understandings set forth herein are being agreed upon on the basis that the increase in the Bank Amendment will be completed and effective by November 30, 2000. If the Bank Amendment is not effective by such date, this letter shall be null and void.

CONFIDENTIAL WC 0039833

B1471

Page 3

If this correctly sets forth your understanding, please execute a copy of this letter on the space provided below.  If a copy of this letter executed by Winstar is not received by us before 12:00 noon, New York time on Wednesday November 8, 2000, this letter shall be null and void.

Lucent Technologies Inc.

By:

Martina Hund-Mejean
Sr. V.P. & Treasurer

Agreed and accepted:

Winstar Communications, Inc.

By:

CONFIDENTIAL WC 0039834



**Lucent Technologies**
Bell Labs Innovations

### General Due Diligence Questions

**Company Overview / Corporate Strategy**
- Please provide an update to the Company's current business plan and strategy for either expanding or contracting from its existing markets. Has the Company's mission changed and if so, please explain? How is the Company looking to be perceived by Customers?
- What are the critical success factors of this plan? What are the Company's greatest challenges going forward? Please explain the Company's strategy around each of the identified critical success factors and challenges.
- Please provide copies of the Company's budgeted versus actual financial reports covering the last 12 months and describe any major differences.
- Please provide copies of the Company's original projections vs. revised projections covering the last 12 months and describe any major differences.
- Please provide a 10 year electronically linked financial model in excel format reflecting the current plan and proposed capital structure.
- Describe the Company's long-term goals regarding future business opportunities / acquisitions / expansion plans, etc.
- Please provide updated charts reflecting any changes to the current corporate structure.

**Senior Management Team / Board of Directors**
- Please provide an update to the Company's organizational chart from a management team perspective.
- Is there any management employment contracts in place? What are the nature and length of these contracts? Are non-compete clauses included in these contracts?
- Is there any required management performance targets and / or incentive schemes in place at this time?
- Have there been any recent changes to the management team?
- For any senior management team positions not filled at this time, please provide an update of the status, strategy and timeline for filling these positions.
- Have members of the senior management team made equity contributions into the Company? If yes, what percentage of the Company is currently owned by the senior management team?
- Please provide detail on any changes to the current members of the Board of Directors. What value does each of the Board members bring to the Company?

**Sponsors / Equity / Strategic Partners**
- Please provide a complete updated list of sponsors and investors including their ownership percentage and the size of investment. (Please include proforma ownership as it relates to any pending capital raising efforts.)
- Provide a summary of the Sponsor's respective rights and obligations to/from the Company? What role will the Sponsors' play going forward (i.e. silent partners, members of the management team, seats on the Board, etc.)?
- Please provide background / summary sponsor information including historical financials and financial projections, if available.
- What does each sponsor bring to the Company? Is their investment strategic or financial in nature? If strategic, please describe the nature of the relationship and how the relationship fits into the Company's strategic plan.

Lucent Technologies Proprietary                    1

CONFIDENTIAL WC 0039835

B1473



**Lucent Technologies**
Bell Labs Innovations

**Sponsors / Equity / Strategic Partners Cont'd**
- Are there additional Strategic Partners that are not Sponsors? Who are they? How does this relationship benefit the Company? How does it fit into the Company's strategic plan? Do these Strategic Partners share in any financial risk of the project? If yes, please explain.
- What are the plans for additional capital from either existing or new sponsors/shareholders? What is the anticipated form of such capital?
- What is the anticipated timing of these infusions? What milestones or events will trigger future infusions? Please provide copies of executed commitment letters / documentation related to these future investments.
- What are the Sponsors long-term strategy for their investments in the Company?
- Is there a time period in which Sponsors are restricted from selling their stock?

**Capital Requirements / Capital Structure**
- What are the total capital requirements needed for execution of the current plan?
- What are the total capital requirements needed to build-out, expand or upgrade the network? What are the capital requirements by deployment phases and / or the deployment factor? What does this translate to on a metrics basis (i.e. per Covered POP, per CO, per addressable access line, per route mile, per square foot, etc) and how does this compare to the competition's network costs?
- Is the plan fully funded? If not, how much capital remains to be raised to fully fund the plan? What are the Company's plans and timelines for raising the capital?
- Does the Company have a financial advisor? If yes, what is the nature of the relationship and what exactly has the financial advisor been engaged to execute? Please provide contact names and numbers. If no, are discussions under way with potential financial advisors? Please describe the nature and status of such discussions and the timeline for engaging a financial advisor.
- What is the planned capital structure of the Company in the near term, medium term and long term?
- If the entire network plan is not fully funded, is the plan scalable (by phases, by markets, etc.) and self-sustaining based on the capital raised? Have financial projections and scenarios been run and analyzed based on current capital? Please provide the current capital view of the financial projections.
- Are all components of the capital structure in local currency? If not, what components are in foreign currency? How will the Company hedge its foreign exchange risk? How is foreign exchange handled in the financial projections?
- How much of the debt structure consists of floating debt? How will the Company hedge against interest rate increases? How is hedging incorporated into the financial projections?

**Service / Product Offering**
- Please describe any changes to your current product and service offerings and explain any future offerings.
- For those products to be offered in the future are the corresponding revenues included in the financial projections or do they represent additional revenue opportunities?
- For those products to be offered in the future, what development work needs to be done or what additional network expenditures need to take place to make these services available to customers? Are these expenses or expenditures incorporated into the financial projections?
- Please breakdown the products and services by targeted customer segment (i.e. wholesale, large business, small & medium business, residential, etc.), if applicable.

Lucent Technologies Proprietary                    2

CONFIDENTIAL WC 0039836

B1474



Lucent Technologies

### Service / Product Offering Cont'd

- How are the products and services fulfilling the needs of each customer segment? How are the products and services positioned to the customer? What is the value proposition?
- How do the Company's products and services differ from the competition?
- Please describe the price points and pricing structures for the various products and services? How do these prices compare to the competition? Please provide any industry information, competitive analysis and / or market research to support pricing assumptions.
- What is the Company's current strategy toward bundling of services?
- Are or will customer contracts be used? Please summarize the general terms and conditions of customer contracts.
- Do the revenue streams in the model reflect specific products and services or product categories?  Please provide the relationships between the revenue streams in the model and the products and services outlined in the business plan.
- Is the Company planning on offering customer equipment subsidies? If yes, how are these subsidies incorporated into the financial projections?

### Market Demand & Competition

- Please provide copies of materials (industry research & forecasts, market research studies, economic studies, focus group results, political & regulatory environment publications, demographic information, teledensity information, etc.) demonstrating the current market demand and the anticipated growth in the targeted regions.
- Please provide a comprehensive competitive analysis by market.  This analysis should outline the current and known future players in each market and include information on the competition's key strengths and weaknesses, overall strategy, target markets, respective market share, network strategy, current build-out, future deployment / expansion plans, etc. on a company by company basis.
- What are the Company's primary competitive advantages verse each competitor?
- What is the Company's overall strategy for tackling the competition in an effort to meet its plan?
- How does the Company's overall cost structure compare to the competition?  In what areas will the Company be able to realize cost savings? How does this translate through to the EBITDA margin in the projections verse the competition?
- How does the Company plan on responding to a marketing / price war?
- How does the Company anticipate the competition to react to a new entrant?
- How much market share does the Company plan to garner over time? How much market share does the Company anticipate the competition to garner / maintain over time?
- Is the Company's strategy to take market share, capitalize on industry growth or unleash an untapped market via a differentiated / niche offering?  Please explain.
- What barriers to entry, if any, exist for future new entrants in the Company's markets (product and / or geographic)?

### Sales / Marketing / Distribution

- What is the Company's overall sales and marketing strategy for the targeted market(s)?
- Please discuss the difference in sales and marketing plans between the various products and services? What are the related marketing expenditures?
- Please discuss the difference in sales and marketing plans between customer segments (i.e. wholesale, business, residential), if applicable.  What percentage of revenues does the Company anticipate deriving from each customer segment?
- How is the Company positioning its services in the marketplace?
- What mediums will be used to reach the target markets?
- How has the Company's brand name and / or slogan been received in its markets?

Lucent Technologies Proprietary          3

CONFIDENTIAL WC 0039837

B1475

11/07/00   19:43 FAX 908 559 1709        LUCENT TREASURY                                        ☒008



**Sales / Marketing / Distribution Cont'd**
- How does the Company's sales and marketing strategy differ from the competition?
- What types of sales channels are being used and what changes if any are being considered? Is the Company relying primarily on direct sales (via direct customer meetings, company-owned stores, etc) or indirect sales (via ISPs, national retailers, regional retailers, local retailers, etc)? If both, what percentage of sales are to be made via each channel?
- What discussions have taken place with potential indirect channels? Have any agreements been entered into with indirect sales channels? What are the nature of these agreements? How is the commission to be structured for the indirect channels? Has the commission structure been incorporated into the financial projections?
- What is the current and anticipated size and structure of the sales organization over time?
- How does the Company view the local market for recruiting sales talent?
- What compensation / incentive plans will be used to attract and retain qualified salespeople?
- How do the compensation / incentive plans relate to the Company's objectives for attracting new customers, growing existing customer base revenue and increasing customer retention? Have these financial relationships been incorporated into the projections?
- Please describe the training mechanism(s) used by the Company for new salespeople? How often is training provided / required?
- When does marketing / sales efforts begin in new markets relative to service availability?
- What are the Company's projected acquisition costs per customer? How do they compare to the competition?

**Regulatory**
- Briefly describe the local regulatory environment as it relates to the Company's service offerings.
- Please describe the nature of the Company's relationship with regulators and the local government.
- Please describe the competition's relationship with regulators and the government.
- Please comment on any legal or regulatory issues / action that may affect the Company.
- What changes in the regulatory environment are foreseen over the next 5-10 years? What impact might such changes have on the Company?
- What regulatory filings or certifications need to be received to offer the planned services in each region / market?
- Has the Company already received the required certifications for any expansion markets or new service offerings? If yes, please provide appropriate documentation. If not, what is the current status of the certification / regulatory approvals? What requirements does the Company still need to meet in order to apply for / receive certification?
- What are the Company's timelines, by market, for applying for and receiving the required certification? How does this timeline relate to the network deployment schedule?
- Who is leading these efforts internally? What is their background in this area?
- Has a third party been engaged to assist in the process? What is the third party's background in this area? What agreements are in place with this third party? Please provide contact names and numbers.
- Describe any concessions, if applicable.

CONFIDENTIAL WC 0039838

B1476



**Network / Deployment / Network Strategy**

- Please provide an overview of the Company's network strategy and network architecture over time.
- Please provide a detailed deployment timeline by phase, by market, by functionality for any expansion markets.
- What are the primary risks related to the network strategy and corresponding deployment timeline?
- Please outline all major activities (site identification and acquisition, CO approvals, rights of way, IRUs, long-haul capacity, etc.) that must take place as part of the deployment process and provide the current status of these activities.
- What is the status of interconnect agreements?  What interconnect agreements are in place and what interconnect agreements are still outstanding?  Please provide documentation.
- For those outstanding, what is the timeline for negotiating interconnect agreements?  How does this relate to the Company's deployment timeline?  What are the Company's options in the event interconnect agreements are not negotiated on time?  Who is leading the interconnect negotiations?  What is their background in this area?  Are any third parties involved in the process?  What is their background in this area?
- Please provide a map of the proposed coverage area.  Is the topography of the coverage area suited to the technology?
- When will the network be operational and service be available in each of the expansion markets?  How aggressive are these timeframes?  What is the worst case scenario?
- How critical are time to market and network coverage to the Company's strategy in light of the competitive environment?
- Please provide detail on the portions of the network that are to be and are not to be owned and operated by the Company.
- Please outline any construction / deployment activities that are going to be outsourced.  Who will be providing these services?  What is their experience in the contracted area?  What are the major terms of the contract (price, timeframes, penalties, etc)?  Please provide copies of the contracts.
- What are the primary advantages of the Company's network over the competition's existing or future network?
- How does the Company's network cost structure compare to the competition's?
- Where and how are the monthly network costs incorporated into the model?  Please provide detail regarding all underlying network assumptions.  Please provide a clear breakdown of the fixed and variable components of the monthly network costs.
- If Dark Fiber IRUs are part of the Company's network strategy, please provide details and documentation of the terms.  How are the IRUs reflected in the projections?

**Licenses (if applicable)**

- Does the Company require licenses to execute its revised business plan?  If so, what types of licenses does the Company need?
- What licenses does the Company currently own?  Please provide a detailed list of license properties.
- Does the Company need to obtain additional licenses to build-out the coverage area as reflected in both the business and financial plan?  If yes, what are the Company's plans to obtain additional licenses (acquisitions, auctions, etc)?  Please explain.
- Have any assumptions been made in the financial projections regarding future license purchases?  Please outline the underlying assumptions.
- What company within the Company's legal structure holds the licenses?  Where will future licenses be held?
- What is the nature of the License agreements (i.e. build-out requirements, transferability, assignability, duration, etc.)?

CONFIDENTIAL WC 0039839

B1477



**Licenses (If applicable) Cont'd**

- How much did the Company pay for these licenses?  How does the Company's license costs compare to the competition's?
- Are these licenses in any way superior or inferior to the competition's?
- What is the current valuation of these licenses?  What is the basis of this valuation?
- Do the licenses owned by the Company have enough capacity based on today's technology to support the products / services to be offered?
- What other companies own licenses in the Company's markets?  Have these companies already built-out their networks?  If not, what are their plans for the licenses?
- Are there any planned or known sales (new spectrum, re-auctions, etc.) of additional licenses in the Company's markets?  How are these sales being structured?  What companies are planning or likely to purchase these licenses?  How will this impact the Company's plan and the competitive environment?  In the Company's viewpoint, how will these future sales impact the value of the Company's licenses?

**Operations / Back Office**

- What changes if any, are there to the Company's strategies toward network operations, customer care, billing, provisioning, etc.?
- What underlying assumptions have been made in the financial projections for each of these areas?
- Are there plans to outsource any of the operations?  If yes, please respond to the following questions for each of the functions to be outsourced.  To whom will they be outsourced?  What is their background in this area?  Are any contracts / agreements already in place?  What are the major terms and conditions of the contracts (pricing, duration, quality of service, performance metrics)?  Are the negotiated pricing structures incorporated into the Company's financial projections?  Will the contracted company be able to support the growing needs of the Company over time?  What provisions related to growth have been incorporated into the contracts?  Are there critical junctions at which the outsourcing strategy may change?
- How are the Company's operating and back office systems functioning to date.  Are there any issues we should be aware of that will negatively impact operations?  How do your systems compare to that of your competitors?
- In regards to the billing system, does the platform meet all the Company's current and future requirements based on their product and service offering?  For example, does the billing software adequately handle bundled and integrated services?
- What is the Company's strategy toward e-commerce or web-based platforms?  When will these be implemented?
- What hours of the day is customer service available?  If customer service is available 24x7, is any portion of this service outsourced?  Is customer service is being done in-house and if so, where is this team located?
- Who is leading up the Customer Service team?  What is their background in this area?  What types of training programs are being implemented?  What performance metrics are going to be used?  What incentives or rewards are going to be offered to the Customer Service Representatives ("CSR")?
- What is the average number of days to provision service in the Company's markets?  Does the subscriber growth in the projections reflect these provisioning times / capabilities?
- How does the Company plan to improve provisioning times?
- If applicable, are there any electronic bonding initiatives underway with the incumbent to improve provisioning times?  What are the timelines for these initiatives?  Who is leading these efforts and what experience do they have in the development and implementation of electronic bonding?

CONFIDENTIAL WC 0039840

B1478

11/07/00  19:44 FAX 908 559 1709     LUCENT TREASURY     ☒011



Lucent Technologies
Bell Labs Innovations

**Personnel / Labor**
- Describe any positive / negative characteristics of the labor environment.
- What are the projected labor requirements for each area of the business over time? Please point to where headcount requirements can be found in the financial projections.
- Describe availability of labor in local market for key jobs including sales, technical support, administrative and operations.
- What is the Company's strategy for recruiting and hiring personnel in the different areas mentioned above?
- What is the historical unemployment rate for the past two years?
- Who is leading the recruiting efforts? What is their background in this area? Are any third parties assisting in the effort? If yes, please explain the nature of the relationship.
- What types of training mechanisms will be implemented? How often will training be offered / required?
- What proportion of the labor force is expected to be unionized? For the unionized labor force, when does the union contract expire? Please describe the Company's relationship with the union?
- Have increased salaries and wages been forecasted in the financial projections? What annual percentage increase is reflected in the financial projections?
- What is the current inflation rate? What is the historical inflation rate for the past two years? What is the forecasted inflation rate? How have current and forecasted inflation rates been incorporated into the salaries and wages forecasts in the financial projections?
- Please provide an analysis of GDP per capita and per capita income as reflected in the salaries and wages forecasts in the financial projections.

**Contractual / Legal**
- Please identify and describe any contractual and legally binding agreements that have not been addressed in previous sections.
- Please describe any issues with the Company's current insurance coverage (i.e. network, corporate, business interruption, key man life insurance, etc).
- Please describe any current or future litigation and expected impact and costs (if any)?

**Political / Economic Environment**
- Please describe the Company's view of the political and economic scenarios which underlie the Company's international portion of its business plan including:
  - Political stability
  - Economic expansion / domestic consumption
  - Economic stability
  - Exchange rate stability

Lucent Technologies Proprietary               7

CONFIDENTIAL WC 0039841

B1479

## Mcgovern, Carolyn Beth (Carolyn)

**From:** Montemarano, Michael A (Michael)
**Sent:** Thursday, December 28, 2000 11:22 AM
**To:** Mcgovern, Carolyn Beth (Carolyn); Carroll, Christopher
**Subject:** FW: winstar

For file

-----------
**From:** Verwaayen, Bernardus J (Ben)
**Sent:** Thursday, December 28, 2000 10:33 AM
**To:** Hund-Mejean, Martina (Martina); Harris, Deborah K (Deborah Kristine); Montemarano, Michael A (Michael); Hopkins, Deborah C (Debby/CFO)
**Cc:** Carroll, Christopher F (Christopher); Rosen, Stephen R (Stephen); Spurrier, Carole J (Carole); Derrick, Peter (Peter)
**Subject:** RE: winstar

Well, after the read out from the lawyers and after reviewing the options with everybody on our pre call yesterday.
Winstar can draw upon the credit facility, including services.
We did push back on credits ( no cash, but off setting a/r's) and the 30 million request that came in Friday.
We really had not the option of denying their rights here.
In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change.
So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship.
We will create from both sides a wishlist how to recreate our legal platform working together and renegotiate on those issues.
I think we all understand now much better where we are and how to get out of this situation going forward.
We want to make this a profitable account with clear rules of engagement.

Ben

-----------
**From:** Hopkins, Deborah C (Debby/CFO)
**Sent:** Thursday, December 28, 2000 7:57 AM
**To:** Hund-Mejean, Martina (Martina); Harris, Deborah K (Deborah Kristine); Montemarano, Michael A (Michael)
**Cc:** Carroll, Christopher F (Christopher); Rosen, Stephen R (Stephen); Verwaayen, Bernardus J (Ben); Spurrier, Carole J (Carole); Derrick, Peter (Peter)
**Subject:** RE: winstar

WE HAD ALREADY SAID no TO THE SERVICES FUNDING!!!!!!!

-----------
**From:** Montemarano, Michael A (Michael)
**Sent:** Wednesday, December 27, 2000 6:42 PM
**To:** Hund-Mejean, Martina (Martina); Harris, Deborah K (Deborah Kristine)
**Cc:** Carroll, Christopher; Hopkins, Deborah; Rosen, Stephen; Verwaayen, Bernardus; Spurrier, Carole J (Carole); Derrick, Peter (Peter)
**Subject:** winstar

Based on a call today with the winstar chairman, president and CFO we took the following position as articulated by Ben.

We would "allow" winstar to use the credit facility to fund their services for this quarter. We would not engage in any billing/PO's between the companies, but they could and intend to draw down the facility for about 65M. This would be cash out the door for us.

We agreed that the 35m credit granted in 4qtr can be used as a reduction to their outstanding credit facility. It would not be dispersed in cash to them, but we go against the credit facility as a "repayment".

They also indicated they had presented a draw down last week of 32M. Ben asked them to reconsider this given the extremely low lucent content.

I will work this tomorrow with their CFO and plan to ensure they adequately document the cash draws. In addition, Ben asked the CT to set up a meeting with Winstar to get the relationship to a new level where both companies benefit.

Page 1





CONFIDENTIAL

LW00059739

B1480

Other issues to be discussed:
Retroactive pricing of Hubs and Buildings "b's and hubs"
Closure on services/outsourcing arrangement

Michael

CONFIDENTIAL

LW00059740

B1481

Printer Printer

| | |
|---|---|
| From: | Hund-Mejean, Martina (Martina) |
| Sent: | Thursday, November 02, 2000 10:28 PM |
| To: | Hopkins, Deborah C (Debby/CFO) |
| Cc: | Derrick, Peter (Peter); Perricone, Elizabeth (Beth); Hayes, Paul (Paul); Quinn, Alice (Alice) ** CTR **; Keefe, Michael C (Michael); Rogers, Leslie L (Leslie) |
| Subject: | FW: Winstar |

Attached provides a recommendation on a course of action on Winstar that I am supportive of. Please let us know your thoughts.

——Original Message——

| | |
|---|---|
| From: | Derrick, Peter (Peter) |
| Sent: | Thursday, November 02, 2000 2:15 PM |
| To: | Hund-Mejean, Martina (Martina) |
| Subject: | FW: Winstar |

Martina,

As requested, attached is a review of the current Winstar situation.  In summary, the situation is as follows:

- Winstar's current cash burn rate is $350M per quarter, without additional financing, they are funded through Q2 2001.
- According to Bear Stearns, Winstar's access to the capital markets and the syndicated loan market is currently very limited
- Their paper was recently priced for up to $200M at 85.

The implications of issuing a Refinance Notice are:

Pros

- Puts pressure on Winstar to seek alternative sources of capital
- Forces parties to table to deal with funding issues
- Provides Lucent with ability to re-negotiate certain provisions

Cons

- Winstar likely to file 8-K to disclose material adverse event
- Disclosure may result in public disclosure of Lucent's arrangement
- Market rumors may further disrupt capital markets and deter new investors
- Existing Winstar securities could suffer price deterioration
- Potential rating agency implications for Lucent and Winstar
- Potential increased cash flow requirement for Winstar if they fail to refinance.

Recommendation

Meet with Winstar to verbally advise of notice.  The advantages to Lucent would be as follows:

- Provides an opportunity to immediately sell up to $300 million of Lucent loans
- Flush out any strategic options currently under consideration by Winstar
- Extract other amendments or concessions
- Limit public disclosure and market impacts.

Please call to discuss.

Regards,

1

DEPOSITION EXHIBIT
Hopkins 17
7/18/01
Richard Germosen, C.S.R. R.P.R., C.R.R.

CONFIDENTIAL   PLAINTIFF'S EXHIBIT PX-200   LWI   00037159

**B1482**

Peter

-----Original Message-----
From: Perricone, Elizabeth (Beth)
Sent: Thursday, November 02, 2000 12:04 PM
To:   Derrick, Peter (Peter)
Subject:    Winstar



Beth Implications for
Winstar....

2

CONFIDENTIAL              LWI     00037160

B1483

# MEMORANDUM

| | |
|---|---|
| **TO:** | Peter Derrick |
| **FROM:** | Beth Perricone |
| **CC:** | Leslie Rogers, Bill Quinn, Paul Hayes, Michael Keefe |
| **DATE:** | November 2, 2000 |
| **SUBJECT:** | WINSTAR REFINANCE NOTICE<br>IMPLICATIONS FOR WINSTAR AND LUCENT |

Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice. What follows is a summary of the current situation as well as our view of the various outcomes. These conclusions are not comprehensive but provide a broad overview of the most evident outcomes. To further refine the potential outcomes and help ultimately affirm any Lucent decision on a refinance strategy, we would require an opportunity to engage Winstar to better understand their plans to accommodate our refinance need, as well as canvas the capital markets for additional details as to the current investor demand for incremental Winstar debt or equity.

As you know, much of the history of Lucent's relationship with this account is that we have continuously made concessions to Winstar's demands as it relates to their financing needs in the interest of the Lucent/Winstar relationship. PFO was not in favor of the current financing in particular, however, in an effort to accommodate our customer once again, the refinance language was specifically engineered by PFO as a means to limit Lucent exposure and use Winstar's potential access to the capital markets as a source for repayment of our loans.

## I. Highlights of the Winstar/Lucent Loan Agreement:

- $690M of Lucent Loans ( a defined legal term) currently outstanding;
- Lucent Loans represent purchase money debt below the bank borrower level;
- Winstar can currently increase its Lucent Loans up to $1B without restriction;
- Current Lucent content is less than 50% while Supply Agreement stipulates 70/30 ratio;
- Lucent has the right to issue a Refinance Notice (a defined legal term) for all or a portion of Lucent Loans;
- Refinance Notice provides Winstar 90-105 days for Winstar to refinance Lucent Loans (all or a portion);
- Lucent needs to obtain Winstar's consent for loan sales before and until the end of the 90-105 day Refinance Period (a defined legal term);
- Refinance Notices do not trigger an event of default for Winstar, so Winstar may continue to borrow under the Lucent facility up to the $1B level;
- Lucent is not limited to a particular number of Refinance Notices; i.e. Lucent may give multiple Refinance Notices in varying amounts.

## II. Current Situation of Winstar:

- A recent Bear Stearns analyst report cites $583M of cash on hand as of June 2000. Winstar's current cash burn rate is $350M per quarter and without access to the additional $1B Lucent tranche, Winstar is funded only through Q2 2001;
- Winstar's access to the capital markets is more limited than in the past and strategic investors may be one of the few sources of future funding for Winstar given the current capital markets environment;

CONFIDENTIAL          LWI     00037161

B1484

- Bear Stearns believes that due to unfavorable conditions facing the CLEC market, along with an existing bank facility of over $1B, Winstar's ability to access the syndicated loan market to repay the Lucent Loans is highly unlikely.

### III. Current Capital Market Read:

- Winstar has some amount of access to the capital markets, however how much, what type of security and at what price, is at question;
- A recent indication of interest to Lucent Syndications was for up to $200M at 85. This is the likely barometer for today's investor appetite for purchase money debt of Winstar.

### IV. Implications of Issuing a Refinance Notice:

#### Option 1-Issue a written 105 day refinance notice for all or a portion of the Lucent Loans

**Pros:**

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors and Vendors);
- Forces parties to table to deal with funding shortfall issues;
- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);
- Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;
- Lucent can always rescind or modify the refinance notice

**Cons:**

- Winstar is likely to immediately file S-K to disclose material adverse event, disclosing the amount of the refinancing;
- Disclosure may result in the details of Lucent's arrangement becoming public;
- Market rumors may further disrupt capital markets and deter new investors;
- Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;
- Potential Rating Agency implications for Lucent and Winstar;
- Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90-105 days). If Winstar does not refinance, rate on Lucent Loans increases by 2% (i.e. a potential $13.8M in additional interest cost annually on current $690M of Lucent Loans). If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash pay coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62M of additional interest cost annually on current $690M of Lucent Loans)

#### Option 2-Meet with Winstar immediately and advise verbally of pending notice

**Pros:**

- Provides opportunity to negotiate right to sell up $300M of Lucent Loans today if Lucent desires;
- Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;
- Flush out any strategic options currently under consideration by Winstar;
- Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)
- Limit public disclosure and market impacts

CONFIDENTIAL            LWI        00037162

**B1485**

Cons:
- Time is of the essence
- 105 days required for refinance
- Rumors may still permeate the marketplace

**V. Conclusions:**
- Lucent's ultimate negotiating position may be driven by our perception of Winstar as a "going concern";
- If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;
- To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make more informed decision; A confidential discussion may begin immediately on this;
- Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?
- Ultimately our options should be driven by what where we think this is going. In our judgement, if the capital market disruption is temporary, i.e., 3-6 months longer, than Winstar is likely to survive.

CONFIDENTIAL            LWI      00037163

B1486

**Sasvari, Jean A (Jean)**

| | |
|---|---|
| **From:** | Perricone, Elizabeth (Beth) |
| **Sent:** | Monday, January 29, 2001 9:21 AM |
| **To:** | Hopkins, Deborah C (Debby/CFO); Verwaayen, Bernardus J (Ben) |
| **Cc:** | Derrick, Peter (Peter); Keller, William C (Bill); Quinn, William N (William); Hund-Mejean, Martina (Martina) |
| **Subject:** | Winstar Due Diligence |

Below please find 2 documents:

- Executive Summary of our findings during the 2 week due diligence on Winstar;
- Final version of Complete Due Diligence Report (for your files)

Kindly feel free to call Bill Keller or me with any questions. Thank you.

WINSTAR DUE DILIGENCE_.doc

Winstar Credit Review 12-2000....

*delete + file Winstar*

1

PLAINTIFF'S EXHIBIT PX-201

LW00072885

**B1487**

# Memo

| | |
|---|---|
| To: | D. Hopkins; B. Verwaayen |
| From: | B. Perricone; B. Keller |
| CC: | B. Quinn; P. Derrick; M. Hund-Mejean |
| Re: | Winstar Due Diligence |

We have concluded our due diligence on Winstar and thought that you might be interested in a brief executive summary. The review took place from December 1, 2000 to December 15, 2000 and encompassed (1) a review by PFO and Credit of the latest electronic models of the company's business plans, (2) an information gathering session with Winstar Management held on November 30, 2000, (3) an information gathering session and a visit to Winstar's NOC in Virginia on December 14, 2000, and (4) a review of the network architecture and underlying CAPEX assumptions with the Lucent Commercial and Product Units. Based on the above, we provide the following summary:

➢ Good business model. Winstar, a service provider that offers last mile broadband solutions, uses a hybrid of fiber and fixed wireless to compete with the ILECs;

➢ Winstar has a much larger addressable market than fiber-based CLECs and has proven its ability to add customers and gain business access rights;

➢ Winstar continues to demonstrate the ability to execute its plan by continually exceeding management and Wall Street expectations;

➢ The company's plan is scalable and as such has sufficient capital and resources currently to fully fund its operations to free cash flow positive;

➢ Management has been extremely successful in raising debt and/or equity over the last 12 months ($1.17B in new equity and $1.9B of new debt (net of refinancing));

➢ Assuming normal capital market conditions, the company is likely to enable a refinance of its debt and /or increase its debt capacity in '04';

➢ The current scaled model provided to Lucent reflects the ability to absorb an additional 2% interest carry cost upon the end of a Refinance Notice but is unable to carry interest based on the Lucent Conversion Option;

➢ We recommend an adjustment be made to the current AQR rating from 6 to 7 due to (1) Lucent Loans structurally subordinate to Bank Debt, (2) CLEC sector under scrutiny due to concerns over profitability of the business model, and (3) challenging conditions in the high yield and syndicated loan markets which may make it more difficult for Lucent to decrease its exposure and in fact, may require us to make available all or a portion of our commitments;

CONFIDENTIAL

LW00072886

**B1488**

Winstar Due Diligence
December 20, 2000

➤ We also recommend an adjustment to the current recourse reserves, both for the revised AQR rating and increased COF of 20% based on current market conditions;

➤ As you know the Refinance Notice has been sent by Lucent and at the end of the 105 day period, the following positive events occur for Lucent: (1) drawdowns must be in compliance with the 70/30 content provisions our Supply Agreement, (2) Lucent Loans become freely assignable and carry enhanced voting rights and (3) Lucent has the option to force Conversion Notes if it so desires. Given 1 and 2 above, the Lucent Loans will be more marketable and we should consider selling into the Bank Leveraged Loan Market as much paper as possible.

➤ Given the Conversion Option Lucent has after 4/3/01, perhaps Winstar will consider entertaining a revised capital structure which would result in a reduced Lucent commitment.

Attached for your reference and files, is a copy of the final due diligence document.

2

CONFIDENTIAL

LW00072887

**B1489**

# CREDIT REVIEW

*This Credit Review memorandum highlights the financial position of Winstar Communications, Inc., the consequences of issuing a refinancing notice and our recommendation.*

| SECTION I: PROJECT HIGHLIGHTS | | |
|---|---|---|
| **Project** <br> Winstar Communications, Inc. | **Obligor** <br> WVF-I, LLC | **Review Date/ Period** <br> December 15, 2000 |
| **Technology** <br> Fixed Wireless | **Guarantor** <br> Winstar Communications, Inc. <br> WCI Capital Corp. (Bank Borrower) | **Date of Last Review** <br> October 17, 2000 |
| **Credit Contact/ Phone** <br> Fred Rubin, Treasurer (# 212-792-9039) <br> Kevin Monaco, AT (# 212-792-9061) | **Transactor / Credit Analyst** <br> Beth Perricone / Bill Keller | **Country** <br> U.S. |
| **Sponsors Ownership % (as of AOR Approval)** <br> 11.3% Management <br> 85.0%   Public <br> 3.7%   GEM Capital | **Sponsors Ownership % (as of Current Review Date)** <br> 8.85% CSFB <br> 5.53% Welsh Carson <br> 5.53% Microsoft <br> 0.65% Compaq <br> 79.44% Public | |

| SECTION II: RATINGS | | | |
|---|---|---|---|
| **AOR (Facility)** | **AOR (Obligor)** | **Deal Close Date (original): 10-21-98** | |
| AOR Facility Recommended: 7 | AOR Obligor Recommended: 7 | Deal Close Date (new):         5-4-00 | |
| AOR Facility Approved: 6 | AOR Obligor Approved:  6 | Maturity Date:           12-31-06 | |

**Reason for AOR Changes:**
Suggesting downgrade due to: 1) Lucent Loans structurally subordinate to Bank Debt, 2) CLEC sector under scrutiny due to concerns over the profitability of the business model, 3) challenging conditions in the high yield and syndicated loan markets.  Given the above, it might be more difficult for Lucent to decrease its exposure and in fact we may be approached to make available all or a portion of our commitments.

| S&P Sovereign Rating | | | | S&P / Moody's Corporate Rating | | |
|---|---|---|---|---|---|---|
| | L-T rating | Outlook | S-T rating | | Senior Unsecured | Preferred Stock | Outlook |
| Current: | AAA | Stable | A-1+ | Current: | B / B3 | NR / Caa | Stable |
| Closed: | AAA | Stable | A-1+ | Closed: | B / B3 | NR / Caa | Stable |

| SECTION III: EXPOSURE / LOAN REMOVAL | | |
|---|---|---|
| **A/R Outstanding** <br> $25,924,645 | **Aging of A/R (30, 60, 90)** <br> Current:                    $ 4,013,384 <br> 1-30 days past due:    $   866,029 <br> 31-60 days past due:  $ 4,703,942 <br> 61 +  days past due:    $16,341,129 | **A/R Exposure (Limit)** <br> $18 million (originally $35 million) <br> Lou St. Peter authorized shipments <br> on credit hold to be released and <br> therefore, the limit is overdrawn. |
| **Type of Facility(ies)** <br> Purchase Mortgage Security Interest. <br> Advances based on min. 75% Lucent <br> Content; 25% Non-Lucent content. | **Amount Committed** <br> $2 billion ($1 billion initial <br> availability; additional $1 billion <br> available upon syndication or <br> repayment of initial availability.) | **Amount Outstanding** <br> *$559,570,709 <br><br> * Excludes outstanding A/Rs. |
| **Currency of Loan** <br> USD | **Currency Hedged (Yes / No)** <br> Not applicable | |
| **\*Hold Period** <br> Holding Period Approved:   6 months <br> Current Period Held:          6 months <br> Holding Period Remaining:  0 months <br> \* Given the health of the capital markets at time of <br> approval, combined with the refinance provisions of the <br> loan documents, a 6 month hold period was assumed. <br> Likely hold period is now 18 months given the <br> current state of the capital markets and our <br> structurally subordinated position to the Bank Facility. | **Loan Removal Strategy** <br> Options available as follows: <br> 1.  Sale of Lucent Loans into syndicated bank market. <br> 2.  Lucent Loans greater than $500 million triggers <br>     refinance provisions with source of exit strategy <br>     coming from Winstar accessing capital through a <br>     filed $2 billion shelf registration. <br> 3.  Lucent Loans greater than $500 million enables <br>     Lucent to exercise conversion rights and access the <br>     high yield markets for repayment. | |

CONFIDENTIAL

LW00072888

**B1490**

| SECTION IV: FINANCIAL COVENANT REVIEW | | | |
|---|---|---|---|
| *Financial Covenant | Violated Yes or No | Covenant Level 9/30/00 | Actual 9/30/00 |
| Max. EBITDA Losses/Min. EBITDA | No | ($38,000M) | ($25,818M) |
| Minimum Revenues | No | $139,000M | $174,415M |
| Max. Capital Expenditures | N/A | Annual Test | Annual Test |
| Max. Senior Secured Debt / Total Capitalization | No | 25.0% | 16.0% |
| Max. Total Debt / Total Capitalization | No | 75.0% | 58.6% |
| Max. Senior Secured Debt /Adj. PP&E | No | 50% | 36% |
| On Network Hubs | No | 159 | 165 |
| On Network Buildings | No | 3,320 | 3,940 |

* Phase I Financial Covenants Only

2

CONFIDENTIAL

LW00072889

B1491

| SECTION V:  HISTORY OF RELATIONSHIP / OBJECTIVES / OPTIONS / RECOMMENDATION |
|---|

### History of Relationship

Lucent Facility:

On May 4, 2000, Lucent entered into a $2 billion senior secured financing with WVF-I LLC, a subsidiary of Winstar Communications, Inc. ("Winstar"). The purpose of this facility is to support purchases of eligible equipment under the Lucent Supply Agreement dated 10/21/98. This Lucent financing was provided in conjunction with a recapitalization of Winstar, which included the following: 1) $900 million Equity Investment, 2) $1.6 billion Public Debt Offering, and 3) $1.150 billion Senior Secured Bank Facility.

Winstar has $559.6 million outstanding under the Lucent Facility ("Lucent Loans"). At the time of Lucent's approval, it was our understanding from this client that borrowings would not occur until after October 1, 2000 nor exceed $500 million. Due to the deterioration in the high yield markets in April, the company raised less than anticipated and therefore, accessed the Lucent Facility sooner than anticipated.

To limit Lucent exposure it was negotiated that if, in the event Lucent Loans exceed $500 million, Lucent could require a refinancing of all or a portion of the Lucent Loans. Once notice is provided, Winstar has 90 days (or 105, if necessary to complete a year end audit) to refinance the Lucent Loans. A $2 billion shelf registration is in place to allow for this refinance. If at the end of the 90 or 105-day period, the Lucent Loans are not refinanced, Lucent has two options: 1) Conversion Provision – Lucent has the right to convert any of the Lucent Loans to what is referred to in the Credit Agreement as Conversion Notes. These Conversion Notes could be priced as high as 2% above Winstar's 12.75% Sr. Notes due 2010. Currently these notes carry a YTW of 27.22%, which in effect means that if Lucent could force a conversion today, the Conversion Notes would price at 29.22%. It is likely that the pricing on the notes would increase due to the debt service required for these notes, and the resultant funding gap that would occur, and 2) Yield & Credit Enhancement – at the end of the 90 or 105 days, if Lucent Loans are not repaid the pricing on outstanding Lucent Loans increases by 2%. In effect the price would increase to Libor + 5.75% from Libor + 3.75%. In addition, full voting rights are restored on assignments and participations and Winstar's permission is no longer required to sell the Lucent Loans. Lastly, there are also drawdown restrictions that require compliance with the content provisions of Lucent's Supply Agreement. (See below for content requirements.)

Supply Agreement:

The current Lucent Supply Agreement mandates that at least 75% of all purchases be made for Lucent Content, with the balance of 25% allowable for Non-Lucent Content purchases made via the Supply Agreement. This requirement is monitored annually by the Commercial Team and is likely to not be met again this year. The maximum penalty for non-compliance of the content requirement is $3 million. (Last year Winstar was not in compliance, and the penalty was waived by the Commercial Team.)

Profitability of Relationship:

For fiscal 2000 Winstar generated $533 million of revenue to Lucent at an SGP of 61%; however, this includes a significant software deal for $100 million that drove the margin higher. CFO has advised that currently there is no ability to reconcile to a net margin. It does not appear that a business case was ever prepared when the Lucent Facility was increased to $2 billion from $1 billion.

Reserves:

Lucent is currently not reserving for cost of financing and loan loss reserves. We recommend a 20% cost of financing and 15.77% loan loss reserve given the loan structure, proposed hold period and AQR rating.

3

CONFIDENTIAL

LW00072890

**B1492**

## Objectives

Lucent:    To reduce outstandings and if possible, commitments under the Lucent Facility to limit the cash flow and balance sheet impact to Lucent.  In addition, at a $2 billion commitment, Winstar is our largest credit exposure.  It represents 45% of the SPN North America outstandings and 22% of commitments as of Nov. 30, 2000.

Winstar:   To terminate the $500 million refinancing notice trigger.  Analyst reports have suggested that Lucent's refinance provisions have resulted in the bonds trading down due to a perceived risk that Lucent would exercise it conversion rights under the Lucent Facility.  This would result in increased debt service and could dilute bondholders further as the percentage of unsecured debt increases.

## Options

Below is an overview of Lucent's options and the likely consequences of exercising such options.

**Option 1:**     Refinancing notice is <u>not</u> issued.

*Consequence:*   *Based upon the fully funded plan provided to Lucent, Lucent Loans would peak at $1 billion in 2Q01.  Winstar is pleased because there is no disturbance to the markets.  However, Lucent's exposure is not reduced and this paper is less marketable.*

**Option 2:**     Refinancing notice is issued, but Lucent does <u>not</u> exercise its option to convert the Lucent Loans into senior notes of Winstar.

*Consequence:*   *Winstar pays a 200 bps premium above the prevailing interest rate.  The several million-dollar difference in cash interest expense is inconsequential.  This approach would not result in an Event of Default nor deter Winstar from drawing additional funds under the Lucent Facility.  For Lucent, this option results in more marketable paper in terms of both higher coupon and enhanced voting rights. In addition, the company must comply with the Lucent content provisions of our Supply Agreement (75% Lucent content).  This would have the following positive impacts to Lucent cash flow: 1) increased revenues since the Lucent content is currently less than 50%, 2) lower cash outflows and 3) improved collateral package.  This may strain the Lucent / Winstar relationship.  However, the company's cost of capital would still be better than if they refinanced.*

**Option 3:**     Refinancing notice is issued, and Lucent exercises its option to convert the Lucent Loans into senior notes of Winstar.

*Consequence:*   *Winstar pays a 200 bps premium above Winstar's 12.75% Sr. Notes due 2010.  Currently these notes carry a YTW of 27.22%, which in effect means that if Lucent could force a conversion today, we could price our Conversion Notes at 29.22%.  However, it is probable that the pricing on the notes would increase due to market concerns as earlier noted.  This has a material adverse effect on Winstar's business model and would create a $2.2 billion funding gap (reflected in Conversion Provision Model in Section IX).  The relationship would be strained and it is not likely Lucent would exercise this option without having pre-sold the bonds.  In addition, Lucent would move from a secured to unsecured position.  Further, this might inhibit future investment in Winstar, as there might be concern over the company's overall relationship with its largest supplier.*

**Option 4:**     Lucent uses this opportunity to renegotiate its deal with Winstar, i.e. enhance collateral position, interest rate, move to Bank Borrower level, etc.

*Consequence:*   *Lucent paper becomes more marketable.  Winstar likely to require removal of $500 million conversion trigger in consideration of restructure.  Bank Group not likely to share its collateral.*

4

CONFIDENTIAL

LW00072891

**B1493**

### Recommendation

The entire reason for creating the refinance trigger was to limit the balance sheet impact to Lucent. It was also Winstar's verbal commitment to us that Lucent Loans would never exceed $500 million. However, given the state of the capital markets, the likelihood of Winstar honoring its verbal commitment is highly unlikely. In addition, with Winstar recently raising approximately $1 billion of new capital, future access may be limited. It should be noted, however, that with this recent capital raise, Lucent Loans and commitments were reduced by $194 million.

Given that, we would recommend option 2 above. DLJ has suggested that should Winstar not refinance the Lucent Loans in 105 days, there could be a market for as much as 50% of our paper at a price to Lucent of 80-85.

### SECTION VI:  COMPANY PROFILE

Winstar is a broadband services company that provides voice and data services to business customers and Internet Service Providers (ISPs), among others. The company is building one of the world's largest broadband networks for business. It offers last-mile, broadband solutions in 60 major markets, including each of the top 30 US markets. The company uses a hybrid of fiber and wireless fiber to compete with ILECs, using 38 GHz, 28 GHz and other portions of the radio spectrum in order to reach business customers directly. This "fat pipe" can reach more than 200 million people and more than 80% of the U.S. business market. The company offers bandwidth ranging from T1 (1.544 Mbps) to OC-3 (155.52 Mbps), as well as a full range of telecommunications, frame relay and ATM functionality.

Winstar has a much larger addressable market compared to fiber-based CLECs and has proven its ability to add customers and gain building access rights, the key to growth for a fixed wireless company. By targeting the largest markets in the United States, Winstar is able to quickly recover its initial capital investment. Its breakeven point is small, as it only needs one-to-two customers per building to breakeven, one-eighth the requirement compared to a fiber CLEC. The anticipated completion of the MFN and Williams networks in the 2nd half of 2001 will give the company more flexibility to compete as it will gain control over its networks as more than 60% of customers will be on the network. Furthermore, Winstar's network is valuable as a shortage of local fiber exists and customers are demanding more bandwidth.

### SECTION VII:  MAJOR CHANGES

Major Events since AOR Approval Date:
- In December 2000, Winstar announced a $1,020 million funding package of which $770 million is immediately available to the company. The funding consists of: 1) $270 million private equity investment (in the form of preferred shares) from Microsoft, Welsh Carson, CSFB Private Equity and Compaq; 2) $500 million in vendor financing from Cisco of which $250 million will be immediately available, and $50 million vendor financing from Compaq; and 3) $200 million incremental increase in its existing $1.150 billion bank facility.
- In November 2000, the Courts ruled in favor of CLECs allowing them full access to co-location sites of the ILECs.
- $3.65 billion of capital raised from Feb-May 2000. This consisted of $900 million in equity from investors like Microsoft and CSFB, $1.6 billion of senior notes for the purposes of refinancing certain existing debt and preferred stock and $1.15 billion of Senior Secured Bank facility.
- Additional spectrum granted of 38 GHz acquired from FCC in March 2000. The new licenses cover more than 54 million POPs.
- Strategic alliances with Microsoft and CBS in December 1999 for developing bandwidth applications and an online business center ("office.com"), respectively.
- Expanded relationship with Metromedia Fiber Networks by acquiring local fiber rings in an additional 38 markets in October 1999.

5

CONFIDENTIAL

LW00072892

B1494

SECTION VIII:  STRENGTHS & RISKS

6

CONFIDENTIAL

| Strengths |
|---|

**Valuable Network**
- Solves the last mile bottleneck
- Labor only represents 20% of fixed wireless builds versus 80% for fiber builds
- By second half of 2001, the company will be able to drive 100% of its traffic on-net (MFN's metro build and Williams' long haul build to be completed) which should result in enhanced margins
- With technology costs continuing to decline and technology comprising 80% of network costs, we would expect the company's cost structure to continue to decline
- Bulk of capital spending has occurred; future CAPEX will focus on add-on services (i.e., data, web hosting)
- Network architecture allows for integrated service offering

**Product/Services Offering**
- Only company to offer a fully integrated broadband solution (e.g., ASP, web hosting, voice, Internet, data)
- Priced competitively at about 8% lower than comparable ILEC service
- Offers bandwidth of up to 155.2 Mbps (optical carrier level) whereas, DSL only offers speeds up to 1.544 Mbps (T1)
- OC-6 (311 Mbps) soon to be available and OC-12 (622 Mbps) in beta testing

**Fully Funded and Scalable Business Plan**
- The new capital raise in December 2000 coupled with a scaled back network build suggests the company is fully funded until free cash flow positive (1Q2003)

**Business Model versus Traditional CLEC Model**
- Winstar continues to differentiate itself from the other CLECs by the high proportion of on-net line additions, the large number of on-net buildings, and the likelihood of turning EBITDA positive in the first half of 2001
- High quality service as measured by less than 1% in the troubled customer report versus 3.5% reported by the ILECs
- In-house lab performs full testing including equipment interoperability prior to finalization of network structure and customer installation to ensure network operating performance

**Strong Operating Metrics**
- Gross margins rose seven consecutive quarters, ARPU rose 14 straight quarters and EBITDA losses peaked in 2Q99

**Low Breakeven Point**
- Winstar's breakeven point is small, as it only needs one-to-two customers per building to breakeven, one-eighth the requirement compared to a fiber CLEC

**Capital Markets Track Record**
- Winstar has a good track record in the capital markets having raised $4.67 billion in new capital in 2000. The funding consisted of $3.5 billion in new debt and $1.17 billion in private equity

**Demand for Broadband Capacity**
- CSFB Research estimates that data services (local and long distance) represent a $20 billion opportunity, or about 11% of the CLEC addressable market, with annual growth rates expected to stay in the 30% range over the next few years
- CSFB Research forecasts a CAGR of 7.3% in the aggregate business communications services market (from $178 billion in 1999 to $360 billion in 2009 (CAGR of 7.3%))
- IDC forecasts a CAGR of 91.2% in the B2B e commerce market (from $24.8 billion in 1998 to $632.9 billion in 2003)
- Forrester Research forecasts a CAGR of 88.7% in the always-on Internet access market (from $1.4 billion to $33.5 billion)
- Yankee Group forecasts a CAGR of 26.2% in the ASP services market (from $5 billion in 1998 to $16 billion in 2003)

7

CONFIDENTIAL

LW00072894

B1496

## Risks

**CLEC Model in Question**
- CLEC shares are down significantly since the beginning of the year. The weakness is related to concerns about execution risk and capital availability. Unlike the weakness experienced in 1998 and 1999, investors question long-term profitability assumptions in CLEC models. *Mitigant: Unlike the traditional CLEC model, Winstar has over 44.2% of its traffic on-net. By the second half of 2001, the company will be able to drive 100% of its traffic on-net which should result in enhanced margins and the ability to fully control quality of service.*

**Weak Capital Markets**
- High yield and public equity markets are virtually closed. *Mitigant: Given the current conditions in the capital markets, Winstar has scaled back its roll-out and is focusing on increasing penetration of existing buildings and preserving capital. Winstar continues to successfully access private equity and vendor financing as alternatives.*

**Highly Leveraged**
- Significant debt and associated financing costs. *Mitigant: According to the company's scaled down model, there is ample cash flow to meet current debt obligations.*

**Building Access Rights**
- Real estate entities do not perceive the value in allowing service providers full access. *Mitigant: Recent court ruling allows full access to the providers. Further, companies will no longer be willing to occupy buildings without broadband access.*

**Alternative Technologies**
- Laser Technology (Terrabeam model). *Mitigant: Unproven; still in the developmental stages.*

**Competition**
- Competition from DSL, cable modems and other broadband fixed wireless operators is increasing. Teligent is the only other fixed wireless operator offering services on a national basis. XO Communications (formerly NEXTLINK) and Advanced Radio Telecom are expected to rapidly roll out services. *Mitigant: Teligent has had difficulties in executing on its plan and raising capital. No other company offers a full broadband service offering. DSL is plagued by long provisioning times and slower speed and less bandwidth.*

**Reciprocal Compensation**
- A report from Morgan Stanley Dean Witer (12/1/2000) suggests that the FCC is likely to leave existing reciprocal compensation agreements in place for 2001 and 2002 with Bill & Keep starting in 2003. This would eliminate 100% EBITDA margin reciprocal compensation revenues CLECs generate when providing local services to ISPs. *Mitigant: The company is not a D-LEC and therefore, receives very little reciprocal compensation.*

**Weak Loan Structure**
- Lucent is secured only by purchase money mortgages on equipment financed with drawdowns under the Lucent Facility. Our collateral coverage is further weakened because Non-Lucent component may contain services. Further, Lucent is structurally subordinate to the bank lenders in terms of both collateral and organizational structure (i.e., borrower level – parent vesse special purpose subsidiary) and has lower pricing. *Mitigant: None, except when Lucent Loans exceed $500 million and refinance provisions may be exercised.*

8

CONFIDENTIAL

**B1497**

## SECTION IX:  FINANCIAL PROFILE:

Credit's financial model and information presented in this memo were based upon: (i) the latest electronic models of the business plans (received on 12-1-2000), (ii) information from Winstar's due diligence session held in New York on November 30, (iii) information from Winstar's NOC visit held in Virginia on December 14, (iv) information from Winstar's Treasurer and Assistant Treasurer via email, conference calls and courier, and (v) information from Lucent's sales team, primarily verifying Winstar's network architecture and CAPEX.  Credit's goal was to: (i) check the calculations of Winstar Management Cases, (ii) assess the peak-funding requirement of the project on the basis of the Management Case's assumptions, (iii) assess financial impact on Winstar's financial position if refinancing notice is issued, but Lucent does not exercise its option to convert the Lucent Loans into senior notes, (iv) assess financial impact on Winstar's financial position if refinancing notice is issued and Lucent exercise its option to convert the Lucent Loans into senior notes, (v) sensitize Winstar's main assumptions, and (vi) assess the peak-funding requirement for some sensitivities.

### BACKGROUND

- We received two 10-year business models from Winstar on December 1, 2000.  One model assumed the company would raise additional capital to continue to fund its rollout ("Management Case") and the other model scaled back its rollout in order to create a fully funded plan ("Scaled Management Case").  In reality, the company's operations will be driven by market conditions.
- The Scaled Management Case included scaled down CAPEX and a smaller capital structure.  Given the current conditions in the capital markets, Winstar has scaled back its roll-out and is focusing on increasing penetration of existing buildings.
- The two models do not include Office.Com and Winstar's international operations.  The Treasurer indicated that Office.Com is cash flow neutral and the international operations monthly cash burn rate is between $1-$2 million.  Management expects the international operations to be cash neutral in the second half of 2002.
- The Lucent's Winstar sales team verified the network CAPEX assumptions over the period 2001-2009.
- Winstar is not a typical CLEC and therefore, we can only interpret industry data.

9

CONFIDENTIAL

LW00072896

**B1498**

## SOURCES & USES

The two tables below highlight the funding requirements of the Management Case & Scaled Management Case. In order to better highlight the funding requirements in the Management Case, future capital raises were eliminated.

*Table 1: Management Base Case*

SOURCES & USES THROUGH 2Q2004

| $in USD | Source | | Uses |
|---|---|---|---|
| *Cash Flow From Operations* | *53,333* | *Working* | *339,800* |
| *Invest* | *31,932* | *Capex* | *3,393,280* |
| *Bank Line* | *139,090* | *License Fees* | *162,000* |
| *Capital Lease* | *333,387* | *Investments in Marketable* | *81,231* |
| *Additional Paid in Capital* | *243,950* | *Other* | *113,595* |
| *Equity* | *138,045* | *Debt* | *28,973* |
| *Funding Gap* | *2,340,233* | | |
| *Cash* | *2,173,339* | | |
| Total | *4,775,906* | Total | *4,775,906* |

Notes:
- Winstar needs about $4.8 billion in capital to finance its project costs until the company becomes free cash flow positive in 2Q04.
- Winstar does not have enough capital to fund the project costs.
- Funding shortfall peaking at $2.3 billion in 4Q04.
- Lucent Loans peak at $700 million in 4Q01.
- Assumes minimum cash balances of $75 million.

*Table 2: Scaled Management Case*

SOURCES & USES THROUGH 1Q2003

| $in USD | Source | | Use |
|---|---|---|---|
| *Invest* | *53,333* | *Cash Flow From Operations* | *178,293* |
| *Bank Line* | *198,900* | *Capex* | *1,783,789* |
| *Capital Lease* | *412,487* | *License Fee* | *162,000* |
| *Additional Paid in Capital* | *243,950* | *Investments in Marketable* | *83,257* |
| *Equity* | *7,805* | *Other* | *99,360* |
| *Working* | *74,148* | *Debt* | *55,973* |
| *Funding Gap* | | | |
| *Cash* | *518,017* | | |
| Total | *2,302,750* | Total | *2,302,750* |

Notes:
- Winstar needs about $2.3 billion in capital to finance its project costs until the company becomes free cash flow positive in 1Q03.
- Winstar has enough capital to finance the project costs.
- Lucent Loans peak at $1 billion in 2Q01.
- Assumes minimum cash balances of $75 million.

## KEY DRIVERS

Credit has reviewed the main drivers in the model and has performed sensitivities when deemed appropriate. Winstar is not a traditional CLEC and therefore, benchmarking is a challenge and at times inappropriate. Below Credit has highlighted the main drivers, provided comparative data, and described the logic behind performing sensitivities.

- ### MARKET PENETRATION

Although the penetration levels do not look completely unreasonable, we sensitized the model to assume the company captures 90% of its projected penetration. As illustrated in table 4 below, this sensitivity reduces penetration from 16.3% to 14.7% in 2001 and from 34.1% to 30.7% in 2009.

Penetration rates in excess of 30% by 2009 is likely for the following reasons: 1) the company changed its business model to a building centric model, from a city centric model, 2) unlike ILECs, a sales representative is designated to each account, 3) strong industry fundamentals related to demand for broadband, 4) in many cases, Winstar is the only broadband solution in the building, and 5) Winstar will not connect a building to its network unless it is determined that significant penetration will be realized (prescreened).

*Table 3: Customer Growth*

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Base | 32,899 | 55,858 | 79,343 | 99,203 | 117,660 | 133,881 | 145,193 | 149,510 | 152,564 | 155,048 |
| Growth | n/a | 69.8% | 42.0% | 25.0% | 18.6% | 13.8% | 8.4% | 3.0% | 2.0% | 1.6% |
| Sensitized | 32,899 | 52,384 | 73,301 | 90,850 | 107,002 | 121,708 | 131,983 | 136,423 | 139,127 | 141,537 |
| Growth | n/a | 59.2% | 39.9% | 23.9% | 17.8% | 13.7% | 8.4% | 3.4% | 2.0% | 1.7% |

*Source: Winstar's Scaled Management Case and Lucent Downside Case*

10

CONFIDENTIAL

LW00072897

**B1499**

*Table 4: Penetration Rates*

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Base | 14.2% | 16.3% | 22.8% | 26.2% | 28.0% | 30.9% | 33.1% | 33.6% | 33.9% | 34.1% |
| Growth | n/a | 15.3% | 39.7% | 14.9% | 7.1% | 10.2% | 7.3% | 1.5% | 0.8% | 0.7% |
| Sensitized | 14.2% | 14.7% | 20.5% | 23.6% | 25.2% | 27.8% | 29.8% | 30.3% | 30.5% | 30.7% |
| Growth | n/a | 3.9% | 39.5% | 14.9% | 7.1% | 10.2% | 7.3% | 1.5% | 0.8% | 0.7% |

*Source: Winstar's Scaled Management Case and Lucent Downside Case*

- **ARPU**

As illustrated in table 5 below, Winstar's ARPU growth rate does not appear unrealistic when compared with Teligent's ARPU forecast. However, Credit has decided to err on the side of being conservative and has assumed a 2% annualized growth rate. The reason for this conservative approach is as follows: 1) voice becomes commoditized and partially offset by ARPU gains associated with data traffic growth, 2) Credit has not performed sensitivities on the other revenue streams (focusing on 80/20 rule) and 3) with the exception of ARPU data extracted from the Teligent model, Credit was unable to find acceptable benchmarkable data. DSL models are not comparable because they offer bandwidth of up to 1.544 Mbps, whereas, fixed wireless can offer bandwidth of up to 155.2 Mbps (optical carrier level).

*Table 5: ARPU projections in the Winstar and Teligent Business Plans / Credit ARPU sensitivity (*)*

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Teligent | 580 | 772 | 1,046 | 1,182 | 1,265 | 1,344 | 1,423 | 1,505 | 1,586 | 1,672 |
| Growth | n/a | 33.2% | 35.5% | 13.0% | 7.0% | 6.2% | 5.9% | 5.8% | 5.4% | 5.4% |
| Winstar | 726 | 753 | 831 | 917 | 1,012 | 1,117 | 1,233 | 1,362 | 1,503 | 1,659 |
| Growth | n/a | 3.7% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% | 10.4% |
| Winstar Sensitized | 726 | 713 | 727 | 742 | 756 | 772 | 787 | 803 | 819 | 836 |
| Growth | n/a | -1.8% | 2.0% | 2.1% | 1.9% | 2.1% | 1.9% | 2.0% | 2.0% | 2.1% |

*Source: Teligent's model, Winstar's Scaled Management Case and Lucent Downside Case*
*(*) Does not include enhanced services, long distance resale, and Williams revenue*

- **REVENUE**

The model focuses on several different revenue streams, including: Network Channel, Professional Services (LAN and WAN systems integration), Web Hosting/ASP and New Media (marketing and distribution of information and entertainment content through the Internet).

Credit has focused on Winstar's Network Channel, the main driver of its business. Network Channel represents local resale, long distance, private lines, WAN transport (frame/ATM/IP) and Internet access. Other revenue streams included in Network Channel are Winstar's long distance resale business (being phased out), revenue recognized through the capacity sale agreement with Williams Communications and Enhanced Services (call waiting, call forwarding, voice mail, operator assistance and directory assistance).

*Table 6: Revenue Composition in USD thousands*

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | 596,634 | 983,968 | 1,421,451 | 1,806,139 | 2,224,474 | 2,667,634 | 2,984,435 | 3,302,459 | 3,620,848 | 3,957,010 |
| Professional Services | 31,590 | 40,929 | 60,316 | 88,062 | 185,976 | 140,989 | 188,380 | 230,083 | 332,183 | 441,996 |
| Web Hosting/ASP | 9,287 | 48,608 | 117,912 | 202,965 | 301,534 | 412,817 | 538,146 | 681,687 | 852,979 | 1,064,913 |
| New Media | 130,000 | 115,924 | 94,992 | 722,838 | 167,347 | 211,242 | 251,964 | 305,221 | 356,990 | 408,222 |
| **Total Revenue** | **767,530** | **1,191,431** | **1,694,373** | **2,241,975** | **2,399,232** | **3,372,481** | **3,962,825** | **4,545,440** | **5,163,000** | **5,872,142** |

*Source: Winstar's Scaled Management Case*

11

**B1500**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | 596,634 | 977,288 | 1,272,356 | 1,571,529 | 1,799,529 | 1,972,216 | 2,099,137 | 2,187,945 | 2,246,995 | 2,299,591 |
| Professional Services | 31,589 | 48,929 | 60,816 | 80,042 | 105,876 | 144,989 | 188,288 | 250,080 | 327,483 | 441,398 |
| Web Hosting/ASP | 9,287 | 48,603 | 117,912 | 202,965 | 301,514 | 412,817 | 538,144 | 681,687 | 852,079 | 1,064,313 |
| New Media | 130,000 | 115,926 | 94,992 | 122,830 | 167,567 | 213,242 | 251,964 | 305,221 | 356,990 | 408,222 |
| **Total Revenue** | **767,550** | **1,155,663** | **1,546,476** | **1,977,466** | **2,365,287** | **2,732,261** | **3,077,525** | **3,424,936** | **3,788,547** | **4,214,721** |

Source: Lucent Downside Case

As illustrated in table 7 below, by sensitizing penetration and ARPU, Network Channel as a percentage of total revenue declined from 82.8% to 82.2% in 2001 and from 67.4% to 54.6% in 2009.

Table 7: Revenue Composition as % of Total Revenue

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | 77.7% | 87.8% | 83.9% | 81.9% | 79.5% | 77.2% | 75.3% | 72.6% | 70.1% | 67.4% |
| Professional Services | 4.1% | 3.4% | 3.5% | 3.6% | 3.8% | 4.7% | 4.8% | 3.5% | 6.4% | 7.5% |
| Web Hosting/ASP | 1.2% | 4.1% | 7.0% | 9.1% | 10.8% | 12.2% | 13.6% | 13.0% | 16.5% | 18.1% |
| New Media | 16.9% | 9.7% | 5.4% | 5.5% | 6.9% | 6.3% | 6.4% | 6.3% | 6.9% | 7.0% |

Source: Winstar's Scaled Management Case

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | 77.7% | 82.2% | 82.4% | 79.5% | 75.7% | 72.1% | 68.2% | 63.9% | 59.3% | 54.6% |
| Professional Services | 4.1% | 3.5% | 3.9% | 4.0% | 4.5% | 5.3% | 6.1% | 7.3% | 8.6% | 10.5% |
| Web Hosting/ASP | 1.2% | 4.2% | 7.6% | 10.3% | 12.7% | 15.1% | 17.5% | 19.9% | 22.5% | 25.3% |
| New Media | 16.9% | 10.0% | 6.1% | 6.2% | 7.1% | 7.7% | 8.2% | 8.9% | 9.4% | 9.7% |

Source: Lucent Downside Case

As illustrated in table 8 below, by sensitizing penetration and ARPU, Network Channel growth rates declined from 65.2% to 59.2% in 2001 and from 9.3% to 2.3% in 2009.

Table 8: Revenue Growth Rates

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | n/a | 65.2% | 44.7% | 22.2% | 11.2% | 9.2% | 14.4% | 10.9% | 9.4% | 9.5% |
| Professional Services | n/a | 29.6% | 46.6% | 33.4% | 32.2% | 33.2% | 33.5% | 32.8% | 32.9% | 37.9% |
| Web Hosting/ASP | n/a | 425.4% | 142.6% | 72.1% | 48.6% | 34.9% | 30.4% | 26.7% | 25.0% | 25.0% |
| New Media | n/a | -10.8% | -18.1% | 29.3% | 36.3% | 26.7% | 19.3% | 21.1% | 17.0% | 14.4% |

Source: Winstar's Scaled Management Case

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Network Channel | n/a | 59.2% | 34.1% | 23.4% | 13.9% | 10.1% | 6.4% | 4.2% | 2.7% | 2.3% |
| Professional Services | n/a | 29.6% | 46.6% | 33.4% | 32.2% | 33.2% | 33.5% | 32.8% | 32.9% | 32.9% |
| Web Hosting/ASP | n/a | 423.4% | 142.6% | 72.1% | 48.6% | 36.9% | 30.4% | 26.7% | 25.0% | 25.0% |
| New Media | n/a | -10.8% | -18.1% | 29.3% | 36.3% | 26.2% | 19.3% | 21.1% | 17.0% | 14.4% |

Source: Lucent Downside Case

12

CONFIDENTIAL

LW00072899

**B1501**

- **EBITDA**

Voice/Non Voice split

The following table suggests that Winstar's assumptions are comparable to its peer group in terms of voice versus non-voice split. Therefore, the voice/non-voice revenue mix was not sensitized.

*Table 9: Comparison of Voice as a % of Revenue*

| Winstar | 40.0% |
|---|---|
| Adelphia | 39.4% |
| Allegiance | 37.0% |
| McLeod | 40.7% |
| Rhythms Communications | 31.6% |
| Teligent | 41.7% |
| XO Comm. (formerly known as NEXTLINK) | 39.0% |

*Source: Salomon Smith Barney estimates*

On-Net / Off-Net Customer Split

The on-net / off-net customer is considered reasonable and therefore, was not sensitized. The split is considered reasonable based upon the following:

- Winstar's in-building marketing campaign focuses the majority of its marketing dollars directly on prospective customers located in on-net buildings, where sales are most profitable. Further, the company's sales representatives receive commission equal to about 8.3% of the annual contract for booking on-net sales versus about 1% for off-net sales.

- By second half of 2001, MFN's metro build and Williams' long haul build will be completed. The completion of these builds will allow Winstar to drive 100% of its traffic on-net which should result in enhanced margins and the ability to fully control quality of service.

*Table 10: On-Net / Off-Net Customer Split*

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| On-Net Customers | 44.2% | 65.1% | 73.9% | 78.2% | 80.8% | 82.5% | 83.5% | 83.8% | 84.1% | 84.2% |
| Off-Net Customers | 55.8% | 34.9% | 26.1% | 21.8% | 19.2% | 17.5% | 16.5% | 16.2% | 15.9% | 15.8% |

*Source: Winstar's Scaled Management Case*

- **CAPEX**

Salomon Smith Barney Report (October 17, 2000 Report on CLECs) stated that the assumption most out of line with reality for emerging telecom companies when it comes to long term models, is capital expenditures. Over the past two decades CAPEX as a percent of revenue for existing telecom operators has hovered between 15% and 20%. Currently, it is 30% of revenue, which is clearly at peak level. The report further suggested that CLECs need to keep up with changing technology and incumbents, hence CAPEX relative to revenues will likely be 15% in the steady state. Further, it is unrealistic to assume that depreciation/amortization will exceed CAPEX in a company operating in a growing industry.

Our discussions with the Lucent sales team and Winstar gives us comfort that the CAPEX spent over the next several years is realistic. However, this assumption is not consistent with projections made by equity analysts as well as independent research organizations (see tables 11 & 12 below). Capex was not sensitized in the model because of the following: 1) CAPEX is in line with its peer group, 2) CAPEX spending will most certainly increase when the capital markets re-open and therefore, increases in future CAPEX will be offset by committed capital and 3) future CAPEX is largely success based.

13

LW00072900

**B1502**

*Table 11: Copex / Revenue*

| | |
|---|---|
| Adelphia | 7.8% |
| Allegiance | 6.1% |
| McLeod | 12.4% |
| Rhythms Communications | 5.3% |
| XO Comm. (formerly known as NEXTLINK) | 11.6% |

*Source: Salomon Smith Barney*

*Table 12: Copex / Revenue*

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Management Case:** | | | | | | | | | | |
| CapEx / Revenues | 154.2% | 96.9% | 51.9% | 24.7% | 17.4% | 12.8% | 10.3% | 8.5% | 7.0% | 5.8% |
| CapEx / Dep. & Amort. | 361.6% | 246.6% | 175.6% | 131.3% | 102.5% | 95.1% | 93.4% | 91.6% | 87.5% | 84.1% |
| **Lucent Downside:** | | | | | | | | | | |
| CapEx / Revenues | 150.4% | 64.9% | 27.0% | 18.1% | 8.5% | 7.4% | 6.7% | 6.3% | 6.0% | 5.8% |
| CapEx / Dep. & Amort. | 353.9% | 164.9% | 89.9% | 26.9% | 35.7% | 34.7% | 34.4% | 34.5% | 35.3% | 37.9% |
| **Teligent:** | | | | | | | | | | |
| CapEx / Revenues | 190.8% | 73.3% | 45.2% | 23.0% | 18.2% | 13.8% | 11.6% | 8.7% | 7.2% | 6.3% |
| CapEx / Dep. & Amort. | 333.9% | 191.8% | 109.4% | 121.6% | 123.0% | 109.3% | 112.4% | 105.9% | 105.1% | 105.1% |

*Source: Teligent's model, Winstar's Scaled Management Case and Lucent Downside Case*

14

CONFIDENTIAL

LW00072901

B1503

## MANAGEMENT BASE CASE

This section is a summary of the Management Base Case.

### MAIN MARKET/REVENUE ASSUMPTIONS
✓ Penetration rate per building of 14.2% by end of 2000, rising up to 32.8% by 2009.
✓ Average ARPU of $726 by 2000, rising up to $1,659 by 2009.

### KEY OPEX/CAPEX ASSUMPTIONS
✓ Front-loaded CAPEX profile as more than $4.9 billion or 52.2% of the cumulated CAPEX throughout 2009 ($9.4 billion) are spent by 2004.
✓ Capex per revenue of 96.9% by end of 2001, 24.7% by 2003 and 5.8% by 2009.

### KEY FINANCING ASSUMPTIONS
✓ $1 billion Lucent Facility priced at 10.75%.
✓ $1.35 billion syndicated bank facility priced at 10.5%.
✓ $325 million 12.50% senior notes due 2008
✓ $646.4 million 12.75% senior notes due 2010
✓ $194 million 12.75% senior Euro notes due 2010
✓ $455.8 million 14.75% senior notes due 2010

*For Year Ended December 31,*

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|

*(Table data illegible due to image quality)*

### MAIN RESULTS
✓ Winstar cannot repay Lucent Loans through the cash flow generated and additional funding is required.
✓ Funding gap – Winstar needs about $2.3 billion in capital to finance its projects until the company becomes free cash flow positive in 1Q03. Additional capital of $565 million needed in 2001, $1.03 billion in 2002, $553 million in 2003, and $223 million in 2004.
✓ Lucent Loans peak at $700 million in 4Q01
✓ EBITDA positive in 2001 and Net Income positive by 2005.
✓ EBITDA margin increases from 20.6% in 2002 and reaches 47% by 2009.
✓ Free cash flow positive in 2Q04.
✓ Debt to capitalization improves from 127.3% in 2002 to 20.5% by 2009.
✓ Debt to EBITDA improves from 4.5x in 2004 to 0.3x by 2009.

## SCALED MANAGEMENT CASE

15

LW00072902

B1504

This section is a summary of the Scaled Management Case.

**MAIN MARKET/REVENUE ASSUMPTIONS**
✓ Penetration rate per building of 14.2% by end of 2000, rising up to 32.8% by 2009.
✓ Average ARPU of $726 by 2000, rising up to $1,659 by 2009.

**KEY OPEX/CAPEX ASSUMPTIONS**
✓ Front-loaded CAPEX profile as more than $2.7 billion or 71% of the cumulated CAPEX throughout 2009 ($3.8 billion) are spent by 2004.
✓ Capex per revenue of 96.9% by end of 2001, 24.7% by 2003 and 5.8% by 2009

**KEY FINANCING ASSUMPTIONS**
✓ $1 billion Lucent Facility priced at 10.75%.
✓ $1.35 billion syndicated bank facility priced at 10.5%.
✓ $325 million 12.50% senior notes due 2008
✓ $646.4 million 12.75% senior notes due 2010
✓ $194 million 12.75% senior Euro notes due 2010
✓ $455.8 million 14.75% senior notes due 2010

[Table: financial projections For Year Ended December 31, columns 2000–2009 — values illegible due to image resolution]

**MAIN ASSUMPTIONS**
✓ Winstar can repay Lucent Loans through the cash flow generated and additional funding is not required.
✓ EBITDA positive in 2001 and Net Income positive by 2005.
✓ EBITDA margin increases from 17.2% in 2002 and reaches 44.2% by 2009.
✓ Free cash flow positive in 1Q03.
✓ Debt to capitalization improves from 121.0% in 2002 to 33.0% by 2009.
✓ Lucent Loans peak at $1 billion in 2Q01.
✓ Debt to EBITDA improves from 4.0x in 2004 to 0.7x by 2009.

16

LW00072903

B1505

## LUCENT DOWNSIDE CASE

As compared to the Scaled Management Case:

**MAIN MARKET/REVENUE ASSUMPTIONS**
- ✓ Penetration rate per building of 14.2% by end of 2000, rising up to 30.7% by 2009.
- ✓ Average ARPU of $726 by 2000, rising up to $836 by 2009.

**KEY OPEX/CAPEX ASSUMPTIONS**
- ✓ Unchanged

**KEY FINANCING ASSUMPTIONS**
- ✓ Unchanged

| | | | | | For Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| Revenues | | | | | | | | | | |
| Gross Profit | | | | | | | | | | |
| EBITDA | | | | | | | | | | |
| Depreciation & Amortization | | | | | | | | | | |
| EBIT | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Cash Interest Expense | | | | | | | | | | |
| Net Income to Common | | | | | | | | | | |

*(Financial table — values illegible)*

**MAIN RESULTS**
- ✓ Funding shortfall materializes in the amount of $272 million in 2005 and peaks at $738 million in 2007.
- ✓ Winstar cannot repay Lucent Loans through the cash flow generated and additional funding is required. This should be easily raised based upon a debt to EBITDA ratio of 3.8x in 2005.
- ✓ EBITDA positive in 2001 and Net Income positive by 2007.
- ✓ EBITDA margin increases from 17.0% in 2002 and reaches 37.1% by 2009.
- ✓ Free cash flow positive in 3Q03.
- ✓ Debt to capitalization improves from 123.5% in 2002 to 97.3% by 2009.
- ✓ Lucent Loans peak at $1 billion in 2Q01.
- ✓ Debt to EBITDA improves from 5.1x in 2004 to 1.2x by 2009.

17

CONFIDENTIAL

LW00072904

**B1506**

## YIELD & CREDIT ENHANCEMENT CASE

As compared to the Lucent Downside Case:

**MAIN MARKET/REVENUE ASSUMPTIONS**
✓  Unchanged

**KEY OPEX/CAPEX ASSUMPTIONS**
✓  Unchanged

**KEY FINANCING ASSUMPTIONS**
✓  Increased interest rate on Lucent Loans from 10.75% to 12.75%. Refinancing notice is issued, but Lucent does not exercise its option to convert the Lucent Loans into senior notes of Winstar. Winstar pays a 200 bps premium above the prevailing interest rate.

*Table : Yield & Credit Enhancement Case*

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | | | | | | | | | | |
| Gross Profit | | | | | | | | | | |
| EBITDA | | | | | | | | | | |
| Depreciation & Amortization | | | | | | | | | | |
| EBIT | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| Cash Interest Expense | | | | | | | | | | |
| Net Income to Common | | | | | | | | | | |
| Total Assets | | | | | | | | | | |
| Cash and Equivalents | | | | | | | | | | |
| Funding Gap | | | | | | | | | | |
| Total Debt (includes Pending Cap Lease) | | | | | | | | | | |
| Preferred Equity | | | | | | | | | | |
| Common Equity | | | | | | | | | | |
| Funds From Operations (FFO) | | | | | | | | | | |
| Net Working Capital | | | | | | | | | | |
| Capital Expenditures | | | | | | | | | | |
| Free Cash Flow | | | | | | | | | | |
| Cumulative Free Cash Flow | | | | | | | | | | |
| **FINANCIAL RATIOS** | | | | | | | | | | |
| Revenue Growth | | | | | | | | | | |
| Gross Margin | | | | | | | | | | |
| EBITDA Margin | | | | | | | | | | |
| EBIT Margin | | | | | | | | | | |
| Net Income Margin | | | | | | | | | | |
| EBIT / Average Assets | | | | | | | | | | |
| Net Income / Average Common Equity | | | | | | | | | | |
| CapEx / Revenues | | | | | | | | | | |
| CapEx / Depreciation & Amortization | | | | | | | | | | |
| Debt / Capitalization | | | | | | | | | | |
| EBITDA / Gross Int Exp | | | | | | | | | | |
| EBITDA / Gross Cash Int Exp | | | | | | | | | | |
| FFO / Gross Int Expense | | | | | | | | | | |
| EBITDA - CapEx / Gross Interest Expense | | | | | | | | | | |
| Debt / FFO | | | | | | | | | | |
| Debt / EBITDA | | | | | | | | | | |

**MAIN RESULTS**
✓  Funding shortfall materializes in the amount of $39 million in 2002 and peaks at $892 million in 2007.
✓  Winstar cannot repay Lucent Loans through the cash flow generated and additional funding is required. Cash balances can cover the shortfall until 2004. In 2005 and after, the necessary capital should be easily raised based upon a debt to EBITDA ratio of 3.9x in 2005, 3.1x in 2006 and 2.4x in 2006.
✓  EBITDA positive in 2001 and Net Income positive by 2007.
✓  EBITDA margin increases from 17.0% in 2002 and reaches 37.1% by 2009.
✓  Free cash flow positive in 3Q03.
✓  Debt to capitalization improves from 124.6% in 2002 to 107.2% by 2009.
✓  Lucent Loans peak at $1 billion in 2Q01.
✓  Debt to EBITDA improves from 5.1x in 2004 to 1.2x by 2009.

18

LW00072905

**B1507**

## CONVERSION PROVISION CASE

As compared to the Lucent Downside Case:

**MAIN MARKET/REVENUE ASSUMPTIONS**
- ✓ Unchanged

**KEY OPEX/CAPEX ASSUMPTIONS**
- ✓ Unchanged

**KEY FINANCING ASSUMPTIONS**
- ✓ Increased interest rate on Lucent Loans from 10.75% to 29.22%. Refinancing notice is issued, and Lucent exercises its option to convert the Lucent Loans into senior notes of Winstar. Winstar pays a 200 bps premium above Winstar's 12.75% Sr. Notes due 2009 which currently carry a YTW of 27.22%.

*Table : Conversion Provision Case*

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|

*(Table data illegible)*

**MAIN RESULTS**
- ✓ Funding shortfall materializes in the amount of $144 million in 2001 and peaks at $2.2 billion in 2007.
- ✓ Winstar cannot repay Lucent Loans through the cash flow generated and additional funding is required.
- ✓ EBITDA positive in 2001 and Net Income positive by 2008.
- ✓ EBITDA margin increases from 17.0% in 2002 and reaches 37.1% by 2009.
- ✓ Free cash flow positive in 3Q04.
- ✓ Debt to capitalization deteriorates from 116.2% in 2002 to 229.0% by 2009.
- ✓ Lucent Loans peak at $1 billion in 2Q01.
- ✓ Debt to EBITDA improves from 6.0x in 2004 to 2.0x by 2009.

19

CONFIDENTIAL

LW00072906

**B1508**

| Required Signatures | | | |
|---|---|---|---|
| Bill Quinn, Director, Credit | Date | Peter Derrick, Assistant Treasurer | Date |

20

CONFIDENTIAL

LW00072907

**B1509**

**Unknown**

| | |
|---|---|
| From: | Hopkins, Deborah C (Debby/CFO) |
| Sent: | Wednesday, December 06, 2000 9:57 AM |
| To: | Spurrier, Carole J (Carole) |
| Cc: | Verwaayen, Bernardus J (Ben); Hund-Mejean, Martina (Martina); Derrick, Peter (Peter); Montemarano, Michael A (Michael) |
| Subject: | winstar |

Carole...talked to Beth in Treasury re the due diligence---it is moving forward.  We should see our 188M thursday or friday....that's even better!  Regarding the  concept of funding via higher prices---definite no.  And we believe we may want to send the notice letter re:500M anyway after we receive the 188m.  We WILL NOT DO THIS without your involvement.  I will have a summary of what the implications of this action would be and will forward it to you as part of the dialogue.

Whats happening on outsourcing deal?

Deb





1

CONFIDENTIAL

LW00045314

**B1510**

| From: | Hund-Mejean, Martina (Martina) |
|---|---|
| Sent: | Thursday, December 07, 2000 9:13 PM |
| To: | Hopkins, Deborah C (Debby/CFO) |
| Cc: | Perricone, Elizabeth (Beth); Derrick, Peter (Peter); Rogers, Leslie L (Leslie) |
| Subject: | FW: WINSTAR REPAYMENT |

Printed & In E-Mail Folder 12/8

we will lay out for you the pros/cons for triggering the refinancing note from both a Lucent and Winstar perspective.

Beth...pls. advise expected timing for that to me. tx.

——Original Message——
| From: | Perricone, Elizabeth (Beth) |
|---|---|
| Sent: | Thursday, December 07, 2000 3:00 PM |
| To: | Harris, Deborah K (Deborah Kristine); Alexander, Linda M (Linda); Derrick, Peter (Peter); Rogers, Leslie L (Leslie); Hund-Mejean, Martina (Martina) |
| Subject: | FW: WINSTAR REPAYMENT |

FYI.  We are receiving wire in from Winstar today of $188 million.  In addition, we will be receiving interest and fees of an add'l $8 million.  Please see Adrian's note below on O/S loan balance with this repayment.  We have alerted cash ops.

——Original Message——
| From: | Alfred, Adrian (Adrian) |
|---|---|
| Sent: | Thursday, December 07, 2000 12:50 PM |
| To: | Carrone, Angela (Angela); Derksen, Anja (Anja); Jerden, Antonietta (Antonietta); Moron, Beatriz (Beatriz); Bates, Bradley A (Brad); Nelson, Brooks Michael (Brooks); PALES, Bruce (Bruce); Lippard, Catherine C (Cathy); Thill, Daniel E (Dan); Nichols, Danielle L (Danielle); VanDeusen, Darcia B (Darci); Gillespie, David (David); Waingortin, Diego Hernan (Diego); Perricone, Elizabeth (Beth); Calderon, Enrique F (Enrique); Castro, Fidel (Fidel); O'Brien, Gregory M (Gregory); Engelbrecht, Hans (Hans); Rooker, Ian (Ian); Cocito, James Vincent (Jim); Ayre, Jayne E (Jayne); Schieper, Jeffrey (Jeff); Diroma, Jill B (Jill); Cinicolo, John (John); Gregg, John Andrew (John); LaVela, Joseph A (Joseph); Quillen, Judy (Judy); Richardson, Kimberly A (Kimberly); Black, Kyle J (Kyle); Elliott, Laura Schoels (Laura)** CTR **; Rogers, Leslie L (Leslie); Shultz, Linda D (Diane); Si Peter, Louis (Louis); Hughes, Margaret P (Margaret); Wehrman, Mark D (Mark); Dowdy, Mary M (Mary); Cunningham, Mary Ellen (MaryEllen); Haan, Rob De (Rob); Secrest, Stephen S (Stephen); Colross, Susan M (Susan); Petrini, Vanessa H (Vanessa); Pinto, Viviana (Viviana); Vickers, James T, SR (Jim); Shultz, Linda D (Diane); Harris, Deborah K (Deborah Kristine); Hayes, Paul (Paul); Damiano, Richard J (Richard); Morales, Victor O (Victor); Parker, Katie G (Katie); Raimondi, Maximiliano (Maximiliano); Grinspan, Adrian Javier (Adrian Javier); Ugarte, Carlos S (Carlos); Alfred, Adrian (Adrian); Derrick, Peter (Peter); Quinn, William N (William); Montemarano, Michael A (Michael) |
| Subject: | WINSTAR REPAYMENT |

All:

Please be advised that on Thursday, December 07, 2000,  Winstar WVF-I will  REPAY $194,000,000.00 of the $752.570,709 principal outstanding under the Winstar-Lucent $2B Credit Agreement.

Of the $194Million, Winstar will deduct an Upfront fee of $5,820,000.00 which is due to Winstar.  The net amount to be remitted to Lucent will be $188,180,000.00.  This entire amount will be used to reduce Winstar's Note Receivable balance.

Mark:  Please debit Arrangement/Upfront Fee for $5.820 Million and credit Winstar's Note Receivable Balance.

Winstar's new principal outstanding will now be $558,570,709.

Regards,
Adrian Alfred
Senior Treasury Manager





1

CONFIDENTIAL

LW00016020

908 582-1778

2

CONFIDENTIAL

LW00016021

B1512

**SUMMARY**
**GENERAL TERMS AND CONDITIONS**

**LUCENT VENDOR FINANCE FACILITY**
**TO**
**WVF-I LLC**

This Summary of Terms and Conditions is not meant to be inclusive or specific to all terms and conditions of the Lucent Financing. If there is a general interest in these terms, a copy of the Credit Agreement dated May 4, 2000 may be requested.

**Borrower:** WVF-I LLC (the "Borrower"), a special purpose, wholly-owned subsidiary of Winstar Communications, Inc., (the "Parent")

**Facility:** Up to $2 Billion (the "Facility")

**Available Commitments:** Lending commitments under the Facility will not be available to the extent that loans under the Facility ("Loans") would result in aggregate amount of outstanding Lucent Loans (a defined term) exceeding $1 Billion.

**Amortization/ Maturity:** The Facility will mature on December 31, 2006, and will amortize in quarterly installments (subject to reductions for prepayments) of $250 Million, commencing on March 31, 2005.

**Guarantees:** The Facility is guaranteed by the Parent and WCI Capital Corp., (the "Bank Borrower"), the borrower under a $1.150 Billion Revolving Credit and Term Loan Agreement dated as of May 4, 2000 (the "Bank Facility").

**Use of Proceeds:** Loans will be available only to finance the purchase by Borrower of "Eligible Equipment and Services" (a defined term) pursuant to the supply contract between the Borrower and Lucent.

**Collateral:** First priority, perfected security interest in all assets and capital stock of the Borrower and proceeds thereof.



EXHIBIT

Perricone 1
7/24/01



PLAINTIFF'S
EXHIBIT
PX-776

CONFIDENTIAL

LW00208694

**B1513**

**Pricing:**    Interest Rates is Adjusted LIBOR plus 4.75% per annum or Base Rate plus 3.75% per annum prior to October 1, 2000. Thereafter, the interest rates will be Adjusted LIBOR plus 3.75% per annum or Base Rate plus 2.75% per annum. Interest is payable currently and will not be capitalized or deferred.

**Fees:**    Commitment fees will accrue at 1.5% per annum on the total amount of Available Commitments, payable quarterly. Up front fees to be discussed.

CONFIDENTIAL

LW00208695

**B1514**

| From: | Perricone, Elizabeth (Beth) |
|---|---|
| Sent: | Thursday, November 02, 2000 11:00 AM |
| To: | Derrick, Peter (Peter) |
| Cc: | Rogers, Leslie L (Leslie) |
| Subject: | FW: Winstar: Implications of Refinance Notice |

Peter:
After talking through all the issues last nite, I am not sure I agree w/Paul's strategy. I believe we need to meet w/Winstar asap, verbally notice them and get their response as to how they invision us getting repaid. If we provide written refinance notice I am concerned they will need to immediately need to file the 8-K and this could be very disruptive to their debt and equity pricing and to us in our efforts to get refinanced (all or a portion at the best price). I personally do not believe that the capital markets can today absorb our full $690M (in either a debt or equity issuance). I think best we can hope for is some amount of refi (maybe as high as $500M coming from combo of $250-300M of loans sales by us thru DLJ or Bear Stearns (at a discount) and maybe some of the current equity sponsors stepping up to say another $200-300M.

Beth
----Original Message----
| From: | Hayes, Paul (Paul) |
|---|---|
| Sent: | Thursday, November 02, 2000 11:35 AM |
| To: | Derrick, Peter (Peter) |
| Cc: | Quinn, William N (William); Keefe, Michael C (Michael); Rogers, Leslie L (Leslie); Perricone, Elizabeth (Beth) |
| Subject: | RE: Winstar: Implications of Refinance Notice |

Peter,

As discussed before, in my opinion the best course of action is to send the refinancing notice for the full amount that is drawn, and know that we will immediately enter a negotiation period. We should enter the negotiation with the objective of preserving an exit at par. I believe that this is possible, but not within the 105 days for the full amount, which is where we can offer some flexibility.

Regards,
Paul
----Original Message----
| From: | Perricone, Elizabeth (Beth) |
|---|---|
| Sent: | Thursday, November 02, 2000 11:02 AM |
| To: | Derrick, Peter (Peter) |
| Cc: | Quinn, William N (William); Keefe, Michael C (Michael); Rogers, Leslie L (Leslie); Hayes, Paul (Paul) |
| Subject: | Winstar: Implications of Refinance Notice |

Attached is a memo collectively prepared to address the pros and cons of issuing a refinance notice to Winstar. Please advise if there is any additional information you need.

I do have a call into Jill Diroma to confirm the following issues which may impact any decision we may to consider a discounted sale of our paper:

• What is Lucent's current reserve for this account?
• What has Lucent generated in revenues and profitability on this relationship?

<< File: Refi Implications for Winstar.doc >>



PLAINTIFF'S
EXHIBIT
PX-231

EXHIBIT
Perricone 23
2/24/01

1

CONFIDENTIAL          LW00197803

**B1515**



(CAPITAL LABOR SCHEDULES)(Lucent Billing Estimate for 4Q [2000] (see EXCOM1134)

Winstar Telecommunications, Inc.
Lucent Billing of Capital Labor
Q4 2000 Estimate

| Department | October | | | November | | | December (Estimate) | | | Quarter 4 (Estimate) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Direct Lucent Billable | Budget Lucent Billable | Total Lucent Billable | Direct Lucent Billable | Budget Lucent Billable | Total Lucent Billable | Direct Lucent Billable | Budget Lucent Billable | Total Lucent Billable | Direct Lucent Billable | Budget Lucent Billable | Total Lucent Billable |
| **WINSTAR SYSTEMS GROUP** | | | | | | | | | | | | |
| Consumer Systems | | | | | | | | | | | | |
| ESP Plus | | | | | | | | | | | | |
| Billing System | | | | | | | | | | | | |
| Usage/Mgmt Systems | | | | | | | | | | | | |
| NSS Testing | | | | | | | | | | | | |
| Implementation | | | | | | | | | | | | |
| UI & ABI | | | | | | | | | | | | |
| System Architecture | | | | | | | | | | | | |
| OSS Development | | | | | | | | | | | | |
| WSG Total | | | | | | | | | | | | |
| **WINSTAR FDB BUILDINGS** | | | | | | | | | | | | |
| RE-Const'd Utilize | | | | | | | | | | | | |
| RE Field Office | | | | | | | | | | | | |
| WFB Total | | | | | | | | | | | | |
| Engineering Area | | | | | | | | | | | | |
| VSG Total | | | | | | | | | | | | |
| **WINSTAR NETWORK SERVICES** | | | | | | | | | | | | |
| Transmission Engineering | | | | | | | | | | | | |
| Architecture and Advanced Technology | | | | | | | | | | | | |
| City Planning | | | | | | | | | | | | |
| Engineering Program Office | | | | | | | | | | | | |
| Vendor Program Office | | | | | | | | | | | | |
| Enterprise Network Engineering | | | | | | | | | | | | |
| Capacity Planning | | | | | | | | | | | | |
| IP & Broadband Engineering | | | | | | | | | | | | |
| Service Management | | | | | | | | | | | | |
| Access Design & Engineering | | | | | | | | | | | | |
| ISP & Data Center Engineering | | | | | | | | | | | | |
| RF Engineering | | | | | | | | | | | | |
| Network Deployment | | | | | | | | | | | | |
| HQ/Circuits Deployment | | | | | | | | | | | | |
| Network Deployment Support | | | | | | | | | | | | |
| Central Office Integration | | | | | | | | | | | | |
| WNS Total | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | |
| Shared Services | | | | | | | | | | | | |
| Grand Total | | | | | | | | | | | | |



CONFIDENTIAL 2WC 0073761

B1516

582  3101

December 28, 2000

*VIA FACSIMILE  (908) 559-2399*

Mr. Michael Montemarano
Vice President, Finance
Lucent Technologies
283 King George Road, Room C4-C11
Warren, NJ  07059

Dear Michael:

Pursuant to your agreement that Lucent will finance Winstar's 4th Quarter 2000 Capital Labor, I have
enclosed an analysis of such activity.

Please confirm to me that Lucent will wire transfer, prior to 3:00PM EST tomorrow, $62,324,930 to WCI
Capital Corp. As provided below:

| WIRE TRANSFER INSTRUCTIONS | |
|---|---|
| BANK NAME: | **STATE STREET BANK & TRUST**<br>**BOSTON, MA** |
| ABA NUMBER: | **011 000 028** |
| ACCOUNT NUMBER: | **9 9 0 3 7 5 8 2** |
| ACCOUNT NAME: | **MERRILL GROUP**<br>**CREDIT: MERRILL PREMIER FUND** |
| FOR FURTHER CREDIT TO:<br>ACCOUNT NUMBER: | **WCI Capital Corp.**<br>**3 3 1 6 0 7 6** |
| AMOUNT: | $62,324,930 |

It is agreed and understood that the amount financed, as a consequence of this request, will be done so
pursuant to the Credit Agreement between the parties dated May 4, 2000.  Borrower elects and agrees that
this will be an ABR Type of Borrowing.

Sincerely,

Richard J. Uhl
Group Executive and CFO
Winstar Communications, Inc.

encl.



CONFIDENTIAL                                                      LW00059882

**B1517**

Winstar Telecommunications, Inc.
Level3 Billing for Capital Labor
Q4 2002 Estimate

CONFIDENTIAL

| From: | Derrick, Peter (Peter) |
|---|---|
| Sent: | Wednesday, November 29, 2000 11:05 AM |
| To: | Hund-Mejean, Martina (Martina); 'Jody Bisson'; Montemarano, Michael A (Michael) |
| Cc: | Quinn, William N (William) |
| Subject: | RE: Need your Help:  WindStar Negotiations on Friday |

Michael,

Given our discussions with Debby yesterday regarding this topic, do you still require my assistance on Friday ?  Please call to discuss.

Thanks.

Peter

-----Original Message-----
From: Hund-Mejean, Martina (Martina)
Sent: Tuesday, November 28, 2000 9:50 PM
To:  'Jody Bisson'; Montemarano, Michael A (Michael)
Cc:  Derrick, Peter (Peter); Quinn, William N (William)
Subject:   RE: Need your Help:  WindStar Negotiations on Friday

Jody..thanks for the e-mail.  I would volunteer Peter Derrick to join you on the Friday session, subject to his availability...he is taking this on as a "special" assignment given the big issues we have with this customer -- he was on point in the prior Winstar meeting and involved in all the issues.  After Carol/Debbie's meetings last week I have not heard when we get the $200 million which is an absolute must now given our cash flow situation. We need to get this done urgently.

Peter...where does due diligence stand?

-----Original Message-----
From: Jody Bisson [mailto:jody_bisson@ins.com]
Sent: Tuesday, November 28, 2000 5:28 PM
To: Hund-Mejean, Martina (Martina); Montemarano, Michael A (Michael)
Subject: Need your Help: WindStar Negotiations on Friday

Martina,
Hello?  We have not yet had a chance to talk - I am the CFO for NetworkCare Professional Services.  Michael Montemarano and I have been working on a possible WinStar Services outsourcing deal that they will look to apply against the outstanding Lucent financing line.  The plan is for the combined CT and NPS team to present the proposed outsource arrangement to WinStar on Friday (this week).  The proposal is to enter into a 120 day due diligence agreement where we charge them for project management and due diligence at market rates plus bill them for all of their folks working on these services agreements contingent on them signing the appropriate outsource agreements.

Since I know that Lucent is currently doing due diligence with WindStar on



CONFIDENTIAL



LW00022980

**B1519**

our financing arrangement and that this needs to be done before they will be able to draw down on the line, etc. - I think it critical for someone from your team to sit in on the negotiation on Friday.  We believe that any finance issues that come up on this during the talks with WinStar Friday will be around the financing arrangements.  So participation by your or someone on your team would address this as well as provide continuity for the talks with WindStar (FYI, Michael and I did not plan to have anyone from our teams participate in this discussion).

FYI, I believe that Michael and Debby H. had a discussion on this and Debby was ok with proceeding with the meeting to have initial discussions on the outsource deal (Michael if this is incorrect or you need to add to this, please do!).

Let me know your thoughts on this. Thanks and I look forward to meeting you soon!

Jody

Jody Bisson
CFO, Financial Vice President
NetworkCare Professional Services
Lucent Technologies
650-318-1397
408-921-3374 (cell phone)
800-467-1467 (pager)
650-318-1717 (fax)
jbisson@lucent.com

CONFIDENTIAL

LW00022981

| | |
|---|---|
| From: | Hund-Mejean, Martina (Martina) |
| Sent: | Thursday, December 07, 2000 9:24 PM |
| To: | Montemarano, Michael A (Michael); Spurrier, Carole J (Carole) |
| Cc: | Derrick, Peter (Peter); Perricone, Elizabeth (Beth); Harris, Deborah K (Deborah Kristine) |
| Subject: | FW: WINSTAR REPAYMENT |

thank you so much for working on this....this was just what we needed this week to help cash!!

unfortunately, since the customer drew $26 million last Friday, we are more down to $150 million vs. the $200 million in cash that we were hoping for....c'est la vie...

we owe you a basic analysis of the pros/cons on triggering the refinancing note...both from a customer and Lucent perspective. we will review with you when ready.

thanks again for the work.
-----Original Message-----

| | |
|---|---|
| From: | Montemarano, Michael A (Michael) |
| Sent: | Thursday, December 07, 2000 1:59 PM |
| To: | Spurrier, Carole J (Carole); Hund-Mejean, Martina (Martina); Hopkins, Deborah C (Debby/CFO); Derrick, Peter (Peter) |
| Subject: | RE: WINSTAR REPAYMENT |

# NICE !!!

---------
From: Derrick, Peter (Peter)
Sent: Thursday, December 07, 2000 1:01 PM
To: Spurrier, Carole J (Carole); Hund-Mejean, Martina (Martina); Hopkins, Deborah C (Debby/CFO)
Cc: Montemarano, Michael A (Michael)
Subject: FW: WINSTAR REPAYMENT

All,

Hurray !!

Peter

-----Original Message-----
From: Alfred, Adrian (Adrian)
Sent: Thursday, December 07, 2000 12:50 PM
To:    Carrone, Angela (Angela); Derksen, Anja (Anja); Jerden, Antonietta (Antonietta);
       Moron, Beatriz (Beatriz); Bates, Bradley A (Brad); Nelson, Brooks Michael (Brooks);
       PALES, Bruce (Bruce); Lippard, Catherine C (Cathy); Thill, Daniel E (Dan); Nichols,
       Danielle L (Danielle); VanDeusen, Darcia B (Darci); Gillespie, David (David);

1

DEPOSITION EXHIBIT
Martenmar 21
7 /11 /01
TAMMEY M. PASTOR, R.P.R.

PLAINTIFF'S
EXHIBIT
PX-767

CONFIDENTIAL

LW00023000

Waingortin, Diego Hernan (Diego); Perricone, Elizabeth (Beth); Calderon, Enrique F (Enrique); Castro, Fidel (Fidel); O'Brien, Gregory M (Gregory); Engelbrecht, Hans (Hans)'; Rooker, Ian (Ian); Cocito, James Vincent (Jim); Ayre, Jayne E (Jayne); Schlieper, Jeffrey (Jeff); Diroma, Jill B (Jill); Cinicolo, John (John); Gregg, John Andrew (John); LaVela, Joseph A (Joseph); Quillen, Judy (Judy); Richardson, Kimberly A (Kimberly); Black, Kyle J (Kyle); Elliott, Laura Schools (Laura)** CTR **; Rogers, Leslie L (Leslie); Shultz, Linda D (Diane); St Peter, Louis (Louis); Hughes, Margaret P (Margaret); Weinman, Mark D (Mark); Dowdy, Mary M (Mary); Cunningham, Mary Ellen (MaryEllen); Haan, Rob De (Rob); Secrest, Stephen S (Stephen); Colross, Susan M (Susan); Petrini, Vanessa H (Vanessa); Pinto, Viviana (Viviana); Vickers, James T, SR (Jim); Shultz, Linda D (Diane); Harris, Deborah K (Deborah Kristine); Hayes, Paul (Paul); Damiano, Richard J (Richard); Morales, Victor O (Victor); Parker, Katie G (Katie); Raimondi, Maximiliano (Maximiliano); Grinspan, Adrian Javier (Adrian Javier); Ugarte, Carlos S (Carlos); Alfred, Adrian (Adrian); Derrick, Peter (Peter); Quinn, William N (William); Montemarano, Michael A (Michael)

**Subject:**     WINSTAR REPAYMENT

All:

Please be advised that on Thursday, December 07, 2000, Winstar WVF-I will  <u>REPAY</u> $194,000,000.00 of the $752,570,709 principal outstanding under the Winstar-Lucent $2B Credit Agreement.

Of the $194Million, Winstar will deduct an Upfront fee of $5,820,000.00 which is due to Winstar. The net amount to be remitted to Lucent will be $188,180,000.00. This entire amount will be used to reduce Winstar's Note Receivable balance.

<u>Mark:</u>   Please debit Arrangement/Upfront Fee for $5.820 Million and credit Winstar's Note Receivable Balance.

Winstar's new principal outstanding will now be $558,570,709.


Regards,
Adrian Alfred
Senior Treasury Manager
908 582-1778

2

CONFIDENTIAL                                           LW00023001

B1522

**From:** Verwaayen, Bernardus J (Ben)
**Sent:** Friday, December 29, 2000 12:05 PM
**To:** Spurrier, Carole J (Carole); Montemarano, Michael A (Michael)
**Cc:** Rosen, Stephen R (Stephen); Mark, Robert M (Rob); Hund-Mejean, Martina (Martina); Hopkins, Deborah C (Debby/CFO)
**Subject:** winstar renegotiations

Carole/Michael,

Now we have positioned ourselves for a major overhaul of our relationship with Winstar, I think we should involve our partners in Treasury and Legal in preparing a model for our negotiations on Jan 9 or 10.
I would like to agree upfront on the desired outcome and have a list of A and B items:
A are must wins, B nice to have.
If possible I would like to get a proposal ready by Jan 5, so we have some time to discuss with everyone involved.
We should understand our legal manouvering space.
The outcome should be a balanced relationship:
profitable, no more acting as their 'bank' and an eager Lucent trying to win their business on business merits.

Thanks

Ben

2



CONFIDENTIAL

LW00139158

**B1523**

**Winstar Communications, Inc.**
**January 2, 2001**
**Potential Amended Financing Parameters**

### "A" List-"Nice To Have"-Change Type of Loan*

- Re-negotiate Supply Agreement for minimum purchases equal to atleast Lucent commitments;
- Enhance Best of Breed Language in Supply Agreement and provide for any additional vendor financing provided by others will reduce Lucent commitments vs. baskets for add'l indebtedness allowed;
- Reduce Lucent commitments to expected Lucent purchases over next 24 months vs. $2 Billion open commitment with no corresponding $2B Supply Agreement commitment;
- Finance 100% Lucent content only vs. 75% Lucent content/25% Non-Lucent content;
- Limit Lucent Services to 20% of Lucent content vs. limited only to extent of Supply Agreement;
- Enhance best of breed
- Lucent commitment to be at Bank Borrower level vs. Special Purpose Subsidiary;
- Share in same collateral pool as Bank Group vs. Purchase Money Financing (which may enable us to revisit limit suggested above of 20% on Services);
- Obtain guarantees of operating subsidiaries similar to that of Bank Group vs. no guarantees of operating subsidiaries;
- Same pricing/fees as Bank Group, with fees payable upfront vs. Lucent price 50 bps below Bank Group and fees paid upon drawdown;
- Same voting/assignment rights as Bank Group vs. limited voting and assignment rights;
- Revise availability termination date to 2 years vs. 4 years;
- Amend amortization to begin in year 3 vs. year 5;
- Amended amortization to have "market average life" vs. deferred structure;

*Certain recommendations above will require credit analysis to determine impact to Winstar's financial plan, i.e. revised amortization, pricing/fee increases, etc.



CONFIDENTIAL

LW00275476

B1524

### "B" List-"Must Have"-Keep as Purchase Money Mortgage*

- Re-negotiate Supply Agreement for minimum purchases equal to atleast Lucent commitments;
- Enhance Best of Breed Language in Supply Agreement and provide for any additional vendor financing provided by others will reduce Lucent commitments vs. baskets for add'l indebtedness allowed;
- Reduce Lucent commitments to expected Lucent purchases over next 24 months vs. $2 Billion open commitment with no corresponding $2B Supply Agreement commitment;
- Finance 75% Lucent content/25% Non-Lucent content and have each draw down be in compliance with this ratio vs. 75%/25% measured at annual contract date and penalty assessed;
- Existing Refinance Provisions remain in place;
- Add event of default if non-compliance with content provisions vs. no event of default (merely annual max. penalty of $3M);
- Limit Lucent and Non- Lucent Services to no more than 20% of total vs. limited only to extent of Supply Agreement;
- Special Purpose Subsidiary as Borrower, however obtain secured guaranty by Parent and Bank Borrower, along with operating subsidiaries vs. Unsecured Guarantees by Parent and Bank Borrower and no operating subsidiary guarantees;
- Pricing to increase immediately by 225 bps, with 5% warrants vs. Lucent price 50 bps below Bank Group (resulting in implied discount of 15%);
- Increase fees on unused, with fees payable in cash on total commitment vs. below market unused fee payable on portion of commitment;
- Eliminate Fee Refund Provisions vs. Fee Refund to Winstar for various events;
- Same voting/assignment rights as Bank Group immediately vs. limited voting and assignment rights;
- Revisit mandatory prepayments, i.e. equity raises below $350M threshold vs. no prepayment unless equity event greater than $350M;

*Certain recommendations above will require credit analysis to determine impact to Winstar's financial plan, i.e. revised amortization, pricing/fee increases, etc.

CONFIDENTIAL

LW00275477

B1525

 winstar

Richard J. Uhl
Group Executive
Chief Financial Officer
Winstar Communications, Inc.

The Winstar Building
685 Third Avenue
31st Floor
New York, NY 10017
T (212) 584 4002
F (212) 584 4001

February 12, 2001

*VIA FACSIMILE (908) 559-2399*

Mr. Michael Montemarano
Vice President, Finance
Lucent Technologies
283 King George Road
Room C4-C11
Warren, NJ 07059

Dear Michael:

I am in receipt of your February 6, 2001 letter describing Lucent's position as "clear" regarding non-Lucent performed services not being funded from the credit facility. I want there to be no misunderstanding and reiterate Winstar's position as stated many times during our recent meetings. All of the agreements, past practices and recent commitments support this activity and financing. Just because people leave Lucent does not mean that previous commitments should be arbitrarily changed. Lucent's position on this subject is totally unacceptable and we hope that a positive resolution will be arrived at during the dinner being scheduled between Nate Kantor and Ben Verwaayen.

Sincerely,

Richard J. Uhl
Group Executive and CFO

**B1526**

encl.

cc:    Carole Spurrier
       Deborah Harris
       Ben Verwaayen
       Nate Kantor



**CONFIDENTIAL**
**3WC 0008377**



Bcc:    Fred Rubin
        Ken Zinghini

CONFIDENTIAL
3WC 0008378

B1527

```
************** -COMM. JOURNAL- ****************** DATE FEB-12-2001 ***** TIME 15:15 ********

MODE = MEMORY TRANSMISSION          START=FEB-12 15:14    END=FEB-12 15:15

    FILE NO.=758

STN NO.   COM'L   ABBR NO.    STATION NAME/TEL. NO.    PAGES   DURATION

 001      OK     ▪            819065592399            002/002  00:00:24


******************************* -         - **** -         - ********
```

# WINSTAR COMMUNICATIONS
### 685 THIRD AVENUE
### NEW YORK, NY 10017
### (212) 792-9800

winstar

## FACSIMILE TRANSMITTAL SHEET

| DATE: | Monday, February 12, 2001 | | |
|---|---|---|---|
| TO: | Michael Montemarano | FROM: | Rick Uhl |
| FAX: | (908) 659-2399 | FAX: | (212) 584-4001 |
| TEL: | | TEL: | (212) 584-4002 |
| CC: | | | |

# of Pages:   2 (including cover page)

**COMMENT:**

Original to follow via overnight mail.

CONFIDENTIAL
3WC 0008379

B1528

From:        Cocito, James Vincent (Jim)

To:          Diroma, Jill B (Jill);

cc:          Deady, Mark A (Mark);

Subject:     RE: Kenan VoCall revenue issues

Date:        2/27/00 2:52:43 PM

Jill
Lets sit down in April to discuss.  I don't want to take time out of this
quarter to deal with this internal issue.

OK

JVC

----------
From:    Diroma, Jill B (Jill)
Sent:    Friday, February 25, 2000 12:35 PM
To:      Cocito, James Vincent (Jim); Wilson, Mark (Mark)
Cc:      Deady, Mark A (Mark)
Subject:    FW: Kenan VoCall revenue issues

forwarded to Kelly to schedule time with Jill.

Jim,

Mark Wilson asked me to share this issue we have with the Winstar account and
ask your assistance in solving.

History: As you know Winstar has been a key customer of ours over the last year
and has consistently helped us close huge gaps each quarter. In order to close
many of these deals it has been necessary to impact some Product Unit's
profitability. To assist the sales team in negotiating these types of deals real
time we tried throughout 1999 to ask the PU's benefiting the most from sales to
Winstar to allow us to establish a reserve. This reserve was to be used at the
sales teams discretion with CFO oversight and review, to make up revenues to
Loss Leaders who stepped up to assist us in closing key Winstar business.  Each
time I tried ( copies attached) I was told emphatically NO by the key product
units Switching/Access and ONG.  Therefore no reserve has been established.

Ongoing Issues:  Mark Wilson in order to close these key deals has made
commitments to various Loss Leaders throughout the year even though there was
no reserve.  I did have a very small reserve from the hold back of revenue due
to financing which allowed me to make up some revenue to the services
organization which clearly has suffered due to expanded service requirements
without additional revenues from various Winstar equipment proposals.

Current Burning Issue:  In June of 1999 the Sales team negotiated a very large
Ascend sale to Winstar (OEM at that time).  In order to close the deal we also
agreed to allow Winstar (under our reseller agreement) to purchase products for

CONFIDENTIAL                    PLAINTIFF'S EXHIBIT                LUTX0997444
                                12
                              10/8/03  CE



CONFIDENTIAL                                      L W00303165

B1529

a customer of ours, VOCAL, from us and then resell to VOCAL. The deal involved some 5E, SAS, DAC IV, Ascend products, Kenan software and Prof. Services. In order to cut the deal Mark Wilson needed to cut the price on the Prof. Services and Kenan products (Connectvu, Software License, Consult. Svc, Activivw). Mark told the Kenan people as well as the Netcare people that he would "make up" revenue to these PU's. Since I have no additional funds in the small reserve I had I do not have any way to make up these funds to these two PU's.

My view: Kenan is stating that they should have received revenues of $7M but the contract only gives them $2.6M. This means they are looking for $4.4M in revenue "make up". In looking at the profitability of Kenan products to WINSTAR, Kenan has made a 90% margin which is very healthy. Therefore if we need to chalk this up to sorry we cannot make up any revenue I do not think they have suffered that significantly

Prof. Services on the other hand is getting no revenue from the VOCAL contract therefore their entire revenue expectation of $2.1M would need to be made up. I was able to give them $300K in the last quarter of 1999 towards this revenue leaving $1.8M to be made up. Under the Winstar contract they have only received margins of 23% as they consistently have been providing more and more services to Winstar without any increases for these services.

Kenan (Mike Perozek) has been calling me regularly to see where we are at with this issue. They are expecting some resolution but I do not know where I can go with this at this point. I have discussed with Mark Deady and he concurs that basically promises were made that based on our operating guidelines cannot be met. CFO of the CBU does not have any authority to take monies from one PU and give it to another.

Please let me know when we can discuss to determine how we want to respond to Prof. Services and Kenan.

Thanks,

Jill


Attachments: Spread sheet showing Kenan & Prof. Svcs margins on their sales to VOCAL as well as a Tab showing the profitability of these PU's sales directly to Winstar.
Spread sheet from Kenan showing their shortfall
emails to PU's asking for permission to set up a reserve


<<File: Vocal Analysis.xls>><<Message: FW: August Accrual for Winstar >>

----------
From:       Perozek, Michael (Michael)
Sent:       Wednesday, January 26, 2000 1:35 PM
To:         Assimopoulos, Constantin (Constantin)
Cc:         jschneider@kenan.com
Subject:    Kenan VoCall revenue issues

<<File: vocall-ksc pricing summary jan12.xls>>
Constantin,


CONFIDENTIAL                                                    LUTX0997445

Jason and I were reviewing the numbers today and we found an error in the data. See revised spreadsheet. There is no $600K of 3rd party sw/hw.

This reduces the gap a small bit. Please call with any questions.

Mike Perozek

CONFIDENTIAL

LUTX0997446

CONFIDENTIAL

LW00303167

B1531

Diroma, Jill B (Jill)

From:       Di Pietro, Elizabeth (Betty)
Sent:       Tuesday, March 21, 2000 8:48 PM
To:         Diroma, Jill B (Jill)
Subject:    RE: bill and hold

Jill

Here's what I have right now

pretty solid
SBC - roughly $50M
Primary Networks - say $10M

no revenue anyway so I think we can forego the Bill & Hold pain
Broadslate -$30M

Pending -
SynerG $17M

Betty

From:       Diroma, Jill B (Jill)
Sent:       Tuesday, March 21, 2000 8:01 PM
To:         Di Pietro, Elizabeth (Betty)
Subject:    bill and hold

Betty,

Can you give me the latest on your bill and hold.  Repetition is necessary as I am losing it at this point in time.
Today was not a fun day.  I am upset with my team as they have a VERY large bill and hold for Winstar which
I thought was only $20M but is now $80M.  Think Gil will like that one?

Jill

Page 1

CONFIDENTIAL





LUTX0962458

CONFIDENTIAL                          LW00303180

B1532

### Winstar / Lucent
### 1ST QTR Business Summary

| ONG Buildout Deal | | 1st Qtr Rec. Rev. | Future Rec. Rev. |
|---|---|---|---|
| **Total PO Value: $** | **$3,819,402** | **$ 36,098,127** | **$ 17,721,276** |
| | Hardware | 24,083,255 | $ 24,083,255 | $ |
| | Services (E,I&I & Turnkey) | 11,774,874 | $ 11,774,874 | $ |
| Recently Rec'd | PCO & Services | 3,003,735 | $ 1,501,868 | $ 1,501,868 |
| $42M PO | Network Management | 2,660,000 | $ 2,660,000 | $ |
| | Discount | (1,300,002) | $ (1,300,002) | $ |
| | Metro Growth | 3,000,000 | $ - | $ 3,000,000 |
| 2 Additional Routes | Hardware | 8,958,454 | $ 8,958,454 | $ |
| To be purchased | Services (E,I&I & Turnkey) | 1,229,981 | $ | $ 1,229,981 |
| from Anixter | PCO & Services | 429,106 | $ 214,553 | $ 214,553 |

| Hubs and BS | | | 1st Qtr Rec. Rev | Future Rec. Rev. |
|---|---|---|---|---|
| **Total Value:** | **$ - ~165,198,247** | | **$ 48,676,420** | **$ 118,521,827** |
| Trky Svcs | Turnkey Services until June 2010 | $ 3,324,720 | $ 1,862,360 | $ 1,862,360 |
| Service Nodes | 36 Service Nodes | $ 4,870,620 | $ 4,415,480 | $ 455,169 |
| | Materials (3A) | | | |
| | Detailed Equipment Engineering (2B) | | | |
| | Construction Activities | NA | NA | NA |
| | Installation Activities (4C) | | | |
| | Staging Activities - Columbia GPC (3D) | | | |
| Hubs | 100 Hubs for the year | $ 56,483,708 | $ 9,102,900 | $ 47,380,808 |
| | Materials (3A) | | | |
| | PSAX2300 ATM Acc. Conc.(Siemens or Hughes) | | | |
| | Point to Multi-Point Radio | | | |
| | MAX20 DSLAM (1 DS3 Egress / 8 SDSL ingress) | | | |
| | DSX-1, DSX-3, OHP, Misc. | | | |
| | Network Engineering Services (2D) | | | |
| | Detailed Equipment Engineering (2B) | | | |
| | Construction Activities (4A,C) | TBD | TBD | TBD |
| | Installation Activities (4D) | | | |
| | Pre-monitoring, cable ladder rack, etc. | | | |
| | Data Distrard Installation | | | |
| | Optical T&D Interconnect Panel (OHP) | | | |
| | PSX, Misc Equipment | | | |
| | Point to Multi-Point Radio IDU | TBD | TBD | TBD |
| | Staging Activities - Columbia GPC (3D) | | | |
| B-Site | End to End Network Integration (6D) | | | |
| UP TO | 2000 Bs for the year (≥2 PR) | $ 100,519,200 | $ 33,495,900 | $ 67,023,400 |
| 5,000 | Materials (3A) | | | |
| B-SITES | DSL MAX20: DS3 ATM | | | |
| | DSL MAX20: OC-3 ATM | | | |
| | Point to Multi-Point Radio IDU, ODU, Antenna | | | |
| | Cabinet Assemblies | | | |
| | Pre-wire Construction Materials | | | |
| | Detailed Equipment Engineering (2B) | | | |
| | Construction Activities (6A,B) | | | |
| | B-Site - Base Ready (3A Partial) | | | |
| | Installation Activities | | | |
| | Staging Activities - Phoenix GPC (3C) | | | |

Winstar / Lucent Proprietary

Page 2 of 3

CONFIDENTIAL                                    LUTX0962461

CONFIDENTIAL                              LW00303181

B1533

## Winstar / Lucent
## 1ST QTR Business Summary

### Switching

| | | | | 1st Qtr Rec. Rev | | Future Rec. Rev. |
|---|---|---|---|---|---|---|
| Total PO Value: | $ | | 18,427,704 | $ | 16,357,861 | $ 2,070,842 |
| Memphis & Richmond | Material | | | $ 4,644,774 | $ 4,544,774 | $ |
| | Engineering | | | $ 384,037 | $ 384,037 | $ |
| | Installation | | | $ 1,058,573 | | $ 1,058,573.00 |
| 38 ASMs | Material | | | $ 6,120,000 | $ 6,120,000 | $ |
| | Engineering | | | $ 92,952 | $ 92,952 | $ |
| | Installation | | | $ 115,272 | | $ 115,272 |
| 23 Octel Sys. | Octel Hardware | | | $ 4,893,704 | $ 4,893,104 | $ |
| | Octel Services | | | $ 895,202 | | $ 895,202 |
| San Jose, Nashville Cincinnati | Pay As You Grow (Quarterly Billing) | | | $ 522,820 | $ 522,820 | |

### Communications Software Deal

| | | | | 1st Qtr Rec. Rev | Future Rec. Rev. |
|---|---|---|---|---|---|
| Total Value | $ | 8,188,298 | | $ 6,077,932 | $ 108,333 |
| GS-00-VA1036 | Project Physical Architecture Svcs. (4Q99-12/99) | | $ 76,000 | $ 76,000 | $ |
| GS-00-VA1037 | Proj. Mgt. / Training (4Q99) | | $ 225,000 | $ 225,000 | $ |
| GS-00-VA1038 | Proj. Mgt. / Training (1Q00) | | $ 325,000 | $ 216,667 | $ 108,333 |
| GS-00-VA1048 | Yearly Maintenance CONNECT/VU - Core | | $ 536,800 | $ 536,800 | $ |
| GS-00-VA1065 | Integration Point Analysis (IPA) (Complete 2/28) | | $ 150,000 | $ 150,000 | $ |
| GS-00-VA1002 | CONNECT/VU Lab Upgrade Service (Complete) | | $ 18,000 | $ 18,000 | |
| GS-00-VA1048 | Annual Maintenance - Kansas Arbor BP (7/2/99-7/2 | | $ 180,000 | $ 180,000 | $ |
| GS-00-VA1009 | ITM NM/XM DynaStar Certification (Complete) | | $ 80,000 | $ 80,000 | $ |
| GS-00-VA1010 | ITM NM/XM Lab Deployment Services (Complete) | | $ 150,000 | $ 150,000 | $ |
| | Other Year 2000 OES Support | | $ 3,446,465 | $ 3,446,465 | |

### Miscellaneous Data

| | | | | 1st Qtr Rec. Rev | Future Rec. Rev. |
|---|---|---|---|---|---|
| Total Value: | $ | 3,321,989 | | $ 3,321,989 | $ |
| | SunWaveXtend | | $ 729,000 | $ 729,000 | |
| | Sun/Email-DH3 | | $ 400,000 | $ 400,000 | |
| | CBX6007a | | $ 249,000 | $ 249,000 | |
| | PMP PROJECT | | $ 220,255 | $ 220,255 | |
| | OPTICAL MANAGEMENT PROJECT | | $ 173,941 | $ 173,941 | |
| | WINSTAR NAVISCORE PLATFORM | | $ 722,792 | $ 722,792 | |
| | PSAX (11) | | $ 636,000 | $ 636,000 | |
| | PSAX (4) | | $ 200,000 | $ 200,000 | |

### Other Services Deal

| | | | | 1st Qtr Rec. Rev | Future Rec. Rev. |
|---|---|---|---|---|---|
| Total Value: | $ | 12,000,000 | | $ 2,298,333 | $ 9,701,667 |
| | Global Network Capacity Management - Vorsas/24 | | $ 6,600,000 | $ 1,200,000 | $ 5,400,000 |
| | Telco-Engineers-Cortez | | $ 220,000 | $ 36,667 | $ 183,333 |
| | Telco-Engineers-Carter | | $ 240,000 | $ 40,000 | $ 200,000 |
| | Telco-Engineers-Martin | | $ 250,000 | $ 41,667 | $ 208,333 |
| | NKC Reconciliation/True-up - Ziolkick | | $ 1,700,000 | $ 400,000 | $ 1,300,000 |
| | Data Consulting/Engineering - Huber | | $ 2,500,000 | $ 416,667 | $ 2,083,333 |
| | TRS/DS0 Synchronization Project - Dodd | | $ 490,000 | $ 163,333.33 | $ 326,667 |

Winstar / Lucent Proprietary

Page 3 of 3

CONFIDENTIAL

LUTX0962462

CONFIDENTIAL

LW00303182

B1534

| From: | Kipke, Reginald J (Reg) |
|---|---|
| Sent: | Friday, December 08, 2000 8:29 AM |
| To: | Helfrich, Richard A (Richard); Diroma, Jill B (Jill) |
| Cc: | Fawcett, Lee F (Lee); Garrett, Gregory A (Gregory); Petrini, Vanessa H (Vanessa); Harris, Deborah K (Deborah Kristine); Rigotti, David Roy (David); VanDeusen, Darcia B (Darci); Roberts, Karen L (Karen) |
| Subject: | RE: Winstar Bill and Hold IMMEDIATE ATTENTION NEEDED |

Jill:

Per our conversation this morning, Rich and I will be updating the spreadsheets.  As we reviewed on our call, the following are some of the steps taken by WinStar to formalize their ownership of the electronics material in Morrow.

WinStar's Asset Management Group has sent auditors to Morrow and they have inventoried the electronics material and placed bright orange "Property of WinStar" labels on the exterior of all the cartons.  This information is being entered into WinStar's MP5 Asset Management Tracking System.  WinStar material is stored in its own area of the warehouse segregated from any non-WinStar material.  When electronics material is needed, an email request listing part number and quantity is sent to WinStar, and must receive their approval before it can be removed.

During First Calendar Quarter 2001, WinStar is planning to provide a terminal in the warehouse linked to MP5 so material may be directly scanned and logged into the WinStar system when it is received in Morrow.  WinStar has also requested that in the same timeframe some type of physical barrier (such as chain-link fence) be put-in place to further segregate WinStar material from any non-WinStar material in the warehouse.  After MP5 is implemented, all requests for electronics material and approvals will follow the same requisition processes used in WinStar owned warehouses.

I would think the above steps taken by WinStar ought to help further document the fact that WinStar has taken ownership of this material and that Morrow is providing Warehousing & Inventory Management as a professional service for WinStar.

*Reg Kipke*
Program Management Director
WinStar Optical Long Haul Program

---

From: Diroma, Jill B (Jill)
Sent: Friday, December 08, 2000 7:25 AM
To: Kipke, Reginald J (Reg); Helfrich, Richard A (Richard)
Cc: Fawcett, Lee F (Lee); Garrett, Gregory A (Gregory); Petrini, Vanessa H (Vanessa); Harris, Deborah K (Deborah Kristine)
Subject: RE: Winstar Bill and Hold IMMEDIATE ATTENTION NEEDED
Importance: High

Reg and Rich,

I need this spread sheet updated immediately.  I understood that all prior (1st and 2nd) quarter bill and hold related ONG equipment had left Morrow, GA at least by the Sept. timeframe when an additional bill and hold was discussed with me. This must be provided today as PWC needs to sign off on our 4Q numbers.

I was also told that any ONG equipment shipped in 3Q for which a bill and hold was denied also left Morrow. I

CONFIDENTIAL





LW00079251

**B1535**

relied on this information to book revenue subsequently on this material. I need to understand if that was done in error.

Thanks,

Jill

| From: | Helbich, Richard A (Richard) |
|---|---|
| Sent: | Monday, April 03, 2000 5:23 PM |
| To: | Kipke, Reginald J (Reg); Diroma, Jill B (Jill) |
| Subject: | FW: Winstar Bill and Hold |

Jill,

The spreadsheet showing equipment leaving Morrow was based on the Estimate Working Date (Column F) on the Williams Spreadsheet Reg sent you earlier. These are the dates Winstar is pushing Williams and Lucent on which to base their deployments. Please let me know if you have any more questions.

Thanks,

Rich

From: Diroma, Jill B (Jill)
Sent: Monday, April 03, 2000 12:07 PM
To: Kipke, Reginald J (Reg); Helfrich, Richard A (Richard)
Subject: Winstar Bill and Hold

Rich and Reg,

Attached are the files you both sent me. I am trying to link them up but when I look at Reg's file from Williams many routes do not have dates to connect to Rich's report. Please advise as to why this is.

Thanks,

Jill
<<Message: FW: spreadsheets for call>>-<<Message: Equipment in Morrow>>

2

CONFIDENTIAL                                    LW00079252

**B1536**

**Bayer, Cynthia C (Cindy)**

| | |
|---|---|
| From: | Hund-Mejean, Martina (Martina) |
| Sent: | Thursday, November 02, 2000 10:28 PM |
| To: | Hopkins, Deborah C (Debby/CFO) |
| Cc: | Derrick, Peter (Peter); Perricone, Elizabeth (Beth); Hayes, Paul (Paul); Quinn, Alice (Alice)** CTR **; Keefe, Michael C (Michael); Rogers, Leslie L (Leslie) |
| Subject: | FW: Winstar |

Attached provides a recommendation on a course of action on Winstar that I am supportive of. Please let us know your thoughts.

——Original Message——
From:    Derrick, Peter (Peter)
Sent:    Thursday, November 02, 2000 2:15 PM
To:      Hund-Mejean, Martina (Martina)
Subject: FW: Winstar

Martina,

As requested, attached is a review of the current Winstar situation. In summary, the situation is as follows:

- Winstar's current cash burn rate is $350M per quarter, without additional financing, they are funded through Q2 2001.
- According to Bear Stearns, Winstar's access to the capital markets and the syndicated loan market is currently very limited
- Their paper was recently priced for up to $200M at 85.

The implications of issuing a Refinance Notice are:

Pros

- Puts pressure on Winstar to seek alternative sources of capital
- Forces parties to table to deal with funding issues
- Provides Lucent with ability to re-negotiate certain provisions

Cons

- Winstar likely to file 8-K to disclose material adverse event
- Disclosure may result in public disclosure of Lucent's arrangement
- Market rumors may further disrupt capital markets and deter new investors
- Existing Winstar securities could suffer price deterioration
- Potential rating agency implications for Lucent and Winstar
- Potential increased cash flow requirement for Winstar if they fail to refinance.

Recommendation

Meet with Winstar to verbally advise of notice. The advantages to Lucent would be as follows:

- Provides an opportunity to immediately sell up to $300 million of Lucent loans
- Flush out any strategic options currently under consideration by Winstar
- Extract other amendments or concessions
- Limit public disclosure and market impacts.

Please call to discuss.

Regards,

Peter

**CONFIDENTIAL**





LWI 00042554

**B1537**

-----Original Message-----
From: Perricone, Elizabeth (Beth)
Sent: Thursday, November 02, 2000 12:04 PM
To: Derrick, Peter (Peter)
Subject: Winstar



2

CONFIDENTIAL

LWI 00042555

B1538

# MEMORANDUM

**TO:**          Peter Derrick

**FROM:**        Beth Perricone

**CC:**          Leslie Rogers, Bill Quinn, Paul Hayes, Michael Keefe

**DATE:**        November 2, 2000

**SUBJECT:**     **WINSTAR REFINANCE NOTICE**
                    **IMPLICATIONS FOR WINSTAR AND LUCENT**

       Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice. What follows is a summary of the current situation as well as our view of the various outcomes. These conclusions are not comprehensive but provide a broad overview of the most evident outcomes. To further refine the potential outcomes and help ultimately affirm any Lucent decision on a refinance strategy, we would require an opportunity to engage Winstar to better understand their plans to accommodate our refinance need, as well as canvas the capital markets for additional details as to the current investor demand for incremental Winstar debt or equity.

       As you know, much of the history of Lucent's relationship with this account is that we have continuously made concessions to Winstar's demands as it relates to their financing needs in the interest of the Lucent/Winstar relationship. PFO was not in favor of the current financing in particular, however, in an effort to accommodate our customer once again, the refinance language was specifically engineered by PFO as a means to limit Lucent exposure and use Winstar's potential access to the capital markets as a source for repayment of our loans.

## I. Highlights of the Winstar/Lucent Loan Agreement:

- $690M of Lucent Loans ( a defined legal term) currently outstanding;
- Lucent Loans represent purchase money debt below the bank borrower level;
- Winstar can currently increase its Lucent Loans up to $1B without restriction;
- Current Lucent content is less than 50% while Supply Agreement stipulates 70/30 ratio;
- Lucent has the right to issue a Refinance Notice (a defined legal term) for all or a portion of Lucent Loans;
- Refinance Notice provides Winstar 90-105 days for Winstar to refinance Lucent Loans (all or a portion);
- Lucent needs to obtain Winstar's consent for loan sales before and until the end of the 90-105 day Refinance Period (a defined legal term);
- Refinance Notices do not trigger an event of default for Winstar, so Winstar may continue to borrow under the Lucent facility up to the $1B level;
- Lucent is not limited to a particular number of Refinance Notices; i.e. Lucent may give multiple Refinance Notices in varying amounts.

## II. Current Situation of Winstar:

- A recent Bear Stearns analyst report cites $583M of cash on hand as of June 2000. Winstar's current cash burn rate is $350M per quarter and without access to the additional $1B Lucent tranche, Winstar is funded only through Q2 2001;
- Winstar's access to the capital markets is more limited than in the past and strategic investors may be one of the few sources of future funding for Winstar given the current capital markets environment;

**CONFIDENTIAL**

**LWI 00042556**

**B1539**

- Bear Stearns believes that due to unfavorable conditions facing the CLEC market, along with an existing bank facility of over $1B, Winstar's ability to access the syndicated loan market to repay the Lucent Loans is highly unlikely.

### III.  Current Capital Market Read:

- Winstar has some amount of access to the capital markets, however how much, what type of security and at what price, is at question;
- A recent indication of interest to Lucent Syndications was for up to $200M at 85.  This is the likely barometer for today's investor appetite for purchase money debt of Winstar.

### IV.  Implications of Issuing a Refinance Notice:

#### Option 1-Issue a written 105 day refinance notice for all or a portion of the Lucent Loans

**Pros:**

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors and Vendors);
- Forces parties to table to deal with funding shortfall issues;
- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);
- Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;
- Lucent can always rescind or modify the refinance notice

**Cons:**

- Winstar is likely to immediately file 8-K to disclose material adverse event, disclosing the amount of the refinancing;
- Disclosure may result in the details of Lucent's arrangement becoming public;
- Market rumors may further disrupt capital markets and deter new investors;
- Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;
- Potential Rating Agency implications for Lucent and Winstar;
- Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90-105 days).  If Winstar does not refinance, rate on Lucent Loans increases by 2% (i.e. a potential $13.8M in additional interest cost annually on current $690M of Lucent Loans).  If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash pay coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62M of additional interest cost annually on current $690M of Lucent Loans)

#### Option 2-Meet with Winstar immediately and advise verbally of pending notice

**Pros:**

- Provides opportunity to negotiate right to sell up $300M of Lucent Loans today if Lucent desires;
- Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;
- Flush out any strategic options currently under consideration by Winstar;
- Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)
- Limit public disclosure and market impacts

CONFIDENTIAL                    LWI 00042557

**B1540**

**Cons:**
- Time is of the essence
- 105 days required for refinance
- Rumors may still permeate the marketplace

**V. Conclusions:**
- Lucent's ultimate negotiating position may be driven by our perception of Winstar as a "going concern";
- If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;
- To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make more informed decision; A confidential discussion may begin immediately on this;
- Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?
- Ultimately our options should be driven by what where we think this is going. In our judgement, if the capital market disruption is temporary, i.e., 3-6 months longer, than Winstar is likely to survive.

CONFIDENTIAL

LWI 00042558

B1541

10/27/00  FRI 09:49  FAX 908 559 2338

**Lucent Technologies**

# Fax

| | | | |
|---|---|---|---|
| To: | Debbie Harris | From: | Bill Nelson |
| Fax: | 908-559-2338 | Date: | October 26, 2000 |
| Phone: | | Pages: | |
| Re: | | CC: | — |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

**Comments:**

Debbie,

Per my voice mail message to you, attached is the material that I received from Nate Kantor of Winstar.

Bill



PLAINTIFF'S
EXHIBIT
PK320

LW00015941

CONFIDENTIAL

B1542

Lucent Product Overview                    10/09/00

Lucent Products Winstar Buys Because They are Better:

5ESS Switches        Quality product
                     Compatible with Winstar needs
                     Adequate capacity
                     Delivery/installation good and on time
                     Pricing acceptable
                          PAYG option lost with EOQ deals
                     Uneven support after Winstar acceptance

Software:            SNMS, SNC (have to use – no alternative)
                     Maestar, ConnectVu, One Vision, Netminder – all Best of Breed

Lucent Products Winstar Buys Because of Partnerships:

Optronics (both Long Haul and Metro)
                     Priced 15% higher than competition
                     Larger footprint than competition
                     Lacking fully integrated network management system
                     Poor installation services
                     Missed installation/deployment deadlines

ATM Switches (500's, 550's)
                     Lower performance than competition
                     Not enough capacity growth
                     Higher cost than competition
                     Already deployed in network

IADs                 Adequate for Winstar's needs; Lucent was responsive on requests to improve
                     product
                     Competitively priced
                     Not an internal Lucent product; 3rd party vendor – Lucent has no direct control
                     over product

DSLAM (Stinger)      Not proven Best of Breed
                     Higher cost than competition
                     Larger unit than necessary
                     Product just became available – competition already available
                     Lacking fully integrated network management system
                     As yet unproven in actual deployment

Servers              Not an internal Lucent product; 3rd party vendor – Lucent has no direct control
                     over product
                     Pricing higher than what we can get ourselves
                     No integrated construction/installation services
                     Limited vendors – Lucent has not partnered with all server manufacturers
                     Winstar uses

Software             Arbor, Strategist – not Best of Breed
                     Already have comparable software deployed in network
                     Higher priced than competition

                              DRAFT

CONFIDENTIAL

LW00015942

**B1543**

Lucent Product Overview　　　　　　　10/09/00

**What Lucent Could Do Better:**

- Best Of Breed products across the board
- Products designed to fit Winstar's needs rather than forcing existing products into our network
- Listen to our requests/needs
- Quality service/installation everywhere
- Products sold as integrated package including all software, maintenance, and services necessary to operate
- Global approach; consistency in pricing, service delivery globally
- Meet delivery deadlines
- When providing turnkey services, do just that — stop handing back to Winstar whenever a problem occurs
- Become more aware of Winstar business plan regarding future product offerings — start designing products now that will meet Winstar's future needs
- Integrated network management that is operational before equipment is deployed
- Stop overextending yourselves — leads to lack of focus and frustration all around
- Competitive pricing — Lucent is almost constantly priced higher than competition
- Better support services, both Engineering and Operations Technicians — currently Lucent outsources these services

*Notes*
*Nokia*
*Stingers*

DRAFT

LW00015944

CONFIDENTIAL

B1544

Sasvari, Jean A (Jean)

*[handwritten: Forward to Michael Montemarano and cer everyone. Mike - here is the response MPH 12/11]*

| | |
|---|---|
| **From:** | Derrick, Peter (Peter) |
| **Sent:** | Tuesday, December 05, 2000 7:52 PM |
| **To:** | Hund-Mejean, Martina (Martina) |
| **Subject:** | FW: clarity required |

Martina,

In my view the purpose of the Winstar due diligence is as follows:

- Ensure that Winstar is viable, and that we will not push them into bankruptcy if we issue the refinancing letter
- Validate Winstar's business plan and operating assumptions.
- Review their funding plan and determine if they have viable third party equity and debt funding such that they can repay Lucent in a timely fashion.  Or how long is Winstar planning to utilize our line of credit and are they planning to increase it to the full $1 billion.
- Review their business plan to determine how they can be more efficient or if they should curtail growth plans and consolidate their operations (ex. International)

Regards,

Peter

*[handwritten: Ken, delete & file in Winstar]*

——Original Message——
**From:** Montemarano, Michael A (Michael)
**Sent:** Tuesday, December 05, 2000 1:16 PM
**To:**    Spurrier, Carole J (Carole); Derrick, Peter (Peter); Hopkins, Deborah; Hund-Mejean, Martina;
             Hund-Mejean, Martina; Harris, Deborah K (Deborah Kristine); Keefe, Michael C (Michael)
**Cc:**    White, Mark R (Mark)
**Subject:**    clarity required

As part of the winstar account "action" we need to be aligned around expectation from the due diligence work being done. I have been of the opinion that the purpose of the review was to be in a position to give winstar strong recommendation to improve their cash flows and thus improve lucent position to sell paper at better than 20 cents off on the dollar and thus create more capacity for other customers or at least reduce borrowings for LU.  In separate conversations business deals with winstar were put on hold pending review of the due diligence.

We are all running hard at this, but I am concerned we are not together.  Sales wants to sell and that is good.  Winstar, at least the initial read as part of the due diligence is not in risk of going under.....my concern was never that but again was to have them improve their cash flows so LU could move their paper and not take a beating on the margin.

Martina, can you articulate the finance position (if different) and debby harris let's get the channel view given those constraints.  We agreed waiting two weeks for the finalization of due diligence is right, but we should get a periodic temperature check as we continue to sell to this customer.

michael

1

CONFIDENTIAL

PLAINTIFF'S EXHIBIT

LW00072924

**B1545**

## SOFTWARE POOL AGREEMENT
### BETWEEN
### WINSTAR COMMUNICATIONS, INC.
### AND
### LUCENT TECHNOLOGIES INC.

This Agreement ("Agreement") is entered into on September 29, 2000 (hereinafter "Effective Date") between Winstar Communications Inc., a Delaware Corporation, having an office located at 685 Third Ave, New York, NY, 10017 ("Winstar"), and Lucent Technologies Inc., a Delaware Corporation with offices located at 600 Mountain Avenue, Murray Hill, New Jersey 07974 ("Lucent").

NOW, THEREFORE, the parties agree as follows:

**1. SCOPE OF AGREEMENT**

This Agreement sets forth the terms and conditions pursuant to which Winstar irrevocably agrees to purchase one hundred and thirty-five million dollars ($135,000,000) worth of licenses from the list of Optical Networking, OS, Switching, and Data Software as delineated in Attachment A.

**2. TERM**

This Agreement shall become effective upon execution by both parties and shall continue in effect until September 29, 2001. The rights granted in Section 7 below shall survive the term of this Agreement.

**3. APPLICABILITY OF EXISTING AGREEMENT**

This Agreement shall consist of and be controlled by, in addition to the specific clauses contained herein, Supply Agreement effective as of October 21, 1998 and Amendments and Addenda thereto between Winstar and Lucent. If there is any conflict between the specific clauses contained herein and those in the aforementioned contract, the clauses contained herein shall govern. All initially capitalized terms not defined herein shall have the meaning set forth in Supply Agreement, as amended.

**4. SOFTWARE POOL**

Winstar irrevocably agrees to license one hundred and thirty-five million dollars ($135,000,000) worth of Generally Available and Accepted Software ("Pool") based upon the license fee schedule in Attachment A, Software Pool Summary. Winstar agrees to select the Software from Attachment A that it elects to license for use hereunder and notify Lucent in writing on or before September 29, 2001 of the Software Winstar has selected.

**5. GENERAL AVAILABILITY, DELIVERY AND ACCEPTANCE**

Lucent warrants that the Software set forth in Attachment A is Generally Available (GA), has been delivered to Winstar, meets the requirements of the applicable Lucent Specifications, and is ready for activation in Winstar's network. Winstar agrees that the Software items set forth in Attachment A are Generally Available, have been delivered and have been accepted for use by Winstar on the Effective Date of this Agreement. Lucent will provide to Winstar, software access codes at the time in which Winstar selects the software application features for use in their network, from the software pool delineated in Attachment A.

Page 1 of 2

CONFIDENTIAL



LW00005662

B1546

6.  INVOICING AND SCHEDULE OF PAYMENTS

Lucent shall invoice Winstar for the Software on the Invoice Dates. Invoices shall be due and payable thirty (30) days from the Invoice Date.

| INVOICE DATE | AMOUNT |
|---|---|
| January 15, 2001 | $33.75M |
| March 30, 2001 | $33.75M |
| June 29, 2001 | $33.75M |
| August 29, 2001 | $33.75M |

Winstar agrees that it will maintain sufficient cash on hand to meet the above-described payment obligations at the respective Invoice Dates independent of any financing arrangements in place between Lucent and Winstar.

7.  RIGHTS IN SOFTWARE

The clause entitled "Software Licenses and Proprietary Rights" as set forth in the Supply Agreement shall govern that subject in this Agreement

8.  ENTIRE AGREEMENT

The terms and conditions contained in this Agreement, including its Attachments, together with the Supply Agreement and all Amendments and Addenda, supersede all prior oral or written understandings between the parties with respect to the subject matter thereof and constitute the entire Agreement of the parties with respect to such subject matter. This Agreement may be modified only by an amendment executed in writing by both parties.

In WITNESS WHEREOF the parties have caused this Agreement to be executed on the date indicated.

| WINSTAR COMMUNICATION INC. | LUCENT TECHNOLOGIES INC. |
|---|---|
| Signature | Signature |
| Richard J. Uhl | Nina Aversano |
| Typed Name | Typed Name |
| Group Executive & Chief Financial Officer | President, North America |
| Title | Title |
| September 29, 2000 | 9/29/00 |
| Date | Date |

Page 2 of 2

TOTAL P.03

CONFIDENTIAL

LW00005663

B1547

P.02/02

## Winstar Software Pool Sign-Off

Signatures on this document certify that the Generally Available software products and features (list attached) have been delivered to the Winstar location(s) specified.

Winstar                                   Lucent Technologies

Signature *Bob Hannan*              Signature *Alan W Fulton*

Name:  Bob Hannan                    Name:  Alan Fulton

Title:  Senior Director                 Title:  Senior Manager

OSS Development                      Software Products Specialist

Date:  9/29/2000                     Date:  9/29/00

CONFIDENTIAL

LW00005664

B1548

P 03/04

| SOFTWARE | RELEASE LEVEL | DELIVERY LOCATION* | DELIVERY DATE | TOTAL VALUE |
|---|---|---|---|---|
| ONG | | | | |
| FT2000 OC-48 | 9.1 | WP | 09/29/00 | $ 1,523,780.00 |
| Wavestar 2.5G OC-48 | 4.0 | WP | 09/29/00 | $ 2,733,750.00 |
| 400G | 3.0 | WP | 09/29/00 | $ 28,620,000.00 |
| SNMS | 3.1 | WP | 09/28/00 | $ 350,000.00 |
| SNC | 10.0 | PP | 09/21/00 | $ 15,000.00 |
| Total ONG | | | | $ 33,242,530.00 |
| DATA | | | | |
| IP Navigator | 5.1 | WP | 09/29/00 | $ 1,305,000.00 |
| Lightship | 1.1 | WP | 09/29/00 | $ 50,000.00 |
| PSAX | 6.2.2 | WP | 09/29/00 | $ 1,266,000.00 |
| Navis Provisioning Manager for Stinger LS | 5.0.1 *S.D.A et P* | WP | 09/29/00 | $ 4,765,000.00 |
| NavisAccess Hash Code Pre-Purchase Option for Stinger LS | 5.0 *RJH* | WP | 09/29/00 | $ 8,985,000.00 |
| TOTAL DATA | | | | $ 16,371,000.00 |
| SWITCHING | | | | |
| Additional Switching Features | 15.0 | PP | 09/15/00 | $ 93,519,025.00 |
| 5E15 Base/Features | 15.0 | PP | 09/15/00 | $ 5,679,399.96 |
| TOTAL SWITCHING | | | | $ 99,198,424.96 |
| OSS/BSS | | | | |
| Fraud Management System (FMS) 20 - 30M CDRs | 1.0 | WP | 09/29/00 | $ 2,550,000.00 |
| Arbor B/P (Add'l $18 ABR) | 9.1 | WP | 09/29/00 | $ 8,875,000.00 |

CONFIDENTIAL

LW00005665

**B1549**

| SOFTWARE | RELEASE LEVEL | DELIVERY LOCATION* | DELIVERY DATE | TOTAL VALUE |
|---|---|---|---|---|
| Macstar-Federal | 13.2 | WP | 09/29/00 | $ 2,625,000.00 |
| CONNECTVU Support for add150 switches | 6.2 | WP | 09/29/00 | $ 1,524,000.00 |
| CONNECTVU ACO | 7.0.2 | WP | 09/29/00 | $ 1,143,000.00 |
| Arbor/OM-Federal | 1.3.7 | WP | 09/29/00 | $ 1,000,000.00 |
| Arbor/OM-Europe | 1.3.7 | WP | 09/29/00 | $ 1,000,000.00 |
| BILLDATS | 6.2 | WP | 09/29/00 | $ 1,875,000.00 |
| Interprenet | 1.0 | WP | 09/29/00 | $ 2,249,195.00 |
| Strategist for Federal | 4.0 | WP | 09/29/00 | $ 690,000.00 |
| Strategist for Global | 4.0 | WP | 09/29/00 | $ 2,070,000.00 |
| OneVision NFM Additional Cores | 10.0 | WP | 09/29/00 | $ 1,300,000.00 |
| OneVision NFM 1st Add150 NE Support (up to 100 NEs) | 10.0 | WP | 09/29/00 | $ 1,950,000.00 |
| OneVision NFM 2nd Add150 NE Support (up to 150 NEs) | 10.0 | WP | 09/29/00 | $ 1,950,000.00 |
| OneVision-NFM SNMP | 10.0 | WP | 09/29/00 | $ 390,000.00 |
| NetMinder PTM | 1.0 | WP | 09/29/00 | $ 3,510,000.00 |
| TOTAL OSS/BSS | | | | $ 35,751,195.00 |
| Grand Total Pool Candidates | | | | $184,563,149.96 |
| Total Winstar Pool Commitment | | | | $135,000,000.00 |

\* WP = 2350 Corporate Park Drive, Herndon, VA
  PP = 2545 Horsepen Road, Herndon VA

TOTAL P.04

CONFIDENTIAL

LW00005666

B1550

# $135M Software Pool Allocations
## Fiscal Q42000 EOQ Deal
### Prepared October 20, 2000

| Amount | Description |
|--------|-------------|
| $135M | Total Software Pool |
| ($20M) | Useful Software |
| $115M | Subtotal |
| ($35M) | Credit |
| $80M | Subtotal |
| ($45M) | Enterprise Integration Lab |
| $35M | Total (this amount is being used to partially fund the B/Hub pricing discounts which are projected to total at least $120M if Lucent builds 3,000 B's/20Hubs) |

CONFIDENTIAL



LW00029316

B1551

**From:** Diroma, Jill B (Jill)
**Sent:** Thursday, November 16, 2000 3:47 PM
**To:** Moogan, Robert H (Bob)
**Subject:** FW: Winstar- Special Services Arrangement

**Importance:** High

**Categories:** Winstar

---

**From:** Aye-Boafo, Joseph K (Joseph)
**Sent:** Tuesday, August 29, 2000 4:47 PM
**To:** Deady, Mark A (Mark)
**Cc:** Diroma, Jill B (Jill)
**Subject:** Winstar- Special Services Arrangement
**Importance:** High

Mark,

As requested, I have reviewed four quarters of the Winstar special services arrangement, dating back June 30,1999. Below is the read out on the past transactions.

**Background**

As you may recall, this is the quarterly transaction we have been doing for Winstar, which is not recognizable revenue to Lucent. Per the contract, Lucent have the responsibility to build the client's entire network, however, there are some services which only they can perform.

In order to fulfil our contractual obligation, and to strengthen strategic relationship with the client, Lucent agreed to flow the services through, by sub-contracting the services back to the client. The expectation was that, the amount would not exceed $25M per a quarter, but, have increased over time (3Q00 - $55.4M).

**Process Flow (Same accounting Period):**

1) Winstar places an order on Lucent to perform the services (orders are received in the middle of quarter close).

- Asset Management then invoices client upon receipt of order and performs the following accounting entry:
  - DR:        A/R
  - CR:        Progress Bill (228 account)

  No impact on the P&L (Revenue, COGS, & Expenses)

2) Lucent GPO, then places an order on Winstar for the same amount (timing is critical).

- Winstar then issues an invoice to Lucent for the services. Upon receipt of the invoice from the client, the following entry is performed:
  - DR:        Inventory Account 15124100 (services related)
  - CR:        Accounts payable account

  No impact on the P&L (Revenue, COGS, & Expenses)

3) An adjustment entry is then submitted by LFS to clear the balances in the inventory and progress billing accounts as follows:
  - DR:        Progress Billing (228 account)
  - CR:        Inventory account (15124100) for services

  This entry eliminates the progress bill in item (1) and the inventory in item (3) respectively. Please note, this entry has to  be approved by the controllers group.

517



CONFIDENTIAL

LW00002758

B1552

4)  The client then wires payment to Lucent to offset the A/R set up in (1). Lucent upon receipt, wires money back to client.

In summary, we did not recognize revenues on the four transaction that I reviewed. In fact, there were no impact to our &L.

I have supporting journal entries from both Asset Management and LFS to back up my findings.  If you have further questions or require additional information, please let me know.

Thank you,
Joseph.

51B

CONFIDENTIAL

LW00002759

B1553

**LUCENT/WINSTAR END OF QUARTER DEAL**
**FISCAL YEAR Q42000**
*Prepared October 19, 2000*

*Q4 Billed Revenue*

$158M (Included $135M Software pool)

*Deferred Billing*

Lucent agreed to defer $32.7M in expected Services billing until January 2, 2001

*Pricing Commitments*

B/Hub Site: Effective October 1, 2000 for all new B's, Hubs: $20K per B site pricing (previous price was $57K); $400K per Hub pricing (previous price was $713K). Winstar committed to deploy Lucent's converged access solution in at least 3,000 B's. Winstar committed to provide Lucent these 3,000 B's in 2001 or at least half of the total build program of 2001 if building issues prevent Winstar from providing Lucent with 3,000 B's. If the latter is the case, the remaining B's will be built in 2002.

Optical Networking: Winstar agreed to exclusive build of long haul and metro networks in the domestic U.S. with Lucent's solution. Lucent agreed to meet Sycamore pricing for the same product with like features, capacity and network design.

Note: Account Team Concerns: Imminent award of a portion of their 2001 network build to Siemens/Accelerated Networks; Possible financing deal with Cisco for network core/edge router equipment.

*Winstar Contractors*

Lucent agreed to pick up Winstar's contractors retroactive to October 1, 2000 subject to contract negotiations to be completed by the end of October, 2000.

*Enterprise Integration Laboratory*

Lucent committed to provide up to $45M worth of equipment and services for the development of an Enterprise Integration Laboratory as needed for a term of 18 months commencing November 15, 2000. The lab will demonstrate flow through provisioning and fool proof record keeping across network technologies.

*Credits*

$35M (to be applied in fiscal Q12001)



CONFIDENTIAL

LW00029314

B1554

01-21-05    04:20pm    From-215 563 5083                    215-563-5083        T-387  P.001/001  F-976

| From: | Aversano, Nina (Nina) |
|---|---|
| Sent: | Friday, September 29, 2000 2:36 PM |
| To: | Harris, Deborah K (Deborah Kristine); Plunkett, William Montgomery, II (Bill); Cocito, James Vincent (Jim) |
| Subject: | FW: Lucent Credit |
| Importance: | High |

9/29/00

Debbie Harris
Bill Plunkett
Jim Cocito

Hold this – Nate asked me to possibly give them this – if we need to include in the deal – if we need to give it, deal goes to $145 for software.

Nina

| From: | (Credit Memory/ SMTP.rmdonror@winstar.com) |
|---|---|
| Sent: | Thursday, September 28, 2000 5:05 PM |
| To: | Aversano, Nina (Nina) |
| Cc: | nkantor@winstar.com; ndl@n-instar.com |
| Subject: | Lucent Credit |
| Importance: | High |

Nina,

At Nate's request I am sending you the request for credit for the 3rd quarter similar to what we have received in the past.  The credit amount requested is $10,000,000.  We need the following on your letterhead dated September 29th and addressed to Nate.  Bill Plunkett provided this in the 2nd quarter.

Please fax to my attention at 212-792-9723 with a follow-up hard copy to Nate.

Dear Nate:

Due to the delay in the installation and turn-up of various intra-city and inter-city routes, Winstar has incurred an additional $10,000,000 in network operating costs.

In order to assist Winstar, Lucent will provide Winstar a $10,000,000 credit against product and services purchases.  This credit can be redeemed currently.

1

CONFIDENTIAL



LW00054762

FORM B10 (Official Form 10) (9/97)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Winstar Communications, Inc. | Case Number: 01-01430 (JJF) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): Lucent Technologies Inc. and its affiliates

□ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

WINSTAR COMMUNICATION, ET AL
01-1430 (JJF)          0000002026

□ Check box if you have never received any notices from the bankruptcy court in this case.

X Check box if the address differs from the address on the envelope sent to you by the court.

Name and address where notices should be sent:
Lucent Technologies Inc.          Jones Day, Reavis & Pogue
Attn: Thomas M. O'Hara, Esq.     Attn: Richard M. Cieri, Esq.
600-700 Mountain Ave.             North Point, 901 Lakeside Ave.
Murray Hill, N.J. 07974-0636      Cleveland, Ohio 44114-1190
Telephone number: (908)582-8500  (216)586-3939

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identified debtor:<br>See Exhibit A | Check here if this claim □ replaces □ amends a previously filed claim, dated:_____ |
|---|---|

1. Basis for Claim
X Goods sold
□ Services performed
X Money loaned
□ Personal injury/wrongful death
□ Taxes
X Other: See Exhibit A

□ Retiree benefits as defined in 11 U.S.C. § 1114(a)
□ Wages, salaries, and compensation (fill out below)
Your SS #: ___ - ___ - ___
Unpaid compensation for services performed
from _____ to _____
(date)          (date)

2. Date debt was incurred: Prior to April 18, 2001

3. If court judgment, date obtained:

4. Total Amount of Claim at Time Case Filed: An amount not less than $138,957,218.90 (a statement of this claim is attached hereto as Exhibit A)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
□ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Secured Claim.*
X Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
□ Real Estate    □ Motor Vehicle
X Other See Exhibit B
Value of Collateral: In excess of dollar amount of claims.
Amount of arrearage and other charges at time case filed included in secured claims if any: An amount not less than $138,957,218.90.
* Lucent asserts the full amount of these claims as secured; however, to the extent that all or a portion of these claims is not secured, this proof of claim also shall be deemed to be a proof of claim for unsecured claims in such amount.

6. Unsecured Priority Claim.
□ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
□ Wages, salaries, or commissions (up to $4,650,* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
□ Contribution to an employee benefit plan – 11 U.S.C. § 507(a)(4).
□ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6).
□ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
□ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
□ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

7. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED
OCT 15 2001
BANKRUPTCY SERVICES, LLC

Date
10/4/01

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any). On behalf of Lucent Technologies Inc. and its affiliates:

Lucinda Sadvice, Managing Director

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

PLAINTIFF'S EXHIBIT
PX-340

B1556

**Exhibit A**

**Summary of Secured Claim of**
**Lucent Technologies Inc. (collectively with its affiliates, "Lucent")**
**Relating to Certain Equipment Sold**

I.   Summary of Claim

Prior to the date of the Debtor's bankruptcy filing, Lucent sold equipment to the Debtor and certain of its affiliates pursuant to the terms of the Lucent Supply Agreement (as such term is defined herein). The Debtor and its affiliates failed to pay for certain of this equipment in the amount of $138,957,218.90, and such amount was not financed by the Debtor and its affiliates under the Lucent Credit Agreement (as such term is defined herein). This amount constitutes the secured claim asserted by Lucent herein. A breakdown of this secured claim is set forth at **Tab A.1**.[1/]

II.   Supporting Documentation

A summary of the documents supporting Lucent's secured claim in the foregoing equipment is set forth at **Tab A.2**.

III.   Detailed Information Supporting Claim

A.   A chart summarizing the invoices relating to the equipment sold by Lucent to the Debtor and its affiliates pursuant to the terms of the Lucent Supply Agreement, the payment for which was never made by the Debtor and its affiliates, is set forth at **Tab A.3**.[2/] In addition, certain equipment was sold to the Debtors by Lucent

---

[1/]   The Debtors currently have possession of certain lab equipment in which Lucent holds all title, interests and rights; accordingly, the Debtors' estates do not have any interest in or right to the lab equipment. The lab equipment is described on Exhibit A to the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts, filed by the Debtors and Lucent on or about October 3, 2001. To the extent that the Debtors fail to turn over the lab equipment to Lucent, Lucent hereby reserves its rights to assert claims against the Debtors relating to the lab equipment and to amend, modify or supplement this proof of claim to incorporate such claims.

[2/]   The invoices attached hereto at **Tab A.3** also may include certain equipment and services sold to the Debtor and its affiliates by Lucent under the Lucent Supply Agreement that currently do not appear to be subject to Lucent's security interests. Lucent has not included the amount of such equipment and services in this secured proof of claim, but

(continued...)

B1557

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## DEFINITIONS

### Debtor

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

### Proof of Claim

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*.)

### Unsecured Claim

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims*.

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:**
   Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly described the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:**
   Fill in the date when the debt first was owned by the debtor.

3. **Court Judgments:**
   If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Total Amount of Claim at Time Case Filed:**
   Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Secured Claim:**
   Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

6. **Unsecured Priority Claim**
   Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

7. **Credits:**
   By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

8. **Supporting Documents:**
   You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

B1558

**Exhibit A**

**Summary of Secured Claim of**
**Lucent Technologies Inc. (collectively with its affiliates, "Lucent")**
**Relating to Certain Equipment Sold**

I.    Summary of Claim

Prior to the date of the Debtor's bankruptcy filing, Lucent sold equipment to the Debtor and certain of its affiliates pursuant to the terms of the Lucent Supply Agreement (as such term is defined herein). The Debtor and its affiliates failed to pay for certain of this equipment in the amount of $138,957,218.90, and such amount was not financed by the Debtor and its affiliates under the Lucent Credit Agreement (as such term is defined herein). This amount constitutes the secured claim asserted by Lucent herein. A breakdown of this secured claim is set forth at **Tab A.1**.[1]

II.    Supporting Documentation

A summary of the documents supporting Lucent's secured claim in the foregoing equipment is set forth at **Tab A.2**.

III.    Detailed Information Supporting Claim

A.    A chart summarizing the invoices relating to the equipment sold by Lucent to the Debtor and its affiliates pursuant to the terms of the Lucent Supply Agreement, the payment for which was never made by the Debtor and its affiliates, is set forth at **Tab A.3**.[2] In addition, certain equipment was sold to the Debtors by Lucent.

---

[1]    The Debtors currently have possession of certain lab equipment in which Lucent holds all title, interests and rights; accordingly, the Debtors' estates do not have any interest in or right to the lab equipment. The lab equipment is described on Exhibit A to the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts, filed by the Debtors and Lucent on or about October 3, 2001. To the extent that the Debtors fail to turn over the lab equipment to Lucent, Lucent hereby reserves its rights to assert claims against the Debtors relating to the lab equipment and to amend, modify or supplement this proof of claim to incorporate such claims.

[2]    The invoices attached hereto at **Tab A.3** also may include certain equipment and services sold to the Debtor and its affiliates by Lucent under the Lucent Supply Agreement that currently do not appear to be subject to Lucent's security interests. Lucent has not included the amount of such equipment and services in this secured proof of claim, but

(continued...)

B1559

under the Lucent Supply Agreement, but was not invoiced because of, among other things, the commencement of the Debtors' chapter 11 cases. The value of such equipment and services is included in this proof of claim, and Lucent has attached invoices for this equipment at **Tab A.4.**

B.    A chart summarizing the UCC-1 Financing Statements filed by or on behalf of Lucent in connection with the Lucent Security Agreements (as such term is defined herein) is set forth at **Tab A.5.**

IV.    <u>Reservation of Rights</u>

A.    Lucent has used its best efforts in preparing this proof of claim based on the information currently available to it. To the extent that additional information becomes available or other claims come to its attention, Lucent hereby reserves its rights to amend, modify or supplement this proof of claim.

B.    In addition to the documents and information provided herein to support Lucent's secured claim, Lucent also relies upon applicable law, including applicable federal, state and common law, and hereby reserves all of its rights thereunder.

---

2/    (...continued)
rather has filed a separate unsecured proof of claim for such amounts. Lucent hereby specifically reserves its rights to amend, modify or supplement this proof of claim to include such equipment and services to the extent that its security interests are determined to extend thereto. In addition, to the extent that any of the equipment subject to this proof of claim was sold to the Debtor after the commencement of its chapter 11 case, such equipment would have provided a direct and substantial benefit to the Debtor and its estate and, therefore, Lucent's claims for such equipment would be entitled to administrative expense priority under sections 503(b)(1) and 507(a) of the Bankruptcy Code.

B1560

Tab A.1

### Breakdown of Lucent's Secured Equipment Claim

| Basis for Claim | Amount |
| --- | --- |
| Equipment | $128,893,116.43 |
| Final Installment ("Pay As You Grow") Payments Related to Certain Equipment | $9,970,788.40 |
| Taxes Related to Equipment[1] | $21,087.88 |
| Transportation Costs Related to Equipment[2] | $72,226.21 |
| TOTAL | $138,957,218.92 |

---

[1]    These amounts are included in the invoices related to, and constitute part of the purchase price for, the equipment subject to this proof of claim.

[2]    These amounts are included in the invoices related to, and constitute part of the purchase price for, the equipment subject to this proof of claim.

CL: 622688v5

<u>Tab A.2</u>

## <u>Summary of Supporting Documentation</u>

Because of the voluminous nature of the Supporting Documents, Lucent has not attached copies of such documents hereto. Lucent, however, will provide copies of the Supporting Documents to any party in interest (i) upon request to its counsel, Jones, Day, Reavis & Pogue, and (ii) and subject to appropriate confidentiality restrictions acceptable to Lucent. Lucent believes that the Debtor has copies of all of the documents listed below.

<u>Supporting Documents</u>:

- Supply Agreement, dated October 21, 1998, between Winstar Communications, Inc. and Lucent Technologies Inc. (as amended and collectively with any exhibits and schedules thereto, the "Lucent Supply Agreement"), any amendments thereto and any and all related documents, agreements and statements of work.

- Security Agreement, dated as of May 9, 2000, between WVF-I LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (the "WVF-I Security Agreement").

- Security Agreement, dated as of December 22, 2000, between WVF-LU2 LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (collectively with the WVF-I Security Agreement, the "Lucent Security Agreements").

- All documents, agreements and other materials that may be produced in connection with any discovery related to this proof of claim.

CL: 622688v5

**B1562**

## Summary of Equipment Invoices                              Tab A.3

| | | |
|---|---|---|
| 400013390 | 400025949 | SU105490 |
| 400013392 | 400026029 | SO114675 |
| 400013989 | 400026072 | ER103548 |
| 400014175 | 400026444 | 11101746 |
| 400014393 | 400026550 | 21102911 |
| 400014526 | 400027357 | 31103242 |
| 400014686 | 400027599 | 41104351 |
| 400014900 | 400027686 | SO116623 |
| 400015042 | 400027733 | SU108080 |
| 400015109 | 400027734 | 21103023 |
| 400015170 | 400027899 | 21103024 |
| 400015231 | 400027975 | ER104204 |
| 400015311 | 400028099 | SO119490 |
| 400015370 | 400028120 | ER104372 |
| 400015622 | 400028183 | 11102513 |
| 400018146 | 400028228 | 21103542 |
| 400021882 | 400028291 | 31104142 |
| 400021950 | 400028331 | 61101390 |
| 400022221 | 400028332 | SO121389 |
| 400022388 | 400028333 | 11102197 |
| 400022443 | 400028366 | 61101127 |
| 400022538 | 400028448 | 71101867 |
| 400022994 | 400028596 | 41105326 |
| 400023249 | 400028675 | 41105327 |
| 400023588 | 400028722 | 11102207 |
| 400023589 | 400028723 | 61101528 |
| 400023663 | 400028724 | 71102270 |
| 400023750 | 400028974 | SO122302 |
| 400024066 | 400028975 | 11102288 |
| 400024158 | 400028976 | 31104462 |
| 400024298 | 400029039 | 11102360 |
| 400024322 | 400029511 | 31104656 |
| 400024324 | 400029943 | 41106107 |
| 400024325 | 400030047 | SO127749 |
| 400024369 | 400031049 | 41312168 |
| 400024377 | 400031106 | 41313197 |
| 400024405 | 400031144 | 40115092 |
| 400024596 | 400031778 | 40325463 |
| 400024597 | 400031839 | 10107336 |
| 400024638 | 400031857 | 11107608 |
| 400024864 | 400032192 | ER015009 |
| 400025021 | 400032397 | NR012702 |
| 400025140 | 400032472 | 11100056 |
| 400025195 | 400033205 | 11100172 |
| 400025239 | 400033373 | 41300429 |
| 400025272 | 3000000873 | ER100250 |
| 400025308 | 40319428 | 21100581 |
| 400025310 | 40323151 | PR100298 |
| 400025365 | 40324944 | 21100731 |
| 400025396 | 40326302 | 21100732 |
| 400025880 | 41301100 | 41301036 |
| | 41303216 | ER100804 |

B1563

## Summary of Equipment Invoices                    Tab A.3

| | |
|---|---|
| NR100489 | 31102722 |
| SR100862 | CR102043 |
| SU101858 | SR103424 |
| 11100590 | SR103431 |
| 21101144 | 31102793 |
| ER101292 | ER103301 |
| NR101051 | PR101707 |
| WR100945 | 41103996 |
| WR100946 | 71101686 |
| 21101438 | ER103373 |
| 71100810 | 31102970 |
| 61100426 | PR101850 |
| ER101813 | SO116265 |
| ER101863 | SR103723 |
| ER101864 | ER103695 |
| ER101865 | WR103565 |
| NR101492 | WR103590 |
| 51101644 | WR103674 |
| ER101912 | WR103675 |
| ER101913 | SO038194 |
| WR101361 | NR010016 |
| 11100961 | NR010164 |
| 31101535 | SU022528 |
| ER009343 | ER011986 |
| ER102325 | ER011987 |
| ER102401 | ER011988 |
| NR101927 | |
| NR101952 | |
| ER102478 | |
| 11101259 | |
| 11101329 | |
| 41103361 | |
| ER102810 | |
| 11101399 | |
| 31102301 | |
| 51102471 | |
| 61100915 | |
| ER102907 | |
| ER102918 | |
| NR102464 | |
| ER102926 | |
| ER102977 | |
| ER103004 | |
| ER103008 | |
| ER103010 | |
| ER103019 | |
| SO114640 | |
| ER103033 | |
| ER103057 | |
| ER103060 | |
| ER103069 | |
| NR102674 | |

B1564

Tab A

Secured Claim Invoice Number WVFI-101501-1

Bill To: WVFI-LLC

| Purchase Order | PO Date | LU Order # | Commode | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|
| Sites: 1061 Perimeter - Chicago | | | | | | | |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982D1L1 | OLS Integrated Bay | 1 | $21,100.00 | $21,100.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108056284 | LU01 OTCTL | 1 | $2,848.00 | $2,848.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107976367 | LEA104 OA (Long Span) | 4 | $51,800.00 | $207,200.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107272569 | LDA1 TLM | 2 | $11,413.00 | $22,826.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107273328 | LEA5 TOHCTL | 1 | $1,903.00 | $1,903.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107272510 | LEA1 SYSCTL | 1 | $1,572.00 | $1,572.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107786558 | LEA3 SYSMEM | 1 | $1,460.00 | $1,460.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108033814 | 505A ODU -16 | 2 | $18,000.00 | $36,000.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108033822 | 606B ODU-16 (1 OA) | 0 | $18,850.00 | $0.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 107727828 | 505A OMU -16 | 2 | $9,720.00 | $19,440.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982D1L162 | Ligde Jumper Kit (16W/2.0A) 1 per line | 2 | $530.00 | $1,060.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982D1L101 | ET 4 Line Label Kit | 1 | $150.00 | $150.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982D1L131 | SC LBO Kit (6W) | 2 | $505.00 | $1,010.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108187996 | 41A2C 1.5u OTU<360nm | 2 | $15,900.00 | $31,800.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108187994 | 41A3C 1.5u OTU<360nm | 2 | $15,900.00 | $31,800.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86000C1L133 | SC LBO kit (6W) | 4 | $60.00 | $240.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982C51L13 | OLS 40G R3.3 Software | 1 | $0.00 | $0.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | J86982C51LH | OLS 40G R3.3 User Manual | 1 | $0.00 | $0.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | ED8C78930G2E | WaveStar 2.5G Shelf e/w Cover | 1 | $4,590.00 | $4,590.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | ED8C78933G1 | Baffle | 1 | $123.50 | $123.50 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | ED8C78928G1 | 2.5G BASIC CABLE KIT | 1 | $231.00 | $231.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | ED8C78933G20E | BLANK FACEPLATE KIT - 2.5G | 1 | $72.00 | $72.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | ED8C78932G1E | COMMON CIRCUIT PACKS - 2.5G | 1 | $13,141.85 | $13,141.85 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | LEY1T6, DS-3EC1/8 | LEY1T6, DS-3EC1/8 | 3 | $4,250.00 | $12,750.00 |
| WVFI-1-0000000134 | 05/18/00 | NJ045RT | 108733452 | LEY1BE SWITCH DS3/EC1 | 1 | $1,200.00 | $1,200.00 |

Tab A

| | | | | Description | Qty | Price | Ext |
|---|---|---|---|---|---|---|---|
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C28031G13 0E | DS3 Proth Ckt Pack Kit (incl (1) LEY17AE & (1) LEY18AE) | 0 | | $0.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108730821 | LEY16AE OC-3 MEDIUM RANGE PORT UNIT | 2 | $6,992.70 | $13,985.40 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108735184 | LEY7AE OC-48 STM16 1.3 Long Range Port Unit | 0 | $8,242.45 | $0.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108735192 | LEY8AE OC-48 STM16 1.5 Long Range Port Unit | 0 | $12,273.00 | $0.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108734666 | LEY50AE - OC48/STM18/OWDM01 | 1 | $20,000.00 | $40,000.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | J88974E1L136 | LBO set with SC (2 ea. 0, 1 ea for 5, 10, 15, 20 dB SM) | 4 | $68.00 | $272.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | J88974E1L137 | LBO set with SC (2 ea. of 0 & 15 dB SM) | 4 | $40.00 | $160.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C78941G1 | Release 3.0 Software CD-ROM and SRD | 1 | $15,000.00 | $15,000.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30021G1 | Timing Cable 50 ft. | 2 | $23.39 | $46.78 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30021G20 | Cable, Office Alarm, 50 ft. | 1 | $28.05 | $28.05 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30021G30 | Cable, Miscellaneous Discretes, 50 ft. | 2 | $34.85 | $69.70 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C28025G1 | Power Feeder A 12 ft. | 1 | $34.43 | $34.43 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C28025G2 | Power Feeder B 12 ft. | 1 | $34.43 | $34.43 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C28031G18 0 | DS3 Wmg Panel (844540852) | 1 | $2,400.00 | $2,400.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30022G07 | Cable Assy, DSX-3 to I/O of 2.5G, 2 per DS-3, 50 ft. | 32 | $30.40 | $972.80 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30022G9AA | 1 ST BNC Near End | 32 | $8.80 | $281.50 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C30022G1A | 1 ST BNC Far End (Loose) | 32 | $4.00 | $128.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C72430G4 | DDM-2000 SHELF ASSY | 1 | $2,150.00 | $2,150.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C72430GE | DDM-2000 Users/Service Manual (R13.0 and Higher) | 1 | $0.00 | $0.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C73330G01 | DDM-2000 BAFFLE | 1 | $48.00 | $48.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 106995046 | BBF2B TGS Synchronous Timing Generator | 2 | $884.00 | $1,768.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 106926595 | 22D-U OLIU OC-3 IS-3 Interface w/TSI | 2 | $1,916.00 | $3,832.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108247990 | B6G2B MXRVO VT to STS-1 Multiplexer | 6 | $730.00 | $4,380.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108543506 | B8F1B DS1 Low Speed Intfc. | 24 | $414.00 | $9,936.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 107830549 | B9G9B SYSCTL | 1 | $1,442.00 | $1,442.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 106606121 | B8G9 OHCTL OC3 | 1 | $841.00 | $841.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | 108878868 | DDM-2000 Software R16.0.3 incl RTU | 1 | $2,331.00 | $2,331.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C72420G30 5 | DS1 to DSX1 gr.A 150ft. 1249032A ea | 1 | $427.00 | $427.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C72420G31 1 | DS1 to DSX1 gr.B 150ft. 1249032A ea | 1 | $427.00 | $427.00 |
| WVF1-0000000134 | 05/18/00 | NJ046RT | ED6C72420G31 7 | DS1 to DSX1 gr.C 150ft. 1249032A ea | 1 | $427.00 | $427.00 |

B1566

Tab A

| | | | | | Qty | Unit | Total |
|---|---|---|---|---|---|---|---|
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8G72420G357 | Office Alm to Sh 1 150ft | 1 | $105.00 | $105.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8G72420G382 | Parallel Telemetry 150ft | 1 | $131.00 | $131.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8G72420G369 | Misc Disc Alm to Sh 1 addln 150ft | 1 | $122.00 | $122.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8G72420G373 | DS1 Timing Ref for add'l Shelves | 0 | $100.00 | $0.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8G72420G371 | OC-3/OC-12 shelf Pwr Ca | 1 | $39.00 | $39.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8125G012 | 7ft Seismic Bayframe | 2 | $479.00 | $958.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8055G05 | Shims for 1 frame | 2 | $50.00 | $100.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8055G06 | Floor Molding 10 ft Lg | 2 | $40.00 | $80.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8055G07 | 4 Insulators & bushings for 1 frame | 2 | $12.00 | $24.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8055G02 | 4 Anchor Bolt 7 ft Fr, Zone 3&4 | 2 | $58.00 | $116.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | ED8C8125G71 | 7-0 end shield | 2 | $34.00 | $68.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 501339588 | | 1 | $935.00 | $935.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | NE0O2823G3A | Assembly, Wiring & Equipment for 48v Fuse Panel, | 2 | $550.00 | $1,100.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 107535569 | LGX SHELF-LSTU-14449 | 1 | $315.00 | $315.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 104384490 | Cable Clamp 12A1 | 6 | $24.00 | $144.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 104223060 | D181268 Ribbon Blocking Kit | 6 | $31.00 | $186.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 105539899 | LG Splice Organizer LT1A-F/F | 6 | $26.00 | $160.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 107719049 | 1200SG1-12E/M (c/w 12 SC couplings) | 12 | $66.00 | $792.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 106908262 | LS1SC-SC 05 FIBER JUMPER | 8 | $32.00 | $256.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 106908270 | LS1SC-SC-10 FIBER JUMPER | 16 | $33.00 | $528.00 |
| WVF1-0000000134 | 05/18/00 | NJ045RT | 107671000 | ML1SC-SC-05 | 4 | $32.00 | $128.00 |
| **Site: 161 N. Wacker - Chicago** | | | | | | | |
| WVF1-0000002827 | 08/30/00 | NL285RT | 10973-4666 | LEY50AE - OC48/STM16/DWDM01 | 2 | $20,000.00 | $40,000.00 |
| WVF1-0000002827 | 08/30/00 | NL285RT | 108959477 | BWM Software R3.0.1 upgrade from R2.x incl RTU | 1 | $34,550.00 | $34,550.00 |
| WVF1-0000002827 | 08/30/00 | NL285RT | 108847082 | BWM Spare Software Release 3.0 | 1 | $75.00 | $75.00 |
| WVF1-0000002827 | 08/30/00 | NL285RT | ED8C28028G53 | System Controller to Switch Cable Kit for Office Timing Appls | 1 | $3,528.00 | $3,528.00 |
| WVF1-0000002827 | 08/30/00 | NL285RT | ED8C28028G19 | I/O to Switch Interconnect Cable (1 per 2 SWIFs) | 6 | $5,000.00 | $30,000.00 |
| WVF1-0000002827 | 08/30/00 | NL285RT | ED8C28028G31 | I/O Shelf to Controller Shelf Cable (1 per I/O Shelf) | 2 | $1,635.00 | $3,270.00 |

Tab 2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| VVVF1-0000002827 | 08/30/00 | NL285RT | ED9C28028G32 | I/O Shelf to Controller Shelf Cable (1 per I/O Shelf) | 2 | $1,635.00 | $3,270.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 109909288 | Jumper, fiber, LS15C-SC-15, SM (15') | 8 | $33.00 | $264.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 109909387 | Jumper, fiber, LS15C-SC-75, SM (75') | 40 | $46.00 | $1,840.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 601338989 | NE00282-34, G4 -48V CKT BREAKER PANEL | 1 | $935.00 | $935.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 109908262 | LS15C-SC-05 FIBER JUMPER | 4 | $32.00 | $128.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 109909270 | LS15C-SC-10 FIBER JUMPER | 64 | $33.00 | $2,112.00 |
| VVVF1-0000002827 | 08/30/00 | NL285RT | 107671000 | ML15C-SC-05 | 0 | $32.00 | $0.00 |
| **Site: 811 Vermont - Washington, DC** | | | | | | | |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109735184 | LEY7AE OC-48 STM16 1.3 Long Range Port Unit | 2 | $8,242.45 | $16,484.90 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 107708951 | LBO, A3060, 0dB (SM-MM) | 8 | $15.50 | $124.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109440579 | LBO, ASCM5, 5dB (SM-MM) | 8 | $71.40 | $571.20 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109440595 | LBO, ASCM10, 10dB (SM-MM) | 8 | $71.40 | $571.20 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109440611 | LBO, ASCM15, 15dB (SM-MM) | 8 | $71.40 | $571.20 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109440637 | LBO, ASCM20, 20dB (SM-MM) | 8 | $71.40 | $571.20 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109918972 | DSX1-R1-84-7/6S323 (alg, 84 ckt) | 0 | $1,576.00 | $0.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109949118 | DSX1-R1-56-7/6SBU (alg, 56 ck, 19" rack-mount) | 2 | $1,313.00 | $2,626.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109573321 | DSX1P1A-01-BNP 1 foot simplex bantam patch | 8 | $12.00 | $48.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109578552 | DSX1P2A-01-BNP 1 foot duplex bantam patch | 4 | $18.00 | $72.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109578560 | DSX1P2A-03-BNP 3' duplex bantam patch | 4 | $20.00 | $80.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109578685 | DSX1DP1-BLKBNA (Dummy Plug) set of 10 | 2 | $8.00 | $16.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109578651 | DSX1TP1-100BNA (100 ohm Term plug) | 2 | $7.00 | $14.00 |
| VVVF1-0000002827 | 08/30/00 | M1625TT | 109578693 | DSX1LP1-WHTBNA Looping plug | 2 | $10.00 | $20.00 |
| **Site: 240 E 39th St. - NY (10G Cola Ring)** | | | | | | | |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED8C76035G1E | 10G Bay e/w (1) 10G Shelf & (1) 2.5G Shelf w/ covers & baffles | 0 | $12,465.00 | $0.00 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED8C76035G2E | 10G Bay e/w (1) 10G Shelf & (2) 2.5G Shelf w/ covers & baffles | 0 | $17,170.00 | $0.00 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED8C76031G1E | WaveStar 10G HS Shelf w/ cover | 1 | $7,400.00 | $7,400.00 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED8C76932G10E | Common Circuit Packs 10G Shelf | 1 | $22,495.95 | $22,495.95 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED9C76932G12 0E | Blank Faceplates K0I 10G Shelf | 1 | $212.50 | $212.50 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED9C76932G2 | Basic Cable Kit 10G Shelf | 1 | $231.00 | $231.00 |
| VVVF1-0000003179 | 09/14/00 | K9421NT | ED8C76930G2E | WaveStar 2.5G Shelf e/w Cover | 0 | $4,590.00 | $0.00 |

B1568

Tab /

| WVF | Date | Code | Part No. | Description | Qty | Unit | Total |
|---|---|---|---|---|---|---|---|
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7893JG1 | Baffle | 1 | $123.50 | $123.50 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7892BG1 | 2.5G BASIC CABLE KIT | 0 | $231.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7892DG1 | Cable Kit for Connecting 2.5G (1 or 2) to 10G Shelf | 0 | $1,525.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7893JG20E | BLANK FACEPLATE KIT - 2.5G | 0 | $72.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7893JG1E | COMMON CIRCUIT PACKS - 2.5G | 0 | $13,141.85 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108733445 | LEY17E, DS-3EC1/8 | 0 | $4,250.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108733482 | LEY18E SWITCH DS3/EC1 | 0 | $1,200.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C28031G130E | DS3 Protn Ckt Pack Kit (incl (1) LEY17AE & (1) LEY8AE) | 0 | $5,270.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108730821 | LEY18AE OC-3 MEDIUM RANGE PORT UNIT | 0 | $6,992.70 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108730557 | LEY14AE OC-12 MEDIUM RANGE PORT UNIT | 0 | $7,727.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108735184 | LEY7AE OC-48 STM16 1.3 Long Range Port Unit | 0 | $8,242.45 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108735192 | LEY8AE OC-48 STM16 1.5 Long Range Port Unit | 0 | $12,273.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108734866 | LEY50AE - OC-48/STM16/DWDM01 | 0 | $20,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108734716 | LEY55AE - OC-48/STM16/DWDM05 | 0 | $20,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108617309 | LEY69E OC-192/STM64/1.5IR1 IR Port Unit w/ FEC (80 Km) | 2 | $40,000.00 | $80,000.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108734823 | LEY7E OC-192/STM64/1.5IR1 IR Port Unit (40 Km) | 0 | $35,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | J68974E1L136 | LBO set with SC (2 ea. 0, 1 ea for 5, 10, 15, 20 dB SM) | 2 | $99.00 | $198.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | J68974E1L137 | LBO set with SC (2 ea. of 0 & 15 dB SM) | 0 | $40.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108708951 | LBO, A3060, 0dB (SM-MM) | 0 | $15.50 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108440579 | LBO, ASCM5, 5dB (SM-MM) | 0 | $71.40 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108440595 | LBO, ASCM10, 10dB (SM-MM) | 0 | $71.40 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108440611 | LBO, ASCM15, 15dB (SM-MM) | 0 | $71.40 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108440637 | LBO, ASCM20, 20dB (SM-MM) | 0 | $71.40 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108847779 | Software Release 4.0 incl RTU | 1 | $19,800.00 | $19,800.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | 108847187 | Spare Software Release 4.0 | 1 | $375.00 | $375.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C7894G1 | Relase 3.0 Software CD-ROM and SRD | 0 | $15,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C60021G1 | Timing Cable 50 ft. | 0 | $23.38 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C60021G20 | Cable, Office Alarm, 50 ft. | 0 | $26.05 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C60021G30 | Cable, Miscellaneous Discretes, 50 ft. | 2 | $34.85 | $69.70 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C28028G65 | Power Feeders A & B, 6 AWG, 12 ft. (10G or 2.5G) | 1 | $429.25 | $429.25 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C28031G160 | DS3 Wing Panel (84054052) | 0 | $2,400.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K642NT | ED8C60020G2 | Cable Assy, DSX-3 to I/O of 2.5G, 2 per DS-3, 100 ft. | 0 | $52.00 | $0.00 |

B1569

| Order | Date | Code | Part Number | Description | Qty | Unit Price | Tab |
|---|---|---|---|---|---|---|---|
| WVF1-0000003179 | | K6421NT | ED6C90020GAA | 1 ST BNC Near End | 0 | $4.68 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6421NT | ED6C90020GLA | 1 ST BNC Far End (Loose) | 0 | $4.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6421NT | 109508288 | LS15C-SC-15 FIBER JUMPER | 4 | $33.00 | $132.00 |
| Site: 140 West St. - NY (10G Cole Ring) | | | | | | | |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76935G1E | 10G Bay e/w & (1) 2.5G Shelf w/ covers & baffles | 1 | $12,155.00 | $12,155.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76935G2E | 10G Bay e/w (1) 10G Shelf & (2) 2.5G Shelf w/ covers & baffles | 0 | $17,170.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76931G1E | WaveStar 10G HS Shelf w/ cover | 0 | $7,400.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76932G10 | Common Circuit Packs 10G Shelf | 1 | $22,496.95 | $22,496.95 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76932G12 0E | Blank Faceplates Kit 10G Shelf | 1 | $212.50 | $212.50 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76928G2 | Basic Cable Kit 10G Shelf | 1 | $231.00 | $231.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76930G2E | WaveStar 2.5G Shelf e/w Cover | 0 | $4,590.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76933G1 | Baffle | 0 | $123.50 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76928G1 | 2.5G BASIC CABLE KIT | 1 | $231.00 | $231.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76929G1 | Cable Kit for Connecting 2.5G (1 or 2) to 10G Shelf | 1 | $1,525.00 | $1,525.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76932G20 E | BLANK FACEPLATE KIT - 2.5G | 1 | $72.00 | $72.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C76933G1E | COMMON CIRCUIT PACKS - 2.5G | 1 | $13,141.85 | $13,141.85 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108733445 | LEY1TE, DS-3EC1/8 | 4 | $4,250.00 | $17,000.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108733452 | LEY1BE SWITCH DS3/EC1 | 1 | $1,200.00 | $1,200.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | ED6C28031G13 0E | DS3 Protn Ckt Pack Kit (incl (1) LEY1TAE & (1) LEY16AE) | 0 | $5,270.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108730921 | LEY16AE OC-3 MEDIUM RANGE PORT UNIT | 0 | $36,992.70 | $13,985.40 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108730557 | LEY14AE OC-12 MEDIUM RANGE PORT UNIT | 2 | $7,727.00 | $15,454.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108735184 | LEY7AE OC-48 STM16 1.3 Long Range Port Unit | 0 | $8,242.45 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108735192 | LEY8AE OC-48 STM16 1.5 Long Range Port Unit | 0 | $12,273.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108734686 | LEY50AE - OC-48/STM16/DWDM01 | 0 | $20,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108734716 | LEY55AE - OC-48/STM16/DWDM05 | 0 | $20,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108617309 | LEY96E OC-192/STM64/1.5IR1 IR Port Unit w/ FEC (60 Km) | 0 | $40,000.00 | $0.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | 108734023 | LEY97E OC-192/STM64/1.5IR1 IR Port Unit (40 Km) | 2 | $35,000.00 | $70,000.00 |
| WVF1-0000003179 | 09/14/00 | K6422NT | J5897I4E1L138 | LBO set with SC (2 ea. 0.1 ea for 5, 10, 15, 20 dB SM) | 14 | $68.00 | $952.00 |

Tab 1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WVF1-0000003179 | K6422NT | 09/14/00 | J68974E1L137 | LBO w/ext with SC (2 ea, of 0 & 16 dB SM) | 0 | $40.00 | $0.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 106708951 | LBO, A3080, 0dB (SM-MM) | 12 | $15.50 | $186.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108440579 | LBO, ASCM5, 5dB (SM-MM) | 12 | $71.40 | $856.80 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108440595 | LBO, ASCM10, 10dB (SM-MM) | 12 | $71.40 | $856.80 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108440611 | LBO, ASCM15, 15dB (SM-MM) | 12 | $71.40 | $856.80 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108440637 | LBO, ASCM20, 20dB (SM-MM) | 12 | $71.40 | $856.80 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108847179 | Software Release 4.0 incl RTU | 2 | $19,800.00 | $39,600.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 108847187 | Spare Software Release 4.0 | 2 | $75.00 | $150.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C078941G1 | Release 3.0 Software CD-ROM and SRD | 0 | $15,000.00 | $0.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C90021G1 | Timing Cable 50 ft. | 0 | $23.38 | $0.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C90021G20 | Cable, Office Alarm, 50 ft. | 0 | $28.05 | $0.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C90021G30 | Cable, Miscellaneous Discretes, 50 ft. | 4 | $34.85 | $139.40 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C28028G65 | Power Feeders A & B, 6 AWG, 12 ft. (10G or 2.5G) | 2 | $429.25 | $858.50 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C28031G16 0 | DS3 Wing Panel (84054G652) | 1 | $2,400.00 | $2,400.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C90020G27 | Cable Assy, DSX3 to I/O of 2.5G, 2 per DS-3, 50 ft. | 95 | $30.40 | $2,918.40 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C90020GAA | 1 ST BNC Near End | 95 | $8.80 | $844.80 |
| WVF1-0000003179 | K6422NT | 09/14/00 | E08C80020GLA | 1 ST BNC Far End (Loose) | 96 | $4.00 | $384.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 107489080 | DX3-3-R1-24/7-DS3, 24 Ckt Panel | 4 | $5,200.00 | $20,800.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 106782815 | DSX24P2B-06-8NG, 6 FT. Cross Connect cord | 24 | $87.00 | $2,088.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 107228512 | Test and Loopback Cord, Starter Kit - Small | 1 | $1,260.00 | $1,260.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 107533569 | LGX SHELF-LSTIU1-1449 | 1 | $315.00 | $315.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 104384480 | Cable Clamp 12A1 | 6 | $24.00 | $144.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 104223060 | D161268 Ribbon Blocking Kit | 6 | $31.00 | $186.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 105338999 | LG Splice Organizer LT1A-F/F | 6 | $25.00 | $150.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 107719049 | 1209SG1-12EW (ww-12.5C couplings) | 12 | $66.00 | $792.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 106908282 | L51SC-SC-05 FIBER JUMPER | 24 | $32.00 | $768.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 106908270 | L51SC-SC-10 FIBER JUMPER | 4 | $33.00 | $132.00 |
| WVF1-0000003179 | K6422NT | 09/14/00 | 106908288 | L51SC-SC-15 FIBER JUMPER | 24 | $33.00 | $792.00 |
| **Site: 275 7th Ave., New York** | | | | | | | |
| WVF1-0000002157 | J4610NT | 08/01/00 | 107533569 | LGX SHELF-L-STIU1-1449 | 1 | $315.00 | $315.00 |
| WVF1-0000002157 | J4610NT | 08/01/00 | 104384480 | Cable Clamp 12A1 | 6 | $24.00 | $144.00 |

B1571

Tab 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WVF1-0000002157 | 08/10/00 | J461ONT | 104223060 | D181268 Ribbon Blocking Kit | 6 | $31.00 | $186.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 105336899 | LG Splice Organizer LT1A-FF | 6 | $25.00 | $150.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 107719049 | 1200SC1-12EAV (e/w 12 SC couplings) | 12 | $66.00 | $792.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 108908270 | LS1SC-SC-10 FIBER JUMPER | 4 | $33.00 | $132.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 107671000 | ML1SC-SC-05 | 4 | $32.00 | $128.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 108908395 | LS1SC-SC-100 FIBER JUMPER | 12 | $106.00 | $1,272.00 |
| WVF1-0000002157 | 08/10/00 | J461ONT | 107671109 | ML1SC-SC-75 | 8 | $93.00 | $744.00 |

Total    $1,013,717.12.

B1572

Tab

Secured Claim Invoice Number WVFI-101601-2

Bill To: WVFI-LLC

| | Location | PO Number | PO Date | Amount |
|---|---|---|---|---|
| Detroit (2 SMs) | 21280 Melrose Ave., Southfield, MI 48075 | VNE000004454 | 12/14/99 | $ 1,157,904.00 |
| Houston (2 SMs) | 333 Clay Street, Houston, TX 77002-4000 | VNE000005609 | 03/27/00 | $ 1,157,904.00 |
| Minneapolis (2 SMs) | 608 Second Ave. - South, Minneapolis, MN 55415 | VNE000004371 | 12/08/99 | $ 1,162,489.40 |
| Miami (1 SM) | 150 SE 2nd Ave., Miami, FL 33131 | VNE000005105 | 02/24/00 | $ 581,098.06 |
| Portland | 8132 NE 112th Ave., Portland, OR 97220-1013 | VVFI-0000001213 | 06/30/00 | $ 2,083,200.00 |
| San Fran. (#2) (3 SMs) | 200 Paul Ave., San Francisco, CA 94105 | VVFI-0000002782 | 08/30/00 | $ 1,744,993.00 |
| Buffalo | 50 Fountain Plaza, Buffalo, NY 14202-2212 | VNE000002024 | 08/07/99 | $ 2,083,200.00 |

Total    $    9,970,788.46

B1573

Tab A.5

## Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | AK | SECRETARY OF STATE | 6/19/2000 | 482386 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | AL | SECRETARY OF STATE | 6/16/2000 | B2000-24609 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | AR | SECRETARY OF STATE | 6/16/2000 | 124843 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | AZ | SECRETARY OF STATE | 6/16/2000 | 1121874 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | AZ | MARICOPA | 6/16/2000 | 00-0-160046 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | CA | SECRETARY OF STATE | 6/16/2000 | 17260131 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | CO | SECRETARY OF STATE | 6/16/2000 | 20002055626 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | CT | SECRETARY OF STATE | 6/19/2000 | 2004895 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | DC | SECRETARY OF STATE | 6/20/2000 | 2000057462 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | DE | SECRETARY OF STATE | 6/19/2000 | 38324 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | DE | SECRETARY OF STATE | 7/11/2000 | 43441 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | FL | SECRETARY OF STATE | 6/16/2000 | 200000140342 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | GA | COBB | 6/21/2000 | 33200008647 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | GA | DE KALB | 6/21/2000 | 44200005237 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | GA | FULTON | 6/16/2000 | 6020001341 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | GA | GWINNETT | 6/21/2000 | 6782 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | HI | SECRETARY OF STATE | 6/20/2000 | 2000-084279 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | IA | SECRETARY OF STATE | 6/16/2000 | P111550 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | ID | SECRETARY OF STATE | 6/16/2000 | B-873094 |
| 1 | WVF-1 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | IL | SECRETARY OF STATE | 6/27/2000 | 4223359 |

CI: 6342154

Summary of UCC    Filing Statements

ˮb A.5

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | IN | SECRETARY OF STATE | 6/19/2000 | 2331444 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | KS | SECRETARY OF STATE | 6/19/2000 | 3727690 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | KY | SECRETARY OF STATE | 6/16/2000 | 1603816 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | LA | JEFFERSON | 6/29/2000 | 26245536 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | LA | ORLEANS | 6/16/2000 | 36-149029 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | SECRETARY OF STATE | 6/16/2000 | 723960 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BOSTON | 6/26/2000 | 426443 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BOSTON CITY | 6/19/2000 | 426263 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BURLINGTON | 6/26/2000 | 398 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | MANSFIELD | 6/27/2000 | 136-00 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MD | SECRETARY OF STATE | 6/19/2000 | 181049885 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | ME | SECRETARY OF STATE | 6/16/2000 | 1368723 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MI | SECRETARY OF STATE | 6/16/2000 | 14696C |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MN | SECRETARY OF STATE | 6/16/2000 | 2236862 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | SECRETARY OF STATE | 6/16/2000 | 4058409 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | JACKSON | 6/16/2000 | 2000004424078 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | ST. LOUIS | 6/26/2000 | 200008006 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MS | SECRETARY OF STATE | 6/16/2000 | 1440594 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MT | SECRETARY OF STATE | 6/19/2000 | 60040282 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NC | SECRETARY OF STATE | 6/16/2000 | 200000061209 |

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NC | MECKLENBURG | 6/19/2000 | 20005418 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | ND | SECRETARY OF STATE | 6/16/2000 | 949158 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NE | SECRETARY OF STATE | 6/16/2000 | 9900063540 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NH | SECRETARY OF STATE | 6/21/2000 | 562377 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NJ | SECRETARY OF STATE | 6/15/2000 | 1981526 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NM | SECRETARY OF STATE | 6/15/2000 | 616033 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NV | SECRETARY OF STATE | 6/15/2000 | 9341 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | SECRETARY OF STATE | 6/15/2000 | 119059 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | SECRETARY OF STATE | 7/11/2000 | 134993 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | DUTCHESS | 8/21/2000 | 00-2201 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | ERIE | 6/26/2000 | 795741 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | KINGS | 6/22/2000 | 00PK08557 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | NY | NEW YORK | 6/21/2000 | 00PN30843 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OH | SECRETARY OF STATE | 6/19/2000 | AP0245892 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OH | CUYAHOGA | 6/21/2000 | 2000062191 04 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OH | FRANKLIN | 6/16/2000 | 2000061601 9447 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OH | HAMILTON | 6/29/2000 | 0-98950 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OK | OKLAHOMA | 6/16/2000 | 33113 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | OR | SECRETARY OF STATE | 6/16/2000 | 516058 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | PA | SECRETARY OF STATE | 6/19/2000 | 31750680 |

CL-624213v1

B1576

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | PA | ALLEGHENY | 6/21/2000 | 00-4300 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | PA | PHILADELPHIA | 6/20/2000 | 3069 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | RI | SECRETARY OF STATE | 6/16/2000 | 714041 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | SC | SECRETARY OF STATE | 6/19/2000 | 000619-124522A |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | SD | SECRETARY OF STATE | 6/19/2000 | 1711000723 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | TX | SECRETARY OF STATE | 6/19/2000 | 00-521418 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | UT | SECRETARY OF STATE | 6/19/2000 | 00-683058 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | VA | SECRETARY OF STATE | 6/21/2000 | 6197804 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | VA | ARLINGTON | 6/21/2000 | 62714 B0000179 PO1869 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | VA | FAIRFAX | 6/21/2000 | 00-006901 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | VA | NEWPORT NEWS | 6/21/2000 | 11640 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | VT | SECRETARY OF STATE | 6/19/2000 | 00-126144 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | WA | SECRETARY OF STATE | 6/19/2000 | 2000-171-0211 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | WI | SECRETARY OF STATE | 6/19/2000 | 1966871 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | WV | SECRETARY OF STATE | 6/19/2000 | 541871 |
| 1 | WVP-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | WY | SECRETARY OF STATE | 6/19/2000 | 00-171141803 |
| 1 | WVP-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AK | SECRETARY OF STATE | 1/4/2001 | 491279 |
| 1 | WVP-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AL | SECRETARY OF STATE | 1/4/2001 | 2001-00475 PS |
| 1 | WVP-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AR | SECRETARY OF STATE | 1/4/2001 | 1280218 |
| 1 | WVP-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AZ | SECRETARY OF STATE | 1/4/2001 | 1155419 |

CL: 62421.5v1

B1577

Ib.A.5

Summary of UCC   Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AZ | MARICOPA | 1/4/2001 | 2001-0007943 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CA | SECRETARY OF STATE | 1/4/2001 | 100961014 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CO | SECRETARY OF STATE | 1/4/2001 | 20012000781 (COPY TO FOLLOW) |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CT | SECRETARY OF STATE | 1/4/2001 | 2043818 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | DC | SECRETARY OF STATE | 1/4/2001 | 2001001221 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | DE | SECRETARY OF STATE | 1/4/2001 | 10010806 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | FL | SECRETARY OF STATE | 1/4/2001 | 200100003129-0 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | COBB | 1/4/2001 | 33200100238 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | DEKALB | 1/4/2001 | 442001000116 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | FULTON | 1/4/2001 | 6020010241 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | GWINNETT SECRETARY OF STATE | 1/4/2001 | 184 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | HI | SECRETARY OF STATE | 1/9/2001 | 2001-061159 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IA | SECRETARY OF STATE | 1/4/2001 | P154817 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | ID | SECRETARY OF STATE | 1/4/2001 | B-890038 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IL | SECRETARY OF STATE | 1/12/2001 | 4321540 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IN | SECRETARY OF STATE | 1/4/2001 | 2367297 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | KS | SECRETARY OF STATE | 1/4/2001 | 4310025 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | KY | SECRETARY OF STATE | 1/4/2001 | 1606230 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | LA | JEFFERSON | 1/4/2001 | 26251026 |

B1578

Vb A.5

## Summary of UCC     Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | LA | ORLEANS | 1/4/2001 | 36-154927 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BOSTON | 1/5/2001 | 430797 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BOSTON | 1/4/2001 | 430785 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BURLINGTON | 1/4/2001 | 4 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | SECRETARY OF STATE | 1/4/2001 | 766592 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | MANSFIELD | 1/5/2001 | 36892 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MD | SECRETARY OF STATE | 1/4/2001 | 18109974 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-416066 | ME | SECRETARY OF STATE | 1/4/2001 | 1394384 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MI | SECRETARY OF STATE | 1/4/2001 | 20430C |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MN | SECRETARY OF STATE | 1/4/2001 | 2287451 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | SECRETARY OF STATE | 1/4/2001 | 4120431 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | JACKSON | 1/4/2001 | 2001J0430421 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | ST. LOUIS CITY | 1/5/2001 | 200100255 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MS | SECRETARY OF STATE | 1/4/2001 | 1489753 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MT | SECRETARY OF STATE | 1/4/2001 | 62339043 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | SECRETARY OF STATE | 1/5/2001 | 20010001594 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | SECRETARY OF STATE | 1/5/2001 | 20010001594 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | MECKLENBURG | 1/5/2001 | 200111718 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4145066 | ND | SECRETARY OF STATE | 1/4/2001 | 01-000986184 |
| 1 | WVF-LUZLLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NE | SECRETARY OF STATE | 1/4/2001 | 9900110515 |

Summary of UCC          Filing Characteristics

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NH | SECRETARY OF STATE | 1/4/2001 | 573421 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NJ | SECRETARY OF STATE | 1/4/2001 | 2016518 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NM | SECRETARY OF STATE | 1/5/2001 | 10105924 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | DUTCHESS | 1/4/2001 | 2713 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | DUTCHESS | 1/4/2001 | 34 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | ERIE | 1/5/2001 | 087-1322 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | KINGS | 1/4/2001 | 01PK00151 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | NEW YORK | 1/5/2001 | 01PN00689 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NV | SECRETARY OF STATE | 1/4/2001 | 100223 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | SECRETARY OF STATE | 1/5/2001 | AP306060 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | CUYAHOGA | 1/4/2001 | 200101049082 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | FRANKLIN | 1/4/2001 | 20010104000S2968 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | HAMILTON | 1/8/2001 | 632968 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OK | OKLAHOMA | 1/4/2001 | 537548 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146065 | OR | SECRETARY OF STATE | 1/4/2001 | 537546 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | ALLEGHENY | 1/4/2001 | UCC-01-43 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | PHILADELPHIA | 1/9/2001 | 10113 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | SECRETARY OF STATE | 1/4/2001 | 33461186 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | RI | SECRETARY OF STATE | 1/4/2001 | 722899 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | SC | SECRETARY OF STATE | 1/5/2001 | 085109A |

CL-6242159-1

Page 7 of 14

B1580

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | SD | SECRETARY OF STATE | 1/4/2001 | 10040901695 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | TX | SECRETARY OF STATE | 1/4/2001 | 01-001236 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | UT | SECRETARY OF STATE | 1/4/2001 | 01-702771 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | UT | SECRETARY OF STATE | 1/4/2001 | 01-702771 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | ARLINGTON | 1/4/2001 | 63659 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | SECRETARY OF STATE | 1/4/2001 | 01-01-04-7817 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | FAIRFAX | 1/8/2001 | 01-000152 (COPY TO FOLLOW) |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | NEWPORT NEWS | 1/9/2001 | 12177 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VT | SECRETARY OF STATE | 1/4/2001 | 01-133687 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WA | SECRETARY OF STATE | 1/4/2001 | 2001-004-0339 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WI | SECRETARY OF STATE | 1/4/2001 | 2023277 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WV | SECRETARY OF STATE | 1/4/2001 | 552988 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WV | SECRETARY OF STATE | 1/4/2001 | 200100413-1A03 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AK | SECRETARY OF STATE | 6/16/2000 | 462268 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AL | SECRETARY OF STATE | 6/16/2000 | B2000-24611 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AR | SECRETARY OF STATE | 6/19/2000 | 12500004 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | SECRETARY OF STATE | 6/19/2000 | 1122358 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | MARICOPA | 6/19/2000 | 00-0463881 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CA | SECRETARY OF STATE | 6/19/2000 | 17360580 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CO | SECRETARY OF STATE | 6/19/2000 | 20002056034 |

Ex A 5

Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CT | SECRETARY OF STATE | 6/19/2000 | 2004899 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DC | SECRETARY OF STATE | 6/20/2000 | 2000057454 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DE | SECRETARY OF STATE | 6/19/2000 | 38321 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | FL | SECRETARY OF STATE | 6/19/2000 | 200000141978-5 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | COBB | 6/21/2000 | 3320008648 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | DEKALB | 6/28/2000 | 44200005390 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | FULTON | 6/20/2000 | 6020011446 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | GWINNETT | 6/21/2000 | 67-2000006781 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | HI | SECRETARY OF STATE | 6/20/2000 | 2000-084280 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IA | SECRETARY OF STATE | 6/19/2000 | P111801 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ID | SECRETARY OF STATE | 6/19/2000 | B673292 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IL | SECRETARY OF STATE | 6/29/2000 | 4225685 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IN | SECRETARY OF STATE | 6/19/2000 | 2331445 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KS | SECRETARY OF STATE | 6/19/2000 | 3725868 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KY | SECRETARY OF STATE | 6/19/2000 | 1603834 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | JEFFERSON | 6/29/2000 | 26245537 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | ORLEANS | 6/19/2000 | 36-149069 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | SECRETARY OF STATE | 6/19/2000 | 724289 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 6/19/2000 | 426264 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 6/26/2000 | 426442 |

CL 63421591

Page 9 of 14

B1582

Summary of UC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BURLINGTON | 6/26/2000 | 399 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | MANSFIELD | 6/23/2000 | 133-00 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MD | SECRETARY OF STATE | 6/16/2000 | 181049593 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ME | SECRETARY OF STATE | 6/19/2000 | 1369076 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MI | SECRETARY OF STATE | 6/19/2000 | 14743C |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MN | SECRETARY OF STATE | 6/19/2000 | 2237375 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | SECRETARY OF STATE | 6/19/2000 | 4058868 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | JACKSON | 6/19/2000 | 2000T0424100 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | ST. LOUIS | 6/26/2000 | 200008009 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MS | SECRETARY OF STATE | 6/19/2000 | 1441212 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MT | SECRETARY OF STATE | 6/19/2000 | 60048260 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | SECRETARY OF STATE | 6/19/2000 | 20000061572 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | MECKLENBURG | 6/19/2000 | 20005460 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ND | SECRETARY OF STATE | 6/16/2000 | 949153 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NE | SECRETARY OF STATE | 6/19/2000 | 9900064014 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NH | SECRETARY OF STATE | 6/21/2000 | 562378 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NJ | SECRETARY OF STATE | 6/19/2000 | 1981670 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NM | SECRETARY OF STATE | 6/16/2000 | 616034 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NV | SECRETARY OF STATE | 6/19/2000 | 9444 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | SECRETARY OF STATE | 6/19/2000 | 120282 |

CL-624215v1

B1583

Tab A.5

## Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | DUTCHESS | 6/21/2000 | 2200 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | ERIE | 6/26/2000 | Q795739 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | KINGS | 6/22/2000 | 00PK08558 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | NEW YORK SECRETARY OF STATE | 6/21/2000 | 00PN30844 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | CUYAHOGA | 6/19/2000 | AP0248593 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | CUYAHOGA | 6/21/2000 | 200006219103 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | FRANKLIN | 6/16/2000 | 200006160119449 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | HAMILTON | 6/29/2000 | 0-9894B |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OK | OKLAHOMA SECRETARY OF STATE | 6/19/2000 | 33443 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OR | SECRETARY OF STATE | 6/19/2000 | 516188 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | SECRETARY OF STATE | 6/19/2000 | 31750679 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | ALLEGHENY | 6/21/2000 | 004-4297 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | PHILADELPHIA | 6/20/2000 | 3070 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | RI | SECRETARY OF STATE | 6/19/2000 | 714130 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | SC | SECRETARY OF STATE | 6/19/2000 | 000619-124510A |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | SD | SECRETARY OF STATE | 6/19/2000 | 1711000722 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | TX | SECRETARY OF STATE | 6/19/2000 | 00-521416 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | UT | SECRETARY OF STATE | 6/19/2000 | 00-483052 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | SECRETARY OF STATE | 6/21/2000 | 6197803 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | ARLINGTON | 6/21/2000 | 62713 B00000179PD1867 |

B1584

Tab A.5

## Summary of UC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | FAIRFAX | 6/27/2000 | 00-006900 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | NEWPORT NEWS | 6/21/2000 | 11639 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VT | SECRETARY OF STATE | 6/19/2000 | 00-126143 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WA | SECRETARY OF STATE | 6/16/2000 | 2000-168-0264 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WI | SECRETARY OF STATE | 6/16/2000 | 1986776 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WV | SECRETARY OF STATE | 6/16/2000 | 541772 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WY | SECRETARY OF STATE | 6/16/2000 | 200015815 1802 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AK | SECRETARY OF STATE | 1/4/2001 | 491280 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AL | SECRETARY OF STATE | 1/4/2001 | 2001-0076 FS |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AR | SECRETARY OF STATE | 1/4/2001 | 01280219 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | SECRETARY OF STATE | 1/4/2001 | 01155418 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | MARICOPA | 1/4/2001 | 2001-0007944 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CA | SECRETARY OF STATE | 1/4/2001 | 0100960957 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CO | SECRETARY OF STATE | 1/4/2001 | 20012000780 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CT | SECRETARY OF STATE | 1/4/2001 | 2043819 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DC | SECRETARY OF STATE | 1/4/2001 | 20091001213 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DE | SECRETARY OF STATE | 1/4/2001 | 1001079 B |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | FL | SECRETARY OF STATE | 1/4/2001 | 200100003130-B |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | COBB | 1/4/2001 | 033200100239 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | DEKALB | 1/17/2001 | 442001000457 |

B1585

Tab A.5

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | FULTON | 1/4/2001 | 060200100240 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | GWINNETT | 1/4/2001 | 000183 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | HI | SECRETARY OF STATE | 1/9/2001 | 2001-003160 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IA | SECRETARY OF STATE | 1/4/2001 | P154816 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ID | SECRETARY OF STATE | 1/4/2001 | 890039 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IL | SECRETARY OF STATE | 1/12/2001 | 4321541 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IN | SECRETARY OF STATE | 1/4/2001 | 2367298 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KS | SECRETARY OF STATE | 1/4/2001 | 4310017 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KY | SECRETARY OF STATE | 1/4/2001 | 1606231 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | JEFFERSON | 1/4/2001 | 701062 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | ORLEANS | 1/4/2001 | 36-154929 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 1/5/2001 | 430797 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 1/4/2001 | 430784 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BURLINGTON | 1/4/2001 | 3 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | SECRETARY OF STATE | 1/4/2001 | 768591 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | MANSFIELD | 1/5/2001 | 2-01 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MD | SECRETARY OF STATE | 1/4/2001 | 181069975 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ME | SECRETARY OF STATE | | PENDING |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MI | SECRETARY OF STATE | 1/4/2001 | 20427C |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MN | SECRETARY OF STATE | 1/4/2001 | 2287453 |

CL-624215v1

B1586

eb.A.5

## Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | SECRETARY OF STATE | 1/4/2001 | 4120430 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | JACKSON | 1/4/2001 | 200100430422 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | ST. LOUIS CITY | 1/5/2001 | 200100256 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MS | SECRETARY OF STATE | 1/4/2001 | 01489754 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MT | SECRETARY OF STATE | 1/4/2001 | 62392911 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | SECRETARY OF STATE | 1/5/2001 | 200100001593 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | MECKLENBURG | 1/5/2001 | 200111717 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ND | SECRETARY OF STATE | 1/4/2001 | 0100986189 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NE | SECRETARY OF STATE | 1/4/2001 | 9901106516 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NH | SECRETARY OF STATE | 1/4/2001 | 573422 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NJ | SECRETARY OF STATE | 1/4/2001 | 2016520 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NM | SECRETARY OF STATE | 1/5/2001 | 010105025 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NV | SECRETARY OF STATE | 1/4/2001 | 0100222 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | SECRETARY OF STATE | 1/4/2001 | 002727 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | DUTCHESS | 1/4/2001 | 1-0033 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | ERIE | 1/5/2001 | Q87-1314 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | KINGS | 1/4/2001 | 01PK00150 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | NEW YORK | 1/5/2001 | 01PN00690 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | SECRETARY OF STATE | 1/5/2001 | AP306061 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | CUYAHOGA | 1/4/2001 | 200101049081 |

CL: 6242150

B1587

## Exhibit B

### Description of Collateral

Pursuant to the Lucent Security Agreements,[1] Lucent was granted a security interest in all of the Grantors' (as such term is defined in the Lucent Security Agreements) right, title and interest in, to and under the "Collateral," which is defined as follows:

- *"Collateral"* shall mean all (i) Equipment, (ii) General Intangibles (but excluding General Intangibles to the extent that an assignment thereof would violate a restriction on assignment contained therein) and (iii) Proceeds.

For purposes of this definition of the Collateral, capitalized terms have the following meanings:

- *"Equipment"* shall mean all equipment, furniture and furnishings, and all tangible personal property similar to any of the foregoing, including tools, parts and supplies of every kind and description, and all improvements, accessions or appurtenances thereto, in each case that are now owned or hereafter acquired by the Grantors. The term Equipment shall also include Fixtures.

- *"Fixtures"* shall mean all items of Equipment, whether now owned or hereafter acquired, of the Grantor that become so related to particular real estate that an interest in them arises under any real estate law applicable thereto.

- *"General Intangibles"* shall mean all choses in action and causes of action and all other assignable intangible personal property of the Grantors of every kind and nature now owned or hereafter acquired by the Grantors, including the Grantors' rights under the Lucent Supply Agreement and all intellectual property acquired by or granted to the Grantors pursuant to the Lucent Supply Agreement.

- *"Proceeds"* shall mean any consideration received from the sale, exchange, license, lease or other disposition of any asset which constitutes Collateral, including any payment received from any insurer or other person as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset which constitutes Collateral, and shall include any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

The Collateral includes the Equipment subject to the invoices set forth at Tab A.3 and Tab A.4.

---

[1] See Lucent Security Agreement § 1.02. The description of the Collateral set forth herein is intended as a summary of the provisions of the Lucent Security Agreements and should not be interpreted to alter or amend the Lucent Security Agreements in any respect.

FORM B10 (Official For 10) (4/01)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | | PROOF OF CLAIM |
|---|---|---|
| Name of Debtor: Winstar Communications, Inc. | Case Number: 01-01430 (JJF) | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "report" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): Lucent Technologies Inc. and its affiliates | ☐ Check be anyone e claim reb Attach co particular |
|---|---|

FROM USBC - DISTRICT OF DELAWARE
WINSTAR COMMUNICATION, ET AL
01-1430 (JJF)        0000002019

| Name and address where notices should be sent:
Lucent Technologies Inc.
Attn: Thomas M. O'Hara, Esq.
600-700 Mountain Ave.
Murray Hill, N.J. 07974-0636
Telephone number: (908)582-8500 | Jones Day, Reavis & Pogue
Attn: Richard M. Cieri, Esq.
North Point, 901 Lakeside Ave.
Cleveland, Ohio 44114-1190
(216)586-3939 | ☐ Check bo bankruptcy court in this case.
X Check box if the address differs from the address on the envelope sent to you by the court. |
|---|---|---|

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identified debtor:
See Exhibit A | Check here
if this claim    ☐ replaces        a previously filed claim, dated:_____
☐ amends |
|---|---|

| 1. Basis for Claim
X   Goods sold
X   Services performed
X   Money loaned (and related claims)
☐   Personal injury/wrongful death
☐   Taxes
X   Other: (See Exhibit A) | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
    Your SS #: ___ ___ ___
    Unpaid compensation for services performed
    from _____ to _____
              (date)              (date) |
|---|---|

| 2. Date debt was incurred: 5/4/2000 | 3. If court judgment, date obtained: |
|---|---|

**4. Total Amount of Claim at Time Case Filed:**  An amount not less than $799,060,307.68, plus certain unliquidated amounts (an itemized statement of this claim is attached hereto as Exhibit A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
X   Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. Secured Claim.
X   Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
    X Other  See Exhibit B
Value of Collateral:    In excess of dollar amount of claims.

Amount of arrearage and other charges at time case filed included in secured claims if any:  An amount not less than $766,489,553.80, plus certain unliquidated amounts. | 6. Unsecured Priority Claim.
☐  Check this box if you have an unsecured priority claim
    Amount entitled to priority $_____
    Specify the priority of the claim:
☐  Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
☐  Contribution to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐  Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6).
☐  Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐  Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
☐  Other – Specify applicable paragraph of 11 U.S.C. § 507(a) (___)
    *Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |
|---|---|

7.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8.  **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

9.  **Date-Stamped Copy:** To received an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED

OCT 15 2001

BANKRUPTCY SERVICES, LLC

| Date
10/11/01 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any). On behalf of Lucent Technologies Inc. and its affiliates:
*Lucinda Sodrian, Managing Director* |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

PLAINTIFF'S EXHIBIT
PX - 342

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

— DEFINITIONS —

**Debtor**

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

**Secured Claim**

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*.)

**Unsecured Claim**

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims*.

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt; if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly described the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:**
Fill in the date when the debt first was owned by the debtor.

3. **Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Total Amount of Claim at Time Case Filed:**
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Secured Claim:**
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

6. **Unsecured Priority Claim**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

7. **Credits:**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

8. **Supporting Documents:**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

B1590

## Exhibit A

### Summary of Secured Claim of
### Lucent Technologies Inc. (collectively with its affiliates, "Lucent")
### Relating to the Lucent Credit Agreement

I.    Summary of Claim

Prior to the date of the Debtor's bankruptcy filing, Lucent sold equipment and services to the Debtor and certain of its affiliates pursuant to the Lucent Supply Agreement (as such term is defined herein). The Debtor and its affiliates financed their purchases of equipment and services from Lucent, as well as their purchases of certain equipment and services from third-party vendors, pursuant to the Lucent Credit Agreement (as such term is defined herein). The secured claim asserted by Lucent herein arises under or relates to, among other things, the Lucent Credit Agreement and related documents and agreements, including the Lucent Supply Agreement, the Lucent Security Agreements, the Lucent Cash Collateral Agreements, the Lucent Guarantee Agreement, the Lucent Pledge Agreement (as such terms are defined herein) and certain UCC-1 Financing Statements.[1] A breakdown of this secured claim is set forth at **Tab A.1**.[2]

II.    Supporting Documentation

A summary of the documents supporting Lucent's secured claim is set forth at **Tab A.2**.

---

[1]    Lucent was granted certain rights and remedies under the Lucent Credit Agreement. For instance, Lucent had the right to convert certain loans extended under the Lucent Credit Agreement to senior notes to be issued by Debtor Winstar Communications, Inc. ("WCI"), pursuant to the Conversion Agreement executed between WCI and Lucent and the related indenture. Lucent hereby specifically reserves its rights in the future to assert and pursue its rights and remedies under the Lucent Credit Agreement and any and all related documents and agreements and to amend, modify or supplement this proof of claim to the extent necessary to assert such rights and remedies.

[2]    The Debtors currently have possession of certain lab equipment in which Lucent holds all title, interests and rights; accordingly, the Debtors' estates do not have any interest in or right to the lab equipment. The lab equipment is described on Exhibit A to the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts (the "Stipulation and Agreed Order"), filed by the Debtors and Lucent on or about October 3, 2001. To the extent that the Debtors fail to turn over the lab equipment to Lucent, Lucent hereby reserves its rights to assert claims against the Debtors relating to the lab equipment and to amend, modify or supplement this proof of claim to incorporate such claims.

CL:  620013v5

III.    Detailed Information Supporting Claim

    A.    A summary of Lucent's claims under the Lucent Credit Agreement and related documents is set forth at **Tab A.3.**

    B.    A summary of the borrowing requests submitted under the Lucent Credit Agreement is set forth at **Tab A.4.**

    C.    A chart summarizing the UCC-1 Financing Statements filed by or on behalf of Lucent in connection with the Lucent Credit Agreement, the Lucent Security Agreements, the Lucent Cash Collateral Agreements and the Lucent Pledge Agreement is set forth at **Tab A.5.**

IV.    Reservation of Rights

    A.    Lucent has used its best efforts in preparing this proof of claim based on the information currently available to it.  To the extent that additional information becomes available or other claims come to its attention, Lucent hereby reserves its rights to amend, modify or supplement this proof of claim.

    B.    In addition to the documents and information provided herein to support Lucent's secured claim, Lucent also relies upon applicable law, including applicable federal, state and common law, and hereby reserves all of its rights thereunder.

B1592

Tab A.1

**Breakdown of Lucent's Secured Claim
Under the Lucent Credit Agreement**

| Basis of Claim | Relevant Section of Lucent Credit Agreement | Amount |
|---|---|---|
| Principal | 2.01, 2.02 | $736,919,626.31 |
| Interest | 2.11, 2.12 | $47,471,506.32 |
| Fees | 2.10 | $10,208,734.32 |
| Expenses | 9.03(a) | $4,460,440.73 |
| Indemnity[1] | 9.03(b) | Unliquidated |
| Other Fees, Costs and Charges Due Under Lucent Credit Agreement[2] | | Unliquidated |
| TOTAL[3] | | $799,060,307.68 |

---

[1]   Although the amount of Lucent's indemnity claims under the Lucent Credit Agreement is not known at this time, Lucent hereby specifically reserves its rights to assert such claims and to amend, modify or supplement this proof of claim to reflect the amount of such claims.

[2]   Although the amount of additional fees, costs and other charges due under the Lucent Credit Agreement is not known at this time, Lucent hereby specifically reserves its rights to assert such claims and to amend, modify or supplement this proof of claim to reflect the amount of such claims.

[3]   On or about October 3, 2001, the Debtors and Lucent executed and filed the Stipulation and Agreed Order. The Stipulation and Agreed Order resolves, among other things, the parties' respective interests in and rights to certain Accounts (as such term is defined in Exhibit B attached hereto) and permits Lucent to apply a portion of the proceeds of the Accounts towards the payment of Lucent's secured claim against certain of the Debtors. As of the date of this proof of claim, however, the Stipulation and Agreed Order has not yet been entered by the Court. Accordingly, Lucent has not yet received or applied the proceeds of the Accounts to reduce its secured claim against certain of the Debtors.

CL: 620013v5

B1593

## Summary of Supporting Documentation

Because of the voluminous nature of the supporting documents, Lucent has not attached copies of such documents hereto. Lucent, however, will provide copies of the Supporting Documents to any party in interest (i) upon request to its counsel, Jones, Day, Reavis & Pogue, and (ii) subject to appropriate confidentiality restrictions acceptable to Lucent. Lucent believes that the Debtor has copies of all of the documents listed below.

Supporting Documents:

- Credit Agreement, dated May 4, 2000, among WVF-I LLC, Winstar Communications, Inc., The Bank of New York and Lucent Technologies Inc. (as amended and collectively with any schedules and exhibits thereto, the "Lucent Credit Agreement"), any amendments thereto and any and all related documents and agreements.

- First Amendment to the Lucent Credit Agreement, dated June 23, 2000, among WVF-I LLC, Winstar Communications, Inc., The Bank of New York and Lucent Technologies Inc.

- Acknowledgment, dated June 20, 2000, among WVF-I LLC, Winstar Network Expansion, LLC, Winstar Communications, Inc., Lucent Technologies Inc. and The Bank of New York, as Administrative Agent and Collateral Agent for the lenders under that certain Revolving Credit and Term Loan Agreement, dated May 4, 2000.

- Acknowledgment, dated December 22, 2000, among WVF-LU2 LLC, Winstar Network Expansion, LLC, Winstar Communications, Inc., Lucent Technologies Inc. and The Bank of New York, as Administrative Agent and Collateral Agent for the lenders under that certain Revolving Credit and Term Loan Agreement, dated May 4, 2000.

- Cash Account Security Agreement, dated June 23, 2000, between WVF-I LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (the "WVF-I Cash Collateral Agreement").

- Cash Account Security Agreement, dated December 22, 2000, between WVF-LU2 LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (collectively with the WVF-I Cash Collateral Agreement, the "Lucent Cash Collateral Agreements").

- Equipment User Agreement, dated May 23, 2000, among WVF-I LLC, Winstar Wireless, Inc., Lucent Technologies Inc., as Administrative Agent and The Bank of New York, as Collateral Agent for the benefit of Lucent.

CL: 620013v5

Summary of Supporting Documentation
Continued . . . .

- Guarantee Agreement, dated May 9, 2000, among Winstar Communications, Inc., WCI Capital Corp., and Lucent Technologies Inc., as Administrative Agent.

- Investment Intermediary Acknowledgments and Disbursing Bank Acknowledgments, dated June 23, 2000, among WVF-I LLC, The Bank of New York, as Collateral Agent for the benefit of Lucent, and Fleet National Bank and State Street Bank & Trust Company, respectively (collectively, the "WVF-I Acknowledgments").

- Investment Intermediary Acknowledgments and Disbursing Bank Acknowledgments, dated December 22, 2000, among WVF-LU2 LLC, The Bank of New York, as Collateral Agent for the benefit of Lucent, and Fleet National Bank and State Street Bank & Trust Company, respectively (collectively with the WVF-I Acknowledgments, the "Acknowledgments").

- Pledge Agreement, dated May 4, 2000, between Winstar Wireless, Inc. and The Bank of New York, as Collateral Agent for the benefit of Lucent (the "Lucent Pledge Agreement").

- Security Agreement, dated as of May 9, 2000, between WVF-I LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (the "WVF-I Security Agreement").

- Security Agreement, dated as of December 22, 2000, between WVF-LU2 LLC and The Bank of New York, as Collateral Agent for the benefit of Lucent (collectively with the WVF-I Security Agreement, the "Lucent Security Agreements").

- Supply Agreement, dated October 21, 1998, between Winstar Communications, Inc. and Lucent Technologies Inc. (as amended and collectively with any schedules and exhibits thereto, the "Lucent Supply Agreement"), any amendments thereto and any and all related documents, agreements and statements of work.

- All documents, agreements and other materials that may be produced in connection with any discovery related to this proof of claim.

B1595

**Tab A.3**

## Summary of Secured Claims under the Lucent Credit Agreement

- **Principal.** The Borrowers (as such term is defined in the Lucent Credit Agreement) are obligated to pay Lucent principal loaned through the Borrowing Requests under the Lucent Credit Agreement. See Lucent Credit Agreement § 2.01-02; Tab A.4. As of April 18, 2001 (the "Petition Date"), the amount of principal due under the Lucent Credit Agreement totaled $736,919,626.31.

- **Interest.** The Borrowers must pay Lucent interest on the outstanding principal under the Lucent Credit Agreement. See Lucent Credit Agreement § 2.11. As of the Petition Date, the amount of interest due under the Lucent Credit Agreement totaled $18,922,649.51. Since the Petition Date, interest has continued to accrue under the Lucent Credit Agreement and, as of October 8, 2001, such amount totaled $28,548,856.81 (for the period from the Petition Date through October 8, 2001).[1]

- **Fees.** The Borrowers owe Lucent a commitment fee that is payable on the last day of March, June, September and December of each year. The commitment fee accrues at 1.5% per annum on the average daily amount of the Available Commitment (as such term is defined in the Lucent Credit Agreement). See Lucent Credit Agreement § 2.10(a). As of the Petition Date, the amount of such fees due under the Lucent Credit Agreement totaled $2,839,538.06. In addition, the Borrowers were obligated to pay to Lucent a 1% fee on outstanding principal on April 4, 2001 (the parties extended this deadline to April 13, 2001). See Lucent Credit Agreement § 2.10(b). As of the Petition Date, the Borrowers owed Lucent $7,369,196.26 on account of such fee.

- **Expenses.** The Borrowers must pay certain costs and expenses reasonably incurred by Lucent in connection with the negotiation, preparation and execution of the Lucent Credit Agreement, including fees, charges and disbursements of counsel and costs relating to the enforcement or protection of Lucent's rights under the Lucent Credit Agreement. See Lucent Credit Agreement § 9.03(a). As of October 8, 2001, the amount of expenses due under the Lucent Credit Agreement totaled approximately $4,460,440.73.

  - These expenses include storage and warehousing charges incurred by Lucent on behalf of the Debtor to store and protect the equipment. As of the Petition Date, the amount of storage and warehousing charges due under the Lucent Credit Agreement totaled $159,841.00. Since the Petition Date, storage and warehousing charges have continued to accrue under the Lucent Credit

---

[1] Interest continues to accrue under the Lucent Credit Agreement, and Lucent hereby specifically reserves its rights to amend, modify or supplement this proof of claim to incorporate and assert such additional interest.

B1596

## Summary of Borrowing Requests

| Date of Borrowing Request | Borrower | Total Borrowing |
|---|---|---|
| 6/23/00 | WVF-1 LLC | $248,064,106.03 |
| 7/24/00 | WVF-1 LLC | 72,369,718.05 |
| 8/24/00 | WVF-1 LLC | 73,540,891.64 |
| 9/22/00 | WVF-1 LLC | 103,058,768.11 |
| 10/20/00 | WVF-1 LLC | 192,932,320.87 |
| 11/30/00 | WVF-1 LLC | 63,604,904.42 |
| 12/22/00 | WVF-LU2 LLC | 32,006,966.01 |
| 12/29/00 | WVF-LU2 LLC | 62,324,930.00 |
| 1/26/01 | WVF-LU2 LLC | 48,735,275.74 |
| 2/23/01 | WVF-LU2 LLC | 34,281,745.44 |
| Subtotal | | $930,919,626.31 |
| Payment on 12/7/00 | | (194,000,000.00) |
| TOTAL | | $736,919,626.31 |

CL: 620013v5

tb A 5

## Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | AK | SECRETARY OF STATE | 6/19/2000 | 482386 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | AL | SECRETARY OF STATE | 6/16/2000 | B2000-24609 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | AR | SECRETARY OF STATE | 6/16/2000 | 1249843 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | AZ | SECRETARY OF STATE | 6/16/2000 | 1121874 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | AZ | MARICOPA | 6/16/2000 | 00-0-160046 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | CA | SECRETARY OF STATE | 6/16/2000 | 17260131 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | CO | SECRETARY OF STATE | 6/16/2000 | 20002035626 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | CT | SECRETARY OF STATE | 6/19/2000 | 2004895 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | DC | SECRETARY OF STATE | 6/20/2000 | 2000057462 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | DE | SECRETARY OF STATE | 6/19/2000 | 38324 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | DE | SECRETARY OF STATE | 7/11/2000 | 43441 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | FL | SECRETARY OF STATE | 6/16/2000 | 20000140342 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | GA | COBB | 6/21/2000 | 33200008647 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | GA | DE KALB | 6/21/2000 | 442000005237 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | GA | FULTON | 6/16/2000 | 6020001341 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | GA | GWINNETT | 6/21/2000 | 6782 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | HI | SECRETARY OF STATE | 6/20/2000 | 2000-084279 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | IA | SECRETARY OF STATE | 6/16/2000 | P111550 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | ID | SECRETARY OF STATE | 6/16/2000 | B-873094 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-414885 | IL | SECRETARY OF STATE | 6/27/2000 | 4228359 |

CL-6242159-1

Page 1 of 14

B1598

Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | IN | SECRETARY OF STATE | 6/19/2000 | 2331444 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | KS | SECRETARY OF STATE | 6/19/2000 | 3721690 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | KY | SECRETARY OF STATE | 6/16/2000 | 1603816 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | LA | JEFFERSON | 6/29/2000 | 26245536 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | LA | ORLEANS | 6/16/2000 | 36-149020 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | SECRETARY OF STATE | 6/16/2000 | 723960 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BOSTON | 6/26/2000 | 426443 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BOSTON CITY | 6/19/2000 | 426263 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MA | BURLINGTON | 6/26/2000 | 398 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MD | MANSFIELD | 6/27/2000 | 136-00 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | ME | SECRETARY OF STATE | 6/19/2000 | 18 1049085 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MI | SECRETARY OF STATE | 6/16/2000 | 1368723 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MN | SECRETARY OF STATE | 6/16/2000 | 14696C |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | SECRETARY OF STATE | 6/16/2000 | 2236862 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | SECRETARY OF STATE | 6/16/2000 | 4058409 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MO | ST. LOUIS JACKSON | 6/16/2000 | 20000424078 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MS | SECRETARY OF STATE | 6/26/2000 | 200008006 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | MT | SECRETARY OF STATE | 6/16/2000 | 1440594 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NC | SECRETARY OF STATE | 6/19/2000 | 60040282 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NC | SECRETARY OF STATE | 6/16/2000 | 20000061209 |

CL-62421.v1

Page 2 of 14

B1599

Tb.A.5

## Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NC | MECKLENBURG | 6/19/2000 | 20005418 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | ND | SECRETARY OF STATE | 6/16/2000 | 949158 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NE | SECRETARY OF STATE | 6/16/2000 | 9900063540 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NH | SECRETARY OF STATE | 6/21/2000 | 562377 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NJ | SECRETARY OF STATE | 6/15/2000 | 1981526 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NM | SECRETARY OF STATE | 6/15/2000 | 616033 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NV | SECRETARY OF STATE | 6/15/2000 | 9341 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | SECRETARY OF STATE | 6/15/2000 | 119059 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | SECRETARY OF STATE | 7/11/2000 | 134993 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | DUTCHESS | 8/21/2000 | 00-2201 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | ERIE | 6/26/2000 | 795741 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | KINGS | 6/22/2000 | 00PK08557 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | NY | NEW YORK | 6/21/2000 | 00PN30843 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OH | SECRETARY OF STATE | 6/19/2000 | AP0248592 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OH | CUYAHOGA | 6/21/2000 | 200006219104 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OH | FRANKLIN | 6/16/2000 | 2000061601947 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OH | HAMILTON | 6/29/2000 | 0-88950 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OK | OKLAHOMA | 6/16/2000 | 33113 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | OR | SECRETARY OF STATE | 6/16/2000 | 516058 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4114885 | PA | SECRETARY OF STATE | 6/19/2000 | 31730680 |

CL: 624215-v1

Page 3 of 14

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | PA | ALLEGHENY | 6/21/2000 | 00-4300 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | PA | PHILADELPHIA | 6/20/2000 | 3069 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | RI | SECRETARY OF STATE | 6/16/2000 | 714041 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | SC | SECRETARY OF STATE | 6/19/2000 | 000619-124522A |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | SD | SECRETARY OF STATE | 6/19/2000 | 1711000723 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | TX | SECRETARY OF STATE | 6/19/2000 | 00-521418 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | UT | SECRETARY OF STATE | 6/19/2000 | 00-683058 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | VA | SECRETARY OF STATE | 6/21/2000 | 6197804 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | VA | ARLINGTON | 6/21/2000 | 62714 B0000179 P01869 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | VA | FAIRFAX | | 00-006901 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | VA | NEWPORT NEWS | 6/21/2000 | 11640 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | VT | SECRETARY OF STATE | 6/19/2000 | 00-126144 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | WA | SECRETARY OF STATE | 6/19/2000 | 2000-171-0211 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | WI | SECRETARY OF STATE | 6/19/2000 | 1966871 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | WV | SECRETARY OF STATE | 6/19/2000 | 541871 |
| 1 | WVF-I LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4414885 | WY | SECRETARY OF STATE | 6/19/2000 | 00-171141803 |
| 1 | WVF-I,LU2 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AK | SECRETARY OF STATE | 1/4/2001 | 491279 |
| 1 | WVF-I,LU2 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AL | SECRETARY OF STATE | 1/4/2001 | 2001-00475 FS |
| 1 | WVF-I,LU2 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AR | SECRETARY OF STATE | 1/4/2001 | 1280218 |
| 1 | WVF-I,LU2 LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AZ | SECRETARY OF STATE | 1/4/2001 | 1155419 |

CL: 6241591

B1601

Summary of UCC-1 Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | AZ | MARICOPA | 1/4/2001 | 2001-0007943 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CA | SECRETARY OF STATE | 1/4/2001 | 100951014 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CO | SECRETARY OF STATE | 1/4/2001 | 20012000781 (COPY TO FOLLOW) |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | CT | SECRETARY OF STATE | 1/4/2001 | 2043818 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | DC | SECRETARY OF STATE | 1/4/2001 | 2001001221 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | DB | SECRETARY OF STATE | 1/4/2001 | 10010806 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | FL | SECRETARY OF STATE | 1/4/2001 | 200100003129-0 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | COBB | 1/4/2001 | 33200100238 |
| 1 | WVF-LU02LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | | | | |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | DEKALB | 1/4/2001 | 442001000116 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | FULTON | 1/4/2001 | 6020100241 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | GA | GWINNETT | 1/4/2001 | 184 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | HI | SECRETARY OF STATE | 1/9/2001 | 2001-063159 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IA | SECRETARY OF STATE | 1/4/2001 | P154817 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | ID | SECRETARY OF STATE | 1/4/2001 | B-890038 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IL | SECRETARY OF STATE | 1/12/2001 | 4321540 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | IN | SECRETARY OF STATE | 1/4/2001 | 2367297 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | KS | SECRETARY OF STATE | 1/4/2001 | 4310025 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | KY | SECRETARY OF STATE | 1/4/2001 | 1606230 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | LA | JEFFERSON | 1/4/2001 | 26251026 |

CL: 634215v1

B1602

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | LA | ORLEANS | 1/4/2001 | 36-15497 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BOSTON | 1/5/2001 | 430797 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BOSTON | 1/4/2001 | 430785 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | BURLINGTON | 1/4/2001 | 4 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | SECRETARY OF STATE | 1/4/2001 | 766592 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MA | MANSFIELD | 1/5/2001 | 36892 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146064 | MD | SECRETARY OF STATE | 1/4/2001 | 18105974 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-416065 | MB | SECRETARY OF STATE | 1/4/2001 | 1394384 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146065 | MI | SECRETARY OF STATE | 1/4/2001 | 2043DC |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MN | SECRETARY OF STATE | 1/4/2001 | 2287451 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | SECRETARY OF STATE | 1/4/2001 | 4120431 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | JACKSON | 1/4/2001 | 2001J0430421 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MO | ST. LOUIS CITY | 1/5/2001 | 200100255 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MS | SECRETARY OF STATE | 1/4/2001 | 1489753 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | MT | SECRETARY OF STATE | 1/4/2001 | 62393043 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | SECRETARY OF STATE | 1/5/2001 | 20010001594 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | SECRETARY OF STATE | 1/5/2001 | 20010001594 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NC | MECKLENBURG | 1/5/2001 | 200111718 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4145066 | ND | SECRETARY OF STATE | 1/4/2001 | 01-000986184 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NE | SECRETARY OF STATE | 1/4/2001 | 9900110651S |

CU: 634215v1

B1603

6 A.5

## Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NH | SECRETARY OF STATE | 1/4/2001 | 573421 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NJ | SECRETARY OF STATE | 1/4/2001 | 2016518 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NM | SECRETARY OF STATE | 1/5/2001 | 10105024 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | SECRETARY OF STATE | 1/4/2001 | 2713 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | DUTCHESS | 1/4/2001 | 34 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | ERIE | 1/5/2001 | 087-1322 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | KINGS | 1/4/2001 | 01PK00151 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NY | NEW YORK | 1/5/2001 | 01PN00689 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | NV | SECRETARY OF STATE | 1/4/2001 | 100223 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | SECRETARY OF STATE | 1/5/2001 | AP306060 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | CUYAHOGA | 1/4/2001 | 200101049082 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | FRANKLIN | 1/4/2001 | 20010104002968 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OH | HAMILTON | 1/8/2001 | 632968 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OK | OKLAHOMA | 1/4/2001 | 537648 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | OR | SECRETARY OF STATE | 1/4/2001 | 537646 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | ALLEGHENY | 1/4/2001 | UCC-01-43 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | PHILADELPHIA | 1/9/2001 | 10113 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | PA | SECRETARY OF STATE | 1/4/2001 | 33461186 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | RI | SECRETARY OF STATE | 1/4/2001 | 722899 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | SC | SECRETARY OF STATE | 1/5/2001 | 085109A |

CL: 62421;v1

B1604

Summary of UCC Filing Statements

p.A.5

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | SD | SECRETARY OF STATE | 1/4/2001 | 10040901695 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | TX | SECRETARY OF STATE | 1/4/2001 | 01-001236 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | UT | SECRETARY OF STATE | 1/4/2001 | 01-702771 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | UT | SECRETARY OF STATE | 1/4/2001 | 01-702771 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | ARLINGTON | 1/4/2001 | 63659 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | SECRETARY OF STATE | 1/4/2001 | 01-01-04-7817 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VA | FAIRFAX | 1/8/2001 | 01-000152 (COPY TO FOLLOW) |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146065 | VA | NEWPORT NEWS | 1/9/2001 | 12177 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | VT | SECRETARY OF STATE | 1/4/2001 | 01-133687 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WA | SECRETARY OF STATE | 1/4/2001 | 2001-004-0339 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WI | SECRETARY OF STATE | 1/4/2001 | 2023277 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WV | SECRETARY OF STATE | 1/4/2001 | 552988 |
| 1 | WVF-LU2LLC | 685 THIRD AVENUE NEW YORK, NY 10017 | 13-4146066 | WV | SECRETARY OF STATE | 1/4/2001 | 200100413-1A03 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AK | SECRETARY OF STATE | 6/16/2000 | 462258 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AL | SECRETARY OF STATE | 6/16/2000 | B2000-24611 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AR | SECRETARY OF STATE | 6/19/2000 | 12500004 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | SECRETARY OF STATE | 6/19/2000 | 1122358 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | MARICOPA | 6/19/2000 | 00-0463881 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CA | SECRETARY OF STATE | 6/19/2000 | 17360580 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CO | SECRETARY OF STATE | 6/19/2000 | 20002056034 |

CLt: 624215v1

B1605

Ex.A.5

## Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CT | SECRETARY OF STATE | 6/19/2000 | 2004899 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DC | SECRETARY OF STATE | 6/20/2000 | 2000057454 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DE | SECRETARY OF STATE | 6/19/2000 | 38321 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | FL | SECRETARY OF STATE | 6/19/2000 | 200000141978-5 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | COBB | 6/21/2000 | 33200008648 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | DEKALB | 6/28/2000 | 442000005350 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | FULTON | 6/20/2000 | 60200011446 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | GWINNETT | 6/21/2000 | 67-2000006781 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | HI | SECRETARY OF STATE | 6/20/2000 | 2000-084280 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IA | SECRETARY OF STATE | 6/19/2000 | P(11801 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ID | SECRETARY OF STATE | 6/19/2000 | B673292 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IL | SECRETARY OF STATE | 6/29/2000 | 4229685 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IN | SECRETARY OF STATE | 6/19/2000 | 2231445 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KS | SECRETARY OF STATE | 6/19/2000 | 3725868 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KY | SECRETARY OF STATE | 6/19/2000 | 1603834 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | JEFFERSON | 6/29/2000 | 26245537 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | ORLEANS | 6/19/2000 | 36-149069 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | SECRETARY OF STATE | 6/19/2000 | 724289 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 6/19/2000 | 426264 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 6/26/2000 | 426442 |

CL:624215v1

B1606

Tab A 5

Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BURLINGTON | 6/26/2000 | 399 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | MANSFIELD | 6/23/2000 | 132-00 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MD | SECRETARY OF STATE | 6/16/2000 | 181049593 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ME | SECRETARY OF STATE | 6/19/2000 | 1369076 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MI | SECRETARY OF STATE | 6/19/2000 | 14743C |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MN | SECRETARY OF STATE | 6/19/2000 | 2237375 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | SECRETARY OF STATE | 6/19/2000 | 4058868 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | JACKSON | 6/19/2000 | 20000424100 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | ST.LOUIS | 6/26/2000 | 200008009 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MS | SECRETARY OF STATE | 6/19/2000 | 1441212 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MT | SECRETARY OF STATE | 6/19/2000 | 60048260 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | SECRETARY OF STATE | 6/19/2000 | 20000061572 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | MECKLENBURG | 6/19/2000 | 20005460 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ND | SECRETARY OF STATE | 6/16/2000 | 949153 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NE | SECRETARY OF STATE | 6/19/2000 | 9900064014 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NH | SECRETARY OF STATE | 6/21/2000 | 562378 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NJ | SECRETARY OF STATE | 6/19/2000 | 1981670 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NM | SECRETARY OF STATE | 6/16/2000 | 616034 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NV | SECRETARY OF STATE | 6/19/2000 | 9444 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | SECRETARY OF STATE | 6/19/2000 | 120282 |

CL: 624215v1

B1607

b.A.5

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | DUTCHESS | 6/21/2000 | 2200 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | ERIE | 6/26/2000 | Q795739 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | KINGS | 6/22/2000 | 00PK08558 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | NEW YORK | 6/21/2000 | 00PN30844 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | SECRETARY OF STATE | 6/19/2000 | AP0248593 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | CUYAHOGA | 6/21/2000 | 200006219103 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | FRANKLIN | 6/16/2000 | 200006160119449 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | HAMILTON | 6/29/2000 | 0-9894B |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OK | OKLAHOMA | 6/19/2000 | 33445 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OR | SECRETARY OF STATE | 6/19/2000 | 516188 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | SECRETARY OF STATE | 6/19/2000 | 31750679 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | ALLEGHENY | 6/21/2000 | 00-4297 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | PA | PHILADELPHIA | 6/20/2000 | 3070 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | RI | SECRETARY OF STATE | 6/19/2000 | 714130 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | SC | SECRETARY OF STATE | 6/19/2000 | 000619-124510A |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | SD | SECRETARY OF STATE | 6/19/2000 | 1711000722 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | TX | SECRETARY OF STATE | 6/19/2000 | 00-521416 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | UT | SECRETARY OF STATE | 6/19/2000 | 00-483052 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | SECRETARY OF STATE | 6/21/2000 | 6197803 |
| 1 | WINSTAR WIRELESS, INC. | 220 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | ARLINGTON | 6/21/2000 | 62713 B00001179PD1867 |

CL:624215v1

B1608

Summary of UCC Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | FAIRFAX | 6/27/2000 | 00-006900 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VA | NEWPORT NEWS | 6/21/2000 | 11639 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | VT | SECRETARY OF STATE | 6/19/2000 | 00-126143 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WA | SECRETARY OF STATE | 6/16/2000 | 2000-168-0264 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WI | SECRETARY OF STATE | 6/16/2000 | 1986776 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WV | SECRETARY OF STATE | 6/16/2000 | 541772 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | WY | SECRETARY OF STATE | 6/16/2000 | 200015815 1802 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AK | SECRETARY OF STATE | 1/4/2001 | 491280 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AL | SECRETARY OF STATE | 1/4/2001 | 2001-00476 FS |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AR | SECRETARY OF STATE | 1/4/2001 | 01280219 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | SECRETARY OF STATE | 1/4/2001 | 01155418 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | AZ | MARICOPA | 1/4/2001 | 2001-0007944 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CA | SECRETARY OF STATE | 1/4/2001 | 0100960957 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CO | SECRETARY OF STATE | 1/4/2001 | 20012000780 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | CT | SECRETARY OF STATE | 1/4/2001 | 2043819 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DC | SECRETARY OF STATE | 1/4/2001 | 20001001213 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | DE | SECRETARY OF STATE | 1/4/2001 | 1001079 B |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | FL | SECRETARY OF STATE | 1/4/2001 | 200100003130-B |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | COBB | 1/4/2001 | 033200100239 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | DEKALB | 1/17/2001 | 442001000457 |

$p A.5$

Summary of UCC    Filing Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | FULTON | 1/4/2001 | 060200100240 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | GA | GWINNETT | 1/4/2001 | 000183 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | HI | SECRETARY OF STATE | 1/9/2001 | 2001-003160 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IA | SECRETARY OF STATE | 1/4/2001 | P154816 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ID | SECRETARY OF STATE | 1/4/2001 | 890039 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IL | SECRETARY OF STATE | 1/12/2001 | 4321541 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | IN | SECRETARY OF STATE | 1/4/2001 | 2367298 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KS | SECRETARY OF STATE | 1/4/2001 | 4310017 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | KY | SECRETARY OF STATE | 1/4/2001 | 1606231 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | JEFFERSON | 1/4/2001 | 701062 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | LA | ORLEANS | 1/4/2001 | 36-154929 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 1/5/2001 | 430797 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BOSTON | 1/4/2001 | 430784 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | BURLINGTON | 1/4/2001 | 3 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | SECRETARY OF STATE | 1/4/2001 | 768591 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MA | MANSFIELD | 1/5/2001 | 2-01 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MD | SECRETARY OF STATE | 1/4/2001 | 181069975 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ME | SECRETARY OF STATE | | PENDING |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MI | SECRETARY OF STATE | 1/4/2001 | 20427C |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MN | SECRETARY OF STATE | 1/4/2001 | 2287453 |

CL: 624115v1

B1610

db A.5

Summary ... UCC Statements

| UCC TYPE | DEBTOR | DEBTOR ADDRESS | DEBTOR TAX ID | FILING STATE | FILING JURISDICTION | FILE DATE | FILE NUMBER |
|---|---|---|---|---|---|---|---|
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758610 | MO | SECRETARY OF STATE | 1/4/2001 | 4120430 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | JACKSON | 1/4/2001 | 20010430422 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MO | ST. LOUIS CITY | 1/5/2001 | 200100256 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MS | SECRETARY OF STATE | 1/4/2001 | 01489754 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | MT | SECRETARY OF STATE | 1/4/2001 | 62392911 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | SECRETARY OF STATE | 1/5/2001 | 20010001593 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NC | MECKLENBURG | 1/5/2001 | 200111717 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | ND | SECRETARY OF STATE | 1/4/2001 | 01/00986189 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NB | SECRETARY OF STATE | 1/4/2001 | 9901106516 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NH | SECRETARY OF STATE | 1/4/2001 | 573422 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NJ | SECRETARY OF STATE | 1/4/2001 | 2016520 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NM | SECRETARY OF STATE | 1/5/2001 | 010105025 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NV | SECRETARY OF STATE | 1/4/2001 | 0100222 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | SECRETARY OF STATE | 1/4/2001 | 002727 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | DUTCHESS | 1/4/2001 | 1-0033 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | ERIE | 1/5/2001 | Q87-1314 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | KINGS | 1/4/2001 | 01PK00150 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | NY | NEW YORK | 1/5/2001 | 01PN00690 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | SECRETARY OF STATE | 1/5/2001 | AP306061 |
| 1 | WINSTAR WIRELESS, INC. | 230 PARK AVENUE NEW YORK, NY 10169 | 13-3758650 | OH | CUYAHOGA | 1/4/2001 | 20010104908 |

CL: 6242151

B1611

**Exhibit B**

**Description of Collateral**

I.      Lucent Security Agreements

   Pursuant to the Lucent Security Agreements,[1/] Lucent was granted a security interest in all of the Borrowers' right, title and interest in, to and under the "Collateral," which is defined as follows:

-  *"Collateral"* shall mean all (i) Equipment, (ii) General Intangibles (but excluding General Intangibles to the extent that an assignment thereof would violate a restriction on assignment contained therein) and (iii) Proceeds.

For purposes of this definition of the Collateral, capitalized terms have the following meanings:

-  *"Equipment"* shall mean all equipment, furniture and furnishings, and all tangible personal property similar to any of the foregoing, including tools, parts and supplies of every kind and description, and all improvements, accessions or appurtenances thereto, in each case that are now owned or hereafter acquired by the Borrowers. The term Equipment shall also include Fixtures.

-  *"Fixtures"* shall mean all items of Equipment, whether now owned or hereafter acquired, of the Borrowers that become so related to particular real estate that an interest in them arises under any real estate law applicable thereto.

-  *"General Intangibles"* shall mean all choses in action and causes of action and all other assignable intangible personal property of the Borrowers of every kind and nature now owned or hereafter acquired by the Borrowers, including the Borrowers' rights under the Lucent Supply Agreement and all intellectual property acquired by or granted to the Borrowers pursuant to the Lucent Supply Agreement.

-  *"Proceeds"* shall mean any consideration received from the sale, exchange, license, lease or other disposition of any asset which constitutes Collateral, including any payment received from any insurer or other person as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset which constitutes Collateral, and shall include any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

The Collateral includes the Equipment subject to the invoices financed by the Borrowing Requests set forth at Tab A.4.

---

[1/] See Lucent Security Agreements § 1.02. The description of the Collateral set forth herein is intended as a summary of the provisions of the Lucent Security Agreements and should not be interpreted to alter or amend the Lucent Security Agreements in any respect.

B1612

### Description of the Accounts

Pursuant to section 1.02 of the Lucent Cash Collateral Agreements, the Accounts include the following accounts, together with any investment property therein and proceeds thereof:

| Account | Account Number |
|---|---|
| Fleet Bank Investment Account | 9427772529 |
| Fleet Bank Investment Account | 9428385707 |
| State Street Investment Account | 3274457 |
| State Street Investment Account | 3324773 |
| Fleet Bank Disbursement Account | 9427772510 |
| Fleet Bank Disbursement Account | 9428385694 |

CL: 620013v5

## 2Q00 EOQ DEAL SUMMARY

| Stuff we need now | | stuff we need later this year | |
|---|---|---|---|
| ONG spares | 4.6 | B-site Cabinets | 1 |
| Metro equipment | 4.8 | ONG spares | 6.3 |
| 5 BWM | 3.6 | Data center equipment | 6 |
| NY BWM | 1.9 | | 13.3 |
| Synchronization | 2.5 | | |
| Naviscore support (NOC) | 0.5 | stuff we need next year (or years after) | |
| NY – DC ONG growth | 1.1 | | |
| SNC/SNMS support (NOC) | 0.07 | Switch PAYG | 17 |
| Vitalnet licenses | 0.25 | 2001 400G equipment | 20 |
| SM cards for GX550 | 0.25 | BOS-CLE-NY ONG equip | 6.7 |
| Misc material | 0.12 | Jamie's software proposal | 17 |
| | 19.69 | | 60.7 |

**stuff we really need this year that we could be buying instead of the next year stuff**

| Ascend 500 switches | 10 |
|---|---|
| Cisco routers | 40 |
| Dell/compaq equipment | 12 |
| | 62 |



CONFIDENTIAL   ZHC   0132322

B1614

From:          Naylor, Charles L (Chuck)
Sent:          Monday, June 26, 2000 8:50 AM
To:            Petrini, Vanessa H (Vanessa); Plunkett, William Montgomery, II (Bill)
Cc:            Harris, Deborah K (Deborah Kristine); Rigotti, David Roy (David); Newsom, Janice Gilliam
               (Janice); O'Hara, Thomas M (Tom)
Subject:       RE: EOQ Deal

Guys:

I just told Jill that we'd need another Bill & Hold letter this quarter to support this URGENT EOQ deal and she didn't
balk! I believe Nina is getting Gil Harris cranked up for support (that's Pat Russo's CFO). She asked who we should
work with on our team - I told her Vanessa

Chuck


      -----Original Message-----
      From:    Petrini, Vanessa H (Vanessa)
      Sent:    Monday, June 26, 2000 10:13 AM
      To:      Plunkett, William Montgomery, II (Bill); Naylor, Charles L (Chuck)
      Cc:      Harris, Deborah K (Deborah Kristine); Rigotti, David Roy (David); Newsom, Janice Gilliam (Janice);
               O'Hara, Thomas M (Tom)
      Subject: EOQ Deal
      Importance: High


      Bill, Chuck.

      Attached is the EOQ deal summary which outlines the required Action Items in order to recognize revenue.
      We have calls into Lisa to review the Action Items with her. In many instances, we need PO's back from
      Winstar. In another instance we need to ship equipment (cabinets) to a Winstar or 3rd party warehouse in
      order to be able to recognize revenue. Your assistance is required to reinforce with Dave that we need
      these PO's back ASAP and we need him to advise Lisa of our shipping requirements. The bottom line
      is that we want all the PO's back now but the items in red are the most critical (because these represent our
      best opportunities to recognize revenue in Q3).

      We also have contractual issues that need to be resolved NOW in order to recognize revenue. These issues
      have been discussed with Winstar in the past, but were shelved in favor of Bill and Hold letters. On advice
      we've received from Tom O'Hara and Jill Diroma, we must change the Supply Agreement so that Title, Risk of
      Loss and Product Acceptance pass to Winstar upon shipment. The only way we are going to resolve
      this is if you can get Dave Ackerman to advise Jonathan Ritter (Winstar's attorney) and Lisa that the
      Supply Agreement needs to be changed. Tom is available this week to work with Jonathan on this.

      I also need to call your attention to a warehousing issue involving the optronics for the long haul and metro
      builds. Currently, this equipment is being shipped to Lucent's Morrow warehouse. Again, in the past, we
      were able to recognize revenue on shipped ONG equipment via Bill and Hold letters. We must now employ
      another tactic in order to ensure we can recognize revenue on the equipment we ship going forward and to
      ensure the remaining inventory (approx. $20M by the end of our fiscal year) DOES NOT GET REVERSED.
      Our team recommends the best tactic is to get Winstar to lease the portion of the warehouse (approx.

                                                    1

CONFIDENTIAL

LW00095079



B1615

one/third) that houses their ONG equipment.  Rich is getting all the details on this.  We will need you to
discuss this with Dave and ask him to have Lisa work with us on this  We will work to make Winstar's
lease payment transparent (i.e., we will give them a corresponding reduction in the price of equipment on a
future proposal).

Please call me on my cell phone (410-960-1121) to discuss.

Thanks,

Vanessa

- << File: 3q2000 - Deal Summary - 000671 - Worksheet.xls >>

2

CONFIDENTIAL

LW00095080

B1616

| | |
|---|---|
| From: | Helfrich, Richard A (Richard) |
| Sent: | Friday, September 22, 2000 6:19 AM |
| To: | Perry, Patricia Ann (Patricia); Fulton, Alan W (Alan); Riesa, Martin W (Marty); Hanner, Gary B (Gary); Parks, David Matthew (David); Petrini, Vanessa H (Vanessa) |
| Cc: | Dowdy, Mary M (Mary) |
| Subject: | SOFTWARE POOL |

All,

The dynamics of the software pool may be changing. Nina and Bill Plunkett discussed the SP after a meeting with Bill Rohauna and McGinn. Nina and Bill would like us to get the SP dollars up in the neighborhood of $100MI To do this, we are being asked to do two things:

1. Change all the pricing from FLOOR to LIST.
2. Organize calls with your business unit liaisons this morning and have them review your software list and request if there are additional features/dollars you could add to your list.

Please forward your revised LIST pricing and BU additions to myself and Vanessa by this afternoon.

Thanks in advance.

Rich

PLAINTIFF'S EXHIBIT PX-349

CONFIDENTIAL

LW00114575

B1617

**Printer Printer**

| | |
|---|---|
| **From:** | David Ackerman {dackerman@winstar.com} |
| **Sent:** | Friday, June 23, 2000 10 40 AM |
| **To:** | nkantor@winstar.com |
| **Subject:** | Lucent $$ |

<x-flowed>Here's the deal.
I spoke with Plunkett, and he was actually able to spend some time talking through it and focusing on what we need to do.
He can come up to $14Million, if we do the following (he takes a charge back against the revenue as a promo)
He wants us to agree to another $53M in purchases for 2Q (that includes $17M of accelerated "pay as you grow" $$ for the 5ESS's, and $4M for optronic spares for the long distance fiber that we need, $3M for some test equipment that we can also use, and the rest for metro fiber optronics and other miscellaneous stuff )
Further, since we have agreed to move ahead with the $66M for the data center build-outs, I told Plunkett that we should quickly engage on this, and determine if Lucent can supply and install everything we need based on their new initiative in this area, Dennis and their guys will be on it this afternoon.  This would give them another $50M in revenue for 2Q (altho' we still don't know where we'll get the capital budget from), and would enable us to have Lucent finance the data center build out,  and give them the ability to announce their first major customer and contract for this new line of business
I told him we should probably be able to do all the above except the pay as you grow for the 5E's
He said that if we do all of this, he will be able to do $14Million in damages.

Please confirm that you are OK with the above.

Thanks . Dave


</x-flowed>

1

CONFIDENTIAL 2WC 0065225

B1618

**From:**       Diroma, Jill B (Jill)
**Sent:**       Tuesday, January 18, 2000 5:27 AM
**To:**         Naylor, Charles L (Chuck); Wilson, Mark (Mark); Epstein, Marc N (Marc); Dowdy, Mary M
                (Mary); Quinn, John F (John); Jerden, Antonietta (Antonietta); Carrone, Angela (Angela)
**Cc:**         Manzi, Frank P (Frank); Cocito, James Vincent (Jim); Coleman, Glenn (Glenn)
**Subject:**    Winstar Services

Mark,

We have discussed the Winstar performed services and have concurrence from Corporate CFO that this transaction can be done ONE MORE TIME. This one time allowance is to cover Calendar 4th quarter services for Winstar. We all recognize that this means that a Lucent PO needed to be generated to Winstar dated prior to Dec. 31, 1999. This will then be followed up with invoicing and payments between the parties to take place sometime in Feb. 2000. Finally a journal entry will be processed in March 2000 to clear out the transaction from our books.

I understand that the team is working towards a Turn Key solution with this customer. Please keep in mind that this alone will not allow us to continue this practice of running Winstar performed services through our books. The only way we will run these through our books after this transaction is if they are services performed by some party other than Winstar and it is deemed after careful review that Lucent can take revenue on these services.

Since it is doubtful that we will move to a third party performing all of these services it is imperative that communication is sent to Winstar to inform them that we cannot issue any further Purchase Orders for services performed by them. Please provide a copy of this correspondance to me as soon as possible.

Thanks,

Jill

1



Confidential

PLAINTIFF'S
EXHIBIT
S
10/8/02 GS

LUTX0175323

**B1619**

| | |
|---|---|
| From: | Harris, Deborah K (Deborah Kristine) |
| Sent: | Thursday, November 16, 2000 6:38 PM |
| To: | Spurrier, Carole |
| Subject: | Outsourcing Services |
| Categories: | Winstar |

Carole

We had 2 calls with David Butze and team today. The first one I thought was productive and I expected to move forward with action and progress. The second call was colored by a conversation that David had had with Deb Hopkins which called a halt to any action on an outsourcing arrangement until the Financial agreement had been settled. I believe I have David convinced to at least construct our proposal and business model but hold back from providing it to our customer.

The finance agreement is still attracking emotion and controversy. I had a long conversation with Bill Nelson today that was very helpful. I penned a letter for me to send back to Winstar which incorporated the direction that Bill suggested. You have a copy in your email. It has already been shot down by Leslie Rogers. I can't wait to see everyone else's comments. I hesistated from calling the customer because I am not sure who has perhaps already talked to them or sent them information. David Butze told me tonight that Henry had sent a reply to their letter. I hope he has the story wrong.

The suggestion David presented on the Outsourcing agreement is to create a MOU that designates a management team to do due diligence on the possible areas that could be outsourced to us. And at the end of 90-120 days we will provide proposal on what we can do. And that we would charge for the due diligence. But there is nothing in it that cares for their immediate need and we now have a ruling from the finance community that even if we set up this cost/plus arrangement with a "program management/general contractor structure" it would still be viewed as a "sham". So no revenue recognition and no ability to set up an arrangement to start taking over accountability in a phased manner.

I have a list of topics to discuss with Nate on Monday but this may be a throw us out of the office scenario. Talk about reset to an account......

I hope we have the opportunity to talk in the morning. I don't even know where I will be in the morning but I can always be reached on my cell: 908-759-5342.

Debbie

31



PLAINTIFF'S
EXHIBIT
PX 440

CONFIDENTIAL

LW00017230

**B1620**

Frederic E. Rubin
Senior Vice President
Treasurer
Winstar Communications

The Winstar Building
685 Third Avenue
12th Floor
New York, NY 10017
Tel    (212) 792 9065
Fax   (212) 584 4073

Ms. Elizabeth T. Perricone
Director, Treasury
Lucent Technologies Inc.
600-700 Mountain Avenue, Room 7C-509
Murray Hill, NJ 07974-0636

Dear Beth:

Attached please find WVF-1 LLC invoice Number WVF1121500 for $62,660,285.09. This amount includes (a) the amount of credits due to Winstar Communications, Inc. ("Winstar") from Lucent Technologies Inc. ("Lucent") for various items agreed to between our two companies, and (b) credit for the amounts borrowed by Winstar at October 23, 2000 with respect to which Winstar has disputed the underlying charges from Lucent. Please credit this amount against WVF-1 LLC's outstanding loan balance under the Credit Agreement dated May 4, 2000.

Additionally, please find Schedule 1 which details the 3% Commitment Fee which Winstar has paid Lucent for the items referenced above. This amount will be deducted from the amount Winstar owes to Lucent for Draw 6. Winstar will wire transfer this net amount to Lucent.

In addition, I have enclosed Schedule 2, which recaps the loan balance by Draw following the application of the above referenced credit for $62,660,285.09.

Thank you,

Sincerely,

Frederic E. Rubin

enc.

cc:    Carole Spurrier, Lucent Technologies
       Linda Alexander, Lucent Technologies
       Deborah Harris, Lucent Technologies
       Rick Uhl

DEPOSITION EXHIBIT
*Rubin 52*
12 '9' 03
MARLENE LEE, CSR, RPR, CRR

PLAINTIFF'S
EXHIBIT
PX 443

CONFIDENTIAL
3WC 0008653

B1621



**INVOICE**

| | |
|---|---|
| Invoice: | WVF1121500 |
| Invoice Date : | December 15, 2000 |
| Page: | 1 of 1 |
| Payment Terms: | Upon Receipt |
| Due Date: | December 15, 2000 |

**WVF-1, LLC**
685 Third Avenue
NEW YORK NY 10017-4024
ATTENTION: Doreene Nidowicz, (212) 792-9069

| | |
|---|---|
| **TOTAL AMOUNT DUE:** | $62,660,285.09 |

S  Lucent Technology
o  600-700 Mountain Ave.
l  Murray Hill, NJ 07974
d
t
o

S
h
i
p
t
o

| Line Project ID | Item # | Description Quantity UOM | Purchase Order Unit Amt | Order Date | Int Terms/Ship Via/Ship Dt Net Amount | Tax Amt | Total Line Amt |
|---|---|---|---|---|---|---|---|
| 1 | | Optical Equipment Credit - reduction to Draw 6 | | | | | |
| | | 1 | $35,000,000.00 | | $35,000,000.00 | 0 | $35,000,000.00 |
| 2 | | Newbridge Switch Credit - reduction to Draw 6 | | | | | |
| | | 1 | $2,574,000.00 | | $2,574,970.00 | 0 | $2,574,970.00 |
| 3 | | 3rd Qtr COR Credit | | | | | |
| | | 1 | $10,000,000.00 | | $10,000,000.00 | 0 | $10,000,000.00 |
| 4 | | Marketing Credit | | | | | |
| | | 1 | $117,500.00 | | $117,500.00 | 0 | $117,500.00 |
| 5 | | Items paid on Draw 5 that are in dispute | | | | | |
| | | 1 | $12,499,424.09 | | $12,499,424.09 | 0 | $12,499,424.09 |
| 6 | | Items paid on Draw 5 that are not approved | | | | | |
| | | 1 | $2,468,391.00 | | $2,468,391.00 | 0 | $2,468,391.00 |
| | | **TOTALS:** | | | $62,660,285.09 | 0 | $62,660,285.09 |

CONFIDENTIAL
3WC 0008654

B1622

# PARENTERANDOLPH

*The Power of Ideas*

**Forensic & Litigation Services**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| WINSTAR COMMUNICATIONS, INC., et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| CHRISTINE C. SHUBERT, CHAPTER 7 TRUSTEE | ) Case No.: 01-1430 |
| OF WINSTAR COMMUNICATIONS, INC. AND | ) |
| WINSTAR WIRELESS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LUCENT TECHNOLOGIES INC. | ) |
| | ) |
| Defendant. | ) |

Expert Report
by
Paul W. Pocalyko

February 26, 2004



PLAINTIFF'S EXHIBIT

# Table of Contents

|  |  | Pages |
|---|---|---|
| I. | Executive Summary | 2 - 4 |
| II. | Background | 4 - 8 |
|  | A  The Supply Agreement | 6 - 7 |
|  | B.  The Credit Agreements | 7 - 7 |
|  | C.  The Network Build-Out Services Agreement | 7 - 8 |
|  | D.  Summary of the Credit Facilities | 8 - 8 |
| III. | Basis for Analysis | 8 - 9 |
| IV. | Analysis | 9 - 38 |
|  | A.  Definitions - Arm's-Length Transaction and Undue Influence | 10 - 10 |
|  | B.  The Analyses of the Financial Records | 11 - 30 |
|  |    1.  End of Quarter Transactions | 13 - 19 |
|  |    2.  "Bill and Hold" Transactions | 20 - 25 |
|  |    3.  Software Pool Agreement | 25 - 28 |
|  |    4.  Duplicate Invoices | 28 - 28 |
|  |    5.  Other Credits | 28 - 29 |
|  |    6.  Excess Interest Charged | 29 - 30 |
|  |    7.  Summary of the Analyses of the Financial Records | 30- 30 |
|  | C.  The Analyses of the Correspondence and Testimony | 31 - 37 |
|  |    1.  End of Quarter Transactions | 31 - 33 |
|  |    2.  "Bill and Hold" Transactions | 34 - 36 |
|  |    3.  Software Pool Agreement | 36 - 38 |
| V. | Conclusion | 38 - 39 |

# PARENTERANDOLPH

*The Power of Ideas*

Forensic & Litigation Services

CONFIDENTIAL

February 26, 2004

## Winstar Communications, Inc., et al.

### v.

## Lucent Technologies Inc.

At counsel's request, we have analyzed and investigated the adequacy and appropriateness of the various financial transactions between Lucent Technologies Inc. ("Lucent") and Winstar Communications, Inc. ("Winstar", collectively the "Parties") that occurred as a result of the various agreements entered into by the Parties. Counsel requested that we analyze whether the financial transactions between Lucent and Winstar were conducted at arm's-length and whether Lucent used its position in the relationship to exert undue influence and control over Winstar to participate in these transactions.[1] This report is structured as follows:

I.    Executive Summary
II.   Background
III.  Basis for Analysis
IV.   Analysis
V.    Conclusion
      Appendices
      Exhibits

---

[1] Defined on Pg. 10.


BAKER TILLY
INTERNATIONAL

PARENTE RANDOLPH, LLC  ACCOUNTANTS & CONSULTANTS  TWO PENN CENTER PLAZA, SUITE 1800  PHILADELPHIA, PA 19102-1725
(P) 215.972.0714  (F) 215.563.5083  www.parentenet.com

## I.    EXECUTIVE SUMMARY

The trustee has alleged that a $194 million loan payment made to Lucent on December 7, 2000 was a preference payment under Section 547 of the U.S. Bankruptcy Code. Because this payment was made more than 90 days before Winstar's filing for bankruptcy protection, the trustee has alleged that Lucent was an insider on that date. Lucent has denied that allegation.[2]

This report analyzes the financial transactions between the Parties up to and including December 7, 2000, to determine if Winstar and Lucent were at arm's-length and whether Lucent exerted undue influence and control over Winstar, facts which we believe are relevant to determining whether Lucent was an insider on December 7, 2000.

We performed our financial analysis by evaluating the detailed contemporaneous financial records and the written agreements that were executed between the Parties. We focused on the following questions relevant to determining whether the transactions were arm's-length and if Lucent exerted undue influence and control.

- Did the transactions make business sense for Winstar?

- Did Winstar achieve a rational business objective from entering into the transactions?

- Did the transactions favor Lucent and harm Winstar?

The financial records, when assembled in a logical manner, identify a series of transactions that include:

- The Parties' practice of engaging in a series of end of quarter deals, in which Winstar purchased an ever-increasing volume of products and services in order for Lucent to achieve its revenue goals. These deals were done without regard for Winstar's equipment needs and demands and without regard to scheduled installation periods.

---

[2] Second Amended Complaint dated September 27, 2002, Pgs. 58-59. Amended Answer and Counterclaims of Defendant Lucent Technologies Inc. to the Second Amended Complaint ("Answer and Counterclaims"), dated August 18, 2003, Pgs. 20-21.

---

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

Confidential                                                                                    Page: 3

- Winstar's employees signed and executed numerous bill and hold letters at Lucent's request that were designed to show imminent deployment for goods and services purchased through the letters. Winstar and Lucent consistently failed to meet the deployment schedule. In fact, significant amounts of bill and hold equipment remained in warehouses when Winstar filed for bankruptcy protection. These transactions were used by Lucent to recognize revenue on equipment that remained in Lucent warehouses for an extended period of time.

- Lucent's pre-billing of Winstar for installation services on invoices which bundled equipment, engineering and network services into one line item, thus enabling the recording of revenue months, if not a year, before the services were performed (if ever) and in most cases, before the network equipment was physically in Winstar's possession or before title had actually passed to Winstar.

- A Software Pool Agreement in September 2000 in which Lucent purported to sell a total of $135 million of software to Winstar when it intended to deliver only $20 million of actual potential value.

- Lucent's use of period-straddling billings and off-setting credits to the account of Winstar, which resulted in accelerating revenue into Lucent's current year end, and which maximized Winstar's purchases from Lucent without causing Winstar to violate its covenant obligations to its lenders.

Our analysis revealed a series of inappropriate, unnecessary and financially burdensome transactions that adversely impacted Winstar. While some of these transactions were fashioned in a manner to appear to be performed at arm's-length, most if not all when evaluated reveal a pattern of concealment, manipulation and deception. Our analysis of the financial records concluded these transactions were not conducted at arm's-length and that Lucent exerted its undue influence and control over Winstar. In summary, we conclude that:

- Many of the transactions did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into these transactions.

- These transactions favored Lucent and harmed Winstar.

*Winstar Communications. Inc. et al., v. Lucent Technologies Inc.*

Confidential

Upon completion of our analysis of the financial records, we then evaluated the correspondence between the Parties and deposition testimony. In essence, we wanted to see if contemporaneous written materials by individuals with direct knowledge and recollection as to how and why these transactions were conducted would either support or refute our financial analysis.

This analysis further established that Winstar repeatedly engaged in financial transactions with no legitimate business purpose or justification. When Winstar attempted to curtail or even diminish its participation in the transactions, Lucent exerted extraordinary pressure to compel Winstar's continued participation. Lucent knowingly required Winstar's employees to sign and return false bill and hold letters to achieve Lucent's desired revenue and sales goals. Lucent crafted a fictional software transaction in which it solicited Winstar's participation to generate approximately $115 million of bogus revenue.

At Lucent's request, Winstar repeatedly purchased equipment that it did not need, subjected itself to unnecessary additional business risks, utilized its limited capital and increased its business costs. Furthermore, to help Lucent, Winstar knowingly engaged in fraudulent transactions that assisted Lucent in its efforts to achieve revenue recognition before the earnings process was complete. Within a reasonable degree of accounting certainty, we can reach no other conclusion than that these transactions between Lucent and Winstar were not arm's-length. Further, we conclude that Lucent exerted its undue influence and control over Winstar to obtain Winstar's participation in these transactions.

## II.    BACKGROUND

Winstar, based in New York, New York, was a publicly traded telecommunications company, offering a wide range of high-speed voice, data and Internet services to small and medium sized businesses and government. Winstar developed a unique "last mile solution" for reaching its customers through the use of wireless technology. This "last mile solution" was widely recognized within the telecommunications industry and the investment community as presenting a new proposition and a break-through opportunity for a Competitive Local Exchange Carrier ("CLEC") to compete with Incumbent Local Exchange Carriers ("ILEC"). Winstar's business

B1628

Confidential

model was based on the concept that it was to be recognized as the vendor of choice within the CLEC industry, offer services as a CLEC and provide what were scarce and difficult to obtain broadband services for end users without depending on the ILECs to make the last mile connection.[3]

In October of 1998, Winstar and Lucent entered into a strategic relationship, whereby Winstar would purchase Lucent's telecommunications network equipment, and Lucent would finance these and other vendor purchases, as well as design, build and manage Winstar's network.[4] From Winstar's standpoint, the strategic partnership was a milestone that validated the technology and affirmed its business model. Winstar partnered with Lucent, one of the world's largest and most respected telecommunications equipment manufacturers. As a result of the strategic partnership, Winstar received access to the equipment, engineering, labor and financing required to accelerate the build-out of its end-to-end global network. Lucent was to provide world-class technology, network design, integration and build-out services as well as provide the communications hardware and software. Further, Lucent was going to access, test and integrate Winstar's network elements, including the equipment provided by other manufacturers.[5] Finally, Lucent committed to provide $2 billion in financing toward the build-out of the network. The Lucent financing provided Winstar with the capital necessary to complete its construction of the network.

This relationship provided the instant credibility that Winstar needed to enhance its position among the competitive CLEC market. Ultimately, as a result of the Lucent relationship, Winstar became a leading CLEC in the market. William J. Rouhana Jr., Chairman and Chief Executive Officer of Winstar summarized this relationship as follows:

> "This is a defining moment for Winstar. Lucent's major commitment of expertise and financing, combined with the overwhelming speed-to-market and cost advantages of Winstar's business model, clearly propels us to the top of the competitive local exchange carrier industry. With Lucent's network knowledge behind us, we are positioned to be

---

[3] Second Amended Complaint, dated September 27, 2002 Pg. 5.
[4] Lucent press release, dated October 22, 1998. "$2 billion Winstar/Lucent strategic agreement to expand Winstar's broadband network."
[5] "Winstar & Lucent In Broadband Network Deal 10/23/98." Newsbytes PM.

Confidential

the first competitive carrier to create a nearly ubiquitous end-to-end broadband network in the top 100 world markets."[6]

The importance of the strategic partnership to Winstar was evident through the negotiation process. Winstar employed a code name for the project: "The Wooly Mammoth."[7] Lucent expected that the Winstar partnership would establish it as a dominant vendor in providing equipment and services to the CLEC industry.[8] While Lucent expected to realize revenues and profits from its sale of network equipment and the services that were associated with the strategic partnership, Lucent's domestic sales to Winstar only provided approximately one percent of Lucent's total revenues for the fiscal years ended September 30, 1999 and 2000.[9] In sum, the strategic partnership was far less significant to Lucent as a company than it was to Winstar as a company.

The Parties memorialized the strategic partnership in a series of agreements that describe the vendor/supplier, lender/borrower and contractor/subcontractor relationships. These relationships are summarized in the following paragraphs.

A.    THE SUPPLY AGREEMENT - DATED OCTOBER 1998

The Supply Agreement's objective was to set forth "the general terms and conditions under which Winstar may purchase and receive Deliverables and Services from Lucent and financing (sic) the network-related Third Party Products and services purchased directly by Winstar."[10]

Under the terms of the Supply Agreement, the Parties expected the network to be built primarily using Lucent's equipment and services. The Supply Agreement had a clause stating the equipment and services provided by Lucent were to be the "Best of Breed" in the industry in

---

[6] Lucent press release, dated October 22, 1998. "$2 billion Winstar/Lucent strategic agreement to expand Winstar's broadband network."
[7] Deposition of David Ackerman, (Winstar's Group Executive of Network Engineering), dated June 28, 2001, Pgs. 17-18. See also Deposition of Nathan Kantor, (Winstar's President and COO), dated August 6, 2001, Pgs. 154-155.
[8] Deposition of Nathan Kantor (Winstar's President and COO), dated August 6, 2001. Pg. 130.
[9] Winstar's total domestic purchases from Lucent of $706 million divided by Lucent's 1999 ($30.617 million) and 2000 ($33,813 million) fiscal years ended revenues equals approximately one percent.
[10] The Supply Agreement, Pg. 6.

B1630

both quality and reliability. The definition of "Best in Breed" is defined as "Products and/or Services that are commercially available and that have the best functionality for the lowest price."[11]

### B.    THE CREDIT AGREEMENTS - FIRST CREDIT AGREEMENT - DATED OCTOBER 1998 AND THE SECOND CREDIT AGREEMENT - DATED MAY 2000

The First Credit Agreement provided Winstar with a financing structure to obtain the products and services defined under the Supply Agreement. This financing was to complete the construction of its network. It was understood that the construction of a massive telecommunications infrastructure would require significant up-front capital expenditures, which would occur prior to Winstar ever achieving profitability. As such, the First Credit Agreement deferred principal payments until 2002.

In May 2000, Winstar repaid the approximately $1.2 billion outstanding balance under the First Credit Agreement.[12] At the same time, the Parties entered into the Second Credit Agreement, whereby Lucent agreed to extend to Winstar up to $2 billion in credit, available in $1 billion tranches.[13] Under the Second Credit Agreement, Winstar was not obligated to repay principal until 2005. However, on December 7, 2000, Winstar repaid Lucent $194 million, leaving a balance claimed by Lucent of $559 million.[14]

### C.    THE NETWORK BUILD-OUT SERVICES AGREEMENT - DATED JANUARY 1999

Shortly after signing the Supply and Credit Agreements Lucent and Winstar Wireless, Inc. ("WWI") entered into the Agreement for Network Build-Out Services (commonly referred to as the "Subcontract,"). As discussed above, Lucent had committed itself to design, supply and

---

[11] The Supply Agreement, Schedule H.
[12] 2WC 0617766.
[13] LW00064116. Lucent Due Diligence: The Second Agreement included several requirements beneficial to Lucent. For example, under certain conditions Lucent had the ability to issue a refinancing notice to Winstar. The interest rate would increase during the refinancing period and Lucent could then require all monthly draws to have 70 percent Lucent content. Lucent could also convert the debt into marketable unsecured notes.
[14] 2WC 00600988.

build Winstar's network in the Supply Agreement.  At the outset of the strategic partnership Lucent was not able to supply the anticipated services.  Ultimately, Lucent subcontracted with WWI to perform these services.  These services essentially included the specialized labor force needed to build and install the network.  Through December 2000, Lucent paid WWI for these services.  Winstar used the borrowings under the Credit Agreement to pay Lucent for the services performed by WWI.

### D.    SUMMARY OF THE CREDIT FACILITIES

To demonstrate the magnitude of the relationship between the Parties, Table 1 summarizes Winstar's draw requests that were financed during the credit facilities as follows:

Table 1:  Summary of the Credit Facilities

| Credit Facility | Total |
|---|---|
| 1st | $1,207,124,434 |
| 2nd | 930,919,626 |
| Total | $2,138,044,060 |

Lucent has filed a secured claim with the bankruptcy court for an additional $138 million related to the equipment and services Lucent claimed it supplied but were not financed.

Our analysis of the credit facilities focused on Lucent's domestic invoices issued to Winstar that were financed by Lucent.  Attached, as Exhibit A is a summary by draw of Lucent's domestic transactions and attached as Exhibit B is the detailed transactions history of Lucent's domestic invoices.

### III.    BASIS FOR ANALYSIS

The analysis and opinions in this report are based primarily upon the documentation available to date and my experience in performing similar financial analyses and forensic analyses.  I have been qualified and presented testimony on numerous occasions, including the presentation of

| Confidential | Page: 9 |
|---|---|

financial analysis in courts throughout the United States. I am a Certified Public Accountant and have a Masters Degree in Business Administration with a concentration in Corporate Finance.

I am a Principal with Parente Randolph, LLC's Forensic & Litigation Services department. Attached, as Appendix A, is my current curriculum vitae and information concerning my testimony history and publications.

I, or others under my direct supervision, have performed this analysis with the information available to date. Accordingly, we reserve the right to amend our analysis and this report should additional or updated information become available.

Our analysis was based primarily on the documentation listed in Appendix B. The documents and information utilized are the types of documents and information experts in my field typically rely upon in performing such an analysis.

Our firm is being compensated at rates of $75 to $350 per hour. Our compensation is not contingent upon the outcome of this litigation.

## IV.   ANALYSIS

Initially, we analyzed the financial records and supporting financial documentation to make a determination as to whether the transactions were arm's-length and whether Lucent exerted undue influence and control over Winstar. Beyond the written agreements, our financial analysis was performed by evaluating the Parties' detailed contemporaneous financial documentation. Examples of such records included invoices, purchase orders, inventory listings and other accounting information maintained by Winstar and Lucent.

After we completed our analysis of the financial transactions and supporting financial documentation, we evaluated correspondence and deposition testimony by the Parties to provide additional explanations and help to characterize the nature and reasons for the financial transactions. Our analysis is structured as follows:

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

**B1633**

Confidential                                                                Page: 10

A. Definitions – Arm's-Length Transaction and Undue Influence.

B. The Analyses of the Financial Records:

    1. End of Quarter Transactions.

    2. "Bill and Hold" Transactions.

    1. Software Pool Agreement.

    2. Duplicate Invoices.

    3. Other Credits.

    4. Excess Interest Charged.

    5. Summary of the Analyses of the Financial Records.

C. The Analyses of the Correspondence and Testimony:

    1. End of Quarter Transactions.

    2. "Bill and Hold" Transactions.

    3. Software Pool Agreement.

A.    DEFINITIONS – ARM'S-LENGTH TRANSACTION AND UNDUE INFLUENCE

In an effort to provide a proper framework for our methodology, we utilized a set of definitions as a basis for the critical analytical work counsel asked us to perform.

For our definition of an arm's-length transaction, we applied Black's Law Dictionary's definition of an arm's-length transaction, as a transaction resulting from business dealings between independent parties presumed to have equal bargaining power.[15]

We also relied on Black's Law Dictionary for the definition of undue influence: the improper use of power or trust in a way that deprives a person of free will and substitutes another party's objective.[16]

---

[15] Black's Law Dictionary, Seventh Edition, "Of or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship <an arm's-length transaction does not create fiduciary duties between the parties."

[16] Black's Law Dictionary, Seventh Edition, "The improper use of power or trust in a way that deprives a person of free will and substitutes another's objective. Consent to a contract, transaction, relationship, or conduct is voidable if the consent is obtained through undue influence."

## B.   THE ANALYSES OF THE FINANCIAL RECORDS

To proceed with our financial analysis, we first needed to obtain an understanding of how the purchases by Winstar and the sales by Lucent were documented in each party's accounting system. Within Exhibit C is an overview of our initial work, which includes:

- Lucent's Sales Cycle Process.
- Winstar's Purchase Order Processes.

Upon completion of our evaluation of how the Parties recorded and documented transactions, we turned to counsel's specific questions. Based upon the above definitions, we focused on the following questions relevant to determining whether the transactions were arm's-length and if Lucent exerted undue influence and control.

- Did the transactions make business sense for Winstar?
- Did Winstar achieve a rational business objective from entering into the transactions?
- Did the transactions favor Lucent and harm Winstar?

Our analysis revealed a series of inappropriate, unnecessary and financially burdensome transactions from Winstar's perspective. While some of these transactions were fashioned in a manner to appear to be performed at arm's-length, most if not all reveal a pattern of concealment, manipulation and deception. Our analysis of the financial records concluded these transactions were not conducted at arm's-length and that Lucent exerted undue influence and control over Winstar.

The financial records, when assembled in a logical manner, identify a series of transactions that include:

- The Parties' practice of engaging in a series of end of quarter deals, in which Winstar purchased an ever-increasing volume of products and services in order

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

for Lucent to achieve its revenue goals. These deals were done without regard for Winstar's needs and equipment demands and without regard to scheduled installation periods.

- Winstar's employees signed and executed numerous bill and hold letters at Lucent's request that were designed to show imminent deployment for goods and services purchased.    Winstar and Lucent consistently failed to meet the deployment schedule listed on the letters.  In fact, significant amounts of bill and hold equipment remained in warehouses when Winstar filed for bankruptcy protection.   These transactions were used by Lucent to recognize revenue on equipment that remained in Lucent warehouses for an extended period of time.

- Lucent's pre-billing of Winstar for installation services on invoices which bundled equipment, engineering and network services into one line item, thus enabling the recording of revenue months, if not a year, before the services were performed (if ever) and in most cases, before the network equipment was physically in Winstar's possession or before title had actually passed to Winstar.

- A Software Pool Agreement in September 2000, in which Lucent purported to sell a total of $135 million of software to Winstar when it intended to deliver only $20 million of actual potential value.

- Lucent's use of period-straddling billings and off-setting credits to the account of Winstar, which resulted in accelerating revenue into Lucent's current year end, and maximized Winstar's purchases from Lucent without causing Winstar to violate its covenant obligations to its lenders.

Each of these transactions is discussed in detail within the financial analysis section of the report. Within a reasonable degree of accounting certainty, we can reach no other conclusion than that these transactions were done in a manner that was not at arm's-length. Further, these financial transactions and the related documents analyzed provide evidence of Lucent's significant undue influence and control over Winstar.

In summary, we conclude that:

- These transactions did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into these transactions.

- These transactions favored Lucent and harmed Winstar.

Confidential

### 1.    End of Quarter Transactions

We noticed a significant increase in the transaction volume that occurred in the months when the quarter ended ("EOQ") when compared to the non-end of quarter ("NON-EOQ") months during the period October 1999 through September 2000.[17]  Chart 1 details the difference between the average monthly transaction volume during the NON-EOQ months to the EOQ months from October 1999 through September 2000.



**Chart 1: Average Monthly Lucent Domestic Purchases[18]**
**(in Millions of Dollars)**



The use of end of quarter transactions is not necessarily unusual.  Here, the disparity in the sales volume evidenced in Chart 1, in addition to the fact that Winstar's uninstalled network equipment was accumulating in the warehouses at an unusual rate, suggested that further examination of these transactions was appropriate.

---

[17] The EOQ months include March, June, September and December.  The NON-EOQ months include January, February, April, May, July, August, October and November.  Exhibit D confirmed the pattern that was demonstrated in Chart 1: the volume of transactions dramatically increased at the end of each quarter.

[18] Chart 1 excludes the $135 million software purchase entered into in September 2000.

**B1637**

Confidential                                                                    Page: 14

Our analysis established that Winstar accumulated tremendous amounts of uninstalled network equipment that Winstar's records establish was not immediately necessary for its network build-out.[19] Table 2 below summarizes the approximate amount of uninstalled network equipment on hand in Winstar's and Lucent's warehouses when Winstar filed for Bankruptcy protection.

Table 2: Network Equipment on Hand March 31, 2001

| Location | Amount |
|---|---|
| Winstar | $ 275,096,523 |
| Lucent | 52,384,505 |
| Total | $ 327,481,028 |

We analyzed the Lucent invoices to determine whether the network equipment that remained in the warehouse uninstalled was purchased directly from Lucent.[20] We excluded the uninstalled network equipment that was purchased directly from third party suppliers. Table 3 summarizes the results of our analysis.

---

[19] For example during our invoice analysis we identified a Winstar "Deal Document" that appears to have been drafted before the end of quarter deal in June 2000. (ZWC 0132322. Exhibit E). The document stated the following information:

- [Lucent] Stuff we need now - $19.69 million.
- [Lucent] Stuff we need later this year - $13.3 million.
- [Lucent] Stuff we need next year (or years after) - $60.7 million.
- [Non-Lucent] Stuff we really need this year that we could be buying instead of next year [Lucent] stuff - $62 million.

Despite the recognition that it did not immediately need approximately $74 million identified. apparently, Winstar went ahead and issued purchase orders for approximately $113 million as evidenced in a Lucent document containing a similar summary. (WPLU00221-WPLU00222. Exhibit F). Winstar purchased approximately $88 million of equipment and services from Lucent in June 2002.

[20] Our analysis traced the Lucent invoices to the specific product numbers and descriptions detailed within the inventory of the uninstalled network equipment. In order to quantify the remaining uninstalled network equipment to specific Lucent invoices, we applied a First in, First out ("FIFO") inventory accounting methodology to conservatively determine the approximate number of days the equipment remained uninstalled. The FIFO approach used the latest purchase of network equipment to accumulate the uninstalled quantity.

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

Confidential                                                                    Page: 15

Table 3: Summary of Equipment Matched Using FIFO[21]

| Warehouse Location | FIFO Match |
|---|---|
| Winstar | $ 36,378,710 |
| Lucent – Long Haul | 36,802,929 |
| Lucent – Metro | 258,412 |
| Total | $ 73,440,051 |

Chart 2 identified the specific periods Winstar acquired the network equipment as follows:

Chart 2: FIFO Equipment Acquisition Date Based on Invoice Ship Date (Dec 99 – Dec 00)



1 - Approximately $36 million was part of the December 1999 Bill and Hold transaction.

2 - Approximately $15 million was part of the June 2000 Bill and Hold transaction.

---

[21] Table 3 includes only FIFO matched equipment and excludes over $135 million of equipment that was purchased through the vague invoices because we could not identify the specific equipment purchased. In addition, Table 2 includes over $78 million of inventory that was purchased for resale and excluded from our FIFO calculation. Table 2 also includes approximately $71 million of non-Lucent equipment that was excluded from our FIFO calculation.

B1639

Chart 2 shows four distinct periods when the uninstalled network equipment was acquired from Lucent: 1) December 1999; 2) March 2000; 3) June 2000 and 4) September 2000.[22]   A significant portion of the network equipment was purchased through bill and hold deals during the end of quarter transactions and should have followed a fixed delivery schedule that was consistent with Winstar's business purpose.   It appears that the bill and hold installation schedules were not followed, as discussed in section IV-B-2 below.

The data summarized in Charts 1 and 2 establishes that the vast majority of Winstar's purchase transactions occurred through end of quarter transactions and that these end of quarter transactions resulted in dramatic increases in Winstar's supply of uninstalled network equipment stored in Winstar – and Lucent -- warehouses.

We have identified no business justification for Winstar to make these large purchases of network equipment that was not currently needed to continue Winstar's network build-out.  As a result, we conclude that these end of quarter transactions were not arm's-length and may have been the result of Lucent's undue influence and control.

We encountered another issue while conducting our analysis.   Under Generally Accepted Accounting Principles ("GAAP") persuasive evidence of an arrangement must exist for revenue to be recognized from a transaction.[23]   A significant percent of Lucent's invoices are vague, rendering tracking of the related purchases problematic, if not impossible.   The invoicing process adds additional evidence these transactions were incomplete at the time they occurred.  Numerous Lucent invoices fail to provide the level of detail necessary to specifically identify all the products purchased, omitting critical details like the specific product number and/or product descriptions.   When we encountered these non-descriptive invoices, we researched and analyzed Winstar's purchase orders, some of which were similarly vague.   In some cases, Winstar's purchase requisitions and other supporting documentation identified additional detail that

---

[22] Winstar's records indicate it was near the limits of the capital expenditure loan covenants during the September 2000 end of quarter deal, making an end of quarter deal for December 2000 an impossibility.  Additionally, the bulk of the September 2000 end of quarter deal involved a software pool ($135 million) that did not result in an increase of equipment purchased.
[23] Staff Accounting Bulletin No. 101 and No. 104.

B1640

documented the actual products purchased. The amount of vague invoicing is significant: we identified over $135 million of Winstar equipment purchases where Lucent failed to detail the product purchased, product number, descriptions and quantities purchased. Table 4 summarizes the total amount purchased by Winstar on the Lucent invoices that lacked product numbers or descriptions. Exhibit G details the invoices and the specific descriptions.

| Table 4: Summary of Lucent Invoices Without Detailed Product Description | | | | |
|---|---|---|---|---|
| | Equipment | Installation, Service and Engineering | Other | Total |
| Total | $ 135,476,827 | $ 51,791,812 | $ 4,292,403 | $ 191,561,042 |

In our experience, these transactions are among the most poorly documented that we have encountered. Invoices presented in this nature are not within normal business practices and would not be paid or honored among parties acting at arm's-length. The vague invoicing practice suggests that Lucent was exerting undue influence and control to force Winstar to accept transactions that it would not have agreed to if it had equal bargaining power. Examples of the network equipment purchases include:

- Invoice Number – SU909857 – dated July 6, 1999, Item No. 1 with a ship date of June 18, 1999, which was shipped to Lucent's Morrow, Georgia warehouse, has a part number/description of Long Haul Material – Quantity shipped – 1 – a unit price of $1,700,000. However, the total price is $11,700,000, which appears to be an over billing of $10 million. The difficulty in confirming this comes from the lack of detail in the part number/description because we have no supporting documentation to compare the price and quantity purchased. The invoice and purchase order are attached as Exhibit H.

- Purchase order number WNE-0000005825 dated March 29, 2000, detailed the following items 8-1 Misc Material quantity of $5,479,728 and a purchase order price of $1. In addition 14-1 Misc Material quantity of 27,200,000 and a purchase order price of $1. The purchase order is attached as Exhibit I.

In total, we cannot reconcile approximately $191 million or 27 percent of transactions between the Parties due to the vague documentation prepared contemporaneously with the sale. In analyzing the financial records, we found information prepared by Winstar's internal auditors

documenting this specific problem.[24]   Notwithstanding the auditor's concerns, Lucent and Winstar continued to fail to establish the fundamental accounting controls necessary to prohibit the occurrence of these ambiguous transactions.  In our experience, such a practice would never occur in an arm's-length sale, but might very well occur within closely held businesses, a parent/subsidiary transaction, an intercompany transfer between divisions or sales between closely related parties.

Winstar's unnecessary purchases provided Lucent with revenue, but harmed Winstar.  Through the accumulation of all the unnecessary transactions, Lucent caused Winstar to finance more products than it needed.  If Lucent had not used its undue influence and control to pressure Winstar into accepting transactions that at the time were not needed, Winstar's financing balance would have been significantly lower.  Table 5 calculates Winstar's revised financing balance as follows:

**Table 5:  Revised Financing Balance as of 4/18/01[25]**

|  | Amount |
| --- | --- |
| Loan Balance – 12/1/00 | $753,570,709 |
| Less Prepayment – 12/7/00 | 194,000,000 |
| Balance | 559,570,709 |
|  |  |
| Less: |  |
| Unnecessary Prepurchased Equipment[26] | 250,000,000 |
| Credits Not Honored | 47,574,970 |
| Duplicate Payments | 22,975,352 |
| Excess Interest | 8,243,576 |
| Subtotal | 328,793,898 |
|  |  |
| **Revised Financing Balance** | **$230,776,811** |

---

[24] 3WC 0004228 - 3WC 0004231.

[25] In fact, Winstar prepared its own analysis, showing a corrected loan balance of $427,556,384.27 as of January 5, 2001. (2WC 0073643-2WC 0073646.  Exhibit J).  This analysis did not account for the duplicate invoices and the excess interest charged, and also assumes Winstar would return over $167 million of equipment and software rather than $250 million of unnecessary prepurchased equipment.

[26] The reduction of $250 million for unnecessary prepurchased equipment conservatively estimates carrying a reasonable amount of uninstalled network equipment on hand of approximately $77 million.

Confidential

Through these purchases, Lucent caused the amount financed to exceed the refinancing covenants contained in the Credit Agreements.[27]  When this occurred, Lucent's rights under the Second Credit Agreement to serve a refinancing notice were triggered.  Lucent exercised these rights on December 18, 2000, (less than two weeks after Winstar's payment) to Winstar's considerable detriment.

As a result of these end of quarter transactions we also observed that:

- Winstar accumulated over $327 million of uninstalled network equipment by the time Winstar filed for bankruptcy protection.  This subjected Winstar to unacceptable inventory levels, unnecessary use of working capital, equipment cannibalization, theft and/or damaged equipment.

- Winstar's equipment diminished in value as it remained in Lucent's warehouses.[28]

- Winstar received vague invoices and thus the financial records could not be used to verify the actual products and services purchased.

- Winstar received an additional financial burden as a result of increased warehouse space necessary to house the volume of uninstalled network equipment.

- Winstar recorded additional finance costs as a result of the excess network equipment purchased.

In summary, we conclude that:

- These EOQ transactions did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into these transactions.

- These transactions favored Lucent and harmed Winstar.

---

[27] The Second Credit Agreement, Pg. 33.
[28] This is evidenced by Lucent's offer to repurchase $47 million of optronics equipment stored in a Lucent warehouse for approximately 420 days at a 70 percent discount.

2.    *"Bill and Hold" Transactions*

As discussed above, the Parties entered into a number of significant bill and hold transactions at the end of the quarters through bill and hold letters.[29] In order to determine the reasonableness of the basis for bill and hold transactions, we identified the appropriate GAAP requirements for a bill and hold transaction. Generally, for revenues to be recognized they must be realized or realizable and earned.[30] Specifically, GAAP identifies seven criteria that must occur for the seller to recognize revenue from a bill and hold transaction. These seven criteria as detailed in Table 6 below provide the foundation that Winstar and Lucent should have utilized to enter into appropriate bill and hold transactions, and Exhibit L summarizes the basis for determining whether the Parties achieved the criteria.[31]

Table 6: The Criteria for Bill and Hold Transactions to Occur

| Item Number | GAAP Requirements |
|---|---|
| 1 | The risk of ownership must pass to the buyer. |
| 2 | The buyer must have a fixed commitment to purchase the goods, preferably reflected in written documentation. |
| 3 | The buyer, not the seller, must request the transaction be on a bill and hold basis. In addition, the buyer must have had a substantial business purpose for ordering the goods on a bill and hold basis. |
| 4 | There must be a fixed schedule for delivery of the goods and the date for delivery must be reasonable and must be consistent with the buyer's business purpose. |
| 5 | The seller must not have retained any specific performance obligations such that the earning process is not complete. |
| 6 | The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders. |
| 7 | The equipment must be complete and ready for shipment. |

It is important to note that Winstar encountered significant risks associated with the bill and hold transactions. These risks included accumulation of uninstalled network equipment, equipment obsolescence, cannibalization of the equipment,[32] theft of and/or damage to the equipment. It is our understanding that the bulk of the network equipment purchased by Winstar included high

---

[29] See Exhibit K.

[30] FASB Concept Statement 5.

[31] SEC Accounting and Auditing Enforcement Release ("AAER"). No. 108, August 5, 1986.

[32] The cannibalization of the equipment is described as pulling pieces or component parts of the warehoused equipment towards delivering a particular component in the field. Winstar's Director of Asset Management raised similar concerns about the bill and hold equipment. Exhibit M.

Confidential

technology telecommunications equipment. We would expect such equipment to be at high risk of becoming outdated and losing its value as it sat uninstalled in warehouses. In the telecommunications sector, this would presumably have been a basic consideration when purchasing network equipment.

Based on our prior experience with bill and hold transactions we expected to identify:

- A Winstar analysis that documented the need for purchasing equipment prior to entering into the bill and hold transactions, including fixed deployment schedules.

- A Winstar analysis of whether the bill and hold transactions were appropriate under GAAP.

These types of analysis would have identified and/or justified a business reason to purchase the equipment on a bill and hold basis. However, we failed to find that any such analyses existed or that Winstar prepared them before entering into any of the bill and hold transactions with Lucent.

To conduct our analysis of the bill and hold transactions, we accumulated the purchase orders that were referenced within the bill and hold letters. From the purchase orders, we identified the Lucent invoices to determine the volume, amounts and items included in the bill and hold transactions. While GAAP criteria One and Two in Table 6 above appear to have been documented by the Parties, it is unclear if the Parties truly accomplished these items to achieve the elements of a bill and hold transaction. GAAP criteria Three requires that the buyer (Winstar), not the seller (Lucent), request the transaction be made on a bill and hold basis. These letters raise an issue with the GAAP criteria for recognizing revenue related to bill and hold transactions, because based on the transmittal documents between the Parties, Lucent -- rather than Winstar -- requested the bill and hold transactions.[33]

---

[33] Transmittal correspondence confirms Lucent's request of the bill and hold transactions. Exhibit N.

Table 7 summarizes the bill and hold transactions as follows:[34]

<table>
<tr><td colspan="9" align="center"><b>Table 7:  Summary of Bill and Hold Transactions</b></td></tr>
<tr><td><b>Period</b></td><td colspan="2"><b>Material<br>(Equipment)</b></td><td colspan="2"><b>Installation &<br>Services</b></td><td colspan="2"><b>Other</b></td><td colspan="2"><b>Total</b></td></tr>
<tr><td>December - 1999</td><td>$</td><td>44,313,134</td><td>$</td><td>10,000,000</td><td>$</td><td>5,445,469</td><td>$</td><td>59,758,603</td></tr>
<tr><td>March - 2000</td><td></td><td>40,641,165</td><td></td><td>15,476,597</td><td></td><td>340,304</td><td></td><td>56,458,066</td></tr>
<tr><td>June - 2000</td><td></td><td>33,844,684</td><td></td><td>204,062</td><td></td><td>65,787</td><td></td><td>34,114,533</td></tr>
<tr><td>September - 2000</td><td></td><td>5,166,868</td><td></td><td>36,920</td><td></td><td>20,582</td><td></td><td>5,224,370</td></tr>
<tr><td>Total</td><td>$</td><td>123,965,851</td><td>$</td><td>25,717,579</td><td>$</td><td>5,872,142</td><td>$</td><td>155,555,572</td></tr>
<tr><td>Percent</td><td></td><td>79.70%</td><td></td><td>16.53%</td><td></td><td>3.77%</td><td></td><td>100.00%</td></tr>
</table>

As noted in Table 7, Winstar purchased approximately $124 million of network equipment using bill and hold transactions between December 1999 and September 2000.  Bill and hold transactions represented over 22 percent of all Winstar purchases from Lucent.[35]  Of these purchases, approximately $52 million of the uninstalled network equipment purchased as part of the bill and hold transactions remained in Lucent warehouses when Winstar filed for Bankruptcy protection.  Of this $52 million of equipment, the equipment that was matched in our FIFO analysis remained in Lucent's warehouse on average 420 days.

GAAP criteria Four on Table 6 above reflects that the Parties must utilize a fixed schedule for delivery.  The average lag of 420 days exceeds any fixed delivery schedule we have ever encountered.  Further, a holding time of 420 days in inventory is inconsistent with any legitimate business purpose to justify a bill and hold transaction.

Table 7 also identifies approximately $31 million of additional installation, services and other charges that were billed by Lucent on these invoices.  The $31 million represented over 20

---

[34] During our invoice analysis, we identified a series of transactions that indicated that Lucent used the concept of bill and hold as early as June 1999. Lucent shipped approximately $48 million of network equipment to its Morrow, Georgia warehouse before the first bill and hold letter we identified in December 1999.  Incredibly some of this equipment remained in Lucent's warehouse when Winstar filed for Bankruptcy.  This provided a strong indication that transactions of this nature occurred prior to December 1999.  Exhibit O details the invoices that support the shipments to the Morrow, Georgia warehouse prior to December 1999 and the quarterly bill and hold transactions from December 1999 through September 2000.

[35] $155,555,572 divided by $706,277,084 (total Lucent purchases) equals 22 percent.

Confidential                                                                    Page: 23

percent of the total bill and hold transactions. [36]  GAAP criteria Five in Table 6 above states the seller must not have retained any specific performance obligations such that the earnings process is not complete.    Pre-billing for installation services, by definition, includes an ongoing performance obligation.  In its amended answer, Lucent admits that Lucent invoiced and Winstar paid a $10 million long term maintenance agreement that was included as a bill and hold transaction for no identifiable reason.[37]

It is difficult to document any rational basis or valid business reason to justify why Winstar would pre-purchase installation services.  This is particularly true considering the large volumes of equipment that remained uninstalled in the warehouse for periods that exceed one year.  Much of this equipment remained within Lucent warehouses and was never delivered to Winstar, let alone scheduled for installation.  Assuming Winstar could have installed $35 million to $50 million of network equipment in a month, Winstar had approximately seven to ten months of uninstalled network equipment on hand at the time Winstar filed for Bankruptcy protection.  This build up of uninstalled network equipment is inconsistent with the basic accounting concepts of a bill and hold transaction.

Ultimately, Lucent failed to complete its performance obligation related to these transactions and as such, failed to complete the earnings process and improperly recognized revenue from these transactions.  Finally, and irrespective that the equipment was never used, there appears to be no basis for Lucent to invoice for these services considering the amount of time that existed between the ship date, the invoice date and the time when Lucent would actually perform these services.

Table 8 details the average number of days before Lucent shipped the equipment it sold (or performed the services it billed) under the bill and hold transaction as follows:

---

[36] $25,717,578 plus $5,872,139 equals $31,589,717 and 16.53 percent plus 3.77 percent equals 20.3 percent.
[37] Answer and Counterclaims, Pg. 17, and Invoice Number ER912954 – WCV A0002220.

**B1647**

Confidential

Table 8: Aging from "Bill and Hold" Date to Invoice Ship Date

| Date | Less then 15 | 15-29 Days | 30-59 Days | More then 60 | Total |
|------|-------------|-----------|-----------|-------------|-------|
| 12/20/1999 | $59,676,757 | - | $81,846 | - | $59,758,603 |
| 3/30/2000 | 39,880,384 | 1,320,114 | 267,464 | 14,990,104 | 56,458,066 |
| 6/30/2000 | 29,861,230 | - | 1,775,074 | 2,478,229 | 34,114,533 |
| 9/29/2000 | 5,224,370 | - | - | - | 5,224,370 |
| Total | $134,642,741 | $1,320,114 | $2,124,384 | $17,468,333 | $155,555,572 |
| | | | | | |
| Percent | 86.55% | 0.85% | 1.37% | 11.23% | 100.00% |
| | | | | | |
| Average Days | (1) | 30 | 49 | 180 | |

GAAP criteria Seven in Table 6 requires that Lucent must have the equipment completed and ready for shipment. The delayed shipment of the network equipment as demonstrated above and Lucent's performance of the services in some cases averaging 180 days after the bill and hold transaction is inconsistent and fails to achieve the criteria for recognizing revenue from a bill and hold transaction, and raised questions as to why these transactions were conducted on a bill and hold basis.

Our financial analysis noted that these transactions share many common characteristics with channel stuffing practices. Channel stuffing is commonly referred to as the practice of accelerating shipments to vendors before the end of quarter in an effort to achieve revenue or earnings.[38] Channel stuffing typically involves deliberately manipulating the accounting records to create the appearance of controlled or disciplined growth. The irregularities related to channel stuffing "are extremely hard to detect, if not impossible, if customers of the company are partners in the concealment scheme."[39] In the end of quarter deals and particularly the bill and hold transactions, Lucent appears to have deliberately manipulated its accounting records and exerted its undue influence and control to make Winstar accept products and services before they were needed. Because Winstar was not a distributor for Lucent, Winstar was not able to return equipment and services that it could not use, unlike the distributors in channel stuffing schemes, who retain the right to return the excess goods. Thus, Winstar suffered financial consequences that a normal channel stuffing partner would not incur.

---

[38] "Major Business News Behind Lucent's Woes: Push to Meet High Revenue Goal," Wall Street Journal, dated March 29, 2001.

[39] IT Audit – Audit Tools – Confronting Earnings Management, Vol. 6, dated February 1, 2003.

We conclude that the bill and hold transactions failed to meet the definition of an arm's-length transaction between willing buyers and seller because:

- These transactions did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into these transactions.

- These transactions favored Lucent and harmed Winstar.

   3.    *Software Pool Agreement*

In addition to the bill and hold transactions, Lucent used another form of agreement to enhance its revenue position. In September 2000, the Parties entered into a Software Pool Agreement, which on the face, purported to allow Winstar to select $135 million of software from a pool of $184 million of available software.[40] We analyzed the various draft agreements issued prior to the finalization of the Software Pool Agreement and curiously we noted that within a nine-day period, the software pool expanded from an initial obligation of $31 million to the final amount of $135 million. Table 9 illustrates the Parties' expansion of the transaction and the ultimate quantification of the Software Pool Agreement as follows:

Table 9: Summary of the Various Draft Dates and
Amount to the $135 Million Software Pool Agreement[41]

| Draft Date | Amount |
|---|---|
| 09/20/00 | $31 Million |
| 09/28/00 | $110 Million |

| Final Agreement Amount | |
|---|---|
| 09/29/00 | $135 Million |

---

[40] As will be seen in the second half of the report, Lucent intended to provide Winstar with only $20 million in software.

[41] Attached as Exhibit P are copies of the draft software pool agreements.

---

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

We have not identified any possible business justification for such a rapid increase in the amount of software to be purchased within the agreement or the timeframe of its creation, nor did we observe any Winstar request for additional software during negotiations. Winstar's financial documentation related to the Software Pool Agreement was minimal, far less than what would be expected for a transaction of this magnitude. In fact, there was far less documentation for the Software Pool Agreement then existed in many of the smaller transactions between the Parties.

We did not identify the normal planning documents one would expect to find, such as budgets, feasibility studies or consultant's reports to assist in preparing a proposal for implementation. In our opinion these types of actions are normal and typical to document what is being agreed-upon when making a commitment to purchase software – let alone a commitment for $135 million. We also saw no indication that Winstar studied the financial ramifications of implementing such a large volume of software in such a short period of time within its network operations.

Additionally, the available financial documentation raises significant doubts as to whether Winstar had the financial capacity to implement such a large software purchase. According to the terms of the Software Pool Agreement, Winstar was prohibited from funding the software purchase through the credit facility with Lucent. At the time, Winstar had limited cash available to pay for a commitment of this size.

The payment terms were structured so Lucent could recognize the revenue associated with the Software Pool Agreement in September 2000 (Lucent's year end); Winstar's payment was deferred until after December 31, 2000 (Winstar's year end). Thus, based upon the structured terms of the Software Pool Agreement, Winstar eliminated, until 2001, the impact on its spending covenants that existed in 2000. In addition, for reasons not explained in the documents, Winstar agreed to pay list price for the software and not the contractual discounted price that Winstar negotiated in the Supply Agreement.[42] Based on these facts, we concluded that the Software Pool Agreement had little, if any financial substance and was a method for Lucent to accelerate its own revenue while delaying the financial burden on Winstar, its strategic partner.

---

[42] The Supply Agreement, Pg. 28, Section 11.5.

Confidential

In November 2000, Lucent announced that it was conducting an internal investigation of the transaction. The SEC also conducted an investigation of Lucent for its role in the Software Pool Agreement.[43]   Following the investigation Lucent subsequently reversed the revenue it had recognized related to the Software Pool Agreement.

In summary of our analysis of the Software Pool Agreement, we noted the following issues:

- The Parties rapidly expanded the size of the transaction during the sales process - within nine days it expanded from $31 million to $135 million.

- The documentation supporting the transactions did not identify the normal planning documents such as budgets, feasibility studies or proposals.

- Winstar did not have the financial ability to support a purchase (let alone its implementation) of this size absent Lucent's financing, which Winstar was specifically precluded from using.

- Lucent changed the pricing of the software to list price from the contractually negotiated discounted price in the Supply Agreement.

- Winstar records do not document any need for the software, which should have been the basis for entering into the purchase obligation.

- Lucent conducted an internal investigation and the SEC investigated Lucent for its role in the transaction.  Ultimately, Lucent restated its earnings, and did not recognize the revenue associated with this transaction.

- Lucent in its $138 million secured proof of claim continues to contend that it is entitled to $67.5 million from Winstar for this transaction.

In summary, we conclude with respect to the Software Pool Agreement that:

- The transaction did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into the transaction.

- The transaction favored Lucent and harmed Winstar.

---

[43] Lucent press release, dated November 21, 2000. "Lucent Technologies Identifies Revenue Issue From Fourth Fiscal Quarter 2000."

---

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

Confidential                                                           Page: 28

This transaction fails to meet the definition of arm's-length and we conclude that only through Lucent's undue influence and control would Winstar have entered into the $135 million purchase.

### 4.    Duplicate Invoices

Winstar paid for the same things twice (or more). During our invoice analysis, we identified a number of invoices that were duplicative. A duplicative invoice is one that was included more than one time within the funding under the Credit Agreement financing. These invoices were financed under the credit facilities and covered both Lucent's domestic and international invoices (See Exhibit Q for details). Table 10 summarizes the duplicative invoices as follows:

| Table 10: Summary of Duplicate Payments | |
|---|---|
| Location | Amount |
| Domestic | $    16,545,405 |
| International |       6,429,947 |
| Total Duplicate Payments | $    22,975,352 |

The gross duplicative charges approximated $23.5 million. These payments were reduced by approximately $500,000 of duplicate credits. While some invoicing exceptions would be unavoidable, the magnitude of these errors suggests that the Parties' transactions did not undergo the required level of accounting scrutiny.

Lucent's failure to appropriately provide the credits suggests the lack of arm's-length relationship with Winstar. The volume of these types of irregularities should not have occurred in a business relationship that was arm's-length.

### 5.    Other Credits

Another unusual aspect of the relationship between Winstar and Lucent was the number and size of the credits issued by Lucent. While the volume of credits is surprising, what was particularly

B1652

Confidential                                                                    Page: 29

troublesome is that Lucent on multiple occasions refused to allow Winstar to apply credits that it had previously authorized. Table 11 summarizes the credits approved by Lucent during the Second Credit Facility that were subsequently not honored as follows:

**Table 11: Approved Credits Not Honored**

| Date | Amount | Description |
|------|--------|-------------|
| 12/31/2000 | $ 35,000,000 | Optical Equipment Credit-Reduction to Draw #6, Per Bill Plunkett Letter (10/20/00) |
| 12/31/2000 | 2,574,970 | Newbridge Switch Credit-Reduction to Draw #6, Invoice #SU029095 |
| 12/31/2000 | 10,000,000 | 3rd Qtr Credit-Lucent Invoice # SU028448 |
| Total | $ 47,574,970 | |

Winstar's inability to receive credits is another indicia of Lucent's undue influence and control.

6.    *Excess Interest Charged*

In the preceding sections we identified numerous transactions that Winstar apparently entered into for other than valid business reasons. These purchases caused Winstar to unnecessarily finance a significant portion of uninstalled network equipment. We calculated the interest associated with these network equipment purchases. Additionally, to the extent Winstar was invoiced twice for these purchases, we also calculated excess interest charges.[44]

We were unable to specifically identify and segregate the actual interest charges incurred throughout the credit facilities. Accordingly, we estimated the excess interest charges by using the average lowest monthly LIBOR rate for the one-, three-, and six-month periods. This methodology applied a conservative approach since it estimated the average rate using the lowest possible rates experienced during the period. Table 12 summarizes each component of the excess interest charges as follows:

---

[44] Our analysis excludes interest costs associated with Lucent's vague invoices. We excluded these invoices due to our inability to precisely track the network equipment purchased and the timing it went into Winstar's inventory.

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

B1653

Confidential                                                                                            Page: 30

### Table 12:  Summary of Excess Interest[45]

| Equipment Matched | | Amount |
|---|---|---|
| Interest on Winstar Inventory | $ | 2,683,125 |
| Interest on Long Haul Inventory | | 4,321,551 |
| Interest of Metro Inventory | | 30,416 |
| Total interest of matched equipment inventory | $ | 7,035,092 |
| **Equipment Unmatched** | | |
| Interest on Long Haul Inventory | $ | 261,854 |
| **Duplicate Payments** | | |
| Interest on Domestic Invoices | $ | 755,136 |
| Interest on International Invoices | | 191,494 |
| Total interest on duplicate invoices | $ | 946,630 |
| **Total calculated interest** | $ | 8,243,576 |

The total calculated excess interest charges of the $8 million represents additional harm caused to Winstar, and a benefit realized by Lucent, from the transactions.

7.    *Summary of the Analyses of the Financial Records*

Our analysis of the financial records revealed a series of inappropriate, unnecessary and financially burdensome transactions that the Parties entered that favored Lucent and adversely impacted Winstar. Within a reasonable degree of accounting certainty, we can reach no other conclusion than that these transactions were not arm's-length. Further, we cannot explain why Winstar would engage in these transactions absent the presence of Lucent's undue influence and control.

In summary, we conclude that:

- These transactions did not make business sense for Winstar.

- Winstar achieved no rational business objective from entering into these transactions.

- These transactions favored Lucent and harmed Winstar.

---

[45] The second section of Table 12, Equipment Unmatched, calculates additional interest based on a physical inventory taken on November 21, 2000. We used this information for the network equipment located in Morrow, Georgia that we were unable to capture due to the vague invoice descriptions.

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

**B1654**

Confidential

C.        THE ANALYSES OF THE CORRESPONDENCE AND TESTIMONY

Upon completion of our analysis of the financial records, we then evaluated the correspondence and deposition testimony between the Parties. This evaluation provided a basis to help characterize the nature and rationale for the financial transactions. In essence, we wanted to see if contemporaneously written materials by individuals with direct knowledge and recollection could add further support to determine whether these transactions were arm's-length and whether Lucent exercised undue influence and control over Winstar.

This analysis confirmed our earlier conclusion that these transactions were not arm's-length and that Lucent exerted undue influence and control over Winstar. Further, when Winstar attempted to curtail or even diminish its participation, Lucent exerted extraordinary pressure to compel Winstar's continued participation. Lucent knowingly required Winstar's employees to sign and return false bill and hold letters to achieve Lucent's desired revenue and sales goals. Lucent crafted a fictional software transaction in which it solicited Winstar's participation to generate $115 million of fictitious revenues for itself.

We have identified numerous examples of Lucent's undue influence and control over Winstar. A discussion of some of the examples of correspondence and deposition testimony is organized in sections below as follows:[46]

- The End of Quarter Transactions
- The "Bill and Hold" Transactions
- The Software Pool Transaction

1.        *End of Quarter Transactions*

Throughout the duration of the Lucent and Winstar strategic partnership, Lucent exerted undue influence and control over Winstar through its efforts to induce transactions at the end of

---

[46] Additional items of correspondence and deposition testimony not specifically discussed are listed in Exhibit R.

accounting quarters to produce additional revenue for Lucent. According to Lucent, these transactions were designed in order for both Parties to benefit financially. However, our analysis of the financial records concluded that these transactions benefited Lucent and caused Winstar to suffer totally unnecessary financial burdens.

While we were unable to identify a legitimate business reason to justify the end of quarter transactions through our financial analysis, the correspondence and deposition testimony added clarification. According to several Winstar employees, Winstar engaged in these transactions, because, "...partners help each other."[47] See also the deposition of Lisa Hicks, (Winstar's Vice President of Vendor Program Management), January 22, 2004, Pages 107 – 108.

The documentation suggests that Lucent would approach Winstar at the end of each quarter with a "revenue request" where it would ask Winstar to purchase additional products and services prior to the quarter ending.[48] Where Winstar employees resisted, Lucent went over the Winstar employees' heads. For example, Winstar advised Lucent in August and September 2000 that Winstar could not engage in an end of quarter transaction for that quarter. In a memo from Lisa Hicks, (Winstar's Vice President of Vendor Program Management), to Nathan Kantor, (Winstar's President and COO), and David Ackerman (Winstar's Group Executive of Network Engineering) dated August 20, 2000, Ms. Hicks advised them of her belief that Winstar could not afford to do a September 2000 end of quarter deal with Lucent:

> "1)    No more EOQ deals with Lucent effective immediately.
> There is no capital budget left to negotiate with. 1Q00, 2Q00 reciprocal revenue deals used future purchases as part of negotiations; Winstar has pre-purchased equipment that will not be deployed during 2000 in an effort to meet revenue commitments.
>
> 2)    We need to delay/cancel/rebook deals made 1Q00, 2Q00...
>
> ...Specifically we need to delay into 2001:
> a)    Software licenses          $26M
> b)    Switch Pay-as-you-grow      $17M

---

[47] Deposition of Bill Zlotnick, (Winstar Vice President of Program Management) – January 15, 2004, Pg. 114. It is important to note that the deposition testimony cited above was not limited to just end of quarter transactions.
[48] LW0012129 - LW0012130. Exhibit S.

Confidential                                                                                      Page: 33

    c)      Ascend switches        $22M
    d)      Optronics spares/BWM    $15M  (BWM = Bandwith Manager
– Used with Optronics)

                                                $80M  (Lucent has already booked
as revenue)

    e)      Data Center            $23M
    f)      Hub's/B's Turnkey      $83M
                                        $106M (Committed to Lucent as
revenue they would receive in 2000 – they have not booked this yet, but are
indicating being able to book this during CY2000)

    g)     ONG equipment/installation
    - scheduled 2000 deployment pre-purchased      $44.6M
    - scheduled 2001 deployment pre-purchased      $23.2M
                                        $67.8M (Lucent has
already booked as revenue)..."[49]

Later on in the memo, Winstar discussed the possibility of returning goods to Lucent. It appears
that Mr. Ackerman communicated these points to Lucent. Nina Aversano (Lucent, President of
North America Sales) testified based on her handwritten notes that Mr. Ackerman had objected
to doing a deal, stating to another Lucent employee that "Nina's forcing this down [our]
throat,"[50] that Winstar "[don't] intend to buy – sold a bunch of stuff that's not going to be
used,"[51] and finally that Winstar "Can't help."[52]  On being told of Mr. Ackerman's statement,
Ms. Aversano was asked to go over his head to Nathan Kantor, (Winstar's President and COO).[53]
She did, and the September 2000 end of quarter transaction ended up -- incredibly -- as the
largest the Parties entered into.

The timing and content of this correspondence demonstrates Lucent's desire to achieve its
quarterly and year-end revenue goals without regard to the effect such transactions would have
on Winstar, its strategic partner.  Ultimately, the correspondence and deposition testimony
confirmed our conclusion that these transactions were not arm's-length and that Lucent exerted
its undue influence and control over Winstar to generate its desired revenue goals.

---

[49] 2WC 0073217-2WC 0073219.  Exhibit T.
[50] NA006732.  Exhibit U.
[51] Ibid.
[52] Ibid.
[53] LW00016338 - LW00016347.  Exhibit V.

2.    *"Bill and Hold" Transactions*

Our analysis of the financial records raised questions about whether Lucent was using Winstar to achieve revenue recognition goals prior to Lucent's completion of the earning process. In essence, we were concerned that Lucent was booking false revenue as a result of the bill and hold transactions with Winstar. As previously demonstrated, Winstar accumulated a tremendous amount of uninstalled network equipment through these bill and hold transactions. This is entirely inconsistent with the nature of bill and hold transactions, which are typically used to minimize the build-up of equipment as the deployment is scheduled. The correspondence and deposition testimony between the Parties confirmed that Lucent used its undue influence and control to require Winstar's employees to sign false bill and hold letters for Lucent's benefit and the ultimate detriment of Winstar.

On January 15, 2004 William Zlotnick, (Winstar's Vice President of Program Management), testified in response to questions from Lucent's counsel that he knew the deployment schedules in the bill and hold letters he signed were not realistic:

> Q  Okay. What was the -- what was the difference then? Because I believe during Mr. King's questioning you answered that you believed that Winstar's plan for deployment of this equipment was scheduled to happen during the year 2001, and I just want to understand what the discrepancy is between that testimony and what the letter says?
> A  The facts of the world were -- real facts were that we -- it would have -- it would take us throughout the first couple quarters of 2001 to deploy that equipment. Notwithstanding what was said in the letter, the facts of real world deployment were that --
> Q. Okay.
> A.  -- that it would take those many months to do it.
> Q  So then is it fair to say that the schedule put out in your December 29, 2000, letter is an ambitious schedule, but still one that you believed was consistent with fact?
> MR. KING:  Object to the form, and you again called it a December 29th letter.
> MR. PASKIN: Oh, I'm sorry.

> THE WITNESS: It is -- it was a very, very, very aggressive schedule, the one put forth here.[54]

Deposed on January 22, 2004, Lisa Hicks, (Winstar's Vice President of Vendor Program Management), similarly testified that she signed knowingly false bill and hold letters again on questions by Lucent's counsel:

> Q. I'd like to go back to Hicks 20, and, again to the last page. You testified on Mr. King's redirect examination that you thought that part of this [bill and hold] letter was in fact inaccurate. What part was that?
> A. The sentence "Winstar does not have the physical space to store the required equipment."
> Q. And are there any other inaccuracies in this letter?
> A. The rest of it, the entire letter is Lucent language. It was developed by Lucent, not by Winstar.
> Q. I understand. But are there any other inaccuracies that you can see?
> A. I can only speak to my opinion. My opinion would be that the second sentence that, "Winstar requires Lucent ship the needed products to the appropriate Lucent facilities," my opinion is that, since I knew that we had physical space, that that was inaccurate also.
> Q. Okay. And did you know that that was inaccurate at the time that you signed this letter?
> A. This, I don't know how to make this clear. This was just standard status quo that we had gone through every quarter. And we had hashed this out with Lucent initially with the -- I believe the first end of quarter letter that I saw was the one for the last quarter of '99. And we had hashed out all these issues with Lucent, and my understanding, coming back from Lucent, was that it had to be this way, and it had to read this way. And so, therefore, it was just status quo, every quarter.
> Q. I understand, I understand what you're saying. But you signed this letter, and my question to you is, if you knew that it was inaccurate, why did you go ahead and sign the letter?
> A. Because I --
>     MR. KING: Objection. Go ahead.
> A. Because I was required to.
> Q. Who required you to sign this letter?
> A. Lucent. It was a Lucent requirement that this letter be signed.
> Q. I understand that you said that, you testified that Lucent drafted this letter, correct?
> A. Yes.
> Q. So how did Lucent require you to sign it if you knew that it was inaccurate?

---

[54] Deposition of William Zlotnick, (Winstar Vice President of Program Management), dated January 15, 2004. Pgs. 223 - 224.

    A. They verbally said it had to be signed.

    Q. And what would happen if you didn't sign it?

    A. That the deal wouldn't be complete.

    Q. Okay. So you signed this deal -- you signed this letter because you wanted the deal to be complete?

    MR. KING: Objection to the form of the question.

    Q. Correct?

    D. I signed this letter because Lucent wanted the deal to be complete. This was with regard to Lucent's revenue recognition.

    Q. But you work for Winstar, and you don't work for Lucent?

    A. That's correct.

    Q. Did anyone at Winstar require you to sign this letter?

    A. It was, if this is something that Lucent is requiring to make this happen, then we have to do it.

    Q. And that's why you signed it, even though, according to your testimony now, parts of this were inaccurate?

    A. Yes.[55]

The correspondence and deposition testimony highlight Winstar's participation in a transaction that resulted directly from Lucent's undue influence and control. These sworn statements and correspondence demonstrate that Winstar's employees knowingly signed false bill and hold letters at Lucent's request. Lucent, in its efforts to achieve revenue recognition goals, successfully pressured Winstar's employees into assisting Lucent with the fraudulent booking of revenues.

Obviously, Lucent's actions with respect to the bill and hold letters buttress our earlier conclusions that these transactions were not arm's-length and as a result of Lucent's undue influence and control.

> 3.    Software Pool Agreement

In the bill and hold letters, Lucent required Winstar's employees to make false statements in order for Lucent to achieve its desired revenue recognition goals. The correspondence related to the Software Pool Agreement established that Lucent went even further to achieve its revenue goals. In September 2000, through the Software Pool Agreement, Lucent enlisted Winstar's

---

[55] Deposition of Lisa Hicks, (Winstar Vice President of Vendor Program Management), dated January 22, 2004, Pgs. 197-201.

cooperation to engage in a sham transaction designed to enable Lucent recognize $115 million of nonexistent revenue.

By September, Lucent auditors were restricting the use of bill and hold transactions. Furthermore, Winstar had run out of room under its capital expenditure spending limitations to the extent required that it could help Lucent through additional bill and hold transactions.[56]  To circumvent Winstar's limitations as a revenue channel, Lucent devised the software deal, in which it essentially "sold" Winstar $20 million of software for $135 million.  In exchange for Winstar's purchase commitment, Lucent gave Winstar $90 million of credits for the fourth quarter of 2000 (Winstar's year end), as well as a pricing reduction for services to be performed by Lucent:

Table 13:  Summary of the Software Pool Agreement[57]

| Components of the Software Pool Agreement | Amount |
|---|---|
| Actual Software | $ 20,000,000 |
| Credits for September-2000 | 10,000,000 |
| Credit for Fourth Quarter 2000 | 35,000,000 |
| Enterprise Integration Lab Commitment | 45,000,000 |
| Hub and B Pricing Concessions | 25,000,000 |
| **Total Software Pool** | $ 135,000,000 |

In November 2000, Lucent reversed its recognition of $125 million of revenues under this software deal.  Shortly thereafter, the SEC initiated an investigation of Lucent, and since, both Lucent and Winstar employees have been involved in investigations brought by the Justice Department.[58]  At a recent deposition, a Lucent employee invoked his fifth amendment right, rather than testify about the transaction.[59]  We are advised that another Lucent employee is expected to do the same, and several Winstar employees have refused to testify in this action while the investigation continues.

---

[56] In a September 18, 2000 e-mail from Nathan Kantor, (Winstar's President and COO), to David Ackerman, (Winstar's Group Executive of Network Engineering), noted Winstar's capital expenditure limitation and advised Mr. Kantor that Winstar would have to look for "creative" ways to have Lucent reach its revenue goal without getting "totally stupid." (3WC 0011540 - 3WC 0011541.  Exhibit W).
[57] LW00099621-LW00099622.  Exhibit X.
[58] Lucent Technologies Inc. Form 10-Q, dated August 13, 2002.
[59] Deposition of William Plunkett, (Lucent Vice President of Sales), dated February 3, 2004.

Confidential                                                                                    Page: 38

The fact that Lucent and Winstar were sufficiently close so as to participate in a transaction like the software deal conclusively establishes that the Parties were not at arm's-length. The fact that Winstar did so to assist Lucent in its effort to obtain revenue establishes Lucent undue influence and control over Winstar.

## IV.    CONCLUSION

The results of the financial and analytical methodology and procedures performed revealed a series of inappropriate, unnecessary and financially burdensome transactions that adversely impacted Winstar.

Our financial investigation identified a series of non-arm's-length transactions between the Parties:

- Lucent used the end of quarter transactions to cause Winstar to purchase an ever-increasing volume of products and services when no imminent need for the equipment existed.

- Lucent repeatedly used the bill and hold letters that were designed to show imminent deployment needs for goods and services purchased by Winstar when no such deployment need existed on either a current basis or at any reasonable time in the future.

- Lucent pre-billed Winstar for installation services in invoices that bundled equipment, engineering and network services, on one line item thus enabling the recording of revenue months, if not a year, before the services were performed and in most cases, before the network equipment was physically or legally in Winstar's possession.

- Lucent created the September 2000 Software Pool Agreement, which purported to sell a total of $135 million of Software to Winstar when only $20 million of actual value would have been received by Winstar.

- Lucent used billing deferrals and credits to the account of Winstar, which were designed to provide Lucent revenue while keeping Winstar within certain capital expenditure covenants of its borrowing agreements.

*Winstar Communications, Inc. et al., v. Lucent Technologies Inc.*

**B1662**

Our follow up of the examination of the correspondence between the parties, up through and including December 7, 2000, buttress our conclusion that the above transactions were not arm's-length and evidence undue influence and control by Lucent. We learned that Lucent required Winstar's employees to sign knowingly false bill and hold letters to enable Lucent to conceal from its auditors, and obtain Winstar's participation in a fictitious Software Pool Agreement creating $115 million of nonexistent revenue.

These transactions did not make business sense for Winstar, and Winstar achieved no rational business objective from entering into the transactions, and finally, these transactions favored Lucent and harmed Winstar.

Within a reasonable degree of accounting certainty, we concluded that these transactions were not arm's-length. Further, we conclude that Lucent used its undue influence and control over Winstar to compel its participation in these transactions.

We reserve the right to amend our analysis and this report if additional or updated information is provided.

PARENTE RANDOLPH, LLC

Paul W. Pocalyko, CPA                                                      February 26, 2004

**Printer Printer**

| | |
|---|---|
| **From:** | Rif Haffar [rhaffar@winstar com] |
| **Sent:** | Tuesday, March 09, 1999 1 52 PM |
| **To:** | nkantor@winstar com |
| **Subject:** | Update Re Your Meeting with Nina |

Nate,

I did get the opportunity to talk to Chuck and Mark today, and took it.

They understand that we are looking for

      $ 750 in overall funding
      $ 200 in WinStar pass-through with no mark-up
      $ 105 in Non-Lucent equipment with no mark-up

Mark and Chuck reacted positively and said they would brief Nina before you
met with her  Still need to do that, please, to drive the deal home

Important point: Nina is about $1B behind plan this year, and we could be
very helpful if we timed the $750 in the most advantageous way to them.  I
assured them we would.

Happy Hunting

R



1

CONFIDENTIAL 2WC 0065840

B1664

**Printer A**

| | |
|---|---|
| From: | Frank Jules [fjules@winstar.com] |
| Sent: | Tuesday, January 09, 2001 9:35 AM |
| To: | nate Kantor |
| Subject: | Fwd: Re: Fwd: q101 capex estimate |

```
fyi
>X-Sender: hshartel@mail.winstar.com
>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>Date: Tue, 09 Jan 2001 08:02:42 -0500
>To: Frank Jules <fjules@winstar.com>
>From: Howard Shartel <hshartel@winstar.com>
>Subject: Re: Fwd: q101 capex estimate
>
>Frank:
>
>As you know, we had a very large carryover from 2000, that hit 2001,
>because of all the late December shipments (DMC, P-Com, AFC, etc.). All
of
>this equipment was shipped to Lucent in 2000, and shipped by Lucent to
>Winstar in January, to keep it out of 2000 capex.
>I'm sure Gary can give us a breakdown of this number.
>
>The controls in place remain that we process nothing in Procurement
>without WNSS (Bill Zlotnick) and Capital Planning (Gary Simpson)'s
advance
>signoff.
>
>Please let me know if you'd like additional detail.
>
>Howie
>
>At 11:10 PM 01/08/2001 -0500, you wrote:
>>how can this be..we are only in the first week of the year...this
process
>>appears out of control
>>>X-Sender: jodonnell@mail.winstar.com
>>>X-Mailer: QUALCOMM Windows Eudora Pro Version 4.2.0.58
>>>Date: Mon, 08 Jan 2001 18:04:22 -0500
>>>To: fjules@winstar.com
>>>From: james odonnell <jodonnell@winstar.com>
>>>Subject: Fwd: q101 capex estimate
>>>
>>>
>>>Frank, fyi. Here's the q1 estimate of capex spend as provided by Gary

>>>Simpson. Points to note:
>>>
>>>WINSTAR CONSOLIDATED
>>>2001 Full Year Plan            $850 mil
>>>2001 Q1 estimate               $377 mil
>>>
>>>WNSS Only
>>>2001 Full Year Plan            $650 mil
>>>2001 Q1 estimate               $319 mil        (includes $133 mil
>>>Lucent carryover from 2000)
>>>
>>>Regards...
>>>
>>>Jim
>>>
>>>>Date: Mon, 08 Jan 2001 17:06:34 -0500
>>>>To: ruhl@winstar.com
```

1



CONFIDENTIAL ZWC 0159190

```
>>>>From: james odonnell <jodonnell@winstar.com>
>>>>Subject: q101 capex estimate
>>>>
>>>>
>>>>Rick, here's the soft copy of the summary I just left on your desk.
>>>>Please advise any questions.
>>>>
>>>>Regards...
>>>>
>>>>Jim
>>
>
```

2

CONFIDENTIAL ZWC 0159191

B1666

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WINSTAR COMMUNICATIONS, INC., | ) | Case No. 01-1430 (LK) |
| a Delaware corporation, et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### STIPULATION AND AGREED ORDER RESOLVING MOTION OF SECURED CREDITOR LUCENT TECHNOLOGIES INC. FOR RELIEF FROM AUTOMATIC STAY OR, ALTERNATIVELY, ADEQUATE PROTECTION WITH RESPECT TO CERTAIN INVESTMENT AND DISBURSEMENT ACCOUNTS

### RECITALS

     A.    On or about June 14, 2001, Lucent Technologies Inc. (collectively with its

affiliates, "Lucent"), a secured creditor and party in interest in these chapter 7 cases, filed the

Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or,

Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement

Accounts (the "Stay Motion") (D.I. 371).[1]

     B.    By the Stay Motion, Lucent seeks an order, pursuant to sections 361,

362(d) and 363(e) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"):

     (I)    granting relief from the automatic stay of section 362(a) of the Bankruptcy Code by (a) terminating the automatic stay with respect to certain investment and disbursement accounts (collectively, the "Accounts")

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Stay Motion.



because the above-captioned debtors (collectively, the "Debtors") do not have any interest in the Accounts or the ability to provide adequate protection of Lucent's interest in the Accounts, and (b) permitting Lucent to take all actions necessary or appropriate to block and liquidate the Accounts and to apply the proceeds thereof (the "Cash Proceeds") to its claims against certain of the Debtors;

(2)    alternatively, providing for adequate protection of Lucent's secured interest in the Accounts; and

(3)    granting Lucent such other and further relief as may be just and proper.

C.    The Accounts at issue in the Stay Motion were established pursuant to the Lucent Cash Collateral Agreements and the Acknowledgements and were intended to secure the obligations of the Borrowers under the Lucent Credit Agreement. In particular, pursuant to Section 2.01 of the Lucent Cash Collateral Agreements, the Borrowers granted BONY, as Collateral Agent, a security interest in the Accounts and the Cash Proceeds for the benefit of Lucent. The Accounts include: (1) certain investment accounts (including Nos. 9427772529 and 9428385707) with Fleet; (2) certain investment accounts (including Nos. 3274457 and 3324773) with State Street; and (3) certain disbursement accounts (including Nos. 9427772510 and 9428385694) with Fleet. The parties believe that the aggregate balance in the Accounts is approximately $14,781,130.00

D.    By a Stipulation to Adjourn Until Further Notice the Hearing on the Motion for Relief from Automatic Stay or, Alternatively, for Adequate Protection with Respect to Certain Investment and Disbursement Accounts (the "Adjournment Stipulation") (D.I. 634), entered by the Court on or about July 18, 2001, the Debtors and Lucent agreed to adjourn the hearing on the Stay Motion indefinitely, provided that either party could request that the Court schedule the Stay Motion for hearing upon notice to the other party. The Adjournment Stipulation also provided that Fleet and State Street would continue to hold the Accounts

B1668

pending adjudication of the Stay Motion by, or further order of, the Court or the resolution of the Stay Motion by the parties.

      E.    On or about October 4, 2001, Lucent and the Debtors entered into the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts (D.I. 1105) (the "Debtor Stipulation"), pursuant to which the Accounts were to be immediately liquidated and the majority of the proceeds were to be distributed to Lucent.

      F.    On or about October 11, 2001, BONY, as Administrative Agent and Collateral Agent; Citicorp North America, Inc. as Syndication Agent; and CIBC World Markets Corp. and Credit Suisse First Boston, as Documentation Agents, all of which are prepetition lenders to the Debtors (collectively, the "Agents"), filed their Objection of the Pre-Petition Agents to Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts (D.I. 1199). As a result of the Agents' objection to the Debtor Stipulation, the parties agreed to adjourn the hearing on the Debtor Stipulation. To date, no order resolving the Stay Motion or the Debtor Stipulation has been entered by the Court.

      G.    On or about April 18, 2001, Debtor Winstar Wireless, Inc. ("Winstar Wireless") and Debtor Winstar Communications Inc. ("Winstar Communications") commenced an adversary proceeding against Lucent, captioned as _Winstar Communications, Inc. v. Lucent Technologies Inc._, No. 01-1063 (D. Del. 2001) (the "Adversary Proceeding").

B1669

H.    On or about September 27, 2002, the chapter 7 trustee appointed in these cases, Christine C. Shubert (the "Trustee" and, together with Winstar Wireless and Winstar Communications, the "Plaintiffs"), filed a Second Amended Complaint and Jury Demand, captioned as Shubert v. Lucent Technologies, Inc., No. 01-1063 (D. Del. 2002) in the Adversary Proceeding (the "Second Amended Complaint"). Count Eleven of the Second Amended Complaint seeks equitable subordination of Lucent's claims against Winstar Communications in these chapter 7 cases (the "Equitable Subordination Claim").

K.    Lucent and the Trustee have agreed to resolve the Stay Motion on the terms and subject to the conditions set forth in this Stipulation and Agreed Order.

## STIPULATION AND AGREED ORDER

It is hereby stipulated and agreed by and between the parties to this Stipulation and Agreed Order, through their undersigned counsel, that:

1.    The Trustee hereby acknowledges and agrees that Lucent holds a valid, properly perfected, first priority secured lien in the Accounts (including all funds in the Accounts and any and all interest thereon, if any) and the proceeds thereof (collectively, the "Lucent Lien"), including, without limitation: (a) Fleet Account No. 9427772529, in the amount of approximately $17,491.00, and (b) Fleet Account No. 9428385707, in the amount of approximately $14,763,639.00 (collectively, the "Fleet Accounts").[2] Notwithstanding the foregoing acknowledgements, the Trustee does not agree that Lucent has any right to enforce the Lucent Lien, except as set forth in paragraphs 3 and 4 below.

---

[2]    It is the parties' understanding that all Accounts other than the Fleet Accounts either maintain a zero balance or have been closed. To the extent that any of these Accounts do in fact maintain a positive cash balance, the parties intend this Stipulation and Agreed Order to apply to such Accounts.

B1670

2.       Lucent hereby agrees that it will not seek to enforce the Lucent Lien and, thereby, liquidate and apply the proceeds of the Accounts and the Escrow Account (as such term is defined below) to its claims under the Lucent Credit Agreement, except as expressly provided in paragraph 3 below.

3.       Lucent may seek relief from the Court to enforce the Lucent Lien and, thereby, liquidate and apply the proceeds of the Accounts and the Escrow Account to its claims under the Lucent Credit Agreement upon the earlier to occur of the following: (a) a resolution by the Court or written agreement of the parties of the Equitable Subordination Claim in such a manner that some or all of Lucent's claims under the Lucent Credit Agreement are not subject to equitable subordination; or (b) a written agreement by the parties that Lucent may take such action.

4.       Nothing in this Stipulation and Agreed Order shall affect or impair: (a) Lucent's right to assert any and all arguments in support of enforcement of the Lucent Lien and the liquidation and application of the Accounts and the Escrow Account to its claims under the Lucent Credit Agreement; (b) the Trustee's right to assert any and all defenses to any attempt to enforce the Lucent Lien (but not to contest that Lucent holds a valid, properly perfected, first priority secured lien); (c) the parties' respective rights, arguments, defenses and remedies in the Adversary Proceeding; (d) Lucent's other rights and remedies under the Lucent Credit Agreement and related documents, including its rights to seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code with respect to, and adequate protection of, Lucent's interest in, the Collateral (other than the Accounts) under sections 361, 362(d) and 363(e) of the Bankruptcy Code; and (e) the Trustee's right to oppose the assertion by Lucent of any such rights.

CLJI-1055444                                    -5-

B1671

5.      The parties agree that, as soon as reasonably practicable, the Trustee and Lucent shall take any and all actions necessary or appropriate to transfer the funds currently located in the Fleet Accounts (the "Transferred Funds") to an escrow account (the "Escrow Account") to be established at a financial institution selected and agreed upon by the Trustee and Lucent (the "Escrow Bank"). The escrow agreement and the investment procedures for the Escrow Account must be in a form and substance reasonably satisfactory to both the Trustee and Lucent. The Escrow Bank, as agent of the Escrow Account, shall not release the funds in the Escrow Account to any party, except pursuant to a further order of this Court or the written agreement of the Trustee and Lucent. Fleet is hereby directed and authorized to comply with any written instructions signed by both the Trustee and Lucent to transfer the proceeds of the Fleet Accounts to the Escrow Account.

6.      The Lucent Lien will (a) continue to attach to the same extent and with the same validity, perfection and priority to the Transferred Funds in the Escrow Account as set forth in paragraph 1 above and (b) constitute a valid, properly perfected, first priority secured lien in the Escrow Account (including all funds in the Escrow Account and interest thereon) and the proceeds thereof. Lucent shall not be required to take any further action to perfect or otherwise assert the Lucent Lien in the Escrow Account.

7.      Upon entry of this Stipulation and Agreed Order, no Debtor, creditor or other party in interest may challenge, object to or otherwise oppose the extent, validity, perfection or priority of the Lucent Lien as set forth in paragraph 1 above.

8.      The Trustee shall be authorized to perform fully her obligations under this Stipulation and Agreed Order and to take any and all actions and execute any and all documents

B1672

and instruments that are reasonably necessary or appropriate to implement and effectuate the terms and conditions of this Stipulation and Agreed Order.

9.     This Stipulation and Agreed Order shall not be modified, altered, amended or vacated without the prior written consent of all parties hereto. Any such modification, alteration, amendment or vacation in whole or part shall be subject to the approval of this Court. No statement made or action taken in the negotiation of this Stipulation and Agreed Order may be used by any party for any purpose whatsoever.

10.     This Stipulation and Agreed Order is the entire agreement between the parties in respect of the subject matter hereof and may be signed in counterpart originals, and the Court's endorsement hereon shall constitute its approval of this Stipulation and Agreed Order and the transactions, compromises and settlements contemplated hereby.

[Remainder of Page Left Intentionally Blank]

B1673

11.    This Stipulation and Agreed Order shall be binding upon the parties hereto

prior to its being "So Ordered."

Dated: February _____, 2003

_____
Stephen M. Rathkopf
David R. King
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016-9301
(212) 592-1400

- and -

Richard G. Smolev (RS 2222)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022-3598
(212) 836-8000

- and -

Sheldon K. Rennie
FOX ROTHSCHILD O'BRIEN
& FRANKEL, LLP
919 N. Market Street, Suite 1400
Wilmington, Delaware 19801
(302) 655-7460

ATTORNEYS FOR CHRISTINE C.
SHUBERT, CHAPTER 7 TRUSTEE

_____
Rebecca L. Booth (4031)
Daniel J. DeFranceschi (No. 2732)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Post Office Box 551
Wilmington, Delaware 19899

- and -

Richard M. Cieri (OH 0032464)
Michelle Morgan Harner (OH 644833)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

ATTORNEYS FOR LUCENT
TECHNOLOGIES INC.

SO ORDERED THIS 9th DAY OF April , 2003.

_____
UNITED STATES BANKRUPTCY JUDGE

CLI-1055446                                -8-

B1674



Martin M. Pomerantz, Esq.
The Bank of New York
One Wall Street – 20th Floor
New York, NY 10286
(212) 635-1964

ATTORNEY FOR THE BANK OF NEW YORK AS COLLATERAL AGENT

B1675

Richard S. Cobb, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Ste. 1410
Wilmington, DE 19801
(302) 552-4212

- and -

Stephen Karotkin, Esq.
767 Fifth Ave.
New York, NY 10153
(212) 310-8000

ATTORNEYS FOR CITICORP USA, INC.,
AS AGENT FOR DIP LENDERS

CLII-1055444                    -9-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., et al., | : | CASE NO. 01-1430 (JBR) |
| | : | (Jointly Administered) |
| | : | Related Motion Docket # 4007 |
| Debtors. | : | Hearing Date: November 12, 2003 @ 9:30 a.m. |
| | : | Objection Deadline: October 31, 2003 @ 4:00 p.m. |

### ORDER APPROVING SETTLEMENT WITH LUCENT TECHNOLOGIES INC. PURSUANT TO FED. R. BANKR. P. 9019

This matter came before the Court on the motion of Christine C. Shubert, the chapter 7

trustee (the "Trustee") for the estate of Winstar Communications, Inc. et. al., for the entry of an

order approving the settlement agreement by and between the Trustee and Lucent Technologies,

Inc. ("Lucent") pursuant to Fed. R. Bankr. P. 9019 (the "Motion"); and the Court having

determined that adequate notice of the Motion has been given pursuant to Fed. R. Bankr. P. 2002

and 9019; and the Court having read and considered the Motion, objections to the Motion, if any,

and arguments of any counsel appearing regarding the relief requested in the Motion at a hearing

before the Court; and the Court having determined that the legal and factual bases set forth in the

Motion and at any hearing establish just cause for the relief granted herein:

It is hereby ORDERED that:

    1.    The Motion be and is hereby GRANTED.

    2.    The Stipulation of Settlement by and between the Trustee and Lucent,

which is attached hereto and made a part hereof as Exhibit "A," be and is hereby approved

pursuant to Fed. R. Bankr. P. 9019 and is entered as an Order of the Court.

    3.    The Trustee be and hereby is authorized to carry out the transactions

contemplated by the Stipulation of Settlement.

PHI 549725v1 10/31/03



4.    This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the Stipulation of Settlement and to resolve any dispute concerning this Order, the Stipulation of Settlement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stipulation of Settlement and this Order.

_____
JOEL B. ROSENTHAL,
UNITED STATES BANKRUPTCY JUDGE

Dated: 11/12/03

PHl 549725v1 10/31/03

B1678

Exhibit "A"

PHI 553091v1 11/03/03

B1679

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.  01-1430 (JBR) |
| | ) | |
| WINSTAR COMMUNICATIONS, INC., et al., | ) | |
| | ) | JOINTLY ADMINISTERED |
| | ) | |
| DEBTORS. | ) | CHAPTER 7 |

STIPULATION OF SETTLEMENT AND ORDER

WHEREAS, on the Petition Date,[1] the Debtors filed petitions for relief under

chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court"); and

WHEREAS, as of the Petition Date, the Debtors, collectively, used their end-to-

end broad band network to provide small and medium businesses and large enterprises with high

speed Internet and data communications, local and long distance phone services, ASP services,

web hosting, e-commerce solutions and Office.com, an online business carrier. The Debtors also

provided band-width intensive enterprises and carriers with enhanced network products,

including local and long-haul broadband network capacity; and

WHEREAS, prior to the Petition Date in October 1998, the Debtors and Lucent

entered into the Supply Agreement with respect to the development, design, building and

implementation of a nationwide and global communications network for the Debtors; and

WHEREAS, under the Supply Agreement, the Debtors agreed to purchase

products and services from Lucent in connection with the buildout of its communications

network. Lucent agreed to provide the Debtors with certain financing to purchase products and

services; and

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the prefixed
      Application.

RLF1-2662937-1

B1680

WHEREAS, concurrently with the Supply Agreement and to implement the financing commitment therein, Lucent and the Debtors executed a credit agreement dated October 21, 1998. Lucent extended approximately $1.15 billion in financing to the Debtors under the October 1998 credit agreement. In or around May 2000, the Debtors raised additional capital from other sources which allowed them to repay the approximately $1.15 billion in outstanding debt to Lucent in May 2000; and

WHEREAS, on May 4, 2000, Lucent agreed to enter into an amended credit agreement (the "Credit Agreement") with the Debtors extending up to an additional $2 billion in financing, under specified terms and conditions, increasing the level of availability of those funds at any one time for the designated purposes from $500 million to $1 billion; and

WHEREAS, Lucent filed numerous proofs of secured claim against the Debtors' estates, identified on Exhibit "A" hereto, asserting that it held a valid, properly perfected, first priority secured lien in the collateral described in such proofs of secured claim (the "Collateral"), and that such secured lien arose from the security agreements executed in connection with the Supply Agreement and the Credit Agreement; and

WHEREAS, on December 18, 2001, IDT and the Debtors entered into the IDT Purchase Agreement, whereby IDT acquired substantially all of the Debtors' assets (the "Acquired Assets") including substantially all of the Collateral and the Debtors received certain cash and stock amounting to approximately $42,500,000 (the "Purchase Price"), and the Debtors retained a five percent (5%) interest in IDT and certain Excluded Assets (as defined in the IDT Purchase Agreement). On December 19, 2001, the Court entered an Order approving the IDT Purchase Agreement. In or around April 2002, the Trustee sold the estate's 5% interest in IDT back to the IDT Corporation in exchange for 792,079 shares of Class B common stock of IDT

B1681

Corporation (the "IDT Shares," together with the Purchase Price defined herein as the "Sale Proceeds"); and

WHEREAS, on the Petition Date, the Debtors commenced an adversary proceeding against Lucent, captioned as *Winstar Communications, Inc. v. Lucent Technologies Inc.*, Adv. Proc. No. 01-1063 (D. Del. 2001) (the "Contract Adversary Proceeding"), for, inter alia, breach of the Supply and Credit Agreements based on, among other things, Lucent's alleged failure to fund purchases and provide goods and services under the Supply Agreement; and

WHEREAS, on January 24, 2002 (the "Conversion Date"), the Court entered an Order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and on January 28, 2002, Christine C. Shubert was appointed as Trustee in these chapter 7 cases; and

WHEREAS, on September 26, 2002, the Trustee commenced an adversary proceeding against Lucent and two other defendants that asserted secured claims in the Sale Proceeds, captioned as *Christine C. Shubert, Esq., v. CitiCapital Commercial Corporation, General Motors Acceptance Corporation and Lucent Technologies Inc.*, Adv. Proc. No. 02-05784 (D. Del. 2002) (the "Lien Adversary Proceeding"); and

WHEREAS, on November 6, 2002, Lucent filed its Answer and Counterclaim, wherein Lucent alleged that the Debtors wrongfully retained certain Lab Equipment that Lucent loaned to the Debtors on a trial basis, which the Debtors never purchased, and Lucent demanded the Turnover of the Lab Equipment from the Trustee; and

WHEREAS, on December 9, 2002, the Trustee filed her Answer to Counterclaims of Lucent Technologies and asserted various affirmative defenses to Lucent's counterclaims; and

B1682

WHEREAS, through the Lien Adversary Proceeding, the Trustee sought to: (i) require Lucent to prove the validity, priority and extent of its liens in the Acquired Assets; (ii) determine pursuant to Bankruptcy Code Section 506 the validity, priority and extent of Lucent's alleged liens in the Acquired Assets; and (iii) to the extent Lucent is deemed to have valid, perfected liens that rightfully attach to the Sale Proceeds, (x) determine the value of the Collateral securing such liens, and (y) determine the appropriate allocation of the Sale Proceeds, if any, that may be attributable to any valid secured claims Lucent may hold; and

WHEREAS, pending the outcome of the Lien Adversary Proceeding and in response to the objection of Lucent to certain interim distributions made by the Trustee, such distributions were subject to the following conditions provided by certain Bankruptcy Court Orders[1]: (i) payments made by the Trustee pursuant to the Prior Distribution Orders would be subject to disgorgement in the event that the Bankruptcy Court subsequently determined that such payments were funded by the proceeds of the Collateral of Lucent; (ii) the Trustee would not use any estate funds in which Lucent asserts an interest without Lucent's prior written consent or further order of this Court after appropriate notice and hearing provided, however, that Lucent's written consent would not be required for the Trustee's use of estate funds to cover expenses incurred in the ordinary course of the Trustee's administration of the Debtors' estates commencing as of December 1, 2002, which amount could not exceed $100,000 per month; and (iii) to the extent that funds the Trustee disbursed pursuant to the Prior Distribution Orders were funded by cash held in the Debtors' accounts on December 18, 2001, up to the amount of $2,487,030.51 (the "Cash Proceeds"), and in the event that the Bankruptcy Court subsequently determined that Lucent has a security interest in the Cash Proceeds, the Trustee would be

---

[1] The Conditions were contained in the following orders: Docket Nos. 3102; 3103; 3105; 3106; 3107; 3108; 3109; and 3803 (the "Prior Distribution Orders").

B1683

required to replenish the Cash Proceeds with the proceeds of the Trustee's successful recoveries of preferences as defined in section 547 of the Bankruptcy Code provided, however, that the Cash Proceeds shall still be subject to the Trustee's commission of three percent (3%) (collectively defined as the "Conditions"); and

WHEREAS, the Trustee and Lucent explored and took contrary positions with respect to whether Lucent holds a valid, properly perfected, first priority lien in any portion of the Sale Proceeds, and whether a portion of the Sale Proceeds should be allocated to any such lien; and

WHEREAS, the parties engaged in extensive discovery and each party retained experts in connection with the prosecution of the Lien Adversary proceeding; and

WHEREAS, the parties hereto have reached an agreement, as more fully set forth below, subject to the approval of the Bankruptcy Court, for the resolution of any and all secured claims that Lucent has asserted or may have against the Debtors' estates with respect to the Sale Proceeds in consideration for the parties' agreement that (I) Lucent holds a valid, properly perfected, first priority secured lien in $5,500,000.00 of the Sale Proceeds, which represents the total value of Lucent's lien in the Acquired Assets, (ii) the Trustee shall place $5,500,000.00 of the Sale Proceeds into an interest bearing escrow account to be maintained by the Trustee (the "Escrow Account") in respect of such lien and (iii) the Trustee shall not release the funds from the Escrow Account to Lucent or any other party, except pursuant to a further final and nonappealable order of the Court, after notice and a hearing, or a written agreement by the parties directing the Trustee to distribute such funds; and

NOW THEREFORE, in consideration of the mutual covenants set forth herein, the parties agree as follows:

RLF1-2662937-1

5

B1684

1.    This Stipulation of Settlement and Order (the "Settlement Stipulation") shall not be effective or enforceable until it is approved by final and nonappealable order of the Bankruptcy Court.

2.    Lucent shall be deemed to hold a valid, properly perfected, first priority secured lien in $5,500,000.00 of the Sale Proceeds, which represents the total value of Lucent's lien in the Acquired Assets.

3.    Immediately upon entry of a final Order of the Bankruptcy Court approving the Settlement Stipulation, the Trustee shall place $5,500,000.00 of the Sale Proceeds into the Escrow Account and the Trustee shall not release the funds to Lucent or any other party, except pursuant to a further final order of the Bankruptcy Court, after notice and a hearing, or a written agreement by the parties directing the Trustee to distribute such funds.

4.    Lucent may seek relief from the Bankruptcy Court to compel the Trustee to distribute the $5,500,000.00 (plus interest thereon) to it in satisfaction of its lien in the Acquired Assets upon the earlier to occur of the following:  (i) a resolution by the Bankruptcy Court (or District Court) through entry of a final and nonappealable order of, or resolution through written agreement of the parties with respect to, Count Eleven of the Trustee's second amended complaint in the Contract Adversary Proceeding in such a manner that some or all of Lucent's claims under the Lucent Credit Agreement, Supply Agreement or related agreements are not subject to equitable subordination; or (ii) a written agreement by the parties that Lucent may take such action.

5.    Upon the Trustee's transfer of $5,500,000.00 of the Sale Proceeds into the Escrow Account, that portion of Lucent's secured proofs of claim relating to Collateral constituting Acquired Assets shall be permanently reduced to $5,500,000.00 (plus interest thereon) and any

6

B1685

deficiency claim related thereto shall be deemed part of Lucent's unsecured proofs of claim; Lucent's rights, if any, in connection with the remaining portion of its secured proofs of claim with respect to Collateral not constituting Acquired Assets shall not be affected in any respect by the Settlement Stipulation.

6.     Lucent shall be deemed to hold an allowed secured claim in the amount of $5,500,000.00 (plus interest thereon) on account of Lucent's interest in the Sale Proceeds (the "Allowed Sales Proceeds Secured Claim"). The Trustee shall not distribute funds from the Escrow Account to Lucent in satisfaction of the Allowed Sales Proceeds Secured Claim, except pursuant to a further final and nonappealable order of the Bankruptcy Court, after notice and a hearing, or written agreement by the parties directing the Trustee to distribute such funds.

7. .     Upon the Trustee's transfer of $5,500,000.00 of the Sale Proceeds into the Escrow Account, Lucent shall waive, release and forever discharge any and all secured claims that it has or may have against the Sale Proceeds, except the Allowed Sales Proceeds Secured Claim. Lucent shall have a valid, properly perfected, first priority secured lien (without further action or filing) on account of the Allowed Sales Proceeds Secured Claim in the $5,500,000.00 (plus interest thereon) transferred to the Escrow Account.

8.     Resolution of Lucent's secured claims against the Debtors' estates with respect to the Acquired Assets pursuant to this Settlement Stipulation shall have no effect on any rights that Lucent may have, if any, with respect to any general unsecured claims that Lucent may have asserted against the Debtors' estates.

9.     Resolution of Lucent's secured claims against the Debtors' estates with respect to the Acquired Assets pursuant to this Settlement Stipulation shall have no effect on any rights that Lucent may have, if any, with respect to any secured claim that Lucent may have asserted against

B1686

the Debtors' estates with respect to (a) any assets that constitute Collateral and are not Acquired Assets or (b) any sales proceeds that are not the Sale Proceeds.

10.    Resolution of Lucent's secured claims against the Debtors' estates with respect to the Acquired Assets pursuant to the Settlement Stipulation shall have no effect on Lucent's rights under the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement Accounts entered by the Bankruptcy Court on or about April 9, 2003.

11.    Upon the Trustee's transfer of $5,500,000.00 of the Sale Proceeds into the Escrow Account, Lucent hereby waives, releases, and forever discharges the Debtors' estates, the Trustee, her affiliates, her past and present agents, employees, independent contractors, attorneys, accountants, representatives, predecessors, successors, heirs, and assigns from all claims, demands, actions, causes of action, complaints, suits, sums of money, damages and judgments of any kind or nature whatsoever arising in connection with the Lab Equipment.

12.    Upon entry of a final Order of the Bankruptcy Court approving the Settlement Stipulation and final Orders of the Bankruptcy Court resolving the secured claims of General Motors Acceptance Corporation and CitiCapital Commercial Corporation, the Trustee shall at her own cost take steps to have the Lien Adversary Proceeding dismissed with prejudice.

13.    The full and final resolution of the causes of action and/or claims asserted or arising out of the Lien Adversary Proceeding shall have no effect on the causes of action and/or claims, defenses or arguments asserted in the Contract Adversary Proceeding or Adversary Proceeding No. 03-53024, wherein the Trustee is seeking the avoidance and recovery of

RLF1-2662937-1

8

**B1687**

allegedly preferential transfers that the Debtors made to Lucent, in the aggregate amount of $28,908,624.46, pursuant to Bankruptcy Code section 547 and 550.

14.    The Conditions set forth in the Prior Distribution Orders are hereby vacated.

15.    Upon Bankruptcy Court approval of this Settlement Stipulation, no Debtor, creditor or other party in interest may challenge, object to or otherwise oppose the extent, validity, perfection or priority of Lucent's lien in the Sale Proceeds as set forth in paragraph 2 above.

16.    The Trustee shall not use any estate funds in which Lucent has an interest pursuant to any order of the Bankruptcy Court, stipulation, or settlement for any purpose in these cases without Lucent's prior written consent or further order of this Court after appropriate notice and hearing.

17.    The recitals set forth above are part of this Settlement Stipulation and are incorporated herein by reference.

18.    No term hereof shall be modified, altered, or waived except by further written agreement executed by all the parties hereto.

19.    This Settlement Stipulation constitutes the entire agreement of the parties and there are no other agreements or understandings between or among the parties of any kind relating to the subject matter of this Settlement Stipulation.

20.    Counsel or other person executing this Settlement Stipulation in a representative capacity represent that they are fully authorized to execute this Settlement Stipulation in such capacity.

RLF1-2665937-1

9

B1688

21.     This Settlement Stipulation may be executed in one or more counterparts, each and all of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

22.     Any provision of this Settlement Stipulation which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

23.     This Settlement Stipulation shall be construed under and governed by the laws of New York, without application of conflicts of laws principles.

24.     The parties hereto acknowledge that no representations, warranties, or covenants have been made to or relied upon by them except those expressly set forth in this Settlement Stipulation.

25.     The Bankruptcy Court shall retain jurisdiction over any and all disputes that shall arise in connection with this Settlement Stipulation.

RLF1-2662937-1

10

B1689

IN WITNESS WHEREOF, the Parties have executed this Settlement Stipulation and

Order as of the date set forth below.

Dated: October ___, 2003
   Wilmington, Delaware

CHRISTINE C. SHUBERT,
CHAPTER 7 TRUSTEE

LUCENT TECHNOLOGIES INC.

_____
Sheldon K. Rennie (No. 3772)
FOX ROTHSCHILD LLP
919 N. Market Street, Suite 1400
Wilmington, Delaware 19801-3046
(302) 655-7460

_____
Daniel J. DeFranceschi (No. 2732)
Rebecca L. Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

  - and -

Richard G. Smolev, Esq.
John D. Geelan, Esq.
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

Attorneys for Chapter 7 Trustee

  - and -

David F. Adler, Esq.
Michelle Morgan Harner, Esq.
JONES DAY
901 Lake Side Avenue
Cleveland, Ohio 44114
(216) 586-3939

Attorneys for Lucent Technologies Inc.

RLF1-2662937-1

11

B1690

**EXHIBIT "A"**

| Claim # | Name of Creditor | Debtor | Amount |
|---|---|---|---|
| 2019 | Lucent Technologies, Inc. | Winstar Communications, Inc. | $799,060,307.68 |
| 2020 | Lucent Technologies, Inc. | WCI Capital Corp. | $799,060,307.68 |
| 2021 | Lucent Technologies, Inc. | Winstar Equipment Corp. | $799,060,307.68 |
| 2022 | Lucent Technologies, Inc. | Winstar Wireless, Inc. | $799,060,307.68 |
| 2023 | Lucent Technologies, Inc. | Winstar Network Expansion, LLC | $799,060,307.68 |
| 2024 | Lucent Technologies, Inc. | WVF-1, LLC | $799,060,307.68 |
| 2025 | Lucent Technologies, Inc. | WVF-LU2, LLC | $799,060,307.68 |
| 2026 | Lucent Technologies, Inc. | Winstar Communications, Inc. | $138,957,218.90 |
| 2027 | Lucent Technologies, Inc. | WCI Capital Corp. | $138,957,218.90 |
| 2028 | Lucent Technologies, Inc. | Winstar Equipment Corp. | $138,957,218.90 |
| 2029 | Lucent Technologies, Inc. | Winstar Wirless, Inc. | $138,957,218.90 |
| 2030 | Lucent Technologies, Inc. | Winstar Network Expansion, LLC | $138,957,218.90 |
| 2031 | Lucent Technologies, Inc. | WVF-1, LLC | $138,957,218.90 |
| 2032 | Lucent Technologies, Inc. | WVF-LU2, LLC | $138,957,218.90 |
| 2214 | Lucent Technologies, Inc. | Winstar Network Expansion, LLC | $138,957,218.90 |
| 2215 | Lucent Technologies, Inc. | WVF-1, LLC | $138,957,218.90 |
| 2216 | Lucent Technologies, Inc. | WVF-LU2, LLC | $138,957,218.90 |
| 2218 | Lucent Technologies, Inc. | Winstar Communications, Inc. | $799,060,307.68 |
| 2219 | Lucent Technologies, Inc. | WCI Capital Corp. | $799,060,307.68 |
| 2220 | Lucent Technologies, Inc. | Winstar Equipment Corp. | $799,060,307.68 |
| 2221 | Lucent Technologies, Inc. | Winstar Wireless, Inc. | $799,060,307.68 |
| 2222 | Lucent Technologies, Inc. | Winstar Network Expansion, LLC | $799,060,307.68 |

Doc #30730304_V2.WPD

| Claim # | Name of Creditor | Debtor | Amount |
|---------|------------------|--------|--------|
| 2223 | Lucent Technologies, Inc. | WVF-1 LLC | $799,060,307.68 |
| 2224 | Lucent Technologies, Inc. | WVF-LU2 LLC | $799,060,307.68 |
| 2225 | Lucent Technologies, Inc. | Winstar Communications, Inc. | $138,957,218.90 |
| 2226 | Lucent Technologies, Inc. | WCI Capital Corp. | $138,957,218.90 |
| 2227 | Lucent Technologies, Inc. | Winstar Equipment Corp. | $138,957,218.90 |
| 2228 | Lucent Technologies, Inc. | Winstar Wireless, Inc. | $138,957,218.90 |

Doc #90730504_V2.WPD

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| WINSTAR COMMUNICATIONS, INC., et al., | CASE NO. 01-1430 (JBR) |
| | (Jointly Administered) |
| | Related Motion Docket # 4343 |
| Debtors. | |
| | Objection Deadline: October 28, 2004 @ 4:00 p.m. |

### ORDER APPROVING SETTLEMENT
### WITH LUCENT TECHNOLOGIES INC.
### PURSUANT TO FED. R. BANKR. P. 9019

This matter came before the Court on the motion of Christine C. Shubert, the chapter 7

trustee (the "Trustee") for the estate of Winstar Communications, Inc. et. al., for the entry of an

order approving the settlement agreement by and between the Trustee and Lucent Technologies,

Inc. ("Lucent") pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 (the "Motion"); and the

Court having determined that adequate notice of the Motion has been given pursuant to Fed. R.

Bankr. P. 2002 and 9019; and the Court having read and considered the Motion, objections to the

Motion, if any, and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein:

It is hereby ORDERED that:

    1.    The Motion be and is hereby GRANTED.

    2.    The Stipulation of Settlement by and between the Trustee and Lucent,

which is attached hereto and made a part hereof as Exhibit "A," be and is hereby approved

pursuant to Fed. R. Bankr. P. 9019 and is entered as an Order of the Court.

    3.    The Trustee be and hereby is authorized to carry out the transactions

contemplated by the Stipulation of Settlement.

PHI 654550v1 10/07/04



**B1693**

4.     This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the Stipulation of Settlement and to resolve any dispute concerning this Order, the Stipulation of Settlement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stipulation of Settlement and this Order.

*Joel B. Rosenthal*

_____
JOEL B. ROSENTHAL,
UNITED STATES BANKRUPTCY JUDGE

Dated: *November 4, 2004*

*EXHIBIT "A"*

B1695

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| WINSTAR COMMUNICATIONS, INC., et al., | : | Case No. 01-1430 (JBR) |
| | : | (Jointly Administered) |
| Debtors. | : | |

### STIPULATION OF SETTLEMENT

WHEREAS, on the Petition Date,[1] the Debtors filed petitions for relief under

chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court"); and

WHEREAS, prior to the Petition Date in October 1998, the Debtors and Lucent

entered into the Supply Agreement with respect to the development, design, building and

implementation of a nationwide and global communications network for the Debtors; and

WHEREAS, under the Supply Agreement, the Debtors agreed to purchase

products and services from Lucent in connection with the buildout of its communications

network. Lucent agreed to provide the Debtors with certain financing to purchase products and

services; and

WHEREAS, concurrently with the Supply Agreement and to implement the

financing commitment therein, Lucent and the Debtors executed a credit agreement dated

October 21, 1998. Lucent extended approximately $1.15 billion in financing to the Debtors

under the October 1998 credit agreement. In or around May 2000, the Debtors raised additional

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion of
the Chapter 7 Trustee for an Order Pursuant to Section 105 of Title 11 of the United States Code and Rule 9019 of
the Federal Rules of Bankruptcy Procedure Approving the Stipulation of Settlement Entered Into By and Between
the Trustee and Lucent Technologies Inc. regarding certain of the secured claims that Lucent asserted against the
Debtors' estates filed on October   , 2004.

PHI 654530v1 10/04/04
RLF1-2793871-1

capital from other sources which allowed them to repay the approximately $1.15 billion in outstanding debt to Lucent in May 2000; and

WHEREAS, on May 4, 2000, Lucent agreed to enter into an amended credit agreement (the "Credit Agreement") with the Debtors extending up to an additional $2 billion in financing, under specified terms and conditions, increasing the level of availability of those funds at any one time for the designated purposes from $500 million to $1 billion. Lucent and the Debtors also executed certain security agreements in connection with the Supply Agreement and/or the Credit Agreement, whereby Lucent obtained security interests in certain of the Debtors' assets (the "Security Agreements"); and

WHEREAS, during the pendency of the chapter 11 cases, the Debtors sold several of its business divisions and various other assets to various third-parties during the chapter 11 cases (the "Miscellaneous Assets") including: (i) Winstar-XNET Division to XNET Information Systems, Inc.; (ii) Winstar-NorthwestNexus Division to Corporate Telecommunications Group; (iii) Winstar-ISPNetworks Division to Fastmetrics LLC; (iv) Winstar-ICI Division to North Atlantic Internet Inc.; and (v) various types of equipment and other assets to Voicestream PCS BTA I Corporation, Tera Communications, Inc., Lighthouse Communications and American Communications. The aggregate amount of the proceeds that the Debtors received during the pendency of their chapter 11 cases from the Miscellaneous Asset sales was approximately $1,890,000.00 (the "Miscellaneous Asset Sale Proceeds"); and

WHEREAS, pursuant to the Bankruptcy Court's Orders approving the foregoing asset sales, Lucent was directed to provide the Debtors with all documentation purporting to establish that Lucent had a valid and perfected lien on a portion of the Miscellaneous Assets. Subsequently, Lucent asserted that it held a valid and perfected lien on certain assets transferred

B1697

as part of the Miscellaneous Assets' sales and provided certain documentation to the Debtors. The Debtors and Lucent were unable to agree on the extent of Lucent's liens in the Miscellaneous Assets prior to the Conversion Date (as defined below); and

WHEREAS, on December 18, 2001, IDT and the Debtors entered into the IDT Purchase Agreement, whereby IDT acquired substantially all of the Debtors' assets (the "Acquired Assets") including substantially all of the collateral and the Debtors received certain cash and stock amounting to approximately $42,500,000 (the "Purchase Price"), and the Debtors retained a five percent (5%) interest in IDT and certain Excluded Assets (as defined in the IDT Purchase Agreement). On December 19, 2001, the Court entered an Order approving the IDT Purchase Agreement. In or around April 2002, the Trustee sold the estate's 5% interest in IDT back to the IDT Corporation in exchange for 792,079 shares of Class B common stock of IDT Corporation (the "IDT Shares," together with the Purchase Price defined herein as the "Sale Proceeds"); and

WHEREAS, pursuant to the Security Agreements, Lucent asserted that it held a valid, properly perfected, first priority secured lien in, among other things, a portion of the Sale Proceeds and the Miscellaneous Asset Sale Proceeds. Lucent filed numerous proofs of secured claims against the Debtors' estates pursuant to its alleged valid and perfected first priority lien arising from the Security Agreements; and

WHEREAS, on the Petition Date, the Debtors commenced an adversary proceeding against Lucent, captioned as *Winstar Communications, Inc v. Lucent Technologies Inc.*, Adv. Proc. No. 01-1063 (D. Del. 2001) (the "Contract Adversary Proceeding"), for, *inter alia*, breach of the Supply and Credit Agreements based on, among other things, Lucent's

B1698

alleged failure to fund purchases and provide goods and services under the Supply Agreement; and

WHEREAS, on January 24, 2002 (the "Conversion Date"), the Court entered an Order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and on January 28, 2002, Christine C. Shubert was appointed as Trustee in these chapter 7 cases; and

WHEREAS, on September 26, 2002, the Trustee commenced an adversary proceeding against Lucent and two other defendants that asserted secured claims in the Sale Proceeds, captioned as *Christine C. Shubert, as Chapter 7 Trustee v. CitiCapital Commercial Corporation, General Motors Acceptance Corporation and Lucent Technologies Inc.*, Adv. Proc. No. 02-05784 (D. Del. 2002) (the "Lien Adversary Proceeding"); and

WHEREAS, through the Lien Adversary Proceeding, the Trustee sought to: (i) require Lucent to prove the validity, priority and extent of its liens in the Acquired Assets; (ii) determine pursuant to Bankruptcy Code Section 506 the validity, priority and extent of Lucent's alleged liens in the Acquired Assets; and (iii) to the extent Lucent is deemed to have valid, perfected liens that rightfully attach to the Sale Proceeds, (x) determine the value of the collateral securing such liens, and (y) determine the appropriate allocation of the Sale Proceeds, if any, that may be attributable to any valid secured claims Lucent may hold; and

WHEREAS, after over one year of litigation and extensive negotiations, the Trustee and Lucent entered into a settlement agreement that resolved substantially all of Lucent's secured claims against the estates and resulted in the dismissal of the Lien Adversary Proceeding; and

B1699

WHEREAS, the Trustee filed her Motion to Approve Settlement Stipulation with Lucent Technologies, Inc. Pursuant to Federal Bankruptcy Rule 9019 [Docket No. 4007], which was approved by this Court by order dated November 12, 2003 [Docket No. 4026] (the "November 2003 Settlement"). Pursuant to the foregoing settlement, the parties resolved any and all secured claims that Lucent asserted or may have against the Debtors' estates with respect to the Sale Proceeds in consideration for the parties' agreement that (i) Lucent held a valid, properly perfected, first priority secured lien in a substantial portion of the Acquired Assets, (ii) the Trustee would allocate $5,500,000.00 to Lucent's validly perfected lien, which represented the total value of Lucent's lien in the Acquired Assets at the time of the sale of substantially all of the Debtors' assets to IDT on December 18, 2001, (iii) the Trustee would place $5,500,000.00 of the Sale Proceeds into an interest bearing escrow account to be maintained by the Trustee in respect of such lien and (iv) that the Trustee would not release the funds to Lucent or any other party, except pursuant to a further final and nonappealable order of the Court, after notice and a hearing, or a written agreement by the parties directing the Trustee to distribute such funds; and

WHEREAS, the parties further agreed that Lucent's claims against the Debtors' estates with respect to the Miscellaneous Asset Sale Proceeds would remain unaffected by the November 2003 Settlement; and

WHEREAS, the parties continued to negotiate and exchange information regarding the extent of Lucent's liens in the Miscellaneous Assets and whether a portion of the Miscellaneous Asset Sale Proceeds should be allocated to Lucent's liens, if any, based on the value of Lucent's collateral transferred as part of such asset sales; and

WHEREAS, the Trustee and Lucent explored and took contrary positions with respect to the extent of Lucent's validly, properly perfected, first priority secured lien in a

B1700

portion of the Miscellaneous Assets, and whether a portion of the Miscellaneous Asset Sale

Proceeds should be allocated to Lucent's liens; and

WHEREAS, the parties hereto have reached an agreement, as more fully set forth

below, subject to the approval of the Bankruptcy Court, for the resolution of any and all secured

claims that Lucent has asserted or may have against the Debtors' estates with respect to the

Miscellaneous Asset Sale Proceeds in consideration for the parties' agreement (i) that Lucent

holds a valid, properly perfected, first priority secured lien in a substantial portion of the

Miscellaneous Assets, (ii) to allocate $800,000.00 of the Miscellaneous Asset Sale Proceeds

(plus interest actually earned thereon) to Lucent's lien, which represents the total value of

Lucent's lien in the Miscellaneous Assets at the time of the sale of the Miscellaneous Assets

during the pendency of the Debtors' chapter 11 cases; (iii) the Trustee shall place $800,000.00

of the Miscellaneous Asset Sale Proceeds (plus interest actually earned thereon) into an interest

bearing escrow account to be maintained by the Trustee (the "Escrow Account") in respect of

such lien; and (iv) the Trustee shall not release the funds to Lucent or any other party, except

pursuant to a further order of the Court, after notice and a hearing, or a written agreement by the

parties directing the Trustee to distribute such funds; and

NOW THEREFORE, in consideration of the mutual covenants set forth herein,

the parties agree as follows:

1.    This Stipulation of Settlement and Order (the "Settlement Stipulation")

shall not be effective or enforceable until it is approved by final and nonappealable order of the

Bankruptcy Court.

2.    Lucent shall be deemed to hold a valid, properly perfected, first priority

secured lien in a substantial portion of the Miscellaneous Assets.

PHI 654530v1 10/04/04
RLF1-2793871-1

6

B1701

3.    The Trustee shall allocate $800,000.00 of the Miscellaneous Asset Sale Proceeds (plus interest actually earned thereon) to Lucent's liens in the Miscellaneous Assets, which represents the total value of Lucent's liens in the Miscellaneous Assets at the time of the sale of the Miscellaneous Assets to various third-parties during the pendency of the Debtors' chapter 11 cases.

4.    Upon entry of a final order of the Bankruptcy Court approving the Settlement Stipulation, the Trustee shall place $800,000.00 of the Miscellaneous Asset Sale Proceeds (plus interest actually earned thereon) into the Escrow Account in respect of such lien and the Trustee shall not release the funds to Lucent or any other party, except pursuant to a further final order of the Bankruptcy Court, after notice and a hearing, or a written agreement by the parties directing the Trustee to distribute such funds.

5.    Lucent may seek relief from the Bankruptcy Court to compel the Trustee to distribute the $800,000.00 (plus interest actually earned thereon) to it in satisfaction of its lien in the collateral upon the earlier to occur of the following: (i) a resolution by the Bankruptcy Court (or District Court) through entry of a final and nonappealable order of, or resolution through written agreement of the parties with respect to, Count Eleven of the Trustee's second amended complaint in the Contract Adversary Proceeding in such a manner that some or all of Lucent's claims under the Lucent Credit Agreement, Supply Agreement or related agreements are not subject to equitable subordination; or (ii) a written agreement by the parties that Lucent may take such action.

6.    Upon the Trustee's transfer of $800,000.00 of the Miscellaneous Asset Sale Proceeds (plus interest actually earned thereon) into the Escrow Account, all of Lucent's secured proofs of claim relating to the Miscellaneous Assets shall be permanently reduced to

B1702

$800,000.00 (plus interest actually earned thereon) and any deficiency claim related thereto shall be deemed part of Lucent's unsecured proofs of claim.

7.    Lucent shall be deemed to hold an allowed secured claim in the amount of $800,000.00 (plus interest actually earned thereon) on account of Lucent's interest in the Miscellaneous Asset Sale Proceeds (the "Allowed Miscellaneous Asset Sale Proceeds Secured Claim"). The Trustee shall not distribute funds from the Escrow Account to Lucent in satisfaction of the Allowed Miscellaneous Asset Sale Proceeds Secured Claim, except pursuant to a further final and nonappealable order of the Bankruptcy Court, after notice and a hearing, or written agreement by the parties directing the Trustee to distribute such funds.

8.    Upon the Trustee's transfer of $800,000.00 of the Miscellaneous Asset Sale Proceeds (plus interest actually earned thereon) into the Escrow Account, Lucent shall waive, release and forever discharge any and all secured claims that it has or may have against the Miscellaneous Asset Sale Proceeds, except the Allowed Miscellaneous Asset Sale Proceeds Secured Claim. Lucent shall have a valid, properly perfected, first priority secured lien (without further action or filing) on account of the Allowed Miscellaneous Asset Sale Proceeds Secured Claim in the amount of $800,000.00 (plus interest actually earned thereon) transferred to the Escrow Account.

9.    Resolution of Lucent's secured claims against the Debtors' estates with respect to the Miscellaneous Assets pursuant to the Settlement Stipulation shall have no effect on Lucent's rights under the November 2003 Settlement or the Stipulation and Agreed Order Resolving Motion of Secured Creditor Lucent Technologies Inc. for Relief from Automatic Stay or, Alternatively, Adequate Protection with Respect to Certain Investment and Disbursement

B1703

Accounts entered by the Bankruptcy Court on or about April 9, 2003 (the "Collateral Account Settlement").

10.    As a result of the Settlement Stipulation (upon final approval of the same), the November 2003 Settlement and the Collateral Account Settlement, all of Lucent's secured claims against the Debtors' estates have been resolved. The full and final resolution of all of Lucent's secured claims against the Debtors' estates shall have no effect on the parties' respective causes of action and/or claims, defenses or arguments asserted in the Contract Adversary Proceeding.

11.    Resolution of all Lucent's secured claims against the Debtors' estates pursuant to the Settlement Stipulation (upon final approval of the same), the November 2003 Settlement and the Collateral Account Settlement shall have no effect on the parties' respective rights, claims, defenses and arguments with respect to any rights that Lucent may have, if any, with respect to any general unsecured claims that Lucent may have asserted against the Debtors' estates.

12.    Upon Bankruptcy Court approval of this Settlement Stipulation, no Debtor, creditor or other party in interest may challenge, object to or otherwise oppose the extent, validity, perfection or priority of Lucent's lien in the Miscellaneous Asset Sale Proceeds as set forth in paragraphs "2" and "3" herein.

13.    The Trustee shall not use any estate funds in which Lucent has an interest pursuant to any order of the Bankruptcy Court, stipulation, or settlement for any purpose in these cases without Lucent's prior written consent or further order of this Court after appropriate notice and hearing.

B1704

14. The recitals set forth above are part of this Settlement Stipulation and are incorporated herein by reference.

15. No term hereof shall be modified, altered, or waived except by further written agreement executed by all the parties hereto.

16. Counsel or other person executing this Settlement Stipulation in a representative capacity represent that they are fully authorized to execute this Settlement Stipulation in such capacity.

17. This Settlement Stipulation may be executed in one or more counterparts, each and all of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

18. Any provision of this Settlement Stipulation which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

19. This Settlement Stipulation shall be construed under and governed by the laws of New York, without application of conflicts of laws principles.

20. The parties hereto acknowledge that no representations, warranties, or covenants have been made to or relied upon by them except those expressly set forth in this Settlement Stipulation.

21. The Bankruptcy Court shall retain jurisdiction over any and all disputes that shall arise in connection with this Settlement Stipulation.

B1705

IN WITNESS WHEREOF, the Parties have executed this Settlement Stipulation

as of the date set forth below.

Dated: October _____, 2004
      Wilmington, Delaware

_____
Sheldon K. Rennie (No. 3772)
FOX ROTHSCHILD LLP
919 N. Market Street, Suite 1400
Wilmington, Delaware 19801-3046
(302) 655-7460

-and-

KAYE SCHOLER LLP
Richard G. Smolev, Esq.
John D. Geelan, Esq.
425 Park Avenue
New York, New York 10022
(212) 836-8000

Attorneys for Chapter 7 Trustee

Dated: October 6, 2004
      Wilmington, Delaware

_____
Daniel J. DeFranceschi (No. 2732)
Rebecca Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899-0551
(302) 651-7700

-and-

JONES DAY
David F. Adler, Esquire
Michelle Morgan Harner, Esquire
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

Attorneys for Lucent Technologies Inc.

B1706

**From:**        Rigotti, David Roy (David)
**Sent:**        Thursday, January 04, 2001 2:10 PM
**To:**          Petrini, Vanessa; Newsom, Janice
**Subject:**     Restructure Structure

Here is what we have so far...

EOQ restructure

## David R. Rigotti
**Lucent Technologies**
**Optical & Switching Sales Director - WinStar**
**(703) 326-6346 (Work)**
**(703) 980-7450 (Mobile)**
**drigotti@lucent.com**

CONFIDENTIAL


PLAINTIFF'S EXHIBIT
PX-5D9

LW00099621

B1707

# Restructuring of the End Of Quarter Deal
## (9/2000)

| |
|---|
| • $135M Software Pool |
| • $10M Credit issued 9/2000 |
| • $35M Credit to be issued 4Q2000 (Calendar) |
| • $45M Lab commitment to be implemented within 18 months |
| • $20M of actual software from list provided. Any software purchased by Winstar that is not on this list will be purchased seperately |
| • $25M to subsidize Hub and B pricing for 3,000 Bs at $20K per B and $400K per Hub |
| • Software Pool Payment terms outlined as $33.75M on each of the following dates: 1/15/2001, 3/30/2001, 6/29/2001, 8/29/2001. |

| |
|---|
| • Original $135M Software Pool Eliminated |
| • $10M Credit issued 9/2000 stands |
| • $35M Credit issued 4Q2000 stands |
| • Winstar issues Lucent a PO for $45M to build Lab |
| • Winstar issues Lucent $20M for listed software |
| • Winstar issues Lucent PO for 1,200 Bs at $40K per B, and 20 Hubs at $450K per Hub. Per original agreement, remaining 1,800 Bs will be priced at $20K & $400K. |
| * (Prices do not include Radios, and overhead costs such as A&E, Construction Mgt. Engineering services, Integration NOC support, etc. Hub and B pricing is based on the scope outlined in original proposal. Outside the scope elements will be subject to the change management process and agreed upon fence guidelines.) |

CONFIDENTIAL