ORAL ARGUMENT
REQUESTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>Winstar Communications, Inc., *et al.*,<br>Debtor. | Chapter 7<br><br>Bankr. Case No. 01-01430 (KJC) |
| Christine C. Shubert,<br>Chapter 7 Trustee,<br><br>       Plaintiff-Appellee,<br><br>   v.<br><br>Lucent Technologies Inc.,<br><br>       Defendant-Appellant. | Civil Action No. 06-147 (JJF)<br><br>Adv. Proc. No. 01-01063 (KJC) |

## LUCENT TECHNOLOGIES, INC.'S REPLY BRIEF

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (DE Bar No. 2732)
Paul N. Heath (DE Bar No. 3704)
Jason M. Madron (DE Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

CRAVATH, SWAINE & MOORE LLP
Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

WILMER CUTLER PICKERING HALE
  AND DORR LLP
Seth P. Waxman
Craig Goldblatt
Danielle Spinelli
Michelle Glassman Bock
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000

- and -

Philip D. Anker
James H. Millar
399 Park Avenue
New York, NY 10022
(212) 230-8800

Dated:  August 1, 2006
       Wilmington, Delaware

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

ARGUMENT .......................................................................................................................... 3

    I.     THE PREFERENCE JUDGMENT MUST BE REVERSED ....................................... 3

          A.    Lucent Was Not An Insider Of Winstar .................................................... 3

               1.    A "person in control" must exercise actual
                     managerial control. .......................................................... 3

               2.    The bankruptcy court's finding that Winstar was
                     Lucent's "captive buyer" does not meet the
                     managerial control standard. ............................................. 7

               3.    Lucent was not a "non-statutory insider" of Winstar ........................ 8

          B.    The Siemens Funds Were Earmarked. .................................................... 9

               1.    The parties agreed that the Siemens loan proceeds
                     would be paid to Lucent ................................................... 10

                2.    The transfer did not diminish Winstar's estate .................................. 12

                3.    Lucent did not waive the earmarking doctrine .................................. 13

          C.    Lucent Is Entitled To A $90.7 Million New Value Defense ........................ 14

                1.    Lucent advanced the $90.7 million after December
                       7, 2000. ...................................................................... 14

                2.    Lucent gave the $90.7 million in new value on an
                       unsecured basis. ............................................................. 16

    II.    LUCENT DID NOT BREACH THE SUBCONTRACT ........................................... 18

          A.    Lucent's Conduct Did Not Evince Assent To A
               Modification. ...................................................................................... 19

          B.    Even If The Parties Had Modified The Subcontract, Any
               Modification Was Ineffective Because It Was Not In
               Writing ............................................................................................... 22

          C.    Even If The Parties Had Modified The Subcontract, Lucent
               Did Not Breach Any Obligation Under The Subcontract As
               Modified. ............................................................................................ 24

          D.    The Subcontract Claim Is Non-Core ......................................................... 25

III.   THE BANKRUPTCY COURT ERRED IN EQUITABLY
       SUBORDINATING LUCENT'S CLAIMS AND TRANSFERRING
       ITS REMAINING LIEN ...................................................................................26

       A.    Subordination Was Not Warranted Since Lucent Was Not
             An Insider .................................................................................26

       B.    The Bankruptcy Court Found No Misconduct Sufficient To
             Subordinate the Claim Of A Non-Insider, And Its Remedy
             Was Improperly Punitive ...........................................................28

       C.    The Bankruptcy Court Ignored The Terms Of The
             Bankruptcy Code In Subordinating Lucent's Debt Claims To
             Equity Interests .........................................................................29

CONCLUSION ....................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................... 27

*ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.),*
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) ............................................................... 27

*AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distrib., Inc.),*
    315 B.R. 24 (Bankr. D. Del. 2004) ................................................................... 13

*Adams v. Anderson (In re Superior Stamp & Coin Co., Inc.),*
    223 F.3d 1004 (9th Cir. 2000) ................................................................... 10, 12

*Ansel Props. Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.),*
    178 B.R. 645 (E.D. Pa. 1995) ......................................................................... 27

*Austin v. Chisick (In re First Alliance Mortgage Co.),*
    298 B.R. 652 (C.D. Cal. 2003) ....................................................................... 27

*Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co.*
*(In re Badger Freightways, Inc.),*
    106 B.R. 971 (Bankr. N.D. Ill 1989) ................................................................. 4

*Bank of New Richmond v. Prod. Credit Assoc. (In re Osborne),*
    42 B.R. 988 (W.D. Wis. 1984) ........................................................................ 27

*Beacon Terminal Corp. v. Chemprene, Inc.,*
    429 N.Y.S.2d 715 (App. Div. 1980) ................................................................. 19

*Bergen v. Bergen,*
    439 F.2d 1008 (3d Cir. 1971) .......................................................................... 14

*Browning v. Fox,*
    171 N.Y.S. 648 (App. Div. 1918) ..................................................................... 21

*Browning Interests v. Allison (In re Holloway),*
    955 F.2d 1008 (5th Cir. 1992) .......................................................................... 5

*Butler v. David Shaw, Inc.,*
    72 F.3d 437 (4th Cir. 1996) ............................................................................. 4

*CPY Co. v. Ameriscribe Corp. (In re Chas P. Young Co.),*
    145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992) ....................................................... 5

*Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust*
*(In re 604 Columbus Ave. Realty Trust),*
    968 F.2d 1332 (1st Cir. 1992) .................................................................... 27, 28

*Carter-Waters Okla. Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.)*,
    266 B.R. 483 (B.A.P. 10th Cir. 2001)................................................................................27

*Chase Manhattan Bank, N.A. v. Am. Nat'l Bank and Trust Co.*,
    93 F.3d 1064 (2d Cir. 1996)...................................................................................................22

*Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*,
    339 B.R. 165 (E.D. Mich. 2006).............................................................................................12

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998)...........................................................................................28, 29

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006)....................................................................................................28

*Cole Taylor Bank v. Truck Ins. Exch.*,
    51 F.3d 736 (7th Cir. 1995) ....................................................................................................21

*Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*,
    285 B.R. 822 (S.D.N.Y. 2002)...............................................................................................26

*Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*,
    No. 01-Civ-3796, 2005 WL 447377 (S.D.N.Y. Feb. 24, 2005)......................................19

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*,
    339 F.3d 702 (8th Cir. 2003) ..................................................................................................14

*De Rosa v. Buildex Inc. (In re F&S Cent. Mfg. Corp.)*,
    53 B.R. 842 (Bankr. E.D.N.Y. 1985).................................................................................5, 12

*EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.)*,
    934 F.2d 1315 (4th Cir. 1991) ................................................................................................27

*Friedman v. Sheila Plotsky Brokers Inc. (In re Friedman)*,
    126 B.R. 63 (B.A.P. 9th Cir. 1991)..........................................................................................6

*Gray v. Chace (In re Boston Publ'g Co.)*,
    209 B.R. 157 (Bankr. D. Mass. 1997) ....................................................................................6

*Gray v. Giant Wholesale Corp.*,
    758 F.2d 1000 (4th Cir. 1985) .................................................................................................6

*Grossman v. Charmoy (In re Craig Sys.)*,
    244 B.R. 529 (Bankr. D. Mass. 2000) .....................................................................................5

*H.G. Holloway & Bro. v. White-Dunham Shoe Co.*,
    151 F. 216 (7th Cir. 1906) ......................................................................................................16

*Halper v. Halper*,
    164 F.3d 830 (3d Cir. 1999).....................................................................................................26

iv

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)................................................................................................................. 3

*Hohmann & Barnard, Inc. v. Sciaky Bros.*,
    333 F.2d 5 (2d Cir. 1964)................................................................................................. 23

*Howard Delivery Serv. v. Zurich American Ins. Co.*
    126 S. Ct. 2105 (2006)..................................................................................................... 17

*Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp.*
*(In re Ice Cream Liquidation, Inc.)*,
    320 B.R. 242 (Bankr. D. Conn. 2005) ............................................................................ 17

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) .............................................................................. 5

*In re Elcona Homes Corp.*,
    863 F.2d 483 (7th Cir. 1988) .......................................................................................... 19

*In re Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) .......................................................................................... 30

*Int'l Ventures, Inc. v. Block Props. VII (In re Int'l Ventures, Inc.)*,
    207 B.R. 618 (Bankr. E.D. Ark. 1997) ........................................................................... 13

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961).................................................................................................... 4, 9

*John St. Leasehold LLC v. FDIC*,
    No. 95-Civ-10174, 1998 WL 411328 (S.D.N.Y. July 22, 1998) ...................................... 23

*Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)*,
    137 F.3d 1087 (8th Cir. 1998) ................................................................................. 12, 13

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Co.*
*(In re Kamine/Besicorp Allegany, L.P.)*,
    214 B.R. 953 (Bankr. D.N.J. 1997) ............................................................................ 25-26

*Kham & Nate's Shoes No.2, Inc. v. First Bank of Whiting*,
    908 F.2d 1351 (7th Cir. 1990) ........................................................................................ 28

*Koch v. Rogers (In re Broumas)*,
    203 B.R. 385 (D. Md. 1996) ............................................................................................ 5

*Kornacki v. Norton Performance Plastics*,
    956 F.2d 129 (7th Cir. 1992) .......................................................................................... 21

*L & B 57th St., Inc. v. E.M. Blanchard, Inc.*,
    143 F.3d 88, (2d Cir. 1998) ............................................................................................ 23

*Lichenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*,
    284 B.R. 415 (E.D. Pa. 2002) ........................................................................................ 27

*Lynn v. Cont'l Bank (In re Murchison)*,
    154 B.R. 909 (Bankr. N.D. Tex. 1993) ................................................................ 4, 5, 6, 9

*Maas v. Cornell Univ.*,
    721 N.E.2d 966 (N.Y. 1999) ........................................................................................ 19

*Mandross v. Peoples Banking Co. (In re Hartley)*,
    825 F.2d 1067 (6th Cir. 1987) ..................................................................................... 12

*McKloskey v. Schabel (In re Schabel)*,
    338 B.R. 376 (Bankr. E.D. Wis. 2006) ....................................................................... 15

*Midatlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp (In re Mayo)*,
    112 B.R. 607 (Bankr. D. Vt. 1990) ............................................................................. 27

*Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*,
    458 U.S. 50 (1982) ...................................................................................................... 25

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston*
*(In re Exide Techs., Inc.)*,
    299 B.R. 732 (Bankr. D. Del. 2003) ............................................................................. 5

*Perrin v. United States*,
    444 U.S. 37 (1979) ........................................................................................................ 3

*Pinky Originals, Inc. v. Bank of India*,
    No. 94 Civ. 3568, 1996 WL 603969 (S.D.N.Y. Oct. 21, 1996) .................................. 23

*Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.)*,
    No. Civ.A. 04-390-GMS, 2004 WL 2283599 (D. Del. Oct. 4, 2004) ............................ 2

*Puerta v. United States*,
    121 F.3d 1338 (9th Cir. 1997) ..................................................................................... 22

*Rose v. Spa Realty Assocs.*,
    42 N.Y.2d 338, 397 N.Y.S.3d 922 (1977) .................................................................. 23

*Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*,
    380 F.3d 1292 (10th Cir. 2004) ................................................................................... 30

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
    335 B.R. 539 (D. Del. 2005) .......................................................................................... 5

*Schlumberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc.*
*(In re Cellnet Data Sys., Inc.)*,
    327 F.3d 242 (3d Cir. 2003) ........................................................................................... 2

*Southern Technical Coll. v. Graham Props. P'ship (In re Southern Technical Coll.)*,
    199 B.R. 46 (Bankr. E.D. Ark. 1995) .......................................................................... 17

*Southwestern Bell Tel. Co. v. FCC,*
    100 F.3d 1004 (D.C. Cir. 1996) ................................................................................... 22

*Tenn. Wheel & Rubber Co. v. Street (In re Tenn. Wheel & Rubber Co.),*
    62 B.R. 1002 (Bankr. M.D. Tenn. 1986) .................................................................. 5

*Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship),*
    213 B.R. 292 (D. Md. 1997) ...................................................................................... 5

*Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., Inc.),*
    162 B.R. 359 (Bankr. S.D. Fla. 1993) ............................................... 10, 11, 12, 13

*United States v. Clementon Sewerage Auth.,*
    365 F.2d 609 (3d Cir. 1966) ............................................................................. 11-12

*United States v. Ron Pair Enters., Inc.,*
    489 U.S. 235 (1989) .................................................................................................. 3

*Unsecured Creditors Comm. v. Banque Paribas (In re Heartland Chems., Inc.),*
    136 B.R. 503 (Bankr. C.D. Ill. 1992) ...................................................................... 28

*Walsh v. Dutil (In re Demko),*
    264 B.R. 404 (Bankr. W.D. Pa. 2001) ................................................................. 5, 9

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),*
    161 B.R. 107 (E.D. Pa. 1993) ........................................................................... 27, 28

*Wasserman v. Vill. Assocs. (In re Freestate Mgmt. Servs., Inc.),*
    153 B.R. 972 (Bankr. D. Md. 1993) ....................................................................... 13

## STATUTES

### Federal

11 U.S.C. § 101(31) ......................................................................................................... 4, 8

11 U.S.C. § 506(a)(1) .................................................................................................... 16-17

11 U.S.C. § 510(c) ........................................................................................................ 26, 30

11 U.S.C. § 547(a)(2) ......................................................................................................... 15

11 U.S.C. § 547(b) ...................................................................................................... 13, 14

11 U.S.C. § 547(c)(4) ................................................................................... 14, 15, 17, 18

11 U.S.C. § 547(g) .............................................................................................................. 13

28 U.S.C. § 157(b)(2) ........................................................................................................ 25

## State

N.Y. U.C.C. § 2-401(2)..................................................................................................................... 18

## BOOKS AND ARTICLES

Helen Shaw & David M. Katz, *Judge Socks Lucent for $300 Million*, CFO.COM, Dec. 28, 2005, *available at* http://www.cfo.com/article.cfm/5349962/c_2984411/?f=archives.................................. 1

*Random House Unabridged Dictionary* (2d ed. 1993) ............................................................... 4

The theme of the Trustee's brief, predictably following the course she charted in the bankruptcy court, is that Lucent engaged in misconduct for which it deserves to be punished. In purpose and effect, her brief serves only to distract from the dispositive legal principle: neither the bankruptcy preference statute nor New York contract law provides a remedy for the allegations of securities fraud that lie at the heart of the Trustee's story.

The Trustee's argument that Lucent was an "insider" of Winstar for purposes of her preference claim is illustrative of the way in which the Trustee tries to obscure the operative law with atmospherics. As Lucent showed in its opening brief,[1] a creditor is not a "person in control" (and hence not an "insider" subject to an extended look-back period) unless it exercised actual managerial control over the debtor's business affairs. The bankruptcy court nevertheless erroneously concluded that Lucent "controlled" Winstar even though the two companies were managed by separate and independent directors and officers. No previous reported bankruptcy decision has ever found one public company to "control" another. Indeed, the Trustee's counsel has admitted that the bankruptcy court's decision "establish[es] new case law."[2] That decision cannot be justified under any established legal principle, and the Trustee makes no serious attempt to do so. Instead, she turns her brief into a rhetorically overplayed saga of corporate scandal: "Enron, Worldcom, Tyco, etc. have shown [that] being a public company does not provide immunity from the law." Tr. Br. 3. The question on this appeal, however, has nothing at all to do with whether Lucent is "immune" from the law. It is whether the particular laws under which the Trustee has asserted her claims—the Bankruptcy Code and New York contract law— entitle her to the relief granted by the bankruptcy court. They do not.

Thus, the Trustee's efforts to defend the bankruptcy court's faulty reasoning fail, and her arguments quickly become entangled in internal contradiction. For instance, she insists, for

---

[1]    Lucent's opening brief, referred to as "Lucent Br.," is at D.I. 14. The Trustee's brief in opposition, referred to as "Tr. Br.," is at D.I. 25. The Trustee's Appendix is referred to as Tr. App. Citations otherwise follow the conventions in Lucent's opening brief. *See* Lucent Br. 8 n.7.

[2]    Helen Shaw & David M. Katz, *Judge Socks Lucent for $300 Million*, CFO.COM, Dec. 28, 2005, *available at* http://www.cfo.com/article.cfm/5349962/c_2984411/?f=archives.

purposes of her preference claim, that Lucent is an insider because it "dominated," "controlled," and "'bull[ied]'" Winstar.  Tr. Br. 7.  Yet, she contends, for purposes of her contract claim, that Lucent agreed to pay for any and all work that Wireless, in its sole discretion, chose to perform on the Winstar network.  In an attempt to evade Lucent's demonstration that the transferred funds were "earmarked" and thus not a preference, the Trustee insists that Lucent was undersecured. But she then contradicts herself by arguing that Lucent's loans could not constitute new value, because they were fully secured.  And then, in yet another about-face, when it comes to her equitable subordination claim, the Trustee knocks the legs out from under her own new-value argument, seeking to strip Lucent of the very security that is the premise of that argument.

The Trustee's extended discussion of the applicable standard of review is as confused as her merits arguments are self-contradictory.  The standard of review for this appeal is neither controversial nor complex.  It does not depend on the subject matter of the claim, but only on the nature of the bankruptcy court's conclusions.  Of course, this Court may disturb findings of historical fact, whatever the subject matter, only if clearly erroneous.  But the bankruptcy court's conclusions of law and its application of law to fact—which make up the heart of this appeal— must be reviewed *de novo* regardless of the subject matter.[3]  Moreover, deference is due only to the bankruptcy court's *actual* findings of fact.  The Trustee's lengthy tale of woe and wrongdoing, based substantially on testimony that was contradicted in the record and never described as creditable even by the bankruptcy court below,[4] is entitled to no deference at all.

---

[3]    *Schlumberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.3d 242, 244 (3d Cir. 2003) ("[O]n appeal, findings of fact . . . are set aside if clearly erroneous . . . . We review legal conclusions *de novo* and mixed questions of law and fact under a mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of . . . application of those facts to legal precepts."); *Pro-Tec Servs., LLC v. Inacom Corp (In re Inacom Corp.)*, No. Civ.A. 04-390-GMS, 2004 WL 2283599, at *1 (D. Del. Oct. 4, 2004) ("[T]he bankruptcy court's application of the law to the facts is reviewed *de novo*.").

[4]    *See, e.g.*, Tr. Br. 9 (full-page quotation from testimony of Winstar employee Hicks; the *sole* mention of Hicks in the court's opinion is in its footnote listing the individuals whose testimony was admitted via videotaped deposition, Op. n.5); Tr. Br. 24-25 (citing to the evidence the Trustee *presented*, not to portions of the opinion crediting that evidence, for a proposition the Trustee claims she "proved").

2

The Trustee's rhetoric cannot plug the holes in the bankruptcy court's deficient legal analysis. The judgment should be reversed.

## ARGUMENT

## I.     THE PREFERENCE JUDGMENT MUST BE REVERSED

### A.     Lucent Was Not An Insider Of Winstar.

Lucent demonstrated in its opening brief that, under bankruptcy preference law, a creditor is an "insider" of a corporate debtor, on the basis that it is a "person in control" of the debtor, only if the creditor has actual managerial control of the debtor's business affairs. The Trustee all but abandons the heart of the bankruptcy court's reasoning—its heavy (and improper) reliance on an adverse inference drawn from former Lucent employees' invocation of their Fifth Amendment rights—and instead makes three points in response. *First,* she contends that managerial control is merely "a factor that courts have looked at" in deciding whether a creditor is an "insider," not a prerequisite. Tr. Br. 30. *Second*, she argues that even if managerial control is required, the bankruptcy court's finding that Lucent treated Winstar as a "captive buyer" meets that standard. *Id.* at 29, 32. *Third*, she claims that, in any event, the record demonstrates that Lucent was a so-called "non-statutory insider," a category on which the bankruptcy court never relied and that has no application to this case. *Id.* at 33-35. Each of the Trustee's arguments is wrong.

1. *A "person in control" must exercise actual managerial control.* The Trustee is incorrect in arguing that a creditor can be a "person in control" without exercising managerial control of the debtor's business affairs. Her argument is flatly contradicted by the ordinary meaning of "in control," a term that implies a master-servant relationship. When the language of a statute like the Bankruptcy Code is clear on its face, that plain meaning must be given effect. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). "[T]he sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce [the plain meaning] according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (citations omitted); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979)

3

("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

The ordinary, common meaning of "control" is to "exercise restraint or direction over, dominate, command." *Random House Unabridged Dictionary* 442 (2d ed. 1993). One exercises "direction" over and "commands" a corporation only by running it—by directing its operations. Thus, to show that a defendant is a "person in control" of a debtor-corporation (like Winstar), a plaintiff must prove that the defendant exercised actual managerial control over the debtor-corporation. That conclusion is reinforced by the canon of statutory construction *noscitur a sociis*, "a word is known by the company it keeps," *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), under which the term "person in control" should be interpreted in light of the nearby statutory tests for an "insider"—*e.g.* "director," "officer," "general partner." 11 U.S.C. § 101(31).

Unsurprisingly, in the business, commercial, and lender context, courts have uniformly interpreted "person in control" to require actual managerial control over the debtor. *See, e.g., Lynn v. Cont'l Bank (In re Murchison)*, 154 B.R. 909, 913 (Bankr. N.D. Tex. 1993) (insider status requires "actual managerial control"); *Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 981 (Bankr. N.D. Ill 1989) ("person in control" requires "operating control"). In fact, *every case* that Lucent has found requires a showing of managerial control to establish that a creditor is an "insider" under the "control" standard. *See e.g., Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996).[5]

In response, the Trustee relies on a handful of cases for the proposition that a creditor is an "insider" if it engaged in non-arm's length transactions with the debtor. The cases she cites, however, are wholly inapposite. Most address the entirely distinct question of when close

---

[5]     The Trustee argues that "control" means "the ability to dictate corporate policy and the disposition of corporate assets." Tr. Br. 29. The case law requires more: the ability to direct the debtor to do whatever the insider wants, whenever the insider wants. An insider must have "sufficient authority over the corporate debtor so as to *unqualifi[edly]* dictate corporate policy and the disposition of corporate assets." *In re Murchison*, 154 B.R. at 913 (citations omitted; emphasis added). That is simply another way of saying "actual managerial control." *Id.*

personal relationships between individuals establish insider status.[6] The remainder are either simply irrelevant,[7] or apply the correct managerial control standard.[8] Moreover, the personal-relationship situations presented by the majority of her cases—the golfing buddy, the cohabiting couple, the divorced husband and wife—are better understood as implicating the separate "non-statutory insider" category, *see* Part I.A.3, *infra*, and do not offer any guidance on the application of the "person in control" standard as between two *public companies*, absent a close personal relationship (never alleged in this case) between the managers of the companies.

For example, the Trustee relies on *In re Holloway*, a case interpreting the term "insider" in Texas's Uniform Fraudulent Transfers Act in light of that term in the Bankruptcy Code, for the proposition that a party can be an insider on the basis of a "sufficiently close" relationship and a failure to "deal[] at arms-length." Tr. Br. 28. Tellingly, however, *Holloway* involved an individual debtor and an individual creditor in a close personal relationship (the alleged insider creditor was the former wife of the debtor and had lent money to assist the debtor in litigation against people they blamed for paralyzing their child). *See* 995 F.2d at 1012. In a later case, a bankruptcy court in the same circuit grappled with how to apply *Holloway*'s broad statements in the context of a commercial lender alleged to be an "insider." *See In re Murchison*, 154 B.R. at

---

[6]    *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1014 (5th Cir. 1992) (ex-wife); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 545 (D. Del. 2005) (debtor's attorney, attorney's wife, uncle, law firm, and family trusts); *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292, 298-301 (D. Md. 1997) (10-year friendship); *Koch v. Rogers (In re Broumas)*, 203 B.R. 385, 391 (D. Md. 1996) (15-year friendship), *aff'd in part, rev'd in part*, 135 F.3d 769 (4th Cir. 1998); *Walsh v. Dutil (In re Demko)*, 264 B.R. 404, 408 (Bankr. W.D. Pa. 2001) (4-year cohabiting relationship); *Grossman v. Charmoy (In re Craig Sys.)*, 244 B.R. 529, 540-41 (Bankr. D. Mass. 2000) (trust, controlled by debtor's principal, set up to benefit debtor's principal's estranged wife).

[7]    *See In re Allegheny Int'l, Inc.*, 118 B.R. 282, 295-301 (Bankr. W.D. Pa. 1990) (plan proponent held to be fiduciary and insider where it attempted to obtain control of debtor in bankruptcy process via coercive tender offer, announced that it controlled the debtor, and improperly used inside information); *Tenn. Wheel & Rubber Co. v. Street (In re Tenn. Wheel & Rubber Co.)*, 62 B.R. 1002, 1005-06 (Bankr. M.D. Tenn. 1986) (debtor's president, who withdrew resignation and maintained presidential authority at all relevant times, was an insider); *DeRosa v. Buildex Inc. (In re F&S Central Mfg. Corp.)*, 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985) (former parent who would reacquire full legal control of debtor if debtor failed to make transfer was an insider).

[8]    *See, e.g., CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 743 (Bankr. D. Del. 2003).

911-13. The court concluded: "[A] lender bank is not an 'insider' for § 547(b) purposes unless it is able to exercise *actual managerial control* over the debtor or has some *special affinity* with the debtor that extends beyond a business relationship." *Id.* at 913 (emphases added). In identifying two distinct "insider" standards—actual managerial control and special affinity—the court made clear that a showing of the "special affinity" alternative "will be most likely in cases involving individuals, such as *Holloway.*" *Id.* "Although the Court can imagine an 'affinity' between a bank and a corporate borrower—for example, where the bank's president is the brother-in-law of the debtor's 100% shareholder—no such relationship has been alleged here other than the course of business dealings between the parties." *Id.* The same analysis applies here. The Trustee has never alleged any "special affinity" between Winstar and Lucent, and the record is clear that no such affinity existed between the companies. Indeed, Winstar had so little "affinity" with Lucent that the day it filed for bankruptcy, it sued Lucent for more than $10 billion.

Despite her heavy reliance on inapposite cases involving personal relationships of individuals, the Trustee objects to Lucent's invoking cases from the commercial-lending context, asserting that Lucent was more than a mere lender to Winstar. Tr. Br. 31. But business and commercial cases outside the lender/borrower context also make clear that managerial control is the applicable legal standard.[9] In short, the bankruptcy court and the Trustee are both wrong in asserting that Lucent was "in control" of Winstar merely because the bankruptcy court found that

---

[9]     *See, e.g., Gray v. Giant Wholesale Corp.*, 758 F.2d 1000, 1003 (4th Cir. 1985) (defendant-wholesaler was not an insider of debtor-corporation even though it dispensed checks from debtor's account and repossessed debtor's inventory; rather, debtor continued to "manage[ ] every aspect of the store, including setting the store's hours, setting employee wages, making hiring and firing decisions, . . . and determining what goods were to be purchased"); *Friedman v. Sheila Plotsky Brokers Inc. (In re Friedman)*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991) (real estate brokers who assisted debtor in investing were not "insiders"; brokers performed specific tasks "unrelated to the overall direction or control of" debtor's business); *Gray v. Chace (In re Boston Publ'g Co.)*, 209 B.R. 157, 169-70 (Bankr. D. Mass. 1997) (shareholder who had resigned from debtor's board was not "insider" since he could not exercise managerial control over debtor or unilaterally dictate corporate policy).

certain of the transactions between the parties were not "at arm's length."[10] The law requires more—proof that Lucent exercised actual managerial control over Winstar.

2. *The bankruptcy court's finding that Winstar was Lucent's "captive buyer" does not meet the managerial control standard.* The Trustee contends that Lucent was a "person in control" because it made Winstar its "captive buyer," forcing Winstar to purchase unneeded goods. Tr. Br. 29, 32; Op. ¶ 138. As a matter of law, the bankruptcy court's findings on this point cannot show managerial control.

There is nothing surprising or uncommon—in the commercial world or elsewhere—about one independent actor deciding, in its own self-interest, to take actions intended to curry favor with another. The Trustee herself acknowledges that Winstar could have replaced Lucent as its primary vendor, though it would have been expensive for Winstar to do so. Tr. Br. 15. And the bankruptcy court itself found—at the same time that it noted that Winstar bought equipment it did not need to assist Lucent in meeting its revenue targets—that "Winstar benefited from some of its dealings with Lucent." Op. ¶ 18. In light of the relationship and contractual leverage of the parties and in its own self-interest, Winstar *chose* to buy equipment that Lucent wanted to sell it. On the legally dispositive question—whether Lucent exercised managerial control over Winstar—even the bankruptcy court's findings make clear that the parties made independent managerial decisions.[11]

Beyond this, the Trustee points only to Lucent's alleged "breaches and threatened breaches of contractual duties" and its exercise of its contractual rights to support her contention

---

[10]    The Trustee is simply incorrect in arguing that Lucent did not argue the correct standard below; to the contrary, Lucent advanced the very proposition set forth herein. *See* ROA 335, Lucent's Proposed Findings of Fact and Conclusions of Law ("Lucent PF&C") at 161, ¶ 51.

[11]    *See* Op. ¶ 28 n.23 (Winstar purchased far more non-Lucent equipment than the Supply Agreement permitted); *id.* ¶¶ 29-30 ("Lucent wanted to build Winstar's entire global network . . . on a completely turnkey basis," but was never able to reach a Transition Plan whereby Winstar granted Lucent such control); *id.* ¶ 34 (Lucent "desired to keep its good customer relationship with Winstar and thus in May 2000" entered into the Second Credit Agreement on terms favorable to Winstar); *id.* ¶¶ 43, 45 (Lucent "balk[ed]" at the parties' pass through arrangement, but "ultimately agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired . . . as an accommodation to Winstar"); *id.* ¶ 54 (Winstar made clear in third quarter of 2000 that it would not make end of quarter purchases from Lucent unless Lucent continued the pass-through).

that Lucent was Winstar's insider. Tr. Br. 31; *see also id* at 3, 15, 18, 19, 21, 25, 48. This argument fails. *First*, the Trustee's assertion that Lucent repeatedly breached the parties' contracts is belied by the Trustee's abandonment of all her contract claims other than the Subcontract claim. ROA 219 (dismissing claims by stipulation). *Second*, that a creditor breaches a contract with a debtor says nothing about whether it has managerial control over the debtor. And, *third*, to the extent that the Trustee bases her argument not on Lucent's alleged breaches, but on the exercise of its contractual rights, the law is settled that a creditor is not an insider because it exercises contractual leverage. *See* Lucent Br. 30-31 (citing cases).

Finally, the Trustee herself concedes that a creditor's ability to dictate the timing of a debtor's bankruptcy filing is evidence of control, Tr. Br. 32, and the lack of such ability is evidence of its absence. Here, Lucent obviously had no control over the timing or, for that matter, the substance, of Winstar's bankruptcy filing. Winstar kicked off its bankruptcy by filing, on the first day of the case, a $10 billion lawsuit against Lucent. ROA 1. Research has not found a single decision reaching the implausible conclusion that a creditor sued by a debtor-in-possession on the first day of that debtor's bankruptcy was a "person in control" of the debtor.

3. *Lucent was not a "non-statutory insider" of Winstar.* In an implicit concession that the record does not support a finding that Lucent was a "person in control" of Winstar, the Trustee resorts to arguing that Lucent was a so-called "non-statutory insider" of Winstar. Tr. Br. 33-35. The bankruptcy court never so found,[12] and, in any event, the Trustee's argument fails.

Because the Bankruptcy Code defines "insider" by virtue of what it "includes," courts have held that the enumerated definitions are non-exclusive, and thus that one can be an insider of a debtor without meeting any of the express statutory definitions set forth in section 101(31)(B). For this reason, as described above, *supra* at 4-6, a number of cases have found a creditor to be a

---

[12]    The Trustee asserts that the court found Lucent to be a non-statutory insider, but the paragraph she cites for that assertion, Tr. Br. 28 (citing Op. ¶ 71), does not use the term "non-statutory insider," and in fact appears in the discussion of the Subcontract. The insider discussion, which has relevance only to the preference claim, has its own section—titled "Insider Status," Op. ¶¶ 132-46—and there the only discussion is of whether Lucent satisfied the statutory definition of "insider" as a "person in control." *E.g.*, Op. ¶ 133.

non-statutory insider in particular circumstances involving non-arm's-length dealings between individuals with close personal relationships that fall outside the specified categories of statutory insiders. *See, e.g., In re Demko,* 264 B.R. at 408 (recipient of payment was non-statutory insider of debtor where the two had "cohabited for more than four years when the transaction occurred").

The Trustee, however, asks this Court to apply this lenient "non-arm's-length" standard in a corporate debtor/corporate creditor context in which, fundamentally, she is contending that Lucent "controlled" Winstar. To allow her to do so would render the more specific term in the Bankruptcy Code's definition of an insider, a "person in control," superfluous. But if a statute "admits a reasonable construction which gives effect to all of its provisions," a court will not "adopt a strained reading which renders one part a mere redundancy." *Jarecki,* 367 U.S. at 307-08. It is precisely for this reason that in the context of commercial and business affairs, every case we have located requires the creditor to exercise actual managerial control over the debtor to be deemed an insider. *See, e.g., In re Murchison,* 154 B.R. at 913; *see also* Lucent Br. 24 n.18 (citing cases stating that in the commercial and corporate context, the statutory "person in control" and non-statutory standards are the same).

### B. The Siemens Funds Were Earmarked.

The Trustee concedes the central fact that demonstrates that the Siemens funds were earmarked for Lucent and therefore not a preference: Siemens loaned Winstar $188.2 million in net proceeds and, on the very same day, Winstar used those funds to make the $188.2 million payment to Lucent that is the subject of the Trustee's preference judgment.[13] Neither Winstar nor its subsequently-formed bankruptcy estate was harmed at all. The net effect of the transaction was to reduce Winstar's debt to Lucent by $188.2 million, replacing that indebtedness with $188.2 million of debt to Siemens. In short, all that happened was the substitution of one lender for another—a paradigmatic case of earmarking.

Brushing aside the economic substance of the transaction, the Trustee argues that two requirements for earmarking—agreement with Siemens to pay the proceeds to Lucent, and no

---

[13]    As noted in Lucent's opening brief, the $188.2 million is net of fees. Lucent Br. 20 n.15.

diminution of Winstar's estate—are not satisfied. She also continues half-heartedly to argue that Lucent waived the issue in the bankruptcy court. The Trustee is wrong in all respects.

1. *The parties agreed that the Siemens loan proceeds would be paid to Lucent.* The Trustee first argues that Siemens and Winstar never agreed that Winstar would use the Siemens loan proceeds to pay down the Lucent loan. This argument simply ignores the terms of the Siemens-Winstar loan agreement.

As the Trustee acknowledges, the central inquiry is "whether the debtor had the right to disburse the funds to whomever it wished, or whether the disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor." Tr. Br. 35 (quoting *Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1009 (9th Cir. 2000)). Here, Winstar did not have the right to disburse the funds to whomever it wished; it had to use the funds to pay Lucent. The bank credit agreement Siemens joined provided that any default by Winstar on any other material loan would be a default under the bank facility. DX 284 at § 9.01(f), ROA 763. And the Lucent loan agreement required Winstar to use any new borrowings under the bank facility to pay down the pre-existing Lucent loan. DX 29 at § 6.12(d) & Art. VII(c), ROA 507. Winstar was thus required to use the Siemens loan proceeds to pay Lucent. Had it not done so, it would have been in immediate default under its loan agreement with its new creditor, Siemens.

*Tolz v. Barnett Bank of South Florida, N.A. (In re Safe-T-Brake of South Florida, Inc.)*, 162 B.R. 359 (Bankr. S.D. Fla. 1993), is directly on point. There, the debtor needed additional funding beyond that provided under its existing loan from Barnett Bank. A new lender, SunBank, was willing to lend a greater amount, but insisted on receiving a first-priority lien on the debtor's assets. Those assets, however, were already pledged to Barnett. Thus, in order to fulfill SunBank's first-priority-lien condition, the new proceeds had to be used immediately to pay off Barnett. The court held that the earmarking doctrine barred a subsequent preference claim against Barnett, *even though* the loan agreement did not explicitly state that the debtor needed to use the requisite portion of the new loan proceeds to pay off Barnett.

10

In *In re Safe-T-Brake*, "it was SunBank, not the Debtor, who realistically exercised the power in naming Barnett as [the] recipient" of the payments at issue. *Id.* at 366. So too, here. The Siemens credit agreement required Winstar to use the Siemens loan proceeds to pay Lucent, because it incorporated the requirement in the Lucent loan agreement that the proceeds be so used. Had Winstar failed to use the new proceeds to pay Lucent, and thus defaulted on the bank facility, Siemens and the banks could have demanded immediate payment of their entire principal balance of over $1 billion and, upon non-payment, foreclosed on all their collateral. DX 284 at § 9.01(f), ROA 763; DX 29 at § 6.12(d) & Art. VII(c), ROA 507.

The Trustee ignores this cross-default provision. Instead, she asserts that "[t]o honor its obligation to Lucent under the [Lucent loan] Agreement, Winstar could have used *other* funds to pay Lucent (not the Siemens funds), including the $270 million private equity investment Winstar received." Tr. Br. 37. The Trustee is wrong. The Lucent loan agreement expressly provided that Winstar could incur additional indebtedness under the bank facility only if "the proceeds [were] applied to prepay [the Lucent] Loans." DX 29 at §§ 6.12(d), 1.01, and 6.01, ROA 507. The contract required that *these* proceeds—not money from other sources—be paid to Lucent. Moreover, at the time of the Siemens loan, Winstar owed Lucent more than $700 million. So even if Winstar had used every penny of the $270 million equity infusion to reduce its outstanding debt to Lucent, it still would have been required to use the entire $188.2 million in proceeds from the Siemens loan to further pay down its debt to Lucent.

The Trustee's only other argument relies on a single statement by a Siemens representative suggesting that its loan proceeds were available for Winstar's "corporate purposes" and a sentence in the Siemens loan amendment to the same effect. Tr. Br. 36. While that particular sentence would permit, but not require, Winstar to use the proceeds to repay Lucent, the separate cross-default provision of the bank agreement did so require. That provision can no more be ignored than can any other express term of the relevant loan documents. As for the testimony about Siemens' understanding of the agreements, such parol evidence cannot vary the unequivocal terms of the written agreement. *See United States v. Clementon Sewerage Auth.*, 365

11

F.2d 609, 613 (3d Cir. 1966) (parol evidence "will not be admitted for the purpose of varying or contradicting the writing").

   *2. The transfer did not diminish Winstar's estate.* The Trustee also argues that the substitution of Siemens for Lucent diminished Winstar's estate—which could be the case only if Winstar surrendered value as a result of the substitution. That could be true only if the bank facility was oversecured—that is, secured by assets worth more than the debt outstanding to the banks—*and* the Lucent loan was undersecured—that is, secured by assets worth less than the debt outstanding to Lucent.[14]

   But this is all just idle speculation. The Trustee presented no evidence at trial of the value of the different collateral pools at the time of the transaction. It was her burden to do so.[15] It is therefore not surprising that the bankruptcy court made no finding that the additional $188.2 million Siemens loan, for which Winstar pledged no new collateral, consumed any Winstar equity in the banks' collateral base. *See* Op. ¶ 99. Moreover, since all of Winstar's assets were ultimately sold for less than $60 million, it would have been impossible for the Trustee to prove that the banks' $1 billion credit line was *oversecured. See, e.g., In re Superior Stamp & Coin Co.*, 223 F.3d at 1008 n.3 (holding that payment to old creditor was earmarked and there was no

---

[14]    Lucent's opening brief explained the relationship between the creditors' collateral base and diminution of the estate. Lucent Br. 39 n.37. If the banks' collateral base had been worth $1.1 billion, and the bank debt had been $1 billion, the debtor would have had $100 million of equity in those assets. The addition of the Siemens loan to the bank debt would thus have consumed that $100 million in equity. At the same time, if Lucent's loan had been undersecured—for example, if Lucent had had a collateral base worth only $500 million securing $700 million of debt outstanding—then reducing the debt owed to Lucent by $188.2 million would not have freed up any collateral. Accordingly, in such circumstances, replacing $188.2 million in debt to Lucent with an equal indebtedness to Siemens *would* have diminished the Winstar estate by $100 million. Even in that case, however, it is only the amount of that diminution that a trustee may recover—in this hypothetical, $100 million. *See, e.g., Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1071-72 (6th Cir. 1987) (when debtor gives security in return for loan, amount of voidable preference is equal to the value of the collateral, not the full amount of the loan to the debtor); *In re F&S Cent. Mfg. Corp.*, 53 B.R. at 847 (same).
[15]    *See Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)*, 137 F.3d 1087, 1089 (8th Cir. 1998) (reversing preference judgment because trustee had the burden to prove earmarking did not apply and failed to do so); *Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 339 B.R. 165, 169 (E.D. Mich. 2006) (holding that trustee has the burden to establish a diminution of debtor's estate); *In re Safe-T-Brake*, 162 B.R. at 365 ("it is up to the trustee to prove by a fair preponderance of the evidence that the earmarking doctrine does not apply"); Lucent Br. 34 & n.31 (citing cases).

diminution in value to the estate even though the new loan was subject to the new lender's existing security interest because the new lender was "an undersecured creditor").

Siemens' addition of $188.2 million in debt "secured" by the same collateral as the original bank loan did not diminish the estate. One undersecured creditor (Siemens) was merely substituted for another (Lucent). That is not a preference. "'[R]eplacing one creditor with another of equal priority does not diminish the estate and thus no voidable [transfer] results.'" *In re Heitkamp*, 137 F.3d at 1089.

    *3. Lucent did not waive the earmarking doctrine.* After addressing the merits of earmarking, the Trustee half-heartedly argues that Lucent waived the argument in the bankruptcy court. This is meritless.

    *First*, the Trustee contends that Lucent waived the earmarking argument by stipulating that the Trustee had satisfied the requirements of section 547(b)(1). Tr. Br. 38. But the "transfer-of-property-of-the-debtor" requirement appears in the prefatory language of section 547(b), *not* in paragraph (1) of that subsection. *See* Lucent Br. 35-36. The Trustee cites no case to the contrary because there is none.

    *Second*, the Trustee continues to suggest that Lucent waived the doctrine by failing to plead earmarking as an affirmative defense. Tr. Br. 38-39. Earmarking, however, is not an affirmative defense, and neither of the cases the Trustee cites holds otherwise.[16] The cases that address this question hold just the opposite.[17] The "plain meaning of section 547 necessarily leads to [this] conclusion," *In re Safe-T-Brake*, 162 B.R. at 364, since it provides that "the trustee has the burden of proving the avoidability of a transfer." 11 U.S.C. § 547(g).

---

[16]    *See AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distribution, Inc.)*, 315 B.R. 24, 29-30 (Bankr. D. Del. 2004) (noting that the defendant did plead earmarking, but nowhere holding that it was required to do so); *Wasserman v. Vill. Assocs. (In re Freestate Mgmt. Servs., Inc.)*, 153 B.R. 972, 981-82 (Bankr. D. Md. 1993) (acknowledging that "the trustee . . . bears the burden of proving all the elements of a preference," but stating that the defendant must produce some evidence in support of earmarking—a standard easily satisfied in this case).

[17]    *See, e.g., Int'l Ventures, Inc. v. Block Props. VII (In re Int'l Ventures, Inc.)*, 207 B.R. 618, 620 (Bankr. E.D. Ark. 1997) ("the earmarking doctrine is not required to be pleaded as an affirmative defense since it is an element of the plaintiff's proof"); *In re Safe-T-Brake*, 162 B.R. at 364 (rejecting the trustee's argument that earmarking is an "affirmative defense").

*Finally*, the Trustee claims that Lucent did not list the question whether the $188.2 million payment was a transfer of property of the debtor as an open issue in the pre-trial order, and that it was required to do so by Local Delaware Bankruptcy Rule 7016-2(d). Tr. Br. 39. The bankruptcy court did not invoke the Local Rule, and in the parties' joint pretrial memorandum, Lucent specifically identified, as a disputed issue, whether the Trustee could prove that the transfer of the Siemens funds was a voidable preferential transfer of property of the debtor under Section 547(b). *See* ROA 292 at ex. 12 B(I)(A)(1). The Trustee's waiver argument fails.

### C.    Lucent Is Entitled To A $90.7 Million New Value Defense.

Even if the $188.2 million payment of the Siemens funds to Lucent had been a preferential transfer, Lucent provided $90.7 million of new value to Winstar after it received the Siemens proceeds, and thus is entitled to a reduction of the preference judgment by that amount. *See* 11 U.S.C. § 547(c)(4). After the December 7, 2000 transfer of the Siemens funds, Lucent advanced to Winstar, on an unsecured basis, $28.4 million[18] in equipment and related services, and made a $62.3 million loan under the Second Credit Agreement. The Trustee claims that Lucent failed to establish that the transfers (1) occurred after December 7, 2000 and (2) were unsecured. She is wrong on both points.

*1. Lucent advanced the $90.7 million after December 7, 2000.* As Lucent has already noted, the bankruptcy court made no findings related to the timing of the payments. Lucent Br. 41-42. Rather, it simply concluded, without citing to any evidence, that Lucent had failed to meet its burden on this issue. Op. ¶ 150.[19] The Trustee is unable to defend this conclusion.

---

[18]    The Trustee is correct that the parties stipulated that the proper amount was $28.4 million rather than $28.6 million. Tr. Br. 39 n.18.

[19]    Appellate courts accord deference to a trial court's *specific* findings of fact. *See, e.g., Bergen v. Bergen*, 439 F.2d 1008, 1014 (3d Cir. 1971) ("[I]t is only if specific findings of fact are made that it is possible for a reviewing court to apply the [clearly erroneous] standard.") When, as here, a trial court merely states its conclusion that a party has not met its evidentiary burden, without specifically addressing the evidence that party put before it, its conclusion is entitled to no deference. *See, e.g., Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 339 F.3d 702, 712 (8th Cir. 2003). In such circumstances, if the factual record is disputed, a remand for specific findings to enable informed appellate review may be necessary. *See id.*

14

First, with respect to the $62.3 million loan, the Trustee concedes what the record unquestionably establishes: that Lucent transferred the money to Winstar on December 29, 2000, *after* Lucent received the $188.2 million payment on December 7, 2000. DX9, ROA 487; Tr. Br. 43. But she nevertheless argues that the "new value" given by Lucent was not the loan proceeds, but rather the services paid for with those loan proceeds. Tr. Br. 43-44 n.25. The Bankruptcy Code directly refutes that contention, providing that "new value" means "money or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2).[20] Indeed, extending a new loan is perhaps the paradigmatic example of providing new value. *See, e.g.*, *McCloskey v. Schabel (In re Schabel)*, 338 B.R. 376 (Bankr. E.D. Wis. 2006). When Lucent wired Winstar $62.3 million, in response to the December 29, 2000 draw request, it provided "new value" on that date, "subsequent" to the payment it had received more than three weeks earlier.

As to the $28.4 million in goods, the alleged "dispute" over when the new value was provided is simply concocted. The Trustee's position is that the record might fairly be read to suggest that Lucent *sent invoices*, rather than *shipped product*, after December 7, 2000. While the Trustee surely deserves credit for ingenuity, the full context of the record—and the use of the word "shipped"—makes clear that Lucent employee Vernon Terrell was referring to the shipment of *goods* in his undisputed testimony on this point. In response to an objection that a question improperly led the witness, the court interjected:

> THE COURT:  [L]et's not worry about leading if we're only talking about getting into these invoices * * *  I mean * * * *goods are manufactured, they're shipped, they're received and they're billed for*.  I mean, that's not—their system flow may be a little bit different, but that's pretty much what everybody * * * is supposed to do, so let's move on.
>
>                                     * * *
>
> Q.  Okay, now with respect to the shipping time frame, did you in your analysis confirm that all of the invoices that are collected at Exhibit 644 were shipped by Lucent between December 8th, 2000 and April 18th, 2001?

---

[20]       In the first instance, because there was no "pass-through" in December 2000, the Trustee is incorrect in asserting that the $62.3 million draw financed Lucent-provided services. Lucent Br. 20-21. But even if that were right, that would make plain that it was the *loan*, not the services for which the loan proceeds were used to pay, that constitutes new value. *See* 11 U.S.C. § 547(c)(4)(B) (requiring that new value remain unpaid).

A. In my analysis that is correct.

ROA 376 at 21-50-52 (Terrell Tr.). While the testimony would have been cleaner had the question referred expressly to the "goods reflected on the invoices," the context hardly leaves real doubt. And any remaining doubt is eliminated by Mr. Terrell's declaration, also in evidence, in which he states: "Lucent also provided Winstar with approximately $28,566,207.62 *in goods and services* on an unsecured basis *after December 7, 2000*." PX 480, ROA 1722. Indeed, the "ship date" on the invoices themselves confirms as much. DX 644, ROA 1123.

Because the bankruptcy court never addressed any of this evidence, and made no finding on this issue, if this Court reaches the issue it must examine this undisputed record evidence in the first instance (or remand for the bankruptcy court to do so). Such a review can leave no question that Lucent advanced the $90.7 million in new value after December 7, 2000.[21]

2. *Lucent gave the $90.7 million in new value on an unsecured basis.* The Trustee makes much of the fact that Lucent checked the box on the proof of claim form it filed in Winstar's bankruptcy to indicate that its claim was "secured by collateral." *See* Fed. R. Bankr. P. Off. Form 10; Tr. Br. 40, 44, 46-47. The claim Lucent filed in the Winstar bankruptcy (for almost $800 million) was, in fact, "secured by collateral." The Trustee's contention that Lucent's current position—that the new value was provided on an unsecured basis—implies that the filed claim form was "fraudulent" is baseless. The language of the Bankruptcy Code makes clear that there is no inconsistency. It provides that when a creditor holds a claim that is secured by property worth less than the full amount of the debt, that claim is bifurcated into secured *and* unsecured portions. "An allowed claim of a creditor secured by a lien on property in which the estate has an

---

[21]    The Trustee contends that the invoiced prices are insufficient "in light of the Lucent/Winstar relationship" to meet Lucent's burden of proof regarding the amount of new value that Lucent provided. Tr. Br. 43. But it is long-established that invoices showing the contract price make out a *prima facie* case that the contract price was the value of the goods. *See, e.g.*, *H.G. Holloway & Bro. v. White-Dunham Shoe Co.*, 151 F. 216, 218 (7th Cir. 1906) ("[T]he contracts, invoices, bills of lading, etc., which showed the contract price, were properly received in evidence . . . and made out a prima facie case that the contract price was the value.").

16

interest . . . is a secured claim to the extent of the value of such creditor's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). Of course, a creditor holding such a claim will check the box on the proof of claim form providing that such a claim is "secured." [22]

The Trustee also argues—directly contrary to her position on earmarking—that the value of the collateral securing Lucent's loan may have exceeded the more than $500 million then due to Lucent. The evidence is decisively to the contrary. Winstar itself sold substantially all of its assets for less than $60 million.[23] And the Trustee stipulated that Lucent's collateral was worth only $21 million.[24] On this record, it cannot seriously be contended that Lucent was oversecured.

The Trustee next contends that even if Lucent had been undersecured when it made the $62.3 million loan, that loan was secured because loans under the Second Credit Agreement were subject to a security agreement. The plain language of section 547(c)(4), however, provides that a creditor has a defense to a preference action "*to the extent that*" it gave new value not secured by a security interest. 11 U.S.C. § 547(c)(4) (emphasis added). Thus, when an undersecured creditor like Lucent extends new credit, and receives no corresponding increase in its collateral base, it is entitled to offset the unsecured new value it provided against any preference liability. *See Southern Technical Coll. v. Graham Props. P'ship (In re Southern Technical Coll.)*, 199 B.R. 46, 50 (Bankr. E.D. Ark. 1995), *aff'd sub nom. Southern Technical Coll., Inc. v. Hood*, 89 F.3d 1381 (8th Cir. 1996) (landlord may claim new value in provision of leased space in excess of security held).[25] Since the $62.3 million went to finance services rather than to acquire any more

---

[22]    In contrast to the Trustee's repeated allegations of "fraud," in a recent decision the Supreme Court treated the creditor's assertion in a proof of claim form that a claim was entitled to administrative priority—a claim that it later abandoned—as entirely unremarkable. *See Howard Delivery Service v. Zurich American Ins. Co.*, 126 S. Ct. 2105, 2109 n.2 (2006).

[23]    *See* PX 507 Ex. A at 2, ROA 1749; PX 508, ROA 1750; ROA 367 at 12-34 (Scherf Tr.).

[24]    *See* PX 506 at ¶ 1, ROA 1748 ($14,781,130.00); PX 508 ex. A at ¶ 2, ROA 1749 ($5,500,000); PX 508 ex. A at ¶ 3, ROA 1750 ($800,000).

[25]    The Trustee attempts to distinguish the cases adopting the majority view on the ground that they do not involve facts identical to those here. For example, she argues that *In re Southern Technical Coll.* and *Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242 (Bankr. D. Conn. 2005), are inapplicable because the security in question was a security deposit rather than some other form of collateral, and the

17

collateral,[26] and because Lucent was already undersecured at the time it made its loan, the $62.3 million constitutes unsecured new value.

As for the $28.4 million of goods and related services, there is no dispute that they were never financed at all—meaning that Winstar never borrowed money from Lucent to pay for these goods and services. ROA 376 at 21-52 (Terrell Tr.). Because the security agreements extend only to obligations under the credit agreement, Winstar's obligation to pay for these goods and services was not secured. The Trustee's only response is to theorize that even though the goods were not in fact financed, "the parties understood that all of these purchases were to be financed." and that the parties so "intended." Tr. Br. 41. But an *intent* to collateralize a debt, without an actual grant of a security interest, does not amount to the extension of secured credit.[27]

## II.    LUCENT DID NOT BREACH THE SUBCONTRACT

In its opening brief, Lucent explained that the bankruptcy court erred in finding that Lucent breached the Subcontract. No one disputes that the Subcontract provided a mechanism— the "task order" requirement—by which Lucent could decide which services, if any, it would ask Wireless to perform. And the Subcontract was clear that without a task order, Lucent had no obligation to pay Wireless.

Nevertheless, from March 1999 through September 2000, Lucent paid Wireless for work performed, even though Lucent had not first issued Wireless a task order describing that work— waiving its right to insist on issuing a task order *before* the services were performed. In

---

advances were not loans governed by lending documents. These are distinctions without a difference. The legal principle for which these cases stand—that an extension of credit by an undersecured creditor constitutes new value—applies, under the plain language of section 547(c)(4), without regard to the form of the collateral.

[26]    *See* JX 9 at 38-39, ROA 468 (Montemarano Cr.).

[27]    In any event, Lucent obtained a security interest only in assets held by the special-purpose borrowers under the Second Credit Agreement, WVF-1 and WVF-LU2. Because title to the $28.4 million in equipment, which was neither shipped to nor billed to these entities, was not held by either of these entities, Lucent's extension of credit could not have been secured by these assets. Again, the Trustee's argument that the parties "intended" these entities to hold title cannot overcome the fact that they did not. *See* N.Y. U.C.C. § 2-401(2) (2006) ("buyer" of goods holds title to them upon delivery). Nor is there merit to the Trustee's argument that this point was waived. In arguing that the advances were unsecured, Lucent's proposed findings and conclusions pointed directly to the specific record evidence showing that only the special purpose borrowers gave Lucent a security interest. *See* Lucent PF&C ¶¶ 461-464, ROA 335.

September 2000, however, Lucent informed Winstar in writing that it was no longer willing to pay for services that it had not ordered in advance. And it never again did. While the Trustee makes much of the fact that in December 2000, Lucent honored a draw request made by *Winstar* under the parties' loan agreement, that was not a payment to *Wireless* under the Subcontract. This case is therefore no different from one posed by Judge Posner, in which a tenant is two weeks late in paying the rent for several consecutive months, and then argues that this conduct "modified" the lease, allowing the tenant to pay late in perpetuity. Unsurprisingly, contract law provides nothing of the sort. *See In re Elcona Homes Corp.*, 863 F.2d 483, 487 (7th Cir. 1988) ("Suppose the practice of a landlord is to accept late payment from his tenant. That practice does not entitle the tenant to pay late; it does not modify the contract.").

The Trustee's response is, in effect, to say over and over that seven months went by and the landlord accepted late payment every month. That responds not at all to the fundamental legal point: such conduct is nothing more than a waiver, not a modification. The Subcontract judgment should be reversed.

### A. Lucent's Conduct Did Not Evince Assent To A Modification.

New York law is clear that the party alleging a modification must prove "mutual assent to its terms."[28] The requirements for establishing assent from the parties' conduct are stringent: to do so, the Trustee would have had to point to conduct by Lucent demonstrating that, if Wireless had handed Lucent an amendment to the Subcontract containing the modified terms, Lucent would have signed it. *See Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999) ("The conduct of a party may manifest assent if the party intends to engage in such conduct and knows that such conduct gives rise to an inference of assent. Thus, a promise may be implied when a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it.") (citation omitted).

---

[28] *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (App. Div. 1980); *see also Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-Civ-3796, 2005 WL 447377, at *11 (S.D.N.Y. Feb. 24, 2005) ("[W]hen asserting that a contract was impliedly modified [by conduct], the proponent . . . must show that acceptance "compl[ied] with the terms of the offer and [was] clear, unambiguous, and unequivocal."" (citations omitted)).

The bankruptcy court failed even to identify this legal standard, let alone apply it correctly. The court found that the Subcontract was modified because, from the second quarter the Subcontract was in effect until September 2000, Lucent paid Wireless for its services without first having issued a task order.[29] That does not even begin to demonstrate that Lucent agreed to eliminate the task-order requirement *permanently*, for every future quarter in which Winstar wished to build its network. The task order, after all, was the mechanism by which Lucent was able to decide beforehand which parts of the build-out it would ask Wireless to perform. The procedure that the bankruptcy court found to have replaced that mechanism—the exchange of purchase orders and invoices *after* Wireless had performed the build out—would have permanently deprived Lucent of any say over what was built and what it would pay for.[30] Neither the bankruptcy court nor the Trustee has offered any explanation of what Lucent might have gained in return for agreeing to this. Absent such an explanation, it is not plausible that Lucent would have done so. The most this evidence could demonstrate is that, each quarter, Lucent agreed to *waive* the task-order requirement for that particular quarter—just like the landlord who accepts late payment from his delinquent tenant. The Trustee's contrary arguments lack merit.

*First*, the Trustee asserts that "Lucent has no record evidence to support" its assertion that it temporarily waived, rather than permanently modified, the Subcontract's task order requirement. This is both incorrect and irrelevant. The course of conduct on which the Trustee relied to establish a modification—the parties' performance of the pass-through without task orders from March 1999 until September 2000—is exactly the same evidence that demonstrates,

---

[29] The only other evidence on which the bankruptcy court relied—Mr. Montemarano's statement that the parties were in a commercially binding relationship, Op. ¶ 80—says no more than the unremarkable proposition that once the parties had exchanged purchase orders and invoices in a particular quarter, they had thereby created a binding contract as to that transaction.

[30] The Trustee now contends, contrary both to the thrust of her argument below and the bankruptcy court's reasoning, that the exchange of purchase orders and invoices made up no part of the "modified" terms. Tr. Br. 58 ("The Trustee never argued that Lucent's obligation to pay was triggered by purchase orders or invoices: instead, Lucent's obligation to pay, in every quarter, was triggered by Wireless' performance of services on Lucent's behalf."). *But see* Op. ¶ 85 ("based on the parties' behavior, the Subcontract was modified to provide for payment of purchase orders, invoices, etc. after [] Wireless performed the work"). While accusing Lucent of "sleight of hand" in its direct quotes from the bankruptcy court's opinion, Tr. Br. 58, the Trustee does not defend her characterization of the decision below with any citation to that opinion.

in each quarter up to and including September 2000, that Lucent waived its right to insist upon strict compliance with the task order requirement. It was the *Trustee's* burden to establish the additional and unlikely fact that Lucent agreed permanently to eliminate the task order requirement.[31] By failing to recognize that the high bar of modification could not be satisfied by a mere "practice" in which the parties had "previously engaged"—a practice equally consistent with a backwards-looking waiver—the bankruptcy court erred.

*Second*, the Trustee claims that Winstar's Uhl and Kantor testified that Lucent had "eliminated" the task order requirement, and that Lucent employees testified that (in the Trustee's words) "the Subcontract was a binding agreement, even without task orders." Tr. Br. 55. Even if self-serving testimony from Winstar employees were reliable evidence of a modification—and it is not[32]—the testimony in the pages cited by the Trustee simply describes the process that was followed in those specific quarters in which Lucent waived the requirement for a task order. The Lucent employees' testimony to which she cites merely acknowledges that there was an agreement between the parties—the Subcontract—that related to build-out services, and their statements are by no means inconsistent with Lucent's having merely waived the right to insist on task orders up until and including September 2000.[33]

*Third*, the Trustee mistakenly contends that Lucent's conduct was inconsistent with waiver. As to the September 2000 letter on which the Trustee relies, it was reasonable business practice, as a courtesy and in the interest of maintaining good relationships, for Lucent's executives to give Winstar a chance to agree or disagree with its decision to begin to enforce the

---

[31]    *Browning v. Fox*, 171 N.Y.S. 648, 649 (App. Div. 1918) ("The burden of proof to establish the modification was upon the [party asserting the modification].").

[32]    *See Kornacki v. Norton Performance Plastics*, 956 F.2d 129, 132 (7th Cir. 1992) (rejecting claim that contract was modified by conduct where "the only evidence Kornacki provides is his own self-serving affidavit and his strained reading of Pelzer's deposition testimony"); *Cole Taylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir. 1995) (seeking to reconcile waiver doctrine with "the principle that parties should not be allowed to get out of their written contracts by self-serving testimony").

[33]    It is unclear what testimony the Trustee relies on; the pages contain such innocuous statements as "Lucent had an agreement to subcontract those services back to Winstar," JX 4 at 183, ROA 463 (DiRoma Dir. 11/20/02 dep.) (Tr. App. B865), and "My testimony is that there was an underlying agreement between the two companies," JX 9 at 68, ROA 468 (Montemarano Dir.) (Tr. App. B958).

21

task order requirement, even though Lucent had every right to do so unilaterally. Moreover, the December 2000 email, which the Trustee presents as evidence that Lucent believed it was obliged to pay for Wireless services, is no such thing. Rather, it demonstrates only a belief that Lucent was obliged to allow *Winstar* to *borrow* under the parties' loan agreement. PX 199, ROA 1441 ("Winstar can *draw upon the credit facility*, including services. . . . We really had not the option of denying their rights here. In reality, we can make their lives miserable for a couple of days, but they have *an open line* and *that* is what we have to change." (emphases added)).

*Finally*, the Trustee asserts that Lucent "waived" the "new" argument that Lucent merely temporarily waived the task order requirement, rather than permanently agreeing to modify the Subcontract. There is no new argument. Lucent's argument is, and always has been, that Lucent did not agree to modify the Subcontract.[34] That is precisely what Lucent argued below. Its use of slightly different words to make the argument here is of no legal significance.[35]

### B.      Even If The Parties Had Modified The Subcontract, Any Modification Was Ineffective Because It Was Not In Writing.

The Subcontract provides that non-written modifications are ineffective. DX 117 at § 8.6, ROA 595 ("No modification . . . shall be binding upon the parties . . . unless made in writing . . . .") The bankruptcy court correctly recognized that such clauses "are generally enforceable

---

[34]      *See* Lucent PF&C 146-50, 150-52, ROA 335 (subsections titled, respectively, "The Subcontract was not orally modified" and "The fact that the parties had previously engaged in the pass-through did not obligate Lucent to continue that practice or otherwise to pay Wireless for services allegedly performed building the Winstar network" (capitalization altered)); *see also* Lucent's Mem. In Support of Mot. For Summary Judgment 38 (June 11, 2004), ROA 212 ("Here, there is no evidence in the record suggesting that the parties ever agreed in a signed writing—or in any other manner—to modify the Subcontract by eliminating the Task Order requirement.").

[35]      *See Chase Manhattan Bank, N.A. v. Am. Nat'l Bank and Trust Co.*, 93 F.3d 1064, 1072 (2d Cir. 1996) (the "defendants' waiver argument is unpersuasive" because the plaintiff argument in the district court "is the same argument, albeit in different terms, that [it] makes on appeal"); *Sw. Bell Tel. Co. v. FCC*, 100 F.3d 1004, 1007-08, (D.C. Cir. 1996) ("[P]resent[ing] the same basic argument in a more polished and imaginative form . . . is not the same thing as presenting a new argument on appeal."). Nor is Lucent forbidden to cite additional cases in this Court to support arguments presented below. *Puerta v. United States*, 121 F.3d 1338, 1341-42 (9th Cir. 1997) ("The bank argues that Puerta's argument should not be considered, because he cites some authorities, such as legislative history, which he did not cite in the district court. That argument is frivolous. An argument is typically elaborated more articulately, with more extensive authorities, on appeal than in the less focused and frequently more time pressured environment of the trial court, and there is nothing wrong with that.").

under New York law," subject only to the "partial-performance" and "reliance" exceptions announced in *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 397 N.Y.S.3d 922 (1977). Op. ¶ 83.[36] Critically, however, the bankruptcy court failed to recognize that "[u]nder either exception, to overcome the requirement that modifications be in writing, the plaintiff must show 'that the *only inference* possible from [its] conduct is that an oral agreement had been concluded between the parties.'" *John St. Leasehold LLC v. FDIC*, No. 95-Civ-10174, 1998 WL 411328, at *7 (S.D.N.Y. July 22, 1998) (quoting *L & B 57th St., Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 93 (2d Cir. 1998) (emphasis added)), *aff'd*, 196 F.3d 379 (2d Cir. 1999). That is what it means for conduct to be "unequivocally referable" to a modification. *Id.*

But here, another inference is eminently possible from Wireless' building out Winstar's network: that Winstar wanted its engineering subsidiary to build its network regardless of whether Lucent was going to perform the pass-through. The Trustee's reply is that Lucent paid Wireless for the work it performed from June 1999 through September 2000. While that fact may be *consistent* with the assertion that the Subcontract was modified, it is by no means *inconsistent* with the contrary proposition that Wireless was building the network for the benefit of its corporate parent, and would have done so without Lucent performing the pass-through. *See L&B 57th St., Inc.*, 143 F.3d at 93 (under *Rose*, "the existence of a competing inference" from the conduct of the party insisting upon a modification "makes summary judgment for . . . [the other party] appropriate"). The Trustee has thus failed to identify any conduct "unequivocally referable" to the claimed modification.

---

[36]    The Trustee appears to suggest that the clause requiring modifications to be in writing is not even at issue because the contract was modified by conduct. Tr. Br. 52-53. This surprising claim was not endorsed by the bankruptcy court, and is not borne out by the caselaw. *See Hohmann & Barnard, Inc. v. Sciaky Bros.*, 333 F.2d 5, 9 (2d Cir. 1964) (finding the predecessor to N.Y. Gen. Oblig. L. 15-301 to be inapplicable to a "course of conduct, which constituted a modification of the written contract" because "it was fully executed"); *Pinky Originals, Inc. v. Bank of India*, No. 94 Civ. 3568, 1996 WL 603969, at *16 (S.D.N.Y. Oct. 21, 1996) (rejecting plaintiff's claim that contract "was modified by a 'course of conduct'" because (1) plaintiff's evidence did not establish agreement to modify, and (2) contract contained clause "barring modification by oral agreement or course of conduct" and plaintiff had failed to show that either of the *Rose v. Spa Realty* exceptions applied).

23

C.    **Even If The Parties Had Modified The Subcontract, Lucent Did Not Breach Any Obligation Under The Subcontract As Modified.**

Even if the parties had agreed to eliminate the task-order requirement and instead to exchange purchase orders and invoices, and even if such a non-written modification was effective despite the Subcontract's requirement that modifications must be in writing, Lucent did not breach. As explained in Lucent's opening brief, all that happened in March 2001 was that Winstar requested to borrow. Lucent Br. 54; DX 668, ROA 1147 (Winstar document titled "Notice of Request for Borrowing"). Wireless did not issue Lucent an invoice seeking payment for work it had performed, and Winstar did not issue Lucent a purchase order covering such work; indeed, no exchange of purchase orders or invoices took place in that quarter. Lucent accordingly had no obligation to pay Wireless, even under the modified terms of the Subcontract, and committed no breach.[37]

The Trustee's only response is to assert an even more startling modification of the Subcontract than the Bankruptcy Court posited: that the parties agreed that in the absence of any task order or even any purchase order or invoice, Lucent would pay Wireless for whatever build-out Wireless elected to undertake at whatever price such work cost. Tr. Br. 58.[38] The bankruptcy court understandably never so found. It defies all common sense—not to mention the Trustee's own theory that Lucent was a "person in control" of Winstar (as opposed to the reverse)—to claim that Lucent effectively wrote Wireless a blank check, agreeing to a modification under

---

[37]    The Trustee claims that Lucent has waived the argument that, even if the contract was modified, Lucent did not breach. Tr. Br. 57 n.37. She is wrong again. Lucent PF&C 149-150, ¶¶ 14-18, ROA 335 (section entitled "Lucent did not breach the terms of the allegedly modified Subcontract" (capitalization altered); explaining that modification under which task orders were replaced by exchange of purchase orders and invoices was not breached because "Lucent and Wireless did not exchange purchase orders and invoices . . . after September 2000").

[38]    To the contrary, Winstar's Nate Kantor testified (in a deposition that the Trustee elsewhere relies on as evidence of what the parties agreed to, Tr. Br. 55) that the task order requirement was replaced prior to September 2000 with purchase orders and invoices, not that it was completely eliminated. JX 1 at 361-62, ROA 460 (Kantor Dir.) (Tr. App. B950b) ("The contract was administered by using the invoices and a Lucent purchase order to reflect these task orders and the work that was performed by WinStar to Lucent and agreed to by Lucent and those invoices were paid for several years."); *id.* at 363 (Tr. App. B950c) ("I think the parties used the purchase orders and invoices to define the work.").

which Lucent was required to pay Wireless for whatever build-out services Wireless, in its sole discretion, chose to perform for the benefit of its parent, Winstar.

### D.    The Subcontract Claim Is Non-Core.

In any event, the bankruptcy court should not have entered judgment on the Trustee's Subcontract claim because that claim was not a part of the claims allowance process, and therefore was not a "core" matter. Lucent Br. 54-55 n.56. Any judgment on the Subcontract claim affects only the amount that the Trustee will be able to distribute to creditors—not the ordering or priority of those creditors' claims. The *Trustee's* Subcontract claim clearly had nothing to do with the allowance of *Lucent's* claims, as the bankruptcy court purported to enter final judgment on the Trustee's Subcontract claim without so much as mentioning any issue related to the allowance or disallowance of Lucent's claims.

In fact, the Trustee's Subcontract claim is no more part of the claims allowance process than was the breach of contract claim in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982). The Trustee is wrong that the Subcontract claim is a core matter under 28 U.S.C. § 157(b)(2)(B). That subsection merely states that core proceedings include "allowance or disallowance of claims *against the estate*" (emphasis added). The Trustee's Subcontract claim is brought *by*—not against—the estate, and thus falls outside the plain language of section 157(b)(2). As recognized by *Marathon*, contract claims brought *by* the estate that involve solely questions of state law, and do not implicate the bankruptcy process except to increase the estate's assets, are non-core. *See Marathon Pipeline Co.*, 458 U.S. at 84 & n.36.

The Trustee attempts to distinguish *Marathon* by stating that the defendants in that case, unlike Lucent here, did not file a proof of claim. But nothing in Lucent's proof of claim turned on the construction of the Subcontract; so the bankruptcy court, in deciding whether or not to allow Lucent's claim, would have no occasion to resolve the Trustee's Subcontract claim. That is what it means to say that the Subcontract claim is not "part of the claims allowance process."[39]

---

[39]    Nor is the Subcontract claim a "counterclaim" to a proof of claim, 28 U.S.C. § 157(b)(2)(C), as it was asserted by the Trustee *before* Lucent filed a proof of claim. *See Kamine/*

On this point, the Trustee offers no response at all.[40] Finally, Lucent has not impliedly waived its argument that the bankruptcy court exercised only non-core jurisdiction, as the text of the Bankruptcy Rules makes clear that such a waiver must be express. Fed. R. Bankr. P. 7012(b).

## III.    THE BANKRUPTCY COURT ERRED IN EQUITABLY SUBORDINATING LUCENT'S CLAIMS AND TRANSFERRING ITS REMAINING LIEN

In its opening brief, Lucent showed that the bankruptcy court erred in (1) transferring Lucent's $21 million lien to the estate and (2) having thus rendered Lucent entirely unsecured, subordinating its claim to those of other creditors and to all equity interests. The Trustee makes three arguments in response: *First*, she claims that, even if Lucent were not an insider, Lucent's conduct was sufficiently egregious to warrant equitable subordination. *Second*, the Trustee argues that the bankruptcy court found sufficient misconduct by Lucent and "quantified" the harm it caused to Winstar's estate adequately to justify its equitable subordination remedy. *Third*, she suggests that section 510(c) of the Bankruptcy Code permits the subordination of Lucent's debt claims to the equity interests of Winstar's shareholders. Each of these points is wrong.

### A.    Subordination Was Not Warranted Since Lucent Was Not An Insider.

As Lucent has shown, it was not an "insider" within the meaning of the Bankruptcy Code. The Trustee asserts that this is beside the point, because the bankruptcy court stated that Lucent's misconduct was sufficiently egregious to justify equitable subordination even of a non-insider. Tr. Br. 48; Op. ¶ 159. But that reasoning only highlights how misguided the bankruptcy

---

*Besicorp Allegany L.P. v. Rochester Gas & Elec. Co.* (*In re Kamine/Besicorp Allegany, L.P.*), 214 B.R. 953, 965 (Bankr. D.N.J. 1997) (finding that proofs of claim filed subsequent to adversary proceeding did not render the adversary proceeding a core matter).

[40]     The Trustee cites a case from the Second Circuit, *Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating LLC*), 285 B.R. 822, 834 (S.D.N.Y. 2002) for the proposition that Lucent's proofs of claim invoked the claims allowance process, which encompassed any "logically connected" claims. The Trustee argues that the previously-filed Subcontract claim is "logically connected" under this standard. Tr. Br. 59. While even under the Second Circuit's standard there is no such logical connection here, the more important point is that Third Circuit law is to the contrary. This circuit has adopted the "claim by claim approach," under which a district court determining whether an individual claim is core or non-core must assess whether it invokes a substantive right provided by title 11 or is a proceeding that by its nature could arise only in the context of a bankruptcy case. *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999). Because the Trustee's breach of contract claim invokes only state law and could be resolved in state court, it is not a "core" claim under the Third Circuit test.

court's decision is. Equitable subordination—the altering of a creditor's normal contractual and legal priority and the stripping of its liens—is an "extraordinary remedy" even when directed at insiders.[41] But, as against non-insiders, it is virtually unheard of.[42]

The few reported decisions that have subordinated the claims of non-insiders are readily distinguishable. The bankruptcy court's opinion cited only one such case. Op. ¶ 155 (citing *Bank of New Richmond v. Prod. Credit Assoc. (In re Osborne)*, 42 B.R. 988 (W.D. Wis. 1984)). In *Osborne*, the non-insider lender made "outright misrepresentations" in response to direct inquiries from another creditor, *which directly harmed that creditor and solely benefited the lender. Id.* at 999. Here, by contrast, the bankruptcy court did not find that Lucent made any misrepresentation to (indeed, ever communicated at all with) other creditors. Similarly, the Trustee points to only one non-insider case—Tr. Br. 48 (citing *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332 (1st Cir. 1992))—a case in which the non-insider had demanded and obtained a "kickback," *id.* at 1360, and had knowingly collected large amounts that were not due to it, to the detriment of other creditors, *id.* at 1362. By contrast, in this case, Lucent received no "kickbacks," and importantly, Lucent suffered the harm for any actual misconduct that occurred. *See* Part III.B, *infra*.

---

[41]    *See EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.)*, 934 F.2d 1315, 1320-21 (4th Cir. 1991) (citation omitted) (equitable subordination is an "extraordinary remedy" and further finding the standard not met as to insider); *Ansel Props., Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.)*, 178 B.R. 645, 657 (E.D. Pa. 1995) (same).

[42]    *See, e.g., Austin v. Chisick (In re First Alliance Mortgage Co.)*, 298 B.R. 652, 667 (C.D. Cal. 2003) ("While courts commonly discuss the level of non-insider, non-fiduciary conduct sufficient to warrant equitable subordination, that standard is rarely if ever met."); *Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 119 (E.D. Pa. 1993) ("equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries"), *aff'd*, 37 F.3d 1487 (3d Cir. 1994); *see also Carter-Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.)*, 266 B.R. 483, 489 (B.A.P. 10th Cir. 2001) (same); *Lichenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*, 284 B.R. 415, 427 (Bankr. E.D. Pa. 2002) (same); *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) (same); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 839 (Bankr. S.D.N.Y. 1994) ("The cases that enunciate the 'gross and egregious' or similar standard [for equitable subordination of the claim of a non-insider] uniformly fail to find conduct that meets the standard, and deny equitable subordination."); *Midatlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 650 (Bankr. D. Vt. 1990) ("There are few cases in which gross misconduct has actually been applied to non-insiders, and even fewer where [it] has caused a claim to be subordinated.").

**B.    The Bankruptcy Court Found No Misconduct Sufficient To Subordinate The Claim Of A Non-Insider, And Its Remedy Was Improperly Punitive.**

The very case on which the Trustee relies makes clear that the "minimum" required for equitable subordination of a non-insider's claim is "gross misconduct" that "shocks the conscience of the court." *In re 604 Columbus Ave. Realty Trust*, 968 F.2d at 1361. And even then, equitable subordination does not allow a court "to weigh the moral quality of each debt or to compare creditors in terms of moral worth." *Id.* at 1360. Rather, it "is remedial, not penal," *Cohen v. K.B. Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 462 (3d Cir. 2006) (citations and internal quotation omitted), and is proper "only to the extent necessary to offset the harm" to other creditors. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998) (citation omitted). Here, while the Trustee provided a long list of Lucent's supposed misdeeds, the bankruptcy court based its equitable subordination ruling on Lucent's exercise of its contractual rights—its alleged "delay" in issuing a refinancing notice—and the pressure it applied to require Winstar to make unnecessary end-of-quarter purchases. Op. ¶¶ 158-60. Neither prong of the court's analysis is sustainable.

As to the former, the Trustee defends the bankruptcy court's finding that Lucent delayed issuing a refinancing notice that might have forewarned Siemens of Winstar's financial peril. But even if that finding were factually supportable, it would be legally irrelevant. The Trustee's own authority makes clear that a creditor does not engage in misconduct by exercising its contractual rights—let alone by *delay* in exercising them.[43] As to the latter, the bankruptcy court missed the point entirely. Winstar paid for the equipment that it supposedly did not need through funds it borrowed from Lucent—which have never been paid back and never will be. Because Lucent

---

[43]    *In re 604 Columbus Ave. Realty Trust*, 968 F.2d. at 1361-62. *See also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("firms that have negotiated contracts are entitled to enforce them to the letter… without being mulcted for lack of 'good faith'"); *In re M. Paolella & Sons*, 161 B.R. at 120 ("a creditor does not act inequitably in exercising its contractual rights"); *Unsecured Creditors Comm. v. Banque Paribas (In re Heartland Chems., Inc.)*, 136 B.R. 503, 518-520 (Bankr. C.D. Ill. 1992) (a creditor can act strategically to protect its own interests to the potential detriment of other claimants, as such other creditors extend credit at their own risk).

financed such purchases, Lucent's actions ultimately harmed *Lucent* itself,[44] which lost *three quarters of a billion dollars*[45] in principal alone by financing Winstar's build-out. All it has to show for that is a lien on property that the parties stipulated is worth a mere $21 million. PX 506-508, ROA 1748-1750. It was thus *Lucent*, not other Winstar creditors, that suffered from the supposed unnecessary purchases. The transfer of Lucent's $21 million lien to the estate can thus be only an improper penalty, not a remedy.[46]

In any event, contrary to the Trustee's contention (Tr. Br. 49), the law in this Circuit is settled that a bankruptcy court must "identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination." *Citicorp Venture Capital*, 160 F.3d at 991. The bankruptcy court here simply defied this Third Circuit precedent, failing to quantify the harm to the estate[47] and making no attempt to explain how its remedy might compensate for any injury to creditors.

### C.    The Bankruptcy Court Ignored The Terms Of The Bankruptcy Code In Subordinating Lucent's Debt Claims To Equity Interests.

The Bankruptcy Court did more than simply strip Lucent of its remaining $21 million lien securing a tiny fraction of the hundreds of millions owed to it. It also subordinated Lucent's

---

[44]    To be sure, Winstar's purchases under the September Software Pool Agreement were not financed by Lucent. Op. ¶ 36 & n.30. But Winstar never paid any cash for any products or services furnished under that contract. Instead, Lucent created financing "credits" to offset any cash cost to Winstar in 2000 (*id.* at ¶ 62) and in the months thereafter Winstar failed to pay for the goods and services provided. *See* DX 605, ROA 1084 (quarterly software pool invoice); DX 674, ROA 1153 (quarterly software pool invoice); ROA 376 at 21-60-61 (Terrell Tr.) (testifying that invoices at DX 605 and 674 were never paid). Accordingly, as with the other purchases, Lucent itself incurred the costs of providing these products and services.

[45]    Lucent loaned $931 million to Winstar under the Second Credit Agreement, of which it received repayment of $194 million through the transfer of the Siemens loan proceeds, leaving an outstanding principal balance of $737 million. ROA 385 at Tab A.4 (Lucent Proof of Claim).

[46]    The bankruptcy court also disregarded the law in subordinating Lucent's unsecured claims for the financing of *non-Lucent* equipment and services—more than half of its total claims. *See* DX 285, ROA 764 and DX 7-11, ROA 485-489. Those purchases could have benefited only the estate, not Lucent.

[47]    For example, the bankruptcy court found that Winstar was harmed by interest charges on unnecessary equipment, but made no finding as to how much interest (if any) Winstar paid to Lucent—let alone how much is attributable to purchases of unneeded equipment. Op. ¶ 160.

now unsecured claim, not only to all other unsecured claims of Lucent's creditors, but also to the equity holdings of Winstar's shareholders. As a practical matter, that determination is of little consequence. Unsecured creditors are highly unlikely to receive any meaningful distribution from the bankruptcy estate. Even if the Trustee's judgments were upheld, the primary beneficiaries (other than the Trustee and her counsel) would be the postpetition lenders to the Winstar estate (who lent with full knowledge of Winstar's alleged prepetition actions—as Winstar had already sued Lucent—and who, therefore, could not conceivably have been harmed by anything Lucent did months and years earlier). But the bankruptcy court's decision to subordinate Lucent's claim to the equity interests of shareholders does provide another striking example of the extent to which the bankruptcy court disregarded black-letter law.

As even the Trustee concedes, "Bankruptcy Code section 510(c) refers to subordination of claims to claims and interests to interests." Tr. Br. 50. The bankruptcy court cited no case to the contrary. The two cases on which the Trustee relies address a wholly separate matter—the "recharacterization" of debt as equity (*e.g.*, where an owner/shareholder undercapitalizes an entity and purports to provide it with "capital" in the form of debt, not equity). *See In re Lifschultz Fast Freight*, 132 F.3d 339, 341-42 (7th Cir. 1997); *Sender v. Bronze Group, Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1297 (10th Cir. 2004). Indeed, this very authority recognizes that "in an equitable subordination analysis, ... the remedy is subordination of the creditor's claim to that of *another creditor*." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d at 1297 (emphasis added).

## CONCLUSION

The judgment of the Bankruptcy Court should be reversed.

Dated:  August 1, 2006
        Wilmington, Delaware

CRAVATH, SWAINE & MOORE LLP
Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (DE Bar No. 2732)
Paul N. Heath (DE Bar No. 3704)
Jason M. Madron (DE Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

WILMER CUTLER PICKERING HALE
  AND DORR LLP
Seth P. Waxman
Craig Goldblatt
Danielle Spinelli
Michelle Glassman Bock
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000

- and -

Philip D. Anker
James H. Millar
399 Park Avenue
New York, NY  10022
(212) 230-8800

31

### *List of Attachments—Unpublished Cases*

A.   *Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.)*, No. Civ. A. 04-390-GMS, 2004 WL 2283599 (D. Del. Oct. 4, 2004)

B.   *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-Civ-3796, 2005 WL 447377 (S.D.N.Y. Feb. 24, 2005)

C.   *Pinky Originals, Inc. v. Bank of India*, No. 94 Civ. 3568, 1996 WL 603969 (S.D.N.Y. Oct. 21, 1996)

D.   *John St. Leasehold LLC v. FDIC*, No. 95-Civ-10174, 1998 WL 411328 (S.D.N.Y. July 22, 1998)

# ATTACHMENT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: INACOM CORP., et al., Debtors.
PRO-TEC SERVICES, LLC, Appellants,
v.
INACOM CORP., et al., Appellees.
**No. 00-2426 (PJW), Civ.A. 04-390-GMS.**

Oct. 4, 2004.

Laura Davis Jones, Pachulski, Stang, Ziehl, Young &
Jones, P.C., Wilmington, DE, for Debtors and
Appellees.
William D. Sullivan, Elzufon Austin Reardon Tarlov
& Mondell, P.A., Wilmington, DE, for Appellants.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

*1 On June 16, 2000 (the "Petition Date"), Inacom
Corp., *et al.* ("Inacom") filed voluntary petitions for
relief under Chapter 11 of the United States
Bankruptcy Code. Pro-Tec Services, LLC ("Pro-
Tec") filed a timely Proof of Claim on November 2,
2000. On June 13, 2001, Inacom filed its Fifth
Omnibus Objection to Claims-Objections to Claims
filed Against Inacom, Inc. or Its Affiliates (the
"Objection"). On July 13, 2001, the United States
Bankruptcy Court for the District of Delaware (the
"Bankruptcy Court") entered an order disallowing
Pro-Tec's claim pursuant to Inacom's Objection.
Inacom's plan of liquidation was confirmed on May
23, 2003.

On April 2, 2004, Pro-Tec filed a motion to
reconsider its claim. The motion was denied at a
hearing before the Bankruptcy Court on April 20,
2004. Pro-Tec appealed this decision on April 30,
2004. Because the court agrees that Pro-Tec has
made a satisfactory showing of excusable neglect, its
motion to reconsider the allowance of its claims
should have been granted by the Bankruptcy Court.
Further, because the court disagrees with the
Bankruptcy Court's analysis of *Pioneer Investment
Services Co. v. Brunswick Associates Ltd.*

*Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123
L.Ed.2d 74 (1993), as it applies to the facts of this
case, the court will reverse the ruling of the
Bankruptcy Court and remand the matter for further
proceedings consistent with this opinion.

## II. STANDARD OF REVIEW

In reviewing a case on appeal, the district court
reviews the Bankruptcy Court's legal determinations
*de novo,* its factual findings for clear error, and its
exercise of discretion for abuse. *In re O'Brien Envtl.
Energy, Inc.* 188 F.3d 116, 122 (3d Cir.1999). A
bankruptcy court abuses its discretion when its ruling
is founded on an error of law or misapplication of
law to the facts. *Id.* In determining whether an error
exists, the bankruptcy court's application of the law to
the facts is reviewed *de novo. Id.*

## III. BACKGROUND

The basic facts pertinent to Pro-Tec's motion to
reconsider the allowance of its claims are not in
dispute. On September 18, 1997, Pro-Tec and
Vanstar Corporation ("Vanstar") were parties to a
computer and communication repair services
agreement (the "Agreement"). Subsequent to the
execution of the Agreement, Inacom purchased
Vanstar, and Pro-Tec continued to provide services to
Inacom under the Agreement. From February 1999 to
June 2000, Inacom incurred charges for services
rendered by Pro-Tec under the Agreement. On June
16, 2000, Inacom filed voluntary petitions for relief
under Chapter 11 of the Bankruptcy Code in the
District of Delaware. On August 1, 2000, Inacom
filed its Schedules of Assets and Liabilities (the
"Schedules"). Pro-Tec was listed on Exhibit F-3 of
Inacom's Schedules as a creditor holding unsecured
non-priority claims in the amount of $195,823.20.

On November 2, 2000, Pro-Tec's counsel timely filed
a Proof of Claim (the "Claim"), in the amount of
$330,115.61, with Bankruptcy Services, Inc.
("B.S.I."), Inacom's claims agent. On November 6,
2000, B.S.I. stamped the Claim as received, timely,
and numbered the Claim 6647. On June 13, 2001,
Inacom filed its Objection. The Objection contests
approximately 412 claims spread over 96 pages of
exhibits. The exhibits are lettered A through H, with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

some exhibits containing multiple alphabetical listings of objections. Pro-Tec was listed on the first alphabetical list of Exhibit E to the Objection. The Objection contained a Proof of Service, indicating that it was served on Pro-Tec's counsel, William Sullivan, at his office address. Pro-Tec's counsel did not respond to the Objection. On July 13, 2001, the Bankruptcy Court entered an Order Disallowing Claims, Expunging Claims, Altering the Status of Claims, or Allowing the Claims in a Reduced Amount (the "Order").

*2 On July 22, 2002, Inacom filed the Notice of Debtors Twenty-Ninth Amendment of Schedules (the "Twenty-Ninth Amendment"), seeking to amend the Claim from $195,823.20 to $0.00. On May 23, 2003, Inacom's Joint Plan of Liquidation (the "Plan") was confirmed. In February 2004, after Pro-Tec did not receive a distribution under the Plan (which was expected on or about January 30, 2004), Pro-Tec's counsel inquired into the status of distributions. After contacting B.S.I., Pro-Tec was advised of the July 13, 2001 Order disallowing the Claim. Accordingly, Pro-Tec filed its Motion for Reconsideration on April 2, 2004. A hearing on Pro-Tec's motion was held before the Bankruptcy Court on April 20, 2004. The Bankruptcy Court denied Pro-Tec's motion. On April 30, 2004, Pro-Tec appealed the decision.

IV. DISCUSSION

As a result of the Bankruptcy Court's July 13, 2001 Order, Pro-Tec's Claim in connection with the Agreement was disallowed. It is undisputed that Pro-Tec received the Objection but failed to respond prior to the July 13, 2001 Order, or prior to the May 23, 2003 confirmation of the Plan. Pro-Tec filed a motion for reconsideration pursuant to 11 U.S.C. 502(j) and Fed. R. Bankr.P. 3008. Section 502(j) provides that "a claim that has been allowed or disallowed may be reconsidered for cause." Pro-Tec asserts that a motion for reconsideration based on a claim disallowed as a result of the claimant's failure to appear or to produce evidence is usually decided based on whether the claimant is able to show "excusable neglect." Pro-Tec, therefore, seeks relief from the July 13, 2001 Order under Federal Rule of Civil Procedure Rule 60(b), made applicable to bankruptcy cases by Bankruptcy Rule 9024. Rule 60(b) states, in pertinent part, "on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, or excusable neglect." The factors a

court must consider when determining whether a party has failed to appear or to produce evidence because of excusable neglect were articulated by the Supreme Court in _Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership_, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The _Pioneer_ factors were adopted and applied by the Third Circuit in _In re O'Brien Environmental Energy, Inc._, 188 F.3d 116, 125 (3d Cir.1999). Pro-Tec asserts that its failure to respond to the Objection was the result of excusable neglect, and that the Bankruptcy Court made an inadequate excusable neglect analysis under _Pioneer_. As previously noted, the basic facts pertinent to Pro-Tec's motion are not in dispute. Thus, the court must review _de novo_ whether the Bankruptcy Court engaged in a proper analysis under _Pioneer_ to make its excusable neglect determination, and whether the Bankruptcy Court abused its discretion in determining that there was no excusable neglect warranting reconsideration of Pro-Tec's claim.

A. Did the Bankruptcy Court Engage in a Proper _Pioneer_ Analysis?

*3 Pro-Tec first argues that the Bankruptcy Court failed to review the totality of the circumstances surrounding Pro-Tec's failure to respond to the Objection and, therefore, failed to adequately apply _Pioneer's_ standards for excusable neglect. The court will start with a brief review of _Pioneer_ and the excusable neglect factors articulated in that case. In _Pioneer_, the Supreme Court determined that a Chapter 11 creditor was entitled to file its proof of claim after the bar date deadline because its failure to timely reply was the result of excusable neglect, within the meaning of Bankruptcy Rule 9006(b)(1). The Court held that the determination of what type of neglect would be considered "excusable" was an equitable one "tak[ing] account of all relevant circumstances surrounding the party's omission." _Pioneer_, 507 U.S. at 395. The Court listed four factors to consider in making the excusable neglect determination: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." _Id._ Under the facts of _Pioneer_, the Court held that the creditor's failure to timely file was inadvertent, and in good faith. There was no danger of prejudice to the debtor because the untimely claim was accounted for in the reorganization plan and was filed prior to the plan's effective date. Lastly, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

court noted that notice of the bar date "was outside the ordinary course" because of its "inconspicuous placement"-a single sentence in a document regarding a creditors' meeting-which was not accompanied by a statement of significance and "left a 'dramatic ambiguity' in the notification." *Id.* at 398.

Pro-Tec argues that, while the Bankruptcy Court considered the reason for the delay, including whether it was within the reasonable control of Pro-Tec, and the potential prejudice to Inacom, it did not consider the other *Pioneer* factors. After reviewing the transcript from the April 20, 2004 hearing, the court cannot agree. In making its determination, the Bankruptcy Court made the following findings of fact: (1) overturning the Order would prejudice Inacom because allowing the claims would "open the floodgates to hundreds of these [reconsideration] applications being filed;" (2) allowing the delayed claim "would be a mistake at this very late stage of this case;" and (3) Pro-Tec's counsel was fully responsible for the delay in failing to file a response to the Objection.[FN1] Tr. at 35-36. Thus, the Bankruptcy Court considered the prejudice to the debtor, the length of the delay and its effect on judicial proceedings, and whether the reason for the delay was in the reasonable control of the movant. The only *Pioneer* factor that the Bankruptcy Court did not consider was the good faith of Pro-Tec's counsel. Inacom, however, acknowledged Pro-Tec's good faith at the April 20, 2004 hearing, which meant that the Bankruptcy Court did not have to consider this factor. For the foregoing reasons, the court finds that the Bankruptcy Court engaged in a proper *Pioneer* analysis.[FN2]

> FN1. The Bankruptcy Court noted that Pro-Tec's "client's name and your [Pro-Tec's counsel's] name and address with the law firm is [the] first item on Page 11, it's the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9.

> FN2. In this section of its brief, Pro-Tec argues its counsel's diligence upon receiving omnibus objections to its other clients' claims. Pro-Tec also argues that the Bankruptcy Court's Local Rule 3007-1, implemented in September 2002, addresses the difficulties created by the large omnibus claim objections by limiting them to 150, but does not ameliorate the difficulties posed by omnibus objections filed before September 1, 2002 (Inacom's Objection was

filed before September 1, 2002). The court will not address these arguments because they are not material to whether the Bankruptcy Court engaged in a proper *Pioneer* analysis.

### B. Did the Bankruptcy Court Abuse Its Discretion When It Determined There Was No Excusable Neglect?

*4 Pro-Tec next argues that the Bankruptcy Court abused its discretion in failing to find excusable neglect. In addressing this contention, the court will analyze each of the *Pioneer* factors in turn.

#### 1. Danger of Prejudice to the Debtor

The Supreme Court in *Pioneer* noted that lack of any prejudice to the debtor weighs strongly in favor of permitting a tardy claim, but provided little guidance as to what prejudice actually is in the bankruptcy context. The United States Court of Appeals for the Third Circuit has recognized that "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence." *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 127 (3d Cir.1999). Under Third Circuit case law, *Pioneer* requires a detailed analysis of more than "whether the Plan set aside money to pay the claim at issue." *Id.* at 126. Thus, the relevant factors for analysis of prejudice under *O'Brien* include: whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; whether the payment of the claim would force the return of amounts already paid out under the confirmed Plan or affect the distribution to creditors; whether payment of the claim would jeopardize the success of the debtor's reorganization; whether allowance of the claim would adversely impact the debtor actually or legally; and whether allowance of the claim would open the floodgates to other future claims *Id.* at 126-28. Pro-Tec argues that none of the prejudice factors articulated in *O'Brien* serve as potential prejudice to Inacom.

With regard to the first *O'Brien* factor, the court cannot conclude that Inacom was surprised or caught unaware by the assertion of a claim that it had not anticipated. Inacom listed Pro-Tec as a creditor holding unsecured non-priority claims in the amount of $195,823.20 in the Schedules. Pro-Tec timely filed the Claim, which was stamped as received and numbered by Inacom's claims agent. The Claim remained scheduled for more than one year after it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

was disallowed by default, on July 13, 2001. In fact, the Claim remained scheduled by Inacom until it filed the Twenty-Ninth Amendment on July 22, 2002, which sought to amend Pro-Tec's scheduled Claim from $195,823.00 to $0.00. Clearly then, Inacom was aware of the assertion of the Claim.

The second *O'Brien* factor requires the court to consider whether the payment of the claim would force the return of amounts already paid out under the confirmed Plan or affect the distribution to creditors. Pro-Tec argues that the resolution of the Claim does not impact the recovery being paid to unsecured creditors because Inacom is still litigating the value of many of the unsecured claims. Pro-Tec alleges that unsecured creditors were advised in the Plan that their recovery was uncertain, and, based on the Plan, reconsideration of its Claim will not prejudice other creditors because no creditor will have to return any distribution it may have already received and the ultimate distribution to creditors under the Plan will vary. Inacom notes that the Plan states that "[e]ach holder of a Class 4(a) Allowed General Unsecured Claim shall receive such Holder's Pro Rata Share of Available Cash," (Plan at 13, D.I. 4757). However, as Pro-Tec points out, the Plan also states that the recovery of unsecured creditors is uncertain and may vary. Because every creditor is receiving its pro rata share of available amounts, allowing another claim will affect the distribution to each creditor holding an allowed claim. Pro-Tec argues, however, that Inacom is still litigating the value of many of the unsecured claims and does not know at this time which unsecured creditors will recover or what amount each creditor will recover.

**\*5** Pro-Tec's argument is persuasive. It is not clear how many creditors will ultimately hold an allowed claim. In addition, the final distributions to creditors will vary based on the results of litigation and the claims resolution process. Moreover, Inacom was not required to allocate funds for each disputed claim under the Plan.[FN3] Thus, any disputed claim that is allowed is paid without regard to what other claims exist. Lastly, absent from the record is any evidence that Inacom will have to return amounts already paid out under the Plan. Based on these facts, the court finds that payment of the claim will not affect the distribution to creditors.

> FN3. Pro-Tec urges that whether the plan set aside money to pay the claim at issue is a factor that the Third Circuit held should not be considered in evaluating potential

prejudice. The court disagrees. The court in *O'Brien* stated that "*Pioneer* requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue." *O'Brien*, 188 F.3d at 126. The Third Circuit, however, did not state that an analysis of prejudice should not include whether the Plan set aside money to pay the claim at issue as one of the factors to consider. Rather, the Third Circuit stated that it should not be the only factor that the Bankruptcy Court considers in determining whether there is potential prejudice to the debtor. The Third Circuit stated "[t]he Bankruptcy Court's prejudice analysis seemed to hinge *solely* on the fact that by virtue of Manus's failure to respond to the Application, its claim was not accounted for in the funding of the plan. We believe that *Pioneer* requires a more detailed analysis which would account for more than whether the Plan set aside money to pay the claim at issue." *Id.* (emphasis added).

The third *O'Brien* factor is whether payment of the claim would jeopardize the success of the debtor's reorganization. There is no evidence on the record as to whether payment of the claim would jeopardize the success of Inacom's reorganization. In addition, Pro-Tec and Inacom have not made arguments, nor has the Bankruptcy Court made any findings concerning this factor. Thus, the court will treat this consideration as a neutral factor in its analysis.

The fourth *O'Brien* factor is whether allowance of the claim would adversely impact the debtor actually or legally. Pro-Tec argues that there is no prejudice to Inacom created by the delay in litigating the disallowed Claim because the inquiry to be performed in a reconsideration of the Claim is straightforward. Pro-Tec further argues that Inacom is currently reconsidering other creditors' claims. Finally, Pro-Tec asserts that Inacom scheduled its Claim at the outset of the case, a claim that remained scheduled for more than a year after the Bankruptcy Court entered the Order disallowing the Claim. Inacom could not explain why Pro-Tec was listed on the Twenty-Ninth Amendment when Pro-Tec's claim was disallowed a year earlier, negating the need to amend the schedule with respect to Pro-Tec. Tr. at 32:10-20. Because Pro-Tec was still listed on the Twenty-Ninth Amendment, Pro-Tec contends that Inacom ascribed some validity to its claim.[FN4] While this may be true, this fact is not relevant to the court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

analysis of whether allowance of the claim would adversely impact the debtor actually or legally. Regardless, the court finds that Inacom has not alleged that payment of the Claim would adversely impact it. Rather, Inacom alleges only that one of the policies underlying the *Pioneer* analysis is the value of finality in judicial proceedings.

> FN4. At the hearing in the Bankruptcy Court, Inacom argued that it was irrelevant that Pro-Tec was listed on its Twenty-Ninth Amendment. The Bankruptcy Court agreed, acknowledging that "the debtors' 29th amendment is confusing. But, quite frankly, that was a year after the disallowance of this claim and I think it's essentially irrelevant to the issue of excusable neglect."

The Third Circuit has addressed Inacom's argument in contexts other than a bankruptcy proceeding. In *Feliciano v. Reliant Tooling Co.,* 691 F.2d 653 (3d Cir.1982), the court held that "the cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim 'rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment." ' *Id.* at 656-57. In *O'Brien,* the court highlighted, with approval, its decision in *Feliciano,* stating that "prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue." *O'Brien,* 188 F.3d at 127. Thus, the court finds that the value of finality in judicial proceedings is not sufficient for a finding of prejudice. In addition, there is no evidence in the record showing that payment of Pro-Tec's Claim would adversely impact Inacom or affect the finality of Inacom's judicial proceedings. To the contrary, as previously noted, Inacom is still litigating disputed claims. However, even were there such a showing, the court cannot discern a reason why the rationale of the Court of Appeals would be inapposite merely because the scene has shifted to the bankruptcy court. Under the circumstances of this case, the court concludes that allowing the Claim would not adversely impact Inacom.

**\*6** The final *O'Brien* factor is whether allowance of the claim would open the floodgates to other future claims. The Bankruptcy Court determined that allowing Pro-Tec's Claim might subject Inacom to a large number of additional claims:
I will observe that given the massive number of claims filed in this case and the equally massive number of objections that were filed with numerous

exhibits attached to the objection, I really think that to allow this claim would potentially open the floodgates to hundreds of these applications being filed. And I think that would be a mistake at this very late stage of this case.

Tr. at 35:22-36:3. The court cannot agree. There is no evidence in the record that allowing the Claim would cause a "flood" of motions. Although Inacom argues that it is inconceivable that at least a fraction of the creditors would not file motions for reconsideration if the appeal was granted, Inacom has not asserted that any other creditor whose claim was eliminated by default has filed a motion for reconsideration.

Considering all of the *O'Brien* factors, the court determines that Inacom would not be prejudiced by reconsidering Pro-Tec's Claim. Inacom was not surprised by, or unaware of, the Claim. Inacom is still litigating the value of many of its claims, and still litigating claims objections. Moreover, Inacom has not shown through evidence in the record that it will be adversely impacted if Pro-Tec's claim is reconsidered. Finally, Inacom has not alleged that any other creditor whose motion was denied by default has filed a motion for reconsideration. The court, therefore, finds that there is no prejudice to Inacom.

#### 2. Length of Delay and Potential Impact on Judicial Proceedings

The court next considers the length of the delay and its impact on the judicial proceedings. The Bankruptcy Court found that "it would be a mistake" to allow the Claim because the case was at "a very late stage." While the Bankruptcy Court considered the delay's effect on the judicial proceedings, it did not "consider the length of the delay in absolute terms." *O'Brien,* 188 F.3d at 130. In the present case, Inacom filed the Objection on June 13, 2001. Pro-Tec did not respond. The Order disallowing the Claim issued on July 13, 2001. Pro-Tec still had not responded. Inacom's Twenty-Ninth Amendment was filed on July 22, 2002. Pro-Tec did not respond.[FN5] Inacom's Plan was confirmed on May 23, 2003, and, as of that time, there was still no response from Pro-Tec. Pro-Tec did not respond until February 2004, after it did not receive its expected distribution under the Plan. On April 2, 2004, Pro-Tec then filed its motion for reconsideration. Pro-Tec's motion was filed almost two years and ten months after the Objection, almost two years and nine months after the Order was served, and nine months after the Plan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

was confirmed. Pro-Tec argues that the length of the delay has no impact on the implementation of the Plan. Specifically, Pro-Tec asserts that Inacom is still litigating claims subject to the Objection and that creditors have been advised that distributions under the Plan are dependent on the claims resolution process. Pro-Tec also asserts that distributions to unsecured creditors are expected to occur between June 2003 and June 2008, and will be adjusted depending on Inacom's progress in resolving the claims. Lastly, Pro-Tec argues that Inacom is partly responsible for the delay because of the time it took for Inacom to move through the confirmation process. Inacom's Plan was confirmed almost three years after Inacom filed its petitions.

FN5. Pro-Tec alleges that the Twenty-Ninth Amendment was not served on its counsel.

*7 Inacom argues that Pro-Tec's counsel's failure to respond, in and of itself, weighs in favor of denying the appeal. Inacom further argues that Pro-Tec's failure to respond after the Order warrants denying the appeal. In addition, Inacom argues that Pro-Tec should have attempted to contact Inacom to inquire about the Claim. Lastly, Inacom contends that the fact that it is still litigating and negotiating claims indicates that reconsidering Pro-Tec's Claim will delay closure of the case. The court agrees with Pro-Tec and finds Inacom's arguments unpersuasive. Nowhere in *Pioneer* or *O'Brien*, do the Supreme Court or the Third Circuit find that failure to respond, in and of itself, weighs in favor of denying the Claim. Additionally, there is no finding that the creditor must attempt to make contact with the debtor. When considering the delay's effect on the judicial proceedings in absolute terms, as *O'Brien* instructs, the court concludes that this *Pioneer* factor weighs in favor of Pro-Tec because Inacom is still litigating disputed claims and distributions to creditors are based on Inacom's progress in resolving the claims.

C. The Reason for the Delay

The Bankruptcy Court determined that the cause of the delay was in Pro-Tec's control, because it is undisputed that Pro-Tec's counsel received the Objection and read it, but missed the objection to Pro-Tec's Claim. The Bankruptcy Court found that Pro-Tec's neglect did not fall within the *Pioneer* standard for excusable neglect:
In looking at this document, I think it would probably take maybe 15 or 20 minutes for an informed person

to review the document to find out if any of its clients were affected by the objection. And as I pointed out, your client's name and your name and address with the law firm is first item on Page 11, it's the first Exhibit E in the batch. And I don't see how you could miss it. But apparently you did miss it-I don't say you, someone in your office did, or they didn't even look at the document. And so I don't think that that falls within the *Pioneer* standard for excusable neglect. Presumably it is neglect. Indeed, there's no basis for knowing what the young associate did, including the possibility that he lost the document before he ever looked at it or he just put it in a circular file and didn't look at it. Or that he was otherwise plain remiss in performing his duties.

Tr. at 35:3-17. It is clear in this case, that the delay was due to Pro-Tec's lack of care. However, the concept of excusable neglect clearly anticipates neglect on the part of the party seeking to be excused. *See Pioneer,* 507 U.S. at 388; *O'Brien,* 188 F.3d at 128. The court, therefore, must decide whether Pro-Tec's delay was excusable.

Pro-Tec urges the court to follow *Pioneer* and *O'Brien,* in which the Supreme Court and the Third Circuit held that the debtors' inadequate notice contributed to the creditors' delay. Pro-Tec argues that its delay in responding to the Objection was due in part to inadequate notice provided by Inacom. Pro-Tec asserts that Inacom's Objection contested approximately 412 claims spread over 96 pages plus exhibits A through H. Pro-Tec further asserts that the exhibits contained multiple lists, some of which were not in alphabetical order. Pro-Tec argues that this type of notice is ambiguous and that even though its counsel failed to find the objection to its Claim, Inacom is partly responsible, like the debtors in *Pioneer* and *O'Brien.* Inacom argues that Pro-Tec's comparison of the present case to the facts in *Pioneer* and *O'Brien* "misses the mark." The Bankruptcy Court recognized that there are multiple schedules within the various exhibits attached to the Objection, some of which were not in alphabetical order, but determined that Inacom's notice was adequate, noting that "your [Pro-Tec's counsel's] client's name and your name and address with the law firm is [the] first item on page 11, it is the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9. The court agrees with the Bankruptcy Court and Inacom.

*8 The notice that Inacom provided Pro-Tec is distinguishable from the notice provided by the debtors in both *Pioneer* and *O'Brien* . In *Pioneer,* the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Supreme Court held that the debtor's notice was inadequate because the bar date was placed in a notice regarding a creditors' meeting "without any indication of the significance of the bar date." *Pioneer, 507 U.S. at 398.* In *O'Brien,* the debtor gave notice in an application that was twelve pages long, consisting of twenty-four paragraphs. The three important paragraphs, which would provide notice to the contracting parties, were buried in the middle of the document and did not list the relevant contracting parties' names or claims. *O'Brien,* 188 F.3d at 129. The present case is distinguishable from *Pioneer* and *O'Brien* because Inacom's notice was not inconspicuous. Inacom provided notice in its Fifth Omnibus Objection to Claims. Unlike *Pioneer,* in which the bar date appeared in a notice of a creditors' meeting, the title of Inacom's document, which included the word "objection," should have alerted Pro-Tec that its Claim may be affected. Furthermore, unlike *O'Brien,* in which the contracting parties' names and claims were not provided in the relevant document, Pro-Tec's name and address and its counsel's name and address is the first item on Page 11 of the first Exhibit E. The court agrees with the Bankruptcy Court that "it would probably take maybe 15 or 20 minutes for an informed person to review the document to find out if any of its clients are affected by the objection." [FN6] Tr. at 35:4-6. The court finds that this *Pioneer* factor weighs in favor of Inacom.

> FN6. The court is not in accord, however, with the Bankruptcy Court's view that if the notice of objection to Pro-Tec's Claim had been on the second or third Exhibit E list, instead of the first, then it "might be excusable." Tr. at 26:3-6. This seems to suggest that Pro-Tec would have less responsibility for the delay if it had been in the middle of Exhibit E. However, as the Bankruptcy Court noted, "it would probably take maybe 15 to 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection." Tr. at 35:4-6. Thus, the court cannot see how Pro-Tec's inadvertence would be any more excusable if the notice had been on the second or third Exhibit E list.

### 4. Good Faith

The Bankruptcy court did not make any determination on the issue of whether Pro-Tec acted

in good faith because Inacom acknowledged Pro-Tec's good faith at the April 20, 2004 hearing. In view of the agreement of the parties, the court finds that Pro-Tec and its counsel acted in good faith.

### V. CONCLUSION

In the present case, the court cannot say that the Bankruptcy Court failed to apply the *Pioneer* factors. In light of the Bankruptcy Court's consideration and weighing of the facts, the court concludes that the Bankruptcy Court engaged in a proper analysis under *Pioneer.* However, considering the *Pioneer* factors, the facts of this case, and the equitable nature of excusable neglect, the court concludes that the Bankruptcy Court abused its discretion when it determined that Pro-Tec was not entitled to reconsideration of its Claim based upon excusable neglect. As the court in *Pioneer* observed, "the lack of any prejudice to the debtor or to the interests of efficient judicial administration, combined with ... good faith ... [of the appellant and its counsel], weigh strongly in favor of permitting the tardy claim." *Pioneer,* 507 U.S. at 398. In the present case, Pro-Tec has shown that there will be no prejudice to Inacom if its Claim is reconsidered, the delay's effect on judicial proceedings in absolute terms will not prejudice Inacom, and Pro-Tec has acted in good faith. The only *Pioneer* factor that weighs against Pro-Tec is the reason for the delay, for which Pro-Tec was fully responsible.

*9 The court, therefore, will reverse the Bankruptcy Court's ruling denying Pro-Tec reconsideration of its Claim and remand this case to the Bankruptcy Court for proceedings consistent with this opinion.

### *ORDER*

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:
1. The April 20, 2004 decision of the Bankruptcy Court for the District of Delaware is REVERSED and REMANDED.

D.Del.,2004.
In re Inacom Corp.
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2283599 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

• 2006 WL 1435851 (Trial Motion, Memorandum and Affidavit) Hewlett-Packard Company's Objection to Evidence of Letters Directed to Third Parties (Apr. 17, 2006) Original Image of this Document (PDF)
• 2001 WL 34818323 (Trial Motion, Memorandum and Affidavit) Motion in Limine of Plaintiff to Exclude Evidence of Compromise and Offers of Compromise (2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT B

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
COMMERCE FUNDING CORPORATION,
Plaintiff,
v.
COMPREHENSIVE HABILITATION SERVICES,
INC., Better Medical Services, P.C., Sisters of
Charity Medical Center, Barnert Hospital, Saint
Vincent's Hospital and Medical Center, Staten Island
University Hospital, Inc., Saint Francis Hospital, and
Sisters of Charity Hospital, Defendants.
**No. 01 Civ. 3796(PKL).**

Feb. 24, 2005.

Harris Beach LLP, New York, New York, John W.
Clarke, Dean M. Monti, Arent Fox Kintner Plotkin &
Kahn, PLLC, New York, New York, Jeffrey R.
Ruggiero, for Defendant / Cross-Claimant
Comprehensive Habilitation Services, Inc.
Garfunkel, Wild & Travis, PC, Great Neck, New
York, Roy W. Breitenbach, for Defendant / Cross-
Claim Defendant Saint Francis Hospital.

*OPINION AND ORDER*
LEISURE, J.
**\*1** This action, originally brought by plaintiff,
Commerce Funding Corporation, regarding an
alleged breach of a factoring agreement, has been
trimmed down by settlements and arbitration, such
that only the cross-claims asserted by defendant
Comprehensive Habilitation Services ("CHS")
against defendants St. Francis Hospital ("St. Francis"
or "the Hospital") and Staten Island University
Hospital ("Staten Island") remain unresolved. From
September 13, 2004 through September 15, 2004,
this Court conducted a bench trial as to CHS's breach
of contract claim against St. Francis.[FN1] Having
considered the parties' post-trial submissions and the
evidence presented at trial, the Court sets forth herein
its findings of fact and conclusions of law, pursuant
to Rule 52(a) of the Federal Rules of Civil Procedure.

> FN1. CHS's breach of contract claim against
> Staten Island will be tried before a jury on a
> yet to be determined date.

Findings of Fact [FN2]

> FN2. The Court bases its findings of fact on:
> the testimony at the three-day bench trial
> ("Tr."); the 45 exhibits admitted into
> evidence during the bench trial ("CHS's Ex."
> and "Def.'s Ex."); and, to the extent
> appropriate, this Court's *in limine*
> Memorandum and Opinion, issued on
> September 2, 2004, *Commerce Funding
> Corp. v. Comprehensive Habilitation Servs.*,
> No. 01 Civ. 3796, 2004 U.S. Dist. LEXIS
> 17791 (S.D.N.Y. Sept. 2, 2004) (Leisure, J.).

I. *Introduction*

The present dispute stems from a services agreement
between the parties, entered into on May 25, 1995
(the "Contract"). In this agreement, CHS was to
provide medical and administrative services at St.
Francis' part-time clinics in and around the
Poughkeepsie, New York area. CHS was to be
compensated for this service at the rate of $45 or $50
per billable patient contact, depending on the type of
care.[FN3] Following payment difficulties and an
ongoing investigation by the New York State
Attorney General's Medicare Fraud Control Unit
("MFCU" or "Attorney General") into the parties'
relationship and operation of Article 28 clinics, the
parties entered into a Memorandum of Understanding
("MOU") which terminated the Contract. CHS was to
provide interim services until St. Francis could
replace CHS's services with other providers or sell
off its part-time clinics to another medical services
company. CHS was to be compensated for these
interim services at the normal rate. St. Francis was
allowed to hold two invoices back as a security in
case the MFCU investigation required St. Francis to
make immediate payments. In the spring of 2000,
CHS and St. Francis exchanged correspondence
regarding St. Francis' failure to satisfy its payment
obligation to CHS. In the fall of 2000, St. Francis
informed CHS that it was formally suspending
payment because the Attorney General had recently
issued subpoenas to St. Francis' staff and members of
its Board of Trustees, requiring they testify before a
grand jury. Thereafter, on June 20, 2001, CHS
instituted this cross-claim to recoup some $212,555 it
claims is due and owing, plus prejudgment interest.
St. Francis entered into a settlement agreement with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

the Attorney General on February 1, 2002, requiring St. Francis to pay $1,000,000 over 676 weeks and donate $500,000 in charitable services over seven years. This Court issued an *in limine* ruling on September 2, 2004, preliminarily finding that all communications and documents prior to the MOU were irrelevant to the instant matter because the MOU terminated the Contract.

> FN3. There is also a dispute as to whether CHS was properly granted a $5 rate increase during the parties' relationship. The dispute is discussed in further detail below. *See infra,* Part III.B.

## II. *The Parties*

*2 During all relevant times, CHS was a Delaware corporation with its principle place of business located in New York, New York. (CHS's Ex. 1, ¶ 1.) CHS provided consultation and administrative services to health providers, providing services such as occupational therapy, physical therapy, and social work in part-time clinics [FN4] for the mentally retarded and developmentally disabled ("MR/DD Services"). (Tr. 18-19.) CHS was headed by Dr. Peter A. Magaro, who founded the company in 1993. (*Id.*)

> FN4. "Part-time clinics" offer outpatient health care for a set number of hours per week and are governed by Article 28 of the New York State Public Health Law. (Tr. 20, 182; Defendant / cross-claimant CHS's Proposed Findings of Fact and Conclusions of Law ("CHS's Proposals"), at 1, ¶ 3; Defendant St. Francis' Proposed Findings of Fact and Conclusions of Law ("Def.'s Proposals"), ¶ 3.)

During all relevant times, defendant St. Francis was a not-for-profit hospital in Poughkeepsie, New York, that provided a full range of health care services. (Def.'s Proposals, ¶ ¶ 1-3.) St. Francis has three different areas of operation. The primary division is a 300-bed acute-care hospital in Poughkeepsie focused on orthopedics, trauma, rehabilitation, behavioral medicine, and other general medical services. (Tr. 320.) The second division is in Beacon, New York, where St. Francis operates a 100-bed facility specializing in substance abuse and detoxification. (*Id.*) Finally, St. Francis operates many outpatient services throughout the Hudson Valley region of New York State. (*Id.*) As part of its outpatient

services, St. Francis owned and operated part-time clinics located offsite, providing services to patients in Dutchess County and the surrounding areas for a fixed number of hours per week. (Tr. 182-83.) Prior to 1994, St. Francis only provided speech therapy and audiology services in these clinics. (Tr. 183-84.)

At some point prior to May 25, 1995, the parties determined it would be advantageous to enter into a relationship, with CHS providing St. Francis' part-time clinics with speech therapy, audiology, physical therapy, occupational therapy, social work, psychology, and nutrition services. (Tr. 185-86.) To further that end, the parties entered into the Contract outlined in the ensuing section.

## III. *The Contract*

On May 25, 1995, the parties entered into a six-year services contract wherein CHS agreed to provide MR/DD services to St. Francis' part-time clinics. (CHS's Ex. 1, ¶ 2.) Specifically, CHS was to assist St. Francis in "defining, developing, providing and marketing MR/DD Services throughout the Hospital's service area." (*Id.* ¶ 3.) CHS exclusively was to provide administrative services to St. Francis' clinics and not to service any other clinics operating in Dutchess County of New York state. (*Id.* ¶ 4.) The services were only to be provided "upon obtaining all Federal, State and local approvals." (*Id.* ¶ 5.) CHS was to "ensure compliance with all applicable laws, rules and regulations pertaining to the operation of the Clinics." (*Id.* ¶ 6.) CHS was to care for and maintain all records but the records remained the exclusive property of St. Francis. (*Id.* ¶ 8.) St. Francis was responsible for obtaining "all permits, certifications and approvals" for the clinics and was "responsible for compliance of such Clinics with all applicable Federal, State and local laws, rules and regulations." (*Id.* ¶ 9(a).) CHS was to be compensated at a rate of $45 per billable patient contact, with payments to be made "within 45 days of the date of the invoicing for the first two monthly billing cycles and thereafter within 90 days of the date of such invoicing." (*Id.* ¶ 10.) Finally, the Contract states it is the entire understanding between the parties, may only be modified by writing, and is to be interpreted pursuant to the laws of New York. (*Id.* ¶ 15.)

### A. *Addendum*

*3 On September 14, 1995, the parties entered into an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

addendum to the Contract wherein CHS was to be compensated $50 per billable patient contact for services to adult group homes. (CHS's Ex. 1A.) This rate change was effective August 1, 1995 and was to be renegotiated three months hence. (*Id.*) However, the rate was never renegotiated and both parties agree it was still in effect throughout CHS's provision of services to St. Francis. (CHS's Proposals, at 2, ¶ 8; Defendant St. Francis' Objections to CHS's Proposals ("Def.'s Objections"), at 2, ¶ 8.)

### B. Additional Rate Increase

Sometime while the Contract was in effect, CHS requested and received a $5 rate increase, from $45 to $50 per billable patient contact, for all other services that CHS provided to St. Francis in the part-time clinics.[FN5] (Tr. 236; *see* Tr. 71.) Dr. Attanasio granted the rate increase on behalf of St. Francis. (Tr. 236.) Dr. Attanasio was St. Francis' Director of Communications Disorders at this time, directly reporting to St. Francis' Chief Financial Officer ("CFO"), Marian Muise, until he was replaced by Laurie Cohn. (Tr. 183-84, 258, 283.) During his tenure as Director of Communications Disorders, Dr. Attanasio supervised CHS's administration of the part-time clinics. (Tr. 183-84, 243, 258.) Dr. Attanasio was also employed by CHS at this time, though the record does not reveal in what capacity. (Tr. 237; CHS's Brief in Opposition to Defendant's Proposals ("CHS's Objections"), at 6.)

> FN5. The record is unclear as to when this rate increase was granted. At trial, counsel for St. Francis, Roy W. Breitenbach, Esq., intimated that the rate increase was granted by Dr. Fred Attanasio in 1998, but his question moments later asserted that St. Francis attempted to terminate its relationship with CHS due to this rate increase dispute in 1997. (Tr. 71-72.)

### C. Performance of the Contract

After the commencement of the Contract, CHS provided services to St. Francis and issued invoices to St. Francis for payment. Due to cash flow problems, St. Francis did not consistently make timely payments on the invoices. (Tr. 188-89.) St. Francis had also complained to CHS regarding quality assurance in the part-time clinics. (Tr. 80.) Ultimately, St. Francis stopped payment, failing to satisfy invoices Nos. 136-148, which memorialized

CHS's provision of services from July 20, 1998 to January 17, 1999. (CHS's Proposals, at 2, ¶ 13.) In total, St. Francis owed CHS $908,805 as of February 14, 1999. (CHS's Ex. 2, at Ex. B.)

### IV. Memorandum of Understanding

#### A. New York State Attorney General's Medicaid Fraud Control Unit Investigation

Sometime around 1996, the MFCU began a statewide investigation into the billing practices and whether it was necessary that the state continue to fund part-time clinics operating pursuant to Article 28 of the New York State Public Health Law. (Tr. 54-55.) CHS was not directly investigated by the MFCU, nor was it charged with any civil or criminal misconduct. (Tr. 55.) CHS maintained to St. Francis that the MFCU investigation would not find fault in CHS's operation of the part-time clinics. (Tr. 134.) However, CHS did assist St. Francis while St. Francis was being investigated. CHS compiled the part-time clinics' records and provided them to the MFCU. (Tr. 201.) CHS also attended two joint meetings with St. Francis and the MFCU. (Tr. 141, 197-200.) The discussion focused on the length of therapy sessions and the medical necessity of clinic services. (Tr. 141-43, 198-200, 293.) At some point during the investigation, the parties entered into a joint defense agreement but St. Francis terminated the agreement. (Tr. 95, 201-02.) The last communication between the parties regarding the MFCU investigation was by letter from Donald F. Murphy, Chief Executive Officer ("CEO") of St. Francis, to Magaro, on September 22, 2000. (*See* Def.'s Ex. UU; Tr. 57-58, 338.)

*4 The Attorney General and St. Francis entered into a settlement agreement on February 1, 2002 stating that:
(a) the Clinics were neither authorized under, nor operated in accordance with, applicable New York State laws, rules and regulations; (b) [St. Francis] submitted improper claims for payment to Medicaid during the Service Period relating to the Clinics; and (c) [CHS's] relationship with [St. Francis] violated applicable New York State laws, rules and regulations.

(Def.'s Ex. WW, 2d Agreement, at 1.) St. Francis expressly denied the allegations of the Attorney General's Office, asserting that St. Francis' "Clinics, the claims for payment it submitted to Medicaid

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

during the Service Period relating to the Clinics, and its relationship with CHS were, in all respects, proper under applicable New York State laws, rules and regulations." (*Id.* at 2.) However, "in order to avoid the uncertainties, burdens and expenses of litigation," St. Francis agreed to pay a $1,000,000 settlement. (*Id.* at 2-3; *accord* Tr. 337-38.) Under the terms of the settlement, the State Department of Health would withhold $1,479.29 per week for 676 weeks from future Medicaid checks payable to St. Francis. (*Id.* at 3.) In addition to the $1,000,000, St. Francis was also to provide $500,000 in charitable services, to be provided in installments of at least $71,428.58 net per year until the $500,000 goal was reached. (*Id.*, 1st Agreement, at 2.) As stated above, at this time St. Francis and CHS had ceased communications regarding the MFCU investigation; therefore, St. Francis did not consult or apprise CHS of St. Francis' settlement with the MFCU. (Tr. 57-58, 338.)

### B. *Memorandum of Understanding*

On February 19, 1999, after the Attorney General's Office had commenced its investigation into the parties' performance under the Contract, but before St. Francis reached a settlement with the Attorney General's Office, CHS and St. Francis agreed to a Memorandum of Understanding. (CHS's Ex. 2.) In the MOU, the parties agreed to, *inter alia,* the following terms:
(1) The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein.
(2) *Payment and Holdback.* ... the Hospital shall pay certain invoices received by it from CHS for services rendered in connection with the Contract on the following schedule: $510,115 on or before February 26, 1999. Invoices 149 and 150 will be withheld as a holdback, and all other outstanding invoices will be paid in accordance with the Hospital's 90-day cycle.
....
(4) *Continuity of Services.* CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by the Hospital or (ii) the Hospital shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill the Hospital in the ordinary course of business at the current rates.
*5 ....
(7) *Disputes arising during performance of Contract.* CHS and Magaro acknowledge that this MOU does not diminish, impair or release either party from any claim that may be raised by that party concerning its

conduct, as such conduct relates directly or indirectly to the performance of the Contract, Hospital and the services rendered.
....
(10) *Holdback of Monies-Attorney General-Department of Health Investigation.* CHS, and the Hospital acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract, and related issues, and that Magaro CHS and Hospital will arrange to meet with Attorney General personnel as soon as possible, and, thereafter, will cooperate in good faith to reach agreement. To the extent that a long term payment plan is offered, the parties hereto shall cooperate in good faith to quantify the liability and reach a suitable repayment agreement. In the event there is an immediate repayment required [by the Attorney General's Office], any outstanding invoices would be used as part of such a repayment plan.

(CHS's Ex. 2, at ¶¶ 1, 2, 4, 7, 10.)

Attached as Exhibit B to the MOU is a full accounting of monies St. Francis owed CHS at the time of signing the MOU. It covered invoice Nos. 136-48, totaling $908,805, and estimated invoice Nos. 149 and 150, totaling $120,000. (*Id.* at Ex. B.) Invoice Nos. 136-48 were to be paid by a lump sum of $510,115 on or before February 26, 1999, followed by payment in accordance with the parties' 90-day payment cycle. (*Id.* at ¶ 2.) Payment on invoice Nos. 149 and 150 was to be held back by St. Francis as security in case St. Francis was required to make immediate repayment to the Attorney General due to the MFCU investigation. (*Id.* at ¶¶ 2, 10.)

### 1. *Performance of the MOU*

After the parties signed the MOU, CHS continued to provide services and submit invoices to St. Francis, Nos. 151-55. (Tr. 39, 93.) St. Francis received the services provided by CHS (Tr. 39-41), but failed to make timely payments (Tr. 260-63). St. Francis ultimately paid invoice Nos. 136-148 in full, though payment of No. 146 in particular was untimely-the first payment being almost one year late (Def.'s Ex. OO). Invoice Nos. 149 and 150 were partially paid, but the invoiced transitional services were not paid at all. (Tr. 34-38, 41.) The invoices and payments for invoice Nos. 149-55 are summarized as follows:
• No. 149-issued February 9, 1999 for services rendered from January 18 through 31, 1999 in the amount of $68,700. St. Francis made payment by two checks: (1) $32,000 on September 7, 1999; (2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$32,365 on November 11, 1999.
• No. 150-Issued February 24, 1999 for services rendered from February 1 through 14, 1999 in the amount of $61,700. St. Francis made one payment of $23,000 on June 9, 2000.
• No. 151-Issued March 8, 1999 for services rendered from February 15 through 28, 1999 in the amount of $72,400. St. Francis made no payment.
*6 • No. 152-Issued March 22, 1999 for services rendered from March 1 through 14, 1999 in the amount of $69,150. St. Francis made no payment.
• No. 153-Issued April 6, 1999 for services rendered from March 15 through 28, 1999 in the amount of $18,600. St. Francis made no payment.
• No. 154-Issued April 19, 1999 for services rendered from March 29 through April 11, 1999 in the amount of $12,200. St. Francis made no payment.
• No. 155-Issued May 3, 1999 for services rendered from April 12 through 25, 1999 in the amount of $1,000. St. Francis made no payment.

(Def.'s Proposals, ¶ ¶ 33-39; CHS's Exs. 3A-3F.) At some point in 1999, St. Francis took the position that it was allowed to hold back all of the invoices as a security against the MFCU investigation. (See Tr. 100-01, 166, 230.) However, St. Francis did make three payments in 2000:(1) $20,000 on February 10, 2000 on invoice No. 146 (CHS's Ex. 6); (2) $18,621.10 on April 13, 2000 on invoice No. 146 (Id.); and, 3) $23,000 on June 9, 2000 on invoice No. 150 (CHS's Ex. 3B).

### 2. Correspondence Between the Parties While Performing Under the MOU

Due to lack of payment, the parties communicated via several letters while performing pursuant to the MOU. On June 24, 1999, Magaro wrote to Muise, regarding the unpaid invoices. (Def.'s Ex. II .) In this letter, Magaro stated that the spirit of the MOU allowed St. Francis to hold back two full invoices but that all other unpaid invoices should be paid. (Id.) In that vein, Magaro proposed that St. Francis hold back invoice numbers 151 and 152 but pay the balance on invoice Nos. 146, 149, 150, 153, 154, and 155 as due. (Id.) St. Francis did not accept this proposal. (Tr. 229.)

On January 5, 2000, Magaro again wrote to Muise regarding the unpaid invoices. (CHS's Ex. 4.) Apparently, Muise and St. Francis agreed to pay all invoices under the Contract but St. Francis was still withholding payment on all other invoices, Nos. 149-55. (Id.) Magaro proposed "that you [St. Francis] pay

us the total amount over a year starting January, 2000." (Id.) Recognizing that this arrangement would not allow St. Francis to hold back any invoices pending the outcome of the Attorney General's investigation, Magaro justified his proposal, stating, "considering how long we have not been paid and the lack of interest of the AG in our records, I do not believe a further hold on our payments is equitable." (Id.) Instead, Magaro proposed that St. Francis pay $23,044.26 per month for one year, plus 10% interest. (Id.)

In Muise's return letter on February 11, 2000, she corrected Magaro's estimation of the total due to $251,626.[FN6] (CHS's Ex. 5.) Muise also stated that she agreed,

> FN6. Magaro had estimated $276,531.10 based on the disputed $50 rate increase discussed above. See supra, Part III.B.

to making the $23,000 per month payments with check points quarterly as to the status of the Attorney General audit. This will leave the Hospital the opportunity to use this accounts payable as a form of payment for any obligations that might be found against Saint Francis CHS from such audit.
*7 (Id.) St. Francis claims the three payments it made in 2000 constituted performance on this allegedly modified contract. In seeming contradiction to this position, Muise stated at trial that she believed that ¶ 10 of the MOU allowed St. Francis to institute quarterly check points. (Tr. 272.) Magaro claims he never accepted St. Francis' proposal for quarterly check points, instead stating that the correspondence constituted a "constant revising of proposals and never getting an agreement on a proposal." (Tr. 58-59, 103.)

After the payments ceased, CHS's Director of Finance, Greg Walton, wrote to St. Francis' new CFO, Connie Defrees, on August 26, 2000 regarding the delinquent invoice payments (Def.'s Ex. SS.) In this letter, Walton expressed frustration at the lack of payment, stating, "[t]he balance owed at 2/11/00, acknowledged by your letter dated the same date, was $251,578.12 [sic ]. In your letter, you promised $23,000 per month. You have made three payments since February ($20,000, $18,621, and $23,000), which leaves a balance of $189,957. Thus, you are $76,378 behind on your commitment ." (Id.)

On August 30, 2000, Magaro wrote to St. Francis' CEO, Donald Murphy, to request payment. (Def.'s

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

Ex. TT.) In that letter, Magaro stated, "[CHS] agreed to grant you a payment plan and reduced the final amount to $251,276 [*sic* ], which was to be paid at $23,000 a month until the total was paid," and referenced Muise's February 11, 2000 letter to Magaro. (*Id.; see* CHS's Ex. 5.) Magaro closed the letter by asking for a total of $373,000 allegedly due on the invoices to be paid by September 30, 2000 because St. Francis failed to "follow the contract payment schedule." (Def.'s Ex. TT.)

The last communication between the parties, excepting the instant litigation, was Murphy's response to Magaro on September 22, 2000. (Def.'s Ex. UU.) In that letter, Murphy informed Magaro that, as stated in Muise's February 11, 2000 letter, "the agreed upon payment schedule was subject to check points as to the status of the Attorney General investigations leaving the Hospital the opportunity to use the accounts payable as a form of payment for any obligations that might be found against Saint Francis from such investigation." (*Id.*) Murphy then stated that many of his hospital's staff and Board of Trustees members were recently subpoenaed to testify before a grand jury regarding the MFCU's investigation. (*Id.*) He closed the letter, advising Magaro that, "[a]s this is literally occurring this month, we must suspend payments to CHS and will revisit this upon the conclusion of this activity." (*Id.*) There is no evidence that the payments were revisited, nor that St. Francis advised CHS of the "conclusion of this activity."

### Conclusions of Law

This case originally involved several claims and cross-claims arising out of factoring fee agreements between the original plaintiff, Commerce Funding Corp. ("CFC"), and the original defendants, CHS, Better Medical Services, and the obligors of CHS, six hospitals (Sisters of Charity Health Care System Corp., Barnert Hospital, Saint Vincent's Hospital and Medical Center, Staten Island University Hospital, Saint Francis Hospital, Sisters of Charity Hospital). All of the action has been resolved through settlement and arbitration but for two cross-claims, a breach of contract claim brought by defendant / cross-claimant CHS against defendant St. Francis, and a breach of contract claim brought by CHS against defendant Staten Island Hospital. CHS's action against Staten Island will be determined by a jury trial, yet to be scheduled. CHS's claims against St. Francis were heard by this Court during a bench trial beginning September 13, 2004 and ending

September 15, 2004. These findings of fact and conclusions of law are issued following this bench trial, pursuant to Federal Rule of Civil Procedure 52(a). Defendant / cross-claimant has the burden of proving its claims by a preponderance of the evidence.

\*8 This Court has subject matter jurisdiction to hear CHS's cross-claim against St. Francis, though the parties are non-diverse. The Court had diversity jurisdiction over the original action by CFC against, *inter alia*, defendants CHS and St. Francis, pursuant to 28 U.S.C. § 1332(a), diversity of citizenship. *See Maryland Casualty Co. v. W.R. Grace & Co.*, 23 F.3d 617, 622 (2d Cir.1994) ("The relevant focus for determining diversity is the parties' citizenship when the suit is commenced.") (citing *Anderson v. Watt*, 138 U.S. 694, 702-03, 11 S.Ct. 449, 34 L.Ed. 1078 (1891)). The Court now has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). *See Rosenman & Colin v. Rubin*, 752 F.Supp. 178, 180 (S.D.N.Y.1990) (Cederbaum, J.) ("[A]ncilary jurisdiction allows a district court once it has acquired jurisdiction over a case or controversy to decide matters incident to the main claim which otherwise could not be asserted independently.") (citing *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 810 (2d Cir.1979)); *see also Parris v. St. Johnsburry Trucking Co.*, 395 F.2d 543, 544 (2d Cir.1968).

### I. *CHS's Breach of Contract Claim*

This contract dispute is governed pursuant to New York state law. (*See* CHS's Ex. 2, ¶ 11.) Non-performance of a contractual duty constitutes a breach of contract. *Restatement (Second) of Contracts* § 235 (1981). The elements a complainant must show by a preponderance of the evidence pursuant to a breach of contract claim in New York are: (1) the existence of a contract; (2) the litigant's performance; (3) breach by the defendant; and, (4) damages. *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996).

### A. *The Parties' Positions*

Though the parties' theory of the case necessarily adjusted to conform to the facts unveiled over the long course of this litigation, below is the Court's understanding of the parties' positions based on the bench trial and the parties' post-trial submissions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

St. Francis concedes that a contract existed (the MOU) governing the parties relationship, at least until February 11, 2000. (Def.'s Proposals, ¶ 58.) At that point, however, St. Francis contends that that "the parties agreed, through CHS's implied consent to the February 11, 2000 counterproposal [ (CHS's Ex. 5) ], to modify the payment terms of the MOU" in accordance with the terms of that February 11, 2000 letter. (Def.'s Proposals, ¶ ¶ 61-62.) St. Francis also asserts that it properly suspended payment on September 22, 2000, because the MFCU investigation had then culminated in grand jury subpoenas for St. Francis' staff and members of its Board of Trustees. (Id. ¶ 63.) St. Francis asserts that, under the terms of the modified MOU, payment was subject to quarterly check points regarding the MFCU investigation to determine if the payments due to CHS should be applied to liability St. Francis might incur from the MFCU investigation. (See id.; CHS's Ex. 5.) Because an assessment of liability appeared likely, St. Francis avers that it properly suspended payment in anticipation of applying its outstanding debt to CHS to any future payment required by the Attorney General. (Def.'s Proposals, ¶ ¶ 63-64.)

*9 CHS, on the other hand, contends that it never agreed to the proposed modification of the MOU, as evidenced by three points. First, CHS asserts that there was no meeting of the minds regarding the quarterly check points. (CHS's Post-Trial Brief ("CHS's Post-Trial Br."), at 20-21.) Second, CHS claims the negotiation of the April 13, 2000 check for $18,621 could not constitute acceptance because it did not "in every respect, meet and correspond with the offer" that CHS accept St. Francis' monthly checks for $23,000. (Id. at 21-23.) In that vein, CHS contends its negotiation of the $18,621 check was actually a counter-offer which was never accepted by St. Francis. (Id. at 23.) As for the $23,000 check issued on June 9, 2000, CHS claims the negotiation of that check also could not be an acceptance because, by that time, the offer had lapsed for failure to accept within a reasonable time. (Id. at 23-24.) Therefore, CHS contends the MOU controlled the parties relationship from its creation and through to the present litigation.

Pursuant to this theory, CHS claims that St. Francis breached the MOU by failing to pay for services rendered. (Id. at 18.) CHS claims that St. Francis had no basis for withholding payment under the MOU because St. Francis failed to "cooperate in good faith" to quantify liability between the parties as to the MFCU investigation, as required under paragraph

ten of the MOU. (Id.; CHS's Ex. 2, ¶ 10.) Further, CHS asserts that St. Francis was not eligible to hold back invoice Nos. 149 and 150 because St. Francis's settlement agreement with the MFCU was a long-term repayment plan, not requiring immediate repayment. (CHS's Post-Trial Br. at 18; see CHS's Ex. 2, ¶ 10.)

In the alternative, CHS argues that, even if the MOU was modified, St. Francis breached the modified contract by not making the monthly $23,000 payments or sending CHS quarterly reports regarding the MFCU investigation. (Id. at 25.) This breach, CHS asserts, relieved it of all obligations under the contract as allegedly modified, for instance its obligation to allow St. Francis to withhold payments as subject to quarterly check points, and to reduce of the total due from $276,531 to $251,626. (CHS's Objections, at 3.) Also, CHS claims the modified MOU is void for fraudulent inducement because St. Francis never intended to make the $23,000 payments as promised, and CHS reasonably relied on that false promise to its detriment. (CHS's Post-Trial Br. at 26.)

Therefore, the parties agree that a contract existed between CHS and St. Francis (the MOU, either as original or as modified), and that CHS performed services for St. Francis as part of that agreement, but disagree as to whether a preponderance of the evidence shows that St. Francis breached the MOU, and damages resulted.

The unresolved issues before the Court in this matter are, (1) whether the MOU was modified; (2) whether St. Francis materially breached the MOU as written or modified; and finally, (3) to what extent, if any, was CHS damaged. These issues are addressed in turn, below.

## II. Alleged Modification of the MOU

### A. Applicable Law

*10 Under New York law, a contract cannot be deemed modified unless the evidence shows that "each element requisite to the formulation of a contract, including mutual assent to its terms," combined to form the modification. Deutsche Asset Mgmt. v. Callaghan, No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, *46-47 (S D.N.Y. Apr. 7, 2004) (Motley, J.). In Deutsche, Judge Motley clearly espoused the rule of law in this Circuit:

In order to show that a contract has been modified, a party must establish the modification "in the same way as any other contract. *No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract."*

*Id.* (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 228 (2d Cir.2001) (emphasis in original), and citing 6 Arthur Linton Corbin, *Corbin on Contracts* § 1293 (1962)); *see Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 783 (2d Cir.2003) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (App.Div.1980)). Thus, modification can only be found where there was: (1) an offer; (2) an acceptance of the offer; (3) mutual assent to the terms of the contract; and, (4) consideration. *Restatement (Second) of Contracts* § § 17, 24, 50, 71 (1981); *see Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *47; *Oscar Prod., Inc. v. Zacharius,* 893 F.Supp. 250, 255 (S.D.N.Y.1995) (Leisure, J.). Whether a new, modified contract was formed turns on the intent of the parties. *Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *47 (citing *Precision Testing Labs., Ltd. v. Kenyon Corp. of Am.,* 644 F.Supp. 1327, 1343 (S.D.N.Y.1986) ("[T]he intent of the parties is of central importance.")). To determine the intent of the parties, the court should look to " 'objective manifestations of intent of the parties as gathered by their expressed words and deeds given the attendant circumstances, situation of the parties, and the objectives they were striving to attain." ' *Id.* at *47-48 (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,* 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977)).

If the parties intended to be bound, contracts can be formed through a series of writings; it is not necessary that a final integration be created to impose contractual obligations on the parties. *Id.* at *48, 393 N.Y.S.2d 350, 361 N.E.2d 999 ("A written contract can be formed from more than one writing, including letters or memoranda signed by only one party or unsigned by either party.") (citing *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572-73 (2d Cir.1993)); *see Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 53-55, 110 N.E.2d 551 (1953). The writings need not be contemporaneous. *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49, 52-53 (2d Cir.1993). The writings should be interpreted together if " 'the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise

or set of promises had been stricken." ' *Id.* at 53 (quoting 6 *Williston on Contracts* § 863, at 275 (3d ed.1970)). Further, " '[w]here several instruments constitute part of the same transaction, they must be interpreted together." ' *Id.* (quoting *BWA Corp. v. Alltrans Express U.S.A., Inc.,* 112 A.D.2d 850, 493 N.Y.S.2d 1, 3 (App.Div.1985)). Absence of affirmative rejection by either party supports a court's determination that a series of writings constituted a contract. *Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *48 ("The failure of the writings to contain a disavowal is one of the common law principles courts rely on in deciding whether several writings together form a contract between the parties.") (quoting *Consarc,* 996 F.2d at 573 (finding a contract where "the combined writings contain no expression by either party of any intent *not* to be bound by them" (emphasis added))). Also, the terms provided in a series of written correspondence need not be reduced to a single contract in order for obligation to attach, even if the parties intended to reduce the correspondence to a single writing at some point in the future. *Id.* at *49-50.

*11 The parties' conduct also illuminates the court's path when inquiring into the parties' intent to modify the existing contract. *Id.* at *50 ("[T]he parties' conduct plays a central role in contract formation and, by extension, contract modification."). If the parties recognized the contract as modified and acted in accordance, it is more likely that the parties intended to so modify the contract. *Id.; see also Apex Oil Co. v. Vanguard Oil & Serv. Co. Inc.,* 760 F.2d 417, 422 (2d Cir.1985) ("[T]he existence of a contract may be established through conduct of the parties recognizing the contract.") (citing *P.J. Carlin Constr. Co. v. Whiffen Elec. Co.,* 66 A.D.2d 684, 411 N.Y.S.2d 27 (1978)). This is because a contract can be either expressly or impliedly modified. *Deutsch,* 2004 U.S. Dist. LEXIS 5945, at *50 (citing *S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assocs.,* 145 B.R. 375, 386 (S.D.N.Y.1991)); *Marine Transp. Lines, Inc. v. Int'l Org. of Master, Mates & Pilots,* 878 F.2d 41, 45 (2d Cir.1989) ("[A]n agreement to modify a contract may be proven circumstantially by the conduct of the parties.")).

Thus, an offer to modify can be impliedly accepted by conduct. *See Consarc,* 996 F.2d at 573. However, even when asserting that a contract was impliedly modified, the proponent of the modification must show that acceptance " 'compl[ied] with the terms of the offer and [was] clear, unambiguous, and unequivocal." ' *Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *51 (citing *King v. King,* 208 A.D.2d 1143,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

617 N.Y.S.2d 593 (1994)). A communication that purports to accept an offer cannot be subject to additional or different terms. Such a communication is no acceptance at all, but is an absolute rejection of the offer and a proposed counter-offer. *See Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 83 (2d Cir.1998); Greystone P'ships Group, Inc. v. Koninklijke Luchtvaart Maatschappij N.V., 815 F.Supp. 745, 753 (S.D.N.Y.1993)*. Further, acceptance of that which is "rightfully and indisputably" owed does not constitute an acceptance of an offer to modify a contract. *See Greenberg v. Pine Hollow Standardbred Sale & Mgmt. Corp., 94 A.D.2d 836, 463 N.Y.S.2d 108, 110 (App.Div.1983)*. Acceptance must also be within a reasonable time of the offer or the offer will be deemed to have lapsed. *See, e.g., Etablissement Asamar Ltd. v. Lone Eagle Shipping, 882 F.Supp. 1409, 1411-12 (S.D.N.Y.1995)*.

While, "[u]nder New York law 'the initial interpretation of a contract is a matter of law for the court to decide," ' *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115, *62-63 (S.D.N.Y. Sept. 25, 2002) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir.1998)*), the determination of the above is the sole province of the fact-finder. *Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *53 ("[J]ust as the question whether the parties intended to form a contract is a question of fact, so is the question whether the parties' conduct expresses an intention to modify an existing agreement.") (citing *Marine Transp. Lines,* 878 F.2d at 45). Conveniently, here, the Court's role includes both applying the law and finding the facts. The Court now turns to the application of the law to the facts in this case.

## B. The MOU Was Not Modified Through the Correspondence and Conduct of CHS and St. Francis Because There Was no Intent to be Bound and Consideration Was Lacking

*12 The terms of the alleged modification are set out in a series of letters between CHS and St. Francis Hospital, detailed above in the Court's findings of fact. *See supra,* Part IV.B.2. The first letter proposing a modification of the MOU was dated January 5, 2000, sent by Magaro, then the President and CEO of CHS, to Muise, then the CFO and Vice President of Finance and Administrative Services at St. Francis. (CHS's Ex. 4.) In this letter, Magaro "propose[s]" that St. Francis pay the outstanding invoices, Nos. 149-

150 partially owing and Nos. 151-55 completely owing, totaling $276,531.10. (*Id.*) Payment would be made in monthly installments of $23,044.26, for twelve months beginning in January, 2000. (*Id.*) Further, Magaro suggested a 10% interest finance charge on the unpaid balance. Magaro recognized that this proposal would not

allow a hold-back unless you [St. Francis] held the last payment, December 2000, for the conclusion of the AG [MFCU] audit. However, considering how long we [CHS] have not been paid and the lack of interest of the AG in our [CHS's] records, I do not believe a further hold on our [CHS's] payments is equitable.

(*Id.*)

The Court finds that Magaro's January 5, 2000 letter constituted an offer to modify the MOU. Magaro used clear, unambiguous language evidencing his and CHS's intent to be bound by the terms of this letter. The words "I am proposing" make this determination relatively simple. All the material terms of the proposed modification follow that proposal language, as described above. Further, it cannot be argued that this letter did not constitute an offer, the acceptance of which would create a contract, because it lacked consideration. (*See* CHS's Post-Trial Br. at 24-25.) Consideration need not be monetary but need only represent a "bargained-for exchange." 2-5 Corbin, *Corbin on Contracts* § 5.1. St. Francis had the right under the MOU to hold back certain invoice payments pending a disposition of the MFCU investigation. (CHS's Ex. 2, ¶¶ 4, 10.) If St. Francis were to accept Margaro's offer, that right would be lost. CHS, on the other hand, had a right to timely payment for services rendered to St. Francis on the Contract, as well as interim services rendered under the MOU. (CHS's Ex. 1, ¶ 10; CHS's Ex. 2, ¶¶ 2, 4.) If St. Francis were to accept Magaro's offer, CHS would lose that timely payment in favor of the monthly installment plan. Thus, Magaro's January 5, 2000 offer to modify the MOU was supported by consideration on both sides.

However, St. Francis did not accept Magaro and CHS's offer to modify the contract. Instead, St. Francis proposed a counter-offer including a material term which was explicitly objected to in Magaro's previous letter. On February 11, 2000, Muise responded by letter to Magaro's offer to modify the MOU. (CHS's Ex. 5.) First, Muise stated that, according to St. Francis' records, the amount due on the outstanding invoices only totaled $251,626, not, as Magaro had asserted, $276,531.10. (*Id.*) Following

that, Muise stated St. Francis would begin making the $23,000 per month payments, but only if those payments would be subject to "check points quarterly as to the status of the Attorney General audit. This will leave the Hospital the opportunity to use this accounts payable as a form of payment for any obligations that might be found against Saint Francis CHS from such audit." (*Id.*) This February 11, 2000 letter is necessarily a counter-offer instead of an acceptance, as a matter of law. The altered total due along with the addition of quarterly check points preclude the possibility of a "clear, unambiguous, and unequivocal" acceptance of Magaro's offer. *See Deutsche,* 2004 U.S. Dist. LEXIS 5945, at *51. It is a counter-offer, however, instead of an outright rejection as Muise's letter contains clear language evidencing an intent to be bound. Muise's statement that St. Francis would begin payment supports this conclusion.

**\*13** However, St. Francis' actions regarding this alleged proposal belie its language of an intent to be bound to a modified contract. First, Muise stated under cross-examination that she believed the "check points quarterly" condition on St. Francis' payment to CHS was allowed under paragraph ten of the MOU. (Tr. 272.) This clearly indicates that she did not intend to modify the MOU with her February 11, 2000 letter, but rather only intended to assert St. Francis' rights, as she interpreted them, under the already existing MOU. Second, St. Francis issued a check the day before this letter, on February 10, 2000, for $20,000 which could be construed as a good faith partial payment evidencing an intent to be bound to the $23,000 monthly payment plan. (*See* Def.'s Ex. OO.) However, St. Francis did not continue payment in the proposed monthly manner; the next check was not issued until April 13, 2000, for $18,621 (Def.'s Ex. QQ), less than the proposed $23,000. St. Francis did finally issue a check conforming to its own proposed terms on June 9, 2000, for $23,000 (Def.'s Ex. RR), CHS's negotiation of which St. Francis claims was an implied acceptance of their offer.

The Court need not deal with the timeliness or efficacy of CHS's implied acceptance (*See* CHS's Proposals, at 19, ¶ 9; CHS's Post-Trial Br. at 22-23) as the Court finds that consideration was lacking from St. Francis' offer at its inception. St. Francis failed to even allege consideration in its post-trial papers or at trial, as it cannot. Under the MOU, St. Francis was allowed to hold back certain invoices, Nos. 149 and 150, totaling $126,570. (CHS's Ex. 2, ¶ ¶ 2, 10; CHS's Exs. 3A, 3B.) This hold back was not

absolute, however, and was subject to the provisions of paragraph ten of the MOU, as discussed below. *See infra,* Part III.B.3. Quarterly check points, on the other hand, would allow St. Francis the absolute right to withhold any unpaid monies for use "as a form of payment for *any obligations that might* be found against Saint Francis" pursuant to the MFCU investigation. (Def.'s Ex. PP (emphasis added).) Potentially, therefore, if St. Francis had made the monthly payments and determined in the next quarter (May, 2000) that the MFCU might find St. Francis liable, it could withhold $182,626 of the money it owed CHS. The Court can find no bargain for CHS if it had accepted this offer, instead seeing only a boon of almost $60,000 to St. Francis. Therefore, the Court need not determine whether CHS impliedly accepted St. Francis' counter-offer, modifying the contract, because consideration was clearly absent from the exchange.

St. Francis' argument that two letters from CHS to St. Francis in the summer of 2000 (Def.'s Exs. SS, TT) evidence that CHS intended to be bound to the terms of St. Francis' offer when CHS negotiated these checks is inapposite because consideration was lacking. Moreover, though CHS communicated in terms of agreement, it is plausible the "agreement" portion of the communication referred only to its agreement to accept payment already due from St. Francis. The letters do not evidence an intent to agree to quarterly check points. And though, as stated above, Magaro's initial offer was supported by consideration, that offer was rejected and replaced by a counter-offer that was not supported by consideration.

**\*14** Therefore, from February 19, 1999 through to the present, the parties were bound under the terms of the MOU. The Court now turns to the question of whether St. Francis breached the MOU.

### III. *CHS's Claim that St. Francis Breached the MOU*

#### A. *In Limine Ruling Stands*

St. Francis alluded at trial and in its post-trial submissions that there was some relevance to its assertion that CHS breached the original Contract. (*See* Def.'s Proposals, at ¶ 12; Tr. 191.) However, the Court stands by its *in limine* ruling that communications regarding the meaning of the MOU or the intent of the parties entering into the MOU are irrelevant because the MOU is an unambiguous,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

entire integration of the parties intentions in ending the Contract. *See Commerce Funding,* 2004 U.S. Dist. LEXIS 17791, at *1.

The Court cannot consider extrinsic evidence of the intent of the parties in entering the MOU unless the MOU is ambiguous or not a full integration. *See Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir.1994); *Roberts v. Consol. Rail Corp.,* 893 F.2d 21, 24 (2d Cir.1989) ("Absent an ambiguity in a written contract, courts will not look to the underlying intent of the parties in executing the contract."). The question of ambiguity is a question of law to be decided by the Court. *See Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir.2002); *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996). The Court here finds that the MOU is unambiguous regarding the intent of the parties when entering into the agreement. The MOU clearly states that the "Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein." (CHS's Ex. 2, at ¶ 1.) The MOU does state that the parties are not relieved from any liability for their actions under the Contract (*Id.* ¶ 7); however, the instant claim arises from the parties' conduct pursuant to the MOU, not the Contract.[FN7]

> FN7. The Court also notes that, though the Court finds the MOU unambiguous, *arguendo* any ambiguity is to be resolved against the drafter of the document. *See Sure-Trip, Inc. v. Westinghouse Eng'g & Instrumentation Servs. Div.,* 47 F.3d 526, 534 (2d Cir.1995); *Waterman S.S. Corp. v. United States,* 595 F.2d 91, 96 (2d Cir.1979) (recognizing that, while it is true that ambiguous contract provisions should be construed against the drafter, such construction is unnecessary where the contract is unambiguous). Here, St. Francis' lawyers drafted the MOU. (Tr. 29, 258.)

Further, the MOU is an entire integration. "An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted." *Restatement (Second) of Contracts* § 228 (1981). The Court sees, and the parties allege, no reason to find the MOU was not a complete integration expressing the parties' intentions. Therefore, the parties' behavior under the original Contract and intentions when entering into the MOU are irrelevant to the instant case as the

MOU is an unambiguous, entire integration.

### B. *Performance Under the MOU*

Breach of contract occurs when a party fails to perform its contractual duty. *Restatement (Second) of Contracts* § 235(2) (1981). Material breach of a contract occurs when a party's non-performance goes to the root of the agreement and is so substantial that it defeats the purpose of the contract. *Felix Franks Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284 (2d Cir.1997), *corrected op. reported at,* No. 96 Civ. 7604, 1997 U.S.App. LEXIS 19795, *14 (2d Cir. Apr. 10, 1997). Failure to satisfy payment obligations under a contract is "generally deemed a material breach of contract." *Wechsler v. Hunt Health Systems, Ltd.,* 330 F.Supp.2d 383, 417 (S.D.N.Y.2004) (Leisure, J.) (quoting *ARP Films, Inc. v. Marvel Entm't Group, Inc.,* 952 F.2d 643, 649 (2d Cir.1991)); *Jafari v. Wally Findlay Galleries,* 741 F.Supp. 64, 67 (S.D.N.Y.1990).

### 1. *Performance Under Paragraph Two of the MOU*

*15 Paragraph two of the MOU required St. Francis to make a lump payment of $510,115, followed by payment of the remaining outstanding invoices "in accordance with the Hospital's 90-day cycle." (CHS's Ex. 2, ¶ 2.) The dates and amounts of the invoices due were attached as Exhibit B to the MOU. (*Id.* at Ex. B.) The MOU also allowed St. Francis to withhold payment on invoice Nos. 149 and 150 as a "holdback." (*Id.* ¶ 2) St. Francis did make the $510,115 payment on or before February 26, 1999 in accordance with the terms of paragraph two. (Tr. 226.) However, St. Francis did not comply with the 90-day cycle at least with regard to invoice No. 146. Invoice 146 was issued on December 20, 1998 for $38,621. (*See* Def.'s Exs. OO, QQ.) Thus, payment on 146 was due on or before March 20, 1999. St. Francis first made payment on this invoice on February 10, 2000, almost a year late. (Def.'s Ex. OO.) The invoice was not fully paid until April 13, 2000. (Def.'s Ex. QQ.) The Court finds that this failure to timely pay was a breach of the express terms of the MOU as it constitutes non-performance of a contractual duty. *Restatement (Second) of Contracts* § 235 (1981). However, this was not a material breach because it did not go to the root of the contract and frustrate its purpose. *See Felix Franks,* 1997 U.S.App. LEXIS 19795, at *14. While the MOU was intended to wrap up the parties' relationship and satisfy St. Francis' outstanding debt,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

the Court does not find that St. Francis' failure to make timely payment on invoice No. 146 necessarily thwarted that purpose.

Paragraph two also allowed St. Francis to hold back invoice Nos. 149 and 150. (CHS's Ex. 2, ¶ 2.) The parties agree that the purpose of the holdback was that, "[i]n the event there [was] an immediate repayment required [pursuant to the MFCU investigation], any outstanding invoices would be used as part of such a repayment plan." (CHS's Ex. 2, ¶ 10; CHS's Proposals at 5, ¶ 16; Def.'s Proposals ¶ 23, 26.) However, St. Francis made payment on both of these invoices despite the express language of paragraph two of the MOU. On September 7, 1999, St. Francis issued a check for $32,000 to pay on invoice No. 149. (CHS's Ex. 3A.) On November 11, 1999, St. Francis issued a check for $32,365 to pay on invoice No. 149. (Id.) Finally on June 9, 2000, St. Francis issued a check for $23,000 to pay on invoice No. 150. (CHS's Ex. 3B.) These payments constituted a waiver of St. Francis' right to withhold the amounts paid on invoice Nos. 149 and 150.

A party waives its bargained-for advantage under a contract when it voluntarily and intentionally abandons " 'a known right which, but for the waiver, would have been enforceable." ' Readco, 81 F.3d at 303 (quoting Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982)). It is clear to the Court that St. Francis' right to hold back the full amount of invoice Nos. 149 and 150 would have been enforceable under the MOU had St. Francis not made payment on those invoices. This does not necessarily mean that St. Francis would be allowed to apply Nos. 149 and 150 toward its eventual repayment to the MFCU, pursuant to paragraph ten of the MOU. Whether that application would be proper is a separate inquiry addressed, infra, Part III.B.3. It is also apparent that St. Francis' payments on these invoices constituted conduct evidencing " 'an intent not to claim the purported advantage" ' under the MOU. Readco, 81 F.3d at 303 (quoting Hadden v. Consol. Edison Co., 45 N.Y.2d 466, 410 N.Y.S.2d 274, 382 N.E.2d 1136, 1138 (N.Y.1978)). There is no evidence that these payments were the result of "negligence, oversight, or thoughtlessness" on St. Francis' part. See id. (quoting Agati v. Agati, 92 A.D.2d 737, 461 N.Y.S.2d 95, 96 (1983)). Rather, St. Francis affirmatively made payments on these invoices despite its express right to withhold payment under paragraph two of the MOU. See, e.g ., Lamborn v. Dittmer, 873 F.2d 522, 529 (2d Cir.1989) (quoting Washburn v. Union Nat'l Bank & Trust Co.,

151 Ill.App.3d 21, 104 Ill.Dec. 242, 502 N.E.2d 739, 742 (Ill.App.Ct.1986) ("To establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such purpose [to waive].")). Therefore, St. Francis waived its advantage to the extent it paid on invoice Nos. 149 and 150. It lost the right to withhold $87,365, the sum of its payments.

### 2. Performance Under Paragraph Four of the MOU

*16 Paragraph four of the MOU provided for continuity of services while the parties wrapped up their relationship pursuant to the terms of the MOU. (Def.'s Ex. 2, ¶ 4.) CHS was to continue to provide services to the part-time clinics and "bill the Hospital in the ordinary course of business at the current rates." (Id.) The parties do not contest that CHS provided services and that St. Francis accepted those services. (CHS's Proposals at 5, ¶ 1-3; Def.'s Objections at 4, ¶¶ 1-3.) These interim services were memorialized in invoice Nos. 151-55. (CHS's Proposals at 5, ¶ 1; Def.'s Objections at 4, ¶ 1.) However, St. Francis disputes that the invoices were due pursuant to a 90-day billing cycle.[FN8]

> FN8. St. Francis also contends it complied with the payment terms under the modified MOU. (Def.'s Objections at 8.) However, the Court will not address this assertion because it has already determined that the parties did not modify the MOU. See supra, Part II.B.

The Court finds that St. Francis breached paragraph four of the MOU by failing to pay CHS's interim invoice Nos. 151-55 according to the 90-day billing cycle. Though paragraph four does not directly state that the interim services are to be paid in accordance to the 90-day cycle, it does state that CHS shall "bill the Hospital in the ordinary course of business." (CHS's Ex. 2, ¶ 4.) The ordinary course of business is identified in paragraph two of the MOU as "the Hospital's 90-day cycle." (Id. ¶ 2.) Plaintiff would like to interject an ambiguity where there is none. "Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.' ... 'Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." Fleet Capital, 2002 U.S. Dist. LEXIS 18115, at *62-63 (quoting Alexander & Alexander, 136 F.3d at 86). The Court finds the MOU unambiguous as to the 90-day payment cycle despite

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

testimony that St. Francis was making payments on "an intermittent 90 day, 130, 60 day, very random, delayed, late cycle" in 1998 and 1999. (Tr. 93.) As stated in the Court's conclusions of law above, *supra,* Part II.A., the parties intentions prior to entering into the MOU are irrelevant to the instant litigation. Further, the Court finds the MOU unambiguous because an examination of the "entire integrated agreement" reveals "a definite meaning" and the Court finds "no reasonable basis exists for a difference of opinion about that meaning." *Fleet Capital,* 2002 U.S. Dist. LEXIS 18115, at *63-64 (internal citations and quotations omitted). That St. Francis was improperly failing to adhere to its own 90-day cycle at the time of entering into the MOU does not require the Court to find anything other than that, under the plain meaning of the MOU, St. Francis was to pay invoices pursuant to a 90-day payment cycle. *See Sure-Trip,* 47 F.3d at 533 (When interpreting the contract, "[n]ot only should the entire contract be considered, but its parts must be reconciled....").

St. Francis, to date, has not made any payments on interim invoice Nos. 151-55. The most recent of these invoices, No. 155, was due no later than August 1, 1999. St. Francis is therefore well past due and has been so almost from the inception of the MOU on February 19, 1999. The Court finds that, absent justification, St. Francis materially breached the MOU by failing to timely pay invoice Nos. 151-55 according to the 90-day cycle. *See Wechsler,* 330 F.Supp.2d at 417; *V.S. Int'l,* 862 F.Supp. at 1197 ("A party's failure to make required payments as required by an Agreement has been held to be a material breach as a matter of law."); *Jafari,* 741 F.Supp. at 67. Because the February 1, 2002 settlement agreement with the MFCU (Def.'s Ex. WW) is the only plausible justification for St. Francis' failure to pay these invoices (*See* CHS's Ex. 2, ¶ 10), the Court addresses that issue in turn, below.

### 3. Performance Under Paragraph Ten of the MOU

*17 Under paragraph ten of the MOU, the parties were to "arrange to meet with Attorney General personnel as soon as possible, and ... cooperate in good faith to reach agreement." (CHS's Ex. 2, ¶ 10.) If the MFCU found St. Francis liable and offered a "long term payment plan," the parties were to "cooperate in good faith to quantify the liability and reach a suitable repayment agreement." (*Id.*) If the MFCU required "immediate repayment ... any outstanding invoices would be used as part of such a

repayment plan." (*Id.*)

The Court finds that CHS performed under paragraph ten, to the extent possible. After signing the MOU, on February 24, 1999, CHS and St. Francis attended a meeting in Pearl River, New York, with the Attorney General's office wherein the length of therapy sessions and the necessity of the part-time clinics were discussed. (*See* Tr. 197-99, 290-94; CHS's Ex. 2, at cover letter.) CHS also attended a second joint meeting in Albany, New York. (Tr. 200-01, 296.) Beyond that, CHS attended at least five meetings with St. Francis regarding the MFCU investigation where the Attorney General's office was not present. (Tr. 194, 297.) Also, CHS "assisted" with St. Francis' document production to the Attorney General's office. (Tr. 201.) Though St. Francis claims it was difficult to get CHS to complete the document production (Tr. 202-03), the Court finds that the above participation demonstrates without doubt that CHS attempted in good faith to comply with the terms of paragraph ten of the MOU. CHS's participation was rendered futile, however, by an increasingly uncooperative St. Francis.

The last correspondence between the parties regarding the MFCU investigation was from St. Francis to CHS on September 22, 2000, wherein St. Francis informed CHS that St. Francis was suspending all payments due to the subpoenas issued by the Attorney General. (Def.'s Ex. UU.) First, the Court notes that this letter constituted an unjustified repudiation of the MOU and, therefore, a total and material breach. *See* 9-53 Corbin, *Corbin on Contracts* § 954 (stating that partial breach and repudiation of an installment-based contract constitutes " 'total' breach, justifying immediate action for the remedies appropriate thereto"). St. Francis was not justified in suspending payment under any provision of the MOU. Paragraph 10 only allowed St. Francis to potentially apply outstanding payments against an immediate repayment if required by the Attorney General's office, and paragraph two only allowed a hold back of invoice Nos. 149 and 150. Thus, under no provision of the MOU could St. Francis hold back all the invoice payments.

St. Francis was obligated to "cooperate in good faith to reach agreement." (CHS's Ex. 2, ¶ 10.) Instead, however, St. Francis unilaterally suspended contact with CHS and never reopened that communication. (*See* Def.'s Ex. UU.) St. Francis was also obligated, "to the extent that a long term payment plan" was entered into, to "cooperate in good faith to quantify the liability and reach a suitable repayment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement" with CHS. (CHS's Ex. 2, ¶ 10.) Instead, CHS was completely excluded from St. Francis' settlement discussions with the Attorney General's office because St. Francis' CEO and President from May 2001 to present, Robert L. Savage, "concluded that CHS was not a good partner, had not lived up to its terms of agreements, [and] was the cause for St. Francis to be in front of the Attorney General." (Tr. 361.) Savage conceded, as was unavoidable, that St. Francis' settlement agreement with the Attorney General's office was a long-term repayment plan.[FN9] (Tr. 358-61; see also CHS's Ex. 11.) Despite the clear language of paragraph 10, however, St. Francis decided to withhold all payments due to CHS without consulting it. This breach of St. Francis' duty in itself is material as the parties' potential liability pursuant to the MFCU investigation was a primary reason for the creation of the MOU. St. Francis' failure to cooperate struck at the heart of the agreement and defeated its purpose. See Felix Franks, 1997 U.S.App. LEXIS 19795, at *14. Savage's explanation for St. Francis' failure to perform is unconvincing at best. Far worse partners have been allowed to reap the benefit of their contractual bargain. See, e.g., Camp Kennybrook, Inc. v. Kuller, 214 A.D.2d 264, 632 N.Y.S.2d 874 (App.Div.1995) (holding parents of a boy claiming he was abused at summer camp responsible for balance due to the camp pursuant to the contract). Further, St. Francis has not articulated any scenario wherein CHS breached the MOU. Nor is financial disadvantage a meritorious explanation. That St. Francis would have been better off financially by repudiating the MOU does not excuse its material breach. Bank of Am. Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A., 740 F.Supp. 260, 266 (S.D.N.Y.1990) (Leisure, J.) (" 'The applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts." ') (quoting 407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37, 42 (1968)), aff'd without opinion sub nom. First Nat'l Bank of Maryland v. Envases Venezolanos, 923 F.2d 843 (2d Cir.1990); Beaumont Birch Co. v. Najjar Indus., Inc., 477 F.Supp. 970, 972 n. 1 (S.D.N.Y.1979); A.W. Fiur Co., Inc. v. Ataka & Co., Ltd., 71 A.D.2d 370, 422 N.Y.S.2d 419, 423 (App.Div.1979).

FN9. This admission is quite a windfall for CHS as the language of paragraph 10 would allow St. Francis to apply "any outstanding invoices" toward an immediate repayment plan. (CHS's Ex. 2, ¶ 10.) Though CHS adamantly contends that paragraph ten only referenced the holdback invoice Nos. 149 and 150, the Court reads the language more broadly, giving it its plain meaning. See Alexander & Alexander, 136 F.3d at 86 ("If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence."). However the point is moot as the repayment was long-term, thus not authorizing St. Francis to apply any outstanding invoices to the payment.

*18 CHS was not required to continue to hound St. Francis in an attempt to secure a good faith agreement regarding their respective liabilities pursuant to the MFCU investigation. See Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (App.Div.1987) ( "[W]here it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts....") First, CHS was completely unaware of St. Francis' agreement with the Attorney General's office. Second, St. Francis's material breach relieved CHS from all obligation of continued performance under the contract. Alesayi Beverage Corp. v. Canada Dry Corp., 947 F.Supp. 658, 667 (citing Jafaria, 741 F.Supp. at 68); Restatement (Second) of Contracts § 242 cmt. a (1981) ("[A] party's uncured material failure to perform or to offer to perform not only has the effect of suspending the other party's duties (§ 225(1)) but, when it is too late for the performance or the offer to perform to occur, the failure also has the effect of discharging those duties (§ 225(2)."); id. § 238 ("[I]t is a condition of each party's duties to render such performance that the other party either render or, with manifested present ability to do so, offer performance of his part of the simultaneous exchange.")

## C. Conclusion

The Court finds, therefore, that St. Francis materially breached the MOU by failing to make timely payments pursuant to its terms. St. Francis also materially breached by failing to "cooperate in good faith to reach agreement" (CHS's Ex. 2, ¶ 10) with CHS regarding the MFCU investigation. St. Francis was not justified in withholding any payments to CHS because of these two material breaches. Further, St. Francis was not justified in applying "any

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

outstanding invoices" due to CHS to St. Francis'
settlement with the Attorney General because the
settlement did not constitute an "immediate
repayment" but, rather was a long-term repayment
plan. Whether CHS was damaged by St. Francis'
material breaches is discussed below.

### IV. Damages

#### A. Actual Damages

Damages for material breach of contract generally
should place the aggrieved party in the same
economic position it would have enjoyed had the
breaching party fully performed. *Wechsler*, 330
F.Supp.2d at 424-25 (citing *Siegel v. Laric Entm't
Corp.*, 307 A.D.2d 861, 763 N.Y.S.2d 607, 608-09
(App.Div.2003); *Rogen v. Scheer,* No. 86 Civ 2058,
1991 U.S. Dist. LEXIS 2715, *7 (S.D.N.Y. Feb. 22,
1991) ("In an action for breach of contract the
'injured party is entitled to the benefit of his bargain
as written and is entitled to damages for the loss
caused by failure to perform the stipulated bargain'
and the recovery 'may include the profits which he
would have derived from performance of the
contract." ' (citations omitted)); *Carmania Corp.,
N.V. v. Hambrecht Terrell Intern.,* 705 F.Supp. 936,
938 (S.D.N.Y.1989) ("The law of contracts is meant
to facilitate voluntary economic exchange. Plaintiffs
who sue successfully for breach of contract are
entitled to damages providing them with the benefit
of the bargains they and the defendants chose to
strike-i.e., to be placed in the positions they would
have enjoyed had the parties' expectations panned
out."); *Menzel v. List,* 24 N.Y.2d 91, 298 N.Y.S.2d
979, 983, 246 N.E.2d 742 (1969) (citing 11 *Williston
on Contracts* § 1395, at 484 (3d ed.)); *Restatement
(Second) of Contracts* § 347 cmt. a (1981)
("Contract damages are ordinarily based on the
injured party's expectation interest and are intended
to give him the benefit of his bargain by awarding
him a sum of money that will, to the extent possible,
put him in as good a position as he would have been
in had the contract been performed.")). "Damages for
breach of contract are limited to expectation
damages-the amount necessary to put plaintiff in as
good a position as if defendant had fulfilled the
contract." *Saxton Communication Group, Ltd. v.
Valassis Inserts, Inc.,* No. 93 Civ. 0388, 1995 U.S.
Dist. LEXIS 17037, *5 (S.D.N.Y. Nov. 15, 1995)
(citing *Bausch & Lomb, Inc. v. Bressler,* 977 F.2d
720, 728 (2d Cir.1992)); *V.S. Int'l,* 862 F.Supp. at
1197. The aggrieved party "must prove any claimed

damages were caused by defendant's breach to a
reasonable degree of certainty." *Xpedior Creditor
Trust v. Credit Suisse First Boston (USA) Inc.,* 341
F.Supp.2d 258, 271 (S.D.N.Y.2004). Further, the
aggrieved party need not prove the exact amount of
damage. *Am. Fed. Group, Ltd. v. Rothenberg,* 136
F.3d 897, 907-08 (2d Cir.1998) ("[O]ne must prove
with certainty that the loss was caused by a breach of
contract ... and must prove with reasonable certainty,
though not mathematical precision, the amount of the
loss.") (citing *Ashland Mgmt. Inc. v. Janien,* 82
N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d
1007 (1993)); *Saxton,* 1995 U.S. Dist. LEXIS 17037,
at *5. Further, the complainant must demonstrate that
the particular damages were "fairly within
contemplation of the parties to the contract at the
time it was made ." *Trademark Research Corp. v.
Maxwell Online, Inc.,* 995 F.2d 326, 332 (2d
Cir.1993) (citations omitted).

**\*19** Here, the Court finds that CHS was damaged by
St. Francis' breach of the MOU. CHS expected
certain monetary remuneration for interim services
rendered pursuant to paragraph four of the MOU,
memorialized by invoice Nos. 151-55. Because St.
Francis did not enter into an "immediate repayment"
plan with the Attorney General, CHS was also
entitled to payment for services rendered under the
original Contract, invoice Nos. 149 and 150. This
remuneration was certainly in the contemplation of
the parties when entering into the MOU because the
main purposes of the MOU was to resolve St.
Francis' debts to CHS and that CHS would provide
interim services for a smooth transition out of the
parties' relationship. However, the exact amount of
damages is disputed because the parties disagree as to
whether CHS was properly granted a rate increase
from $45 per billable patient contact to $50 by Dr.
Attanasio. CHS claims it is owed $212,555 while St.
Francis claims the MOU was modified and therefore
it owes nothing. However, St. Francis also asserts it
never authorized the rate increase. Absent the
increase and pursuant to the Court's conclusions of
law, *supra,* St. Francis would owe $190,004.90. The
Court resolves this dispute below.

#### 1. Rate Increase

CHS claims that Dr. Attanasio was an agent of St.
Francis with the apparent authority to authorize the
rate increase. To so prove, CHS must demonstrate
that, "(1)[the] principal 'was responsible for the
appearance of authority in the agent to conduct the
transaction in question,' ' *Herbert Constr. Co. v.*

Not Reported in F.Supp.2d                                                                    Page 16
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

_Cont'l Ins. Co.,_ 931 F.2d 989, 993-94 (2d Cir.1991) (quoting _Ford v. Unity Hosp.,_ 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (N.Y.1973)), "and (2) the third party reasonably relied on the representations of the agent." _Id._ at 994 (citing _Hallock v. State,_ 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178, 1181 (N.Y.1984)); _see also Doxsee Sea Clam Co. v. Brown,_ 13 F.3d 550, 553-554 (2d Cir.1994). This requires an analysis of the principal's actions, not the agent's. _Herbert Constr.,_ 931 F.2d at 993 (" '[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal-not the agent.' ") (quoting _Ford,_ 346 N.Y.S.2d 238, 299 N.E.2d at 664)); _ITEL Containers Int'l Corp. v. Alanttrafik Express Servs.,_ 909 F.2d 698, 702-03 (2d Cir.1990) (differentiating between express and implied or apparent authority). CHS had no duty to inquire as to the scope of Dr. Attansaio's authority because the $5 rate increase was not an extraordinary transaction obviating reasonable reliance. _See Herbert Constr.,_ 931 F.2d at 995-96 (extrapolating from New York law that, if the third party did not inquire into the scope of the agent's authority and the transaction is extraordinary, the third party could not have reasonably relied on the agent's apparent authority).

Despite CHS's insistence that Dr. Attanasio was "clothed" in apparent authority, _see Hallock,_ 485 N.Y.S.2d 510, 474 N.E.2d at 1181-82, the Court finds that St. Francis' conduct regarding Dr. Attanasio would not lead a reasonable third party to rely on his authority to grant a rate increase. CHS contends that, because Dr. Attanasio reported directly to Muise and was "entrusted with most of the responsibility of overseeing" CHS's administration of the clinics, it was reasonable for CHS to rely on Dr. Attanasio's authorization of the rate increase. (CHS's Objections, at 4.) However, Muise was the contact point for all things financial at St. Francis and she took the lead in the initial negotiation of CHS's fees. (Tr. 185, 236-37.) She was also the "primary administrative contact" for CHS. (Tr. 178.) CHS has presented no evidence of St. Francis' conduct or statements that would lead CHS to believe that Dr. Attanasio was authorized to make financial decisions for St. Francis. Dr. Attanasio was the Director of Communications Disorders who ensured that CHS properly administered its medical services. It does not follow that Dr. Attanasio would have a say in authorizing a rate increase. Nor is CHS's reliance on _Hallock_ persuasive. The court there found that an attorney had apparent authority to enter into a settlement

stipulation on behalf of his client in open court. _See Hallock,_ 485 N.Y.S.2d 510, 474 N.E.2d at 1181-82. However, as the court in _Gordon v. Esopus_ pointed out, the _Hallock_ court's decision was premised on the "policy favoring such stipulations of settlement" and the _Hallock_ court did not indicate that its holding should be broadly applied to different facts. _Gordon v. Esopus,_ 107 A.D.2d 114, 486 N.Y.S.2d 420, 421 (App.Div.1985).

*20 Moreover, assuming _arguendo_ that Dr. Attanasio had apparent authority, he was working for CHS at the time he authorized the rate increase, unbeknownst to St. Francis. (Tr. 237.) Unfortunately, the record does not reveal the nature of Dr. Attanasio's employment. CHS argues that St. Francis can only avoid the bargain if Dr. Attanasio was representing both St. Francis and CHS at the time of authorizing the increase. (CHS's Objections, at 6 (relying on _Bernstein v. Centaur Inc. Co.,_ 644 F.Supp. 1360, 1370-71 (S.D.N.Y.1986) ("The doctrine of voidability on the ground of dual agency is limited to dual representation in the transaction sought to be voided.")).) CHS then makes the conclusory statement that Dr. Attanasio was only representing St. Francis when he authorized the rate increase. While CHS is correct that there is no evidence that Dr. Attanasio was acting as a dual agent, there similarly is no evidence that he was not. It is CHS's burden to prove that the rate increase was properly authorized. Because CHS does not meet this burden, the Court finds that the rate increase was not properly authorized.

CHS's final argument is that, even absent authority, St. Francis ratified the rate increase by paying the full amount of invoice No. 146 three years after it was aware of Dr. Attanasio's actions and employment by CHS. (CHS's Objections, at 5.) "Ratification is the express or implied adoption of acts" of an agent, by a principal for whom the agent assumed to be acting, though without authority. _Prisco v. New York,_ 804 F.Supp. 518, 523 (S.D.N.Y.1992) (citing _Holm v. C.M.P. Sheet Metal, Inc.,_ 89 A.D.2d 229, 455 N.Y.S.2d 429, 432 (App.Div.1982)). Ratification only occurs "where the principal has full knowledge of all material facts and takes some action to affirm the agent's actions." _Id._ (citing same). If ratification occurs, the principal may be liable for acts of an agent, even where those acts were initially unauthorized. _Id._ New York courts also require that the principal obtain some benefit from the agent's transaction. _See, e.g., New York State Med. Transporters Ass'n v. Perales,_ 77 N.Y.2d 126, 131, 564 N.Y.S.2d 1007, 566 N.E.2d 134 (1990).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 17

Here, CHS is blatantly incorrect in stating that St. Francis expressly adopted Dr. Attanasio's transaction when it paid invoice No. 146 calculated pursuant to the $5 rate increase. While St. Francis knew of Dr. Attanasio's authorization and simultaneous employment by CHS when it made the two payments, on February 10, 2000 for $20,000 and on April 13, 2000 for $18,621.10 (*See* Def.'s Exs. OO, QQ), those payments comported with Muise's recalculation of the invoice sent from Magaro (*See* Def.'s Ex. PP, at attachment); a recalculation which subtracted the rate increase (Tr. 235-36). The fact that counsel calculated the total incorrectly at trial and Magaro did not correct him does nothing to change this Court's ability to engage in basic addition. (*See* Tr. 45-46 (surmising falsely that the total of checks for $20,000 and $18,621.10 equaled $38,756.10).) The record therefore belies CHS's assertion that these payments were made "ostensibly without deducting the disputed rate increase from the invoice." (CHS's Objections, at 5.) The Court finds no other indication that St. Francis ratified the rate increase.

**\*21** In conclusion, the Court finds that CHS did not reasonably rely on Dr. Attanasio's authority to grant the $5 rate increase. Further, the Court finds that St. Francis did nothing to ratify the unauthorized behavior. Therefore, the Court finds that St. Francis' material breaches of the MOU actually damaged CHS in the amount of $190,004.90.

### B. *Prejudgment Interest*

CHS requests prejudgment interest to be assessed on its damage award.

In diversity actions, prejudgment interest awards are deemed substantive issues to be governed by state law. *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999) (citing *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998) (finding that state law applies to prejudgment interest calculations on supplemental state law claims)). Pursuant to New York state law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. CPLR § 5001 (McKinney 1992). "In an action at law for breach of contract, 'prejudgment interest is recoverable as of right.' " *Wechsler*, 330 F.Supp.2d at 434 (quoting *Trademark Research*, 995 F.2d at 342); *accord U.S. Naval Inst. v. Charter Communication, Inc.*, 936 F.2d 692, 698 (2d Cir.1991); *cf. Sobiech v. Int'l Staple & Mach. Co.,*

*Inc.*, 867 F.2d 778, 781 (2d Cir.1989) (stating that "incidental damages," such as prejudgment interest, are purposed to "put the aggrieved party in as good a position as had the other party performed"). The prejudgment interest rate for breach of contract cases in New York is 9% per annum, accruing on a simple, rather than a compound, basis. *See* N.Y. CPLR § 5004 (McKinney 2004); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir.1991) (finding that New York's statutory rate applies in all actions except those "of an equitable nature"); *Wechsler*, 330 F.Supp.2d at 435 (citing *Marfia*, 147 F.3d at 90 ("New York courts have held that in a breach of contract action of this sort prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent." (citing *Patane v. Romeo*, 235 A.D.2d 649, 652 N.Y.S.2d 142, 144 (App.Div.1997); *Kaufman v. Le Curt Constr. Co.*, 196 A.D.2d 577, 601 N.Y.S.2d 186, 187, 188 (App.Div.1993))). New York Civil Practice Law and Rule, section 5001(b) provides in pertinent part that prejudgment interest,

shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. CPLR § 5001(b) (McKinney 2004). Further, "where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir.1994) (citing *Cotazino v. Basil Dev. Corp.*, 167 A.D.2d 632, 562 N.Y.S.2d 988, 991 (App.Div.1990) (calculating prejudgment interest from the date the action was commenced)); *cf. Esquire Radio & Elecs. Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 796 (2d Cir.1986) ("In the case of anticipatory repudiation *on payments due over a period of time*, [N.Y. CPLR § 5001(b) ] has been construed to mean a reasonable intermediate date during the period in which payments due would have been made.") (emphasis added).

**\*22** The Court here finds that the cause of action under the MOU first accrued on August 1, 1999, the day the last of the invoices, No. 155, was due. CHS contends that the cause of action accrued on May 10, 1999, the due date for invoice No. 149. (*See* CHS's Post-Trial Br. at Ex. B.) However, this argument fails

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on two counts: (1) St. Francis had a right to hold back invoice Nos. 149 and 150 prior to its material breach of the MOU (CHS's Ex. 2, ¶ 10)-at this time it could be argued that St. Francis was still attempting performance under the MOU; and, (2) invoice No. 149 was fully paid as the Court has found that CHS was not granted a $5 rate increase, *supra*, Part IV.A.1. It is for the former reason that the Court also does not find that the cause of action accrued on May 25, 1999, when CHS contends invoice No. 150 was due. June 6, 1999 is, therefore, the "earliest ascertainable date the cause of action existed." N.Y. CPLR § 5001. However, damages were incurred at various times since June 6, 1999.[FN10] (*See* CHS's Post-Trial Br., Ex. B.) Therefore, because New York law allows the Court to choose a "single reasonable intermediate date," N.Y. CPLR § 5001(b), in situations such as the present, the Court finds that prejudgment interest should be calculated from August 1, 1999, the date the most recent invoice, No. 155, was due, going forward to today.

> FN10. In fact, damages on invoice No. 150 may not have occurred until September 22, 2000 when St Francis' letter to CHS formally and unjustly suspended all payment and communication regarding the MFCU investigation. (*See* Def.'s Ex. UU.) Until that time, St. Francis could still be said to be "cooperating in good faith" pursuant to paragraph ten and, therefore, still able to hold back the unpaid portion of invoice No. 150 in case a settlement with the Attorney General's office required "immediate repayment." (*See* CHS's Ex. 2, ¶ 10.)

Thus, CHS is owed prejudgment interest in the amount of a 9% per year, simple rate, beginning as of August 1, 1999, continuing until the date of this judgment. St. Francis owes CHS prejudgment interest in the amount of $95,340.81.

### Conclusion

As set forth in its findings of fact and conclusions of law above, the Court finds as follows:
(1) As to defendant / cross-claimant CHS's breach of contract claim, the Court finds for CHS. Defendant St. Francis hereby owes damages to CHS in the amount of $190,004.10
(2) As to defendant / cross-claimant CHS's request for prejudgment interest, the Court finds for CHS. Defendant St. Francis hereby owes prejudgment

interest to CHS in the amount of $95,340.81

The Court hereby orders CHS to appear on March 3, 2005, at 9:30 a.m., with defendant Staten Island Hospital for a conference to fix a date for the jury trial in this action.

SO ORDERED.

S.D.N.Y.,2005.
Commerce Funding Corp. v. Comprehensive Habilitation Services, Inc.
Not Reported in F.Supp.2d, 2005 WL 447377 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv03796 (Docket) (May 3, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT C

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
PINKY ORIGINALS, Inc., Rajender Singh, Inderjit
Rangi and Indo-American Design Workshop, Inc.,
Plaintiffs,
v.
BANK OF INDIA, Defendant and Counterclaim
Plaintiff,
andThomas R. Allen, Kumar Sanjay, Board of
Managers of Manhattan Place Condominium, Board
of Managers of Stanton Condominium and "John
Does" and "Jane Doe", Counterclaim Defendants.
No. 94 CIV. 3568 (AGS).

Oct. 21, 1996.

*OPINION AND ORDER*
SCHWARTZ, District Judge:
*1 Plaintiffs in this action assert various common law
claims against defendant Bank of India (the "Bank"),
alleging that they were damaged by actions taken by
the Bank and that plaintiffs should not have to repay
approximately $13.4 million borrowed from the
Bank. The Bank has counterclaimed for the monies
allegedly owed by plaintiffs and counterclaim
defendant Thomas R. Allen (collectively,
"plaintiffs") pursuant to financing and guarantee
agreements with the Bank. This matter is before the
Court upon the Bank's motion for summary judgment
dismissing all of plaintiffs' claims and granting the
Bank a judgment in its favor on its counterclaims.
Because the claims and defenses asserted by the
plaintiffs fail to raise genuine issues of material fact,
the Bank's motion is granted in its entirety.

*FACTS*

The following facts are gleaned from the Bank of
India's Statement of Undisputed Material Facts
("Bank Stmt.") and responsive statements filed by the
parties pursuant to Civil Rule 3(g) of the United
States District Court for the Southern District of New
York. To determine whether there are any genuine
issues of material fact, the Court has carefully
reviewed Plaintiffs' Statement of Disputed Material
Facts ("Pl. Stmt."), as well as the Bank's Reply
("Bank's Rep.") and Response ("Bank's Resp.")

thereto.

*I. The Parties*

Pinky Originals, Inc. ("Pinky") and Indo-American
Design Workshop, Inc. ("Indo") are New York
corporations involved in the importing and
wholesaling of clothing from India and other
countries. Rajender Singh ("Singh") is a stockholder
and officer of Pinky and Indo. Singh guaranteed
Pinky and Indo's obligations to the Bank. Singh's
wife, Inderjit Rangi ("Rangi"), is also an officer and
stockholder of Pinky, and guaranteed Pinky's
obligations to the Bank. Singh and Rangi own certain
mortgaged premises which have been pledged as
security to secure the indebtedness to the Bank.
Thomas R. Allen ("Allen") is or was an officer of
Indo, and Kumar Sanjay ("Sanjay") was employed by
Pinky and was an officer of Indo. Allen and Sanjay
guaranteed repayment of Indo's debt to the Bank.
Bank Stmt. ¶¶ 2-7. Although he was named as a
counterclaim defendant, Sanjay apparently was never
served with process in this action.

The Bank is wholly owned by the Government of
India and is thus an agency or instrumentality of a
foreign state as defined by 28 U.S.C. § 1603. The
Bank has a branch in Manhattan licensed to do
business in the State of New York. Bank Stmt. ¶ 1.

*II. The Bank's Claims*

*A. Pinky's Indebtedness*

On or about September 1, 1988, the Bank and Pinky
entered into a facility letter agreement (the "Facility
Letter"). As of that date, Pinky's revolving line of
credit was limited to an aggregate principal sum of
$7,350,000. On or about May 1, 1989, the Bank and
Pinky entered into Amendment Number One to the
Facility Letter,[FN1] which raised the total credit limit
to $10 million, with the following credit facilities and
sub-limits: (a) Overdraft: $550,000; (b) Letters of
Credit (Documents against Payment): $500,000, (c)
Letters of Credit (Documents against Acceptances):
$2,500,000, and (d) Import Trust Receipts:
$5,000,000. The Bank and Pinky agreed that the
aggregate sub-limit available for the Letters of Credit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

(Documents against Payment) facility, Letters of Credit (Documents against Acceptances) facility, and Import Trust Receipts ("ITRs") facility could not exceed the principal sum of $9,450,000. Bank Stmt. ¶ ¶ 8-14.

*2 Pinky agreed to repay principal and to pay interest to the Bank in accordance with the terms of the Facility Letter. Pinky further agreed to "promptly pay off all existing overdue ITRs" as one of several "special conditions to any loan or extension of credit" under the Facility Letter. The Bank and Pinky agreed that neither of them had any obligation to lend or borrow under any of the credit facilities, and that in the event any lending or borrowing occurred, the provisions of the Facility Letter would govern. The Bank and Pinky also agreed that
[t]he Loan Documents contain the entire agreement between the Bank and the Borrower with respect to all subject matters contained therein. A Loan Document cannot be amended, modified, or changed in any way except by a written instrument executed by all parties to such Loan Document.

Compl. at Ex. A, Schedule of General Provisions ¶ 15; Bank Stmt. ¶ ¶ 14-18.

Plaintiffs admit the essential facts set forth above, but they maintain that the Facility Letter was "modified by future agreements or courses of conduct." Pl. Stmt at 2. However, the Court has examined plaintiffs' citations to the record and determined that the evidence cited by plaintiffs does not create a genuine issue of fact as to whether the Facility Letter was modified. *See* Bank's Resp. ¶ ¶ 22-25, 40-47, 50-64, 109-16, and 128-32 (discussing testimony cited by plaintiffs). In any event, the parties expressly agreed that no oral promises or courses of conduct could vary the Facility Letter's terms. The parties agreed that the Facility Letter
cannot be changed orally or by course of conduct, and no extension or other modification of this Facility Letter shall be valid, binding or enforceable against the Bank unless contained in a writing made expressly for that purpose and executed by the Bank.

Compl. at Ex. A, Facility Letter at 15. No writing modifying the Facility Letter in accordance with plaintiffs' contentions has been submitted to the Court.

From September 1, 1988, through April 27, 1994, the Bank extended credit to Pinky pursuant to the Facility Letter. As of April 27, 1994, the amount of principal overdue and outstanding on Pinky's account

was $9,472,857.15. As of May 15, 1995, accrued and outstanding interest was not less than $4,426,631.84. The Bank has demanded that Pinky repay all outstanding and overdue amounts, but Pinky has not repaid the Bank. Bank Stmt. ¶ ¶ 19-22.

### B. *Indo's Indebtedness*

On or about May 10, 1991, the Bank and Indo entered into an Overdraft Agreement (the "Indo Overdraft Facility") with a credit limit of $150,000. In connection with the Indo Overdraft Facility, Indo executed a Demand Promissory Note (the "Indo Demand Note") for $150,000 in favor of the Bank. Indo agreed to repay principal and pay interest to the Bank on the principal amount outstanding under the Indo Overdraft Facility. From time to time, the Bank extended credit to Indo pursuant to the Indo Overdraft Facility. As of April 27, 1994, the amount of principal overdue and outstanding was $121,434.07. As of May 15, 1995, accrued and outstanding interest was not less than $20,953.13. The Bank has demanded that Indo repay all outstanding and overdue amounts, but Indo has not repaid the Bank. Bank Stmt. ¶ ¶ 23-30.

*3 Again, plaintiffs do not dispute the essential facts set forth above as to Indo's indebtedness, but instead argue that the Indo Overdraft Facility was "modified by future agreements or courses of conduct." Pl. Stmt. at 2. However, plaintiffs' citations to the record are largely irrelevant and do not create a genuine issue of fact as to whether the Indo Overdraft Facility was modified. *See* Bank's Rep. ¶ 24. In any case, the parties agreed that no oral promises or courses of conduct could vary the Overdraft Facility's terms. *See* Counterclaims at Ex. T, Overdraft Facility ¶ ¶ 14-15.

### C. *Singh's Indebtedness*

On or about July 16, 1987, the Bank and Singh entered into an agreement by which the Bank granted Singh a term loan of $3,450,000 (the "Term Loan") to purchase certain commercial real property in Secaucus, New Jersey. The Bank loaned Singh the $3,450,000, and Singh is the debtor on the Term Loan. In connection with the Term Loan, Singh executed a mortgage note for $3,450,000 dated January 27, 1988, in favor of the Bank (the "Mortgage Note"). Pursuant to the Mortgage Note, Singh agreed to pay the Bank on the first day of each month a fixed installment toward the principal and interest, and to pay off all amounts of Singh's

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 3

indebtedness on or before February 1, 1993. As of April 27, 1994, the amount of principal overdue and outstanding on the Term Loan was $2,569,147.87. As of May 15, 1995, accrued and outstanding interest was not less than $732,572.80. The Bank has demanded that Singh repay all outstanding and overdue amounts. Singh has not repaid the Bank. Bank Stmt. ¶¶ 31-38.

### D. *The Guarantors*

On or about December 3, 1985, Singh and Rangi executed Continuing Guarantees by which they agreed to repay Pinky's obligations to the Bank. On or about January 27, 1988, Singh executed a further guarantee by which he agreed to repay Pinky's indebtedness, up to a principal sum of $4,475,000. Bank Stmt. ¶¶ 39-41.

On or about October 6, 1988, Singh and Rangi executed a further guarantee by which they agreed to repay then-existing and future debts, liabilities, and obligations of Pinky to the Bank. On or about May 2, 1989, Indo executed a Guarantee by which it agreed to repay Pinky's indebtedness. On or about April 14, 1989, Singh, Allen, and Sanjay each executed individual Continuing Guarantees by which each agreed to repay Indo's liabilities and obligations then or thereafter existing up to a principal sum of $1 million. On or about January 27, 1988, Singh executed a further Guarantee by which he agreed to repay Indo's indebtedness up to a principal sum of $1 million. Bank Stmt. ¶¶ 42-45.

Plaintiffs again admit the essential facts set forth above, but dispute "that there is any [legal] obligation to pay any indebtedness." Pl. Stmt. at 2. However, plaintiffs fail to offer any evidence to support this claim, other than to rely on their allegations against the Bank, which are discussed below.

### III. *Plaintiffs' Claims Against the Bank*

### A. *The Bank's $10 Million Limit*

*4 Undisputed evidence in the record demonstrates that Pinky knew that the Bank had a single borrower limit of $10 million beyond which the Bank could not extend further credit to Pinky. On December 1, 1989, Pinky wrote the Bank and requested an increase in Pinky's then-existing aggregate credit limit from $10 million to $14,250,000. Bank Stmt. ¶¶ 46-47. The

Bank informed Pinky by letter dated December 19, 1989, that the Bank would not extend it credit in excess of $10 million. Bank Stmt. ¶ 48. Although plaintiffs dispute this, they provide no factual support for their denial of this fact. Indeed, plaintiffs' denial is expressly contradicted by Pinky's admission in a July 6, 1990, letter to the General Manager of the Bank.[FN2] In any event, plaintiffs do not dispute that "Pinky understood that the Bank would not itself provide credit to Pinky beyond the $10,000,000 limit and the Bank would not commit to extend credit to Pinky beyond what the Facility Letter provided." Bank Stmt. ¶ 49; Pl. Stmt. at 1 (not disputing Bank Stmt. ¶ 49).

In the December 19, 1989, letter, the Bank also informed Pinky that it must strictly comply with the covenants set forth in the Facility Letter and emphasized the necessity of Pinky's payment of ITRs on their due dates. Bank Stmt. ¶ 50. Plaintiffs dispute this but again fail to provide any factual support. The letter is clear: "We are ... reviewing the present [credit] facilities unchanged & would greatly appreciate your adherance [sic] to covenants of sanction strictly in future, especially, as regards payment of ITRs on due date." Def. Depo. Ex. 6 and Pl. Depo. Ex. 64. Pinky understood and acknowledged that the Bank was under corporate constraints to keep Pinky within the credit limits set forth in the Facility Letter. Bank Stmt. ¶ 51; Pl. Stmt. at 1 (not disputing Bank Stmt. ¶ 51).

Despite warnings from the Bank not to exceed its approved credit limits, Pinky drew checks on its accounts in excess of its approved limits. Bank Stmt. ¶ 52. Plaintiffs dispute this fact, but the evidence they cite is temporally irrelevant and does not refute the evidence submitted by the Bank that it warned plaintiffs in 1990 and thereafter that they could not continue to exceed their credit limits, and that the Bank would return checks unpaid if plaintiffs continued to engage in such conduct. *See* Bank's Rep. ¶ 52.

It is undisputed that in the spring of 1990, Pinky had overdue ITRs and was overdrawn on its approved overdraft limit. For example, on March 2, 1990, the balance in Pinky's overdraft account was $616,649 against the approved limit of $550,000, and the Bank received for payment further checks in the amount of $42,000. Bank Stmt. ¶¶ 53-54. The Bank contends that it did not pay these checks because Pinky had insufficient funds in its account to cover their payment. Bank Stmt. ¶ 55. Plaintiffs do not deny this essential fact, but instead attempt to demonstrate that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

it was the Bank's "practice" to honor checks drawn on Pinky and Indo's accounts even when there were insufficient funds. However, this contention ignores the dispositive terms of the relevant agreements as well as the numerous warnings given Pinky by the Bank that it would not permit overdrawings to continue. *See* Bank's Rep. ¶ 55.

### B. *Pinky and its Customers Experience Financial Difficulties in 1990*

**\*5** In the spring of 1990, Pinky faced financial difficulties as the market it sold into was "soft," that is, suffering from the effects of economic recession, and several of its large customers, including major department stores, were in financial straits and had difficulty obtaining credit to complete the purchase of goods previously ordered from Pinky. Bank Stmt. ¶ 56. As a result, Pinky's factors began to deny credit approval to Pinky in connection with shipments to such customers, and Pinky began to suffer large losses. By March 6, 1990, Pinky's business began to suffer from the effects of poor market conditions and lost store orders. Bank Stmt. ¶ ¶ 57-58. Pinky does not deny these essential facts. Rather, Pinky points to conclusory statements which assert that Pinky's economic losses in 1990 were the Bank's fault. However, these self-serving, after-the-fact assertions are contradicted by Pinky's contemporaneous documentary admissions. *See, e.g.,* Def. Depo. Ex. 30 at 000332 (referring to "soft" business, canceled orders, and accumulating inventory).

During mid-1990, some of Pinky's major customers filed for bankruptcy, sales orders were canceled, and inventory began to amass in Pinky's warehouse. The general economic conditions -- including the recession, the decline of credit approvals with the factors, the department store bankruptcies, and cancellation of orders -- adversely affected Pinky's business. Bank's Stmt. ¶ ¶ 59-60. While not denying these essential facts, plaintiffs again point to their conclusory assertions that all of Pinky's business set-backs in 1990 and thereafter were a result of "wrongful conduct" by the Bank, including the failure to finalize a participation agreement, which would have raised Pinky's credit limit, with another bank. Pl. Stmt. ¶ ¶ 134-135. These assertions are unsupported by the evidence and, in fact, contradicted by Pinky's own documentary admissions that it was the sluggish economy in the garment industry in 1990 which caused it to lose store orders and money. *See* Bank's Resp. ¶ 136.

By letter dated March 12, 1990, the Bank reiterated to Pinky that it would not approve letters of credit beyond the \$10 million limit of the Facility Letter. Bank Stmt. ¶ 61.

### C. *The Proposed Bank of Oman Participation*

On March 15, 1990, Pinky, the Bank, and the Bank of Oman met to discuss a possible participation agreement. On March 22, 1990, Pinky wrote the Bank of Oman and the Bank requesting a participation agreement through which the Banks would extend a \$16.5 million credit facility to Pinky. On May 11, 1990, the Bank of Oman's head office agreed in principle to a participation facility by which the Bank of Oman would lend Pinky up to \$5.5 million if certain securities then pledged by Pinky to the Bank as security for Pinky's indebtedness would be shared with the Bank of Oman on a "pari passu basis." Prior to May 11, 1990, Pinky did not know that the Bank of Oman would approve the participation. Bank Stmt. ¶ ¶ 62-65; Pl. Stmt. at 1 (not disputing Bank Stmt. ¶ ¶ 62-65).

**\*6** The Bank's New York branch immediately began a review of the proposed participation with the Bank of Oman. On May 31, 1990, the Bank's New York branch submitted the participation proposal to the Bank's headquarters in Bombay, India (the "Head Office") and recommended its approval. Bank Stmt. ¶ 66. Plaintiffs dispute this fact, but nothing contained in plaintiffs' rendition of the facts indicates a genuine dispute with the essential facts contained in ¶ 66 of the Bank's Statement.

Pinky's officers were aware that the participation proposal had to be approved by the Head Office and could not be approved by the Bank's New York branch. Bank Stmt. ¶ 67. Plaintiffs attempt to dispute this by pointing to the self-serving, after-the-fact deposition testimony of Pinky's officers. However, there is no genuine issue as to this fact because plaintiffs' own contemporaneous documentary admissions make absolutely clear that they knew the participation proposal had to be approved by the Head Office. Indeed, plaintiffs admitted in July 1990 that they knew that the proposal was "pending ... with Head Office." Def. Depo. Ex. 19 at 000132; *see also* Def. Depo. Ex. 40 at B01543 (referring to "pending proposal lying in Head Office"); Def. Depo. Ex 41 at B01546-47 (referring to Group Credit Facilities with Bank of Oman "in process for sanction from Head Office").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 5

On June 6, 1990, the Head Office rejected the proposal because of concern regarding Pinky's sales projections, its overdue accounts, and dilution of the Bank's security, among other things. On the same date, the Bank received a telex from the Head Office rejecting the participation proposal. According to the Bank, K.N. Chaturvedi ("Chaturvedi") -- the Vice President for credit at the New York branch -- immediately telephoned Singh and informed him that the Head Office had rejected the participation proposal. Bank Stmt. ¶¶ 68-69. It is undisputed that Chaturvedi met with Singh at the Bank's New York branch on June 8, 1990. The Bank contends that Chaturvedi again told Singh that the Head Office had rejected the proposal, and the two men then discussed the Head Office's decision. Bank Stmt. ¶ 70. Later on June 8, 1990, after the meeting, Pinky wrote a letter to the New York branch regarding the proposal and issues raised by the Bank. Bank Stmt. ¶ 71; see Def. Depo. Ex. 14.

Plaintiffs' version of these events is somewhat different. Plaintiffs dispute that they were informed that the Bank had rejected the proposal, pointing to the deposition testimony of Pinky's officers that "[n]o rejection of the participation agreement by the Head Office was ever communicated to Pinky." Pl. Stmt. ¶ ¶ 91, 100. Pinky also claims that its June 8 letter was meant only to "clarify" certain issues raised by the Bank, and that Pinky remained under the impression, throughout the second half of 1990, that the proposal had been accepted. See Pl. Stmt. ¶¶ 82, 91. Pinky's claim that it was never informed that the Bank had rejected the proposal is expressly contradicted by Singh's documentary admission in February 1991 that Pinky was "informed after four months [of] a denial decision from Bank of India by not participating with another bank." Def. Depo. Ex. 30 at 000332. Moreover, the documentary record makes clear that Pinky was immediately informed that the Bank's Head Office had found the participation proposal unacceptable. Pinky's letter of June 8 was obviously written in response to serious questions raised by the Bank regarding the merits of the proposal. There is no indication in the text of this letter that Pinky believed the proposal had been accepted.[FN2] Rather, the substance of the letter and the events of the following months demonstrate that Pinky was informed that the Bank's Head Office found the participation proposal unacceptable, and that Pinky tried its best during the next several months to convince the Bank otherwise. For example, the evidence shows that Singh traveled to Bombay in September 1990 to meet with senior Bank officials in an attempt to secure the Head Office's approval of the proposal, and Singh submitted revised proposals during September and October 1990. See infra at 17-19. None of this would have been necessary if Pinky truly believed the proposal had been approved. Thus, there is no genuine issue as to the fact that the Bank timely informed Pinky that the Bank's Head Office had found the participation proposal unacceptable.

*7 Four days later, on June 12, 1990, the New York branch advised the Head Office of the discussions with Singh and provided the Head Office with the information submitted by Pinky. In accordance with Singh's request, the New York branch requested that the Head Office reconsider its decision rejecting the proposal. Bank Stmt. ¶ 72. Plaintiffs' citations to the record do not dispute this essential fact. Plaintiff merely points to a document which purportedly demonstrates that the participation proposal had been approved by the Bank and was not merely proposed. However, the testimony of a senior Bank officer demonstrates that the document cited by plaintiff was a draft prepared by a clerk "for approval" by the senior Bank officer, and that the document was corrected before being telexed to the Head Office. See Bank's Rep. ¶ 72.

The Head Office reviewed the participation proposal again on July 26, 1990. On August 1, 1990, the Head Office rejected it and advised the New York branch of its decision. Bank Stmt. ¶ 73. Plaintiffs provide no evidence to support their contention that this is in dispute. The Bank contends that Chaturvedi promptly informed Singh that the proposal had again been rejected by the Head Office. Bank Stmt. ¶ 74. Plaintiffs again argue that the testimony of Pinky officers disputes this, and that "[n]o rejection of the participation agreement by the Head Officer was ever communicated to Pinky." Pl. Stmt. ¶ ¶ 91, 100. However, this contention is contradicted by Singh's admission that Pinky was "informed after four months [of] a denial decision from Bank of India by not participating with another bank." Def. Depo. Ex. 30 at 000332. Furthermore, as discussed above, the events of September and October 1990 -- including Singh's trip to Bombay and his submission of revised proposals -- demonstrate that Pinky was informed that the Bank's Head Office found the participation proposal unacceptable.

On or about August 17, 1990, Pinky approached and subsequently engaged Kishore Mirchandani as consultant to assist Pinky in efforts to obtain financing. The Bank contends that it did not require Pinky to retain Mirchandani or any other particular accountant. Bank Stmt. ¶ ¶ 75-76. Plaintiffs dispute

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

this by citing the deposition testimony of Pinky's officers, who contend, without any corroboration, that the Bank "required" them to hire Mirchandani "in order to assure that the participation would be finalized." Pl. Stmt. ¶ ¶ 92-93. However, in light of the fact that Mirchandani was not hired by Pinky until August 17, 1990 -- several weeks *after* the Bank had already rejected the participation proposal -- and in light of the fact that Mirchandani was contacting potential creditors *other* than the Bank in September 1990, the record leads to the conclusion that there is no genuine issue that the Bank did not require Pinky to retain Mirchandani. *See* Bank's Rep. ¶ 76, Bank's Resp. ¶ 92.

Mirchandani communicated with the Bank on Pinky's behalf and informed Pinky on August 28, 1990, that the Bank of Oman participation proposal was being reconsidered by the Head Office. Bank Stmt. ¶ 77. Plaintiffs purport to dispute this, but their citations to the record merely contain different characterizations of the same essential fact.

*8 On September 1, 1990, Singh traveled to Bombay and met with N.T. Bhavnani ("Bhavnani"), the Bank's General Manager, to discuss the Bank's rejection of the participation proposal. Bank Stmt. ¶ 78. Plaintiffs apparently dispute that, at the time of Singh's trip, Pinky knew the Bank had rejected the proposal. However, Singh's documentary admissions and actions, including his submission of additional information in an attempt to convince the Bank to reconsider its rejection, demonstrate that Singh knew that the Bank had found Pinky's proposal unacceptable.

Plaintiffs admit that at the meeting, Bhavnani told Singh that the Bank wanted to reduce its credit exposure on the existing Pinky facilities. Plaintiffs further admit that four days later, on or about September 5, 1990, Pinky submitted a revised request for a participation with the Bank of Oman directly to Bhavnani at the Head Office in Bombay. Bank Stmt. ¶ ¶ 79-80.

The revised request proposed a participation agreement wherein the Bank's credit exposure to Pinky would be reduced to an aggregate $9 million exposure while the Bank of Oman would still provide $5.5 million in credit to Pinky per its May 11, 1990, approval letter. Bank Stmt. ¶ 81. Pinky contends that the reduction to $9 million was "for a temporary period of six months," but the text of the revised proposal itself makes no reference to the reduction being temporary. Def. Depo. Ex. 20 at B01585.

The Head Office rejected the revised proposal because it still had concerns regarding Pinky's overdue accounts and sharing of collateral with the Bank of Oman. The New York branch informed Pinky of the Head Office decision. Bank Stmt. ¶ 82. Plaintiffs contend that they were never advised of the rejection, but these contentions are explicitly contradicted by Pinky's documentary admissions. In February 1991, Singh admitted that he was informed after four months that the Bank of India had rejected the participation proposal. *See, e.g.,* Def. Depo. Ex. 30 at 000332.

On September 13, 1990, Singh submitted another proposal[FN4] for a participation, which proposed to reduce the Bank's overall credit exposure to $8 million. Bank Stmt. ¶ 83. On September 14, 1990, the New York branch conveyed this second revised proposal to the Head Office, which reviewed it and rejected it on October 9, 1990, because the Bank was still concerned regarding Pinky's overdue accounts and sharing collateral with the Bank of Oman. Bank Stmt. ¶ 84-85.

On October 15, 1990, Chaturvedi met with Singh at the New York branch's offices and informed him of the Head Office's decision.[FN5] Singh accepted the decision and advised the New York branch that he was working on managing the operations within the existing limits. Bank Stmt. ¶ 86.

After October 1990, Pinky did not submit any other proposals to the Bank for financing in participation with the Bank of Oman. Bank Stmt. ¶ 87. The Bank never approved a participation agreement with the Bank of Oman. Bank Stmt. ¶ 88. Pinky disputes this, contending that it was repeatedly assured that the Bank would approve the participation proposal and that it was unaware that the Head Office had to approve the participation proposal. However, these contentions are thoroughly refuted by the record, which makes clear that Pinky knew that the Head Office had serious reservations about the proposal as early as June 8, 1990. The record also makes clear that Singh communicated directly with the Head Office concerning Pinky's proposal and made various revisions to the original proposal. *See* Bank's Rep. ¶ 88.

*9 In sum, there is no contemporaneous evidence that the Bank ever informed anyone at Pinky, orally or in writing, that the Bank of Oman participation proposal had been or would be approved. Bank Stmt. ¶ ¶ 89-93. Although plaintiffs contend that certain Bank

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

officers in the New York branch "at all times" assured Pinky that the participation proposal would be approved and finalized (citing the after-the-fact deposition testimony of Pinky's officers), this testimony is not significantly probative in light of the record as a whole. Singh's admission that Pinky was informed of a rejection within four months, his June 8 letter responding to the Bank's serious concerns about the proposal, his September meeting with officials in the Head Office to discuss Pinky's proposal, and the fact that Singh submitted various revisions to the proposal in September and October all refute plaintiffs' claim that Pinky was continually misled into believing the proposal had been or would be approved.

Pinky's consultant, Mirchandani, testified that Pinky knew that the Bank had rejected the proposed participation. Singh told Mirchandani that Pinky was having difficulty obtaining further credit facilities from the Bank and that Pinky needed assistance in obtaining financing from other banks. Sometime after September 6, 1990, Mirchandani prepared an "alternate financing" proposal for Pinky which was submitted to other potential creditors, specifically ABN Amro Bank, National Westminster Bank, and CIT Factors. The creditors to whom Mirchandani presented this proposal did not extend financing because they concluded that Pinky was not adequately capitalized to support the requested financing. From April until the end of September 1990, all of the credit sublimits on Pinky's Facility Letter with the Bank were exhausted. Until April 1990, at the earliest, Pinky did not know whether it could get any more credit because it had received no response from the Bank of Oman. Bank Stmt. ¶¶ 95-100. Significantly, plaintiffs admit all of the facts contained in this paragraph.

When Pinky made all of its business decisions and formed a business plan, it did not have an approved participation with the Bank of Oman. For example, Pinky ordered finished goods from suppliers even though the participation proposal was not approved.[FN6] Bank Stmt. ¶ 101-02. By the fall of 1990, Pinky recognized that the "general market conditions" in the U.S. economy meant that Pinky would have to plan very conservatively. Bank Stmt. ¶ 103.

After the Bank rejected the second revised participation proposal on or about October 15, 1990, Singh wrote to the New York branch requesting the Bank to allow Indo to open an interim letter of credit for $750,000 for its upcoming Spring 1991 season

Indo would not have required the $750,000 letter of credit if the proposal for participation with the Bank of Oman was still expected to go forward. Bank Stmt. ¶¶ 104-05.

As of December 1990, Pinky was expecting to have a good year in 1991. On or about December 11, 1990, Pinky transmitted its "Strategic Business Plans for 1991" to the New York branch. By Pinky's own admission, Pinky's business projections set forth therein were conservative because "there has been current economic slowdown and severity of general market conditions." Def. Depo. Ex. 27 at B01653. Pinky's December 1990 business plan does not mention any participation agreement with the Bank of Oman. In January 1991, the Gulf War adversely affected Pinky's "business conditions more than expected and big stores [were] not writing the business to their full consumption." Def. Depo. Ex. 45. The "soft" market conditions Pinky was experiencing as a seller prevailed into the first quarter of 1991. On or about January 29, 1991, the Bank wrote Pinky concerning the status of its overdue ITRs and unpaid Acceptances because the total amounts overdue and owing to the Bank had been increasing instead of decreasing in the preceding three-month period. The Bank told Pinky "to monitor the reduction of overdues more intensively and restrict your LC opening to approximately 50% of the payments made." Doc. No. B01689. As of January 31, 1991, Pinky was attempting to work cooperatively with the Bank and expressing appreciation for the Bank's assistance and indulgence with respect to Pinky's business setbacks and overdue account position. Thereafter, Pinky prepared a letter to the Governor of the Reserve Bank of India, in which Pinky admitted that it had exhausted its available letter of credit and ITR line with the Bank, and proposed to reschedule outstanding debts in a demand note. Bank Stmt. ¶¶ 106-13.

**\*10** In a draft of Pinky's letter to the Governor of the Reserve Bank of India on Pinky Originals stationery, dated February 11, 1991, Pinky admitted that it was informed that the Bank had rejected the participation proposal, stating:
During May 1990, we were sanctioned an additional $5.5 million from Bank of Oman, New York on participation basis with Bank of India ... *When all our business planning were made and we were just waiting Head Office decision, we were informed after four months [of] a denial decision from Bank of India by not participating with another bank.*

Def.'s Depo Ex. 30 at 000332 (emphasis added);

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 8

Bank Stmt. ¶ 114.[FN7]

On March 5, 1991, in discussing its overdue ITR and unpaid Acceptances position with the Bank, Pinky admitted that a "nationwide sluggishness" in the marketplace, major department store bankruptcies, and last-minute cancellation of orders had played a "major role to bring us [to] current outstanding exposure." Def. Depo. Ex. 31 at B01699. In March 1992, Pinky requested that the Bank utilize certificates of deposit that Pinky had previously pledged as security to the Bank to reduce the overdue and outstanding amounts under the credit facilities and also pay off certain collection items. In May 1992, Pinky had old ITRs which were overdue. Bank Stmt. ¶¶ 115-17.

In June 1992, Pinky requested that the Bank debit $2,000 each working day from its current account toward partially reducing a portion of its overdue obligations to the Bank. Bank Stmt. ¶ 118. Plaintiffs argue that this request was contingent upon the bank's agreement to open new letters of credit for Pinky, but there is no evidence supporting their position. Plaintiffs also contend that the Bank breached its alleged agreement to open new letters of credit for Pinky. However, the letters Pinky points to as evidence of the Bank's alleged agreement to open new letters of credit for Pinky do not substantiate plaintiffs' allegations. Rather, the letters merely reflect that Pinky *requested* such action; no agreement is evidenced in these letters. *See* Bank's Rep. ¶ 118.

In or about April 1992, Pinky issued checks to the U.S. Customs Service which it did not have sufficient funds to cover, and the Bank dishonored these checks because Pinky's lines of credit were fully drawn and Pinky had insufficient funds to cover such checks. The Bank had the right to reject checks written beyond the $550,000 line of Pinky's overdraft facility sub-limit. Bank Stmt. ¶¶ 119-121. Plaintiffs dispute this, arguing that the Bank had a "practice" of allowing the clearance of overdrawn checks at certain times, but the document and deposition testimony cited by plaintiffs does not support their claims. Rather, the record merely reflects that the Bank accommodated certain overdrawings from time to time. The record is clear, however, that the Bank did not condone such overdrawings and indeed warned plaintiffs that they ran a risk of checks being dishonored if they continued to write checks in excess of available funds. *See* Bank's Rep. ¶¶ 119-21.

*11 As of September 24, 1992, Pinky was attributing its overdue account position with the Bank exclusively to the overall economic conditions in the U.S. for the preceding two-year period. Bank Stmt. ¶ 122. Plaintiffs attempt to dispute this, but Pinky's officers clearly made such an admission in a contemporaneous letter to the Bank. *See* Def. Depo. Ex. 37 at B02163-64 (reasons for overdue account position "were beyond our control due to overall economic conditions in the U.S.").

The Bank declined to open new letters of credit for Pinky in 1993 because of large overdue amounts in Pinky's account. During 1993, Pinky and the Bank communicated frequently regarding the status of Pinky's overdue accounts and Pinky submitted to the Bank several "proposals" to rehabilitate its accounts, but none were acceptable to the Bank. Bank Stmt. ¶¶ 123-24.

Also during 1993, the Bank communicated with Singh regarding the overdue status of his Term Loan with the Bank.[FN8] By letter dated December 6, 1993, the Bank informed Pinky, Indo, and Singh of their then-current overdue account status. As of that date, Pinky owed the Bank $10,909,108.14, Indo owed $328,463.50, and Singh owed $2,540.778.02. The Bank requested that they submit a reasonable plan to render the overdue accounts current. Rather than propose the requested reasonable plan of repayment, Pinky, Indo, Singh, and Rangi filed the instant lawsuit against the Bank asserting that the Bank breached various obligations owed to plaintiffs. Bank Stmt. ¶¶ 126-27.

### D. *The Necessity for Documentation of the Proposed Bank of Oman Participation*

It is undisputed that the Bank of Oman contemplated that any extension of credit it made to Pinky would be documented. Bank Stmt. ¶ 128. Moreover, Pinky has admitted that the loan documentation had to be executed as part of the loan sanctioning/approval process, notwithstanding Singh's deposition testimony to the contrary. Pinky's controller testified that "as part of the overall sanctioning process, the loan documentation has to be executed." Maker Depo. 309:15-20. Pinky now asserts that the Bank assured Pinky that the participation proposal would be and had been approved, and that the Bank billed Pinky for the services of outside counsel in preparing the participation documents. However, the one piece of contemporaneous documentary evidence cited by plaintiffs -- a bill prepared by the Bank's outside

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

counsel -- does not support Pinky's allegations. In fact, the document demonstrates that Pinky knew the Bank had rejected the participation proposal. An entry dated August 14, 1990, states the following: "Spoke with borrower ... he claims deal is off." *See* Bank's Rep. ¶ 129 (citing Doc. No. 000771).

It was contemplated that documents for the proposed participation with the Bank of Oman would be put together and executed by the parties, and that funding would not occur until "all the legal papers were done." Singh Depo. 40:22-41:3 and 98:2-14. Pinky admits that it understood that it would not receive funds pursuant to the proposed participation until documents were executed by the banks, and that no such documents were ever executed in connection with the proposed participation with the Bank of Oman. Bank Stmt. ¶¶ 130-132.

### E. *Pinky's Alleged Reliance on the Participation Proposal*

*12 The following facts are undisputed. As of December 1, 1989, Pinky's production and design departments were working ahead for the next year's Spring and Fall seasons and Pinky had "in full swing" sales and advertising promotion campaigns for these seasons. Def. Depo. Ex. 5 at B01351. Pinky had already accepted $18 million in sales orders "for the coming spring 1990 season." *Id* at B01354. Prior to May 1990, Pinky had begun making plans with its suppliers to import goods into the U.S. In May, June, and July 1990, Pinky began to scale down its business because it could not deliver and it did not have adequate facilities to cope with its production plan. Bank Stmt. ¶¶ 133-36.

### F. *Credit References Provided by the Bank*

As part of its claim for libel and slander, Pinky asserts that three import suppliers were given negative credit references by the Bank: Rangi International, Design Connection, and D.V. International. The credit reference stated the following with respect to Pinky: "The Company is having liquidity problems and substantial portion of their ITRs/Unpaid Acceptances are overdue." Def. Depo. Ex. 34 at B01824. As of August 16, 1991, there is nothing untrue in the statement made in the credit reference. Pinky was having liquidity problems and a substantial portion of Pinky's ITRs and unpaid Acceptances were overdue. Bank Stmt. ¶¶ 137-39. The plaintiffs admit these facts regarding the credit references. *See* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶¶ 137-39).

### G. *The Bank's Knowledge of Pinky's Business*

The deposition testimony of Singh and various Bank officers demonstrates that the Bank had no special or extraordinary familiarity with Pinky's business, nor did it exercise control over Pinky's business affairs. Bank Stmt. ¶ 140. Significantly, plaintiffs do not dispute this. *See* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶ 140).

### H. *The Bank's Dishonor of Pinky's Checks*

The Bank dishonored certain of Pinky's checks because there were insufficient funds in Pinky's overdraft account and honoring these checks would have caused Pinky's overdraft limit to be exceeded. Bank Stmt. ¶ 141. Plaintiffs' contention that the Bank had a "practice" of honoring Pinky's checks drawn over the limits of its overdraft account is not supported by the record. *See supra* at 9-10, 25.

### I. *The Instant Lawsuit*

Plaintiffs originally brought this lawsuit in state court in New Jersey. It was removed to the District of New Jersey and then transferred to this District. In their complaint, plaintiffs assert a number of claims against the Bank: breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation and inducement, negligent misrepresentation and failure to disclose, tortious interference with contractual and prospective business relationships, breach of fiduciary duty, libel and slander, and prima facie tort. Plaintiffs also seek a declaratory judgment that the various guarantors are not liable on the guarantees they entered into because of the Bank's allegedly wrongful conduct. In its counterclaims, the Bank asserts various breach of contract claims against certain plaintiffs and counterclaim defendants, and the Bank also seeks foreclosure of certain mortgaged premises.

### DISCUSSION

#### I. *Summary Judgment Standards*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 10

**\*13** Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citations omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'.). A defendant moving for summary judgment must prevail if the plaintiff fails to establish an essential element of its case. Chase Manhattan Bank, N.A. v. American Nat'l Bank and Trust Co. of Chicago, 93 F.3d 1064, 1072 (2d Cir. 1996) (citing Anderson, 477 U.S. at 249). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ...." Matsushita, 475 U.S. at 586 (citations omitted). The opposing party must provide concrete particulars showing that a trial is needed, not merely a conclusion without supplying supporting arguments or facts in opposition to the motion. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984).

In this case, the Court has carefully reviewed the documentary and testimonial evidence submitted by the parties. Although plaintiffs contend that there are numerous factual disputes precluding the entry of summary judgment for the Bank, the Court concludes that none of plaintiffs' contentions raise genuine, material issues of fact. The documentary and testimonial evidence, taken as a whole, could not lead a rational trier of fact to find for the plaintiffs on their claims or defenses. Accordingly, summary judgment for defendant is appropriate.

Aside from raising purported factual disputes, plaintiffs also contend that the Bank's summary judgment motion is premature and "cannot prevail

because discovery is incomplete." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 3. In support of this contention, plaintiffs cite two exhibits attached to the declaration of attorney Philip L. Guarino, dated July 7, 1995 (the "Guarino Declaration"). In a letter to the Bank's counsel dated April 18, 1995 -- approximately one month before the Bank filed its motion for summary judgment -- plaintiffs' counsel requested cooperation in scheduling 14 depositions of Bank employees who had not previously been deposed. Guarino Dec., Ex. 1. In response, defendants' counsel wrote that "we do not agree to the depositions you request.... Your firm has deposed all of the present and former officers of the Bank of India who had significant involvement in the matters at issue." Guarino Dec., Ex. 2.

**\*14** Under Rule 56(f) of the Federal Rules of Civil Procedure, "summary judgment 'may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition.'" Trebor Sportswear Co. v. Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (quoting Fed. R. Civ. P. 56(e) advisory committee's note (1963)). The Second Circuit has held that requests to conduct further discovery in order to oppose a summary judgment motion must explain (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d 414, 422 (2d Cir. 1989)

The Guarino declaration fails to discuss, let alone satisfy, any of the four requirements identified in Hudson River. Other than citing plaintiffs' letter regarding the scheduling of 14 additional depositions, it contains no statement detailing the specific discovery plaintiffs seek or how the testimony sought is reasonably expected to create a genuine issue of material fact. As a result, the Court has no basis to conclude that plaintiffs have not had a fully adequate opportunity for discovery, or that further discovery would yield evidence favorable to their case. See, e.g., Trebor Sportswear, 865 F.2d at 511-12. Indeed, it appears to the Court that plaintiffs have had all the discovery they need to address the motion. The Bank produced approximately 4,000 pages of documents and produced for deposition five Bank employees with significant knowledge of the matters at issue. See Bank's Reply Memorandum of Law in Further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Support of Bank of India's Motion for Summary Judgment ("Bank's Rep. Mem.") at 23. "An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion." *Contemporary Mission, Inc. v. United States Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) (citation omitted). Because plaintiffs have failed to satisfy the standard required to defeat summary judgment in order to conduct further discovery, the Court reaches the merits of the Bank's motion.

## II. *Breach of Contract*

In Count One of their complaint, plaintiffs allege that the Bank breached its contractual obligations to them by (1) not issuing letters of credit to Pinky when Pinky allegedly had "available credit," (2) not allowing Pinky to draw on "its lines of credit," (3) refusing to approve and finalize the participation agreement with the Bank of Oman which would have enlarged Pinky's available credit, and (4) refusing to issue new letters of credit upon the payment of old Acceptances. *See* Compl. ¶ ¶ 35-37.

These claims fail for several independent reasons, discussed in more detail below. First, the evidence submitted on this motion establishes that the Bank did not breach any contractual obligation owed to plaintiffs. Pursuant to the express terms of the Facility Letter, which clearly spell out the obligations of the parties, the Bank was not even obligated to extend credit to Pinky -- all lending to Pinky was at the Bank's discretion. Second, it is undisputed that Pinky attempted to obtain credit when it was not complying with its obligations under the Facility Letter. Contrary to Pinky's conclusory arguments, there is no evidence supporting Pinky's claims that it was ever relieved of these obligations. Finally, there is simply no evidence which raises a genuine issue of fact as to plaintiffs' allegations that the Bank entered into enforceable agreements to approve and finalize the participation agreement, or to "rotate" old Acceptances and issue new letters of credit.

**\*15** Significantly, plaintiffs do not dispute the existence of the Facility Letter, nor do they dispute the existence of the Indo Overdraft Agreement or the various guarantees. Rather, the cornerstone of plaintiffs' opposition is their contention that the Facility Letter was modified by oral agreements between Pinky and the Bank and by a "course of conduct." *See, e.g.,* Pl. Mem. at 3-5. However, even assuming the existence of the oral agreements and the

course of conduct plaintiffs allege in conclusory fashion, plaintiffs' argument that the Facility Letter was modified does not a raise a genuine issue of material fact because it is expressly precluded by the dispositive terms of the Facility Letter itself, in which the parties agreed to prohibit modification by oral agreement or course of conduct.

### A. *The Bank Fully Performed its Obligations under the Facility Letter, Which Was Not Modified*

Plaintiffs appear to admit that, pursuant to the loan documents executed by Pinky, all lending to Pinky was discretionary. *See* Compl. ¶ 33. Notwithstanding this admission, plaintiffs argue that the Bank had no right to exercise discretion over whether to approve advances to Pinky because the parties "intended ... that so long as Pinky was within its credit lines the Bank would fund the lines." Compl. ¶ ¶ 33-34. This intent, according to plaintiffs, was evidenced by the course of conduct of the parties.

Plaintiffs' argument, however, is precluded by the express language of the Facility Letter. In clear language set in bold type, the Facility Letter unequivocally provides:
BY ACCEPTING THIS FACILITY LETTER, THE BORROWER ACKNOWLEDGES AND AGREES THAT THERE IS NO CONTRACTUAL COMMITMENT ON THE BANK'S PART TO MAKE ANY LOANS OR ADVANCE ANY CREDIT TO THE BORROWER, OR FOR THE BORROWER'S ACCOUNT, UNDER THE UNCOMMITTED FACILITY SET FORTH IN THIS FACILITY LETTER AND THAT THE BANK MAY DEMAND PAYMENT OF ALL LOANS MADE UNDER THE UNCOMMITTED FACILITIES AT ANY TIME. THE BORROWER FURTHER AGREES THAT NO PAYMENT OF ANY FEE TO THE BANK, NO CONDUCT OR COURSE OF DEALING BETWEEN THE BANK AND THE BORROWER, PAST OR FUTURE AND NO WRITTEN OR ORAL STATEMENT, PROMISE OR REPRESENTATION BY ANY OFFICER OR EMPLOYEE OF THE BANK SHALL LIMIT THE BANK'S RIGHT TO DECLINE TO MAKE ANY SUCH LOAN OR TO DEMAND SUCH PAYMENT AT ANY TIME.

Compl. at Ex. A, Facility Letter at 15. Pinky and the Bank also agreed that the Facility Letter could not *be changed orally or by course of conduct,* and no extension or other modifications of this Facility Letter shall be valid, binding or enforceable against

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 12

the Bank unless contained in a writing made expressly for that purpose and executed by the Bank.

*Id.* (emphasis added).

Thus, pursuant to the Facility Letter, the parties expressly agreed that the Bank had no obligation to extend credit to Pinky and that no course of conduct could create such an obligation. The terms of the Facility Letter providing that all lending to Pinky was discretionary are unambiguous. "When parties have entered into an unambiguous contract, the court should look to the terms expressed in the contract itself rather than to 'extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'" *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir. 1994) (citation omitted).

**\*16** Although Pinky does not contend that the Facility Letter's terms are ambiguous, Pinky does argue strenuously that the Facility Letter was modified by a "course of conduct," claiming that during the parties' ten-year lending relationship, the Bank repeatedly opened letters of credit and provided funding to Pinky even though Pinky (a) had exhausted the limit of its credit facility, and (b) was past due in repaying the Bank. Pl. Mem. at 5. However, plaintiffs' modification arguments lack substantive merit. As discussed above, the Court has carefully examined the record and finds that there is no genuine issue of fact with respect to plaintiffs' contention that the Facility Letter was modified by a course of conduct.

Moreover, Pinky's contention is prohibited by the Facility Letter's terms barring modification by oral agreement or course of conduct. Under New York law, which governs the Facility Letter,[FN2] "[a] written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301(1). In general, therefore, a written agreement that expressly states it can be modified only in writing cannot be modified orally. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir. 1990). There are two exceptions to this principle recognized under New York law:
First, an oral modification may be enforced where there has been partial performance of the agreement to modify, so long as the partial performance is 'unequivocally referable to the oral modification.'

*Rose v. Spa Realty Assocs.,* 42 N.Y. 2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1283 (1977). If the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced. Second, when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification must be in writing. Here, too, the conduct claimed to have been performed in reliance on the oral modification must be unequivocally referable to the modification.... Thus, for either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written.

*Id.*

Pinky contends, in essence, that these two exceptions to the general rule apply here because of the Bank's conduct in extending credit to Pinky under the Facility Letter even though Pinky was not in compliance with all of its obligations. Pl. Mem. at 4. However, the Facility Letter makes clear that any funding extended to Pinky was entirely at the Bank's discretion. In addition, under the terms of the Facility Letter, the Bank could "vary the sub-limits of the different uncommitted facilities" and "any such exercise of discretion shall not in any manner be a precedent for or otherwise oblige the Bank to exercise such discretion at any future time." Complaint at Ex. A, Facility Letter at 3. Thus, the conduct Pinky points to was expressly anticipated by the terms of the Facility Letter. Accordingly, the alleged conduct claimed to have resulted from the alleged modification is not "unequivocally referable" to the modification, *Towers Charter,* 894 F.2d at 592, and cannot support Pinky's contentions that the Facility Letter was modified.

### B. *Pinky Did Not Fulfill its Obligations Under the Facility Letter and Was Never Relieved of These Obligations*

**\*17** The record is clear that Pinky did not fulfill its own obligations under the Facility Letter, and, accordingly, its breach of contract claims must fail. The essential elements of an action for breach of contract under New York law are: (1) formation of a contract between the parties; (2) plaintiff's performance of its obligations thereunder; (3) defendant's failure to perform; and (4) resulting damages to plaintiff. *Litton Indus. v. Lehman Bros.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*Kuhn Loeb, Inc., 767 F.Supp. 1220, 1227 (S.D.N.Y. 1991)* (citations omitted), *rev'd on other grounds, 967 F.2d 742 (2d Cir. 1992).* Pinky was obligated as a "special condition to any loan or extension of credit" under the Facility Letter to "promptly pay off all existing overdue ITRs." Compl. at Ex. A, Facility Letter at 7. The Bank contends that plaintiffs have failed to establish that Pinky duly performed its obligations under the Facility Letter because Pinky was clearly in default of this obligation in regard to overdue ITRs.

Pinky admits that it "fell behind in the payment" of ITRs. Pl. Mem. at 7. Pinky argues, however, that "at the time the Bank failed to issue letters of credit and releases and honor Pinky's checks any conditions precedent to the Bank's funding had been excused or waived." Pl. Mem. at 5. These contentions are examined in turn below.

### 1. *Excuse*

According to Pinky, any non-performance of the Facility Letter's conditions precedent was excused because the Bank's actions were the cause of any non-performance. Pl. Mem. at 5-7. Pinky cites cases applying the "prevention" doctrine, which excuses a condition precedent when a party wrongfully prevents the condition from occurring. *See, e.g., In re Gulf Oil/Cities Service Tender Offer Litigation, 725 F.Supp. 712, 737 n.9 (S.D.N.Y. 1989)* (citing *District-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1023 (D.C. Cir. 1985)).* Pinky argues in its opposition memorandum that the Bank's "wrongful refusal to finalize the participation" is what "caused Pinky to fall behind in the payment of ITRs." Pl. Mem. at 6-7.

Pinky's contention of excuse, however, lacks support in the record. The Bank's refusal to finalize the participation proposal was not wrongful in any way, notwithstanding plaintiffs' conclusory assertions to the contrary. The evidence before the Court shows the following: (1) all lending to Pinky under the Facility Letter was discretionary; (2) the Bank promptly reviewed Pinky's proposal for increased credit through a participation agreement with the Bank of Oman; (3) Pinky was promptly informed that its proposal was not acceptable to the Bank of India; (4) Pinky submitted revised proposals and additional information in response to such knowledge; and (5) Pinky was informed within "four months" that the proposal had been rejected. Furthermore, Pinky has admitted in contemporaneous documents that a "soft"

market for its products, major department store bankruptcies, and cancellation of orders caused Pinky's defaults and cash-flow problems in 1990 and 1991, and that these problems began even before the participation proposal was approved in principle by the Bank of Oman and submitted to the Bank of India for its review in late May 1990. *See, e.g.,* Def. Depo. Ex. 7 at B01429 (in letter dated March 6, 1990, Singh states that "we have nothing but to exhibit a sorry figure facing last minute order cancellations, delay in delivery, heavy storage costs and messing up our financial structure"). In light of this evidence, the highly conclusory deposition testimony of Pinky's officers that the Bank's conduct is what "caused" Pinky's financial problems is simply insufficiently probative to create a triable issue of fact as to Pinky's claim of excuse.

### 2. *Waiver and Estoppel*

**\*18** Plaintiffs also argue that the Bank "can be held to have waived performance and can be estopped from demanding performance." Pl. Mem. at 7. Plaintiffs contend that waiver or estoppel may occur by express agreement, or through a course of conduct. "The latter -- sometimes referred to as implied waiver -- arises 'when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which leads one of the parties into a reasonable belief that a provision of the contract has been waived.'" *Id.* (quoting *Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1222 (Pa. Super. Ct. 1989)).* According to plaintiffs, the doctrine of implied waiver applies because the Bank lead Pinky to believe that the participation would be finalized and that additional funds would become readily available to Pinky. *Id.* at 9.

Plaintiffs' contentions regarding waiver are devoid of legal and factual merit. Under New York law, "waivers of rights in contract will not be inferred unless the intent to waive is clear." *Seven-Up Bottling Co. (Bangkok) v. Pepsico, Inc., 686 F.Supp. 1015, 1023 (S.D.N.Y. 1988)* (citation omitted). Here, plaintiffs cannot point to any evidence showing a clear and unequivocal intent to waive. Furthermore, there is no waiver where a party "repeatedly, emphatically and unambiguously, orally and in writing, reserved its rights to declare breach under the contract." *Id.* In this case, there is ample evidence that the Bank repeatedly warned Pinky, orally and in writing, that there would be consequences if Pinky continued to exceed its approved credit limits. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Not Reported in F.Supp.**
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 14

Bank Stmt. ¶¶ 50-55, 111, discussed *supra.*

The argument that the Bank is equitably estopped from demanding performance also lacks merit. Equitable estoppel is
imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Readco, Inc. v. Marine Midland Bank, N.A.,* 81 F.3d 295, 301 (2d Cir. 1996) (citation omitted). Under New York law, the party asserting estoppel must show that the party alleged to be estopped (1) engaged in conduct which amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts. *Id.* In addition, the party alleging estoppel must also "show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in position." *Id.* Here, as discussed below in the context of plaintiffs' fraud claims, there is insufficient probative evidence to support a jury verdict for plaintiffs on their contention that the Bank fraudulently misrepresented its intention to finalize the participation agreement. Moreover, to establish equitable estoppel, plaintiffs must show their lack of true knowledge of the facts. Although plaintiffs cite the conclusory testimony of Pinky's officers that they believed at all times that the proposal had been approved, this testimony is expressly contradicted by Pinky's contemporaneous admissions and actions during the time period in question. Based on this documentary record, it is indisputable that plaintiffs did not lack knowledge of the true facts of the Bank's rejection of the participation proposal.

**\*19** Accordingly, there are no facts raising a genuine issue as to plaintiffs' contention that the Bank waived Pinky's performance under the Facility Letter or can be estopped from demanding such performance.

### C. *No Legally Binding Agreements Exist Apart from the Facility Letter*

Plaintiffs argue that the Bank is contractually liable for breaching its alleged agreement to enter into the participation with the Bank of Oman and breaching its alleged agreement to rotate acceptances and open

letters of credit. Pl. Mem. at 10-12. However, in place of evidence, plaintiffs rely on a series of conclusory allegations by their principals that are refuted by their own documentary admissions.

In supporting their claims, plaintiffs assert the following: (1) that the participation proposal was approved by the Bank's New York branch; (2) that Pinky was never advised the proposal had to approved by the Bank's Head Office; (3) that the proposal was not finalized because of a dispute between the New York branch and the Head Office; and (4) that Pinky was never advised the proposal had been rejected. Pl. Mem. at 10. However, Pinky's own contemporaneous documents establish (1) that the New York branch submitted the proposal to the Head Office; (2) that Pinky knew the Head Office would make the decision; (3) that the Head Office rejected the original proposal and subsequent amended proposals; and (4) that Pinky was advised of the final decision, at the latest, within four months of the proposal's submission. Pinky's correspondence with the Bank during July and August 1990 demonstrates beyond dispute that Pinky was kept abreast of the approval process and was fully aware that the proposal was under review in the Head Office.

Since the Bank rejected the participation proposal, and no other oral agreement existed, plaintiffs cannot present evidence raising a genuine issue as to the existence of the alleged contractual obligations on which they premise their claims. First, as a matter of law, there is no enforceable agreement when parties have failed to agree on essential terms. *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 252 (2d Cir.), *cert. denied,* 473 U.S. 906 (1985). Here, there was no agreement as to essential terms because the evidence is clear that the Bank rejected the participation proposal.[FN10] Moreover, the absence of a written agreement modifying the Facility Letter is also fatal to plaintiffs' claim that the Bank breached an agreement to enter into a participation with the Bank of Oman. If parties do not intend to be bound until their agreement is reduced to a writing which they have executed, there is no contract until that event occurs. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir. 1984) (citing *Scheck v. Francis,* 311 N.Y.S.2d 841, 843 (1970)). Here, the record makes clear that Pinky, the Bank of India, and the Bank of Oman contemplated that executed documentation was required prior to any enforceable commitment to fund Pinky. *See* Bank Stmt. ¶¶ 128-32, discussed *supra.*[FN11] Since no such documentation exists, there was no enforceable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 15
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

agreement.

**\*20** With respect to plaintiffs' allegation that the Bank breached an oral agreement in 1992 to rotate old Acceptances and issue new letters of credit, there is no significant factual support for the existence of such an agreement. Plaintiffs' evidence consists almost entirely of the after-the-fact deposition testimony of Pinky principal Rajender Singh in which he alleges, without independent corroboration, that he entered into an oral agreement in June 1992, with an unidentified officer of the Bank, by which the Bank would debit $2,000 daily from Pinky's accounts and, in return, open new letters of credit. Plaintiffs also cite three letters in support of the existence of this purported agreement. Far from supporting plaintiffs' contention, however, these letters expressly demonstrate that there was no meeting of the minds and no *quid pro quo* arrangement. The letters make clear that Singh was merely paying these overdues while seeking more credit, to which Pinky was not entitled, and which the Bank had discretion to grant or deny. For example, in a letter dated August 10, 1992 -- two months after Singh claims an agreement was solidified -- Singh wrote:

I. we continue to pay $2,000/a working day in reduction of ITR's and *simultaneous request* to open fresh LC's for same amount in Pinky Originals account.

Pl. Depo. Ex. 37 (emphasis added). This letter, and the other letters between Pinky and the Bank from July through September 1992, merely demonstrate that Singh authorized the daily debit of $2,000 to pay down his overdue account while simultaneously *requesting* the opening of new letters of credit. The correspondence between Pinky and the Bank makes clear that there was no commitment on the Bank's part to open new letters of credit. In light of the record as a whole, there is no genuine issue of fact regarding Pinky's contention that the Bank entered into such an agreement.

For all of the reasons set forth above, the Bank's motion for summary judgment on Count One of the Complaint, plaintiffs' claim for breach of contract, is granted.

### III. *Promissory Estoppel*

Plaintiffs allege in Count Two of their complaint that the Bank is liable under the doctrine of promissory estoppel because "[i]n reasonable reliance on the implied and express promises of the Bank, Pinky planned its sales and marketing efforts, made commitments to its suppliers, and refrained from seeking other sources of financing." Compl. ¶ 41. As the basis for this claim, plaintiffs assert that the "New York branch approved and promised to finalize the participation" agreement with the Bank of Oman. Pl. Mem. at 13.

Under New York law, promissory estoppel has three elements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of the reliance." *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986); *see also Shearson Lehman CMO, Inc. v. TCF Banking and Sav., F.A.*, 710 F.Supp. 67, 73 (S.D.N.Y. 1989).

**\*21** The record here reveals that there was no clear and unambiguous promise by the Bank to finalize the participation proposal. Rather, the evidence demonstrates that the Bank rejected the participation proposal several times, and that these decisions were communicated to Pinky. Moreover, Pinky has admitted in contemporaneous documents that it knew the participation proposal required the approval of the Bank's head office, and that Pinky knew that the proposal had been rejected within four months of its submission. Pinky's current contention that it was unaware of these facts is simply insufficient to create a triable issue of fact in light of Pinky's contemporaneous admissions.

Even if there were a genuine factual dispute as to the existence of the Bank's purported promise to finalize the participation proposal, the record clearly establishes that plaintiffs did not rely on any such promise. Indeed, Pinky does not dispute that it entered into commitments to expand its business long before the participation agreement was even proposed in March 1990, and before the Bank of Oman approved the participation proposal in principle on May 11, 1990. *See* Bank Stmt. ¶¶ 133-36, discussed *supra*. Thus, while plaintiffs may have anticipated additional funding, they clearly did not rely on any promise of such funding. In fact, in his December 1, 1989, letter to the Bank requesting an increase in Pinky's credit facilities, Singh makes clear that he was seeking additional funding in order to meet financial commitments already made. *See* Def. Depo. Ex. 5 ("Now ... there are tremendously growing needs to back up financial plans so as to meet our sales and production requirements").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Accordingly, the Bank is awarded summary judgment on Count Two, plaintiffs' promissory estoppel claim.

### IV. *Good Faith and Fair Dealing*

Plaintiffs claim in Count Three that the Bank breached its implied covenant of good faith and fair dealing "by undermining the essential purpose of the loan relationship." Compl. ¶ 44. This claim is based on the Bank's (1) alleged refusal to finalize the proposed participation, (2) alleged supplying of false credit information regarding Pinky, (3) dishonoring of Pinky's checks and alleged delays in issuing letters of credit, and (4) alleged reneging on an oral agreement to "revolve" old Acceptances and issue new letters of credit. *Id.*

This claim fails for several reasons. First, while plaintiffs do not identify the contract from which this covenant supposedly arises, their conclusory assertions are largely premised on the existence of enforceable oral agreements and a modified Facility Letter, which, for the reasons discussed above, do not exist and therefore do not create genuine issues of fact.

Second, insofar as this claim relates to the Facility Letter itself -- devoid of any alleged modification -- plaintiffs' claim also fails as a matter of law. Under New York law, the duty of good faith and fair dealing "does not ... operate to create new contractual rights" between the parties. *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y. 1990). "In general, courts enforce the implied covenant where an implied promise [is] 'so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract." *M/A Com Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990). However, the covenant of good faith and fair dealing cannot be used to create rights which are inconsistent with the express terms of a contract. *See, e.g., Banco Español de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 44 (S.D.N.Y. 1991) (citation omitted), *aff'd,* 973 F.2d 51 (2d Cir. 1992), *cert. denied,* 113 S.Ct. 2992 (1993).

*22 Here, plaintiffs attempt to use the implied covenant of good faith and fair dealing to create additional rights inconsistent with the express terms of the Facility Letter. For example, it is clear that under the Facility Letter the Bank was not obligated to extend any credit, let alone credit when Pinky was in default or had reached the Bank's $10 million single borrower limit. In addition, plaintiffs do not dispute that the Bank extended credit as long as Pinky remained within the limits of the Facility Letter. As long as a borrower is receiving its promised benefits under a contract, the implied covenant of good faith does not require a lender to "take actions contrary to [its] own economic interest such as extending, or even negotiating the possible extension of, a risky loan." *Bank of New York v. Sasson,* 786 F.Supp. 349, 354 (S.D.N.Y. 1992). Under the Facility Letter, the Bank had every right to refuse to issue new letters of credit when Pinky had failed to pay overdue ITRs. [FN12]

Plaintiffs' claim that the Bank wrongfully dishonored checks is equally without merit. Plaintiffs have admitted that the Bank had every right under the Facility Letter to dishonor checks written in excess of the overdraft limit. There is no genuine issue with regard to the fact that the checks were dishonored because plaintiffs had exceeded this limit. Although plaintiffs contend that it was the Bank's "practice" to honor checks beyond this limit, plaintiffs' contention is not supported by the evidence.

Plaintiffs' claim that the Bank issued false credit references ignores plaintiffs' admission that the Bank's statements regarding Pinky's past due account status were true. Moreover, plaintiffs' assertion that the Bank interfered with Pinky's ability to obtain credit from suppliers is supported only by conclusory summaries of alleged conversations with third parties, which are nothing more than inadmissible hearsay. *See, e.g.,* Pl. Stmt. ¶ 117. Plaintiffs have not presented any admissible evidence that the Bank impermissibly and in bad faith interfered with Pinky's ability to obtain credit from suppliers. Plaintiffs "cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a showing that admissible evidence will be available at trial." *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985) (citations omitted). Plaintiffs have made no such showing.

For all of these reasons, the Bank is granted summary judgment on Count Three.

### V. *Fraud*

Plaintiffs allege in Count Four of their complaint that the Bank fraudulently misrepresented various facts to Pinky and its principals concerning the Bank's intention to finalize the proposed participation with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Bank of Oman and that the Bank misrepresented that it would rotate old Acceptances with new lines of credit by using proceeds from certificates of deposit that Pinky had provided. *See* Compl. ¶ ¶ 48-52. In Count Eleven, plaintiffs allege that the Bank fraudulently induced Singh to infuse capital into Pinky by falsely representing that upon doing so it would finalize the participation proposal. Compl. ¶ ¶ 79-80.

**\*23** Under New York law, the elements of fraud are "(1) that [the defendant] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for purpose of inducing [[[the plaintiff] to rely upon it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." *SNCB Corp. Finance Ltd. v. Schuster*, 877 F.Supp. 820, 826 (S.D.N.Y. 1994) (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994), *aff'd*, 71 F.3d 406 (2d Cir. 1995). Additionally, where, as here, the alleged misrepresentation concerns future conduct, "the defrauded party must allege specific facts showing that the promisor intended not to honor her obligations at the time she made statement." *SNCB*, 877 F.Supp. at 826 (citing *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991), *aff'd sub nom.*, *Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir. 1992)). "The defrauded party may not satisfy this requirement simply by showing that the future event never occurred." *Id.*

Here, contrary to plaintiffs' contentions, the record shows that the Bank considered and rejected the proposed participation in a timely manner, that Pinky and Singh knew that the Bank considered the proposal unacceptable, and that Pinky attempted, unsuccessfully, to convince the Bank to reverse its decision and accept the proposal. The Bank contends that it first told Pinky about the decision of the Bank's Head Office to reject the proposal on June 6 and 8, 1990. Although plaintiffs dispute this, there is insufficient probative evidence to support a jury verdict for plaintiffs on their contention that the Bank fraudulently misrepresented its intention to finalize the participation agreement. Based on the documentary record and Pinky's own admissions in various contemporaneous documents, the following facts are indisputable: (1) Pinky knew that approval from the Bank's Head Office was required; (2) Pinky knew that the Head Office had not approved the proposal; and (3) with this knowledge, Pinky submitted additional financial information to the Bank following the June 8 meeting, responding to

various concerns raised by the Bank. The evidence also shows that Singh attempted to solicit the Head Office's approval by communicating directly with the Head Office in July and August 1990 and traveling to Bombay in September 1990 to meet with senior Bank officials, and that Pinky made several revisions to the participation proposal following this meeting. Finally, Singh admitted in a document drafted in 1991 that Pinky was informed of the Head Office's rejection of the participation proposal within "four months" of its submission. Thus, rather than supporting plaintiffs' contention that Pinky was misled about the Bank's intention to approve the proposal, the evidence demonstrates that Pinky and Singh were apprised of the Head Office's unfavorable reaction to the proposal, and that Pinky took various actions in response to such knowledge.

**\*24** Plaintiffs further contend that its principals infused funds into Pinky in May and July 1991 upon assurances by the Bank that Pinky's credit lines would be realigned and the participation proposal with the Bank of Oman would be finalized. Compl. ¶ ¶ 20-22. However, the evidence demonstrates that any infusions of capital into Pinky in mid-1991 were not done for the purpose of finalizing the participation proposal with the Bank of Oman, which Pinky knew had been rejected within four months of its submission in May 1990.[FN13]

Even if plaintiffs were able to demonstrate that the Bank made the various misrepresentations they allege, there are other deficiencies in plaintiffs' fraud claims that mandate the entry of summary judgment. First, there can be no genuine dispute that Pinky's actions allegedly taken in "reliance" on the misrepresentation that the participation proposal would be approved occurred long before May 1990, when the Bank of Oman first indicated its conditional approval. Pinky admits that it made commitments to its suppliers and customers to expand its business in the preceding six months. Thus, it is clear that Pinky's commitments were made in anticipation of, and not in reliance upon, approval of the participation proposal. Also, Pinky could not have reasonably relied on the alleged oral promise to "rotate" old Acceptances as the Facility Letter precluded oral modification of its terms.

Moreover, where an alleged misrepresentation concerns future conduct, as is the case here, the defrauded party must allege specific facts showing that the promisor intended not to honor his obligations at the time he made the statement; a showing that the future event did not occur is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

insufficient. *See SNCB, 877 F.Supp. at 826.* Even if the Court were to assume that officials in the Bank's New York branch represented that the participation proposal would be approved and finalized, plaintiffs have produced no facts from which one might infer that at the time the Bank allegedly made such representations, it did not intend to honor its promise. All plaintiffs have done here is to demonstrate that the future event -- in this case, approval and finalization of the participation proposal -- did not occur. Accordingly, plaintiffs' fraud claims must fail, and the Bank is entitled to summary judgment on Counts Four and Eleven.

### VI. *Negligent Misrepresentation and Breach of Fiduciary Duty*

Plaintiffs allege in Count Five that the Bank owed Pinky and its principals a duty of reasonable care with respect to acting on Pinky's financing and participation requests and a duty to disclose material facts concerning such requests. They claim that the Bank breached these alleged duties by "unduly delaying in responding to Pinky's queries ... concerning financing and the participation, by representing ... that the participation would be finalized, by giving false information about Pinky to Pinky's suppliers and their banks, and by representing that old Acceptances and new lines of credit would be revolved ..." Compl. ¶¶ 57-58. Plaintiffs allege in Count Twelve that the Bank owed a similar duty to Singh which it breached by misrepresenting that it would finalize the participation upon infusion of additional capital into Pinky. Compl. ¶ ¶ 84-85. In Count Seven, plaintiffs allege that the Bank owed plaintiffs a fiduciary duty which it breached through various wrongful acts and omissions. Compl. ¶¶ 66-67.

*25 It is well settled that a plaintiff may not recover for negligent misrepresentation unless "the author [of the misrepresentation] is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all." *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 252 (2d Cir.), cert. denied, 473 U.S. 906 (1985).* It is also clear that an ordinary creditor-debtor relationship between bank and customer does not create such a duty of care.[FN14] *Id.; see also Congress Fin. Corp. v. John Morrell & Co., 790 F.Supp. 459, 474 (S.D.N.Y. 1992)* ("Banking relationships ... are generally not viewed by courts as special relationships giving rise to a heightened duty of care.") (citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d*

112, 122 (2d Cir. 1984)). Under New York law, a duty to disclose material facts only arises where there is a fiduciary relationship between the parties, or where one party possesses knowledge that is not readily available to the other and knows that the party is acting on the basis of mistaken knowledge. *Congress Fin. Corp., 790 F.Supp. at 472.* Thus, plaintiffs' claims premised on negligent misrepresentation, failure to disclose, and breach of fiduciary duty are dependent on a showing that the Bank owed some fiduciary duty to plaintiffs.

### A. *Fiduciary Relationship and Duty to Disclose*

Here, there can be no genuine issue as to the fact that the Pinky and the Bank had a common debtor and creditor relationship and nothing more. Under New York law, the "usual relationship of bank and customer is that of debtor and creditor," *Aaron Ferer & Sons, supra, 731 F.2d at 122, see Bank Leumi Trust Co. v. Block 3102 Corp., 580 N.Y.S.2d 299, 301 (1st Dep't 1992),* and "does not create a fiduciary relationship between the bank and its borrowers or its guarantors," *id; accord Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993).* In unusual circumstances, "a fiduciary relationship may arise even between a bank and a customer if there is either 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding,' or an assumption of control and responsibility." *Manufacturers Hanover, 7 F.3d at 318* (citations omitted). However, "the mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary." *Id.*

Citing a large number of cases from jurisdictions across the country without any apparent similarity to the facts of this case, plaintiffs argue that a fiduciary relationship was created due to, *inter alia,* Pinky's long-standing relationship with the Bank and its alleged intimate familiarity with Pinky's business and its financing needs.[FN15] *See* Pl. Mem. at 19-21. Plaintiffs contend that "whether the Bank owed Pinky a fiduciary duty is a factual matter which must be determined at trial." *Id.* at 21. Although this may be true in cases where there are facts supporting the assertion that a fiduciary relationship exists, the present record is devoid of evidence supporting the conclusion that a fiduciary relationship existed. Based on undisputed evidence in the record, it is clear that the Bank and Pinky had an ordinary, arm's-length commercial relationship. In their Rule 3(g)

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 19

statement, plaintiffs admit that the Bank had no extraordinary familiarity with Pinky's affairs and exercised no control over its business. *See* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶ 140). In situations like this, "in which there is no issue of fact regarding the nonexistence of a fiduciary relationship, summary judgment is a proper method of disposing of a claim asserting the breach" of the nonexistent duty. *Frutico S.A. de C.V. v. Bankers Trust Co.,* 833 F.Supp. 288, 301 (S.D.N.Y. 1993).

**\*26** In their memorandum in opposition, plaintiffs cite a long list of criteria which they assert establish that the Bank owed a fiduciary duty to Pinky.[FN16] However, plaintiffs fail to cite evidence establishing that these criteria actually apply to the facts of this case. The fact that Bank personnel visited Pinky's showroom and warehouse and inspected its product line, that Pinky communicated its business plans to the Bank when it sought credit, that Pinky and Bank personnel had regular meetings and spoke frequently on the telephone, or that the Head Office closely monitored Pinky's account merely describes normal oversight in a commercial banking relationship. The Bank argues that "[t]he criteria plaintiffs claim create a fiduciary relationship are so prevalent in any banking relationship that plaintiffs' argument would convert all lending relationships into fiduciary relationships." Bank's Rep. Mem. at 18. The Court agrees. On the undisputed facts before the Court, a reasonable jury could not find that a fiduciary relationship existed between the Bank and Pinky or its principals.

As to the negligent misrepresentation and nondisclosure claim, the evidence does not establish any circumstances that would impose a duty on the Bank to disclose facts to Pinky. As discussed above, there was no fiduciary or other special relationship between the parties. In addition, there is no evidence that the Bank "possess[ed] superior knowledge, not readily available" to the plaintiffs. *See Congress Fin. Corp.,* 790 F.Supp. at 472. Rather, the evidence demonstrates that the Bank promptly informed Pinky that the Head Office had found the participation proposal unacceptable. Acting in accord with this knowledge, the evidence further shows that Pinky revised and resubmitted its proposal to the Bank several times and was informed within "four months" that its proposal had been rejected.

### B. Breach of Duty

Even if plaintiffs could show facts establishing the existence of a fiduciary relationship between Pinky and the Bank, they could not establish the breach of any fiduciary duty owed to plaintiffs. As discussed above in relation to plaintiffs' claims for breach of contract and breach of the duty of good faith and fair dealing, the facts demonstrate that (1) the Bank communicated the Head Office's rejection of the participation proposal to Pinky; (2) the Bank did not wrongfully refuse to fund advances to Pinky; all lending to Pinky was discretionary pursuant to the Facility Letter, and Pinky was delinquent in repayment of its indebtedness to the Bank; and (3) the Bank had the right to dishonor Pinky's checks when Pinky was over its overdraft limit.

Accordingly, the Bank is awarded summary judgment on Counts Five, Seven, and Twelve.

### VII. *Remaining Tort Claims*

Plaintiffs allege in Count Six that the Bank intentionally interfered with Pinky's contractual and prospective business relationships with its suppliers and with the Bank of Oman. Compl. ¶¶ 61-63. In Count Nine, plaintiffs allege that the Bank committed a prima facie tort as its wrongful actions were taken "without any business justification." Compl. ¶ 73. Plaintiffs claim in Count Eight that the Bank defamed Pinky by "knowingly provid[ing] Pinky's suppliers and their banks with false written and oral information concerning Pinky's creditworthiness." Compl. ¶ 70.

### A. *Interference with Contract and Prima Facie Tort*

**\*27** The elements of a claim for tortious interference with contractual relations are: (1) a valid contract between plaintiff and a third party for a specific term; (2) defendant's knowledge of the contract; (3) defendant's intentional procuring of its breach; and (4) damages. *International Minerals and Resources, Inc. v. Pappas,* 761 F.Supp. 1068, 1074-75 (S.D.N.Y. 1991) (citations omitted), *vacated on other grounds,* 96 F.3d 586, 1996 WL 506612 (2d Cir. Sept. 6, 1996). For a claim of interference with prospective contractual relations, a plaintiff must prove, in addition to the elements listed above, either (1) the defendant acted with exclusive malicious motivation, *i.e.,* that defendant had no business or other motivation; or (2) that defendant employed "wrongful means" in interfering with the contract. *Id.* "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

prosecutions, and 'some degrees of economic pressure.'" *Id.* Similarly, to recover for prima facie tort, a plaintiff must allege and prove that the defendant acted with "exclusive malicious motivation." *See Sharma v. Skaarup Ship Management Corp., 699 F.Supp. 440, 445 (S.D.N.Y. 1988), aff'd, 916 F.2d 820 (2d Cir. 1990).* A claim for prima facie tort is defeated when the defendant's action were motivated to some extent by economic self-interest. *Frutico, supra, 833 F.Supp. at 301.*

Here, there is no proof of a valid and binding existing contract with which the Bank intentionally interfered. With respect to the Bank's suppliers, plaintiffs allege that "[t]he Bank wrongfully prevented Pinky from obtaining credit from its suppliers ... [by] wrongfully inform[ing] suppliers and their banks that Pinky was not creditworthy." Compl. ¶ 23. Plaintiffs' only support for their allegations that the Bank interfered with Pinky's contractual relationships with suppliers is their self-serving deposition testimony, which is based on inadmissible hearsay. *See* Pl. Stmt. ¶¶ 122-24. Plaintiffs have failed to come forward with any admissible evidence that there existed a valid contract, of which the Bank had knowledge, with which the Bank interfered. [FN17] In addition, there was no existing contract with the Bank of Oman with which the Bank could have interfered. Moreover, since the Bank was to have been a party to the proposed participation with the Bank of Oman, it could not, as a matter of law, have tortiously interfered with that contract because "under New York law, defendants cannot be guilty of inducing the breach of their own contract." *Robbins v. Ogden Corp., 490 F.Supp. 801, 810 (S.D.N.Y. 1980)* (citations omitted).

Plaintiffs also have failed to establish that the Bank interfered with any prospective contracts with Pinky's suppliers or the Bank of Oman, or that the Bank committed a prima facie tort, because there is no evidence that any alleged interference by the Bank was done with exclusive malicious intent. The fact that the defendant had a business motive will excuse its actions. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 428 N.Y.S.2d 628, 632 (1980).* With respect to the credit reports issued by the Bank to Pinky's suppliers, plaintiffs do not deny that the reports were truthful, *see* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶¶ 137-39), and it is indisputable that the Bank has legitimate business interests in rendering truthful credit reports. With respect to plaintiffs' claim that the Bank threatened to "kill [[[suppliers'] business if they extended credit to Pinky or did business with Pinky," Compl. ¶ 62,

plaintiffs have offered no specifics as to these alleged threats, and rely only on inadmissible hearsay, while the Bank's representatives have denied knowledge of any such threats.

*28 In addition, based on the undisputed record, there is no genuine dispute that the Bank had an economic motivation for rejecting the participation proposal, *i.e.,* its concerns regarding sharing with the Bank of Oman collateral that had already been pledged to the Bank.

Finally, there is no evidence that the Bank employed any "wrongful means" in allegedly interfering with Pinky's prospective contract with the Bank of Oman. In fact, there is no evidence that the Bank engaged in *any* dealings with the Bank of Oman after the initial meeting between the two banks and Pinky in March 1990.

### B. Defamation

Truth is a complete defense to a cause of action for defamation. *See, e.g., American Benefits Corp. v. Administrative Consultants, Inc., No. 87 Civ. 1797, 1989 WL 129495, at *8-10 (S.D.N.Y. Oct. 26, 1989); Guarneri v. Korea News, Inc., 625 N.Y.S.2d 291, 292 (2d Dep't 1995)* ("truth is an absolute bar to a libel action"). Here, the libelous statements of which Pinky complains appear to be set forth in credit reports issued by the Bank at the request of certain third parties. The report simply states: "The Company is having liquidity problems and substantial portion of their ITRs/unpaid Acceptances are overdue." *See, e.g.,* Def. Depo. Ex. 34 at B01824. As of August 16, 1992, the date of the credit reference, there is nothing untrue in this statement. Plaintiffs do not dispute the truthfulness of the credit reference. *See* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶¶ 137-39).[FN18] Accordingly, the Bank has a complete defense to plaintiffs' defamation claim.

Because there are no genuine issues of material fact, summary judgment for defendants is granted on Counts Six, Eight, and Nine.

### VIII. Guarantor Liability

In Count Ten of the complaint, plaintiffs seek a declaratory judgment discharging the guarantees they executed and declaring void all liens upon the property of the guarantors on account of "the Bank's wrongful conduct as set forth" in the complaint.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 21

Compl. ¶ 76. As the Court finds that there are no genuine issues of fact with respect to plaintiffs' claims against the Bank, this Count of the complaint is also dismissed.

Finally, the Bank is entitled to judgment against the guarantor defendants for all of the guaranteed obligations since it is undisputed that the guarantees which were executed were guarantees of payment, not collection. *See, e.g., General Phoenix Corp. v. Cabot,* 300 N.Y. 87, 93 (1949).

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. Plaintiffs' complaint is dismissed, and a judgment will be entered against plaintiffs and the counterclaim defendant and in favor of the defendant on its counterclaims, with interest as well as all expenses incurred by defendant in enforcing its rights under the Loan Documents, including its reasonable attorneys' fees as provided by the Facility Letter. [FN12] The parties are directed to confer regarding the amount and form of the award on defendant's counterclaims so that judgment can be entered. Absent an agreement, the parties are to submit by November 20, 1996, proposed judgments and statements explaining their differences.

*29 SO ORDERED.

FN1. For convenience, the Court will use the term "Facility Letter" to refer to the Facility Letter as amended, the underlying credit instruments referred to in the Facility Letter and its amendment, and all other "Loan Documents" as such term is defined in the Facility Letter.

FN2. In the letter, Singh admits that the New York branch of the Bank informed Pinky in December 1989 that the Bank's $10 million single borrower limit precluded the bank from approving Pinky's request for extensions of credit beyond $10 million, and that Pinky should attempt to locate a "participant" to make such extension if Pinky felt it necessary. *See* Def. Depo. Ex. 40 at B01543 ("we were advised by the branch (letter dated December 19, [1989]) that apparently we do fall in [single borrower limit] of $10 million and in such

cases a participation of another financial institution is now imminent to enable us to fall in line with the Head Office guidelines in force.")

FN3. For instance, the letter concludes: "We hope that with all the foregoing facts and our clarificatory [sic] observations to some of your pertinent quarries [sic] would suffice your requirements on our combined proposal... We take this opportunity to thank you once again and look forward to hearing from you soon." Def. Depo. Ex. 6 at 000162.

FN4. Plaintiffs argue that Singh's submission was not a new proposal, but this contention is completely unsupported by the record, including Singh's deposition testimony. Singh admitted that he submitted a number of proposals and "changes to proposals." *See* Bank's Rep. ¶ 85.

FN5. As discussed above, plaintiffs' contention that the Bank never informed Singh that the proposal was rejected is refuted by the record, including Singh's contemporaneous admissions.

FN6. Plaintiffs' contention that this is in dispute is unsupported by the record. *See* Bank's Rep. ¶ ¶ 101-02.

FN7. Significantly, plaintiffs do not dispute that this letter was a draft produced in discovery from Pinky's files, nor do they dispute the content of the draft letter. Plaintiffs, however, do argue that other facts are in dispute, including their claim that the New York branch mislead Pinky regarding the necessity of Head Office approval and that Pinky was not advised of the Head Office's decision to reject the proposal. However, plaintiffs' contention that these facts are genuinely in dispute is fatally undermined by Singh's admission in the draft letter that Pinky knew within four months of its submission of the participation proposal that the Head Office had decided to decline Pinky's request.

FN8. Singh contends that the communication concerned a refinancing of the Term Loan rather than its overdue status, but the documentary evidence is clear that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 22

the Bank informed Singh that his account was overdue on several occasions in 1993. *See* Bank's Rep. ¶ 125.

FN9. *See* Counterclaims at Ex. A, Schedule of General Provisions ¶ 15 ("The Note and the rights and obligations of the Borrower and the Bank under the Loan Documents shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to any conflicts-of-laws rules which would require the application of the laws of any other jurisdiction.") Forty-two of the 70 cases cited by plaintiffs in their opposition memorandum are from jurisdictions other than New York. *See* Bank's Rep. at 2 n.3. However, it is clear that New York law requires enforcement of the choice of law provision in the parties' agreement. N.Y. Gen. Oblig. Law § 5-1401. In addition, because plaintiffs have not argued that there are any conflicts of law at issue, New York law should govern the entire controversy. *See Totalplan Corp. of America v. Colborne,* 14 F.3d 824, 832 (2d Cir. 1994) (where "one party has argued its position under New York law, and no claim of conflict has been made, we will apply New York law.") Accordingly, cases cited from jurisdictions other than New York are largely irrelevant.

FN10. Plaintiffs assert that the essential terms of the participation agreement were contained in the Bank of Oman's commitment letter dated May 11, 1990. On its face, however, the letter is contingent on the Bank of India's agreement. Moreover, at the time this letter was prepared, the Bank of India had merely discussed the possibility of entering into a participation arrangement. This does not create a contract. "The promise to negotiate cannot be equated with a promise to finalize an agreement." *Massachusetts Mut. Life Ins. Co. v. Gramercy Twins Assocs.,* 606 N.Y.S.2d 158, 160 (1st Dep't 1993) (no agreement to restructure mortgage).

FN11. Plaintiffs assert that documentation was unnecessary because the Bank funded $10 million under the Facility Letter prior to documentation on that lending. This contention is irrelevant and immaterial; the circumstances of the prior increase to $10

million and the proposed increase to more than $15 million under a participation arrangement involving a second bank are entirely different. Similarly unavailing is plaintiffs' argument that the Bank "prevented" the execution of a written agreement. The Bank only "prevented" execution insofar as it rejected the proposal.

FN12. Plaintiffs contend that the Bank "suddenly and without warning" stopped rotating old Acceptances. Pl. Mem at 16. However, the evidence demonstrates that the Bank repeatedly asserted its rights under the Facility Letter by warning Pinky, in writing, of the consequences of exceeding its approved limits. Bank Stmt. ¶ ¶ 50-55, 111, discussed *supra.*

FN13. In addition, there is no genuine issue as to Pinky's assertion that the Bank represented to Pinky that the participation proposal would be finalized if Pinky hired Mirchandani, the consultant. Rather, the evidence demonstrates that Mirchandani attempted to assist Pinky in obtaining alternate financing from sources other than the Bank. *See supra* at 16-17. There is also no genuine dispute as to plaintiffs' allegations that the Bank fraudulently represented that it would rotate old Acceptances and new letters of credit. *See supra* at 46-47. In any event, pursuant to the Facility Letter, such an oral promise would be unenforceable against the Bank.

FN14. Plaintiffs argue that a bank that enjoys an ongoing relationship with a borrower assumes a duty of care to provide accurate information when the bank knows that the borrower is relying on the information to make particular business decisions, citing various cases including *Edrei v. Copenhagen Handelsbank A/S,* No. 90. Civ. 1860, 1991 WL 64201, at 7-8 & n 8 (S.D.N.Y. Apr. 18, 1991). However, *Edrei* and other cases cited by plaintiff are inapposite. In *Edrei,* the bank became part owner of plaintiffs' business while plaintiff still had rights to the company, which is not the case here. Similarly, *Banker's Trust Co. of Western New York v. Steenburn,* 409 N.Y.S.2d 51 (Sup. Ct. Chautauqua Cty. 1978), *aff'd,* 418 N.Y.S.2d 723 (4th Dep't 1979) and *White v. Guarante,* 401 N.Y.S.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

474 (1977) bear no factual resemblance to the facts of this case.

FN15. The Bank notes that plaintiffs cite 20 cases from 16 foreign jurisdictions in an effort to support their argument that a fiduciary relationship existed here. *See* Bank's Rep. Mem. at 19. The decision in *Resnick v. Resnick,* 722 F.Supp. 27, 39 (S.D.N.Y. 1989) -- the only New York case cited by plaintiffs on the question of the existence of a fiduciary duty -- actually contradicts plaintiffs' central assertion that the nature and length of their relationship with the Bank gave rise to a fiduciary duty. In *Resnick,* the Court held that there was no fiduciary duty between a bank and its customer even where arm's-length transactions had taken place "over a long period of time."

FN16. The plaintiffs argue that various factors should be considered: whether the parties have worked together for a long period of time, whether the borrower has justifiably relied upon the lender to act in his best interests, whether the lender has superior knowledge of facts, whether the borrower reposes trust and confidence in the lender, whether the borrower relies upon the lender to provide financial advice and assistance, whether the lender exerts control or dominance over the borrower, and whether there are close personal and social friendships between the parties. *See* Pl. Mem. at 19-21.

FN17. Additionally, plaintiffs' own documents demonstrate that the downturn in the economy led to Pinky's inability to finalize deals with their suppliers. *See* Def. Depo. Ex. 37.

FN18. Later in their 3(g) statement, plaintiffs contend that the Bank "wrongfully informed suppliers and their Banks that Pinky was not creditworthy." Pl. Stmt. at 27. However, this is not an accurate paraphrase of the credit references, which stated: "The Company is having liquidity problems and substantial portion of their ITRs/unpaid Acceptances are overdue." Plaintiffs admit that this more narrow statement was true when made. *See* Pl. Stmt. at 1-2 (not disputing Bank Stmt. ¶¶ 137-139). If plaintiffs mean to contend that the Bank made defamatory statements *other* than those contained in the credit references, they have utterly failed to demonstrate that any such statements were made and/or that they were false; their reliance on the hearsay deposition testimony of Pinky's officers does not establish a genuine issue of fact. To the extent Pinky is complaining that the Bank shifted its position in credit references to Credit Agricole, *see* Pl. Stmt. ¶¶ 119, 121, such claims also fail to support a claim for defamation. There is record evidence that certain credit reports regarding plaintiffs' accounts were sent out as "satisfactory" in error. *See* Bank's Resp. ¶ 121. There is nothing defamatory about making an honest error which states that Pinky's credit history is "satisfactory."

FN19. The Facility Letter provides as follows: "The Borrower shall be liable to the Bank and shall pay to the Bank immediately on demand as part of its liability under the Loan Documents all costs and expenses of the Bank, including all reasonable fees and disbursements of the Bank's counsel incurred in the collection or enforcement or attempted enforcement of the Bank's rights under the Loan Documents, whether within or apart from any legal action or proceeding." Compl. at Ex. A, Schedule of General Provisions ¶ 12.

S.D.N.Y.,1996.
Pinky Originals, Inc. v. Bank of India
Not Reported in F.Supp., 1996 WL 603969 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:94cv03568 (Docket) (May. 16, 1994)

END OF DOCUMENT

# ATTACHMENT D

Westlaw.

1998 WL 411328
1998 WL 411328
(Cite as: 1998 WL 411328)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
JOHN STREET LEASEHOLD LLC, Plaintiff,
v.
THE FEDERAL DEPOSIT INSURANCE
CORPORATION and the Federal Deposit Insurance
Corporation, as Receiver, Defendants.
**No. 95 Civ. 10174(JGK).**

July 22, 1998.

Robert Ward, Richard A. Spehr, Mayer Brown &
Platt, New York, NY, for Plaintiff.
Barry Werbin, Andrew C. Gold, Paul Rubin, Herrick,
Feinstein LLP, New York, NY, for Defendant.

*OPINION AND ORDER*
KOELTL, J.
*1 This is an action for money damages arising out of
a syndicated loan secured by a mortgage ("the
Mortgage") over a property known as 127 John Street
in New York City ("127 John Street"). The plaintiff,
John Street Leasehold LLC ("John Street"), alleges
that the defendants, Federal Deposit Insurance
Corporation in its capacity as receiver of American
Savings Bank and the Federal Deposit Insurance
Corporation (collectively, "the FDIC"), orally agreed
to waive a provision in the Mortgage Extension,
Consolidation & Modification Agreement (the
"Mortgage Agreement") that permitted the
participating institutions to require the prepayment of
the outstanding balance of the Mortgage at any time
after December 20, 1992 (the "Call Provision"), and
then breached that oral agreement (the "Oral
Agreement"). Prior to the conclusion of discovery,
the defendants moved for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure. In a Memorandum Opinion and Order
dated December 24, 1996, this Court granted the
motion in part and denied it in part. See *John Street
Leasehold LLC v. The Federal Deposit Insurance
Corp.*, No. 95 Civ. 10174, 1996 WL 737196
(S.D.N.Y. Dec.24, 1996) ("*John Street I*"). The
Court dismissed the plaintiff's claims for fraud,
negligent misrepresentation, and breach of the
covenant of good faith and fair dealing. However, the
Court denied the motion with respect to the plaintiff's
breach of contract claim, finding that issues of fact

existed as to whether the Oral Agreement existed,
whether it was a waiver of the Call Provision in the
Mortgage Agreement or a modification of the
Mortgage Agreement, and "whether John Street's
asbestos abatement expenditures constituted partial
performance or established equitable estoppel." *John
Street I*, 1996 WL 737196, at *7.

Following the close of discovery, the defendants have
renewed their motion for summary judgment directed
at the plaintiff's breach of contract claim. First, they
argue that no oral agreement to waive the call
provision ever existed, and, even if such an
agreement did exist, its terms are too vague and
indefinite to be enforceable. Second, the defendants
contend that the Oral Agreement was not a waiver of
the Call Provision and that, viewing the Oral
Agreement as a modification, the plaintiff cannot
establish either partial performance or equitable
estoppel as required to overcome the Statute of
Frauds. Third, the defendants assert that the plaintiff
breached the terms of the purported Oral Agreement
by failing to keep the loan current. For the reasons
that follow, the defendants' motion for summary
judgment is granted. [FN1]

> FN1. The defendants also argue that Alfredo
> Santos and Robert Reilly did not have the
> authority to bind the FDIC to any agreement
> they might have reached with the plaintiff.
> However, the Court need not reach that
> argument because summary judgment is
> appropriate on several other bases.

I.

The standard for granting summary judgment is well
established. Summary judgment may not be granted
unless "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
the affidavits, if any, show that the moving party is
entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986); Gallo v. Prudential Residential Servs. Ltd.
Partnership, 22 F.3d 1219, 1223 (2d Cir.1994)*. "The
trial court's task at the summary judgment motion
stage of the litigation is carefully limited to
discerning whether there are genuine issues of
material fact to be tried, not to deciding them. Its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." _Id.,_ _22 F.3d at 1224._

*2 The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrates[s] the absence of a genuine issue of material fact." _Celotex, 477 U.S. at 323._ The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." _Anderson v. Liberty Lobby,_ _Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d_ _202 (1986)._ In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. _See Matsushita Elec. Indus._ _Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106_ _S.Ct. 1348, 89 L.Ed.2d 538 (1986)_ (citing _United_ _States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct._ _993, 8 L.Ed.2d 176 (1962)); see also Gallo, 22 F.3d_ _at 1223._

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." _Fed.R.Civ.P. 56(e)._ With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. _See Chambers v. TRM Copy Ctrs. Corp.,_ _43 F.3d 29, 37 (2d Cir.1994)._

## II.

Many of the underlying facts on this motion were set forth in this Court's previous Opinion in _John Street_ _I,_ familiarity with which is presumed. To summarize briefly, the undisputed facts show that John Street owns the leasehold interest in 127 John Street. In 1972, it entered into the Mortgage Agreement with a syndicate of fifteen savings banks and a commercial bank. Under the terms of the Mortgage Agreement, John Street obtained a loan extension of $20,330,000 secured by a thirty year non-recourse Mortgage encumbering the leasehold interest in and the rents from a commercial office building located at 127 John Street. The Call Provision within the Mortgage Agreement allowed the syndicate to require the Mortgage to be prepaid as of December 20, 1992, on 180 days prior written notice, even if the loan and the

Mortgage were not in default. _John Street I, 1996 WL_ _737196,_ at *2. Between July 1992 and February 1993, John Street entered into negotiations with the FDIC, as receiver for American Savings Bank, to waive the Call Provision. (Kaufman Aff. ¶ 9.) No agreement was reached during that period. (_Id._)

Further discovery has revealed additional details of the negotiations with respect to the Call Provision. John Street contends that in January and February 1993, it withheld payments on the principal and interest on the Mortgage in the amount of $313,000 to focus the FDIC's attention on its request for a waiver of the Call Provision. (Kaufman Aff. ¶ 10.) On February 19, 1993, a representative of the FDIC, Fred Santos, contacted John Street, indicating that he was aware of the issues and that the FDIC on behalf of the consortium of banks was willing to negotiate if the loan was brought current. (Kaufman Aff. ¶ 11 & Ex. A-1 at 576.) Thereafter, between February 19, 1993 and April 23, 1993, John Street contends that it reached an agreement with Santos to waive the call provision contained in the Mortgage Agreement. (Kaufman Aff. ¶ 13; Santos Aff. ¶ 11.) The plaintiff contends that the Oral Agreement was negotiated over the course of seven telephone conversations [FN2] between Melvyn Kaufman on behalf of John Street and Santos and one face-to-face meeting between Kaufman, Santos, and Santos' supervisor, Robert Reilly. (Kaufman Aff. ¶ 17 & Ex. A.) Following the face-to-face meeting on February 24, 1993, the plaintiff alleges that it forwarded a $313,000 check to cover outstanding installments of principal and interest. (Kaufman Aff. ¶ 17 n. 1; Santos Aff. ¶ 7.) The plaintiff now contends that the key conversation in the negotiations for the purported Oral Agreement occurred on April 23, 1993, at which time Santos allegedly offered that in exchange for John Street removing the asbestos as tenants left the building over a period of five years or "a reasonable proximity thereof," the banks would give John Street a "release of the call provision." (Kaufman Aff. at 10-11 & Ex. A-7 at 35-36; Tr. at 31.) During the course of that conversation, Santos advised Kaufman that the FDIC had prepared a written ballot which would memorialize the loan participants' agreement to waive the call, although this ballot was never sent out. (Santos Aff. ¶¶ 12, 14.)

> FN2. Melvyn Kaufman taped his conversations with Santos and has attached copies of the tape transcripts as Exhibit A to his affidavit. These transcripts were not provided to the Court on the previous

1998 WL 411328
1998 WL 411328
(Cite as: 1998 WL 411328)

Page 3

motion, even though they were in the plaintiff's possession. (Transcript of Jan. 14, 1998 Arg. ("Tr.") at 34.)

**\*3** In opposition to the defendants' first motion for summary judgment, the plaintiff alleged that it had undertaken certain acts in reliance on "a valid and enforceable Agreement with the FDIC in February, 1993 to waive the call." [FN3] (May 28, 1996 Kaufman Aff. ¶ 23, attached as Ex. A to Werbin Decl. ("May 28, 1996 Kaufman Aff.")) These actions included making all outstanding payments of interest and principal on the loan in amounts exceeding $940,000, "vigorous" pursuit of asbestos abatement efforts, including having a construction firm encapsulate asbestos in several part of the Building at a total cost in excess of $50,000, and actively seeking new tenants.[FN4] (May 28, 1996 Kaufman Aff. ¶¶ 20-22.) However, on this motion and at his deposition, Kaufman testified that he was incorrect when he stated in his May 28, 1996 Affidavit that the $50,000 in expenditures for removing asbestos occurred in reliance on the Oral Agreement. Those expenditures actually occurred in 1992, prior to the Agreement's alleged formation, and not in 1993. (Kaufman Aff. ¶ 29; Kaufman Dep. at 274, attached as Ex. B to Werbin Decl.) However, the plaintiff now alleges that there were three additional capital expenditures which it asserts were undertaken in reliance on the Oral Agreement. (Kaufman Aff. ¶ 22.) First, the plaintiff contends that it replaced the building's variable speed drives at a cost of $50,414 which was a "significant long-term capital project." (Id. ¶ 24.) Second, John Street commenced a Phase 1 environmental study of the building at a cost of $8,148.43, "in part to assess the scope of the building's asbestos problem," and performed air quality testing. (Id. ¶ 25.) Finally, the plaintiff replaced the building's condensate tank at a cost of $23,975.99. (Id. ¶ 26.)

> FN3. Although Kaufman previously asserted that the Agreement had been reached in February 1993, he now contends that the Agreement was reached between February 19, 1993 and April 23, 1993. (Kaufman Aff. ¶ 11.) The plaintiff's position at oral argument was that there was no agreement before April 23, 1993. See Tr. at 32 ("But without the 23rd you don't have it. The 23rd is the final day .").

> FN4. In John Street I, the Court found that the payments on principal and interest and

the solicitation of new tenants were not legally relevant to the issue of whether there was partial performance or equitable estoppel, since these actions were perfectly consistent with the Mortgage Agreement without the modification and thus were not "unequivocally referable" to the Oral Agreement. See John Street I, 1996 WL 737196, at \*6.

The plaintiff alleges that sometime in late June 1993, the FDIC's new loan servicer, Capital Management Resources, breached the FDIC's agreement to waive the call. (Kaufman Aff. ¶ 27.) After the FDIC's alleged breach, John Street ceased all capital expenditures in July 1993. (Kaufman Aff. ¶ 27 & Ex. G.)

III.

The defendants first argue that no Oral Agreement was actually reached, and, even if such an Agreement was reached, its terms are too indefinite to be enforceable. "It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." Candid Productions, Inc. v. International Skating Union, 530 F.Supp. 1330, 1333 (S.D.N.Y.1982) (Weinfeld, J.); see also Vian v. Carey, No. 92 Civ. 0485, 1993 WL 138837, at \*3 (S.D.N.Y. Apr. 26, 1993). The New York Court of Appeals has explained that the purpose of the requirement of definiteness is twofold:

**\*4** First, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy ... Second, the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.

Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989), cert. denied, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Courts are cautioned not to apply the doctrine with a "heavy hand" since "[w]hile there must be a manifestation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mutual assent to essential terms, parties also should be held to their promises ..." *Id.; see, e.g., Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 453 (2d Cir.1977).

Thus, before finding that an agreement is too indefinite, "a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes it meaning clear." *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d 203; *accord Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 110, 436 N.Y.S.2d 247, 249-50, 417 N.E.2d 541 (1981) ("It certainly would have sufficed, for instance, if a methodology for determining the rent was to be found within the four corners of the lease, for a rent so arrived at would have been the end product of agreement between the parties themselves."). Methods for determining the meaning of such ambiguous terms can be found within the agreement itself or by comparison to "an extrinsic event, commercial practice, or trade usage." *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d 203.

In this case, both the purported Oral Agreement itself and the terms allegedly contained in it are far too vague to be enforceable by the Court. First, the Oral Agreement itself is overly vague and indicates that no mutual assent between the parties could have been reached because the terms of the Agreement presented by the plaintiff have changed so often in the course of the litigation that it is not reasonably possible to determine the Agreement's actual terms. Thus, the Court has been presented with at least *five* different versions of the Oral Agreement, each one with different terms and obligations purportedly binding the parties. The current version of the Oral Agreement is set forth in the Affidavit of Melvyn Kaufman dated September 5, 1997 submitted in conjunction with this motion. In his Affidavit, Kaufman states that the terms of the Agreement were "that the FDIC would permanently waive its right to call the loan in exchange for which plaintiff at its own expense would perform a complete asbestos abatement of the building as tenants moved out of their space and would make capital improvements in the building." (Kaufman Aff. ¶ 14.) The second version of the Agreement is dated May 23, 1997 and was submitted in the Plaintiff's Rule 56.1 Counterstatement. In paragraph 44 of the Counterstatement, the plaintiff admitted that "two, but not all, of the conditions of the waiver of the Call were (i) remaining current on the loan and (ii) performing asbestos abatement. John Street also

agreed to perform other renovations and make capital expenditures in the building in exchange for a waiver of the call." (Pl.'s Rule 56.1 Counterstatement ¶ 44, attached as Ex. D to Werbin Decl.) Thus, the provision that the loan be kept current disappeared in the formulation of the current version of the Agreement in Kaufman's Affidavit.

**\*5** Kaufman himself provided a third version of the Agreement at his deposition on April 25, 1997, a version without the requirement that John Street make capital improvements and undertake renovations. He stated that in exchange for waiving the call provision, the plaintiff would "proceed to do business-you know, to sustain and keep the building going and so on, not pocket the money...." (Kaufman Dep. at 66-67, attached as Ex. B to Werbin Decl.) Kaufman also testified that, "we discussed the waiver of the call and the procedure, that we would make ourselves current and that we would sustain the current payment for the next semester, which ends in June. And on the other hand, we would not be charged interest for the two months' delinquency because it was not malicious or negligence or anything." (Kaufman Dep. at 244-45, attached as Ex. B to Werbin Decl.) A fourth version of the Oral Agreement obligated the plaintiff, in exchange for a waiver of the Call Provision, to keep the loan current and to remove the asbestos as tenants changed, without a description of the time period over which the parties were obligated under either term (Reilly Aff. ¶ 7, attached as Ex. 3 to Werbin Reply Decl.; *see also* Santos Dep. at 62-63, attached as Ex. L to Werbin Decl. (same)). Finally, the Amended Complaint dated December 7, 1995 stated that in exchange for waiving the Call Provision, the plaintiff would remove or contain all asbestos over a "five year or other reasonable period depending upon the rate of move-out of tenants." (Am.Compl.¶¶ 26, 27.)

These different versions of the Agreement were provided by those three individuals who actually participated in the negotiations that allegedly culminated in the Agreement-Melvyn Kaufman, Fred Santos, and Robert Reilly. Indeed, terms and provisions of the Agreement have disappeared and appeared as this case has progressed. Thus, a term requiring the plaintiff to make capital improvements has appeared, even though it was not mentioned in the previous summary judgment motion or the Amended Complaint,[FN5] while the term requiring the plaintiff to keep the loan current has disappeared. Under these circumstances, no reasonable jury could find that the parties had reached an agreement as to all material terms in the contract.

FN5. In addition, the tape transcripts of the conversations between Santos and Kaufman do not reflect any agreement to make capital improvements. *See, e.g.,* Kaufman Aff. Ex. A-7 at 35-36. In his Affidavit, Santos provides conflicting statements as to what the provisions of the Oral Agreement were. In paragraphs 9 and 10, he states that the "condition that the participants asked me to convey to Mr. Kaufman was that the banks would agree to waive the call in exchange for which Mr. Kaufman would remove all of the asbestos in the building at his own cost, a cost estimated at upwards of \$13 million.... As the transcript of that telephone conversation shows, I conveyed that proposal to Mr. Kaufman during the call, and I believe that Mr. Kaufman accepted at that time the banks' request that he remove all of the asbestos in the building at his own expense as tenants moved out of their space." (Santos Aff. ¶ ¶ 9-10.) Later, in paragraph 18, he states that the "Agreement was that the FDIC would waive the call in exchange for asbestos removal and other capital improvements to be paid for by the owner." (Santos Aff. ¶ 18.) Santos does not explain the appearances of the "capital improvements" term in his Affidavit, and it is not reflected at all in the transcript of the telephone conversation which he referred to earlier in his Affidavit.

Moreover, the terms of the Oral Agreement purportedly reached by the parties (in its various formulations) are themselves fatally vague and indefinite. The material terms, including the waiver of the call provision, the provision requiring asbestos removal, and the provision requiring capital improvements, are never precisely defined. It is unclear whether the waiver of the call provision was temporary or, as alleged by Kaufman in his Affidavit submitted for this motion, whether it was permanent. (Kaufman Aff. ¶ 14.) In addition, the scope of the asbestos removal or containment as well as its timing is ambiguous and has been set out in several different ways at various points in this case. Thus, while Melvyn Kaufman stated in his Affidavit that John Street was required "to perform a complete asbestos abatement of the building as tenants moved out of their space," the Amended Complaint, as well as the transcript of the April 23, 1993 conversation between Kaufman and Santos, reflect that the asbestos

removal was to take place "over a five year or other reasonable period depending upon the rate of moveout of tenants." (Am. Compl. ¶ 26.; *see also* Kaufman. Aff. A-7 at 36.) Finally, the requirement that John Street perform "capital improvements" is completely ambiguous. This purported term has taken on added significance because the plaintiff could not show that any asbestos work was performed after the alleged Oral Agreement was reached and now, for purposes of the present motion, it has been forced to rely on alleged capital improvements. But there is no description of how much money should be spent, over how long a time period such improvements should be made, or whether the banks would have the ability to approve any significant improvements. For each of these three terms, there is no way to ascertain the parties' intent sufficient to enforce the purported agreement. *See Cobble Hill Nursing Home, Inc.,* 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d 203.

\*6 Thus, because the Oral Agreement fails to meet the contractual requirement of definiteness under New York law, it is unenforceable and the defendants are entitled to summary judgment dismissing the plaintiff's breach of contract claim.

IV.

Even if the Oral Agreement were sufficiently definite to be enforceable, the defendants also argue that it is barred by the Statute of Frauds. Part IV, Article 31 of the Mortgage Agreement provides that "[n]o change, amendment, modification, cancellation or discharge hereof, or of any part hereof, shall be valid unless in writing and signed by the parties hereto or their respective successors and assigns." (Ward Aff. Ex. G. at 52.) New York law permits parties to a written contract to agree to a provision such as the one in the Mortgage Agreement requiring that all modifications of a contract be made in writing. *See* N.Y. Gen. Oblig. Law § 15-301(1). The plaintiff argues that the Oral Agreement is not barred by the Statute of Frauds because it was a waiver of the Call Provision, and that under the terms of the Mortgage Agreement and the Statute of Frauds a waiver does not have to be in writing. The plaintiff also argues that, even if this is a modification of the contract rather than a waiver, the plaintiff undertook certain actions in reliance upon the Oral Agreement such that its claim falls within the two exceptions to the no-oral-modification rule: partial performance or equitable estoppel.

Under New York law waiver is "the intentional

Page 6

abandonment or relinquishment of a known right or advantage ... and does not require or depend upon a new contract, new consideration, or an estoppel." *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 36, 118 N.E. 210 (1917). Unlike a modification, no consideration is required for a waiver. Thus, "if consideration is established by the proof there would then be a modification, as distinct from waiver or estoppel." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 187, 451 N.Y.S.2d 663, 669, 436 N.E.2d 1265 (1982). Moreover, because a waiver is not binding, it can be withdrawn at any time so long as it is executory and reasonable notice is given. *Id.*, 56 N.Y.2d at 184, 451 N.Y.S.2d at 668, 436 N.E.2d 1265.

In this case, there can now be no genuine dispute that the alleged Oral Agreement on which the plaintiff is suing is a modification, as that term is used in the New York cases, rather than a waiver. The only claim that has survived after the first motion for summary judgment is a breach of contract claim. The plaintiff alleges that in return for the defendants' promise to "waiver" the Call Provision it gave reciprocal promises which it has variously described as promises to keep the loan current, to remove asbestos, and to make capital improvements. The plaintiff is suing on a contract which involves an alleged exchange of promises. That is a modification because, by definition, consideration is alleged for the promise to "waiver" the call provision. [FN6]

> FN6. The plaintiff argues that this Court's prior Opinion should govern the issue of whether there was a waiver or a modification in this case. In its Opinion, the Court found that issues of fact existed with respect to whether there was a waiver or a modification. *See John Street I*, 1996 WL 737196, at *5. However, a prior opinion in this case would not be binding, particularly when it was a decision as to whether there were factual issues on a motion for summary judgment before the completion of discovery. The evidentiary record, including the transcripts, is now complete. Moreover, it is now clear that the plaintiff cannot maintain that there was a waiver and at the same time assert that there was a binding exchange of promises. *See Nassau Trust Co.*, 56 N.Y.2d at 187, 451 N.Y.S.2d at 669, 436 N.E.2d 1265.

*7 Accordingly, the Oral Agreement, which is a purported modification of the Mortgage Agreement, is barred by the Statute of Frauds unless there was part performance or equitable estoppel, both of which the plaintiff contends exist in this case. The New York Court of Appeals explained these exceptions as follows:

Partial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing.

Analytically distinct from the doctrine of partial performance, there is the principle of equitable estoppel. Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification. Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written.

*Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 341, 344, 397 N.Y.S.2d 922, 924, 927, 366 N.E.2d 1279 (1977) (citations omitted); *see also L & B 57th St., Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 93 (2d Cir.1998) Under either exception, to overcome the requirement that modifications be in writing, the plaintiff must show "that the only inference possible from [its] conduct is that an oral agreement had been concluded between the parties." *Id.* Thus, while an act is unequivocally referable to the alleged oral modification if the oral modification is the only reasonable explanation for the act, an act is not unequivocally referable where it is equally consistent with the underlying agreement as it is written. *O & Y (U.S.) Financial Co. v. Chase Family Ltd. Partnership No. 3*, Nos. 93 Civ. 1855-1857, 1994 WL 512532, at *2 (S.D.N.Y. Sept. 20, 1994); *Marcraft Recreation Corp. v. Francis Devlin Co., Inc.*, 506 F.Supp. 1081, 1085 (S.D.N.Y.1981).

In this case, the plaintiff initially contended in its opposition to the defendants' first motion for summary judgment that it undertook over $50,000 in asbestos abatement in reliance on the purported Oral Agreement, and the Court denied the motion on the basis that there were issues of fact as to whether this expenditure was unequivocally referable to the Oral Agreement. *See John Street I*, 1996 WL 737196, at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 411328
1998 WL 411328
(Cite as: 1998 WL 411328)

**6-7. However, the plaintiff now concedes that it was incorrect. In the affidavit submitted in opposition to the current motion for summary judgment, Melvyn Kaufman states that this asbestos abatement was performed in 1992, before the alleged Oral Agreement and plainly not in reliance on it. (Kaufman Aff. ¶ 29.) Instead, the plaintiff now contends that it undertook three different projects in reliance upon the Oral Agreement. First, it asserts that the building's variable speed drives were replaced at a cost of $50,414. (Kaufman Aff. ¶ 24.) Second, it commenced a Phase I environmental study of the building in part to assess the scope of the building's asbestos problem and performed air quality testing. (Kaufman Aff. ¶ 25.) Finally, it replaced the building's condensate tank at a cost of $23,975.88. (Kaufman Aff. ¶ 26.) The defendants argue that these expenditures were not unequivocally referable to the Oral Agreement, and in fact, that they were each perfectly compatible with the requirements of the Mortgage Agreement.

*8 With respect to the first and third projects, the replacement of the variable speed drives and the condensate tank, neither project is unequivocally referable to the Oral Agreement as required to establish either partial performance or equitable estoppel. First, the plain language of Part IV, Article 4 of the Mortgage Agreement requires that the "Mortgagor will keep and maintain ... the Building and ... the Building Equipment, in good order and condition and in a rentable and tenantable state of repair, and will make or cause to be made, as and when the same shall become necessary, all ... ordinary and extraordinary, foreseen and unforeseen repairs, and all renewals and replacements necessary to that end." (Ward Aff. Ex. G at 17.) The mortgage defines "Building Equipment" to include, among other things, power equipment, engines, pipes, pumps, tanks, motors, air cooling and air conditioning apparatus, and elevators. (Ward Aff. Ex. G at 4-5.) Accordingly, because the Mortgage Agreement required that the plaintiff maintain the building equipment in good working order, the installation of the replacement equipment is perfectly compatible with the terms of the original agreement as written. The existence of the "competing inference" in this case-that the plaintiff was acting as a responsible mortgagor under the terms of its existing agreement-means that these capital improvements were not unequivocally referable to the Oral Agreement. See *L & B 57th St., Inc.,* 143 F.3d at 93.

Moreover, each of these capital expenditures was

expressly budgeted prior to the negotiations to waive the Call Provision beginning in February 1993. In a November 10, 1992 budget prepared by Sage Realty Corp. pursuant to its Management Agreement with the plaintiff, one of the general repairs listed was the "replacement of the steam condensate tank" which was budgeted at $7,000. (Werbin Reply Decl. Ex. 9 at JS 004235.) Under the category "Building Improvements" the budget contained an item for the installation of variable speed drives, budgeted at $133,000, minus a Con Edison rebate of $78,000, for a total expense of $55,000. (Werbin Reply Decl. Ex. 9 at JS 004239.) This category also contained a budget of $31,000 for the replacement of the reclamation tank.[FN7] (*Id.*) The replacement of the tank was also discussed at a February 23, 1993 building meeting. The agenda for the meeting informed the meeting's attendees that the reclamation tank was to be replaced, that proposals had already been received from three firms, and that the job would "come in" at $20,500, below the budgeted $31,000. (Werbin Reply Decl. Ex. 10.) Thus, the project was underway prior to any substantial negotiations had taken place with the FDIC. Finally, the invoice attached to Kaufman's Affidavit as evidence of his assertion that the condensate tank was replaced indicates that the "job date" was April 15, 1993, prior to the date that negotiations for the waiver of the Call Provision were actually completed. (Kaufman Aff. Ex. F.) Accordingly, these capital improvements were not unequivocally referable to the Oral Agreement. They were consistent with the plaintiff's existing obligations under the Mortgage Agreement and they were planned, budgeted and even completed prior to the Oral Agreement.

> FN7. It is unclear which item in the budget refers to the steam reclamation tank. In his Affidavit, Kaufman states that the expense for the tank's replacement was $23,975.88. (Kaufman Aff. ¶ 26.) However, the invoice attached as an exhibit in support of this statement indicates a cost of $4,275. (Kaufman Aff. Ex. F.) It is not necessary to resolve this disparity since in either case the plaintiff had planned to replace the tank prior to the formation of the Oral Agreement and therefore the decision could not have been unequivocally referable to the Oral Agreement.

*9 With respect to the second project, neither the Phase I Environmental Study nor the air quality tests were unequivocally referable to the Oral Agreement.

1998 WL 411328
1998 WL 411328
(Cite as: 1998 WL 411328)

Page 8

These were undertaken prior to the conclusion of the alleged Oral Agreement or after the Agreement was allegedly breached by the FDIC, and, in any event, they too were perfectly compatible with the Mortgage Agreement. The Phase I assessment was authorized at least as early as March 5, 1993, prior to the date of the April 23, 1993 Agreement, as reflected by a March 5, 1993 invoice requesting a deposit of $1,500. (Kaufman Aff. Ex. D at JS 000330). <u>FN8</u> The records also show that the study was in progress prior to the completion of the Oral Agreement. For example, as the defendants point out, a Freedom of Information Act request was filed with the New York City Fire Department on March 17, 1993, and a conversation with the building manager discussed in the report took place on March 31, 1993. (Kaufman Aff. Ex. D at JS 000273 and 000283.) <u>FN9</u> With respect to the air quality tests performed by Hillman Environmental Corp., although the purchase order attached as Exhibit E to the Kaufman Affidavit reflects a date of May 19, 1993, the services that form the basis for this order are set forth more fully in an invoice dated July 10, 1992 from Hillman Environmental. (Werbin Reply Decl. Ex. 7 at JS 010070.) The July 10, 1992 invoice, received by the plaintiff on May 19, 1993, indicates that air samples were taken at various locations in the building during the month of June 1992, eight months before the plaintiff's negotiations with the FDIC began. Moreover, at his deposition, Melvyn Kaufman expressly stated that these invoices related to work performed in 1992. (Werbin Decl. Ex. B at 262-264.) In addition, the July 13, 1993 invoice from Consulting & Testing Services, Inc. was for work performed after the FDIC allegedly breached the Oral Agreement, and therefore cannot be unequivocally referable to that Agreement. See Kaufman Aff. Ex. E. at JS 000244; DeBiase Dep. at 65-66, attached as Ex. S to Werbin Decl.).

> FN8. The assessment was conducted along with nine similar assessments performed at the same time on other buildings in which the Kaufmans, two of the principals of John Street, owned an interest. See Kaufman Aff. Ex. D. at JS 000336 (discussing the economies of scale obtained from the performance of ten studies at once); Werbin Reply Decl. ¶ 38(e). Thus, another reason why this study is not unequivocally referable to the Oral Agreement is that it would be perfectly reasonable for the plaintiff to want to take advantage of the reduced costs associated with conducting the study en

masse rather than a more expensive individual study.

> FN9. Kaufman contends that this assessment was done, in part, to determine the scope of the building's asbestos problem. However, in a sixty-seven page report, asbestos is only mentioned on two pages, and the information for such references was provided by the Building Manager. See Kaufman Aff. Ex. D at JS 00283 (Report at 26); JS 003364-65.

Finally, the testing of the air quality in the building, rather than indicating something extraordinary to the Mortgage Agreement, is itself compatible with the requirement that the building and the building equipment be maintained in good order and condition and in a rentable and tenantable state of repair. (Ward Aff. Ex. G. at 17.) Thus, even after the FDIC allegedly breached the Oral Agreement in June 1993, the building management company, Sage Realty Corp., continued to spend money to conduct air quality testing at 127 John Street in July 1993.<u>FN10</u>

> FN10. The plaintiff has also submitted an invoice dated June 16, 1993 for "Indoor Air Quality" testing for $4,675 from Consulting and Testing Services, Inc. (Kaufman Aff. Ex. E at JS 000241.) On its face, there is nothing on this invoice that would indicate that the only tests performed were for asbestos. The plaintiff does not provide any further explanation for this document. In any event, air quality testing is plainly referable to ongoing obligations of a landlord and to the plaintiff's obligations under the Mortgage Agreement. The fact that such testing continued even after the alleged breach of the Oral Agreement underlines that such testing was not unequivocally referable to the existence of the alleged Oral Agreement.

Accordingly, all of the plaintiff's purported capital investments undertaken in reliance on the alleged Oral Agreement fail to meet the "stringent standard" required under New York law to demonstrate either partial performance or equitable estoppel. *L & B 57th St., Inc.,* 143 F.3d at 93. Therefore, the Oral Agreement is barred by the terms of the Mortgage Agreement and the Statute of Frauds, N.Y. Gen. Obl. L. § 15-301(1). Thus, the Statute of Frauds provides an independent basis to grant the defendants' motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 411328
1998 WL 411328
(Cite as: 1998 WL 411328)

for summary judgment and to dismiss the plaintiff's breach of contract claim.

## V.

*10 Finally, the defendants argue that the plaintiff breached a material term of the alleged Oral Agreement by failing to make a payment of "Additional Interest" which was due on April 15, 1993. The Additional Interest payment is required by Part II, ¶ 1(c)(ii) of the Mortgage Agreement. The plaintiff has alleged that a term of the Oral Agreement was to keep the loan current. The defendants contend that prior to their alleged breach in June, 1993, the plaintiff had already materially breached the alleged Oral Agreement by not maintaining the loan. Although originally denying that the payment was not made, the plaintiff now concedes that the payment of Additional Interest was not made, but states that there was no breach because John Street "was in the process of calculating the payment ... at the time the FDIC breached. Had the FDIC not breached the agreement, John Street would have made that payment in July, 1993." (Kaufman Aff. ¶ 36.) However, the clear and unambiguous language of the Mortgage Agreement requires that the payment be made on April 15, 1993, not in July 1993. Moreover, as the defendants correctly point out, prior to April 15, 1993 the payment had already been calculated by the plaintiff's accountants, David Berdon & Co., to be $170,213 for the year ended December 31, 1992. (Werbin Reply Decl. Ex. 16, at JS012510 Note 1.)

The plaintiff also contends that it did not breach the Oral Agreement because the timely payment of interest on the loan had "nothing whatsoever to do with the call waiver agreement at issue in this lawsuit." (Kaufman Aff. ¶ 38.) However, this statement is one of several such statements in Kaufman's Affidavit setting forth a new version of the Agreement without a requirement that the plaintiff keep the loan current. It is directly contradicted by the plaintiff's own Rule 56.1 Counterstatement, submitted for this motion. In paragraph 44 of the Counterstatement, the plaintiff admitted "that two, but not all, of the conditions for waiver of the Call were (i) remaining current on the loan...." (Plaintiff's Rule 56.1 Counterstatement ¶ 44, attached as Ex. D to Werbin Decl.) Kaufman also admitted at his deposition that at the meeting with the FDIC, the waiver of the call was associated with the plaintiff making itself current on the loan. (Kaufman Dep. at 66-67, attached as Ex. B to Werbin Decl.) A

party cannot create an issue of fact by submitting an affidavit directly contradicting its own Rule 56.1 admission and prior testimony. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.* 925 F.2d 566, 572-73 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior testimony." (citations omitted)); *Fodelmesi v. Schepperly,* No. 87 Civ. 6762, 1993 WL 127211, at *3 (S.D.N.Y. Apr. 20, 1993).

Accordingly, by failing to make the April 15, 1993 payment of Additional Interest, the plaintiff breached the alleged Oral Agreement's requirement that it remain current on the loan, thereby relieving the FDIC of its alleged obligation under the Oral Agreement not to call the loan. This breach of the alleged Oral Agreement by the plaintiff provides a third independent basis for summary judgment.

## CONCLUSION

*11 For all of the foregoing reasons, the defendants' motion for summary judgment dismissing the plaintiff's breach of contract claim is granted. The Clerk of the Court is directed to enter judgment for the defendants and to close this case.

SO ORDERED.

S.D.N.Y.,1998.
John Street Leasehold LLC v. F.D.I.C.
1998 WL 411328

Briefs and Other Related Documents (Back to top)

• 1:95cv10174 (Docket) (Dec. 01, 1995)

END OF DOCUMENT

## CERTIFICATE OF SERVICE

I, Jason M. Madron hereby certify that on August 1, 2006 I caused copies of the

foregoing **Lucent Technologies Inc.'s Reply Brief** to be served upon the following parties in

the manner indicated:

**Via Hand Delivery:**

Sheldon K. Rennie
Michael G. Menkowitz
Fox, Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, DE   19801-3046

**Via First Class Mail:**

Stephen M. Rathkopf
David R. King
Herrick Feinstein LLP
2 Park Avenue
New York, NY  10016-9301

Paul C. Saunders
Daniel Slifkin
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 8th Avenue
New York, NY  10019

Philip D. Anker
James H. Millar
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York  10022

Craig T. Goldblatt
Danielle Spinelli
Michelle Bock
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M. Street N.W.
Washington, D.C. 20037

Jason M. Madron (DE Bar No. 4431)